```
 1            UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

 3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

 4                      -  -  -  -

 5


 6
   UNITED STATES OF AMERICA,        )
 7                                  )
                   PLAINTIFF,       )
 8                                  )
        vs.                         )   No. CR 11-00072(A)-RGK
 9                                  )
   (1)  MHER DARBINYAN,             )
10   (4)  ARMAN SHAROPETROSIAN,     )
   (35) RAFAEL PARSADANYAN,         )
11                                  )
                   DEFENDANTS.      )
12 _____)

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15                      DAY 1

16                  PAGES 1 - 197

17            TUESDAY, MARCH 25, 2014

18             LOS ANGELES, CALIFORNIA

19                   9:03 A.M.

20

21

22    _____

23       SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
          Official Reporter, U.S. District Court
24               255 East Temple Street
                 Los Angeles, CA  90012
25                   213.894.5949
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFF UNITED STATES OF AMERICA:

3         ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
4              ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
5         LOS ANGELES, CALIFORNIA  90012
          213.894.4477

6
          UNITED STATES DEPARTMENT OF JUSTICE
7         BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
8         LOS ANGELES, CALIFORNIA  90012
          213.894.2579

9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                           I N D E X

 2    PROCEEDINGS:                                      PAGE
```

```
 3      DISCUSSION RE MOTIONS IN LIMINE                  7

 4      JURY VOIR DIRE                                  26

 5      PRE-INSTRUCTIONS TO JURY                       155

 6      GOVERNMENT'S OPENING STATEMENT BY MR. ESTRADA   166

 7      DEFENDANT DARBINYAN'S OPENING STATEMENT
        BY MR. SEVERO                                  182
 8
        DEFENDANT PARSADANYAN'S OPENING STATEMENT
 9      BY MR. FLIER                                   188
```

```
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                 LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 25, 2014

 2                              9:03 A.M.

 3                              - - - -

 4          THE CLERK:  Calling calendar item No. 1, case

 5   No. Criminal 11-72(A)-RGK, United States of America versus

 6   Mher Darbinyan, Arman Sharopetrosian and Rafael Parsadanyan.

 7       Counsel, please come forward and state your appearances.

 8          MR. ESTRADA:  Good morning, your Honor.  Martin

 9   Estrada on behalf of the United States.  With me at counsel

10   table are Elizabeth Yang, AUSA, Jeremy Stebbins, FBI special

11   agent, and Andrew Creighton, trial attorney, Department of

12   Justice.

13          THE COURT:  Thank you, Counsel.

14          MR. SEVERO:  Good morning, your Honor.  Michael Severo

15   appearing on behalf of Mher Darbinyan.  He's present, out of --

16   in custody.

17          THE COURT:  Thank you, Counsel.

18          MR. PEREYRA-SUAREZ:  And good morning, your Honor.

19   Charles Pereyra-Suarez representing Mr. Sharapetrosian.  He is

20   present, in custody.

21          THE COURT:  Thank you, Counsel.

22          MR. FLIER:  Good morning, your Honor.  Andrew Flier,

23   F-l-i-e-r, on behalf of Mr. Parsadanyan, who is not in custody,

24   and I'm being also assisted by a law clerk, Mr. Jerry

25   Gettleson.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Okay.  Thank you, Counsel.

2          MR. FLIER:  Thank you, your Honor.

3          THE COURT:  The jury has been notified.  They're going

4    to be -- we're gearing for hopefully they will be down here at

5    quarter of 10:00, and we can get started with the voir dire

6    quarter of 10:00.

7          Let me talk to you a little bit about logistics.

8          When we start the voir dire, there's going to be about 60

9    jurors out there, so there's not going to be room for

10   spectators.  They can come in as seats become available, but if

11   you can get the word out to any spectators either side might

12   have for the voir dire.  In fact, if they want, just to make it

13   convenient for everybody, we'll voir dire this morning, but we

14   won't do opening statements this morning.  If we get through

15   voir dire, we'll wait till this afternoon for opening

16   statements.  So they can come back this afternoon if they want

17   or they can stick around, and if there's seats that are open,

18   they can come in during voir dire as those seats open up.  And

19   I think the clerk's already explained to everybody the jurors

20   will be by number.

21         My understanding is, and I expressed the desire to the

22   government, to be able to proceed and get this case in within

23   about ten days.

24         And I think you said you've worked toward that; is that

25   correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  We certainly have, your Honor.

 2              THE COURT:  Okay.  Before I get back into the motions

 3    in limine which we've already talked about, are there any

 4    questions we have as far as procedure goes?

 5         Yes, sir.

 6              MR. ESTRADA:  Your Honor, one procedural issue.  At

 7    the last status conference, the Court had mentioned that the

 8    actual presentation of evidence would begin on Wednesday, so we

 9    have not brought witnesses for today.

10              THE COURT:  That's correct.

11              MR. ESTRADA:  So that I just want --

12              THE COURT:  I told you that you would not have to call

13    your first witness till Wednesday morning.

14              MR. ESTRADA:  Yes.

15              MR. SEVERO:  Actually, I have the opening statements

16    would be Wednesday with witnesses, but I -- did I

17    misunderstand?

18              THE COURT:  Yeah.  It was the witnesses themselves

19    would be called in Wednesday.  So if we -- this afternoon

20    hopefully we'll get to opening statements.

21              MR. FLIER:  Your Honor, it was my understanding --

22    Andrew Flier, for the record -- that the opening statements

23    would be tomorrow.

24              MR. SEVERO:  Yes, that's --

25              THE COURT:  That's just what he said.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  He said Wednesday.

 2            THE COURT:  Tomorrow is Wednesday.

 3            MR. FLIER:  Oh, yeah.  Never mind.

 4            THE COURT:  Okay.

 5       This is going to be a great trial.

 6       I'll remind you again that during voir dire we do have the

 7  bench conferences over here, but I also remind you that during

 8  the trial we don't have bench conferences.  And as I think I

 9  told everybody last time, don't feel bad about it.  If --

10  nobody's perfect.  If I make a mistake and you want to put

11  something on the record, the next time we have a break in the

12  jury, we can put it on the record.

13       And I've already told you about the time frames.  Starting

14  tomorrow we start right at 8:30 in the morning, go till 11:00,

15  and in the afternoon we go from 1:00 until 3:00.  And we'll be

16  very rigid with that.  Have witnesses available, because at

17  quarter of -- excuse me, 1:00 to 4:00.  1:00 to 4:00.  If at

18  quarter of 4:00 you don't have any witnesses, we don't wait.

19  We go on.  So make sure you have witnesses backing you up on

20  it.

21       I did cover -- and we'll go through this quickly, because

22  I know you want time to prepare for the jury coming in here,

23  but we talked last time about the first six motions in limine.

24  I gave you tentatives on it.  Those tentatives would be the

25  rulings of the Court at this time.  Keep in mind on motions in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    limine that they're normally evidentiary motions, and the Court
2    makes the rulings that you can't get into that area or you can
3    get into that area, subject to it being revisited if the
4    evidence shows that it should be revisited.  So I want to make
5    sure everybody understands that, that you can't get into it
6    until and unless the Court says you can get into it.  So
7    anytime we make the ruling on it, it doesn't mean that that's
8    going to be the ruling hard and fast for the entire trial,
9    because as evidence comes in, that ruling may or may not
10   change.
11        I think we talked about it last time, and let me go
12   through it very briefly so we're all on the same page.
13        As to plaintiff's first motion in limine, the Court
14   granted part of it and denied part of it.  Any crimes during
15   the last ten years for moral turpitude would be admitted.  I
16   don't think there's any questions on that.  Any crimes by the
17   defendants during those ten years would -- during the ten
18   years, would be admitted.  If they're outside the ten years,
19   they would not be.
20        As far as number two goes, there is an objection to the --
21   excuse me.  There is a motion by the government to admit a 2005
22   conviction and the facts underlying it, and that would be
23   admitted.
24        The letter.  There was an alleged letter on 2013 written
25   by the defendant Darbinyan.  That would not be admitted.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1        And Ramirez's prior conviction would be immaterial at this
2   time, since he's not part of the trial.
3        As to defendants' motions, the motion in limine to exclude
4   testimony pertaining to the codes would be denied.
5        The motions in limine pertaining to expert testimony would
6   be denied.
7        The motion to exclude evidence of prior bad acts, again,
8   if they are part and parcel of or relevant to the charges, they
9   would be -- it would be denied, but as to any other bad acts
10  that were not relevant to these charges, they would be granted;
11  those could not be brought in.
12       Number four, you know, it wasn't specific enough, so I
13  can't really rule on it at this time.  That's the motion to
14  exclude evidence not disclosed.  It wasn't specified.  As that
15  comes up, I can rule on it during the trial.
16       The other two motions by Mr. Parsadanyan, there is a
17  motion to exclude audio transcripts because they are hard to
18  understand.  That would be denied.
19       There is motion to strike and not put in the speakers.
20  You can identify the speakers, but not by name.  And I think
21  we've talked about that, and hopefully the government has
22  redacted or has amended that.
23           MR. ESTRADA:  Your Honor, what the Court will see in
24  the government's transcripts is, as to the speakers who are not
25  stipulated to voice identification --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Right.
2              MR. ESTRADA:  -- and that's Darbinyan and Parsadanyan,
3    what the government has done is, for Darbinyan, put in
4    Speaker 1 --
5              THE COURT:  That's what I suggested.
6              MR. ESTRADA:  -- and for Parsadanyan, Speaker 2, and
7    we would be presenting voice testimony regarding that.
8              THE COURT:  That's fine.  Just didn't want it in the
9    transcript.
10        Number six, where there's a motion to exclude references
11   to Armenian Power gang, that would be denied.
12        There is a motion to limit the evidence of individual
13   defendants to the individual defendants.  Again, this is
14   conspiracy.  That would be denied.
15        There is a instruction -- for instructions that an
16   association to co-defendants is not criminal.  Again, this is
17   conspiracy, so that's denied.
18        To exclude references to Mr. Parsadanyan's aliases, that
19   would be denied.
20        To require disclosure of all deals given to informants and
21   co-defendants, that has been granted.  I'm assuming that has
22   already been taken care of, but that was granted.
23             MR. ESTRADA:  That was taken care of, your Honor.
24             THE COURT:  There were three motions that were made,
25   two by defense and one by the plaintiff, or government, that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   were kind of -- well, they were untimely.  They just came in

 2   just very recently, and although they're untimely, I'm still

 3   going to give you the Court's ruling on it.

 4        The motion to exclude the wiretap testimony -- excuse me.

 5   The motion to exclude playing wiretap testimony of -- I don't

 6   know exactly how to phrase this.  The government's going to put

 7   in wiretap testimony, and the motion to exclude any further

 8   evidence of wiretap testimony by the defense as hearsay,

 9   probably in most cases would be denied.  Again, it's going to

10   have to depend on the evidence at the particular time, but

11   where it goes to -- I don't know exactly why it would be

12   admitted, but I can't foreclose it on all possibilities.  I'm

13   going to have to hear wherever it takes us, but it would be

14   denied on hearsay, and it can't be used for completeness.

15        Let me talk to you a little bit about completeness, just

16   so we're not confused.  Completeness of the statement, yeah,

17   the whole statement has to come in.  Completeness of an idea,

18   where somebody explains a statement later, no, that doesn't

19   come in.  But if somebody says, for instance, "Boy, I killed

20   him at Bridge," you can't put in "I killed him," you have to

21   put in the whole statement.  But if it's, you know, "I killed

22   him," then later, "Oh, I was talking about Bridge," that would

23   stay out.  So I just want to make sure you understand.  The

24   completeness of the statement has to be -- the entire statement

25   has to be included, but not the idea.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          MS. YANG:  Your Honor, if I may state a clarification.

2   When the Court says the motion is denied as to hearsay, does

3   that mean that if the defense intends to introduce wiretap

4   calls that the government has not offered, they will be

5   precluded from doing so on the grounds that it's hearsay?

6          THE COURT:  Yes.

7          MS. YANG:  Okay.

8          THE COURT:  Until and unless the Court -- I mean, they

9   may come up with something at the time that the evidence now

10  shows that it's admissible, and then -- until and unless I

11  reverse that, yes.

12         MS. YANG:  Yes, your Honor.  Okay.  Thank you.  I just

13  wanted clarification.

14         THE COURT:  Exclude notes on transcripts, that will be

15  denied, with the exception of one note that was in there that

16  said something about said in an angry tone.

17         MR. SEVERO:  Yes.

18         THE COURT:  That's going to be stricken.  That's going

19  to be granted on that.  You can't say --

20         MR. SEVERO:  I only found that one, but I don't know

21  if there are others throughout the transcripts, but I assume --

22         THE COURT:  If there are others, let me know, but that

23  definitely should be stricken.

24         MR. ESTRADA:  Your Honor, we would ask that if counsel

25  finds those, to let us know, so we can go ahead and redact
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    those out from the transcripts.
 2            MR. SEVERO:  I assume that we'll be told which exhibit
 3    we're going to be presenting, and then we can take a quick look
 4    and decide --
 5            THE COURT:  Sure.
 6        Get the information to defense, you know, maybe the day
 7    before as to what exhibits you're going to play, so they can
 8    make those objections.
 9            MR. ESTRADA:  They've had all of them for months now,
10    and they now have every single transcript that the government
11    intends to --
12            THE COURT:  Okay, but anything you intend to play, let
13    them know, and if they have an objection -- I just don't want
14    to hold the trial while we have to listen to objections.  So
15    let them know ahead of time, okay?
16            MR. SEVERO:  Thank you.
17            THE COURT:  The last one that just came in was a
18    motion to exclude hearsay in conversations with a informant
19    M.M.  That's going to be denied.  The hearsay objection's going
20    to be denied, again subject to where the evidence takes us, but
21    it is -- and it's being denied because it provides context and
22    completeness to any statements made by the defendant and can be
23    an adoptive admission.  So at this time it will be denied
24    subject to us revisiting this if we have to, if the evidence
25    shows we should.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1       The request for information on the disclosure of the

2   informant, again, that's going to be denied.  Very speculative

3   as to any relevancy of the disclosure -- or excuse me, of the

4   informant's testimony, and the high risk, and it just overrides

5   any speculative indication that the informant may say something

6   that might help.

7       And the last one was as to the records of the

8   investigator, and the Court's going to deny that also, because

9   the probative value far outweighs, as far as the Court's

10  concerned -- these are just allegations that were made.  There

11  have been no findings.  The probative value would be far

12  outweighed, which is very minimal, by the time consumption,

13  delay, prejudice, confusion, et cetera.

14      So that's the rulings on the motions in limine.  I do want

15  to talk to you a little bit about -- I do want to talk to you a

16  little bit about verdict forms.  And the verdict forms that

17  have been introduced, and I think they'd probably be joint, but

18  they're going to have to be corrected.

19          MR. ESTRADA:  Okay.

20          THE COURT:  And the reason they're going to have to be

21  corrected is the following.  There are several verdict forms --

22  and let me just give you an example.  On Mr. Darbinyan, Count 6

23  and Count 7, if you read the verdict form, there's no way to

24  differentiate between those two if you just read the verdict

25  form.  So you're going to have to put something in the verdict

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1  form to make them unique, so the jury can tell what they're

 2  voting on.

 3      Same thing for Count 8 and 9, Count 14, 15 and 16.  Some

 4  of these are saying, well, you know, they were identity theft

 5  as to J.M., identity theft as to P.X.  Well, that's okay, but

 6  if they're both saying identity theft as to J.M. on the same

 7  date, you have to be able to distinguish so the jury knows what

 8  they're voting on on the verdict form.  And if it helps you, I

 9  can tell you the ones that I caught, but you might want to go

10  through it.

11      MR. ESTRADA:  Your Honor, we will do that.  And I

12  think what we can do, because there are numerous bank fraud

13  counts, we can specify perhaps the checks or check numbers.

14      THE COURT:  That's fine.  Anything to distinguish the

15  two.  It could be a check number.  It could be a check amount.

16  Anything so the jury can look at it and say, "Oh, this one's

17  talking about this act, this one's talking about this act."

18      MR. ESTRADA:  Yes, your Honor.

19      THE COURT:  You have several on Mr. Darbinyan.  I

20  don't know if you want me to go over those or if you can do it

21  yourself.

22      MR. ESTRADA:  I think we can figure it out, your

23  Honor.

24      THE COURT:  Okay.  And there's two on Mr. Parsadanyan,

25  Fifty and Fifty-one.  You can look at those.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Okay.  I want to hurry so I can give you some time before
 2   the jury comes in.  What else was there that I wanted to talk
 3   to you about?  Well, let me open it up for questions.
 4        Any questions we have?
 5             MR. PEREYRA-SUAREZ:  Yes, your Honor.  Charles
 6   Pereyra-Suarez representing Mr. Sharopetrosian.
 7        With respect to the Court's ruling on the alleged victim
 8   M.M. --
 9             THE COURT:  I'm sorry, on the what?
10             MR. PEREYRA-SUAREZ:  With respect to the Court's
11   ruling --
12             THE COURT:  On?
13             MR. PEREYRA-SUAREZ:  -- on the alleged victim M.M.,
14   the one that wants to use --
15        THE COURT:  On the admissibility of his statement or
16   on his disclosure?
17             MR. PEREYRA-SUAREZ:  I'm talking about the statements
18   made by victim M.M. --
19             THE COURT:  Okay.
20             MR. PEREYRA-SUAREZ:  -- on the tape --
21             THE COURT:  Okay.  I'm with you.
22             MR. PEREYRA-SUAREZ:  -- or the transcript.
23             THE COURT:  I'm with you.
24             MR. PEREYRA-SUAREZ:  The government, in its opposition
25   to our motion, at footnote 1, acknowledged that such statements
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    require a limiting instruction.
 2            THE COURT:  You're correct, Counsel, I did not mention
 3    that.  There should be a limiting instruction given.
 4            MR. PEREYRA-SUAREZ:  Okay.  And I will work with
 5    government counsel --
 6            THE COURT:  Sure.
 7            MR. PEREYRA-SUAREZ:  -- to work on that.
 8            THE COURT:  Thank you for bringing that up, yeah.
 9    There definitely should be a limiting instruction that it's not
10    introduced for the truth of the matter but it's introduced for
11    the -- okay, yeah.
12            MR. PEREYRA-SUAREZ:  That is correct.
13            MR. ESTRADA:  Yes, your Honor.  We'll work with
14    defense counsel.
15            THE COURT:  Okay.
16            MR. SEVERO:  On the disclosure issue --
17            THE COURT:  Yes.
18            MR. SEVERO:  -- of M.M.
19            THE COURT:  Yes.
20            MR. SEVERO:  M.M. is not an informant, your Honor.  He
21    is a material witness to this case.  He is an alleged victim.
22    In our case in particular, it is critical that we may -- that
23    we question M.M. concerning his activities, because my client
24    had very limited contact with M.M. and in fact doesn't even
25    talk to him for months, until later, when he decides, M.M.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    decides, to pay some money, according to the best evidence

2    that's put forth.  I think it is very -- and when he goes to

3    the FBI, M.M. doesn't ever mention my client.  I think it's

4    critical for us to bring M.M. in in order for us to question

5    him.

6         THE COURT:  Let me make a suggestion to you, because I

7    believe that motion, and correct me if I'm wrong, was made by

8    Mr. Sharopetrosian.

9         MR. SEVERO:  And I joined in it.

10        THE COURT:  I know you joined, but those arguments

11   you're making now were not part of that motion.

12        MR. SEVERO:  I thought I had.

13        THE COURT:  No.  No, no, they really weren't.  We

14   talked about that he might come in and testify that this was

15   just a payback, or he felt guilty, or whatever it was.  You're

16   talking about something different.  You're talking about you

17   want to call him in to present your case as to -- and so I'm

18   going to let you renew that motion for your client as to

19   whether or not --

20        MR. SEVERO:  You want me to rewrite that or to --

21        THE COURT:  Yeah, because I didn't see it.  Based upon

22   what I read, I would have still denied the motion, but I don't

23   want to foreclose you from expanding on that and giving your

24   position on that.

25        MR. SEVERO:  I will be happy to resubmit that.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000018**

```
 1          MR. ESTRADA:  Just to be clear, we have communicated

 2   with counsel and asked him what the basis for this alleged

 3   defense with regard to M.M. is.  We haven't been informed of

 4   any materiality to it.  And with regard to the limited role,

 5   the calls themselves will play that out, because there are only

 6   so many calls between victim M.M. and Darbinyan, and once M.M.

 7   went to the FBI and became an informant, there were no calls

 8   with Darbinyan.

 9          THE COURT:  The beauty of motions is, is that he will

10   get a chance to fully explain his position, and you will get a

11   chance to fully explain your position, too.  I don't know when

12   you're calling -- or that you're going to play that, but I

13   would suggest that if you could get that in by tomorrow, and

14   you can get your reply in by Thursday and not play that wiretap

15   until at least Friday.

16          MR. ESTRADA:  Yes, your Honor.  That won't be -- we'll

17   start out with some check fraud calls instead.

18          THE COURT:  Yeah, but let's hold that one until we get

19   a ruling on this.  And if you can do it by tomorrow and you can

20   do it by Thursday.

21          MR. ESTRADA:  Yes, your Honor.

22          MR. FLIER:  Your Honor, are we allowed to talk about

23   voir dire now?

24          THE COURT:  I talked about voir dire last time we were

25   in here.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              MR. FLIER:  I just want to expand.  On behalf of my

2    client, Mr. Parsadanyan, I think it's very important.  I read

3    the joint statement.  We're okay with everything, but I think

4    there should be some statement by the Court that each defendant

5    still has to be individually analyzed and separated although

6    there's a conspiracy charge.  I think that's critical for my

7    client.

8              THE COURT:  Well, and it may or may not be.  That

9    should have been included on the voir dire questions that were

10   submitted to the Court before trial.

11             MR. FLIER:  I did.

12             THE COURT:  I read all those questions on it, and I

13   will incorporate it to the extent that I think it's

14   appropriate.  I think that that is much more significant on

15   jury instructions, but if I remember and if I think it's

16   appropriate, I'll include it on the voir dire.  Right now I've

17   got the voir dire down.  If I can remember all the --

18             MR. FLIER:  Should I raise my hand to remember?

19             THE COURT:  No, but nice try.

20             MR. FLIER:  Thank you.

21             THE COURT:  Okay.  Now, on voir dire, this is another

22   interesting question, because we have one less defendant here.

23   So you will be getting ten plus one each, which will be 13, and

24   over here you'd be getting nine, and then on the alternate,

25   each side would get one.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          My question is this.  I don't know -- and I don't know if
 2    defense counsel have had a chance to talk or not, but we can do
 3    it one of two ways.  We can have either 13 kind of joint, or we
 4    can have 12 where we have four, four, and four.  I don't know
 5    how you want to handle it.  I would think 13 jointly would be
 6    the way I would normally handle it, but I don't know how much
 7    disagreement there is between people.
 8              MR. SEVERO:  Your Honor, I have 12 plus one for each
 9    defendant.  That was what we had at the status conference, 12
10    jointly --
11              THE COURT:  Why would there be --
12              MR. SEVERO:  Because --
13              THE COURT:  Am I wrong?  On a criminal trial, is it 12
14    or ten?
15              MR. SEVERO:  No, it's ten, but the Court has
16    discretion when there's multiple defendants --
17              THE COURT:  I'm sorry.  Then I misspoke.  It would be
18    ten plus one for each defendant.
19              MR. ESTRADA:  And I think at that time there were five
20    defendants, your Honor.
21              THE COURT:  I understand, but it would be -- at this
22    time the Court is making the ruling that it would be ten plus
23    one for each defendant, which would be 13.  You have six plus
24    one for each defendant, which would be nine.  One each for each
25    of the alternate jurors.  I think we can do it with two
```

1    alternate jurors.

2              MR. SEVERO:  This is a long trial, Judge.

3              THE COURT:  I know it's a long trial.  I'm looking at

4    logistics, and I don't -- it would be very tough.  If you want,

5    if you think we should have 13, we'll figure out a way,

6    someplace to put that 13.  We can do 13.

7              MR. ESTRADA:  I think three would be fine, your Honor,

8    so --

9              THE COURT:  Excuse me, not 13.  15.  Yeah, okay.

10             MR. SEVERO:  Yeah, I think three alternates.

11             THE COURT:  Okay, we'll have three alternates, then.

12         Okay.  And do you want to do the defense challenges

13    jointly?

14             MR. SEVERO:  I'm sorry, your Honor.

15             MR. PEREYRA-SUAREZ:  May we confer, your Honor?

16             THE COURT:  You bet.

17         *(Defense counsel conferred privately.)*

18             MR. PEREYRA-SUAREZ:  Your Honor, Charles

19    Pereyra-Suarez for Mr. Sharopetrosian.

20         Defense counsel have conferred.  We would like to do the

21    first ten challenges jointly, and then one apiece thereafter.

22             THE COURT:  I agree.  I think that's probably the best

23    way to do it.

24             MR. PEREYRA-SUAREZ:  Thank you.

25             MR. ESTRADA:  Just one quick question, your Honor, on

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    peremptories, and also challenges for cause.  Does the Court do
 2    those at a sidebar or --
 3              THE COURT:  Sidebar.
 4              MR. ESTRADA:  Thank you, your Honor.
 5              THE COURT:  Sidebar.
 6         Okay.  Anything else?
 7              MR. ESTRADA:  Not by the government, your Honor.
 8              THE COURT:  The last thing I want to get into is this,
 9    is that one of the hangups the Court does have, if you really
10    want to tweak the Court, anytime -- and I'm saying this because
11    I say it at any trial.  I've been very, very impressed with the
12    professionalism of both sides up till now, so I'm not casting
13    aspersions at this time, but one of the things that can really
14    get this Court off to the wrong start is any type of
15    non-civility during the trial.  When witnesses are called, you
16    address them by last name.  You don't ever address them by
17    first name.  It's going to be a very professional trial.  When
18    the jury leaves here, they're not going to be able to think of
19    any attorney jokes.  They're going to be thinking this is a
20    very professional organization, they're going to respect both
21    sides, and they're going to respect the process.  That also has
22    to carry out into the audience.  If you have any members who
23    want to view it, that's fine, people can come in and view the
24    case, but if there's any disruption or any contact, where they
25    try to contact the jury or make facial contacts or anything
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   else, they're out of here.  So make sure that they are also
 2   well-behaved and professional on it.  As you know, you can
 3   instruct them that there is to be no contact between any
 4   witnesses or any viewers in the audience during the trial.
 5       Yes?
 6           MR. ESTRADA:  Your Honor, I guess there's one last
 7   thing I should have mentioned.  Because of all the wire calls,
 8   we intend to call one witness to present all the wire calls in
 9   segments, so that witness will take the stand six different
10   times.
11           THE COURT:  Okay.
12           MR. ESTRADA:  And I leave it to the Court and defense
13   counsel to figure out how many times cross-examination will
14   take place.
15           THE COURT:  That's fine.  And counsel, anything that
16   the two sides work out together, I normally will go with.  If
17   you want to call witnesses out of order, anything that you want
18   to do.  As long as it doesn't affect the time frame of the
19   jurors, I almost will go along with anything.  These attorneys
20   are the experts in this case much more than I am.  You know
21   your case inside and out, and so I'd like to let you try it the
22   best, you know, as much as I can, and as long as you cooperate
23   with each other, I normally will go along with anything that
24   you have.
25           MR. ESTRADA:  Appreciate it, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Okay, we'll see you back in at
 2    quarter of.
 3              THE CLERK:  All rise.
 4         (Recess held from 9:28 a.m. to 10:27 a.m.)
 5         (In the presence of the prospective jurors:)
 6              THE CLERK:  Calling case No. Criminal 11-72(A)-RGK,
 7    United States of America versus Mher Darbinyan,
 8    Arman Sharopetrosian and Rafael Parsadanyan.
 9         Counsel, please state your appearances.
10              MR. ESTRADA:  Good morning, your Honor.  Martin
11    Estrada on behalf of the United States.
12              THE COURT:  Counsel.
13              MR. ESTRADA:  With me at counsel table is
14    Elizabeth Yang, also on behalf of the United States,
15    Special Agent Jeremy Stebbins with the FBI, and
16    Andrew Creighton, also on behalf of the United States.
17              THE COURT:  Thank you, Counsel.
18              MR. SEVERO:  Thank you, your Honor.  Michael Severo
19    appearing for Mike Darbinyan.
20              MR. PEREYRA-SUAREZ:  Charles Pereyra-Suarez
21    representing Mr. Sharopetrosian.
22              MR. FLIER:  Good morning, your Honor.  Andrew Flier on
23    behalf of Rafael Parsadanyan, assisted by Jerry Gettleman, your
24    Honor.
25              THE COURT:  All sides ready for trial?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Yes, your Honor.

 2              MR. SEVERO:  Counsel's ready.

 3              THE COURT:  Ladies and gentlemen, at this time we're

 4   going to call in the name of 18 jurors, and we'll bring you up

 5   and sit you.  First eight go in the back row, starting in the

 6   back, coming up this way, second row, then third row here.

 7         As your number is called -- and on criminal cases, we also

 8   group by number rather than names, so as your number is

 9   called -- hopefully all of you are intelligent enough to know

10   what your number is.

11         Anybody don't know who they are?

12         As soon as we get everybody in the box, we'll ask you

13   questions.

14         Go ahead.

15              THE CLERK:  Juror No. 1, want to come through this

16   way, please.  Juror No. 2, Juror No. 3, Juror No. 4, Juror

17   No. 5, Juror No. 6, Juror 7, Juror No. 8, Juror No. 9,

18   Juror 10, Juror 11, Juror No. 12, Juror 13, Juror 14.

19         And then for the temporary seats in the front, Juror 15,

20   Juror 16 -- the first one -- Juror 17, and Juror 18.

21              THE COURT:  Okay.  If there's any jurors standing, I'm

22   going to ask you to take a seat out there.

23         Okay.  Ladies and gentlemen, I'm going to be directing my

24   questions to the jurors that are in the box here, the 18 jurors

25   in the box.  And a lot of you jurors are still out there in the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    audience, and oddly enough, I'm going to ask you to be

2    listening just as carefully to the questions that I ask as I do

3    these jurors in the box.  I'm going to be asking you to think

4    what your answers would be also to those questions.

5        You may say, "Why?  If I don't have to answer the

6    questions, why should I be thinking about it?"

7        Well, the reason is because we would like to handle the

8    situation where, if a juror is excused and we call one of you

9    and you take a seat up here in the juror box, we can ask you,

10   "Have you heard the questions we've asked everybody else, and

11   would your answers be any different, or is there anything you

12   should tell us?"  You can't do that, you can't answer that

13   question unless you listen to my questions, and that saves us a

14   lot of time.

15       If we don't do it that way, then I have to go through each

16   individual juror, ask everybody the same questions all over

17   again, and that could take us years.  So I really would like

18   you to participate, make sure that you are hearing everything,

19   seeing everything, and that you're part of this jury, even

20   though we won't be asking you questions directly at this time.

21       If for some reason you can't see something or hear

22   something, raise your hand out there, and we'll catch you, and

23   we'll make sure we correct that, okay?  Everybody on line with

24   that?  Okay.

25       The case before us today is the matter of the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   United States of America versus three defendants, and they are

2   Mr. Darbinyan, Mr. Sharopetrosian and Mr. Parsadanyan.

3        This is what I'll tell you beforehand.  The government is

4   alleging in -- the first superseding indictment in this case

5   charges the defendants, Mr. Darbinyan, Mr. Sharopetrosian and

6   Mr. Parsadanyan, and I apologize if I mispronounce names, with

7   certain violations of federal law.

8        An indictment is simply a description of the charges

9   against the defendant; it is not evidence against the

10  defendant.  The indictment charges defendants Mr. Darbinyan and

11  Mr. Sharopetrosian with being members of a conspiracy to engage

12  in racketeering.

13       The indictment also charges defendant Darbinyan and

14  Sharopetrosian both with being members of a conspiracy to

15  extort and with actually extorting money from the victim

16  M.M. -- those are the initials -- by threatening physical

17  violence to victim M.M. and victim M.M.'s family.

18       Defendant Darbinyan is also charged in the indictment with

19  devising, executing, and attempting to execute bank fraud

20  between July 2008 and December 2010, and with committing

21  aggravated identity theft as to six different individuals

22  during and in relation to the bank fraud scheme.

23       The indictment also charges Defendant Darbinyan and

24  Parsadanyan with devising, executing, and attempting to execute

25  a separate bank fraud scheme between July of 2009 and August of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    2009, with committing aggravated identity theft as to six

 2    different individuals during and in relation to the bank fraud

 3    scheme, and with being members of a conspiracy to commit access

 4    device fraud.

 5         And finally, the indictment charges defendant

 6    Mr. Darbinyan with two counts of being a felon in possession of

 7    a firearm and ammunition.

 8         The defendants have denied all charges and have pled not

 9    guilty.

10         So that is the allegation and the charges that you're

11    going to be asked to decide.

12         In this matter, I want to at this time introduce to you

13    the people that are going to be participating in this case.

14    I'm going to ask the attorneys if they would introduce who they

15    are and the people that they're working with and any witnesses

16    they intend to call.  Now, the reason they're going to be

17    introduced to you --

18         And I'm going to ask you if you could give us the name of

19    a witness, if you could tell us what location, what city that

20    person lives in.

21         The reason we're doing this is so, when they finish, I can

22    ask you whether or not you know anybody involved in this case.

23    So that's why I'm going to ask you to listen carefully to the

24    names.

25         Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Yes, your Honor.

 2         Good morning, ladies and gentlemen.  My name is

 3  Martin Estrada.  I'm the assistant United States attorney.  I

 4  represent the United States.  With me at counsel table is

 5  another assistant United States attorney, Elizabeth Yang.

 6              MS. YANG:  Good morning, ladies and gentlemen.

 7              MR. ESTRADA:  Next to her is an FBI special agent,

 8  Jeremy Stebbins.

 9              MR. STEBBINS:  Good morning.

10              MR. ESTRADA:  And next to him is Andrew Creighton,

11  also a trial attorney, on behalf of the Department of Justice.

12              MR. CREIGHTON:  Good morning, everybody.

13              MR. ESTRADA:  Now I'm going to read the witness list.

14  It's a long witness list, so if you could bear with me.

15              THE COURT:  And keep in mind, these are witnesses that

16  may or may not be called, but I've asked them to include all

17  witnesses that they may present so we can find out if you know

18  any of them.

19              MR. ESTRADA:  The first name is Alen Derpetrossian.

20  The second witness on the list is FBI Special Agent Jeremy

21  Stebbins, who's sitting at counsel table.  The third is

22  Officer Joseph Allen of the Glendale Police Department.  Fourth

23  is Yegish Zarkinyan.  The fifth is Manuel Angulo.  Sixth is

24  Rozine Kazandijian.  Seventh is Detective Anton Umansky of the

25  Los Angeles Police Department.  Eighth is Grace Ferguson.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Ninth is Yoones Gidanian.  Number ten is Marjorie Duncan.

 2        Number 11 is Corrections Officer Jason Heins of Avenal

 3   State Prison.  12th is Officer Nikita Orloff of the Glendale

 4   Police Department.  13th is Corrections Officer Karina

 5   Rodriguez of the Santa Ana jail.  14th is Sergeant Larry Mead

 6   of the Los Angeles Sheriff's Department.  15th is Armando

 7   Moreno.  16th is Detective Brian Hickey of the Los Angeles

 8   Sheriff's Department.  17th is Detective Kevin Giberson of the

 9   Los Angeles Police Department.  18th is Detective Hans Almaraz

10   of the Los Angeles Police Department.  19th is Sergeant James

11   Zboravan of the Los Angeles Police Department.  20th is

12   Sergeant Rafael Quintero of the Glendale Police Department.

13        21st is Jose Lozano with the company MoneyGram.  22nd is

14   Susan Carter with the company Western Union.  23rd is

15   Detective Scott Padin of the Los Angeles Police Department.

16   24th is Detective Anna Carlisle of the Los Angeles Police

17   Department.  25th is Detective Jeffrey Davis of the

18   Glendale Police Department.  26th is Detective Michelle

19   Gonzalez of the Glendale Police Department, and she is sitting

20   right here.  27th is Officer Brian Balleweg of the

21   Beverly Hills Police Department.  28th is Special Agent David

22   Hamilton of the Bureau of Alcohol, Tobacco, Firearms &

23   Explosives.  27th (sic) is Scott Camery.  30th is Nicholas

24   Mitchell.

25        31st is Sergeant Mark Stohl of the Burbank Police
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Department.  32nd is Officer Christopher Krivak of the Glendale

2   Police Department.  33rd is Sergeant Christopher Spencer of the

3   Glendale Police Department.  34th is Officer Gonzalo Zendejas

4   of the Glendale Police Department.  35th is Sergeant

5   Christopher Nesmith of the Huntington Beach Police Department.

6   36th is Detective Lawrence Pitcher of the Huntington Beach

7   Police Department.  37th is Detective David McCain of the

8   Huntington Beach Police Department.  38th is Detective David

9   Humphreys of the Huntington Beach Police Department.  39th is

10  Special Agent David Ogden of the United States Secret Service.

11  40th is Gustavo Ortega.

12      41st is Corporal Nancy Miranda of the Glendora Police

13  Department.  42nd is Officer Ryan Lombardi of the Glendora

14  Police Department.  43rd is Janell Arnold.  44th is Judith

15  DeVanzo.  45th is Stephen Gonzalez.  46th is Maria Lemus.  47th

16  is Muriel Johnson.  48th is Mary Jane King.  49th is Lydia

17  Motley.  50th is Daniel Ortega.

18      51st is Carol Stevens.  52nd is Dennis Acevedo.  53rd is

19  Special Agent Karen Smyth of the Federal Bureau of

20  Investigation, FBI.  54th is Deputy Joseph Abercromby of

21  Los Angeles Sheriff's Department.  And finally, 55th is

22  Deputy Paul Kashani of the Los Angeles Sheriff's Department.

23          THE COURT:  Thank you, Counsel.

24      And many of these witnesses may be included as far as

25  defense witnesses, but if the defense has any other witnesses

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    they care to share at this time, feel free to.

2        MR. SEVERO:  Thank you.

3        Good morning, everyone.  I'm Michael Severo.  I am an

4    attorney, and I'm privileged to represent Mher Darbinyan, to my

5    right.

6        We will be calling Nune Ognessian, FBI Agent Samuel Hanks,

7    and Orange County Sheriff Tunstall.

8        THE COURT:  Thank you, Counsel.

9        MR. PEREYRA-SUAREZ:  And good morning, ladies and

10   gentlemen.  My name is Chuck Pereyra.  I am privileged to

11   represent Mr. Sharopetrosian.

12       I plan to cross-examine many of the government witnesses.

13   I haven't decided yet whether or not to call additional

14   witnesses.

15       THE COURT:  Okay.  Thank you very much, Counsel.

16       Counsel.

17       MR. FLIER:  Thank you, your Honor.  Good morning

18   again.

19       Andrew Flier.  I'm the lawyer for Mr. Rafael Parsadanyan,

20   and assisting me is Mr. Jerry Gettleman.

21       We have a brief witness list:  A Mr. Arman Muradyan,

22   Mr. Hayk Mkrtchyan, a Lilit Parsadanyan, Karen Mantashyan,

23   Vahayn Zakharyan, Armen Karapetyan, a Karen Babayan, a

24   Gohar Ghazanehyan, a Santur Pogosyan, and a Arman Muradyan.

25       Thank you, your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Okay.  Thank you, Counsel.

 2       Okay.  Ladies and gentlemen -- excuse me.  And I

 3  apologize, I've got a little laryngitis, and so hopefully I'll

 4  be able to make it through this.

 5       We've introduced to you all the people that will be

 6  involved in this case, and we've told you a summary, a brief

 7  summary of what the case is.  So my next question to you is

 8  this:  Is there anybody in the jury, and I'm just talking to

 9  the 18 of you now, that knows anything about this case or any

10  of the people involved in this case?

11            PROSPECTIVE JUROR:  That includes witnesses, right?

12            THE COURT:  I'm sorry?

13            PROSPECTIVE JUROR:  I grew up and I knew someone named

14  Dave McCain.

15            THE COURT:  I'm sorry, the name was what?

16            PROSPECTIVE JUROR:  Dave McCain.  You said

17  David McCain.  And I know he works for the Huntington Beach

18  Police Department.  That's where I grew up.

19            THE COURT:  Is that --

20            MR. ESTRADA:  There is a Detective Dave McCain who

21  works for the Huntington Beach Police Department.

22            THE COURT:  You grew up with him.  Do you know him

23  well?

24            PROSPECTIVE JUROR:  I don't know him well.  He's a

25  friend of my parents.  I don't know if it's the same person.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  And let's assume it was the same
 2    person.  Is there something about that that would make it
 3    difficult for you to hear this case?
 4              PROSPECTIVE JUROR:  No.  I don't know him too
 5    personally.  I just thought --
 6              THE COURT:  Okay.  Well, I'm going to be asking you
 7    more questions about that when we get into the voir dire as far
 8    as effect of police officers and friends that you have that
 9    might be police officers.  So keep that in mind, and we'll get
10    back to that.
11              PROSPECTIVE JUROR:  Okay.
12              THE COURT:  Anybody else?
13         Okay.  Let me ask, how many of you have served on juries
14    before and gone back and deliberated?  Can you raise your
15    hands?
16         That's what I thought.  Less than half of you.  It was
17    pretty obvious by your answers.
18         Let me help you out.  There's two ways to ask questions.
19    I could ask general questions, where I ask of the entire 18,
20    and you can respond by letting me know what your response would
21    be, or I can go through each juror individually and ask every
22    single question of every single juror.  One, we can do it
23    fairly rapidly; the other one, you know, we'll be here until
24    after Christmas going through the questions.  So I choose the
25    first one.  I go through as many general questions as I can
```

1    with the 18 of you, and that works beautifully except if you

2    don't respond.  So anytime I ask a general question, you're

3    going to have to respond somehow, raise your hand, jump up, say

4    something, yell, scream, something, to let me know what the

5    answer would be and also to let me know that you're not just

6    over there sleeping.  You know, give me a response on it.  If

7    we do that, then I can go with that method of asking general

8    questions.

9         So with that explanation, let me try one more time.  Of

10   the 18 of you, does anybody, other than the one that's already

11   mentioned, anybody know anybody involved in this case or

12   anything about this case?

13             MULTIPLE PROSPECTIVE JURORS:  No.

14             THE COURT:  Much better.  Thank you very much.

15        Since we have so many new jurors, I think it would be

16   worthwhile for me to explain to you what you're doing here, you

17   know, what is your duty as a juror.  And I will give you this

18   explanation because many of the questions I'm going to be

19   asking will pertain to that duty.

20        The duty of a juror is basically twofold.  The first duty

21   you have is, you are to determine what the facts of the case

22   are.  How are you going to do that?  You've already told me you

23   don't know anything about this case.  Well, the law is very

24   clear.  You determine what the facts of the case are from and

25   only from the evidence that's produced during trial.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        You may say, "Well, what's evidence?"

2        Evidence is the testimony of witnesses here under oath, or

3   any exhibits that are introduced and accepted as evidence into

4   this trial, such as any exhibits that are received into

5   evidence.  And the third thing is, if all counsel have

6   stipulated to any fact, you must assume that fact to be true.

7   It's only from those three areas that you are to determine what

8   the facts are.

9        Maybe a better way to explain this is, most of you, I'm

10  assuming, have done jigsaw puzzles; is that correct?

11           MULTIPLE PROSPECTIVE JURORS:  Yes.

12           THE COURT:  And, you know, when you get that jigsaw

13  puzzle, you throw it on the table and you put the box top up

14  there and you start putting it together.

15       Nobody's asking you what's on that box cover.  We're

16  asking you what do the pieces, when put together, show?

17       You know, you might have the wrong pieces in a box, and

18  the box cover may be a dog, and the puzzle, when you put it

19  together, may be a boat.  We're asking you what the puzzle --

20  what the pieces are when you put them together, what it says.

21       It's a technical distinction, but it's very important.

22  Nobody's asking you what happened on a certain date, at a

23  certain time, at a certain place.  What we're asking you is,

24  what does the evidence show happened at a certain time in a

25  certain place?  It's a technical distinction, but it's very

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    important.  It's only what does the evidence show, and that's

2    how you determine what the facts of the case are.

3         After you determine what the facts of the case are, your

4    second duty kicks in, and that is, you must follow the law that

5    I give to you at the end of the case, whether you like that law

6    or not.  If you don't like it, go up to Sacramento and change

7    it, or go back to Washington, D.C. and change it.  But for

8    purposes of this case, we all have to be operating off the same

9    rules and laws that apply.

10         You may think it should be -- if I asked you what the law

11   should be, I'd get 18 different responses.  So it's not what

12   you think it should be; it's based on the rules that I give

13   you.  You have to apply those rules so everybody gets judged by

14   the same standard.

15         You understand that?

16         And then what you do is, you take the facts and you apply

17   the law to it, and then you give your decision, whether you

18   like the decision or not.  You may not like the decision.  You

19   may think, "Gee, I really would like to come in with this

20   decision, but this is what the evidence says, and when I apply

21   the law, it comes out this other way, and I've got to abide by

22   that."

23         So it really is a very humbling experience to be a juror.

24   Nobody's asking you what you like.  Nobody's asking you what

25   you think is right.  What we're asking you is, what does the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    evidence say, and, when you apply the law to it, what does it

2    say?  So it really is a very humbling experience being a juror.

3         Everybody understand that duty?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Okay.  I told you that I was going to ask

6    general questions.  I'm going to break from that.  I'm going to

7    ask you two or three individual questions just as background,

8    and then we'll get back to the general questions.  They're not

9    that tough.  I think you'll be able to answer them.  But just

10   in case you think it's tough, I'll give you a little heads-up

11   as to what the questions are so you can think about it.

12        We're going to be asking you what is your occupation, what

13   area do you live in, and, if there's anybody in the home that

14   works outside of the home, what is their occupation.  And then

15   I may ask you some follow-up questions.

16        When I ask you follow-up questions, please don't take

17   anything personal, because I use that as a springboard to

18   pretty much instruct all the other jurors.  So if I'm asking

19   you questions, it's not just directed to you; it's really

20   directed to everybody, to kind of educate everybody.  So please

21   don't take anything personally when I ask you these questions.

22        But let's start with Juror No. 1, then.

23        What is your occupation?

24             PROSPECTIVE JUROR:  I don't have -- well, I guess it

25   would be college student.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Well, let me ask you about that.

 2   Have you ever had an occupation in the last five years?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  Okay.  What are you studying in college?

 5              PROSPECTIVE JUROR:  Studying 3D animation and art.

 6              THE COURT:  Okay.  And anybody in the home that works

 7   outside the home?

 8              PROSPECTIVE JUROR:  Yes.  My dad.

 9              THE COURT:  What type of work does he do?

10              PROSPECTIVE JUROR:  Managing, like warehouse and

11   deliveries and stuff.

12              THE COURT:  Okay.  And what area do you live?  I don't

13   want the street address, just the city or area.

14              PROSPECTIVE JUROR:  Cerritos, California.

15              THE COURT:  Cerritos?  Okay.

16       You already told us you know nothing about this case, and

17   this is not really a fair question to ask you, but I'm going to

18   ask it anyway.  Is there anything so far that you have heard,

19   that we've been talking about here, that you think would make

20   it difficult to be a juror in this case?

21              PROSPECTIVE JUROR:  Anything said here?  Not really.

22   The only problem I have is being able to get to the courthouse.

23   I have to usually take a -- like two buses or whatever, and

24   because I don't have a job or occupation, I don't really get

25   paid, but I assume you'd reimburse me with that with whatever I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   get paid at the end of the week, so...

 2            THE COURT:  And those are the logistics you're going

 3   to have to work out with the jury services.  You know where

 4   they are over there.

 5            PROSPECTIVE JUROR:  Yeah.  They told me at the end of

 6   this I should go back to them, so...

 7            THE COURT:  Anything about the case itself?

 8       And by the way, all of you have been cleared for a 20-day

 9   estimate on the case, and we're going to try to make it a lot

10   shorter than that.

11       But anything else about the facts of the case that would

12   bother you?

13            PROSPECTIVE JUROR:  No.

14            THE COURT:  Okay.  If you could pass it over to

15   Juror No. 2.

16       And by the way, we pass this microphone around because the

17   reporter has to take down everything that's said in court, and

18   so that's why we have to use a microphone.

19       Juror No. 2, what is your occupation?

20            PROSPECTIVE JUROR:  Payroll clerk.  Payroll clerk.

21            THE COURT:  Okay.  For what type of corporation?

22            PROSPECTIVE JUROR:  It's government.

23            THE COURT:  Government?  Okay.

24       The agencies that you've heard, you know, Glendale Police

25   Department, whatever, is it for any of those agencies?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              PROSPECTIVE JUROR:  No, it's not.

 2              THE COURT:  Okay.  Anybody in the house that works

 3    outside the home?

 4              PROSPECTIVE JUROR:  Just me.

 5              THE COURT:  Okay.  And what area do you live in?

 6              PROSPECTIVE JUROR:  Los Angeles.

 7              THE COURT:  Okay.  Well, you live in Los Angeles.  Be

 8    a little bit more specific.  East L.A.?  West L.A.?

 9              PROSPECTIVE JUROR:  Closer to East L.A., yes.

10              THE COURT:  Okay.  How about you?  Anything that

11    you've heard so far that you think you should call to our

12    attention as far as your ability to be fair to both sides?

13              PROSPECTIVE JUROR:  No.

14              THE COURT:  Okay.  We'll get back to additional

15    questions later.

16         Occupation?

17              PROSPECTIVE JUROR:  Manager, healthcare.

18              THE COURT:  A healthcare manager?  Okay.

19         And spouse's occupation -- oh, excuse me, not spouse.

20    Anybody in the home that works outside the home?

21              PROSPECTIVE JUROR:  No.

22              THE COURT:  And what area do you live in?

23              PROSPECTIVE JUROR:  San Fernando Valley.

24              THE COURT:  Okay.  And again, to you, is there

25    anything about this case at all that bothers you as far as
```

1    being fair to both sides?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Okay.  Next juror.

4              PROSPECTIVE JUROR:  I am a high school teacher and a

5    high school coach.

6              THE COURT:  Okay.  What sport?

7              PROSPECTIVE JUROR:  Volleyball and football.

8              THE COURT:  I don't really have to know.  I'm just

9    curious.

10        Okay.  Anyone in the home that works outside of the home?

11             PROSPECTIVE JUROR:  My wife is the district math

12   coach.

13             THE COURT:  District --

14             PROSPECTIVE JUROR:  Math coach.

15             THE COURT:  Math coach.  Okay.

16        And what area do you live in?

17             PROSPECTIVE JUROR:  Whittier.

18             THE COURT:  Anything you've heard so far that would

19   cause you problems being fair to both sides?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Okay.  Next juror.

22             PROSPECTIVE JUROR:  I'm a parking officer for

23   university.

24             THE COURT:  Okay.  And what area do you live in?

25             PROSPECTIVE JUROR:  Lakewood.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  And is there anyone in the home that works
 2    outside the home?
 3              PROSPECTIVE JUROR:  Yes.  My partner works in -- he's
 4    operation manager.
 5              THE COURT:  Operation manager at the same place you
 6    work?
 7              PROSPECTIVE JUROR:  No.
 8              THE COURT:  Okay.  What type of an industry?
 9              PROSPECTIVE JUROR:  Foreclosure industry.
10              THE COURT:  Okay.  Anything about this case that
11    you've heard so far that would cause you problems being fair?
12              PROSPECTIVE JUROR:  No.
13              THE COURT:  Next juror.
14              PROSPECTIVE JUROR:  I am operations manager at a
15    retail store.
16              THE COURT:  Okay.  And anyone in the home that works
17    outside the home?
18              PROSPECTIVE JUROR:  No.
19              THE COURT:  What area do you live in?
20              PROSPECTIVE JUROR:  West L.A.
21              THE COURT:  Okay.  Is there anything about this case
22    you've heard so far that would cause you problems?
23              PROSPECTIVE JUROR:  Aside from what I mentioned
24    earlier, no.
25              THE COURT:  Okay.  And we'll get back to the officer's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    testimony in just a second.

 2        Okay.

 3            PROSPECTIVE JUROR:  At the moment, I'm unemployed, but

 4    my usual occupation is a paralegal.

 5            THE COURT:  Okay.  And anyone in the home that works

 6    outside the home?

 7            PROSPECTIVE JUROR:  My mother works in healthcare.

 8            THE COURT:  Okay.  And what area do you live in?

 9            PROSPECTIVE JUROR:  Santa Clarita.

10            THE COURT:  And again, your occupation is a paralegal?

11            PROSPECTIVE JUROR:  Correct.

12            THE COURT:  Do you get into working with cases similar

13    to this?

14            PROSPECTIVE JUROR:  No.  It's all civil litigation.

15            THE COURT:  Okay.  During the trial -- and I'll be

16    asking you or anybody else that's connected with law, you have

17    some contact with law, what it should be or what it is.  If

18    what I say is different than what you think, can you put aside

19    anything you've heard on the outside and what your belief is

20    and follow the law that I give you?

21            PROSPECTIVE JUROR:  Yes.  I'm not familiar with

22    criminal law at all, so...

23            THE COURT:  Okay.  But there may be some crossovers in

24    the law.

25        You know, it's funny, because we run into this.  Judges
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   sit on juries, and so you'll have a judge out there, and I'll

2   say, "No matter what you think about the law, you've gotta

3   follow what I say."  And of course, they understand the system,

4   they'll say, yes, we have to follow it.

5        But it's very important that you put aside anything that

6   you're not given here in court and not decide this case by

7   anything that you hear outside of court.  And you can do that?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Okay.  Next juror.

10           PROSPECTIVE JUROR:  Middle school English teacher.

11           THE COURT:  Okay.  In what area?

12           PROSPECTIVE JUROR:  Downtown L.A.

13           THE COURT:  And anyone that works outside the home?

14           PROSPECTIVE JUROR:  My mother-in-law works for

15   Farmer John, and my father-in-law's a roofer.

16           THE COURT:  Okay.  Farmer John, is it marketing or

17   sales or what?

18           PROSPECTIVE JUROR:  It's like, they make sausages

19   and -- the factory itself.

20           THE COURT:  Okay.  Anything you've heard about this

21   case so far that would make you feel that you could not be fair

22   to both sides?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  I'm going to ask you a more important

25   question.  Can you figure out a way to get that microphone down
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    to the next juror?  All the way down to the end.
 2       Okay.
 3            PROSPECTIVE JUROR:  I'm a library clerk at a community
 4    college.
 5            THE COURT:  Okay.
 6            PROSPECTIVE JUROR:  My 21-year-old son works at Lowe's
 7    hardware, in the paint department.  I live in the Los Feliz
 8    section of Los Angeles, and I haven't heard anything that
 9    disposes me one way or the other.
10            THE COURT:  Have you served on a jury before?
11            PROSPECTIVE JUROR:  Yes.
12            THE COURT:  I thought so.  You had all the answers
13    memorized.
14       Okay.  Thank you very much.
15            PROSPECTIVE JUROR:  I'm a financial analyst for a
16    government contractor.  My husband is a business manager for
17    the entertainment industry.  I live in Santa Clarita, and I
18    haven't heard anything that would sway me.
19            THE COURT:  Okay.  And you work for a government
20    agency?  What agency do you --
21            PROSPECTIVE JUROR:  Contractor.
22            THE COURT:  I'm sorry?
23            PROSPECTIVE JUROR:  It's a defense contractor.
24            THE COURT:  Defense contractor.  Okay.
25       You have no connections with any of the agencies that were
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   mentioned?

 2          PROSPECTIVE JUROR:  No.

 3          THE COURT:  Okay.  Okay.  Pass over.

 4          PROSPECTIVE JUROR:  Good morning.  I'm an assessment

 5   technician for the assessor's office in San Luis Obispo County.

 6          THE COURT:  Okay.

 7          PROSPECTIVE JUROR:  I live in Templeton, California.

 8          THE COURT:  Okay.

 9          PROSPECTIVE JUROR:  And I haven't heard anything that

10   would sway my decision one way or another.

11          THE COURT:  Anyone in the home that works outside the

12   home?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Okay.  Long drive?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Are they putting you up down here?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Okay.  That's what I thought.

19       Next juror.

20          PROSPECTIVE JUROR:  For now, I'm an administrative

21   assistant.  This Friday's my last day.  I just got a new job

22   offer in healthcare.

23          THE COURT:  In healthcare?

24          PROSPECTIVE JUROR:  Mm-hmm.

25       And I live in the San Fernando Valley, Woodland Hills/West
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Hills area.  And honestly, I may be a little biased when I
 2   heard the fact that there has been potential violence.  I've
 3   had experiences with -- with a couple friends that -- that
 4   affected --
 5            THE COURT:  That involved some type of violence?
 6            PROSPECTIVE JUROR:  Yeah.
 7            THE COURT:  The allegation here is -- and I don't know
 8   much about the facts of the case much more than you do.  I
 9   don't know if there's actual violence alleged here or not.
10   There may be threats or extortion, that type of thing.
11            PROSPECTIVE JUROR:  Okay.
12            THE COURT:  But let's talk about that.  That's
13   interesting, because you may be in a situation where you hear
14   something and you say, "Well, I know what happened in my case."
15            PROSPECTIVE JUROR:  Yeah, I --
16            THE COURT:  And you might be tempted to bring it in,
17   and I've got to talk to you a little about that.
18        And I'm really talking to the whole jury.
19        That's what's so important.  Every single one of us have
20   had outside experiences.  I mean, we all have.  But we're asked
21   to take those and put those aside, because the experience you
22   had or the person you dealt with can't be cross-examined or
23   anything.  You know, it's completely different in this case.
24   And so the question really isn't what happened to you or how
25   bad that is; it's what does the evidence show here?  Whether
```

1   you like the person or dislike the person isn't material.  It's

2   what does the evidence show happened in this case.

3        And so that's really the question, is can you put all your

4   outside experiences aside and judge this case only on the

5   evidence that you hear here?

6        Obviously, and I'll say this before everybody says it, a

7   lot of people are going to say, "Well, I'll try."  And that's

8   all we can ask of you, is that you try.  But if you say, "I'll

9   try," can you, and do you have enough strength to tell us, if

10  you get into the trial, "Hey, I can't do it anymore," to raise

11  your hand and tell us you can't do it anymore, you can't set it

12  aside?  But, obviously, the best anybody can do is try.

13       So let me get back to you.  How difficult would it be for

14  you to put that aside and say, "Hey, this may have happened to

15  me, but they're not the same people, not the same thing, I

16  don't know if it happened or not"?

17            PROSPECTIVE JUROR:  I can admit that I might be biased

18  because of past personal experience that has affected close to

19  neighborhood, but as you said, I can try to keep it away.

20            THE COURT:  Yeah.

21            PROSPECTIVE JUROR:  Yeah.

22            THE COURT:  And whatever happened in your neighborhood

23  you know is not part of this case.

24            PROSPECTIVE JUROR:  It's not part of it, but it's

25  just -- I guess it might be like a recall experience.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  May be a recall.  And everyone's going to
 2    have those recalls as far as evidence.  And what we're going to
 3    be asking you -- and I know you said you'd try.  What we're
 4    going to be asking you is, can you put that aside?  Because
 5    your job is not to judge what happened to you or memories that
 6    you have or recall you have; it's what was produced here at
 7    trial.  And if it's not produced at trial, you can't consider
 8    it.  If it was produced at trial, you -- and so you understand
 9    what your duty would be?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  Okay.  And if you ever run into any
12    problems with doing that, you can raise your hand, tell us?
13              PROSPECTIVE JUROR:  (Nods head up and down.)
14              THE COURT:  If it came to a situation where you'd say,
15    "Emotionally I just can't handle this anymore because of past
16    experience, I can't do it anymore," you'd raise your hand and
17    tell us?
18              PROSPECTIVE JUROR:  I could try, yeah.
19              THE COURT:  Okay.  Next juror.
20              PROSPECTIVE JUROR:  I work for the Department of
21    Housing and Urban Development.
22              THE COURT:  Okay.
23              PROSPECTIVE JUROR:  I'm a manager.  My husband is not
24    currently employed, but he works in accounting in the
25    entertainment industry.  I work -- I live in the Mid-Wilshire
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    area.

2            THE COURT:  Okay.  Anything about this trial that

3    would cause you any problems?

4            PROSPECTIVE JUROR:  No, sir.

5            THE COURT:  You could be fair to both sides?

6            PROSPECTIVE JUROR:  Not at all.  I've not heard

7    anything --

8            THE COURT:  I said, you could be fair to both sides?

9    "Not at all."

10       You could be fair to both sides?

11           PROSPECTIVE JUROR:  I could be fair to both sides.

12           THE COURT:  See, what we're looking for is jurors, and

13   I'll be asking this of many of you, that can say, "Hey, if I

14   was the defendants in this case, I'd be satisfied the 12 people

15   would give me a fair trial, and, you know, if I was the

16   prosecution, I'd be satisfied that 12 people like me would give

17   me a fair trial.  I can be fair to both sides."

18       So when I say can you be fair to both sides, can you put

19   yourself in that image and say, "If I was the defendant or the

20   prosecution, I can be -- a jury like me would be fair to you"?

21   Do you think you can do that?

22           PROSPECTIVE JUROR:  I do.

23           THE COURT:  Okay.  Next juror.

24           PROSPECTIVE JUROR:  I'm a retired speech language

25   pathologist.  My husband's a chemical engineer.  We live in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    El Segundo.  And I can give both sides fair judgment.

2            THE COURT:  Okay.  And you can go just on the evidence

3    and not bring anything from the outside in?

4            PROSPECTIVE JUROR:  That's correct.

5            THE COURT:  Okay.  Let's see if we can get that all

6    the way down to Juror No. 15.

7            PROSPECTIVE JUROR:  I'm a tax service clerk for

8    L.A. County.

9            THE COURT:  Okay.  And anyone in the home that works

10   outside the home?

11           PROSPECTIVE JUROR:  Yes.  Warehouse.

12           THE COURT:  In warehouse management or --

13           PROSPECTIVE JUROR:  Soda distribution.

14           THE COURT:  Okay.  What area do you live in?

15           PROSPECTIVE JUROR:  West L.A.

16           THE COURT:  West L.A.

17      How about you?  Anything about the facts of this case that

18   you've heard so far that would bother you?

19           PROSPECTIVE JUROR:  No.

20           THE COURT:  I mean, we've had a couple of people say,

21   "Hey, you know, I know someone who's a police officer," "I've

22   had problems with violence in the past."

23      Anything about you that you should call to our attention?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  Okay.  You're very comfortable, if you're

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   the defendants in this case or the government in this case,

 2   that people like you would give you a fair trial?

 3            PROSPECTIVE JUROR:  Yes, sir.

 4            THE COURT:  Okay.  Next juror.

 5            PROSPECTIVE JUROR:  I work in retail as a receiver.

 6            THE COURT:  Okay.  Anyone in the home that works

 7   outside the home?

 8            PROSPECTIVE JUROR:  Yeah.  My parents.  My dad's a

 9   security officer, and my mom works at the airport.

10            THE COURT:  Works where?

11            PROSPECTIVE JUROR:  At the airport, LAX.

12            THE COURT:  In what capacity?

13            PROSPECTIVE JUROR:  She drives a shuttle bus.

14            THE COURT:  Okay.  And what area do you live in?

15            PROSPECTIVE JUROR:  South-Central.

16            THE COURT:  Okay.  Your dad's in security?

17            PROSPECTIVE JUROR:  Yes.

18            THE COURT:  There's going to be a lot of police

19   officer testimony here.  Being in security, he may have had

20   contact with a lot of police officers.

21            PROSPECTIVE JUROR:  No, he's fine.  I'm fine.

22            THE COURT:  Okay.  So you wouldn't see yourself siding

23   with one side or the other because your father's a security --

24            PROSPECTIVE JUROR:  (No audible response.)

25            THE COURT:  Okay.  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          Next.
 2          PROSPECTIVE JUROR:  I work in property management for
 3   Irvine Company.  I live in downtown Long Beach with three
 4   roommates, two of which are in hospitality, one of which is a
 5   server for a restaurant.  And I have no bias.
 6          THE COURT:  Okay.  And you can leave anything you've
 7   heard outside of this trial outside and judge it just on the
 8   evidence you hear here?
 9          PROSPECTIVE JUROR:  Yes.
10          THE COURT:  Okay.  Next juror.
11          PROSPECTIVE JUROR:  I work in the I.T. field as a
12   system engineer.  My wife is -- she runs own business and --
13          THE COURT:  Just generally, what type of a business
14   does she do?
15          PROSPECTIVE JUROR:  She make crafts.
16          THE COURT:  Okay.  Okay.  And what area do you live
17   in?
18          PROSPECTIVE JUROR:  I live in Lakewood.
19          THE COURT:  Lakewood.
20      You've heard what the allegations are here.  You've had
21   people introduced to you.  You know a little bit about the
22   case.  Is there anything about this case that would cause you
23   problems hearing it?
24          PROSPECTIVE JUROR:  No.
25          THE COURT:  Any hesitation you'd have?  If you're the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    attorneys on either side, is there anything about you you'd

2    want to know?

3              PROSPECTIVE JUROR:  Not really.

4              THE COURT:  Okay.  Okay.  Sometimes being boring is

5    good.

6         Okay.  Let me ask some general questions of all of you,

7    and we're going to have to be passing this mic around quite a

8    bit.

9         The case here is going to involve, from what I've heard

10   here, and I know not a whole lot more than you do, but it's

11   going to be involving testimony of police officers and

12   involvement of police officers.  So let me ask you a few

13   questions about police officers.

14        Let me start out by saying this.  Anybody had an

15   experience with police officers where -- and I'll ask it both

16   ways, but a bad experience, where you got that ticket that

17   nobody deserves, or whatever it is, you've had a problem with

18   the police, and you figure, "Maybe this is my chance to get

19   even," because there's police in it?  Anybody have any bad

20   experiences that would influence them in this case to go one

21   way or the other?

22             MULTIPLE PROSPECTIVE JURORS:  No.

23             THE COURT:  Okay.  Any of you have any really good

24   experience, found a lost child, returned property, you really

25   feel indebted?  You know, "The police are there to protect us,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    and maybe this is my chance to pay them back and do something

2    for them."  Anybody going to have that feeling, where it would

3    affect you as far as this case is concerned?

4              MULTIPLE PROSPECTIVE JURORS:  No.

5              THE COURT:  So you could be fair and impartial and

6    say, "Hey, I don't care which side it falls on, I'm just going

7    to tell you what the facts are, what the evidence is, and let

8    the cards fall where they may"?  You think you can all do that?

9              MULTIPLE PROSPECTIVE JURORS:  Yes.

10             THE COURT:  Okay.  Police officers will be taking the

11   stand and testifying.  Everybody has a different occupation.

12   When they take the stand, they have one occupation:  They're a

13   witness.  And we will give you the instruction at the end of

14   the case to judge credibility of witnesses, and we'll give you

15   different things you can consider, et cetera, and all witnesses

16   should be judged by the same credibility standards.  You know,

17   it has to do with what their experiences were, whether they

18   have bias or prejudice, you know, all kinds of things.  But you

19   use the same standard to judge every witness.

20        Is there anybody here that would give a police officer's

21   testimony any more weight or any less weight because he's a

22   police officer?

23             MULTIPLE PROSPECTIVE JURORS:  No.

24             THE COURT:  I'm assuming that you all will accept the

25   fact that you have police officers that tell the truth, you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   have police officers that don't tell the truth, you have all

2   kinds of good, bad, et cetera.  Anybody have problems with

3   that?

4           MULTIPLE PROSPECTIVE JURORS:  No.

5           THE COURT:  Everybody agree with that?

6           MULTIPLE PROSPECTIVE JURORS:  Yes.

7           THE COURT:  Okay.  And Juror No. 6 has already

8   indicated, but other than Juror No. 6 -- and I'll get back to

9   No. 6 in a second -- anybody here that have had close friends

10  or relatives that are involved with police work, or maybe

11  you've been involved with police work, to the extent that

12  you're afraid that that may bring in some of those experiences

13  they've talked about, or some of the things they did you may

14  bring into this trial?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Yes, sir.

17          PROSPECTIVE JUROR:  My brother is a police officer for

18  the Cal State L.A.

19          THE COURT:  For the school?

20          PROSPECTIVE JUROR:  Yeah.

21          THE COURT:  Okay.  And anything he may have said or

22  done, could you leave out of this trial?

23          PROSPECTIVE JUROR:  I suppose so.

24          THE COURT:  Okay.  You understand how important that

25  is?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            PROSPECTIVE JUROR:  Right.

 2            THE COURT:  You know, I've been harping on it all

 3   morning, but it's gotta be judged on its own facts.  And

 4   anything he may have told you is not part of this trial, and

 5   your job is going to be to leave that out and tell us what just

 6   the evidence says here.  You can do that?

 7            PROSPECTIVE JUROR:  Yes.

 8            THE COURT:  Okay.  Because he's your brother --

 9        And I'm asking of this everybody, also.

10        Because he's your brother, if there are any friends or

11   relatives that you know of that are police officers, is that

12   going to make you lean over towards finding for the police

13   officers because you might be embarrassed to find the other way

14   or you don't want to insult him?

15        Anybody feel that way?

16            MULTIPLE PROSPECTIVE JURORS:  No.

17            PROSPECTIVE JUROR:  No, I don't think so.

18            THE COURT:  Okay.  So if you went to dinner with your

19   brother the night after this trial was over, you wouldn't mind

20   telling him either we found them guilty or not guilty, and

21   neither one would bother you one way or the other?

22            PROSPECTIVE JUROR:  Yeah.

23            THE COURT:  Neither one would bother you one way or

24   the other?

25            PROSPECTIVE JUROR:  Yeah, it wouldn't bother me.
```

```
 1                 THE COURT:  Okay.  Anybody else have any leanings or
 2     tendencies to decide one way or the other because of friends or
 3     relations that are police officers?  Anybody at all?
 4                 MULTIPLE PROSPECTIVE JURORS:  No.
 5                 THE COURT:  Let me ask you, just so I can get your
 6     hands, who on the jury has real close friends or close family
 7     members that are members of law enforcement?  You know,
 8     brothers --
 9          Yes, and I'll get back to you in just a second.
10          Okay.  So we have Juror No. 5, No. 6 and No. 18.
11          Juror No. 5.
12                 PROSPECTIVE JUROR:  Yes.
13                 THE COURT:  We're going to have to get the mic to you.
14     Juror No. 18 doesn't want to give it up.
15          Okay.  Is this a brother?  A friend?  A relative?  What?
16                 PROSPECTIVE JUROR:  Two cousins.
17                 THE COURT:  Do you talk to them much about their
18     cases?
19                 PROSPECTIVE JUROR:  No.  We live five hours away, so
20     we don't really talk.
21                 THE COURT:  Okay.  So there's not a whole lot you'd
22     have to exclude in this trial, because they haven't told you a
23     lot?
24                 PROSPECTIVE JUROR:  Correct.
25                 THE COURT:  Anything they may have said or any
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    feelings you might have, you can leave out of this case and be

2    fair to both sides?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay.

5         Juror No. 6, you've had a long time to think about it now,

6    and you know what we're looking for, and you know the questions

7    we're asking.  Again, this relative was --

8              PROSPECTIVE JUROR:  No, it was --

9              THE COURT:  Oh, this was a friend.

10             PROSPECTIVE JUROR:  It was a family friend.

11             THE COURT:  Yeah, this is going to be a little

12   different, because it may be someone who testifies here in

13   court.  Strong likelihood, because same name, same department.

14        You said you don't know this person that well.  When's the

15   last time you talked to this person?

16             PROSPECTIVE JUROR:  It was when I was a kid, so --

17             THE COURT:  So many years ago?

18             PROSPECTIVE JUROR:  Maybe, like, 15-plus years.

19             THE COURT:  Okay.  You know, if you're in a situation

20   where you heard the testimony and you didn't believe it, could

21   you tell us?  You know, could you render a verdict where you --

22   based on the fact you didn't believe him?

23             PROSPECTIVE JUROR:  Yeah.  I mean, I don't think that

24   knowing him would sway me either way.

25             THE COURT:  Okay.  So you can't see it affecting you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    one way or the other?

 2            PROSPECTIVE JUROR:  No.

 3            THE COURT:  So if you are the defendants here or the

 4    prosecution, you'd say, "This person will still be fair"?

 5            PROSPECTIVE JUROR:  Yeah, I can --

 6            THE COURT:  Okay.  Any other persons you know other

 7    than that one?

 8            PROSPECTIVE JUROR:  Yes.

 9            THE COURT:  Okay.  That's what I thought.

10            PROSPECTIVE JUROR:  Really, really close family friend

11    is -- was the most recent undersheriff in the L.A. Sheriff's

12    Department, and he's now running for sheriff.

13            THE COURT:  Okay.  And is there anything about that

14    relationship -- first of all, about any things they've told you

15    about their case or anything like that, that you'd bring into

16    this case?

17            PROSPECTIVE JUROR:  No.  I feel like I'm a pretty

18    reasonable person, so I'm pretty good at not letting my

19    emotions get, you know, the best of me.

20            THE COURT:  Okay.  And you feel very confident --

21            PROSPECTIVE JUROR:  Yeah.

22            THE COURT:  -- that you could judge this case only on

23    the evidence you receive here and the law that applies to the

24    case, not bring anything else in?

25            PROSPECTIVE JUROR:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  And not be -- have a tendency to go one

 2    way or the other because of these friendships?

 3              PROSPECTIVE JUROR:  Correct.

 4              THE COURT:  Okay.

 5       Juror No. 18, we're back to you.  Is there anybody else

 6    that you haven't mentioned to us, or did we cover it?

 7              PROSPECTIVE JUROR:  No.  I mean, my brother and his

 8    friends, policemen too.

 9              THE COURT:  Okay.  And none of that would affect you?

10              PROSPECTIVE JUROR:  No.

11              THE COURT:  Okay.

12       How about experience with law enforcement?  Has anybody

13    had any training or experience with law enforcement?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  You know, been in the military police or

16    anything like that where -- anybody at all?

17              MULTIPLE PROSPECTIVE JURORS:  No.

18              THE COURT:  Okay.  And one of the reasons I ask that

19    question is that, if you have had experience, you're going to

20    have to put that aside and listen to just what the evidence

21    says here, not any experiences or things you've heard.

22       And I've talked to you about credibility of police

23    officers.  I think we may be hearing testimony of informants.

24    You're going to have to judge their testimony, like I said

25    before, like any other person.  One of the things you'll be
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   looking at is if there's any bias or motive for them to tell

 2   the truth or not tell the truth.  There may be testimony that

 3   they were either compensated for or given some privilege for

 4   their immunity for testifying.  You're going to have to weigh

 5   that in as to how that might affect their testimony or not.

 6        Does anybody have any strong feeling about informants that

 7   you say, "I couldn't be that objective because either I like

 8   informants or I don't like informants"?  Anybody feel that way?

 9            MULTIPLE PROSPECTIVE JURORS:  No.

10            THE COURT:  Because what we're asking you to do is to

11   be able to say, "Okay, I'm going to view this, I'm going to

12   judge this, and if I feel this person -- you know, with

13   everything involved there, I'm going to have to judge the

14   credibility of that person based on all those factors."  And

15   you feel comfortable doing that, everybody?

16            MULTIPLE PROSPECTIVE JURORS:  Yes.

17            THE COURT:  Okay.  We're going to have some

18   interpretation.  We have some testimony that either the

19   testimony or maybe there may be recordings that will be in a

20   different language, in Armenian.

21        Does anybody have any Armenian experience with language?

22        Okay.  If you do or if you ever -- if somebody told you,

23   "This is what this word means," anything else, anytime there's

24   an interpretation given in court, a translation given in court,

25   you are governed by the translation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        And let me just give you -- this is kind of interesting.
 2   Let's say it was Spanish, and some of you speak Spanish, and
 3   somebody's testifying in Spanish.  You're not allowed to listen
 4   to the testimony of the person in Spanish.  You have to listen
 5   to the translation.  Because some people will listen to the
 6   Spanish language and give it different meanings.
 7        Everyone has to go off the same page.  So you are governed
 8   by and have to listen just to the interpreter.  In fact, you'll
 9   notice, if we do have someone where there's a translator, we'll
10   take the microphone away from the witness and put it in front
11   of the translator.  It's the translator's interpretation or
12   translator's translation that is evidence.
13        So I don't think that's a problem, because nobody speaks
14   Armenian, but if it is, you have to discount that and listen
15   just to the translation.
16        Let me go through some more experiences.  We talked about
17   police officers.  How about in the area of -- and what I'm
18   looking at is if you have any expertise, if you've had any
19   education, any training, any connection with the law.  For
20   instance, if anybody's been to law school.
21        Other than the one gentleman that's a paralegal, anybody
22   else?
23             MULTIPLE PROSPECTIVE JURORS:  No.
24             THE COURT:  Have any, you know, brother, sister, or
25   anything that talks to you about law at all and tells you what
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   the law should be or shouldn't be?

 2              MULTIPLE PROSPECTIVE JURORS:  No.

 3              THE COURT:  Okay.  How about accounting?  Anybody have

 4   any background, training, experience in accounting?

 5        Okay.  Juror No. 10.

 6              PROSPECTIVE JUROR:  Yes.

 7              THE COURT:  Okay.  And what was your training in?

 8              PROSPECTIVE JUROR:  Oh, I have a master's degree in

 9   finance.

10              THE COURT:  You have what?

11              PROSPECTIVE JUROR:  A master's degree in finance.

12              THE COURT:  Master's degree in finance.

13        Again, we may have testimony concerning accounting, and so

14   you're going to have to limit yourself just to what the

15   testimony says, and you can't go back and say, "Let me tell you

16   what it is at school."  You gotta leave that out of it and just

17   go on the evidence.  Can you do that?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Okay.  Anybody else have experience with

20   accounting?

21        Okay.

22              PROSPECTIVE JUROR:  It's not so much experience; it's

23   just I've taken finance classes.

24              THE COURT:  Okay.  And anything that you've heard in

25   finance classes, you won't bring into this trial unless it's in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    evidence in this trial?

2            PROSPECTIVE JUROR:  Correct.

3            THE COURT:  Okay.

4        Same thing about banking, either accounting or banking.

5    Anybody have any more experience?  I don't mean has anybody

6    banked.  I'm assuming you all have a bank account or something.

7    But in the field of banking.

8        Okay.  How about forensic?  Anybody have any experience or

9    training in forensic science?

10           MULTIPLE PROSPECTIVE JURORS:  No.

11           THE COURT:  You know, fingerprints, firearms,

12   ballistics, anything like that?

13           MULTIPLE PROSPECTIVE JURORS:  No.

14           THE COURT:  Nobody?

15       Has anybody been a victim or -- well, I'll ask it both

16   ways.  Has anybody been a victim of fraud or extortion or

17   identity theft?

18           PROSPECTIVE JUROR:  Attempted.

19           PROSPECTIVE JUROR:  Yes.

20           PROSPECTIVE JUROR:  Attempted.

21           THE COURT:  Okay.  Back row.  Anybody in the back row,

22   first of all?

23       Okay.  Front row, we're down to Juror No. 11?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  Okay.  And you were a victim of one of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    those?

2            PROSPECTIVE JUROR:  Oh, I'm sorry.  Attempted identity

3    theft.  Somebody tried to embezzle some money from me.

4            THE COURT:  Okay.  Well, in this case, that's one of

5    the allegations, is identity theft.  And you know where I'm

6    going.  It's the same question we've been asking.  What

7    happened to you and the experiences you had, you gotta leave

8    out of this and you gotta judge this case by itself and it has

9    nothing to do with what happened to you.  Do you think you can

10   do that?

11           PROSPECTIVE JUROR:  I understand.  I could be

12   impartial.

13           THE COURT:  Okay.  Somebody else raised their hand.

14       Yes.  Okay.

15           PROSPECTIVE JUROR:  Attempted identity theft.

16           THE COURT:  Okay.  And same thing.  What happened to

17   you has nothing to do with what happened here.  You understand

18   that?

19           PROSPECTIVE JUROR:  Mm-hmm.

20           THE COURT:  And you think you could leave what

21   happened to you out of this and judge it just on its own facts?

22           PROSPECTIVE JUROR:  I'll try.

23           THE COURT:  So --

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  -- you're going to be trying on a lot of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    things.

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Okay.

4         Anybody else?  Anybody else in that front row?  Anybody up

5    here that's been a victim of identity theft, fraud,

6    embezzlement or extortion?

7         Okay.  Let me pass it up to Juror No. 17 first.

8              PROSPECTIVE JUROR:  I've had identity theft.  I would

9    not be biased either way.

10             THE COURT:  Okay.  So just because somebody's charged

11   with it doesn't mean in your mind that he committed identity

12   theft?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Okay.

15        Sir, how about you?

16             PROSPECTIVE JUROR:  Yeah, I've been a victim of

17   identity theft, but I'm open.

18             THE COURT:  You still could be fair?

19             PROSPECTIVE JUROR:  Yeah.

20             THE COURT:  If somebody charged you with identity

21   theft, people like you would give you a fair trial?

22             PROSPECTIVE JUROR:  Yeah.

23             THE COURT:  Okay.

24        Okay.  Anybody been accused of identity theft or fraud or

25   extortion in the jury?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MULTIPLE PROSPECTIVE JURORS:  No.

 2              THE COURT:  Or any close friends or relatives that

 3    have been accused of that?

 4              MULTIPLE PROSPECTIVE JURORS:  No.

 5              THE COURT:  Okay.  Any connection with charges of

 6    identity theft, fraud or extortion, where you've been involved

 7    with the trial or the investigation or anything, other than the

 8    people that have already spoken?  Anybody?

 9              MULTIPLE PROSPECTIVE JURORS:  No.

10              THE COURT:  Of those that have already spoken as far

11    as being victims of identity theft, I'm assuming it may have

12    been reported and there's an investigation, et cetera.  How

13    that investigation went, how it was investigated, what happened

14    to those people, anything that came up, is there any of that

15    that you'd bring into this trial?

16              MULTIPLE PROSPECTIVE JURORS:  No.

17              THE COURT:  Okay.  How about felonies?  Has anybody,

18    either themselves, friends or relatives in the last ten years

19    that have been convicted of a felony?

20              MULTIPLE PROSPECTIVE JURORS:  No.

21              THE COURT:  Anybody been accused of a felony?

22    Friends, relatives, close friends of yours?

23              MULTIPLE PROSPECTIVE JURORS:  No.

24              THE COURT:  Okay.  In this matter, I mentioned that

25    the language, the Armenian language will be spoken.  There may
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    be a referral here to an organization or a group referred to as

 2    "Armenian Power."

 3        Has anybody heard that expression, "Armenian Power"?

 4        Does anybody have any strong feelings towards the Armenian

 5    community, one way or the other, that would cause you problems

 6    being fair and impartial, going both ways, on a issue like

 7    this?  Does anybody feel any bias or prejudice or strong

 8    feelings that Armenians are either good people or bad people or

 9    different from any other people?

10            MULTIPLE PROSPECTIVE JURORS:  No.

11            THE COURT:  Okay.  How many of you in the last ten

12    years have been sued or have sued somebody in a court of law?

13    Other than domestic relations.  You know, divorce, I'm not

14    interested in.  Nobody?

15        And you've raised your hands on this before, but let me

16    find out again.  How many have served on jury duty?  I'm going

17    to have to talk to each one of you.

18        Okay.  Let me start with the back row.  Let's get the mic

19    back to the back row, and we'll just go down.  Start with Juror

20    No. 2, and then we'll just pass it down until somebody is in

21    that category.

22        How many juries have you sat on before?

23            PROSPECTIVE JUROR:  Two.

24            THE COURT:  And were they criminal or civil?

25            PROSPECTIVE JUROR:  Both criminal.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  No civil cases?

 2              PROSPECTIVE JUROR:  No.

 3              THE COURT:  Okay.  Were any of them cases like this?

 4              PROSPECTIVE JUROR:  No.

 5              THE COURT:  Were they able to reach a verdict in those

 6   cases?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:  Okay.  Is there anything about not

 9   reach -- were you able to reach a verdict in either one of

10   those cases?

11              PROSPECTIVE JUROR:  No.

12              THE COURT:  Is there anything about that fact that you

13   sat on hung juries that make you feel that it's useless to even

14   try to deliberate?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  It was just the facts in those unique

17   cases?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Okay.  So you feel it's possible to reach

20   a verdict in most cases?

21              PROSPECTIVE JUROR:  Yeah.

22              THE COURT:  In that criminal trial, you were

23   instructed that the burden of proof is beyond a reasonable

24   doubt, not a preponderance of the evidence.  You had no problem

25   with that burden of proof, beyond a reasonable doubt?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              PROSPECTIVE JUROR:  No, I have no problem with that.

2              THE COURT:  Okay.  Let's pass it down -- and nothing

3    about that case you'd bring into this case?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Okay.  Let's pass it down to the next

6    juror that's had jury duty.

7              PROSPECTIVE JUROR:  I was in a criminal case in 2011.

8              THE COURT:  Was it a case similar to this?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Were they able to reach a verdict?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Did you have any problem with that burden

13   of proof?

14             PROSPECTIVE JUROR:  No.  None.  Not at all.

15             THE COURT:  Okay.  Nothing about that case you'd bring

16   into this case?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  Anybody else in the back row?

19   Last -- No. 8.

20             PROSPECTIVE JUROR:  I think it was a civil case, but I

21   don't remember how many years ago.

22             THE COURT:  Okay.  Anything similar to this?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Okay.  Nothing about that case you'd bring

25   into this case?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Were you able to reach a verdict in that

 3    case?

 4              PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  Now, when you say it's a civil case, just

 6    so everybody understands, in civil cases, normally the burden

 7    of proof is by what we call a preponderance of the evidence.

 8    That means if one side tips the scale by 51 percent, they win.

 9    They take all the marbles, they go home.

10         Criminal case is much different.  It's beyond a reasonable

11    doubt, which is a much, much higher burden of proof.

12         So will you be able to make that distinction and

13    understand that in this case it's beyond a reasonable doubt,

14    not just a preponderance of the evidence?

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  Okay.  No problems with that?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Okay.  Let's get it down to the first row

19    here, starting with juror -- anybody after Juror No. 9?

20         Let's go all the way down to -- let's go by order, if we

21    can.  Who's the first one?  Okay.

22              PROSPECTIVE JUROR:  I was a juror on a criminal case.

23    We did reach a verdict.  I -- nothing about that case would

24    affect this case.

25              THE COURT:  And it wasn't similar to this?
```

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Okay.  Okay.  Next juror.

 3              PROSPECTIVE JUROR:  I was on a civil case in '05, and

 4   we did reach a verdict.

 5              THE COURT:  Anything similar to this case?

 6              PROSPECTIVE JUROR:  No.

 7              THE COURT:  And anything about that case you'd bring

 8   into this case?

 9              PROSPECTIVE JUROR:  No.

10              THE COURT:  '05, you probably don't remember much of

11   that case.

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  But it was a preponderance of the

14   evidence.  This is beyond a reasonable doubt.  Much higher

15   standard.  You understand that?

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  And you have no problem with that?

18              PROSPECTIVE JUROR:  No, no problem.

19              THE COURT:  Okay.  Next juror that's been on jury

20   duty.

21              PROSPECTIVE JUROR:  I was on the jury for a criminal

22   trial, and they reached a verdict.

23              THE COURT:  Okay.

24              PROSPECTIVE JUROR:  It had nothing similar to this

25   case.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Nothing you'd bring into this trial?
 2         PROSPECTIVE JUROR:  No.
 3              THE COURT:  Any problems with that burden of proof
 4    being by a reasonable doubt -- beyond a reasonable doubt?  I'm
 5    sorry.
 6         PROSPECTIVE JUROR:  No problem.
 7              THE COURT:  Okay.  Next juror.
 8         PROSPECTIVE JUROR:  There were two cases of criminal,
 9    and we reached a verdict.
10              THE COURT:  Okay.  Anything similar to this?
11         PROSPECTIVE JUROR:  No.
12              THE COURT:  Okay.  Anything about that case you might
13    bring into this case?
14         PROSPECTIVE JUROR:  No.
15              THE COURT:  And you had no problem with the burden of
16    proof --
17         PROSPECTIVE JUROR:  Correct.
18              THE COURT:  -- beyond a reasonable doubt?
19         PROSPECTIVE JUROR:  No problem.
20              THE COURT:  Okay.  And, of course, with that burden of
21    proof, I'm assuming you all understand I'm talking about
22    defendants are presumed to be innocent -- and I'll give you
23    that definition on the burden of proof, but they are presumed
24    to be innocent until and unless the government can meet that
25    burden.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    So of those I've already talked to, any problems presuming

2  the defendants are innocent at this time?  Anybody?

3      *(Multiple prospective jurors shake their heads.)*

4          THE COURT:  Okay.  First juror -- 15, first juror in

5  the front row.

6    Well, let me ask, anybody in the front row that's had jury

7  duty?

8          MULTIPLE PROSPECTIVE JURORS:  No.

9          THE COURT:  Okay.  That speeds it up.

10    In this matter, you understand that there are going to be

11  multiple counts, multiple charges.  I think, I don't know, 50

12  or 60 or 70 charges.

13    Do you know how many, Counsel?

14          MR. ESTRADA:  Over 50, your Honor.

15          THE COURT:  Over 50.  So you're going to have to be

16  making a determination on each count.  And there are three

17  different defendants, so you're going to have to be making a

18  determination on each defendant.

19    Does anybody have any problem with that, understanding

20  that just because you might find one way on one defendant, you

21  may not find that way on the other defendants?  They all have

22  to be viewed independently, and each count has to be viewed

23  independently.  Do you all understand that?

24          MULTIPLE PROSPECTIVE JURORS:  Yes.

25          THE COURT:  Anybody have any problem with that at all?

```
 1            MULTIPLE PROSPECTIVE JURORS:  No.

 2            THE COURT:  Okay.  Sometimes in criminal cases jurors

 3   are a little bit upset because they're not involved -- I don't

 4   know where they got the idea they were, but they're not

 5   involved with the question or area of punishment at all.  All

 6   they're charged with is to determine whether or not a person is

 7   guilty or not guilty of a crime.  Any punishment, if any, has

 8   to be determined by the Court at a later time.

 9       Sometimes you feel so invested in the case, you want to

10   get involved with what should happen or shouldn't happen.

11       Anybody feels that that would bother them in this case,

12   that nobody cares what you think, if there's a verdict of

13   guilty, as to what a sentence would be?

14            MULTIPLE PROSPECTIVE JURORS:  No.

15            THE COURT:  Okay.  During this case, you may have to

16   be reading transcripts, because we're going to have recordings

17   read.  Sometimes they're hard to understand.  There's

18   transcripts that will probably be provided to the jury, and you

19   have to read the transcript.

20       Is there anybody here that has any difficulty in reading

21   transcripts or holding the transcripts during the trial?

22            MULTIPLE PROSPECTIVE JURORS:  No.

23            THE COURT:  Okay.  Let me ask you -- we've asked all

24   kinds of questions here.  We've kept you here, oh, man,

25   45 minutes to an hour.  I'm going to be talking to the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    attorneys over here in a second, but it all goes down to -- you
 2    know, I've been going over and over and over certain elements
 3    and certain things, and it's almost ad nauseam, and you all
 4    know where we're going, but let me just ask you again.  Putting
 5    it in perspective, you, as a juror, you know more than anybody
 6    else about you and your dispositions and your bias and your
 7    prejudice and your motives.  And we all have them.  The
 8    question is, can we set them aside and hear the case?  Is
 9    there -- do you all feel that, knowing that much about you and
10    knowing what you know about this case, that if you were sitting
11    here as a defendant or as a prosecution, you're comfortable
12    that jurors like you would give you a fair trial?
13              MULTIPLE PROSPECTIVE JURORS:  Yes.
14              THE COURT:  Okay.  I'm going to be coming over here
15    and talking with the attorneys.  We call it a sidebar.  You may
16    have heard about that before, or bench conference.  Two things
17    to remember.  One is, we'll be having them during the voir
18    dire.  After the voir dire is over, you're not going to see any
19    more bench trials.  I don't have bench trials during the trial.
20    Second thing to remember is, when we're talking over here,
21    you're going to notice we'll be whispering over here.  You may
22    not believe it, but we're going to be whispering because we
23    don't particularly want you to hear what we're saying.
24        Is anybody going to feel offended or anybody going to try
25    to read lips or eavesdrop?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1         All I can tell you is that nothing over here would even

 2   interest you.  So, you know, we're going to ask you over here

 3   to be quiet, but at the same time, you know, you can kind of

 4   relax, do whatever you want.  And it seems to me the technology

 5   has come to the point, and I think my clerk will tell you, that

 6   she can press something, and the white noise or something comes

 7   on, which will help you on it.  But try not to be concerned

 8   with what we're doing over here unless we ask you a direct

 9   question, and then we'll be back to talk to you in just a

10   second.

11         Can I have the attorneys over at the side bench, please.

12         (At sidebar:)

13         THE CLERK:  Counsel, the reporter asks when you speak

14   if you could identify yourself, because she can't see.

15         THE COURT:  What we're going to be doing is, we'll go

16   through the challenges, direct challenges, and then the last

17   three you can either do at the end, or if somebody -- if the

18   defense decides to pass, then I'll go through each one of you

19   and see if any of you have a challenge at that time as far as

20   your individual challenge goes.

21         So let's start with the government, first of all.  Any --

22   for cause.  I'm sorry.  For cause.

23         MR. FLIER:  It's Mr. Flier.  Number 12, please.

24         THE COURT:  Okay.

25         MR. ESTRADA:  Martin Estrada on behalf of the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    United States.  No challenges for cause.

2              THE COURT:  Okay.  Anybody else other than the 12?

3              MR. FLIER:  No.

4              THE COURT:  Do you want to state your reason?

5              MR. FLIER:  That was the prospective juror who said

6    that they didn't think they could be fair if there's any acts

7    of violence, and that's what this case about, especially

8    Count 1, in my opinion.

9              MR. ESTRADA:  I agree, your Honor.  Join in that.  I

10   don't -- I still think there might be some further questioning

11   that may need to be approached, but I think for cause is --

12             THE COURT:  I'm going to deny the challenge for cause.

13   You can always use it on the peremptory, but she has said that

14   she will try to be fair, and if she can't be fair, she will

15   raise her hand, and the Court is convinced that she means that

16   when she says that.  So I'm going to deny it for cause.

17        Anything further for cause?

18             MR. ESTRADA:  No challenges for cause on behalf of the

19   government, your Honor.

20             THE COURT:  Rests with the government.

21             MR. FLIER:  May we have a moment to --

22             THE COURT:  Yeah, but he's going to go first, okay,

23   and you guys can talk about who you want at this time.

24             MR. FLIER:  Right now?

25             THE COURT:  Yeah.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Your Honor, Martin Estrada on behalf of
 2   United States.  The government asks that the Court thank and
 3   excuse Juror No. 1.
 4              THE COURT:  Juror No. 1.
 5         Twelve?
 6              MR. FLIER:  Yes, No. 12.
 7              THE COURT:  Yes, sir.
 8              MR. FLIER:  Thank you.
 9              THE COURT:  Just for everybody's sake, 13 goes into
10   1's position, so you know who's where.
11              MR. CREIGHTON:  13 goes to 1?
12              THE COURT:  Yeah, and 14 goes to 12.
13              MR. CREIGHTON:  13 goes to 1 and --
14              THE COURT:  Just so we know where they're sitting.
15              MR. CREIGHTON:  Thank you, your Honor.
16              MR. ESTRADA:  Which one goes to 12, your Honor?
17              THE COURT:  14 goes to 12.
18         Let's keep on the same number rather than where they're
19   sitting.
20              MR. CREIGHTON:  Who's in No. 1 now?
21              THE COURT:  So in the first seat is Juror No. 13, and
22   in the 12th seat is 14.
23         Peremptories back to --
24              MR. ESTRADA:  Government asks that the Court thank and
25   excuse Juror No. 2.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Juror No. 2.  So 15 goes into seat No. 2.
 2       And you get two now.
 3              MR. FLIER:  Yes.  We would like to thank and excuse
 4    No. 11.
 5              THE COURT:  Okay.
 6              MR. FLIER:  And No. 16.
 7              THE COURT:  Okay.  11 goes into -- will be excused,
 8    and 16 goes into that position, and then 16 will be excused,
 9    and 17 goes into that position.
10              MR. CREIGHTON:  17 goes to --
11              THE COURT:  11.
12              MR. CREIGHTON:  17 goes to 11.
13              MR. ESTRADA:  17 goes to 11, your Honor?
14              THE COURT:  Technically, 16 goes into 11, and they're
15    excused, and so 17 goes into 11.
16              MR. CREIGHTON:  Put them both in the same spot.
17              THE COURT:  You gotta admit this is the most fun part
18    of the trial.
19       With the government.
20              MR. ESTRADA:  Can I have a moment, your Honor?
21              THE COURT:  Sure.
22              MR. ESTRADA:  Your Honor, the government will pass at
23    this time.
24              THE COURT:  I think we talked about before, you pass,
25    you don't lose it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. FLIER:  Excuse number --

 2              THE COURT:  They're excusing 17 and 9.

 3         Okay.  We're going to -- what that leaves right now is a

 4    vacancy in 9.

 5              MR. CREIGHTON:  18.  Kicked 18?

 6              THE COURT:  They excused 17.  18 went into that

 7    position, which is --

 8              MR. CREIGHTON:  I'm sorry.  You're right.

 9              THE COURT:  And then No. 9 is excused now, so that's

10    open, and so we'll go back and go through the rest.  Okay.

11              MS. YANG:  Your Honor, just for clarification, so 13,

12    15, 3, 4, 5, 6, 7, 8, 10, 18, 14.

13         Okay.  Thank you, your Honor.

14         (In the presence of the prospective jurors:)

15              THE COURT:  Okay.  Going to ask the following

16    jurors -- again, remember what your number is.  Going to ask

17    the following jurors to stand up, if you would:  Juror No. 1,

18    Juror No. 2, Juror No. 9, Juror No. 11, 12, 16 and 17.

19         Okay.  At this time I want to thank you very much.  You're

20    going to be excused at this time.  You have to go back to the

21    juror room, unfortunately.  Wish we could keep you longer, but

22    we can't.  You're excused at this time.  Thank you very much.

23         Okay.  Juror No. 13, I'm going to have you take seat No. 1

24    back there, but remember, your number is still 13.

25              PROSPECTIVE JUROR:  13.  Got it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay?

 2         Juror No. 15, I'm going to have you take seat No. 2 back

 3    there.

 4         Juror No. 18, I'm going to have you take the 11th seat.

 5    Not 9, but 11, the second seat in there.  Perfect.

 6         And Juror No. 14, I'm going to have you take seat No. 12,

 7    right next to 11.

 8         Okay.  We're going to call the name of one, two, three,

 9    four, five, six, seven new jurors.  As you come up, the first

10    person will take seat No. 9 back there, and then the rest of

11    you will fill in these two, and then the front, in order.

12              THE CLERK:  Juror No. 19, Juror No. 20, Juror 21.

13         Then for the first seat in the first row, Juror 22.

14    Juror 23.  I'm sorry, that first seat.  Yeah, sorry.  Juror 24

15    and Juror 25.

16              THE COURT:  Okay.  Now directing my questions to those

17    seven new jurors that have just taken their seats.

18         First of all, I promised you, so I'm going to ask, have

19    you been listening carefully to all the questions we've asked

20    all the other jurors, and is there anything about you or your

21    background as far as being able to be a juror on this case that

22    you should call to our attention where your answer would be

23    different?

24         Okay.  Juror No. 22.

25              PROSPECTIVE JUROR:  I have a hearing problem.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  You have a hearing problem?

 2              PROSPECTIVE JUROR:  I don't hear that well, and I

 3    didn't catch anything --

 4              THE COURT:  Okay.  And at the next break, we'll

 5    provide you with a hearing device.

 6         Yes.

 7              PROSPECTIVE JUROR:  I don't have any difficulties, but

 8    is this where I let you know that one of my relatives is a

 9    police officer?

10              THE COURT:  Yeah, I'll tell you what.  Why don't you

11    wait, because I'm going to be asking you that question.

12         Okay.  Let me start with Juror No. -- might as well give

13    the mic back to him, Juror No. 19.

14         Can we have your occupation?

15              PROSPECTIVE JUROR:  I'm seeking employment.  My last

16    job was as a systems engineer.

17              THE COURT:  Okay.

18              PROSPECTIVE JUROR:  My wife works for a local

19    university.  She's an internal auditor.

20              THE COURT:  Okay.

21              PROSPECTIVE JUROR:  She's the one working right now.

22              THE COURT:  Okay.  I'm not going to make any comments

23    on that.  My wife would kill me if I did, so I won't.

24         What area do you live in?

25              PROSPECTIVE JUROR:  I live in Torrance.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Anything about this case -- you've
 2   heard all these facts.  You've heard all the answers of any
 3   other jurors.  Anything at all that would cause you any problem
 4   being fair and impartial to either side?
 5              PROSPECTIVE JUROR:  No.  I will be fair.
 6              THE COURT:  And you could just tell us what the
 7   evidence says whether you like it or not?
 8              PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  Okay.  Juror No. 20.
10              PROSPECTIVE JUROR:  I'm a security alarms station
11   operator at a nuclear power plant in San Luis Obispo.
12              THE COURT:  Okay.  Are they still open?
13              PROSPECTIVE JUROR:  You betcha.
14              THE COURT:  Okay.  I'm sorry, I knew there was
15   discussion about that, but --
16              PROSPECTIVE JUROR:  My wife's a nursery school
17   teacher.
18              THE COURT:  Okay.  And what area do you live in?
19              PROSPECTIVE JUROR:  San Luis Obispo County.
20              THE COURT:  I'm sorry, San Luis Obispo.  I was
21   thinking of the other --
22              PROSPECTIVE JUROR:  Grover Beach.
23              THE COURT:  Yeah, I was thinking of the other power
24   plant down there.  Where is it?  Around Dana Point or whatever.
25              PROSPECTIVE JUROR:  San Onofre.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  San Onofre, yeah.

 2       Anything about this case at all that would cause you

 3   problems hearing it?

 4              PROSPECTIVE JUROR:  No.

 5              THE COURT:  Do you think you'd be fair to both sides?

 6              PROSPECTIVE JUROR:  Yes, I would.

 7              THE COURT:  And you can limit yourself just to what

 8   the evidence says?  Whether you like it or not, you can tell us

 9   what the evidence says?

10              PROSPECTIVE JUROR:  That's correct.

11              THE COURT:  Okay.  Next juror.

12              PROSPECTIVE JUROR:  Recreation leader, league manager

13   for Torrance adult sports.

14              THE COURT:  Okay.  And anybody in the home that works

15   outside the home?

16              PROSPECTIVE JUROR:  My mother is a preschool teacher.

17              THE COURT:  Okay.  And what area do you live in?

18              PROSPECTIVE JUROR:  Torrance.

19              THE COURT:  Okay.  How about you?  Is there anything

20   about this case that would cause you any problems hearing the

21   case?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  And like I just asked the gentleman before

24   you, you could limit yourself just to the evidence you hear

25   here and decide this case whether you like the way it comes
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    down or not?  Just let the cards fall where they may?

 2            PROSPECTIVE JUROR:  Yes.

 3            THE COURT:  You can do that.  Okay.  Can you get that

 4    mic down to the first person down there?

 5        And what is your name -- excuse me, what is your

 6    occupation, please?

 7            PROSPECTIVE JUROR:  I'm retired.  I used to be an

 8    editor and writer.

 9            THE COURT:  Yeah, I used to say don't ever tell me

10    you're retired; I just get jealous.

11        The question is, what was your occupation?  Is it as an

12    editor and writer?

13            PROSPECTIVE JUROR:  Right.

14            THE COURT:  Okay.  And anybody in the home that works

15    outside the home?

16            PROSPECTIVE JUROR:  No.  My husband has a podcast.

17    He's a radio broadcaster, but he's -- it's at home, a studio.

18            THE COURT:  But that's his occupation?

19            PROSPECTIVE JUROR:  Yes.  Well, he's a medically

20    retired police officer.

21            THE COURT:  Okay.  And we'll get to that when we get

22    to police officers' testimony.

23        What area do you live in?

24            PROSPECTIVE JUROR:  Oh, East Valley.  East San

25    Fernando Valley.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Okay.  You've heard all the questions --
 2   I'm hoping you've heard most of the questions we've asked.
 3            PROSPECTIVE JUROR:  I have.
 4            THE COURT:  I know I'm a little louder than others, so
 5   you probably could hear most of what I said, but my question
 6   is, is there anything about this case, is there any reason why
 7   you feel you couldn't be fair to both sides?
 8            PROSPECTIVE JUROR:  Well, I could be fair, although my
 9   husband and I were victims of identity theft back in 2011.  Our
10   Social Security --
11            THE COURT:  And we appreciate -- that's exactly why
12   we're asking these questions.
13            PROSPECTIVE JUROR:  Yeah.
14            THE COURT:  We appreciate you letting us know that.
15   But could you still put that aside and say, "I'm going to judge
16   this case on my own, this has nothing to do with me, it may or
17   may not have happened, I'm going to tell you what the evidence
18   says"?
19            PROSPECTIVE JUROR:  I believe I could.
20            THE COURT:  Okay.  And if you had any problems, you'd
21   let us know?
22            PROSPECTIVE JUROR:  Yes.  Yes, I would.
23            THE COURT:  Okay.  Any other reason why you could not
24   be fair?
25            PROSPECTIVE JUROR:  No.  I have to admit I get a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    little bit of anxiety in a courtroom, okay.  It's just the
 2    way -- from my past.
 3              THE COURT:  Join the crowd.
 4              PROSPECTIVE JUROR:  Ooh.  Every day.  Ooh.
 5              THE COURT:  Yeah.  Yeah.  Okay.  If you start having
 6    problems, you'd let us know, right?
 7              PROSPECTIVE JUROR:  Yes.  Yes, indeed.
 8              THE COURT:  Okay.  Next juror.
 9              PROSPECTIVE JUROR:  I am a forklift operator.
10              THE COURT:  Anyone in the home that works outside the
11    home?
12              PROSPECTIVE JUROR:  I have two sisters that do.  One's
13    a vegetable seed researcher for Monsanto Corporation.
14              THE COURT:  Okay.
15              PROSPECTIVE JUROR:  The other one's a medical
16    assistant.
17              THE COURT:  Okay.  And what area do you live in?
18              PROSPECTIVE JUROR:  Guadalupe, California.
19              THE COURT:  Now, if you were the attorneys in this
20    case, what would you want to know about you, as far as being
21    fair and impartial in a case like this?  Is there anything in
22    your background that the attorneys should know about?
23              PROSPECTIVE JUROR:  Well, I was a band one sergeant
24    for McWalavee (phonetic) Police Department Explorer Program for
25    two and a half years.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Okay.

2              PROSPECTIVE JUROR:  And I helped for Santa Maria

3   Police Department and Santa Barbara's Sheriff's Department and

4   Arroyo Grande Police Department.

5              THE COURT:  With all those departments, your position

6   was as a volunteer or as a paid peace officer?

7              PROSPECTIVE JUROR:  No, I was an Explorer.

8              THE COURT:  As Explorer?

9              PROSPECTIVE JUROR:  Yeah.

10             THE COURT:  Again, you know, what happened to you and

11  what you saw out there isn't on trial today.  Can you limit

12  yourself just to the evidence in this case and not assume that

13  anything that happened to you would happen here?

14             PROSPECTIVE JUROR:  No.  Like, it won't affect me.

15             THE COURT:  It won't affect you.  Okay.  Yeah, that

16  question was probably asked poorly.  But you could leave that

17  aside and judge this case and tell us what the evidence says

18  whether you like the results or not?  You could tell us?

19             PROSPECTIVE JUROR:  Yes, sir.

20             THE COURT:  Okay.  Thank you.

21         Next.

22             PROSPECTIVE JUROR:  Good morning.  I'm retired.

23  Formerly a contract administrator --

24             THE COURT:  I told you not to say that.  Okay.

25             PROSPECTIVE JUROR:  Former contract administrator with
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   an aerospace firm.
 2           THE COURT:  Okay.
 3           PROSPECTIVE JUROR:  I live in the Long Beach area.  My
 4   spouse works in a hospital.
 5           THE COURT:  Okay.
 6           PROSPECTIVE JUROR:  And I have no reason to be biased.
 7           THE COURT:  Okay.  You feel you could be a good juror
 8   in this case?
 9           PROSPECTIVE JUROR:  Believe so.
10           THE COURT:  Okay.  Next.
11           PROSPECTIVE JUROR:  I'm unemployed right now, but when
12   I do work, it's customer service.
13           THE COURT:  Okay.
14           PROSPECTIVE JUROR:  From Alhambra, and I live alone.
15           THE COURT:  Okay.  Any reason at all why you might not
16   be a good and fair juror for both sides?
17           PROSPECTIVE JUROR:  No reason.
18           THE COURT:  And you think even if you didn't like the
19   results, if the evidence pointed one way or the other, you
20   could follow that evidence even though you didn't like the
21   result?
22           PROSPECTIVE JUROR:  Yes.
23           THE COURT:  Okay.  Let me ask some general questions
24   of you.  Getting back, we have two that have police officer
25   issues, and we'll get to your friends -- well, let me ask
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   first, anybody that has close friends or relatives that are in

2   law enforcement?  And I think we have three that do, so let me

3   talk -- anybody else other than those three?

4        Okay.  Let me talk to Juror No. 19 first.

5        Friend or relative or what?

6            PROSPECTIVE JUROR:  My nephew is a police officer, and

7   my -- let's see.  Just got married.  I guess he's my niece's

8   husband, is also a -- an officer with the Border Patrol.  Those

9   two individuals.

10           THE COURT:  Anything they may have told you about

11  their work, anything that you may have heard from them, could

12  you leave out of this trial?

13           PROSPECTIVE JUROR:  Right.  I hardly ever talk

14  about --

15           THE COURT:  Oh, okay.

16           PROSPECTIVE JUROR:  -- their work at all when we have

17  family reunion, so I don't know what they do.

18           THE COURT:  The fact that -- your relationship with

19  them, would that make you lean one way or the other in a case

20  like this, or could you be fair and right down the middle?

21           PROSPECTIVE JUROR:  It won't affect me either way.  I

22  will just base any decisions on the information presented

23  before me.

24           THE COURT:  Okay.  Good.  If you could pass that to

25  the juror right in front of you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          Okay.  Do you want to describe the relationships?

 2              PROSPECTIVE JUROR:  My husband is retired police

 3    officer and investigator.

 4              THE COURT:  From?

 5              PROSPECTIVE JUROR:  From -- he used to work in

 6    Colorado, Pennsylvania, and Boise, Idaho.

 7              THE COURT:  Not with any of the agencies we've talked

 8    about here?

 9              PROSPECTIVE JUROR:  No.

10              THE COURT:  Same thing with you.  Anything that he may

11    have done or anything that you know that he has talked about is

12    not part of this trial.  We have to try this case on its own

13    facts.  Do you think you can do that?

14              PROSPECTIVE JUROR:  Yeah, I believe I could.  It -- I

15    have to hear it first.

16              THE COURT:  Sure.  And if you had any problems doing

17    that, you could tell us?

18              PROSPECTIVE JUROR:  Yes, indeed.

19              THE COURT:  Okay.  We just don't want a juror that

20    says, "I don't care what the evidence is, this is what I'm

21    going to decide."  We want someone that will listen and tell us

22    what the evidence says.

23              PROSPECTIVE JUROR:  There's an awful lot of witnesses,

24    sounds like.

25              THE COURT:  Yeah, and they may or may not be called.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    As I said before, I asked them to list all their witnesses.
 2              PROSPECTIVE JUROR:  Okay.  I --
 3              THE COURT:  Okay.
 4              PROSPECTIVE JUROR:  I don't know about if this was
 5    part of it, but I have a son who's an attorney, and I have an
 6    uncle who was.  He's passed on.  Was a very prestigious
 7    attorney here in Los Angeles.
 8              THE COURT:  Okay.  And anything they may have said to
 9    you or any information you picked up from them, could you set
10    that aside and just follow the law that I give to you?
11              PROSPECTIVE JUROR:  Sure.
12              THE COURT:  Okay.  Next person.  I'm assuming as an
13    Explorer you knew a lot of officers?
14              PROSPECTIVE JUROR:  Yeah, I established a good
15    relationship with a lot of officers.
16              THE COURT:  Okay.  Can you leave out all those
17    experiences in this case and try this case on its own evidence?
18              PROSPECTIVE JUROR:  Yes.
19              THE COURT:  And whether it comes in with a verdict of
20    guilty or not guilty, you have no problem with it?  If that's
21    what the evidence says, you could come up with that; is that
22    correct?
23              PROSPECTIVE JUROR:  Yes, sir.
24              THE COURT:  Okay.  Can you see that affecting you at
25    all, your relationship?  Are you going to be biased or
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   prejudiced because you don't want -- you're embarrassed to tell

2   them what your verdict might be?

3           PROSPECTIVE JUROR:  No.  I'll be fine.

4           THE COURT:  Okay.

5       Okay.  Then let me ask some other questions, and these

6   were general questions I asked before.

7       Anybody, other than what we've already heard, any of the

8   seven of you that have had good experiences or bad experiences

9   that you think might prejudice you in this case, any

10  experiences you've had with police departments?

11      No?

12          PROSPECTIVE JUROR:  I have --

13          THE COURT:  You've got to answer.  You've got to let

14  me know one way or the other.  Just raise your hand, say

15  something.  Anybody?

16          PROSPECTIVE JUROR:  Yeah.

17          THE COURT:  Yes, Juror No. 20.

18          PROSPECTIVE JUROR:  Most of the security force members

19  where I work are ex-military.  There is a percentage that's

20  ex-police officers and sheriffs.  And then we are in contact on

21  a daily basis through communications checks with the sheriffs

22  and local law enforcement.

23          THE COURT:  Well, a couple of questions.  First of

24  all, can I assume -- and tell me if I'm wrong -- that you feel,

25  you know, you got good officers, you got bad officers, you have
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   to judge each one individually?  Do you agree to that?
 2              PROSPECTIVE JUROR:  I agree.
 3              THE COURT:  Okay.  And those experiences you've had
 4   and the fact that you've worked with these people, is that
 5   going to push you to decide one way or the other in a case like
 6   this?
 7              PROSPECTIVE JUROR:  No, I don't think so.
 8              THE COURT:  Okay.  So whatever the evidence said,
 9   you'd feel comfortable telling us either guilty or not guilty?
10              PROSPECTIVE JUROR:  That's correct.
11              THE COURT:  Okay.  Thank you.
12        Anybody else that's had a good experience or bad
13   experience with police?
14        Anybody that has a problem judging a police officer's
15   testimony like any other witness by the same standard?  Anyone?
16              PROSPECTIVE JUROR:  No, no problem.
17              THE COURT:  Okay.  Anybody have any -- and other than
18   those that have already talked about it, anybody have any
19   experience, training in law enforcement where you've taken
20   courses or anything like that?
21        Well, you've already talked about yours as an Explorer.
22   Did you take other courses?
23              PROSPECTIVE JUROR:  Yeah, I took -- well, in
24   Explorer Program, I took a course there as a police officer.
25              THE COURT:  Okay.  Anything you learned in that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   course, can you leave out of this case and just decide this
 2   case based on the evidence and what I tell you the law is that
 3   applies?
 4            PROSPECTIVE JUROR:  Yes, I will leave it out.
 5            THE COURT:  And Juror No. 19?
 6            PROSPECTIVE JUROR:  I forgot.  My sister works for the
 7   police department.  We never talk about her work.  And she's a
 8   computer technician, but --
 9            THE COURT:  Any one of these departments?
10            PROSPECTIVE JUROR:  -- thought I'd let you know.
11       For the -- I think it's for the Los Angeles Police
12   Department.
13            THE COURT:  What city?
14            PROSPECTIVE JUROR:  In the city of Commerce.  I forgot
15   about that, because we never talk about work, so...
16            THE COURT:  I appreciate that, but you can't see how
17   that would affect --
18            PROSPECTIVE JUROR:  No, but I wanted bring that
19   forward.
20            THE COURT:  Oh, I appreciate that.  That's what this
21   whole process is for.
22       Okay.  Let me ask you about some other areas.
23            MR. SEVERO:  Your Honor, may I take a short break?
24            THE COURT:  We're going to take a break in about two
25   minutes.  Can you last two minutes?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  I think so.

 2              THE COURT:  Okay.  I hope.

 3              MR. SEVERO:  Hopefully.

 4              THE COURT:  Okay.  Just two other areas I want to

 5    cover, then we'll come back.

 6         Informants.  Credibility of informants.  Anybody have any

 7    problem judging their testimony like anybody else?

 8              PROSPECTIVE JUROR:  No.

 9              THE COURT:  Anybody have any bias one way or the other

10    toward informants?

11              PROSPECTIVE JUROR:  No.

12              THE COURT:  Okay.  And the last one, on

13    interpretation.  Any of the seven of you speak Armenian?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  Okay.

16         Okay, you got it, Counsel.  We're going to break at this

17    time.

18         Ladies and gentlemen, you're all part of the jury at this

19    time.  I want you to be back here at 25 -- we're going to start

20    right at 11:30.  Excuse me.  1:30.  And I have to talk to you a

21    little bit about this, because starting tomorrow it's going to

22    be so rigid you can set your clock by it.  When we say start at

23    8:30, we start at 8:30, and if you walk in at 8:35, you've

24    caused us a huge amount of inconvenience, because everybody has

25    to sit around here in the jury box and wait for you to walk in.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   And besides, you don't want to be held in contempt of court

 2   anyway, but that's beside the point.  But I also will end right

 3   at the same time, and every evening we'll break right at 4:00

 4   o'clock.  I'll talk to you more about the time frame when you

 5   come back in.

 6        At this time, we're going to break now.  We're going to

 7   come back in and start up again at 1:30, but we would really

 8   like you to be here about 1:25 so we don't inconvenience

 9   anybody.

10        Don't talk to anybody outside about this case, any

11   witnesses, any spectators, anybody else.

12             THE CLERK:  All rise.

13        (Recess held from 11:51 a.m. to 1:32 p.m.)

14             THE COURT:  Okay.  The record will reflect that all

15   the members of the jury are in their respective seats in the

16   jury box, the parties are present.

17        Ladies and gentlemen, I hope you had a pleasant lunch.

18   We're ready to get back into the voir dire and maybe even start

19   the case today or hear opening statements.

20        Let me go on with the seven jurors that I've been talking

21   to.  I want to get into the area of expertise, and the question

22   I'm going to be asking is the same I asked earlier, and that

23   is, does anybody have any expertise or knowledge or

24   instructions or training in law, of the seven of you?

25             PROSPECTIVE JUROR:  No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  And let me go through the others.
 2    How about accounting or banking?
 3              PROSPECTIVE JUROR:  No.
 4              THE COURT:  How about forensic?  Firearms,
 5    fingerprints, anything along those lines?
 6              MULTIPLE PROSPECTIVE JURORS:  No.
 7              THE COURT:  Okay.  Of the seven of you, have any of
 8    you been victims of either fraud, ID theft or extortion?
 9         Okay.  Well, let me talk to Juror No. 19 first.  Can you
10    tell us about it?  Was it extortion, ID theft, or what?
11              PROSPECTIVE JUROR:  About three years ago, I had
12    identity theft.  They drained my -- some moneys from my
13    account.
14              THE COURT:  Oh, okay.
15              PROSPECTIVE JUROR:  And so that was the extent of it,
16    and --
17              THE COURT:  Can you leave that out of this case?
18              PROSPECTIVE JUROR:  Oh, yes, there's -- there's no
19    impact to my judgment.
20              THE COURT:  Okay.  Wouldn't affect you one way or the
21    other?
22              PROSPECTIVE JUROR:  That's correct.
23              THE COURT:  Okay.  Juror No. 22, I think you raised
24    your hand, also.
25              PROSPECTIVE JUROR:  In 2011, my husband and I filed a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   joint return, and our -- his Social Security number was stolen,

 2   and we didn't get our refund.

 3           THE COURT:  Is there anything about that that you'd

 4   bring into this case?

 5           PROSPECTIVE JUROR:  I don't see why, no.

 6           THE COURT:  Okay.  So you can't see that affecting you

 7   one way or the other in this case?

 8           PROSPECTIVE JUROR:  No.

 9           THE COURT:  Anybody else of the seven of you?

10       I'm even going to ask you about, has anybody of the seven

11   of you been accused of a crime of identity theft, fraud, or

12   extortion?

13           MULTIPLE PROSPECTIVE JURORS:  No.

14           THE COURT:  Okay.  How about, have any of the seven of

15   you been charged with or had any close friends or relatives

16   that have been charged with a felony within the last ten years?

17       Okay.  Number 20.  Or 19.  I'm sorry.

18           PROSPECTIVE JUROR:  I think my nephew was, within the

19   last ten years.

20           THE COURT:  Are you familiar with the facts of his

21   case?

22           PROSPECTIVE JUROR:  Related to drug usage, I believe.

23           THE COURT:  Anything at all about that that would make

24   you biased or prejudiced or lean one way or the other in this

25   case?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            PROSPECTIVE JUROR:  No.  I will -- I will have a

 2    proper judgment, yeah.

 3            THE COURT:  Okay.  I mentioned -- any of the seven of

 4    you familiar with the term "Armenian Power"?

 5            MULTIPLE PROSPECTIVE JURORS:  No.

 6            THE COURT:  Any of the seven of you have any strong

 7    feelings one way or the other about the Armenian community or

 8    culture?

 9            MULTIPLE PROSPECTIVE JURORS:  No.

10            THE COURT:  Wouldn't affect you one way or the other?

11            MULTIPLE PROSPECTIVE JURORS:  No.

12            THE COURT:  Lawsuits.  Have any of you sued or been

13    sued in the last ten years?

14        Okay.  Juror No. 22, what type of case was it?

15            PROSPECTIVE JUROR:  Must be my lucky day, right?

16        There's some kind of lawsuit that's happening right now

17    regarding my mortgage, and my son who is an attorney is

18    checking it out, and I have no idea what it's about.

19            THE COURT:  And you haven't gone to court on it or

20    anything?

21            PROSPECTIVE JUROR:  No, no, just -- no.

22            THE COURT:  So there's no way that could affect your

23    case.

24            PROSPECTIVE JUROR:  No, I guess not.  No.

25            THE COURT:  Okay.  Of the seven of you, how many have
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000104**

1    had jury duty experience?

2        Let's start with 19 first.  How many cases have you had?

3            PROSPECTIVE JUROR:  If I remember correctly, two.

4            THE COURT:  Were they civil or criminal?

5            PROSPECTIVE JUROR:  I believe there was one of each.

6            THE COURT:  Okay.  You understand there's a

7    distinction on the burden of proof?

8            PROSPECTIVE JUROR:  Yes.  Earlier --

9            THE COURT:  Civil case is a preponderance of the

10   evidence.  Criminal case, much higher standard, beyond a

11   reasonable doubt.  Do you understand that?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  And you have no problem applying the

14   reasonable doubt standard here?

15           PROSPECTIVE JUROR:  No, I don't.

16           THE COURT:  Either of those juries end in a hung jury?

17           PROSPECTIVE JUROR:  No, they didn't.

18           THE COURT:  Either of those cases involve anything

19   similar to what's alleged here?

20           PROSPECTIVE JUROR:  No, it wasn't.  Neither.

21           THE COURT:  Okay.  And nothing about those cases you'd

22   bring into this case?

23           PROSPECTIVE JUROR:  No, absolutely not.

24           THE COURT:  Okay.  Of the seven of you again, who else

25   was on jury duty?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          Okay.  Let's pass it down to the front row, I think.
 2               PROSPECTIVE JUROR:  I had one case, and I was an
 3     alternate.
 4               THE COURT:  Okay.  So you didn't deliberate?
 5               PROSPECTIVE JUROR:  No.
 6               THE COURT:  Anything about that you'd bring into this
 7     case?
 8               PROSPECTIVE JUROR:  No.
 9               THE COURT:  Okay.  And was that a case similar to
10     this?
11               PROSPECTIVE JUROR:  No.
12               THE COURT:  Okay.  And Juror No. 22, did you raise
13     your hand on that?  Okay.
14               PROSPECTIVE JUROR:  I think it was a couple years ago.
15     I was an alternate on a civil case in Glendale.
16               THE COURT:  Okay.  And nothing about that case you'd
17     bring into this case?
18               PROSPECTIVE JUROR:  No.
19               THE COURT:  Okay.  The concept that nobody's going to
20     care what you think about punishment if there is a conviction,
21     does that bother anybody?
22               MULTIPLE PROSPECTIVE JURORS:  No.
23               THE COURT:  Okay.  Can all of you handle reading
24     transcripts if they're presented to you?
25               MULTIPLE PROSPECTIVE JURORS:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  And you all understand your duty is to

 2   deliberate individually as to each defendant and as to each

 3   count --

 4              MULTIPLE PROSPECTIVE JURORS:  Yes.

 5              THE COURT:  -- separate?

 6       Okay.  You know, we've gone through this quickly, but we

 7   really haven't.  We've been at this over an hour to an hour and

 8   a half, talking to all of you.  You know where we're going.

 9   You know what the questions are.  You know what we're looking

10   for.  Each side is looking for jurors who can give them a fair

11   trial.  And so the standard question:  If you're on either

12   side, defense or prosecution, are you satisfied that people

13   like you would give you a fair trial?

14       (Multiple prospective jurors nod their heads.)

15              THE COURT:  Anybody -- okay.

16       Counsel, let me see you over at the side bench.

17       (At sidebar:)

18              THE COURT:  Pre-instructions we'll be going over -- we

19   will give you a break if you need it, but before that,

20   depending on where we are on it.

21       I'm assuming that the government is looking at, what,

22   about 45 minutes, opening statement?

23              MR. ESTRADA:  I was actually thinking around

24   20 minutes, your Honor.

25              THE COURT:  About 20 minutes.  Okay.  Well, you're
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    capped at 45 minutes.

 2         And 30 minutes for each side?

 3              UNIDENTIFIED ATTORNEY:  Much less.  Less.

 4         Each side, or you mean each one?

 5              THE COURT:  Each one.  You get an individual --

 6              UNIDENTIFIED ATTORNEY:  Yeah, I know.

 7              THE COURT:  Okay.  And then I already cautioned you,

 8    no witness today.

 9              MR. ESTRADA:  Yes.

10              UNIDENTIFIED ATTORNEY:  Yes.

11              THE COURT:  Okay.  The peremptory, I believe, is back

12    with the government.

13              MS. YANG:  Your Honor, the government would like to

14    thank and excuse Juror No. 25.  This is Elizabeth Yang on

15    behalf of the United States.

16              THE COURT:  First of all -- I'm sorry, I messed up.

17    Challenges for cause, first of all.

18              MR. ESTRADA:  None by the government, your Honor.

19              UNIDENTIFIED ATTORNEY:  None by the defense.

20              THE COURT:  Now, on peremptory challenges, it should

21    be for the first 12 only.

22              MS. YANG:  Okay.

23              THE COURT:  25's not in the first 12 yet, so why waste

24    a peremptory until you have to.

25              MR. ESTRADA:  Government passes, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Government passes.  Okay.
2        And with the defense?
3              UNIDENTIFIED ATTORNEY:  We would like to thank and
4    excuse the juror who's seated in No. 9.  I think he's No. 19.
5              THE COURT:  Granted.  And you have one more.
6        Oh, by the way, 20 goes into --
7              THE CLERK:  20 moves up.
8              THE COURT:  20 goes into --
9              UNIDENTIFIED ATTORNEY:  We'd like to thank and excuse
10   Juror No. --
11             UNIDENTIFIED ATTORNEY:  Number 10 and No. 13.
12             UNIDENTIFIED ATTORNEY:  -- number 10.
13             THE COURT:  You got 11 down there.  Who has 10?  10 is
14   still 10.  Okay.  So you want 10 out.  Okay.
15       You already did 19, so 10.  Okay.
16             MS. YANG:  10?
17             UNIDENTIFIED ATTORNEY:  We don't have --
18             THE CLERK:  21 goes in 10.
19             THE COURT:  So 21 goes into 10.  I love this game.
20             UNIDENTIFIED ATTORNEY:  21 or 24?  Oh --
21             THE COURT:  20 goes into 9.  21 goes into 10.
22       Back with the government.
23       So everybody knows, there will be one, two, three, four
24   left.  And the defense has one, two, three left.  And then you
25   have three more for each of the three.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              UNIDENTIFIED ATTORNEY:  Thank you.

 2         May we have a moment, your Honor?

 3              THE COURT:  Sure.

 4              UNIDENTIFIED ATTORNEY:  We have what?

 5              THE COURT:  You have three plus three.  They have four

 6    plus three.

 7              MS. YANG:  Your Honor, on behalf of the government,

 8    we'd like to thank and excuse Juror No. 6.

 9              THE COURT:  Juror No. 6?

10              MS. YANG:  Yes.

11              THE COURT:  Okay.  So 22 goes into 6.  So we're going

12    to go one at a time, because they have --

13              UNIDENTIFIED ATTORNEY:  Right.

14              THE COURT:  So it's with the defense.

15              UNIDENTIFIED ATTORNEY:  We're going to excuse No. 13.

16              THE COURT:  You got it.  13 is in No. 1's position.

17    Or No. 1's seat, but it's 13.

18         Okay.  Back with the government.

19              UNIDENTIFIED ATTORNEY:  Wait a minute.  He's in seat

20    No. 13.  I'm sorry.

21              THE COURT:  Oh, I'm sorry.  That's a different juror.

22              MS. YANG:  No one right now.

23              THE COURT:  No one right now, because we just moved.

24    So No. 13, so --

25              MR. FLIER:  He's in seat No. 10.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  19, excuse him.  20, come in.  This
 2   one, 10 we'll excuse, and 21 went in there.
 3              UNIDENTIFIED ATTORNEY:  Correct.
 4              THE COURT:  20 and 21 were sitting in seat 13 or 14.
 5   Okay.
 6              MR. ESTRADA:  That's, what, 10?  Okay.  I have that
 7   all wrong.
 8              THE COURT:  Okay.  Juror No. 21 is in seat No. 10.
 9   That's right.  That's what we have now.
10              UNIDENTIFIED ATTORNEY:  And I don't know -- now I
11   don't remember where 21's seated now.  Where is he seated now?
12   That's the problem.  Where is he seated now?  Looking for where
13   he's seated, and number -- chair No. 13 right now.
14              THE COURT:  The one that was in chair No. 13 is now
15   sitting in seat No. 9.
16              MR. FLIER:  What was -- what was the job or the
17   location of the person you're looking for?
18              MR. ESTRADA:  I think it's the --
19              THE COURT:  This person was --
20              MR. FLIER:  To make it easy, your Honor, we'd like to
21   excuse the person who's seated in seat No. 10 right now,
22   whatever his number is.
23              MR. ESTRADA:  We already --
24              MR. FLIER:  No, no.
25              THE COURT:  Oh, the one that's sitting there now?
```

1       MR. FLIER:  Right now.

2       THE COURT:  20's in there now.

3       MR. FLIER:  That's who we want.

4       THE COURT:  Okay.  It's a woman sitting there now.

5  There was a guy.

6       UNIDENTIFIED ATTORNEY:  I think you're referring to a

7  guy from San Onofre.

8       MR. FLIER:  That's correct.

9       THE COURT:  That's the one that you want, whatever his

10  number is, correct?

11       MR. FLIER:  He is in seat No. 1.

12       UNIDENTIFIED ATTORNEY:  Yeah, but he was 20-something.

13  He was 20-something.

14       MS. YANG:  He's not within the 12 right now.  He's

15  outside the 12.

16       MR. FLIER:  Thank you.

17       UNIDENTIFIED ATTORNEY:  I keep saying --

18       THE COURT:  If you look at them now -- tell me what

19  seat number we're talking about.

20       UNIDENTIFIED ATTORNEY:  13.

21       THE COURT:  He's in seat No. 13 right now?

22       UNIDENTIFIED ATTORNEY:  Right.  Right now, seat --

23       THE COURT:  His number's 20, and he's over here in

24  seat No. -- he's going to be moved to seat No. 9.  So you want

25  20 gone?  You want this guy --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MS. YANG:  Striking --

 2          THE COURT:  20 is being stricken.  That means that 23

 3   now is in 9's seat.

 4       So we're back with the government.

 5          MS. YANG:  Can we have one moment, your Honor?

 6          THE COURT:  Sure, give you one moment.

 7       The peremptory is with the government at this time.

 8          MS. YANG:  Yes, your Honor.  On behalf of the

 9   government, we'd like to thank and excuse Juror No. 7.

10          THE COURT:  Seven.  Okay.  So No. 24 goes into seat 7.

11       Okay.  Now, I have the government has -- correct me if I'm

12   wrong.  The government has two left?

13          MS. YANG:  Yes, your Honor.

14          THE COURT:  And the defense has two left until we get

15   to the three, three.

16          MS. YANG:  The defense actually has one left.

17          THE COURT:  Two left.

18          THE CLERK:  Two.

19          THE COURT:  Do we -- no.

20          MS. YANG:  They exercised before we went.

21          THE COURT:  They didn't exercise anybody here.

22          MS. YANG:  I thought they got rid of No. 20.

23          THE COURT:  They did?

24          THE CLERK:  He's over here.  First they said 13, but

25   they didn't mean 13.  So they've only --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              MS. YANG:  Okay.

2              THE COURT:  Okay.  Gotta love it.  Okay.  So each have

3    two left, and defendant goes first.

4              MR. SEVERO:  Defense would -- this is Severo.  The

5    defense would excuse Juror No. 18, seated in seat 11.

6              MR. ESTRADA:  Which one is being excused?

7              MR. SEVERO:  18.

8              MR. ESTRADA:  18 in seat 11?

9              MR. SEVERO:  That's right.

10             THE COURT:  25 goes there.  Okay.  25 goes there.

11             MR. SEVERO:  Right.

12             THE COURT:  And government's -- yeah.

13             MS. YANG:  Your Honor, the government would thank and

14   excuse Juror No. 25, seated in seat 11.

15             THE COURT:  Okay.  So this is what we have right now.

16   You have 13 in seat -- 15 in seat 2.  3, 4, 5.  22 in seat 6.

17   24 in seat 7.  8.  23 in seat 9.  21 in seat 10.  11 is vacant.

18             THE CLERK:  No, 11's 25.

19             THE COURT:  No, 25 was just excused.

20             UNIDENTIFIED ATTORNEY:  Right.

21             THE COURT:  And 14 is in 12.

22             UNIDENTIFIED ATTORNEY:  Right.

23             THE COURT:  Okay.

24             MR. FLIER:  Can we have a moment with this round?

25             THE COURT:  Number 11.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        I got to go back up, but what we have left is, the defense
 2   has one and the government has one, right?
 3             THE CLERK:  Yes.
 4             MS. YANG:  Yes, your Honor.
 5             THE COURT:  Yeah, one and one, and then we get into
 6   the three and three.
 7        (In the presence of the prospective jurors:)
 8             THE COURT:  Okay.  Would the following numbers please
 9   stand up:  Juror No. 7, Juror No. 19 -- remember, this is your
10   original number, not what seat you're in.  Juror No. 7, Juror
11   No. 19, Juror No. 10, Juror No. 6, Juror No. 20, Juror No. 18,
12   and Juror No. 25.
13        One, two, three, four, five, six, seven.  Okay.  At this
14   time, I want to thank you very much for your participation.
15   You've been excused, and you can go back to the jury room at
16   this time.  Thank you.
17        Okay.  Juror No. 23, I'm going to have you go back to seat
18   No. 9.
19        Juror No. 21, after he passes you, I'm going to have you
20   go to seat No. 10.
21        Juror No. 22, I'm going to have you go back to seat No. 6,
22   which is the first seat back there.
23        And Juror No. 24, I'm going to have you go right beside
24   her, in seat No. 7.
25        Okay.  If you'd call seven more names to take the empty
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    seats.  First one, if they go to seat No. 11, and then fill in

2    13, 14 in the front row.

3          THE CLERK:  Okay.  Juror No. 26, Juror No. 27, Juror

4    No. 28.  And then for the first seat in the front row, Juror

5    29.  Juror 30, 31, and 32.  Too many.

6        What's your number?

7          PROSPECTIVE JUROR:  David.  David Sanchez.

8          THE CLERK:  What was your number?

9          PROSPECTIVE JUROR:  31.

10         THE CLERK:  31.

11       What's your number?

12         PROSPECTIVE JUROR:  30.

13         THE CLERK:  No, you're 50.

14         PROSPECTIVE JUROR:  50.  My neck and head are not

15   working out well today.

16         THE CLERK:  Thank you.

17       Okay, perfect.  Thank you.

18         THE COURT:  Okay.  Ladies and gentlemen, we go through

19   the same process with the new seven jurors.

20       First of all, to the seven of you, have you been listening

21   carefully to all the questions that I've asked everybody else?

22         MULTIPLE PROSPECTIVE JURORS:  Yes.

23         THE COURT:  Okay.  And is there anything about this

24   case or anything, the questions we've asked, anything you

25   should call to our attention as far as your ability to sit and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   hear this case?

 2              MULTIPLE PROSPECTIVE JURORS:  No.

 3              THE COURT:  Okay.  You all feel you can be fair?

 4              MULTIPLE PROSPECTIVE JURORS:  Yes.

 5              THE COURT:  Okay.  Let me start with Juror No. 26.  If

 6   we can get the microphone to her.

 7              PROSPECTIVE JUROR:  Him.

 8              THE COURT:  To him.  I'm sorry.

 9        Can we have your occupation, please?

10              PROSPECTIVE JUROR:  Associate pastor.

11              THE COURT:  Okay.  And is this with what denomination?

12              PROSPECTIVE JUROR:  Assemblies of God.

13              THE COURT:  Okay.  And anybody in the home that works

14   outside the home?

15              PROSPECTIVE JUROR:  My son.

16              THE COURT:  And what type of job does he do?

17              PROSPECTIVE JUROR:  He works at a private school in

18   Anaheim as a go-fer.  Does whatever you tell him to do.

19              THE COURT:  Okay.  It's a good son.

20        What area do you live in?

21              PROSPECTIVE JUROR:  La Mirada.

22              THE COURT:  La Mirada.  Okay.

23        You've heard the questions we've been asking everybody.

24   Is there anything that you've heard so far that would cause you

25   any trouble being a fair juror to both sides?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Okay.  We'll get back for more questions

 3    later, but let me have you pass it down to Juror No. 27.

 4         Can we have your occupation, please?

 5              PROSPECTIVE JUROR:  Union sheet metal worker in the

 6    HVAC field.

 7              THE COURT:  Anyone in the home that works outside the

 8    home?

 9              PROSPECTIVE JUROR:  No.

10              THE COURT:  And what area do you live in?

11              PROSPECTIVE JUROR:  Norwalk.

12              THE COURT:  How about you?  Anything you've heard

13    about, anything about this case, all the questions I've been

14    asking, that you should bring to our attention?

15              PROSPECTIVE JUROR:  I was a victim of fraud, identity

16    theft, about two years ago.

17              THE COURT:  Okay.  Same question that I asked the

18    others:  Can you leave anything that happened to you out of

19    this case, understanding it has nothing to do with this case,

20    this is on its own facts?

21              PROSPECTIVE JUROR:  It'll be hard, but I'll try.

22              THE COURT:  Okay.  And if there's some reason why you

23    can't, you would bring it to our attention?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Okay.  You understand your case is not on
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    trial, none of the evidence on your trial has anything to do

 2    with the trial here?

 3              PROSPECTIVE JUROR:  Correct.

 4              THE COURT:  Yeah.  Okay.  Anything else?

 5              PROSPECTIVE JUROR:  No, that's it.

 6              THE COURT:  Okay.  Why don't you pass it over to Juror

 7    No. 28, please.

 8         How about you?

 9              PROSPECTIVE JUROR:  I am a landscaper.

10              THE COURT:  Okay.  And is there anyone in the home

11    that works outside the home?

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  What area do you live in?

14              PROSPECTIVE JUROR:  San Fernando Valley.

15              THE COURT:  Okay.  What is there about you we'd want

16    to know about?  Anything at all as far as you being fair and

17    impartial in a trial like this?

18              PROSPECTIVE JUROR:  No.  I will be fair.

19              THE COURT:  Okay.  You've heard the prior juror

20    bringing up stuff that we might want to know about.  Anything

21    about you we'd want to know about?

22              PROSPECTIVE JUROR:  I took the security guard course

23    to become a security guard.

24              THE COURT:  Okay.  Other than that -- well, I'll get

25    back into more questions when we talk about law enforcement
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   there.  If you can get the microphone down to the first juror

 2   in the front row.

 3       Okay.  Juror No. 29.

 4           PROSPECTIVE JUROR:  I'm a former county government

 5   employee.

 6           THE COURT:  Okay.

 7           PROSPECTIVE JUROR:  Worked in the CACEO and also in

 8   the probation department and welfare department.

 9           THE COURT:  Okay.  Anyone in the home that works

10   outside the home?

11           PROSPECTIVE JUROR:  No one.

12           THE COURT:  Okay.  And what area do you live in?

13           PROSPECTIVE JUROR:  Carson.

14           THE COURT:  Okay.  In your jobs with the government,

15   have you had much affiliation with and contact with police and

16   police officers?  I'm assuming you have if you worked in

17   probation.

18           PROSPECTIVE JUROR:  Yes, I have.

19           THE COURT:  Is there anything about that that would

20   make you feel that you would not be fair to one side or the

21   other in a case like this?

22           PROSPECTIVE JUROR:  Nothing would cause that.

23           THE COURT:  So you've seen both sides?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  Okay.  And if you were the defendant
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    sitting here being charged with a crime like that, would you be

2    satisfied that 12 people like you would give you a fair trial?

3            PROSPECTIVE JUROR:  Yes.  I'd be glad to have me.

4            THE COURT:  Pardon me?

5            PROSPECTIVE JUROR:  I'd be glad to have me if all the

6    12 were like me.

7            THE COURT:  Okay.  How about if you were prosecution?

8    Would you be --

9            PROSPECTIVE JUROR:  Prosecution should be happy too.

10   I've been on both sides.

11           THE COURT:  Okay.  So what you're telling me is that

12   you're probably the prototype of the excellent juror?

13           PROSPECTIVE JUROR:  That's right.

14           THE COURT:  Okay.  Why don't you pass that to the

15   juror next to you.

16           PROSPECTIVE JUROR:  I'm a line cook/inventory manager

17   for a catering company.

18           THE COURT:  Okay.  And anyone in the home that works

19   outside the home?

20           PROSPECTIVE JUROR:  Yeah.  I have two older brothers

21   who work in security, and my mom works in -- she's a monitor

22   technician for Glendale Adventist.

23           THE COURT:  Okay.  And, again, when you talk about

24   security, they have some contact with police departments and

25   police agencies?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              PROSPECTIVE JUROR:  My older brother is attempting to

 2    apply to become a police officer.

 3              THE COURT:  Okay.  Anything about that relationship

 4    that you think would cause you problems hearing this case?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  Okay.  You understand there's good people

 7    and bad people in every profession?

 8              PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  People you can trust, people you can't

10    trust in every profession?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  So nothing about that relationship would

13    affect you in this trial?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  And you can give us a verdict whether you

16    like the verdict or not?  If that's what the evidence said,

17    you'd follow it?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Okay.  Next juror.

20              PROSPECTIVE JUROR:  Sorry, sir.  No speak English.

21              THE COURT:  Well, you know, they clear that over with

22    jury services.  They must have felt you spoke good enough

23    English to be here.  Did they talk to you about it?

24              PROSPECTIVE JUROR:  I no understand.

25              THE COURT:  Just a second.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1    Okay.  I'm going to have you go back to jury services.

 2  Because they check that, and if they sent you over, they must

 3  have felt that you have no problem.  So I'm going to send you

 4  back to jury services at this time, and I'm going to have --

 5  and excuse you for cause at this time.

 6    Any objection to that, Counsel?

 7         MR. SEVERO:  No objection by defense.

 8         MR. ESTRADA:  No, your Honor.

 9         MR. FLIER:  No, your Honor.

10         THE COURT:  Okay.  I'm going to send you back to jury

11  service at this time.  I'm going to have Juror No. 32 take your

12  seat, and we'll bring another juror out.  So you're excused to

13  go back at this time.

14         PROSPECTIVE JUROR:  Thank you.

15         THE CLERK:  Then if I can have juror --

16         THE COURT:  He understood that.

17    Okay.

18         THE CLERK:  If I can have Juror 33 take the last seat,

19  please.

20         PROSPECTIVE JUROR:  This here?

21         THE CLERK:  Yes.  Thank you.

22         THE COURT:  Okay.  Let me talk to Juror No. 32.

23         PROSPECTIVE JUROR:  I'm a business analyst.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR:  For a utility company.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE COURT:  Okay.

 2                PROSPECTIVE JUROR:  My wife doesn't work.  I live in

 3      La Verne.

 4                THE COURT:  Don't ever say, at least when she's

 5      around, your wife doesn't work.

 6                PROSPECTIVE JUROR:  Outside of the house.

 7                THE COURT:  Oh, okay.  Just word of wisdom.

 8          Anything about this case that you think would make it hard

 9      for you to be fair to both sides?

10                PROSPECTIVE JUROR:  No, nothing.

11                THE COURT:  And you could determine this case based on

12      the evidence you hear here in court and not on anything else?

13                PROSPECTIVE JUROR:  Yes, I can.

14                THE COURT:  And you can give us a verdict whether you

15      agree with it or not if that's what the evidence leads you to?

16                PROSPECTIVE JUROR:  Yes.

17                THE COURT:  Okay.  Next juror.

18                PROSPECTIVE JUROR:  Sorry to have to tell you, but I'm

19      retired.  My wife's a teacher in South El Monte.

20                THE COURT:  Help me out.  You're retired from what?

21      What line of work did you do?

22                PROSPECTIVE JUROR:  I was in the motorcycle industry.

23                THE COURT:  Oh, okay.  Okay.

24                PROSPECTIVE JUROR:  Retail.

25                THE COURT:  And your spouse is a teacher?  Is that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    what you said?

 2              PROSPECTIVE JUROR:  Yeah.  She's a teacher in South

 3    El Monte.  My son --

 4              THE COURT:  What level does she teach at?

 5              PROSPECTIVE JUROR:  Eighth grade.

 6              THE COURT:  Eighth grade.

 7         Does she get into civics and law and things like that?

 8              PROSPECTIVE JUROR:  She's a social studies teacher, so

 9    I'm sure there's something going on with that.

10              THE COURT:  Okay.  She doesn't share any of that with

11    you?  I mean, anything that she may have told you about the

12    law, you can leave out of this case?

13              PROSPECTIVE JUROR:  Oh, I'm sure.

14              THE COURT:  Okay.  And you live in where?

15              PROSPECTIVE JUROR:  Whittier.

16              THE COURT:  Whittier.

17         You came in a little late.  You've heard the questions

18    that I've asked everybody else, and it really comes down to

19    whether or not there's anything in your background that we

20    should know about that would affect your ability to be fair and

21    impartial to both sides.

22              PROSPECTIVE JUROR:  I should have no problem with

23    that.  I do have one thing.

24              THE COURT:  Sure.

25              PROSPECTIVE JUROR:  The government had a witness named
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Angulo.

 2          THE COURT:  Yes.

 3          PROSPECTIVE JUROR:  And I do know that -- I don't know

 4   if I know that part of the family, but I do have a -- friends

 5   who have that same last name.

 6          MR. ESTRADA:  Yeah, there was a Manuel Angulo.

 7          PROSPECTIVE JUROR:  Yeah, I don't necessarily remember

 8   that name, but they live in Whittier/Pico Rivera.  So I don't

 9   know if that makes any difference at all.  I just wanted to let

10   you know.

11          MR. ESTRADA:  I think that's unlikely, your Honor,

12   given the geographic location.

13          THE COURT:  Let me ask you this.  Let's assume when

14   this witness got on the stand you say, "Yeah, somehow or

15   another they're related to the people I know.  I may not know

16   them."  Would that have any effect on you?  I mean, would you

17   hesitate to decide one way or the other on that person's

18   testimony?

19          PROSPECTIVE JUROR:  I don't believe so.

20          THE COURT:  Okay.  So if you believe that person, you

21   could tell us; if you didn't believe that person, you could

22   tell us?

23          PROSPECTIVE JUROR:  Yes, sir.

24          THE COURT:  So you can call it the way it is?

25          PROSPECTIVE JUROR:  Mm-hmm.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2         Okay.  Let me ask some general questions of everybody

 3    here.

 4         As far as police officers, anybody out of the seven of you

 5    that are related to or have close friends or relatives that are

 6    police officers?

 7         Okay.  Let's get it down to the first two jurors in the

 8    front row.

 9         Other than your work, and I know you see all kinds in your

10    work --

11              PROSPECTIVE JUROR:  Yes.  Other than the work, I have

12    a nephew who's in the DEA, and also a niece DEA, a friend,

13    county district attorney, but essentially that's it.

14              THE COURT:  Okay.  And let me ask you.  That

15    relationship or the knowledge that you've gotten from them

16    about their cases, do you have any problem putting that aside

17    and not even bringing that into this trial?

18              PROSPECTIVE JUROR:  I would have no problem

19    whatsoever.

20              THE COURT:  And you still feel that would have no

21    effect on your juror service at all?  You could be fair to both

22    sides still?

23              PROSPECTIVE JUROR:  Right.

24              THE COURT:  Okay.  Next juror.

25              PROSPECTIVE JUROR:  I have my cousin's husband, who is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    a -- I believe he's in the application process of, like,

 2    becoming a full-fledged part of the sheriff's department.

 3              THE COURT:  Okay.  Anything about that that would make

 4    you lean one way or the other in a case like this?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  And you'd be just as comfortable if you're

 7    the defendants having 12 people like you hear this case?

 8              PROSPECTIVE JUROR:  Yeah.

 9              THE COURT:  Or the prosecution?

10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  I don't know what you think of your

12    cousin, so that's why I have to ask it both ways.

13              PROSPECTIVE JUROR:  Yeah.

14              THE COURT:  Okay.  You don't see that affecting you

15    one way or the other?

16              PROSPECTIVE JUROR:  No, I do not.

17              THE COURT:  Any of the seven of you have any good or

18    bad experiences that might affect you in this trial, with

19    police officers?

20              MULTIPLE PROSPECTIVE JURORS:  No.

21              THE COURT:  Any of you have any problems judging the

22    testimony of a police officer like any other witness?

23              MULTIPLE PROSPECTIVE JURORS:  No.

24              THE COURT:  And you have no problem saying "I believe

25    them" or "not believe them," is that correct?
```

```
 1              MULTIPLE PROSPECTIVE JURORS:  Correct.

 2              THE COURT:  Have any of you had personally any

 3    training or experience in police work or police science or any

 4    training that way?  Other than Juror No. 29.

 5         I know you have to have had.

 6         Anybody else have?

 7              MULTIPLE PROSPECTIVE JURORS:  No.

 8              THE COURT:  And your training was for your work that

 9    you did.  Were you ever a member of a police department, sir?

10              PROSPECTIVE JUROR:  No, I was never a member of the

11    police department.  I trained as a probation officer, which

12    is --

13              THE COURT:  Very similar.

14              PROSPECTIVE JUROR:  -- primarily rehab.

15         Of course, I was a assistant director of one of the

16    juvenile institutions and director of another, but only in

17    those issues.  Never a police officer as such.

18              THE COURT:  Okay.  That's perfect.  Thank you.

19         There may be informants that are testifying.  Does anybody

20    have any problem judging the credibility of an informant just

21    because they're informant or -- well, let me rephrase that.

22         Will you give an informant's testimony, judge it by the

23    same standard you judge everybody else's testimony by?

24              MULTIPLE PROSPECTIVE JURORS:  Yes.

25              THE COURT:  Is there anybody that would give it more
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    weight or less weight than it's entitled to just because you

2    either like or dislike informants?

3              MULTIPLE PROSPECTIVE JURORS:  No.

4              THE COURT:  Do any of you speak Armenian?

5              MULTIPLE PROSPECTIVE JURORS:  No.

6              THE COURT:  Okay.  And are all of you comfortable with

7    the fact that you have to take the English translation of any

8    foreign language in court?

9              MULTIPLE PROSPECTIVE JURORS:  Yes.

10             THE COURT:  Any of you have any experience with law,

11   study of law, lawyer at one time, paralegal, anything like

12   that?

13             MULTIPLE PROSPECTIVE JURORS:  No.

14             THE COURT:  How about experience --

15             PROSPECTIVE JUROR:  Well, just --

16             THE COURT:  I'm sorry.  Yes?

17             PROSPECTIVE JUROR:  I certainly -- but I did attend

18   law school for two years.

19             THE COURT:  Oh, okay.  There's very little you haven't

20   done.

21             PROSPECTIVE JUROR:  At my age, there's very little you

22   haven't done.

23             THE COURT:  Let me go back to you.  Anything that you

24   remember or picked up or what you feel the law should be, can

25   you leave it out of this and just follow the law that I give
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   you?

 2            PROSPECTIVE JUROR:  Yes, your Honor, I can.

 3            THE COURT:  Okay.  That's fine.

 4        Anybody had any experience or training with accounting or

 5   banking?

 6            MULTIPLE PROSPECTIVE JURORS:  No.

 7            THE COURT:  Anybody in forensics, such as

 8   fingerprints, firearms?  Any forensic experience at all?

 9            MULTIPLE PROSPECTIVE JURORS:  No.

10            THE COURT:  Any of you been a victim of identity

11   theft, extortion or fraud?

12        Okay.  Let's start with Juror No. 26 first.

13            PROSPECTIVE JUROR:  They used my wife and I's credit

14   card.

15            THE COURT:  Okay.  Can you leave that out of this

16   trial?  It has nothing to do what that's alleged here.  Can you

17   leave that out of this trial and not be affected by that?

18            PROSPECTIVE JUROR:  Yes.

19            THE COURT:  Okay.  And that would not make you lean

20   one way or the other in a case like this?

21            PROSPECTIVE JUROR:  Correct.

22            THE COURT:  Okay.

23        Next person's that had identity theft was down here, or

24   fraud.

25            PROSPECTIVE JUROR:  Yeah, I was a victim of identity
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   theft.

 2          THE COURT:  Same question to you.  Can you leave the

 3   facts of that case out of this and judge this on its own facts?

 4          PROSPECTIVE JUROR:  Yes.

 5          THE COURT:  We talked about that before.

 6          PROSPECTIVE JUROR:  Yes.

 7          THE COURT:  And if there's any problem, you'd tell us

 8   right away?

 9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Anybody else in the back row?

11      Okay.  Front row.  We have somebody in the front row.

12          PROSPECTIVE JUROR:  I've had about probably close to

13   $300 stolen from my bank account --

14          THE COURT:  Okay.

15          PROSPECTIVE JUROR:  -- getting my card number.

16          THE COURT:  Okay.  And, again, that transaction and

17   those people have nothing to do with this case.  You understand

18   that?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  And can you leave that out and not hold

21   that against either side?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  So if you're either the defendant or the

24   plaintiff, you'd be satisfied, like the gentleman next to you,

25   that you'd be a good juror for either side?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                    PROSPECTIVE JUROR:  Yes.

2                    THE COURT:  Anybody else with identity theft or --

3       okay.

4                    PROSPECTIVE JUROR:  Of course, money was fraudulently

5       taken out of my bank account for several months.  I have a -- I

6       recovered the -- most of it, and so that would not cause me

7       to -- to be biased against --

8                    THE COURT:  Okay.  Realizing that somebody could have

9       committed a crime against you, that doesn't mean a crime was

10      committed here.

11                   PROSPECTIVE JUROR:  That's correct.

12                   THE COURT:  Okay.

13          Has anybody been accused of fraud, extortion or identity

14      theft?

15                   MULTIPLE PROSPECTIVE JURORS:  No.

16                   THE COURT:  Has anybody been accused or had any close

17      friends or relatives that have been accused of a felony within

18      the last ten years?

19                   MULTIPLE PROSPECTIVE JURORS:  No.

20                   THE COURT:  Talked to you about the term "Armenian

21      Power" coming up.  Anybody has any prenotion as to what that

22      means?

23                   MULTIPLE PROSPECTIVE JURORS:  No.

24                   THE COURT:  Anybody have any strong feelings one way

25      or the other about anybody in the Armenian community or the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Armenian culture that would affect you in hearing this case?

2              MULTIPLE PROSPECTIVE JURORS:  No.

3              THE COURT:  Anyone been sued or sued anybody in the

4    last ten years other than domestic?

5              MULTIPLE PROSPECTIVE JURORS:  No.

6              THE COURT:  Okay.  Jury duty.  How many of the seven

7    of you had jury duty?

8         Only one.  Okay, let me talk to you.

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Two.  Okay.  I suspected.

11        Juror No. 29, how many cases have you had?

12             PROSPECTIVE JUROR:  As I recall, six.

13             THE COURT:  And were they criminal or civil?

14             PROSPECTIVE JUROR:  Only one was civil.  The other

15   five were criminal.

16             THE COURT:  And you had no difficulty understanding

17   the duty between -- excuse me.  The burden of proof, criminal

18   is preponderance of the evidence.  Civil is just -- excuse me.

19   Civil is preponderance of the evidence.  Criminal is beyond a

20   reasonable doubt, much higher standard.  And this is criminal.

21   You understand that?

22             PROSPECTIVE JUROR:  That's my understanding.

23             THE COURT:  Okay.  The six cases you were on, were any

24   of them similar to this, where you might bring it into this

25   case?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1               PROSPECTIVE JUROR:  None.

 2               THE COURT:  Okay.  Were they able to reach verdicts in

 3      any of those cases?

 4               PROSPECTIVE JUROR:  Verdicts were reached in, of the

 5      criminal cases, four of the five.

 6               THE COURT:  Okay.  And in the civil case?

 7               PROSPECTIVE JUROR:  Civil case, verdict was reached.

 8               THE COURT:  Anything about any of those cases you'd

 9      bring into this case?

10               PROSPECTIVE JUROR:  No, I would bring none of that

11      into this.

12               THE COURT:  Okay.  Anybody else on jury duty?

13          Okay.  Number 32.

14               PROSPECTIVE JUROR:  I was on two cases, one criminal,

15      one civil.  Both cases we reached a verdict.

16               THE COURT:  Okay.  Anything like this?

17               PROSPECTIVE JUROR:  Nothing like this on either case.

18               THE COURT:  Okay.  And there's nothing about what

19      you've heard in those cases you'd bring in?  And you know what,

20      maybe -- and I don't mean just the facts of that case, but even

21      the law that you may have been instructed on that case.  I may

22      instruct you on law that's completely different than what they

23      said.  You've got to follow what I say for this case.  Any

24      problems with that?

25               PROSPECTIVE JUROR:  No problem.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2         Anybody have any problems with -- yes, sure.  Let's get

 3    you the mic.  Okay.

 4              PROSPECTIVE JUROR:  As far as witnesses, I know of a

 5    Grace Ferguson.  I don't know if that --

 6              THE COURT:  What's the name again?

 7              PROSPECTIVE JUROR:  Grace Ferguson.

 8              THE COURT:  Grace Ferguson?

 9              PROSPECTIVE JUROR:  That was one of the names that

10    were --

11              THE COURT:  Do you know what city that

12    Grace Ferguson --

13              PROSPECTIVE JUROR:  Live in Long Beach.

14              THE COURT:  Do you know?

15              MR. ESTRADA:  Probably not the Grace Ferguson on the

16    witness list, your Honor.

17              THE COURT:  Is that person out in Long Beach?

18              MR. ESTRADA:  Not in Long Beach, your Honor.

19              THE COURT:  Okay.  If it turns out it is the same

20    person, can you call it to our attention?  And even if it is,

21    do you know Grace Ferguson closely?

22              PROSPECTIVE JUROR:  Not closely.

23              THE COURT:  Okay.  Could you be able to judge the

24    testimony and decide if the person was not telling the truth?

25    Would that cause you any problem?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              PROSPECTIVE JUROR:  No problem.

2              THE COURT:  Okay.  Does it bother any of the seven of

3      you that we don't care what you think about punishment?

4              MULTIPLE PROSPECTIVE JURORS:  No.

5              THE COURT:  Okay.  Does it bother any of you that --

6      would reading transcripts cause anybody problems?

7              MULTIPLE PROSPECTIVE JURORS:  No.

8              THE COURT:  And you all understand that in this case

9      we have separate defendants and separate counts, and each count

10     and each defendant has to be judged on their own, separately

11     from everybody else.  You understand that?

12             MULTIPLE PROSPECTIVE JURORS:  Yes.

13             THE COURT:  Any problems with that?

14             MULTIPLE PROSPECTIVE JURORS:  No.

15             THE COURT:  Any reason at all that you can think of

16     that you would not be a good juror for either side?

17             MULTIPLE PROSPECTIVE JURORS:  No.

18             THE COURT:  Any of you?

19             MULTIPLE PROSPECTIVE JURORS:  No.

20             THE COURT:  Okay.  Counsel, can I see you over at the

21     bench.

22         (At sidebar:)

23             THE COURT:  Okay.  Government's first.

24             MR. ESTRADA:  We're first?  Your Honor, we'll pass at

25     this time.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  And defense?

 2              UNIDENTIFIED ATTORNEY:  We'll excuse No. 9, 23 seated

 3      in 9.

 4              THE COURT:  Okay.  Government?

 5              MR. ESTRADA:  Who goes into 9, your Honor?

 6              THE COURT:  Oh, I'm sorry.  27 goes into 9.  Don't

 7      want to touch it here.

 8              MR. ESTRADA:  Yeah.  Thought it was just me.

 9              THE COURT:  Okay.  27 goes into 9.

10              MR. ESTRADA:  Your Honor, I believe the government has

11      four left?

12              THE COURT:  Yeah.  And they've got three left.

13              MR. ESTRADA:  Just a moment, your Honor.

14              THE COURT:  Mm-hmm.

15              MR. ESTRADA:  Your Honor, the government would like to

16      thank and excuse Juror No. 26, sitting in seat 11.

17              THE COURT:  26 goes out, and 28 goes into 11.

18              MR. FLIER:  I can do mine.

19              UNIDENTIFIED ATTORNEY:  Are we doing the individuals?

20              THE COURT:  Yeah.

21              MR. FLIER:  This is Mr. Flier.  Thank you.  I followed

22      the rules.  I would like to thank and excuse Juror No. 22.

23              THE COURT:  Okay.  And so 29 goes into 6's seat.

24              UNIDENTIFIED ATTORNEY:  29 goes where 22 was.

25              THE COURT:  Yes, in 6's seat.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        With the government.

 2             MR. ESTRADA:  One moment, please, your Honor.

 3        Your Honor, the government will pass at this time.

 4             THE COURT:  Okay.  With the defense.

 5             UNIDENTIFIED ATTORNEY:  If I pass on my individual I

 6   don't use, if I pass on my individual --

 7             THE COURT:  You don't lose it, but going to him next.

 8             UNIDENTIFIED ATTORNEY:  All right.  I'm going to pass.

 9             MR. PEREYRA-SUAREZ:  This is Chuck Pereyra.  I'd like

10   to thank and excuse Juror No. 29.

11             MR. ESTRADA:  Does Juror No. 30 become Juror 36?

12             THE COURT:  Yes.

13        With the government.

14             MR. ESTRADA:  Your Honor, the government passes at

15   this time.

16             THE COURT:  Okay.

17             UNIDENTIFIED ATTORNEY:  I'm sorry, I lost track.  30

18   went to -- up here.

19             THE COURT:  31 here.

20             UNIDENTIFIED ATTORNEY:  And what do we have?

21             THE COURT:  Now it's up to you.  It's your peremptory.

22             UNIDENTIFIED ATTORNEY:  May I have a moment?

23             THE COURT:  Sure.

24             UNIDENTIFIED ATTORNEY:  We accept as constituted.

25             THE COURT:  Okay.  Then we have a jury.  Now -- you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    passed, and they just passed, so we have a jury now.  So these

2    are the 12.

3        Now my next question is this.  On the three alternates, I

4    think we should address the alternates first and then ask for

5    challenges rather than find out about these two, so let's find

6    out what we have to look at.

7            UNIDENTIFIED ATTORNEY:  Sure.  Thank you.

8        (*In the presence of the prospective jurors*:)

9            THE COURT:  We're going to have Juror No. 23 -- Juror

10   No. 23, if you can stand.

11       Juror No. 26 --

12           MR. CREIGHTON:  Can't hear you.

13           THE COURT:  Okay.  Juror No. 23, Juror No. 26 -- thank

14   you, by the way -- Juror No. 26, Juror No. 22, and Juror

15   No. 29, if you could stand, please.

16       One, two, three, four of you are excused and to go back to

17   the jury room.  We thank you very much for your participation,

18   and they're looking forward to seeing you back there.

19           PROSPECTIVE JUROR:  Thank you.

20           THE COURT:  Okay.  We're going to have Juror No. 30 go

21   back to seat No. 6, please.

22       We're going to have Juror No. 27 go over to seat 9,

23   please, first seat.

24       Juror No. 28, we're going to have you go over to seat 11.

25       It's kind of like the Mad Hatter's tea party.  I don't

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    know if you remember that when you were kids.

 2         At this time, let me have the 12 jurors that are in the

 3    back two rows there, if you'd please stand up and raise your

 4    hand to be sworn in as jurors.

 5       (Jurors sworn.)

 6            THE CLERK:  Thank you.  You may be seated.

 7            THE COURT:  Now we're going to need one, two -- you

 8    think you're off the hook, but you're not yet.  We have to get

 9    three alternates, so I'm going to have four more jurors called.

10         And let me move the two of you, if I can, back here.  So

11    we'll have -- sir, if you'd go over to the first one, and then

12    you go to the last one.  Okay.

13            THE CLERK:  Okay.  Juror 34, the first seat there.

14    Juror 35, Juror 36 and Juror 37.

15            THE COURT:  Okay.  The six of you, I've already talked

16    to the two of you, so the four new people that have come in,

17    have you listened to the questions we've asked all the other

18    jurors?  Is there anything you should call to our attention as

19    to whether or not you'd be a good juror on this case?  Anybody?

20            MULTIPLE PROSPECTIVE JURORS:  No.

21            THE COURT:  Okay.  Let me have your occupation,

22    Juror No. 34.

23            PROSPECTIVE JUROR:  Registered nurse.  I live in

24    Norwalk.  My wife works registered nurse, too.

25            THE COURT:  Okay.  You've heard all of the questions
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    we've asked.  You know what we're looking for.  I don't want to

2    bore you with all that.  So let me ask you, do you feel that

3    there's anything at all that you can think of that the

4    attorneys would want to know about as to whether or not you'd

5    be fair or impartial in this trial?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  You think you'd be a good juror for either

8    side?

9              PROSPECTIVE JUROR:  I think so.

10             THE COURT:  Okay.  And you could be fair to either

11   side?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Okay.  Next juror.  Juror No. 35.

14   Occupation.

15             PROSPECTIVE JUROR:  I'm a technician for a fitness

16   corporation.  I live in Oxnard.

17             THE COURT:  Okay.  Anybody that works outside the

18   home?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Same question to you.  Is there anything

21   about you or your background or experiences you had that the

22   attorneys will want to know about you that you might bring into

23   this case?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  You think you'd be a good juror for either

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    side?

 2              PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  Be as good as the 29 who just left here?

 4              PROSPECTIVE JUROR:  Oh, absolutely.  Better.

 5              THE COURT:  Better.  Okay.  Okay, thank you.

 6         Next juror.

 7              PROSPECTIVE JUROR:  I'm a customer service agent for

 8    transportation.  My daughter currently lives with me, and she

 9    works in senior housing, general services.  And I don't think

10    there'd be anything that would keep me impartial as to one

11    side.

12              THE COURT:  Be a good juror for either side?

13              PROSPECTIVE JUROR:  I would listen carefully, yes.

14              THE COURT:  Okay.  Juror No. 37.

15              PROSPECTIVE JUROR:  I am an accountant at a museum

16    here in Los Angeles.  My dad and my brother work at a

17    dealership.  And I'm from Long Beach, and I would be fair for

18    both parties.

19              THE COURT:  Okay.  Accounting experience?

20              PROSPECTIVE JUROR:  Yes.  A bachelor's in accounting,

21    and I work in accounting.

22              THE COURT:  Okay.  And I don't know if it will be an

23    issue in this case or not, but if something came up where

24    something wasn't in evidence, you can't go back on your

25    experience and say, "Well, let me tell you what it's really
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    like."  It's got to be heard in the evidence.  Can you limit

2    yourself just to the evidence in here?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay.  Let me go through some of the

5    general questions with you.

6         As far as police officers, any of you have any close

7    friends or relatives that are police officers?

8              MULTIPLE PROSPECTIVE JURORS:  No.

9              THE COURT:  No?

10        Anybody have any good experiences or bad experiences with

11   the police department or law enforcement that might cause you

12   to go one way or the other in a case like this?

13             MULTIPLE PROSPECTIVE JURORS:  No.

14             THE COURT:  Would any of you give a police officer's

15   testimony any more weight or any less weight merely because

16   they're a police officer?

17             MULTIPLE PROSPECTIVE JURORS:  No.

18             THE COURT:  Okay.  Anybody have any experience or

19   training in police work?

20             MULTIPLE PROSPECTIVE JURORS:  No.

21             THE COURT:  Nobody?

22        Informants may be testifying.  You know, informants are

23   going to have to be viewed by the same standard you do

24   everybody else.  Is anybody going to have trouble following

25   that instruction and give their testimony more weight or any

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1    less weight because you either like or dislike informants?

 2              MULTIPLE PROSPECTIVE JURORS:  No.

 3              THE COURT:  Can you all treat them like anybody else?

 4              MULTIPLE PROSPECTIVE JURORS:  Yes.

 5              THE COURT:  Okay.  Well, some of these -- you

 6    understand that you have to -- anytime a foreign language is

 7    interpreted, you have to go by the English interpretation.  You

 8    have no problem with that?  Anybody?

 9         *(Multiple prospective jurors shake their heads.)*

10              THE COURT:  Okay.  I know that we've already talked to

11    Juror No. 37.

12         Anybody have any experience or training in the field of

13    law, the four of you?

14         *(Multiple prospective jurors shake their heads.)*

15              THE COURT:  How about field of accounting or banking

16    other than that you've already mentioned?  Anybody else had any

17    experience in banking?

18         *(Multiple prospective jurors shake their heads.)*

19              THE COURT:  How about forensic chemistry or forensic

20    work as far as fingerprints go, as far as firearms, anything

21    like that?

22         *(Multiple prospective jurors shake their heads.)*

23              THE COURT:  Of the four of you, who has ever been a

24    victim of fraud or identity theft or extortion?

25              PROSPECTIVE JUROR:  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Juror No. 34.  Was this identity

 2    theft or fraud or --

 3              PROSPECTIVE JUROR:  Well, it was a -- there was -- it

 4    was twice.

 5              THE COURT:  Okay.

 6              PROSPECTIVE JUROR:  '09 and '10.

 7              THE COURT:  Okay.

 8              PROSPECTIVE JUROR:  One was a gasoline card, and

 9    another one was a credit card.

10              THE COURT:  Anything about that that would cause you

11    to not be a good juror in this case?

12              PROSPECTIVE JUROR:  No.

13         THE COURT:  You understand the facts of that case,

14    what happened to you, have nothing to do with what happened

15    here?

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  Okay.  And so you still could be fair to

18    both sides?

19              PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Anybody else here?

21       Okay.  Has anybody been accused of fraud or theft or

22    identity theft or extortion?

23       (Multiple prospective jurors shake their heads.)

24              THE COURT:  Has anybody themselves or close friends or

25    relatives suffered a conviction for a felony?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Okay.  Let me go to Juror No. 20 -- 36.

 3              PROSPECTIVE JUROR:  Yes.

 4              THE COURT:  Was it you or your friend or --

 5              PROSPECTIVE JUROR:  No, it wasn't me.  It was close

 6    family.

 7              THE COURT:  Okay.  Was that for an offense similar to

 8    this?

 9              PROSPECTIVE JUROR:  No.  It had nothing to do like

10    this.  It did have to do with weapons, but it wasn't on the

11    same thing.

12              THE COURT:  Okay.  And was that person prosecuted?

13              PROSPECTIVE JUROR:  They spent some time in jail.

14    They -- yes.

15              THE COURT:  Do you know if it went to trial or not?

16              PROSPECTIVE JUROR:  Well, yes, it did.

17              THE COURT:  Or was it just a plea or something like

18    that?

19              PROSPECTIVE JUROR:  I think it was -- actually, I

20    think it was a plea, and he was given just one year.

21              THE COURT:  Okay.  Is there anything about that

22    experience that would cause you problems hearing a case like

23    this, where you might either feel one way or the other because

24    of that experience?

25              PROSPECTIVE JUROR:  No.  I think everything's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    different.  You have to listen.
 2              THE COURT:  Yeah, it sounds to me like it's completely
 3    different than this fact situation.
 4              PROSPECTIVE JUROR:  Yeah, exactly.
 5              THE COURT:  Okay.  There is an allegation here of an
 6    ex-con with a gun, but there's no -- I don't know if yours was
 7    that type of charge, your friend's.
 8              PROSPECTIVE JUROR:  I think it was just possession.
 9              THE COURT:  Possession?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  Okay.  And the facts of that case, you
12    feel comfortable you could leave out of this case entirely?
13              PROSPECTIVE JUROR:  Oh, definitely.
14              THE COURT:  And judge this case on its own?
15              PROSPECTIVE JUROR:  Yes.
16              THE COURT:  Okay.  Anybody else?
17         Any of the four of you heard of the term "Armenian Power"?
18         (Multiple prospective jurors shake their heads.)
19              THE COURT:  Any of you have any strong feelings one
20    way or the other about the Armenian culture or community that
21    would make you lean one way or the other or have any feelings
22    in a case like this?
23         (Multiple prospective jurors shake their heads.)
24              THE COURT:  Any of you sued or been sued within the
25    last ten years?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          (Multiple prospective jurors shake their heads.)

 2               THE COURT:  Jury duty.

 3          PROSPECTIVE JUROR:  Yes.

 4               THE COURT:  Okay.  Let's talk about jury duty.

 5      Juror No. 34.

 6          PROSPECTIVE JUROR:  I served on a jury, although not

 7      in the state of California.  It was in Texas.

 8               THE COURT:  Case like this?

 9          PROSPECTIVE JUROR:  It was a civil, civil case.

10               THE COURT:  Oh, it was a civil case.  Okay.  Were they

11      able to reach a verdict?

12          PROSPECTIVE JUROR:  Yes.

13               THE COURT:  And is there anything about that case that

14      you'd bring into this case?

15          PROSPECTIVE JUROR:  No, not at all.

16               THE COURT:  Completely separate.  You can forget about

17      that case and just hear this case on its own?

18          PROSPECTIVE JUROR:  Yes.

19               THE COURT:  Okay.  Were they able to reach a verdict?

20          PROSPECTIVE JUROR:  Yes.

21               THE COURT:  Okay.  Thank you.

22      Juror No. 36.  Oh, you -- Juror No. 35.

23          PROSPECTIVE JUROR:  I had one that was a criminal, and

24      it reached a verdict.

25               THE COURT:  Was it a criminal case alleging either
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    theft or fraud or anything like this?

2              PROSPECTIVE JUROR:  It was a murder case.

3              THE COURT:  Okay.  Anything about that case you'd

4    bring into this case?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Were they able to reach a verdict?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Okay.  You do -- both of you understand

9    the obligation that the government would have to prove their

10   case by beyond a reasonable doubt, very high standard.

11       Anybody have any problem with that?

12       (Multiple prospective jurors shake their heads.)

13             THE COURT:  Somebody else had jury duty.

14             PROSPECTIVE JUROR:  I did.

15             THE COURT:  Yeah.  And how many cases?

16             PROSPECTIVE JUROR:  I was on three.  Two, I was a

17   regular juror, and then on the third I was the substitute.

18             THE COURT:  Were they criminal or civil?

19             PROSPECTIVE JUROR:  Two were criminal, and the other

20   one was -- well, I guess it would be considered -- it was a

21   domestic.

22             THE COURT:  Anything like this?

23             PROSPECTIVE JUROR:  No, nothing like this.  Totally

24   different.

25             THE COURT:  Were they able to reach a verdict?  You
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    said that they were.

 2              PROSPECTIVE JUROR:  On all three, yes.

 3              THE COURT:  Is there anything about that case you'd

 4    bring into this case?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  You have no problem with that burden of

 7    proof, civil, criminal?  Civil is very low, preponderance of

 8    the evidence.  Criminal is very high, beyond a reasonable

 9    doubt.  You have no problem with that?

10              PROSPECTIVE JUROR:  Beyond a reasonable doubt, I think

11    is --

12              THE COURT:  Well, that's what your standard would be

13    here, beyond a reasonable doubt.

14              PROSPECTIVE JUROR:  Yeah, exactly.

15              THE COURT:  Okay.  Any problem with the idea that

16    you're not going to be involved with any type of sentencing if

17    there is a conviction?

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  Nobody has any problem with that?  No?

20    Any of the four of you?

21              MULTIPLE PROSPECTIVE JURORS:  No.

22              THE COURT:  Okay.  All four of you understand that

23    each defendant has to be judged separately on their own and

24    each count on its own.  Anybody have any problem with that?

25         (Multiple prospective jurors shake their heads.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  And none of you would have any problem

2     reading testimony?

3          *(Multiple prospective jurors shake their heads.)*

4          THE COURT:  Okay.  I'm sorry.  The catchall question:

5     If you're on the defense side or if you're on the prosecution

6     side, will you be satisfied with jurors like you hearing this

7     case?

8          MULTIPLE PROSPECTIVE JURORS:  Yes.

9          THE COURT:  Okay.  Let me talk to the four of you and

10    the two here.  What we're choosing now are alternate jurors.

11    Alternate jurors, it's deceptive, because during the entire

12    case, you will be treated like every other juror.  There's no

13    distinction between the alternate jurors and the regular

14    jurors.  At time of deliberation, you may not be called to go

15    back into the jury room.  It may just be the other 12.  So you

16    have to assume the fact that you may do a lot of work and may

17    not be called on this as to what you think.

18         Any problems with that?

19         MULTIPLE PROSPECTIVE JURORS:  No.

20         THE COURT:  Second thing is, is that if you are called

21    on at any time, and even maybe during deliberation, let's

22    assume it's during deliberation, the jury would have to start

23    their whole deliberation over again if you had to take the

24    place of somebody during deliberation, because you weren't

25    there for the first part of it.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1        Are you strong enough to be able to tell the whole jury,
2   "Wait, gotta go back and review the whole thing again?"  Can
3   all of you do that?  All of you do that?
4        (Multiple prospective jurors nod their heads.)
5            THE COURT:  Okay.  Any problem with being an
6   alternate, then, any of the six of you?
7        (No response.)
8            THE COURT:  Okay.  Counsel, see you over at side
9   bench.
10       (At sidebar:)
11           THE COURT:  Each side has one.  And I don't want you
12  to worry, because it's not a cold.  It's not a cold.
13       Okay.  The first three would be the ones you'd be excusing
14  as far as cause or peremptory challenge.
15       First of all, any challenges for cause?
16           MR. FLIER:  Not by the defense.
17           MR. ESTRADA:  Not by the government, your Honor.
18           THE COURT:  Okay.  Then we're in peremptory
19  challenges.  We have one for the government and one for the
20  defense.
21       So do you have any peremptory challenge as to the first
22  three, 32, 33, 34?
23           MS. YANG:  No, your Honor.  The government would pass.
24           THE COURT:  Okay.  Pass.
25       Defense?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000153**

```
1           MR. PEREYRA-SUAREZ:  Can we talk about this?

2           THE COURT:  Yeah.  Remember, so you're not --

3           MR. PEREYRA-SUAREZ:  Just doing these three, yes.

4           THE COURT:  That's correct.  And if you did have one,

5    they'd still be able, because they passed.

6         (Defense counsel conferred privately.)

7           MR. PEREYRA-SUAREZ:  Your Honor, this is

8    Chuck Pereyra.  The defense would thank and excuse

9    Juror No. 34.

10          THE COURT:  34.  Yep.

11       Juror No. 35.  So any peremptories on 32, 33, or 35?

12          MS. YANG:  One moment, your Honor.

13          MR. ESTRADA:  Your Honor, the government would pass at

14   this time.

15          THE COURT:  Okay.  We have our alternates.

16       Now what I'm going to do is, I'm going to -- we have to

17   try the case, too.  We're going to do the -- I'm going to do

18   some pre-instructions, then take a break, and then you can come

19   back with opening statements.  And I doubt that we're going to

20   get all of the jury --

21          UNIDENTIFIED ATTORNEY:  Can we have tomorrow so I can

22   take a nap today?

23          THE COURT:  Unfortunately, once you get into the

24   trial --

25          MR. FLIER:  Are we done?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (In the presence of the prospective jurors:)
 2           THE COURT:  Okay.  Juror No. 34, you're excused at
 3   this time.  Thank you very much for being here.
 4        And I'm going to have Juror No. 32, 33, and 35 -- two,
 5   three -- and 35 stand up, please, and be sworn in.
 6        (Alternate jurors sworn.)
 7           THE COURT:  You may be seated.
 8        Okay.  Juror No. 36 and 37, you're excused at this time
 9   also to go back to the jury room.  Thank you very much for your
10   participation.
11        And ladies and gentlemen, all of you that are still out
12   there in the audience, it went a little smoother than we
13   thought, so we're not going to need you, so you're also excused
14   to go back to the jury room at this time.  Wish we could keep
15   you, but you probably don't, so thank you very much.
16        Okay.  Ladies and gentlemen, I'm going to give you some
17   pre-instructions first, and then we'll take a break, and then
18   we'll come back for opening statements after the break.  And
19   this is only going to take about five minutes for
20   pre-instructions, five or ten minutes maximum, but I'm going to
21   ask you to listen very carefully.
22        You are now the jury in this case, and I want to take a
23   few minutes to tell you something about the duties of a juror
24   and to give you some preliminary instructions.  At the end of
25   the trial, I'll give you more detailed instructions that will
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   control your deliberations.

2       When you deliberate, it'll be your duty to weigh all the

3   evidence and -- excuse me, to weigh and evaluate all the

4   evidence received in this case, and in that process to decide

5   the facts.  To those facts that you find, you will apply the

6   law that I give to you whether you agree with that law or not.

7   You must decide this case solely on the evidence and the law

8   before you and must not be influenced by any personal likes or

9   dislikes, opinions, prejudice or sympathies.

10       Please do not take anything that I may say or do during

11   this trial as to indicate what I think of the evidence or what

12   your verdict should be.  That is entirely up to you.

13       This is a criminal case brought by the United States

14   Government.  The government charges the defendants with

15   racketeering conspiracy, extortion conspiracy, extortion, bank

16   fraud, aggravated identity theft, access device fraud

17   conspiracy, and felon in possession of firearm and ammunition.

18       The charges against the defendants are contained in the

19   first superseding indictment.  The indictment simply describes

20   the charges that the government brings against the defendant.

21   The indictment is not evidence and does not prove anything.

22       Each defendant has pled not guilty to the charges in which

23   he has been named and is presumed innocent until and unless the

24   government proves that the defendants are guilty beyond a

25   reasonable doubt.  In addition, the defendant has a right to

1    remain silent and never has to prove innocence or to prove any

2    evidence.

3        Evidence you are to consider in deciding what the facts

4    are consist of -- and I talked to you about this before --

5    three things:  The sworn testimony of witnesses, the exhibits

6    which are received into evidence, and any fact to which the

7    parties agree or stipulate.

8        The following things are not evidence, and you must not

9    consider them as evidence in deciding the facts of this case.

10   Such things as statement or argument of attorneys may be very

11   worthwhile, but it's not evidence.  Questions and objections by

12   the attorneys, not evidence.  Testimony that I instruct you to

13   disregard, not evidence.  Anything that you may see or hear

14   when court is not in session, even if what you see or hear is

15   done by some -- or said by one of the parties or by one of the

16   witnesses, it's not evidence if it's not here in court under

17   oath.

18       Evidence may be either direct or circumstantial.  Direct

19   evidence is direct proof of a fact, such as the testimony by a

20   witness about what that witness personally saw, heard or did.

21   Circumstantial evidence is indirect evidence.  That is, it is

22   proof of one or more facts from which you can find another fact

23   to be true.  You are to consider both circumstantial evidence

24   and direct evidence.  Either can be used to prove any fact.

25   The law makes no distinction between the weight to be given to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    either direct or circumstantial evidence.  It is for you to

2    decide how much weight is to be given to any evidence.

3         There are rules of evidence that control what can be

4    received into evidence.  When a lawyer asks a question or

5    offers an exhibit into evidence, and the lawyer on the other

6    side thinks that it is not permitted by the rules of evidence,

7    that lawyer may object.  If I overrule the objection, the

8    question may be answered or the exhibit received.  If I sustain

9    the objection, the question cannot be answered or the exhibit

10   cannot be received.  Whenever I sustain an objection to a

11   question, you must ignore the question and not assume or guess

12   what the answer might have been.

13        Let me give you the example you've all heard:  Have you

14   stopped beating your wife?  And if I sustain that as being an

15   improper question, you can't assume that because the question

16   said -- you can't assume that he ever beat his wife.  You

17   understand that.

18        Okay.  Sometimes I may order that evidence be stricken

19   from the record or that you disregard or ignore the evidence.

20   That means that when you are deciding this case, you must not

21   consider that evidence that I told you to disregard.

22        In deciding the facts of the case, you may have to decide

23   which testimony is to be believed and which testimony not to

24   believe.  You may believe everything a witness says or part of

25   it or none of it.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    In considering the witness' testimony, you may take into

2    account the following:  Number one, the witness's opportunity

3    and the ability to see or hear or know the things testified to;

4    number two, the witness's memory; number three, the witness's

5    manner while testifying; number four, the witness's interest in

6    the outcome of the case, if any; number five, the witness's

7    bias or prejudice, if any; number six, whether other evidence

8    contradicts the witness's testimony; number seven, the

9    reasonableness of the witness's testimony in light of all the

10   other evidence; and number eight, any other factor that bears

11   on believability.

12    The weight of the evidence as to any fact does not

13   necessarily depend on the number of witnesses who have

14   testified.

15    Now I would say a few words about the conduct of jurors.

16    First, keep an open mind throughout the trial and do not

17   decide what the verdict should be until you and your fellow

18   jurors have completed your deliberations at the end of the

19   case.  It's important that you realize this.  We ask you not to

20   form any opinions until you get back in the jury room.  You may

21   say, "Well, why?  You know, that's my job, to form opinions."

22   In a jury, opinions are formed only after you have the input of

23   the other jurors.  So what we ask you to do is keep an open

24   mind.  When you go back to the jury room, listen to all the

25   other jurors, and then make your individual determination in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    your deliberations.  If you do it here, you may go back there

 2    and you may be reluctant to listen to anybody else.  You may

 3    prejudge what you think it should be.  So that's what the law

 4    says, that you keep an open mind, don't form any opinions until

 5    you get back in the jury room, and then after you've listened

 6    to everybody else, then form your opinion as to the weight of

 7    the evidence.

 8        Second, because you must decide this case based only on

 9    the evidence received in this case and on my instructions as to

10    the law that applies, you must not be exposed to any other

11    information about the case or to the issues it involves during

12    the course of the trial.  Thus, until the end of the case or

13    unless I tell you otherwise, do not communicate with anybody in

14    any way, and do not let anyone else communicate with you in any

15    way about the merits of the case or anything to do with it.

16    This includes discussing the case in person, in writing, by

17    phone, electronic means via e-mail, texting, or any Internet

18    chat room, blogs, websites, or other features.

19        I love technology.

20        This applies to communicating with your fellow jurors,

21    until I give you the case for deliberation, and it applies to

22    communicating with everyone else, including your family members

23    or employers, the media, the press, and the people involved in

24    this trial, although you may notify your family or your

25    employer that you have been seated in a jury in this case.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        And by the way, you can tell them it's going to be, you

2   know, whatever the length is, two weeks, three weeks, four

3   weeks.  You can tell your family and your employer that.  You

4   can say even to the fact that it's a criminal jury, but other

5   than that, nothing else.  Not what it's about, anything about

6   the case itself.

7        You can't discuss the case with anybody outside of your

8   other jurors during deliberation.  If you are asked or

9   approached in any way about your jury service or about anything

10  about this case, you must respond that you have been ordered

11  not to discuss the matter, and to report that contact to the

12  Court.

13       Because you will receive all the evidence and legal

14  instructions you probably may consider -- that doesn't make any

15  sense -- you properly may consider to return a verdict, do not

16  do any research such as consulting dictionaries, searching the

17  Internet or using other reference materials, and do not make

18  any investigations or in any way try to learn more about the

19  case.

20       This is important.  A lot of people will say, "Well, gee,

21  I don't know what this means, I'm going to go look in a

22  dictionary," or "I'm going to go on the Internet and find out

23  what this means."  You can't do that.  If it's not given to you

24  here in court, you can't consider it.  The problem with that

25  is, when you go out there and start investigating on your own,

1    you become an advocate one way or the other.  And that's not

2    your job.  Your job is to take the evidence and tell us what it

3    says and apply the law to it, and if you step out of that role

4    and become an advocate, we lose you as being an effective

5    juror.  So you can't do that.  You can't make independent

6    research or analysis on your own.

7        The law requires these instructions to ensure the parties

8    have a fair trial based on the same evidence that each party

9    has had an opportunity to address.  A juror who violates these

10   restrictions jeopardizes the fairness of these proceedings, and

11   a mistrial could result that would require the entire trial

12   process to start all over again.

13       If any juror is exposed to any outside information, please

14   notify the Court immediately.

15       Going to expand on one more little thing on that.  During

16   breaks, if you walk into an elevator and you say good morning

17   to someone and they don't answer you, they look straight on

18   through you like you don't exist, it's because they're also

19   under court order not to communicate with a jury, and you're on

20   court order not to communicate with any of them.

21       You may say, "Well, you know, saying hello, that doesn't

22   hurt anything."  If one side sees somebody from the other side

23   talking to one of the jurors, even if you're saying hello, it

24   doesn't sit well, and so we just want absolutely no contact or

25   communication between anybody on the outside and the jurors.

1   And if anybody does talk to you or say hello or tries to

2   discuss it, come back and tell the Court right away.  Okay?

3   Don't feel offended if they ignore you.  They're under court

4   order to ignore you.

5       Okay.  At the end of the trial, you will have to make your

6   decision based on what you recall of the evidence.  You will

7   not have a written transcript of the trial.  So I urge you to

8   pay very close attention to the testimony as it is given.  In

9   fact, if you wish, you may take notes to help you remember the

10  evidence.  If you do take notes, please keep them to yourselves

11  until you and your fellow jurors go to the jury room to decide

12  this case.  Do not let note-taking distract you from being

13  attentive.  When you leave the court for recesses, your notes

14  should be left in the courtroom.  No one will read those notes.

15      Whether or not you take notes, you should rely on your own

16  memory of the evidence.  Notes are only to assist you in your

17  memory, and you should not be overly influenced by notes or

18  those of the fellow jurors.

19      We've run into this, too, where people go back into the

20  jury room, and one person will say, "I remember it being A,"

21  and somebody says, "No, it can't be; I've got it in my notes

22  it's B."  That has no more significance than if they say, "I

23  remember it being B."  Notes are only there to help your

24  memory.  It's your memory that controls in the case.

25      The next phase of the trial will begin not now, but as

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    soon as we get back from break.  We're going to be taking a

2    break.

3         First, each side will make an opening statement if they

4    wish.  The opening statement is not evidence.  It is simply an

5    outline to help you understand what the parties expect the

6    evidence will show.  A party is not required to make an opening

7    statement, as I said.

8         The government will then present evidence, and counsel for

9    the defense may cross-examine.  Then if the defendant chooses

10   to offer any evidence, counsel for the government may

11   cross-examine.

12        After the evidence has been presented, the attorneys will

13   make their closing argument, and I will instruct you on the law

14   that applies to this case.  After that, you'll go back into the

15   jury room to deliberate.

16        So those are your opening instructions.  We'll come back

17   after a short break, and we'll go right into opening statement.

18        During each break, I'll probably forget, but if I don't

19   forget, remember the admonishment.  I'll try to say it after

20   every break -- or the beginning of every break.  Remember not

21   to discuss the case among yourselves or with anybody else or

22   form or express any opinions about the matter until you get the

23   case and you retire to the jury room.

24        With that admonishment, let's take a 15-minute break.

25   We'll come back, then go into opening statement.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1             THE CLERK:  All rise.

 2         (Recess held from 2:50 p.m. to 3:11 p.m.)

 3         (In the presence of the jury:)

 4             THE COURT:  Okay.  Two things I'd like to do before we

 5    get started.  First of all --

 6         For the record, the jury is in their respective seats in

 7    the jury box, and all the parties are present.

 8         First thing, I mentioned it earlier, but I want to make

 9    sure that everybody understands.  Starting tomorrow, you can

10    almost set your watch by it, we will start right at 8:30 every

11    day and go till 11:30.  Three-hour block.  There will be a

12    15-minute break in there for you.  11:30 to 1:00 will be lunch.

13    Come back at 1:00 o'clock, go till 4:00 o'clock.  Again have a

14    15-minute break there.

15         We do that rather than -- a lot of courts start at 9:00

16    and end at 4:30.  I don't do that, because all the jurors have

17    told me they really want to get on the freeway before 4:30.

18    And so that's why we always break at 4:00 o'clock, for the

19    convenience of the jurors.  But you can almost set your watch

20    by that.

21         You'll find out that at 8:30 -- you've gotta be here at

22    8:30.  I'm going to advise you to come in at 8:15, give

23    yourself some leeway, because there's always traffic problems,

24    because at 8:30 we've gotta start right on time.  And at 4:00

25    o'clock, counsel may be halfway through a question, I'll say,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    "Remember the question, bring it back tomorrow."  At 4:00

2    o'clock, you people will be free to do what you have to do.

3    Same thing at 11:30 and 1:00.  So we are very strict on that.

4    I just want to make sure we understand.

5        Second thing is, we're going to start the case now and go

6    into opening statements.  Keep in mind, opening statements,

7    again, it's not evidence; it's the attorneys' view of what they

8    think the evidence is going to show.  It's helpful because it

9    kind of gives you an idea as to where they're going to go so

10   you're not confused at the very beginning.  So it's very

11   important to listen to it, but it's not evidence.  That has to

12   come from the mouth of the witnesses.

13       Counsel, you ready to proceed?

14            MR. ESTRADA:  Yes, your Honor.

15            THE COURT:  Okay.  Please.

16            MR. ESTRADA:  Good afternoon, ladies and gentlemen.

17       Ladies and gentlemen, on August 20th of 2009, this

18   defendant, Mher Darbinyan, issued a call for backup.  See,

19   Darbinyan was a leader of an organized crime group known as

20   Armenian Power.

21       You're going to hear about Armenian Power during this

22   case.  You're going to learn that this group was both a street

23   gang and also a sophisticated criminal group with ties to

24   organized crime figures both in Armenia and Russia.  Most of

25   the members of Armenian Power were from Armenian descent or

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    previously from the former Soviet Union, but they were also

2    allied, because they were a street gang, with the powerful

3    prison gang known as the Mexican Mafia, a group that controls

4    almost all Hispanic street gangs within Southern California.

5         You'll hear that Armenian Power was involved in many, many

6    different types of crimes, violent crimes, things such as drug

7    crimes, illegal gambling, and, their bread and butter: fraud

8    and identity theft.  And when I say that, I simply refer to

9    stealing people's money by having their personal information:

10   dates of birth, Social Security numbers, things of that sort.

11        So on August 20th of 2009, Defendant Darbinyan was on his

12   way to confront some rivals.  He was driving to a restaurant in

13   Hollywood, California, known as the Chicken House.  And as he

14   was driving to that restaurant to confront these rivals, he and

15   another person in the car with him, another leader of

16   Armenian Power, known as Karo Yerkanyan, got on the phone and

17   started making phone calls, and they talked about intimidating

18   the rivals by filling the place with "homies," referring to

19   Armenian Power members.  They also talked about bringing guns

20   to help intimidate the rivals.

21        You're going to learn in this case, ladies and gentlemen,

22   that's exactly what Defendant Darbinyan did.  But what he

23   didn't know at the time was that officers were actually

24   listening in on his telephone calls.  They'd gotten permission

25   from the Court, through something known as a wiretap order, to

1  listen to his telephone calls, and they were investigating him.

2  So they heard when he was talking about filling the restaurant

3  with the homies and bringing guns, and they weren't about to

4  sit back and let a shootout take place, so they sent in

5  officers to investigate.

6      The first to arrive were two LAPD gang detectives.  When

7  they arrived, what they saw were a bunch of people outside the

8  restaurant, meeting in a parking lot filled with luxury cars,

9  Mercedes and Range Rovers.  When the suspects saw them, they

10  ran away, many of them into the restaurant.  The officers

11  waited for support to arrive for safety reasons.  When that

12  support arrived, they cleared out the restaurant and lined up

13  the suspects outside the restaurant, and what they found were

14  several Armenian Power members, including, as you'll see,

15  defendant Mher Darbinyan.  Also in the restaurant cleared out

16  of there was the person in the car with him, Karo Yerkanyan,

17  another leader of Armenian Power, also known as "AP".

18      After clearing the restaurant, officers, for security

19  reasons, searched the restaurant and some of the luxury cars

20  outside the restaurant, and what they found was exactly what

21  Darbinyan had talked about on the telephone:  Guns.  Lots of

22  guns, six guns total, all loaded and ready to be used.

23      Ladies and gentlemen, in this case, what you're going to

24  hear about is a long-term investigation into Armenian Power and

25  these three defendants:  Mher Darbinyan, Arman Sharopetrosian

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    and Rafael Parsadanyan.  This investigation involved over a

2    year of these wiretaps that I talked about, listening to

3    telephone calls.  It involved almost daily surveillance by the

4    FBI and other police groups watching these suspects and others.

5    It involved searches.  It involved arrests.  And through the

6    investigation, they learned about the crimes being committed by

7    the three defendants who are before you.

8         You'll hear that defendant Darbinyan, as I mentioned, a

9    leader of Armenian Power, was involved in many different types

10   of crimes, things such as extortion -- and by "extortion," I

11   simply mean threatening someone to get money from them --

12   things such as fraud and identity theft, and offenses involving

13   firearms.  And those are important, because you'll hear that

14   defendant Darbinyan had actually been convicted of a felony,

15   and because he was a felon, under the law he was not allowed to

16   possess any firearms.  But you'll hear numerous calls where he

17   repeatedly seeks to possess, obtain, and get firearms.

18        You'll hear about defendant Sharopetrosian.  Defendant

19   Sharopetrosian was actually incarcerated in state prison at the

20   time of this investigation.  He was in a state prison up at

21   Avenal, California, which is near Fresno.  And even though he

22   was incarcerated, he was able to use his power and influence to

23   obtain smuggled cell phones.  Using those smuggled cell phones,

24   he committed numerous crimes.  He discussed and agreed to have

25   drugs smuggled into prison, he discussed an extortion plot,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   trying to threaten someone to get money from them, and he

 2   talked about committing fraud and identity theft.  And in one

 3   call, you'll hear, he talks about getting information from

 4   different banks, Bank of America, Wells Fargo, other banks, and

 5   says the information he wants, the victim information he wants,

 6   is for older victims, people with dates of birth under 1930 or

 7   1935, because he believed they could be more easily victimized.

 8       You'll also hear about defendant Rafael Parsadanyan, a

 9   friend and associate of Darbinyan who helped him commit various

10   crimes, but most importantly in this case what you'll hear

11   about is his work with Darbinyan to carry out a scheme to steal

12   money from customers of the discount store 99 Cent Only Stores,

13   a scheme to steal their debit cards and their PIN numbers, to

14   steal money from their accounts.  And I'll talk a little bit

15   more about that later.

16       Because of all the evidence in this case, ladies and

17   gentlemen, it's going to be presented to you in what I'll call

18   segments, different groupings of calls and evidence.

19       The first segment you're going to hear about is a check

20   fraud scheme orchestrated by Darbinyan.  This was a scheme

21   where Darbinyan and others -- because he worked with many

22   different people, Darbinyan and others would obtain checks from

23   different people's accounts, and then they'd forge those

24   checks, forge the signatures, forge the amounts, and then

25   they'd find low-level criminals, known as "runners," to go and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    take these checks, take them to banks to cash or deposit the

2    checks, and that was how they got the money out.

3        During the scheme, officers had a wiretap, and they were

4    listening to the phone calls.  You're going to hear many phone

5    calls in which Darbinyan directs others on what to do, talks

6    about using deposit boxes, talks about how to get the money out

7    using cashier's checks, using cash.  He talks about amounts of

8    checks, talks about check numbers.

9        You're going to hear from many of the victims, the victims

10   whose information was actually stolen and taken so that money

11   could be stolen from their bank accounts, and they'll tell you

12   they did not authorize Darbinyan or any of his associates to

13   have their information.

14       You're also going to see some of those fraudulent checks.

15   Some of those checks didn't actually make it through, because

16   the bank or police stopped them.  In particular, you're going

17   to hear about one episode on January 28, 2009, where one of

18   Darbinyan's runners was actually arrested inside a Bank of

19   America branch in Glendale, California, and at the same time

20   this runner is being arrested, Darbinyan is on the phone with

21   one of his associates talking about the fact that he's going to

22   jail, the runner, and that the "army" came, the police had

23   arrived to arrest their runner.

24       The next segment you're going to hear about is calls in

25   which Darbinyan discusses his role within Armenian Power and

```
 1   his connections to other high-level criminal groups.  I
 2   mentioned that group, the Mexican Mafia, a powerful prison
 3   gang.  He's going to talk about the Mexican Mafia, and at one
 4   point he'll brag about being "validated," meaning that the
 5   prison system has recognized his connection to the Mexican
 6   Mafia.  And he talks to different associates and in fact works
 7   with a Mexican Mafia member, who you're going to hear from, in
 8   committing fraud and identity theft.
 9        You're also going to hear calls where defendant Darbinyan
10   talks about his connections to high-level organized crime
11   figures in Russia and Armenia known as thieves-in-law -- in
12   other words, a way of saying godfathers -- and he talks about
13   his connections to those individuals.  And in this segment,
14   you'll hear about that Chicken House incident in Hollywood that
15   I talked about with the six guns, and you'll hear about what
16   officers did and what they found.
17        The third segment you're going to hear about is an
18   extortion plot.  There was a plot between defendant
19   Sharopetrosian and defendant Darbinyan to steal money from a
20   person who we'll refer to as victim "M.M." or "Minas" for his
21   security.  That individual here was himself involved in
22   criminal activity, things such as fraud, Medicare fraud and
23   loan fraud.
24        Defendant Sharopetrosian, as I mentioned, was actually in
25   jail at the time, in prison, so he called Darbinyan to assist
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   him in carrying out the extortion.  Defendant Sharopetrosian
 2   believed that this M.M. or Minas owed him money.  But he wanted
 3   not just that money, he wanted interest.  And at some point,
 4   you will hear him talk about over $4,000 a day in interest.
 5   And he and Darbinyan wanted to get involved in his fraud
 6   businesses, loan fraud and Medicare fraud.
 7        You'll hear numerous calls in which defendant
 8   Sharopetrosian and defendant Darbinyan talked to this Minas in
 9   three-way calls and threatened him.  At different points, they
10   refer to skinning him.  They refer to hurting him.
11   Sharopetrosian says, "God forbid you don't bring my money."  At
12   one point, they refer to taking him away from his family.
13        In late October of 2009, ladies and gentlemen, you're
14   going to hear that something unexpected happened in that
15   extortion scheme.  This victim M.M., or Minas, he went to the
16   FBI.  This was unexpected, because this type of extortion or
17   kidnapping plot is something Armenian Power --
18             MR. SEVERO:  Objection, argumentative.
19             THE COURT:  Sustained.  Sustained.
20             MR. ESTRADA:  And you're going to hear it was
21   unexpected because, based on the officer's experience, people
22   involved in criminal activity were often targets of extortion
23   plots, and they were targets because they wouldn't go to the
24   police.
25             MR. SEVERO:  Still argument, your Honor.
```

```
 1          THE COURT:  No.  He's talking about what he
 2  anticipates they'll hear.  Overruled.
 3          MR. ESTRADA:  So in this case, it was unexpected when
 4  victim M.M. went to the FBI.
 5      When he went to the FBI, the first thing they did was,
 6  they arrested him on an outstanding warrant, and then after
 7  that, they talked to him, and he agreed to be an informant and
 8  he agreed to have all his telephone calls recorded.  And you're
 9  going to hear some of those telephone calls which
10  Sharopetrosian continues to extort victim M.M. and demand
11  money.
12      The next segment you're going to hear about is guns.  As I
13  mentioned, defendant Darbinyan had many calls discussing guns.
14  You're going to hear about two incidents where guns were
15  actually seized and obtained in this case.  The first was in
16  November of 2009.  It was at a weed shop in Hollywood,
17  California.
18      What happened is, the day before, on November 23rd, 2009,
19  there were calls.  A Hispanic gang member known as "Mugsy"
20  called Darbinyan and offered him firearms, three firearms, and
21  even described one of the firearms he was offering.  He called
22  it a snubnose without a hammer.  Darbinyan agreed to meet with
23  this Mugsy, and they met at that weed shop in Hollywood,
24  California.  And there was surveillance showing them meeting.
25      The next day, Darbinyan talked to the owner of the weed
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   shop, who's a friend of his, and talked about getting the guns

 2   out.  And Darbinyan, as you heard, had previously been

 3   convicted of a felony, didn't want those guns on him, so he

 4   sent an associate to go pick them up.

 5       Well, as you heard with this Chicken House incident,

 6   officers were listening to the calls.  When they heard these

 7   calls, they went to investigate, and they had a detective

 8   traffic-stop the associate and search for those guns, and he

 9   found the guns.  You're going to hear that he found three guns,

10   just as Darbinyan discussed, and he found that one of the guns

11   was a snubnose without a hammer, just as was said in the calls.

12       The second gun incident you're going to hear about where a

13   gun was actually seized was referring to a Beverly Hills

14   incident.  This was on December 1st of 2009.  Defendant

15   Darbinyan was caught on phone calls talking about wanting to

16   give, as a gift, a high-powered rifle known as an Omega rifle,

17   and he talks about the Omega on the telephone calls.  He wants

18   to give it as a gift to a powerful Armenian politician with

19   ties to organized crime, and that politician is at the Montage

20   Hotel in Beverly Hills.  So Darbinyan drives to that location

21   with another individual in his Mercedes with the Omega rifle.

22   Officers are listening to the calls.  They follow him to

23   Beverly Hills, and they have him stopped, and when he's

24   stopped, what they find in the truck of the Mercedes is that

25   same Omega high-powered rifle, gift-wrapped.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        The final segment you're going to hear about in this case
 2   is about that scheme I talked to you about earlier, targeting
 3   the customers of the discount store 99 Cent Only Stores.  This
 4   was a very sophisticated scheme.  What the defendants did, and
 5   it was numerous individuals, including Darbinyan and
 6   Parsadanyan, they figured out the type of point-of-sale
 7   terminal that is used by 99 Cent Only Stores.  And by
 8   point-of-sale terminal, I'm referring to that device that you
 9   see when you go to the grocery store and you slide your credit
10   card or debit card.  They figured out the specific device that
11   99 Cent Only Stores used, and they obtained those, and then
12   they installed, inside that device, skimmers, which are little
13   computer devices.  They're essentially parasites that can be
14   placed on these point-of-sale terminals, and they record debit
15   card numbers, credit card numbers, PINs.
16        They installed those in their point-of-sale terminals.
17   Then they would take their point-of-sale terminals to the
18   stores, and they'd switch out the good terminal with their
19   corrupted terminal, leaving a little mark on theirs so they
20   could find it later.  They'd leave it there for about a week or
21   ten days, while the customers who went to the discount store to
22   save money were swiping their cards and having it recorded on
23   that little skimmer.  After about a week or ten days, they'd go
24   back to the store and basically harvest those debit card
25   numbers.  They'd switch them out, take the corrupted ones back
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   and put back the good one.  And you'll actually see store

 2   surveillance video footage of these associates of Darbinyan and

 3   Parsadanyan doing the switching.  And they're very good at it,

 4   do it very quickly.

 5       Once they retrieve their corrupted terminal, they would

 6   take it, load the information on a computer, and then use that

 7   information to create counterfeit debit cards, which is

 8   something you will hear can be done.  Something called a

 9   reader-writer can be installed in the computer.  You can swipe

10   any type of card with a magnetic strip, a gift card, other type

11   of credit card, and re-encode that debit card with the PIN on

12   that other card.

13       With these stacks of counterfeit cards, they would then

14   distribute those to associates of theirs, who rounded up these

15   low-level criminals I talked to you about earlier, runners, and

16   then they'd have the runners go take those cards to various

17   ATMs throughout Southern California and steal money from the

18   customers' accounts.  They did this on a very large scale.

19       And you'll hear that even the way they stole the money

20   from the ATMs was very sophisticated.  As many of you know,

21   there is often a daily limit on how much money you can take out

22   of the ATM.  What they would do is go before midnight to take

23   out the most they could, and then use the cards after midnight,

24   to maximize the amount of money they could take.  And they

25   refer to this repeatedly in the calls.  Once they got the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   money, they distributed.  You'll hear calls in which Darbinyan

2   talks to the people who are actually going in the stores to

3   switch out the terminals, which he directs the scheme, calls

4   others and tells them to obtain runners because they're going

5   to get counterfeit credit cards.

6        Parsadanyan had a cell phone store and used that cell

7   phone store to help coordinate this fraud.  He would have the

8   cards and distribute it to those people who organized the

9   runners, and he'd also get the money back and then give it to

10  Darbinyan.  And you'll hear numerous calls between Darbinyan

11  and Parsadanyan where they talk about how many cards are being

12  used, how much money was withdrawn and how much money is

13  available.  And at one point, Parsadanyan refers to doing the

14  "day and night," referring to taking the money out before

15  midnight and after midnight.  And you'll also hear one

16  incident, on July 18th of 2009, where Parsadanyan was actually

17  caught with stolen money, the proceeds from the scheme, part of

18  the proceeds.

19        MR. FLIER:  I'm going to object, argumentative.

20        THE COURT:  Sustained.

21     Couch it in terms of what you intend to show.

22        MR. ESTRADA:  And the evidence will show that

23  Parsadanyan was caught with over $30,000.  But before he was

24  caught, you're going to hear there were telephone calls in

25  which Darbinyan talks to an associate and says I'm going to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   send "Rafo" -- Parsadanyan -- over with something, because he

 2   didn't want to take it himself.

 3        Officers heard those calls, just as they had in other

 4   instances, and they went and they did surveillance, and they

 5   saw Darbinyan and Parsadanyan meeting at the cell phone store,

 6   and then they saw Parsadanyan leave in his BMW, and they had

 7   him stopped, and officers found on him over $30,000 in cash.

 8   In order not to compromise the investigation, they allowed the

 9   money to leave and continue.  You'll hear phone calls that same

10   night where the associate of Darbinyan calls Darbinyan and

11   says, "It's a touchdown, it's a touchdown.  He was stopped, but

12   it's okay."  He had received the money.

13        Ladies and gentlemen, based on all the evidence you're

14   going to hear in this case, the defendants are charged with

15   numerous counts.  Defendant Darbinyan and defendant

16   Sharopetrosian are charged with a conspiracy to commit

17   racketeering.  And by "conspiracy," I simply mean an agreement

18   to engage in racketeering, to work with Armenian Power to

19   commit various crimes: fraud, identity theft, extortion, drug

20   trafficking, all different types of racketeering.

21        Darbinyan and Sharopetrosian are also charged with regard

22   to that extortion plot I talked to you about with regard to

23   victim M.M. or Minas.

24        Defendant Darbinyan is also charged with numerous counts

25   of bank fraud and aggravated identity theft based on that check

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    fraud scheme.

2            MR. SEVERO:  This is argument.

3            THE COURT:  No, it's not.  He's stating what the

4    charges are.

5            MR. ESTRADA:  As I said, defendant Darbinyan is

6    charged with numerous counts of bank fraud and aggravated

7    identity theft based on that check fraud scheme I told you

8    about where they'd get checks and have runners go and cash or

9    deposit the checks.  And defendant Darbinyan and defendant

10   Parsadanyan are charged with numerous counts of bank fraud and

11   aggravated identity theft for that 99 Cent Only Store scheme,

12   when they went after the customers of 99 Cent Only Stores to

13   steal their debit card numbers and their PINs.  And finally,

14   Defendant Darbinyan is also charged with two different counts

15   of being a felon in possession of a firearm based on those guns

16   I talked to you about earlier, the Hollywood guns on November

17   2009 and the Beverly Hills guns in December of 2009.

18       You're going to hear a great deal of evidence with regard

19   to these charges, as I mentioned.  You're going to hear

20   testimony from various officers who were involved in the

21   wiretaps and surveillance and stops.  You're going to hear from

22   the victims of the fraud and aggravated identity theft charges.

23       You're also going to hear from two cooperating defendants.

24   These are two individuals who were charged in this case, pled

25   guilty, and decided to cooperate.  Both of them are Hispanic

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    gang members who worked with Darbinyan in committing fraud and

2    identity theft, and they'll tell you about that fraud and

3    identity theft.  And one of them, as I mentioned, was actually

4    a Mexican Mafia member, and he'll also tell you about

5    Darbinyan's ties to the Mexican Mafia.

6        Of course, as you'll hear, every cooperator is seeking

7    some sort of benefit, but you'll see in this case that their

8    information will be corroborated by the wiretap calls, the

9    phone calls, and the other evidence.

10       The most important evidence you'll hear in this case,

11   ladies and gentlemen, is those wiretap calls, where defendants,

12   when they don't know they're being recorded, speak and say what

13   they're actually doing and admit to their criminal conduct,

14   discuss planning criminal activity, executing criminal activity

15   and carrying out criminal activity.  And you'll hear numerous

16   of those calls in this case.

17       Ladies and gentlemen, based on all that evidence, at the

18   conclusion of this trial, the government will ask you to return

19   the only verdicts that are consistent with the facts and the

20   evidence.  Those are verdicts of guilty on each and every count

21   as to defendant Darbinyan, defendant Sharopetrosian and

22   defendant Parsadanyan.

23       Thank you.

24           THE COURT:  Thank you, Counsel.

25       Counsel, do you care to make an opening statement at this

```
 1    time or reserve it?

 2              MR. SEVERO:  I will make an opening statement --

 3              THE COURT:  Please.

 4              MR. SEVERO:  -- if it please the Court --

 5              THE COURT:  Please.

 6              MR. SEVERO:  -- and counsel.

 7         Good afternoon, folks.

 8         Mher Darbinyan is proud to be Armenian.  He is -- he

 9    speaks Armenian most of the time.  He has a lot of associates,

10    people that he -- friends of his who are Armenians.  He, you

11    will discover during the course of this trial, has a number of

12    tattoos on him.  They are tattoos that reflect his Armenian

13    heritage.  Tattoos about the Armenian genocide.  Tattoos about

14    a dead relative.  The evidence will be that he has no tattoos

15    related to gangs or anything related to something called

16    "Armenian Power."

17         You saw, for example, the evidence that the government

18    expects to introduce of Karo Yerkanyan, who has an "A" and a

19    "P" on his shoulder.  You will find that the evidence will be

20    that Mr. Darbinyan, Mher, or "Mike" sometimes, has no such

21    tattoos, no gang signs, no evidence of gang affiliation.  He

22    has many Armenian contacts.  As a result, oftentimes he hangs

23    out with Armenian people.

24         What you will find in the evidence is that this so-called

25    "Armenian Power" has no particular leader, no particular
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    soldiers, no organization as such.  That's what the evidence
 2    will be.  Therefore, the idea, or that the evidence that this
 3    Armenian Power is somehow all connected and they're all working
 4    towards a common purpose, will not be able to be proved by the
 5    government.
 6         This case is about guilt by innuendo, supposition, and
 7    guesswork.  And it comes in exactly as Mr. Estrada said,
 8    through those wiretap calls.  You will hear that the wiretap
 9    calls are, in their majority, in Armenian.  You will hear the
10    calls in Armenian.  You will have to decide who are the
11    speakers, and you will have to decide whether the translation
12    that is made says what Mr. Stebbins, this gentleman seated in
13    the middle here, said they'll say.  Because the evidence will
14    be that while some conversations are going on, the notion that
15    they admit, as Mr. Estrada said in his opening, or that they
16    say something specific, is only derived from a -- an opinion by
17    this gentleman, an FBI agent, not from what you will
18    necessarily hear directly from the call.
19         The case will break out into the dates as Mr. Estrada
20    stated, and you will hear about this Chicken House incident.
21    And this Chicken House incident, there are some calls --
22    Mr. Darbinyan was at the Chicken House the day that the police
23    showed up and arrested some people for gun possession.  The
24    evidence will be that Mr. Darbinyan was not arrested for gun
25    possession, but, rather, on the police report, it lists
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Mr. Darbinyan as a witness.  So that anything that has to do

2    with the Chicken House incident will -- the evidence will be

3    that was a gathering, and there are suppositions about what

4    could have happened, none of which did, and that Mr. Darbinyan

5    was only there because it's a restaurant in the Hollywood area

6    that's frequented and owned by Darb- -- by Armenian people.

7         There are a number of other incidents, of course, that

8    we'll be talking about during the course of this trial, but

9    there -- the government intends to introduce evidence of an

10   extortion plot of this "Minas" person.  Now, you will learn

11   during the course of the trial that when Minas went to the FBI

12   on October 26 of 2009, he never once mentioned Mher Darbinyan.

13   Never said that Mr. Darbinyan had threatened him.  Never said

14   anything about Mr. Darbinyan at all.  And you will hear that

15   from the person that interviewed him, the FBI agent that

16   interviewed him.

17        The evidence of Mr. Darbinyan's conversations with

18   Mr. Sharopetrosian having to do with Minas took place in June,

19   on June 29 to July 4th.  Five days.  You'll hear the evidence

20   that Mr. -- that Minas went to the FBI in October of 2009 to

21   complain about some sort of threat made to him, but that

22   Mr. Darbinyan never talked to him between July 4th and October,

23   that when Mr. Darb- -- or, rather, Mr. Minas, "Minas," "M.M.,"

24   purportedly or presumably paid money, he never paid money

25   associated with anything that Mr. Darbinyan said to him.

1    Of course, we don't know if we're going to hear from

2  Mr. M.M.  You will hear testimony that M.M. was given money by

3  the government to move, relocate, that the government is in

4  contact with M.M., but at this stage of the case we do not know

5  if M.M. will be invited to testify and tell you what happened.

6    It is true that Mr. Darbinyan suffered a conviction in

7  2005.  The government has alleged that conviction as a basis

8  for trying to get him convicted once again, of gun possession,

9  but the evidence concerning the discovery of the three guns

10  that were being talked about, Mr. Darbinyan not once is shown

11  in surveillance, photos, or anywhere near those guns, that he

12  never possessed any such guns.

13    When we talk about this case and the enormous resources of

14  the United States Government that were brought to bear on this

15  investigation, you will hear that there were thousands of

16  telephone calls recorded, that the government was listening in

17  on these calls, but that when the government attempted to

18  conduct surveillance to try to corroborate these, they didn't

19  match.  So what the call was saying, they cannot show evidence

20  of meetings.  They cannot show Mr. Darbinyan at a 99 Cent

21  Store.  They cannot show, and this is where it's important that

22  you follow closely, the money trail going back to

23  Mr. Darbinyan.  This entire amount of fraud that they're

24  talking about, they are not able to show you in the evidence

25  the money went to Mr. Darbinyan.  Not the bank fraud, not the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   99 Cent Store fraud, not the skimming devices that Mr. Estrada

2   explained about so well.  Not one in his possession.

3       His home was searched, Mr. Darbinyan's home was searched,

4   in 2010, March.  They didn't find any false credit cards.  They

5   didn't find any guns.  They didn't find any large amounts of

6   cash.

7       Mr. Darbinyan owned a jewelry chain manufacturing business

8   and a yard for propane dispensation.  He is married.  And aside

9   from his 2005 mistake, the evidence will be that he has not,

10  cannot be shown to have been involved in any fraudulent

11  activities.

12      The evidence that I expect will be most important will be

13  those phone calls.  I guess that's the one area of agreement

14  between the defense and the government, but not for what the

15  calls -- on the government's side, not for what the calls

16  actually say, but for what the calls are intended or expected

17  to mean.  And that evidence, it'll be up to you to determine

18  what the calls mean and whether they can corroborate anything

19  that was said there.  The importance here is that the

20  surveillance at the many locations did not disclose or will not

21  disclose, did not disclose, and it will be shown that did not

22  disclose, that Mr. Darbinyan was engaged in any criminal

23  activity.

24      You will hear from the two informants.  One of them has a

25  155-page criminal history, and he -- both of them are indicted

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    in several cases, including several federal cases, and are

2    looking at a life sentence.  They decided to cooperate with the

3    government.  But curiously, you will hear that one of them,

4    Armando Moreno, who claims to be a Mexican Mafia member, also

5    cooperated in another case and never once mentioned

6    Mr. Darbinyan.  While it is true that you will be hearing from

7    informants, and the Court has instructed you as to how to view

8    that evidence, you will hear on cross-examination that they

9    have every motive to lie.

10        And at the end of this case, when all the evidence is in,

11    we are going to ask you to bring the only verdicts that are

12    really consistent with what was said and what was seen and that

13    is consistent with the fact that the money trail never leads

14    back to Mr. Darbinyan, and that verdict has to be not guilty.

15        Thank you.

16        THE COURT:  Thank you very much, Counsel.

17        Counsel, will you care to make an opening statement now,

18    or reserve?

19        MR. PEREYRA-SUAREZ:  I'm sorry, your Honor?

20        THE COURT:  Would you care to make the opening

21    statement now, or reserve it till the defense?

22        MR. PEREYRA-SUAREZ:  Your Honor, I'm going to defer

23    the opening statement on behalf of Mr. Sharopetrosian until the

24    beginning of the defense case.

25        THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. PEREYRA-SUAREZ:  Thank you.

 2              THE COURT:  Counsel, would you like to make it now, or

 3     would you like to defer till the defense case?

 4              MR. FLIER:  I'd like to make it now, your Honor.

 5              THE COURT:  Okay.  Thank you.

 6              MR. FLIER:  Thank you.

 7          Good afternoon, everybody.  Again, my name is Andrew

 8     Flier.  I'm the lawyer for Mr. Parsadanyan.

 9          In most cases, the lawyers get to participate in picking

10     the jury, but obviously, we did not, so this is the first time

11     you have the opportunity to hear from me.

12              THE COURT:  That's not exactly accurate.  Particularly

13     in federal court, it's not accurate at all.

14              MR. FLIER:  I didn't mean anything negative about

15     that.  My point is, it's the first opportunity to hear from me.

16              THE COURT:  Okay.

17              MR. FLIER:  Now, I'm the lawyer for Mr. Parsadanyan.

18     And as the Court has indicated, and I think everybody would

19     know and understand, everyone in this case has to be judged

20     separately.  Now, there is some evidence that might be

21     connecting people, but with respect to a verdict and the actual

22     evidence, everyone has to be separated.

23          With respect to my role, I am not a prosecutor, so I am

24     not here to help prove anything with respect to any of the

25     co-defendants.  I am here solely about my client.  So I'd like
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    to talk about that.

2         Number one, my client, out of everyone you're going to

3    hear about, is the only one who had a job.  My client started a

4    business in 2006, Wireless Exchange.  That's what he does.  You

5    are not going to hear that he's ever suffered any prior

6    conviction for anything.  He is a young man, almost 30 years of

7    age, who was just trying to make money.  We're in America.

8    Capitalism.

9         With respect to Mr. Darbinyan, Mher, or Mike, they are

10   friends, there's no doubt about it.  But just because, as the

11   evidence will show, that you have a friend, doesn't mean that

12   you are culpable or doing anything wrong.

13        There is no doubt in this case that the phone calls will

14   be important, so I'd like to address that issue.

15        With respect to the role of Mr. Parsadanyan, you are going

16   to hear basically -- it's basically four days.  I think it's a

17   July 4th of 2009, July 18th of 2009, August 8th of 2009, and

18   August 9th of 2009.  Those are going to be the issues about my

19   client besides the alleged incident when he is stopped by the

20   Glendale Police Department on July 18th, where, purportedly or

21   allegedly, there was currency in his vehicle.

22        With respect to the phone calls, I think co-counsel

23   mentioned a good point.  The big issue in the phone calls, as

24   they relate to my client, is going to be very clear after my

25   cross-examination and after my presentation of the defense,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   including my client, who will testify.  With respect to the

2   phone calls, you will see that there's different subject

3   matters.  It's very convoluted.  And what the government has

4   done, as the evidence will show, is they're picking and

5   choosing certain issues that they want to explore and not bring

6   up the other things that do not support their theory, as the

7   evidence will show.

8       With respect to the language on the tapes, I don't speak

9   Armenian, so we have to rely on two issues.  One, the

10  detective, as co-counsel said, and his opinion and

11  interpretations.  The second one is an Armenian translator.  I

12  think his name is Mr. Derpetrossian.  Now, that's an

13  interesting issue, as you will see, because with respect to

14  that gentleman, he's going to come in and say, "I have a job of

15  listening or reviewing what someone else did, either way, and I

16  support what we are saying these translations utter."

17      Well, what's interesting about that is, my client is

18  originally a Russian-speaking individual.  He lived in the old

19  Soviet Union.  Now it's Yerevan, Armenia.  There's been

20  separation.

21      The other issue you're going to hear about, that,

22  respectfully, I submit, is a little confusing, is the Armenian

23  language has two dialects.  One is eastern dialect, and one is

24  a western dialect.  So in this case, you're going to hear

25  Russian, potentially, western and eastern Armenian dialects.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    And with respect to those communications, you're going to see
 2    that in some aspects of the phone calls, the beginning isn't
 3    monitored.  The expressions are going to be conclusions of what
 4    they think the parties meant instead of specific language and
 5    actually what they said.
 6         So what I'm getting at, as the evidence is going to show
 7    quite clear with my client and my cross-examination, is that
 8    the reliance on these transcripts is insufficient to convict my
 9    client.
10         So what else does the government have to convict my client
11    besides maybe association with other individuals?  And you're
12    going to hear the law on that.  Guilt by association, that's
13    not a crime.  Aiding and abetting and other principles, you
14    need to encourage, actively be involved, and other issues.
15              MR. ESTRADA:  This is not an opening statement.
16              THE COURT:  Sustained.
17              MR. FLIER:  Okay.  Thank you.
18         I'd like to now discuss the July 18 stop of my client.
19         On July 18th, there are apparently some phone calls
20    between my client and then Mr. Darbinyan and some other
21    individuals.  With respect to any specific language or any type
22    of criminal conduct, absolutely none.  But when the police and
23    the FBI believe that there is a connection, what do they do?
24    They do what I hope they would do, and they do a surveillance.
25    That's great for the defense in this case, because what the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

surveillance is never going to show is my client being handed
any money by anybody.  And when the vehicle was stopped, for
whatever reason, and the police asked, "Hey, do you mind if we
search your car," my client freely and voluntarily says, "Go
ahead."  And when they find the currency, they ask him about
it, he says it's the proceeds from his business, and they let
him go with the money.

     Now, I heard Mr. Estrada state that the reason they let
him go was because they did not want to compromise the
investigation.  At first glance, that makes sense.  However, as
the evidence will show, once they stopped the car, that's all
they did.  So, in other words, think about it.  As the evidence
is going to show "We think $30,000 is illegal proceeds from the
99 Cent Store," once we see that money, although it's really
not documented and the exact amount is unclear, what happens?
"Oh, we don't want to compromise, so we're just going to let
the individuals in the car take off," and they're not going to
find out or follow what they're going to do, and then there is
the presupposition that that money somehow is turned over to
Mr. Darbinyan, from my client, without one scintilla of
evidence.

     The money in the car, as you will see, because we have
bank records -- we have the bank records from my client's
business, Bank of America, for a couple years.  More
importantly, this time period.  And you will see the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    denominations on the monthly statements.  They're very

2    consistent with each other and a young man trying to survive.

3    Now, remember about this business he's in.  He is in the

4    business of selling phones, selling phone products, selling SIM

5    cards and prepaid phone cards.  That's what he does.

6         So his relationship with Mr. Darbinyan and Mr. Darbinyan

7    himself is not criminal.  It's "I want to have people go into

8    lines, I'm going to give them money, and when there's a big

9    sale or a new big phone coming out," because there's limits on

10   what somebody like my client -- my client cannot call Verizon

11   and say "I want to order 5,000 of these phones today."  So what

12   happens, and you've seen this on the news a lot, where people

13   line around the block to get into a store, kind of like Black

14   Friday, and purchase these high-sought-after items.  We all

15   know how important cell phones are.  I'm more of an old

16   dinosaur that way, but we all know how important they are.

17        So what happens?  The government has mixed conversations

18   between --

19             MR. ESTRADA:  Your Honor, this is argumentative.

20             THE COURT:  It is argumentative.

21             MR. FLIER:  Sorry, your Honor.

22             THE COURT:  Just tell them what the evidence will

23   show.

24             MR. FLIER:  What the evidence will show is that they,

25   the government, are intertwining innocent behavior with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    whatever else they think.  We are not going to see any, based

2    on the evidence, video showing my client doing anything wrong.

3    Based on the evidence, we're not going to see any surveillance

4    of my client doing anything wrong.  There was nothing ever

5    found illegal during any search of my client.  My client is

6    never going to be seen in a bank.  My client is never going to

7    be seen at a 99 Cent Store.  My client's never going to be seen

8    with any alleged runner.  My client never confessed.

9        Mr. Parsadanyan does not have great wealth.  He's not

10   driving around in 25 Rolls Royces.  The government has the

11   ability, as the evidence will show, to follow the money trail.

12   Well, my client doesn't have much money.

13       What scares me is, the evidence is going to show, as we

14   heard in the beginning of Mr. Estrada's statement -- and I'm

15   almost done.  We started off about a racketeering charge, then

16   we went into extortion charges, then we heard about gun issues,

17   and then we heard about a 99 Cent Store.  The first three

18   topics that were brought up by the --

19           MR. ESTRADA:  Objection, your Honor, argumentative.

20           THE COURT:  Sustained.

21           MR. FLIER:  The evidence will show that the first

22   three topics brought up by the government have nothing to with

23   my client.

24           MR. ESTRADA:  Your Honor, I hate to object, but this

25   is argument, not opening statement.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          THE COURT:  Sustained.

2          MR. FLIER:  Thank you.

3      It is the defense of Mr. Parsadanyan that the evidence

4  will be incomplete.  In addition, as I briefly stated, when we

5  analyze any alleged conversation that deals with my client, I

6  think -- and I don't want to minimize it or anything, but I

7  think there's about eight or nine, I would estimate, as the

8  evidence will show, the total length of those calls is around

9  four minutes.  And when you break down the four minutes, the

10 evidence will show it's probably around 40 seconds of what the

11 government believes is incriminating evidence.  And lastly, any

12 of that 40 seconds will have a reasonable interpretation, and

13 that reasonable interpretation is this, and here's how I'm

14 going to close:  Sometimes when the fishermen throw the net

15 into the water to catch tuna, they catch a dolphin.  My

16 client's the dolphin.

17     Thank you.

18          THE COURT:  Thank you very much, Counsel.

19     Okay.  Ladies and gentlemen, you've heard opening

20 statement.  As I said before, it's not evidence; it's what they

21 expect the evidence will show.  Tomorrow morning we'll start

22 with the testimony of witnesses.

23     You saw that we went a little over 4:00 today, and that's

24 because this is the first day and we don't have those time

25 frames.  Starting tomorrow, at 4:00 o'clock, we're out of here,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  even if it's in the middle of a question.  8:30 we start, no
 2  matter what.
 3      Also should tell you, we always will be -- Tuesday,
 4  Wednesday, Thursday and Friday, always in session.  Monday,
 5  depending.  Sometimes we are, sometimes we aren't.  This Monday
 6  we will be in session for only the afternoon, so you can make
 7  plans for Monday morning if you wish.  Some other Mondays, we
 8  may or may not have to miss an afternoon or a whole day.  But
 9  Tuesday, Wednesday, Thursday, Friday, you can plan on us being
10  here every single Tuesday, Wednesday, Thursday, Friday, unless
11  it's a court holiday.
12      Okay.  With that, I want to admonish you again not to
13  discuss the case among yourselves or with anybody else or form
14  or expression any opinions about the matter until it's
15  submitted to you and you retire to the jury room.
16      We'll see you back here tomorrow at what time?
17          MULTIPLE JURORS:  8:30.
18          THE COURT:  Anybody else have another one?
19          JUROR:  8:15.
20          THE COURT:  8:15.  Somebody was listening.
21      See you back at 8:15.  We'll start right at 8:30.
22          THE CLERK:  All rise.
23      Court is in recess.
24              (Proceedings adjourned at 4:07 p.m.)
25                      --oOo--
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1

2                              _CERTIFICATE_

3

4        I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported proceedings

7    held in the above-entitled matter and that the transcript page

8    format is in conformance with the regulations of the

9    Judicial Conference of the United States.

10

11   Date:  MARCH 4, 2015

12

13

14

15              _/S/ SANDRA MACNEIL_

16             Sandra MacNeil, CSR No. 9013

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3     HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4     - - - -

5

6

7     UNITED STATES OF AMERICA,        )
                                        )
                PLAINTIFF,              )
8                                       )
          vs.                           )    No. CR 11-00072(A)-RGK
9                                       )
      (1)  MHER DARBINYAN,              )
10    (4)  ARMAN SHAROPETROSIAN,        )
      (35) RAFAEL PARSADANYAN,          )
11                                      )
                DEFENDANTS.             )
12    _____ )

13

14             REPORTER'S TRANSCRIPT OF JURY TRIAL

15                          DAY 2

16                     PAGES 1 – 275

17             WEDNESDAY, MARCH 26, 2014

18                       8:34 A.M.

19             LOS ANGELES, CALIFORNIA

20

21

22    _____

23             *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
               *Official Reporter, U.S. District Court*
24                   *255 East Temple Street*
                     *Los Angeles, CA  90012*
25                       *213.894.5949*

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477

 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579

 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                         I N D E X

2

3    GOVERNMENT'S WITNESSES:                        PAGE

4    ALLEN DERPETROSSIAN
       DIRECT EXAMINATION BY MR. ESTRADA              6
5      CROSS-EXAMINATION BY MR. SEVERO               20
       CROSS-EXAMINATION BY MR. FLIER                31
6      REDIRECT EXAMINATION BY MR. ESTRADA           65
       RECROSS-EXAMINATION BY MR. SEVERO             73
7      RECROSS-EXAMINATION BY MR. FLIER              80

8    JEREMY STEBBINS
       DIRECT EXAMINATION BY MR. ESTRADA             87
9      CROSS-EXAMINATION BY MR. SEVERO              181
       CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ      194
10     RECROSS-EXAMINATION BY MR. FLIER             195

11   JOSEPH ALLEN
       DIRECT EXAMINATION BY MR. ESTRADA           218
12     CROSS-EXAMINATION BY MR. SEVERO             231
       CROSS-EXAMINATION BY MR. FLIER              233
13
     MANUEL ANGULO
14     DIRECT EXAMINATION BY MS. YANG              234
       CROSS-EXAMINATION BY MR. SEVERO             246
15     CROSS-EXAMINATION BY MR. FLIER              255
       REDIRECT EXAMINATION BY MS. YANG            260
16     RECROSS-EXAMINATION BY MR. SEVERO           261

17   YEGHISHE ZAKUNTS
       DIRECT EXAMINATION BY MR. CREIGHTON         262
18     CROSS-EXAMINATION BY MR. SEVERO             268
       CROSS-EXAMINATION BY MR. FLIER              269
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                          E X H I B I T S

2           GOVERNMENT'S                      GOVERNMENT'S

3        NUMBER        ADMITTED            NUMBER           ADMITTED

4        1                115           114A                  17

5        5 through 81     116           116A through 121A     17

6        14A              17            123A                  17

7        15A              17            125A through 181A     17

8        19A              17            203                  133

9        20A              17            201 through 236      142

10       21A              17            241                  125

11       27A              17            243                  132

12       31A              17            244                  129

13       32A              17            245                  138

14       39A through 46A  17            252                  169

15       48A              17            271                  223

16       49A              17            272                  228

17       51A through 63A  17            275                  177

18       65A through 110A 17            294A                  19

19                                      295A                  19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 26, 2014

 2                          8:34 A.M.

 3                          – – – –

 4     (In the presence of the jury:)

 5          THE COURT:  Okay.  The record will reflect that all

 6     the members of the jury are in their respective seats in the

 7     jury box, including the alternates.

 8          Ladies and gentlemen, I've gotta compliment you.  First

 9     day, you're right on time.  Nobody was late.  What time did you

10     come in, 8:30 or 8:15?

11          JUROR:  8:15.

12          THE COURT:  You guys are good.  I've gotta compliment

13     you.  You ready to get started?

14        Okay.  Counsel, do you wish to call your first witness?

15          MR. ESTRADA:  Yes, your Honor.  The government calls

16     Alen Derpetrossian.

17        Before that, since we're beginning with the evidence, the

18     government would move to exclude witnesses at this time.

19          THE COURT:  Okay.  If there's any witnesses that will

20     be testifying other than the parties, they're to remain outside

21     the courtroom until you're called in.  Okay.

22          THE CLERK:  Good morning.  Right here to be sworn,

23     please.

24     (Witness sworn.)

25          THE CLERK:  Thank you.  You may be seated.  You can
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    adjust the microphone if you need to.
 2         May I please ask that you state and spell your name for
 3    the record.
 4              THE WITNESS:  My name is Alen Derpetrossian, A-l-e-n,
 5    D-e-r-p-e-t-r-o-s-s-i-a-n.
 6              THE CLERK:  Thank you.
 7              THE COURT:  Okay.  You may inquire, Counsel.
 8              MR. ESTRADA:  Thank you, your Honor.
 9                ALEN DERPETROSSIAN, GOVERNMENT'S WITNESS,
10                          DIRECT EXAMINATION
11    BY MR. ESTRADA:
12    Q.   Sir, where do you work?
13    A.   I have two jobs, two main jobs.  What I do in the morning
14    is my main job.  I work for the L.A. Superior Court as a court
15    interpreter in Armenian.  I'm certified in Eastern Armenian as
16    a court interpreter.  And on a part-time basis, on a contract
17    basis, I work for the FBI as a translator.  I work evenings,
18    sometimes weekends, sometimes other hours, so as a part-time
19    translator for FBI.
20    Q.   I want to talk to you about your day job.  You said you're
21    an interpreter for the courts.  Could you explain to the jury
22    what that means?  What do you do on a daily basis?
23    A.   Well, I work for the -- mostly the criminal court system,
24    L.A. Superior Court.  I work for -- I work in various
25    courthouses.  I interpret for defendants, witnesses who needs
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000203**

```
 1   interpreting services who are not fluent in English.  I
 2   interpret from Eastern Armenian to English and from English to
 3   Armenian for them.  So I've done trials.  I've done short and
 4   long proceedings.  I've been working for approximately 20
 5   years.  And besides that, I've also worked in civil assignments
 6   such as depositions, insurance statements, medical
 7   appointments, and other -- various other civil assignments.
 8   Q.   So when you interpret for an individual in the court
 9   system, that would be in some cases an individual defendant who
10   you'd interpret from English into Eastern Armenian?
11   A.   Yes.
12   Q.   Now, can you describe for the jury what Eastern Armenian
13   is.
14   A.   Eastern Armenian, Armenian language, due to its unique
15   history and geography, has two dialects, the eastern and
16   western.  Eastern Armenian is -- is one branch of the Armenian
17   language.
18   Q.   Are you fluent in Eastern Armenian?
19   A.   Yes.
20   Q.   Are you also fluent in English?
21   A.   Yes.
22   Q.   How long have you worked as an interpreter in the
23   Eastern Armenian language?
24   A.   Over 20 years.
25   Q.   Now, you mentioned that your day job is with the superior
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    court?

2    A.    Yes.

3    Q.    Have you also worked in the U.S. District Court?

4    A.    Yes.  I worked in this courthouse, I worked in the

5    courthouse next door, and I also worked in the Orange County

6    courthouse.  I've done maybe two or three trials and numerous

7    other proceedings.  I worked until 2009 when I joined FBI.

8    Then after that, I stopped.

9    Q.    Now, you mentioned you're certified.  Are you certified by

10   a particular group in Eastern Armenian?

11   A.    Judicial Council of California is the entity that

12   certifies interpreters.  They administer the test.  And we also

13   need to take continuing education classes every year.  We have

14   to renew -- renew our certification.

15   Q.    About how many criminal proceedings would you say you've

16   worked as an Eastern Armenian interpreter for?

17   A.    Including short and long, I would say over 1,500.

18   Q.    Now, do you have a bachelor's degree?

19   A.    Yes, I do.

20   Q.    What's that in?

21   A.    Bachelor's degree in business administration.

22   Q.    You said you're fluent in Eastern Armenian.  Did you

23   actually grow up speaking Eastern Armenian?

24   A.    Yes.

25   Q.    Did you receive formal schooling in Eastern Armenian?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    I went to Armenian school, yes.  I learned formal, yes.

2    Q.    Now, Eastern Armenian, you said, was a particular dialect

3    of Armenian.

4    A.    Yes.

5    Q.    In the current country of Armenia and the former Soviet

6    Union, what was the dialect of Armenian spoken by people from

7    the former Soviet Union or Armenia?

8    A.    Yes.  Armenia was part of the Soviet Union.  Now it's been

9    an independent country for several years now.  They speak

10   Eastern Armenian in Armenia and other former Soviet republics

11   where Armenians live, such as Georgia and Russia and other

12   places where Armenians live.

13        Eastern Armenian is also spoken by Armenians from Iran,

14   whereby there is some differences with the way the Persian

15   Armenians speak.  Armenians from Iran are referred to as

16   Persian Armenians oftentimes.  So Persian Armenians speak the

17   same dialect but with a little difference.  Some pronunciation

18   of some words are a little different.  Persian Armenians use

19   some Farsi words in a conversation, and the Russian Armenians

20   use Russian words.  There are some expressions that are

21   different.  So in a normal conversation, a Persian Armenian and

22   a Russian Armenian would have no trouble understanding each

23   other.

24              MR. FLIER:  Objection.  No foundation, your Honor.

25              THE COURT:  Overruled.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE WITNESS:  But when it comes to translating,
 2    especially these types of complex translations, you need to be
 3    familiar with expressions that Russian Armenians use.  If your
 4    audience that you're translating for are Russian Armenians, you
 5    have to know the Russian words, expressions that they use;
 6    otherwise, there may be some issues.
 7    BY MR. ESTRADA:
 8    Q.   Now, you mentioned you interpreted in the superior court
 9    for 1,500 proceedings.  Were most of those proceedings in --
10    for individuals from Armenia or the former Soviet Union?
11    A.   I would say --
12              MR. SEVERO:  Objection.  That calls for speculation,
13    no foundation.
14              THE COURT:  Counsel, do you want to lay a foundation
15    on that?
16              MR. ESTRADA:  I can ask further, your Honor.
17    Q.   The interpretations you've done have been predominantly in
18    the Eastern Armenian language?
19    A.   Yes.
20    Q.   And that particular Eastern Armenian, is that from Armenia
21    or the former Soviet Union?
22    A.   I would say it's 70 percent were from Armenia and the
23    other 30 percent from Iran.
24    Q.   So 70 percent of the 1,500 proceedings you've done?
25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And now I would like to ask you about your evening job,

2   your moonlighting, the transcripts that you've done for the

3   FBI.

4        As an interpreter and a transcriber for the FBI, about how

5   many transcripts have you done?

6   A.   Hundreds of hours.  Between 400 to 500 hours, I would say.

7   Q.   Were all those transcriptions in the Eastern Armenian

8   language?

9   A.   Yes.  The audio was in Eastern Armenian.  I would listen

10  to it and transcribe it into English.

11  Q.   And just if you can explain to the jury how this is

12  different from your day job, what you do with the transcripts.

13  A.   Well, in my morning job, everything is oral.  You

14  translate -- you interpret standing next to the defendant or

15  sitting next to the defendant.  It's verbal.  It's oral.

16       And my evening job, everything is written.  You have to

17  transcribe it.  Everything has to be much -- my morning job is

18  also accurate, but with written, there's no room for error.

19  Everything goes on a paper, and it stays there.  So you have to

20  be really accurate.

21       So morning job is oral, afternoon job is written, main

22  difference.

23  Q.   So you're creating a written transcript?

24  A.   Yes.

25  Q.   And is it based on recorded telephone calls that you're

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    listening to?

2    A.    Yes.  Telephone calls, some other recorded calls, some

3    surreptitiously recorded calls, but mostly telephone calls.

4    Q.    Now, you mentioned that accuracy is very important.  Can

5    you describe for the jury the method you use when you create a

6    transcript.

7    A.    Well, we get audio from the agents in the form of a CD or

8    an audio file.  We play it with a special software that we have

9    with a foot pedal.  We listen to it, and we use a word

10   processor on the computer, and we transcribe it, and at the

11   end, we print it.  And it goes through several stages of

12   quality -- quality control.  For example, if I do a

13   transcription, somebody else reviews my work.  If somebody else

14   reviews it -- does it, I review their work.  Sometimes locally,

15   sometimes goes out of state to other Armenian translators that

16   FBI has.  So ultimately, one person reviews everything and

17   presents it to court.

18   Q.    Is it a pretty time-consuming process to create one of

19   these transcripts?

20   A.    Yes, very time-consuming.  Everything has to be -- every

21   word, every utterance, every small word, ohs, ahs, yes, okays,

22   everything is included in transcripts.

23   Q.    Do you have to listen to the recordings more than once

24   oftentimes?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Now, you mentioned this process of other translators being

2   involved.  Is there a quality control system that's in place

3   for these transcripts?

4          MR. SEVERO:  Objection, no foundation.

5          THE COURT:  Overruled.

6          THE WITNESS:  Yes.

7   BY MR. ESTRADA:

8   Q.   Can you explain what that quality control process is.

9   A.   If someone does a translation, I review it.  If I do a

10  translation, somebody else reviews it.  And ultimately, one

11  person who's the one who reviews everything and presents it to

12  court.  And in this case, I was the one.

13  Q.   Do you take a cautious approach when you create these

14  transcripts?

15  A.   Yes.  Very.

16  Q.   Can you explain that to the jury.

17  A.   Well, every word has to be included.  For example, in a

18  day-to-day conversation when people speak to each other, they

19  speak over each other oftentimes.  We all do that.  So when

20  that happens, we put a mark called "OV," which means

21  overlapping voices.  You might see that in the transcripts a

22  lot, which means somebody was speaking and somebody else came

23  in and cut him off.  So we make it -- make sure it's clear that

24  somebody was speaking and somebody else came in.

25          Punctuation is very important.  We make sure -- quotation
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   marks are very important to make sure who says what.  We don't
 2   want to put all in one sentence so the reader thinks it's all
 3   one person saying.  So all these details.
 4   Q.   And for anyone familiar with recordings, there's sometimes
 5   cases where you can't hear recording too well.  Does that
 6   sometimes happen with these telephone calls?
 7   A.   Yes.  Often happens.  Sometimes you can't hear at all, so
 8   we put the initials "UI," which means unintelligible.  You
 9   might see that in the transcripts.  Oftentimes the word --
10   part of the word is audible, the remaining is not audible.
11   So if we hear a part of it, we put a part, or if we can't, if
12   it's really not clear, even if we hear a portion of it, we put
13   "unintelligible" because we don't want to guess.  We don't
14   want to assume anything.  So it's safer to put
15   "unintelligible."
16   Q.   Now, in this case, did you review transcripts?
17   A.   Yes.
18   Q.   Many transcripts?
19   A.   Yes.
20   Q.   And were those transcripts prepared into English from the
21   Eastern Armenian language?
22   A.   Yes.
23   Q.   In those transcripts, did you also identify some of the
24   speakers?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    And how did you identify the speakers?

2    A.    Well, having worked on the live wire, when the wire was

3    on, I'm very familiar with the voices of the speakers.  So

4    we -- we usually take the first name and last name of the

5    speaker, and in the transcript we put the initials, those

6    initials of the first name and last name.  And then sometimes

7    when we were not familiar, it was like a third person in the

8    conversation or we didn't know who it was, we used to -- we put

9    male -- "MV," which stands for male voice, "1," or "FV," which

10   stands for female voice, "1."  Or we -- if we didn't know at

11   all, we would put "UM," which means un- -- unknown male, or

12   "UF," unknown female.

13         So all of those markings are clearly identified in the

14   first page, on the first page, which is the cover page.  So

15   once you read the cover page, you know this initial stands for

16   this person.  So all the parties, depends who speak or are

17   heard on that recording, are marked in -- on the first page.

18   Q.    So is it fair to say you prepared or reviewed thousands of

19   transcripts in this case?

20   A.    Yes.

21   Q.    I don't want to ask you about the thousands, but just some

22   of the transcripts that were prepared in this case.

23         Have you previously reviewed exhibits for this trial?

24   A.    Yes.

25               MR. ESTRADA:  And I'll -- your Honor, I'll list those
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    exhibits, but he's previously reviewed them.

2        Just for the record, those would be Exhibits 14A through

3    15A; 19A through 21A; 27A; 31A through 32A; 39A through 46A;

4    48A through 49A; 51A through 63A; 65A through 110A; 114A; 116A

5    through 121A; 123A; and 125A through 181A.

6    Q.    Have you previously reviewed those?

7    A.    Yes.

8    Q.    And that was just last week; is that right?

9    A.    Correct.

10   Q.    Based on your training and experience as an

11   Eastern Armenian translator, are those transcripts true and

12   accurate?

13   A.    Yes.

14   Q.    Are you confident in those translations?

15   A.    Yes.

16        MR. ESTRADA:  Your Honor, the government would move to

17   admit those transcripts into evidence at this time.

18        THE COURT:  Any voir dire?  Any objection?

19        MR. SEVERO:  I would ask that the Court await

20   cross-examination before --

21        THE COURT:  Counsel, what I'll do is, I'll admit them

22   subject to a motion to strike, depending on your

23   cross-examination.

24        MR. SEVERO:  Thank you.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          (*Received in evidence, Exhibits 14A, 15A; 19A through*

2          *21A; 27A, 31A, 32A; 39A through 46A; 48A, 49A; 51A*

3          *through 63A; 65A through 110A; 114A; 116A through*

4          *121A; 123A; and 125A through 181A.*)

5    BY MR. ESTRADA:

6    Q.   Now, in addition to the actual recordings you listened to

7    and preparing transcripts of the recordings, did you also

8    review some letters or correspondence that were provided to you

9    that were written in the Eastern Armenian language?

10   A.   Yes.

11   Q.   Did you translate those into English?

12   A.   Yes.

13   Q.   Have you previously reviewed Exhibits 291A, 294A, and

14   295A?

15   A.   Remind me, which ones are those?

16   Q.   Well, we'll just do it the easy way.

17        If we could please take a look at Exhibits 291A, 294A

18   through 295A, and I'll ask the case agent to please hand those

19   to the witness.

20        And if it's easier, your Honor, also some black binders

21   behind the witness that contain these same exhibits.

22             THE CLERK:  Counsel, do you know which volume that is?

23             MR. ESTRADA:  I know they're 291A --

24             MR. SEVERO:  Volume 5.

25             MR. ESTRADA:  -- to 294A.

```
 1            THE CLERK:  Thank you so much.
 2            THE COURT:  Counsel for both sides, just for
 3   logistics, if you have anything that you wish to introduce
 4   or -- excuse me -- to have a witness review, if you'd always
 5   pass it up through the clerk.
 6            MR. ESTRADA:  Thank you, your Honor.
 7            THE COURT:  Okay.
 8            THE WITNESS:  291 and which one?
 9            MR. ESTRADA:  291A and 294A through 295A.
10            MR. SEVERO:  May I have a moment, your Honor?
11            THE COURT:  Yes.
12            THE WITNESS:  And 292 also?
13   BY MR. ESTRADA:
14   Q.    No.  Just 291A, 294A and 295A.
15   A.    Yes.  Yes.
16   Q.    You previously looked at these?
17   A.    Yes.
18   Q.    Are those translations of letters that you prepared?
19   A.    Yes.
20   Q.    Are they true and correct?
21   A.    Yes.
22   Q.    Are you confident in the translation?
23   A.    Yes.
24            MR. ESTRADA:  Your Honor, the government will not ask
25   to publish these exhibits; would ask to move 294A and 295A into
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000215**

```
1    evidence and not move at this time 291A.

2             THE COURT:  Again, subject to motion to strike.

3             MR. SEVERO:  Thank you, your Honor.

4        (Received in evidence, Exhibits 294A and 295A.)

5    BY MR. ESTRADA:

6    Q.   And just one last thing.  You mentioned that you listened

7    to a wire in this case.

8    A.   Yes.

9    Q.   What were you referring to when you say the "wire"?

10   A.   Wiretap.  Listening to live phone calls.

11   Q.   So just to be clear, you're familiar there's a wiretap in

12   this case?

13   A.   Yes.

14   Q.   And while it was actually going on live, did you listen to

15   Eastern Armenian conversations?

16   A.   Yes.

17   Q.   And did you prepare summaries of those?

18   A.   Yes.

19   Q.   And then once the case was completed and you were done

20   listening to live conversations, did you then prepare these

21   transcripts with more time to sit down and translate them?

22   A.   Yes.

23            MR. ESTRADA:  No further questions, your Honor.

24            THE COURT:  Okay.  Cross.

25            MR. SEVERO:  Yes, your Honor.  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**CROSS-EXAMINATION**

BY MR. SEVERO:

Q.   Good morning, sir.

A.   Good morning, sir.

Q.   Where were you born?

A.   I was born in Vienna, Austria, but I was -- I grew up in Tehran, Iran.

Q.   So the Eastern Armenian that you learned was the Persian variety?

A.   Yes.

Q.   With the Persian words in it?

A.   Yes.

Q.   You speak Russian?

A.   In the last three years, I've been studying Russian on my own with a self-study program.  I don't speak it, but I have a basic understanding of it.  I can read.  I can write.

Q.   You're not certified in Russian?

A.   No, I don't speak Russian, but I've been take -- I'm a very, very novice.  I'm -- I can read --

        THE COURT:  The answer is, you're not certified in it?

        THE WITNESS:  I'm not, no.

        THE COURT:  Okay.

    Go ahead, Counsel.

        MR. SEVERO:  Thank you.

Q.   The Eastern Armenian that's spoken in Armenia is a Russian

```
 1   variety type, isn't it?
 2   A.   Well, it's Armenian with some Russian words, yes, with --
 3   with sometimes a lot of Russian words, sometimes some Russian
 4   words.
 5   Q.   And, in fact, the Russian words that are mixed into that
 6   Eastern Armenian language is slang, correct?
 7   A.   Some are slang.  Some are Russian words, proper Russian
 8   words.  Some words are hybrid; they start with Armenian, end
 9   with Russian, or start with Russian, end with Armenian.
10   Q.   Your schooling was in Austria at the beginning?
11   A.   No.  In Iran.  I was an infant when I went to Iran.
12   Q.   All right.  It was in Farsi?
13   A.   I was in Farsi and Armenian.
14   Q.   You spoke Armenian at home?
15   A.   Yes.  That's my first language.
16   Q.   The only language you're certified in is the gen- --
17   generally Eastern Armenian, correct?
18   A.   Yes.
19   Q.   And you're certified by this -- the California Judicial
20   Council; is that true?
21   A.   Yes.
22        THE COURT:  Why don't you bring the microphone down a
23   little closer.
24        THE WITNESS:  I'm sorry.
25        Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   Is there a reason why you're not on the roster of

 3   interpreters for the United States District Court, this court?

 4   A.   Yes, there is a reason.  I was on the roster from 1994

 5   till 2009.  When I joined the FBI, I told -- I told the office

 6   here to remove my name, and I also turned in my badge, because

 7   I didn't want to work for the federal court while working for

 8   the FBI.  But I worked from 1994 to almost 2009.  I did trials

 9   here.  I did interviews with -- with the attorneys.

10   Q.   The reason you resigned is because your job with the FBI

11   would be a conflict --

12   A.   Yes.

13   Q.   -- with the job in the district court, true?

14   A.   Potential conflict.

15   Q.   And it would be a conflict because in the district court

16   you're required to be neutral, true?

17   A.   Yeah.

18   Q.   While your job with the FBI is a contract with the FBI.

19   A.   Yes, I'm a -- my title is a contract linguist.  So they

20   call me when they -- there's work.  The understanding is if

21   there's no work, I don't work.  So I'm a contract person.

22   Q.   Is this a written contract?

23   A.   Yes.  Yes, there is a -- yes, it's written.

24   Q.   What portion of your income do you derive from the FBI

25   work?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    I would say one-third.

2    Q.    That's an important portion of your income, is it?

3    A.    Yes.

4    Q.    And you've been doing this for how long?

5    A.    Approximately five years.

6    Q.    The training that you've received in creating transcripts

7    for -- from live wire, was that training given to you by the

8    FBI?

9    A.    I received some training, but I had previous experience

10   with other law enforcement agencies doing wires, so I was very

11   familiar with the way they do it.  I -- I worked with other

12   agencies working wiretaps before this.

13   Q.    All your training in creating wiretaps comes from law

14   enforcement, true?

15   A.    I wouldn't say --

16   Q.    Creating transcripts?

17   A.    I wouldn't say directly from the agents.  From other

18   translators who work in the translator's room, they tell you

19   this is how the computer works, this is how you write a

20   summary.  So I started in 2003 doing various wires for other

21   agencies, and in 2009 I joined FBI.

22   Q.    Weren't you taught that in creating a transcript there

23   should be two columns to the transcript, one in

24   Eastern Armenian and one in English?

25   A.    In FBI, they don't --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Yes or no, sir:  Were you taught that way?

2    A.    Taught by whom?

3    Q.    By whomever trained you to do these transcripts.

4    A.    No.

5    Q.    Isn't it, in fact, what you have seen that most

6    translators will do that, create the target language, Spanish,

7    Eastern Armenian, on the left column, and then provide the

8    English translation on the right side?

9    A.    My understanding is the FBI -- with FBI, they do it in

10   Spanish.  With other languages, they don't do.  So I am a

11   contractor.  I just follow their procedures.

12   Q.    Right.  So once again, the way you created these

13   transcripts is the way the FBI taught you to create these

14   transcripts.

15   A.    Yes.

16   Q.    True?

17   A.    Yes.

18   Q.    Did you create all the transcripts in this -- in this

19   case?

20   A.    You mean all the exhibits here?

21   Q.    Sure, let's start with that.

22   A.    Well, I did most of them.  Some of them were done by

23   others, that I reviewed.  I made changes, some corrections if

24   necessary.  And this is the way the FBI does it.  You review

25   it, and then you put your initials on it, and then you become

```
 1   responsible for it.  So I don't recall now how many exactly I
 2   personally did.  Some were done by others that I reviewed, some
 3   I personally did.
 4   Q.   If I direct your attention to a particular transcript --
 5   you have them in front of you?
 6   A.   I hope so.
 7            MR. ESTRADA:  Your Honor, there's a binder behind the
 8   witness where -- the first three volumes of the transcripts.
 9            THE COURT:  Okay.
10            THE CLERK:  Counsel, do you know which volume you're
11   using?
12            MR. SEVERO:  I will tell you.  I am using Volume 1.
13            THE CLERK:  Okay.  Thank you.
14   BY MR. SEVERO:
15   Q.   Is the exhibit -- you have the exhibit?
16   A.   Which exhibit?
17   Q.   Do you have Volume 1 in front of you?
18   A.   Yes.
19   Q.   Would you turn your attention to 14A, please.
20        You see 14A, the cover page?
21   A.   Yes.
22   Q.   It says "Linguist," and it has the initials A.D.
23   A.   Yes.
24   Q.   You're actually an interpreter, correct?
25   A.   With the FBI, my title is contract linguist.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   I know what they -- FBI titles are, but you're an

2   interpreter, you're not a linguist, are you?

3   A.   In the morning I am interpreter, yes.

4   Q.   And in the evening you are a linguist?

5   A.   Or you -- you can call it anything you want.  Translator.

6   Q.   Did you create this transcript from the live wire, or

7   rather, from the audio?  Let me clean up that question.

8        Did you create this transcript from the audio recording?

9        May the record reflect the witness is taking time to read

10  the exhibit.

11  A.   To the best of my recollection, I think I did it, yes.

12  Q.   You're not sure?

13  A.   Oh, as I said, I reviewed everything thoroughly.  This one

14  sounds very familiar, so I think I did it.

15  Q.   You think you did it because you may have reviewed it.

16  You don't -- you don't really know if you created the

17  transcript to begin with?

18       MR. ESTRADA:  Objection, your Honor, asked and

19  answered.

20          THE COURT:  Sustained.

21          MR. SEVERO:  I'm sorry?

22          THE COURT:  Sustained.

23          MR. SEVERO:  Ah.  Thank you.

24  Q.   Is this one of the transcripts that was created by someone

25  whom you may have reviewed?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   As I said, I most likely believe I did it personally.

 2   Q.   So if -- if we go through every one of the transcripts

 3   that we talked about or that were introduced earlier, you would

 4   not be able to tell me with certainty that you created them; is

 5   that true?

 6   A.   Some of them I will, because I would have a fresh memory

 7   of them.

 8   Q.   This one, you don't have a fresh memory of, 14A?

 9   A.   As I said, more -- it sounds very familiar, so I -- most

10   likely I did.  That's my best answer.

11   Q.   How many other people work on these transcripts?

12   A.   Many.  At least seven, maybe ten people.  On --

13   Q.   Which --

14   A.   A lot of them part-time.  They would come and go.  They

15   would do it, so their work needed to be reviewed.

16   Q.   You don't know their names?

17   A.   I do.  Most of them, yes, I do.

18   Q.   So someone comes around and creates a transcript, you

19   review it and give it the okay?  Is that true?  In

20   some instances?

21   A.   Yes, I would say that's correct.

22   Q.   Do you do it together with the rest of the interpreters?

23   A.   Together -- not in a sense of together.  We all have our

24   own computer screens, but for the most -- most of the time we

25   are in a room where others are also located.  So if we have a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    question, we ask the guy next door, next to us, or if she has

2    a -- he or she has a question, will ask me.  So it's a

3    teamwork.  There's no -- there are no egos.  There's no -- no

4    one says "I'm better than you."  If we have a question, we ask

5    each other.

6    Q.   If a particular transcript has the name of an individual

7    as a speaker, that name is given to you by the FBI agents; is

8    that correct?

9    A.   Well, not necessarily.  If it's someone who is on the wire

10   very, very often that I'm familiar with --

11   Q.   How would you know their name if you're not fam- -- if

12   somebody doesn't tell you this is so-and-so and you start

13   listening to the wire?

14   A.   Well, on the first day of the wire, for very first day of

15   the wire, we were introduced to the, you know, the players,

16   basically the people who are participants or will be on the

17   phone.  So we have their names and the sample voice.  So from

18   there on, it comes up often and often and often, so we know

19   this person -- this voice belongs to this person.

20   Q.   Mr. Derpetrossian, the fact is, that on the first day, you

21   are asked by the agents to hear a tape and you are told who the

22   speakers are on the tape.  It is thereafter that you become

23   familiar with the voices.  Isn't that the case?

24   A.   I agree with that, yeah.  And then -- and from there on,

25   we listen --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000225**

```
1    Q.   Right.

2    A.   -- back and forth, on and on and on, and it's the same

3    voice.

4    Q.   So if you are -- just to give you an example, on the first

5    day, you are told that one of the speakers is John Smith.  You

6    will put John Smith on the transcript, and every time you hear

7    a voice that sounds to you familiar, to be like John Smith, you

8    will always say John Smith.  True?

9    A.   That's -- that's a fair -- yeah, that's correct.

10   Q.   Because you have not heard John Smith speak to you

11   directly and identify him directly, correct, from your personal

12   knowledge?

13   A.   That's correct.

14   Q.   How many hours would you say -- strike that.

15        When did you start working on these transcripts?

16   A.   The transcripts or working for FBI on a wire?  Which --

17   what is your question?

18   Q.   Okay.  That's fair.

19        You started working for the FBI first listening to live

20   wires, correct?

21   A.   Correct.

22   Q.   And it was then that you were told who the voices might --

23   might be, correct?

24   A.   Yes.

25   Q.   So the -- when -- when did that start?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    I started working for FBI in approximately January of
 2   2009, and I immediately started with the wire.
 3   Q.    How long before you created your first transcript?
 4   A.    I'm sorry?  Transcript or summary?
 5   Q.    Transcript.
 6   A.    The one like this?  Like this?
 7   Q.    Sure.  "Like this," you mean -- you were referring to the
 8   exhibit in front of you, correct?
 9   A.    Yes.
10   Q.    So, yes, let me rephrase the question so the record is
11   clear.
12         How long before you created a transcript such as the one
13   you have in front of you in the exhibit book?
14   A.    Okay.  The wire lasted quite a time.  I mean, several
15   months.  So after the wire was over -- during the wire, we
16   write summaries, because we don't have time to do all this
17   transcripts, but after the wire was over, we started doing
18   transcripts.  So I would say a year after that.  So roughly
19   sometime in February or January or March of 2010, we started
20   slowly doing this transcripts, me and several other
21   translators.
22   Q.    These other translators that you're talking about, were
23   they listening to live wire as well?
24   A.    Yes.  Some of them were.  Some came later.  Some were
25   part-time from other states who came, helped us for a couple
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   months.  They left and they came back.

 2   Q.   Are these people you were familiar with, these other

 3   translators, people you were familiar with from your day job?

 4   A.   No.

 5   Q.   So you --

 6   A.   Actually, one of them I was, yes.

 7   Q.   Other than the one that you were familiar with from the

 8   day job, did you review their qualifications?

 9   A.   No.

10         MR. SEVERO:  I have no other questions.

11         THE COURT:  Counsel?

12         MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

13   of this witness.

14         THE COURT:  Counsel?

15         THE WITNESS:  Good morning, sir.

16         MR. FLIER:  Good morning, sir.  How are you?

17         THE WITNESS:  Thank you very much.

18                        CROSS-EXAMINATION

19   BY MR. FLIER:

20   Q.   We know each other, correct?

21   A.   Thank you.  Yes, we do.

22   Q.   You've testified in another matter relating to this

23   indictment, this matter; is that correct?

24   A.   Yes.  I've testified twice, yes.

25   Q.   And I think you recently testified, might have been in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    this courthouse, for a case against a Mr. Aloyan; is that
2    correct?
3    A.   Yes.
4    Q.   And that was not before this judge; is that correct?
5    A.   That's correct.
6    Q.   But the same prosecutors were present on that case; is
7    that correct?
8    A.   Yes.
9    Q.   And Mr. Estrada was the lead lawyer?
10   A.   Yes.
11   Q.   Okay.  Thank you.
12        Now, first, we now know that you were not born in the old
13   Russia republic; is that correct?
14   A.   Yes.
15   Q.   And we know that you were born in -- I think you said
16   Austria; is that correct?
17   A.   Yes.
18   Q.   But at some point in time, as an infant, you then went
19   somewhere else; is that correct?
20   A.   Yes.
21   Q.   And is that Iran?
22   A.   Yes.
23   Q.   Now, with respect to the language that's primarily spoken
24   in Iran, what dialect?
25   A.   You mean the Armenian language or the -- the language of
```

```
 1    the country?

 2    Q.    The language of the country.

 3    A.    Language of the country is Farsi.

 4    Q.    Okay.  And that language is completely different than the

 5    Armenian language; is that correct?

 6    A.    Yes.  Two different languages.

 7    Q.    So you were raised in a community, your home, where Farsi

 8    was the main spoken language?

 9    A.    No.  We spoke Armenian at home.  All my community,

10    everyone around me spoke Armenian.

11    Q.    So one last question on that.  Your parents, are they

12    Iranian or Armenian?

13    A.    They're Armenian.

14    Q.    Okay.  Now, with respect to the dialect in this case,

15    we've heard testimony that it is of the Eastern Armenian

16    dialect; is that correct?

17    A.    Yes.

18    Q.    And then we also heard testimony that with respect to this

19    particular language, there's a second dialect, western dialect,

20    correct?

21    A.    Armenian has a western dialect, yes.

22    Q.    What is the significant difference between those two

23    dialects?

24    A.    Western dialect, the western Armenian is very different

25    from the eastern.  The conjugation of verbs are different.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    There is a large difference of vocabulary.  One of the biggest
 2    differences is the pronunciations.  All the sounds that --
 3    Eastern Armenians say "du," they say "ta."  All the Gs, they
 4    say "ka" instead of the "ga" sound.  They conjugate the verbs
 5    differently.  Their future -- future is different, conjugated
 6    different than the Eastern Armenian.
 7         There's a whole lot of issues, and that's why the Judicial
 8    Council came up with the interpreting exam in both dialects,
 9    eastern and western, because we had problems, and we continued
10    to have problems in the courtroom and in depositions where
11    interpreters are hired.  That's why we have two separate
12    dialects.
13    Q.   Now, the Soviet Union broke up sometime I think in 1991;
14    is that correct?
15    A.   Yes.  Yes, that's correct.
16    Q.   And that's what -- I don't want to say "originated."
17    That's where the republic of Armenia comes into play now; is
18    that correct?
19    A.   That's correct.
20    Q.   And the capital is Yerevan; is that correct?
21    A.   Yes.
22    Q.   Now, what about someone who was brought up in a home that
23    was pre-republic of Armenia?  What language do you think they
24    normally would speak in Russia?
25              MR. ESTRADA:  Your Honor, it calls for speculation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.
 2   BY MR. FLIER:
 3   Q.   If I was to tell you that my client, Mr. Parsadanyan, was
 4   raised in the community of a Russian-speaking family, would
 5   that in any way change your opinion about any transcripts that
 6   you believe relate to him?
 7              MR. ESTRADA:  Objection, your Honor, relevance and
 8   calls for speculation.
 9              THE COURT:  Overruled.
10         Would that change your opinion?
11              THE WITNESS:  Mr. Parsadanyan spoke all Armenian.  He
12   spoke Eastern Armenian.  So there were some Russian words.  I
13   believe all the -- all the people on the wires used some
14   Russian words that I'm familiar with.
15   BY MR. FLIER:
16   Q.   But if somebody is brought up --
17              THE COURT:  Excuse me, Counsel.
18         So your answer would be no, it would not change your
19   opinion?
20              THE WITNESS:  That -- that's correct.
21              THE COURT:  Okay.  Next question.
22              MR. FLIER:  Thank you, your Honor.
23   Q.   So if somebody is brought up in a community of
24   Russian-language-speaking parents, but they are from Armenian
25   descent -- not all Armenian people just solely speak Armenian;
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    am I correct?

2    A.   That's correct.

3    Q.   Some Armenian families in the old republic speak Russian;

4    is that correct?

5    A.   That's correct.

6    Q.   So once there's a change in the government, there might be

7    changes in the teaching.  And as an example, in the Armenian

8    schools after 1991, they might focus on, let's say, eastern

9    dialect of Armenian; is that correct?

10           MR. ESTRADA:  Objection, your Honor, calls for

11   speculation and irrelevant.

12           THE COURT:  Sustained.

13   BY MR. FLIER:

14   Q.   So with respect to the training and schooling in the old

15   Russia, you cannot tell this jury what language they focus on;

16   is that correct?

17           MR. ESTRADA:  Objection, your Honor, calls for

18   speculation and relevance.

19           THE COURT:  Sustained.

20   BY MR. FLIER:

21   Q.   That would be speculation, correct?

22   A.   I'm not sure if I understand your question.

23           THE COURT:  I don't, either.

24       Counsel, why don't you reask the question.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. FLIER:  Thank you, your Honor.
 2   Q.   All I'm asking is -- let me try it this way.  Have you
 3   ever been to the republic of Armenia yourself?
 4   A.   No.
 5   Q.   Have you ever been to any province, town or village in
 6   that community of Armenia?  Have you ever traveled to any of
 7   those?
 8   A.   No.  I said I've never been to Armenia.
 9   Q.   So you've never been to Armenia.
10        So we've heard testimony that certain people potentially
11   speak Eastern Armenian; is that correct?
12   A.   Yes.
13   Q.   What about people who live in the provinces or the
14   villages or towns in the outskirts of Yerevan?  What is their
15   language?
16   A.   They also speak Armenian, but they have some unique words
17   of -- some unique expressions of their own.  Pronunciation,
18   some, depends -- depending on where you are from, the
19   pronunciation is sometimes different, but it's very, very close
20   to the one spoken in Yerevan.
21   Q.   Now, in that last point, you say there are examples where,
22   let's say the last question, someone who speaks Russian might
23   also know and speak fluent Eastern Armenian; is that correct?
24   A.   Yes.
25   Q.   But the actual expressions and specific meaning sometimes,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  of phrases and individual words, could be different meanings;

2  am I correct?

3  A.   What they say is -- I don't understand your question.

4  Q.   Well, just as an example, in the Aloyan case, there was an

5  issue about, and I don't know the Armenian word, but the

6  English translation by you to the word "discharge."  Do you

7  remember what I'm speaking about?

8  A.   Yes.  Yes.

9  Q.   And in America, the word "discharge" could mean different

10 words in a vocabulary, a dictionary, correct?

11 A.   Yes.

12 Q.   So when you hear a particular word that might have

13 different meanings in your language, can I assume you then try

14 to feel the whole subject matter of that conversation to try to

15 figure out what the true expression meant?  Does that make

16 sense?

17 A.   If we -- if we can figure out from the context what is

18 being said, yes, but we are not in -- the translators are not

19 in the business of guessing or assuming.  So if -- if it's --

20 if it's clear from the context, we can put it, but if it --

21 that word is not used, we're not allowed to assume that that

22 word means something else and put something outlandish that

23 will be objectionable.  So we try to put the accurate meaning.

24 That's my best answer.

25 Q.   And the whole purpose of not assuming is because it can

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000235**

```
 1    completely blow out of context the true subject matter; is that
 2    correct?
 3    A.    Yes.
 4    Q.    And in this case, we now have heard you have listened --
 5    and I'll start with the wiretap information now.  I thought I
 6    heard that sometime in, maybe it was January or February of
 7    2009, that you started to work on a part-time basis with the
 8    FBI.  Is that correct?
 9    A.    Yes, that's correct.
10    Q.    And then I thought I heard this was your first assignment
11    with that agency.
12    A.    With FBI, yes.
13    Q.    Okay.  So this was the first time that you were dealing
14    with the federal government and them asking you to either
15    listen to live wire types or eventually transcribe as you're
16    telling us now, correct?
17    A.    No.  I worked with other federal law enforcement agencies
18    before.  I worked on several other wires.  I worked on three
19    other Eastern Armenian wires prior to this one.
20    Q.    So then why would you testify a minute ago that this was
21    your first job assignment as to the FBI and the live wire?
22          MR. ESTRADA:  Objection, your Honor, misstates
23    testimony.
24          THE COURT:  Sustained.  That's improper questioning.
25          MR. FLIER:  In no way am I trying to mislead you.  I'm
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    just asking.

 2            THE COURT:  No.  And let me clarify.

 3        Ladies and gentlemen, when attorneys -- and everybody does

 4    it.  I mean, it's common.  But when attorneys say, "You

 5    remember when he testified to this," that's an improper

 6    question.  You're the persons that have to remember what was

 7    testified and what not to.  You're not to assume that

 8    attorneys, when they're asking the question, are stating

 9    correctly what was testified before.  So that's why technically

10    it's improper for an attorney to say, "Didn't you testify to

11    this a few minutes ago?"  It's for you to determine that, not

12    for the attorneys to state that.  So it's a technical

13    objection.

14        Counsel, go ahead.

15            MR. FLIER:  Thank you, your Honor.

16    Q.   Before the work on this case, you've had some previous

17    experience; is that correct?

18    A.   Yes.

19    Q.   Now, I want to just specifically talk about this case.

20    A.   Okay.

21    Q.   You're given a job assignment, and you do your work; is

22    that correct?

23    A.   Yes.

24    Q.   So let's do as an example your first job assignment on

25    this case.  Were you told to go to a federal building where
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   they are listening in on conversations?  Were you out in
 2   somebody's undercover vehicle listening?  I'd like to know
 3   that, please.
 4              MR. ESTRADA:  Objection, relevance.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  Yes, I was in a federal building, in a
 7   room where the listening was happening, and I sat there and I
 8   listened to calls.
 9   BY MR. FLIER:
10   Q.   Okay.  And there's other people around, correct?
11   A.   What do you mean other people?
12   Q.   Other interpreters, other workers.
13              THE COURT:  Counsel, are we talking about the tapings
14   in this case?
15              MR. FLIER:  Yeah, I'm talking about the tapes in this
16   case --
17              THE COURT:  Okay.
18              MR. FLIER:  -- in my first example.
19              THE COURT:  Yes.
20         Go ahead.
21              THE WITNESS:  Yes, there are other people.
22   BY MR. FLIER:
23   Q.   Well, how many people are in the room, approximately?
24   A.   It varied.  Usually we have one agent.  We have maybe one
25   more translator, maybe two more translators.  Sometimes more
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  than one agent.  Sometimes the agent comes and goes.  Sometimes
 2  one translator comes.  We have different schedules.  They would
 3  leave, they would come back.  But at least, I would say, one
 4  translator, oftentimes one more translator, and an agent.
 5  Q.    And are you ever listening or is there people next to you
 6  listening to other intercept calls, or is it just everyone in
 7  that room is selectively focusing on the intercept calls
 8  pertaining to that particular investigation?
 9  A.    In that room where we were, we had several monitors, and
10  it was only this case.
11  Q.    But in this case, there's evidence that there's more than
12  one phone that's being utilized to the wiretaps; is that
13  correct?  There's more than one phone you're listening to.
14  A.    There was, yes.
15  Q.    How many phone numbers do you independently recall right
16  now that you were overhearing?  The number, approximately.
17  A.    At least three.  And different subjects sometimes would
18  change their phone numbers, so that would -- that would make it
19  other phone numbers.  But it started with one phone line, and
20  then it went to two lines, and then at some point we had three.
21  And if I'm not mistaken, for a short period we had one call
22  also for a month or two.
23  Q.    Now, with respect to that same topic, was there ever a
24  situation where you would be focusing on one particular phone
25  number in the conversation, but at the same time the other
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   phones were ringing and there were other conversations?  Do you

 2   recall?

 3   A.   Yes.

 4   Q.   So what happens in that situation?

 5   A.   We have two translators.

 6   Q.   Okay.  I was -- thank you.

 7        After you listen to yours, in any way can you overhear

 8   what's going on, or do they have some type of device over their

 9   ears?

10   A.   They have headphones.  We all have headphones.

11   Q.   Okay.  Now, you have your job.  You're focusing.  Where is

12   the FBI agent during this, approximately?  Is he in the room?

13   A.   Usually in the room.  Sometimes they leave, come back.

14   Q.   And with respect to Agent Stebbins, I think that's how he

15   pronounced his name, the gentleman right here in the courtroom,

16   are you familiar with him?

17   A.   Yes.

18   Q.   Was he always there during this?

19   A.   Not always.

20   Q.   Now, there was a conversation brought up by co-counsel,

21   how do you know and identify the voice of the speakers.  Do you

22   remember that?

23   A.   Yes.

24   Q.   Have you ever met my client, Mr. Rafael Parsadanyan?

25   A.   Met him personally, no.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Okay.  Can you tell us right now the first time you ever

2   specifically recall overhearing allegedly his voice?

3   A.   I don't remember the first time, no.

4   Q.   Okay.  Now --

5   A.   But it was during the wire.

6   Q.   But we know in this case there were 65 people indicted.

7   You listened to a lot of voices, correct?

8   A.   Yes.

9   Q.   How many different voices did you listen to?

10  A.   Many.  Many.

11  Q.   How many?  Many?  What is that number around, sir?

12  A.   Well, the --

13  Q.   And I mean approximately, of course.

14  A.   The people who were under wire, obviously, we heard their

15  voice, and the people that they were talking to, and they all

16  talked a lot.

17  Q.   Okay.

18  A.   Many.  I would say between 50 to 70, maybe 80.

19  Q.   Okay.  And clearly you cannot look at this jury and say,

20  "I feel very confident in telling you the speaker as to all of

21  these particular transcripts."  Would that be a fair statement?

22  A.   No, I can't -- I know -- I know the speak -- in

23  transcript, I know who spoke.

24  Q.   Sir, when the phone rings for you to intercept that

25  conversation, isn't it true that they're not -- the speakers in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   most of these transcripts are not even identifying their own
 2   first name?  Is that correct?
 3   A.   Sometime -- yes, that's true.  Sometimes they don't, yes.
 4   Q.   So in my example, you're overhearing a call, nobody
 5   identifies anybody's name, and you've never spoken to these
 6   people.  You would have no idea the identity of the speakers,
 7   correct?
 8   A.   First time, that's --
 9            MR. ESTRADA:  Calls for speculation, your Honor.
10            THE COURT:  Overruled.
11       First time what?
12            THE WITNESS:  Well, first time that I hear the voice,
13   yes, I don't know who it is.
14   BY MR. FLIER:
15   Q.   Okay.  But, based on co-counsel's questions, you are aided
16   now in some capacity to try to either familiarize yourself or
17   get a name to document as that voice, correct?
18   A.   Yes.
19   Q.   So you're relying on the FBI agent for that information,
20   correct?
21   A.   Yes, you could say that.
22   Q.   So have you ever, after listening to any tapes that you
23   believe were my client, have you ever asked to speak to my
24   client to see if it's accurately him?
25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Have you ever had any voice impressions, anything of my

2    client, to compare?

3    A.   What is a voice impression?

4    Q.   Anything.  Him on a tape.  You speaking to him as an

5    expert.  Anything.

6    A.   No, I don't speak to the people on the phone.

7    Q.   Okay.  So all you have done, and I don't want to minimize

8    it, is -- you have no idea as to whether or not my client

9    specifically is an actual speaker; is that a fair statement?

10   A.   We hear -- first time we come to the wire room, first,

11   very first time, you don't know who it is, so we put a "UM,"

12   unknown male, and then the phone number goes to the agent.

13   Agent finds out and tells us this is the name.  And then

14   throughout the conversations we have more and more calls, and

15   many times the target who was on the line refers to this person

16   he is speaking to by his name.  So -- but we get the

17   information from the agents, yeah, you are correct.

18   Q.   What happens if the agent's wrong?

19   A.   I can't speak for that.

20   Q.   Okay.  Because we know that sometimes someone hands their

21   phone to someone else, and they can use that phone line that's

22   been tapped.  Does that make sense?

23   A.   People handing phones to each other, you mean somebody

24   borrows somebody's phone?

25   Q.   Or I give my phone to a friend who, unfortunately, calls

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    someone, the FBI's listening.  That happens, correct?

2    A.    It probably happened, but not that much in this case.

3    Q.    Okay.  Not that much in this case; is that correct?

4    A.    Yes.

5    Q.    Now, with respect to being a "linguistic," do you think

6    that word is interchangeable with the word "interpreter"?

7              MR. ESTRADA:  Objection, your Honor, relevance.

8              THE COURT:  Sustained.

9    BY MR. FLIER:

10   Q.    Have you had any courses, educational training in that

11   field?

12             MR. ESTRADA:  Relevance, your Honor.

13             THE COURT:  In what field, Counsel?

14             MR. FLIER:  In speech and linguistics.

15             THE COURT:  He's already testified to that.

16   Sustained.

17             MR. FLIER:  I don't recall what his answer was.

18             THE COURT:  Sustained, Counsel.

19             MR. FLIER:  Thank you, your Honor.

20   Q.    How many calls, right now as I ask you this question,

21   please, do you think relate to my client?

22             MR. ESTRADA:  Objection, your Honor, asked and

23   answered, beyond the scope.

24             MR. SEVERO:  This is cross.

25             THE COURT:  I don't know if it's been asked and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    answered.  Overruled.
 2              THE WITNESS:  I'm sorry, what is the question?
 3    BY MR. FLIER:
 4    Q.   How many tapes do you think you listened to that deal with
 5    my client as a potential participant speaker?
 6              THE COURT:  If you know.
 7              THE WITNESS:  I don't know now.  I don't have that
 8    number.
 9    BY MR. FLIER:
10    Q.   But you're the one --
11    A.   There have been many.
12    Q.   You're the one who's testifying that you know that there
13    was a lot of defendants arrested in this case, but it appears
14    that you feel very confident in testifying that you can
15    specifically identify a speaker and say positively it's that
16    person "because I recognize the voice"; is that correct?
17    A.   I don't know what your question is, but if I hear
18    somebody's voice, if it's one of the people who was frequently
19    on the line, I can recognize it.  And if I don't recognize,
20    I'll tell you I don't.
21    Q.   But -- thank you.
22         What about someone who's not frequently on these calls?
23    A.   In that case, if we don't know the name, we -- in the
24    transcripts we put "UM" or "MV."
25    Q.   And what about that same person with respect to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  identifying his voice?  Like, a good example, you and I are

2  speaking.  Six months later there's a phone call.  You think it

3  might be me.  You wouldn't be able to say it was positive me,

4  would you?

5  A.   I don't understand the question.

6  Q.   What I'm trying to say, sir, and to try to make it simple,

7  is, it's very difficult to try to recall 60 people, their

8  voices, listening to over hundreds and hundreds of wiretaps,

9  and feeling confident to say this is exactly what happened; is

10 that fair?

11 A.   Actually, repetition makes it -- makes -- makes your work,

12 your job easier.  If you repeat the same -- if you hear the

13 same voice repeated several time, time and time and time and

14 again, you -- you start becoming more familiar with the voice.

15 Q.   And that makes sense, but what happens if you're not

16 familiar with the voice and you don't hear it on a lot of

17 occasions?

18          MR. ESTRADA:  Calls for speculation.

19          THE COURT:  Sustained.  And it's repetitive.  We've

20 already covered this area.

21 BY MR. FLIER:

22 Q.   I would like to know now how many specific hours do you

23 think you worked on any transcript that deals with

24 Mr. Parsadanyan, if you know.

25 A.   I don't have that number.  I don't know.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    If I was simply to ask you, do you think you recognize and
 2    heard Mr. Parsadanyan in relationship to some other individuals
 3    who were focused on?
 4    A.    You're asking me if I can recognize his voice?
 5    Q.    Yeah.
 6    A.    If I hear it now, I can recognize it, yes.
 7    Q.    Okay.  Thank you.
 8          So up to today, when you're testifying in front of this
 9    jury, have you ever heard his voice to say "I'm positive it's
10    him"?
11    A.    I heard his voice on the wires many, many times.  And then
12    I did the transcripts, I heard his voice.
13    Q.    What do you mean, many, many times?  That's what I was
14    asking you before, and you could not tell us a specific one.
15    A.    I can't tell you a specific --
16          THE COURT:  It's been asked and answered, Counsel.  He
17    said many times.  He doesn't know the exact number.
18          MR. FLIER:  Okay.
19    Q.    But many times you don't know the exact tone or the
20    speaker, too; is that correct?
21          MR. ESTRADA:  Objection, your Honor, asked and
22    answered.
23          THE COURT:  Sustained.  Sustained.
24    BY MR. FLIER:
25    Q.    The quality control issue.  There are some procedures that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    you follow to make sure, and let's say the FBI or whomever,

2    that you try to get it right, correct?

3    A.    Correct.  Correct.

4    Q.    Now, what about this case?  Were there quality control

5    individuals utilized?

6    A.    Well, as I said, this -- these transcripts were done by me

7    and others, and my work was done -- reviewed by others.  I

8    reviewed other people's work.  And eventually, I reviewed

9    everybody's work one more time before submitting to the

10   prosecutor.

11   Q.    From now on, my questions are going to be related, sir, to

12   my specific client and the specific work you did with him.  Is

13   that fair?

14   A.    Okay.  No problem.

15   Q.    So what quality control happened on the individual tapes,

16   assuming there are, that deal with my client?  Tell us

17   specifically.

18   A.    There's no exception to one client or the other client.

19   We -- we review everything.  We quality control everything and

20   submit it to the prosecutor.  At this moment, I don't remember

21   exactly what we did with what call number.  If you point it out

22   to me, maybe I can try to.

23   Q.    Well, you've testified a couple times in this matter,

24   correct?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   You're familiar with this case, correct?

2    A.   Yes.

3    Q.   And it's very important for you to be prepared and

4    accurate, correct?

5    A.   Yes.

6    Q.   You take your job very seriously, correct?

7    A.   Yes.

8    Q.   So with respect to my client, Mr. Parsadanyan, I would

9    like to know, please, exactly -- well, first of all, can you

10   tell us, without having the aid of the government, what exhibit

11   numbers you think Mr. Parsadanyan applies to?

12   A.   No, I can't.  Without -- without looking, I won't be able

13   to.

14   Q.   With respect to that question, you would need help from

15   the government, whether it's the prosecutor or the agent, to

16   assist you on that subject, correct?

17            MR. ESTRADA:  Your Honor, objection.

18            THE COURT:  Sustained.

19            MR. ESTRADA:  He didn't prepare the transcript

20   binders.

21            THE COURT:  Sustained.

22   BY MR. FLIER:

23   Q.   See, that -- can you tell this jury positively that you

24   prepared each transcript that the government believes

25   Mr. Parsadanyan is involved in?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Give me the question one more time.

2   Q.   Can you tell us which transcripts?  Forget an exhibit.  Do

3   you -- in your own independent recollection, can you visualize

4   anything?  Can you actually say, "Hey, you know, I remember

5   there was an August 15th call," anything like that?

6   A.   I can't remember dates, but I do remember Mr. Parsadanyan

7   had a cell phone business, so a lot of calls were coming from

8   his -- he call -- talked about phones, cell phones, so that's

9   something -- if that's your question, if -- that's something

10  that sticks out in my mind right now.

11  Q.   It's one of them.  I don't want to lose track.

12       With respect to that point, you have overheard a lot of

13  phone calls that you believe deal with Mr. Parsadanyan; is that

14  correct?

15  A.   Yes.

16  Q.   And you believe that some of those calls could even

17  originate from his place of work; is that correct?

18  A.   Either his -- I don't know his land line or cell line.

19  That -- that -- that, I don't know.

20  Q.   Okay.  So let's assume that it is a cell phone that the

21  government believes is Mr. Parsadanyan's.  A lot of people who

22  own a business will use their cell phone within the business;

23  is that correct?

24  A.   Yeah, that's correct.

25  Q.   They also might have a business land line, like my law

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    firm.  Does that make sense?

2    A.    That's correct.

3    Q.    So you just mentioned that you listened to tapes and you

4    overheard clearly my client talking about the phone business;

5    is that correct?

6    A.    Yes.

7    Q.    And that would make sense, forget being any translator,

8    since he owns a phone company, correct?

9    A.    Phone store.

10   Q.    Phone store.  Correct?

11   A.    (Nods head up and down.)

12   Q.    Is that "yes"?

13   A.    Yes.

14   Q.    So, clearly, in these communications that you're

15   overhearing, the wiretaps, you hear my client talking about the

16   phone business at times, correct?

17   A.    Sometimes, yes.

18   Q.    Okay.  So there might be subject matters about a quantity

19   of something.  So, a good example, "40 blank."  I'm just giving

20   an example.  Someone might interpret the "40 blank" part to be

21   something, let's say, illegal in nature, but if you're not

22   certain about it, that "40" and "blank" could be something

23   completely innocent, correct?

24        MR. ESTRADA:  Objection, your Honor.  It calls for

25   speculation.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.
 2   BY MR. FLIER:
 3   Q.   What I'm asking is, again, back to how I started,
 4   sometimes in the Armenian culture and dialect, words are
 5   similar but have different meanings; is that correct?
 6              MR. ESTRADA:  Objection, your Honor.  It calls for
 7   speculation.
 8              THE COURT:  That has been asked and answered.  He's
 9   already answered it.
10   BY MR. FLIER:
11   Q.   When you were going over any transcripts, although you
12   can't specifically say which ones today deal with
13   Mr. Parsadanyan, you review them, after it's finished product,
14   with the agent?
15   A.   Not with the agent, no.
16   Q.   What happens if there is a phrase or a word that you're
17   not certain of the specific meaning?  What would you do?
18   A.   If -- we have -- we work as a team, as I told you.  I ask
19   questions from a guy next to me.  He asks me questions all the
20   time.  Goes back and forth.  And if there's something that we
21   don't know, we just put "unintelligible."
22   Q.   And would you agree that in certain portions of these
23   transcripts -- and now I'm going to group it together or we'll
24   be here forever.  And that question is, there's -- sometimes in
25   the midstream of the translation there's a blank because it was
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    inaudible; would you agree?

2    A.    If it's inaudible, we put "UI."  We don't put blank.

3    Q.    I said -- okay.  Thank you.

4          So let's say you mark it the way you just described.

5    There is certain words potentially lost in that sentence,

6    correct?

7    A.    Yes, because we didn't hear it, and we don't want to

8    assume anything.

9    Q.    Because you didn't hear it and you don't want to assume

10   anything, it would be -- it could be completely out of context,

11   potentially, correct?

12   A.    I don't understand the question.

13   Q.    In other words, if someone says something in the

14   beginning, and the middle of the sentence is missing, and you

15   only hear the end, too, the whole flavor and true subject

16   matter could be missing.  Does that make sense?

17         MR. ESTRADA:  Objection, your Honor.  It calls for

18   speculation.

19         THE COURT:  Sustained.

20   BY MR. FLIER:

21   Q.    Have you ever had a situation where you have reviewed a

22   transcript and you have come to the conclusion that the true

23   meaning of that sentence is unclear because there were missing

24   words?

25   A.    Yeah, it happened.

```
1    Q.   What about this question:  Isn't it true that there are
2    exhibits and transcripts that the beginning of the sentence is
3    missing?
4    A.   I don't recall any specifics, but it's very possible, yes.
5    Q.   So you do not have an independent recollection of one of
6    these calls, thousands of calls, that in the beginning is
7    missed?
8    A.   I don't have recollection right now.
9    Q.   Well, have you reviewed all those lovely big volume books
10   in front of you?
11   A.   Yes.
12   Q.   Well, have you seen in those big books examples of where
13   the beginning is missing?
14        MR. ESTRADA:  Objection, your Honor, asked and
15   answered.
16        THE COURT:  It has been asked and answered.
17        MR. FLIER:  I never got an answer.  I'm sorry.
18        THE COURT:  Counsel, it's been asked and answered.
19   Sustained.
20        MR. FLIER:  Thank you.
21   Q.   Do you have any idea where my client's from?
22   A.   He's from Armenia, but I don't know exactly where.
23   Q.   Armenia's big, correct?  It's a big country, correct?
24   A.   Big?  Some say big, some say small.
25   Q.   Well, that was --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Compared to what?

2    Q.    Correct.  To the United States.

3    A.    Yes.

4    Q.    It's not that big, is it?

5    A.    I don't want to speculate that.  I don't want to say.

6    Q.    Well, let's talk about this brief topic that was brought

7    up, slang terms.  What does that mean to you, please?

8    A.    These are words that every language has, words that are

9    not found in dictionary.  They're either words or a combination

10   of words put together.  Some are in Armenian.  Some are hybrid.

11   Some are -- start with Russian, end with Armenian.  Some are

12   just expressions.  Some put words put together.  And you find

13   it in any language.

14   Q.    What about eastern dialect?

15   A.    Yes, there are some.  There are some slangs.

16   Q.    What about your review of the transcripts?  Did you notice

17   that issue?

18   A.    Yes, it comes up a lot.

19   Q.    But isn't it true an interpretation of a slang word or

20   phrase could have different meanings to the speaker or the

21   listener?

22   A.    Well, that -- that's where -- that's where experience

23   comes in.  If you know what this expression means, you put it.

24   If you don't, you put "unintelligible."  Or you ask the guy

25   next to you, and if the guy next to you doesn't know, you ask

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    the other guy, and if they don't know, you still put

 2    "unintelligible."  But if you do know, you put it.

 3    Q.   But sometimes that expression and its true meaning can be

 4    lost.  Does that make sense?

 5    A.   It depends on the reader.

 6    Q.   Okay.  Thank you.

 7         You have a independent recollection, sir, of seeing in any

 8    of these transcripts, forget any alleged to be part of my

 9    client's case, that had slang terminology?

10    A.   Slang is a -- there was some slang, yeah, but it's -- even

11    the word "slang" is hard to define, what exactly means slang,

12    what -- when does it cross over to become a slang, when is

13    proper.  So a lot of these terminologies are put together.

14    There are a lot of expressions, a lot of proverbs.  So all of

15    that comes in play.  That's when experience comes in, I think.

16    Q.   When you listen to a word and you're not familiar it --

17    familiar with it, you might look it up in a dictionary,

18    correct?

19    A.   Yes.

20    Q.   You might ask a fellow interpreter to whom you have

21    confidence in and you rely on, too, correct?

22    A.   Yes.

23    Q.   What happens if the interpreter's not there to rely on and

24    the word's not in the dictionary?

25              MR. ESTRADA:  Objection, your Honor.  I think we
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   covered this already.

 2              THE COURT:  I think so, many times.

 3              MR. FLIER:  I don't remember the dictionary line.

 4              THE COURT:  That's your problem, Counsel.  Sustained.

 5              MR. FLIER:  See, I think that could have two different

 6   interpretations.

 7   Q.   Do you have an independent recollection, sir, of who did

 8   any quality control as to any alleged exhibit that's dealing

 9   with my client?

10   A.   These exhibits that are here, I was the final person who

11   reviewed them.  So specifically I can't tell you which one

12   relates to your client.

13   Q.   So you could not tell us potentially the name of the first

14   listener; is that fair?  On all of them, I'm saying.

15   A.   You mean the first person who was on the wire?

16   Q.   No.  I thought you -- were you the first or the final

17   reviewer?

18   A.   Of the transcripts, I was final.

19   Q.   So there's a first person, correct?

20   A.   As I said, many of them, I was the first person, but some

21   were others, but -- so I don't know exactly which one is which.

22   Q.   Okay.  Maybe this will speed it up.  Do you know what

23   exhibit numbers, just -- and it doesn't matter how, that deal

24   with Mr. Parsadanyan?

25              MR. ESTRADA:  Your Honor, I think we covered this as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    well.  Objection.
 2              THE COURT:  Over- --
 3        Are you familiar with which exhibit pertains to --
 4              THE WITNESS:  I don't -- I don't know the exhibit
 5    number.
 6              THE COURT:  Okay.  Next question.
 7    BY MR. FLIER:
 8    Q.   Do you teach Armenian?
 9    A.   No.
10    Q.   Now, clearly, Russian, eastern and western dialect, as you
11    say, and I'm going to move on, sometimes the verbs are
12    different, some meanings are different, there's a vocabulary
13    difference, and even the pronunciation and sounds can be
14    different; is that correct?
15    A.   Between which languages?
16    Q.   Well, I think a good example, then, would be eastern and
17    western dialect --
18    A.   Yes.
19    Q.   -- or Farsi.
20    A.   Farsi's a completely different language.
21    Q.   Okay.  Thank you.  And we covered that.
22        Do you in any way maintain your original notes, if that's
23    even proper, when you're first listening and dictating?  Are
24    there rough notes first, or is it just a finished, final
25    product?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   When the wire is ongoing, when we have live calls, we

2   create what's called a summary.  I think that's what you're

3   referring to.

4   Q.   Yes.

5   A.   Those summaries stay, yes.  Some -- not often, but a few

6   times when I -- I need it, I look back at the summary.

7   Q.   I'll move on.  Thank you.

8        May I just have a brief moment, your Honor?

9           THE COURT:  Yes.

10          MR. FLIER:  Thank you, sir.

11  Q.   Now, you mentioned that the FBI policy, and I know that's

12  not you specifically, that when co-counsel was asking you, in

13  certain languages, and in the example I heard Spanish, you'll

14  have both the English interpretation and, on the other column,

15  on the same page, that language that -- the language itself,

16  correct?

17  A.   Yes.

18  Q.   But Spanish is the only one the FBI does that way?

19  A.   I believe so.

20  Q.   Okay.

21  A.   I believe so.  And I don't -- I don't know if they do it

22  on all cases, but I believe Spanish they do.  Sometimes.

23  Q.   When you transcribe the part of the tape and you use the

24  word "U" or whatever to identify unintelligible, at that point

25  in time you could not testify or document the true content of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   that right there; is that correct?

2   A.   I -- if I understand you correctly, if it's

3   unintelligible, we put "unintelligible."  We listen to it.  We

4   try several times.  We change headphones.  We ask another

5   colleague to hear it.  But, again, if we can't make it out, we

6   can't.

7   Q.   And if you can't make it out, you can't, and you document

8   the way you've already described --

9   A.   Yes.

10  Q.   -- with the "U" or whatever.

11  A.   We put "UI."

12  Q.   But whatever you could not hear and whatever you put as a

13  "UI," whether right or wrong, that missing phrase or word could

14  have significance to the true subject matter.  Does that make

15  sense?

16  A.   No, it could have.

17  Q.   Thank you.

18       How do you know if any of the missing parts or

19  unintelligible nature changes the true meaning of the true

20  transcript itself?  Have you seen that in this case?  That

21  happens, in other words, correct?

22       MR. ESTRADA:  Objection, your Honor, asked and

23  answered and calls for speculation.

24       THE COURT:  I'm not too sure exactly what you --

25       MR. FLIER:  I'll rephrase it, your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  And let me just clarify.

 2         You're a translator.

 3              THE WITNESS:  Yes.

 4              THE COURT:  So what you are reporting are the words

 5    that were said to the best of your ability.

 6              THE WITNESS:  Yes.

 7              THE COURT:  You're not there to figure out what the

 8    content of the message is or anything else, you're just there

 9    to report the words; is that correct?

10              THE WITNESS:  Correct, translate the words.

11              THE COURT:  Okay.

12         Go ahead, Counsel.

13              MR. FLIER:  Thank you, your Honor.

14    Q.   But based on what the Court just said, like with

15    Detective Stebbins, if there is a phrase or a word, wouldn't

16    you talk to him about its meaning, potentially, and what the

17    true content was?

18    A.   No, I don't talk to the agent.

19    Q.   So --

20    A.   Agent doesn't know.  It's a live call.

21    Q.   So back to my example of the word "discharge" in the

22    eastern dialect language.  It can mean different things.  We

23    know that already.  But my real point is, the subject matter of

24    that transcript and what it truly means could be up for

25    different interpretations based on what you thought the word
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    "discharge" meant; is that fair?

2    A.    Yeah.

3    Q.    Thank you.

4          Your Honor, if I'm done with my cross-examination, can I

5    still have the witness on call, please?

6              THE COURT:  Sure.

7              MR. FLIER:  Was that "yes," sir?

8              THE COURT:  Sure.

9              MR. FLIER:  Okay.  Thank you.

10         No further questions, your Honor.

11             THE COURT:  Redirect?

12             MR. ESTRADA:  Yes, your Honor.

13         And one thing on the on-call.  He does have a day job, so

14   as long as he can have notice.

15             THE COURT:  We can work it out as far as logistics go

16   if he wishes to call him on defense.

17                        **REDIRECT EXAMINATION**

18   BY MR. ESTRADA:

19   Q.    Mr. Derpetrossian, you were asked about previous

20   proceedings you've been involved with in this case.

21   A.    Yes.

22   Q.    Have you previously testified in other trials in this

23   case?

24   A.    Yes.

25   Q.    And testified as to the accuracy of transcripts?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   Has the accuracy of the transcripts ever been called into

 3   doubt?

 4          MR. SEVERO:  Objection, hearsay.

 5          MR. FLIER:  Objection.

 6          THE COURT:  Sustained.

 7   BY MR. ESTRADA:

 8   Q.   Has the accuracy of your transcripts ever been in question

 9   in those prior proceedings?

10          MR. SEVERO:  Objection.

11          MR. FLIER:  Objection.

12          THE COURT:  Sustained.

13   BY MR. ESTRADA:

14   Q.   Now, you were asked about that word "discharge" that you

15   testified about in the prior proceeding.  You testified that

16   was "discharge" based on the context?

17          MR. SEVERO:  Objection, relevancy of the prior

18   proceeding.

19          THE COURT:  Counsel, I'm not too sure what the

20   relevancy was on cross-examination either, but since we've

21   already gone into it, I'll allow you to go into it.

22          MR. ESTRADA:  Yes, your Honor.  I was just going to

23   clarify that, but I'll move on.

24   Q.   The point is, you testified in two prior trials in this

25   case, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   You're very familiar with the case?

 3   A.   Yes.

 4           MR. SEVERO:  Asked and answered.

 5           THE COURT:  Sustained.

 6   BY MR. ESTRADA:

 7   Q.   Are you familiar with the case?

 8   A.   Yes.

 9           MR. SEVERO:  Asked and answered.

10           THE COURT:  Sustained.

11   BY MR. ESTRADA:

12   Q.   You were asked about having never been to Armenia.  You've

13   never been to Armenia?

14   A.   That's correct.

15   Q.   You have lived in this country for quite some time,

16   correct?

17   A.   Yes.

18   Q.   And in this country, do you live in the Armenian

19   community?

20   A.   Yes.

21   Q.   Do you speak with other Armenians?

22   A.   Yes.

23   Q.   In Armenian?

24   A.   Yes.

25   Q.   Eastern Armenian?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    And is that individuals that include people from the

3    former USSR?

4    A.    Yes.

5    Q.    Does it include people from Armenia?

6    A.    Yes.

7    Q.    Are you able to communicate with those people?

8    A.    Yes.

9    Q.    You also mentioned that in your day job you interpret for

10   defendants and other people in Eastern Armenian, correct?

11   A.    Yes.

12   Q.    Most of those people, is it fair to say, are from the

13   former USSR or Armenia?

14          MR. FLIER:  Objection, no foundation.

15          THE COURT:  Sustained.  And let's cut through it a

16   little bit.

17      Is your primary or first language Armenian?

18          THE WITNESS:  Yes.

19          THE COURT:  Eastern Armenian?

20          THE WITNESS:  Yes.

21          THE COURT:  Go ahead, Counsel.

22   BY MR. ESTRADA:

23   Q.    In interpreting Eastern Armenian in your day job, have you

24   ever had an instance where someone said, "I don't understand

25   you.  You're not speaking the right language"?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. FLIER:  Objection, hearsay.

 2          THE COURT:  And I'm not too sure it's relevant.

 3   People have told me that on English, Counsel.

 4      Next question.

 5          MR. ESTRADA:  Very good, your Honor.

 6   Q.   You were asked about working for the FBI, correct?

 7   A.   Yes.

 8   Q.   And you have worked for the FBI?

 9   A.   Yes.

10   Q.   And you received income from the FBI?

11   A.   Yes.

12   Q.   As a translator, is your reputation important?

13   A.   Yes.

14   Q.   Explain that.

15   A.   Well, we need to make sure everything is done accurately

16   in court, especially when you're interpreting for defendants or

17   witnesses.  Every word counts.  Every word matters.  You can't

18   assume.  You can't presume anything.  We have to take an ethics

19   class administered by the Judicial Council which tells us we

20   have to be accurate and do a correct job.  If there's something

21   that we don't know, we say -- we raise our hands, defer to the

22   Court, and ask for a moment for clarification.  Or if we don't

23   know, we say we don't know.  And the same is true with written

24   translations.  We try to be accurate, don't assume anything.

25   Q.   Now, if you were to favor one side or the other, would
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    that affect your reputation?

2    A.    Yes.

3    Q.    And could that affect your job as a translator?

4    A.    Yes.

5    Q.    Have you previously even been hired by public defenders?

6    A.    Yes.  I do a lot of work for L.A. County Public Defender's

7    Office, doing transcripts, translations, recorded interviews,

8    jail calls.  I do a lot of work for Public Defender's Office.

9    Q.    Now, you were also asked about quality control in

10   reviewing the transcripts.

11         Now, you're not sure whether you prepared every single one

12   of the exhibits that the government prepared in its exhibit

13   book; is that right?

14   A.    I'm not sure if I was the first one who did it, that's

15   correct.

16   Q.    But you did review all of them?

17   A.    Yes.

18   Q.    And when you review them, do you ensure their accuracy?

19   A.    Yes.

20   Q.    Do you review them carefully?

21   A.    Yes.

22   Q.    Now, you were also asked about identifying voices.

23   A.    Yes.

24   Q.    You listened to the actual live telephone calls as they

25   came in in this case?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    For over a year?

3    A.    Yes.  Approximately one year.

4    Q.    And then after that, did you also then prepare the

5    transcripts by listening to a recording?

6    A.    Yes.

7    Q.    Now, was that a more even-paced sort of task?

8    A.    Yes.  That was more leisurely paced.  We didn't have the

9    pressure of calls coming every minute.  So we had more time to

10   sit down and look up words in dictionary, ask questions.  That

11   was more -- we had more time.

12   Q.    And by listening to the calls both in the leisurely pace

13   preparing the transcripts and in listening to the live

14   recordings, did you become familiar with the speakers?

15   A.    Yes.

16   Q.    Now, you were asked about this hypothetical John Smith.

17   I'm going to ask you about a particular example.

18         Mher Darbinyan.  Did you become familiar with that voice?

19   A.    Yes.

20            MR. SEVERO:  Objection, calls for speculation.

21            THE COURT:  Overruled.

22            THE WITNESS:  Yes, I'm familiar with his voice.

23   BY MR. ESTRADA:

24   Q.    And was it sometimes the case that Mher Darbinyan would,

25   or others, would identify him by name?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    You mean calling somebody else?

2    Q.    For instance, the word "Mher."

3    A.    Yes, the word "Mher" came up, yes.

4          THE COURT:  And Counsel, pertaining to your objection,

5    let me just clarify that.

6          You learned the identity of these people not from seeing

7    them, actually, but somebody telling you what their identity

8    was, and then you could recognize it as the same voice later;

9    is that correct?

10         THE WITNESS:  That's correct.

11         THE COURT:  But you never met any of these people; is

12   that correct?

13         THE WITNESS:  I've never met these people.

14         THE COURT:  Okay.

15         Go ahead, Counsel.

16   BY MR. ESTRADA:

17   Q.    But in addition to that, while listening to the

18   recordings, did they sometimes give names?

19   A.    Sometimes, yes.

20   Q.    For instance, with regard to Mher Darbinyan, the word

21   "Mher"?

22   A.    The word "Mher" came up sometimes, yes.

23   Q.    And with regard to Rafael Parsadanyan, another specific

24   example, did the word "Raf" or "Rafo" come up?

25   A.    Oftentimes people who would call him -- would call him as

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   "Raf," "Rafo" sometimes.  And with -- with all these

 2   individuals, a lot of "bro" or "brother" or "hey," all of those

 3   expressions also came up.

 4           MR. ESTRADA:  May I just have a moment, your Honor?

 5           THE COURT:  Yes.

 6           MR. ESTRADA:  No further questions, your Honor.

 7           THE COURT:  Counsel, recross?

 8           MR. SEVERO:  Thank you.  Never miss a chance.

 9                      RECROSS-EXAMINATION

10   BY MR. SEVERO:

11   Q.   Is it your experience that people's voices always sound

12   the same every day, every time of the day?

13   A.   No.

14   Q.   So somebody may say -- may speak at 10:00 in the morning,

15   and the voice changes by 5:00 o'clock.  Take me, for example.

16   A.   That's a fair statement.

17   Q.   All right.  Get tired, smoke.  That kind of stuff changes

18   the voice, doesn't it?

19   A.   I agree with that.

20   Q.   Are you acquainted with this Court's, the United States

21   District Court for the Central District of California, rules

22   with respect to interpreter's translation of tapes, videotapes

23   and compact discs?

24   A.   No.

25   Q.   Are you aware of whether this Court requires that when the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   translator is asked to identify the speakers by name, that you

 2   include that in the transcript, and the notation would have to

 3   be, "Translator's note:  Identity of speakers provided by,"

 4   blank?  Are you aware of that requirement?

 5   A.   No.

 6   Q.   Are you aware that this Court requires that the translator

 7   identify who provided the identification because the translator

 8   cannot have any independent knowledge of the speakers'

 9   identities?

10          MR. ESTRADA:  Objection, your Honor, relevance.

11          THE COURT:  Sustained.

12          MR. ESTRADA:  Calls for a legal conclusion.

13          THE COURT:  Sustained.  And it's really outside the

14   area of redirect.

15          MR. SEVERO:  Is that on -- is the Court sustaining on

16   that --

17          THE COURT:  On both grounds.

18          MR. SEVERO:  On both grounds.  Thank you, your Honor.

19   Q.   When you create -- strike that.

20        When you're told of an individual's specific identity

21   pertaining to a voice, you don't know if the person who's

22   telling you is guessing, do you?

23   A.   I assume that they know what they're talking about.

24   Q.   You assume because you don't know -- in other words, you

25   are guessing -- that the individual who's telling you knows
```

1    what he's talking about.

2    A.   Well, the person who told me, I'm sure he's not lying.

3    Q.   You don't know if he's guessing, though.

4    A.   I don't know his state of mind, no.

5    Q.   He doesn't tell you, "I know this voice because I have

6    done this or that or the other."  He doesn't tell you that,

7    does he?

8    A.   No.

9    Q.   He just says, "This is the voice of Mher Darbinyan," and

10   you go with that, correct?

11   A.   That's -- that's correct.

12          MR. ESTRADA:  Objection, your Honor, misstates the

13   testimony.

14          THE COURT:  Overruled.

15   BY MR. SEVERO:

16   Q.   The Court asked you if, as an interpreter, you don't

17   interpret content, you interpret words.  That's not true, is

18   it?

19          THE COURT:  Counsel, what I -- and I tried to make it

20   clear.

21       You're interpreting the words that come in.  Sometimes you

22   have to do that by context or interpreting what the words may

23   be, but you don't have the responsibility for interpreting what

24   the entire conversation means, do you?

25          THE WITNESS:  I interpret, I translate what's being

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   said on that conversation.
 2             THE COURT:  And it may or may not make sense.
 3             THE WITNESS:  And sometimes expressions or proverbs
 4   will not translate word-for-word, so you have to translate the
 5   meaning, but as close to the word-for-word as possible.
 6             THE COURT:  Okay.
 7        Go ahead, Counsel.
 8   BY MR. SEVERO:
 9   Q.   Context provides meaning to the words you translate,
10   doesn't it?
11   A.   We don't rely too much on the context, because that will
12   be -- that could lead us to some slippery slope.  So we take
13   each call separately on its own.
14   Q.   Okay.  That answers --
15   A.   For the most -- for the most part, but we can't ignore the
16   fact that we know the context.
17   Q.   So context provides meaning to the translation, doesn't
18   it?
19             MR. ESTRADA:  Objection, your Honor, asked and
20   answered.
21             MR. SEVERO:  No, that's -- I'm sorry.
22             THE COURT:  Let me rule on it.
23        Overruled.
24             MR. SEVERO:  Thank you.  Sorry, sir.
25             THE WITNESS:  Context helps a little, yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   So oftentimes you will -- the context that you believe is

 3   being conveyed in the conversation provides a translation of a

 4   word, true?

 5   A.   Not often.  We take --

 6   Q.   But it happens.

 7   A.   We take each call on its face value.

 8   Q.   But it happens.

 9   A.   Context -- we can't ignore the fact that we know the fact,

10   we know the -- we know the case, we know the speakers --

11   Q.   Right.

12   A.   -- being on the live wire for over a year.

13        So you can't ignore that fact.  But each call that we get,

14   we work on it separately, individually for that separate call.

15             THE COURT:  Okay.  Ladies and gentlemen, it being

16   10:00 o'clock, we're going to take our morning recess.

17        Remember the admonishment not to discuss the case among

18   yourselves or with anybody else or form or express any opinions

19   about the matter until it's submitted to you and you retire to

20   the jury room.

21        We'll see you back in 15 minutes.

22        (Recess held from 10:03 a.m. to 10:21 a.m.)

23        (In the presence of the jury:)

24             THE COURT:  Okay.  The record will reflect that all

25   the members of the jury are in their respective seats in the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

000274

1    jury box, including the alternate, and we are in

2    cross-examination.

3         Counsel, you may continue.

4              MR. SEVERO:  Thank you, your Honor.

5    Q.  When you review a transcript that was prepared -- let me

6    strike that.  Let me ask the question this way.

7         When you do a final review of these transcripts, do you

8    listen to the audio as you are reviewing the transcript?

9    A.  Yes.

10   Q.  So every time you review a transcript, you listen to the

11   audio along with it?

12   A.  Yes.

13   Q.  The use of slang requires -- or the -- strike that.

14        The translation of slang requires some knowledge of how

15   it's used on the streets, doesn't it?

16   A.  You could say that, yes.

17   Q.  The community that you live in, does it include people

18   that hang around Little Armenia in Hollywood?

19   A.  I personally don't live in Hollywood, but there are people

20   who visit from Hollywood.  There are people everywhere.

21   Q.  You speak or communicate, fraternize with people who are

22   actually on the streets talking the slang of the

23   Eastern Armenian?

24   A.  I speak to all kinds of people.  I don't know what -- how

25   to answer that question.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Well, you speak to all kinds of people because they come

 2   to the criminal courts building in L.A., right?

 3   A.   Some of them, yes, but my contact with them is limited.

 4   Q.   You did not grow up learning the slang that's used south

 5   of Yerevan.

 6   A.   That's correct.

 7   Q.   True?

 8   A.   That's true.  I did not grow up, but I learned --

 9   Q.   To the extent that --

10   A.   -- through -- through my work.

11   Q.   To the extent that you have lived here, you did not

12   socialize with people who spoke slang south of Yerevan.

13   A.   I -- I do have a lot of friends and colleagues who are

14   from Armenia, who are from Yerevan.  I don't know if they're

15   from south of Yerevan.  Some of them use some slang, some use

16   more proper.  So there's all kinds of people that I interact

17   with, both socially and my -- my work.

18   Q.   Fair to say that you cannot possibly be familiar with all

19   the slang words that are used today on the streets of

20   Los Angeles by people from Armenian descent?

21   A.   Not all of them, but a lot of them I am familiar with --

22   Q.   Not all.

23   A.   -- through -- not all, but a lot, through work and through

24   wiretaps.

25   Q.   How do you say "water" in Armenian, Eastern Armenian?
```

```
 1   A.   Water?

 2   Q.   Yes.

 3   A.   "Jur."

 4   Q.   Can you spell that for the court reporter?

 5   A.   I would say j-u-r.

 6   Q.   And how do you say "liquid"?

 7   A.   "Heguk."

 8   Q.   Can you --

 9   A.   H-e-g-u-k.  Armenia has a different alphabet, so I'm just

10   phonetically spelling it.

11   Q.   Thank you for that.

12        I have no other questions.

13            THE COURT:  Counsel?

14            MR. PEREYRA-SUAREZ:  No questions, your Honor.

15            THE COURT:  Okay.  Counsel?

16            MR. FLIER:  Thank you, your Honor.  Briefly.

17                      RECROSS-EXAMINATION

18   BY MR. FLIER:

19   Q.   Obviously, based on the questions by Mr. Estrada, you're a

20   professional and you want to do the best job you can, correct?

21   A.   Yes.

22   Q.   And clearly, in any field, doesn't matter what it is,

23   reputation's important, right?

24   A.   Yes.

25   Q.   But would you also agree with this simple proposition:
```

1    Everyone makes mistakes sometimes?

2    A.    Everyone, yes.

3    Q.    Okay.  Do you think you made any mistakes in your work on

4    this case?  Are you not sure?

5    A.    It's very unlikely, but I'm not perfect by any means.

6    There can be mistakes, yes.

7    Q.    Okay.  Co-counsel asked you, and I think you agreed, that

8    sometimes somebody can speak differently based on

9    circumstances:  Stress, tired, sick, laryngitis, stuff like

10   that.  Am I correct?

11   A.    Yes.

12   Q.    Would it be true that there were sometimes on these tapes,

13   not always, overlapping voices, as you already discussed what

14   you would do if there is?  Correct?

15   A.    Yes.  Yes.

16   Q.    The pros- -- Mr. Estrada, excuse me, he brought up the

17   word, as to my client, did you ever see "Ralf" (sic) or any

18   type of name.  Do you remember that question?

19   A.    Yes.

20   Q.    When you were first -- when you first heard the first call

21   that you believed, or the agent believed, excuse me, was

22   Mr. Parsadanyan, you had no idea what his name was, correct?

23   A.    Very, very first time, no.

24   Q.    Now, you are told information from the investigator to --

25   not to mislead you, maybe, but to help you identify the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   speaker, correct?

2   A.   Well, what we did was, every time we had a new individual

3   on the line that was a unknown male for a while, we would write

4   down the name and the phone number that he -- that was

5   associated with.  We would give it to the agent.  The agent

6   would find out.  And once we knew -- we had a log.  We had a

7   list of names.  So next time it would come up, we would look

8   back at that number, and we see that's the name, the person who

9   was speaking.

10  Q.   But you're relying on the agent for that first

11  identification feature, correct?

12  A.   Yes.

13  Q.   What happens if he's wrong?

14  A.   I'm sorry?

15  Q.   What happens if he's wrong?

16  A.   I can't speak for him.

17  Q.   Okay.  And I'm not saying intentionally wrong to you.

18  Potentially.  You understand that, correct?

19  A.   Yes.

20  Q.   Now, the word "Rafael."  Let's assume for this question

21  that's his first name.  I want you to tell the jury all of the

22  different slang terms, nicknames that are associated with that

23  in your language.

24  A.   I don't call anybody by the nicknames, but in this -- you

25  want to know about this wire, or generally in the community?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   No.  I want to know, sir -- forget these wires now -- what
 2   are the nicknames in your dialect for a person named Rafael?
 3   A.   It could be anything.  Somebody -- people can call each
 4   other "bro" or "jefe" or "friend," or oftentimes people shorten
 5   it and say "Raf" or "Rafo" or "Rafi."  It can be any -- a
 6   number of things.  I personally don't call anybody name -- by
 7   any of their nicknames, so I don't know.
 8   Q.   But if there is a name and you don't identify the voice,
 9   Rafael could be different persons or people that have different
10   slang names, like "Ralf," "Ralfo," like you said, correct?
11   A.   I don't understand the question.
12   Q.   What I'm trying to say is, somebody named Rafael could
13   have different nicknames maybe, correct?
14   A.   Yes, that's true.
15   Q.   But that nickname does not mean it's that specific same
16   person.  There could be different Rafaels with different
17   nicknames, correct?
18            MR. ESTRADA:  Objection, your Honor.  It calls for
19   speculation.
20            THE COURT:  Well, it does, but let me just try to
21   clarify it.
22        There could be many people that have the name Rafael or
23   Raf; is that correct?
24            THE WITNESS:  In the whole world?
25            THE COURT:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE WITNESS:  Yes.

2              THE COURT:  So -- okay.

3         Go ahead, Counsel.

4    BY MR. FLIER:

5    Q.   And that's kind of my point.  You're relying on the fact

6    that a specific caller must be that same Rafael because maybe

7    the detective told you or maybe there was a phone line --

8    right? -- a phone connection to that person?

9    A.   We -- we go based on the phone number.

10   Q.   Okay.  But the phone number does not mean the person who

11   owns the phone, the subscriber, is the speaker always.  Would

12   you agree with that?

13   A.   That's true.  Sometimes they hand it to friends.

14   Q.   Correct.

15        And as the Court asked you, there's more than one Rafael

16   in the world, right?

17   A.   Yes.

18   Q.   Or your response.

19   A.   Yes.

20   Q.   Okay.  But there's also indications in these tapes where

21   "Ralf," "Ralfo," or any full name is not even mentioned.  Would

22   you agree?

23   A.   I agree.

24   Q.   So that would tell me two things.  One, you would have to

25   rely on identifying the speaker based on your familiarity.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    "Yes, I recognize that voice."  Correct?
 2    A.    Yes.
 3    Q.    Or the second thing would be, it must be that voice
 4    because it's his phone line maybe; is that true?
 5    A.    More his voice; secondly, the phone number.
 6    Q.    And I think I used the wrong word when I was first
 7    examining you.  Did you ever do any voice exemplars in this
 8    case as it relates to my client?
 9    A.    What do you mean by that?
10    Q.    Oh, that didn't work, then.  Sorry.  Okay.  I thought --
11    well, I used comparison last time.  I tried "exemplar."  Just
12    like, I'll give you a good example, a fingerprint.  You have a
13    fingerprint of the crime scene, you have the suspect, you
14    compare them.  I'm asking like that.
15    A.    Well, as I explained, we start the wire, we know a couple
16    of people on the line, but there are new individuals, every day
17    they come up, people, friends, acquaintance, that we don't
18    know.  Initially we put "UM" and we give the phone number to
19    the agent.  The agent finds out.
20          And then the name comes up, also.  They call each other,
21    hey -- by this name or that name.  And then once we are
22    familiar, we write that down, we write that name and the
23    associated phone number on our log, on our list of phone
24    numbers, and the next time it comes up, we know it's this
25    person.  I think I had said that.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Now, throughout the tapes, and maybe it's in the Armenian

 2   community and culture, there seems to be the phrase or the word

 3   "dear," d-e-a-r.  Would you agree with that?

 4            MR. ESTRADA:  Objection, your Honor, calls for

 5   speculation.  It's also beyond the scope.

 6            THE COURT:  It's outside the scope of direct.

 7            MR. FLIER:  The Court --

 8        I'm almost done, your Honor.  Thank you.

 9            THE COURT:  Sure.

10   BY MR. FLIER:

11   Q.   The Court asked a question, and you responded, but the

12   Court said to you sometimes when you're translating it may or

13   may not make sense.  Do you remember the judge asking that

14   question to you?

15   A.   The sentence may not make sense?

16   Q.   Yes.

17   A.   Sometimes it did, yes, you're correct.

18   Q.   Okay.  Do you agree with that?  Is that true?

19   A.   A lot of people say things that are out of context or,

20   like, phrases, incomplete sentences without a verb, without a

21   pronoun.  It happens a lot.

22   Q.   Thank you.

23        Subject to recall, your Honor, I have no further

24   questions.  Thank you.

25            THE COURT:  Okay.  You may step down.  If this -- as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    long as you can remain on call so they know how to get ahold of
 2    you, okay?
 3              THE WITNESS:  Okay.
 4              THE COURT:  Okay.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  Mm-hmm.
 7         Next witness.
 8              MR. ESTRADA:  Your Honor, the government calls
 9    Special Agent Jeremy Stebbins.
10              THE CLERK:  Right here to be sworn, please.
11         (Witness sworn.)
12              THE CLERK:  Thank you.  You may be seated.
13         May I please ask that you state your full name for the
14    record and spell your last name.
15              THE WITNESS:  My name's Jeremy Stebbins,
16    S-t-e-b-b-i-n-s.
17              THE CLERK:  Thank you.
18              THE COURT:  Okay.  You may inquire, Counsel.
19              MR. ESTRADA:  Thank you, your Honor.
20              JEREMY STEBBINS, GOVERNMENT'S WITNESS,
21                    DIRECT EXAMINATION
22    BY MR. ESTRADA:
23    Q.   Sir, where do you work?
24    A.   Federal Bureau of Investigation.
25    Q.   Commonly known as the FBI?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    What's your title with the FBI?

3    A.    I am a special agent.

4    Q.    How long have you worked for the FBI?

5    A.    Approximately nine years.

6    Q.    Now, before working for the FBI, did you have other

7    experience -- well, I should say, did you have other

8    experience?

9    A.    Yes.

10   Q.    Other work experience?

11   A.    Yes.

12   Q.    What was that other work experience?

13   A.    I worked as a fraud investigator for an accounting firm

14   for several years.

15   Q.    You did auditing?

16   A.    Forensic accounting and fraud investigation.

17   Q.    Now, prior to that employment, did you obtain a degree?

18   A.    Yes.

19   Q.    What was that degree in?

20   A.    I have a bachelor's in accounting.

21   Q.    Turning back to your work with the FBI, currently what's

22   your assignment with the FBI?

23   A.    I'm currently assigned to narcotics investigations,

24   specifically Cartel Task Force.

25   Q.    Prior to that assignment, what was your assignment with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000285**

```
 1   the FBI?

 2   A.   I worked at the Eurasian Organized Crime Task Force, which

 3   is based in Glendale, California.

 4   Q.   Can you explain to the jury what the Eurasian Organized

 5   Crime Task Force is.

 6   A.   Yes.  It's a federally funded task force.  It's made up of

 7   several different agencies.  We're hosted by Glendale PD,

 8   Burbank Police Department, Los Angeles Police Department,

 9   Los Angeles Sheriffs, the Marshals Service, Secret Service,

10   IRS, and Homeland Security Investigations.

11   Q.   So it's a bunch of different officers from different

12   agencies?

13   A.   Yes.

14   Q.   Working together?

15   A.   Yes.

16   Q.   And generally speaking, what do those agents and officers

17   working together work on?

18   A.   We target organized crime groups that their members

19   originated from the former Soviet Union, including Armenia and

20   Russia, Georgia.

21   Q.   How long were you a member of the Eurasian Organized Crime

22   Task Force?

23   A.   Approximately five years.

24   Q.   Now, prior to that assignment, did you have another job

25   with the FBI?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Yes.

 2   Q.    What was that?

 3   A.    I spent several years working white-collar investigations

 4   as well as counterterrorism and counterintelligence.

 5   Q.    Now, turning back to your time with the Eurasian Organized

 6   Crime Task Force, you mentioned that the agency or the task

 7   force would investigate organized crime.  What do you mean by

 8   organized crime?

 9   A.    Organized crime are groups of individuals that oftentimes

10   have a common goal, and they commit a variety of violations,

11   whether it's bank fraud and identity theft or extortion,

12   kidnapping and murder.  We investigate those types of groups.

13   Q.    Have you received training in investigating organized

14   crime groups?

15   A.    Yes.

16   Q.    What sort of training?

17   A.    We received several hours of training in utilizing the

18   RICO statutes in order to investigate these groups.  I've also

19   received training as far as the white-collar crime that these

20   groups are often involved in.

21   Q.    You said RICO.  Is that another way of referring to

22   racketeering?

23   A.    Yes, sir.

24   Q.    Now, you mentioned that you received training with regard

25   to the white-collar crimes.  You're referring to the fraud and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000287**

1    identity theft?

2    A.    Yes, sir.

3    Q.    What sort of training have you received in fraud and

4    identity theft investigation?

5    A.    I've attended several lectures from both professors and

6    then also several officers that have worked extensive cases

7    in -- in bank fraud and identity theft.

8    Q.    You mentioned earlier that before going with the FBI you

9    worked for an accounting group.

10   A.    Yes.

11   Q.    During that time that you worked for them and did forensic

12   accounting, were you certified?

13   A.    Yes.

14   Q.    In what?

15   A.    I was a certified fraud examiner.

16   Q.    In addition to the training you received in terms of

17   investigating fraud and identity theft offenses, do you have

18   experience actually investigating those types of crimes?

19   A.    Yes.

20   Q.    About how many of those types of fraud crimes have you

21   investigated in your time with the FBI?

22   A.    Fifty to a hundred, maybe more.

23   Q.    And in terms of identity theft, about how many of those

24   prosecutions or investigations have you been involved with

25   during your time with the FBI?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Approximately same amount, fifty to a hundred.

2   Q.   Have you also interviewed suspects involved in fraud and

3   identity theft?

4   A.   Yes.

5   Q.   Now, you worked in this particular investigation, correct?

6   A.   Yes.

7   Q.   Are you familiar with the fact it involved a wiretap?

8   A.   Yes, I am.

9   Q.   Have you received training in conducting wiretap

10  investigations?

11  A.   Yes, I have.

12  Q.   Do you have experience in conducting wiretap

13  investigations?

14  A.   Yes, I do, sir.

15  Q.   What sort of experience?

16  A.   There's been several cases where I've either been a

17  monitor, sitting on the wire actually listening to the calls,

18  or, in this case, where I was the case agent who actually

19  writes the wiretaps and participates in the compiling the

20  evidence in order to get the wiretap.

21  Q.   I'm going to ask you more about the wiretap and the

22  monitoring that you referred to a little later.  Before I get

23  there, I want to go back to your background.

24       With regard to fraud and identity theft, have you had

25  occasion to instruct others in investigating those types of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   offenses?

2   A.   Yes.

3   Q.   What sorts of occasions have those been?

4   A.   I've been -- sorry.  I've instructed groups, foreign law

5   enforcement groups over in Budapest, Hungary, at the

6   International Law Enforcement Academy, and I've also provided

7   instruction to the California Gang Investigators Association.

8   Q.   Okay.  Now I'd like to talk to you about your

9   investigation in this case.  When did the investigation in this

10  case begin?

11  A.   It began in the fall of 2008.

12  Q.   Did it involve many targets and defendants?

13  A.   Yes.

14  Q.   What sorts of crimes were the defendants in this case --

15  now speaking generally in terms of the many defendants, what

16  were they involved with?

17  A.   The defendants in this case were involved in large-scale

18  bank frauds, identity theft, extortion, kidnapping, murder,

19  firearms trafficking and narcotics trafficking.

20        MR. FLIER:  I'm going to object, your Honor,

21  irrelevant.

22        THE COURT:  Overruled.

23        MR. SEVERO:  I'll -- for the record, I'll join in that

24  objection.

25        THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000290**

```
 1              MR. PEREYRA-SUAREZ:  So I do, your Honor.

 2              THE COURT:  Okay.  You got it.

 3   BY MR. ESTRADA:

 4   Q.   So many of the different crimes that organized crime

 5   groups tend to be involved in?

 6   A.   Yes.

 7   Q.   Were the defendants in this case tied to a particular

 8   group?

 9   A.   Yes.

10   Q.   What group was that?

11   A.   It was a group known as Armenian Power.

12              MR. SEVERO:  Objection as compound.

13              MR. FLIER:  I object.  No foundation as to my client.

14              MR. SEVERO:  And the word "defendants."

15              THE COURT:  "What group was that" is compound?

16              MR. SEVERO:  No.  Were the "defendants" in this group.

17              THE COURT:  Overruled.

18   BY MR. ESTRADA:

19   Q.   Would you like me to repeat the question?

20   A.   Please.

21   Q.   Let me repeat the question.

22              THE COURT:  Yes.

23   BY MR. ESTRADA:

24   Q.   The defendants overall that you were investigating, were

25   they tied to a particular group?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.  They were tied to Armenian Power.
 2              MR. FLIER:  I'm going to object, your Honor.
 3              THE COURT:  As a conclusion, Counsel?
 4              MR. SEVERO:  Yes.
 5              MR. FLIER:  And no foundation as to my client, yes,
 6    sir.
 7              MR. SEVERO:  That's --
 8              THE COURT:  As a conclusion, sustained.
 9    BY MR. ESTRADA:
10    Q.    Through your investigation in this case, did you learn
11    they were tied to a particular group?
12    A.    Yes.
13              MR. FLIER:  Objection to the word "they."
14              THE COURT:  Overruled.
15              THE WITNESS:  Yes.  Armenian Power.
16              THE COURT:  Now, and that's a good objection, Counsel.
17        There are three defendants here.  Are you saying in your
18    investigation you're investigating all three of them for being
19    tied to that group?
20              MR. SEVERO:  That's a conclusion of this witness
21    without foundation.
22              THE COURT:  No, it's not.  It's whether or not he's
23    investigating them for that.
24              THE WITNESS:  Yes, they are tied to this --
25              THE COURT:  I'm going to overrule your objection to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000292**

```
 1    the Court's question.

 2              MR. SEVERO:  Thank you.

 3              THE WITNESS:  Yes, all three --

 4              THE COURT:  Investigating all three for that?

 5              THE WITNESS:  Yes.

 6              THE COURT:  Okay.

 7         Go ahead, Counsel.

 8    BY MR. ESTRADA:

 9    Q.   Now, I'd like to ask you about Armenian Power, that group

10    that you found the defendants were tied to.

11              THE COURT:  Well, Counsel, there's an objection to

12    "they were tied to."  The ones that he suspected they were tied

13    to.

14    BY MR. ESTRADA:

15    Q.   Yes, the ones you suspected they were tied to

16    Armenian Power.  But focusing on Armenian Power, that group,

17    did you learn about that group during the investigation?

18    A.   Yes.

19    Q.   Did you actually interview members of that group?

20    A.   Yes, I did.

21    Q.   Did you learn about whether that group had connections to

22    a street gang?

23              MR. SEVERO:  Hearsay.

24              THE COURT:  Overruled.

25              THE WITNESS:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:
 2   Q.   Can you explain that, please.
 3   A.   The Armenian Power group started off as a street gang in
 4   California.  They're recognized by California as a street gang.
 5            MR. SEVERO:  I'm going to object.
 6            MR. FLIER:  Object.
 7            THE COURT:  Counsel, you can have a continuing
 8   objection to it, but the Court feels that he's qualified to
 9   testify in this area, so...
10            MR. FLIER:  Thank you, your Honor.
11            THE COURT:  But I'll treat it as a continuing
12   objection.
13            MR. PEREYRA-SUAREZ:  And I'll join in that objection,
14   your Honor.
15            THE COURT:  As to all three of you.
16            MR. PEREYRA-SUAREZ:  Thank you.
17            THE COURT:  I'm sorry, Counsel, was there more than
18   just that?
19            MR. SEVERO:  Well, I think the hearsay portion is
20   different than the Court's ruling on expertise.
21            THE COURT:  I'm assuming he's testifying as an expert,
22   Counsel.  Is that what you're doing?
23            MR. ESTRADA:  Yes, your Honor.  He's been notified as
24   an expert here.
25            THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:

 2   Q.   Okay.  So let's go back.  Armenian Power, it's been

 3   recognized as a street gang?

 4   A.   Yes, it's been recognized as a street gang in California,

 5   and it's also what we would consider to be a nontraditional

 6   street gang, meaning they engage in nontraditional street gang

 7   crimes.

 8        Traditional street gangs generally engage in narcotics

 9   trafficking, extortion, and things of that nature.

10            MR. SEVERO:  I'm going to object to that,

11   "traditional" --

12            THE COURT:  Overruled.

13            MR. SEVERO:  -- "nontraditional" as beyond the scope

14   of this witness's expertise.

15            THE COURT:  Overruled.

16            MR. SEVERO:  Move to strike.

17            THE COURT:  Overruled.  Motion denied.  And I will

18   treat it as a continuing objection because --

19            MR. SEVERO:  Thank you, your Honor.

20            THE COURT:  -- it's going to come up on every

21   question.

22            MR. SEVERO:  Yes.

23            THE WITNESS:  Traditional -- traditional street gangs

24   often engage in narcotics trafficking, extortion, and they

25   generally control an area.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Armenian Power is generally known for conducting bank

2   fraud, identity theft, and that's considered to be their --

3   what we call the bread and butter.

4   BY MR. ESTRADA:

5   Q.   Were the members and associates of Armenian Power

6   generally from a particular area of the world?

7   A.   Yes.  Generally, they were born in Armenia and then came

8   to the United States, oftentimes settling in Hollywood,

9   Glendale, and the San Fernando Valley.

10  Q.   Now, you mention that there were -- there was a street

11  gang component to Armenian Power, but you said they were

12  nontraditional in many ways.  What ways were they

13  nontraditional?

14  A.   As I stated before, they -- they committed bank fraud as

15  their main moneymaker.  Additionally, Armenian Power members

16  often did not want to identify themselves as gang members, to

17  avoid law enforcement scrutiny.  They would not traditionally

18  always wear the tattoos.  They wouldn't always flash the gang

19  signs of Armenian Power, in order to avoid law enforcement.

20  Q.   But they sometimes have the tattoos?

21  A.   Yes, they did.

22  Q.   Not always?

23  A.   Correct.

24  Q.   And are you familiar with the practice of traditional,

25  shall we say, street gangs doing graffiti?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    Was that something Armenian Power did?

3    A.    Yes.

4    Q.    Not always?

5    A.    Not always.

6          MR. SEVERO:  Move to strike.  This is leading the

7    witness considerably.

8          THE COURT:  Up to this point, overruled.

9    BY MR. ESTRADA:

10   Q.    Now, you mentioned the term "members and associates" of

11   Armenian Power.  By "associates," what do you mean by that?

12   A.    Individuals who worked with members of Armenian Power to

13   carry out their crimes, different people that work with them

14   to commit bank fraud or extortion that may not be actual

15   validated members of the gang, they may not wear the tattoos,

16   but they are associates of the gang by committing crimes with

17   them.

18   Q.    Now, did you find during your investigation that this

19   group, Armenian Power, had international ties?

20   A.    Yes.

21   Q.    Could you explain that to the jury, please.

22   A.    Armenian Power also existed back in the former

23   Soviet Union, in Yerevan, actually in Armenia.  Many of the

24   members of Armenian Power in the early days were deported from

25   here and formed Armenian Power over in Yerevan, so there were
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    ties to Armenian Power over there.  Additionally, members here

2    had high-level contacts with what we call -- I believe it was

3    referred to earlier as a thief-in-law, which is loosely

4    translated to a godfather in the Italian equivalent.

5    Q.   And during the investigation, did you actually intercept

6    calls between members of Armenian Power and these

7    thieves-in-law you describe?

8    A.   Yes.

9    Q.   And did you actually watch, do surveillance of meetings

10   between them?

11   A.   Yes.

12   Q.   Now, did you also find that this group, Armenian Power,

13   was tied to a group known as the Mexican Mafia?

14   A.   Yes.

15   Q.   Can you explain that, please.

16   A.   Mexican Mafia is a very powerful prison gang.  Many of the

17   gangs in Southern California, if not all the Hispanic gangs in

18   Southern California --

19         THE COURT:  Excuse me, there's going to be an

20   objection.

21         MR. SEVERO:  Lacks foundation.

22         THE COURT:  Sustained.

23      As to the expertise on the Mexican Mafia, you haven't

24   established that, Counsel.

25         MR. SEVERO:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:

 2   Q.   During your investigation into Armenian Power, did you

 3   find that it was a street gang?

 4   A.   Yes.

 5   Q.   And a Southern California street gang?

 6   A.   Yes.

 7        MR. SEVERO:  Asked and answered.

 8        THE COURT:  Okay.  Next question.

 9   BY MR. ESTRADA:

10   Q.   And as a Southern California street gang, did you find

11   that it had ties to the number 13?

12        THE COURT:  Counsel, again, counsel had objected to

13   leading questions.  Let's do it by question and answer.  Go

14   ahead.

15   BY MR. ESTRADA:

16   Q.   Okay.  Did you find that Armenian Power had ties to

17   Mexican Mafia?

18   A.   Yes.

19        MR. SEVERO:  Objection, leading.

20        THE COURT:  Overruled.  Let's move on.

21   BY MR. ESTRADA:

22   Q.   And how did you determine that?

23   A.   Armenian Power utilized the number 13 to show their

24   allegiance to the Mexican Mafia.  Additionally, incarcerated --

25        MR. SEVERO:  Objection, speculation, no foundation at
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1     this point.

2            MR. ESTRADA:  Your Honor, I would ask that the

3     interruptions stop of the witness.

4            THE COURT:  Overruled.

5         Well, Counsel, they are legitimate objections.  You have

6     to be careful not to lead the witness, and in the areas of

7     Mexican Mafia, he hasn't been qualified to be an expert to

8     testify about the Mexican Mafia yet.

9            MR. ESTRADA:  And certainly, your Honor, I'm not going

10    to get into those particulars.

11           THE COURT:  Okay.

12    BY MR. ESTRADA:

13    Q.   Simply put, Armenian Power is a Southern California street

14    gang?

15    A.   Yes.

16           MR. SEVERO:  Objection, leading, suggestive, and --

17           THE COURT:  It's foundational.  Overruled.

18    BY MR. ESTRADA:

19    Q.   And based on its status as a Southern California street

20    gang, did you find that it was tied to the Mexican Mafia?

21    A.   Yes.

22    Q.   How did you find that?

23           MR. SEVERO:  No foundation.

24           THE COURT:  And that will be overruled.  He's not

25    testifying as to the Mexican Mafia organization itself.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        And, again, let's try it as question and answer rather
 2   than leading.  Next question.
 3   BY MR. ESTRADA:
 4   Q.   How did you find that?
 5   A.   We found that Armenian Power utilized the number 13 to
 6   show their allegiance to the Mexican Mafia.  Mexican Mafia
 7   identifies themselves with the number 13 because "M" is the
 8   13th letter of the alphabet.
 9            MR. SEVERO:  Move to strike.
10            THE COURT:  Sustained.
11            MR. SEVERO:  No foundation.
12            THE COURT:  Sustained.
13   BY MR. ESTRADA:
14   Q.   Generally speaking, you have familiarity with street gangs
15   in Southern California?
16   A.   Yes.
17   Q.   And generally speaking, is it -- based on your familiarity
18   with street gangs in Southern California, is the number 13
19   known to associate to something?
20   A.   Yes.
21            MR. SEVERO:  Objection, your Honor, no foundation.
22            THE COURT:  Sustained.
23        There hasn't been a foundation as to how he knows anything
24   about the other gangs, including the street gangs.  All you
25   asked is that is he familiar with it.  Don't know what his
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  experience and training is.

2  BY MR. ESTRADA:

3  Q.  How do you know about street gangs in Southern California?

4  A.  Much of my knowledge comes from this investigation, where

5  Armenian Power members committed crimes and associated

6  oftentimes with Mexican Mafia members.

7  Q.  Did you see Armenian Power members meeting with

8  Mexican Mafia members?

9  A.  Yes, I did, several times.

10  Q.  Did you see Armenian Powers having phone calls with

11  Mexican Mafia members?

12  A.  Yes, I did.

13      MR. SEVERO:  Objection, your Honor.  There's no

14  foundation for those answers that people were Mexican Mafia

15  members, just no foundation at all.

16      THE COURT:  Sustained.  Sustained.

17  BY MR. ESTRADA:

18  Q.  Did you see Armenian Power members meeting with Hispanic

19  gang members?

20  A.  Yes.

21      MR. SEVERO:  Objection.  Same objection.

22      THE COURT:  Sustained.

23  BY MR. ESTRADA:

24  Q.  Did you see Armenian Powers meeting with self-admitted

25  Mexican Mafia members?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2             MR. SEVERO:  Objection.  That's --

 3             THE COURT:  Overruled.

 4             MR. SEVERO:  Well, objection's hearsay, Judge, just

 5   for the record.

 6             THE COURT:  Okay.  Overruled.

 7   BY MR. ESTRADA:

 8   Q.   Okay.  So just to be clear, you saw Armenian Power members

 9   meeting with self-identified Mexican Mafia members?

10   A.   Yes.

11   Q.   And have you, during your time in the investigation,

12   actually spoken to members of the Mexican Mafia?

13   A.   Yes.

14   Q.   And spoken to Hispanic gang members?

15   A.   Yes.

16   Q.   And discussed the Mexican Mafia with them?

17   A.   Yes.

18   Q.   And Southern California gangs with them?

19   A.   Yes.

20   Q.   And through that knowledge, did you learn what the number

21   13 is typically associated with?

22   A.   Yes.

23   Q.   What's that?

24   A.   It's a sign for the Mexican Mafia.  The number 13 is

25   associated to the letter "M," which Mexican Mafia is two M's.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   The Mexican Mafia often is called "La Eme" in Spanish?

 2   A.   Yes.

 3   Q.   Okay.  And now let's get to the wiretap recordings in this

 4   case.  One of the tools that was utilized, was it wiretap

 5   investigation?

 6   A.   Yes.

 7   Q.   Can you explain what a wiretap is, generally.

 8   A.   A wiretap is basically where the FBI or another law

 9   enforcement agency collects a lot of information about a

10   target, and then they go to the Court and -- with an affidavit

11   documenting the investigative steps they've taken, and ask that

12   they be able to listen to the phone.

13   Q.   Now, let's talk about specifically what a wiretap is.

14   Does it involve listening to phone calls?

15   A.   Yes, it does.

16   Q.   Can you explain how that works.

17   A.   A line is set up with the phone company so the FBI's able

18   to listen to the phone calls without the subject knowing that

19   we're listening to the phone calls.  The call comes into the

20   FBI, what we call it, the wire room, and that's where the

21   monitors are sitting and listening to the calls.

22   Q.   Let's talk about that.  You mentioned the "wire room."

23   What is the wire room?

24   A.   Wire room is a small room in -- in the FBI in Los Angeles

25   here where the calls are monitored.  Basically each case gets
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    its own wire room.

2    Q.   Now, I want to talk to you about the procedures used in

3    obtaining a wiretap.  You have to go to the Court to get a

4    wiretap?

5    A.   Yes.

6    Q.   How does that work?

7         MR. FLIER:  I'm going to object, irrelevant, your

8    Honor.

9         MR. SEVERO:  I agree.

10        THE COURT:  I don't know why it's an issue.

11        MR. FLIER:  It's not.

12        THE COURT:  Sustained.

13   BY MR. ESTRADA:

14   Q.   Now, with regard to after a wiretap is obtained, is there

15   some permission that's required to obtain a wiretap?

16        MR. SEVERO:  Objection.  This is irrelevant.

17        THE COURT:  Overruled.

18      You have to get permission to obtain a wiretap?

19        THE WITNESS:  Yes.

20        THE COURT:  Okay.  Is that from the Court?

21        THE WITNESS:  Yes.

22        THE COURT:  Next question, Counsel.

23   BY MR. ESTRADA:

24   Q.   Once you obtain that permission from the Court, are there

25   procedures that are used to ensure the security of the wiretap?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    What are those?

 3    A.    Well, as I said, it's monitored in a secure room in the

 4    FBI building.  After 30 days, the tapes are often sealed in FBI

 5    evidence so that they cannot be listened to by anybody else.

 6    Q.    And in terms of the security of the wire room, what do you

 7    mean by that?

 8    A.    The wire room is located inside the FBI secured building,

 9    and then the wire room is secured itself by a combination lock

10    that is given only to the individuals that work there.

11    Q.    You mentioned earlier a term called "monitoring" with

12    regard to wiretaps.  Can you explain what monitoring is.

13    A.    Yes.  Monitoring will be basically the person sitting at

14    the actual computer that wears the headphones and listens to

15    the calls that's happening.

16    Q.    Is that required under the court order?

17    A.    Yes.

18    Q.    And is that sealing you mentioned, where you have to

19    preserve the recordings, is that required by the court order?

20    A.    Yes, it is.

21    Q.    Is there special equipment that's used to monitor the

22    telephone calls?

23    A.    Yes.

24    Q.    What's that equipment?

25    A.    It's a program we call Voicebox.  It allows the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   information from the call to be -- to come in onto a computer.

 2   It records the date, the time, the number that's calling into

 3   that subject phone or calling out to that -- or from that

 4   subject phone.  It records a lot of information.

 5   Q.   You mentioned it does record the date and time?

 6   A.   Yes, it does.

 7   Q.   And you said calls coming in.  How does it record that?

 8   A.   Well, I'm not a technical person, but it basically -- any

 9   call coming into the phone --

10          MR. SEVERO:  No foundation.

11          THE COURT:  Sustained.  Sustained.

12   BY MR. ESTRADA:

13   Q.   And perhaps my question was not as good as it could be.

14   Does it record the telephone number that's actually dialing in

15   to the person with the wiretap?

16   A.   Yes.

17          MR. SEVERO:  Objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes, it does.

20   BY MR. ESTRADA:

21   Q.   Does it record the telephone number used by the person who

22   has the wiretap order on them?

23   A.   Yes.

24   Q.   Now, let me ask you about the specific case here.  Was

25   there a wiretap in this case on telephones used by a person
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    believed to be Mher Darbinyan?

2    A.   Yes.

3    Q.   Many telephones?

4    A.   Yes.

5    Q.   And in terms of the exhibits in this case, are there

6    different telephones that were recorded that were believed to

7    be used by Mher Darbinyan?

8            MR. SEVERO:  Objection, vague, "different telephones."

9            THE COURT:  Overruled.  I think -- he'll have to

10   explain it.  Overruled.

11           THE WITNESS:  Yes.

12   BY MR. ESTRADA:

13   Q.   Let's talk about telephones, telephone numbers.  Was there

14   a telephone number that was believed to be used by Darbinyan

15   known as "TT1"?

16   A.   Yes.

17   Q.   What does TT1 refer to?

18   A.   TT1 is the very first target telephone that we went up on

19   on Mher Darbinyan.  It was 818-793-7303.

20           THE COURT:  For the sake of the jury, "TT" means

21   target telephone?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  So when you say "TT1," that's the first

24   target telephone?

25           THE WITNESS:  Yes, your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1            THE COURT:  Go ahead, Counsel.

2    BY MR. ESTRADA:

3    Q.   And were there numerous target telephones in this case?

4    A.   Yes, there were.

5    Q.   Were there different target telephones for Darbinyan?

6    A.   Yes.

7    Q.   Are you familiar with TT2, target telephone 2 in this

8    case?

9    A.   Yes, I am.

10   Q.   Was that another one believed to be used by Darbinyan?

11   A.   Yes, it was.

12   Q.   I'm a little worried to ask this, but do you remember the

13   phone number?

14   A.   310-497-6753.

15   Q.   All right.  And let's go to target telephone 8.  Was that

16   another telephone number believed to be used by Darbinyan?

17   A.   Yes, it was.

18   Q.   What was that telephone number?

19   A.   310-779-1177.

20   Q.   Are you familiar with target telephone 13?

21   A.   Yes, I am.

22   Q.   Was that another telephone believed to be used by

23   Darbinyan?

24   A.   Yes, it was.

25   Q.   What was the number on that one?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    310-480-7070.

2    Q.    And how do you remember these phone numbers so well?

3    A.    I listened to a lot of calls and read a lot of line

4    sheets.

5    Q.    And you meant -- you said the term "line sheets," and that

6    came up a little bit with the previous witness.  What's a line

7    sheet?

8    A.    A line sheet is basically what the translator generates as

9    they're listening to the call.  It's as fast as they can type a

10   summary to get it to the case agent so that we can have

11   actionable intelligence.

12   Q.    It's a summary?

13   A.    Yes.

14   Q.    And were there many line sheets in this overall case?

15   A.    Yes.

16   Q.    About how many line sheets were there?

17   A.    Thousands.

18   Q.    Was there also a wiretap order for a telephone believed to

19   be used by Sharopetrosian?

20   A.    Yes.

21   Q.    Defendant Sharopetrosian?

22   A.    Yes.

23   Q.    Was that target telephone 11?

24   A.    Yes, it was.

25   Q.    And do you recall the telephone number for that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    telephone?

2    A.    818-809-7057.

3    Q.    And now with regard to all these telephones we've talked

4    about, the ones believed to be used by Darbinyan, the one

5    believed to be used by Sharopetrosian, those procedures you

6    described earlier about using a wiretap, were those used in

7    this case?

8    A.    Yes.

9    Q.    The calls were monitored?

10    A.    Yes, they were.

11    Q.    And the calls were sealed and preserved pursuant to a

12    court order?

13    A.    Yes, they were.

14    Q.    Now, please take a look, if you would, at Exhibit 1, which

15    is not in the binder before you.

16         And I'll ask that perhaps the detective could go and

17    assist and retrieve that, or if --

18              THE CLERK:  It's in the box?

19              MR. ESTRADA:  It is in the box, yes.

20    Q.    You have Exhibit 1 in front of you?

21    A.    I do.

22    Q.    What's Exhibit 1?

23    A.    It is a -- it's Exhibits 5 through 181.  It's basically

24    the phone calls being utilized in the trial.

25    Q.    So all the phone calls, the wiretap calls that are being

```
 1   used in this case, are on that CD?

 2   A.   Yes, they are.

 3   Q.   Have you listened to all those calls?

 4   A.   Yes, I have.

 5   Q.   Have you reviewed that CD?

 6   A.   Yes, I have.

 7   Q.   How are you familiar with that CD?

 8   A.   It has my initials on it.

 9   Q.   Does Exhibit 1 contain fair and accurate copies of the

10   wiretap recordings being used in this case?

11        MR. FLIER:  Objection, no foundation, and we're --

12   sorry, Judge.  No foundation.

13        THE COURT:  Okay.  Overruled.

14        THE WITNESS:  Yes, it does.

15        MR. ESTRADA:  Move to admit Exhibit 1.

16        MR. FLIER:  Objection.

17        THE COURT:  Nature of the objection?

18        MR. FLIER:  We're challenging this issue, your Honor,

19   and the content.

20        THE COURT:  Overruled.

21        MR. PEREYRA-SUAREZ:  For the record, I'll join in the

22   objection, your Honor.

23        THE COURT:  Okay.  We'll include all three of you as

24   far as the objection goes.  It will be overruled.

25        (Received in evidence, Exhibit 1.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:

 2   Q.   Now, you mentioned Exhibits 5 through 181.  Are you

 3   familiar with Exhibits 5 through 181?

 4   A.   Yes.

 5   Q.   I'm going to ask to have all of those pulled out for you,

 6   but have you previously reviewed Exhibits 5 through 181?

 7   A.   Yes, I have.

 8   Q.   What are they?

 9   A.   They are -- basically, each exhibit is a compact disc

10   containing one call that we intend to play here at trial.

11   Q.   So Exhibits 5 through 181 are individual calls that will

12   be played during the trial?

13   A.   Correct.

14   Q.   Exhibit 1 is all of those calls on one disc?

15   A.   That's correct.

16        MR. ESTRADA:  Your Honor, government moves to admit

17   Exhibits 5 through 181 at this time.

18        MR. SEVERO:  Objection.

19        MR. FLIER:  Objection.

20        THE COURT:  Subject to the same objection, which will

21   be overruled, they'll be admitted.

22      (Received in evidence, Exhibits 5 through 181.)

23   BY MR. ESTRADA:

24   Q.   Now, with regard to these calls, were transcripts prepared

25   for all these calls?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, they were.

2   Q.   Have you previously reviewed Exhibits 5A through 181A?

3   A.   Yes, I have.

4   Q.   Are those transcripts that were prepared for these calls?

5   A.   Yes, they are.

6   Q.   Now, were some of those recordings in the English

7   language?

8   A.   Yes.

9   Q.   And were other of those calls in the Eastern Armenian

10  language?

11          MR. FLIER:  Objection.  How do we know it's eastern?

12          MR. SEVERO:  Or Armenian.

13          THE COURT:  Sustained.

14          MR. FLIER:  Thank you.

15          THE COURT:  Some were in English, and some were in a

16  different language?

17          THE WITNESS:  That's correct.

18          THE COURT:  Okay.

19  BY MR. ESTRADA:

20  Q.   Okay.  Now, with regard to the English calls, were those

21  transcribed?

22  A.   Yes.

23  Q.   How were they transcribed?

24  A.   They were transcribed by other individuals working at the

25  FBI or myself.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    And in terms of transcribing those English calls, what was
2    the process of doing that?
3    A.    We would listen to the calls several times, and basically,
4    similar to the Armenian transcripts, we would create a
5    word-for-word record of what's said on the call.
6              MR. SEVERO:  Your Honor, I think beyond the ones that
7    he did himself, everything else is no foundation, calling for
8    speculation.
9              MR. FLIER:  Join.
10             MR. PEREYRA-SUAREZ:  I'll join as well, your Honor.
11             THE COURT:  Sustained.
12             MR. ESTRADA:  I haven't finished with the foundation,
13   your Honor.
14             THE COURT:  Okay.  Well, go ahead.
15   BY MR. ESTRADA:
16   Q.    So that was a general process, and these English-language
17   calls were prepared.  Did you review all of the
18   English-language calls being used in this case?
19   A.    Yes.
20             MR. SEVERO:  Leading.  There was a whole speech in
21   front of that question.
22             THE COURT:  Overruled.
23             THE WITNESS:  Yes, I did review them all.
24   BY MR. ESTRADA:
25   Q.    Did you listen to the actual English-language recording?
```

```
 1   A.   Yes.

 2   Q.   And compare it to the actual transcript?

 3   A.   Yes.

 4   Q.   And did you determine that the transcript was fair and

 5   accurate?

 6   A.   Yes.

 7        MR. FLIER:  I'm going to object.  If it's in English,

 8   your Honor, I think that's a jury issue.  Submitted.  I can

 9   understand if it's in a different language.

10        THE COURT:  Overruled.  He's saying the transcript was

11   the same as the -- and it is a jury issue, ultimately will be a

12   jury issue.  Overruled.

13        MR. FLIER:  Thank you.

14   BY MR. ESTRADA:

15   Q.   And now, there are also transcripts in another language.

16   We'll say not English, but another language.

17   A.   Yes.

18   Q.   Were those submitted to certified translators in this

19   case?

20   A.   Yes.

21   Q.   What language were those certified translators in?

22   A.   Eastern Armenian.

23   Q.   Now, with regard to all the calls -- the transcripts,

24   excuse me.  With regard to all the transcripts, 5A through

25   181A, have you reviewed the information on the first page which
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   include a date and time, duration, and phone numbers?

 2   A.   Yes.

 3   Q.   Was that found to be accurate?

 4   A.   Yes.

 5   Q.   Now, in the transcripts, do they generally identify the

 6   names of the participants in the conversation?

 7   A.   Yes.

 8   Q.   The speakers?

 9   A.   Yes.

10   Q.   Are there two speakers who are not specifically identified

11   in the transcripts at 5A through 181A?

12   A.   Yes.

13   Q.   Who are those speakers?

14   A.   Mher Darbinyan and Rafael Parsadanyan.

15        MR. SEVERO:  Well, that's kind of -- that calls for

16   speculation.

17        THE COURT:  I'm not too sure I understand the

18   question, Counsel.  You said there were two speakers that are

19   not identified, and then you asked him what the identification

20   was.

21        MR. SEVERO:  Right.

22        MR. ESTRADA:  Who those people are.

23        THE COURT:  I just don't understand the question.

24   What do you mean by "were not identified"?  Why don't you start

25   again, because if he can't identify them, asking him to
```

```
 1    identify them now -- try it again.
 2              MR. ESTRADA:  Let me clarify that, your Honor.
 3    Q.   On the transcripts, do they generally name --
 4              MR. SEVERO:  I'm sorry, your Honor.  Is the last
 5    answer stricken from --
 6              THE COURT:  Last answer is stricken.
 7              MR. SEVERO:  Thank you.
 8              THE COURT:  Go ahead.
 9    BY MR. ESTRADA:
10    Q.   On the transcripts, they generally name the person who is
11    speaking in the conversation?
12    A.   That's correct.
13    Q.   With an actual name for that person?
14    A.   That's correct.
15    Q.   Are there two individuals who don't have their names
16    written out?
17    A.   Yes.
18    Q.   Who are those two individuals?
19              THE COURT:  Well, before you get to there, are there
20    only two people who were not identified?
21              MR. ESTRADA:  Well, that --
22              THE COURT:  Or were there more than two?
23              THE WITNESS:  Umm, there's two different questions
24    there, your Honor.
25              THE COURT:  Let me start this --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Can we do this outside the presence?

 2              THE COURT:  I'm sorry?

 3              MR. SEVERO:  Can we do this outside the presence?

 4              THE COURT:  No, no.  There's no need to, Counsel.  I

 5    just want to clarify counsel's question.

 6         Were there only two people whose names were not identified

 7    on the transcripts?

 8              THE WITNESS:  No.

 9              THE COURT:  Okay.

10    BY MR. ESTRADA:

11    Q.   Okay.  Let me just clarify it.  Are there two people in

12    the transcripts who are listed as Speaker 1 and Speaker 2?

13    A.   Yes.

14    Q.   And who are those Speaker 1 and Speaker 2, based on your

15    knowledge of the investigation?

16              MR. SEVERO:  Objection.  There's no foundation for

17    that.

18              THE COURT:  Well, you're going to have to lay the

19    foundation as to how he knows who Speaker 1 is and Speaker 2.

20              MR. ESTRADA:  I'm going to get into that, your Honor.

21    It's just the preface.

22    Q.   So there's Speaker 1, who you believe to be Darbinyan?

23              MR. SEVERO:  Objection.  Leading, suggestive, and

24    without foundation.

25              THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1           MR. FLIER:  Objection.  It depends on what specific
 2   transcript to ask that question.
 3           THE COURT:  Overruled, Counsel.
 4   BY MR. ESTRADA:
 5   Q.   Okay.  So let me lay out -- just to make it easier, if you
 6   could take a look at Exhibit 245.
 7           MR. SEVERO:  Which?
 8           THE CLERK:  Counsel, is that in a binder or --
 9           MR. ESTRADA:  It's in the binder, actually, behind
10   him.
11           THE WITNESS:  Yes.
12   BY MR. ESTRADA:
13   Q.   Do you see Exhibit 245?
14   A.   Yes, I do.
15   Q.   What's Exhibit 245?
16   A.   It is a chart documenting who's Speaker 1, the identity of
17   Speaker 1 and the identity of Speaker 2.
18   Q.   Okay.  So before I show, or ask permission to show that
19   chart, let's talk about Speaker 1.  Was that a person you
20   believe to be Mher Darbinyan?
21   A.   Yes.
22   Q.   Are you familiar with the voice of Mher Darbinyan?
23   A.   Yes.
24   Q.   How are you familiar with the voice of Mher Darbinyan?
25   A.   I've reviewed tapes of interviews of him.  I've reviewed
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    jail calls with Mher Darbinyan.  Mher Darbinyan also identifies
2    himself on several phone calls as Mike Darbinyan, gives his
3    home address.  I'm also -- I've also listened to interviews
4    with him, and I've spoken to him in the court.
5    Q.   And let's clarify that.  Have you actually spoken to
6    Mher Darbinyan?
7    A.   Yes, I have.
8    Q.   In a meeting?
9    A.   Yes.
10   Q.   Are you familiar with his voice based on having spoken to
11   him?
12   A.   Yes.
13   Q.   And you mention that in the calls there's also indications
14   of who he is?
15   A.   Yes.
16   Q.   Can you explain what that is.
17   A.   He makes several calls where he identifies himself as
18   Mike Darbinyan, provides his home address.
19   Q.   I'd like to play some of those calls for you, with the
20   Court's permission.  If you could take a look at Exhibit 241,
21   which should be a disc, actually, one of the exhibits.
22        I believe, your Honor, that for ease, the detective's
23   placed those on top of the cabinet.
24             THE CLERK:  Thank you.
25             THE WITNESS:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:
 2   Q.   What's Exhibit 241?
 3   A.   Exhibit 241 is a compact disc containing two recordings of
 4   phone calls wherein Mike Darbinyan identifies himself.
 5   Q.   Are those wiretap recordings?
 6   A.   Yes, they are.
 7   Q.   Were they recorded using the same procedures you discussed
 8   earlier?
 9   A.   Yes, they were.
10        MR. ESTRADA:  Your Honor, the government moves to
11   admit Exhibit 241 and play those for the jury.
12        THE COURT:  Counsel, do you want to --
13        MR. SEVERO:  I don't think there's foundation, still,
14   for that.
15        THE COURT:  Overruled.  Subject to a motion to strike,
16   they will be received.
17        (Received in evidence, Exhibit 241.)
18        MR. ESTRADA:  I believe those are on a compact disc
19   already.  With the Court's permission, we'll play those at this
20   time.
21        THE COURT:  Okay.  Counsel, can I get a stipulation
22   from all counsel that any recordings that are played here in
23   court that are in evidence, that the reporter doesn't have to
24   try and take down the recording?
25        MR. ESTRADA:  Yes, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1          MR. SEVERO:  Stipulate on behalf of Mr. Darbinyan.

 2          MR. FLIER:  Stipulated.

 3          MR. PEREYRA-SUAREZ:  So stipulated, your Honor.

 4          THE COURT:  Thank you, Counsel.

 5      (*Audio played.*)

 6          MR. SEVERO:  Your Honor, that's not -- I have an

 7  objection to this outside --

 8          THE COURT:  Can you hold it?

 9      (*Audio paused.*)

10          THE COURT:  Objection?

11          MR. SEVERO:  I think it brings in evidence that is

12  not -- is not admissible by this Court's in limine motion.

13          THE COURT:  Overruled.

14      (*Audio resumed playing.*)

15  BY MR. ESTRADA:

16  Q.   Okay.  So in that call we just heard, is that an example

17  of one of the wiretap calls where Mher or Mike Darbinyan

18  self-identifies himself?

19  A.   Yes.

20  Q.   And was that call to a probation officer?

21  A.   Yes.

22  Q.   And do you know that Mike Darbinyan was on probation at

23  the time?

24          MR. SEVERO:  Objection.

25          THE WITNESS:  I believe it was parole.


UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.

 2              MR. SEVERO:  Move to strike.

 3              THE COURT:  Sustained.  It will be stricken.

 4              MR. ESTRADA:  It's for identification purposes, your

 5    Honor.

 6              THE COURT:  Whether he was on parole -- the objection

 7    was sustained.

 8    BY MR. ESTRADA:

 9    Q.   Now, were there other instances similar to this where Mike

10    or Mher Darbinyan self-identified himself?

11    A.   Yes.

12              MR. ESTRADA:  If we could play the next call on that.

13         (Audio playing.)

14              MR. SEVERO:  Is that it?

15              THE COURT:  Is she going to come back?

16              MR. ESTRADA:  I think it's eventually going to get

17    there, your Honor.

18         (Audio continues to play, and then is stopped.)

19    BY MR. ESTRADA:

20    Q.   Okay.  Special Agent Stebbins, in those two recordings,

21    were those examples of instances where Mher or Mike Darbinyan

22    self-identified himself?

23    A.   Yes.

24    Q.   And those call numbers, the actual telephone numbers that

25    were used in those calls, were those later intercepted,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000324**

```
 1   involving criminal conversations?

 2           MR. SEVERO:  Objection.

 3           MR. FLIER:  Objection.

 4           MR. SEVERO:  That calls for a conclusion that is a

 5   call for the jury.

 6           MR. ESTRADA:  I'll rephrase, your Honor.

 7           MR. SEVERO:  Creates the problem.

 8           MR. ESTRADA:  I'll rephrase.

 9           THE COURT:  Overruled.

10   BY MR. ESTRADA:

11   Q.  Were those conversations that we just heard, where

12   Mike Darbinyan self-identified, were those later the same

13   telephone numbers that were used in some of the exhibits here?

14   A.   Prior to these calls and after these calls, yes.

15   Q.   Okay.  Now I'd like to ask you --

16       Actually, before I do that, with the Court's permission,

17   I'd like to read into the record a stipulation, Exhibit 244.

18           THE COURT:  Okay.  Before this is read, remember,

19   ladies and gentlemen, I said there's three ways you could

20   receive evidence.  One's from the testimony of the witnesses.

21   One's from the exhibits that are received into trial.  The

22   third one was when I said counsel agree to -- and they call it

23   a stipulation -- agree to some facts as being true.  When

24   there's a stipulation by both sides that any testimony is true,

25   then you have to accept that as being fact, as being proved.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Okay?

2        The stipulation is?

3        MR. ESTRADA:  The stipulation's titled "Joint

4   Stipulation re Voice Identification for Arman Sharopetrosian."

5   It reads:

6        "Plaintiff, United States of America, by and

7        through its counsel of record, the United States

8        Attorney's Office for the Central District of

9        California, and Defendant Arman Sharopetrosian, by

10       and through his counsel of record, Charles

11       Pereyra-Suarez, hereby stipulate as follows:

12       "Voice identification.  Defendant Arman

13       Sharopetrosian is a speaker on the recordings at

14       Government's Exhibits 66 through 75, 77, 80 through

15       90, 108 through 109, and 136, and is the speaker

16       identified as A.S. and/or Arman Sharopetrosian in

17       the corresponding transcripts at Government's

18       Exhibits 66A through 77A -- excuse me, 66A through

19       75A, 77A, 80A through 90A, 108A through 109A, and

20       136A."

21       THE COURT:  Thank you.  Okay.

22       MR. ESTRADA:  Now, in --

23       THE COURT:  So you understand that that stipulation is

24   to be presumed by you as being proved, okay?

25       Counsel, go ahead.

```
 1   BY MR. ESTRADA:

 2   Q.   In addition to Mher Darbinyan's voice and

 3   Arman Sharopetrosian, which we just read a stipulation to, are

 4   you familiar with the voice of Rafael Parsadanyan?

 5   A.   Yes, I am.

 6   Q.   How are you familiar with his voice?

 7   A.   I've spoken with him several times.

 8   Q.   In addition, was there a particular phone number

 9   associated with him captured in the wiretap?

10   A.   Yes, there was.

11   Q.   What was that phone number?

12   A.   818-216-0000.

13   Q.   And let me just, for clarity, have you identify now that

14   person you spoke to with the name Rafael Parsadanyan.  Do you

15   see him in the courtroom today?

16   A.   Yes, I do.

17           MR. FLIER:  I'll stipulate it's my client, your Honor.

18           THE COURT:  Thank you, Counsel.

19           MR. FLIER:  You're welcome.

20   BY MR. ESTRADA:

21   Q.   In addition, that person Mher Darbinyan who you've met

22   with in the past and spoken to, do you see him in the courtroom

23   today?

24   A.   Yes, I do.

25           MR. SEVERO:  I'll have the same stipulation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2   BY MR. ESTRADA:

 3   Q.   Now, with regard to that phone number you described

 4   associated with Rafael Parsadanyan, did you do any

 5   investigation as to that telephone number?

 6   A.   Yes.

 7   Q.   What sort of investigation did you do?

 8   A.   We sent subpoenas out for subscriber information related

 9   to that phone number.

10   Q.   Can you explain to the jury what that means, what a

11   subscriber information is.

12   A.   Basically, it's the name that's on the phone.  So we get a

13   order from the AUSA that we send to the phone company, and they

14   provide us with the name that's on the phone.

15   Q.   And is that a name that's given by the person using the

16   phone?

17   A.   Yes.

18              MR. FLIER:  Objection.  That's not necessarily true.

19              THE COURT:  I don't think that's a valid objection.

20              MR. FLIER:  Oh, I'm sorry.  Thank you.

21              THE COURT:  Speculation?

22              MR. FLIER:  Yes, sir.

23              THE COURT:  Sustained.

24   BY MR. ESTRADA:

25   Q.   Okay.  Please take a look at Exhibit 243.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes.

2    Q.   Do you have Exhibit 243 in front of you?

3    A.   Yes, I do.

4    Q.   Is that a certified record?

5    A.   Yes, it is.

6    Q.   A certified record from whom?

7    A.   I believe it's AT&T.

8    Q.   And is Exhibit 243 subscriber information for various

9    telephones, including telephone number 818-216-0000?

10   A.   Yes, it is.

11       MR. ESTRADA:  Your Honor, the government moves to

12   admit Exhibit 243 and asks permission to publish.

13       THE COURT:  Okay.  It'll be received.

14       (*Received in evidence, Exhibit 243.*)

15   BY MR. ESTRADA:

16   Q.   I'd like to show you page 3 of Exhibit 243.  Let me focus

17   in there.  You see a name there at the top?

18   A.   Yes.

19   Q.   What's the name?

20   A.   Rafael Parsadanyan.

21   Q.   In addition, do you see user information there toward the

22   bottom of the screen?

23   A.   Yes.

24   Q.   Do you see a telephone number associated with that name?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   What's that telephone number?

 2    A.   818-216-0000.

 3    Q.   And is that the same telephone number intercepted through

 4    the wiretaps for a person believed to be Rafael Parsadanyan?

 5    A.   Yes.

 6    Q.   In addition, there's an address there.  Do you see that?

 7    A.   Yes.

 8    Q.   What's that address?

 9    A.   5356 Franklin Avenue, Apartment 4, Los Angeles,

10    California.

11    Q.   Now, please take a look, if you would, at Exhibit 203.

12         And your Honor, this is a certified document, which

13    the government would ask to admit and ask permission to

14    publish.

15         You see that?

16    A.   Yes, I do.

17    Q.   What's Exhibit 203?

18    A.   It is a certified DMV record for Rafael Parsadanyan.

19         MR. ESTRADA:  Your Honor, the government moves to

20    admit and requests permission to publish.

21         THE COURT:  Be received.  You may publish.

22         (Received in evidence, Exhibit 203.)

23    BY MR. ESTRADA:

24    Q.   I'm going to zoom out a little bit.  Do you see the name

25    at the top?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   See the picture here?

 3   A.   Yes.

 4   Q.   Do you see the person in that picture in the courtroom

 5   today?

 6   A.   Yes.

 7   Q.   Could you point him out and describe an article of

 8   clothing he's wearing for the jury.

 9        MR. FLIER:  Same thing, your Honor.

10        THE COURT:  Repetitive, Counsel.

11   BY MR. ESTRADA:

12   Q.   And also there is an address listed.

13   A.   Yes.

14   Q.   What's the address listed for Rafael Parsadanyan?

15   A.   5356 Franklin Avenue, Apartment 4, Los Angeles,

16   California, 90027.

17   Q.   I'm going to go back to the subscriber information.  Is

18   that the same address there as on Rafael Parsadanyan's DMV

19   photo?

20   A.   Yes, it is.

21   Q.   And now turning back to Exhibit 245, in the transcripts

22   that are prepared at Exhibit 5A through 181A, except for two

23   individuals, are the names of the speakers written out?

24   A.   Yes.

25   Q.   Who are the two individuals for whom the name is not
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    written out, based on your knowledge?

 2              THE COURT:  First of all, are they identified in any

 3    way other than by name in there?

 4              THE WITNESS:  Yes.

 5              THE COURT:  As what?

 6              THE WITNESS:  Mher Darbinyan is identified as

 7    Speaker 1.

 8              MR. FLIER:  No.

 9              THE WITNESS:  Sorry.

10              MR. SEVERO:  Move to strike that.

11              THE COURT:  Yeah.  What are the identifications in the

12    transcript?

13              THE WITNESS:  Speaker 1 and Speaker 2.

14              THE COURT:  Okay.  Now your next question, Counsel.

15    BY MR. ESTRADA:

16    Q.   So in the transcripts, all the name -- all the people are

17    identified by name except for Speaker 1 and Speaker 2?

18    A.   That's correct.

19    Q.   And based on your familiarity with his voice, who is

20    Speaker 1?

21              MR. SEVERO:  Objection, no foundation.

22              THE COURT:  Are you -- were you able to recognize the

23    voice that's Speaker No. 1?

24              THE WITNESS:  Yes.

25              THE COURT:  And why were you able to recognize that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   voice?

 2          THE WITNESS:  Based on having conversations with him,

 3   based on the self-identity in the phone calls.  Basically that.

 4          THE COURT:  Okay.  I'm going to overrule the

 5   objection.

 6          MR. SEVERO:  May I be heard?

 7          THE COURT:  Yes.  Yeah.

 8          MR. SEVERO:  Everything he testifies about are

 9   conversations with Mr. Darbinyan in English.  These transcripts

10   and the Speaker 1 is a different story.  So I don't know that

11   that has --

12          THE COURT:  Well, let me ask this question, and then

13   I'll let you phrase your objection.

14      Some of the testimony of Speaker 1 was in a different

15   language other than English?

16          THE WITNESS:  That's correct.

17          THE COURT:  Could you still recognize the voice

18   whether it was in English or not?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.

21          MR. SEVERO:  Calls for a conclusion of this witness

22   that he can't --

23          MR. ESTRADA:  Your Honor, it's really the weight of

24   the evidence.

25          THE COURT:  I'm sorry, one at a time, please.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1        Objection?

2             MR. SEVERO:  It's a conclusion of this witness without

3    foundation.

4             THE COURT:  Okay.  Overruled.

5             MR. SEVERO:  Thank you.

6    BY MR. ESTRADA:

7    Q.   So where the transcript states "Speaker 1," based on your

8    knowledge of the voices, that's Mher Darbinyan?

9    A.   Yes.

10   Q.   And where the transcript states "Speaker 2," based on your

11   knowledge of the voice of Rafael Parsadanyan, who's that

12   person?

13   A.   Speaker 2 is Rafael Parsadanyan.

14            MR. FLIER:  Objection.

15            THE COURT:  Noted.  Same ruling.  Overruled.

16   BY MR. ESTRADA:

17   Q.   And looking at 245, what is Exhibit 245?

18   A.   245 is a chart of Speaker 1 and Speaker 2.

19            MR. ESTRADA:  Your Honor, the government moves to

20   admit and requests permission to publish.

21            MR. FLIER:  Same objection.

22            THE COURT:  I'm sorry, what is it?  I don't know --

23            MR. ESTRADA:  Simply a chart which sets forth --

24            THE COURT:  Okay.  Any objection?

25            MR. FLIER:  Objection.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1            MR. SEVERO:  Yeah, same objection based on the
2   previous --
3            THE COURT:  Rulings, yeah.  Overruled.
4        (Received in evidence, Exhibit 245.)
5   BY MR. ESTRADA:
6   Q.   Okay.  And I'll zoom out.  So does this chart demonstrate
7   your knowledge of the speakers in the transcripts?
8   A.   Yes.
9   Q.   Speaker 1 would be Mher Darbinyan?
10  A.   Yes.
11  Q.   And Speaker 2 would be Rafael Parsadanyan?
12  A.   That's correct.
13  Q.   Now, with regard to the other individuals who are in some
14  of these calls, are you familiar with their voices as well?
15  A.   Yes.
16  Q.   For instance, are you familiar with a person known as
17  Paraman -- Paramaz Bilezikchyan?
18  A.   Yes, I am.
19  Q.   Are you familiar with his voice?
20  A.   Yes.
21  Q.   How are you familiar with his voice?
22  A.   Spoken to him on several occasions.
23  Q.   Is he listed as a speaker in some of the wire calls?
24  A.   Yes, he is.
25  Q.   Now, with regard to an individual named Gustavo Ortega,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   are you familiar with that person?

2   A.   Yes.

3   Q.   Have you spoken to that person?

4   A.   Yes, I have.

5   Q.   Is that person identified in some of the wiretap

6   recordings?

7   A.   Yes, he is.

8   Q.   With regard to Armando Moreno, are you familiar with that

9   person?

10  A.   Yes, I am.

11  Q.   Have you spoken to that person?

12  A.   Yes, I have.

13  Q.   Is that person listed as Armando Moreno in some of the

14  wiretap calls?

15  A.   Yes, he is.

16  Q.   With regard to a person named Manuk Terzyan, are you

17  familiar with that person?

18  A.   Yes, I am.

19  Q.   Have you spoken to that person?

20  A.   Yes, I have.

21  Q.   Is that person recorded in some of the wiretap calls?

22  A.   Yes, sir.

23  Q.   Is that person listed by name in some of the wiretap

24  calls?

25  A.   Yes, he is.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   With regard to a person named Raymond Tarverdyan, are you

 2   familiar with that person?

 3   A.   Yes.

 4   Q.   Have you spoken to that person?

 5   A.   Yes.

 6   Q.   Is that person contained in some of the wiretap calls?

 7   A.   Yes.

 8   Q.   And has that name been listed in the wiretap calls where

 9   he is included?

10   A.   Yes.

11   Q.   And finally, with regard to a person named

12   Arman Tangabekyan, are you familiar with that person?

13   A.   Yes.

14   Q.   Have you spoken to that person?

15   A.   Yes, I have.

16   Q.   And in the wiretap calls, is that person recorded?

17   A.   Yes.

18   Q.   Do the transcripts list that name of Arman Tangabekyan?

19   A.   Yes.

20   Q.   Based on your knowledge of the investigation as a whole,

21   do the transcripts correctly identify who the speakers are in

22   the various wiretap conversations?

23   A.   Yes, they do.

24           MR. FLIER:  Objection as to my client, your Honor.

25           THE COURT:  It'll be noted for the record.  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. FLIER:  Thank you.

 2    BY MR. ESTRADA:

 3    Q.   Now I'd like to ask you about Exhibits 201 through 236.  I

 4    think you previously reviewed those, but if you could take a

 5    look.  203, we've already gone through, but I want you to look

 6    at 201 through 236, if you could.

 7    A.   Yes.

 8    Q.   Have you previously reviewed those?

 9    A.   Yes, I have.

10    Q.   Are they essentially the same thing we saw in 203 for

11    Rafael Parsadanyan?  DMV photos?

12    A.   Yes.

13    Q.   Certified?

14    A.   Yes.

15              MR. ESTRADA:  Your Honor, the government moves to

16    admit Exhibits 201 through 236.  I won't ask permission to

17    publish at this time.

18              MR. SEVERO:  Object, irrelevant.

19              THE COURT:  I don't know if it is or not.  I will

20    overrule at this time subject to a motion to strike if it's not

21    relevant.

22              MR. ESTRADA:  And it's simply for purposes of the wire

23    calls, your Honor.

24              THE COURT:  Okay.  And you can finish the questioning

25    in that area at 1:00 o'clock.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Very good, your Honor.

 2         (Received in evidence, Exhibits 201 through 236.)

 3              THE COURT:  It is 11:30, ladies and gentlemen.  It's

 4     lunchtime, so I'm going to excuse you at this time until

 5     1:00 o'clock.

 6         Remember the admonishment not to discuss the case among

 7     yourselves or with anybody else or form or express any opinions

 8     about the matter until it's submitted to you and you retire to

 9     the jury room.

10         Make sure that we come back in a little bit before

11     1:00 o'clock so we can get started right on time.

12              THE CLERK:  All rise.

13         (Lunch recess held from 11:30 a.m. to 1:03 p.m.)

14         (In the presence of the jury:)

15              THE COURT:  Okay.  The record will reflect that all

16     the members of the jury are in their respective seats in the

17     jury box, and we're in direct examination.

18         Counsel, you may continue.

19              MR. ESTRADA:  Thank you, your Honor.

20                    DIRECT EXAMINATION (Continued)

21     BY MR. ESTRADA:

22     Q.  Special Agent Stebbins, when we left off, we were

23     discussing the transcripts in this case, and I want to just

24     finish one last point on that.

25         There was a voice exemplar played for defendant Darbinyan.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Do you recall that, Exhibit 241?

 2   A.   Yes.

 3   Q.   And do you recall a -- one of those calls where

 4   defendant Darbinyan says, "I'm Mike Darbinyan," where he gives

 5   an address?

 6   A.   Yes.

 7   Q.   Do you know what that address was?

 8   A.   27033 Fairway Lane, Valencia, California.

 9   Q.   Okay.  And how do you remember that so well?

10   A.   I was there many times on surveillance, and I know it to

11   be his address from his driver's license.

12   Q.   I want to show you that.  Can you please take a look at

13   Exhibit 201.

14       And with the Court's permission -- this has already been

15   admitted.  I'd like permission to publish it.

16          THE COURT:  Yes.

17   BY MR. ESTRADA:

18   Q.   So I've got Exhibit 201 there.  And just for

19   clarification, the person photographed there, do you see him in

20   the courtroom today?

21   A.   Yes.

22   Q.   Can you please point him out, identify an article of

23   clothing he's wearing?

24          MR. SEVERO:  I'll stipulate that it's Mr. Darbinyan.

25          THE COURT:  Okay.  He's already identified him, also,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Counsel.  Go ahead.  It's been stipulated to.

 2    BY MR. ESTRADA:

 3    Q.   And now at the top here, you see the address listed for

 4    Mher Darbinyan?

 5    A.   Yes.

 6    Q.   27033 Fairway Lane?

 7    A.   That's correct.  Valencia, California.

 8    Q.   Now I'd like to turn your attention to the wiretap calls

 9    that are actually in the exhibits in this case.

10         There were numerous wiretap calls in this case; is that

11    right?

12    A.   Yes.  Thousands.

13    Q.   And here, they are Exhibits 5 through 181.  Not all the

14    calls are being played.

15    A.   That's correct.

16    Q.   In the calls, is there some vague language used?

17    A.   Some, yes.

18         MR. SEVERO:  Objection, vague as to "vague."

19         THE COURT:  Just a second.

20    I'm sorry, objection is to what?  The question was, "In

21    the calls, were there some vague language used."

22         MR. SEVERO:  And the objection is vague.

23         THE COURT:  Oh, vague.  I'm sorry, I thought you said

24    "they."  Okay.  Overruled.

25         THE WITNESS:  Yes, there was vague language used.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MR. ESTRADA:

2    Q.   Based on your training, experience, is this a common

3    practice among people involved in criminal activity?

4              MR. SEVERO:  Objection, no foundation.

5              THE COURT:  Sustained.

6    BY MR. ESTRADA:

7    Q.   Now, as an agent with the FBI, have you listened to many

8    wiretap calls?

9    A.   Yes, I have.

10   Q.   Are you familiar with some of the practices of people

11   involved in criminal activity?

12   A.   Yes, I am.

13   Q.   In wiretap calls?

14   A.   Yes.

15   Q.   Do people involved in criminal activity make efforts to

16   conceal their activities from law enforcement?

17             MR. SEVERO:  Objection, irrelevant as to other general

18   calls.

19             THE COURT:  Overruled.  Overruled.

20             MR. SEVERO:  Other general calls.  That was my

21   objection.

22             THE COURT:  Okay.  Overruled.

23             THE WITNESS:  Yes, they take very significant efforts

24   to disguise what they're talking about.

25             MR. SEVERO:  Move to strike the answer as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    nonresponsive and goes beyond the scope of the question.

2              THE COURT:  Sustained.

3    BY MR. ESTRADA:

4    Q.   Can you describe means that are used by people involved in

5    criminal activity to conceal their activities with regard to

6    the wiretaps?

7              MR. SEVERO:  Leading.

8              THE COURT:  Overruled.

9              THE WITNESS:  Oftentimes they would utilize language

10   such as "the thing, take it over there to that place where we

11   met yesterday, take it to that guy who we saw," things of that

12   nature, so that they wouldn't mention names, places, or ways of

13   doing business on the phone.

14   BY MR. ESTRADA:

15   Q.   And you mentioned earlier that in this case the wiretap

16   calls that will be sought to be introduced for the jury, those

17   are for four different telephones believed to be used by

18   Mher Darbinyan; is that right?

19   A.   That's correct.

20   Q.   Are you familiar with the practice of people involved in

21   criminal activity using multiple telephone numbers?

22   A.   Yes, I am.

23   Q.   Could you explain how that works?

24   A.   Oftentimes individuals involved in criminal activity will

25   utilize prepaid cellular phones, and they will use these phones

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   for much shorter duration than -- than many other people would

2   use them.  They'd use them for 30 days, 60 days, and then

3   they'd get rid of the phone.  Thinking that law enforcement may

4   be able to listen to them, or their number may have been

5   provided by an informant, they would get rid of their

6   telephone.

7   Q.   That sort of practice, is that referred to as dropping

8   telephones?

9   A.   Yes.

10  Q.   Does that sort of practice take place in this

11  investigation?

12  A.   Yes, many times.

13           MR. FLIER:  Objection, no foundation, "many times."

14           THE COURT:  Overruled.  You can cross-examine on it.

15  Overruled.

16           MR. FLIER:  Thank you.

17  BY MR. ESTRADA:

18  Q.   Now, with regard to defendant Darbinyan specifically,

19  about how many telephones were identified as being used by

20  defendant Darbinyan in this investigation?

21  A.   Approximately ten.

22  Q.   Now, you talked a little bit earlier about subscriber

23  information for a telephone used by Rafael Parsadanyan.

24  A.   Yes.

25  Q.   Are you familiar with the use of fake subscriber

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   information by people involved in criminal activity?

2   A.   Yes.

3   Q.   Can you explain what that means.

4   A.   Oftentimes individuals involved in these types of crimes,

5   at least in this investigation especially, would use

6   subscribers such as Juan Garcia, Jose Gomez, Jose Vargas,

7   Juan Gonzalez, things like that, and it would actually be an

8   Armenian speaker or these defendants on the phone.

9   Q.   So it's believed to be fake subscriber information?

10  A.   Yes.

11  Q.   Okay.  Now, as you mentioned, there were numerous calls

12  intercepted during this case.  What I'd like to do is start

13  playing some of those calls for you, separated by different

14  types of criminal activity.

15       With the Court's permission, your Honor, I'd like to first

16  play a segment regarding a check fraud, and if I could please

17  distribute transcript binders to the jury.

18       MR. SEVERO:  Your Honor, I object to the

19  characterization by Mr. Estrada and the testimony being given

20  from the podium as to what the calls mean or what they are

21  about rather than simply asking questions about the calls.

22       MR. FLIER:  Join.

23       MR. PEREYRA-SUAREZ:  I join as well, your Honor.

24       THE COURT:  Yeah.  Well, obviously, it's for

25  identification.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    And it's not testimony, as I already told you, ladies and

2  gentlemen.

3    But I think just for clarity's sake, you should always

4  talk about an alleged rather than --

5        MR. ESTRADA:  Very good.

6        THE COURT:  Okay.  Or what you feel it to be, but it's

7  for identification purposes only.

8    You're going to have to determine if there was a crime or

9  not committed, if these were about bank fraud or anything else.

10  You're going to have to figure that out as a jury.

11    Go ahead, Counsel.

12        MR. ESTRADA:  With the Court's permission, if I could

13  distribute the -- or if the government could distribute the

14  binders to the jury.

15        THE COURT:  Okay.

16        MR. ESTRADA:  And we'd like to start out, with the

17  Court's permission, with the first volume.  There are three

18  volumes of transcripts.  If we could start with the first

19  volume.

20        THE COURT:  Is there a number for counsel to know what

21  you're playing, exhibit number?

22        MR. ESTRADA:  I will -- once they get the volumes,

23  then I'll specify the exhibit numbers.

24        THE COURT:  Okay.  Volume 1?

25        MR. ESTRADA:  Volume 1 to begin with, yes, your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Okay.  Does everybody have a copy of the
 2   transcripts?
 3          JUROR:  Yes.
 4          THE COURT:  Volume 1?  Okay.
 5     Go ahead, Counsel.
 6          MR. ESTRADA:  Your Honor, with the Court's permission,
 7   I'd like to now play for the jury Exhibit 5 and ask that the
 8   jurors be instructed to turn to Exhibit 5A in their binder.
 9          THE COURT:  Exhibit 5?
10          MR. ESTRADA:  Correct, your Honor.
11          THE CLERK:  Counsel, I'm sorry, you wanted them to
12   turn to 5A?
13          MR. ESTRADA:  5A, correct.
14          THE CLERK:  Thank you.
15     (Audio played.)
16          MR. ESTRADA:  And your Honor, the Court has a copy in
17   Volume 1 in the exhibits provided.
18          THE COURT:  Yes, I got it.
19   BY MR. ESTRADA
20   Q.  Special Agent Stebbins, turning to the first page of
21   Exhibit 5A, do you have that in front of you?
22   A.  Yes, I do.
23   Q.  And turning to the first page, what's the date of that
24   call?
25   A.  January 26, 2009.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   What's the time of that call?

2   A.   Approximately 9:58 a.m.

3   Q.   And who are the listed participants?

4   A.   Speaker 1 and Gustavo Ortega.

5   Q.   And just to be clear, Speaker 1, based on your knowledge

6   of the investigation and familiarity with Mher Darbinyan's

7   voice, is who, based on your information?

8         MR. SEVERO:  Objection.  That invades the province of

9   the jury.

10        THE COURT:  Overruled.

11        THE WITNESS:  It's Mike Darbinyan.

12  BY MR. ESTRADA:

13  Q.   Now, turning to page 2 of the transcript, do you have that

14  in front of you?

15  A.   Yes.

16  Q.   Ten speakers from the top, Gustavo Ortega refers to "four

17  runners."

18        Based on your training and experience, what does the term

19  "runner" refer to?

20        MR. SEVERO:  Lack of foundation.

21        THE COURT:  Overruled.

22        THE WITNESS:  Runners are low-level members of a

23  scheme.  Oftentimes when it comes to a bank fraud scheme,

24  they'll be the individuals that actually go in the bank and try

25  to cash a check.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:
 2   Q.   Five speakers from the bottom, Gustavo Ortega asks, "Can
 3   they deposit in different bank?"
 4        Based on your training and experience, what does the
 5   process of depositing in different bank refer to?
 6            MR. SEVERO:  Improper expert testimony.  This is -- it
 7   is what it is.
 8            THE COURT:  Well, it is what it is.
 9        Does that saying have any significance to you as far as
10   your expertise in either gangs or bank fraud or wire fraud,
11   wiretap?
12            THE WITNESS:  Yes.
13            THE COURT:  Okay.  You can ask what the significance
14   is to him in those fields.
15   BY MR. ESTRADA:
16   Q.   What's the significance of that?
17   A.   Oftentimes with these types of schemes, they will want to
18   take a Bank of America victim and deposit it into a Bank of
19   America runner's account or cash it at a Bank of America using
20   the runner at a Bank of America.
21            THE COURT:  Okay.  Ladies and gentlemen, you're to
22   determine whether or not that's what they meant here or not.
23        Counsel.
24   BY MR. ESTRADA:
25   Q.   And generally speaking, is it easier to deposit a check at
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   a bank for which a customer has an account rather than a

 2   different bank?

 3   A.   Yes.

 4   Q.   Now, two speakers from the bottom, Darbinyan states, "Hey,

 5   Bam, I don't want to talk on the phone about this stuff, you

 6   know."

 7        Based on your knowledge of the investigation, were the

 8   targets of this investigation very cautious about law

 9   enforcement?

10   A.   Yes.

11   Q.   Can you explain that, please.

12   A.   Oftentimes if somebody would talk too much on the phone,

13   defendant Darbinyan would tell them, "Hey, don't talk about

14   this on the phone, I don't want to talk about this on the

15   phone," and they would try to either use code or they would

16   talk in person.

17             MR. SEVERO:  I'll move to strike all of this.

18   Speculation of this witness.

19             MR. FLIER:  Join.

20             THE COURT:  Overruled.

21             MR. ESTRADA:  Your Honor, the government asks to play

22   Exhibit 6 and asks that the jurors turn to Exhibit 6A in their

23   binders.

24             THE COURT:  Okay.

25        (Audio played.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:

 2   Q.   Okay.  Special Agent Stebbins, turning to the first page

 3   of Exhibit 6A, do you have that in front of you?

 4   A.   Yes, I do.

 5   Q.   What's the date of the recording?

 6   A.   January 26, 2009.

 7   Q.   What's the time of the recording?

 8   A.   Approximately 12:07 p.m.

 9   Q.   Who were the participants in the recording?

10   A.   Mike Darbinyan and Gustavo Ortega.

11   Q.   And again, Mike Darbinyan is referred to as Speaker 1?

12   A.   That's correct.

13   Q.   Now, turning to page 2 of 3 of Exhibit 6A, do you have

14   that in front of you?

15   A.   Yes.

16   Q.   Starting --

17        MR. SEVERO:  Just for the record, your Honor, may I

18   have a running objection on --

19        THE COURT:  Certainly.  It will be a continuing

20   objection as to his identifying Speaker 1 as Mr. Darbinyan.

21        MR. SEVERO:  Thank you.

22   BY MR. ESTRADA:

23   Q.   Now, starting at the first speaker, Ortega says, "Yes,

24   Mikey," and Speaker 1 states, "Hey, Bam."

25        Based on your knowledge of the investigation, what does
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000351**

1   "Bam" refer to?

2   A.   It's a reference to "Bam Bam," aka Gustavo Ortega.

3   Q.   That was a nickname of Gustavo Ortega?

4   A.   Yes.

5   Q.   And four speakers from the bottom, Ortega refers to "I got

6   one of my runners by the Washington Mutual."

7        Are you familiar with what Washington Mutual referred to,

8   based on your knowledge of the investigation?

9   A.   Yes.

10  Q.   What is that?

11  A.   Washington Mutual was one of the larger banks prior to

12  merging with Chase.

13       MR. ESTRADA:  Your Honor, with the Court's permission,

14  I'd ask to play Exhibit 7 and ask that the jurors turn to

15  Exhibit 7A in their binders.

16       THE COURT:  Okay.

17       (*Audio played.*)

18  BY MR. ESTRADA:

19  Q.   Special Agent Stebbins, turning to the first page of the

20  transcript of Exhibit 7A, what's the date of this call?

21  A.   January 27, 2009.

22  Q.   What's the time of this call?

23  A.   Approximately 6:07 p.m.

24  Q.   And who are the participants in this call?

25  A.   Gustavo Ortega and Mike Darbinyan, and there's unknown

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   voices in the background.

 2   Q.   Now, turning to page 3 of 3 of the transcript, if you

 3   could, third speaker from the top, Darbinyan states, "Okay, you

 4   got them other dudes, right?"

 5        Ortega, "I got everything.  I got one B of A on tinta and

 6   two guys."

 7        Based on your knowledge of the investigation, what did the

 8   term "B of A" refer to?

 9   A.   Bank of America.

10   Q.   Was that a bank that was actually victimized in this case?

11   A.   Yes.

12   Q.   There's a reference to tinta and two guys.  Based on your

13   knowledge of the investigation, what did that refer to?

14        MR. SEVERO:  No foundation.  There's a foreign word in

15   here.  We don't have anything on this.

16        THE COURT:  Sustained until foundation's laid.

17   Sustained.

18   BY MR. ESTRADA:

19   Q.   Now, you investigated this particular incident?

20   A.   Yes.

21   Q.   January 2009?

22   A.   Yes.

23   Q.   Did you learn that fraud was actually perpetrated against

24   a customer of Bank of America?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection.  It's a conclusion of this

 2    witness.  He's invading the province of the jury with --

 3              THE COURT:  Whether there was an actual fraud or not,

 4    you have to determine that.

 5         But you felt there was a fraud committed; is that what

 6    you're saying?

 7              THE WITNESS:  Yes, your Honor.

 8    BY MR. ESTRADA:

 9    Q.   And were certain people photographed taking money from an

10    individual's account with regard to this particular incident?

11    A.   Yes.

12    Q.   And those people, can you describe what they generally

13    look like.

14    A.   There was one African-American female.  There was a white

15    male and a Hispanic male.

16    Q.   Now, here it refers to two guys and tinta.  Based your

17    knowledge of the investigation, what did "tinta" refer to?

18    A.   "Tinta" referred to Debra May-Lawson, who was one of the

19    common runners in this case.

20    Q.   Looking towards the bottom, six speakers from the bottom,

21    Ortega states, "It's up to you, Mike.  I'm right here, carnal."

22         Based on your training and experience, what does the term

23    "carnal" refer to?

24              MR. SEVERO:  Oh, there's no foundation for that.

25              THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000354**

```
1    BY MR. ESTRADA:

2    Q.   Are you familiar with investigating street gangs in

3    Southern California?

4    A.   Yes.

5    Q.   Have you spoken to street gang members?

6    A.   Yes.

7    Q.   Based on your knowledge of the investigation, what does

8    "carnal" refer to?

9             MR. SEVERO:  Still not a foundation.

10            THE COURT:  Have you heard that term in your

11   investigations and in your experience with the street gangs?

12            THE WITNESS:  Yes.

13            THE COURT:  Okay.  And in relation to that

14   investigations and experience you've had with street gangs, in

15   that context, what does it mean?

16            THE WITNESS:  It's a term of respect.

17   BY MR. ESTRADA:

18   Q.   Now, four speakers from the bottom, there is a reference

19   by Ortega to "I'm by the Griffith Park."

20        Based on your knowledge of the investigation, generally

21   speaking, where is the Griffith Park area?

22   A.   Griffith Park is near the 5 and 134.

23   Q.   In Los Angeles?

24   A.   By the Los Angeles Zoo.

25            MR. ESTRADA:  Your Honor, the government asks
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    permission to play Exhibit 8 and asks that the jurors be
 2    instructed to turn to 8A in their binders.
 3              THE COURT:  Okay.
 4         (Audio played.)
 5    BY MR. ESTRADA:
 6    Q.   Okay.  Now, Special Agent Stebbins, turning to the first
 7    page of Exhibit 8A, what's the date of that call?
 8    A.   January 28th, 2009.
 9    Q.   What's the time of the call?
10    A.   11:43 a.m.
11    Q.   Who are the participants?
12    A.   They are Julio Rivas and Mike Darbinyan.
13    Q.   Who is Julio Rivas?
14    A.   Julio Rivas was another defendant in this case.  He was
15    responsible for driving runners to the banks.
16    Q.   Now, turning to page 2 of the transcript, five speakers
17    from the top, Julio Rivas states, "He's going in there right
18    now.  I'm the number 3444."
19         Based on your knowledge of the investigation, did 3444
20    have significance to you?
21    A.   Yes.
22    Q.   What's the significance of that?
23    A.   The victim in this particular incident had a check
24    number 3444 written against their account that they did not
25    write.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And now seven speakers from the top, Rivas refers to the

2   number 5,900.  Do you see that?

3   A.   Yes.

4   Q.   Did that have significance?

5   A.   Yes.

6   Q.   What was the significance?

7   A.   That was the amount on that fraudulent check that was

8   written.

9   Q.   Now, the next line after Rivas states 5,900, Darbinyan

10  states, "Okay, yeah, I know.  Don't talk, man."

11       Based on your knowledge of the investigation, did

12  Darbinyan repeatedly tell others not to speak much on the

13  telephone?

14  A.   Yes.

15       MR. ESTRADA:  Your Honor, the government asks

16  permission to play Exhibit 9 and asks that the jurors turn to

17  9A in their transcript binders.

18       THE COURT:  Okay.

19       (*Audio played.*)

20  BY MR. ESTRADA:

21  Q.   Okay.  Now turning to page 1 of Exhibit 9A, do you have

22  that in front of you?

23  A.   Yes.

24  Q.   What's the date of this call?

25  A.   January 28th, 2009.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   What's the time of the call?

2    A.   Approximately 12:14 p.m.

3    Q.   And who are the participants?

4    A.   Mike Darbinyan and an unidentified male.

5         MR. ESTRADA:  Your Honor, with the Court's permission,

6    I'd like to play Exhibit 10 and ask that the jurors turn to tab

7    10A in their books.

8         THE COURT:  Okay.

9    (*Audio played.*)

10   BY MR. ESTRADA:

11   Q.   Special Agent Stebbins, turning to the first page of

12   Exhibit 10A, do you see that page?

13   A.   Yes.

14   Q.   What's the date of that call?

15   A.   January 28th, 2009.

16   Q.   What's the time of the call?

17   A.   Approximately 12:33 p.m.

18   Q.   Who are the participants?

19   A.   Julio Rivas and Mike Darbinyan.

20   Q.   Turning to page 2, eight speakers from the bottom, Rivas

21   tells Darbinyan, "A lot of cops."

22        Based on your knowledge of the investigation, was there an

23   incident on January 28th, 2009, involving a lot of cops?

24   A.   Yes.

25   Q.   What was that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   One of the runners was --

 2              MR. SEVERO:  Hearsay.

 3              THE COURT:  I'm sorry, I didn't hear it.

 4              MR. SEVERO:  Hearsay.  I'm sorry.

 5              THE COURT:  Overruled.

 6              MR. SEVERO:  Not --

 7              THE COURT:  Overruled.

 8              THE WITNESS:  One of the runners was arrested inside

 9    of a Bank of America branch attempting to deposit a fraudulent

10    check in the amount of $5,900, in Glendale, California, at

11    Wilson and Brand.  Actually, it's technically Wilson and

12    Glendale, but it's close.

13    BY MR. ESTRADA:

14    Q.   Now, looking at the bottom of the transcript, last speaker

15    from the bottom, Darbinyan states, "Glendale is not a good

16    place, man."

17         Based on your knowledge of the investigation, were

18    defendants in this case cautious about doing things in

19    Glendale?

20              MR. FLIER:  Objection.

21              MR. SEVERO:  Calls for speculation.

22              THE COURT:  Sustained.

23    BY MR. ESTRADA:

24    Q.   Based on your knowledge of the investigation, had you

25    discussed and heard statements from other defendants about
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    being cautious about doing things in Glendale?

 2    A.   Yes.

 3         MR. SEVERO:  Irrelevant as to "other defendants" as it

 4    applies here.

 5         THE COURT:  Overruled.

 6    BY MR. ESTRADA:

 7    Q.   What was the concern about doing things in Glendale?

 8    A.   Glendale has a very active police force, and they have a

 9    finite area.  It's not as large an area as LAPD.  So they

10    patrol -- they're able to patrol a little bit more

11    aggressively.

12         MR. ESTRADA:  Now, with the Court's permission, I'd

13    like to play Exhibit 11 and ask the jurors turn to tab 11A in

14    their binders.

15         THE COURT:  Okay.

16       (Audio played.)

17    BY MR. ESTRADA:

18    Q.   Special Agent Stebbins, turning to the first page of

19    Exhibit 11A, do you have that in front of you?

20    A.   Yes.

21    Q.   What's the date of that call?

22    A.   January 28th, 2009.

23    Q.   What's the time of the call?

24    A.   Approximately 1:10 p.m.

25    Q.   Who are the participants?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Mike Darbinyan and an unidentified male.

2    Q.   Now, turning to page 2 of the transcript, four speakers

3    from the bottom, Darbinyan states, "Call the tinta, see what

4    happened, because the funds came out."

5         Based on your knowledge of the investigation, who was

6    "the tinta"?

7    A.   Debra May-Lawson.

8    Q.   And there's a reference to funds coming out.  Based on

9    your knowledge of the investigation, was money actually taken

10   from a bank account from a victim that had a Bank of America

11   account?

12   A.   Yes.

13   Q.   Please take a look, if you would, at Exhibit 252.

14        And your Honor, that's a certified record which the

15   government would ask to admit and ask permission to publish.

16             MR. SEVERO:  May I have a moment, your Honor?

17             THE COURT:  Yeah.

18        Exhibit 252?

19             MR. ESTRADA:  252, which is in the binders.

20             MR. SEVERO:  Object to this exhibit.

21             THE COURT:  I don't know what the relevancy is yet.

22        Counsel, you want to lay the foundation?

23             MR. SEVERO:  Or foundation.  It's hearsay also.

24             MR. ESTRADA:  Those will be the -- that's the account

25   that had money taken out from it the same day as these calls.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  Well --
 2            THE COURT:  I don't know what the account -- I don't
 3   know.  You have to lay more of a foundation than that, Counsel.
 4            MR. ESTRADA:  I will, your Honor.
 5   Q.   Now, based on your knowledge of the investigation, was
 6   there a particular account that was identified as being
 7   connected to fraud on this same date?
 8   A.   Yes.
 9   Q.   What was that account?
10   A.   Pompos Jewelry Company, P-o-m-p-o-s.
11   Q.   And how is it identified as being connected to fraud on
12   this same date?
13   A.   It was initially identified when one of the runners was
14   arrested inside a Bank of America attempting to cash that
15   $5,900 check that came up on the calls.
16   Q.   Now, one of the calls referred to a check for $5,900,
17   check number 3444.
18   A.   That's correct.
19   Q.   Was that check actually seized through the investigation?
20   A.   Yes, it was.
21            MR. ESTRADA:  And I'll ask that the witness look at
22   Exhibit 271, which is going to be a physical exhibit in one of
23   the boxes that will be next, and it should be on top of the
24   bookcase as well.
25            THE CLERK:  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE WITNESS:  Yes.
2   BY MR. ESTRADA:
3   Q.    You have Exhibit 271 in front of you?
4   A.    I do.
5   Q.    What's Exhibit 271?
6   A.    It is a Bank of America check written on Pompos Jewelry
7   Company to Rafael Roger Zendejas.
8   Q.    What's the number on that account -- on that check?
9              MR. SEVERO:  Objection, no -- the document will speak
10  for itself if and when admitted.
11             THE COURT:  The document does speak for itself if you
12  admit it, yes.
13             MR. ESTRADA:  Move to admit, your Honor.
14             MR. SEVERO:  There's no foundation for it yet.
15             MR. ESTRADA:  There is another witness who will talk
16  about this check.
17             THE COURT:  Going to admit it subject to a motion to
18  strike if you don't connect it up.
19             MR. ESTRADA:  Permission to approach, your Honor?
20             THE COURT:  Sorry?
21             MR. ESTRADA:  Permission to approach?
22             THE COURT:  To approach whom?
23             MR. ESTRADA:  To get the check so I can publish it,
24  please.
25             THE COURT:  We'll get it back to you.  Yeah, we do
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    everything through the clerk in this court.

2              MR. ESTRADA:  Very good.

3              THE COURT:  That's been admitted subject to a motion

4    to strike, so don't walk off with it.  It's an exhibit.

5              MR. ESTRADA:  I will not, your Honor.

6    Q.    This item at Exhibit 271, was that kept in the custody of

7    the task force and the FBI?

8              MR. SEVERO:  Objection, hearsay.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.

11   BY MR. ESTRADA:

12   Q.    Are you familiar with this check?

13   A.    Yes.

14   Q.    How was it obtained, based on your knowledge of the

15   investigation?

16   A.    It was obtained when the runner I mentioned before,

17   defendant Zendejas, was arrested in the bank attempting to cash

18   a check.

19             MR. SEVERO:  Object, move to strike.  It's hearsay.

20             THE COURT:  Sustained.

21             MR. ESTRADA:  Permission to publish, your Honor?

22             THE COURT:  The check?

23             MR. ESTRADA:  Yes.

24             THE COURT:  The problem is that we don't know where

25   the check came from yet.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  And there will be testimony on that, but
 2    in order for him to talk about the bank account, the bank
 3    records, this is how he came to believe the bank records were
 4    tied to those calls.
 5              THE COURT:  Unless there's an agreement to receive it
 6    subject to a motion to strike, you'd have to lay the foundation
 7    first before bringing it in front of the jury.
 8    BY MR. ESTRADA:
 9    Q.   Now, from this check, did the investigation learn that a
10    particular account had been defrauded that same date, on
11    January 28, 2009?
12    A.   Yes.
13    Q.   Now if you could please take a look at Exhibit 252.
14    A.   Yes.
15              MR. ESTRADA:  Your Honor, the government moves to
16    admit Exhibit 252, which is a certified record.
17              MR. SEVERO:  No foundation for a certified record.
18    Hold on.
19              THE COURT:  I'm sorry?
20              MR. SEVERO:  I'm sorry, your Honor.  I don't believe
21    there is a foundation laid for this, but --
22              MR. ESTRADA:  The last page of the exhibit has the
23    certification, your Honor.
24              MR. SEVERO:  It's a declaration without any foundation
25    as to its authenticity.  No authentication of this.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.

 2              MR. ESTRADA:  It's a business record certification,

 3   your Honor.

 4              THE COURT:  Do you have anyone to testify it's a

 5   business record?

 6              MR. ESTRADA:  There's a declaration attached to it.

 7              THE COURT:  An affidavit or a declaration?

 8              MR. ESTRADA:  Declaration.

 9              THE COURT:  Done under penalty of perjury?

10              MR. ESTRADA:  And your Honor, it's admitted pursuant

11   to 902(11).  We gave notice prior to trial.

12              THE COURT:  Okay.  It will be overruled.

13         (Received in evidence, Exhibit 252.)

14              MR. SEVERO:  There was no --

15              THE COURT:  I'm sorry?

16              MR. SEVERO:  I'm sorry, I don't -- I disagree.  I

17   don't remember ever getting -- I know it's my problem, but

18   there is no declaration or notice regarding 902 --

19              THE COURT:  Oh, you don't have that last page with

20   your exhibits?

21              MR. SEVERO:  I do not have a --

22              THE COURT:  Why don't you show it to him before going

23   on, Counsel.  He doesn't have a copy of it.

24              MR. ESTRADA:  Your Honor, the government's moving to

25   admit it pursuant to Federal Rule of Evidence 902(11).
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  But still, if you're going to admit
 2    it, you have to give him a copy of it.
 3              MR. ESTRADA:  He has a copy of it.
 4              THE COURT:  Oh, I'm sorry.
 5              MR. SEVERO:  I have the same binder that everybody
 6    has.
 7              THE COURT:  Okay.  Okay.  Overruled.
 8    BY MR. ESTRADA:
 9    Q.   Okay.  Now, looking at Exhibit 252, what is Exhibit 252?
10    A.   They're -- it is a bank statement from the January 2009
11    time frame for Pompos Jewelry Corporation.
12    Q.   You see there the name of the account holder?
13    A.   Yes.
14    Q.   Is that the same name of the check that was seized on
15    January 28, 2009?
16    A.   Yes, it was.
17              MR. SEVERO:  Move to strike that as hearsay.  The
18    check is not in evidence, and he's reading it into evidence.
19              THE COURT:  The check's not in evidence yet.
20              MR. SEVERO:  No.  Move to strike his answer saying it
21    was the same.
22              MR. ESTRADA:  Although the government had requested to
23    conditionally publish subject to being stricken later.  There
24    will be evidence about it later.
25              THE COURT:  Well, I know you requested that, and I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000367**

```
1    said no, you're going to have to lay the foundation first
2    unless there's an agreement between counsel.
3    BY MR. ESTRADA:
4    Q.   Now, looking at the bank records, towards the bottom you
5    see a check number 3439 on January 27th of 2009?
6    A.   Yes.
7    Q.   Do you see the amount of that check?
8    A.   Yes.  Ten dollars.
9    Q.   You see another check, 3442, on January 27th, 2009?
10   A.   Yes.
11   Q.   What's the amount of that check?
12   A.   Fifteen dollars.
13        MR. SEVERO:  No foundation.
14        THE COURT:  Overruled.
15        MR. SEVERO:  Assumes facts not in evidence.
16        THE COURT:  Overruled.
17   BY MR. ESTRADA:
18   Q.   What's the amount of the check?
19   A.   Fifteen dollars.
20   Q.   Now, finally, January -- excuse me.  On the wrong line
21   there.
22        January 28th, 2009, do you see a check there?
23   A.   Yes.
24   Q.   What's the check number?
25   A.   3438.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   What's the amount?

2  A.   $5,600.

3  Q.   Turning to the next page of the certified bank records, do

4  you see a check there?

5  A.   Yes.

6  Q.   Is that the same check number we just talked about?

7  A.   Yes.

8  Q.   And same amount?

9  A.   Yes.

10  Q.   You see the name there?

11  A.   Yes.   Debra Jane May-Lawson.

12  Q.   Is that the person referred to as "la tinta" in the calls

13  earlier?

14  A.   Yes.

15         MR. SEVERO:   Hearsay, no foundation, move to strike

16  the answer.

17         THE COURT:   Well, it's not hearsay.   It's

18  conclusionary --

19         MR. SEVERO:   Yes.

20         THE COURT:   -- or speculation.

21     But the name on this check is the same name as the person

22  you talked about before?

23         THE WITNESS:   Yes, your Honor.

24         THE COURT:   Whether or not it is the same person or

25  not, you couldn't testify to.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Go ahead, Counsel.
 2            MR. ESTRADA:  Now, your Honor, the government would
 3   publish Exhibit 220, which has been admitted.
 4            THE COURT:  I'm sorry, two --
 5            MR. ESTRADA:  Exhibit 220, which has been admitted.
 6            THE COURT:  It will be received -- it may be
 7   published.
 8   BY MR. ESTRADA:
 9   Q.   You see Exhibit 220?
10   A.   Yes.
11   Q.   Is that Debra May-Lawson?
12   A.   Yes, it is.
13   Q.   Are you familiar with what she looks like?
14   A.   Yes.
15   Q.   That's the same name on the check for Pompos Jewelry?
16   A.   Yes, it is.
17   Q.   Now, there were two other checks which were listed in the
18   bank account, for $10 and $15.  Do you see that?
19   A.   Yes.
20   Q.   Looking at the next page of Exhibit 252, you see that
21   check?
22   A.   Yes.
23   Q.   Check 3439?
24   A.   Yes.
25   Q.   What's the amount of the check?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Ten dollars.

 2   Q.   What's the name?

 3   A.   Rafael Zendejas.

 4   Q.   Are you familiar with that person?

 5   A.   Yes.

 6   Q.   How are you familiar with that person?

 7   A.   He was arrested in a Bank of America on January 28, 2009,

 8   attempting to cash a $5,900 check.

 9        MR. SEVERO:  Move to strike, hearsay.

10        THE COURT:  Sustained.

11   BY MR. ESTRADA:

12   Q.   Now, was that individual a defendant in this case?

13   A.   Yes.

14   Q.   Are you familiar with that person?

15        MR. SEVERO:  The problem with those questions is that

16   it assumes facts that came from the other question that you

17   sustained the objection to, so --

18        MR. ESTRADA:  It doesn't, your Honor.  It actually

19   does not at all.

20        THE COURT:  Go ahead with the question.

21        MR. SEVERO:  I'm sorry?

22        THE COURT:  Go ahead with the question.

23   BY MR. ESTRADA:

24   Q.   That person, Rafael Zendejas, are you familiar with that

25   person?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes.

 2              THE COURT:  A person by that name?  Is that what

 3    you're saying, Counsel?  Is he familiar with a person by that

 4    name?

 5              MR. ESTRADA:  Yes.

 6    Q.   Are you familiar with a person by that name?

 7    A.   Yes, I am.

 8    Q.   Was a person by that name a defendant in this case?

 9    A.   Yes.

10    Q.   Please take a look at Exhibit 218.

11         Which has been admitted, your Honor.  I ask permission to

12    publish.

13              THE COURT:  Okay.

14    BY MR. ESTRADA:

15    Q.   Is that Rafael Roger Zendejas, the person you're familiar

16    with as a defendant in this case?

17    A.   Yes.

18    Q.   Now, turning to the next page of the records, you see that

19    check there, 3442?

20    A.   Yes.

21    Q.   What's the amount of the check?

22    A.   Fifteen dollars.

23    Q.   What's the name on the check?

24    A.   Joseph Mares.

25    Q.   Are you familiar with a person by the name Joseph Mares?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Was that person a defendant in this case as well?

 3    A.    Yes, he was.

 4    Q.    Now please take a look at Exhibit 219.

 5          Which, your Honor, has been admitted, and the government

 6    asks permission to publish.

 7              THE COURT:  You may.

 8    BY MR. ESTRADA:

 9    Q.    Is that Joseph Mares?

10    A.    Yes.

11    Q.    Now, through the investigation, did you and other officers

12    actually obtain surveillance footage from the bank for these

13    two deposits of $15 and $10?

14    A.    Yes.

15    Q.    Please take a look at Exhibit 275, which should be in one

16    of the binders in front of you.

17          Have you taken a look at that?

18    A.    Yes.

19    Q.    Is that also a certified bank record with a declaration

20    pursuant to Federal Rule of Evidence 902(11)?

21    A.    Yes.

22              MR. ESTRADA:  Your Honor, the government moves to

23    admit and requests permission to publish.

24              MR. SEVERO:  Just to make it consistent, I'll have the

25    same objection of no foundation, no notice on the 902.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Counsel, just help me out.  Are we talking
 2     about the photographs?
 3              MR. ESTRADA:  Yes.
 4              THE COURT:  Let's make sure I see the --
 5              MR. ESTRADA:  It's the last page, your Honor.
 6              THE COURT:  Okay.  Objection will be noted.  It'll be
 7     overruled.
 8          (Received in evidence, Exhibit 275.)
 9              MR. SEVERO:  Thank you.
10              MR. ESTRADA:  Permission to publish, your Honor?
11              THE COURT:  Yes.
12     BY MR. ESTRADA:
13     Q.  Looking at the first page of Exhibit 275, what do we see
14     there?
15     A.  Joseph Mares.
16              MR. SEVERO:  That invades the province of the jury.
17     Whether it is or it isn't is a question for the jury to
18     determine.
19              THE COURT:  Have you met this person or -- in person?
20              THE WITNESS:  No.  I've seen him in person, but I've
21     not met him.
22              THE COURT:  Have you seen the person depicted in this
23     picture in person?
24              THE WITNESS:  Yes.
25              THE COURT:  And how was he identified to you?  By
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   whom?

 2          THE WITNESS:  He was identified on surveillance and

 3   then comparing it to driver's license photograph.

 4          THE COURT:  But you actually saw him yourself?

 5          THE WITNESS:  Yes, when he was arrested.

 6          THE COURT:  Overruled.

 7   BY MR. ESTRADA:

 8   Q.   This is the same Joseph Mares who is -- and the same name

 9   was on the check we saw earlier on the check deposited from

10   Pompos Jewelry?

11   A.   Yes.

12   Q.   And that check, do you remember the date of it?

13   A.   That one, I believe, is January 26th on the check, and it

14   was deposited on January 27th.

15   Q.   And looking at the surveillance photo, you see the date

16   there?

17   A.   It's January 26th.

18   Q.   Looking at the next page, do you see the next page of that

19   exhibit?

20   A.   Yes.

21   Q.   What does that show?

22   A.   It's a bank photograph of Rafael Zendejas.

23   Q.   Is there a date --

24          MR. SEVERO:  Speculation, Judge.

25          THE COURT:  It's the same objection on it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Let me ask you again, have you ever met or have you ever

 2    seen Mr. Zendejas?

 3            THE WITNESS:  Yes.

 4            THE COURT:  Okay.  And are you test --

 5            MR. SEVERO:  Your Honor, my -- sorry.

 6            THE COURT:  Go ahead.

 7            MR. SEVERO:  My objection is, this picture, if you'll

 8    look at it, it's quite speculative that that's --

 9            THE COURT:  Well, I understand that.  That's something

10    the jury is going to have to decide.

11            MR. SEVERO:  As to who it is.

12            THE COURT:  But let me ask you, are you saying that

13    you think the person depicted in this is the same person you

14    saw whose name is Zendejas?

15            THE WITNESS:  Yes, your Honor.

16            THE COURT:  Okay.

17        And ladies and gentlemen, obviously, you have to determine

18    that at the end.  He's saying that this looks like the same

19    person.  You have to determine whether it is or not.  Okay?

20    BY MR. ESTRADA:

21    Q.  And has Zendejas actually admitted to cashing a check on

22    this date?

23    A.  Yes, he has.

24            MR. SEVERO:  It's hearsay.  Move to strike.

25            MR. ESTRADA:  An admission, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Overruled.  Overruled.

 2   BY MR. ESTRADA:

 3   Q.   And Zendejas has admitted to cashing a check for

 4   Pompos Jewelry on January 26, 2009?

 5   A.   Yes.

 6   Q.   Turning to the next page, is that another photo of

 7   Zendejas cashing that check on Pompos Jewelry?

 8   A.   Yes, it is.

 9              MR. SEVERO:  Your Honor, leading the witness.

10              THE COURT:  Overruled.  Foundational.

11   BY MR. ESTRADA:

12   Q.   What do we see in Exhibit 275?

13   A.   It's an additional picture of Rafael Zendejas cashing a

14   check on January 26, 2009.

15   Q.   Page 5?

16   A.   Another photo of Rafael Zendejas cashing the check on

17   January 26, 2009.

18              MR. ESTRADA:  May I just have a moment, your Honor?

19              THE COURT:  Yes.

20              MR. ESTRADA:  No further questions, your Honor.

21              THE COURT:  Cross.

22              MR. SEVERO:  May I have a moment?

23              THE COURT:  Certainly.

24              MR. SEVERO:  May I have a moment with counsel?

25              THE COURT:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1          (*Defense counsel confer privately.*)

 2          MR. SEVERO:  If I may, your Honor, I understand that

 3   Mr. Stebbins will be on six times in this case, and there is a

 4   question as to whether we defer it all to the end or put it

 5   in -- or take it one at a time, so...

 6          THE COURT:  If you'd like to reserve --

 7          MR. SEVERO:  Well, I -- the difficulty is, some of it

 8   I may want to ask now, but I -- some of it I may want to come

 9   back at another time, but I just want the Court's permission

10   for that.

11          THE COURT:  That's fine.  That's fine.

12          MR. SEVERO:  All right.  Thank you.

13                        **CROSS-EXAMINATION**

14   BY MR. SEVERO:

15   Q.   Good afternoon, sir.

16   A.   Good afternoon, sir.

17   Q.   You've been with the FBI how long?

18   A.   Little over nine years.

19   Q.   And you say you're a special agent?

20   A.   Yes, sir.

21   Q.   All the agents of the FBI are special agents, aren't

22   they?

23          MR. ESTRADA:  Objection, your Honor, relevance.

24          THE COURT:  Overruled.

25          THE WITNESS:  That's correct.  That's our title.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:
 2   Q.   I don't mean to say you're not special.  I'm sure you are
 3   to someone, but --
 4   A.   I appreciate that, sir.  Thank you.
 5   Q.   -- special agent is -- is a title that's given to all the
 6   agents in the --
 7   A.   That's correct, sir.
 8   Q.   All right.  You currently are assigned to narcotics; is
 9   that correct?
10   A.   That's correct, sir.
11   Q.   How long have you been in narcotics?
12   A.   Since November 2013.
13   Q.   And how long were you assigned to the Eurasian Task Force?
14   A.   From August 2008 until October 2013.
15   Q.   Now, as far as your experience and training in this -- in
16   these matters, the term "organized crime" refers to some
17   organization with common goals; is that correct?
18   A.   Yes.
19   Q.   That was your testimony this morning.
20   A.   Yes.
21   Q.   So that people who act on behalf of a crime organization
22   that's referred to as "organized crime" would all work towards
23   the common good of the organization, true?
24   A.   Yes.
25   Q.   You started -- when you started this investigation, you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   wrote out a number of wiretap affidavits?

 2   A.   That's correct, sir.

 3   Q.   And you wrote --

 4        May I have a moment?

 5            THE COURT:  Yes.

 6   BY MR. SEVERO:

 7   Q.   And when did you first write -- when did you write the

 8   first wiretap application in this case?

 9   A.   I believe the first affidavit was signed by the judge on

10   January 22nd or January 23rd, 2009.

11   Q.   And that -- how long had you been investigating this case

12   at the time that you wrote the first wiretap application?

13   A.   Approximately five or six months.

14   Q.   When you wrote the first wiretap application, you

15   specifically said that you were investigating something called

16   the "Darbinyan organization," correct?

17   A.   That's correct.

18   Q.   And you said that this Darbinyan organization had some

19   ties to Armenian Power.

20   A.   That's correct.

21   Q.   It was an affiliate, I think you said, correct?

22   A.   That's correct.

23   Q.   So your understanding of whatever it was that you thought

24   you had uncovered was not that it was an Armenian Power

25   activity, but that it was an activity related to the Darbinyan
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   organization, true?

2   A.   I think it was termed as "an affiliate."  Like you said,

3   was the most accurate to say.  There were members of

4   Armenian Power within his organization, and there were members

5   that were not members of Armenian Power.

6   Q.   So essentially what you concluded at that time was that

7   whatever was going on, if it was criminal at all, was not a

8   common goal of anything called Armenian Power.

9   A.   I think there were common goals depending on the criminal

10  activity at play.

11  Q.   But you didn't say that, did you?  You said this was an

12  activity related to a -- something called a "Darbinyan

13  organization."

14  A.   That's correct.  We've termed his organization --

15  Q.   You didn't say it was an activity related to

16  Armenian Power as such.

17  A.   That's correct, not in the initial wiretaps.

18  Q.   And, in fact, you are aware that at least one individual

19  has testified that he was the leader of Armenian Power,

20  correct?

21  A.   Yes.

22  Q.   That's Paramaz Bilezikchyan, correct?

23  A.   Yes.

24  Q.   And just so that I -- you are not claiming -- are you

25  claiming that any of this -- well, let's start with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Exhibit 252.  Has a check for $5,900 -- or rather $5,600 to

2    Debra May-Lawson.  You recall that?

3    A.   Yes.

4    Q.   And the check was actually cashed, correct?

5    A.   I don't recall whether it was cashed or deposited in her

6    account.

7    Q.   You're not saying -- you cannot point to this amount of

8    money going to Mr. Bilezikchyan.

9    A.   No.

10   Q.   You cannot actually find any records that will determine

11   that this money went to Mr. Darbinyan.

12   A.   Not bank records, no.

13   Q.   In fact, you searched his house, or someone searched his

14   house, at least one occasion between October 8th -- rather,

15   August 8th of 2008 and January -- and December 31st -- strike

16   that, and March of 2010; is that correct?

17   A.   I did not participate in any searches.

18   Q.   In this investigation, have you seen any searches where

19   Mr. Darbinyan's house was searched?

20   A.   Yes.

21   Q.   And how much cash was taken from that house?

22   A.   I don't know.

23   Q.   As a matter of fact, you don't know because there wasn't

24   any; is that true?

25   A.   I don't know because I don't know.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Calls for speculation, your Honor.
 2              THE COURT:  Sustained.  I'm sorry, sustained.
 3    BY MR. SEVERO:
 4    Q.   To the best of your knowledge, this $5,600, after -- if,
 5    in fact, it was cashed by Debra May-Lawson -- let me rephrase
 6    that, if I may.
 7         You don't know if the $5,600 check was cashed by
 8    Debra May-Lawson.
 9    A.   The money was obtained.  I don't know whether it was
10    cashed or deposited in her account.
11    Q.   The money that was obtained went out?
12    A.   Correct.
13    Q.   To whom?
14    A.   To Debra May-Lawson.
15    Q.   How about the $15 check?  Was it -- where did the money
16    go?  To Joseph Myres, or Mares?
17    A.   Whatever name was on the check, yes, sir.
18    Q.   And the other, was it $10?
19    A.   Yes, sir.
20    Q.   To whom did it go?
21    A.   Whatever name was on that check.
22    Q.   Debra May-Lawson?
23    A.   I believe that one was either Rafael Zendejas or
24    Joseph Mares.
25    Q.   So the money that Mr. Zendejas cashed, the check -- strike
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000383**

1     that.

2         The check that Mr. Zendejas cashed went to Mr. Zendejas?

3     A.   Yes.

4     Q.   Let me go back a little bit to your training and

5     experience.

6         Before you became the lead investigator in this case, how

7     many other cases like this did you investigate?

8     A.   I had never done a case this large.

9     Q.   You've never done a bank fraud case before this one?

10    A.   Oh, I've done bank fraud cases.

11    Q.   But you never led an investigation of a bank fraud case?

12    A.   I had led investigations of bank fraud cases.

13    Q.   All right.  How many?

14    A.   Multiple.  Few.

15    Q.   Small cases?

16    A.   Smaller, yes.

17    Q.   Was this the first time you were a lead agent in a RICO

18    investigation, a racketeering investigation?

19    A.   Yes.

20    Q.   Before you were assigned to the Eurasian Task Force, what

21    was your assignment in the FBI?

22    A.   Directly before, I was assigned to counterterrorism.

23    Directly before that, I was assigned to counterintelligence.

24    And before that, I was assigned to white-collar crime.

25    Q.   All right.  So in white-collar crimes, you didn't deal

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   with street gangs, did you?

2   A.   No, sir.

3   Q.   And how long were you with white-collar crimes?

4   A.   Approximately a year to a year and a half.

5   Q.   How long were you in -- what was the second one?

6   Counterintelligence?

7   A.   Counterintelligence, yes, sir.

8   Q.   That didn't deal with street gangs, did it?

9   A.   No, sir.

10  Q.   How long were you assigned to that?

11  A.   Approximately one to one and a half years.

12  Q.   And in counterterrorism, any street terrorism attached to

13  that?

14  A.   No, sir.

15  Q.   So no street gangs on that one, either?

16  A.   No, sir.

17  Q.   How long were you there?

18  A.   Approximately three months.

19  Q.   All right.  So anywhere between two years and three months

20  or three years and three months, you were assigned to something

21  that had no dealings at all with street gangs, correct?

22  A.   That's correct.

23  Q.   So is your assignment to the Eurasian Task Force the first

24  time that you came across street gangs?

25  A.   I wouldn't say it's the first time I came across street

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    gangs, but it's the first time I investigated them, yes.

2    Q.   Oh, that's what I meant.  For purposes of investigation.

3    A.   Yeah.

4    Q.   It was the first time you investigated street gangs?

5    A.   That's correct, sir.

6    Q.   And the only -- and what year was that, sir?

7    A.   August of 2008.

8    Q.   So when you came to work at the Eurasian Task Force in

9    August of 2008, you had no knowledge of investigations of

10   street gangs?

11   A.   I had not investigated street gangs prior to that, but

12   I -- through the FBI, you generally gain a general

13   understanding of the fact that there are street gangs.

14   Q.   Oh.  Right.  Sure.

15        You also get a general understanding that there's

16   espionage, but that doesn't make you an espionage expert.

17             MR. ESTRADA:  Objection, your Honor.

18             THE WITNESS:  That's correct.

19             THE COURT:  Let's get back on track.  Go ahead, next

20   question.

21             MR. SEVERO:  I need a moment.

22             THE COURT:  Sure.

23   BY MR. SEVERO:

24   Q.   When was the first time you ever talked to a Mexican Mafia

25   member or associate?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Probably the summer of 2009.

2   Q.   And would that have been someone that was cooperating with

3   the government?

4   A.   Yes.

5   Q.   That would be in the summer of 2009?

6   A.   Yes.

7   Q.   How many Mexican Mafia members or associates have you

8   spoken to since June of -- or summer of 2009?

9   A.   Several.

10  Q.   More than one?

11  A.   Yes.

12  Q.   More than three?

13  A.   Yes.

14  Q.   More than six?

15  A.   Probably somewhere around there.

16  Q.   Three to six?

17  A.   Yes, sir.

18  Q.   And based on that, it is your testimony that you are,

19  quote/unquote, familiar with Mexican Mafia?

20  A.   Yes.

21  Q.   Do all Mexican Mafia members -- strike that.

22       A member is different than an associate in your

23  understanding, correct?

24  A.   Of the Mexican Mafia?

25  Q.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

000387

```
 1    A.   Yes, sir.

 2    Q.   Well, how about any other street gangs, the Russian gangs?

 3    A.   Yes, sir, it's different.

 4    Q.   Members are different than associates across the board,

 5    true?

 6    A.   Yes, that's correct.

 7    Q.   A member is a ranking individual in the gang, correct?

 8    A.   Not necessarily.  They could just be a documented member.

 9    They could be a low-level member.

10    Q.   But an associate is someone who just works with them?

11    A.   Generally speaking, yes.

12    Q.   Did you gain an understanding as to how many members there

13    were in the so-called Armenian Power organization?

14    A.   I believe when it comes to the street gang, there's over

15    250 documented members.

16    Q.   How many associates?

17    A.   I don't know.

18    Q.   Is it your testimony that the common goal of this

19    Armenian Power organization is to gather money from bank

20    fraud?

21    A.   There's not only one goal of the organization.

22    Q.   One of the goals.

23    A.   One of the goals.  They make money from bank fraud.

24    Q.   Have you raided the headquarters of Armenian Power?

25    A.   I don't believe that there is a headquarters building.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Oh, there isn't.

2       Have you seized large quantities of money from a place

3  where they all congregate?

4  A.   Not that I recall.

5  Q.   One of the other common goals is identity theft; is that

6  correct?

7  A.   One of the other crimes they commit, yes, is identity

8  theft.

9  Q.   Well, one of the alleged crimes they commit, right?

10 A.   One of the alleged crimes they commit?

11 Q.   And when you talk about identity theft, are you talking

12 about credit cards?

13 A.   Credit cards have an aspect of identity theft, yes.

14 Q.   Okay.  Now, when Mr. Darbinyan's house was searched in

15 2010, do you know if there were any credit cards that didn't

16 belong to him?

17      MR. ESTRADA:  Object, your Honor, calls for

18 speculation.

19      MR. SEVERO:  Well, if he knows.

20      THE COURT:  He can answer that.

21   The question is, do you know?

22      THE WITNESS:  No, I do not know.

23 BY MR. SEVERO:

24 Q.   Mr. Darbinyan was a focus of your efforts since 2008; is

25 that correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    One of the focuses, yes.

 2    Q.    You were quite interested in Mr. Darbinyan, were you not?

 3    A.    He was one of the targets of our investigation.

 4    Q.    So anything that had to do with him, you would be aware

 5    of, wouldn't you?

 6    A.    Generally speaking, we would have some knowledge, yes.

 7    Q.    So if he had gotten busted with a bunch of credit cards

 8    that didn't belong to him, you would know that?

 9    A.    Yes.  If he had been arrested, yes.

10    Q.    Do you know if he himself has gotten busted with any

11    credit cards that don't belong to him?

12    A.    Yes, he has.

13    Q.    All right.  When was that?

14    A.    2005.

15    Q.    Before -- no.  During the course of your investigation.

16          Between 2008 and 2011, during this investigation, are you

17    aware of whether Mr. Darbinyan has ever been arrested, stopped,

18    searched -- that may be a little compound, but I'm going to

19    make it all one global question, whether he's ever been in

20    possession of credit cards that didn't belong to him between

21    2008 and today?

22    A.    No, he was not arrested for that.

23    Q.    Between 2008 and today, are you aware of whether

24    Mr. Darbinyan was arrested in possession of checks that didn't

25    belong to him?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000390**

```
 1    A.   I don't believe he was.

 2          MR. SEVERO:  Your Honor, I am going to defer some of

 3    my cross-examination.  I don't want to abandon some of the

 4    subject matter that was talked about today, so I want to make

 5    sure I preserve all that for when he testifies again.

 6          THE COURT:  No problem.

 7          MR. SEVERO:  Thank you, Mr. Stebbins.

 8          THE WITNESS:  Thank you, sir.

 9          THE COURT:  Any questions, Counsel?

10                      CROSS-EXAMINATION

11    BY MR. PEREYRA-SUAREZ:

12    Q.   Good afternoon, Agent Stebbins.

13    A.   Good afternoon, sir.

14    Q.   You testified earlier about Exhibit 252, which was a

15    $5,600 check payable to Debra May-Lawson.  Do you recall that

16    testimony?

17    A.   Yes.

18    Q.   And you testified that there was no proof that any of that

19    money went to Mr. Darbinyan; is that correct?

20          MR. ESTRADA:  Objection, your Honor, misstates the

21    testimony.

22          THE COURT:  Well, I don't know if it did or not.

23       Do you know if any of it went to Mr. Darbinyan?

24          THE WITNESS:  I stated there was no proof in the bank

25    records.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000391**

```
 1              THE COURT:  Okay.
 2   BY MR. PEREYRA-SUAREZ:
 3   Q.   Similarly, there's no proof in the bank records that any
 4   of that money went to Mr. Sharopetrosian; is that correct?
 5   A.   That's correct.
 6   Q.   Would the same be true as to the check payable to
 7   Mr. Mares?
 8   A.   In regards to Mr. Sharopetrosian?
 9   Q.   Yes.
10   A.   That's correct.
11   Q.   And also the check payable to Mr. Zendejas.  No proof
12   that money went to Mr. Sharopetrosian; is that correct?
13   A.   That's correct.
14   Q.   Now, you testified earlier that the federal government
15   never raided the headquarters of Armenian Power, correct?
16   A.   Correct.
17   Q.   In fact, do you know of any headquarters of
18   Armenian Power?
19   A.   No.
20              MR. PEREYRA-SUAREZ:  Thank you, your Honor.
21              THE COURT:  Thank you, Counsel.
22                      CROSS-EXAMINATION
23   BY MR. FLIER:
24   Q.   Good afternoon, sir.
25   A.   Good afternoon, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   I'm Mr. Parsadanyan's attorney.  You're aware of that?

2   A.   Yes, sir.

3   Q.   What was the first application of a wiretap in this case

4   again?  When?

5   A.   January of 2009.

6   Q.   And I think you testified today, correct me if I'm wrong,

7   please, that Mr. Darbinyan -- was he the first focus point?

8   A.   He was the first target of wire interception.

9   Q.   And in order to apply, which I'm not going to get into it,

10  and a judge signing off, there's information gathered that you

11  think is pertinent enough to start that type of investigation,

12  correct?

13  A.   That's correct.

14  Q.   And once you start investigating and you get the wiretap,

15  there's phone calls, correct?

16  A.   Yes.

17  Q.   And from those phone calls, potentially, there might be

18  leads to other investigations that you think are relevant to

19  the subject matter that you were first investigating; am I

20  correct?

21  A.   Yes.

22  Q.   Now, you have testified in this case that you believe my

23  client, Mr. Parsadanyan, is an associate Armenian Power gang

24  member.

25  A.   He is an associate of Armenian Power.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Well, it's what I said.  You think this young man is an

2   associate Armenian Power gang member, correct?

3        MR. ESTRADA:  Objection, your Honor, asked and

4   answered, argumentative.

5        THE COURT:  Asked and answered.  He said yes.

6        MR. FLIER:  Thank you, your Honor.

7   Q.   Now, I want to talk about that.  I don't want -- do not

8   want to get into everything that co-counsel asked about your

9   history with the FBI and other work, 'cause you were in some

10  type of other fields before law enforcement.

11  A.   Yes.

12  Q.   And what was that?

13  A.   Fraud investigation.

14  Q.   That has nothing to do with gangs, does it?

15  A.   No, sir.

16  Q.   And that was in the private sector, correct?

17  A.   That's correct.

18  Q.   And that has nothing to do with gangs, correct?

19  A.   That's correct.

20  Q.   So have you had official training in gangs?

21  A.   Not in gangs.  In organized crime.

22  Q.   Okay.  But I asked gangs, though.  Have you had training

23  in gangs?

24  A.   Nothing.  Nothing outside of on-the-job training.

25  Q.   Now, based on your speaking with other law enforcement

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   officers, FBI, I've heard Glendale Police Department, is that
 2   how you acquire information about certain gang members?
 3   A.   Yes, among other things.
 4   Q.   Well, what information have you acquired from a
 5   Glendale Police Department officer about my client being any
 6   type of associate of the Armenian Power?
 7   A.   The information we got in this investigation associated
 8   him to Armenian Power.
 9   Q.   I didn't ask that, please.
10        What information did you get from a police officer from
11   the Glendale Police Department or anyone from that agency that
12   my client is a gang member or an associate gang member of the
13   AP gang?
14   A.   Well, sir, it's a little bit more difficult, because we
15   have members of Glendale Police Department on the task force,
16   so I received information from them.
17   Q.   Sir, besides maybe my client speaking with someone or
18   being seen with someone, what information do you have, like a
19   field identification card, that shows and demonstrates gang
20   ties?  Do you have anything like that?
21   A.   We don't have any field identification cards.
22   Q.   Now, have you spoken to any Glendale Police Department,
23   even if they're in a joint task force, about what they look for
24   to ascertain and determine if someone's a gang member?  Have
25   you done that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   Okay.  Let's start with field identification cards.  Tell

 3   the jury what that is, please.

 4   A.   It's something that's used when police officers come in

 5   contact with an individual out on the streets on a traffic stop

 6   or they contact them when they're walking.  If it's a gang

 7   member, they'll document their tattoos, things of that nature.

 8   Q.   And if they admit that they're gang members, that would be

 9   documented, correct?

10   A.   Correct.

11   Q.   And if they're around other people that are gang members,

12   then it might be documented that they're an associate; is that

13   correct?

14   A.   That's correct.

15   Q.   So I'll start it again.  Do you have any of that

16   information against my client?

17        MR. ESTRADA:  Objection, your Honor, asked and

18   answered.

19        THE COURT:  Asked and answered.  He said no.

20        MR. ESTRADA:  And argumentative.

21        MR. FLIER:  I'm not really sure he ever really

22   said no.

23        THE COURT:  Counsel.

24        MR. FLIER:  Okay.  I'll move on.

25        THE COURT:  You did say were there any cards.  He said
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    he knows they don't keep any of those cards.

2         Is that correct?

3             MR. FLIER:  He didn't -- sorry.

4    Q.   Do they keep those cards, sir, in the Glendale Police

5    Department?

6    A.   We don't have any F.I. cards on your client.

7             THE COURT:  Hold on.  You don't have any of those

8    cards in the FBI.  He's asking, do you know if they keep them

9    in the Glendale Police Department?

10            THE WITNESS:  Yes, they do keep F.I. cards at

11   Glendale Police Department.

12   BY MR. FLIER:

13   Q.   And that was the topic I've been asking, about the

14   Glendale Police Department right now; is that correct?

15   A.   Yes.

16   Q.   Okay.  Now, there's other ways to determine if someone's a

17   gang member besides associate --

18            MR. ESTRADA:  Objection, your Honor, relevance as to

19   "gang member."

20            THE COURT:  Overruled.

21   BY MR. FLIER:

22   Q.   There's other ways to determine if someone is either a

23   gang member or an associate; is that correct?

24   A.   Yes.

25   Q.   And you've brought up an example of potential tattoos; is

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   that correct?

2   A.   Yes.

3   Q.   I know we saw, maybe it was today or yesterday, an exhibit

4   that showed a gentleman, and he had "AP" tattooed on his chest.

5   Do you remember that?

6   A.   Yes.

7   Q.   And what's that gentleman's name?

8   A.   Karo Yerkanyan.

9   Q.   Now, "AP" would connotate to you and maybe any other gang

10  officer that that might be a gang member, correct?

11  A.   Yes.

12  Q.   And that's someone who has such pride in the gang that he

13  wants everyone to know about it if he takes off his shirt,

14  correct?

15  A.   Yes.

16  Q.   Well, that's the point, sir, of gangs sometimes, is to

17  intimidate, correct?

18  A.   That's correct.

19  Q.   And the way they intimidate is that other people in the

20  community and other gangs know they are a particular gang,

21  correct?

22  A.   Yes, they get tattoos to identify themselves.

23  Q.   Do you have any tattoos on my client?

24  A.   No.

25  Q.   Now, another way to determine if someone's a gang member,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   we heard something about graffiti; is that correct?
 2   A.    Yes.
 3   Q.    Gang members, no matter what street gang, sometimes like,
 4   as we all see driving on the street sometime, to write their
 5   graffiti and ruin that beautiful wall or something; is that
 6   correct?
 7   A.    Yes, they do.
 8   Q.    Do you have any information that my client has ever even
 9   had a spray can?
10   A.    No.
11   Q.    Okay.  What other factors, besides what we have already
12   mentioned just now, are factors that someone like yourself
13   would guide to see if someone's a gang member or an associate?
14   Are there other factors, in other words?
15   A.    The factors we used in this case were that they were
16   speaking on the phone with other AP gang members, they were
17   associating with them, and they were conducting criminal
18   activity with them.
19         MR. FLIER:  I'm going to object to the last one about
20   conducting criminal activity as nonresponsive and
21   argumentative.
22         THE COURT:  Overruled, Counsel.  It's questions that
23   are argumentative.  Overruled.
24         MR. FLIER:  Okay.  I don't want to be too
25   argumentative.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Not talking about you.  I'm saying that's

2    an objection to questions that are being asked, not to

3    witnesses' testimony.

4              MR. FLIER:  Thank you.

5    Q.   With respect to Mr. Parsadanyan, I thought I heard today

6    that you had two previous contacts with him; is that correct?

7    A.   I've had several previous contacts with him.

8    Q.   I thought you said two, though.  Is that incorrect?

9    A.   I don't know that I said two, but I have had previous

10   contact with him.

11   Q.   So let's talk about that.  How many have you had?

12   A.   I'm not sure.  A few times in the courtroom, and then once

13   in person when he was arrested.

14   Q.   Did you ever go to his place of business and misrepresent

15   to whom you were?

16   A.   No.

17   Q.   Have ever been to Mr. Parsadanyan's business?

18   A.   Inside?

19   Q.   Yes.

20   A.   No.

21   Q.   It's your testimony you have never entered that business

22   location?

23   A.   No.

24   Q.   Are you sure about that?

25              MR. ESTRADA:  Objection, your Honor, asked and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   answered --
 2          THE COURT:  Sustained.
 3          MR. ESTRADA:  -- and argumentative.
 4       That is an argumentative question, actually.
 5          THE COURT:  It's been sustained.
 6       Next question.
 7   BY MR. FLIER:
 8   Q.   Now, you have just mentioned to this jury that one of the
 9   factors that you believe is important is the fact that someone
10   has been speaking with potentially an associate or a gang
11   member; is that correct?
12   A.   I'm sorry, could you repeat the question?
13   Q.   One of the factors that you thought was important or is
14   utilized to determine if someone is an associate is that
15   they're talking to a gang member, maybe; is that correct?
16   A.   It's considered, yes.
17   Q.   Well, I want to give you an example.  I want you to assume
18   that your brother, if you had one, was a gang member, and a law
19   enforcement officer sees you talking to your brother.  Does
20   that make you an associate?
21          MR. ESTRADA:  Objection, your Honor.  It calls for
22   speculation.
23          THE COURT:  And argumentative.  Sustained.
24   BY MR. FLIER:
25   Q.   Well, my point on that question, sir, is this:  The mere
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    fact that someone is seen talking to someone, do you believe
2    that's sufficient enough to label them an associate, that fact
3    alone?
4    A.   No, not necessarily.
5    Q.   Would you agree that due to economy, culture issues, some
6    people, unfortunately, live in gang-infested areas?
7    A.   Yes, they do.
8    Q.   And those same people, due to economic restraints, can't
9    always leave that area.  Would you agree?
10   A.   Yes, that's correct.
11   Q.   So those same people, due to economic issues, still have
12   to be in the same area and community of known gang members.
13   Would you agree with that?
14   A.   Yes.
15   Q.   Would you think all of those people are gang members or
16   associates?
17   A.   No.
18   Q.   It takes more than that.  Other information.  Would you
19   agree with that?
20   A.   Yes.
21   Q.   The fact that my client knows Mr. Darbinyan, and let's
22   even say for this question, are friendly, do you think that
23   fact alone makes my client an associate of any gang?
24   A.   No.
25   Q.   Have you ever spoken to anyone on any task force in this
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    case, because you mentioned a couple, that has specifically

2    told you, "I have information that that man over there,

3    Mr. Parsadanyan, is a gang member," and they told you why, that

4    has nothing to do with this investigation?

5    A.   Can you repeat that question?

6    Q.   Forgetting this investigation, have you ever acquired any

7    information from any law enforcement personnel in the world

8    that my client is an associate gang member?

9    A.   No.

10   Q.   And by the way, this case seems to be -- and would you

11   agree?  The tapes and the wiretap information seems to be

12   strong in your mind.  Is that a fair statement?

13   A.   Yes.

14   Q.   So then how come you didn't get or acquire a wiretap for

15   my client's phone?  Is there a reason?

16           MR. ESTRADA:  Argumentative, your Honor.

17           THE COURT:  Well, and it's irrelevant.  Sustained.

18   BY MR. FLIER:

19   Q.   Did you acquire any wiretap applications for

20   Mr. Parsadanyan's phone number that we saw as an exhibit?

21           MR. ESTRADA:  Objection, your Honor, relevance.

22           MR. FLIER:  I think that's -- sorry.

23           THE COURT:  Overruled.

24        Did you ever have any wiretap of his phone?

25           THE WITNESS:  No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. FLIER:
 2   Q.   Sir, he's part of this indictment that you think is
 3   associating with Mr. Darbinyan, correct?
 4   A.   Yes.
 5   Q.   Then how come you didn't take that extra step to get the
 6   wiretap on his phone?  Is there a reason?
 7   A.   Yes.  We were -- yes.
 8   Q.   The reason cannot be that you're lazy, correct?
 9   A.   No.
10   Q.   And you have been investigating this case from the start,
11   I think it was the summer or something of '09; is that correct?
12   A.   Fall of 2008.
13   Q.   Okay.  Fall of 2008 up to today.  And you've never even
14   attempted one application on his phone; is that correct?
15   A.   That's correct.
16   Q.   Now, there was another exhibit that showed
17   Mr. Parsadanyan's face, his DMV Soundex; is that correct?
18   A.   Yes.
19   Q.   It's just his DMV photo, correct?
20   A.   Yes.
21   Q.   The relevance of showing that photograph, I assume, was to
22   show the residence listed on that same document, correct?
23            MR. ESTRADA:  Objection, your Honor, calls for --
24            THE COURT:  Sustained.
25            MR. ESTRADA:  -- legal conclusion.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MR. FLIER:

2    Q.   Okay.  Why did you acquire --

3         THE COURT:  Excuse me, Counsel.  He's not the

4    attorney, he's a witness.  You're going to have to ask the

5    attorney why they're introducing evidence, not this witness.

6    Remember that, he's a witness.

7         MR. FLIER:  I know, and it's his investigation --

8         THE COURT:  Counsel, all through your questioning

9    you've been asking as to why they did this, why they did this

10   for the investigation.  He's a witness.  He can testify to what

11   was done, not why it was done.  That's part of the prosecution

12   of this case.

13        MR. FLIER:  I don't want to have too many speaking

14   objections, but if something's relevant about that --

15        THE COURT:  Counsel, please.

16        MR. FLIER:  Okay.

17        THE COURT:  I've ruled on this.  If you'd please keep

18   yourself to the -- in fact, at this time we're going to take a

19   break.

20        Ladies and gentlemen, let me excuse you at this time.

21   Remember the admonishment that you're not to discuss the case

22   among yourselves or with anybody else or form or express any

23   opinions about the matter until it's submitted to you and you

24   retire to the jury room.

25        THE CLERK:  All rise.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1           *(Outside the presence of the jury:)*

2                   THE COURT:  Okay.  The record will reflect the jurors

3       have left the courtroom.

4               You may have a seat.

5               Let me make it very clear.  In this courtroom, once I make

6       a ruling on it, it is not open for argument of counsel or

7       discussion with counsel as to whether I'm making a mistake or

8       not or why he's doing it or why he's not doing it.  If I make a

9       ruling, I make a ruling.  If you want at a break to put

10      something on the record, I'll let you put it on the record, but

11      when we make an objection, we do not argue it in front of the

12      jury.

13                  MR. FLIER:  I didn't try to argue in front of the

14      jury.  I understand, and the Court was clear about that issue,

15      and I understand.  But there has been some times in this trial

16      where there has been some response by the lawyers.  That's all

17      I was attempting to do, your Honor.  In no way do I want to get

18      the Court upset, but I do have still a responsibility to my

19      client.  That's all I was doing.

20                  THE COURT:  Counsel, you'll find out that it's very

21      difficult to upset this Court to the point where it's going to

22      affect anybody's trial one way or the other.  But I can tell

23      you this, that the questions you have been asking have been in

24      an argumentative form.  Listen to the other attorneys.  The

25      questions you've been asking have been in an argumentative

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    form, and you've been asking questions that the witnesses have

2    no capability of knowing.

3        If you're talking about -- and I don't know what you're

4    talking about when you're saying the attorneys have said

5    things.  Nothing the attorney says is evidence.

6            MR. FLIER:  I agree with that.

7            THE COURT:  So to ask this attorney -- or excuse me,

8    to ask this witness why he's investigating this or why he

9    didn't investigate that or -- excuse me, let me rephrase that,

10   why this case was being presented or why it was not being

11   presented, that is completely at the discretion of the

12   attorneys in this case.  He can't testify as to why something's

13   being presented in this case.

14       One way or the other, I think you should -- my suggestion

15   is, listen to all the other attorneys, keep an eye on the jury,

16   and make sure that the questions that you ask are not

17   argumentative, and you'll have no problems.

18       But one of the things I do want to make sure is that when

19   I make a ruling, the ruling is there.  And as I say, don't

20   argue in front of the jury.  At the time, like this time, when

21   the jury is out of the room, then you can put anything you want

22   on record.

23           MR. ESTRADA:  One quick thing, your Honor.

24           THE COURT:  What?

25           MR. ESTRADA:  We're a little behind schedule.  We have

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    a victim.  If we could take the victim out of order after this

 2    witness.

 3            THE COURT:  If it's agreeable with counsel on it, we

 4    can take a witness out of order.

 5            MR. ESTRADA:  And the one thing with that witness is,

 6    he would testify about a check, Exhibit 271, but I know

 7    counsel's objected to foundation for that.  There will be an

 8    officer testifying about seizing that check, but we'd like to

 9    show it to the victim witness.

10            THE COURT:  All I can tell you is, if counsel all

11    agree on it, that's fine.  If counsel does not agree on it,

12    counsel for the defense has a right to finish their

13    cross-examination.

14            MR. ESTRADA:  I'm fine with finishing the

15    cross-examination.  I mean the next witness after this one.

16            THE COURT:  Call the witnesses the way you wish.

17            MR. ESTRADA:  But there's a foundation issue, because

18    they've objected to foundation on the check, and we --

19            THE COURT:  Why don't you talk with counsel.  We'll

20    talk about it when we come on back.

21        This court will be recess.

22            THE CLERK:  All rise.

23        (Recess held from 2:33 p.m. to 2:47 p.m.)

24        (In the presence of the jury:)

25            THE COURT:  Okay.  The record will reflect that all
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    the members of the jury are in their respective seats,

2    including the alternate, and we're on cross-examination.

3         Counsel, you may inquire.

4              MR. FLIER:  Thank you, your Honor.

5    Q.   Did you ever conduct a search of my client's business?

6    A.   I did not.

7    Q.   Did you ever procure, or any other agent, a search warrant

8    for his place of business?

9    A.   No, sir.

10   Q.   At some point in time did you arrest my client?

11   A.   Yes.

12   Q.   Do you recall when that was?

13   A.   February 16th, 2011.

14   Q.   Where did you arrest him?

15   A.   3649 Monon Avenue in Los Angeles.

16   Q.   And was that a location of his residence, you believe?

17   A.   At that time, yes.

18   Q.   Did you search his residence?

19   A.   Yes, we did.

20   Q.   Did you find any of the victims' credit card information

21   in any location in that dwelling?

22   A.   Which victim, sir?

23   Q.   Any victim.

24   A.   No, sir.

25   Q.   Did you ever find any skimming, any of those machines in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    any way?

2    A.   Not that I recall.

3    Q.   You have reports that document exactly what was recovered

4    at certain locations; is that correct?

5    A.   Yes.

6    Q.   Did you find any evidence at the search of

7    Mr. Parsadanyan's residence with respect to information that

8    specifically detailed 99 Cent Stores?

9    A.   Did we find evidence?

10   Q.   Yeah.

11   A.   Related to that scheme?

12   Q.   In his house, that actually mentions the word or lettering

13   "99 Cent Store."

14           MR. ESTRADA:  Objection, your Honor, beyond the scope.

15   There's going to be testimony about the 99 Cent Only Store

16   scheme later.  That wasn't brought up during his direct

17   examination.

18           MR. FLIER:  I could reserve that, your Honor.

19           THE COURT:  Yeah.

20           MR. FLIER:  That's fine.  Thank you.

21   Q.   Now, we heard, not all of them, of course, today, some

22   exhibits played before the jury; is that correct?

23   A.   Yes.

24   Q.   And those transcripts deal with conversations so far

25   between Mr. Darbinyan and some other people; is that correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   That's correct.

 2   Q.   Would you agree so far that any exhibit that has been

 3   played before the jury, my client has not been referenced or is

 4   not part of?  Is that a fair statement?

 5   A.   That's correct.

 6   Q.   Now, I'm going to need your help a little on this one, but

 7   on one of the exhibits there was some phraseology about

 8   numbers, 444 and maybe a fourth 4, about a check.  Do you

 9   remember what I'm referencing?

10   A.   Yes.  It's check number 3444.

11   Q.   Thank you.  I knew you would remember that.

12        So with respect to that, that was part of a telephonic

13   intercept conversation; is that correct?

14   A.   Correct.

15   Q.   And is it your testimony that those numbers related to a

16   particular, say, victim and check of a victim?

17   A.   Yes.

18   Q.   With respect to the exhibits today, was there any check

19   that had the last three numbers 444, though?  Because I might

20   have missed that.

21   A.   I -- yes.  I don't believe it was published, but yes.  It

22   was the one that was showed to me.

23   Q.   But the tape that we heard today that mentions 444, you

24   were not shown any applicable check that corresponded with that

25   telephone call and the date; am I correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Objection --
 2              THE WITNESS:  No, you're not correct.
 3              MR. ESTRADA:  I'll withdraw the objection.
 4    BY MR. FLIER:
 5    Q.   Now, is it common for, let's say, this kind, this type of
 6    bank fraud, for the participants to only want to cash a ten or
 7    a fifteen-dollar check?  Is that low amount significant in any
 8    way, based on your expertise?
 9    A.   Yes.
10    Q.   Is it because they don't want detection?  The smaller
11    amount, maybe no one's going to really, you know --
12    A.   Generally, they're considered what are called "test
13    checks," and they -- they get the bank used to seeing the check
14    numbers beginning in that order.
15    Q.   And that's based on your experience, correct?
16    A.   Yes.
17    Q.   Now, with respect to two Hispanic gentlemen or Mexican
18    gentlemen, one of them's name is Rafael, though, Zendejas; is
19    that correct?
20    A.   That's correct.
21    Q.   So there has been or there's at least one other in this
22    investigation where the first name is a Rafael, correct?
23    A.   Correct.
24    Q.   And we know exactly, in this example, that Rafael is
25    Rafael Zendejas, who we heard about today; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Correct.

2    Q.    And obviously, that's not Mr. Parsadanyan.

3    A.    Correct.

4    Q.    Correct me if I'm wrong.  In some of the exhibits today of

5    the telephone conversations, I thought that the number

6    mentioned was 5,900, but the check is 5,600.  Am I correct or

7    incorrect on that?

8    A.    Incorrect, sir.

9    Q.    Okay.  Thank you.

10         With respect to the number that you might think relates

11   to, say, a bank fraud issue or a check, in the tapes we heard

12   today, was there a 5,900 referenced, that figure?

13   A.    Yes.

14   Q.    Okay.  Thank you.

15         Do you have any information that my client has ever been

16   associated with, talking to, any Mexican Mafia gang member?

17   A.    No.

18   Q.    With respect to Mr. Rafael Zendejas and the other

19   gentleman, whose last name was like "Marias," Joseph, I

20   think --

21   A.    Mares.  Yes, sir.

22   Q.    And how do you spell that last name, please?

23   A.    M-a-r-e-s.

24   Q.    Thank you.

25         Have you -- do you have any video surveillance that shows
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    those two individuals with my client?

2    A.   No, sir.

3    Q.   Lastly, on some of the tapes that we heard today, clearly,

4    banks are mentioned, "don't talk to the police," maybe, certain

5    specific topics are mentioned.  Would you agree with that?

6    A.   Yes.

7         MR. FLIER:  I have no further questions, your Honor.

8    However, I'd ask to reserve.

9         THE COURT:  Yes.

10        MR. FLIER:  Thank you, sir.

11        THE COURT:  Counsel.

12        MR. ESTRADA:  Your Honor, no questions at this time.

13   However, we will ask to re-call the witness at a later time.

14        THE COURT:  We'll see you again.

15        THE WITNESS:  Thank you, your Honor.

16        THE COURT:  You're excused at this time.

17      Next witness.

18        MR. ESTRADA:  Your Honor, the government calls

19   Officer Joe Allen.

20        THE CLERK:  Right here to be sworn, please.

21      (Witness sworn.)

22        THE CLERK:  Thank you.  You may be seated.

23      May I please ask that you state your full name for the

24   record and spell your last name.

25        THE WITNESS:  Joseph Allen, A-l-l-e-n.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Thank you.

2        You may inquire.

3              MR. ESTRADA:  Thank you, your Honor.

4              JOSEPH ALLEN, GOVERNMENT'S WITNESS,

5                    DIRECT EXAMINATION

6   BY MR. ESTRADA:

7   Q.    Sir, where do you work?

8   A.    Glendale Police Department.

9   Q.    What's your title with the Glendale Police Department?

10  A.    I'm a police officer.

11  Q.    How long have you been with the Glendale Police

12  Department?

13  A.    24 years.

14  Q.    What's your current assignment with the Glendale Police

15  Department?

16  A.    I'm a community lead officer.

17  Q.    What does that mean?

18  A.    I'm assigned to a geographical portion of the city, and

19  I'm a liaison between the business district of Glendale with

20  the police department and work towards long-term crime

21  problems.

22  Q.    You're out in the community a lot?

23  A.    Excuse me?

24  Q.    You're out in the community a lot?

25  A.    Yes, I am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   I want to turn your attention back to 2009, that time
2   frame.  Back then, what was your assignment with the
3   Glendale Police Department?
4   A.   I was assigned to patrol, as a patrol officer.
5   Q.   As a patrol officer, what are your general duties?
6   A.   To answer calls for service and to do proactive,
7   preventative patrol.
8   Q.   Now, as a patrol officer, about how many calls for service
9   had you responded to by 2009, in your career?  Approximately.
10  A.   Thousands.
11  Q.   And now I want to turn your attention to a specific date
12  of January 28th, 2009.  Do you have that date in mind?
13  A.   Yes, sir.
14  Q.   Were you on patrol that date?
15  A.   Yes.
16  Q.   What time did your shift begin that date?
17  A.   I believe it was noon.
18  Q.   At some point did you get a call, a dispatch call about an
19  incident?
20  A.   Yes.
21  Q.   What was that about?
22  A.   It was to respond to a Bank of America at Glendale and
23  Wilson Avenue regarding a suspicious person attempting to cash
24  a stolen check.
25  Q.   Now, that particular Bank of America, was that in a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    particular city?
 2    A.    Yes.  It's in Glendale.
 3    Q.    About what time did you -- well, I'll backtrack.
 4          Based on that call, did you drive out to the bank?
 5    A.    Yes, I did.
 6    Q.    How long did it take you to get to the bank?
 7    A.    A few minutes.
 8    Q.    Is that particular location close to the police
 9    department?
10    A.    It's a block away.
11    Q.    About what time did you arrive at the bank?
12    A.    Without looking -- I wouldn't know without referring to a
13    report, but it was in the 12:30 range.
14    Q.    Thank you.
15          Can you describe what -- that Bank America branch, its
16    location and what's next to it.
17    A.    It is on the northwest corner of Glendale and Wilson.  It
18    has a parking lot that is on the west side of the building.  On
19    the east side, along Glendale Avenue, it is connected to a
20    Starbuck coffee shop.  There is an interior accessway between
21    Starbucks and the Bank of America.  So there is only one
22    entrance to the true bank.  That's on the west side from the
23    parking lot.  And then to get it -- entrance from the east
24    side, you have to go through Starbucks to enter the bank.
25    Q.    Now, when you arrived at that Bank America branch, were
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   you the first officer there?
 2   A.    No.
 3   Q.    There were other officers there?
 4   A.    Yes.
 5   Q.    What did you do when you arrived at the branch?
 6   A.    I parked in the west parking lot and entered the bank
 7   through the west doors.
 8   Q.    Was there a perimeter set up?
 9   A.    There were already officers on scene, yes, on the outside.
10   Q.    Can you explain to the jury what that means.
11   A.    That means they had arrived prior to me getting there and
12   had stationed or positioned themselves on the west side, in the
13   parking lot, of the doors, and on the east side of the doors.
14   Q.    Was there a suspect in custody at that time?
15   A.    Yes, there was a man being detained.
16   Q.    So you said when you arrived, you parked and you went
17   inside the branch.
18   A.    That's correct.
19   Q.    What did you do when you went inside the branch?
20   A.    I contacted a representative from the bank.
21   Q.    Did you speak to that person?
22   A.    Yes.
23   Q.    And what were you told about the situation?
24   A.    I was told that a male had entered the bank and attempted
25   to --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection, hearsay.

 2              THE COURT:  Sustained.

 3              MR. SEVERO:  Move to strike.

 4              THE COURT:  Be stricken.

 5   BY MR. ESTRADA:

 6   Q.  Was your -- did you have an understanding that there was a

 7   report of some alleged crime taking place?

 8              MR. SEVERO:  Objection, hearsay.

 9              THE COURT:  Overruled.

10              THE WITNESS:  Yes.

11   BY MR. ESTRADA:

12   Q.  Now, were you referred to a particular item that was

13   alleged to be part of the crime?

14   A.  Yes.

15   Q.  Was that a check?

16   A.  Yes, it was.

17   Q.  Please take a look at Exhibit 271, if you would.

18       And I believe that one should be on top of the cabinet

19   there.

20              THE CLERK:  Thank you.

21   BY MR. ESTRADA:

22   Q.  Do you have that in front of you?

23   A.  Yes.

24   Q.  What's Exhibit 271?

25   A.  It is a check from a business.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.    You recognize it?

2   A.    Yes.

3   Q.    How do you recognize it?

4   A.    I took custody of this on that date, and that is my

5   handwriting on the evidence bag, on the inside of the bag.

6   Q.    Now, why did you take custody of this particular item?

7   A.    After contacting the owners of this check, it was

8   determined that they had not issued this check to anyone.

9          MR. SEVERO:  Objection.

10         MR. FLIER:  Hearsay.

11         MR. SEVERO:  Move to strike, hearsay.

12         THE COURT:  Sustained.

13  BY MR. ESTRADA:

14  Q.    Was this an item of evidence you took?

15  A.    Yes, it was.

16  Q.    Related to a crime taking place?

17  A.    Yes.

18         MR. ESTRADA:  Your Honor, the government moves to

19  admit Exhibit 271.

20         THE COURT:  It'd be received.

21      (Received in evidence, Exhibit 271.)

22         MR. ESTRADA:  And request permission to publish.

23         THE COURT:  Yes.

24         MR. ESTRADA:  Your Honor, if I may ask the clerk to

25  obtain the item so I may publish it, please, and permission to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    approach, your Honor.

2    Q.   Do you see Exhibit 271 in front of you on the screen?

3    A.   Yes, I do.

4    Q.   Is that the item of evidence you recovered at the Bank of

5    America branch on January 28, 2009?

6    A.   Yes, it is.

7    Q.   You see that number there, the check number?

8    A.   Yes, I do.

9    Q.   Is that 3444?

10   A.   Yes.

11   Q.   And do you see an amount there?

12   A.   Yes, I do.

13   Q.   What's the amount?

14   A.   $5,900.

15   Q.   And do you see this name here?

16   A.   Yes.

17   Q.   What's that name?

18   A.   Rafael Roger Zendejas.

19   Q.   Now, once you spoke to the branch manager and obtained

20   this check, what did you do next?

21   A.   I had contacted, using a -- a contact telephone number

22   they have for that account, and spoke to a person regarding the

23   check.

24   Q.   You spoke to the contact for what?

25   A.   For this account on the check, a Pompos Jewelry

```
 1   Corporation.
 2   Q.   What did the victim inform you?
 3   A.   That they had never received that --
 4          MR. FLIER:  Objection.
 5          MR. SEVERO:  Hearsay.
 6          MR. FLIER:  Hearsay.
 7          THE COURT:  Sustained.
 8   BY MR. ESTRADA:
 9   Q.   Did you speak to a person connected with the check?
10   A.   Yes.
11   Q.   Based on speaking to the victim or the person who was
12   connected to this check, did you then take custody of this
13   check?
14   A.   Yes, I did.
15   Q.   Now, this name here, Rafael Roger Zendejas, did you
16   actually speak to a person with that name?
17   A.   I spoke to a male that was being detained on the outside
18   of the bank, on the east side of the building, yes.
19   Q.   And that was Rafael Roger Zendejas?
20   A.   That's who he claimed to be, yes.
21   Q.   Now, in addition to this check that you obtained at the
22   bank branch, were there also other items of evidence you
23   collected?
24   A.   Yes.
25   Q.   What other items of evidence did you collect?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Well, there were -- there were personal property items

2   that were on his person at the time.

3   Q.   Please take a look at Exhibit 272.

4        And that's another physical item which, hopefully, is in

5   one of the manila envelopes on top of the cabinet.

6        Oh, it's in the box, I'm being told.  It's in the box.

7            THE CLERK:  Okay.  Thank you.

8   BY MR. ESTRADA:

9   Q.   You have 272 in front of you?

10  A.   Yes, I do.

11  Q.   What is Exhibit 272?

12  A.   Miscellaneous pieces of paper.  It is folded, with the

13  items on the inside, where I have to look through the back, but

14  it looks like a Xerox copy of a California ID.

15           MR. SEVERO:  May I have a moment, your Honor?

16           THE COURT:  Certainly.

17  BY MR. ESTRADA:

18  Q.   You can go ahead and take it out of the bag and take a

19  look to confirm, please.

20       Now if you can tell us what's in Exhibit 272.

21  A.   It is issued from the Department of Motor Vehicles.  It's

22  a receipt, not a license or permit, and not a valid -- not a

23  verified identification, and it's issued to Rafael Roger

24  Zendejas.  That is one item.

25       The second item is an interim driver's license from the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Department of Motor Vehicles to a Rafael Roger Zendejas.
2           MR. FLIER:  Your Honor, I'm sorry, my exhibit shows my
3   client's last name.  So I just want to bring that up, sir.
4           THE COURT:  Okay.
5           MR. ESTRADA:  Your Honor, that's not accurate.  This
6   is pertaining to Rafael Zendejas.
7           THE COURT:  First of all, what exhibit is it?
8           MR. FLIER:  272.
9           MR. ESTRADA:  272.
10          MR. FLIER:  I have it right here, your Honor.
11          MS. YANG:  Your Honor, may we have a moment with
12  counsel?
13          THE COURT:  Sure.  Why don't you talk to each other,
14  the three of you, or two of you.
15          MR. ESTRADA:  I think there's confusion about a
16  placeholder, your Honor.  It's not going back to the jury, so
17  it's not an issue.
18      (Counsel confer privately.)
19          MS. YANG:  Thank you, your Honor.
20          THE COURT:  Okay.
21          MR. ESTRADA:  So with the Court's permission, we'll
22  continue, your Honor?
23          THE COURT:  Yes.
24  BY MR. ESTRADA:
25  Q.  Okay.  272, those exhibits, were those items you recovered
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   at the bank?

2   A.   Yes.

3   Q.   On January 28, 2009?

4   A.   Yes.

5        MR. ESTRADA:  Your Honor, the government moves to

6   admit Exhibit 272.

7        THE COURT:  It will be received.

8        (*Received in evidence, Exhibit 272.*)

9        MR. ESTRADA:  Request permission to publish.

10       THE COURT:  Yes.

11       MR. ESTRADA:  If I may approach, please, to grab it

12  from the clerk.

13  Q.   So I'll show you the first page of 272.

14       Do you see that in front of you?

15  A.   Yes, I do.

16  Q.   You see a California -- what's a photocopy of a California

17  driver's license?

18  A.   Yes.

19  Q.   See the name there?

20  A.   Yes, I do.

21  Q.   What's that name?

22  A.   Rafael Roger Zendejas.

23  Q.   And then the next page that you obtained from the bank,

24  it's an interim driver's license, and the same name,

25  Rafael Roger Zendejas?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    That's the same name on the check that you recovered at

 3    the bank branch January 28th, 2009?

 4    A.    Yes.

 5    Q.    Now, did you actually speak to the suspect?

 6    A.    Yes, I did.

 7    Q.    Was it confirmed that was the person who tried to cash

 8    this check?

 9    A.    Yes, it was.

10    Q.    What did the suspect, Zendejas, tell you about this check?

11          MR. SEVERO:  Objection.

12          MR. PEREYRA-SUAREZ:  Hearsay, your Honor.

13          MR. ESTRADA:  It's an admission and -- a

14    co-conspirator admission.

15          THE COURT:  Overruled.

16          MR. ESTRADA:  He's a defendant in this case.

17          THE COURT:  Overruled.

18    BY MR. ESTRADA:

19    Q.    What did he tell you?

20    A.    He told me that he had been given the check as

21    compensation for some bad jewelry that he had purchased from a

22    jewelry store in downtown L.A., and that when he went back to

23    complain about the jewelry, that the store issued him a check

24    of this amount to compensate him for the bad jewelry, and that

25    he was trying to cash the check.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   Did you follow up on this story?

 2    A.   By speaking to the representative from the checking

 3    company, or from the account holder of the check, yes.

 4    Q.   And did you find any basis for this story about the check?

 5              MR. FLIER:  Objection, calls for hearsay.

 6              MR. SEVERO:  Based on hearsay.

 7              THE COURT:  I haven't heard the question yet.

 8              MR. SEVERO:  I'm sorry.

 9              MR. FLIER:  Sorry.

10              THE COURT:  Go ahead.

11    BY MR. ESTRADA:

12    Q.   Did you find any basis for this story about the bad gold?

13              THE COURT:  Objection sustained.

14    BY MR. ESTRADA:

15    Q.   Did you follow up on this bad gold story?

16              MR. SEVERO:  Asked and answered.

17              THE COURT:  Overruled.

18         Did you follow up on it?

19              THE WITNESS:  Yes.

20    BY MR. ESTRADA:

21    Q.   And after speaking to the owner of the jewelry

22    corporation, did you do any other follow-up?

23    A.   I'm not sure I understand the question.

24    Q.   You spoke to the owner of the jewelry company with regard

25    to this bad gold story?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   Did you find any legitimacy into this bad gold story?

 3           MR. SEVERO:  Objection.  That's the same question.

 4           THE COURT:  Sustained.

 5           MR. SEVERO:  Hearsay.

 6   BY MR. ESTRADA:

 7   Q.   After speaking to the representative, did you --

 8           THE COURT:  "A" for effort, Counsel.

 9           MR. ESTRADA:  Excuse me?

10           THE COURT:  "A" for effort, but --

11   BY MR. ESTRADA:

12   Q.   Did you do any additional follow-up?

13   A.   No.

14   Q.   And were all these items taken into custody?

15   A.   Yes, they were.

16   Q.   And booked into evidence?

17   A.   Yes.

18           MR. ESTRADA:  Just a moment, your Honor.

19       No further questions, your Honor.

20           THE COURT:  Okay.  Cross-examination.

21           MR. SEVERO:  Thank you.

22                      CROSS-EXAMINATION

23   BY MR. SEVERO:

24   Q.   Good afternoon, Officer Allen.

25   A.   Hello.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Did you preserve this check, Exhibit 271, for fingerprint

2    analysis?

3    A.    No.

4    Q.    So you just picked it up and put it in an envelope?

5    A.    A paper bag.

6    Q.    Paper bag.

7    A.    Yes.

8    Q.    Not the evidence bag that's in front of you today?

9    A.    I don't have --

10   Q.    The one you opened a little while earlier?

11   A.    No.   There was a paper bag within that plastic bag.   The

12   paper bag is what I sealed it in.

13   Q.    I see.   Did you submit this for fingerprint analysis?

14   A.    No.

15   Q.    Do you know if someone did?

16   A.    Not to my recollection or knowledge.

17   Q.    Are you aware of what this area in the check is, this dark

18   spot?

19   A.    I hadn't looked at it before you pointed it out, but it

20   could be a smudge mark, a fingerprint mark of some sort.

21   Q.    In fact, there are a number of smudge marks on here,

22   aren't there?

23   A.    There are.

24   Q.    You don't know what those are?

25   A.    They look like smudge marks.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   After you booked it -- did you book it into evidence?

2    A.   Yes, I did.

3    Q.   And after you booked it into evidence, did you ever see it

4    again before today?

5    A.   No.

6         MR. SEVERO:  That's all I have.  Thank you.

7         MR. PEREYRA-SUAREZ:  I have no questions of this

8    witness, your Honor.

9         THE COURT:  Counsel?

10        MR. FLIER:  I just have one.  Can I ask it from here,

11   your Honor?

12        THE COURT:  You can ask it from there.

13                      **CROSS-EXAMINATION**

14   BY MR. FLIER:

15   Q.   Did you see my client at the bank when you arrived on that

16   day?

17   A.   No.

18        MR. FLIER:  Thank you.

19        THE COURT:  Any redirect?

20        MR. ESTRADA:  No further questions, your Honor.

21        THE COURT:  You may step down.

22        THE WITNESS:  Thank you, your Honor.

23        THE COURT:  Next witness.

24        MS. YANG:  Yes, your Honor.

25        The government calls Manuel Angulo.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE CLERK:  Right here to be sworn.

 2        (Witness sworn.)

 3              THE CLERK:  Thank you.  You may be seated.

 4        May I please ask that you state your full name for the

 5   record and spell your last name.

 6              THE WITNESS:  My name is Manuel, initial E., last name

 7   Angulo, A-n-g-u-l-o.

 8              THE COURT:  You may inquire.

 9              MS. YANG:  Thank you, your Honor.

10              MANUEL E. ANGULO, GOVERNMENT'S WITNESS,

11                       DIRECT EXAMINATION

12   BY MS. YANG:

13   Q.   Good afternoon, Mr. Angulo.

14   A.   Good afternoon.

15   Q.   Where do you currently live?  What city do you currently

16   live in?

17   A.   I live in the city of Torrance.

18   Q.   And where are you currently employed?

19   A.   In city of downtown Los Angeles.

20   Q.   And what type of employment are you in?

21   A.   I run a jewelry manufacturing company with my family.

22   Q.   And is this jewelry manufacturing company known as Pompos,

23   P-o-m-p-o-s, Jewelry?

24   A.   That's correct.  Pompos Jewelry, Inc.

25   Q.   Inc.  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Now, you mention that you run this jewelry business with
 2   your family.  Who in your family is involved in this business
 3   with you?
 4   A.    My father, my younger brother, and my older brother.
 5   Q.    Now, in the time frame of 2005 to 2009, did Pompos
 6   Jewelry, Incorporated, have an account with a specific bank?
 7   A.    Yes.
 8   Q.    And which bank was that?
 9   A.    Bank of America.
10   Q.    Now, I'd like to direct your attention to January of 2009.
11   Did you learn at some point that a fraud had been committed
12   against the -- an attempted fraud had been committed against
13   the bank account for Pompos Jewelry, Incorporated?
14   A.    Yes.  I received a call from a branch asking me if I
15   have -- had written a check for about --
16             MR. SEVERO:  Objection, your Honor.  It's hearsay.
17             THE COURT:  Overruled.
18             MS. YANG:  Your Honor, it's the effect on the
19   listener.
20             THE COURT:  Overruled.
21   BY MS. YANG:
22   Q.    Continue.
23   A.    -- for about $5,000 or so.
24        I don't remember the exact amount.  And they -- I asked --
25   I told them that I had not written that check, and they told me
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   the name of the person, and I told them to -- to stop the
 2   person and call the police, because I had not written that
 3   check.
 4   Q.   Now, you just testified that you recall it was
 5   approximately nine -- $5,000, correct?
 6   A.   Around there.
 7   Q.   Were you shown the check around the time that you received
 8   this call from the bank branch?
 9   A.   If I was shown the check from whom?
10   Q.   From law enforcement or someone at the bank at some point
11   close in time to when you received that call.
12   A.   No.
13   Q.   And since that call in January of 2009, have you had an
14   opportunity to see that check?
15   A.   I believe so.
16         MS. YANG:  Your Honor, I'd like to show the witness
17   Exhibit 271, which has already been admitted into evidence.
18         THE COURT:  Okay.
19   BY MS. YANG:
20   Q.   Mr. Angulo, is this the check that you were shown related
21   to the alleged fraud that would have been committed against
22   your account in January of 2009?
23   A.   That's correct.
24   Q.   And looking at the check amount, does $5,900 sound
25   approximately right?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   And you had testified that the bank representative had

 3   told you the name of the individual who had attempted to cash

 4   the check.

 5        Does the name Rafael Roger Zendejas sound familiar?

 6   A.   Yes.

 7   Q.   Do you know Rafael Roger Zendejas?

 8   A.   No, I don't.

 9   Q.   Did you authorize check number 3444 from the Pompos

10   Jewelry Corporation bank account at Bank of America to be

11   issued to Rafael Roger Zendejas in the amount of $5,900?

12   A.   No, I did not.

13   Q.   Now, looking at Government's Exhibit 271, this address of

14   606 South Hill Street, Suite 309, Los Angeles, California,

15   90014, do you recognize that address?

16   A.   That's my business address.

17   Q.   And looking at the signature line on check 344 (sic), the

18   "ME," is that "Angulo"?

19   A.   Yes.

20   Q.   Is that your signature?

21   A.   No.

22   Q.   Is it a good forgery?

23   A.   It's similar.

24            MR. FLIER:  Objection.

25            THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. FLIER:  Thank you.
 2    BY MS. YANG:
 3    Q.   Now, you testified that you don't know a Rafael Roger
 4    Zendejas, correct?
 5    A.   Correct.
 6    Q.   Did you ever issue check 344 to this Mr. Zendejas to
 7    reimburse him for some bad gold jewelry purchased at your
 8    company?
 9    A.   No, I did not.
10    Q.   And taking a look, again, at your -- the signature on
11    check 344, is this similar to your signature?
12    A.   It's similar, but it's not.
13              MS. YANG:  Your Honor, I'd like to now show the
14    witness Exhibit 252, which has already been admitted into
15    evidence.
16              THE COURT:  Okay.
17    BY MS. YANG:
18    Q.   Mr. Angulo, I'm going to show you the first page of
19    Government's Exhibit 252 on the screen in front of you.
20        Again, Pompos Jewelry Corporation.  You previously
21    testified that your company was called Pompos Jewelry, Inc.
22    A.   It's corporation.
23    Q.   It's corporation?
24    A.   Yes.
25    Q.   And again, the address is 606 South Hill Street.  That is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   your business address, correct?

2   A.    Correct.

3   Q.    And is this your company's bank account statement from

4   Bank of America for January 9th through January 29th of 2009?

5   A.    Looks like it.

6   Q.    Now, more specifically, I'd like to show you page 4 of

7   Government's Exhibit 252.

8         Can you see that clearly on your screen up there?

9   A.    Yes.

10  Q.    Again, this is a check from your company at your company's

11  business address, correct?

12  A.    Correct.

13  Q.    And the date is September 26, 2009?

14  A.    Correct.

15  Q.    Issued to a Rafael Zendejas for $10.  Do you see that?

16  A.    Yes, I do.

17  Q.    And again, the signature line, is that your signature?

18  A.    No, it is not.

19  Q.    And did you ever authorize anyone to issue check 3439 on

20  your company's bank account to Rafael Zendejas for $10?

21  A.    No.

22  Q.    Looking at page 5 of Government's Exhibit 252, check

23  number 3442 from your company's Bank of America account, do you

24  know a Joseph Mares?

25  A.    No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And looking at the signature line, is that your signature?

2    A.    No.

3    Q.    Did you ever authorize anyone to issue check 3442 from

4    your company's Bank of America account to Joseph Mares for $15

5    on September 26, 2009?

6    A.    No, I did not.

7    Q.    And again, the signature on check 3442, is that similar to

8    your actual real signature?

9    A.    The previous one was more similar.  It looks like it.

10   Q.    But neither of them are your signature, correct?

11   A.    No.

12   Q.    Now, looking at the next check, check 3443, again, this is

13   off the Bank of America account for Pompos Jewelry Corporation,

14   correct?

15   A.    Correct.

16   Q.    Do you know an individual by the name of Debra Jane

17   May-Lawson?

18   A.    No.

19   Q.    And looking at the signature on check 3443, is that your

20   signature?

21   A.    No.

22   Q.    Did you ever authorize anyone to issue a check from your

23   company's bank account to a Debra Jane May-Lawson in the amount

24   of $5,600 on -- I believe that's cut off, but September 28th,

25   2009?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   No.

 2   Q.   Correction.  It was January 28, 2009.

 3        And looking at page 3 of Government's Exhibit 252,

 4   Mr. Angulo, again, the date on this check is what date?

 5   A.   January 28th, 2009.

 6   Q.   And the same individual, Debra Jane May-Lawson, you don't

 7   know her, correct?

 8   A.   I don't.

 9   Q.   And the amount of this check, what is it?

10   A.   5,600.

11   Q.   And the signature, is that your signature?

12   A.   No.

13   Q.   Did you authorize anyone to issue check 3438 from

14   Pompos Jewelry Corporation's Bank of America account to

15   Debra Jane May-Lawson for $5,600 on January 28th, 2009?

16   A.   No.

17   Q.   Now, at some point in January of 2009, did you learn that

18   the phone number that had been associated with your company's

19   bank account had been changed?

20   A.   No.

21   Q.   Do you not recall if it had been changed, or do you know

22   that it had not been changed?

23   A.   I don't recall.

24        MR. FLIER:  Objection.

25        MR. SEVERO:  Objection, leading.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  It's not leading.  Overruled.

2        You don't know one way or the other?

3              THE WITNESS:  No, I don't recall.

4              MR. FLIER:  Objection, argumentative.

5        I tried.

6              THE COURT:  You get an "A," too, Counsel.

7              MR. FLIER:  Thank you.  I've been waiting for that.

8              THE COURT:  Okay.  Overruled.

9        Go ahead, Counsel.

10   BY MS. YANG:

11   Q.   Mr. Angulo, do you know an individual by the name of Mher

12   or Mike Darbinyan?

13   A.   No.

14   Q.   Did you ever authorize an individual by the name of Mher

15   or Mike Darbinyan to use your Pompos Jewelry Corporation Bank

16   of America account number?

17   A.   No.

18   Q.   And did you ever authorize an individual by the name of

19   Mher or Mike Darbinyan to use your name and to sign your name

20   to a check off of your company's bank account?

21   A.   No.

22   Q.   And did you ever authorize a Mher or Mike Darbinyan to

23   cash checks from your Pompos Jewelry Corporation Bank of

24   America account?

25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Did you ever authorize Rafael Zendejas to use your name or

2    account number associated with the Pompos Jewelry Corporation

3    bank account?

4    A.    No.

5    Q.    Did you ever authorize Rafael Zendejas to sign your name

6    to checks belonging to the Pompos Jewelry Corporation Bank of

7    America account?

8    A.    No.

9    Q.    Did you authorize any of the individuals on your check,

10   including Joseph Mares or Debra Jane May-Lawson, to use your

11   account number or your name?

12   A.    No.

13   Q.    And did you authorize any of them to sign your name to any

14   checks from the Pompos Jewelry Corporation Bank of America

15   account?

16   A.    Absolutely not.

17   Q.    Now, after this fraud was reported to you, what, if

18   anything, did you do with regard to your Bank of America

19   account?

20          MR. SEVERO:  The question's argumentative.  It

21   includes a conclusion of witness.

22          THE COURT:  Sustained.

23      After this event, what did you do with your account?

24          THE WITNESS:  We closed our bank accounts.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MS. YANG:

 2   Q.   And did you have to deal with any adverse consequences as

 3   a result of this fraud?

 4          MR. SEVERO:  Objection, vague.

 5          THE COURT:  Sustained.

 6   BY MS. YANG:

 7   Q.   Mr. Angulo, what, if anything, did you do after you closed

 8   your Bank of America account with regard to correcting the

 9   fraud that had been committed against your account?

10          THE WITNESS:  I had --

11          MR. SEVERO:  Objection.  It's argumentative and

12   includes a conclusion that a fraud was committed.

13          THE COURT:  Well, I'm not too sure of the relevancy,

14   Counsel.

15   BY MS. YANG:

16   Q.   Mr. Angulo --

17          THE COURT:  I'm going to sustain the objection on

18   relevancy.

19   BY MS. YANG:

20   Q.   -- because of some of these checks, were funds not

21   immediately available in your bank account?

22          MR. SEVERO:  Leading.

23          THE COURT:  Overruled.

24          THE WITNESS:  Do not recall.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MS. YANG:

 2   Q.   Were you ultimately reimbursed for funds that were taken

 3   out of your account because of these checks that you did not

 4   authorize?

 5   A.   Yes, we were.

 6            MR. SEVERO:  Assumes facts not in evidence.

 7            THE COURT:  Overruled.

 8        Were you reimbursed?

 9            THE WITNESS:  Yes, we were.

10   BY MS. YANG:

11   Q.   Was it problematic for you and your business to have to

12   deal with the fraud committed against your account?

13            MR. FLIER:  Objection, relevance.

14            MR. SEVERO:  Objection, relevance.

15            THE COURT:  Sustained.

16   BY MS. YANG:

17   Q.   Mr. Angulo, I believe you testified before you were cut

18   off -- do you sign checks anymore?

19   A.   I do not.

20            MS. YANG:  One moment, your Honor.

21            THE COURT:  Mm-hmm.

22            MS. YANG:  Thank you.  Nothing further.

23            THE COURT:  Okay.  Cross.

24            MR. SEVERO:  Thank you.

25        Do you have the exhibit -- do you have the exhibits?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MS. YANG:  Yes.
 2                    CROSS-EXAMINATION
 3  BY MR. SEVERO:
 4  Q.   Good afternoon, sir.
 5  A.   Good afternoon.
 6  Q.   Before today, did you speak to any police officers
 7  regarding this transaction with these various checks on your
 8  account?
 9  A.   We -- we had to go to the police station and fill out a
10  report when it first happened.
11  Q.   There's a gentleman seated at the table here, right in the
12  middle, younger-looking guy, Mr. Stebbins.  Is he -- have you
13  ever talked to him before?
14  A.   No.
15  Q.   All right.  Thank you.
16          THE COURT:  I don't know if that's a compliment to him
17  or an insult to everybody else at the table.
18          MR. SEVERO:  Well, I --
19          THE COURT:  Okay.  Go ahead.
20          MR. SEVERO:  Forget it.
21          MR. FLIER:  Your Honor, I was going to object to that
22  question.
23          THE COURT:  It would have been sustained.  Look at
24  him.
25      Go ahead, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. SEVERO:

2   Q.   The account at Pompos Jewelry in 2009, in or about, let's

3   say, January of 2009, how many people could sign on that

4   account?

5   A.   Three people.

6   Q.   Who were they?

7   A.   My father and my younger brother.

8   Q.   And yourself?

9   A.   Correct.

10  Q.   So, including you, two more, right?

11  A.   Yes.

12  Q.   All right.

13       THE COURT:  Can we have you bring that microphone down

14  a little bit closer to you so we can hear you?  Thank you.

15       Go ahead, Counsel.

16       MR. SEVERO:  Thank you.

17  Q.   Is there any one of you who was then in charge of actually

18  writing checks to pay bills?

19  A.   Yes.

20  Q.   Who was that?

21  A.   My younger brother.

22  Q.   And what's his name?

23  A.   Gabriel Angulo.

24  Q.   Your job was to sign checks from time to time, when

25  necessary, back then?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I had the option to.  I did it -- I wasn't in the custom

 2   of writing checks.  I manage manufacturing.

 3   Q.   I see.  So did you have any contact with -- let me

 4   rephrase that.

 5        Did you have any duties that had to do with balancing the

 6   checking account?

 7   A.   No.

 8   Q.   Did you know anything -- did you know anything about how

 9   your checks were ordered, blank checks?

10   A.   No.

11   Q.   Before January 28th of 2009, did you become -- were you

12   aware whether any checks had been stolen, blank checks?

13   A.   No.  After we received the calls, we -- we saw --

14   Q.   No.  Wait.  I'm sorry.

15        Move to strike, nonresponsive, after "no."

16             THE COURT:  Sustained.

17        Before then, you didn't know; is that correct?

18             THE WITNESS:  No.

19             THE COURT:  Okay.

20   BY MR. SEVERO:

21   Q.   I'm going to direct your attention to Exhibit 252, our

22   copy of that.  Let's see if I can make this work.

23        Are you acquainted with the check numbering that was --

24   the check numbers -- let me start that again.

25        Are you acquainted with the check numbers that were being
```

1    used in your Bank of America account at the time of in or about

2    January 9th of 2009?

3    A.   I don't understand the question.

4    Q.   Well, for example, if you look at the first check here,

5    you see that?  That check is number 3566.

6    A.   Okay.

7    Q.   Are you aware of whether or not that check was validly

8    written on your account by someone from your company?

9    A.   That was five years ago.  I don't remember exactly

10   everything that went on.

11   Q.   Looking at these, all these checks, top to bottom, if you

12   would, please, all the way down.  I'm not as good with this.

13   Do you see any checks there that you are aware today were not

14   validly written on your account?

15   A.   I'm not aware today exactly all the transactions that were

16   going on during that time.

17   Q.   And directing your attention to the second page --

18        How do I get rid of this?  All right.

19        THE COURT:  You want to remove that?  What is it, the

20   bottom left corner --

21        MR. SEVERO:  How do I get rid of this?

22   *(Counsel is assisted with the Elmo.)*

23        MR. SEVERO:  Thanks.

24   Q.   When did you become aware that check -- this check, the

25   $10 check, 3439, do you see that there?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000446**

1   A.   Yes, I can see it.

2   Q.   When did you become aware that that check had been written

3   on your account?

4   A.   Up until now.

5   Q.   You mean today?

6   A.   Today.

7   Q.   Today is the first time -- today is the first time that

8   it's been brought to your attention that that $10 check may not

9   have been written on your account properly?

10  A.   That $10 check, yes.

11  Q.   You do remember that, though, that that -- you don't

12  remember any of the other checks, but you remember that one?

13       Let me -- am I confusing you?

14  A.   Yes.

15  Q.   Let me try -- let me -- I understand.

16       You have testified that you were not aware that any of --

17  you don't remember any of these other checks being written on

18  your account.

19  A.   I would have to see who they were made out to in order to

20  know approximately.

21  Q.   Well, let me show you check number 2946.

22       You see that?

23  A.   Yes.

24  Q.   That has a signature on there.  It's made out to

25  Quality Water World, right?

```
 1    A.    Yes.

 2    Q.    And is that your signature?

 3    A.    That is my signature.

 4    Q.    Sir?

 5    A.    Yes.

 6    Q.    So you did -- you were writing checks at or about that

 7    time, right?

 8    A.    Yes.

 9          THE COURT:  Again, if you can move the microphone a

10    little closer to you so we can pick you up.  Everyone in the

11    courtroom has to hear it, so --

12          THE WITNESS:  Yeah.  Excuse me.

13          THE COURT:  Okay.

14    BY MR. SEVERO:

15    Q.    And how about check number 3486?  That is page 9 of 13 on

16    Exhibit 252, check 3486.

17          Do you know who Jose Luis Romero is?

18    A.    Yes, I do.

19    Q.    Is he a customer?

20    A.    No.  He's one of my employees.

21    Q.    He still is?

22    A.    Yes.

23    Q.    You wrote that check, right?

24    A.    Correct.

25    Q.    Bethel Company, is that a supplier?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   So you were writing checks on this account --

 3   A.   Yes, I was.

 4   Q.   -- even though -- even though your job was manufacturing,

 5   correct?

 6   A.   Yes.

 7   Q.   And the signatures on check number -- let's start moving

 8   in.

 9        Page 3 of Exhibit 252, this exhibit, your testimony is

10   that this signature is similar to yours, but not quite.

11   A.   That's not my signature.

12   Q.   All right.  And you don't know who signed that check, do

13   you?

14   A.   No, I don't.

15   Q.   So when you were asked whether Mr. Mher Darbinyan, sitting

16   over here to -- sitting over here to my right, ever wrote that

17   check, you don't know who wrote it one way or another.

18             MS. YANG:   Objection, your Honor, misstates the

19   examination and the testimony.

20             THE COURT:   Yeah, why don't you state the question

21   again.

22   BY MR. SEVERO:

23   Q.   You don't know who wrote this, this check, do you?

24   A.   No.

25   Q.   You don't know that Mr. Darbinyan ever came in contact
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   with this check, do you?

 2   A.   No, I don't.

 3   Q.   Before today, you didn't even know who Mr. Darbinyan was,

 4   correct?

 5   A.   No.

 6   Q.   Not correct.  I'm sorry.  You didn't know who he was?

 7   A.   I did not know who he was.

 8   Q.   All right.  Do you know who wrote check number 3439, which

 9   is page 4 of Exhibit 252?

10   A.   I do not know who wrote it.

11   Q.   You don't know who signed it?

12   A.   No.

13   Q.   And you don't know who Rafael Zendejas is?

14   A.   No, I don't.

15   Q.   And Joseph Mares, you don't know who he is?

16   A.   No.

17   Q.   And you don't know who wrote check number 3442, do you?

18   A.   No.

19   Q.   Or 3443?  You don't know who wrote 3443?

20   A.   No.

21   Q.   The next check is made out to you.  You see that?

22   A.   Yes.

23   Q.   That's signed by your brother or your father?

24   A.   That's my father's signature.

25   Q.   All right.  Now, the checks -- this check, 3591, you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  recognize your endorsement on this check.  It's the second --

2  it's the signature on the back.  See it there?

3  A.   Yes.

4  Q.   Is that your signature?

5  A.   Yes.

6  Q.   So this is a legitimate check from Pompos Jewelry Corp.,

7  correct?

8  A.   Correct.

9  Q.   And it is -- the check itself, not the writing, is the

10 same as the check that you say you don't recognize, number 3443

11 of Exhibit 252.  Same type of check.

12 A.   It seems like it is.  I'm not an expert.

13 Q.   Looks like the same format, doesn't it?

14 A.   Yes.

15 Q.   And it looks like -- let's see if I can make this -- it

16 looks like one of your checks, right?

17 A.   Yes, it does.

18 Q.   Before January 28th of 2009, was your company or your

19 company store or shop broken into?

20 A.   No.

21 Q.   Was your mail stolen?

22 A.   No.

23 Q.   Did you find any employees may have taken checks from your

24 company?

25 A.   No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000451**

1    Q.    You didn't lose any money as a result of all this?

2    A.    No.

3            MR. SEVERO:  I have no other questions.

4            THE COURT:  Counsel?

5            MR. PEREYRA-SUAREZ:  I have no questions for this

6    witness.  Thank you, your Honor.

7            THE COURT:  Okay.  Counsel.

8            MR. FLIER:  Very briefly.

9                        **CROSS-EXAMINATION**

10   BY MR. FLIER:

11   Q.    Good afternoon.

12   A.    Good afternoon.

13   Q.    The reason why you didn't suffer any loss is, can I

14   assume, you were reimbursed?

15           MS. YANG:  Objection, relevance and asked and

16   answered.

17           THE COURT:  Overruled.

18       Were you reimbursed?

19           THE WITNESS:  Yes, we were.

20   BY MR. FLIER:

21   Q.    Okay.  The point of my question is, before you were

22   reimbursed, it appears, and correct me if I'm wrong, that there

23   were three checks that went through that were fraudulent; is

24   that correct?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   One is for $5,600, one is for $10, and one is for $15; is

2   that correct?

3   A.   Correct.

4   Q.   I believe that the other, fourth check, the one that had

5   Mr. Zendejas' name, that check clearly never cleared; he was

6   arrested in the bank.  Is that a fair statement?

7        MS. YANG:  Objection, calls for speculation.

8        THE COURT:  Sustained.

9   BY MR. FLIER:

10  Q.   Do you know if that check that you were first shown

11  today -- and it might be Exhibit 252.  I apologize if it's not.

12  Did that go through, and did you sustain a loss?

13  A.   I don't know if it went through.

14  Q.   Okay.  Thank you.

15       So the loss before any reimbursement for you, and I'm not

16  minimizing it, is $5,625; is that correct?

17  A.   I don't have the numbers available.

18  Q.   Have you ever tried to determine that issue, about any

19  loss that you suffered, whether or not you were reimbursed?

20  A.   I don't understand the question.

21  Q.   I just would like to know how much money was taken from

22  your account fraudulently before any reimbursement, if you

23  know.

24  A.   I don't remember.

25  Q.   So with respect to the four checks that you were shown

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    today by the government, and some of the other checks from that

2    same account by co-counsel, are there any other checks that

3    you're aware of, besides those, that you believe had fraudulent

4    activity on them?

5    A.    Besides the ones I was shown today?

6    Q.    Yes.

7    A.    No.

8    Q.    And then, based on questioning today, you were not even

9    aware, and correct me if I'm wrong, that those last two checks

10   that you were shown by the government, the $10 one and the $15

11   one, you didn't even know you were a victim of that; is that

12   correct?

13   A.    This was five years ago.

14   Q.    No, I understand that, but am I correct, sir?

15            THE COURT:  If you remember.

16            THE WITNESS:  I don't remember.

17   BY MR. FLIER:

18   Q.    Did you testify today that you first found out that

19   information about the ten and fifteen dollar check issue and

20   you were going to be shown them?

21   A.    As I said before, my brother's the one that took care of

22   all the bank statements.  I don't remember all the names, and I

23   don't remember everything that was shown to me.

24   Q.    What about today?

25   A.    Everything that I was shown today, I did not write those

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   checks, and I don't know who those people are.

2   Q.   Well, you were shown some checks today by co-counsel that

3   you admitted you did write, correct?

4        MS. YANG:   Objection, your Honor.  He's arguing with

5   the witness.  Relevance.

6        THE COURT:   Overruled.

7     There were some that you wrote, there were some that you

8   didn't write; is that correct?

9        THE WITNESS:   Yes.  And I recognize the ones I wrote.

10       MR. FLIER:   Thank you.

11  Q.   Now, at any point in time in 2008 and the beginning of

12  2009, did you, your older brother, younger brother, or your dad

13  ever realize that someone stole some checks from your company?

14  A.   No.

15  Q.   And then, as counsel asked, your store was not

16  burglarized; is that correct?

17  A.   That's correct.

18  Q.   Are you the individual -- and I'm almost done -- to whom

19  received the call from any officer from the Glendale Police

20  Department to speak about that one check that was worth

21  $5,900?

22  A.   Don't remember.

23  Q.   Did you personally, if you recall, ever go to the

24  Glendale Police Department to speak with any law enforcement

25  personnel about any of this subject matter we're now talking

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   about?

2   A.   No.

3   Q.   Do you know if your, I think it would be your younger

4   brother, ever went to the police station?  By personal

5   knowledge.

6   A.   No.

7   Q.   I believe you testified that your older brother did not

8   have the authority to write a check; is that correct?

9   A.   That's correct.

10           MS. YANG:  Objection, misstates the testimony.

11           THE COURT:  Well, as to what you testified before,

12   now, that's up to the jury.

13       Did your brother, older brother, have authority to write a

14   check?

15           THE WITNESS:  No, he did not.

16   BY MR. FLIER:

17   Q.   With respect to my client, the young man with the dark

18   jacket, have you ever seen him before?

19   A.   No.

20   Q.   Have you ever received any return check from any banking

21   institution that shows the name Rafael Parsadanyan as the

22   payee?

23   A.   No.

24           MR. FLIER:  I have no further questions.

25           MS. YANG:  Your Honor, one question.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | **REDIRECT EXAMINATION**                                     |
| 2  | BY MS. YANG:                                                 |
| 3  | Q.   Mr. Angulo, I'm going to place on the screen -- this is |
| 4  | page 3 of Government's Exhibit 252, check 3438.  Do you see  |
| 5  | this telephone number up in the right?                       |
| 6  | A.   Yes.                                                    |
| 7  | Q.   213-453-3874?                                           |
| 8  | A.   Yes.                                                    |
| 9  | Q.   Is that a telephone number that's ever been associated  |
| 10 | with Pompos Jewelry Corporation?                             |
| 11 | A.   No.                                                     |
| 12 | Q.   And is that a telephone number that's ever been associated |
| 13 | with you, your brother or your father?                       |
| 14 |         MR. SEVERO:  Your Honor, that --                     |
| 15 |         THE WITNESS:  No.                                    |
| 16 |         MR. SEVERO:  -- assumes facts not in evidence.       |
| 17 |     It's speculative.  He's kind of young.  We don't know how |
| 18 | long this company has been around.                           |
| 19 |         THE COURT:  To your knowledge.                       |
| 20 |         THE WITNESS:  No.  This company has been -- we've had |
| 21 | it since 2005.                                               |
| 22 |         THE COURT:  Okay.                                    |
| 23 |         MS. YANG:  Thank you.  Nothing further, your Honor.  |
| 24 |         THE COURT:  Okay.                                    |
| 25 |         Recross in that area?                                |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                        **RECROSS—EXAMINATION**

2      BY MR. SEVERO:

3      Q.    This phone number here, 453-3874, do you know whose number

4      that is?

5      A.    No.

6      Q.    Do you know who provided that number to the bank?

7      A.    No.

8      Q.    Do you know whose handwriting it is that -- on these

9      numbers?

10     A.    No.

11             MR. SEVERO:  That is all I have.

12             THE COURT:  Counsel?

13             MR. SEVERO:  Thank you.

14             MR. PEREYRA-SUAREZ:  No further questions, your Honor.

15     Thank you.

16             THE COURT:  Counsel?

17             MR. FLIER:  No questions, your Honor.

18             THE COURT:  You may step down.

19          May this witness be excused?

20             MR. SEVERO:  He may, your Honor.

21             THE COURT:  Any objection?

22          Okay, you're excused.  Thank you for coming in, sir.

23             THE WITNESS:  Thank you, sir.

24             THE COURT:  Next witness.

25             MR. CREIGHTON:  The government calls Yeghishe Zakunts.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          THE CLERK:  Right here to be sworn, please.

2      (Witness sworn.)

3          THE CLERK:  Thank you.  You may be seated.

4      May I please ask that you state and spell your full name

5  for the record.

6          THE WITNESS:  First name Yeghishe, Y-e-g-h-i-s-h-e,

7  last name Zakunts, Z-a-k-u-n-t-s.

8          THE COURT:  Counsel, you may inquire.

9              YEGHISHE ZAKUNTS, GOVERNMENT'S WITNESS,

10                      DIRECT EXAMINATION

11  BY MR. CREIGHTON:

12  Q.   Good afternoon, Mr. Zakunts.

13  A.   Good afternoon.

14  Q.   Where are you employed?

15  A.   Bank of America.

16  Q.   And how long have you been employed there?

17  A.   Seven years.  Over seven years.

18  Q.   What location are you employed at?

19  A.   Wilson, Glendale.

20  Q.   And how long have you been at that location?

21  A.   I have been there since 2008 until 2010, and then for two

22  years I was in another location, and then I came back again to

23  that location.

24  Q.   What is your position with Bank of America?

25  A.   Personal banker.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Would you explain to the jury what your duties are.

2   A.   Certainly.  It's opening accounts, servicing accounts,

3   including checking, savings and credit cards.

4   Q.   Now, you were working at this location in January of 2009;

5   is that correct?

6   A.   That's correct, sir.

7   Q.   Would you tell the jury, as you enter this Bank of America

8   location, roughly how the bank is laid out on the inside.

9   A.   When you walk in from the parking lot --

10          MR. SEVERO:  Objection, relevancy.

11          MR. FLIER:  I join.

12          THE COURT:  And I don't know what the relevancy would

13  be, Counsel.

14          MR. CREIGHTON:  Your Honor?

15          THE COURT:  Yes.

16          MR. CREIGHTON:  May I explain the relevancy?  May I

17  make a proffer?

18          THE COURT:  Offer of proof, yes.

19          MR. CREIGHTON:  He's going to be describing events

20  inside the bank with regard to his movements.

21          THE COURT:  Okay.

22          MR. CREIGHTON:  I'll proceed.

23          THE COURT:  Okay.

24  BY MR. CREIGHTON:

25  Q.   Directing your attention to January 28th, at approximately

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   noon, did an incident happen at the bank?

 2   A.   Yes.

 3   Q.   What do you recall first noticing?

 4   A.   First, I was on my desk, and then assistant manager called

 5   me over from the teller line.  Usually, as the manager, she is

 6   the person who actually helps the tellers and manage the

 7   tellers.  There was customer who was trying to cash a check,

 8   and the customer did not have an account with Bank of America.

 9   Q.   Now, let me pause you there.  When someone's trying to

10   cash a check and they don't have an account with Bank of

11   America, at that time what was the normal procedure that would

12   be followed?

13   A.   We usually offer the customer to open an account with

14   Bank of America.  But if they don't have an account, also we

15   can cash the Bank of America check without having accounts,

16   having a government-issued ID and also having their

17   fingerprints on the check.

18   Q.   Now, what happened after you learned that an individual

19   was trying to cash this check?

20   A.   Assistant manager, she offer to noncustomers -- he didn't

21   have an account with us -- to open an account, and at the same

22   time, she called me to help the customer to open an account.

23   Meanwhile, she said she's going to verify the check.  She

24   already had a suspicious on the -- suspicion on the check.

25        MR. SEVERO:  Judge, I'm going to move to strike that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   last portion of the statement.
 2             THE COURT:  The last portion will be stricken.
 3   BY MR. CREIGHTON:
 4   Q.   Now, what did you do after you were approached by the
 5   assistant manager?
 6   A.   Well, I just invite the customer to follow me and -- to my
 7   desk and process the opening account.
 8   Q.   Now, did the man come with you to your desk?
 9   A.   Yes, he did.
10   Q.   And what happened after you got to your desk?
11   A.   I started opening account for the man.
12   Q.   Did the man present identification?
13   A.   Yes, sir.  By bank policy, required two forms of ID.  One
14   should be government-issued ID, which is driver's license or
15   state ID.  The second form of ID can be anything, any credit
16   cards from -- or debit cards from other bank, shows their name
17   on it.
18   Q.   Now, did you stay with the customer at your desk all the
19   while you were processing his application?
20   A.   Until I open finished account, yes, sir.
21   Q.   And at some point did you -- well, let me ask this.  What
22   was the man's demeanor?  What did you observe about his
23   behavior when he first came over to your desk?
24   A.   From first, he was okay, but when lately it was like
25   delaying opening process, and he was getting nervous.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection, your Honor.  Move to strike

 2      that as conclusion of a witness.

 3              THE COURT:  Overruled.

 4      BY MR. CREIGHTON:

 5      Q.   And on what grounds, what basis did you have for thinking

 6      that he was starting to get nervous?

 7      A.   Well, the assistant manager, she took the check to verify,

 8      and actually, it took too long for her to do that.  That was my

 9      suspicion.  I called her, because I already was opening

10      account, and she told me she needs to call -- call the customer

11      and verify the check, if the customer issued the check.

12      Q.   Okay.  Now, what did you observe about the man's behavior

13      that made you think that he was getting nervous?

14      A.   Well, he was kind of like -- I don't really recall what it

15      was, but I remember he was nervous.  It made me, like, feel he

16      was nervous.

17      Q.   At some point did you leave your desk and go someplace

18      else in the bank?

19      A.   Yes.  Actually, the account, everything was opened

20      already, and -- and the same time, customer was nervous, and I

21      went to assistant manager to follow up with the check.

22      Q.   Okay.  Now, would you describe where you went.

23      A.   My desk is right -- well, the very last desk closer to

24      Starbucks entrance.  And our assistant manager, she is in front

25      of me back there, like probably like from here to the people
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    there, sit there.  I went to her, back teller line, behind the

2    teller line, to find out what's happened with the check.

3    Q.    And what, if anything, happened then?

4    A.    And then when I turn around, I saw customer -- there's no

5    customer on my desk.

6    Q.    Did you notice anything about the customer's departure

7    from your desk?

8    A.    Sorry, can you rephrase that?

9    Q.    Did you see the -- did you see the individual leave your

10   desk?

11   A.    No, sir.

12   Q.    Did you see him leave the bank?

13   A.    No, I don't recall it.

14   Q.    Based on where you were, could you see which entrance he

15   must have used?

16   A.    I could see if I would face to him.  I wasn't facing to

17   him.

18   Q.    Let me rephrase that.

19        When you went to talk to the assistant manager, were you

20   closer to the front entrance of the bank, or let me say the

21   parking lot entrance of the bank, or were you closer to the

22   Starbucks entrance?

23   A.    Closer to parking lot entrance.

24   Q.    Okay.  Did you -- but did you see which direction the

25   individual went?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    I don't recall it.

 2            MR. CREIGHTON:  No further questions.

 3            THE COURT:  Cross?

 4            MR. SEVERO:  Try to get it done so he can leave.

 5            THE COURT:  That's okay.

 6                      CROSS-EXAMINATION

 7    BY MR. SEVERO:

 8    Q.    With respect to opening the account --

 9          Good afternoon, sir.

10    A.    Good afternoon.

11    Q.    With respect to opening the account, did you -- does the

12    bank use, or did the bank then use a system to determine

13    whether the individual was worthy of an account to be opened?

14    A.    If you can rephrase your question, please.

15    Q.    ChexSystems.

16    A.    Yes.  It's automatic, actually, for the consumer accounts.

17    It's automated system.

18    Q.    So it automatically goes through ChexSystems?

19    A.    Through -- that's correct.

20    Q.    And ChexSystems is spelled C-h-e-x Systems?

21    A.    That's correct.

22    Q.    So you were able to open the account validly through the

23    system, right?

24    A.    That's correct.

25            MR. SEVERO:  I have nothing further.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. PEREYRA-SUAREZ:  I have no questions, your Honor.

2          MR. FLIER:  Oh, I'm sorry.

3          THE COURT:  Counsel?

4          MR. FLIER:  Thank you, your Honor.

5                        **CROSS-EXAMINATION**

6    BY MR. FLIER:

7    Q.   What language do you speak?

8    A.   Armenian, Russian, English.

9    Q.   Where are you originally from?

10   A.   I'm originally -- I was born in Armenia.  After high

11   school --

12          MR. CREIGHTON:  Objection, relevance.

13          THE COURT:  Overruled at this time.

14          THE WITNESS:  After high school, I moved to Russia.

15   The university, I entered university in Russia, and then I

16   moved to United States in 2004.

17   BY MR. FLIER:

18   Q.   My last question on that topic.  If I was to ask you are

19   you more familiar with Russian, eastern or western dialect in

20   the Armenian language, what would your answer be?

21          MR. CREIGHTON:  Objection.

22          THE COURT:  Sustained.

23   BY MR. FLIER:

24   Q.   Do you know my client, Mr. Parsadanyan?

25   A.   Yes, I do.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   How do you know him?

2    A.   I know him as a customer from Bank of America.

3    Q.   Have you ever had problems with him?

4    A.   I never had a problems with him.

5    Q.   And he has a legitimate account with your banking

6    institution?

7    A.   In my knowledge, I don't really know every single

8    customer's account system.

9    Q.   Well, maybe I misspoke.  He -- at some point in time,

10   based on your relationship and knowledge of him, he had an

11   account with your bank?

12   A.   That's correct.

13   Q.   Okay.  Thank you.

14        Curiosity and my last point.  Is your bank the type of

15   institution that, once you're put on notice that somebody

16   appears to be issuing a fraudulent check, the gentleman who we

17   were discussing, do you still welcome that same person to open

18   a new account at your bank?

19   A.   Well, if your question is why did we open an account for

20   him?

21   Q.   Besides maybe a delay issue for the police to come, yes.

22   A.   Technically -- not only, but technically, when the

23   customer comes to cash the check, known customer, we offer them

24   first to open an account.  What was five years ago and what is

25   it now, technologically, it was totally different.  And when
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  you have a suspicious, you can -- I mean, one of the duties of

2  the assistant manager, to verify the check, and that's what she

3  did.  She called the -- she first verified the check, and then

4  she called the customer to verify if that check has been issued

5  by issuer.

6  Q.  Was the verification by the assistant manager done before

7  or after they were taken to your desk to open the account?

8  A.  After.

9          MR. FLIER:  Thank you.  No further questions.

10         THE COURT:  Anything further?

11         MR. CREIGHTON:  Nothing, your Honor.

12         THE COURT:  You may step down.

13         THE WITNESS:  Thank you.

14         THE COURT:  Okay.  And may this witness be excused?

15         MR. SEVERO:  Yes, your Honor.

16         THE COURT:  Okay.  Thank you for coming in, sir.

17         THE WITNESS:  Thank you.

18         THE COURT:  Okay.  Ladies and gentlemen, it's

19 4:00 o'clock, so we're going to break at this time.  Enjoy

20 yourself this afternoon.  I don't even know what's on TV

21 anymore.  I don't think we have March Madness until tomorrow.

22 So watch whatever you want to watch, enjoy yourself, but don't

23 think about this case at all until you come on back in tomorrow

24 morning.

25         Remember the admonishment not to discuss the case among

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    yourselves or with anybody else or form or express any opinions

2    about the matter until it's submitted to you and you retire to

3    the jury room.

4         Have a pleasant evening.  We'll see you back in tomorrow

5    morning at?

6              JURORS:  8:15.

7              THE COURT:  8:15.  I love it.

8         And if you'd leave quietly, because I'm going to be

9    talking to the attorneys for a second afterwards.

10             THE CLERK:  All rise.

11        *(Outside the presence of the jury:)*

12             THE COURT:  Okay.  The record reflects the jurors have

13   left the courtroom, and you may all have a seat.

14        Counsel, an observation.  Not a criticism, just

15   observation.  This is going to be a fairly lengthy trial, 10,

16   15 days, whatever it is.  It appears on the first day -- and

17   again, just an observation to help everybody out.  It appears,

18   from my viewpoint, and I know a little bit more about these

19   cases than the jury does, there's been an awful lot of

20   surplusage that's come into the case.  I'm not too convinced at

21   this time what the last witness had to do at all as far as

22   being pertinent to this case.  But anyway, the only reason I

23   mention that is that in 10 to 15 days, you know the jurors get

24   bored.  If I start getting bored, they're really going to start

25   getting bored.  So it's just a suggestion that everybody who

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   has an interest in this case may want to focus the jury in on

 2   their issue rather than -- just an observation.  Just trying to

 3   be a friend.

 4           MR. ESTRADA:  I'll just note, your Honor, a lot of

 5   these witnesses are intended to be quick foundation witnesses.

 6   The victims are intended to be quick witnesses.

 7           THE COURT:  Okay.

 8           MR. ESTRADA:  We didn't anticipate the lengthy

 9   cross-examination of the victim in particular.

10           THE COURT:  Counsel, I'm not telling you -- you all

11   can put on the case you want to.  I was just making an

12   observation.  I'm not criticizing you.

13       Yes, Counsel.

14           MR. FLIER:  Your Honor, can we get notification each

15   day before we leave as to whom the people are going to call the

16   next day?

17           THE COURT:  Any problems with that, Counsel?

18           MR. ESTRADA:  There's a witness list that's in order,

19   and there's no problem with that, your Honor.

20           THE COURT:  Okay.  So you intend to go by the witness

21   list that everybody's been provided by --

22           MR. ESTRADA:  Yes, your Honor.  Apart from -- some of

23   the victims we want to call out of order because the Court has

24   a very strict schedule.

25           THE COURT:  As soon as you know you're going to call
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    somebody out of order, can you tell counsel.

2         MR. ESTRADA:  And the Court, yes, your Honor.

3         THE COURT:  Let me ask you one other question.  Is

4    Mr. Parsadanyan charged with any of the allegations that these

5    last three witnesses have testified to?

6         MR. ESTRADA:  No, your Honor.

7         THE COURT:  So their testimony doesn't go to him at

8    all?

9         MR. ESTRADA:  No, your Honor.

10        THE COURT:  That's what I thought.  Okay.

11        MR. FLIER:  Will the Court reconsider a motion to

12   sever?

13        THE COURT:  No.

14        THE CLERK:  All rise.

15        THE COURT:  See everybody in the morning.  Make sure

16   we're here by 8:15 in the morning.  Don't want to keep the jury

17   waiting.

18

19              *(Proceedings adjourned at 4:04 p.m.)*

20

21                        *--oOo--*

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                              _CERTIFICATE_

2

3        _I hereby certify that pursuant to Section 753,_

4    _Title 28, United States Code, the foregoing is a true and_

5    _correct transcript of the stenographically reported proceedings_

6    _held in the above-entitled matter and that the transcript page_

7    _format is in conformance with the regulations of the_

8    _Judicial Conference of the United States._

9

10   _Date:  MARCH 4, 2015_

11

12

13

14              _/S/ SANDRA MACNEIL_

15           _Sandra MacNeil, CSR No. 9013_

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3      HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5

6
UNITED STATES OF AMERICA,        )
7                                 )
                 PLAINTIFF,       )
8                                 )
            vs.                   )    No. CR 11-00072(A)-RGK
9                                 )
(1)  MHER DARBINYAN,              )
10   (4)  ARMAN SHAROPETROSIAN,   )
(35) RAFAEL PARSADANYAN,          )
11                                )
                 DEFENDANTS.      )
12   _____)

13

14      REPORTER'S TRANSCRIPT OF JURY TRIAL

15           DAY 3; VOLUME I of II

16             PAGES 1 – 108

17        THURSDAY, MARCH 27, 2014

18               8:30 A.M.

19        LOS ANGELES, CALIFORNIA

20

21

22    _____

23      *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
        *Official Reporter, U.S. District Court*
24           *255 East Temple Street*
           *Los Angeles, CA  90012*
25              *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF UNITED STATES OF AMERICA:

 3         ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
           BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4              ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
           312 NORTH SPRING STREET
 5         LOS ANGELES, CALIFORNIA  90012
           213.894.4477
 6
           UNITED STATES DEPARTMENT OF JUSTICE
 7         BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
           312 NORTH SPRING STREET
 8         LOS ANGELES, CALIFORNIA  90012
           213.894.2579
 9

10    FOR DEFENDANT MHER DARBINYAN:

11         THE SEVERO LAW FIRM
           BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12         70 SOUTH LAKE AVENUE, SUITE 945
           PASADENA, CALIFORNIA  91101
13         626.844.6400

14    FOR DEFENDANT ARMAN SHAROPETROSIAN:

15         LAW OFFICES OF CHARLES PEREYRA-SUAREZ
           BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16         800 WILSHIRE BOULEVARD, 12TH FLOOR
           LOS ANGELES, CALIFORNIA  90017
17         213.623.5923

18    FOR DEFENDANT RAFAEL PARSADANYAN:

19         FLIER AND FLIER, ALC
           BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20         15250 VENTURA BOULEVARD, SUITE 600
           SHERMAN OAKS, CALIFORNIA  91403
21         818.990.9500

22

23    ALSO PRESENT:

24         SPECIAL AGENT JEREMY STEBBINS, FBI
           DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25         JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                        I N D E X

 2   GOVERNMENT'S WITNESS:                              PAGE

 3   JEREMY STEBBINS

 4     DIRECT EXAMINATION (RESUMED) BY MR. ESTRADA        5

 5

 6

 7

 8                       E X H I B I T S

 9                        GOVERNMENT'S

10                 NUMBER           ADMITTED

11                  251                66

12                  253                89

13                  256                59

14                  261                22

15                  262                35

16                  263                96

17                  276                65

18                  277                92

19                  278                92

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 27, 2014

 2                              8:30 A.M.

 3                              - - - -

 4       (In the presence of the jury:)

 5            THE COURT:  Okay.  The record will reflect that the

 6   jurors are all present in their respective seats in the jury

 7   box.

 8       And I gotta compliment you.  You guys are golden, right on

 9   time, and gets us to a position where we get a good full day.

10   Hopefully, if we get these good full days, the trial won't take

11   as long as it might if it didn't.

12       Ready to proceed?

13            JURORS:  Yes.

14            THE COURT:  Okay.

15   Counsel.

16            MR. ESTRADA:  Yes, your Honor.

17       The government re-calls Special Agent Stebbins to the

18   stand.

19            THE COURT:  Okay.

20            THE CLERK:  Agent Stebbins, I'll just remind you

21   you're still under oath.

22            THE WITNESS:  Okay.

23            THE CLERK:  Thank you.

24            MR. ESTRADA:  May I proceed, your Honor?

25            THE COURT:  Yes, please.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    **JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,**

2             **DIRECT EXAMINATION (RESUMED)**

3    BY MR. ESTRADA:

4    Q.   Special Agent Stebbins, yesterday you testified about a

5    call in which there was a reference, the number 3444, in an

6    amount of 5,900.

7    A.   Yes.

8    Q.   That was Exhibit 8, I believe.

9    A.   I'm sorry?

10   Q.   That was Exhibit 8, I believe.

11   A.   The call?  I don't recall which call was what.

12   Q.   Okay.  I'll represent to you it's Exhibit 8.

13   A.   Okay.

14   Q.   But with regard to that call, was there an item of

15   evidence that helped you link that call to a particular bank

16   account?

17        MR. SEVERO:  Objection, that's -- calls for a

18   conclusion and --

19        MR. ESTRADA:  It's his investigation, your Honor.

20        MR. SEVERO:  -- it's leading.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes.

23   BY MR. ESTRADA:

24   Q.   Please take a look at Exhibit 271.

25        And I'll ask that the clerk please hand that to the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   witness.
 2        Your Honor, it has been admitted and published, and I have
 3   a color copy here.  Perhaps I can simply put it on the screen.
 4             THE COURT:  Okay.
 5   BY MR. ESTRADA:
 6   Q.   You see what's on the screen in front of you?
 7   A.   Yes.
 8   Q.   Is this the item of evidence that helped you link that
 9   call to a particular bank account?
10   A.   Yes, it is.
11   Q.   And what about this item of evidence linked that call to
12   this bank account?
13   A.   During the call, they mentioned check number 3444 and the
14   amount of $5,900.
15   Q.   That's written on the check?
16   A.   Yes.
17   Q.   Now I'd like to turn your attention to some other calls
18   that were intercepted in this case.
19        Your Honor, with the Court's permission, the government
20   would like to play Exhibit 13.
21        I would ask that the jurors turn to 13A in their
22   transcript books.
23             THE COURT:  Okay.
24             MR. ESTRADA:  Thank you, your Honor.
25        (Audio played.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:
 2   Q.   Special Agent Stebbins, turning to the first page of
 3   Exhibit 13A, do you have that in front of you?
 4   A.   Yes, I do.
 5   Q.   What's the date of that call?
 6   A.   March 16, 2009.
 7   Q.   What's the time of that call?
 8   A.   Approximately 12:47 p.m.
 9   Q.   Who are the participants in the call?
10   A.   Mike Darbinyan, Armando Moreno, and an unknown man.
11   Q.   Turning to page 2 of the transcript, five speakers from
12   the top, Darbinyan states, "Okay, let me give," and then refers
13   to "Mando."
14        Based on your knowledge of the investigation, what does
15   "Mando" refer to?
16   A.   Mando is a nickname for Armando Moreno.
17   Q.   And then last speaker at the bottom, the unidentified
18   male, refers to someplace behind a 7-Eleven, a Peruvian place,
19   and then continuing to page 3 of 3, it says, "It's called
20   Natalie's."
21        Based on your knowledge of the investigation, was that a
22   actual location?
23   A.   Yes.
24   Q.   How do you know that?
25   A.   We conducted surveillance on this date at Natalie's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Peruvian restaurant.
 2    Q.   Okay.  I want to get to that in a second, but before I do,
 3    I want to play some more calls.
 4         Your Honor, with the Court's permission, if I could play
 5    Exhibit 14 and have the jurors turn to 14A in their transcript
 6    books.
 7              THE COURT:  Okay.
 8         (Audio played.)
 9    BY MR. ESTRADA:
10    Q.   All right.  Special Agent Stebbins, turning to the first
11    page of that transcript, 14A, you have that in front of you?
12    A.   Yes, I do.
13    Q.   What's the date of that recording?
14    A.   March 16, 2009.
15    Q.   What's the time of the recording?
16    A.   Approximately 2:05 p.m.
17    Q.   Who are the participants in that recording?
18    A.   Mike Darbinyan and Arman Tangabekyan.
19              MR. SEVERO:  As the Court may recall, there was a
20    continuing objection to --
21              THE COURT:  Yes, and the Court will treat it as a
22    continuing objection.
23              MR. SEVERO:  Yes.  Thank you.
24    BY MR. ESTRADA:
25    Q.   Based on your knowledge of the investigation, who is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Arman Tangabekyan?

2   A.   Arman Tangabekyan is an associate of Mike Darbinyan who

3   goes by "Spito."  He's a large bank fraud perpetrator.

4   Q.   Was he also a defendant in this case?

5   A.   Yes.

6   Q.   Okay.  Turning to page 2 of the transcript -- and I should

7   clarify, this is the first transcript we're listening to in the

8   Eastern Armenian language?

9   A.   That's correct.

10  Q.   Based on your knowledge of the investigation, were there

11  numerous calls in the Eastern Armenian language?

12  A.   Yes.

13  Q.   Now, turning to page 2, four speakers from the bottom,

14  Darbinyan states, "Would you be able to make some paper or

15  something quickly, so I give it to this guy to take it to

16  Orange County?"

17       Based on your knowledge of the investigation, what did the

18  term "paper" refer to?

19  A.   "Paper" is a fraudulent check.

20            MR. SEVERO:  Objection, your Honor, move to strike,

21  no -- no foundation.

22            THE COURT:  What are you making that assumption on?

23            THE WITNESS:  Based on my knowledge of the

24  investigation.

25            MR. SEVERO:  It's hearsay and --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  There's later --

 2              THE COURT:  It's not enough.  It will be sustained,

 3    Counsel.

 4    BY MR. ESTRADA:

 5    Q.   Were there later calls in this case that helped you

 6    determine that "paper" referred to a fraudulent check?

 7    A.   Yes.

 8    Q.   Now, there's a reference to Orange County.  Based on your

 9    knowledge of the investigation, was there a tie between

10    Armando Moreno and Orange County?

11    A.   Yes.  Armando Moreno lived in Orange County and was the

12    controlling Eme brother over Orange County.

13              MR. SEVERO:  I'm going to object.

14              MR. FLIER:  Foundation.

15              THE COURT:  The second part will be stricken.

16    BY MR. ESTRADA:

17    Q.   Do you know Armando Moreno?

18    A.   Yes.

19    Q.   Have you spoken to Armando Moreno?

20    A.   Yes.

21    Q.   Have you investigated Armando Moreno?

22    A.   Yes.

23    Q.   Based on your knowledge of the investigation, was

24    Armando Moreno the controlling Eme brother of Orange County?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. SEVERO:  Objection, your Honor.  That still calls

 2  for conclusion.

 3          THE COURT:  Sustained.

 4  BY MR. ESTRADA:

 5  Q.   Turning to the bottom of the transcript, Arman Tangabekyan

 6  asked, "To take it and put it there?"

 7       And at the top of page 3, Darbinyan states, "Take it and

 8  put it, take it and cash it."

 9       Based on your knowledge of the investigation, what did the

10  phrase "take it" refer to?

11  A.   "Take it" would be to --

12          MR. SEVERO:  Objection, your Honor.  That calls for a

13  conclusion.  No --

14          THE COURT:  Counsel, you're going to have to lay more

15  of a foundation than just say "based on your investigation."

16  You're going to have to explain why he knows this means a

17  particular item.

18  BY MR. ESTRADA:

19  Q.   Based on your knowledge of the investigation, did you form

20  a conclusion as to what "take it" referred to?

21          MR. SEVERO:  State same objection.

22          MR. ESTRADA:  Well, I'm going to lay the foundation.

23          THE COURT:  Overruled at this point.  He hasn't asked

24  the question yet.

25          THE WITNESS:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1  BY MR. ESTRADA:

 2  Q.   And was that conclusion -- what was that conclusion based

 3  on?

 4  A.   It was based on conversations with cooperators, including

 5  Armando Moreno, who told us what these calls meant.

 6  Q.   Was there also the word "cash it" after "take it"?

 7  A.   Yes.

 8  Q.   Did that help you form your conclusion about what you

 9  believe the "take it" referred to?

10  A.   Yes.  It meant to cash the fraudulent check in

11  Orange County or deposit it in Orange County.

12         MR. SEVERO:  Move to strike that.  It's all based on

13  some hearsay that --

14         MR. ESTRADA:  Your Honor, he is entitled to his

15  opinions, his lay opinion --

16         THE COURT:  Excuse me, Counsel.  Counsel, one person

17  at a time.  Don't talk over each other.  He hasn't finished his

18  objection yet.

19      Yes?

20         MR. SEVERO:  It's based on hearsay about something

21  that somebody else told him.  I understand he's -- there is a

22  mixture of expert and investigator here, but I believe this is

23  crossing the line from the expert to the investigator.

24         THE COURT:  Okay.  I'm going to overrule the

25  objection.  Counsel, you can get into it in cross-examination.

1       Next question.

2    BY MR. ESTRADA:

3    Q.   Did you form an opinion as to what "take it" referred to?

4    A.   Yes.

5    Q.   What was that?

6    A.   Transport the fraudulent check to Orange County.

7    Q.   Four speakers from the top, Arman Tangabekyan states,

8    "There is one available for 90."

9        Based on your knowledge of the investigation, what did the

10   term "90" refer to, in your opinion?

11   A.   $90,000 in a victim's account.

12   Q.   Was it sometimes the case that defendants in this case

13   would refer to amounts in shorthand?

14            MR. SEVERO:  Objection.

15            THE WITNESS:  Yes.

16            MR. SEVERO:  Your Honor, there's no foundation.

17            MR. FLIER:  Sorry.  For the reporter, Mr. Flier.

18   Objection.

19            THE COURT:  One at a time.

20        Go ahead, Counsel.

21            MR. FLIER:  Thank you.

22        Objection, no foundation, and calls for a conclusion.

23            MR. SEVERO:  I'll join in that.

24            THE COURT:  Overruled.

25            THE WITNESS:  Yes.  In this case, they often refer to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   dollar amounts in accounts in the shorthand.  90 was 90,000.  A
 2   hundred is a hundred thousand.  400 was 400,000.  That's how
 3   they referred to it.
 4           MR. FLIER:  Going to object, your Honor, to the word
 5   "they," and I'll submit.
 6           THE COURT:  Overruled.
 7   BY MR. ESTRADA:
 8   Q.   Now, five speakers from the bottom --
 9           THE COURT:  Counsel, it may help, and you may want to
10   do this through the entire trial -- and counsel brings up
11   something worthwhile.
12       Ladies and gentlemen, the indictment here alleges many,
13   many counts.  Some counts are as to one person, some counts are
14   as to two people, some counts -- I don't think there's any
15   counts as to three people.
16       It may help, Counsel, if you can identify what counts
17   you're referring to as to which defendants you're alleging
18   these transactions as to.
19           MR. ESTRADA:  Yes, your Honor.
20           THE COURT:  Counsel raises a good question.  When you
21   say "they," I'm assuming on the counts you're going to now, not
22   all three are included on that count.
23           MR. ESTRADA:  Absolutely correct, your Honor.  These
24   counts only pertain to Mher Darbinyan.  These are --
25           THE COURT:  Okay.  So the testimony of this witness,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   then, is limited just to Darbinyan at this time; is that
 2   correct?
 3           MR. ESTRADA:  Correct.  Count 1 is bank fraud counts
 4   and the aggravated identity theft counts as to Mher Darbinyan
 5   only.
 6           THE COURT:  Okay.  But as the witnesses are
 7   testifying, if you'd tell us what counts they're testifying
 8   to, so you're not confusing the jury.  The jury has to know
 9   this.
10           MR. ESTRADA:  Perfect, your Honor.
11   Q.   Now, five speakers from the bottom --
12           THE COURT:  And so as to this witness at this time,
13   during this examination, it's only referring to defendant
14   Darbinyan; is that correct?
15           MR. ESTRADA:  Yes, your Honor.  This whole segment
16   with his testimony will refer only to Darbinyan, and then at
17   the end there are a couple of calls as to defendant
18   Sharopetrosian.
19           THE COURT:  Well, then you're going to have to tell us
20   when it's -- it's going to be limited just to Darbinyan until
21   you tell us otherwise.
22           MR. ESTRADA:  Yes.  He'll be -- Sharopetrosian will be
23   on the phone, so it will become clear at that point, but I will
24   make it clear as well.
25           THE COURT:  You're going to have to explain it to the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    jury.
 2          Because at this time, ladies and gentlemen, it's limited
 3    just to Darbinyan.  Okay.
 4    BY MR. ESTRADA:
 5    Q.   Now, five speakers from the bottom, Darbinyan states,
 6    "Take it or deposit it like that."
 7          Based on your knowledge of the investigation -- and this
 8    word "deposit," it was in English?
 9    A.   Yes.
10    Q.   Based on your knowledge of the investigation, did
11    defendants charged in these particular check fraud counts
12    sometimes use English words interspersed with Eastern Armenian?
13    A.   Yes.
14    Q.   And based on your knowledge of the investigation, what did
15    "deposited" refer to?
16    A.   Would be to deposit the fraudulent check.
17          MR. SEVERO:  Objection.  The answer is a conclusion of
18    the witness, no foundation.
19          THE COURT:  And I don't want to discourage you from
20    making the objection.  You can make it every time, but I'm
21    considering it as a continuing objection also.
22          Overruled.
23          MR. ESTRADA:  Your Honor, with the Court's permission,
24    if we could play Exhibit 15 and ask that the jurors turn to 15A
25    in their transcript books.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2         (Audio played.)

 3   BY MR. ESTRADA:

 4   Q.   Special Agent Stebbins, turning to the first page of

 5   Exhibit 15A, do you have that in front of you?

 6   A.   Yes.

 7   Q.   What's the date of that call?

 8   A.   March 16, 2009.

 9   Q.   What's the time of the call?

10   A.   Approximately 2:27 p.m.

11   Q.   Who are the participants?

12   A.   Arman Tangabekyan and Mike Darbinyan.

13   Q.   Now, turning to page 2 of the transcript, three speakers

14   from the top, Darbinyan states, "Yeah bro," to Tangabekyan.

15        Are you familiar with the -- what the word "bro" is in

16   Armenian?

17   A.   Yes.

18   Q.   What is it?

19   A.   "Aper," a-p-e-r.

20              MR. SEVERO:  Move to strike that.  No foundation.

21              THE COURT:  Sustained.  Will be stricken.

22   BY MR. ESTRADA:

23   Q.   How long have you been investigating this case?

24   A.   Approximately five years.

25   Q.   About how many of these calls have you listened to?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Approximately 50- to 100,000.

 2   Q.   And have you spoken to some of the Eastern Armenian

 3   translators about some of the common terms in the word -- in

 4   the calls?

 5   A.   Yes.

 6   Q.   And learned what the Armenian word is?

 7   A.   Yes.

 8   Q.   And based on that background, did you learn what the

 9   Armenian word for "bro" was?

10   A.   Yes.

11   Q.   And what's that word?

12   A.   "Aper."

13        MR. SEVERO:  Still no foundation.

14        THE COURT:  Sustained.

15        MR. ESTRADA:  Your Honor, with the Court's permission,

16   the government would ask to play Exhibit 16 and ask that the

17   jurors turn to 16A of their transcript book.

18        THE COURT:  Okay.

19   (Audio played.)

20   BY MR. ESTRADA:

21   Q.   Special Agent Stebbins, turning to the first page of

22   Exhibit 16A, you have that in front of you?

23   A.   Yes.

24   Q.   What's the date of that call?

25   A.   March 16, 2009.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What's the time of the call?

 2   A.   Approximately 3:36 p.m.

 3   Q.   Who are the participants in that call?

 4   A.   Mike Darbinyan, Armando Moreno, Karen Samawi, and an

 5   unknown male is heard in the background briefly.

 6   Q.   Based on your knowledge of the investigation, who is

 7   Karen Samawi?

 8   A.   Karen Samawi is another defendant in this case, and she

 9   was the girlfriend of Armando Moreno at the time.

10   Q.   Now, turning to page 2 of the transcript, 2 of 3 in

11   Exhibit 16A, five speakers from the bottom, Darbinyan refers to

12   the number 26,300.

13        Based on your knowledge of the investigation, what did you

14   believe that referred to?

15   A.   I believe that referred to the amount of a fraudulent

16   check that they would write against a victim's account.

17            MR. SEVERO:  No foundation, move to strike.

18            THE COURT:  Overruled.

19        As far as referring to amount on a check will remain in.

20   The rest will be stricken as to whether or not it's fraudulent

21   or not.

22            MR. SEVERO:  Thank you.

23   BY MR. ESTRADA:

24   Q.   Now, turning to the last speaker on page 2, Karen Samawi

25   asked, "Who's the payee?  Who's the person on, the person that
```

```
 1   wrote me the check?"
 2       Based on your training and experience, what does a "payee"
 3   refer to?
 4   A.   The payee would be the account that the check is written
 5   on, the person who wrote the check to Karen Samawi in this
 6   case.
 7   Q.   Turning to page 3 of that transcript, first speaker at the
 8   top, Darbinyan states, "I will let you know that later on.  If
 9   he went to get everything done, he's bring it, he's gonna write
10   it.  I will call you before I do anything."
11       Based on your knowledge of the investigation, what did the
12   term "write it" refer to?
13   A.   "Write it" would be to forge the signature on the check.
14           MR. ESTRADA:  Your Honor, with the Court's permission,
15   the government would ask to play Exhibit 17 and ask that the
16   jurors turn to 17A in their transcript books.
17           THE COURT:  Okay.
18       (Audio played.)
19   BY MR. ESTRADA:
20   Q.   Now, Agent Stebbins, turning to the first page of
21   Exhibit 17A, do you have that in front of you?
22   A.   Yes, I do.
23   Q.   What's the date of the recording?
24   A.   March 16, 2009.
25   Q.   What's the time of the recording?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Approximately 3:45 p.m.

 2    Q.    Who are the participants in the recording?

 3    A.    Mike Darbinyan, Armando Moreno.

 4    Q.    Now turning to page 4 of 5, do you have that in front of

 5    you?

 6    A.    Yes, I do.

 7    Q.    Six speakers from the bottom, Darbinyan states -- refers

 8    to conducting themselves with "people like you."

 9          Based on your knowledge of the investigation, what does

10    the phrase "people like you" refer to?

11          MR. SEVERO:  It's got no foundation.

12          THE COURT:  Overruled.

13          THE WITNESS:  Armando Moreno is a Mexican Mafia

14    brother, which is a position of power, and when he said "people

15    like you," he's referring to the fact that he's a Mexican Mafia

16    brother.

17          MR. SEVERO:  Calls for speculation, move to strike.

18          THE COURT:  Overruled.  You can cross-examine on it.

19    BY MR. ESTRADA:

20    Q.    Now, Special Agent Stebbins, I'd like to ask you about

21    that day that we are talking about in these calls, March 16th

22    of 2009.  On that date, did you and other officers conduct

23    surveillance?

24    A.    Yes, we did.

25    Q.    Where did you conduct surveillance?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    In the Hollywood area, Los Angeles.  Specifically, outside
 2   of Natalie's Peruvian restaurant.
 3   Q.    And during that surveillance, did you and other officers
 4   take photographs of some of the people that were seen outside
 5   the restaurant?
 6   A.    Yes, we did.
 7   Q.    Please take a look at Exhibit 261.  I believe that should
 8   be in the binder behind you.
 9   A.    Yes, I have it.
10   Q.    What is Exhibit 261?
11   A.    Exhibit 261 are surveillance photographs that were taken
12   the date of the surveillance.
13   Q.    Do these -- and you were there for the surveillance?
14   A.    Yes.
15   Q.    Do these photographs fairly and accurately depict what was
16   seen during the surveillance?
17   A.    Yes.
18         MR. ESTRADA:  Your Honor, the government moves to
19   admit Exhibit 261 and requests permission to publish.
20         THE COURT:  They will be received, and you can
21   publish.
22         (Received in evidence, Exhibit 261.)
23   BY MR. ESTRADA:
24   Q.    Now, starting with the first page of 261, by this point in
25   the investigation had you and other officers conducted
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1  surveillance of Darbinyan in the past?

 2  A.   Many times.

 3  Q.   And had you become familiar with what he looked like?

 4  A.   Yes.  Very familiar.

 5  Q.   And what types of cars he often drove?

 6  A.   Yes.

 7  Q.   Now, starting with the first page, if you can explain

 8  what's shown in the first page of Exhibit 261.

 9  A.   The individual in the blue shirt is the defendant,

10  Mike Darbinyan.  The individual in the white is Armando Moreno,

11  the Mexican Mafia brother that we were talking about.

12  Q.   Now, at page 2, can you explain what's seen there.

13  A.   That's a really nice Bentley that was driven by

14  Arman Tangabekyan, aka "Spito," from the calls.

15  Q.   And that was another person you were familiar with in this

16  case?

17  A.   Yes.

18  Q.   Another defendant in this case?

19  A.   Very familiar.  Yes.

20  Q.   And turning to page 3, what's depicted in page 3?

21  A.   That's a Chrysler 300.  It's driven by Armando Moreno.

22  And the passenger is Karen Samawi, his girlfriend.

23  Q.   Now, turning to page 4 of 261, what is shown in page 4?

24  A.   The individual on the left, in the black, is

25  Vahe Mnatsakanyan, another defendant in this case.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Is that the person I just circled there?

2    A.    Yes.

3          And individual in the blue, on the phone, is Mike

4    Darbinyan.

5    Q.    This person here?

6    A.    Yes.

7    Q.    I'll just zoom in a little bit.

8          This is the person you're referring to?

9    A.    Yes.

10   Q.    Page 5.  Again, what's seen in page 5?

11   A.    That's Mike Darbinyan on the phone.

12   Q.    Skip through some of the photographs.

13         Turning to page 8, you see this sign here on page 8?

14   A.    Yes.

15   Q.    What's that sign show?

16   A.    Says "Natalie Peruvian."

17   Q.    And this sort of colored, I guess, awning, what was that

18   for?

19   A.    That's the 7-Eleven.

20   Q.    And at page 9, who's that person shown on page 9?

21   A.    That's Karen Samawi, another defendant in this case.

22   Q.    Was that one of the persons captured on the phone calls as

23   well?

24   A.    Yes.

25   Q.    Turn to page 10.  Who's that person?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    That's Armando Moreno, the Mexican Mafia brother.

2    Q.    Finally, I'll just show you page 11 of 13 at this time.

3    What do you see in page 11 of 13 of Exhibit 261?

4    A.    The individual on the left, you can see the top of his

5    head, is Mike Darbinyan.  The individual in the white is

6    Arman Tangabekyan.  And the individual in the black is

7    Vahe Mnatsakanyan.  All three are defendants in this case.

8              MR. ESTRADA:  Your Honor, with the Court's

9    permission --

10             THE COURT:  Before you do, Counsel, I want to clarify

11   to the jury.  When you refer to "defendants," there's only

12   three defendants in this case -- or excuse me, in this trial.

13   So "defendants in this case" don't mean defendants in this

14   trial.  So I want to make sure you understand, only three

15   people are being tried during this trial, okay?

16        Okay.  Go ahead, Counsel.

17             MR. ESTRADA:  Your Honor, I wanted -- that's a good

18   point.  I just want to clarify.

19   Q.    There are numerous defendants in the overall case?

20   A.    That's correct.

21   Q.    When you refer to "defendants in the case," you're

22   referring to the overall case?

23   A.    Yes.

24             MR. ESTRADA:  Your Honor, with the Court's permission,

25   if the government could play Exhibit 18, and ask that the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    jurors turn to 18A in their transcript.
 2              THE COURT:  Okay.
 3         (Audio played.)
 4    BY MR. ESTRADA:
 5    Q.   Agent Stebbins, turning to the first page of Exhibit 18,
 6    do you have that in front of you?
 7    A.   Yes, I do.
 8    Q.   What's the date of that recording?
 9    A.   March 17, 2009.
10    Q.   What's the time of the recording?
11    A.   Approximately 9:45 a.m.
12    Q.   Who are the participants in the recording?
13    A.   Mike Darbinyan and Armando Moreno.
14    Q.   Turning to page 2 of 6 in that transcript, five speakers
15    from the top, Darbinyan refers to "they just brought it, the
16    square ones."
17         That term, "the square ones," had you heard it previously
18    in this investigation?
19    A.   Yes.
20    Q.   Have you become familiar with what it referred to?
21    A.   Yes.
22    Q.   Based on your knowledge of the investigation, what does
23    "the square ones" refer to?
24              MR. SEVERO:  No foundation, calls for speculation.
25              THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE WITNESS:  It refers to fraudulent credit cards.

 2   BY MR. ESTRADA:

 3   Q.   Was that something that was obtained a lot by defendants

 4   overall in the investigation?

 5   A.   Yes.

 6              MR. SEVERO:  Objection, irrelevant.

 7              THE COURT:  Sustained.

 8   BY MR. ESTRADA:

 9   Q.   Turning to page 5 of 6, seven speakers from the bottom,

10   Darbinyan states that "this fucker is like the best.  You know?

11   In that field, you know what I mean?"

12              You were familiar with Arman Tangabekyan?

13   A.   Yes.

14   Q.   Familiar with what his role was in this particular bank

15   fraud scheme?

16   A.   Yes.

17   Q.   What was his role in this particular bank fraud scheme?

18   A.   He was --

19              MR. SEVERO:  Objection, irrelevant.

20              THE COURT:  Overruled.

21              THE WITNESS:  He was a very good forger, and he would

22   control the victim bank accounts.

23              MR. ESTRADA:  Your Honor, with the Court's permission,

24   the government would ask to play Exhibit 19 and ask that the

25   jurors turn to tab 19A in their binders.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          (*Audio played.*)

2     BY MR. ESTRADA:

3     Q.   Agent Stebbins, turning to the first page of Exhibit 19A,

4     do you have that in front of you?

5     A.   Yes.

6     Q.   What's the date of that call?

7     A.   March 17, 2009.

8     Q.   What's the time of the call?

9     A.   Approximately 12:58 p.m.

10    Q.   Who are the participants?

11    A.   Mike Darbinyan and Arman Tangabekyan.

12    Q.   Turning to page 2 of the transcript, six speakers from the

13    top, Darbinyan refers to "that rim store."

14         Based on your knowledge of the investigation, what did the

15    rim store refer to?

16    A.   Rim store was a place called AKA Eurosport.  It was a rim

17    store and auto body shop on Ventura Boulevard.

18    Q.   Did you actually conduct surveillance there?

19    A.   On several occasions.

20    Q.   And on this day in particular?

21    A.   Yes.

22    Q.   I'm going to ask you about that later, but I want to play

23    the calls first.

24         Five speakers from the bottom, Darbinyan states, "You'll

25    write and give it to me right there."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1         Based on your knowledge of the investigation, what did the
 2    term "write" refer to there?
 3    A.    It would be to write the fraudulent --
 4              MR. SEVERO:  Objection, no foundation.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  To write the fraudulent check and forge
 7    the signature.
 8    BY MR. ESTRADA:
 9    Q.    And he's speaking there to Arman Tangabekyan?
10    A.    Yes.
11              MR. ESTRADA:  Your Honor, with the Court's permission,
12    the government would ask to play Exhibit 20 and ask that the
13    jurors turn to 20A in their transcript binders.
14              THE COURT:  Okay.
15         (Audio played.)
16    BY MR. ESTRADA:
17    Q.    Agent Stebbins, turning to first page of Exhibit 20A,
18    what's the date of that call?
19    A.    March 17, 2009.
20    Q.    What's the time of the call?
21    A.    Approximately 4:47 p.m.
22    Q.    Who are the participants in that call?
23    A.    Mike Darbinyan, Manuk Terzyan.
24    Q.    Are you familiar with Manuk Terzyan?
25    A.    Yes, I am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Have you spoken to him?

2    A.    Yes, I have.

3    Q.    Who is Manuk Terzyan?

4    A.    He's another defendant in this case.  He would oftentimes

5    drive runners around to the bank for Mike Darbinyan.

6          THE COURT:  Go ahead, Counsel.

7    BY MR. ESTRADA:

8    Q.    Did you also surveil him on numerous occasions?

9    A.    Yes.

10   Q.    Would he also drive defendant Darbinyan around?

11   A.    Yes, he would.

12   Q.    And pick him up?

13   A.    Yes.

14   Q.    Where would he pick him up?

15   A.    At his house.

16   Q.    Which was, again, where?

17   A.    Valencia, California.

18   Q.    Now, turning to page 2 of the transcript, three speakers

19   from the bottom, Darbinyan states, "Take and tell them 'I'm

20   dropping this in the drop box.'  That's it."

21         Based on your training and experience and knowledge of how

22   fraud takes place, what does the term "drop box" refer to?

23         MR. SEVERO:  No foundation, leading.

24         THE COURT:  Overruled.

25         THE WITNESS:  It is the overnight drop box outside the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    bank.
 2              MR. ESTRADA:  Your Honor, the government asks
 3    permission to play Exhibit 21 and asks the jurors to turn to
 4    21A in their transcript books.
 5              THE COURT:  Okay.
 6         (Audio played.)
 7    BY MR. ESTRADA:
 8    Q.   Agent Stebbins, turning to the first page of Exhibit 21A,
 9    do you have that in front of you?
10    A.   Yes.
11    Q.   What's the date of that call?
12    A.   March 17, 2009.
13    Q.   What's the time of the call?
14    A.   Approximately 4:56 p.m.
15    Q.   Who are the participants in that call?
16    A.   Mike Darbinyan, Manuk Terzyan.
17    Q.   This is the same day as the previous call?
18    A.   Yes.
19    Q.   Turning to page 2 of that transcript, six speakers from
20    the bottom, Manuk Terzyan states, "I am going to do it from
21    another place from inside."
22         Based on your knowledge of the investigation, what does
23    the term "from inside" refer to?
24    A.   He would make the deposit from inside the bank as opposed
25    to using the outside drop box.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    Now, four speakers from the bottom -- actually, five
 2   speakers from the bottom, Darbinyan states, "Where are you?"
 3         Manuk Terzyan responds, "28th Street and Crenshaw."
 4         Did you do any investigation to determine what 28th Street
 5   and Crenshaw, what was around that location?
 6   A.    Yes.   There's a Bank of America branch right there.
 7   Q.    Now, three speakers from the bottom, in response to
 8   Manuk Terzyan saying "28th Street and Crenshaw," Darbinyan
 9   states, "You totally disclosed your whereabouts.  Get out of
10   that place and go somewhere else and put it that way."
11         Based on your knowledge of the investigation, was the
12   defendant Darbinyan in particular often concerned about
13   surveillance of him?
14             MR. SEVERO:  Objection, leading, suggestive.
15             THE COURT:  And speculative.  Sustained.
16   BY MR. ESTRADA:
17   Q.    Did you listen to many calls involving Darbinyan?
18   A.    Yes.
19   Q.    Did he refer at different times to getting rid of phones?
20   A.    Yes.
21   Q.    And not speaking a lot on phones?
22   A.    Yes.
23   Q.    And did you actually follow an undercover surveillance of
24   Darbinyan on occasions?
25   A.    Yes.   Very many times.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    Many occasions?

 2    A.    Yes.

 3    Q.    And during those occasions, would he engage in something

 4    known as countersurveillance driving techniques?

 5              MR. SEVERO:  Objection, foundation.

 6              THE WITNESS:  Yes.

 7              THE COURT:  Overruled.

 8    BY MR. ESTRADA:

 9    Q.    Can you explain to the jury what countersurveillance

10    driving is.

11    A.    Oftentimes he would drive in nondirect routes to his

12    locations.  He would also oftentimes, when he was being driven

13    around by defendant Terzyan, he would turn around and watch the

14    cars traveling behind them and around them, and they would take

15    various turns, drive very slow on the freeway, drive very fast

16    on surface streets, things of that nature.

17    Q.    Based on your training and experience, what does that sort

18    of driving suggest?

19    A.    It suggests that they're looking for law enforcement.

20    Q.    Based on that background, when Darbinyan states, "You

21    totally disclosed your whereabouts, get out of that place, go

22    someplace else," were you aware that Darbinyan often referred

23    to a concern about law enforcement watching him?

24    A.    Yes.

25              MR. ESTRADA:  Your Honor, the government asks
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    permission to play Exhibit 22.  Actually, before I get there --

2    that's the next day.

3    Q.    Still on March 17, 2009, did you conduct surveillance that

4    day?

5    A.    Yes, we did.

6    Q.    Where did you conduct surveillance?

7    A.    The business I referred to earlier, AKA Eurosport on

8    Ventura Boulevard.

9    Q.    You and other officers conducted the surveillance?

10   A.    Yes, we did.

11   Q.    And on that date were photographs taken of some of that

12   surveillance?

13   A.    Yes, there were.

14   Q.    Please take a look at Exhibit 262, which should be in a

15   binder next to you.

16   A.    I have it.

17   Q.    You recognize 262?

18   A.    Yes, I do.

19   Q.    What is 262?

20   A.    262 is photographs taken from the surveillance at

21   AKA Eurosport.

22   Q.    Do the photographs fairly and accurately depict

23   surveillance conducted that day by law enforcement, including

24   yourself?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Your Honor, the government moves to

 2    admit Exhibit 262 and requests permission to publish.

 3              THE COURT:  Were you there during the surveillance?

 4              THE WITNESS:  Yes.  I took the photos, sir.

 5              THE COURT:  It may be received and published.

 6         (Received in evidence, Exhibit 262.)

 7    BY MR. ESTRADA:

 8    Q.   Turning to the first page of Exhibit 262, please explain

 9    what is seen there.

10    A.   That is the back of Mher Darbinyan in the dark blue shirt

11    and Armando Moreno in the gray shirt.

12    Q.   So where I'm circling here in the blue shirt, that would

13    be Darbinyan?

14    A.   Yes.

15    Q.   And where I'm circling here, would that be Armando Moreno?

16    A.   Yes.

17    Q.   Now turning to page 2 of Exhibit 262, what is seen there?

18    A.   The -- it's a circle of gentlemen, and it's

19    Arman Tangabekyan, Darbinyan, Manuk Terzyan, Armando Moreno and

20    Vartan Avedissian.

21    Q.   Now, just to be clear, where I'm circling here, the person

22    in the blue shirt with his hands sort of blocking the sun,

23    who's that person?

24    A.   That's Mike Darbinyan.

25    Q.   This gentleman here, with the shaved head and the gray
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   shirt that I've circled here, who is that person?

2   A.   It's Armando Moreno.

3   Q.   And this person here, also with the shaved head and the

4   reddish-black T-shirt, who is that person?

5   A.   Arman Tangabekyan.

6   Q.   And that's a person that was actually captured on the

7   phone calls?

8   A.   Yes.

9   Q.   Turning to the last page of 262 -- I won't show you all

10  the photos, but just turn to the last page.  What do you see in

11  Exhibit 262, page 5 of 5?

12  A.   It's a Chrysler 300 that was driven by Moreno on the

13  previous day, with some fancy new rims, and Mike Darbinyan in a

14  dark blue shirt again, and Armando Moreno is the driver.

15  Q.   So here, that's Mher Darbinyan?

16  A.   Yes.

17  Q.   With the blue shirt?

18  A.   Yes.

19  Q.   And you referred to rims on the car?

20  A.   Yes.

21  Q.   Did you see the car before it arrived or as it arrived at

22  the auto body shop?

23  A.   No.  I saw it the day before without those rims on it.

24  Q.   So these rims were different from the day before?

25  A.   That's correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Were they chrome rims, based on your --

2           MR. SEVERO:  Objection, no foundation.

3    BY MR. ESTRADA:

4    Q.    -- based on your ability to see them in your presence

5    there?

6           THE COURT:  Sustained.

7         You can testify as to what you thought they were but not

8    what they were.

9    BY MR. ESTRADA:

10   Q.    Did they appear to be chrome rims?

11   A.    They appeared to be chrome rims.

12   Q.    Shiny?

13   A.    Shiny, yes.

14          MR. ESTRADA:  Your Honor, with the Court's permission,

15   the government would ask to play Exhibit 22 and ask that the

16   jurors turn to 22A in their transcript books.

17          THE COURT:  Okay.

18        (Audio played.)

19   BY MR. ESTRADA:

20   Q.    Okay.  Agent Stebbins, turning to the first page of

21   Exhibit 22A, do you have that in front you?

22   A.    Yes.

23   Q.    What's the date of the call?

24   A.    March 18th, 2009.

25   Q.    Time of the call?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Approximately 9:16 a.m.

 2    Q.    Who are the participants in this call?

 3    A.    Mike Darbinyan and Armando Moreno.

 4    Q.    This is the next day after the surveillance you conducted

 5    at the rim store?

 6    A.    Yes.

 7    Q.    Turning to page 2 of the transcript, three speakers from

 8    the bottom, Darbinyan states, "And then tell her to get some --

 9    tell them to give them some temporary ones."

10          Based on your training and experience, what does the term

11    "temporary ones" refer to in the context of conducting fraud?

12                MR. SEVERO:  Hearsay, no foundation.

13                THE COURT:  Overruled.

14                THE WITNESS:  Temporary checks.

15    BY MR. ESTRADA:

16    Q.    Then turning to page 3 of the transcript, nine speakers

17    from the bottom, Armando Moreno states, "Now, the other two

18    things, the other two gift cards, I can go and use those,

19    right?"

20          Darbinyan responds, "Yeah, there are, there are, there

21    are, those are yours."

22          Now, based on your training and experience in conducting

23    fraud investigations, are you familiar with the use of gift

24    cards in conducting fraud?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Can you explain how gift cards can be used in conducting
 2   fraud.
 3   A.   Oftentimes individuals involved in credit card fraud will
 4   re-encode somebody else's credit card information onto gift
 5   cards and then take the gift cards inside stores and buy things
 6   like they normally would, when, in fact, they're not using
 7   money that's on the gift card, they're using money from
 8   victims' credit cards.
 9        MR. ESTRADA:   Your Honor, with the Court's permission,
10   the government would ask to play Exhibit 23 and ask the jurors
11   to turn to 23A in their transcript books.
12        THE COURT:   Okay.
13     (Audio played.)
14   BY MR. ESTRADA:
15   Q.   Agent Stebbins, turning to the first page of Exhibit 23A,
16   do you have that in front of you?
17   A.   Yes.
18   Q.   What's the date of this call?
19   A.   March 18th, 2009.
20   Q.   What's the time of the call?
21   A.   Approximately 10:35 a.m.
22   Q.   Who are the participants in the call?
23   A.   Mike Darbinyan, Armando Moreno, and Karen Samawi.
24   Q.   Turning to page 2 of the transcript, eight speakers from
25   the top, Darbinyan states, "Get, uh, get one or two people, get
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    couple of people, like three people, that they got license and

2    a second form of ID."

3        Based on your training and experience in investigating

4    fraud cases, what does "second form of ID" refer to?

5    A.    In order to cash or deposit the checks, you need a second

6    form of ID.

7    Q.    For cashier's checks?

8    A.    Yes.

9    Q.    Six speakers from the bottom, Armando Moreno asks, "Okay.

10   Well, you said hold off on the blank one that I had, right?"

11       Based on your knowledge of the investigation, what did

12   "blank one" refer to?

13            MR. SEVERO:  Calls for speculation.

14            THE COURT:  Sustained.

15   BY MR. ESTRADA:

16   Q.    Now, there's a reference here to "blank one."  Later on in

17   the investigation, was it learned that there was an additional

18   check that was deposited on a fraudulent account?

19            MR. SEVERO:  It's leading.

20            THE COURT:  Overruled.

21            THE WITNESS:  Yes.

22   BY MR. ESTRADA:

23   Q.    Additional fraudulent check that was cashed?

24            MR. SEVERO:  Objection.

25            THE WITNESS:  Deposited.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  I'm sorry, objection what?

 2              MR. SEVERO:  To "fraudulent."  No foundation.

 3              THE COURT:  In your opinion, they were fraudulent?

 4              THE WITNESS:  Yes.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Yes, there was another fraudulent check

 7   that was deposited against this same victim.

 8   BY MR. ESTRADA:

 9   Q.   Now, turning to page 4 of 7, six speakers from the top,

10   Darbinyan states, "Like sixty-five seven, you know?  Like if

11   you get three of them, you know?"

12        Based on your training and experience, what does the term

13   "sixty-five" refer to?

14   A.   $6,500 cashier's checks.

15   Q.   Eight speakers from the top, Darbinyan states, "No, no,

16   no, they were, as long as it's not over ten thousand."

17        Based on your training and experience investigating fraud

18   cases, is there something significant about the number $10,000?

19              MR. SEVERO:  Your Honor, that calls for a legal

20   conclusion, will call for a legal conclusion.

21              THE COURT:  I don't know if it does or not.

22        In your training, experience, is there any significance to

23   10,000?

24              THE WITNESS:  Yes, your Honor.

25              THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000513**

```
 1              THE WITNESS:  At the $10,000 point, you need to file a
 2    currency transaction report.
 3              MR. SEVERO:  There you go.  Move to strike.
 4              THE COURT:  Overruled.
 5    BY MR. ESTRADA:
 6    Q.   So based on your knowledge of this investigation, was
 7    10,000 an important number?
 8    A.   Yes.
 9    Q.   Now, two speakers from the bottom, Armando Moreno states,
10    "Oh, uh, you know, you know I don't -- I don't travel light."
11         Based on your knowledge of the investigation, what did
12    "I don't travel light" refer to, in your opinion?
13    A.   It means he traveled with firearms.
14    Q.   And other individuals?
15    A.   Yes.
16    Q.   Did you know Armando Moreno to be involved in violent
17    activity?
18    A.   Yes.
19    Q.   Finally, six -- page 5 of 7, six speakers from the bottom,
20    Darbinyan states, "Okay, but if you need some assistance, I can
21    send you couple of them federal agents."
22         The day before, had you done surveillance on Darbinyan and
23    Armando Moreno?
24    A.   Yes.
25    Q.   And through the surveillance you were conducting on this
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000514**

```
 1    occasion and other occasions, did agents learn that the
 2    defendants, referring to Darbinyan and the people involved in
 3    the check fraud, had detected some of the surveillance?
 4    A.   Yes.
 5    Q.   How did you learn that?
 6    A.   He would oftentimes talk on the phone about different cars
 7    that he had seen.  Sometimes they were our cars from the
 8    surveillance group, other times they were just other people
 9    driving around.
10         MR. SEVERO:  Move to strike that.  It's nonresponsive,
11    and it's speculation of this witness.
12         THE COURT:  Overruled.
13    BY MR. ESTRADA:
14    Q.   Now, were you and other officers surveilling Darbinyan on
15    numerous occasions?
16    A.   Yes.
17    Q.   Almost daily?
18    A.   Yes.
19         MR. ESTRADA:  Your Honor, the government requests
20    permission to play Exhibit 24 and asks that the jurors turn to
21    24A in their transcript books.
22         THE COURT:  Okay.
23         (Audio played.)
24    BY MR. ESTRADA:
25    Q.   Agent Stebbins, turning to the first page of Exhibit 24A,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   do you have that in front of you?

 2   A.   Yes.

 3   Q.   What's the date of that call?

 4   A.   March 18th, 2009.

 5   Q.   What's the time of that call?

 6   A.   Approximately 12:18 p.m.

 7   Q.   Who are the participants?

 8   A.   Mike Darbinyan, Armando Moreno, and Karen Samawi.

 9   Q.   So this call is the same day as the previous call?

10   A.   Yes.

11   Q.   Turning to page 2 of the transcript, eight speakers from

12   the bottom, Darbinyan states, "Oh, yeah, of course, she's

13   suppo- -- we have to get it out quick, you know?"

14        Based on your training and experience investigating fraud

15   cases, is there a significance to getting money out quickly?

16        MR. SEVERO:  Objection, no foundation.  It's not

17   proper testimony for expert witness.

18        THE COURT:  Not properly -- I'm sorry?

19        MR. SEVERO:  I'm sorry.  Not proper expert witness

20   testimony.

21        THE COURT:  Sustained.

22   BY MR. ESTRADA:

23   Q.   Based on your training and experience investigating fraud

24   cases, is there often detection that takes place by banks and

25   officers of fraud?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000516**

1    A.    Yes.

2    Q.    Does that take some time?

3    A.    Yes.

4    Q.    And when fraud occurs, does it often occur quickly or over

5    a long period of time?

6              MR. SEVERO:  Objection.  It's speculation.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes, they need to get the money out of

9    the account quick, before the bank can freeze it.

10             MR. ESTRADA:  Your Honor, the government asks

11   permission to play Exhibit 25 and asks the jurors to turn to

12   25A in their transcript books.

13             THE COURT:  Okay.

14       (Audio played.)

15   BY MR. ESTRADA:

16   Q.    Now, Agent Stebbins, turning to the first page of

17   transcript 25A, do you have that in front of you?

18   A.    Yes.

19   Q.    What's the date of this call?

20   A.    March 18th, 2009.

21   Q.    Time of the call?

22   A.    Approximately 2:51 p.m.

23   Q.    Who are the participants?

24   A.    Mike Darbinyan, Armando Moreno, and Karen Samawi.

25   Q.    Is this the same day as the call before this?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Yes.

 2   Q.    Turning to page 2 of that transcript, three speakers from

 3   the bottom, Karen Samawi refers to "Four," Armando Moreno

 4   states, "Four," and Darbinyan states, "Okay, get two more and

 5   leave the other in there."

 6         Based on your knowledge of the investigation, what did the

 7   term "four" refer to?

 8   A.    It was $4,000 left in Karen Samawi's bank account at this

 9   point.

10   Q.    And Darbinyan stated, "And when you're done, call me so I

11   can put more in there."

12         Based on your training and experience conducting fraud

13   investigations, are you familiar with the practice of taking

14   over a victim's bank account?

15   A.    Yes.

16   Q.    Explain how that works.

17   A.    Oftentimes, especially in this case, they would take over

18   a victim's account by creating an online ID.  Because they were

19   generally elderly victims, they would not have an online bank

20   account.  So they would create one through the bank.  Then they

21   would be able to control the account.  So they would change the

22   phone number on the account.  Sometimes they would change the

23   mailing address to a P.O. box, where they could receive checks.

24   And then basically they would have control of the account,

25   because they had the online profile, and then they would be
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   able to perpetrate the fraud against the account.

 2   Q.   And based on your training and experience investigating

 3   fraud cases, are you familiar with the practice of transferring

 4   money as it applies to fraud?

 5   A.   Yes.

 6   Q.   Can you explain how that works.

 7   A.   In this case especially, they would find the accounts that

 8   had a larger amount of money and transfer it into the checking

 9   account.  So, many times they would take certificate of deposit

10   accounts that would have 100,000, 200,000, and they would

11   transfer the money from the CDs into the checking account so

12   they would have easy access to write checks against that money.

13        MR. ESTRADA:  Your Honor, the government asks

14   permission to play Exhibit 27 and asks that the jurors turn to

15   27A in their transcript books.

16        THE COURT:  Okay.

17     (Audio played.)

18   BY MR. ESTRADA:

19   Q.   Agent Stebbins, turning to the first page of Exhibit 27A,

20   do you have that in front of you?

21   A.   Yes.

22   Q.   What's the date of that call?

23   A.   March -- March 18th, 2009.

24   Q.   What's the time of the call?

25   A.   Approximately 4:59 p.m.
```

1  Q.  Who are the participants in this call?

2  A.  Mike Darbinyan and Arman Tangabekyan.

3  Q.  Turning to page 2 of 3 of that transcript, three speakers

4  from the bottom, Arman Tangabekyan states, "It will be

5  something like 40."

6       Based on your knowledge of the investigation, what did the

7  term "40" refer to?

8  A.  $40,000.

9       MR. ESTRADA:  Your Honor, the government asks

10  permission to play Exhibit 28 and asks permission to -- or asks

11  that the jurors turn to 28A in their transcript books.

12       THE COURT:  Okay.

13       (Audio played.)

14  BY MR. ESTRADA:

15  Q.  Agent Stebbins, turning to the first page of Exhibit 28A,

16  do you have that in front of you?

17  A.  Yes.

18  Q.  What's the date of that call?

19  A.  March 18th, 2009.

20  Q.  What's the time of the call?

21  A.  Approximately 5:08 p.m.

22  Q.  Who are the participants?

23  A.  Mike Darbinyan, Karen Samawi, and Armando Moreno.

24  Q.  Now, turning to the second page of the transcript, page 2

25  of 3 of Exhibit 28A, seven speakers from the top, Karen Samawi

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   states, "I, I just read your text.  Did you mean 40 or 4,000?"

2        And Darbinyan states, "40."

3        Based on your knowledge of the investigation, were text

4   messages sometimes used by the targets of the investigation?

5   A.   Yes.

6   Q.   At this time were you able to obtain those text messages?

7   A.   No.

8   Q.   Why not?

9   A.   We didn't have court authorization to obtain the text

10  messages at this point.

11  Q.   You have to have a special, additional authorization for

12  text messages?

13  A.   Yes.

14  Q.   And at this time did you have that authorization?

15  A.   No, we did not.

16          MR. ESTRADA:  Your Honor, the government asks

17  permission to play Exhibit 30 and asks that the jurors turn to

18  30A in their transcript books.

19          THE COURT:  Okay.

20       (*Audio played.*)

21  BY MR. ESTRADA:

22  Q.   Agent Stebbins, turning to the first page of Exhibit 30A,

23  do you have that in front of you?

24  A.   Yes.

25  Q.   What's the date of that call?

1   A.    March 19, 2009.

2   Q.    What's the time of the call?

3   A.    Approximately 11:17 a.m.

4   Q.    Who are the participants?

5   A.    Mike Darbinyan and Armando Moreno.

6   Q.    Turning to page 2 of 4 of Exhibit 30A, five speakers from

7   the bottom, Armando Moreno states, "No, no, no, no.  They're

8   gonna take the cash to 65 one."

9        Based on your knowledge of the investigation, what did

10  "65 one" refer to?

11  A.    It's a $6,500 cashier's check.

12  Q.    Was that something being used in this particular incident?

13  A.    Yes.

14  Q.    And now, in the next line -- actually, third speaker from

15  the bottom, Armando Moreno states, "And then they're gonna try,

16  she's gonna try to put, deposit that in the mailbox."

17       Darbinyan replies, "No, no, not in the mailbox.  She has

18  to go in there for it."

19       Armando Moreno says, "No, I just say mailbox."

20       Based on your knowledge of the overall investigation, did

21  the targets try to use language that -- that would be coded?

22  A.    Yes.

23  Q.    And try to use certain code words rather than explicitly

24  say what they were doing?

25            MR. SEVERO:  Objection, leading.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.
 2   BY MR. ESTRADA:
 3   Q.   During the investigation, was -- based on the language in
 4   the calls, did you determine that there was some effort to
 5   avoid being detected by law enforcement?
 6              MR. SEVERO:  This is leading.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  Yes.  They would oftentimes try to
 9   conceal what they were actually doing by their speech.
10   BY MR. ESTRADA:
11   Q.   Would they use certain terms in doing that?
12   A.   Yes.
13   Q.   Was that a common thing throughout the investigation?
14   A.   Very common.
15              MR. ESTRADA:  Your Honor, the government asks
16   permission to play Exhibit 31 and asks that the jurors turn to
17   31A in their transcript books.
18        (Audio played.)
19   BY MR. ESTRADA:
20   Q.   Okay.  Now, Agent Stebbins, turning to the first page of
21   the transcript, 31A, do you have that in front of you?
22   A.   Yes.
23   Q.   What's the date of that call?
24   A.   March 19, 2009.
25   Q.   What's the time of the call?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.    Approximately 12:02 p.m.

2   Q.    Who are the participants?

3   A.    Mike Darbinyan and Arman Tangabekyan.

4   Q.    Now, turning to page 2 of the transcript, second speaker

5   from the top, Darbinyan states, "The thing, brother.  That car

6   is 38,000."

7         Based on your knowledge of the investigation, did the

8   term -- did the amount 38,000 have significance in the

9   investigation?

10  A.    Yes.  It was the amount of a fraudulent check that was

11  written against a victim and into Karen Samawi's bank account.

12  Q.    And now five speakers from the top, Arman Tangabekyan

13  states, "14, 60, is it 63, huh?"

14        Did those numbers have significance in the investigation?

15  A.    Yes.  1463 was the check number on the check that was

16  written against the victim and deposited into Karen Samawi's

17  bank account.

18  Q.    And was that check, check number 1463, in the amount of

19  $38,000?

20  A.    Yes, it was.

21        MR. ESTRADA:  Your Honor, the government asks

22  permission to play Exhibit 32 and asks the jurors turn to 32A

23  in their transcript books.

24        THE COURT:  Yes.

25        (Audio played.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. ESTRADA:

2   Q.    Special Agent Stebbins, turning to the first page of

3   Exhibit 32A, do you have that in front of you?

4   A.    Yes.

5   Q.    What's the date of that recording?

6   A.    March 19, 2009.

7   Q.    What's the time of the recording?

8   A.    Approximately 4:32 p.m.

9   Q.    Who are the participants in that recording?

10  A.    Mike Darbinyan and Arman Tangabekyan.

11  Q.    Now, turning to page 2 of 3 of that transcript, seven

12  speakers from the bottom, Darbinyan states, "Dear, I'm going to

13  send my uncle because I can't get rid of these faggots.  I

14  don't want to bring and connect them there."

15        Based on your knowledge of the investigation, did

16  Darbinyan often refer to law enforcement following him?

17  A.    Yes.

18  Q.    And did he have certain language he would use to refer to

19  law enforcement?

20  A.    Yes.  He would call us dogs, faggots, bitches.

21  Q.    Pejorative terms?

22  A.    Yes.

23  Q.    And did he have people that he associated with that would

24  often do tasks for him?

25  A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And deliver things for him?

2    A.    Yes.

3    Q.    Five speakers from the bottom, Darbinyan refers to "number

4    9.5" being on its way.

5          Based on your knowledge of the investigation, what did the

6    "number 9.5" refer to?

7    A.    $9,000 or $9,500.

8              MR. ESTRADA:  Your Honor, the government asks

9    permission to play Exhibit 33 and asks the jurors turn to 33 --

10   actually --

11             THE COURT:  34?

12             MR. ESTRADA:  Hold that thought.

13         Government asks permission to play 36 and asks that the

14   jurors turn to 36A in the transcript books.

15             THE COURT:  Okay.  Okay.

16         (*Audio played.*)

17   BY MR. ESTRADA:

18   Q.    Agent Stebbins, turning to the first page of transcript

19   36A, do you have that in front of you?

20   A.    Yes.

21   Q.    What's the date of the call?

22   A.    March 20th, 2009.

23   Q.    What's the time of the call?

24   A.    Approximately 1:55 p.m.

25   Q.    Who are the participants?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Mike Darbinyan and Armando Moreno.

 2   Q.    Turning to page 2 of 3 of the transcript at 36A, six

 3   speakers from the bottom, Armando Moreno states, "'Cause she

 4   checked it, we checked it last night, and the computer said

 5   that her account had been frozen due to irregularities."

 6         As these calls were taking place, were agents and officers

 7   listening to the call?

 8   A.    Yes, we were.

 9   Q.    Including these fraud calls?

10   A.    Yes.

11   Q.    And when you and other agents were able to detect a

12   particular account that was tied to these types of fraudulent

13   activities, what did you do?

14   A.    We would contact the bank and attempt to freeze the

15   account as quickly as possible.

16   Q.    Why would you do that?

17   A.    We were trying to limit the victim's exposure to fraud

18   loss.

19   Q.    Did you do that on this occasion?

20   A.    Yes.

21         MR. ESTRADA:  Your Honor, the government asks

22   permission to play Exhibit 37 and asks that the jurors turn to

23   37A in their transcript books.

24         THE COURT:  Counsel, we'll get back to that after the

25   break.  It's 10:00 o'clock.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        So ladies and gentlemen, at this time we're going to be
 2   taking a break.  Remember the admonishment not to discuss the
 3   case among yourselves or with anybody else or form or express
 4   any opinions about the matter until it's submitted to you and
 5   you retire to the jury room.  We'll see you back in about
 6   15 minutes.
 7            THE CLERK:  All rise.
 8        (Outside the presence of the jury:)
 9            THE COURT:  Okay.  You may have a seat.
10        Counsel, yesterday afternoon my clerk informed me that --
11   you can have seats.  My clerk informed me that one of the
12   jurors made a comment to her that when the witness --
13            MR. ESTRADA:  I think it was Manuel Angulo,
14   your Honor.
15            THE COURT:  Yes.
16        -- was testifying, that he did not recognize the name when
17   the name was given, but when he saw the person on the stand, he
18   recognized the face and said that he has seen him around the
19   area and that either that witness or that witness's brother he
20   thinks plays in a city basketball league with him.
21        He brought it to the Court's attention, and I asked my
22   clerk to bring it to your attention, and I didn't see where it
23   would affect the trial one way or the other or anybody had to
24   be questioned on it.  It seemed to be benign.  But I wanted to
25   express it to all the attorneys.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1          Anybody want to take it any further than that?

 2              MR. ESTRADA:  The government has no issues with that,

 3     your Honor.

 4              MR. SEVERO:  I have no problems.

 5              MR. PEREYRA-SUAREZ:  Neither do I, your Honor.

 6              MR. FLIER:  Neither does Mr. Parsadanyan.

 7              THE COURT:  Okay.  Thank you very much, Counsel.

 8          We'll be in recess, then.  We'll come on back in 15

 9     minutes.

10          *(Recess held from 10:01 a.m. to 10:20 a.m.)*

11          *(In the presence of the jury:)*

12              THE COURT:  Okay.  The record will reflect that all

13     the jurors are in their respective seats in the jury box,

14     including the alternates.

15          Counsel, you're at direct examination.  You may continue.

16              MR. ESTRADA:  Thank you, your Honor.

17     Q.  Now, Agent Stebbins, before the break, we played a call

18     from March 20, 2009.

19     A.  Yes.

20     Q.  I'd like to play you another call from that date.  If you

21     could turn to Exhibit 37.

22          And your Honor, the government would ask permission to

23     play 37 and ask that the jurors turn to 37A in their transcript

24     books.

25              THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          (*Audio played.*)

2     BY MR. ESTRADA:

3     Q.    Special Agent Stebbins, turning to page 1 of the

4     transcript at 37A, do you have that in front of you?

5     A.    Yes.

6     Q.    What's the date of that call?

7     A.    March 20th, 2009.

8     Q.    What's the time of the call?

9     A.    Approximately 3:23 p.m.

10    Q.    Who are the participants?

11    A.    Karen Samawi and Mike Darbinyan.

12    Q.    Now, turning to page 2 of the transcript, seven speakers

13    from the bottom, Darbinyan says, "Yeah, okay, but give me, give

14    me the number and your social."

15         There's then a number given, 06255, and onto the next

16    page, 3 of 4, 275143.

17         Did that number correspond to something in your

18    investigation?

19    A.    Yes.  It was Karen Samawi's bank account number.

20    Q.    And did you use that account number to do anything?

21    A.    Yes.  We subpoenaed that bank account number.  And we also

22    froze that account earlier.

23    Q.    And now there's an additional number that's given.  Two

24    speakers from the top, Darbinyan asks, "Okay, what's the, the

25    social?"  And the number 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 is given.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Did that number correspond to anything in the

2  investigation?

3  A.    Yes.  It is Karen Samawi's Social Security number.

4  Q.    Please take a look at Exhibit 256, which should be in one

5  of the binders next to you.

6      Your Honor, this is actually certified pursuant to Federal

7  Rule of Evidence 902(11).  The government asks permission to

8  admit and publish.

9           THE COURT:  902?

10          MR. ESTRADA:  The exhibit number is 256.

11          THE COURT:  Oh, 257.  I'm sorry.

12          MR. SEVERO:  -56 or -57?

13          MR. ESTRADA:  256.

14          THE COURT:  257.

15          MR. ESTRADA:  I'm sorry.  256, your Honor.

16          THE COURT:  256.  Okay.  It will be admitted and can

17  be published.

18      (*Received in evidence, Exhibit 256.*)

19  BY MR. ESTRADA:

20  Q.    Okay.  Now, Agent Stebbins, looking at the first page,

21  Exhibit 256, what are these documents?

22  A.    They're some Bank of America record for Karen Hesham, also

23  known as Karen Samawi.  It's a signature card.

24  Q.    And is the name of the account title on these records?

25  A.    Yes.

```
 1   Q.   You said Karen Hesham is also another name for

 2   Karen Samawi?

 3   A.   Yes.

 4   Q.   And towards the middle of the page there, there's

 5   something that refers to tax identification number.

 6        Based on your training and experience, are you familiar

 7   with what a tax identification number is?

 8   A.   Yes.

 9   Q.   What is it?

10   A.   In the case of personal accounts, it's the person's Social

11   Security number.

12   Q.   And that number there, 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, does that correspond

13   to the previous call that we heard?

14   A.   Yes, it does.

15   Q.   In looking at the next page, there's the name again,

16   Karen Hesham?

17   A.   Yes.

18   Q.   And looking at the number there for the account number,

19   does that number closely correspond to the number given in the

20   call we just listened to?

21   A.   Yes, it does.

22   Q.   Is there a difference?

23             MR. SEVERO:  Move to strike.

24             THE WITNESS:  Yes.

25             MR. SEVERO:  It's irrelevant.  "Closely corresponds"?
```

```
 1              THE COURT:  Overruled at this time.

 2        Do you want to inquire into that, Counsel?

 3              MR. ESTRADA:  Yes.

 4   Q.   Is there a difference between this number and what was

 5   given in the previous call?

 6   A.   Yes, there is one difference.  After 06255, they said the

 7   number 2 prior to saying 75143.

 8              THE COURT:  Okay.  One number off; is that correct?

 9              THE WITNESS:  That's correct, sir.

10   BY MR. ESTRADA:

11   Q.   Just to make it clear, let's go back to the transcript at

12   37A, and that second set of numbers had an extra 2?

13   A.   That's correct.

14   Q.   Where was that extra 2?

15   A.   At the beginning.

16              MR. SEVERO:  Objection, calls for speculation, no

17   foundation.

18              THE COURT:  Well, it speaks for itself.  Jurors can

19   see it.

20   BY MR. ESTRADA:

21   Q.   And on that transcript, that's the Social Security number

22   that corresponds to the account that you're looking at?

23   A.   Correct.

24   Q.   And in this account for Karen Hesham Samawi, did you find

25   checks that corresponded to the amounts discussed in the calls?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. SEVERO:  I'm going to object to that.  That is

2     leading, and I think it's the jury's call to --

3          MR. ESTRADA:  Your Honor, it's not at all.  We're just

4     talking about amounts that correspond --

5          THE COURT:  Don't argue.

6          In this particular matter, you're talking about in the

7     last call that we just heard?

8          MR. ESTRADA:  No.  In the previous calls, there were

9     amounts listed, and I'm asking him if those amounts correspond

10    to amounts that are actually on --

11         THE COURT:  Overruled.

12         You can identify any amounts you think correspond to this.

13         THE WITNESS:  Yes.  I believe the one call referred to

14    26,300.  It's actually 26,400.  And then one of the more recent

15    calls refers to $38,000.

16    BY MR. ESTRADA:

17    Q.   And are those numbers reflected here in branch ATM

18    deposits?

19    A.   Yes.

20    Q.   One check on March 17th, 2009, for 26,400?

21    A.   Yes.

22    Q.   Another check, on March 19th, 2009, for $38,000?

23    A.   Yes.

24    Q.   Also in the bank records, did it actually show the checks

25    that corresponded to those deposits?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000534**

1    A.   Yes, it did.

2    Q.   Please take a look at another page.  And just for

3    clarification, I'll give the page number.  The fifth page on

4    that exhibit.

5             MR. SEVERO:  Fifth or sixth?

6             MR. ESTRADA:  Fifth page in that exhibit.

7    Q.   You see the fifth page in that exhibit?

8    A.   Yes.

9    Q.   What does that show?

10   A.   It is a check written on the account of the victim,

11   Grace Ferguson, to Karen Hesham, in the amount of $26,400.

12   Q.   And it's dated 3/16/2009?

13   A.   That's correct.

14   Q.   Posted 3/17/2009?

15   A.   Correct.  Check number is 1462.

16   Q.   Now, looking at the next page, do you see a deposit slip

17   there?

18   A.   Yes.

19   Q.   What's the date on the deposit slip?

20   A.   March 19th, 2009.

21   Q.   What's the amount?

22   A.   38,000.

23   Q.   And looking at the next page, is there a check that

24   corresponds to that deposit slip?

25   A.   Yes.  It's check number 1463, in the amount of $38,000, to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Karen Hesham.
 2   Q.   Now, that check number 1463, did that correspond to any of
 3   the previous calls you listened to?
 4   A.   Yes, it did.  On the one call, they talked about a car
 5   being of the year 1463.
 6   Q.   Now, is that a call between Arman Tangabekyan and
 7   Mher Darbinyan?
 8   A.   Yes, it was.
 9   Q.   Based on your investigation, did you also obtain a
10   surveillance photograph corresponding to Karen Hesham Samawi's
11   bank account?
12   A.   Yes.
13   Q.   Please take a look at Exhibit 276.
14        And your Honor, this is also a certified copy.  It's
15   sought to be admitted pursuant to Federal Rule of Evidence
16   902(11).  The government would ask permission to admit and to
17   publish.
18            THE COURT:  What is the exhibit?  276?
19            MR. ESTRADA:  276.
20            MR. SEVERO:  Your Honor, just so that the record
21   is clear...
22            THE COURT:  Yes.
23            MR. SEVERO:  I have a continuing objection --
24            THE COURT:  Yes, you do, Counsel.
25            MR. SEVERO:  -- on this.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Thank you.
 2             THE COURT:  Thank you.
 3        There is a declaration?  Okay.  It's going to be admitted,
 4   and you may publish.
 5        (Received in evidence, Exhibit 276.)
 6   BY MR. ESTRADA:
 7   Q.   Okay.  And what do you see in Exhibit 276?
 8   A.   There's a bank surveillance photograph of Karen Hesham
 9   Samawi.
10   Q.   In a Bank America branch?
11   A.   Yes.
12   Q.   And you're familiar with what Karen Hesham Samawi looks
13   like?
14   A.   Yes.
15   Q.   Now, turning to -- before I do that, based on the records
16   we just looked at, with a check in the name of Grace Ferguson
17   paid to Karen Hesham Samawi, did you obtain bank records for
18   Grace Ferguson?
19   A.   Yes.
20   Q.   Please take a look at Exhibit 251.
21        And your Honor, again this is a certified bank record
22   which the government seeks to admit pursuant to Federal Rule
23   of Evidence 902(11), which the government gave notice of on
24   March 12th, 2014.
25             THE COURT:  251?
```

```
 1              MR. ESTRADA:  Exhibit 251.

 2              MR. SEVERO:  There are two 251s.

 3              MR. ESTRADA:  251 without any dashes next to it.

 4              THE COURT:  Okay.  It will be received.

 5          (Received in evidence, Exhibit 251.)

 6              MR. ESTRADA:  Permission to publish, your Honor?

 7              THE COURT:  Yes.

 8   BY MR. ESTRADA:

 9   Q.   Looking at Exhibit 251, you see the name of the account

10   holder there?

11   A.   Yes.  It's Grace E. Ferguson.

12   Q.   And looking at the second page of that exhibit, in the

13   checks paid area, there's a reference to two checks there.  Do

14   you see those?

15   A.   Yes.

16   Q.   Check number 1462 and check number 1463?

17   A.   Yes.

18   Q.   Did those correspond to anything in your investigation?

19   A.   Yes.  They were the checks deposited into Karen Samawi's

20   bank account.

21              MR. ESTRADA:  Now, your Honor, the government asks

22   permission to play Exhibit 38 and asks the jurors to turn to

23   38A in their transcript books.

24              THE COURT:  Okay.

25          (Audio played.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

BY MR. ESTRADA:

Q.   Agent Stebbins, turning to the first page of Exhibit 38A,

do you have that in front of you?

A.   Yes.

Q.   What's the date of this call?

A.   March 20th, 2009.

Q.   What's the time of the call?

A.   3:37 p.m.

Q.   Who are the participants in this calling?

A.   Mike Darbinyan and Karen Samawi.

Q.   Now, turning to page 3 of 3 in the transcript, three

speakers from the top, Darbinyan states, "Okay, let me find out

for you, because we're talking too much on this phone."

     Based on your knowledge of the investigation, were there

numerous references to talking too much on phones?

A.   Yes.

Q.   And a concern about law enforcement --

          MR. SEVERO:  Objection.

BY MR. ESTRADA:

Q.   -- detecting their activities?

          MR. SEVERO:  Calls for speculation.

          THE COURT:  Sustained.

BY MR. ESTRADA:

Q.   There are numerous references of this sort?

A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ESTRADA:  Your Honor, the government requests

 2    permission to play 39 and asks that the jurors turn to 39A in

 3    their transcript books.

 4            THE COURT:  Okay.

 5        (Audio played.)

 6    BY MR. ESTRADA:

 7    Q.   Now, Agent Stebbins, turning to the first page of this

 8    transcript, you see the date of the call?

 9    A.   Yes.

10    Q.   What --

11    A.   It's March 20th, 2009.

12    Q.   What's the time of the call?

13    A.   Approximately 4:51 p.m.

14    Q.   Who are the speakers?

15    A.   Mike Darbinyan, Arman Tangabekyan.

16    Q.   Again, this is the same day as the previous call where

17    Samawi talks about an amount of the check?

18    A.   Yes.

19    Q.   And turning to page 2 of the transcript, five speakers

20    from the top, Arman Tangabekyan tells Darbinyan, "That one is

21    not good."

22        Based on your knowledge of the investigation, what did

23    "that one" refer to?

24            MR. SEVERO:  Objection, your Honor.  That's not the

25    proper subject of --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.
 2   BY MR. ESTRADA:
 3   Q.   Based on your knowledge of the investigation, were
 4   there -- was there an account that was frozen in this case?
 5   A.   Yes.  The account of Karen Samawi.
 6   Q.   Okay.  Now I'd like to turn your attention to another set
 7   of calls.
 8        And just for the record, this pertains again to the check
 9   fraud counts against defendant Darbinyan which are included in
10   the indictment.
11              THE COURT:  Okay.  Just defendant Darbinyan, right?
12              MR. ESTRADA:  Just defendant Darbinyan, correct, your
13   Honor.
14        Well, I should be clear.  They pertain to the bank fraud
15   counts, the aggravated identity theft counts, and the
16   racketeering count as to defendant Darbinyan only.
17              THE COURT:  Okay.  So this testimony is going to just
18   defendant Darbinyan only, okay?
19   BY MR. ESTRADA:
20   Q.   And now I'd like to turn your attention to calls that
21   occurred on March 30th of 2009.  If you could take a look at
22   Exhibit 40.
23        I'll ask that the jurors please be directed to turn to 40A
24   in their transcript books.
25              THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          (Audio played.)

 2     BY MR. ESTRADA:

 3     Q.    And now, Special Agent Stebbins, turning to the first

 4     page of this transcript, Exhibit 40A, what's the date of this

 5     call?

 6     A.    March 30th, 2009.

 7     Q.    What's the time of this call?

 8     A.    Approximately 2:48 p.m.

 9     Q.    Who are the speakers?

10     A.    There's a unknown male initially.  Gustavo Ortega,

11     Mike Darbinyan, and Manuk Terzyan.

12     Q.    Turning to the second page of the transcript -- and

13     actually, before I ask you questions about that,

14     Gustavo Ortega, you're familiar with that person?

15     A.    Yes, I am.

16     Q.    Who is that person?

17     A.    He was a defendant in this case who cooperated and

18     provided information.

19     Q.    Okay.  Now turning to page 2 of 3 of Exhibit 40A, six

20     speakers from the top, Ortega states, "I don't have no

21     navigation system or nothing, homie."

22          Based on your knowledge of the investigation, what would a

23     navigation system be used for?

24               MR. SEVERO:  Objection, your Honor, this --

25               THE COURT:  It speaks for itself.  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:
 2   Q.   Based on your knowledge of the investigation, would the
 3   targets in this case tend to use different bank branches?
 4   A.   Yes, they did.
 5   Q.   Why is that?
 6   A.   They would not try to cash or deposit checks at the same
 7   bank branch, so they would use the navigation system to find
 8   different Bank of America branches in the area so that they
 9   could deposit multiple checks in a row.
10   Q.   In different places?
11   A.   In different places, yes.
12   Q.   And why would they not just deposit all the checks at the
13   same bank?
14   A.   The bank would definitely become suspicious if everybody
15   was depositing checks from the same victim at the same bank.
16   Q.   And in this call, initially Ortega's talking to an
17   unidentified male, and then it switches to Darbinyan.  Was that
18   something that sometimes occurred in this investigation?
19   A.   On occasion.
20   Q.   Where Darbinyan would have his phone used by others?
21   A.   Sometimes, yes.
22   Q.   Were you, nonetheless, able to detect when Darbinyan was a
23   speaker?
24   A.   Yes.  Very easily.
25   Q.   How was that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000543**

```
 1   A.   Very familiar with the voice of Mike Darbinyan, and he has

 2   a very distinctive voice.

 3   Q.   It was also -- was it also --

 4           MR. SEVERO:  Move to strike that as a conclusion of

 5   this witness.

 6           THE COURT:  Overruled.

 7           MR. SEVERO:  And --

 8   BY MR. ESTRADA:

 9   Q.   Was it also --

10           MR. SEVERO:  Sorry, your Honor.

11           THE COURT:  Go ahead.

12           MR. SEVERO:  And it is improper expert testimony, no

13   foundation.

14           THE COURT:  Okay.  Overruled.

15   BY MR. ESTRADA:

16   Q.   And was there also occasions where Darbinyan would, on the

17   call, switch to another caller?

18   A.   Yes.

19   Q.   Would that happen on occasion?

20   A.   Yes, on occasion.

21   Q.   Did that happen on this occasion?

22   A.   He did not switch to another call on this.  Manuk got on

23   the phone when Ortega --

24           MR. SEVERO:  Objection.  That's nonresponsive.

25           THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:

 2   Q.   Okay.  That's not on this occasion, but another person got

 3   on the phone?

 4   A.   Yes.

 5         MR. ESTRADA:  Now, with the Court's permission,

 6   your Honor, I'd like to play Exhibit 41, and ask that the

 7   jurors turn to 41A in their transcript books.

 8        (Audio played.)

 9   BY MR. ESTRADA:

10   Q.   Turning to the first page of this transcript, 41A, what's

11   the date of this call?

12   A.   March 30th, 2009.

13   Q.   What's the time of the call?

14   A.   Approximately 2:52 p.m.

15   Q.   Who are the participants in this call?

16   A.   Mike Darbinyan, Manuk Terzyan.

17   Q.   Turning to page 2 of the transcript, two speakers from the

18   top, Manuk Terzyan asks, "Yes, dear, I just left.  Should I do

19   it from small to large?"

20        After some conversation, Terzyan states, "They are in

21   order, from small."

22        Darbinyan responds, "Yes."

23        Terzyan, "The same way they are placed now.  One at a

24   time."

25        Based on your knowledge of the investigation, was an
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    account later identified with regard to these calls?

 2    A.   Yes.

 3    Q.   And were checks deposited for an account linked to these

 4    calls?

 5    A.   Yes, they were.

 6              MR. SEVERO:  Objection.  I object to the "linked to

 7    this call" as speculation of this witness and --

 8              THE COURT:  Overruled.

 9              MR. ESTRADA:  It's based on his investigation, your

10    Honor.

11              THE COURT:  Overruled.

12              THE WITNESS:  Yes, there was an account linked to

13    these calls, and the checks were deposited from small to large.

14              MR. ESTRADA:  Your Honor, the government asks

15    permission to play Exhibit 42 and asks that the jurors turn to

16    42A in their binders.

17         (Audio played.)

18    BY MR. ESTRADA:

19    Q.   Turning to the first page of this transcript, 42A, do you

20    have that in front of you?

21    A.   Yes.

22    Q.   What's the date of this call?

23    A.   March 30th, 2009.

24    Q.   What's the time of the call?

25    A.   Approximately 3:02 p.m.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Who are the speakers?

 2   A.   Mike Darbinyan, Manuk Terzyan.

 3   Q.   Was this just after the call before it?

 4   A.   Yes, it was.

 5        MR. ESTRADA:  Your Honor, the government asks

 6   permission to play Exhibit 43 and asks that the jurors turn to

 7   43A in their books.

 8        THE COURT:  Okay.

 9        (Audio played.)

10   BY MR. ESTRADA:

11   Q.   Turning to the first page of the transcript, what's the

12   date of the call?

13   A.   March 30th, 2009.

14   Q.   What's the time of the call?

15   A.   3:07 p.m., approximately.

16   Q.   And who are the participants?

17   A.   Mike Darbinyan, Manuk Terzyan.

18   Q.   This is the same day as the previous call?

19   A.   Yes, it is.

20   Q.   Shortly after?

21   A.   Shortly after.

22   Q.   Turning to page 2 of this transcript, second speaker from

23   the top, Darbinyan states, "Yes, bro."

24        Manuk Terzyan, "Yes, bro.  There was no line, and that

25   idiot had gotten close there.  Now they said -- I told the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    other person, and he said, 'Come out.'  He said, 'Wait.'"

2        Based on your knowledge of the investigation, were

3    low-level criminals referred to as runners sometimes used in

4    the fraud?

5    A.   Yes, they were.

6    Q.   How were they used?

7    A.   Especially in this case, the runners were taken to the

8    bank, and they would take the check into the bank to have it

9    deposited or cashed.

10   Q.   There are additional calls that I'll play, but on this

11   particular date, did you become aware that a runner was

12   actually stopped in a bank?

13   A.   Yes.  We were conducting surveillance on this day as well.

14       MR. ESTRADA:  Your Honor, the government asks

15   permission to play 44 and asks that the jurors turn to 44A in

16   their binders.

17       THE COURT:  Okay.

18       (Audio played.)

19   BY MR. ESTRADA:

20   Q.   Okay.  Turning to the first page of Exhibit 44A, do you

21   have that in front of you?

22   A.   Yes.

23   Q.   What's the date of the call?

24   A.   March 30th, 2009.

25   Q.   What's the time of the call?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Approximately 3:14 p.m.

2    Q.    Who are the speakers?

3    A.    Mike Darbinyan and Manuk Terzyan.

4    Q.    Is this the same day as the call before it?

5    A.    Yes, it is.

6    Q.    Turning to page 2 of the transcript, three speakers from

7    the bottom, Manuk Terzyan states, "I've sent that one.  It

8    looks like it will be okay.  As soon as it is okay, I'll call

9    you."

10         Darbinyan responds, "Okay.  Look, when you send him off,

11   say, 'I've sent him.'  When he comes, say, 'I've greeted.'

12   That's it.  Nothing else."

13         Based on your knowledge of the investigation, were code

14   words used often in the calls?

15              MR. SEVERO:  Objection, relevance.

16              THE COURT:  It's already been testified to.  It's been

17   asked and answered that code words were used during this

18   investigation.

19   BY MR. ESTRADA:

20   Q.    Based on your knowledge of the investigation, when

21   Darbinyan referred to "send him off," what's your opinion as to

22   what he's referring to?

23              MR. SEVERO:  Objection.  That's an improper -- it's

24   opinion testimony.

25              THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE WITNESS:  He's referring to sending the runner

2    into the bank.  And when he says "I've greeted," he was

3    referring to the runner coming back out of the bank.

4    BY MR. ESTRADA:

5    Q.   Was "greeted" a code word that was sometimes used by

6    Darbinyan?

7          MR. SEVERO:  Objection.

8          THE WITNESS:  Yes, it was.

9          MR. SEVERO:  No foundation.

10         THE COURT:  Overruled.

11   BY MR. ESTRADA:

12   Q.   And were there actually other calls in which Darbinyan

13   uses the term "greeted"?

14   A.   Yes, there were.

15   Q.   To refer to money coming back?

16   A.   Yes.

17         MR. ESTRADA:  Your Honor, the government asks

18   permission to play Exhibit 45 and asks that the jurors turn to

19   45A in their transcript books.

20         THE COURT:  Okay.

21       (*Audio played.*)

22   BY MR. ESTRADA:

23   Q.   Turning to the first page of this transcript, what's the

24   date of this call?

25   A.   March 30th, 2009.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What's the time of the call?

 2   A.   Approximately 3:19 p.m.

 3   Q.   Who are the participants?

 4   A.   Mike Darbinyan, Manuk Terzyan.

 5   Q.   Is this the same day as the previous call?

 6   A.   Yes, it is.

 7   Q.   Now, turning to page 2 of the transcript, second speaker

 8   from the top, Darbinyan states, "Yes.  Okay.  When you send the

 9   other one off, it's 4.5.  It's with you."

10        Based on your knowledge of the investigation, was there an

11   account that was detected that had a fraudulent check written

12   on it that same day for 4.5 thousand dollars?

13   A.   Yes.  There was a victim identified that had a check

14   written against the account for $4,500.

15             MR. ESTRADA:  Your Honor, the government asks

16   permission to play Exhibit 46 and asks that the jurors turn to

17   46A in their books.

18             THE COURT:  Okay.

19        (Audio played.)

20   BY MR. ESTRADA:

21   Q.   Now, turning to the first page of Exhibit 46, do you have

22   that in front of you?

23   A.   Yes.

24   Q.   What's the date of the call?

25   A.   March 30th, 2009.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What's the time of the call?

 2   A.   Approximately 3:45 p.m.

 3   Q.   Who are the participants?

 4   A.   Mike Darbinyan, Manuk Terzyan.

 5   Q.   It's the same date as the call before it?

 6   A.   Yes, it is.

 7   Q.   Two speakers from the bottom, Darbinyan refers to

 8   "5 pieces."

 9        Based on your knowledge of the investigation, what does

10   "5 pieces" refer to?

11            MR. SEVERO:  Objection, speculation.

12            THE COURT:  Overruled.

13            THE WITNESS:  It's a reference to a fraudulent check

14   being cashed or deposited for $5,000.

15   BY MR. ESTRADA:

16   Q.   That day, was there an account detected that had a

17   fraudulent check written on it for $5,000?

18   A.   Yes.

19   Q.   The same account that had a fraudulent check that same day

20   for $4,500?

21   A.   Yes.

22            MR. ESTRADA:  The government asks permission to play

23   Exhibit 47 and asks the jurors turn to 47A in their binders.

24            THE COURT:  Okay.

25            (Audio played.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:
 2   Q.   Agent Stebbins, turning to the first page of Exhibit 47A,
 3   what's the date of that call?
 4   A.   March 30th, 2009.
 5   Q.   What's the time of the call?
 6   A.   Approximately 4:44 p.m.
 7   Q.   Who are the participants?
 8   A.   Mike Darbinyan, Gustavo Ortega.
 9   Q.   Turning to page 2 of the transcript, six speakers from the
10   bottom, Ortega asks, "How many so far?"
11        Darbinyan responds, "Three."
12        Based on your knowledge of the investigation and the
13   actual account being defrauded that day, what did you believe
14   "three" referred to?
15   A.   "Three" was a reference to three fraudulent checks being
16   cashed or deposited thus far.
17             MR. SEVERO:  Move to strike, speculation of a witness.
18             THE COURT:  Overruled.
19             MR. SEVERO:  No foundation.
20             THE COURT:  Overruled.
21   BY MR. ESTRADA:
22   Q.   There were three fraudulent checks actually deposited or
23   cashed that day?
24   A.   Yes.
25             MR. ESTRADA:  Your Honor, the government asks
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    permission to play Exhibit 48 and ask the jurors turn to

2    Exhibit 48A in their books.

3        (*Audio played.*)

4    BY MR. ESTRADA:

5    Q.   Now, Special Agent Stebbins, turning to page 1 of

6    Exhibit 48A, do you have that in front you?

7    A.   Yes.

8    Q.   What's the date of that call?

9    A.   March 30th, 2009.

10   Q.   What's the time of the call?

11   A.   Approximately 5:01 p.m.

12   Q.   Who are the participants?

13   A.   Mike Darbinyan, Manuk Terzyan.

14   Q.   It's the same day as the call before?

15   A.   Yes, it is.

16   Q.   Turning to page 2 of the transcript, second speaker from

17   the top, Manuk Terzyan says, "The second one went in and came

18   out.  He says they are waiting for some fax."

19       Four speakers from the bottom, Darbinyan states, "Tell him

20   to send, to say, 'Hurry up.  I don't have time.  I have to go.

21   I got a phone call.'"

22       This same day, on March 30th, 2009, were you aware that an

23   individual was caught trying to pass a fraudulent check?

24   A.   Yes.

25            MR. SEVERO:  Leading and suggestive, calls for

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   speculation, no foundation.
 2           THE COURT:  Sustained.
 3   BY MR. ESTRADA:
 4   Q.   Was there anything significant about this sort of
 5   conversation based on your knowledge of the investigation?
 6   A.   Yes.  On this date, there was a runner that was caught
 7   inside the bank.  Actually, he was -- he left his ID when he
 8   was trying to negotiate a fraudulent check.  He wasn't actually
 9   able to cash the fraudulent check, and left his ID when he left
10   in a hurry.
11   Q.   And was this attempted fraudulent check on the same
12   account for the other three that you mentioned earlier?
13   A.   Yes, it was.
14   Q.   So three went in, and one was attempted, the fourth didn't
15   go through?
16   A.   That's correct.
17   Q.   And that fourth one, where was that at?
18   A.   Believe it was Larchmont branch of Bank of America in
19   Los Angeles.
20           MR. ESTRADA:  Your Honor, the government asks
21   permission to play Exhibit 49 and asks that the jurors turn to
22   49A in their books.
23           THE COURT:  Okay.
24       (Audio played.)
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

BY MR. ESTRADA:

Q.    Agent Stebbins, turning to the first page of 49A, what's the date of this call?

A.    March 30th, 2009.

Q.    What's the time of the call?

A.    Approximately 5:09 p.m.

Q.    Who are the participants?

A.    Mike Darbinyan and Manuk Terzyan.

Q.    Is this the same day as the call before it?

A.    Yes, it is.

Q.    Turning to page 2 of the transcript, three speakers from the top, Manuk Terzyan states, "They took his thing and kept it with them."

        And then four speakers from the bottom, Darbinyan states, "Yeah.  If they are doing that, let him come out, take and come back, brother."

        Based on your knowledge of the investigation, when Terzyan refers to "his thing" and it being kept with them, what was he referring to?

        MR. SEVERO:  Speculation, no foundation.

        THE COURT:  Well, based on your training, experience in the area, or is it just based on what you've learned in this investigation?

        THE WITNESS:  Based on my knowledge in this investigation.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.
 2    BY MR. ESTRADA:
 3    Q.    Now, were you aware that this same date, an attempted
 4    check -- or check was attempted to be cashed on an account?
 5    A.    Yes.
 6    Q.    And that when that attempt was made, the bank actually
 7    retained some information?
 8    A.    Yes.  There was a defendant in this case, Steven Wilson --
 9              MR. SEVERO:  Objection, nonresponsive after "yes."
10              THE COURT:  Sustained.
11    BY MR. ESTRADA:
12    Q.    What was retained?
13    A.    A Cox Communications employee identification card for
14    Steven Wilson and a California driver's license for
15    Steven Wilson.
16    Q.    Was that actually taken into custody by you and other
17    officers?
18    A.    Yes.
19              MR. ESTRADA:  Your Honor, the government asks
20    permission to play Exhibit 50 and asks that the jurors turn to
21    50A in their transcript books.
22              THE COURT:  Okay.
23         (Audio played.)
24    BY MR. ESTRADA:
25    Q.    Agent Stebbins, turning to the first page of that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    transcript, 50A, what's the date of that recording?
 2    A.    March 30th, 2009.
 3    Q.    What's the time of the recording?
 4    A.    Approximately 6:29 p.m.
 5    Q.    Who are the participants?
 6    A.    Mike Darbinyan, Gustavo Ortega.  And an unknown male can
 7    briefly be heard in the background.
 8    Q.    And is Gustavo Ortega also known by a nickname or moniker?
 9    A.    Yes.  "Bam Bam."
10    Q.    Now, turning to page 2 of the transcript, four speakers
11    from the bottom, Darbinyan states, "Oh, tell -- Bam Bam tell
12    Big Boy over there, from now on give his cell phone to his
13    employees."
14          Based on your training and experience, what's the term
15    "employees" refer to in the context of fraud?
16                MR. SEVERO:  Objection, your Honor.  This is
17    speculation, no foundation.
18                THE COURT:  Overruled.
19                THE WITNESS:  It refers to the runners that were going
20    into the bank.
21    BY MR. ESTRADA:
22    Q.    Two speakers from the bottom, Darbinyan states, "Tell --
23    yeah, yeah, no.  What you do, just go straight Perro, just
24    straight to Wilshire.  He is right there, he is parked, because
25    this dude is driving them dudes."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Based on your knowledge of the investigation, was there an
 2   associate of Darbinyan driving others on this date?
 3             MR. SEVERO:  Objection, your Honor, calls for
 4   speculation.
 5             THE COURT:  Sustained.
 6             MR. SEVERO:  Leading and suggestive.
 7             THE COURT:  Sustained.
 8   BY MR. ESTRADA:
 9   Q.   Based on your knowledge of the investigation, was
10   Manuk Terzyan driving others on this day?
11             MR. SEVERO:  Objection, still leading.
12             THE COURT:  Sustained.
13   BY MR. ESTRADA:
14   Q.   Based on your knowledge of the investigation, what did
15   "dudes" refer to?
16   A.     The first dude was Manuk Terzyan driving --
17             MR. SEVERO:  Calls for speculation, and there's no
18   foundation for this, and it's improper expert testimony.
19             THE COURT:  When you say "the first dude," you're
20   talking about that was referred to in the report here?
21             THE WITNESS:  In the call, the first "dude" driving
22   "them dudes."
23             THE COURT:  Is that what your question is?
24             MR. ESTRADA:  Yes, your Honor.
25             THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. ESTRADA:

 2    Q.   Now, were you aware that on this day Manuk Terzyan was

 3    driving others?

 4    A.   Yes.

 5    Q.   Now, turning to page 3 of the transcript, ten speakers

 6    from the bottom, Ortega states, "Down here, I am on Third,

 7    okay?  By the freeway, by the 110 and the 101."

 8         Are you familiar with that location near the 110 and the

 9    101?

10    A.   Yes.

11    Q.   Where is that?

12    A.   It's downtown Los Angeles.

13    Q.   Now, you mentioned that on this date you had identified an

14    account that was being defrauded the same day, on March 30th,

15    2009.

16    A.   Yes.

17    Q.   Please take a look at Exhibit 253.  Should be in one of

18    the books behind you.

19    A.   Yes.

20    Q.   What's Exhibit 253?

21    A.   They're certified bank records from Bank of America for

22    Yoones Gidanian, dba Yoones Gidanian Diamond House.

23    Q.   Is this the account that you found had had fraudulent

24    checks deposited on it that same day of March 30th, 2009?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      MR. ESTRADA:  Your Honor, the government moves to

2  admit Exhibit 253 and asks permission to publish.

3      THE COURT:  Be received.

4      (*Received in evidence, Exhibit 253.*)

5  BY MR. ESTRADA:

6  Q.   Now, looking at the first page of 253, do you see the name

7  for the account there?

8  A.   Yes.

9  Q.   What's the name?

10 A.   Yoones Gidanian, sole proprietor, dba Yoones Gidanian

11 Diamond House.

12 Q.   Now, turning to page 5 of the bank records for

13 Yoones Gidanian Diamond House -- I'm going to place that in

14 front of you.  Do you see that?

15 A.   Yes.

16 Q.   What do you see on page 5?

17 A.   There's a fraudulent check written out to Steven A. Wilson

18 in the amount of $4,500.

19 Q.   And the date?

20 A.   March 30th, 2009.

21 Q.   Are you familiar with a person named Steven A. Wilson?

22 A.   Yes, I am.  He's a defendant in this case, overall case.

23 Q.   And that number, 4,500, did it correspond to earlier calls

24 that we heard?

25 A.   Yes.  The call where they referred to 4.5 is 4,500.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Now, turning to page 6 of these bank records, what do you

2   see in page 6?

3   A.   It is the next check in sequence, written to Joseph Mares,

4   in the amount of $5,300, on March 30th, 2009.

5   Q.   Are you familiar with Joseph Mares?

6   A.   Yes.  He's a defendant in this case and, if you recall,

7   from the first fraud scheme.

8          MR. SEVERO:  Objection, your Honor.  After "defendant

9   in this case," move to strike.

10          THE COURT:  Sustained.  Sustained.  Not responsive.

11   BY MR. ESTRADA:

12   Q.   He's a defendant in this case?

13   A.   Yes, he is.

14   Q.   There were other calls that were played yesterday.  Did

15   the name Joseph Mares come up in that discussion?

16          MR. SEVERO:  Leading.

17          THE COURT:  Well, the jury will make that

18   determination whether it came up or not.

19          MR. ESTRADA:  I can show the photo again, your Honor,

20   but --

21   Q.   You saw a photo yesterday for Joseph Mares?

22   A.   Yes.

23   Q.   Is that the same name as on this check?

24   A.   Yes.

25   Q.   And you mentioned "in sequence."  This first check I

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000562**

1  showed you, that's check number 304?

2  A.    Yes.

3  Q.    And the next check, what's the number there?

4  A.    305.

5  Q.    Now turning to the third check, what's the number on that

6  check?

7  A.    306.

8  Q.    And what's the check we see there on page 7 of the

9  records?

10  A.    It's a check written against the same account, to a

11  Joseph Mares, in the amount of $5,000, on March 30th, 2009.

12  Q.    Is that the same name that you testified to yesterday with

13  regard to the fraud on the Pompos account?

14  A.    Yes.

15  Q.    Now, in addition to the bank records, did you obtain

16  surveillance photographs with regard to this date and checks

17  being deposited or cashed on Yoones Gidanian's account?

18  A.    Yes, we did.

19  Q.    Please take a look at Exhibits 277 and 278.  It should be

20  in the books.

21  A.    Yes, I have them.

22  Q.    Are both of these -- well, what are these records?

23  A.    They are bank surveillance photos inside various banks

24  of -- 277 is Joseph Mares.  278 is Mares and Wilson.

25  Q.    Are they certified?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes, they are.

 2             MR. ESTRADA:  Your Honor, the government moves to

 3   admit both of these and requests permission to publish.

 4             THE COURT:  Be received.

 5        (Received in evidence, Exhibits 277 and 278.)

 6   BY MR. ESTRADA:

 7   Q.   Starting with Exhibit 277, what do you see in Exhibit 277?

 8   A.   It is Joseph Mares at a Bank of America branch.

 9   Q.   What's the date there?

10   A.   March 30th, 2009.

11   Q.   I won't show you all the photographs, but there are

12   additional photos of Mares at the branch depositing a check.

13   A.   Yes.

14   Q.   And is that -- do these photographs correspond to a

15   particular deposit?

16   A.   Yes.

17   Q.   What particular deposit is that?

18   A.   I believe it's the first one for -- you know what, the

19   first one to Joseph Mares, I believe it's the $5,300 check.

20   Q.   Is that in the Melrose branch?

21   A.   Yes.

22   Q.   Now, turning to Exhibit 278, first page of 278, what do

23   you see in 278?

24   A.   This is a bank surveillance photograph of Steven Wilson in

25   the red shirt and ball cap, and Joseph Mares in the dark blue
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    collared shirt.

2    Q.    And is this at a particular branch?

3    A.    Yes.  It's in the Wilshire branch.

4    Q.    That's stated here at the bottom of the photo?

5    A.    Yes.

6    Q.    And the date of this, is it also depicted in this

7    surveillance photo?

8    A.    Yes, it is.

9    Q.    What's the date?

10   A.    March 30th, 2009.

11   Q.    Was there actually a fraudulent check for

12   Yoones Gidanian's account cashed or deposited at the Wilshire

13   branch?

14   A.    Yes, there was.

15   Q.    Now, you saw the three checks deposited in names of

16   Steven Wilson and Joseph Mares for Yoones Gidanian's account.

17   Did the information on the checks tell you what branches they

18   were deposited at?

19   A.    Yes.

20   Q.    And in addition, you mentioned there was a fourth check

21   that was attempted to be deposited?

22   A.    Yes.

23   Q.    Was that at a particular branch?

24   A.    Yes.  The Larchmont branch.

25   Q.    Please take a look at Exhibit 263, which should also be in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    one of the binders there.

 2    A.    Yes, I have it.

 3    Q.    What's Exhibit 263?

 4    A.    It is a map of the different banks where fraudulent checks

 5    were either negotiated or attempted to be negotiated at on

 6    March 30th, 2009.

 7              MR. SEVERO:  There's no foundation for this.

 8    BY MR. ESTRADA:

 9    Q.  Did you create this map?

10              THE COURT:  Sustained as to -- sustained.

11    BY MR. ESTRADA:

12    Q.  Did you create this map?

13    A.  Yes, I did.

14    Q.  And would this map aid you in testifying before the jury?

15    A.  Yes.

16              MR. ESTRADA:  Your Honor, the government moves to

17    admit, requests permission to publish.

18              MR. SEVERO:  Still no foundation.

19              THE COURT:  Sustained.

20        Not that it's a map, Counsel.  As to the fraudulent

21    transactions taking place at these four locations, that's

22    sustained.

23    BY MR. ESTRADA:

24    Q.  How did you determine that these locations depicted on the

25    map at 263 were of significance?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection, your Honor.  Refers to a map
 2     that's been kept out so far.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Can you repeat that question, please?
 5              MR. ESTRADA:  I will.
 6     Q.   How did you determine that the four locations depicted on
 7     this map were of significance in this investigation?
 8     A.   Utilizing the bank records which showed the branch, and
 9     also the bank surveillance video.
10     Q.   Now, you mentioned there are three deposits on
11     Yoones Gidanian's account.
12          Was there a deposit at a Bank of America branch at
13     Franklin Avenue in Los Angeles?
14     A.   Yes.
15     Q.   Was there a deposit at a Bank of America branch at
16     Melrose Avenue?
17     A.   Yes.
18     Q.   Was there a deposit on Yoones Gidanian's account at a
19     Bank of America branch on Wilshire Boulevard?
20     A.   Yes.
21     Q.   Was there an attempted deposit at a Bank of America branch
22     on Larchmont Boulevard?
23     A.   Yes.
24              MR. ESTRADA:  Now, your Honor, the government would
25     move to admit Exhibit 263, request permission to publish.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Still no foundation for the map.

 2              THE COURT:  Where did you get this map?

 3              THE WITNESS:  I created it, sir.

 4              THE COURT:  From where?  You drew it yourself?

 5              THE WITNESS:  I utilized the Internet to plot the

 6     points on a mapping system.

 7              THE COURT:  What map system did you use?  What --

 8              THE WITNESS:  I believe this one is MapQuest.

 9              THE COURT:  MapQuest?

10        Okay.  Overruled.

11        (Received in evidence, Exhibit 263.)

12     BY MR. ESTRADA:

13     Q.  Okay.  Now, looking at Exhibit 263, what do we see in

14     Exhibit 263?

15     A.  That is a map of the two different banks where the checks

16     were deposited or cashed.

17     Q.  And it lists the addresses of those bank branches on the

18     left side?

19     A.  Yes.

20     Q.  And I'll show you the second page, which is a bit larger.

21        Those four locations, what do those correspond to?

22     A.  They're the four banks where the checks were deposited or

23     cashed on Yoones Gidanian's bank account on March 30th, 2009.

24     Q.  And that fourth location, is that the attempted deposit?

25     A.  That is the attempted deposit.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. ESTRADA:  Now, your Honor, I'd like to move on to

2     another set of calls, and just for the record, these calls will

3     also correspond to the racketeering conspiracy, bank fraud

4     charges and also aggravated identity theft charges as to

5     Mher Darbinyan.

6          THE COURT:  And as to him only?

7          MR. ESTRADA:  Yes.

8          THE COURT:  Okay.

9          MR. ESTRADA:  Your Honor, the government asks

10    permission to play Exhibit 51 and asks that the jurors turn to

11    51A in their books.

12        (*Audio played.*)

13    BY MR. ESTRADA:

14    Q.   Agent Stebbins, turning to the first page of this

15    transcript, 51A, what's the date of this recording?

16    A.   April 14th, 2009.

17    Q.   What's the time of this recording?

18    A.   Approximately 1:54 p.m.

19    Q.   Who are the participants in this recording?

20    A.   Mike Darbinyan and Arman Tangabekyan.

21    Q.   Now we're in April, and the prior call was March 30th,

22    2009.

23    A.   That's correct.  Approximately two weeks later.

24    Q.   Turning to page 2 of the transcript, three speakers from

25    the top, Darbinyan states, "Brother, where do you want to do

1    that thing so I can pick it up?"

2        Tangabekyan responds, "Wherever you want."

3        Based on your knowledge of the investigation and previous

4    calls heard, what was Arman Tangabekyan's general role in

5    fraud?

6    A.   He would control the victim bank accounts, forge checks,

7    and basically control the victim account.

8            MR. ESTRADA:  Your Honor, the government requests

9    permission to play Exhibit 52 and asks that the jurors turn to

10   52A in their binders.

11           THE COURT:  Okay.

12       (*Audio played.*)

13   BY MR. ESTRADA:

14   Q.   Agent Stebbins, turning to page 1 of 52A, do you see that

15   page in front of you?

16   A.   Yes.

17   Q.   What's the date of that call?

18   A.   April 14, 2009.

19   Q.   What's the time of the call?

20   A.   Approximately 2:08 p.m.

21   Q.   Who are the participants?

22   A.   Mike Darbinyan and Hagop Yamalyan.

23   Q.   Who's Hagop Yamalyan?

24   A.   Hagop Yamalyan was another defendant in this case.

25   Q.   The overall case?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    The overall case.

 2    Q.    Now turning to page 2 of the transcript, five speakers

 3    from the top, Darbinyan states, "Brother, I called, um -- the

 4    villager is supposed to bring something to the 7-Eleven in

 5    Hollywood in half an hour."

 6          Yamalyan asks, "Who?"

 7          Darbinyan responds, "The villager.  The one we saw the

 8    other day."

 9          Based on your knowledge of the investigation, what does

10    the term "the villager" refer to?

11              MR. SEVERO:  Objection, no foundation.

12              THE COURT:  Overruled.

13              THE WITNESS:  "Villager" is a common nickname for

14    Arman Tangabekyan.

15    BY MR. ESTRADA:

16    Q.    Why is it that they would use the term "the villager"?

17    A.    Arman Tanga- --

18              MR. SEVERO:  Calls for speculation.

19              THE COURT:  Sustained.

20    BY MR. ESTRADA:

21    Q.    Do you know why they call him "the villager"?

22    A.    Yes.

23    Q.    Can you explain.

24              MR. SEVERO:  Objection.  Same question, still calls

25    for speculation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Sustained, unless he can show it's his
 2   personal knowledge, not something told him.
 3   BY MR. ESTRADA:
 4   Q.   Is it through personal knowledge?
 5   A.   No.
 6          THE COURT:  Okay.
 7   BY MR. ESTRADA:
 8   Q.   Do you know a nickname that Arman Tangabekyan often went
 9   by?
10   A.   Yes.  "Spito."
11          MR. SEVERO:  Objection.
12          THE COURT:  Overruled.
13   BY MR. ESTRADA:
14   Q.   And based on personal knowledge, do you know if there's a
15   place in Armenia that corresponds to the name "Spito"?
16   A.   Yes.  There is a village in Armenia called Spitak, which
17   is where Arman Tangabekyan comes from.
18   Q.   Nine speakers from the bottom, Darbinyan states, "He will
19   be there in half -- 20 minutes.  Give Manuk a call, take it so
20   he can enter and put it inside."
21        Based on your knowledge of the investigation, the name
22   "Manuk," what does that refer to?
23   A.   It's a reference to Manuk Terzyan.
24   Q.   Who was heard in previous calls?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   And there is a reference to "take it so he can enter and

 2    put it inside."

 3         Based on your knowledge of the investigation, what did you

 4    believe the "it" referred to?

 5              MR. SEVERO:  Objection.  That's improper expert

 6    testimony.

 7              THE COURT:  Sustained.

 8              MR. ESTRADA:  Your Honor, he can testify to that as a

 9    lay opinion.

10              THE COURT:  Sustained.

11    BY MR. ESTRADA:

12    Q.   Now, he refers to Manuk, "take it so he can enter and put

13    it inside."

14         Based on your training and experience, is there a

15    difference between inside and outside with regard to committing

16    fraud?

17              MR. SEVERO:  Objection, your Honor.

18              THE COURT:  Overruled.

19              MR. SEVERO:  This is --

20              THE COURT:  Overruled.

21              THE WITNESS:  Yes.  Inside is referring to taking a

22    check and depositing it inside a bank versus outside in the

23    drop box as we discussed earlier.

24              MR. ESTRADA:  Your Honor, the government asks

25    permission to play Exhibit 53 and requests permission to have
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    the jurors turn to 53A in their binders.

2            THE COURT:  Okay.

3        (*Audio played.*)

4    BY MR. ESTRADA:

5    Q.    Now, turning to page 1 of the transcript of 53A, what's

6    the date of this call?

7    A.    April 14th, 2009.

8    Q.    What's the time of the call?

9    A.    Approximately 2:12 p.m.

10   Q.    Who are the speakers?

11   A.    Mike Darbinyan and Manuk Terzyan.

12   Q.    Is this the same day as the call before?

13   A.    Yes.

14   Q.    Turning to page 2 of the transcript, three speakers from

15   the top, Darbinyan states, "Brother, in 10 minutes he is going

16   to go to 7-Eleven.  I told Hago too.  He comes, let's make a

17   deposit into the account so Hayko can take it out from there,

18   brother."

19        Based on your knowledge of the investigation, what does

20   "Hago" refer to?

21   A.    "Hago" is a reference to Hagop Yamalyan.

22            MR. ESTRADA:  Your Honor, the government asks

23   permission to play Exhibit 54 and asks that the jurors turn to

24   54A in their books.

25            THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (Audio played.)
 2   BY MR. ESTRADA:
 3   Q.   Agent Stebbins, turning to the first page of 54A, do you
 4   have that in front of you?
 5   A.   Yes.
 6   Q.   What's the date of that call?
 7   A.   April 14th, 2009.
 8   Q.   What's the time of the call?
 9   A.   Approximately 3:25 p.m.
10   Q.   And who are the speakers?
11   A.   Mike Darbinyan, Arman Tangabekyan, and Manuk Terzyan.
12   Q.   This is the same day as the call before?
13   A.   Yes, it is.
14   Q.   Turning to page 2 of the transcript, three speakers from
15   the top, Arman Tangabekyan tells Darbinyan, "I gave it to him
16   and he left."
17        Darbinyan responds, "When?"
18        Tangabekyan, "Just now."
19        Darbinyan, "Which one came?"
20        Tangabekyan, "The one with the thing, the one who wears
21   glasses."
22        And Darbinyan states, "Oh, yeah?  The one from the special
23   police force?"
24        Based on your knowledge of the investigation, was there a
25   defendant in this case who had a connection to a special police
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    force?

 2            MR. SEVERO:  Objection, your Honor, not -- withdraw.

 3            THE COURT:  Overruled.

 4            THE WITNESS:  Yes.

 5    BY MR. ESTRADA:

 6    Q.    Who is that person?

 7    A.    Manuk Terzyan.

 8    Q.    And did you actually speak to that person?

 9    A.    Yes, I did.

10    Q.    Did you become familiar with his background?

11    A.    Yes.

12    Q.    Did he have a connection to a special police force in

13    Armenia and Russia?

14            MR. SEVERO:  Objection.  Hearsay, calls for

15    foundation, no -- excuse me, calls for speculation, no

16    foundation.

17            THE COURT:  I'm not too sure it's relevant either, so

18    it's sustained.

19            MR. ESTRADA:  Just to identify the individual,

20    your Honor.

21            THE COURT:  He's already identified him.

22            MR. ESTRADA:  Your Honor, with the Court's permission,

23    the government would ask to play Exhibit 56 and ask that the

24    jurors turn to 56A in their binders.

25            THE COURT:  56?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000576**

```
 1              MR. ESTRADA:  Yes.

 2              THE COURT:  Okay.

 3         (Audio played.)

 4   BY MR. ESTRADA:

 5   Q.  Agent Stebbins, turning to the first page of the

 6   transcript of 56A, do you have that in front of you?

 7   A.  Yes.

 8   Q.  What's the date of this call?

 9   A.  April 14, 2009.

10   Q.  What's the time of the call?

11   A.  Approximately 4:40 p.m.

12   Q.  Who are the participants?

13   A.  Mike Darbinyan and Manuk Terzyan.

14   Q.  Is this the same day as the call we heard before at

15   Exhibit 54?

16   A.  Yes.

17   Q.  Turning to page 2 of the transcript, four speakers from

18   the bottom, Darbinyan asks, "Didn't he give you a deposit

19   slip?"

20         Manuk Terzyan, "No, brother.  He only gave me that thing."

21         Based on your training and experience investigating fraud

22   cases, what's the significance of a deposit slip?

23   A.  A deposit slip is needed in order to actually put the

24   check into the bank account.

25   Q.  And into what bank account?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Into --
 2              MR. SEVERO:  Objection.  Sorry.  Withdraw.
 3              THE COURT:  Overruled.
 4         Go ahead.
 5              THE WITNESS:  Into whatever bank account you're trying
 6    to deposit the check.
 7    BY MR. ESTRADA:
 8    Q.    And is it -- based on your training and experience in
 9    conducting fraud cases, are accounts in other people's names
10    sometimes used in conducting fraudulent activity?
11    A.    Yes.
12    Q.    Please explain that.
13    A.    Oftentimes, as was the case in this one, they would
14    utilize --
15              MR. SEVERO:  This calls for a narrative answer and --
16              MR. FLIER:  I'm going to object.  Sorry.  Your Honor,
17    I'm going to object.  When it's "often in these cases or this
18    case," that's improper.
19              THE COURT:  Counsel, my understanding is, none of this
20    testimony today goes towards your client.  Is that correct?
21              MR. FLIER:  That's true.
22              THE COURT:  Okay.  Then your objection's overruled as
23    being irrelevant to your client.
24         Counsel, what was the objection?  Narrative?
25              MR. SEVERO:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Okay.  You know, oddly enough, almost any

2     question you ask is either going to be hearsay or narrative,

3     depending on how you look at it.

4          MR. SEVERO:  So --

5          THE COURT:  So it's something the Court has to

6     determine.  And you know what we're going to do?  We're going

7     to determine this at 1:00 o'clock, because we're going to break

8     for lunch at this time.

9          So remember the admonishment I gave you not to discuss

10    among yourselves or with anybody else or form or express any

11    opinions about the matter until it's submitted to you and you

12    retire to the jury room.

13         Have a pleasant lunch.  We'll see you back in right at

14    1:00 o'clock so we can start right at 1:00 o'clock.

15         THE CLERK:  All rise.

16

17              *(Lunch recess held at 11:32 a.m.)*

18

19                        *--oOo--*

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                        CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  MARCH 4, 2015

11

12

13

14              /S/ SANDRA MACNEIL

15           Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                        WESTERN DIVISION

4                              ---

5           HONORABLE R. GARY KLAUSNER, JUDGE PRESIDING

6                              ---

7

8   UNITED STATES OF AMERICA,    )
                                 )
9                 Plaintiff,     )
                                 )
10                               )
         vs.                     ) NO:  11-00072(A)-RGK
11                               )
                                 )
12  MHER DARBINYAN, et al.,      )
                                 )
13                Defendants.    )
    _____  )

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                (JURY TRIAL - DAY 3; VOLUME II)
16
                       AFTERNOON SESSION
17
                      PAGES 581 - 699
18
                  Los Angeles, California
19
                 Thursday, March 27, 2014
20

21

22
                        KATHERINE M. STRIDE, RPR, CSR
23                      1107 Fair Oaks Avenue, #68
                        S. Pasadena, California  91030
24                      www.stridecourtreporting.com

25                      (323)474-6420

1    **APPEARANCES:**

2    In behalf of the Government:

3                    E. MARTIN ESTRADA
                    ELIZABETH R. YANG
4                    ASSISTANT UNITED STATES ATTORNEYS
                    ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
5                    312 North Spring Street
                    Los Angeles, California  90012
6                    (213)894-4477

7                    ANDREW CREIGHTON
                    ASSISTANT UNITED STATES ATTORNEY
8                    U.S. DEPT OF JUSTICE, CRIMINAL DIVISION
                    312 North Spring Street
9                    Los Angeles, California  90012
                    (213)894-2579

10

11   In behalf of Defendant Mher Darbinyan:

12                    THE SEVERO LAW FIRM
                    BY:  MICHAEL V. SEVERO
13                    70 South Lake Avenue, Suite 945
                    Pasadena, CA  91101
14                    (626)844-6400

15   In behalf of Defendant Arman Sharopetrosian:

16                    LAW OFFICES OF CHARLES PEREYRA-SUAREZ
                    BY:  CHARLES PEREYRA-SUAREZ
17                    800 Wilshire Boulevard, 12th Floor
                    Los Angeles, CA  90012
18                    (213)623-5923

19   In behalf of Defendant Rafael Parsadanyan:

20                    FLIER AND FLIER, ALC
                    BY:  ANDREW REED FLIER
21                    15250 Ventura Boulevard, Suite 600
                    Sherman Oaks, CA  91403
22                    (818)990-9500

23

24   ALSO PRESENT:

25                    JEREMY STEBBINS, FBI

1                          **I N D E X**

2

3                   **GOVERNMENT'S WITNESS(S)**

4
                                                    Page
5

**JEREMY STEBBINS, PREVIOUSLY SWORN**............   585
6  DIRECT EXAMINATION (RESUMED)
   BY MR. ESTRADA...............................   585
7  CROSS-EXAMINATION
   BY MR. SEVERO............................... 627, 641
8  REDIRECT EXAMINATION
   BY MR. ESTRADA...............................   656
9  RECROSS-EXAMINATION
   BY MR. SEVERO...............................   664

10

11 **MARJORIE DUNCAN, SWORN**......................   676
   DIRECT EXAMINATION
12 BY MR. CREIGHTON............................   676
   CROSS-EXAMINATION
13 BY MR. SEVERO...............................   681

14

15 **GRACE E. FERGUSON, SWORN**....................   685
   DIRECT EXAMINATION
16 BY MS. YANG.................................   686
   CROSS-EXAMINATION
17 BY MR. SEVERO...............................   694
   REDIRECT EXAMINATION
18 BY MS. YANG.................................   697

19

20

21

22

23

24

25

1          **E X H I B I T S**


2

3              **GOVERNMENT'S EXHIBIT(S)**

4

5                                                    <u>Page</u>

6    Exhibit No. 273 received....................     589

7    Exhibit No. 274 received....................     589

8    Exhibit No. 257 received....................     597

9    Exhibit No. 259 received....................     600

10   Exhibit No. 254 received....................     606

11   Exhibit No. 255 received....................     607

12

13

14

15

16

17

18

19

20

21

22

23

24

25

584

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 27, 2014;

 2                          1:00 P.M.

 3

 4                      AFTERNOON SESSION

 5

 6           THE CLERK:  All rise.

 7           You may be seated.

 8               (Jury present.)

 9               (Brief interruption.)

10           THE CLERK:  All rise.  This United States

11    District Court is now in session.

12           You may be seated.

13           THE COURT:  Okay.  The record will reflect that

14    all the jurors are in their respected seats in the jury

15    box including the alternates.  I hope you had a pleasant

16    lunch and ready for the afternoon.

17           Counsel, when we -- when we broke last time we

18    were talking about an objection.  You're going to help

19    the Court by asking the question again, and then we'll

20    fill in the objection again.  So let's strike the

21    question again and start again.

22           MR. ESTRADA:  Yes, Your Honor.

23    ///

24    ///

25    ///
```

1    JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

2                DIRECT EXAMINATION (RESUMED)

3    BY MR. ESTRADA:

4    Q.   So before the break, we were talking about

5    Exhibit 56; do you recall that?

6    A.   Yes.

7    Q.   And we were looking at Exhibit 56-A.  We asked if

8    the jurors to, please, turn to page 2 of 2 of Exhibit

9    56-A, and you already talked about the fact that this

10   call was from April 14th, 2009?

11   A.   Yes.

12   Q.   Between Darbinyan and Manuk Terzyan?

13   A.   Yes.

14   Q.   Now, beginning with page 2 of 2 of 56-A, two

15   speakers from the top, Terzyan states, "Yes, Brother.

16   I'm about to enter, and the guy from the inside is

17   telling me that there's no account number.  Where should

18   I put it?"  And four speakers from the bottom, Darbinyan

19   states, "Didn't he give you a deposit slip?"

20        Based on your training and experience

21   investigating fraud cases, are you familiar with the

22   practice of using account numbers and other people's 's

23   name to deposit checks?

24        MR. SEVERO:  Objection.

25        THE COURT:  Counsel, objection?

586

1          MR. SEVERO:  It's leading.

2          THE COURT:  It was a narrative, last time was

3     the objection.

4          MR. SEVERO:  And it called for a narrative;

5     that's correct.

6          THE COURT:  Overruled.

7          THE WITNESS:  Yes, they use deposit slips in

8     other people's names.

9     Q.   BY MR. ESTRADA:  And based on your training and

10    experience, why is that done?

11    A.   They want to conceal the fact that they're utilizing

12    that account.  So they will make the deposit into

13    another account that is not in their name.  So even if a

14    photo of them shows up on the bank surveillance video,

15    it won't come back to their bank account.  It will be an

16    account in somebody else's name.

17    Q.   So you're familiar with what's known as laundering

18    accounts as it refers to bank fraud?

19    A.   Yes.

20    Q.   Explain what those are.

21    A.   A money laundering account is an account in the name

22    of somebody else that you basically deposit fraudulent

23    checks into, and then you can pull cash out of.  But the

24    account, if you -- if you look for the person that's on

25    the account, they've already left the country or, you

1    know, it's not the person doing the depositing or

2    withdrawing the money.  So the person that's actually

3    doing the activity is never connected to the actual

4    account.

5    Q.   And before I move on to the next column in this

6    sequence, there was some prior calls I played for you

7    regarding a March 30th incident as to an account owned

8    by, you know, Yoones Gidanian; business, Diamond House;

9    do you recall that?

10   A.   Yes.

11   Q.   There was some items of evidence you testified about

12   that were left behind at a Larchmont branch?

13   A.   Yes.

14   Q.   And those items and evidence helped you link you to

15   the Y. Gidanian account?

16   A.   Yes.

17   Q.   Can you please take a look at Exhibits 273 and 274,

18   which should actually be physical exhibits, which are on

19   the cabinet, I understand.

20   A.   Yes, I have it.

21   Q.   What is Exhibit 273 and 274?

22            MR. SEVERO:  Compound.

23            THE COURT:  Sustained.  Let's do one at a time.

24   Q.   BY MR. ESTRADA:  What's Exhibit 273.

25   A.   Exhibit 273 is a check written to Steven A. Wilson,

```
 1   written on the account of Y. Gidanian Diamond House, the
 2   check number is 307.  Exhibit -- sorry.  Should I
 3   continue?
 4   Q.   I'll ask the next question:  What's Exhibit 274?
 5   A.   Exhibit 274 are California driver's license and a
 6   Cox Communications identification card of Steven Wilson.
 7   These items were left behind at the Larchmont branch.
 8   Q.   Did officers recover those items at the Larchmont
 9   branch?
10   A.   Yes, we did.
11           MR. SEVERO:  Objection.  Hearsay.
12           THE COURT:  Sustained.
13   Q.   BY MR. ESTRADA:  Do you understand these items were
14   booked into evidence?
15   A.   Yes.
16   Q.   Where were they booked into evidence?
17   A.   FBI.
18           MR. SEVERO:  Objection.  Both, the last
19   question and this one, are hearsay as well.  There's no
20   personal knowledge.
21           MR. ESTRADA:  It's not a Declaration,
22   Your Honor.  It's where it was booked.
23           THE COURT:  I'm sorry, Counsel?
24           MR. ESTRADA:  It's not an out-of-court
25   statement.
```

```
 1              THE COURT:  Well, maybe.  Does the fact that
 2    your knowledge of them being booked into evidence comes
 3    from something somebody else told you?
 4              THE WITNESS:  No, it comes from having
 5    researched these items for court.
 6              THE COURT:  You actually went and saw whether
 7    they were booked or not?
 8              THE WITNESS:  Yes.
 9              THE COURT:  Okay.  Overruled.
10    Q.   BY MR. ESTRADA:  Okay.  So where were these items
11    booked?
12    A.   FBI.
13              MR. ESTRADA:  Your Honor, the Government moves
14    to admit these items, 273 and 274.  Request permission
15    to publish.
16              THE COURT:  They may be received, and you may
17    publish.
18                   (Government's Exhibits No. 273 and 274
19                    received into evidence.)
20              MR. ESTRADA:  May I approach the Clerk, please,
21    Your Honor.
22              THE COURT:  Sure.
23    Q.   BY MR. ESTRADA:  Okay.  So starting with 273, I'm
24    going to open up the bag here.  Do you see 273?
25    A.   Yes.
```

1   Q.   Exhibit 273, I should say.

2   A.   Yes.

3   Q.   Do you see a name on that check?

4   A.   Yes, Steven A. Wilson.

5   Q.   Do you know a person by the same name?

6   A.   Yes, he's a defendant in this case.

7   Q.   And do you see the date there, March 30th, 2009?

8   A.   Yes.

9   Q.   And the amount there?

10  A.   $5,500.

11  Q.   And the check number?

12  A.   307.

13  Q.   And did this item of evidence help you link the

14  calls from March 30th, 2009, to this account of Y.

15  Gidanian?

16          MR. SEVERO:  Your Honor, I'm going to make the

17  observation to the jury whether it's linked or not.

18          THE COURT:  Overruled.  The question is whether

19  or not it would help you link it, not whether or not the

20  jury's goes to link it or not.

21          THE WITNESS:  Yes, it did.

22  Q.   BY MR. ESTRADA:  Now, turning to Exhibit 274, what

23  do you see in Exhibit 274?

24  A.   Exhibit 274 is a California driver's license for

25  Steven A. Wilson and a Cox Communications contractor

```
 1   card for Steven Wilson.  These were left in the bank at
 2   Larchmont.
 3   Q.  And you've seen this --
 4            MR. SEVERO:  Motion to strike the last portion
 5   as hearsay.
 6            THE COURT:  The last portion will be stricken.
 7   Q.  BY MR. ESTRADA:  You left the -- you're familiar
 8   with the person depicted here?
 9   A.  Yes, he's a defendant in this case.
10            MR. ESTRADA:  With the Court's permission, I'll
11   hand these back to the Clerk, Your Honor.
12            THE COURT:  Okay.
13            MR. ESTRADA:  And now if we could -- let's move
14   on to the next call.  With the Court's permission, the
15   Government would ask to play Exhibit 57 and ask the
16   jurors to go to Exhibit 57-A in their transcript book.
17            THE COURT:  Okay.
18            (Audio recording played in open court.)
19   Q.  BY MR. ESTRADA:  Agent Stebbins, turning to the
20   first page of Exhibit 57-A, do you have that in front of
21   you?
22   A.  Yes.
23   Q.  What's the date of the call?
24   A.  April 14th, 2009.
25   Q.  What's the time of the call?
```

1    A.    Approximately, 4:41 P.M.

2    Q.    Who are the speakers?

3    A.    Mike Darbinyan and Arman Tangabekyan.

4    Q.    Is this the same date as the call before,

5    Exhibit 56?

6    A.    Yes.

7    Q.    Turning to page 2 of 3 of Exhibit 57-A, six speakers

8    from the bottom, Arman Tangabekyan says, "One minute.

9    This is the Washington ones, Dear."  Based on your

10   training and experience, what does the term Washington

11   refer to?

12            MR. SEVERO:  Objection.  Speculation.

13            THE COURT:  Overruled.

14            THE WITNESS:  Washington was a reference to

15   Washington Mutual Bank.

16   Q.    And did that bank have a transition at some point in

17   2009?

18   A.    Yes, in 2009, it became Chase Bank.

19   Q.    Now, there's a reference four speakers up by Arman

20   Tangabekyan, "It's America."

21            Based on your training and experience, what did

22   the term America refer to in the context of fraud?

23            MR. SEVERO:  This involves the testimony of an

24   expert.  Improper -- improper expert testimony.

25            THE COURT:  Well, I don't know.  I don't know.

1          Why don't you ask the question again.  I want

2     to find out what it is based on.  Go ahead.  Ask the

3     question again.

4          MR. ESTRADA:  Yes, Your Honor.

5     Q.  Now, based on your training and experience, are you

6     familiar with code words used to refer to bank?

7     A.  Yes.

8     Q.  What does the term America refer to with regard to

9     fraud and identity theft?

10          THE COURT:  The objection will be overruled.

11          THE WITNESS:  It refers to Bank of America.

12          MR. ESTRADA:  Your Honor, the Government

13     requests permission to play Exhibit 58 and ask that the

14     jurors turn to 58-A in their binders.

15          (Audio recording played in open court.)

16     Q.  BY MR. ESTRADA:  Turning to the first page of

17     Exhibit 58, do you have that in front of you?

18     A.  Yes.

19     Q.  What's the date of that call?

20     A.  April 14th, 2009.

21     Q.  What's the time of the call?

22     A.  Approximately, 4:56 P.M.

23     Q.  Who are the participants?

24     A.  Mike Darbinyan and Manuk Terzyan.

25     Q.  Turning to page 2 of the call, two speakers from the

594

 1    top, Manuk Terzyan states, "Yes, Brother.  It's done."

 2    Darbinyan, "Thank you, Dear."  Terzyan, "Okay, my bro,

 3    but working with these guys needs a lot of caution.  I

 4    swear on my dad this time that he gave the wrong number.

 5    I went in."

 6            Based on your knowledge of the investigation,

 7    was there evidence that you learned of Manuk Terzyan

 8    going into a particular location this day?

 9    A.   Yes, he went into a Bank of America.

10    Q.   What was the evidence that helped confirm that for

11    you?

12    A.   We obtained a account information for -- I believe

13    it was for Ruzzana Hakobyan, and then ultimately we

14    obtained a video from inside the Bank of America, and it

15    was Manuk Terzyan.

16    Q.   I'll shot that to you a little bit later.

17            Before I do, if I could play Exhibit 59,

18    Your Honor, and ask that the jurors turn to 59-A in

19    their binders.

20            THE COURT:  Okay.

21            (Audio recording played in open court.)

22    Q.   BY MR. ESTRADA:  Agent Stebbins, turning you to the

23    first page of 59-A, do you have that in front of you?

24    A.   Yes.

25    Q.   What's the date of the call?

1   A.   April 14, 2009.

2   Q.   What's the time of the call?

3   A.   Approximately, 5:39.  M.

4   Q.   Who were the speakers?

5   A.   Mike Darbinyan and Musho LNU.

6   Q.   Who's Musho LNU?

7   A.   He was one of the co-conspirators in this bank fraud

8   scheme.  LNU stands for "last name unknown."  We were

9   unable to identify him.

10  Q.   So if you're not able to identified someone, you

11  specify that in the transcripts?

12  A.   That's correct.

13  Q.   Turning to page 2 of 3 of that transcript, five

14  speakers from the top, Darbinyan states, "Yes, 2328 and

15  300-something."

16       Based on your knowledge of the investigation,

17  did that number have some significance?

18  A.   Yes.

19  Q.   What's that significance?

20  A.   There was a check deposited by Manuk Terzyan in the

21  amount of $28,357 into an account of Ruzzana Hakobyan.

22  Q.   A check in, approximately, that amount?

23  A.   Approximately, 28,300.

24       MR. ESTRADA:  With the Court's permission, I

25  would ask that Exhibit 60 be played and ask the jurors

1    to turn to Transcript 60-A in their binders.

2              THE COURT:  Okay.

3                   (Audio recording played in open court.)

4    Q.   BY MR. ESTRADA:  Now, Agent Stebbins, turning to

5    page 1 of Exhibit 60, do you have that in front of you?

6    A.   Yes, I do.

7    Q.   What's the date of that call?

8    A.   April 15th, 2009.

9    Q.   What's the time of the call?

10   A.   Approximately, 2:53 P.M.

11   Q.   Who are the participants?

12   A.   Mike Darbinyan and Musho LNU.

13   Q.   Turning to page 2 of the transcript, four speakers

14   from the top, Darbinyan states, "The one with Citi."

15             Based on your training and experience, does the

16   term Citi have significance in the context of fraud?

17             MR. SEVERO:  Objection, Your Honor.  This is

18   improper expert testimony.

19             THE COURT:  Overruled.  Does -- does that word

20   have any meaning in -- in the field that you're an

21   expert in?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  What's that?

24             THE WITNESS:  Citi means Citibank.  It's a code

25   word for it.

1    Q.   BY MR. ESTRADA:  Nine speakers from the bottom, or

2    actually ten speakers from the bottom, Darbinyan states,

3    "Give me the name on the personal one," and Musho

4    responds, "It is the same, Ruzzana Hakobyan."

5         Did that name Ruzzana Hakobyan have

6    significance for the you in the investigation?

7    A.   Yes.

8    Q.   Explain.

9    A.   There was a bank account in the name of Ruzzana

10   Hakobyan that had fraudulent checks deposited into it.

11   Q.   Please take a look, if you would, at Exhibit 257,

12   which should be in a binder next to you.

13        Your Honor, this is a certified bank record,

14   and the Government would move to admit it under Federal

15   Rules of Evidence 902.11.

16        THE COURT:  257?

17        MR. ESTRADA:  257, yes.

18        THE COURT:  Okay.  It will be received.

19             (Government's Exhibit No. 257 received into

20             evidence.)

21        MR. ESTRADA:  Permission to publish,

22   Your Honor.

23        THE COURT:  Yes.

24   Q.   BY MR. ESTRADA:  Okay.  Now, I'm showing you

25   Exhibit 257.  What is Exhibit 257?

1   A.   This is a certified bank record for Bank of America,

2   a bank statement in the name of Ruzzana Hakobyan and RZ

3   Diginet.

4   Q.   This Ruzzana Hakobyan, was that the name we just

5   heard mentioned in Exhibit 60?

6   A.   Yes.

7   Q.   In addition to Exhibit 60, if you still have it in

8   front of you, page 3 of 3, first speaker from the top,

9   Darbinyan states, "You have all the things from both of

10   them; right?" Musho responds, "Yes, there's also that

11   thing, the one for the business RZ Diginet."

12         Does that have significance as well?

13   A.   Yes.

14   Q.   What?

15   A.   It was the business that was connected to Ruzzana

16   Hakobyan that was listed on this bank statement.

17   Q.   Where I'm indicating here on the exhibit

18   (Indicating)?

19   A.   Yes.

20   Q.   Now, the use of bank accounts in other people's

21   names or other businesses, is that something you're

22   familiar with?

23   A.   Yes.

24   Q.   Explain the significance in the context of fraud.

25   A.   As I stated before, it's a bank account that is

```
 1    controlled by the subjects.
 2              MR. SEVERO:  Objection.  It's been asked and
 3    answered.
 4              THE COURT:  It has.
 5    Q.   BY MR. ESTRADA:  Does this appear to be one of those
 6    accounts, laundering accounts you described earlier?
 7    A.   Yes.
 8    Q.   Now, you mentioned earlier that there was an amount
 9    stated in the call actually before this by Musho, and it
10    was about 28,000-something?
11    A.   28,300, that's what they said.
12    Q.   Looking at the second page of this exhibit as a
13    deposit on 4-14-2009, do you see an amount there?
14    A.   Yes, $28,357.
15    Q.   And it's under credits.  Based on your training and
16    experience, what does that mean that it's under credits?
17    A.   It means that it's a deposit into a bank account.
18    Q.   Now, turning to page 4 of those records, what do you
19    see on page 4 of those records?
20    A.   It's a check written on the account of the victim,
21    Frank Duncan, to RZ Diginet in the amount of $28,357
22    dated April 14th, 2009.
23    Q.   And you mentioned the payee of the check was Frank
24    Duncan?
25              MR. SEVERO:  Misstates the evidence.
```

```
 1            MR. ESTRADA:  Perhaps, I'm using the wrong
 2     word.
 3     Q.   The victim on the account.
 4     A.   The victim on the account was Frank Duncan.
 5     Q.   You mentioned earlier there was some surveillance
 6     photographs from Bank of America that you obtained as
 7     well?
 8     A.   Yes.
 9     Q.   Please take a look at Exhibit 279.
10            And, Your Honor, this is also a certified
11     record the Government will seek to pursuant to 902.11.
12            Would move to admit and publish, Your Honor.
13            THE COURT:  Yes.
14            (Government's Exhibit No. 279 received into
15            evidence.)
16     Q.   BY MR. ESTRADA:  Okay.  I'm showing to you
17     Exhibit 279 on the screen.  What's seen in Exhibit 279?
18     A.   Exhibit 279 is one angle of Manuk Terzyan at the
19     Bank of America negotiating a $28,357 check.
20     Q.   What's the date there for the video?
21     A.   April 14th, 2009.
22     Q.   And on the next page, what do we see there?
23     A.   This is Manuk Terzyan approaching the teller window
24     where he ultimately negotiates the $28,000 check.
25     Q.   Does he appear to be wearing glasses?
```

1   A.   Yes.

2   Q.   And looking at page 3, what is seen in page 3?

3   A.   This is Manuk Terzyan depositing the $28,357 check

4   into the account of Ruzzana Hakobyan, RZ Diginet.

5   Q.   On April 14th?

6   A.   On April 14th.

7         MR. ESTRADA:  Your Honor, with the Court's

8   permission, the Government would ask to play Exhibit 61

9   and ask the jurors to turn to Exhibit 61-A in their

10  binders.

11        THE COURT:  Okay.

12              (Audio recording played in open court.)

13  Q.   BY MR. ESTRADA:  Agent Stebbins, turning to the

14  first page of Exhibit 61, do you have that in front of

15  you?

16  A.   Yes.

17  Q.   What's the date of that call?

18  A.   April 16th, 2009.

19  Q.   What's the time of that call?

20  A.   Approximately, 4:02 P.M.

21  Q.   Who are the speakers?

22  A.   Mike Darbinyan and Karen Markosian.

23  Q.   Who's Karen Markosian?

24  A.   Karen Markosian is another defendant in this case.

25  Q.   In the overall case?

1    A.   Yes.

2    Q.   Now, turning to page 2 of 2, and this call was on

3    April 16th, 2009?

4    A.   Yes.

5    Q.   Turning to page 2 of 2, three speakers from the

6    bottom, Karen Markosian tells Darbinyan, "Additional

7    200, 135, 200."  Darbinyan, "Yeah, yeah."

8         That amount, 135, 200, did it have significance

9    based on your knowledge of the investigation?

10   A.   Yes.

11   Q.   What was the significance?

12   A.   That was the amount of a fraudulent check written

13   against Lauren Rose's bank account, deposited into the

14   bank of Ruzzana Hakobyan.

15        MR. ESTRADA:  Your Honor, the Government asks

16   permission to play Exhibit 62 and ask that the jurors

17   turn to 62-A in their binders.

18        THE COURT:  Okay.

19            (Audio recording played in open court.)

20   Q.   BY MR. ESTRADA:  Now, Agent Stebbins, turning to the

21   first page of Exhibit 62-A, what's the date of this

22   call?

23   A.   April 17th, 2009.

24   Q.   What's the time of the call?

25   A.   Approximately, 3:23 P.M.

603

```
 1    Q.    Who are the speakers in this call?

 2    A.    Mike Darbinyan and Lusine Ogandganyan.

 3    Q.    Who is Lusine Ogandganyan?

 4    A.    Lusine Ogandganyan is another defendant in this

 5    case.

 6    Q.    Now, turning to page -- in the overall case?

 7    A.    Yes.

 8    Q.    Turning to page 2 of 4 of the transcript, three

 9    speakers from the bottom, Darbinyan states, "Four, zero,

10    zero."  Lusine, "Uh-huh."  Darbinyan, "Four, two,

11    seven."  Turning to page 3, Lusine, "Uh-huh."  And

12    Darbinyan, "75114, no, no.  Second 75144."  Lusine,

13    Ogandganyan states, "Okay."  Darbinyan states, "That one

14    is for Citi."

15           Based on your knowledge of the investigation,

16    did that number that was given by Darbinyan have

17    significance in the case?

18    A.    Yes.

19    Q.    What was the significance?

20    A.    That bank account belonged to Ruzzana Hakobyan in

21    Citibank.

22    Q.    Now, please take a look again at Exhibit 257, which

23    I showed you before, and the first few pages I showed

24    you for a Bank of America account in the name of Ruzzana

25    Hakobyan and RZ Diginet.
```

```
 1              I'd like to now show you page 6 of that
 2      exhibit.
 3              With the Court's permission, if I could
 4      publish.
 5              THE COURT:  What was the number, again?
 6              MR. ESTRADA:  It was 257.
 7              THE COURT:  275.  Okay.  Yes you may.
 8      Q.  BY MR. ESTRADA:  Okay.  So do you see page 6 of 257?
 9      A.  Yes.
10      Q.  What's page 6 of 257?
11      A.  It's a bank statement for Ruzzana Hakobyan at
12      Citibank.
13      Q.  Is her name there at the top?
14      A.  Yes.
15      Q.  And there's an account number there; do you see
16      that?
17      A.  Yes.
18      Q.  Does that account number correspond to anything in
19      the wire calls?
20      A.  Yes, it's the same number given in the last call.
21      Q.  Now, turning to page 7, the next page, it's a bank
22      statement.  It says "Checking Activity"; do you see
23      that?
24      A.  Yes.
25      Q.  It refers to a deposit on April 16th, 2009; do you
```

1    see that?

2    A.    Yes.

3    Q.    And the amount of the deposit; do you see that?

4    A.    Yes, $135,200.

5    Q.    Did that amount correspond to a number given in the

6    wire calls?

7    A.    Yes.

8    Q.    How so?

9    A.    The same number was given by Karen Markosian to

10   Darbinyan to say the deposit was $135,200.

11   Q.    Now, turning to page 12 of that exhibit still in the

12   Citibank records, what do you see on page 12?

13   A.    It is a fraudulent check written against Lauren Rose

14   to Ruzzana Hakobyan in the amount $135,200.

15   Q.    And Lauren Rose's name would be here on the top at

16   the left --

17   A.    Yes.

18   Q.    -- in the amount of 135,200; is that where I'm

19   indicating there (Indicating)?

20   A.    Yes, it is.

21   Q.    Have you spoken to Lauren Rose?

22   A.    Yes, I have.

23   Q.    And, now, based on these records that you found for

24   Ruzzana Hakobyan and checks written on Lauren Rose's

25   account and the Duncan's account, did you do any further

1    investigation on those accounts?

2    A.   Yes.

3    Q.   Did you obtain bank records for those accounts?

4    A.   Yes.

5    Q.   Please take a look at Exhibit 254.

6         Your Honor, this is a certified bank record

7    with a 902.11 Declaration at the end.  The Government

8    asks to admit this and requests permission to publish.

9         THE COURT:  254?

10        MR. ESTRADA:  Correct.

11        THE COURT:  It will be received.

12             (Government's Exhibit No. 254 received into

13             evidence.)

14   Q.   BY MR. ESTRADA:  Now, I'm just going to show this to

15   you briefly.  Are these bank records in the name of

16   Frank and Marjorie Duncan?

17   A.   Yes.

18   Q.   Page 4 of that exhibit, what do you see?

19   A.   It's the fraudulent check written and deposited into

20   RZ Diginet on April 14, 2009, in the amount of $28,357.

21   Q.   Does this appear to be the same check that we saw in

22   the Ruzzana Hakobyan, RZ Diginet, Bank of America

23   records?

24   A.   Yes, it is.

25        MR. ESTRADA:  Now, Your Honor, with regard to

```
 1    255, that is also a certified record, which the
 2    Government would move to admit and request permission to
 3    publish.
 4              THE COURT:  Okay.  It's received.
 5                    (Government's Exhibit No. 255 received into
 6                    evidence.)
 7    Q.   BY MR. ESTRADA:  What's Exhibit 255?
 8    A.   They're the bank records of Lauren Rose.
 9    Q.   That person you see is in Seattle, Washington?
10    A.   Yes.
11    Q.   Turning to page 7 of that exhibit, what do you see
12    at page 7?
13    A.   That is the fraudulent check written and deposited
14    into the account of Ruzzana Hakobyan in the amount of
15    135,200.  On April 15, 2009, is when the check was
16    written.
17    Q.   And does that appear to be the same check that we
18    saw in the Citibank records for Ruzzana Hakobyan?
19    A.   Yes.
20              MR. ESTRADA:  Your Honor, with the Court's
21    permission, the Government would ask to play Exhibit 63
22    and ask that the jurors turn to Exhibit 63-A in their
23    books.
24              THE COURT:  Okay.
25                    (Audio recording played in open court.)
```

608

```
 1    Q.   BY MR. ESTRADA:  Agent Stebbins, looking at the
 2    first page of this transcript, what is the date of this
 3    call?
 4    A.   April 21st, 2009.
 5    Q.   What's the time of the call?
 6    A.   Approximately, 1:52 P.M.
 7    Q.   Who are the participants?
 8    A.   Mike Darbinyan and Lusine Ogandganyan.
 9    Q.   Now, in this call, on page 2 and into page 3,
10    there's a reference to Ruzzana Hakobyan.
11              Did you try to tack down Ruzzana Hakobyan?
12    A.   Yes, we did.
13    Q.   Did you have any success?
14    A.   No, we did not.
15    Q.   What happened?
16    A.   We believe that she left and went back to Armenia.
17              MR. SEVERO:  I'm going to move that that is
18    speculation.
19              THE COURT:  Sustained.  It will be stricken.
20    Q.   BY MR. ESTRADA:  Were you able to track her down?
21    A.   No.
22              MR. ESTRADA:  And, now, Your Honor, I'm going
23    to move on to a different series of calls, and these
24    will pertain to fraud allegations with regard to both
25    Defendant Darbinyan and Defendant Sharopetrosian.
```

1    Defendant Sharopetrosian is charged in the racketeering

2    conspiracy, Count 1, which would include fraud

3    allegations.

4         THE COURT:  Okay.  And just for the jury's

5    sake, this is as to the first two defendants, not

6    Mr. Parsadanyan.

7         MR. ESTRADA:  Yes.

8         THE COURT:  Okay.

9    Q.   BY MR. ESTRADA:  Now, Agent Stebbins, before I start

10   playing some of these calls, with regard to

11   Defendant Sharopetrosian, were you familiar with that

12   defendant?

13   A.   Yes, I was.

14   Q.   At the time any of your investigation in 2009, were

15   you aware of where he was?

16   A.   Yes.

17   Q.   Where was he?

18   A.   He was incarcerated at Avalon state prison in

19   California.

20   Q.   During the investigation, did you actually obtain

21   wiretap interception for phones being used by him?

22   A.   Yes, I did.

23   Q.   And through that wiretap interception, which we've

24   gone over before, are you able to obtain GPS

25   information?

1    A.    Yes.

2    Q.    Can you explain what that is?

3    A.    Basically when a call is made, the commuter system

4    that's capturing the call actually gives a location for

5    the call.  In this case, it gives you a geographical

6    area where the phone that's making the call is actually

7    located.

8    Q.    And in this case with Sharopetrosian, where did it

9    indicate he was located?

10   A.    The area of Avalon state prison.

11   Q.    And just generally speaking, where is Avalon state

12   prison?

13   A.    It's near Fresno.

14   Q.    Now, based on your training and experience, do you

15   know whether it's allowed to have cell phones in prison?

16   A.    No, it's illegal to have cell phones in prison.

17             MR. SEVERO:  Objection.  There's no foundation

18   for this.  I understand that it's sort of common

19   knowledge.

20             THE COURT:  It is common knowledge, but if you

21   want to lay the foundation, go ahead.

22   Q.    BY MR. ESTRADA:  Have you spoken to prison

23   officials?

24   A.    Yes, I have.

25   Q.    Have you actually been to different prisons and

```
 1    jails?

 2    A.   Yes.

 3    Q.   Are you familiar with some of the basic rules and

 4    regulations in prisons?

 5    A.   Yes.

 6    Q.   Are you allowed to have cell phones in prison?

 7              MR. SEVERO:  Same, hearsay.

 8              THE COURT:  Overruled.

 9    Q.   BY MR. ESTRADA:  Are you familiar with the practice

10    of smuggling cell phones into prisons?

11    A.   Yes.

12    Q.   Did you ever attempt to determine how Sharopetrosian

13    was able to obtain cell phones in prisons?

14    A.   Yes.

15    Q.   Did you ever find out how?

16    A.   No.

17    Q.   In prison, is it common to smuggle items --

18    A.   Yes.

19    Q.   -- among the inmates?

20    A.   Yes.

21              MR. ESTRADA:  Okay.  Now, Your Honor, if I

22    could play Exhibit 65 and ask the jurors to turn to

23    sixty -- excuse me.  I misspoke again.  Exhibit 66.  Can

24    we go to Exhibit 66 and have the jurors turn to

25    Exhibit 66-A in their binders.
```

```
 1              THE COURT:  66-A?

 2              MR. ESTRADA:  Yes, Your Honor.

 3              THE COURT:  Okay.

 4                  (Audio recording played in open court.)

 5    Q.   BY MR. ESTRADA:  Okay.  Agent Stebbins, turning to

 6    page 1 of the transcript, what's the date of this call?

 7    A.   April 20th, 2009.

 8    Q.   What's the time of the call?

 9    A.   Approximately, 10:47 A.M.

10    Q.   Who are the speakers in this call?

11    A.   Mike Darbinyan and Arman Sharopetrosian.

12    Q.   Now, I stopped the recording at page 5 of 7.  Does

13    the remainder of the call deal with some gossip of

14    various sorts?

15    A.   Yes.

16    Q.   Does it deal with the discussion of banks and

17    anything of that sort?

18    A.   No.

19    Q.   So turning to page 3 of 7 of the transcript, two

20    speakers from the top, Sharopetrosian states, "Dear, I

21    need one -- one America that would have some three or

22    $400 in it.  Can you get it from someone?"

23              Based on your training and experience, what

24    does the term American refer to in this context?

25    A.   Bank of America.
```

1    Q.   And there's a reference to three or $400.

2         Based on your training and experience, what

3    does three or $400 refer to in this context?

4    A.   Three or $400,000.

5         MR. SEVERO:  Objection.  Speculation of this

6    witness.  Just no foundation for it.

7         THE COURT:  Well, why don't you -- you may be

8    correct.  Why don't you lay the foundation for it,

9    Counsel, as to why he feels that's three or $400,000.

10   Q.   BY MR. ESTRADA:  Agent Stebbins, why do you feel

11   it's three our 400,000?

12   A.   As I testified earlier, they often use shorthand, 90

13   is 90,000, a hundred is a hundred thousand, three or 400

14   would be three or $400,000.  They didn't go after

15   accounts that had three or $400 in it.

16        MR. SEVERO:  First of all, witness is arguing

17   to the jury at this point; and, secondly, there's still

18   no foundation for any of this.  He said often, and that

19   is -- there's no foundation.

20        THE COURT:  Okay.  I'm going to clear it up

21   before I -- before I overrule the objection.

22        When you say three or 400, in the area that

23   you're an expert in, sometimes that can be used to mean

24   three or 400,000?

25        THE WITNESS:  Yes.

614

```
 1            THE COURT:  In some cases, I'm assuming it
 2    could mean three or 400.
 3            THE WITNESS:  It could depending on the case.
 4            THE COURT:  So it could either be either way on
 5    that?
 6            THE WITNESS:  During this call or in general?
 7            THE COURT:  In general.
 8            THE WITNESS:  In general, it could be either
 9    way.
10            THE COURT:  Okay.  Next question, Counsel.
11    Q.   BY MR. ESTRADA:  In this case, in investigating bank
12    fraud, did you find that any of the defendants ever
13    targeted bank accounts with 300 or $400 in them?
14    A.   No.
15    Q.   They looked for large-volume bank accounts?
16    A.   Yes, they did.
17    Q.   Why is that?
18    A.   The more money the bank account had, the more they
19    could get from it.
20    Q.   Okay.  So nine speakers from the bottom, Darbinyan
21    states, "There is that -- the horses, good stuff."  This
22    is page 3 of 7.  Sharopetrosian responds, "What's their
23    available?  And you said was incomplete.  I have someone
24    in the inside.  In your opinion how much is there in
25    that one?"  Darbinyan responds, "Well, about 100 or
```

615

```
 1    hundred-fifty, something like that."
 2            Based on your training and experience, what
 3    does the term horses refer to in the fraud context?
 4    A.   Horses is a common code for Wells Fargo because the
 5    emblem for Wells Fargo is the horse-drawn carriage or
 6    the stage coach.
 7    Q.   And when Darbinyan referred to 100 or hundred-fifty,
 8    based on your training and experience, what did you
 9    believe that referred to?
10            MR. SEVERO:  Same objection.
11            THE COURT:  Same ruling, overruled.
12            THE WITNESS:  100 or $150,000.
13    Q.   BY MR. ESTRADA:  Before I move on from page 3, and
14    what I just read, Sharopetrosian stated, "I have someone
15    on the inside."
16            Based on your training and experience, what
17    does having someone on the inside refer to.
18    A.   He has a bank employee inside one of the banks that
19    can get the information if needed.
20            MR. SEVERO:  Objection.  Hearsay.
21            THE COURT:  Overruled.
22    Q.   BY MR. ESTRADA:  Based on your training and
23    experience, is that a common way of getting bank
24    information from bank customers?
25    A.   Yes.
```

1   Q.   And actually a common way used in this

2   investigation?

3   A.   Yes.

4   Q.   By the targets?

5   A.   Yes.

6           MR. ESTRADA:  Your Honor, the Government asks

7   permission to play Exhibit 67 and ask the jurors to turn

8   to Exhibit 67-A in their binders.

9           THE COURT:  Okay.

10          (Audio recording played in open court.)

11  Q.   BY MR. ESTRADA:  Agent Stebbins, turning to the

12  first page of Exhibit 67-A, do you have that in front of

13  you?

14  A.   Yes.

15  Q.   What's the date of the call?

16  A.   August 20th, 2009.

17  Q.   What's the time of the call?

18  A.   Approximately, 4:20 P.M.

19  Q.   Who are the participants?

20  A.   Mike Darbinyan and Arman Sharopetrosian.

21  Q.   Now, six speakers from the top, Sharopetrosian

22  starts, "Dear, there's this pogo stick.  Do you know

23  him, pogo stick, Artok, the one who supposedly wanted to

24  be a thief or something."

25          Based on your training and experience

```
 1    investigating organized crime cases, are you familiar
 2    with the term thief?
 3    A.   Yes.
 4    Q.   What does that refer to?
 5    A.   It's a short term word for "thief-in-law," which is
 6    basically, as we talked about earlier, a God father.
 7    Q.   Now, turning to page 3 of the transcript, six
 8    speakers from the top, Darbinyan states, "No, there's
 9    stuff with horses.  Would you like me to give it to
10    you?"  Sharopetrosian, "I can't hear you."  Darbinyan,
11    "I said there's stuff with horses.  Would you like me to
12    give it to you?"  Sharopetrosian, "How much is in it?"
13    Darbinyan, "Probably about 200."
14         Based on your training and experience, what do
15    you believe 200 refers to?
16    A.   $200,000.
17              MR. SEVERO:  Your Honor, same objection.
18              THE COURT:  Yeah, I'll -- I'll make it a
19    continuing objection, Counsel.
20              MR. SEVERO:  Thank you.
21    Q.   BY MR. ESTRADA:  Five speakers from the bottom,
22    Sharopetrosian states, "Referring to the horses."
23         And, again, what does the horses refer to?
24    A.   Wells Fargo.
25    Q.   "Referring to the horses, they call back to see if
```

```
1    the owner has picked it up or send a letter via Express

2    mail right after it.  I can't put someone at the door

3    and collect and take away the entire mail."

4         Based on your training and experience, are you

5    familiar with the practice of ordering checks as it

6    refers to bank fraud?

7    A.   Yes.

8    Q.   Explain how that works.

9    A.   The subjects in this case would order checks on the

10   victim's account.

11        MR. SEVERO:  Objection, Your Honor.  That's

12   nonresponsive.

13        THE COURT:  Sustained.  He's saying -- well,

14   why don't you ask it again.  He's saying, in the

15   ordinary field that you're an expert in, that being bank

16   fraud, et cetera, how does that work, not in this

17   particular case?

18        THE WITNESS:  Yes, Your Honor.  The subjects

19   would order checks from, let's say, Wells Fargo in this

20   case.  The checks would actually be sent to the home of

21   the victim, and they would be waiting outside and pick

22   the checks up off the doorstep of the victim or they

23   would have the checks made to a P.O. Box that they

24   controlled.  Either way, they would get ahold of the

25   checks and be able to write checks against the victim's
```

1    accounts.

2    Q.    And how does it affect that technique of obtaining

3    checks from a victim's account if the bank calls back to

4    see if the owner has picked it up?

5    A.    It basically puts a hold on the account if the

6    actual account holder is notified that a check order was

7    made.

8    Q.    Now, at the bottom of page 3 of 6, Sharopetrosian

9    states, "it's horses.  I asked for Washington, Citi, and

10   most of all Citi.  I said Citi and America" -- going on

11   to page 4 -- "I asked about those two."

12           Are those various code words for banks?

13           MR. SEVERO:  Objection.  Asked and answered.

14           THE COURT:  He's testified to what Citi and

15   what America means and Washington.

16   Q.    BY MR. ESTRADA:  With the Court's permission, I

17   would ask to play Exhibit 68 and ask the jurors to turn

18   to page 68-A in their binders.

19           (Audio recording played in open court.)

20   Q.    BY MR. ESTRADA:  Turning to page 1 of the transcript

21   of Exhibit 68, do you have that in front of you?

22   A.    Yes.

23   Q.    What's the date of that call?

24   A.    September 1st, 2009.

25   Q.    What's the time of the call?

1    A.    Approximately, 6:32 P.M.

2    Q.    Who are the participants?

3    A.    Arman Sharopetrosian and Emil Airapetian.

4    Q.    Who is Emil Airapetian?

5    A.    Emil Airapetian goes by the moniker Clever from

6    Armenian Power, and he's a defendant in the overall

7    case.

8    Q.    Based on your knowledge of the investigation, is he

9    a known Armenian Power member?

10   A.    Yes, he is.

11          MR. ESTRADA:   Briefly, if I could show

12   Exhibit 221, Your Honor, which has been admitted.

13          THE COURT:   221?

14          MR. ESTRADA:   Yes.

15          THE COURT:   Yes.

16   Q.    BY MR. ESTRADA:   What do you see in 221?

17   A.    It's a driver's license photograph of Emil,

18   Airapetian, aka, Clever from Armenian Power.

19   Q.    And he's one of the speakers on this call?

20   A.    Yes, he is.

21   Q.    Now, turning to page 2 of the transcript, three

22   speakers from the bottom, Sharopetrosian states, "Tell

23   him to bring something in the amount of 700 to $800.

24   Are you listening?"  Emil Airapetian, "Yeah."

25   Sharopetrosian, "It should be a man and have one phone

1    number.  Are you listening?"

2           Based on your training and experience, what did

3    you believe the amount of 700 to $800 referred to?

4    A.   700- to 800,000 dollars.

5           MR. PEREYRA-SUAREZ:  Again.  Your Honor, I

6    would join in the continuing objection.

7           THE COURT:  Yes, the Court will consider that

8    you joined in.

9           MR. PEREYRA-SUAREZ:  Thank you.

10   Q.   BY MR. ESTRADA:  And now at the bottom of the

11   transcript where Sharopetrosian refers to, "It should be

12   a man and one phone number," based on your training and

13   experience, in committing bank fraud, is it common to

14   attempt to control a victim's telephone number?

15   A.   Yes.

16   Q.   How does is that work?

17   A.    If they're able to create an on-line ID for them or

18   to call into a call center and change the phone number

19   on the account, when the account is being defrauded,

20   they won't be able to actually contact the victim.

21   They'll be contacting a prepaid cell phone that the

22   subjects themselves control and they authorize the

23   checks that are written against the account.

24   Q.   Why does it matter if the victim's a male or female?

25   A.   Well, it matters in this case for Arman

1    Sharopetrosian because he could imitate a male voice.

2    It would probably be more difficult for him to imitate a

3    female voice.

4          MR. SEVERO:  There's no foundation for

5    anything.

6          THE COURT:  Sustained.

7          MR. ESTRADA:  Okay.

8          MR. SEVERO:  Move to strike the answer.

9          MR. ESTRADA:  I -- I can certainly establish

10   the foundation, Your Honor.

11         THE COURT:  Okay.

12   Q.   BY MR. ESTRADA:  In this case, have you investigated

13   bank fraud?

14   A.   Yes.

15   Q.   Have you investigated many instances of bank fraud?

16   A.   Yes.

17   Q.   Have you investigated bank fraud committed by Arman

18   Sharopetrosian and others?

19   A.   Yes.

20   Q.   And their practice of hijacking bank accounts?

21   A.   Yes.

22   Q.   Have you listened to calls involving Arman

23   Sharopetrosian and others actually calling into banks?

24   A.   Yes.

25   Q.   Impersonating bank customers?

1    A.    Yes.

2    Q.    And based on your familiarity with the investigation

3    overall, are you familiar with the practice of using

4    male or female voices?

5    A.    Yes.

6    Q.    How does it work?

7    A.    They call into a call center and basically imitate

8    the account holder and claim to be that person and

9    answer various security questions that allow them to

10   claim to be that person.

11         MR. PEREYRA-SUAREZ:  Objection, Your Honor.

12   With respect to general practice, it's irrelevant as to

13   my client.

14         THE COURT:  Overruled.  He's talking about the

15   general practice, not necessarily this.

16   Q.    BY MR. ESTRADA:  Turning to page 3 of 4, two

17   speakers from the top, Sharopetrosian states, "He should

18   have more than one account, about two, and he should be

19   very old.  His age should be under the year 30, 35.  All

20   right."  Emil Airapetian, "Okay.  The year 35."

21   Sharopetrosian, "Under that."  Emil Airapetian, "About

22   700."  Arman Sharopetrosian, "There should be 700- to

23   800,000 money in it."

24         Now, based on your knowledge of the

25   investigation, what did you believe the year 30 to 35

```
 1    meant?

 2    A.   They're referring to the victim's being born prior

 3    to 1935.

 4    Q.   Now, based on your knowledge of this investigation,

 5    was it common to target elderly victims?

 6    A.   Yes, very common.

 7    Q.   And in calls, some of the targets actually discuss

 8    why they wanted elderly victims?

 9    A.   Yes.

10    Q.   And what was discussed?

11    A.   They discussed that they wanted elderly victims

12    because they don't use the Internet and they don't check

13    their banks accounts.  They basically receive their

14    statements every 30 days.

15              MR. SEVERO:  Your Honor, this is hearsay.

16    There's no --

17              MR. ESTRADA:  Your Honor, these are

18    co-conspirators.

19              MR. SEVERO:  May I finish?

20              THE COURT:  One at a time.  Go ahead.  You're

21    up first.

22              MR. SEVERO:  Sorry.  Okay.  It's all based on

23    hearsay.  There's no foundation for any of this

24    testimony, and it's improper expert testimony anyway

25    because he's not -- he's parroting what he may have
```

1    heard.

2            THE COURT:  Overruled.

3            You heard this from a co-conspirator?

4            THE WITNESS:  Yes.

5            THE COURT:  Okay.  Overruled.

6            MR. SEVERO:  If I may, on that basis, where

7    there's no furtherance of the conspiracy shown in the

8    statement.

9            THE COURT:  Well, overruled.  Subject to a

10   motion to strike.

11   Q.   BY MR. ESTRADA:  Okay.  So just to clarify because

12   we had some objections there, with regard to this

13   practice, did you find that the targets in this case

14   targeted people at an older age?

15           MR. SEVERO:  Well, this is asked and answered.

16           THE COURT:  Sustained.  It's been asked and

17   answered.

18           MR. ESTRADA:  I don't know if he gave an

19   answer, Your Honor.

20           THE COURT:  He did answer it.

21   Q.   BY MR. ESTRADA:  And did you find that many of the

22   targets in this case were elderly victims?

23           MR. SEVERO:  Asked and answered.

24           THE COURT:  Sustained.  He answered yes.

25   Q.   BY MR. ESTRADA:  Okay.  Turning to the bottom of the

626

```
 1    transcript, four speakers from the bottom,

 2    Sharopetrosian states, "If he can get us loan equity

 3    lines.  Also it would be better if he brings that too."

 4          Based on your training and experience, how are

 5    loan equity lines used in the practice of bank fraud and

 6    identity theft?

 7    A.  If they have equity lines of credit, they're able to

 8    transfer money from that bank account into checking

 9    accounts that the subjects ultimately control.

10    Q.  And thereby get money from the loan equity line?

11    A.  Yes, and generally equity lines are much larger than

12    a normal bank account.  They can bring the money over

13    from the equity line.

14          MR. SEVERO:  There's no foundation to that, and

15    it is all nonresponsive, anyway.

16          THE COURT:  Overruled.

17          MR. ESTRADA:  Just a moment, Your Honor.

18              (Mr. Estrada and Ms. Yang confer.)

19          MR. ESTRADA:  No further questions, Your Honor.

20          THE COURT:  Okay.  Counsel.

21          MR. SEVERO:  Thank you.

22          And, Your Honor, this is Stage 2 of his

23    testimony.  So --

24          THE COURT:  Yes, the record will note that.

25    ///
```

627

## CROSS-EXAMINATION

BY MR. SEVERO:

Q.   Good afternoon, Agent Stebbins.

A.   Good afternoon, sir.

        THE COURT:  Just let me help you and the jury,
since hopefully they won't be looking at the clock, this
is -- this is our second day, I guess.  But, anyway, we
break at 2:30.  So we'll be taking a short break at 2:30
and coming back and going to 4:00 four.

        Go ahead, Counsel.

        MR. SEVERO:  Thank you.

Q.   You personally were involved in this investigation
from '08 to date; correct?

A.   Yes, sir.

Q.   And during that time, did you learn Armenian?

A.   I did learn many words in Armenian, yes.

Q.   Did you learn the language eastern Armenian?

A.   Am I certified?

Q.   No, did you learn to speak Armenian?

A.   I learned several phrases, yes, sir.

Q.   You learned and words here or there; correct?

A.   Yes, sir.

Q.   Did you study Armenian geography?

A.   I became familiar with several cities in Armenia.

Q.   Did you review any maps?

628

1    A.    Yes.

2    Q.    And you still believe that Spitak is a village?

3    A.    Yes.

4    Q.    You didn't learn that it's the fourth largest city

5    in Armenia?

6    A.    They consider him a villager.  They call it a

7    village.

8           MR. SEVERO:  Move to strike they consider him a

9    villager.

10          THE COURT:  That will be stricken They call it

11   a village shall remain in.

12   Q.    BY MR. SEVERO:  How many orders for handwriting

13   exemplars did you get in this case?

14   A.    I don't recall getting any.

15   Q.    You didn't take handwriting exemplars from any of

16   the defendants?

17   A.    I don't believe so.

18   Q.    You didn't take any handwriting exemplars from any

19   of the victims?

20   A.    I don't believe so.

21   Q.    You didn't take handwriting exemplars from anybody?

22   A.    No, sir.

23   Q.    And how many orders for text messages did you get?

24   A.    I believe we intercepted text messages for one

25   month, perhaps, two.

1    Q.   You're not sure?

2    A.   No.

3    Q.   Which phone?

4    A.   I believe it was Target Telephone 2.

5    Q.   Who's phone is that?

6    A.   Mike Darbinyan.

7    Q.   For the period of March 16th, 2009, through March

8    18th, how many calls did you intercept on what you

9    believed to be Mr. Darbinyan's phone?

10   A.   I don't know.  Several.

11   Q.   More than a hundred?

12   A.   Probably.

13   Q.   The ones you played here in court had been picked

14   and chosen from those calls; true?

15   A.   That's correct.

16   Q.   Oops.  Sorry.  Now, when did you first become in

17   contact in this investigation with Armando Moreno?

18   A.   I believe it was March 10th, 2009.

19   Q.   And obviously you remember the date clearly.  Is

20   that -- did you pick him up on a wire call?

21   A.   I don't believe we intercepted him on a wire that

22   day, but we traffic stopped a car that he was in.

23   Q.   Were you part of that traffic stop?

24   A.   No.

25   Q.   You weren't there?

1    A.    I was there, but it was done by police officers.

2    Q.    But you were present at the scene of the traffic

3    stop?

4    A.    No, I was on the surveillance, then he was traffic

5    stopped, and then I spoke with the officers afterwards.

6    Q.    All right.  Before March 10th of 2009, how well did

7    you know Armando -- or strike that.

8           Before March 10th of 2009, did you know about

9    Armando Moreno.

10   A.    No, I don't believe so.

11   Q.    But you've come to know Mr. Moreno, have you not?

12   A.    Yes, sir.

13   Q.    And you know him to be a very dangerous murderer;

14   isn't that true?

15   A.    Yes, it is.

16   Q.    How many murders has he committed to the best of

17   your knowledge?

18   A.    I don't recall.

19   Q.    More than one, certainly?

20   A.    I'm not sure.

21   Q.    He's also a drug dealer, isn't he?

22   A.    I don't know.

23   Q.    He's a drug user; true?

24   A.    I believe the call refers to them smoking marijuana.

25   Q.    No, that's -- okay.  So he uses drugs?  The answer

1    is yes; true?

2    A.   He used drugs that day, yes.

3    Q.   Mr. Moreno is also involved in a different

4    Indictment, is he not?

5           MR. ESTRADA:  Objection, Your Honor.

6    Relevance.

7           THE COURT:  Overruled.

8           Is he -- is he part of this case?

9           MR. SEVERO:  Yes.

10          THE WITNESS:  Yes.

11          MR. ESTRADA:  And he'll be testifying in this

12   case, Your Honor.

13          THE COURT:  Okay.  Mr. Moreno will be

14   testifying?

15          MR. ESTRADA:  Yes.

16          THE COURT:  Okay.

17          MR. ESTRADA:  So the objection is relevance

18   because his credibility isn't at issue yet.

19          MR. SEVERO:  Well --

20          THE COURT:  At this time, I'm going to overrule

21   it.  Next -- next case -- or next question.

22   Q.   BY MR. SEVERO:  When was the first time you directly

23   spoke with Mr. Moreno person to person?

24   A.   I don't recall the first date.  It was following his

25   arrest.

1    Q.   You were aware that he is the subject of another

2    Indictment other than the one here; correct?

3    A.   Yes, I'm aware.

4    Q.   And you're also aware that, based on the various

5    factors including his conduct, that he's looking at a

6    life sentence, is he not?

7           MR. ESTRADA:  Objection.  Relevance.  He will

8    be testifying.

9           THE COURT:  Sustained.

10   Q.   BY MR. SEVERO:  Now, Mr. Moreno decided to cooperate

11   with you; is that true?

12   A.   Yes.

13   Q.   So when you were talking to him -- when did you

14   first talk to him about the phone calls that were played

15   here today where he is a participant?

16          MR. ESTRADA:  Objection, Your Honor.

17   Relevance.  Calls for hearsay.

18          THE COURT:  Overruled.  But I'll also indicate

19   to counsel that, after Mr. Moreno testifies, you're free

20   to recall this officer as far as impeachment goes.

21          MR. SEVERO:  I'm aware of that, Judge.

22          THE COURT:  Okay.  I understand.

23          MR. ESTRADA:  And just for the record, he will

24   be testifying, this witness, after Armando Moreno in any

25   case.

633

1          MR. SEVERO:  Thank you.

2          THE WITNESS:  Your question again, sir.

3     Q.   BY MR. SEVERO:  If I can remember it, I'll ask it.

4     Hold on.

5          When was the first you spoke to Mr. Moreno

6     about the phone calls that were played here today?

7     A.   I don't recall.

8     Q.   Was it this year?

9     A.   No, it was the same date that you spoke about I

10    first meet Armando Moreno.

11    Q.   That would have been?

12    A.   I don't recall that time either.

13    Q.   What year?

14    A.   Probably, 2011 or 2012.

15    Q.   So at least two or three years after the calls;

16    correct?

17    A.   Yes.

18    Q.   Mr. Moreno was known for carrying guns at all times

19    to the best of your knowledge in your investigation?

20    A.   I don't think really know.

21         MR. SEVERO:  Just one moment.  May I have a

22    moment, Your Honor?

23         THE COURT:  Yes.

24            (Brief interruption.)

25    Q.   BY MR. SEVERO:  Are you aware of any checks in this

```
 1    case that were written for $90,000?

 2    A.   That exact amount?

 3    Q.   Yes.

 4    A.   No, sir.

 5    Q.   Were you aware of any checks -- let me have you look

 6    at Exhibit 14-A in the books.

 7              And, Your Honor, if the jury wants to --

 8              THE COURT:  14-A?

 9              MR. SEVERO:  14-A.

10              THE COURT:  Page?

11              MR. SEVERO:  It would be the third page.

12              THE COURT:  Page 3?

13              MR. SEVERO:  Yes.

14    Q.   The fourth speaker from the top, "Since there is one

15    available for 90" -- strike that.  Third speaker from

16    the top, "How much can you prepare one for?"  And the

17    next speaker says, "There's one available for 90."

18              Do you see that?

19    A.   Yes.

20    Q.   Now, the -- one of the speakers in this is you claim

21    to be Arman Tangabekyan; is that correct?

22    A.   Tangabekyan; yes, sir.

23    Q.   Tangabekyan.  Thank you for the correction.  And you

24    don't know -- you didn't take any handwriting exemplars

25    from Mr. Tangabekyan, did you?
```

1   A.   I don't believe so, no.

2   Q.   And you haven't seen a check written by anyone for

3   90 or 90,000?

4   A.   No.

5   Q.   Directing you attention to 16-A, the transcript, and

6   the third page on that -- second page -- sorry --

7   on -- on that call, do you have it in front of you, sir?

8   A.   Yes, sir.

9   Q.   From the bottom up, the fifth speaker says, "It's

10  going to be -- he's going to be 20 -- 26,300."

11          Do you see that?

12  A.   Yes, sir.

13  Q.   You haven't -- you saw a check for 26,400; correct?

14  A.   That's correct.

15  Q.   Now, that check for 26,400 was written on whose

16  account?

17  A.   It was Victim Grace Ferguson.

18  Q.   And deposited into whose account?

19  A.   Karen Samawi.

20  Q.   All right.  Do you have any records to show that any

21  of the moneys of the $26,400 went to Mr. Darbinyan?

22  A.   Bank records?

23  Q.   Yes.

24  A.   No, sir.

25  Q.   Did you subpoena Mr. Darbinyan's bank records?

```
 1    A.   Yes, we did.

 2    Q.   Any of the money that was written by Karen Samawi or

 3    in her account went out by way or cashier's checks?

 4    A.   Cashier's check and cash withdrawals.

 5    Q.   Did you find Mr. Darbinyan in possession of any of

 6    those cashier's checks?

 7    A.   No.

 8    Q.   Did you find him in possession of any large amounts

 9    of cash?

10    A.   At what point?

11    Q.   At any point.

12    A.   Yes.

13    Q.   Himself?

14    A.   Yes.

15    Q.   How much?

16    A.   In 2004, he was arrested with $20,000.

17    Q.   Excuse me.  $2,400?

18    A.   No, in 2004, he was arrested with over $20,000.

19    Q.   I'm going to move to strike that because --

20             THE COURT:  It's stricken.

21    Q.   BY MR. SEVERO:  Your investigation?

22    A.   Oh.

23    Q.   Did you find -- and I'd appreciate that you would

24    keep your answers to this investigation unless I ask

25    you.
```

```
 1            MR. ESTRADA:  Your Honor, he has to specify
 2    because the Indictment actually charges the 2004, 2005
 3    conducts.  So it is technically part of the overall
 4    investigation.
 5            THE COURT:  Yeah, but he asked about that.
 6    he -- he -- and you may get into it maybe, Counsel, but
 7    right now, he's just asking and asked this witness to
 8    limit his answers to just this investigation; is that
 9    correct, Counsel?
10            MR. SEVERO:  Yes, yes Your Honor.
11            THE COURT:  And you're saying this is part of
12    this investigation?
13            MR. ESTRADA:  It would include the
14    investigation.
15    Q.  BY MR. SEVERO:  Okay.  You were not part of the 2004
16    investigation, were you?
17    A.  No, I was not.
18    Q.  So the only investigation are you -- you were
19    personally involved in was 2008 to 2011 when he was
20    indicted; correct?
21    A.  2013.
22    Q.  Okay.  All the way through today even?
23    A.  Yes.
24    Q.  Okay.  2008 to this date?
25    A.  Yes, sir.
```

```
 1   Q.   Between 2008 and 2013, have you -- did you, in your

 2   investigation, determine that Mr. Darbinyan had been

 3   found with any large amounts of cash?

 4   A.   Could you define large?

 5   Q.   Sure.  Anything over $10,000?

 6   A.   No, sir.

 7   Q.   Did you determine that he was found in possession of

 8   some cash?

 9   A.   Yes.

10   Q.   Under 2,000?

11   A.   I don't recall.  Approximately, over a thousand,

12   maybe.

13   Q.   The -- when did you first learn anything about

14   counter-surveillance driving?

15   A.   Probably, 2008.

16   Q.   Is that because someone told you about what goes on

17   on the streets?

18   A.   Yes, in speaking to officers that were on the task

19   force.

20   Q.   That's how you learned what it was; correct?

21   A.   Yes.

22   Q.   And have you observed counter-surveillance driving

23   in your own surveillances?

24   A.   Yes.

25   Q.   Have you observed Mr. Darbinyan doing
```

1    counter-surveillance driving?

2    A.  Yes.

3    Q.  When there's counter-surveillance driving, isn't it

4    true that the driver's trying to avoid detention because

5    he's carrying something in his car he doesn't want to be

6    stopped with?

7    A.  Not necessarily.

8    Q.  So if he wants to go home and go the long route,

9    you'll call that counter-surveillance driving?

10   A.  No.

11          THE COURT:  Let me just help out if I can

12   because it's a compound question.  The first part was

13   did you find that counter-surveillance driving because

14   the driver did not want to be noticed?

15          THE WITNESS:  To be noticed, yes.

16          THE COURT:  The second part was whether or not

17   he had something in his car.  That -- it was a compound

18   question.

19          MR. SEVERO:  Okay.  Thank you.

20   Q.  You don't want to be noticed, but part of what a

21   counter-surveillance driver does is speed up and slow

22   down; correct?

23   A.  Yes.

24   Q.  Make quick turns; true?

25   A.  Yes.

1    Q.   Make quick U-turns?

2    A.   Yes.

3    Q.   So it's hard not to notice someone doing that; isn't

4    that true?

5    A.   Well, it's kind of difficult using the word notice.

6    Basically, they don't want to be followed by law

7    enforcement.

8              THE COURT:   Ladies and gentlemen, we're going

9    to break at this time being it's 2:30.   Remember the

10   admonishment not to discuss the case among yourselves or

11   with anybody else or form or express any opinion about

12   the matter until it's submitted to you and you return to

13   the jury.

14             We'll see you back in fifteen minutes.

15             THE CLERK:   All rise.

16                  (Jury out.)

17                  (Recess taken.)

18             THE CLERK:   All rise.

19                  (Jury present.)

20             THE CLERK:   You may be seated.

21                  (Brief interruption.)

22             THE CLERK:   All rise.   This United States

23   District Court is now in session.

24             You may be seated.

25             THE COURT:   Okay.   The record reflect all the

1    members of the jury in their respective seats in the

2    jury box, including the alternates, and we're in

3    cross-examination.

4              Counsel, you may continue.

5              MR. SEVERO:  Thank you, Your Honor.

6    **JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

7                 **CROSS-EXAMINATION (RESUMED)**

8    BY MR. SEVERO:

9    Q.   Your wire interceptions, sir, or phone call

10   interceptions in this case include a number of

11   telephones that you believed belonged to Mr. Darbinyan?

12   A.   That's correct.

13   Q.   And you would get these numbers from intercepted

14   calls that would come in and the number would show and

15   then you go and get an order for that phone numbers?

16   A.   That was one of the ways.

17   Q.   Well, how else did you get phone numbers to

18   intercept?

19   A.   We could get phone numbers from confidential

20   informants.

21   Q.   And then did you get some in this case for

22   Mr. Darbinyan?

23   A.   Yes.

24   Q.   For -- okay.  How many -- according to your

25   testimony about six; correct?

1    A.    Six phones.

2    Q.    Six phones, six target telephones?

3    A.    Yes.

4    Q.    Now, starting in 2008 through the end of 2009, is it

5    your belief that you intercepted all calls in all those

6    target telephones?

7    A.    No.

8    Q.    What -- what calls did you not intercept?

9    A.    Well, we started in January, 2009, but when he was

10   arrested, I believe, in 2009, he had a couple other

11   phones that we never intercepted.

12   Q.    Did you have the numbers for those phones?

13   A.    After he was arrested, yes.

14   Q.    But you didn't choose to -- you chose not to

15   intercept those?

16   A.    We had custody of the phones.  He was arrested.

17   Q.    All right.  So you didn't need to intercept those?

18   A.    That's correct.

19   Q.    All right.  How many of the -- which of the

20   defendants in this case is someone who worked inside

21   Bank of America?

22   A.    This case?

23   Q.    Yes.

24   A.    There were none in this case.  The related case had

25   Bank of America bank insiders.

```
 1              MR. SEVERO:  Move to strike after the related
 2     case.
 3              MR. ESTRADA:  Objection, Your Honor.  It's
 4     vague as to case because the overall investigation
 5     included at least four different Indictments.
 6              THE COURT:  Okay.
 7     Q.  BY MR. SEVERO:  The case Mr. Darbinyan is indicted
 8     on, this one --
 9              THE COURT:  Okay.
10     Q.  BY MR. SEVERO:  -- how many Bank of America
11     employees did you indict?
12     A.  None.
13     Q.  How many Chase individuals did you -- Chase
14     employees did you indict?
15     A.  None.
16     Q.  How many Citibank employees did you indict?
17     A.  None.
18     Q.  Directing your attention to Exhibit 38-A, the call
19     on March 20th, 2009, at 2:37 -- did I say 2:37?  It's
20     3:37 -- yes, 3:37 P.M. -- in the middle of the page,
21     speaker one says, "Before I call my guy to check because
22     I want to know everything."
23              Is it your belief that Speaker 1 was talking
24     about somebody inside the bank?
25     A.  No.
```

1    Q.   Aside from indicting anyone inside of any bank, you

2    did not identify any bank employees of any bank that

3    were connected to the frauds in this case?

4    A.   No.

5    Q.   Based on your investigation in this case, how many

6    gift cards were found in Mr. Darbinyan's possession at

7    any time between 2008 and 2013?

8    A.   None.

9    Q.   And it's your testimony that gift cards is a method

10   by which money is taken out of accounts; correct?

11   A.   It's part of the scheme, but it's not as simple as

12   gift cards being used to take money out.

13   Q.   It's one of the methods by which -- it's one of the

14   methods used in the scheme?

15   A.   Yes.

16   Q.   Let me ask to direct your attention and the jurors'

17   attention to 37-A.

18          You've testified that this is a call between

19   Speaker 1 and Karen Samawi, where Ms. Samawi is

20   providing her Social Security number and account number;

21   do you see that?

22          MR. ESTRADA:   Objection, Your Honor.   Misstates

23   the testimony.

24          THE COURT:   Well, why don't you tell us what

25   Exhibit 37-A -- well, why don't you rephrase.

```
 1    Q.    BY MR. SEVERO:   Let me -- let me take it back.

 2              In Exhibit 37-A, seven speakers down on the

 3    first -- on the second page of the exhibit, the person

 4    identified as Karen Samawi by you says, "Hm, no.  I'll

 5    be with him in one minute, but, um, I cannot -- what do

 6    you do -- what do you -- let me give you my information

 7    so that you can check it over because I am looking at it

 8    right now, and it's okay, okay.  Go."

 9              So what was the purpose of providing this

10    information?

11    A.    She'll give it to Mike Darbinyan so that he could

12    check on her account.

13    Q.    And this is three days after the deposit --

14    correct? -- was made into her account?

15    A.    She specifies to the deposit.  There were two

16    deposits.

17    Q.    One on the 16th and one on the 17th?

18    A.    There was one on the 17th and one on the 19th.

19    Q.    Later that day, after the account information is

20    presumably provided, in 38-A -- back to 38-A --

21    Speaker 1 -- six speakers down on the second page,

22    Speaker 1 is still asking her, this person that you've

23    identified as Karen Samawi, to check owe her account; is

24    that correct?

25    A.    Yes.
```

1    Q.    There is no call here where Speaker 1 is -- is

2    confirming that he checked the account, is there?

3    A.    There's no calls presented here at trial.

4    Q.    You picked and chose those calls that you thought

5    were helpful to your case; correct?

6            MR. ESTRADA:  Objection, Your Honor.

7    Argumentative.

8            THE COURT:  Overruled.

9            THE WITNESS:  We chose these calls.

10   Q.    BY MR. SEVERO:  We, being you and the -- the

11   prosecution team?

12   A.    That's correct.

13   Q.    All these good looking people here at the table?  I

14   try to even the score here.

15           THE COURT:  The objection of facts not in

16   evidence will be sustained.

17           MR. SEVERO:  Thank you, Your Honor.

18   Q.    All right.  How much surveillance did you conduct at

19   Mr. Darbinyan's house?

20   A.    Many days.

21   Q.    How many times did you author a search warrant for

22   his house?

23   A.    I don't believe we needed a search warrant.  He was

24   on parole.

25   Q.    How many times did you search his house?

1    A.   I personally did not search.

2    Q.   How many times did the Eurasian task force search

3    his house?

4    A.   The Eurasian task force did not search.

5    Q.   How many times, to your knowledge, did his parole

6    officer search his house?

7    A.   I don't know.

8    Q.   Did you ask anyone to search his house?

9    A.   Yes.

10   Q.   How many times?

11   A.   Once; probably, maybe twice.

12   Q.   When?

13   A.   I don't recall.

14   Q.   Because nothing significant was found at any search;

15   correct?

16   A.   I don't recall.

17   Q.   When you first asked for a search of his house, was

18   it early in the investigation?

19   A.   No.

20   Q.   Late in the investigation?

21   A.   I think it was later in the investigation.

22   Q.   In 2009?

23   A.   Probably, but I don't recall.

24   Q.   Now, you wrote -- did you write reports in this

25   case?

1    A.    Yes.

2    Q.    And you would have written somewhere that you

3    requested a search warrant for his house?

4    A.    No.

5    Q.    That's not important?

6    A.    It's important.  Glendale P.D. made a report of

7    searching his house.

8    Q.    So you're -- you're acquainted with that search?

9    A.    I'm aware that there was a search.  I don't know the

10   exact date.

11   Q.    Now, did Glendale report to you on what evidence

12   they were gathering pertaining to Mr. Darbinyan?

13   A.    I'm sure I was told what was there.

14   Q.    And I'm sure you would have been told if something

15   significant had come up; correct?

16   A.    I would have been told if he was arrested, yes, sir.

17   Q.    No.  You would have been told if something

18   significant had come up in the search of his house?

19   A.    Yes.

20           THE COURT:  Pertaining to your investigation?

21           THE WITNESS:  Yes, sir.

22   Q.    BY MR. SEVERO:  And you would have brought us all

23   that information, wouldn't you?

24   A.    Yes, sir.

25   Q.    Of the checks that were cashed in or around the

 1    March 30th, 2009, date, how much of that money do the

 2    bank records show went to Mr. Darbinyan?

 3    A.   I don't recall bank records show any money went to

 4    Mr. Darbinyan.

 5    Q.   After March 30th of 2009, did you stop Mr. Darbinyan

 6    between 2:30 -- strike that.

 7          Between March 30th and April 15th of 2009, did

 8    you have an opportunity to stop and search

 9    Mr. Darbinyan?  When I say you, I mean the task force.

10    A.   Did we have an opportunity or did we?

11    Q.   Yeah, did you have an opportunity to do so?

12    A.   I'm sure we had opportunities.

13    Q.   Did you stop him and search him?

14    A.   No.

15    Q.   So obviously nothing -- no money was ever found

16    between March 30th and April 15th of '09 --

17          MR. ESTRADA:  Objection, Your Honor.

18    Q.   BY MR. SEVERO:  -- of Mr. Darbinyan?

19          MR. ESTRADA:  Excuse me.  Vague, Your Honor.

20          THE COURT:  Overruled.

21          Did you or the task force find any money on him

22    between those dates?

23          THE WITNESS:  No.

24    Q.   BY MR. SEVERO:  And the reason -- March 30th of 2009

25    to April 14th was the subject of calls, 46 through -- it

650

```
 1   would be 43 through 50 -- through 50.  During that time,
 2   that period of time, you have no records that show that
 3   Mr. Darbinyan received any money from anybody involved
 4   in this conspiracy?
 5   A.   Again, bank records?
 6   Q.   Yes.
 7   A.   No, we have no bank records.
 8   Q.   Is there any checks written by Ms. Samawi to
 9   Mr. Darbinyan?
10   A.   No.
11   Q.   Are there any checks written by Mr. Ortega, Gustavo
12   Ortega, to Mr. Darbinyan?
13   A.   No.
14   Q.   Any checks written by Mr. Moreno to Mr. Darbinyan?
15   A.   No.
16   Q.   And you were the lead investigator in this case --
17   are the lead investigator in this case; correct?
18   A.   Yes, sir.
19   Q.   And you're the lead investigator of the task force?
20   A.   At this time, yes, sir.
21   Q.   Now, you made no effort to determine whose
22   handwriting it was that appeared on these checks, did
23   you?
24   A.   Can you specify the signatures that were forged or
25   the payee handwriting?
```

1   Q.   Do you know that the person that signed the check

2   was different than the person that wrote it?

3   A.   In some instances, it was.

4   Q.   Well, how would you know that?  You didn't do any

5   handwriting exemplars?

6   A.   Because they asked what amount they should write it

7   for, and they wrote it.

8   Q.   Well --

9   A.   Also speaking to the co-defendants in this case.

10  Q.   Well, the fact is that you made no effort to

11  determine, through handwriting analysis, who may have

12  written these checks?

13          MR. ESTRADA:  Objection, Your Honor.

14  Argumentative.

15          THE COURT:  Overruled.  But I think it has been

16  asked and answered.  What is the answer?  No?

17          THE WITNESS:  No.

18  Q.   BY MR. SEVERO:  How many laundering accounts did you

19  find in this -- in the period of April -- I'm sorry --

20  March 30th through August of 2009?

21  A.   I'm not sure.  Several.

22  Q.   Well, we talked about one this afternoon; correct?

23  A.   We talked about two.

24  Q.   Which?

25  A.   Ruzzana Hakobyan at Bank of America and Ruzzana

652

```
 1    Hakobyan at Citibank.
 2    Q.   Those are what you determined to be laundering
 3    accounts?
 4    A.   Yes.
 5    Q.   Did you subpoena the bank records for Ruzzana
 6    Hakobyan?
 7    A.   Yes, we did.
 8    Q.   Did you see any checks out of Ruzzana Hakobyan's
 9    account by Mr. Darbinyan?
10    A.   No, we stopped the check.  The money was not
11    available.
12    Q.   So no checks were ever written to Mr. Darbinyan?
13    A.   No.
14    Q.   Or anyone for that matter; correct?
15    A.   No.
16    Q.   Not correct?
17    A.   Can you ask it a little --
18    Q.   Sure.  No specks were written to Mr. Darbinyan nor
19    anyone else?
20    A.   No, sir.
21    Q.   Your surveillance in this case was driven in large
22    part by the calls you were listening to; correct?
23    A.   Sometimes.
24    Q.   So in January of 2009 -- strike that.
25              Your Honor, I'll confine my cross-examination
```

1    now to what he testified to today, but I reserve for

2    later the entirety of the --

3            THE COURT:  That's understood.

4            MR. SEVERO:  Of the -- I need a moment,

5    Your Honor.

6            THE COURT:  Sure.

7                (Brief interruption.)

8    Q.  BY MR. SEVERO:  How many of the co-defendants in

9    this case have turned informants?

10           MR. ESTRADA:  Objection, Your Honor.  That

11   calls for under-seal court information.

12           THE COURT:  I'm sorry.  What?

13           MR. SEVERO:  Under --

14           THE COURT:  I didn't hear the objection.

15           MR. ESTRADA:  Yes, it asked for under-seal

16   information.  He's asking for --

17           THE COURT:  Sustained.

18           MR. SEVERO:  Your Honor, I'm not asking for

19   identity, just how many.

20           THE COURT:  Do you know how many?

21           THE WITNESS:  Several.

22           THE COURT:  But you don't have a number?

23           THE WITNESS:  No, sir.

24           THE COURT:  Okay.

25   Q.  BY MR. SEVERO:  You say you spoke to some

1    co-defendants in this case and learned some factors in

2    this case; correct?

3    A.   Yes, sir.

4    Q.   Are these co-defendants turned informants that you

5    spoke to and that's how you learned these things?

6    A.   We call them cooperating defendants.  They're not

7    informants that we use on the streets; but yes.

8         MR. SEVERO:  Okay.  Your Honor, I'll reserve

9    the rest of my cross-examination for the end of the case

10   or another time.

11        THE COURT:  Thank you.

12        Counsel.

13                    **<u>CROSS-EXAMINATION</u>**

14   BY MR. PEREYRA-SUAREZ:

15   Q.   Hello, again, Agent Stebbins.

16   A.   Good afternoon, sir.

17   Q.   You testified in response to Mr. Severo's questions

18   that a check for $26,400 went from Victim Grace

19   Ferguson's account to Karen Samawi; do you recall that

20   testimony?

21   A.   Yes.

22   Q.   Did any of that money end up going to Arman

23   Sharopetrosian?

24   A.   Not that I'm aware of.

25   Q.   Did any money from Karen Samawi go to

1   Mr. Sharopetrosian?

2   A.   Not that I'm aware of.

3   Q.   You testified about a number of victims today and

4   yesterday.  Did any money from any one of those victims

5   go to Arman Sharopetrosian?

6   A.   Not that I'm aware of.

7   Q.   Did any money from any of the alleged perpetrators

8   of the fraud go from those perpetrators to Arman

9   Sharopetrosian?

10  A.   Not that I know of.

11  Q.   In fact, you didn't even begin investigating

12  Mr. Sharopetrosian until June or July of 2009; is that

13  correct?

14  A.   That's correct, sir.

15  Q.   You didn't find any gift cards on

16  Mr. Sharopetrosian, did you?

17  A.   No, sir.

18          MR. PEREYRA-SUAREZ:  I have nothing further at

19  this time, Your Honor.

20          THE COURT:  Counsel.

21          MR. FLIER:  I'm going to defer, Your Honor.

22  Thank you.

23          THE COURT:  You may step down at this time.

24          MR. ESTRADA:  If I could have --

25          THE COURT:  Oh, I'm sorry.

```
 1              MR. ESTRADA:  Just briefly, Your Honor.

 2              THE COURT:  Redirect.  I'm sorry.

 3              MR. ESTRADA:  Just briefly.

 4              THE COURT:  I get carried away, Counsel.
```

### REDIRECT EXAMINATION

```
 5

 6   BY MR. ESTRADA:

 7   Q.   Agent Stebbins, you were asked about any bank

 8   records of money going to Defendant Darbinyan; do you

 9   recall that?

10   A.   Yes.

11   Q.   There are no bank records showing money going to

12   Darbinyan?

13   A.   No.

14   Q.   No checks showing money going to Darbinyan?

15   A.   No.

16   Q.   Is there other evidence showing money going to

17   Darbinyan?

18   A.   Yes.

19   Q.   What other evidence is there?

20   A.   The lifestyle that Mr. Darbinyan led.  He drove a

21   Range Rover, Mercedes S550.  He had a Maserati at the

22   time, and they lived in a luxury condo with no known

23   employment.

24   Q.   No known employment, meaning you said you surveilled

25   Darbinyan on a daily basis?
```

1    A.    Yes.

2    Q.    Did you see any evidence that he held any legitimate

3    employment?

4    A.    No.

5    Q.    Now, in addition to his lifestyle, were there actual

6    calls that weren't played today in which there's

7    discussions of money going to Darbinyan and others?

8    A.    Yes.

9    Q.    And proceeds being distributed?

10   A.    Yes.

11   Q.    And money being picked up from Armando Moreno?

12   A.    Yes.

13   Q.    Now, was it your fault those calls weren't being

14   played?

15   A.    No.

16   Q.    It's my fault, isn't it?

17             MR. FLIER:  Objection.  Argumentative.

18             THE COURT:  Sustained.

19   Q.    BY MR. ESTRADA:  Now, you were asked about the calls

20   in this case and that you --

21             THE COURT:  I couldn't see who was objecting.

22   Q.    BY MR. ESTRADA:  With regard to calls being picked

23   and chosen, was there an effort to make this case

24   efficiently presented?

25             MR. SEVERO:  Objection.  Beyond the scope.

658

1     MR. ESTRADA:  Well, it was asked, Your Honor.

2     So the door's been open.

3     Q.  With regard to picking and choosing calls, did you

4     direct how many calls we played in this trial?

5     A.  No.

6     Q.  Was there an effort to make the case presented

7     efficiently?

8     MR. SEVERO:  Objection.  Couching.

9     Q.  BY MR. ESTRADA:  Was -- were you involved in

10    trimming down the case?

11    A.  Just consultation; but no, I did not pick which

12    calls came in.

13    Q.  Now, there are many calls that were played today; is

14    that right?

15    A.  Yes, thousands more.

16    Q.  Are there any of those calls in which Darbinyan

17    states, "No, no.  I don't want to be involved in fraud"?

18    A.  No.

19    Q.  Are there any calls in which Darbinyan states,

20    "Moreno, stop what you're doing.  I don't want to be

21    involved in fraud"?

22    A.  No.

23    Q.  Are there any calls at all in which Darbinyan

24    suggests he didn't want to be involved in criminal

25    activity?

1    A.   No.

2    Q.   And also on that topic of bank records regarding

3    money going to Darbinyan, based on your investigation in

4    this case, did you find that the defendants tended to

5    keep nice accounting records?

6              MR. SEVERO:  That's --

7              MR. PEREYRA-SUAREZ:  Objection.  Argumentative,

8    Your Honor.

9              MR. SEVERO:  It's argumentative.

10             MR. FLIER:  I'm going to object to

11   "defendants."

12             THE COURT:  Well, the form of question is

13   well-supported.  It seems to be very speculative whether

14   they were nice or not nice.

15             MR. ESTRADA:  Very good, Your Honor.

16             THE COURT:  I'm not too sure what that word

17   means.

18             MR. ESTRADA:  It's a difficult word, but

19   I'll -- I'll go on.

20   Q.   Was there any evidence in this case, with your own

21   investigation, that the defendants attempted to keep

22   bank accounts documenting the proceeds they were

23   obtaining?

24             MR. FLIER:  Objection as to "defendants,"

25   Your Honor.

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  No, they did not.
 3              THE COURT:  Sustained.  As to these two
 4    defendants, was there any?
 5              THE WITNESS:  No.
 6    Q.   BY MR. ESTRADA:  Well, as to the targets in the
 7    overall investigation with regard to criminal activity,
 8    did you find that that criminal activity was being
 9    reported to the I.R.S.
10    A.   No.
11    Q.   Did you find that criminal activity was being
12    documented in bank accounts?
13    A.   No.
14    Q.   And with regard to this criminal activity, were --
15    did you find the targets were paying each other in
16    checks?
17    A.   No, they didn't do that.
18    Q.   How did they tend to pay each other?
19    A.   It was all cash.
20    Q.   Why would it tend to be cash based on your training
21    and experience?
22    A.   More difficult to trace.
23    Q.   And with regard to Defendant Darbinyan, in
24    particular, was there evidence in the case that he was
25    conscious that law enforcement was detecting his
```

1    activities?

2            MR. SEVERO:  Objection.  Calls for speculation.

3            THE COURT:  Sustained.

4    Q.  BY MR. ESTRADA:  Was there evidence in the case that

5    led you to believe that he was aware that law

6    enforcement was following him?

7            MR. SEVERO:  Objection.  What he believed is

8    irrelevant.

9            THE COURT:  Sustained.

10   Q.  BY MR. ESTRADA:  Was there evidence in the record

11   that Darbinyan stated that law enforcement was following

12   him?

13   A.  Yes.

14   Q.  Was there evidence in the record that Darbinyan

15   would drop telephones?

16   A.  Yes.

17   Q.  And based on your training and experience, what does

18   the practice of dropping telephones demonstrate?

19   A.  It demonstrated that he was worried --

20           MR. SEVERO:  Asked and answered, Your Honor.

21           THE COURT:  Overruled.

22           THE WITNESS:  It demonstrated that he was

23   worried about us listening to his phone calls.

24   Q.  BY MR. ESTRADA:  Now, also in the case, did you find

25   evidence that Darbinyan would use others to carry

```
 1   criminal proceeds and items?
 2             MR. SEVERO:  Objection.  That's hearsay.
 3             THE COURT:  Overruled.
 4             THE WITNESS:  Yes, he did.
 5   Q.  BY MR. ESTRADA:  Can you explain.
 6   A.  On several occasions, he had other co-defendants in
 7   this case carry cash for him because he didn't want to
 8   be found in possession of that amount of cash.
 9             MR. SEVERO:  Everything after because should be
10   stricken.
11             THE COURT:  Sustained.
12   Q.  BY MR. ESTRADA:  Was there evidence that other
13   people carried guns for Darbinyan?
14             MR. SEVERO:  Objection.
15             THE WITNESS:  Yes.
16             THE COURT:  Overruled.
17   Q.  BY MR. ESTRADA:  Was there also evidence that
18   low-level criminals were used to cash and deposit
19   checks?
20   A.  Yes.
21   Q.  And not the higher-level criminals?
22   A.  That's correct.
23   Q.  Is that common, based on your training and
24   experience, that the people higher in a conspiracy will
25   not actually go into banks or take money out?
```

1  A.   Yes, they don't like to get their hands dirty.

2  Q.   You were asked about Exhibit 14-A, and I'm not going

3  to pull it out now, but there's a reference to finding

4  one for 90, and you said you didn't believe that

5  referred to a check.  What do you believe that referred

6  to?

7  A.   That's the amount of money that was available in the

8  bank account that they could steal.

9  Q.   And that number, 90, was it $90?

10  A.   No, $90,000.

11  Q.   You were also asked by Defendant Sharopetrosian's

12  counsel whether he received any money and whether there

13  was any evidence he received any money.

14        Were there calls in which he discussed

15  fraudulent activity?

16  A.   Yes.

17  Q.   Having others find accounts for him?

18  A.   Yes.

19  Q.   And agreed to be part of fraudulent activity?

20  A.   Yes.

21        MR. ESTRADA:  Can I have a moment, Your Honor?

22        THE COURT:  Yes.

23        MR. ESTRADA:  No further questions, Your Honor.

24        THE COURT:  Okay.  Recross.

25        MR. SEVERO:  Yes.

## RECROSS-EXAMINATION

BY MR. SEVERO:

Q.   Let's talk about lifestyle.  Did you -- did you subpoena his tax returns?

A.   Yes.

Q.   Were you aware that, when his house was searched in 2010, there were documents reflecting that he had to obtain a loan modification on his house because he was in foreclosure?

A.   Yes, I believe he was indicted for it.

       MR. SEVERO:  Well, I'll move to strike that last portion because that's -- because it's inaccurate.

       MR. ESTRADA:  Your Honor, he opened the door to that.

       MR. SEVERO:  No, I didn't open the door to anything.

       THE COURT:  That's the whole world.  It will be stricken.

       MR. SEVERO:  Thank you.

Q.   The -- the bank account that you subpoenaed, what sort of balances were you seeing?

A.   I don't recall.

Q.   Your memory fails on cross-examination; is that what happens?

       MR. ESTRADA:  Objection, Your Honor.

1    Argumentative.  It's totally improper, Your Honor.

2                MR. SEVERO:  I'll withdraw it.

3                THE COURT:  He's going to withdraw the

4    question, anyway.

5                MR. SEVERO:  Yes, Your Honor.

6    Q.   BY MR. SEVERO:  When you say cash is difficult to

7    trace, what you really mean is you couldn't find any

8    cash going to Mr. Darbinyan; right?

9    A.   We didn't stop him with any cash.

10   Q.   You could not find any evidence of cash going to

11   Mr. Darbinyan in your investigation?

12   A.   There were numerous calls where he discussed getting

13   cash in this case.

14   Q.   There were numerous calls where there were some

15   words being said, but you couldn't find any cash going

16   to Mr. Darbinyan, could you?

17               MR. ESTRADA:  Argumentative, Your Honor.

18               THE COURT:  Not argumentative.  But it wasn't

19   the same question he asked before, one was did you find

20   any evidence of it going him, the other one was did you

21   ever find any on him, and so why don't you ask the next

22   question.

23               MR. SEVERO:  Sure.

24   Q.   Your knowledge -- or your testimony concerning cash

25   going to Mr. Darbinyan is your opinion?

666

```
 1              MR. ESTRADA:  Objection, Your Honor.  Misstates
 2     the evidence.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  No.
 5     Q.  BY MR. SEVERO:  It's an opinion based on what other
 6     people have told you?
 7     A.  No.
 8     Q.  It's an opinion based on you seeing cash going to
 9     him?
10     A.  Would you like me to explain?
11     Q.  No, I want you to answer the question yes or no.
12     A.  Physically, I have not seen green cash go from one
13     hand to another.
14     Q.  Very good.  You're seeing cash being deposited into
15     his bank account?
16     A.  I don't recall seeing that.
17     Q.  So these payments that were being made on these
18     cards were being made with cash?
19     A.  They're generally made with his --
20     Q.  Not generally, sir?
21     A.  -- credit card.
22     Q.  Credit cards.  And the credit cards were paid how?
23     A.  I don't recall.
24     Q.  Bank account checks; right?  That's what you see in
25     his bank account, isn't it?
```

1      MR. ESTRADA:  Argumentative.

2      THE COURT:  Sustained.  I'm sure the jury

3  pretty much has the picture.

4  Q.  MR. SEVERO:  All right.  Counsel asked you whether

5  he ever said I don't want to commit any fraud -- any --

6  any fraud at all.

7      Did he -- are there any calls where he said,

8  "Hey, let's go and commit these frauds," those words?

9  A.  I don't know if he ever says fraud.

10  Q.  What you've got is a number of calls where money is

11  discussed, what would you believe to be money; correct?

12  A.  There are calls where money is discussed, yes.

13  Q.  There are calls where you believe what's being

14  discussed is certain amounts and you have deducted,

15  using your training and experience, that these are the

16  checks that were being written; correct?

17      MR. ESTRADA:  Argumentative.  Compound.  Asked

18  and answered.

19      THE COURT:  Overruled.

20      THE WITNESS:  We followed individuals from

21  meeting with Darbinyan to banks where the check numbers

22  discussed on the phone were being cashed.

23  Q.  BY MR. SEVERO:  Right.  You have nothing in your

24  investigation that suggests that Mr. Darbinyan wrote a

25  check that you believed to be fraudulent?

```
 1              MR. ESTRADA:  Objection, Your Honor.
 2   Relevance.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  I don't know.
 5   Q.  BY MR. SEVERO:  You don't know?
 6              THE COURT:  Well, if counsel objected that it
 7   would have been outside the scope of redirect, I would
 8   have sustained your objection, Counsel.
 9              MR. ESTRADA:  I'll do that.
10              THE COURT:  I'm not hinting or anything.  Go
11   ahead.
12              MR. SEVERO:  No, no hints.
13              THE COURT:  Okay.
14              MR. SEVERO:  I'm sorry, Judge.  I lost my train
15   of thought there.
16   Q.  Okay.  You don't know that there were any checks
17   written by Mr. Darbinyan that --
18              MR. ESTRADA:  Objection, Your Honor.
19   Q.  BY MR. SEVERO:  -- that appear on the -- the phone
20   calls?
21              MR. ESTRADA:  Objection, Your Honor.  Outside
22   the scope.
23              THE COURT:  Sustained.
24              MR. SEVERO:  So just so that I know, I'm
25   precluded from asking, when I come back at the end of
```

```
1    the case, these questions?
2            THE COURT:  Not if it pertains to what's going
3    on, but at this time, the redirect is only -- is limited
4    to recross.
5            MR. SEVERO:  All right.
6            THE COURT:  Or excuse me.  Recross is limited
7    to redirect.
8            MR. SEVERO:  The recross was pretty wide.
9            THE COURT:  I'm sorry?
10           MR. SEVERO:  Recross was pretty --
11           THE COURT:  No, its limited to whatever the
12   redirect was, not to the entire direct testimony.
13   Q.   BY MR. SEVERO:  How large was the condominium he
14   lived in?
15   A.   I don't recall how many square feet it was.
16   Q.   How many bedrooms?
17   A.   I've never been inside.
18   Q.   Is it marble on the floors?
19   A.   I don't recall.
20   Q.   You don't recall.  You've never been inside?  You
21   don't know?
22   A.   That's correct; I don't know.
23   Q.   Was there luxury furniture in the place?
24           MR. ESTRADA:  Objection, Your Honor.  Asked and
25   answered.  Calls for speculation.
```

```
 1              MR. SEVERO:  Actually --

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I believe I have seen a photo

 4   where there is a large thrown in the living room.  I

 5   don't recall anything other than that.

 6   Q.  BY MR. SEVERO:  Are you aware of the value of that

 7   condominium?

 8   A.  I don't know offhand.

 9   Q.  Essentially, when you said he owned a luxury

10   condominium, you were just guessing, weren't you?

11              MR. ESTRADA:  Objection, Your Honor.

12   Argumentative.

13              THE COURT:  Well, it's overruled as far as

14   argumentative, but it was your opinion; is that correct?

15              THE WITNESS:  That's correct.

16   Q.  BY MR. SEVERO:  Shall I move to strike the opinion

17   as having no foundation?  He's never seen it.

18              You're aware that he had a yard where propane

19   was sold?

20              MR. ESTRADA:  Objection, Your Honor.  Beyond

21   the scope.

22              MR. SEVERO:  No, unemployment.  He said he was

23   unemployed.

24              THE COURT:  Excuse me, Counsel.

25              MR. SEVERO:  I'm sorry, Judge.
```

```
1              THE COURT:  Counsel, you're going to have to
2     help me out.  Where propane was sold?
3              MR. SEVERO:  Yes.
4              THE COURT:  Overruled.
5              THE WITNESS:  He had a large parking lot.
6     Q.   BY MR. SEVERO:  He owned it, didn't he?
7     A.   I believe he paid rent there, yes.
8     Q.   And you're also aware that there was a chain
9     manufacturing company that he owed; correct?
10    A.   Yeah, I believe in one of the calls, he said he
11    didn't own it anymore more, but we didn't play it here.
12    Q.   And you don't -- I may have asked you this.  I'm
13    sure I'm going to be reminded that I did.
14             THE COURT:  Well, try it.
15    Q.   BY MR. SEVERO:  Did you review his tax returns?
16    A.   Members of the task force did.  I don't recall
17    reviewing them myself.
18    Q.   What sort of task force were you running here in the
19    investigation of the task force?  Were you being
20    provided information on a regular basis as to what was
21    going on by other task force members?
22             MR. ESTRADA:  Objection, Your Honor.  Beyond
23    the scope.
24             THE COURT:  Overruled.
25             THE WITNESS:  Yes, I was provided information.
```

1    Q.  BY MR. SEVERO:  And the information you would be

2    provided would be information only that was thought to

3    be relevant or important by the people that were

4    developing the information?

5    A.  I can't speak as to what information was provided.

6    There's a lot of information.

7    Q.  Or did you create a policy of some sort saying I

8    want to know what happens here under -- if this -- if

9    certain things were to develop, was there a policy that

10   it was to be told to you?

11   A.  A written policy?

12   Q.  Or -- or oral.  It doesn't have to be written.

13   A.  I think it was just general sharing of information.

14   Q.  So when you take the stand here and you testify that

15   Mr. Darbinyan's lifestyle led you to believe he was

16   getting money from this scheme, it's not because you

17   received any information on his tax returns?

18          MR. ESTRADA:  Objection, Your Honor.

19   Argumentative.  Asked and answered.

20          THE COURT:  Overruled.

21          THE WITNESS:  We did receive his tax returns.

22   I don't recall what was on them.

23   Q.  BY MR. SEVERO:  Obviously, because it was not

24   important.

25          THE COURT:  Counsel.

1    MR. SEVERO:  I'm sorry, Your Honor.  I didn't

2    hear you.

3    THE COURT:  The question was:  Is that what you

4    formed your opinion on, the tax returns, that he was

5    living a lavish style life?

6    THE WITNESS:  No, not based on the tax returns.

7    THE COURT:  Okay.  Thank you.

8    Q.   BY MR. SEVERO:  Did you ever look at his credit card

9    bills?

10   A.   I believe at some point I did.

11   Q.   Was he spending a lot of money on dinners?

12   A.   Not dinners.  I believe his Maserati, Range Rover,

13   and Mercedes were pretty expensive.

14   Q.   So those were being paid through the credit card; is

15   that your testimony?

16   A.   I don't recall if all three of them were; but, yes,

17   at least two of them were being paid through the credit

18   cards.

19   Q.   And credit cards were being paid down by his bank

20   account -- through his bank account?

21   A.   I believe I testified that I don't remember how the

22   credit cards were being paid.

23   Q.   You don't remember because it wasn't important until

24   today, was it?

25   MR. ESTRADA:  Objection, Your Honor.

674

```
 1    Argumentative.
 2              MR. SEVERO:  I have nothing further.  Thank
 3    you.
 4              THE COURT:  Counsel.
 5              MR. PEREYRA-SUAREZ:  I have nothing further at
 6    this time.
 7              THE COURT:  You may step down.
 8              Oh, I'm sorry, Counsel.
 9              MR. FLIER:  No questions.
10              THE COURT:  Okay.  You may step down.
11              Next witness?
12              MS. YANG:  Your Honor, may I approach the
13    Clerk?  I accidentally took some exhibits.
14              THE COURT:  You took some of the Clerk's
15    materials?
16              MS. YANG:  I did.
17              THE COURT:  Counsel, for the aid of the jury
18    does the testimony as to the next witness go towards all
19    three defendants?  Two of the defendants?  What counts?
20              MR. ESTRADA:  Yes, Your Honor, the next witness
21    will be testifying to the bank fraud and aggravated
22    identity thefts that are charged against
23    Defendant Darbinyan and are also incorporated in the
24    RICO conspiracy count.
25              THE COURT:  So this testimony is limited only
```

1    to those two defendants?

2            MS. YANG:  To Defendant Darbinyan, Your Honor,

3    with regard --

4            THE COURT:  Just to Defendant Darbinyan and not

5    to Sharopetrosian; is that correct?

6            MS. YANG:  That is correct, Your Honor.

7            THE COURT:  Okay.

8                (Brief interruption.)

9            MS. YANG:  Your Honor, I apologize.  It appears

10   that that witness is in the restroom.  So we will call

11   another witness.

12           THE COURT:  Okay.

13           MS. YANG:  The Government calls Marjorie

14   Duncan.

15           THE COURT:  And as she's approaching, Counsel,

16   is there the same limitation, only as to

17   Defendant Darbinyan?

18           MR. CREIGHTON:  Yes, Your Honor.

19           THE COURT:  Okay.

20           THE CLERK:  Can you please raise your right

21   hand.

22           Do you solemnly swear that the testimony that

23   you're about to give in the matter now pending before

24   this Court shall be the truth, the whole truth, and

25   nothing but the truth so help you God?

1         THE WITNESS:  I do.

2         **MARJORIE DUNCAN, GOVERNMENT'S WITNESS, SWORN**

3         THE CLERK:  Thank you.  You may be seated.

4    Okay.  May I please ask that you state your full name

5    for the record and spell your last name.

6         THE WITNESS:  Marjorie Duncan; capital,

7    D-u-n-c-a-n.

8         THE CLERK:  Thank you.

9         THE COURT:  Thank you.

10        Counsel, you may inquire.

11        MR. CREIGHTON:  Thank you, Your Honor.

12              **DIRECT EXAMINATION**

13   BY CREIGHTON:

14   Q.   Good afternoon, Ms. Duncan.

15   A.   Good afternoon.

16   Q.   Are you a customer of Bank of America?

17   A.   I am.

18   Q.   And how long have you been a customer of Bank of

19   America?

20   A.   For about 30 years, I think.

21   Q.   Do you share your account with anybody?

22   A.   With my husband.

23   Q.   And what is his name?

24   A.   Frank Duncan.

25   Q.   Now, directing your attention to the spring of 2009,

1    did you learn of a fraud that had taken place on your

2    account?

3    A.   Yes.

4    Q.   Can you tell the jury how you learned of that fraud.

5    A.   Bank of America gave me a call one day to tell me --

6    to ask me if I had written certain checks.

7            MR. SEVERO:  Sorry.  Hearsay.

8            THE COURT:  Overruled.  This is not for the

9    truth of the matter, just as to notification.

10           So they asked you a question?

11           THE WITNESS:  They asked me if I had written

12   certain checks to certain people, and I said no.

13           THE COURT:  Okay.  Next question.

14   Q.   BY MR. CREIGHTON:  Now, Ms. Duncan, I'm showing you

15   what has been -- may I have permission to publish a

16   previously admitted exhibit, Your Honor?

17           THE COURT:  Yes.

18   Q.   BY MR. CREIGHTON:  I'm showing you what has been

19   admitted as Exhibit 254.

20           What is this exhibit?

21   A.   It's a bank statement.

22   Q.   And whose bank statement is it?

23   A.   Frank and Marjorie Duncan.

24   Q.   Are you that Marjorie Duncan?

25   A.   Yes.

1    Q.    Frank is your husband?

2    A.    Yes.

3    Q.    And what period is this bank statement for?

4    A.    It covers March 21st through April, I believe it

5    says, 21st.

6    Q.    Now, I'd like to show you a check that came with

7    that bank statement.

8              What is this check?

9    A.    It's to a Chevon gasoline company.

10   Q.    And who wrote this check?

11   A.    I did.

12   Q.    Is that your signature on the check?

13   A.    Yes.

14   Q.    And that's your address up on the left?

15   A.    Yes.

16   Q.    Now, is that actually your address?

17   A.    No, it's our office address.

18   Q.    I'm know showing you another check.  What is this

19   check?

20   A.    It's a check to Federal Express office.

21   Q.    And who wrote this check?

22   A.    Frank Duncan.

23   Q.    Is that his signature?

24   A.    Yes, it is.

25   Q.    I'm now showing you another check.  What is the

1    number on this check?

2    A.    2386.

3    Q.    And who is this check made out to?

4    A.    It looks like RZ Digerit.

5    Q.    Could that be RZ Diginet?

6    A.    Yes.

7    Q.    And what amount is that check written in?

8    A.    $28,357.

9    Q.    Did you write this check?

10   A.    No.

11   Q.    Did your husband write this check?

12   A.    No.

13   Q.    Is this, in fact, one of your checks?

14   A.    No.

15   Q.    How do you know?

16   A.    It's got a different border around the edge.

17   Q.    And when you say "different border," are you

18   referring to this trim (Indicating)?

19   A.    Yes.  Also, it does not have our office phone number

20   on it.

21   Q.    And your checks have your office phone number on it?

22   A.    Yes.

23   Q.    And that's neither your signature nor your husband's

24   signature?

25   A.    Right.

1  Q.  I now show you another check.  Whom is this check

2  written to?

3  A.  A David Petrisof (Phonetic) or something.

4  Q.  What's the amount on this check?

5  A.  $74,350.

6  Q.  Is that your husband's signature down below?

7  A.  It is not.

8  Q.  Is this your signature down below?

9  A.  No.

10  Q.  Did you write this check?

11  A.  No.

12  Q.  And what was the number on this check, Ms. Duncan?

13  A.  2387.

14  Q.  Now, going back to your bank statement, what is this

15  section of your bank statement?

16  A.  It says "Checks Paid Continued."

17  Q.  And in that section, did you see those check numbers

18  for the checks I showed you that you did not write?

19  A.  Yes.

20  Q.  And are the amounts the same?

21  A.  As the checks you just showed me, yes.

22  Q.  Okay.  Now, Ms. Duncan, did you ever authorize a

23  check to be written to RZ Diginet?

24  A.  No.

25  Q.  Did you ever authorize anybody named Ruzzana

1   Hakobyan to have a check or to have funds delivered from

2   you?

3   A.   No.

4   Q.   Did you ever authorize anybody by the name of David

5   Petrisof to have a check of yours?

6   A.   No.

7   Q.   Or Arman Tangabekyan?

8   A.   No.

9   Q.   Or Mher Darbinyan?

10  A.   No.

11          MR. CREIGHTON:  No further questions.

12          THE COURT:  Cross.

13                    **CROSS-EXAMINATION**

14  BY MR. SEVERO:

15  Q.   Good afternoon, Ms. Duncan.

16  A.   Good afternoon.

17  Q.   Is Mr. Duncan still working?

18  A.   Yes.

19          MR. CREIGHTON:  Objection.  Relevance.

20          THE COURT:  Overruled.  She's answered yes.

21  Q.   BY MR. SEVERO:  Do you work at the office?

22  A.   No, I do not.

23  Q.   In 2009, did you work at the office?

24  A.   No, I did not.

25  Q.   Did you suffer any monetary loss as a result of

1    these two checks that were written against your account

2    without your permission?

3    A.    No.

4    Q.    Before April of 2009, did you -- were you aware of

5    whether your husband's office was broken into?

6    A.    No, it wasn't.

7    Q.    Not burglarized; correct?

8    A.    No.

9    Q.    Are you aware of whether his mail was stolen?

10   A.    Not to my knowledge.

11   Q.    The -- the address on the checks that we have seen

12   today, is the address for his office; is that correct?

13   A.    Yes.

14   Q.    You don't have your home address on the checks?

15   A.    No.

16   Q.    One of checks -- let me have a moment, please.

17                  (Brief interruption.)

18   Q.    BY MR. SEVERO:  The statement is addressed to -- and

19   I'll -- with the Court's permission, I'm publishing 254.

20          MR. CREIGHTON:  Yes.

21          MR. SEVERO:  Thank you.

22   Q.    The statement has -- I'm writing in the wrong

23   place -- yours and his name on the account; correct?

24   A.    Yes.

25   Q.    And the check --

683

```
 1              THE COURT:  Counsel, just for record, it's --
 2    it's Exhibit 254; is that what you said?
 3              MR. SEVERO:  Yes, Exhibit 254, Your Honor.
 4              THE COURT:  Okay.  Thank you.
 5    Q.  BY MR. SEVERO:  The checks -- the check written to
 6    Chevron, No. 2379 --
 7    A.  Yes.
 8    Q.  -- for 4945, it's actually written on a check that
 9    shows it's Frank Duncan, Attorney at Law.
10    A.  Yes.
11    Q.  Now, is this his business account?
12    A.  No, it is all -- it's one account for everything.
13    Q.  So you write your -- your personal bills from this
14    account as well?
15    A.  Yes.
16    Q.  I get it, but the checks have Attorney at Law on
17    them, while the statement does not, is that --
18    A.  That's right.
19    Q.  That's correct.  You're a signatory on this account,
20    of course.
21    A.  Yes.
22    Q.  You wouldn't want him to keep his money from you,
23    would you?  You better not.
24              Okay.  Do you -- are you aware of whether any
25    checks were ordered in April of 2009 by your husband?
```

684

```
1    A.   I don't recall.  If they were ordered, I would have

2    been the one that ordered them, but I don't recall.

3    Q.   So you didn't work at the office, but you were

4    involved in the running of the office to some degree;

5    correct?

6    A.   No, I paid the bills.  Every bill that goes into the

7    office is brought home.

8    Q.   I get you.  All right.  You were just involved in

9    the bank account?

10   A.   I was what?

11   Q.   You were involved in the bank account and the

12   payment of bills?

13   A.   I --

14   Q.   -- including the bills --

15   A.   Yes.

16   Q.   -- including the bills associated with the office?

17   A.   Yes.

18            MR. SEVERO:  I have nothing further.  Thank you

19   very much.

20            THE WITNESS:  Thank you.

21            THE COURT:  Cross.

22            MR. PEREYRA-SUAREZ:  Your Honor, I have nothing

23   further.

24            THE COURT:  I'm sorry, Counsel.

25            MR. FLIER:  No questions.
```

685

```
 1            MR. CREIGHTON:  Nothing further from the
 2    Government.
 3            THE COURT:  Okay.  You may step down.  Thank
 4    you very much for coming in.
 5            THE WITNESS:  Thank you.
 6            THE COURT:  Your next witness, Counsel?
 7            MS. YANG:  Your Honor, the Government now calls
 8    Grace Ferguson.
 9            THE COURT:  And is this witness's testimony
10    limited to one or both --
11            MS. YANG:  Again, it is limited to the bank
12    counts and aggravated identity theft accounts and the
13    RICO conspiracy charge against Defendant Darbinyan.
14            THE COURT:  Okay.
15            THE CLERK:  Good afternoon, Mrs. Ferguson.  I
16    will go ahead and place you under oath.  May I please
17    ask that you raise your right hand.
18            THE WITNESS:  Thank you.
19            THE CLERK:  Do you solemnly swear that the
20    testimony that you are about to give in the matter now
21    before this Court shall be the truth, the whole truth,
22    and nothing but the truth so help you God?
23            THE WITNESS:  I do.
24       GRACE E. FERGUSON, GOVERNMENT'S WITNESS, SWORN
25            THE CLERK:  Thank you.  May I please ask that
```

686

```
1    you state your full name for the record and spell your

2    last name.

3              THE WITNESS:  Grace E. Ferguson,

4    F-e-r-g-u-s-o-n.

5              THE CLERK:  Thank you.  You can adjust that

6    microphone, too.

7              THE COURT:  Okay.  Counsel, you may inquire.

8              MS. YANG:  Thank you, Your Honor.
```

                      **DIRECT EXAMINATION**

```
10   BY MS. YANG:

11   Q.   Good afternoon, Ms. Ferguson.

12   A.   Good afternoon.

13   Q.   Are you a customer of Bank of America?

14   A.   Yes, I am.

15   Q.   And for, approximately, how many years have you been

16   a customer of Bank of America?

17   A.   For about 30.

18   Q.   Now, in the year 2009, did you have two accounts

19   with Bank of America?

20   A.   Yes, I did.

21   Q.   A checking account and a trust account?

22   A.   Yes.

23   Q.   And I'd like to direct your attention to March of

24   2009.  Did you receive a call or an inquiry from Bank of

25   America about suspicious activity on your accounts?
```

1    A.    Yes, I did.

2    Q.    Could you please describe for the jury what

3    happened.

4    A.    Well, someone from the bank called and told me to

5    get to the bank right away.  So I called my God sister

6    to meet me at the bank at 29th and Crenshaw, and we went

7    there, and he showed me two checks that I had not

8    written, and that I had another check had the same

9    number, and we went over it and over it.

10            THE COURT:  Okay.  Counsel, your next question.

11            MS. YANG:  Yes, Your Honor.

12   Q.    You said that you went to the bank at 79th and

13   Crenshaw; is that correct?

14   A.    29th and Crenshaw.

15   Q.    29th.  Was that your home bank?

16   A.    Yes.

17   Q.    Now, you testified that, when you arrived at the

18   bank, a bank representative showed you two checks that

19   you had not authorized; is that correct?

20   A.    That's correct.

21            MR. YANG:  Your Honor, I'd like to publish

22   Exhibit 251, which has already been admitted into

23   evidence.

24            THE COURT:  Okay.

25   Q.    BY MS. YANG:  Now, Ms. Ferguson, you also testified

1    that, in addition to those two checks, you were also

2    shown other checks with the same numbers that you did

3    authorize; is that correct?

4    A.   That's correct.

5    Q.   I'd like to first show you the checks; first, this

6    check No. 1462.  Who is the person payable to?

7    A.   It's payable to Karen -- I can't make that last name

8    out.

9    Q.   Karen -- does it look like Hesham, H-e-s-h-a-m; does

10   that look close?

11   A.   Yes.

12   Q.   And is this your address at the top of the check?

13   A.   Yes, it is.

14   Q.   And is this your signature at the bottom of the

15   check?

16   A.   No, it isn't.

17   Q.   Do you know Karen Hesham?

18   A.   No, I don't.

19   Q.   And did you write a check to a Karen Hesham for

20   $26,400 on March 16th?

21   A.   No, I did not.

22   Q.   Now, you testified that you were shown a check with

23   this same check number, 1462; correct?

24   A.   Yes.

25   Q.   I'd like to now show you also part of Exhibit 251.

1    A.    Yes.

2    Q.    What check number is this?

3    A.    1462.

4    Q.    And, again, in the upper left corner, is that your

5    address 2505 West 80th Street, Inglewood?

6    A.    Yes.

7    Q.    And is that your phone number, (323)758-4603?

8    A.    Yes, it is.

9    Q.    And do you know who Ms. Bessie --

10   A.    Dyson.

11   Q.    -- Dyson is?

12   A.    Yes, I do.

13   Q.    And is this your signature at the bottom of the

14   check?

15   A.    Yes, it is.

16   Q.    Now, on all the checks that you authorized, did you

17   have your address and phone number on those checks?

18   A.    Yes, I did.

19   Q.    Did you also order the same style of check?

20   A.    Yes.

21   Q.    And could you just generally describe what style of

22   check that was?

23   A.    They usually pink with flowers on them.

24   Q.    And did those checks have a border or trim on the

25   check?

```
 1    A.    No.
 2    Q.    So directing your attention back to the first check
 3    1462, this trim that I'm circling, that was not on the
 4    checks you normally use; correct?
 5    A.    Correct.
 6    Q.    I'd also like to show you a check, the second check
 7    you were shown at the bank that you did not authorize,
 8    Check No. 1463.  Do you see that up on the screen?
 9    A.    Yes, it is 1463.
10    Q.    And, again, Karen Hesham, who is the payee on the
11    check, you don't know her; correct?
12    A.    No, I do not.
13    Q.    And you never wrote a $3,000 check to her on
14    March 18th?
15    A.    No, I did not.
16    Q.    And the signature at the bottom of this check, is
17    that your signature?
18    A.    No, it isn't.
19    Q.    Now, here's another check, 1463, that you were also
20    shown at the bank, I believe you testified.  Is this
21    your real check?
22    A.    Yes, it is.
23    Q.    And, again, to confirm, that's because your address
24    and phone number is on the top left?
25    A.    Yes.
```

```
 1    Q.   And is this your signature on the signature line?

 2    A.   Yes, it is.

 3    Q.   And who is -- do you know Ms. Gloria Cotton?

 4    A.   No, it was someone that I gave a donation to.

 5    Q.   But this is a check that you authorized and signed?

 6    A.   Yes.

 7    Q.   Now, you also testified that you had a trust account

 8    with Bank of America; correct?

 9    A.   Correct.

10         MS. YANG:  And I'd like to publish, Your Honor,

11    Exhibit 251-1, which has already been admitted into

12    evidence.

13         THE COURT:  Okay.

14    Q.   BY MS. YANG:  Now, Mrs. Ferguson, is this the Bank

15    of America statement for your trust account for the time

16    period of February 19th through March 20th, 2009?

17    A.   (No response.)

18    Q.   Your address is blacked out, but does this appear to

19    be your bank statement?

20    A.   Yes.

21    Q.   Now, at the bottom of page 1 of this bank statement,

22    there are two transfers noted, one on March 9th for

23    $45,000; do you see that?

24    A.   Yes, I see it.

25    Q.   And another one on March 19th for $40,000; do you
```

1    see that?

2    A.   Yes.

3    Q.   Did you transfer $45,000 on March 9th from your

4    trust account into your checking account?

5    A.   No, I did not.

6    Q.   Did you authorize anyone to transfer $45,000 from

7    your trust account to your checking account on

8    March 9th?

9    A.   No, I did not.

10   Q.   Did you transfer $45,000 -- $40,000 -- I

11   apologize -- on March 19th, 2009, from your trust

12   account to your checking account?

13   A.   I -- I did not.

14   Q.   And did you authorize anyone to transfer 40,000 from

15   your trust account to your checking account?

16   A.   No, I did not.

17   Q.   Mrs. Ferguson, did you bank on-line?  Do you use a

18   computer to do any of your banking?

19   A.   No, I do not.

20   Q.   So do you, to your knowledge, have an on-line bank

21   profile?

22   A.   No.

23   Q.   And in the 30-odd years that you have banked with

24   Bank of America have you ever changed your phone number

25   associated with your accounts?

1   A.   Yes, yes.

2   Q.   How many times?

3   A.   Once.

4   Q.   And when was that?

5   A.   Back in 1998, I believe.

6   Q.   Do you recognize the phone number (323)632-0169?

7   A.   Repeat that again, please.

8   Q.   Sure.  323-632-0169?

9   A.   No, I do not.

10  Q.   Did you ever authorize anyone to change your bank

11  account to be associated with that telephone number?

12  A.   No, I have not.

13  Q.   Now, I just showed you some checks written out to a

14  Karen Hesham.  Do you know a Karen Samawi?

15  A.   No, I do not.

16  Q.   Do you know an individual by the name of Armando

17  Moreno?

18  A.   No.

19  Q.   Do you know an individual by the name of Vartan

20  Avadesian?

21  A.   No.

22  Q.   And do you know an individual by the name of Mher or

23  Mike Darbinyan?

24  A.   No, I do not.

25  Q.   Did you authorize any of these people to ever have

694

```
 1   your name, account number, address, or phone number?
 2   A.   No.
 3   Q.   Did you ever authorize any of these people to sign
 4   your name to any checks associated with your account?
 5   A.   No, I have not.
 6   Q.   Did you authorize any of these people to transfer
 7   money between either of your accounts?
 8   A.   No.
 9   Q.   And did you authorize any of these people to write
10   checks on either of your accounts?
11   A.   No.
12            MS. YANG:  Your Honor, no further questions.
13            THE COURT:  Okay.  Cross-examination.
14            MR. SEVERO:  I'll make this quick.
15                    CROSS-EXAMINATION
16   BY MR. SEVERO:
17   Q.   Good afternoon, Ms. Ferguson.
18   A.   Good afternoon.
19   Q.   When you received a call from Bank of America in
20   March of 2009, did they call your home number?
21   A.   Yes, they did.
22   Q.   And to the best of your knowledge, that's the number
23   that had been in your records all along since '98?
24   A.   Yes.
25   Q.   You did not receive a call before the check was
```

1    cashed, did you?

2    A.   No, I did not.

3    Q.   Now, before -- just before March of 2009, had your

4    checks been stolen?

5    A.   No.

6    Q.   Let me actually ask you this way:  Do you keep --

7    did you keep your blank checks at home in March of 2009?

8    A.   I can't remember just what year they stopped sending

9    the check to you but --

10   Q.   Okay.  But the checks you did have, the blank checks

11   you did have, your checkbook --

12   A.   Oh, yes.

13   Q.   -- you kept it at home, did you?

14   A.   Yes, I did.

15   Q.   And had you're home been broken into?  Your checks

16   stolen?

17   A.   My home was broken into in 2008, but there wasn't

18   any checks stolen.

19   Q.   Okay.  To the best of your knowledge, any of your

20   mail in 2009 stolen?

21   A.   No.

22   Q.   Do you recall whether in 2009 you ordered any

23   checks?

24   A.   I don't recall ordering in 2009.

25   Q.   Do you know this gentleman seated here in a sweater

696

```
1    (Indicating)?  You see him?

2              Can you stand up, Mr. Darbinyan?

3              Do you know this gentleman?

4    A.   No.

5    Q.   Ever seen him before?

6    A.   Not to my knowledge.

7    Q.   Okay.  Thank you.  Did you lose any money as a

8    result of these checks that were cashed in this account?

9              MS. YANG:  Objection.  Relevance, Your Honor.

10             THE COURT:  Sustained.

11             THE WITNESS:  Yes.

12             MR. SEVERO:  All right.

13             MS. YANG:  Motion to strike.

14             MR. SEVERO:  Yeah, motion to strike.

15             THE COURT:  It will be stricken.

16   Q.   BY MR. SEVERO:  All right.  Let me ask you this:

17   Did Bank of America reimburse you for these checks that

18   were cashed?

19   A.   Yes, they did.

20             MS. YANG:  Objection.  Relevance.

21             THE COURT:  Overruled.

22             MR. SEVERO:  That's all I have.  Thank you.

23             MR. PEREYRA-SUAREZ:  Your Honor, I have no

24   questions of this witness.

25             THE COURT:  Counsel.
```

1          MR. FLIER:  No questions Your Honor.

2          THE COURT:  Any redirect?

3          MS. YANG:  One very brief question.

4                    **REDIRECT EXAMINATION**

5    BY MS. YANG:

6    Q.   Mrs. Ferguson, even though you were reimbursed, did

7    this cause you great inconvenience?

8    A.   Beg your pardon?

9    Q.   Even though you were reimbursed by the bank

10   eventually, did this cause you great inconvenience?

11         MR. SEVERO:  Objection.  It's irrelevant.

12         THE COURT:  Sustained.

13   Q.   BY MS. YANG:  Mrs. Ferguson, how long did it take

14   for the bank to reimburse you for the thousands of

15   dollars that were not authorized to be withdrawn from

16   your account?

17   A.   It was --

18         THE COURT:  You already asked the question.

19         How long did it take before they reimbursed

20   you?

21         THE WITNESS:  Just a few days.

22         THE COURT:  Okay.

23         MS. YANG:  Nothing further, Your Honor.

24         THE COURT:  Anything further, Counsel?

25         MR. SEVERO:  No, nothing.  Nothing at all.

698

1    Thank you.

2              THE COURT:  Okay.  At this time, ladies and

3    gentlemen -- and, logistically, I think we can do it

4    this way -- I'm going to break being it's 4:00 in the

5    evening.  We'll come back in tomorrow morning at --

6              THE JURORS:  8:15.

7              THE COURT:  You guys are golden.  Enjoy

8    yourself tonight.  Think about anything else other than

9    this case.  Come on back in at 8:15, and we'll have you

10   leave before the witness leaves.

11             MR. SEVERO:  We starting at 8:15?

12             THE COURT:  We're starting at 8:30.  They're

13   going to be here at 8:15.  They're going to be ready to

14   start at 8:15 we'll start at 8:30.

15             THE WITNESS:  Sir, I will not be able to come

16   back tomorrow.

17             THE COURT:  You don't have to.  You're going to

18   be excused at this time.

19             THE WITNESS:  Thank you.

20             THE COURT:  Unless you want to come back.

21             THE CLERK:  All rise.

22

23                 (At 4:03 P.M., an adjournment was

24                  taken until Friday, March 28, 2014,

25                  at 8:30 A.M.)

1          **C E R T I F I C A T E**

2

3               I hereby certify that, pursuant to Title 28,

4     Section 753, United States Code, the foregoing is a true

5     and correct transcript of the stenographically reported

6     proceedings held in the above-entitled matter and that

7     the transcript page format is in conformance with the

8     regulations of the Judicial Conference of the

9     United States.

10              Certified on February 16, 2015.

11

12

13

14                              /s/ Katherine M. Stride
                                KATHERINE M. STRIDE, CSR, RPR
15                              Official Court Reporter
                                License No. 11773
16

17

18

19

20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3          HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                         - - - -

5


6
UNITED STATES OF AMERICA,        )
7                                )
                   PLAINTIFF,    )
8                                )
       vs.                       )    No. CR 11-00072(A)-RGK
9                                )
(1)  MHER DARBINYAN,             )
10  (4)  ARMAN SHAROPETROSIAN,    )
(35) RAFAEL PARSADANYAN,         )
11                               )
                   DEFENDANTS.   )
12  _____)

13


14             REPORTER'S TRANSCRIPT OF JURY TRIAL

15                         DAY 4

16                     PAGES 1– 263

17               FRIDAY, MARCH 28, 2014

18                       8:31 A.M.

19                 LOS ANGELES, CALIFORNIA

20


21


22     _____

23         *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
           *Official Reporter, U.S. District Court*
24                *255 East Temple Street*
                 *Los Angeles, CA  90012*
25                   *213.894.5949*


UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000701**

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477
 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579
 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        JEREMY STEBBINS, FEDERAL BUREAU OF INVESTIGATION
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    I N D E X

 2   GOVERNMENT'S WITNESSES:                    PAGE
     BRIAN HICKEY
 3     DIRECT EXAMINATION BY MS. YANG            6

 4     CROSS-EXAMINATION BY MR. SEVERO          19

 5   JASON HEIN

 6     DIRECT EXAMINATION BY MR. ESTRADA        27

 7     CROSS-EXAMINATION BY MR. SEVERO          44

 8     CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ  45

 9   YOONES GIDANIAN

10     DIRECT EXAMINATION BY MR. CREIGHTON      47

11     CROSS-EXAMINATION BY MR. SEVERO          56

12   ARMANDO MORENO, JR.

13     DIRECT EXAMINATION BY MR. ESTRADA        62

14     CROSS-EXAMINATION BY MR. SEVERO         110

15     REDIRECT EXAMINATION BY MR. ESTRADA     172

16     RECROSS-EXAMINATION BY MR. SEVERO       182

17   KEVIN GIBERSON

18     DIRECT EXAMINATION BY MR. CREIGHTON     185

19     CROSS-EXAMINATION BY MR. SEVERO         214

20     CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ 228

21   HANS ALMARAZ

22     DIRECT EXAMINATION BY MR. CREIGHTON     230

23     CROSS-EXAMINATION BY MR. SEVERO         239

24   JAMES ZBORAVAN

25     DIRECT EXAMINATION BY MR. ESTRADA       240
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                         E X H I B I T S

2                         GOVERNMENT'S

3                 *NUMBER*              *ADMITTED*

4                   246                  139

5                   251-1                  6

6                   292                   32

7                   297                   13

8                   298                   15

9                   301                  190

10                  302                  258

11                  303                  192

12                  304                  206  (by reference)

13                  305                  207  (by reference)

14                  306                  209  (by reference)

15                  307                  210  (by reference)

16                  308                  211  (by reference)

17                  309                  211  (by reference)

18                  310                  213  (by reference)

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000704**

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 28, 2014

 2                              8:31 A.M.

 3                              - - - -

 4        (In the presence of the jury:)

 5             THE COURT:  Okay.  The record will reflect that all

 6    the members of the jury are in their respective seats in the

 7    jury box, including the alternates.

 8             Ladies and gentlemen, I hope you had a pleasant evening

 9    last night.

10             Do we have any UCLA fans?

11             MR. FLIER:  I do.

12             THE COURT:  Okay.  I hope that you can bear up after

13    last night and still put in a full day today.  It's going to be

14    tough, but see if you can concentrate.

15             MR. FLIER:  I was going to ask for today off, but I

16    didn't think it would look right.

17             THE COURT:  Memorial services?  Is that what you're

18    talking about?

19             MR. FLIER:  Yes, sir.

20             THE COURT:  Okay.  Ready to proceed?

21          Counsel, you want to call your next witness?

22             MS. YANG:  Yes, your Honor.

23          Your Honor, the government calls Brian Hickey.

24          Your Honor, as a housekeeping matter, the government would

25    like to move into evidence Government's Exhibit 251-1, which is
```

1   accompanied by a 902(11) declaration.

2           THE COURT:  Okay.

3           MR. PEREYRA-SUAREZ:  No objection, your Honor.

4           THE COURT:  It will be received.

5       (Received in evidence, Exhibit 251-1.)

6           MS. YANG:  Thank you, your Honor.

7           THE CLERK:  Good morning.  Right here to be sworn,

8   please.

9       (Witness sworn.)

10          THE CLERK:  Thank you.  You may be seated.

11      May I please ask that you state your full name for the

12  record and spell your last name.

13          THE WITNESS:  Brian Hickey, H-i-c-k-e-y.

14          THE CLERK:  Thank you.

15          MS. YANG:  Your Honor, may I proceed?

16          THE COURT:  Yes, please.

17          MS. YANG:  Thank you.

18              **BRIAN HICKEY, GOVERNMENT'S WITNESS,**

19                  **DIRECT EXAMINATION**

20  BY MS. YANG:

21  Q.   Good morning, sir.

22  A.   Good morning, ma'am.

23  Q.   Where do you currently work?

24  A.   Los Angeles County Sheriff's Department.

25  Q.   And what is your position at the Los Angeles County

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Sheriff's Department?

 2    A.   I'm a detective assigned to the Eurasian Organized Crime

 3    Task Force out of Glendale Police Department.

 4              THE COURT:  You may want to talk a little slower.  Our

 5    reporter here...

 6         Okay.

 7    BY MS. YANG:

 8    Q.   Is the Eurasian Organized Crime Task Force also known as

 9    EOCTF?

10    A.   Yes, ma'am.

11    Q.   And how long have you been assigned to that task force?

12    A.   Since about June of 2008.

13    Q.   Now, how long have you been with the sheriff's department

14    in total?

15    A.   26 years.

16    Q.   And during your time with the sheriff's department, prior

17    to your assignment to the task force, what other types of cases

18    have you worked?

19    A.   I was assigned to a surveillance team since 2000.  Prior

20    to that, I worked West Hollywood Station patrol and handled all

21    various crimes, including murder all the way down to simple

22    assaults.

23    Q.   And do you have experience with fraud and identity theft

24    investigations?

25    A.   Yes, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Now, during the course of your work with the sheriff's

2  department as well as the task force, have you become familiar

3  with an organization known as Armenian Power?

4  A.   Yes, ma'am.

5           MR. SEVERO:  Objection, assumes facts not in evidence.

6           THE COURT:  Overruled.

7  BY MS. YANG:

8  Q.   And have you become familiar with many of the members of

9  Armenian Power?

10 A.   Yes, ma'am.

11 Q.   Now, I'd like to direct your attention to 2010.  Were you

12 involved in a large-scale investigation at the task force?

13 A.   Yes, ma'am.

14 Q.   And what was that investigation of, generally?

15 A.   Organized crime involving Armenian Power.

16 Q.   And was there a specific target as well that that

17 investigation was focused on?

18 A.   There were several targets, yes, ma'am.

19 Q.   Now, by 2010, had the investigation been going on for a

20 few years?

21 A.   Yes, ma'am.

22 Q.   And at some point during the investigation, did you learn

23 of a power struggle or a rivalry within Armenian Power?

24 A.   Yes, ma'am.

25 Q.   And did you learn that a death threat had been issued?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, ma'am.

 2              MR. FLIER:  I'm going to object, leading.

 3              THE COURT:  Sustained.

 4    BY MS. YANG:

 5    Q.    What, if any -- what did you learn about this rivalry or

 6    power struggle within Armenian Power?

 7    A.    That a death threat had been made.

 8    Q.    And how did you learn about the death threat?

 9    A.    Through the investigation.

10    Q.    And what --

11              THE COURT:  Counsel, just again for the record,

12    because we didn't do it at the beginning of this witness, is

13    this witness's testimony directed only towards -- which of the

14    defendants?

15              MS. YANG:  Yes, your Honor.  I apologize.  This

16    testimony is directed towards defendant Mher Darbinyan and the

17    RICO conspiracy count.

18              THE COURT:  So is it also directed towards or relevant

19    to Mr. Sharopetrosian?

20              MS. YANG:  Only to the extent that he is also charged

21    in the RICO conspiracy count, but is more directly related to

22    defendant Darbinyan.

23              THE COURT:  So it's limited just to these two

24    defendants?

25              MS. YANG:  Yes, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000709**

```
 1                THE COURT:  Okay.  Go ahead.
 2     BY MS. YANG:
 3     Q.   Detective Hickey, what did you learn about the death
 4     threat?
 5                MR. SEVERO:  Objection, hearsay.
 6                MS. YANG:  Your Honor, it's effect on the listener.
 7                THE COURT:  I'm sorry?
 8                MS. YANG:  Effect on the listener.  Effect on the
 9     listener to explain his subsequent actions.
10                THE COURT:  Overruled.  Excuse me.  Sustained.
11     Sustained.
12     BY MS. YANG:
13     Q.   Was the death threat, based on your knowledge of the
14     investigation --
15                MR. SEVERO:  Objection, calls for hearsay information.
16     This is based on hearsay.
17                THE COURT:  You didn't hear any death threats or any
18     tapes of any death threats?
19                THE WITNESS:  No, your Honor.
20                THE COURT:  Okay.  Next question, Counsel.
21     BY MS. YANG:
22     Q.   Following the information you received about a death
23     threat, what, if anything, did you do?
24                MR. SEVERO:  That assumes information that is hearsay.
25                THE COURT:  Overruled.  Overruled.  It's not for the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   truth of the matter, Counsel.  Overruled.

2   BY MS. YANG:

3   Q.   Detective Hickey, what, if anything, did you do in

4   response to learning about the death threat?

5   A.   We effected a traffic stop on Mr. Darbinyan to advise him

6   of the death threat.

7   Q.   And was that on August 10th, 2010?

8   A.   Yes, ma'am.

9   Q.   Now, you said that you effected a traffic stop on

10  Mr. Darbinyan.  Were you in a police vehicle?

11  A.   Yes, ma'am.

12  Q.   And when you stopped defendant Darbinyan, did you do the

13  warning in his vehicle or in your vehicle?

14  A.   In our police vehicle.

15  Q.   Now, you said "our."  Were you with a partner at the time?

16  A.   Yes, ma'am.

17  Q.   And who was that?

18  A.   Detective George Semenez.

19  Q.   How do you spell his last name?

20  A.   S-e-m-e-n-e-z.

21  Q.   Now, when you effected the traffic stop and you warned

22  defendant Darbinyan, did you document this warning in any way?

23  A.   Yes, ma'am.

24  Q.   And how did you document it?

25  A.   It was videotaped by my partner, George.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. YANG:  Your Honor, at this time if Exhibit 297

 2    could be placed before the witness.

 3              MR. SEVERO:  I think it's -- objection, relevance.

 4              THE COURT:  Sustained.

 5        I'm assuming those are the videotapes?

 6              MS. YANG:  Yes, your Honor.

 7              THE COURT:  He's already testified to it.  It would be

 8    repetitive.

 9              MS. YANG:  Your Honor, it's also dual purpose for

10    voice identification, which is at issue in this case by the

11    defendant.

12              MR. SEVERO:  I think that's --

13              THE COURT:  I'm sorry?

14              MR. SEVERO:  I think it's cumulative, 403.

15              THE COURT:  Okay.  Overruled.

16              MS. YANG:  Exhibit 297 placed before the witness?

17              THE COURT:  Okay.

18              MS. YANG:  Thank you.

19    Q.   Detective Hickey, could you please take a look at

20    Exhibit 297 and describe what it is.

21    A.   It's a CD matchable DVR.

22    Q.   And does that CD contain a recording of the warning that

23    you and your partner gave to Mr. -- defendant Darbinyan on

24    August 10th, 2010?

25    A.   Yes, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000712**

1    Q.    Did you view that CD prior to testifying here in court

2    today?

3    A.    Yes, ma'am.

4    Q.    And are there any identifiers on that CD to indicate that

5    you had previously viewed it?

6    A.    Yes, ma'am.  My initials, with the date of 3/14/14.

7              MS. YANG:  Your Honor, at this time the government

8    would move to admit Exhibit 297.

9              THE COURT:  It will be received.

10        (*Received in evidence, Exhibit 297.*)

11             MS. YANG:  And at this time the government asks

12   permission to play Exhibit 297.

13             THE COURT:  You may publish.  You may play it.

14        (*Video plays.*)

15             MR. SEVERO:  Your Honor, object.

16             THE COURT:  Let's cut it off, okay.  No, I said cut it

17   off.

18        (*Video stopped.*)

19             THE COURT:  Okay.  Enough has been played as far as

20   the purpose that you asked for it to be played for.  That's for

21   voice identification.

22   BY MS. YANG:

23   Q.    Detective Hickey, in addition to --

24             MR. SEVERO:  Your Honor, I ask that be turned -- thank

25   you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MS. YANG:

2    Q.   In addition to warning defendant Darbinyan about the death

3    threat, did you and/or your partner also search him?

4    A.   Yes, ma'am.

5    Q.   And was that pursuant to his parole conditions?

6    A.   Yes, ma'am.

7    Q.   I'd like you to take a look at Exhibit 298.  There's a

8    binder behind you.

9         MR. SEVERO:  Your Honor, I dropped the binder in the

10   well.

11        THE COURT:  We'll get it for you.

12        MR. SEVERO:  Thank you.

13   BY MS. YANG:

14   Q.   Detective Hickey, if you could take a look at what's in

15   Exhibit 298.

16   A.   Yes, ma'am.

17   Q.   Do you recognize what is in Exhibit 298?

18   A.   Yes, ma'am.

19   Q.   And could you generally describe what they are.

20   A.   There's a picture with a large amount of money and a --

21        MR. SEVERO:  Your Honor, move to strike "large" as a

22   conclusion of this witness.

23        THE COURT:  Overruled.  He's just giving his opinion.

24        MR. SEVERO:  Okay.

25        THE COURT:  What's large to one isn't large to others.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MS. YANG:

 2    Q.   Detective Hickey, are these photographs that were taken on

 3    August 10th, 2010, of defendant Darbinyan as well as items that

 4    were found on him?

 5    A.   Yes, ma'am.

 6    Q.   Do these photos accurately represent defendant Darbinyan

 7    and the items taken from him on August 10th, 2010?

 8    A.   Yes, ma'am.

 9         MS. YANG:  Your Honor, at this time the government

10    moves to admit Exhibit 298 and asks for permission to publish.

11         THE COURT:  They're received and may be published.

12         (Received in evidence, Exhibit 298.)

13    BY MS. YANG:

14    Q.   Now, Detective Hickey, why did you and your partner take

15    photographs of the defendant Darbinyan?

16    A.   To document.

17    Q.   And publishing page 3 of 6 of Exhibit 298.  You documented

18    his tattoos; is that correct?

19    A.   Correct.

20    Q.   Publishing page 6 of 6.  And that's the back of the

21    defendant, correct?

22    A.   Correct.

23    Q.   Now, you also testified that you photographed items seized

24    from him, correct?

25    A.   Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Publishing page 2 of 6.  Were these BMW keys found on

2    defendant Darbinyan?

3    A.   Yes, ma'am.

4    Q.   And you had mentioned cash.  Publishing page 1 of 6 of

5    Exhibit 298.  Is this the cash that you found on defendant

6    Darbinyan?

7    A.   Yes, ma'am.

8    Q.   Now, in this photograph, there is also a note card with

9    the name Armen Hovanissian.  Was this note card also found on

10   defendant Darbinyan?

11   A.   Yes, ma'am.

12   Q.   Do you know who Armen Hovanissian is?

13   A.   Yes, ma'am.

14   Q.   And who is he?

15        MR. SEVERO:  Objection, relevance.

16        THE COURT:  I don't know if it's relevant or not.

17   You may ask the question over, or subject to a motion to

18   strike.

19        THE WITNESS:  He's a documented member of the

20   Armenian Power gang.

21        MR. SEVERO:  Move to strike, hearsay, conclusion of

22   this witness.

23        THE COURT:  Overruled.

24   BY MS. YANG:

25   Q.   And did you learn of Armen Hovanissian during your
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   years-long investigation of Armenian Power?

 2   A.   Yes, ma'am.

 3   Q.   What was Armen Hovanissian known as?

 4   A.   "Sniper."

 5   Q.   And during the course of your investigation with the task

 6   force into Armenian Power, do you know where Armen Hovanissian

 7   was at the time?

 8   A.   He was in custody at the L.A. County Jail.

 9   Q.   I'd like you to take a look at Exhibit 298 in that binder.

10   A.   298?

11   Q.   I apologize.  299.

12        THE COURT:  Should be the next exhibit.

13        THE WITNESS:  Sorry, didn't bring my glasses, your

14   Honor.

15        THE COURT:  That's okay.

16        THE WITNESS:  They're at the office.

17   BY MS. YANG:

18   Q.   Do you recognize what's depicted in Exhibit 299?

19   A.   Yes, ma'am.

20   Q.   And what is it?

21   A.   It's a photo of Armen Hovanissian.

22   Q.   And does this photograph fairly and accurately depict the

23   defendant -- the individual you know as Armen Hovanissian?

24   A.   Yes, ma'am.

25        MS. YANG:  Your Honor, at this time the government
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    moves Exhibit 299 into evidence.

 2            MR. SEVERO:  Objection, relevance.

 3            THE COURT:  Sustained.

 4    BY MS. YANG:

 5    Q.   Based on your investigation, did you know

 6    Armen Hovanissian, also known as "Sniper," to have an AP

 7    tattoo?

 8            MR. SEVERO:  Objection, relevance and --

 9            THE COURT:  Sustained.

10    BY MS. YANG:

11    Q.   Based on your investigation of Armenian Power with the

12    task force, was Armen Hovanissian an associate of

13    defendant Darbinyan?

14            MR. SEVERO:  Objection, relevance, hearsay.

15            MS. YANG:  Your Honor, goes to the Count 1 RICO

16    conspiracy.

17            THE COURT:  Well, overruled.

18            THE WITNESS:  I'm sorry, can you repeat that?

19    BY MS. YANG:

20    Q.   Based on your investigation of the task force into

21    Armenian Power, was Armen Hovanissian a known associate of

22    defendant Mher Darbinyan?

23    A.   Yeah.

24            MR. SEVERO:  Objection.  Think it's a different

25    question than before, but --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  So why don't we try it one more
 2   time.  State the question, then we'll hear the objection.
 3   BY MS. YANG:
 4   Q.   Based on your investigation of Armenian Power with the
 5   task force, was Armen Hovanissian an associate?  Did you know
 6   him to be an associate of defendant Mher Darbinyan?
 7              MR. SEVERO:  Vague as to "associate" and calls for a
 8   conclusion, hearsay, no foundation.
 9              THE COURT:  Overruled.
10              THE WITNESS:  Yes, ma'am.
11              MS. YANG:  One moment, your Honor.
12         Nothing further, your Honor.
13              THE COURT:  Cross?
14                      CROSS-EXAMINATION
15   BY MR. SEVERO:
16   Q.   Good morning, sir.
17   A.   Good morning, sir.
18   Q.   The tattoos that you showed of Mr. Darbinyan --
19         May I publish portions of the --
20              THE COURT:  Yes, certainly.
21              MR. SEVERO:  Thank you.
22   Q.   As I understand your testimony -- as I understand your
23   testimony, you took these pictures to document his -- document
24   his tattoos?
25   A.   Yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000719**

```
 1   Q.   And do you recognize what this tattoo signifies?

 2   A.   Are you referring to the chain?

 3   Q.   Yes.

 4   A.   The links?  It could mean several things, sir.  It could

 5   mean --

 6   Q.   So the answer is, you don't know specifically why he had

 7   that tattoo.

 8   A.   No.

 9   Q.   And do you know what the center portion of the tattoo is?

10   I'm pointing at it.

11   A.   No, sir.

12   Q.   How about the stars on the ends?

13   A.   The stars could signify in the criminal organization

14   somebody of --

15   Q.   But you don't know that.  You don't.

16          THE COURT:  Well, you cut him off.

17          MR. SEVERO:  Sorry.

18          THE COURT:  You may finish the answer.

19          THE WITNESS:  It could show somebody of authority

20   within a criminal enterprise gang.

21   BY MR. SEVERO:

22   Q.   Do you know that to be the case in this case?

23   A.   In this case, no, not exactly.

24   Q.   You know what the two, I don't know, Tauruses or bulls

25   are?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   No, sir.

 2    Q.   Do you know -- in this -- on this page of Exhibit 298,

 3    this tattoo of what appears to be a king or royalty --

 4    A.   No, sir.

 5    Q.   -- do you know what that is?

 6    A.   No, sir.

 7    Q.   And on this side of the tattoo of the -- on this side of

 8    Mr. Darbinyan's torso, you see this tattoo here?

 9    A.   Yes, sir.

10    Q.   That looks like a gentleman in a suit?

11    A.   Yes, sir.

12    Q.   You know who he is?

13    A.   No, sir.

14    Q.   Did you ask him?

15    A.   I don't recall.

16    Q.   You didn't see any tattoos saying -- that had the initials

17    AP on it, did you?

18    A.   No, sir.

19    Q.   Now, the car he was in at the time of the traffic stop,

20    was he driving?

21    A.   Yes, sir.

22    Q.   What car was that?

23    A.   I don't recall what car he was in.

24    Q.   Was he alone in the car?

25    A.   Yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   So he was removed from the car and placed in your patrol
2    car?
3    A.   Yes, sir.
4    Q.   Did you handcuff him?
5    A.   No, sir.
6    Q.   You just put him in the car to advise him?
7    A.   Yes, sir.
8    Q.   And you advised him after you took the photos, didn't you?
9    A.   I believe my partner did, yes, sir.
10   Q.   He's buttoning his shirt in the --
11   A.   Yes, sir.
12   Q.   -- video, so that means he probably took it off and put it
13   back on while you were advising him, right?
14   A.   Correct.
15   Q.   And you released him after that?
16   A.   Correct.
17   Q.   Now, this Armen Hovanissian here.
18   A.   Yes.
19   Q.   See a phone number at the top?
20   A.   Yes, sir.
21   Q.   Did you call that phone number?
22   A.   No, sir.
23   Q.   Do you know anyone who did?
24   A.   No, sir.
25   Q.   Do you know whether that phone number belongs to an
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Armen Hovanissian who is a doctor?

2    A.   No, sir.

3           MR. SEVERO:  Need a moment, your Honor.

4           THE COURT:  Yes.

5    BY MR. SEVERO:

6    Q.   Your involvement in this case was mostly surveillance?

7    A.   Yes, sir.

8    Q.   And how many times did you surveil Mr. Darbinyan other

9    than the date that he was stopped?

10          MS. YANG:  Objection, your Honor.  This is outside the

11   scope.

12          MR. SEVERO:  I think --

13          THE COURT:  Sustained.

14   BY MR. SEVERO:

15   Q.   Was this the first time that you tried to stop

16   Mr. Darbinyan to advise him of his -- of this purported threat?

17   A.   Yes, sir.

18   Q.   Had you seen him before, or were you looking for him

19   before this date?

20   A.   I don't understand your question.

21   Q.   Were you looking to stop him before this date to advise

22   him of this threat?

23   A.   No, sir.

24   Q.   Where was the stop made?

25   A.   I'm sorry?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Where was the stop made?

 2   A.   I don't recall which street it was on.  It was on a street

 3   in the city of Los Angeles.

 4   Q.   Did you write a report?

 5   A.   No, sir.

 6   Q.   This was how long ago?

 7   A.   2010.

 8   Q.   And the information that you received concerning this

 9   purported threat, did you get it directly from some informant?

10   A.   It would have been from my supervisor.

11   Q.   Who was your supervisor?

12   A.   Sergeant Larry Hastings.

13   Q.   Was he also a member of the task force?

14   A.   Yes, sir.

15   Q.   Did Mr. Hastings show you any kind of letter, note, or any

16   report of an interview that showed that there was a threat?

17   A.   No, sir.

18   Q.   Did Mr. Hastings show you any kind of -- or give you any

19   kind of information as to who the threat was from?

20   A.   Yes, sir.

21   Q.   Did he give you a name?

22   A.   Yes, sir.

23   Q.   Did you ever interview the person that presumably

24   threatened Mr. Darbinyan?

25   A.   No, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   Do you know if anyone did?

 2    A.   Yes, sir.

 3    Q.   Who would have been the one who interviewed this person?

 4    A.   Would have been Jeremy Stebbins.

 5             MR. SEVERO:  I don't have anything further.  Thank

 6    you.

 7             THE COURT:  Counsel.

 8             MR. SEVERO:  Just a moment, your Honor.  May I have a

 9    moment before you --

10         (Mr. Severo and Mr. Darbinyan confer privately.)

11             MR. SEVERO:  May I?  May I have one more?

12    Q.   Wasn't there a juvenile in the car?

13    A.   I don't recall a juvenile.  I believe Mike was -- or,

14    excuse me, Mr. Darbinyan was by himself.

15    Q.   That's what you remember?

16    A.   Yes, sir.

17    Q.   And you remember he was driving?

18    A.   Yes, sir.

19             MR. SEVERO:  All right.  Thank you.

20             MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

21    of this witness.

22             THE COURT:  Okay.  Counsel.

23             MR. FLIER:  I have no questions, your Honor.  Thank

24    you.

25             MS. YANG:  No redirect, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  You may step down.  Thank you very much.

 2              THE WITNESS:  Thank you, your Honor.

 3              MR. ESTRADA:  We're just going to check if our victim

 4     witness is here.  If he's not here, then we'll proceed with

 5     another witness.

 6              THE COURT:  Okay.

 7              MR. ESTRADA:  Your Honor, the government calls

 8     Jason Hein to the stand.

 9              THE COURT:  Okay.

10              MR. SEVERO:  I'm sorry, I missed it.  Who's this?

11              MR. ESTRADA:  Your Honor, just as a preface, as we

12     have done with other witnesses, Jason Hein's testimony will

13     pertain to the Count 1 RICO count as to defendant Darbinyan,

14     defendant Sharopetrosian.

15              THE COURT:  Okay.  So ladies and gentlemen, it will be

16     limited to those two defendants.

17              THE CLERK:  May I please ask that you raise your right

18     hand.

19          (Witness sworn.)

20              THE CLERK:  Thank you.  You may be seated.

21          May I please ask that you state your full name for the

22     record and spell your last name.

23              THE WITNESS:  Jason Darrow Hein, H-e-i-n.

24              THE CLERK:  Thank you.

25              THE COURT:  You may inquire, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Thank you, your Honor.
 2              JASON HEIN, GOVERNMENT'S WITNESS,
 3                       DIRECT EXAMINATION
 4    BY MR. ESTRADA:
 5    Q.   Sir, where do you work?
 6    A.   Avenal State Prison.
 7    Q.   How long have you worked at Avenal State Prison?
 8    A.   Been at Avenal going on seven years.
 9    Q.   Now, Avenal State Prison, is that part of the California
10    Department of Corrections?
11    A.   Yes, it is.
12    Q.   How long have you worked for the California Department of
13    Corrections?
14    A.   Over 12 years.
15    Q.   Currently, what's your position with the California
16    Department of Corrections?
17    A.   I work within a correctional housing unit.  Basically,
18    they're living quarters for inmates.
19    Q.   I'll ask you a little bit about that, but before I do,
20    some more background.
21         In addition to Avenal State Prison, have you worked at
22    other state prisons?
23    A.   I've -- started my career at Salinas Valley State Prison.
24    From there, went to Soledad State Prison, and currently Avenal.
25    Q.   Now, Avenal, for those of us who aren't familiar with
```

```
1    Avenal or haven't traveled there, where, generally, is it
2    within California?
3    A.    It's next to Coalinga and Kettleman City.  It's south --
4    Q.    For those of us who aren't familiar with Kettleman City --
5    A.    It's south of Fresno.
6    Q.    South of Fresno?  Okay.
7          THE COURT:  There you go.
8    BY MR. ESTRADA:
9    Q.    And with regard to Avenal State Prison specifically, where
10   you worked, about how many inmates can Avenal State Prison
11   hold?
12   A.    I think right now we're about three, a little bit over
13   three, close to four thousand.
14   Q.    And you mentioned your specific title is corrections
15   officer?
16   A.    Correction officer, yes.
17   Q.    As a corrections officer, do you work in a specific
18   building?
19   A.    I'm currently in housing unit 350, but we are assigned --
20   I am assigned to five day a week in one housing unit, yes.
21   Q.    Now, as a corrections officer, what are your general
22   duties?
23   A.    It depends on the -- on the areas that you work at.  Being
24   in a housing unit, I'm in charge with the daily activities
25   on -- during the day shift, of inmates, anywhere from releasing
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    them to the -- go to their meals, releasing them to go to yard,

2    and releasing them going to visits and medical appointments,

3    things like that.

4    Q.   And for those of us who aren't familiar with prison,

5    what's it mean to release an inmate to do something?

6    A.   In the prison system, everything is controlled.  So when

7    it's time for the, for example, the breakfast, we would release

8    them by area, and they walk out in a controlled manner, and we

9    basically just supervise and make sure everything's being done

10   correctly, in a controlled manner.

11   Q.   Do you do the same thing for visits?

12   A.   I do the same thing for visits, yes.

13   Q.   And your job, in terms of your daily activities, are you

14   among the inmates?

15   A.   Yes.  We -- there's me and my partner, and we walk the

16   housing unit.  We walk -- in Avenal, they live in dorms with

17   basically -- anywhere between 10 to 12 inmates live in each

18   dorm.  There's a total of 24 dorms.  We walk the dorms.  We

19   search the areas.

20        When we release, we -- they have to show their ID, which

21   also has a picture and their name on their IDs.  When we

22   release for visits or medical, we write duckets, and we

23   correspond the duckets, which is basically passes for the

24   inmates, checking with their IDs, make sure they're the right

25   person going to the right appointment.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   So there are a few things there that I'd just like to

 2   clarify.  Duckets?

 3   A.   Duckets is like a pass, like a -- basically you're writing

 4   down on like a, like a ticket, like you could get a ticket for

 5   a movie theater, that you're supposed to go to this area.  And

 6   the reason why we do that is to verify that each inmate is

 7   going to the correct appointment.  Like, if you get called for

 8   a visit, we verify that this is the right inmate going to the

 9   right visit.

10   Q.   And all that, that releasing of inmates and making sure

11   inmates are going to right place, is that because security's

12   important in prison?

13   A.   Very important.

14   Q.   Now, I'd like to ask you about a specific period in 2009.

15   In 2009, were you working at Avenal State Prison?

16   A.   Yes.  Housing unit 630.

17   Q.   Were you assigned a particular location within

18   building 630?

19   A.   I was a day cop, working from 6:30 to 2:30, with I believe

20   Thursday, Fridays off.

21   Q.   6:30 a.m. to 2:30 p.m.?

22   A.   Yes.

23   Q.   Please take a look, if you would, at Exhibit 292.  And it

24   should be -- there's some black binders that should be behind

25   you that would contain 292.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Okay.

 2   Q.    You have that in front of you?

 3   A.    Yes.

 4   Q.    What is Exhibit 292?

 5   A.    It's an overall picture of Avenal State Prison.

 6   Q.    Does it fairly and accurately depict Avenal State Prison?

 7   A.    Yes.

 8         MR. ESTRADA:  Your Honor, the government moves to

 9   admit and requests permission to publish 292.

10         MR. SEVERO:  Objection, relevance.

11         THE COURT:  Sustained.

12   BY MR. ESTRADA:

13   Q.   Looking at 292, that's a general photo of Avenal State

14   Prison?

15   A.   Yes, it is.

16   Q.   Would it help in describing the general layout of the

17   prison?

18   A.   Yes, it does.

19         MR. ESTRADA:  Your Honor, the government moves to

20   admit Exhibit 292.

21         THE COURT:  I have no idea what the relevancy of this

22   whole testimony is at this time.  I don't know why the layout

23   of the prison is relevant.

24         MR. ESTRADA:  Well, it will become evident,

25   your Honor, but he needs to explain his time in the prison,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    what Avenal State Prison was about, because defendant

2    Sharopetrosian was incarcerated there.

3              MR. PEREYRA-SUAREZ:  I'm going to join the objection,

4    your Honor.

5              THE COURT:  I don't know where the layout of the

6    prison makes any difference at all.  I think he can testify to

7    whether or not someone was imprisoned there or not without

8    going into the layout of the prison.

9         I'm going to overrule it but subject to a motion to

10   strike.  It seems like we're getting into a lot of testimony

11   here that really is not relevant, that is just kind of more of

12   a waste of time, but go ahead, Counsel.

13             MR. ESTRADA:  Yes, your Honor.  I'm just trying to lay

14   a foundation, but let me just publish this briefly --

15             THE COURT:  Okay.

16             MR. ESTRADA:  -- so the jury can see.

17        (Received in evidence, Exhibit 292.)

18   BY MR. ESTRADA:

19   Q.   That's a general layout at Avenal State Prison?

20   A.   Yes.

21   Q.   And you mentioned building 630.  In 2009 at building 630,

22   were you familiar with an inmate named Arman Sharopetrosian?

23   A.   Yes.

24   Q.   And how do you remember that inmate?

25   A.   He was incarcerated in -- in my housing unit.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Do you recall interacting with this inmate?

2    A.   Yes.  I -- like I said, I controlled daily activities of

3    the prison, releasing for trials, releasing for visits, count,

4    things like that.

5    Q.   About how many inmates were there at building 630 where

6    you were working?

7    A.   At the time, I'm going to guess about 250, somewhere

8    around there.

9    Q.   Approximately 250?

10   A.   Yeah.

11   Q.   And how is it you remember the specific inmate

12   Arman Sharopetrosian?

13   A.   He had weekly visits quite regularly, so, like I said,

14   when an inmate has a visit, I call them down, I verify his name

15   with his ID, picture ID, and then I write him passes and

16   release him to his visit.

17   Q.   And based on your dealings with defendant Arman Sharop- --

18   this Arman Sharopetrosian -- before I do that, actually, that

19   Arman Sharopetrosian you're familiar with, do you see him in

20   the courtroom today?

21   A.   Yes.

22   Q.   Can you please point him out, identify an article of

23   clothing he's wearing.

24        MR. PEREYRA-SUAREZ:  I'll stipulate to the

25   identification, your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2   BY MR. ESTRADA:

 3   Q.   And this defendant, Arman Sharopetrosian, were you aware

 4   whether he was a Southerner or not?

 5   A.   He was a classified Southerner.

 6   Q.   Could you please explain --

 7              MR. PEREYRA-SUAREZ:  Objection, lack of foundation,

 8   your Honor.

 9              THE COURT:  I'm not too sure -- you're going to have

10   to define the terms that you're talking about.  I don't know if

11   the jury understands what "Southerner" means.

12              MR. ESTRADA:  That was going to be my next question,

13   your Honor.

14              THE COURT:  So let's hold this question until you

15   establish what you're talking about.

16              MR. ESTRADA:  Okay.

17   Q.   You worked at Avenal State Prison for many years?

18   A.   Yes.

19   Q.   Worked in the California Department of Corrections for

20   many years?

21   A.   Yes.

22   Q.   Are you familiar with the term "Southerner"?

23   A.   Yes, I am.

24   Q.   Can you explain what the term "Southerner" is?

25   A.   When an inmate comes into the prison system and they are
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    involved with criminal activity, southern -- southern part of
 2    California, they come in, they get what's called a orientation
 3    in the prison, and we ask them, who can you bunk with?  Who can
 4    you sleep with?  Can you -- can you be housed with anybody, or
 5    is there a certain fraction that you -- that you could only
 6    stay with?
 7        And when an inmate says, I need to sleep with -- I have to
 8    be with the other Southerners, we classify them as being part
 9    of the Southerner fraction of California, which involved --
10    it's usually involved with a lot of criminal activity.
11    Q.   And stepping --
12            MR. PEREYRA-SUAREZ:  Move to strike the last --
13            THE COURT:  The last portion will be stricken.
14    BY MR. ESTRADA:
15    Q.   Well, stepping back from there, what is a Southerner,
16    based on your knowledge in working at Avenal State Prison?
17    A.   A Southerner is an inmate who either identifies himself
18    as being grouped with that typical type of people which are
19    involved in many types of gangs within the streets, like AP or
20    Aryan Power 13 --
21            MR. PEREYRA-SUAREZ:  Move to strike the last part,
22    your Honor.
23            THE COURT:  Overruled.
24            THE WITNESS:  Basically are involved in criminal
25    activity and grouped within the prison, like Southern
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    California.

 2    BY MR. ESTRADA:

 3    Q.   Maybe it'll be easier if I just ask more directly.  Is a

 4    Southerner associated with gang members?

 5    A.   Yes.

 6    Q.   How so?

 7    A.   On the streets, there is multiple types of gang members.

 8         MR. SEVERO:  Objection.  This is -- there's no

 9    foundation for this witness testifying --

10         THE COURT:  Sustained.

11    BY MR. ESTRADA:

12    Q.   Let's take it away from the streets.

13    A.   Okay.

14    Q.   In the prison, when people go from the streets to prison

15    and they classify as a Southerner, generally speaking, what

16    does that mean within prison?

17    A.   It means that --

18         MR. SEVERO:  No foundation.

19         THE COURT:  Overruled.  This is depending on -- excuse

20    me.  This is explaining what they classify as Southerners.

21         So what do the prison officials classify as Southerners?

22         THE WITNESS:  What happens when you come into

23    orientation, you get asked certain questions of, who do you

24    associate yourself with?  Are you -- are you by yourself?  Are

25    you just someone who committed a crime and you don't want to be
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   labeled with a bunch of other inmates?  Are you individual, or,

 2   because of your past history, do you need to be grouped with

 3   certain individuals?

 4        And majority of the time they'll say, I need to live with

 5   other Southerners, because if I -- for example, if I lived with

 6   a Northerner inmate, we would -- we would be at war.

 7        For example, when I worked on that yard, I --

 8             THE COURT:  Let's wait until the next question.

 9        Counsel.

10   BY MR. ESTRADA:

11   Q.   Okay.  Within prison, is previous gang ties important?

12   A.   Yes.

13   Q.   And as a Southerner, does that connote or -- I'll withdraw

14   the question.  No "connote."

15        Within prison, does a Southerner generally tie to a gang

16   member?

17             MR. SEVERO:  Objection, lack of foundation.

18             THE COURT:  Sustained.

19   BY MR. ESTRADA:

20   Q.   Within prison, as a Southerner, generally speaking, what

21   does that tie to?

22             MR. SEVERO:  Objection, lack of foundation.

23             THE COURT:  I don't understand the question, "what's

24   it tied to."

25             MR. SEVERO:  And vague.
```

```
 1                THE COURT:  Sustained.
 2   BY MR. ESTRADA:
 3   Q.   Is gang life important in prison?
 4   A.   For those who are involved in gang life, yes.
 5   Q.   How so?
 6                MR. SEVERO:  Objection.  That's speculation of this
 7   witness.
 8                THE COURT:  Sustained.
 9                MR. SEVERO:  Move to strike.
10   BY MR. ESTRADA:
11   Q.   Well, for the prison, security's important, correct?
12   A.   Security's very important, correct.
13   Q.   And is it important to designate who is associated with a
14   gang and who isn't?
15   A.   Yes.
16   Q.   Why is that?
17   A.   For example, at the time when -- when I had him in my
18   housing unit, the -- there was two fractions of inmates that
19   were --
20                MR. SEVERO:  Your Honor, going into a narrative.
21                THE COURT:  Yeah.  Like I said, just try to answer the
22   question rather than explain it.  If he wants you to explain
23   it, he'll ask you further questions.
24                MR. ESTRADA:  Yes, your Honor, I think I was asking.
25   Q.   So there is -- security's important?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    It is very important.

 2    Q.    And is it sometimes the case that groups will fight each

 3    other within prison?

 4    A.    Yes.

 5    Q.    So, for instance, the Southerners, will they fight other

 6    groups?

 7    A.    Yes.

 8    Q.    At the time that you were actually working at Avenal in

 9    2009 and Sharopetrosian was there, was there some sort of a

10    tension between the Southerners and another group?

11    A.    Yes, there was.

12              MR. SEVERO:  Objection, vague.

13              THE COURT:  Overruled.

14    BY MR. ESTRADA:

15    Q.    You can answer.

16    A.    Yes, there was.

17    Q.    And what was that other group?

18    A.    The Southerners were -- were at odds with the Fresno State

19    Bulldogs, the Bulldogs.

20    Q.    Who are the Bulldogs?

21    A.    They are a localized street gang --

22              MR. SEVERO:  Objection, no foundation.

23              THE COURT:  Sustained.

24              MR. ESTRADA:  Your Honor, he works within the prison.

25              THE COURT:  Let me see if I can cut through it.  If I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    can't, that's fine.

 2         Did you designate Mr. Sharopetrosian as a Southerner?

 3             THE WITNESS:  Sharopetrosian was classified as a

 4    Southerner, yes.

 5             THE COURT:  Okay.

 6    BY MR. ESTRADA:

 7    Q.   Okay.  And as a Southerner, did that mean he was

 8    associated with a particular group?

 9    A.   The rest of the Southerners.  Correct.

10    Q.   And are the Southerners generally gang members from

11    Southern California?

12    A.   Yes.

13             MR. SEVERO:  Objection, your Honor.

14             THE COURT:  Sustained.

15    BY MR. ESTRADA:

16    Q.   Based on your knowledge?

17    A.   Yes.

18             THE COURT:  Sustained.

19         I'm sorry, did you object, Counsel?

20             MR. SEVERO:  Yeah, of course.

21             THE COURT:  Sustained.

22             MR. SEVERO:  The problem is, the question was

23    sustained, and then he just, second part --

24             THE COURT:  It was sustained.

25         You can tell him where you designated the person to.  You
```

1    can tell him what that designation means.  Whether or not he

2    was a member of a gang down here, that would be sustained.

3            MR. ESTRADA:  Yes.  And I'm not asking that,

4    your Honor.

5            THE COURT:  Well, then ask the next question.

6    BY MR. ESTRADA:

7    Q.   Based on your training, experience within the prison,

8    generally speaking, when a person is a Southerner, what does

9    that mean?

10           MR. SEVERO:  Objection, asked and answered.

11           THE COURT:  Sustained.

12           MR. ESTRADA:  I don't think it's been answered,

13   your Honor.

14           THE COURT:  I think I ruled, Counsel.  Sustained.

15           MR. ESTRADA:  Very good.

16   Q.   Now, are you familiar with the term "validated" as --

17   A.   Yes.

18   Q.   -- it applies within the California Department of

19   Corrections?

20   A.   Yes.

21   Q.   Can you explain what "validated" generally means?

22   A.   The difference between classification and validation is,

23   when an inmate is validated, it means there's three hard proof,

24   such as tattoos, pictures, or a self-admittance, saying that

25   they are involved in a prison gang.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    So you come in and you say, "Well, I could only be housed

2    with, like, in a dorm with other Southerners or bunked on top

3    of another Southerner," you're classified as a Southerner.  But

4    once you get validated, it's -- it's more of a hard-core proof

5    that you are involved with a gang activity.

6    Q.    And that's hard-core proof determined by the California

7    Department of Corrections?

8    A.    Yes.

9    Q.    Now, are you familiar with the practice of inmates

10   committing crimes within prison?

11   A.    Yes.

12   Q.    And smuggling items?

13   A.    Yes.

14   Q.    What types of items can be smuggled?

15   A.    Everything from drugs to cell phones to money.

16   Q.    And obviously, security is important in prison.  And not

17   to get too graphic, but are there ways inmates can smuggle

18   items without it being detected by officers such as yourself?

19       MR. PEREYRA-SUAREZ:  Objection, your Honor, relevance,

20   your Honor.

21       THE COURT:  Is there going to be testimony that

22   something was smuggled?

23       MR. ESTRADA:  There's going to be testimony that

24   Sharopetrosian talks about narcotics being smuggled into prison

25   and about the cell phones.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Is it your testimony that he's going to be
 2    testifying as to how things were smuggled?
 3              MR. ESTRADA:  I don't want to get into those details,
 4    but generally that they are --
 5              THE COURT:  Then it would be sustained.
 6              MR. ESTRADA:  Well, then I can get into the details,
 7    your Honor.
 8              THE COURT:  Counsel, it's not relevant unless he
 9    talked about ways that things were smuggled in.  Not just that
10    things were smuggled in, but the way that things were smuggled
11    it.  Then it would be relevant.
12              MR. ESTRADA:  Okay.
13    Q.   So I won't ask about the ways, but generally speaking,
14    items are smuggled into prison?
15    A.   They can -- yes, they are.
16    Q.   Do officers attempt to seize those items?
17    A.   Yes.
18    Q.   Are you successful in seizing all those items?
19    A.   All of them, no.
20    Q.   Why not?
21    A.   For example, in the building I work in, there's 250
22    inmates, and there's two officers that are assigned to that
23    building.  There's more of them than there is of us.
24    Q.   It's not easy to detect all types of criminal activity.
25    A.   I could be walking one side of the building --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  Objection, your Honor.  Calls for "yes"

 2   or "no" answer.

 3            THE COURT:  Yeah.  Sustained.

 4            THE WITNESS:  It is not that easy.

 5            MR. ESTRADA:  Just a moment, your Honor.

 6            THE COURT:  Yes.

 7            MR. ESTRADA:  No further questions, your Honor.

 8            THE COURT:  Cross.

 9                          CROSS-EXAMINATION

10   BY MR. SEVERO:

11   Q.   Good morning, sir.

12   A.   Good morning.

13   Q.   In fact, guards very often are the ones who smuggle cell

14   phones in; is that correct?

15   A.   Very often?

16   Q.   Yes.

17   A.   That would be an overstatement.

18   Q.   All right.  But they do it?

19   A.   It happens.

20   Q.   Drugs.  They -- guards smuggle drugs in?

21   A.   From guards to free staff to plumbers to inmates to

22   visitors.  It happens.

23   Q.   Okay.  Say it one at a time.

24        Guards do it?

25   A.   Visitors do it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Just answer my question, please.

2         Guards do it, yes?

3              MR. ESTRADA:  Objection, your Honor, argumentative.

4              THE COURT:  Overruled.

5         Do guards do it?

6              THE WITNESS:  It has been known to happen, yes.

7              THE COURT:  Okay.

8    BY MR. SEVERO:

9    Q.   And plumbers do it?

10   A.   Plumbers do it, yes.

11   Q.   And visitors do it?

12   A.   Visitors do it.

13   Q.   Isn't it a fact that all people of Armenian descent are

14   classified as Southerners?

15   A.   No.

16              MR. SEVERO:  That's all I have.  Thanks.

17              THE COURT:  Counsel.

18                        **CROSS-EXAMINATION**

19   BY MR. PEREYRA-SUAREZ:

20   Q.   Sir, you testified earlier that Mr. Sharopetrosian got

21   weekly visits at Avenal.

22   A.   On a regular basis.

23   Q.   I'm sorry?

24   A.   Weekly on a regular basis.

25   Q.   Who exactly was visiting him on a regular basis?

```
 1   A.    You would have to ask the visiting cops for that.  They

 2   would call me to let me know that he had a visit.  I wrote a

 3   ducket for him and sent him to his visit.  I stayed in the

 4   housing unit.

 5   Q.    So you have no idea who visited Mr. Sharopetrosian?

 6   A.    I do not.

 7   Q.    And are you speculating that he had visits every single

 8   week?

 9   A.    On a regular basis, I was the housing cop, so I was the

10   one who wrote the passes for that particular inmate.  And

11   that's how I knew his face and his name very well, because on a

12   regular basis I wrote passes for visiting.

13   Q.    Were there times when Mr. Sharopetrosian was on lockdown

14   at Avenal State Prison?

15   A.    Yes, there is lockdowns.

16   Q.    In fact, you cannot get a visit if you're on lockdown; is

17   that correct?

18   A.    Correct.

19   Q.    So whenever he was on lockdown, he got no visits, correct?

20   A.    Correct.

21         MR. PEREYRA-SUAREZ:  I have nothing further,

22   your Honor.

23         MR. FLIER:  I have no questions.

24         MR. ESTRADA:  No further questions, your Honor.

25         THE COURT:  You may step down.  Thank you very much
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    for coming in.

 2              THE WITNESS:  Thank you, your Honor.

 3              THE COURT:  Next.

 4              MR. CREIGHTON:  The government calls Yoones Gidanian.

 5              MR. ESTRADA:  Your Honor, if I can just have a moment

 6    to check on a witness.

 7              THE COURT:  Yes, certainly.

 8              THE CLERK:  Good morning.  Right here to be sworn,

 9    please.

10        (Witness sworn.)

11              THE CLERK:  Thank you.  You may be seated.  You can

12    adjust the microphone if you need to.

13        May I please ask that you state and spell your full name

14    for the record.

15              THE WITNESS:  Yoones Gidanian.

16              YOONES GIDANIAN, GOVERNMENT'S WITNESS,

17                      DIRECT EXAMINATION

18    BY MR. CREIGHTON:

19    Q.   Sir, would you please spell your last name for the record.

20    A.   G-i-d-a-n-i-a-n.

21    Q.   Good morning, Mr. Gidanian.

22    A.   Good morning.

23    Q.   What do you do?

24    A.   I'm in a jewelry business.

25    Q.   Do you have your own business, or do you work for somebody
```

```
 1   else?
 2   A.    I have my own business.
 3   Q.    And what is the name of that business?
 4   A.    Diamond House.
 5   Q.    And approximately where are you located?
 6   A.    Downtown L.A.
 7   Q.    Are you a business customer of Bank of America for your
 8   banking services?
 9   A.    Yes, sir.
10   Q.    Approximately how long have you been with Bank of America?
11   A.    It's a long time.
12   Q.    More than five years?
13   A.    Yes.
14   Q.    Were you a customer in 2009?
15   A.    Yes.
16   Q.    Now, in March of 2009, did you learn of a fraud that had
17   taken place on your account?
18   A.    Yes.
19         MR. FLIER:  I'm sorry, your Honor.  Is this dealing
20   with my client?
21         THE COURT:  Oh, let's find that out.
22         Is this only as to --
23         MR. CREIGHTON:  Your Honor, this pertains to the bank
24   fraud charges, the aggravated identity theft charges and the
25   racketeering conspiracy charges against defendant Mher
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Darbinyan.

2            THE COURT:  Okay.  So it will be limited just to

3    Mr. Darbinyan.

4            MR. FLIER:  Thank you.

5    BY MR. CREIGHTON:

6    Q.   And I'm -- I'm sorry, I lost my point.

7         At some point in March of 2009, you learned of a fraud

8    against your account?

9    A.   Yes.

10   Q.   How did you learn that?

11   A.   Somebody called me from Bank of America and warned me that

12   there is a check came from your account and gentleman trying to

13   cash it and if I issued such a check.

14   Q.   Mr. Gidanian --

15        With the Court's permission, I'm sorry, your Honor,

16   publishing -- permission to publish what has previously been

17   admitted as Government's Exhibit 273.

18            THE COURT:  Yes.

19   BY MR. CREIGHTON:

20   Q.   Mr. Gidanian, would you look at this check.  Is this the

21   check that Bank of America asked you about?

22   A.   Yes.

23   Q.   What is the number of this check?

24   A.   307.

25   Q.   Now, this check is written to Steven Wilson.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Right.

2    Q.    Did you ever write a check to Steven Wilson?

3    A.    No.

4    Q.    Did they ask you about Steven Wilson when Bank of America

5    called you?

6    A.    Yes.

7    Q.    Did you know at that time whether or not you had written a

8    check to Steven Wilson?

9    A.    Yes.

10    Q.    Why?

11    A.    Because my business -- my -- my business check is only

12    limited to the bills and the suppliers that I work with.  So I

13    know which bills I issue check, and I know suppliers that I

14    issue checks to them.

15    Q.    And is that a relatively small number?

16    A.    I'm sorry?

17    Q.    I'm sorry.  Is that a relatively small number of people

18    and --

19    A.    Yeah.

20    Q.    -- entities you write checks to?

21    A.    Yeah, there are limited people that I, you know, write a

22    check to.

23    Q.    So you knew very quickly that this, in fact, was not a

24    check that you had written?

25    A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Now, looking at this check, is this the name of -- is this

2   your name and the name of your company up here?

3   A.   Yes.

4   Q.   And is this the name of -- is this your address?

5   A.   Yes.

6   Q.   And looking at the signature that appears down here on the

7   lower right, is that your signature?

8   A.   No.

9   Q.   So you didn't authorize this check, did you?

10  A.   I didn't.

11  Q.   Now, did you learn that other fraudulent checks had been

12  issued against your account?

13  A.   The person that called me told --

14           MR. SEVERO:  Objection.  Calls for a "yes" or "no."

15           THE COURT:  Did you or did you not?

16           THE WITNESS:  Yes.  Sorry.

17  BY MR. CREIGHTON:

18  Q.   Mr. Gidanian, with the Court's permission, I'd like to

19  show you what's previously been admitted as Exhibit 253.

20           THE COURT:  Okay.

21           MR. CREIGHTON:  I keep doing that.

22  Q.   Mr. Gidanian, what is this?  I'm sorry.  What is the

23  document?

24  A.   Sorry.  This is statement from my bank.

25  Q.   Okay.  And that's your name up on the upper left there?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000751**

1    A.    Yes.

2    Q.    And just to be clear, what statement is this?

3    A.    March 13 through April 6, 2009.

4    Q.    Thank you.

5          Now, turning to page 4 of that exhibit, what is this

6    document?

7    A.    That's a check that I issued.

8    Q.    And is that your signature on the lower right?

9    A.    Yes.

10   Q.    And to whom is this check made?

11   A.    Business Card.

12   Q.    So this is a legitimate check that you issued --

13   A.    Yeah.

14   Q.    -- is that right?

15         What is this document?

16   A.    Another check.

17   Q.    To whom is this check written?

18   A.    Joseph -- I can't read -- I cannot read the other.  Pres,

19   P-r-e-s, I guess.

20   Q.    Can you read the last three letters under that smudge

21   there?

22   A.    P-r-e-s, I guess.

23   Q.    Okay.  Could that be Mares?

24   A.    Maybe.

25   Q.    Now, what is this -- what is the check number on this

1    check?

2    A.  305.

3    Q.  And in what amount is this check written?

4    A.  5,300.

5    Q.  Is this your signature on this check?

6    A.  No.

7    Q.  Did you authorize this check?

8    A.  No.

9    Q.  How would you compare the style of order on this check up

10   here to the style of order on the check that you previously

11   said was legitimate?  Are they the same?

12   A.  No, they're not.

13   Q.  Turning to page 7, to whom is this check written?

14   A.  Joseph Mares.

15   Q.  And what is the number of this check?

16   A.  306.

17   Q.  And in what amount was this check?

18   A.  5,000.

19   Q.  Is that your signature?

20   A.  No.

21   Q.  Did you write this check?

22   A.  No.

23   Q.  And then if you would look at this check, please.  What is

24   the number on this check?

25   A.  304.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   To whom has it been written?

2   A.   Steven A. Wilson.

3   Q.   And in what amount?

4   A.   4,500.

5   Q.   Is that your signature?

6   A.   No.

7   Q.   Did you authorize this check?

8   A.   I didn't.

9   Q.   Turning back to the first portion of your bank statement,

10  do you see these two check numbers down in the lower left?

11  A.   Yes.

12  Q.   What are those numbers?

13  A.   304 and 305.

14  Q.   And on the right, what are the amounts of those checks?

15  A.   304:  4,500.  305:  5,300.

16  Q.   And those are the checks that you did not write; is that

17  correct?

18  A.   Correct.

19  Q.   And turning to the last page, what is that check number?

20  A.   306.

21  Q.   And in what amount is that check written?

22  A.   5,000.

23  Q.   And that's also for a check that you did not --

24  A.   Right.

25  Q.   -- authorize?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1         Were you reimbursed for the amounts that were taken from

2    your account?

3    A.    Yes.

4    Q.    Did you ever authorize Steven A. Wilson to have a check

5    drawn on your account?

6    A.    No.

7             MR. SEVERO:  Asked and answered, cumulative.

8             THE COURT:  Sustained.  He answered "no."

9    BY MR. CREIGHTON:

10   Q.    Did you ever authorize Manuk Terzyan to have a check drawn

11   on your account?

12            MR. SEVERO:  Asked and answered.  He --

13            MR. CREIGHTON:  I believe, your Honor, I have not

14   asked that question.

15            THE COURT:  Overruled.  Overruled.

16   BY MR. CREIGHTON:

17   Q.    Did you ever authorize Mher Darbinyan --

18            THE COURT:  Well, he didn't answer the last question,

19   Counsel.

20            MR. CREIGHTON:  I'm sorry.

21   Q.    Did you ever authorize Manuk Terzyan?

22   A.    No.

23   Q.    Did you ever authorize Mher Darbinyan?

24   A.    No, I don't know that.

25   Q.    Do you know Mher Darbinyan?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    No.

 2              MR. CREIGHTON:  Thank you.  No further questions.

 3              THE COURT:  Cross.

 4              MR. SEVERO:  Thank you.

 5                         CROSS-EXAMINATION

 6   BY MR. SEVERO:

 7   Q.    Good morning, sir.

 8   A.    Good morning, sir.

 9   Q.    You are --

10         If I may have a moment, your Honor.

11         You are in the -- in one of the jewelry buildings

12   downtown, correct?

13   A.    Yes, sir.

14              MR. SEVERO:  May I publish a portion of --

15              THE COURT:  Yes.

16              MR. SEVERO:  -- 253?

17         Thank you.

18   Q.    Just looking at your address here.  550 South Hill; is

19   that correct?

20   A.    Yes, sir.

21   Q.    550 South Hill?

22   A.    Yes.

23   Q.    Now, suite is 1373.  Is that on the 13th floor?

24   A.    Yes.

25   Q.    This building is a secured building, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Supposedly, yes.

2    Q.    It's got security guards --

3    A.    Yes.

4    Q.    -- at the entrance?

5    A.    Yeah.  Is that what you mean?  I'm sorry.

6    Q.    You can only go -- excuse me, sir.  I'm sorry.

7    A.    I'm sorry.  I didn't know what you mean, so --

8    Q.    Well, if you don't, let me know, and I'll try to rephrase.

9          This building, in order to get to any floor, you have to

10   ask the elevator for the particular floor you're going to,

11   correct?

12            MR. CREIGHTON:  Objection, relevance.

13            THE COURT:  Overruled.

14            THE WITNESS:  I don't know what you mean.

15   BY MR. SEVERO:

16   Q.    When you go to the elevators --

17   A.    Yes.

18   Q.    -- can you go to any floor on the elevator, or do you have

19   to ask for the elevator to take you to the 13th floor?

20         Let me rephrase that, because it's a little confusing.

21         When you touch the panel to ask for the elevator, you ask

22   for an elevator that will go to the 13th floor only; isn't that

23   true?

24         You understand me?

25   A.    No, I --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  I don't either, Counsel.

 2              MR. SEVERO:  Yeah, I know.

 3   Q.   The elevators in the building open according to the floors

 4   it's going to?

 5   A.   Yes.  Recently this is what they had, designed it like

 6   this.  It wasn't like that before.

 7   Q.   Has it been like that for several years since it's --

 8   A.   Since --

 9   Q.   For ten years at least?

10   A.   I don't think so.

11   Q.   All right.  Now, you are -- your office is glass all the

12   way on the outside, correct?

13   A.   No.

14   Q.   You have a small office inside?

15   A.   Yes.

16   Q.   Your building is on the corner of 5th and Hill?

17   A.   Yes, sir.

18   Q.   Not 6th and Hill?

19   A.   I'm sorry.  6th and Hill.

20   Q.   6th and Hill.

21   A.   Sorry.

22   Q.   Across from Pershing Square?

23   A.   Yes, sir.

24   Q.   All right.  So did you have any break-ins into your office

25   prior to March 30th of 2009?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    Office wasn't burglarized, correct?

 3    A.    No.

 4    Q.    Did you have someone steal any checks from you during that

 5    time?

 6    A.    Not from my office, no.

 7    Q.    Did you order any checks prior to March 30th?

 8    A.    Yes.

 9    Q.    Did those checks come to your office?

10    A.    No.

11    Q.    Did they go to the bank?

12    A.    Yes.

13    Q.    Is that how you normally would do that?

14    A.    It depends.  Sometimes yes, sometimes no.

15    Q.    Okay.  Are you aware of whether any of your mail was

16    stolen prior to March 30th of 2009?

17    A.    I wouldn't know.

18    Q.    So the answer's no, you were not aware?

19    A.    I'm not aware of it, no.

20    Q.    Did you have more than one checking account at that time?

21    A.    No.

22    Q.    The phone number that the bank called is the phone number

23    that appeared on the checks?

24    A.    For what?

25    Q.    Okay.  When the bank called you on this fraudulent check
```

1  that was written --

2  A.   Yes.

3  Q.   -- did they call the number that is on the check?

4  A.   Yes.

5  Q.   And is that the number that you have filed with the bank

6  as your contact number?

7  A.   Yes, sir.

8  Q.   You have never changed that number?

9  A.   No.

10 Q.   How long have you banked with Bank of America?

11 A.   It's very long time.  I --

12 Q.   20 years?

13 A.   15, probably.

14 Q.   Okay.  Did you receive a call to this number only after

15 the check was cashed?

16 A.   I received a call when the person was in the bank with the

17 teller about to cash.

18 Q.   But the -- the check was cashed anyways?

19 A.   Can I explain, or just I say yes/no?

20 Q.   Well, go ahead and -- I'm the one who started that, so I

21 guess -- let me -- can you answer it yes or no?

22        THE COURT:  Or does it need an explanation?

23 BY MR. SEVERO

24 Q.   Or does it need an explanation?

25        Right.  Thank you, Judge.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Need an --

 2   Q.   Do you need an explanation?

 3   A.   Yes, please.

 4   Q.   Go ahead, please.

 5   A.   When the person called me from bank, told me a check

 6   already was cashed to your account --

 7   Q.   Right.

 8   A.   -- and this is -- I don't know, I don't remember, this is

 9   the second or third check the gentleman, whoever is there,

10   tried to cash it.

11   Q.   All right.  It was all on the same day, though?

12   A.   Yes, I think so.

13        MR. SEVERO:  I have nothing further.

14        Thank you, sir.

15        THE COURT:  Counsel.

16        MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

17   of this witness.

18        THE COURT:  Counsel.

19        MR. FLIER:  I have no questions.  Thank you, your

20   Honor.

21        THE COURT:  Redirect?

22        MR. ESTRADA:  No.

23        MR. CREIGHTON:  Nothing, your Honor.

24        THE COURT:  You may step down.  Thank you very much

25   for coming in.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Your Honor, the government calls
 2    Armando Moreno.  And I'll ask the marshal's assistance on
 3    having that witness brought up.
 4              THE COURT:  Okay.
 5       (Witness sworn.)
 6              THE CLERK:  Thank you.  You may be seated.
 7         And may I ask that you please state your full name for the
 8    record and spell your last name.
 9              THE WITNESS:  Armando Moreno, Jr., M-o-r-e-n-o.
10              THE CLERK:  Thank you.
11              THE COURT:  Okay.  Counsel, you may inquire.
12              MR. ESTRADA:  Thank you, your Honor.
13              ARMANDO MORENO, JR., GOVERNMENT'S WITNESS,
14                        DIRECT EXAMINATION
15    BY MR. ESTRADA:
16    Q.   Sir, I see you're in a jumpsuit there.  Are you currently
17    incarcerated?
18    A.   Yes.
19    Q.   Are you incarcerated based on charges in this case?
20    A.   Yes.
21    Q.   And on another federal case?
22    A.   Yes.
23    Q.   I want to stick with this case first.
24         Did you plead guilty to charges in this case?
25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   What did you plead guilty to?

2    A.   To identity theft and RICO.

3    Q.   And fraud?

4         THE COURT:  I'm going to ask you to pull the

5    microphone a little closer to you, if it moves.

6         There you go.  That's perfect.  Thank you.

7    BY MR. ESTRADA:

8    Q.   Fraud as well?

9    A.   Fraud, yes.

10   Q.   Now, you were also indicted and you pled guilty in another

11   case as well?

12   A.   Yes.

13   Q.   Is that case known as the Ojeda case?

14   A.   Yes.

15   Q.   What did you plead guilty to in that case?

16   A.   To RICO, to RICO act.

17   Q.   And the RICO in that case, did it involve a conspiracy to

18   commit murder?

19   A.   Yes.

20   Q.   And did you plead guilty to conspiracy to commit murder?

21   A.   Yes.

22   Q.   Was that in connection with the Mexican Mafia?

23   A.   Yes.

24   Q.   And before I ask you about the Mexican Mafia, I want to

25   just ask you a bit more about your background.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000763**

```
 1        This isn't the first time you've been in trouble with the
 2   law, has it?
 3   A.    No.
 4   Q.    Have you had previous convictions?
 5   A.    Yes.
 6   Q.    What previous convictions have you had?
 7   A.    Murder, robbery, and drugs.
 8   Q.    Just to be clear, you've been previously convicted of
 9   murder; is that right?
10   A.    Yes.
11   Q.    1991?
12   A.    Yes.
13   Q.    Previously convicted of bank robbery?
14   A.    Yes.
15   Q.    Was that a federal case or a state case?
16   A.    Federal.
17   Q.    And you said drugs.  Were you convicted of possession of a
18   controlled substance?
19   A.    Yes.
20   Q.    Was that in 2004?
21   A.    Yes.
22   Q.    Were you also convicted of possession of a hypodermic
23   needle?
24   A.    Yes.
25   Q.    Is that related to drugs?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    And that was in 2009?

 3    A.    Yes.

 4    Q.    Now, on all these various convictions, did you spend time

 5    in prison?

 6    A.    Yes.

 7    Q.    And after being in prison, did you serve time on parole?

 8    A.    Yes.

 9    Q.    You have parole violations, too?

10    A.    Yes.

11    Q.    So for all these parole violations and the convictions

12    you've had, about how much time have you spent inside of

13    prison, state or federal?

14    A.    Over 20 years.

15    Q.    Now, on top of the stuff you've been convicted of and that

16    you've pled guilty to, have you committed other crimes, too?

17    A.    Yes.

18    Q.    Things you haven't been caught on?

19    A.    Yes.

20    Q.    Have you stabbed people?

21    A.    Yes.

22    Q.    In prison?

23    A.    Yes.

24    Q.    Do you know if they survived?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Whether the people you stabbed survived?

2    A.   No, I don't know.

3    Q.   Did you also work with different gangs and groups in

4    distributing drugs?

5    A.   Yes.

6    Q.   Did you actually work with a cartel known as La Familia to

7    distribute drugs?

8    A.   Yes.

9    Q.   Did you also work with cartel members to plan a

10   kidnapping?

11   A.   Yes.

12   Q.   You were never convicted of that?

13   A.   No.

14   Q.   I mentioned before that you pled guilty in this Ojeda case

15   related to the Mexican Mafia.  Do you remember that?

16   A.   Yes.

17   Q.   You said you spent 20 years in prison, approximately.

18        Are you a gang member?

19   A.   Yes.

20   Q.   You've been a gang member most of your life?

21   A.   Approximately.

22   Q.   At some point did you become linked to the Mexican Mafia?

23   A.   Yeah.

24   Q.   Explain how that happened.

25   A.   I became an associate of Mexican Mafia around 1993.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   What's it mean to be an associate in the Mexican Mafia?

2   A.   An associate is someone who does behalfs on Mexican Mafia,

3   does acts for them.

4   Q.   When you say "acts," are those legitimate acts, or are

5   those criminal acts?

6   A.   Criminal acts.

7   Q.   What sort of criminal acts would you do for the Mexican

8   Mafia?

9   A.   Anything that benefits the Mexican Mafia.  For example,

10  stabbing somebody, killing somebody, selling drugs, collecting

11  money.

12  Q.   And you're familiar with the Mexican Mafia?

13  A.   Yes.

14  Q.   Can you explain to the jury what the Mexican Mafia is.

15  A.   The Mexican Mafia is a prison gang that controls all

16  Southern California Mexican gangs.

17  Q.   So just to break it down, the Mexican Mafia is in prison?

18  A.   Prison and on the streets.

19          MR. SEVERO:  It's asked and answered.

20          THE COURT:  Overruled.

21  BY MR. ESTRADA:

22  Q.   Now, you mentioned the Mexican Mafia controls Mexican

23  gangs on the street.

24  A.   Not just Mexican gangs, but all Southsider gangs.

25  Q.   And when you say Southsider gang, what are you talking

1   about?

2   A.    There's two -- there's two sides.    There's the northern

3   side for Northern California, and then you have the gangs for

4   Southern California.

5   Q.    And are the gangs in Southern California, does that

6   include every single gang in Southern California?

7   A.    Every single gang that represents the southerners.

8   Q.    So, for instance, in Southern California, there are

9   African-American gangs, right?

10  A.    Yes.

11  Q.    The Crips, the Bloods?

12  A.    Yes.

13  Q.    Are they part of the Southsiders?

14  A.    No.

15  Q.    Why not?

16  A.    Because only Southsiders claim "sur trece."

17  Q.    And I'll ask you about that "trece" a little bit later,

18  but before I do, are the Southsiders generally Hispanic gang

19  members?

20  A.    Not necessary.

21  Q.    Could you explain that.

22  A.    Well, the -- it used to be all Mexican gangs, but now we

23  have different races that also claim Southsiders.

24  Q.    Now, I want to ask you about that, but before I do, you

25  mentioned northerners and southerners.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Is there some sort of division between Southern California

 2   gangs and Northern California gangs?

 3   A.   Yes.  They're rivals.

 4   Q.   Do they fight each other?

 5   A.   Yes.

 6   Q.   In prison?

 7   A.   In prison and on streets.

 8   Q.   Okay.  So you mentioned that you were an associate of the

 9   Mexican Mafia.  At some point did you become a member of the

10   Mexican Mafia?

11   A.   Yes.  I became a member of the Mexican Mafia in 2007.

12   Q.   What's the difference between being an associate in the

13   Mexican Mafia and being a member of the Mexican Mafia?

14   A.   As an associate, you're just considered a soldier.  Once

15   you become a member, then you have authority over all gangs,

16   all actions, anything that has to do with the gangs.

17   Q.   Are there many, many members of the Mexican Mafia?

18   A.   There's about a couple hundred.

19   Q.   And in comparison to how many gang members there are in

20   prison, are there many more gang members in prison?

21   A.   Oh, absolutely.

22   Q.   Is it hard to become a member of the Mexican Mafia?

23   A.   Yes.

24   Q.   What do you have to do?

25   A.   You have to either kill or be someone that can produce
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    money for the benefit of the Mexican Mafia.

2    Q.   When you say kill, who do you kill?

3    A.   Anybody that's a threat to the Mexican Mafia or someone

4    that for some reason has been targeted by the Mexican Mafia.

5    Q.   Now, you mentioned that the Mexican Mafia is a prison

6    gang?

7    A.   Mexican Mafia was created in prison, but it expanded into

8    the streets.

9    Q.   Could you explain what you mean by "expanded into the

10   streets."

11   A.   Well, Mexican Mafia was mainly to keep Mexicans together,

12   united, to help each other and protect each other.  Eventually

13   it became to where members went out to the streets and seeing

14   there was a benefit of controlling gangs and getting money from

15   them.

16   Q.   And if a gang is controlled by the Mexican Mafia, do they

17   show some symbol of that?

18   A.   The gangs?

19   Q.   The gangs.

20   A.   Yeah.

21   Q.   You mentioned this term, "sur trece," before.  "Trece," is

22   that 13?

23   A.   13 is for the letter M.

24   Q.   And that 13, is it important when it comes to Mexican

25   Mafia?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   What's it mean?

 3   A.   "Eme."  Eme represents M, which is Mexican Mafia.

 4   Q.   And 13 is the 13th letter of the alphabet?

 5   A.   Yes.

 6   Q.   Now, when did you become a member of the Mexican Mafia?

 7   A.   In 2007.

 8   Q.   And as a member, were you referred to as a specific name?

 9   A.   Yes.

10   Q.   What do they call you?

11   A.   Carnal.

12   Q.   Is "carnal" a word of respect?

13   A.   A carnal -- we consider each other "carnales," which means

14   brothers.

15           MR. SEVERO:  Move to strike that as nonresponsive.

16   Calls for a "yes" or "no" answer.

17           THE COURT:  Overruled.

18   BY MR. ESTRADA:

19   Q.   Now, for gangs that have their allegiance to the Mexican

20   Mafia, do they use the number 13 in their name?

21   A.   Yes.

22   Q.   Once you're a member of the Mexican Mafia, does that give

23   you power?

24   A.   Yeah.  Absolutely.

25   Q.   What sort of power?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    The power to control a gang, the power to order someone to

2    be killed, order someone to collect money.  You control all --

3    all the gangs, to do whatever you ask them to do.

4    Q.    And you mentioned "collect money."  Are you familiar with

5    the word "tax" as it applies to gangs and the Mexican Mafia?

6    A.    Yes.

7    Q.    What's that mean?

8    A.    Tax is something that we use to collect money.  We charge

9    everybody a fee.  Whether you sell drugs or you have a

10   business, we charge them a fee to protect them and to be able

11   to sell drugs.

12   Q.    Is that one of the ways the Mexican Mafia makes money?

13   A.    Yes.

14   Q.    Now, for you, as a member of the Mexican Mafia -- before I

15   ask that question, do members of the Mexican Mafia generally

16   control territories?

17   A.    Yes.

18   Q.    Within Southern California?

19   A.    Yes.

20   Q.    And other places?

21   A.    Yes.

22   Q.    You, as a member of the Mexican Mafia, did you have a

23   certain territory that you controlled?

24   A.    Yes.  Usually a brother has a control over whatever area

25   he's originally from.

1    Q.    Where were you originally from?

2    A.    Orange County.

3    Q.    So did you have control of Orange County?

4    A.    Yes.

5    Q.    And by "control of Orange County," what did you control?

6    A.    As a brother from Orange County, I controlled the gangs

7    within Orange County.

8    Q.    And when you say gangs, is it every single gang or just

9    certain gangs?

10   A.    All gangs that represent sur trece.

11   Q.    So the 13?

12   A.    The 13.

13   Q.    Now, when you're in prison as a member of the Mexican

14   Mafia and you're collecting money or taxes, you don't get to

15   carry cash in prison, do you?

16   A.    No.

17   Q.    How does money get sent to you?

18   A.    Money is -- gets diverted to you by either a friend or a

19   crew, someone you have on the streets that represents you.

20   They collect the money and they send it to wherever you ask

21   them to send it, whether on your books or to some specific

22   spot.

23   Q.    Is money sometimes sent by money orders, things like that?

24   A.    Yes.

25   Q.    Now, are there certain symbols that show someone to be a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   member of the Mexican Mafia?

2   A.    Yes.

3   Q.    What sort of symbols are those?

4   A.    They have a black hand or the letters E-M-E, which is Eme.

5   Q.    Now, when you said black hand, you pointed to your neck.

6   A.    Yeah.

7   Q.    What's on your neck?

8   A.    A hand.

9   Q.    A black hand?

10  A.    Black hand.

11  Q.    Is that a symbol for the Mexican Mafia?

12  A.    Yes.

13  Q.    Now, could anyone just put that hand tattoo on their neck?

14  A.    No.  If -- if you put that tattoo on your -- on yourself

15  and you're not a member, you will be killed.

16  Q.    Are you familiar with the term "validated" --

17  A.    Yes.

18  Q.     -- as it applies to Mexican Mafia?

19  A.    Yes.

20  Q.    What's that mean?

21  A.    "Validated" is what the CDC has labeled anybody that does

22  anything on behalf of Eme, whether being a shot-caller or

23  collecting stuff inside the prison.

24  Q.    Okay.  Now, you mentioned that gangs associated with the

25  Mexican Mafia had that 13.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   Are you familiar with a gang known as Armenian Power?

 3   A.   Yes.

 4   Q.   Did they have the 13?

 5   A.   Yes.

 6   Q.   Were they connected to the Mexican Mafia?

 7   A.   Yes.

 8   Q.   Could you explain that.

 9   A.   Well, as -- for having the letter 13 means they're

10   representing us.

11   Q.   Did you meet Mexican Mafia -- or excuse me.  Did you meet

12   Armenian Power members?

13   A.   Yes.

14   Q.   Were you familiar with the gang?

15   A.   Yes.

16   Q.   Did they have any sort of reputation?

17   A.   Yes.

18   Q.   What was their reputation?

19   A.   They had a reputation of people who had money and could

20   make money.

21   Q.   And that making money, is that something important in the

22   Mexican Mafia?

23   A.   Yes.  Money is important because it benefits the Mexican

24   Mafia, whether -- not individually, but also for the brothers

25   that are in jail.  Part of the responsibility as a Eme member
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   is to look out for them.

 2   Q.   Are most of the members of the Mexican Mafia -- you

 3   mentioned there were around 200 or something.  Are they mostly

 4   in prison?

 5   A.   Yeah, most of them are held in prison.

 6   Q.   Some of them are released from prison?

 7   A.   Yes.

 8   Q.   And are the ones outside prison, are they responsible for

 9   giving money to people inside prison?

10   A.   Yes.  That's one of your responsibilities, is -- is to

11   look out for them.  Money is important because it benefits the

12   Eme.  Your responsibility as a member is to remember those

13   individuals and look out for those individuals.

14   Q.   Now, sir, are you familiar with a person by the name of

15   Mher Darbinyan?

16   A.   Yes.

17   Q.   How did you become familiar with this person?

18   A.   I met Capone in around 2007 in Chino prison.

19   Q.   Now, you said Capone.  Who's Capone?

20   A.   Mike Darbinyan.

21   Q.   Is that what you knew him as?

22   A.   Yes.

23   Q.   You said you met him in prison?

24   A.   Yes.

25   Q.   What year was this?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1    A.    Around 2007, I think, believe.

 2    Q.    Where were you when you met Capone, or Mike Darbinyan?

 3    A.    We were in the hole, Palm Hall.

 4    Q.    What's "the hole"?

 5    A.    The hole is where you're held for either disciplinary

 6    action or for safety concerns or you're validated as an

 7    associate or a member of a prison gang.

 8    Q.    So if you're a Mexican Mafia member like yourself, do you

 9    go straight to the hole?

10    A.    Straight to the hole.

11    Q.    You mentioned Palm Hall.  What's Palm Hall?

12    A.    Palm Hall is the -- is the hole.

13    Q.    Where?

14    A.    Chino State Prison.

15    Q.    When you met Mike Darbinyan, did he claim any sort of

16    gang?

17    A.    Yes.

18    Q.    What gang?

19              MR. SEVERO:  Objection.

20              THE WITNESS:  Armenian Power.

21              THE COURT:  I'm sorry, was there an objection?

22              MR. SEVERO:  Yes, your Honor, but I'll withdraw it.

23              THE COURT:  Okay.

24    BY MR. ESTRADA:

25    Q.    He claimed Armenian Power?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Yes.

2    Q.   This practice of prisoners claiming a gang, is that

3    common?

4    A.   Yes.

5    Q.   Why is that?

6    A.   Because we have a list.  Everybody that's in prison, we

7    keep a list of who they are and what they represent.

8    Q.   When you say "we," are you referring to the Mexican Mafia

9    and the Southsiders?

10   A.   Yes.

11   Q.   Why do you keep a list of who's in prison and who they

12   represent?

13   A.   We need to know who's there.  They might be on a list

14   that's an individual that needs to be -- that has been

15   targeted.

16   Q.   What do you mean by that, someone that's been targeted?

17   A.   They have a green light on them.

18   Q.   And I'll ask you that, too.  What does a green light mean?

19   A.   A green light means that you have been targeted for

20   some -- for some reason.  Green light means go, proceed.

21   Q.   But for assault?

22   A.   There's -- yeah, for assault.

23   Q.   And for murder?

24   A.   Yes.  There's -- there's -- there's -- there's like three

25   lists.  One list would be monetary, for money funds, one would
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   be for assault, and one would be for killing 'em.

2   Q.   What's that called, the killing 'em list?

3   A.   Take his win.

4        MR. SEVERO:  I'm sorry, I didn't hear that.  Take

5   his --

6        THE WITNESS:  Take his win.

7        THE COURT:  Take his win.

8        MR. SEVERO:  Thank you.

9   BY MR. ESTRADA:

10  Q.   Okay.  So you were introduced by -- you were introduced to

11  Mike Darbinyan, who introduced himself as Capone?

12  A.   Yes.

13  Q.   That person who introduced himself to you as Capone, do

14  you see him in the courtroom today?

15  A.   Yes.

16  Q.   Can you please point him out, identify an article of

17  clothing that he's wearing.

18  A.   Wearing a black sweater.

19        THE COURT:  Indicating the defendant.

20  BY MR. ESTRADA:

21  Q.   Now, when you met defendant Darbinyan, did he ask you for

22  anything?

23        MR. SEVERO:  Objection.  Vague.

24        THE COURT:  Overruled.

25        THE WITNESS:  He introduced himself to me and told me

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   his situation.
 2            MR. SEVERO:  Calls for a "yes" or "no" answer.
 3            THE COURT:  Why don't you re-ask the question,
 4   Counsel.
 5            MR. ESTRADA:  I'll ask the question, your Honor.
 6   Q.  When you introduced -- when you introduced yourself and
 7   got to know Mike Darbinyan, what did you talk about?
 8            MR. SEVERO:  Objection.  Calls for a narrative.
 9            THE COURT:  Overruled.
10            THE WITNESS:  We talked about his situation.
11   BY MR. ESTRADA:
12   Q.  And what was his situation?
13   A.  That he had -- he had got rolled up from CRC.  So he
14   explained the reason why he was there in the hole.
15   Q.  When you say rolled up -- there are two things there.
16   Rolled up.  What does "rolled up" mean?
17   A.  Rolled up means you've been moved from one facility to
18   another, not by choice.
19   Q.  What does CRC mean?
20   A.  I think it's the California Rehabilitation Center.
21   Q.  It's some sort of prison?
22   A.  Yes, a prison.
23   Q.  So he told you he'd been rolled up from CRC.  And did he
24   tell you about any issues he had?
25   A.  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   What did he tell you about the issues he had?

2   A.   Capone represented one crew at CRC, and there was another

3   crew that represented a different brother out there, so they

4   had a little conflict.

5   Q.   Okay.  Let me ask you about that.  "Represent a crew."

6   What does that mean?

7   A.   A crew is -- is a group of individuals that looks out for

8   the interests of a particular brother.

9   Q.   So within prison, the Mexican Mafia members are in the

10  hole.

11  A.   Mm-hmm.

12  Q.   Yes?

13  A.   Yes.

14  Q.   Are there inmates who are outside of the hole?

15  A.   Yes.

16  Q.   And are they in charge of collecting taxes?

17  A.   Yes.  Because we're -- because we're -- we're held in the

18  hole --

19          MR. SEVERO:  Objection.  Nonresponsive after "yes."

20          THE COURT:  Okay.  Sustained.

21  BY MR. ESTRADA:

22  Q.   Yes?

23  A.   Yes.

24  Q.   Could you explain?

25  A.   Because we're held in the hole, we need people that's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    willing to do our -- whatever we need that's necessary on our

 2    behalf.  We don't have access to the rest of the population.

 3    Q.   And you use other people -- I say they, Mexican Mafia

 4    members, use other inmates to do things for them?

 5    A.   Yes.  That's part -- that's part of their -- their duty as

 6    Southsiders.

 7    Q.   Are those trusted inmates?

 8    A.   Yes.

 9    Q.   If you're part of a crew, does it mean you're a trusted

10    inmate with the Mexican Mafia?

11    A.   Yes.

12    Q.   So Darbinyan told you he had a conflict with another crew.

13    Did he tell you what Mexican Mafia member he was representing?

14    A.   George Bustamante.

15    Q.   Junior?

16    A.   Yes.

17    Q.   Who's George Bustamante, Jr.?

18              MR. SEVERO:  Hearsay.

19              THE COURT:  Overruled.

20         Do you know who he is?

21              THE WITNESS:  Yes.

22              THE COURT:  Okay.

23    BY MR. ESTRADA:

24    Q.   Who is he?

25    A.   He's a Mexican Mafia member.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Known as Bucket Head?

2   A.   Bucket Head.

3   Q.   Did they -- did Darbinyan tell you who the other crew

4   represented?

5   A.   Yes.

6   Q.   Who did the other crew represent?

7   A.   Perico.

8   Q.   Who's Perico?

9   A.   Perico is another Mexican Mafia member.

10  Q.   Is he -- his formal name, is it Ralph Rocha?

11  A.   Yes.

12  Q.   Did the fact that Darbinyan had issues with Rocha have

13  interest to you?

14  A.   Yes.

15  Q.   Why is that?

16  A.   Because we have -- brothers back each other up.  So any

17  conflict that someone does to them, we have to keep in touch.

18  That way, we know.

19  Q.   Did you have issues with Rocha?

20  A.   Yes.

21  Q.   What were your issues with Rocha?

22  A.   My issues with Rocha was, I had been given the green light

23  to kill him.

24  Q.   Now, when you say given the green light to kill him, who

25  gave you the green light to kill him?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    The carnales.

 2   Q.    Other Mexican Mafia brothers?

 3   A.    Other Mexican Mafias had made a decision that he needed to

 4   go.

 5   Q.    Where did that decision come from?

 6   A.    From Pelican Bay State Prison.

 7              MR. SEVERO:  I didn't hear that.

 8              THE WITNESS:   From Pelican Bay.

 9   BY MR. ESTRADA:

10   Q.    What's Pelican Bay State Prison?

11   A.    Pelican Bay is a -- it's a hole.

12   Q.    Have you spent time there?

13   A.    Yes.

14   Q.    Is it the maximum security prison in California?

15   A.    Yes.

16   Q.    Are there a lot of Mexican Mafia members there?

17   A.    Most -- most of all Mexican Mafias in state prison are

18   held there.

19   Q.    And because most Mexican Mafia members are there, are a

20   lot of decisions made there for the Mexican Mafia?

21   A.    Yes.

22   Q.    So based on the fact that Darbinyan had issues with Rocha

23   and you had issues with Rocha, what did you do?

24   A.    Well, at that time I told him that I would look into it,

25   that he didn't need to concern himself with it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Now, based on the fact that Darbinyan said he was running

2   a crew for Bustamante, Jr., did that tell you anything about

3   his status?

4   A.   Yes, that he -- that Bustamante held him in high regard.

5   Q.   And if a Mexican Mafia member holds you in high regard,

6   what's that mean?

7   A.   That means you're capable of handling responsibilities.

8   You can't just give --

9              MR. SEVERO:  Objection.  No question pending.

10             THE COURT:  Sustained.

11  BY MR. ESTRADA:

12  Q.   What do you mean by high responsibilities?

13  A.   Well, you can't just put any individual to control your

14  crew.  That person has to be willing to do whatever's

15  necessary.  He's gotta be responsible.  He's gotta have a head

16  on his shoulders.

17  Q.   And if you control a crew within prison on behalf of the

18  Mexican Mafia member, does that give you power?

19  A.   Yes.

20  Q.   What sort of power?

21  A.   It gives you the power to say yes and no.

22  Q.   And is anyone other than Southsiders allowed to run a crew

23  on behalf of the Mexican Mafia?

24  A.   No.

25  Q.   Now, now at some point did you leave Palm Hall, the hole,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    in Chino prison?

2    A.    Yes.

3    Q.    When you left, was Darbinyan still there?

4    A.    Yes.

5          THE COURT:  At this time, being 10:00, we're going to

6    break for our morning recess.  We'll come back in 15 minutes.

7        Remember the admonishment not to discuss this case among

8    yourselves or with anybody else or form or express any opinions

9    about the matter until you go back to deliberate.

10       We'll be in recess.

11         THE CLERK:  All rise.

12       *(Recess held from 10:00 a.m. to 10:17 a.m.)*

13       *(In the presence of the jury:)*

14         THE COURT:  The record will reflect that all the

15   members of the jury are in their respective seats in the jury

16   box, including the alternate, and we're at direct examination.

17       Counsel, you may continue.

18         MR. ESTRADA:  Thank you, your Honor.

19   Q.    Sir, when we left off, you were talking about meeting

20   Mike Darbinyan in Palm Hall in Chino prison.  Do you recall

21   that?

22   A.    Yes.

23   Q.    Now, you understood that he had led a crew of people at a

24   different prison?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   You know what the term "shot-caller" refers to?

A.   Yes.

Q.   What's a shot-caller?

A.   Shot-caller is a person that orders whatever needs to be done. Keep control. Because -- because brothers are held in solitary confinement, we need someone that can do the things that we can't. We're limited by things we can do, so we have crews in the prison, but that crew has to be established by somebody that has a little common sense, because it is prison, so we have to maintain order and discipline. So the crews are important for us.

Q.   And the shot-caller runs the crew?

A.   And the shot-caller runs that crew.

Q.   Did you understand Darbinyan to be a shot-caller?

A.   Yes.

Q.   Now, we were talking about when you left Palm Hall. At some point you left Palm Hall?

A.   Yes.

Q.   Darbinyan was still there?

A.   Yes.

Q.   When you left Palm Hall, did you leave any instructions for Darbinyan?

A.   Yes. I left Capone the authority of Palm Hall.

Q.   What did that mean, to leave him the authority of Palm Hall?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   That he was in charge of that unit.

 2   Q.   And that means he would be the shot-caller for Palm Hall?

 3   A.   That he was responsible for all those individuals in that

 4   place.

 5   Q.   Did you exchange contact information with Darbinyan?

 6   A.   Yes.

 7   Q.   Why did you do that?

 8   A.   He told me -- he told me about the conflicting brothers

 9   that were out there with Armenian Power.  There was two

10   brothers fighting for control of Armenian Power.  Darbinyan

11   told me that, unfortunately, the other brother was

12   incarcerated, so there was only one brother out there.  So he

13   needed my help to come and help him out there.

14   Q.   And just to be clear, the two brothers fighting for

15   control of Armenian Power, you're referring to two Mexican

16   Mafia members?

17   A.   Yes.

18   Q.   Who were those two brothers who were trying to control

19   Armenian Power?

20   A.   Bucket Head and Perico.

21   Q.   So Bucket Head being Bustamante, Jr.?

22   A.   Yes.

23   Q.   And Perico being Rocha?

24   A.   Yes.

25   Q.   And you had issues with Rocha already?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    Which one of those two was in jail?

3    A.    Both of them, I believe.

4    Q.    But you said one of them was --

5    A.    Oh, I believe George was in jail at the time.

6    Q.    And the other one was outside?

7    A.    Yes.

8    Q.    Now, was it of interest to you to be -- to get involved

9    with Armenian Power?

10   A.    Yes.

11   Q.    Why?

12   A.    Capone told me that he had access to certain scams to make

13   money.

14   Q.    Was that important to you?

15   A.    Yes.  Like I said, money's important for -- for all

16   members, because we need to assist while they're in jail.

17          MR. SEVERO:  Your Honor, object.  Cumulative.

18          THE COURT:  Next question.

19   BY MR. ESTRADA:

20   Q.    Now, you mentioned you got released from Palm Hall.  Was

21   that around 2007?

22   A.    Yes.

23   Q.    At some point after then, did you reestablish ties with

24   Darbinyan?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Outside of prison?

2   A.   Yes.

3   Q.   Explain how that happened.

4   A.   When I -- when I learned he was out, I gave him -- I gave

5   him a call.

6   Q.   Did you start spending time with Darbinyan?

7   A.   Yes.

8   Q.   Around what year was this you started spending time with

9   Darbinyan?

10  A.   2007, 2008, somewhere around there.

11  Q.   Now, at some point after 2007, did you go back into

12  prison?

13  A.   Yes.

14  Q.   When was that?

15  A.   I believe in 2008.

16  Q.   In 2008 you went back into prison?

17  A.   Yes.

18  Q.   Was that on yet another violation?

19  A.   On a violation.

20  Q.   Sometime in early 2009, did you get released again from

21  prison?

22  A.   Yes.

23  Q.   And during those times you were outside of prison, from

24  2007 to 2008 and then in early 2009, did you spend time with

25  Darbinyan?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes.

 2    Q.   I want to ask you about some of the things you would do

 3    with Darbinyan.

 4         Did Darbinyan ever take you to businesses or restaurants?

 5    A.   Yes.

 6    Q.   Explain that.

 7    A.   Around 2007, 2008, he took me around to certain businesses

 8    where he wanted to have some kind of relationship with that

 9    businessman or the owners of the business.

10    Q.   Was this some sort of legitimate business or nonlegitimate

11    business?

12    A.   Legitimate business.

13    Q.   Why would he bring you to do legitimate business?

14         MR. SEVERO:  Objection.  Calls for speculation, state

15    of mind.

16         THE COURT:  Did he ever tell you why he wanted you to

17    go with him?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.  Overruled.

20    BY MR. ESTRADA:

21    Q.   What did he tell you?

22    A.   At that time there was also a struggle with the -- within

23    Armenian Power.

24         MR. SEVERO:  Objection.  Hearsay.

25         THE COURT:  Overruled.
```

```
1              THE WITNESS:  So what -- with me attending with Capone

2    gave him the appearance to those businessmen that he had my

3    support.  And not only my support, but that he was a friend of

4    mine, which was important.

5    BY MR. ESTRADA:

6    Q.   And did you understand that to give Darbinyan status?

7    A.   Absolutely.

8    Q.   Is that generally true if a gang member has ties to a

9    Mexican Mafia member?  Does that give them status?

10   A.   Yes.

11   Q.   Did you understand that these business owners would be

12   taxed?

13   A.   Yes.

14   Q.   Explain what that means.

15   A.   They would have to pay a fine.

16   Q.   Money?

17   A.   Money.

18   Q.   When you would meet with these owners, would you get any

19   money?

20   A.   I would get money from Capone.  He would get the money

21   from the businessmen, then he would give me a cut, what we'd

22   call a cut.

23   Q.   About how many times did this happen?

24   A.   At that time it was about seven or eight times.  Was

25   brief.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   How much money are we talking about that you would get

2    from Capone or Darbinyan?

3    A.   Couple thousand.

4    Q.   Did you ever discuss with Darbinyan getting involved with

5    the Russian Mafia?

6    A.   Yes.

7    Q.   What did you discuss with him?

8    A.   He told me that he had access to the Russian Mafia.

9    Q.   Why was that of interest to you?

10   A.   Because it was -- because as a member of the Mexican

11   Mafia, I wanted to see what kind of things they were involved

12   in, maybe could be benefit with us.

13   Q.   And when you say what kinds of things they were involved

14   in, you're not talking about legitimate activities?

15   A.   No.

16   Q.   Talking about criminal activities?

17   A.   Criminal activities.

18   Q.   As a member of the Mexican Mafia and a gang member, were

19   you interested in guns?

20   A.   Yes.

21   Q.   Why?

22   A.   They become necessary.

23   Q.   It was important for you to have guns?

24   A.   We have -- as a member, we have crews also on the streets

25   that are assigned simply to either assault somebody or kill

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   somebody.  So those -- those individuals need to always have

 2   access to guns.

 3   Q.    So do you try to give them access to guns?

 4   A.    I try to provide -- I provide them with guns.

 5   Q.    Did you discuss with Darbinyan shipping guns with the

 6   Russian Mafia?

 7   A.    Yes.

 8   Q.    What did you discuss?

 9   A.    He asked me at one time if by any chance I had any access

10   to the Mexican docks where the ships came in.

11   Q.    When you say Mexican docks, are you talking about harbors

12   in Mexico?

13   A.    Yes.

14   Q.    And what did you say in response to that?

15   A.    I told him that I could look into it, that at that time

16   there was a member in Mexico.

17   Q.    Mexican Mafia member?

18   A.    Yes.

19   Q.    And what would be the importance of having access to docks

20   in Mexico?

21           MR. SEVERO:  Objection.  That calls for speculation.

22           THE COURT:  Overruled.

23           THE WITNESS:  I -- I told him that in Mexico

24   everything goes with money.  They don't really abide by the

25   law, so --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Move to strike that statement as
 2   speculation of this witness.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Therefore, the brother would be able to
 5   go over there, investigate, see what's going on, who's in
 6   charge, who he can bribe.
 7              THE COURT:  This is what you told him?
 8              THE WITNESS:  Yes.
 9              THE COURT:  Okay.
10   BY MR. ESTRADA:
11   Q.   Did that ever pan out, that scheme of working with the
12   harbors to work with the Russian Mafia?
13   A.   No.
14   Q.   You mentioned also that you had issues with this Rocha
15   character.
16   A.   Yes.
17   Q.   Did you ever discuss with Darbinyan plans to do anything
18   to Rocha?
19   A.   Yes.
20   Q.   What did you discuss with him?
21   A.   At that time, Perico wouldn't meet up with me.  He knew
22   that I was gonna try to get him.  So Capone told me that he
23   would try to convince him to come see him, and set him up for
24   me.
25   Q.   Now, you said Rocha was known as Perico?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Perico.

 2   Q.   Did he have any other names that he went by?

 3   A.   Not that I know of.

 4   Q.   Did you ever refer to him as "P"?

 5   A.   Oh, yes.  Short for Perico.

 6   Q.   And with Darbinyan you discussed trying to find Perico?

 7   A.   He told me that he would be able to probably lure him in

 8   for me.

 9   Q.   Lure him in to do what?

10   A.   To come wherever I could -- so I could get him.

11   Q.   To kill him?

12   A.   Yes.

13   Q.   And those were your orders, to kill him?

14   A.   Absolutely, yes.

15   Q.   Did you and Darbinyan ever attempt to lure Rocha, or

16   Perico, to have him killed?

17   A.   No.

18   Q.   Was it ever successful?

19   A.   No.

20   Q.   Did Darbinyan ever discuss with you a location where you

21   might be able to lure in Perico?

22   A.   Yes.

23   Q.   What did he say?

24   A.   At one time in a meeting we had at a business, he

25   explained to me that there was a room there where he could
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    probably lure Perico to come in there, and I would either be

2    inside there waiting or I could come in.

3    Q.    What kind of business was this?

4    A.    Believe a rim, tire place.

5    Q.    Car rims?

6    A.    Yes.

7    Q.    But, obviously, it never succeeded, the murder of Rocha?

8    A.    No.

9    Q.    Now, I want to go forward to 2009, early 2009.

10          In early 2009, did you begin working with Darbinyan to

11   commit fraud and identity theft?

12   A.    Yes.

13   Q.    Now, explain how that took place.

14   A.    He told me that he had access to the banks, and checks

15   that could be put into the bank and then withdrawn.

16   Q.    Fraudulent checks?

17   A.    Yes.

18   Q.    Did you bring in another person to help you with that?

19   A.    Yes.

20   Q.    Who did you bring in?

21   A.    Karen Samawi.

22   Q.    Who's Karen Samawi?

23   A.    Karen was a girl I was seeing at the time.

24   Q.    And how did you use Karen Samawi in this scheme?

25   A.    They -- they deposited the check into her account so she
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    could withdraw them, the money.
 2    Q.   Now, why didn't you just use your own bank account, have
 3    the money deposited in your account?
 4    A.   I wasn't gonna risk getting in trouble.
 5    Q.   So you used Karen Samawi so you wouldn't get in trouble?
 6    A.   Absolutely, yes.
 7    Q.   And that's something you would do as a person involved in
 8    criminal activity, use others?
 9    A.   Yes.
10    Q.   Now, at some point did you meet with Darbinyan and other
11    people at a restaurant in Hollywood?
12    A.   Yes.
13         MR. ESTRADA:  Your Honor, if I could publish what's
14    been previously admitted as Exhibit 261.
15         THE COURT:  Okay.
16    BY MR. ESTRADA:
17    Q.   I won't publish all those photos, but page 3 of 261, you
18    see that on the screen in front of you?
19    A.   Yes.
20    Q.   What do you see on the screen?
21    A.   Me and Karen.
22    Q.   Is that a car you were driving back in early 2009?
23    A.   Yes.
24    Q.   You see that person there?
25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Is that a person you met with that day?

2    A.    Yes.

3    Q.    Is that Darbinyan?

4    A.    Yeah.

5    Q.    Now, what was the purpose of this meeting at the

6    restaurant?

7    A.    The purpose at this meeting was to get the check that was

8    gonna be deposited into the bank.

9    Q.    Was there another person who had an important role in the

10   scheme that you met with that day?

11   A.    Yes.

12          MR. SEVERO:  Objection.  Vague or calls for a

13   conclusion as to "important."

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes.

16   BY MR. ESTRADA:

17   Q.    Who is that person?

18   A.    The person that was going to do the signature on the

19   check, forge the signature.

20   Q.    Did you know the name of that person?

21   A.    I don't know the name.  I don't remember his name.

22   Q.    Did you call him anything?

23   A.    I only know what they used when they referred to him.  I

24   don't know if that's his name, but they referred to him as

25   "Fat Ass."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And this Fat Ass, what was his role in the whole scheme?

 2   A.   He was the one that --

 3            MR. SEVERO:  Objection.  Asked and answered.

 4            THE COURT:  Overruled.

 5            THE WITNESS:  -- forged the checks.

 6   BY MR. ESTRADA:

 7   Q.   Was he supposed to be good at forging the checks?

 8   A.   Yes.

 9   Q.   That day when you met at the restaurant with Darbinyan,

10   Samawi, and this person that you knew as Fat Ass, was there any

11   issue with how Fat Ass conducted himself?

12   A.   Yes.

13   Q.   What was that issue?

14   A.   He was so high that he couldn't -- he couldn't forge the

15   check.

16   Q.   When you say "high," what do you mean?

17   A.   Stoned.

18            MR. SEVERO:  Speculation of the witness.  Move to

19   strike.

20            THE COURT:  Overruled.  Observation.  Overruled.

21   BY MR. ESTRADA:

22   Q.   He appeared to be high?

23   A.   He was high.

24   Q.   And you're familiar with what it looks like when people

25   are high?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   You've used drugs?

 3   A.   Yes.

 4   Q.   You've seen other people use drugs?

 5   A.   Yes.

 6   Q.   So he couldn't do his job?

 7   A.   He couldn't forge it.

 8   Q.   And did that upset you at all?

 9   A.   Yes.

10   Q.   Why?

11   A.   Because we were there to handle business, and he came high

12   and couldn't even forge the check.

13   Q.   And what happened because he showed up high?

14   A.   We told him leave.

15   Q.   He was sent away?

16   A.   Yeah.

17   Q.   Did you meet again after that meeting at the restaurant to

18   discuss the fraud scheme?

19   A.   Yes.

20   Q.   You recall where this next meeting was?

21   A.   At the -- at his business.

22   Q.   What kind of business was that?

23   A.   I think the rim tire place.

24   Q.   The rim shop?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Your Honor, with the Court's permission,

 2    if I could play what's been previously admitted as Exhibit 18

 3    at this time.

 4              THE COURT:  This 18A?

 5              MR. ESTRADA:  This would be 18A.

 6              THE COURT:  Okay.

 7              MR. ESTRADA:  And I don't know if we can put the

 8    exhibit in front of the witness there, with the Court's

 9    permission.

10              THE CLERK:  And that's in one of the binders?

11              MR. ESTRADA:  It's the first volume in the binders.

12              THE CLERK:  Okay.  18A?

13              MR. ESTRADA:  18A.

14              THE CLERK:  Okay.

15              MR. ESTRADA:  I'll ask that the jurors be directed to

16    turn to 18A in their binders, please, your Honor.

17         If we could play the exhibit, your Honor?

18              THE COURT:  Yes.

19         (Audio played.)

20    BY MR. ESTRADA:

21    Q.   All right, sir.  This call has previously been played.

22    It's a call from March 17th, 2009, 9:45 a.m.

23         Did you listen to the call?

24    A.   Yes.

25    Q.   Did you recognize the voices on the call?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    Who was speaking on the call?

3    A.    Me and Capone.

4    Q.    When you say Capone, are you referring to Mike Darbinyan?

5    A.    To Mike.

6    Q.    You're familiar with Mike Darbinyan?

7    A.    Yes.

8    Q.    Now, in the call there is reference to chrome rims, where

9    you can get chrome rims from Darbinyan?

10   A.    Yes.

11   Q.    Did Darbinyan tend to give you gifts?

12   A.    Yes.

13   Q.    Did you ask him for the gifts?

14   A.    No, I -- I didn't ask him for stuff, so -- he gave me

15   stuff.

16   Q.    He would give you gifts?

17   A.    Yes.

18   Q.    What sorts of gifts would he give you?

19   A.    Money.

20   Q.    Rims?

21   A.    Rims.  Guns.

22   Q.    You mentioned guns.  Did he sometimes give you firearms?

23   A.    Yes.

24   Q.    Did you ask him for those?

25   A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Why?

 2   A.   I like one of them that he showed me.

 3   Q.   What kind of gun did he show you?

 4   A.   .22 with a silencer.

 5   Q.   Why did you want that gun?

 6   A.   Because didn't make noise.

 7   Q.   So you could kill someone?

 8   A.   Yes.

 9   Q.   Was there a particular person you were planning on

10   killing?

11   A.   Yes.

12   Q.   Who was that?

13   A.   Perico.

14   Q.   Rocha?  Yes?

15   A.   Yes.

16   Q.   Now, there's a person that you mentioned in this call.

17   You say that's not professionalism, it's not good business.

18   What were you referring to in that call?

19   A.   That he was so high that he couldn't forge the check.

20   Q.   Who's "he"?

21   A.   Fat Ass.

22   Q.   Were you upset about that?

23   A.   Yeah, I was upset, because I drove all the way up there

24   with the intention of getting the check so it can be deposited

25   and get the money.  So it was a waste of time.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Now, eventually did you go to, that same day, a meeting

2    with Darbinyan and this Fat Ass and other people?

3    A.   Yes.

4         MR. ESTRADA:  Your Honor, the government would ask to

5    publish what's been previously admitted as Exhibit 262.

6         THE COURT:  You may publish it.

7    BY MR. ESTRADA:

8    Q.   I'm going to show you the first page of Exhibit 262.

9         Do you recognize those two people?

10   A.   Yes.

11   Q.   Who are they?

12   A.   Me and Capone.

13   Q.   When you say Capone, you're referring to Darbinyan?

14   A.   Mike.

15        THE COURT:  Counsel, so you don't have to keep asking

16   that question --

17        Anytime you refer to Capone, you're referring to

18   Darbinyan?

19        THE WITNESS:  Yes.

20        THE COURT:  Okay.

21   BY MR. ESTRADA:

22   Q.   And looking at page 2, you see a bunch of people meeting?

23   A.   Yes.

24   Q.   You recognize that person I'm indicating in the light gray

25   shirt?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes.

 2    Q.   Who is that?

 3    A.   Me.

 4    Q.   You recognize this person?

 5    A.   Yes.

 6    Q.   Who's that person?

 7    A.   Mike.

 8    Q.   Capone?

 9    A.   Yeah.

10    Q.   This person I'm indicating here, you recognize that

11    person?

12    A.   Yes.

13    Q.   Who is that?

14    A.   Fat Ass.

15    Q.   Now, at that meeting at the rim store, what did you

16    discuss with Darbinyan?

17    A.   At that meeting, we discussed the check.  I don't remember

18    if he told me it had been deposited already or it was going to

19    be deposited that day.  And a problem that Fat Ass had.

20    Q.   You discussed the check?

21    A.   Yes.

22    Q.   What was this problem with -- Fat Ass had?

23    A.   He was having problems with the -- a business partner.

24    Q.   And did he want you to do anything with regard to that

25    business partner?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes.  He said that he owed him money, but he no longer

2   wanted the money; he just wanted him -- wanted him killed

3   instead.

4   Q.   Business partner?

5   A.   Yes.

6   Q.   Now, at some point in that meeting on March 17, 2009, did

7   you learn that people were following Darbinyan?

8   A.   Yes.

9   Q.   How did you learn that?

10  A.   When I was walking up -- when I went outside, he -- he

11  told me to come back in because the place was under

12  surveillance.

13  Q.   And what was your reaction when you heard that?

14  A.   I was upset.

15  Q.   Why?

16  A.   I told him, why would you invite, bring me up here if you

17  knew this place was under surveillance?

18  Q.   By "under surveillance," what did you understand that to

19  mean?

20  A.   That they were watching that -- that business.

21  Q.   When you say "they," who are you referring to?

22  A.   The feds.

23  Q.   Police officers?

24  A.   Yes.

25  Q.   Later, after this meeting, did you work with Darbinyan to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   get checks and take money from another account?

 2   A.   Yes.

 3   Q.   How did you take the money out of the account?

 4   A.   I drove Karen to the banks so she could withdraw them.

 5   Q.   And she would take money out?

 6   A.   Yes.

 7   Q.   Who was telling you what to do in order to get the money

 8   out of the account?

 9   A.   Capone was instructing Karen, since she was the one that

10   was going to be withdrawing the checks, I mean the money.

11   Q.   And eventually did you get a bunch of money from this

12   scheme that you guys were involved in?

13   A.   Yes.

14   Q.   Did you keep all the money?

15   A.   No.

16   Q.   What did you do with the money?

17   A.   We split it three ways.

18   Q.   When you say "we" split it, who split it?

19   A.   Me, Capone, and then another person.

20   Q.   Who was the other person?

21   A.   A person that was doing us the favor with the -- with the

22   checks.

23   Q.   You were -- you and Karen Samawi were the ones getting the

24   money?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   How did you get it to Darbinyan?

2    A.   Once -- we had a meeting.

3    Q.   And what happened there?

4    A.   I put the money out, we divided it in threes, and said

5    good-bye.

6    Q.   Did you also have someone come and pick up the money from

7    you?

8    A.   On -- yes, on another occasion.

9    Q.   So did you split up the money many times?

10   A.   Yes.

11   Q.   About how much money did you make in this scheme?

12   A.   I think -- I think in total it was only like 40,000, or

13   somewhere around there.

14   Q.   Now, after this scheme with Darbinyan and Karen Samawi,

15   did you keep doing fraud with Darbinyan?

16   A.   No.

17   Q.   What happened?

18   A.   I got arrested.

19   Q.   When did you get arrested?

20   A.   Couple days after that.

21   Q.   You went back to prison?

22   A.   Yes.

23   Q.   Have you been in prison since?

24   A.   Just about, yes.

25          MR. ESTRADA:  Your Honor, just a moment.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        No further questions, your Honor.

 2            THE COURT:  Cross-examination.

 3        Counsel?

 4            MR. SEVERO:  Thank you, your Honor.

 5                      CROSS-EXAMINATION

 6   BY MR. SEVERO:

 7   Q.   How long you been a rat?

 8            MR. ESTRADA:  Objection, your Honor.  Argumentative.

 9            THE COURT:  Sustained.

10        Why don't you rephrase the question, Counsel.

11   BY MR. SEVERO:

12   Q.   How long have you been a government -- or how long have

13   you been cooperating with the government?

14   A.    I think I made my deal in 2011, maybe, 2012.

15   Q.   And where are you being held --

16            MR. ESTRADA:  Objection, your Honor.

17   BY MR. SEVERO:

18   Q.   -- that you --

19            MR. ESTRADA:  Calls for confidential information.

20   BY MR. SEVERO:

21   Q.   -- that you have to wear a red --

22            THE COURT:  Excuse me, Counsel.

23            MR. SEVERO:  Can I finish my question?

24            THE COURT:  Yes, you can.

25            MR. SEVERO:  Thanks.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Do you --
2              MR. SEVERO:  I'm sorry, sir.
3              THE COURT:  Finish the question first.
4              MR. SEVERO:  Yes.
5   Q.   Where are you being held that you have a red jumpsuit?
6              MR. ESTRADA:  Objection, your Honor.  It's a security
7   issue.  The location where he's being held is a security issue.
8              THE COURT:  Sustained.
9   BY MR. SEVERO:
10  Q.   Is the red jumpsuit significant to you?
11  A.   Yes.
12  Q.   How?
13  A.   That I'm high custody.
14  Q.   It lets you move and do things within the jail, doesn't
15  it?
16  A.   Excuse me?
17  Q.   Lets you do things within the jail, gives you some
18  privileges, doesn't it?
19  A.   No.
20  Q.   How many times did you meet with Mr. Estrada before
21  testifying here today?
22  A.   Maybe four times.
23  Q.   When was the last time?
24  A.   Couple weeks ago.
25  Q.   Were you instructed to look at the jury when you were
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000811**

1    testifying?

2    A.    No.

3    Q.    That's not something you know from something that's innate

4    in you?

5    A.    No.  I was explaining something to them.

6    Q.    Were you taught how to testify?

7    A.    No.

8    Q.    Is this the first time you testified in court?

9    A.    No.

10   Q.    You testified against others?

11   A.    No.

12   Q.    You testified against any Mexicans?

13   A.    No.

14   Q.    You are charged in this case in at least 20 counts; is

15   that correct?

16   A.    I don't know exactly how many counts.

17   Q.    Lot.

18   A.    Yes.

19   Q.    And you're pleading to two?

20   A.    I think it's three.

21   Q.    And how many counts are you charged in the Ojeda case?

22   A.    I believe two or three charges.

23   Q.    And you're pleading to one?

24   A.    Excuse me?

25   Q.    You're pleading to one count there?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   No.  I think it's two counts.  Two.

 2   Q.   In which case are you exposed to a life sentence?

 3   A.   Probably Ojeda case.

 4   Q.   So if everything goes well here, you're going to get that

 5   reduced, correct?

 6           MR. ESTRADA:  Objection, your Honor.  Calls for

 7   speculation.

 8           THE COURT:  Probably does.

 9      Are you guaranteed anything?

10           THE WITNESS:  No.

11   BY MR. SEVERO:

12   Q.   That's what you're hoping, though?

13   A.   Yes.

14   Q.   Because you certainly haven't reformed, have you?

15   A.   I think I took a great step right here.

16   Q.   So this is your first step towards being a new man?

17   A.   I wouldn't say a new man.  I would say a new start.

18   Q.   You been in jail how long?

19   A.   On this case?

20   Q.   I'm sorry.  Since your last arrest.

21   A.   Three years.  Little over three years.

22   Q.   You haven't been out for the last three years?

23   A.   No.

24   Q.   How many times have you been violated inside the jail?

25   A.   Violations?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    Yes.

 2    A.    I don't know how many.  A few.

 3    Q.    More than five?

 4    A.    Probably, yes.

 5    Q.    More than six?

 6    A.    Yes.

 7    Q.    More than ten?

 8    A.    Somewhere around there.

 9    Q.    So in the last three years, you've violated the law inside

10    the jail ten times, have you?

11    A.    You mean rules violations?

12    Q.    Yes, rule violations.

13    A.    Oh, no, I have no rule violations.

14    Q.    Oh.  You've been violated inside the jail ten times for

15    what?

16    A.    No, I meant -- I thought you meant violations of my

17    parole.  I have no rule violation while I'm in custody.

18    Q.    While on parole, you were violated ten times?

19    A.    Yes.

20    Q.    And ten times you went back to jail?

21    A.    Yes.

22    Q.    Your criminal life didn't start in the 1991 murder, did

23    it?

24    A.    No.

25    Q.    You've been a criminal since you were 15?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    And in fact, you were -- before the 1991 murder

3    conviction, you were in the California Youth Authority?

4    A.    Yes.

5    Q.    How long were you in prison there?

6    A.    Maybe a year.

7    Q.    For what?

8    A.    For burglary and possession of a gun.

9    Q.    Breaking into someone's house?

10   A.    Yes.

11   Q.    Did you steal?

12   A.    Yes.

13   Q.    So in '91 you were convicted of murder, correct?

14   A.    Yes.

15   Q.    And you got 39 years to life, did you not?

16   A.    Yes.

17   Q.    But you got out when?

18   A.    1995 my case was -- my case was reversed around ninety --

19   '93, '94.

20   Q.    Did you plead then again?

21   A.    Yes.

22   Q.    And then how much time did you do?

23   A.    I got six years.

24   Q.    You got away with murder?

25         MR. ESTRADA:  Objection, your Honor.  Argumentative.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1           THE COURT:  Sustained.

2   BY MR. SEVERO:

3   Q.   When you got -- when you came out, you went and committed

4   a robbery, did you?

5   A.   Yes.

6   Q.   What year was that?

7   A.   Believe it was 1999.

8   Q.   That was a bank robbery?

9   A.   Bank robbery.

10  Q.   Sir?

11  A.   Yes.

12  Q.   Did you do that with a gun?

13  A.   I had a gun with me.

14  Q.   What kind of gun?

15  A.   .25, I believe it was.

16  Q.   You got that in the streets?

17  A.   Yes.

18  Q.   The murder you committed in '91, was it with a firearm?

19  A.   No.

20  Q.   You stabbed somebody?

21  A.   Yes.

22  Q.   You been using drugs since you were young?

23  A.   Yes.

24  Q.   And when was the last time you used drugs?

25  A.   2009.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   You don't get drugs in jail?

2   A.   No.

3   Q.   You sure?

4   A.   I don't.  I don't.

5   Q.   Because you've reformed?

6   A.   No.  Because I have --

7   Q.   You're clean?

8   A.    -- cooperating, so I don't have that privilege anymore.

9   Q.   I see.  You don't get to use drugs while you're

10  cooperating?

11  A.   Well, I don't choose to use drugs, but, no, I don't get

12  drugs.

13  Q.   Did you discuss your drug use, your many years of drug

14  use, with Mr. Stebbins?

15       You know Mr. Stebbins?

16  A.   Yes.

17  Q.   Did you discuss your drug use with him?

18  A.   I don't believe so.

19  Q.   You didn't tell him?

20  A.   I don't know.  I don't recall.

21  Q.   Did he ever ask you?

22       THE COURT:  If you recall.

23  BY MR. SEVERO:

24  Q.   If you remember, yes.

25  A.   Excuse me?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   If you remember.
 2              THE COURT:  Did he ever ask you?  If you remember.
 3              THE WITNESS:  I don't remember.
 4    BY MR. SEVERO:
 5    Q.   How about your alliance with the methamphetamine drug
 6    distribution organization that you've referred to as
 7    La Familia?  When did that take place?
 8    A.   That occurred around 2009.
 9    Q.   At the same time that you had spoke to Mr. Darbinyan?
10    A.   Yes.
11    Q.   And did you discuss your drug distribution activities with
12    Mr. Stebbins?
13    A.   I don't believe so.
14    Q.   Who did you discuss it with?
15    A.   With -- with the U.S. attorney in the Ojeda case.
16    Q.   Have you seen those reports?
17    A.   No.
18    Q.   While you were in prison, you stabbed people, did you not?
19    A.   Yes.
20    Q.   How many times?
21    A.   A few times.
22    Q.   You can't even count them, can you?
23    A.   About three.
24    Q.   In 1993, you became an associate of the Mexican Mafia?
25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   You were in prison then?

2   A.   Yes.

3   Q.   How did you became -- how did you become an associate?

4   A.   At that time I was doing a life sentence, so I was willing

5   to stab somebody for them.

6   Q.   Before 1993, what gang were you affiliated with?

7   A.   With Hard Times.

8   Q.   Hard Times?

9   A.   Yes.

10  Q.   That's a street gang?

11  A.   Yes.

12  Q.   As a member of that gang, what other crimes did you

13  commit?  That we haven't talked about.

14  A.   Drug use, selling drugs.

15  Q.   Burglaries?

16  A.   Yes.

17  Q.   But you didn't get caught for it?

18  A.   Yes.

19  Q.   Robberies?

20  A.   Yes.

21  Q.   And I mean taking something from someone by fear, correct?

22  A.   Yes.

23  Q.   Or violence, correct?

24  A.   Yes.

25  Q.   Is that the only gang you were a member of on the streets?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    No.

2    Q.    You were a member of an African-American gang, weren't

3    you?

4    A.    Yes.

5    Q.    You were a member of Crips, weren't you?

6    A.    Yes.

7    Q.    And Crips were at war with the Mexican Mafia during that

8    time; is that correct?

9    A.    At that time I didn't know anything about that.

10   Q.    So you don't know if they were at war?

11   A.    The Hoodlum Crips was not a black gang.  It was a Mexican

12   and Samoan gang.

13   Q.    So you just agreed with me that it was an African-American

14   gang, but now you're changing your testimony?

15          MR. ESTRADA:  Objection, your Honor.  Argumentative.

16          THE WITNESS:  No.

17          THE COURT:  Sustained.

18   BY MR. SEVERO:

19   Q.    The Crips were at war with the Bloods, weren't they?

20   A.    Yes.

21   Q.    And the Bloods was an African-American gang?

22   A.    Yes.

23   Q.    What crimes did you commit when you were with the Crips?

24   A.    The crimes I mentioned.

25   Q.    Sir?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    I was only a member of that gang when I was 15 years old,

2    for about a year.

3    Q.    All right.  So when you were 15, did you stab somebody as

4    a member of Crips?

5    A.    No.

6    Q.    Did you rob somebody as a member of Crips?

7    A.    Yes.

8    Q.    You didn't go to the California Youth Authority for those

9    robberies, did you?

10   A.    I went -- no.

11   Q.    So you didn't get caught on those?

12   A.    No.

13   Q.    How about burglaries as a member of the Crips?

14   A.    Yes.

15   Q.    How many?  Fair to assume that you did them, so how many?

16   A.    A couple.

17   Q.    How many people did you hurt as a member of the Crips?

18   A.    A few.

19   Q.    More than five?

20   A.    Yes.

21   Q.    More than ten?

22   A.    Around there, yeah.

23   Q.    And as a member of the Hard Times, how many people did you

24   hurt?

25   A.    A few.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    More than ten?

2    A.    Yes.

3    Q.    More than 20?

4    A.    Less than 20.

5              MR. SEVERO:  Need a moment, your Honor.

6              THE COURT:  Mm-hmm.

7    BY MR. SEVERO:

8    Q.    The indictment in the Ojeda case -- by the way, it's

9    called the Ojeda case because Peter Ojeda is the first

10   defendant; is that your understanding?

11   A.    Yes.

12   Q.    And who's the second defendant in that case?

13   A.    Me.

14   Q.    You're high up there?

15   A.    Yes.

16   Q.    And there are at least 20 people in that indictment,

17   right?

18   A.    Yes.

19   Q.    And it's a Mexican Mafia Orange County indictment,

20   correct?

21   A.    Yes.

22   Q.    It's a drug distribution activity?

23   A.    Yes.

24   Q.    Murder activity?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   How many times did you bring drugs into the prisons where

2    you -- while you were a prisoner?

3    A.   Once.

4    Q.   And you went to the hole for that?

5    A.   Yes, I was charged with it.

6    Q.   You were actually charged with a separate crime, right?

7    A.   Yes.

8    Q.   So you were in prison between '91 and '95, correct?

9    A.   Yes.

10   Q.   And then went back when?

11   A.   I believe it was '98, '99.

12   Q.   For what?

13   A.   For a bank robbery.

14   Q.   That's with the feds?

15   A.   Yes.

16   Q.   And how long were you in federal prison?

17   A.   Seven and a half years.

18   Q.   In Marion, Illinois, correct?

19   A.   Yes.

20   Q.   High-power prison?

21   A.   Yes.

22   Q.   Because you're a dangerous man, aren't you?

23   A.   Yes.

24   Q.   Your affiliation inside the prison with Southsiders

25   started in '91?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   And back then it was just Hispanics in '91?

 3   A.   Yes.

 4   Q.   And then anyone who is not Hispanic is part of that

 5   Southsider classification, correct?

 6   A.   I don't understand the question.

 7   Q.   Yeah, that's a bad question.

 8            THE COURT:  I didn't, either.

 9   BY MR. SEVERO:

10   Q.   Once you go to prison, if you're not affiliated with a

11   gang, who protects you?

12   A.   Nobody.

13   Q.   So most people, when they go into prison, affiliate with

14   someone, true?

15            MR. ESTRADA:  Objection, your Honor.  Calls for

16   speculation and vague as to "people."

17            THE COURT:  Overruled.

18            THE WITNESS:  Yes.  You -- you more -- you affiliate

19   with your race, or if you're part of a gang, if there's -- your

20   gang members there, then with that gang.

21   BY MR. SEVERO:

22   Q.   Well, for example, people we refer to as Asians, but,

23   like, Chinese and Koreans and stuff, who are they affiliated

24   with?

25   A.   With their own race.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Whites?

2    A.    With whites.

3    Q.    Aryan?

4    A.    Yes, unless they claim a Mexican gang.

5    Q.    So there are some white people in the Mexican gangs?

6    A.    Yes.

7    Q.    But one way or another, you need to affiliate with someone

8    in order to protect yourself?

9    A.    Yes.

10   Q.    So to be affiliated inside prison with a gang is not

11   unusual?

12   A.    No.

13   Q.    And it doesn't take very much to be validated as a gang

14   member, correct?

15        MR. ESTRADA:  Objection, your Honor.  Vague, and it

16   calls for speculation.

17        THE COURT:  Sustained.

18   BY MR. SEVERO:

19   Q.    What does it take to be validated as a gang member?

20   A.    You have to have committed disciplinary violations on

21   behalf of the gang.

22   Q.    That's it?

23   A.    Stabbings, beatings, yes.

24   Q.    To be validated?

25        Isn't it a fact, sir, that in order to be validated as a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   gang member, you could be in possession of a picture of a gang

 2   member and that would lead to validation?

 3         MR. ESTRADA:  Objection, your Honor.  Calls for

 4   speculation, calls for legal conclusion.

 5         MR. SEVERO:  Legal conclusion?

 6         THE COURT:  Well, it depends.

 7      Are you talking about being validated by the gang, or are

 8   you talking about being validated by the prison authorities?  I

 9   think you have to make a distinction there.

10   BY MR. SEVERO:

11   Q.   Okay.  To be validated by the prison.

12   A.   That would count as a one point.

13   Q.   And you need three, right?

14   A.   Yes.

15   Q.   So if you're seen or determined by the prison authorities,

16   in your -- in your -- within the area of your knowledge, of

17   course.  If you're seen with other gang members, you -- that's

18   another point?

19   A.   No.

20         MR. ESTRADA:  Objection, your Honor.  Calls for

21   speculation.

22         THE COURT:  Sustained.

23      You don't do the validation yourself; that's the prison

24   authorities?

25         THE WITNESS:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  I'm asking about his knowledge of how
 2    validation works.
 3              THE COURT:  Sustained.
 4              THE WITNESS:  No.
 5    BY MR. SEVERO:
 6    Q.   The word "carnal," c-a-r-n-a-l, it's not a word of
 7    respect, is it?
 8    A.   Excuse me?
 9    Q.   The word "carnal" is just -- it means brother, doesn't it?
10    A.   Yes.
11    Q.   So it's not a respect --
12    A.   Yes.
13    Q.    -- respectful term, it's an endearing term?
14    A.   In --
15              MR. ESTRADA:  Objection, your Honor.  The question is
16    vague and compound.
17              THE COURT:  Overruled.
18         Is it a respectful term?
19              THE WITNESS:  Yes, in this lifestyle, it is.
20    BY MR. SEVERO:
21    Q.   I'm sorry?
22    A.   In this lifestyle, it is.
23    Q.   Because to be a brother is respectful?
24    A.   You're a man of honor.
25    Q.   So when you refer to someone as "carnal," you're saying
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   you're a man of honor?
 2   A.   He's a -- he's considered one.  He's a brother.
 3   Q.   The Mexican Mafia had a hierarchy.  Do you understand me
 4   when I say that?
 5   A.   Yes.
 6   Q.   Did it?
 7   A.   It does.
 8   Q.   There are leaders and there are soldiers, correct?
 9   A.   Well, as a Mexican Mafia member, we're all supposed to be
10   equals, but there is some that have been longer members of the
11   Mexican Mafia, so they have a little bit more respect.  But as
12   brothers, we're all considered equal.
13   Q.   Well, that's -- there are people who order others to do
14   things; isn't that right?
15   A.   Other brothers?
16   Q.   Yeah.  You, for example, were a member, correct?
17   A.   Yes.
18   Q.   And you ordered other people in the gang that were below
19   you to do certain things?
20   A.   Oh, yes.
21        MR. ESTRADA:  Objection, your Honor.  Vague as to a
22   gang versus the Mexican Mafia.
23        THE COURT:  Can a Mexican Mafia member order another
24   Mexican Mafia member to commit a crime?
25        THE WITNESS:  No.  No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. SEVERO:

 2    Q.   But a Mexican Mafia member would order associates to

 3    commit crimes?

 4    A.   Yes.

 5    Q.   So that's what I mean by "hierarchy."  There are ranking

 6    members and then there are those who did the dirty work.

 7    A.   Yes.

 8    Q.   Right?

 9    A.   Yes.

10    Q.   You came out -- in '99 you were sent to the federal

11    prison, right?

12    A.   Yes.

13    Q.   And you came out in, what, '06?

14    A.   2003.

15    Q.   You said you were there for seven and a half years.

16    A.   In ninety -- in ninety -- '98, yes, I went to prison.  I

17    got a eight-year sentence for bank robbery.  I did about seven

18    and a half.

19    Q.   Okay.  So '98 plus seven and a half gives me 2005.  '5 or

20    '6.

21    A.   Okay.

22    Q.   You lost count.

23    A.   Well --

24    Q.   So you come out in '05 or '06, do you?

25    A.   Oh, yeah, you know, I'm sorry.  I move -- I went from
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Marion to Leavenworth in 2003, yes.

2   Q.   Another high-security prison?

3   A.   Leavenworth?

4   Q.   Yes.

5   A.   Yes.  It's a USP.

6   Q.   And you went from that to the streets in about '06, '07?

7   A.   Yes.

8   Q.   And went back in in '07?

9   A.   Yes.

10   Q.   And this time it was for what?

11   A.   Violation.

12   Q.   A parole violation?

13   A.   Yes.

14   Q.   In federal prison or state?

15   A.   I believe I got two violations.  I was arrested, and I got

16   a violation.  I was on state parole and federal probation.

17   Q.   Okay.  You were on both federal parole in '99?  In '06?

18   You were on supervised release.

19   A.   Yes.

20   Q.   And you were in state parole, on state parole?

21   A.   Not in 2006, no.

22   Q.   All right.  So you went back on a federal violation?

23   A.   In 2006?  I believe so.

24   Q.   For how long?

25   A.   I don't remember.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   More than a year?

2    A.   I'm -- I'm not sure.

3    Q.   So in 2007 you were in a federal penitentiary somewhere?

4    A.   No.  In 2007 I was in CDC.

5    Q.   For what?

6    A.   A violation.

7    Q.   Violation of what?

8    A.   Of probation.

9    Q.   You were on probation in --

10   A.   Federal probation.

11   Q.   Okay.  Hold on.  What's CDC?

12   A.   Central Detention Center.

13   Q.   You mean the MDC here?

14   A.   No.  In San Bernardino.

15   Q.   But it was federal, a federal hold that had you there?

16   A.   Yes.

17   Q.   In 2007?

18   A.   Yes.

19   Q.   Correct?

20   A.   Yes.

21   Q.   And when did you come out of that?

22   A.   In 2007.

23   Q.   What month?

24   A.   I don't remember what month.

25   Q.   Did you go back in in 2007?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Prob- -- yeah, in the end, I think, end of 2007, beginning

2    2008.

3    Q.   For what?

4    A.   For violation.

5    Q.   Another parole violation?

6    A.   They violated me, yes.

7    Q.   Federal?

8    A.   No.  A state violation.

9    Q.   Well, you said you were not on state parole, so I'm a

10   little confused.  Tell me what you were violated for --

11        MR. ESTRADA:  Objection, your Honor.  Misstates the

12   testimony.

13        THE COURT:  Sustained.

14   BY MR. SEVERO:

15   Q.   Okay.  In 2007 were you on state parole?

16   A.   In 2007, yes, I believe I was on state parole.

17   Q.   You're not sure?

18   A.   No, I don't remember.

19   Q.   What were you on parole for?

20   A.   I think it was in -- in 2005 or somewhere, I was arrested

21   for I think taking drugs into the county jail.

22   Q.   You took drugs for someone else in county jail?

23   A.   No.  I got -- I got caught bringing drugs into the jail.

24   Q.   Were you in custody?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   In 2005 you were in Leavenworth, aren't you?

 2        It's all become one big mess, hasn't it?

 3            MR. ESTRADA:  Objection, your Honor.

 4            THE WITNESS:  I'm confused on when --

 5            MR. ESTRADA:  Argumentative.

 6            THE WITNESS:  It's been so long, when I went out and

 7   went back in.

 8            THE COURT:  Okay, next question.

 9   BY MR. SEVERO:

10   Q.   What is it that sent you to state prison in 2007?

11            THE COURT:  If you remember.

12            MR. SEVERO:  Yeah, that's probably a good --

13   Q.   If you remember.

14   A.   Bringing drugs into the jail.

15   Q.   As a --

16   A.   I was --

17   Q.   As a new crime or as a violation of some parole or

18   probation?

19   A.   I was being violated on probation for the federal.  So

20   when I was taken -- when they were taking me in, that's when

21   they found drugs on me and gave me a new charge.

22   Q.   When you were being taken into federal for --

23   A.   I was being taken into custody.

24   Q.   Hold on, hold on, because it's going to get confusing.

25            MR. ESTRADA:  Objection.  It is confusing.  If he can
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    let the witness finish so we can get an answer.

2              MR. SEVERO:  Well, if I can get a question, maybe he

3    can answer.

4              THE COURT:  Counsel, please.

5         He hadn't finished the question when the answer started

6    coming in.  So let him finish the question first, then

7    Mr. Moreno can answer the question, and we'll proceed that way.

8              MR. ESTRADA:  Yes, your Honor.

9              THE COURT:  And again, this is confusing because

10   there's been so many and so much time, so just answer to the

11   best of your ability.

12        Go ahead.

13             MR. SEVERO:  Thank you, your Honor.

14   Q.   You're being brought into federal custody, and you have

15   drugs on you?

16   A.   Yes.

17   Q.   Did you have drugs in your pants?

18   A.   Yes.

19   Q.   In your pocket?

20   A.   In my pocket.

21   Q.   Were you being brought in in cuffs?

22   A.   Yes.

23   Q.   Okay.  So where were you being taken?

24   A.   I was being taken into the Santa Ana jail.

25   Q.   The Santa Ana jail?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.
 2   Q.   And that's where they charged you with a new crime, state
 3   crime?
 4   A.   Yes.
 5   Q.   And you did your time for the federal parole in San
 6   Bernardino?  I'm sorry.  Federal parole violation.
 7   A.   My violation I did -- I did in San Bernardino.
 8   Q.   And then after that, you went to prison for the state
 9   crime of bringing drugs into a jail?
10   A.   I don't remember if that was afterwards.
11   Q.   You don't remember what, sir?
12   A.   You said that I -- did I get charged with the drugs after
13   I got out from San Bernardino?
14   Q.   No.  Did you go and do your time for the drug charge of
15   bringing drugs into the Santa Ana jail after you left San
16   Bernardino?
17   A.   Yes.
18   Q.   And where did you go to prison there?
19   A.   I went to Tehachapi.
20   Q.   So that was at the end of 2007?
21   A.   I don't remember exactly when.
22   Q.   It's all now a -- fuzzy?
23   A.   Yes, when I went in there?
24   Q.   Yeah.
25   A.   Like I said, I went in for -- I got 32 months.  I went and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    did 16 months in Tehachapi, which I think --

 2    Q.   You are in federal prison in 2007 --

 3         THE COURT:  Counsel, these questions have been very

 4    confusing, time-consuming, and not real relevant, and --

 5         MR. SEVERO:  It is --

 6         THE COURT:  -- I'm getting very close to the point of

 7    sustaining the Court's own objection under 403.

 8         MR. SEVERO:  Right.

 9         THE COURT:  For instance, whether they're in his pants

10    pocket or not, who cares?  So I'd like to keep the questions

11    relevant and moving the case along.

12        Go ahead.

13         MR. SEVERO:  Thank you.

14        The dates are important here, your Honor.  That's why --

15         THE COURT:  Next question.

16    BY MR. SEVERO:

17    Q.   Your supervised release on federal -- your federal

18    supervised release is violated, and you go to Santa Ana jail --

19    excuse me, San Bernardino, spend time in San Bernardino in

20    2007; is that correct?

21    A.   When I went -- yeah, I did a violation in San Bernardino

22    in 2007.

23    Q.   For how long were you in San Bernardino?

24    A.   For a few months.

25    Q.   And from there you went to Tehachapi?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   No.  From there I went home.

2   Q.   Okay.  And for how long were you home?

3   A.   Few months.

4   Q.   I thought you said you had brought drugs into the jail

5   when they took you out of the federal supervised release

6   violation --

7             MR. ESTRADA:  Objection, your Honor.

8             THE WITNESS:  That was before, before 2007.

9             MR. SEVERO:  May I finish, Judge?

10            MR. ESTRADA:  Objection.  Relevance.

11            THE COURT:  Counsel, don't make the objection until

12   the answer -- or until the question is finished.  I have no

13   idea.  I can't rule on it till he finishes.

14       So why don't you go ahead and finish the question --

15            MR. ESTRADA:  The answer was coming out, and that's

16   why I --

17            THE COURT:  Counsel.

18       And also, if you can try to save your answer until after

19   the question is over.

20       Okay.  Go ahead.

21       And I can --

22            MR. SEVERO:  I'm trying to get the timing in --

23            THE COURT:  Excuse me.

24       I can guarantee you the reporter is not taking down a

25   question and an answer at the same time.  She's only taking
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    down one.  So let's finish the question, then have any

 2    objections, and then have the answers.

 3         Okay.  Go ahead, Counsel.

 4              MR. SEVERO:  Thank you, your Honor.

 5    Q.   In 2007, you were out, at home for some time?

 6    A.   Yes.

 7    Q.   For how many months?

 8    A.   I don't remember exactly how many months.

 9    Q.   Then you got arrested again?

10    A.   Yes.

11    Q.   For what?

12    A.   For a violation, I believe.

13    Q.   Which?  Federal or state?

14    A.   I believe state.

15    Q.   And you went in Tehachapi?

16    A.   No.  Went to Chino.

17    Q.   Okay.

18         Just -- may I have a moment, your Honor?

19              THE COURT:  Sure.

20    BY MR. SEVERO:

21    Q.   Your cooperation agreement says that -- strike that.

22         The agreement you entered into with the government covers

23    both the Ojeda and this case, correct?

24    A.   No.

25    Q.   You sure?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I -- does this one cover the other one?  I made an

 2   agreement on the other case, yes.

 3          MR. SEVERO:  Your Honor, I have a document entitled

 4   "Plea Agreement for Defendant Moreno."  It states that it's

 5   under seal.

 6          THE COURT:  Okay.

 7          MR. SEVERO:  However, it's necessary for me to publish

 8   it in order to properly cross-examine this defendant.

 9          MR. ESTRADA:  Your Honor, the government has no

10   objection to admitting this document.  It's in government's

11   Exhibit 246.

12          THE COURT:  Is that agreed, Counsel?

13          MR. SEVERO:  Sure.

14          THE COURT:  Okay.  246 will be received.

15       (Received in evidence, Exhibit 246.)

16          MR. SEVERO:  And just so I'm -- I have the official

17   copy --

18   Q.   Your understanding is that the plea agreement you entered

19   into is only for this case?

20   A.   No.  I made two plea agreements.

21   Q.   Well, let me show you the third page of Exhibit 246.

22   A.   Mm-hmm.

23          MR. SEVERO:  Did I ask for permission to publish

24   this?

25          THE COURT:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1              MR. SEVERO:   Thank you.

2    Q.    See that?

3    A.    Yes.

4    Q.    You recognize the first page here?

5    A.    Yes.

6    Q.    It has two captions on it, doesn't it?

7    A.    Yes.

8    Q.    *United States vs. Darbinyan*?   It's this case, correct?

9    A.    Yes.

10   Q.    And *United States vs. Ojeda*, this case?

11   A.    Yes.

12   Q.    So the plea agreement covered both cases, correct?

13   A.    I don't -- I don't understand.   I -- I guess.   I know that

14   I agreed to make a plea on that case, and I made a -- agree to

15   make a plea on this case.

16   Q.    So did you sign two plea agreements?

17   A.    I believe.

18   Q.    Okay.   Your plea agreement in this case, the one that we

19   have before us, says that you only -- you only plead to two

20   counts, correct?

21   A.    I don't know.   I don't --

22   Q.    Don't even remember?

23   A.    No.

24   Q.    Let me show you page 3 of 33.

25         How close can I get?   I don't know if -- can this be read

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    by the jury the way it is?

2              JUROR:  Yes.

3              THE COURT:  Can you see it, ladies and gentlemen?

4              JURORS:  Yes.

5              THE COURT:  Yeah.

6              MR. SEVERO:  Thank you.

7    Q.   You were asked, or required to plead in the Ojeda

8    indictment to two racketeering offenses, correct?

9    A.   Yes.

10   Q.   Plead to counts 1 and 28, right?  In this case.

11   A.   Yes.  Oh, no.  This is the Ojeda case.

12   Q.   No.  You're right.  You're pleading to counts 1 and 2 of

13   the indictment in the Ojeda case.

14   A.   Yes.

15   Q.   And you're pleading to counts 1 and 28 of -- in this case,

16   correct?

17   A.   No.  I'm pleading -- on this case, it's a racketeering

18   conspiracy and aggravated identity theft.

19   Q.   Yeah.  It says that you will appear and plead guilty to

20   counts 1 and 28 of the first superseding indictment in

21   United States vs. Darbinyan.  You see that?

22   A.   Okay.  Yes.

23   Q.   So you're pleading to two counts, correct?

24   A.   Yes.

25   Q.   Now, you have been advised -- you've been told that your
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   exposure in the Ojeda case is potentially a life sentence,

2   correct?

3   A.   Yes.

4   Q.   How about in this case?  Also a life sentence?

5   A.   No, I don't believe so.

6   Q.   What's -- what is your understanding of what your

7   potential sentence is in this case?

8   A.   I have no idea.

9   Q.   And your hope is that that'll get reduced?

10  A.   Yes.

11  Q.   And of course, you haven't been guaranteed anything?

12  A.   No.

13  Q.   So your incentive is to try and come in here and testify

14  and hope you get a reduction in your sentence?

15  A.   In a way.  I -- I pled guilty to this -- I agreed to make

16  a plea on -- on this case even before the indictment for Ojeda

17  came in.  I had no idea that --

18  Q.   Because you --

19  A.   -- that charge was coming.

20  Q.   Sorry.

21       You wanted to get a reduction in your sentence?

22  A.   Yes.

23  Q.   And in this case, the government has promised you at time

24  of sentencing to dismiss the other 20 counts against you in

25  this case?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   They haven't promised me anything.

 2    Q.   They haven't?

 3    A.   No.

 4    Q.   So for all you know, they are not going to dismiss the

 5    other 20 counts?

 6    A.   I'm only being charged with two counts, but they haven't

 7    promised me anything.

 8    Q.   You've only pled guilty to two counts.

 9    A.   Yes.

10    Q.   Have you read the indictment in this case?

11    A.   A long time ago.  It's been a while.

12    Q.   Do you know that you're charged in 20 counts here?

13    A.   Yes.

14    Q.   What's happening to the other --

15    A.   If you tell me.

16    Q.   Sorry.

17    A.   It's been a while since I read it.

18    Q.   And what happens to the other 18 counts?  You pled to two.

19    A.   Yes.

20    Q.   You going to trial on the other 18?

21    A.   No.

22    Q.   You're going to plead guilty to the other 18?

23    A.   No.

24    Q.   What happens to the other 18?

25    A.   This --
```

```
1    Q.   Isn't your understanding that they're going to dismiss the
2    rest of the indictment?
3    A.   Yes.
4    Q.   Oh, okay.  And that, you hope, will reduce your sentence
5    in this case?
6    A.   Yes.
7    Q.   And that's also true in the Ojeda case?
8    A.   Yes.
9    Q.   There is -- you know that Mr. Darbinyan was afraid of you,
10   didn't you?
11   A.   He was afraid of me?
12   Q.   Yes.
13   A.   No.
14   Q.   No?  When you said --
15        Well, let me direct the attention of the Court to
16   Exhibit 18A, which is the transcript.  And if the jury could
17   be --
18            THE COURT:  Okay.
19   BY MR. SEVERO:
20   Q.   And Speaker 1 in this --
21        Are you able to read this?
22   A.   Yes.
23   Q.   -- which is -- you've identified as Mr. Darbinyan.
24        Says, "Zoom, zoom, huh?  But promise when you come, you're
25   not gonna traumatize, man."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   And you answer, "I'm not gonna traumatize you?"

 3        He answers, "Yeah."

 4        "You're not gonna come down" --

 5        As you go down to the second speaker from the bottom,

 6   "You're not gonna come down" -- sorry.

 7        "You're not gonna, you're not gonna come down like one of

 8   them -- you know, Samarias man."

 9        He was referring to the fact that he was concerned that

10   you would be violent towards him.

11   A.   Actually, we were being funny.  If you listen to the phone

12   call, we're sort of being sarcastic, just having fun.

13   Q.   Having fun about being --

14   A.   We weren't serious about that.

15   Q.   You being serious about traumatizing him?  He wasn't

16   serious about that?

17   A.   No.

18   Q.   And you answered, "I wasn't mean to you, was I?"

19   A.   I wasn't mean to him.

20   Q.   You see any notation here that there was laughter going

21   on?

22   A.   No, but if you hear the voice.

23   Q.   Wasn't his voice timid?

24            MR. ESTRADA:  Objection, your Honor.

25            THE WITNESS:  No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              MR. ESTRADA:  Calls for speculation.

2              THE COURT:  The tape speaks for itself, and the jury

3   has heard it.

4              MR. ESTRADA:  Yes.

5              THE COURT:  Ladies and gentlemen, it is 11:30.  We're

6   going to break at this time.  We're going to have you come back

7   at 1:00.  The problem is, we may have a logistical problem at

8   1:00 that might take a few minutes, so rather than have you

9   come back on the potential of waiting around doing nothing, why

10  don't we have you come back at 1:15.  So if you want to come

11  back at 1:00, that's fine, but we'll start up right at 1:15.

12  So if you're late, don't worry about it, as long as you're here

13  by 1:15.  Remember the admonishment not to discuss the case

14  among yourselves or with anybody else or form or express any

15  opinions about the matter till it's submitted to you and you

16  retire to the jury room.  We'll see you back at that time.

17             THE CLERK:  All rise.

18      (Lunch recess held from 11:31 a.m. to 1:18 p.m.)

19      (In the presence of the jury:)

20             THE COURT:  Okay.  The record will reflect that all

21  the members of the jury are in their respective seats in the

22  jury box, including the alternate.

23      We were at cross-examination.

24      Counsel, you may continue.

25             MR. SEVERO:  Thank you, your Honor.
```

1               **CROSS-EXAMINATION (Continued)**

2    BY MR. SEVERO:

3    Q.   At the lunch break we were talking about this conversation

4    that was recorded, Exhibit 18A.  Do you recall that, sir?

5    A.   Yes.

6    Q.   I'll direct your attention, the Court's attention, and the

7    jury, please, to Exhibit 18A in the binders, and page 3 of 6 on

8    the exhibit, top of the page.

9         Well, let's give this some context.  Let's go back to

10   page 2.  This is when you were talking about trauma -- Mr. --

11   or the speaker that you've identified as Mr. Darbinyan was

12   saying that he was concerned that you were not going to

13   traumatize him.  You remember that?

14   A.   Yes.

15   Q.   You thought you were joking, correct?

16   A.   We were.

17   Q.   Yeah.  And you don't -- we talked about the fact you don't

18   see any laughter or hear any laughter on the tape, do you?

19   A.   I think you can hear the voices, that we are being --

20   Q.   On the second page, on the next page, you ask him, or tell

21   him, "I wasn't mean to you, my friend."

22        He says, "I know, I am just joking, but" --

23        And then you tell him, "Imagine, imagine if you weren't my

24   friend."

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   You were not threatening him?

2   A.   No.

3   Q.   Is it your understanding under the terms of your plea

4   agreement that whatever you tell the prosecution and whatever

5   you testify here today won't be used against you to prosecute

6   you for crimes that you haven't been caught for?

7   A.   Only if I -- yes, but --

8   Q.   So you're going to be not only --

9        MR. ESTRADA:  Object, your Honor.  He has not

10  completed his response.

11       THE COURT:  Well, go ahead, next question.

12       MR. SEVERO:  Thank you.

13  Q.   You were not -- you are expecting, hoping, that your

14  sentence will be reduced, but also, you are not going to be

15  prosecuted for all the crimes that you've committed that you

16  are telling him about now, right?

17  A.   Yes.

18  Q.   So it's important to you to come into this Court and tell

19  a story that will get my client convicted.

20       MR. ESTRADA:  Object, your Honor.  This is

21  argumentative.

22       THE COURT:  Sustained.

23       MR. ESTRADA:  Improper.  He's done this before, your

24  Honor.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   Let me ask you this, Mr. Moreno.

 3          MR. ESTRADA:  I would ask that those types of

 4   questions not be repeated, your Honor.

 5          MR. SEVERO:  Well, I --

 6          THE COURT:  Well, the answer is, is yes, they

 7   shouldn't repeated.  In fact, I'll --

 8        Were you told to say something that would support the

 9   prosecution, or were you told just tell the truth?

10          THE WITNESS:  Tell the truth.  The U.S. attorney

11   specifically, when he read me the plea, pointed at each word,

12   stating -- reminding me the fact that I was not to lie,

13   diminish, or embellish in any way.  If I did, then my plea deal

14   was going to be taken.

15          MR. SEVERO:  All right.

16          THE COURT:  Next question.

17          MR. SEVERO:  Thank you, your Honor.

18   Q.   How many times did you meet with Mr. Estrada, you say?

19   A.   Four or five times, I believe.

20   Q.   And he questioned you every time?

21   A.   Yeah, we talked a little.  He asked me some questions.

22   Q.   Your testimony this morning talks about going to the bank,

23   or meeting with my client and receiving a check at some point?

24   A.   No.  I didn't receive a check.

25   Q.   You never got a check from him?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    Karen Samawi got a check from you?  From him?

 3    A.    No.

 4    Q.    What?  Did you receive any kind of a check at all?

 5    A.    No.

 6    Q.    How many businesses did Mr. Darbinyan, according to your

 7    testimony, take you to that he wanted to tax?

 8    A.    We had lunch in about, I'd say, seven, seven or eight

 9    businesses.

10    Q.    I didn't get the first part of that.

11          THE COURT:  He said "We had lunch at seven or eight

12    businesses."

13    BY MR. SEVERO:

14    Q.    You had lunch at seven or eight different restaurants?

15    A.    Yes.

16    Q.    And do you remember the names of the restaurants?

17    A.    No.

18    Q.    You remember where they were located?

19    A.    Some of them.

20    Q.    All right.  How about some of them?

21    A.    One was in Glendale, and another one was in Hollywood.

22    Q.    Sir, over the lunch hour did you speak to Mr. Stebbins at

23    all?

24    A.    No.

25    Q.    Mr. Estrada?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   No.

2    Q.   Any member of the prosecution team?

3    A.   No.

4    Q.   You met Mr. Estrada and Mr. Stebbins for the first time in

5    June of 2011?

6    A.   I believe it was in 2011.  I don't know exactly when.

7    Q.   Sometime in 2011?

8    A.   Yes.

9    Q.   And you, at that time, were questioned about your

10   activities related to Mr. Darbinyan; is that correct?

11   A.   No, I believe at that -- at that meeting it was just to

12   see that in fact I was willing to cooperate.

13   Q.   Well, you spoke to him for at least an hour and a half.

14   A.   He might ask me some questions at that time.

15   Q.   So you told him a story that time, didn't you?

16            MR. ESTRADA:  Objection, your Honor.

17            THE WITNESS:  I told him the truth.

18            MR. SEVERO:  Well, that's --

19            MR. ESTRADA:  Argumentative.

20            THE COURT:  He's already said he told him the truth.

21   Overruled.

22   BY MR. SEVERO:

23   Q.   You told him some things about your relationship with

24   Mr. Darbinyan, didn't you?

25   A.   I had told him about our relationship.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And, in fact, you spoke on for -- what did I say? -- an

2   hour and 25 minutes, didn't you?

3   A.   I don't know exactly how long it was.

4   Q.   It was a long meeting, wasn't it?

5   A.   I'm not sure.

6   Q.   And did you tell him everything you remembered about your

7   relationship with Mr. Darbinyan?

8   A.   I answered some questions.

9   Q.   Okay.  You were interviewed also in connection with the

10  Orange County case, correct?

11  A.   When?

12  Q.   Well, okay.  That's a good question.  November of 2011.

13  A.   With who?

14  Q.   In Orange County.

15  A.   Did I discuss it with who?

16  Q.   Tunstall.  Deputy Tunstall.

17  A.   Oh, yes.

18  Q.   Remember him?

19  A.   Yes.

20  Q.   T-u-n-s-t-a-l-l.

21       And, in fact, you've met with Mr. Tunstall, your lawyer,

22  and some other people, in the United States attorney's office

23  eight times from between 11 -- 2011 and 2013.

24  A.   I don't know approximately how many times, but, yes, I met

25  with them.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000852**

1   Q.   A bunch of times?

2   A.   Few, yes.

3   Q.   And every time, you talked about your activities, didn't

4   you?

5   A.   Concerning the Orange County case.

6   Q.   Yeah.  You never once mentioned Mr. Darbinyan in any of

7   those meetings, did you?

8   A.   I'm not sure.  It wasn't -- questions weren't -- were more

9   about the Orange County case and another matter.

10  Q.   Right.  Including your mission that was given to you to

11  kill Mr. Rocha, Perico.

12  A.   Yes.

13  Q.   Right?

14  A.   Yes.

15  Q.   And you talked in Orange County about Mr. Rocha, didn't

16  you?

17  A.   Yes.

18  Q.   And you never once mentioned in Orange County that --

19  anything about Mr. Darbinyan trying to help you to lure him,

20  did you?

21  A.   Yes.  If they asked me the question concerning that, yeah,

22  I would have answered.  I would have told them.

23  Q.   I see.  So if you talk about Mr. Perico, or whatever his

24  name is, but if they didn't ask you, you wouldn't tell them.

25  You only answered the questions, right?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I answered the questions and told them the story of

2   whatever we were talking about.

3   Q.   All right.  So not once in the 11 times -- sorry, the

4   eight times you met in Orange County did you mention

5   Mr. Darbinyan as being involved in your attempt to kill

6   Mr. Rocha?

7   A.   Yeah, I probably did.  Yes.

8   Q.   You did?

9   A.   Probably.

10  Q.   All right.  So we expect that that's what the evidence

11  will be in this case, that you did, correct?

12  A.   I guess.  I'd imagine.

13  Q.   All right.  In fact, in your first interview with

14  Mr. Stebbins and Mr. Estrada, never once mentioned that

15  Mr. Darbinyan had anything to do with you and your desire to

16  kill Perico.

17  A.   At that first meeting, there was only certain questions.

18  We didn't get into all details.  It was just a matter of

19  discussing whether I was -- in fact was willing to make a plea

20  agreement.

21  Q.   You didn't come up with this story until two years later,

22  did you?

23       MR. ESTRADA:  Object, your Honor.

24       THE WITNESS:  What story?

25       MR. ESTRADA:  As I said --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.

 2              MR. ESTRADA:  -- it's improper.

 3         It shouldn't be done.

 4              THE COURT:  Argumentative.

 5              MR. SEVERO:  What?  I'm sorry, your Honor?

 6              THE COURT:  Argumentative.  Sustained.

 7    BY MR. SEVERO:

 8    Q.   You didn't tell anyone about this situation with

 9    Mr. Darbinyan presumably wanting to help you lure Mr. Rocha

10    until June of 2013, when you were interviewed by Mr. Stebbins

11    and Mr. Estrada.

12    A.   I don't know exactly when.  We didn't really get into all

13    the matters until after we agreed to -- to the plea agreement,

14    and then we discussed -- I answered whatever questions I

15    believe they asked me, from -- from day one.

16    Q.   All right.  You met with them on several occasions?

17    A.   Yes.

18    Q.   And the only time you mentioned it was on the last

19    interview in June of 2011?

20    A.   I don't -- I'd imagine I mentioned it before then.  I

21    don't remember all the questions from every single interview.

22    Q.   Remember when your plea agreement was filed?

23    A.   I believe in 2012.

24              MR. SEVERO:  Need a moment, your Honor.

25              THE COURT:  Certainly.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   Is it your testimony that Fat Ass had a problem with

 3   Mr. Rocha?

 4   A.   No.

 5   Q.   In fact, you testified that that -- that the person who's

 6   referred to as Fat Ass had a problem with somebody, didn't he?

 7   A.   Yes.

 8   Q.   Somebody that you were willing to kill?

 9   A.   Yes.

10   Q.   And that was in what year?

11   A.   In 2009.

12   Q.   And you -- and your reformation came after you were

13   arrested in 2011?

14   A.   What's that?

15   Q.   In this case?

16   A.   Concerning?

17   Q.   When were you arrested in this case?

18   A.   In 2009.

19   Q.   And that's when you began your --

20   A.   Oh, for this case.

21   Q.   -- act of reformation?

22   A.   No, in this case I was arrested in 2011.

23   Q.   '11.

24   A.   Yes.

25   Q.   That's when you started the path back to re- -- to be
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   reformed, correct?

2   A.   In a way.  This -- this decision wasn't based on one

3   reason alone.

4   Q.   All right.  No, it was based on two: the Ojeda case and

5   this one.

6   A.   No, it was based on a little bit more than that.

7   Q.   Oh.  Well, didn't you pay for the rims that you picked up

8   at that EuroSports place?

9   A.   No.

10   Q.   Didn't you pay $800 for those?

11   A.   No.

12   Q.   And do you think Fat Ass is the owner of that business?

13   A.   That's what I was told.

14   Q.   Did you meet the owner of the business himself, yourself?

15   A.   Yeah.  They told me it was Fat Ass.

16   Q.   Did you see -- at any of these meetings that you attended

17   where you believe Mr. Darbinyan was there, did you see any

18   checks there?

19   A.   No.

20   Q.   So you never saw any checks at all?

21   A.   Just on the first meeting when he couldn't forge the

22   signature.

23   Q.   So you never saw anyone sign any checks?

24   A.   No.  Just that one day.

25   Q.   That one day you didn't see anyone sign any checks?

1    A.    The day he attempted to the sign the checks.

2    Q.    Did you see anyone sign a check?

3    A.    Yes.

4    Q.    All right.  Was it given to you?

5    A.    No.

6    Q.    The checks -- strike that.

7          Did you -- isn't it a fact that while one is in prison,

8    one needs to align himself -- and this is prefaced -- I may

9    have asked this question before, but you need to align yourself

10   with someone to protect yourself, correct?

11              MR. ESTRADA:  Object, your Honor.  Asked and answered.

12              THE COURT:  Overruled.  Well, it has, but to refresh

13   everyone's memory, overruled.

14              MR. SEVERO:  Thank you.

15              THE COURT:  So when you go to prison, is it a good

16   idea to align yourself with someone for protection?

17              THE WITNESS:  Yes.

18   BY MR. SEVERO:

19   Q.    And, in fact, it's also a good idea to talk big, isn't it?

20   You understand what I mean by that?

21   A.    People do, but it's not a good idea.

22   Q.    All right.  So people talk big because they want others to

23   stay away from them?

24   A.    They want to impress other people, yes.

25   Q.    Not everything that's ever said is really true, is it?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   No.

 2   Q.   In your various debriefings with some of these government

 3   people, there are some folks you didn't want to talk about,

 4   correct?

 5   A.   Yes.

 6   Q.   So you sort of pick and choose who you want to talk about,

 7   true?

 8   A.   No.

 9   Q.   No?  You didn't want to talk about whoever it was that you

10   gave the gun -- a gun to, did you?

11   A.   Yes.

12   Q.   And it is not part of your plea agreement that you talk

13   about everyone they ask you about, correct?

14   A.   I'm to answer every question they ask me truthfully.

15   Q.   So if they ask you about who picked up that gun, you say,

16   "I don't want to talk about him," that's okay?

17   A.   No.

18   Q.   Well, okay.  Who did?

19   A.   Who picked up the gun?

20   Q.   Yes.

21   A.   I believe it was Karen.

22   Q.   So now you're willing to tell.

23        MR. ESTRADA:  Objection.  Argumentative.  We've gone

24   through this before.

25        THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ESTRADA:  He shouldn't be doing this.  It's
 2   improper.
 3        And your Honor, I don't like to keep standing to object,
 4   but this type of question --
 5            THE COURT:  Counsel, if you feel a question is
 6   objectionable, that's exactly what you're supposed to do.
 7            MR. SEVERO:  I do it all the time.
 8            THE COURT:  Counsel.
 9            MR. SEVERO:  Thank you.
10   Q.    You say you received some money on this check-cashing
11   scheme?
12   A.    Yes.
13   Q.    And this money went back to your other members of the
14   Mexican Mafia?
15   A.    No.
16   Q.    It was for yourself?
17   A.    Mostly, yes.
18   Q.    So it wasn't for the good of the Mafia?
19   A.    No.
20   Q.    How many times do you say you received money here?
21   A.    A few times.
22   Q.    This .22 caliber gun that you say you received, how was it
23   given to you?
24   A.    Someone went and picked it up.
25   Q.    Was it in a -- in a bag?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   In a -- in a case.

 2   Q.   Person that picked it up was not Karen, was it, Karen

 3   Samawi?

 4   A.   I believe it was.  She was one of the persons, I believe.

 5   Q.   You're not sure?

 6   A.   No.

 7   Q.   Was this gun plastic?

 8   A.   No.

 9   Q.   Metal?

10   A.   Yes.

11   Q.   What color?

12   A.   I believe it was black.

13   Q.   It's a good guess.  Your --

14        MR. ESTRADA:  Objection, your Honor.  There shouldn't

15   be comment on the answer of the witness.

16        THE COURT:  Sustained.

17   BY MR. SEVERO:

18   Q.   You were chosen to set up and organize the distribution of

19   methamphetamine in Orange County, weren't you, by the Familia

20   cartel?

21   A.   Yes.

22   Q.   And how much methamphetamine did you actually distribute?

23   A.   About a pound or two.

24   Q.   Sir?

25   A.   About a pound or two.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   That's all?

2   A.   Yes.  I was incarcerated right afterwards.

3   Q.   You got picked up for what?

4   A.   In 2009, I -- I don't recall what I got picked up on.  I

5   think it was a violation.  No, no.  I got picked up for the

6   hypodermic needle.

7   Q.   Did you talk to Mr. Stebbins about your methamphetamine

8   distribution activities?

9   A.   I don't know.  I might have mentioned it.  I don't

10  remember.

11  Q.   Not if he didn't ask, right?

12  A.   Yeah.

13  Q.   Weren't you told, sir, that you had to be complete and

14  open about what you told?

15  A.   Yeah, but that was -- that didn't relate to this case.

16  Q.   So you wouldn't talk about it?

17  A.   Well, I talked about it with the other U.S. attorney.

18  Q.   You forgot?

19  A.   No, I didn't forget.

20  Q.   Do you know if any of your interviews with Mr. Stebbins

21  and Mr. Estrada were recorded?

22  A.   No, I don't know.

23  Q.   It was your desire to hook up to the Russian mob; is that

24  right?

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Because you wanted to generate more money?

2    A.   Yes.

3    Q.   For yourself?

4    A.   No, not just for myself.

5    Q.   And you boasted that you had influence in Mexico, did you?

6    A.   No.  I said that we had a brother in Mexico.

7    Q.   If I told you that the report says that you boasted you

8    had influence in Mexico, would that be inaccurate?

9    A.   Yes.

10   Q.   All right.  You've been to Mexico?

11   A.   Yes.

12   Q.   Fact is, you didn't have any influence in Mexico.

13   A.   I never stated I had influence.  I said we had a brother

14   over there and I knew members of La Familia that were from

15   Mexico.

16   Q.   All right.  Did you understand your sentence in this case

17   may be determined by using what's called the Federal Sentencing

18   Guidelines?

19   A.   Yes.

20   Q.   And the government has promised that it will recommend a

21   sentence at the low end of the range that you end up on?

22   A.   The government didn't promise me anything.

23   Q.   Direct your attention to 246, Exhibit 246.

24        Need a moment to find it here.

25             THE COURT:  Mm-hmm.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. SEVERO:
 2    Q.    It's your understanding the government has not promised
 3    you anything?
 4    A.    No, they haven't promised me nothing.
 5    Q.    They didn't promise to drop those -- all those 20 counts
 6    or 18 counts once you're sentenced?
 7    A.    No.
 8    Q.    They didn't do that?
 9          And they didn't promise to move the Court for a reduction
10    based on what we call acceptance of responsibility?
11    A.    The government didn't promise me anything.
12    Q.    All right.  Let me direct your attention to Exhibit 5.
13    I'm sorry, Exhibit 246.  And ask you to look on page 23 --
14    A.    Mm-hmm.
15    Q.    -- of that.
16          It's actually -- yeah, 23 of 33.  You see that, that page?
17    A.    Yes.
18    Q.    Is that your signature here?
19    A.    Yes.
20    Q.    You see the signature date of December of 2011?
21    A.    Yes.
22    Q.    All right.  At page 5 of the agreement -- did you read the
23    agreement?
24    A.    Well, yes, I read the agreement one time, but after that,
25    I didn't keep the plea agreement because, due to the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    circumstances that I was cooperating --

2    Q.    Right.

3    A.    -- I don't want to have it in my possession, so it

4    wouldn't end up in somebody else's hands.

5    Q.    Sure.

6    A.    So when I signed it and read it, that was the last time

7    that I went through it and seen it.

8    Q.    Did you go through it with your lawyer?

9    A.    Yes.  And just like that page you had before, where it

10   says on there no promises have been given to me.

11   Q.    Well, you see what it says --

12   A.    On that same page that I signed.

13   Q.    Well, you see what it says at page 5 of Exhibit 246?  You

14   know what this means, the USAO's obligations?

15   A.    Mm-hmm.

16   Q.    You know what that is, sir?

17   A.    No.

18   Q.    Do you know what USAO is?

19   A.    U.S. Attorney's Office.

20   Q.    Right.  Obligations under your plea agreement.  You

21   understood that?

22   A.    Okay.

23   Q.    All right.  And it says that at the time of sentencing,

24   provided the defendant demonstrates an acceptance of

25   responsibility, they'll recommend a two-level reduction in the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   guidelines, plus an additional one level, if available.

2       You understood that?

3   A.   Recommend, not promise me.

4   Q.   I didn't say -- is that my -- it's not what my question

5   is.  They promised they would recommend.  They can't -- they

6   can't guarantee what the judge is going to do, but they would

7   recommend that, wouldn't they?

8   A.   Yes.

9   Q.   All right.  So that's one promise they made, right?

10  Correct?

11  A.   No.

12  Q.   They didn't make that promise?

13  A.   That's not a promise.  The first page you showed me, it

14  states right there, no promises were made to me.  Right?  The

15  first page you showed me.

16  Q.   Listen.  Maybe -- maybe I'm not getting the question out

17  well.  Let me try it --

18          THE COURT:  Yeah, it's not clear, the way it's being

19  asked, either.  There is a difference between an obligation and

20  a promise, and these are obligations that the AUSA says they

21  are to adhere to.  Promises made to him may be something

22  different.

23      But I just don't want to confuse everything in your mind.

24      Go ahead, Counsel.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:
 2   Q.   The obligation of the United States government is to stand
 3   up at your sentencing and recommend a reduction of three levels
 4   based on acceptance of responsibility, correct?
 5   A.   Yes.  Yes.
 6   Q.   All right.  You remember that promise.  That's what I'm
 7   talking about a promise.
 8   A.   I don't see obligation as being the same thing as a
 9   promise.
10   Q.   Okay.
11   A.   Or a promise --
12   Q.   You have another recommendation by the government, don't
13   you?  They have said that they are obligated to recommend that
14   you be sentenced at the low end of the guidelines.  You
15   understand that?
16   A.   Yes.
17   Q.   And you understood that when you signed this agreement,
18   right?
19   A.   Yes.
20   Q.   All right.  The other agreement they -- the government has
21   made for your benefit is not to offer evidence of your -- in
22   their case against you for further prosecution -- let me get
23   this right.  Hold on.  Not to use -- all right, here we go.
24   Not to offer as evidence in any other prosecution or the
25   sentencing proceeding, not to -- not to use cooperation, any
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   cooperation information.  Correct?
 2   A.   Yes.
 3   Q.   We talked about this earlier.  You can tell 'em all the
 4   crimes you want; you are not going to be used -- that's not
 5   going to be used against you, correct?
 6   A.   As long as I don't lie.
 7   Q.   Yeah.  That's right.  As long as they think you don't lie.
 8           MR. ESTRADA:  Objection, your Honor.
 9           MR. SEVERO:  Right?
10           MR. ESTRADA:  Again, argumentative.
11           THE COURT:  Sustained.
12           MR. ESTRADA:  It's improper.
13   BY MR. SEVERO:
14   Q.   Your -- one of the biggies here is the government's
15   obligation not to use the information you give them for
16   increasing your sentencing guideline range.  You understand
17   that?
18        I assume you're reading it, correct?
19   A.   Yes, yes.  Thank you.  Yes.
20   Q.   Right.  And that that stuff will not be used against you,
21   correct?
22   A.   Yes.
23   Q.   And not only that, but even the cooperation information
24   will not be disclosed to the probation office and to the Court.
25   So if the Court wanted to find out, that sentences you, will
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   never know all that stuff you did, correct?

 2   A.   It says that --

 3        MR. ESTRADA:  Your Honor, objection.  It misstates the

 4   agreement.

 5        MR. SEVERO:  Oh, it does?

 6        MR. ESTRADA:  Document speaks for itself.

 7        MR. SEVERO:  Yes.

 8        THE COURT:  The document does speak for itself, and

 9   the jury can see it, because it is in evidence.

10      Why don't you state the question again, Counsel.

11        MR. SEVERO:  Yeah.

12        THE WITNESS:  Says it will be disclosed.

13   BY MR. SEVERO:

14   Q.   Yes, it will be disclosed, but that information will not

15   be used to prosecute you.

16   A.   No.

17   Q.   Correct?

18      In connection -- the next promise, obligation of the

19   government is to bring to the Court's attention the nature and

20   extent of your cooperation, correct?

21   A.   Yes.

22   Q.   And if the government determines you've been good --

23   right?  If it determines that you have provided, quote/unquote,

24   "substantial assistance," to move the Court to fix an offense

25   level below what is otherwise dictated by the sentencing
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    guidelines and recommend a term of imprisonment in that reduced

 2    range.

 3    A.   Yes.

 4    Q.   Correct?

 5              MR. ESTRADA:  Objection, your Honor.

 6              THE WITNESS:  Assistance to the law.

 7              MR. ESTRADA:  Compound, asks for a legal conclusion.

 8              THE COURT:  Overruled.  And he answered "yes."

 9         Next question.

10              THE WITNESS:  Says assistance to the law.

11              MR. SEVERO:  Right.

12         Give me just one moment, Judge, if I may.

13    Q.   Your statements to Deputy Tunstall in Orange County were

14    all true, correct?

15    A.   Yes.

16    Q.   And your statements to Mr. Stebbins and Mr. Estrada in the

17    different debriefings that you had here were also true?

18    A.   Yes.

19    Q.   And they were complete, correct?

20    A.   Yes.

21              MR. SEVERO:  I have nothing further.

22              THE COURT:  Counsel?

23              MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

24    of this witness.

25              THE COURT:  Counsel?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. FLIER:  Yeah, just a couple, your Honor.

 2          MR. ESTRADA:  Your Honor, I should have clarified

 3  before, this witness only pertains to the RICO counts against

 4  defendant Sharopetrosian, and also only pertains to the bank

 5  fraud, aggravated identity theft charges against defendant

 6  Darbinyan, just to clarify.

 7          THE COURT:  Are you asking the Court to limit his

 8  testimony only to those two and the charges against those two?

 9          MR. ESTRADA:  It is limited to those, your Honor.

10          THE COURT:  Okay.

11      Counsel, any questions?

12          MR. FLIER:  I got a couple questions.  I want to ask

13  him --

14          THE COURT:  Relevant to your client?

15          MR. FLIER:  Yes, but on a subject matter that is --

16  might overlap.  That's why.

17          THE COURT:  Well, on the overlap -- I'm assuming he's

18  going to have to call witnesses or you'll call witnesses, but

19  at this time it would be irrelevant to your client, because

20  your client is not charged with any of these charges.

21          MR. FLIER:  So I can re-call this witness --

22          THE COURT:  Certainly.

23          MR. FLIER:   -- in my case in chief?

24          THE COURT:  Certainly.

25          MR. FLIER:  Okay.  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Redirect?

 2            MR. ESTRADA:  Yes, your Honor.  Thank you.

 3                    REDIRECT EXAMINATION

 4  BY MR. ESTRADA:

 5  Q.   Sir, you were asked about people talking big in jail.

 6  A.   Yes.

 7  Q.   Do you recall that?

 8  A.   Yes.

 9  Q.   And you said it's not a good idea to talk big in jail?

10  A.   Yes.

11  Q.   Why is that?

12  A.   Because then people will take you as a liar, that you have

13  no word.

14  Q.   And if you talk big in prison and are found out, what can

15  be the consequences?

16  A.   You will be stabbed or beat up.  You'd be targeted because

17  you're considered a liar.

18  Q.   Now, you dealt with defendant Mike Darbinyan a lot?

19  A.   Yes.

20            MR. SEVERO:  Objection to "a lot."

21            THE COURT:  Sustained.

22       Why don't you be more specific.

23  BY MR. ESTRADA:

24  Q.   Did you deal with defendant Mike Darbinyan many times?

25  A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    Have a lot of interaction with him?

 2    A.    Yes.

 3    Q.    Inside prison and outside prison?

 4    A.    Yes.

 5    Q.    Did you ever get the impression he was just talking big?

 6    A.    No.

 7              MR. SEVERO:  Objection.  That's speculation of this

 8    witness.

 9              THE COURT:  Sustained.

10    BY MR. ESTRADA:

11    Q.    Did you ever get the impression he was lying about having

12    run a crew in prison?

13              MR. SEVERO:  Objection.  Speculation of the witness.

14              THE COURT:  Sustained.

15    BY MR. ESTRADA:

16    Q.    Did you have any information that came to you that he lied

17    about running a crew in prison?

18    A.    No.

19    Q.    Do you have any information that came to you that he lied

20    about being a shot-caller?

21    A.    No.

22    Q.    And when you gave him the authority to run Palm Hall, the

23    hole at Chino when you left, why did you do that?

24    A.    Because he already had been in the position as a

25    shot-caller running the crew.  So he had that experience, and I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    knew he could be capable of handling that responsibility.
 2    Q.   You were incarcerated for over 20 years in prison?
 3    A.   Yes.
 4    Q.   Were you good at determining whether people were lying to
 5    you or talking big to you?
 6    A.   Yes.  Espe- --
 7              MR. SEVERO:  Objection.  Irrelevant with --
 8              THE COURT:  Well, it'd be speculation, Counsel.
 9              MR. ESTRADA:  Well, I'm asking him were you good at
10    telling whether someone's talking big or lying.
11              THE COURT:  That would be speculation, too.  Whether
12    he was good or not would be speculation.
13    BY MR. ESTRADA:
14    Q.   Were you able -- did you believe you were able to
15    understand if someone's talking big or lying to you?
16    A.   Yes.  As -- as a carnal, you're in charge of all gang
17    members and everything.  So when they make mistakes or they
18    mess up, they're going to come to you and going to make up an
19    excuse, anything to get out of whatever mistake or error they
20    made.  And they know that if they lie to a brother, there's
21    consequences.  And one person you do not want to lie to is a
22    brother, because if you lie to him, you're going to have severe
23    consequences.  So we pretty much have heard every story that
24    somebody comes up with, making excuses to justify what they did
25    or what they didn't do or to get out of whatever trouble
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   they're in.  So pretty much you get an idea when someone is

2   lying to you or trying to make something up.

3            THE COURT:  Next question, Counsel.

4   BY MR. ESTRADA:

5   Q.   When you say "consequences," what do you mean by that?

6   A.   Well, depending on what -- what they lied about.  But

7   anytime that you lie to a brother, more than likely you are

8   going to get targeted for assault.

9   Q.   Now, you were shown your plea agreement in this case, in

10  the Ojeda case, Exhibit 246.  Do you recall that?

11  A.   Yes.

12  Q.   You mentioned that there were no promises.  What do you

13  understand that to mean, that there are no promises?

14  A.   That part of this agreement, nothing is promised me that

15  the government is going to say that you are gonna get this

16  amount of time or you're gonna get this.  They didn't promise

17  me anything like that.

18  Q.   So you're not guaranteed a sentence?

19  A.   I'm not guaranteed a sentence.

20  Q.   You were never promised a sentence?

21  A.   No.

22  Q.   And what do you understand about this agreement if you

23  were to lie?

24  A.   Like you explained it to me that one day and you read it

25  to me word by word, you explained that I was not to lie,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    embellish, or diminish in any way, or this deal would be taken

2    back.

3              MR. ESTRADA:  Your Honor, permission to publish

4    Exhibit 246.

5              THE COURT:  Yes.

6    BY MR. ESTRADA:

7    Q.   I'm going to show you page 4 of the plea agreement.  It

8    states that the cooperation requires defendant --

9         That's you, right?

10   A.   Yes.

11   Q.   -- to respond truthfully and completely to all questions

12   that may be put to you --

13        You see that?

14   A.   Yes.

15   Q.   -- in interviews, the grand jury, or any trial or other

16   proceedings.

17        Do you understand that?

18   A.   Yes.

19   Q.   And if you're to lie, what do you understand will be the

20   consequences with regard to this plea agreement?

21   A.   This plea agreement will be pulled, taken from me.

22   Q.   Now I'm going to show you page 6 of the plea agreement.

23        You were asked about whether information you provide can

24   be used to enhance your sentence.  You remember that?  Or I

25   should -- I'll withdraw the question.  Whether information you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   provided can be used to increase your sentence.  Do you
 2   remember that?
 3   A.   Yes.  What --
 4   Q.   The information, however, under the agreement, can be used
 5   to pursue leads and other evidence.  You see that?
 6   A.   Yes.
 7   Q.   And can be used in a prosecution for false statement,
 8   obstruction of justice, or perjury.  Did you understand that?
 9   A.   Yes.
10   Q.   Do you know what perjury is?
11   A.   Yes.
12   Q.   What is it?
13   A.   Lying on the stand.
14   Q.   You could be prosecuted for perjury under the agreement.
15   Do you understand that?
16   A.   Yes.
17   Q.   If you also -- well, you mentioned that you can't
18   embellish.  What did you understand that to mean?
19   A.   Well, that day that you read it to me, you pointed at each
20   word and told me that I was not to lie or diminish anybody's
21   role or make the -- put -- make that person seem like they did
22   more than they actually did.
23   Q.   Let me show you page 18 of the agreement, which talks
24   about a breach of the agreement, a violation of the agreement,
25   and it describes what a breach or violation would be.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1     For example, if defendant knowingly, in an interview

2   before a grand jury or at trial, falsely accuses another person

3   of criminal conduct or falsely minimizes defendant's own role

4   or the role of another in criminal conduct, that would be a

5   breach.

6     What did you understand that to mean?

7   A.   That I was to tell the truth, nothing but the truth,

8   otherwise this plea would be gone.  This is what you read to

9   me --

10  Q.   And this part about falsely accusing someone, what did you

11  understand that to mean?

12  A.   Not to make something up concerning somebody else.

13  Q.   Who was it, were you told, would be the one who decides

14  what your sentence will be?

15  A.   The judge.

16  Q.   Looking at page 20 of the agreement, do you see here where

17  it says the Court and the United States Probation Office are

18  not parties to this agreement and need not accept any of the

19  U.S. Attorney's Office's sentencing recommendations or the

20  agreements to facts or sentencing factors?

21    What did you understand that to mean?

22  A.   That the judge is gonna do what he -- what he feels is

23  best, what he wants.

24  Q.   Now, you were asked about whether defendant Darbinyan was

25  scared of you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Whether he was frightened of you.

 3    A.    Yes.

 4    Q.    Do you have any indication that defendant Darbinyan was

 5    scared of you?

 6    A.    No.

 7    Q.    Did he ever tell you he was scared of you?

 8    A.    No.

 9    Q.    Had he ever tried to avoid you?

10    A.    No.

11    Q.    Who is the person who first approached you, or first

12    approached, either one?  Did you approach Darbinyan, or did you

13    approach him?

14    A.    He approached me.

15    Q.    And that question came out very poorly.  But he approached

16    you?

17    A.    Yes.

18    Q.    Now, you mentioned at one point, when you were asked about

19    whether you've used drugs while in prison --

20    A.    Yes.

21    Q.    -- that you don't get drugs anymore in jail.

22    A.    Yes, but it -- not in that context.  As a carnal, or a

23    brother, you all -- people automatically send you a cut, a

24    third of every, all the drugs that come in or any contraband.

25    They have to give it to you off the top.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Now, you've agreed to testify, correct?

 2   A.   Yes.

 3   Q.   You signed up as a cooperator with the government.

 4   A.   Yes.

 5   Q.   Has your status as a carnal, as a brother, changed?

 6   A.   Yes, that's why I meant I don't get drugs or nothing.  My

 7   privileges, I am -- right now I'm considered on disregard, but

 8   because of today, you know, the consequences are extremely more

 9   higher.

10   Q.   So you're here to testify to get a benefit, right?

11   A.   In a way, yes.

12   Q.   You're trying to reduce your sentence?

13   A.   Yes.

14   Q.   If at some point you get out of prison, are there

15   consequences to you from taking the stand here today?

16   A.   Not only consequences to me, but more importantly --

17            MR. SEVERO:  Objection, your Honor.

18            THE WITNESS:  -- to my --

19            MR. SEVERO:  Nonresponsive to the question.

20            THE COURT:  Okay.  Yes or no:  Are there consequences?

21            THE WITNESS:  Yes.

22   BY MR. ESTRADA:

23   Q.   What are the consequences?

24   A.   For me, automatic death.  Anybody gets the opportunity to

25   kill me, they will kill me.  I put my family, my loved ones,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   and those that consider my friends in danger as well.  So the

 2   risk is -- is -- is pretty high.  It's not a -- that wasn't

 3   done lightly for the sentencing, you know, consideration.  It

 4   was more than -- than that.

 5   Q.   Can you go back to the Eme?

 6   A.   Absolutely not.

 7   Q.   Can you go back to the gang?

 8   A.   No.

 9   Q.   In fact, if you show up to see your old gang member

10   friends again, what are they required to do?

11   A.   To kill me.  Anybody -- as of this moment, anybody that

12   has an opportunity to not just stab me, but kill me, will

13   attempt to kill me, not only because of what status they will

14   give it --

15            MR. SEVERO:  Nonresponsive to the question.

16            THE COURT:  Next question, Counsel.

17   BY MR. ESTRADA:

18   Q.   I forgot where we were in the question, but the

19   consequence of you testifying today, is it now others are

20   required to kill you?

21   A.   Absolutely.

22   Q.   And if, let's say, another Hispanic gang member kills you

23   as a former Eme member, what happens?

24   A.   He -- he earned his bones, he made his bones, which, more

25   than likely, because he's killed someone that was a member that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    told, will more likely make him a member.

2              MR. ESTRADA:  No further questions, your Honor.

3              THE COURT:  Recross in that area.

4                      **RECROSS-EXAMINATION**

5    BY MR. SEVERO:

6    Q.   When you came out of the prison, it was you who called

7    Mr. Darbinyan, wasn't it?

8    A.   No.

9    Q.   You told this morning, told us this morning that you made

10   the phone call to Mr. Darbinyan.

11   A.   Yeah, but he called and left a number for me to call him.

12   Q.   Oh, we didn't -- we didn't ask you that, so you didn't

13   tell us that.  Is that why that didn't come out?

14             MR. ESTRADA:  Objection, your Honor.  Again it's

15   argumentative.  It's improper.

16             THE COURT:  Sustained.  Next question.

17   BY MR. SEVERO:

18   Q.   The question of -- once again, you met with the government

19   in this case in 2011, correct?

20             MR. ESTRADA:  Object, your Honor.  Beyond the scope.

21             MR. SEVERO:  No, it isn't.

22             THE COURT:  Overruled.

23             MR. SEVERO:  This --

24             THE COURT:  Why don't you ask the question again.

25             THE WITNESS:  I'm sorry, can you repeat the question,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    please?
2            MR. SEVERO:  Sure.  Give me a second.  That okay?
3    Q.   You were -- you testified on redirect that Mr. Darbinyan
4    was running a crew.
5    A.   Yes.
6    Q.   But you never told Mr. Stebbins and Mr. Estrada that in
7    June of 2011, did you?
8    A.   I don't know exactly, what exactly I told them that day.
9    Q.   In fact, you never told them that at all, did you?
10   A.   Yes, I did.
11   Q.   But you didn't tell them in June of 2013, did you?
12   A.   I don't know when I told them.
13   Q.   But you didn't -- it took you two years to remember that.
14           MR. ESTRADA:  Objection, your Honor.  Argumentative.
15           THE COURT:  Sustained.
16           MR. ESTRADA:  And beyond the scope.
17           THE COURT:  Sustained.
18   BY MR. SEVERO:
19   Q.   Did it take you two years to remember that?
20   A.   No.
21           MR. ESTRADA:  Objection, your Honor.  Beyond the
22   scope.
23           THE COURT:  Overruled.  He said "no."
24   BY MR. SEVERO:
25   Q.   All these promise -- all these things in the plea
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   agreement, that you were supposed to tell the truth and stuff,

 2   have actually turned your life around, haven't they?

 3   A.    Turned my life around?

 4   Q.    Yeah.  You've become an honest man, have you?

 5   A.    No.

 6   Q.    I didn't think so.

 7         Thank you.  No further questions.

 8              THE COURT:  Okay.

 9         Counsel?

10              MR. PEREYRA-SUAREZ:  I have nothing further, your

11   Honor.

12              THE COURT:  Counsel?

13              MR. FLIER:  I don't --

14              THE COURT:  You may step down.

15              MR. SEVERO:  He's still on call?

16              THE COURT:  He's going to be on call.  Counsel's

17   already asked that he be kept on call, and he is.

18              MR. SEVERO:  Thank you.

19              THE COURT:  You may step down.

20         Thank you very much.

21              MR. CREIGHTON:  The government calls Kevin Giberson.

22              THE CLERK:  Good afternoon.  Right here to be sworn,

23   please.

24       (Witness sworn.)

25              THE CLERK:  Thank you.  You may be seated.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        May I please ask that you state your full name for the
 2   record and spell your last name.
 3             THE WITNESS:  Kevin Giberson, G-i-b-e-r-s-o-n.
 4             THE CLERK:  Thank you.
 5             THE COURT:  Okay.  You may inquire, Counsel.
 6                 KEVIN GIBERSON, GOVERNMENT'S WITNESS,
 7                        DIRECT EXAMINATION
 8   BY MR. CREIGHTON:
 9   Q.   Good afternoon.
10   A.   Sir.
11   Q.   How are you employed?
12   A.   Through the Los Angeles Police Department.
13   Q.   What is your rank?
14   A.   Police Officer II.
15   Q.   Where are you currently assigned?
16   A.   Currently assigned to Mission Division, patrol.
17   Q.   Where were you assigned in 2000 -- in the summer of 2009?
18   A.   To Northeast Division, gang enforcement detail.
19   Q.   And what are your -- what were your duties at that point?
20   A.   We were a intel-based unit.  We would respond to
21   gang-involved radio calls as well as patrol the streets in
22   the -- in the -- during -- in the community, in the areas where
23   we know that there's gang activity, suppress gang crime within
24   the community.
25   Q.   And you said this was part of the west side gang unit, I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   believe?

2   A.   Yeah.  We -- Northeast Division was split into two areas,

3   east and the west, and I was working the west side.

4   Q.   Okay.  And from the perspective of the Los Angeles Police

5   Department, what area is that specifically covering?

6   A.   East Hollywood area, roughly.

7   Q.   Okay.  Can you describe roughly the boundaries of that

8   area.

9   A.   Yeah.  The boundaries of just East Hollywood area?

10  Q.   Of the area that you were patrolling in that period.

11  A.   Okay.  The -- our west boundary's going to be Normandie.

12  South boundary, Santa Monica Boulevard to Sunset.  Our

13  eastbound route would be the 110 freeway.  And the north would

14  be the 134.

15  Q.   And you said that your duties involved gang suppression.

16  As part of those duties, what gangs did you encounter?

17  A.   I encountered La Mirada Locos, Armenian Power,

18  White Fence, Mara Salvatrucha, Avenues, Cypress Park,

19  Highland Park.

20  Q.   Now, in the course of these duties, how many encounters

21  would you say that you had with various gangs?

22  A.   Hundreds.

23  Q.   And -- strike that.

24      Turning to October 20th, 2009, at about 9:00 p.m., what

25  were you doing?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    I was working for the gang enforcement detail, patrolling

2    the East Hollywood area.

3    Q.    Were you in uniform?

4    A.    Yes, sir.

5    Q.    And when you were on patrol, were you in a vehicle?

6    A.    Yes.

7    Q.    What kind of vehicle was that?

8    A.    It was a marked black-and-white hybrid police vehicle.

9    Q.    And I'm sorry, correct for the record.  I misspoke.  I

10   said October.  I meant August of 2009.

11        Okay.  So on August 20th, 2009, you were in this hybrid

12   vehicle, which had no light bar, I believe.

13   A.    Yes.  The only difference between the hybrid and the

14   regular black-and-white police vehicle, it's still black and

15   white, we just don't have a light bar on top of the vehicle.

16   Q.    What difference does that make?

17   A.    It gives us an extra second or two when we're driving up

18   to sneak up on people, possible criminals in the streets.  Our

19   vehicles -- normal black-and-white vehicle with a light bar on

20   top has a particular and distinct silhouette.

21   Q.    So at approximately 9:10 p.m., were you directed to

22   respond to possible gang activity?

23   A.    Yes.

24   Q.    And where were you directed to go?

25   A.    It was a restaurant by the name of the Chicken House on

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Hollywood Boulevard.

2    Q.    Do you recall the address?

3    A.    I could take a stab at it.  I -- I recall it to be -- I

4    think it was 5019 Hollywood Boulevard.

5    Q.    And what kind of restaurant was the Chicken House?

6    A.    Think it was -- it was more of like a smaller fast --

7    almost like a fast-food with the small dining area, chicken

8    restaurant.

9    Q.    Now, I'm going to ask you to turn to Exhibit 301, which

10   should be in a binder behind you or in front of you.

11          THE CLERK:  Is it in that binder?

12          THE WITNESS:  Can you repeat that again?

13          MR. CREIGHTON:  301.

14          MR. FLIER:  Your Honor, can I assume this does not go

15   to my client?

16          THE COURT:  Good question, Counsel.

17       Is this directed just to the first two defendants?

18          MR. CREIGHTON:  Correct, your Honor.

19          THE COURT:  Okay.

20          MR. CREIGHTON:  This pertains to the racketeering

21   conspiracy charges as against defendant Sharopetrosian and

22   defendant Darbinyan.

23          THE COURT:  Then this will be limited just to those

24   two defendants and those counts.

25       Thank you, Counsel.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. FLIER:  Thank you.

 2            THE WITNESS:  Okay.

 3  BY MR. CREIGHTON:

 4  Q.   Do you have that in front of you now?

 5  A.   Yes.  Yes.

 6  Q.   Now, this exhibit consists of two pages, and let me begin

 7  by directing my questions to page 1.  What is this?

 8  A.   It's a photo of the location where the incident occurred.

 9  Q.   Okay.  Do you recognize the streets that are labeled on

10  this photograph?

11  A.   I do.

12  Q.   And is the address of the -- does the address of

13  5019 Hollywood Boulevard appear to be in the correct location

14  in this photograph?

15  A.   Yes, sir.

16  Q.   And the street names appear to be correct?

17  A.   Yes.

18  Q.   Okay.  And down at the bottom, do you see a label

19  indicating what entity produced the photograph, on the

20  photograph itself?  Can you read that?

21  A.   Yes.  Google.

22  Q.   Okay.  And below that, what does it say?

23  A.   Says "Imagery 2014, Digital Globe, U.S. Geological

24  Survey."

25  Q.   Okay.  Now, if we could turn to the second page of this
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   exhibit, there's a photograph here.  What is depicted in that
2   photograph?
3   A.   It's the restaurant where the incident occurred, the
4   Chicken House, as well as the parking lot.
5   Q.   And does this photograph fairly and accurately depict the
6   location of the Chicken House relative to the street and to the
7   parking lot?
8   A.   Yes, it does.
9   Q.   And what is that street, by the way, in front of the
10  Chicken House?
11  A.   Hollywood Boulevard.
12        MR. CREIGHTON:  Your Honor, the government would move
13  to admit Exhibit 301 and publish.
14        THE COURT:  It will be received.
15        MR. SEVERO:  Page 1 --
16        THE COURT:  I'm sorry?
17        MR. SEVERO:  Page 1 lacks foundation.  It's a 2014
18  depiction, and it hasn't been properly --
19        THE COURT:  Overruled.  It may be admitted, and you
20  can cross-examine as to whether or not it's changed in the last
21  few years.
22      (Received in evidence, Exhibit 301.)
23        THE COURT:  Next question.
24        MR. CREIGHTON:  Now, permission to publish
25  Exhibit 301, your Honor?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1           THE COURT:  Yes.

2       Just to help out with the objection that was just made,

3   does that appear to be the same area as it was back in 2009?

4           THE WITNESS:  Yes, it does.

5   BY MR. CREIGHTON:

6   Q.   What is that street?

7   A.   Hollywood Boulevard.

8   Q.   What is this building as depicted on this photograph?

9   A.   5019 Hollywood Boulevard, the Chicken House restaurant.

10  Q.   And what is this area that I am circling to the right?

11  A.   This is the parking lot for the restaurant.

12  Q.   Turning to page 2 of Exhibit 301, is this the

13  Chicken House on the left?

14  A.   Yes, sir.

15  Q.   And this is the parking lot?

16  A.   Correct.

17  Q.   Officer Giberson, I'd ask you to turn to Exhibit 303 in

18  that book.  Would you look through the pages of that exhibit.

19  A.   Yes.

20  Q.   What is this exhibit?

21  A.   It's numerous pictures that were -- that were taken of the

22  vehicles that were in the parking lot, firearms that were

23  recovered, as well as the front of the business.

24  Q.   Do these photos fairly and accurately depict locations and

25  scenes and items the night that you -- of the events in

1   question?

2   A.   Yes.

3        MR. CREIGHTON:  Your Honor, we would move to admit

4   Exhibit 303.

5        THE COURT:  Be received.

6        (*Received in evidence, Exhibit 303.*)

7   BY MR. CREIGHTON:

8   Q.   What does this photograph depict?

9   A.   It depicts the -- a night photo of the front of the

10  business, the Chicken House.

11  Q.   Is this the way the Chicken House looked that night?

12  A.   Yes.

13  Q.   And was it indeed nighttime when you arrived at the

14  Chicken House?

15  A.   Yes.

16  Q.   So, unlike the previous photograph, it was dark when you

17  got there?

18  A.   Correct.

19  Q.   Was the interior of the Chicken House lit up?

20  A.   Yes.

21  Q.   Now, when you arrived, what did you do?

22  A.   When we arrived, we were -- we pulled into the parking

23  lot, and we observed a group of about, I would say about eight

24  males standing to the -- in the parking lot to the rear of the

25  Chicken House business.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   When you pulled into the parking lot, what, if anything,

2   happened?

3   A.   As soon as we made a turn into the parking lot, several of

4   the males in the group behind the business made eye contact

5   with us, and a few, I would say about six of them, ran inside

6   the rear door of the business.

7   Q.   What did you do?

8   A.   I immediately exited the vehicle and ran to the front of

9   the business to -- to make sure -- okay.

10  Q.   As you were doing that, did you observe your partner?

11  A.   I did.

12  Q.   Did anything -- did anybody approach your partner?

13  A.   Yes.

14  Q.   How many people?

15  A.   I believe it was one, one person.

16  Q.   Now, in your -- while -- and let me be clear.  One person

17  approached your partner, and what had happened to the group in

18  the back of the parking lot?

19  A.   They ran to the rear, rear door of the business, and went

20  inside.

21  Q.   Now, you've responded to, as you said, hundreds of

22  gang-related incidents; is that correct?

23  A.   Possibly thousands.  Yeah.

24  Q.   And have you -- how many of those have been gang incidents

25  where you have shown up and there have been groups of people
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    clustered?

2    A.    Numerous.

3    Q.    And have you had numerous incidents where people have run

4    away when you have approached?

5    A.    Yes.

6    Q.    And have you also seen individuals approach you when

7    others are running away?

8    A.    Yes.

9         MR. SEVERO:  Questions have become leading.  I would

10   ask --

11        THE COURT:  Sustained.

12   BY MR. CREIGHTON:

13   Q.    And in your training and experience, does someone

14   approaching a police officer at a gang incident have any

15   significance?

16   A.    Yes.

17   Q.    What is that?

18        MR. PEREYRA-SUAREZ:  Objection, lacks foundation,

19   calls for speculation.

20        THE COURT:  Sustained.

21   BY MR. CREIGHTON:

22   Q.    You said you moved to the front of the restaurant.

23   A.    Correct.

24   Q.    What was your purpose in doing that?

25   A.    My purpose in doing that was to keep eyes inside of the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    front of the restaurant as well as prevent anybody from exiting

2    the front door of the business.

3    Q.    What did -- what, if anything, did you observe about the

4    interior of the restaurant?

5    A.    I observed it to be -- there was actually quite a few

6    people at that moment sitting down in the front area of the

7    eating area.

8    Q.    Now, you said "at that moment."  Was that the same way it

9    had looked when you first pulled into the parking lot?

10   A.    No, it wasn't.

11   Q.    What was it like when you first pulled in?

12   A.    I think I maybe saw one or two people, maybe three,

13   sitting down eating, talking.

14   Q.    But then when you went to the front, there were more

15   people, correct?

16   A.    More people appeared to -- to be sitting down in the front

17   of the business, correct.

18   Q.    Did you request assistance at this point?

19   A.    Yes, sir.

20   Q.    How did you do that?

21   A.    I requested additional gang units to respond to our

22   location over radios.

23   Q.    And did they come?

24   A.    They did.

25   Q.    What did you do while you were waiting for them?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   We -- we just held the -- I held the front of the

2    business.  My partner held the rear.

3    Q.   After your additional gang units arrived, what happened

4    next?

5    A.   At that point, we had enough officers to be able to handle

6    the amount of people that were inside the business, so we asked

7    the patrons as well as the people that we knew ran in there

8    from the back to exit the front of the business and come

9    outside.

10   Q.   And where were those -- were those people moved someplace?

11   A.   Yes.  They were moved to the east wall of the business,

12   facing the business, facing away from us.

13   Q.   What did you do next?

14   A.   We -- we had to search the interior of the business to

15   clear it of any other sus- -- additional suspects.

16   Q.   So you used both the words "search" and "clear" in here.

17   A.   Correct.

18   Q.   But what does "clear" mean?

19   A.   "Clear" means I'm trying to clear it to make sure there's

20   no people inside the business, because while we're outside

21   conducting our investigation, we don't want to have someone in

22   there we don't know is in there.

23   Q.   So when you went into the front part of the restaurant,

24   was there anybody there?

25   A.   No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And where did you go from the front part of the

2    restaurant?

3    A.    Through the -- through the dining area, through the

4    kitchen, and to the rear, all the way through the -- to the

5    rear of the business, where we observed a staircase that was

6    leading up top to something.

7    Q.    What did you do?

8    A.    We went up the staircase.  Ended up being a small, little

9    landing area.

10   Q.    What, if anything, did you observe up there?

11   A.    I observed -- we observed a handgun protruding from behind

12   a box.

13   Q.    Did you seize that handgun at that point?

14   A.    No.

15   Q.    Why not?

16   A.    Our main concern was to continue to clear the business

17   of suspects, people that could cause harm to us.

18   Q.    After you finished clearing the restaurant, what did you

19   do next?

20   A.    We exited and searched the parking lot.

21   Q.    What were you searching the parking lot for?

22   A.    Additional suspects in the -- in the vehicles.

23   Q.    Now directing your attention to some of the photographs.

24   Not all of these are easy to see.  I'm going to put a few of

25   these up.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1      Were these some of the vehicles that you observed in the
 2  parking lot?
 3  A.   Yes.
 4  Q.   And what were the brands or the makes of these cars?
 5          MR. SEVERO:  Objection, irrelevant.
 6          THE COURT:  Overruled.
 7  BY MR. CREIGHTON:
 8  Q.   What's the make of this car?
 9  A.   Mercedes.
10  Q.   And this car?
11  A.   BMW.
12  Q.   And this car?
13  A.   BMW.
14  Q.   This car?
15  A.   Looks -- appears to be a Lexus.
16  Q.   Hold that for a moment.
17      This car?
18  A.   Mercedes.
19  Q.   Now, while you were assisting in the search of the --
20  well, let me ask this.
21      Now that you had additional units that had arrived and
22  people had been removed from the restaurant, what was your role
23  in the investigation at this point?
24  A.   I'm the primary unit.  I pretty much take charge and -- I
25  wouldn't say give orders, but, you know, I'm in charge of the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   investigation at this point, so I now want to know who's who.
 2   I'm asking my fellow officers if they'll help me out and
 3   conduct, you know, investigations on each individual.
 4   Q.   Now, also did you bear any responsibilities with regard to
 5   any evidence that was located at the scene?
 6   A.   Yes, sir.
 7   Q.   What was that?
 8   A.   I was collecting the evidence, recovering the evidence.
 9   Q.   Now, while you were clearing the parking lot, was it
10   brought to your attention that there was any evidence in this
11   vehicle?
12   A.   Yes.
13        THE COURT:  Counsel, at this time we're going to break
14   for our afternoon recess, it being 2:30.
15        Remember the admonishment not to discuss the case among
16   yourselves or form or express any opinions about the matter
17   until it's submitted to you and you retire to the jury room.
18        See you back in 15 minutes.
19        THE CLERK:  All rise.
20        (Recess held from 2:30 p.m. to 2:48 p.m.)
21        (In the presence of the jury:)
22        THE COURT:  Okay.  The record will reflect that all
23   the members of the jury are in their respective seats in the
24   jury box, including the alternates.
25        Counsel, you may continue.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. CREIGHTON:  Thank you, your Honor.
 2    Q.   Directing your attention once again to Exhibit 303,
 3    page 13, did you learn that an item of interest had been found
 4    in this vehicle?
 5    A.   Yes.
 6    Q.   Was this vehicle parked in the Chicken House parking lot?
 7    A.   Yes.
 8    Q.   Turning your attention to page 5 of Exhibit 303, what is
 9    this?
10    A.   It's a firearm.  It's the butt end, bottom of the magazine
11    well.
12    Q.   Is that the area that I've circled there?
13    A.   Correct.
14    Q.   And do you recognize that as a butt end of a firearm
15    because of your training and experience in firearms?
16    A.   Yes, sir.
17    Q.   What is this photograph?
18    A.   That is the photograph of the entire firearm, handgun.
19    Q.   So in your role as a finder, did you pull it out and take
20    this photo?
21    A.   Yes, I -- correction.  I did not take the photo, but I was
22    there while it was taken.
23    Q.   Thank you.
24         Also during the search of the area around the
25    Chicken House, did you learn that a firearm had been found in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    another vehicle?

2    A.    Yes.

3    Q.    Showing you a photograph of a Range Rover.  Is that the

4    vehicle the other firearm was found in?

5    A.    Yes.

6    Q.    Where in the vehicle was the firearm found?

7    A.    In the spare tire area in the back.

8    Q.    Is this a photograph of that area?

9    A.    Yes.

10            MR. CREIGHTON:  Let the record reflect I'm referring

11    to page 16 of Exhibit 303.

12            THE COURT:  Yes.

13    BY MR. CREIGHTON:

14    Q.    And would you describe this photograph in a little more

15    detail for the jury.

16    A.    Yeah.  It's a -- this is a handgun that was wrapped in a

17    rag that was recovered underneath -- there was some -- actually

18    some area lifted up to be able to observe this.

19            THE COURT:  Counsel, you want to -- thank you.

20    BY MR. CREIGHTON:

21    Q.    And turning to the next page, what is depicted in this

22    photograph?

23    A.    It's a semi-automatic handgun.

24    Q.    Is that the photograph of the semi-automatic that was

25    found in the Range Rover?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.    Yes.

2   Q.    Did you notice anything about the condition of the firearm

3   after it was unwrapped?

4   A.    Yes.

5   Q.    What?

6   A.    The hammer was back, meaning it was ready to go, ready

7   to -- ready to fire.

8   Q.    Did you determine whether the firearm was loaded?

9   A.    Yes, I did.

10   Q.    Was it?

11   A.    Yes, it was.

12   Q.    Was there a round in the chamber?

13   A.    Yes, there was.

14   Q.    What about the firearm that was found in the Mercedes?

15   Was that also loaded?

16   A.    Yes, it was.

17   Q.    Was there a round in the chamber?

18   A.    There was.

19   Q.    Did you recover both of these firearms?

20   A.    Yes.

21   Q.    After you did that, did you return and search the

22   restaurant?

23   A.    Yes.

24   Q.    What, if anything, did you find there?

25   A.    Four firearms.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Where were they located?

2   A.   In the landing area where I had first originally seen the

3   firearm where we were searching for people.

4   Q.   Let's be a little -- let's break this down --

5   A.   Okay.

6   Q.   -- a little bit more.

7        This landing area, I believe you referred to a -- a ladder

8   or some kind of entryway earlier.  Where was that located in

9   the restaurant?

10  A.   To -- it was near the kitchen area.

11  Q.   Okay.  Was it to the front of the restaurant or behind the

12  kitchen?

13  A.   It was behind the kitchen, to the rear.

14  Q.   Was it close to the rear door to the restaurant?

15  A.   Yes.

16  Q.   Was it -- is that area observable from the street when --

17  where you had originally stood?

18  A.   No.

19  Q.   I'm showing you Exhibit 303, page 2.  What is depicted in

20  this photograph?

21  A.   A handgun.

22  Q.   And where is it located?

23  A.   It's located on the landing, behind a cardboard box,

24  between a cardboard box and a wall.

25  Q.   And turning to page 3 of the exhibit, this appears to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    be -- is this a close-up of that same --

 2    A.    Correct.

 3    Q.    -- firearm?

 4          And then in page 4 of Exhibit 303, what's depicted here?

 5    A.    Multiple handguns.

 6    Q.    Okay.  Were these found in the same location?

 7    A.    Yes.

 8    Q.    In that loft area above the kitchen?

 9    A.    Correct.

10    Q.    Thank you.

11          Were these firearms loaded?

12    A.    Yes.

13          MR. CREIGHTON:  Your Honor, I have six firearms and an

14    ammunition exhibit I would like to present to the witness at

15    this point.  I think it will save time if I present them all to

16    him at once and have Detective Gonzalez bring them to him.

17          THE COURT:  You can do that.  Are the weapons

18    unloaded?

19          MR. CREIGHTON:  They're unloaded, and the marshal has

20    checked that they're safe.

21          THE COURT:  Okay.  We'll bring them up separately.

22    One is the weapons.  The other one is the ammunition.

23          MR. CREIGHTON:  Thank you, your Honor.

24    Q.    Now, Officer Giberson, just a moment before we start

25    opening these -- and let's explore a little bit further.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        You've had training in firearms?

 2   A.   Yes, I have.

 3   Q.   And you've had experience in firearms?

 4   A.   Correct.

 5   Q.   So you know how to handle firearms?

 6   A.   I do.

 7   Q.   Okay.  And you know something -- you can recognize their

 8   condition; is that correct?

 9   A.   Yes.

10   Q.   Okay.  If you would open them up in order, starting with

11   Exhibit 304.  Well, maybe it's best if we do this one at a

12   time.  Can you find Exhibit 304 there?

13        Okay.  Would you open that up, please?

14   A.   Okay.

15   Q.   Do you recognize it?

16   A.   I do.

17   Q.   What is it?

18   A.   It's a Springfield semi-automatic handgun.

19   Q.   Is this the firearm you recovered in the Mercedes?

20   A.   Yes.

21   Q.   Is it in substantially similar condition?

22   A.   Yes.

23        MR. CREIGHTON:  Your Honor, move to admit Exhibit 304

24   and publish.

25        THE COURT:  Why don't you bring -- hold it up.
```

```
 1              MR. CREIGHTON:  I'm sorry, Exhibit, yes, 304.  Open

 2   them all up?

 3              THE COURT:  No, no, no.  Just hold it up, I said.

 4              MR. CREIGHTON:  I'm sorry, hold it up.  Yes, please.

 5              THE COURT:  It'll be received.

 6              MR. CREIGHTON:  Thank you, your Honor.

 7              MR. SEVERO:  Is that by reference, your Honor, or --

 8              THE COURT:  By reference.

 9         Thank you, Counsel.

10              MR. SEVERO:  Thank you.

11              MR. CREIGHTON:  Yes, thank you, Counsel.

12         (Received in evidence by reference, Exhibit 304.)

13   BY MR. CREIGHTON:

14   Q.   And again, this was recovered in the Mercedes?

15   A.   Yes.

16   Q.   And it was loaded at the time?

17   A.   Yes.

18   Q.   Would you close that box and open up box 305.

19         Do you recognize it?

20   A.   I do.

21   Q.   What is it?

22   A.   It's a SIG semi-automatic handgun.

23   Q.   Is it in the substantially similar condition to -- I'm

24   sorry, is it -- where did you find it?

25   A.   In -- on the attic landing area.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Thank you.

2          Is it in substantially similar condition?

3    A.    It is.

4                MR. CREIGHTON:  Your Honor, move to admit Exhibit 305.

5                THE COURT:  Yes.

6                MR. SEVERO:  Again by reference?

7                THE COURT:  By reference only.  All the weapons would

8    be by reference only.

9                MR. SEVERO:  Thank you.

10               THE COURT:  And thank you, Counsel.

11         *(Received in evidence by reference, Exhibit 305.)*

12               MR. CREIGHTON:  And your Honor, we will also be having

13   one ammunition exhibit and ask that --

14               THE COURT:  That will also be by reference only.

15               MR. CREIGHTON:  Thank you, your Honor.

16   Q.    You said that this was recovered in the loft.  Was it

17   loaded at the time it was recovered?

18   A.    Yes, it was.

19   Q.    Was there a round in the chamber, do you recall?

20   A.    I do.  There was.

21   Q.    Was there?

22   A.    Yes, there was.

23   Q.    Okay.  Can we turn to Exhibit 306 now.  Do you recognize

24   this?

25   A.    I do.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What is it?

 2   A.   It's a Desert Eagle semi-automatic handgun.

 3   Q.   Was it recovered at the restaurant?

 4   A.   Yes, it was.

 5   Q.   Do you recall where?

 6   A.   In the attic.

 7          MR. CREIGHTON:  Move to admit Exhibit 304 and publish.

 8          THE COURT:  By reference, it'll be.

 9   BY MR. CREIGHTON:

10   Q.   Now, Officer Giberson, would you hold that up for the jury

11   for a moment.

12          There's some plastic ties, zip ties on that.  Would you

13   explain to the jury what the function of those are.

14   A.   The plastic zip ties?

15   Q.   Yes.  In this -- in this case, what are they being used

16   for?

17   A.   They're to keep the -- the slide from chambering so it

18   could actually fire or have a round in it.

19   Q.   Okay.  And there's -- and there's no round in it at

20   present, correct?

21   A.   No round it in presently.

22          THE COURT:  All those plastic ties weren't there when

23   you recovered them; is that correct?

24          THE WITNESS:  Correct.

25          THE COURT:  And you do that for safety purposes so the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**000908**

1   gun can't be accidentally discharged?

2          THE WITNESS:  Correct, sir.

3          THE COURT:  Okay.  Go ahead, next question.

4   BY MR. CREIGHTON:

5   Q.   Was that loaded at the time you recovered it?

6   A.   Yes, it was.

7   Q.   Was that one of the four that you recovered in the loft?

8   A.   Yes.

9   Q.   Okay.  Can we turn to the next exhibit, 307.

10         THE CLERK:  Counsel, I'm sorry, were you moving 306

11  into evidence?

12         MR. CREIGHTON:  Yes, I'd like to move -- I'm sorry,

13  your Honor.  I'd like to move Exhibit 306 into evidence and

14  publish.

15         THE COURT:  Yes.  It'll be received by reference.

16      (Received in evidence by reference, Exhibit 306.)

17  BY MR. CREIGHTON:

18  Q.   Would you open Exhibit 307 now, please.

19  A.   Yes.

20  Q.   What is it?

21  A.   It's a HK.

22  Q.   I'm sorry, HK?  What is that?

23  A.   Heckler & Koch.  It's the brand --

24  Q.   Okay.

25  A.   -- or the model.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          It's a Smith & Wesson HK semi-automatic handgun.

 2     Q.   Okay.  Do you recognize it?

 3     A.   I do.

 4     Q.   Where was it found?

 5     A.   On the landing as well.

 6     Q.   Okay.  Is it in substantially similar condition?

 7     A.   Yes.

 8          MR. CREIGHTON:  Move to admit and publish Exhibit 307

 9     by reference.

10          THE COURT:  Yes.

11          (Received in evidence by reference, Exhibit 307.)

12     BY MR. CREIGHTON:

13     Q.   Turning to Exhibit 308, do you recognize this?

14     A.   I do.

15     Q.   What is it?

16     A.   It's a Glock semi-automatic handgun.

17     Q.   Do you recognize the Glock model?

18     A.   I do.

19     Q.   What is it?

20     A.   It's a model 17.

21     Q.   And was that also recovered in the loft?

22     A.   Yes, it was.

23     Q.   Is it in substantially similar condition?

24     A.   Yes.

25          MR. CREIGHTON:  Move to admit and publish Exhibit 308
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    by reference.

 2              THE COURT:  Granted.

 3         (Received in evidence by reference, Exhibit 308.)

 4    BY MR. CREIGHTON:

 5    Q.  Now, before you box that up, one question.  Is there

 6    anything unusual about that Glock?

 7    A.  Yeah.  One thing that I -- that I notice that I don't

 8    usually see is, there's some Velcro on the right side, on top

 9    of the handle.

10    Q.  Okay.  Thank you.

11         Now, turning to Exhibit 309, what is this?

12    A.  This is a Taurus semi-automatic handgun.

13    Q.  Where was that found?

14    A.  That was found in the trunk area of the Range Rover.

15    Q.  Okay.  Is this in substantially similar condition?

16    A.  Yes.

17              MR. CREIGHTON:  Move to admit and publish, by

18    reference, Exhibit 309.

19              THE COURT:  Granted.

20         (Received in evidence by reference, Exhibit 309.)

21    BY MR. CREIGHTON:

22    Q.  Now, just a couple of summary questions about these

23    firearms.  You said they're semi-automatic firearms.  Quickly,

24    what does that mean?

25    A.  Semi-automatic firearms generally have higher round
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   capacity.  You'd be able to fire more rounds in a -- in a
 2   quicker amount of time.
 3   Q.   Okay.  Were all of these weapons loaded?
 4   A.   Yes.
 5   Q.   And I'm sorry, I neglected to ask, follow -- finish that
 6   up.  The Velcro on the handle of the Glock, are you aware of
 7   what purpose that serves, in your training and experience with
 8   firearms?
 9   A.   Yes.
10   Q.   What's it for?
11   A.   A lot of times people will add a laser sight to the
12   fire -- to a firearm, which -- which would necessitate a way to
13   attach it to the firearm, which that particular firearm doesn't
14   have something built into it to attach a laser sight, so you
15   would need something else to use.
16   Q.   All right.  Thank you.
17        With the Court's permission, if we could now return the
18   firearms to the possession of the detective back here and bring
19   up the ammunition.
20            THE COURT:  Yes.
21   BY MR. CREIGHTON:
22   Q.   Would you look at this exhibit, please.  And feel free to
23   open the bag and look at the items that are contained in there.
24        Officer Giberson, do you recognize these items?
25   A.   I do.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What are they?

 2   A.   They are ammunition that was located in the firearms that

 3   were just shown.

 4            MR. CREIGHTON:  Your Honor, move to admit Exhibit 310

 5   by reference and publish to the jury.

 6       Actually, I would like to postpone publishing at this

 7   time, your Honor.

 8            THE COURT:  All right.  Granted.

 9       (Received in evidence by reference, Exhibit 310.)

10   BY MR. CREIGHTON:

11   Q.   Now, all of these firearms -- I think if we could stop --

12   oh, I see what you're doing.  Yes, please, go ahead.

13       All of these firearms and ammunition, you -- you seized

14   these items on the evening in question, right?

15   A.   Yes.

16   Q.   What did you do after you seized them?

17   A.   They were brought back to our station and booked into our

18   property section.

19            MR. CREIGHTON:  No further questions.

20            THE COURT:  Cross?

21       And before we go any further, is this witness's testimony

22   being limited as far as the defendants?

23            MR. CREIGHTON:  Yes, your Honor.  This witness's

24   testimony concerns defendants Darbinyan and Sharopetrosian with

25   regard to the racketeering conspiracy charge.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Limited just to those two?

 2              MR. CREIGHTON:  Correct, your Honor.

 3              THE COURT:  Okay.

 4                       CROSS-EXAMINATION

 5   BY MR. SEVERO:

 6   Q.   Good afternoon, sir.

 7   A.   Good afternoon.

 8   Q.   How long have you been a gang -- strike that.

 9        How long had you been assigned to the gang suppression

10   unit on August 20th of 2009?

11   A.   About two and a half years.

12   Q.   And you're still in that unit?

13   A.   I'm not.

14   Q.   Did you have an opportunity to review any documents

15   pertaining to your testimony before you came to court today?

16   A.   Briefly.

17   Q.   What did you review?

18   A.   Just a -- my arrest report.

19   Q.   Anything else?

20   A.   I don't recall, no.  Not that I can think of.

21   Q.   Did you speak to Mr. Creighton before your testimony

22   today?

23   A.   Yes.

24   Q.   For how long?

25   A.   I don't know.  I wasn't keeping track.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Five minutes?

2   A.   A few minutes, sure.

3   Q.   And you went over your report?

4   A.   Not really.

5   Q.   When did you last read your -- well, let me ask you this.

6   Did you write the report in this case?

7   A.   No.

8   Q.   This was written by your partner, correct?

9   A.   Yes, sir.

10  Q.   Officer Gatsby?

11  A.   Yes.

12  Q.   But this is the -- well, you write an arrest report

13  because it could be, what, five years before you get to testify

14  about the events, and this helps refresh your recollection,

15  correct?

16  A.   Yes, sir.

17  Q.   So all the information that is important about the events

18  are contained in this report, correct?

19  A.   Not necessarily.

20  Q.   So you leave stuff out?

21  A.   Not -- not intentionally, sir.

22  Q.   Well, I understand.  But if you don't put it in there,

23  five years later you forget, correct?

24  A.   Sometimes.

25  Q.   How many instances of arrests have you encountered since

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   August 21st of -- August 20th, 2009?

2   A.    Quite a few.

3   Q.    Thousands?

4   A.    I wouldn't say thousands.

5   Q.    All right.

6   A.    Hundreds.

7   Q.    Certainly hundreds?

8   A.    Yes, sir.

9   Q.    You remember things about each one, do you?

10  A.    When brought to my attention, sir.  It depends on the

11  situation.

12  Q.    All right.  Good.

13        So when you read this report, did you find it to be

14  accurate?

15  A.    Yes.

16  Q.    Did you find it to be complete, as complete as you

17  remember?

18  A.    Yes.

19  Q.    The call that you received on August 20th, 2009, at about

20  9:10, had to do with some Armenian folks gathering at the

21  restaurant, correct?

22  A.    I guess you can put it that way.

23  Q.    Well, it's thought to be gang members --

24  A.    Correct.

25  Q.    -- were congregating at the restaurant?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Correct, sir.

 2   Q.   And that was the extent of the information you had when

 3   you arrived at the restaurant?

 4   A.   Yes.

 5   Q.   You had no other information about them possessing --

 6   possessing guns or anything?

 7   A.   My training and experience tells me that.

 8   Q.   Well, training and experience tells you that there is a

 9   possibility --

10   A.   Correct.

11   Q.   -- and maybe even a good one --

12   A.   Correct.

13   Q.   -- that there would be guns.

14   A.   Yes.

15   Q.   But my question is specifically directed at the call you

16   received.

17   A.   Correct.

18   Q.   The call you received did not say they have guns.

19   A.   Correct, sir.

20   Q.   The call you received didn't say we have information that

21   they have guns.

22   A.   No.

23   Q.   The call you received -- when you read this report --

24   strike that.

25        This report contains everything you -- all the information
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   you got from that call; is that true?

2   A.   I believe so.

3   Q.   Would you need to review it again?

4   A.   Would you like me to?

5   Q.   Well, you have it with you?

6   A.   I do not.

7        MR. SEVERO:  May I?

8        THE COURT:  Sure.  Sure.  Pass it up through the

9   clerk.

10       MR. CREIGHTON:  Your Honor, before he reviews the

11  report, maybe there should be a specific question that he is

12  supposed to be refreshing his recollection in regards to.

13       THE COURT:  Well, do you have an objection to his

14  reading the report?  I don't know what -- I'm assuming there's

15  going to be multiple questions.

16       MR. SEVERO:  My question right now has to do with the

17  radio call that he received concerning --

18       THE COURT:  Okay.

19       MR. SEVERO:  And it's only that page that I'm giving

20  him --

21       THE COURT:  Okay.

22       MR. SEVERO:  -- because it's only contained here.

23       MR. CREIGHTON:  May I review the --

24       MR. SEVERO:  Yes.  It's in -- it was produced in

25  discovery by the government.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Understand.
 2        This is being introduced at this time to refresh your
 3    memory.  So we don't want you testifying from the paper.  All
 4    we're doing is asking you whether or not, after looking back at
 5    the report, if it refreshes your memory as to what was said.
 6              THE WITNESS:  Yes, sir.
 7        Thank you.
 8              THE COURT:  Does that refresh your memory?
 9              THE WITNESS:  Yes, it does.
10              THE COURT:  Okay.  Next question.
11              MR. SEVERO:  Thank you, your Honor.
12    Q.   Having refreshed your memory with the report, does that --
13    you recall that the call that came in at about 9:10 on
14    August 20th said that there were some possible gang members
15    congregating at the Chicken House restaurant?
16    A.   Yeah.  It doesn't say "possible" in here, but it says a
17    tip about Armenian Power gang members congregating.
18    Q.   All right.  And that's the whole of the information you
19    received?
20    A.   Yes.
21    Q.   You did not -- well, let me ask you this.  If there had
22    been an expectation of gun violence that was imminent, you
23    would have been told that, of course?
24    A.   We hope.
25    Q.   Yeah.  For your safety, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, sir.

2   Q.   All right.  But that didn't happen in this case, did it?

3   A.   No.

4   Q.   You went there because you thought there might be some

5   activities you wanted to suppress, correct?

6   A.   Correct.

7   Q.   Now, when you arrived there, your -- I think your -- the

8   testimony is that somebody -- one person approached your

9   partner; isn't that correct?

10  A.   Yes.

11  Q.   And were you standing next to your partner when that

12  happened?

13  A.   Not immediately next to him, no.

14  Q.   Where were you?

15  A.   Towards the front of the business.

16  Q.   How far from him were you?

17  A.   About 20 yards or so.

18  Q.   Could you observe the individual approaching your partner?

19  A.   Yes.

20  Q.   When you received the call that there were potential gang

21  members gathering at the restaurant, did you ask for backup

22  then?

23  A.   No.

24  Q.   Did your dispatcher tell you that backup was on the way?

25  A.   No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Did you -- so when you arrived, you alighted from your

2    car; is that correct?  You exited your vehicle, I'm sorry, and

3    your -- you went to the front of the restaurant immediately?

4    A.   Yes.

5    Q.   Open the door and went in, did you?

6    A.   No.

7    Q.   You stood outside?

8    A.   Yes.

9    Q.   To prevent anyone from coming out?

10   A.   Correct.

11   Q.   So you're trying to contain the sit- -- the -- the

12   property, the location?

13   A.   Yes.

14   Q.   When -- and your partner actually didn't go to the rear of

15   the restaurant, did he, immediately?

16   A.   He was held up for a sec- -- one second, probably.

17   Q.   Right.  And that person that held him up was detained?

18   A.   Yes.

19   Q.   Was he detained by your partner?

20   A.   I believe so.

21   Q.   Was he handcuffed?

22   A.   Not sure.

23   Q.   Was he placed in a car?

24   A.   I'm -- I don't think so.

25   Q.   So did your partner, after being contacted by this

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    individual, go to the rear of the restaurant?

2    A.   I don't recall.  I believe he did.

3    Q.   But you're not sure?

4    A.   I know he was towards the rear.  I know he had eyes on the

5    rear, yes.

6    Q.   Because he told you that?

7    A.   I -- I could see.

8    Q.   You could see him looking towards the rear.  Okay.

9         And based on your knowledge of this investigation, there

10   were some people that were -- about six of them ran away from

11   the location where they were when they were first observed,

12   true?

13   A.   Yes.

14   Q.   And where did they go?  Do you know?

15   A.   The rear door of the business.

16   Q.   All right.  Did you observe them at the rear door?

17   A.   Yes.

18   Q.   At the rear door?

19   A.   I observed them disappear behind the building, and there

20   was no other exit other than the rear door.

21   Q.   Fair enough.  So you -- you see them disappear, and all

22   that's back there is a rear door.

23        Did you see them come into the restaurant?

24   A.   As -- as I was standing out front, I observed people in

25   the restaurant, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Well, there were people in the restaurant as you're

2   standing outside, but did additional people come into the

3   restaurant from the rear?

4   A.   Yes, they did.

5   Q.   Okay.  How many?

6   A.   I would say around six or so.

7   Q.   All six of them?

8   A.   Yeah.

9   Q.   You think, right?

10  A.   I believe so.

11  Q.   Yeah.

12       Now, if I understand it correctly, none of these weapons

13  were found on anybody that was inside the restaurant, correct?

14  A.   You mean on their person, sir?

15  Q.   On their person.

16  A.   Correct.

17  Q.   And did you identify the owners of the several vehicles

18  that were at the location?

19  A.   I believe we did.

20  Q.   Did you document that in your report?

21  A.   I would have to look at the report again, sir.

22  Q.   All right.  Give me a sec.

23       One moment, your Honor.

24           THE COURT:  Yes.

25           MR. SEVERO:  I need a moment, your Honor.  I --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Yes.

 2              MR. SEVERO:  -- want to make sure.

 3   Q.   Let me direct your attention to page 7 of Exhibit 303.

 4        May I publish?

 5              THE COURT:  Yes.

 6              MR. SEVERO:  Thank you.

 7   Q.   This is one of the cars that was at the location that

 8   you've identified; is that correct, sir?

 9   A.   Yes.

10   Q.   Do you know who owned this vehicle?

11   A.   I don't recall.

12   Q.   You know who was driving this vehicle?

13   A.   No.

14   Q.   Would the reading of the arrest report help, help you

15   refresh your recollection?

16   A.   Possibly.

17              MR. SEVERO:  Your Honor, I have given page 1 to the

18   clerk.  May I give her the rest of the report and ask that the

19   witness refresh his recollection?

20              THE COURT:  Yes.

21              MR. SEVERO:  Thank you.

22        And let us know when you are done reviewing, please.

23   Q.   Have you had an opportunity to review your entire report?

24   A.   Yes.

25   Q.   Is there anything in there that helps you refresh your
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    recollection as to the registered owner of the vehicle on

2    page 7 of Exhibit 303?

3    A.   No.

4    Q.   In fact, there is no section of that report that documents

5    who the vehicles were registered to; is that true?

6    A.   Correct.

7    Q.   And there is also no section in that report that helps you

8    refresh your recollection as to who would have been the drivers

9    of these vehicles.

10   A.   Yes, actually, there is.

11   Q.   Okay.  So who's driving the Mercedes?

12   A.   Torosyan said that it was his and he drove it there.

13   Q.   Okay.  And -- all right.  And I'll show you Exhibit --

14   page 8.

15        May I publish the rest of this?

16            THE COURT:  Yes.

17   BY MR. SEVERO:

18   Q.   Page 8 of Exhibit 303.  Who's driving the -- this looks

19   like an Audi; is that right?

20   A.   It looks like an Audi, yes, sir.

21   Q.   Who's driving the Audi?

22   A.   No one's driving it.

23   Q.   Who drove the Audi then?

24   A.   Oh, who drove -- you're talking about who drove it there?

25   Q.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I'm not sure, sir.

2   Q.   Is it in your report anywhere?

3   A.   I didn't see it in there, no.

4   Q.   All right.  And this BMW here, page 9 of the exhibit.

5   A.   Okay.

6   Q.   Do you have any documentation as to who drove that?

7   A.   No, sir.

8   Q.   Well, let's get to the one that's really important here.

9   How about this Range Rover?  Do you have anything in your

10  report that says, that tells you who was the occupant, or who

11  was the occupant that drove the car, this Range Rover, to that

12  location?

13  A.   Yes.

14  Q.   Who?

15  A.   I can't really pronounce it, sir, but I can spell it for

16  you if you'd like.

17  Q.   Sure.

18  A.   Last name K-h-a-c-h-a-t-r-y-a-n.

19  Q.   Khachatryan?

20  A.   Yes.

21  Q.   First name?

22  A.   Vachagan.

23  Q.   Did you arrest Vachagan Khachatryan?

24  A.   Yes.

25  Q.   For gun possession?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I believe so, yes.

2   Q.   All right.

3        Your Honor, may I have -- may I approach to have -- to get

4   the report back?

5             THE COURT:  Sure.

6             MR. SEVERO:  Thank you.  Hopefully I won't have to

7   refresh his recollection again.

8        Give me the yellow pages, too.

9             THE CLERK:  Yeah.

10  BY MR. SEVERO:

11  Q.   The guns -- you arrested three people that day; is that

12  true?

13  A.   Yes.

14  Q.   And -- back up.  Once you saw the six people come in from

15  the rear of the restaurant, did you enter the restaurant?

16  A.   No.

17  Q.   Did you enter the restaurant at any point?

18  A.   Later on, after we had pulled them out, yes.

19  Q.   All right.  The stairs leading to the landing, that is in

20  the rear of the restaurant?

21  A.   Yes.

22  Q.   From the time you saw the people disappear to the back,

23  the six people disappear from the parking lot into the rear, to

24  the time you saw them come into the eating area, was that like

25  a matter of seconds?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    I believe so.  Yeah, couple seconds.

 2   Q.    Did you particularly see anyone go up the landing, to the

 3   landing?

 4   A.    No.

 5   Q.    Do you have any idea how long those -- the guns that you

 6   found in the landing had been there?

 7   A.    No.

 8   Q.    You listed Mr. Darbinyan, Mike Darbinyan, as a witness

 9   that night, correct?

10   A.    Yes.

11   Q.    And that's part of your report --

12   A.    Yes.

13   Q.    -- is that true?

14         I have nothing further for this witness.  Thank you, your

15   Honor.

16              THE COURT:  Counsel.

17                        CROSS-EXAMINATION

18   BY MR. PEREYRA-SUAREZ:

19   Q.    Good afternoon, sir.

20   A.    Hello, sir.

21   Q.    Sir, have you ever seen my client, Mr. Sharopetrosian,

22   before today in this courtroom?

23   A.    Not that I can recall.

24   Q.    You didn't see him at the Chicken House restaurant on

25   August 20 of 2009, did you?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    I don't believe so.

 2    Q.    You didn't find any car belonging to Mr. Sharopetrosian on

 3    August 20, 2009, at the Chicken House restaurant, did you?

 4    A.    Not that I can recall, sir.

 5    Q.    You didn't find any firearm that you knew to be owned by

 6    Mr. Sharopetrosian that night; is that correct?

 7    A.    Correct.

 8    Q.    You didn't arrest or detain Mr. Sharopetrosian that night,

 9    did you?

10    A.    I don't believe so, sir.

11    Q.    In fact, he wasn't there; is that correct?

12    A.    I don't think so.

13          MR. PEREYRA-SUAREZ:  Thank you, your Honor.

14          THE COURT:  Thank you, Counsel.

15    Counsel.

16          MR. FLIER:  I thought I wasn't allowed.

17          MR. SEVERO:  It's not his --

18          THE COURT:  At this point, this was not limited.

19    Is this witness being limited just to the first two

20    defendants?

21          MR. FLIER:  Yes, it was.

22          MR. CREIGHTON:  This concerns the racketeering

23    conspiracy count against --

24          THE COURT:  Okay, if it's only limited to those two.

25    Again, Counsel, if it's relevant, that's fine; if not -- I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    don't see where it would be, but if not -- if it's relevant to

2    your client.

3              MR. FLIER:  I have no questions.

4              THE COURT:  Okay.

5              THE WITNESS:  Thank you, sir.

6              THE COURT:  You may -- oh, no.  Excuse me.  Re --

7              MR. CREIGHTON:  No redirect, your Honor.

8              THE COURT:  Okay.

9              THE WITNESS:  Thank you.

10             THE COURT:  You may step down.

11             MR. CREIGHTON:  The government calls Hans Almaraz.

12             THE CLERK:  Right here to be sworn, please.

13         *(Witness sworn.)*

14             THE CLERK:  Thank you.  You may be seated.

15        May I please ask that you state your full name for the

16    record and spell your last name.

17             THE WITNESS:  Hans Almaraz, H-a-n-s, A-l-m-a-r-a-z.

18             THE CLERK:  Thank you.

19             THE COURT:  Okay.  You may inquire.

20             MR. CREIGHTON:  Thank you, your Honor.

21             **HANS ALMARAZ, GOVERNMENT'S WITNESS,**

22                      **DIRECT EXAMINATION**

23    BY MR. CREIGHTON:

24    Q.   Where do you work?

25    A.   Los Angeles Police Department, Metropolitan K9 Division.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And how long have you worked for the Los Angeles Police

 2   Department?

 3   A.   24 years.

 4   Q.   What's your present rank?

 5   A.   Police Officer III.

 6   Q.   And where were you assigned in August of 2009?

 7   A.   Metropolitan Division, K9 unit.

 8   Q.   Does that mean you work with a dog?

 9   A.   Yes, sir.

10   Q.   Is your dog referred to as your partner?

11   A.   That's a fair way to say it.

12   Q.   What was your dog partner's name at the time?

13   A.   Derrik, D-e-r-r-i-k.

14   Q.   And what breed is the dog?

15   A.   He was a Shepherd.

16   Q.   And what kind of a dog was he in the sense of what purpose

17   did you have him for?

18   A.   His single purpose was a firearm detection canine.

19   Q.   And how long did you work with him?

20   A.   At the time, it was probably almost two years.

21   Q.   How many searches had you done with him?

22   A.   I would say upwards of 100 to 150.

23   Q.   And briefly, as part of your service in Metro K9, you've

24   had formal training in dog handling?

25   A.   Yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Can you briefly describe that.

2    A.    Well, if we stick to just the -- I work two dogs, one that

3    looks for suspects, and a firearm detection dog.  So if we

4    stick to just the firearm detection dog --

5    Q.    Please.

6    A.    Okay.  Once we obtain a dog, we begin a training process

7    with the dog, and it is to get him familiar with the odor we're

8    going to be using, which in this case would be a firearm,

9    gunpowder, oils, the residue from a fire -- a gun that's been

10   fired.  And it's a -- basically a reward system.  We usually

11   obtain dogs that are very high in play drive, which means they

12   like a toy or, in this case, it would be a ball, and we

13   associate the reward with the scent.  And through much

14   training, the dog discovers that when he alerts on a certain

15   odor, he gets a reward, which is -- in this case, is a tennis

16   ball.

17   Q.    Okay.  Now, you said when your dog "alerts."  What does

18   that mean?

19   A.    We use a passive alert, which means, basically, depending

20   on where the item is, they'll either sit or lay down and stare

21   at where they believe the strongest odor is coming from.

22   Passive alert means they're just sitting, they aren't doing

23   anything, whereas the opposite would be an aggressive alert,

24   which a lot of narcotics dogs use, and that would be more

25   scratching, biting at where they think the odor is coming from.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    We don't want them to do that to a weapon.
 2    Q.    How often do you practice?
 3    A.    We train nightly.  I mean, it's -- it's a nightly thing we
 4    do in my unit.  When we're not busy doing actual searches,
 5    we're out usually training.
 6    Q.    And are you certified in -- somehow in handling the dog?
 7    A.    Yeah.  Once we've trained the dog, we go, we put the dog
 8    actually through a certification to make them feel -- feel
 9    ready, and it's basically just a series of finds he has to do.
10            MR. SEVERO:  Your Honor --
11            THE WITNESS:  And then we --
12            MR. SEVERO:  I'll wait for the --
13            THE COURT:  Finish the answer first.
14            THE WITNESS:  Yeah.
15        The dog has to go through a series of tests to get
16    certified, and once he does that, we field certify him, and he
17    is officially a firearm detection dog.  Training doesn't stop,
18    though.  Training just continues throughout his career.
19            THE COURT:  Okay, Counsel.
20            MR. SEVERO:  There's no expert designation for this
21    witness, so I would object on the grounds that he's not been
22    previously disclosed as an expert.
23            THE COURT:  I haven't heard any expert testimony being
24    offered yet.
25            MR. SEVERO:  Well, sounds like he's being qualified --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  We'll find out.

 2              MR. SEVERO:  -- but --

 3              THE COURT:  Okay.

 4   BY MR. CREIGHTON:

 5   Q.   Turning to the evening of August 20th, 2009, did you

 6   assist in the search of a restaurant known as the

 7   Chicken House?

 8   A.   Yes, sir.

 9   Q.   That's located at 5019 Hollywood Boulevard?

10   A.   Correct.

11   Q.   When you arrived at the location, where did you search?

12   A.   I began with an interior search of the location.

13   Q.   And so you went inside the restaurant?

14   A.   Yes, sir.

15   Q.   With your dog?

16   A.   Yes.

17   Q.   What search pattern did you use in the restaurant?

18              MR. SEVERO:  Vague.

19              THE COURT:  Sustained.

20        What do you mean by that?

21   BY MR. CREIGHTON:

22   Q.   What order did you take the dog through the location in?

23              MR. SEVERO:  Still vague.

24              THE COURT:  Overruled.

25              THE WITNESS:  Began at the front entrance and just
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  systematically searched from the front, which was the eating

2  area, towards the back of the restaurant, behind the counter

3  area, and then beyond that, storage areas, till we were -- I

4  was finished.

5  BY MR. CREIGHTON:

6  Q.   So when you went into the eating area, did Derrik alert on

7  anything in the eating area?

8  A.   Yes, sir.

9  Q.   What location did Derrik alert on?

10  A.   A trash can.

11       MR. SEVERO:  Objection, your Honor.  That calls for an

12  expert, for expert testimony.

13       THE COURT:  No, it doesn't.  It calls for his

14  observations.  The expert in this case I think is a dog.

15       MR. SEVERO:  Well, the word "alert" is a word of art

16  that's used by these fellows to ascertain whether --

17       THE COURT:  Well, let's find out.

18       What do you mean by the word "alert"?  Is this where the

19  dog goes up and lays down and looks at something?

20       THE WITNESS:  Correct.

21       THE COURT:  Okay.

22       MR. SEVERO:  That's --

23       THE COURT:  Overruled.

24  BY MR. CREIGHTON:

25  Q.   And did your dog sit or lay down and look at something?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   He sat.

 2    Q.   Okay.  And what did he look at?

 3    A.   Trash can.

 4    Q.   What did you do then?

 5    A.   I advised my search team that he is alerting on the trash

 6    can and that they're going to have to go through it by hand,

 7    search it and figure out what exactly is in there that would

 8    make him alert.

 9    Q.   What did you do next?

10    A.   I continued -- as they did that, I just continued with my

11    systematic search.

12    Q.   Did you later learn that anything had been found inside

13    the trash can?

14    A.   Yes, the --

15         MR. SEVERO:  Objection, nonresponsive after "yes."

16         THE COURT:  Okay.  Next question.

17    BY MR. CREIGHTON:

18    Q.   What did you learn?

19         MR. SEVERO:  Objection, hearsay.

20         THE COURT:  Sustained.

21    BY MR. CREIGHTON:

22    Q.   Did you go into the kitchen?

23    A.   Yes, sir.

24    Q.   Did Derrik alert in the kitchen?

25    A.   No, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  That's hearsay, too, isn't it?

 2              THE COURT:  I don't think so, Counsel.

 3              MR. CREIGHTON:  I think there's a Supreme Court case

 4    on that, your Honor.

 5              THE COURT:  Okay.

 6    BY MR. CREIGHTON:

 7    Q.   Did Derrik do a full alert in the kitchen?

 8    A.   No, sir.

 9    Q.   Was there anything unusual about his behavior in the

10    kitchen?

11              MR. SEVERO:  Objection.  "Unusual" is vague and calls

12    for expert testimony.

13              THE COURT:  Doesn't call for expert testimony.  He's

14    not giving any opinion as an expert.

15              MR. CREIGHTON:  May I use the word "significant,"

16    your Honor?

17              THE COURT:  What happened in the kitchen?

18              THE WITNESS:  Did a systematic search.  Derrik did

19    show some interest, but never fully alerted.

20              THE COURT:  Okay.  Next question.

21    BY MR. CREIGHTON:

22    Q.   Did you then search outside the restaurant?

23    A.   Yes, sir.

24    Q.   Where did you search?

25    A.   The parking lot area of the Chicken House.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    And in the vicinity of the Chicken House, did Derrik alert
2    at any other locations?
3    A.    Yes, sir.  There was a vehicle that was parked in front,
4    on the curbside of the Chicken House, and while running Derrik
5    around the vehicle, searching, he alerted on the driver's side
6    rear wheel well of a Range Rover.
7            MR. SEVERO:  It's cumulative testimony.  Already know
8    that there was a gun in the -- I will object on 403 grounds.
9            THE COURT:  I don't know what use there is of it,
10   because the gun's already been introduced into evidence, I
11   believe.  So I think I'm going to sustain your objection on
12   time consumption outweighs relevancy.
13   BY MR. CREIGHTON:
14   Q.    At the conclusion of your search, did you reward Derrik
15   with his tennis ball?
16   A.    Yes, sir.
17           MR. CREIGHTON:  No further questions.
18           THE COURT:  Okay.
19           MR. PEREYRA-SUAREZ:  Happy ending, your Honor.
20           THE COURT:  Counsel, you better not ask the brand of
21   the tennis --
22           MR. SEVERO:  No, no.  Nothing about the tennis ball, I
23   promise.
24           THE COURT:  Okay.
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                      CROSS-EXAMINATION

 2   BY MR. SEVERO:

 3   Q.   Good afternoon, sir.

 4   A.   Good afternoon.

 5   Q.   Was Derrik the only dog at the location?  I mean the only

 6   police dog at the location?

 7   A.   Well, no.  I had my other patrol dog in the car.

 8   Q.   You had two dogs that evening?  You handle two dogs?

 9   A.   Yes, sir.

10   Q.   Oh.  Did you take them both out?

11   A.   No, sir.

12   Q.   Was Derrik the only one involved in this search?

13   A.   Yes, sir.

14        MR. SEVERO:  Thank you.  That's all I have.  Thank

15   you.

16        MR. PEREYRA-SUAREZ:  I have no questions.

17        THE COURT:  Counsel?

18        MR. FLIER:  No questions, your Honor.

19        THE COURT:  You may step down.

20        THE WITNESS:  Thanks, sir.

21        THE COURT:  I don't know, was there redirect on that?

22   I'm sorry, I cut you loose too soon.

23   Any redirect?

24        MR. CREIGHTON:  No, your Honor.

25        THE COURT:  Okay.  Thank you, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Your Honor, the government calls James

 2    Zboravan to the stand.

 3              THE CLERK:  Good afternoon.  Right here to be sworn,

 4    please.

 5         (Witness sworn.)

 6              THE CLERK:  Thank you.  You may be seated.

 7              THE WITNESS:  Thank you.

 8              THE CLERK:  May I please ask you to state your full

 9    name for the record and spell your last name.

10              THE WITNESS:  Yes.  First name James, J-a-m-e-s, last

11    name Zboravan, Z as in zebra, B as in boy, o-r-a, V as in

12    Victor, a-n, as in Nora.

13              THE CLERK:  Thank you.

14              THE COURT:  Okay.  Counsel, you may inquire.

15              MR. ESTRADA:  Thank you, your Honor.

16                   JAMES ZBORAVAN, GOVERNMENT'S WITNESS,

17                           DIRECT EXAMINATION

18    BY MR. ESTRADA:

19    Q.   Sir, where do you work?

20    A.   I'm a sergeant with the Los Angeles Police Department,

21    assigned to Northeast area.

22    Q.   How long have you been with the Los Angeles Police

23    Department?

24    A.   It will be 18 years in June.

25    Q.   I think we've heard previous testimony about what the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Northeast area is, but as a sergeant, are you assigned to a

 2   particular group?

 3   A.   At the time of the incident in question, I was a sergeant

 4   assigned to the gang enforcement unit.

 5   Q.   I guess you are one step of ahead of me.

 6        So in 2009, you were in the gang enforcement unit?

 7   A.   Yes.

 8   Q.   About how long were you in that gang enforcement unit?

 9   A.   At that time, approximately two years.

10   Q.   And during your time as a sergeant with the gang

11   enforcement unit, about how many gang investigations have you

12   been part of?

13   A.   As a supervisor, I may not be, you know, the first one on

14   the scene, but if accompanying officers are arriving after my

15   officers were involved in either talking with or investigating

16   or arresting gang members, hundreds.

17   Q.   Now, as a sergeant with the gang enforcement unit for the

18   Northeast Division of the Los Angeles Police Department, were

19   you familiar with gangs in the area?

20   A.   Yes.

21   Q.   Were you familiar with a gang known as Armenian Power?

22   A.   Yes.

23   Q.   You knew of them?

24   A.   I have had experience with them.

25   Q.   I'll repeat the question.  You had experience with them?
```

1    A.    Yes.

2    Q.    Were they known to be in that area?

3    A.    Yes.

4    Q.    And generally speaking, was Armenian Power a gang that

5    presented itself like other gangs in your area?

6    A.    No.

7    Q.    Are they different in some ways?

8    A.    Yes.

9    Q.    How are they different?

10   A.    I would classify them as, you know, in layperson's terms,

11   more low-key.  They weren't out and about showing their gang

12   signs, if you will, hanging out on street corners, businesses,

13   things like that.  You did not see the Armenian Power acting in

14   that fashion.

15   Q.    Were they known to be involved in any particular types of

16   crimes?

17   A.    Yes.

18   Q.    What sorts of crimes?

19   A.    We would classify it more as, you know, white-collar-type

20   crimes or extortion crimes.  Things that weren't readily

21   visible from the street, if you will.

22   Q.    When you say "white-collar," does that include fraud

23   crimes?

24   A.    Yes.

25   Q.    Identity theft?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Did you know Armenian Power to have any rival in the gang

 3    world?

 4            MR. SEVERO:  Your Honor, this witness is apparently

 5    testifying as an expert as well, and he's not been previously

 6    designated as such in any disclosure to the defense.

 7            MR. ESTRADA:  Your Honor, this is all based on his

 8    training and experience.

 9            MR. SEVERO:  Well, yeah.

10            THE COURT:  Up until this point, it's going to be

11    overruled.  But ask your next question.  We'll take it question

12    by question.

13            MR. FLIER:  I'm sorry, your Honor.  Does this apply to

14    me, my client?

15            THE COURT:  Doesn't apply to you, Counsel.  Let's see

16    if it applies to your client.

17            MR. ESTRADA:  I will make it clear once again.  The

18    testimony of this witness will go to the Count 1 racketeering

19    charge, racketeering conspiracy, in which defendant Parsadanyan

20    is not charged.

21            THE COURT:  So it's limited just to the first two

22    defendants?

23            MR. ESTRADA:  Yes, your Honor.

24            THE COURT:  Okay.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  BY MR. ESTRADA:

 2  Q.   Had you had occasion to interact with Armenian Power

 3  members?

 4  A.   In my experience, very limited.

 5  Q.   Did you know of any rival to Armenian Power?

 6          MR. SEVERO:  Objection, opinion testimony.

 7          THE COURT:  Sustained.

 8  BY MR. ESTRADA:

 9  Q.   Now, I want to ask you about an incident that occurred on

10  August 20th of 2009.  Are you familiar with that date?

11  A.   Yes, sir.

12  Q.   And on that date, did you respond to a particular location

13  in Hollywood, California?

14  A.   It would be Northeast Division.  You said Hollywood.

15  That's not Hollywood Division.  That's still Northeast

16  Division.

17  Q.   I'll make it more specific.  Did you respond to a specific

18  location on August 20th, 2009?

19  A.   Yes.

20  Q.   Where was that location?

21  A.   Roughly the 5000 block of Hollywood Boulevard.

22  Q.   And what type of location was this?

23  A.   It was a independent restaurant or eatery.

24  Q.   Did it have a name?

25  A.   The Chicken House.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Why did you respond to that location?
2   A.   Two of my -- or officers that responded there via the --
3   got on their police radio and requested for additional units to
4   respond.
5   Q.   Now, was that a typical thing in your gang unit, that if
6   other officers called, you would appear and respond?
7   A.   Yes.
8   Q.   Why would you appear and respond?
9   A.   Couple reasons.  Number one, if officers are requesting
10  additional units, it doesn't matter if you're a detective, a
11  sergeant, or another officer, you're going to respond to back
12  them up in whatever they need.  Number two, as a supervisor for
13  those officers, if they're requesting an additional unit, they
14  may need supervisory guidance.  So for those two reasons, I
15  responded.
16  Q.   Now, when you got this call about responding to the scene,
17  about how long did it take you to get there?
18  A.   I was at Northeast Station at the time, on San Fernando
19  Road.  Roughly San Fernando and Fletcher is where the station
20  is, for the most part.  Drive time from there, after 9:00 p.m.
21  that night, probably around 10 to 12 minutes.
22  Q.   When you got there, what was the scene like?
23  A.   Several units, patrol and gang units, had responded there
24  prior to my arrival, and those officers had several individuals
25  lined up against a wall of an adjacent building, either
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    searching them -- some were being searched still.  Some were

2    being interviewed, field interview cards being completed on the

3    individuals.

4    Q.   So when you arrived, there were many officers there?

5    A.   Yes.

6    Q.   Suspects lined up outside?

7    A.   Yes.

8    Q.   Was there also people observing what was going on?

9    A.   There was a few people across the street at that time

10   observing what was going on, yes.

11   Q.   And do you recall, as you were there, the entire time you

12   were there, cars driving by to observe the scene?

13   A.   We were there for a prolonged period of time.  After a

14   little while, traffic flow increased greatly, meaning vehicles

15   were passing either east and west on Hollywood, slowing,

16   looking into the parking lot where we were, as well as on the

17   south side of the street people were actually standing and

18   watching what we were doing.

19   Q.   Large amount of people?

20   A.   In my opinion, I -- yes.

21   Q.   Now, at some point did you or other officers contact the

22   Glendale Police Department?

23   A.   Yes.

24   Q.   Why did that happen?

25   A.   Northeast area borders the city of Glendale, and we have

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   several or a handful of gangs that actually frequent Northeast

2   and Glendale as well as other jurisdictions, so my officers

3   have developed working relationships with Glendale as well as

4   other LAPD entities in other cities.  So when we encounter

5   those type of gangs that frequent both areas, they will call

6   upon each other for either, you know, guidance, expertise,

7   things like that.

8   Q.   When you refer to "those types of gangs that frequent both

9   areas," on this particular night, in this incident, did you

10  encounter that type of gang?

11  A.   Yes.

12  Q.   Which was what?

13  A.   Armenian Power.

14  Q.   Now, when you arrived at the scene, did you understand

15  that some of the suspects had run into the restaurant?

16  A.   Yes, after --

17           MR. SEVERO:  Objection, hearsay.

18           MR. ESTRADA:  Effect on the listener, your Honor.

19           THE COURT:  Sustained.

20  BY MR. ESTRADA:

21  Q.   Based on information you received, what did you do when

22  you arrived at the scene?

23  A.   Started talking with officers that arrived before my

24  arrive -- before I got there.

25  Q.   And when you spoke to the officers, did you take any

1  additional action?

2  A.    Yes.

3  Q.    What did you do?

4  A.    I formulated a plan, as supervisors normally do, and part

5  of that plan was to clear the Chicken House, or search the

6  Chicken House for other possible people that may have run

7  inside, for, you know, officer safety concerns.

8  Q.    So you understood that people had been inside the

9  restaurant?

10  A.    Yes.

11  Q.    Now, when you say clear the restaurant and you formulated

12  this plan, what was the purpose of that?

13  A.    The purpose of going inside, sir?

14  Q.    Yes.  To clear the restaurant.

15  A.    Yes.  To clear is to make sure there isn't anybody hiding

16  inside the restaurant.

17  Q.    When you entered the restaurant, did you understand that

18  you were one of the first officers inside the restaurant?

19  A.    Yes.

20  Q.    At some point did you enter a loft area?

21  A.    I don't recall an area being locked.

22        THE COURT:  No.  Loft.

23        THE WITNESS:  Oh, a loft.  I'm sorry.  Thank you.

24  BY MR. ESTRADA:

25  Q.    Sometimes I mumble.  Loft area.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I had three days of firearms training, so it might have
 2   been me, too.  I'm sorry.
 3        Yes, I -- myself and another officer walked up a makeshift
 4   ladder up to a loft area.
 5   Q.   Was it dark up there?
 6   A.   Yes.  There was no lights on, but we had our own
 7   flashlights which we illuminated the loft area with.
 8   Q.   Now, while in there looking for suspects, did you see a
 9   gun?
10   A.   Yes.
11   Q.   I won't ask you too much about that, because another
12   officer's testified about that, but after you came down from
13   the loft area, did you see anything else of interest?
14   A.   Yes.
15   Q.   What did you see?
16   A.   As I was walking down the ladder and looking down at each
17   rung, on top of a -- it looked like employee locker, a bunch of
18   lockers, gray-colored, I believe, lockers.  On top was a set of
19   car keys.
20   Q.   So the restaurant had some back area where you -- where
21   there was some lockers?
22   A.   Yes.
23   Q.   And as you walked down the stairs from the loft, you saw
24   some keys on top of the lockers?
25   A.   Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Was that area above the lockers high up?

2    A.    I'd -- I'd -- I wouldn't say high up.  I'd say -- you got

3    a standard ceiling and then a hole in that ceiling with the

4    makeshift ladder that went to a loft area.  So when you're on

5    the loft area, I guess you can consider that maybe the second

6    story for -- in painting-a-picture purposes.

7    Q.    With regard to the area on top of the locker area, could

8    you have seen that just from standing next to it?

9    A.    I couldn't have.  I'm approximately 5-10 to 5-11.  You'd

10   have to be slightly taller to be able to see on.  The lockers

11   were -- I would say were approximately six and a half feet, you

12   know, tall, from floor to the top.

13   Q.    Now, when you saw those keys on top of the locker, what

14   did you do?

15   A.    On the way down, I -- as I was walking down, backing down

16   the stairs, it was close by, I was able to grab them and put

17   them in my hands.

18   Q.    Did you see other keys that day?  Or I should be more

19   clear.  Did you see other keys inside the restaurant?

20   A.    Yes.

21   Q.    About how many other sets of keys?

22   A.    Anywhere from two to four sets of keys were either found

23   by me or others throughout the restaurant.

24   Q.    Now, based on your training and experience investigating

25   gangs, are you familiar with the tactic of tossing keys?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2          MR. SEVERO:  Objection, your Honor, calls for expert

 3   testimony.

 4          MR. ESTRADA:  Based on his experience, your Honor.

 5          THE COURT:  Just a second.

 6      Sustained.

 7   BY MR. ESTRADA:

 8   Q.   Now, are you familiar with this practice of tossing keys?

 9          MR. SEVERO:  Objection.  Foundation, calls for expert

10   testimony.  It's irrelevant.

11          THE COURT:  I think your question before the objection

12   was overruled to this question, are you familiar with that?

13          THE WITNESS:  Yes.

14   BY MR. ESTRADA:

15   Q.   And based on your familiarity, what do you often see this

16   used for?

17          MR. SEVERO:  Objection.

18          THE COURT:  Sustained.

19          MR. SEVERO:  Calls for expert testimony.

20   BY MR. ESTRADA:

21   Q.   So you're familiar with this tossing of keys?

22   A.   Yes.

23          MR. SEVERO:  Asked and answered.

24          THE COURT:  Sustained.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:

 2   Q.   In your capacity as a gang officer?

 3   A.   I'm sorry, can you back up?

 4   Q.   The familiarity that you have with tossing keys, is that

 5   in your capacity as a gang officer?

 6   A.   Both as a gang officer and a police officer in general.

 7   Q.   Now, when you went inside the restaurant, had a look

 8   around, did the restaurant appear to be busy?

 9   A.   No.

10   Q.   Can you explain.

11        MR. SEVERO:  Your Honor, I'm going to object at this

12   point on 403, cumulative and irrelevant.

13        THE COURT:  At this time I'm going to overrule it, but

14   I may stop if it goes too far.

15      What do you mean by that, it wasn't busy?

16        THE WITNESS:  I would say that, not busy, there was a

17   lack of food on various tables.  Most the tables were clean.

18   If there was -- if my officers had ordered everybody out of the

19   restaurant, I would have encountered -- being one of the first

20   officers in there, I would have encountered, you know, half

21   eaten, a quarter eaten, or leftover plates and cups, utensils

22   on tables.  There was a lack of that.

23        THE COURT:  Okay.  Next question.

24   BY MR. ESTRADA:

25   Q.   Did you also go in the kitchen area?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   Did you see any food cooking?

 3   A.   No food was cooking currently, no.

 4   Q.   Now, did you start checking and looking into some of the

 5   cars in the parking lot?

 6   A.   Yes.

 7   Q.   Why did you do that?

 8   A.   Two main reasons.  Number one, to see if there was anybody

 9   that could have been hiding or secreting themselves in the car

10   or different vehicles, and number two, to see if we could tie

11   any of the people to those vehicles.

12   Q.   Now, there was previous testimony on this, but were you

13   one of the officers who saw a gun protruding from under a seat

14   in a Mercedes?

15   A.   Yes.

16   Q.   Now, when you saw that, did you take any efforts to

17   discover who the driver of the vehicle was?

18   A.   Yes.

19   Q.   What did you do?

20   A.   I, via police radio, contacted dispatch.  And we call it

21   running the license plate, or a license plate check of the

22   vehicle.  You run the license plate, and it will come back

23   with -- usually come back with a registered owner.

24   Q.   Did you also find keys for that vehicle?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And did you find out who claimed that those keys belonged

2    to?

3    A.   Yes.

4    Q.   Who claimed the keys to that vehicle?

5    A.   One of the people that was detained at scene.

6    Q.   Do you recall the person's name?

7    A.   I believe the last name was Torosyan.

8    Q.   Harut Torosyan?

9    A.   Yes.

10   Q.   Okay.  And I won't ask you about other guns, but other

11   guns were found at the scene as well?

12   A.   Yes.

13   Q.   Now, did you and other officers conduct a thorough search

14   of the cars in the restaurant on this occasion?

15   A.   Can you be more specific about "thorough search of the

16   cars"?

17   Q.   Sure.

18        MR. SEVERO:  This is still cumulative.  403,

19   cumulative and --

20        THE COURT:  I don't know where we're going with it.

21   Is there more evidence that's going to be disclosed?

22        MR. ESTRADA:  There will be calls as well that are

23   going to follow this, your Honor.

24        THE COURT:  There will be what?

25        MR. ESTRADA:  There will be calls, wiretap calls,

```
1    pertaining to this incident.
2           THE COURT:  Go ahead, then.  Overruled subject to a
3    motion to strike.
4    BY MR. ESTRADA:
5    Q.   Now, there was a search that was conducted, correct?
6    A.   Yeah.  We -- yes.  We visually looked in, I would be safe
7    to say, every vehicle that was in the parking lot as well as
8    the street in front of.  You know, Hollywood Boulevard, in
9    front of the restaurant, you know, peering in.  As well as,
10   some of the keys that were found had the key fob, you know, the
11   alarm, and, you know, you know, chirping it or clicking it, a
12   few of the cars you could tell it was to the keys that you had,
13   because the alarm was, you know, chirping, or the doors were
14   unlocking.
15   Q.   Now, the suspects who were lined up outside, you
16   understood them to be Armenian Power members?
17   A.   Yes.
18   Q.   Was it typical, based on your work as a gang officer, to
19   find this many Armenian Power members together?
20          MR. SEVERO:  Objection, calls for expert testimony.
21          THE COURT:  Overruled.
22          THE WITNESS:  I had personally never seen that many
23   Armenian Power gang members in one time together.
24   BY MR. ESTRADA:
25   Q.   And did that appear suspicious to you, based on your
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   experience as an officer?

2   A.   Yes.

3   Q.   How so?

4   A.   At the most we had ever encountered is two, maybe three,

5   and that would either maybe be on a traffic stop, rarely

6   walking down the street or congregating together.

7   Q.   Now, among the suspects who were lined up outside the

8   restaurant, was there an individual named Mher Darbinyan?

9   A.   Yes.

10  Q.   Please take a look at Exhibit 302.  And that should be in

11  one of the black binders behind you or to your right there.

12         THE COURT:  302?

13         MR. ESTRADA:  302, yes, your Honor.

14         THE WITNESS:  Flip to 302?

15         MR. ESTRADA:  Please.

16         THE WITNESS:  If I don't break it first.

17         MR. ESTRADA:  There's a lot of stuff in there.

18         THE COURT:  I don't think that's what he meant by

19  "flipping."

20         THE WITNESS:  I'm at 302.

21  BY MR. ESTRADA:

22  Q.   There are numerous pages.  Can you just briefly flip

23  through those pages.

24  A.   Yes.

25  Q.   Have you done that now?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Can you generally explain what Exhibit 302 is.

 3    A.    Yes.  It seems -- it appears to be the individuals that

 4    were at the Chicken House on the night in question.

 5    Q.    Now, that individual you said who was one of the people

 6    there at the Chicken House, Mher Darbinyan, do you see him in

 7    the courtroom today?

 8    A.    Yes.

 9    Q.    Can you point him out, identify an article of clothing

10    he's wearing.

11          MR. SEVERO:  I will stipulate that this gentleman

12    seated to my right is Mher Darbinyan.

13          THE COURT:  Okay.  Next question.

14    BY MR. ESTRADA:

15    Q.    Now, this Exhibit 302, is it many photos of different

16    individuals who were there?

17    A.    Yes, it is.

18    Q.    Does it fairly and accurately depict many of the

19    individuals who were there on that day?

20    A.    Yes.

21    Q.    August 20, 2009?

22    A.    Yes.

23          MR. ESTRADA:  Your Honor, the government moves to

24    admit Exhibit 302 and requests permission to publish just the

25    first page.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  It will be received and can be published,

 2    but not until Monday.

 3         (Received in evidence, Exhibit 302.)

 4              THE COURT:  It's 4:00 o'clock.  We're going to quit at

 5    this time.  Remember the admonishment not to discuss the case

 6    among yourselves or with anybody else or form or express any

 7    opinions about the matter until it's submitted to you and you

 8    retire to the jury room.

 9         Remember Monday is a half day; it's not a full day.  We

10    were going to try to start you at 10:00 o'clock, but people had

11    other arrangements that -- relying on what the Court had said,

12    so we're going to start at 1:00 o'clock.  So if you could be in

13    about quarter of 1:00, we'll get started right at 1:00 o'clock.

14         Have a great weekend.  Enjoy yourself.  Again, don't think

15    about this case at all.  Wait until you get back into trial.

16    We'll see you at 1:00 o'clock on Monday.

17              THE CLERK:  All rise.

18         (Outside the presence of the jury:)

19              THE COURT:  The record will reflect that the jurors

20    have left the courtroom.

21         You can have a seat.

22         Monday, I'm going to ask you if you could be in about

23    quarter of 1:00, if you don't mind, because we may have an

24    opportunity to rule on the motion that counsel made as far as

25    witness M.M.  I've got the opposition on it, and maybe we can
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    rule on it before.

2         I don't know when you're planning on calling M.M., but I'd

3    like to get that one way or the other.  Or, excuse me, when you

4    plan on putting in testimony concerning M.M.

5              MR. ESTRADA:  Yes.  It would be -- there are some

6    additional witnesses: this witness, the witness after him,

7    still discussing some of the suspects of the Chicken House, and

8    then two custodians of record.

9              THE COURT:  Okay.

10             MR. ESTRADA:  And then there will be wire calls played

11   pertaining to the Chicken House, other calls, and then the

12   calls pertaining to the extortion plot.  So they'll come in --

13             THE COURT:  Okay.  Well, hopefully we can rule on it

14   at that time.

15        Also, again, observations.  You have to put on your own

16   case, I understand it, but I think that the 403 objections have

17   some merit on them.  It's hard for me to rule on it because I

18   don't know what's going to be relevant and what's not when it

19   comes in, but I've gotta tell you, and it may come up much more

20   relevant later on in the trial, but I have no idea what all

21   that testimony about the dogs were.  It added nothing to the

22   case from what I can see.  But then again, I can't see

23   everything, so -- but it is an observation, just so that you

24   are familiar with what a third person is seeing on this trial.

25             MR. ESTRADA:  Yes, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Yes, Counsel.

 2              MR. FLIER:  Thank you, your Honor.  Two quick things,

 3    please.

 4              THE COURT:  Sure.

 5              MR. FLIER:  One, although I did it, I'd like to renew

 6    the motion to sever and the reason why, and I just want to make

 7    a brief record.

 8         We had a week of testimony so far, almost, and I think one

 9    phrase, that my client was an associate, has come in, and I

10    just think there's just overwhelming prejudice.  I just wanted

11    to put that on the record again.

12              THE COURT:  It will be noted for the record, Counsel.

13    Thank you.

14              MR. FLIER:  And then number two --

15              THE COURT:  It will be noted, and motion will be

16    denied.  Okay.

17              MR. FLIER:  Thank you.

18         And then number two is, the Court just indicated -- since

19    the Court's unaware of where some of the questions are going, a

20    good example with -- I think it was Mr. Moreno.  The question I

21    wanted to ask, even though it didn't deal with me, and a good

22    example, they showed photographs of Mr. Moreno with other

23    individuals in the parking lot.  A good question would have

24    been, "Had you ever seen my client and have you ever been with

25    him?  Have you ever seen him with the co-defendant?"  Now I'm
```

```
 1   going to have to re-call him in my case in chief when sometimes

 2   I think I could have done it very simple and quickly.  So just

 3   for my own guidance.

 4         THE COURT:  Counsel, sure, and let me talk to you

 5   about that.  You can always talk with counsel.  Anything that

 6   both sides agree to -- I have no problem with you bringing

 7   people out of order or bringing them in early.  If it's going

 8   to expedite the case, I think it's a great idea, but everyone

 9   has to agree on that.  But anything in the testimony here --

10   and I can see you're worried about kind of overflow from

11   something he may say here overflowing on your client, but,

12   again, it has been limited in this case, and anytime you have

13   limiting instructions, it can't even be argued anything that

14   happened here could overflow to your client, because it's

15   limited, and we have limited the jury on that, and we'll be

16   instructing them on that at the end of case.

17       But I understand where you're talking about, where, to

18   save time, let's just do it.

19         MR. FLIER:  Correct.

20         THE COURT:  All you gotta do is talk with counsel.  If

21   there's some objection to it, that's fine, but if there's not,

22   I think it makes a lot of sense.

23         MR. FLIER:  What I said?  I think -- okay.

24         THE COURT:  Okay.

25         MR. FLIER:  I know when to quit.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2        Okay.  We'll be in recess.

 3              MR. PEREYRA-SUAREZ:  Thank you, your Honor.

 4              THE CLERK:  All rise.

 5

 6                 (Proceedings adjourned at 4:05 p.m.)

 7

 8                          --oOo--

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3         I hereby certify that pursuant to Section 753,

 4    Title 28, United States Code, the foregoing is a true and

 5    correct transcript of the stenographically reported proceedings

 6    held in the above-entitled matter and that the transcript page

 7    format is in conformance with the regulations of the

 8    Judicial Conference of the United States.

 9

10    Date:  MARCH 4, 2015

11

12

13

14              /S/ SANDRA MACNEIL

15         Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3     HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4             - - - -

5

6

UNITED STATES OF AMERICA,      )

7                               )
              PLAINTIFF,        )
8                               )
         vs.                    )    No. CR 11-00072(A)-RGK
9                               )
(1)  MHER DARBINYAN,            )
10   (4)  ARMAN SHAROPETROSIAN, )
(35) RAFAEL PARSADANYAN,        )
11                              )
              DEFENDANTS.       )
12   _____)

13

14      REPORTER'S TRANSCRIPT OF JURY TRIAL

15             DAY 5

16           PAGES 1 – 114

17       MONDAY, MARCH 31, 2014

18            12:52 P.M.

19        LOS ANGELES, CALIFORNIA

20

21

22   _____

23      *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
      *Official Reporter, U.S. District Court*
24          *255 East Temple Street*
          *Los Angeles, CA  90012*
25            *213.894.5949*

```
1   APPEARANCES OF COUNSEL:

2   FOR PLAINTIFF UNITED STATES OF AMERICA:

3         ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
4              ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
5         LOS ANGELES, CALIFORNIA  90012
          213.894.4477
6
          UNITED STATES DEPARTMENT OF JUSTICE
7         BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
8         LOS ANGELES, CALIFORNIA  90012
          213.894.2579
9

10  FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14  FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18  FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23  ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                          I N D E X

2    GOVERNMENT'S WITNESSES:                          PAGE

3    JAMES ZBORAVAN
        DIRECT EXAMINATION (Continued) BY MR. ESTRADA     6
4       CROSS-EXAMINATION BY MR. SEVERO                  15
        CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ          25
5       REDIRECT EXAMINATION BY MR. ESTRADA             26
        RECROSS-EXAMINATION BY MR. SEVERO               29
6
     JOSE LOZANO
7       DIRECT EXAMINATION BY MR. CREIGHTON             33
        CROSS-EXAMINATION BY MR. SEVERO                 42
8       CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ         43

9    SUSAN CARTER
        DIRECT EXAMINATION BY MR. CREIGHTON             45
10
     RAFAEL QUINTERO
11      DIRECT EXAMINATION BY MR. ESTRADA               52
        CROSS-EXAMINATION BY MR. SEVERO             67, 73
12      REDIRECT EXAMINATION BY MR. ESTRADA             75
        RECROSS-EXAMINATION BY MR. SEVERO               77
13
     JEREMY STEBBINS
14      DIRECT EXAMINATION (Resumed) BY MR. ESTRADA     82

15

16

17

18                        E X H I B I T S

19                         GOVERNMENT'S

20            NUMBER              ADMITTED

21             283                  35

22             284                  47

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, MARCH 31, 2014

 2                            12:52 P.M.

 3                            - - - -

 4       (Outside the presence of the jury:)

 5              THE COURT:  Okay.  The record will reflect the jurors

 6    are not present.

 7         The Court is holding this hearing outside the presence of

 8    the jury to rule on a motion that was made by Mr. Darbinyan's

 9    attorney to compel the production of the material witness M.M.,

10    and the Court has read that motion and also the government's

11    opposition to the motion and is ready to rule at this time, and

12    that is that the motion is going to be granted.  The Court has

13    found that the probative nature outweighs, far outweighs the

14    prejudicial effect as far as security goes of the victim.

15              DEFENDANT SHAROPETROSIAN:  But your Honor --

16              THE COURT:  Therefore, one of three things.  You can

17    either not produce any testimony as to M.M., or you can divulge

18    the whereabouts so that the government -- or the defendant can

19    subpoena them, or you can produce them yourselves,

20    understanding also that if the government wants -- or if the

21    defense wants to question before trial, or before testimony

22    wants to question the witness, that's completely up to the

23    witness.  If the witness wants to, that's fine.  If the witness

24    doesn't want to, that's fine, also.

25         So any other questions you might have on that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MS. YANG:  Your Honor, just as a matter of

2   clarification.  When you state that the government will not be

3   able to present any evidence regarding M.M. unless it discloses

4   his whereabouts or procures him for trial, does that include

5   the wires calls, which the --

6          THE COURT:  Oh, sure.

7          MS. YANG:  -- government had previously filed a

8   motion, that the Court had granted, allowing in the statements

9   as non-hearsay?

10         THE COURT:  They can come in as not -- well, then it

11  would be irrelevant, because if you're prosecuting that count,

12  he has to be produced.

13         MS. YANG:  Well, as the government set forth in its

14  motion, it wouldn't be irrelevant in terms of it gives context

15  to the calls, and it's set forth the Ninth Circuit authority --

16         THE COURT:  If you want to drop the charges for

17  extortion, that's fine.  And if it gives context and is

18  relevant to some other count, that's fine.  If you're keeping

19  the charges of extortion of that victim, then you're going to

20  have to produce that victim.

21         MS. YANG:  Okay.  For clarification, if the government

22  intends to proceed on the extortion counts, the Court is not

23  going allow the government --

24         THE COURT:  I didn't hear you.  If the government does

25  what?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MS. YANG:  If the government is proceeding on the
 2    extortion counts, the Court will not allow the wiretap calls in
 3    which the victim speaks unless the government produces the
 4    victim; is that correct?
 5          THE COURT:  Yeah.  Yeah.  Yeah.
 6       Anything else?
 7       Okay.  That'll be the order of the Court --
 8          MR. SEVERO:  Yes.  Thank you.
 9          THE COURT:  -- and we'll start back in a few minutes.
10       (Brief recess held.)
11       (In the presence of the jury:)
12          THE COURT:  The record will reflect all the members of
13    the jury are in their respective seats in the jury box.
14       I hope you had a very good weekend.  Hopefully we don't
15    have any Arizona State fans here.  I mean, it's bad enough
16    having UCLA fans last time.  But are you ready to get started
17    again on the trial?  Great.
18       We're at direct examination, Counsel.  You may inquire.
19          MR. ESTRADA:  Yes, your Honor.  Thank you.
20       JAMES ZBORAVAN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,
21                    DIRECT EXAMINATION (CONTINUED)
22    BY MR. ESTRADA:
23    Q.   Good afternoon, Sergeant Zboravan.
24    A.   Good afternoon, sir.
25    Q.   Now, on Friday when we left off, we were talking about
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   this incident at the Chicken House.  Do you recall that?
 2   A.    Yes.
 3   Q.    And about identifying some of the suspects who were lined
 4   up outside the Chicken House once you arrived.  Do you recall
 5   that?
 6   A.    Yes.
 7   Q.    I'd like to show you an exhibit.
 8         Your Honor, this has been previously admitted and
 9   published, Exhibit 302.  With the Court's permission?
10            THE COURT:  Yes.
11   BY MR. ESTRADA:
12   Q.    Do you recall defendant Darbinyan being present there at
13   the Chicken House restaurant?
14   A.    Yes, I do.
15   Q.    Do you also recall that day, August 20, 2009, defendant
16   Darbinyan's general demeanor?
17   A.    Yes.
18   Q.    Can you explain.
19            MR. SEVERO:  Objection, irrelevant.
20            THE COURT:  Overruled.
21            THE WITNESS:  His demeanor was, in my opinion,
22   subdued.
23            MR. SEVERO:  Objection, opinion testimony not
24   previously disclosed.
25            THE COURT:  You can testify as to your observations,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    any observations you made of him.

 2         It'll be subject to a motion to strike later.

 3              MR. SEVERO:  Thank you, your Honor.

 4              THE WITNESS:  He appeared to be subdued, yet confident

 5    in nature.

 6              MR. SEVERO:  Move to strike.

 7              THE COURT:  Overruled.  These are just observations.

 8    BY MR. ESTRADA:

 9    Q.   And in terms of your observations of others, the other

10    suspects lined up against the wall of the Chicken House, what

11    was their general demeanor towards the defendant, Darbinyan?

12              MR. SEVERO:  Objection, irrelevant.

13              THE COURT:  Overruled.

14              MR. SEVERO:  Calls for an opinion.

15              THE COURT:  Overruled.

16              THE WITNESS:  There was two times that I recall.  Two

17    of the individuals that we had detained were talking back a

18    little bit to my officers, kind of questioning and wondering

19    why we were doing what we were doing, they were just there

20    eating, et cetera, et cetera.  When that went on for a little

21    while, Mr. Darbinyan said something in a foreign language,

22    which I'm going to assume to be Armenian, and immediately those

23    individuals stopped, you know, their -- their banter.

24    BY MR. ESTRADA:

25    Q.   With the officers?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Now, at some point that evening did you learn that

 3    defendant Darbinyan was on parole?

 4    A.    Yes.

 5    Q.    Because of that, did you take any action?

 6    A.    Yes.  He was taken to Northeast Station.

 7    Q.    Detained?

 8    A.    Yes.

 9    Q.    Now, when you say Northeast Station, is that a LAPD

10    station?

11    A.    That's correct.  Los Angeles Police Department, Northeast

12    Station, which is on 3353 North San Fernando Road.

13    Q.    Was he kept at the LAPD station?  Or I should be more

14    clear.

15          MR. SEVERO:  Objection, yes.

16    BY MR. ESTRADA:

17    Q.    At some point that evening was he released from the

18    station?

19          MR. SEVERO:  Lacks foundation.

20          THE COURT:  Overruled.

21    BY MR. ESTRADA:

22    Q.    Are you actually the person who released him?

23    A.    Yes.

24    Q.    Now, why was he released that night?

25    A.    I was told by one of the detectives --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection, hearsay.

 2              THE COURT:  Sustained.

 3              MR. ESTRADA:  Not for the truth, your Honor, just for

 4    his actions.

 5              MR. SEVERO:  Well, if -- it's irrelevant, then.

 6              THE COURT:  Sustained.

 7    BY MR. ESTRADA:

 8    Q.   Why did you release him?

 9    A.   For continuance -- or continuing the investigation.

10    Q.   Based on your understanding of the facts, did you believe

11    there was a valid parole violation there?

12    A.   There was a valid parole violation.

13    Q.   Which was what?

14              MR. SEVERO:  Objection, calls -- that's a legal

15    conclusion.  Move to strike.

16              THE COURT:  Overruled.

17              THE WITNESS:  Mr. Darbinyan was on active parole.

18    There were other active parolees present with him at the

19    Chicken House, and one of the conditions of parole is to not

20    associate with other parolees.  So since he was associating

21    with other parolees, we had a legal reason to detain and

22    transfer him to -- or transfer --

23              THE COURT:  The last part will be stricken as to they

24    had legal reason, Counsel.

25              MR. SEVERO:  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  I'm assuming that was your objection.

 2              MR. SEVERO:  I'm sorry?

 3              THE COURT:  I'm assuming that was your objection.

 4              MR. SEVERO:  That was my objection.

 5    BY MR. ESTRADA:

 6    Q.   You had reason as a police officer to take him to the

 7    station?

 8    A.   Yes.

 9    Q.   Now, when you released him that night, what did you

10    observe?

11    A.   If I may back up a little bit?

12    Q.   Okay.

13              MR. SEVERO:  Nonresponsive.

14              THE COURT:  Okay.  Next question.

15    BY MR. ESTRADA:

16    Q.   Okay.  If you can back up a little bit.  Before you

17    released him, can you explain what happened?

18    A.   I was called to the watch commander's office, and when I

19    was called to the watch commander's office, the watch

20    commander, who is the -- out of the presence of a captain, the

21    watch commander's in charge of the station when the captain's

22    not there.  He asked --

23              MR. SEVERO:  Objection, your Honor.  That's getting

24    into hearsay.

25              THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ESTRADA:  Not -- just the effect on the listener,

 2   your Honor.

 3            THE COURT:  I'm not too sure what section you keep

 4   referring to on no effect on the listener.

 5            MR. ESTRADA:  Well, it's a Ninth Circuit case, but

 6   I'll move on, your Honor.

 7            THE COURT:  And the reason I said that, Counsel, is

 8   every statement that's ever made is going to have some effect

 9   on the listener.  But go ahead.

10   BY MR. ESTRADA:

11   Q.   Now, with regard your release of Darbinyan, what was

12   the -- why did you go to the watch commander?

13   A.   I was called to the watch commander's office via the

14   intercom system because of a commotion of several individuals

15   that were in the lobby of the station.

16   Q.   When you say a commotion, what do you mean by that?

17   A.   There was approximately eight to ten males and females

18   talking loudly and arguing with the -- the desk police officers

19   there at Northeast Station.

20   Q.   And did you understand whether they were there for a

21   particular person?

22   A.   Yes.

23   Q.   Who were they there for?

24            MR. SEVERO:  Objection, hearsay.

25            THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. ESTRADA:

2   Q.   Now, at some point did you release Darbinyan?

3   A.   Yes.

4   Q.   And what area of the station did you release him into?

5   A.   I released him into the lobby of Northeast Station.

6   Q.   In that lobby, is that where there were a bunch of

7   individuals causing commotion?

8   A.   Yes.

9   Q.   And when you released him into that lobby area where there

10  were a bunch of people, what did you observe?

11  A.   I observed, as soon as Mr. Darbinyan walked from the door

12  into the lobby, everybody that was speaking loudly and arguing

13  immediately silenced, looked at Mr. Darbinyan and, in my

14  opinion, in a reverent way looked down as he approached them.

15       MR. SEVERO:  Move to strike "reverent" as a conclusion

16  of this witness.

17       THE COURT:  Overruled.  Again, it's an observation.

18  BY MR. ESTRADA:

19  Q.   Now, based on your experience as a police officer

20  investigating gangs, what did this sort of reaction to

21  Darbinyan demonstrate to you?

22       MR. SEVERO:  This is an opinion that's not been

23  previously disclosed to the other side.

24       THE COURT:  Sustained.

25       MR. ESTRADA:  Your Honor, he's entitled to his lay
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   opinion, your Honor.

 2           MR. SEVERO:  This is not lay opinion testimony.

 3           THE COURT:  Sustained.  Next question.

 4   BY MR. ESTRADA:

 5   Q.   Based on your experience as a police officer, not as an

 6   expert, but as an investigator, as a police officer, what did

 7   this reaction tell you?

 8           MR. SEVERO:  I don't think there was any difference.

 9   Still --

10           THE COURT:  Sustained.  Sustained.

11   BY MR. ESTRADA:

12   Q.   Now, when you released Darbinyan and you saw this

13   reaction, what did you do?

14   A.   Walked back into the other side of the station, back to

15   the gang office, and stood by while my officers completed

16   reports related to the incident.

17   Q.   Based on your observations, was this reaction to Darbinyan

18   unusual?

19   A.   Yes.

20           MR. SEVERO:  Objection.

21           THE COURT:  Overruled.

22   BY MR. ESTRADA:

23   Q.   Excuse me, what was the answer?

24   A.   Yes.

25           MR. ESTRADA:  Just one moment, your Honor?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE COURT:  Yes.

 2                MR. ESTRADA:  No further questions, your Honor.

 3                THE COURT:  Cross.

 4                      CROSS-EXAMINATION

 5     BY MR. SEVERO:

 6     Q.   Good afternoon, sir.

 7     A.   Good afternoon, sir.

 8     Q.   How many people did you take into custody that day?

 9     A.   Without referring to the police report, if I can

10     speculate, roughly five or six.

11     Q.   Okay.  Were they all in the -- at the Northeast Station?

12     A.   At some point they were all at Northeast Station, yes.

13     Q.   Same time that Mr. Darbinyan was?

14     A.   I would say so, yes.

15     Q.   Did you attempt to identify the people in the lobby?

16     A.   I did not, no.

17     Q.   Did you try to identify whether it was his relatives that

18     were outside?

19     A.   I did not.

20     Q.   Did anyone?

21     A.   The watch commander --

22     Q.   To your knowledge.

23     A.   To my knowledge, they asked the watch commander if they

24     could see and wanted to bail out Mr. Darbinyan.

25     Q.   All right.  So you don't know if they were relatives or --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   and friends?

 2   A.   I do not.

 3   Q.   This reverence of which you speak could have come from

 4   relatives and friends, correct?

 5   A.   It could have.

 6   Q.   And -- well, let me start from the beginning, since we

 7   started your testimony on Friday.

 8        Did you receive a call in the -- did you get a call -- did

 9   you hear of a call that went out for a response to the

10   Chicken House?

11   A.   Yes.

12   Q.   And did you document what the call stated at any point?

13        Let me rephrase that question, because it's grammatically

14   mixed up.

15        Did you at any point document what the call said?

16   A.   I would -- I don't recall at this point.  I'd have to

17   refer to my sergeant's log to see what I did write.  I would

18   have written an entry for what occurred.  Offhand, I don't know

19   exactly what I wrote.

20   Q.   But you approved the report that was written by Mr. --

21   Officer Giberson?

22   A.   No.  That'd be Giberson, and I believe that was Sergeant

23   Dave Armus.  If I remember looking at the report, lower -- we

24   initial the lower right-hand corner.  I think it said "DA,"

25   which would be for Dave Armus.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    So you reviewed the report before testifying Friday?

2    A.    Yes.

3    Q.    Immediately before testifying?

4    A.    Probably within 30 minutes before testifying.

5    Q.    And did you speak to any of the prosecutors beforehand?

6    A.    Yes.

7    Q.    Did you find anything in the report that you objected to?

8    A.    No.

9    Q.    So whatever the report said, you agreed with?

10   A.    Yes.

11   Q.    Essentially, the call that went out to the Chicken --

12   about the Chicken House was excessive congregation of people,

13   correct?

14   A.    The call into which you are referring, I assumed that you

15   meant when Officer Giber- --

16   Q.    If you don't understand my question, tell me.

17   A.    I'm sorry?

18   Q.    If you don't understand my question, tell me.  If

19   you're --

20         THE COURT:  Well, I think he's asking you to explain

21   the question.

22      Go ahead.

23         THE WITNESS:  Can you explain the question again, sir?

24         MR. SEVERO:  Sure.

25   Q.    As you understand it today, having read the report and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  having spoken to Investigator Giberson and -- Gatsby is it?

2  A.   Yes.

3  Q.   Both officers.  The call that went out to the officers on

4  patrol was there were too many people congregating, and there

5  was some concern about that?

6  A.   No.

7  Q.   There were -- as I recall Officer Giberson's testimony,

8  there were possible gang members congregating, and there were a

9  lot of them there.

10  A.   Yes.

11  Q.   And that's the extent of the knowledge that the officers

12  had, as far as you know, when they went out to the location?

13       MR. ESTRADA:  Object, your Honor, calls for

14  speculation.

15       MR. SEVERO:  As far as he knows.

16       THE COURT:  Do you have any reason to doubt that?

17       THE WITNESS:  No, I have no reason to doubt that.

18       MR. SEVERO:  Thank you.

19  Q.   How many people were inside the restaurant when you

20  arrived?

21  A.   Zero.

22  Q.   So the officers had brought everybody out?

23  A.   That were -- that appeared to be visible from what you

24  could see outside into the windows, I didn't see anybody

25  inside.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   All right.  Can you recall how long it took you to get to

2   the scene from the time the call went out?  If you know.

3   A.   I believe on Friday I testified I think ten minutes or so.

4   Q.   And when you testified about that on Friday, is that

5   because it was your memory that it was ten minutes or so?

6   A.   Yes.

7   Q.   Okay.  You went out to the scene -- strike that.

8        At the time that you arrived at the scene, how many

9   officers were there?

10  A.   Approximately ten.

11  Q.   And how many people were under arrest?  If you know.

12  A.   At that point, I would say nobody was under arrest.

13  People were detained.

14  Q.   All right.  Everyone, as far as you know, or that you

15  observed, everyone that was inside the restaurant was lined up

16  on the wall outside?

17  A.   Yes.

18  Q.   And everyone that was lined up on the wall outside was

19  photographed; is that true?

20  A.   I would -- I don't know.  I know photographs were taken.

21  I would assume it would be everybody that was there.

22            MR. SEVERO:  What was the exhibit number that we just

23  had?

24            MR. ESTRADA:  Your Honor, the photos were contained at

25  Government's Exhibit 302.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Thank you.

 2              THE COURT:  Thank you, Counsel.

 3              MR. SEVERO:  Thank you.

 4        This is --

 5        Oh, may I publish this, your Honor?

 6              THE COURT:  Yes.

 7              MR. SEVERO:  Thank you.

 8   Q.   This is the photo that Mr. Estrada showed you a few

 9   minutes ago.  Do you recall that?

10   A.   Yes.

11   Q.   And there were -- do you recall there being at least 14

12   people lined up on that wall?

13   A.   I would say -- if you would ask, I would say 10 to 15.  So

14   it would fall within there, but I couldn't give you an exact

15   number.

16   Q.   I will represent to you that I have at least 14 people --

17   A.   Sure.

18   Q.   -- excluding Mr. Darbinyan in this stack.

19        So that appears to correct?

20              MR. ESTRADA:  Calls for speculation, your Honor, and

21   asked and answered.

22              THE COURT:  I think he's already answered.  He said

23   somewhere between 10 and 14.

24   BY MR. SEVERO:

25   Q.   Of the 15 people that were lined up on the wall and were
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   similarly photographed, such as this gentleman and these

 2   gentlemen and many others, were all of them taken into custody?

 3   A.   Meaning taken to -- arrested and taken to Northeast

 4   Station?  No, they weren't.

 5   Q.   Mr. Darbinyan, about five through seven is what you said,

 6   others, were taken?

 7           MR. ESTRADA:  Object, your Honor, misstates the

 8   testimony.

 9           THE COURT:  Why don't you ask the question again.

10   BY MR. SEVERO:

11   Q.   Mr. Darbinyan and how many others were taken to the

12   station?

13   A.   I think I said roughly five or six total.

14   Q.   All right.

15   A.   Approximately.

16   Q.   He was taken to the station because you identified him as

17   being on parole, correct?

18   A.   Yes.

19   Q.   And the reason you gave for arresting him and taking him

20   to the station is that there were other parolees there, and

21   that's why you took him, correct?

22   A.   Yes.

23   Q.   That's the only reason you took him, true?

24   A.   Yes.

25   Q.   I don't mean this facetiously, but other people that could
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   be parolees there do not necessarily show it, do they?  I mean,
 2   they don't have it tattooed --
 3   A.   No.
 4   Q.   -- on their forehead or anything.
 5   A.   No.
 6   Q.   So you don't -- you can't -- if you want to go into the
 7   restaurant and sit down and eat, you don't know if there is
 8   another parolee there or not, correct?
 9        MR. ESTRADA:  Object, your Honor, calls for
10   speculation.
11        THE COURT:  Sustained.
12   BY MR. SEVERO:
13   Q.   You testified on Friday that there was traffic, traffic
14   increased on the outside of the restaurant; is that correct?
15   A.   Yes.
16   Q.   Is it unusual for police activity to attract looky-loos?
17   A.   In and of itself, no, it's not unusual.
18   Q.   Right.  So it's, in fact, more often the case than not
19   that when there is police activity, people will slow down to
20   look.
21   A.   Yes.
22   Q.   As on the freeways, correct?
23   A.   Yes.
24   Q.   It's true on Hollywood Boulevard, isn't it?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Yes.  And you did not identify these people on the

2  street -- the increased traffic, you didn't identify who these

3  people were, did you?

4  A.   Meaning stop and ask them who they were?

5  Q.   Yes.

6  A.   Did not.

7  Q.   All right.  What time -- it was, what, about 9:00 o'clock

8  at night?  A little after 9:00?

9  A.   Between 9:00 and 10:00, yes.

10 Q.   You were aware that Mr. Darbinyan was listed as a witness

11 to the events of that evening, correct?

12 A.   Yes.

13         MR. SEVERO:  May I have a moment, your Honor?

14         THE COURT:  Yes.

15         MR. SEVERO:  Thank you.

16 Q.   Is there a reason why you didn't approve the report

17 instead of Sergeant Armus?

18 A.   No particular reason.

19 Q.   Just whoever's available, whoever sees it first, is --

20 A.   Correct.  There was three sergeants assigned to Northeast

21 gangs at that time, and he was probably sitting there when the

22 officers completed the report.

23 Q.   Very well.  Now, to the best of your knowledge, were the

24 weapons that were found that evening submitted for fingerprint

25 analysis?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I don't know.

 2   Q.   Any of the evidence, the live ammo or magazines, do you

 3   know if they were submitted for fingerprint analysis?

 4   A.   I don't have any independent knowledge, no, sir.

 5   Q.   Are you aware of whether Special Agent Stebbins was at the

 6   scene that evening?

 7   A.   Who is that?

 8   Q.   Okay.  Obviously, he wasn't.

 9        This gentleman right here in the middle.

10   A.   I've seen him the last couple days.  As far as I know,

11   that's the only time I've ever seen him.

12   Q.   All right.  Okay.  So when you decided to not -- no longer

13   detain Mr. Darbinyan in order to continue the investigation,

14   you didn't see Mr. Stebbins at the -- at the police station at

15   that time, did you?

16   A.   No.  I did meet with a LAPD detective, and she was with

17   another male.

18   Q.   But it wasn't Mr. Stebbins?

19   A.   I don't think so.

20   Q.   Okay.

21   A.   I -- but I -- it could have been.

22   Q.   Okay.  Very good.

23        I have nothing further.  Thank you.

24            THE COURT:  Counsel.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                              **CROSS-EXAMINATION**

2    BY MR. PEREYRA-SUAREZ:

3    Q.    Good afternoon, Sergeant.

4    A.    Good afternoon, sir.

5    Q.    You testified a few minutes ago that five or six people

6    were taken from the Chicken House restaurant to the LAPD

7    Northeast Station.  Do you recall that testimony?

8    A.    Yes.  Approximately five or six, yes.

9    Q.    My client, Mr. Sharopetrosian, was not one of the people

10   who was taken to the Northeast Station; is that correct?

11   A.    Without looking at the arrest report, I couldn't tell you,

12   but if he's not on the arrest report, he wasn't one taken to

13   the station.

14   Q.    In fact, you didn't see Mr. Sharopetrosian at the

15   Chicken House, did you?

16   A.    Not --

17   Q.    Here's Mr. Sharopetrosian right here.  You didn't see him

18   at the Chicken House on August 20 of 2009, did you?

19   A.    Not that I recall.

20   Q.    To your knowledge, were any photographs of

21   Mr. Sharopetrosian taken at the Chicken House on August 20,

22   2009?

23   A.    If they're not submitted into evidence, then I would say

24   no photos were taken of him.

25   Q.    In fact, he was not there that date; is that correct?

```
 1   A.   If there's no photos and he's not in the report, it's safe

 2   to say he was not there.

 3        MR. PEREYRA-SUAREZ:  I have nothing further, your

 4   Honor.

 5        THE COURT:  Okay.  Counsel.

 6        MR. FLIER:  I have no questions, your Honor.

 7        THE COURT:  Thank you, Counsel.

 8      Redirect?

 9                    REDIRECT EXAMINATION

10   BY MR. ESTRADA:

11   Q.   Sergeant Zboravan, you were asked about the fact that

12   Darbinyan was listed as a witness in the report.

13   A.   Yes.

14   Q.   What does that mean, that he was listed as a witness in a

15   report?

16   A.   When completing reports, whether they're arrest reports or

17   just regular crime reports, crime property reports, et cetera,

18   there are certain categories that we in the City of Los Angeles

19   list people under.  For example, if you're arrested, you could

20   either use the term "arrestee" or "defendant."  If you're at

21   the scene and we do not arrest you, traditionally we put down

22   you as a witness.

23   Q.   And the fact that someone is listed as a witness, does

24   that mean they weren't at all involved in criminal activity?

25        MR. SEVERO:  Objection, your Honor, that calls for
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    speculation.

2              THE COURT:  Sustained.

3    BY MR. ESTRADA:

4    Q.  Well, based on your knowledge, when you list someone as a

5    witness, does that mean they're not involved in any criminal

6    activity?

7              MR. SEVERO:  Still calls for speculation.

8              THE COURT:  Sustained.

9    BY MR. ESTRADA:

10   Q.  Does the mere fact that you list someone as a witness mean

11   they're not involved in criminal activity?

12             MR. SEVERO:  Objection.  Same objection.  Still --

13             THE COURT:  Sustained.

14   BY MR. ESTRADA:

15   Q.  Based on your knowledge.

16             MR. SEVERO:  Still --

17             THE WITNESS:  (No response.)

18   BY MR. ESTRADA:

19   Q.  Now, Darbinyan was listed as a witness in the report.

20   Under your understanding of the facts and your observations,

21   was there still a potential parole violation for him?

22   A.  Yes.

23   Q.  But you didn't violate his parole; is that right?

24   A.  I did not, that is correct.

25   Q.  Why is that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection, your Honor.  That calls for a

 2   conclusion, legal con- -- he can't violate anybody's parole.

 3   That's not his job, so --

 4              THE COURT:  Sustained.

 5   BY MR. ESTRADA:

 6   Q.   Now, you've listed other people as witnesses in reports?

 7   A.   Yes.

 8   Q.   Does that mean, when they're listed as a witness, based on

 9   the prior times you've done it, that they weren't at all

10   involved in the incident?

11              MR. SEVERO:  Objection, your Honor.  It's the same

12   question in a different --

13              MR. ESTRADA:  It's going to his knowledge, your Honor.

14              THE COURT:  The fact that someone's listed as a

15   witness, does that mean that they were or were not involved?

16   Does that have anything to do with being involved in the crime?

17              THE WITNESS:  It does not.

18              THE COURT:  Okay.

19   BY MR. ESTRADA:

20   Q.   Now, you also testified about reverence that people in the

21   lobby showed to Darbinyan when he was released.  Based on your

22   experience not even as a police officer, just as a living,

23   breathing human being and dealing with family members, was that

24   unusual to you?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Explain.

2    A.   When you --

3              MR. SEVERO:  Calls for speculation.

4              THE COURT:  Overruled.

5              THE WITNESS:  Traditionally, when I've personally seen

6    that type of reaction to an individual, it means that

7    individual has -- holds some kind of clout or power to those

8    people that were doing the either being quiet or, you know,

9    bowing their head, showing reverence.

10             MR. SEVERO:  Move to strike that answer as speculation

11   of this witness and opinion without foundation.

12             THE COURT:  Overruled.

13             MR. ESTRADA:  No further questions, your Honor.

14             THE COURT:  Redirect?  Or recross?

15                      RECROSS-EXAMINATION

16   BY MR. SEVERO:

17   Q.   You know Armenian people to be loud?

18   A.   Yes.

19   Q.   Like the Italians, right?

20   A.   I'm part Italian.  Sure.

21   Q.   Yeah, right.  So it's not unusual, when three or four of

22   them get together, to be loud; is that true?

23             MR. ESTRADA:  Calls for speculation.

24             MR. SEVERO:  No.

25             THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE WITNESS:  They can be.

2    BY MR. SEVERO:

3    Q.   Especially if they're upset or excited, true?

4    A.   True.

5    Q.   What was the crime that anyone was arrested for on this

6    evening, on the 20th of August of 2009?

7    A.   There were firearms violations.

8    Q.   Right.  Three people were arrested for firearms violation.

9    And those who were listed as witnesses are not charged with a

10   weapons violations; is that accurate?

11   A.   That would be correct.

12   Q.   So even though they may have some other collateral

13   problems, such as parole violations, what being listed as a

14   witness means is that you have no evidence to suggest that they

15   were violating firearms laws.

16              MR. ESTRADA:  Object, your Honor, calls for

17   speculation.

18              THE COURT:  Overruled.

19        I think you can answer that.  You can answer.

20              THE WITNESS:  Can you repeat?  I'm sorry, sir.

21              MR. SEVERO:  I don't know that I can.

22   Q.   If a person is listed as a witness on a report that has

23   three people arrested for firearms violation, that means that

24   the witnesses are not charged with the weapons violation.

25   A.   That would be correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  Q.    That there is no evidence to charge them with a weapons

 2  violation at that point.

 3          THE COURT:  Does it necessarily mean that?

 4          THE WITNESS:  I would say there are oftentimes where

 5  there is evidence, but there may not be enough evidence to

 6  charge somebody or arrest somebody, and we will not.

 7  BY MR. SEVERO:

 8  Q.    Right.  So there wasn't enough evidence --

 9  A.    True.

10  Q.    -- to arrest Mr. Darbinyan for weapons violation, which is

11  the reason he's listed as a witness, correct?

12          MR. ESTRADA:  Object, your Honor, calls for

13  speculation.

14          THE COURT:  Overruled.

15          THE WITNESS:  Mr. Darbinyan was not arrested that

16  night for a weapons violation.

17          MR. SEVERO:  Thank you.  Nothing further.

18          MR. PEREYRA-SUAREZ:  I have nothing further, your

19  Honor.

20          MR. FLIER:  I have no questions, your Honor.  Thank

21  you.

22          THE COURT:  You may step down.

23          THE WITNESS:  Thank you, your Honor.  Thank you.

24          MR. CREIGHTON:  The government calls Jose Lozano.

25      And your Honor, with this witness, I will be reviewing two
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   exhibits with him.  One of the exhibits, I have spoken with

2   defense counsel about this, we are conditionally publishing at

3   this time so that this traveling witness can talk about it.

4           MR. PEREYRA-SUAREZ:  And your Honor, just so the

5   record is clear, I'm going to have a continuing objection until

6   counsel somehow ties this all together.

7           MR. SEVERO:  I have no -- no objection to the

8   conditional.  Since he's made it conditional, obviously, if a

9   condition doesn't come through --

10          THE COURT:  Then it will be stricken.

11          MR. SEVERO:  -- then it will be stricken.

12          MR. PEREYRA-SUAREZ:  And that's exactly the theme of

13  my objection.

14          THE COURT:  Yes, I understand.

15      And Counsel, what counts do these go towards?  What

16  defendants?

17          MR. CREIGHTON:  These counts go towards the extortion

18  and extortion conspiracy and racketeering conspiracy counts

19  against defendants Sharopetrosian and Darbinyan.

20          THE COURT:  Thank you.

21          THE CLERK:  Mr. Lozano, right here to be sworn,

22  please.

23      (Witness sworn.)

24          THE CLERK:  Thank you.  Careful when you turn.  You

25  may be seated.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        May I please ask that you state your full name for the
 2   record and spell your last name.
 3             THE WITNESS:  Jose Luis Lozano.  Last name
 4   L-o-z-a-n-o.
 5             THE CLERK:  Thank you.
 6             THE COURT:  Okay.  You may inquire.
 7            JOSE LUIS LOZANO, GOVERNMENT'S WITNESS,
 8                       DIRECT EXAMINATION
 9   BY MR. CREIGHTON:
10   Q.   Where do you work?
11   A.   At MoneyGram International.
12   Q.   What's your position there?
13   A.   Global subpoena specialist.
14   Q.   And how long have you served in that capacity?
15   A.   Since February 1st, 2012.
16   Q.   What are your duties?
17   A.   Gather information associated with search warrants or
18   subpoenas in regard to money orders and/or money transfers.
19   Q.   Are you knowledgeable about the record-keeping practices
20   and policies of MoneyGram?
21   A.   Yes, sir.
22   Q.   Are you knowledgeable through training and experience?
23   A.   Yes.
24   Q.   Are you a designated custodian of records for MoneyGram?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   A little background.  What is MoneyGram's business?

2    A.   MoneyGram's business has to do with, mainly, transferring,

3    money transfers, and also sale, purchase of money orders, paper

4    money orders.

5    Q.   And what is a money transfer?

6    A.   Money transfer is a wire between person A to person B

7    associated with currency.

8    Q.   And does that go through agents of MoneyGram?

9    A.   Correct.

10   Q.   Mr. Lozano, I would like to now direct your attention to

11   Exhibit 283, which I believe should be in a binder behind you.

12        If I could ask assistance from the court clerk.

13   A.   Yes, sir.

14   Q.   Would you take a second and quick look through Exhibit

15   283.

16        Do you recognize this exhibit?

17   A.   Yes.

18   Q.   What is it?

19   A.   It is the Excel spreadsheet that MoneyGram provides,

20   satisfying the subpoena associated with money transfers.

21   Q.   So this is -- these are records pertaining to certain

22   money transfers?

23   A.   Yes, sir.

24   Q.   Were these records made at or near the time of these

25   transactions?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Correct.

 2   Q.   Were they made by someone with knowledge of these

 3   transactions?

 4   A.   Yes.

 5            MR. SEVERO:  Objection, calls for speculation.

 6            THE COURT:  Overruled.

 7   BY MR. CREIGHTON:

 8   Q.   Are these records kept in the course of a regularly

 9   conducted activity of MoneyGram?

10   A.   Yes.

11   Q.   And is making these records a regular practice of

12   MoneyGram?

13   A.   Correct.

14            MR. CREIGHTON:  Your Honor, move to admit as business

15   records under Rule 803(6).

16            THE COURT:  Okay.  It will be received.

17        (Received in evidence, Exhibit 283.)

18            MR. CREIGHTON:  Permission to publish?

19            THE COURT:  For the jury, this Exhibit 283 consists of

20   nine pages; is that correct?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  Okay.  Go ahead, Counsel.

23            MR. CREIGHTON:  Thank you, your Honor.

24   Q.   Now, Mr. Lozano, I'm showing you page 1 of Exhibit 283.

25   A.   Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.    And there are a number of columns and a number of rows,
and I'm going to ask for your help in telling us what the
various columns are.

      Let's begin with the third column, the heading for the
third column that is spelled R-e-f, pound sign, or hashtag, I
guess these days.  What is that?

A.    That is the specific reference number associated with the
money transfer.

Q.    So it's a reference number associated with a particular
transaction?

A.    Yes, sir.

Q.    Are these numbers unique?

A.    Yes.  We also match them with the time and date.

Q.    Now, to the right of that, I'm going to -- or to the left
of that, I'm sorry, there are two items, "snd dt" and "snd
time."  What do these indicate?

A.    The first one from left to right, "snd dt," stands for
sender date, and then following by sender time, and the time is
in Central time, United States.

Q.    And over here we have two more columns, "sndr fnm" and
"sndr lnm."  What are those?

A.    "Sndr" space "fnm" stands for sender first name.  The
following column is "sndr" space "lnm."  Stands for sender last
name.

Q.    So the names below, are those the sender names that are

1   associated with each wire transaction?

2   A.   Yes, sir.

3   Q.   Now, let me ask.  Is it the policy of MoneyGram to check

4   the IDs of someone sending money?

5   A.   Yes.

6   Q.   On any particular transaction with any particular agent,

7   do you actually know that that ID was checked?

8   A.   It's per company policy.  Our MoneyGram agents are trained

9   to be due diligent to recognize a valid ID at the time of -- of

10  the transaction.

11  Q.   But do you actually know whether an ID was checked on any

12  given occasion?

13          MR. SEVERO:  Asked and answered.

14          THE COURT:  Overruled.  It was asked, but it wasn't

15  answered.

16          THE WITNESS:  I, personally, myself, have no access to

17  that; however, per company policy, correct.

18  BY MR. CREIGHTON:

19  Q.   That is something that's done by someone that's not here

20  in this courtroom; is that correct?

21  A.   That is correct, yes, sir.

22  Q.   Now, let's turn to page 2 of Exhibit 283, and I want to go

23  directly to the two columns over here that I have marked.

24  Would you tell us what those columns are and what they mean.

25  A.   Column "fee" parenthesis "U.S." is the fee associated with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    this transaction in United States dollars, followed by "total"

2    parenthesis "U.S."  It's the -- it's the amount of the

3    transaction plus the fee.  That's the total amount.

4    Q.    So the total is what someone who's wiring money has

5    actually paid to the MoneyGram agent; is that correct?

6    A.    Correct.

7    Q.    And if we actually wanted to find out how much money was

8    sent in this transaction, we would subtract the fee from the

9    total; is that correct?

10   A.    That is correct.

11   Q.    Now, if we could, if you might, if you would please turn

12   to page 5 of Exhibit 283.

13   A.    Yes, sir.

14   Q.    On the left, we again have columns that are "fnm" and

15   "lnm" but something different's in front of them.  What are

16   those columns?

17   A.    From left to right, "rcvr" space "fnm" stands for receiver

18   first name.  Following column, "rcvr" space "lnm," stands for

19   receiver last name.

20   Q.    And just for purposes of the record, how many transactions

21   are we talking about on this spreadsheet?

22   A.    Six.

23   Q.    To the right of receiver first name and receiver last

24   name, there are another set of columns.  What are those last

25   four columns on this page?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Beginning with "rcvr" space "addr," that's the receiver

2    address, followed by "rcvr addr2."  Additional information

3    associated with that domicile would be placed in that column.

4    Third column, "rcvr" space "city" is the receiver city.  And

5    lastly, the receiver state, "rcvr st."

6    Q.   Now, is it the policy of MoneyGram to require IDs to be

7    presented when people receive or pick up money?

8    A.   Yes, sir.

9    Q.   I see on this spreadsheet that not all of the addresses

10   are recorded for all of the transactions.  Can you explain

11   that?  And in particular I'm referring to -- there appears to

12   be no address for the last row.

13   A.   Our MoneyGram agents, again, referring to their due

14   diligence, even though they may not record the address, they

15   still check a valid ID for -- a valid ID for that particular

16   person receiving the funds.  In this case, given the dollar

17   amount that was associated with those transfers, it was not a

18   requirement to provide that information on record, but they

19   still check that ID.

20   Q.   Okay.  Now, if we could turn to the next page, we see what

21   appears to be another set of addresses.

22   A.   Correct.

23   Q.   But if you would begin by explaining this column that I

24   have marked on the left here.

25   A.   "Rcv" space "location" stands for the MoneyGram agent

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   location that received the funds.

 2   Q.   So that is the -- the agent or the store where someone

 3   goes to get money; is that correct?

 4   A.   Correct.

 5   Q.   And to the right of that name of the store, there are

 6   addresses; is that correct?

 7   A.   That's the particular physical address for that MoneyGram

 8   agent, correct.

 9   Q.   Now, is it the policy and practice of MoneyGram to know

10   where their agents are located?

11   A.   Yes.

12   Q.   And in these cities that you see on the right, say, for

13   example, Bullhead City, Arizona, the third line down, that

14   means that that money was picked up at that location; is that

15   correct?

16   A.   That is correct.

17   Q.   Now, I would ask the clerk's -- the courtroom deputy's

18   assistance in showing you Exhibit 281, which is a physical

19   exhibit.

20        And I apologize, I'm not sure it's been pulled out yet.

21             THE CLERK:  Okay.

22             THE WITNESS:  Yes, sir.

23   BY MR. CREIGHTON:

24   Q.   Now, I know there's a lot of paper there.  If you would

25   remove the clip and briefly look through each of those and then
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    tell us what they are.

 2    A.   These are receipts, MoneyGram -- from the MoneyGram agent.

 3    Q.   And I'll get into that in a second, okay.

 4         Have you had a chance to review the information that's on

 5    these receipts?

 6    A.   Yes, sir.

 7              MR. CREIGHTON:  May I ask the assistance of the

 8    courtroom deputy, and if I could get them.

 9    Q.   So I'm just going to put one of these up for the moment.

10    It says "Vcom" up at the top.  What is Vcom?

11    A.   They are one of MoneyGram agents.

12    Q.   And over here I see a number.  What is that number?

13    A.   That is the reference number for that specific money

14    transfer.

15    Q.   Now, and there is a date up here.  What is that date?

16    A.   That is the date when the transaction was sent or

17    originated.

18    Q.   And I'm sorry, I drew it badly.  And what is that?

19    A.   That is the time.  Again, that's Central Standard Time.

20    Q.   There's a name that appears there.  What's that name?

21    A.   Tony Franco.

22    Q.   And what purpose is that name?  What's the significance of

23    that name?

24    A.   For the individual, the sender.

25    Q.   Okay.  And how about for the name that appears there?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  A.    Porfirio Guerrero.  That's the receiver.

 2           MR. CREIGHTON:  Have a moment, your Honor?

 3           THE COURT:  Yes.

 4           MR. CREIGHTON:  One last question.

 5  Q.    MoneyGram.  MoneyGram's a business, right?

 6  A.    Yes, sir.

 7  Q.    Where does MoneyGram operate?

 8  A.    Headquarters are out of Dallas, Texas, sir.

 9  Q.    And does it operate throughout the United States?

10  A.    And worldwide.

11           MR. CREIGHTON:  No further questions for this witness.

12           THE COURT:  Cross.

13                      CROSS-EXAMINATION

14  BY MR. SEVERO:

15  Q.    Good afternoon, sir.

16  A.    Good afternoon, sir.

17  Q.    The amount of --

18         Sorry, your Honor.  Permission to publish the same -- I

19  think it's the same one.  Yes.

20           THE COURT:  Yes.

21  BY MR. SEVERO:

22  Q.    The amount, the actual amount transferred, was $899?

23  A.    Correct.

24  Q.    And you guys charge 60 bucks for that, is that it?

25  A.    For that particular transaction, yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    Okay.  Are you a franchise-type business?
2    A.    I wouldn't use the word "franchise."  It's -- our agents
3    go through a due diligent process to be accepted.
4    Q.    And when you say a due diligent process, you mean they go
5    through training?
6    A.    Correct.  And also application to become a MoneyGram
7    agent.
8    Q.    And they are also provided with your company policies; is
9    that correct?
10   A.    Correct.
11   Q.    And do you know what are the sanctions for a violation of
12   company policies?
13   A.    I do not.
14   Q.    Do you know what happens if someone doesn't check IDs?
15   A.    I do not.
16          MR. SEVERO:  I don't have anything further.  Thank
17   you.
18          THE WITNESS:  You're welcome.
19                        CROSS-EXAMINATION
20   BY MR. PEREYRA-SUAREZ:
21   Q.    Good afternoon, sir.
22   A.    Good afternoon, sir.
23   Q.    With respect to the exhibits you were shown here this
24   afternoon, you don't know for a fact one way or another if
25   somebody in particular at the company checked IDs; is that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  correct?
 2  A.    Correct.
 3              MR. PEREYRA-SUAREZ:  Thank you.
 4              MR. FLIER:  I have no questions, your Honor.
 5              THE COURT:  Redirect?
 6              MR. CREIGHTON:  No, your Honor.
 7              THE COURT:  You may step down.  Thank you for coming
 8  in.
 9              THE WITNESS:  Yes, sir.
10              THE COURT:  Next witness.
11              MR. CREIGHTON:  The government calls Susan Carter.
12              THE COURT:  Is this witness going to the same
13  defendants and the same counts?
14              MR. CREIGHTON:  That's correct.  Thank you, your
15  Honor.
16              THE CLERK:  Good afternoon.  Right here to be sworn,
17  please.
18       (Witness sworn.)
19              THE CLERK:  Thank you.  You may be seated.
20       May I please ask that you state your full name for the
21  record and spell your last name.
22              THE WITNESS:  Susan Carter, C-a-r-t-e-r.
23              THE CLERK:  Thank you.
24              MR. CREIGHTON:  May I begin?
25              THE COURT:  Yes, please.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          Make sure you have that mic up close to you.  You've got a

2     soft voice, so we have to make sure we hear you.

3               THE WITNESS:  Thank you.

4               THE COURT:  Go ahead, Counsel.

5               MR. CREIGHTON:  Thank you, your Honor.

6                    SUSAN CARTER, GOVERNMENT'S WITNESS,

7                         DIRECT EXAMINATION

8     BY MR. CREIGHTON:

9     Q.   Good afternoon, Miss Carter.

10         Where do you work?

11    A.   Western Union Financial Services.

12    Q.   What's your position there?

13    A.   Senior investigative security analyst.

14    Q.   How long have you worked in that capacity?

15    A.   Three years.

16    Q.   And how long have you worked for Western Union?

17    A.   Three years.

18    Q.   Where did you work before that?

19    A.   MoneyGram.

20    Q.   What are your duties?

21    A.   I receive requests from law enforcement for Western Union

22    records via subpoena, fulfill those records and provide

23    testimony as needed in regard to those records.

24    Q.   You're knowledgeable about the record-keeping policies and

25    practices of Western Union?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    I am.

 2    Q.    Through training and experience?

 3    A.    Yes.

 4    Q.    Are you the designated custodian of records for

 5    Western Union?

 6    A.    Yes.

 7    Q.    Where does Western Union do business?

 8    A.    Worldwide.

 9    Q.    And throughout the United States as well?

10    A.    Correct.

11    Q.    I'm going to ask you to turn to Exhibit 284 with the

12    assistance of the courtroom deputy.  It should be in the same

13    binder.  Would you quickly flip through this exhibit.

14          Do you recognize these documents?

15    A.    I do.

16    Q.    What are they?

17    A.    These are internal records that detail money transfer

18    transactions.

19    Q.    Were these records made at or near the time of the

20    transactions?

21    A.    They were.

22    Q.    Were they made by someone with knowledge of the

23    transactions?

24    A.    Yes.

25    Q.    Are these records kept in the course of a regularly
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    conducted activity of Western Union?

2    A.    Yes.

3    Q.    And is making these records a regular practice of that

4    activity?

5    A.    Yes.

6              MR. CREIGHTON:  Move to admit Exhibit 284 and publish.

7              MR. SEVERO:  Conditionally?

8              THE COURT:  Is this one conditionally also?

9         So subject to a motion to strike.

10             MR. PEREYRA-SUAREZ:  Same.  I'm taking the same

11   position on behalf of Mr. Sharopetrosian, for the record.

12             THE COURT:  And the Court's ruling that --

13             MR. CREIGHTON:  Your Honor, if I may, she's the

14   custodian of records.  These are her records.  There should be

15   nothing conditional about the admission of these records.

16             MR. SEVERO:  Except for the Court's earlier ruling

17   this afternoon this is what --

18             THE COURT:  I understand.

19        And Counsel, I am admitting them subject to a motion to

20   strike, which shouldn't hurt you one way or other.

21             MR. CREIGHTON:  Thank you, your Honor.

22        (Received in evidence, Exhibit 284.)

23   BY MR. CREIGHTON:

24   Q.    Let me begin by showing you Exhibit 284, at page 1.  What

25   is this record?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    This is the -- our internal record of a money transfer

 2   transaction.

 3   Q.    Now, do you have a unique identifying number that you use

 4   for following transactions?

 5   A.    We do.  We have a ten-digit number called a money transfer

 6   control number, or MTCN.

 7   Q.    And does that number appear on this internal record?

 8   A.    It does.

 9   Q.    Can you touch your screen and point to where it's located?

10   A.    It's just above (indicating).

11   Q.    Is it the area to the -- above the line I have just drawn

12   to the top left of the document?

13   A.    Correct.

14   Q.    Thank you.

15         Does the amount of the transaction appear in this record?

16   A.    It does.

17   Q.    Is that the amount down there?

18   A.    Yes.

19   Q.    And what are the letters that appear before it?

20   A.    Principal, or "prin," which means principal.

21   Q.    Does the fee associated -- and I'm sorry, is that the same

22   number that appears up here as well?

23   A.    Correct.

24   Q.    Does the fee that Western Union charges for the

25   transaction, does that also appear on this internal record?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.  It's included in with the principal amount, down at

2    the bottom here.

3    Q.    So for this transaction, what would the fee have been?

4    A.    $58.

5    Q.    Does the sender of the money appear on this transaction?

6    A.    Yes.

7    Q.    Can you touch where.

8    A.    (Indicating.)

9    Q.    All right.  So that's the second name from the top left

10   that appears there.  What is that name on this transaction?

11   A.    Minas Matsoyan (sic).

12   Q.    And does the recipient appear?  Is that the name that

13   appears directly above it?

14   A.    Correct.

15   Q.    I'm now going to show you page 2 of the document, of the

16   exhibit.  What is this?

17   A.    This is a -- another money transfer record.

18   Q.    And without going through all the pointing, can you

19   identify the amount of this transaction.

20   A.    The principal amount sent was a hundred dollars.

21   Q.    And what was the fee?

22   A.    Eleven dollars.

23   Q.    Who was the sender?

24   A.    Minas Matosyan.

25   Q.    Minas -- and who's the payee?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Juan Martinez.

 2    Q.    Turning to the third page of Exhibit 284, what is this?

 3    A.    This is the check that was used to pay out the transaction

 4    at the receiver location.

 5    Q.    And how do you know that?

 6    A.    This number here is the same number that appears on the

 7    page that was just previous.  That's the same money transfer

 8    control number.

 9    Q.    Turning to the next page of the document, who's the

10    sender?  This is page 4, I'm sorry.

11    A.    Minas Matosyan.

12    Q.    And who's the payee?

13    A.    Ana Lorena Portillo.

14    Q.    What is the amount?

15    A.    $1,100.

16    Q.    Turning to page 5 of the exhibit, what is this?

17    A.    This is the check that was used to pay out the first

18    thousand dollars.

19    Q.    And you say the first thousand dollars.  Why do you say

20    that?

21    A.    Each check has a limit of a thousand dollars that it can

22    be made out for.

23    Q.    So page 6 is another check.  Is that the remainder of that

24    payment?

25    A.    Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    And page 7 of Exhibit 284, who's the sender?

 2    A.    Minas Matosyan.

 3    Q.    And who's the payee?

 4    A.    Sharon Jones.

 5    Q.    And what is the amount?

 6    A.    $50.

 7    Q.    And is there a fee charged on this?

 8    A.    Yes.  Twelve dollars.

 9          MR. CREIGHTON:  Thank you.  No further questions.

10          THE COURT:  Cross?

11          MR. SEVERO:  I have no questions of this witness.

12          THE COURT:  Cross?

13          MR. PEREYRA-SUAREZ:  I have no questions, your Honor.

14          THE COURT:  Counsel?

15          MR. FLIER:  I have no questions.

16          THE COURT:  You may step down.  Thank you very much

17    for coming in.

18       Next witness.

19          MR. ESTRADA:  Your Honor, the government calls

20    Sergeant Rafael Quintero.

21          THE CLERK:  Good afternoon.  Right here to be sworn,

22    please.

23       (Witness sworn.)

24          THE CLERK:  Thank you.  You may be seated.

25          THE COURT:  Okay.  You may inquire.  Oh, excuse me.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      THE CLERK:  Can I please ask that you state your full

2   name for the record and spell your last name.

3      THE WITNESS:  Rafael Quintero.  R-a-f-a-e-l,

4   Q-u-i-n-t-e-r-o.

5      THE CLERK:  Thank you.

6      THE COURT:  Okay.  Now you can inquire, Counsel.

7      MR. ESTRADA:  Thank you, your Honor.

8            **RAFAEL QUINTERO, GOVERNMENT'S WITNESS,**

9                 **DIRECT EXAMINATION**

10  BY MR. ESTRADA:

11  Q.   Sir, where do you work?

12  A.   Glendale Police Department.

13  Q.   How long have you worked for the Glendale Police

14  Department?

15  A.   Be going on 13 years.

16  Q.   Now, before those 13 years at the Glendale Police

17  Department, did you work for another law enforcement agency?

18  A.   Yes, I did.

19  Q.   What was that?

20  A.   San Jose Police Department.

21  Q.   How long did you work there?

22  A.   Two years.

23  Q.   Now, currently, turning back to Glendale, currently with

24  the Glendale Police Department, what's your position?

25  A.   Currently employed as a sergeant, patrol sergeant.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Now, prior to your time as a patrol sergeant, what was

2    your assignment with the Glendale Police Department?

3    A.   I was a detective in our gang unit.

4    Q.   How long were you a detective in the gang unit?

5    A.   A little over seven years.

6    Q.   During your time as a detective in the gang unit, were you

7    assigned to a particular gang to investigate?

8    A.   Yes.

9    Q.   Which particular gang were you assigned to?

10   A.   I was actually assigned to investigate two.  One was the

11   Toonerville gang, and the second one was Armenian Power.

12   Q.   And by assigned to particular gang, what does that mean?

13   A.   That means you're responsible for overseeing all the

14   activity involving a set gang.  So, for example, cataloging

15   gang members that have been identified as gang members,

16   identifying, just -- or just receiving intelligence from on the

17   street as far as concerning gang members.

18   Q.   Now, I'm going to ask you about some of your background

19   and your training.

20        Do you have training in conducting investigations of

21   gangs?

22   A.   Yes.

23   Q.   What sort of training?

24   A.   Well, city -- when I was employed with San Jose, one of my

25   training officers was a gang expert, so I received training

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    there.  Also received training at the academy.  I've attended a

2    40-hour gang investigation class.  Attended an 80-course

3    homicide class.  I've attended a 16-hour high-intensity drug

4    trafficking organization on gangs.  Attended courses with

5    regard to the gangs and narcotics, and attended gangs and

6    online investigations.

7    Q.   Now, in addition to that training that you've done, do you

8    also have experience in investigating gangs?

9    A.   Yes.

10   Q.   About how many cases have you investigated involving

11   gangs, approximately?

12   A.   Hundreds.

13   Q.   Have you also, during your time as a detective in the gang

14   unit, had a chance to actually speak to gang members?

15   A.   Yes.

16   Q.   Is that something that you did frequently?

17   A.   Yes.

18   Q.   About how many gang members would you say you talked to

19   during your time as a detective?

20   A.   Hundreds.

21   Q.   Have you previously testified as an expert in the area of

22   gangs?

23   A.   Yes.

24   Q.   Now, I want to ask you about an incident that occurred on

25   August 20th of 2009.  Do you have that date in mind?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   On that date --

 3        THE COURT:  Does this go to all three defendants?

 4        MR. ESTRADA:  This particular testimony, your Honor,

 5   will go to the RICO charge against defendants Darbinyan and

 6   defendant Sharopetrosian.

 7        THE COURT:  Thank you.

 8   BY MR. ESTRADA:

 9   Q.   Now, I want to take you back to that date of August 20th

10   of 2009.  On that date, did you respond to a particular

11   location?

12   A.   Yes.

13   Q.   What location was it?

14   A.   It was the Chicken House in Hollywood.

15   Q.   Why did you respond to that area?

16   A.   I received a call from an LAPD officer asking for

17   assistance and identifying some of the subjects or members that

18   they had stopped.

19   Q.   Now, was it common for you to get calls from the

20   Los Angeles Police Department about gang members?

21   A.   Yes.

22   Q.   Was it common to get calls about particular -- a

23   particular gang?

24   A.   Yes.

25   Q.   What gang was that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.    Both -- depending on the gang members, usually it was

2   either Toonerville or AP.

3   Q.    When you say AP, are you referring to Armenian Power?

4   A.    Yes.

5   Q.    Now, why is it that you get calls from the LAPD about

6   Armenian Power?

7   A.    Well, we border LAPD Northeast, LAPD Foothill.  We share a

8   lot of people or gang members that live in both of our cities,

9   and they're also transient within, meaning they move from our

10  city, Glendale, to LAPD Northeast or Foothill.

11  Q.    Now, did you arrive at the location?

12  A.    Yes.

13  Q.    Did you arrive with any other Glendale Police Department

14  officers?

15  A.    Yes.

16  Q.    What other Glendale Police Department officers?  Let me

17  backtrack.  I'll withdraw the question.

18        What type of Glendale police officers did you arrive with?

19  A.    Other gang detectives.

20  Q.    Now, when you arrived at the scene of this restaurant on

21  August 20th, 2009, was it the evening?

22  A.    Yes.

23  Q.    Can you describe what the scene looked like.

24  A.    Several LAPD officers were present.  Several subjects that

25  I recognized as Armenian Power gang members were being detained

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    as long as -- as well as some other subjects that looked like

 2    organized crime type figures, based on my training and

 3    experience, and there was an active search going on for other

 4    members.

 5    Q.   Now, did you and other officers with the Glendale Police

 6    Department take photographs?

 7    A.   Yes.

 8    Q.   Who did you take photographs of?

 9    A.   Several subjects that I recognized as well as subjects

10    that I did not recognize.

11    Q.   And you're referring to individuals?

12    A.   Correct.

13    Q.   Why did you take photographs?

14    A.   To document that they were present and for the purposes of

15    identifying them as -- identifying them as gang members.

16    Q.   Please take a look, if you would, at Exhibit 302.

17         And your Honor, that's been previously admitted.  I'll ask

18    permission to publish.

19              THE COURT:  Yes.

20    BY MR. ESTRADA:

21    Q.   So I'm going to put that on the screen in front of you

22    there.

23         Turning to the first page of Exhibit 302, do you have that

24    in front of you?

25    A.   Yes.
```

```
1    Q.   Do you recognize that individual as being at the

2    Chicken House restaurant on August 20, 2009?

3    A.   Yes.

4    Q.   And that person who you see depicted there, his name's

5    written there.  Did you write that name in?

6    A.   No.

7    Q.   Were you familiar with that person?

8    A.   Yes.

9    Q.   Do you see that same person that you saw on August 20,

10   2009 at the Chicken House restaurant in the courtroom today?

11   A.   Yes, I do.

12   Q.   Could you please point him out and identify an article of

13   clothing that he's wearing.

14   A.   He is seated at counsel's table wearing a -- say like a

15   reddish sweater with a pink shirt.

16        THE COURT:  Indicating the defendant.

17   BY MR. ESTRADA:

18   Q.   Now, had you previously stopped defendant Darbinyan during

19   your time as a Glendale Police Department detective?

20   A.   I had not stopped him, no.

21   Q.   Were you aware of him?

22   A.   Yes.

23   Q.   Did you know that he went by any particular name?

24   A.   Yes.

25   Q.   What was that name?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  Objection, hearsay.

 2            THE COURT:  How did you know this?

 3            THE WITNESS:  From other gang officers and detectives.

 4            THE COURT:  Okay.  Overruled.

 5    BY MR. ESTRADA:

 6    Q.    What was that name he went by?

 7    A.    "Capone."

 8    Q.    Now, turning to the next page, did you document tattoos of

 9    defendant Darbinyan?

10    A.    Yes, we did.

11    Q.    Is that one of the pictures that was taken that night, on

12    August 20, 2009, of defendant Darbinyan's tattoos?

13    A.    Yes.

14    Q.    I'm not going to show you all of the photographs, but

15    turning to page 4, you see that individual on page 4?

16    A.    Yes.

17    Q.    Were you familiar with that person?

18    A.    Yes.

19    Q.    Who's that person?

20    A.    Ara Fermanyan.

21    Q.    Does that person go by any particular name?

22    A.    Yes, he does.  "Casper."

23    Q.    And did you know that person to be an Armenian Power gang

24    member?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Turning to page 6 of that exhibit, you see that person

2    there?

3    A.   Yes.

4    Q.   You know who that person is?

5    A.   Edgar Khachatryan.

6    Q.   Did you know that person to be an Armenian Power gang

7    member?

8    A.   Yes.

9    Q.   Did he go by any particular name?

10   A.   "Little Gunner."

11   Q.   Turning to page 7, are you familiar with that person?

12   A.   Yes.

13   Q.   Who's that person?

14   A.   Garik Galstyan.

15   Q.   Did you know that person to be an Armenian Power gang

16   member?

17   A.   Yes.

18   Q.   Did you know that person to go by any particular name?

19   A.   "Stomper."

20   Q.   Now turning to page 8, do you see the person on page 8?

21   A.   Yes.

22   Q.   Who's that person?

23   A.   Karo Yerkanyan.

24   Q.   Are you familiar with that person?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Do you know whether that person was an Armenian Power gang

2    member?

3    A.   Yes.

4    Q.   Do you know that person to go by any particular name?

5    A.   "Guilty."

6    Q.   Turning to page 9 of that exhibit, is that a photograph of

7    the same person we saw at page 8, "Guilty"?

8    A.   Yes.

9    Q.   As I mentioned, I'm not going to show you all the photos,

10   but were there additional Armenian Power gang members that you

11   recognize present there?

12   A.   Yes.

13   Q.   Was it unusual to see that many Armenian Power members

14   congregating in one area?

15   A.   Yes.

16   Q.   Why is that?

17   A.   It's unusual because normally you don't see that many gang

18   members congregating in one area.  When you do see them

19   congregating in one area with that many, there's usually a

20   purpose behind it.  That purpose is usually a meeting or

21   something needs to be discussed of importance.

22   Q.   Now, some of those photographs that I showed you, for

23   instance, Ara Fermanyan, "Casper," page 4, did you notice some

24   of the suspects had red aprons on?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Did you find that to be suspicious in any way?

2    A.   Yes.

3    Q.   Why is that?

4    A.   Because they don't have jobs.

5    Q.   And do you know that based on your interaction with the

6    Armenian Power gang members?

7    A.   With these specific individuals, yes.

8    Q.   And did you see many of these individuals with red aprons

9    on?

10   A.   Yes.

11   Q.   Did you have any information that they worked at the

12   restaurant?

13   A.   No.

14   Q.   Cooked at the restaurant?

15   A.   No.

16   Q.   Now, based on your familiarity with the Armenian Power

17   gang, you mentioned that it was unusual to see this many gang

18   members congregate.  Was that different from other gangs that

19   you were familiar with, such as Toonerville?

20   A.   No.  It'd be the same.

21   Q.   Were there ways in which Armenian Power was distinct from

22   other Hispanic street gangs?

23        MR. SEVERO:  Objection, vague.

24        THE COURT:  Well, at this time, overruled.

25        Yes or no.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE WITNESS:  They are different.
 2    BY MR. ESTRADA:
 3    Q.   Can you explain what some of the differences are between
 4    Hispanic street gangs and Armenian Power.
 5    A.   Well, the biggest difference is, they're ethnically pure,
 6    and within Armenian Power there is -- you won't find an
 7    Hispanic, a black, or any other race other than Armenian.
 8    Hispanics, you might find a black, a white guy, someone outside
 9    of their race.
10    Q.   And in terms of claiming territory, were they different
11    from other gangs in terms of claiming territory?
12    A.   AP, or Armenian Power, for the most part, refers to
13    themselves as Westside AP.  They have borders like other gangs,
14    but they don't follow them traditionally like Hispanic gangs.
15    For example, Toonerville --
16              MR. SEVERO:  Object, calling for a narrative answer at
17    this point.
18              THE COURT:  Sustained.
19    BY MR. ESTRADA:
20    Q.   Now, can you explain some of the differences between
21    Armenian Power and Hispanic street gangs.
22              MR. SEVERO:  Objection, asked and answered.  I think
23    we just got that.
24              THE COURT:  I think so, yeah.
25              MR. ESTRADA:  Well, he didn't allow him to answer,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    your Honor.

 2              THE COURT:  You have to ask a further question.  He

 3    answered your question.  He said yes, he did see differences.

 4    BY MR. ESTRADA:

 5    Q.   So there were differences.  Was there a difference in

 6    terms of the profile that Armenian Power members kept as

 7    opposed to Hispanic street gangs?

 8              MR. SEVERO:  Objection, vague as to "profile."

 9              THE COURT:  Overruled.

10              THE WITNESS:  Excuse me.  As far as profile...

11              MR. SEVERO:  Obviously, he doesn't understand the

12    question.

13              THE COURT:  Want to restate the question, Counsel.

14              MR. ESTRADA:  I'll restate the question.

15    Q.   Did you find that Armenian Power members tend to keep a

16    low profile?

17    A.   Yes.

18    Q.   Can you explain that?

19    A.   Normally, Armenian Power guys are involved more in

20    white-collar type criminal activity.  They don't like to draw

21    attention to themselves.

22    Q.   Now, are you familiar with gang tattoos in your work as a

23    gang detective?

24    A.   Yes.

25    Q.   And earlier I showed you some tattoos for "Guilty,"
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Karo Yerkanyan.  Do you recall those?
 2    A.   Yes.
 3    Q.   Are you familiar with the use of the tattoo "AP" to
 4    signify Armenian Power?
 5    A.   Yes.
 6    Q.   Do all Armenian Power members have "AP" tattoos?
 7    A.   No.
 8    Q.   Why not?
 9         MR. SEVERO:  Objection, calls for speculation.
10         THE COURT:  Sustained.
11    BY MR. ESTRADA:
12    Q.   Now, do you know whether Armenian Power members tend to
13    try to display their tattoos or not?
14    A.   No, they usually don't try to display them.
15    Q.   Why is that?
16    A.   Because they don't want to get noticed.
17    Q.   Now, generally speaking, what were the areas that you knew
18    that Armenian Power members tended to be in?
19    A.   Glendale, Hollywood, North Hollywood, Van Nuys.
20    Q.   Did you know Armenian Power to have any particular gang
21    rival?
22    A.   Yes.
23    Q.   What was that particular gang rival?
24    A.   Two of the biggest rivals were White Fence and MS, or
25    Mara Salvatrucha.
```

1    Q.    What is White Fence?

2    A.    White Fence is an Hispanic gang.

3    Q.    What area is White Fence in?

4    A.    In the Hollywood area.

5    Q.    And you mentioned Mara Salvatrucha.  Is that another gang?

6    A.    Yes.

7    Q.    What type of gang is that?

8    A.    Salvadorian.

9    Q.    Were they also rivals of Armenian Power?

10   A.    Yes.

11   Q.    Did you know Armenian Power members to often possess and

12   have guns?

13   A.    Yes.

14   Q.    Is that a general characteristic of Armenian Power gang

15   members?

16         MR. SEVERO:  Objection.  Object to "general

17   characteristics."  This is 403.

18         THE COURT:  Overruled.

19         THE WITNESS:  Yes.

20         MR. ESTRADA:  May I just have a moment, your Honor?

21         THE COURT:  Yes.

22         MR. ESTRADA:  No further questions, your Honor.

23         THE COURT:  Cross?

24         MR. SEVERO:  Thank you.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**CROSS-EXAMINATION**

1   BY MR. SEVERO:

2   Q.   Afternoon.

3   A.   Afternoon, sir.

4   Q.   What time did you receive a call on August 20th, 2009 to

5   respond to the Chicken House?

6   A.   I don't remember exactly.  And I don't remember if it was

7   a call to the office phone or to my cell phone.

8   Q.   Is it customary for you to receive calls on your cell

9   phone to do your work?

10   A.   Yes.

11   Q.   Do you know what time you arrived at the Chicken House?

12   A.   No.

13   Q.   Did you write a report on this?

14   A.   No.

15   Q.   That's why you don't remember, right?

16   A.   Correct.

17   Q.   Have you read any reports concerning this incident at the

18   Chicken House?

19   A.   No.

20   Q.   When you arrived at the Chicken House, do you remember

21   where Mr. Darbinyan was located?

22   A.   He was along one of the walls of the business.

23   Q.   Okay.  And you've been shown a number of photographs.

24        If I may, your Honor.

```
 1        Before I show you anything, everyone that was present at
 2   the Chicken House did you recognize to be gang members?
 3   A.   Not everybody, no.
 4   Q.   How many would you say you recognized as gang members?
 5   The four or five you -- let me rephrase that, because that's
 6   kind of --
 7        You've seen four or five pictures.  Are those the ones you
 8   recognized as gang members?
 9   A.   And there were a couple more.
10   Q.   So about six?
11   A.   I think a little bit more than that.  Maybe at least
12   eight.
13   Q.   You remember their names?
14   A.   The ones that were missing, remember were "Stranger"
15   and --
16   Q.   What's his name?
17   A.   David Muradyan.
18        Can't remember off memory.  I'd have to see the
19   photographs.
20   Q.   You know a Karapet Kalantaryan?
21   A.   Karapet Kalantaryan.  Kalantaryan.  I'd have to see his
22   photograph.
23             MR. SEVERO:  May I publish, your Honor?
24             THE COURT:  Yes.
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   This is part of 302.  You know this fellow here?

 3   A.   No.  Not at that time, no.

 4   Q.   You didn't recognize him at that time as a gang member?

 5   A.   Correct.

 6   Q.   How about Gokor Arakelyan?

 7   A.   Do you have his photograph?

 8   Q.   Recognize this happy-looking fellow?

 9   A.   Yes.

10   Q.   Okay.  Is he a gang member, too?

11   A.   Not that I recognized.

12   Q.   Fair to say that everyone that was photographed was not

13   necessarily a gang member, obviously?

14   A.   Not an Armenian Power gang member, correct.

15   Q.   Any other Armenian gangs out there that you know?

16   A.   No.

17   Q.   Okay.  Did you speak to any of these people there that

18   evening, any of these fellows that were photographed here?

19   A.   Yes.

20   Q.   Did you speak with Mr. Darbinyan?

21   A.   Yes.

22   Q.   Was he arrested, do you know?

23   A.   I remember him being taken into custody by LAPD, but I

24   don't remember specifically for what.

25   Q.   Now, it's your opinion that this Armenian Power is -- keep
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   themselves relatively pure as far as their ethnic composition,

 2   correct?

 3   A.   Correct.

 4   Q.   They don't associate with Hispanics?

 5   A.   They do associate with Hispanics.

 6   Q.   But they don't have them in their gang?

 7   A.   Correct.

 8   Q.   They don't associate with blacks?

 9   A.   They do associate with blacks for purpose of business.

10   Q.   In determining whether they're gathering -- well, strike

11   that.

12        It's fair to say that if you looked Armenian that evening,

13   you were going to be detained, correct?

14            MR. ESTRADA:  Object, your Honor, argumentative and --

15            THE COURT:  Overruled.

16        If you know.

17            THE WITNESS:  I don't know, your Honor.  I wouldn't

18   make that assumption.

19   BY MR. SEVERO:

20   Q.   You didn't show up for backup, did you?

21   A.   No.

22   Q.   You just showed up for intelligence.

23   A.   Yes.

24   Q.   Directing your attention to this exhibit, do you know --

25   and I'm showing, I think it's page 2 of Exhibit 302, which has
```

```
1   been previously shown to you as tattoos of Mr. Darbinyan.

2   Recognize that?

3   A.   Yes.

4   Q.   You recognize who this person is?

5   A.   Paramaz Bilezikchyan, if I pronounced his --

6   Q.   You're kidding me.

7   A.   -- last name correctly.

8   Q.   You think that's Paramaz Bilezikchyan?

9            MR. ESTRADA:  Object, your Honor, argumentative.

10           THE COURT:  He's already testified he thinks it is.

11  He said he thought it was.

12           MR. SEVERO:  Okay.  Hmm.

13  Q.   Do you know what this is?

14  A.   Infinity symbol.

15  Q.   A what?

16  A.   Infinity symbol.

17  Q.   Okay.  And these are just stars, right?

18  A.   Correct.

19  Q.   Your knowledge of -- have you met Mr. Bilezikchyan?

20  A.   Yes.

21  Q.   You don't think this is Mr. Darbinyan's cousin who was

22  killed, do you?

23  A.   His cousin, the other "Capone" that was killed?

24  Q.   I don't know --

25  A.   That's the only cousin that I know if he's referring to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    "Capone."

2    Q.   So your intelligence is somewhat limited in terms of what

3    you know about every -- each one of these people; is that a

4    fair statement?

5    A.   Correct.

6    Q.   You were also part of the team that searched

7    Mr. Darbinyan's house in March of 2010, correct?

8    A.   Yes.

9         MR. ESTRADA:  Object, your Honor, beyond the scope.

10        THE COURT:  Well, up to now, overruled.

11   BY MR. SEVERO:

12   Q.   As far as you know, was Mr. Fermanyan arrested that

13   evening?

14   A.   I do not recall.

15   Q.   How about, and I'm showing you pictures of them as we go,

16   Mr. Khachatryan, Edgar Khachatryan?  Was he arrested that

17   evening?

18   A.   I don't know.

19   Q.   And Mr. Garik Galstyan.  I'll show you his picture.  Was

20   he arrested?

21   A.   Don't know.

22   Q.   Karo Yerkanyan, was he arrested?

23   A.   Don't know.

24        MR. SEVERO:  Your Honor, I don't have anything further

25   of this witness.  I do want to keep him on call, though.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2              MR. SEVERO:  Thank you.

 3              MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

 4   of this witness.

 5              MR. FLIER:  I'd like him on call on my case in chief,

 6   your Honor.

 7              THE COURT:  Okay.

 8              MR. FLIER:  Thank you.

 9              THE COURT:  Counsel, if you can keep him on call,

10   he'll be excused at this time.

11              MR. ESTRADA:  Your Honor, if I can just follow up with

12   a couple questions, your Honor.

13              THE COURT:  Oh, I'm sorry.  But before you do...

14         There's a question, Counsel?

15              MR. SEVERO:  I had one more, if I could.

16              THE COURT:  Sure.  Go back on cross.

17              MR. SEVERO:  Yes.  Thank you.

18                    CROSS-EXAMINATION (Continued)

19   BY MR. SEVERO:

20   Q.   I previously showed you this picture, correct, of

21   Mr. Darbinyan's tattoo?

22   A.   Yes.

23              MR. SEVERO:  And your Honor, I -- the government has

24   marked as Exhibit 215 a photograph, California Department of

25   Motor Vehicles photograph, of Paramaz Bilezikchyan.  I'm
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    actually going to move that into evidence and ask that it be

2    admitted and ask to publish.

3              MR. ESTRADA:  Your Honor, that's already in evidence,

4    and the government has no objection.

5              THE COURT:  Okay.  Be received.

6              MR. SEVERO:  Thank you.

7         May I publish this?

8              THE COURT:  Yes.

9    BY MR. SEVERO:

10   Q.   You recognize this fellow here?

11   A.   Yes.

12   Q.   Is that Paramaz Bilezikchyan?

13   A.   That's him.

14   Q.   And you think this is Paramaz Bilezikchyan?

15   A.   Looks a little younger.

16   Q.   Well, yeah.

17   A.   I mean, he's aged a bit.

18   Q.   He looks Armenian, doesn't he?

19   A.   No, he looks a little older.

20             MR. ESTRADA:  Your Honor, the --

21             MR. SEVERO:  I have nothing further.

22             THE COURT:  Counsel, you want to redirect?

23             MR. ESTRADA:  Yes, your Honor.

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    REDIRECT EXAMINATION

 2   BY MR. ESTRADA:

 3   Q.   Sergeant Quintero, you were asked about -- and I didn't go

 4   through all the pictures.  It was about 19.  But suffice to say

 5   there were numerous Armenian Power members there?

 6   A.   Yes.

 7   Q.   And then you mentioned there was some other people there

 8   that you hadn't identified as Armenian Power members.

 9   A.   Correct.

10   Q.   Who were those individuals, based on your knowledge?

11   A.   Based on my knowledge in my city and dealing with AP

12   members, I'd describe them as organized crime type figures.

13   Q.   When you describe them as organized crime type figures,

14   what do you refer to?

15   A.   Well, usually with -- with Armenian Power, there's

16   always -- there's two factions.  You got the organized crime

17   side and then you got the gang member side.  The organized

18   crime side will not look like an Armenian-type gang member.

19   Looks like an average-type person.  If you have several

20   Armenian gang members in one place and you have individuals

21   that look like them, usually being Armenian, it's fair to say

22   that they're going to be from an organized crime component.

23   Q.   Are you familiar, based on your training, experience, of

24   disputes between Armenian Power members and traditional

25   organized crime members?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   Yes.

2  Q.   And does that sometimes occur?

3  A.   Yes.

4  Q.   And now looking at page 2 of Exhibit 302, there was some

5  tattoos you were shown, and you described this as the infinity

6  symbol, I believe.

7  A.   Yes.

8  Q.   And this, what's that tattoo?

9  A.   It's a star.

10 Q.   Are you familiar with that star tattoo?

11 A.   Yes.

12 Q.   What's your familiarity with that star tattoo based on

13 your training, experience?

14 A.   Well, normally that star is associated -- if anyone's ever

15 seen "Eastern Promises" with a made guy, a thief-in-law, a

16 thief-in-law, or a "vor," is someone of status, someone of

17 importance, that is made by a godfather.  For someone to have

18 that star, it means that this person is very well-respected.

19 Normally, these days, people are getting those stars, and they

20 haven't been approved in a sense where, traditionally, that

21 they would be made by a godfather.  That, these days,

22 especially in Armenian Power, would mean someone that they

23 consider themselves better than the average gangbanger.  So,

24 for example, you have gang member one, gang member two with

25 that star, the gang member with the star just believes that

1    he's a better gang member or thief than the other one.

2              MR. ESTRADA:  No further questions, your Honor.

3              THE COURT:  Recross.

4                        **RECROSS-EXAMINATION**

5    BY MR. SEVERO:

6    Q.   You don't have any documentation on those people that you

7    didn't recognize as gang members as being in organized crime

8    anywhere.

9    A.   Correct.

10   Q.   So what you're doing is you're guessing.

11             MR. ESTRADA:  Object, your Honor, argumentative.

12             THE COURT:  Overruled.

13             THE WITNESS:  No.  I'm going off based on my training,

14   based on my experiences.

15   BY MR. SEVERO:

16   Q.   Based on your training and experience, anyone who

17   associates with other gang members is an organized crime

18   figure; is that true?

19             MR. ESTRADA:  Object, your Honor, misstates the

20   testimony and it's argumentative.

21             THE COURT:  Overruled.  Overruled.

22             THE WITNESS:  No.  Glendale is very unique.  Glendale,

23   outside of Yerevan, has the second largest population of

24   Armenians outside of Yerevan.  So what that means for us is, we

25   get to see a lot of Armenian organized crime related and gang

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    member related activity.

2        When I came over from San Jose in '01, I was working

3    patrol.  I got to see a lot of organized crime related

4    activity, stopped a lot of organized crime figures, and also

5    witnessed a lot of organized crime activity.

6    BY MR. SEVERO:

7    Q.   What is it about an individual --

8            THE COURT:  I'm going to interrupt at this time,

9    Counsel.  It's a little past 2:30.  We're going to break at

10   this time.  We'll come back in 15 minutes.

11       Remember the admonishment not to discuss the case among

12   yourselves.

13           THE CLERK:  All rise.

14       (Recess held from 2:33 p.m. to 2:48 p.m.)

15       (In the presence of the jury:)

16           THE COURT:  Okay.  The record will reflect all the

17   members of the jury are in their respective seats in the jury

18   box, the witness is on the witness stand, and we are on

19   cross-examination.

20       Counsel.

21           MR. SEVERO:  Thank you, your Honor.

22   Q.   These organized crime types that you've described, do they

23   dress differently than the other type of Armenians that you

24   find on the street?

25   A.   No, they do not.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Do they drive different cars?

 2   A.   They drive nice, high-end cars.

 3   Q.   So if you are Armenian, have a high-end car, you would

 4   classify that as a organized crime type?

 5   A.   No, but it's an indicator.

 6   Q.   Is there an average age?

 7   A.   I wouldn't say so.  I mean --

 8   Q.   Do they -- they don't show their tattoos, right?

 9   A.   Not some, no.

10   Q.   And they certainly don't make gang signs.

11   A.   No.

12   Q.   When you classify someone as an organized crime type, it's

13   almost something that you're guessing at based on their cars

14   and jewelry.

15        MR. ESTRADA:  Object, your Honor, argumentative and

16   asked and answered.

17        THE COURT:  Overruled.

18      Is it a guess?

19        THE WITNESS:  No, sir.

20   BY MR. SEVERO:

21   Q.   It's a -- an estimate based on people you've observed?

22   A.   No.  It's based on the totality of the circumstances of

23   that given incident.

24   Q.   Ah.  So if you find them in a spot where somebody else has

25   committed a gang-type crime, then you classify them as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   organized crime types?

 2   A.   No.

 3   Q.   Not that, either?

 4        In a situation like the Chicken House, all the Armenians

 5   that were there were organized crime types, true?

 6   A.   I thought they were.

 7   Q.   Even though you have no documents on them.

 8             MR. ESTRADA:  Object, your Honor, argumentative.

 9             THE COURT:  Sustained.

10             MR. ESTRADA:  And asked and answered.

11             THE COURT:  Sustained.

12   BY MR. SEVERO:

13   Q.   As a gang investigator, you keep documentation on gang

14   members, don't you?

15   A.   Yes, I do.

16   Q.   And some of the people that you have classified as

17   organized crime type figures, you did not have documentation on

18   for that evening, did you?

19   A.   Yes, I did not.

20   Q.   If I understood your testimony correctly regarding the

21   star tattoo, pretty much anybody who wants to wear one these

22   days will have one?

23   A.   Well, yes, but it's also within meaning, though.

24   Q.   Right.  And do you know how old the star tattoo is on

25   Mr. Darbinyan?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   No, I don't.

 2    Q.   And you've never talked to him about his star tattoo, have

 3    you?

 4    A.   No.

 5              MR. SEVERO:  That's all I have.  Thank you.

 6              THE COURT:  Counsel?

 7              MR. PEREYRA-SUAREZ:  Your Honor, I still have nothing

 8    further.

 9              THE COURT:  Okay.

10              MR. FLIER:  I'm going to call him in my case in chief.

11    Thank you.

12              THE COURT:  Counsel?

13              MR. ESTRADA:  That was already the recross, your

14    Honor, so at this time the government would excuse the witness.

15              THE COURT:  Okay.  Excused subject to recall.

16              MR. ESTRADA:  Yes, although I'd like to -- I'll talk

17    with counsel about what the subject of the recall is, because

18    it doesn't seem pertinent.

19              THE COURT:  That's different, but one way or the

20    other, if he's needed, you can get him back within a day?

21              MR. ESTRADA:  We'll do our best, your Honor.

22              THE COURT:  Okay.  Excused subject to recall.

23         Next witness.

24              MR. ESTRADA:  Your Honor, at this time the government

25    re-calls Special Agent Stebbins to the stand.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE CLERK:  You can take the stand.  Just remember

 2    you're still under oath.

 3              MR. STEBBINS:  Yes, ma'am.

 4              THE CLERK:  Thank you.

 5              THE COURT:  And Counsel, does the testimony of this

 6    witness at this time go towards all three, or just two, or

 7    what?

 8              MR. ESTRADA:  Your Honor, at this time the government

 9    will be playing calls related to the Chicken House incident.

10    Those calls will relate to defendants Darbinyan and

11    Sharopetrosian as to Count 1, the racketeering conspiracy

12    count.

13              THE COURT:  Okay.
```

**14          JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,**

**15                     DIRECT EXAMINATION (RESUMED)**

```
16    BY MR. ESTRADA:

17    Q.   Good afternoon, Special Agent Stebbins.

18    A.   Good afternoon, sir.

19    Q.   Now, you previously testified about wire calls that were

20    intercepted in this case.

21    A.   Yes.

22    Q.   You played some of those wire calls.

23    A.   Yes.

24    Q.   I'd like to play some additional wire calls for you now.

25         Did you become familiar, during your time of this
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    investigation, of an incident that occurred at a restaurant

2    known as the Chicken House?

3    A.   Yes.

4    Q.   And were there calls that were intercepted by agents that

5    related to this incident?

6         MR. SEVERO:  Objection, your Honor.  That related to

7    the Chicken House is a conclusion of the witness without

8    foundation at this point.

9         THE COURT:  Overruled.

10        That you felt were related.

11        THE WITNESS:  Yes.

12   BY MR. ESTRADA:

13   Q.   And did those calls occur beginning on August 20th, 2009,

14   the same date as the Chicken House incident?

15   A.   Yes.

16        MR. ESTRADA:  Your Honor, the government asks

17   permission to play Exhibit 91.  And I don't believe we passed

18   out those binders to the jury, so with the Court's permission,

19   if we could pass out Volume 2 to the jury.

20        THE COURT:  Okay.  Counsel, are we finished with

21   Volume 1?

22        MR. ESTRADA:  We are at this time, your Honor, so if

23   the Court wants to take those back, or --

24        THE COURT:  Okay.

25        MR. ESTRADA:  They may have notes, is why the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    government won't take those back, but we leave it to the

2    Court's discretion.

3             THE COURT:  Don't have notes in the volumes, Counsel.

4             MR. ESTRADA:  No.  In terms of the government

5    receiving them back from the jurors, we'll leave it to the

6    Court to decide how it wants to handle them.

7             THE COURT:  Well, what you said on that disturbs me.

8         Ladies and gentlemen, on the transcripts we have here, I'm

9    assuming that -- if you have, don't do it again in the future.

10   You're not to take notes in these notebooks.  You have your own

11   notebooks, but nothing goes into these translation notebooks.

12            MR. ESTRADA:  So can the government take those back,

13   your Honor?

14            THE COURT:  Yes.

15        Has anybody made any notes in their individual notebook?

16            MR. PEREYRA-SUAREZ:  Your Honor, while the notebooks

17   are being passed out, I want to raise a continuing objection to

18   the use of this exhibit or the tape in light of the ruling made

19   by the Court.

20            THE COURT:  The ruling made earlier today?

21            MR. PEREYRA-SUAREZ:  Earlier today, yes.

22            THE COURT:  Okay.  It'll be noted for the record.

23            MR. PEREYRA-SUAREZ:  Thank you.

24        Your Honor, I had misspoke.  My objection had to do with

25   Exhibit 90, not 91.  I got the wrong page.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE COURT:  Okay.

 2                MR. ESTRADA:  Your Honor, I believe all the jurors

 3   have copies of the notebooks at this time.

 4                THE COURT:  Yes.

 5                MR. ESTRADA:  The government would ask permission to

 6   play Exhibit 91 and ask the jurors be instructed to turn to 91A

 7   in their books.

 8                THE COURT:  Okay.

 9        (Audio played.)

10   BY MR. ESTRADA:

11   Q.   All right.  Special Agent Stebbins, turning to the first

12   page of Exhibit 91, do you have that in front of you?

13   A.   Yes.

14   Q.   What's the date of this call?

15   A.   August 20, 2009.

16   Q.   What's the time of the call?

17   A.   Approximately 8:21 p.m.

18   Q.   Who are the participants in this call?

19   A.   Mike Darbinyan and Karen "Linoo" (phonetic).

20   Q.   And again, the listed participant is Speaker 1, but based

21   on your knowledge and familiarity with defendant's voice, you

22   believe that to be Darbinyan?

23   A.   Yes.  It's Mike Darbinyan.

24   Q.   Now, that date, August 20, 2009, was that the same date as

25   the incident that you learned about at the Chicken House
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    restaurant?

2    A.    Yes.

3    Q.    Turning to page 2 of 4 of Exhibit 91A, four speakers from

4    the bottom, Darbinyan states, "I am now going to Hollywood,

5    brother.  They came with bodyguards, six cars.  The movie

6    'Vorogait' is nothing compared to this, bro."

7        Based on your knowledge of the investigation, do you know

8    what the move "Vorogait" refers to?

9    A.    Yes.  It's a Armenian TV series or movie that kind of

10   depicts organized crime figures, guns, drugs, things of that

11   nature.

12   Q.    Now turning to page 3 of the transcript, 3 of 4, Exhibit

13   91A, three speakers from the top -- actually, we'll just start

14   at the top.  Darbinyan states, "There is this chicken place in

15   Hollywood, right?  Next to Tchut's body shop."

16       The other speaker responds, "Zankou Chicken?"

17       Darbinyan responds, "No, it's on Hollywood, between

18   Alexandria and Mariposa."

19       Are you familiar with the Chicken House restaurant being

20   approximately in that area?

21   A.    Yes.

22   Q.    And now four speakers -- excuse me, five speakers from the

23   top, Darbinyan states, "I am with Karo, bro.  It's nothing,

24   it's just this brother's name was messed with, and Yerevan got

25   involved too, so we need to see what's going on."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          Karo, the name Karo.  During your time of this

2    investigation, did you become familiar with a defendant that

3    went by the name Karo?

4    A.    Yes.

5    Q.    Who is that person?

6    A.    In this instance, it's Karo Yerkanyan aka "Guilty" from

7    Armenian Power.

8          MR. SEVERO:  Objection, speculation as to this

9    witness.

10          THE COURT:  What are you basing that on?

11          THE WITNESS:  Based on the fact he was detained with

12    Darbinyan that night and I received information that Darbinyan

13    was with Karo Yerkanyan that night.

14          THE COURT:  Overruled.

15    BY MR. ESTRADA:

16    Q.    And Karo Yerkanyan, was he an Armenian Power member?

17    A.    Yes.

18    Q.    A high-level member?

19    A.    Yes.

20          MR. ESTRADA:  Your Honor, the government requests

21    permission to play Exhibit 92 and asks the jurors turn to 92A

22    in their books.

23        (Audio played.)

24    BY MR. ESTRADA:

25    Q.    Okay.  Special Agent Stebbins, looking at the first page

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    of Exhibit 92A, do you have that in front of you?

2    A.    Yes.

3    Q.    What's the date of this call?

4    A.    August 20, 2009.

5    Q.    What's the time of the call?

6    A.    Approximately 8:30 p.m.

7    Q.    Who are the participants in this call?

8    A.    Mike Darbinyan and Artur Pembejian.

9    Q.    Who is Artur Pembejian?

10   A.    He is one of the defendants in this case.

11   Q.    And this date, August 20, 2009, is that the same date as

12   this Chicken House incident?

13   A.    Yes.

14   Q.    Turning to page 2 of 3, five speakers from the top,

15   Darbinyan states, "Remember I mentioned those two names to you,

16   those two friends?  Zhor and Lyovcho or something like that."

17        Are you familiar with those two names as it pertains to

18   this investigation?

19   A.    Yes.

20   Q.    How are you familiar with them?

21   A.    Lyovcho is a shortened version of Levon in the Armenian

22   culture, and Levon Kankanian was detained that night at the

23   Chicken House.

24   Q.    Was that Levon Kankanian believed to be an Armenian Power

25   member?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    Did he have a connection to any other group?

 3    A.    Yes.

 4    Q.    What other group?

 5    A.    He was connected to a --

 6              MR. SEVERO:  Objection, hearsay.

 7              THE COURT:  What is this knowledge based on?

 8              THE WITNESS:  Based on conversations with confidential

 9    informants.

10              THE COURT:  Sustained.

11    BY MR. ESTRADA:

12    Q.    Did you also receive information in the wiretap calls

13    indicating who this Levon Kankanian was, who he was tied to?

14    A.    Yes.

15              MR. SEVERO:  Object.

16              THE COURT:  Overruled.

17    BY MR. ESTRADA:

18    Q.    Now, based on the information from wire calls and

19    Darbinyan's own statements, who did you understand that person

20    to be tied to?

21    A.    He was tied to a thief-in-law that was located in Los

22    Angeles, Samvel Arutyunyan.

23    Q.    Does that person have another name?

24    A.    Yeah.

25    Q.    What's the other name?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   "Young Samo" or "Little Samo."

 2   Q.   And thief-in-law, you talked about that previously, but

 3   generally speaking, what's a thief-in-law?

 4   A.   It's a powerful organized crime figure loosely equivalent

 5   to a godfather in the Italian mob.

 6   Q.   And did you understand Armenian Power to sometimes have

 7   conflicts with other organized crime groups?

 8   A.   Yes, on occasion.

 9   Q.   Including thieves-in-law?

10   A.   Yes.

11        MR. ESTRADA:  Your Honor, the government requests

12   permission to play Exhibit 93 and asks the jurors turn to 93A

13   in their transcript books.

14        THE COURT:  Okay.

15     (Audio played.)

16   BY MR. ESTRADA:

17   Q.   Now, Special Agent Stebbins, if you could turn to page 1

18   of that call.  In that call, does it continue?  Does it stop

19   naturally?

20   A.   Yes, it continues on another, another exhibit.

21   Q.   Turning to page 1 of Exhibit 93A, what's the date of that

22   recording?

23   A.   August 20, 2009.

24   Q.   What's the time of the recording?

25   A.   Approximately 8:33 p.m.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Who were the speakers in that recording?

2   A.   Mike Darbinyan is initially talking to Karapet

3   Kalantaryan, and then he switches over to a call with

4   Paramaz Bilezikchyan.

5   Q.   Who is Paramaz Bilezikchyan?

6   A.   He was a high-level Armenian Power member at that time.

7   Q.   Now, turning to page 2 of Exhibit 93A, five speakers from

8   the bottom, Paramaz Bilezikchyan states, "Did you call the

9   guys?  By all means do call and have everyone come over there

10  so that those pieces of condoms get frightened."

11       Based on your knowledge of the information, were you

12  familiar with the phrase "pieces of condoms"?

13  A.   Yes.

14  Q.   What was that term used for?

15  A.   Basically, it was a derogatory term, like "piece of crap"

16  or something like that.

17  Q.   Derogatory term towards others?

18  A.   Yes.

19            MR. ESTRADA:  Your Honor, the government requests

20  permission to play Exhibit 94 and asks that the jurors turn to

21  94A in their books.

22            THE COURT:  Okay.

23       (Audio played.)

24  BY MR. ESTRADA:

25  Q.   Now, turning to the first page of that call, just to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    backtrack a bit, is that the continuation of the call before?

2    A.   Yes.

3    Q.   Exhibit 93?

4    A.   Yes.

5    Q.   Okay.  So turning to 94A, first page of that, what's the

6    date of this call?

7    A.   August 20, 2009.

8    Q.   What's the time of the call?

9    A.   Approximately 8:33 p.m.

10   Q.   Who are the speakers?

11   A.   Mike Darbinyan, Paramaz Bilezikchyan.

12   Q.   And this date, August 20, 2009, is that the same date as

13   the Chicken House incident?

14   A.   Yes.

15   Q.   Turning to page 2 of the transcript, three speakers from

16   the top, Paramaz Bilezikchyan states, "Bring over as many

17   homies as you can."

18       Darbinyan, "Yes, it's fine this way, brother."

19       Paramaz Bilezikchyan, "Yes, fill that place full of

20   homies."

21       Based on your knowledge of the investigation, what does

22   the term "homies" refer to?

23   A.   "Homies" was a reference to Armenian Power gang members.

24           MR. ESTRADA:  Your Honor, the government requests

25   permission to play Exhibit 95 and asks the jurors to turn to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   95A in their books.

 2              THE COURT:  Yes.

 3        (Audio played.)

 4   BY MR. ESTRADA:

 5   Q.   Now, Special Agent Stebbins, turning to the first page of

 6   Exhibit 95A, do you have that in front of you?

 7   A.   Yes.

 8   Q.   What's the date of that call?

 9   A.   August 20, 2009.

10   Q.   What's the time of the call?

11   A.   Approximately 8:34 p.m.

12   Q.   Who are the speakers in this call?

13   A.   Mike Darbinyan, Artur Pembejian, and you can hear

14   Karo Yerkanyan talking in the background.

15   Q.   Now, August 20, 2009, that's the same evening as the

16   Chicken House incident?

17   A.   Yes.

18   Q.   Now, turning to page 2 of 3, do you have that in front of

19   you?

20   A.   Yes.

21   Q.   Eight speakers from the bottom, Darbinyan states, "Bro,

22   there is the chicken place by the body shop next to Tchut's

23   place.  I summoned them to go over there."

24        Based on your knowledge of the investigation, what did you

25   understand "summon them" to refer to?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   He told them to go to the Chicken House.

2   Q.   Now, four speakers from the top, Darbinyan states, "Bro,

3   you -- could you possibly have some of those things with you?"

4        And then four speakers from the bottom, Darbinyan states,

5   "I called.  I called them and invited them.  I said, 'Come over

6   here, brother.'  It's not a problem.  No problem.  I just need

7   a couple of things.  That's all.  We have some with us, but it

8   would be better if we have some more."

9        Based on your knowledge of the investigation, were you

10  familiar with the defendants in this case, including defendant

11  Darbinyan, using vague or coded language to refer to firearms?

12  A.   Yes.

13       MR. SEVERO:  Objection, your Honor, that calls for

14  speculation.  It's improper opinion testimony by an expert.  It

15  is what it is.

16       THE COURT:  Well, I don't think it's improper opinion

17  testimony, but it was leading.

18       MR. SEVERO:  Leading.

19       THE COURT:  Sustained.  You have to re-ask the

20  question, Counsel.

21  BY MR. ESTRADA:

22  Q.   Are you familiar with the use of vague or coded words to

23  refer to items by the defendants?

24  A.   Yes.

25  Q.   Would those words also be used to refer to firearms?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001057**

```
1    A.    Yes.

2    Q.    What types of words were used to refer to firearms?

3              MR. SEVERO:  Object.

4              THE WITNESS:  They would talk about --

5              MR. SEVERO:  Well, I'll withdraw at this point.

6              THE COURT:  Okay.

7              THE WITNESS:  They would use "things" or "toys."

8              MR. SEVERO:  Move to strike.  Speculation of this

9    witness, improper expert testimony.

10             THE COURT:  It will be noted.  Overruled.

11   BY MR. ESTRADA:

12   Q.    Were you aware of the fact that that evening at the

13   Chicken House restaurant, firearms were in fact found?

14   A.    Yes.

15   Q.    Now, before I move on to the next call, these previous

16   calls which I played for you, describing this incident that was

17   to take place at the Chicken House restaurant, was that a

18   concern for the Eurasian Organized Crime Task Force?

19   A.    Yes.

20   Q.    Why was that?

21   A.    We had seen incidents like this escalate into shootings in

22   the past, and we didn't want that to happen.

23   Q.    When you say "incidents like this," what are you referring

24   to?

25   A.    May 20, 2008, several of the same subjects that were at
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    the Chicken House, including --
 2            MR. SEVERO:  Objection, irrelevant.
 3            THE COURT:  I don't know if it is or not.
 4         Why don't you ask the question again, Counsel.
 5            MR. ESTRADA:  Yes, your Honor.
 6    Q.   Had there been previous incidents of gatherings that the
 7    Eurasian Organized Crime Task Force was aware of?
 8    A.   Yes.
 9    Q.   Had some of these gatherings turned violent?
10    A.   Yes.
11    Q.   Was that something, at the time of these calls, the task
12    force was well aware of?
13    A.   Yes.
14    Q.   Within the task force and listening to the calls, was
15    there an effort to minimize violence?
16    A.   Absolutely.
17    Q.   Can you explain that?
18    A.   When we would get information that a gun was going to
19    change hands or that there was a gathering to discuss some type
20    of conflict, especially involving Mr. Darbinyan, we would try
21    to either be present to make sure that no violence occurred or
22    to actually intercept the subjects before any violence could
23    occur.
24    Q.   Now, we played certain calls that lead up to the time of
25    9:00 o'clock on August 20, 2009.  Were there additional calls
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    that were intercepted after the police had arrived at the

 2    Chicken House restaurant?

 3    A.    Yes.

 4          MR. ESTRADA:  Your Honor, the government requests

 5    permission to play Exhibit 96 and asks that the jurors turn to

 6    96A in their book.

 7          THE COURT:  Okay.

 8       (Audio played.)

 9    BY MR. ESTRADA:

10    Q.    Now, Special Agent Stebbins, turning to the first page of

11    the transcript at 96A, do you have that in front of you?

12    A.    Yes.

13    Q.    What's the date of that call?

14    A.    August 20, 2009.

15    Q.    What's the time of that call?

16    A.    Approximately 11:25 p.m.

17    Q.    Who are the participants in that call?

18    A.    Paramaz Bilezikchyan and Jack Gambaryan.

19    Q.    Who's Jack Gambaryan?

20    A.    It's another defendant in this case, he goes by "Speedy,"

21    from Armenian Power.

22    Q.    And Paramaz Bilezikchyan, was he a leader of

23    Armenian Power?

24    A.    Yes.

25    Q.    Turning to page 2 of 5 of Exhibit 96A, do you have that in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   front of you?

2   A.   Yes.

3   Q.   Eight speakers from the bottom, Paramaz Bilezikchyan

4   states, "Yeah.  Do you see Karo?"

5        Did you understand Karo Yerkanyan to have a connection to

6   Paramaz Bilezikchyan?

7   A.   Yes.

8   Q.   What was that?

9   A.   They were very close criminal associates.

10  Q.   Turning to page 3 of the transcript of 96A, there's a

11  statement by Jack Gambaryan referring to a "narc unit came in,"

12  at the bottom of that statement.

13       Are you familiar with the term "narc unit" as it applied

14  to this investigation?

15  A.   Yes.

16  Q.   What did it refer to?

17  A.   A police car.

18  Q.   Now, were you aware of whether there were actually

19  individuals who were targets of the investigation who were

20  observing the events at the Chicken House?

21  A.   Yes.

22  Q.   How are you aware of that?

23  A.   We had individuals from the Eurasian task force also in

24  the area that were observing Armenian Power members watching

25  the activities going on with regards to Mr. Darbinyan and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   others.

 2          MR. SEVERO:  Move to strike.  That answer is hearsay.

 3          THE COURT:  Sustained.

 4   BY MR. ESTRADA:

 5   Q.   Were there also calls in which there were individuals

 6   describing the events happening at the Chicken House?

 7   A.   Yes.

 8   Q.   Turning to page 4 of 5 of the transcript, seven speakers

 9   from the top, Paramaz Bilezikchyan states, "Yeah, with them,

10   brother, see what the issue is.  Those whores, three or four

11   cars, whatever, they are going to suck my dick.  Brother, they

12   know that those two guys are AP guys, right?  Mher and Karo."

13          Based on your knowledge of the investigation, what does

14   the term "AP" refer to?

15   A.   Armenian Power.

16   Q.   And the reference to Mher and Karo, were you familiar with

17   a defendant that went by the first name Mher?

18   A.   Yes.

19   Q.   Who's that?

20   A.   Mike Darbinyan or Mher Darbinyan.

21   Q.   And the name Karo?

22   A.   Karo Yerkanyan, "Guilty," from Armenian Power.

23          MR. ESTRADA:  If I might have just a quick moment,

24   your Honor?

25          THE COURT:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ESTRADA:  Now with the Court's permission, the
 2   government would ask to play Exhibit 97 and ask the jurors turn
 3   to 97A in their transcript books.
 4        Just a quick moment, your Honor.
 5        Your Honor, if we could play Exhibit 97 and ask that the
 6   jurors turn to 97A in their books.
 7            THE COURT:  Okay.
 8        (Audio played.)
 9   BY MR. ESTRADA:
10   Q.   Special Agent Stebbins, turning to the first page of
11   Exhibit 97A, do you have that in front of you?
12   A.   Yes.
13   Q.   What's the date of this call?
14   A.   August 21, 2009.
15   Q.   What's the time of the call?
16   A.   Approximately 2:20 a.m.
17   Q.   Who are the speakers in this call?
18   A.   Mike Darbinyan, Artur Pembejian, and an unknown male in
19   the background.
20   Q.   So is this the same night and going into early morning as
21   the Chicken House incident?
22   A.   Yes, it is.
23   Q.   Now, turning to page 2 of the transcript, do you have that
24   in front of you?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Nine speakers from the top, Darbinyan states, "Yes, they

2    detained me at that time."

3         Are you familiar with the fact that defendant Darbinyan

4    was detained that evening at the Chicken House?

5    A.   Yes.

6    Q.   Three speakers from the bottom on page 2 of 97A, Darbinyan

7    states, "Well, they came and detained me and saw there were

8    many."

9         Pembejian, "Yeah.  Yeah."

10        Darbinyan, "Criminals and such."

11        Are you familiar with the term "criminals" by targets in

12   this investigation?

13   A.   Yes.

14        MR. SEVERO:  Your Honor, that's not the subject of any

15   expert testimony.  It is what it is.

16        THE COURT:  Overruled.

17   BY MR. ESTRADA:

18   Q.   And how did the targets in this investigation use the term

19   "criminals"?

20   A.   They often referred to themselves as criminals.

21   Q.   Now, turning to page 3 of 6 on 97A, do you have that in

22   front of you?

23   A.   Yes.

24   Q.   Two speakers from the top, Darbinyan refers to the

25   Glendale Gang Coordination Group.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        Are you aware of whether Glendale officers were there at

2   the Chicken House?

3   A.   Yes, they were.

4   Q.   Now, four speakers from the top, Darbinyan states, "Okay,

5   bro.  Anyway, that's how it is.  Bye, dear bro."

6        Then he resumes the conversation with Pembejian, "That's

7   how they let me go.  There were a few people who had warrants

8   and such.  They retrieved about 15 toys."

9        Based on your knowledge of the investigation, what did the

10  term "toys" refer to?

11  A.   It referred to guns.

12  Q.   Now, was that same term used in other conversations in

13  this investigation?

14  A.   Yes.

15  Q.   Six speakers from the top, Darbinyan states, "I don't know

16  what else they retrieved.  They brought a dog.  They let the

17  dog go into the roof and it found four guns."

18       Based on your familiarity with this incident, are you

19  aware of a dog being used by police officers?

20  A.   Yes.

21  Q.   Okay.  Now, turning to page 5 of the transcript, five

22  speakers from the bottom, Darbinyan states, "TMZ.  Hey, what

23  don't you understand?  There was TMZ and helicopters.  They

24  closed the streets, brother.  People were standing and watching

25  from across the street.  The fag.  TMZ people with cameras and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    such.  You say 'I couldn't find.'"

 2         Are you familiar with what the term "TMZ" refers to?

 3    A.   Yes.

 4    Q.   What's that refer to?

 5    A.   It's a form of news reporting.

 6    Q.   And did TMZ sometimes capture gatherings during their form

 7    of news reporting?

 8    A.   Yes.

 9    Q.   Now, turning to page 6 of the transcript, four speakers

10    from the bottom, Darbinyan states, "Hey, I got lucky to get

11    away.  The most they would give me was a 12-month violation.

12    That's it.  There wouldn't be anything else."

13         Were you aware at the time of Darbinyan being on parole?

14    A.   Yes, he was.

15    Q.   What's a violation with regard to parole --

16              MR. SEVERO:  Objection.

17    BY MR. ESTRADA:

18    Q.   -- based on your training and experience?

19              MR. SEVERO:  Sorry.

20         Calls for a legal conclusion.

21              THE COURT:  Sustained.

22    BY MR. ESTRADA:

23    Q.   Are you familiar with that term connected to parole?

24    A.   Yes.

25              MR. SEVERO:  Still a legal conclusion.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  There's no question pending.

 2              MR. SEVERO:  Oh.

 3              MR. ESTRADA:  Your Honor, the government requests

 4    permission to play Exhibit 98 and asks that the jurors turn to

 5    98A in their books.

 6              THE COURT:  Okay.

 7          (Audio played.)

 8              MR. ESTRADA:  Your Honor, I'll stop there.  I'll just

 9    stop the recording right there with your permission, your

10    Honor.

11              THE COURT:  Okay.

12    BY MR. ESTRADA:

13    Q.   Now, before I ask you about the date and time and

14    everything, the remainder of this call, does it just continue

15    to talk about the same incident?

16    A.   Yes.

17    Q.   Details of who was there?

18    A.   Yes.

19    Q.   Let's go back to the beginning of the transcript at 98A.

20    What's the date of this call?

21    A.   August 21, 2009.

22    Q.   What's the time of the call?

23    A.   Approximately 12:32 p.m.

24    Q.   Who are the speakers in this call?

25    A.   In this part, it's only Mike Darbinyan and Alen Petrosian.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   You can hear an unknown male in the background.

 2   Q.   Who is Alen Petrosian?

 3   A.   Alen Petrosian was one of the associates of Darbinyan

 4   during the case.

 5   Q.   Now, turning to page 3 of the transcript at 98A, do you

 6   have that in front of you?

 7   A.   Yes.

 8   Q.   Four speakers from the top, Darbinyan states, "They called

 9   the Glendale task force unit and the Glendale gang unit over.

10   They came."

11        Alen, "Yeah."

12        And then Darbinyan, "They were checking out, checking out,

13   checking out and checking out everybody that came over.  That

14   Orloffski and Riley came over while checking everyone."

15        Based on your knowledge of the investigation, are you

16   familiar with those two names, Orloffski and Riley?

17   A.   Yes.

18   Q.   Who are those two individuals?

19   A.   Officers Nick Orloff and Agent Sean Riley.

20   Q.   Are they with the Glendale Police Department?

21   A.   Yes.

22   Q.   In the gang unit?

23   A.   At that time they were in the gang unit.

24   Q.   And to your knowledge, was this Officer Orloff even

25   present that day?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   I believe he was, yes.

2  Q.   Now, turning to page 4 of 16.  Excuse me.  Yes, 4 of 16.

3  Bottom of the transcript.  Do you have that in front of you?

4  A.   Yes.

5  Q.   Darbinyan, last speaker from the bottom, states, "At the

6  end I told that cop, 'Hey, take the handcuffs off and put them

7  in the front, please.  I have something in my shoulder.  I have

8  a muscle ache in my shoulder.'  He said, 'No, I will put

9  two'" --

10       Turn to page 5.

11       -- "'handcuffs so your shoulders can get some rest.'"

12       Alen Petrosian, "Uh-huh."

13       Darbinyan, "He put two handcuffs.  I had something in my

14  pocket.  I wanted to take it out and get rid of it."

15       Alen Petrosian, "Yeah."

16       Darbinyan, "I did it in a sneaky way."

17       Based on your knowledge and experience, are you familiar

18  with arrestees attempting to toss evidence?

19  A.   Yes.

20  Q.   What's your experience with that?

21  A.   Oftentimes they'll either try to get their handcuffs off

22  or try to get you to loosen them so they can get into their

23  pocket and drop something on the ground or make some type of

24  way to get something out of their pocket before you have a

25  chance to really give them a thorough search.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.  Now, turning to page 7 of 16 in Exhibit 98A, six speakers

2  from the bottom of page 98A, Alen Petrosian states, "Huh.  It's

3  not good, but listen.  Who were the guys that you were going to

4  see?  Uh, that you accidentally saw over there?"

5      Darbinyan, "Bro, I didn't accidentally see them.  I told

6  them, 'Hey, I want to see you.  There is such an issue.'"

7      Based on your knowledge of this investigation, are you

8  familiar with targets, Armenian Power members, summoning others

9  to meetings?

10  A.  Yes.

11  Q.  Is that a common practice?

12  A.  It happened from time to time.

13  Q.  And generally speaking, would the people being summoned

14  appear at those meetings?

15  A.  Yes.

16      MR. SEVERO:  Summon, summoning.  This is irrelevant.

17      THE COURT:  Overruled.

18  BY MR. ESTRADA:

19  Q.  The answer's "yes"?

20  A.  Yes.

21  Q.  And at the bottom of page 7 of 16, Darbinyan states, "I

22  said, 'No one can make rules in this town.  I am the only one

23  who makes rules,'" turning to page 8 of 16.

24      Are you familiar, based on your knowledge of this

25  investigation, of Armenian Power members having conflicts with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   other criminal groups?

2   A.   Yes.

3   Q.   And generally speaking, what was the nature of those

4   conflicts?

5   A.   Would generally be over some type of criminal activity,

6   whether it's a fraud scheme gone wrong or something where

7   somebody felt that they were owed something monetary.

8   Q.   Were there conflicts about authority and who would have

9   authority in Los Angeles?

10  A.   Yes.

11  Q.   Now, three speakers from the top of page 8, Darbinyan

12  states, "I said, 'Yeah, okay, if it's like that, then okay.'

13  Both Karo and me made a couple of calls.  They came and filled

14  the place, bro."

15      Based on your knowledge of the investigation, who was the

16  Karo referred to there?

17  A.   Karo Yerkanyan from Armenian Power.

18  Q.   Now turning to page 9 of the transcript, eight speakers

19  from the top, Darbinyan states, "The other friend went and took

20  the blame for the weapon on him, but they still didn't release

21  the naïve guy."

22      Alen Petrosian, "Oh, did they find things like that

23  nearby?"

24      Darbinyan, "Yes.  About 10 to 15 of them."

25      Alen Petrosian, "Oh, mother fucker.  They came prepared,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    huh, with that mindset?"

2        Darbinyan states, "No, not from them.  Not from them."

3        Based on your knowledge of the investigation, would

4    Armenian Power members often carry and possess firearms?

5    A.   Yes.

6    Q.   Is that an important part of Armenian Power?

7    A.   Yes.

8        MR. ESTRADA:  Your Honor, the government asks

9    permission to play Exhibit 99 and asks the jurors turn to 99A

10   in their books.

11       THE COURT:  Yes.

12       (Audio played.)

13   BY MR. ESTRADA:

14   Q.   Now, Special Agent Stebbins, turning to the first page of

15   Exhibit 99A, do you have that in front of you?

16   A.   Yes.

17   Q.   What's the date of this call?

18   A.   October 12, 2009.

19   Q.   What's the time of the call?

20   A.   Approximately 1:18 p.m.

21   Q.   Who are the speakers in this call?

22   A.   Mike Darbinyan and Karo Yerkanyan.

23   Q.   Now, this was over a month after the Chicken House

24   incident?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Turning to page 2 of the transcript, three speakers from

2   the bottom, Darbinyan states, "Brother, I am on the freeway, on

3   my way to Hollywood.  That merchandise from the Chicken, I got

4   one of those things, the one you had with you at the end, the

5   one that started with B, with 16 in it and a laser.  I got that

6   one.  I said, 'Come so we'll go and pick it up.'"

7        Karo Yerkanyan responds, "Yes."

8        Are you familiar, based on your training and experience,

9   with a laser as it applies to firearms?

10  A.   Yes.

11  Q.   What's your familiarity with that?

12  A.   A laser can be attached to a firearm in order to help

13  guide your shooting.

14  Q.   And with regard to a firearm able to hold 16 rounds, are

15  you familiar with those types of firearms?

16  A.   Yes.

17  Q.   What are they referred to?

18  A.   High capacity.

19  Q.   Turning to page 3 of 4 of the transcript, two speakers

20  from the top, Darbinyan states, "Until one of his friends has a

21  Desert one just like yours."

22       Based on your training and experience, are you familiar

23  with a firearm that has the name "Desert" in it?

24  A.   Yes.

25  Q.   What's that firearm?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    It's a Desert Eagle.

2    Q.    Is that a type of firearm?

3    A.    Yes, it is.

4    Q.    At the bottom of that transcript, Darbinyan asks, second

5    speaker from the bottom, "Where is Paro?  Take Paro with you."

6          Yerkanyan responds, "Brother, Paro is visiting the old

7    man."

8          Turning to page 4 of 4, Darbinyan asks, "Grandpa?"

9          Yerkanyan, "Yes."

10         Based on your knowledge of the investigation, who's Paro?

11   A.    Paramaz Bilezikchyan.

12   Q.    Was his name sometimes shortened in the calls?

13   A.    Yes.  "Paro," "P," "Parik," "Par."

14   Q.    There's a reference to "the old man," to "Grandpa."  Based

15   on your knowledge of the investigation, do you know of an

16   individual who went by the name "Grandpa"?

17   A.    Yes.  It was George Bustamante, Sr.

18             MR. SEVERO:  Move to strike.  Hearsay, no foundation.

19             THE COURT:  What's that based on?

20             THE WITNESS:  Intercepting calls with George

21   Bustamante, Sr., and speaking with informants about George

22   Bustamante, Sr.

23             THE COURT:  Overruled.

24   BY MR. ESTRADA:

25   Q.    Now, George Bustamante, Sr., based on your knowledge and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    interception of calls of him, was he involved in criminal

2    activity?

3    A.   Yes.

4    Q.   Was he involved with any particular crime groups?

5              MR. SEVERO:  Hearsay.

6              THE WITNESS:  Yes.

7              THE COURT:  Overruled.

8    BY MR. ESTRADA:

9    Q.   What were those crime groups?

10   A.   He was involved with the Mexican Mafia, and his son was

11   George Bustamante, Jr., a Mexican Mafia brother.

12   Q.   Now, that -- his son, George Bustamante, Jr., is that the

13   individual who went by a particular nickname?

14   A.   Yes.

15   Q.   What was the nickname?

16   A.   "Bucket Head."

17   Q.   And George Bustamante, Sr., did he go by the name

18   "Grandpa"?

19   A.   Yes.

20   Q.   Was he also connected to the Mexican Mafia?

21   A.   Yes, he was.

22   Q.   Did you know this Paramaz Bilezikchyan to have ties to

23   Mexican Mafia figures?

24   A.   Yes.

25             MR. ESTRADA:  Your Honor, I would move on to a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    different segment of calls.

 2            THE COURT:  We're going to break at this time,

 3    Counsel.  It's 4:00 o'clock.

 4        Ladies and gentlemen, remember the admonishment not to

 5    discuss the case among yourselves or with anyone else or form

 6    or express any opinions about the matter until it's submitted

 7    to you and you retire to the jury room.

 8        Have a pleasant evening.  See you back in tomorrow at?

 9            JUROR:  8:15.

10            THE COURT:  8:15.  That's good.  See you then.

11            THE CLERK:  All rise.

12

13            (Proceedings adjourned at 4:00 p.m.)

14

15                        --oOo--

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  MARCH 4, 2015

11

12

13

14                   /S/ SANDRA MACNEIL

15             Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1

1           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4                    ---

5      HONORABLE R. GARY KLAUSNER, JUDGE PRESIDING

6                    ---

7

8    UNITED STATES OF AMERICA,   )
                                 )
9              Plaintiff,        )
                                 )
10                               )
         vs.                     ) NO:  11-00072(A)-RGK
11                               )
                                 )
12   MHER DARBINYAN, et al.,     )
                                 )
13             Defendants.       )
     _____)

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS
            (JURY TRIAL - DAY 6; VOLUME I)

16
                  MORNING SESSION
17
             Los Angeles, California
18
             Tuesday, April 1, 2014
19

20

21

22
                    KATHERINE M. STRIDE, RPR, CSR
23                  1107 Fair Oaks Avenue, #68
                    S. Pasadena, California  91030
24                  www.stridecourtreporting.com

25                  (323)474-6420

2

1   **APPEARANCES:**

2   In behalf of the Government:

3             E. MARTIN ESTRADA
            ELIZABETH R. YANG

4             ASSISTANT UNITED STATES ATTORNEYS
            ANDRE BIROTTE, JR., UNITED STATES ATTORNEY

5             312 North Spring Street
            Los Angeles, California  90012

6             (213)894-4477

7             ANDREW CREIGHTON
            ASSISTANT UNITED STATES ATTORNEY

8             U.S. DEPT OF JUSTICE, CRIMINAL DIVISION
            312 North Spring Street

9             Los Angeles, California  90012
            (213)894-2579

10

11   In behalf of Defendant Mher Darbinyan:

12             THE SEVERO LAW FIRM
            BY:  MICHAEL V. SEVERO

13             70 South Lake Avenue, Suite 945
            Pasadena, CA  91101

14             (626)844-6400

15   In behalf of Defendant Arman Sharopetrosian:

16             LAW OFFICES OF CHARLES PEREYRA-SUAREZ
            BY:  CHARLES PEREYRA-SUAREZ

17             800 Wilshire Boulevard, 12th Floor
            Los Angeles, CA  90012

18             (213)623-5923

19   In behalf of Defendant Rafael Parsadanyan:

20             FLIER AND FLIER, ALC
            BY:  ANDREW REED FLIER

21             15250 Ventura Boulevard, Suite 600
            Sherman Oaks, CA  91403

22             (818)990-9500

23

24   ALSO PRESENT:

25             JEREMY STEBBINS, FBI

3

**I N D E X**

<u>**GOVERNMENT'S WITNESS(S)**</u>

<u>Page</u>

**JEREMY STEBBINS, PREVIOUSLY SWORN**............ 11, 49
DIRECT EXAMINATION (RESUMED)
BY MR. ESTRADA............................... 11, 49

```
1          LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 1, 2014;

2                            8:30 A.M.

3

4                        MORNING SESSION

5

6              (Jury out.)

7          THE CLERK:  All rise.  This United States

8    District Court is now in session.

9          You may be seated.

10         THE COURT:  Okay.  Let the reflect the jurors

11   are not present.  I understand counsel wants to talk to

12   me about an issue.  Before we do, let me just indicate

13   that one of the jurors sort of called in at 7:00 o'clock

14   this morning, which is great.  The train was delayed.

15   So they were at home and got their car, and they're in

16   their car now, and they're stuck on the 101, then they

17   should be here within a few minutes -- 101 and Sunset, I

18   think they said.  So they're pretty close.  So we'll

19   wait for that.

20         There's an issue you wanted to discuss,

21   Counsel?

22         MR. ESTRADA:  Yes, Your Honor.  The issue I

23   wanted to raise with the Court is, based on the Court's

24   ruling yesterday about having Victim M.M. testify --

25         THE COURT:  Pardon?  The ruling was not that
```

**001081**

```
 1    M.M. had to testify.  The ruling was that the Defense
 2    wanted to call M.M., that -- that you had to make him
 3    available.
 4            MR. ESTRADA:  Yes, and the Government is
 5    endeavoring to do that and will be attempting to serve a
 6    subpoena on M.M.  The Government wouldn't call that
 7    person in their case in chief.  The Defense would call
 8    it in their case in chief.
 9            But I want to raise the issue of appointment of
10    counsel for Victim M.M.  There are statements in the
11    calls, you'll find, in which there are references to
12    various fraud activity.  I suspect that, if Defense
13    Counsel raised those issues in the questioning of
14    Victim M.M., so I think it would be appropriate that
15    counsel be appointed for Victim M.M.
16            THE COURT:  Okay.  Is that the only issue, that
17    you want to put the Court on notice that counsel may
18    have to be appointed for M.M.?
19            MR. ESTRADA:  Yes.
20            THE COURT:  Okay.  Anything else?
21            Yes.
22            MR. FLIER:  Different issue.  I have a
23    sentencing on Monday, 9:00 o'clock with Judge Otero.  I
24    just want to give notice.  However --
25            THE COURT:  You talking about next Monday?
```

1          MR. FLIER:  Monday, yes.

2          THE COURT:  And what time is it.

3          MR. FLIER:  9:00 o'clock.

4          THE COURT:  I don't think there will be any

5     problem with that at all.

6          MR. FLIER:  I'm sorry.  I forgot about that.

7     Thank you.

8          THE COURT:  The only way we'd be in session is

9     if everything else folded on the Monday calendar, and

10    that never has happened.

11         MR. SEVERO:  We're not in session at all on

12    Monday?

13         THE COURT:  No, no.  I don't know yet.

14         MR. SEVERO:  Okay.

15         THE COURT:  But -- but -- but the probability

16    of us being in session in the morning is probably as

17    much as the Chicago Cubs winning the World Series.  As

18    far as the afternoon, I don't know.  We'll have to wait

19    and see.

20         MR. ESTRADA:  Your Honor, once we are able to

21    serve the subpoena, then I'll raise it again with the

22    Court and potentially appoint counsel for Victim M.M.

23         THE COURT:  Yeah, okay.  Anything else?

24         MR. ESTRADA:  The only other thing I'd mention,

25    and I raised this with counsel, we did notice that some

7

```
 1    of the family members were mingling with the jurors
 2    outside, and I did raise to counsel he's going to have
 3    to speak with the family.
 4              THE COURT:  Be careful.  That's always a
 5    problem during a trial.  Be careful with that.  Make
 6    sure you notify both sides of no contact with the jury
 7    at all, and I have a -- a C.S.O. that's supposed to be
 8    watching that also.
 9              MR. PEREYRA-SUAREZ:  Your Honor -- I'm sorry.
10    Go ahead.
11              MR. SEVERO:  When you say there's no contact,
12    they sit on the benches out there.  That's the only
13    place to sit, but I'll make sure.
14              THE COURT:  Just make sure everybody knows.
15              MR. PEREYRA-SUAREZ:  Your Honor, I just wanted
16    to clarify what the situation is with respect to
17    Victim M.M.
18              THE COURT:  Sure.
19              MR. PEREYRA-SUAREZ:  As I understand what
20    Mr. Estrada is saying, the Government intends to play
21    the tapes involving Victim M.M.
22              THE COURT:  Okay.
23              MR. PEREYRA-SUAREZ:  And then has agreed to
24    produce him for the Defense to examine him in the
25    Defense case.
```

1          THE COURT:  Right.

2          MR. PEREYRA-SUAREZ:  Is that accurate?

3          MR. ESTRADA:  We -- we're going to subpoena

4    M.M., serve him with a subpoena, and instruct him to

5    appear, and that is to happen in the next couple of

6    days.  And before that, we'll play the wire calls, which

7    involve Victim M.M. which, as we have laid out for the

8    Court, is for non-hearsay purposes.

9          MR. PEREYRA-SUAREZ:  The reason I'm raising it

10   now is the Defense does not want to be sandbagging by

11   the promise that the Government is attempting to

12   subpoena M.M. so that the Government can go ahead and

13   play those tapes, and then we might learn that "Sorry.

14   We've been unsuccessful.  We can't get him here."  And

15   that raises an issue whether the Defense is going to

16   have to move for a mistrial in that situation.

17          THE COURT:  It may happen.

18          MR. PEREYRA-SUAREZ:  But I just wanted to --

19          THE COURT:  I understand.  I understand.

20          MR. PEREYRA-SUAREZ:  -- alert the Court.

21          THE COURT:  I understand, and I appreciate

22   that.  We can't predict the -- I think the safest thing

23   for the Government is to make sure the subpoena, before

24   you play the tapes, has been served on -- on the person.

25   If the person absconds or dies or whatever, then we have

```
 1    to deal with that later down the road, but as long as

 2    the Government's saying they attempt to serve them,

 3    then -- that's what I would do if I was the Government.

 4            MR. ESTRADA:  Yes, we will make that good faith

 5    attempt.  The only reason I say attempt is we have no

 6    control over this person.

 7            THE COURT:  I know, but if you find out they

 8    cannot be served, once you serve them, you did

 9    everything that you can.

10            MR. ESTRADA:  And we'll do that.

11            MR. PEREYRA-SUAREZ:  So I understand the

12    situation, the Court is advising the Government to make

13    sure that M.M. has been subpoenaed and will be here

14    before putting on the tapes involving M.M.?

15            THE COURT:  That's not what I did.  I -- I told

16    them that, if I were them, I would definitely do it

17    exactly the way you said.  If they don't do it that way,

18    then they've opened themselves up to a mistrial and

19    everything else.

20            MR. ESTRADA:  Your Honor, for efficiency

21    reasons, we do intend, hopefully, to get into the call

22    of Victim M.M. today and play those calls.  So we would

23    intend to do that, and we intend to serve Victim M.M.

24            THE COURT:  All I'm saying is, if you don't

25    serve M.M. and you show that you haven't been able to
```

10

```
1    serve him, and yet you still play the tapes, you open

2    yourself to the possibility of a mistrial.

3              MR. ESTRADA:  We understand, Your Honor.

4              THE COURT:  Okay.  Okay.  Anything else?  Okay.

5    Okay.  We'll start as soon as that juror gets here.

6              THE CLERK:  All rise.  Court is in recess.

7                   (Recess taken.)

8              THE CLERK:  All rise.

9                   (Jury present.)

10             THE CLERK:  All rise and face the flag.

11             In the presence of the flag of our country,

12   emblematic of the Constitution and in remembrance of the

13   principles for which it stands, this United States

14   District Court is now in session.

15             You may be seated.

16             THE COURT:  Okay.  The record reflect that all

17   the members of the jurors are at their seats -- in their

18   respective seats in the jury box.

19             We are getting started late, but I appreciate

20   the problem that you ran into, and I want to thank you

21   for -- a juror was late, and I've got to thank that

22   juror because you started calling at like 7:00 or 7:15

23   in the morning to let us know that your train was down

24   and you made every effort you could to get here.

25   Sometimes you just have to through that, but it just
```

```
 1   shows me how much the jury appreciates the need to be

 2   here on time and the -- the effort to make sure we do,

 3   and I appreciate that.

 4           So the record reflect that the witness is on

 5   the witness stand.

 6           And, Counsel, do you want to continue?

 7           MR. ESTRADA:  Thank you, Your Honor.

 8   JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

 9                 DIRECT EXAMINATION (RESUMED)

10   BY MR. ESTRADA:

11   Q.   Good morning, Special Agent Stebbins.

12   A.   Good morning, sir.

13   Q.   Now, yesterday we played some telephone calls

14   related to the chicken house incident, and today I want

15   to play some additional telephone calls.

16           And, Your Honor, for the record, these calls

17   pertain to the racketeering conspiracy count to

18   Darbinyan and Sharopetrosian.

19           THE COURT:  Okay.

20           MR. ESTRADA:  If you could turn to Exhibit 100

21   in your binder there, and with the Court's permission,

22   if the Government could play Exhibit 100 and ask if the

23   jurors be instructed to turn 100-A in their transcript

24   book.

25           THE COURT:  Okay.
```

12

```
 1              (Audio recording played in open court.)
 2              MR. ESTRADA:  Special Agent Stebbins, turning
 3    to the first page of Exhibit 100-A, do you have that in
 4    front of you?
 5    A.   Yes, I do.
 6    Q.   What's the date of that call?
 7    A.   August 4th, 2009.
 8    Q.   What's the time of the call?
 9    A.   Approximately, 1:15 P.M.
10    Q.   Who are the participants in that call?
11    A.   Mike Darbinyan and Alen Petrosian.
12    Q.   And who is Alen Petrosian?
13    A.   He's an associate of Mike Darbinyan.
14    Q.   And turning to page 2 of the transcript, do you have
15    that in front of you?
16    A.   Yes, I do.
17    Q.   Page 2 of 4, five speakers from the bottom,
18    Darbinyan states, "Yes, Brother, I got a call yesterday
19    from the fat one, Pzo, and also that Georgian thief and
20    such.  Josie and Ann Darbinyan, they wanted to meet up.
21    There was stuff to talk.  So I went and met up with
22    them."
23              Based on your knowledge of the investigation,
24    do you know an individual who went by the name Pzo?
25    A.   Yes.
```

13

1    Q.   Who is that person?

2    A.   Pzo is a thief-in-law in Los Angeles.  His real name

3    is Arman Kazarian.

4    Q.   And when you say "thief-in-law," what are you

5    referring to?

6    A.   The God father equivalent that we talked about.

7    Q.   Now, in addition, Darbinyan refers to a Georgian

8    thief.

9         Based on your knowledge of the investigation,

10   were you familiar with a Georgian thief-in-law?

11   A.   Yes.

12   Q.   Who is the Georgian thief-in-law?

13   A.   There was a thief-in-law at that time named Badri

14   Koghuashvilli, who is also associated to Pzo.

15        MR. SEVERO:  Move to strike.  That is hearsay.

16        THE COURT:  Overruled.

17   Q.   BY MR. ESTRADA:  And was he known as a powerful

18   figure?

19   A.   Yes, he was.

20   Q.   Based on your knowledge of the investigation, was it

21   unusual for thieves-in-law to meet with other people?

22        MR. SEVERO:  Objection.  Vague and calls for

23   speculation.

24        THE COURT:  Overruled.

25        THE WITNESS:  It's not unusual to meet with

14

```
 1   other people.  It's usual to meet with Darbinyan.

 2   Q.   And why was it unusual?

 3   A.   Because thieves-in-law generally kept to their own,

 4   people that respected them, and Darbinyan would have

 5   been seen as like a rival group.

 6        MR. SEVERO:  Move to strike.  Speculation.  No

 7   foundation.

 8        THE COURT:  Sustained.

 9   Q.   BY MR. ESTRADA:  Was it a matter of status for an

10   individual to meet with a thief-in-law?

11        MR. SEVERO:  Objection.  Speculation.  No

12   foundation.

13        THE COURT:  Overruled.

14        THE WITNESS:  Yes, in many cases.

15   Q.   BY MR. ESTRADA:  Turning to page 3 of the

16   transcript, three speakers from the bottom, Petrosian

17   states, "Hm, but in general, the conversation and such

18   was normal; right?"  Darbinyan, "Yes, Brother, we will

19   talk when we meet."

20        Based on your knowledge of the investigation,

21   did Darbinyan often attempt to minimize these

22   conversations on the phone?

23        MR. SEVERO:  Objection, Your Honor.  This is

24   leading.  Suggestive.  It's also --

25        THE COURT:  Also been asked and answered in the
```

15

```
 1    past.
 2              MR. SEVERO:  Yes.
 3              THE COURT:  Sustained.
 4    Q.  BY MR. ESTRADA:  Turning to page 4 of the
 5    transcript, two speakers from the top, Petrosian asks,
 6    "Are those -- those dogs still around?"  Darbinyan,
 7    "I've not seen them around these past few days."
 8              During this time in August of 2009, were you
 9    and other offices conducting surveillance of Darbinyan?
10    A.  Yes, almost daily.
11    Q.  And by "dogs," do you understand them to refer to
12    law enforcement?
13    A.  Yes.
14              MR. ESTRADA:  Your Honor, the Government
15    requests permission to play Exhibit 103 and ask that the
16    jurors turn to 103-A in their transcript.
17              THE COURT:  Okay.
18                  (Audio recording played in open court.)
19    Q.  BY MR. ESTRADA:  Special Agent Stebbins, turning to
20    the first page of the transcript of 103-A, do have that
21    in front of you?
22    A.  Yes.
23    Q.  What's the date of that call?
24    A.  August 13th, 2009.
25    Q.  What's the time of this call?
```

16

1   A.   Approximately, 11:01 P.M.

2   Q.   Who are the participants in this call?

3   A.   Mike Darbinyan and Vahan (LNU).

4   Q.   Based on your knowledge of the investigation, who

5   was Vahan (LNU)?

6   A.   He was an associate of some individuals that

7   stabbed Darbinyan's cousin or family member.

8            MR. SEVERO:  Objection.  Hearsay.  Move to

9   strike.

10           THE COURT:  Overruled.

11  Q.   BY MR. ESTRADA:  Now, there -- were there previous

12  calls pertaining to this Vahan (LNU) that I didn't play

13  here?

14  A.   Yes.

15  Q.   And were there previous calls where Darbinyan

16  discussed his conflict with this Vahan (LNU)?

17           MR. SEVERO:  Objection.  Hearsay.  Lacks

18  foundation.

19           THE COURT:  Overruled.

20           THE WITNESS:  Yes.

21  Q.   BY MR. ESTRADA:  And did Darbinyan explain what the

22  nature of his conflict was with this Vahan (LNU)?

23  A.   Yes.

24  Q.   Before I ask you what that is, "LNU" is last name

25  unknown; correct?

17

1   A.   That's correct.

2   Q.   With this Vahan (LNU), what was the nature of the

3   conflict?

4           MR. SEVERO:  Objection.  Hearsay.

5           THE COURT:  Overruled.

6           THE WITNESS:  Vahan (LNU) had had an associate

7   named Zahre who had stabbed Darbinyan's -- we'll just

8   call him his cousin and several other people outside of

9   a music studio in Burbank, approximately, one month

10  prior.

11  Q.   BY MR. ESTRADA:  Based on this incident, did

12  Darbinyan, in previous calls, make an effort to meet

13  with this Vahan (last name unknown)?

14  A.   Yes.

15  Q.   And were those efforts successful based on the phone

16  calls?

17  A.   Not that night but, yes.

18  Q.   There was a reference in the call to someone named

19  Kof are you familiar with that person?

20  A.   Yes.

21  Q.   Who's Kof?

22  A.   Arman Kirakosian.

23  Q.   And was there a previous call between Darbinyan and

24  Kof discussing this conflict?

25  A.   Yes.

```
 1    Q.   And was there --

 2              MR. SEVERO:  Move to strike that as hearsay.

 3              THE COURT:  Overruled.

 4    Q.  BY MR. ESTRADA:  And with regard to that previous

 5    call involving the conflict, generally what was

 6    discussed about the conflict?

 7              MR. SEVERO:  Hearsay.  No foundation.

 8              THE COURT:  Why don't you lay the foundation,

 9    Counsel.

10    Q.  BY MR. ESTRADA:  Did you listen to the call?

11    A.   Yes.

12    Q.   And is it, in fact, a call that I trimmed out for

13    efficiency reasons?

14    A.   Yes.

15              MR. SEVERO:  Objection.  That's irrelevant.

16              THE COURT:  Sustained as to whether or not he

17    trimmed it out.

18              Were there calls between whom?

19              THE WITNESS:  Aram Petrosian and Mike

20    Darbinyan.

21              THE COURT:  Okay.  Go ahead.

22    Q.  BY MR. ESTRADA:  Okay.  In general, Arman

23    Kiropesian -- I'm probably butchering the name -- that's

24    the Kof?

25    A.   Yes.
```

19

1    Q.   And the call between Darbinyan and Kof, generally

2    what was discussed?

3    A.   They discussed the incident with the stabbing, and

4    Darbinyan demonstrated his power in Los Angeles to Kof.

5              MR. SEVERO:  Speculation of the witness.  Move

6    to strike.

7              THE COURT:  Overruled.

8    Q.   BY MR. ESTRADA:  Now, turning to page 2 of the

9    transcript, five speakers from the bottom, Darbinyan

10   tells Vahan, "Yes, you went there with good intentions,

11   but the person you went in support of has hurt five

12   people."

13             Based on your knowledge of the investigation,

14   was there some incident where five people were injured?

15   A.   Yes.

16   Q.   What was that incident?

17   A.   This was the stabbing I was referring to.

18   Q.   Turning to page 3 of the transcript, three speakers

19   from the bottom, Darbinyan states "Look, Bro.  Let me

20   tell you something.  First of all, My Dear, we do not

21   know each other that well.  So you may not ask me

22   questions.  I'm the one who asks questions in this town,

23   Bro.  There's no one who asks me questions here."

24             Based on your knowledge of Vahan, did you

25   understand him to have a group backing him?

**001096**

20

```
 1          MR. SEVERO:  Objection, Your Honor.  This is
 2   hearsay.
 3          THE COURT:  I don't understand the question.
 4   Why don't you state the question again.
 5   Q.  BY MR. ESTRADA:  Based on your knowledge of the
 6   investigation with regard to this Vahan, do you
 7   understand him to be an Armenian Power member?
 8          MR. SEVERO:  Objection, hearsay.
 9          THE COURT:  Overruled.
10          THE WITNESS:  No.
11   Q.  BY MR. ESTRADA:  Now, turning to page 4 of the
12   transcript, last speaker at the bottom, Darbinyan
13   states, "It's just the other day you, Brother, went on
14   behalf of that guy as he was Vahan's soldier or fellow
15   youngster or I do not know who.  I, Dear Brother, my
16   friend Vahan, and I open my book to see who is who in
17   this town and who has soldiers.  The name Vahan is not
18   in that book."
19          With regard to that statement by Darbinyan, did
20   you understand Vahan to be supporting another particular
21   individual?
22          MR. SEVERO:  Leading.  Suggestive.  Hearsay.
23          THE COURT:  It's leading.  Sustained.
24   Q.  BY MR. ESTRADA:  Was there another individual that
25   Vahan supported with regard to this conflict?
```

**001097**

21

```
 1           MR. SEVERO:  Objection.  Leading.  Same
 2    question.
 3           THE COURT:  Sustained.
 4    Q.   BY MR. ESTRADA:  With regard to this conflict, was
 5    there an individual who Vahan was supporting?
 6    A.   Yes.
 7    Q.   Who is that individual?
 8    A.   Zahre Manzekian.
 9    Q.   Is he a person involved in the family?
10    A.   Yes.
11    Q.   Now, there's a reference in the -- in that statement
12    to soldiers.
13           Based on your training and experience, what
14    does the term soldiers refer to in the context of
15    Armenian Power?
16           MR. SEVERO:  Hearsay -- I'm sorry --
17    speculation.
18           THE COURT:  Overruled.
19           THE WITNESS:  Soldiers would be lower-level
20    people that would work for him.
21    Q.   BY MR. ESTRADA:  And work for you in what sense?
22    A.   Conducting criminal activity.
23    Q.   Now, turning to page 5 of the transcript, three
24    speakers from the bottom, Darbinyan refers to Kof and
25    others, and in the middle of that statement says, "The
```

**001098**

22

1    more people you call, the sadder it will be for you,

2    Bro, because if I get angry, no one will be able to save

3    you, my Brother."

4            Based on your knowledge of the investigation,

5    are you familiar with the practice of calling others in

6    to settle a conflict?

7    A.   Yes.

8    Q.   Can you describe how that conflict will work?

9            MR. SEVERO:  Objection.  Speculation.  No

10   foundation.

11           THE COURT:  Overruled.

12           THE WITNESS:  Generally speaking, when there is

13   a conflict like this, Vahan, or somebody like that,

14   would call another high-level person that they knew to

15   try to have them call Darbinyan to have them mediate the

16   dispute.

17   Q.   BY MR. ESTRADA:  And was that mediation always

18   successful based on your knowledge of the investigation?

19           MR. SEVERO:  Objection.  That's --

20           THE WITNESS:  No.

21           MR. SEVERO:  -- vague.  Mediation of what?

22   When?  There's no --

23           THE COURT:  Well, you're talking about your

24   experience and training with -- with -- with the

25   Armenian Power in general.  Are mediations usually

**001099**

```
 1   successful?

 2              THE WITNESS:  Many times they are but not

 3   always.

 4              THE COURT:  Okay.

 5   Q.   BY MR. ESTRADA:  Often, based on your training and

 6   experience, do people with less power in the criminal

 7   world attempt to obtain mediators to settle disputes?

 8   A.   Yes.

 9   Q.   And now at the bottom, the last speaker from the

10   bottom, Darbinyan states, "Now, I'll be waiting for you

11   tomorrow, Bro.  I get up at 5:00 in the morning.  I get

12   up early, Bro.  I watch the news.  I watch the Russian

13   channel to see how our brother Yaponchik is doing and

14   stuff like that."

15              Based on your knowledge of the investigation,

16   who's Yaponchik?

17   A.   Yaponchik was a powerful thief-in-law who was still

18   alive at that time.  I believe his name -- and I'll

19   probably butcher it -- is Vyucheslav Ivankov.  He was in

20   Russia at the time.

21              MR. SEVERO:  Move to strike.  Hearsay.  No

22   foundation.

23              THE COURT:  Overruled.

24   Q.   BY MR. ESTRADA:  He's a thief-in-law?

25              THE WITNESS:  Yes, the most powerful
```

24

1    thief-in-law at that time.

2    Q.   BY MR. ESTRADA:  And when you said "at that time,"

3    he since passed away?

4    A.   Yes, he's been killed.

5         MR. ESTRADA:  Your Honor, the Government

6    requests permission to play Exhibit 104 and ask that the

7    jurors turn to 104-A in their book, and I'll just note

8    that this particular call has been -- because its rather

9    lengthy, fifteen pages, we've broken it up into

10   segments.

11        THE COURT:  Okay.

12        MR. ESTRADA:  And the first segment will begin

13   on page 2 of 15.

14        THE COURT:  Okay.

15            (Audio recording played in open court.)

16        MR. ESTRADA:  If you could turn to 104 -- I may

17   have misspoken.  104 -- first segment of 104.

18            (Audio recording played in open court.)

19   Q.   BY MR. ESTRADA:  Special Agent Stebbins, before I

20   move on to the next segment, turning to the first page

21   of Exhibit 104, do you have that in front of you?

22   A.   Yes.

23   Q.   What's the date of that call?

24   A.   August 28th, 2009.

25   Q.   What is the time of the call?

25

1   A.   Approximately, 11:02 A.M.

2   Q.   Who are the participants in this call?

3   A.   Mike Darbinyan and an unknown male.

4   Q.   Now, and you and other investigators were unable to

5   identify this particular individual?

6   A.   No.

7   Q.   Were you able to identify where he was calling from?

8   A.   Yes, he was calling from prison.

9   Q.   Turning to page 2 of 15, do you have that in front

10  of you?

11  A.   Yes.

12  Q.   Six speakers from the bottom, the unidentified male

13  talks about "Hiding his phone and such, Friend, the

14  faggot.  It's fucked up.  It's not even working at all.

15  So I put my SIM card in someone else's phone and using

16  that."

17          Based on your knowledge of the investigation,

18  what's a SIM card?

19  A.   That's the little card that can be used to take in

20  and out of phones and switch out phones.

21          MR. SEVERO:  Objection.  Move to strike.

22  Expert testimony.

23          THE COURT:  Sustained.

24  Q.   BY MR. ESTRADA:  Are you familiar what a SIM card

25  is?

1    A.    Yes.

2    Q.    How are you familiar with what a SIM card.

3    A.    I've seen many phones before.

4    Q.    And are you familiar with the practice, in people

5    involved in criminal activity, switching out SIM cards?

6    A.    Yes.

7            MR. SEVERO:  That calls for expert testimony of

8    SIM cards.

9            THE COURT:  Overruled.

10            THE WITNESS:  Yes, I'm familiar.

11    Q.    MR. ESTRADA:  What is that practice?

12    A.    They will take a SIM card from one phone and put it

13    in the -- in the next phone that they want to use.

14    Q.    And what does the SIM card do, that you would want

15    to switch it out to a different phone?

16            MR. SEVERO:  Objection.

17            THE COURT:  Sustained.

18    Q.    BY MR. ESTRADA:  What information is contained in a

19    SIM card?

20            MR. SEVERO:  Objection.

21            THE COURT:  Sustained.

22    Q.    BY MR. ESTRADA:  Is a SIM card something used in a

23    cell phone?

24            MR. SEVERO:  Objection.

25            THE COURT:  Overruled.

27

1      THE WITNESS:  Yes.

2   Q.   BY MR. ESTRADA:  And is it something that can be

3   traded among criminals?

4      MR. SEVERO:  Objection.

5      THE COURT:  Sustained.

6   Q.   BY MR. ESTRADA:  Based on your knowledge of the

7   investigation, is it something that can be traded among

8   criminals?

9      MR. SEVERO:  Objection.

10      THE COURT:  Sustained.

11   Q.   BY MR. ESTRADA:  In prison, are you familiar with

12   the smuggling of SIM cards and cell phones?

13      MR. SEVERO:  Objection.  No foundation.

14      THE COURT:  Overruled.

15      THE WITNESS:  Yes.

16      MR. ESTRADA:  Your Honor, with the Court's

17   permission, I'll play the next segment, which begins at

18   page 6 of 15 of the transcript of 104-A.

19      THE COURT:  Fifteen starting at --

20      MR. ESTRADA:  The next segment beginning at

21   page 6 of 15 of Transcript 104-A.

22      THE COURT:  Top of the page or bottom or what?

23      MR. ESTRADA:  It will be eight speakers from

24   the bottom.

25      THE COURT:  Okay.

1          (Audio recording played in open court.)

2    Q.   BY MR. ESTRADA:  Let's stop it there, Special Agent

3    Stebbins, but the remainder of the call is there more

4    general discussions with the prison inmate?

5    A.   Yes.

6    Q.   Turning to page 6 of the transcript at 104-A, do you

7    have that in front of you?

8    A.   Yes.

9    Q.   Three speakers from the bottom, Darbinyan states,

10   "Brother, I can give you an address, but if you send

11   anything on that address, they will take you and put you

12   in the 'SHU,' Brother."  Unidentified male, "They'll

13   stop."  Darbinyan, "If you -- because I've been

14   'validated'; right?  If you send me letters and stuff,

15   they will fuck you up and take you away, Bro."

16          Based on your training and experience, what

17   does "SHU" refer to?

18   A.   Special housing unit, or the hole.

19   Q.   It's an area in the prison?

20   A.   Yes.

21   Q.   And the term "validated," are you familiar with

22   that?

23   A.   Yes.

24   Q.   What does that refer to?

25   A.   It refers to a validated Mexican mafia associate.

29

1　Q.　And are you familiar, base on your training and

2　experience, with the practice of prison officials

3　monitoring mail?

4　A.　Yes.

5　Q.　And monitoring addresses in the possession of

6　inmates?

7　A.　Yes.

8　Q.　Are you familiar with the practice of monitoring

9　addresses with validated individuals?

10　A.　Yes.

11　Q.　What is that practice?

12　A.　Generally speaking, they'll keep track of what

13　addresses people are sending letters to and try check

14　out who these individuals are.

15　Q.　Now, turning to page 7 of 15, two speakers from the

16　top, Darbinyan states -- or one speaker from the top,

17　the unified male states, "Listen.  Why did they validate

18　you?"  Darbinyan said, "Cause I was doing stuff; right?

19　I was looking over the yard and stuff for them."

20　　　　　Based on your training and experience, what

21　does the term "yard" refer to?

22　A.　It's the exercise area for the prison.

23　Q.　Nine speakers from the top, the unidentified male

24　responds, "Yeah, well, you can then traffic."

25　　　　　Based on your training and experience, what

30

```
1    does the term traffic refer to as it relates to prison
2    life?
3    A.   It would mean to move drugs and contraband into the
4    prison.
5    Q.   And the next line down after the word "traffic,"
6    Darbinyan states "Well, Palmoll and stuff -- all Palmas
7    was all mine, Bro, when I was there."  The unidentified
8    male, "Really?"  Darbinyan, "Yeah."  Unidentified male,
9    "That's 'juice,' yeah.  Is that how they say it?  That's
10   'juice."  Darbinyan, yeah, I think so, you know."
11            Based on your training and experience, are you
12   familiar with validated individuals having more power
13   within a prison?
14   A.   Yes.
15            MR. ESTRADA:  Your Honor, the Government
16   requests permission to play Exhibit 106 and ask the
17   jurors to turn to 106-A in their transcript books.
18            THE COURT:  Okay.
19              (Audio recording played in open court.)
20   Q.   BY MR. ESTRADA:  Special Agent Stebbins, turning to
21   the first page of that transcript at 106-A, do you have
22   that in front of you?
23   A.   Yes.
24   Q.   And what's the date of that call?
25   A.   April 24th, 2009.
```

1   Q.   What's the time of the call?

2   A.   Approximately, 3:31 PM.

3   Q.   And turning to page 2 of 4, who are the participants

4   in this call?

5   A.   Mike Darbinyan and Aram Petrosian, aka Tot, from

6   Armenian Power.

7   Q.   Who is Aram Petrosian?

8   A.   He's another Defendant in this case.

9   Q.   Is he an Armenian Power member?

10  A.   Yes.

11  Q.   Turning to page 3 of 4 of the transcript, do you

12  have that in front of you?

13  A.   Yes.

14  Q.   Eight speakers from the top, Darbinyan states, "The

15  entire White Fence came and erased everything.  Tell

16  those youngsters to come down and paint over those

17  faggots, Bother."

18           Based on knowledge of the investigation, what's

19  "White Fence"?

20  A.   White Fence is a Hispanic gang that's based largely

21  in Hollywood.

22  Q.   Is it known to be a rival of Armenian Power?

23  A.   Yes.

24  Q.   And there's a reference to "youngsters."  What does

25  "youngsters" refer to in this context?

32

1          MR. SEVERO:  Objection.  Improper expert

2     testimony.

3          THE COURT:  Overruled.

4          THE WITNESS:  Youngsters refers to the

5     lower-level gang members.

6          MR. ESTRADA:  Your Honor, the Government

7     requests permission to play Exhibit 107 and ask the

8     jurors to turn to page 107-A in the books, and for

9     efficiency reasons, I'm going to stop that that one

10    early.  It's a ten-page transcript, Your Honor.

11         THE COURT:  All right.  Okay.

12              (Audio recording played in open court.)

13    Q.  BY MR. ESTRADA:  Okay.  And we'll end it there.

14         And does the remainder of the call involve the

15    individual calling Darbinyan speaking to a different

16    individual?

17    A.  Yes.

18    Q.  Who's that?

19    A.  He also speaks to Aram Petrosian, who is Toto for

20    Armenian Power.

21    Q.  Now, turning to page 1 of the transcript at 107-A,

22    do you have that in front of you?

23    A.  Yes.

24    Q.  What's the date of the call?

25    A.  July 8th, 2009.

33

1   Q.   What's the time of the call?

2   A.   Approximately, 12:41 P.M.

3   Q.   Now, on page 2 of the transcript, who are the

4   participants in this call?

5   A.   Mike Darbinyan and Arman Mkrtchyan.

6   Q.   And we didn't play the part Aram Petrosian speaks?

7   A.   That's correct.

8   Q.   Who's Arman Mkrtchyan?

9   A.   Arman Mkrtchyan is Floco from Armenian Power.  He

10  was in custody at the time.

11  Q.   Now, turning to page 3 of the transcript, do you

12  have that in front of you?

13  A.   Yes.

14  Q.   Eleven speakers from the top, Mkrtchyan states,

15  "Yeah, fuck him, Brother!  He wrote (Unintelligible) AP

16  member and stuff.  Darbinyan, "He gave you one point for

17  AP."  Mkrtchyan, "Yeah?  I don't know, Brother."

18        Based on your knowledge of the investigation,

19  what does "a point" refer to?

20  A.   It's a point towards validation.

21  Q.   And the next speaker down Darbinyan refers to

22  appealing that.

23        Are you familiar with how an appeal would work

24  with regard towards points?

25  A.   Yes.

34

1    Q.   How would it work?

2    A.   Well, when you come out of prison you can work

3    through different channels to try and get the AP member

4    taken from your name.

5           MR. ESTRADA:  Your Honor, the Government

6    requests permission to play Exhibit 108 and ask the

7    jurors to turn to 108-A in their transcript book.

8           THE COURT:  Okay.

9           MR. ESTRADA:  Before I, actually, start it,

10   I'll ask you a couple questions.

11   Q.   With regard to Arman Sharopetrosian during the time

12   frame of your entire investigation, was Arman

13   Sharopetrosian in prison?

14   A.   Yes.

15   Q.   And was he at some point wiretapped for Aram

16   Petrosian?

17   A.   Yes.

18           MR. ESTRADA:  Okay.  Now, if we could play

19   Exhibit 108.

20           (Audio recording played in open court.)

21   Q.   BY MR. ESTRADA:  Special Agent Stebbins, turning to

22   the first page of 108-A, do you have that in front of

23   you?

24   A.   Yes.

25   Q.   What's the date of that call?

**001111**

35

1   A.   July 12th, 2009.

2   Q.   What's the time of the call?

3   A.   Approximately, 10:39 P.M.

4   Q.   Who were the participants in this call?

5   A.   Mike Darbinyan; Zero, last name unknown; and Arman

6   Sharopetrosian.

7   Q.   During the time you were investigating Arman

8   Sharopetrosian, were you aware of different times he was

9   using his phone?

10  A.   Yes.

11  Q.   Were you still able to determine when Arman

12  Sharopetrosian used the phone?

13  A.   Yes.

14  Q.   How's that?

15  A.   Generally, he spoke in Armenian, and I knew his

16  voice fairly well at this point.

17  Q.   Now, turning to page 3 of 7, the first speaker at

18  the top, Darbinyan states, "Yeah, you're over there with

19  my home boy, over there ha?"  Zero, "Yeah, 'Bad boy' was

20  my cellie when I was in the hole."  Darbinyan, "Yeah,

21  yeah.  Oh, you came back, huh?"  Zero, "Yeah, I came

22  back.  Me and him was the one that got wrote up.  I came

23  back."

24          Based on your training and experience, what

25  does "wrote up" refer to?

**001112**

36

1          MR. SEVERO:  Objection.  Relevance.

2          THE COURT:  Overruled.

3          THE WITNESS:  I think in this call he said

4    "rolled up," but it refers to being -- basically, put in

5    the hole because of some type of illegal activity in the

6    prison.

7          MR. SEVERO:  Move to strike.  Nonresponsive and

8    speculation of this witness.

9          THE COURT:  Well, as to what's described as

10   illegal activity will be stricken.  The rest will stay

11   in.

12   Q.   BY MR. ESTRADA:  Would individuals go to the hole,

13   or do they generally go to the hole?

14   A.   Yes.

15   Q.   Why is that?

16   A.   Illegal activity.

17   Q.   Now, turning to page 4 of 7, do you have that in

18   front of you?

19   A.   Yes.

20   Q.   Seven speakers from the bottom, Sharopetrosian

21   refers to wrapping something and states, "Give it to

22   Emo."

23          Based on your investigation, who is Emo?

24   A.   Emo is Emul Airapetian.

25   Q.   Who is Emul Airapetian?

1   A.   He's Clever from Armenian Power.

2   Q.   Also a Defendant in this case?

3   A.   Yes, he is.

4   Q.   And turning to the last speaker on page 4 of 7,

5   Sharopetrosian states, "-- what they're using.  Look.

6   These guys, they use the white one, the glass.  Are you

7   listening?"

8           Based on your training and experience, are you

9   familiar with what the word "glass" refers to?

10  A.   Yes.

11  Q.   What does the term "glass" refer to?

12  A.   It's --

13          MR. SEVERO:  Objection.  Lacks foundation.

14          THE COURT:  Overruled.

15          THE WITNESS:  Methamphetamine.

16          MR. SEVERO:  Move to strike.  No Foundation.

17          THE COURT:  Denied.

18  Q.   BY MR. ESTRADA:  Does methamphetamine often have a

19  glass-like appearance?

20  A.   Yes.

21          MR. SEVERO:  No foundation.

22          THE COURT:  Sustained.

23  Q.   BY MR. ESTRADA:  Have you seen methamphetamine?

24  A.   Yes, I have.

25  Q.   Does it have a glass-like appearance?

38

```
1              THE WITNESS:  Yes, it does.

2              MR. SEVERO:  Objection.  No foundation.

3              THE COURT:  You want to go into the foundation

4    of that, Counsel.  He's already got most of it in, but

5    if you want to go through the foundation, you're going

6    to have to lay the foundation as to his expertise.

7              MR. ESTRADA:  I was just asking him about

8    his --

9    Q.   You viewed methamphetamine in the past, or you have

10   viewed methamphetamine?

11   A.   Yes, I have.

12   Q.   You've seen what it looks like?

13   A.   Yes.

14   Q.   It has a glass-like appearance?

15   A.   Yes, it does.

16             THE COURT:  The ones you saw had a glass-like

17   looking --

18             THE WITNESS:  Yes, it does, Your Honor.

19             THE COURT:  Okay.

20   Q.   BY MR. ESTRADA:  Now, turning to page 5 of 7, four

21   speakers from the top, Sharopetrosian state's, "One of

22   those needs to be wrapped to give them.  That's for

23   them.  And for me the black one to bring me."

24             Based on your training and experience, are you

25   familiar with what "black" or "black one" refers to in
```

1    the context of drugs?

2    A.   Yes, I am.

3              MR. SEVERO:  Objection.

4              THE COURT:  Sustained.

5    Q.   BY MR. ESTRADA:  Have you investigated cases

6    involving heroine?

7    A.   Yes.

8    Q.   In this investigation?

9    A.   Yes.

10   Q.   Are you familiar with a Defendant in this case known

11   as Armen Hovanissian?

12   A.   Yes.

13   Q.   And Armen Hovanissian, who is that person?

14   A.   He's a sniper from Armenian Power.

15   Q.   Was that the individual who's name was obtained on

16   Darbinyan's person by the Los Angeles Sheriff's

17   Department?

18   A.   Yes.

19   Q.   And that person, Armen Hovanissian, what was he

20   investigated for in this investigation?

21   A.   Extortion, RICO, and moving drugs in the prison.

22   Q.   With regard to the drugs that he was investigated

23   for, what drug was he investigated for?

24             THE COURT:  Black tar heroine.

25             MR. SEVERO:  Objection.  Relevance.

40

```
1            THE COURT:  Overruled.
2            THE WITNESS:  Black tar heroine.
3   Q.   BY MR. ESTRADA:  And with regard to the black bar
4   heroine he was charged with, did you learn through an
5   admission of his as to what a term was used to refer to
6   heroine?
7   A.   Yes.
8   Q.   What was that term?
9   A.   Black.
10  Q.   So based on your knowledge of the investigation, the
11  term "black," what did you understand it referred to in
12  the context of drug trafficking?
13  A.   Black tar heroine.
14           MR. ESTRADA:  Your Honor, the Government
15  requests permission to play Exhibit 109 and ask the
16  jurors to turn to 109-A in their transcript.
17           THE COURT:  Yes.
18           And, ladies and gentlemen, because we started
19  late, rather than breaking at 10:00, we're going to
20  break at 10:15.
21           MR. ESTRADA:  Your Honor, if it helps, this is
22  the last call played on this particular segment of
23  calls, and I'll transition into another segment after
24  this.
25           THE COURT:  Okay.
```

1      (Audio recording played in open court.)

2  Q.  BY MR. ESTRADA:  Now, Special Agent Stebbins,

3  turning to the first page of Exhibit 109-A, do you have

4  that in front you?

5  A.  Yes.

6  Q.  What's the date of this call?

7  A.  July 13th, 2009.

8  Q.  What's the time of the call?

9  A.  Approximately, 3:54 P.M.

10  Q.  Turning to page 2 of the transcript, who are the

11  participants in the call?

12  A.  Mike Darbinyan and Arman Sharopetrosian.

13  Q.  Now, turning to page 3 of the transcript, 6 speakers

14  from the top, Sharopetrosian states, "He is saying that

15  he's selling the black one.  Are you listening?"

16  Darbinyan, "Yeah."  Sharopetrosian, "Okay.  So now we

17  just need to find the glass."  Darbinyan:  Yeah, okay."

18  Sharopetrosian, "That's all.  That's all right."

19  Darbinyan, "Yeah, 24 of them."  Sharopetrosian, "Okay.

20  Hold on a minute.  I will get a number for Spito."

21      Based on your knowledge of the investigation,

22  who is Spito?

23  A.  Spito is Arman Tangabekyan.

24  Q.  And through the investigation, did you understand

25  him to be involved in drug trafficking?

42

1   A.   Yes.

2   Q.   Turning to page 4 of the transcript, five speakers

3   from the top, Sharopetrosian states, "Hold on a minute,

4   Dear.  I'll give you this broad's name."  And then

5   there's later on, nine speakers from the top,

6   Sharopetrosian states, "Oh, okay.  No that's not

7   working.  When you call to this one, tell him/her that

8   you're calling for Z."

9        Based on your training and experience, are you

10  familiar with using individuals to smuggle drugs in the

11  prison?

12  A.   Yes.

13  Q.   Using females at times to smuggle drugs in the

14  prison?

15       MR. SEVERO:  Objection, Your Honor.  There is

16  no foundation for this.

17       THE COURT:  Overruled.

18       THE WITNESS:  Yes.

19  Q.   BY MR. ESTRADA:  Now, we'll go into the -- the

20  details and particulars of that.  But generally

21  speaking, there's a process of using others to smuggle

22  drugs into the prison?

23  A.   Yes.

24       MR. ESTRADA:  Your Honor, that's all for this

25  segment of calls.  I can move on to the next one, or if

43

1       the Court likes, we can take the break.

2               THE COURT:  No, we'll go until quarter after.

3               MR. ESTRADA:  Okay.

4       Q.  Now, Special Agent Stebbins, at some point in the

5       investigation -- and before I do, Your Honor, I should

6       preface, these calls will pertain to the racketeering

7       conspiracy as well as the extortion and extortion

8       conspiracy counts as to Defendant Darbinyan and

9       Defendant Sharopetrosian.

10              THE COURT:  Okay.  Thank you.

11              MR. ESTRADA:  And there will be a call in which

12      Defendant Parsadanyan is captured as well.

13              MR. FLIER:  I'm going to objects to that.

14              THE COURT:  So it's being offered as to all

15      three of them, or anything that Mr. Parsadanyan is -- is

16      involved with is limited just to these two?

17              MR. ESTRADA:  Limited to these two as to the

18      charges; but Parsadanyan as to knowledge.

19              THE COURT:  Okay.  Then go ahead.  You can ask

20      the questions.

21              MR. ESTRADA:  Very good.

22      Q.  BY MR. ESTRADA:  At some point in the investigation,

23      did you learn about a particular individual who is being

24      targeted for extortion?

25      A.  Yes.

1   Q.   What was the -- what were the initials of that
2   individual?
3   A.   M.M.
4   Q.   And what was the first name of that individual?
5   A.   Minas.
6   Q.   How did you first learn about this plot taking
7   place?
8   A.   There were calls intercepted between Sharopetrosian
9   and Darbinyan discussing how they were going to get a
10  certain amount of money from this individual.
11  Q.   That was when the task force learned about this?
12  A.   Yes.
13          MR. ESTRADA:  Your Honor, with the Court's
14  permission, I would ask to play Exhibit 69, which is the
15  first transcript in Volume 2 and ask that the jurors
16  turn to --
17          THE COURT:  Exhibit 69?
18          MR. ESTRADA:  Yes, Your Honor.
19          MR. PEREYRA-SUAREZ:  And, Your Honor, I would
20  just like to interpose a continuing objection based on
21  our previous conversations.
22          THE COURT:  Yes, and it will be -- it will be
23  noted.
24          MR. ESTRADA:  Government ask to play Exhibit 69
25  and ask the jurors to turn to Exhibit 69-A in their

45

1    transcript books.

2              (Audio recording played in open court.)

3    Q.   BY MR. ESTRADA:  Special Agent Stebbins, turning to

4    the first page of that transcript of 69-A, do you have

5    that in front of you?

6    A.   Yes.

7    Q.   What's the date of that call?

8    A.   June 29th, 2009.

9    Q.   What's the time of the call?

10   A.   Approximately, 3:02 P.M.

11   Q.   Who are the participants in this call?

12   A.   Mike Darbinyan and Arman Sharopetrosian.

13   Q.   Now, turning to page 2 of the transcript, the first

14   speaker at the bottom, Sharopetrosian states, "Yes.  I

15   told him to arrange the thing, the money around

16   7:00 P.M.  It's around 120.  It's 123 and something.  He

17   says it's $60, My Dear, but it's not $60.  Do you hear

18   me?  That is true, that Luso gave him $60.  Do you hear

19   me?"

20              Now, based on your knowledge of the

21   investigation, what does the term "120 and 123 and

22   something" mean?

23              MR. SEVERO:  Objection.  Calls for hearsay.

24              THE COURT:  Overruled.

25              THE WITNESS:  $120,000, $123,000.

**001122**

1    Q.   BY MR. ESTRADA:   Now, turning to page 3 of the

2    transcript, there's a reference to "Luso gave him $60.

3         Who's Luso?

4    A.   Luso is Lusine Ogandganyan.   She's another Defendant

5    in this case.

6    Q.   And did you understand the relationship between

7    Lusine Ogandganyan and Defendant Sharopetrosian?

8    A.   Yes.

9    Q.   What was it?

10   A.   Defendant --

11        MR. SEVERO:   Objection.   Hearsay.

12        THE COURT:   I'm sorry?

13        MR. SEVERO:   Hearsay.

14        THE COURT:   Overruled.

15        THE WITNESS:   Defendant Sharopetrosian is

16   married to Lusine's sister.   That would make him her

17   brother-in-law.

18   Q.   BY MR. ESTRADA:   What was Lusine Ogandganyan's

19   sister's name?

20   A.   Christine Ogandganyan.

21   Q.   Was she also a Defendant in this case?

22   A.   Yes, she was.

23   Q.   Now, turning to the fourth speaker from the top,

24   Defendant Sharopetrosian states, "At first it was 95,

25   then 35.   Anyways, they brought and gave it, then they

47

```
 1    he took it back.  They did the thing.  There's 69 left.
 2    That 69, My Dear, is with interest.  Do you understand,
 3    Brother?"
 4            Based on your knowledge of the investigation,
 5    what did the term "69" refer to
 6            MR. SEVERO:  Objection, Your Honor.  This is
 7    hearsay, and for the record, it involves confrontation
 8    clause issues.
 9            THE COURT:  Overruled.  Overruled.
10            THE WITNESS:  $69,000.
11            MR. ESTRADA:  Your Honor, the Government
12    requests permission to play Exhibit 70 and ask the
13    jurors to turn to 70-A in their books.
14                (Audio recording played in open court.)
15    Q.  MR. ESTRADA:  Now, Agent Stebbins, turning to the
16    first page of the transcript at 70-A, do you have that
17    in front of you?
18            THE COURT:  We can go over that transcript when
19    we get back from the break.
20            Ladies and gentlemen, we're going to break at
21    this time.  Fifteen minutes.  Remember the admonishment
22    not to discuss the case among yourselves or with anybody
23    else or form or express any opinions about the matter
24    until you retire to the jury room.  We'll see you back
25    in fifteen minutes.
```

```
 1              THE CLERK:  All rise.

 2                  (Recess taken.)

 3              THE CLERK:  All rise.

 4                  (Jury present.)

 5              THE CLERK:  You may be seated.

 6                  (Brief interruption.)

 7              THE CLERK:  All rise.  This United States

 8    District Court is now in session.

 9              You may be seated.

10              THE COURT:  Okay.  Before we get back to the

11    testimony, I just want to clarify something that you had

12    mentioned earlier, Counsel.  My understanding is -- is

13    the testimony you're going to introduce at this time is

14    introduced just as to Mr. Darbinyan and

15    Mr. Sharopetrosian on those particular counts.  There

16    may be some transcripts that are read where it's

17    allegedly Mr. Parsadanyan talking; is that correct?

18              MR. ESTRADA:  Yes, Your Honor, there's one.

19              THE COURT:  Okay.  And any transcript of

20    Mr. Parsadanyan is -- is going to be -- as it may relate

21    to those charges against Mr. Parsadanyan, would be

22    relevant, but Mr. Parsadanyan, just to be clear on the

23    record, is not charged with the extortion counts or the

24    RICO counts; is that correct?

25              MR. ESTRADA:  Correct; he's not charged with
```

1    Count 1 of the racketeering conspiracy or the extortion

2    count or the extortion conspiracy.

3            THE COURT:  Okay.  So, if and when, any

4    testimony of his comes up, it will be limited to just

5    those counts that he's charged with?

6            MR. ESTRADA:  Yes, Your Honor, with his

7    knowledge with regard to the scheme he's charged with.

8            THE COURT:  Okay.  Okay.

9    **JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

10            **DIRECT EXAMINATION (RESUMED)**

11   Q.   BY MR. ESTRADA:  Now, Special Agent Stebbins,

12   turning to Exhibit 70-A, do you have that in front of

13   you?

14   A.   Yes, I do.

15   Q.   And I believe we already went through the date and

16   time of the call and participants.  Starting at page 2

17   of the transcript, do you have that in front of you?

18   A.   Yes.

19   Q.   Five speakers from the top, Sharopetrosian states,

20   "Okay.  Yes.  Look, this moron looks like he doesn't

21   have anything, but he does some loan.  Are you

22   listening?"  Darbinyan, "Yes, yes."  Sharopetrosian,

23   "With some Russians."

24            And later down the -- that page 2 of the

25   transcript, Sharopetrosian refers to "They're going to

1    get him a loan for two and a half million.  Do you

2    understand?"

3            Based on your knowledge of the investigation,

4    were the targets in this investigation at times involved

5    in loan fraud?

6    A.   Yes.

7    Q.   Mortgage fraud?

8    A.   Yes.

9    Q.   Also based on your knowledge of the investigation?

10           MR. SEVERO:  Move to strike.  Speculation of

11   this witness and compound.

12           THE COURT:  Overruled.  The objection is for

13   both Defendants.

14           MR. PEREYRA-SUAREZ:  Yes.  Thank you,

15   Your Honor.

16   Q.   BY MR. ESTRADA:  In fact, the Defendants in this

17   case were charged with mortgage fraud?

18   A.   Yes.

19   Q.   Now, in addition, based on your knowledge of the

20   investigation, were members and associates of Armenian

21   Power at times involved in extortion or kidnapping?

22   A.   Yes.

23   Q.   And oftentimes were the targets of their activity

24   also involved in criminal activity?

25   A.   Yes.

```
 1    Q.   Could you explain how that worked?

 2    A.   Generally speaking --

 3              MR. SEVERO:  Objection.  No foundation.

 4    Irrelevant.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Generally speaking, the

 7    individuals would extort other individuals involved in

 8    criminal activity because they would be less likely to

 9    go to the police when they were threatened.  So they

10    could basically extort them for their criminal proceeds.

11    Q.   BY MR. ESTRADA:  And did you find that with, not

12    just Victim M.M., but numerous victims in this case?

13    A.   Yes.

14              MR. SEVERO:  Objection.  Irrelevant.  No

15    foundation.

16              THE COURT:  It will be noted.  Overruled.

17    Q.   BY MR. ESTRADA:  Now, turning to page 3 of the

18    transcript of Exhibit 70-A, four speakers from the top,

19    Darbinyan states, "Brother, I will see him, My Dear.

20    Regardless if I'm busy or not, I will call, and I will

21    see him."  Sharopetrosian, "No.  That moron.  Do you

22    hear me?  I don't want to go" -- excuse me -- "I don't

23    want to do the something with Emul and get him.  He will

24    go there and get arrested for no reason, and then we

25    will get fucked."
```

1          Based on your knowledge of the investigation,

2     who's Emul?

3     A.   Emul is a nickname for Emil Airapetian, aka Clever,

4     from Armenian Power.

5     Q.   At some point later during this particular plot, did

6     Emil Airapetian get involved?

7     A.   Yes, he did.

8          MR. ESTRADA:  Your Honor, the Government asks

9     permission to play Exhibit 71 and ask the jurors to turn

10    to Exhibit 71-A in their transcript book.

11         THE COURT:  Okay.

12         (Audio recording played in open court.)

13    Q.   BY MR. ESTRADA:  All right.  Special Agent Stebbins,

14    if you could turn to page 1 of Exhibit 71-A, do you have

15    that in front of you?

16    A.   Yes.

17    Q.   What's the date of this call?

18    A.   June 29th, 2009.

19    Q.   What's the time of the call?

20    A.   Approximately, 3:15 P.M.

21    Q.   Who are the participants in this call?

22    A.   Mike Darbinyan, Minas Matosyan, and Arman

23    Sharopetrosian.

24    Q.   Did it appear to be a three-way call?

25    A.   Yes.

1          MR. SEVERO:  Your Honor, at this point, having

2     played the call, I will add an objection on

3     confrontation clause grounds.

4          THE COURT:  You mean under *Crawford*, Counsel.

5          MR. SEVERO:  I'm sorry.

6          THE COURT:  Under *Crawford*?

7          MR. SEVERO:  Well --

8          THE COURT:  This is not --

9          MR. SEVERO:  Not under *Crawford*, just general

10    611.

11         THE COURT:  Overruled.

12         MR. PEREYRA-SUAREZ:  And I'll join in the

13    Defense, Your Honor.

14         MR. SEVERO:  I'm sorry, Your Honor.  This is in

15    anticipation of the Court's --

16         THE COURT:  Oh, I understand.  Okay.

17    Q.  BY MR. ESTRADA:  Now, turning to page 3 of the

18    transcript on 71-A, nine speakers from the top,

19    Sharopetrosian states, "Without a word, everything that

20    you took like that, you'll return it back, everything,

21    because my brother is not going to come like that and

22    go, or get involved in conversations or do something.

23    Get your father.  Do you hear me?"  Darbinyan states,

24    Dear Arm, I'll do that, My Brother.  I will see him.  I

25    will tell him.  Now you --"

54

```
 1          Based on your knowledge of the investigation,
 2   when Sharopetrosian referred to "everything that you
 3   took," do you understand what he's referring to?
 4   A.   Yes.
 5   Q.   What was that?
 6   A.   He was referring to the money that he was extorting
 7   from victim Matosyan.
 8   Q.   At the bottom of page 3, Sharopetrosian states,
 9   "Everything you took from me, My Friend, it will reach
10   me, my Friend.  Neither thieves nor the whores will be
11   able to save you, My Dear.  Mime will come back and
12   reach me back 100 percent.  Do you hear me?"
13          Based on your knowledge of the investigation,
14   what does the term "thieves" refer to?
15   A.   It refers to thieves-in-law or God fathers.
16   Q.   And what does the term "whores" refer to?
17   A.   It refers to the police or FBI.
18   Q.   Now, with regard to thieves-in-law, based on your
19   training and experience, in investigating organized
20   crime cases, how would thieves-in-law get involved in a
21   conflict between two individuals involved in criminal
22   activity?
23          MR. SEVERO:  Calls for speculation.
24          MR. PEREYRA-SUAREZ:  Lake of foundation,
25   Your Honor.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  In a conflict like this, the

3     victim could go to a thief-in-law and ask that they

4     mediate the dispute in order so that no harm will come

5     to the victim.

6     Q.   BY MR. ESTRADA:  Are thieves-in-law at times used as

7     mediators of disputes?

8     A.   Yes.

9     Q.   Is that because there is status in the criminal

10    world?

11    A.   Yes.

12    Q.   Now, turning to page 5 of 71-A, six speakers from

13    the bottom, Darbinyan states, "Listen, listen my friend.

14    Leave the police thing out.  You hear me, Brother?"

15          And on page 6, second speaker from the top,

16    Sharopetrosian states, "Listen, now what I'm going to

17    tell you.  By giving me the name of the police, do you

18    want to scare me?"

19          Based on your knowledge of the investigation,

20    were the police involved at this time.

21    A.   No.

22    Q.   Did law enforcement later get involved?

23    A.   Yes.

24          Your Honor, the Government asks permission to

25    play Exhibit 72 and ask the jurors to turn to 72-A in

1    their books.

2              THE COURT:  Okay.

3                  (Audio recording played in open court.)

4    Q.  BY MR. ESTRADA:  Special Agent Stebbins, turning to

5    the first page of Exhibit 72-A, do you have that in

6    front of you?

7    A.  Yes.

8    Q.  What's the date of the call?

9    A.  June 29th, 2009.

10   Q.  This is the same day as the call before?

11   A.  Yes, it is.

12   Q.  What's the time of the call?

13   A.  Approximately, 6:08 P.M.

14   Q.  Who were the speakers in this call?

15   A.  Mark Darbinyan and Arman Sharopetrosian.

16   Q.  Now, turning to page 3 of the transcript, seven

17   speakers from the top, Sharopetrosian states, "No,

18   Brother, let's say if he calls the police, mother

19   fucker, I will die here, Brother.  You're crazy.  What

20   if he calls the police?"  Darbinyan responds,

21   No, he will not call the police, Bro."

22              Based on your knowledge of the investigation at

23   this time, did Victim M.M. call the police?

24   A.  No, he did not.

25   Q.  Five speakers from the bottom, Sharopetrosian refers

1    to "I'm going to have count here in an hour, hour and a

2    half."

3            Based on your training and experience, are you

4    familiar with what the term "count" refers to as it

5    applies to prison?

6    A.   Yes.

7    Q.   What does it refert to?

8    A.   It's generally counting the inmates.

9    Q.   Turning to page 4 of the transcript, top of the

10   page, first speaker from the top, Darbinyan states, "The

11   Russians who you work with, you need to bring them and

12   introduce them to us."

13           Then further down the transcript, Speaker 6,

14   "Okay.  They are three Russians, Dear -- Sharopetrosian

15   states, Okay.  They are three Russians, Dear.  Their

16   names are Valodia, Max, and the other guy's name is

17   Felix or something.  I don't know, Dear.  These guys are

18   from the San Francisco area, Dear.  They're able to

19   re-open old, dead corporations and get loans between 2.5

20   and 4.8 million and blow it up, Dear.  And you know on

21   what kind of scores?  On 680, 670, and below 700."

22           Based on your training and experience with

23   regard to fraud investigations, are you familiar with

24   the term "blow it up"?

25   A.   Yes.

58

```
1    Q.   What's that refer to?
2    A.   It would be to take all the money.
3              MR. SEVERO:  Objection.  Lacks foundation.
4              THE COURT:  Overruled.
5              THE WITNESS:  To take all the money.
6    Q.   BY MR. ESTRADA:  To take all the money from what?
7    A.   From whatever loan there was.
8              MR. SEVERO:  Objection.  Move to strike.  No
9    foundation.
10             THE COURT:  Overruled.
11   Q.   BY MR. ESTRADA:  Now, with regard to scores of 680,
12   670, 700, based on your training and experience with
13   regard to fraud cases, are you familiar with what those
14   numbers refer to?
15   A.   Yes.
16             MR. SEVERO:  Objection.  No foundation.
17             THE COURT:  Overruled.
18   Q.   BY MR. ESTRADA:  What does it refer to?
19   A.   It refers to credit scores.
20             MR. SEVERO:  Objection.  Move to strike.  No
21   foundation.
22             THE COURT:  Overruled.
23   Q.   BY MR. ESTRADA:  And are credit scores used in
24   obtaining loans?
25   A.   Yes.
```

```
 1    Q.   Turning to page 5 of the transcript,
 2   Sharopetrosian -- second speaker from the top, Darbinyan
 3   is referring to what he's going to tell Victim M.M., "So
 4   you know who they are.  So when you upset the brother in
 5   the inside, you upset a lot of people on the outside.
 6   Sharopetrosian, "Yeah, make them angry.  Yeah, you get
 7   angrier.  Darbinyan, "Let's just say the cop will get
 8   me, will get the other buy, but there are several
 9   hundred people who will stay behind no matter what."
10          Based on your knowledge of the investigation,
11   was Darbinyan linked to numerous associates?
12   A.   Yes.
13          MR. SEVERO:  Objection.  No foundation.
14   Hearsay.
15          THE COURT:  Overruled.
16   Q.   BY MR. ESTRADA:  Was he linked to numerous
17   associates who conducted criminal activities for him?
18   A.   Yes.
19          MR. ESTRADA:  Your Honor, the Government
20   requests permission to play Exhibit 73 and ask the
21   jurors to turn to 73 in their books -- 73-A in their
22   books, and this is one that we cut for sufficiency
23   reasons, and we'll start at page 4 of 73-A, and it will
24   start specifically at the top of page 4, first speaker
25   at the top, 4 of 8 of 73-A.
```

60

```
 1              THE COURT:  Okay.
 2                  (Audio recording played in open court.)
 3   Q.   BY MR. ESTRADA:  Special Agent Stebbins, during the
 4   first page of Exhibit 73-A, do you have that in front of
 5   you?
 6   A.   Yes.
 7   Q.   What's the date of this call?
 8   A.   June 30th, 2009.
 9   Q.   What's the time of this call?
10   A.   Approximately, 1:59 PM.
11   Q.   Who are the participants in this call?
12   A.   Mike Darbinyan and Arman Sharopetrosian.
13   Q.   Now, turning to page 4 of the transcript, do you
14   have that in front of you?
15   A.   Yes.
16   Q.   Nine speakers from the top, Sharopetrosian states,
17   "Hopefully, at least he brings 4 or 5.  I need it
18   urgently, that before end of the week, and the rest
19   we'll decide later."  Darbinyan, "How much?"
20   Sharopetrosian, "Let him initially bring at least 4 or
21   5."  Darbinyan, "Yeah, that's nothing."
22              Based on your knowledge of the investigation,
23   what does "4 or 5" refer to.
24              MR. PEREYRA-SUAREZ:  Lacks foundation,
25   Your Honor.
```

61

1        THE COURT:  Overruled.  With his expertise.

2        THE WITNESS:  Four or five thousand dollars.

3   Q.   BY MR. ESTRADA:  Last speaker at the bottom on

4   page 4, Darbinyan refers to "Twin Towers."

5        Are you familiar with what Twin Towers is?

6   A.   Yes.

7   Q.   What's Twin Towers?

8   A.   It's the jail facility in downtown Los Angeles.

9   Q.   Turning to page 5 of the transcript, second speaker

10  from the bottom, Darbinyan states, "Yeah, Karine's.

11  Yeah, yeah, yeah.  The guys came outside for a minute.

12  Tsyom and all others were there.  They came outside.

13  They gave me a head nod.  I told them 'No, it's fine.'

14  This guy saw that, and they were already giving him a

15  hard time.  I told him, Bro, this is how it is.  If you

16  get the brother upset on the inside, you make our dicks

17  stand up on you, and we are going to chase after you,

18  and it won't be good for you."

19        Based on your knowledge of the investigation,

20  who is the brother on the inside?

21  A.   Arman Sharopetrosian.

22        MR. SEVERO:  Objection.  Calls for speculation.

23        THE COURT:  Sustained.

24  Q.   BY MR. ESTRADA:  Are you familiar with the term

25  "inside" based on your training and experience?

62

1    A.    Yes.

2    Q.    As it relates to criminal activity?

3    A.    Yes.

4    Q.    How is the term "inside" sometimes used to refer to

5    criminal activity?

6    A.    It refers to somebody in custody.

7    Q.    And towards the bottom of that same statement by

8    Darbinyan, he refers to the term "clinic."

9          Were you familiar with targets in this

10   investigation being involved in Medicare fraud?

11   A.    Yes.

12         MR. SEVERO:  Objection.  Irrelevant.  403 as to

13   this Defendant.

14         THE COURT:  What count -- does this go to the

15   extortion count?

16         MR. ESTRADA:  It goes to the extortion and the

17   interstate commerce aspect of the extortion.

18         MR. SEVERO:  There is no medical fraud in this

19   case.

20         THE COURT:  Sustained.

21   Q.    BY MR. ESTRADA:  Were you familiar with individuals

22   in this case involved in Medicare fraud?

23         MR. SEVERO:  Objection.  Irrelevant.

24         THE COURT:  Overruled.

25         THE WITNESS:  Yes.

63

1    Q.   BY MR. ESTRADA:   And were clinics at times used to

2    commit this Medicare fraud?

3    A.   Yes, they were.

4         MR. ESTRADA:   Your Honor, the Government asks

5    permission to play Exhibit 74 and ask the jurors to turn

6    to Exhibit 74-A in their books.

7              (Audio recording played in open court.)

8    Q.   BY MR. ESTRADA:   Special Agent Stebbins, turning to

9    the first page of the transcript of 74-A, do you have

10   that in front of you?

11   A.   Yes.

12   Q.   What's the date of this call?

13   A.   July 3rd, 2009.

14   Q.   What's the time of the call?

15   A.   Approximately, 10:46 P.M.

16   Q.   Who are the participants in this call?

17   A.   Mike Darbinyan, Arman Sharopetrosian, and Minas

18   Matosyan.

19   Q.   Does it appear to be a three-way call?

20   A.   Yes.

21   Q.   Turning to page 4 of 8 of the transcript, top of the

22   page, cutting off from the speaker before,

23   Sharopetrosian states, "Set your priorities, what you

24   are or what are not going to do.  I don't give a fuck,

25   Friend.  Bring my money forward.  Are you listening,

```
 1    Friend?  Meet my friend might now.  The guy is sitting
 2    and waiting for you in Hollywood since this morning.
 3    Whore!  Hey!  Like we have nothing else to do than
 4    chasing you."  Minas, "Bro."  Sharopetrosian, "Resolve
 5    the issues.  I have to pay minimum about five dollars
 6    tomorrow."
 7            Based on your knowledge of the investigation,
 8    what did "five dollars refer to?
 9    A.    $5,000.
10    Q.    There's a reference there and elsewhere to having to
11    pay a debt, Sharopetrosian having to pay a debt.
12            Are you familiar with debts as they accrue in
13    prison?
14    A.    Yes.
15    Q.    And are there things that inmates have to sometimes
16    pay for?
17    A.    Yes.
18    Q.    That wouldn't be to prison officials?
19    A.    Yes.
20    Q.    What sorts of things?
21    A.    They could either be paying for protection or they
22    could be paying to bring drugs in the prison for their
23    own use.
24            MR. SEVERO:  Objection.  Move to strike.  This
25    is hearsay.  No foundation.
```

1  MR. PEREYRA-SUAREZ:  And calls for speculation,

2  Your Honor.

3  THE COURT:  Sustained.

4  Q.  BY MR. ESTRADA:  Turning to page 6 of 8 of 74-A,

5  four speakers from the top, Sharopetrosian says, "Call

6  your partner and tell him to get it from his home, to

7  get it from his wife's credit card, to get it from his

8  kid's loan, business, or student loan.  I don't give a

9  fuck.  Don't come without money, Friend.  If you plan on

10  coming without money, it would be better not to come.

11  Look.  I'm telling you, Friend, that's about it."

12  Based on your knowledge of the investigation,

13  was there loan fraud in this case?

14  MR. SEVERO:  Objection, Your Honor.  403.  It's

15  irrelevant to this.

16  THE COURT:  Overruled.

17  THE WITNESS:  Yes.

18  Q.  BY MR. ESTRADA:  And are you familiar with, based on

19  your training and experience, loan fraud as it applies

20  to student loans?

21  A.  Yes.

22  Q.  As well as to mortgage loans?

23  A.  Yes.

24  Q.  Now, turning to page 8 of the transcript, second

25  speaker from the top, Sharopetrosian states, "Hey, let

66

1    me talk.  Don't think my hands are so short just because

2    I'm in this cage over here.  That's about it, Bro."  And

3    down towards the bottom of this statement, "God forbid

4    if you come without any money.  I don't have nerves,

5    Friend.  Mother fucker!  Don't drive me crazy!  I have

6    some debts.  It should be paid off and reach the point,

7    Friend."

8                Based on your knowledge of the investigation,

9    are you aware of debts being accrued in prison?

10   A.   Yes.

11               MR. SEVERO:  Objection.  Move to strike.  No

12   foundation.

13               THE COURT:  Overruled.

14               MR. ESTRADA:  Your Honor, the Government asks

15   permission to play Exhibit 75 and ask the jurors to turn

16   to 75-A in their books.

17               THE COURT:  Yes.

18                  (Audio recording played in open court.)

19   Q.   BY MR. ESTRADA:  Now, Special Agent Stebbins,

20   turning to the first page of 75-A, do you have that in

21   front of you?

22   A.   Yes.

23   Q.   What's the date of that call?

24   A.   July 4th, 2009.

25   Q.   What's the time of the call?

67

1   A.   Approximately, 1:10 P.M.

2   Q.   Who are the participants?

3   A.   Mike Darbinyan, Arman Sharopetrosian, and Minas

4   Matosyan.

5   Q.   Now, turning to page 2 of the transcript, five

6   speakers from the top, Darbinyan speaks, "Bro, listen.

7   This friend is here with me now."  Sharopetrosian,

8   "Yeah."  Darbinyan, "That he brought his clinic check.

9   He says there are 4,200 in there."

10          And then turning to page 5 of 8 of

11   Exhibit 75-A, five speakers from the bottom,

12   Sharopetrosian, "No!  You are not going home.  Period!

13   I don't give a fuck.  Anyway if you call now you're

14   relatives, your father, or your mother, whoever it is,

15   Friend!  Let them go, take a risk, bring the money and

16   give the money!  Hand the phone to my friend!"

17          Based on your training and experience in this

18   case, are you familiar with having others cash and

19   deposit checks?

20   A.   Yes.

21   Q.   And generally speaking, for those involved in fraud,

22   is the cashing or depositing of fraudulent checks a

23   risk?

24   A.   Yes.

25   Q.   How so?

1    A.   An individual that's going to cash or deposit is

2    going to be sought by law enforcement if it comes back

3    as fraud.

4    Q.   Now, turning to page 7 of 8, four speakers from the

5    top, Sharopetrosian states, "Now, I have to pay $4,000

6    in prison.  I have to pay that money off by

7    10:00 o'clock at night.  How are you going to get that

8    done, whore?  Hey!  Do you think I'm asking for that

9    money to have fun on the outside?"

10          Further down, eight speakers from the top,

11   Sharopetrosian, "Are you aware at all?  You said, 'I was

12   also imprisoned.'  Are you aware that you are under

13   obligation inside?  That you have to pay money and

14   such?"

15          Based on your training and experience, what

16   sorts of thing do you have to pay money for in prison?

17          MR. SEVERO:  Objection, Your Honor.

18          THE COURT:  Sustained.

19   Q.   BY MR. ESTRADA:  Are you aware of what sorts of

20   things you have to pay?

21          MR. PEREYRA-SUAREZ:  Same objection,

22   Your Honor.

23          THE COURT:  Sustained.

24   Q.   BY MR. ESTRADA:  Now, turning to page 8 of the

25   transcript, second speaker from the top, Sharopetrosian,

69

1   "Clock -- by 10:00 o'clock.  Are you listening?  I'm

2   going to give my brother 4 or 5 addresses.  $4,000 must

3   get there by 10:00 o'clock, cash.  Are you listening?

4        Based on your training and experience, are you

5   familiar with the practice of paying or wiring money to

6   others when you're a prison inmate?

7   A.   Yes.

8   Q.   Can you explain how that works?

9   A.   Oftentimes, the money --

10       MR. SEVERO:  Objection.  No foundation.

11  Hearsay and speculation of the witness.

12       THE COURT:  Overruled.  It's still within his

13  expertise.

14       THE WITNESS:  Oftentimes, the money used to pay

15  for taxes or drugs inside prison is wired to associates

16  of those inmates on the outside.

17       MR. ESTRADA:  Your Honor, the Government asks

18  permission to play Exhibit 76 and ask the jurors to turn

19  to Exhibit 76-A in their books.

20       THE COURT:  Okay.

21          (Audio recording played in open court.)

22  Q.   MR. ESTRADA:  Now, Special Agent Stebbins, turning

23  to the first page of the transcript of Exhibit 76-A, do

24  you have that in front of you?

25  A.   Yes.

70

1    Q.   What is the date of this call?

2    A.   July 4th, 2009.

3    Q.   What's the time of the call?

4    A.   Approximately, 4:22 P.M.

5    Q.   Who are the speakers in this call?

6    A.   Mike Darbinyan and Rafael Parsadanyan.

7              MR. SEVERO:  Objection.  No foundation.

8              THE COURT:  I don't know if we did this before

9    or not.  Why don't you lay a foundation as to

10   Mr. Parsadanyan if you can.

11             MR. ESTRADA:  Yes, Your Honor, and that was

12   some of the testimony of the first day of the --

13             THE COURT:  I think it was, but I don't

14   remember.

15   Q.   BY MR. ESTRADA:  Now, with regard to Speaker 2, you

16   identified that as Rafael Parsadanyan?

17   A.   Yes.

18   Q.   How did you identify Rafael Parsadanyan as

19   Speaker 2?

20   A.   I spoke with Mr. Parsadanyan, and I recognize his

21   voice.  He provided his phone number to officers when he

22   was traffic stopped, and when he's arrested on

23   February 16th, 2011, he has this phone in his bedroom.

24   Q.   Now, when you say "this phone," does the wiretap

25   call actually show the number that is calling into

1   Darbinyan?

2   A.   Yes.

3   Q.   Where does it show that looking at page 1 of the

4   transcript?

5   A.   It's the Associate No. (818) 216-0000, which is also

6   subscribed to Rafael Parsadanyan.  I left that out.

7           THE COURT:  Have you ever talked to him

8   personally?

9           THE WITNESS:  Yes, I have.

10          THE COURT:  About how many times?

11          THE WITNESS:  Approximately, five.

12          THE COURT:  Okay.  Go ahead, Counsel.

13  Q.   BY MR. ESTRADA:  And now, just to be clear in terms

14  of that associate number, you mentioned -- looking at

15  page 1 of 3 of the transcript, the second to the last

16  line above participants, is that where the associates

17  number is listed?

18  A.   Yes.

19  Q.   And that Associate No. (818) 216-0000, was that

20  subscribed to anyone?

21  A.   Yes.

22  Q.   Who is it subscribed to?

23  A.   Rafael Parsadanyan.

24  Q.   Is that how you concluded that Rafael Parsadanyan is

25  Speaker 2?

72

1    A.    It's part of it, yes.

2    Q.    Now, turning to page 2 of 3 of the transcripts, do

3    you have that in front of you?

4    A.    Yes.

5    Q.    The first -- first line, first speaker, Darbinyan

6    states, "Yes, Dear Raf."

7          Do you understand Raf to be a reference to

8    Rafael Parsadanyan?

9    A.    Yes, it was one of his nicknames.

10         MR. SEVERO:  I'm going to object.  No

11   foundation.

12         THE COURT:  Overruled.

13   Q.    BY MR. ESTRADA:  Now, in addition, in the call,

14   Darbinyan, fourth speaker from the top, states,

15   "Nothing.  Are you in Glendale" -- excuse me --

16   Parsadanyan states, "Nothing.  Are you in Glendale?"

17   Darbinyan, "Yes.  I was in Glendale and just left."

18   Parsadanyan, "I'm at the store.  Can you come over?"

19         Based on your knowledge of the investigation,

20   did Rafael Parsadanyan have a store?

21   A.    Yes, he did.

22   Q.    In Glendale?

23   A.    Yes.

24   Q.    What kind of store was that?

25   A.    It was an AT&T cell phone store.

73

1   Q.   Nine speakers from the top, Darbinyan states, "Where

2   did you see me?"  Parsadanyan, in Marquis' lot.  Is

3   there anything going on?  Darbinyan, "Oh, there's a son

4   of a bitch that I kidnapped.  I have him with me since

5   morning.  I sent him and told him to get my money."

6           Now, this call here that we played, is that the

7   same date as the previous call?

8   A.   Yes.

9   Q.   Exhibit 75?

10  A.   Yes.

11  Q.   Was that a call where there's a reference to a

12  "clinic check"?

13  A.   Yes.

14          THE COURT:  We're going to break at this time,

15  ladies and gentlemen, for the lunch break.  We'll see

16  you back in at 1:00 o'clock.

17          Remember the admonition, not to discuss the

18  case among yourselves or with anybody else or form or

19  express any opinions about the matter until -- until you

20  retire to the jury room.  We'll be in recess.

21          THE CLERK:  All rise.

22              (Jury out.)

23          THE CLERK:  Court is in recess until

24  1:00 o'clock.

25  ///

74

1          (At 11:32, A.M., a recess was taken

2          until 1:00 P.M. of the same day.)


4                    --oOo--

1          **C E R T I F I C A T E**

2

3              I hereby certify that, pursuant to Title 28,

4    Section 753, United States Code, the foregoing is a true

5    and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the

9    United States.

10             Certified on March 31, 2015.

11

12

13

14                              /s/ Katherine M. Stride
                                KATHERINE M. STRIDE, CSR, RPR
15                              Official Court Reporter
                                License No. 11773
16

17

18

19

20

21

22

23

24

25

## #

**#68** [1] - 1:23

## $

**$120,000** [1] - 45:25
**$123,000** [1] - 45:25
**$4,000** [2] - 68:5, 69:2
**$5,000** [1] - 64:9
**$60** [4] - 45:17, 45:18, 46:2
**$69,000** [1] - 47:10

## '

**'Bad** [1] - 35:19
**'juice** [2] - 30:9, 30:10
**'No** [1] - 61:13
**'SHU** [1] - 28:12
**'validated'** [1] - 28:14

## /

**/s** [1] - 75:14

## 1

**1** [7] - 1:18, 4:1, 32:21, 49:1, 52:14, 71:3, 71:15
**100** [3] - 11:20, 11:22, 54:12
**100-A** [2] - 11:23, 12:3
**101** [2] - 4:16, 4:17
**103** [1] - 15:15
**103-A** [2] - 15:16, 15:20
**104** [5] - 24:6, 24:16, 24:17, 24:21
**104-A** [4] - 24:7, 27:18, 27:21, 28:6
**106** [1] - 30:16
**106-A** [2] - 30:17, 30:21
**107** [1] - 32:7
**107-A** [2] - 32:8, 32:21
**108** [2] - 34:6, 34:19
**108-A** [2] - 34:7, 34:22
**109** [1] - 40:15
**109-A** [2] - 40:16, 41:3
**10:00** [4] - 40:19, 68:7, 69:1, 69:3
**10:15** [1] - 40:20
**10:39** [1] - 35:3
**10:46** [1] - 63:15
**11** [2] - 3:5, 3:6
**11-00072(A)-RGK** [1] - 1:10
**1107** [1] - 1:23
**11773** [1] - 75:15
**11:01** [1] - 16:1
**11:02** [1] - 25:1
**11:32** [1] - 74:1
**120** [2] - 45:16, 45:21
**123** [2] - 45:16, 45:21
**12:41** [1] - 33:2
**12th** [2] - 2:17, 35:1
**13th** [2] - 15:24, 41:7
**15** [5] - 24:13, 25:9, 27:18, 27:21, 29:15
**15250** [1] - 2:21

**16th** [1] - 70:23
**1:00** [3] - 73:16, 73:24, 74:2
**1:10** [1] - 67:1
**1:15** [1] - 12:9
**1:59** [1] - 60:10

## 2

**2** [17] - 12:14, 12:17, 19:8, 24:13, 25:9, 31:3, 33:3, 41:10, 44:15, 45:13, 49:16, 49:24, 67:5, 70:15, 70:19, 71:25, 72:2
**2.5** [1] - 57:19
**2009** [15] - 12:7, 15:8, 15:24, 24:24, 30:25, 32:25, 35:1, 41:7, 45:8, 52:18, 56:9, 60:8, 63:13, 66:24, 70:2
**2011** [1] - 70:23
**2014** [2] - 1:18, 4:1
**2015** [1] - 75:10
**213)623-5923** [1] - 2:18
**213)894-2579** [1] - 2:9
**213)894-4477** [1] - 2:6
**216-0000** [2] - 71:5, 71:19
**24** [1] - 41:19
**24th** [1] - 30:25
**28** [1] - 75:3
**28th** [1] - 24:24
**29th** [3] - 45:8, 52:18, 56:9

## 3

**3** [13] - 14:15, 19:18, 31:11, 33:11, 35:17, 41:13, 46:1, 51:17, 53:17, 54:8, 56:16, 71:15, 72:2
**30th** [1] - 60:8
**31** [1] - 75:10
**312** [2] - 2:5, 2:8
**323)474-6420** [1] - 1:25
**35** [1] - 46:25
**3:02** [1] - 45:10
**3:15** [1] - 52:20
**3:31** [1] - 31:2
**3:54** [1] - 41:9
**3rd** [1] - 63:13

## 4

**4** [19] - 12:17, 15:4, 20:11, 31:3, 31:11, 36:17, 37:4, 42:2, 57:9, 59:23, 59:24, 59:25, 60:13, 60:17, 60:20, 60:23, 61:4, 63:21, 69:2
**4,200** [1] - 67:9
**4.8** [1] - 57:20
**403** [2] - 62:12, 65:14
**49** [2] - 3:5, 3:6
**4:22** [1] - 70:4
**4th** [3] - 12:7, 66:24, 70:2

## 5

**5** [10] - 21:23, 38:20, 55:12, 59:1, 60:17, 60:21, 60:23, 61:9, 67:10, 69:2

**5:00** [1] - 23:11

## 6

**6** [8] - 1:15, 27:18, 27:21, 28:6, 41:13, 55:15, 57:13, 65:4
**600** [1] - 2:21
**611** [1] - 53:10
**626)844-6400** [1] - 2:14
**670** [2] - 57:21, 58:12
**680** [1] - 57:21, 58:11
**69** [6] - 44:14, 44:17, 44:24, 47:1, 47:2, 47:5
**69-A** [2] - 44:25, 45:4
**6:08** [1] - 56:13

## 7

**7** [6] - 29:15, 35:17, 36:17, 37:4, 38:20, 68:4
**70** [2] - 2:13, 47:12
**70-A** [4] - 47:13, 47:16, 49:12, 51:18
**700** [2] - 57:21, 58:12
**71** [1] - 52:9
**71-A** [4] - 52:10, 52:14, 53:18, 55:12
**72** [1] - 55:25
**72-A** [2] - 55:25, 56:5
**73** [2] - 59:20, 59:21
**73-A** [4] - 59:21, 59:23, 59:25, 60:4
**74** [1] - 63:5
**74-A** [3] - 63:6, 63:9, 65:4
**75** [2] - 66:15, 73:9
**75-A** [3] - 66:16, 66:20, 67:11
**753** [1] - 75:4
**76** [1] - 69:18
**76-A** [2] - 69:19, 69:23
**7:00** [3] - 4:13, 10:22, 45:16
**7:15** [1] - 10:22

## 8

**8** [7] - 59:25, 63:21, 65:4, 65:24, 67:10, 68:4, 68:24
**800** [1] - 2:17
**818** [2] - 71:5, 71:19
**818)990-9500** [1] - 2:22
**8:30** [1] - 4:2
**8th** [1] - 32:25

## 9

**90012** [3] - 2:5, 2:9, 2:17
**91030** [1] - 1:23
**91101** [1] - 2:13
**91403** [1] - 2:21
**945** [1] - 2:13
**95** [1] - 46:24
**9:00** [2] - 5:23, 6:3

## A

**A.M** [3] - 4:2, 25:1, 74:1

**able** [7] - 6:20, 9:25, 22:2, 25:7, 35:11, 54:11, 57:18
**above-entitled** [1] - 75:6
**absconds** [1] - 8:25
**accrue** [1] - 64:12
**accrued** [1] - 66:9
**accurate** [1] - 8:2
**activities** [1] - 59:17
**activity** [12] - 5:12, 21:22, 26:5, 36:5, 36:10, 36:16, 50:23, 50:24, 51:8, 54:22, 62:2, 62:5
**add** [1] - 53:2
**addition** [3] - 13:7, 50:19, 72:13
**additional** [1] - 11:15
**address** [2] - 28:10, 28:11
**addresses** [4] - 29:5, 29:9, 29:13, 69:2
**admission** [1] - 40:5
**admonishment** [1] - 47:21
**admonition** [1] - 73:17
**advising** [1] - 9:12
**afternoon** [1] - 6:18
**Agent** [18] - 11:11, 12:2, 15:19, 24:19, 28:2, 30:20, 34:21, 41:2, 43:4, 45:3, 47:15, 49:11, 52:13, 56:4, 60:3, 63:8, 66:19, 69:22
**agreed** [1] - 7:23
**ahead** [5] - 7:10, 8:12, 18:21, 43:19, 71:12
**Airapetian** [4] - 36:24, 36:25, 52:3, 52:6
**aka** [2] - 31:5, 52:3
**al** [1] - 1:12
**ALC** [1] - 2:20
**Alen** [2] - 12:11, 12:12
**alert** [1] - 8:20
**alive** [1] - 23:18
**allegedly** [1] - 48:17
**almost** [1] - 15:10
**ALSO** [1] - 2:24
**AMERICA** [1] - 1:8
**amount** [1] - 44:10
**AND** [1] - 2:20
**ANDRE** [1] - 2:4
**ANDREW** [2] - 2:7, 2:20
**ANGELES** [1] - 4:1
**Angeles** [8] - 1:17, 2:5, 2:9, 2:17, 13:2, 19:4, 39:16, 61:8
**angrier** [1] - 59:7
**angry** [2] - 22:2, 59:6
**Ann** [1] - 12:20
**answered** [1] - 14:25
**anticipation** [1] - 53:15
**anyway** [1] - 67:13
**Anyways** [1] - 46:25
**AP** [3] - 33:15, 33:17, 34:3
**appeal** [1] - 33:23
**appealing** [1] - 33:22
**appear** [3] - 8:5, 52:24, 63:19
**appearance** [3] - 37:19, 37:25, 38:14
**APPEARANCES** [1] - 2:1

**applies** [1] - 57:5, 65:19
**appoint** [1] - 6:22
**appointed** [2] - 5:15, 5:18
**appointment** [1] - 5:9
**appreciate** [3] - 8:21, 10:19, 11:3
**appreciates** [1] - 11:1
**appropriate** [1] - 5:14
**APRIL** [1] - 4:1
**April** [2] - 1:18, 30:25
**Aram** [6] - 18:19, 31:5, 31:7, 32:19, 33:6, 34:15
**area** [3] - 28:19, 29:22, 57:18
**Arm** [1] - 53:24
**Arman** [21] - 2:15, 13:3, 17:22, 18:22, 33:5, 33:8, 33:9, 34:11, 34:12, 35:5, 35:7, 35:11, 41:12, 41:23, 45:12, 52:22, 56:15, 60:12, 61:21, 63:17, 67:3
**Armen** [3] - 39:11, 39:13, 39:19
**Armenian** [13] - 20:7, 21:15, 22:25, 31:6, 31:9, 31:22, 32:20, 33:9, 35:15, 37:1, 39:14, 50:20, 52:4
**arrange** [1] - 45:15
**arrested** [2] - 51:24, 70:22
**aspect** [1] - 62:17
**ASSISTANT** [2] - 2:4, 2:7
**Associate** [2] - 71:5, 71:19
**associate** [5] - 12:13, 16:6, 17:6, 28:25, 71:14
**associated** [1] - 13:14
**associates** [5] - 50:20, 59:11, 59:17, 69:15, 71:16
**AT&T** [1] - 72:25
**attempt** [5] - 9:2, 9:5, 14:21, 23:7
**attempting** [2] - 5:5, 8:11
**ATTORNEY** [2] - 2:4, 2:7
**ATTORNEYS** [1] - 2:4
**audio** [17] - 12:1, 15:18, 24:15, 24:18, 28:1, 30:19, 32:12, 34:20, 41:1, 45:2, 47:14, 52:12, 56:3, 60:2, 63:7, 66:18, 69:21
**August** [4] - 12:7, 15:8, 15:24, 24:24
**available** [1] - 5:3
**Avenue** [2] - 1:23, 2:13
**aware** [5] - 35:8, 66:9, 68:11, 68:12, 68:19

## B

**backing** [1] - 19:25
**Badri** [1] - 13:13
**bar** [1] - 40:3
**base** [1] - 29:1
**based** [59] - 4:23, 12:23, 13:9, 13:20, 14:20, 16:4, 17:11, 17:15, 19:13, 19:24, 20:5, 21:13, 22:4, 22:18, 23:5, 23:15, 25:17, 27:6, 28:16, 29:20, 29:25, 30:11, 31:18, 31:20, 33:18, 35:24, 36:23, 37:8, 38:24, 40:10, 41:21, 42:9, 44:20, 45:20, 47:4, 50:3,

50:9, 50:19, 52:1, 54:1, 54:13, 54:18, 55:19, 56:22, 57:3, 57:22, 58:12, 59:10, 60:22, 61:19, 61:25, 64:7, 65:12, 65:18, 66:8, 67:17, 68:15, 69:4, 72:19
**bedroom** [1] - 70:23
**begin** [1] - 24:12
**beginning** [1] - 27:20
**begins** [1] - 27:17
**behalf** [5] - 2:2, 2:11, 2:15, 2:19, 20:14
**behind** [1] - 59:9
**below** [1] - 57:21
**benches** [1] - 7:12
**better** [1] - 65:10
**between** [7] - 17:23, 18:18, 19:1, 44:8, 46:6, 54:21, 57:19
**binder** [1] - 11:21
**BIROTTE** [1] - 2:4
**bitch** [1] - 73:4
**black** [10] - 38:23, 38:25, 39:24, 40:2, 40:3, 40:9, 40:11, 40:13, 41:15
**blow** [2] - 57:20, 57:24
**book** [6] - 11:24, 20:16, 20:18, 24:7, 34:7, 52:10
**books** [10] - 30:17, 32:8, 45:1, 47:13, 56:1, 59:21, 59:22, 63:6, 66:16, 69:19
**Bother** [1] - 31:17
**bottom** [22] - 12:17, 14:16, 19:9, 19:19, 20:12, 21:24, 23:9, 23:10, 25:12, 27:22, 27:24, 28:9, 36:20, 45:14, 54:8, 55:13, 56:25, 61:3, 61:10, 62:7, 66:3, 67:11
**Boulevard** [2] - 2:17, 2:21
**box** [1] - 10:18
**boy** [1] - 35:19
**boy'** [1] - 35:19
**break** [6] - 40:20, 43:1, 47:19, 47:20, 73:14, 73:15
**breaking** [1] - 40:19
**brief** [1] - 48:6
**bring** [6] - 38:23, 57:11, 60:20, 63:25, 64:22, 67:15
**brings** [1] - 60:17
**Bro** [12] - 19:19, 19:23, 22:2, 23:11, 23:12, 28:15, 30:7, 56:21, 61:15, 64:4, 66:2, 67:6
**broad's** [1] - 42:4
**broken** [1] - 24:9
**Brother** [15] - 12:18, 14:18, 20:13, 20:15, 22:3, 28:10, 28:12, 33:15, 33:17, 47:3, 51:19, 53:24, 55:14, 56:18, 56:19
**brother** [7] - 23:13, 46:17, 53:21, 59:4, 61:16, 61:20, 69:2
**brother-in-law** [1] - 46:17
**brought** [2] - 46:25, 67:8
**Burbank** [1] - 17:9
**business** [1] - 65:8
**busy** [1] - 51:20
**butcher** [1] - 23:19

**butchering** [1] - 18:23
**buy** [1] - 59:8
**BY** [76] - 2:12, 2:16, 2:20, 3:6, 11:10, 13:17, 14:9, 14:15, 15:4, 15:19, 16:11, 16:21, 17:11, 18:4, 18:10, 18:22, 19:8, 20:5, 20:11, 20:24, 21:4, 21:21, 22:17, 23:5, 23:24, 24:2, 24:19, 25:24, 26:18, 26:22, 27:2, 27:6, 27:11, 28:2, 30:20, 32:13, 34:21, 36:12, 37:18, 37:23, 38:20, 39:5, 40:3, 41:2, 42:19, 43:22, 45:3, 46:1, 46:18, 49:11, 50:16, 51:11, 51:17, 52:13, 53:17, 55:6, 56:4, 58:6, 58:11, 58:18, 58:23, 59:16, 60:3, 61:3, 61:24, 62:21, 63:1, 63:8, 65:4, 65:18, 66:19, 68:19, 68:24, 70:15, 71:13, 72:13

### C

**C.S.O** [1] - 7:7
**CA** [3] - 2:13, 2:17, 2:21
**cage** [1] - 66:2
**calendar** [1] - 6:9
**CALIFORNIA** [2] - 1:2, 4:1
**California** [4] - 1:17, 1:23, 2:5, 2:9
**cannot** [1] - 9:8
**captured** [1] - 43:12
**car** [2] - 4:15, 4:16
**card** [10] - 25:15, 25:18, 25:19, 25:24, 26:2, 26:12, 26:14, 26:19, 26:22, 65:7
**cards** [3] - 26:5, 26:8, 27:12
**careful** [2] - 7:4, 7:5
**case** [16] - 5:7, 5:8, 7:25, 31:8, 37:2, 39:10, 46:5, 46:21, 47:22, 50:17, 51:12, 62:19, 62:22, 65:13, 67:18, 73:18
**cases** [4] - 14:14, 39:5, 54:20, 58:13
**cash** [3] - 67:18, 68:1, 69:3
**cashing** [1] - 67:22
**cell** [3] - 26:23, 27:12, 72:25
**cellie** [1] - 35:20
**CENTRAL** [1] - 1:2
**certain** [1] - 44:10
**Certified** [1] - 75:10
**certify** [1] - 75:3
**channel** [1] - 23:13
**channels** [1] - 34:3
**charged** [6] - 40:4, 48:23, 48:25, 49:5, 49:7, 50:17
**charges** [2] - 43:18, 48:21
**CHARLES** [2] - 2:16, 2:16
**chase** [1] - 61:17
**chasing** [1] - 64:4
**check** [3] - 29:13, 67:8, 73:12
**checks** [2] - 67:19, 67:22
**Chicago** [1] - 6:17
**chicken** [1] - 11:14
**chief** [2] - 5:7, 5:8
**Christine** [1] - 46:20
**clarify** [2] - 7:16, 48:11

**clause** [2] - 47:8, 53:3
**clear** [2] - 48:22, 71:13
**CLERK** [10] - 4:7, 10:6, 10:8, 10:10, 48:1, 48:3, 48:5, 48:7, 73:21, 73:23
**Clever** [2] - 37:1, 52:3
**clinic** [3] - 62:8, 67:8, 73:12
**clinics** [1] - 63:1
**Clock** [1] - 69:1
**close** [1] - 4:18
**Code** [1] - 75:4
**coming** [1] - 65:10
**commerce** [1] - 62:17
**commit** [1] - 63:2
**compound** [1] - 50:11
**concluded** [1] - 71:24
**conducted** [1] - 59:17
**conducting** [2] - 15:9, 21:22
**Conference** [1] - 75:8
**conflict** [13] - 16:16, 16:22, 17:3, 17:24, 18:5, 18:6, 20:25, 21:4, 22:6, 22:8, 22:13, 54:21, 55:2
**conformance** [1] - 75:7
**confrontation** [2] - 47:7, 53:3
**conspiracy** [5] - 11:17, 43:7, 43:8, 49:1, 49:2
**Constitution** [1] - 10:12
**contact** [2] - 7:6, 7:11
**contained** [1] - 26:18
**context** [4] - 21:14, 31:25, 39:1, 40:12
**continue** [1] - 11:6
**continuing** [1] - 44:20
**contraband** [1] - 30:3
**control** [1] - 9:6
**conversation** [1] - 14:17
**conversations** [3] - 14:22, 44:21, 53:22
**cop** [1] - 59:7
**corporations** [1] - 57:19
**correct** [7] - 16:25, 17:1, 33:7, 48:17, 48:24, 48:25, 75:5
**counsel** [7] - 4:11, 5:10, 5:15, 5:17, 6:22, 6:25, 7:2
**Counsel** [8] - 4:21, 5:13, 11:6, 18:9, 38:4, 48:12, 53:4, 71:12
**Count** [1] - 49:1
**count** [6] - 11:17, 49:2, 57:1, 57:4, 62:14, 62:15
**counting** [1] - 57:8
**country** [1] - 10:11
**counts** [5] - 43:8, 48:15, 48:23, 48:24, 49:5
**couple** [2] - 8:5, 34:10
**COURT** [134] - 1:1, 4:10, 4:25, 5:16, 5:20, 5:25, 6:2, 6:4, 6:8, 6:13, 6:15, 6:23, 7:4, 7:14, 7:18, 7:22, 8:1, 8:17, 8:19, 8:21, 9:7, 9:15, 9:24, 10:4, 10:16, 11:19, 11:25, 13:16, 13:24, 14:8, 14:13, 14:25, 15:3, 15:17, 16:10, 16:19, 17:5, 18:3, 18:8, 18:16, 18:21, 19:7, 20:3, 20:9, 20:23, 21:3, 21:18,

22:11, 22:23, 23:4, 23:23, 24:11, 24:14, 25:23, 26:9, 26:17, 26:21, 26:25, 27:5, 27:10, 27:14, 27:19, 27:22, 27:25, 30:18, 32:3, 32:11, 34:8, 36:2, 36:9, 37:14, 37:17, 37:22, 38:3, 38:16, 38:19, 39:4, 39:24, 40:1, 40:17, 40:25, 42:17, 43:2, 43:10, 43:14, 43:19, 44:17, 44:22, 45:24, 46:12, 46:14, 47:9, 47:18, 48:10, 48:19, 49:3, 49:8, 50:12, 51:5, 51:16, 52:11, 53:4, 53:6, 53:8, 53:11, 53:16, 55:1, 56:2, 58:4, 58:10, 58:17, 58:22, 59:15, 60:1, 61:1, 61:23, 62:14, 62:20, 62:24, 65:3, 65:16, 66:13, 66:17, 68:18, 68:23, 69:12, 69:20, 70:8, 70:13, 71:7, 71:10, 71:12, 72:12, 73:14
**Court** [13] - 4:8, 4:23, 5:17, 6:22, 8:8, 8:20, 9:12, 10:6, 10:14, 43:1, 48:8, 73:23, 75:15
**court** [17] - 12:1, 15:18, 24:15, 24:18, 28:1, 30:19, 32:12, 34:20, 41:1, 45:2, 47:14, 52:12, 56:3, 60:2, 63:7, 66:18, 69:21
**Court's** [5] - 4:23, 11:21, 27:16, 44:13, 53:15
**cousin** [2] - 16:7, 17:8
**Crawford** [3] - 53:4, 53:6, 53:9
**crazy** [2] - 56:19, 66:5
**credit** [3] - 58:19, 58:23, 65:7
**CREIGHTON** [1] - 2:7
**crime** [1] - 54:20
**CRIMINAL** [1] - 2:8
**criminal** [11] - 21:22, 23:6, 26:5, 50:24, 51:8, 51:10, 54:21, 55:9, 59:17, 62:2, 62:5
**criminals** [2] - 27:3, 27:8
**CSR** [2] - 1:22, 75:14
**Cubs** [1] - 6:17
**custody** [2] - 33:10, 62:6
**cut** [1] - 59:22
**cutting** [1] - 63:22

### D

**daily** [1] - 15:10
**DARBINYAN** [1] - 1:12
**Darbinyan** [81] - 2:11, 11:18, 12:11, 12:13, 12:18, 12:20, 13:7, 14:1, 14:4, 14:18, 14:21, 15:6, 15:9, 16:3, 16:15, 16:21, 17:12, 17:23, 18:20, 19:1, 19:4, 19:9, 19:19, 20:12, 20:19, 21:24, 22:15, 23:10, 25:3, 28:9, 28:13, 29:16, 29:18, 30:6, 30:8, 30:10, 31:5, 31:14, 32:15, 33:5, 33:16, 33:21, 35:5, 35:18, 35:20, 41:12, 41:16, 41:17, 41:19, 43:8, 44:9, 45:12, 48:14, 49:22, 51:19, 52:22, 53:23, 55:13, 56:15, 56:20, 57:10, 59:2, 59:7, 59:11, 60:12, 60:19, 60:21, 61:4, 61:10, 62:8, 63:17, 67:3, 67:6, 67:8, 70:6, 71:1, 72:5, 72:14, 72:17, 73:1, 73:3

**Darbinyan's** [3] - 16:7, 17:7, 39:16
**date** [16] - 12:6, 15:23, 24:23, 30:24, 32:24, 34:25, 41:6, 45:7, 49:15, 52:17, 56:8, 60:7, 63:12, 66:23, 70:1, 73:7
**DAY** [1] - 1:15
**days** [2] - 8:6, 15:7
**dead** [1] - 57:19
**deal** [1] - 9:1
**Dear** [14] - 19:20, 20:15, 42:4, 45:17, 47:2, 51:19, 53:24, 54:11, 57:14, 57:15, 57:17, 57:18, 57:20, 72:6
**debt** [2] - 64:11
**debts** [3] - 64:12, 66:6, 66:9
**decide** [1] - 60:19
**Defendant** [16] - 2:11, 2:15, 2:19, 31:8, 37:2, 39:10, 43:8, 43:9, 43:12, 46:4, 46:7, 46:10, 46:15, 46:21, 46:24, 62:13
**Defendants** [3] - 1:13, 50:13, 50:16
**Defense** [8] - 5:1, 5:7, 5:12, 7:24, 7:25, 8:10, 8:15, 53:13
**definitely** [1] - 9:16
**delayed** [1] - 4:14
**demonstrated** [1] - 19:4
**denied** [1] - 37:17
**Department** [1] - 39:17
**deposit** [2] - 67:19, 68:1
**depositing** [1] - 67:22
**DEPT** [1] - 2:8
**describe** [1] - 22:8
**described** [1] - 36:9
**details** [1] - 42:20
**determine** [1] - 35:11
**dicks** [1] - 61:16
**die** [1] - 56:19
**dies** [1] - 8:25
**different** [5] - 5:22, 26:15, 32:15, 34:3, 35:8
**DIRECT** [3] - 3:6, 11:9, 49:10
**discuss** [3] - 4:20, 47:22, 73:17
**discussed** [4] - 16:16, 18:6, 19:2, 19:3
**discussing** [2] - 17:24, 44:9
**discussions** [1] - 28:4
**dispute** [2] - 22:16, 55:4
**disputes** [2] - 23:7, 55:7
**District** [3] - 4:8, 10:14, 48:8
**DISTRICT** [2] - 1:1, 1:2
**DIVISION** [2] - 1:3, 2:8
**dogs** [2] - 15:6, 15:11
**dollars** [3] - 61:2, 64:5, 64:8
**done** [1] - 68:8
**down** [9] - 9:1, 10:23, 30:5, 31:16, 33:21, 49:24, 57:13, 66:3, 68:10
**downtown** [1] - 61:8
**drive** [1] - 66:5
**drug** [3] - 39:23, 40:12, 41:25
**drugs** [9] - 30:3, 39:1, 39:21, 39:22, 42:10, 42:13, 42:22, 64:22, 69:15
**during** [6] - 7:5, 15:8, 34:11, 35:7, 52:5,

60:3

## E

**early** [2] - 23:12, 32:10
**efficiency** [3] - 9:20, 18:13, 32:9
**effort** [3] - 10:24, 11:2, 17:12
**efforts** [1] - 17:15
**eight** [3] - 27:23, 31:14, 68:10
**either** [1] - 64:21
**eleven** [1] - 33:14
**ELIZABETH** [1] - 2:3
**elsewhere** [1] - 64:10
**emblematic** [1] - 10:12
**Emil** [2] - 52:3, 52:6
**Emo** [3] - 36:22, 36:23, 36:24
**Emul** [5] - 36:24, 36:25, 51:23, 52:2, 52:3
**end** [2] - 32:13, 60:18
**endeavoring** [1] - 5:5
**enforcement** [2] - 15:12, 55:22, 68:2
**entire** [2] - 31:15, 34:12
**entitled** [1] - 75:6
**equivalent** [1] - 13:6
**erased** [1] - 31:15
**Estrada** [1] - 7:20
**ESTRADA** [123] - 2:3, 4:22, 5:4, 5:19, 6:20, 6:24, 8:3, 9:4, 9:10, 9:20, 10:3, 11:7, 11:10, 11:20, 12:2, 13:17, 14:9, 14:15, 15:4, 15:14, 15:19, 16:11, 16:21, 17:11, 18:4, 18:10, 18:22, 19:8, 20:5, 20:11, 20:24, 21:4, 21:21, 22:17, 23:5, 23:24, 24:2, 24:5, 24:12, 24:16, 24:19, 25:24, 26:11, 26:18, 26:22, 27:2, 27:6, 27:11, 27:16, 27:20, 27:23, 28:2, 30:15, 30:20, 32:6, 32:13, 34:5, 34:9, 34:18, 34:21, 36:12, 37:18, 37:23, 38:7, 38:20, 39:5, 40:3, 40:14, 40:21, 41:2, 42:19, 42:24, 43:3, 43:11, 43:17, 43:21, 43:22, 44:13, 44:18, 44:24, 45:3, 46:1, 46:18, 47:11, 47:15, 48:18, 48:25, 49:6, 49:11, 50:16, 51:11, 51:17, 52:8, 52:13, 53:17, 55:6, 56:4, 58:6, 58:11, 58:18, 58:23, 59:16, 59:19, 60:3, 61:3, 61:24, 62:16, 62:21, 63:1, 63:4, 63:8, 65:4, 65:18, 66:14, 66:19, 68:19, 68:24, 69:17, 69:22, 70:11, 70:15, 71:13, 72:13
**ESTRADA**............................ [1] - 3:6
**et** [1] - 1:12
**exactly** [1] - 9:17
**EXAMINATION** [3] - 3:6, 11:9, 49:10
**examine** [1] - 7:24
**excuse** [2] - 51:22, 72:15
**exercise** [1] - 29:22
**Exhibit** [34] - 11:20, 11:22, 12:3, 15:15, 24:6, 24:21, 30:16, 32:7, 34:6, 34:19, 40:15, 41:3, 44:14, 44:17, 44:24, 44:25, 47:12, 49:12, 51:18, 52:9, 52:10, 52:14, 55:25, 56:5, 59:20, 60:4,

63:5, 63:6, 66:15, 67:11, 69:18, 69:19, 69:23, 73:9
**experience** [21] - 21:13, 22:24, 23:6, 28:16, 29:2, 29:20, 29:25, 30:11, 35:24, 37:8, 38:24, 42:9, 54:19, 57:3, 57:22, 58:12, 61:25, 65:19, 67:17, 68:15, 69:4
**expert** [3] - 25:22, 26:7, 32:1
**expertise** [2] - 38:6, 61:1, 69:13
**explain** [3] - 16:21, 51:1, 69:8
**express** [2] - 47:23, 73:19
**extort** [2] - 51:7, 51:10
**extorting** [1] - 54:6
**extortion** [11] - 39:21, 43:7, 43:24, 48:23, 49:1, 49:2, 50:21, 62:15, 62:16, 62:17

## F

**face** [1] - 10:10
**facility** [1] - 61:8
**fact** [2] - 18:12, 50:16
**faggot** [1] - 25:14
**faggots** [1] - 31:17
**Fair** [1] - 1:23
**fairly** [1] - 35:16
**faith** [1] - 9:4
**familiar** [28] - 13:10, 17:19, 22:5, 25:24, 26:2, 26:4, 26:10, 27:11, 28:21, 29:1, 29:8, 30:12, 33:23, 37:9, 38:25, 39:10, 42:10, 57:4, 57:23, 58:13, 61:5, 61:24, 62:9, 62:21, 64:12, 65:18, 67:18, 69:5
**family** [4] - 7:1, 7:3, 16:7, 21:9
**far** [1] - 6:18
**fat** [1] - 12:19
**father** [3] - 13:6, 53:23, 67:14
**fathers** [1] - 54:15
**FBI** [2] - 2:25, 54:17
**February** [1] - 70:23
**Felix** [1] - 57:17
**fellow** [1] - 20:14
**females** [1] - 42:13
**Fence** [3] - 31:15, 31:19, 31:20
**few** [2] - 4:17, 15:7
**fifteen** [4] - 24:9, 27:19, 47:21, 47:25
**figure** [1] - 13:18
**fine** [1] - 61:13
**FIRM** [1] - 2:12
**first** [28] - 12:3, 15:20, 19:20, 24:12, 24:17, 24:20, 30:21, 34:22, 35:17, 41:3, 44:4, 44:6, 44:15, 45:4, 45:13, 46:24, 47:16, 56:5, 57:10, 59:24, 60:4, 63:9, 66:20, 69:23, 70:12, 72:5
**five** [13] - 12:17, 19:9, 19:11, 19:14, 42:2, 49:19, 56:25, 61:2, 64:5, 64:8, 67:5, 67:11, 71:11
**flag** [2] - 10:10, 10:11
**FLIER** [8] - 2:20, 2:20, 5:22, 6:1, 6:3, 6:6, 43:13
**Floco** [1] - 33:9

**Floor** [1] - 2:17
**folded** [1] - 6:9
**forbid** [1] - 66:3
**force** [1] - 44:11
**foregoing** [1] - 75:4
**forgot** [1] - 6:6
**form** [2] - 47:23, 73:18
**format** [1] - 75:7
**forward** [1] - 63:25
**Foundation** [1] - 37:16
**foundation** [30] - 14:7, 14:12, 16:18, 18:7, 18:8, 22:10, 23:22, 27:13, 37:13, 37:21, 38:2, 38:3, 38:5, 38:6, 42:16, 51:3, 51:15, 54:24, 58:3, 58:9, 58:16, 58:21, 59:13, 60:24, 64:25, 66:12, 69:10, 70:7, 70:9, 72:11
**four** [5] - 38:20, 51:18, 61:2, 65:5, 68:4
**fourth** [2] - 46:23, 72:14
**frame** [1] - 34:12
**Francisco** [1] - 57:18
**fraud** [14] - 5:12, 50:5, 50:7, 50:17, 57:23, 58:13, 62:10, 62:18, 62:22, 63:2, 65:13, 65:19, 67:21, 68:3
**fraudulent** [1] - 67:22
**Friend** [20] - 25:13, 54:9, 54:10, 63:25, 64:1, 65:9, 65:11, 66:5, 66:7, 67:15
**friend** [5] - 20:16, 55:13, 64:1, 67:7, 67:16
**front** [25] - 12:4, 12:15, 15:21, 24:21, 25:9, 28:7, 30:22, 31:12, 32:22, 33:12, 34:22, 36:18, 41:4, 45:5, 47:17, 49:12, 49:17, 52:15, 56:6, 60:4, 60:14, 63:10, 66:21, 69:24, 72:3
**fuck** [5] - 28:15, 33:15, 63:24, 65:9, 67:13
**fucked** [2] - 25:14, 51:25
**fucker** [2] - 56:19, 66:5
**fun** [1] - 68:9

## G

**gang** [2] - 31:20, 32:5
**GARY** [1] - 1:5
**general** [5] - 14:17, 18:22, 22:25, 28:4, 53:9
**generally** [12] - 14:3, 18:5, 19:1, 22:12, 29:12, 35:15, 36:13, 42:20, 51:2, 51:6, 57:8, 67:21
**gentlemen** [3] - 40:18, 47:20, 73:15
**Georgian** [4] - 12:19, 13:7, 13:10, 13:12
**glass** [8] - 37:6, 37:9, 37:11, 37:19, 37:25, 38:14, 38:16, 41:17
**glass-like** [4] - 37:19, 37:25, 38:14, 38:16
**Glendale** [4] - 72:15, 72:16, 72:17, 72:22
**God** [3] - 13:6, 54:15, 66:3
**Government** [24] - 2:2, 5:4, 5:6, 7:20, 8:11, 8:12, 8:23, 9:3, 9:12, 11:22, 15:14, 24:5, 30:15, 32:6, 34:5, 40:14, 44:24, 47:11, 52:8, 55:24, 59:19, 63:4, 66:14, 69:17
**Government's** [1] - 9:2
**GOVERNMENT'S** [3] - 3:2, 11:8, 49:9
**great** [1] - 4:14
**grounds** [1] - 53:3
**group** [2] - 14:5, 19:25
**guy** [3] - 20:14, 61:14, 64:1
**guys** [3] - 37:6, 57:17, 61:11

## H

**half** [2] - 50:1, 57:2
**hand** [1] - 67:16
**hands** [1] - 66:1
**hard** [1] - 61:15
**harm** [1] - 55:4
**head** [1] - 61:13
**hear** [6] - 45:17, 45:18, 51:22, 53:23, 54:12, 55:14
**Hearsay** [4] - 16:8, 16:17, 17:4, 46:11
**hearsay** [15] - 8:8, 13:15, 18:2, 18:7, 20:2, 20:8, 20:22, 21:16, 23:21, 45:23, 46:13, 47:7, 59:14, 64:25, 69:11
**held** [1] - 75:6
**helps** [1] - 40:21
**hereby** [1] - 75:3
**heroine** [6] - 39:6, 39:24, 40:2, 40:4, 40:6, 40:13
**Hiding** [1] - 25:13
**high** [1] - 22:14
**high-level** [1] - 22:14
**him/her** [1] - 42:7
**Hispanic** [1] - 31:20
**Hm** [1] - 14:17
**hold** [1] - 41:20
**Hold** [1] - 42:3
**hole** [5] - 28:18, 35:20, 36:5, 36:12, 36:13
**Hollywood** [2] - 31:21, 64:2
**home** [4] - 4:15, 35:19, 65:6, 67:12
**Honor** [47] - 4:22, 6:20, 7:9, 7:15, 9:20, 10:3, 11:7, 11:16, 14:23, 15:14, 20:1, 24:5, 27:16, 30:15, 32:6, 32:10, 34:5, 38:18, 40:14, 40:21, 42:15, 42:24, 43:5, 44:13, 44:18, 44:19, 47:6, 47:11, 48:18, 49:6, 50:15, 52:8, 53:1, 53:13, 53:14, 54:25, 55:24, 59:19, 60:25, 63:4, 65:2, 65:14, 66:14, 68:17, 68:22, 69:17, 70:11
**HONORABLE** [1] - 1:5
**Hopefully** [1] - 60:17
**hopefully** [1] - 9:21
**hour** [2] - 57:1
**house** [1] - 11:14
**housing** [1] - 28:18
**Hovanissian** [3] - 39:11, 39:13, 39:19
**hundred** [1] - 59:9
**hurt** [1] - 19:11

## I

**identified** [1] - 70:16
**identify** [3] - 25:5, 25:7, 70:18
**illegal** [3] - 36:5, 36:10, 36:16
**imprisoned** [1] - 68:12
**improper** [1] - 32:1
**incident** [5] - 11:14, 17:11, 19:3, 19:14, 19:16
**indicate** [1] - 4:12
**individual** [15] - 12:24, 14:10, 20:21, 20:24, 21:5, 21:7, 25:5, 32:15, 32:16, 39:15, 43:23, 44:2, 44:4, 44:10, 68:1
**individuals** [10] - 16:6, 29:9, 29:14, 30:12, 36:12, 42:10, 51:7, 54:21, 62:21
**information** [1] - 26:18
**initials** [1] - 44:1
**injured** [1] - 19:14
**inmate** [2] - 28:4, 69:6
**inmates** [4] - 29:6, 57:8, 64:15, 69:16
**inside** [7] - 59:5, 61:16, 61:20, 61:25, 62:4, 68:13, 69:15
**instruct** [1] - 8:4
**instructed** [1] - 11:23
**intend** [3] - 9:21, 9:23
**intends** [1] - 7:20
**intentions** [1] - 19:10
**intercepted** [1] - 44:8
**interest** [1] - 47:2
**interpose** [1] - 44:20
**interruption** [1] - 48:6
**interstate** [1] - 62:17
**introduce** [2] - 48:13, 57:12
**introduced** [1] - 48:14
**investigated** [4] - 39:5, 39:20, 39:22, 39:23
**investigating** [2] - 35:7, 54:19
**investigation** [42] - 12:23, 13:9, 13:20, 14:20, 16:4, 19:13, 20:6, 22:4, 22:18, 23:15, 25:17, 27:7, 31:18, 33:18, 34:12, 36:23, 39:8, 39:20, 40:10, 41:21, 41:24, 43:5, 43:22, 45:21, 47:4, 50:3, 50:4, 50:9, 50:20, 52:1, 54:1, 54:13, 55:19, 56:22, 59:10, 60:22, 61:19, 62:10, 64:7, 65:12, 66:8, 72:19
**investigations** [1] - 57:23
**investigators** [1] - 25:4
**involve** [2] - 8:7, 32:14
**involved** [17] - 21:9, 26:5, 41:25, 43:16, 50:4, 50:21, 50:24, 51:7, 52:6, 53:22, 54:20, 54:21, 55:20, 55:22, 62:10, 62:22, 67:21
**involves** [1] - 47:7
**involving** [4] - 7:21, 9:14, 18:5, 39:6
**irrelevant** [4] - 18:15, 51:4, 62:12, 65:15
**Irrelevant** [2] - 51:14, 62:23
**issue** [7] - 4:12, 4:20, 4:22, 5:9, 5:16, 5:22, 8:15
**issues** [3] - 5:13, 47:8, 64:5

**Ivankov** [1] - 23:19

## J

**jail** [1] - 61:8
**JEREMY** [4] - 2:25, 3:5, 11:8, 49:9
**join** [1] - 53:12
**Josie** [1] - 12:20
**JR** [1] - 2:4
**JUDGE** [1] - 1:5
**Judge** [1] - 5:23
**Judicial** [1] - 75:8
**July** [6] - 32:25, 34:1, 41:7, 63:13, 66:24, 70:2
**June** [4] - 45:8, 52:18, 56:9, 60:8
**juror** [3] - 10:5, 10:21, 10:22
**jurors** [20] - 4:10, 4:13, 7:1, 10:17, 11:23, 15:16, 24:7, 30:17, 32:8, 34:7, 40:16, 44:15, 44:25, 47:13, 52:9, 55:25, 59:21, 63:5, 66:15, 69:18
**JURY** [1] - 1:15
**jury** [8] - 7:6, 10:9, 10:18, 11:1, 47:24, 48:4, 73:20, 73:22
**Jury** [1] - 4:6
**JUSTICE** [1] - 2:8

## K

**Karine's** [1] - 61:10
**Katherine** [1] - 75:14
**KATHERINE** [2] - 1:22, 75:14
**Kazarian** [1] - 13:3
**keep** [1] - 29:12
**kept** [1] - 14:3
**kid's** [1] - 65:8
**kidnapped** [1] - 73:4
**kidnapping** [1] - 50:21
**killed** [1] - 24:4
**kind** [2] - 57:21, 72:24
**Kirakosian** [1] - 17:22
**Kiropesian** [1] - 18:23
**KLAUSNER** [1] - 1:5
**knowledge** [36] - 12:23, 13:9, 13:20, 14:20, 16:4, 19:13, 19:24, 20:5, 22:4, 22:18, 23:15, 25:17, 27:6, 31:18, 33:18, 40:10, 41:21, 43:18, 45:20, 47:4, 49:7, 50:3, 50:9, 50:19, 52:1, 54:1, 54:13, 55:19, 56:22, 59:10, 60:22, 61:19, 64:7, 65:12, 66:8, 72:19
**known** [3] - 13:17, 31:22, 39:10
**knows** [1] - 7:14
**Kof** [7] - 17:19, 17:21, 17:24, 18:24, 19:1, 19:4, 21:24
**Koghuashvilli** [1] - 13:14

## L

**Lacks** [1] - 37:13
**lacks** [3] - 16:17, 58:3, 60:24
**ladies** [3] - 40:18, 47:20, 73:15
**laid** [1] - 8:7

**Lake** [1] - 2:13
**lake** [1] - 54:24
**largely** [1] - 31:20
**last** [9] - 16:24, 17:13, 20:12, 23:9, 35:5, 37:4, 40:22, 61:3, 71:15
**late** [3] - 10:19, 10:21, 40:19
**law** [20] - 13:2, 13:4, 13:10, 13:12, 13:13, 13:21, 14:3, 14:10, 15:12, 23:17, 23:24, 24:1, 46:17, 54:15, 54:18, 54:20, 55:3, 55:6, 55:22, 68:2
**LAW** [2] - 2:12, 2:16
**lay** [3] - 18:8, 38:6, 70:9
**leading** [3] - 14:24, 20:22, 20:23
**Leading** [1] - 21:1
**learn** [4] - 8:13, 40:4, 43:23, 44:6
**learned** [1] - 44:11
**least** [2] - 60:17, 60:20
**leave** [1] - 55:14
**left** [3] - 47:1, 71:6, 72:17
**lengthy** [1] - 24:9
**less** [2] - 23:6, 51:8
**letters** [2] - 28:14, 29:13
**level** [3] - 21:19, 22:14, 32:5
**License** [1] - 75:15
**life** [1] - 30:2
**likely** [1] - 51:8
**limited** [3] - 43:16, 43:17, 49:4
**line** [3] - 30:5, 71:16, 72:5
**linked** [2] - 59:11, 59:16
**listed** [1] - 71:17
**Listen** [3] - 29:17, 55:13, 55:16
**listen** [3] - 18:10, 55:13, 67:6
**listening** [6] - 37:7, 41:15, 49:22, 63:25, 69:1, 69:3
**LNU** [7] - 16:5, 16:12, 16:16, 16:22, 16:24, 17:2, 17:6
**LNU)** [1] - 16:3
**loan** [8] - 49:21, 50:1, 50:5, 58:7, 65:8, 65:13, 65:19
**loans** [4] - 57:19, 58:24, 65:20, 65:22
**look** [3] - 37:5, 49:20, 65:11
**Look** [1] - 19:19
**looking** [4] - 29:19, 38:17, 71:3, 71:14
**looks** [2] - 38:12, 49:20
**LOS** [1] - 4:1
**Los** [8] - 1:17, 2:5, 2:9, 2:17, 13:2, 19:4, 39:16, 61:8
**lower** [2] - 21:19, 32:5
**lower-level** [2] - 21:19, 32:5
**lunch** [1] - 73:15
**Lusine** [3] - 46:4, 46:7, 46:18
**Lusine's** [1] - 46:16
**Luso** [4] - 45:18, 46:2, 46:3, 46:4

## M

**M.M** [23] - 4:24, 5:1, 5:2, 5:6, 5:10, 5:14, 5:15, 5:18, 6:22, 7:17, 7:21, 8:4, 8:7, 8:12, 9:13, 9:14, 9:22, 9:23, 9:25, 44:3, 51:12, 56:23, 59:3

**mafia** [1] - 28:25
**mail** [1] - 29:3
**male** [7] - 25:3, 25:12, 28:12, 29:17, 29:23, 30:8
**Manzekian** [1] - 21:8
**March** [1] - 75:10
**mark** [1] - 56:15
**Marquis'** [1] - 73:2
**married** [1] - 46:16
**MARTIN** [1] - 2:3
**Matosyan** [4] - 52:22, 54:7, 63:18, 67:4
**matter** [5] - 14:9, 47:23, 59:9, 73:19, 75:6
**Max** [1] - 57:16
**mean** [3] - 30:3, 45:22, 53:4
**mediate** [2] - 22:15, 55:4
**mediation** [2] - 22:17, 22:21
**mediations** [1] - 22:25
**mediators** [2] - 23:7, 55:7
**medical** [1] - 62:18
**Medicare** [3] - 62:10, 62:22, 63:2
**meet** [7] - 12:20, 13:21, 13:25, 14:1, 14:10, 14:19, 17:12
**Meet** [1] - 64:1
**member** [5] - 16:7, 20:7, 31:9, 33:16, 34:3
**members** [4] - 7:1, 10:17, 32:5, 50:20
**mention** [1] - 6:24
**mentioned** [2] - 48:12, 71:14
**met** [1] - 12:21
**methamphetamine** [5] - 37:15, 37:18, 37:23, 38:9, 38:10
**Mexican** [1] - 28:25
**Mher** [1] - 2:11
**MHER** [1] - 1:12
**MICHAEL** [1] - 2:12
**middle** [1] - 21:25
**might** [2] - 8:13, 64:1
**mike** [3] - 25:3, 35:5, 67:3
**Mike** [12] - 12:11, 12:13, 16:3, 18:19, 31:5, 33:5, 41:12, 45:12, 52:22, 60:12, 63:17, 70:6
**million** [2] - 50:1, 57:20
**mime** [1] - 54:11
**Minas** [5] - 44:5, 52:22, 63:17, 64:4, 67:3
**mine** [1] - 30:7
**mingling** [1] - 7:1
**minimize** [1] - 14:21
**minimum** [1] - 64:5
**minute** [3] - 41:20, 42:3, 61:11
**minutes** [3] - 4:17, 47:21, 47:25
**misspoken** [1] - 24:17
**mistrial** [3] - 8:16, 9:18, 10:2
**Mkrtchyan** [5] - 33:5, 33:8, 33:9, 33:14, 33:17
**Monday** [5] - 5:23, 5:25, 6:1, 6:9, 6:12
**money** [20] - 44:10, 45:15, 54:6, 58:2, 58:5, 58:6, 63:25, 65:9, 65:10, 66:4,

67:15, 67:16, 68:6, 68:9, 68:13, 68:16, 69:5, 69:9, 69:14, 73:5
**monitoring** [3] - 29:3, 29:5, 29:8
**month** [1] - 17:9
**MORNING** [2] - 1:16, 4:4
**morning** [8] - 4:14, 6:16, 10:23, 11:11, 11:12, 23:11, 64:2, 73:5
**moron** [2] - 49:20, 51:21
**mortgage** [3] - 50:7, 50:17, 65:22
**most** [2] - 23:25, 38:4
**mother** [3] - 56:18, 66:5, 67:14
**move** [17] - 8:16, 13:15, 14:6, 16:8, 18:2, 19:5, 23:21, 24:20, 25:21, 30:3, 36:7, 37:16, 42:25, 58:8, 58:20, 64:24, 66:11
**Move** [1] - 50:10
**moving** [1] - 39:21
**MR** [216] - 3:6, 4:22, 5:4, 5:19, 5:22, 6:1, 6:3, 6:6, 6:11, 6:14, 6:20, 6:24, 7:9, 7:11, 7:15, 7:19, 7:23, 8:2, 8:3, 8:9, 8:18, 8:20, 9:4, 9:10, 9:11, 9:20, 10:3, 11:7, 11:10, 11:20, 12:2, 13:15, 13:17, 13:22, 14:6, 14:9, 14:11, 14:15, 14:23, 15:2, 15:4, 15:14, 15:19, 16:8, 16:11, 16:17, 16:21, 17:4, 17:11, 18:2, 18:4, 18:7, 18:10, 18:15, 18:22, 19:5, 19:8, 20:1, 20:5, 20:8, 20:11, 20:22, 20:24, 21:1, 21:4, 21:16, 21:21, 22:9, 22:17, 22:19, 22:21, 23:5, 23:21, 23:24, 24:2, 24:5, 24:12, 24:16, 24:19, 25:21, 25:24, 26:7, 26:11, 26:16, 26:18, 26:20, 26:22, 26:24, 27:2, 27:4, 27:6, 27:9, 27:11, 27:13, 27:16, 27:20, 27:23, 28:2, 30:15, 30:20, 32:1, 32:6, 32:13, 34:5, 34:9, 34:18, 34:21, 36:1, 36:7, 36:12, 37:13, 37:16, 37:18, 37:21, 37:23, 38:2, 38:7, 38:20, 39:3, 39:5, 39:25, 40:3, 40:14, 40:21, 41:2, 42:15, 42:19, 42:24, 43:3, 43:11, 43:13, 43:17, 43:21, 43:22, 44:13, 44:18, 44:19, 44:24, 45:3, 45:23, 46:1, 46:11, 46:13, 46:18, 47:6, 47:11, 47:15, 48:18, 48:25, 49:6, 49:11, 50:10, 50:14, 50:16, 51:3, 51:11, 51:14, 51:17, 52:8, 52:13, 53:1, 53:5, 53:7, 53:9, 53:12, 53:14, 53:17, 54:23, 54:24, 55:6, 56:4, 58:3, 58:6, 58:8, 58:11, 58:16, 58:18, 58:20, 58:23, 59:13, 59:16, 59:19, 60:3, 60:24, 61:3, 61:22, 61:24, 62:12, 62:16, 62:18, 62:21, 62:23, 63:1, 63:4, 63:8, 64:24, 65:1, 65:4, 65:14, 65:18, 66:11, 66:14, 66:19, 68:17, 68:19, 68:21, 68:24, 69:10, 69:17, 69:22, 70:7, 70:11, 70:15, 71:13, 72:10, 72:13
**music** [1] - 17:9
**must** [1] - 69:2

## N

**name** [15] - 12:24, 13:2, 16:24, 17:13,

18:23, 20:17, 23:18, 34:4, 35:5, 39:15, 42:4, 44:4, 46:19, 55:17, 57:16
**named** [3] - 13:13, 17:7, 17:18
**names** [1] - 57:16
**nature** [2] - 16:22, 17:2
**need** [4] - 41:1, 41:17, 57:11, 60:17
**needs** [1] - 38:22
**nerves** [1] - 66:4
**never** [1] - 6:10
**news** [1] - 23:12
**next** [9] - 5:25, 8:5, 24:20, 26:13, 27:17, 27:20, 30:5, 33:21, 42:25
**nickname** [1] - 52:3
**nicknames** [1] - 72:9
**night** [2] - 17:17, 68:7
**nine** [4] - 29:23, 42:5, 53:18, 60:16
**Nine** [1] - 73:1
**NO** [1] - 1:10
**non** [1] - 8:8
**non-hearsay** [1] - 8:8
**nonresponsive** [1] - 36:7
**normal** [1] - 14:18
**North** [2] - 2:5, 2:8
**note** [1] - 24:7
**noted** [2] - 44:23, 51:16
**Nothing** [2] - 72:15, 72:16
**nothing** [2] - 60:21, 64:3
**notice** [3] - 5:17, 5:24, 6:25
**notify** [1] - 7:6
**number** [5] - 41:20, 70:21, 70:25, 71:14, 71:17
**numbers** [1] - 58:14
**numerous** [3] - 51:12, 59:11, 59:16

## O

**o'clock** [8] - 4:13, 5:23, 6:3, 68:7, 69:1, 69:3, 73:16, 73:24
**Oaks** [2] - 1:23, 2:21
**object** [1] - 72:10
**objection** [49] - 13:22, 14:11, 14:23, 16:8, 16:17, 17:4, 18:15, 20:1, 20:8, 21:1, 22:9, 22:19, 25:21, 26:16, 26:20, 26:24, 27:4, 27:9, 27:13, 32:1, 36:1, 37:13, 38:2, 39:3, 39:25, 42:15, 44:20, 45:23, 46:11, 47:6, 50:12, 51:3, 51:14, 53:2, 58:3, 58:8, 58:16, 58:20, 59:13, 61:22, 62:12, 62:23, 64:24, 65:14, 66:11, 68:17, 68:21, 69:10, 70:7
**objects** [1] - 43:13
**obligation** [1] - 68:13
**obtain** [1] - 23:7
**obtained** [1] - 39:15
**obtaining** [1] - 58:24
**OF** [5] - 1:2, 1:8, 1:15, 2:8, 2:16
**offered** [1] - 43:14
**officers** [1] - 70:21
**offices** [1] - 15:9
**OFFICES** [1] - 2:16
**Official** [1] - 75:15

**officials** [2] - 29:2, 64:18
**often** [3] - 14:21, 23:5, 37:18
**oftentimes** [1] - 50:23, 69:9, 69:14
**Ogandganyan** [2] - 46:4, 46:7, 46:20
**Ogandganyan's** [1] - 46:18
**old** [1] - 57:19
**once** [2] - 6:20, 9:8
**One** [1] - 38:21
**one** [43] - 4:13, 12:19, 17:9, 19:22, 19:23, 22:2, 26:12, 29:16, 32:9, 33:16, 35:22, 37:6, 38:23, 38:25, 41:15, 42:7, 42:25, 48:18, 59:22, 72:9
**ones** [1] - 38:16
**oOo** [1] - 74:4
**open** [20] - 10:1, 12:1, 15:18, 20:16, 24:15, 24:18, 28:1, 30:19, 32:12, 34:20, 41:1, 45:2, 47:14, 52:12, 56:3, 57:19, 60:2, 63:7, 66:18, 69:21
**opened** [1] - 9:18
**opinions** [2] - 47:23, 73:19
**order** [1] - 55:4
**organized** [1] - 54:19
**Otero** [1] - 5:23
**outside** [7] - 7:2, 17:8, 59:5, 61:11, 61:12, 68:9, 69:16
**overruled** [40] - 13:16, 13:24, 14:13, 16:10, 16:19, 17:5, 18:3, 19:7, 20:9, 21:18, 22:11, 23:23, 26:9, 26:25, 27:14, 32:3, 36:2, 37:14, 40:1, 42:17, 45:24, 46:14, 47:9, 50:12, 51:5, 51:16, 53:11, 55:1, 58:4, 58:10, 58:17, 58:22, 59:15, 61:1, 62:24, 65:16, 66:13, 69:12, 72:12
**own** [2] - 14:3, 64:23

## P

**P.M** [13] - 12:9, 16:1, 33:2, 35:3, 41:9, 45:10, 45:16, 52:20, 56:13, 63:15, 67:1, 70:4, 74:2
**page** [74] - 3:4, 12:3, 12:14, 12:17, 14:15, 15:4, 15:20, 19:8, 19:18, 20:11, 21:23, 24:13, 24:20, 25:9, 27:18, 27:21, 27:22, 28:6, 29:15, 30:21, 31:3, 31:11, 32:8, 32:10, 32:21, 33:3, 33:11, 34:22, 35:17, 36:17, 37:4, 38:20, 41:3, 41:10, 41:13, 42:2, 45:4, 45:13, 46:1, 47:16, 49:16, 49:24, 51:17, 52:14, 53:17, 54:8, 55:12, 55:15, 56:5, 56:16, 57:9, 57:10, 59:1, 59:23, 59:24, 60:4, 60:13, 61:4, 61:9, 63:9, 63:21, 63:22, 65:4, 65:24, 66:20, 67:5, 67:10, 68:4, 68:24, 69:23, 71:3, 71:15, 72:2, 75:7
**pages** [1] - 24:9
**paid** [1] - 66:6
**paint** [1] - 31:16
**Palmas** [1] - 30:6
**Palmoll** [1] - 30:6
**Pardon** [1] - 4:25
**Parsadanyan** [21] - 2:19, 43:12, 43:15,

43:18, 48:17, 48:20, 48:21, 48:22, 70:6, 70:10, 70:16, 70:18, 70:20, 71:6, 71:23, 71:24, 72:8, 72:16, 72:18, 72:20, 73:2

**part** [2] - 33:6, 72:1

**participants** [14] - 12:10, 16:2, 25:2, 31:3, 33:4, 35:4, 41:11, 45:11, 49:16, 52:21, 60:11, 63:16, 67:2, 71:16

**particular** [7] - 20:20, 24:8, 25:5, 40:22, 43:23, 48:15, 52:5

**particulars** [1] - 42:20

**partner** [1] - 65:6

**Pasadena** [2] - 1:23, 2:13

**passed** [1] - 24:3

**past** [3] - 15:1, 15:7, 38:9

**pay** [10] - 64:5, 64:11, 64:16, 68:5, 68:6, 68:13, 68:16, 68:20, 69:14

**paying** [1] - 64:21, 64:22, 69:5

**people** [13] - 13:21, 14:1, 14:4, 17:8, 19:12, 19:14, 21:20, 22:1, 23:6, 26:4, 29:13, 59:5, 59:9

**percent** [1] - 54:12

**PEREYRA** [18] - 2:16, 2:16, 7:9, 7:15, 7:19, 7:23, 8:2, 8:9, 8:18, 8:20, 9:11, 44:19, 50:14, 53:12, 54:24, 60:24, 65:1, 68:21

**PEREYRA-SUAREZ** [18] - 2:16, 2:16, 7:9, 7:15, 7:19, 7:23, 8:2, 8:9, 8:18, 8:20, 9:11, 44:19, 50:14, 53:12, 54:24, 60:24, 65:1, 68:21

**period** [1] - 67:12

**permission** [16] - 11:21, 15:15, 24:6, 27:17, 30:16, 32:7, 34:6, 40:15, 44:14, 47:12, 52:9, 55:24, 59:20, 63:5, 66:15, 69:18

**person** [12] - 5:7, 8:24, 8:25, 9:6, 13:1, 17:19, 19:11, 21:9, 22:14, 39:13, 39:16, 39:19

**personally** [1] - 71:8

**pertain** [2] - 11:17, 43:6

**pertaining** [1] - 16:12

**Petrosian** [10] - 12:11, 12:12, 14:16, 15:5, 18:19, 31:5, 31:7, 32:19, 33:6, 34:16

**phone** [15] - 14:22, 17:15, 25:13, 25:15, 26:12, 26:13, 26:15, 26:23, 35:9, 35:12, 67:16, 70:21, 70:23, 70:24, 72:25

**phones** [4] - 25:20, 26:3, 27:12

**place** [2] - 7:13, 44:7

**Plaintiff** [1] - 1:9

**plan** [1] - 65:9

**play** [27] - 7:20, 8:6, 8:13, 8:24, 9:22, 10:1, 11:15, 11:22, 15:15, 16:12, 24:6, 27:17, 30:16, 32:7, 33:6, 34:6, 34:18, 40:15, 44:14, 44:24, 47:12, 52:9, 55:25, 59:20, 63:5, 66:15, 69:18

**played** [21] - 11:13, 12:1, 15:18, 24:15, 24:18, 28:1, 30:19, 32:12, 34:20, 40:22, 41:1, 45:2, 47:14, 52:12, 53:2,

56:3, 60:2, 63:7, 66:18, 69:21, 73:6

**plot** [2] - 44:6, 52:5

**PM** [1] - 31:2, 60:10

**point** [10] - 33:16, 33:19, 33:20, 34:15, 35:16, 43:4, 43:22, 52:5, 53:1, 66:6

**points** [1] - 33:24

**police** [9] - 51:9, 54:17, 55:14, 55:17, 55:20, 56:18, 56:20, 56:21, 56:23

**possession** [1] - 29:5

**possibility** [1] - 10:2

**potentially** [1] - 6:22

**power** [3] - 19:4, 23:6, 30:12

**Power** [12] - 20:7, 21:15, 22:25, 31:6, 31:9, 31:22, 32:20, 33:9, 37:1, 39:14, 50:21, 52:4

**powerful** [2] - 13:17, 23:17, 23:25

**practice** [7] - 22:5, 26:4, 26:11, 29:2, 29:8, 29:11, 69:5

**predict** [1] - 8:22

**preface** [1] - 43:6

**presence** [1] - 10:11

**present** [3] - 4:11, 10:9, 48:4

**PRESENT** [1] - 2:24

**PRESIDING** [1] - 1:5

**pretty** [1] - 4:18

**previous** [7] - 16:11, 16:15, 17:12, 17:23, 18:4, 44:21, 73:7

**PREVIOUSLY** [3] - 3:5, 11:8, 49:9

**principles** [1] - 10:13

**priorities** [1] - 63:23

**prison** [25] - 25:8, 27:11, 28:4, 28:19, 29:2, 29:22, 30:1, 30:4, 30:13, 34:2, 34:13, 36:6, 39:21, 42:11, 42:14, 42:22, 57:5, 64:13, 64:18, 64:22, 66:9, 68:6, 68:16, 69:6, 69:15

**probability** [1] - 6:15

**problem** [3] - 6:5, 7:5, 10:20

**proceedings** [1] - 75:6

**PROCEEDINGS** [1] - 1:15

**proceeds** [1] - 51:10

**process** [1] - 42:21

**produce** [1] - 7:24

**promise** [1] - 8:11

**protection** [1] - 64:21

**provided** [1] - 70:21

**purposes** [1] - 8:8

**pursuant** [1] - 75:3

**put** [5] - 5:17, 25:15, 26:12, 28:11, 36:4

**putting** [1] - 9:14

**Pzo** [4] - 12:19, 12:24, 13:2, 13:14

---

**Q**

**quarter** [1] - 43:2

**questioning** [1] - 5:13

**questions** [5] - 19:22, 19:23, 34:10, 43:20

---

**R**

**racketeering** [3] - 11:17, 43:6, 49:1

**Raf** [2] - 72:6, 72:7

**Rafael** [9] - 2:19, 70:6, 70:16, 70:18, 71:6, 71:23, 71:24, 72:8, 72:20

**raise** [4] - 4:23, 5:9, 6:21, 7:2

**raised** [2] - 5:13, 6:25

**raises** [1] - 8:15

**raising** [1] - 8:9

**ran** [1] - 10:20

**rather** [2] - 24:8, 40:19

**re** [1] - 57:19

**re-open** [1] - 57:19

**reach** [3] - 54:9, 54:12, 66:6

**read** [1] - 48:16

**real** [1] - 13:2

**Really** [1] - 30:8

**reason** [3] - 8:9, 9:5, 51:24

**reasons** [4] - 9:21, 18:13, 32:9, 59:23

**recess** [5] - 10:6, 48:2, 73:20, 73:23, 74:1

**Recess** [1] - 10:7

**recognize** [1] - 70:20

**record** [5] - 10:16, 11:4, 11:16, 47:7, 48:23

**recording** [17] - 12:1, 15:18, 24:15, 24:18, 28:1, 30:19, 32:12, 34:20, 41:1, 45:2, 47:14, 52:12, 56:3, 60:2, 63:7, 66:18, 69:21

**REED** [1] - 2:20

**refer** [20] - 15:11, 21:14, 28:17, 28:24, 29:21, 30:1, 31:25, 33:19, 35:25, 37:11, 40:5, 47:5, 54:14, 54:16, 58:1, 58:14, 58:18, 60:23, 62:4, 64:8

**reference** [7] - 17:18, 21:11, 31:24, 46:2, 64:10, 72:7, 73:11

**references** [1] - 5:11

**referred** [2] - 40:11, 54:2

**referring** [5] - 13:5, 19:17, 54:3, 54:6, 59:3

**refers** [18] - 13:7, 21:24, 28:25, 32:4, 33:21, 36:4, 36:21, 37:9, 38:25, 49:25, 54:15, 54:17, 56:25, 57:4, 58:19, 61:4, 62:6, 62:8

**refert** [1] - 57:7

**reflect** [3] - 4:10, 10:16, 11:4

**regard** [18] - 18:4, 20:6, 20:19, 20:25, 21:4, 33:24, 34:11, 39:22, 40:3, 49:7, 54:18, 57:23, 58:11, 58:13, 70:15

**regardless** [1] - 51:20

**regulations** [1] - 75:8

**relate** [1] - 48:20

**related** [1] - 11:14

**relates** [2] - 30:1, 62:2

**relationship** [1] - 46:6

**relatives** [1] - 67:14

**Relevance** [1] - 36:1

**relevance** [1] - 39:25

**relevant** [1] - 48:22

**remainder** [2] - 28:3, 32:14
**remember** [3] - 47:21, 70:14, 73:17
**remembrance** [1] - 10:12
**reported** [1] - 75:5
**Reporter** [1] - 75:15
**REPORTER'S** [1] - 1:15
**requests** [8] - 15:15, 24:6, 30:16, 32:7, 34:6, 40:15, 47:12, 59:20
**Resolve** [1] - 64:4
**respect** [1] - 7:16
**respected** [1] - 14:4
**respective** [1] - 10:18
**responds** [2] - 29:24, 56:20
**rest** [2] - 36:10, 60:18
**RESUMED** [3] - 3:6, 11:9, 49:10
**retire** [2] - 47:24, 73:20
**return** [1] - 53:20
**RICO** [2] - 39:21, 48:24
**rise** [8] - 4:7, 10:6, 10:8, 10:10, 48:1, 48:3, 48:7, 73:21
**risk** [2] - 67:15, 67:23
**rival** [2] - 14:5, 31:22
**road** [1] - 9:1
**rolled** [1] - 36:4
**room** [2] - 47:24, 73:20
**RPR** [2] - 1:22, 75:14
**ruling** [3] - 4:24, 4:25, 5:1
**Russia** [1] - 23:20
**Russian** [1] - 23:12
**Russians** [4] - 49:23, 57:11, 57:14, 57:15

### S

**sadder** [1] - 22:1
**safest** [1] - 8:22
**San** [1] - 57:18
**sandbagging** [1] - 8:10
**save** [2] - 22:2, 54:11
**saw** [2] - 38:16, 61:14
**scare** [1] - 55:18
**scheme** [1] - 49:7
**scores** [4] - 57:21, 58:11, 58:19, 58:23
**seated** [4] - 4:9, 10:15, 48:5, 48:9
**seats** [2] - 10:17, 10:18
**second** [6] - 55:15, 59:2, 61:9, 65:24, 68:25, 71:15
**Section** [1] - 75:4
**see** [9] - 6:19, 20:16, 23:13, 47:24, 51:19, 51:21, 53:24, 73:2, 73:15
**segment** [8] - 24:12, 24:17, 24:20, 27:17, 27:20, 40:22, 40:23, 42:25
**segments** [1] - 24:10
**selling** [1] - 41:15
**send** [2] - 28:10, 28:14
**sending** [1] - 29:13
**sense** [1] - 21:21
**sent** [1] - 73:5
**sentencing** [1] - 5:23
**Series** [1] - 6:17

**serve** [8] - 5:5, 6:21, 8:4, 9:2, 9:8, 9:23, 9:25, 10:1
**served** [2] - 8:24, 9:8
**SESSION** [2] - 1:16, 4:4
**session** [6] - 4:8, 6:8, 6:11, 6:16, 10:14, 48:8
**Set** [1] - 63:23
**settle** [2] - 22:6, 23:7
**seven** [2] - 36:20, 56:16
**several** [2] - 17:8, 59:8
**SEVERO** [74] - 2:12, 2:12, 6:11, 6:14, 7:11, 13:15, 13:22, 14:6, 14:11, 14:23, 15:2, 16:8, 16:17, 17:4, 18:2, 18:7, 18:15, 19:5, 20:1, 20:8, 20:22, 21:1, 21:16, 22:9, 22:19, 22:21, 23:21, 25:21, 26:7, 26:16, 26:20, 26:24, 27:4, 27:9, 27:13, 32:1, 36:1, 36:7, 37:13, 37:16, 37:21, 38:2, 39:3, 39:25, 42:15, 45:23, 46:11, 46:13, 47:6, 50:10, 51:3, 51:14, 53:1, 53:5, 53:7, 53:9, 53:14, 54:23, 58:3, 58:8, 58:16, 58:20, 59:13, 61:22, 62:12, 62:18, 62:23, 64:24, 65:14, 66:11, 68:17, 69:10, 70:7, 72:10
**Sharopetrosian** [56] - 2:15, 11:18, 34:11, 34:13, 35:6, 35:8, 35:12, 36:20, 37:5, 38:21, 41:12, 41:14, 41:16, 41:18, 41:19, 42:3, 42:6, 43:9, 44:8, 45:12, 45:14, 46:7, 46:15, 46:24, 48:15, 49:19, 49:22, 49:25, 51:21, 52:23, 53:19, 54:2, 54:8, 55:16, 56:15, 56:17, 56:25, 57:14, 59:2, 59:6, 60:12, 60:16, 60:20, 61:21, 63:17, 63:23, 64:4, 64:11, 65:5, 65:25, 67:3, 67:7, 67:12, 68:5, 68:11, 68:25
**Sheriff's** [1] - 39:16
**Sherman** [1] - 2:21
**short** [1] - 66:1
**show** [3] - 9:25, 70:25, 71:3
**shows** [1] - 11:1
**SHU** [1] - 28:17
**sides** [1] - 7:6
**SIM** [11] - 25:15, 25:18, 25:24, 26:2, 26:5, 26:8, 26:12, 26:14, 26:19, 26:22, 27:12
**sister** [1] - 46:16
**sister's** [1] - 46:19
**sit** [2] - 7:12, 7:13
**sitting** [1] - 64:1
**situation** [3] - 7:16, 8:16, 9:12
**six** [2] - 25:12, 55:12
**smuggle** [3] - 42:10, 42:13, 42:21
**smuggling** [1] - 27:12
**sniper** [1] - 39:14
**soldier** [1] - 20:14
**soldiers** [4] - 20:17, 21:12, 21:14, 21:19
**someone** [2] - 17:18, 25:15
**sometimes** [3] - 10:25, 62:4, 64:15
**son** [1] - 73:3
**soon** [1] - 10:5

**Sorry** [1] - 8:13
**sorry** [6] - 6:6, 7:9, 21:16, 46:12, 53:5, 53:14
**sort** [1] - 4:13
**sorts** [3] - 64:20, 68:16, 68:19
**sought** [1] - 68:2
**South** [1] - 2:13
**Speaker** [4] - 57:13, 70:15, 70:19, 71:25
**speaker** [19] - 20:12, 23:9, 29:16, 33:21, 35:17, 37:4, 45:14, 46:23, 55:15, 57:10, 59:2, 59:24, 61:3, 61:9, 63:22, 65:25, 68:25, 72:5, 72:14
**speakers** [33] - 12:17, 14:16, 15:5, 19:9, 19:18, 21:24, 25:12, 27:23, 28:9, 29:15, 29:23, 31:14, 33:14, 36:20, 38:21, 41:13, 42:2, 42:5, 49:19, 51:18, 53:18, 55:12, 56:14, 56:17, 56:25, 60:16, 65:5, 67:6, 67:11, 68:4, 68:10, 70:5, 73:1
**speaking** [7] - 22:12, 29:12, 32:15, 42:21, 51:2, 51:6, 67:21
**speaks** [2] - 32:19, 33:6, 67:6
**special** [2] - 28:18, 63:8
**Special** [16] - 11:11, 12:2, 15:19, 24:19, 28:2, 30:20, 34:21, 41:2, 43:4, 45:3, 49:11, 52:13, 56:4, 60:3, 66:19, 69:22
**specifically** [1] - 59:24
**speculation** [11] - 12:23, 14:6, 19:5, 21:17, 22:9, 36:8, 50:10, 54:23, 61:22, 65:1, 69:11
**Speculation** [1] - 14:11
**Spito** [3] - 41:20, 41:22, 41:23
**Spring** [2] - 2:5, 2:8
**stabbed** [2] - 16:7, 17:7
**stabbing** [2] - 19:3, 19:17
**stand** [2] - 11:5, 61:17
**stands** [1] - 10:13
**start** [4] - 10:5, 34:9, 59:23, 59:24
**started** [3] - 10:19, 10:22, 40:18
**starting** [2] - 27:19, 49:16
**state** [1] - 20:4
**state's** [1] - 38:21
**statement** [5] - 20:19, 21:11, 21:25, 62:7, 66:3
**statements** [1] - 5:10
**STATES** [5] - 1:1, 1:8, 2:4, 2:4, 2:7
**States** [5] - 4:7, 10:13, 48:7, 75:4, 75:9
**states** [38] - 12:18, 14:17, 19:19, 20:13, 23:10, 28:9, 29:16, 29:17, 30:6, 31:14, 33:14, 35:18, 36:21, 37:5, 41:14, 42:3, 42:6, 45:14, 46:24, 49:19, 51:19, 53:19, 53:23, 54:8, 55:13, 55:16, 56:17, 57:10, 57:15, 60:16, 61:10, 63:23, 65:25, 68:5, 72:6, 72:14, 72:16, 73:1
**status** [2] - 14:9, 55:9
**stay** [2] - 36:10, 59:9
**Stebbins** [18] - 11:11, 12:2, 15:19, 24:19, 28:3, 30:20, 34:21, 41:2, 43:4, 45:3, 47:15, 49:11, 52:13, 56:4, 60:3,

63:8, 66:19, 69:22
**STEBBINS** [4] - 2:25, 3:5, 11:8, 49:9
**stenographically** [1] - 75:5
**still** [5] - 10:1, 15:6, 23:17, 35:11, 69:12
**stop** [3] - 28:2, 28:13, 32:9
**stopped** [1] - 70:22
**store** [4] - 72:18, 72:20, 72:24, 72:25
**Street** [2] - 2:5, 2:8
**stricken** [1] - 36:10
**STRIDE** [2] - 1:22, 75:14
**Stride** [1] - 75:14
**strike** [14] - 13:15, 14:6, 16:9, 18:2, 19:6, 23:21, 25:21, 36:7, 37:16, 50:10, 58:8, 58:20, 64:24, 66:11
**stuck** [1] - 4:16
**student** [2] - 65:8, 65:20
**studio** [1] - 17:9
**stuff** [7] - 12:21, 23:14, 28:14, 29:18, 29:19, 30:6, 33:16
**SUAREZ** [18] - 2:16, 2:16, 7:9, 7:15, 7:19, 7:23, 8:2, 8:7, 8:20, 9:11, 44:19, 50:14, 53:12, 54:24, 60:24, 65:1, 68:21
**subpoena** [6] - 5:6, 6:21, 8:3, 8:4, 8:12, 8:23
**subpoenaed** [1] - 9:13
**subscribed** [3] - 71:6, 71:20, 71:22
**successful** [3] - 17:15, 22:18, 23:1
**sufficiency** [1] - 59:22
**suggestive** [2] - 14:24, 20:22
**Suite** [2] - 2:13, 2:21
**Sunset** [1] - 4:17
**support** [1] - 19:11
**supported** [1] - 20:25
**supporting** [2] - 20:20, 21:5
**supposed** [1] - 7:7
**surveillance** [1] - 15:9
**suspect** [1] - 5:12
**sustained** [17] - 14:8, 15:3, 18:16, 20:23, 21:3, 25:23, 26:17, 26:21, 27:5, 27:10, 37:22, 39:4, 61:23, 62:20, 65:3, 68:18, 68:23
**switch** [2] - 25:20, 26:15
**switching** [1] - 26:5
**SWORN** [2] - 11:8, 49:9
**SWORN...........** [1] - 3:5

---

**T**

**talks** [1] - 25:13
**Tangabekyan** [1] - 41:23
**tapes** [5] - 7:21, 8:13, 8:24, 9:14, 10:1
**tar** [3] - 39:24, 40:2, 40:13
**targeted** [1] - 43:24
**targets** [3] - 50:4, 50:23, 62:9
**task** [1] - 44:11
**taxes** [1] - 69:15
**telephone** [2] - 11:13, 11:15
**ten** [1] - 32:10
**ten-page** [1] - 32:10

**term** [17] - 21:14, 28:21, 29:21, 30:1, 37:11, 40:5, 40:8, 40:11, 45:21, 47:5, 54:14, 54:16, 57:4, 57:24, 61:24, 62:4, 62:8
**terms** [1] - 71:13
**testify** [2] - 4:24, 5:1
**testimony** [7] - 25:22, 26:7, 32:2, 48:11, 48:13, 49:4, 70:12
**THE** [177] - 2:12, 4:7, 4:10, 4:25, 5:16, 5:20, 5:25, 6:2, 6:4, 6:8, 6:13, 6:15, 6:23, 7:4, 7:14, 7:18, 7:22, 8:1, 8:17, 8:19, 8:21, 9:7, 9:15, 9:24, 10:4, 10:6, 10:8, 10:10, 10:16, 11:19, 11:25, 13:16, 13:24, 13:25, 14:8, 14:13, 14:14, 14:25, 15:3, 15:17, 16:10, 16:19, 16:20, 17:5, 17:6, 18:3, 18:8, 18:16, 18:19, 18:21, 19:7, 20:3, 20:9, 20:10, 20:23, 21:3, 21:18, 21:19, 22:11, 22:12, 22:20, 22:23, 23:2, 23:4, 23:23, 23:25, 24:11, 24:14, 25:23, 26:9, 26:10, 26:17, 26:21, 26:25, 27:1, 27:5, 27:10, 27:14, 27:15, 27:19, 27:22, 27:25, 30:18, 32:3, 32:4, 32:11, 34:8, 36:2, 36:3, 36:9, 37:14, 37:15, 37:17, 37:22, 38:1, 38:3, 38:16, 38:18, 38:19, 39:4, 39:24, 40:1, 40:2, 40:17, 40:25, 42:17, 42:18, 43:2, 43:10, 43:14, 43:19, 44:17, 44:22, 45:24, 45:25, 46:12, 46:14, 46:15, 47:9, 47:10, 47:18, 48:1, 48:3, 48:5, 48:7, 48:10, 48:19, 49:3, 49:8, 50:12, 51:5, 51:6, 51:16, 52:11, 53:4, 53:6, 53:8, 53:11, 53:16, 55:1, 55:2, 56:2, 58:4, 58:5, 58:10, 58:17, 58:22, 59:15, 60:1, 61:1, 61:2, 61:23, 62:14, 62:20, 62:24, 62:25, 65:3, 65:16, 65:17, 66:13, 66:17, 68:18, 68:23, 69:12, 69:14, 69:20, 70:8, 70:13, 71:7, 71:9, 71:10, 71:11, 71:12, 72:12, 73:14, 73:21, 73:23
**themselves** [1] - 9:18
**they've** [1] - 9:18
**thief** [12] - 12:19, 13:2, 13:4, 13:8, 13:10, 13:12, 13:13, 14:10, 23:17, 23:24, 24:1, 55:3
**thief-in-law** [10] - 13:2, 13:4, 13:10, 13:12, 13:13, 14:10, 23:17, 23:24, 24:1, 55:3
**thieves** [8] - 13:21, 14:3, 54:10, 54:14, 54:15, 54:18, 54:20, 55:6
**thieves-in-law** [6] - 13:21, 14:3, 54:15, 54:18, 54:20, 55:6
**thousand** [1] - 61:2
**threatened** [1] - 51:9
**three** [9] - 14:16, 19:18, 21:23, 28:9, 43:15, 52:24, 57:14, 57:15, 63:19
**three-way** [2] - 52:24, 63:19
**Title** [1] - 75:3
**today** [2] - 9:22, 11:14
**tomorrow** [2] - 23:11, 64:6

**took** [4] - 47:1, 53:20, 54:3, 54:9
**top** [33] - 15:5, 27:22, 29:16, 29:23, 31:14, 33:14, 35:18, 38:21, 41:14, 42:3, 42:5, 46:23, 49:19, 51:18, 53:18, 55:15, 56:17, 57:9, 57:10, 59:2, 59:24, 59:25, 60:16, 63:21, 65:5, 65:25, 67:6, 68:5, 68:10, 68:25, 72:14, 73:1
**Tot** [1] - 31:5
**Toto** [1] - 32:19
**towards** [4] - 33:20, 33:24, 62:7, 66:3
**Towers** [5] - 61:4, 61:5, 61:7
**town** [2] - 19:22, 20:17
**track** [1] - 29:12
**traded** [2] - 27:3, 27:7
**traffic** [4] - 29:24, 30:1, 30:5, 70:22
**trafficking** [2] - 40:12, 41:25
**train** [2] - 4:14, 10:23
**training** [21] - 21:13, 22:24, 23:5, 28:16, 29:1, 29:20, 29:25, 30:11, 35:24, 37:8, 38:24, 42:9, 54:19, 57:3, 57:22, 58:12, 61:25, 65:19, 67:17, 68:15, 69:4
**TRANSCRIPT** [1] - 1:15
**transcript** [53] - 11:23, 12:14, 14:16, 15:5, 15:16, 15:20, 19:9, 19:18, 20:12, 21:23, 27:18, 28:6, 30:17, 30:21, 31:11, 32:10, 32:21, 33:3, 33:11, 34:7, 40:16, 41:10, 41:13, 42:2, 44:15, 45:1, 45:4, 45:13, 46:2, 47:16, 47:18, 48:19, 49:17, 49:25, 51:18, 52:10, 53:18, 56:16, 57:9, 57:13, 59:1, 60:13, 61:9, 63:9, 63:21, 65:24, 67:5, 68:25, 69:23, 71:4, 71:15, 75:5, 75:7
**Transcript** [1] - 27:21
**transcripts** [2] - 48:16, 72:2
**transition** [1] - 40:23
**trial** [1] - 7:5
**TRIAL** [1] - 1:15
**trimmed** [2] - 18:12, 18:17
**true** [2] - 45:18, 75:4
**try** [3] - 22:15, 29:13, 34:3
**Tsyom** [1] - 61:12
**Tuesday** [1] - 1:18
**TUESDAY** [1] - 4:1
**turn** [19] - 11:20, 11:23, 15:16, 24:7, 24:16, 30:17, 32:8, 34:7, 40:16, 44:16, 44:25, 47:13, 52:9, 52:14, 55:25, 59:21, 63:5, 66:15, 69:18
**turning** [53] - 12:2, 12:14, 14:15, 15:4, 15:19, 19:8, 19:18, 20:11, 21:23, 24:20, 25:9, 28:6, 29:15, 30:20, 31:3, 31:11, 32:21, 33:11, 34:21, 35:17, 36:17, 37:4, 38:20, 41:3, 41:10, 41:13, 42:2, 45:3, 45:13, 46:1, 46:23, 47:15, 49:12, 51:17, 53:17, 55:12, 56:4, 56:16, 57:9, 59:1, 60:13, 61:9, 63:8, 63:21, 65:4, 65:24, 66:20, 67:5, 67:10, 68:4, 68:24, 69:22, 72:2
**Twin** [2] - 61:4, 61:5, 61:7
**two** [6] - 15:5, 29:15, 43:16, 43:17, 50:1, 54:21

**type** [1] - 36:5

## U

**U.S** [1] - 2:8
**unable** [1] - 25:4
**under** [4] - 53:4, 53:6, 53:9, 68:12
**unidentified** [4] - 25:12, 29:23, 30:7, 30:8
**Unidentified** [1] - 28:12
**unified** [1] - 29:17
**Unintelligible** [1] - 33:15
**unit** [1] - 28:18
**United** [5] - 4:7, 10:13, 48:7, 75:4, 75:9
**UNITED** [5] - 1:1, 1:8, 2:4, 2:4, 2:7
**unknown** [4] - 16:25, 17:13, 25:3, 35:5
**unsuccessful** [1] - 8:14
**unusual** [3] - 13:21, 13:25, 14:2
**up** [15] - 9:18, 12:20, 12:21, 23:11, 23:12, 24:9, 25:14, 28:15, 35:22, 35:25, 36:4, 49:4, 57:20, 57:24, 61:17
**upset** [3] - 59:4, 59:5, 61:16
**urgently** [1] - 60:18
**usual** [1] - 14:1

## V

**vague** [2] - 13:22, 22:21
**Vahan** [17] - 16:3, 16:5, 16:12, 16:16, 16:22, 17:2, 17:6, 17:13, 19:10, 19:24, 20:6, 20:16, 20:17, 20:20, 20:25, 21:5, 22:13
**Vahan's** [1] - 20:14
**validate** [1] - 29:17
**validated** [4] - 28:21, 28:25, 29:9, 30:12
**validation** [1] - 33:20
**Valodia** [1] - 57:16
**various** [1] - 5:12
**Ventura** [1] - 2:21
**Victim** [13] - 4:24, 5:10, 5:14, 5:15, 6:22, 7:17, 7:21, 8:7, 9:22, 9:23, 51:12, 56:23, 59:3
**victim** [3] - 54:7, 55:3, 55:5
**victims** [1] - 51:12
**viewed** [2] - 38:9, 38:10
**voice** [2] - 35:16, 70:21
**Volume** [1] - 44:15
**VOLUME** [1] - 1:15
**vs** [1] - 1:10
**Vyucheslav** [1] - 23:19

## W

**wait** [2] - 4:19, 6:18
**waiting** [2] - 23:10, 64:2
**wants** [1] - 4:11
**watch** [2] - 23:12
**watching** [1] - 7:8
**week** [1] - 60:18
**WESTERN** [1] - 1:3
**White** [2] - 31:15, 31:19

**white** [2] - 31:20, 37:6
**Whore** [1] - 64:3
**whore** [1] - 68:8
**whores** [2] - 54:10, 54:16
**wife's** [1] - 65:7
**Wilshire** [1] - 2:17
**winning** [1] - 6:17
**wire** [1] - 8:6
**wired** [1] - 69:15
**wiretap** [1] - 70:24
**wiretapped** [1] - 34:15
**wiring** [1] - 69:5
**witness** [6] - 11:4, 11:5, 19:5, 36:8, 50:11, 69:11
**WITNESS** [35] - 11:8, 13:25, 14:14, 16:20, 17:6, 18:19, 20:10, 21:19, 22:12, 22:20, 23:2, 23:25, 26:10, 27:1, 27:15, 32:4, 36:3, 37:15, 38:1, 38:18, 40:2, 42:18, 45:25, 46:15, 47:10, 49:9, 51:6, 55:2, 58:5, 61:2, 62:25, 65:17, 69:14, 71:9, 71:11
**WITNESS(S** [1] - 3:2
**word** [3] - 30:5, 37:9, 53:19
**works** [1] - 69:8
**world** [2] - 23:7, 55:10
**World** [1] - 6:17
**wrapped** [1] - 38:22
**wrapping** [1] - 36:21
**wrote** [3] - 33:15, 35:22, 35:25
**www.stridecourtreporting.com** [1] - 1:24

## Y

**YANG** [1] - 2:3
**Yaponchik** [3] - 23:13, 23:16, 23:17
**yard** [2] - 29:19, 29:21
**yesterday** [3] - 4:24, 11:13, 12:18
**youngster** [1] - 20:15
**youngsters** [4] - 31:16, 31:24, 31:25, 32:4
**yourself** [1] - 10:2
**yourselves** [2] - 47:22, 73:18

## Z

**Zahre** [2] - 17:7, 21:8
**Zero** [3] - 35:5, 35:19, 35:21

001163

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5

6
UNITED STATES OF AMERICA,        )
7                                )
                    PLAINTIFF,   )
8                                )
            vs.                  )    No. CR 11-00072(A)-RGK
9                                )
(1)  MHER DARBINYAN,             )
10   (4)  ARMAN SHAROPETROSIAN,  )
(35) RAFAEL PARSADANYAN,         )
11                               )
                    DEFENDANTS.  )
12   _____)

13

14           REPORTER'S TRANSCRIPT OF JURY TRIAL

15              DAY 6, VOLUME II of II

16                 PAGES 1 – 92

17            TUESDAY, APRIL 1, 2014

18                 1:02 P.M.

19            LOS ANGELES, CALIFORNIA

20

21

22   _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
         *Official Reporter, U.S. District Court*
24            *255 East Temple Street*
         *Los Angeles, CA  90012*
25              *213.894.5949*


       UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477

 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579

 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                        I N D E X

 2   GOVERNMENT'S WITNESSES:                           PAGE

 3   JEREMY STEBBINS

 4     DIRECT EXAMINATION BY MR. ESTRADA               4

 5     CROSS-EXAMINATION BY MR. SEVERO                 67

 6

 7

 8

 9                      E X H I B I T S

10                       GOVERNMENT'S

11              NUMBER              ADMITTED

12               281                  15

13               282                  24

14               315                  52

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 1, 2014

 2                              1:02 P.M.

 3                              - - - -

 4       (In the presence of the jury:)

 5              THE COURT:  The record will reflect that all the

 6    members of the jury are in their -- oh, there she is.  All the

 7    members of the jury are in the jury box, the witness is on the

 8    witness stand.

 9          Counsel, you may continue your direct.

10              MR. ESTRADA:  Thank you, your Honor.

11       JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

12                    DIRECT EXAMINATION (CONTINUED)

13    BY MR. ESTRADA:

14    Q.   Good afternoon, Special Agent Stebbins.

15    A.   Good afternoon, sir.

16    Q.   I think when we broke, we were on call 76, a call from

17    July 4, 2009.

18    A.   That's correct.

19              MR. ESTRADA:  Your Honor, with the Court's permission,

20    I'd like to play the next call, Exhibit 77, and ask the jurors

21    be instructed to turn to 77A in their books.

22              THE COURT:  Yes.

23          (Audio played.)

24    BY MR. ESTRADA:

25    Q.   Now, Special Agent Stebbins, turning to the first page of
```

1    Exhibit 77A, do you have that in front of you?

2    A.    Yes, I do.

3    Q.    What is the date of the call?

4    A.    July 5th, 2009.

5    Q.    Is that the next day after the previous call between

6    Darbinyan and Rafael Parsadanyan?

7    A.    Yes, it is.

8    Q.    What's the time of the call?

9    A.    Approximately 8:17 p.m.

10   Q.    Who are the participants in this call?

11   A.    Mike Darbinyan and Arman Sharopetrosian.

12   Q.    Now, turning to page 3 of the transcript, do you have that

13   in front of you?

14   A.    Yes, I do.

15   Q.    Some speakers from the top, Sharopetrosian states, "Or

16   with a couple of bucks, whatever works out, we will do it like

17   that.  So that's done, dear, on Monday, tomorrow."

18        Darbinyan, "Yeah."

19        Sharopetrosian, "Now today whatever he got so far with the

20   MoneyGrams and things, and he had a check in his hand that

21   wanted to give us, right?"

22        Darbinyan, "I picked it up, it's with me."

23        Based on your knowledge of this investigation, are you

24   familiar with MoneyGrams being used in this plot?

25   A.    Yes.

```
 1   Q.   How so?

 2   A.   Matosyan would send MoneyGrams to people that Arman

 3   Sharopetrosian would tell him to send the MoneyGrams to in

 4   order to get his extortion taken care of as far as the prison

 5   taxes or the drugs in prison.

 6          MR. SEVERO:  Move to strike "extortion" and everything

 7   after that as conclusion of this witness.

 8          THE COURT:  Overruled.

 9          MR. ESTRADA:  Your Honor, the government requests

10   permission to play Exhibit 78 and asks that the jurors turn to

11   78A in their transcript books.

12      (Audio played.)

13   BY MR. ESTRADA:

14   Q.   Now, Special Agent Stebbins, turning to the first page of

15   this transcript, do you have that in front of you?

16   A.   Yes.

17   Q.   What's the date of this call?

18   A.   July 6, 2009.

19   Q.   This is the date after the previous call, Exhibit 77?

20   A.   Yes.

21   Q.   What's the time of this call?

22   A.   Approximately 4:22 p.m.

23   Q.   Who are the participants in this call?

24   A.   Mike Darbinyan, Minas Matosyan.

25   Q.   Now, turning to page 2 of 3 of the transcript, Exhibit
```

```
1   78A, five speakers from the bottom, M.M. states, "Yes, bro.  I

2   just, that, uh, I was in his office.  I brought the

3   prescriptions and gave them to him.  Wait, he is checking and

4   doing that, so that he gives the money."

5        Darbinyan, "I'm waiting for you in North Hollywood then.

6   Look, don't fuck around with me.  Hey, if you fuck around with

7   me, I will hurt you."

8        Based on your training and experience in investigating

9   fraud cases, are you familiar with how prescriptions can be

10  used in conducting fraud?

11  A.   Yes.

12           MR. SEVERO:  Objection, no foundation.

13           THE COURT:  Overruled.

14           THE WITNESS:  Yes.

15  BY MR. ESTRADA:

16  Q.   How are they used?

17  A.   Prescriptions can be used to obtain any number of

18  medicines, and then these medicines are oftentimes resold

19  either on the street or they're recycled into the whole

20  pharmacy process.

21  Q.   And in the overall investigation, was there a related case

22  involving this sort of prescription fraud?

23  A.   Yes.

24           MR. ESTRADA:  Your Honor, the government requests

25  permission to play Exhibit 79 and asks the jurors turn to 79A
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    in their books.

2        *(Audio played.)*

3    BY MR. ESTRADA:

4    Q.   And now, Special Agent Stebbins, turning to the first page

5    of Exhibit 79A, do you have that in front of you?

6    A.   Yes, I do.

7    Q.   What's the date of this call?

8    A.   July 6, 2009.

9    Q.   What's the time of the call?

10   A.   Approximately 4:58 p.m.

11   Q.   Who are the participants in this call?

12   A.   Mike Darbinyan, Minas Matosyan.

13   Q.   Is this the same date as the prior call where Darbinyan

14   talks to M.M. about prescriptions?

15   A.   Yes.

16   Q.   Now, turning to page 3 of 4 of that transcript, five

17   speakers from the bottom, Darbinyan states, "I am waiting then,

18   bro.  Don't delay it to eight or nine o'clock, so I can send

19   all the money in an hour or hour and a half, brother."

20       M.M., "Bro, I know, dear.  I wrote, I wrote today's

21   prescriptions my own hand.  I took such a risk, I..."

22       Darbinyan, "Hey, I don't care what you did.  Don't talk

23   over the phone, brother.  Bring the money and wire it.  People

24   are sitting hungry and waiting for that money, brother."

25       Based on your knowledge of the investigation, were you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   familiar with wires of money taking place in this particular

2   plot?

3   A.   Yes.

4   Q.   What sorts of wires of money?

5   A.   As I said before, they would wire the money to associates

6   of Mexican Mafia members in prison.  They would wire it to

7   associates on the outside in order to pay for taxes or drugs.

8           MR. ESTRADA:  Your Honor, the government requests

9   permission to play Exhibit 80 and asks the jurors turn to 80A

10  in their transcript.

11          THE COURT:  Okay.

12      (Audio played.)

13  BY MR. ESTRADA:

14  Q.   Now, Special Agent Stebbins, looking at this first page of

15  the transcript at 80A, do you have that in front of you?

16  A.   Yes.

17  Q.   What's the date of that call?

18  A.   September 3rd, 2009.

19  Q.   What's the time of this call?

20  A.   Approximately 11:41 p.m.

21  Q.   Who are the participants in this call?

22  A.   Arman Sharopetrosian and Minas Matosyan.

23  Q.   Now, taking a look at page 3 of the transcript, five

24  speakers from the bottom, Sharopetrosian states, "This money,

25  you owe me 106,000 dollars.  You listen to me now.  I listened

1  to you.  You are not going to bring this money by November 20,

2  I promise you."

3      Based on your knowledge of the investigation, was there

4  something significant about the November 20th date?

5  A.  Yes.  It was the last date that Arman Sharopetrosian gave

6  Matosyan to pay the money.

7  Q.  Now, turning to page 4 of the transcript, six speakers

8  from the bottom, Sharopetrosian states, "Listen to what I'm

9  telling you.  You have to forget whoever you have seen.  I am

10  telling you something.  God forbid if I don't get my money and

11  my money does not arrive.  I'm telling you something, my

12  friend.  November 20 is your last time.  The 106 dollars will

13  have to be paid.  Tomorrow, wherever you get it from.  You can

14  borrow it, steal it or whatever you do."

15      And later on in that same statement, he refers to "I

16  needed 15 dollars, I have found 7.5, and you need to bring the

17  other 7.5."

18      Based on your knowledge of the investigation, what does

19  the 7.5 refer to?

20  A.  $7,500.

21  Q.  Now, at some point before November 20th of 2009, did you

22  learn that this individual, M.M., contacted the FBI?

23  A.  Yes.

24  Q.  How did you learn about that?

25  A.  I was contacted by what we call the duty agent at the FBI.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    It's basically the person who listens to the phones and talks
 2    to anybody who walks into the FBI on that day.
 3    Q.   So the duty agent would be a general intake agent?
 4    A.   Yes.
 5    Q.   And on that date were you contacted by the duty agent?
 6    A.   Yes, I was.
 7    Q.   And did you learn that victim M.M. had gone to the FBI?
 8    A.   Yes, I did.
 9    Q.   Did you learn what happened to victim M.M. when he went to
10    the FBI?
11              MR. PEREYRA-SUAREZ:  Objection, vague.
12              MR. SEVERO:  It's hearsay.
13              THE COURT:  Well, the hearsay may be a question too
14    soon.  Overruled.
15         Did you hear what happened when he went to the FBI?
16              THE WITNESS:  Yes.  He was arrested.
17              THE COURT:  No.
18              MR. SEVERO:  Move to strike everything after "Yes."
19              THE COURT:  It will be stricken.
20    BY MR. ESTRADA:
21    Q.   Well, did you learn firsthand that M.M. was arrested?
22    A.   Yes.
23    Q.   How did you learn that?
24    A.   I visited him in the cell block when he was arrested.
25    Q.   Do you recall the date when you first learned that M.M.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    went to the FBI?

2    A.    October 26, 2009.

3    Q.    What was the date you visited him in the cell block of the

4    jail?

5    A.    October 26, 2009.

6    Q.    The same day?

7    A.    Yes.

8    Q.    Did you learn why M.M. had been arrested?

9    A.    Yes.

10   Q.    What was it for?

11   A.    He had outstanding warrants.

12   Q.    Now, why did you visit M.M. in the cell block?

13   A.    Victim M.M. had come to the FBI in order to report that he

14   had been kidnapped by associates of Sharopetrosian, and he was

15   seeking protection.

16          MR. SEVERO:  Move to strike as hearsay.

17          MR. FLIER:  Join.

18          MR. PEREYRA-SUAREZ:  Join as well.

19          THE COURT:  Sustained.

20   BY MR. ESTRADA:

21   Q.    Did you learn that victim M.M. had gone to the FBI?

22   A.    Yes.

23   Q.    And you spoke to victim M.M.?

24   A.    Yes, I did.

25   Q.    At the time you spoke to M.M., were you aware of who that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    person was, generally?

2    A.    Yes.

3    Q.    How were you aware of who that person was?

4    A.    We had followed him around at the time of this extortion

5    in June and July of 2009.

6    Q.    And now, when you follow -- you say you followed him

7    around.  Was that with his knowledge and consent?

8    A.    No.

9    Q.    How was it that you followed him around?

10   A.    We were following Mr. Darbinyan.  He was with Matosyan

11   from time to time.

12   Q.    That was in June and July?

13   A.    Yes.

14   Q.    Did you learn, after you went to meet with this M.M. at

15   the cell block, that he had a criminal history?

16   A.    Yes.

17   Q.    Were you aware that he had prior convictions?

18   A.    Yes.

19   Q.    What did those convictions include?

20   A.    Believe he had a conviction for theft.

21   Q.    In 2008?

22   A.    Yes.

23   Q.    Did he also have a forgery conviction in 2008?

24   A.    Yes.

25   Q.    And you mentioned there were also warrants and failures to

```
 1    appear.
 2    A.    Yes.
 3    Q.    That was what he was arrested on by the FBI?
 4    A.    Yes.
 5    Q.    Now, when you went to visit M.M. at the cell block, did
 6    you talk to him about the issues that we've discussed in the
 7    calls that have been played today?
 8    A.    Yes.
 9    Q.    Did he agree to meet with you after that day on October
10    26?
11              MR. SEVERO:  Hearsay.
12              THE COURT:  Overruled.
13              THE WITNESS:  Yes, he did.
14    BY MR. ESTRADA:
15    Q.    Did you in fact meet with him?
16    A.    Yes, I did.
17    Q.    When you met with him, did he bring anything to you?
18    A.    Yes.  When he was released, he brought me receipts from --
19    I believe it was MoneyGram.
20              MR. SEVERO:  Move to strike as speculation of the
21    witness, "I believe."
22              THE COURT:  The last part will be stricken.
23    BY MR. ESTRADA:
24    Q.    Please take a look at Exhibit 281.
25              And your Honor, I'll ask for your clerk's assistance with
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    that.  It will be one of the boxes there on the shelf.  Exhibit

2    281.

3            THE WITNESS:  Yes, I have them.

4    BY MR. ESTRADA:

5    Q.   Okay.  Now, looking at Exhibit 281, what is 281?

6    A.   They are receipts that were provided to me by victim M.M.

7    Q.   Provided to you that day in October 2009?

8    A.   Yes.

9    Q.   Do they fairly and accurately appear to be the same

10   receipts?

11   A.   Yes.

12           MR. ESTRADA:  Your Honor, the government moves to

13   admit Exhibit 281 and requests permission to publish.

14           THE COURT:  Be received.  You may publish.

15           MR. ESTRADA:  Your Honor, if I could approach to

16   retrieve them.

17           *(Received in evidence, Exhibit 281.)*

18   BY MR. ESTRADA:

19   Q.   Now, Special Agent Stebbins, I'm not going to show you all

20   of these, but just so the jury can see.  Looking at the first

21   page, are these the receipts you referenced?

22   A.   Yes.

23   Q.   And how did you recognize those to be MoneyGram receipts?

24   A.   I believe we spoke with somebody from MoneyGram that

25   recognized "Vcom" as one of their agents.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Move to strike the testimony regarding
 2    receipts --
 3              THE COURT:  Sustained.
 4              MR. SEVERO:  -- based on hearsay.
 5         Did I get a ruling?
 6              MR. ESTRADA:  Is there a --
 7              THE COURT:  I sustained it.
 8              MR. SEVERO:  I'm sorry.
 9              MR. ESTRADA:  Excuse me.
10    Q.   Is the word "MoneyGram" there on the receipts?
11    A.   Yes, it is.
12    Q.   And did you see amounts there, amount tendered?
13    A.   Yes.
14    Q.   What was the amount?
15    A.   $1,000.
16    Q.   And the receiver name, did you see that?
17    A.   Yes.
18    Q.   Who was that?
19    A.   Porfirio Guerrero on that one.
20    Q.   And the sender name, what was that?
21    A.   Tony Franco.
22    Q.   Now, that wasn't --
23              MR. SEVERO:  This is asked and answered.  This -- this
24    testimony has already been elicited from the witness Lozano
25    earlier on at one point.  It's the exact same thing.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  I don't know if he's going to have more

 2    testimony or not on it.

 3              MR. SEVERO:  Okay.

 4              MR. ESTRADA:  Your Honor, that was a custodian of

 5    records.  This is the case agent, the investigator.

 6              MR. SEVERO:  Well --

 7              THE COURT:  Okay.

 8    BY MR. ESTRADA:

 9    Q.   Now, were there numerous receipts with different names on

10    them?

11    A.   Yes.

12    Q.   I'll show you another one of the receipts there.  Do you

13    see that word "MoneyGram" there?  Did that help inform you this

14    was a MoneyGram wire?

15    A.   Yes, it was a good clue.

16    Q.   And here, "sender, Tony Franco," do you see that?

17    A.   Yes.

18    Q.   And do you see another name for the receiver, Concepción

19    Vergara?

20    A.   Yes, I see it.

21    Q.   Were there numerous receipts that M.M. provided to you?

22    A.   Yes.

23    Q.   Why did he provide those to you?

24              MR. PEREYRA-SUAREZ:  Objection, calls for speculation.

25              THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   BY MR. ESTRADA:

2   Q.   Did he inform you why he provided those to you?

3   A.   Yes.

4   Q.   Why did he --

5          MR. PEREYRA-SUAREZ:  Hearsay, your Honor.

6          MR. ESTRADA:  Not for the truth of the matter, your

7   Honor.

8          MR. SEVERO:  It's irrelevant, then.

9          THE COURT:  Then it'd be irrelevant, you're correct.

10  Sustained.

11  BY MR. ESTRADA:

12  Q.   Now, were you familiar with the use of MoneyGram receipts

13  in prison?

14         MR. SEVERO:  Asked and answered.

15         THE COURT:  Overruled.

16         THE WITNESS:  The use of the actual receipts?

17  BY MR. ESTRADA:

18  Q.   I misspoke.  MoneyGram wires in prison.

19  A.   Yes.

20  Q.   How are MoneyGram wires used in prison?

21  A.   They're used to make --

22         MR. SEVERO:  Asked and answered.

23         THE COURT:  I'm sorry?

24         MR. SEVERO:  Asked and answered.

25         THE COURT:  Overruled.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    THE WITNESS:  They're used to pay taxes and pay for

2  drugs in prison.

3  BY MR. ESTRADA:

4  Q.   Now, at some point did M.M. agree to work as a cooperator?

5  A.   Yes, he did.

6  Q.   And was M.M. formally signed up as a cooperator?

7  A.   Yes, he was.

8  Q.   Can you explain to the jury what it means to formally sign

9  someone up as a cooperator.

10  A.   When we speak to somebody for the first time and want them

11  to cooperate in the investigation, they're explained -- it's

12  explained to them what their role will be as far as wearing

13  recording devices.  In this case, we recorded his phone.  He

14  was instructed that he's not working for the government and he

15  is not to enter in any agreements on behalf of the government

16  and he's not to commit any criminal activity outside of that

17  which we may allow him to commit.

18  Q.   Did M.M. agree to work as an informant?

19  A.   Yes.

20  Q.   Now, you mentioned that his phone calls would be recorded.

21  Is there a particular way you're recording his phone calls?

22  A.   Yes.

23  Q.   What was that?

24  A.   It was called a consensual wiretap.

25  Q.   What's that mean?

1    A.    Basically, every single phone call to and from his phone

2    was recorded in the same wire room, the same procedures, with

3    the exception of we didn't have to go in front of a judge in

4    order to get that.

5    Q.    Why didn't you have to go in front of a judge?

6    A.    All that's required is consent from the individual.

7    Q.    Here that would be M.M.?

8    A.    Yes.

9    Q.    Now, were there benefits that were provided to M.M. as a

10   cooperator?

11   A.    Yes.

12   Q.    What sort of benefits?

13   A.    We made the extortion payments on his behalf.

14   Q.    Was there also surveillance you conducted of M.M.?

15   A.    Yes.

16   Q.    For protection?

17   A.    Yes.

18   Q.    Was there also relocation that was paid for M.M.?

19   A.    Yes, we did.

20   Q.    How much was that relocation that was paid?

21   A.    Approximately $15,000.

22   Q.    Why did that -- was that relocation paid?

23   A.    We felt, after the indictment in this case, that victim

24   M.M. and his family would probably be targeted for killing.

25   Q.    Was it for safety?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Now, you mentioned there were extortion payments that the

 3    FBI paid.

 4    A.    Yes.

 5    Q.    Did the FBI pay the full amounts, the over a hundred

 6    thousand dollars that Sharopetrosian was demanding?

 7    A.    No.

 8    Q.    What amounts did they pay?

 9    A.    We paid smaller increments, I believe several times.  The

10    total was approximately $12,000.

11    Q.    Now, why didn't you just pay the entire amount?

12    A.    If we paid the entire amount, Sharopetrosian would just

13    keep asking for more money.

14              MR. PEREYRA-SUAREZ:  Objection, calls for speculation.

15              THE COURT:  Sustained.

16    BY MR. ESTRADA:

17    Q.    Based on your training and experience conducting extortion

18    cases, is it the practice of the FBI not to pay the full

19    extortion demanded?

20    A.    Yeah, we try not to pay the whole amount.

21    Q.    Now, you mentioned that phone calls of M.M. were recorded

22    by the FBI.  In addition, were there meetings that M.M. had

23    with others that were recorded?

24    A.    Yes.

25    Q.    Was there a meeting with defendant Emil Airapetian?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes.

2   Q.   Was that recorded?

3   A.   Yes, it was.

4   Q.   Was there also a meeting with Lusine Ogandganyan that was

5   recorded?

6   A.   Yes.

7   Q.   I'm not going to talk to you about those today, but those

8   were recorded and used as evidence in this case?

9   A.   That's correct.

10         MR. ESTRADA:  Okay.  Now, if, with the Court's

11   permission, I can play Exhibit 81 and have the jurors turn to

12   81A in their books.

13         THE COURT:  Okay.

14         MR. ESTRADA:  Need to change the feed here.

15     *(Audio played.)*

16   BY MR. ESTRADA:

17   Q.   Now, Special Agent Stebbins, turning to the first page of

18   Exhibit 81, do you have that in front of you?

19   A.   Yes, I do.

20   Q.   What's the date of that call?

21   A.   October 28th, 2009.

22   Q.   What's the time of the call?

23   A.   Approximately 11:50 a.m.

24   Q.   Who are the participants?

25   A.   Minas Matosyan and Arman Sharopetrosian.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Now, this date of October 28th, 2009, was that after M.M.

2   had agreed to work as an informant?

3   A.   Yes.

4   Q.   And you were recording his calls?

5   A.   Yes, we were.

6   Q.   Now, in this call there's references to various names and

7   people waiting and amounts of money.  Did you take any action

8   in response to this telephone call?

9   A.   Yes.

10  Q.   What did you do?

11  A.   Later we -- we sent some of these wire transfers out to

12  these individuals.

13  Q.   What company did you use to send those wire transfers?

14  A.   Western Union.

15  Q.   Please take a look at Exhibit 282.  And this should be in

16  one of the binders behind you.

17  A.   Yes, I have it.

18  Q.   What is Exhibit 282?

19  A.   They're receipts from Money Mart in West Los Angeles.

20  Q.   Do you recognize them?

21  A.   Yes.

22  Q.   How do you recognize them?

23  A.   I was there when victim M.M. sent these wires to these

24  associates of Sharopetrosian.

25  Q.   Now, are these receipts that you obtained and booked into

1  custody?

2  A.   Yes.

3          MR. ESTRADA:  Your Honor, the government moves to

4  admit Exhibit 282 at this time.

5          THE COURT:  They'll be received.

6      (Received in evidence, Exhibit 282.)

7          MR. ESTRADA:  I'll ask for permission to publish after

8  the next call, if I may, your Honor.

9          THE COURT:  Yes.

10         MR. ESTRADA:  Now, if we could, with the Court's

11 permission, if we could play Exhibit 84 and ask that the jurors

12 turn to 84A in their books.

13         THE COURT:  Okay.

14     (Audio played.)

15 BY MR. ESTRADA:

16 Q.   Okay.  Now, Special Agent Stebbins, turning to the first

17 page of Exhibit 84A, do you have that in front of you?

18 A.   Yes.

19 Q.   What's the date of the call?

20 A.   October 30, 2009.

21 Q.   What's the time of the call?

22 A.   Approximately 6:47 p.m.

23 Q.   Who are the participants?

24 A.   Minas Matosyan and Arman Sharopetrosian.

25 Q.   Now, is this a couple days after the previous call where

```
 1    Sharopetrosian gave the names to M.M.?

 2    A.   Yes, it is.

 3            MR. ESTRADA:  Now, your Honor, if I could publish

 4    Exhibit 282.

 5            THE COURT:  Okay.

 6    BY MR. ESTRADA:

 7    Q.   Now, looking at 282, that's a 12-page exhibit.  Could you

 8    describe generally what you see on the first page.

 9    A.   The first page is a receipt for money sent.

10    Q.   Now turning to the third page of this exhibit, do you see

11    that?

12    A.   Yes.

13    Q.   See the name of the sender there?

14    A.   Yes.

15    Q.   Who's that person?

16    A.   That's victim M.M.

17    Q.   And the name there, Rafael Armendariz, do you recognize

18    that name?

19    A.   Yes.

20    Q.   Is that one of the names mentioned in the call we just

21    listened to at Exhibit 84?

22    A.   Yes, it was.

23    Q.   What was the amount sent there?

24    A.   $610.

25    Q.   Looking at the next page, again we have the sender M.M.?
```

1    A.    Yes.

2    Q.    And the receiver there, Sharon Jones, is that another name

3    mentioned in the call we just listened to at Exhibit 84?

4    A.    Yes, it was.

5    Q.    Page 7 of 12, again is the sender M.M.?

6    A.    Yes.

7    Q.    And the receiver, Ana Lorena Portillo, is that another

8    name we heard in the call at Exhibit 84?

9    A.    Yes, it is.

10   Q.    And the amount there, does that correspond to the amount

11   discussed in Exhibit 84?

12   A.    Yes, it does.

13   Q.    Now, looking at page 10, is that the sender M.M. again?

14   A.    Yes.

15   Q.    And the receiver, Porfirio, is that one of the names that

16   was mentioned in Exhibit 84?

17   A.    Yes.

18   Q.    And finally, page 12 of 12, is that sender again M.M.?

19   A.    Yes.

20   Q.    And the receiver, Juan Martinez, is that another name

21   mentioned in Exhibit 84?

22   A.    Yes, it is.

23   Q.    Now, you maintained custody of these receipts?

24   A.    Yes, I did.  I booked them into evidence.

25            MR. ESTRADA:  Your Honor, with the Court's permission,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    the government would ask to play Exhibit 85 and ask the jurors

 2    turn to 85A in their books.

 3              THE COURT:  Okay.

 4        (Audio played.)

 5    BY MR. ESTRADA:

 6    Q.   Now, Special Agent Stebbins, turning to page 1 of Exhibit

 7    85A, do you have that in front of you?

 8    A.   Yes.

 9    Q.   What's the date of this call?

10    A.   November 2nd, 2009.

11    Q.   What's the time of the call?

12    A.   Approximately 10:58 a.m.

13    Q.   Who are the participants in this call?

14    A.   Minas Matosyan and Arman Sharopetrosian.

15    Q.   Now, in this call -- turning to page 7 of 8, do you have

16    that in front of you?

17    A.   Yes.

18    Q.   Two speakers from the bottom, Sharopetrosian states,

19    "Whatever I told you.  That money, the 10 dollars today will be

20    delivered to Krist."

21        Based on your knowledge of the investigation, who's Krist?

22    A.   "Krist" is short for Kristine Ogandzhanyan, Horse's wife.

23    Sorry.  Arman Sharopetrosian's wife.

24    Q.   You said Horse's wife.  Why do you refer to him as

25    "Horse"?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   His moniker is "Horse."

 2   Q.   Now, there is a reference to 10 dollars there.  Based on

 3   your knowledge of the investigation, what did the 10 dollars

 4   refer to?

 5   A.   It's a reference to the $10,000.

 6   Q.   And then did you understand, based on your monitoring

 7   these phone calls, that $10,000 was to be paid this day, on

 8   November 2nd, 2009?

 9   A.   Yes.

10   Q.   Now, this call was at approximately 10:57 a.m.?

11   A.   Yes.

12   Q.   At some point that day, did you learn that M.M. had paid a

13   thousand dollars to Krist?

14   A.   Yes.

15   Q.   How did you learn that?

16   A.   In the afternoon, he told us.

17   Q.   Now, did you have surveillance out there to see that

18   payment?

19   A.   We did not.

20        MR. ESTRADA:  Your Honor, the government requests

21   permission to play Exhibit 86 and asks the jurors turn to 86A

22   in their books.

23        THE COURT:  Okay.

24        (Audio played.)

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. ESTRADA:

 2    Q.    Okay.  Now, Special Agent Stebbins, turning to the first

 3    page of the transcript.  It's 86A.  Do you have that in front

 4    of you?

 5    A.    Yes.

 6    Q.    What's the date of this call?

 7    A.    November 2nd, 2009.

 8    Q.    It's the same date as the prior call in Exhibit 85?

 9    A.    Yes, it is.

10    Q.    What's the time of this call?

11    A.    Approximately 4:12 p.m.

12    Q.    Who are the participants in this call?

13    A.    Minas Matosyan and Arman Sharopetrosian.

14    Q.    Now, turning to page 2 of the transcript, four speakers

15    from the bottom, Sharopetrosian states, "You have time for two

16    hours to come up with approximately 9,000 dollars."

17         Based on your involvement in the investigation, did you

18    meet with M.M. with regard to this demand for $9,000?

19    A.    Yes.

20    Q.    And did you come up with a plan with regard to this

21    $9,000?

22    A.    Yes.

23    Q.    What did you come up with?

24    A.    We decided that we were not going to pay him.

25    Q.    Did you pay some amount that day?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   We did.  Following several more phone calls.

2   Q.   What was that amount that was paid?

3   A.   $500.

4         MR. ESTRADA:  Your Honor, the government requests

5   permission to play Exhibit 87 and asks the jurors turn to 87A

6   in their books.

7         THE COURT:  Okay.

8        *(Audio played.)*

9   BY MR. ESTRADA:

10  Q.   Now, Special Agent Stebbins, turning to the first page of

11  87A, do you have that in front of you?

12  A.   Yes, I do.

13  Q.   What's the date of this call?

14  A.   November 2nd, 2009.

15  Q.   What's the time of the call?

16  A.   Approximately 4:27 p.m.

17  Q.   About how long after the prior call was this call?

18  A.   About 20 -- I'm sorry, about 16 minutes.

19  Q.   Who are the participants in this call?

20  A.   Minas Matosyan and Arman Sharopetrosian.

21  Q.   Now, four speakers from the bottom, Sharopetrosian states,

22  "Hey, I will skin you."

23       M.M., "Brother, what can I do?  The check."

24       Sharopetrosian, "If it does not happen, that deposit does

25  not happen by six o'clock, I will not give a fuck.  Good luck

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    to you.  The money must be deposited by six o'clock."

2        Based on this call, did you and other FBI agents take

3    action?

4    A.    Yes.

5    Q.    What did you do?

6    A.    We provided Minas Matosyan with $500.

7    Q.    Now, in a later call, did Sharopetrosian call M.M. and

8    tell him to call from a pay phone?

9    A.    Yes.

10   Q.    Describe what happened.

11        MR. PEREYRA-SUAREZ:  Objection, hearsay, lack of

12   foundation.

13        THE COURT:  Overruled.

14        THE WITNESS:  Sharopetrosian called Matosyan, told him

15   to throw away his phone and to call him back from a pay phone.

16   BY MR. ESTRADA:

17   Q.    Did you have M.M. call Sharopetrosian from a pay phone?

18   A.    Yes, we did.

19   Q.    Where was that pay phone?

20   A.    It was in North Hollywood.

21   Q.    Was it hard to find a pay phone?

22   A.    It was a little bit hard, yeah.

23   Q.    Now, how did you go about -- well, I should ask before

24   that, did you record the conversation between M.M. and

25   Sharopetrosian on the pay phone?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, we did.

 2    Q.    How did you go about doing that?

 3    A.    We had a recording device that's normally used for meeting

 4    people in person, and we had him hold it up to the phone while

 5    he was making the call.

 6    Q.    Was that a long call?

 7    A.    It was a long call.

 8    Q.    A long recording?

 9    A.    Yes.

10    Q.    I'm not going to play that recording for you, but do you

11    recall some of the substance of what Sharopetrosian stated in

12    that recording?

13    A.    Yes.

14          MR. SEVERO:  Objection, secondary evidence.

15          THE COURT:  Sustained.

16    BY MR. ESTRADA:

17    Q.    Now, do you recall Sharopetrosian making statements in

18    that recording?

19    A.    Yes.

20    Q.    Did you hear those statements?

21    A.    Yes.

22    Q.    In those statements, did he refer to speaking to the

23    police?

24    A.    Yes.

25    Q.    What did he say about the police?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. PEREYRA-SUAREZ:  Objection.  Right now it's

 2   hearsay with a lack of foundation.

 3              MR. ESTRADA:  It's an admission by the defendant, your

 4   Honor.

 5              MR. PEREYRA-SUAREZ:  It's secondary evidence, your

 6   Honor.

 7              THE COURT:  Well, secondary evidence is not the best

 8   evidence, but it would not be hearsay.  Best evidence is the

 9   tape itself.

10              MR. PEREYRA-SUAREZ:  Exactly.

11              MR. ESTRADA:  Your Honor, we could elongate the trial

12   by hours playing the recording.  We're trying to make it

13   efficient here.

14              MR. PEREYRA-SUAREZ:  Your Honor, I'm going to object

15   to this witness summarizing what happens --

16              THE COURT:  Okay.

17              MR. PEREYRA-SUAREZ:  -- when we actually have the --

18              THE COURT:  Objection will be sustained.  I don't want

19   to go long hours, either, Counsel, but it's gotta be done

20   appropriately.

21              MR. ESTRADA:  Very good.

22   Q.   Suffice it to say there was a recording on the pay phone?

23   A.   Yes.

24   Q.   Based on that, this call about skinning M.M. and then the

25   call on the pay phone, what action did the FBI take?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    That was when we gave Matosyan the $500, to take it to

2    Sharopetrosian's wife's house.

3    Q.    Was surveillance done of that delivery?

4    A.    Yes, it was.

5    Q.    Were you involved in that surveillance?

6    A.    Yes, I was.

7    Q.    About what time did the surveillance begin?

8    A.    I don't recall exactly.  It was probably after 9:00

9    o'clock at night.

10   Q.    Did you provide M.M. with $500?

11   A.    Yes, I did.

12   Q.    What form was the $500 in?

13   A.    Cash.

14   Q.    Not a check?

15   A.    No, we did not give a check.

16         MR. SEVERO:  Your Honor, may I have a moment --

17         THE COURT:  Yes.

18         MR. SEVERO:  -- with counsel?

19     (Mr. Severo and Mr. Estrada confer privately.)

20   BY MR. ESTRADA:

21   Q.    Now, during that surveillance, was M.M. seen interacting

22   with Kristine Ogandzhanyan, defendant Sharopetrosian's wife?

23   A.    Yes.

24   Q.    What happened?

25   A.    He gave her the money and quickly got back in his car and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   drove away.
 2           MR. ESTRADA:  Your Honor, with the Court's permission,
 3   the government would play Exhibit 88 and ask the jurors turn to
 4   88A in their book.
 5           THE COURT:  88?
 6           MR. ESTRADA:  88.
 7           THE COURT:  Okay.
 8           MR. ESTRADA:  There's a bit of a technical glitch,
 9   your Honor.  I'll just go straight into the call and ask about
10   the transcript --
11           THE COURT:  Okay.
12           MR. ESTRADA:  -- with the Court's permission.
13           THE COURT:  Okay.
14       (Audio played.)
15   BY MR. ESTRADA:
16   Q.   Now, turning to the first page of the transcript, do you
17   have that in front of you?
18   A.   Yes.
19   Q.   What's the date of that call?
20   A.   November 3rd, 2009.
21   Q.   What's the time of the call?
22   A.   Approximately 8:02 p.m.
23   Q.   Who are the participants in this call?
24   A.   Minas Matosyan and Arman Sharopetrosian.
25   Q.   Now, turning to page 5 of 6 of the transcript, do you have
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    that in front of you?

2    A.    Yes.

3    Q.    There are references throughout the call to money being

4    paid to different individuals.  Do you remember that?

5    A.    Yes.

6    Q.    Nine speakers from the top, Sharopetrosian states,

7    "Whatever money you have, you call me and tell me where you

8    are, whatever time it is.  I'll tell someone to come and pick

9    it up, because that $2,500, my friend -- "

10        M.M., "Yeah."

11        Sharopetrosian, "It is the prison overseer's money,

12   overseer's money.  Is it clear?"

13        M.M., "Yeah, okay, okay, I understood.  I understood."

14        Sharopetrosian, unintelligible.

15        M.M., "Yeah."

16        Sharopetrosian, "They took my friend to the hole

17   yesterday.  This is his money."

18        Based on your training and experience, what is a prison

19   overseer?

20   A.    Prison overseer would be the Mexican Mafia brother that

21   that prison belongs to.

22        MR. SEVERO:  Objection, move to strike, no foundation.

23        THE COURT:  Overruled.

24   BY MR. ESTRADA:

25   Q.    Now, in response to this particular call about delivering
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    $2,500 to a prison overseer, did the FBI take any action?

2    A.   Yes, we did.

3    Q.   What was that?

4    A.   We gave Matosyan a portion of that money, and then we

5    conducted surveillance to see where the money would end up.

6    Q.   What was the portion of the money?

7    A.   We gave him $2,000.

8    Q.   The next day, did M.M. contact an individual?

9    A.   Yes, he did.

10   Q.   Who was that individual?

11   A.   His name was Luis Mascorro, who was a gang member from

12   State Street.

13   Q.   Did you surveil a meeting based on the delivery of the

14   money that next day after the call on November 4th, 2009?

15   A.   Yes.

16   Q.   Where was that surveillance done?

17   A.   It was done in North Hollywood.

18   Q.   And you mentioned that M.M. was given $1,500?

19   A.   Initially he was given 1,500, and then we added 1,500

20   (sic) to it.

21   Q.   How did it come about that you added money to it?

22   A.   He went to the initial meeting with Mascorro, and Mascorro

23   said that he didn't want 1,500, he wanted 2,000, and in that

24   case Matosyan might as well keep the 1,500.

25             MR. PEREYRA-SUAREZ:  Objection, motion to strike,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    hearsay, lack of foundation.

 2            THE COURT:  Overruled.

 3    BY MR. ESTRADA:

 4    Q.   So originally it was 1,500 and you added 500 to it?

 5    A.   That's correct.

 6    Q.   Was the $2,000 delivered to an individual during that

 7    surveillance?

 8    A.   Yes, it was.

 9    Q.   And who was that individual that it was delivered to?

10    A.   His name was Luis Mascorro, aka "Scrappy" from State

11    Street.

12    Q.   Now, after the money was paid by M.M., did you conduct

13    further surveillance?

14    A.   Yes, we did.

15    Q.   What did you do?

16    A.   We followed Mascorro to several different addresses in the

17    Los Angeles area.  Then we followed him to Victorville, where

18    he met with a Mexican Mafia associate.

19    Q.   And this following that you're referring to, is that

20    undercover surveillance?

21    A.   Yes, it is.

22    Q.   Involving numerous different officers?

23    A.   Yes, it did.

24    Q.   When you or other officers are conducting surveillance,

25    are you all in different vehicles?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Generally, yes.

2    Q.    Are those unmarked cars?

3    A.    Yes.

4    Q.    And eventually you say that he was followed out to

5    Riverside County?

6    A.    Yes.

7    Q.    Did you surveil this Mascorro meeting with another

8    individual?

9    A.    Yes, I did.

10   Q.    Who was that other individual you saw him meeting with?

11   A.    His name was Angel Aranda, who is "Bandit."

12   Q.    When you say "Bandit," is that his nickname?

13   A.    That is his gang moniker.

14   Q.    Were you familiar with "Bandit" based on your -- I should

15   say, are you familiar with "Bandit" based on your role in this

16   investigation?

17   A.    Yes, I am.

18   Q.    Who is "Bandit"?

19   A.    He was a associate of Rafael Gonzalez-Munoz, who is

20   "Cisco" from the Mexican Mafia.  He was intercepted several

21   times on our various wiretaps.

22   Q.    When you say "he," who was intercepted several times?

23   A.    I apologize.  "Bandit" was intercepted, as well as

24   "Cisco."

25   Q.    And just to be clear, because the nicknames, "Bandit" was
```

```
 1  an associate of Rafael Gonzalez-Munoz?

 2  A.    Yes.

 3  Q.    And Rafael Gonzalez-Munoz went by the name "Cisco"?

 4  A.    That's correct.

 5  Q.    And Rafael Gonzalez-Munoz was a Eme member?

 6  A.    Yes.  He is a Mexican Mafia brother.

 7  Q.    After you saw Mascorro meet with Aranda, did you continue

 8  surveillance?

 9  A.    Yes, we did.

10  Q.    And what did you see?

11  A.    We followed Aranda to a house in Victorville, and then we

12  also followed Mascorro back to the Los Angeles area, where we

13  subsequently had him traffic-stopped.

14  Q.    Was he identified during that traffic stop?

15  A.    Yes, he was.

16  Q.    As Luis Mascorro?

17  A.    Yes.

18        MR. ESTRADA:  Your Honor, the government requests

19  permission to play Exhibit 89 and asks the jurors turn to 89A

20  in their book.

21        THE COURT:  Okay.

22    (Audio played.)

23  BY MR. ESTRADA:

24  Q.    Now, Special Agent Stebbins, turning to page 1 of 89A, do

25  you have that in front of you?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, I do.

2   Q.   What's the date of that call?

3   A.   November 4, 2009.

4   Q.   Time of the call?

5   A.   Approximately 6:05 p.m.

6   Q.   Who are the participants?

7   A.   Minas Matosyan and Arman Sharopetrosian.

8   Q.   Turning to page 2 of the transcript, four speakers from

9   the bottom, Sharopetrosian refers to "Three and a half.  That

10  person lives in Tulare county.  He will come down halfway and

11  you also go up halfway.  As soon as you have the money, the

12  3,500 dollars, you let me know."

13       Are you aware of where Tulare county is?

14  A.   Actually, no, I'm not.

15  Q.   Were there references in the calls to wiring money out of

16  state?

17  A.   Yes.

18  Q.   What other place?

19  A.   To Arizona.

20  Q.   Now, you had mentioned earlier that there was a deadline

21  for the payment that M.M. was to provide to Sharopetrosian.

22  A.   Yes.

23  Q.   Do you recall what that deadline was?

24  A.   November 20, 2009.

25  Q.   Through the calls that you listened to, was that deadline

1  extended?

2  A.    By one day, yes.

3  Q.    Now, based on that deadline, did the FBI take any action

4  to make a payment?

5  A.    Yes.

6  Q.    What did you do?

7  A.    We provided Matosyan with a percentage of the amount that

8  was to be paid and then had him go to the home of Arman

9  Sharopetrosian's wife to make the payment.

10  Q.    What was the amount that you understood was to be paid?

11  A.    Well, initially it was the remainder, which was over

12  $100,000.

13  Q.    And what percentage did you provide?

14  A.    I'm not sure the percentage, but $3,800, approximately.

15  Q.    Was the delivery of that money conducted under FBI

16  surveillance?

17  A.    Yes, it was.

18  Q.    What happened?

19  A.    He made the payment to Sharopetrosian's wife's house, and

20  then we continued to conduct surveillance of Matosyan for the

21  rest of the night.

22  Q.    You continued to follow M.M.?

23  A.    Well, yes.  We followed him home, and then we sat outside

24  his house to ensure that nobody came to take or kidnap him.

25  Q.    Were you concerned about the amount of this payment being

1    less than what was demanded?

2    A.   Yes.

3    Q.   In what way?

4    A.   We believed that if we paid less than what was demanded,

5    there was a decent chance that violence was going to be carried

6    out.

7         MR. PEREYRA-SUAREZ:  Objection.  Motion to strike.

8    Calls for speculation.

9         THE COURT:  Overruled.

10   BY MR. ESTRADA:

11   Q.   Well, you did conduct surveillance that night, and no

12   violence took place?

13   A.   That's correct.

14        MR. ESTRADA:  Your Honor, the government requests

15   permission to play Exhibit 90 and asks the jurors turn to 90A

16   in their book.

17        THE COURT:  Okay.

18        (Audio played.)

19   BY MR. ESTRADA:

20   Q.   Special Agent Stebbins, turning to the first page of

21   Exhibit 90A, do you have that in front of you?

22   A.   Yes, I do.

23   Q.   What's the date of this call?

24   A.   November 21, 2009.

25   Q.   Was this the same date that the approximately $3,800 was

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   paid by the FBI?

 2   A.    Yes.

 3   Q.    What's the time of the call?

 4   A.    Approximately 7:06 p.m.

 5   Q.    Who are the participants in this call?

 6   A.    Minas Matosyan, an unknown male answers the phone, and

 7   then Arman Sharopetrosian.

 8   Q.    Now, turning to page 2 of the transcript, five speakers

 9   from the bottom, Sharopetrosian states, "I don't have anything

10   with you.  Someone called from Yerevan for you and told me that

11   if you don't pay the money, he will.  In the morning I'm going

12   to call Yerevan and he's going to cover all the debt.  I don't

13   have any more dealing with you, friend, you understand?"

14         Based on your training and experience investigating

15   organized crime cases, are you familiar with other individuals

16   taking over a debt for a victim?

17   A.    Yes.

18   Q.    How does that work?

19   A.    Many times, when it's a victim like this, they'll have

20   family in Armenia.  Yerevan is the capital of Armenia.  And the

21   family in Armenia will take over the debt and make the payments

22   on behalf of that individual.

23   Q.    Did you or anyone from the FBI ask that family in Armenia

24   take over this debt?

25   A.    No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Were you aware that other people related to M.M. were

2   aware of this plot going forward?

3   A.   Yes.

4   Q.   Now, turning to page 5 of the transcript, three speakers

5   from the top, Sharopetrosian states, "I am a criminal, friend.

6   Today I'm here and tomorrow, in a couple of years you will see

7   that I am no longer here, and you will never see me again in

8   your life, dear."

9        M.M., "I know what you're saying."

10        Sharopetrosian, "I don't give a fuck.  I have nothing to

11   lose, friend.  Do you understand?  No one has ever gobbled up

12   my money, and I've been successful in receiving everything I've

13   been involved in, friend.  Even if there was a corpse, I would

14   pick it up, too.  I don't give a fuck."

15        At this time were you aware that Sharopetrosian was in

16   state prison?

17   A.   Yes.

18   Q.   Were you aware that his sentence was soon to be over

19   around this time?

20   A.   Fairly soon, yes.

21        MR. SEVERO:  Objection, hearsay.

22        THE COURT:  Overruled.

23        MR. ESTRADA:  Your Honor, I'm going to move on to

24   another set of calls, and I'll just preface it by saying these

25   calls deal with Count 1, the racketeering conspiracy charge,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   against defendants Darbinyan and Sharopetrosian, and to one of
 2   the felon in possession of a firearm counts against defendant
 3   Darbinyan.
 4            THE COURT:  And none to Mr. Parsadanyan?
 5            MR. ESTRADA:  No, nothing to do with Parsadanyan.
 6            THE COURT:  Okay.
 7   BY MR. ESTRADA:
 8   Q.   Now, during the course of the investigation, Special Agent
 9   Stebbins, were firearms recovered at times?
10   A.   Yes.
11   Q.   Was there an effort by the task force to recover firearms?
12   A.   Yes.
13   Q.   Why is that?
14   A.   Anytime we heard about a gun being released on the street,
15   or sold, we knew that it probably meant that violence would
16   happen with that gun, so we tried to prevent it whenever we
17   could.
18   Q.   At different times of the investigation, were associates
19   of Darbinyan found with firearms?
20   A.   Yes.
21   Q.   Including Darbinyan found with firearms?
22   A.   Yes.
23            MR. ESTRADA:  Your Honor, with the Court's permission,
24   I'd like to play Exhibit 113 and ask the jurors turn to 113A in
25   their transcript books.
```

```
 1              THE COURT:  Okay.

 2          (Audio played.)

 3   BY MR. ESTRADA:

 4   Q.   Now, Special Agent Stebbins, turning to the first page of

 5   Exhibit 113A, do you have that in front of you?

 6   A.   Yes.

 7   Q.   What's the date of this call?

 8   A.   November 23rd, 2009.

 9   Q.   What's the time of the call?

10   A.   Approximately 11:27 a.m.

11   Q.   Who are the participants in this call?

12   A.   Mike Darbinyan and Miguel Ramirez.

13   Q.   Who is Miguel Ramirez, based on your knowledge of the

14   investigation?

15   A.   Miguel Ramirez is "Mugsy" from Cuatro Flats.  He's another

16   defendant in this case.

17   Q.   And when you say from Cuatro Flats, what is Cuatro Flats,

18   based on your knowledge of the investigation?

19   A.   It's a Hispanic gang in the Los Angeles area.

20   Q.   Were there numerous calls intercepted during the course of

21   this investigation between "Mugsy," Miguel Ramirez, and

22   Darbinyan?

23   A.   Yes.

24   Q.   And were there calls discussing firearms in these captured

25   calls between Ramirez and Darbinyan?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  Objection.  We're without the best
 2   evidence.
 3            THE COURT:  Overruled.
 4            THE WITNESS:  Yes.
 5   BY MR. ESTRADA:
 6   Q.   Now, turning to page 2 of the transcript of 113A, do you
 7   have that in front of you?
 8   A.   Yes.
 9   Q.   Four speakers from the top, Ramirez states, "Hey, I got
10   you more of those things, bro."
11        And then six speakers from the bottom, Ramirez states,
12   "One of 'em I got, it is specially for Armen.  Armen.
13   Remember, Armen had asked me for a snubnose with no hammer.  So
14   I got a combo."
15        Based on your training and experience, what does a
16   snubnose with no hammer refer to?
17   A.   It refers to a handgun without the external hammer on the
18   back of the gun.
19            THE COURT:  Okay, ladies and gentlemen, we're going to
20   break at this time for our afternoon recess.  We'll see you
21   back in 15 minutes.
22        Remember the admonishment not to discuss the case among
23   yourselves or with anybody else or form or express any opinions
24   about the matter until it's submitted to you and you retire to
25   the jury room.  See you back in 15 minutes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (Recess held from 2:32 p.m. to 2:49 p.m.)

 2        (In the presence of the jury:)

 3            THE COURT:  The record will reflect that all the

 4   members of the jury are in their respective seats in the jury

 5   box, and we were at direct examination.

 6        You may continue, Counsel.

 7            MR. ESTRADA:  Thank you, your Honor.

 8   Q.   Now, Special Agent Stebbins, when we left off, we were at

 9   transcript 113A in the book, and I was asking about the second

10   page of that transcript, you talk about the snubnose with no

11   hammer.  I'd like to ask you about the line that follows that,

12   starting at Speaker 1, Darbinyan.

13        Darbinyan states, "Okay, can we see it?"

14        Ramirez, "Yeah, I'm on my way over there.  Go over there

15   right now."

16        Based on this call, did you and other officers take any

17   action?

18   A.   Yes, we did.

19   Q.   What sort of action?

20   A.   We went out on surveillance to the Hollywood area.

21   Q.   Before I ask you about the surveillance, I'd like to play

22   the next call for you.

23        Your Honor, with the government's -- with the Court's

24   permission, the government would like to play Exhibit 114, ask

25   that the jurors turn to 114A in their books.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2         (Audio played.)

 3    BY MR. ESTRADA:

 4    Q.   Special Agent Stebbins, turning to the first page of

 5    Exhibit 114A, do you have that in front of you?

 6    A.   Yes.

 7    Q.   What's date of this call?

 8    A.   November 23rd, 2009.

 9    Q.   What's the time of the call?

10    A.   Approximately 11:41 a.m.

11    Q.   Who are the participants?

12    A.   Mike Darbinyan, Artur Pembejian.

13    Q.   Who's Artur Pembejian?

14    A.   He is another defendant in this case.

15    Q.   Turning to page 2 of 3 in the transcript, three speakers

16    from the bottom, Pembejian tells Darbinyan, "Let's go to

17    downtown and then go see him, bro."

18         Darbinyan, "Yeah, he's here in Hollywood.  He is at Kiaj's

19    place."

20         Based on your knowledge of the investigation, who's

21    "Kiaj"?

22    A.   "Kiaj" is Gevork Kasabyan, another defendant in this case.

23    Q.   Was that a name he went by, "Kiaj"?

24    A.   Yes.

25    Q.   How did you learn that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Through speaking with other individuals on this case.  And

2    "kiaj" means "blonde" in Armenian, and he is a blonde-haired

3    gentleman.

4    Q.   Now I'd like to ask you about surveillance that day, on

5    November 23rd, 2009.  You and other officers conducted

6    surveillance?

7    A.   Yes, we did.

8    Q.   Where did you go to?

9    A.   We went to a marijuana dispensary that was owned by Gevork

10   Kasabyan.

11   Q.   Had you known about this marijuana dispensary before this

12   particular day, November 23rd?

13   A.   Yes, we did.

14   Q.   Generally speaking, where was this marijuana dispensary?

15   A.   It was on Sunset Boulevard and Hobart in the Hollywood

16   area of Los Angeles.

17   Q.   Please take a look at Exhibit 315, which should be in one

18   of the black binders behind you.

19   A.   Yes, I have it.

20   Q.   What's Exhibit 315?

21   A.   It is a map of the area that I was just describing.

22   Q.   Is it in three pages?

23   A.   Yes.

24   Q.   Does it include photographs and locations?

25   A.   Yes, it does.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    Is this a map that you helped prepare?

 2    A.    Yes.

 3    Q.    And what did you use to make the map?

 4    A.    Used Google.

 5    Q.    And does this map fairly and accurately depict the area of

 6    the marijuana store in Hollywood, California, that you

 7    conducted surveillance at on November 23rd, 2009?

 8    A.    Yes, it does.

 9          MR. ESTRADA:  Your Honor, the government moves to

10    admit Exhibit 315 and would request permission to publish only

11    page 2 at this time.

12          THE COURT:  Let me just take a look at it.  I haven't

13    seen it yet.  315?

14          MR. ESTRADA:  Yes.

15          THE COURT:  Okay.  May publish.

16      (Received in evidence, Exhibit 315.)

17    BY MR. ESTRADA:

18    Q.    I'm showing you page 2 of Exhibit 315.

19          You mentioned a marijuana shop.  Looking at the photo

20    there, where was the marijuana shop?

21    A.    It's this -- sorry, this building here, and there is a

22    door in this general area behind the gate.

23    Q.    This is the back of the shop?

24    A.    That's correct.

25    Q.    The back of the shop opened into some sort of auto repair
```

1   business?

2   A.   Yes.  It was a smog check, auto repair.

3   Q.   Had you conducted surveillance here in the past?

4   A.   Yes.

5   Q.   Was it a place that different activities involving

6   Darbinyan took place?

7   A.   Yes.

8   Q.   Around what time did you set up on the surveillance on

9   November 23rd, 2009?

10   A.   Around noon.

11   Q.   Was it difficult to conduct surveillance in this area?

12   A.   Yes.

13   Q.   Why is that?

14   A.   This area of Hollywood is known as Little Armenia.  Most

15   of the individuals in this area are Armenian, and many of our

16   targets either live in this area or frequent this area, and

17   it's difficult for us to sit there and not stand out a little

18   bit.

19   Q.   And at this point in the investigation in November 2009,

20   had you and other officers been following, watching Darbinyan

21   for many months?

22   A.   Many months, yes.

23   Q.   And had there been efforts, as you were out on

24   surveillance, to detect your surveillance?

25   A.   Yes.

```
 1              MR. SEVERO:  Objection, calls for speculation, state
 2  of mind.
 3              THE COURT:  Overruled.
 4  BY MR. ESTRADA:
 5  Q.   Now, you talked about countersurveillance measures in
 6  prior testimony.  I won't ask you about that again, but at this
 7  point in the investigation, was there a great deal of
 8  countersurveillance driving and activity taking place?
 9  A.   Yes.
10  Q.   On this particular day conducting surveillance, did you
11  use any tools to assist you in your surveillance?
12  A.   Yes.
13  Q.   What did you use?
14  A.   I used binoculars.
15  Q.   At some point during that surveillance, did you see any of
16  the subjects of the investigation?
17  A.   Yes.
18  Q.   Who did you see?
19  A.   I saw Mher Darbinyan and Artur Pembejian.
20  Q.   And what did you see them doing?
21  A.   I saw them park at the curb near the shop, and I saw them
22  go inside the shop.
23  Q.   And Mher Darbinyan, Artur Pembejian, were those the same
24  people in the call we just listened to in Exhibit 114?
25  A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   About what time was it that you saw them going into the

2   shop?

3   A.   I believe it was approximately 12:30.

4   Q.   That same day, did you see them again?

5   A.   Yes, I did.

6   Q.   What did you see them doing?

7   A.   They came out of the shop and proceeded southbound on

8   Hobart.

9   Q.   When they went southbound, were they walking?

10  A.   No.  They were driving inside a Range Rover.

11  Q.   Do you remember the color of the Range Rover?

12  A.   I think that one was white.

13  Q.   Did you see any other subjects of the investigation that

14  day?

15  A.   Yes.

16  Q.   Who did you see?

17  A.   Shortly behind them, going southbound on Hobart, was

18  Miguel Ramirez in an older model Toyota Camry.

19  Q.   How did you recognize Miguel Ramirez?

20  A.   He was -- the streets aren't that large down there, so he

21  was coming head-on with me, and I recognized him immediately as

22  he came southbound behind Darbinyan.

23  Q.   And approximately what time was this that you saw Miguel

24  Ramirez?

25  A.   I would say just a few minutes after.  Approximately

```
1    12:45.

2            MR. ESTRADA:  Your Honor, the government requests

3    permission to play Exhibit 115 and asks the jurors turn to 115A

4    in their books.

5            THE COURT:  Okay.

6        (Audio played.)

7    BY MR. ESTRADA:

8    Q.   Now, Special Agent Stebbins, turning to page 1 of the

9    transcript at Exhibit 115A, do you have that in front of you?

10   A.   Yes, I do.

11   Q.   Date of this call?

12   A.   November 23, 2009.

13   Q.   Time of the call?

14   A.   Approximately 3:36 p.m.

15   Q.   Who are the participants in this call?

16   A.   Mike Darbinyan, Miguel Ramirez.

17   Q.   So is this after the surveillance that you and other

18   officers conducted that day?

19   A.   Yes, it is.

20   Q.   Did your investigation of this particular incident

21   continue to the next day?

22   A.   Yes, it did.

23           MR. ESTRADA:  Your Honor, the government requests

24   permission to play Exhibit 116 and asks the jurors turn to 116A

25   in their books.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  116?  Okay.

 2              MR. ESTRADA:  116, yes.

 3              THE COURT:  Okay.

 4         (Audio played.)

 5    BY MR. ESTRADA:

 6    Q.   And now, Special Agent Stebbins, turning to the first page

 7    of Exhibit 116A, do you have that in front of you?

 8    A.   Yes, I do.

 9    Q.   What's the date of this call?

10    A.   November 24, 2009.

11    Q.   This is the next day after your surveillance?

12    A.   Yes, it is.

13    Q.   I should say the next day after your surveillance of

14    November 23rd, 2009?

15    A.   That's correct.

16    Q.   What's the time of the call?

17    A.   10:43 a.m.

18    Q.   Who were the participants?

19    A.   Mike Darbinyan and Gevork Kasabyan.

20    Q.   Now, turning to page 2 of the transcript, six speakers

21    from the top, Gevork Kasabyan says, "Fine, dear.  Dear, could

22    you send someone here to pick that up?"

23         Darbinyan, "Yeah, I will come over, bro."

24         Kasabyan, "Oh, yeah?  Okay, dear.  Okay, my brother.  I

25    just wanted to know what am I going to do."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Darbinyan, "Yeah, no, no."
 2        Kasabyan, "I don't want to leave it.  I don't want to keep
 3   it inside, dear.  I'm scared.  There are lots of big things.  I
 4   don't want them to come in and catch me.  I'm going at once.
 5   You know that."
 6        Based on your knowledge of the investigation, what did you
 7   understand Kasabyan to be referring to by "pick that up"?
 8   A.   The guns that he was holding inside his marijuana
 9   dispensary.
10            MR. SEVERO:  Move to strike.  Speculation of this
11   witness.
12            THE COURT:  Sustained.
13            MR. ESTRADA:  It's based on his knowledge of the
14   investigation, your Honor.
15            THE COURT:  Sustained.
16            MR. ESTRADA:  Your Honor, the government requests
17   permission to play Exhibit 118 and asks that the jurors turn to
18   118 in their transcript books.  118A, that is, in their
19   transcript book.
20        (Audio played.)
21   BY MR. ESTRADA:
22   Q.   Special Agent Stebbins, turning to page 1 of the
23   transcript at 118A, do you have that in front of you?
24   A.   Yes.
25   Q.   What's the date of this call?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   November 24, 2009.

 2    Q.   What's the time of the call?

 3    A.   Approximately 12:05 p.m.

 4    Q.   Who are the participants in this call?

 5    A.   Mike Darbinyan, Souren Serobyan.

 6    Q.   Who is Souren Serobyan?

 7    A.   He's another defendant in this case.

 8    Q.   Was he an associate of Armenian Power?

 9    A.   Yes.

10    Q.   Now, turning to page 3 of 4 of 118A, do you have that in

11    front of you?

12    A.   Yes, I do.

13    Q.   Second speaker from the top, Serobyan states, "I took it,

14    my friend.  The car is with me now.  Let me head down and pick

15    it up from Kaj and take it there."

16         Eight speakers from the bottom, Darbinyan states, "When

17    you meet with Kaj, are you going to take it very far?"

18         Serobyan, "No, my brother.  I will take it to our yard.  I

19    have a car parked over there, my friend.  I will put it in that

20    car's trunk, and it will stay there."

21         Based on your knowledge of the investigation, did Serobyan

22    have a residence near the area of Kaj's weed shop?

23    A.   Yes.

24    Q.   Where was that residence?

25    A.   It was on Harvard.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    In the Hollywood area?

 2   A.    Yes.

 3   Q.    And on this date, was surveillance conducted?

 4   A.    Yes.

 5   Q.    Was it later learned that guns were recovered from Souren

 6   Serobyan?

 7             MR. SEVERO:  Objection, hearsay.

 8             THE COURT:  Sustained.

 9   BY MR. ESTRADA:

10   Q.    Did you see the guns?

11   A.    Yes.

12   Q.    Did you see guns that were recovered from Souren Serobyan?

13   A.    Yes.

14             MR. SEVERO:  Still hearsay.

15             THE COURT:  Sustained.

16             MR. SEVERO:  Move to strike the answer.

17             THE COURT:  It will be stricken as to where they came

18   from.

19   BY MR. ESTRADA:

20   Q.    Now, based on your role in this investigation, were you

21   familiar with defendant Darbinyan using others to conduct

22   criminal activities for him?

23   A.    Yes.

24   Q.    Could you explain that.

25   A.    Oftentimes Darbinyan wouldn't want to be in the car with
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    any form of contraband, whether it's guns, fraud stuff.  He

 2    just wouldn't want to travel with it.

 3    Q.   Based on your knowledge of the investigation, would he

 4    have others pick things up for him?

 5    A.   Yes.

 6    Q.   And deliver things for him?

 7    A.   Yes.

 8         MR. ESTRADA:  Your Honor, the government requests

 9    permission to play Exhibit 119 and asks the jurors turn to 119A

10    in their books.

11         THE COURT:  Okay.

12         (Audio played.)

13    BY MR. ESTRADA:

14    Q.   Now, Special Agent Stebbins, turning to the first page of

15    Exhibit 119A, do you have that in front of you?

16    A.   Yes.

17    Q.   What's the date of this call?

18    A.   November 24, 2009.

19    Q.   What's the time of the call?

20    A.   Approximately 1:06 p.m.

21    Q.   Who are the participants in this call?

22    A.   Mike Darbinyan and Gevork Kasabyan.

23    Q.   Turning to page 3 of the transcript, five speakers from

24    the top, Gevork Kasabyan tells Darbinyan, "Suro came here and

25    then left, my brother."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        Darbinyan, "Yeah, when I call that guy, he doesn't pick up

2   the phone."

3        Based on your knowledge of the investigation, who's

4   "Suro"?

5   A.   Suro Serobyan.

6   Q.   Is "Suro" a shorter form of "Souren"?

7   A.   Yes.

8   Q.   Now, on this day, November 24th, 2009, did you and other

9   officers conduct surveillance?

10  A.   Yes, we did.

11  Q.   Approximately what time did this surveillance begin?

12  A.   Probably a little after noon.

13  Q.   Where was the surveillance?

14  A.   Outside the same marijuana dispensary as the day before.

15       MR. ESTRADA:  Your Honor, with the Court's permission,

16  I would ask to publish page 1 of Exhibit 315, which has been

17  admitted.

18       THE COURT:  Yes.

19  BY MR. ESTRADA:

20  Q.   Looking at the map here, Exhibit 312 (sic), generally

21  speaking, what was the area of the surveillance that you and

22  other officers conducted that day on November 24, 2009?

23  A.   We started the surveillance here, in this area.

24  Q.   Is that the location of the weed shop?

25  A.   Yes, it is.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   And conducting surveillance on that date, did you see any

 2    of the targets of the investigation?

 3    A.   Yes.

 4    Q.   What did you see?

 5    A.   I saw Souren Serobyan.

 6    Q.   And what did you see him doing?

 7    A.   I saw him arrive at the weed shop and exit his vehicle and

 8    walk into the weed shop.

 9    Q.   Did you see him at any point after that?

10    A.   Yes.

11    Q.   About how long after that?

12    A.   No more than five minutes.

13    Q.   When you saw him five minutes later, what did you see?

14    A.   He came back out with a bag and got into his Audi Q7.

15    Q.   What kind of a car is an Audi Q7?

16    A.   It's a --

17              MR. SEVERO:  It's irrelevant.

18              MR. ESTRADA:  Just for the description, your Honor.

19              THE COURT:  Overruled.

20              THE WITNESS:  It's a nice SUV.

21              MR. SEVERO:  Move to strike "nice."

22              THE COURT:  The word "nice" will be stricken.

23    BY MR. ESTRADA:

24    Q.   Now, when you saw Souren Serobyan leave the weed shop in

25    this SUV, this Audi SUV, with the bag, what did you do?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    We conducted a mobile surveillance of Souren Serobyan.

 2   Q.    What does that mean, a mobile surveillance?

 3   A.    We began to follow him, and we were attempting to get

 4   ahold of a marked unit to do a traffic stop.

 5   Q.    Now, you didn't do a traffic stop of Souren Serobyan

 6   yourself?

 7   A.    I did not.

 8   Q.    And other undercover surveillance officers didn't do the

 9   traffic stop themselves?

10   A.    No, we didn't.

11   Q.    Why is that?

12   A.    Generally speaking, especially in this case, we were

13   trying to continue the investigation.  We didn't want to be

14   burned with some of the targets.  So we have marked -- officers

15   in uniform do the traffic stops so that they don't know that

16   it's the Glendale task force investigating.

17   Q.    When you say "burned," can you describe for the jury what

18   you mean by the term "burned"?

19   A.    If subjects see somebody more than once, they may

20   associate them to a police officer, and we didn't really want

21   to put our faces out there at this point.

22   Q.    During the course of this investigation, were officers

23   that were part of the investigation burned at times?

24   A.    Yes.

25   Q.    Were you in fact burned?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes, I was.

2            MR. ESTRADA:  May I have just a moment, your Honor?

3            THE COURT:  Yes.

4    BY MR. ESTRADA:

5    Q.   Now, later, after this surveillance, when other

6    officers -- I should explain that.

7        You're conducting surveillance November 24, 2009.  When

8    you saw Serobyan leave, did you pull a U-turn and start

9    following Serobyan?

10   A.   No, I didn't.

11   Q.   Why not?

12   A.   I was facing the proper direction to go behind him, but I

13   didn't want to leave right away.  If you pull out right behind

14   somebody --

15           MR. SEVERO:  Objection, nonresponsive after --

16           THE COURT:  Sustained.

17   BY MR. ESTRADA:

18   Q.   What happens if you just pull out behind a target in the

19   investigation?

20   A.   They'll know that you're there, and they'll think you're a

21   cop.

22   Q.   So do you use many different officers conducting

23   surveillance to try to conceal the investigation?

24   A.   Yes.

25   Q.   Why is it important to conceal or protect the

1    investigation?

2    A.   We don't want them to either change their tactics or to

3    stop doing what they're doing if they see us.

4    Q.   Later that day on November 24, 2009, did you learn that

5    three guns were recovered?

6    A.   Yes.

7    Q.   Did you learn that one of them was in fact a snubnose

8    without a hammer?

9             MR. SEVERO:  Objection.

10            THE WITNESS:  Yes.

11            MR. SEVERO:  It's all hearsay.  Move to strike the

12   answer.

13            THE COURT:  Sustained.  It will be stricken.

14   BY MR. ESTRADA:

15   Q.   Did you see the guns?

16   A.   Yes.

17   Q.   Seeing the guns -- are you familiar with firearms?

18   A.   Yes.

19   Q.   Based on your familiarity with firearms, did you see that

20   one of them was a snubnose without a hammer?

21   A.   Yes.

22            MR. ESTRADA:  Your Honor, no further questions at this

23   time.

24            THE COURT:  Cross.

25            MR. SEVERO:  I need a moment, your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sure.

 2                      CROSS-EXAMINATION

 3   BY MR. SEVERO:

 4   Q.   Good afternoon, sir.

 5   A.   Good afternoon, sir.

 6   Q.   You started your testimony yesterday with the events of

 7   August 20th, 2009.  You recall?

 8   A.   Yes, sir.

 9   Q.   Let me ask you generally.  Did you conduct -- strike that.

10        When conducting surveillance, did you keep logs of every

11   surveillance that was done?

12   A.   Did I personally, or just the task force?

13   Q.   Okay.

14   A.   The task force generally did.

15   Q.   Task force would keep surveillance logs, correct?

16   A.   Yes, sir.

17   Q.   And it's your understanding that every surveillance that

18   was done in this case has a corresponding log, written log?

19   A.   No.  I said generally they will have a log.

20   Q.   So you're -- the real answer is, sometimes there is a log

21   and sometimes there might not be.

22   A.   That's correct.

23   Q.   And is it your understanding that all the logs that were

24   produce -- prepared were produced to the defense?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    The logs that are not prepared are not prepared because
2    it's inconvenient to do so at the time?
3              MR. ESTRADA:  Object, your Honor, argumentative.
4              THE COURT:  Overruled.
5              THE WITNESS:  No, it's not because of inconvenience.
6    BY MR. SEVERO:
7    Q.    It's because you don't have the utensils to write them
8    with?
9    A.    I'm not sure, sir.
10   Q.    Is there a strategic reason for not keeping a log?
11   A.    No, sir.
12   Q.    Is it because you're shorthanded and have no one to write
13   them, to write the log?
14   A.    No, sir.
15   Q.    All right.  When you are monitoring wiretap calls, is an
16   FBI agent present at all times?
17   A.    Usually an FBI agent or a task force officer.
18   Q.    So the answer's yes, either an FBI agent or some member of
19   a law enforcement is present?
20   A.    Yes.
21   Q.    And at the same time, there is a -- in this case
22   particularly, there was an Armenian-speaking monitor listening
23   to the calls, correct?
24   A.    That's correct, sir.
25   Q.    And then that person would create a line sheet, true?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    Your understanding of August 20th, 2009 -- strike that.

3          At what point during the evening of August 20th, 2009, did

4    you become aware of a gathering at the Chicken House?

5    A.    At some point during the calls we were intercepting, I

6    would have been informed.

7    Q.    Do you know what time it would have been?

8    A.    No, sir.

9    Q.    You don't -- you didn't write a report in that respect,

10   did you?

11   A.    No, sir.

12   Q.    Now, it's true that in your training you were taught to

13   write reports in order to memorialize what you are observing,

14   true?

15   A.    Yes.

16   Q.    And it's important because you may not testify in a case

17   until five years later and you need that to refresh your

18   recollection; is that true?

19   A.    That's true.

20   Q.    And normally when you write -- when you prepare reports,

21   you prepare those reports noting the items that at that moment

22   are significant to you, true?

23   A.    Yes, that's correct.

24   Q.    That's true not only for you personally, but for every

25   police officer that you're aware of is trained that way,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001232**

```
1    correct?

2    A.   I can't speak to everybody else's training, but yes, sir,

3    the FBI agents are trained that way.

4    Q.   You work with other law enforcement agencies, don't you?

5    A.   That's correct.

6    Q.   And you know them to write reports as well, don't you?

7    A.   Yes, they write reports.

8    Q.   I'm sorry, refresh my recollection on this, and maybe the

9    jury's.  You've been an FBI agent for how long?

10   A.   Approximately nine years.

11   Q.   Let me direct your attention to Exhibit 91A.

12        And your Honor, if I could have the jury look -- turn to

13   91A in their books.

14           THE COURT:  Yes.

15   BY MR. SEVERO:

16   Q.   Do you have it, sir?

17   A.   Yes, sir.

18   Q.   There is a -- directing your attention to page 3 of 4,

19   following Mr. Estrada's lead on how to direct your attention to

20   it, eighth speaker down from the top, KA, there is a reference

21   to "Tachik."  You see that?

22   A.   Yes.

23   Q.   Do you know who that is?

24   A.   No.

25   Q.   From a reading of this call, is it -- did you come to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   understand that there was some issue regarding Tachik that was

2   the reason for this meeting in Hollywood?

3   A.   I didn't know him as "Tachik," but I knew who the

4   individual was they were referring to.

5   Q.   So it's -- there is a -- there was nothing in the calls

6   before August 20th that indicated that a meeting was going to

7   take place at the Chicken House.

8   A.   I don't recall.

9   Q.   Is that a fair statement?

10  A.   I don't recall, sir.

11  Q.   You don't recall.

12       You didn't alert any law enforcement agency before August

13  20th, 2009, that there would be a meeting at the Chicken House?

14  A.   No, sir.

15  Q.   Based on your investigation, your knowledge of the

16  different monitors in this case, you don't know any law

17  enforcement officer that alerted LAPD to a meeting at the

18  Chicken House before August 20th, 2009?

19  A.   That's correct.

20  Q.   And it appears that there was some meeting at a bakery

21  beforehand.  Did you -- you remember seeing that in the calls?

22  A.   Yes, sir.

23  Q.   And do you know where that bakery was?

24  A.   No, I don't, sir.

25  Q.   Did you attempt to find out what bakery they were talking

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    about?

2    A.    No, sir.

3    Q.    So there was a meeting at a bakery where there were 20

4    other people there when Mr. Darbinyan arrived.  Is that your

5    understanding of what happened?

6    A.    Yes, sir.

7    Q.    And they decided, all these people, to go to this

8    Hollywood Chicken House, correct?

9    A.    That's correct, sir.

10   Q.    And the people that were at the bakery were actually

11   following Mr. Darbinyan, correct?

12         MR. ESTRADA:  Object, your Honor, calls for

13   speculation.  The calls are the best evidence here, and they

14   speak for themselves.

15         THE COURT:  Overruled.

16         THE WITNESS:  Can you repeat that question, sir?

17         MR. SEVERO:  Yes.

18   Q.    The people that were at the bakery, the 20 or so that were

19   referenced, were following Mr. Darbinyan to the Chicken House?

20         THE COURT:  If you know.

21         MR. SEVERO:  If you know.

22         THE WITNESS:  I have no independent knowledge about

23   that, only the calls.

24   BY MR. SEVERO:

25   Q.    Okay.  From the calls, let's look at -- if I could ask you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   to turn to page -- sorry, to call 92 and transcript 92A.

2        How many times have you reviewed this call?

3   A.   I'm sure several, sir.

4   Q.   And it's fair to say that you know this -- almost every

5   call by heart nearly, true?

6   A.   I know a lot about the calls, sir.

7   Q.   Yes.  So you remember now that there were -- they were

8   driving in five cars right behind Mr. Darbinyan, true?

9   A.   That's what it says in the call, sir.  Yes, sir.

10  Q.   Okay.  Now --

11       I need a moment, your Honor.

12       You are aware that at the Chicken House that evening, a

13  number of vehicles were identified, correct?

14  A.   That's correct.

15  Q.   You know how many?

16  A.   No.  Several.

17  Q.   Need a moment again.

18       You recall having read the report prepared by LAPD in this

19  case?

20  A.   Yes, I recall reading it.

21  Q.   And do you -- you don't remember how many cars were seized

22  that evening?  Not seized, but identified.

23  A.   I'm not sure how many in the report.  I know several were

24  photographed.

25  Q.   More than three?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes, sir.

2    Q.   More than five?

3    A.   Probably, yes, sir.

4    Q.   Do you know how many of those vehicles had guns in them?

5            MR. ESTRADA:  Object, your Honor, calls for

6    speculation, lack of foundation.  He was wasn't present at the

7    Chicken House.

8            MR. SEVERO:  I'm only asking if he knows.

9            THE COURT:  Overruled.

10       You only can testify to your personal knowledge.  Do you

11   know?

12           THE WITNESS:  I know that there were two guns

13   recovered from cars.

14   BY MR. SEVERO:

15   Q.   From two cars or one car?

16   A.   Two different cars.

17   Q.   You make reference in this call, No. 92 -- Exhibit 92,

18   five speakers down from the top, on page 2, you testified about

19   Lyovcho.  Lyovcho or --

20   A.   Lyovcho.

21   Q.   And you believe that to be someone by the name of Levon,

22   correct?

23   A.   Yes.

24   Q.   How about Zhor?

25   A.   I don't know who Zhor is.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And it is on this call that we learn that Speaker 1 went

2    to the bakery and then drove to Hollywood, correct?

3    A.    There are many additional calls, but yes, sir, it says

4    that in this call.

5    Q.    That's the first time we hear about that, correct?

6    A.    I can't speak to whether it's the first time.

7    Q.    In call number -- Exhibit 93, you have identified Paramaz

8    Bilezikchyan as being one of the speakers.

9    A.    Yes, sir.

10   Q.    And it appears like he's giving instructions, doesn't it?

11   A.    No, I think they're agreeing.

12   Q.    So you don't think they're instructions?

13   A.    No.

14   Q.    You know Mr. Bilezikchyan to claim to be the leader of

15   Armenian Power?

16   A.    Yes, he is a leader of Armenian Power.

17   Q.    And you heard -- you know Mr. Bilezikchyan well, don't

18   you?

19   A.    Yes, I do.

20   Q.    Because he's an informant in this case, correct?

21   A.    He's a cooperating defendant, sir, yes.

22   Q.    Remember the testimony yesterday about Mr. Darbinyan's

23   tattoo on the left side being Bilezikchyan?

24   A.    Yes, sir.

25   Q.    Do you think it's Bilezikchyan?

```
 1              MR. ESTRADA:  Object, your Honor, improper to comment

 2    on another person's testimony.

 3              MR. SEVERO:  What?

 4              THE COURT:  Sustained.  Whether he was right or wrong,

 5    it would be improper.

 6         But did you recognize the person in the -- on the tattoo?

 7              THE WITNESS:  Yes, sir.

 8    BY MR. SEVERO:

 9    Q.   Who is that?

10    A.   Parunak Krbashyan.

11    Q.   Who is Parunak Krbashyan?

12    A.   He's the original "Capone" from Armenian Power.

13    Q.   It's Mr. Darbinyan's cousin, isn't he?

14    A.   He's also his cousin, yes, sir.

15    Q.   And he was stabbed to death, correct?

16    A.   He was what?

17    Q.   He was stabbed?

18    A.   I believe he overdosed on heroin.

19    Q.   That's correct.  You're correct.

20    A.   Yes, sir.

21    Q.   He overdosed, correct?

22    A.   Yes, sir.

23    Q.   Directing your attention, sir, to Exhibit 97.  Your

24    testimony earlier was that you believe that "things" or "toys"

25    refers to guns?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes.

2   Q.   Let me direct your attention in 97 to page 3 of 6.  That

3   would be the fourth page of the exhibit.  Four speakers down.

4   Speaker 1 says, "They retrieved about 15 toys," the last

5   sentence.  You see that?

6   A.   Yes, sir.

7   Q.   Two more speakers down, that'd be one, two -- six, the

8   same person says, "They brought a dog.  They let the dog go

9   into the roof, and it found four guns."

10       No need for disguising what they found, right?  He

11   referred to them as guns there, don't --

12   A.   Yes, he's talking about guns.

13   Q.   And are you aware whether 15 guns were found that evening?

14   A.   No, there were not 15 guns found.

15   Q.   There were actually about, what, five or six?

16   A.   Six guns.

17   Q.   Six.  You heard testimony yesterday -- actually, it's --

18   you've testified yesterday as to what is TMZ.

19   A.   Yes, sir.

20   Q.   What's TMZ?

21   A.   It's a news outlet of sorts that carries celebrity gossip

22   for the most part.

23   Q.   Mostly entertainment news, right?

24   A.   Yes, sir.

25   Q.   And apparently they showed up at this location that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    evening.  Were you present when that happened?

2    A.   I'm not sure that they did or not.  It says so in the

3    calls.

4    Q.   You did see the press there?

5          MR. ESTRADA:  Object, your Honor, calls for

6    speculation.  He wasn't present at the Chicken House.

7          MR. SEVERO:  Well, wasn't he?

8          THE COURT:  Were you present?

9          THE WITNESS:  No, sir.  No, your Honor.

10          THE COURT:  All right.

11   BY MR. SEVERO:

12   Q.   Your testimony earlier today was that Mr. Darbinyan tends

13   to understate things when he's talking on the phone.

14   A.   I don't know that my testimony said he understated things.

15   Can you explain that, sir?

16   Q.   Yes, but a little later.

17        Your testimony at -- let me direct your attention to 98,

18   Exhibit 98.  Page 7 of 16, seven from the bottom -- eighth from

19   the bottom, person designated as "AP," Alen Petrosian, says,

20   "Yeah.  Who else?  Was he with you?  Was the bro with you?  The

21   one who was on the road with you?"

22        Speaker 1, "Yes.  All of them, bro.  And 40 more apers."

23        You know what 40 is being referred to here?

24   A.   Think he was talking about all the AP gang members that

25   were there.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Do you believe there were 40?

2   A.   No, I don't.

3   Q.   You think it was an exaggeration, wasn't it?

4   A.   Yes.

5   Q.   Didn't you find that throughout all these calls wherein

6   this person, you think it's Mr. Darbinyan, would speak, there

7   would be a tendency to exaggerate things?

8   A.   No.

9   Q.   So 40 is not an exaggeration, but he didn't always

10  exaggerate; is that what you're saying?

11  A.   I'm saying he didn't always exaggerate, yes, sir.

12  Q.   But he did sometimes?

13  A.   Yes, sir.

14  Q.   And he bragged, didn't he?

15  A.   On occasion, yes, sir.

16  Q.   Like, for example, at page 9 of 16, ten speakers down,

17  it's about the middle of the page, AP says, "Oh, did they find

18  thing -- find things like that nearby, huh?"

19       "Yes.  Around 10, 15 of them."

20       That's an exaggeration, isn't it?

21  A.   As far as the amount of guns found?

22  Q.   Well, as far as toys or things, or what you believe to be

23  guns.

24       MR. ESTRADA:  Object, your Honor, calls for

25  speculation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Yes, it's more than what was actually

 3    found.

 4              MR. SEVERO:  Just need one moment.

 5    Q.   You remember Mr. -- strike that.

 6         At page 13 of 16, right in the middle of the page, there

 7    is a reference to a "Khuchuch."  You see that?

 8    A.   Yes, sir.

 9    Q.   You know who that is?

10    A.   Yes.

11    Q.   Who's that?

12    A.   It's Artur Margaryan.

13    Q.   Who?

14    A.   Artur Margaryan.

15    Q.   He's not a defendant in this case?

16    A.   No, he's not.

17    Q.   Do you recall there being a reference by a person you

18    believed to be Mr. Darbinyan to tossing evidence when he was

19    arrested?

20    A.   Yes.

21    Q.   And this interpretation of the call by you that he was

22    tossing evidence came as a result of some words spoken while he

23    was in a police car, right?  Some words spoken about when he

24    was in the police car.

25    A.   No, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Did he toss -- according to you, did he toss the evidence

2   while he was in the police car?

3   A.   No, I don't think so, sir.

4   Q.   Where did he toss the evidence?

5   A.   I believe while he was standing near the wall.

6   Q.   Are you aware of any evidence recovered while he was

7   standing near the wall?

8   A.   No, sir.

9   Q.   The people that -- strike that.

10        It's been your testimony that you alerted -- or that the

11   task force alerted LAPD because there was a belief that there

12   would be some shooting.

13   A.   Yes, sir.

14   Q.   Potentially.

15   A.   Yes, sir.

16   Q.   But you don't know what the conflict, if anything, if

17   there was a conflict, was about, do you?

18   A.   Yes, I do.

19   Q.   You had no information -- strike that.

20        You did not stop Mr. Darbinyan -- you don't know of any

21   law enforcement officer that stopped Mr. Darbinyan's car

22   en route to Chicken House, do you?

23   A.   No.

24   Q.   You were listening to the calls, correct?

25   A.   Yes, that's correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Were you personally doing it?

2    A.   No, sir.

3    Q.   You know who was?

4    A.   No, sir.

5    Q.   So your testimony is from what someone else told you?

6    A.   Regarding what, sir?

7    Q.   Regarding having alerted LAPD.

8         MR. ESTRADA:  Object, your Honor.  This misstates the

9    testimony that he gave yesterday.

10        THE COURT:  Why don't you restate the question.

11   BY MR. SEVERO:

12   Q.   You believe that at some point LAPD was alerted, correct?

13   A.   Yes, they were.

14   Q.   By whom?

15   A.   By another detective on the task force.

16   Q.   That's something that was learned -- you learned that from

17   someone else.  You weren't there when that other detective

18   presumably alerted LAPD.

19   A.   That's correct.

20   Q.   Let me direct your attention back to --

21        Just a moment, your Honor.

22        -- Exhibit 95, if you would, please.

23        I'm turning to the second page of the exhibit.  First

24   page, that sets out the call.  Four speakers from the bottom,

25   about the fifth sentence there, "I just needed a couple things.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    That's all.  We have some with us."

2         Your testimony yesterday was you believe that to mean

3    guns?

4    A.    Yes.

5    Q.    Did you identify, during the evening of the Chicken House

6    incident, what car Mr. Darbinyan may have been traveling in

7    when he went to the Chicken House?

8    A.    I did not go to the Chicken House, sir.

9    Q.    Did you learn at any point what car he was in?

10   A.    I believe there was a -- you know what, I don't think it

11   was ever documented, no, sir.

12   Q.    Nor is it documented that any car he was seen riding in

13   had any guns in them.

14   A.    No, sir.

15   Q.    Nor is it documented -- let me ask you this.  Strike that.

16        Other than Officer Giberson's report that we referred to

17   earlier, are you aware of any other police reports that were

18   prepared in connection with the Chicken House incident?

19   A.    Yes.  There is an FBI 302 documenting the individuals who

20   were identified there.

21   Q.    All right.  The FBI 30- -- FBI 302 report -- by the way,

22   302 is the form number the FBI uses for preparing the reports,

23   correct?

24   A.    Yes, sir.  It's basically just a report.

25   Q.    Right.  That was prepared by someone who had personal

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  knowledge of the incident?

2  A.   There were actually two FBI 302s prepared.  One person who

3  was there conducting surveillance, and then the other was a

4  after-action, basically.  This is who was there at the

5  Chicken House.

6  Q.   Well, the surveillance that you speak of is actually after

7  the fact.  After -- after 9:00 p.m., when the call went out to

8  LAPD, FBI agents also went to the Chicken House, correct?

9  A.   It was two task force officers, yes, sir.

10  Q.   And who are those officers?

11  A.   Anna Carlisle and Bob Zahreddine.

12  Q.   They didn't prepare 302s?  They're not FBI agents?

13  A.   We all wrote 302s on the task force, sir.

14  Q.   All right.  Now, your understanding of Mr. Darbinyan's

15  position was that he was outside, at the wall at some point

16  at -- when he was first identified, correct?

17  A.   I believe so, sir.

18  Q.   So he was never seen inside the Chicken House?

19  A.   I don't know, sir.

20       MR. SEVERO:  I gave up that book too soon.  If I may.

21  Q.   Direct your attention to Exhibit 103.  You know what time

22  of the night of the day it was that this call was recorded?

23  A.   Approximately 11:01 p.m.

24  Q.   You don't believe that person you identified as

25  Mr. Darbinyan was drunk when he was talking here, do you?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001247**

1    A.   I don't know whether he was drunk, sir.

2    Q.   You knew him to state on many occasions that late at night

3    he would drink quite a bit?

4    A.   He had said he was drunk on the phone before.

5    Q.   Directing your attention to page 5 of 6, second from the

6    top, there is a reference to "my book."  You see that?

7    A.   Yes, sir.

8    Q.   Do you know what book he's referring to?

9    A.   No.  I believe it's a metaphor, sir.

10   Q.   Think it's a roster of some sort?

11        MR. ESTRADA:  Object, your Honor, asked and answered.

12        THE COURT:  Overruled.

13        THE WITNESS:  As I said, I believe it's a metaphor,

14   sir.

15   BY MR. SEVERO:

16   Q.   Okay.  But whatever belief you may have, you're not aware

17   of any book of any sort containing information pertaining to

18   any illegal activity that was found in Mr. Darbinyan's

19   possession, do you?

20   A.   No, sir.

21   Q.   And as you read through this call, it's obvious that he's

22   exaggerating again, isn't he?

23   A.   No, sir.

24   Q.   At the bottom of page 5 of 6, he refers to checking out

25   the stock market.  You knew him to have investments outside the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   country?

 2   A.   I don't know, sir.

 3   Q.   Did you know him to have received income from outside the

 4   country?  This country.

 5   A.   I don't know, sir.

 6   Q.   This person on this call, is it Vahan?  Vahan?  You know

 7   who he is?

 8   A.   No, sir.

 9   Q.   When you say "Linoo," you actually meant "LNU," because

10   it's last name unknown?

11   A.   That's correct, sir.

12   Q.   And you never identified this person Vahan?  Vahan?

13   A.   Vahan, yes, sir.  No, we did not identify him.

14   Q.   Somehow you know that he's someone who stabbed

15   Mr. Darbinyan's cousin?

16   A.   No, that's not correct, sir.

17   Q.   He was involved in a stabbing of -- in a fight?

18   A.   No, it was not my testimony, sir.

19   Q.   Zareh is the one who stabbed his cousin?

20   A.   That's correct, sir.

21   Q.   And Zareh is associated with Vahan in some fashion?

22   A.   Yes, sir.

23   Q.   They're -- but you don't know who they are, so you don't

24   know if they're gang members or not.

25   A.   I know who Zareh Manjikian is, yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   But you don't know who Vahan is, so you don't know if

2    Vahan is a gang member.

3    A.   I don't know, no, sir.

4    Q.   And you don't know when -- strike that.

5         This call was monitored as well, of course?

6    A.   That's correct.

7    Q.   Was there any surveillance of any meeting between

8    Mr. Darbinyan and Vahan?

9    A.   No, sir.

10        MR. SEVERO:  I need a moment, your Honor.  Sorry.

11   Q.   Directing your attention to Exhibit 104.  It's --

12   according to your testimony, this is between the person you

13   have identified as Mr. Darbinyan and an unknown male; is that

14   correct?

15   A.   That's correct.

16   Q.   And it's a call that is received by Mr. Darbinyan?

17   A.   Yes.

18   Q.   Did you trace the phone number that it was -- that the

19   call was generated from?

20   A.   No.

21   Q.   So this number that appears on the first page,

22   562-457-9680, did you find out whose number that was?

23   A.   We get subscriber information, yes, sir.

24   Q.   But that subscriber information didn't tell you who the

25   unknown male in this call was?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   No, I doubt it, sir.

 2   Q.   Yeah.  You have testified that this is a call from prison.

 3   This individual was in prison?

 4   A.   Yes, sir.

 5   Q.   Is that -- you're getting that from the content of the

 6   call?

 7   A.   That's correct, sir.

 8   Q.   When this individual is, this unknown male -- let me try

 9   to refer you to a page.

10        Well, let me ask you generally speaking.  When you hear

11   the word "validate" in this context, it's your understanding

12   that it's someone who is validated as a Mexican Mafia

13   associate; is that true?

14   A.   No, sir.  If you could point me to the exact reference.

15   Q.   I'm looking.

16        MR. ESTRADA:  Your Honor, page 6 of 15.  Bottom of

17   page 6 refers to the term "validated."

18        MR. SEVERO:  Thank you.  Thank you, Mr. Estrada.

19   Q.   Okay.  Let me direct your attention to the bottom of 6 of

20   15.  You see that?

21   A.   Yes, sir.

22   Q.   In this context, do you believe that this speaker was

23   saying you've been validated as an Eme or Mexican Mafia

24   associate?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   He wasn't any -- you're not aware of any validation for

 2   Armenian Power, do you?  Are you?

 3   A.   There is a validation for Armenian Power.

 4   Q.   But in this context, the only validation you're aware of

 5   is a Mexican Mafia validation?

 6   A.   In this context, Darbinyan is referring to being validated

 7   by the Mexican Mafia.

 8   Q.   Even though it doesn't say so?

 9   A.   Based on the context, it's pretty clear.

10   Q.   It's pretty clear to you, in your opinion.

11   A.   It is very clear, yes, sir.

12   Q.   To you.

13        THE COURT:  Counsel, this may be a good time to break,

14   being 4:00 o'clock.  We'll break at this time, come back in

15   tomorrow morning at 8:15.  We'll see you back in the morning at

16   8:15.

17        Remember the admonishment not to discuss the case among

18   yourselves or with anybody else or form or express any opinions

19   about the matter until it's submitted to you and you retire to

20   the jury room.

21        With that admonishment, you'll be excused at this time,

22   and if you'd leave quietly at this time, because court will

23   still be in session.

24        (Outside the presence of the jury:)

25        THE COURT:  Okay.  The record will reflect that the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    jurors have left the courtroom.

 2         You can have a seat.

 3         There is a concern that was conveyed to the Court that

 4    M.M. may be called as a defense witness, and that may somewhat

 5    trigger more of an obligation on the government as far as

 6    disclosure goes, because they weren't planning on calling him,

 7    and now he may very well be called.

 8         I don't think that the duty to disclose would be any

 9    different whether you call him or not, but I just do want to

10    call that to everybody's attention, that the indication -- or

11    at least there's been a representation that M.M. will be or may

12    very well be called by the defense in this case.

13              MR. ESTRADA:  Yes, your Honor.

14         And the only difference would be, under *Jencks*, he

15    wouldn't be a government witness.  But under *Brady* and *Giglio*,

16    the government has already produced all their reports,

17    surveillance reports, pertaining to M.M. --

18              THE COURT:  I would --

19              MR. ESTRADA:  -- as well as the benefits that he

20    received as --

21              THE COURT:  Okay.  I'm assuming that all of that is

22    true, but I'm saying I don't know if there's any further

23    obligations, but I just want to call it to everybody's

24    attention.

25              MR. ESTRADA:  Yes, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        THE COURT:  Okay.  See everybody in the morning.

2        MR. SEVERO:  Thank you.  Yes.

3        THE COURT:  Bright and early.

4        MR. ESTRADA:  Yes, your Honor.  Thank you.

5        THE CLERK:  All rise.

6

7            *(Proceedings adjourned at 4:01 p.m.)*

8

9                        *--oOo--*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

<u>CERTIFICATE</u>

1

2

3      I hereby certify that pursuant to Section 753,

4  Title 28, United States Code, the foregoing is a true and

5  correct transcript of the stenographically reported proceedings

6  held in the above-entitled matter and that the transcript page

7  format is in conformance with the regulations of the

8  Judicial Conference of the United States.

9

10  Date:  MARCH 4, 2015

11

12

13

14           /S/ SANDRA MACNEIL

15        Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1            UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                 Plaintiff,         )
                                     )
8        vs.                         )   NO:  CR-11-0072(A)-RGK
                                     )
9   (1)  MHER DARBINYAN,             )
    (4)  ARMAN SHAROPETROSIAN,       )
10  (35) RAFAEL PARSADANYAN,         )
                                     )
11                Defendants.        )
    _____ )
12

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15     DAY 7; VOLUME I OF II; PAGES 1 THROUGH 146

16                 MORNING SESSION

17              Los Angeles, California

18             Wednesday, April 2, 2014

19

20

21

22

23                    KATHERINE M. STRIDE, RPR, CSR
                      1107 Fair Oaks Avenue, #68
24                    S. Pasadena, California  91030
                      www.stridecourtreporting.com
25                    (323)474-6420

**APPEARANCES:**

On behalf of the Government:

      UNITED STATES ATTORNEY'S OFFICE
      ANDRÉ BIROTTE, JR., UNITED STATES ATTORNEY
      BY:  E. MARTIN ESTRADA
         ELIZABETH R. YANG
      ASSISTANT UNITED STATES ATTORNEYS
      312 North Spring Street
      Los Angeles, California  90012
      (213)894-4477

      U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
      BY:  ANDREW CREIGHTON, TRIAL ATTORNEY
      312 North Spring Street
      Los Angeles, California  90012
      (213)894-2579

On behalf of Defendant Mher Darbinyan:

      THE SEVERO LAW FIRM
      BY:  MICHAEL SEVERO, ATTORNEY AT LAW
      70 South Lake Avenue, Suite 945
      Pasadena, California  91101
      (626)844-6400

On behalf of Defendant Arman Sharopetrosian:

      LAW OFFICES OF CHARLES PEREYRA-SUAREZ
      BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
      800 Wilshire Boulevard, 12th Floor
      Los Angeles, California  90012
      (213)623-5923

On behalf of Defendant Rafael Parsadanyan:

      FLIER AND FLIER, ALC
      BY: ANDREW REED FLIER, ATTORNEY AT LAW
      15250 Ventura Boulevard, Suite 600
      Sherman Oaks, California  91403
      (818)990-9500

Also Present:

      JEREMY STEBBINS, F.B.I. SPECIAL AGENT

      MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT

1
# I N D E X

2
GOVERNMENT'S WITNESSES

3
JURY TRIAL – DAY 7, VOLUME I OF II

**Page**

4

**JEREMY STEBBINS, PREVIOUSLY SWORN**..................... 5

5
   CROSS-EXAMINATION CONTINUED
   BY MR. SEVERO...................................... 5

6
   CROSS-EXAMINATION
   BY MR. FLIER...................................... 17

7
   REDIRECT EXAMINATION
   BY MR. ESTRADA................................... 37

8
   RECROSS-EXAMINATION
   BY MR. FLIER..................................... 39

9

   **SCOTT PADIN, SWORN**................................. 40

10
   DIRECT EXAMINATION
   BY MS. YANG...................................... 41

11
   CROSS-EXAMINATION
   BY MR. SEVERO................................... 58

12
   CROSS-EXAMINATION
   BY MR. FLIER..................................... 71

13
   REDIRECT EXAMINATION
   BY MS. YANG..................................... 74

14
   RECROSS-EXAMINATION
   BY MR. SEVERO................................... 77

15
   RECROSS-EXAMINATION
   BY MR. FLIER..................................... 80

16

   **ANNA CARLISLE, SWORN**............................... 81

17
   DIRECT EXAMINATION
   BY MS. YANG...................................... 82

18
   CROSS-EXAMINATION
   BY MR. SEVERO................................... 96

19

   **JEFFREY DAVIS, SWORN**.............................. 102

20
   DIRECT EXAMINATION
   BY MR. CREIGHTON............................... 103

21
   CROSS-EXAMINATION
   BY MR. SEVERO.................................. 126

22

   **JEREMY STEBBINS, PREVIOUSLY SWORN**.................. 136

23
   DIRECT EXAMINATION
   BY MR. ESTRADA................................. 136

24

25

# **E X H I B I T S**

GOVERNMENT'S EXHIBITS

JURY TRIAL – DAY 7, VOLUME I OF II

**Page**

Exhibit No. 316 received............................. 121

Exhibit No. 317 received............................. 123

Exhibit No. 318 received............................. 125

Exhibit No. 319 received............................. 124

Exhibit No. 320 received............................. 112

Exhibit No. 321 received............................. 115

Exhibit No. 322 received............................. 114

1        LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 2, 2014

2                          A.M. SESSION

3                            --oOo--

4                   (8:28 a.m., the jury

5                   *entered the courtroom.)*

6        THE CLERK:  All rise.  All rise and face the flag.

7            *(Judge Klausner enters courtroom.)*

8        THE CLERK:  You may be seated.

9        THE COURT:  Okay.  The record will reflect that the

10   jury is all present, including the alternates.  Again, you

11   guys were right on time.  I really appreciate it.

12       Ready for another day?  One of these days someone's

13   going to say "No."

14                        *(Laughter.)*

15       THE COURT:  Okay.  Counsel, we were at

16   cross-examination.

17       MR. SEVERO:  Thank you, Your Honor.

18       THE CLERK:  I'll remind you you're still under oath.

19                     **JEREMY STEBBINS,**

20   GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, TESTIFIED FURTHER:

21       THE WITNESS:  Yes, ma'am.

22                **CROSS-EXAMINATION (Continued)**

23   BY MR. SEVERO:

24   Q.    Good morning.

25   A.    Good morning, sir.

1    Q.     Yesterday, you testified about the events of

2    October 29, 2006.  Do you remember those?  Do you remember

3    those events?

4    A.     October 29, 2006?

5    Q.     Yes.

6           THE COURT:  2009, Counsel?

7    BY MR. SEVERO:

8    Q.     Did I say '6?  I'm sorry, 2009.  I apologize.  2009.

9    A.     I -- no.  In regards to what, sir?

10   Q.     All right.  There was a -- there was some

11   surveillance done on the Weed Shop.  Do you remember that?

12   A.     I believe you are talking about November 23, 2009,

13   and November 24, 2009.

14   Q.     All right.  So I got that.

15          Now, on November 23, 2009, you intercepted a call

16   from Ramirez; is that correct?

17   A.     Yes.  We intercepted several calls, yes, sir.

18   Q.     And one of the calls had a reference called --

19   113 in -- Exhibit 113 had a reference to a snubnose, no

20   hammer.  Do you recall that?

21   A.     Yes, sir.

22   Q.     Now, that day, what time did you start surveillance?

23   A.     Approximately noon.

24   Q.     And where?

25   A.     In the area of the Weed Shop at Hobart and Sunset.

1   Q.    And who was present?  Who else was conducting

2   surveillance along with you?

3   A.    Myself and several members of the task force.

4   Q.    Do you remember the names?

5   A.    No, sir.

6   Q.    Do you -- are you aware of a log, whether a log was

7   prepared?

8   A.    Yes, there was a log prepared, sir.

9   Q.    And you were there; is that correct?

10  A.    That's correct, sir.

11  Q.    And Detective Hickey from the Los Angeles Sheriff's

12  Department, who testified earlier in this trial, was there;

13  is that correct?

14  A.    I don't know, sir.

15  Q.    How about Detective Michelle Gonzalez?

16  A.    I don't know, sir.

17  Q.    You don't remember who was there at all?

18  A.    No, sir.

19  Q.    Who prepared the log?

20  A.    I don't know, sir.

21  Q.    But you did not.

22  A.    I doubt it.

23  Q.    Do you recall whether any photos were taken while

24  surveillance was being conducted?

25  A.    I don't believe there were photos that day, sir.

1    Q.    So directing your attention to --

2          MR. SEVERO:  If I may publish 315 --

3          THE COURT:  Yes.

4    BY MR. SEVERO:

5    Q.    -- previously introduced into evidence.  Do you

6    recall this photo?

7    A.    Yes, sir.

8    Q.    When did you take this photo?

9    A.    That is a photo from Google Maps, sir.

10   Q.    So you don't know when it was taken?

11   A.    It usually says on the image date.  It usually says

12   it on their website, but I don't know when that photo was.

13   Q.    The answer to the question is:  No, you don't know

14   when it was taken?

15   A.    No, sir.

16   Q.    And you believe that the Weed Shop looks like that

17   now.

18   A.    I don't believe the Weed Shop is there anymore, sir.

19   Q.    You believe that this picture accurately depicts the

20   way it looked back in 2009?

21   A.    Yes.  The building structure, yes, sir.

22   Q.    Now, that car that's sitting on the -- on the street

23   here at the -- on this photo is not related to this case;

24   correct?

25   A.    No, sir.

1   Q.    There are -- what position did you take in

2   connection with the surveillance relative to the building?

3   A.    I was the initial eye.

4   Q.    And where would that put you?

5   A.    I was south of the location on Hobart Avenue --

6   Boulevard.

7   Q.    If I may put this picture back up, south of the

8   location would be to the right of the picture, this way

9   or --

10  A.    It would be that direction (indicating).

11  Q.    How close were you to the building?

12  A.    I would guess between 50 and 100 yards.

13  Q.    Were you using binoculars that day?

14  A.    Yes, sir.

15  Q.    What power?

16  A.    I'm not sure.

17  Q.    Do you know where any of the other officers were

18  situated in -- in this surveillance?

19  A.    I don't recall, sir.

20  Q.    And the log doesn't tell you, does it?

21  A.    No, sir.

22  Q.    Did you see -- on that day, you saw Mr. Darbinyan

23  arrive at the location?

24  A.    Yes, I did, sir.

25  Q.    Did you see him going into the Weed Shop?

001264

1    A.    I saw him disappear in the area of the Weed Shop.

2    Q.    What does that mean?

3    A.    It's hard to see the back door from where I was

4    positioned.  So I couldn't tell.

5    Q.    Did he come in through the back door?

6    A.    I can't tell, sir.

7    Q.    So you don't know where he was?

8    A.    I know he was in front of the Weed Shop, parked in

9    front of the Weed Shop.

10   Q.    So he parked in front of the Weed Shop and then got

11   out of the car --

12   A.    Yes, sir.

13   Q.    -- and walked into the Weed Shop?

14   A.    Like I said, he disappeared in the area of the Weed

15   Shop, sir.

16   Q.    Did you see him come back to the car?

17   A.    Yes, sir.

18   Q.    Did you see him get into the car?

19   A.    Yes, sir.

20   Q.    Did you see him leave the location?

21   A.    Yes, sir.

22   Q.    Did you stop the car?

23   A.    No, sir.

24   Q.    Who was driving the car?

25   A.    Artur Pembejian, sir.

1    Q.    Now, directing your attention to Exhibit 113 --

2          MR. SEVERO:  If I may ask the jurors to -- ask the

3    Court to instruct the jurors to turn to 113A.

4          THE COURT:  113A?

5          MR. SEVERO:  Yes, Your Honor.

6    BY MR. SEVERO:

7    Q.    This is the log -- I'm sorry.  This is the

8    transcript of the call that was intercepted on November 23,

9    2009; correct?

10   A.    That's correct, sir.

11   Q.    And about the middle of the page, about here, this

12   is where M.L. (indicating) --

13         Who's M.L.?

14   A.    That's Miguel Ramirez.

15   Q.    Okay.

16         -- said that Armen had asked for a snub nose with no

17   hammer.  Do you see that?

18   A.    Yes, sir.

19   Q.    Right here?

20   A.    Yes, sir.

21   Q.    Did you see Armen, any Armen, at the location that

22   day?

23   A.    No, sir.

24   Q.    Did you conduct any further surveillance on this

25   Weed Shop the next day?

1    A.    Yes, sir.

2    Q.    Did you see an Armen at that -- at that time?

3    A.    No, sir.

4    Q.    Let me ask you this, back to --

5          MR. SEVERO:  If I may, show 315 again, Your Honor.

6          THE COURT:  Uh-huh.

7    BY MR. SEVERO:

8    Q.    What street is the one that we're looking at in

9    the -- in the map here?

10   A.    Hobart, sir.

11   Q.    So the front of the shopping center or the -- this

12   structure is on Hobart?

13   A.    No, sir.  The front door of the Weed Shop is on

14   Sunset, and the back door, in this area here, is on Hobart.

15   Q.    So this is Sunset here (indicating)?

16   A.    Yes, sir.

17   Q.    And your surveillance was on Hobart?

18   A.    Yes, sir.

19   Q.    And the car that you saw Mr. Darbinyan in arrived

20   and parked in this little parking lot here, did it?

21   A.    Which day, sir?

22   Q.    On the 23rd.  We're still on the 23rd.

23   A.    It parked here, sir, at the curb (indicating).

24   Q.    It parked at the curb.

25         How long was he in the area of the Weed Shop?

1    A.    Not long, less than 15 minutes, I would say.

2    Q.    Now, directing your attention to the next day, the

3    24th, did you start surveillance on that date at what time?

4    A.    I believe that was around noon as well, sir.

5    Q.    And were you personally involved in that

6    surveillance?

7    A.    Yes, sir.

8    Q.    Were you aware if -- whether a log was prepared?

9    A.    Yes, sir, there was.

10   Q.    Do you know who prepared it?

11   A.    No, sir.

12   Q.    What time -- sorry.  Strike that.

13         What position did you take at the location of the

14   surveillance on the 24th?

15   A.    Approximately the same place as the day before,

16   south on Hobart, 50 to 100 yards south of the location.

17   Q.    Also using binoculars?

18   A.    Yes, sir.

19   Q.    And on that date, you also saw Mr. Darbinyan arrive

20   at the location?

21   A.    I don't believe so, sir.

22   Q.    What did you see that day?

23   A.    I saw Souren Serobyan arrive in the Audi Q7 SUV.

24   Q.    Did you see Mr. Serobyan going to the Weed Shop?

25   A.    I saw him go into the area of the back door of the

1     Weed Shop.

2     Q.     You didn't see him in the Weed Shop?

3     A.     I did not personally see him, no, sir.

4     Q.     Was the Q7 stopped that day?

5     A.     Yes, it was, sir.

6     Q.     Were there any photographs taken of that

7     surveillance that day?

8     A.     Not of the surveillance, no, sir.

9     Q.     Do you know what other officers -- excuse me -- were

10    present that day at the surveillance?

11    A.     There were several, sir, but I don't know how many

12    or who.

13    Q.     Mr. Serobyan arrived in the Q7.  Was he driving the

14    car?

15    A.     Yes, sir.

16    Q.     Now, you personally observed this?

17    A.     Yes, sir.

18    Q.     And your recollection has been refreshed by

19    reviewing the log?

20    A.     Actually, I recollect this very clearly without the

21    log.

22    Q.     Did you review the log before coming to court?

23    A.     Yes, sir.

24    Q.     Yesterday?

25    A.     Within the last few days, sir.

1    Q.    But not today or yesterday?

2    A.    Not today, sir.

3    Q.    Some of the surveillance in this case was

4    photographed and some was not; is that true?

5    A.    That's correct, sir.

6    Q.    And that is a -- the question of whether to take

7    photographs of the surveillance was left entirely up to

8    you?

9    A.    No, sir.

10   Q.    Who makes that decision?

11   A.    The individual who has the opportunity to take

12   photographs.

13   Q.    The opportunity requires that he have a camera.  Did

14   you have people with cameras at all surveillance?

15   A.    Not everybody had cameras, and the opportunity

16   requires that it doesn't happen too quickly to take a

17   picture of it.

18   Q.    Where was Mr. Serobyan stopped, if you were there?

19   A.    I was not there at his stop.

20   Q.    And did you search the -- did you -- strike that.

21         Are you aware of whether the Weed Shop was searched?

22   A.    No, sir, the Weed Shop was not searched.

23   Q.    How many days of surveillance altogether did you

24   engage in at the -- at the Weed Shop?  Was it just the two?

25   A.    No, sir.

1    Q.    November 23rd; right?

2    A.    Yes, sir.

3    Q.    November 24th; right?

4    A.    Yes, sir.

5    Q.    What other days?

6    A.    I don't know, sir.

7    Q.    You were not present at the others?

8    A.    No.  I do recall going to the area of the Weed Shop

9    several times, but I don't recall what days they were.

10   Q.    So some days you remember clearly without looking at

11   logs, and some things you remember -- don't remember at all

12   regarding the surveillance?

13   A.    I remember when people get arrested, sir.

14   Q.    You remember the 24th because Mr. Serobyan was

15   arrested?

16   A.    Yes, sir.

17   Q.    And Gevork Kasabyan, is it?

18   A.    Kasabyan, yes, sir.

19   Q.    Kasabyan.

20         When was he arrested?

21   A.    February 16, 2011.

22   Q.    Two years later?

23   A.    Yes, sir.

24   Q.    Are you aware of whether surveillance logs for every

25   day of surveillance at the Weed Shop were prepared?

1     A.     I don't know, sir.

2            MR. SEVERO:  Your Honor, I have other areas of

3     examination that I will defer at this point.

4            THE COURT:  Okay.

5            MR. SEVERO:  Thank you.

6            THE COURT:  Thank you, Counsel.

7            MR. PEREYRA-SUAREZ:  Your Honor, I'm going to defer

8     further questioning of this witness until the defense case.

9            THE COURT:  Thank you, Counsel.

10           MR. FLIER:  Thank you, Your Honor.

11                     **CROSS-EXAMINATION**

12    BY MR. FLIER:

13    Q.     Good morning, sir.

14    A.     Good morning, sir.

15    Q.     I'm going to try to limit it to what you testified

16    yesterday in that one particular call.  Is that okay?

17    A.     Yes, sir.

18    Q.     With respect to my client, Mr. Parsadanyan, he's not

19    charged with any kidnapping acts or attempted; is that

20    correct?

21    A.     No, sir.

22    Q.     Now, with respect to the conversation -- and I think

23    it's Exhibit 76 and 76A -- is that the first time that you

24    heard or realized of someone named M.M.?

25    A.     76, sir?

1  Q.     Exhibit 76.  I'm just saying that's -- I believe

2  it's July 4th.

3  A.     No, sir, that's not the first time.

4  Q.     When was the first time, please?

5  A.     It would have been late June, probably June 28th or

6  29th.

7  Q.     Thank you.

8         And with respect to -- and I'll call him M.M., of

9  course.  With respect to him, did you actually know

10 physically where he was located on July 4th?  Did you see

11 him ever?

12 A.     I don't believe we had surveillance on July 4th,

13 sir.

14 Q.     That answers the next question.  Thank you.

15        With respect to my client, Mr. Parsadanyan, on

16 July 4th of 2009, do you have any video surveillance photos

17 of him with Mr. Darbinyan?

18 A.     No, sir.

19 Q.     And clearly -- and I just have to ask this:  You do

20 not have any photographs of my client with this M.M. ever;

21 is that correct?

22 A.     That's correct, sir.

23 Q.     With respect to Exhibit 76 and 76A, that particular

24 conversation is in Armenian; is that correct?

25        It was originally in Armenian?

1    A.    Yes, sir.

2    Q.    And you needed the assistance of the interpreter,

3    which I'm not going to get into, and that's why we have

4    this exhibit; is that correct?

5    A.    That's correct, sir.

6    Q.    Does Mr. M.M. have anything to do with the 99 Cent

7    video alleged fraud?

8    A.    No, sir.

9    Q.    Thank you.

10         Do you have any evidence that Mr. Parsadanyan ever

11   has even spoken to M.M.?

12   A.    I don't know, sir.

13   Q.    Do you have any taped intercept calls dealing with

14   Mr. Parsadanyan and M.M.?

15   A.    I don't believe so, sir.

16   Q.    Do you have any information as to whether

17   Mr. Darbinyan, on July 4th of 2009, went to my client's

18   store?

19   A.    I don't know, sir.

20   Q.    You had testified that Mr. Darbinyan, you think, is

21   the leader or the organizer of this particular group; is

22   that correct?

23         MR. SEVERO:  Objection, misstates the testimony.

24         THE COURT:  Sustained.

25         You want to rephrase the question?

```
 1              MR. FLIER:  Thank you.

 2     BY MR. FLIER:

 3     Q.      Forget that question.  What I'm really asking is:

 4     If you believe someone is a shot-caller, are they usually

 5     the person who does the dirty work, like say an actual

 6     kidnapping, or would other people, based on your

 7     investigation?

 8     A.      It could be either way, sir.

 9     Q.      Now, I'm going to specifically get to Exhibit 76,

10     but with respect to July 4th of 2009 -- and what time is

11     the phone call pertaining to Exhibit 76?  Is it 4:22 p.m.,

12     sir?

13     A.      That's correct.

14     Q.      And with respect to any other taped conversations

15     after four, let's say, thirty, and up to Exhibit 77 --

16     which I think is on July 5th; is that correct, sir?

17     A.      Yes, sir.

18     Q.      So my question is:  Between the call at 4:22 and the

19     time of the July 5th first call, that's Exhibit 77, are

20     there any other calls?

21     A.      Yes, sir.

22     Q.      Are there any other taped calls that have been

23     presented to the jury?

24     A.      I don't believe so, sir.

25     Q.      And that would make sense that Exhibit 76 is July
```

1    4th, 4:22, and then the next exhibit is the July 5th.  Is

2    that accurate?

3    A.     Yes, sir.

4    Q.     Now, although -- and I'm sure it's not your decision

5    about which exact exhibits, but there are no other exhibits

6    being provided in between those two -- is that correct? --

7    to the jury, I'm saying?

8    A.     There are no other exhibits between 76 and 77.

9    Q.     Thank you.

10          You testified as to another exhibit.

11          And I don't think I need the aid of that exhibit,

12   Your Honor, to ask the question.

13          THE COURT:  Okay.

14   BY MR. FLIER:

15   Q.     It was Exhibit 72, just for your edification,

16   Officer.  There was testimony about what the term "blow it

17   up" means.  Do you recall that?

18   A.     Yes, sir.

19   Q.     You testified that that term means to take all of

20   the money, in essence; is that correct, sir?

21   A.     In the context of this call, yes.

22   Q.     Thank you.

23          So my last question as to that, are you saying that

24   the phrase "blow it up" has different expressions, and it's

25   dependent on what context it's in?

1   A.      Yes, sir.

2   Q.      Thank you.

3           Exhibit No. 74A references a particular area where

4   allegedly some people were going to meet in Hollywood.

5           Do you remember that?

6   A.      No, sir.  I'll have to look at the transcript.

7   Q.      If you don't mind, Exhibit 74.  And I believe it's

8   on page 4 of 8, sir.  And then tell me when you're done,

9   please.

10          It might be page 5 of 8, the fourth Speaker 1, in

11  that area.

12  A.      Yes, sir.

13  Q.      And I just want to ask:  With respect to Exhibit

14  74A, page 5 of 8, there's a particular area where

15  individuals were going to meet or is referenced; is that

16  correct?

17  A.      In reference to 74, yes, sir.

18  Q.      And that's Hollywood and Vermont; is that correct?

19  A.      Yes, sir.

20  Q.      Thank you.

21          Would it be a fair statement that, during the

22  investigation, you had no idea about how many exact phones

23  Mr. Darbinyan has or utilizes?  Is that a fair statement?

24  A.      I'd say, from time to time, we didn't know, yes,

25  sir.

1    Q.    And during the course of your investigation, it

2    appears that he's had numerous different phones.  Is that

3    also a fair statement?

4    A.    Yes, sir.

5    Q.    On July 4th of 2009 at around 1:00 o'clock in the

6    afternoon, did you have any idea where Mr. Darbinyan was

7    located?

8    A.    At that time, we would have had GPS, but I don't

9    recall independently.

10   Q.    Do you have any idea, on July 4th -- and this is

11   about Exhibit 75A.  But with respect to July 4th, around

12   1:00 o'clock, do you have any idea what car Mr. Darbinyan

13   was either in or a passenger?

14   A.    No, sir.

15         MR. FLIER:  Now, as to Exhibit 76, Your Honor, I

16   want to -- I'm not the greatest when it comes to

17   electronics, but this has already been admitted and

18   received, I believe.  And I think the proper terminology

19   I'm hearing is:  Can I publish it, Your Honor?

20         THE COURT:  Yes.

21         MR. FLIER:  Thank you.

22   BY MR. FLIER:

23   Q.    Sir, with respect to Exhibit 76, we now know that

24   this call, based on Page 1 of 3, is around 4:22; is that

25   correct?

1     A.     That's correct, sir.

2     Q.     And obviously the transcript speaks for itself with

3     respect to the language, but I'd like to discuss some

4     issues within it.  Is that okay, sir?

5     A.     Yes, sir.

6     Q.     With respect to the length of this particular call,

7     page 1 of 3 indicates the duration is 38 seconds.  Is that

8     accurate, around?

9     A.     Yes, sir.

10    Q.     And with respect to this particular call, do you

11    actually have an independent recollection as to it coming

12    in?  In other words, were you at that FBI office that we

13    heard about previously?

14    A.     No, I was not, sir.

15    Q.     And I think this would be along where, if an

16    interpreter heard something that might have significance,

17    it would be documented in a line sheet?

18    A.     Yes.

19    Q.     Do you have any line sheets about this particular

20    date and specific call?

21    A.     They've been produced, sir, but I don't have it.

22    Q.     Okay.  And just for the record, it's recording

23    No. 1439; is that correct?

24    A.     Yes, sir.

25    Q.     Now, with respect to the call (reading:)

1          "SPEAKER 1:  Yes, dear Raf?

2          "What's up my brother?

3          "Nothing, you?

4          "Nothing, are you in Glendale?"

5     So far this appears just to be casual conversations

6     amongst maybe two friends or people who know each other;

7     correct?

8   A.    Yes, they know each other, sir.

9   Q.    There is no coded language so far.  Am I correct?

10  A.    That's correct, sir.

11  Q.    (Reading:)

12          "Yes, I was in Glendale and just left.

13          "I am at the store, can you come over?"

14     When Speaker 2, who you believe is

15  Mr. Parsadanyan -- and let's say we agree with that.  When

16  he references a store, what store do you believe he's

17  referencing?

18  A.    His cellular phone store.

19  Q.    Where is that located, what city?

20  A.    Glendale.

21  Q.    (Reading:)

22          "Yeah, we just got here.  I saw you on the

23           road.

24          "Where did you see me?

25          "In Marquis' lot.  Is there anything going

1                  on?"

2          As to Marquis' lot, that's a particular business or

3    establishment that you're aware of; is that correct?

4    A.    Yes, sir.

5    Q.    So when the word "Marquis" is used in that context,

6    no coded language, it just means a location; correct?

7    A.    Yes, sir.

8    Q.    And with respect to Marquis' lot, approximately what

9    is the distance, if you know, between that area and where

10    Mr. Parsadanyan's cellular phone business is located?

11    A.    Just a few blocks.

12    Q.    (Reading:)

13            "Oh, there is --"

14     First there's an "OV."

15            "[OV] Oh, There is a son of a bitch that I

16               kidnapped; I have him with me since

17               morning."

18     You see that line; is that correct, sir?

19    A.    Yes, sir.

20    Q.    Now, the "OV" part, do you have any idea what was

21    mentioned there, or it just says "OV," and you have no

22    idea?

23    A.    I don't think it means "unintelligible."  It's

24    basically speaking over Mr. Parsadanyan.

25    Q.    Who's speaking over Mr. Parsadanyan?

1    A.    Mike Darbinyan.

2    Q.    Oh, at times during at least this particular tape,

3    there's overlapping between the two speakers at times.  Is

4    that a fair statement?

5    A.    Yes, sir.

6    Q.    And that is similar to some of the other exhibits

7    we've heard.  Is that also a fair statement?

8    A.    Yes.

9    Q.    Now, with respect to the word "kidnapped," did you

10    specifically ask any interpreter/translator, like the

11    gentleman who testified first in this case, about that

12    word?

13    A.    I have in the past, yes, sir.

14    Q.    You had a specific detailed conversation about that

15    isolated word?

16    A.    About the word "kidnapping," yes, sir.

17    Q.    And did the interpreter tell you that that word in

18    Armenian has different meanings, and it's based on the

19    context?  Was that part of the conversation?

20    A.    I don't recall that, sir.

21    Q.    Well, I think I heard that based on your familiarity

22    now with this case that you've learned some Armenian

23    language; is that correct?

24    A.    Yes, sir.

25    Q.    And with respect to what you have learned and

1    speaking with other, let's say, experts in that language,

2    have you ever developed that word in any context?

3    A.    No.  I never said "kidnapping" in Armenian.

4    Q.    Thank you.

5          Now, the next sentence says, "I sent him and told

6    him to get my money."

7          In a kidnapping, usually you don't let the other

8    person go away from you to go get money.  Does that make

9    sense?  And I'm not trying to trick you when I say that.

10   A.    I think sometimes you do let them go in order to go

11   get the money and bring it back to you.

12   Q.    So sometimes you might let the person go and other

13   times you might not; is that correct?

14   A.    That's correct.

15   Q.    So I assume it depends on the circumstances and the

16   individuals that are part of this; is that correct?

17   A.    Yes, sir.

18   Q.    But you have no information that, on that particular

19   day of July 4th, that M.M. was kidnapped.  We already

20   talked about that; is that correct?

21   A.    Other than the call, sir?

22   Q.    Yes.

23   A.    No, sir.

24   Q.    So "...and told him to get my money."  That's the

25   last part of that sentence; is that correct?

1   A.      Yes, sir.

2   Q.      (Reading:)

3                "Come over.

4                "I am coming, okay.

5                "Come over.  I am opening the store.

6                "Yeah."

7        And then it says, "[Aside] Are you well...[laughter

8   in the background.]"

9        Isn't it true that at least in two different areas

10  of this short tape, Exhibit 76, you can hear laughter in

11  two different segments of it?

12       Do you recall that?

13  A.      I only see the one notation, sir.

14  Q.      What about when you have an independent recollection

15  like yesterday of listening to it?  Do you ever hear more

16  of the laughter at the end of the conversation, if you

17  recall?

18  A.      I believe Parsadanyan may have laughed when he said

19  he kidnapped somebody.

20  Q.      Now, with respect to -- that's the extent of

21  Exhibit 76A; is that correct?

22  A.      Yes, sir.

23  Q.      And then we already discussed that, after that phone

24  call, you have no intercepted phone calls that deal with

25  Mr. Parsadanyan after 4:22 on July 4th.  Is that also

1    correct?

2    A.     No, sir, I don't believe I testified to that.

3    Q.     I'm sorry.  Maybe I misspoke.

4           Do you have phone calls after 4:22 on July 4th that,

5    in any context, good or bad, in your mind, that deal with

6    Mr. Parsadanyan?

7    A.     At any point, sir?

8    Q.     On July 4th after 4:22.

9    A.     I don't know, sir.

10   Q.     You seem to know the case very well, and that's a

11   compliment.  Is that correct?

12          THE COURT:  Let me just make sure I understood the

13   question.

14          The question was:  Did you have any other phone

15   calls of Mr. Parsadanyan from that day, the 24th, other

16   than that one?

17          Is your answer you don't know?

18          THE WITNESS:  I don't know, sir.

19          THE COURT:  Go ahead.

20   BY MR. FLIER:

21   Q.     Just to be clear, if the Court said, "after 4:22"

22   specifically, you still don't know?

23   A.     No, sir.

24   Q.     Thank you.

25          You testified that you had met Mr. Parsadanyan -- I

 1   don't think I'm much longer -- on a couple of occasions

 2   where you feel comfortable speaking about identifying his

 3   voice or the tone; is that correct?

 4   A.     Yes.

 5   Q.     And all these occasions -- I think I asked you

 6   previously -- did you document them, the dates, the times,

 7   the circumstances?

 8   A.     No.  Many times it was in court here.

 9   Q.     Did you ever document any conversation that you had

10   with Mr. Parsadanyan where you tape-recorded it?

11   A.     Yes.

12   Q.     And When was that?

13   A.     February 16, 2011.

14   Q.     Is that the day that he was arrested?

15   A.     Yes, sir.

16   Q.     Thank you.

17          But whenever you spoke with Mr. Parsadanyan, it

18   appears -- and correct me if I'm wrong -- that he was at

19   least cooperating and he spoke with you; is that correct?

20   A.     He did speak with me on the day of his arrest.

21   Q.     I believe you testified there were other times or

22   places where you have spoken to Mr. Parsadanyan outside a

23   courtroom.  Is that accurate?

24   A.     No, I didn't testify to that, sir.

25   Q.     Thank you.

1    You did return some property after Mr. Parsadanyan's

2  arrest -- is that correct? -- to him?

3  A.    I returned a lot of property.  I probably returned

4  property to Mr. Parsadanyan.

5  Q.    On July 4th of 2009, do you have any -- is there any

6  specific evidence that shows that Mr. Parsadanyan spoke

7  with anyone, including Mr. Darbinyan, to assist anything on

8  that day, based on a taped transcript?

9  A.    To assist the kidnapping?

10  Q.    Yes.

11  A.    No, sir.

12  Q.    Thank you.

13    And just for the record, because I found it, Exhibit

14  77A, which I briefly mentioned, I just want to make sure

15  the record's clear, that's a July 5, 2009, call.

16    And is it at 8:17 p.m. or a.m., sir?

17  A.    It should be 8:17 p.m.

18  Q.    Thank you.

19    So from the 4:22 call, Exhibit 76, to Exhibit 77A,

20  the 8:17 p.m. call, those are the taped calls, and only

21  those that are presented in this case so far; is that

22  correct?

23  A.    Could you be a little more specific about the taped

24  calls, sir?

25  Q.    Well, I'm just asking:  Are you aware of any other

1    exhibit taped calls that fall in between July 4th at 4:22

2    and 8:00 o'clock the following evening, July 5th?

3    A.     I don't believe there are any, sir.

4    Q.     You've testified that you have believed that you

5    thought Mr. Darbinyan sometimes suspected that potentially

6    maybe he's being followed, stuff like that. Is that

7    accurate?

8    A.     Yes, sir.

9    Q.     In this case -- well, strike that.

10          In Exhibit No. 87, there was a reference, and that's

11   an 11/2/09 call. And I think that might have been a call

12   that deals with Mr. Sharopetrosian. There was some

13   language about throwing away a phone and using a public

14   payphone. Do you remember that?

15          And to help you refresh, then I think there was a

16   question by Mr. Estrada: Was it easy or hard to find a

17   public phone?

18   A.     Yes, it was difficult.

19   Q.     Okay. Thank you.

20          Now, sometimes people throw away phones; correct?

21   A.     Yes, sometimes people throw away phones.

22   Q.     Do you have any surveillance logs of July 4th?

23   A.     No, sir.

24   Q.     July 17th?

25   A.     I don't know, sir.

1    Q.    July 18th?

2    A.    Yes, sir.

3    Q.    And what about July 19th?

4    A.    I don't know, sir.

5    Q.    Okay.  That's fair.  Thank you.

6          Now, there have been some tapes that we heard that

7    it appears Mr. Darbinyan is referencing or saying that he

8    drank a lot of alcohol or partied hard the night before.

9    Is that accurate?

10         I don't know if he really did that, but I'm saying

11   that it's reflected on the tapes.

12   A.    There may have been a couple calls, yes, sir.

13   Q.    Thank you.

14         Can you describe to the jury -- and now I'm

15   definitely almost done -- Mr. Parsadanyan's vehicle back in

16   2009, the ones or one that you're aware of?

17   A.    Yes.  He had a BMW 6 series coupe, black.

18   Q.    And what was the model year?

19   A.    I would be guessing.  I don't remember.

20   Q.    Does 2007 sound accurate?

21   A.    It's possible.

22   Q.    And It's a two-door black vehicle; is that correct?

23   A.    Yes.  It could be described as that, yes, sir.

24   Q.    Did you ever procure any records about the cost and

25   the circumstances on how Mr. Parsadanyan purchased or

1    arrived with that vehicle?

2    A.    At some point we may have, but I don't recall, sir.

3    Q.    Well, there's been some testimony about an

4    elaborate, extravagant lifestyles; is that correct?

5    A.    Yes, sir.

6    Q.    And Mr. Parsadanyan, besides that vehicle, was

7    renting an apartment; is that correct?

8    A.    Yes, sir, I believe he was.

9    Q.    Do you have any information that he had other

10   vehicles or other luxuries?  And I mean luxuries like boats

11   and properties type of issues.

12   A.    No, he didn't have any boats, sir.

13   Q.    Lastly, Exhibit No. 88 has to do with November 3,

14   2009, and an investigation; is that correct?

15   A.    Yes, sir.

16   Q.    I don't want to really get into that whole thing,

17   but we heard yesterday that, due to certain calls, your

18   agency followed individuals.  And I think I even wrote

19   down, "All the way down to Riverside," and some individual

20   named Bandit; is that correct?

21   A.    Yes.  The surveillance went to Victorville.

22   Q.    So there are occasions where you thought a day was

23   important enough where there was actual surveillance, and

24   it actually took a long process and different locations and

25   distances.  Am I correct?

1    A.    Yes, sir.

2    Q.    And then finally, there was some mention about

3    counter-surveillance driving, and the purpose was you don't

4    want to be spotted; is that correct?

5          Law enforcement doesn't want to be spotted, or I

6    think I wrote down burned, spotted.  Is that -- is that

7    right?

8    A.    Well, we're kind of talking about two different

9    things.  I mean, counter-surveillance driving is done by

10   the defendants, and then our driving is so that we don't

11   get burned.

12   Q.    Correct, correct.  Thank you.

13         And that's the topic.  And you used the terminology

14   "burned," right?

15   A.    Yes, sir.

16   Q.    And that just shows "Hey, they might know my

17   whereabouts or who I am.  I got caught," right?

18   A.    They may know my vehicle, they may know my face,

19   yes, sir.

20         MR. FLIER:  Besides other issues for my

21   case-in-chief, Your Honor, I have no other questions.

22         THE COURT:  Okay.  Thank you very much, Counsel.

23         MR. FLIER:  Thank you, Your Honor.

24         THE COURT:  Redirect?

25         MR. ESTRADA:  Yes, Your Honor.

1                    <u>REDIRECT EXAMINATION</u>

2   BY MR. ESTRADA:

3   Q.    Special Agent Stebbins, you were asked with regard

4   to Parsadanyan about evidence connecting him in any way to

5   this plot to extort M.M.  Do you remember that?

6   A.    Yes, sir.

7   Q.    And there's a call that was highlighted for you,

8   Exhibit 76, in which Darbinyan references a kidnapping.

9   A.    Yes, sir.

10  Q.    Based on your understanding of the circumstances,

11  did you understand the person being kidnapped was M.M.?

12  A.    Yes, sir.

13  Q.    Now --

14        MR. SEVERO:  I move to strike that as speculation

15  and hearsay.

16        MR. PEREYRA-SUAREZ:  And lacks foundation,

17  Your Honor.

18        THE COURT:  Overruled.

19  BY MR. ESTRADA:

20  Q.    Now, you mentioned there were other calls involving

21  Parsadanyan discussing matters connected to this plot.

22        MR. FLIER:  I think that misstates the evidence,

23  Your Honor.

24        THE COURT:  I don't remember him testifying to that,

25  Counsel.

```
1            MR. ESTRADA:  I'll ask it a different way.

2            THE COURT:  Okay.

3   BY MR. ESTRADA:

4   Q.    Were there calls intercepted involving Parsadanyan?

5   And I'm talking about wire transfers.

6   A.    Yes, sir.

7   Q.    Wire transfers with Darbinyan?

8   A.    Yes, sir.

9   Q.    And at some point --

10           MR. FLIER:  I object, Your Honor.  I think this is

11  outside the scope.

12           THE COURT:  It may be, Counsel.

13           MR. ESTRADA:  Your Honor, he raised the issue about

14  Parsadanyan's connection in this whole thing.

15           THE COURT:  With the kidnapping.

16           MR. ESTRADA:  With the kidnapping and the whole plot

17  to extort M.M.

18           THE COURT:  Okay.  Well, go ahead.  I don't know

19  where you're going now.  Go ahead.

20  BY MR. ESTRADA:

21  Q.    Were you aware that, when Parsadanyan was stopped

22  later in this case, he was found with money order receipts?

23  A.    Yes, sir.

24  Q.    And that a name on one of those money order receipts

25  actually was the same name or a similar name to what we
```

1    heard in these wire calls?

2    A.     Yes, sir.

3    Q.     Do you know what that name was?

4    A.     Rafael Armendariz.

5           MR. ESTRADA:  No further questions, Your Honor.

6           THE COURT:  Let me just make sure.

7           You testified earlier, other than this phone call,

8    there's no connection with Mr. Parsadanyan and the

9    extortion; is that correct?

10          THE WITNESS:  That's correct, sir.

11          THE COURT:  Okay.

12          Anything further, Counsel?

13          MR. SEVERO:  I don't have anything further.

14          THE COURT:  Counsel?

15          MR. PEREYRA-SUAREZ:  Nothing further.

16          THE COURT:   Counsel?

17          MR. FLIER:  Just on that last point, Your Honor.

18          THE COURT:  Sure.

19                   **RECROSS-EXAMINATION**

20   BY MR. FLIER:

21   Q.     The last point that Mr. Estrada just brought up, do

22   you -- you just testified that there's some type of

23   receipt; is that correct?

24   A.     Yes, sir.

25   Q.     And What type of document are we referencing,

1    please?

2    A.     It's a money order receipt, sir.

3    Q.     And do you have that exact item?

4    A.     In my possession?

5    Q.     Yes.

6    A.     No, sir.

7    Q.     Does the government have that item in its possession

8    that you're aware of?

9    A.     I don't believe they seized it, sir.  They

10   documented it at the traffic stop.

11   Q.     Who documented it at the traffic stop?

12   A.     The Glendale officers.

13          MR. FLIER:  Well, I think this is a subject matter

14   that's going to be developed later in the government's

15   case.  I'll just deal with that issue when the time comes.

16          Thank you.

17          THE COURT:  Okay.  Thank you.

18          You may step down.

19          Next witness.

20          MS. YANG:  Yes, Your Honor.  The government calls

21   Scott Padin.

22          THE CLERK:  Good morning.

23          Right here, please.  Please raise your right hand.

24                          **SCOTT PADIN,**

25    GOVERNMENT'S WITNESS, WAS SWORN, TESTIFIED AS FOLLOWS:

```
 1              THE CLERK:  Do you solemnly swear the testimony you

 2      shall give in the cause now pending before this Court shall

 3      be the truth, the whole truth, and nothing but the truth,

 4      so help you God?

 5              THE WITNESS:  I do.

 6              THE CLERK:  Thank you.  You may be seated.

 7          May I please ask that you state your full name for

 8      record and spell your last name.

 9              THE WITNESS:  Scott Padin, P-a-d-i-n.

10              THE CLERK:  Thank you.

11              THE COURT:  Okay.  And this goes to --

12              MS. YANG:  Yes, Your Honor.

13          This witness will be testifying with regards to the

14      RICO conspiracy count as well as one of the felon in

15      possession counts charged against defendant Darbinyan, and

16      the RICO conspiracy applies to defendants Sharopetrosian

17      and Darbinyan.

18              THE COURT:  Okay.  Go ahead.

19              MR. ESTRADA:  Thank you, Your Honor.
```

**DIRECT EXAMINATION**

```
21      BY MS. YANG:

22      Q.    Good morning.

23      A.    Good morning.

24      Q.    Where do you currently work?

25      A.    I'm employed by the Los Angeles Police Department.
```

1    I'm assigned to L.A.P.D.'s Major Crimes Division,

2    Transnational Organized Crime Section.

3    Q.    And what position -- what is your current position?

4    A.    I'm a detective for the organized crime section of

5    L.A.P.D.

6    Q.    Now, how long have you worked for the Los Angeles

7    Police Department?

8    A.    For approximately 19 and 1/2 years.

9    Q.    And how long have you been with the Major Crimes

10   Transnational Organized Crime Section?

11   A.    I was assigned there in May of 2009.

12   Q.    Now, during your time in the Major Crimes

13   Transnational Organized Crime Section, what type of crimes

14   have you been tasked with investigating?

15   A.    From extortion, credit card fraud, bank fraud,

16   mortgage fraud, those type of crimes.

17   Q.    And do you investigate particular groups in the

18   Major Crimes Transnational Organized Crime Section?

19   A.    Yes.

20   Q.    And what groups would those be?

21   A.    I worked from Romanians, Armenians, Russians, and

22   Israelis, to name a few.

23   Q.    And those are organized crime groups; correct?

24   A.    Yes.

25   Q.    Now, prior to joining that division, were you a

1    member of the Eurasian Organized Crime Task Force?

2    A.    Yes, I was.

3    Q.    And from when to when?

4    A.    From approximately May of 2009 until about April of

5    2011.

6    Q.    And prior to joining the -- actually, I'm going to

7    ask you this:  Is the Eurasian Organized Crime Task Force

8    also known in shorthand as the EOCTF?

9    A.    That's correct.

10   Q.    And now, prior to joining the EOCTF, what was your

11   assignment?

12   A.    I was assigned to L.A.P.D.'s Major Crimes Division,

13   Surveillance Support Section.

14   Q.    And from -- for what time period?

15   A.    From September 11, 2001, all the way to about

16   January of 2007.

17   Q.    And prior to that assignment, where were you

18   assigned?

19   A.    Prior to that assignment, I was assigned to

20   L.A.P.D.'s Narcotics Field Enforcement Section.

21   Q.    And from what year to what year, approximately?

22   A.    From 1997 until 9/11.

23   Q.    In 2001?

24   A.    2001, yes.  I'm sorry.

25   Q.    And now we're going all the way back to when you

1    first started L.A.P.D.  What was your first assignment?

2    A.    Right after I completed my academy time, I was

3    assigned to South Central Division as a patrol officer.

4    Q.    Now, during your approximately, I believe you

5    testified, four years in the Narcotics Section, among your

6    duties, did you participate in surveillance operations?

7    A.    Yes, I did.

8    Q.    Now, approximately what percentage of your duties

9    was spent engaged in surveillance operations?

10   A.    I would say about at least half -- approximately

11   half of my day when I came to work.

12   Q.    And your subsequent assignments are to, I believe

13   you testified, the Surveillance Support Section?

14   A.    Yes.

15   Q.    What percentage of your time did you spend engaged

16   in surveillance operations?

17   A.    From the period I was there, from 9/11/2001 to

18   January 2007, my duty was solely to conduct surveillances

19   all day, every day I was working.

20   Q.    Now, have you received training in surveillance

21   operations?

22   A.    Yes.

23   Q.    And could you please describe generally your formal

24   training that you have received.

25   A.    Not only have I received on the -- I call it field

1    surveillance training, meaning, when I first got there, I

2    was trained by other experienced officers, but L.A.P.D. has

3    also sent me out to training classes.  I've had over, I'd

4    say, 80 hours, of classroom time, plus.

5    Q.    And would that be in both surveillance as well as

6    counter-surveillance techniques?

7    A.    That is correct.

8    Q.    Did you receive formal training at the Los Angeles

9    Police Department Academy when you first joined the force?

10   A.    Yes, I did.

11   Q.    And you had mentioned field training.  Is that

12   basically on-the-job training as you engage in surveillance

13   operations on a daily basis?

14   A.    That is correct.

15   Q.    Now, have you provided training to other law

16   enforcement officers on surveillance operations and

17   counter-surveillance techniques?

18   A.    Yes.  Not only to other agencies, but also to

19   members of L.A.P.D. as well.

20   Q.    And have you regularly participated in a particular

21   training program with regard to surveillance and

22   counter-surveillance techniques?

23   A.    Yes.

24   Q.    Could you please describe, generally, that program.

25   A.    There's a detective training class that L.A.P.D.

1    puts on quarterly where other members from different

2    departments attend for detective school.  It's a two-week

3    course, and during that two-week course, there's a block

4    for surveillance training, and I partake in that block.

5    Q.    And since what year have you participated in this

6    formal training on a quarterly basis?

7    A.    I believe 2011 was when I first took place in

8    assisting with that training.

9    Q.    Now, Detective Padin, in total, during your years

10   with the Los Angeles Police Department, approximately how

11   many surveillance operations have you participated in?

12   A.    Well over 800.

13   Q.    Now, could you please describe for the jury

14   generally how a surveillance operation works.

15            MR. SEVERO:  Objection, Your Honor.  This is 403.

16            THE COURT:  I'm sorry?

17            MR. SEVERO:  Cumulative and --

18            THE COURT:  I don't know what the relevancy of it is

19   at this time.  If you can -- if you can tie it up fairly

20   soon because I don't know what this would be going to.

21            MS. YANG:  Yes, Your Honor.  This would be going to

22   the counter-surveillance that was engaged in by the

23   defendants, and we'll make it very brief, though.

24            THE COURT:  Okay.

25

**001301**

1    BY MS. YANG:

2    Q.    Detective Padin, let me just sort of move forward.

3          Is there a difference between foot surveillance and

4    vehicle surveillance?

5    A.    Yes, there is.

6    Q.    Now, in a vehicle surveillance, are there multiple

7    cars and officers involved?

8    A.    Yes, there is.

9    Q.    And does each officer and/or car have a specific

10   role to play in the surveillance?

11   A.    Yes, for the most part.

12   Q.    And are these cars black-and-white patrol vehicles

13   or unmarked vehicles?

14   A.    They're unmarked vehicles.

15   Q.    And during the surveillance operation, a vehicle

16   surveillance operation, how do the members of the team

17   communicate?

18   A.    Either through their police radios or through cell

19   phones.

20   Q.    Now, could you please describe for the jury your

21   experience with detecting counter-surveillance.

22   A.    Yes.

23         Basically counter-surveillance is when -- the way I

24   describe it is when we're following another person or

25   individuals commuting from one location to another, where

1   we find ourselves observing the individual conducting

2   either numerous turns --

3          As an example, let's say the individual lives at a

4   location, and his direct route to work or to a friend's

5   house is pretty much a straight line.  We would find

6   ourselves following the individual in circles through a

7   neighborhood where the individual conducts a lot of

8   U-turns, a lot of unnecessary turns that normally a normal

9   person wouldn't do when driving from one location to the

10  other, driving really fast on the freeway and then all of a

11  sudden hitting the brakes real hard in the No. 1 lane, in

12  the fast lane, and slowing traffic way down where everybody

13  else is passing them.

14         That type of activity normally is done by the

15  individual to find out whether or not he's being followed

16  because a lot of times, when I see that type of activity,

17  sometimes I find myself --

18         MR. SEVERO:  Objection.

19         THE COURT:  Sustained.  It's getting narrative.

20         And again, you really haven't connected up the

21  relevancy in this case, Counsel.

22         MS. YANG:  Yes, Your Honor.

23  BY MS. YANG:

24  Q.     Detective Padin, did you participate in the

25  investigation of the Armenian Power organization?

1    A.    Yes, I did.

2    Q.    And was one of the roles in your investigation to

3    conduct surveillance operations?

4    A.    Yes, it was.

5    Q.    And were there multiple surveillance operations in

6    this investigation?

7    A.    Yes.

8    Q.    And during the course of your participation in these

9    operations, did you observe counter-surveillance techniques

10   being utilized by the subjects?

11   A.    Yes.

12   Q.    Particularly, could you -- did you conduct

13   surveillance of defendant Mher Darbinyan?

14   A.    Yes, I did.

15   Q.    On approximately how many occasions?

16   A.    Over a dozen times.

17   Q.    And did you see defendant Mher Darbinyan engage in

18   counter-surveillance techniques?

19   A.    Yes, I did.

20   Q.    Could you please describe one of those techniques

21   that you observed?

22   A.    Yes.  Several times when we started at his

23   residence, I would notice the individual, when he was

24   either leaving his residence or coming home, when he was

25   driving his vehicle, he would make it a point to come out

1    of his residence on the street, and he would --

2         If I may demonstrate --

3         As he'd be driving, he'd pull up alongside the

4    parked vehicles that were parked in his neighborhood, and

5    he would lean over in this manner (indicating), across the

6    passenger seat, and look into the vehicles that were parked

7    on the street as he was leaving his residence.

8         Sometimes he would drive across the street to the

9    opposite side of traffic and do that to the vehicles that

10   were parked on the other side, leaning over (indicating),

11   and appearing that he was looking inside those vehicles to

12   see if somebody was sitting inside those vehicles.

13   Q.    That was a very deliberate action that you observed

14   on the part of defendant Darbinyan to detect whether law

15   enforcement vehicles or personnel were in his neighborhood;

16   correct?

17   A.    That is correct.

18   Q.    Now, with regard to other subjects in this

19   investigation, did you observe them engaging in

20   counter-surveillance techniques?

21   A.    Yes.

22   Q.    And in your experience, having conducted

23   surveillance, over 800 surveillance operations, were these

24   subjects more aggressive in their counter-surveillance?

25   A.    Yes.  In my experience, out of all the groups that I

1    have worked, this group, for me, was the hardest group to

2    follow and stay with without revealing ourselves, that we

3    were watching them.

4    Q.     Now, Detective Padin, having conducted several

5    surveillance operations involving defendant Mher Darbinyan,

6    do you recognize an individual here in court today as

7    defendant Darbinyan?

8    A.     Yes, I do.

9    Q.     Could you please identify him by pointing out where

10   he is sitting and describing an article of clothing that he

11   is wearing.

12   A.     The gentleman seated to my left in the dark -- it

13   looks like a dark top, between the two counsel members.

14          THE COURT:  Indicating the defendant.

15          MS. YANG:  Thank you, Your Honor.

16   BY MR. YANG:

17   Q.     Detective Padin, I would like to direct your

18   attention to a specific surveillance in this investigation

19   on November 24, 2009.  Do you have that in mind?

20   A.     Yes.

21   Q.     And on that day, at approximately 12 noon, did you

22   participate in a surveillance operation in the area of

23   Hobart and Sunset Boulevard in Los Angeles?

24   A.     Yes, I did.

25   Q.     Now, at that area of Hobart and Sunset Boulevard,

1   was there a Weed Shop?

2   A.      Yeah.  The location, yes.  We referred to that.

3   Q.      And what was your position or role in the

4   surveillance operation?

5          MR. SEVERO:  Objection.  That could be compound.

6   It's either one or the other.

7          THE COURT:  What was your role in this?

8          THE WITNESS:  My role at the time was to assist

9   Agent Stebbins, who was holding what we called the point,

10  meaning he had eyes on the location at the time.  And I was

11  assisting him as he called me around to see if I could see

12  inside the yard (indicating).

13  BY MS. YANG:

14  Q.      You know what, you just motioned with your hand sort

15  of in a circular motion.  Does that mean that you were in

16  motion, you were driving?

17  A.      I was doing passes, yes.

18  Q.      And is that called a roving surveillance?

19  A.      Yes, doing drive-bys.

20  Q.      Now, where were you -- what street were you are

21  driving by on?

22  A.      I was coming off the major, which is Sunset, onto

23  Hobart, which is a north-south street.

24          MS. YANG:  Your Honor, may I publish page 2 of

25  Exhibit 315, already admitted into evidence?

1          THE COURT:  Yes.

2     BY MS. YANG:

3     Q.     And, Detective Padin, looking at the screen, is this

4     the back of the Weed Shop that fronts onto Hobart?

5     A.     Yes.

6     Q.     And is this the street that you were driving down as

7     you passed around the location?

8     A.     That's correct.

9     Q.     Could you just draw with your fingers on the screen

10    an arrow in what direction you were driving?

11    A.     Here is Sunset (indicating).  I call Sunset an

12    east-west street.  And here is Hobart.  That's the

13    north-south street.  And as I'm pointing now, that would be

14    in a southern direction.

15    Q.     Now, at some point, did you observe a black Audi Q7

16    SUV at the location?

17    A.     Yes, I did.

18    Q.     And did you see an individual enter or exit the Weed

19    Shop?

20    A.     Exited the location.

21    Q.     And was it a male or female?

22    A.     A male.

23    Q.     Now, do you know who this individual was?

24    A.     Yes.  I was later told that this was --

25          MR. SEVERO:  Objection, hearsay.

1          THE COURT:  Sustained.

2    BY MS. YANG:

3    Q.      At the time, did you have a photograph of the target

4    that you were looking for?

5    A.      Yes.

6    Q.      And who was that target?

7    A.      An individual named Souren Serobyan.

8    Q.      And did the individual who you saw exiting the Weed

9    Shop match the distribution of Souren Serobyan?

10   A.      Yes.

11   Q.      Now, as you drove by, did you see the individual get

12   into the black Audi SUV?

13   A.      I saw him walking to the driver's side door, yes.

14   Q.      And was he carrying anything?

15   A.      Yes, he was.

16   Q.      What was he carrying?

17   A.      I observed him carrying a dark -- kind of like a

18   canvas bag, about a foot and a half in length, with

19   handles.

20          I observed him coming from the back of that --

21   from -- can I point here on the --

22   Q.      Point on the screen, yes.

23   A.      I saw him walking from the back of the shop area

24   towards the vehicle (indicating), carrying this bag with

25   both hands.  And the bag appeared to be weighted in the

1    manner that he was carrying it towards the vehicle.

2    Q.     Did you see the driver get into the black Audi with

3    the dark colored, weighted bag?

4    A.     I saw him reach the driver's side door, and I

5    continued driving southbound, and then I lost sight of him

6    for that moment.

7    Q.     Did you ever regain sight of the black Audi SUV?

8    A.     No, not after that.

9    Q.     Why did you not flip a U-turn?

10   A.     Because what I didn't want to do was to reveal

11   myself and to come back on the street, knowing that we had

12   other members of the surveillance squad there tasked with

13   doing a compass around the area, and I knew the area was

14   being observed by other members.  I didn't want to reveal

15   myself to come back and get -- the term that I use, "get

16   burnt" on the surveillance.

17   Q.     When you mentioned "compass," what do you mean by

18   "compass"?

19   A.     When we do a surveillance like this, we establish

20   not only the point, the person watching, but we also

21   establish a compass around the area.  We assign individuals

22   on the north end, south, the east, and the west.  And those

23   individuals are to maintain their area.  In case the

24   subject comes out, we can call that subject and pass him

25   off to other individuals who are in that area.

1    Q.    Detective Padin, having set up at that location with

2    other members of the team, is it fair to say you were

3    confident that another team member would catch up to the

4    black SUV?

5    A.    Yes.

6    Q.    And in fact, as you previously testified, were team

7    members in communication via radios and telephones?

8    A.    That is correct.

9    Q.    Now, after you passed, on Hobart, the black SUV --

10   as you saw Mr. Serobyan open the driver's side door, where

11   did you go?

12   A.    I continued southbound to the minor street on the

13   south side.  I don't remember the name, and I turned off

14   there, and that was what I did at that point.

15         MS. YANG:  And, Your Honor, publishing page 1 of

16   Exhibit 315.

17         THE COURT:  Yes.

18   BY MS. YANG:

19   Q.    Detective Padin, I'm circling in the lower left

20   corner the Hobart Boulevard location.  That's the Weed

21   Shop; correct?

22   A.    Let me try and get my bearings here.

23   Q.    Maybe I should expand out.

24   A.    Yes, I see it.  Yes.  Sorry, I didn't bring my

25   glasses.

1    Q.    After you went on the minor street, did you then

2    continue on to Sunset Boulevard?

3    A.    I eventually made my way back north.

4    Q.    And where ultimately did you -- did you stay within

5    the compass area as you previously described?

6    A.    At that point, when Mr. Serobyan left in the

7    vehicle, in the Audi Q7, I was monitoring the radio to

8    listen to where they were driving to, and I -- and I did

9    find myself in the area where he originally ended up

10   stopping.

11   Q.    And, again -- I'm sorry.  I took down that map too

12   soon.

13         And when you say the area that he was essentially

14   stopped, you mean this location on Winona Boulevard?

15   A.    Well, he ended up originally stopping on a street

16   called Harvard, which is one east -- I'm sorry -- one west

17   of that location you just circled, if I'm looking at the

18   map correctly, yes.

19   Q.    And where were you?  What area were you in?

20   A.    I was closer to Hollywood Boulevard, in that area.

21   Q.    And that was your location; is that correct?

22   A.    Yes.

23   Q.    Now, did you subsequently hear over the radio that

24   Mr. Serobyan had been stopped?

25   A.    Yes, I did.

001312

1      MR. SEVERO:  Objection, move to strike.  Hearsay.

2      THE COURT:  Sustained.

3  BY MS. YANG:

4  Q.    Were you at the stop of Mr. Serobyan?

5  A.    I did not witness that stop, no, but I was in the

6  area.

7      MS. YANG:  One moment, Your Honor.

8      MR. SEVERO:  Move to strike "I was in the area."

9      THE COURT:  Sustained.  It will be stricken.

10  BY MS. YANG:

11  Q.    Detective Padin, were you in the area of Harvard

12  Avenue and Winona Avenue?

13  A.    Yes.

14      MS. YANG:  Nothing further, Your Honor.

15      THE COURT:  Cross?

16      MR. SEVERO:  Thank you.

17                  **CROSS-EXAMINATION**

18  BY MR. SEVERO:

19  Q.    Good morning, sir.

20  A.    Good morning, sir.

21  Q.    Your assignment in 2009 was to the Eurasian Task

22  Force?

23  A.    Yes, sir.

24  Q.    And after the Eurasian Task Force, were you assigned

25  elsewhere?

1   A.      After -- yes, in April.  Approximately April 2011, I

2   was brought back to L.A.P.D. Transnational Organized Crime

3   Section.

4   Q.      Is it fair to say that some people do not drive a

5   straight line to make sure they're not being followed so

6   they're not carjacked?

7   A.      That's fair to say.

8   Q.      Especially if you're driving a high-end car?

9   A.      I would imagine so.

10  Q.      How many -- before you came to court today, what

11  documents did you use to refresh your recollection

12  regarding your testimony here today?

13  A.      Which documents was -- the 302 FBI document that was

14  for that day, on November 24, 2009.

15  Q.      Have you seen a log of the surveillance?

16  A.      That's the -- that's the document that I'm speaking

17  about, the 302.

18  Q.      And what time did you start surveillance on

19  November 24, 2009?

20  A.      It was approximately 11:55 in the morning, 12:00,

21  12 noon.

22  Q.      Did you prepare the 302 for court?

23  A.      No, I did not.

24  Q.      Do you know who did?

25  A.      I'd have to look at it to see.  There's a section on

1    the bottom that states who wrote it.  If you want to show

2    it to me, I can --

3    Q.    You didn't bring it with you?

4    A.    I don't have it with me up here, sir.

5    Q.    How many instances of surveillance have you engaged

6    in since November 21st of 2009 to this date?

7    A.    How many times have I gone out?

8    Q.    Yes, sir.

9    A.    Sorry about that.

10         I would say -- I would say approximately over 100,

11    at least; over a 100, 200.

12    Q.    From 2009 to 2011, when you left the Eurasian Task

13    Force, were you engaged in surveillance?

14    A.    I was assigned to the Task Force all the way to

15    2011.

16    Q.    Were you engaged in surveillance during that time?

17    A.    Yes, sir, I was.

18    Q.    Every day?

19    A.    Pretty much, sir.  Yes, sir.

20    Q.    Five days a week?

21    A.    No, not -- I wouldn't say five days a week because

22    we were working -- my schedule was about four days a week.

23    Q.    Four days a week you were doing surveillance between

24    '09 and '11?

25    A.    On a consistent basis, yes.  Most of everything we

1    did at the time that I was there consisted of going out in

2    the field and conducting surveillance petty much on a daily

3    basis.

4    Q.    At least between '09 and '11, you had at least over

5    1,000 surveillance days; correct?

6         MS. YANG:  Objection, misstates the testimony.

7         THE COURT:  Overruled.

8         THE WITNESS:  From 2009 to 2011, over a thousand

9    surveillances?

10   BY MR. SEVERO:

11   Q.    Four days a week, 52 -- 50 weeks.  I'll give you two

12   for vacation.

13   A.    In the two-year span?

14   Q.    800 times.

15   A.    No.  My testimony was that from 2001 --

16   Q.    That's -- I understand what that testimony is.

17        My question is:  Between '09 and '11, you engaged

18   four days a week in surveillance during that time,

19   continuously; correct?

20   A.    For the most part, we went out on surveillance every

21   day, yes, sir.

22   Q.    And between '11 and this date, you've conducted

23   surveillances, haven't you?

24   A.    Yes, I have, for L.A.P.D.

25   Q.    Over a hundred times.

1    A.      From that period, approximately.

2    Q.      So it's fair to say that unless you read a log or a

3    report, you're not going to have an independent

4    recollection of every surveillance you've engaged in.  Is

5    that fair?

6    A.      Yes, sir.  And that's why we write --

7    Q.      That's the reason you write reports; true?

8    A.      Yes, to help refresh our recollection on a date or a

9    date in time.

10   Q.      In fact, that's what they teach you at the L.A.P.D.

11   Academy; correct?

12   A.      To write reports?

13   Q.      Write reports.

14   A.      Yes, sir.

15   Q.      And make sure you put in there everything that's

16   significant in order to be able to testify five years

17   later; correct?

18   A.      Yes, sir.

19   Q.      So what you testified about today -- well, let me

20   ask you this:  Other than Mr. Stebbins, who else was on

21   surveillance that day, on November 24, 2009?

22   A.      There was approximately 10 other individuals.

23   Q.      Who?  Can you name them?

24   A.      I'd have to look at the log to find -- if you want

25   me to list every individual that was there.

1    Q.    Your answer is no, you can't remember?

2    A.    I can name -- I can name a couple.

3    Q.    All right.

4    A.    But if you wanted every one, I would have to look at

5    the logs.

6    Q.    Why don't you tell me who you remember.

7    A.    I remember myself, Agent Stebbins, a detective from

8    Burbank named Mark Stohl, an L.A.P.D. detective named

9    Anna Carlisle.  And those are the ones that came up off the

10   top of my head.

11   Q.    And do you remember -- do you know where

12   Mr. Stebbins was positioned on November 24, 2009, about

13   noon?

14   A.    That's the time that I just described up here, and

15   he was the "OP," which is the observation point.  He had

16   eyes on the location.

17   Q.    Maybe I can get the answer to the question.

18         What was the observation point?

19         MS. YANG:  Objection, argumentative.

20         THE COURT:  The answer was not responsive.  State

21   the question again.

22         And just listen to the question and answer the

23   question.  Go ahead.

24   BY MR. SEVERO:

25   Q.    What was the observation point?  Where?

1          THE COURT:  Do you know where he was?

2          THE WITNESS:  Oh, no.  I'm sorry.  No, sir, I don't

3     know exactly where he was parked.  No, sir, I don't.

4     BY MR. SEVERO:

5     Q.    About what street was he on?

6     A.    You'd have to ask him, sir.

7     Q.    Yes.  Because he didn't communicate that over the

8     radio, did he?

9     A.    I'm not sure whether he did or not, but I don't

10    recall where specifically he was parked at that moment.  I

11    don't, sir.

12    Q.    And it's not on the log that you reviewed, is it?

13    A.    I did not see it there, sir.

14    Q.    So if it's not documented, you're not going to

15    remember it; true?

16    A.    I wouldn't say that.  Like I stated earlier, the

17    reports are written to help refresh and recollect what

18    happened some time ago but --

19    Q.    All right.  How many times --

20          Well, give me the first date that you remember

21    seeing Mr. Darbinyan on surveillance.

22    A.    When I was -- prior to me being assigned to the

23    Eurasian Organized Crime Task Force, like I stated, I was

24    assigned to L.A.P.D. Surveillance Support Section.  There

25    was a period in time where --

1    Q.    Can I get a date from you?

2    A.    I can't give a specific date.  I was just trying to

3    narrow it to --

4    Q.    Just give me a year.

5    A.    It would have been in 2008 and part of 2009 --

6    Q.    All right.

7    A.    -- sir.

8    Q.    So during that time, where did you observe

9    Mr. Darbinyan?

10   A.    I remember at his residence out in -- off the 5

11   Freeway in Sun Valley, Santa Clarita area.

12   Q.    Is that what you remember, that it was in the

13   Santa Clarita area?

14   A.    Out in that area, sir, yes.

15   Q.    You don't remember the actual city, do you?

16   A.    Sun Valley.  I think the street name was Fair- -- I

17   think the street was called Fairlane or Fairview or

18   something like that.

19   Q.    Do you remember the time of the day?

20   A.    Morning hours.

21   Q.    And that's the first time you saw him drive away

22   from his home?

23   A.    That would have -- that would have been, yes, sir.

24   Q.    And he was looking around, according to your

25   testimony here today?

```
1    A.    Yes.

2    Q.    Did you follow him?

3    A.    Yes.

4    Q.    Did you stop him?

5    A.    Traffic stop, no, sir.

6    Q.    For how long did you observe him?

7    A.    Sir, I'd have to look at -- if you're talking about

8    a specific day and you have something in a log you want to

9    show me I could look at -- again, I've done multiple

10   surveillances.

11         THE COURT:  Excuse me.  The questions he's asking is

12   not what was written in some report.  That will only

13   refresh your memory.  The question is, after looking at

14   those reports today, do you have a recollection?

15         MR. SEVERO:  Right.  Thank you.

16         THE COURT:  He's asking you what your recollection

17   is as you sit on the stand today, what you remember.

18         MR. SEVERO:  Thank you, Your Honor.

19         THE WITNESS:  Can you repeat the question?

20   BY MR. SEVERO:

21   Q.    Yes.  What is your recollection of how long you

22   observed Mr. Darbinyan that first day in 2008 or '09 when

23   you were at his house and you saw him drive away from his

24   home?

25   A.    Several hours.
```

1    Q.    And were did you observe him go?

2    A.    Thinking back all those years, I couldn't give you a

3    specific.

4    Q.    You don't remember, do you?

5    A.    No.

6    Q.    Nor do you remember what type of driving he was

7    engaging in while he was driving.

8    A.    I remember that, sir.

9    Q.    Every day of your surveillance of Mr. Darbinyan?

10   A.    The reason I can remember that is --

11   Q.    Just tell me "yes" or "no," sir.

12         THE COURT:  Excuse me, Counsel.

13         The first question you asked was:  On the first day

14   that you saw him, was he doing this?

15         Now is your question as to that day or as to every

16   day that he saw him?

17         MR. SEVERO:  Right.

18   BY MR. SEVERO:

19   Q.    On every day that you saw him, you remember what

20   type of driving he was engaged in?

21   A.    I do remember that, sir.

22   Q.    Every day?

23   A.    Pretty much, sir, yes.

24   Q.    Tell me how many instances of surveillance you had

25   of Mr. Darbinyan between 2008 and 2011 when you left the

1    task force.

2    A.    I would say over a dozen times, sir.

3    Q.    And do you have a dozen logs that you've reviewed

4    before coming today?

5    A.    I'm sure of that, yes, sir.

6    Q.    Have you reviewed them during --

7    A.    Oh no, sir.  I'm sorry.  I didn't.

8    Q.    Okay.  Before coming today, you didn't review a

9    dozen logs, did you?

10    A.    No, sir.

11    Q.    How many times did you effect a traffic stop on

12    Mr. Darbinyan?

13    A.    That I effected a traffic stop on him?  None that I

14    remember, sir.

15    Q.    How many times did you arrive at a location where he

16    had been stopped by some other officer?

17    A.    I don't recall.

18    Q.    How many times -- strike that.

19          Your testimony is that some people engage in this

20    what you have termed counter-surveillance driving because

21    they want to avoid -- or detect, rather, law enforcement;

22    correct?

23    A.    Yes, sir.

24    Q.    And isn't it true that the reason that some people

25    do that is because normally they're carrying some sort of

**001323**

1    contraband in the car?

2    A.    That they're carrying contraband -- not only for

3    that reason, sir.

4    Q.    That they're carrying guns in the car?

5    A.    Well, there are lots of reasons why somebody would

6    be conducting counter-surveillance, in my opinion, sir.

7    Q.    Including possibly detecting people who may want to

8    hurt them?

9    A.    That could be a possibility, too, yes, sir.

10   Q.    Steal their car?

11   A.    Yes, sir.

12   Q.    How many times have you actually spoken with

13   Mr. Darbinyan?

14   A.    Face-to-face, once.  Just once, I believe.

15   Q.    Do you remember the date?

16   A.    Not the specific date, no, sir.

17   Q.    Because you haven't been able to refresh your

18   recollection with a report; true?

19   A.    Correct.  I believe it was probably 20 --

20   Q.    Well, I don't want you to guess.  If you don't

21   remember, you don't remember.

22   A.    Okay.

23         MR. SEVERO:  May I have a moment, Your Honor?

24         THE COURT:  Yes.

25         MR. SEVERO:  May I publish page 2 of 315, previously

**001324**

1    admitted?

2            THE COURT:  Yes.

3            MR. SEVERO:  Thank you.

4    BY MR. SEVERO:

5    Q.      Mr. Padin, I'm going to ask you to look at 315 now

6    before you on the monitor.

7            Can you tell me where the rear door of this location

8    is?

9    A.      The rear door of the location, it's in this area

10   back here (indicating).

11   Q.      On November 24, 2009, did you observe Mr. Darbinyan

12   go into that rear door?

13   A.      No, I did not.

14   Q.      Did you observe him go into -- well, strike that.

15           Where is the front door to this location?

16   A.      On Sunset, up in the front of the building, up in

17   this area.

18   Q.      Is it a glass door?

19   A.      I believe so.

20   Q.      You're not sure?

21   A.      I'm not sure.

22   Q.      You don't remember?

23   A.      No, it's been some time since I've been there.

24   Q.      And it's not on the log that you reviewed before you

25   came.

1  A.    I don't recall it.

2  Q.    Other than that front door and this rear door here,

3  what other doors lead into or out of the Weed Shop?

4  A.    Those are the only two doors that I'm aware of, sir.

5  I'm not sure of any other doors.

6  Q.    Did you see Mr. Darbinyan go into the front door of

7  the Weed Shop?

8  A.    No, sir.

9        MR. SEVERO:  I have no further questions.  Thank

10  you.

11        THE WITNESS:  You're welcome.

12        MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

13  of this witness.

14        MR. FLIER:  Very briefly, Your Honor so I don't have

15  to recall him.

16        MR. PEREYRA-SUAREZ:  And, Your Honor, I may question

17  him in the defense case, but I have no questions now.

18        THE COURT:  Okay.

19                    **CROSS-EXAMINATION**

20  BY MR. FLIER:

21  Q.    Good morning, sir.

22  A.    Good morning.

23  Q.    Did you write some pamphlet or policy regarding

24  surveillance techniques?

25  A.    I have written something that I use when I help

1    train other individuals, yes, sir.

2    Q.    And with respect to this investigation, if you

3    recall, did you give that surveillance technique document

4    to anyone involved in this investigation?

5    A.    Yes, I did.

6    Q.    I just want to direct your attention to -- there's a

7    "do" section with respect to your policy that I just --

8         MS. YANG:  Objection, Your Honor.  This is not in

9    evidence.

10        MR. FLIER:  Oh, I'm sorry.  That was my mistake,

11   Your Honor.

12        Thank you.

13        THE COURT:  Okay.

14   BY MR. FLIER:

15   Q.    With respect to the document that briefly was shown,

16   do you recognize it?

17   A.    I didn't.

18   Q.    Okay.  Good, I'm glad.

19        With respect to any type of surveillance technique

20   document, can you describe that type of document that you

21   had prepared before?

22   A.    I have written out, in a Word doc, certain things

23   that I use to help teach and train individuals in regards

24   to surveillance.  And not only do I -- it helps me train

25   individuals, sometimes I do give that out to the people

1    that I'm training.  It's just a small list of some of the

2    things that have helped me in my surveillance techniques

3    throughout the years.

4    Q.    And is there certain sections within that document

5    that has a section called do's?

6    A.    Yes, sir.

7    Q.    And with respect to one of the primary do's was to

8    assign someone ahead of time to keep the log and take

9    photos; is that correct?

10   A.    Yes.

11   Q.    And without getting into it, because I'm almost

12   done, photos and logs are important for different reasons;

13   am I correct?

14   A.    Yes, sir.

15   Q.    One reason could be, like what you have said today,

16   to refresh your memory if the event was some time ago; is

17   that correct?

18   A.    That is correct.

19   Q.    Another reason could also be to document and verify,

20   let's say, evidence recovered and retrieved; is that also

21   correct?

22   A.    Yes, sir.

23         MR. FLIER:  I have no further questions.  Thank you.

24         THE COURT:  Redirect.

25   ///

<u>**REDIRECT EXAMINATION**</u>

BY MS. YANG:

Q.     Detective Padin, you were asked on cross-examination about whether people sometimes don't drive in a straight line to avoid carjacking. Do you recall that?

A.     Yes.

Q.     During your surveillance operations of defendant Darbinyan, did you observe him stand outside of his residence and look around at the other cars?

A.     From his residence --

        MR. SEVERO:  Objection, calls for speculation, given his testimony about his memory.

        THE COURT:  Overruled.

        THE WITNESS:  Standing outside his residence?

BY MS. YANG:

Q.     Let me -- I'm sorry, that was a poor question.

        During your surveillance operations of defendant Darbinyan, did you ever see him stand outside a location and just look around for other vehicles?

A.     Yes.

Q.     No carjacking; correct?

A.     No.

Q.     And the neighborhood where defendant Darbinyan lived, that was a nice neighborhood; correct?

A.     Yes.

1    Q.    No carjackings; correct?

2    A.    As far as I know, no.

3          MR. SEVERO:  Objection.

4          THE COURT:  Sustained, speculation.

5    BY MS. YANG:

6    Q.    And in addition to some of the other surveillance

7    operations you conducted of defendant Darbinyan, did he

8    oftentimes ride as a passenger in a vehicle?

9    A.    Yes.

10   Q.    And as a passenger in a vehicle, could you describe

11   what his behavior was?

12   A.    Yes.

13   Q.    And please describe it.

14   A.    I observed him numerous times, if he was the front

15   passenger, or even the rear passenger, if he was being

16   driven around, he would turn around to see -- so if the car

17   was facing this way, he would turn around to see and do

18   this type of thing, looking out the rear window as he was

19   being driven (indicating).

20         MS. YANG:  And may the record reflect the witness

21   turned all the way around towards the back.

22         THE COURT:  Yes.

23   BY MS. YANG:

24   Q.    And during the time that you surveilled defendant

25   Darbinyan, was there ever a threat of carjacking?

```
 1              MR. SEVERO:  Objection, calls for speculation.

 2              THE COURT:  Sustained.

 3      BY MS. YANG:

 4      Q.     Did you ever observe any threat of carjacking?

 5              MR. SEVERO:  Objection.

 6              THE COURT:  Sustained.

 7      BY MS. YANG:

 8      Q.     Now, you were also asked on cross-examination that

 9      one of the do's that you train other officers in conducting

10      surveillance operations is to assign someone to take a log

11      or take photographs; correct?

12      A.     Yes.

13      Q.     It's not always possible to take photographs; is

14      that correct?

15      A.     That is correct.

16      Q.     And not every surveillance operation --

17              MR. SEVERO:  Can I ask that the witness not be led?

18              THE COURT:  Sustained.

19      BY MS. YANG:

20      Q.     And is it possible to write a log for every

21      surveillance operation?

22      A.     No.

23              MS. YANG:  Thank you.  Nothing further.

24              THE COURT:  Recross.

25      ///
```

**RECROSS-EXAMINATION**

BY MR. SEVERO:

Q.    The number of times that you observed Mr. Darbinyan

standing in front of his home, what times of the day were

those?

A.    I never said I saw him standing in front of his

home, sir.

Q.    All right.  Did you ever see him come outside his

house?

A.    No.  The only times I saw him was when he was

driving away from his residence.

Q.    So you never saw him stand outside of his house and

look up and down?

A.    Not in front of his residence, sir.

Q.    Okay.  When you set up your surveillance team, do

you assign someone ahead of time to take notes?

A.    Generally, yes, sir.

Q.    When you say "generally," you mean sometimes you

don't?

A.    Sometimes, as we get to the location, we will ask

somebody, is somebody taking notes if we haven't done so

already.  "Is somebody taking notes?"  And if not, then

we'll say hey, we'll assign somebody over there, "You take

notes today."

Q.    The Eurasian Task Force, was it the policy, if you

1    will, to gather up beforehand and determine a plan for

2    that -- for the surveillance?

3    A.    Yes.  It's called a brief.

4    Q.    A briefing; correct?

5    A.    A briefing, yes, sir.

6    Q.    And during that briefing, wasn't someone assigned to

7    take notes?

8    A.    Yes, sir.

9    Q.    Because if you don't take notes, you don't remember

10   later; true?

11   A.    It's not that you don't remember, but it's something

12   that -- that we do.  Just because somebody doesn't write

13   notes doesn't mean that somebody's not going to remember

14   what happened the day before or --

15   Q.    Or five years later.

16   A.    Yes.

17   Q.    Now, during these briefings, is someone assigned to

18   take photos?

19   A.    We have -- in my experience, it's not just one

20   person with a camera in the team.  We have multiple

21   cameras.  Depending on where you find yourself in the

22   surveillance, as the surveillance moves and becomes active,

23   whoever is in the best position can take a photo.  So if I

24   was --

25         Can I use an example?

1    Q.    Sure.

2    A.    If I was to say to you "I want you to take photos

3    today," that wouldn't be fair for me to say because what

4    happens if you find yourself in the tail end of the

5    surveillance and you're the only person with a camera?

6    Q.    That's why you have several people with cameras.

7    A.    Yes.

8    Q.    And during the surveillance on November 24, 2009,

9    how many people were assigned to take photos?

10   A.    I -- I don't recall if somebody was specifically.

11         Like I said, in my experience, we'll assign a

12   log-taker.  But when it came to cameras, multiple people in

13   the unit will have cameras, and it's just kind of

14   understood that whoever can get a picture will just take a

15   picture, if possible, without being detected by the

16   individuals.

17   Q.    I understand.

18         Who was assigned to take notes on November 24, 2009?

19   A.    I would have to look at that 302 to tell you who

20   wrote it.

21   Q.    That's the person who took the notes?

22   A.    Yes, sir.

23   Q.    All right.  And who would have been assigned to take

24   photos on that day?

25   A.    Again, I don't know if it's -- a specific person was

1    given that sole duty to do that.

2    Q.    Because if it's not written in the log, you don't

3    remember today; correct?

4          MS. YANG:  Objection.  Asked and answered, the

5    question.

6          THE COURT:  Overruled.

7          THE WITNESS:  No, that's because, again, when it

8    comes to cameras, it's not one person assigned to take the

9    photos; it's whoever can take the best shot at the moment

10   without being detected, sir.

11   BY MR. SEVERO:

12   Q.    Are you aware of any pictures on November 24, 2009,

13   having been taken in this surveillance of the Weed Shop?

14   A.    Of the location?  I'm not aware -- I'm not sure.  I

15   haven't seen any photos from that day, sir.

16         MR. SEVERO:  Thank you.  No further questions.

17         MR. PEREYRA-SUAREZ:  No questions, Your Honor.

18         MR. FLIER:  Just from here, Your Honor if that's

19   okay.

20                    **RECROSS-EXAMINATION**

21   BY MR. FLIER:

22   Q.    Were you part of any surveillance, it doesn't matter

23   in what context, on July 18th of 2009, that you recall,

24   sir?

25   A.    Off the top of my head, sir, I'd have to look at

1    something.

2    Q.    So your answer is you don't recall?

3    A.    I don't recall, sir.

4         MR. FLIER:  Thank you.

5         THE COURT:  Thank you.  You may step down.

6         THE WITNESS:  Thank you.

7         THE COURT:  Next witness.

8         MS. YANG:  Yes, Your Honor.  Anna Carlisle.

9         THE CLERK:  Good morning.  Wait right here to be

10   sworn, please.

11                        **ANNA CARLISLE,**

12    GOVERNMENT'S WITNESS, WAS SWORN, TESTIFIED AS FOLLOWS:

13        THE CLERK:  Do you solemnly swear the testimony you

14   shall give in the cause now pending before this Court shall

15   be the truth, the whole truth, and nothing but the truth,

16   so help you God?

17        THE WITNESS:  Yes.

18        THE CLERK:  Thank you.  You may be seated.

19        May I ask that you please state your full name for

20   the record, and spell your last name.

21        THE WITNESS:  Anna Carlisle, C-a-r-l-i-s-l-e.

22        THE CLERK:  Thank you.

23        MS. YANG:  And again, Your Honor, this witness goes

24   to the racketeering conspiracy charge against defendants

25   Darbinyan and Sharopetrosian, as well as the felon in

1    possession charge against defendant Darbinyan.

2         THE COURT:  Thank you, Counsel.

3         MS. YANG:  May I proceed?

4         THE COURT:  Yes.

5                    **DIRECT EXAMINATION**

6    BY MS. YANG:

7    Q.    Good morning.

8    A.    Good morning.

9    Q.    Where do you currently work?

10   A.    I am a detective with the Los Angeles Police

11   Department.

12   Q.    And how long have you been with the Los Angeles

13   Police Department?

14   A.    Since 1991.

15   Q.    And are you assigned currently to a specific section

16   or unit within the Los Angeles Police Department?

17   A.    Yes.  I work our Organized Crime Section in the

18   Major Crimes Division.

19   Q.    And how long have you been with the Organized Crime

20   Major Crimes Division?

21   A.    Since 2008.

22   Q.    Now, prior to 2008, were you a member of the

23   Eurasian Organized Crime Task Force?

24   A.    No.  In 2008, October, I was assigned to the

25   Eurasian Organized Crime Task Force.

```
 1   Q.      I'm sorry.  I misspoke.

 2           How long were you with the Eurasian Organized Crime

 3   Task Force?

 4   A.      From October 2008 until about April 2011.

 5   Q.      So while assigned to the organized crime division of

 6   Los Angeles P.D., you were essentially loaned out to the

 7   Task Force; is that correct?

 8   A.      That's correct.

 9   Q.      I'd like to direct your attention to November 24,

10   2009.

11           Did you participate in a surveillance operation in

12   the area of Hobart and Sunset Boulevard in Los Angeles?

13   A.      Yes, I did.

14   Q.      And where were you located for that surveillance

15   operation?

16   A.      I positioned myself on Sunset Boulevard, the north

17   side of the street, and it was inside a motel parking lot.

18           MS. YANG:  And, Your Honor, I'll just publish page 1

19   of Exhibit 315.

20           THE COURT:  Why don't we publish it when we get

21   back.

22           Ladies and gentlemen, it's 10:00 o'clock.  We'll

23   break for our morning recess.

24           Remember the admonishment not to discuss the case

25   among yourselves or with anybody else or form or express
```

1    any opinions about the matter until it's submitted to you

2    and you retire to the jury room.

3          If you would leave quietly.  We'll still be in

4    session when you leave.

5          THE CLERK:  All rise.

6                    *(Jurors exit courtroom.)*

7          THE COURT:  Okay.  Let the record reflect that the

8    jurors have left the courtroom.

9          You may have a seat.

10          In the spirit of what we've been doing since the

11    very beginning, and that's just giving you the Court's

12    observations, not making rulings one way or the other, but

13    just observing, so it gives you the benefit of somebody

14    that's listening to this case.

15          The last witness, that was 45 minutes, 40 of which

16    were the most useless, painful experience to have to sit

17    there and listen to.  And if it's that way for me, I can

18    guarantee you -- and I'm looking at the jurors -- it's that

19    way for them.

20          This is a long case.  I would suggest that people

21    focus in on what you really want the jury to know;

22    otherwise, they're going to just ignore everything that

23    you're saying.  That really was a very painful experience

24    to go through, that last witness.  And very, very little,

25    maybe four our five minutes was relevant.

1      So anyway, that's an observation.  As I say, if it's

2  affecting me that way, you can guarantee it's probably

3  affecting the jury that way.  So keep your eyes on the jury

4  and understand that it's much better to focus your case

5  than just to shotgun it and completely lose the jury.

6      We'll be in recess.

7      MR. ESTRADA:  One other matter?

8      THE COURT:  Yes.

9      MR. ESTRADA:  Yesterday we talked about subpoenaing

10  M.M.  We have done --

11      THE COURT:  I'm sorry.  You talked about what?

12      MR. ESTRADA:  Subpoenaing M.M. --

13      THE COURT:  Oh, yes.

14      MR. ESTRADA:  -- according to the Court's orders.

15      That has been done, and now counsel needs to be

16  appointed for M.M., as discussed yesterday.

17      THE COURT:  Okay.  Well, we'll do that if and when

18  he gets into court.

19      MR. ESTRADA:  When he gets into court will be too

20  late because that will be the day that he's testifying.

21      THE COURT:  Counsel, why don't you let the Court do

22  what the Court's supposed to do.  It's not your obligation

23  to appoint somebody or tell the Court when to appoint

24  somebody.

25      MR. ESTRADA:  Yes.  I'm --

1          THE COURT:  He isn't even a witness yet.  When and

2     if he gets to the point of being a witness, then the Court

3     will consider whether or not it's going to appoint an

4     attorney to represent him.

5          MR. ESTRADA:  Very good.

6          THE COURT:  You have put the Court on notice.  I've

7     heard you.  You put the Court on notice.  I'll do it when I

8     think it's appropriate.

9          MR. ESTRADA:  Okay.  And he's subpoenaed for Monday,

10    just so the Court's aware.

11         THE COURT:  Okay.  Are you -- is that realistic?

12         MR. ESTRADA:  Just in the abundance of caution, we

13    chose Monday as the possible --

14         THE COURT:  I don't know how long the case is going

15    to be, but if that's a realistic date, that's great.

16         Okay.  Thank you.

17         THE CLERK:  All rise.  Court is in recess.

18         *(10:18 a.m. to 10:35 a.m., recess taken.)*

19                    *(Jury present.)*

20         THE CLERK:  You may be seated.

21         All rise.

22         *(Judge Klausner enters courtroom.)*

23         THE CLERK:  This District Court is now in session,

24    you may be seated.

25         THE COURT:  Okay.  Let the record reflect that the

1    jurors are present, including the alternates.  The witness

2    is on the witness stand, and we are in direct examination.

3         Counsel, you may continue.

4    BY MS. YANG:

5    Q.    Detective Carlisle, when we broke, you had just

6    testified that you were positioned on Sunset Boulevard as

7    part of a surveillance team on November 24, 2009.  Do you

8    recall that?

9    A.    Yes.

10   Q.    Now, did you subsequently pick up the surveillance

11   of a black Audi SUV?

12   A.    Yes.

13        MR. SEVERO:  Objection, Your Honor.  Leading.

14        THE COURT:  Overruled, foundational.

15   BY MS. YANG:

16   Q.    Is that a "yes"?

17   A.    Yes.

18   Q.    And were did you follow the black Audi SUV?

19   A.    The black Audi set up for a left, which would be a

20   northbound turn on Harvard, and I was directly behind it at

21   that point.  So I just followed -- fell directly behind him

22   on Sunset, and then he made a quick turn onto Harvard, and

23   I followed as well.

24        MS. YANG:  Your Honor, publishing page 1 of

25   Exhibit 315.

1          THE COURT:  Yes.

2     BY MS. YANG:

3     Q.    Did the black Audi SUV stop at a particular area on

4     Harvard Boulevard?

5     A.    Yes.

6     Q.    And where did it stop?

7     A.    A little further -- just to the right, he pulled to

8     the curb.  He didn't quite pull to the curb as somebody who

9     would normally park a car.  He was a little further out,

10    but he stopped probably a third to halfway up the block.

11    Q.    Now, directing your attention to this location at

12    1562 North Harvard Boulevard, on page 1 of Exhibit 315, was

13    that a location where the black Audi SUV stopped near?

14         MR. SEVERO:  Leading.

15         THE COURT:  Overruled.

16         THE WITNESS:  Yes.

17    BY MS. YANG:

18    Q.    And when the black Audi SUV stopped, did you also

19    stop behind it?

20    A.    Yes.

21    Q.    And what did you observe?

22    A.    The driver immediately got out, and he walked back

23    in my direction.  And then he walked across the back of his

24    car and then up to the passenger side.  He opened the

25    passenger door and removed a bag with two hands.  It seemed

1   weighted.  It was dark in color.  It could have been black

2   or blue, and it had a strap on top.  I could see it

3   hanging, and he walked quickly up the driveway.

4   Q.    Now, when you say "up the driveway," would that be

5   the driveway of 1562 Harvard?

6   A.    Yes.

7          MS. YANG:  Your Honor, publishing page 3 of

8   Exhibit 315.

9   BY MS. YANG:

10  Q.    Is this the driveway, where my arrow is drawn, that

11  you indicate in your testimony you saw the individual

12  carrying the dark weighted bag go up?

13  A.    Yes.

14  Q.    Now, to your knowledge, this photograph wasn't taken

15  on November 24, 2009; correct?

16  A.    Not to my knowledge.

17  Q.    Now, after you saw -- well, let me ask you this:

18         The individual who got out of the black Audi SUV,

19  who was it?

20  A.    Turned out to be a gentleman named --

21         MR. SEVERO:  Objection.  No foundation, calls for

22  hearsay.

23         THE COURT:  It may be.  It may be.

24         Why don't you ask those questions, Counsel?

25  ///

1    BY MS. YANG:

2    Q.    Detective Carlisle, prior to this surveillance

3    operation, were you provided a photograph of the target

4    that you were conducting surveillance on?

5    A.    Yes.

6    Q.    And who was that individual?

7    A.    His name was Souren Serobyan.

8    Q.    And did the individual you see get out of the black

9    Audi SUV and carry the dark weighted bag up the driveway of

10   1562 Harvard, did he match the description of the

11   photograph that you had of Souren Serobyan?

12   A.    Yes.

13   Q.    Now, when did you next see Mr. Serobyan?

14   A.    I -- after he went up the driveway out of my sight,

15   I continued up northbound on Harvard and pulled to the side

16   of the street in an open parking -- or an open curb area,

17   and I waited there.  And just a few minutes, maybe three,

18   four, five minutes at the most, he drove by me northbound.

19   Q.    And when you mean "he," was it Mr. Serobyan in the

20   black Audi SUV?

21   A.    Yes.

22   Q.    Was there anybody else in the vehicle?

23   A.    Not to my knowledge.

24   Q.    And actually, let me ask you this:  When he stopped

25   near 1562 Harvard and you stopped behind him initially, was

1    there anyone else in the vehicle with him?

2    A.    I could not see anyone else.

3    Q.    Now, after Mr. Serobyan drove past you on the upper

4    part of Harvard Avenue, did you see him again?

5    A.    I did not.

6    Q.    And what did you do after he drove past you?

7    A.    He drove past me and made a right on Hollywood

8    Boulevard.  I did a U-turn and parked on the -- so now it's

9    going to be the west curb facing back to the location of

10   the house where he had gone up the driveway.

11        And I was keeping an eye on our officers who were

12   down there.  We had some undercover officers who had parked

13   there and gone up the driveway.

14   Q.    Now, you were part of a surveillance team on this

15   day; correct?

16   A.    Yeah.

17   Q.    And were the members communicating via radio and/or

18   cell phone?

19   A.    Yes.

20   Q.    And did you learn at some point that Mr. Serobyan

21   had been traffic stopped?

22   A.    Yes.

23   Q.    But you weren't at the actual traffic stop location;

24   correct?

25   A.    I was not.

1    Q.    Now, while you were parked on Harvard, across from

2    the 1562 Harvard Avenue location, did you observe anything

3    unusual?

4    A.    I sat there for probably a good hour while all the

5    events were taking place.  Some undercover, plain dark

6    vehicles came back with Glendale P.D., and they came back

7    to the location.  And so I watched that.

8    Q.    Did you see any of the targets of the investigation

9    in the area of Harvard Avenue as you sat and watched the

10   activity?

11   A.    Yes.

12   Q.    And who did you see?

13   A.    I saw two people I recognized.  The first one is --

14   his name is Jack or "Hakop," (phonetic) and I have a

15   horrible time pronouncing his last name, but he's a friend

16   of Mr. Darbinyan's.

17        MR. SEVERO:  Objection, move to strike "a friend of

18   Mr. Darbinyan's."

19        THE COURT:  It's stricken.

20   BY MS. YANG:

21   Q.    Detective Carlisle, you were part of the organized

22   crime task force that was investigating Armenian Power; is

23   that correct?

24   A.    Correct.

25   Q.    Based on your knowledge of the investigation, did

**001347**

```
 1   you know what the relationship was between this Mr. Hagop

 2   (phonetic) and defendant Darbinyan?

 3          MR. SEVERO:  Objection, hearsay.

 4          THE COURT:  Sustained.

 5   BY MS. YANG:

 6   Q.     How do you know what the basis of their relationship

 7   was?

 8   A.     In many prior surveillances, we had been to that

 9   location where he lives, and Mr. Darbinyan had been there.

10   In fact, the day before, he was there at the house with him

11   on Wilton Avenue, where he lived.

12   Q.     So there was a lot of personal interaction between

13   Hagop (phonetic) and Mr. Darbinyan; correct?

14          MR. SEVERO:  That's been asked and misstates the

15   evidence.

16          THE COURT:  Sustained.

17   BY MS. YANG:

18   Q.     So you saw interactions between Hagop (phonetic) and

19   the defendant Darbinyan; correct?

20   A.     Yes.

21   Q.     Now, you say that you saw this Hagop (phonetic)

22   individual.  Was he in a vehicle or on foot?

23   A.     He was in a black vehicle, driving northbound

24   towards me.

25   Q.     And you said that you also saw another individual
```

1    you recognized.  Who was the other individual?

2    A.     Mr. Darbinyan.

3    Q.     And did you -- how did you see Mr. Darbinyan?

4    A.     As I was sitting at the curb watching the activity

5    up in front of me, I looked to my side, and a light

6    colored, small compact car was inching by me, and the front

7    passenger was Mr. Darbinyan.

8    Q.     And had you been on previous surveillances of

9    defendant Darbinyan?

10   A.     Yes.

11   Q.     And is that how you were able to recognize him?

12   A.     Yes.

13   Q.     Now, could you please -- do you see an individual in

14   court here today who you can identify as defendant Mher

15   Darbinyan?

16   A.     Yes.

17   Q.     Could you please identify him by describing where he

18   is sitting and an article of clothing that he's wearing.

19   A.     He's at the front counsel table, wearing a blue

20   sweater.

21          THE COURT:  Indicating the defendant.

22   BY MS. YANG:

23   Q.     And you testified that you saw defendant Darbinyan.

24   Was he a passenger in that vehicle?

25   A.     Yes.

1    Q.    And you were parked in a south direction on Harvard

2    Avenue; is that correct?

3    A.    Yes.

4    Q.    So your driver's seat position would have been right

5    next to the passenger seat in the vehicle that

6    Mr. Darbinyan was being driven in; correct?

7          MR. SEVERO:  Leading.

8          THE COURT:  Sustained.

9    BY MS. YANG:

10   Q.    Could you please describe your position in relation

11   to the defendant, Darbinyan.

12   A.    Yes.

13         I was parked southbound on the west curb, facing

14   Sunset.  And a small, compact, light-colored car came

15   southbound in the same direction that I was sitting, and it

16   pulled pretty much right next to me at some point.  And I

17   looked over, and it was Mr. Darbinyan, who was staring

18   straight ahead.

19   Q.    So you did not make eye contact with defendant

20   Darbinyan; correct?

21   A.    I saw him, but he did not look over at me.

22         MS. YANG:  Your Honor, one moment.

23         THE COURT:  Yes.

24         MS. YANG:  Nothing further.

25         THE COURT:  Cross?

## CROSS—EXAMINATION

BY MR. SEVERO:

Q.    Good morning.

A.    Good morning, sir.

Q.    Did you review any reports before coming to court today?

A.    Yes.

Q.    What did you review?

A.    I reviewed a surveillance report written regarding this event that we're discussing.

Q.    And is that a copy that you have or was given to you?

A.    It was a copy that was provided to me.

Q.    By whom?

A.    By U.S. Attorney Yang.

Q.    And when did she provide you with this?

A.    Maybe a week or two ago.

Q.    In person?

A.    Yes.

Q.    So you also had a conference with them?

A.    You know, could I correct that?  She did e-mail it to me.

Q.    Okay.  How did you remember that just now?

A.    I just remembered it.

Q.    All right.  Did you have any personal meetings with

1    the -- any member of the prosecution team?

2    A.    Yeah.

3    Q.    When?

4    A.    Pardon me?

5    Q.    When?

6    A.    When?  We were -- I was here yesterday, we spoke.

7    And maybe last week I went to their office, maybe a week

8    before that.

9    Q.    Is that it?

10          How about at the break?

11   A.    At the break today?

12   Q.    Yes.

13   A.    They came into the room, yes.

14   Q.    You gathered in the attorney room?

15   A.    Yes.

16   Q.    And discussed the testimony?

17   A.    No.

18   Q.    All right.  So no discussion of testimony today with

19   the team?

20   A.    Not in detail, no.

21   Q.    Some?

22   A.    Just what she was going to ask me.

23   Q.    All right.  When you observed the driver of the Q7

24   exit the vehicle at 1552 Harvard, where was the vehicle?

25          MS. YANG:  Objection, Your Honor.  That would be

```
1   1562.

2          MR. SEVERO:  I'm sorry.

3          Thank you.

4          THE COURT:  Thank you, Counsel.

5          MR. SEVERO:  Thank you for correcting me, Ms. Yang.

6   1562, yes.

7   BY MR. SEVERO:

8   Q.     Where --

9   A.     Where was the vehicle?

10  Q.     Yes.

11  A.     I would say it was just north of the driveway a

12  hair.  It wasn't south of, it wasn't in front of.  I would

13  say it was just a little parked in front of that driveway

14  so he could go directly up the driveway pretty much from

15  the passenger door.  It was probably in line with the

16  driveway.

17  Q.     And you saw him remove a bag from the car?

18  A.     I did.

19  Q.     How did he carry the bag?

20  A.     It was -- he kind of held it high, with two hands.

21  And I could see a strap, and at some point he turned from

22  me.  And at that point, I don't know how he carried it, but

23  it was kind of in this fashion as he removed it from the

24  car.

25         MR. SEVERO:  May the record reflect the witness has
```

```
1    turned both her hands with her palms up at about -- just

2    about chest level.

3           THE COURT:  Yes.

4           MR. SEVERO:  You thank.

5    BY MR. SEVERO:

6    Q.    So he didn't carry it by the handles?

7    A.    Not at that point when he pulled it out, no.

8    Q.    And he disappeared into the driveway?

9    A.    He walked down that driveway; correct.

10   Q.    Do you know where he went?

11   A.    That driveway continues on, to the back of the

12   house.  And at that point, I don't know where he went.

13   Q.    Now, directing your attention to the time when you

14   say you saw Mr. Darbinyan in a -- in a vehicle, when was

15   that, that day?

16   A.    That day, it was approximately an -- maybe an hour

17   after the driveway incident.  So it was a good amount of

18   time later.

19   Q.    And where was it that -- approximately what street

20   was it on that you saw him?

21   A.    It was on Harvard.

22   Q.    At about 1562 Harvard?

23   A.    No.  Well, he drove down in that direct -- he was

24   the passenger, but that car drove down in that direction.

25   But it was coming from Hollywood Boulevard down Harvard
```

1    towards Sunset.  And as it made that movement, it drove

2    right by me.

3    Q.    And you're sure it was a light-colored vehicle?

4    A.    It's my recollection, that it was a light vehicle.

5    Q.    And that recollection comes from where?  Did you

6    refresh your recollection with anything?

7    A.    Well, I did review the report, but that's -- that's

8    what I'm remembering.

9         THE COURT:  That's what you remember today here in

10   court?

11        THE WITNESS:  That's what I remember.

12        MR. SEVERO:  Thank you for the help, Your Honor.

13   BY MR. SEVERO:

14   Q.    The report didn't say anything about a light-colored

15   vehicle, does it?

16   A.    I think it does.

17   Q.    It doesn't say anything about a black Mercedes with

18   tinted windows?

19   A.    There was a black vehicle referenced to Jack, Hakop,

20   (phonetic), the one that was driving northbound.  He was in

21   a black vehicle.  And there was a license plate we captured

22   on that, and it is registered to him.

23   Q.    Did you ever identify the driver of the vehicle that

24   you say Mr. Darbinyan was in?

25   A.    No.

1    Q.    As you are sitting in your car on the driver's seat,

2    you're looking across to this car that's driving by with

3    Mr. Darbinyan in it?

4    A.    Yes.

5    Q.    And that -- you were facing what direction?

6    A.    Southbound.

7    Q.    And the car was driving in what direction?

8    A.    Southbound.

9    Q.    So the car was slowly driving by?

10   A.    Yes.  In fact, that's what caught my eye is why is

11   this car driving so slow.

12   Q.    When did you first become a member of the task

13   force?

14   A.    Approximately October 2008.

15   Q.    And had you had instances of surveillance of

16   Mr. Darbinyan between 2008, October 2008, and November of

17   2009?

18   A.    Yeah.

19   Q.    How many times?

20   A.    Quite a few.  To put a number to it would be tough,

21   but a lot.

22         MR. SEVERO:  That's all I have.  Thank you.

23         MR. PEREYRA-SUAREZ:  No questions, Your Honor.

24         THE COURT:  Counsel?

25         MR. FLIER:  I have no questions, Your Honor.

1          THE COURT:  Thank you, Counsel.

2          Oh, I'm sorry.  Redirect.

3          MS. YANG:  No redirect, Your Honor.

4          THE COURT:  Okay.  You may step down.

5          Next witness.

6          MR. CREIGHTON:  The government calls Jeff Davis.

7          THE CLERK:  Wait right here to be sworn, Mr. Davis.

8                         **JEFFREY DAVIS,**

9      GOVERNMENT'S WITNESS, WAS SWORN, TESTIFIED AS FOLLOWS:

10         THE CLERK:  Do you solemnly swear the testimony you

11    shall give in the cause now pending before this Court shall

12    be the truth, the whole truth, and nothing but the truth,

13    so help you God?

14         THE WITNESS:  I do.

15         THE CLERK:  Thank you.  You may be seated.

16         MR. CREIGHTON:  And, Your Honor, two things about

17    this witness.

18         THE COURT:  Before you do that, let's get his name.

19         MR. CREIGHTON:  I'm sorry, Your Honor.

20         THE CLERK:  Please state your full name for the

21    record and spell your last name.

22         THE WITNESS:  Jeffrey Davis, D-a-v-i-s.

23         THE CLERK:  Thank you.

24         THE COURT:  Okay, thank you.

25         Counsel, go ahead.

1      MR. CREIGHTON:  Two things.

2      First, this witness goes to the RICO conspiracy

3  counts against defendant Darbinyan and Sharopetrosian and

4  the felon in possession count against defendant Darbinyan.

5      And also, Your Honor, the government will be

6  presenting this witness with firearms, which will be

7  introduced by reference.  They have been safed, both by the

8  agent and by -- and checked by the marshals.

9      THE COURT:  And they're separate?

10      MR. CREIGHTON:  Yes, Your Honor.

11      THE COURT:  Okay.

12                    **DIRECT EXAMINATION**

13  BY MR. CREIGHTON:

14  Q.    Good morning.

15  A.    Good morning.

16  Q.    Where do you work?

17  A.    Glendale Police Department.

18  Q.    How long have you worked there?

19  A.    Ten years.

20  Q.    What did you do before that?

21  A.    I was assigned to the special -- I was enlisted in

22  the United States Marine Corps.

23  Q.    What is your present rank?

24  A.    I'm a detective assigned to the Robbery Homicide

25  Detail.

1    Q.     Where were you assigned in November of 2009?

2    A.     The Special Enforcement Detail.

3    Q.     What is that?

4    A.     It's a suppression detail that works at the

5    direction of our commanders, and we basically will suppress

6    any crime activity as it arises.  And we also work in

7    supporting the detective detail if they need assistance

8    with surveillance or vehicle stops.

9    Q.     Now, you've participated in vehicle stops?

10   A.     Yes.

11   Q.     How many?

12   A.     Over 500.

13   Q.     Directing your attention to midday on November 24,

14   2009, where were you located?

15   A.     I was in the area of Hollywood Boulevard and Harvard

16   Avenue in Los Angeles.

17   Q.     How were you dressed?

18   A.     I was dressed in our uniform, which consisted of a

19   black polo shirt --

20   Q.     Just in uniform?

21   A.     In uniform.

22   Q.     Thank you.

23          And were you alone?

24   A.     I had my partner with me.

25   Q.     And were you in a marked or unmarked vehicle?

1    A.    Unmarked vehicle.

2    Q.    Now, were you advised to be on the lookout for a

3    particular vehicle?

4    A.    Yes, I was.

5          MR. SEVERO:  Objection, hearsay.

6          THE COURT:  Overruled.

7    BY MR. CREIGHTON:

8    Q.    What vehicle were you looking for?

9    A.    An Audi Q7.

10   Q.    Did you see this vehicle?

11   A.    Yes.

12   Q.    Where was it?

13   A.    It was traveling eastbound on Hollywood Boulevard.

14   Q.    What did you do?

15   A.    I was behind the vehicle, and I saw that it had no

16   license plates on it, nor did it have any DMV stickers in

17   the windshield.

18   Q.    Did you see the vehicle do anything?

19   A.    Yes.  The vehicle -- when we pulled behind the

20   vehicle, it signaled to make a turn on a minor street, and

21   it failed to signal within 100 feet of making the turn, in

22   violation of the Vehicle Code.

23   Q.    So what did you do next?

24   A.    We made a traffic stop on the vehicle, and the

25   vehicle stopped mid-block on Winona Avenue.

1   Q.    And what did you do?

2   A.    I contacted the driver of the vehicle.

3   Q.    What do you do when you contact a driver?

4   A.    I ask them -- well, first I inform them the reason

5   for the stop, and then I ask them for their DMV documents,

6   which would be identification, driver's license, insurance,

7   and registration for the vehicle.

8   Q.    What did the driver do?

9   A.    The driver told me that it wasn't his car.

10        MR. SEVERO:  Objection, hearsay.

11        THE COURT:  Overruled.

12        THE WITNESS:  The driver told me it wasn't his car,

13   and he did not know where these documents were kept.

14        I told him that most of the time they're in the

15   glove box, and he told me that the glove box was locked,

16   and he did not have access to it.

17   BY MR. CREIGHTON:

18   Q.    Did you learn that the driver was on probation?

19   A.    Yes, I did.

20        MR. SEVERO:  Objection, hearsay.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes.

23        I also asked if the driver was on any type of

24   probation, to which he replied he was on formal probation

25   for identity theft.

1   BY MR. CREIGHTON:

2   Q.     And what is the significance of that?

3          MR. SEVERO:  Objection, calls for a legal

4   conclusion.

5          THE COURT:  Overruled.

6          THE WITNESS:  Based on my training and --

7          THE COURT:  To you, what's the significance?

8          THE WITNESS:  That he could be subject to search and

9   seizure, Your Honor.

10         THE COURT:  Okay.

11  BY MR. CREIGHTON:

12  Q.     What did you do next?

13  A.     I asked him to step out of the vehicle.  He

14  complied.

15         Based on his probation status and the fact that we

16  can search without a warrant, I searched his pockets, and I

17  found some currency as well as a Mercedes-Benz key.

18  Q.     And what, if anything, did he say about the

19  Mercedes-Benz key?

20         MR. SEVERO:  Hearsay.

21         THE COURT:  Overruled.

22         THE WITNESS:  He was -- he couldn't -- he was unsure

23  of who it belonged to or if it actually belonged to an

24  actual vehicle.

25  ///

BY MR. CREIGHTON:

Q.    I'm sorry.  You said he wasn't sure if it actually belonged to a vehicle?

A.    Correct.

Q.    How did the key look?

A.    It was a single key.  And it had the Mercedes-Benz logo embossed on top of it or embedded on top of it.  So it was very apparent that it was a Mercedes-Benz key.

Q.    Did you also search the vehicle?

A.    Yes, I did.

Q.    What, if anything, did you find?

A.    In the driver's seat map pocket, I located a small baggie of a green leafy substance, which I recognized to be marijuana, based off my training and experience.

Q.    Did you ask him about the marijuana?

A.    Yes, I did.

Q.    What did he say?

A.    He told me he had no knowledge of it and he does not smoke marijuana.

        MR. SEVERO:  Your Honor, just so that I only interrupt once --

        THE COURT:  Continuing objection.  Thank you, Counsel.

BY MR. CREIGHTON:

Q.    Now, during the traffic stop, did you ask Serobyan

1    about his movements prior to the stop?

2    A.    Yes, I did.

3    Q.    What, if anything, did he say?

4    A.    Mr. Serobyan told me that had taken a bag and thrown

5    it in trash dumpsters one block to our west prior to us

6    stopping him.

7    Q.    What did you do next?

8    A.    I explained to Serobyan that, based on the fact that

9    he was driving a car and he didn't have any knowledge of

10   who the owner was, no documentation of the vehicle, the

11   fact that he told me he doesn't have a job, yet he had $200

12   currency in his pocket, and the fact that I found what I

13   believed to be marijuana in the vehicle, I told him that I

14   suspected that he was selling marijuana, and the bag that

15   he was seen taking to the dumpster, as he stated, contained

16   more marijuana.

17   Q.    So what -- did you ask him to do anything?

18   A.    Yes.  I told him that we were conducting a narcotics

19   investigation, and I would like him to take me to where the

20   dumpster was that he discarded the bag so that I could

21   investigate further.

22        MR. CREIGHTON:  Your Honor, permission to publish

23   315, previously admitted, page 1.

24        THE COURT:  Yes.

25   ///

1    BY MR. CREIGHTON:

2    Q.    Can you look at this map?

3    A.    Yes.

4    Q.    Do you recognize the area depicted in this map?

5    A.    Yes, I do.

6    Q.    Do you see a location on Winona Boulevard where you

7    stopped him?

8    A.    Yes.

9    Q.    Can you point that out to the jury?

10   A.    (Indicating.)

11   Q.    Now, after you asked him to go back to the other

12   location with you, where did you take him?  When you

13   arrived at 1562 Harvard Avenue -- Boulevard, what did you

14   do?

15   A.    We walked down a driveway to the rear of an

16   apartment complex, 1562 Harvard.  And upon entering the

17   parking area, I saw two --

18   Q.    Oh, I'm sorry.  That was my next question.

19         What did you see when you entered the parking area?

20   A.    I saw two trash dumpsters as well as a Mercedes-Benz

21   that was parked adjacent to the trash dumpsters.

22   Q.    Did you ask Serobyan anything at this point?

23   A.    I asked him if he threw the bag into either of those

24   trash dumpsters.

25   Q.    What was his response?

1    A.    He said he could not recall.

2    Q.    What did you do next?

3    A.    I recalled that I had just recovered a Mercedes-Benz

4    key from his pocket, to which he stated he had no knowledge

5    of.  The type of key that it was, it had buttons on it, so

6    it could be manipulated.  When I manipulated the buttons on

7    the key, the Mercedes-Benz that was parked next to the

8    trash dumpster activated and was unlocked.

9    Q.    Now, asking you about that Mercedes, did you run the

10   license plate on that Mercedes?

11   A.    Yes, I did.

12   Q.    Where did that vehicle come back registered to?

13   A.    To one apartment complement south of the apartment

14   complex that we were at.  I believe the address was -- the

15   last two digits were 58.

16   Q.    Now, at this point, when you manipulated the key and

17   the car responded, did Serobyan say anything?

18   A.    No.

19   Q.    Now, I'm going to ask you to turn to Exhibit 320,

20   which will be in a binder behind you.

21         MR. CREIGHTON:  If I could ask for the assistance of

22   the clerk in helping him to locate that appropriate binder.

23   BY MR. CREIGHTON:

24   Q.    So we're looking for Exhibit 320.

25   A.    Okay.

1    Q.    And if you would just quickly flip through these

2    documents.

3          Do you recognize these documents?

4    A.    Yes, I do.

5    Q.    What are they?

6    A.    The items that I recovered from the Mercedes.

7    Q.    Are there photographs of more than just the items?

8    A.    Yes.

9    Q.    Do these photographs accurately depict the scene on

10   that afternoon?

11   A.    Yes, they do.

12         MR. CREIGHTON:  Your Honor, move to admit

13   Exhibit 320 and permission to publish.

14         THE COURT:  Yes.

15            (Exhibit 320 admitted into evidence.)

16   BY MR. CREIGHTON:

17   Q.    I'm showing you page 1 of Exhibit 320.  What is

18   that?

19   A.    That would be the driveway that we walked down to

20   where the dumpsters and the Mercedes were located.

21   Q.    I'm now showing you exhibit -- page 2 of that

22   exhibit, what is that?

23   A.    That is the Mercedes key in the door of the

24   Mercedes.

25   Q.    And I'm showing you page 3 of that exhibit, what is

 1   that?

 2   A.    A picture of the rear of the Mercedes that was

 3   located.

 4   Q.    Now, did you search this vehicle?

 5   A.    Yes, I did.

 6         MR. CREIGHTON:  Your Honor, may I have a moment?

 7         THE COURT:  Yes.

 8   BY MR. CREIGHTON:

 9   Q.    Did you search the interior of the vehicle?

10   A.    Yes, I did.

11         MR. CREIGHTON:  With the assistance of the courtroom

12   deputy, I would like to show the witness Exhibit 322.

13         THE COURT:  Okay.

14         MR. CREIGHTON:  It's a physical exhibit on top.

15         THE CLERK:  Thank you.

16   BY MR. CREIGHTON:

17   Q.    Do you recognize this exhibit?

18   A.    Yes, I do.

19   Q.    What is it?

20   A.    These are the items I recovered from the map pocket

21   on the driver's seat of the Mercedes.

22   Q.    Are they in substantially the same condition as when

23   you recovered them?

24   A.    They appear to be.

25         MR. CREIGHTON:  And, Your Honor, in the interest of

1  saving time, I'm just going to ask the witness --

2  BY MR. CREIGHTON:

3  Q.    Is there a name that appears on any of those

4  documents?

5  A.    Yes, there is.

6  Q.    What is that name?

7  A.    Souren Serobyan.

8  Q.    Now, did you also search --

9        MR. CREIGHTON:  Actually, Your Honor, may I have

10  those documents, please?

11        THE COURT:  Sure.

12        MR. CREIGHTON:  And move to admit.

13        THE COURT:  They're received.

14          (Exhibit 322 admitted into evidence.)

15        MR. CREIGHTON:  Permission to publish?

16        THE COURT:  Yes.

17        MR. CREIGHTON:  I'm sorry.  I'm getting a little bit

18  of a glare here.

19  BY MR. CREIGHTON:

20  Q.    So is this the name that you just read?

21  A.    Yeah.

22  Q.    Is that Souren Serobyan?

23  A.    Yes, it is.

24  Q.    Thank you.

25        Did you also search the trunk of the Mercedes?

1    A.     Yes.

2           MR. CREIGHTON:  Your Honor, with the assistance of

3    the courtroom deputy, I'd like to show the witness

4    Exhibit 321.  It's a physical exhibit.

5           THE COURT:  Okay.

6    BY MR. CREIGHTON:

7    Q.     Would you take a look at this exhibit.  Do you

8    recognize this?

9    A.     Yes, I do.

10   Q.     What is it?

11   A.     It's a bag that I located in the trunk of the

12   Mercedes.

13   Q.     Is it in substantially similar condition?

14   A.     It appears to be.

15          MR. CREIGHTON:  Move to admit and permission to

16   publish.

17          THE COURT:  It's received, and you may publish.

18            (Exhibit 321 admitted into evidence.)

19   BY MR. CREIGHTON:

20   Q.     Now, if I may ask you, would you hold that exhibit

21   up so the jury can see it.

22   A.     (Witness complies.)

23   Q.     Now, when you saw this bag in the trunk, did you ask

24   Serobyan about the bag?

25   A.     I believe I did.

1    Q.    Was the bag closed at this point?

2    A.    Yes.

3    Q.    What, if anything, did Serobyan say about the bag?

4          MR. SEVERO:  Speculation, based on his last answer.

5          THE COURT:  Overruled.

6    BY MR. CREIGHTON:

7    Q.    What, if anything, did Serobyan say about the bag?

8    Excuse me.

9    A.    Essentially, he stated that it was the bag that he

10   put in the trunk.  However, he didn't know that there were

11   guns inside of it.

12   Q.    Okay.  Now, at this point, did you ask your partner

13   to do anything?

14   A.    Yes.

15   Q.    What did you ask him to do?

16   A.    I asked him to go to 1558 Harvard Avenue, which was

17   the adjacent --

18   Q.    Now, if I may pause you there, I'm going to show you

19   what's previously been admitted as Exhibit 315.

20         Do you recognize this photo?

21   A.    Yes.

22   Q.    What is it?

23   A.    This is the front of the apartment building where

24   the dumpsters and Mercedes were located.

25   Q.    Now, I'm going to zoom in here.

```
1              What are the numbers on this building?

2    A.     It appears to be a 15.  I can't tell what that is

3    with the tree there, but the last digit is 8.  It looks

4    like 1558 and 1562.

5    Q.     So the numbers for both of those addresses appear on

6    the same building?

7    A.     Yes.

8    Q.     Did you determine whether 1558 was a different part

9    of this building?

10   A.     Not at that time.

11   Q.     But both those numbers appear on the same building;

12   is that correct?

13   A.     Yes.

14   Q.     Now, if I may repeat and go back to my question,

15   what did you ask your partner to do?

16   A.     I asked him to contact the residents at 1558 where

17   the Mercedes was registered to, to inquire about the

18   firearms that we had just located in the trunk.

19          MR. SEVERO:  Could I get the witness to pull the

20   microphone closer?

21          THE COURT:  Yes, please.

22          MR. SEVERO:  Thank you.

23   BY MR. CREIGHTON:

24   Q.     What, if anything, did Serobyan do when you said

25   that?
```

1    A.    He spontaneously stated that his father lived there

2    and he did not want us to contact his father and that the

3    car, the Mercedes, belonged to his father.

4    Q.    Did he say anything about the bag at that point?

5    A.    He stated that, since we had seen him with the bag,

6    that the bag was his; however, he had no knowledge that

7    there were firearms inside of the bag.

8          MR. CREIGHTON:  Now, with the Court's permission, I

9    am publishing Exhibit 320, which has been previously

10   admitted, page 4.

11   BY MR. CREIGHTON:

12   Q.    What does this photograph depict?

13   A.    It is the bag inside the trunk with the firearms

14   located in the bag.

15   Q.    And how many firearms are there?

16   A.    Three.

17   Q.    And just based on looking at this photograph, what

18   can you tell us about the silver firearm on the left?

19   A.    It's a .38-caliber revolver, identical to the one

20   that I carry on duty as a law enforcement officer, as a

21   backup weapon.

22   Q.    So you recognize the firearm?

23   A.    Yes, I do.

24   Q.    Directing you to page 5 of Exhibit 320, what is this

25   photograph?

1   A.     It's a photograph of the revolver with the cylinder

2   open, as well as depicting the model type of the revolver,

3   which is Airweight.  It's given that name for --

4   Q.     Let me pause you there.

5          I'm showing you page 6 of Exhibit 320.  What is

6   this?

7   A.     It's a semiautomatic pistol.

8   Q.     And that was also from the blue bag?

9   A.     Yes.

10  Q.     And showing you page 7, what is this?

11  A.     A Tec .22-caliber firearm.

12  Q.     And based on your training and experience with

13  firearms, is it a semiautomatic weapon?

14  A.     I believe it to be a submachine gun, rapid fire, not

15  semiautomatic.

16         THE COURT:  In both of those last two pictures,

17  there were magazines also with the guns.  Were there

18  magazines at the scene?

19         THE WITNESS:  Yes, they were, Your Honor.

20         THE COURT:  Were they loaded?

21         THE WITNESS:  The magazines were loaded; however,

22  they were not inserted into the weapons.  They were lying

23  adjacent to them in the bags.

24         THE COURT:  Okay.

25  ///

1   BY MR. CREIGHTON:

2   Q.    Now, with the Court's permission and with the

3   assistance of Detective Gonzalez, I'd like to show you

4   exhibits -- the firearms exhibits, Exhibits 316, 317, 319

5   and 318.

6        And if could have her bring those to the witness,

7   Your Honor.

8        THE COURT:  Yes.

9   BY MR. CREIGHTON:

10  Q.    Now, Detective Davis, would you look at Exhibit 316,

11  please.

12       And without showing it to the jury, if you would

13  open it up and just inspect it.

14  A.    Okay.

15  Q.    Do you recognize it?

16  A.    Yes, I do.

17  Q.    What is it?

18  A.    It's the firearm that I recovered from the trunk of

19  the vehicle, the semiautomatic pistol.

20  Q.    Is it in substantially similar condition?

21  A.    Yes.

22  Q.    Would you -- and I'm sorry.  What is the exhibit

23  number on the box?

24  A.    316 -- oh, I'm sorry, 317.

25  Q.    Okay.  Can you find Exhibit 316, please.

1    A.    316.  Oh.

2    Q.    Okay.  Do you recognize that?

3    A.    Yes.

4    Q.    What is it?

5    A.    It's the Airweight .38-caliber revolver that I

6    recovered from the trunk of the Mercedes.

7    Q.    Is it in substantially similar condition?

8    A.    Yes, it is.

9          MR. CREIGHTON:  Your Honor, move to admit

10   Exhibit 316 and permission to publish?

11         THE COURT:  Yes.

12          (Exhibit 316 admitted into evidence.)

13   BY MR. CREIGHTON:

14   Q.    Detective Davis, would you hold that weapon up and

15   show it to the jury with the barrel down, please.

16         Now, is there anything unusual about this weapon?

17   A.    Yes.

18   Q.    What is it?

19   A.    It does not have a hammer.

20   Q.    Can you demonstrate with your finger?

21   A.    Typically, the hammer would be here on the firearm.

22   Q.    Now, you said yourself that you carry a weapon like

23   this, this make and model, as your backup weapon.  Why do

24   you do that?

25         MR. SEVERO:  Objection, irrelevant.

```
 1            THE COURT:  Sustained.

 2    BY MR. CREIGHTON:

 3    Q.    Detective Davis, what is the point of not having a

 4    hammer on the back of a revolver?

 5            MR. SEVERO:  Objection, no foundation.

 6            THE COURT:  Overruled.

 7            THE WITNESS:  The point of not having a hammer -- I

 8    correct myself.  There is a hammer.  It's internal.  It's

 9    not an external hammer.  It is so that it can be carried

10    and concealed upon the person.

11            And for example, if I'm in a situation, in a fight

12    or something violent where I need to use my backup weapon,

13    I can remove the weapon from my pocket without the hammer

14    snagging on any type of clothing.

15    BY MR. CREIGHTON:

16    Q.    Thank you.  Now, would you return that to the box,

17    please.

18            And if you would turn to Exhibit 317.  Do you

19    recognize it?

20    A.    Yes.

21    Q.    What is it?

22    A.    It's the 9-millimeter semiautomatic pistol that I

23    recovered from the Mercedes.

24    Q.    Is it in substantially similar condition?

25    A.    Yes.
```

1          MR. CREIGHTON:  Your Honor, move to admit

2    Exhibit 317 and publish by reference.

3          THE COURT:  Yes.

4             (Exhibit 317 admitted into evidence.)

5    BY MR. CREIGHTON:

6    Q.    Would you hold that up for the jury, please.

7    A.    (Witness complies.)

8    Q.    Thank you.  And if you'd return that to the box.

9          Now, I'd ask you to look at Exhibit 319, which I

10   believe is not in a box but in that red well in front of

11   you.  Do you recognize this?

12   A.    Yes, I do.

13   Q.    What is it?

14   A.    It's the magazine to the Tec .22-caliber firearm.

15   Q.    Is there any ammunition in that exhibit?

16   A.    Not in the magazine, no, there's not.

17   Q.    In the exhibit itself, is there any ammunition?

18         You can open the bag.

19   A.    Yes, there is.

20   Q.    Do you recognize that?

21   A.    Yes.

22   Q.    What is it?

23   A.    They are the .22-caliber rounds that were recovered

24   from the magazine of the weapon.

25   Q.    And so these were in the magazine when you took the

1    magazine out of the blue bag?

2    A.    Yes.

3    Q.    Now, I'd ask you to put that back together.

4          MR. CREIGHTON:  And -- I'm sorry.  Have I moved to

5    admit this, Your Honor?

6          THE COURT:  I think you did, yes.

7          MR. CREIGHTON:  Okay.  Thank you.

8          THE COURT:  You may publish it.

9          MR. CREIGHTON:  I just -- permission to publish

10   and -- I'm sorry, Your Honor.

11         THE COURT:  It's been admitted, Counsel.

12           (Exhibit 319 admitted into evidence.)

13         MR. CREIGHTON:  I had a moment, Your Honor.

14   BY MR. CREIGHTON:

15   Q.    If we could turn to the box which is Exhibit 318,

16   would you open that.  Do you recognize it?

17   A.    Yes, I do.

18   Q.    What is it?

19   A.    It's the .22-caliber firearm that I recovered from

20   the trunk of the Mercedes.

21   Q.    Is it in substantially similar condition?

22   A.    Yes, it is.

23         MR. CREIGHTON:  Move to admit and permission to

24   publish by reference.

25         THE COURT:  Yes.

```
 1              (Exhibit 318 admitted into evidence.)

 2    BY MR. CREIGHTON:

 3    Q.      Now, would you hold that up for the jury.

 4    A.      (Witness complies.)

 5    Q.      Now, Detective Gonzalez, is this a type of firearm

 6    that you're familiar with?

 7    A.      Um --

 8    Q.      Do you own one of these?

 9    A.      No, I do not.

10    Q.      I'm sorry, Detective Davis.

11    A.      No, I do not.

12    Q.      Okay.  If we could put that away.

13            What did you do after you recovered the firearms?

14    A.      We photographed them.

15    Q.      What did you do with Mr. Serobyan?

16    A.      I advised him that he was under arrest for

17    possession of loaded firearms.

18            MR. CREIGHTON:  No further questions.

19            THE COURT:  Okay.  The firearms that were admitted

20    into evidence, and the ammunition, are going to be admitted

21    for reference only.

22            MR. CREIGHTON:  Thank you, Your Honor.  Yes, please.

23            THE COURT:  Cross-examination.

24            MR. SEVERO:  Thank you.

25    ///
```

## CROSS-EXAMINATION

BY MR. SEVERO:

Q.    Good morning.

A.    Good morning.

Q.    Do you have Exhibit 321 in front of you?

A.    No, I do not.

Q.    Is that the blue bag?  Do you now have it in front
of you?

A.    Yes.

Q.    And would you remove it from the -- its container.
How many handles do you see there?

A.    Just one.

Q.    And it's -- it's like a -- not navy blue, but
something lighter than that; correct?

A.    Similar, yes.

Q.    Did you recover a black bag with two handles at all
in this operation?

A.    I don't recall.

Q.    Is this the only bag you recovered?

A.    Yes.

Q.    Now, directing your attention back to when you first
caught sight of the Audi, you had been -- you're a Glendale
police officer; correct?

A.    Yes, I am.

Q.    But you were not on patrol that day, were you?

1   A.    I was on duty.

2   Q.    You were not on patrol that day, were you?

3   A.    Specifically to functioning as a patrol officer

4   responding to 911 calls, I work in my capacity as a Special

5   Enforcement Detail officer.

6   Q.    Were you on patrol in Glendale?

7   A.    Yes.

8   Q.    All right.  And as part of your patrol duties, it's

9   your responsibility to cross over to Los Angeles?

10   A.    Yes.

11   Q.    So you were patrolling Los Angeles?

12   A.    Yes.

13   Q.    And who asked -- were you asked to stop this car?

14   A.    Yes, I was.

15   Q.    By whom?

16   A.    If I recall correctly, Detective Michelle Gonzalez,

17   Glendale Police Detective Michelle Gonzalez.

18   Q.    Do you know where Detective Gonzalez was when she

19   asked you to do that?

20   A.    No, I do not.

21   Q.    Were you given a description of the vehicles?

22   A.    Yes.

23   Q.    Were you given plates?

24   A.    I do not recall.

25   Q.    Was it just a black Audi Q7?  Is that all you got?

1    A.    Very basic description, as I recall.

2    Q.    Had you seen the car before that day?

3    A.    No.

4    Q.    Did you position your vehicle directly behind the

5    Q7?

6    A.    Yes.

7    Q.    The Q7 has tinted rear windows, doesn't it?

8    A.    I believe it does.  I do not recall.

9    Q.    And you effected the stop because it had no plates?

10   A.    Yes.

11   Q.    Now, at any point before you effected the stop, did

12   you drive by the vehicle first?

13   A.    No.

14   Q.    You were always behind the vehicle before you

15   stopped it?

16   A.    Yes.

17   Q.    You were always directly behind the vehicle when you

18   stopped it -- before you stopped it?

19   A.    At one point, I moved slightly to the left so that I

20   could view the bottom corner of the driver's front

21   windshield to see if there was any DMV stickers on the

22   windshield, as is common with newer vehicles.

23   Q.    On the lower front corner of the driver's side?

24   A.    Either the driver's side or the passenger's side,

25   most commonly the passenger's side.

1    Q.    And the windows on that Q7 were tinted in the rear;

2    is that correct?

3    A.    I don't recall.

4    Q.    So you saw no sticker on the left, on the driver's

5    side?

6    A.    I didn't see any stickers on the windshield at all.

7    Q.    You were not part of a surveillance team that

8    Saturday, were you?

9    A.    I was not.

10   Q.    And were you informed as to why you -- they wanted

11   that Q7 -- strike that.

12         Were you informed by Detective Gonzalez why she

13   wanted that Q7 stopped?

14   A.    Yes.

15   Q.    So when you effected the stop, it was a pretext to

16   try to get into the car; correct?

17   A.    Coupled with the Vehicle Code violations that I

18   observed, yes.

19   Q.    Now, this individual you pulled out of the car, had

20   you been given a picture of that individual beforehand?

21   A.    No.

22   Q.    You didn't know who you were stopping at that point,

23   did you?

24   A.    That is correct.

25   Q.    You didn't even -- you were not given a name either?

1    A.    Correct.

2    Q.    All right.  And you found the Mercedes key in his

3    pocket?

4    A.    Yes.

5    Q.    And it's your testimony that you were able to

6    manipulate the buttons on the key to turn on the car?

7    A.    Yes.

8    Q.    Or not to -- sorry -- to open the car?

9    A.    Yes.

10   Q.    Is that correct?

11   A.    That is correct.

12   Q.    Is this the type of key that has no blade; it's just

13   what they call a fob, f-o-b?

14   A.    It does have a blade; however, there were still

15   buttons on the key.

16   Q.    The buttons were on the handle of the key?

17   A.    Correct.

18   Q.    How many buttons?

19   A.    I do not recall.

20   Q.    Is that the key that's shown in Exhibit 320, page 2

21   of 9?

22         MR. SEVERO:  May I publish?

23         THE COURT:  Yes.

24   BY MR. SEVERO:

25   Q.    Is this the key you got?

1    A.    Yes.

2    Q.    All right.  Would the button be on the side?

3    A.    Yes.

4    Q.    Other than this picture, did you take another

5    picture of the key?

6    A.    I don't believe so.

7    Q.    Were you the one who took the pictures?

8    A.    No, I was not.

9    Q.    Were these pictures taken at the scene of the stop?

10   A.    Yes, they were.

11   Q.    Do you know by whom?

12   A.    I do not recall.

13   Q.    Once you made the stop -- strike that.

14         At the point that you moved to the Mercedes, was it

15   just you and your partner?

16   A.    Yes.

17   Q.    Who was your partner?

18   A.    Officer Darby.

19   Q.    And what was the reason you needed to put the blade

20   in the -- in the driver's door -- or the door of the car?

21   A.    I didn't put it in, sir.

22   Q.    Is that how you opened the car?

23   A.    One of the ways.

24   Q.    Is that how you opened the car that day?

25   A.    Yes.

```
 1              THE COURT:  Is that how you opened the car?

 2              THE WITNESS:  Yes, it is.

 3    BY MR. SEVERO:

 4    Q.     When -- did you -- strike that.

 5              Any other officers arrive at the scene while you

 6    were conducting the search of the vehicle?

 7    A.     Yes.

 8    Q.     Who?

 9    A.     I believe my supervisor, Sergeant Anderson, and my

10    other partners, Officer Rosas and Officer Jimenez.

11    Q.     When -- when you opened the blue bag, it was in the

12    trunk of the car?

13    A.     Yes.

14    Q.     Did you open the trunk of the car with the key, the

15    blade?

16    A.     I believe so.

17    Q.     At the time that you recovered -- that you opened

18    the bag, did the weapons look similar to the photograph,

19    Exhibit 320.

20              MR. SEVERO:  May I publish, Your Honor?

21              THE COURT:  Yes.

22    BY MR. SEVERO:

23    Q.     Page 4?

24    A.     Yes, they did.

25    Q.     Is that how it looked?
```

1    A.    Yes.

2    Q.    I'm sorry.  That's how the weapons were positioned,

3    pretty much, in the bag?

4    A.    Yes.

5    Q.    So you just unzipped the bag, and a picture was

6    taken?

7    A.    Yes.

8    Q.    So the cartridge was out of the Tec?

9    A.    Yes, it was.

10   Q.    And there were bullets in the car in that cartridge?

11   A.    Yes.

12   Q.    With respect to the snub nose --

13   A.    Yes.

14   Q.    -- there were no bullets in it?

15   A.    Correct.

16   Q.    And with respect to the semiautomatic, there were no

17   bullets in that either?

18   A.    Correct.

19   Q.    Let me show you --

20         MR. SEVERO:  May I publish page 6 of Exhibit 320?

21         THE COURT:  Yes.

22   BY MR. SEVERO:

23   Q.    Do you see that?  Is that the gun on the -- on the

24   pavement?

25   A.    Yes, it is.

1  Q.    I'm going to direct your attention to this area

2  here.

3        Was the hammer pulled back, or did you do that?

4  A.    I did not do that.

5  Q.    The gun was not loaded, was it?

6  A.    Yes; correct.

7  Q.    Now, when you picked the gun -- strike that.

8        Did you take the guns out of the bag yourself?

9  A.    No, I did not.

10 Q.    Do you know who did?

11 A.    I believe my partner, Officer Darby.

12 Q.    Was he wearing gloves?

13 A.    Yes.

14 Q.    Were the weapons preserved for fingerprint analysis?

15 A.    Yes, they were.

16 Q.    Do you know if they were submitted for fingerprint

17 analysis?

18 A.    Yes, they were.

19 Q.    Without telling me what they are, do you know if

20 there were any results?

21 A.    They were negative for any prints.

22 Q.    So much for that.  All right.  So no, no

23 fingerprints?

24 A.    Correct.

25 Q.    You say you're not familiar with the Tec .22?

```
 1   A.      That is correct.

 2   Q.      You're not?

 3   A.      Not familiar with it.

 4   Q.      So your previous testimony about it being a

 5   submachine gun is sort of a guess, isn't it?

 6   A.      It's my basic knowledge of the firearm, being a

 7   professional law enforcement officer and prior military.

 8   When I state that I know the weapon, that means that I know

 9   the nomenclature as well as how it operates but --

10   Q.      So you have some --

11   A.      I have some knowledge, but not very intimate.

12   Q.      You didn't fire this -- any one of these weapons,

13   did you?

14   A.      No, I did not.

15   Q.      And you don't know if they were operable?

16   A.      Correct.

17           MR. SEVERO:  I have no other questions.

18           MR. PEREYRA-SUAREZ:  No questions, Your Honor.

19           MR. FLIER:  No questions, Your Honor.

20           THE COURT:  Redirect?

21           MR. CREIGHTON:  Nothing from the government.

22           THE COURT:  Okay.  You may step down.  Thank you

23   very much for coming in.

24           THE WITNESS:  Thank you, Your Honor.

25           THE COURT:  Next witness.
```

1          MR. ESTRADA:  Your Honor, the government recalls

2    Agent Stebbins.

3                        **JEREMY STEBBINS,**

4    GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, TESTIFIED FURTHER:

5          THE CLERK:  You may be seated, and you're reminded

6    you're still under oath.

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.  You may inquire.

9          MR. ESTRADA:  Thank you, Your Honor.

10                    <u>**DIRECT EXAMINATION**</u>

11   BY MR. ESTRADA:

12   Q.    Special Agent Stebbins, I want to take you back to

13   the wiretap calls in this case.

14         Yesterday, we finished up with some wiretap calls

15   dealing with three guns that were found on November 24,

16   2009.  Do you recall that?

17   A.    Yes, sir.

18   Q.    And there were calls involving defendant Darbinyan?

19   A.    Yes, sir.

20   Q.    Defendant Mugsy Ramirez?

21   A.    Yes, sir.

22   Q.    Defendant Gevork Kasabyan?

23   A.    Yes, sir.

24   Q.    Defendant Souren Serobyan.

25         Do you recall that?

1    A.    As well as defendant Artur Pembejian, yes, sir.

2    Q.    I forgot one.  So one other defendant?

3    A.    Yes, sir.

4    Q.    Now, we talked about calls that led up to the actual

5    seizure of firearms.  Were there also calls that took place

6    after the firearms were -- I shouldn't say after they were

7    seized -- after the arrest was made?

8    A.    Yes, sir.

9          MR. ESTRADA:  Now, with the Court's permission, I

10   would ask to play Exhibit 120 and ask the jurors to turn to

11   120A in their transcript books.

12         MR. FLIER:  Your Honor, what does this deal with?

13         MR. ESTRADA:  I'll give the preface again.

14         THE COURT:  Yes.

15         MR. ESTRADA:  These calls go to the racketeering

16   charges against defendant Darbinyan and defendant

17   Sharopetrosian, as well as one of the felon in possession

18   charges against defendant Darbinyan.

19         THE COURT:  Okay.

20         MR. ESTRADA:  I think we have a little volume

21   control issue, Your Honor.  We're going to try to figure

22   that out.

23         THE COURT:  Okay.

24                   *(Exhibit 120 played.)*

25   ///

1    BY MR. ESTRADA:

2    Q.    Now, Special Agent Stebbins, turning to the first

3    page of this call, do you have that in front of you?

4    A.    Yes, I do.

5    Q.    What is the date of this call?

6    A.    November 24, 2009.

7    Q.    What is the time of the call?

8    A.    Approximately 1:27 p.m.

9    Q.    Turning to page 2 of the transcript, who are the

10   participants in this call?

11   A.    Mike Darbinyan, Gevork Kasabyan, and an unknown male

12   in the background.

13   Q.    Now, turning to page 3 of the transcript, do you

14   have that in front of you?

15   A.    Yes, I do.

16   Q.    Second speaker from the top, Gevork Kasabyan, tells

17   Darbinyan (reading:)

18              "Yeah bro, it looks like they arrested Suro

19                on Harvard."

20         Based on your knowledge of the investigation, who is

21   Suro?

22   A.    Souren Serobyan.

23   Q.    Are you familiar with the location known as Harvard?

24   A.    Yes.

25   Q.    What's that location?

1    A.    It's a street in Hollywood where --

2          MR. SEVERO:  Objection, speculation.

3          THE COURT:  Overruled.

4          THE WITNESS:  It's a street in Hollywood where he

5    was arrested.

6    BY MR. ESTRADA:

7    Q.    Are you familiar with that street?

8    A.    Yes.

9    Q.    Were you familiar with the fact that Souren Serobyan

10   was arrested that day in the Harvard area --

11   A.    Yes.

12   Q.    -- of Hollywood?

13   A.    Yes.

14   Q.    Now, five speakers from the top, Darbinyan states

15   (reading:)

16              "What did they arrest him for?

17              "Gevork Kasabyan: Probably for guns.

18              "Darbinyan:  Oh mother fucker, man!

19              "Kasabyan:  Yeah bro, we're going crazy.  Me

20               and Hovo are going crazy.  Hovo just went

21               there, and I decided to let you know."

22         Based on your knowledge of the investigation, do you

23   know of an individual that went by "Hovo"?

24   A.    Yes.

25   Q.    What individual do you know that went by Hovo?

1   A.    There are several Hovos.

2   Q.    Were any of those Hovos associates of Darbinyan?

3   A.    There are many Hovos associated with Darbinyan.

4   Q.    Now, turning to page 4 of the transcript, do you

5   have that in front of you?

6   A.    Yes.

7   Q.    Several speakers from the top, Darbinyan states, "Oh

8   fuck.  Did the black and whites detain him?"

9         Based on your training and experience, what does the

10  term "black and whites" refer to in that context?

11  A.    It would be a black-and-white police car.

12        MR. ESTRADA:  Now, with the Court's permission, the

13  government would ask to play Exhibit 121 and ask the jurors

14  to turn to 121A in their transcript books.

15        THE COURT:  Okay.

16                  (Exhibit 121 played.)

17  BY MR. ESTRADA:

18  Q.    Special Agent Stebbins, during the first page of the

19  transcript at 121A -- do you have that in front of you?

20  A.    Yes, I do.

21  Q.    What's the date of that call?

22  A.    November 24, 2009.

23  Q.    What's the time of the call?

24  A.    Approximately 1:35 p.m.

25  Q.    Directing you to page 2 of the transcript, who are

1    the participants in this call?

2    A.    Mike Darbinyan and Gevork Kasabyan.

3    Q.    Now, turning to page 3 of the transcript, two

4    speakers from the top, Darbinyan states (reading:)

5              "Bro, I passed by and it wasn't a black and

6              white.  It was one of those really bad cars,

7              my friend.

8              "Gevork Kasabyan:  Yeah my friend.  They are

9              at their lot.  They have opened the garage

10             and are doing...they're at Suro's yard now

11             and are taking everything out of the garage.

12             "Darbinyan:  That's what I'm saying.  When I

13             passed by, it wasn't a black and white.  It

14             was one of those fucked up cars, the really

15             bad one."

16        Based on your knowledge of the investigation, what

17   type of vehicle was the Glendale Police Department using

18   that day when they stopped Souren Serobyan?

19   A.    It was an undercover, unmarked police car.

20   Q.    Not a black and white?

21   A.    No, sir.

22   Q.    And are those types of undercover cars that were

23   used that day to stop Souren Serobyan the types used by

24   gang enforcement detail?

25   A.    Yes.

**001396**

1    Q.    Now, turning to page 4 of the transcript, seven

2    speakers from the top, Gevork Kasabyan refers to Suro being

3    on probation.

4          Based on your knowledge of the investigation, was

5    Souren Serobyan on probation at this time?

6    A.    Yes, he was.

7    Q.    And turning to the last speaker on page 4 of 5,

8    Darbinyan states (reading:)

9                "Motherfucker, bro.  Let me hook up another

10                phone.  I'm going to discard this phone,

11                bro."

12         And going on to the next page, page 5 of 5:

13                "Gevork Kasabyan:  Discard that one dear.  I

14                can't talk with this one either.  I don't

15                want to talk with this one either.  It looks

16                really bad for me too."

17         Based on your knowledge of the investigation, were

18    you familiar with the targets of the investigation

19    discarding telephones?

20    A.    Yes.

21    Q.    How are you familiar with that?

22    A.    On several occasions, Darbinyan would talk about

23    having to get rid of his phone, or his criminal associates

24    would tell him hey, you need a new phone, and they'd talk

25    in code about getting a new phone.

001397

1    Q.    Based on your training and experience, is that a

2    tactic that's used by people involved in criminal activity,

3    to discard phones?

4    A.    Yes.

5    Q.    Why is that?

6    A.    If they believe that they've used the phone for too

7    long, they may think that they're being wiretapped or that

8    we're tracking their phone with GPS, something of that

9    nature.

10   Q.    Based on your training and experience, when officers

11   would do stops and seize items, would there often be talk

12   about discarding phones?

13   A.    Yes.

14         MR. ESTRADA:  Your Honor, at this time I'm going to

15   move on to a different set of calls, and I'll preface it by

16   saying these calls yield a seizure of firearms in the

17   Beverly Hills area.  It deals with the racketeering

18   conspiracy charge against defendants Darbinyan and

19   Sharopetrosian as well as the other felon in possession

20   charge against defendant Darbinyan.

21         THE COURT:  None of it has to do with

22   Mr. Parsadanyan?

23         MR. ESTRADA:  There are no calls in this segment

24   that will deal with Parsadanyan.

25         THE COURT:  Okay.

1    BY MR. ESTRADA:

2    Q.    Now, Special Agent Stebbins, we talked about a

3    seizure of three firearms on November 24, 2009.

4    A.    Yes.

5    Q.    At this time in the investigation, were agents and

6    officers with the Eurasian Organized Crime Task Force

7    attempting to seize other items from defendant Darbinyan?

8    A.    Yes, we were.

9    Q.    Based on looking through his phone calls?

10    A.    Yes.

11    Q.    Were firearms an important thing to seize?

12    A.    Yes.

13    Q.    Why is that?

14    A.    To us, firearms meant violence.  And the more

15    firearms we keep off the street, the less likely it was

16    there was going to be a shooting with Mr. Darbinyan.

17          MR. ESTRADA:  Your Honor, with the Court's

18    permission, I would ask to play Exhibit 125 and ask the

19    jurors to turn to 125A in their books.

20          THE COURT:  125?

21          MR. ESTRADA:  Yes, Your Honor.

22          THE COURT:  Okay.

23                  (Exhibit 125 played.)

24          THE COURT:  Okay.  We're going to break at this

25    time, ladies and gentlemen, for lunch.  We'll see you back

1    in at 1:00 o'clock.

2            Remember the admonishment not to discuss the case

3    among yourselves or with anybody else.

4            We'll see you back in at 1:00 o'clock.

5            THE CLERK:  All rise.

6                    *(At 12:00 p.m., the jurors exit the*

7                    *Courtroom, and the lunch recess was*

8                    *Taken until 1:00 p.m.)*

9                    *(Afternoon transcript filed*

10                   *Under separate cover.)*

11                        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **C E R T I F I C A T E**

2

3          I hereby certify that, pursuant to Title 28,

4    Section 753, United States Code, the foregoing is a true

5    and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United

9    States.

10          Certified on March 20, 2015.

11

12                              /s/ Katherine M. Stride
                                KATHERINE M. STRIDE, CSR RPR
13                              Official Court Reporter
                                License No. 11773
14

15

16

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5


6
   UNITED STATES OF AMERICA,      )
7                                 )
                  PLAINTIFF,      )
8                                 )
           vs.                    )   No. CR 11-00072(A)-RGK
9                                 )
   (1)  MHER DARBINYAN,           )
10   (4)  ARMAN SHAROPETROSIAN,    )
   (35) RAFAEL PARSADANYAN,       )
11                                 )
                  DEFENDANTS.     )
12   _____)

13


14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15              DAY 7, VOLUME II of II

16                 PAGES 1 - 126

17            WEDNESDAY, APRIL 2, 2014

18                  1:00 P.M.

19            LOS ANGELES, CALIFORNIA

20


21


22      _____

23          *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24              *255 East Temple Street*
          *Los Angeles, CA  90012*
25                *213.894.5949*


UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477
 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579
 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                        I N D E X

 2   GOVERNMENT'S WITNESSES:                          PAGE

 3   JEREMY STEBBINS
         DIRECT EXAMINATION (Resumed) BY MR. ESTRADA    4
 4       CROSS-EXAMINATION BY MR. SEVERO               27
         CROSS-EXAMINATION BY MR. FLIER                41
 5       REDIRECT EXAMINATION BY MR. ESTRADA           61
         RECROSS-EXAMINATION BY MR. SEVERO             67
 6       RECROSS-EXAMINATION BY MR. FLIER              72

 7   BRIAN BALLEWEG
         DIRECT EXAMINATION BY MR. CREIGHTON           74
 8       CROSS-EXAMINATION BY MR. SEVERO               85
         CROSS-EXAMINATION BY MR. FLIER                87
 9       REDIRECT EXAMINATION BY MR. CREIGHTON         88

10   DAVID HAMILTON
         DIRECT EXAMINATION BY MR. CREIGHTON           90
11       CROSS-EXAMINATION BY MR. SEVERO              107
         REDIRECT EXAMINATION BY MR. CREIGHTON        112
12
     SCOTT CAMERY
13       DIRECT EXAMINATION BY MS. YANG               114

14

15

16                     E X H I B I T S

17                       GOVERNMENT'S

18              NUMBER           ADMITTED

19               327              83  (by reference)

20               328              79

21               329              80

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001404**

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 2, 2014

 2                              1:00 P.M.

 3                              - - - -

 4        (In the presence of the jury:)

 5            THE COURT:  The record will reflect that all the

 6   jurors are in their respective seats in the jury box, including

 7   the alternates, witness is on the witness stand.

 8        Counsel, you may continue direct.

 9            MR. ESTRADA:  Thank you, your Honor.

10      JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

11                  DIRECT EXAMINATION (RESUMED)

12   BY MR. ESTRADA:

13   Q.   Now, Special Agent Stebbins, when we left at the break, we

14   were -- we had just played call 125.  Do you recall that?

15   A.   Yes.

16   Q.   And gone through the transcript at 125A?

17   A.   I'm sorry, sir?

18   Q.   And we had opened up the transcript to 125A?

19   A.   Yes.

20   Q.   Do you have that open in front of you?

21   A.   Yes, I do.

22   Q.   Now, looking at 125A, what's the date of that call?

23   A.   November 30, 2009.

24   Q.   What's the time of the call?

25   A.   Approximately 7:26 p.m.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Who are the participants in this call?

2   A.   Mike Darbinyan and Hakob Makseredzhyan.

3   Q.   Now, here we're in November 30, 2009.  Is that after the

4   arrest of November 24, 2009, where three firearms were found?

5   A.   Yes, it is.

6   Q.   Turning to page 2 of the transcript, do you have that in

7   front of you?

8   A.   Yes.

9   Q.   Ten speakers from the top, Darbinyan states, "I spoke to

10  Gago yesterday."

11       And then on page 3 of the transcript, eight speakers from

12  the top, Darbinyan states, "He says, 'Keep in mind that you

13  have a brother in Yerevan by the name, by the last name of

14  Tsarukyan.'"

15       Based on your knowledge of the investigation, who was that

16  Gago individual?

17  A.   His name is --

18            MR. SEVERO:  Calls for speculation and no foundation.

19            THE COURT:  Overruled.

20            THE WITNESS:  His name is Gagik Tsarukyan.  He goes by

21  "Dodi Gago."

22  Q.   Who is this individual?

23  A.   Dodi Gago is a powerful oligarch primarily located in

24  Armenia.

25  Q.   Is he known to have ties to organized crime figures?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes, he is.

 2              MR. SEVERO:  Move to strike that as hearsay.

 3              THE COURT:  Be stricken.

 4    BY MR. ESTRADA:

 5    Q.   Do you know him to have ties to organized crime figures?

 6              MR. SEVERO:  Object.

 7              THE WITNESS:  Yes, I do.

 8              MR. SEVERO:  Your Honor, maybe I can get an objection

 9    in before an answer comes out.

10              THE COURT:  Okay.

11              MR. SEVERO:  The objection is, I'll move to strike the

12    answer again on grounds of speculation.

13              THE COURT:  Sustained.

14         Unless you can lay a foundation as to how he knows.

15    BY MR. ESTRADA:

16    Q.   Why don't we do that.  Turn to page 4, please.

17              THE COURT:  Page 4 of the exhibit?

18              MR. ESTRADA:  4 of 5, Exhibit 125A.

19              THE COURT:  Okay.

20    BY MR. ESTRADA:

21    Q.   Five speakers from the bottom, Darbinyan states, "We --

22    our share from here.  Then Pzo came over."

23         HM, "Yeah."

24         Darbinyan, "Pzo a couple of times."

25         HM, "He rebuked him."
```

```
 1        Darbinyan, "He didn't rebuke.  He didn't rebuke.  I

 2   rebuked him."

 3        And I'll stop there.  Are you familiar with who "Pzo" is?

 4   A.   Yes.

 5   Q.   Who is "Pzo"?

 6   A.   Armen Kazarian.

 7   Q.   Does it appear from the call and defendant's own

 8   statements that this Gago individual had contacts with "Pzo"?

 9   A.   Yes.

10             MR. SEVERO:  Objection, calls for speculation.

11             THE COURT:  Sustained.

12   BY MR. ESTRADA:

13   Q.   Does defendant admit that there was contact between "Pzo"

14   and Gago?

15             MR. SEVERO:  Objection, your Honor.  The best evidence

16   is the admission.

17             THE COURT:  Is the --

18             MR. ESTRADA:  Your Honor, it's his own admission.

19   It's very simple.

20             THE COURT:  Counsel, are you saying that the document

21   speaks for itself?

22             MR. SEVERO:  Yes.

23             THE COURT:  Sustained.

24   BY MR. ESTRADA:

25   Q.   Who's "Pzo"?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  Asked and answered.  How many times are

 2   we going --

 3            THE COURT:  He's answered it.

 4   BY MR. ESTRADA:

 5   Q.   Have you investigated "Pzo"?

 6   A.   Yes.

 7   Q.   And do you know him to have been indicted in an organized

 8   crime case?

 9            MR. SEVERO:  Objection, that --

10            MR. ESTRADA:  He's asked for foundation, your Honor.

11   We're laying foundation.

12            MR. SEVERO:  No relevance.

13            THE COURT:  Counsel, let's not talk over each other.

14       The objection is what?

15            MR. SEVERO:  No foundation and relevance.

16            THE COURT:  Okay.  Overruled.

17            THE WITNESS:  Yes.  I arrested Armen Kazarian.

18   BY MR. ESTRADA:

19   Q.   On an indictment?

20   A.   Yes.

21   Q.   What was he indicted for?

22   A.   Conspiracy to commit healthcare fraud, RICO, and

23   extortion.

24   Q.   When you say RICO, is that racketeering conspiracy?

25   A.   Yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.    Is he known to be an organized crime figure?

2   A.    Yes, he is.

3   Q.    And now turning to page 2 of the transcript, do you have

4   that in front of you?

5   A.    Yes, I do.

6   Q.    Ten speakers from the top, Darbinyan states, "I spoke to

7   Gago yesterday."

8         HM, "You spoke to him, bro?"

9         Darbinyan, "Yeah, I am going to gift him a gun today.  One

10  of my guns.  You know I had an Omega, a crazy thing."

11        Based on your training, experience, what's an Omega?

12  A.    The Omega is a rifle.

13  Q.    Type of rifle?

14  A.    Yes.

15        MR. ESTRADA:  Your Honor, the government requests

16  permission to play Exhibit 126 and asks the jurors turn to 126A

17  in their books.

18        THE COURT:  Okay.

19    (Audio played.)

20  BY MR. ESTRADA:

21  Q.    Now, Special Agent Stebbins, turning to the first page of

22  the transcript at 126A, do you have that in front of you?

23  A.    Yes, I do.

24  Q.    What's the date of that call?

25  A.    November 30, 2009.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What's the time of the call?

 2   A.   Approximately 7:32 p.m.

 3   Q.   Who are the participants in that call?

 4   A.   Mike Darbinyan and Armen Sarkissian.

 5   Q.   Is this the same date as the call before it?

 6   A.   Yes, it is.

 7   Q.   Turning to page 2 of the transcript, do you have that in

 8   front of you?

 9   A.   Yes.

10   Q.   Six speakers from the bottom -- I would say eight speakers

11   from the bottom, Darbinyan states, "Did you speak with your

12   friend?"

13        Sarkissian, "With whom?"

14        Darbinyan, "With Cham."

15        Based on your knowledge of the investigation, who's

16   "Cham"?

17   A.   Artur Pembejian.

18   Q.   Was that a name that he went by?

19   A.   Yes.

20   Q.   Now, turning to page 6 of 6 of the transcript at 126A, do

21   you have that in front of you?

22   A.   Yes, I do.

23   Q.   Seven speakers from the bottom, Darbinyan states, "Let me

24   get there.  Call Cham now and say, 'Bro, is that toy nice?'

25   But don't tell him that you spoke with me."
```

```
 1        Based on your training, experience, what does the term

 2   "toy" refer to?

 3   A.   A gun.

 4        MR. ESTRADA:  Your Honor, the government requests

 5   permission to play Exhibit 127 and asks that the jurors turn to

 6   127A in their books.

 7        THE COURT:  Yes.

 8        (Audio played.)

 9   BY MR. ESTRADA:

10   Q.   Special Agent Stebbins, turning to the first page of that

11   transcript at 127A, do you have that in front of you?

12   A.   Yes, I do.

13   Q.   What's the date of that call?

14   A.   December 1, 2009.

15   Q.   So now we're on the next day after the previous call?

16   A.   That's correct.

17   Q.   What's the time of this call?

18   A.   Approximately 9:29 p.m.

19   Q.   Who are the participants?

20   A.   Mike Darbinyan, Artur Pembejian.

21   Q.   Is Artur Pembejian the person also known as "Cham"?

22   A.   Yes, it is.

23   Q.   Turning to page 2 of that transcript, do you have that in

24   front of you?

25   A.   Yes, I do.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Six speakers from the top, Pembejian states, "Yeah?  They
 2   called."
 3        Darbinyan, "So what."
 4        Pembejian, "They went somewhere.  He said, 'We are going
 5   down to Montage, bro.  Will you come down to Montage?'"
 6        And towards the bottom, Pembejian refers to picking up
 7   Darbinyan.
 8        Are you familiar with the location known as the Montage?
 9   A.   Yes.
10   Q.   What's that location?
11   A.   It's a nice hotel in Beverly Hills.
12        MR. ESTRADA:  Your Honor, the government requests
13   permission to play Exhibit 128 and asks the jurors turn to 128A
14   in their book.
15        THE COURT:  Okay.
16        (Audio played.)
17   BY MR. ESTRADA:
18   Q.   Special Agent Stebbins, turning to the first page of the
19   transcript at 128A, do you have that in front of you?
20   A.   Yes, I do.
21   Q.   What's the date of the call?
22   A.   December 1, 2009.
23   Q.   What's the time of the call?
24   A.   Approximately 9:35 p.m.
25   Q.   Who are the participants in this call?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Mike Darbinyan, Artur Pembejian.

2    Q.    And is this the same day as the call before it?

3    A.    Yes, it is.

4    Q.    Approximately how long after the previous call was this

5    one?

6    A.    Approximately six minutes.

7    Q.    Now, turning to page 2 of 3 of the transcript, five

8    speakers from the bottom, Darbinyan states, "But can you

9    please -- that thing nicely with a --"

10         Pembejian, "Yeah, that is what I was thinking, you know."

11         Darbinyan, "Because we cannot take it and go there just

12   like that."

13         Pembejian, "And go in."

14         "That thing" that's referred to, based on your knowledge

15   of the investigation, what did you believe that referred to?

16   A.    The Omega rifle.

17         MR. ESTRADA:  Your Honor, the government requests

18   permission to play Exhibit 129, asks the jurors turn to 129A in

19   their books.

20         THE COURT:  Okay.

21         (Audio played.)

22   BY MR. ESTRADA:

23   Q.    Now, Special Agent Stebbins, turning to the first page of

24   the transcript at 129A, do you have that in front of you?

25   A.    Yes.

1    Q.   What's the date of the call?

2    A.   December 1, 2009.

3    Q.   Time of the call?

4    A.   Approximately 9:44 p.m.

5    Q.   Who are the speakers in this call?

6    A.   Mike Darbinyan, Artur Pembejian.

7    Q.   About how long after the previous call is this call?

8    A.   Approximately 10 minutes.

9    Q.   Turning to page 2 of 2 of the transcript at 129A, do you

10   have that in front of you?

11   A.   Yes, I do.

12   Q.   Four speakers from the top, Darbinyan states, "Bro, we

13   can -- that -- is there a jacket or anything on it, paper or

14   something.  If we take it -- it's not something -- if we take

15   it like that and go."

16        Pembejian, "Oh, I will tell Gohar to gift wrap it.  Fine."

17        Darbinyan, "Yeah, she will gift wrap it and leave the

18   handle out."

19        Based on your knowledge of the investigation, what did you

20   believe "it" referred to?

21        MR. SEVERO:  Objection, speculation, document speaks

22   for itself.

23        THE COURT:  Overruled.

24        THE WITNESS:  The gun.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MR. ESTRADA:

2    Q.   Did you learn that a rifle was in fact seized this same

3    evening?

4    A.   Yes, it was.

5    Q.   Now, was there surveillance that was conducted this

6    evening, on December 1st, 2009?

7    A.   Yes, sir.

8    Q.   Were you part of that surveillance?

9    A.   Yes, I was.

10   Q.   Where did the surveillance begin?

11   A.   Began at the residence of Artur Pembejian.

12   Q.   Where is that?

13   A.   In Burbank, California.

14   Q.   Around what time did the surveillance begin?

15   A.   I believe we went out after we started intercepting the

16   calls.  I think we got there around 10:00 o'clock.

17   Q.   I'm not going to ask you about all the surveillance, but

18   were many officers involved in the surveillance?

19   A.   Yes.

20        MR. ESTRADA:  Your Honor, I'm going to move on to

21   another set of calls.

22        THE COURT:  Okay.

23        MR. ESTRADA:  I will -- these calls will require the

24   next volume, Volume 3, of the books.

25        THE COURT:  Okay.  Why don't we just hand those out.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Are you going to be referring back to any of these?

2  Should they keep this volume?

3          MR. ESTRADA:  It may be better to keep it.  I don't

4  know what the defense is planning on doing, but may be better

5  to keep it.

6          THE COURT:  Okay.  They can put them on the floor in

7  front of them.

8          MR. ESTRADA:  It will be Volume 3, your Honor.

9          THE COURT:  Volume 3.

10          MR. ESTRADA:  And your Honor, I will preface this

11  segment of calls by saying this involves calls regarding

12  another firearm, pertains to the RICO conspiracy allegations

13  against defendant Darbinyan and Sharopetrosian, and also has

14  calls containing Rafael Parsadanyan and goes to his knowledge

15  regarding the scheme he was involved in.

16          THE COURT:  Okay.

17          MR. FLIER:  I'm going to object to "goes to his

18  knowledge," your Honor.  I think that's improper.  Submitted.

19          THE COURT:  Okay.  Overruled.

20  BY MR. ESTRADA:

21  Q.  Now, during the course of the investigation, were there

22  various calls in which Darbinyan referenced firearms and

23  possessing firearms?

24  A.  Yes.  There were many.

25          MR. SEVERO:  Move to strike as not the best evidence.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. ESTRADA:  Your Honor, he's well familiar with the

2     calls.

3          THE COURT:  Overruled.

4     BY MR. ESTRADA:

5     Q.   I'd like to play you another segment of calls, and we'll

6     start with Exhibit 131, with the Court's permission.

7          I'll ask that the jurors turn to 131A in their books.

8          (Audio played.)

9     BY MR. ESTRADA:

10    Q.   Now, Special Agent Stebbins, turning to the first page of

11    the transcript, do you have that in front you?

12    A.   Yes, I do.

13    Q.   What's the date of this call?

14    A.   October 14, 2009.

15    Q.   What's the time of the call?

16    A.   Approximately 11:32 a.m.

17    Q.   Who are the participants in this call?

18    A.   Mike Darbinyan and Rafael Parsadanyan.

19    Q.   And those are designated as Speaker 1 for Darbinyan,

20    Speaker 2 for Rafael Parsadanyan?

21    A.   That's correct.

22    Q.   Now, turning to page 2 of 3 of the transcript, do you have

23    that in front of you?

24    A.   Yes, I do.

25    Q.   Eight speakers from the top, Darbinyan states, "Bro, do

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    you know the number for Hazatun?"

 2         Parsadanyan, "I can find out, give me a minute."

 3         Darbinyan, "Call over there and tell Harut, 'This is Rafo,

 4    Mher's friend.'"

 5         Based on your knowledge of the investigation, what is

 6    Hazatun?

 7    A.   Hazatun is an Armenian restaurant in Glendale.

 8    Q.   Four speakers from the bottom, Parsadanyan states, "So it

 9    is Hazatun, Glendale, California."

10         Darbinyan, "I blew it up inside there.  That is why I am

11    saying it.  Did you get it?"

12         Parsadanyan, "Oh, yeah?  All right, I will call him right

13    now."

14         Darbinyan, "Tell him, bro Mher is saying is there anything

15    over there that needs to be fixed?  I don't know, how do -- how

16    do I know?"

17         Based on your knowledge of the investigation, had there

18    been a reference to a shooting at Hazatun the previous night?

19    A.   Yes.

20    Q.   And was that defendant Darbinyan who actually made the

21    reference to a shooting there the previous night?

22    A.   Yes.  He talked about shooting up the inside of the

23    restaurant.

24         MR. FLIER:  I'm going to object.  Calls for -- no

25    foundation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Overruled.
 2              MR. ESTRADA:  Your Honor, the government requests
 3    permission to play Exhibit 132 and asks the jurors turn to 132A
 4    in their book.
 5              THE COURT:  Yes.
 6          (Audio played.)
 7    BY MR. ESTRADA:
 8    Q.    Now, Special Agent Stebbins, turning to the first page of
 9    the transcript at 132A, do you have that in front of you?
10    A.    Yes, I do.
11    Q.    What's the date of that call?
12    A.    October 14, 2009.
13    Q.    What's the time of the call?
14    A.    Approximately 11:55 a.m.
15    Q.    Who are the participants in this call?
16    A.    Mike Darbinyan, Paramaz Bilezikchyan.
17    Q.    Again, who's Paramaz Bilezikchyan?
18    A.    He's one of the leaders of Armenian Power at this time,
19    and he's a defendant in this case.
20    Q.    Is this the same day as the previous call we heard between
21    Darbinyan and defendant Rafael Parsadanyan?
22    A.    Yes.
23    Q.    Turning to page 2 of the transcript, do you have that in
24    front of you?
25    A.    Yes, I do.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Seven speakers from the top, Paramaz Bilezikchyan states,

2    "That is what you are saying now.  Every time you drink, you

3    say the next day that you won't drink anymore.  Mother fucker,

4    I went to Hazatun and the people have no electricity and are

5    not operating.  All the wires have electrical short.  Hazatun

6    is closed mother fucker."

7         Darbinyan, "Yeah, I was going there now as well, bro."

8         Paramaz Bilezikchyan, "That thing, the toy, is there.

9    Just don't pick it up."

10        Darbinyan, "Huh?"

11        Bilezikchyan, "If needed.  That toy is there, just don't

12   pick it up."

13        Based on your training and experience, what does the term

14   "toy" refer to in this context?

15             MR. SEVERO:  Asked and answered.

16             THE COURT:  I'm sorry?

17             MR. SEVERO:  I'm sorry, Judge.  Asked and answered.

18             THE COURT:  Sustained.  Several times.

19   BY MR. ESTRADA:

20   Q.   Based on your knowledge of the investigation, in this

21   context what does the term "toy" refer to?

22   A.   A gun.

23   Q.   Now, turning to page 3 of 4, do you have that in front of

24   you?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Seven speakers from the bottom, Paramaz Bilezikchyan

2    refers to Edgar and Karo, and that Karo was already drunk and

3    did not come out of the restroom.

4         Based on your knowledge of the investigation, what does

5    "Edgar" refer to?

6    A.    Edgar Yerkanyan, another defendant in this case.

7    Q.    And Karo?

8    A.    Karo Yerkanyan, "Guilty" from Armenian Power, another

9    defendant in this case.

10         MR. ESTRADA:  Your Honor, the government requests

11   permission to play Exhibit 133 and asks the jurors turn to 133A

12   in their books.

13         THE COURT:  Yes.

14        (Audio played.)

15   BY MR. ESTRADA:

16   Q.    Now, Special Agent Stebbins, turning to the first page of

17   the transcript at 133A, do you have that in front of you?

18   A.    Yes, I do.

19   Q.    What's the date of this call?

20   A.    October 14, 2009.

21   Q.    What's the time of the call?

22   A.    Approximately 3:19 p.m.

23   Q.    Who are participants?

24   A.    Mike Darbinyan and Harut Khachaturyan.

25   Q.    Is this the same date as the previous call?

1    A.   Yes, it is.

2    Q.   Now, turning to the second page of the transcript, do you

3    have that in front of you?

4    A.   Yes, I do.

5    Q.   Five speakers from the top, Darbinyan states, "Yes, dear

6    Harut."

7        Based on your knowledge of the investigation, did you know

8    who Harut was?

9    A.   Harut was a manager at Hazatun at the time.

10   Q.   Was Hazatun a place where, based on the investigation,

11   targets in the investigation would often go to?

12   A.   Yes.

13   Q.   Eight speakers from the top, Harut states, "They came here

14   in the morning, dear."

15       Darbinyan, "Hmm."

16       Harut, "I am not going to say what and how.  They came,

17   and it's a good thing we covered all those places early in the

18   morning."

19       On this date, on October 14, 2009, did members of the task

20   force send officers to Hazatun restaurant?

21           MR. SEVERO:  Objection, hearsay.

22           THE COURT:  Sustained.

23   BY MR. ESTRADA:

24   Q.   Are you familiar with officers being sent to Hazatun

25   restaurant?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  Objection.  That's the same question in a

 2    different disguise.

 3            THE COURT:  Well, let me ask.  Are you familiar one

 4    way or the other?  Not -- just yes or no.

 5            THE WITNESS:  Yes, sir.

 6            THE COURT:  And what's it based on?

 7            THE WITNESS:  Speaking with those officers.

 8            THE COURT:  Sustained.

 9    BY MR. ESTRADA:

10    Q.   Well, in speaking to the officers, did you understand that

11    they were directed -- not what they told you, but they were

12    directed to go to Hazatun restaurant?

13            MR. SEVERO:  What's the difference?

14            THE COURT:  Sustained.

15            MR. ESTRADA:  It's not for the truth of the matter,

16    your Honor.

17            MR. SEVERO:  Irrelevant.

18            MR. ESTRADA:  Directing the --

19            THE COURT:  Counsel, sustained.

20    BY MR. ESTRADA:

21    Q.   You spoke to officers that day?

22    A.   Yes, I did.

23    Q.   Glendale Police Department officers?

24    A.   Yes.  I directed them.

25            MR. SEVERO:  Objection.  Move to strike the answer.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   First it was nonresponsive, and it involves hearsay.

 2           THE COURT:  No.  Overruled.

 3   BY MR. ESTRADA:

 4   Q.   On that date, did the task force attempt to investigate

 5   this incident that took place the night before?

 6   A.   Yes.

 7           MR. SEVERO:  Objection.  "Task force," it's -- again,

 8   it's vague and it's hearsay.  "Task force."  Who's --

 9           THE COURT:  Overruled.  You can cross-examine on it.

10           THE WITNESS:  Yes.

11   BY MR. ESTRADA:

12   Q.   And how did they -- and you, how did you attempt to

13   investigate this?

14   A.   I asked one of the robbery homicide detectives at Glendale

15   Police Department to go over to Hazatun and inspect the

16   location to see if there were gunshot bullet holes in the walls

17   and such.

18   Q.   Now, turning to page 3 of 4 of the transcript, do you have

19   that in front of you?

20   A.   Yes.

21   Q.   Nine speakers from the bottom, Harut states, "The only

22   thing we need is that we want to erase the video."

23        Darbinyan, "Yeah, erase that."

24        Harut, "Yeah, but we can't.  We don't know how.  Someone

25   is needed to come and take that out."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Darbinyan, an aside, "Bro, how can they erase the video?"

2      Harut, "I don't know, dear."

3      Darbinyan, an aside, "Video.  One second."

4      Harut, "If there is someone, send him here on your

5  behalf."

6      Darbinyan, "Yeah, let me call Rafo so he can come and

7  erase it."

8      Based on your knowledge of the investigation, what did

9  "Rafo" refer to?

10 A.   Rafael Parsadanyan.

11      MR. ESTRADA:  Your Honor, the government requests

12 permission to play Exhibit 134 and asks the jurors turn to 134A

13 in their books.

14      (Audio played.)

15 BY MR. ESTRADA:

16 Q.   Now, Special Agent Stebbins, turning to the first page of

17 the transcript at 134A, do you have that in front you?

18 A.   Yes, I do.

19 Q.   What's the date of this call?

20 A.   October 14, 2009.

21 Q.   The time of the call?

22 A.   Approximately 4:55 p.m.

23 Q.   Who are the participants?

24 A.   Mike Darbinyan, Rafael Parsadanyan.

25 Q.   Is this the same date as the previous call referring to

1    the video that needed to be erased?

2    A.    Yes, it is.

3    Q.    Turning to page 2 of the transcript, do you have that in

4    front of you?

5    A.    Yes, I do.

6    Q.    Seven speakers from the bottom, Darbinyan states, "Did you

7    ask him if there was anything to be done over there?"

8         Parsadanyan, "Yes, I asked there any anything.  He said,

9    'Bro, there's nothing to do, whatever was needed is already

10    done.'"

11        Darbinyan, "Glad.  I'm glad."

12        Parsadanyan, "I asked if there was any monetary issue tied

13    to that.  He said, 'Nothing, don't worry, let us just do this

14    and let's just do this, that's it.'"

15        Darbinyan, "Yeah, okay, bro."

16        Parsadanyan, "I picked this up, it is with me, I will take

17    it to the guy and he will start working on it."

18        Darbinyan, "Okay, dear."

19        Now, you mentioned that you attempted to investigate this

20    incident.

21    A.    Yes.

22    Q.    Was a surveillance video from the restaurant ever

23    recovered by the task force?

24    A.    No, it was not.

25    Q.    Or by law enforcement?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   No, it was not.

 2           MR. ESTRADA:  Just one moment, your Honor?

 3           THE COURT:  Yes.

 4           MR. ESTRADA:  No further questions, your Honor --

 5           THE COURT:  Cross?

 6           MR. ESTRADA:  -- at this time.

 7                        CROSS-EXAMINATION

 8   BY MR. SEVERO:

 9   Q.   Afternoon, sir.

10   A.   Good afternoon, sir.

11   Q.   In your investigation of this case, how many times was

12   Mr. Serobyan, Suro - what's his first name?

13   A.   Souren, sir?

14   Q.   Souren.  Thank you.  Serobyan, seen with Mr. Darbinyan?

15   A.   I don't recall any, sir.

16   Q.   Directing your attention to call 120 and Exhibit 120A, do

17   you have it in front of you, sir?

18   A.   Yes, sir.

19   Q.   Five speakers from the top.

20           May I have a moment?

21           THE COURT:  Yes.

22           MR. SEVERO:  Make sure everybody's got it.  That's

23   Exhibit 120A.

24   Q.   When you -- while we're doing that, were you at the site

25   of the stop for Mr. -- a Mr. Serobyan?
```

```
 1   A.    No, sir.

 2   Q.    Were you being advised during the search of the car as to

 3   what was going on?

 4   A.    Yes, sir.

 5   Q.    And five speakers from the top at Exhibit 120, Speaker 1

 6   says, "What did they arrest him for?"

 7         You see that?

 8   A.    Yes, sir.

 9   Q.    And the gentleman you've identified as Gevork Kasabyan, or

10   Kasabyan, says, "Probably for guns."

11         See that?

12   A.    Yes, sir.

13   Q.    At 1:27 p.m. on November 24th, had Mr. Serobyan already

14   been arrested?

15   A.    Yes, sir.

16   Q.    And in calls that you monitored, is this the first time

17   that Mr. Darbinyan, whom you've identified as Speaker 1, is

18   made aware of this arrest, to the best of your knowledge?

19   A.    I believe so, sir.

20   Q.    Directing your attention now to the next exhibit, 121A.

21         If everyone may turn to that, your Honor.

22             THE COURT:  Yes.

23   BY MR. SEVERO:

24   Q.    This is a call that's made at 1:34, 1:35 p.m.; is that

25   correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, sir.

2   Q.   And directing your attention to page 4 of 5 of the

3   transcript.  On direct examination you were asked about this.

4   Speaker 1, whom you have identified as Mr. Darbinyan, says,

5   "Let me hook up another phone.  I am going to discard this

6   phone, bro."

7        You see that?

8   A.   Yes, sir.

9   Q.   That's on November 24th?

10  A.   Yes, sir.

11  Q.   And the number that was intercepted, the telephone number

12  that was intercepted, was that 310-480-7070?

13  A.   Yes, sir.

14  Q.   And did you understand that discarding this phone meant

15  discarding the phone number as well?

16  A.   Yes, sir.

17  Q.   And just briefly if you could look at Exhibit 125A, the

18  first page.

19       If everyone can turn to that.

20       That's -- you have that in front of you, sir?

21  A.   Yes, sir.

22  Q.   How many days later is that phone call?

23  A.   Approximately six.

24  Q.   And what phone number is being used?

25  A.   310-480-7070.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   The same one that he said he was going to discard?

2  A.   Yes, sir.

3  Q.   And in fact, do you know if that phone was ever

4  discontinued until --

5  A.   Yes, sir.  On December 1st, when he was arrested, yes,

6  sir.

7  Q.   On December 1st?

8  A.   Yes, sir.

9  Q.   So it was never discarded, correct?

10  A.   No, sir.

11  Q.   So there was talk about discarding it, but no action on

12  it, correct?

13  A.   He -- no, sir.

14  Q.   Do you know what the name "Hovo" is short for, by any

15  chance?

16  A.   It could be short for a number of different things.

17  Ogannes, Hovik, Hovannes, Hovan- --

18  Q.   That's --

19  A.   Yeah.

20  Q.   -- what you've learned in your six years in the Eurasian

21  task force?

22          MR. ESTRADA:  Your Honor, object.

23          THE WITNESS:  That's one of the things I've learned,

24  yes, sir.

25          THE COURT:  Overruled.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   I didn't mean to argue with you.  I was just --

 3   A.   Yes, sir, I've learned that, yes.

 4   Q.   So that the reference to "Hovo" in Exhibit 120, without

 5   necessarily having to look at it, it doesn't tell you who that

 6   person is.

 7   A.   Not based on the context of that call, no, sir.

 8   Q.   Because much of what you interpret is based on what you

 9   believe the context to be, correct?

10   A.    I don't really do the interpreting of the calls, sir,

11   but --

12   Q.   No.  Once you get the call interpreted, you determine the

13   context of the call and then assign meaning, which you've come

14   to --

15   A.   Yes, sir.

16   Q.   -- provide in this trial, correct?

17   A.   Yes, sir.

18   Q.   Now, you testified that you intercept guns whenever you

19   can; is that correct?

20   A.   Whenever it's possible, yes, sir.

21   Q.   Because of the fear of violence?

22   A.   Yes, sir.

23   Q.   Directing your attention to 125 and 125A.  Not going to

24   play the call 125, but if you could look at 125.

25        Do you have it in front of you?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   Yes, sir.

2  Q.   All right.  Directing your attention to -- give me a

3  moment -- eight speakers from the bottom, page 2 of 5,

4  Speaker 1, whom you have identified as Mr. Darbinyan, says he's

5  going to gift him a gun today.  You see that?

6  A.   Yes, sir.

7  Q.   Now, you've testified that you are, based on training,

8  experience, or maybe this investigation, aware of what an Omega

9  rifle is?

10 A.   Yes, sir.

11 Q.   When was the first time you saw an Omega rifle?

12 A.   December 1st, 2009.

13 Q.   Hadn't seen one before, had you?

14 A.   No, sir.

15 Q.   It's kind of a rare piece, isn't it, to the best of your

16 knowledge?

17 A.   Yes, sir.

18 Q.   In fact, at some -- at one point there's a reference to it

19 being worth $40,000.

20 A.   Yes, he says that in the call.

21 Q.   You think that's an exaggeration?

22       MR. ESTRADA:  Object, your Honor, calls for

23 speculation.

24       THE COURT:  Overruled.

25       THE WITNESS:  I don't know the value of that gun, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. SEVERO:

2   Q.   Mr. Darbinyan was given to exaggeration at times; is that

3   correct?

4   A.   At times he exaggerated, yes, sir.

5   Q.   Now, I know you've testified earlier that Armen Kazarian

6   was indicted for healthcare fraud; is that correct?

7   A.   Healthcare fraud conspiracy, yes, sir.

8   Q.   Was he indicted in this case?

9   A.   New York.

10  Q.   Was he indicted in this case?

11  A.   No, sir.

12  Q.   Thank you.

13       Did you do any more follow-up on what this Omega rifle

14  was?

15  A.   As far as?

16  Q.   Was it a collector's gun?

17  A.   I don't recall doing the follow-up, but I believe others

18  in my unit would have done it.

19  Q.   And in fact, at page 126 -- not page.  Exhibit 126, it's

20  referred to in page -- starting at page 2 -- I'm sorry, 3 of 6,

21  that's where he says 30 to 40 thousand dollars, first speaker

22  at the top?  See that?

23  A.   Yes, sir.

24  Q.   And essentially the context of this conversation reveals

25  that it may have been a collector's gun, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, that's according to your client, sir.

2   Q.   All these conversations were heard before you dispatch --

3   anyone in the task force dispatched a police officer to make a

4   traffic stop on Mr. Darbinyan; is that true?

5   A.   If you could be more specific with regards to "all these

6   conversations," sir.

7   Q.   120 through 126.

8        Let me do this.  Do you know, do you have any knowledge as

9   to when Mr. Darbinyan was stopped that evening of December 1st?

10  A.   It was late at night, that's all I know.

11  Q.   So all these calls, given the times of the calls has

12  already been introduced during direct examination, had been

13  monitored and heard by the time he was stopped?

14  A.   Yes, sir.

15  Q.   And it was clear to you that this was a collector's gun at

16  that point, correct?

17       MR. ESTRADA:  Object, your Honor, misstates the

18  testimony and calls for speculation.

19       THE COURT:  Overruled.

20       THE WITNESS:  No, I still didn't know whether it was a

21  collector's item or not.  It was a gun.

22  BY MR. SEVERO:

23  Q.   It was a gun that was going to be given as a gift.  That's

24  what you understood from call 120.

25  A.   Yes, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    It wasn't a conversation where you felt there was going to
 2    be any violence anywhere, correct?
 3    A.    Based on those conversations?
 4    Q.    Based on those conversations.
 5    A.    No, sir.
 6    Q.    No violence anticipated, at least gleaned from the
 7    conversations?
 8            MR. ESTRADA:  Object, your Honor, calls for
 9    speculation.
10            THE COURT:  Sustained.
11            MR. ESTRADA:  Misstates the testimony.
12    BY MR. SEVERO:
13    Q.    You rely on the interpretations of the calls in order to
14    come into court and give it the meaning you wish it to have; is
15    that correct?
16            MR. ESTRADA:  Your Honor, that is argumentative.
17            THE COURT:  Sustained.
18            MR. SEVERO:  It is somewhat.
19            THE COURT:  Somewhat, yes.
20            MR. SEVERO:  So it's somewhat sustained, or --
21            THE COURT:  No.
22            MR. SEVERO:  Fully sustained.  All right.
23            THE COURT:  Fully sustained, yes.
24            MR. SEVERO:  All right.
25    Q.    You rely on the translations as given to you in order to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    testify about these calls, correct?

2    A.    No, sir.

3    Q.    You rely on the actual Armenian language that you hear

4    directly to testify about the calls, do you?

5    A.    In order to testify?

6    Q.    Yes.

7    A.    Or to testify about the calls?

8    Q.    Testify about the calls.

9    A.    The calls are based on surveillance, the activities that

10   we observe that night as far as the interpretation of the

11   calls.

12   Q.    All right.  So the interpretation of the call is made not

13   at the time that the call comes in, but five years later when

14   you've learned everything about the case, correct?

15   A.    No, sir, that's not correct.

16   Q.    On these calls, 120 through 126, the calls were clearly

17   about a gun.  It was specifically said that way, right?

18   A.    I think, going back to 120, is actually about the Serobyan

19   guns, and all the way to 126 is a different incident, so --

20   Q.    You're absolutely right.  I didn't mean to confuse you.

21   Starting at 125.

22   A.    Can you ask your question again, please, sir?

23   Q.    Sure.  In that -- in call 125, there is no reference to a

24   "toy," is there?

25   A.    I don't believe 125 has the "toy" reference.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    Right.

2    A.    126 does, I think.

3    Q.    125 specifically says "gun," doesn't it?

4    A.    Yes, it does.

5    Q.    There is no reference to a "thing," is there?

6    A.    I don't know, sir.  I'd have to review the whole

7    transcript again.

8    Q.    What, 125?

9    A.    Yes, sir.

10   Q.    Why don't you take a look.

11   A.    Actually, page 2, he says "I had an Omega, a crazy thing."

12   Q.    Okay.  We don't know what a crazy -- you know what "crazy"

13   means in this context?

14   A.    I mean, it would be an impressive gun, if that's what you

15   want to say.

16   Q.    Okay.  So that's -- this is your interpretation today of

17   "a crazy thing"?

18   A.    Yes, that would be my interpretation of what he just said.

19   Q.    Bottom line is, these calls at 125, 126 did not give you

20   the impression that the meeting between -- purported meeting or

21   anticipated meeting between Speaker 1, Mr. Darbinyan, and this

22   other person, Go -- that he was -- Gago, that this was going to

23   be an adversarial type of meeting.

24   A.    No, it didn't seem that way, sir.

25   Q.    Seemed like it was going to be a friendly type of thing,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  correct?

2  A.   Yes, sir.

3  Q.   And was it you that directed a traffic stop in this --

4  that evening of December 1st?

5  A.   Yes.

6  Q.   Who did you talk to?

7  A.   I believe I was speaking to a number of different officers

8  who were actually talking to the officers making the stop.

9  Q.   The officers that you were talking to were task force

10  officers or officers from local police departments?

11  A.   I was speaking with the task force officers.  They were

12  calling the local police departments.

13  Q.   All right.  Now, on that date of December 1st, 2009, was

14  there any surveillance of Mr. Darbinyan?

15  A.   That night?  Yes, sir.

16  Q.   That night?  At what point?

17  A.   I believe we started approximately 10:00 o'clock.

18  Q.   All right.  So nothing before 10:00 o'clock?

19  A.   I don't know, sir.  I'd have to review.

20  Q.   Where did the surveillance start?

21  A.   Where?

22  Q.   Yes.

23  A.   In Burbank, sir.

24  Q.   And who prepared the log?

25  A.   I don't remember who prepared the log.  One of the task

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    force officers, sir.

2    Q.   But you've seen the log, right?

3    A.   Yes, sir.

4    Q.   Did you review the log before coming to work -- to work.

5    To testify today?

6    A.   Not very recently, sir.

7    Q.   Were you part of the surveillance team?

8    A.   Yes, sir.

9    Q.   How many people were involved in that surveillance?

10   A.   Approximately four.

11   Q.   So were you at the site of the traffic stop?

12   A.   No, sir, I don't believe so.

13   Q.   You surveilled -- did you see Mr. Darbinyan that evening?

14   A.   I saw his car, yes, sir.

15   Q.   Did you see Mr. Darbinyan that evening?

16   A.   I don't recall whether I specifically saw him.

17   Q.   All right.  Now, with respect to the events of October

18   14th, 2009, Hazatun, or -- I'm probably chopping that up

19   something awful, but --

20   A.   It's close enough, sir.

21   Q.   -- is a family restaurant, isn't it?

22   A.   I don't know if it's a family restaurant, sir.  It's an

23   Armenian restaurant.

24   Q.   You ever been there?

25   A.   No, sir.  Inside.  I have not been inside, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Do you know, or have you seen a report prepared by

2    Glendale police on the visit to Hazatun?

3    A.   I don't recall seeing one.  I don't know if there was a

4    report prepared.

5    Q.   So it was you who asked someone in Glendale to go over to

6    the restaurant?

7    A.   Yes, sir.

8    Q.   Do you know who you spoke with?

9    A.   Officer -- I'm sorry.  Detective Pete Kmbikyan.

10   Q.   And when did you speak to him?

11   A.   The morning of October 14th.

12   Q.   Remember what time in the morning?

13   A.   I don't recall, sir.

14   Q.   Are you aware if Glendale made a visit in the morning?

15   A.   I don't know whether they went there in the morning or the

16   afternoon, sir.

17   Q.   Because there's no report, correct?

18   A.   I don't know if there's a report, sir.

19   Q.   Not one you've seen.

20   A.   I don't recall seeing a report, sir.

21   Q.   Directing your attention to 134 and 134A, do you have that

22   in front of you?

23   A.   Yes, sir.

24   Q.   This is a call that was previously testified to, on the

25   14th at nearly 5:00 o'clock, 4:54, 4:55 in the afternoon; is

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    that correct?

 2    A.    That's correct, sir.

 3    Q.    And Speaker 2 says, on page 2, second from the top, "I

 4    picked up this thing."

 5          Now, does "thing" have a different meaning in this call?

 6    A.    Yes, sir.

 7    Q.    You don't believe "thing" to be a gun, do you, in this

 8    call?

 9    A.    Not in this call.

10    Q.    Did you place that restaurant under surveillance on the

11    14th?

12    A.    I don't recall, sir.

13    Q.    Have you seen a surveillance log for that, for that day?

14    A.    I don't recall seeing a surveillance log for that day,

15    sir.

16          MR. SEVERO:  I have no other questions at this time

17    concerning this last portion of the testimony.  Thank you.

18          THE WITNESS:  Thank you, sir.

19          MR. PEREYRA-SUAREZ:  No questions, your Honor.

20          THE COURT:  Okay.  Counsel.

21          MR. FLIER:  Thank you, your Honor.

22                      CROSS-EXAMINATION

23    BY MR. FLIER:

24    Q.    Good afternoon.

25    A.    Good afternoon, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Mr. Parsadanyan has nothing to do with any type of weapon

 2   or racketeering issue with respect to this case and indictment;

 3   am I correct?

 4   A.   Could you be more specific as to "issue," sir?  Charges?

 5   Q.   Charges.

 6   A.   He is not charged, sir.

 7   Q.   Thank you.

 8        And please correct me if I'm wrong.  With respect to those

 9   tapes that we just heard, in particular, Exhibits 131 to 134,

10   does any of that information have to do with the 99 Cent Store?

11   A.   No, sir.

12        MR. FLIER:  Well, I move to strike the whole

13   testimony, your Honor, as to my client.

14        THE COURT:  I don't -- I will take that under

15   submission, and I may or may not at the end of the case.

16        MR. ESTRADA:  Your Honor, it goes to a legal

17   conclusion.

18        THE COURT:  I may or may not at the end of the case.

19        MR. FLIER:  Okay.  Thank you, your Honor.

20   Q.   Clearly, you have an opinion as to Exhibit No. 134 as to

21   what the "thing" references or connotates; am I correct?

22   A.   Yes, sir.

23   Q.   And as co-counsel just asked, we now know that, in your

24   opinion, has nothing to do with any type of weapon; am I

25   correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.    In this call, yes, sir.

2   Q.    And therefore, if we now know this call has nothing to do

3   with, let's say, the 99 Cent fraud issue, can I assume that you

4   believe the "thing" references something to do with a tape,

5   maybe?

6             MR. ESTRADA:  Your Honor, calls for a legal conclusion

7   as to whether it deals with a 99 Cent Store issue.

8             THE COURT:  Overruled.

9             THE WITNESS:  Can you repeat that, sir?

10  BY MR. FLIER:

11  Q.    In your impression, does the "thing" in Exhibit 134,

12  Exhibit 134, deal with a tape?

13  A.    Yes.  Picking up the video to erase it, yes, sir.

14  Q.    Okay.  Well, to erase it.  So let me ask about that,

15  please.

16        As co-counsel asked, do you have any reports from Glendale

17  or Burbank or Hollywood that there was any type of shooting,

18  altercation, or problem at that restaurant on October 13, which

19  would be the day before the call?

20  A.    I don't believe there are any police reports from that

21  night.

22  Q.    Now, clearly, if there were police reports, and based on

23  your knowledge of this case, you could have procured those; is

24  that correct?

25  A.    Yes, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And have you attempted to verify, investigate whether or

2   not there was any type of incident and/or police reports on

3   October 13th at that location?

4   A.   At that time we would have.

5   Q.   But based on the fact that we have no information about

6   that, can we assume there was no report or incident?  Is that

7   fair at least, sir?

8        MR. ESTRADA:  Object, your Honor, compound as to

9   report and incident.

10  BY MR. FLIER:

11  Q.   Forget the word "incident."  Let's just say report,

12  please.

13  A.   I don't know if there's a report.

14  Q.   Okay.  Thank you.

15       Now, with respect to your involvement, did you personally

16  ever go to that particular restaurant on October 13th?

17  A.   On October 13th?

18  Q.   Of 2009.

19  A.   No, sir.

20  Q.   Did you ever personally go to that restaurant on October

21  14th of 2009?

22  A.   Inside?

23  Q.   Yes.

24  A.   No, sir.

25  Q.   Do you know if any personnel from the task force or law

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   enforcement personnel ever actually entered that location, the

2   restaurant, on the 14th?

3   A.   Yes, sir.

4   Q.   Okay.  And did they?

5   A.   Yes, sir.

6   Q.   Are there photographs, any type of video of anything

7   within that restaurant's dwelling, inside of it?

8   A.   I don't believe so.  I believe they said that it was very

9   darkened inside.

10  Q.   So it seems like the impression is that -- and correct me

11  if I'm wrong.  Are you trying to imply that you think there was

12  a shootout at the restaurant?

13  A.   No, sir.

14  Q.   Okay.  So have you, on your own accord, ever spoke to

15  anyone who's affiliated with that restaurant, the one that

16  starts with an "H," Hazutson?  Have you done that, sir?

17  A.   No, sir.

18  Q.   So do you even know if that restaurant has any video

19  apparatus in any capacity?

20  A.   I believe Glendale PD asked them if they had video.

21  Q.   Okay.  Well, I'm asking do you specifically know that?

22  A.   No, I don't specifically know.

23  Q.   So with respect to the testimony today, you have no idea,

24  based on personal knowledge, whether or not there was any video

25  anything in that restaurant; am I correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Object, your Honor, vague, because the
 2    calls constitute knowledge.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Outside of the calls, sir?
 5              MR. FLIER:  Outside of the calls, yes.
 6              THE WITNESS:  Outside of the calls, no, sir.
 7    BY MR. FLIER:
 8    Q.   Do you have any information that my client picked up a
 9    tape?
10    A.   Outside of the calls?
11    Q.   Outside of the calls.
12    A.   No, sir.
13    Q.   The call does not reference anything that my client picked
14    up specifically; am I correct?
15    A.   It says he should pick up the video to erase it, sir.
16    Q.   So, in your impression, that means that somebody's asking
17    my client to pick up something and maybe do something with it,
18    correct?
19    A.   No.  He says video, and he says erase it.
20    Q.   I'm going to add those words, "video" and "erase it."  But
21    you have no information if my client erased anything, do you?
22    A.   Outside of the calls, no, sir.
23    Q.   Okay.  And with respect to any search of my client,
24    whether it's him, his business, his residence, anything, did
25    you find any erased tapes or videotapes that you thought had
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  relevance in this case?

2  A.    I don't know, sir.  I wasn't there at that search.

3  Q.    If you found a videotape, sir, you would tell the jury,

4  "I found a videotape."  Does that make sense?

5  A.    If there was a videotape of a shooting, yes, sir, I would

6  tell them I found a videotape of a shooting.

7  Q.    And since we have no information about any videotape, is

8  it a fair assessment that no tape has ever been recovered?

9  A.    No tape of the shooting has ever been recovered, sir.

10 Q.    Let me add a word there.  Forget no tape of the shooting.

11 I'm asking, did you find any videotape in any capacity that

12 relates to a restaurant?

13 A.    I don't believe so, sir.

14 Q.    The conversation appears that Mr. Darbinyan is asking my

15 client to help him and go pick something up.  Is that your

16 understanding?

17 A.    Yes.  A video.  Yes, sir.

18 Q.    Now, sometimes people who know each other ask friends to

19 do favors for them, or chores or requests; would you agree with

20 that?

21 A.    Yes, I do.

22 Q.    Now, with respect to the conversation that we're dealing

23 with, and I believe it was in Exhibit 134, but correct me if

24 I'm wrong, there again I notice the terminology "blew it up."

25       Do you recall seeing that in one of these exhibits?  And

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    I'll find it specifically, of course.  Do you remember that,
2    sir?
3    A.   Yes, I remember seeing that.
4    Q.   And I asked you that question today about what was your
5    impression on what "blew it up" means, and today, earlier, you
6    said it connotates a meaning about money; is that correct?
7    A.   I said it depends on the context, but in this context that
8    you're pointing out to me, it depends on money.
9    Q.   Okay.  But now we have another context, in your opinion;
10   is that correct?
11   A.   Yes, sir.
12   Q.   So what is your opinion about this context, "blew it up"?
13   What does it mean to you as the expert?
14   A.   He shot up the inside of the restaurant.
15   Q.   So it's your testimony that you believe potentially
16   Mr. Darbinyan did a criminal act in that restaurant, but you
17   never checked into it?  Is that what you're saying?
18   A.   No, sir.
19   Q.   Well, we already went over that you never went to the
20   restaurant, correct?
21   A.   Yes, sir.
22   Q.   Was Mr. Darbinyan arrested for any illegal conduct based
23   on acts on October 13th?
24   A.   No, sir.
25   Q.   So, normally, I would think, and correct me if I'm wrong,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    if there was a shootout in a public restaurant dealing with, as
 2    you say, AP gang members, don't you think that would have been
 3    investigated?  Does that make sense?
 4    A.    It was investigated, sir.
 5    Q.    Were any weapons found in the restaurant on the 13th or
 6    14th, based on your information?
 7    A.    No, sir.
 8    Q.    There's a mention on Exhibit 134 about a jacket.  Do you
 9    recall that?
10    A.    Yes, sir.
11    Q.    There's been some other references of jackets within some
12    of the tapes, too; would you agree?
13    A.    Yes, sir.
14    Q.    So when, in Exhibit 134, there's a reference about a
15    jacket, is that a coded language, based on your experience, or
16    maybe it's a jacket?
17    A.    In that case, it was a jacket, sir.
18    Q.    So sometimes when you see a tape and it has a meaning,
19    like jacket, it means exactly what it's supposed to be,
20    correct?
21    A.    Yes, sir.
22    Q.    You don't need an expert to decode "a jacket," do you?
23          MR. ESTRADA:  Objection, your Honor, argumentative.
24          THE COURT:  Sustained.
25          MR. ESTRADA:  Calls for legal conclusion.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1           MR. FLIER:  I'm sorry.

2           THE COURT:  Sustained.

3           MR. FLIER:  Thank you, your Honor.

4    Q.   I'm not trying to be argumentative on that question, sir.

5    Let me ask you this way.  "Jacket" in this exhibit means a

6    clothing garment; is that correct?

7    A.   That is correct, sir.

8    Q.   In Exhibit 134, on page 2 of 3 -- I won't even try to

9    figure out how to turn that on, so let me ask you this.  It

10   says, "Did you ask him if there was anything to be done over

11   there?"

12        And the reply by Mr. Parsadanyan, "Yes, I asked if there

13   was anything.  He said, 'Bro, there is nothing to do, whatever

14   was needed is already done.'"

15        I read that accurately; is that correct, sir?

16   A.   Yes, sir.

17   Q.   Now, is there any coded language, based on your

18   experience, as to how Mr. Parsadanyan replied, what I just

19   read?

20   A.   It's just vague, but it's not coded.

21   Q.   It's vague, correct?

22   A.   Yes, sir.

23   Q.   So a vague sentence could be -- you know, could mean

24   different things; would you agree?

25   A.   We derive meaning from the previous and the calls that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    come after it.
2    Q.   Well, I understand that you're -- I don't mean to be
3    argumentative.  You're trying, based on the investigation and
4    your knowledge, to put the pieces together; is that correct?
5    A.   Yes.  That's part of our job.
6    Q.   But sometimes you can't figure out what pieces need to be
7    put together because it's vague or unclear or ambiguous.  Is
8    that a fair statement?
9    A.   It does happen, sir.
10   Q.   So back to the statement that I was reading, it appears
11   that my client is just responding to what someone else told
12   him; is that correct?  That's why it's in quotes, I assume?
13   A.   I'm sorry.  Can you say that again, sir?
14   Q.   My client, Mr. Parsadanyan, is just responding as to what
15   someone told him in that sentence; is that correct?
16   A.   He's recapping his conversation with the manager that took
17   care of the shooting incident.
18   Q.   Well, I -- okay.  The manager who took care of the
19   shooting incident.  First of all, do you even have a name of
20   the manager?
21   A.   Harut Khachaturyan.  He's on the calls.
22   Q.   And the same guy, that you know who he is and where to
23   locate him, have you ever spoke to him?
24   A.   No, sir.
25   Q.   So you didn't think it would be prudent to just ask him,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   "Hey, by the way, was there a shooting in your restaurant the
 2   night before?"  Did you ever think that might be a good
 3   investigation tool?
 4   A.   The Glendale police asked him, and he lied about it.
 5   Q.   I'm asking you.  So now are you throwing in the manager's
 6   lying?
 7   A.   He says it in the call, that he lied to him.
 8   Q.   Okay.  So when I ask questions, so we're very clear, I'm
 9   asking your personal information.  Is that okay, sir?
10   A.   Yes, sir.
11   Q.   Okay.  So back to what I was asking before the other
12   answer, how come you didn't just ask the manager that simple
13   question?
14   A.   I never interviewed the manager, sir.
15   Q.   How come you didn't think it would be important to garnish
16   the information, like you've done with these other calls, and
17   corroborate it with other evidence?  Like speaking to the
18   manager, seeing if there's holes or a shootout, seeing if there
19   were -- police responded, seeing if there were witnesses.  I'm
20   just trying to think of some investigative issues.
21           MR. ESTRADA:  Objection, asked and answered.  He's
22   already explained what he did.
23           THE COURT:  Well, it is a compound question.
24           MR. FLIER:  That was compound, your Honor.  Thank you.
25           THE COURT:  Why don't you start again.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. FLIER:
 2   Q.   Why didn't you just investigate that personally?  And I'll
 3   move on.
 4   A.   Why didn't we investigate it personally?
 5   Q.   No.  You.  Why didn't you investigate this personally?
 6   A.   I didn't personally do everything on the task force.  It
 7   was a team effort.
 8   Q.   But what we've heard in this case is a lot of information;
 9   would you agree?
10   A.   Yes, sir.
11   Q.   But there's a little different information in this call.
12   This might be an actual shooting of an Armenian Power gang in a
13   restaurant when it seems to be a main focus point in the
14   investigation; would you agree?
15   A.   Yes, sir.
16   Q.   But you, on your own accord, have done nothing to
17   investigate that issue; am I correct?
18   A.   No, sir.
19   Q.   Besides maybe speaking to the Glendale Police Department,
20   have you, on your own, interviewed, investigated information,
21   so I can now move on?
22        MR. ESTRADA:  Objection, your Honor, vague as to
23   "investigated."  He said he --
24        THE COURT:  Yeah, "investigate" means a lot of things.
25        You didn't talk to the manager personally, yourself; is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    that correct?

2              THE WITNESS:  No, I didn't talk to the manager, sir.

3              THE COURT:  Okay.  Next question.

4              MR. FLIER:  Thank you, your Honor.

5    Q.   Going to Speaker 2 on the bottom of page 2 of 3, the

6    second-to-last time it says Speaker 2 -- and I will read it.

7         Mr. Parsadanyan says, "I asked if there was any monetary

8    issue tied to that.  He said, 'Nothing, don't worry, let us

9    just do this, and let's just do this, that's it.'"

10        "Yeah, okay, bro."

11        First, I read that accurately, sir?

12   A.   Yes, sir.

13   Q.   Now, if we're talking about maybe a jacket, maybe a gun,

14   maybe a shooting, do you have any coded information on why

15   Mr. Parsadanyan would bring up a monetary issue?

16   A.   Because of the repairs that they made in the early morning

17   hours.

18   Q.   What information do you have, with personal knowledge,

19   that any repairs were made at that restaurant?  Not what you've

20   heard.  What you know specifically.

21   A.   I have never been in the restaurant, sir.

22   Q.   Now, what about this impression:  This call, could it mean

23   that Mr. Darbinyan got very drunk, like we've heard some other

24   calls, maybe caused a ruckus, and wanted to know if there was

25   any damage that they can pay to fix it?  Am I way off, in your
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    opinion?

2    A.   Yes, sir.

3    Q.   Okay.  Lastly, as to Speaker 2 on page 2 of 3, "I picked

4    it up, it is with me, I will take it to the guy and he will

5    start working on it."

6         The words "pick this up," with personal knowledge you have

7    no idea what that means; am I correct?

8    A.   Other than the calls, sir?

9    Q.   Other than the call, sir, yes.

10   A.   I believe it means the video, from the calls, but I did

11   not traffic-stop Mr. Parsadanyan.

12   Q.   Was there a surveillance in any capacity on the 14th at

13   the restaurant?

14   A.   I don't believe so, sir.

15   Q.   Was there any surveillance of Mr. Parsadanyan on the 15th?

16   A.   I don't believe so, sir.

17   Q.   "I will take it to the guy, that he will start working on

18   it."

19        If somebody has evidence of a crime, a video, and they

20   remove it from the area in question, why would they have to

21   take it anywhere to get it fixed?  Why not just throw it away?

22   Does that make sense, sir?

23   A.   Are you asking if the question makes sense?

24   Q.   Yeah.

25   A.   The question makes sense.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    Okay.  Thank you for saying that, too, by the way.

 2         So you would agree with the general proposition that if my

 3   client took a video, he would not have to give it to someone

 4   else, like this nice lady over here, for her to fix it; am I

 5   correct?

 6   A.    No, sir, you're not correct.

 7   Q.    So you think that there is significance to taking a video

 8   that no one knows where it's going to go so someone else can

 9   fix it?  Is that your testimony?

10   A.    I believe they probably took the DVR machine, the actual

11   hard drive and everything, and took it to someone who could

12   download the machine.

13              MR. SEVERO:  Move to strike.  Complete speculation.

14              THE COURT:  Sustained.

15   BY MR. FLIER:

16   Q.    Do you have any evidence of what you just said?

17              MR. ESTRADA:  Your Honor, the question asked for

18   speculation.

19              THE COURT:  Well, it's been stricken.

20              MR. FLIER:  Thank you.  I won't ask.

21   Q.    You understand that my client is in the phone business; is

22   that correct?

23   A.    He has a -- or had a cell phone store, yes, sir.

24   Q.    And you understand, I assume, and correct me if I'm wrong,

25   that there's different work type of jobs that someone like
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001457**

```
 1   Mr. Parsadanyan can have at his store.  Would you agree with
 2   that?
 3   A.   I'm sorry, sir, that's --
 4   Q.   One type of work would be selling merchandise, phones, and
 5   products of phones; would you agree?
 6   A.   Yes, sir.
 7   Q.   Another one would be maybe fixing phones; would you agree?
 8        MR. ESTRADA:  Objection, your Honor.  This is calling
 9   for speculation.
10        THE COURT:  Overruled.
11   BY MR. FLIER:
12   Q.   Would you agree that sometimes in that business, phones
13   get broken, they take it to the person to whom they purchased,
14   and maybe they can fix it?  Does that make sense?
15   A.   Yes, that makes sense, sir.
16   Q.   And in this investigation, we've heard communications with
17   other exhibits about different phones, different phone numbers;
18   am I correct?
19   A.   I don't know what you're referring to, sir.
20   Q.   That there's been conversations about phones and different
21   phone numbers, correct?
22   A.   Yes.
23   Q.   And we've already heard today, based on my questioning of
24   you, that it's not uncommon for someone to have multiple
25   phones; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    For one of these defendants or for someone in general?

 2    Q.    For one of these defendants.

 3    A.    Yes, these defendants generally carried multiple phones.

 4    Q.    And you already said that Mr. Darbinyan had many phones;

 5    is that correct?

 6    A.    Yes, sir.

 7    Q.    And lastly as to this topic, you already testified today

 8    that you're unaware about the number of phones that

 9    Mr. Darbinyan, and I'll throw in other defendants, had during

10    this investigative time period; am I correct?

11    A.    At any one time, we wouldn't know, sir.

12    Q.    So a simple proposition, and then I'm done.  Do you think

13    it's uncommon that Mr. Parsadanyan might fix some of his

14    friends' phones?

15          MR. ESTRADA:   Objection, your Honor, calls for

16    speculation.

17          THE COURT:   It does.  Sustained.

18    BY MR. FLIER:

19    Q.    Oh, and I found it, by the way, just for the record.  It's

20    Exhibit 131A, page 2 of 3, Speaker 1, second to last, where

21    Mr. Darbinyan says, "I blew it up inside there.  That is why

22    I'm saying it.  Did you get it?"

23          So in your impression and investigation, that can only

24    mean some negative conduct; is that correct?

25    A.    In this call, it means he shot up the inside of Hazatun
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    restaurant.

2    Q.    Okay.  Thank you.

3        Then, after what I just read, Mr. Parsadanyan says, "Oh,

4    yeah?" and there's a question mark; is that correct?

5    A.    Yes, sir.

6    Q.    Now, with respect to who puts the question mark in, that's

7    the interpreter; is that correct?

8    A.    Yes, sir.

9    Q.    And we already know the interpreter did this tape, because

10   it was all in Armenian; is that correct?

11   A.    That's correct, sir.

12   Q.    So my client has, with a question, has no idea what he's

13   talking about, correct?

14        MR. ESTRADA:  Objection, calls for speculation, your

15   Honor.

16        THE COURT:  Sustained.  Jury can figure that out for

17   themselves.

18        MR. FLIER:  Thank you, your Honor.

19   Q.    "Oh, yeah?" question mark, "All right," comma, "I will

20   call him now."

21        And then Mr. Darbinyan says, "Tell him, bro Mher is

22   saying -- Is there anything over there, that needs to be fixed?

23   I don't know, how do I know?"

24        I would like to ask about that last part, "I don't know,

25   how do I know?"  What do you think that means?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Objection, your Honor, calls for
 2   speculation.  It's not a term.  It's not within his experience.
 3              THE COURT:  Let me just ask.  Do you give any meaning
 4   to that other than the plain meaning of the words?
 5              THE WITNESS:  Basically, the plain meaning of the
 6   words, sir.
 7              THE COURT:  Okay.
 8   BY MR. FLIER:
 9   Q.   Do you believe that's Mr. Darbinyan saying something
10   personal or what someone else has said to him?
11              MR. ESTRADA:  Objection, your Honor, calls for
12   speculation.
13              THE COURT:  Sustained.
14              MR. FLIER:  Just have a brief moment, your Honor?
15              THE COURT:  Certainly.
16              MR. FLIER:  Thank you, sir.
17   Q.   So with respect to this tape that we're now discussing,
18   I'm going to go back to 134, and I'm almost done, the word "it"
19   or "thing" is interchangeable at times; is that correct?
20   A.   You're back on 134, sir?
21   Q.   Yes.  And I'll also add 131, too, because I'm just trying
22   to say the term "it" and "thing" is used sometimes, correct?
23   A.   Yes, "it" and "thing' is used sometimes.
24   Q.   And in this case, 134, that exhibit, "it" could mean a
25   jacket, a gun, a tape, fixing a restaurant, or maybe some other
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    things; would you agree?

2    A.    It depends on the call, sir.

3    Q.    Okay.  Thank you.

4          I have no further questions, your Honor.  Thank you.

5              THE COURT:  Redirect?

6                    **REDIRECT EXAMINATION**

7    BY MR. ESTRADA:

8    Q.    Special Agent Stebbins, is context important in

9    interpreting calls?

10   A.    Yes, sir.

11   Q.    Why is it important?

12             MR. SEVERO:  Objection.  That's vouching to some

13   degree.

14             THE COURT:  That's what?

15             MR. SEVERO:  Vouching.

16             THE COURT:  Overruled.

17             THE WITNESS:  If you don't know the context of the

18   call based on your other investigative techniques, you're not

19   going to know what it's about.

20   BY MR. ESTRADA:

21   Q.    And in this particular set of calls, Exhibits 130 through

22   134, is there a previous call which references the shooting at

23   the restaurant?

24   A.    Yes.

25   Q.    And is there, in fact, a reference to blowing something

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001462**

1    up?

2          MR. SEVERO:  Objection, your Honor, not the best

3    evidence.

4          THE COURT:  Overruled.

5          THE WITNESS:  Yes.  He tells Paramaz Bilezikchyan that

6    he shot up the restaurant.

7    BY MR. ESTRADA:

8    Q.   Now, you were asked if you investigated this incident.

9    Was it important for the task force to investigate these sorts

10   of incidents?

11   A.   Yes, very important.

12   Q.   Why was it important?

13   A.   It was a matter of safety for us.  It was pretty much

14   safety for any of the residents, anybody who was inside Hazatun

15   at that time of night.

16   Q.   Now, you mentioned that another Glendale police officer

17   went to investigate.

18   A.   Yes, sir.

19   Q.   Was the restaurant, were the employees cooperative?

20   A.   No, sir.

21   Q.   And if they're not cooperative, does that make it

22   difficult to investigate?

23   A.   Yes, it does, sir.

24   Q.   Why is it that you personally didn't go into the

25   restaurant and speak to the manager?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Generally speaking, if these defendants or other subjects

2    are aware that the FBI is looking at them, it's a lot higher

3    level, as far as they're concerned, than if the local police

4    come around asking about a shooting.

5    Q.    And why is that a concern for you, that it be at a much

6    higher level for defendants?

7    A.    We don't want them to change their tactics, because we had

8    been effective following them and listening to their phones,

9    and this may make them drop their phones or change the way they

10   drive, change the cars they drive, change who they do business

11   with.

12         MR. FLIER:  Objection, move to strike.

13         THE COURT:  Well, it was really -- it went into a

14   narrative.  The first part of the answer will remain in.  The

15   last part will be stricken.

16         Ladies and gentlemen, we're going to break at this time,

17   it being 2:30.  We'll come back in 15 minutes and take up at

18   that time.

19         Remember the admonishment not to discuss the case among

20   yourselves, with anyone else, or form or express any opinions

21   about the matter until it's submitted to you and you retire to

22   the jury room.

23         THE CLERK:  All rise.

24         (Recess held from 2:31 p.m. to 2:48 p.m.)

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001464**

```
 1          (In the presence of the jury:)

 2              THE COURT:  Again for the record, all the jurors are

 3     present, including the alternate.  Witness is on the witness

 4     stand, and we were at redirect.

 5          Counsel.

 6              MR. ESTRADA:  Thank you, your Honor.

 7     Q.  Now, before the break you talked about the fact that you

 8     asked and directed another Glendale police officer to go to

 9     Hazatun to investigate.

10     A.  Yes, sir.

11     Q.  Was it common during this investigation to send other

12     officers, uniformed officers, to do traffic stops and do

13     investigations?

14     A.  Yes, it was.

15     Q.  Why was that done?

16     A.  If the FBI does that type of enforcement action and

17     they're able to see that the FBI's involved, it oftentimes

18     changes the activities of the subjects.

19     Q.  Was there an effort to protect the wiretap in this case?

20     A.  Yes, sir.

21     Q.  Why is that?

22     A.  If they know that there's a wiretap, they'll make it even

23     harder for us to stay up on their phones and begin switching

24     phones every couple weeks.

25     Q.  You were asked about why you didn't just arrest defendant
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Darbinyan on October 14, 2009, after you heard about this
 2   shooting at the restaurant.  Why didn't you do that?
 3   A.   Defendant Darbinyan's shown that short prison terms do not
 4   deter him from criminal activity, and we wanted to put --
 5          MR. SEVERO:  Your Honor, this is terribly prejudicial.
 6          THE COURT:  Sustained.  403.  It will be sustained.
 7          MR. ESTRADA:  Well, your Honor, I can lead a little
 8   bit to avoid that, if the Court would like.
 9          THE COURT:  I don't know.  It depends on what the
10   question is.
11   BY MR. ESTRADA:
12   Q.   Was there an effort to protect the investigation in this
13   case to determine defendant's associates?
14   A.   Yes.
15   Q.   Was there an effort through the investigation to determine
16   the full scope of the conspiracy defendant Darbinyan was
17   involved in?
18   A.   Yes.
19          MR. SEVERO:  Your Honor, that is not only leading, but
20   it's 403 as well.
21          THE COURT:  Overruled.
22          THE WITNESS:  Yes, sir.
23          THE COURT:  Is that the reason he wasn't arrested
24   then?
25          THE WITNESS:  Yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Next question.
 2    BY MR. ESTRADA:
 3    Q.   Okay.  And then you were asked about the December gun
 4    that -- we heard about the calls on December 1 of 2009.  Do you
 5    recall that?
 6    A.   Yes, sir.
 7    Q.   You were asked about if there was a concern about violence
 8    with regard to that.
 9    A.   Yes, sir.
10    Q.   Why there was a concern about violence when Darbinyan
11    would be in possession of guns?
12    A.   Because Darbinyan was a violent person and he shot up the
13    Hazatun restaurant.
14              MR. FLIER:  I'm going to object.
15              MR. SEVERO:  Yeah, I'm objecting, too.
16              MR. ESTRADA:  The question was asked about --
17              THE COURT:  I'm sorry.  I'm sorry.
18              MR. SEVERO:  403, sir.
19              MR. ESTRADA:  Your Honor, the question was asked about
20    violence, whether there was a concern about violence.
21              THE COURT:  And he answered "yes."  Anything other
22    than "yes" will be stricken.
23    BY MR. ESTRADA:
24    Q.   Was there a prior history with defendant Darbinyan that
25    concerned you about violence?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Yes.

 2              MR. ESTRADA:  No further questions, your Honor.

 3              THE COURT:  Okay.  Redirect in that area.

 4              MR. SEVERO:  It's kind of a little broader, but...

 5                      RECROSS-EXAMINATION

 6   BY MR. SEVERO:

 7   Q.    Your testimony on redirect is that the employees of the

 8   restaurant were not cooperative?

 9   A.    Yes, sir.

10   Q.    Does that mean that law enforcement has no means by which

11   to force cooperation from citizens who don't want to talk to

12   them?

13   A.    I don't know what means Glendale Police Department has,

14   but the Federal Bureau of Investigation has powers.

15   Q.    You don't think the Glendale Police Department could have

16   gotten a warrant for the place and searched it?

17   A.    Yes, but I believe that would have disclosed our

18   investigation.

19   Q.    You don't believe that -- well, Glendale Police Department

20   showed up because the restaurant called them?

21   A.    No.  I directed them to go there.

22   Q.    Right.  So the fact that they showed up at the place

23   didn't tip off that somebody's listening in?

24   A.    No.  They went there under a ruse, sir.

25   Q.    I see.  We just happened to be by and thought we'd check
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   the place out to see if there was shooting here last night?
 2   A.   No.  I believe there was a lot of people in the restaurant
 3   at the time that he shot, and they used the ruse that somebody
 4   reported it.
 5   Q.   Let me ask you this.
 6           MR. FLIER:  Object, your Honor, assumes facts not in
 7   evidence.
 8           THE COURT:  Overruled.
 9   BY MR. SEVERO:
10   Q.   Let me ask you this.  Do you have any information that any
11   evidence of destroyed furniture was found at the restaurant?
12   A.   No, sir.
13   Q.   Do you have any evidence that there were any holes in the
14   ceiling found at the restaurant?
15   A.   Yes, sir.  The calls.
16   Q.   Do you have any evidence other than what was said in the
17   calls that there were any holes in the ceiling?
18   A.   No, sir.
19   Q.   And are you saying that the calls themselves say there
20   were holes in the ceiling?
21   A.   They say they patched the holes.
22   Q.   In the ceiling?
23   A.   The walls or the ceilings.  I don't recall, sir.
24   Q.   The floor?  Anything?  Holes are made by something other
25   than guns, are they?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001469**

1   A.   I think it said the walls in the call, sir.

2   Q.   Answer the question, please.  Holes are made by something

3   other than guns?

4   A.   Holes?

5        MR. ESTRADA:  Object, your Honor.

6        MR. SEVERO:  Yes, holes.

7        MR. ESTRADA:  I don't understand the question.  It's

8   vague.

9        THE COURT:  I don't, either, and --

10        MR. SEVERO:  I'm sorry, I --

11        THE COURT:  Counsel, please.

12        MR. SEVERO:  Sorry.

13        THE COURT:  Not only do I not understand the question,

14   you asked two questions, and then there's an answer, or there

15   started to be an answer.  So let's identify the question that

16   you asked and go from there.

17        MR. SEVERO:  Of course.

18   Q.   Holes can be made by something other than bullets; is that

19   true?

20   A.   Yes, sir.

21   Q.   You have evidence in the calls that someone said something

22   about repairs, correct?

23   A.   Yes, sir.

24   Q.   Did any officer actually observe repairs, that you're

25   aware of?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   I don't recall.

2    Q.   Are you aware of whether any officer observed any holes

3    anywhere in the place?

4             MR. ESTRADA:  Objection, your Honor, asked and

5    answered.

6             THE COURT:  Overruled.

7             THE WITNESS:  I don't recall.

8    BY MR. SEVERO:

9    Q.   Were there any guns recovered from the restaurant?

10   A.   No, sir.

11   Q.   Were there any guns recovered from anybody pertaining to

12   that incident?

13   A.   No, sir.  There was no search warrant issued.

14   Q.   Or any pretext traffic stops, right?

15   A.   No, sir.

16   Q.   Other than some mentions in the calls about blowing it up

17   and making repairs, you have no other evidence that a shooting

18   occurred at the restaurant.

19            MR. ESTRADA:  Objection, your Honor.  This is asked

20   and answered repeatedly.

21            THE COURT:  Overruled.

22            THE WITNESS:  No, that's not true, sir.

23   BY MR. SEVERO:

24   Q.   Do you have evidence that, outside the calls, that

25   something -- that a shootout happened at the restaurant?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001471**

```
 1   A.    There were calls that were not played where he talks about

 2   how he shot up the restaurant.

 3          MR. SEVERO:  I'm going to move to strike that.

 4          THE COURT:  It will be stricken.

 5   BY MR. SEVERO:

 6   Q.    I said outside the calls, do you have any evidence that

 7   the restaurant was shot up?

 8   A.    No, sir.

 9          THE COURT:  Outside the wiretaps.

10          THE WITNESS:  No, sir.

11   BY MR. SEVERO:

12   Q.    All you have is Mr. Darbinyan mouthing off, perhaps, at

13   times, about what he did.

14          MR. ESTRADA:  Objection, your Honor, argumentative,

15   vague, and asked and answered.

16          MR. SEVERO:  Is mouthing off argumentative?

17          THE COURT:  Overruled.

18          THE WITNESS:  No, it's not true, sir.

19          MR. SEVERO:  I have no other questions.

20          MR. PEREYRA-SUAREZ:  I have nothing further, your

21   Honor.

22          THE COURT:  Counsel.

23          MR. FLIER:  Very briefly.

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001472**

**RECROSS-EXAMINATION**

BY MR. FLIER:

Q.   Special Agent Stebbins, maybe I missed something, please.
What was your testimony about it was too dark inside the
restaurant?

A.   Yes, sir.

Q.   What is that subject matter about?

A.   That's what I recall from my conversation with the
Glendale officer.

Q.   So they don't have flashlights?

A.   I believe that if they had gone that far, probably would
have been a little bit more suspicious than just asking --

        THE COURT:  Let me just stop you.  The only question
was, do you know if they have flashlights.

        THE WITNESS:  I believe Glendale officers carry
flashlights.

BY MR. FLIER:

Q.   And also, an investigation can carry over the following
day, during daylight hours, too; is that correct?

A.   I believe it was during daylight hours, sir.

Q.   I didn't ask that.

        Is that correct, though, that --

A.   Yes, you can investigate during daylight, yes, sir.

Q.   And, clearly, photographs could be taken, let's say, of
recently painted-over items or any type of material that could,

1    let's say, plug up holes; would you agree with that?

2    A.   Yes, you can take photographs, sir.

3    Q.   And in this entire investigation, we have none of that

4    information as to this Haratun restaurant alleged incident,

5    correct?

6    A.   Hazatun, sir.

7    Q.   Thank you for the correction of the restaurant.

8         Besides any information from the Glendale Police

9    Department or any of the tapes, do you have any information,

10   personal?

11   A.   No, sir.

12           MR. FLIER:  I have no further questions.

13           THE COURT:  You may step down.  Thank you.

14           THE WITNESS:  Thank you, sir.

15           THE COURT:  Next witness.

16           MR. CREIGHTON:  The government calls Brian Balleweg.

17           THE CLERK:  Good afternoon.  Right here to be sworn,

18   please.

19      (Witness sworn.)

20           THE CLERK:  Thank you.  You may be seated.

21      May I please ask that you state your name for the record

22   and spell your last name.

23           THE WITNESS:  Brian Douglas Balleweg.  Last name

24   spelled B-a-l-l-e-w-e-g.

25           THE CLERK:  Thank you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  You may inquire, Counsel.

 2              MR. CREIGHTON:  Thank you, your Honor.

 3              BRIAN BALLEWEG, GOVERNMENT'S WITNESS,

 4                    DIRECT EXAMINATION

 5   BY MR. CREIGHTON:

 6   Q.   Good afternoon.

 7        Where do you work?

 8   A.   I work at the Beverly Hills Police Department.

 9   Q.   How long have you worked there?

10   A.   I've been there for approximately 11 years.

11   Q.   And before that, where did you work?

12   A.   L.A. County Sheriff's Department.

13   Q.   What is your present rank?

14   A.   Field training officer.  I work in patrol.

15   Q.   Have you conducted vehicle stops?

16   A.   Yes.

17   Q.   About how many?

18   A.   In my years, I'd probably say approximately over -- at

19   least a minimum of 200, couple hundred.

20   Q.   Directing your attention to December 1, 2009, in the

21   evening, where were you located?

22   A.   I was located along North Santa Monica Boulevard, which

23   divides our city in half from the north to the south.

24   Q.   Were you in uniform?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.    In a marked vehicle?

A.    Yes.

Q.    Were you advised to be on the lookout for a particular vehicle?

A.    Yes.

Q.    What vehicle were you looking for?

A.    I was told it was a Mercedes sedan, four-door.  I believe the model was an S550.

Q.    Did you see such a vehicle?

A.    Yes.

Q.    Where was it traveling?

A.    It was traveling on -- westbound on North Santa Monica Boulevard in the number 1 lane.

Q.    What did you do?

A.    I saw it from a -- from a distance, and I continued to near the vehicle.  As I pulled in behind it, we still continued westbound, and I continued to follow it for some blocks.

Q.    Did you observe anything about the way it was driving?

A.    Yes.

Q.    What was that?

A.    I observed the vehicle while it was traveling in the number 1 lane passing through -- it was Crescent Drive.  It had drifted towards the right side of the number 2, towards the number 2 lane, and then it came back, corrected its position, and went back to the middle of the number 1 lane.

```
 1   Q.   Did you see the vehicle make a turn?

 2   A.   I did, yes.

 3   Q.   What did you observe when the vehicle made a turn?

 4   A.   I observed, once the vehicle made a left-hand turn, I

 5   observed that -- Beverly Drive is basically a north/south

 6   street, and it's divided by double yellow lines, and I saw the

 7   vehicle, once it made its turn, go drift towards the left a

 8   little bit, towards the double yellow lines, where there was a

 9   pedestrian walking southbound in the roadway along those lines.

10   Q.   What happened next?

11   A.   The car continued to veer towards the double yellow lines,

12   and it ended up correcting itself and went in the middle of the

13   number 1 lane of Beverly Drive and continued southbound.

14   Q.   Did you decide to execute a traffic stop?

15   A.   Yes.

16   Q.   What happened after you stopped the vehicle?

17   A.   I approached the car and contacted the driver.

18   Q.   Who was the driver?

19   A.   Mike Darbinyan.

20   Q.   Was there anybody else in the car?

21   A.   Yes.

22   Q.   Who was that?

23   A.   Harutyun Pembejian.

24   Q.   Now, as part of your contact, did you talk with the

25   driver?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   What, if anything, did he say?

 3   A.   I asked him a series of questions.  I -- I asked to see

 4   his driver's license and the paperwork for the vehicle, which

 5   he provided me.  I told him the reason for the stop, that I was

 6   concerned about his driving, and then I went back to my patrol

 7   vehicle.

 8   Q.   Did you learn that he was on probation?

 9   A.   Yes.

10   Q.   What did you do then?

11   A.   I ended up -- well, I learned he was on probation from

12   doing a -- conducting a DL, driver's license check, including a

13   warrant check, and at that time basically I recontacted the

14   driver and had him escorted over to the sidewalk.

15   Q.   Did you ask him where he was going?

16   A.   Yes.

17   Q.   Where did he say?

18   A.   He said to the Montage Hotel.

19   Q.   And I'm sorry, I believe I misspoke earlier.  Did you

20   learn that the defendant was on parole?

21   A.   He was on parole, yes.

22   Q.   Okay.  Did you ask him about the vehicle?

23   A.   I did, yes.

24           MR. SEVERO:  Objection, vague.

25           THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. CREIGHTON:

 2    Q.   What did you ask him?

 3    A.   I asked him if the vehicle had belonged to him, if he was

 4    the registered owner.

 5    Q.   Okay.  Did you ask him if you could search the vehicle?

 6    A.   Yes.

 7    Q.   What did he say?

 8    A.   He said yes, go ahead.

 9    Q.   Now, I'm going to ask you to look at the binders behind

10    you and find Exhibit No. 328.

11              THE CLERK:  Do you know the volume?

12              MR. CREIGHTON:  I'm afraid I don't.

13              THE COURT:  Should be Volume 5.

14              MR. CREIGHTON:  Thank you, your Honor.

15    Q.   Okay.  Would you briefly look through those photographs,

16    please.

17    A.   Yes.

18    Q.   Do you recognize these photographs?

19    A.   Yes.

20    Q.   What do they depict, in general?

21    A.   Basically, they depict the -- all the observable items

22    that were involved in the traffic stop.

23    Q.   Do they fairly and accurately depict those items?

24    A.   Yes.

25              MR. CREIGHTON:  Your Honor, move to admit Exhibit 328
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    and publish.

2            THE COURT:  I will be received.  You may publish.

3        (Received in evidence, Exhibit 328.)

4    BY MR. CREIGHTON:

5    Q.   Officer Balleweg, I'm showing you page 1 of Exhibit 328.

6    What's this depict?

7    A.   That's the vehicle that I conducted a traffic stop on.

8    Q.   Thank you.

9        Now, did you go ahead and search the vehicle?

10   A.   Yes, I did.

11   Q.   Did you search the trunk?

12   A.   Yes.

13   Q.   What -- with the assistance of the court clerk, if we

14   could show you physical Exhibit 329.

15       It's a -- it's a bag.  I believe it may be down on the

16   bottom.

17           THE CLERK:  Oh, thank you.

18           MR. CREIGHTON:  It's a brightly colored bag.

19           THE CLERK:  Just the bag or everything in this box?

20           MR. CREIGHTON:  Could I ask for the assistance of

21   Detective Gonzalez to come up and assist, your Honor?

22           THE COURT:  Yes.

23           MR. CREIGHTON:  Thank you.  And I apologize to the

24   Court.  We should have pulled it earlier.

25   Q.   Now, if you look through those items, and you can pull

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    them out, do you recognize those items?

 2    A.    Yes.

 3    Q.    What are they?

 4    A.    These are the items that were located in the vehicle.

 5    Q.    In the trunk?

 6    A.    Yes.

 7    Q.    Are they in substantially similar condition?

 8    A.    Yes.

 9          MR. CREIGHTON:  Move to admit Exhibit 329 and publish.

10          THE COURT:  Okay.  They may be received and published.

11        (Received in evidence, Exhibit 329.)

12    BY MR. CREIGHTON:

13    Q.    Officer Balleweg, would you find a brightly colored bag

14    that is in that exhibit, I believe.

15    A.    Yes.

16    Q.    Can you take that and open it up and show it to the jury.

17    A.    (Witness complies.)

18    Q.    What is this bag?

19    A.    This is -- appears to be a large, over-sized plastic

20    shopping bag.

21    Q.    Is this the bag that you found in the trunk of the

22    Mercedes S550?

23    A.    Yes.

24    Q.    Was there anything in it when you saw it?

25    A.    Yes, there was.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   If you could put the bag down now and tell us what you saw

2   inside the bag.

3           THE COURT:  Since there are several bags up there,

4   that's a bag that contains the image of Mickey Mouse; is that

5   correct?

6           THE WITNESS:  Yes, your Honor.

7           THE COURT:  Okay.  Go ahead.

8           THE WITNESS:  Can you rephrase?  I'm sorry.  Go ahead

9   with your question again.

10  BY MR. CREIGHTON:

11  Q.   Can you tell the jury what you observed about that Disney

12  bag when you opened the trunk.

13  A.   Yes.  I observed a -- seemed like an object that was

14  protruding out of the bag.  It obviously -- it was apparent to

15  me that it didn't fit in the bag, because there was an

16  elongated portion that was visible from outside of the bag.

17  Q.   Was it wrapped in anything?

18  A.   Yes.

19  Q.   What was it wrapped in?

20  A.   White tissue paper.

21  Q.   Is that the tissue paper that you have in front of you?

22  A.   Yes.

23  Q.   Did you take the bag out of the car?

24  A.   Yes.

25  Q.   What else did you observe inside the tissue paper, if

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    anything?

2    A.   Inside the tissue paper, there was a -- a soft rifle

3    canvas case.

4    Q.   Is that in front of you now?

5    A.   Yes.

6    Q.   Can you hold that up for the jury, please.

7    A.   Yes.

8    Q.   Now, this bag is empty now, correct?

9    A.   Yes.

10   Q.   Was it in that condition when you found it?

11   A.   No.

12   Q.   What was the condition?

13   A.   After opening it up, there was a -- I located a rifle

14   inside.

15   Q.   With the Court's permission, I would like to show you

16   Exhibit 327 at this time, and if you could return the camo bag

17   to Detective Gonzalez.  Thank you.

18        And Exhibit 327, your Honor, is a firearm, and we are

19   going to be seeking to admit it by reference.  It has been

20   checked by the marshals previously.

21             THE COURT:  Been cleared?

22   BY MR. CREIGHTON:

23   Q.   Officer Balleweg, would you open the box and take a look

24   at what's inside.

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    Do you recognize this?

2    A.    Yes.

3    Q.    What is it?

4    A.    It's a rifle.

5    Q.    Do you recognize this rifle?

6    A.    Yes.

7    Q.    Is this the rifle that you found in the trunk of the

8    Mercedes S550?

9    A.    Yes.

10   Q.    Is it in substantially similar condition?

11   A.    Yes, it is.

12         MR. CREIGHTON:  Your Honor, move to admit by reference

13   Exhibit 327 and publish.

14         THE COURT:  Yes.  You may publish.

15         (Received in evidence by reference, Exhibit 327.)

16   BY MR. CREIGHTON:

17   Q.    Would you hold that up for the jury.

18   A.    Yes.  Would you like me to take it out of the box?  Does

19   it come out of the box, or no?

20   Q.    I believe it comes out of the box, but even if it doesn't,

21   if you could lift it and turn it around so you can show it to

22   the jury.  With the barrel towards the ceiling, please.  Thank

23   you.

24   A.    (Witness complies.)

25   Q.    So is this the rifle that you found in the trunk of the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Mercedes?

2    A.   Yes.

3    Q.   Did the rifle have any indicators of the manufacturer on

4    it?

5    A.   Yes.

6    Q.   What did it say?

7    A.   It said Omega III.

8    Q.   Did you ask -- and I believe you can hand the rifle back

9    to Detective Gonzalez at this point.

10       Did you ask the defendant anything about the rifle?

11   A.   Yes.

12   Q.   What did you ask him?

13   A.   I -- I addressed the rifle issue and asked him if he had

14   anything to say about it.  He says he was going to deliver it

15   to a friend.

16   Q.   What did you do next?

17   A.   At that point, I ended up calling an outside agency

18   involved and let her know of my find, or the item.

19   Q.   Did you arrest the defendant?

20   A.   Yes.

21       MR. CREIGHTON:  No further questions.

22       THE COURT:  Cross.

23                    **CROSS-EXAMINATION**

24   BY MR. SEVERO:

25   Q.   Afternoon, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Good afternoon.

2    Q.    As I understand it, the rifle was wrapped in tissue?

3    A.    Yes, sir.

4    Q.    And then placed inside the camouflage bag?

5    A.    No, that's not correct.

6    Q.    I'm sorry.  It was -- the rifle was in the bag, in the

7    camouflage case?

8    A.    Yes.

9    Q.    And then wrapped in tissue?

10   A.    That's correct.

11   Q.    Such that if you, when you took it out of the Mickey Mouse

12   bag, you couldn't tell what it was until you took the tissue

13   out?

14   A.    That's correct.

15   Q.    And then wrapped in tissue and placed inside that Mickey

16   Mouse bag; is that correct?

17   A.    Yes.

18   Q.    So when you first looked at the -- in the trunk of the

19   car, it was not readily apparent to you that there was a

20   firearm in the car, correct?

21   A.    That's -- that's correct.

22   Q.    Did you -- you were instructed to stop this car at some

23   point, correct?

24   A.    Yes.

25   Q.    And that car never drifted outside its lanes, did it?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    You used that pretext to stop the car, correct?

 3    A.    Yes.

 4    Q.    Were there any -- was there any ammunition accompanying

 5    the rifle?

 6    A.    No.

 7    Q.    Did anyone else arrive, any other -- strike that.

 8          Any other law enforcement officer arrive at the scene

 9    after you determined that Mr. Darbinyan would be arrested?

10    A.    Yes.

11    Q.    Who?

12    A.    There were, I believe, at least two other officers that I

13    know of.

14    Q.    Beverly Hills?

15    A.    Yes.

16    Q.    But no FBI?

17    A.    Not that I can recall.

18    Q.    Anyone from what was known as Eurasian Task Force?

19    A.    On the stop, at the scene?

20    Q.    Yes, at the stop.

21    A.    Not that I can recall.

22    Q.    You testified at the parole hearing for Mr. Darbinyan?

23    A.    Yes.

24    Q.    Was the rifle processed for prints?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Fingerprints?  Are you aware of any reports of

2    fingerprints?

3    A.   No.

4    Q.   You're saying Mr. Darbinyan told you that he was going to

5    the Montage Hotel?

6    A.   Yes.

7    Q.   And that he was going to deliver this rifle to a friend?

8    A.   Yes.

9         MR. SEVERO:  I have nothing further.

10        MR. PEREYRA-SUAREZ:  No questions, your Honor.

11        MR. FLIER:  Very briefly, your Honor.  Two questions.

12                        **CROSS-EXAMINATION**

13   BY MR. FLIER:

14   Q.   Did anyone tell you, sir, that arresting Mr. Darbinyan

15   would compromise the investigation?

16   A.   No.

17   Q.   Thank you.

18        And lastly, I think I heard you testify that -- are you a

19   training officer, patrol?

20   A.   Yes.

21   Q.   A simple question.  If you find evidence based on a stop,

22   what would you do?

23   A.   If I -- if I find evidence based on a stop?

24   Q.   Yes.  What would you do?

25        THE COURT:  Do you understand the question?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE WITNESS:  No.

 2              MR. FLIER:  I'll rephrase.  Thank you, your Honor.

 3   Q.   If you find evidence that you believe has materiality and

 4   relevance, would you document it?

 5   A.   Yes.

 6   Q.   And in this case, you did exactly that, you documented

 7   what you recovered; is that correct?

 8   A.   That is correct.

 9   Q.   And maybe I missed it.  Did you actually photograph that

10   same evidence, also?

11   A.   That, I don't recall, if there was a photograph taken or

12   not or if I was responsible for taking one.

13   Q.   But as a training officer, it's important in police

14   reports to document what is recovered; is that correct?

15   A.   Yeah, I agree with that.

16              MR. FLIER:  Thank you.  No further questions.

17              MR. CREIGHTON:  Yes, your Honor, just a few.

18                     REDIRECT EXAMINATION

19   BY MR. CREIGHTON:

20   Q.   Just to clarify, Officer Balleweg, when you first observed

21   the vehicle, you saw it drifting towards another lane?

22   A.   Yes.

23   Q.   Did it do that more than once?

24   A.   Yes.

25   Q.   Did it touch the lines?
```

```
 1   A.    On the first occasion, yes.

 2   Q.    And then when it turned onto North Beverly Drive, there

 3   was a pedestrian in the middle of the road; is that correct?

 4   A.    Yes.

 5   Q.    What did the vehicle do there?

 6             MR. SEVERO:  Beyond the scope.

 7             THE COURT:  Sustained.

 8   BY MR. CREIGHTON:

 9   Q.    Last question.  When you stopped the vehicle, was it in

10   the vicinity of the Montage Hotel?

11   A.    Yes.

12             MR. CREIGHTON:  Nothing further.

13             THE COURT:  Any redirect in that area?

14             MR. SEVERO:  No, your Honor.

15             MR. FLIER:  No further questions, your Honor.

16             THE COURT:  You may step down.  Thank you very much

17   for coming in.

18             THE WITNESS:  Thank you, your Honor.

19             THE COURT:  Next witness.

20             MR. CREIGHTON:  The government calls Special Agent

21   George Hamilton.

22        And your Honor, this next witness is with the Bureau of

23   Alcohol, Tobacco, Firearms & Explosives.  He's going to be

24   testifying regarding the firearms, all of which have been

25   checked.  We're going to need to bring all ten firearms and an
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001490**

1    ammunition exhibit up for him to look at.

2         THE COURT:  Okay.

3    *(Witness sworn.)*

4         THE CLERK:  Thank you.  You may be seated.

5    May I please that you state your full name for the record

6    and spell your last name.

7         THE WITNESS:  David Hamilton, H-a-m-i-l-t-o-n.

8         THE CLERK:  Thank you.

9         MR. ESTRADA:  Your Honor, with the Court's permission,

10   can the detective bring the firearms up now?

11        THE COURT:  Yes.

12        MR. ESTRADA:  Thank you.

13            **DAVID HAMILTON, GOVERNMENT'S WITNESS,**

14                     **DIRECT EXAMINATION**

15   BY MR. CREIGHTON:

16   Q.   Agent Hamilton, where are you employed?

17   A.   With ATF, the Bureau of Alcohol, Tobacco, Firearms &

18   Explosives.

19   Q.   How long have you worked there?

20   A.   Just short of 14 years.

21   Q.   What's your position?

22   A.   I'm a senior special agent.

23   Q.   And where did you work prior to joining ATFE?

24   A.   Immediately prior to ATF, I was employed as a defense

25   industry analyst at the Central Intelligence Agency.  Prior to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   that, I was a special agent with the Immigration &
 2   Naturalization Service, and before that I was a Russian
 3   cryptologic linguist in the United States Marine Corps.
 4   Q.   What are your duties as a special agent with ATF?
 5   A.   My primary duties are the investigations of violations of
 6   the federal firearms and drug laws.
 7   Q.   Does that include examination of firearms and ammunition?
 8   A.   Yes.
 9   Q.   For what purposes do you examine these firearms?
10   A.   For identification, determination of origin, and
11   classification of the firearms.
12   Q.   Are you familiar with the operation and uses of different
13   kinds of firearms?
14   A.   Yes.
15   Q.   Are you trained in the identification of firearms?
16   A.   Yes.
17   Q.   Can you please describe your training in that.
18   A.   Specifically to identification?
19   Q.   Yes.  Specifically -- let me be precise.  Specifically to
20   identification of firearms and also to identification of
21   manufacturer and location of manufacturing, if I may ask the
22   compound question.
23   A.   Every ATF agent goes to the ATF academy, the first two
24   weeks of which is dedicated to firearms.  During that first two
25   weeks, every agent is introduced to the basics of firearm
```

```
 1    nomenclature, identification and classification of firearms.

 2              THE COURT:  Pull the microphone a little closer to

 3    you.

 4              THE WITNESS:  I was selected to become a firearms and

 5    ammunition interstate nexus expert by ATF, so I received

 6    additional training regarding the identification,

 7    classification and determination of origin of firearms and

 8    ammunition.  I've been through ATF's basic firearms interstate

 9    nexus course, the advanced firearms interstate nexus course,

10    and the advanced ammunition interstate nexus course.

11    BY MR. CREIGHTON:

12    Q.   And we'll return to what that means in just a second, but

13    are you also a firearms instructor?

14    A.   Yes, I am.

15    Q.   And you have previously testified as an expert?

16    A.   Yes.

17    Q.   Approximately how many times?

18    A.   Approximately 41 times in federal court and four times in

19    California superior court.

20    Q.   Now, are you familiar with the term "interstate commerce"

21    as it applies to firearms and ammunition?

22    A.   Yes.

23    Q.   What does it mean?

24    A.   Interstate commerce of firearms and ammunition is the

25    movement of those goods from one state to another state.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  Your Honor, we're prepared to stipulate

 2   that all of these firearms traveled in interstate commerce.

 3            THE COURT:  And ammunition?

 4            MR. SEVERO:  Yes.

 5            THE COURT:  Counsel?

 6            MR. PEREYRA-SUAREZ:  I'll stipulate to that, your

 7   Honor.

 8            MR. FLIER:  So stipulated, your Honor.

 9            THE COURT:  Okay.  That means that the jury is to take

10   that as being proved, that all the ammunitions or parts of the

11   guns traveled through interstate commerce.

12        Next question, Counsel.

13   BY MR. CREIGHTON:

14   Q.   Have you analyzed the firearms in this case?

15   A.   Yes, I've examined them.

16   Q.   If we could begin, with the Court's permission, I'd like

17   to show you Exhibit 304.

18            MR. SEVERO:  I think it's cumulative from here on out.

19   I don't think the testimony will go anywhere else.

20            THE COURT:  I think you have to show it's operable.

21            MR. SEVERO:  I'm sorry?

22            THE COURT:  You have to show the guns are operable,

23   Counsel.  But you're correct, as far as interstate commerce,

24   that's been covered.

25            MR. SEVERO:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1          MR. CREIGHTON:  Yes, and I will ask no interstate

 2   commerce questions, your Honor.

 3          THE COURT:  Okay.

 4          MR. SEVERO:  Thank you, your Honor.

 5          THE COURT:  We appreciate that.

 6          MR. CREIGHTON:  So with the Court's permission, if I

 7   could show Exhibit 304.

 8          THE COURT:  Certainly.

 9   BY MR. CREIGHTON:

10   Q.   Have you examined this firearm before?

11   A.   Yes.

12   Q.   Can you hold it up to the jury and tell the jury what it

13   is.

14   A.   It's a Springfield Armory model XD 45, .45 automatic

15   caliber semi-automatic pistol with serial number US690631.

16   Q.   Now, I'm not going to repeat these questions for all of

17   the firearms, but just to make our terminology clear, would you

18   explain to the jury what some of those words meant that you

19   just used.  What's caliber?

20   A.   Caliber is a designation for the type of ammunition that

21   is used in this particular firearm.  This is a .45 caliber

22   pistol, which means it uses .45 caliber ammunition.  The

23   ammunition and the firearm work together as far as the caliber

24   is concerned.

25   Q.   And I believe you said this weapon's a semi-automatic?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.

2    Q.    What does that mean?

3    A.    As long as there is ammunition in the magazine, the gun

4    will fire one round for each pull of the trigger.

5    Q.    And this is a polymer-framed firearm; is that correct?

6    A.    Yes.  The frame of the pistol, which I'm pointing to now,

7    is polymer.  It's plastic, black plastic.  The slide, which

8    sits on top of the frame, is metal; in this case, steel.

9    Q.    And it has a magazine with it, correct?

10   A.    Yes, it does.  It has a ten-round magazine.

11   Q.    When we talk about magazine capacity, we're talking about

12   how many rounds a magazine holds?

13   A.    Correct.

14   Q.    If we could put that away and turn now to Exhibit 305, and

15   if you could hold the jury up to it -- hold it up so the jury

16   can see it, and tell the jury briefly what it is.

17   A.    This is a Sig Sauer model SP 2340, .40 Smith & Wesson

18   caliber semi-automatic pistol.  Serial number, which I'm

19   reading off of the bottom of the frame, is SP0067088.

20   Q.    And would you describe this as a more expensive or a less

21   expensive handgun?

22          MR. SEVERO:  Objection, irrelevant.

23          THE COURT:  Sustained.

24   BY MR. CREIGHTON:

25   Q.    If we could return it to the box and move to Exhibit 306,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    please.  What is this?

2    A.    This exhibit is a Israel Military Industries model Desert

3    Eagle pistol, commonly called a baby eagle.  Caliber is .40

4    Smith & Wesson, and serial number is 130952.

5    Q.    Okay.  If we could turn to Exhibit 307.  What is this?

6    A.    This exhibit is a Heckler & Koch model USP .40

7    Smith & Wesson caliber semi-automatic pistol, serial number

8    22-26673.

9    Q.    And what is the magazine capacity of this?

10   A.    This is -- it comes with a 13-round magazine.

11   Q.    Now, is this an operable firearm?

12   A.    I did not test-fire myself, but --

13          MR. SEVERO:  Objection, then.  Hearsay.

14          THE COURT:  Sustained.

15   BY MR. CREIGHTON:

16   Q.    Examining the firearm, do you have any indication that

17   it's not operable?

18   A.    No.  All of the major pieces that are visible are present.

19   Q.    Hypothetically, if this weapon were found containing

20   ammunition and a round in the chamber, would that affect your

21   opinion on its operability?

22          MR. SEVERO:  Objection.  Hypothetical, incomplete

23   hypothetical, assumes facts not in evidence.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. CREIGHTON:

 2   Q.   Would that lead you to believe that it was an operable

 3   firearm?

 4            MR. SEVERO:  Objection, calls for speculation.

 5            THE COURT:  Sustained.

 6   BY MR. CREIGHTON:

 7   Q.   How would it affect your opinion if you knew the weapon

 8   was found with ammunition in the magazine and a round in the

 9   chamber?

10            MR. SEVERO:  Objection, your Honor.  That's an

11   incomplete hypothetical again.  It doesn't contain specific

12   facts.

13            THE COURT:  Sustained.

14        Well, let me ask a question.  Maybe I shouldn't sustain.

15   Does the mere fact that a round is in the chambers of a weapon,

16   does that make it, per se, operable?

17            THE WITNESS:  No, your Honor, but it tends to indicate

18   that it is an operable firearm or the possessor of the firearm

19   believed that it was operable.

20            THE COURT:  But one way or the other, it doesn't

21   necessarily mean it was operable.

22            THE WITNESS:  Correct.

23            THE COURT:  Okay.  Next question.

24   BY MR. CREIGHTON:

25   Q.   Agent Hamilton, have you been trained in the definition of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  firearm?

 2  A.   Yes.

 3  Q.   What is a firearm?

 4  A.   Under federal law, a firearm is defined as any weapon,

 5  including the starter gun, which will, or is capable of, or is

 6  readily made convertible to, expel a projectile by the action

 7  of an explosive; the frame or receiver of any such weapon; any

 8  firearm muffler, or firearm silencer, or any destructive

 9  device.

10  Q.   If we could move to exhibit three-hundred- --

11       THE COURT:  Let me ask one more question, just to save

12  time.  Can you say with certainty that that is a firearm, then,

13  that you are holding?

14       THE WITNESS:  Yes.

15       THE COURT:  Okay.  Next question.

16  BY MR. CREIGHTON:

17  Q.   And the previous exhibits that we have looked at, 304, 305

18  and 306, those are also firearms?

19  A.   Yes.

20  Q.   Can we turn to Exhibit 308, please.

21  A.   I have it.

22  Q.   Can you hold it up to the jury and tell them what it is.

23  A.   This exhibit is a Glock model 17, 9-millimeter Luger

24  caliber semi-automatic pistol.  Serial number is MU414US.

25  Q.   Now, have there been any modifications made to this
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    firearm?

2    A.    Yes.

3    Q.    What is that modification?

4    A.    There is a small piece of Velcro attached to the right

5    side of the grip frame.

6    Q.    In your opinion as a firearms expert, what is that Velcro

7    for?

8    A.    I can think of only one reason what that would be for, and

9    it would be to attach a tape switch to either a laser or a

10   light that would be mounted forward, either -- probably on the

11   trigger guard of the pistol.

12   Q.    Thank you.

13         If you could turn to exhibit -- and this is also a

14   firearm, correct?

15   A.    Yes, it is.

16   Q.    Can we turn to Exhibit 309.  Please hold it up and tell

17   the jury what it is.

18   A.    This exhibit is a Taurus model PT99 AF 9-millimeter Luger

19   caliber semi-automatic pistol with serial number TNH05928.

20   Q.    And I'm sorry, what caliber is it in?

21   A.    Nine millimeter.

22   Q.    Now, let me ask.  If I told you that this firearm was

23   found loaded with a round in the chamber and the hammer pulled

24   back, what, if any, significance does the hammer being pulled

25   back have?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Incomplete hypothetical.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  It indicates a -- a position that the

 4   firearm is more ready to be fired.  This is a double-action

 5   pistol, meaning it can either be fired with a hammer forward

 6   and a long, heavy pull of the trigger in order to make the

 7   pistol fire, or an easier way would be to have the hammer

 8   cocked, which results in a shorter, lighter trigger pull.

 9   BY MR. CREIGHTON:

10   Q.   Okay.  If we could put that back in the box and if I could

11   ask you a few questions about these handguns.

12        What characteristics, if any, do all of these handguns

13   share?

14              MR. SEVERO:  Objection, vague and compound.

15              THE COURT:  Overruled.

16        Do they share any characteristic?

17              THE WITNESS:  Yes.  They are all classified as

18   handguns.  They are all relatively compact for easier carry or

19   concealability than with a rifle or a shotgun.

20   BY MR. CREIGHTON:

21   Q.   I'm not going to show you the exhibit now, but have you

22   previously examined the ammunition that went with these

23   firearms that I have just shown you?

24   A.   Yes.

25   Q.   Was that ammunition in a variety of calibers to fit those
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001501**

```
 1   weapons?

 2   A.   Yes.

 3   Q.   How would you describe the quality of the ammunition that

 4   was found in these firearms?

 5   A.   My recollection is that it was a mix of basic, relatively

 6   inexpensive target ammunition, as well as some premium

 7   defensive ammunition.

 8   Q.   Does even the inexpensive target ammunition have the

 9   capacity to be lethal?

10   A.   Absolutely, yes.

11   Q.   If we could turn now to Exhibit 317.

12   A.   I have it.

13   Q.   If you could hold it up and tell the jury what it is.

14   A.   This is a Star model 30M 9-millimeter Luger caliber

15   semi-automatic pistol.  Serial number is 1885728.

16   Q.   Thank you.  If you could return that to the box, and if we

17   could return to Exhibit 316.

18        If you would hold that up to the jury and tell the jury

19   what it is.

20   A.   This exhibit is a Smith & Wesson model 638, also known as

21   an Airweight.  It is a .38 Special caliber revolver.  Serial

22   number is CCH2705.

23   Q.   Now, you used a word we haven't heard yet, which is

24   "revolver."  What does that mean?

25   A.   A revolver is a type of handgun that has a cylinder which
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    contains ammunition.  For this revolver, it's five rounds

2    within the cylinder.  And with each pull of the trigger, the

3    cylinder rotates one position for the next round of ammunition

4    to be fired, and will continue to fire ammunition until all

5    five rounds have been fired.

6    Q.   Does this firearm have a hammer?

7    A.   Yes, it does.

8    Q.   Would you explain to the jury what a hammer is and where

9    it is on this firearm.

10   A.   Well, firearms, many firearms use a hammer in order to

11   initiate the firing sequence.  So when you pull the trigger,

12   the hammer is first cocked, or released, and when the hammer

13   goes forward, it hits the firing pin.  And the firing pin is

14   what strikes the round of ammunition and causes it to go

15   "bang."  For this, for this revolver, the hammer is only

16   semi-exposed.  It's enclosed in part of the frame of the

17   revolver to help protect the hammer from snagging on clothing.

18   Q.   Is this a concealable firearm?

19   A.   Yes.

20   Q.   Is there anything unusual about the barrel of this

21   firearm?

22   A.   It's a relatively short barrel.  Many people would call it

23   a "snubnose," which is kind of an industry term or colloquial

24   term.  This revolver was designed for -- for carry purposes.

25   It uses a lightweight aluminum frame.  It has the semi-exposed

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   hammer so it doesn't catch on clothing or in your pocket, and
 2   the barrel is short.  So the overall length of the firearm is
 3   relatively small, so you can have it inside a pocket, and it's
 4   readily retrievable without snagging on any clothing.
 5           MR. CREIGHTON:  And just for clarification purposes
 6   for the stipulation, your Honor, I want to make sure that both
 7   this exhibit and the previous exhibit, Exhibits 316 and 317,
 8   that it is stipulated that these two weapons and the next two
 9   exhibits I'll be talking about have traveled in interstate
10   commerce.
11           THE COURT:  The stipulation was to all weapons and all
12   ammunition that have been in evidence.
13           MR. CREIGHTON:  Thank you, your Honor.
14           THE COURT:  If I'm correct.  Counsel can correct me.
15           MR. SEVERO:  Yes, your Honor.
16           MR. PEREYRA-SUAREZ:  That is correct, your Honor.
17           MR. CREIGHTON:  Thank you.
18   Q.   If we could turn to Exhibit 318.  I'm sorry.  If we could
19   turn to -- yes, please, Exhibit 318.  What is this, Agent
20   Hamilton?
21   A.   This is an Intratec model Tec-22, .22 long rifle caliber
22   semi-automatic pistol.  Serial number was either partially
23   obliterated or attempted obliterated, 036039.
24   Q.   Now, you said that the serial number was obliterated or
25   partially obliterated.  Do you observe any other modifications
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   to this firearm?

 2   A.    Yes.

 3   Q.    Would you tell us what they are.

 4   A.    There is a laser attached to the pistol by a mount

 5   attached to the barrel, with a pigtail wire going back to a

 6   tape switch which is attached to the grip via Velcro.

 7   Q.    Have you tested that laser switch to see whether the laser

 8   works?

 9   A.    Yes.

10         MR. CREIGHTON:  Your Honor, with the Court's

11   permission, if we could point the laser at the ceiling and

12   demonstrate the laser.

13         THE COURT:  Okay.

14         THE WITNESS:  Or I'll point it at my hand.  A little

15   more visible.

16   BY MR. CREIGHTON:

17   Q.    And again, what is the purpose of that laser?

18   A.    It projects a red dot at the target at which the gun is

19   pointing.  So, assuming the laser is properly sighted in, where

20   that dot is aiming is where the bullet is going to impact.

21   Q.    Is there anything noteworthy about the barrel of this

22   firearm?

23   A.    There is a threaded barrel attached to it.  It has a

24   thread cap on it, but the thread would be used for attaching

25   either a flash hider or a sound suppresser, silencer.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Would you explain to the jury what a flash hider is.

2  A.   A flash hider is a device attached to the end of a barrel,

3  the muzzle end, and it helps redirect gasses in the flash from

4  burning gunpowder away from the shooter's line of sight.

5  Q.   And would you explain what a sound suppresser is.

6  A.   A suppresser or a silencer reduces the audible signature

7  of a gunshot.  So you're reducing it a number of decibels.  And

8  the degree on which silencers are effective vary.

9        MR. CREIGHTON:  Keeping that up here, up at the

10  podium, but please keeping it separate from the next exhibit,

11  could we put Exhibit 319 up for Agent Hamilton to look at.

12  Q.   And you can take those out of the bag.  Would you --

13  A.   I have them.

14  Q.   Would you show those items to the jury, please.  Would

15  tell the jury what they are.

16  A.   In my left hand, I'm holding a 30-round magazine

17  compatible with the Tec-22 pistol that I just described.

18        In my right hand, I have -- believe it's 11 rounds of .22

19  long rifle caliber ammunition.

20  Q.   Now, when you say the magazine is compatible with the

21  previous firearm, have you placed that magazine into that

22  firearm?

23  A.   Yes.

24  Q.   If we could put those exhibits away now and turn to

25  Exhibit 327, and if you would hold that up to the jury, for the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  jury, and please tell them what it is.

2  A.   This is an Omega Arms model Omega III.  Believe it's a

3  30-aught-6 caliber bolt action rifle.  Yes, 30-aught-6 caliber

4  bolt action rifle.  Serial number is 548.

5  Q.   Would you explain to the jury what "30-aught-6" and "bolt

6  action rifle" mean.

7  A.   The 30-aught-6 is the caliber designation.  It was

8  introduced in 1906.  It uses a 30-caliber bullet.  30-caliber

9  is .30 inches in diameter.  It's a relatively long caliber.  It

10  was originally designed for military purposes.

11      The bolt action of the rifle is in regards to what I'm

12  holding with my right hand and moving back and forth, which is

13  the bolt of the firearm.  This rifle has a rotary magazine in

14  it where rounds can be individually inserted through the

15  breach.  The bolt is then pushed forward and closed by -- by

16  pushing the bolt handle down and to the right, making the rifle

17  ready to fire.

18  Q.   Is there anything unusual about this rifle?

19  A.   It's a relatively rare rifle.

20  Q.   Is it for hunting?

21  A.   It was -- it was designed for hunting, yes.  There were

22  approximately a thousand of them made.  It was designed to be a

23  take-down rifle.  There's one screw that holds the butt stop

24  onto the rifle, whereas most rifles have two screws attaching

25  the rear and forward part of the rifle.  The design with the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   one screw in the rear allows it to be taken down and put back

2   together without changing the zero of the scope, which means

3   you don't have to re-sight it after it's been taken down and

4   put back together.

5   Q.   And if the rifle is taken down, it's more easily

6   concealable or more easily transportable?

7   A.   Yes.  In this case it would remove approximately 14 inches

8   of length from the -- by removing the butt stop, making its

9   overall length probably three feet.

10          MR. CREIGHTON:  Thank you.  No further questions.

11          THE COURT:  Cross.

12      You can put the rifle back.

13      Cross?

14          MR. SEVERO:  Very briefly.

15                    **CROSS-EXAMINATION**

16  BY MR. SEVERO:

17  Q.   Good afternoon, sir.

18  A.   Afternoon.

19  Q.   This Omega rifle is a -- would you classify it as

20  something of a collector's item now?

21  A.   Not particularly, no.

22  Q.   Is it a high-value rifle?

23  A.   No.  There are a lot of Internet rumors about the

24  exorbitant values of the rifle, but a free market value would

25  be much less.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   But the Internet's blowing it up as something much more
2    valuable, is that it?
3    A.   There is apparently one person who has some of these in
4    his possession who is trying to sell them for a large sum of
5    money, and all it takes is one person to pay that, and that's
6    what a particular rifle is worth, however much someone is
7    willing to pay for it.
8    Q.   Are those amounts something like $30,000 or anywhere near
9    that?
10   A.   I've seen them -- I've seen this one person advertise them
11   for as much as $45,000.  I don't think he's --
12   Q.   Recently?
13   A.   Within the last couple years.  The fair market value would
14   be somewhere around 1,500 to 3,000 dollars.
15   Q.   Let me direct your attention to the snubnose revolver.
16   That's designed to be concealed; is that correct?
17   A.   Yes.
18   Q.   And in fact, many law enforcement officers use it as a
19   backup gun, correct?
20   A.   That type or similar type revolvers, yes.
21   Q.   Something they can wear, like, in their -- carry on their
22   ankle, in an ankle holster?
23   A.   Yes.
24   Q.   Pockets?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Even off duty?

2    A.   Yes.

3    Q.   Directing your attention to 318, the Intratec.  Was

4    that -- did you test the laser to see if it was aligned?

5    A.   I did not.

6    Q.   Are you able to tell if it's aligned by just looking at

7    it?

8    A.   I might be able to.

9    Q.   Could you?

10        Your Honor, may he?

11        THE COURT:  Yes, you can show him again.

12        By the way, was that automatic or semi-automatic?

13        THE WITNESS:  Semi-automatic.  As far as -- it was

14   designed as a semi-automatic.  I have not seen a fully

15   automatic Tec-22 myself.

16        THE COURT:  Okay.

17   BY MR. SEVERO:

18   Q.   And while you -- since you've been asked that question,

19   this is not like a machine gun, is it?

20   A.   I -- because I didn't test-fire it, I can't say.  I didn't

21   even function-check it.

22   Q.   But is it designed to be like a rapid-fire,

23   one-pull-fire-several-rounds type of gun?

24   A.   It was originally designed to be semi-automatic, which

25   means one round for each pull of the trigger.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   All right.  So if somebody said it was a submachine gun,

2  that would be inaccurate?

3  A.   Correct.  It --

4  Q.   Right.

5  A.   It -- commonly known as a submachine gun simply by its

6  appearance, but machine gun would be more than one round fired

7  for each action of the trigger.

8  Q.   Very good.

9       All right.  Could you test the laser and see if it's --

10          THE COURT:  I'm assuming you don't have to fire the

11  weapon --

12          THE WITNESS:  I do not.

13          MR. SEVERO:  I hope not, because he's pointing it this

14  way.

15          THE WITNESS:  I'm aligning the rear sight with the

16  front sight and then comparing that to where the red dot is

17  being projected, and I will do it across -- or actually, I'll

18  do it --

19          MR. SEVERO:  Listen, I --

20          THE WITNESS:  I'm aiming the iron sight at the top of

21  the clock back there, and the dot is projecting roughly 12

22  inches low at that range.  Closer in, obviously, with the

23  muzzle being here and the laser just an inch below it, at close

24  range it's only going to be one inch off.  Because we were

25  working at further distances, the dot is going to be lower than

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   where the bullet actually projects.

2   BY MR. SEVERO:

3   Q.   You've been a witness 41 times?

4   A.   Yes.

5   Q.   Would you classify yourself as a professional witness now?

6   A.   No.

7   Q.   All right.

8   A.   It's -- it's just a minor part of what I do.

9   Q.   Okay.  With respect to the Exhibit 307 --

10       If I could have it shown to the witness.

11  A.   I have it.

12  Q.   Does it have a pin?  Oh, they all have a pin, but can you

13  see it?

14  A.   A firing pin?

15  Q.   Yes.

16  A.   I can see it in the firing pin hole.  What I'm doing is

17  depressing the rear of the firing pin.  The firing pin is held

18  back by spring pressure, so if I push forward with it, I can

19  see the firing pin.  It is not projecting to where the firing

20  pin hole is, by what I can tell.

21  Q.   So there is no firing pin?

22  A.   No, there is a firing pin in there.

23  Q.   Is it working?

24  A.   Well, I don't know.  I would actually have to fire a round

25  to see --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001512**

```
1    Q.   I see.

2    A.   -- if it impacted or left a dimple on the --

3    Q.   And you did not fire any of these guns?

4    A.   I did not fire these guns.  However, I'm looking at the --

5    Q.   I understand, but you didn't fire any of these guns?

6    A.   I did not fire these guns.

7            MR. SEVERO:  I have nothing further.  Thank you.

8            MR. PEREYRA-SUAREZ:  Your Honor, I'm not going to ask

9    the witness to conduct any more demonstrations.

10           THE COURT:  Thank you, Counsel.

11           MR. FLIER:  I have no questions, your Honor.

12           MR. CREIGHTON:  One question, your Honor.

13           THE COURT:  Yes.

14                        REDIRECT EXAMINATION

15   BY MR. CREIGHTON:

16   Q.   Just to be clear, all of these handguns and the rifle that

17   you looked at are firearms under the definition of firearm; is

18   that correct?

19   A.   Yes, they are.

20           MR. CREIGHTON:  Thank you, your Honor.

21           THE COURT:  Anything further?

22           MR. SEVERO:  Nothing further.

23           MR. FLIER:  No, your Honor.

24           THE COURT:  You may step down.  Thank you very much.

25       Next witness.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. YANG:  Yes, your Honor.  The government calls
 2    Scott Camery.
 3         And your Honor, for clarification purposes, this next
 4    witness begins the phase of the government's case regarding the
 5    99 Cent Store fraud scheme, which applies to all three
 6    defendants.
 7              THE COURT:  All three defendants?
 8              MS. YANG:  They are all -- I'm sorry.  Defendants
 9    Darbinyan and Parsadanyan are both charged in that scheme.
10              THE COURT:  That's what I thought.  Does not apply to
11    Mr. Sharopetrosian?
12              MS. YANG:  That is correct.
13         (Witness sworn.)
14              THE CLERK:  Thank you.  You may be seated.  You can
15    adjust the microphone if you need to.
16         May I please ask that you state your full name and spell
17    your last name for the record.
18              THE WITNESS:  Scott Allen Camery, C-a-m-e-r-y.
19              THE CLERK:  Thank you.
20              THE COURT:  You may inquire.
21              MS. YANG:  I'm sorry, one point of clarification.
22    Although defendant Sharopetrosian is not charged in the bank
23    fraud or the aggravated identity theft or access device
24    conspiracy counts, the scheme is charged in the RICO conspiracy
25    in which he is named as a defendant.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2              MS. YANG:  May I proceed?

 3              THE COURT:  Yes.

 4                SCOTT CAMERY, GOVERNMENT'S WITNESS,

 5                        DIRECT EXAMINATION

 6   BY MS. YANG:

 7   Q.   Good afternoon, Mr. Camery.

 8   A.   Good afternoon.

 9   Q.   Where are you presently employed?

10   A.   I'm unemployed at this time.

11   Q.   And prior to that, where were you employed?

12   A.   99 Cent Only Stores.

13   Q.   And for approximately how long were you employed by the

14   99 Cent Only Stores?

15   A.   Approximately seven years.

16   Q.   And what was your position with that company?

17   A.   My last position was vice president of loss prevention.

18   Q.   And approximately how many years were you vice president

19   of loss prevention?

20   A.   About four years.  And prior to that, I was the assistant

21   vice president.  So total of seven years.

22   Q.   Now, the loss prevention department of the 99 Cent Only

23   Stores, could you please describe what your general duties

24   are -- were.

25   A.   They were basically to protect the company's assets, which
```

```
1    is a variety of things, from our merchandise, to our building,

2    to our employees, to our customers, things of that nature.

3    Q.   Now, as first the associate vice -- or I believe you said

4    assistant vice president?

5    A.   Yes.

6    Q.   And then the vice president of the loss prevention

7    department, in order to protect the company's assets, did your

8    department investigate theft within the 99 Cent Only Stores?

9    A.   Yes, ma'am.

10   Q.   And would that be theft internally by employees?

11   A.   Yes, ma'am.

12   Q.   And would that also be theft from external sources, such

13   as customers or other individuals?

14   A.   Yes.

15   Q.   Now, I'd like to direct your attention to mid July of

16   2009.  Did you receive information that the 99 Cent Only Stores

17   were being compromised in some way?

18           MR. SEVERO:  Objection.

19           MR. FLIER:  Object.

20           MR. SEVERO:  Hearsay --

21           MS. YANG:  Your Honor --

22           MR. SEVERO:  -- and --

23           THE COURT:  Sustained.  Sustained as to whether or not

24   you received information.

25           THE WITNESS:  Yes, I did.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. PEREYRA-SUAREZ:  Move to strike, your Honor.

 2            MR. SEVERO:  Move to strike.

 3            THE COURT:  It will be stricken.

 4        Mr. Camery, I'm assuming you're not a professional

 5    witness, so let me help you out.  If I sustain an objection,

 6    you don't answer.  If I overrule it, you do.  Okay?

 7        Go ahead.

 8    BY MS. YANG:

 9    Q.   Mr. Camery, in mid July of 2009, did you initiate a fraud

10    investigation of some 99 Cents Only Stores?

11    A.   Yes, I did.

12    Q.   And what prompted your initiation of that investigation?

13            MR. SEVERO:  May call for hearsay.

14            MR. FLIER:  Same objection.

15            MS. YANG:  Your Honor, under United States v. Payne --

16            THE COURT:  Overruled.

17            MS. YANG:  Apologize.

18    Q.   Mr. Camery, could you answer?

19    A.   We received an e-mail and telephonic communication that --

20            MR. SEVERO:  Objection.  Now hearsay.

21            THE COURT:  So this is based on e-mails and telephonic

22    communication that you received; is that correct?

23            THE WITNESS:  Yes, sir.

24            THE COURT:  Okay.  Next question.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MS. YANG:

 2   Q.   Where did you receive the e-mail and telephonic

 3   communication?  Was it from one of the 99 Cent Only Stores?

 4   A.   Yes, ma'am.

 5   Q.   And which store was that?

 6   A.   The first store was one of our Riverside stores.  I

 7   believe the store number is 104, and possibly 134.  I don't

 8   know all the store numbers by heart.

 9   Q.   So does the 99 Cent Only Stores company keep track of all

10   of their stores by number?

11   A.   Yes, ma'am.

12   Q.   And store -- you mentioned 134 and 104.  Were those both

13   stores in Riverside County?

14   A.   Yes, ma'am.

15   Q.   Did they have common names that you also refer to those

16   stores by?

17   A.   Yes, it did.

18   Q.   And which store was store 134?

19   A.   134 I believe was called Magnolia.

20   Q.   And what was store 104?

21   A.   104 was called Arlington.

22   Q.   So in mid July 2009, you received a communication from one

23   of your stores in Riverside about suspected fraud; is that

24   correct?

25   A.   Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What did you -- did you receive any other communications

 2   from other sources about suspected fraud being committed in

 3   99 Cent Only Stores?

 4          MR. SEVERO:  Objection, hearsay.

 5          THE COURT:  Overruled.

 6          THE WITNESS:  Yes, I did.

 7   BY MS. YANG:

 8   Q.   And from what other sources did you receive this

 9   information?

10   A.   From financial institutions.

11   Q.   And by financial institutions, do you mean banks and

12   credit unions?

13   A.   Yes, ma'am.

14   Q.   And what was the nature of the information you were

15   receiving from the financial institutions?

16          MR. SEVERO:  It's hearsay, or "nature" is vague.

17          THE COURT:  Sustained.

18   BY MS. YANG:

19   Q.   Based on the information you received from one of your

20   Riverside stores as well as financial institutions, what did

21   you do in response?

22   A.   Began an investigation at the store location in question.

23   Q.   Now, did you -- was there an individual in the loss

24   prevention department by the name of Burl, B-u-r-l, last name

25   Davis?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, ma'am.

2   Q.   And did you send Mr. Davis to one of the Riverside stores?

3   A.   Yes, I did.

4   Q.   And was that the Magnolia store, store 134?

5   A.   Yes, ma'am.

6   Q.   And what did you instruct Mr. Davis to do when he arrived

7   at the Magnolia 134 store?

8   A.   I instructed him to look for any signs of fraudulent

9   credit card activity related to our point-of-sale system, which

10  would be our PIN pads, our computer system, to see if he's

11  found anything unusual.

12  Q.   And when you talk about point-of-sale or PIN pads, what

13  are you talking about?

14  A.   It's basically the -- the credit card scanner at the

15  register that a customer would put their credit card or ATM

16  card through to complete a transaction.

17  Q.   So they're the little box devices that are at the checkout

18  counters; is that correct?

19  A.   Correct.

20  Q.   Now, why did you direct Mr. Davis to check -- to look at

21  the PIN point -- PIN pad terminals?

22  A.   From my experience in the credit fraud business, the PIN

23  pad is the most likely spot of the source of the fraud that's

24  being committed, and that was the first area that I instructed

25  him to look at.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And your understanding was that credit card fraud was

 2   being committed against 99 Cents Only Store customers, correct?

 3   A.   Yes, ma'am.

 4   Q.   Now, did you receive a report from Mr. Davis as to what,

 5   if anything, he discovered at the Magnolia store?

 6   A.   Yes, I did.

 7   Q.   And were you -- did you have an understanding whether

 8   there were any signs of tampering with the PIN point pads or

 9   the point-of-sale terminals?

10          MR. FLIER:  Objection.

11          MR. SEVERO:  Objection, hearsay.

12          THE COURT:  Sustained.

13   BY MS. YANG:

14   Q.   Based on your knowledge of the investigation that you

15   conducted of the 99 Cent Only Stores, were compromised devices

16   found at the Magnolia store, number 134 location?

17          MR. SEVERO:  Lacks foundation, hearsay.

18          THE COURT:  Sustained.

19   BY MS. YANG:

20   Q.   What did you do once Mr. Davis reported to you what his

21   findings were at the Magnolia 134 store?

22   A.   Continued my investigation.

23   Q.   Now, did you personally then go to the Magnolia store,

24   number 134?

25   A.   Yes, I did.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   And what did you do when you went there?

2    A.   I surveyed the store and inspected the PIN pad devices and

3    our computer systems and our telecommunication equipment.

4    Q.   So after Mr. Davis went to do his inspection at the

5    Magnolia 134 store, you went yourself to do your own

6    inspection, correct?

7    A.   Correct.

8    Q.   And did you inspect the PIN pads or point-of-sale

9    terminals at the Magnolia 134 store by yourself?

10   A.   Yes, I did.

11   Q.   And did you discover any compromised devices or altered

12   devices?

13   A.   Not at that time.

14   Q.   Now, did you subsequently receive another communication

15   about potential fraudulent activity at another 99 Cent Only

16   Store?

17   A.   Yes, I did.

18   Q.   And do you recall what store that was?

19   A.   It was the Limonite store.

20   Q.   And what store number is that?

21   A.   285.

22   Q.   And what city is the Limonite store located in?

23   A.   It's -- I'm not sure it's the city of Riverside or it's

24   the county of Riverside.  May be one and the same.

25   Q.   Now, who did you receive this communication from?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   From another financial institution.

2   Q.   And in response to that communication from the financial

3   institution about suspected fraud at the Limonite 285 store,

4   what did you do in response?

5   A.   I instructed our I.T. department to send someone to that

6   location to examine the PIN pad devices, the computer

7   equipment, and the telecommunication equipment.

8   Q.   So, similar to your direction to Burl Davis, you had a

9   representative from your I.T. department go to the Limonite

10  store, correct?

11  A.   Yes, ma'am.

12  Q.   And by "I.T." what do you mean?

13  A.   Our computer department.

14  Q.   And was it common for you to send a representative out of

15  your I.T. department to investigate on behalf of the loss

16  prevention department?

17  A.   Not common.  Depending on the situation.

18         THE COURT:  Ladies and gentlemen, we're going to break

19  at this time, being 4:00 o'clock.  I promised you you'd get out

20  at 4:00.  So we will see you back in tomorrow morning.

21     Remember the admonishment not to discuss the case among

22  yourselves or with anybody else or form or express any opinions

23  about the matter until you retire to the jury room.

24     Have a pleasant evening today.  Again, remember, don't

25  think about this case.  Wait till you come back in tomorrow

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   morning.

 2        And we'll see you all in by?

 3           JUROR:  8:15.

 4           THE COURT:  See you then.  We'll still be in session

 5   as you leave.

 6        (Outside the presence of the jury:)

 7           THE COURT:  Okay.  Record will reflect that the jurors

 8   have left the courtroom.

 9        You can have a seat.

10        Counsel, in the spirit of sharing with you observations of

11   the Court, I again should share with you, you know, I've been

12   at this for -- on the bench for over 39 years, and it's a

13   pretty common acceptance that you don't walk through the well,

14   you don't wear floppers to court, and when you have an expert

15   or anybody testifying to a weapon, you don't have that person

16   pointing the weapon at the judge or the jury.

17        Now, I figured --

18           MR. SEVERO:  Or counsel.

19           THE COURT:  Or counsel.

20        I figured that after he's testified 41 times, he probably

21   knew this.  Either that, or he didn't like my rulings.  But

22   whatever it was, he was probably the majority of the time

23   having it directed towards or pretty close to the judge and

24   sometimes to the jury.  I don't care for this case, but there's

25   a lot of judges that will really get upset about that.  So,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   observation that maybe you can convey back to him in the

2   future, be very, very careful not to point firearms either at

3   the bench or at the jury.

4           MR. CREIGHTON:  Your Honor, I apologize, and I will

5   speak with the agent about that.

6           THE COURT:  You don't need to apologize.  It's just an

7   observation I'm making --

8           MR. CREIGHTON:  No, I appreciate it.

9           THE COURT:  -- and I think it would be worthwhile for

10  him on his 43rd testimony.

11      Okay.

12          MR. FLIER:  Your Honor, when I started to ask my

13  questions, I said I'd like the Court to entertain a motion to

14  strike all the testimony.  I think this might be a time to

15  address it.  I don't think there's any relevance --

16          THE COURT:  Counsel, I'm not -- I'm not cutting you

17  off.  Well, I am cutting you off.  I'm not going to address

18  it at this time.  There may or may not be relevance down the

19  line.

20          MR. FLIER:  Okay.

21          THE COURT:  So I will let you reserve that motion.  I

22  might very well strike it.  I don't know what's going to come

23  in in the next witnesses, so --

24          MR. FLIER:  I just want to make sure I brought it up.

25          THE COURT:  And that you've reserved that.  I will do

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    that.

2         Court will be in recess.

3              THE CLERK:  All rise.

4         Court is adjourned.

5

6              *(Proceedings adjourned at 4:03 p.m.)*

7

8                      *--oOo--*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4    Title 28, United States Code, the foregoing is a true and

 5    correct transcript of the stenographically reported proceedings

 6    held in the above-entitled matter and that the transcript page

 7    format is in conformance with the regulations of the

 8    Judicial Conference of the United States.

 9

10    Date:  MARCH 4, 2015

11

12

13

14              /S/ SANDRA MACNEIL

15           Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1

1                   UNITED STATES OF AMERICA
                UNITED STATES DISTRICT COURT
2             CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION
3                      - - -
              HONORABLE GARY KLAUSNER
4        UNITED STATES DISTRICT JUDGE PRESIDING
                    - - -
5

6   UNITED STATES OF AMERICA,       )
                           )
7              PLAINTIFF,      )
                           )
8   VS.                      )  CASE NO.: CR
                           )  11-00072(A)-RGK
9   MHER DARBINYAN             )
   ARMAN SHAROPETROSIAN      )
10  RAFAEL PARSADANYAN,        )
                           )
11           DEFENDANTS.     )
   _____)
12

13

14
          REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
            THURSDAY, APRIL 3, 2014
16
            LOS ANGELES, CALIFORNIA
17

18

19

20

21

22
         LAURA MILLER ELIAS, CSR 10019
23       FEDERAL OFFICIAL COURT REPORTER
       312 NORTH SPRING STREET, ROOM 453
24      LOS ANGELES, CALIFORNIA 90012
          PH:  (213)620-0890
25

```
1   APPEARANCES OF COUNSEL:

2   ON BEHALF OF PLAINTIFF:

3           BY: E. MARTIN ESTRADA
4               ELIZABETH R. YANG
            ASSISTANT UNITED STATES ATTORNEYS
5
            1100 UNITED STATES COURTHOUSE
6           312 NORTH SPRING STREET
            LOS ANGELES, CA 90012
7

8   ON BEHALF OF DEFENDANT MHER DARBINYAN:

9           THE SEVERO LAW FIRM
            BY:  MICHAEL V. SEVERO, ESQ.
10          70 SOUTH LAKE AVENUE
            SUITE 945
11          PASADENA, CA 91101

12  ON BEHALF OF DEFENDANT ARMAN SHAROPETROSIAN:

13          LAW OFFICES OF CHARLES PEREYRA-SUAREZ
            BY:  CHARLES PEREYRA-SUAREZ, ESQ.
14          800 WILSHIRE BOULEVARD
            12TH FLOOR
15          LOS ANGELES, CA 90017

16  ON BEHALF OF RAFAEL PARSADANYAN:

17          FLIER AND FLIER, ALC
            BY:  ANDREW REED FLIER, ESQ.
18          15250 VENTURA BOULEVARD
            SUITE 600
19          SHERMAN OAKS, CA 91403

20

21

22

23

24

25
```

```
1                                   INDEX
2
     WITNESSES FOR
3    THE GOVERNMENT:

4                     DIRECT    CROSS     REDIRECT    RECROSS

5    CAMERY, SCOTT
     BY:  MS. YANG       4                   75
6    BY:  MR. SEVERO             39                     78
     BY:  MR.FLIER               73                     78
7
     MITCHELL, NICHOLAS
8    BY:  MS. YANG       79
     BY:  MR. SEVERO             88
9    BY:  MR. FLIER              95

10   STOHL, MARK
     BY:  MR. ESTRADA    97                  156
11   BY:  MR. SEVERO             132                    159
     BY:  MR. PEREYRA-SUAREZ     147
12   BY:  MR. FLIER              149

13   STEBBINS, JEREMY
     BY:  MR. ESTRADA    162
14

15      EXHIBITS      ADMITTED        EXHIBITS       ADMITTED

16       336             8            339              87
         346            12            367             116
17       347            13            293             128
         337            15            345 A&B         165
18       348            16            346 A           165
         345            19            347 A&B         165
19       350            22            348 A           165
         341            29            350 A           165
20       338            31            351 A&B         165
         353            34            352 A&B         165
21       354            34            353 A           165
         355            35            355 A           165
22       342            37
         349            37
23       351            38
         352            39
24

25
```

```
 1      LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 3, 2014; 8:45 A.M.
 2                            - - -
 3            THE COURT:  Okay.  The record will reflect that all
 4      the jurors in their respective seats in the jury box
 5      including the alternates.  Ladies and gentlemen, I apologize
 6      to you.  We had problems with the reporter setting whatever
 7      has to be set there and there's really no excuse for that and
 8      I'm very sorry.  We will get started on time from here on in.
 9      This will not happen again.
10            Okay.  The witness on the witness stand.
11            Counsel, may continue examination.
12            THE CLERK:  You are reminded you are still under
13      oath.
14                  DIRECT EXAMINATION (CONTINUED)
15      BY MS. YANG:
16      Q.   Good morning, sir.
17      A.   Good morning.
18      Q.   Yesterday when we left off, you had just finished
19      testifying about going to the Magnolia 134 store in Riverside
20      and personally inspecting the pin pads or point of sale
21      devices; is that correct?
22      A.   Yes, ma'am.
23      Q.   Now, just to clarify these PIN pads, point of sale
24      devices that are located in 99 Cent Only stores, can
25      customers use those PIN pads to use either their credit card
```

1    and/or their debit ATM card?

2    A.    Yes, ma'am.

3    Q.    And if they use their debit or ATM card, do they also

4    need to input their PIN numbers?

5    A.    Yes, they do.

6    Q.    Now, the same day that you went to the Magnolia 134

7    store, did you receive another location communication about

8    potential fraudulent activity at a different 99 Cent Only

9    store?

10   A.    Yes, I did.

11   Q.    And from whom did you receive that communication?

12   A.    Uh, from one of the financial institutions.

13   Q.    And based on the information that you received from the

14   financial institution, did you focus on a particular 99 Cent

15   Only store?

16   A.    Yes, we did.

17   Q.    And which store was that?

18   A.    The Limonite Store No. 285.

19   Q.    And I believe yesterday you testified that you sent

20   someone from the IT Department to the Limonite store; is that

21   correct?

22   A.    Correct.

23   Q.    Now, did the IT representative report back to you his or

24   her findings from the Limonite 285 store?

25   A.    Yes, they did.

1    Q.   And based on what the IT representative reported back to

2    you, was something brought to you?

3    A.   Yes.

4    Q.   And what was brought to you?

5    A.   An altered PIN pad off one of the registers from the

6    Limonite store.

7    Q.   Now, at the time were you still at the Magnolia 134

8    store?

9    A.   Yes, ma'am.

10   Q.   And when the IT representative brought the altered PIN

11   pad to you at the store, what did you do with it?

12   A.   I examined the PIN pad by opening up the back panel.

13   Q.   And after opening up the back panel, did you notice

14   anything unusual about that PIN pad?

15   A.   Yes, I did.

16   Q.   And what did you notice?

17   A.   That the PIN pad had been altered from the inside.

18   Q.   And how could you tell it had been altered?

19   A.   The plastic covering over the electronic components

20   inside it had been cutaway and the skimming type device had

21   been altered onto the electronic components inside the PIN

22   pad.

23   Q.   Now, prior to your investigation in mid-July 2009 about

24   fraudulent activity, had you had familiarity with skimming

25   devices?

```
 1    A.    Yes, ma'am.

 2    Q.    So when you saw this device in the altered PIN pad from

 3    the Limonite store, you recognized it as a skimming device;

 4    correct?

 5    A.    Correct.

 6    Q.    And did you also have familiarity with the PIN pads or

 7    point of sale devices at 99 Cent Only stores used in their

 8    locations?

 9    A.    Yes, I did.

10    Q.    And did those PIN pads have these types of skimming

11    devices inserted in them?

12    A.    No, they did not.

13          MS. YANG:  Your Honor, I'd at this time like to ask

14    the clerk's assistance in placing Exhibit 336 before the

15    witness.

16          THE COURT:  Yes.

17          MS. YANG:  It's a physical exhibit.

18          THE WITNESS:  Yes.

19    BY MS. YANG:

20    Q.    Mr. Camery, if you could take a look at Exhibit 336, do

21    you recognize this exhibit?

22    A.    Yes, I do.

23    Q.    Let me preface it by after you opened up and examined

24    the altered PIN pad from the Limonite store, did you turn

25    this device over to law enforcement?
```

1    A.    Yes, I did.

2    Q.    And would that be the Riverside's Sheriff's Department?

3    A.    Yes, ma'am.

4    Q.    And is this device in Exhibit 336 the altered device

5    from the Limonite store that you turned over to the Riverside

6    Sheriff's Department?

7    A.    It's in the same sealed or the bag that I signed and

8    initialed and gave to them, yes.

9    Q.    And does it appear to be in substantially the same

10    condition as when you turned it over to law enforcement?

11    A.    Yes, ma'am.

12            MS. YANG:  Your Honor, at this time the government

13    moves to admit Exhibit 336 into evidence.

14            THE COURT:  It will be received.

15                (Exhibit 336 was admitted.)

16    BY MS. YANG:

17    Q.    Now, during the course of your investigation, did you

18    collect numerous altered PIN pads from various 99 Cent store

19    locations?

20    A.    Yes, we did.

21    Q.    And prior to testifying here today, did you view all of

22    those devices to confirm that they were the ones that you

23    collected?

24    A.    Yes, I did.

25    Q.    And all of those devices did you subsequently turn over

```
1    to various law enforcement agencies?

2    A.   Yes, ma'am.

3    Q.   Now, in addition to the altered PIN pad from the

4    Limonite store, did you ask to view or did you view

5    surveillance video from the Limonite store?

6    A.   Yes, I did.

7    Q.   And did you also view surveillance video from the

8    Magnolia 134 store?

9    A.   Yes, ma'am.

10          MS. YANG:  Now, I'd like you to take a look at

11   Exhibit 346 if that could also be placed before the witness

12   and 347.

13          THE CLERK:  Are you finished with this?

14          MS. YANG:  Yes, thank you.

15   Q.   Mr. Camery, would you please first take a look at

16   Exhibit 346.  What is that?

17   A.   It's a CD disk that's got the markings on it from the

18   99 Cent Only stores.

19   Q.   And was that from the 134 store?

20   A.   Yes, it was.

21   Q.   And is the date of that video July 14, 2009?

22   A.   Yes, ma'am.

23   Q.   Now, prior to testifying here today, did you view the

24   video contained on this CD Exhibit 346?

25   A.   Yes, I did.
```

```
 1    Q.   And when you viewed it, did you notice anything unusual
 2    about the video?
 3    A.   Yes.
 4    Q.   And what did you notice?
 5    A.   Several individuals coming into the store and they were
 6    focused on our PIN pads at the registers.
 7    Q.   Now, the surveillance videos at 99 Cent Only stores
 8    have -- is there any information imprinted on the video?
 9    A.   Yes, there is.
10    Q.   What type of information is imprinted on the video?
11    A.   It's generally the date, the time, store location.
12    Q.   And on the video that's contained on Exhibit 346, was
13    there a date and time imprinted on it?
14           MR. SEVERO:  It's not the best evidence.  The video
15    is the best evidence.
16           MS. YANG:  I'm just asking what was contained on
17    the video, Your Honor.
18           THE COURT:  Overruled as to whether or not it was
19    contained on the video.
20           THE WITNESS:  Yes, it was.
21    BY MS. YANG:
22    Q.   And was also a store location imprinted on that video?
23    A.   Yes, it was.
24    Q.   And based on your knowledge of the 99 Cent Only store
25    locations, was the store location imprinted on that video
```

1    correct for store 134?

2    A.   On the one particular video, it was not the correct

3    store number on the video.

4    Q.   And based on your knowledge of the investigation, what

5    store number was listed on that video, if you can recall?

6            MR. SEVERO:  The video is the one that's got to

7    tell us.  It's not the best evidence and hearsay so far.

8            THE COURT:  Well, I think overruled on that ground.

9    I think it's speculation if I understood the question

10   correctly, so why don't you ask the question again, counsel.

11   BY MS. YANG:

12   Q.   Mr. Camery, based on your viewing of that video, was

13   that video of the Magnolia 134 store?

14   A.   Yes, the video was of store 134.

15           MR. SEVERO:  Calls for speculation based on

16   witness's --

17           THE COURT:  Sustained.

18   BY MS. YANG:

19   Q.   Mr. Camery, have you been to the Magnolia 134 store?

20   A.   Yes, I have.

21   Q.   And are you familiar with the layout?

22   A.   Yes, I am.

23   Q.   And is the video contained in Exhibit 346, a video of

24   the Magnolia 134 store?

25   A.   Yes, it is.

1          MS. YANG:  Your Honor, at this time the government

2     moves to admit Exhibit 346.

3          THE COURT:  Be received.

4                    (Exhibit 346 was admitted.)

5     BY MS. YANG:

6     Q.   Now, similar to the altered PIN pads and point of sale

7     devices, during the course of your investigation, did you

8     download or have downloaded surveillance videos from multiple

9     99 Cent store locations?

10    A.   Yes, I did.

11    Q.   And did you collect all of those videos and subsequently

12    turn them over to law enforcement?

13    A.   Yes, ma'am.

14    Q.   And again prior to testifying here today, did you view

15    all of those videos to confirm that they were the videos you

16    turned over to law enforcement?

17    A.   Previously, yes.

18    Q.   Now, I'd also like you to take a look at Exhibit 347

19    which is before you.  And what is Exhibit 347?

20    A.   It's another video disk from the Limonite Store No. 285

21    dated 7-14-09 and 7-20-09.

22    Q.   And so Exhibit 347 contains two videos from the Limonite

23    store; is that correct?

24    A.   Yes, ma'am.

25    Q.   And this is a video that you collected and turned over

1   to law enforcement; correct?

2   A.   Yes, ma'am.

3        MS. YANG:  Your Honor, at this time the government

4   moves to admit Exhibit 347.

5        THE COURT:  Received.

6            (Exhibit 347 was admitted.)

7   BY MS. YANG:

8   Q.   Now, following the discovery of the altered PIN pad

9   device at the Limonite store, was another PIN pad, altered

10  PIN pad device found at another 99 Cent location?

11  A.   Yes, ma'am.

12  Q.   And what store location was that?

13  A.   I believe the first -- the next one we found was Store

14  104 also in Riverside, the Arlington store.

15  Q.   And what, if anything, did you learn about that altered

16  PIN pad device?

17       MR. SEVERO:  Objection.  Hearsay.

18       THE COURT:  Sustained.

19  BY MS. YANG:

20  Q.   Where was that PIN pad device located at the Arlington

21  104 store?

22  A.   It was in the manager's office.

23  Q.   And was that PIN pad device also brought to you?

24  A.   Yes, it was.

25  Q.   And when it was brought to you, what did you do with it?

1    A.    I examined it.

2    Q.    And what did you find?

3          MR. SEVERO:  Objection.  Hearsay.

4          THE COURT:  Overruled.

5          THE WITNESS:  That the PIN pad had been altered in

6    the same manner as the previous PIN pads located from Store

7    285.

8    BY MS. YANG:

9    Q.    So there was also a skimming device inserted in this PIN

10   pad; correct?

11   A.    Correct.

12   Q.    And did you turn this PIN pad also over to law

13   enforcement?

14   A.    Yes, I did.

15         MS. YANG:  Your Honor, if I could ask the Court's

16   assistance in putting Exhibit 337 before the witness?

17         THE COURT:  Yes.

18   BY MS. YANG:

19   Q.    Do you recognize what is contained in Exhibit 337?

20   A.    Yes, I do.

21   Q.    And is that the PIN pad that was recovered from the

22   Arlington 104 store?

23   A.    Yes, it is.

24   Q.    And you turned that over also to the Riverside Sheriff's

25   Department; correct?

1    A.   Correct.

2    Q.   And is it in substantially the same condition as when

3    you turned it over to law enforcement?

4    A.   Yes, it is.

5         MS. YANG:  Your Honor, at this time the government

6    moves Exhibit 337 into evidence.

7         THE COURT:  It will be received.

8              (Exhibit 337 was admitted.)

9    BY MS. YANG:

10   Q.   Now, did you pull surveillance video from the Arlington

11   104 store, if you recall?

12   A.   I don't know if I personally pulled it, but eventually I

13   received a copy of it and reviewed it.

14   Q.   Now, subsequent to the discovery of the altered PIN pad

15   at Arlington 104 store, did you have any communications or

16   contact with the Riverside's Sheriff's Department to conduct

17   surveillance at the one of the stores?

18   A.   Yes, ma'am.

19   Q.   And which store was surveillance set up at?

20   A.   The Limonite Store No. 285.

21   Q.   Now, were you at the Limonite Store 285 on the date that

22   surveillance was set up on July 22nd, 2009?

23   A.   I don't recall if I was there during the surveillance

24   time, but I was there, I believe, during some portion of the

25   day earlier on.

```
 1    Q.   And did you download or have downloaded surveillance

 2    video from the Limonite 285 store on July 22nd, 2009?

 3    A.   I downloaded the video from that date, yes.

 4              MS. YANG:  Your Honor, if I could have the clerk's

 5    assistance in putting Exhibit 348 before the witness.

 6              THE COURT:  348?

 7              MS. YANG:  Yes, Your Honor.

 8              THE COURT:  Okay.

 9    BY MS. YANG:

10    Q.   Mr. Camery, what is contained in Exhibit 348?

11    A.   It's a video disk from the Limonite Store No. 285 dated

12    7-22-09.

13    Q.   And again did you view this video prior to testifying

14    here today?

15    A.   Yes, I did.

16    Q.   And does it depict the events that you observed on

17    July 22nd, 2009?

18    A.   Yes, it does.

19              MS. YANG:  Your Honor, at this time the government

20    admits Exhibit 348 into evidence.

21              THE COURT:  It will be received.

22                   (Exhibit 348 was admitted.)

23    BY MS. YANG:

24    Q.   Now, Mr. Camery, following the discovery of the

25    compromised devices and the viewing of surveillance videos
```

```
 1    showing suspicious activity, did you receive any other

 2    communications about ongoing fraudulent activity at 99 Cent

 3    Store locations?

 4            MR. SEVERO:  It's leading the witness into hearsay

 5    statements.

 6            THE COURT:  Overruled up till now.  Next question

 7    maybe.

 8            THE WITNESS:  Yes, I did.

 9    BY MS. YANG:

10    Q.   And from whom did you receive those communications about

11    reports of fraudulent activity?

12    A.   Various different financial institutions throughout

13    Southern California.

14    Q.   And based on these communications, as well as the prior

15    information you had received, what did you determine to be

16    the common element with regard to these reports of fraudulent

17    activity?

18    A.   That several of our 99 Cent Only Store locations had

19    been compromised with skimming devices on the register PIN

20    pads.

21    Q.   And it was affecting customers; is that correct?

22    A.   Correct.

23            MR. SEVERO:  Objection.  Calls for speculation.

24            THE COURT:  Sustained.

25    BY MS. YANG:
```

1    Q.    Now, with regard to any of these communications, did you

2    receive information that directed your attention next to a

3    specific 99 Cent Store?

4    A.    Yes.

5    Q.    And which store was that?

6    A.    Well, there was a variety of stores throughout about a

7    three-to-four-week period.  Do you want me to list each

8    store?

9    Q.    Please go ahead.

10   A.    There were stores from Whittier to sort of the

11   Los Angeles area all the way up to Ventura and into Orange

12   County.

13   Q.    So the suspicious reports had started with stores

14   located in Riverside County; is that correct?

15   A.    Yes, ma'am.

16   Q.    And then the reports you were receiving about the

17   suspected fraud had spread to other 99 Cent Store locations

18   in Southern California?

19   A.    Yes, ma'am.

20   Q.    I'd like to direct your attention to the -- you

21   reference the Whittier store?

22   A.    Yes, ma'am.

23   Q.    Now, what store number is that?

24   A.    I believe it's Store No. 76.

25   Q.    Now, did you send a member of your department or the IT

1    Department to the Whittier Store No. 76?

2    A.    Yes, I did.

3    Q.    And did you ultimately get surveillance from the

4    Whittier Store No. 76?

5    A.    Yes, ma'am.

6              MS. YANG:  Your Honor, if I could ask the clerk's

7    assistance in putting Exhibit 345 before the witness.

8    Q.    Mr. Camery, what is contained in Exhibit 345?

9    A.    It's a video disk of Store No. 76 Whittier dated 7-6-09.

10   Q.    And did you turn that video over to law enforcement as

11   well?

12   A.    Yes, I did.

13             MS. YANG:  Your Honor, the government moves to

14   admit Exhibit 345.

15             THE COURT:  It will be received.

16                  (Exhibit 345 was admitted.)

17   BY MS. YANG:

18   Q.    Now, you testified that over the next several weeks you

19   received communications from financial institutions about

20   suspected fraud in various 99 Cent Store locations; correct?

21   A.    Yes, ma'am.

22   Q.    Was one of those or some of those locations also in

23   Ventura?

24   A.    Yes, ma'am.

25   Q.    Now, I'd like to direct your attention to August 21st,

20

```
 1    2009.  Did you receive a communication from the financial
 2    institution that directed your attention to a particular
 3    store in Ventura?
 4    A.   Yes, I did.
 5    Q.   And from whom did you receive this communication?  What
 6    financial institution if you remember?
 7    A.   I don't recall off the top of my head.  There's so many
 8    that I dealt with.  I believe it's in one of my reports.
 9    Q.   But it was a financial institution; correct?
10    A.   Yes, ma'am.
11    Q.   And what store number did you focus your attention on?
12    A.   I can't recall the exact store number in the Ventura
13    area.
14    Q.   Did you write a report of your investigation into this
15    suspected fraud activity?
16    A.   Yes, I did.
17    Q.   And would looking at your report help refresh your
18    recollection as to the store number in Ventura that you
19    focused your attention?
20    A.   Yes, it would.
21              MS. YANG:  Your Honor, if I may approach the clerk
22    to hand her a copy of the report?
23              THE COURT:  Yes.  This is to refresh your memory so
24    the idea is that you look at it and after looking at it, does
25    refresh your memory.  We're not asking you what the document
```

1    says, but what your memory is.  If that refreshes your

2    memory, that's great.

3    BY MS. YANG:

4    Q.   Having looked at your report, does it refresh your

5    memory as to the store number in Ventura that you focused

6    your attention on?

7    A.   Yes, it does.

8    Q.   And what store was that?

9    A.   Store No. 213.

10   Q.   And what did you direct to be done at Store No. 213?

11   A.   Myself and one of associates went out to that location.

12   We examined the PIN pad and register equipment.

13   Q.   And did you discover any altered PIN pads at that

14   location at that time?

15   A.   Not at that time.

16   Q.   Did you download video from Ventura Store No. 213?

17   A.   Yes, we did.

18   Q.   And did you view that video?

19   A.   Yes, I did.

20         MS. YANG:  Your Honor, with the Court's permission

21   if the clerk could place Exhibit 350 before the witness.

22         THE COURT:  Three?

23         MS. YANG:  3-5-0.

24         THE COURT:  Thank you.

25   BY MS. YANG:

```
 1   Q.   And do you recognize the CD that is contained in
 2   Exhibit 350?
 3   A.   Yes, I do.
 4   Q.   And what is it of?
 5   A.   It's a CD of Store 213 Ventura dated 8-8 and 8-17.
 6   Q.   Of 2009; is that correct?
 7   A.   It doesn't say 2009 on this, but that is when it's from.
 8   Q.   And that's because you viewed it at the time you
 9   downloaded it; is that correct?
10   A.   That's correct.
11   Q.   And again you viewed it prior to testifying here today
12   to confirm it's the same video; correct?
13   A.   Correct.
14        MS. YANG:  Your Honor, the government moves
15   Exhibit 350 into evidence.
16        MR. SEVERO:  No foundation.
17        THE COURT:  Overruled.  Subject to a motion to
18   strike or cross.  I think there's sufficient foundation.
19   Overruled.
20             (Exhibit 350 was admitted.)
21   BY MS. YANG:
22   Q.   Now, following your inspection at the Ventura 213 store,
23   did you send out a communication to the 99 Cent Store
24   locations?
25   A.   Yes, I did.
```

```
1    Q.   And what did you direct them to do?
2              MR. SEVERO:  Objection.  Hearsay.
3              THE COURT:  Overruled.
4              THE WITNESS:  The company sent out a broadcast to
5    direct the stores to inspect their PIN pad devices for any
6    fraudulent or altered activity on those particular devices in
7    their stores.
8    BY MS. YANG:
9    Q.   Now, up to this time you had gone to various locations,
10   you had downloaded and viewed surveillance videos.  Did you
11   notice anything that was common to how the individuals in the
12   videos dealt with the altered PIN pad devices?
13             MR. SEVERO:  Objection.  Vague.
14             THE COURT:  Overruled.
15             THE WITNESS:  Yes, I did.
16   BY MS. YANG:
17   Q.   And what did you notice about the process of switching
18   out the PIN pad devices operated?
19             MR. SEVERO:  That assumes facts not in evidence.
20             THE COURT:  Well, sustained.  Why don't you
21   describe your observations.  Well, why don't you ask the next
22   question rather than the Court doing it.
23   BY MS. YANG:
24   Q.   Mr. Camery, did you notice a common method by which
25   these subjects would approach the cashier counters?
```

```
1    A.   Yes, I did.

2    Q.   And what was common to their approach?

3         MR. SEVERO:  The problem is it's the videos that

4    will determine that and this testimony is not the best

5    evidence.

6         THE COURT:  No, but he can explain the video.

7    Overruled.

8         THE WITNESS:  The video showed a common pattern

9    with normally two people coming into a store and selecting

10   large bulk items such as paper towels, roasting pans, things

11   of that nature.  And they would bring them up to the register

12   and use those items to block the PIN pad devices from the

13   cashier's view.

14   BY MS. YANG:

15   Q.   And is this a common method that you saw in multiple

16   surveillance videos?

17   A.   Yes, it is.

18   Q.   Now, I'd like to direct your attention to August 24,

19   2009.  Did you receive a communication from a specific store

20   about an altered PIN pad device?

21   A.   Yes, I did.

22   Q.   And which store was that?

23   A.   Store, I believe it was Store 75 in Huntington Beach.

24   Q.   And what was the shorthand name also for that store?  Is

25   that the beach store?
```

```
 1    A.    Huntington Beach, yeah, the beach.

 2    Q.    You know it as Store 75; correct?

 3    A.    Correct.

 4    Q.    And at the time you received that communication on

 5    August 24th, 2009, were you at a different 99 Cent Store

 6    location?

 7    A.    Yes, I was.

 8    Q.    And which store were you at?

 9    A.    I was at the Ventura store.

10    Q.    Now, in response to this communication that you received

11    from Store 75, what did you do?

12    A.    I dispatched two of my associates to that location.

13    Q.    And who did you dispatch to the Store 75 location?

14    A.    Nick Mitchell and Beryl Davis.

15    Q.    And after you dispatched them, did you do anything else?

16    A.    Yes, I did.

17    Q.    And what did you do?

18    A.    I contacted Huntington Beach Police Department and spoke

19    with Detective Humphrey.

20    Q.    And after speaking with Detective Humphrey, did you

21    leave the Ventura store?

22    A.    Yes, I did.

23    Q.    And where did you go?

24    A.    To the Huntington Beach area.

25    Q.    And did you go with anyone else from your department?
```

1    A.    Yes, with Paul Espinoza.

2    Q.    Now, while you were -- did you drive from Ventura to

3    Huntington Beach?

4    A.    Yes, ma'am.

5    Q.    While you were driving to Huntington Beach, did you

6    receive another communication from another 99 Cent Store

7    location?

8    A.    Yes, I did.

9    Q.    And what store was this?

10   A.    It was Store 97.  Another Huntington Beach store.

11   Q.    And is that also known as the Brookhurst store?

12   A.    Yes, it is.

13   Q.    And were you advised that another altered PIN pad had

14   been found there?

15   A.    Yes, I was.

16   Q.    And in response to that alert from the Brookhurst store,

17   what did you do?

18   A.    I sent Nicholas Mitchell to that location and had Beryl

19   Davis go to the 75 store location.

20   Q.    So you had initially directed Nick Mitchell to go to the

21   75 store location, but then you had him go to the Brookhurst

22   97 store location; correct?

23   A.    Yes, ma'am.

24   Q.    Now, did you go to the Brookhurst location or the Store

25   75 location when you got into the area of Huntington Beach?

```
 1   A.    Basically, I went to the Brookhurst location.  I don't
 2   recall if I went to 75 first or not.
 3   Q.    Did you meet Nick Mitchell at the Brookhurst Store 97
 4   location?
 5   A.    Yes, I did.
 6   Q.    And while at the Brookhurst Store 97 location, did you
 7   receive another communication from Store 75?
 8   A.    Yes, I did.
 9   Q.    And what was that communication?
10         MR. SEVERO:  Objection.  Hearsay.
11         THE COURT:  Sustained.
12   BY MS. YANG:
13   Q.    Did you learn that there had been activity at the Store
14   75 location?
15         MR. SEVERO:  Objection.  Hearsay.
16         THE COURT:  Sustained.
17   BY MS. YANG:
18   Q.    In response to a communication you received from Store
19   75, did you go to Store 75?
20   A.    Yes, I did.
21   Q.    And what did you discover when you went to Store 75?
22   A.    There were two subjects being detained by the Huntington
23   Beach Police Department.
24   Q.    Now, from the Brookhurst 97 location, did you receive an
25   altered PIN pad?
```

```
1   A.   Yes, ma'am.

2   Q.   And from the Store 75 location, did you also collect an

3   altered PIN pad?

4   A.   Yes, ma'am.

5           MS. YANG:  Your Honor, if I could ask the clerk's

6   assistance in putting Exhibits 341, 338 and 339 before the

7   witness?

8           THE COURT:  Okay.

9   BY MS. YANG:

10  Q.   Mr. Camery, let me ask you one other question.  While

11  you were at the Store 75 location, did you receive a third

12  PIN pad device that was not altered?

13  A.   Well, I had an extra PIN pad device that wasn't altered,

14  yes.

15  Q.   And did you turn all of three of these PIN pads over to

16  the Huntington Beach Police Department?

17  A.   Yes, I did.

18  Q.   If you could take a look first at Exhibit 341.  Do you

19  recognize this PIN pad?

20  A.   Yes, I do.

21  Q.   And is this the PIN pad that you collected from the

22  Brookhurst Store 97?

23  A.   Yes, it is.

24          MS. YANG:  Your Honor, the government --

25  Q.   Is it in substantially the same condition as when you
```

1   collected it and turned it over to law enforcement?

2   A.   All the pieces are still here, but it's been opened up.

3            MS. YANG:  Your Honor, at this time the government

4   moves Exhibit 341 into evidence.

5            MR. SEVERO:  I don't think there is enough

6   foundation because he didn't answer the last question yes.

7   It's been altered in some fashion.

8            THE COURT:  I'm sorry.  He didn't answer which

9   question?

10           MR. SEVERO:  The last question about similar

11  condition.

12           THE COURT:  Why don't you ask the last question

13  again, counsel.

14  BY MS. YANG:

15  Q.   Mr. Camery, is Exhibit 341 in substantially the same

16  condition as when you turned it over to law enforcement on

17  August 24th, 2009?

18  A.   Yes, other than it's been opened up.

19           THE COURT:  Yes, but what?

20           THE WITNESS:  Other than it's been opened up.

21           MS. YANG:  Your Honor, the government moves to

22  admit Exhibit 341.

23           THE COURT:  It will be received.

24               (Exhibit 341 was admitted.)

25  BY MS. YANG:

1    Q.   Will you please place that back in the folder and take a

2    look at Exhibit 338?  Do you recognize this as the altered

3    PIN pad from Store No. 75?

4              MR. SEVERO:  It's leading the witness.

5              THE COURT:  Sustained.

6    BY MS. YANG:

7    Q.   Do you recognize Exhibit 338?

8    A.   Yes, I do.

9    Q.   And what is it?

10   A.   It's a PIN pad from the 99 Cent Only Stores.

11   Q.   Now, does this PIN pad have anything distinctive on --

12   any distinctive marks on it that based on your investigation

13   you recognize as signifying that it's an altered PIN pad?

14             MR. SEVERO:  Leading.

15             THE COURT:  Overruled.

16             THE WITNESS:  There is a marking on the front cover

17   of the PIN pad.  It was common with the altered PIN pads.

18   BY MS. YANG:

19   Q.   So of the altered PIN pads you collected during the

20   course of your investigation, they all had a marking on the

21   face of the PIN pad or in the area of the face of the PIN

22   pad?

23   A.   I wouldn't say without seeing them all again that all of

24   them had it, but the majority of them had it, yes.

25   Q.   And Exhibit 338 is the PIN pad you collected from Store

1   75 on August 24th, '09; correct?

2   A.   Correct.

3        MS. YANG:   Your Honor, the government moves Exhibit

4   338 into evidence.

5        THE COURT:   Be received.

6             (Exhibit 338 was admitted.)

7   BY MS. YANG:

8   Q.   Now, take a look at Exhibit 339.  Do you recognize that

9   as another PIN pad you recovered from Store 75 on August 24,

10  2009?

11  A.   Yes, I do.

12  Q.   Now, is this an altered PIN pad?

13  A.   Without pulling the back cover off, I wouldn't be able

14  to tell you, but it does have the same marking on the front.

15  Q.   Now, did you learn subsequently that members of your

16  department had swapped out an altered PIN pad with a decoy

17  PIN pad?

18  A.   Yes.

19        MR. SEVERO:  Objection.  That's hearsay.

20        THE COURT:   Sustained.

21        MS. YANG:   That's fine, Your Honor.  We'll call

22  another witness then.

23        THE COURT:   Okay.

24  BY MS. YANG:

25  Q.   Is Exhibit 339 in substantially the same condition as

```
 1   when you recovered it and turned it over to law enforcement

 2   on August 24, 2009?

 3   A.   Yes, it is.

 4            MS. YANG:  Your Honor, the government moves

 5   Exhibit 339 into evidence.

 6            THE COURT:  It will be received.  What store is

 7   this from?

 8            MR. SEVERO:  May I ask that the witness tell us

 9   what he is examining in order to determine what store it's

10   from?

11            THE COURT:  You're reviewing?

12            THE WITNESS:  I was reviewing the evidence tag and

13   the bag.

14            THE COURT:  As to whether or not it refreshes your

15   memory?

16            THE WITNESS:  Correct.

17            THE COURT:  Why don't you look at it first and then

18   tell me afterward whether or not it refreshes your memory as

19   to which store it came out of.

20            THE WITNESS:  It doesn't refresh my memory as to

21   what store number this one came out of.

22            MS. YANG:  Your Honor, if I could ask the clerk's

23   assistance in putting Exhibit 353, 354 and 355 before the

24   witness.

25            THE COURT:  Can you -- do you know whether or not
```

```
 1    it came out of one of your stores?
 2              THE WITNESS:  Yes, I do.
 3              THE COURT:  You just don't know which one.
 4              THE WITNESS:  That's correct from the information I
 5    have in front of me.
 6              MS. YANG:  Your Honor, if the court clerk could
 7    please place 353 to 355 before the witness?
 8              THE COURT:  Yes.
 9    BY MS. YANG:
10    Q.   Mr. Camery, in addition to recovering PIN pads from the
11    Huntington Beach store locations, did you also view
12    surveillance videos from those locations?
13    A.   Yes, I did.
14    Q.   And both from the Brookhurst as well as the Store 75
15    location; is that correct?
16    A.   That's correct.
17    Q.   Would you first take a look at Exhibit 353.  What does
18    that contain?
19    A.   This contains a CD disk from the 99 Cent Only Store
20    No. 97 dated 8-14-09.
21    Q.   And again Store 97 that's the Brookhurst location;
22    correct?
23    A.   Yes, ma'am.
24    Q.   And you viewed that prior to testifying here today;
25    correct?
```

```
 1    A.   Yes, ma'am.

 2              MS. YANG:  Your Honor, the government would move

 3    Exhibit 353 into evidence.

 4              THE COURT:  Be received.

 5                   (Exhibit 353 was admitted.)

 6    BY MS. YANG:

 7    Q.   Now, take a look 354.  What does that exhibit contain?

 8    A.   This is another video CD from Store No. 75 dated

 9    8-14-09.

10    Q.   And again did you view that video at the time on

11    August 24th, 2009?

12    A.   I'm not sure what date I viewed it on, but I did review

13    this video, yes.

14    Q.   And did you review it prior to testifying here today?

15    A.   Yes, ma'am.

16    Q.   And is this the CD that you turned over to law

17    enforcement?

18    A.   Yes, ma'am.

19              MS. YANG:  Your Honor, the government moves

20    Exhibit 354 into evidence.

21              THE COURT:  Be received.

22                   (Exhibit 354 was admitted.)

23    BY MS. YANG:

24    Q.   And then Exhibit 355, Mr. Camery, what does that

25    contain?
```

1    A.    Another CD from Store No. 75 dated 8-24-09.

2    Q.    And, again, your previous testimony was that on

3    August 24, 2009 when you arrived there, two suspects had been

4    arrested; is that correct?

5    A.    Yes, ma'am.

6    Q.    And did you view this video prior to testifying here

7    today?

8    A.    Yes, ma'am.

9    Q.    And is this the video you turned over to law

10   enforcement?

11   A.    Yes, ma'am.

12          MS. YANG:  Your Honor, the government moves

13   Exhibit 355 into evidence.

14          THE COURT:  It will be received.

15               (Exhibit 355 was admitted.)

16   BY MS. YANG:

17   Q.    Now, subsequent to the events on August 24, 2009, did

18   you collect surveillance videos from other 99 Cent Store

19   locations which you then turned over to law enforcement?

20   A.    Yes, I did.

21          MS. YANG:  And I would finally ask the court clerk

22   to place Exhibits 349, 351, 352 and then 342 before the

23   witness.

24   Q.    And in addition to additional surveillance videos, did

25   you also collect additional altered PIN pads from various 99

1    Cent Store locations?

2    A.    Yes, I did.

3    Q.    Mr. Camery, what exhibit do you have before you?

4    A.    342.

5    Q.    And what does 342 contain?

6    A.    Five PIN pads.

7    Q.    And were those five PIN pads altered PIN pads that you

8    recovered from various 99 Cent Store locations?

9    A.    Should I look at each one?

10   Q.    Absolutely.  You can pull them out.

11   A.    These appear to be all the same PIN pads that I released

12   to law enforcement personnel.

13            THE COURT:  For the record, there's five of them?

14            THE WITNESS:  Yes, sir.

15   BY MS. YANG:

16   Q.    And similar to other altered PIN pads you recovered and

17   turned over to law enforcement, do these have markings on the

18   face or the side of the PIN pad?

19   A.    Uh, I noticed some of them --

20            MR. SEVERO:  Given the initial reaction to the

21   question, it would be compound.  There's five of them and

22   he's --

23            THE COURT:  And he's gonna explain that.

24   Overruled.

25            THE WITNESS:  Some of them had some markings on it.

1    I didn't examine each one thoroughly for the markings.

2    BY MS. YANG:

3    Q.   And you turned all five of those over to law

4    enforcement; correct?

5    A.   Yes.

6            MS. YANG:  Your Honor, the government moves Exhibit

7    342 into evidence.

8            THE COURT:  Be received.

9                (Exhibit 342 was admitted.)

10   BY MS. YANG:

11   Q.   Now, if you could take a look at Exhibit 349.  What does

12   that exhibit contain?

13   A.   It contains a CD video disk from Store 113 the Camarillo

14   store dated 08-07 and 08-17.

15   Q.   And that would be the time frame of 2009; correct?

16   A.   That's correct.

17   Q.   And you previously viewed this video and turned it over

18   to law enforcement; correct?

19   A.   Yes, ma'am.

20           MS. YANG:  Your Honor, the government moves

21   Exhibit 349 into evidence.

22           THE COURT:  It will be received.

23               (Exhibit 349 was admitted.)

24   BY MS. YANG:

25   Q.   And what is Exhibit 351?

```
 1    A.    This is a video disk of Store 144 which is down in

 2    San Diego dated 08-13-09 and 08-27-09.

 3    Q.    And is Store 144 also known as University?

 4    A.    Yes, ma'am.

 5    Q.    And again did you previously view these videos and turn

 6    them over to law enforcement?

 7    A.    Yes, I did.

 8            MS. YANG:  Your Honor, the government moves Exhibit

 9    351 into evidence.

10            THE COURT:  Be received.

11                (Exhibit 351 was admitted.)

12    BY MS. YANG:

13    Q.    And finally, Mr. Camery, Exhibit 352 what does that

14    contain?

15    A.    Contains a video disk from Store 142 also in San Diego

16    dated 08-14-09 and 08-27-09.

17    Q.    And is Store 142 also commonly referred to as the

18    Claremont Mesa?

19    A.    Yes, ma'am.

20    Q.    And did you view these videos and turn them over to law

21    enforcement at the time?

22    A.    Yes, I did.

23            MS. YANG:  Your Honor, the government moves Exhibit

24    352 into evidence.

25            THE COURT:  It will be received.
```

```
 1                    (Exhibit 352 was admitted.)
 2      BY MS. YANG:
 3      Q.   Now, you had previously testified that the fraudulent
 4      activity reports originated or started in Riverside County
 5      and spread throughout Southern California; is that correct?
 6      A.   That's correct.
 7      Q.   Among the PIN pads you recovered in Exhibit 342 were
 8      some of those stores in the greater Los Angeles area?
 9      A.   Yes, they were.
10      Q.   In Venice and North Hollywood?
11      A.   Yes, ma'am.
12      Q.   Was there also PIN pads recovered at the Northridge
13      store?
14      A.   Yes, there was.
15                   MS. YANG:  One moment, Your Honor.
16                   Nothing further, Your Honor.
17                   THE COURT:  Cross-examination, counsel.
18                   MR. SEVERO:  Thank you, Your Honor.
19                             CROSS-EXAMINATION
20      BY MR. SEVERO:
21      Q.   Good morning, sir.
22      A.   Morning.
23      Q.   How long were you a 99 Cent Store loss prevention
24      officer?
25      A.   Approximately seven years.
```

1    Q.   And you were -- oh, I see it.  You were in charge of

2    loss prevention for four years.  That was your department?

3    A.   I was in charge of the department for seven years.

4    Q.   Oh, I thought you were assistant vice president.

5    A.   There was no vice president.

6    Q.   Okay.  Not like a bank; right?

7    A.   Correct.

8    Q.   And you -- your -- you have law enforcement background?

9    A.   Yes, I do.

10   Q.   For how long?

11   A.   Approximately six years.

12   Q.   You had first received -- the first time you received

13   any information concerning a possible compromise of some of

14   the stores when was that?

15   A.   On July 19, 2009.

16   Q.   And the first store you received a report on was

17   Magnolia?

18   A.   Yes, sir.

19   Q.   Now, every one of the -- strike that.

20         Every potential fraudulent activity that you may

21   have detected was solely related to use of the PIN pads?

22   A.   From my determination, yes.

23   Q.   So you are -- what sort of training did you have before

24   07-19-2009 concerning the operation of PIN pads?

25   A.   I've attended probably no less than ten loss prevention

```
 1    seminars on fraudulent PIN pad activity including credit card
 2    fraud and check fraud, forgery through the loss prevention
 3    NRF organization.
 4    Q.   So the use of PIN pads or altered PIN pads for lack of a
 5    better term was not an uncommon occurrence in the 99 Cent
 6    Stores?
 7    A.   No, it was very uncommon.  First time it ever happened.
 8    Q.   So before July 19th, 2009, you had not had any incidents
 9    related to PIN pads?
10    A.   That's correct.
11    Q.   But you received training concerning PIN pads because in
12    the industry it was a problem; correct?
13    A.   Yes, sir.
14    Q.   When was the first training you received related to
15    these PIN pads being a problem in the industry?
16    A.   I could only tell you started maybe seven, eight years
17    ago.
18    Q.   As far back as 2000 or 2002?
19    A.   Possibly.  I have worked credit card cases in the past
20    so I've training going back to early 2000s.
21    Q.   And these types of machines, I wonder if I could ask you
22    to look at Exhibit 336.  If that may be placed in front of
23    the witness.  You have 336 in front of you, sir?
24    A.   Yes, I do.
25    Q.   Would you hold it up for us?  Actually, I wonder if it
```

42

1    could be taken out of the bag.

2    A.    Looks like it's sealed.

3            THE COURT:  You can open it.

4            MR. SEVERO:  I wonder if I could approach and take

5    a look at it.

6            THE COURT:  If you could give it to the clerk,

7    please.

8    BY MR. SEVERO:

9    Q.    Before you do that, is that one of the machines that has

10   the marking in front?

11   A.    Yes, it is.

12   Q.    Thank you.  Did you personally pull 336 from the store?

13   A.    No, sir.

14   Q.    It was given to you?

15   A.    Yes, sir.

16   Q.    By a store employee?

17   A.    By an IT -- the director of our IT Department.

18   Q.    The --

19   A.    It's an employee from the company, but not a store

20   employee.

21   Q.    I understand.  It was brought to your office, was it?

22   A.    It was brought to the Magnolia store where I was at.

23   Q.    Your office was centralized somewhere else?

24   A.    Yes, sir.

25   Q.    Where?

```
 1    A.    Los Angeles, Commerce.
 2    Q.    So you went to the Magnolia store and the IT person
 3    brought you that PIN pad and delivered it to you at the
 4    Magnolia store?
 5    A.    Yes, sir.
 6    Q.    Now, the marking that's on the front, can you direct us
 7    to what -- where it is?
 8    A.    It's on the right side of the PIN pad next to the yes
 9    and no keys.  And there are two kind of diagonal lines going
10    down about an inch long next to each other.
11    Q.    So some of the PIN pads you received do not have that
12    marking on them.
13    A.    Not the exact.  Some have different.  Some have, I
14    believe, none that I noticed to match this pattern.
15    Q.    Do you have any knowledge as to how the markings are
16    made?
17    A.    I could speculate.
18    Q.    So you don't have any knowledge as to how they're made,
19    do you?
20    A.    No, sir.
21    Q.    They're not made with -- are they made with a pencil?
22    A.    I would have to speculate.
23    Q.    It's not something you can erase with your thumb?
24          MS. YANG:  Objection.  Calls your speculation.
25          THE COURT:  Overruled.  You want him to try?
```

44

```
 1              MR. SEVERO:  Sure.
 2              THE WITNESS:  It looks type it's with some type of
 3    hardened pointed object.
 4    BY MR. SEVERO:
 5    Q.    It's scratched?
 6    A.    Yes, piece of plastic.
 7    Q.    The machine is plastic?
 8    A.    The cover, yes.
 9    Q.    Do you buy those machines from a specific supplier?  Do
10    you know if 99 Cent Stores brought that from a specific
11    supplier?
12    A.    I have no knowledge of that.
13    Q.    Do you know whether they got it on the Internet?
14              MS. YANG:  Objection.  Vague as to they.
15              THE COURT:  Assuming you mean the corporation.
16              MR. SEVERO:  Let me rephrase it.
17    Q.    Do you know if 99 Cent Stores bought that on the
18    Internet?
19    A.    They did not buy our PIN pads on the Internet if that's
20    your question.
21    Q.    That came from some supplier you're not aware of;
22    correct?
23    A.    Correct.
24    Q.    Do you know whether that Exhibit 336 was removed from
25    the store?  Do you personally know that?
```

1    A.    Yes, I do.

2    Q.    Because you saw it on a video?

3    A.    I saw it and I was told.

4    Q.    But you didn't personally see 336 being removed from the

5    store?

6    A.    On video if that's in person.

7    Q.    Do you know it was that machine?

8    A.    I'm not sure if I can answer that question.  I don't

9    know.

10   Q.    You don't know that it's that machine, do you, from the

11   video?

12   A.    From the video, I don't know.

13   Q.    In fact if you look at the video, even if you see some

14   removal of machines, you don't know specifically which

15   machine was removed from the store?

16   A.    That's correct.

17   Q.    You had seen the skimming devices before July 19, 2009?

18   A.    Not at our location.  I had seen them from my training,

19   yes, sir.

20   Q.    In your training you had seen this very specific type of

21   skimming device that you saw on the Exhibit 336?

22   A.    I don't know if it's the same specific device.  I don't

23   know enough about the making of them.

24   Q.    Do you know that there are several types of skimming

25   devices?

1    A.    Yes.

2    Q.    And the type of skimming device that is in 336 was that

3    something you had seen before?

4    A.    I may have it seen, but I wouldn't recognize it one from

5    other.

6              THE COURT:  Was it similar to ones you had seen?

7              THE WITNESS:  Yes, sir.

8    BY MR. SEVERO:

9    Q.    How was it similar?

10   A.    Just the size, the fact that the wires are connected to

11   the components inside the pad.

12   Q.    So it's the way it's put together inside the machine

13   that tips you off?

14   A.    Yes.

15   Q.    That it's a skimming device; correct?

16   A.    Correct.

17   Q.    Do you know who makes the skimming devices?

18   A.    No, sir.

19   Q.    Are they manufactured by any particular company you're

20   aware of?

21   A.    Not that I'm aware of.

22   Q.    Are they easily accessible on the Internet, if you know?

23             MS. YANG:  Objection, Your Honor.  Calls for

24   speculation.

25             MR. SEVERO:  If you know.

1          THE WITNESS:  I don't know.

2    BY MR. SEVERO:

3    Q.   You don't know how these skimming devices are procured?

4    A.   Again, I could speculate.

5    Q.   No.  Do you know?

6    A.   I know how they're put on.  I know how they're -- I

7    don't know someone gets one.

8          THE COURT:  Let me ask do you know if they are sold

9    on the open market in stores?

10         THE WITNESS:  No, sir, they're not.  Not to my

11   knowledge anyway.

12         THE COURT:  I don't know if that's where you're

13   going or not, counsel.

14         MR. SEVERO:  That's where I'm going.  Thank you,

15   Judge.

16   Q.   Other than, well, let me ask you.  Are there any

17   markings on 336 that indicate that a screwdriver was used to

18   open it?

19   A.   The question is kind of vague.  Open what?

20   Q.   The back of the machine.  Well, let me ask you

21   beforehand doesn't the skimming device have to be inserted

22   inside the machine, the PIN pad?

23   A.   I'm not an expert on them so I couldn't tell you if they

24   had to be inserted inside or alongside.

25   Q.   Where did you find the skimming device on the exterior?

48

```
1    A.    It was underneath the cover.

2    Q.    Underneath the cover on the inside of the machine?

3    A.    Yes, sir.

4    Q.    In order to take the cover out, do you have to use a

5    screwdriver?

6    A.    Yes, sir.  There are two screws on the back.

7    Q.    Looking at 336, do you see any screwdriver marks on the

8    screws?

9          MS. YANG:  Objection, Your Honor.  As defense

10   objects the best evidence is the actual device.

11         THE COURT:  Overruled.  Anything you recognize as a

12   screwdriver mark?

13         THE WITNESS:  No, I don't recognize any screwdriver

14   marks specifically.

15   BY MR. SEVERO:

16   Q.    And in fact you yourself opened that machine?

17   A.    Yes, I did.

18   Q.    With a screwdriver?

19   A.    Yes, sir.

20   Q.    Is the store location where the PIN pad is used somehow

21   marked on the machine?

22   A.    No, sir.

23   Q.    All it says, has a tag that says 99 Cent Stores;

24   correct?

25   A.    Not all of them.
```

1   Q.   So you recognize, for example, some, well, some of these

2   other machines by being from 99 Cent stores not by looking at

3   them.  Let me rephrase that.

4        Just by looking at the machine is there anything

5   unique about the machine that says it's from the 99 Cent

6   store?

7   A.   Other than the tag that's on the majority of them, no.

8   Q.   This type of machine is sold in the open market;

9   correct?

10  A.   Yes, sir.

11  Q.   I'm gonna direct your attention to the Ventura Store

12  213.  Do you remember that?

13  A.   Yes, sir.

14  Q.   That complaint you received in July 6th of 2009?

15  A.   No, sir, not that I recall.

16  Q.   When did you receive the complaint on the Ventura store?

17  A.   From my memory it was in August of 2009.

18  Q.   And what machines did you retrieve from the Ventura

19  store?

20  A.   I don't know if I retrieved personally any machine from

21  the Ventura store.

22  Q.   That's fair.  What machines did you receive from the

23  Ventura store for examination?

24  A.   It would be whatever's been booked into evidence.

25  Q.   Do you know how many?

```
 1   A.    No, sir.

 2   Q.    Your testimony as I understand it is that the Ventura

 3   Store PIN pads you did not find any skimming devices on; is

 4   that correct?

 5   A.    The time that I went that's correct.

 6   Q.    And when did you go to the Ventura Store?

 7   A.    I specifically remember the 24th of August 2009.

 8   Q.    That's your best recollection right now?

 9   A.    Yes, sir.

10   Q.    How many machines did you examine at the Ventura store?

11   A.    Approximately eight.  I think there's about eight

12   registers.

13   Q.    Eight.  And none of them were compromised?

14   A.    Not at the time I was there.

15   Q.    But you went to the Ventura store on a lark?

16   A.    No, sir.

17   Q.    You had received some communication about the Ventura

18   store?

19   A.    Yes, sir.

20   Q.    Some sort of fraud happened at the Ventura store when

21   you went?

22   A.    I received information from the financial institutions

23   that lead me to the Ventura store, yes.

24   Q.    And the information that you received to the Ventura --

25   from the financial institutions lead you to examine the PIN
```

1   pads?

2   A.   Yes, sir.

3   Q.   What else did you examine?

4   A.   The videos.

5   Q.   Other than the videos and the PIN pads, in order to

6   determine whether any fraud had taken place at the Ventura

7   Store, what did you examine?

8   A.   That was it.  The videos and the PIN pads.

9   Q.   And despite the financial institution's report, you

10  found no tampering with the PIN pads at the Ventura Store;

11  correct?

12  A.   No, sir.  I found video evidence of tampering.

13  Q.   But you found nothing in the PIN pad itself that would

14  tell you that the machines had been tampered with?

15  A.   Not on the PIN pads themselves.

16  Q.   At the Ventura store, did you find -- did you determine

17  that the machines had been switched?

18  A.   Through the video, yes.

19  Q.   So the machine, the PIN pads that you examined had been

20  switched?

21  A.   Yes, sir.

22  Q.   The ones that you found were still not compromised;

23  correct?

24  A.   When we went there, the ones that we examined were not

25  comprised, yes, sir.

 1    Q.    These machines are -- how are they connected to the

 2    system in your stores?

 3    A.    They sit on top of a stand and there's a plug in device

 4    that goes in from the register system into the machine.

 5    Q.    A simple plug?

 6    A.    Yes, sir.

 7    Q.    They're not nailed down?

 8    A.    No, sir.

 9    Q.    The machines are not?

10    A.    No, sir.

11    Q.    The plug that goes into these machines is not covered to

12    prevent it from coming off?  And I'm talking about back in

13    '09.

14    A.    It was very simple to unplug the machine.

15    Q.    So it just sat there very easy to just unplug and pick

16    up?

17    A.    Yes, sir.

18    Q.    And they sat right on the customer side of the register?

19    A.    Yes, sir.

20          MR. SEVERO:  May I ask you to look at Exhibit 342,

21    if it could be placed in front of the witness?

22          THE WITNESS:  Can I put this one away?

23          THE COURT:  You don't need the last exhibit, do

24    you?

25          MR. SEVERO:  I don't.  Thank you.

1  Q.   Directing your attention to 342, is it now in front of

2  you?

3  A.   Yes, sir.

4  Q.   Would you remove the first -- there are five PIN pads in

5  there; correct?

6  A.   Yes, sir.

7  Q.   Are you able to tell us which one came from which store

8  by looking at the machine?

9  A.   By looking at the machine, no, I cannot.

10  Q.   And the first one you have in front of you is -- it --

11  does it have the two markings or the two stripes if you will

12  in front?

13  A.   It has a small almost a crack on the top, but it's not

14  in the same pattern as the previously described markings.

15  Q.   So you don't know where that crack may have come from;

16  correct?

17  A.   No, sir.

18  Q.   And you don't find a marking common to the ones that you

19  had found had been altered?

20  A.   No, sir.

21  Q.   Did you personally open this one machine that is part of

22  Exhibit 342?

23  A.   Yes, sir.

24  Q.   With a screwdriver?

25  A.   Yes, I did.

1    Q.   Did you find a skimming device?

2    A.   All the ones that I turned over to evidence, I found

3    skimming devices.  I can't tell you, I mean, without opening

4    it, you know.

5    Q.   Is the skimming device still in the machine?

6    A.   I don't know.  The back cover is on top.

7    Q.   Do you see any skimming devices separate from the

8    machines in the exhibits that have been placed in front of

9    you today?

10   A.   No, I do not.

11   Q.   So that particular machine you have in front of you

12   right now, you can't tell which store it came from; is that

13   correct?

14   A.   Not by the machine itself, no, sir.

15   Q.   There is some documentation attached to it that tips you

16   off, is there?

17   A.   Yes, sir.

18   Q.   And who wrote the documentation that's attached to it?

19   A.   The name on the evidence tag is M. Fieori.  It says name

20   of officer.

21   Q.   Is there a police department also detailed on the tag?

22   A.   I don't see a police department listed on the tag.

23   Q.   Does the tag tell you, well, if you look at the tag, let

24   me ask you this.  Did you pick up the machine yourself at

25   some point?

```
 1   A.   Yes, sir.

 2   Q.   And do you by looking at it now, you don't remember if

 3   it's -- what store it came from; correct?

 4   A.   Not from the machine, but based off the evidence tag.

 5   Q.   Yeah, that's what my next question is.  Will looking at

 6   the tag refresh your recollection as to where the machine may

 7   have come from?

 8   A.   Yes, sir.

 9   Q.   All right.  Have you looked at it?

10   A.   Yes, sir.

11   Q.   Does it refresh your recollection?

12   A.   Yes, sir.

13   Q.   You moved your head side-to-side.  Are you in doubt?

14   A.   It came from a Huntington Beach location.  I don't know

15   which location because it's not on here.  There were two

16   stores in Huntington Beach.

17   Q.   Does the tag refresh your recollection, though, that it

18   came from Huntington Beach somewhere?

19   A.   Yes, sir.

20   Q.   So that's not an L.A. County machine.

21   A.   No, sir.

22   Q.   Are all five machines altered?

23   A.   Without opening them up --

24   Q.   Can't tell.

25   A.   -- I couldn't tell you.
```

1    Q.   Will you remove the second machine?

2    A.   I'm going to put this back.

3    Q.   Yeah, that's fine.  While you are doing that, did you

4    receive any machines from San Diego County?

5    A.   I don't recall receiving machines from San Diego, just

6    videos, but I may have.  There were so many.

7    Q.   Let me ask you this.  You've looked at all the exhibits

8    that are PIN pads that have been placed in front of you

9    today, have you?

10   A.   Yes, sir.

11   Q.   And in your review of the PIN pads that are in evidence,

12   did you see any from San Diego?

13   A.   No, not that I could tell.

14   Q.   Very good.  So if I can ask you now back to the 342, the

15   second PIN pad, what sort of markings do you see on that PIN

16   pad that might be common with some of the altered ones that

17   you also saw?

18   A.   Again, there's a -- there's a -- there's a mark on the,

19   kind of the screen of the PIN pad, but it's not similar to

20   the two marks that I described earlier.

21   Q.   And that mark on that screen could have been made like

22   with a pencil or a pen or something like that to scratch it?

23             MS. YANG:  Objection.  Calls for speculation.

24             THE COURT:  Overruled.  If you can tell.

25             THE WITNESS:  I don't know.  It could be a scrape,

UNITED STATES DISTRICT COURT

```
 1   scratch.  I really don't know.
 2   BY MR. SEVERO:
 3   Q.   So it doesn't carry the markings that are common to some
 4   of the other ones you saw; correct?
 5   A.   Correct.
 6   Q.   And did you open this machine?  Do you remember opening
 7   it?
 8   A.   Yes.  I opened all the machines that were turned over as
 9   evidence.
10   Q.   So you remember opening it cause you opened them all.
11   A.   Correct.
12   Q.   Not because you remember this one specifically?
13   A.   Yes, sir.
14   Q.   When you opened it, did you remove the skimming device?
15   A.   No, sir.
16   Q.   So as far as we know, there are no skimming devices in
17   here at all in any of these machines as far as we know today?
18          MS. YANG:  Objection, Your Honor.  Calls for
19   speculation.
20          THE COURT:  Overruled.  You don't have any
21   knowledge as to what's in there today, do you?
22          THE WITNESS:  Not today.
23          THE COURT:  But when you opened them, you said you
24   found them in all of the machines?
25          THE WITNESS:  All of the ones that were turned over
```

1    as evidence, yes, sir.

2              THE COURT:  By you?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Okay.

5    BY MR. SEVERO:

6    Q.   What I would like you to do to try to save a little time

7    is to look at the rest of the machines in Exhibit 342 and

8    just tell me if you find markings on the front of each one of

9    them.  So the third machine you're looking at now?

10   A.   Yes, sir.

11   Q.   You see any markings that are common to the others like

12   336?

13   A.   This is similar to the screen having this small,

14   half-inch mark, but not on the actual facing like the other

15   one I described.

16   Q.   Like the other one that you described is the one that I

17   was allowed to examine which is 336; correct?

18   A.   The one that had the two one-inch marks on it.  Yeah,

19   this one has a similar mark to the one I just looked at a few

20   minutes ago on the screen.  It's about the same size and

21   about the same kind of marking in a different location.

22   Q.   When you say marking, it could be just a scratch from a

23   pencil or something or a pen?

24   A.   Could be.

25   Q.   From the use of the PIN pad?

1   A.   It's where the finger presses so . . .

2   Q.   Or it could be a nail or anything that may have made

3   that as far as you know, if you know?

4            MS. YANG:  Objection.  Speculation.

5            THE COURT:  Sustained.

6   BY MR. SEVERO:

7   Q.   So that's number three out of five.  By the way, you

8   know where it came from?  Sorry.  Yes, I need you to --

9   A.   Not off the machine.

10  Q.   But if you'll refresh your recollection with the tag?

11  A.   Had the same officer's name on the front and the same

12  information on the back which would indicate it came from the

13  Huntington Beach Police Department.

14  Q.   If you could move to No. 4 in Exhibit 332.  The first

15  question that I have for you on that is about the markings.

16  Whether the front of the machine has the two diagonal

17  one-inch markings on the right side as similar to 336 in

18  evidence?

19  A.   This does not have any markings that I can determine at

20  all.

21  Q.   Not even on the screen?

22  A.   Again, there's scratches, I mean, but they're not as

23  pronounced as the ones I indicated earlier.

24  Q.   And do you know where the machine came from by looking

25  at it?

```
 1    A.    No, sir.

 2    Q.    Would looking at the documentation attached to the

 3    machine refresh your recollection?

 4    A.    Yes, sir.

 5    Q.    Could you look at it and tell us if it does refresh your

 6    recollection?

 7    A.    Yes, sir.  Same name on the front.  Uh, Fieori is the

 8    officer and the same information on the back indicating it

 9    came from the Huntington Beach Police Department.

10    Q.    Thank you, sir.  And are we on the last one now?

11    A.    Yes, sir.  Do you want me to describe what I see?

12    Q.    Do you have it now in front of you?

13    A.    Yes, sir.

14    Q.    Would you look and see if this fifth pad in 342 has

15    diagonal line markings similar to 336?

16    A.    Yes, it does.

17    Q.    Same size?

18    A.    Well, there's actually one set of double lines it looks

19    like in pen and there's a single line a little bit above it.

20    It looks like it's been scratched in, etched in, like

21    scratched in.

22    Q.    You don't know how that was made?

23    A.    No, sir.

24    Q.    Or by whom?

25    A.    No, sir.
```

1    Q.   Are the lines on this machine, the markings you're

2    talking about, sort of uniform, are they like very straight

3    lines?

4    A.   For the most part.

5    Q.   And -- strike that.  Okay.  Now, do you know where the

6    machine came from?

7    A.   No, sir.

8    Q.   And would looking at the documentation refresh your

9    recollection?

10   A.   Possibly.

11   Q.   Would you look at that, please.

12   A.   Yes, sir.  Indicates it came from Store 92 Venice.

13   Q.   Venice?

14   A.   Venice.

15   Q.   So the only one from L.A. County is that one?

16   A.   Yes, sir, and this does not have a Huntington Beach tag

17   on it.

18   Q.   All the other four are from Huntington?

19   A.   Yes, sir.

20           MS. YANG:  I believe he said from the Huntington

21   Beach Police Department.

22           THE COURT:  He also said one time it came from a

23   Huntington Beach store, but he doesn't know which one; is

24   that correct?

25           THE WITNESS:  On the -- yes, sir.

62

```
 1    BY MR. SEVERO:

 2    Q.   Could have been either of the stores in Huntington

 3    Beach?

 4    A.   Could have been -- could have been any of the Orange

 5    County stores in Huntington Beach because there was four.

 6    Q.   I was just gonna ask.  How many in Huntington Beach?

 7    Four?

 8    A.   Yes, sir.  That I gave to the Huntington Beach Police

 9    Department.

10    Q.   It could be from any one of the four stores?

11    A.   Yes, sir.

12         MR. SEVERO:  Okay.  I'm going to ask that

13    Exhibit 337 be placed in front of the witness.  Thank you.

14    Q.   Mr. Camery, while you're looking at that, are you able

15    to determine whether a particular transaction came from a

16    specific PIN pad machine?

17    A.   No, sir, I'm not.

18    Q.   So the information that, as far as you know, the best of

19    your knowledge, the information that is communicated by the

20    PIN pad to the register does not include like a PIN pad

21    register -- a PIN pad registration number or anything like

22    that, serial number?

23    A.   At this time, no, it did not.

24    Q.   Back in '09 it didn't.

25    A.   Right, back in '09.
```

UNITED STATES DISTRICT COURT

**001589**

```
 1   Q.   Okay.  Now, looking at 337, will you please examine the

 2   front of the machine?  Have you looked at it now?

 3   A.   Yes, I have.

 4   Q.   And does it have the two diagonal lines common to 336?

 5   A.   Yes, it does along with a third shorter line.

 6   Q.   So the markings on this one are different from the

 7   markings in 336 in that it has an additional line?

 8   A.   Yes, sir.

 9   Q.   And is it in the same spot?

10   A.   Uh, generally speaking, it's almost in the same spot.

11   Q.   Generally speaking meaning not exactly in the same spot;

12   correct?

13            THE COURT:  If you know.

14            THE WITNESS:  Not exactly.

15   BY MR. SEVERO:

16   Q.   Any scratches on the screen?

17   A.   Yes, sir.  There's another diagonal one-inch line on the

18   screen.

19   Q.   Do you know where that machine came from?

20   A.   Based off the machine itself, no.

21   Q.   Does it have a 99 Cent Store tag?

22   A.   No, sir.

23            THE COURT:  Ladies and gentlemen, we're gonna break

24   at this time being 10 o'clock.  Remember the admonish to not

25   discuss the case among yourselves or with anybody else or for
```

```
 1   or express any opinions about the matter until it's submitted

 2   to you and you retire to the jury room.  We'll see you back

 3   in 15 minutes.

 4                       (Recess taken.)

 5            THE COURT:  Okay.  The record will reflect all the

 6   jurors are in their respective seats in the jury box.  The

 7   witness on the witness stand.  You are in cross-examination,

 8   counsel.  You may continue.

 9            MR. SEVERO:  Thank you, Your Honor.

10   Q.   Mr. Camery, we were looking at Exhibit 337 at the break.

11   Do you still have it in front of you?

12   A.   Yes, sir.

13   Q.   This particular machine by looking at it, do you recall

14   where it came from?

15   A.   Not from the machine by itself, no, sir.

16   Q.   Can you refresh your recollection with the

17   documentation?

18   A.   Yes, sir.

19   Q.   Has it refreshed your recollection to look at the

20   documentation?

21   A.   Yes, sir.

22   Q.   And what is -- where does this machine come from?

23   A.   It's Store 104 Magnolia.

24   Q.   So which one's Arlington?

25   A.   One -- I'm sorry.  Arlington's 104.  Magnolia's 134.
```

1    Q.   You retrieved this machine yourself?

2    A.   No, sir.

3    Q.   This machine was brought to you?

4    A.   Yes, sir.

5    Q.   At the Arlington store?  Did you go to the Arlington

6    store?

7    A.   No, sir.  It was brought to me at the Magnolia store.

8    Q.   And it was brought to you in a bag or something or just

9    carried by hand?

10   A.   Carried by hand.

11   Q.   Have you seen people using these PIN pads in the

12   ordinary course of business?

13   A.   Yes, sir.

14   Q.   And you know that oftentimes they will have instruments

15   in their hands like keys when they try to sign the PIN pad?

16   A.   Sure they do.

17   Q.   Do you know how old these machines are by looking at

18   them?

19   A.   Can I correct my last answer?

20   Q.   I'm sorry?

21   A.   Can I correct my last answer?  Cause the PIN pads

22   doesn't have the signature on the PIN pad.

23   Q.   Which one 337?

24   A.   These PIN pads don't have a signature pad.

25   Q.   Oh, I was referring to the screen.  The screen when they

```
 1   punch in their PIN number on the machine, they often have

 2   instruments in their hands like keys and stuff like that;

 3   right?

 4            MS. YANG:  Objection.  Calls for speculation.

 5            THE COURT:  If you know.  Do you punch it in your

 6   by your finger or do you -- how do you punch it in the PIN

 7   pad?

 8            THE WITNESS:  Just use a single finger to punch in

 9   each individual number.

10   BY MR. SEVERO:

11   Q.   And oftentimes they are carrying other stuff while

12   they're doing that in your experience watching these things;

13   correct?

14            MS. YANG:  Objection.  Calls for speculation.

15            THE COURT:  Overruled.  I guess his question is

16   have you ever watched people push those numbers with

17   something other than their finger?

18            THE WITNESS:  I've never independently looked for

19   that or seen it.

20   BY MR. SEVERO:

21   Q.   Have you seen people using the machine in the ordinary

22   course of business?

23   A.   Yes, sir.

24   Q.   I asked you that.

25   A.   Yes, sir.
```

1    Q.   And in your observations in the ordinary course of

2    business, you've seen people using their finger to press the

3    different buttons on the PIN pad to put in their PINs;

4    correct?

5    A.   Yes, sir.

6    Q.   And oftentimes they're carrying other things in their

7    same hand like keys and stuff like that that may scratch the

8    machine; correct?

9            MS. YANG:  Objection to oftentimes.

10           THE COURT:  If you know.  Overruled.

11           THE WITNESS:  I've never noticed it.

12   BY MR. SEVERO:

13   Q.   337 is one that has three lines instead of two like 336?

14   A.   There's three specific lines in the area of the other

15   machines.  There are a couple individual lines in different

16   parts of the front.

17   Q.   Suffice it to say, it's not the same as 336?

18   A.   It's not identical, no, sir.

19   Q.   Let me ask you to look at 345.  I'm sorry.  I don't know

20   that 345 is a PIN pad.

21           THE CLERK:  It's a video.

22           MR. SEVERO:  Correct.  I don't want 345.  341 is I

23   believe a PIN pad.  Thank you, madam clerk.  And if you could

24   also place in front of him 338 and 339.

25   Q.   You have 341 in front of you, sir?

UNITED STATES DISTRICT COURT

**001594**

```
 1   A.   Yes, sir.
 2   Q.   And can I ask you to remove it from its container.  Now,
 3   this machine seems to be pulled apart, is it?
 4   A.   Yes, sir.
 5   Q.   And what's -- strike that.  Is the back of the machine
 6   opened?
 7   A.   Yes, sir.
 8   Q.   Do you see a skimming device in there?
 9   A.   Yes, sir.
10   Q.   Looking at 341 the front of the machine, do you see any
11   markings?
12   A.   Yes, sir.
13   Q.   And are there two diagonal lines like in 336?
14   A.   Yes, sir.
15   Q.   Just two?
16   A.   There is a lighter half-line next to them.
17   Q.   So three lines.  Two are more pronounced and one's
18   lighter?
19   A.   Correct.
20   Q.   Is there a screen on this machine?
21   A.   Yes, sir.
22   Q.   Is it scratched?
23   A.   It does have a scratch across it and a slight upward
24   one.
25   Q.   Where did this machine come from if you can tell by
```

```
 1    looking at it?

 2    A.   I cannot tell from the machine.

 3    Q.   Does it have a 99 Cent Store tag?

 4    A.   Yes, sir.

 5    Q.   And do you remember where -- strike that.  Do you

 6    remember when you first received that machine?

 7    A.   The specific date, no, I don't.

 8    Q.   Would looking at the documentation refresh your

 9    recollection?

10    A.   Yes, sir.

11    Q.   And what date did you receive the machine?

12    A.   8/24/09.

13    Q.   By looking at it, can you tell where it came from?

14    A.   Yes, sir.

15    Q.   By looking at the machine or --

16    A.   No.

17    Q.   -- do you have to refresh your recollection?

18    A.   From the evidence tag only, sir.

19    Q.   Having refreshed your recollection, where did the

20    machine come from?

21    A.   The Huntington Beach Store No. 75.

22    Q.   We're looking at 341?

23    A.   Yes, sir.

24    Q.   All right.

25    A.   Well, I should clarify that from the evidence tag, it
```

UNITED STATES DISTRICT COURT

70

1   has the two suspects' names on it that were arrested.

2   Q.   At Huntington Beach.

3   A.   At the Huntington Beach store and the date and the time.

4   Q.   Okay.

5   A.   But it doesn't specifically say Store 75 that I can see.

6   Q.   So it doesn't refresh your recollection as to where it

7   came from?

8   A.   Other than the Huntington Beach Police Department, no,

9   sir.

10  Q.   Is Brookhurst a Huntington Beach store?

11  A.   Yes, sir.

12  Q.   Is there anything on the machine or its documentation

13  that would indicate that it came from Brookhurst?

14  A.   No, sir.

15  Q.   All right.  Let's look at, 338.  If you could remove it

16  from its container, please.  You have it in front of you?

17  A.   Yes, sir.

18  Q.   And you see the markings on this one?

19  A.   Yes, sir.

20  Q.   Same diagonal lines on the right side of the machine as

21  you look it?

22  A.   Yes, sir, however, one's separated on the lower part or

23  in the middle of the key pad and the other one's up above on

24  the screen portion of the key pad.

25  Q.   Okay.  So different than 336 and 337?

```
1    A.    Yes, sir.

2    Q.    And 341?

3    A.    Yes, sir.

4    Q.    Scratches on the screen?

5    A.    Mmm, there's I could see a little minor scratch, but

6    nothing pronounced other than the one I'm talking about up

7    above.

8    Q.    Does it have a 99 Cent Store tag?

9    A.    Yes, sir.

10   Q.    And can you tell where it came from?

11   A.    Not from looking at the machine.

12   Q.    Can you refresh your recollection with documentation?

13   A.    Yes, sir.

14   Q.    And having done that, where did it come from?

15   A.    The evidence tag from the Huntington Beach Police

16   Department with Nick Mitchell's name on it which would

17   indicate it came from Store No. 97 Brookhurst.

18   Q.    And 339, please.  Do you have 339 in front of you?

19   A.    Yes, sir.

20   Q.    Does it have any markings?

21   A.    Yes, sir.

22   Q.    How many lines?

23   A.    The same pattern as the one I just explained one lower

24   and one on the upper screen.

25   Q.    Same pattern meaning diagonal lines?
```

72

1  A.  Yes, sir, as the PIN pad I just put away 338.

2  Q.  338?

3  A.  Yes, sir.

4  Q.  But different than 336?

5  A.  Yes, sir.

6  Q.  And different than 337?

7  A.  Yes, sir.

8  Q.  Is there a scratch on the screen?

9  A.  The screen has -- other than that one scratch that's

10  most pronounced, there's some substances on it like it's

11  dirty.

12  Q.  And you can't tell which store this came from?

13  A.  No, sir.

14  Q.  By looking at the documentation, does it refresh your

15  recollection?

16  A.  Yes, sir.  Again, from the Huntington Beach Police

17  Department evidence.

18  Q.  But you don't know what store.  One of the four stores?

19  A.  It would be one of the Orange County stores, yes, sir.

20  Q.  Does it have a 99 Cent Store tag?

21  A.  Yes, sir.

22  Q.  Are you able to tell how long the skimming device was

23  placed in the machine?

24  A.  To a degree on some of them.

25  Q.  On some of them you can, on some of them you cannot?

UNITED STATES DISTRICT COURT

**001599**

```
 1    A.   Depends on the circumstances that individual PIN pad and

 2    the activity from that store.

 3    Q.   So it's mostly an exercise in trying to figure out when

 4    the potential fraud started and when it was discovered?

 5    A.   Correct.

 6    Q.   It's not actually the machine telling you the skimming

 7    device or something foreign to the machine was placed on

 8    such-and-such a date?

 9    A.   Correct.

10            MR. SEVERO:  I have no further questions.

11            Thank you.

12            THE COURT:  Counsel?

13            MR. PEREYRA-SUAREZ:  No further questions.

14            THE COURT:  Counsel?

15            MR. FLIER:  Very briefly.  Thank you.

16                       CROSS-EXAMINATION

17    BY MR. FLIER:

18    Q.   How are you, sir?

19    A.   Doing well.  Thank you.

20    Q.   I won't be that long.  Whenever you received any of

21    these PIN machines, did you have gloves on?

22    A.   No, sir.

23    Q.   Do you know if anyone who handed them to you, did they

24    have gloves on?

25    A.   No, sir.
```

```
 1    Q.   Did you do anything to preserve any of the evidence that
 2    you touched for any type of law enforcement fingerprint
 3    analysis?
 4    A.   Yes, sir.
 5    Q.   You did do that?
 6    A.   Yes, sir.
 7    Q.   Okay, good.  Thank you.  Did I hear correctly today that
 8    the first time that I would say 99 Cent Store or yourself
 9    personally received notice of any issue was July 19th of '09?
10    A.   Yes, sir.
11    Q.   So before that no issue; correct?
12    A.   We had minor issues, but not related to fraud.
13    Q.   Thank you.  And then with respect to the pattern that I
14    just heard about, is it true that not all of the machines
15    that you believed had any type of fraudulent skimming device
16    had that same shared characteristic pattern; am I correct?
17    A.   Yes, sir.
18    Q.   With respect to the same skimming device machines or the
19    pads themselves, not every single one that you were given had
20    a skimming device within it; am I correct?
21    A.   No, sir.
22    Q.   So every single one?
23    A.   The ones that I received had skimming devices in them.
24    Q.   I thought there were some testimony and correct me if
25    I'm incorrect, that not every one did have any type of pad or
```

```
 1    the skimming device.  That was wrong?

 2    A.   That was wrong.

 3    Q.   So every one that you received you actually checked

 4    yourself?

 5    A.   Yes, sir.

 6    Q.   Okay.  Thank you.  Did you ever catch anyone doing

 7    anything improper?

 8    A.   Other than observation of video, no, sir.

 9    Q.   And then lastly as to observation of video, I assume we

10    might see some of these videos, but in the video while you

11    were investigating and trying to determine what was really

12    going on, can you see people actually removing these devices

13    within the store?

14    A.   Yes, sir.

15              MR. FLIER:  I have no further questions.

16              THE COURT:  Redirect.

17              MS. YANG:  Very briefly, Your Honor.

18                      REDIRECT EXAMINATION

19    BY MS. YANG:

20    Q.   Mr. Camery, following up on defense counsel's question,

21    in viewing the surveillance you testified that you could

22    actually see subjects removing the skimming devices; is that

23    correct?

24    A.   That is correct.

25    Q.   And you previously testified that when you went to the
```

1    Ventura No. 213 store and personally inspected the devices,

2    you did not find any altered devices; is that correct?

3    A.   That's correct.

4    Q.   But you also downloaded video from the Ventura store;

5    correct?

6    A.   Yes, ma'am.

7    Q.   And did that video show individuals swapping out the

8    devices?

9    A.   Yes, ma'am.

10   Q.   During the course of investigation of the fraudulent PIN

11   pads at the various 99 Cent Store locations, did you recover

12   every compromised PIN pad?  Do you believe that you and your

13   team recovered every compromised PIN pad?

14   A.   The ones that were not retrieved by the suspects, yes.

15   Q.   So there were PIN pads, altered PIN pads, that had been

16   switched out and retrieved by the suspects that you did not

17   recover; is that correct?

18            MR. SEVERO:  Speculation.

19            THE COURT:  Sustained.

20   BY MS. YANG:

21   Q.   Based on your viewing of the surveillance videos in

22   which you saw suspects switching out the PIN pads, you did

23   not recover those PIN pads; correct?

24            MR. SEVERO:  Still speculation.

25            THE COURT:  Sustained.

```
 1    BY MS. YANG:

 2    Q.   Did you recover the PIN pads that you saw the suspects

 3    take out of the store with them?

 4              MR. SEVERO:  Speculation.

 5              THE COURT:  Do you know for sure that they were the

 6    same PIN pads, if you know?

 7              THE WITNESS:  No, I don't know that they were the

 8    same PIN pads.

 9              MS. YANG:  Your Honor, my question was slightly

10    different.  Let me rephrase it.

11    Q.   Did you recover the PIN pads that you saw on video a

12    suspect take out of the store?

13              MR. SEVERO:  Objection.  Calls for speculation.

14              THE COURT:  It does, it does.

15    BY MS. YANG:

16    Q.   Did you intercept any of the suspects you saw on video

17    outside the store with PIN pads?

18    A.   No, ma'am.

19    Q.   Now, you testified that you personally opened and

20    observed skimming devices in all of the devices you turned

21    over to law enforcement; correct?

22    A.   Correct.

23    Q.   And those are the devices that were presented here in

24    court today; correct?

25    A.   Yes, ma'am.
```

```
 1              MS. YANG:  One moment, Your Honor.
 2              THE COURT:  Sure.
 3              MS. YANG:  Nothing further.
 4              THE COURT:  Recross.
 5                        RECROSS-EXAMINATION
 6   BY MR. SEVERO:
 7   Q.   From the Ventura store, are you aware of whether any,
 8   and I only want your knowledge based on your investigation,
 9   are you aware of whether any debit cards or credit cards were
10   fraudulently used at the Ventura store?
11   A.   Yes, sir.
12   Q.   But you never recovered altered machines from the
13   Ventura store when you went there?
14   A.   No, sir, I did not.
15              MR. SEVERO:  That's all.
16              THE COURT:  Counsel.
17                        RECROSS-EXAMINATION
18   BY MR. FLIER:
19   Q.   Did you recover any machines from any store in
20   San Diego?
21   A.   Not that I recall.
22              THE COURT:  Okay.  Thank you, counsel.
23              You may step down.
24              MS. YANG:  Your Honor, the government calls
25   Nicholas Mitchell.
```

79

```
1              THE COURT:  Okay.
2              THE CLERK:  Please raise your right hand.
3                        (Witness sworn.)
4              THE CLERK:  Thank you.  You may be seated.  May I
5    please ask you to state your full name for the record and
6    spell your last name.
7              THE WITNESS:  Nicholas Mitchell M-i-t-c-h-e-l-l.
8              THE COURT:  Counsel.
9              MS. YANG:  Thank you, Your Honor.
10                       DIRECT EXAMINATION
11   BY MS. YANG:
12   Q.   Good morning, Mr. Mitchell.
13   A.   Good morning.
14   Q.   Where are you currently employed?
15   A.   The 99 Cent Only Stores.
16   Q.   And what is your position?
17   A.   Regional asset protection manager.
18   Q.   Now, approximately how long have you worked for 99 Cent
19   Only Stores?
20   A.   Eight years.
21   Q.   And as a regional asset protection manager, are you part
22   of the Loss Prevention Department?
23   A.   Yes.
24   Q.   And what are your duties as a regional asset protection
25   manager?
```

80

```
1    A.    Uh, we oversee the physical security of the building.
2    We do internal-external investigations.  We also do auditing
3    compliances as well as environmental teaching and training.
4    Q.    Now, based on your title regional, does that mean that
5    you are responsible for a certain region?
6    A.    Yes.
7    Q.    And what region are you responsible for?
8    A.    Currently now I'm responsible for Long Beach to
9    San Diego market.
10   Q.    Now, I want to direct your attention to 2009.  Were you
11   also a regional asset protection manager in 2009?
12   A.    The title at the time was regional loss prevention
13   manager, but yes.
14   Q.    And what was your region of responsibility in 2009?
15   A.    I oversaw parts of L.A., Industry and I Riverside at the
16   time.
17   Q.    I'd like to direct your attention to August 24th, 2009.
18   Did you receive a directive from Scott Camery to report to a
19   specific 99 Cent Store location?
20   A.    Yes.
21   Q.    And what location did you go to in response to that
22   directive?
23   A.    Huntington Beach store.
24   Q.    And are 99 Cent Only Stores also referred to by store
25   number?
```

```
1    A.    Yes.

2    Q.    And what store number was this Huntington Beach store?

3    A.    75.

4    Q.    Now, did you go to Store 75 alone or with someone else?

5    A.    No, I met with someone else there.

6    Q.    And who did you meet with?

7    A.    Beryl Davis.

8    Q.    And who is Beryl Davis?

9    A.    He was a regional loss prevention manager for that area

10   at the time.

11   Q.    Now, when you arrived at Store 75 what, if anything, did

12   you do?

13   A.    We entered the store and proceeded to one of the

14   registers and there was a compromised PIN pad on the

15   register.  We basically turned it over and reviewed it to

16   confirm it and removed it.

17   Q.    Now, how did you know to go to a specific register to

18   recover that PIN pad?

19   A.    Byerl had gotten instructions from somebody else who had

20   found it.

21              MR. SEVERO:  Move to strike.  It's all hearsay.

22              THE COURT:  Sustained.

23   BY MS. YANG:

24   Q.    Based on information you received, you knew to go to a

25   specific PIN pad at a specific register; is that correct?
```

```
 1    A.   Correct.

 2    Q.   And did you say what register you went to?  I apologize.

 3    A.   No.

 4    Q.   Do you recall?

 5    A.   I don't recall which one offhand.

 6    Q.   When you went to that register and inspected the PIN

 7    pad, did you discover that it had been compromised?

 8    A.   Yes.

 9    Q.   And how were you able to make that determination?

10    A.   We removed the backing of it and the PIN pads have one

11    soft backing and then once you remove it, there should be a

12    second hard shell plastic.  That was removed and inside was a

13    stick with kind of wirings plugged into it.

14    Q.   And did you go recognize what that stick with wires

15    plugged into it was?

16    A.   Yes.

17    Q.   And what was it?

18    A.   A skimming device.

19    Q.   Now, are those skimming devices in the PIN pads or point

20    of sale terminals that 99 Cent Store Only puts out for

21    customers' use?

22    A.   No.

23    Q.   Now, once you found that PIN pad, I believe you

24    testified that you removed it; correct?

25    A.   Correct.
```

```
 1    Q.   Did you do anything to put a new PIN pad at that
 2    register?
 3    A.   We placed a new PIN pad that was company property on
 4    there.
 5    Q.   And did you do anything to that PIN pad before placing
 6    it at that register?
 7    A.   We placed two markings onto it like scratches.
 8    Q.   Now, why did you place two markings or scratches on the
 9    PIN pad that you put at that register?
10    A.   The compromised PIN had two scratch marks on it and so
11    we duplicated it.
12    Q.   Now, what was your intent in placing that PIN pad with
13    two markings on it at that register?
14    A.   In early investigation --
15               MR. FLIER:  Objection.  Irrelevant.
16               THE COURT:  Overruled.
17               THE WITNESS:  In early investigations we had
18    discovered throughout the case that the compromised PIN pads
19    that were found had little slash marks on them.
20    BY MS. YANG:
21    Q.   And why did you put a PIN pad and duplicate the two
22    scratch marks on it back at that register?
23    A.   Um, we had identified that earlier on that, um --
24               MR. SEVERO:  Sorry, Your Honor.  I think this
25    testimony without foundation.  We have identified it's not
```

84

```
1    his personal knowledge.
2              THE COURT:  Well, sustained.  You can testify to
3    what you did, but not what somebody else did.
4    BY MS. YANG:
5    Q.   Did you participate in this investigation of PIN pad
6    fraud at the 99 Cent Only stores?
7    A.   Yes.
8    Q.   Based on your knowledge of the investigation, why did
9    you place a PIN pad with two marks back on the register at
10   Store 75?
11             MR. SEVERO:  That's been asked and answered.
12             THE COURT:  I thought it had.
13             MS. YANG:  I don't believe so, Your Honor.
14             THE COURT:  You can answer it again.
15             THE WITNESS:  You want me to answer?
16             THE COURT:  Why did you put those two marks on it?
17             THE WITNESS:  Because the original PIN pad that was
18   on it that was compromised had scratch marks on it.
19             MS. YANG:  I'm sorry.  My question was unartful.  I
20   actually had a different question.
21   Q.   Why did you put that PIN pad back on the register?
22   A.   In videos that I reviewed and throughout the case, we
23   had noticed or I had noticed on video that the subjects would
24   come back in and retrieve them at a later date.
25             Earlier on in the investigation, in the Limonite
```

1    store, I had seen video where we had -- I had viewed on video

2    that a compromised PIN pad was swapped out.  And we placed as

3    a company, one of our own on there.  When the subjects

4    entered the store, they looked at it and left and did not

5    take it with them.

6           As the case went on and other PIN pads that I was

7    able to view and identify with as being compromised, they had

8    scratch marks on them.

9    Q.   So you put this decoy PIN pad on the register with the

10   expectation that the subjects would remove it?

11   A.   Yes.

12          MS. YANG:  Your Honor, if I could ask the court's

13   clerk assistance in placing Exhibits 338 and 339 before the

14   witness.

15          THE COURT:  Okay.

16          MS. YANG:  Your Honor, for the record 339 has

17   already been admitted into evidence.

18          THE COURT:  Yes.

19   BY MS. YANG:

20   Q.   Mr. Mitchell, looking at this device, can you tell if

21   this is the altered PIN pad that you removed from Store 75?

22   A.   Yes.

23   Q.   And how can you tell that?

24   A.   I can see inside right now where I can see a skimming

25   device in there.

1    Q.   You can see the skimming device through the back of the

2    device even though it's still enclosed?

3    A.   Yes, there's a gap right there.

4         MS. YANG:  Your Honor, may I approach the clerk and

5    retrieve that exhibit?

6         THE COURT:  Yes.

7         MS. YANG:  Your Honor, permission to publish?

8         THE COURT:  Yes.

9    BY MS. YANG:

10   Q.   Now, Mr. Mitchell, you testified you could see that

11   skimming device through the back.

12   A.   Correct.

13   Q.   Could you see it through this gap here?

14   A.   Yes, ma'am.

15   Q.   I don't know if we can show it here.  And is it the

16   skimming device that you can tell this green wire area?

17   A.   Yes.

18   Q.   And that based on your knowledge of the investigation as

19   well as knowledge of skimming devices, that's the skimming

20   device inside this point of sale terminal; correct?

21   A.   Yes.

22   Q.   Now, if you could take a look at Exhibit 339.

23        MS. YANG:  Your Honor, may I approach to return

24   this to the clerk?

25        THE COURT:  Yes.

```
 1    BY MS. YANG:

 2    Q.    Do you recognize Exhibit 339?

 3    A.    Yes.

 4    Q.    What is Exhibit 339?

 5    A.    It's the other PIN pad.

 6    Q.    And by other PIN pad is that the decoy device that you

 7    installed at Store 75?

 8    A.    Yes.

 9    Q.    And how can you tell it's the decoy device and not an

10    altered PIN pad device?

11    A.    Same location as the altered PIN pad.  You can see the

12    hard shell plastic underneath that same gap.

13    Q.    And there's no skimming device; is that correct?

14    A.    Correct.

15              MS. YANG:  Your Honor, the government moves to

16    Admit Exhibit 339.

17              THE COURT:  Will be received.

18                     (Exhibit 339 was admitted.)

19    BY MS. YANG:

20    Q.    Now, on August 24th, 2009, while you were at the Store

21    75 location, were you directed to report to another store in

22    Huntington Beach?

23    A.    Yes.

24    Q.    And which store was that?

25    A.    97.
```

88

1    Q.    And when you arrived at Store 97, did you discover an

2    altered PIN pad there?

3    A.    Yes.

4    Q.    Did you recover that altered PIN pad?

5    A.    Yes.

6    Q.    And what did you do with it?

7    A.    I placed it in the office with me for when I began

8    reviewing video.

9    Q.    And then after you completed your investigation at Store

10   97, did you take the altered PIN pad anywhere?

11   A.    I gave it to Scott Camery.  He met me at the store.

12   Q.    So you handed it directly after removing it from the

13   store to Mr. Camery?

14   A.    Yes.

15          MS. YANG:  Your Honor, one moment.

16          THE COURT:  Yes.

17          MS. YANG:  Nothing further.

18          THE COURT:  Counsel.

19                    CROSS-EXAMINATION

20   BY MR. SEVERO:

21   Q.    Good morning, sir.

22   A.    Good morning.

23   Q.    In 2009 Mr. Camery was your boss?

24   A.    Yes, sir.

25   Q.    You were regional, but he was loss prevention manager

```
 1    for the entire --
 2    A.   Vice president I believe his title was at the time.
 3    Q.   Did you recover, best of your knowledge, do you have any
 4    PIN pad machines from San Diego?
 5    A.   Do I have them?
 6    Q.   Did you recover any, you?
 7    A.   Yes, sir.  Oh, no.  I'm sorry, sir.  No, I did not.
 8    Q.   And did you recover any from Ventura County?
 9    A.   No, sir, I did not.
10    Q.   The ones that you worked on were the Exhibits 338 and
11    339; is that correct?
12    A.   Yes, sir.
13              MR. SEVERO:  Could I get both of those for a moment
14    to examine, Your Honor?
15              THE COURT:  Sure.
16              MR. SEVERO:  If I may have a moment?
17              THE COURT:  Yes.
18              MR. SEVERO:  May I publish?
19              THE COURT:  Yes.
20    BY MR. SEVERO:
21    Q.   Looking at 338, the front of it.  You see that?
22    A.   Yes, sir.
23    Q.   Was this the scratch that was on the machine when you
24    received it?
25    A.   Yes, sir.
```

1    Q.   And this is the one that you can see the skimming device

2    on?  Do you recall or should I turn it over?

3    A.   Can you please turn it over?

4    Q.   Sure.

5    A.   Yes, sir, that's the skimming device.

6    Q.   You can see it from on the screen?

7    A.   Yeah, I can see it.

8    Q.   There's a little green wire in there, isn't there?

9    A.   Correct.

10   Q.   Now, normally, a machine that has not been altered would

11   have a plastic cover underneath this gap; correct?

12   A.   Yes, sir.

13   Q.   So you wouldn't be able to see anything.

14   A.   Correct.

15   Q.   The reason you think this is a skimming device is

16   because it's a wire you normally wouldn't see?

17   A.   It's exposed, yes.

18   Q.   There are no green wires in here otherwise?

19   A.   Below the cover there might be.

20   Q.   So if just the plastic is removed, the plastic covering

21   underneath the outside cover, you could see still some green

22   wires in there even if there is no skimming device?

23   A.   No, sir.  You'd actually have to break the top plastic

24   that's underneath those two screws right there.

25   Q.   Well, that's what I'm saying.  As I understand the

UNITED STATES DISTRICT COURT

1    testimony, removing this plastic device here with the two

2    screws, normally on the regular machine, there would be

3    another plastic cover, would there not?

4    A.    Yes, sir.

5    Q.    But if you remove the plastic cover and put this back on

6    with the screws, you would be able to see wires even in a

7    machine without a skimming device.

8    A.    It's possible.

9    Q.    So -- all right.  So the wire that you see here you know

10   it's from the skimming device because you've seen the

11   skimming device in the machine?

12   A.    Yes.

13   Q.    Just looking at it, all you would know if you didn't

14   know there was a skimming device in here, all you would know

15   is that the plastic, second plastic cover if you will or

16   inside plastic cover had been removed.

17   A.    Yes.  The second plastic's hard.  You'd actually have to

18   break it off.

19   Q.    Okay, that's fine.  But the wire itself doesn't tell you

20   it's a skimming device?

21   A.    Not the wire itself, no.

22   Q.    Okay.  Now, I'm placing the tag back on 338.  Let me

23   direct your attention to 339.  This is your decoy machine?

24   A.    Yes, sir.

25   Q.    And is this the scratch you made?

92

```
 1   A.   Yes, sir.

 2   Q.   And it's only one diagonal line; correct?

 3   A.   Correct.

 4   Q.   Now, by looking inside I don't -- is there a plastic

 5   cover inside of this one?

 6   A.   Yes.  You can see the kind of gray underneath that.

 7   Q.   Right.  That would be --

 8   A.   The hard plastic.

 9   Q.   -- the hard plastic.

10   A.   Yes, sir.

11   Q.   Was this machine then removed from the store at some

12   point by someone?

13   A.   I don't remember.

14   Q.   Well, what was the purpose of the decoy?

15   A.   The decoy was if they came back, that way they didn't

16   get the skimmer.  We had to place them back on.  Not to

17   mention, it's a point of sale so we have to keep business

18   open so we have to put one back on.

19   Q.   But this is not a machine that "they" and I'm using the

20   quote signs came back for?

21   A.   I don't understand your question.

22   Q.   Was it taken by someone on a video that you believed to

23   be a suspect?

24   A.   Um, I saw the video afterwards, yes.

25   Q.   This one was taken.
```

```
1    A.   They attempted to on the video.

2    Q.   All right.  These are suspects that were stopped?

3    A.   Yes.

4    Q.   Which store?

5    A.   75.

6    Q.   That would be Huntington Beach?

7    A.   Yes, sir.

8              MR. SEVERO:  Could I see 336.

9              MS. YANG:  Objection, Your Honor.  This is outside

10   the scope of this witness's testimony.  He testified to 338

11   and 339 only.

12             MR. SEVERO:  Actually, Your Honor, if I may, there

13   are markings in 336 that I want to compare to 339.

14             THE COURT:  I understand.  Technically, you could

15   recall him because it is outside the testimony, but to save

16   time, can we just do it now?

17             MR. SEVERO:  Well, that's fine if the Court wants

18   to do it that way, but my feeling is that it's --

19             THE COURT:  It's not the Court that wants to.

20             MR. SEVERO:  I would want to do that.

21             MS. YANG:  I would rather not inconvenience the

22   witness, so that's fine, Your Honor.

23             THE COURT:  Okay.  Let's do it now then.

24             THE CLERK:  Did you want the witness to look at it?

25             MR. SEVERO:  Sure.
```

94

```
 1    Q.    You have 336 in front of you?

 2    A.    Yes, sir.

 3    Q.    And before I ask you any other questions, did you view

 4    all the machines that were turned over to law enforcement?

 5    A.    No, sir.

 6    Q.    Do you know where this machine came from other than --

 7    A.    No, sir.

 8              MR. SEVERO:  All right.  May I see 336, Your Honor?

 9              THE COURT:  Yes.  The last items you reviewed put

10    back --

11              MR. SEVERO:  They're back on the witness stand.

12              THE COURT:  Can you put that back?

13              MR. SEVERO:  Oh, yes.

14              THE COURT:  Very well.  Put that device you have

15    back there in the red well.  That's exhibit which?

16              THE WITNESS:  338 and 339.

17              THE COURT:  Put 338 and 339 back.

18              MR. SEVERO:  Your Honor, this is still in the

19    plastic.  The plastic has been torn.  May I remove it from

20    the plastic?

21              THE COURT:  Yes.

22              MR. SEVERO:  Let me show you 336.  May I publish?

23              THE COURT:  Yes.

24              MR. SEVERO:  Thank you.

25    Q.    You see these lines here?
```

1    A.    Yes, sir.

2    Q.    These markings are different than the markings in 338

3    and 339, aren't they?

4    A.    Yes, sir.

5    Q.    There are two of them; correct?

6    A.    Yes, sir.

7    Q.    And they're not -- they seem to have been done with a

8    marker.  You see that?

9    A.    Yes, sir.

10   Q.    All right.  Did you find other machines like this with

11   markers?

12   A.    Not that I recall.

13   Q.    And you don't know who placed the lines on these --

14   these two lines on this machine, do you?

15   A.    No, sir.

16            MR. SEVERO:  That's all I have.  Thank you.

17            THE COURT:  Counsel?

18            MR. PEREYRA-SUAREZ:  No questions.

19            MR. FLIER:  Very briefly.

20            THE COURT:  Certainly.

21                    CROSS-EXAMINATION

22   BY MR. FLIER:

23   Q.    Good morning, sir.

24   A.    Good morning.

25   Q.    Just to clear up two things, please.  Was it, I think I

1   wrote down August 24th is when you received the notification

2   from I think it was Mr. Camery?

3   A.   Yes, sir.

4   Q.   So before August 24th of '09, did you have any notice

5   that related to this particular investigation?

6   A.   As far as the general investigation or the incident at

7   Store 75?

8   Q.   Well, we'll say the Store 75 incident.

9   A.   No, no knowledge before that.

10  Q.   And it appears that you went to the Huntington Beach

11  store.  Is that Store 75?

12  A.   Yes, sir.

13  Q.   And that's where you retrieved the item that we heard

14  about today?

15  A.   Yes, sir.

16  Q.   The same item then the decoy one you put it back in?

17  A.   Yes, sir.

18  Q.   Did you preserve those items not the decoy one, but the

19  other one that was fraudulent in any way for fingerprint?

20  A.   Well, that day what I remember it was turned over to

21  Huntington Beach PD.  They arrived at the store not too long

22  after, but I don't recall if we placed it in a bag or

23  anything.

24       MR. FLIER:  Thank you.  No more questions,

25  Your Honor.

```
 1                THE COURT:  Thank you, counsel.

 2                Is there redirect?

 3                MS. YANG:  No redirect.

 4                THE COURT:  You may step down.  Next witness.

 5                MR. ESTRADA:  Your Honor, the government calls Mark

 6     Stohl.

 7                THE CLERK:  Please raise your right hand.

 8                     (Witness sworn.)

 9                THE CLERK:  Thank you.  You may be seated.  Ask you

10     to state your full name for the record and spell your last

11     name.

12                THE WITNESS:  Mark Stohl S-t-o-h-l.

13                THE COURT:  Make sure you get close to that mic so

14     we can pick you up.  You may inquire, counsel.

15                MR. ESTRADA:  Thank you, Your Honor.

16                          DIRECT EXAMINATION

17     BY MR. ESTRADA:

18     Q.   Sir, where do you work?

19     A.   I work for the Burbank Police Department in Burbank,

20     California.

21     Q.   How long have you worked for the Burbank Police

22     Department?

23     A.   Almost 14 years.

24     Q.   Currently with the Burbank Police Department, what's

25     your position?
```

```
 1    A.    I'm a sergeant assigned to the patrol division.

 2    Q.    How long have you been a sergeant?

 3    A.    Year-and-a-half.

 4    Q.    Now, prior to becoming a sergeant, did you have another

 5    assignment with the Burbank Police Department?

 6    A.    Yes.  I was assigned to the rank of detective for a

 7    little over five years.

 8    Q.    Now, during your time as an officer with the Glendale

 9    Police Department, were you assigned any particular task

10    force?

11    A.    Burbank Police Department.

12    Q.    Outside of the Burbank Police Department, were you

13    assigned to a task force?

14    A.    Yes.  I was assigned to work at the Eurasian Organized

15    Crime Task Force which was based out of the Glendale Police

16    Station.

17    Q.    Is that commonly known as the EOCTF?

18    A.    Correct.

19    Q.    How long were you assigned to the EOCTF?

20    A.    Approximately four-and-a-half years.

21    Q.    From when to when?

22    A.    2008 until 2012.

23    Q.    Now, as an officer with the Eurasian Organized Crime

24    Task Force, what were your general duties?

25    A.    My job was to investigate and assist in investigations
```

1  of organized criminal groups, conduct surveillances, write

2  search warrants to -- other court paperwork such as PIN

3  registers, wiretap affidavits.

4  Q.   Now, you mentioned organized criminal groups.  During

5  your investigation of organized criminal groups, did you

6  investigate different types of crimes?

7  A.   Yes.

8  Q.   What sorts of crimes?

9  A.   Fraud, firearms trafficking, firearms possession,

10  narcotics offenses, extortion, things of that nature.

11  Q.   I want to ask you about fraud specifically.  During your

12  time as an officer both with the Eurasian Organized Crime

13  Task Force and generally with the Burbank Police Department,

14  have you had experience with fraud crimes?

15  A.   Yes.

16  Q.   Have you had training with regard to fraud crimes?

17  A.   Yes.

18  Q.   Explain first your training with regard to fraud crimes.

19  A.   I received training in the police academy on basic fraud

20  crimes.  Since that time I received specialized training both

21  formal and informal from various entities including classes

22  of -- presented by California Narcotics Officers Association.

23  I received specialized training from the District Attorney

24  Investigator's Office, FBI, Secret Service.  I've also

25  networked with other fraud investigators from the Sheriff's

1    Department, LAPD and other local law enforcement agencies.

2    Q.   Now, in addition to training regarding fraud offenses,

3    have you had training regarding identity theft offenses?

4    A.   Yes.

5    Q.   Could you explain just generally what identity theft is?

6    A.   That's where someone will obtain the personal

7    identifying information of another individual such as a name,

8    social security number, birth date, credit or debit or

9    checking account number and they'll use it for unlawful

10   purposes to gain money that belongs to either a financial

11   institution or another individual without their knowledge or

12   consent.

13   Q.   Now, I want to ask you a little bit more about fraud

14   crimes and identity theft crimes.  Before we get into that,

15   do you have experience actually investigating fraud crimes

16   and identity theft crimes?

17   A.   Yes.

18   Q.   What sort of experience?

19   A.   Basic examples would be if a person came to the police

20   station to report that they were a victim of identity theft

21   from just taking the initial report as an officer, to

22   investigating the report as a detective, conducting a

23   follow-up with financial institutions, receiving bank

24   records, surveillance photos, conducting surveillance on

25   suspects and people believed to be conducting identity theft

1    related or fraud related crimes.

2    Q.    Now, in terms of numbers about how many fraud crimes

3    would you say you've investigated in the past approximately?

4    A.    Over a hundred.

5    Q.    With regard to identity theft, about how many identity

6    theft cases have you investigated generally?

7    A.    Probably over a hundred.  It's a lot.  Very frequently

8    committed crime.

9    Q.    Have you testified previously as an expert in the area

10   of fraud and identity theft?

11   A.    Yes, on several occasions.

12   Q.    I want to ask you about your expertise with regard to

13   fraud and identity theft offenses.  Are you familiar with

14   what a skimmer or skimming device is?

15   A.    Yes.

16   Q.    Can you explain to the jury what a skimming device is?

17   A.    A skimming device is a computer, I'll just call it a

18   computer chip.  It's a small computer device that's designed

19   to capture and record credit or debit card data.  They're

20   usually -- they can be purchased online for purported

21   legitimate uses, and then the devices are then opened up to

22   gather the memory board and the internal circuitry.

23           And then they're rewired by someone with some

24   knowledge in wiring and electronics, and then they're placed

25   at point of sale terminals or POS.  These could be anything

1    from where you swipe your credit card at a store like

2    Walmart, Target, 99 Cent Store.  It could be in the gas pumps

3    actually inside the pump.

4         They can also be on ATM machines as overlaid

5    devices on the machine itself or in the case of Chase Bank, a

6    lot of them have a swiper at the door to the vestibule to get

7    into the room with the ATM, you have to swipe your card.  The

8    main target for where skimmers are actually put in would be

9    where there is a lot of turn over of customers gas pumps,

10   retail stores, ATM machines.

11   Q.   These skimmers are they a computer or digital devices?

12   A.   Yes.

13   Q.   Generally speaking, can they record a debit card number?

14   A.   Yes.

15   Q.   Can they record what's known as a PIN?

16   A.   Yes.

17   Q.   A personal identification number?

18   A.   Yes.

19   Q.   Now, with regard to these skimmer devices, you mentioned

20   they can record debit card numbers and PINs.  How can someone

21   involved in fraud or identity theft then use these skimming

22   devices to obtain money or property?

23   A.   Once someone has installed the device and it's captured

24   numbers, typically, these devices can store upwards of 2,000

25   or 3,000 records of transactions.  They'll have to either

UNITED STATES DISTRICT COURT

1    retrieve the device and then have a port that you can plug in

2    with certain software and download it on to a computer.  Some

3    of the devices are becoming a little more tech savvy and they

4    can be downloaded via bluetooth or other electronic wireless

5    methods.

6            Once the data is downloaded into a computer, you

7    can use another device called the reader writer to reencode

8    the data onto the back of a magnetic strip on an access card.

9    That could be anything from like a gift card, someone else's

10   credit card, parking passes where you have to swipe.  It's

11   actually quite simple once you have the right equipment.

12   Q.    Let me ask you about some of what you said.  These

13   skimming devices they have to be retrieved in some form?

14   A.    Yes, unless they're wireless enabled, then they can be

15   remotely accessed.  But typically you have to install the

16   device to capture the data from the customers.  Then you have

17   to retrieve it, download it into a computer, and then swipe

18   onto a -- through a reader writer onto a card.

19           Just to give the jury an idea of how simple that

20   would be most people have gone to a hotel and on the hotel

21   now instead of having keys, they have little cards you put in

22   the door.  If you've ever lost your key and you need to get a

23   new one to get in your room, you just go down to the desk and

24   say I lost my key.  They ask you which room number and your

25   name and okay.

104

```
 1              Then they'll just grab a card out of a big box and

 2      they slide it through the machine.  Here's your room key and

 3      it goes and works.  It's as simple as that.  It's a blank

 4      card and they just reprogram it.

 5      Q.   Now, that reprogramming of the card is that what's known

 6      as the reader writer device?

 7      A.   Yes.

 8      Q.   And that's another device that can be plugged into a

 9      computer?

10      A.   Correct.

11      Q.   Now, you mentioned the device the skimmers can be

12      typically retrieved and you mentioned bluetooth.  Is that

13      sort of the remote way of receiving the information?

14      A.   Yes, it's a newer technology.  A lot of cars now have

15      bluetooth enabled stereos so you can stream music or

16      wirelessly transmit call signals from your phone to your car

17      so you don't have to talk on your hand-held phone while

18      driving.

19      Q.   On those bluetooth mechanisms, those more sophisticated

20      mechanisms, do those generally erase the memory on the

21      skimmer?

22      A.   In my experience once they download the data, it's gone

23      off of the chip so it basically starts over with a blank

24      slate.

25      Q.   So if you found one of these devices, these bluetooth
```

UNITED STATES DISTRICT COURT

**001631**

1   devices and it already had been retrieved in terms of the

2   debit card information, it might not have anything physically

3   on it.

4   A.   Correct.

5   Q.   Are these devices often password protected?

6   A.   In my experience, yes.

7   Q.   Can you explain that?

8   A.   Typically, when we find the devices, we will turn them

9   into a forensic examiner who has the software required to

10  examine the device and they'll generate a report, which then

11  I will read and it will explain the type of device, if it was

12  password protected, what the password was, and then how many

13  account numbers were in the memory, if there were any.

14  Q.   Okay.  So you mentioned this obtaining the information,

15  downloading it on a computer, and then placing it on a gift

16  card or some other card with a magnetic strip.  Once the

17  information is on these cards, placed onto these cards with a

18  magnetic strip, how can it then be used to obtain money or

19  property?

20  A.   You can go to a store and you can select items and

21  purchase them at the cash register by swiping the card.  You

22  can go to an ATM machine and insert it.  And typically what I

23  found is these cards will have either a sticker or on the

24  signature panel they will have either a five digit or four

25  digit number written on them which would correspond to the

1    zip code or the PIN number.

2             A lot of times if you go to a store and swipe your

3    card, they'll ask for your zip code so it's written on the

4    card.  That's one of the clues when I see these in the field,

5    if I see something with a five digit number written on it in

6    ink or on a sticker or a four digit number, it's just like a

7    red flag.  This is a fraud because normal people don't write

8    their PIN number on their ATM card.

9    Q.   Now, with regard to the four digit number or the five

10   digit number, when it has a five digit zip code that

11   typically corresponds to a credit card?

12   A.   Yes.

13   Q.   When it has a four digit PIN, does that typically

14   correspond to a debit card?

15   A.   Yes.

16   Q.   What would be the difference between a credit card and a

17   debit card?

18   A.   The debit card you can typically --

19             MR. SEVERO:  Your Honor, this is beyond the scope

20   of this witness's foundation for his expert opinion.

21             THE COURT:  Overruled.

22             THE WITNESS:  The ATM card you can access cash out

23   of an ATM machine.  Credit cards are usually regulated to

24   purchasing items.  Sometimes they'll purchase gift cards or

25   items that can easily be resold like iPads or other

1    electronics.

2    BY MR. ESTRADA:

3    Q.   Based on your experience investigating fraud and

4    identity theft offenses, do the debit cards have more value

5    versus the credit cards?

6    A.   Yes.

7    Q.   In what way?

8    A.   You can get cash immediately and it's only traced back

9    to you if there is a video surveillance.

10   Q.   Among people who are involved in fraud and identity

11   theft, typically are debit cards given more priority?

12   A.   Yes.

13   Q.   Now, once this information is obtained using a skimming

14   device, placed on the reencoded card is there any sort of

15   time pressure based on your experience investigating fraud

16   and identity theft of getting the money out?

17        MR. SEVERO:  Objection.  That calls for

18   speculation.

19        THE COURT:  Sustained.

20   BY MR. ESTRADA:

21   Q.   Based on your experience in investing fraud and identity

22   theft cases is the money typically taken out quickly?

23        MR. SEVERO:  Objection.  Still speculation.

24        THE COURT:  No.  In your experience has it been

25   taken out quickly?

```
 1                  THE WITNESS:  Yes.

 2                  MR. ESTRADA:  Why is that?

 3                  THE COURT:  Sustained.  That's speculation.

 4    BY MR. ESTRADA:

 5    Q.   So in your experience the money is taken out quickly?

 6    A.   Yes.

 7    Q.   Now, in your experience also when the first fraudulent

 8    transaction is made is it more likely to be detected?

 9                  MR. SEVERO:  Objection.  Speculation.

10                  THE COURT:  Overruled.

11                  THE WITNESS:  Yes.

12    BY MR. ESTRADA:

13    Q.   Why is that?

14                  MR. SEVERO:  Speculation.

15                  THE COURT:  Overruled.

16                  THE WITNESS:  Typically, when people start losing

17    three to $400 out of their bank accounts, they get nervous

18    and call the bank wondering where the money went because they

19    didn't make the withdrawal and then --

20                  MR. SEVERO:  Move to strike everything after

21    nervous --

22                  MR. ESTRADA:  Your Honor, it's based on his

23    training and experience.  He's entitled to testify based on

24    his training and experience.

25                  THE COURT:  Counsel, you're interrupting him.  I
```

```
1   don't even know what the objection is.  You only can have one
2   at a time.  What was your objection?
3           MR. SEVERO:  The objection is speculation as to
4   when they get nervous.  The part of the answer that was they
5   get nervous and start calling.
6           THE COURT:  It will be overruled.  He's testifying
7   on his training and experience.  Overruled.  Next question.
8   I think that one's been answered, has it not?
9           THE WITNESS:  I believe so, sir.
10          MR. ESTRADA:  I believe it has been answered.
11  Q.   So generally the money is taken out quickly?
12          MR. SEVERO:  Objection.  Asked and answered.
13          THE COURT:  Sustained.
14          MR. ESTRADA:  Your Honor, the answer keeps getting
15  interrupted.  I wanted to clarify.
16          THE COURT:  It wasn't interrupted.  He's testified
17  it's taken out quickly and he's testified why.
18  BY MR. ESTRADA:
19  Q.   Are you familiar with something known as daily limits as
20  it applies to ATMs and debit cards?
21  A.   Yes.
22  Q.   What are daily limits?
23          MR. SEVERO:  Beyond the expertise of this witness.
24          THE COURT:  Overruled.
25          THE WITNESS:  An amount set by the financial
```

1    institution that lets you take out a certain amount of money

2    300, 400, $500 a day typically.

3    BY MR. ESTRADA:

4    Q.   Based on your training and experience is there an effort

5    by people involved in fraud and identity theft to go around

6    the daily limit?

7              MR. SEVERO:  Objection.  Speculation.

8              THE COURT:  Overruled.

9              THE WITNESS:  Yes.

10   BY MR. ESTRADA:

11   Q.   How is that done?

12   A.   Typically, individuals will go to an ATM machine or

13   multiple ATM machines with a batch of cards close to

14   midnight, take out the daily limit, and then wait till after

15   midnight when the clock resets and then take out the daily

16   limit for the next day.  So basically they're getting a

17   two-for-one special before the victim realizes they're now

18   out 600, 800 or a thousand dollars.

19   Q.   And the victim realizing that's part of the time

20   pressure involved in using these cards?

21   A.   Yes.

22   Q.   Now, based on your training and experience investigating

23   these fraud and identity theft cases, are individuals

24   involved in these types of offenses careful about not having

25   law enforcement detect their activities?

1    A.    Yes.

2    Q.    Do they take measures to avoid being detected?

3    A.    Yes.

4    Q.    Explain some of these measures.

5    A.    Typically, they'll be multiple layers involved in a

6    scheme whereas they'll have one person who makes the devices,

7    the skimmers.  Separate group of people would probably be

8    used to install them, retrieve them.

9          And then you would have a different group of people

10   going out with the reencoded credit cards or debit cards to

11   use them, obtain the money, return it back to whoever their

12   handler is or their group leader who will then be in contact

13   with one of the ring leaders or the mastermind.

14         That way if the people with the credit cards or

15   debit cards get caught by the police, they only know one

16   level up and it insulates the people at the top.

17              THE COURT:  Okay, next question.

18   BY MR. ESTRADA:

19   Q.    Now, are you familiar with the term runners as it

20   applies to debit card fraud?

21   A.    Yes.

22   Q.    Please explain.

23   A.    As I just explained, that would be the people that --

24              MR. SEVERO:  Asked and answered then.

25              THE COURT:  Overruled.

112

```
 1              THE WITNESS:  That would be the people that take
 2      the credit cards, use them to obtain cash or goods, and then
 3      take the money back to their group leader.
 4      BY MR. ESTRADA:
 5      Q.   Are those runners typically lower level individuals in
 6      the overall scheme?
 7      A.   Yes.
 8      Q.   Are you familiar with the practice based on your
 9      training and experience of using different ATMs in a
10      geographic area?
11      A.   Yes.
12      Q.   Can you explain that?
13      A.   You know, it's not normal for one person to stand at an
14      ATM for an hour at a time and make multiple withdrawals.  So
15      in order to make it looking like legitimate transactions,
16      it's not uncommon for people to go to more than one ATM in a
17      certain area to utilize the reencoded cards to obtain money.
18      Q.   Now, did you participate in the general investigation in
19      this case?
20      A.   Yes.
21      Q.   Are you familiar with an individual in this case, the
22      target of this case named Raymond Tarverdyan?
23      A.   Yes.
24      Q.   Was he a defendant in this case?
25      A.   Yes, he was.
```

113

1  Q.   Did you participate in a search of a location, a

2  residence of Raymond Tarverdyan?

3  A.   Yes.

4  Q.   Was this on December 3rd, 2009?

5  A.   I believe that's correct.

6  Q.   What was the general circumstances of this search?

7  A.   I went with members of the Glendale Police Department

8  Gang Enforcement Detail to do a probation search at

9  Mr. Tarverdyan's residence.  They had received some federal

10  grant money to conduct probation and parole compliance

11  checks.  At that particular time Mr. Tarverdyan was on

12  probation for a felony conviction that he had sustained and

13  part of his probation conditions were to subject himself and

14  his property and residence to search or seizure.

15        MR. SEVERO:  Move to strike as hearsay and no

16  foundation for this witness.

17        THE COURT:  Overruled.

18        MR. ESTRADA:  Apparently, I'm being told I

19  misspoke.

20  Q.   December 23, 2009 was that the date of the search?

21  A.   It was in December several years ago.  I think that's

22  correct.

23        THE COURT:  I think that's correct will be

24  stricken.  He's testified it was in December several years

25  ago.  Next question.

114

```
1    BY MR. ESTRADA:
2    Q.   Can you explain what a probation compliance search is?
3    A.   Yes.  It's where we'll go to an address where a
4    probation, a person on probation reports to their probation
5    officer that they live and conduct a search of their
6    residence for any contraband or items they're not allowed to
7    have.
8    Q.   Now, you participated in this search?
9    A.   Yes.
10   Q.   Were items of evidence recovered?
11   A.   Yes.
12   Q.   What sorts of items of evidence were recovered at the
13   search of Raymond Tarverdyan's house?
14           MR. SEVERO:  Objection, Your Honor.  This is not
15   the best evidence.
16           THE COURT:  Overruled.
17           THE WITNESS:  Specifically, I can remember a
18   handwritten piece of paper with a --
19           MR. SEVERO:  Objection.
20           THE COURT:  Overruled.  What else?
21           THE WITNESS:  Well, the piece of paper was a
22   notebook style or Post It note paper.  We found a notation
23   for an Ingencio -- I forget the model number, which happens
24   to be a brand of point of sale machine that 99 Cent Store
25   uses.  There was also a registration and --
```

UNITED STATES DISTRICT COURT

**001641**

```
 1            MR. SEVERO:  Hearsay, Judge.

 2            THE COURT:  Overruled.

 3            MR. SEVERO:  All this information on a written

 4   piece of paper would be hearsay and violates the best

 5   evidence rule.

 6            THE COURT:  Overruled.

 7            THE WITNESS:  Registration and sales paperwork for

 8   a Range Rover in the name of -- registered in the name of

 9   Hermina Barsigyan if I recall correctly.  There was some

10   receipts for purchase of a diamond, multi -- tens of

11   thousands of dollar diamonds in someone else's name.

12   BY MR. ESTRADA:

13   Q.   Were there numerous cell phones found as well?

14            MR. SEVERO:  Is my objection -- did it reach all of

15   those items?

16            THE COURT:  It will be noted as to every item he

17   mentioned.

18   BY MR. ESTRADA:

19   Q.   Were there cell phones found as well?

20   A.   There were several cell phones.

21   Q.   Now, you mentioned some sort of paper with the name of a

22   device on it?

23   A.   Yes.

24            MR. ESTRADA:  Please take a look at Exhibit 367.

25   I'll ask the clerk for assistance in pulling that item.
```

```
 1              THE COURT:  Okay.
 2   BY MR. ESTRADA:
 3   Q.   Do you have 367 in front of you?
 4   A.   I do.
 5   Q.   Please take a look at it.
 6   A.   Yes.
 7   Q.   What is Exhibit 367?
 8   A.   There's two envelopes here.  One of them has got a
 9   yellow piece of paper says Ingencio Pinscript 2100 POS
10   terminal.  The other I previously mentioned the DMV
11   registration and sales paperwork for a 2009 Range Rover SUV
12   with the 6ETX009 in the name of Hermina Barsigyan.
13   Q.   Do you recognize those items as having come from Raymond
14   Tarverdyan's home?
15   A.   Yes, I do.
16              MR. ESTRADA:  Your Honor, the government moves to
17   admit Exhibit 367 and request permission to publish.
18              THE COURT:  May be received and they may be
19   published.
20                   (Exhibit 367 was admitted.)
21              MR. ESTRADA:  May I approach, Your Honor, the clerk
22   to retrieve those items?
23   Q.   I want you to show you Sergeant Stohl that piece of
24   notebook paper you referenced on the screen here.  Let me
25   just try to focus it.  Is this the piece of paper you
```

```
 1    mentioned that was found at Raymond Tarverdyan's house?

 2    A.   Yes.

 3    Q.   And do you see here where it says Ingencio?

 4    A.   Yes.

 5    Q.   And this POS term something there, are you familiar with

 6    the term POS as it applies to fraud and identity theft?

 7    A.   Yes, it's short for point of sale terminal.

 8    Q.   Terminal at the bottom there?

 9    A.   Correct.

10    Q.   Do you know Ingencio to be a brand of point of sale

11    terminals?

12    A.   Yes.

13    Q.   Now, based on your role in the investigation, did you

14    know Ingencio to be relevant to an investigation of fraud at

15    the 99 Cent Only stores?

16    A.   At the time this item was seized, I didn't.

17             THE COURT:  Well, he said at the time it was

18    seized, he didn't.  Overruled.  Next question.

19    BY MR. ESTRADA:

20    Q.   Later as you continued your investigation, did you learn

21    that this Ingencio had significance to the 99 Cent Only Store

22    investigation?

23    A.   Yes.

24    Q.   Explain.

25    A.   I found out this was the type of point of sale terminal
```

```
 1   that the 99 Cent Store used at their stores in Southern
 2   California.
 3   Q.   Now, at some point in this investigation, did you
 4   participate in a search of a gambling house?
 5   A.   Yes.
 6   Q.   A gambling house at 4055 Lankershim Boulevard Studio
 7   City, California?
 8   A.   Yes.
 9   Q.   Do you recall when this search occurred?
10   A.   I believe it was in January of 2010.
11   Q.   Who was present for this search?
12   A.   It was a man named Edgar Khachatryan.
13   Q.   I'll ask it a better way.  Were there many police
14   officers there for the search?
15   A.   Yes, there were.
16   Q.   Were there with other police officers?
17   A.   Yes, I was.
18   Q.   Was this a search pursuant to a search warrant?
19   A.   Yes.
20   Q.   Now, why did officers go to this particular location in
21   January of 2010?
22   A.   Prior to this particular search warrant being served, a
23   Burbank police officer conducted a traffic stop near Forest
24   Lawn Cemetery of a Mercedes Benz and during a search of that
25   vehicle, he located two firearms.
```

119

```
 1              MR. SEVERO:  I'm going to object on hearsay
 2    grounds.
 3              THE COURT:  Sustained.
 4    BY MR. ESTRADA:
 5    Q.   Based on your understanding was the purpose of the
 6    search to investigate criminal activity?
 7    A.   Yes.
 8              MR. SEVERO:  Two searchs now so it's compound.
 9              THE COURT:  You're talking about the search of the
10    gambling house.  Was that to investigate alleged criminal
11    activity?
12              THE WITNESS:  Yes, it was.
13              THE COURT:  Next question.
14    BY MR. ESTRADA:
15    Q.   Now, was the search of the gambling house connected to
16    criminal activity involving Armenian Power?
17    A.   Yes.
18              THE COURT:  Ladies and gentlemen, we're gonna break
19    at this time being 11:30.  We're gonna have you come back in
20    at 1 o'clock.  As I told you when we first started this
21    trial, we definitely go Tuesday through Friday and try to get
22    as much in on Monday as we can if we can adjust the calendar.
23              I wanted to give you as much notice as possible we
24    will not be able to adjust the Monday calendar in the way
25    that we can meet Monday.  So Monday will be a day off as far
```

```
 1    as this trial is concerned.  The only reason I'm telling you
 2    now is that I want to make sure you get as much notice as you
 3    can so you won't have to worry about coming in Monday.
 4    Tuesday morning be here at 8:15.
 5           With that at this time I'm gonna excuse you.
 6    Remember the admonishment not to discuss the case among
 7    yourselves or with anybody else or form or express any
 8    opinions about the matter until it's submitted to you and
 9    you're retired to the jury room.  With that in mind, have a
10    pleasant lunch.  Be back before 1 o'clock so we can get
11    started right at 1 o'clock.
12                        (Lunch Recess.)
13           THE COURT:  Okay.  The record will reflect that the
14    members of the jury are in their respective seats in the jury
15    box including the alternates.  The witness on the witness
16    stand and counsel, you may inquire.
17           MR. ESTRADA:  Thank you, Your Honor.
18                 DIRECT EXAMINATION (CONTINUED)
19    BY MR. ESTRADA:
20    Q.   Sergeant Stohl, before the break we were talking about a
21    search you did in January 2010.  Do you recall that?
22    A.   Yes.
23    Q.   And that was a search at a gambling house on Lankershim
24    Boulevard in Studio City?
25    A.   Yes.
```

```
1    Q.   And did the search have to do with the investigation of
2    Armenian Power?
3    A.   Yes.
4    Q.   Now, when you conducted this search, did you find any
5    suspects inside the gambling house?
6    A.   Yes.
7    Q.   Who was found inside the gambling house?
8    A.   I believe the -- one of the males was named Grigor
9    Garibyan.  Another male Edgar Khachatryan who also goes by
10   the moniker of Gunner.
11   Q.   Are both those individuals Armenian Power members or
12   associates?
13   A.   Yes.
14           MR. SEVERO:  Objection.  Hearsay.
15           THE COURT:  Sustained.
16   BY MR. ESTRADA:
17   Q.   Do you know Edward Khachatryan?
18   A.   Yes.
19   Q.   Have you investigated him?
20   A.   Yes.
21   Q.   Do you know he went by the name Gunner?
22   A.   Yes.
23   Q.   And you participated in this investigation in this case?
24   A.   Yes.
25   Q.   Do you know he was indicted in this case?
```

122

```
1    A.    Yes.

2    Q.    To your knowledge is Edgar Khachatryan a member of

3    Armenian Power?

4              MR. SEVERO:  Hearsay.

5              THE COURT:  Sustained.

6    BY MR. ESTRADA:

7    Q.    Did you know him to be a member of Armenian Power?

8              MR. SEVERO:  Hearsay.

9              THE COURT:  You have to lay the foundation of how

10   he does.  Other than that, it's just hearsay.  Sustained.

11   BY MR. ESTRADA:

12   Q.    What did you investigate about Edgar Khachatryan?

13   A.    During this case, um, we investigated various members of

14   Armenian Power.  He was one of the individuals that was

15   detained at the Chicken House with other Armenian Power gang

16   members.

17             MR. SEVERO:  It's still hearsay that portion.

18             THE COURT:  You weren't there, were you?

19             THE WITNESS:  No.

20             THE COURT:  This is something somebody told you?

21             THE WITNESS:  I reviewed the reports and the

22   photographs.

23             THE COURT:  Sustained.

24   BY MR. ESTRADA:

25   Q.    You reviewed photos, too?
```

UNITED STATES DISTRICT COURT

123

```
1    A.    Yes.

2    Q.    Have you seen Edgar Khachatryan?

3    A.    Yes.

4    Q.    Can you recognize his picture in one of the photos of

5    the people detained at the Chicken House?

6    A.    Yes.

7              MR. SEVERO:  This is all based on hearsay.

8              THE COURT:  Sustained.

9              MR. ESTRADA:  I'm just laying the foundation,

10   Your Honor.  We have the Chicken House.

11   Q.    In addition did you investigate him for a firearm

12   violation?

13             MR. SEVERO:  We have the Chicken House because --

14   we don't have the Chicken House not in this line of

15   questioning.

16             THE COURT:  I don't know what you mean by we do or

17   don't have the Chicken House.  That will be stricken as being

18   superfluous.  Counsel, go ahead.

19   BY MR. ESTRADA:

20   Q.    Let's talk more about the foundation.  What did you

21   investigate Edgar Khachatryan for?

22   A.    Prior to even investigating this case, he was arrested

23   in the city of Burbank with other Armenian Power gang members

24   for possession of firearms and he was convicted of a felony

25   in that case.
```

124

```
 1              MR. SEVERO:  Move to strike.  The further
 2    foundation is hearsay.
 3              THE COURT:  Overruled.
 4    BY MR. ESTRADA:
 5    Q.   In addition to that, did you investigate him in this
 6    case for firearms violations?
 7    A.   Yes, prior to the service of the --
 8              MR. SEVERO:  Nonresponsive after yes.
 9              THE COURT:  Okay.  Yes is in.  Next question.
10              MR. ESTRADA:  Explain.
11              MR. SEVERO:  Calls for a narrative.
12              THE COURT:  Sustained.
13    BY MR. ESTRADA:
14    Q.   Okay.  So you investigated Edgar Khachatryan for firearm
15    violations?
16    A.   Yes.
17    Q.   Explain what you investigated him for with the firearm
18    violations.
19              MR. SEVERO:  Objection.
20              THE COURT:  Sustained or overruled.
21              THE WITNESS:  Prior to our search warrant at the
22    Lankershim address, he was arrested driving a black Mercedes
23    Benz E class where the officer found two firearms inside.
24              MR. SEVERO:  This is hearsay.
25              THE COURT:  Sustained, counsel.
```

125

```
1              MR. SEVERO:  Move to strike.
2              THE COURT:  It will be stricken.
3    BY MR. ESTRADA:
4    Q.   Were you involved in that investigation?
5    A.   Yes.
6    Q.   Were you present?
7    A.   Yes.
8    Q.   Okay.  Now, can you explain?
9              THE COURT:  You can testify to anything you saw not
10   what somebody told you.
11             THE WITNESS:  After the officer conducted the
12   traffic stop and arrested the individuals, I spoke with him
13   at the car.  He showed me where he found two firearms.
14             THE COURT:  He is who?
15             THE WITNESS:  The arresting officer.
16             THE COURT:  You spoke with the arresting officer at
17   the scene?
18             THE WITNESS:  Yes, I watched him conduct the
19   traffic stop.  He placed three individuals under arrest.
20   After they were taken away, I walked up to the car and talked
21   to him.
22             THE COURT:  Who do you mean when you say him?
23             THE WITNESS:  His name is officer --
24             THE COURT:  You talked to the officer.  Okay.
25             THE WITNESS:  Detective Brimway who showed me --
```

126

```
 1              THE COURT:  Counsel, why don't you go ahead and ask
 2    the questions.  Let's not have hearsay or leading questions.
 3    It can be done fairly easily.  Go ahead.
 4              MR. ESTRADA:  Your Honor, I don't want to do the
 5    narrative or the leading --
 6              THE COURT:  Don't worry about that.  The Court's
 7    got to determine when they become leading or narrative.
 8    That's at the discretion of the Court.
 9              MR. ESTRADA:  Very good.
10    Q.   Was Edgar Khachatryan indicted with regard to the
11    racketeering and conspiracy charges in this case?
12              MR. SEVERO:  Calls for hearsay.
13              THE COURT:  Overruled.
14              THE WITNESS:  Yes.
15    BY MR. ESTRADA:
16    Q.   And was he indicted in terms of racketeering and
17    conspiracy tied to Armenian Power?
18    A.   Yes.
19    Q.   And Grigor Garibyan was he also indicted in this case?
20    A.   Yes.
21    Q.   Was he indicted for drug trafficking offenses related to
22    the overall Armenian Power investigation?
23              MR. SEVERO:  Hearsay.  Calls for a conclusion.
24              THE COURT:  Overruled.
25              THE WITNESS:  Yes.
```

**001653**

BY MR. ESTRADA:

Q.   Okay.  Let's talk about what you found inside this Lankershim location when you did the search where you found Edgar Khachatryan and Grigor Garibyan.  What did you find inside?

A.   The location was a two-bedroom apartment with a loft and a main living area.  The main living area had a large poker table surrounded by large black leather type cushion chairs.  Hundreds upon hundreds of poker chips.  Notebooks with handwritten names and amounts that appeared to be numeric amounts corresponding with dollar amounts.

        MR. FLIER:  Objection.  Foundation as to that last part, Your Honor.

        THE COURT:  Sustained.

BY MR. ESTRADA:

Q.   Now, on the actual poker table was anything written that indicated it was tied to Armenian Power?

A.   I don't recall.  Without seeing a picture, I can't recall.

Q.   Do you recall the term Power Poker on the table?

A.   I believe that's correct.

Q.   Now, were there any firearms found in this gambling house?

A.   Yes.

Q.   Were those also items found in the names of Khachatryan

1    and Garibyan?

2    A.   Yes.

3    Q.   Now, please take a look at Exhibit 293.  That should be

4    in one of the binders behind you.

5    A.   I see it.

6    Q.   What is Exhibit 293?

7    A.   This is a piece of paper that was found in the -- I

8    would describe it as the bedroom to the right as you went in

9    the main entrance of the apartment.  It's a piece of notebook

10   paper with handwriting on it.

11   Q.   This was found inside that same residence where

12   Khachatryan and Garibyan were found?

13   A.   Yes.

14   Q.   Does the Exhibit 293 fairly and accurately depict the

15   notebook paper you found on that date during the search of

16   the Lankershim Boulevard residence?

17   A.   Yes.

18        MR. ESTRADA:  Your Honor, the government moves to

19   admit Exhibit 293 and requests permission to publish.

20        THE COURT:  It will be received.

21             (Exhibit 293 was admitted.)

22   BY MR. ESTRADA:

23   Q.   Now, you mentioned you investigated organized crime

24   cases in the past?

25   A.   Yes.

129

1    Q.    Have you investigated gang cases as well?

2    A.    Yes.

3    Q.    About how many gang cases have you investigated?

4    A.    I don't know the specific amount.  I have testified in

5    state court as an expert on criminal street gangs on several

6    prior occasions.

7    Q.    Are you familiar with an item known as a roll call?

8    A.    Yes.

9    Q.    Can you explain what a roll call is?

10    A.    Typically, you will see what's known as a roll call, an

11    item similar to what's depicted on the screen in Exhibit 293.

12    Sometimes you'll see it on paper writing or written in spray

13    paint graffiti on the walls.  Typically, you'll have the name

14    of the criminal street gang at the top.  In this instance

15    here you have the W-S for West Side and then it's kind of

16    hard to read, but I think it says A-R-A for Ara and then

17    P-W-R for Power.  In the middle of those sets of words you

18    have X3 which --

19          MR. SEVERO:  Move to strike.  That's speculation of

20    this witness, no foundation and the document speaks for

21    itself.

22          THE COURT:  Overruled.

23          THE WITNESS:  In between the Ara and the Power, you

24    have X3 which stands for 13.  It's symbolic for the letter M

25    standing for the Mexican Mafia and Surenos which are south

1    side Hispanics.  Then on the right it says WS AP 13 which

2    would be West Side Armenian Power 13.  That indicates that

3    they align with the Surenos or the southern Mexicans in

4    prison and the county jail system.

5    BY MR. ESTRADA:

6    Q.    Now, when you said WS AP 13, you're referring to this

7    part of the paper?

8    A.    Yes, sir.

9    Q.    The top?

10   A.    Yes.  My writer doesn't seem to be working.

11   Q.    Looking at the remainder of the paper, it lists various

12   words and terms.  Do you see that?

13   A.    Yes.  Those would be monikers for various members of the

14   gang.

15   Q.    Are you familiar with a person who went by the name

16   Speedy?

17   A.    Yes.

18   Q.    Who is that person?

19   A.    His name is Jack Yamalyan.

20   Q.    Was he also defendant in this case?

21   A.    He was a defendant in this case.

22   Q.    Are you familiar with a person that went by the name of

23   Guilty?

24   A.    Yes.

25   Q.    Who's Guilty?

```
 1    A.   His name is Carl Yerkanyan.  Also a defendant in this
 2    case.
 3    Q.   Are you familiar with a person who went by the name
 4    Casper?
 5    A.   Yes.
 6    Q.   Who is that person?
 7    A.   His name is Ara Fermanyan.  Also a defendant in this
 8    case.
 9    Q.   Are you familiar with the individual who went by the
10    name Capone?
11    A.   Yes.
12    Q.   Who is that?
13    A.   That's Mike Darbinyan, Mher Darbinyan.  Also a defendant
14    in this case.
15    Q.   Now, this person Mike Darbinyan, who you recognized went
16    by the name Capone, do you see him in the courtroom today?
17    A.   Yes.
18    Q.   Would you please point him out and identify an article
19    of clothing that he's wearing?
20    A.   He's next to defense counsel, slicked back hair with
21    goatee in the black sweater.
22              THE COURT:  Indicating the defendant.
23    BY MR. ESTRADA:
24    Q.   Do you see a name here Clever?
25    A.   Yes.
```

132

```
 1    Q.   Are you familiar with who went by the name Clever?

 2    A.   Yes.

 3    Q.   Who is that person?

 4    A.   Amiel Airapetian.  Also a defendant in this case.

 5    Q.   Are there various other names you're familiar with on

 6    this piece of paper?

 7    A.   Yes.  On the far left Stranger, Estark Galstyan, also a

 8    defendant in this case.  Gunner would be Edgar Khachatryan

 9    one of the people located in the residence where this paper

10    was found.

11    Q.   I'm not going to go through all of them, but you

12    recognize many of the names on this piece of paper?

13    A.   Yes.

14              MR. ESTRADA:  No further questions, Your Honor.

15              THE COURT:  Cross.

16              MR. SEVERO:  I need a moment, Your Honor.

17              THE COURT:  Sure.

18                        CROSS-EXAMINATION

19    BY MR. SEVERO:

20    Q.   Good afternoon, sir.

21    A.   Good afternoon.

22    Q.   Directing your attention to 293, I'll put it back up,

23    you've seen this?

24    A.   Yes.

25    Q.   How many names are you not familiar with?
```

UNITED STATES DISTRICT COURT

**001659**

133

```
1    A.    Probably half.

2    Q.    Half of the list?

3    A.    Yeah, I would say that's a fair amount.

4    Q.    Your -- you've seen lists like this in other cases, have

5    you?

6    A.    Yes.  This is one of the longer lists that I've seen.

7    Q.    Do you know who Flacko is?

8    A.    Yes.

9    Q.    Do you know who Whisper is?

10   A.    Yes.

11   Q.    How about Droopy?

12   A.    No.

13   Q.    Youngster?

14   A.    No.

15   Q.    Phantom?

16   A.    No.

17   Q.    Trouble?

18   A.    No.

19   Q.    The list starts with a guy by the name of Speedy;

20   correct?

21   A.    Yes.

22   Q.    And then it has Trouble; right?

23   A.    Yes.

24   Q.    Are you acquainted with someone by name of Paramaz

25   Bilezikchyan?
```

134

```
1    A.    Yes.

2    Q.    What's your understanding of Mr. Bilezikchyan?

3    A.    In what sense?

4    Q.    Is he an Armenian person that has been indicted in this

5    case?

6    A.    Yes.

7    Q.    And do you know him to claim leadership of Armenian

8    Power?

9    A.    In what sense?

10   Q.    Leadership, if he's a leader of Armenian Power?

11   A.    I don't believe he claims it.  He has considerable

12   power.

13          THE COURT:  I'm sorry.  I didn't hear you.  Did you

14   say is he the leader or a leader?

15          MR. SEVERO:  The leader.

16          THE WITNESS:  He's never claimed to be to me.

17   BY MR. SEVERO:

18   Q.    Not to you personally.

19   A.    Not to my recollection, sir.

20   Q.    Did you testify in the last trial in this case?

21   A.    Yes.

22   Q.    Did you see Mr. Bilezikchyan there?

23   A.    No.

24   Q.    Did you see -- does he have a moniker?

25   A.    Not to my knowledge other than P.
```

UNITED STATES DISTRICT COURT

**001661**

1    Q.   Do you see him on this list?

2    A.   No.

3    Q.   Is there a list -- strike that.  How many members of

4    Armenian Power do you believe exist?

5    A.   Currently or in the history of?

6    Q.   Back in 2010 when you retrieved this document.

7    A.   Known to me or --

8    Q.   Well, you're -- you said you investigated Armenian

9    Power; is that true?

10   A.   I probably knew 35 to 45 personally.

11   Q.   Are they all listed on this list?

12   A.   Most of them are.

13   Q.   Are they all listed on this list?

14   A.   All the ones that I know?

15   Q.   Yes.

16   A.   I couldn't answer that right now, sir.

17   Q.   Well, let's see.  You know that half of these people you

18   don't recognize; correct?

19   A.   That's probably a fair statement.  I believe I said that

20   earlier.

21   Q.   So the other half that you do recognize are they all

22   Armenian?

23   A.   What do you mean?

24   Q.   I don't know.  What part of that did you not get?  Are

25   they all Armenian?

```
1    A.   The ones that I know or the ones I don't know?

2    Q.   Let me reask the question.  The people that you do

3    recognize from the list are they all Armenian?

4    A.   Yes.

5    Q.   The ones you don't recognize, obviously, you don't know;

6    correct?

7    A.   Correct.

8    Q.   So you know Bilezikchyan is not on here.  Do you know

9    who wrote that list?

10   A.   In my experience?

11   Q.   No.

12            THE COURT:  Do you have personal knowledge?

13   BY MR. SEVERO:

14   Q.   Did you see someone write that list?

15   A.   No.

16   Q.   Do you have any handwriting exemplars that you're aware

17   of that tie a person to the writing of this list?

18   A.   Not that I'm aware of.

19   Q.   Is the list written in any particular order of rank in

20   the -- what you believe to be an Armenian Power gang?

21   A.   No.

22   Q.   Does the list show people who gamble perhaps at the

23   house?

24   A.   I don't know.  That would have to be speculation.

25   Q.   Whose house was this that you searched on January 27th,
```

1    2010?

2    A.    In what sense?

3    Q.    All right.  Who lived there?  Anyone?

4    A.    It was rented by Grigor Garibyan.

5    Q.    You find a bedroom in the place?

6    A.    He had a bed in the loft area.

7    Q.    He meaning Grigor?

8    A.    Yes.

9    Q.    Did you find his clothing there?

10   A.    Yes.

11   Q.    Did you find Mr. Darbinyan's clothing in the place?

12   A.    None that I could identify.

13   Q.    Did you find his identification at the location?

14   A.    No.

15   Q.    Did you surveil this -- did you engage in surveillance

16   at this location before you served the warrant?

17   A.    I went there to check to get a legal description and I

18   drove by it on probably two occasions prior.  It's a three or

19   four story apartment building with probably about 100 units.

20   Q.    Well, you wrote a warrant in this case?

21   A.    Yes.

22   Q.    And did you in the warrant specify that you felt this

23   was a gambling house?

24   A.    Not in the warrant.  I don't recall.

25   Q.    You didn't search this place for because you thought

1    there was illegal gambling going on?

2    A.    We were looking for firearms.

3    Q.    So the answer is no, you didn't search it for illegal

4    gambling stuff; right?

5    A.    I don't believe that was covered in the warrant.

6    Q.    You bumped into this stuff.

7    A.    I guess you can put it that way.

8    Q.    It happens from time to time, doesn't it?

9    A.    Sometimes we'll run into interesting things.

10   Q.    Did you find two people inside the location?

11   A.    There were three people.

12   Q.    And that was Grigor?

13   A.    Grigor.

14   Q.    Edgar Khachatryan?

15   A.    Yes.

16   Q.    And who else?

17   A.    A female.

18   Q.    What was the time that you served the warrant?

19   A.    It was around 7:00 a.m.

20   Q.    To the best of your knowledge, were these people asleep

21   when you busted in?

22   A.    They appeared to be.

23   Q.    You know anything about poker?

24   A.    I've watched some on TV.

25   Q.    Well, yeah.  Power Poker isn't that a type of poker

```
1    game?
2    A.   I'm not that familiar with the various types of poker.
3    Q.   So the addition of the word power to the word poker
4    doesn't tell you that it's a type of game that they play at
5    this location?
6    A.   I don't know what the various games they play there,
7    sir.
8    Q.   How much money did you find at this place, I mean U.S.
9    currency?
10   A.   Minimal, if any.
11   Q.   And back to your surveillance, you didn't really conduct
12   any surveillance of these premises before you searched it?
13            MR. ESTRADA:  Objection, Your Honor.  Asked and
14   answered and misstates the testimony.
15            THE COURT:  Overruled.
16            THE WITNESS:  In what sense?
17   BY MR. SEVERO:
18   Q.   I don't know.
19   A.   Did I sit there?  Well, I mean it can be a drive by
20   surveillance where I would seen a car known to be driven by
21   Carl Yerkanyan parked on the street outside?
22   Q.   Is that what you did?
23   A.   On one occasion, yes.
24   Q.   All right.
25   A.   Going into the building to get a legal description and
```

140

1    to get a map with the floor plan because it's a large

2    apartment building that's owned by a company and they have

3    the various floor plans available to prospective lessees.

4    Q.   What's the longest amount of time you spent watching the

5    place?

6    A.   Half hour.

7    Q.   Is that outside?

8    A.   Well, I wasn't gonna stand in the hallway and watch the

9    door.

10   Q.   Well, no, but if you walked in to get the plans, you

11   might have stood inside one of those apartments waiting for a

12   plan to be given to you for a half hour; right?

13   A.   I got that from the office lobby.

14   Q.   All right.  How long did you spend at the office lobby?

15   A.   Five minutes when I asked for the floor plan and they

16   gave me the booklet.

17   Q.   So you stood outside for a half hour looking at this

18   place at one point; correct?

19   A.   That would be the longest I would have stayed there.

20   Q.   And when was that?

21   A.   Before we served the search warrant.

22   Q.   Before that same day?

23   A.   No, it was a couple of days before.

24   Q.   You didn't see Mr. Darbinyan, did you?

25   A.   No.

```
1    Q.   Who is Negro?  Do you know?  Right here.
2    A.   No, I see it.  I'm trying to remember because there is
3    an Armenian gentleman named Negro from a Burbank gang called
4    L Wood, and then there's a guy named Blackie which would also
5    correspond to Negro, but I don't know --
6    Q.   Which Negro this is?
7    A.   I don't know which one this is.
8    Q.   Do you know Ghost right here?
9    A.   I know a Ghost.  I don't know if this would be the
10   particular Ghost.  His name is Larry Kheckian who is a rapper
11   who also claims to be from White Fence, but he raps about
12   Armenian Power.
13   Q.   White Fence being a Hispanic gang?
14   A.   Yes.
15   Q.   A rival presumably of Armenian Power; correct?
16   A.   Yes, but he raps about his membership and affiliation
17   with Armenian Power.
18   Q.   He boasts; right?
19   A.   It's quite a conundrum he's in.
20        MR. SEVERO:  I need a moment, Your Honor.
21   Q.   When you obtained the warrant, you obtained the warrant
22   to search Garik Galstyan, didn't you?
23   A.   That was a separate location other than the Lankershim.
24   That was in the city of Glendale.
25   Q.   That's a different one?
```

142

```
1    A.   Yes, sir.

2    Q.   What date was that other one?

3    A.   Same date, same time, different people.

4    Q.   So Lankershim is one and Verdugo is the other?

5    A.   Yes.  Mr. Galstyan was in the car with Mr. Khachatryan

6    when the firearms were found and the warrant was --

7              MR. SEVERO:  Hold on.  After yes move to strike.

8    Nonresponsive.

9              THE COURT:  Stricken.  Next question.

10             MR. SEVERO:  Thank you.

11   Q.   Earlier in your testimony this afternoon, actually this

12   morning, you testified about the various methods of

13   interfering with a PIN pad.  Do you recall that?

14   A.   I don't know if I referred to it as interfering with a

15   PIN pad.  I was talking about skimming.

16   Q.   You don't believe that's interference with a PIN pad.

17   That's fine.

18   A.   It is altering it.  I don't know if it's interfering

19   with it.

20   Q.   How long have you been a detective at Burbank?

21   A.   I was a detective from approximately 2007 to 2012.

22   Q.   Five years?

23   A.   Yes.

24   Q.   And that's the time when you investigated frauds?

25   A.   I have investigated frauds before that in my capacity as
```

143

1    a patrol officer and a gang investigator slash gang officer.

2    Q.   Okay.  When was the first time you came across a fraud

3    that was -- that involved PIN pads?

4    A.   I don't recall exactly.

5    Q.   Do you have any computer training?

6    A.   Such as?

7    Q.   Computer training.  Software.

8    A.   I can turn a computer on.  I can type in Word.  I can

9    send emails.  I can do some light Excel work.

10   Q.   My three-year-old grandson can do that, too, but --

11          MR. ESTRADA:  Argumentative.  Vague as to computer

12   training.  Then he is arguing with the witness, Your Honor.

13   It's improper.

14          THE COURT:  Next question.  For the record, the

15   Court's gonna take judicial notice most three year olds are

16   better with the computer than all of us are.

17          MR. SEVERO:  I agree with that.

18   Q.   Your knowledge of these skimming devices, in order to

19   make one, are you aware of whether they need -- someone needs

20   knowledge of how software in the PIN pad operates?

21   A.   It's my understanding that it has to be connected to

22   certain points on the PIN pads.  So you would have to know

23   either by purchasing one and opening it up and then

24   researching it.

25   Q.   You've gotta have some knowledge of how the thing works;

144

```
 1    right?
 2    A.    Yeah, I couldn't do it.
 3    Q.    Exactly.  And your -- anyone who is able to connect
 4    needs to know where to connect specifically so he can gather
 5    the information they're looking for; correct?
 6    A.    Yes.
 7    Q.    Well, you would need an individual who has some training
 8    and experience with the chips that are used in these PIN
 9    pads; correct?
10    A.    It would take someone that knows what they're doing,
11    yes.
12    Q.    And the information that you talked about today
13    concerning how, for example, the bluetooth works, that's
14    something you haven't been trained on, is it?
15    A.    As far as how bluetooth works or how?
16    Q.    How bluetooth works in connection with a PIN pad.
17    A.    It's just like any other like, if I want to sync my
18    phone to my car, just have the software and it syncs it.
19    That's all I know.
20    Q.    It doesn't come from any specialized knowledge that you
21    possess.  It just comes from your general knowledge of how to
22    hook up your iPhone to your car radio.
23    A.    That and speaking with other investigators.
24    Q.    Are you aware of how available these PIN pad machines
25    are in the open market?
```

145

```
 1    A.    I've looked them up online.  You can buy them over the
 2    Internet.
 3    Q.    So if you want to set up a business and have a PIN pad
 4    machine, you just order one; correct?
 5    A.    Yes.
 6    Q.    That's also true for the skimming devices; isn't that
 7    correct?
 8    A.    Yes.
 9    Q.    Do you know -- directing your attention to Exhibit 367,
10    I wonder if you have it there?
11            THE CLERK:  Is that a physical exhibit?
12            MR. SEVERO:  Actually, it's in the book.
13            MR. ESTRADA:  Your Honor, that is a physical
14    exhibit, but there is a copy in the book.  So 367,
15    Your Honor, that was the Range Rover paperwork and the
16    Ingencio note.
17            THE WITNESS:  It appears to be a physical item
18    only.
19            MR. SEVERO:  There is no copy in the book.
20            THE COURT:  Now you tell us.
21            MR. SEVERO:  Exactly.
22    Q.    There were some notes retrieved?
23    A.    The yellow notepad paper with the handwriting?
24    Q.    The note that says Ingencio Encrypt.
25    A.    Yes, it's right here.
```

1    Q.    That's attached to the bag in another bag?

2    A.    It was inside the brown paper bag.  That's what it was

3    put into when it's booked into evidence.  It goes into the

4    paper bag.  It's been removed for trial.

5    Q.    Did you personally find this note?

6    A.    Yes.

7    Q.    And where was it?

8    A.    It was in Mr. Raymond Tarverdyan's bedroom.

9    Q.    That's at his residence that you searched on December --

10   in December of '09?

11   A.    Yes, in Montrose, California.

12   Q.    And do you know who wrote the note?

13   A.    No.

14   Q.    Do you know when the note was written?

15   A.    No.

16   Q.    You testified that this is the type of machine that is

17   used at the 99 Cent Stores?

18   A.    Yes.

19   Q.    Do they use any other type of machines?

20   A.    I don't know.

21   Q.    It's one of the ones they use; correct?

22   A.    It's one of the ones that I looked at.

23   Q.    And in fact this Ingencio Encryptor or whatever it's

24   called is used widely by many other businesses; correct?

25              MR. ESTRADA:  Objection, Your Honor.  Calls for

1    speculation.

2              THE COURT:  Overruled.  Do you know?

3              THE WITNESS:  I have seen similar looking devices

4    at other stores.  I don't know if it's the 2100.  They kind

5    of look the same.  I don't know.

6    BY MR. SEVERO:

7    Q.   The brand Ingencio is used widely by other businesses if

8    you know?

9    A.   They appear to have a large market share on the point of

10   sale terminals.

11   Q.   Now, does that note indicate that it was a 2100?

12   A.   Yes.  It says Ingencio Encrypt 2100 POS terminal.

13   Q.   Do you know, if you know, when the 2100 was first

14   offered for sale on the market?

15   A.   No.

16             MR. SEVERO:  And that's all I have.  Thank you very

17   much.

18             THE COURT:  Counsel.

19                        CROSS-EXAMINATION

20   BY MR. PEREYRA-SUAREZ:

21   Q.   Good afternoon, Sergeant.

22   A.   Good afternoon.

23   Q.   Do you still have Exhibit 293 in front of you?

24   A.   Yes.

25   Q.   That's what you referred to earlier as a roll call piece

148

```
 1   of paper?
 2   A.   Yes.
 3   Q.   What do you mean when you refer to something as a roll
 4   call?
 5   A.   Typically, it would be a list of gang members.  The
 6   first name is usually the person that writes it, and then it
 7   will have the gang name, some monikers along with the gang
 8   name like in this case Armenian Power.
 9   Q.   And you say that because you've seen similar roll call
10   pieces of paper in the past; is that correct?
11   A.   Both pieces of paper and spray paint writing on the
12   walls.
13   Q.   Now, this Exhibit 293 is an item that you obtained at
14   the gambling house in January of 2010 pursuant to a search
15   warrant; is that correct?
16   A.   Yes.
17   Q.   Did you look carefully at that piece of paper when you
18   found it?
19   A.   Yes.
20   Q.   And you looked carefully at that piece of paper before
21   you came to testify here today; is that correct?
22   A.   Yes.
23   Q.   Did you find anywhere on that piece of paper the name
24   Arman Sharopetrosian?
25   A.   No.
```

UNITED STATES DISTRICT COURT

**001675**

```
 1    Q.    Did you find Arman Sharopetrosian at the gambling house
 2    in January of 2010?
 3    A.    No, sir.  He was incarcerated.
 4              MR. PEREYRA-SUAREZ:  I'm going to move to strike
 5    the last portion, Your Honor.
 6              THE COURT:  Stricken.
 7    BY MR. PEREYRA-SUAREZ:
 8    Q.    When you prepared warrant application or search warrant
 9    application prior to going to the gambling house, did you
10    reference in that application anything having to do with
11    Mr. Sharopetrosian?
12    A.    No.
13              MR. PEREYRA-SUAREZ:  Nothing further, Your Honor.
14              THE COURT:  Counsel.
15                        CROSS-EXAMINATION
16    BY MR. FLIER:
17    Q.    Good afternoon.
18    A.    Good afternoon, sir.
19    Q.    Since we have been talking about 293, I have a couple of
20    questions, please.  And I definitely am not good with
21    electronics so I want to -- this word right here appears to
22    be Out O-u-t; is that correct?
23    A.    Yes.
24    Q.    Then I see another word down here that purports to be
25    In; is that correct?
```

1    A.    Yes.

2    Q.    Are those two words indications of prior and present

3    gang members?

4    A.    They can be, but in this case it wouldn't make any sense

5    the way the list is written.

6    Q.    So you have no idea?

7    A.    I'm not the person that wrote it so I don't know what

8    their meaning was about it.

9    Q.    We've heard testimony that you're familiar with these

10   roll call lists; correct?

11   A.    Yes.

12   Q.    Ever any seen in any prior investigation with anything

13   similar to this that had same terminology in and out?

14   A.    No.

15   Q.    Have you ever spoken to any fellow police officers or

16   active gang members or ex-gang members about the relevance of

17   those two terminologies?

18   A.    Yes.

19   Q.    And do you have any answer?  In other words, what does

20   that mean on Exhibit 293?  Tell the jury, please.

21   A.    I don't know what it means on this exhibit.  I know what

22   it means in other cases.

23   Q.    But in other cases we're not talking about.  In this

24   case you cannot give expert testimony about what those two

25   words mean; is that correct?

1    A.    Correct.

2    Q.    All right.  In prior cases, now, have you seen the word

3    out that connotates an ex-gang member?

4    A.    Yes.

5    Q.    Okay.  Thank you.  Now, with respect to my client

6    Mr. Rafael Parsadanyan is his name on this list 293?

7    A.    I've never known him to have a moniker for Armenian

8    Power so my answer would be not to my knowledge.

9    Q.    Thank you.  With respect to any search warrant

10   application, did you ever reference Mr. Parsadanyan's name?

11   A.    No.

12   Q.    Now, I want talk about the beginning of your testimony.

13   I think I heard that you were a sergeant and your assignment

14   now is the patrol division; is that correct?

15   A.    Yes, sir.

16   Q.    And then there was some testimony about and that would

17   be the other exhibit, the exhibit with respect to I think it

18   would be Mr. Raymond Tarverdyan; is that correct?

19   A.    Tarverdyan, yes.

20   Q.    And that search was in December 23rd of 2009?

21   A.    To best the of my knowledge, yes.

22   Q.    I think that question was asked first by Mr. Estrada and

23   it was December 3rd, and then that was corrected to

24   December 23rd.  Does that seem accurate?

25   A.    I believe that's what he discussed earlier.

152

1   Q.   But irrespective of what the attorneys say, when did you

2   do it?

3   A.   Sir, it's almost five years ago.  I know it was December

4   of 2009.  I don't know the exact date unless I have the

5   report in front of me which I do not have.

6   Q.   Would you agree with the simple proposition that due to

7   the lapse of time sometimes your memory has faded?

8   A.   Sometimes, yes.

9   Q.   And that doesn't connote that you're intentionally being

10  deceptive.  Sometimes you just can't remember; correct?

11  A.   Like I said, it's been almost five years, sir.

12  Q.   And that's part of the point of what I'm now gonna get

13  into of taking notes and police reports and documenting

14  evidence; correct?

15  A.   Yes.

16  Q.   And in this case it appears you did exactly that with

17  the items that you retrieved from Mr. Tarverdyan's house; is

18  that correct?

19  A.   I did write what we call a 302 or a report of the

20  incident.

21  Q.   Now, a 302 report would be an FBI report; is that

22  correct?

23  A.   It's a form number.

24  Q.   Now, in this investigation whenever you filled out

25  paperwork was it Burbank Police Department paperwork or was

UNITED STATES DISTRICT COURT

**001679**

1   it a 302 form?

2   A.   Which investigation?  The overarching investigation or

3   this particular search warrant where this exhibit was found?

4   Q.   This one.

5   A.   This was Burbank Police Department paperwork.

6   Q.   Then once you recovered items that you thought were

7   relevant and material, you retained them; correct?

8   A.   Yes.

9   Q.   And then you documented what you found and you preserved

10  it, I assume, either by putting it in some of type of

11  evidence locker or maybe turning it over to some other law

12  enforcement; is that correct?

13  A.   Yes.

14  Q.   And that's what you're trained to do; is that correct?

15  A.   Yes.

16  Q.   Would you agree with the proposition that if you find

17  some evidence that you believe is relevant and material, it

18  should be documented properly.  Does that make sense?

19  A.   Yes.

20  Q.   And as a training officer, you would train someone

21  exactly like I just asked you; is that correct?  About that

22  subject matter of preserving, documenting evidence; is that

23  correct?

24  A.   Yes.

25  Q.   Let's assume -- I'm gonna ask you a hypothetical.  Let's

154

1   say you were doing this investigation regarding a gambling

2   house and you came into some information that there might be

3   a second gambling house.  You might go get a search warrant

4   to see whether that information was accurate; is that

5   correct?

6          MR. ESTRADA:  Objection, Your Honor.  Calls for

7   speculation.  It's also irrelevant.

8          THE COURT:  Sustained on speculation.

9   BY MR. FLIER:

10  Q.   There are different tools that investigators can use to

11  try to gather or garnish information; is that correct?

12  A.   Yes.

13  Q.   A good example is procuring a search warrant; is that

14  correct?

15  A.   Yes.

16  Q.   And, obviously, as law enforcement and an investigator,

17  you're trained on how to write and procure search warrants;

18  correct?

19  A.   Yes.

20  Q.   Now, the issue about this gambling house, did you see

21  anyone gambling?

22  A.   No.

23  Q.   Then there was testimony about, I think, some type of

24  table that might have some wording Power Poker; is that

25  correct?

```
1    A.    Yes.
2    Q.    Then you were asked questions about that and you seemed
3    to be unclear and that's not argumentative about all the
4    games of poker.  Am I correct?
5    A.    Yes, I'm not a poker connoisseur.
6    Q.    So when you see Power Poker in that example, it could
7    mean two things maybe.  One, it might be a table showing
8    association with the Armenian Power gang because they use the
9    word power; is that correct?  That might be one
10   interpretation; is that correct?
11            MR. ESTRADA:  Your Honor, it calls for speculation.
12            THE COURT:  Overruled.  Oh, excuse me.  Sustained.
13   BY MR. FLIER:
14   Q.    When you saw Power Poker, did you believe that was some
15   type of indication of the Armenian Power sign?
16   A.    It wasn't my opinion.
17   Q.    Okay.  And then the other question had to do with it
18   could mean potentially a game of poker; is that correct?
19   A.    Says poker on the table, there's poker chips.
20   Q.    The Power Poker part.
21   A.    I don't even know if that's a particular type of poker,
22   sir.
23   Q.    Mr. Parsadanyan was not in custody during this time
24   period, was he?
25   A.    No.
```

1    Q.   Was he at this house, the gambling house?

2    A.   Was he at his house or at this house?

3    Q.   Was he at the gambling house when you entered it?

4    A.   No.

5    Q.   Was Mr. Parsadanyan at Mr. Raymond Tarverdyan's house

6    when you entered that residence?

7    A.   No.

8    Q.   The female individual to whom was at the gambling house,

9    what was her name?

10   A.   I don't recall.

11   Q.   Is she an AP gang member?

12   A.   She is a waitress at a local hookah bar and she happened

13   to not have any clothes on when I went in and said that she

14   was there to have adult relations with Mr. Garibyan.

15   Q.   Don't have pictures of that, do we?

16              I got you to laugh, Your Honor.  I have no further

17   questions.  Thank you.

18              THE COURT:  Redirect.

19                      REDIRECT EXAMINATION

20   BY MR. ESTRADA:

21   Q.   Sergeant Stohl, that poker table said Power Poker on it,

22   do you recall it having an Armenian crest in the middle?

23   A.   Yes.

24   Q.   An Armenian crest and the words Power Poker around it?

25   A.   Yes.

```
1    Q.   Now, the individuals who are linked to that particular
2    location were they also linked to Armenian Power?
3    A.   Yes.
4    Q.   You mentioned a person by the name of Speedy that was
5    the first person listed on that roll call.  Do you recall
6    that?
7    A.   Yes.
8    Q.   Who was that person?
9    A.   It was Jack Gambarian.
10   Q.   Was he tied to that location as well?
11   A.   Yes.
12   Q.   How so?
13            MR. SEVERO:  Objection.  Tied to that location was
14   vague.
15            THE COURT:  Why don't you explain the question a
16   little bit better.  What do you mean tied to that location?
17   BY MR. ESTRADA:
18   Q.   Were there links between him and that location?
19            MR. SEVERO:  It's still the same question.
20            THE COURT:  Overruled.
21            THE WITNESS:  Yes.
22   BY MR. ESTRADA:
23   Q.   What were they?
24   A.   In the room where the roll call was found, there were
25   business cards and invoices for a company called Speedy's
```

1   Delivery or Speedy's Messenger Service, which I thought was

2   ironic because Mr. Gambarian uses the moniker Speedy.

3           MR. SEVERO:  Nonresponsive which I think was

4   ironic.

5           THE COURT:  Next question.

6           MR. ESTRADA:  I was tempted to ask why he thought

7   it was ironic.

8           THE COURT:  You can't get the picture in.  You

9   can't get that in either, can you?

10  BY MR. ESTRADA:

11  Q.   With regard to Speedy's Service, did you know Jack

12  Gambarian to have some sort of messenger service?

13  A.   Yes.

14  Q.   Known as Speedy's Service?

15  A.   It was a paralegal, legal document delivery service.

16  Q.   On that roll call, did you see the first name there was

17  Speedy?

18  A.   Yes.

19  Q.   And is that typical in your experience that the first

20  name on the roll call would be the person who writes it?

21  A.   Yes.

22  Q.   Did you know Speedy to be on the outs with Armenian

23  Power?

24  A.   He did not appear to be.

25  Q.   Is also in that column under out Guilty?  You know who

```
1    that individual is?

2    A.   Yes.

3    Q.   Do you know him to be on the outs with Armenian Power?

4    A.   No, I do not.

5              MR. ESTRADA:  No further questions, Your Honor.

6              THE COURT:  Counsel.

7                        RECROSS-EXAMINATION

8    BY MR. SEVERO:

9    Q.   Sergeant Stohl, does it appear to you and it may not be

10   reflected on the monitor here, but does it appear to you that

11   there are different colors of ink used to write this list?

12   A.   I can't tell based on the monitor.

13   Q.   Does it appear to you that there are different types of

14   handwriting?

15   A.   Yes.  The upper right appears to have smaller

16   handwriting, but I'm not a handwriting expert.

17   Q.   I understand that.  Just from looking at the exhibit,

18   does it appear to you that this exhibit may have been written

19   by more than one person?

20   A.   It's possible.

21   Q.   Do you have any idea why there are question marks on

22   some of these?

23   A.   Uh, I know Danger his name is Yuri Karapetyan I believe.

24   He was believed to have some issues within the gang due to

25   some family ties and some drug issues.  Clever I don't know
```

```
 1    why there's a question mark behind him.
 2    Q.    How about Risky?
 3    A.    I don't know that one.
 4    Q.    You don't know who he is?
 5    A.    I can't recall at this time.  I've heard the name
 6    before, but I don't recall it right now.
 7    Q.    The fact is based on the answers to the three
 8    individuals that have the question mark, you don't know why
 9    that question mark is there; true?
10    A.    It's a question.
11    Q.    Yeah, it's a good question.  Exactly.  And it is --
12    there are actually other question marks by the name of other
13    people and this is all under or after the word "out" appears
14    on the middle of the page; correct?
15    A.    Yes.
16    Q.    And you know for a fact that there are multiple people
17    using the same moniker in any gang; correct?
18    A.    Do I know that for a fact?
19    Q.    Well, you're a gang investigator.  You know that Negro
20    you told us a while back that Negro is used by a number of
21    different people in different gangs; true?
22    A.    Yes.
23    Q.    And you also know that Speedy is used by a number of
24    people in different gangs, don't you?
25    A.    I've heard it used before.
```

161

```
1   Q.   And you've heard more than one Capone has been used by
2   other people in other gangs; correct?
3   A.   It's quite a popular name.
4   Q.   Very popular.
5   A.   Yes.
6            MR. SEVERO:  I have nothing further.
7            MR. PEREYRA-SUAREZ:  Nothing further from me.
8            MR. FLIER:  I have no questions, Your Honor.
9            THE COURT:  You may step down.  Next witness.
10           MR. ESTRADA:  Your Honor, the government calls
11  Special Agent Stebbins to the stand.
12           MR. SUAREZ:  Before he leaves can he be on call?
13           MR. ESTRADA:  And I have to ask because he has
14  another job why he's on call?
15           THE COURT:  Well, you can have any witness on call.
16           MR. ESTRADA:  Your Honor, just for witness
17  convenience, he does work a graveyard shift.  He was here, he
18  worked till 6:00 a.m. this morning.  It's inconvenient for
19  him to come here.  So I'd like to request at least 48 hours
20  notice before he's being called.
21           MR. SEVERO:  It wasn't inconvenient for him to come
22  for the prosecution.
23           MR. ESTRADA:  It actually was inconvenient,
24  Your Honor.
25           THE COURT:  Excuse me.  Let's not argue in front of
```

```
1    the jury and let's not talk over each other.  In this matter
2    as long as he is given 24 hours notice, he is on call.
3              THE CLERK:  Agent Stebbins, you're still under
4    oath.
5              THE WITNESS:  Yes, ma'am.
6              THE COURT:  You may inquire.
7              MR. ESTRADA:  Thank you, Your Honor.
8                   DIRECT EXAMINATION (RESUMED)
9    BY MR. ESTRADA:
10   Q.   Good afternoon, Special Agent Stebbins.
11   A.   Good afternoon, sir.
12   Q.   Now, we left off you were talking about some phone calls
13   involving firearms.  Do you recall that?
14   A.   Yes, sir.
15   Q.   I'd like to now turn your attention to a different
16   segment of wire calls in this case.
17             And, Your Honor, I'll preface it by saying these
18   calls deal with the 99 Cent Only Store bank fraud scheme.
19   They deal with the racketeering conspiracy charges as to
20   Defendant Darbinyan and Sharopetrosian.  They also deal with
21   the bank fraud and aggravated identity theft charges as to
22   Defendant Darbinyan and Rafael Parsadanyan.
23             THE COURT:  What numbers?
24             MR. ESTRADA:  I will ask with the Court's
25   permission to start with Exhibit 135 and it will be Volume II
```

163

1    of the transcript book.  Before I do that -- excuse me

2    Volume III.

3    Q.    Before I do that, do you recall investigating an

4    incident involving fraud against 99 Cent Only Stores?

5    A.    Yes, sir.

6    Q.    Around when did this investigation begin?

7    A.    July of 2009.

8    Q.    Through that investigation, did you obtain video

9    surveillance footage from the 99 Cent Only Stores?

10   A.    Yes, I did.

11   Q.    And did you review this footage?

12   A.    Yes, sir.

13   Q.    Were there numerous videos of different stores?

14   A.    Yes, sir.

15   Q.    Now, with regard to these videos, did you make cuts of

16   the videos for purposes of trial?

17   A.    Yes, sir.

18   Q.    Now, we previously heard testimony about Exhibits 145 --

19   excuse me.  Exhibits 345, 346, 347, 348, 350, 351, 352, 353,

20   354 and 355.  Do you recall that testimony?

21   A.    Yes, sir.

22   Q.    Can you please take a look and I'll try to make this as

23   efficient as possible at Exhibits 345A, 345B, 346A, 347A,

24   347B, 348A, 350A, 351A, 351B, 352A, 352B, 353A, 354A and

25   355A.

UNITED STATES DISTRICT COURT

164

1          Your Honor, with the Court's assistance if those

2     could be shown, they're disks to the witness.

3          You have those in front of you, Special Agent

4     Stebbins?

5     A.   Yes, sir.

6     Q.   Have you previously reviewed all of these disks?

7     A.   Yes, sir.

8     Q.   Do they have your initials on them?

9     A.   Yes, they do.  With the exception of 345B is actually

10    photographs.

11    Q.   345B is photographs, but the remainder are all video

12    clips?

13    A.   Yes, sir.

14    Q.   These video clips that you have previously looked at,

15    are they cuts or segments of other video disks that we heard

16    testimony this morning from Mr. Camery?

17    A.   Yes, they are, sir.

18    Q.   And did you prepare these?

19    A.   Yes, sir.

20    Q.   Did you prepare these to assist in your testimony in

21    this case?

22    A.   Yes, sir.

23    Q.   And do those videos fairly and accurately depict

24    segments of the prior videos that we heard from Scott Camery?

25    A.   Yes, they do, sir.

1          MR. ESTRADA:  The government moves to admit these

2   exhibits.  I can list them out now if the Court likes.

3          THE COURT:  They will be received.

4          MR. ESTRADA:  For the record, should I list them

5   out, Your Honor?

6          THE COURT:  Yes.

7          MR. ESTRADA:  For the record those would be

8   Exhibits 345A, 345B, 346A, 347A and B, 348A, 350A, 351A,

9   351B, 352A and B, 353A, 354A and 355A.

10         (The exhibits above-referenced were admitted.)

11  BY MR. ESTRADA:

12  Q.   Just with regard to these videos, before I move on, are

13  they continual rolling videos?

14         MR. SEVERO:  Objection.  Vague.

15         THE COURT:  I don't understand the question either.

16  Why don't you rephrase it.

17         MR. ESTRADA:  Yes, Your Honor.

18  Q.   Do the videos depict rolling footage of what's going on

19  in the stores?

20  A.   They're made with the video surveillance that was

21  available in the 99 Cent Only Store.  It's not going to be

22  like a home video where it's just continuous movement.  It

23  goes in one-second segments.

24  Q.   Now, with the Court's permission, if I could play

25  Exhibit 135 and ask the jurors to turn to 135A in their

```
 1   transcript books Volume III?
 2            THE COURT:  We're back on the wiretap now; is that
 3   correct?
 4            MR. ESTRADA:  Yes, Your Honor.
 5            THE COURT:  135A, yes.
 6                  (135A played for the jury.)
 7   BY MR. ESTRADA:
 8   Q.   Sir, in the first page of the transcript at 135A, do you
 9   have that in front of you?
10   A.   Yes, I do.
11   Q.   What's date of that call?
12   A.   July 6, 2009.
13   Q.   What's the time of the call?
14   A.   Approximately 11:06 a.m.
15   Q.   Turning to page 2, who are participants in that call?
16   A.   Mike Darbinyan and Raymond Tarverdyan.
17   Q.   Who is Raymond Tarverdyan?
18   A.   He's another defendant in this case.
19   Q.   Were you familiar with Raymond Tarverdyan?
20   A.   Yes.
21   Q.   Now, turning to page three of four of the transcript, do
22   you have that in front of you?
23   A.   Yes, I do.
24   Q.   Seven speakers from the top Darbinyan states:  What are
25   you doing?
```

```
 1              Tarverdyan:  We are about to get on the road soon.
 2              Darbinyan:  Are you also there, man?
 3              Tarverdyan:  No, no.  I am here, bro.  I am getting
 4      on the road over to that area.
 5              Based on your investigation of the 99 Cent Only
 6      Store scheme was there video footage captured this same day
 7      of Raymond Tarverdyan inside a store?
 8      A.   Yes, there was.
 9              MR. FLIER:  Objection.  No foundation.  Calls for
10      hearsay.  Unless they play that video, I'm not sure.
11              MR. ESTRADA:  I'm about to play the video,
12      Your Honor.  Your Honor, with the Court's permission if we
13      could play 345A at this time?
14              THE COURT:  Yes.
15      BY MR. ESTRADA:
16      Q.   And before we actually start the playing, you reviewed
17      these previously?
18      A.   Yes, sir.
19      Q.   Is there going to be activity on the screen of this
20      video?
21      A.   Yes, sir.
22      Q.   Where will the activity take place?  If you indicate
23      that use the little pointing device there.  That area?
24      A.   Yes, sir.
25      Q.   And this before we start the video, that bald individual
```

168

1    there, who is that person?

2    A.    That's Raymond Tarverdyan.

3              MR. ESTRADA:  Now, if we could play the video.

4                    (345A played for the jury.)

5    BY MR. ESTRADA:

6    Q.    And in that screen that we saw could you see

7    manipulation of the point of sale terminal?

8    A.    Yes.

9              MR. SEVERO:  Objection.  The video speaks for

10   itself.

11             THE COURT:  Overruled.

12             THE WITNESS:  Yes, it occurs at 34 seconds.

13             MR. ESTRADA:  If we could advance it to 34 seconds

14   and pause it there.  Actually, if I can assist, Your Honor.

15   Q.    Okay.  And there at 34 seconds do you see the

16   manipulation of the point of sale terminal?

17   A.    It's actually one frame sooner.

18             MR. SEVERO:  It's leading.

19             THE COURT:  Overruled.

20             MR. ESTRADA:  Okay.  Let's move back one frame

21   sooner.

22   Q.    And where do you see that in the screen?

23   A.    You can two point of sale terminals in this individual's

24   hands.

25   Q.    Do you recognize that individual?

1    A.    Yes.

2    Q.    Who is that individual?

3    A.    Simon Antonyan.

4    Q.    Who is Simon Antonyan?

5    A.    Another defendant in this case.

6    Q.    And did you understand based on your investigation of

7    this particular scheme, the point of sale terminals were

8    being switched out?

9    A.    Yes.

10          MR. ESTRADA:  With the Court's permission, I would

11   ask to play Exhibit 137 and ask the jurors turn to 137A in

12   their books.  Actually, before I do, I forgot to play B.  If

13   we could show 345B, please.

14          THE WITNESS:  345B is actually the photos.  This is

15   the video, the second video.

16          MR. ESTRADA:  If we could show 345B.

17          THE COURT:  Is that the photo?

18          MR. ESTRADA:  Yes, that's a separate disk.

19          THE COURT:  I thought that you said that 345B is a

20   photo; is that correct?

21          THE WITNESS:  Yes, sir.

22          MR. ESTRADA:  Can I approach and grab the disk?

23          THE COURT:  Yes.

24   BY MR. ESTRADA:

25   Q.    Can you explain what is 345B?

170

1    A.   345B are still shots taken from the front door camera at

2    the Whittier 99 Cent Only Store.

3    Q.   I'm going to show you the first page of 345B.  Do you

4    have that in front of you?

5    A.   Yes, sir.

6    Q.   What's depicted in the first page of 345B?

7    A.   The first individual there, the bald-headed individual

8    is Raymond Tarverdyan walking into the store.

9    Q.   Are you familiar with Raymond Tarverdyan?

10   A.   Yes, I am.

11   Q.   Looking at the next photo, what do you see in the

12   picture 345B?

13   A.   Again, that's Raymond Tarverdyan at the bottom of the

14   stairs and that's Simon Antonyan at the top of the stairs.

15   Q.   Are these photographs, still photographs, from the same

16   general video we had at Exhibit 345?

17   A.   Yes, they are.

18   Q.   And you see at the top here where it says Store 76,

19   July 6, 2009.  Is that something that came from the video

20   itself?

21   A.   Yes, sir.

22   Q.   I'll show you the next image.  Can you please tell us

23   who we see on the third page?

24   A.   That's Simon Antonyan.

25              MR. ESTRADA:  And, Your Honor, if I could publish

```
 1    what's been previously admitted as Exhibit 211?
 2               THE COURT:  Yes.
 3    BY MR. ESTRADA:
 4    Q.    Looking at 211 who is that individual?
 5    A.    Simon Antonyan.
 6               MR. ESTRADA:  Now, if I could publish, Your Honor,
 7    210 which has also been previously admitted.
 8               THE COURT:  Proceed.
 9    BY MR. ESTRADA:
10    Q.    Who is that individual?
11    A.    Raymond Tarverdyan.
12    Q.    This clothing that we see on page 2 of Exhibit 345B, did
13    you find any clothing associated with Raymond Tarverdyan
14    during the course of this investigation?
15    A.    Yes.
16    Q.    Clothing that would match some of what's seen in the
17    video?
18    A.    In another video, yes, sir.
19               MR. ESTRADA:  And now, Your Honor, if I could play
20    Exhibit 137 and ask the jurors turn to 137A in their
21    transcript books?
22               THE COURT:  Okay.
23               (Exhibit 137 played for the jury.)
24    BY MR. ESTRADA:
25    Q.    Now, turning to page of 1 of 137A, do you have that in
```

172

```
1    front of you, Special Agent Stebbins?

2    A.    Yes, I do.

3    Q.    What's the date of this call?

4    A.    July 13th, 2009.

5    Q.    What's the time of the call?

6    A.    Approximately 5:26 p.m.

7    Q.    Who are the participants in this call?

8    A.    Mike Darbinyan and Khachatur Arakelyan.

9    Q.    Who is Khachatur Arakelyan?

10   A.    He's another defendant in this case.  He also goes by

11   Hetchel.

12   Q.    Now, turning to page two of the two of the transcript,

13   do you have that in front of you?

14   A.    Yes, sir, I do.

15   Q.    Second speaker from the top Darbinyan refers to Hetchel

16   so that's another name that Arakelyan uses?

17   A.    Yes.

18   Q.    And five speakers, actually, six speakers from the

19   bottom Arakelyan tells Darbinyan come over, brother.  Where

20   shall I meet you?  Come wherever you --

21            Darbinyan:  Come to Rafo's store and we'll go from

22   there.

23            Do you know an individual in this case that went by

24   the name Rafo?

25   A.    Yes.
```

173

1    Q.   Who is that?

2    A.   Rafael Parsadanyan.

3    Q.   Did you know him to have a store?

4    A.   Yes.

5            MR. ESTRADA:  Your Honor, with the Court's

6    permission the government would ask to play Exhibit 138 and

7    ask the jurors turn to 138B in their books.

8            THE COURT:  Okay.

9            (Exhibit 138B played for the jury.)

10   BY MR. ESTRADA:

11   Q.   Special Agent Stebbins, turning to the first page of

12   Exhibit 138A, do you have that in front of you?

13   A.   Yes, I do.

14   Q.   What's the date of that call?

15   A.   July 13, 2009.

16   Q.   What's the time of the call?

17   A.   Approximately 7:09 p.m.

18   Q.   Who are speakers in this call?

19   A.   Mike Darbinyan and Aram Petrosyan.

20   Q.   Is there a third person?

21   A.   And Garen Chouldjian.

22   Q.   Who is Aram Petrosyan?

23   A.   Aram Petrosyan is Totes from Armenian Power.  He's

24   another defendant in this case.

25   Q.   Who is Garen Chouldjian?

174

```
 1    A.    Garen Chouldjian is another defendant in this case.
 2    Also goes by Misak.
 3    Q.    Turn to page three of three of that transcript.  Do you
 4    have that in front of you?
 5    A.    Yes, I do.
 6    Q.    Two speakers from the top Chouldjian states:  Is there
 7    any news?
 8          Darbinyan:  Brother, either tomorrow or by Friday.
 9    It's fine, though.  It's all okay, bro.
10          Chouldjian:  Yeah, okay, dear.
11          Darbinyan:  It has left that place and now we are
12    waiting over here.
13          Based on your knowledge of the investigation, was
14    there actual video footage captured of switching of terminals
15    the next day on July 14th, 2009?
16    A.    Yes, there was.
17    Q.    Before I get to that, turning to page 2 of the
18    transcript, do you have that in front of you?
19    A.    Yes, sir.
20    Q.    Six speakers from the top after being asked what's going
21    on, Darbinyan states:  Nothing much, bro.  I'm in Hollywood
22    and waiting for someone.  He is bringing something that I
23    need to pick up.
24          This day did you and other officers conduct
25    surveillance?
```

```
 1    A.    Yes.

 2    Q.    Approximately what time did the surveillance begin?

 3    A.    I don't recall.  It was in the afternoon.

 4    Q.    Do you recall the area of the surveillance?

 5    A.    Yes.

 6    Q.    Where was the area of the surveillance?

 7    A.    Uh, it began in North Hollywood and then moved to the

 8    Los Feliz area, uh, the border of Glendale and Los Angeles.

 9    Q.    At some point did you see Darbinyan's vehicle?

10    A.    Yes.

11    Q.    What kind of vehicle was that?

12    A.    Mercedes Benz S 550.

13    Q.    At some point did you see that vehicle driving in tandem

14    with a Honda Odyssey?

15    A.    Yes.

16    Q.    During your investigation, did you determine who that

17    Honda Odyssey was registered to?

18    A.    Yes.

19    Q.    Who is that?

20    A.    Khachatur Arakelyan.

21    Q.    Did you see the Honda Odyssey and Darbinyan go to any

22    particular location?

23    A.    Yes.

24    Q.    Where?

25    A.    They went to the area of the weed shop that we had
```

176

```
1    talked about a couple days ago.
2              MR. ESTRADA:  Your Honor, with the Court's
3    permission, I'd like to publish 315 which has been admitted?
4              THE COURT:  Yes.
5    BY MR. ESTRADA:
6    Q.   Showing you page 1, does that map depict the area of the
7    weed shop?
8    A.   Yes, the weed shop is right here.
9    Q.   Now, turning to page 2, does page 2 depict the area of
10   the weed shop?
11   A.   Yes, it's the rear parking area.
12   Q.   Where in the area of the weed shop did you see Darbinyan
13   and that Honda Odyssey go?
14   A.   There were several people meeting behind the gated area.
15   Several vehicles all parked and meeting back in this area.
16   Q.   Did they meet until late into the evening?
17   A.   Yes, they did.
18   Q.   And at some point did you see the individuals leave the
19   meeting?
20   A.   Yes.
21   Q.   In cars?
22   A.   Yes.
23   Q.   Did you see the Mercedes leave?
24   A.   I don't recall if we saw the Mercedes leave.  We
25   followed a different car.
```

```
 1    Q.   What car did you follow?

 2    A.   Rafael Parsadanyan in a BMW 6 series coupe.

 3    Q.   So did you see a BMW 6 series coupe leave that area of

 4    the weed shop?

 5    A.   Yes.

 6    Q.   In the evening?

 7    A.   Yes.

 8    Q.   Were there other vehicles you ID'ed leaving that area of

 9    the meeting?

10    A.   Yes.

11    Q.   What vehicles?

12    A.   There was another Audi Q7, a different one, that was --

13    belonged to Petras Babelyan.

14    Q.   Who is Petras Babelyan?

15    A.   He was another individual that was captured on the

16    phones talking about this 99 Cents Only fraud scheme.

17              MR. SEVERO:  Objection.  Move to strike.

18              THE COURT:  The last part is stricken.

19    BY MR. ESTRADA:

20    Q.   Was that person caught on the telephones?

21    A.   Yes.

22    Q.   Did you see where the BMW 6 series went to?

23    A.   Yes.

24    Q.   Where did it go?

25    A.   It went to a cellular phone store in North Hollywood.
```

```
1    Q.   What else did you see it do?
2    A.   Uh, met with several other vehicles.  There were several
3    vehicles around it that we recognized to be other targets of
4    our investigation.
5    Q.   Was one of those vehicles a Range Rover?
6    A.   Yes.
7    Q.   A Range Rover was it associated with any particular
8    target in the investigation?
9    A.   Yes, Harutyan Arthur Pembejian.
10   Q.   Does that person go by a particular name?
11   A.   Champ.
12   Q.   Was that a person we talked about earlier in the case?
13   A.   Yes.
14   Q.   What other vehicles?
15   A.   There was a Toyota Tundra that was associated to Artur
16   Margaryan who was Hoochuch from our investigation.
17   Q.   Was he captured in wiretaps in this investigation?
18   A.   Yes, he was.
19   Q.   Was the Tundra followed?
20   A.   Yes.
21   Q.   Where was it seen going?
22   A.   To a 99 Cent Only Store.
23   Q.   Where?
24   A.   In the North Hollywood area.
25             MR. ESTRADA:  Okay.  Now, with the Court's
```

1    permission if I could play for the witness another video.

2    This will be Exhibit 346A.

3    Q.   And before I do, the previous video that I showed you

4    345A and the still photos 345B, what store were those from?

5    A.   Store 76 in Whittier.

6    Q.   Now, I'll ask you when the video comes up, what store

7    these next videos are going to be from.  Just pull that up.

8    And before we start playing, my eyes might be a little bad,

9    but it appears to say the store number there?

10   A.   Yes, sir.

11   Q.   Do you know what store that is?

12   A.   Store 104 is associated to the Arlington store.

13   Q.   And do you see the date there?

14   A.   July 14, 2009.

15   Q.   Okay.  And you previously viewed this video?

16   A.   That's correct.

17   Q.   Is there a particular place where activity will take

18   place?

19   A.   Yes.  It'll be pretty obvious.

20   Q.   That area in the middle?

21   A.   Yes, sir.

22          MR. ESTRADA:  Okay.  If we could play the video,

23   please.

24          (Exhibit 346A played for the jury.)

25   BY MR. ESTRADA:

1    Q.    Now, in that video did you see two individuals?

2    A.    Yes.

3    Q.    Did you recognize that second individual?

4    A.    Yes.

5    Q.    Who is that second individual?

6    A.    Raymond Tarverdyan.

7    Q.    And did you see him manipulate the point of sale

8    terminal?

9    A.    Yes.  He replaced the point of sale terminal.

10   Q.    Do you recognize that other individual with the black

11   shirt and white hat?

12   A.    Yes.

13   Q.    Who is that?

14   A.    Simon Antonyan.

15          MR. ESTRADA:  Your Honor, with the Court's

16   permission, I would ask to play Exhibit 347A which is another

17   video?

18          THE COURT:  Okay.

19   BY MR. ESTRADA:

20   Q.    Before we start that video, is there a particular area

21   where the activity will take place?

22   A.    Yes.  I believe on this one, it's right there.

23          MR. ESTRADA:  Okay.  Now, if we could play the

24   video.

25              (Exhibit 347A played for the jury.)

181

```
 1              MR. ESTRADA:  Okay.  If we could pause it there.
 2      Actually, if we could go towards the end and pause it,
 3      please.
 4      Q.   And then this area here, the point of sale terminal has
 5      been removed?
 6      A.   Yes.
 7      Q.   Do you recognize the person who removed it?
 8      A.   Yes.
 9      Q.   Who is that person?
10      A.   Simon Antonyan.
11      Q.   And here, again it's kind of small, but it says
12      Store 285, July 14, 2009.  Do you know where Store 285 was?
13      A.   Yes.  It's the Limonite store in Riverside, California.
14              MR. ESTRADA:  Okay.  Now, if we could play the
15      second clip from 247A.  Excuse me.  347A.
16      Q.   Now, before I start that is this from the same overall
17      video 347?
18      A.   Yes, it's just a few seconds later.
19      Q.   And who is this individual here in middle with the black
20      hat and the white-collared shirt?
21      A.   That's Raymond Tarverdyan.
22      Q.   Could you see that same distinctive shirt in the
23      previous video at the different store?
24              MR. SEVERO:  Objection.  That calls for
25      speculation.
```

182

```
 1              THE COURT:  Sustained.

 2    BY MR. ESTRADA:

 3    Q.   Do you recall seeing that shirt anywhere else?

 4              MR. SEVERO:  Objection.  No foundation.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Yes, I saw it in --

 7              MR. SEVERO:  Nonresponsive after yes.

 8              THE COURT:  Next question.

 9    BY MR. ESTRADA:

10    Q.   Where did you see it?

11    A.   Saw it in the previous store in the FBI evidence.

12    Q.   When you say FBI evidence, what do you mean by that?

13    A.   We found that shirt at the home of Raymond Tarverdyan.

14    Q.   During a search of Raymond Tarverdyan?

15    A.   Yes.

16    Q.   In this case?

17    A.   Yes.

18    Q.   Was it a pretty distinctive shirt?

19    A.   It's very distinctive.

20              MR. SEVERO:  Calls for a conclusion.

21              THE COURT:  Overruled.

22              MR. ESTRADA:  Okay.  Now, if we could play that

23    video.

24              (Exhibit 347A played for the jury.)

25    BY MR. ESTRADA:
```

UNITED STATES DISTRICT COURT

183

1    Q.   Did you see towards the end of that video the point of

2    sale terminal being replaced?

3    A.   Yes.

4         MR. ESTRADA:   Your Honor, with the Court's

5    permission, I'd ask to play Exhibit 139 and have the jurors

6    turn to 139A in their books.

7         THE COURT:   Proceed.

8         (Exhibit 139 was played for the jury.)

9    BY MR. ESTRADA:

10   Q.   Okay.  Now, Special Agent Stebbins, turning to the first

11   page of the transcript, do you have that in front of you?

12   A.   Yes.

13   Q.   What's the date of the call?

14   A.   July 16, 2009.

15   Q.   What's the time of the call?

16   A.   Approximately 10:20 p.m.

17   Q.   Who are the participants in that call?

18   A.   Mike Darbinyan and Khachatur Arakelyan.

19   Q.   Also known as Khecho?

20   A.   Yes.

21   Q.   Now, in this call dated July 16, 2009, how long after

22   the last video we saw is that?

23   A.   Two days.

24   Q.   Now, turning to page two of three, do you have that in

25   front of you?

184

```
 1    A.   Yes.
 2    Q.   Ten speakers from the top Darbinyan states:  Can you
 3    tell the Blonde to arrange four people for me tomorrow?
 4              Arakelyan:  Who should I tell?
 5              Darbinyan:  The Blonde, Blonde or do you have
 6    anyone?
 7              Arakelyan:  Blonde arrange for people.  I'll tell
 8    him, bro, but why I am -- oh, yeah, yeah, yeah, yeah, okay.
 9    Okay, my bro, what time?
10              Based on your knowledge of the investigation, those
11    four people referred to do you have an understanding what was
12    being referred to there?
13              MR. SEVERO:  Objection.  Calls for speculation.
14              THE COURT:  Sustained.
15    BY MR. ESTRADA:
16    Q.   Based on your knowledge of the investigation, did you
17    understand that runners were being used in the overall
18    scheme?
19              MR. SEVERO:  Leading.
20              THE COURT:  Sustained.
21    BY MR. ESTRADA:
22    Q.   Based on your knowledge of the investigation, did you
23    understand how money was being taken from ATMs in this
24    particular scheme?
25    A.   Yes.
```

```
1              MR. SEVERO:  First he leads him and now he gives
2      him the answer.  I object to this whole line of questioning.
3              THE COURT:  Overruled.
4              THE WITNESS:  Yes.
5      BY MR. ESTRADA:
6      Q.   How was that done?
7      A.   Debit cards were given to runners and runners went out
8      to the different ATM machines and withdrew cash to further
9      the scheme.
10     Q.   Four speakers from the bottom Darbinyan states:
11             Well, in the morning when I give it and it would go
12     away.
13             Arakelyan:  Okay, my bro.  I'll call him soon.  If
14     I can, I'll see him now.  If not early in the morning.
15             Based on your knowledge of the investigation,
16     generally speaking, when you would see these videos point of
17     sale terminals being switched out, about how long after that
18     would there be further activity?
19     A.   Within one to three days.
20     Q.   And that other activity what would it generally be?
21     A.   It would be that we would get reports that financial
22     institutions were losing a lot of money.
23             MR. FLIER:  Objection.  Calls for hearsay.
24             THE COURT:  Sustained.
25     BY MR. ESTRADA:
```

186

```
 1    Q.    Would there be calls following the video of switching
 2    point of sale terminals referring to people taking money out?
 3    A.    Yes.
 4              MR. ESTRADA:  Your Honor, with the Court's
 5    permission, I would ask to play Exhibit 140 and ask the
 6    jurors to turn to 140A in their books.
 7              THE COURT:  Uh, in 15 minutes.  Ladies and
 8    gentlemen, it's 2:30 so it's time for the afternoon recess.
 9    Be back in 15 for afternoon recess.  Remember the
10    admonishment not to discuss the case among yourselves or with
11    anyone else.  See you back in 15 minutes.
12                        (Recess taken.)
13              THE COURT:  Okay.  The record will reflect that all
14    members of the jury are in their respective seats in the jury
15    box including the alternates and the witness on the witness
16    stand.  You may continue in your direct.
17              MR. ESTRADA:  Thank you, Your Honor.
18    Q.    Now, before the break we played Exhibit 139 for you.
19    That is the call from July 16, 2009.  Do you recall that?
20    A.    Yes, sir.
21              MR. ESTRADA:  I'd like to play you the next call on
22    that same date.  With the Court's permission, I'd like play
23    Exhibit 140 and have the jurors turn to 140A in their books.
24              THE COURT:  Yes.
25                    (Exhibit 140 was played for the jury.)
```

```
 1   BY MR. ESTRADA:
 2   Q.   Now, Special Agent Stebbins, turning to the first page
 3   of the call in Exhibit 140A, do you have that in front of
 4   you?
 5   A.   Yes, I do.
 6   Q.   What's the date of that call?
 7   A.   July 16, 2009.
 8   Q.   What's the time of the call?
 9   A.   Approximately 10:27 p.m.
10   Q.   Who are the speakers in this call?
11   A.   Mike Darbinyan and Khachatur Arakelyan.
12   Q.   Also known as Khecho?
13   A.   Yes.
14   Q.   Is it the same day as the call before it?
15   A.   Yes, it is.
16   Q.   Turning to page two of three, do you have that in front
17   of you?
18   A.   Yes, I do.
19   Q.   Five speakers from the bottom Darbinyan states:  Is
20   there someone available for tomorrow, for the job, for the
21   thing, judo fighter?
22           Arakelyan:  Tomorrow let me find out who has
23   himado.
24           Last speaker at the bottom Darbinyan:  I need four.
25   I'm in Hollywood now.  I will go home, my dear.
```

```
1            Turning to the next page fourth speaker from the
2    top Darbinyan:  I think you understood already.
3            Arakelyan:  Yes, yes, yes.
4            Based on your knowledge of the investigation, did
5    you believe judo fighter referred to some sort of coded
6    language?
7    A.   Yes.
8            MR. SEVERO:  Objection.  Calls for speculation.  No
9    foundation.
10           THE COURT:  Overruled.
11           THE WITNESS:  Yes.
12           THE COURT:  In your training and your experience
13   that you've already explained to the Court, did that judo
14   fighter have some significance?
15           THE WITNESS:  Yes, sir.
16           THE COURT:  And you testify it's within your
17   expertise.
18   BY MR. ESTRADA:
19   Q.   What significance did you understand it to have?
20   A.   Judo fighter was a code they used for runners.
21           MR. ESTRADA:  Your Honor, the government requests
22   permission to play Exhibit 141 and ask the jurors to turn to
23   141A in their books.
24           (Exhibit 141 was played for the jury.)
25   BY MR. ESTRADA:
```

1    Q.   Now, Special Agent Stebbins, turning to the first page

2    of the transcript 141A, do you have in front of you?

3    A.   Yes, I do.

4    Q.   What's the date of that call?

5    A.   July 16, 2009.

6    Q.   Is this the same date as the prior call involving

7    Arakelyan and Darbinyan talking about judo fighters four for

8    tomorrow?

9    A.   Yes, it is.

10   Q.   What's the time of the call?

11   A.   Approximately 10:40 p.m.

12   Q.   Who are the participants in this call?

13   A.   Mike Darbinyan and Raymond Tarverdyan.

14   Q.   Raymond Tarverdyan was that the individual seen going

15   into 99 Cent Only Stores?

16   A.   Yes, it is.

17   Q.   Turning to page 2 of the transcript, four speakers from

18   the top Tarverdyan states:  Is there any judo competition

19   going on tomorrow or not?

20           Darbinyan:  Yes, brother.

21           What was your understanding as to what the judo

22   competition would mean?

23           MR. SEVERO:  Same objection.

24           THE COURT:  It will be noted.  Overruled.

25           THE WITNESS:  The judo competition was whether or

```
 1    not they're going to be sending out runners.

 2    BY MR. ESTRADA:

 3    Q.   The next day?

 4    A.   Yes.

 5            MR. ESTRADA:  Your Honor, the government requests

 6    permission to play Exhibit 142 and ask the jurors to turn to

 7    142A in their books?

 8            THE COURT:  Yes.

 9            (Exhibit 142 was played for the jury.)

10    BY MR. ESTRADA:

11    Q.   Special Agent Stebbins, turning to the first page of

12    Exhibit 142A, do you have that in front of you?

13    A.   Yes, I do.

14    Q.   What's the date of that call?

15    A.   July 16, 2009.

16    Q.   What's the time of the call?

17    A.   Approximately 10:45 p.m.

18    Q.   Who are the participants in this call?

19    A.   Mike Darbinyan and Garen Chouldjian.

20    Q.   Now, turning to page three of four at Exhibit 142A, do

21    you have that in front of you?

22    A.   Yes.

23    Q.   Three speakers from the top Darbinyan states:  Thing,

24    they have a thing.  You that, uh, a while ago you were

25    telling me, do you remember we were talking at that hookah
```

1   place that you were doing, you were giving it and they would

2   go and bring it?

3           Chouldjian:  Yeah.

4           Darbinyan:  Did you understand?

5           Chouldjian:  I know.  Runners.

6           Darbinyan:  What?

7           Chouldjian:  Runners.

8           Darbinyan:  Runners, yeah.  Can you arrange four or

9   five for tomorrow morning?

10          Based on your training and experience, what did you

11  understand the term runners to refer to?

12          MR. SEVERO:  Objection.  Asked and answered.

13          THE COURT:  It has been asked and answered.  We've

14  already defined what runners are.

15  BY MR. ESTRADA:

16  Q.   The next line Chouldjian says:  Bro, they do it from

17  outside.  They don't enter inside.  This has to be from

18  inside.

19          Darbinyan:  They are doing it from outside, my bro,

20  outside.

21          Based on your training and experience, what did you

22  understand outside to refer to?

23  A.   The runners would be withdrawing the money using debit

24  cards from the ATMs that are actually outside the bank rather

25  than going inside the bank.

192

```
 1    Q.   Is that different from using runners to go inside the
 2    bank?
 3    A.   Yes.
 4    Q.   How is that different?
 5    A.   Well, it would be much more risky to go inside the bank.
 6    Usually, if they're doing it outside the bank, they'll go
 7    late at night right before 12 o'clock and just after
 8    12 o'clock.  And then there's less likely to be people
 9    outside that would see them using these debit cards.
10    Q.   Turn to page 4 of the transcript.  Do you have that in
11    front of you?
12    A.   Yes.
13    Q.   Seven speakers from the top Darbinyan states:  20.  They
14    are giving 20 cents money.  Are you listening?
15              Chouldjian:  Yeah, yeah.
16              Darbinyan:  And if you can get a hold of it for 10
17    or 15?
18              Chouldjian:  Yeah.
19              Darbinyan:  You make something.  There are 400
20    things.
21              Based on your training and experience, did you form
22    an opinion as to what 20 cents referred to here?
23    A.   Yes.
24    Q.   What is that opinion?
25              MR. SEVERO:  Objection.  Speculation.
```

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  The runners would receive 20 percent

 3     of whatever money they were able to withdraw.

 4     BY MR. ESTRADA:

 5     Q.   He states you could get ahold of it for 10 or 15.  Did

 6     you form an opinion what that referred to based on your

 7     training and experience?

 8     A.   It would Chouldjian's cut off of the 20 percent.

 9     Q.   There's a reference to 400 things.  Based on your

10     knowledge of the investigation, what did you understand the

11     400 things to refer to?

12                MR. SEVERO:  Speculation.

13                THE COURT:  Is that a term that you see -- did you

14     see it in your training and experience?

15                THE WITNESS:  Yes, sir.

16                THE COURT:  Is it something you are just assuming

17     today?

18                THE WITNESS:  No, sir.  Something I know from the

19     investigation.

20                THE COURT:  You've heard this before in an

21     investigation?

22                THE WITNESS:  Yes, sir.

23                THE COURT:  Go ahead, counsel.

24                THE WITNESS:  They're debit cards.

25     BY MR. ESTRADA:
```

194

```
 1   Q.   Numbers, debit card numbers?

 2   A.   Debit card numbers.

 3           MR. ESTRADA:  Your Honor, the government requests

 4   permission to play Exhibit 143 and ask the jurors turn to

 5   143A in their book?

 6           THE COURT:  Okay.

 7               (Exhibit 143 played for the jury.)

 8   BY MR. ESTRADA:

 9   Q.   Special Agent Stebbins, turning to the first page of

10   Exhibit 143A, do you have that in front of you?

11   A.   Yes, I do.

12   Q.   What's the date of that call?

13   A.   July 17th, 2009.

14   Q.   Time of the call?

15   A.   Approximately 1:45 p.m.

16   Q.   Who are the participants in this call?

17   A.   Mike Darbinyan and Raymond Tarverdyan.

18   Q.   Now, is this call the day after these previous calls

19   about judo fighters and runners?

20   A.   Yes, it is.

21   Q.   Turning to page 2 of the transcript, six speakers from

22   the top Tarverdyan states:  We are waiting for you, bro.

23           Darbinyan:  Hey, bro.  I thought you were supposed

24   to call me.  I'm stuck here.

25           Tarverdyan:  Yeah, are you ready?  Train.  Are the
```

```
 1    trainers ready?
 2              Darbinyan:  Of course they are, bro.
 3              Based on your knowledge of this investigation, did
 4    you form an opinion what trainers referred to?
 5    A.   Yes.  They were talking about giving the debit cards to
 6    the runners.
 7              MR. SEVERO:  I move to strike.  That's complete
 8    speculation.
 9              THE COURT:  Overruled.
10              MR. ESTRADA:  Your Honor, the government requests
11    permission to play Exhibit 144 and ask the jurors to turn to
12    144A in their books?
13              THE COURT:  Yes.
14              (Exhibit 144 played for the jury.)
15    BY MR. ESTRADA:
16    Q.   Now, Special Agent Stebbins, turning to the first page
17    of that transcript Exhibit 144A, do you have that in front of
18    you?
19    A.   Yes, I do.
20    Q.   What's the date of that call?
21    A.   July 17th, 2009.
22    Q.   Time of the call?
23    A.   Approximately 2:20 p.m.
24    Q.   Who are the participants?
25    A.   Mike Darbinyan and Raymond Tarverdyan.
```

1   Q.   Is this the same day as the previous call Exhibit 143?

2   A.   Yes, it is.

3   Q.   Turning to the first page of the transcript at

4   Exhibit 144A eight speakers from the top:

5         Tarverdyan:  Referring to boxers, sodoku.  What's

6   written on their clothes.  They're with horses, bro.  Do you

7   get what I'm saying?

8         Darbinyan:  Uh, what, what?

9         Tarverdyan:  The one that --

10         Darbinyan:  What?

11         Tarverdyan:  Uh, was yeah, he had T-shirts with W

12   and also had it with C.  The T-shirts with W --

13         Darbinyan:  Yeah.

14         Tarverdyan:  Are the horses.

15         Based on your knowledge of the investigation -- let

16   me withdraw that question.

17         Based on your training and experience, did you form

18   an opinion as to what horses referred to?

19   A.   Yes.

20   Q.   What's that?

21         MR. SEVERO:  Objection.  Speculation.

22         THE COURT:  Noted.  Overruled.

23         THE WITNESS:  Wells Fargo bank.

24   BY MR. ESTRADA:

25   Q.   Does Wells Fargo bank start with W?

1    A.   Yes, it does.

2    Q.   Based on your training and experience in committing

3    these sort of debit card fraud offenses was information noted

4    on the debit cards?

5    A.   Yes.

6    Q.   Including information such as bank?

7    A.   Yes.

8           MR. ESTRADA:  Your Honor, the government requests

9    ask permission to play Exhibit 145 and ask the jurors to turn

10   to 145A in their books?

11          THE COURT:  Yes.

12          (Exhibit 145 played for the jury.)

13   BY MR. ESTRADA:

14   Q.   Special Agent Stebbins, turning to the first page of

15   Exhibit 145A, do you have that in front of you?

16   A.   Yes, I do.

17   Q.   What's the date of this call?

18   A.   July 17th, 2009.

19   Q.   The same date as the call before it?

20   A.   Yes, it is.

21   Q.   Time of the call?

22   A.   Approximately 5:34 p.m.

23   Q.   Who are the participants in the call?

24   A.   Mike Darbinyan and Raymond Tarverdyan.

25   Q.   Turning to page 2 of the transcript, do you have that in

```
 1    front of you?

 2    A.    Yes.

 3    Q.    Eight speakers from top Tarverdyan asked Darbinyan:

 4              Are you ready for the second series?

 5              Darbinyan:  Am I ready for the second series?

 6              Tarverdyan:  Yeah.

 7              Darbinyan:  Laughing, yeah, I am prepared.

 8              Based on your training and experience, did you form

 9    an opinion as to what second series referred to?

10    A.    Yes.

11    Q.    What was that?

12    A.    It would be the second series of debit cards that would

13    be given to the runners.

14              MR. SEVERO:  Move to strike.  Speculation of the

15    witness.

16              THE COURT:  Overruled.

17    BY MR. ESTRADA:

18    Q.    Did you understand that Raymond Tarverdyan was one of

19    the individuals actually going into the stores to retrieve

20    the debit card numbers?

21    A.    Yes.

22              MR. ESTRADA:  Your Honor, the government requests

23    permission to play Exhibit 146 and asks the jurors to turn to

24    Exhibit 146A in their books?

25              THE COURT:  Okay.
```

```
 1                    (Exhibit 146 played for the jury.)
 2    BY MR. ESTRADA:
 3    Q.   Special Agent Stebbins, turning to page 1 of Exhibit
 4    146A, do you have that in front of you?
 5    A.   Yes, I do.
 6    Q.   What's the date of that call?
 7    A.   July 17th, 2009.
 8    Q.   Time of the call?
 9    A.   Approximately 11:32 p.m.
10    Q.   Who are the participants in this call?
11    A.   Mike Darbinyan and Raymond Tarverdyan.
12    Q.   The same day as the call before it?
13    A.   Yes, it is.
14    Q.   Turning to page two of three, first speaker at the top
15    Darbinyan states:
16              Yeah, bro.  Hello.
17              Based on your knowledge of the investigation, was
18    Tarverdyan an associate of Darbinyan?
19    A.   Yes.
20              MR. SEVERO:  Move to strike that.  That's in the
21    province of the jury.
22              THE COURT:  Sustained.
23    BY MR. ESTRADA:
24    Q.   Eight speakers from the bottom Tarverdyan states:
25              Are people already on the road, bro?  They're
```

200

```
 1   coming.
 2          Darbinyan:  Well, yeah.  Right when something
 3   happened, bro.  I did.  I said that.
 4          Tarverdyan:  Okay.
 5          Darbinyan:  I have a friend who has a store.
 6          Tarverdyan:  Yeah, yeah, yeah.
 7          Darbinyan:  He would welcome everyone and come
 8   over.
 9          Tarverdyan:  Yeah, I understand.  Okay, bro.
10          Based on your knowledge of the investigation, did
11   Darbinyan have an associate who owned a store?
12   A.   Yes.
13   Q.   Who was that associate who owned a store?
14   A.   Rafael Parsadanyan.
15          MR. FLIER:  I'm going to object.  No foundation.
16          THE COURT:  No foundation yet as to why he has that
17   opinion.
18   BY MR. ESTRADA:
19   Q.   Now, are you familiar with Rafael Parsadanyan from this
20   particular investigation?
21   A.   Yes.
22   Q.   Are you familiar with whether he has a store?
23   A.   Yes.
24   Q.   What kind of store was it?
25   A.   Cell phone store.
```

```
 1    Q.   And did you understand that there calls involving

 2    Darbinyan and Parsadanyan regarding the same scheme?

 3    A.   Yes.

 4              MR. FLIER:  Objection.  No foundation.

 5              THE COURT:  Overruled.

 6              MR. ESTRADA:  Your Honor, the government would

 7    request permission to play Exhibit 147 and ask the jurors to

 8    turn to 147A in their books.

 9              THE COURT:  Yes.

10              (Exhibit 147 played for the jury.)

11    BY MR. ESTRADA:

12    Q.   Special Agent Stebbins, turning to the first page of

13    Exhibit 147A, do you have that in front of you?

14    A.   Yes.

15    Q.   What's the date of this call?

16    A.   July 17th, 2009.

17    Q.   Time of the call?

18    A.   Approximately 11:45 p.m.

19    Q.   Who are the participants?

20    A.   Mike Darbinyan and Raymond Tarverdyan.

21    Q.   Is this the same date as the prior call?

22    A.   Yes, it is.

23    Q.   Turning to page 2 of the transcript, six speakers from

24    the top Darbinyan states to Tarverdyan:

25              You will see what it is and how it is.  You will
```

```
1   separate it.  Then they will come and take theirs until they
2   start the next round.
3            Did you understand based on your training and
4   experience, did you form an opinion what next round referred
5   to?
6            MR. SEVERO:  Speculation.
7            THE COURT:  Overruled.
8            THE WITNESS:  It would be the next round of debit
9   cards.
10           MR. ESTRADA:  Your Honor, the government requests
11   permission to play Exhibit 148 and ask the jurors to turn to
12   148A in their books?
13           THE COURT:  All right.
14           (Exhibit 148 played for the jury.)
15   BY MR. ESTRADA:
16   Q.   Special Agent Stebbins, turning to the first page of
17   Exhibit 148A, do you have that in front of you?
18   A.   Yes.
19   Q.   What's the date of that call?
20   A.   July 18, 2009.
21   Q.   What's the time of the call?
22   A.   Approximately 11:51 a.m.
23   Q.   Turning to page 2, who are the participants in this
24   call?
25   A.   Mike Darbinyan and Petras Babelyan.
```

1    Q.   Now, this Petras Babelyan was he a person who was seen

2    on surveillance earlier in this investigation?

3              MR. SEVERO:  Objection.  Leading.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6    BY MR. ESTRADA:

7    Q.   Where did you see him?

8    A.   I saw him at the weed shop that I was talking about just

9    a few minutes ago.

10   Q.   Was he driving a particular car?

11   A.   Yes, he was an Audio Q7.

12   Q.   Now, turning to page 4 of the transcript, four of seven,

13   do you have that?

14   A.   Yes, I do.

15   Q.   Second speaker from the top Darbinyan states:

16              There is a good source.

17              And then six speakers from the top Darbinyan

18   states:

19              Do you have runners?

20              Petras:  Runners for?

21              Darbinyan:  People.

22              Petras:  They were saying yesterday that there some

23   available.

24              Darbinyan:  Huh?

25              Petras:  They were saying yesterday that they are

1    available; right?

2            Darbinyan:  I mean from the wall, the wall, the

3    thing.

4            Based on your training and experience, what did the

5    term wall refer to as it applies to the fraud?

6    A.   It would be withdrawing money from the ATM in the wall

7    of the bank outside.

8            MR. SEVERO:  Move to strike.  Speculation.

9            THE COURT:  Overruled.

10   BY MR. ESTRADA:

11   Q.   Now, four speakers from the bottom on page four

12   Darbinyan states:  If you find it, the guys will pay you

13   20 percent.

14           Based on your training and experience, are you

15   familiar with the role in fraud schemes of individuals who

16   organize runners?

17   A.   Yes.

18   Q.   Can you explain what type of role those individuals

19   have?

20   A.   They will generally be the layer between the person in

21   charge and the runners.  They will manage the runners.  They

22   will get paid whatever amount and then they'll pay out the

23   money to the runners.

24   Q.   Turning to page 6 of the transcript, do you have that in

25   front of you?

1    A.    Yes.

2    Q.    Six speakers from the bottom Darbinyan states:  If you

3    find people, let me know and you will make some money, too.

4          Petras:  All right.  Can you give me Rafo's number

5    again?  Sorry.

6          Darbinyan:  216-000-0000.

7          Based on your knowledge of the investigation was

8    this telephone number subscribed to Rafael Parsadanyan?

9    A.    Yes, it was.

10         MR. ESTRADA:  Your Honor, the government requests

11   permission to play Exhibit 149 and ask that the jurors turn

12   to 149A in their books.

13         THE COURT:  Okay.

14         (Exhibit 149A played for the jury.)

15   BY MR. ESTRADA:

16   Q.    Special Agent Stebbins, turning to the first page of

17   Exhibit 149A, do you have that in front of you?

18   A.    Yes, I do.

19   Q.    Date of that call?

20   A.    July 18th, 2009.

21   Q.    Time of the call?

22   A.    Approximately 1:42 p.m.

23   Q.    Who are the participants in this call?

24   A.    Mike Darbinyan and Rafael Parsadanyan.

25   Q.    Rafael Parsadanyan is he designated as Speaker 2 in this

```
 1    transcript?
 2    A.   Yes, he is.
 3    Q.   Turning to page two of three in the transcript, do you
 4    have that in front of you?
 5    A.   Yes, I do.
 6    Q.   Seven speakers from the top Darbinyan states:
 7              Bro, they went through the thing; right, to greet
 8    already?
 9              Parsadanyan:  Yeah, yeah, yeah.
10              Darbinyan:  Khecho and others already went; right?
11              Parsadanyan:  Everything is already ready, bro.
12              Based on your knowledge of the investigation, did
13    the term greet, did that have relevance to the investigation?
14    A.   Yes.
15    Q.   What did the term greet mean with regard to the
16    investigation?
17              MR. SEVERO:  No foundation.  Calls for speculation.
18              THE COURT:  Overruled.
19              THE WITNESS:  The term greet was used when somebody
20    would come to meet with the individual.
21    BY MR. ESTRADA:
22    Q.   Now, did this same term greet, did you hear that
23    previously with regard to calls involving the fraud involving
24    against Y. Yadayan?
25    A.   Yes.
```

```
1   Q.   Do you recall that term greet?

2   A.   Yes.

3   Q.   Was it used with Turzyan?

4   A.   Yes.  Darbinyan told Turzyan to just say I've greeted

5   them on the phone and then say I've sent them off when you

6   send them into the bank.

7   Q.   When you're referring to them, who are you talking

8   about?

9   A.   The runners.

10  Q.   There's a reference to Khecho.  Based on your knowledge

11  of this investigation, who is this Khecho?

12          MR. SEVERO:  Asked and answered.

13          THE COURT:  Overruled.

14          THE WITNESS:  Khachatur Arakelyan.

15  BY MR. ESTRADA:

16  Q.   Seven speakers from the bottom Darbinyan states after a

17  pause:  Did he not got go the second time?

18          Parsadanyan:  Oh, no, brother, not the second time.

19  Here, I'll call Khecho and tell him to come then.

20          Darbinyan:  Is that from the one time?

21          Parsadanyan:  Yeah.

22          Darbinyan:  Okay, but, dear, here when you told me

23  that, I realized that it won't work like that.

24          Parsadanyan:  No, it's the day and night, brother.

25  It's from two times.
```

208

```
 1              Based on your training and experience, what does
 2     the phrase day and night refer to?
 3     A.   It would be before midnight and after midnight
 4     withdrawals.
 5     Q.   Based on your training and experience is that a method
 6     that's used to steal money from ATMs?
 7     A.   Yes, it's the best way to maximize the fraud.
 8              MR. SEVERO:  Nonresponsive after yes.
 9              THE COURT:  Only yes will come in.  Next question.
10     BY MR. ESTRADA:
11     Q.   Turning to page 3 of the transcript, do you have that in
12     front of you?
13     A.   Yes, I do.
14     Q.   First speaker at the top Parsadanyan states:
15              That's from the 65.
16              Darbinyan:  What happened to the rest?
17              Parsadanyan:  Not the 50.  As far as the 35, they
18     didn't make it on time, bro.
19              Based on your knowledge of the investigation, what
20     do those numbers 65 and 50 and 35 mean?
21     A.   They're referring to quantities of debit cards.
22              MR. SEVERO:  Move to strike.  Speculation.
23              THE COURT:  Denied.  It will be overruled.  The
24     objection is overruled.
25              MR. ESTRADA:  Your Honor, the government requests
```

```
 1    permission to play Exhibit 150 and I ask that the jurors to

 2    turn to 150A in their books.

 3              THE COURT:  Okay.

 4              (Exhibit 150 played for the jury.)

 5    BY MR. ESTRADA:

 6    Q.   Special Agent Stebbins, turning to the first page of

 7    Exhibit 150A, do you have that in front of you?

 8    A.   Yes.

 9    Q.   What's the date of that call?

10    A.   July 18, 2009.

11    Q.   The time of the call?

12    A.   Approximately 2:15 p.m.

13    Q.   Who are the participants in this call?

14    A.   Mike Darbinyan and Raymond Tarverdyan.

15    Q.   Seven speakers from the bottom Darbinyan states:

16              How many is there?  You want me to send some people

17    right now?

18              Tarverdyan:  Uh.

19              Darbinyan:  Is there a lot?

20              Tarverdyan:  There is, yeah.  There is, uh, a

21    couple of hours we'll give them about 300.

22              Darbinyan:  Okay, bro because I told everyone.

23              Based on your knowledge of the investigation, what

24    did the term 300 refer to?

25              MR. SEVERO:  Objection.  No foundation.
```

```
 1   Speculation.  Improper expert witness testimony.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  Debit cards.

 4   BY MR. ESTRADA:

 5   Q.   Tarverdyan was that the individual who was seen in the

 6   videos going into stores at 99 Cent Only Stores?

 7            MR. SEVERO:  Objection.  Asked and answered.

 8            THE COURT:  It has been asked and answered.

 9   Sustained.

10            MR. ESTRADA:  Your Honor, the government requests

11   permission to play Exhibit 151 and ask that the jurors turn

12   to 151A in their books.

13            THE COURT:  Yes.

14            (Exhibit 151 was played for the jury.)

15   BY MR. ESTRADA:

16   Q.   Special Agent Stebbins, turning to the first page of

17   151A, do you have that in front of you?

18   A.   Yes.

19   Q.   What's the date of this call?

20   A.   July 18, 2009.

21   Q.   Time of the call?

22   A.   Approximately 2:47 p.m.

23   Q.   Who are the participants in this call?

24   A.   Mike Darbinyan and Garen Chouldjian.

25   Q.   Five speakers from the bottom on page 2, do you have
```

1    that in front of you?

2    A.    Yes.

3    Q.    Five speakers from the bottom on page 2 Chouldjian

4    states:  Yeah, you called, my dear.  The thing now the 14.5

5    came out.

6            Based on your training and experience, what did you

7    believe the term 14.5 referred to?

8            MR. SEVERO:  Based on training and experience, it

9    would be speculation I would think.

10           THE COURT:  Overruled.

11           THE WITNESS:  $14,500.

12   BY MR. ESTRADA:

13   Q.    And in your training and experience, are thousands of

14   dollars sometimes referred to in shorthand by individuals

15   involved in criminal activity?

16   A.    Yes.

17   Q.    Now, Chouldjian refers to before 12 o'clock and after

18   the 12 o'clock.  Based on your training and experience, what

19   did you believe that referred to?

20   A.    It would be withdrawals before midnight and after

21   midnight to avoid the daily withdrawal limits to maximize the

22   money.

23   Q.    Chouldjian also states it's all typed on the papers and

24   stuff and wrapped up nicely.

25           Based on your training and experience, in addition

212

```
 1    to the magnetic cards with the reencoded debit cards is there
 2    often other written information along with it?
 3    A.   Yes.
 4    Q.   What sort of information?
 5    A.   It would be receipts that come with debit withdrawals.
 6          MR. ESTRADA:  Your Honor, the government requests
 7    permission to play Exhibit 152 and ask the jurors to turn to
 8    152A in their books?
 9          THE COURT:  Yes.
10          (Exhibit 152 was played for the jury.)
11    BY MR. ESTRADA:
12    Q.   Special Agent Stebbins, turning to the first page of
13    152A, do you have that in front of you?
14    A.   Yes.
15    Q.   What's the date of that call?
16    A.   July 18, 2009.
17    Q.   What's the time of the call?
18    A.   Approximately 4:49 p.m.
19    Q.   Who are the participants in this call?
20    A.   Mike Darbinyan and Raymond Tarverdyan.
21    Q.   Now, turning to page 3 of the transcript four speakers
22    from the top, Darbinyan states:  My brother, I'm on the way.
23    There is terrible traffic, my friend.
24          On this date on July 18th, 2009, did you and other
25    officers conduct surveillance?
```

UNITED STATES DISTRICT COURT

```
 1    A.    Yes.

 2    Q.    During that surveillance was Defendant Darbinyan seen?

 3    A.    Yes.

 4          MR. ESTRADA:  And before I ask you about that

 5    surveillance in more detail, I want to play a couple more

 6    calls.

 7          Your Honor, with the Court's permission, I'd like

 8    to play Exhibit 153 and ask the jurors to turn to 153A in

 9    their books?

10          THE COURT:  Yes.

11          (Exhibit 153 played for the jury.)

12    BY MR. ESTRADA:

13    Q.    Special Agent Stebbins, turning to the first page of

14    Exhibit 153A, do you have that in front of you?

15    A.    Yes.

16    Q.    What's the date of the call?

17    A.    July 18, 2009.

18    Q.    What's the time of the call?

19    A.    Approximately 5:21 p.m.

20    Q.    Who are the participants in this call?

21    A.    Mike Darbinyan and Khachatur Arakelyan.

22    Q.    The reference in this call to the training, based on

23    your training and experience, what did training refer to in

24    the context of this call?

25          MR. SEVERO:  Speculation.
```

214

```
1              THE COURT:  Overruled.
2              THE WITNESS:  Training would be to go do some more
3    debit card fraud.
4              MR. ESTRADA:  Your Honor, the government requests
5    permission to play Exhibit 155 and ask the jurors turn to
6    Exhibit 155A in their books.
7              THE COURT:  Yes.
8              (Exhibit 155 played for the jury.)
9    BY MR. ESTRADA:
10   Q.   Now, Special Agent Stebbins, do you have that in front
11   of you?
12   A.   Yes.
13   Q.   What's the date of that call?
14   A.   July 18, 2009.
15   Q.   Time of this call?
16   A.   Approximately 5:26 p.m.
17   Q.   Turning to page 2 of the transcript, who were the
18   speakers in this call?
19   A.   Mike Darbinyan and Rafael Parsadanyan.
20   Q.   Now, turning to page 3, after Darbinyan asks at what
21   time do you close?  Darbinyan tells Tarverdyan last speaker
22   on page 3:  There are things that I need to give you and the
23   stuff like that.
24              On this date and following this call, did you and
25   other officers conduct surveillance?
```

215

```
 1    A.   Yes, we did.
 2    Q.   Where did you conduct surveillance?
 3    A.   At the cell phone store of Rafael Parsadanyan.
 4    Q.   Approximately what time did this surveillance begin?
 5    A.   I believe it was little after 7:00 p.m.
 6    Q.   Now, why did you go to the cell phone store of Rafael
 7    Parsadanyan?
 8    A.   Because Darbinyan said he was gonna go to the cell phone
 9    store of Rafael Parsadanyan.
10    Q.   Now, generally speaking, where is this cell phone store?
11    A.   It's in Glendale, California off of Colorado and
12    Glendale Boulevard.
13    Q.   Was this a difficult location to do undercover
14    surveillance?
15              MR. FLIER:  Objection to the word difficult.
16              THE COURT:  Sustained.
17    BY MR. ESTRADA:
18    Q.   Had you conducted surveillance in this case?
19    A.   Yes.
20    Q.   Were there places that were easier to do surveillance
21    and places that were more difficult?
22    A.   Yes.
23    Q.   Was this a more difficult place to do surveillance?
24              MR. FLIER:  Same objection.
25              THE COURT:  Sustained.
```

216

```
1    BY MR. ESTRADA:

2    Q.   Was there a challenge to doing surveillance here?

3              MR. FLIER:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes, there was a challenge.

6    BY MR. ESTRADA:

7    Q.   What?

8    A.   There was limited parking in front and the businesses

9    were primarily Armenian-owned so we couldn't just pull into

10   their parking lot and feel comfortable sitting there watching

11   across the street.

12   Q.   Now, during your time doing surveillance in this case,

13   had you had experiences where targets actually looked inside

14   cars?

15   A.   Yes.

16   Q.   For officers such as yourself?

17   A.   Yes.

18             MR. SEVERO:  Objection.  It's irrelevant as to this

19   case.

20             THE COURT:  Well . . .

21             MR. FLIER:  Calls for speculation, too, Your Honor.

22             MR. SEVERO:  I didn't know if you had heard me.

23             THE COURT:  I did hear you, counsel.  It's really

24   repetitive because we've talked many times about this in the

25   past so I'm going to sustain the objection not on any of the
```

```
1   grounds that were raised, but it is repetitive.
2            MR. ESTRADA:  Very good, Your Honor.
3   Q.   On this date because of the challenging nature of the
4   surveillance, what did you do?
5   A.   I walked across the street, left my car, and I climbed
6   up on the roof a building across the street from cell phone
7   store.
8   Q.   How did you get up on the roof there?
9   A.   I used a fire escape to get up on top of the roof.
10  Q.   Now, once you were up on the roof, did you have any
11  instruments there to help you do the surveillance?
12  A.   Yes.  I carried a backpack with my radio and my
13  binoculars on to the roof.
14  Q.   You said this was approximately 7 o'clock?
15  A.   It was a little after 7:00, yeah.
16  Q.   Was there still daylight?
17  A.   Yes.
18  Q.   This was in July of 2009?
19  A.   That's correct.
20  Q.   While you were there on the roof doing surveillance, did
21  you see anyone approach the cell phone store?
22  A.   I saw Mr. Darbinyan come out of the cell phone store and
23  get into a Dodge Charger.
24  Q.   Now, by this point in the investigation July of 2009,
25  were you familiar with what Darbinyan looked like?
```

```
1    A.   Yes, very familiar.
2    Q.   And this Dodge Charger, had you seen Darbinyan in this
3    Dodge Charger previously?
4    A.   No.
5    Q.   Did you look up his information to see if it was
6    registered to him?
7    A.   Yes.  It was a rental car.
8              MR. SEVERO:  Objection.  Hearsay.
9              THE COURT:  It's stricken.
10   BY MR. ESTRADA:
11   Q.   Did you find whether it was registered to him?
12   A.   Yes.
13   Q.   Was it registered to him?
14   A.   No.
15             MR. SEVERO:  Objection, Your Honor.  It's hearsay.
16             THE COURT:  Sustained.
17   BY MR. ESTRADA:
18   Q.   You saw him get into a Dodge Charger?
19   A.   Yes, I did.
20   Q.   Now, was this Dodge Charger parked near the store?
21   A.   Yes.
22   Q.   Where was it parked?
23   A.   It was parked directly in front of the store.
24   Q.   Approximately what time did you see Darbinyan getting
25   into this Dodge Charger?
```

219

```
1    A.    I believe it was around 7:45 p.m.

2    Q.    When you saw Darbinyan get into this Dodge Charger, did

3    you see anyone approach that Dodge Charger?

4    A.    Yes.

5    Q.    Who did you see approach the Dodge Charger?

6    A.    Rafael Parsadanyan.

7    Q.    Anyone else?

8    A.    A gentleman named Arman Muradyan.

9    Q.    How did you identify that individual?

10   A.    He has really bright white hair and he was later stopped

11   with Rafael Parsadanyan.

12   Q.    What did you see next?

13   A.    Darbinyan left the cell phone store and based on the

14   calls, we allowed him to drive away, and we followed Rafael

15   Parsadanyan when he left the store several minutes later.

16   Q.    Okay.  Now, you said you let Darbinyan drive away.  Does

17   that mean no one followed Darbinyan?

18   A.    That's correct.

19   Q.    Did officers follow Parsadanyan?

20   A.    Yes, we did.

21   Q.    You said he left the store.  Did he leave walking?

22   A.    No.  He left the store in the BMW 6 series coupe.

23              MR. SEVERO:  Objection.  Compound.  Vague.

24              THE COURT:  I assume you're referring to

25   Mr. Parsadanyan?
```

220

```
 1              THE WITNESS:  Yes, sir.
 2   BY MR. ESTRADA:
 3   Q.   Anyone else get in that car with Parsadanyan?
 4   A.   Yes, Arman Muradyan.
 5   Q.   Was Parsadanyan followed as he left the cell phone store
 6   in his BMW 6 series?
 7   A.   Yes, he was.
 8   Q.   Did you and other officers ask Glendale police officers
 9   to stop that car?
10   A.   Yes, we did.
11   Q.   Did you later learn that money was found in the car?
12              MR. FLIER:  Objection, Your Honor.
13              THE COURT:  Sustained.  Hearsay.
14   BY MR. ESTRADA:
15   Q.   Other officers will testify about the stop, but did you
16   later learn that the car was stopped?
17   A.   Yes.
18              MR. ESTRADA:  Now, Your Honor, with the Court's
19   permission, I would ask if we could play Exhibit 156 and ask
20   the jurors to turn to Exhibit 156A in their books?
21              THE COURT:  156?
22              MR. ESTRADA:  Yes.
23              THE COURT:  Yes.
24          (Exhibit 156 was played for the jury.)
25   BY MR. ESTRADA:
```

```
1    Q.   Special Agent Stebbins, turning to the first page of

2    156A, do you have that in front of you?

3    A.   Yes.

4    Q.   What's the date of that call?

5    A.   July 18, 2009.

6    Q.   Time of the call?

7    A.   Approximately 7:38 p.m.

8    Q.   Who are the speakers?

9    A.   Mike Darbinyan and Raymond Tarverdyan.

10   Q.   Turning to page 2 of the transcript, do you have that in

11   front of you?

12   A.   Yes.

13   Q.   Six speakers from the bottom Tarverdyan states:

14             Then come, bro to our house we are doing a

15   barbecue.

16             Darbinyan:  Yeah.  Here I just need to stop by

17   Rafo's place.  How should I do those?  I'll have Rafo so he

18   drives so I don't take it on me.

19             Tarverdyan:  Yeah, yeah.

20             You mentioned there was a surveillance the same

21   date on July 18th?

22   A.   Yes.

23   Q.   Why is it that you ordered and directed Glendale police

24   officers to stop Rafael Parsadanyan?

25   A.   Because Darbinyan said that Rafael Parsadanyan would
```

222

```
1    have the contraband on him.
2              MR. FLIER:  Objection.  Misstates the evidence,
3    Your Honor.
4              MR. SEVERO:  And it's --
5              THE COURT:  Overruled.
6              MR. ESTRADA:  Your Honor, the government requests
7    permission to play Exhibit 157 and ask the jurors turn to
8    157A in their books.
9              THE COURT:  157?
10             MR. ESTRADA:  Yes.
11             (Exhibit 157 was played for the jurors.)
12   BY MR. ESTRADA:
13   Q.   Now, Special Agent Stebbins, turning to the first page
14   of that transcript, do you have it in front of you?
15   A.   Yes.
16   Q.   What's the date of this call?
17   A.   July 18, 2009.
18   Q.   Time of the call?
19   A.   Approximately 8:15 p.m.
20   Q.   Turning to page 2, who are the participants in this
21   call?
22   A.   Mike Darbinyan and Raymond Tarverdyan.
23   Q.   Now, four speakers from the top Darbinyan tells Raymond
24   Tarverdyan:  The thing my friend is coming now and he is
25   bringing those things.
```

223

```
1              Based on your knowledge of the investigation, did
2      you form an opinion as to what those things referred to?
3      A.   Yes.
4      Q.   What is that?
5      A.   It was the money that Parsadanyan was carrying.
6              MR. SEVERO:  Objection.
7              THE COURT:  Overruled.
8      BY MR. ESTRADA:
9      Q.   Can you please repeat that?
10     A.   It was the money that Parsadanyan was carrying.
11             MR. FLIER:  I'm going to object.  He just said it
12     was cards a minute ago.  Submitted.  Argumentative.
13             THE COURT:  Overruled.
14             MR. SEVERO:  It's argumentative.
15             THE COURT:  Overruled.
16             MR. ESTRADA:  Your Honor, the government requests
17     permission to turn to Exhibit 158 and ask the jurors to turn
18     to Exhibit 158A in their books.
19             THE COURT:  Yes.
20             (Exhibit 158 played for the jury.)
21     BY MR. ESTRADA:
22     Q.   Special Agent Stebbins, turning to the first page of the
23     transcript in 158A, do you have that in front of you?
24     A.   Yes.
25     Q.   What's the date of this call?
```

224

```
 1    A.    July 18, 2009.

 2    Q.    It's the same date as the previous call with Tarverdyan?

 3    A.    Yes, sir.

 4    Q.    What's the time of the call?

 5    A.    Approximately 8:45 p.m.

 6    Q.    Turning to page 2, who are the participants in the call?

 7    A.    Mike Darbinyan and Raymond Tarverdyan.

 8    Q.    Turning to page 3 of the transcript, second speaker from

 9    the top Tarverdyan says:  Brother, this guy is not here.

10              Darbinyan:  Who?

11              Tarverdyan:  He said he would be here in

12    15 minutes, brother.  Half an hour has passed and he is still

13    not here.

14              Darbinyan:  No, he will come.  He was supposed to

15    come from Glendale, brother.

16              Tarverdyan:  Huh, I thought --

17              Darbinyan:  He was at the store.  Probably

18    somebody, probably someone came into the store that is why,

19    bro.

20              On the surveillance on July 18th, did you see

21    Glendale police officers stopping Parsadanyan?

22    A.    I did not personally.

23    Q.    Were you aware of what time he was stopped?

24              MR. SEVERO:  Objection.  That's hearsay.

25              THE COURT:  Sustained.
```

225

```
1              MR. ESTRADA:  Your Honor, I'll skip 159 and ask the
2   Court for permission to play Exhibit 160 and have the jurors
3   turn to 160A in their books.
4              THE COURT:  Yes.
5              (Exhibit 160 played for the jury.)
6   BY MR. ESTRADA:
7   Q.   Now, Special Agent Stebbins, turning to the first page
8   of 160A, do you have that in front of you?
9   A.   Yes, I do.
10  Q.   What is the date of this call?
11  A.   July 18, 2009.
12  Q.   Time of the call?
13  A.   Approximately 10:21 p.m.
14  Q.   Who is are the participants in the call?
15  A.   Mike Darbinyan and Raymond Tarverdyan.
16  Q.   Turning to page two of two of the transcript, five
17  speakers from the top Tarverdyan says:  He came, bro.  He
18  came.  He came.  It's a touchdown.
19             Darbinyan:  Oh, did he just come, bro?
20             Tarverdyan:  Yeah, yeah.
21             Darbinyan:  Overlapping voices.
22             Tarverdyan:  They had stopped him, but it's all
23  okay here.  There are two.  One for you.
24             When did you -- approximately what time did you see
25  Parsadanyan leave the cell phone store on that same date on
```

1    July 18th, 2009?

2    A.   It was a little after 8:00 p.m.

3    Q.   And approximately what time was it that officers with

4    Glendale Police Department were directed to stop Parsadanyan?

5              MR. FLIER:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  I would have directed the stop to

8    come within five minutes of leaving the store.

9              MR. ESTRADA:  Your Honor, the government requests

10   permission to play Exhibit 161 and ask the jurors turn to

11   161A in their books.

12             THE COURT:  Okay.

13             (Exhibit 161 played for the jury.)

14   BY MR. ESTRADA:

15   Q.   Special Agent Stebbins, turning to the first page of

16   161A, do you have that in front of you?

17   A.   Yes.

18   Q.   What's the date of this call?

19   A.   July 19, 2009.

20   Q.   This is the day after your surveillance of July 18th?

21   A.   That's correct.

22   Q.   The time of this call?

23   A.   Approximately 2:31 p.m.

24   Q.   Turning to page 2, who are the participants in the call?

25   A.   Mike Darbinyan and Rafael Parsadanyan.

1  Q.    Turning to page 3, three speakers from the bottom

2  Darbinyan states:  Will you call Khecho to come over?

3            Parsadanyan:  Okay, okay.

4            Based on your knowledge of the investigation, who

5  is this Khecho?

6            MR. SEVERO:  Objection.  Asked and answered several

7  times.

8            THE COURT:  It has been asked and hopefully this

9  will be the last.

10            THE WITNESS:  Khachatur Arakelyan.

11  BY MR. ESTRADA:

12  Q.    Are you familiar with any other Khecho during this

13  portion of the investigation?

14  A.    No, sir.

15            MR. ESTRADA:  Your Honor, the government requests

16  permission to play Exhibit 162 and ask the jurors turn to

17  Exhibit 162A in their books.

18            THE COURT:  Okay.

19            (Exhibit 162 played for the jury.)

20  BY MR. ESTRADA:

21  Q.    Now, Special Agent Stebbins, turning to the first page

22  of the transcript at 162A, do you have that in front of you?

23  A.    Yes, I do.

24  Q.    What's the date of this call?

25  A.    July 19, 2009.

```
1   Q.   The time of this call?

2   A.   Approximately 8:50 p.m.

3   Q.   Who is are the participants in this call?

4   A.   Mike Darbinyan and Khachatur Arakelyan.

5   Q.   And nine speakers from the bottom on page 2, do you have

6   that in front of you?

7   A.   Yes, I do.

8   Q.   Darbinyan says, Bro, I have tons of things to do, dear.

9   I just want to put it in place so tomorrow again.  Do you get

10  it, my brother?

11         Arakelyan:  Yeah, um, Rafo and the guys were

12  waiting for you to let them know.

13         Based on your knowledge of the investigation was

14  there surveillance footage from the next day July 20th

15  regarding this particular 99 Cent Only Store scheme?

16  A.   Yes, there was.

17  Q.   Footage of who?

18  A.   Raymond Tarverdyan.

19  Q.   Where?

20  A.   At the Limonite store in Riverside, California.

21         MR. SEVERO:  Your Honor, the best evidence is the

22  tape, the video.  This is improper testimony.  Move to

23  strike.

24         THE COURT:  Sustained.

25         MR. ESTRADA:  Your Honor, with the Court's
```

```
 1    permission, I'd like to move on to July 20th, 2009.  That
 2    will be Exhibit 163 and ask the jurors to turn to 163A.
 3              THE COURT:  163.
 4                   (Exhibit 163 played for the jury.)
 5    BY MR. ESTRADA:
 6    Q.   Now, Special Agent Stebbins, turning to the first page
 7    of the transcript here 163A, do you have that in front of
 8    you?
 9    A.   Yes.
10    Q.   What's the date of this call?
11    A.   July 20, 2009.
12    Q.   Time of the call?
13    A.   Approximately 9:53 a.m.
14    Q.   Who are the participants?
15    A.   Mike Darbinyan and Raymond Tarverdyan.
16    Q.   Now, at page 2 of the transcript, four speakers from the
17    bottom, Tarverdyan states:  We need the range.
18              Based on this call, did you and other officers
19    conduct surveillance this day?
20    A.   Yes, we did.
21    Q.   Where did you conduct surveillance?
22    A.   At the home of Raymond Tarverdyan.
23    Q.   Where was that?
24    A.   I believe it's considered Woodland Hills.  Not Woodland
25    Hills.  I'm sorry.  North Hills area.
```

230

```
 1    Q.    In the Los Angeles County area?

 2    A.    Yes.

 3    Q.    Why did you go there?

 4    A.    We wanted to see what type of vehicle was being driven

 5    and also to see what kind of activity was going on.

 6    Q.    And could you describe the general layout of the area of

 7    Tarverdyan's home?

 8    A.    Yes.  The house is on kind of a hill down a long

 9    straightaway on Woodley Avenue.  Very wide streets and very

10    suburban.

11    Q.    Is there a lot of traffic on the street?

12    A.    No.

13    Q.    Approximately what time did the surveillance begin?

14    A.    Probably around noon.

15    Q.    Were you with anyone else on this date doing

16    surveillance?

17    A.    Yes.

18    Q.    Who?

19    A.    Detective Gonzalez.

20    Q.    Were you and Detective Gonzalez together at this time?

21    A.    Yes, we were.

22          THE COURT:  Ladies and gentlemen, we're gonna pick

23    up on the surveillance tomorrow morning.  Remember the

24    admonition not to discuss the case among yourselves or with

25    anyone else.  Again, have a pleasant evening.  We'll see you
```

1    back at 8:15 tomorrow morning.

2           (Proceedings were concluded at 4:00 p.m.)

3

4                        CERTIFICATE OF REPORTER

5

6    COUNTY OF LOS ANGELES      )

7                              )  SS.

8    STATE OF CALIFORNIA        )

9

10   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

11   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

12   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

13   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

14   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

15   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

16   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

17   OF MY STENOGRAPHIC NOTES.

18

19

20   DATE:  MARCH 16, 2015

21

22       /s/  LAURA MILLER ELIAS

23   LAURA MILLER ELIAS, CSR 10019

24   FEDERAL OFFICIAL COURT REPORTER

25

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6   UNITED STATES OF AMERICA,      )
                                   )
7                  Plaintiff,      )
                                   )
8        vs.                       )   NO:  CR-11-0072(A)-RGK
                                   )
9   (1)  MHER DARBINYAN,           )
    (4)  ARMAN SHAROPETROSIAN,     )
10  (35) RAFAEL PARSADANYAN,       )
                                   )
11                 Defendants.     )
    _____)

12

13

14           REPORTER'S TRANSCRIPT OF JURY TRIAL

15       DAY 9; VOLUME I OF II; PAGES 1 THROUGH 116

16                   MORNING SESSION

17               Los Angeles, California

18               Friday, April 4, 2014

19

20

21

22

23                      KATHERINE M. STRIDE, RPR, CSR
                        1107 Fair Oaks Avenue, #68
24                      S. Pasadena, California  91030
                        www.stridecourtreporting.com
25                      (323)474-6420

**APPEARANCES:**

On behalf of the Government:

        UNITED STATES ATTORNEY'S OFFICE
        ANDRÉ BIROTTE, JR., UNITED STATES ATTORNEY
        BY:  E. MARTIN ESTRADA
             ELIZABETH R. YANG
        ASSISTANT UNITED STATES ATTORNEYS
        312 North Spring Street
        Los Angeles, California  90012
        (213)894-4477

        U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY
        312 North Spring Street
        Los Angeles, California  90012
        (213)894-2579

On behalf of Defendant Mher Darbinyan:

        THE SEVERO LAW FIRM
        BY:  MICHAEL SEVERO, ATTORNEY AT LAW
        70 South Lake Avenue, Suite 945
        Pasadena, California  91101
        (626)844-6400

On behalf of Defendant Arman Sharopetrosian:

        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
        BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
        800 Wilshire Boulevard, 12th Floor
        Los Angeles, California  90012
        (213)623-5923

On behalf of Defendant Rafael Parsadanyan:

        FLIER AND FLIER, ALC
        BY: ANDREW REED FLIER, ATTORNEY AT LAW
        15250 Ventura Boulevard, Suite 600
        Sherman Oaks, California  91403
        (818)990-9500

Also Present:

        JEREMY STEBBINS, F.B.I. SPECIAL AGENT

# **I N D E X**

GOVERNMENT'S WITNESSES

JURY TRIAL – DAY 9, VOLUME I OF II

                                                                    **Page**

**JEREMY STEBBINS, PREVIOUSLY SWORN**.....................  5
   DIRECT EXAMINATION CONTINUED
   BY MR. ESTRADA....................................  6
   CROSS EXAMINATION
   BY MR. SEVERO..................................... 70

# E X H I B I T S

## GOVERNMENT'S EXHIBITS

### JURY TRIAL – DAY 9, VOLUME I OF II

**Page**

Exhibit 335 received in evidence...................... 62

Exhibit 396 received in evidence...................... 64

Exhibit 397 received in evidence...................... 64

Exhibit 398 received in evidence...................... 64

Exhibit 399 received in evidence...................... 64

Exhibit 400 received in evidence...................... 64

Exhibit 401 received in evidence...................... 64

Exhibit 402 received in evidence...................... 64

Exhibit 403 received in evidence...................... 64

Exhibit 404 received in evidence...................... 64

Exhibit 405 received in evidence...................... 64

```
 1          LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 4, 2014

 2                          MORNING SESSION

 3                             8:30 a.m.

 4                             --oOo--

 5          THE CLERK:  All rise.

 6                  (Jurors enter courtroom.)

 7          THE CLERK:  You may be seated.

 8          All rise and face the flag.

 9                  (Judge enters courtroom.)

10          THE CLERK:  You may be seated.

11          THE COURT:  Okay.  The record will reflect that the

12     members of the jury are in their respective seats in the

13     jury box, including the alternates.  You're all here on

14     time today.  Nobody had to come through the sheriff's

15     screening area?

16          Okay.  If you haven't noticed, it's "Opening Day"

17     today, and it is packed.  Good look getting home tonight

18     because the game will just be ending.

19          Okay.  Ready for another day?  Okay.

20          Counsel, the witness is on the witness stand.  You

21     may inquire.

22          MR. ESTRADA:  Thank you, Your Honor.

23                        JEREMY STEBBINS,

24     GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, TESTIFIED FURTHER:

25     ///
```

**DIRECT EXAMINATION (Continued)**

1

2     BY MR. ESTRADA:

3     Q.     Special Agent Stebbins, yesterday the last call we are

4     played was from July 20, 2009, a call between Darbinyan and

5     Raymond Tarverdyan, discussing picking up a Range.

6     A.     Yes.

7     Q.     And we talked about, based on that call, did you and

8     other officers go to do surveillance?

9     A.     Yes, we did.

10    Q.     Now, was this a formal surveillance with many

11    officers involved?

12    A.     No.

13    Q.     Explain the circumstances.

14    A.     It was more just a drive-by, which we do on

15    occasion, just to take down license plates and get a

16    description of the house and just kind of get familiar with

17    the area.

18    Q.     I think yesterday you testified it was sometime in

19    the afternoon you did this?

20    A.     Yes.

21    Q.     What area was it in?

22    A.     North Hills, Granada Hills area.

23    Q.     Whose home were you going to?

24    A.     Raymond Tarverdyan.

25    Q.     Okay.  And at some point, did you park your vehicle?

1    A.    Yes, I did.

2    Q.    Where did you park your vehicle?

3    A.    Approximately 100 to 150 yards north of 11852

4    Woodley.

5    Q.    118- -- excuse me?

6    A.    -- 52 Woodley.  That was his home address.

7    Q.    11852 was his home address?

8    A.    Yes.

9    Q.    For Raymond Tarverdyan?

10   A.    Yes.

11   Q.    When you parked your car, at some point did you see

12   defendant Darbinyan drive by?

13   A.    Yes.

14   Q.    What was he driving?

15   A.    He was driving a Honda Pilot that was known to

16   belong to another --

17         MR. SEVERO:  Objection, move to strike.

18         THE COURT:  Sustained.

19         Well, he asked the question.  He was driving a Honda

20   Pilot.

21   BY MR. ESTRADA:

22   Q.    He was driving a Honda Pilot.

23         Had you seen that Honda Pilot before?

24   A.    Yes.

25   Q.    Who was driving that Honda Pilot?

1    A.    Armen Hovanissian.

2    Q.    Now, did you see defendant Darbinyan, as he drove

3    that Honda Pilot, doing anything unusual?

4    A.    Yes.  He slowed down and stopped.  He didn't quite

5    stop, but he slowed down very slow next to my car and

6    looked inside my car.

7    Q.    Did that concern you?

8    A.    Yes.

9    Q.    Why is that?

10   A.    We had known --

11         MR. SEVERO:  Objection.

12         THE COURT:  I'm sorry?

13         MR. SEVERO:  Irrelevant.

14         THE COURT:  Sustained.

15   BY MR. ESTRADA:

16   Q.    Based on your experience at this point and your

17   knowledge of the investigation, did this appear to be

18   consistent with the counter-surveillance of defendant

19   Darbinyan?

20   A.    Yes.

21   Q.    In what way?

22   A.    He would slow down and look inside cars looking for

23   law enforcement sitting in their cars.

24   Q.    And what did you do when defendant Darbinyan drove

25   by?

1    A.    I was -- already laid down in my front seat, all the

2    way back, and I basically froze in position for that

3    moment.

4    Q.    Now, later, did anyone else come by your vehicle?

5    A.    Yes.

6    Q.    What happened?

7    A.    We intercepted phone calls that indicated that he

8    was sending people to check me out, and I climbed into the

9    back seat and tried to lay down behind a clothes hanger in

10   the window.

11        MR. SEVERO:  I'm going to move to strike that

12   testimony.  It's based on speculation of the witness and

13   hearsay.

14        THE COURT:  Overruled.

15   BY MR. ESTRADA:

16   Q.    And what happened?

17   A.    The individual came up in another Range Rover, and

18   he came to my car and put his face against the glass and

19   started talking on the phone with defendant Darbinyan.

20   Q.    Who was that other individual?

21   A.    It was Arman Tarverdyan.

22   Q.    Arman Tarverdyan?

23   A.    Raymond Tarverdyan's brother.

24        MR. ESTRADA:  With the Court's permission, the

25   government would ask to play Exhibit 164 and ask the jurors

1    to turn to 164A in their book.

2                    (Exhibit 164 played.)

3    BY MR. ESTRADA:

4    Q.    Special Agent Stebbins, looking at the first page of

5    this transcript, what's the date of the call?

6    A.    July 29, 2009.

7    Q.    And the time of the call?

8    A.    Approximately 1:52 p.m.

9    Q.    Who are the speakers in this call?

10   A.    Mike Darbinyan and Raymond Tarverdyan.

11   Q.    Around the date and time, was this around the time

12   you were doing surveillance outside Raymond Tarverdyan's

13   house?

14   A.    Yes.

15   Q.    Turning to page 2 of the transcript, do you have

16   that in front of you?

17   A.    Yes.

18   Q.    Two speakers from the top, Darbinyan states (as

19   read:)

20                    "...why don't you send the young guys to take

21                    a look at it.  There is a small, blue 4-door

22                    Chevy parked there.  The last numbers are

23                    69.  The seat was leaned back.  Pass by

24                    there or send someone there to take a look

25                    at it and see if there is a white boy with

1                    glasses lying down or seated.  If it is a

2                    white boy, that means...anyway."

3          On this day when you were doing surveillance, were

4      you driving a Chevy?

5    A.     Yes, I was.

6    Q.     Were you wearing glasses?

7    A.     Sunglasses, yes, sir.

8    Q.     Now, soon after this date, on July 20, 2009, did you

9    find that Darbinyan dropped his cell phone?

10   A.     Yes, he did.

11   Q.     And when you say "dropped," what are you referring

12   to?

13   A.     He stopped making outgoing calls using that same

14   phone that we were intercepting.

15   Q.     Was this after the following day?

16   A.     Yes.

17   Q.     Now, this same date on July 20th of 2009, did you

18   learn of video at one of the 99 Cents Only stores involving

19   the swapping of point-of-sale terminals?

20   A.     Yes.

21          MR. ESTRADA:  Your Honor, the government requests

22   permission to play Exhibit 347B.

23          THE COURT:  I'm sorry.  3- --

24          MR. ESTRADA:  -- -47B.

25          THE COURT:  Is that Volume 5?

```
 1          MR. ESTRADA:  It's a video, Your Honor.  It's
 2     already been admitted.
 3          THE WITNESS:  You are talking about Volume 5, right?
 4          MR. ESTRADA:  Yes, but there won't be anything in
 5     the binder.
 6          THE COURT:  Okay.  You may play it.
 7     BY MR. ESTRADA:
 8     Q.    Before we start the video, Special Agent Stebbins,
 9     there's a date here at the top.  It's a little small, but
10     do you see the date there?
11     A.    Yes, July 20, 2009.
12     Q.    And the store -- it's a little difficult to see, but
13     can you recognize what store that is?
14     A.    Yes.  It's Store 285, Limonite, in Riverside.
15     Q.    And where would the activity be in this video?
16     A.    This person here is Raymond Tarverdyan, and he will
17     basically walk back to the cash register, here, and inspect
18     the pin pad, which has already been replaced by the store
19     (indicating).
20          MR. SEVERO:  I'll move to strike the witness's
21     testimony as his own speculation, and the video speaks for
22     itself.
23          THE COURT:  Why don't you try not responsive to the
24     question?
25          MR. SEVERO:  All right.  Nonresponsive.
```

1          THE COURT:  Yeah.  The question was what area would

2     that activity be taking place in.

3          THE WITNESS:  Along this area, and then right here

4     (indicating).

5          THE COURT:  Thank you very much.

6          Next question.

7          MR. ESTRADA:  Okay.  We can play the video now.

8          MR. SEVERO:  I'm sorry.  Is the previous answer

9     stricken?

10         THE COURT:  Yes.

11         MR. SEVERO:  Okay.

12              (Exhibit 347B is played.)

13    BY MR. ESTRADA:

14    Q.    Now, Special Agent Stebbins, in this video, did you

15    see the point-of-sale terminal being swapped out?

16    A.    No.

17    Q.    Did you understand, based on your investigation,

18    that the corrupted terminal had already been removed by

19    employees?

20    A.    Yes.

21         MR. ESTRADA:  Your Honor, the government asks

22    permission to play Exhibit 165 and asks the jurors to turn

23    to 165A in their books.

24              (Exhibit 165 played.)

25    ///

1    BY MR. ESTRADA:

2    Q.    Now, Special Agent Stebbins, turning to the first

3    page of the transcript, do you have that in front of you?

4    A.    Yes, I do.

5    Q.    What's the date of this call?

6    A.    July 21, 2009.

7    Q.    Is this the day after the video we just saw where

8    Tarverdyan was seen in the 99 Cents Only Store?

9    A.    Yes.

10   Q.    What is the time of this call?

11   A.    Approximately 3:41 p.m.

12   Q.    And who was the participant in this call?

13   A.    Raymond Tarverdyan.

14   Q.    Now, was there some sort of terminal glitch in this

15   particular call?

16         MR. SEVERO:  Objection, calls for speculation, no

17   foundation.

18         THE COURT:  Overruled.

19         THE WITNESS:  Yes.

20   BY MR. ESTRADA:

21   Q.    What was the terminal glitch?

22   A.    Once in a while there will be a call intercepted

23   where only one side of the conversation can be heard.  It

24   doesn't happen very often, but this is what it ends up

25   sounding like.

1    Q.    Now, whose voice can be heard in this call?

2    A.    Raymond Tarverdyan.

3    Q.    Now, looking at the first page of the transcript,

4    Exhibit 165A, what is the target number for this call?

5    A.    The target number is (310)779-1177.

6    Q.    And based on your investigation, whose telephone

7    number is that?

8    A.    Mike Darbinyan.

9    Q.    And the previous calls that we heard, was that

10   defendant Darbinyan's phone number?

11   A.    Yes.

12   Q.    Now, turning to page 2 of the transcript, do you

13   have that in front of you?

14   A.    Yes.

15   Q.    And towards the bottom, after a pause, Tarverdyan

16   states (as read:)

17              "I don't get it either, bro.  I mean we are

18               going to lose this.  If we lose it, it won't

19               be good, bro.  They have realized that

20               somewhere.  Anyway. [Pause].  They have

21               realized it at some place."

22          Going on to page 3, after a pause (as read:)

23              "From those people...I mean at the place of

24               our workout it seems like someone has

25               realized that I am making some good

001773

1          movements.  Do you get it?  Over there, at

2          their place."

3       Now, on this date, on July 21, 2009, were you aware

4   that 99 Cents Only Stores had begun discovering the fraud

5   against their stores?

6          MR. SEVERO:  Objection, hearsay.

7          THE COURT:  Overruled.

8          THE WITNESS:  Yes.

9   BY MR. ESTRADA:

10  Q.    And you mentioned that defendant Darbinyan dropped

11  his cell phone?

12  A.    Yes.

13  Q.    When did that occur?

14  A.    Approximately July 21, 2009.

15  Q.    Did it take some time to discover the new telephone

16  defendant Darbinyan was using?

17  A.    Yes, it did.

18  Q.    In the meantime, did the investigation continue in

19  terms of the fraud against the 99 Cents Only Stores?

20  A.    Yes, it did.

21         MR. ESTRADA:  Your Honor, with the Court's

22  permission, the government would ask to play a segment of

23  Exhibit 348, and that would be 348A, which has been

24  admitted.

25         THE COURT:  Yes.

```
 1                    (Exhibit 348A played.)

 2   BY MR. ESTRADA:

 3   Q.      Okay.  Now, looking at this particular video, at

 4   348A, where does the activity take place?

 5   A.      Well, we put two videos side by side.  So there will

 6   be activity here and then activity here (indicating).

 7   Q.      Now, during the investigation, you previously

 8   testified about Raymond Tarverdyan and Simon Antonyan going

 9   into 99 Cents Only Stores to switch terminals.

10            MR. SEVERO:  Leading.

11            THE COURT:  Overruled.

12            THE WITNESS:  Yes.

13   BY MR. ESTRADA:

14   Q.      Now, did you identify other individuals who began

15   doing the same thing?

16   A.      Yes, we did.

17   Q.      Who were these other individuals?

18   A.      Andranik Bakhchadjian and Vartenie Ananian.

19   Q.      Were they subsequently arrested in the process of

20   doing this?

21   A.      Yes, they were.

22   Q.      But at this time on July 22nd, who are the

23   individuals that can be seen in this video where the

24   activity you identified is happening?

25   A.      The gentleman on the left is Andranik Bakhchadjian,
```

1    and the woman on the right, in the right video, will be

2    Vartenie Ananian.

3    Q.    Are you familiar with those individuals?

4    A.    Yes, I am.

5    Q.    You have seen them before?

6    A.    Yes, I have.

7    Q.    Are they defendants in this case?

8    A.    Yes, they are.

9          MR. ESTRADA:  Your Honor, the government would ask

10   to play the video at 348A.

11                    (Exhibit 348A played.)

12         MR. ESTRADA:  Now, if we could pause the video

13   there.

14   BY MR. ESTRADA:

15   Q.    Do you see on the right side it appears that

16   Vartenie Ananian has fallen?

17   A.    Yes.  Vartenie Ananian slipped and fell.

18   Q.    Based on your knowledge of the investigation, did

19   you understand that there were distraction tactics used by

20   the defendants in order to switch out the terminals?

21   A.    Yes.

22         MR. ESTRADA:  Could we continue the video.

23                    (Exhibit 348A played.)

24   BY MR. ESTRADA:

25   Q.    Now, on this date on July 22, 2009 in the video, did

1    you see the terminal being switched out?

2    A.    No.

3    Q.    Based on your knowledge of the investigation, did

4    you understand that terminal had already been switched out

5    by store employees?

6          MR. SEVERO:  Objection, Your Honor.  This is

7    hearsay.

8          THE COURT:  Sustained.

9    BY MR. ESTRADA:

10   Q.    Did you have knowledge of the investigation?

11   A.    Yes, I did.

12   Q.    Communication with people at the store?

13   A.    Yes.

14   Q.    Did you actually receive point-of-sale terminals

15   from people in the store?

16   A.    Yes.

17   Q.    Did you understand that, at this point on July 22nd,

18   at the Limonite store, the terminals had already been

19   switched out?

20         MR. SEVERO:  That's hearsay.

21         THE COURT:  Sustained.

22   BY MR. ESTRADA:

23   Q.    Did it appear in the video that Bakhchadjian

24   inspected the point-of-sale terminal?

25         MR. SEVERO:  Objection, speculation.

```
 1            THE COURT:  You're going to have to repeat the

 2    question.  I didn't hear it.

 3    BY MR. ESTRADA:

 4    Q.    Did it appear in the video that Bakhchadjian

 5    inspected the point-of-sale terminal?

 6            MR. SEVERO:  That is speculation.

 7            THE COURT:  Overruled.  Overruled.

 8            THE WITNESS:  Yes, he did.

 9    BY MR. ESTRADA:

10    Q.    In addition to the videos that we've seen in the

11    Riverside area and the Whittier area, did you receive

12    videos involving this particular scheme in other areas of

13    Southern California?

14    A.    Yes, we did.

15    Q.    Did you receive videos from the Ventura County area?

16    A.    Yes.

17            MR. ESTRADA:  Your Honor, the government requests

18    permission to play Exhibit 350A, which has been admitted.

19            THE COURT:  Yes.

20    BY MR. ESTRADA:

21    Q.    Before we play that, unfortunately, again, it's very

22    small, but can you see a date there at the top?

23            MR. SEVERO:  Objection, leading.

24            THE COURT:  Overruled.

25            THE WITNESS:  Yes.  It's August 8, 2009.
```

```
 1   BY MR. ESTRADA:

 2   Q.      Are you familiar with what store that was at?

 3   A.      It's either 213 or 113.

 4           MR. SEVERO:  Move to strike, speculation.

 5           THE COURT:  Overruled.

 6   BY MR. ESTRADA:

 7   Q.      And what stores are those?

 8   A.      Camarillo and Ventura.

 9   Q.      Now, where in this video will the activity be taking

10   place?

11   A.      It will be right in this area (indicating).

12   Q.      Those individuals there covered with the hat, based

13   on other portions of the video, can you recognize who those

14   individuals were?

15   A.      Yes.  This individual here is Andranik Bakhchadjian,

16   and this individual here is Vartenie Ananian.

17           MR. ESTRADA:  Okay.  If we could play the video now.

18   BY MR. ESTRADA:

19   Q.      Before we do that, actually, is there also a third

20   individual involved in this particular swapping?

21   A.      Yes, this person (indicating).

22   Q.      Was that person ever identified?

23   A.      No, he was not.

24           MR. ESTRADA:  Now, if we could play the video.

25                       (Exhibit 350A played.)
```

1   BY MR. ESTRADA:

2   Q.    Now, Special Agent Stebbins, in the video did you

3   see a large roasting pan being used in that video?

4   A.    Yes.

5   Q.    Based on your knowledge of the investigation, was

6   that a common tactic used to shield the point-of-sale

7   terminal?

8   A.    Yes.

9         MR. ESTRADA:  If we could forward it to 11 seconds.

10  BY MR. ESTRADA:

11  Q.    Now, at that point, this individual here --

12        Who is that person?

13  A.    Andranik Bakhchadjian.

14  Q.    Do see where his hands are?

15  A.    Yes.

16  Q.    Where are his hands?

17  A.    They are on the point-of-sale terminal.

18        MR. SEVERO:  Objection, the video speaks for itself.

19        THE COURT:  Overruled.

20  BY MR. ESTRADA:

21  Q.    Where?

22  A.    On the point-of-sale terminal.

23  Q.    Now, later in August, toward the beginning of

24  August, did you identify another telephone for defendant

25  Darbinyan?

1    A.    Yes, we did.

2    Q.    Did the wire interception continue?

3    A.    Yes, it did.

4          MR. ESTRADA:  Your Honor, the Government requests

5    permission to play Exhibit 166 and ask that the jurors turn

6    to 166A in their book.

7                    (Exhibit 166 played.)

8    BY MR. ESTRADA:

9    Q.    Now, Special Agent Stebbins, turning to the first

10   page of 166A, do you have that in front of you?

11   A.    Yes, I do.

12   Q.    Date of the call?

13   A.    August 8, 2009.

14   Q.    Time of the call?

15   A.    Approximately 3:01 p.m.

16   Q.    And at the bottom there on page 1 of 3, who are the

17   participants in this call?

18   A.    Mike Darbinyan and Rafael Parsadanyan.

19   Q.    Is Rafael Parsadanyan identified as Speaker 2?

20   A.    That's correct.

21   Q.    Now, turning to page 3 of the transcript, do you

22   have that in front of you?

23   A.    Yes, I do.

24   Q.    Towards the middle, there's a reference by Darbinyan

25   (as read:)

**001781**

1           "Any news from Khecho?  Did they finish?"

2       And seven speakers from the bottom:

3           "Darbinyan:  What happened?

4           "Parsadanyan:  The total about 30.

5           "Darbinyan:  30.

6           "Parsadanyan:  Large."

7       Based on your training and experience, are you

8   familiar with the term "30 large"?

9   A.      Yes.

10  Q.      Based on your training and experience, what did you

11  believe that referred to?

12  A.      $30,000.

13          MR. SEVERO:  Just so we're consistent, I'm going to

14  move to strike that as speculation.

15          MR. FLIER:  And I join in that, Your Honor.

16          THE COURT:  Overruled.

17          MR. ESTRADA:  Your Honor, the government requests

18  permission to play Exhibit 167 and ask the jurors to turn

19  to 167A in their book.

20          MR. SEVERO:  Your Honor --

21          THE COURT:  Excuse me?

22          MR. SEVERO:  Our book doesn't have 167.  I don't

23  know if -- we're missing it.

24          THE COURT:  Make sure they're provided with it, if

25  anybody has an extra copy.

```
 1              MR. ESTRADA:  This is first time that we're playing
 2   Exhibit 167.
 3              THE COURT:  I'm sorry?
 4              MR. ESTRADA:  This will be the first time we're
 5   playing 167.
 6              THE COURT:  Okay.
 7              MR. SEVERO:  May the record show that I've received
 8   a copy of the call.  Thank you.
 9              THE COURT:  Okay.
10              MR. SEVERO:  Thank you.
11              THE COURT:  Go ahead.
12                      (Exhibit 167 played.)
13   BY MR. ESTRADA:
14   Q.    Special Agent Stebbins, turning to the first page of
15   Exhibit 167A, do you have that in front of you?
16   A.    Yes, I do.
17   Q.    What is the date of that call?
18   A.    August 9, 2009.
19   Q.    The time of that call?
20   A.    Approximately 3:49 p.m.
21   Q.    Who are the participants in this call?
22   A.    Mike Darbinyan and Rafael Parsadanyan.
23   Q.    And turning to page 3 of 3, do you have that front
24   of you?
25   A.    Yes, I do.
```

1    Q.    The second speaker from the top, Darbinyan, states

2    (as read:)

3                  "I don't know brother.  The thing.... What

4                  was I going to tell you?  Um... Did you hear

5                  any news from that guy about yesterday's

6                  things?"

7                  "Parsadanyan:  It should be already ready,

8                  brother.  We are waiting for it to arrive.

9                  "Darbinyan:  When will it arrive?  He didn't

10                 tell you?

11                 "Parsadanyan:  He said...two days, brother."

12          The day before this call, on August 8th of 2009, did

13   you intercept video of any activity related to the scheme?

14   A.    Yes.

15   Q.    What was that?

16   A.    It was the video we just watched.

17          MR. SEVERO:  Objection to the question.  "Activity

18   related to the scheme" is a conclusion, and it's leading.

19          THE COURT:  Overruled.

20          THE WITNESS:  The video we just watched with Adranik

21   Bakhchadjian and Vartenie Ananian at the store swapping out

22   the terminal.

23   BY MR. ESTRADA:

24   Q.    And did you understand, based on your training and

25   experience, that once the devices were obtained with the

1    skimmers, it took time to place them on magnetic cards?

2    A.    Yes.

3          MR. ESTRADA:  Your Honor, with the Court's

4    permission, the government would ask to play another video.

5    This one would be at Exhibit 351A, which has been admitted.

6          THE COURT:  Okay.

7    BY MR. ESTRADA:

8    Q.    Before I do that, Special Agent Stebbins, during the

9    investigation, did you learn that the scheme targeting

10   customers at 99 Cents Only Stores involved many different

11   areas in Southern California?

12   A.    Yes.

13   Q.    Including the San Diego area?

14   A.    Yes.

15   Q.    Now, looking at this video, do you see the date

16   there at the top?

17   A.    Yes.

18   Q.    What's the date?

19   A.    August 13, 2009.

20   Q.    The Store 144, were you familiar with what store

21   that was?

22   A.    Yes.

23   Q.    What store was that?

24   A.    It's the University Avenue store in San Diego,

25   California.

1    Q.    Now, before I play this video, where will the

2    activity take place?

3    A.    It will be right at this terminal here (indicating).

4    Q.    And these two individuals here, will they be

5    involved in the activity?

6    A.    Yes.

7    Q.    Were you able to identify those individuals?

8    A.    No, sir.

9    Q.    Were there people in the scheme that you couldn't

10   identify?

11   A.    Yes.

12         MR. ESTRADA:  Now, if we could play the video.

13              (Exhibit 351A played.)

14   BY MR. ESTRADA:

15   Q.    Special Agent Stebbins, in that video, did you see

16   the point-of-sale terminal being swapped out?

17   A.    Yes.

18   Q.    The next day, on August 14, 2009, was there

19   additional video obtained related to the scheme?

20   A.    Yes.

21         MR. ESTRADA:  Your Honor, the government requests

22   permission to play Exhibit 352A, another video.

23   BY MR. ESTRADA:

24   Q.    Now, looking at this video, do you see the date

25   there on top?

1    A.    Yes.

2    Q.    What's the date?

3    A.    August 14, 2009.

4    Q.    There's a Store 142.  Do you know what store that

5    was?

6    A.    Yes.

7    Q.    What store?

8    A.    It's the Clairemont Mesa store in San Diego,

9    California.

10   Q.    And here -- where did that activity take place?

11   A.    Right here with the same two gentlemen wearing the

12   same clothes from the day before (indicating).

13   Q.    They appear to be the same individuals from the day

14   before?

15   A.    Yes.

16         MR. ESTRADA:  Now, if we could play the video.

17              (Exhibit 352A played.)

18   BY MR. ESTRADA:

19   Q.    Now, what did you see in that video?

20   A.    I saw the person in white pull off the terminal and

21   the person in blue replace it with another terminal.

22   Q.    Now, on this same date, on August 14, 2009, was

23   there a video related to the scheme in a different area?

24   A.    Yes.

25   Q.    Where was that?

```
 1    A.      Huntington Beach, California.

 2            MR. ESTRADA:  Your Honor, with the Court's

 3    permission, if we could play Exhibit 353A.

 4            THE COURT:  Yes.

 5    BY MR. ESTRADA:

 6    Q.      And before I do, looking at the top there, do you

 7    see Store 97?

 8    A.      Yes.

 9    Q.      What store is that?

10    A.      I think it's Brookhurst in Huntington Beach.

11    Q.      And that date?  Do you see there the date up top?

12    A.      Yes.  August 14, 2009.

13    Q.      And where will the activity in this video take

14    place?

15    A.      It will be right in this area (indicating).

16            MR. ESTRADA:  Now, this one's a little longer than

17    the others.  So if I could advance it to 1:20.  1:16 is

18    fine.

19            With the Court's permission, if we could play.

20                    (Exhibit 353A played.)

21            MR. ESTRADA:  If we could pause it.

22    BY MR. ESTRADA:

23    Q.      Do you see anything in this area?

24    A.      Yes.  The point-of-sale is missing, and he's got the

25    new one in his hands to put it on.
```

1           MR. SEVERO:  Objection.

2           THE COURT:  Your objection?

3           MR. SEVERO:  Speculation.

4           THE COURT:  Overruled.

5    BY MR. ESTRADA:

6    Q.     When you say "he," who are you referring to?

7    A.     Andranik Bakhchadjian.

8    Q.     Is that the person in black there?

9    A.     Yes, it is.

10   Q.     Who is the other individual with the hat and the

11   white T-shirt?

12   A.     Vartenie Ananian.

13   Q.     Are those the individuals you testified about

14   previously in Ventura?

15   A.     Yes.

16          MR. ESTRADA:  Now if we could continue the video.

17          And if we could pause it there.

18   BY MR. ESTRADA:

19   Q.     Do you see the point-of-sale terminal has now been

20   replaced?

21   A.     Yes.

22   Q.     And among the items being purchased, what do you see

23   there?

24   A.     Paper towels, large items that are stackable in

25   front of the terminal.

1    Q.    Did you see some sort of roasting pan?

2    A.    Ah, yes, the roasting pan.

3    Q.    Was there another video in the Huntington Beach area

4    obtained on the same date, on August 14, 2009?

5    A.    Yes, there was.

6    Q.    I should say from this same date, August 14, 2009.

7    A.    Yes.

8          MR. ESTRADA:  Your Honor, with the Court's

9    permission, the government would ask to play Exhibit 354A,

10   which has been admitted.

11         THE COURT:  Yes.

12   BY MR. ESTRADA:

13   Q.    Now, before I start this one, do you see the date

14   there at the top?

15   A.    Yes.

16   Q.    What's the date there at the top?

17   A.    August 14, 2009.

18   Q.    What store is this from?

19   A.    It's from Store 75, Beach, in Huntington Beach.

20   Q.    Okay.  And where will the activity take place here?

21   A.    As you can see, they have already started stacking

22   up their stuff.  It's going to be right at this terminal.

23   Q.    When you say "they," who are you referring to?

24   A.    Andranik Bakhchadjian and Vartenie Ananian.

25   Q.    Wearing the same clothes from the same day at

```
 1    another 99 Cents Only Store in Huntington Beach?

 2    A.    Yes.

 3          MR. ESTRADA:  If we could play the video.

 4                  (Exhibit 354A played.)

 5    BY MR. ESTRADA:

 6    Q.    Now, Special Agent Stebbins, what do you see in that

 7    video?

 8    A.    In that video, you see Andranik Bakhchadjian change

 9    out the terminal and put a new one on there.

10          MR. ESTRADA:  Now, if we could advance the video and

11    pause it at 27 seconds.

12    BY MR. ESTRADA:

13    Q.    Do you see here on the video the point-of-sale

14    terminal?

15    A.    Yes.

16    Q.    Does it appear to be attached?

17    A.    No.

18          MR. SEVERO:  That's speculation of the witness.

19          THE COURT:  Overruled.

20    BY MR. ESTRADA:

21    Q.    Now, these videos, do they show basically frames and

22    segments over time?

23    A.    Yes.

24    Q.    Can you explain that?

25    A.    This one, as I was watching it, it appeared that
```

**001791**

1    there was a frame every 2 seconds as opposed to, like, a

2    streaming video, the way we would shoot with our iPhones or

3    whatever.

4    Q.    Can you see the point-of-sale terminal there sort of

5    floating in the air?

6    A.    Yes.

7         MR. ESTRADA:  Your Honor, with the Court's

8    permission, the government would ask to play Exhibit 168,

9    which is another wiretap call, and ask that the jurors turn

10   to 168A in their books.

11                    (Exhibit 168 played.)

12   BY MR. ESTRADA:

13   Q.    Now, Special Agent Stebbins, turning to the first

14   page of Exhibit 168A, do you have that in front of you?

15   A.    Yes, I do.

16   Q.    The date of that call?

17   A.    August 14, 2009.

18   Q.    The time of the call?

19   A.    Approximately 6:29 p.m.

20   Q.    Turning to page 2, who are the participants in this

21   call?

22   A.    Mike Darbinyan and Simon Antonyan.

23   Q.    Simon Antonyan, again, is he a defendant in this

24   case?

25   A.    Yes.

1  Q.      Turning to page 3 of 4, do you have that in front of

2  you?

3  A.      Yes.

4  Q.      Seven speakers from the bottom, Darbinyan states

5  (as read:)

6              "Did you guys finish?

7              Antonyan:  Yeah, we're finished, bro.  I just

8               brought and dropped off Khuch.

9              "Darbinyan:  Was it all right?

10             "Antonyan:  It was all right, my bro.

11             "Darbinyan:  What was the score of the goal?

12             "Antonyan:  What was it, bro?  It was three

13              to three.  The score ended at three to zero.

14             "Darbinyan:  Hmm.  Okay, bro."

15      Now, on this date, on August 14, 2009, how many

16  videos were intercepted regarding the switching of

17  terminals at 99 Cents Only Stores?

18  A.      Three.

19  Q.      Three different locations?

20  A.      Yes.

21      MR. ESTRADA:  Your Honor, the government asks

22  permission to play Exhibit 169 and ask the jurors to turn

23  to 169A in their books.

24          THE COURT:  Yes.

25

1   BY MR. ESTRADA:

2   Q.     Now, Special Agent Stebbins, turning to the first

3   page of 169A, do you have that in front of you?

4   A.     Yes.

5   Q.     The date of the call?

6   A.     August 19, 2009.

7   Q.     The time of the call?

8   A.     Approximately 1:08 p.m.

9   Q.     Turning to page 2 of the transcripts, who are the

10  participants in the call?

11  A.     Mike Darbinyan and Simon Antonyan.

12  Q.     Turning to page 4 of the transcript, do you have

13  that in front of you?

14  A.     Yes.

15  Q.     Second speaker from the top, Darbinyan states

16  (as read:)

17               "How was...was it all right?  Was it okay

18                yesterday over there?

19               "Antonyan:  No, man...I don't know, bro; the

20                situation was a bit confusing.

21               "Darbinyan:  Yeah?

22               "Antonyan:  Yeah, nothing was happening.  He

23                did everything manually.

24               "Darbinyan:  Yeah, but was it okay?

25               "Antonyan:  Yeah, one was damaged."

1    Based on your training and experience in

2  investigating fraud cases, are the skimming devises

3  sometimes damaged when being removed?

4  A.    Yes.

5    MR. ESTRADA:  The government requests permission to

6  play Exhibit 170, and asks the jurors to turn to 170A.

7    (Exhibit 170 played.)

8  BY MR. ESTRADA:

9  Q.    Now, Special Agent Stebbins, turning to the first

10  page of 170A, do you have that in front of you?

11  A.    Yes, I do.

12  Q.    What is the date of this call?

13  A.    August 24, 2009.

14  Q.    Time of the call?

15  A.    Approximately 2:56 p.m.

16  Q.    Who are the participants?

17  A.    Mike Darbinyan and Simon Antonyan.

18  Q.    Turning to page 3 of the transcript, 3 of 4, do you

19  have that in front of you?

20  A.    Yes.

21  Q.    Sixth speaker from the bottom, Darbinyan asks

22  Antonyan (as read:)

23    "How's business?

24    "Antonyan:  Ehh!  It's all right for now.

25    We've got to do those things tomorrow; get

```
 1                    the boxes of gold.

 2               "Darbinyan:  Yeah, yeah."

 3          Based on your knowledge of the investigation, what

 4     did you believe "boxes of gold" referred to?

 5     A.    The point-of-sale terminals.

 6     Q.    On this same date, on August 24, 2009, were you

 7     aware that arrests were made with regard to the scheme?

 8     A.    Yes.

 9     Q.    What arrests?

10     A.    Andranik Bakhchadjian.

11               MR. SEVERO:  Objection, hearsay.

12               THE COURT:  Sustained, without a foundation.

13     BY MR. ESTRADA:

14     Q.    Did you become aware that arrests were made?

15     A.    Yes.

16     Q.    How did you become aware that arrests were made?

17     A.    I spoke with officers with the Huntington Beach

18     Police Department.

19     Q.    Did you also observe --

20               MR. SEVERO:  Move to strike that arrests were made.

21     It is hearsay.

22               THE COURT:  At this point, he's laying a foundation;

23     so overruled at this time.

24     BY MR. ESTRADA:

25     Q.    Did you also review items recovered from those
```

1    individuals?

2    A.    Yes.

3    Q.    Did you also review a video showing a police officer

4    apprehending these individuals?

5    A.    Yes.

6          MR. ESTRADA:  Your Honor, if I could play that video

7    now.

8          THE COURT:  Yes.

9          MR. ESTRADA:  With the Court's permission, if the

10   government could play Exhibit 355A, which has been

11   admitted.

12   BY MR. ESTRADA:

13   Q.    Okay.  So, now, on this video, what's the date here?

14   A.    August 24, 2009.

15   Q.    And what location is this video at?

16   A.    I believe it's Store 75, Beach, in Huntington Beach.

17   Q.    And who is this individual here, based on your

18   knowledge of the investigation?

19   A.    Andranik Bakhchadjian.

20   Q.    Who is this individual here?

21   A.    Vartenie Ananian.

22   Q.    And where will the activity take place generally?

23   A.    Generally here and then continuing here

24   (indicating).

25         MR. ESTRADA:  And now, if we could play the video,

```
 1    please.
 2                      (Exhibit 355A played.)
 3         MR. ESTRADA:  I just want to pause the video there.
 4    If we could back up just a couple of frames.
 5    BY MR. ESTRADA:
 6    Q.    Now, Special Agent Stebbins, do you see some of the
 7    large items that you described in prior videos there?
 8    A.    Yes.
 9    Q.    What sorts of items?
10    A.    Paper towels, a turkey roaster.
11    Q.    Now, this individual appearing in the screen here,
12    do you know that individual?
13    A.    Yes.
14    Q.    Who is that individual?
15    A.    Chris Nesmith with the Huntington Beach Police
16    Department.
17         MR. ESTRADA:  Now, if we could continue with the
18    video.
19                      (Exhibit 355A played.)
20         MR. ESTRADA:  And if we could pause there.
21    BY MR. ESTRADA:
22    Q.    Do you see Bakhchadjian and Ananian?
23    A.    Yes.
24    Q.    Did you see where they appeared to go?
25    A.    Yes.  They ran.
```

1    Q.    And what do you see here in Sergeant Nesmith's

2    hands?

3    A.    That would be Sergeant Nesmith's weapon.

4    Q.    And did you understand these individuals were

5    arrested after this took place?

6    A.    Yes, they were.

7    Q.    Now, did you understand that during this arrest

8    phones were recovered?

9    A.    Yes.

10   Q.    Are you familiar with a phone number of

11   310-779-1177?

12   A.    Yes.

13   Q.    What telephone number is that?

14   A.    That is Mike Darbinyan's telephone number, and

15   that's target telephone 8 from our investigation.

16   Q.    Target telephone 8?

17   A.    Yes.

18   Q.    Was it intercepted in other calls?

19   A.    Yes.

20   Q.    Were you aware of this number being found on a cell

21   phone of Andranik Bakhchadjian?

22         MR. SEVERO:  Objection, hearsay.

23         THE COURT:  Overruled.

24         THE WITNESS:  Yes.

25         MR. ESTRADA:  Your Honor, the government asks

1    permission to play another call, Exhibit 171, and asks that

2    the jurors turn to 171A in their books.

3                    (Exhibit 171 played.)

4         MR. ESTRADA:  If you could just pause it for a

5    second.

6         Sorry.  I can just pause it for a second, Your

7    Honor.

8         I should have mentioned that the transcript will

9    actually begin at page 6 of 8 on 171A.  It will start at

10   nine speakers from the bottom, starting with the word

11   "Probably."

12        THE COURT:  Okay.

13        MR. SEVERO:  May I have a moment, Your Honor?

14        THE COURT:  Certainly.

15   BY MR. ESTRADA:

16   Q.   While he has that moment, the period that we've gone

17   over, the pages that we've skipped over, generally

18   speaking, what happened during that period?

19   A.   Just a long conversation, talking about different

20   organized crime figures.

21        MR. SEVERO:  I'm going to move to strike that.

22   That's speculation of the witness, number one, and it's not

23   the best evidence.

24        THE COURT:  When you say "organized crime figures,"

25   is this based on your training and experience?

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Okay.  It's overruled.

 3              MR. ESTRADA:  Okay.  Now, if we could play starting

 4     at page 6 of 8.

 5                      (Exhibit 171 played.)

 6     BY MR. ESTRADA:

 7     Q.     Now, Special Agent Stebbins, turning to the first

 8     page of the transcript at 171A, what's the date of this

 9     call?

10     A.     August 24, 2009.

11     Q.     What is the time of the call?

12     A.     Approximately 10:42 p.m.

13     Q.     Who are the participants in this call?

14     A.     Mike Darbinyan and Artur Margaryan.

15     Q.     Now, this date -- August 24, 2009 -- was this the

16     same date as the video we just saw?

17     A.     Yes, it is.

18     Q.     Turning to page 6 of the transcript, seven speakers

19     from the bottom, Margaryan states (as read:)

20                  "Have you heard from Ando?

21                  "Darbinyan:  No.

22                  "Margaryan:  They arrested him, bro."

23          Based on your knowledge of the investigation, who is

24     Ando?

25     A.     Andranik Bakhchadjian.
```

1    Q.    "Ando" is a short form of Andranik?

2    A.    Yes, it is.

3    Q.    Did you later learn of other videos showing

4    point-of-sale terminals being swapped out?

5    A.    Yes.

6    Q.    Some days later?

7    A.    Yes.

8    Q.    What area of Southern California is this in?

9         MR. SEVERO:  It's hearsay, Your Honor.

10        THE COURT:  Overruled.

11        THE WITNESS:  San Diego.

12        MR. ESTRADA:  Your Honor, the government requests

13   permission to play Exhibit 172 and asks the jurors to turn

14   to 172A in their books.

15        THE COURT:  172?

16        MR. ESTRADA:  Yes.

17              (Exhibit 172 played.)

18   BY MR. ESTRADA:

19   Q.    Now, Special Agent Stebbins, turning to the first

20   page of 172A, do you have that in front of you?

21   A.    Yes, I do.

22   Q.    What is the date of that call?

23   A.    August 27, 2009.

24   Q.    What is the time of the call?

25   A.    Approximately 10:46 a.m.

1    Q.    Who are the participants in this call?

2    A.    Mike Darbinyan and Artur Margaryan.

3    Q.    Is Artur Margaryan the same individual from the

4    prior call discussing Ando and the bail issues?

5    A.    Yes.

6    Q.    Now, turning to 3 of 4 of Exhibit 172A, do you have

7    that in front of you?

8    A.    Yes, I do.

9    Q.    Six speakers from the bottom, Margaryan says

10   (as read:)

11              "Didn't Bam-Bam say anything about the other

12               ones, bro?

13              "Darbinyan:  I'm going so see him right

14               now -- right now, bro."

15        Based on your knowledge of the investigation, who is

16   Bam-Bam?

17   A.    Gustavo Ortega.

18   Q.    Another defendant in this case?

19   A.    Yes.

20   Q.    And now this same date, on August 27, 2009, were

21   there videos depicting swapping of terminals at the 99

22   Cents only Store?

23   A.    Yes.

24        MR. ESTRADA:  Your Honor, the government requests

25   permission to play one of those videos -- well, two of the

1    videos, but starting with 351B.

2         THE COURT:  Yes.

3         MR. ESTRADA:  Starting with 351B.

4         THE COURT:  Yes.

5         MR. ESTRADA:  The second clip, please.

6              (Exhibit 351B played.)

7    BY MR. ESTRADA:

8    Q.    Okay.  Looking there at that clip, do you see an

9    individual here (indicating)?

10   A.    Yes.

11   Q.    Do you recognize that individual?

12   A.    Yes.

13   Q.    Who is that individual?

14   A.    Gustavo Ortega, a.k.a. bam-Bam.

15   Q.    Now, here at the top, it's got a date, August 27,

16   2009.  Do you see that?

17   A.    Yes.

18   Q.    What store is this?

19   A.    Store 144, the University Avenue store in San Diego,

20   California.

21        MR. ESTRADA:  Okay.  And if we could play that clip.

22             (Exhibit 351B played.)

23        MR. ESTRADA:  Okay.  Now, if we could play another

24   clip from that same video, 351.  This one will be 351A.

25

```
1    BY MR. ESTRADA:

2    Q.     Before I do so, this is the same store on the same

3    date?

4    A.     Yes, it is.

5    Q.     Where will the activity take place in this video?

6    A.     It will be right here (indicating).

7           MR. ESTRADA:  Now, if we could play that video,

8    please.

9                     (Exhibit 351A played.)

10   BY MR. ESTRADA:

11   Q.     Now, what did you see in that video?

12   A.     I saw a Hispanic male remove the point-of-sale

13   terminal and forget to put a new one back on.

14          MR. SEVERO:  Objection, speculation by the witness.

15          THE COURT:  Overruled.

16   BY MR. ESTRADA:

17   Q.     Did you identify that individual?

18   A.     No.

19          MR. SEVERO:  I renew my objection.

20          THE COURT:  What's your observation based on?

21          THE WITNESS:  Based on conversations with Gustavo

22   Ortega.

23          THE COURT:  Sustained.  The words "Hispanic male"

24   will be stricken.

25
```

```
 1   BY MR. ESTRADA:

 2   Q.    Did you see an individual there?

 3   A.    Yes.

 4   Q.    Can you identify that individual?

 5   A.    No.

 6         MR. ESTRADA:  Okay.  Now, if we could play, with the

 7   Court's permission, Exhibit 352, 352A -- or 352B.  I'm

 8   sorry.

 9   BY MR. ESTRADA:

10   Q.    And before we start this video, do you see the date

11   at the top?

12   A.    Yes.

13   Q.    What is the date?

14   A.    August 27, 2009.

15   Q.    What store was this?

16   A.    Store 142, Clairemont Mesa in San Diego, California.

17   Q.    Do you see an individual here (indicating)?

18   A.    Yes.

19   Q.    Do you recognize that individual?

20   A.    Yes.

21   Q.    Who is that individual?

22   A.    Catrina Balderrama.

23   Q.    Who is Catrina Balderrama?

24   A.    She's another defendant in this case.

25   Q.    And were will the activity take place in this video?
```

```
1    A.    It will be right here (indicating).

2          MR. ESTRADA:  And if we could play the video,

3    please.

4                    (Exhibit 352B played.)

5    BY MR. ESTRADA:

6    Q.    Now, on that video, what did you see?

7    A.    I saw Catrina Balderrama take off the point-of-sale

8    terminal and replace it with another one.

9    Q.    Did it happen rather quickly?

10   A.    Yes.

11         MR. ESTRADA:  Your Honor, with the Court's

12   permission, the government would ask to play another call.

13   This would be Exhibit 173, and ask that the jurors turn to

14   173A in their books.

15                    (Exhibit 173 played.)

16   BY MR. ESTRADA:

17   Q.    Now, Special Agent Stebbins, turning to the first

18   page of the transcript at 173A, do you have that in front

19   of you?

20   A.    Yes, sir, I do.

21   Q.    What's the date of that call?

22   A.    August 28, 2009.

23   Q.    The time of the call?

24   A.    Approximately 10:59 a.m.

25   Q.    Who are the participants in this call?
```

1   A.     Mike Darbinyan and Rafael Parsadanyan.

2   Q.     Now turning to page 2 of 3, do you have that in

3   front of you?

4   A.     Yes, I do.

5   Q.     The second speaker from the bottom, Darbinyan states

6   (as read:)

7               "That person... Yesterday Hayk was saying

8                that Khecho brought the money... but, did he

9                not bring enough money?

10             "Parsadanyan:  Bro....it was ten and...nine."

11      And going on to page 3:

12             "Darbinyan:  But did Hayk say it was supposed

13               to be more?

14             "Parsadanyan:  For a moment, he did say that

15               it was more... He said, 'As far as I know it

16               was 19.'  But I didn't get if he had mixed

17               it up or something, but he brought 10

18               and 9."

19      Based on your training and experience, what do you

20   believe 10 and 9 refer to?

21   A.     10,900 --

22      MR. SEVERO:  Objection, speculation of the witness.

23      THE COURT:  Overruled.

24      THE WITNESS:  $10,900.

25      MR. ESTRADA:  Your Honor, the government requests

1   permission to play Exhibit 175 and asks the jurors to turn

2   to 175A in their books.

3                   (Exhibit 175 played.)

4   BY MR. ESTRADA:

5   Q.    Now, Special Agent Stebbins, turning to the first

6   page of the transcript at 175A, do you have that in front

7   you?

8   A.    Yes, I do.

9   Q.    What's the date of that call?

10  A.    August 30, 2009.

11  Q.    What's the time of the call?

12  A.    Approximately 10:29 a.m.

13  Q.    Who are the participants in this call?

14  A.    Mike Darbinyan and Hakop Simitian.

15  Q.    Who is Hakop Simitian?

16  A.    He is one of the individuals involved in the 99

17  Cents scheme.

18  Q.    Turning to page 3 of the transcript, do you have

19  that in front of you?

20  A.    Yes.

21  Q.    Three speakers from the bottom, Darbinyan states

22  (as read:)

23              "I'd like to meet with you if you have

24              collected greens and so forth with you,

25              because I'm going to take them somewhere,

```
 1                          bro.  I'd like to see if it's available.

 2                          "Hakop Simitian:  I did them yesterday and

 3                          we're done.  There were three of us and we

 4                          got all of them done.

 5                          "Darbinyan:  Really?  Then let me come by to

 6                          pick them up so that the rest could be done

 7                          today."

 8              Based on your training and experience, what you do

 9          you believe the term "greens" referred to?

10     A.     Money.

11            MR. ESTRADA:  Your Honor, the government asks

12     permission to play Exhibit 176 and ask the jurors to turn

13     to 176A in their books.

14                          (Exhibit 176 played.)

15     BY MR. ESTRADA:

16     Q.     Now, Special Agent Stebbins, during the first page

17     of this transcript at 176A, what is the date of the call?

18     A.     August 30, 2009.

19     Q.     What's the time of the call?

20     A.     Approximately 11:36 a.m.

21     Q.     Turning to page 2, who are the participants in this

22     call?

23     A.     Mike Darbinyan and Khachatur Arakelyan.

24     Q.     The same date as the call before it?

25     A.     Yes.
```

1  Q.    Turning to page 3 of the transcript, do you have

2  that in front of you?

3  A.    Yes.

4  Q.    Four speakers from the top, Darbinyan states

5  (as read:)

6          "I said did they get into two rounds?

7          "Arakelyan:  Pal, your voice gets cut off,

8           dear.

9          "Darbinyan:  I said, these judokas that got

10          into it, did they get into two rounds?

11         "Arakelyan:  Yeah, yeah.

12         "Darbinyan:  Okay.

13         "Arakelyan:  The ones that have been

14          completed so far are two rounds.

15         "Darbinyan:  Yeah.

16         "Arakelyan:  But bro, one of them is not

17          tired at all.  The third one should work as

18          well."

19       Based on your training and experience, were you

20  familiar with the use of the ring-coated (phonetic) debit

21  cards to withdraw money from A.T.M.'s?

22  A.    Yes.

23  Q.    Are you familiar with how often these cards could be

24  used?

25  A.    Yes.

1    Q.      Explain.

2    A.      They would generally, as I said before, try to do it

3    before and after midnight, but if the money was still

4    coming out at a maximum daily rate, they would still

5    continue to try to use the debit cards until they couldn't

6    get any more money.

7            MR. ESTRADA:  Your Honor, the government requests

8    permission to play Exhibit 177 and asks the jurors to turn

9    to 177A.

10                        (Exhibit 177 played.)

11   BY MR. ESTRADA:

12   Q.      Now, Special Agent Stebbins, turning to the first

13   page of 177A, do you have that in front of you?

14   A.      Yes.

15   Q.      What is the date of the call?

16   A.      August 30, 2009.

17   Q.      And the time of the call?

18   A.      Approximately 12:30 p.m.

19   Q.      Turning to page 2, who are the participants in this

20   call?

21   A.      Mike Darbinyan and Khachatur Arakelyan.

22   Q.      Is this the same date as the call before it with

23   Darbinyan and Arakelyan?

24   A.      Yes, it is.

25   Q.      Turning to page 3 of the transcript, do you have it

1    in front of you?

2    A.    Yes.

3    Q.    Six speakers from the top, Darbinyan states

4    (as read:)

5              "Because there's something here, bro.  There

6              are only about 50 or 60 here."

7         Then there's a reference to looking at a plastic

8    bag.  Based on your knowledge of the investigation, what

9    does the 50 or 60 refer to?

10   A.    Debit cards.

11        MR. ESTRADA:  Your Honor, the government requests

12   permission to play Exhibit 179 and ask the jurors to turn

13   to 179A in their books.

14        THE COURT:  Yes.

15              (Exhibit 179 played.)

16   BY MR. ESTRADA:

17   Q.    Special Agent Stebbins, turning to the first page of

18   179A, do you have that in front of you?

19   A.    Yes.

20   Q.    What's the date of the call?

21   A.    September 4, 2009?

22   Q.    What's the time of the call?

23   A.    Approximately 11:00 a.m.

24   Q.    Turning to page 2, who are the participants in this

25   call?

1   A.      Mike Darbinyan and Hakop Simitian.

2   Q.      Turning to page 3 of the transcript, do you have

3   that in front of you?

4   A.      Yes.

5   Q.      Seven speakers from the bottom, Darbinyan states

6   (as read:)

7                   "Bro, I have a wedding today and won't be

8                    able to make it.  Can't you drop by at

9                    Raffo's place before you go to court, bro?

10                  "Simitian:  Hold on for just a second -- hold

11                   on for a second.

12                  "Simitian comes back:  Hello.

13                  "Darbinyan:  Yeah, bro.

14                  "Simitian:  Yeah... I can make it.  I'll

15                   arrange it somehow.  Let me take a shower

16                   and so forth and then I'll drop it by at

17                   this place and then go to court."

18          This individual, Simitian, was that the same

19   individual who was referencing greens a couple calls back?

20   A.      Yes.

21          MR. ESTRADA:  Your Honor, the government requests

22   permission to play Exhibit 180 and asks the jurors to turn

23   to 180A.

24                  (Exhibit 180 played.)

25

1    BY MR. ESTRADA:

2    Q.    Now, Special Agent Stebbins, turning to the first

3    page of the transcript at 180A, do you have that in front

4    of you?

5    A.    Yes.

6    Q.    What's the date of this call?

7    A.    September 4, 2009.

8    Q.    What's the time of the call?

9    A.    Approximately 1:23 p.m.

10   Q.    Turning to page 2 of the transcript, who are the

11   speakers in this call?

12   A.    Mike Darbinyan and Rafael Parsadanyan.

13   Q.    Now, this call was on September 4, 2009?

14   A.    Yes.

15   Q.    Is that the same date as the prior call between

16   Darbinyan and Simitian talking about dropping something off

17   before court?

18   A.    Yes.

19   Q.    Turning to page 3 of the transcript, do you have

20   that in front of you?

21   A.    Yes.

22   Q.    Five speakers from the top, on page 3 of 4,

23   Darbinyan states (as read:)

24              "Bro, did Raf, Hakopik come over?

25              "Parsadanyan:  Yes, bro.  I gave it to him.

```
 1                  It's all right.  He also gave me some."

 2          Based on your knowledge of the investigation, who is

 3    Hakopik?

 4    A.      It would be a nickname for Hakop Simitian.

 5          MR. FLIER:  Objection.  No foundation, Your Honor.

 6          THE COURT:  Overruled.

 7    BY MR. ESTRADA:

 8    Q.    Now, turning towards the bottom of that same page,

 9    seven speakers from the bottom, Parsadanyan states (as

10    read:)

11                  "Yes.  In general and all together, all that

12                   was withdrawn was 1300.

13                  "Darbinyan:  How much?

14                  "Parsadanyan:  The total withdrawal,

15                   including yesterday's, was 1300."

16          Based on your training and experience, what did you

17    believe 1300 referred to?

18          MR. SEVERO:  Speculation.

19          THE COURT:  Overruled.

20          THE WITNESS:  $1,300.

21    BY MR. ESTRADA:

22    Q.    Now, turning to the last speaker on page 3 (as

23    read:)

24                  "Parsadanyan:  By counting yesterday's

25                   withdrawal and today's withdrawal, I still
```

1              have 1300 with me."

2         And going on to page 4, Darbinyan states:

3              "How much did he bring today, bro?

4              "Parsadanyan:  3.2.

5              "Darbinyan:  Oh.

6              "Parsadanyan:  Yesterday it was 6 and, uh,

7                   just a minute, bro; yesterday it was 6.3 and

8                   today it's 3.2.  There was a total of 9.5.

9                   He took out 1900 and I have 1300 with me,

10                   bro."

11        Based on your training and experience, what did you

12   believe 9.5 referred to?

13        MR. SEVERO:  Speculation.

14        THE COURT:  Overruled.

15        THE WITNESS:  $9,500.

16   BY MR. ESTRADA:

17   Q.   And there's a reference that he took 1,900.  Based

18   on your training and experience, what do you believe 1,900

19   referred to?

20   A.   $1,900, which is 20 percent of 9500.

21   Q.   Now, what's the significance of the 20 percent of

22   9.5 or 9,500?

23   A.   That was the cut that was discussed in previous

24   calls that would be given to the crew of runners.

25        MR. ESTRADA:  The government asks permission to play

1    Exhibit 181 and asks the jurors to turn to 181A in their

2    books.

3              THE COURT:  Yes.

4                        (Exhibit 181 played.)

5    BY MR. ESTRADA:

6    Q.    Now, Special Agent Stebbins, turning to the first

7    page of the transcript of 181A, do you have that in front

8    of you?

9    A.    Yes.

10   Q.    What's the date of this call?

11   A.    September 16, 2009.

12   Q.    What's the time of the call?

13   A.    Approximately at 11:42 a.m.

14   Q.    Who are the participants in this call?

15   A.    Mike Darbinyan and Simon Antonyan.

16   Q.    Turning to page 3 of the transcript, do you have

17   that in front of you?

18   A.    Yes.

19   Q.    Fifth speaker from the top, Darbinyan states (as

20   read:)

21              "Bro.  Also if you get a chance to talk to

22               Hayko or see him... Bam-Bam called early in

23               the morning.  How many things were" you

24               "supposed to give him?"

25          And then there's a reference to "500 or something."

1      Based on your knowledge of the investigation, what

2 do you believe the 500 referred to?

3 A.     Credit card numbers.

4 Q.     Now, you mentioned that there were many stores

5 involved in this overall 99 Cents Only Store fraud scheme.

6 A.     Yes.

7 Q.     Please take a look at Exhibit 335, which should be

8 in a book behind you.

9      THE COURT:  We're going to break at this time,

10 ladies and gentlemen, being 10:00 o'clock.

11      Remember the admonishment not to discuss the case

12 among yourselves or with anybody else or form or express

13 any opinions about the matter.

14      See you back in 15 minutes.

15      THE CLERK:  All rise.

16              *(Jurors exit courtroom.)*

17       (Recess taken from 9:55 to 10:11 a.m.)

18              *(Jurors enter courtroom.)*

19      THE CLERK:  All rise.

20              *(Judge enters courtroom.)*

21      THE CLERK:  You may be seated.

22      THE COURT:  Let the record reflect that all the

23 jurors are in their respective seats in the jury box,

24 including the alternates.  The witness is on the witness

25 stand.

```
1              And, Counsel, you may continue.

2              MR. ESTRADA:  Thank you, Your Honor.

3    BY MR. ESTRADA:

4    Q.    Now, Special Agent Stebbins, before the break, we

5    were talking about the 99 Cents Only Store scheme and how

6    there are numerous locations involved.

7    A.    Yes.

8    Q.    Is that throughout Southern California?

9    A.    Yes.

10   Q.    Please take a look at Exhibit 335, which should be

11   in one of the binders behind you.

12   A.    Yes, I have it.

13   Q.    Do you recognize Exhibit 335?

14   A.    Yes.

15   Q.    What is Exhibit 335?

16   A.    It is a map of the affected stores that I prepared.

17   Q.    And would this map aid you in testifying before the

18   jury today?

19   A.    Yes.

20             MR. ESTRADA:  Your Honor, the government moves to

21   admit Exhibit 335 into evidence and requests permission to

22   publish.

23             THE COURT:  It will be received, and it may be

24   published.

25             (Exhibit 335 admitted into evidence.)
```

1    BY MR. ESTRADA:

2    Q.    Now, looking at Exhibit 335, what does it depict?

3    A.    It depicts the stores that we discussed previously

4    that were affected by the point-of-sale skimmers.

5    Q.    Now, were there additional stores that you learned

6    were involved or targeted in the scheme?

7    A.    Yes.

8    Q.    But not depicted here?

9    A.    That's correct.

10         MR. FLIER:  Objection, move to strike.

11         THE COURT:  Overruled.

12   BY MR. ESTRADA:

13   Q.    What does this generally depict?

14   A.    This generally depicts the stores that we showed

15   videos from.

16   Q.    And, now, were there numerous banks or credit unions

17   whose customers were targeted by this scheme?

18   A.    Yes.

19   Q.    Did you obtain certifications with regard to the

20   federally insured status of these financial institutions?

21   A.    Yes, I did.

22   Q.    Please take a look, if you would, at Exhibits 396

23   through 405, which also should be in one of the binders.

24         MR. ESTRADA:  And, Your Honor, these are public

25   records which have been certified, and the government would

1     move to admit them as such.

2              THE COURT:  396 to what?

3              MR. ESTRADA:  396 to 405.

4              THE COURT:  405.

5              They will be received.

6                     *(Exhibits 396 through 405,*

7                 *inclusive, admitted into evidence.)*

8     BY MR. ESTRADA:

9     Q.    I'm going to start with 396.

10    A.    Yes.

11    Q.    Is that a certificate of federal insurance for Bank

12    of America?

13    A.    Yes, it is.

14    Q.    Are you familiar with what FDIC insurance is?

15    A.    Yes.

16    Q.    What is it?

17    A.    It's the Federal Deposit Insurance Corporation.

18    Q.    Does that mean the bank is federally insured?

19    A.    Yes, it does.

20    Q.    Now, turning to 397, do you have that in front of

21    you?

22    A.    Yes.

23    Q.    Is that a certificate of FDIC insurance for

24    Citibank?

25    A.    Yes.

1   Q.    Is that another one of the institutions whose

2   customers were targeted in this scheme?

3   A.    Yes, it is.

4         MR. FLIER:  Your Honor, may I interpose?  Is this

5   the 99 Cents Only Store or more?

6         THE COURT:  Counsel?

7         MR. ESTRADA:  Your Honor, this would go to both the

8   credit -- I'm sorry -- the check fraud scheme that we

9   discussed earlier in the case and the 99 Cents Only Store

10  scheme.

11        THE COURT:  Is there an objection to the checks

12  fraud scheme being limited just to the other two

13  defendants, Counsel?

14        MR. FLIER:  Yes, Your Honor.

15        THE COURT:  Okay.

16        MR. SEVERO:  Your Honor, I'm going to eventually

17  interpose an objection.

18        THE COURT:  Well, before we get to that, let me do

19  this.

20        MR. SEVERO:  I'm sorry, Your Honor.

21        THE COURT:  That's okay.

22        MR. FLIER:  That's correct, Your Honor.

23        THE COURT:  Yeah.  And again, I am going to take

24  that under submission.  I may very well strike it as to

25  your client.

```
 1          Yes, Counsel.

 2          MR. FLIER:  Your Honor, this witness is not

 3   qualified.  There's no foundation for his testimony.

 4          THE COURT:  Overruled.

 5          Is this part of your training and experience in

 6   fraud?

 7          THE WITNESS:  Yes, sir.

 8          THE COURT:  Overruled.

 9          MR. ESTRADA:  Your Honor, just with regard to the

10   motion by counsel for Parsadanyan, it's an element of the

11   offense and that's --

12          THE COURT:  I'm not going to rule on it yet.

13          MR. ESTRADA:  Very good.

14   BY MR. ESTRADA:

15   Q.    Turning to 398, do you have that in front of you?

16   A.    Yes.

17   Q.    Is 398 a certificate of FDIC insurance for Guaranty

18   Bank?

19   A.    Yes, it is.

20   Q.    Is that a bank whose customers were targeted in the

21   99 Cents Only Store scheme?

22   A.    Yes, it was.

23   Q.    Turn to page 399.  Do you that have in front of you?

24   A.    Yes, I do.

25   Q.    Is 399 an FDIC certificate for J.P. Morgan Chase
```

1    Bank?

2    A.    Yes.

3    Q.    And was J.P. Morgan Chase Bank a bank involved in

4    the 99 Cents Only Store scheme?

5    A.    I believe it was a bank fraud scheme as well.

6    Q.    Check fraud scheme?

7    A.    Yes.

8    Q.    Now, turning to 400, do you have that in front of

9    you?

10   A.    Yes.

11   Q.    Is Exhibit 400 a certificate of FDIC insurance for

12   Union Bank?

13   A.    Yes, it is.

14   Q.    Is Union Bank a bank whose customers were targeted

15   in the 99 Cents Only Store scheme?

16   A.    Yes, it is.

17   Q.    Exhibit 401, do you have that in front of you?

18   A.    Yes.

19   Q.    Is 401 a certificate of FDIC insurance for U.S.

20   Bank?

21   A.    Yes.

22   Q.    Is U.S. Bank a bank whose customers were targeted in

23   the 99 Cents Only Store scheme?

24   A.    Yes, it was.

25   Q.    Turning to 402, do you have that in front of you?

1    A.    Yes.

2          MR. ESTRADA:  Now, 402, I'll just briefly publish

3    it, with the Court's permission, Your Honor.

4          THE COURT:  Yes.

5    BY MR. ESTRADA:

6    Q.    This one's a little different.  What's the

7    difference on this one?

8    A.    The difference is that this is a credit union, and

9    you get certified by the National Credit Union

10   Administration.

11   Q.    And are credit unions also institutions that are

12   federally insured?

13   A.    Yes.

14   Q.    And this particular -- 402 is for Altura Credit

15   Union, do you see that?

16   A.    That's correct.

17   Q.    Is that a credit union whose customers were targeted

18   in the 99 Cents Only Stores scheme?

19   A.    Yes.

20   Q.    Now, turning to 403, I won't show that to you, but

21   is that another credit union certificate?

22   A.    Yes, it is.

23   Q.    Federal insurance?

24   A.    Yes.

25   Q.    Is this one for Arrowhead Central Credit Union?

1    A.    Yes, it is.

2    Q.    Is that a credit union whose customers were targeted

3    in this scheme?

4    A.    Yes, it was.

5    Q.    99 Cents Only Stores scheme?

6    A.    Yes.

7    Q.    And turning to 404, do you have that in front of

8    you?

9    A.    Yes, I do.

10   Q.    Is this a certificate of federal insurance for a

11   credit union, Schools First Federal Credit Union?

12   A.    Yes.

13   Q.    Is that a credit union whose customers were targeted

14   in the 99 Cents Only Stores scheme?

15   A.    Yes, it was.

16   Q.    And finally, 405.  Is that another certificate of

17   federal insurance for Ventura County Credit Union?

18   A.    Yes, it is.

19   Q.    Is that a credit union whose customers were targeted

20   in the 99 Cents Only Stores scheme?

21   A.    Yes, it was.

22         MR. ESTRADA:  No further questions, Your Honor.

23         THE COURT:  Cross?

24         MR. SEVERO:  Your Honor, I understand this was

25   Mr. Stebbins' last appearance on stage?

**001827**

```
 1          MR. ESTRADA:  Yes, Your Honor.  The government
 2   doesn't intend to recall Special Agent Stebbins.
 3          THE COURT:  Thank you, Counsel.
 4          MR. SEVERO:  So we may be expanding the length of
 5   the trial.
 6          THE COURT:  That's okay.
 7          MR. SEVERO:  If I might just have a brief moment,
 8   Your Honor.
 9             (Counsel confer off the record.)
10                    CROSS-EXAMINATION
11   BY MR. SEVERO:
12   Q.    Good morning, sir.
13   A.    Good morning, sir.
14   Q.    You are trained as an accountant; is that correct?
15   A.    Yes, I have a degree in Accounting.
16   Q.    And at some point in this trial, you testified that
17   before being an FBI agent, you were a Certified Fraud
18   Examiner?
19   A.    That's correct, sir.
20   Q.    You were certified by whom?
21   A.    The Association of Certified Fraud Examiners.
22   Q.    The Association of --
23   A.    -- Certified Fraud Examiners.  It's called the ACFE.
24   Q.    It's not a government agency, is it?
25   A.    No, sir.
```

1    Q.    Your first assignment with the FBI -- well, strike

2    that.

3          You were hired by the FBI nine years ago?

4    A.    Yes, September of 2004, sir.

5    Q.    And how long were you at the academy?

6    A.    Approximately five months.

7    Q.    Other than -- well, before you joined the FBI, you

8    had no law enforcement experience?

9    A.    No, sir.

10   Q.    And you had not dealt in any -- not engaged in any

11   investigations of narcotics investigations?

12   A.    No, sir.

13   Q.    Or investigations related to credit card fraud?

14   A.    Prior to the FBI?

15   Q.    Yes.

16   A.    I don't believe so, sir.

17   Q.    When you said you were a Certified Fraud Examiner,

18   who did you work for?

19   A.    It was a company called Eide Bailly.

20   Q.    Who is it?

21   A.    Eide Bailly.

22   Q.    Is that certified public accountants?

23   A.    Yes, it is a large accounting firm.

24   Q.    You had no training, prior to the joining the FBI,

25   in extortion?

1   A.      No, sir.

2   Q.      Once you left the academy in, what, the middle of

3   2004 --

4   A.      It would have been early 2005, sir.

5   Q.      -- what was your first assignment?

6   A.      White-collar crime in Indianapolis, Indiana.

7   Q.      When you say "white-collar crime," did you

8   investigate specific instances of crimes?

9   A.      Yes, we investigated crimes, sir.

10  Q.      Specific instances though, not gang related?

11  A.      I was -- the office is very small; so you're

12  involved in everybody's investigations.

13  Q.      And you received further training in the field; is

14  that correct?

15  A.      Yes, sir.

16  Q.      And that lasted one and a half years?

17  A.      My assignment in white-collar crime was

18  approximately one and a half years.

19  Q.      Did you investigate extortion at that time?

20  A.      I don't recall, sir.

21  Q.      Did you investigate violent crimes?

22  A.      Yes.

23  Q.      Did you investigate firearms violations?

24  A.      Yes, sir.

25  Q.      As a -- certainly, as a junior agent -- correct? --

1    still special, but a junior agent; right?

2    A.    Yes, sir.

3    Q.    You were following orders from someone else while

4    you were being trained in the field; correct?

5    A.    I suppose you could say that, yes, sir.

6    Q.    You weren't leading any investigations then?

7    A.    Yes, I was leading my own investigations.

8    Q.    Your own investigation of what?

9    A.    Well, we would have our own fraud investigations,

10   and then because it was a small office, I would help out

11   with violent crimes and those types of investigations.

12   Q.    So a year out of the academy you were investigating

13   your own cases?

14   A.    I was investigating my own cases upon getting to

15   Indianapolis, sir.

16   Q.    Five months out of the academy or immediately after

17   the academy, you were investigating your own cases?

18   A.    Yes, sir.

19   Q.    The second assignment was to where?

20   A.    I was briefly assigned to counter-terrorism.

21   Q.    That didn't involve white-collar crime, did it?

22   A.    Again, it was a small office; so I was involved in

23   all the investigations that were going on.

24   Q.    So it was counter-terrorism only in label?

25   A.    That was my assignment, sir, yes.

1    Q.    And where was that?

2    A.    That was in the West Lafayette -- actually, the

3    Lafayette, Indiana, Resident Agency.

4    Q.    And you investigated extortion?

5    A.    I don't recall.

6    Q.    Your first exposure to a substantial extortion crime

7    would have been, you'd say, around 2008?

8    A.    Yes.

9    Q.    So at the time of this investigation, when you

10   commenced this investigation, this was essentially the

11   first time you had been exposed to an organized crime,

12   extortion-type crime; correct?

13   A.    I'd say that's accurate, sir.

14   Q.    Between 2005, the conclusion of your academy, and

15   2008, you investigated narcotics violations?

16   A.    I was involved in the investigations, sir.

17   Q.    In which investigation?

18   A.    In Indianapolis, there's gang investigations

19   involving narcotics trafficking.

20   Q.    Involved in terms of conducting surveillance for

21   other lead officers?

22   A.    Surveillance and listening to wiretaps, things of

23   that nature, sir.

24   Q.    Did you write any search warrants?

25   A.    As far as the drugs cases, sir?

001832

1    Q.    Yes.

2    A.    No, not on the drug cases.

3    Q.    Any extortion cases during '05 through '08 maybe you

4    wrote search warrants for?

5    A.    Not that I recall, sir.

6    Q.    Any bank fraud or check fraud cases you wrote

7    warrants for between '05 and '08?

8    A.    Yes, I believe so.

9    Q.    More than one?

10   A.    As far as the search warrants or cases?

11   Q.    Search warrants.

12   A.    Perhaps one to three.

13   Q.    And we're talking about the three-year stint;

14   correct?

15   A.    Yes, sir.

16   Q.    And any credit card schemes that you wrote search

17   warrants for between '05 and '08?

18   A.    Not that I remember writing search warrants for.

19   Q.    Now, let me change your subject back to some of the

20   testimony of yesterday and today.

21         You were designated as the lead investigating agent

22   in this case in '08?

23   A.    We don't really have a position like that, but, yes,

24   I would say I was the lead investigator.  There's no real

25   designation, sir.  That's the only --

1    Q.    I understand.  I understand what you're saying.  But

2    did you rise to that as the investigation went on?

3    A.    Yes, that would be a fair statement, sir.

4    Q.    Were you working closely with the U.S. Attorney's

5    Office at that time?

6    A.    Yes, sir.

7    Q.    Your exposure to credit card fraud such as the one

8    that you testified about regarding the -- pertaining to the

9    99 Cents Store scheme is your first encounter with this

10   type of activity; is that true?

11   A.    I wouldn't say that, sir.

12   Q.    All right.  In terms of the manner in which it

13   was -- you've testified it was carried out, it would have

14   been your first time?

15   A.    My first time what, sir?

16   Q.    Investigating the type of activity that you've

17   testified about regarding the 99 Cent Stores.

18   A.    I was very familiar with that type of activity, but

19   as far as being the lead investigator, I believe my first

20   case would have been in 2008, being the lead investigator.

21   Q.    In Indiana or here?

22   A.    Here, sir.

23   Q.    Your investigation of gangs has led you to conclude

24   that there are multiple people who use the same monikers in

25   gang activities; is that true?

1    A.    Yes.

2    Q.    And you have investigated the gangs as organized

3    crime?

4    A.    Can you be more specific, sir?

5    Q.    Well, your gang investigations before '08, can you

6    tell us how many of those you were involved in?

7    A.    It was really probably two gang investigations in

8    Indianapolis.

9    Q.    Street gangs?

10   A.    Yes, sir.

11   Q.    Would you have termed those organized crime?

12   A.    No, sir.

13   Q.    So your first exposure to organized crime is this

14   case?

15   A.    It would be when I was assigned to the task force,

16   sir.

17   Q.    So your answer is yes, to this case?

18   A.    There were other cases I was assigned when I started

19   on the task force, sir.

20   Q.    So the task force was investigating other organized

21   crime?

22   A.    Yes, sir.

23   Q.    Is that correct?

24   A.    Yes, sir.

25   Q.    And you learned that in organized crime, the reason

1    it's organized is because there is a particular group that

2    has some common goals that they engage in or that they try

3    to achieve?

4    A.     Yes.  That's part it, sir, yes.

5    Q.     And the characteristics of organized crime are a

6    number of people come together, they try to do something

7    for the common good of that enterprise; is that true?

8    A.     Yes.

9    Q.     You testified about there being traditional and

10   non-traditional gang activities; is that true?

11   A.     Yes, sir.

12   Q.     And the traditional ones, I believe you testified,

13   were narcotics activities, gang signs, and that sort of

14   thing; correct?

15   A.     Yes, that was some of them.

16   Q.     Would you group that under organized crime as well,

17   the gang investigations you conducted here in Los Angeles?

18   A.     Can you be more specific, sir?

19   Q.     Well, for example, did you -- have you conducted any

20   investigations involving White Fence specifically?

21   A.     I have not led any investigations in the White

22   Fence.

23   Q.     Not led them, but have you been involved in them,

24   targets of the investigation were members of White Fence?

25   A.     No, I wouldn't say so, sir.

1     Q.    How about the Crips?

2     A.    No, sir.

3     Q.    Bloods?

4     A.    No, sir.

5     Q.    What street gangs have you investigated before you

6     started investigating this case?

7     A.    I was involved in the investigations in

8     Indianapolis, which were the two street gangs there.

9     Q.    Small street gangs, by comparison?

10    A.    Probably by comparison, yes, sir.

11          And then, as far as Los Angeles goes, there's a

12    general sharing of information regarding the gangs in the

13    San Fernando Valley.

14    Q.    "General sharing" means information come through,

15    you read them, but you are not involved in the

16    investigation?

17    A.    Correct.

18    Q.    So your testimony regarding traditional and

19    non-traditional characteristics is based primarily on what

20    you learned between 2009 and today?

21    A.    2008 and today, yes, sir.

22    Q.    At the time that you started investigating this

23    case, you had no notion of what a traditional or

24    non-traditional gang would do?

25    A.    I would say I wasn't familiar with the Armenian

1    Power; so I wouldn't know what a non-traditional gang was.

2    Q.    That's what you think Armenian Power was, a

3    non-traditional gang?

4    A.    Yes, sir.

5    Q.    Not organized crime, as such?

6    A.    Well, there's two different distinctions.  There's

7    the Armenian Power street gang.  That's a gang.

8    Q.    Okay.  And you wouldn't call that organized crime?

9    A.    Not at the simplest level, no, sir.

10   Q.    You wouldn't call that gang one that was an

11   enterprise trying to reach a common goal or purpose?

12   A.    There are members that work together for a common

13   purpose, yes, sir.

14   Q.    But not all the members work for the one common

15   purpose of the gang; correct?

16   A.    They don't all work together, sir.

17   Q.    They don't.  In fact, they're very scattered,

18   according to -- if I understand your testimony correctly.

19   A.    Yes, sir.  There are different groups within

20   Armenian Power.

21   Q.    So Armenian Power is not a gang or any particular

22   enterprise.  It is just a number of cells; is that true?

23        MR. ESTRADA:  Objection, Your Honor.  Calls for a

24   legal conclusion as to "enterprise."

25        THE COURT:  Overruled.

1          THE WITNESS:  Armenian power is a street gang.

2    There are many different cells underneath the umbrella of

3    Armenian Power.

4    BY MR. SEVERO:

5    Q.     And those different cells work for their own good,

6    not necessarily for the good of the Armenian Power gang?

7    A.     It depends.  Sometimes they do work for the good of

8    Armenian Power.

9    Q.     You have not determined that there is a particular

10   leader of Armenian Power?

11   A.     At the current time?

12   Q.     At the time that you investigated this case in '08

13   through 2010.

14   A.     I believe there to be two leaders of Armenian Power.

15   Q.     So these are leaders of separate cells?

16   A.     With some crossover between members, yes, sir.

17   Q.     So some members were members of one cell and some

18   members were members of another cell?

19   A.     Yeah.  There's not these black-and-white lines.

20   Q.     The different groups of Armenians would do their own

21   independent thing for themselves; isn't that -- isn't that

22   true?

23   A.     Groups of Armenians, sir?

24   Q.     Yeah, the different -- let's use the same

25   terminology.

**001839**

1           The different cells, as you have termed it --

2     A.      Under Armenian Power?

3     Q.      -- of Armenians working for themselves, you, as in

4     law enforcement, have grouped those cells and called them

5     Armenian Power?

6     A.      No, sir.

7     Q.      All right.  So it is true that, as part of the

8     non-traditional characteristics of the Armenian Power

9     street gang, you have found that they are not commonly

10    united for one particular purpose, that is, to benefit

11    Armenian Power as such?

12          MR. ESTRADA:  Objection, Your Honor.  Misstates the

13    testimony and calls for a legal conclusion.

14          THE COURT:  Overruled.

15          THE WITNESS:  Not at all times.

16    BY MR. SEVERO:

17    Q.      Your testimony today is that organized crime

18    consists of -- strike that.

19          Organized crime is different than street gangs?

20    A.      At the basic level, yes, sir.

21    Q.      And you believe that organized crime, if I

22    understood your -- the meaning of your testimony, is that

23    there is some component that is operating within prisons?

24    A.      Can you restate that, sir?

25    Q.      Yeah.  For example, is Armenian Power an organized

1    crime of some level, according to you?

2    A.    Yes.  There are many members within Armenian Power

3    that are members of organized crime.

4    Q.    Well, members of organized crime because you believe

5    that these are members of another different type of

6    organization, the Mexican Mafia.  Is that it?

7    A.    I don't believe so, sir.

8    Q.    They are members of organized crime because they

9    worked together towards a particular common goal?

10   A.    Towards a goal in criminal activity, yes, sir.

11   Q.    So when the different cells in the street gang work

12   for the good of the cell itself, that's not organized

13   crime, is it?

14   A.    If they're simply making money for themselves?

15   Q.    Right.

16   A.    And all people agree to make the money?  Is that

17   what you're asking, sir?

18   Q.    Within that cell.

19   A.    That's still organized crime.  They are organized.

20   They agree that they're going to conduct a scheme to make

21   money.

22   Q.    Not necessarily to make money for Armenian Power?

23         THE COURT:  Let me try because we've been going over

24   this quite a bit.

25         Does Armenian Power -- are you saying, within

1    Armenian Power, people can have different organized crime?

2              THE WITNESS:  Yes.

3              THE COURT:  Go ahead.

4    BY MR. SEVERO:

5    Q.     You are also saying that, within Armenian Power,

6    people operate for their personal benefits?

7    A.     Yes, people operate for their own benefits.

8    Q.     Not for the benefit of anything called "Armenian

9    Power"?

10   A.     Sometimes they operate for the benefit of Armenian

11   Power; sometimes they operate for the benefit of

12   themselves.

13   Q.     And as I understood your testimony, your -- the

14   specific -- the activities of the Armenian Power cells

15   really relate more to bank fraud and money-making

16   activities?

17   A.     No, sir.  I have never testified to that.

18   Q.     Isn't it a fact that your investigation of Armenian

19   Power or the people that you believe are in Armenian Power

20   demonstrates that these are individuals that operate mostly

21   in the fraud area?

22   A.     They commit fraud crimes, yes, sir.

23   Q.     They operate mostly in the fraud area?

24   A.     I don't believe that I testified that they operate

25   mostly in the fraud area, sir.

1    Q.    I'm asking you that now.

2    A.    I'm saying much of their money is made from fraud,

3    yes, sir.

4    Q.    And they're non-traditional in the street gang sense

5    because they don't wear gang clothes?

6    A.    There's much more than that, sir.

7    Q.    I'm sorry?

8    A.    There's much more than that, sir.

9    Q.    That's one aspect of it?

10   A.    That's one aspect of it, yes, sir.

11   Q.    They don't flash gang signs?

12   A.    They do on occasion, sir.

13   Q.    An individual may flash a gang sign from time to

14   time?

15   A.    Yes, they do use gang signs.

16   Q.    Did you ever see Mr. Darbinyan using a gang sign?

17   A.    Not that I recall, sir.

18   Q.    How much money did you -- and I mean law enforcement

19   in this investigation -- seize from defendants pertaining

20   to the 99 Cents Store scheme?

21   A.    At what point, sir?  When they were arrested?

22   Q.    At any point.

23   A.    I don't know what was taken from their home upon the

24   arrest.  We seized several thousand dollars, but I don't

25   know from whom.

1    Q.    You seized several thousand dollars, but you don't

2    know from whom or where the several thousand dollars

3    specifically came from?

4    A.    That's true, sir.

5    Q.    And I think you testified earlier on a

6    cross-examination, one of the earlier cross-examinations,

7    that you never searched Mr. Darbinyan's home, you?

8    A.    No, I never searched it, sir.

9    Q.    But I think the money that was seized from

10   Mr. Darbinyan was in a stop in August of 2010 where maybe

11   $900 was seized; is that correct?

12   A.    I don't think we seized it during that stop, sir,

13   but he had $1,000.

14   Q.    So the function of these investigations is to try to

15   seize the proceeds of illegal activities?

16   A.    Yes, we try, sir.

17   Q.    So when you stopped Mr. Darbinyan and he had $900 on

18   him, you did not seize that money, did you?

19   A.    No, sir.

20   Q.    And then let me take you back for a moment to this

21   whole Armenian Power cell issue.

22         You have determined in your investigation of

23   Armenian Power, such as it is, that different people carry

24   out activities independent of other people within this

25   whole umbrella that you've created of Armenian Power?

1    A.    The whole umbrella that I've created, sir?

2    Q.    Yes.  You've termed "Armenian Power," as I

3    understood it, in your testimony -- it is your testimony --

4    strike that.

5          It is your testimony that Armenian Power is an

6    umbrella over a number of cells; is that correct?

7    A.    Yes, sir.

8    Q.    Yeah.  And -- but you've also determined that many

9    independent activities by different people within that

10   umbrella were being carried out?

11         MR. ESTRADA:  Your Honor, I think it's been asked

12   and answered a few Times.

13         THE COURT:  Go ahead.  I'll allow him to be asked

14   one more time.

15         Is that correct?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  All right.

18         MR. SEVERO:  Thank you, Your Honor.

19   BY MR. SEVERO:

20   Q.    Your training included the seeking and obtaining of

21   wiretap orders; is that true?

22   A.    Yes.  I have had training as far as Title 3

23   investigations, yes.

24   Q.    When you say "Title 3," for the benefit of people

25   that don't know what it is, you're referring to a

1    particular section of the United States Code; correct?

2    A.    Yes, sir.  It's for wiretaps.

3    Q.    And that you have training in the Academy on,

4    Title 3 wiretap functions?

5    A.    Yes, sir.

6    Q.    And you have in-the-field training, of course;

7    correct?

8    A.    Yes, sir.

9    Q.    And you've become quite adept at writing affidavits

10   that are presented to a judge in order to obtain a wiretap

11   order; correct?

12   A.    Yes, sir.

13   Q.    You've -- you've -- in this particular case, you

14   wrote how many?

15   A.    25, sir.

16   Q.    25 wiretap affidavits?

17   A.    25 different phones, sir.

18   Q.    25 phones?

19   A.    Yes, sir.

20   Q.    And when -- as you've testified earlier, the part of

21   the order that's provided by the Court or by the judge when

22   he signs the -- he or she signs the wiretap order is

23   something called a "sealing order."

24   A.    Yes, sir.

25   Q.    And the sealing order requires that the audio of the

1  wiretap be placed under seal -- correct? -- after -- within

2  30 days of being obtained?

3  A.    I don't know specifically if it says "30 days," sir,

4  but there is a sealing.

5  Q.    It could be 10 days or 30 days?

6  A.    That's correct.

7  Q.    Now, once -- in a situation such as this, where you

8  have a foreign language audio original, did you get that

9  sealed?

10 A.    Yes, sir.

11 Q.    And what did you give your translator in order to

12 create these transcripts?

13 A.    Well, the wiretap sits on this computer, and it

14 stays on this computer.  As far as the sealing goes, we

15 actually take a disk that's in this large jukebox, and we

16 put it into evidence.

17 Q.    So the transcripts are not created from the audio

18 that is sealed and filed with the Court?

19 A.    No, sir.

20 Q.    You get it translated from some other copy or --

21 that sits in a computer at the point of entry of the call;

22 correct?

23 A.    Could you rephrase that, please, sir?

24 Q.    Yes.  Let me back up.

25       The reason you ordered to seal this audio is because

1    the law fears that it would be tampered with.  So you want

2    to have it sealed; correct?

3    A.    I don't believe the law fears it would be tampered

4    with, but there is an order to seal it.

5    Q.    And you don't know why?

6          THE COURT:  Well, it's to protect the integrity.

7          Is that correct?

8          THE WITNESS:  Yes, sir.

9    BY MR. SEVERO:

10   Q.    Right, to protect the integrity of the audio;

11   correct?

12   A.    That's correct, sir.

13   Q.    But that audio is never translated, that one that's

14   sealed.  The one that's -- strike that.

15         The one that is placed with the judge to protect its

16   integrity is never translated.

17   A.    No.  There's an identical disk that everything is

18   translated from.

19   Q.    There is another disk that it is translated from;

20   correct?

21   A.    Yes.

22   Q.    In your first application for wiretap in this case,

23   you believed -- you believed, after almost several months

24   of investigation, that the activities you believed

25   Mr. Darbinyan was engaging in were for the purpose of

1    benefiting something you called the "Darbinyan

2    Organization"; correct?

3    A.    Yes, sir.

4    Q.    You changed that later to make it broader.  And you

5    told other judges, seeking wiretap orders in your

6    affidavits, that this was for the benefit of Armenian

7    Power.

8    A.    That's correct, sir.

9    Q.    You had a different view of it at the beginning, and

10   then you changed your mind; correct?

11   A.    Yes.  We developed more information.

12   Q.    How long did you investigate the case before you

13   provided the first -- you presented the first magistrate

14   with a wiretap request?

15         MR. ESTRADA:  Objection, Your Honor, misstates the

16   legal requirements that there was a magistrate involved in

17   the wiretap.

18         MR. SEVERO:  Any judge that issues a warrant is a

19   magistrate.

20         THE COURT:  Not true, Counsel.

21         Okay.  Why don't you restate the question.

22   BY MR. SEVERO:

23   Q.    All right.  When was the first -- how long had you

24   investigated the case before you presented the first judge

25   with a wiretap request?

001849

1   A.    I would say approximately five months.

2   Q.    And during that five-month period, you surveyed --

3   you engaged in surveillance of Mr. Darbinyan?

4   A.    Yes, sir.

5         Could I correct that last question?

6   Q.    You mean the five months?

7   A.    Yes, sir.  Could I clarify that?

8         The investigation was ongoing prior to my arrival at

9   the task force.  I arrived in August, and then it was

10  January when we went up on the Title 3.

11  Q.    Thanks for the clarification.

12        You had -- the investigation had started when in

13  '08?

14  A.    It would have been early in 2008.  I don't --

15  Q.    Actually, I think -- let me gradually get there.

16        Your investigation of -- of this case started with a

17  review of other investigations by other officers that had

18  started all the way back to '06; correct?

19  A.    I don't recall that, sir.

20  Q.    You wrote an affidavit in this case; correct?

21  A.    Yes, sir.

22  Q.    The first wiretap order that you wrote was in --

23  presented approximately on January 22nd of 2009?

24  A.    That sounds correct, sir.

25  Q.    And you presented a judge with a rather lengthy

1    affidavit -- let me see if I can find the spot -- that

2    summarized the investigation; correct?

3    A.    Yes, sir.

4    Q.    Do you recall that?

5    A.    Yes, sir.

6    Q.    And do you recall saying that, since 2006, members

7    of the task force had participated in investigation of

8    members and associates of Armenian Power?

9    A.    Yes, sir.

10   Q.    So your first job was to review stuff that you --

11   that had been done before you?

12   A.    Yes, sir.

13   Q.    And you had the benefit of two years of

14   investigation when you came to the task force for the first

15   time?

16   A.    No, sir.

17   Q.    2006 to 2008?

18   A.    Oh, I thought you were referring to my experience

19   being two years.

20   Q.    No, no.  Okay.  Let me not confuse you or anyone

21   else.

22         When you came to the task force in '08, you started

23   reviewing what had happened in -- at the inception of the

24   investigation in '06.  Is that a fair statement?

25   A.    Yes, that's fair, sir.

1    Q.    So you had two years of investigation that preceded

2    you, and I think you had another five or six months of your

3    own involvement before you wrote the warrant?

4    A.    Yes, sir.

5    Q.    Excuse me.  Before you wrote the affidavit for the

6    warrant?

7    A.    Yes, sir.

8    Q.    And it was that after two years and six months, you

9    believed that there was a Darbinyan Organization?

10   A.    Well, Darbinyan was in custody for much of that

11   time.

12   Q.    You believed, at that time, that there was a

13   Darbinyan Organization?

14   A.    When we started the wiretap.

15   Q.    You can answer that "yes" or "no," can't you?

16   A.    What time, sir?

17   Q.    In 2009 -- excuse me -- yes.

18         On January 21st or 22nd, when you wrote the

19   affidavit for the first warrant, you had the benefit of two

20   and a half years of investigation in this case.

21   A.    Yes, sir.

22   Q.    And you believed, after two and a half years of

23   investigation, that there was a Darbinyan Organization

24   separate and apart from anything called Armenian Power?

25   A.    I don't believe that we said it was separate and

```
 1   apart.  I believe we termed it separate, but it was

 2   related.

 3   Q.     It was related, but it was termed as a different

 4   type of organization aside from Armenian Power?

 5   A.     Yes.  It had its own name, sir.

 6   Q.     And in fact, you believed at that time that this

 7   Armenian organization was loosely -- a number of loosely

 8   affiliated cells; true?

 9   A.     What Armenian organization, sir?

10   Q.     This Armenian Power --

11   A.     Yes.

12   Q.     -- organization.

13          Actually, what you said was that Armenian organized

14   crime -- not gang -- Armenian organized crime consisted of

15   loosely affiliated cells.

16   A.     Yes, it does.

17   Q.     Do you know how many cells there were?

18   A.     In Los Angeles?

19   Q.     Yes.

20   A.     No, sir.

21   Q.     There were more -- when you said "loosely affiliated

22   cells," what were you telling the judge under penalty of

23   perjury?

24   A.     I was aware of -- I was aware of several different

25   cells.
```

1    Q.    "Several" being more than two?

2    A.    Yes.

3    Q.    More than five?

4    A.    I don't know, sir.

5    Q.    Certainly more than two?

6    A.    Yes, sir.

7    Q.    And each had its own leader; correct?

8    A.    Not necessarily, sir.

9    Q.    Well, do you have a copy of this warrant, by the

10   way?

11   A.    Up here, sir?

12   Q.    Yes.

13   A.    No, sir.

14   Q.    I have my own.  I wonder, did you bring one to

15   court?

16   A.    No, sir.

17   Q.    May I --

18        MR. ESTRADA:  I think, if we wants to refresh the

19   witness's recollection --

20        MR. SEVERO:  Sure.

21        MR. ESTRADA:  -- he can provide it to the Court.

22        If I can take a look first, please.

23        MR. SEVERO:  Sure.

24        MR. ESTRADA:  Which portion?

25        MR. SEVERO:  I'm directing -- let me describe the

1    document for the -- for the Court.

2         This is an application under seal under Title 3.  It

3    has a case number or CR Miscellaneous Number 09-00013.  It

4    has a stamp of the United States District Court Clerk's

5    Office, dated January 22nd, 2009.

6         THE COURT:  Okay.

7         MR. SEVERO:  It consists of --

8         MR. ESTRADA:  I think that description is

9    sufficient.

10        THE COURT:  That completes the description.

11        MR. SEVERO:  It's 123 pages, and I will direct the

12   witness's attention to page 6 of the affidavit.

13        THE COURT:  Okay.

14        MR. SEVERO:  Page 29 of the document.

15        THE COURT:  Okay.

16   BY MR. SEVERO:

17   Q.   Before I hand this to you, you don't recall saying

18   that there were -- that each cell had its own leader?

19   A.   I don't recall if I said that or not.

20   Q.   And would reviewing this document perhaps refresh

21   your recollection?

22   A.   Yes, sir.

23        MR. SEVERO:  May I hand this document to the clerk?

24        THE COURT:  Yes.

25

1    BY MR. SEVERO:

2    Q.    And directing your attention to page 6, I actually

3    have it underlined.

4            THE COURT:  Again, just read it, and then just tell

5    us whether or not it refreshes your memory.

6                    (Witness reads document.)

7    BY MR. SEVERO:

8    Q.    Have you had an opportunity to refresh your

9    recollection?

10   A.    Yes, sir.

11   Q.    Having refreshed your recollection, do you recall

12   now whether the cells -- the several cells for each of

13   these organizations and several cells of -- as part of this

14   organization had their own leaders?

15   A.    Yes.

16           MR. SEVERO:  Thank you.

17           May I?

18           THE CLERK:  Sure.

19           MR. SEVERO:  Thank you.

20           Sorry, Your Honor.  I need a moment.

21           *(Pause while counsel reviews documents.)*

22   BY MR. SEVERO:

23   Q.    In your investigation in this case, how many

24   different Capones did you come across?

25           Let me rephrase that because it may be somewhat

**001856**

1    confusing.

2         "Capone" was a moniker used by a number of people in

3    this particular case; is that true?

4    A.    Within Armenian Power, sir?

5    Q.    Within Armenian Power.

6    A.    There was one Capone that was dead and one that was

7    alive, sir.

8    Q.    All right.  You were present in court when Sergeant

9    Stohl testified yesterday?

10   A.    Yes, sir.

11   Q.    And you are aware that the name Capone is used very

12   commonly by members of different gang organizations?

13   A.    Yes, sir.

14   Q.    How many other nicknames for Mike Darbinyan did you

15   come across?

16   A.    Several.

17   Q.    How about Hollywood Mike?

18   A.    Yes, sir.

19   Q.    How about Bad Boy?

20   A.    Yes, sir.

21   Q.    Caps?

22   A.    Yes, sir.

23   Q.    Actually, Mike Darbinyan is a nickname itself

24   because his name is Mher; is that right?

25   A.    That's correct, sir.

1    Q.    Did he often refer to himself as Mher?

2    A.    Yes, I would say.  Yeah.

3    Q.    From time to time, he would talk and say "Mher would

4    say this" or "Mher would say that," speaking of himself in

5    the third person?

6    A.    Sometimes.

7    Q.    How many calls did you intercept like that?

8    A.    I don't recall, sir.

9    Q.    Do you even recall one?

10   A.    Where he refers to himself as Mher?

11   Q.    Yes.

12   A.    Not off the top of my head, sir.

13   Q.    When was the issue of the 99 Cents Stores fraudulent

14   transactions first brought to your attention?

15   A.    Can you be more specific about that, sir?

16   Q.    When did you first learn that 99 Cent Stores were

17   having a problem with credit card fraud?

18   A.    It would have been July 2009.

19   Q.    And how did you learn of this?

20   A.    I believe we received information, maybe through

21   other channels, but from Riverside Police Department.

22   Q.    What prompted Riverside Police Department to give

23   the task force information about a 99 Cents Store credit

24   card problem?

25   A.    They had discovered a Range Rover during one of the

1    point-of-sale swap-outs, and it was registered to Hermione

2    Barseghian (phonetic), which we knew, that Range Rover.

3    Q.    So did you have like an all-points bulletin out for

4    these names or information out to the various police

5    departments about the involvement of --

6          What was the guy's name?

7    A.    It was a female, Hermione Barseghian.

8    Q.    Hermione Barseghian.

9          -- of Ms. Barseghian?

10   A.    Is there an all-points bulletin?

11   Q.    Yes.

12   A.    I believe Riverside was investigating, sir.

13   Q.    Was it more like you had information out to police

14   departments that any type of criminal activity that

15   involved Armenians should be related to you?

16   A.    No, sir.

17   Q.    So this just happened to come your way because

18   there's a Range Rover with Ms. -- what's her name, again?

19   A.    Barseghian.

20   Q.    -- Barseghian's name on it, just by chance?

21   A.    No, sir.

22         The EOCTF is widely considered in law enforcement as

23   the intelligence hub for organized crime related

24   activities.

25   Q.    For Russian?  Armenians?

1    A.    For Russians, Armenians, basically Eurasian people.

2    Q.    Right.  So if an Armenian name comes up, it gets

3    relayed to you?

4    A.    Yes, but we don't direct them to do that.

5    Q.    It's just that you have this -- this notoriety out

6    there for this sort of investigation.  Is that --

7    A.    Generally, sir, they call us for information.

8    Q.    And you -- did you, yourself, take the call on

9    the -- in July of 2009?

10   A.    I don't recall, sir.

11   Q.    The first instance in July of 2009, I think it was

12   the video on July 6th of 2009, what was the surveillance

13   that was conducted at that store?

14   A.    Just a surveillance video, sir.

15   Q.    No -- no law enforcement surveillance?

16   A.    Not from the task force, sir.

17   Q.    And from anyone that you're aware of?

18   A.    Not that I'm aware of, sir.

19   Q.    From the July 6th video, are you able to determine

20   from that -- from the machine that's shown on that video,

21   what credit card transactions were -- strike that.

22         From that video, can you tell what credit card

23   numbers were taken from that machine?

24   A.    Strictly from the video, sir?

25   Q.    No, not strictly from the video.  From the machine.

001860

1           Let me clarify that.  The machine that was shown on

2     July 6th -- and I believe you testified it was

3     Mr. Tarverdyan that's in the store -- did you tie that

4     machine to a particular -- to particular card numbers or

5     debit card numbers that were taken?

6     A.     We tied victims to that store, but not to the

7     particular machine, sir.

8     Q.     Do you know how many machines were taken?

9     A.     They swapped out two that day.

10    Q.     They swapped out two.  And what did -- did they take

11    the compromised one, or did they deliver it on that day?

12    A.     They would have delivered it, sir.

13    Q.     And what -- and then there's another video.  At what

14    point -- strike that.

15          At what point were the compromised machines picked

16    up?

17    A.     I don't know, sir.

18    Q.     The person that you believed to be Mr. Simonian --

19    A.     Yes, sir.

20    Q.     -- on the photo, 345B?

21    A.     Yes, sir.

22    Q.     Do you recall that?

23    A.     Yes, sir.

24    Q.     That person you said -- you testified that had

25    switched out the -- the machine; correct?

1    A.    Yes, sir.

2    Q.    But it's also true that he did --

3          Did he do this with one hand?

4    A.    I'm sorry, sir?

5    Q.    Did you see him do it with only one hand?

6    A.    You can see the terminal, one in this hand and one

7    in this hand.

8    Q.    Didn't he have the phone to his ear?

9    A.    Like this, sir (indicating).

10   Q.    Did he have the phone to his ear?

11   A.    Yes, like this (indicating).

12   Q.    So he had two hands on the machine and the phone on

13   his shoulder.  Is that what you're saying?

14   A.    Yes.

15         MR. ESTRADA:  So the answer is clear for the record,

16   it's Simon Antonyan, not "Simonian."

17         THE COURT:  Okay.  Is that who we're talking about?

18         THE WITNESS:  Yes, sir.

19         MR. SEVERO:  I appreciate the clarification.  I

20   wrote --

21         THE COURT:  Okay.

22   BY MR. SEVERO:

23   Q.    Now, was Simon Antonyan -- and you've testified

24   about this about many people in this case, when you say

25   that many of these people are defendants in this case, like

1    Simon Antonyan.  Is he a defendant?

2    A.    Yes, sir.

3    Q.    Raymond Tarverdyan?

4    A.    Yes, sir.

5    Q.    And I'm butchering these names, I know.

6    A.    No, you're good so far, sir.

7    Q.    Khachatur Arakelyan?

8    A.    Yes, sir.

9    Q.    When you say they are defendants in this case, they

10   were charged in the case; correct?

11   A.    Yes, sir.

12   Q.    That's all it is; correct?

13   A.    No.

14   Q.    Hold on.  They were charged in this case; correct?

15   A.    Yes, they were charged.

16        (Pause while counsel reviews documents.)

17   BY MR. SEVERO:

18   Q.    All right.  And, now, Khachatur Arakelyan is Hecto?

19   (phonetic)

20   A.    Hecho (phonetic), yes, sir.

21   Q.    That's pretty good.  Khecho?

22   A.    Yes, sir.

23   Q.    All right.  And Khecho and Mr. Darbinyan speak a

24   number of times during -- during a number of the calls that

25   we have heard; correct?

001863

1   A.      Yes, sir.

2   Q.      Directing your attention to July 13, 2009, and Call

3   No. 138, if we could turn to that for a moment, please.

4           MR. SEVERO:  And may the jury also, in their books,

5   turn to 138A.

6   BY MR. SEVERO:

7   Q.      You were -- the task force was monitoring this call

8   as it was coming in; correct?

9   A.      Yes, sir.

10  Q.      And it was 7:09 in the evening?

11  A.      Yes, sir.

12  Q.      Directing your attention to page 3 of the

13  transcript, the last page of the transcript, at this point,

14  five speakers down, Speaker 1 says something about (as

15  read:)

16              "[UI] it has left that place, and now we are

17              waiting over here."

18  Do you see that?

19  A.      Yes, sir.

20  Q.      What surveillance did you engage in to determine

21  what -- where "over here" was?

22  A.      We were following Mike Darbinyan at this time, sir.

23  Q.      And where was he?

24  A.      He was at the Weed Shop.

25  Q.      And that surveillance had started what time of the

1    day?

2    A.    Early afternoon, sir.

3    Q.    Now, did you --

4          MR. SEVERO:  Can I have a moment, Your Honor?

5          THE COURT:  Yes.

6    BY MR. SEVERO:

7    Q.    Had you followed him from another location?

8    A.    Yes, sir.

9    Q.    From where?

10   A.    We began in North Hollywood and then to the Glendale

11   Los Feliz area and then ending -- then we followed him to

12   the Weed Shop.

13   Q.    Was he driving?

14   A.    Yes, sir.

15   Q.    Was he by himself?

16   A.    I believe so, sir.

17   Q.    Did he drive fast to this Weed Shop?

18   A.    I don't recall, sir.

19   Q.    You don't recall either if he drove straight or made

20   many turns along the way, do you?

21   A.    I remember that he had Arakelyan following him, and

22   I believe at one point we lost him, but I don't remember

23   anything particular about it, sir.

24   Q.    Khachatur Arakelyan was following Mike Darbinyan?

25   A.    Yes, sir.

1    Q.    And you lost who?

2    A.    We lost both of them for a few minutes, sir.

3    Q.    But you don't remember how or where?

4    A.    I remember losing them in -- on the way to

5    Hollywood, but other than that, sir, I don't recall the way

6    they were driving.

7    Q.    And while you were at the Weed Shop -- how long were

8    you positioned at the Weed Shop?

9    A.    Several hours, I would say, sir.

10   Q.    And during that time, Mr. Darbinyan was there?

11   A.    I'm sorry?

12   Q.    During all that time, Mr. Darbinyan was at the Weed

13   Shop?

14   A.    Yes, sir.  Darbinyan and several others.

15   Q.    They came and went?

16   A.    No, they were actually parked in their back parking

17   area in the dark for several hours.

18   Q.    Did you ever stop Mr. Darbinyan on that evening?

19   A.    No, sir.

20   Q.    Did anyone, to your knowledge?

21   A.    No, sir.

22   Q.    Was any of the conversation being had with these

23   people overheard?

24   A.    No, sir.

25   Q.    These people -- was Mr. Darbinyan meeting with

1    anyone outside in the parking lot?

2    A.    Was he meeting with anyone?

3    Q.    Yes.

4    A.    Yes, sir.

5    Q.    During all this time?

6    A.    Yes, sir.

7    Q.    So none of the gatherings were inside the Weed Shop;

8    true?

9    A.    On this night, sir?

10   Q.    On this night.

11   A.    Not that I recall, sir.

12   Q.    I'm going to take you back for one moment to

13   Exhibit 137, the call just before that.

14         Is this the call where Mr. Arakelyan and this person

15   you believed to be Mike Darbinyan agreed to go have some

16   coffee somewhere; right?

17   A.    Yes.  There's another call after this.  So we didn't

18   play it, sir.

19   Q.    Did they -- it says, "Come to Raffo's store, and

20   we'll go from there."  Do you see that?

21   A.    Yes, sir.

22   Q.    Five speakers from the bottom?

23   A.    Yes, sir.

24   Q.    Did you follow Mr. Darbinyan to Raffo's store?

25   A.    No, sir.  As I said, there was another call.  They

1    didn't go there.

2    Q.    Directing your attention to Exhibit 139 --

3          If I may turn to that, Your Honor?

4          THE COURT:  Yes.

5    BY MR. SEVERO:

6    Q.    This is on the same day.  Actually, this is on

7    July 16th of 2009 at approximately 10:20 p.m.; correct?

8    A.    That's correct, sir.

9    Q.    The second page of the transcript starts with a

10   recording -- not the transcript, but the call itself,

11   actually, starts with a recording that the call has been

12   forwarded to an automatic voice message system; correct?

13   A.    Yes, sir.

14   Q.    But then you -- what number did -- strike that.

15         Who initiated this call?

16   A.    Well, there's two calls, sir.  Darbinyan calls

17   Arakelyan, and when he's about to leave a voice message, he

18   gets an incoming call from Arakelyan.

19   Q.    You believe that there are -- that --

20         Where in the transcript do you see that, or where in

21   the call did you get that?

22   A.    You can hear the way he's leaving a message, and

23   then you hear him say "Hello, hello."

24   Q.    And the reason you recognize the call coming in is

25   because you recognize Arakelyan's voice?

1    A.    Yes, I recognize Arakelyan's voice.

2    Q.    The same way you recognize Mr. Darbinyan's voice in

3    other instances?

4    A.    Yes, and the numbers come through.  The phone is

5    registered to him.

6    Q.    The number that comes through, it comes through on

7    the screen at the -- at the monitoring center?

8    A.    Yes, sir.

9    Q.    So the call was coming in from what you knew to be

10   Arakelyan's number?

11   A.    Yes, sir.

12   Q.    When you testified that Mr. Darbinyan, in your

13   estimation, was asking for four runners for the following

14   day --

15   A.    Yes, I remember testifying.

16   Q.    Is that your belief?

17   A.    Yes, sir.

18   Q.    -- do you know where those runners were supposed to

19   go?

20   A.    There's additional calls where they talk about where

21   to meet.

22   Q.    Did you follow anyone to the place where these four

23   runners were supposed to go?

24   A.    I don't believe so, sir.

25   Q.    So no surveillance of anyone the following day, the

1    17th?

2    A.      I don't believe so, sir.

3    Q.      Your belief is that he was asking for four runners,

4    but you are not able to tell us here today whether four

5    runners, in fact, were sent anywhere?

6    A.      Yes, I --

7    Q.      You think that four runners went to a particular

8    location?

9    A.      Yes.

10   Q.      And that's based on?

11   A.      Calls and conversations with cooperators.

12   Q.      Which are also interpreted by you, the calls?

13   A.      The calls are transcribed by an Armenian translator,

14   and then the words are what they are.

15   Q.      The words are what they are, not what you want them

16   to be; correct?  I mean, you wouldn't do that?

17          MR. ESTRADA:  Objection, Your Honor.  Argumentative,

18   Your Honor.

19          THE COURT:  Sustained.  Next question.

20   BY MR. SEVERO:

21   Q.      On the next call, 130 -- sorry -- 140, that call is

22   on July 16th also at 10:27?

23   A.      Yes, sir.

24   Q.      Seven minutes after -- correct? -- the last call?

25   A.      Yes, sir.

1    Q.    In your investigation, how many times before

2    July 16th at 10:27, how many times did you come across the

3    use of the word "judo"?

4    A.    I don't recall, sir.

5    Q.    We have heard two weeks of testimony, and is it fair

6    to say that, for the calls that have been played here, the

7    word "judo" has never come up?

8    A.    That's true, sir.

9    Q.    Are you aware that Mr. Darbinyan was, in fact, a

10   practitioner of judo?

11   A.    I think I've heard it here in the courtroom, but I

12   have no independent knowledge of that.

13   Q.    Well, have you -- you've investigated --

14         MR. SEVERO:  Just a moment, Judge, please.

15         *(Pause while counsel reviews documents.)*

16   BY MR. SEVERO:

17   Q.    Isn't Mr. Tarverdyan involved in judo as well?

18   A.    His brother has a mixed martial arts gym.

19   Q.    Where?

20   A.    Glendale.

21   Q.    The code word "judo" you don't recall being used

22   before this date; is that correct?

23   A.    No, sir, I don't recall that.

24   Q.    So when you used -- when you interpreted this call

25   to say that judo meant something other than judo, it was

1   based on your gut feeling about this?

2   A.    No, sir.

3        MR. ESTRADA:  Objection, argumentative.

4        THE COURT:  Overruled.  He said, "No."

5   BY MR. SEVERO:

6   Q.    You think the word "judo fighter" doesn't mean judo

7   fighter?

8   A.    That's correct, sir.

9   Q.    Because you have heard "judo fighter" before?

10  A.    Because of the context of the call and the following

11  calls, I know that it does not mean judo fighter.

12  Q.    Because the judo fight -- because you have heard the

13  word "judo fighter" used before in a context other than

14  judo fighter?

15  A.    I had not heard the word "judo fighter" before this

16  call, sir.

17  Q.    Didn't you, under questioning by Judge Klausner, say

18  that you had heard the word "judo fighter" before?

19  A.    I don't believe that I testified to that, sir.

20  Q.    "Judo fighter" you believed to be a code word?

21  A.    Yes, sir.

22  Q.    You believe it to be a code word based on the

23  context of this conversation and what preceded that

24  conversation a few minutes earlier?

25  A.    Based on my training, experience, and role in this

1    investigation, including surveillance, conversations with

2    cooperators, calls coming after this call, yes, sir, I

3    believe "judo fighter" is code.

4    Q.    But you never heard it before.

5    A.    Before this call, sir?  Not before this call, sir.

6    Q.    And of course, you have never heard the word

7    "kimano" before.

8    A.    I've heard the word "kimano" before.

9    Q.    Well, not in the context of a code word.

10   A.    Not before this call, sir.

11   Q.    The call before, 139, is the request for Blondie to

12   arrange for four people the next day.  Do you recall that?

13   A.    Yes, sir.

14   Q.    Did you follow Mr. Arakelyan to see what four people

15   he would come up with?

16   A.    I don't recall, sir.  I don't believe so.

17         THE COURT:  Ladies and gentlemen, we're going to

18   break at this time, it being 11:30.  We'll come back in at

19   1:00 o'clock.

20         Remember the admonishment not to discuss the case

21   among yourselves.

22         THE CLERK:  All rise.  This court's in recess.

23     (Whereupon the lunch recess taken until 1:00 p.m.)

24   (Volume II of II transcript filed under separate cover.)

25                        --oOo--

1                    **C E R T I F I C A T E**

2

3           I hereby certify that, pursuant to Title 28,

4    Section 753, United States Code, the foregoing is a true

5    and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United

9    States.

10          Certified on March 20, 2015.

11

12                          /s/ Katherine M. Stride
                            KATHERINE M. STRIDE, CSR RPR
13                          Official Court Reporter
                            License No. 11773

14

15

16

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    – – – –

5

6

UNITED STATES OF AMERICA,          )
7                                   )
                    PLAINTIFF,      )
8                                   )
        vs.                         )    No. CR 11-00072(A)-RGK
9                                   )
(1)  MHER DARBINYAN,                )
10   (4)  ARMAN SHAROPETROSIAN,     )
     (35) RAFAEL PARSADANYAN,       )
11                                  )
                    DEFENDANTS.     )
12   _____)

13

14            REPORTER'S TRANSCRIPT OF JURY TRIAL

15               DAY 9; VOLUME II of II

16                  PAGES 1 – 124

17             FRIDAY, APRIL 4, 2014

18                  1:00 P.M.

19             LOS ANGELES, CALIFORNIA

20

21

22      _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24             *255 East Temple Street*
               *Los Angeles, CA  90012*
25                *213.894.5949*

      UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477
 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579
 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                          I N D E X
```

*GOVERNMENT'S WITNESS:*                                    *PAGE*

**JEREMY STEBBINS**

   CROSS-EXAMINATION (Continued) BY MR. SEVERO          4

   CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ              74

   CROSS-EXAMINATION BY MR. FLIER                       84

**DAVID OGDEN**

   DIRECT EXAMINATION BY MR. CREIGHTON                  39

   CROSS-EXAMINATION BY MR. SEVERO                      54

   CROSS-EXAMINATION BY MR. FLIER                       70

```
                       E X H I B I T S

                        GOVERNMENT'S

               NUMBER            ADMITTED

                343                44

                344                48
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001877**

```
 1            LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 4, 2014

 2                           1:00 P.M.

 3                          - - - -

 4       (In the presence of the jury:)

 5            THE COURT:  The record will reflect that the jurors

 6    are all present, including the alternates, the witness is on

 7    the witness stand, and we are in cross-examination.

 8       Counsel.

 9            MR. SEVERO:  Thank you, your Honor.

10       JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

11                    CROSS-EXAMINATION (CONTINUED)

12    BY MR. SEVERO:

13    Q.   Good afternoon, sir.

14    A.   Good afternoon, sir.

15    Q.   Let me direct your attention and of that the jury to

16    Exhibit 150.  This is a call -- you have it in front of you,

17    sir?

18    A.   Yes, sir.

19    Q.   This is a call on July 18th, 2009; is that correct?

20    A.   That's correct, sir.

21    Q.   2:15?

22    A.   Yes, sir.

23    Q.   The person you've identified as Mr. Tarver --

24    Tarverdyan --

25            I chewed that one up this time.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   A little bit, sir.

2   Q.   -- and Speaker 1, or Mr. Darbinyan, according to your

3   testimony, about four speakers up from the bottom, "There is,

4   yeah, here, uhhh, in a couple of hours we'll give them about

5   300."

6        You see that?

7   A.   Yes, sir.

8   Q.   Your testimony is that you believe that's 300 debit cards?

9   A.   Yes, sir.

10  Q.   Who did you seize 300 debit cards from?

11  A.   I'm sorry, sir?

12  Q.   From whom did you seize 300 debit cards?

13  A.   I don't believe we seized any debit cards on this day.

14  Q.   On this particular day?

15  A.   No, sir.

16  Q.   How many debit cards did you seize in the case?

17  A.   Later we seized several.

18  Q.   Several like five?

19  A.   Post takedown, I think we seized a few hundred.

20  Q.   Well, where did you get it?  Post takedown?

21  A.   Yes, sir.

22  Q.   From whom?

23  A.   The Davtyan brothers.

24  Q.   The whom?

25  A.   Subjects in this case.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   No.  What are their names?

 2   A.   Ogannes and Edward Davtyan.

 3   Q.   None of whom we've seen on the videos, correct?

 4   A.   No, sir.

 5   Q.   Maybe I should rephrase that since I said "correct" at the

 6   end.  None of them were seen in the video?

 7   A.   Not that I know of, sir.

 8   Q.   None of them we've heard on the calls?

 9   A.   No, sir.

10   Q.   And were they indicted in this case?

11   A.   Not in this case, sir.  Related case.

12   Q.   But not on this case?

13   A.   No, sir.

14   Q.   Related case meaning other defendants in another case,

15   correct?

16   A.   Well, it's kind of all the same investigation, but it's

17   another indictment, yes, sir.

18   Q.   Separate defendants, another case?

19   A.   Yes, sir.

20   Q.   In this particular indictment that you brought -- well,

21   let me put it this way.  From Mr. Tarverdyan did you seize any

22   cards?

23   A.   Yes, sir.

24   Q.   How many?

25   A.   There were several hundred at a location.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Blank?

2    A.    Some of them had re-encoded card numbers, some of them did

3    not.

4    Q.    At what location?

5    A.    It was an office at Saticoy Street.

6    Q.    We haven't seen that in evidence here, have we?

7    A.    Not in this case, sir, no.

8    Q.    Is that related to another case?

9    A.    No.  It's part of this indictment, sir.

10   Q.    Did you seize any cards from Mr. Darbinyan?

11   A.    No, sir.

12   Q.    Did you seize any cards from Mr. Karo Yerkanyan?

13   A.    I don't believe so, sir.

14   Q.    Arman Tangabekian?

15   A.    No, I don't believe so, sir.

16   Q.    While we're on the subject of those, have you played any

17   calls in this case where there's any reference to a transfer of

18   money from Mr. Darbinyan to Mr. Tangabekian?

19   A.    Yes, sir.

20   Q.    Transfer of actual funds from them?

21   A.    Yes, sir.

22   Q.    Okay.  How much?

23   A.    It was in the calls, sir.  I believe it was several

24   thousand dollars.

25   Q.    Did you seize that money from Mr. Tangabekian?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   No, sir.

2    Q.   Did you ever seize any of that, that kind of money from

3    Mr. Darbinyan?

4    A.   I don't believe so, sir.

5    Q.   Did you play any calls in this case of transfer of money

6    between Mr. Darbinyan and Mr. Tarverdyan?

7    A.   Yes, sir.

8    Q.   How much money?

9    A.   Whatever dollar amount Mr. Parsadanyan was carrying on

10   him.

11            MR. FLIER:  I'm going to object.

12            THE COURT:  I'm sorry?

13            MR. FLIER:  Nonresponsive and assumes facts not in

14   evidence.

15            THE COURT:  Overruled.  You can cross-examine on it.

16   BY MR. SEVERO:

17   Q.   The call you're talking about is a July 18th stop?

18   A.   Yes, sir.

19   Q.   Where there's some reference to 30 being in a car?

20   A.   No, I don't believe the call is about that.  The call is

21   about sending Parsadanyan to Tarverdyan's house, and then he

22   tells the officers that there's $34,000 in the car.

23            MR. FLIER:  I'm going to object, your Honor.

24   BY MR. SEVERO:

25   Q.   And did you see that money transferred --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. FLIER:  Objection.  Argumentative, assumes facts
 2     not in evidence, your Honor.
 3              THE COURT:  Overruled.
 4     BY MR. SEVERO:
 5     Q.   Did you see any of that money transferred to
 6     Mr. Tarverdyan?
 7     A.   Is it the same question as before?  Because you asked if
 8     there was any evidence before.
 9     Q.   No, I didn't ask you if there was any evidence.  I asked
10     you if there was any call that referenced an actual transfer of
11     money.
12     A.   Yes.
13     Q.   Okay.  And you're saying that that call where there is a
14     reference to $34,000 shows that Mr. Tarverdyan received the
15     money?
16     A.   No, sir.  There's no discussion of the money amount.
17     There's a discussion that Mr. Parsadanyan will be transporting
18     the money, and then there's a discussion that the money has
19     arrived, in the call, sir.
20     Q.   There is no reference in the call that Mr. Darbinyan
21     transferred that money to Mr. Tarverdyan.
22     A.   Yes, there is, sir.
23     Q.   So it's fair to say that it's a matter of how you
24     interpret the call?
25     A.   No, sir.  It's in the calls.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Okay. let me direct your attention to August 20th of 2009.

2    Did you put out the call for LAPD to respond to the

3    Chicken House?

4    A.    I contacted an LAPD officer assigned to the Eurasian

5    Organized Crime Task Force, who contacted LAPD Northeast.

6    Q.    Okay.  And you communicated something to the effect that

7    you expected some violence?

8    A.    Yes, sir.

9    Q.    And you expected some gun violence?

10   A.    Yes, sir.

11   Q.    Did you not expect the responding officers to have been

12   told that?

13   A.    I expect they were told that, sir.

14   Q.    Were you here when Mr. -- Officer Giberson testified?

15        MR. ESTRADA:  Your Honor, it's improper to comment on

16   another's testimony.

17        THE COURT:  Sustained.

18        MR. ESTRADA:  And it's been asked and answered.  He

19   inquired about the Chicken House previously.

20        THE COURT:  Overruled on that part.  It's up to the

21   jury to determine whether it was or was not testified to

22   previously.

23        You have to make up your mind as to what you heard or did

24   not hear.

25        Counsel, go ahead.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   Have you seen the -- you know what a CAD is?

 3   A.   I've become familiar with the term, but I don't recall if

 4   I've seen it.

 5   Q.   A record -- if I told you it was a record of a call coming

 6   in to a police station, does that --

 7   A.   That sounds vaguely like what I've heard it is, yes, sir.

 8   Q.   Have you reviewed the CAD to the call to the Chicken House

 9   in this case?

10   A.   No, sir.

11   Q.   You heard Mr. Moreno testify about Mr. Darbinyan wanting

12   to tax some businesses?

13   A.   Yes, sir.

14   Q.   Did you get the addresses of those businesses?

15   A.   No, sir.

16   Q.   Did you investigate what businesses were being taxed?

17   A.   No.  I believe he said he didn't remember, sir.

18   Q.   Did he -- did you ask him to take you to those businesses?

19   A.   No, sir.

20   Q.   Did you ask him to take you to those restaurants?

21   A.   No, sir.

22   Q.   Well, you knew Mr. Moreno to be a liar, didn't you?

23            MR. ESTRADA:  Object, your Honor, argumentative.

24            THE COURT:  Overruled.

25            THE WITNESS:  No, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   From his past, you didn't think -- you think he was a

 3   honest person?

 4   A.   I didn't know as far as what his past -- he was never

 5   convicted of any lying, sir.

 6   Q.   You took his word for there being some businesses that are

 7   gonna be taxed on this so you didn't even have to investigate?

 8   A.   There's nothing to investigate, sir.  He didn't know where

 9   they were.

10   Q.   He went -- he testified in court here that he went to

11   restaurants and he got money at the end of the lunch or dinner.

12   You remember that?

13        MR. ESTRADA:  Again, your Honor, it's improper for him

14   to comment on the testimony of another witness.

15        THE COURT:  Sustained.

16   BY MR. SEVERO:

17   Q.   Did he not tell you what restaurants he went to?

18   A.   He did not tell me what restaurants he went to, sir.

19   Q.   Did you try to tell -- did he tell you what city they were

20   in?

21   A.   I believe he had vague recollections of a city.

22   Q.   Bottom line is, when he told you he didn't remember, you

23   left it at that, correct?

24   A.   We asked follow-up questions about names of any

25   individuals he may have met with, general street locations, and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    he did not have any recollection.

2    Q.   He had no recollection at all of where he had been, but he

3    had recollection that he had received money?

4    A.   Yes.

5    Q.   During the time that Mr. Moreno was talking to

6    Mr. Darbinyan on the telephone, were you tapping all the

7    calls that were coming out of or coming into Mr. Darbinyan's

8    phones?

9    A.   Only the phones that we knew about, sir.

10   Q.   The ones Moreno was calling?

11   A.   Yes, one of them Moreno was calling.

12   Q.   Right.  I mean, you played a number of calls with Moreno,

13   correct?

14   A.   Yes, sir.

15   Q.   Did you have any calls that would direct you to a

16   particular meeting at a restaurant during that period of time

17   when they were meeting?

18   A.   I don't believe so, sir.

19   Q.   Let me ask you, did you play any calls in this case, in

20   this trial, between Mr. Darbinyan and Armen Hovanissian?

21   A.   No, sir.

22   Q.   Do you know -- if you know, is the name Hovanissian

23   relatively common amongst Armenians?

24   A.   There is a number of different spellings.  I don't really

25   know how common it is.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   How about Armen?

2    A.   Armen's very common, yes, sir.

3    Q.   Do you know how many Armen Hovanissians there are in the

4    818 area code?

5    A.   No, sir.

6    Q.   You recall the testimony of Deputy Hickey, that he

7    discovered a card with a phone number and the name Armen

8    Hovanissian on it?

9    A.   Yes, sir.

10   Q.   Did you follow up on that phone number?

11   A.   I don't believe we did, sir.

12   Q.   Did you call that phone number to find out if it was Armen

13   Hovanissian's phone number?

14   A.   No, sir.

15   Q.   You were shown a picture of Armen Hovanissian and you said

16   he was a defendant in this case.

17          MR. ESTRADA:  Your Honor, actually, we didn't get to

18   show the picture.  There was an objection to it.

19          MR. SEVERO:  Actually --

20          MR. ESTRADA:  So it was never shown.

21          THE COURT:  Well, rather than testifying from the two

22   of you, did you ever see or did you ever present here in court

23   a picture or identify a picture of Mr. Hovanissian?

24          THE WITNESS:  No, we weren't.

25          THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   Did you not see it in opening statements?

 3   A.   I don't believe it was in opening statements, sir.

 4   Q.   By Mr. Estrada?  By Mr. Estrada you were shown a picture

 5   of a guy with A and P on his shoulders.

 6        MR. ESTRADA:  I'd like to clarify, your Honor.  That

 7   was Karo Yerkanyan, not Armen Hovanissian.

 8        MR. SEVERO:  Well, okay.

 9        THE COURT:  Correct.

10   BY MR. SEVERO:

11   Q.   So that was not Hovanissian, right?

12   A.   No, sir.

13   Q.   You actually conducted -- you actually installed a pole

14   camera in front of Mr. Darbinyan's place of business, did you

15   not?

16   A.   Yes, sir.

17   Q.   And you had 5,000 hours of surveillance photos, correct?

18   A.   Surveillance footage, yes, sir.

19   Q.   Surveillance footage.

20   A.   Yes, sir.

21   Q.   None of that was presented here, correct?

22   A.   No, sir.

23   Q.   Because you found nothing, correct?

24   A.   We didn't review the 5,000 hours, sir.

25   Q.   Obviously, then, there was nothing significant that you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    could have found in the 5,000 hours --
 2              THE COURT:  If you know.
 3    BY MR. SEVERO:
 4    Q.   -- if you didn't review them.
 5    A.   I don't know what was in it, sir.
 6    Q.   Your surveillance policy in this case was based on the
 7    calls that would come in?  You would then create a surveillance
 8    plan?
 9    A.   Sometimes, sir.
10    Q.   Other times it was just a drive-by, incidental type of
11    surveillance?
12    A.   Sometimes, sir.
13    Q.   On the ones that were planned, there was always a log
14    created?
15    A.   I would say generally there were logs created, sir.
16    Q.   The ones that were planned, was someone assigned to take
17    photographs?
18    A.   No, sir.
19    Q.   Ever?
20    A.   No, sir.
21    Q.   You didn't care to take photographs of the surveillance?
22    A.   No.  I don't remember if I testified about this, but we
23    don't really assign somebody to take photos, because that's
24    really not the way you do it.  Somebody has a camera and you
25    take photos if you're able.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   So you depend on photographs being taken by chance?

2   A.   Well, if you find yourself in a position to take photos

3   and it would not compromise the investigation, you take a

4   photo.

5   Q.   Right, I get that, but don't you plan ahead of time to see

6   if someone should have a camera and take photos --

7   A.   Yes.

8   Q.   -- if the opportunity arises?

9   A.   Most of the people that owned a camera should have had a

10  camera in their car.

11  Q.   And I think there are -- there's a surveillance of

12  Mr. Ortega with Mr. Darbinyan where photos were taken?

13  A.   Yes.  There's several.

14  Q.   And one of Mr. Moreno with Mr. Darbinyan where photos were

15  taken?

16  A.   There's several of those, too, sir.

17  Q.   Several photos?

18  A.   Several surveillances where photos were taken of

19  Mr. Darbinyan and Mr. Moreno.

20  Q.   But the overwhelming majority of the surveillance had no

21  photos.

22  A.   I don't know if I would say the overwhelming majority, but

23  there are many.

24  Q.   The one where you trespassed on the building and climbed

25  up to the fire -- to the roof, you remember that one?

1    A.    I remember the surveillance where I climbed on the roof,

2    sir.

3    Q.    You don't carry a camera, do you?

4    A.    I didn't carry a camera that night, sir.

5    Q.    You carry a camera sometimes?

6    A.    Yes.

7    Q.    How many PIN pad devices were seized from people in this

8    case other than the ones that you got at 99 Cent Store?

9            THE COURT:  As part of this investigation?

10           MR. SEVERO:  Oh, yes.  I'm sorry.

11           THE COURT:  Okay.

12           MR. SEVERO:  Let me rephrase it so it's all one

13   question.

14   Q.    As part of this investigation, how many PIN pad machines

15   did you seize from persons other than the ones given to you or

16   given to the law enforcement by the 99 Cent Store personnel?

17   A.    I believe there was a few.

18   Q.    Taken from whom?

19   A.    Some were taken from the home of Hagop Yamalyan on the

20   arrest date, February 16, 2011.

21   Q.    Hagop who?

22   A.    Yamalyan.

23   Q.    How many?

24   A.    I don't recall.

25   Q.    Any others?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   I don't think so, sir.

2    Q.   You testified earlier in this case that you believe that

3    Mr. Darbinyan had ten phones.  Not all at the same time, but on

4    and off.  Correct?

5    A.   At least ten phones, yes, sir.

6    Q.   When you say "at least," you targeted ten of his phones,

7    correct?

8    A.   I believe we had recorded numbers for ten of his phones.

9    We had wiretaps on either six or seven of them.

10   Q.   You believe that on the ones you had wiretap orders for,

11   you intercepted every call between January 22nd of 2009 and the

12   end of 2009?

13   A.   No.  We -- we would begin intercepting after we learned

14   that there was a number.  There would be a collection of calls

15   before, before we ever got interception authority, so there

16   would be several calls before we ever got up on a wiretap.

17   Q.   How would you know that if you didn't intercept them?

18   A.   Because there would be toll records and pen registers and

19   everything that would have to go on.

20   Q.   That you've seen?

21   A.   That I've written, yes, sir.

22   Q.   Okay.  It's part of your responsibility to stop any

23   violent crime; is that true?

24   A.   Yes.

25   Q.   Well, you sort of shook your head a little bit.  You are
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   not sure about that?
 2   A.   When it's possible.  If it's not possible to stop it, then
 3   it's -- it's difficult.
 4   Q.   Well, when it's possible, you would only stop violent
 5   crime if it doesn't interfere with your ongoing investigation;
 6   is that true?
 7   A.   No, sir.
 8   Q.   Is that -- when you say it's possible, obviously, if you
 9   can't get to the individual or the place, you can't stop it,
10   correct?
11   A.   Exactly.  We could be aware of it, but we don't know where
12   it's going to happen.
13   Q.   Right, exactly.
14   A.   Or what time.
15   Q.   But to the extent you are -- you know the individual, who
16   the individual is, you would try to stop a violent crime
17   against that person?
18   A.   Yes, sir.
19   Q.   The security of other people is important in your job,
20   correct?
21   A.   Yes, sir.
22   Q.   When did you become aware of the phone calls between Minas
23   Matsoyan -- Matosyan, I think we referred to him here as
24   "M.M.," and Mr. Sharopetrosian?
25   A.   I believe the first calls we intercepted were actually on
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Darbinyan's wiretaps, so it was June 28th or 29th.

2   Q.   June 29th sound right?

3   A.   Yes, sir.

4   Q.   Did you have Mr. Matosyan's number sometime shortly after

5   that?

6   A.   Yes, sir.

7   Q.   Did you check to see where the number would go back to on

8   an address?

9   A.   I'm sure we did, sir.

10  Q.   Did you try to warn Mr. Matosyan on June 29th or between

11  June 29th or July 4th that there was a possible extortion plot

12  against him?

13  A.   No, sir.

14  Q.   On June 29th, were you conducting surveillance on

15  Mr. Darbinyan?

16  A.   I don't recall, sir.

17  Q.   Did you -- how many times did you see Mr. Darbinyan meet

18  with Mr. Matosyan?

19  A.   I don't recall, sir.

20  Q.   Did you play any calls in this case where there was a

21  meeting arranged between Mr. Darbinyan and Mr. Matosyan?

22  A.   Yes, sir.

23  Q.   And when you received those calls, did you create a

24  surveillance plan for that meeting?

25  A.   I believe our task force would have.  I wasn't there at

```
 1    the time, sir.

 2    Q.    You were not here?

 3    A.    I was not in town for those couple of days that you're

 4    talking about, sir.

 5    Q.    You're talking about July what?

 6    A.    Sometime between the 2nd and the 5th, 6th.

 7    Q.    4th of July weekend?

 8    A.    Yes, sir.

 9    Q.    Did you investigate Mr. Matosyan for crimes he's

10    committed?

11    A.    No, sir.

12    Q.    Did anyone in the task force?

13    A.    No.  We conducted surveillance of him on several

14    occasions.

15    Q.    To ascertain whether he was committing some sort of crime?

16    A.    That, and to develop his associates and -- and basically

17    identify his circle.

18    Q.    Did you arrest him for prescription fraud, medical fraud?

19    A.    No, sir.

20    Q.    When I say "you," I mean in this case, in this

21    investigation.

22    A.    Yes, sir.  No, we did not.

23    Q.    And did you understand that there was a personal debt owed

24    to Mr. Sharopetrosian's sister-in-law that created these

25    several phone calls?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   Yes, there was a debt that was owed between the two, yes.

2  Q.   If I may direct your attention to Exhibit 75, and it's in

3  the book.

4       The jury could turn to Exhibit 75A.

5       If I may direct your attention to the second page of the

6  exhibit, seven speakers down from the top, "That, uh, he

7  brought his clinic check.  He says 'There is 4,200 in there.'"

8       You see that?

9  A.   Yes, sir.

10 Q.   What clinic is this?

11 A.   I don't know, sir.

12 Q.   Did you ever see that check?

13 A.   No, sir.

14 Q.   Are you aware of whether any check for $4,200 was cashed

15 in connection with this transaction?

16 A.   I don't have any bank statements related, sir.

17      MR. SEVERO:  I need a moment here, your Honor.

18 Q.   Let me direct your attention to page 7 of 8 of that

19 transcript, four speakers from the top.  "Now I have to pay

20 4,000 dollars in prison.  I have to pay that money off by

21 10 o'clock at night."

22      You see that?

23 A.   Yes, sir.

24 Q.   Did you understand that Mr. Sharopetrosian had a debt in

25 prison --

```
1    A.    Yes.

2    Q.    -- that he had to pay?

3    A.    Yes, sir.

4    Q.    Is that what that means?

5    A.    Yes, sir.

6    Q.    So this money was for his personal use if he ever got any?

7    A.    I'm sorry, sir?

8    Q.    The money that he would have received from Mr. Matosyan

9    would have been for his personal use?

10   A.    It could have been for a narcotics trafficking, taxes.  It

11   could have been for anything inside the prison.

12   Q.    Anything he was doing inside prison, perhaps?

13   A.    Yes, sir.

14   Q.    And now let me direct you to 76.  But before I do that, it

15   is fair to say that you have relied on the translations and the

16   accuracy of the translations of these calls in arriving at

17   opinions as to what certain things mean; is that true?

18   A.    Yes, to a certain extent the translations, yes.

19   Q.    To a certain extent?

20   A.    I mean, we also have all the other investigative tools

21   that we've talked about that we rely on for our conclusions.

22   Q.    Well, you got thousands of calls, but only a few

23   surveillances, correct?

24   A.    I'd say there's much more than a few surveillances, sir.

25   Q.    You don't have a hundred of them, do you?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   I believe there are at least a hundred surveillances in

2    your discovery, sir.

3    Q.   Well, I wish I could agree with you, but --

4              MR. ESTRADA:  Objection, your Honor, argumentative.

5    It's improper.

6              THE COURT:  Yeah, it's got no place in front of the

7    jury one way or the other.

8    BY MR. SEVERO:

9    Q.   The surveillances of Mr. Darbinyan number fewer than 20,

10   correct?

11   A.   No, sir.

12   Q.   Directing your attention to 76 in evidence, page 2.  This

13   is a call on July 4th, 2009.  You see that?

14   A.   Yes.

15   Q.   On page 1.  Sorry.

16   A.   Yes, sir.

17   Q.   And the phone that's intercepted is 779-1177, area code

18   310, correct?

19   A.   That's correct, sir.

20   Q.   I think this is number eight, target number eight?

21   A.   That's correct, sir.

22   Q.   Yeah.  About six from the bottom, you see that?  Six

23   speakers from the bottom, I'm sorry.

24   A.   Yes, sir.

25   Q.   It says, "Oh, there's a son of bitch that I kidnapped; I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    have him with me since morning."  See that?

2    A.    Yes, sir.

3    Q.    Was your team on point of surveillance on that day between

4    Mr. Matosyan and Mr. Darbinyan?

5    A.    No, sir.

6    Q.    Was there any observation that Mr. Darbinyan had anyone in

7    his car by some sort of force?

8    A.    I'm sorry, sir?

9              THE COURT:  Any observation --

10             MR. SEVERO:  I'm sorry.  Let me rephrase that.  That's

11   fair.

12   Q.    Did you have any observations from any officer in your

13   task force or law enforcement, that you're aware of, that would

14   support a taking by force of some -- of someone by

15   Mr. Darbinyan?

16   A.    No, sir.

17   Q.    In fact, the little surveillance there is of Mr. Matosyan

18   shows him coming and going and even meeting with Mr. Darbinyan

19   and then leaving him for the -- for hours at a time, correct?

20   A.    I don't know, sir.  I wasn't there for those

21   surveillances.

22   Q.    You believe that -- well, strike that.

23         How many payments did you have -- do you have written

24   evidence of made by Mr. -- let me start that again.

25         How many payments were made by Mr. Matosyan to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001900**

1    Mr. Sharopetrosian?

2    A.    To his associate, sir?

3    Q.    Through his associate, sure.

4    A.    Between six and eight, sir.

5    Q.    And they amount to what?

6    A.    Approximately $12,000.

7    Q.    That's all money advanced by the FBI?

8    A.    Yes, sir.

9    Q.    All of it?

10   A.    Yes, sir.

11   Q.    All the payments that you have evidence of came after

12   October 26, 2009, correct?

13   A.    No, sir.

14   Q.    Did you give Mr. Matosyan money before October 26?

15   A.    No, sir.

16   Q.    Okay.  So $12,000 were paid by the FBI, and that's all the

17   evidence of payments you have?

18   A.    No, sir.

19   Q.    I thought that's what you said.

20   A.    No, sir.  The evidence of payments comes prior to, with

21   the money order receipts, also the phone calls.

22   Q.    Okay.  Okay.  There are money order receipts from

23   September 2006 -- 2009.

24   A.    October 2009, sir.

25   Q.    Do you know any payments before October of 2009 that you

1    have receipts for?

2    A.   Not that I have receipts for, sir.

3    Q.   And when you said the total of payments, $12,000, does

4    that include the ones that were made before the FBI got

5    involved?

6    A.   No, sir.  Those are just the FBI payments.

7    Q.   Okay.  What I wanted to know from you was, do you know how

8    much was paid in total?

9    A.   On the entire -- paid by Mr. Matosyan prior to our

10   involvement?

11   Q.   Yes.

12   A.   I don't know off the top of my head, sir.

13   Q.   How many -- how many payments were made before you got

14   involved?

15        MR. ESTRADA:  Objection, your Honor, calls for

16   speculation.

17   BY MR. SEVERO:

18   Q.   If you know.

19        THE COURT:  Overruled.

20        If you know.

21        THE WITNESS:  I don't know, sir.

22   BY MR. SEVERO:

23   Q.   Are you aware that Mr. Matosyan got a loan from

24   Mr. Darbinyan of a thousand dollars to pay one of these

25   payments?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes, I believe it says that in the call, sir.

2    Q.    This was a loan from Mr. Darbinyan, wasn't it?

3    A.    Yes, sir.

4    Q.    Did you follow Mr. Matosyan after he came to the FBI in

5    order to determine whether he was meeting with Mr. Darbinyan?

6    A.    No, sir.

7    Q.    Did he -- are you aware of any meetings between

8    Mr. Darbinyan and Mr. Matosyan after he was involved -- after

9    the FBI was involved?

10   A.    No, sir.

11         MR. SEVERO:  Just a moment, may I, your Honor?

12   Q.    Hope I haven't asked you this before.  I'll take that

13   chance.  How many blank credit cards or debit cards did you

14   seize from Mr. Darbinyan?

15   A.    Zero, sir.

16   Q.    And you did not subpoena his bank account records?

17   A.    We did subpoena his bank account records.

18   Q.    How many phone calls have you played in this case

19   between -- can't remember the fellow's last name.  Andranik --

20   help me.

21   A.    Bakhchadjian.

22   Q.    What is it?

23   A.    Bakhchadjian.

24   Q.    Bakhchadjian?

25   A.    Yes, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Good.  Let me start it again.
 2        How many calls did you play in this case between Andranik
 3   Bakhchadjian and Mr. Darbinyan?
 4   A.   None, sir.
 5   Q.   The young lady that was shown in the pictures -- everybody
 6   appears young to me, so I'll just say young.  Varten?
 7   A.   Vartenie Ananian.
 8   Q.   Okay.  How many calls between her and Mr. Darbinyan?
 9   A.   None, sir.
10   Q.   How many calls did you play in this case between Andranik
11   and Khachatur Arakelyan?
12   A.   None, sir.
13   Q.   So as far as -- you didn't play any calls between
14   Khecho --
15        Is that his name?  Khecho?
16   A.   Khecho, yes, sir.
17   Q.   -- and Andranik, correct?
18   A.   No, sir.  We didn't have a wiretap on either of those
19   individuals.
20   Q.   Or, for that matter, any calls between Vartenie and
21   Khachatur?
22   A.   No, sir.
23   Q.   Did you ever search Mr. Arakelyan's place?
24   A.   Yes, sir.
25   Q.   And did you get credit cards from him?  I mean blank or
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  fraudulent credit cards.

2  A.   I don't believe so, sir.

3  Q.   How much cash did you take from Mr. Arakelyan?

4  A.   I don't know, sir.

5  Q.   How about Andranik?

6  A.   Yes, we searched his house.

7  Q.   What did you find?

8  A.   Credit cards.  He was trying to flush credit cards when we

9  came through the door.  It doesn't work too well.  Thumb drives

10 and other evidence of skimming.

11 Q.   And were you able to seize those?

12 A.   Yes, sir.

13 Q.   Were you able to link any of the credit cards that he was

14 trying to flush down the toilet to the one -- to anything that

15 was put through the PIN pad machines at 99 Cent Store?

16 A.   I don't believe so, sir.

17 Q.   Did you find any evidence in the thumb drive linking the

18 data there to 99 Cent Store?

19 A.   Not on the thumb drive, sir.

20 Q.   How many of the PIN pads that had skimming devices

21 attached to them showed skimming devices that were damaged, if

22 you know?

23 A.   I don't know, sir.

24 Q.   Did you try to operate any of those machines to see if the

25 skimming device worked?

1    A.    No, sir.

2    Q.    Directing your attention to 171A.  I think it's page 6

3    that we -- we skipped the first few pages of this call.

4         By the way, while you're doing that, is Andranik a

5    relatively common name?

6    A.    Andranik?

7    Q.    Yes.

8    A.    Yes, it's somewhat common.

9    Q.    And do you know, in your investigation and acquired

10   knowledge of your Armenian culture now, that Ando is a common

11   nickname for Andranik?

12   A.    Yes.

13   Q.    Page 6, eight -- nine from the bottom, "Have you heard

14   from Antosh?"

15        And Mr. Darbinyan, or the Speaker 1 that you have

16   identified as Mr. Darbinyan, says, "From whom?"

17        "Have you heard from Ando?"

18        "No."

19        "They arrested him, bro."

20        And Mr. Darbinyan answers, "Why?"

21        Do you see that?

22   A.    Yes, sir.

23   Q.    Were there any communications between Mr. Darbinyan and

24   any bail bond person concerning Andranik Bakhchadjian?

25   A.    Not at this time, sir, no.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    It's this other fellow, Artur Margaryan, that is

2    apparently making arrangements for bail for Andranik or whoever

3    it was that was arrested, correct?

4    A.    Yes, it seems to be him and others.

5    Q.    Did you ever see any transfer of money between

6    Mr. Darbinyan and this fellow, Artur Margaryan?

7    A.    No, sir.

8    Q.    In Exhibit 351A, a video of the San Diego store that you

9    played here earlier, there were two people that you were not

10   able to identify; is that correct?

11   A.    Yes, sir.

12   Q.    You had an informant in this case who provided some

13   information regarding the San Diego dealings?

14   A.    Yes, sir.

15   Q.    That person did not identify them for you, either?

16   A.    No, sir.

17   Q.    When did Mr. Ortega become a cooperating defendant in this

18   case?

19   A.    He first spoke with us 2010, I believe.

20   Q.    After he was arrested in this case?

21   A.    No.   That was after his state arrest.

22   Q.    This case was actually filed in '11, correct?

23   A.    That's correct, sir.

24   Q.    So he was cooperating with you before you indicted -- this

25   case was indicted?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   Yes, sir.  We spoke with him in state prison.

2  Q.   And did he agree to cooperate then?

3  A.   Yes, he did, sir.

4  Q.   He had been -- he's been in custody since that arrest in

5  2010?

6  A.   I believe he was arrested in 2009.

7  Q.   At least since you started talking to him, he's been in --

8  A.   Yes, sir.

9  Q.   -- custody all the time, correct?

10 A.   Yes, sir.

11        THE COURT:  Ladies and gentlemen, I'm going to take a

12 very, very short break here just so I can talk with the

13 attorneys.  So it's not really a break.  Going to bring you

14 back in about two minutes.  I'm going to ask you to step

15 outside the courtroom for just a second.

16        THE CLERK:  All rise.

17    (Outside the presence of the jury:)

18        THE COURT:  Okay.  You may have a seat.

19    The record will reflect that the jurors have left the

20 courtroom.

21    Counsel, I really probably wasn't exactly honest with the

22 jury.  I'm not -- I have no interest in talking to you about

23 anything right now, but several of the jurors were nodding off

24 and starting to sleep, so I thought it'd be a good idea to send

25 them out for one or two minutes and bring them back and finish

1   up.  So in about two minutes we'll start again, but I just

2   didn't want to lose the jurors I saw over there.

3           MR. SEVERO:  Almost done, sir.

4           THE COURT:  That's okay.  I do this for the jury's

5   sake.

6           MR. PEREYRA-SUAREZ:  Your Honor, this might be a good

7   time to mention the government wants to take a witness out of

8   order before I'm able to cross-examine Special Agent Stebbins

9   again.  I'm okay with that.

10          MR. ESTRADA:  We spoke with counsel, your Honor.

11  They're okay with us taking a witness out of order.  He needs

12  to get back to D.C. tonight.

13          THE COURT:  Okay.  That's fine.

14      Okay, I think that that's enough.  I just wanted to get

15  the cobwebs going from the jury.  So why don't you bring them

16  back in, and we'll break again at 2:30.

17      *(In the presence of the jury:)*

18          THE COURT:  Okay.  The record will reflect that the

19  jurors are back in the courtroom and the witness is on the

20  witness stand, and we were at cross-examination.

21          MR. SEVERO:  Thank you, your Honor.

22          THE COURT:  Go ahead.

23  BY MR. SEVERO:

24  Q.  Let me take you back for a moment.  You stated earlier

25  that at the takedown of this case, Mr. Tarverdyan, Tarverdyan,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   was found with some 300 credit cards or several hundred credit
 2   cards.
 3   A.   Yes.  At a business location that he was known to be
 4   involved in.
 5   Q.   And the takedown in this case was two years, over two
 6   years after this conversation; is that correct?
 7   A.   That's correct, sir.
 8   Q.   Directing your attention to Exhibit 181, if I may direct
 9   your attention to page 3 of 5, I want to say nine speakers from
10   the top.  It's probably right in the middle of the page.  It
11   starts with Speaker 1 saying, "It was 200 or something.  It was
12   200 or something like that."
13        Then the next speaker says, "Were there 200 of them over
14   there when he gave those?"
15        "Well, yes, bro.  Do you see, friend, I mean..."
16        And the speaker SA says, "We were supposed to give 500 or
17   something, right?"
18        "Probably, bro.  I probably heard it right."
19        It is your belief that the numbers 200 and 500 refers to
20   what?
21   A.   Credit card numbers.
22   Q.   Numbers?
23   A.   Yes, sir.
24   Q.   Now, was Mr. -- this call was monitored on September 16th
25   of 2009; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, sir.

 2    Q.    And was Mr. Simon Antonyan a defendant in this case?

 3    A.    Yes, he was.

 4    Q.    And was he arrested in 2011?

 5    A.    Yes, he was.

 6    Q.    At the time that he was arrested, was he in possession of

 7    any credit card numbers?

 8    A.    No, sir.

 9    Q.    Was he in possession of blank credit card plastic?

10    A.    I don't believe so, sir.

11    Q.    By the way, we spoke a bit about Artur Margaryan earlier.

12    A.    Yes, sir.

13    Q.    Was he indicted in this case?

14    A.    No, sir.

15    Q.    Mr. Stebbins, it's your duty as an agent to disclose

16    evidence to the United States Attorney's office in cases

17    they -- you're investigating, correct?

18    A.    Yes, sir.

19    Q.    And not only disclose it, but you gotta turn over any

20    physical evidence or reports of investigation that are prepared

21    or discovered during the time of the investigation; is that

22    correct?

23    A.    Yes, sir.

24    Q.    And that's true whether the evidence you collect is

25    favorable or unfavorable to your case, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Yes, sir.

2    Q.   In an interview with the United States Attorney's office,

3    did you not admit that in another case you had withheld

4    evidence --

5              MR. ESTRADA:  Objection, your Honor.  Objection, your

6    Honor.  Court order.

7              MR. SEVERO:  Can I finish the question?

8              MR. ESTRADA:  No, you cannot.

9              THE COURT:  No, you can't, Counsel.  We covered this

10   before the trial started.

11             MR. SEVERO:  We did?

12             THE COURT:  Yes.

13             MR. ESTRADA:  It was a very clear court order.

14             MR. SEVERO:  I apologize.  I --

15             THE COURT:  That's okay.  That's okay.

16             MR. SEVERO:  I have nothing further.

17             THE COURT:  Okay.  Ladies and gentlemen, the attorneys

18   have all agreed at this time to take a witness out of order

19   because the witness has problems, is leaving tonight.  So we're

20   going to excuse this witness at this time, take a witness out

21   of order, and then when we're through with that witness, we'll

22   come back in and have cross-examination by Mr. Sharopetrosian

23   and Mr. -- both attorneys at that time, Parsadanyan's attorney.

24   Thank you.

25        Want to call your witness out of order?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CREIGHTON:  Yes, your Honor.

 2         The United States calls David Ogden.

 3              THE CLERK:  Good afternoon.  Right here to be sworn,

 4    please.

 5         (Witness sworn.)

 6              THE CLERK:  Thank you.  You may be seated.

 7         May I please ask that you state your full name for the

 8    record and spell your last name.

 9              THE WITNESS:  David Ogden, D-a-v-i-d, O-g-d-e-n.

10              THE CLERK:  Thank you.

11              THE COURT:  Thank you.

12         Counsel, you may inquire.

13                   DAVID OGDEN, GOVERNMENT'S WITNESS,

14                         DIRECT EXAMINATION

15    BY MR. CREIGHTON:

16    Q.   Good afternoon.

17         Where do you work?

18    A.   I work for the U.S. Secret Service.

19    Q.   What's your title?

20    A.   Special agent.

21    Q.   And how long have you worked there?

22    A.   Since July 2001.

23    Q.   What is your present assignment?

24    A.   I am assigned to the Presidential Protective Division.

25    Q.   Is that the division that actually protects the President
```

1  both at the White House and all his travels?

2  A.    That's correct.

3  Q.    Where were you assigned before that?

4  A.    I was assigned to Los Angeles field office.

5  Q.    What were your duties while you were assigned to the

6  Los Angeles field office?

7  A.    I was a computer forensics examiner.

8  Q.    What is a computer forensics examiner?

9  A.    It is an agent who uses scientifically derived and proven

10  methods to gather and preserve digital evidence from digital

11  sources for the purpose of reconstructing and facilitating the

12  reconstruction of criminal events.

13  Q.    Have you been trained in computer forensics?

14  A.    Yes.

15  Q.    Have you also been trained in the analysis and examination

16  of point-of-sale terminals?

17  A.    Yes.

18  Q.    Would you describe your training in point-of-sale

19  terminals.

20  A.    Yes.  I underwent training at the Secret Service Cell

21  Phone Forensic Facility at the University of Tulsa, where we

22  analyze both cell phones and skimming devices.

23  Q.    And how long were you doing computer forensics and

24  point-of-sale terminal analysis for the Secret Service?

25  A.    Six years.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Did you examine point-of-sale terminals in this case?

2    A.   Yes.

3            MR. CREIGHTON:  Your Honor, I'd ask the courtroom

4    deputy to show what's previously been admitted as Exhibit 342

5    to the witness, please.

6            THE COURT:  342?  Okay.

7    BY MR. CREIGHTON:

8    Q.   And Special Agent Ogden, if you would look at these items

9    and determine if you recognize them.

10   A.   I do recognize them.

11   Q.   What are they?

12   A.   They're Ingenico eN-Crypt 2100 point-of-sale terminals.

13           THE COURT:  When you say "they," there are five of

14   them?

15           THE WITNESS:  There are five.

16           THE COURT:  Okay.  Go ahead.

17   BY MR. CREIGHTON:

18   Q.   And have you previously analyzed these terminals?

19   A.   I have.

20   Q.   Did you take them apart?

21   A.   Yes.

22   Q.   Did you find anything of significance inside?

23   A.   Yes.

24   Q.   What?

25   A.   These devices contained what we refer to as parasite
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   skimming devices.

2   Q.    Are those also just known as skimmers?

3   A.    That's correct.

4   Q.    What is the purpose of a skimmer?

5   A.    To collect credit card and debit card numbers.

6   Q.    Did the skimmers in these point-of-sale terminals in

7   Exhibit 342 have any particular features?

8   A.    These skimmers all consisted of a Bluetooth skimmer.

9   Q.    And what is a Bluetooth skimmer?

10  A.    A Bluetooth skimmer allows for the data on the skimmer to

11  be transferred wirelessly to another device.

12  Q.    And if someone is engaged in fraud and retrieves the

13  account numbers from the point-of-sale terminals remotely, do

14  they then reset the device to capture more account numbers?

15  A.    Yes.

16        MR. CREIGHTON:  Now, if we could set those exhibits

17  aside and show the witness again what had previously been

18  admitted as Exhibits 337, 336, 338 and 341, and we could clear

19  the other exhibits, please, to give a little room.  Thank you.

20  Q.    And if you could again look at each of these devices, see

21  if you recognize them.

22        THE COURT:  Why don't you identify which exhibit he's

23  looking at, then, Counsel.

24        MR. CREIGHTON:  Yes.

25  Q.    If you could begin with exhibit -- well, if you could tell

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    us what exhibit you're looking at now.

2    A.    Okay.  This has a marking on it that says Plaintiff's

3    Exhibit 341.

4    Q.    Thank you.

5    A.    I recognize that as an Ingenico eN-Crypt 2100.

6    Q.    And that's a unit that you've previously taken apart and

7    examined?

8    A.    That's correct.

9    Q.    Okay.  If you could do the same with the next exhibit, and

10   if you could tell us what --

11   A.    This is Plaintiff's Exhibit 338, and I recognize that as

12   an Ingenico eN-Crypt 2100 point-of-sale terminal.

13   Q.    And you've previously taken this one apart and looked at

14   it?

15   A.    I have.

16        The next is Plaintiff's Exhibit 336, and I recognize that

17   as a Ingenico eN-Crypt 2100 point-of-sale terminal.

18   Q.    And you've previously taken that apart and looked inside

19   it?

20   A.    I have.

21   Q.    And then the fourth exhibit that's up there?

22   A.    This is Plaintiff's Exhibit 337, and that's also an

23   Ingenico eN-Crypt 2100 point-of-sale terminal.

24   Q.    And do you recognize it as a device you've previously

25   analyzed?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   I do.

2    Q.   If you could just hang on to 337 for a moment, and then,

3    with the Court's permission, I would like to show you what has

4    not been admitted, Exhibit 343.  It should be in a binder

5    behind you.

6    A.   Would you repeat the number, sir?

7    Q.   343.  Now, once you get there, if you could quickly flip

8    through it and see if you recognize what's contained in this.

9         Do you recognize these documents?

10   A.   I do recognize these.

11   Q.   What are they?

12   A.   These are photographs that I took of the evidence.

13   Q.   Of these exhibits that you analyzed?

14   A.   That's correct.

15   Q.   Do these photographs fairly and accurately depict the

16   devices as you analyzed them?

17   A.   Yes.

18        MR. CREIGHTON:  Your Honor, move to admit Government's

19   Exhibit 343 and publish.

20        THE COURT:  Be received, may be published.

21        (Received in evidence, Exhibit 343.)

22   BY MR. CREIGHTON:

23   Q.   Now, I am showing you only a -- I'm only going to show you

24   two photographs from this exhibit.

25        This is page 14 of Exhibit 343.  Would you tell the jury
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   what we're looking at here.

 2   A.   This is the inside of a point-of-sale terminal, and that

 3   white device you see there is a -- what we'd refer to as a PIN

 4   pad overlay.

 5   Q.   And what is a PIN pad overlay?

 6   A.   That is used to capture the PIN entry of each number when

 7   you push it on the point-of-sale terminal.

 8   Q.   Where -- so it's part of the skimming device?

 9   A.   That's correct.

10   Q.   So where exactly in the point-of-sale terminal does it go?

11   A.   This is on the inside of the hard plastic casing.

12        THE COURT:   Can you draw a circle around it?  Because

13   I see two.  One's kind of a light blue one, one's kind of

14   white.  I don't know what you're referring to on my screen, so

15   could you just draw, with your finger on the screen, what

16   you're talking about.  Just circle it.

17        (Witness complies.)

18        THE COURT:   There you go.  Okay.  Thank you.

19   BY MR. CREIGHTON:

20   Q.   So there appear to be 16 round circles here; is that

21   correct?

22   A.   That's correct.

23   Q.   Okay.  Do these go in between the key on the top of the

24   device and the switch that's ordinarily part of the device?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And is this how the entries on the PIN pad are skimmed?

2    A.    Yes.

3    Q.    Next, I would direct your attention to page 15 of Exhibit

4    343, and would you tell us what this device is here.

5    A.    That is the skimmer.

6    Q.    Now, I see a bunch of wires coming out of the skimmer.

7    Would you briefly tell the jury what those wires do.

8    A.    Yes.  Those wires are used to capture the credit card

9    number when it is swiped on the magnetic stripe head reader,

10   and also to power the device.

11   Q.    And I see something right here in the middle with a black

12   rectangle, looks like it's inserted into a small metallic

13   square, maybe under some kind of opaque covering.  What is

14   that?

15   A.    That is a USB connection.

16   Q.    Is that like the USB connection people have on their

17   phones and cameras?

18   A.    Yes.

19   Q.    What purpose does it serve?

20   A.    For the transfer of data.

21   Q.    What data does the skimming device collect?

22   A.    It can collect credit card and debit card data.

23   Q.    Account numbers?

24   A.    Yes.

25   Q.    Did you -- turning your attention to Exhibit 337 which you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  have in front of you, did you determine if there was data on
 2  this device?
 3  A.   I did.
 4  Q.   How did you do that?
 5  A.   I utilized forensic software referred to as Exeba Comm.
 6  Q.   When you used that software, you plug into the USB port?
 7  A.   That's correct.
 8  Q.   Were you able to read the data on the device directly?
 9  A.   Yes.
10  Q.   Did you have to do anything before you could look at the
11  data?
12  A.   I had to break a password.
13  Q.   So the data on this skimmer was password protected?
14  A.   Yes.
15  Q.   Do you know what the password for this device was?
16  A.   Excuse my language, but it was "fuck."
17  Q.   If I could ask you to turn in the binder to Exhibit 344.
18  Do you recognize it?
19  A.   I do.
20  Q.   What is it?
21  A.   This is the data that was stored on that device.
22  Q.   It's in the same condition as when you retrieved it?
23  A.   Yes.
24       MR. CREIGHTON:  Your Honor, move to admit and publish
25  Exhibit 344.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. SEVERO:  Your Honor, I think at this point there

2    is no foundation to make this relevant to this case.  I know

3    this is not one of -- unless it's one of the machines that's

4    been previously seized and marked.

5          THE COURT:  I believe it was.  337, wasn't it?

6          MR. CREIGHTON:  Yes, it's been admitted --

7          THE COURT:  Yeah, that was previously received and

8    marked.

9          MR. SEVERO:  43 is a -- I missed that.  Three --

10          THE COURT:  337, wasn't it?

11          MR. CREIGHTON:  Yes.  I'm talking about data that was

12    retrieved from Exhibit 337.

13          MR. SEVERO:  That's fine.

14          MR. CREIGHTON:  Exhibit 344 is that data.

15          THE COURT:  Okay.  It may be received and published.

16          MR. FLIER:  I would object.  I would object it's

17    hearsay and the information is hearsay.

18          THE COURT:  Overruled.

19        (Received in evidence, Exhibit 344.)

20    BY MR. CREIGHTON:

21    Q.  Agent Ogden, I'm showing you page 2 of Exhibit 344, page 2

22    of 76.  This is very hard to read for an ordinary human.  Would

23    you just give us a brief tour of what we're seeing here.

24    A.  So this is track 1 and 2 data from a magnetic stripe of a

25    credit card, and also a date and time stamp.

```
 1   Q.    Does this contain account numbers?

 2   A.    It does.

 3   Q.    Does it contain the names of account holders?

 4   A.    Yes.

 5         MR. CREIGHTON:  Your Honor, may I have just one

 6   moment, please?

 7         THE COURT:  Yes.

 8   BY MR. CREIGHTON:

 9   Q.    Agent Ogden, did you determine how many records had been

10   captured in Exhibit 337?

11   A.    I did.

12   Q.    Do you recall how many?

13   A.    May I refer to my report?

14   Q.    Is your -- are you unable to remember it at this time?

15   A.    I can't recall off the top of my head.

16   Q.    Would your report refresh your recollection?

17   A.    It would.

18         MR. CREIGHTON:  Your Honor, with the assistance of the

19   courtroom deputy, if I could pass up his reports.

20         THE COURT:  Okay.  Take a look at your report, and

21   then when you're through looking at it, put it aside and let us

22   know if it refreshed your memory.

23         THE WITNESS:  Okay.

24         THE COURT:  In other words, we don't want you

25   testifying what the report says.  It's what your memory
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   recalls.

 2           THE WITNESS:  Okay.  Okay.

 3   BY MR. CREIGHTON:

 4   Q.   How many records were stored on the skimming device in

 5   Exhibit 337?

 6   A.   There were 91 records.

 7   Q.   Now, if you could put Exhibit 337 away and turn your

 8   attention to Exhibit 336.  And I don't actually need you to

 9   look at the device, but did you examine this device?

10   A.   I did.

11   Q.   Did it have a skimmer in it?

12   A.   Yes, it did.

13   Q.   Were you able to retrieve data from it?

14   A.   I was.

15   Q.   Was it password protected?

16   A.   It was.

17   Q.   What was the password?

18   A.   Again excuse my language, but it was "fuck."

19   Q.   Were you able to determine how many records were stored,

20   if any, in this device?

21   A.   I was.

22   Q.   Do you need to refresh your recollection again?

23   A.   I do.

24           MR. CREIGHTON:  With the Court's permission?

25           THE COURT:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. FLIER:  I'm going to object, also, for the record,

 2     hearsay.

 3              THE COURT:  Same objection, same ruling.  It will be

 4     overruled.

 5              MR. FLIER:  Thank you.

 6              THE WITNESS:  Okay.

 7     BY MR. CREIGHTON:

 8     Q.   And how many -- is your recollection refreshed?

 9     A.   It is.

10     Q.   How many records were stored in Exhibit 336?

11     A.   There were 1,500 records.

12     Q.   Thank you.

13          And if you'd put that away and we could turn to Exhibit

14     338.  And again, did this have a skimming device in it that you

15     found?

16     A.   It did.

17     Q.   Were you able to retrieve data from it?

18     A.   I was.

19     Q.   Was it password protected?

20     A.   Yes.

21     Q.   What was the password?

22     A.   Again excuse my language.  It was "fuck."

23     Q.   Were you able to determine how many, if any, records were

24     stored on this device?

25     A.   I was.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Do you need to refresh your recollection?

2   A.   I do.

3             MR. CREIGHTON:  With the Court's permission?

4             THE COURT:  Yes.

5        Same objection, Counsel?

6             MR. FLIER:  Yes.  Thank you, your Honor.

7             THE COURT:  Overruled.

8             THE WITNESS:  Okay.

9   BY MR. CREIGHTON:

10  Q.   And how many records were contained therein?

11  A.   437.

12  Q.   Thank you.

13       And finally, if we could put that away and turn to

14  Exhibit 341.  Did Exhibit 341 have a skimming device in it?

15  A.   It did.

16  Q.   Were you able to find data on it?

17  A.   Yes.

18  Q.   Was it password protected?

19  A.   Yes.

20  Q.   What was the password?

21  A.   Excuse my language.  "Fuck."

22  Q.   Were you able to determine the number of records?

23  A.   I was.

24  Q.   Do you need to refresh your recollection?

25  A.   I do.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CREIGHTON:  With the Court's permission?

 2              THE COURT:  Yes.

 3    BY MR. CREIGHTON:

 4    Q.   Is your recollection refreshed?

 5    A.   Yes.

 6    Q.   How many records did you retrieve from Exhibit 341?

 7    A.   645.

 8    Q.   Now, would you take Exhibit 341 out for a moment.  I

 9    believe there's a rubber band around it.  Would you take that

10    rubber band off.

11         How would you describe the condition of this device?

12    A.   This would be the condition that it's installed in a

13    store.

14    Q.   Is the back opened?

15    A.   The back is open.

16              MR. SEVERO:  I'm going to move to strike that answer

17    as, I don't know, nonresponsive, vague.  In the condition that

18    it would be in a store?  It --

19              THE COURT:  In other words, does this look like the

20    normal condition?

21              THE WITNESS:  It -- it does, yes.

22              MR. SEVERO:  Used?

23              THE COURT:  Okay.  Overruled.

24    BY MR. CREIGHTON:

25    Q.   Are you able to determine anything about the device in
```

1    that condition?

2    A.   This has been altered with a skimming device.

3    Q.   Okay.  Can you hold that up a little bit so the jury can

4    see it.

5    A.   (Witness complies.)

6    Q.   So that thing in your right hand is the skimming device?

7    A.   That's correct.

8    Q.   The wires coming out of it, will there be wires for power?

9    A.   Yes.

10   Q.   And wires going to a PIN pad?

11   A.   Yes.

12   Q.   And to the card reader?

13   A.   Yes.

14   Q.   Okay.  If you could put that away, and then one last

15   question.  And I know you had to refresh your recollection

16   earlier, but do you remember approximately how many records in

17   all you recovered from these four devices?

18   A.   I believe it was approximately twenty- -- 2,600.

19        MR. CREIGHTON:  Thank you.  No further questions.

20        THE COURT:  Okay.  Cross-examination.

21                    **CROSS-EXAMINATION**

22   BY MR. SEVERO:

23   Q.   Good afternoon, sir.

24   A.   Hello.

25   Q.   You live in D.C., Washington, D.C. now?

```
 1   A.    Yes.

 2   Q.    You examined these point-of-sale terminals while you were

 3   here in Los Angeles?

 4   A.    Yes.

 5   Q.    So that was five years ago?

 6   A.    I don't recall the exact date.

 7   Q.    When did you move to Washington, D.C.?

 8   A.    In January 2013.

 9   Q.    So several years before you moved, correct?

10   A.    Yes.

11   Q.    Let me ask you first about Exhibit 342, and you don't --

12   we don't have to put it in front of you.  You mentioned that

13   there were -- there was a Bluetooth feature to at least one of

14   the five that are in 342.  Do you recall that?

15   A.    Yes.

16   Q.    All of them have Bluetooth?

17   A.    Yes.

18   Q.    And as I understand it, the Bluetooth allows the data

19   being captured to be transferred to another device off the

20   prem- -- anywhere off, away from the pad, correct?

21   A.    Yes.

22   Q.    Would the information in either the skimming device or the

23   Bluetooth adapter, if you will, tell you to what other device

24   the information's being transferred?

25   A.    No.  No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   You know it's being transferred to another device because

2   it looks like a Bluetooth, correct?

3   A.   Yes.

4   Q.   Did you test the machines yourself?

5   A.   I visually inspected them.

6   Q.   Did you test them by trying to work on them?

7   A.   No.

8   Q.   So you don't know if the Bluetooth was working on any one

9   of these machines, do you?

10  A.   No.

11  Q.   I detected some hesitation when I asked if, by reviewing

12  the data in a machine, you would be able to tell where the data

13  was being -- what the -- where the data was being transferred.

14  Is there anything that tells you that it is going to another

15  point of terminal, computer system, anything?

16  A.   Well, the way that these were constructed, there's a black

17  resin material on top of the device, which, because of that, it

18  doesn't allow me to see the specifications of the chip that's

19  on there, and so, as a result, I can't look up the features of

20  that Bluetooth device to see exactly how it was programmed.

21  Q.   But you can make it work, can you?  Can't you?

22  A.   Not with the available forensic tools that I had.

23  Q.   If you -- there are tools available that would make it

24  work?

25  A.   Not that I know of.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    So actually by -- let me back off of that.

 2         Your understanding of how these point-of-sale terminals

 3   work is that in regular, ordinary course of business use, the

 4   data is transferred by hard wire to another device?

 5   A.    Yes.  In a legitimate point-of-sale terminal, it is.

 6   Q.    Okay.  So the only time you've seen these Bluetooth

 7   devices is in not -- illegitimate use of the point-of-sale

 8   terminal?

 9   A.    No.

10   Q.    All right.

11   A.    My --

12   Q.    That's correct.  The -- the Bluetooth --

13         MR. CREIGHTON:  Objection to his characterization of

14   the witness's answer.

15         THE COURT:  Next question, Counsel.

16         MR. SEVERO:  He said no.  He answered the question.

17         THE COURT:  No, but you said that's correct of what he

18   testified.

19   BY MR. SEVERO:

20   Q.    The Bluetooth has been installed in point-of-sale machines

21   for legitimate use?

22   A.    I haven't seen that, no.

23   Q.    All right.  When was the last time you were involved on

24   the -- in field work on PIN point-of-sale terminals?

25   A.    In -- at the end of the year 2012.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Before you moved, correct?

2    A.    Yes.  Yes.

3    Q.    And the President doesn't have one of these, does he?

4             MR. CREIGHTON:  Objection, your Honor.

5             THE COURT:  Sustained.

6             MR. SEVERO:  Thought I'd wake everybody up.

7    Q.    You took apart one of the exhibits, or all of them?

8    A.    All of them.

9    Q.    And in every instance, there was Bluetooth?

10   A.    In those five exhibits.

11   Q.    Okay.  So in the exhibits contained in 342, there was

12   Bluetooth, a Bluetooth device, but if you look at, for example,

13   341 -- you have it in front of you?  It's one of the buckets

14   there that you --

15            THE COURT:  It's one of the red ones.

16            MR. SEVERO:  It's one of the red, right.

17            THE WITNESS:  The red ones.  Okay.  Yes.  This?

18   BY MR. SEVERO:

19   Q.    Right.  Did you take that one apart?

20   A.    I did.

21   Q.    And did you find Bluetooth in there as well?

22   A.    No.

23   Q.    So some of them had Bluetooth, some of them didn't?

24   A.    That's correct.

25   Q.    So in the case where the Bluetooth is not installed, the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    data is sent -- strike that.

2         In the case where the Bluetooth is not installed, the data

3    is captured by the skimming device and stored where?

4    A.   On the skimming device itself.

5    Q.   There is a chip on the skimming device that accepts that

6    data?

7    A.   Yes.

8    Q.   Now, it's my understanding from your testimony that -- and

9    I'm going to ask you to turn in your book to 343, I think it

10   is.  It's the one with all the pictures, right?

11   A.   Okay.

12   Q.   Do you have it now?

13   A.   Yes.

14   Q.   Which machine is this?  This one is on -- depicted on

15   Exhibit 343.

16   A.   Which photograph number are you referring to?

17   Q.   Well, there's -- is there more than one machine shown in

18   all these pictures?

19   A.   I -- I believe so.  Yes.

20   Q.   Okay.  How many machines are depicted on these, or

21   portrayed in these pictures?

22   A.   Let me refer to the photographs.

23        Three separate machines.

24   Q.   Three separate ones.  Are any of the three machines the

25   ones that you examined here?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    I examined all of them.

2    Q.    Are they any one of these exhibits that are in front of

3    you, the other ones, in the red bucket there, 341 --

4    A.    They should be.  I would have to match it up via serial

5    number.

6    Q.    So you believe that these machines are also -- are

7    pictures of some of the machines you've shown us here today?

8    A.    Yes.

9    Q.    Okay.  How did you obtain these machines for examination?

10   A.    They were submitted to the Los Angeles Electronic Crimes

11   Task Force at which I worked.

12   Q.    Do you know by whom?

13   A.    I can't remember exactly who it was that submitted them.

14   Q.    Were they wrapped in -- were they contained in evidence

15   bags?

16   A.    Yes.

17   Q.    Marked?

18   A.    Yes.

19   Q.    So as I understood your testimony, Exhibit 344, the one

20   that follows it, the exhibit that follows that, is a printout

21   of data taken from all three machines?

22   A.    Let me review the paperwork here.

23         Yes.  This is a printout of data from three of the

24   machines.

25   Q.    Okay.  So three of the machines that you have in front of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   you today?

2   A.   Yes.

3   Q.   The ones we've seen?

4   A.   Yes.

5   Q.   The ones that are depicted in the photographs?  That would

6   be --

7   A.   It's three of the machines that are here on my right.  One

8   of these photographs was actually of a Bluetooth.

9   Q.   I gotcha.

10  A.   Yes.

11  Q.   I see.  Okay.

12       As I understood it, this tran- -- this Exhibit, 344, is a

13  printout of the data that was contained in the machines that

14  you examined.

15  A.   Yes.

16  Q.   How many did you say?  Three of them?

17  A.   Yes.  This is the data from three of the machines.

18  Q.   And the data that you obtained was from the skimming

19  device?

20  A.   Yes.

21  Q.   And the skimming device had a -- the data that you

22  obtained is credit card data?

23  A.   Yes.

24  Q.   So the entries would be the credit card number.  We would

25  expect to see, if we knew how to read the stuff, it would be

```
 1    credit card number, correct?

 2    A.    Yes.

 3    Q.    The amount?

 4    A.    No.  What it would contain is track 1 data, track 2 data,

 5    and a date and time stamp.

 6    Q.    The date and time stamp is -- when you say track 1 data,

 7    you're talking about the account number?

 8    A.    Let me explain.  Track 1 data is 79 -- can contain 79

 9    alphanumeric characters.  Track 2 data will be 40 numeric

10    characters.  And then a date and time stamp would be just a

11    date and time at which the swipe of that credit card occurred.

12    Q.    All right.  So let me ask you to look at page 2 of 76.

13          THE COURT:  We'll look at that in 15 minutes.

14          Ladies and gentlemen, afternoon recess.  Come back in 15

15    minutes.  Remember the admonishment not to discuss the case

16    among yourselves.

17          (Recess held from 2:30 p.m. to 2:46 p.m.)

18          (In the presence of the jury:)

19          THE COURT:  Okay.  The record will reflect all the

20    members of the jury are in their respective seats in the jury

21    box, including the alternate, the witness is on the witness

22    stand.

23          You may continue cross-examination.

24          MR. SEVERO:  Thank you, your Honor.

25    Q.    Agent Ogden, did you speak to anyone about your testimony
```

1    here at the break?

2    A.    No.

3    Q.    I was -- at the break we were talking about Exhibit 344.

4    You recall?

5    A.    Yes.

6    Q.    Okay.  And you had explained to us track 1 and track 2 in

7    terms of the number of characters that each one carries,

8    correct?

9    A.    Yes.

10   Q.    Is there any designation to the track as to what it's

11   supposed to carry?

12   A.    Yes.  There's standards that dictate what goes on each

13   track.

14   Q.    Okay.  So where in the -- in which track is the time stamp

15   shown?

16   A.    That's -- that's not a track thing.  That's something that

17   the skimmer does.

18   Q.    Oh.  This -- these time stamps are done by the skimmer?

19   A.    Yes.

20   Q.    Does the machine have a time stamp itself, outside the

21   skimmer?

22   A.    The machine would be programmed with a time, yes.  The

23   machine, meaning the skimmer, would be programmed with the

24   time.

25   Q.    Well, if a machine didn't have a skimmer, regular use of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   the machine, does it print the time?

 2   A.   As you swipe a card at -- you know, to process a credit

 3   card transaction at a store, yes, there is a time and date.

 4   Q.   All right.  Did you, in looking at this --

 5           THE COURT:  Let me ask a question, Counsel, because

 6   I'm not sure I understand.

 7       A PIN pad that does not have a skimmer in it, does it

 8   retain any information in the PIN pad?

 9           THE WITNESS:  It depends on the point-of-sale

10   terminal, that PIN pad.

11           THE COURT:  Does this one?

12           THE WITNESS:  I would have to look at the

13   specifications on this.

14           THE COURT:  Okay.  So sometimes this information is

15   contained even if it doesn't have a skimmer?  In the PIN pad?

16           THE WITNESS:  Typically it doesn't store it on the

17   point-of-sale terminal.

18           THE COURT:  So what does it do?  Sends it out right

19   away?

20           THE WITNESS:  Yes.

21           THE COURT:  And then doesn't retain it?

22           THE WITNESS:  Yes.

23           THE COURT:  But some do retain it?

24           THE WITNESS:  Some could be programmed to retain it.

25           THE COURT:  Okay.  Go ahead, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   Is there any significance for the skimmer to have the time

 3   stamp?

 4   A.   No.

 5   Q.   Let me have you look at page 2 of Exhibit 344.

 6   A.   Yes.

 7   Q.   And I suppose we could take the very first one at the top.

 8   A.   Okay.

 9   Q.   Is that -- there's only one line -- oh, let's see.  The

10   first line there, is that track 1 information to the left?

11   A.   What you see is, it's a comma followed by a number of

12   characters.  So the comma would separate the track 1 data from

13   the track 2 data.  Then the next comma would then designate the

14   date, and then followed by a comma, followed by another time.

15   Q.   So this skimmer didn't want the track 1 data, so it's away

16   from the comma to the left?

17   A.   It could be that the credit card that was scanned did not

18   contain track 1 data or that it just didn't register through

19   the magnetic stripe reader.

20   Q.   Okay.  Now, the time stamp on the right, you see the first

21   one says 3:20:37 after the date?

22   A.   Yes.

23   Q.   That's -- is this in 24-hour mode, do you know?

24   A.   Well, it says a.m. and p.m.

25   Q.   Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yeah.

2    Q.    So, all right.  Three a.m., 37 seconds.  You see that?

3    A.    Yes.

4    Q.    The next swipe, 19 seconds later?

5    A.    That's what this would designate.  The next swipe is at

6    3:20:56 a.m.

7    Q.    And those, the first two appear to be the same credit

8    cards, correct?  Same credit card number.

9    A.    That is the same.

10   Q.    But the second -- the third one is a different credit

11   card.

12   A.    That's correct.

13   Q.    That swipe came 18 seconds after the last credit card was

14   swiped; is that correct?

15   A.    Yes.

16   Q.    As a matter of fact, if you look through the entire

17   exhibit, credit cards are being swiped every 10 to 12 to 15

18   seconds.

19   A.    If that -- yes, if that's what the data is showing.  I

20   didn't analyze it that closely.

21   Q.    Well, let's look at the one that has a name on it.  On the

22   first -- let me make it easier, 'cause I don't suppose the jury

23   has turned to that page, so --

24            THE COURT:  Nope.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:
 2   Q.   This is what we've been talking about, and if you look at
 3   here, under "Carmen Lemos" -- you see that?
 4   A.   Yes.
 5   Q.   This one here.
 6   A.   Yes.
 7   Q.   That was swiped three times?
 8   A.   Yes.
 9   Q.   By -- the swipe is not done by the skimmer, correct?
10   A.   No.
11   Q.   Does this say that the skimmer -- that the person swiped
12   the card three times?
13   A.   Yes.  This is showing that the card is swiped through the
14   magnetic stripe head reader three times.
15   Q.   Okay.  So Ms. Lemos did the first swipe at 11:53:03 on
16   this, on this time schedule, correct?
17   A.   Yes.
18   Q.   The next one was 31 seconds later?
19   A.   Yes.
20   Q.   And the last one was, what, 6:26, about 36 seconds later?
21   A.   Yes.
22   Q.   Correct?
23   A.   Yes.
24   Q.   And then the next person, Claudia Jimenez.
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Was a few minutes later, correct?

2    A.    Yes.

3    Q.    But she also swiped it three times?

4    A.    Yes.

5    Q.    These customers were coming about seven minutes apart or

6    so?

7          THE COURT:  Well, Counsel, you can't tell when the

8    customer's coming.  Is it being swiped seven minutes apart?

9    BY MR. SEVERO:

10   Q.    Yeah, cards are being swiped every -- by different people,

11   every few minutes apart?  Is that what you get from this?

12   A.    Yes.

13   Q.    In fact, if you look at the entire transcript --

14   exhibit -- transcript -- the entire printout, Exhibit 343 --

15   I'm sorry, 344, this goes on for hours.  This store was buzzing

16   that day.  Is that -- do you get that from this?

17   A.    Sorry?

18   Q.    Do you get that from this printout, that there were

19   customers coming for hours --

20          THE COURT:  Well, again --

21   BY MR. SEVERO:

22   Q.    Can you --

23          THE COURT:  Excuse me, Counsel.  Not to confuse the

24   jury, but the questions are -- because you're talking about

25   customers and swiping as if they're -- as if they're the same.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    All this tells you is how often a card is swiped.  If a

2  customer swipes it twice because they didn't think they got it,

3  or whatever it is, that would show up twice, would it not?

4         THE WITNESS:  Yes.

5         THE COURT:  So all this is showing is when and how

6  often the card is being swiped.  Doesn't tell you anything

7  about customers.

8         THE WITNESS:  That's correct.

9         THE COURT:  Okay.

10        MR. SEVERO:  Oh, I'm sorry.  I see what the Court's

11 saying, yes.  I'm assuming that these guys, these people were

12 customers, you're correct.

13 Q.   But these names, these cards with the same numbers are

14 being swiped two, three times in a row, correct?

15 A.   Yes.

16 Q.   And this is not being done by the skimming device, is it?

17 A.   The skimming device is placing that date and time, based

18 on when the card is registered, on the skimmer.

19 Q.   Okay.  Very good.

20     I don't think I have anything else of at this point.

21        THE COURT:  Okay.

22        MR. SEVERO:  May I have a moment, your Honor,

23 before --

24        THE COURT:  Certainly.  Certainly.

25        MR. SEVERO:  That's all I have.  Thank you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Counsel.
 2              MR. PEREYRA-SUAREZ:  I have no questions of this
 3   witness, your Honor.
 4              THE COURT:  Okay.  Counsel.
 5              MR. FLIER:  Thank you, your Honor.
 6                        CROSS-EXAMINATION
 7   BY MR. FLIER:
 8   Q.   Good afternoon, sir.
 9   A.   Hello.
10   Q.   I would -- let's talk about Exhibit 344.
11        Am I mistaken?  When you review all of the 76 pages, I
12   believe, of that exhibit, every date is in the year of 2004.
13   Am I correct?
14   A.   That is the date stamp.
15   Q.   Do you have any records, based on any of the work that you
16   did, based on your expertise, that deal with 2009, if you
17   recall?
18   A.   Yes.  It was -- the examinations occurred after 2004.
19   Q.   Do you have any records that you're aware of, based on the
20   work you performed, that deal with the year of 2009 and any
21   indications like Exhibit 344?  If you recall.
22   A.   No.  I can explain the date and time stamp for you.
23   Q.   Okay.  Thank you.
24   A.   Okay.
25   Q.   Please.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    So with a -- any digital device, there's a clock

2    associated with that device, and the clock can be programmed

3    with any date and time that you want.  It can match up exactly

4    with the atomic time in the world, or it could be programmed

5    with the year 1970.  In this example, this obviously is -- the

6    date and time that's programmed onto the skimmer is associated

7    with the year 2004.

8    Q.    Okay.  I'll leave it alone.  Thank you.

9          With respect to any indication in these exhibits,

10   something similar to 344, these numbers, are they credit card

11   numbers or debit card numbers or both?

12   A.    They can be both.

13   Q.    Can you separate, when you look at one, to determine which

14   is which?  In other words, oh, yeah, that indication's a credit

15   card, that one's a debit card?  I'm not going to ask you to do

16   it, but when you look at the exhibit, can you do that?

17   A.    I cannot.

18   Q.    Now, with respect to an exhibit like 344, this is an input

19   of the information or indications from a particular machine; is

20   that correct?

21   A.    Yes.

22   Q.    And some of these machines, we heard about in your

23   testimony, whether it was three or five that you analyzed; is

24   that correct?

25   A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Now, do these records ever show where this information was
2    routed to?
3    A.   I don't understand the question.
4    Q.   In other words, let's say I am a thief and I am using the
5    credit cards in these exhibits.  Could you tell that it went to
6    my bank account?
7    A.   I couldn't tell that.
8    Q.   Okay.  So is there any information on these exhibits that
9    you have done that says where the information is going?  Not
10   just what it says; where it goes.
11   A.   No.  The skimmer just contains those captured credit and
12   debit card numbers.
13   Q.   Thank you.
14        It captures the numbers and maybe the time, as we
15   discussed, but it does not say the loss; is that correct?
16   A.   No, it doesn't.
17   Q.   Okay.  Thank you.
18        Were you asked to inspect any other electronic devices in
19   this case, like phones?
20   A.   No.
21   Q.   I believe you said, based on your independent
22   recollection, approximately there was 2,600 information stored
23   in the documents that you looked at; is that correct?
24   A.   Yes.
25   Q.   Can you tell us, with respect to 2,600, how many of those
```

```
 1   are true victims, just by looking at the paperwork?

 2   A.   No, I can't.

 3   Q.   And as the Court indicated, it just shows how many times

 4   that card, we'll say, was swiped on that machine; is that

 5   correct?

 6   A.   Yes.

 7   Q.   So as the Court again said, let's say I'm not sure it went

 8   through, and seconds later I might try again.  That would be

 9   indicated within this document like 344; is that correct, sir?

10   A.   Yes.

11             MR. FLIER:  Thank you.

12             THE COURT:  Redirect?

13             MR. CREIGHTON:  One moment, your Honor.

14        No further questions.

15             THE COURT:  May this witness be excused to go back

16   East?

17             MR. PEREYRA-SUAREZ:  Yes, your Honor.

18             MR. SEVERO:  Yes, your Honor.

19             THE COURT:  Okay.

20             THE WITNESS:  Thank you, sir.

21             THE COURT:  Have a pleasant trip.

22        Okay.  Let's re-call the special agent.

23        Why don't you take the stand.  Remember you're still under

24   oath.

25             MR. STEBBINS:  Yes, your Honor.
```

```
 1            THE COURT:  Mr. Severo, I believe you finished.

 2            MR. SEVERO:  I'm sorry, your Honor?

 3            THE COURT:  You finished cross-examining?

 4            MR. SEVERO:  I did for now.

 5            THE COURT:  Okay.  Counsel?

 6     JEREMY STEBBINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

 7                       CROSS-EXAMINATION

 8  BY MR. PEREYRA-SUAREZ:

 9  Q.   Agent Stebbins, you testified I believe earlier today that

10  you first intercepted a telephone call involving Minas Matosyan

11  on or about June 29 of 2009; is that correct?

12  A.   That's correct, sir.

13  Q.   First time you ever heard his voice, right?

14  A.   Yes, sir.

15  Q.   You didn't meet him until October of that year.

16  A.   That's correct, sir.

17  Q.   Didn't meet him personally, correct?

18  A.   Yes, sir.

19  Q.   And you -- we played here today a tape-recording of the

20  conversation that occurred on June 29, 2009.  That was Exhibit

21  71A; is that correct?

22  A.   Yeah, I don't know what exhibit number it is, sir.  Sorry.

23  Q.   I'll represent to you it was Exhibit 71A.  And I don't

24  need you to look at the actual exhibit unless you want to look

25  at it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   That's fine, sir.

2   Q.   But you recall that in that telephone conversation,

3   Mr. Sharopetrosian is saying to Minas Matosyan that he hasn't

4   paid a debt in 18 months?  Do you recall that?

5   A.   I would have to look at the call, sir.

6   Q.   Go ahead and look at it.  If -- you have it behind you?

7   A.   71, sir?

8   Q.   71A.

9   A.   Yes, sir, I see it.

10  Q.   Refresh your recollection?

11  A.   Yes, sir.

12  Q.   Am I correct that Mr. Sharopetrosian was telling Minas

13  Matosyan during that telephone conversation that he hadn't paid

14  a debt in 18 months?

15  A.   That's correct, sir.

16  Q.   And during the course of your investigation in this case,

17  did you determine that in fact somebody in the Sharopetrosian

18  family had loaned some money to Minas Matosyan?

19          MR. ESTRADA:  Object, your Honor, relevance.

20          THE COURT:  Overruled.

21          THE WITNESS:  Yes, there was.

22  BY MR. PEREYRA-SUAREZ:

23  Q.   Did you determine that the amount of that loan from a

24  member of the Sharopetrosian family to Minas Matosyan was

25  approximately $95,000?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes, it was in that ballpark, sir.

2    Q.    And did you determine that in fact that was a personal

3    loan from Mr. Sharopetrosian's sister-in-law Lusine to

4    Mr. Matosyan?

5    A.    I don't know if it was considered a personal loan, sir.

6    Q.    Well, did you determine that in fact Minas Matosyan went

7    to Lusine and asked for a loan?

8    A.    No, sir.

9    Q.    You don't know how that loan came about?

10   A.    I don't believe it was a loan, sir.

11   Q.    You thought it was some kind of payment for some other

12   reason?

13   A.    No.  I believed it was some type of a investment into

14   something, sir.

15   Q.    And did you determine that in fact Minas Matosyan

16   suggested that he get that money to make an investment?

17   A.    I'm sorry, sir?  Could you repeat that?

18   Q.    Yes.  Did you determine during the course of your

19   investigation that Minas Matosyan went to Lusine and asked for

20   some money to make an investment?

21   A.    I don't know if it went that direction, sir.

22   Q.    Well, you know that the money went from Lusine to

23   Mr. Matosyan, correct?

24   A.    Yes, sir.

25   Q.    You knew by early November of 2009 that that money had not
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   been paid back; is that correct?

 2   A.   Yes, that's correct, sir.

 3   Q.   And in fact, you arranged for payments totaling $12,000

 4   to be made from federal funds on that amount; is that

 5   correct?

 6            MR. ESTRADA:  Objection, your Honor, calls for legal

 7   conclusion.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  We didn't know the amount that was owed

10   exactly.  We knew what Mr. Sharopetrosian was claiming was

11   owed.

12   BY MR. PEREYRA-SUAREZ:

13   Q.   All right.  And so you arranged for payments that were

14   less than what Mr. Sharopetrosian claimed was owed; is that

15   correct?

16   A.   That's correct.

17   Q.   And during the course of your investigation in this case,

18   did you ever come to a conclusion that this money was for

19   anything other than a personal debt?

20   A.   No, sir.

21   Q.   In other words, this money was not for the common purpose

22   of some kind of organized crime organization; is that correct?

23            MR. ESTRADA:  Object, your Honor, calls for a legal

24   conclusion.

25            THE COURT:  Sustained.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**001951**

```
 1   BY MR. PEREYRA-SUAREZ:

 2   Q.   During the course of your investigation, did you come up

 3   with any evidence to tie that amount, whatever it was, to

 4   activity of an entity that you considered to be Armenian Power?

 5   A.   Yes.

 6   Q.   You thought that the money was provided by Lusine to

 7   Mr. Sharap- -- to Mr. Matosyan in order to promote the goals of

 8   Armenian Power?

 9        MR. ESTRADA:  Objection, your Honor, calls for legal

10   conclusion.

11        THE COURT:  Overruled.

12        THE WITNESS:  Not the initial loan, sir.  The

13   repayment.  The extortion.

14   BY MR. PEREYRA-SUAREZ:

15   Q.   So you thought the attempts to obtain payment on that

16   amount were somehow to further the purposes of Armenian Power?

17   A.   Yes, because of the exorbitant interest rate that

18   Mr. Darbinyan, Sharopetrosian were going to charge him.

19        MR. SEVERO:  I'm going to move to strike

20   Mr. Darbinyan.  There is no evidence of that and assumes facts

21   not in evidence.

22        THE COURT:  Overruled.

23   BY MR. PEREYRA-SUAREZ:

24   Q.   So you believed that the amount of interest being charged

25   on a loan makes that part of an organized crime activity?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   When it becomes extortion, yes, sir.

 2   Q.   And when you say when it becomes extortion, you're

 3   referring to attempts by Mr. Sharopetrosian to collect the

 4   money that was owed to Lusine; is that correct?

 5   A.   Through threats of violence, yes, sir.

 6   Q.   And you thought that Mr. Sharopetrosian was angry that the

 7   amount of money had not been repaid; is that correct?

 8   A.   Yes.

 9   Q.   Did it ever occur to you during the course of your

10   investigation that Mr. Matosyan had defrauded the

11   Sharopetrosian family?

12   A.   No, sir.

13   Q.   Never occurred to you that Mr. Matosyan was trying to do

14   something illegal?

15   A.   He was not defrauding them, sir, no.

16   Q.   So a loan not being repaid in 18 months, that's not

17   illegal; is that correct?

18   A.   I don't believe I said it wasn't repaid.  I'm saying they

19   were trying to charge the interest on it.

20   Q.   Okay.  So that's what triggered your conclusion that this

21   had to be related to organized crime; is that correct?

22   A.   Multiple individuals working together to extort the

23   victim.

24   Q.   Did you know if Mr. Matosyan had some kind of family

25   relationship or friendship relationship with the Sharopetrosian
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    family?

2    A.    I believe he was friends with the Sharopetrosians'

3    sister-in-law.

4    Q.    Was that Lusine?

5    A.    Yes.

6    Q.    Did you know that the money obtained by Mr. Matosyan came

7    from the proceeds of a wrongful death settlement involving a

8    family member?

9    A.    Yes.

10   Q.    Did you know that Mr. Matosyan was a godparent to a child

11   of Lusine's sister?

12   A.    No, I believe the child was Lusine's, sir.

13   Q.    You knew he was a godparent to somebody in the family; is

14   that correct?

15   A.    Yes, sir.

16   Q.    And you knew during -- certainly by November of 2009 that

17   the Sharopetrosian family was upset they hadn't gotten their

18   money back from the godparent of one of the family's children,

19   correct?

20   A.    Yes, I knew they were upset that they felt they hadn't

21   been repaid.

22   Q.    At some point was this just a civil dispute between people

23   who had engaged in a loan transaction?

24   A.    I don't believe threatening to kill somebody is a civil

25   dispute.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. PEREYRA-SUAREZ:  I'm going to move to strike that

 2    as nonresponsive, your Honor.

 3              THE COURT:  It will be -- he can explain the answer.

 4         I'll strike it, Counsel.  Why don't you ask the question

 5    again.

 6    BY MR. PEREYRA-SUAREZ:

 7    Q.   At some point you thought that there was a disagreement

 8    about money that had been loaned and not repaid; is that

 9    correct?

10              MR. ESTRADA:  Object, your Honor, misstates the

11    testimony.

12              THE COURT:  Overruled.

13              THE WITNESS:  No, sir.

14    BY MR. PEREYRA-SUAREZ:

15    Q.   You never thought this was a dispute about a loan; is that

16    correct?

17    A.   About a what, sir?

18    Q.   About some kind of loan that had not been repaid.

19    A.   I believe it initially started as a loan, and then the

20    collection on that loan is what made it something else.

21    Q.   And you never came to the conclusion that perhaps Minas

22    Matosyan had defrauded the Sharopetrosian family; is that

23    correct?

24    A.   No, I did not.

25    Q.   And so you decided essentially to take sides in this
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    dispute, correct?

2              MR. ESTRADA:  Objection, your Honor, misstates the

3    testimony, argumentative.

4              THE COURT:  Sustained.  It's argumentative.

5    BY MR. PEREYRA-SUAREZ:

6    Q.   You decided that Mr. Matosyan would become a cooperating

7    government witness certainly by November of 2009, correct?

8    A.   I didn't decide.  He came to the FBI, sir.

9    Q.   He came to the FBI on or about October 26, 2009, correct?

10   A.   That's correct, sir.

11   Q.   And almost immediately you had him arrested, correct?

12   A.   Yes, sir.

13   Q.   Because you thought he had engaged in some kind of

14   criminal activity, correct?

15   A.   No, sir.  He had a failure-to-appear warrant.

16   Q.   All right.  So you checked his background and decided he

17   had to be turned over to somebody, correct?

18   A.   I didn't do it, sir.  I wasn't there.

19   Q.   Somebody in federal law enforcement made that

20   determination, correct?

21   A.   Yes, sir.

22   Q.   And so you turned him over to state authorities, correct?

23   Or somebody did.

24   A.   Yes, they did, sir.

25   Q.   And then while he was in state custody, you worked out a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    cooperation deal with Mr. Matosyan, correct?

2    A.    Mr. Matosyan agreed to cooperate, sir.

3    Q.    Well, somebody formalized that cooperation relationship,

4    correct?

5    A.    Yes, sir.

6    Q.    And one of the people who entered into that relationship

7    was Mr. Matosyan, correct?

8    A.    Yes, sir.

9    Q.    And the other party to that agreement was federal law

10   enforcement, correct?

11   A.    That's correct, sir.

12   Q.    And one benefit that Mr. Matosyan received from that

13   arrangement is that he was not charged with any federal

14   criminal offense, correct?

15   A.    There was no investigation of Mr. Matosyan, sir.

16   Q.    In fact -- did you communicate personally with

17   Mr. Matosyan?

18   A.    Yes, sir.

19   Q.    When did you first communicate with him personally?

20   A.    October 26, 2009.

21   Q.    Did you assure Mr. Matosyan that he would not be charged

22   criminally if he entered into this kind of arrangement?

23   A.    No, sir.

24   Q.    Did you provide him some benefits down the road?

25   A.    Down the road, yes, sir.

```
 1   Q.   In fact, you provided him approximately $15,000 to

 2   relocate, correct?

 3   A.   Yes, sir.

 4        MR. PEREYRA-SUAREZ:  I have nothing further, your

 5   Honor.

 6        THE COURT:  Okay.  Counsel?

 7                    CROSS-EXAMINATION

 8   BY MR. FLIER:

 9   Q.   Was there any written agreement or cooperation agreement

10   between the federal government and the gentleman who we are

11   referring as M.M.?

12   A.   Yes, sir.

13   Q.   Was M.M., as we refer to him, prosecuted?

14        MR. ESTRADA:  Objection, your Honor, relevance.

15        THE COURT:  Overruled.

16        MR. ESTRADA:  His client isn't even charged with this

17   M.M. thing, your Honor.

18        MR. FLIER:  The Court was going to entertain a motion

19   to strike.

20        THE COURT:  I believe, Counsel, you said you wanted

21   that to come in, his knowledge of that to come in.

22        MR. FLIER:  That's --

23        MR. ESTRADA:  The one call about the kidnapping,

24   but -- yes, your Honor.

25        THE COURT:  Well, the kidnapping would be -- would be
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    connected with this, so --

2              MR. ESTRADA:  Very good, your Honor.

3              THE COURT:  -- overruled.

4              MR. FLIER:  I'm not going to ask too many questions

5    about that.

6    Q.   Did you get my last question?

7    A.   No, sir.  Could you go again, please?

8    Q.   What benefits did M.M. get, in your mind, by cooperating

9    in any fashion?

10   A.   He received protection and he received, obviously, the

11   federal funds that we paid on behalf of him for the extortion.

12   Q.   And that was the 12,000?

13   A.   Approximately, sir.

14   Q.   So you helped M.M. with his debt; is that correct?

15   Whether you call it extortion, whatever's owed, you paid 12,000

16   of it for him, correct?

17   A.   We bought him time, sir.

18   Q.   You bought him time.

19        What about you helped him out and gave him $12,000?  Does

20   that make sense?

21   A.   He never received any money, sir.

22   Q.   Well, somebody did.

23   A.   Yes, sir.  Mr. Sharopetrosian.

24   Q.   Mr. Sharopetrosian was in custody, wasn't he?

25   A.   Yes, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   So when somebody's in custody, and correct me if I'm

2   wrong, it's pretty difficult to sue someone; would you agree?

3   Civilly sue.

4   A.   I don't know anything about that, sir.

5   Q.   When someone's in custody and they believe that someone to

6   whom they know is a family member kind of took advantage of

7   them, that would upset somebody.  Does that make sense?

8   A.   Yes, sir.

9   Q.   Okay.  And sometimes when people get upset, they say angry

10  things; is that correct?

11  A.   Yes, sir.

12  Q.   Do you have any evidence that Mr. Sharopetrosian

13  physically did anything to M.M.?

14  A.   Yes, sir.  Not him personally, but people on the outside,

15  yes, sir.

16  Q.   Okay.  And now we're going to talk about Mher Darbinyan.

17  Did Mr. Darbinyan ever physically touch M.M. that you're aware

18  of?

19  A.   I don't know that he physically touched him.

20  Q.   Now, sir, let's say that Mr. Darbinyan beat up, for my

21  question, M.M.  You'd be aware of that; is that correct?

22       MR. ESTRADA:  Object, your Honor, calls for

23  speculation.

24       THE COURT:  Sustained.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. FLIER:

 2   Q.   Do you have any information that Mr. Sharopetrosian or

 3   Mr. Darbinyan ever physically touched M.M.?

 4            MR. ESTRADA:   Object, your Honor, vague as to

 5   whether --

 6            THE COURT:   Overruled.

 7            THE WITNESS:   Mr. Sharopetrosian was in custody, sir.

 8   BY MR. FLIER:

 9   Q.   So the answer's no as to him.   What about Mr. Darbinyan?

10   A.   I don't believe so, sir.

11   Q.   Okay.   And then without getting into it, when I asked you

12   questions about this last time, you said that this issue with

13   M.M. has nothing to do with the 99 Cent Store.   Do you remember

14   that?

15   A.   Yes, sir.

16   Q.   Do you still feel that way?

17            MR. ESTRADA:   Object, your Honor, relevance as to his

18   feelings.

19            THE COURT:   Sustained.

20   BY MR. FLIER:

21   Q.   Anything with M.M. has nothing to do with any

22   investigation with the 99 Cent Stores; is that accurate?

23            MR. ESTRADA:   Calls for speculation.

24            THE COURT:   Overruled.

25            MR. ESTRADA:   Also calls for a legal conclusion.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Overruled.

 2         Does it?  Anything to do with your investigation of the

 3    99 Cent Store?

 4              THE WITNESS:  Not particularly, sir.

 5              THE COURT:  Okay.

 6    BY MR. FLIER:

 7    Q.   Now I'm going to move on, please.

 8         When was the first call that you recorded, that you

 9    recall, that deals with the 99 Cent Store investigation?  I

10    want to know the exact date if you know, please.

11    A.   It would have been early July, sir.

12    Q.   Matter of fact, when we look at Exhibit 135, that was the

13    first exhibit played with respect to the 99 Cent Store

14    investigation, and that date is July 6th of '09, around 11:00

15    o'clock; is that accurate, if you recall?

16    A.   I don't remember the exhibit number, but yes, July 6 was

17    the first call we played.

18    Q.   Thank you.

19         And if I ask a question and you do not recall, then,

20    obviously, with the Court's permission, you can use that aid.

21    You understand that?

22    A.   Yes, sir.

23    Q.   Thank you.

24         Now, on July 6th of '09, had you had any information --

25    did you even know my client's name on that date?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Yes, sir.

2    Q.   On July 6th of '09, do you have any phone calls of my

3    client?

4    A.   I don't know, sir.

5    Q.   But you're the one who clearly knows a lot about this

6    case; is that correct?

7    A.   Yes, sir.

8    Q.   And we heard about you spewing off phone numbers.

9              MR. ESTRADA:  Object, your Honor --

10             MR. FLIER:  Strike "spewing."

11             MR. ESTRADA:  -- to accuse him of spewing anything.

12             MR. FLIER:  Oh, it wasn't done that -- I'll rephrase

13   it.

14             THE COURT:  Rephrase it.

15             MR. FLIER:  Thank you.

16   Q.   You seem to have clearly in your mind memorized a lot of,

17   let's say, phone numbers; is that correct?

18   A.   Yes, sir.

19   Q.   And you know a lot of addresses and suspects' names,

20   correct?

21   A.   Yes, sir.

22   Q.   Matter of fact, we all know you're not born in Armenia,

23   correct?

24   A.   That's correct.

25   Q.   But you clearly have become very pronounced with saying a
```

1    lot of these Armenian names.  Would you agree with that?

2    A.    I'm fairly familiar, yes, sir.

3    Q.    So there are certain questions that you have answered

4    based on some questions that you don't recall some things; is

5    that correct?

6    A.    Yes, I've said I don't recall, yes, sir.

7    Q.    And some of that "I don't recall" can be predicated upon

8    the fact that the investigation was a couple years ago; is that

9    correct?

10   A.    No.  Most of it is the specificity of the questions.

11   Q.    Okay.  But again, that's the importance of documenting

12   everything in 302 forms; is that correct?

13   A.    Regarding the question you just asked me, sir?

14   Q.    No.  About trying to remember the events of an

15   investigation.

16   A.    Yes, we write reports, sir.

17   Q.    And that's just so -- again, for the jury, that's a 302

18   form?

19   A.    On the FBI side, yes, sir.

20   Q.    And we've already heard you've had some state police side.

21   A.    Yes.

22   Q.    And that would just be a state police report, then,

23   correct?

24   A.    That's correct, sir.

25   Q.    Now, back to July 6th of 2009.  Do you have any idea where

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    my client was physically on that day?

2    A.   No, sir.

3    Q.   Do you have any idea whether or not my client knows what

4    other people are saying over phones, even if it includes him in

5    a conversation?

6    A.   If your client is on the phone, I believe he knows what's

7    being talked about.

8    Q.   What happens if my client is not on the phone, but there

9    might be a reference, like maybe three or four exhibits, of the

10   name Rafo or a phone number?  He has no idea what people are

11   saying; would you agree with that?

12   A.   No, I wouldn't agree with that.

13   Q.   So it's your testimony that if someone's not part of a

14   conversation, they should be aware of the content of those

15   conversations?

16        MR. ESTRADA:  Object, your Honor, misstates the

17   testimony.

18        THE COURT:  Overruled.

19     You may answer.  You can explain that in your answer.

20        THE WITNESS:  Okay.  My explanation would be, if

21   Darbinyan says go to Rafo's store, Rafo probably knows, when

22   somebody shows up, that Darbinyan talked to them.

23   BY MR. FLIER:

24   Q.   So if someone arrives at someone's location, are you

25   saying it must be predicated upon a phone call?  What about

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    someone just visiting?  That happens, correct?

 2    A.   Yes, visiting happens.

 3    Q.   Matter of fact, we already know that my client owns a cell

 4    phone business store; is that correct?

 5    A.   Yes, sir, that's correct.

 6    Q.   And we can assume that people sometimes go into the store,

 7    correct?

 8    A.   Yes, sir.

 9    Q.   So since we're on that subject matter, I would like to

10    know specifically, and if you do not know and there's

11    information that can tell you, that would help also, how many

12    days that you actually did specific surveillance of my client

13    at his place of business.

14    A.   I don't know, sir.

15    Q.   Okay.  Do you have any way of trying to determine that

16    answer, since you're the lead agent, we keep on hearing?

17    A.   Not with any of the exhibits that are in front of me here,

18    sir.

19    Q.   Well, can we assume that if we saw no surveillance photos

20    or logs about Mr. Parsadanyan, then there might not be any?

21    Can we assume that?

22    A.   If there are no surveillance logs referencing

23    Mr. Parsadanyan?

24    Q.   Yes.

25    A.   Then, I mean, they're not there.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    Okay.  So forget any logs and any exhibit of, say, people

 2    congregating in a parking lot or anywhere.  Again, do you have

 3    any specific recollection of a surveillance of my client ever?

 4    A.    Yes, sir.

 5              MR. ESTRADA:  Object, asked and answered.

 6              THE COURT:  Overruled.  He's answered "yes."

 7    BY MR. FLIER:

 8    Q.    The answer's "yes."

 9          Is that, an example, the surveillance we heard, I think it

10    was July 18th, where you climb on some type of roof of an

11    adjacent building?

12    A.    Yes, sir.

13    Q.    So you do remember a specific surveillance; is that

14    correct?

15    A.    Yes, sir.

16    Q.    And that first surveillance that you recall, and correct

17    me if I'm wrong, is July 18 of '09, correct?

18              MR. ESTRADA:  Object, your Honor, vague as to first.

19              MR. FLIER:  Just asked him that one.

20              THE COURT:  Overruled.

21    BY MR. FLIER:

22    Q.    That was the first, correct?

23    A.    No, no, it was not the first, sir.

24    Q.    But it's the first that you can tell us about that you

25    recall, then; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    It's the first date that I can give you regarding

2    Mr. Parsadanyan's store.

3    Q.    Well, let's assume, and then I'll move on, that before

4    July 18, you saw my client doing something illegal.  Do you

5    think you would have recalled that?

6    A.    I don't know, sir.

7    Q.    You're saying you would not recall if my client did some

8    criminal activity that had relevance in this investigation

9    before July 18th?  You don't recall, or you wouldn't do

10   anything?

11   A.    Many times you just see these people meeting together.

12   Q.    And people meeting together does not connotate criminal

13   activity by itself; am I correct?

14   A.    That's correct.

15   Q.    Sometimes people know people from the community, whatever

16   the reason is; is that correct?

17   A.    Yes, sir.

18   Q.    So on July 18th, we now know that you did conduct a

19   surveillance.  You went on some type of roof, and you're making

20   some observations, which, I remember, you had binoculars,

21   correct?

22   A.    Yes, sir.

23   Q.    And was anyone else with you on the roof to aid you in any

24   way?

25   A.    No, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Can I assume you had some fellow people with you, law
2    enforcement, maybe somewhere else that day?
3    A.   Yes, sir.
4    Q.   I think you mentioned, correct me if I'm wrong, I think it
5    was a female officer; is that correct?
6    A.   I don't believe I did in this surveillance, sir.
7    Q.   So on July 18th, who else was part of your surveillance
8    team, if you recall?
9    A.   I believe there was approximately five officers.
10   Q.   Now, if you know, while you were doing your surveillance,
11   where those other four or five were located?  Do you know?
12   A.   They were in the vicinity.
13   Q.   And are you communicating with them?
14   A.   Yes.  Via radio.
15   Q.   Do you have any notes regarding this surveillance?
16   A.   Do I personally or does the FBI?
17   Q.   Do you personally.
18   A.   I don't personally.
19   Q.   Did you make any notes while you were making the
20   observations?
21   A.   The individual who writes down the notes takes down the
22   notes.
23   Q.   Well, that person is getting information from someone like
24   yourself to include it in his notes?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Do you know if that person did any notes?

 2   A.   Yes, they did.

 3   Q.   And what's that person's name?

 4   A.   Whoever wrote the 302, sir.

 5   Q.   I think there is a name of Choi.

 6   A.   Okay, sir.

 7   Q.   I'm not sure.  Is that a gentleman that works with your

 8   agency?

 9   A.   Yes, sir.

10   Q.   And what's his first name?

11   A.   Joe.

12   Q.   And for the court reporter, can you spell the last name,

13   please.

14   A.   C-h-o-i.

15   Q.   Thank you.

16        And where is Mr. Choi today, if you know?

17   A.   I don't know his whereabouts, sir.

18   Q.   Is he a witness in this trial, if you know?

19   A.   No, sir.

20   Q.   But he's the one who directly did the notes, correct, on

21   the July 18th issue that I'm now speaking about?

22   A.   Yes, sir.

23   Q.   Okay.  Now, on the July 18th incident, I would like to

24   know, without a guess, do you know the exact time that you were

25   on the roof?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    It would have been the same time that I first observed the

2    Dodge Charger parked in front.  I think it was 7:44.

3    Q.    But -- 7:44 seems like a specific time; is that correct?

4    A.    Yes.

5    Q.    You didn't say approximately 7:30 or 7:40.  7:44, correct?

6    A.    Yes.

7    Q.    Now, that's something without any notes you independently

8    recall; is that correct?

9    A.    No, sir.  That's in the report.

10   Q.    So you have reviewed notes in order to testify and maybe

11   refresh your memory, correct?

12   A.    I reviewed the FD 302, the surveillance log, sir.

13   Q.    Okay.  Now, since you reviewed surveillance logs, back to

14   my other question:  Can you tell us specific other dates of

15   surveillances of my client?

16   A.    No, sir.  We didn't present any others in court.

17   Q.    So, in other words, unless it's presented in court,

18   sometimes you do not have the answer 'cause you didn't refresh

19   your memory; is that fair?

20   A.    It's correct.

21         Could I alter that last statement?  We also surveilled him

22   on July 13.  I testified to that.

23   Q.    Okay.  I'm going to get to that, but I'm on July 18th,

24   please.

25         Now, back to July 18th.  When was the first time that you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   saw my client on that day during your surveillance?

2   A.   It would have been shortly after I got on the roof, sir.

3   Q.   So does that mean shortly after 7:44?

4   A.   Yes, sir.

5   Q.   And how long were you on the roof?

6   A.   Approximately a half an hour.

7   Q.   And when you're on the roof, can you see within the store

8   of my client?

9   A.   A little bit.

10  Q.   Can you see people interacting within the store?

11  A.   If they come closer to the front door, you can see them.

12  Q.   Do you have any video or photographs regarding these

13  observations?

14  A.   No, sir.

15  Q.   Did you actually see my client enter the store, ever?

16  A.   Yes.  He was coming in and out of the store.

17  Q.   After 7:44, did you ever see him enter, or the first time

18  he's exiting?  Which one is it?

19  A.   I believe I saw him come out, speak with Mr. Darbinyan.

20  They went back in the store, mingled, perhaps came in and out a

21  couple times, and then left.

22  Q.   Did Mr. Darbinyan go in the store?

23  A.   He came from inside the store when I first saw him.

24  Q.   I never heard any testimony that you saw Mr. Darbinyan

25  handing anything over to my client; is that accurate?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   That's correct, sir.

2    Q.   Matter of fact, I never heard any testimony that you saw

3    anyone hand anything on that day.  Anything.  Is that also

4    correct?

5    A.   Yes, sir.

6    Q.   Then you said you saw my client speaking with

7    Mr. Darbinyan; is that correct?

8    A.   Yes, sir.

9    Q.   That's not a crime, is it?

10   A.   No, sir.

11   Q.   Okay.  And how long was Mr. Darbinyan in the residence --

12   I mean in the business for?

13   A.   I don't know, sir.  I can only speak to when I got on the

14   roof.

15   Q.   Can you tell us exactly the time that Mr. Darbinyan left,

16   sir?

17   A.   I believe it was approximately 8:02 p.m.

18   Q.   So you do remember specifics like that; is that correct?

19   A.   From the report, sir.

20   Q.   So are you saying if you didn't refresh your memory on the

21   report, you would have never been able to say 8:02?

22        MR. ESTRADA:  Object, your Honor.  This has been asked

23   and answered --

24        THE COURT:  Sustained.

25        MR. ESTRADA:  -- two times.
```

```
 1          THE COURT:  Next question.
 2   BY MR. FLIER:
 3   Q.   What time did my client leave those premises, based on you
 4   reviewing the notes?
 5   A.   I believe it was 8:15, sir.
 6   Q.   Then I heard that you saw a gentleman with him with gray
 7   hair to whom you believe is a person named Mr. Muradyan; is
 8   that correct?
 9   A.   That's correct, sir.
10   Q.   Mr. Muradyan is not a defendant in this case, is he?
11   A.   No, sir.
12   Q.   He's never been indicted, correct?
13   A.   Correct, sir.
14   Q.   You've seen him outside the courtroom, correct?
15   A.   Yes, sir.
16   Q.   You know he's in the coffee business, correct?
17   A.   I don't know that, sir.
18   Q.   Didn't you say to Mr. Muradyan, "How's the coffee
19   business?" during the course of this trial?
20   A.   I don't believe so, sir.
21   Q.   Okay.  Mr. Muradyan.  Did you see anything suspicious
22   about Mr. Muradyan when you're making your observations?
23   A.   No, sir.
24   Q.   Then I heard you testify yesterday that based on a request
25   by you -- I'm not going to say you ordered, but you made the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    request for the Glendale Police Department to effectuate a

 2    traffic stop, correct?

 3    A.   Yes, sir.

 4    Q.   So are you trying to say that even though someone has not

 5    driven improperly or violated any type of traffic law, just

 6    stop him no matter what?  Is that what you're saying?

 7              MR. ESTRADA:  Your Honor, calls for speculation.  Also

 8    calls for a legal conclusion.

 9              THE COURT:  Sustained.

10    BY MR. FLIER:

11    Q.   Is it part of police tactic or FBI technique to pull over

12    people without probable cause?

13    A.   We had probable cause, sir.

14    Q.   But when you're speaking with the -- whomever with the

15    Glendale Police Department, obviously, there's no probable

16    cause at that point, correct?

17              MR. ESTRADA:  Object, your Honor, calls for legal

18    conclusion.

19              THE COURT:  Sustained.

20    BY MR. FLIER:

21    Q.   Forget the word "probable cause."  Up to that point, you

22    have not seen Mr. Parsadanyan do anything illegal; is that

23    fair?

24              MR. ESTRADA:  Objection, your Honor, calls for

25    speculation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Based on the phone calls, we knew he was

 3    carrying something.

 4    BY MR. FLIER:

 5    Q.   Sir, I didn't ask you that, please, so -- here's the

 6    question again.

 7         With your own eyes --

 8              MR. ESTRADA:  Your Honor, he's asking if he did

 9    anything illegal.  There are calls that go into this as well,

10    so the question's vague.

11              MR. FLIER:  I asked if he --

12              THE COURT:  I haven't heard the question yet, Counsel.

13              MR. FLIER:  I asked specifically --

14              THE COURT:  Ask a new question.

15              MR. FLIER:  Okay.  Thank you, your Honor.

16    Q.   You, in your own eyes, when you're making any

17    surveillance, did you see Mr. Parsadanyan do anything illegal?

18    A.   I did not.

19    Q.   And when Mr. Parsadanyan entered, I think it's the BMW, to

20    leave the area, you didn't see him violate any traffic laws,

21    did you?

22    A.   Not in the parking lot, no, sir.

23    Q.   After the vehicle left the parking lot, did you, did you

24    see -- no one else I'm asking -- where it went?

25    A.   The last time I saw it was westbound on Colorado.
```

1   Q.   Now, when Mr. Parsadanyan left his parking lot, did he

2   make a left or a right turn?

3   A.   Right turn, sir.

4   Q.   And the right turn is Colorado Boulevard?

5   A.   Yes, sir.

6   Q.   And that's the last time you saw him, traveling a certain

7   direction on Colorado Boulevard?

8   A.   Yes, sir.

9   Q.   Isn't that the direction that he would go, based on your

10  investigation, to go home?

11       MR. ESTRADA:  Object, your Honor, calls for

12  speculation.

13       THE COURT:  If you know.

14       MR. FLIER:  If you know.

15       THE WITNESS:  I don't know.

16  BY MR. FLIER:

17  Q.   Sir, we've had a couple exhibits in this case.  They are

18  MapQuest exhibits.  Do you recall that?

19  A.   Yes, sir.

20  Q.   And those MapQuest exhibits show certain paths, routes,

21  and locations; is that correct?

22  A.   Yes, sir.

23  Q.   Matter of fact, one example as we keep on hearing, the

24  weed shop MapQuest; is that correct?

25  A.   Yes, sir.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And the word "weed shop," that's a medical marijuana

2   clinic; is that correct?

3   A.   It's a dispensary, sir.

4   Q.   A medical marijuana clinic dispensary; is that correct?

5   A.   Yes, sir.

6   Q.   Was that medical marijuana dispensary ever investigated

7   with a search warrant?

8   A.   Not by the task force, sir, but it is shut down now.

9   Q.   I didn't ask that last part, but thank you.

10       The last time you saw Mr. Parsadanyan, was he going east

11  or westbound on Colorado?

12  A.   Westbound, sir.

13  Q.   And you lose visual sighting of him, correct?

14  A.   Yes, sir.

15  Q.   Later on you acquire information -- I'm not going to ask

16  you about it, but you acquired information that the vehicle was

17  stopped; is that correct?

18  A.   Yes, sir.

19  Q.   After the vehicle was stopped, I would like to know if you

20  carried on your surveillance of Mr. Parsadanyan and the vehicle

21  he was traveling in.

22  A.   No, we did not, sir.

23  Q.   Can you explain to the jury why you would not carry on the

24  surveillance if you think that there is material items within

25  that vehicle that might support your investigation?  Why didn't

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    you just carry it on a little more, the surveillance, if

 2    there's a reason?

 3    A.    Yes, sir.  We had a very small team, as it was a Saturday

 4    night and we all basically rolled out of our houses to go

 5    watch.  So with a small team and the fact that we had just

 6    traffic-stopped a car, we didn't want to continue following it

 7    and possibly burn the surveillance.

 8    Q.    Sir, there was other testimony in this case that you

 9    surveilled a vehicle all the way to Riverside, all the way back

10    to Lancaster, dealing with someone named "Bandit," I remember.

11    Remember those questions?

12    A.    Yes, sir.

13    Q.    So in that situation, it was at least strong enough for

14    you to surveil that, but in this example, you didn't think it

15    was important, or the resources weren't there?  Which one?

16    A.    Resources, sir.

17    Q.    The federal government resources; is that correct?

18    A.    Yes, sir.

19    Q.    The same people, not the prosecutors at this stage, that

20    investigated this case for years; is that correct?

21    A.    Yes, sir.

22    Q.    The same people, and I'm not trying to be too

23    argumentative, that killed a lot of trees to present paperwork

24    in this case?

25              MR. ESTRADA:  That is argumentative, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  It sure is.

 2              MR. ESTRADA:  He's not trying to; he is being

 3    argumentative.

 4              MR. FLIER:  Well, I said it that way so I wouldn't get

 5    yelled at.  Thank you.

 6              THE COURT:  You were able to do it without even

 7    trying, Counsel.  Next question.

 8              MR. FLIER:  Thank you.  I will move on.

 9    Q.   The point being, the federal government has vast

10    resources; is that correct?

11    A.   That's correct, sir.

12    Q.   Just like the last witness, who flew in for 30 minutes to

13    testify about the skimmers; is that correct?  You flew someone

14    out.  I think I heard he was from Washington, D.C., and he had

15    to go catch a plane, right?

16    A.   Yes, we flew somebody out, sir.

17    Q.   So the federal government does have vast resources to

18    investigate and prosecute; is that correct?

19    A.   Sometimes, yes, sir.

20    Q.   Sometimes?  Does it depend on the seriousness of the case?

21    A.   No.  It depends on the day of the week, the time of night,

22    and the resources available.

23    Q.   So, in other words, and I'm going to move on, this was a

24    Saturday night, July 18th, I heard, correct?

25    A.   Yes, it was.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Were you busy?  Did you have plans that night?

2   A.   I'm sure I did, sir.

3   Q.   What did you have planned?  You have a great memory.

4        MR. ESTRADA:  Objection, relevance.  I don't know

5   where this is going.

6        THE COURT:  Sustained, Counsel.  You made the point,

7   and under 403, sustained.

8        MR. FLIER:  Thank you.

9   Q.   So what about the other agents during this surveillance

10  task force on July 18th?  I heard there was around five.  Were

11  they too busy to continue?

12  A.   No.  There would have been -- with me being on the roof,

13  there would have only been four people left.

14  Q.   Okay.  Let me -- please.  Thank you.

15       The four others, were they too busy on a Saturday night?

16       MR. ESTRADA:  Object, your Honor, misstates the

17  testimony and it's argumentative.

18       THE COURT:  Sustained.  It is argumentative.

19  BY MR. FLIER:

20  Q.   Do you know what happened to the other four individuals

21  whom were assisting you on the surveillance on July 18th of '09

22  after 8:02?

23  A.   Could you be more specific, sir, as far as what happened

24  to them?

25  Q.   That was pretty specific, I thought.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Okay.  Do you know if they followed anybody?
 2   A.   I believe Parsadanyan was followed to the traffic stop,
 3   which took a long time, and then he was not followed
 4   thereafter.
 5   Q.   Okay.  I'm really focusing on after, thank you.
 6        After the car was stopped, the car and Mr. Parsadanyan
 7   were not arrested; is that correct?
 8   A.   That's correct, sir.
 9   Q.   And Mr. Parsadanyan drove off with Mr. Muradyan, is your
10   information, correct?
11   A.   That's correct, sir.
12   Q.   Now, I want to -- that's what I'm talking about now.
13   After that point in time, what surveillance was done by the
14   other four individuals, if anything?
15   A.   None, sir.
16   Q.   And again, it's because the resource issue, correct?
17   A.   That, and the fact that we did not want to burn it with a
18   small team, sir.
19   Q.   So the burn issue we just discussed, that's just being
20   detected, correct?
21   A.   That's correct, sir.
22   Q.   So are you trying to say if you had more people there
23   would be more opportunities to not be detected?
24   A.   Yes, sir.
25   Q.   What about more people makes it easier to detect?  Does
```

1   that make sense?

2   A.   That's not really our policy, sir.  It gives you an

3   opportunity to have one person follow for a while, and then

4   that person will not be seen for another couple hours.

5   Q.   Okay.  So, clearly, and I'm going to move on --

6           THE COURT:  Thank you, Counsel.

7   BY MR. FLIER:

8   Q.   But my last question.  Clearly, yourself and the other

9   four did have the opportunity, but you didn't do it.  And now

10  I'll move on.  Is that correct?

11          MR. ESTRADA:  Object, your Honor, argumentative.

12          THE COURT:  Overruled.

13  BY MR. FLIER:

14  Q.   Is that correct?

15  A.   We chose not to, sir.

16          THE COURT:  Okay.

17  BY MR. FLIER:

18  Q.   So you chose not to means you have no idea where

19  Mr. Parsadanyan went after the stop, correct?

20  A.   No, it's not correct, sir.

21  Q.   You think, based on some of the language in the tapes,

22  that you know where Mr. Parsadanyan went, correct?

23  A.   That, and the conversations with other people involved in

24  this case, sir.

25  Q.   Well, without getting into the conversation part, what

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   other people are you referencing about knowledge of the July
 2   18th issue that now we're talking about?  Who are you
 3   referencing?
 4   A.   Mr. Tarverdyan, sir.
 5   Q.   Mr. Tarverdyan?
 6   A.   Yes, sir.
 7   Q.   Is that Raymond?
 8   A.   Yes, sir.
 9   Q.   Raymond Tarverdyan?  Is he -- he was indicted, correct?
10   A.   Yes, sir.
11   Q.   And he's -- is he a cooperating defendant?
12   A.   He's not a cooperating defendant, sir.
13   Q.   So are you saying you had conversations with him and he
14   spoke about July 18th?
15   A.   I have had conversations with him, and he has admitted to
16   his role in this investigation.
17   Q.   I didn't ask that.  I said did he specifically talk about
18   July 18th.
19   A.   He didn't specifically talk about it, sir.
20   Q.   So back to my questions.  What information do you have,
21   besides your interpretation of the tapes based on the
22   translation of the interpreter, what my client did after the
23   stop on July 18th?
24   A.   I believe the word "touchdown" is in English, so I didn't
25   have to rely on a translation for that one.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Okay.  Touchdown -- I don't understand.  Did it say

2    touchdown by Mr. Parsadanyan?  He scored?

3    A.   He said "Touchdown, touchdown, he's arrived, but he got

4    stopped, but everything is okay."

5    Q.   And that's what I'm getting at, sir.  Thank you.  You're

6    assuming that any language about, say, someone being stopped

7    and a touchdown means two things:  One, it's Mr. Parsadanyan

8    who arrived, and two, he must have had some gifts to share or

9    illegal proceeds; is that correct?  That's what you think.

10   A.   Yes, sir, that is correct.

11   Q.   So let's break that down.  That's an assumption by you,

12   correct?

13   A.   No, sir.

14        MR. ESTRADA:  Objection, argumentative.

15        THE COURT:  Sustained.

16   BY MR. FLIER:

17   Q.   Okay.  If it's -- the phone calls.  Touchdown.  Let's talk

18   about that.  Clearly, you think the word "touchdown" is not a

19   football terminology, it's "we scored the proceeds of some

20   sort"; is that correct?

21   A.   That's correct, sir.

22   Q.   But didn't you testify that the number 30 in one of the

23   tapes right before, 8:00 o'clock time period on July 18th,

24   dealt with the number of credit cards?  Remember that

25   testimony?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I don't believe that I did.  I believe that I said the 30

 2   did not reference the money in the car.

 3   Q.   Okay.  If the 30 does not reference the money in the car,

 4   then what could Mr. Parsadanyan scored a touchdown about?

 5   A.   I'm sorry, could you say that again, sir?

 6   Q.   You think money's in Mr. Parsadanyan's car, correct?

 7   A.   It was in Mr. Parsadanyan's car.

 8   Q.   Let's say it was.  But we just heard that the 30, right

 9   before the conversation, deals with credit cards, correct?

10   A.   No.

11   Q.   You just testified that the number 30 was used in one of

12   the tapes and it dealt with the issue of credit cards; am I

13   correct?

14   A.   In one of the tapes, yes, sir, but not the one you're

15   referencing.

16   Q.   First of all, you have no idea which one I'm referencing;

17   is that correct?

18         MR. ESTRADA:  Objection, your Honor, argumentative.

19         THE COURT:  Sustained.

20         MR. ESTRADA:  It's debit cards, not credit cards.

21         THE COURT:  Sustained.

22         MR. ESTRADA:  I think that's part of the confusion.

23   BY MR. FLIER:

24   Q.   Debit cards.  Forget the word "credit."  Debit cards.

25         Was there a tape on July 18th, before 8:00 o'clock, that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   dealt with the number 30, where you interpret the code to mean
 2   debit card?
 3   A.    I don't believe that I testified to that, sir.
 4   Q.    Okay.  Whenever the number 30 is used on July 18th, based
 5   on your independent recollection, does it deal with a numerical
 6   term or a credit card term?
 7   A.    I would have to look at the calls, sir.
 8   Q.    July 6th.  Exhibit 135, as we now know, based on
 9   questioning, is on July 6th at 11:00 o'clock a.m., I assume; is
10   that correct?
11   A.    Yes, sir.
12   Q.    Mr. Tarverdyan and Mr. Darbinyan are the participants
13   within that call; am I correct?
14   A.    That's correct.
15   Q.    My client is not part of that call; am I correct?
16   A.    That's correct, sir.
17   Q.    My client is not referenced in that call by name or Rafo
18   identification or a phone number; am I correct?
19   A.    Not on July 6, no, sir.
20   Q.    Then when we go to the next exhibit, which is 136, the
21   next date is July 11th; would you agree with that, sir?
22   A.    Yes, sir.
23   Q.    So here's my question.  From July 6 through July 10, where
24   are the phone calls?  Are there any phone calls that --
25   A.    Yes, there are phone calls.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    But none of them were presented to this jury, correct?

2    A.    That's correct, sir.

3    Q.    So the next question is simply, how many phone calls do

4    you think you intercepted during that time period?

5    A.    Hundreds probably, sir.

6    Q.    So out of the "hundreds probably, sir," none of them had

7    at least criminal conversation to be included in these

8    exhibits; am I correct?

9    A.    Many of them had criminal conversations.

10   Q.    So now -- forget the word "now."

11        It's your testimony that there are some calls in that time

12   period that have connotations or statements of criminality, but

13   you just didn't present it; is that correct?

14   A.    That's correct, sir.

15   Q.    I would like to know exactly what call you have during

16   that time period of July 6th to July 12th that deal with my

17   client.

18   A.    I couldn't tell you that off the top of my head, sir.

19   Q.    Clearly, you have been called as a witness I think four

20   times by the government; am I correct?

21   A.    That sounds about right, sir.

22   Q.    You've been cross-examined here and there by some of the

23   defense lawyers, correct?

24   A.    Yes, sir.

25   Q.    You clearly understand the importance about being prepared

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   and reviewing documentation when you testify, correct?

2   A.   Yes, sir.

3   Q.   Are you telling us that you never checked any records from

4   July 6 to July 12 about Mr. Parsadanyan?

5   A.   Can you be more specific as to records, sir?

6   Q.   Any phone calls.

7   A.   I'm sure I've seen the phone calls, but I don't have them

8   in front of me, sir.

9   Q.   Well, maybe those phone calls do not deal with any

10  criminal conduct; is that correct?

11  A.   I doubt that, sir.

12  Q.   "I doubt that, sir?"  Okay.  Thank you.

13       So, and I will move on, you're saying there are calls in

14  that time period that show criminal conduct, but you're not

15  going to present them, correct?

16           MR. ESTRADA:  Object, your Honor, argumentative.

17           THE COURT:  Sustained.

18       And Counsel, I'm beginning to believe we don't speak the

19  same language when you keep saying "I'm going to move on."  But

20  anyway, go ahead.  Next question.

21           MR. FLIER:  A suggestion, your Honor.  Thank you.  I'm

22  learning.

23           THE COURT:  The other statement that's used quite

24  often, and I think it's an oxymoron, is when an attorney says

25  "one final question."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. FLIER:  I know.  You know how we like to talk.

 2   Q.   Now, Exhibit No. 137, as we know, is the July 13th first

 3   call on that day that's been presented in this case; is that

 4   correct, sir?

 5   A.   Yes, sir, it's the first one we presented in this case.

 6   Q.   And my client is not part of that call; am I correct?

 7   A.   That's correct, sir.

 8   Q.   But when we look at Exhibit 137, on page 2 of 2, third

 9   Speaker 1 from the bottom, Mr. Darbinyan, "Come to Rafo's store

10   and we'll go from there."

11        "Okay dear brother."

12        Do you see that language, sir?

13   A.   Yes, sir.

14   Q.   It appears that Mr. Darbinyan's saying he's going to go to

15   my client's store; is that correct?

16   A.   Yes, sir, in this call.

17   Q.   Now, it doesn't say that he's gonna do anything illegal at

18   the store, does he?

19   A.   Not in this call, sir.

20   Q.   Well, then we go to the next call, Exhibit 138, which is

21   on July 13th; is that correct?

22   A.   Yes, sir.

23   Q.   Matter of fact, it's less than two hours after the last

24   exhibit we just saw, correct?  And to help you out, I think

25   that was at 5:25.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes, sir.

 2   Q.   Okay.  Do you know if Mr. Darbinyan and whomever else he

 3   might have been with went to my client's store on July 13th?

 4   A.   Yes.  I believe I testified before that they did not go

 5   there.

 6   Q.   Okay.  So there is a conversation and a good example where

 7   somebody says something and mentions my client, but they never

 8   carried out with what happened; in other words, in this case,

 9   to go to the store.  Is that correct?

10   A.   Yes.

11   Q.   So sometimes you have heard tapes where people reference

12   other people, but it didn't get carried out, what was supposed

13   to be referenced in the call; does that make sense?

14   A.   Yes, that makes sense, sir.

15   Q.   Okay.  Thank you.

16        Would you agree that -- and if you have -- let's say -- if

17   you think there was a code or anything, please tell us, but

18   that conversation in 137, when you read it, seems like

19   Mr. Darbinyan was bored and he's gonna go meet someone and they

20   might first go to Rafo's store.  Would you agree with that?

21   A.   No, I don't believe that that's what they're discussing.

22   Q.   Okay.  So back to 137A, page 2 of 2, it says, Speaker 2 --

23   I mean the second time it says Speaker 1, excuse me, "Good

24   morning dear."

25        "Hello brother dear."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        And before I proceed, why is "hello" underlined, if you
 2   know?
 3   A.   It's in English.
 4   Q.   Now, with respect to -- there was testimony from the
 5   interpreter that the English words were in italics.  Do you
 6   remember that?
 7        MR. ESTRADA:  Object, your Honor.  He's asking to
 8   comment on the testimony of another.
 9        THE COURT:  Yes.
10        MR. FLIER:  Thank you, your Honor.  Thank you.
11   Q.   I -- and that was just my curiosity.  The underlined means
12   it's English; is that correct?
13   A.   Yeah.  It says it on page 1.
14   Q.   Okay.  Thank you.
15        And it says, "Hello brother dear."
16        "How are you?"
17        "Ah, going crazy, sitting at home, just idle."
18        "What's up brother?  Why are you like this?"
19        Now, back to my question.  It appears that these two
20   individuals talking are kind of -- forget the word "bored,"
21   they're just having general conversation and maybe are going to
22   go somewhere.  Does that make sense?
23   A.   They're discussing meeting up, yes, sir.
24   Q.   Okay.  Thank you.
25        Well, then it says, "Here I'm coming to Glendale.  Come
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    over, pick me up, and let's go somewhere to get a coffee and
 2    talk a little."
 3         Is "coffee" a code word to you?
 4    A.   Not in this case, sir.
 5    Q.   Sometimes a word like "coffee" means exactly what it
 6    means, correct?
 7    A.   Yes, sir.
 8    Q.   And sometimes, based on your interpretation of the tapes,
 9    it might mean something else; would you agree?
10    A.   Yes, sir.
11    Q.   That doesn't mean you're always right, though; would you
12    agree with that?
13              MR. ESTRADA:  Objection, your Honor, argumentative.
14              THE COURT:  Sustained.
15              MR. ESTRADA:  And irrelevant to this point in terms of
16    going through every single call.
17              MR. FLIER:  That's what -- sorry.
18              THE COURT:  No, it will be sustained as far as being
19    argumentative.
20         Next question.
21              MR. FLIER:  Thank you.
22    Q.   Now, back to Exhibit 138.  That call is around two hours
23    later, and if you see on page 2 of 3, Speaker No. 1 the third
24    time, it says, "Nothing much, bro.  I'm in Hollywood," is that
25    correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Yes, sir.

2    Q.   Where is my client's store located?

3    A.   His store is in Glendale.

4    Q.   Okay.  So right now you would have no information that

5    Mr. Darbinyan went to Glendale ever on this day; is that

6    correct?

7         MR. ESTRADA:  Your Honor, this has been asked and

8    answered.  We've already gone into this.

9         THE COURT:  Overruled.

10   BY MR. FLIER:

11   Q.   Is that correct?

12   A.   Yes, we surveilled him through Glendale.

13   Q.   Okay.  So is it your testimony that because of the calls

14   on July 13th that you decided to do a further surveillance?  Is

15   that correct?

16   A.   I don't recall why we went out on July 13th.  We were out

17   for several hours.

18   Q.   But on July 13th, we know that, so far, up to this period

19   of time, before your surveillance, there's only been two tapes

20   that have been presented, and those are 137 and 138.  Am I

21   correct?  Exhibit numbers.

22   A.   In regard to the 99 Cents Only fraud?

23   Q.   Yes.

24   A.   Yes, sir, there's only been two tapes.

25   Q.   Okay.  Now -- and since you said it, that's the only
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   charges my client's involved with, the 99 Cents, correct?

2   A.   Involved or charged with, sir?

3   Q.   Charged with.

4   A.   It's the only one he's charged with, sir.

5   Q.   Now, in 138 it says, on page 2 -- and I will find it.

6   There it is.  The third speaker again, right after "Hollywood,"

7   "and waiting for someone."  "I'm in Hollywood and waiting for

8   someone."

9        You believe, and correct me if I'm wrong, that my client's

10  at a store in Glendale at this time; am I correct?

11  A.   I would have to look at the log.  I know he shows up in

12  Hollywood.  I don't recall what time.

13  Q.   Okay.  Let me just ask you.  When it says, "I'm in

14  Hollywood and waiting for someone," do you think he's waiting

15  for my client?

16  A.   I don't know, sir.

17  Q.   So you have no idea, when Mr. Darbinyan says "waiting for

18  someone," who the someone is; am I correct?

19  A.   Not during this call, sir, no.

20  Q.   Okay.  "He is bringing something that I need to pick up.

21  I am waiting for him to arrive, brother."

22       "Something that I need to pick up."  It doesn't say what

23  that is; am I correct?

24  A.   No, sir.

25  Q.   He uses the word "something," correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Correct, sir.

 2    Q.    Is that code?

 3    A.    No.  It's vague, sir.

 4    Q.    Okay.  So sometimes a word could be vague in how it's

 5    written in the transcripts, correct?

 6    A.    It's vague in how it's said, sir, I believe.

 7    Q.    All right.  Sometimes the way it's said, it can be vague,

 8    correct?

 9    A.    Yes, sir.

10    Q.    So, "He is bringing something that I need to pick up," you

11    have no idea who he's referencing or what the subject is on

12    that, correct?

13    A.    That's correct, sir.

14    Q.    Now, I thought you said, sir, after this call there was a

15    surveillance, correct?

16    A.    During this call, we were already out on surveillance.

17    Q.    And I then thought I heard yesterday, and correct me if

18    I'm wrong, you saw my client's BMW.

19    A.    Yes, sir.

20    Q.    What time?

21    A.    I don't recall, sir.  It was in the late evening.

22    Q.    Okay.  And where did you see it?  The medical marijuana

23    dispensary?

24    A.    Yes, sir.

25    Q.    And was that the first time you ever saw my client in that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   area?  In your investigation, I'm talking about, and as it
 2   deals with my client.
 3   A.    I don't recall, sir.
 4           THE COURT:  Ladies and gentlemen, we're going to break
 5   at this time, being 4:00 o'clock.  Good luck with the traffic
 6   tonight.  Have a very nice weekend.  For those of you
 7   basketball fans, going to finish the March Madness this
 8   weekend.  Lot of things to do to entertain yourself, but don't
 9   think about this case.  Remember, you got three days off.  I
10   wish we could say the same, but you got three days off.
11        We'll see you in on Tuesday at quarter of 8:00.  Remember
12   the admonishment not to --
13           JUROR:  Quarter of 8:00?
14           THE COURT:  8:15.  8:15.
15           JUROR:  Quarter of --
16           THE COURT:  I thought I was talking to the attorneys,
17   but, yes, 8:15.
18        And remember the admonishment not to discuss the case
19   among yourselves or with anybody else or form or express any
20   opinions about the matter until it's submitted to you and you
21   retire into the jury room.
22        See you back in, then, Tuesday morning.
23           THE CLERK:  All rise.
24              (Proceedings adjourned at 4:02 p.m.)
25                        --oOo--
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1

2                                *CERTIFICATE*

3

4        *I hereby certify that pursuant to Section 753,*

5    *Title 28, United States Code, the foregoing is a true and*

6    *correct transcript of the stenographically reported proceedings*

7    *held in the above-entitled matter and that the transcript page*

8    *format is in conformance with the regulations of the*

9    *Judicial Conference of the United States.*

10

11   *Date:  MARCH 4, 2015*

12

13

14

15                    */S/ SANDRA MACNEIL*

16                *Sandra MacNeil, CSR No. 9013*

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6    UNITED STATES OF AMERICA,      )
                                    )
7                   Plaintiff,      )
                                    )
8         vs.                       )   NO:  CR-11-0072(A)-RGK
                                    )
9    (1)  MHER DARBINYAN,           )
     (4)  ARMAN SHAROPETROSIAN,     )
10   (35) RAFAEL PARSADANYAN,       )
                                    )
11                  Defendants.     )
     _____)

12

13

14            REPORTER'S TRANSCRIPT OF JURY TRIAL

15       DAY 10; VOLUME I OF II; PAGES 1 THROUGH 154

16                    MORNING SESSION

17                 Los Angeles, California

18                 Tuesday, April 8, 2014

19

20

21

22

23                    KATHERINE M. STRIDE, RPR, CSR
                      1107 Fair Oaks Avenue, #68
24                    S. Pasadena, California  91030
                      www.stridecourtreporting.com
25                    (323)474-6420

```
 1      APPEARANCES:

 2      On behalf of the Government:

 3              UNITED STATES ATTORNEY'S OFFICE
                ANDRÉ BIROTTE, JR., UNITED STATES ATTORNEY
 4              BY:  E. MARTIN ESTRADA
                     ELIZABETH R. YANG
 5              ASSISTANT UNITED STATES ATTORNEYS
                312 North Spring Street
 6              Los Angeles, California  90012
                (213)894-4477
 7
                U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
 8              BY:  ANDREW CREIGHTON, TRIAL ATTORNEY
                312 North Spring Street
 9              Los Angeles, California  90012
                (213)894-2579
10
        On behalf of Defendant Mher Darbinyan:
11
                THE SEVERO LAW FIRM
12              BY:  MICHAEL SEVERO, ATTORNEY AT LAW
                70 South Lake Avenue, Suite 945
13              Pasadena, California  91101
                (626)844-6400
14
        On behalf of Defendant Arman Sharopetrosian:
15
                LAW OFFICES OF CHARLES PEREYRA-SUAREZ
16              BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
                800 Wilshire Boulevard, 12th Floor
17              Los Angeles, California  90012
                (213)623-5923
18
        On behalf of Defendant Rafael Parsadanyan:
19
                FLIER AND FLIER, ALC
20              BY: ANDREW REED FLIER, ATTORNEY AT LAW
                15250 Ventura Boulevard, Suite 600
21              Sherman Oaks, California  91403
                (818)990-9500
22
        Also Present:
23
                JEREMY STEBBINS, F.B.I. SPECIAL AGENT
24
                MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25
```

# I N D E X

## GOVERNMENT'S WITNESSES

### JURY TRIAL — DAY 10, VOLUME I OF II

**Page**

**JEREMY STEBBINS, PREVIOUSLY SWORN**..........................6
  CROSS-EXAMINATION CONTINUED
  BY MR. FLIER...............................................6
  REDIRECT EXAMINATION
  BY MR. ESTRADA............................................78
  RECROSS-EXAMINATION
  BY MR. SEVERO.............................................90
  RECROSS-EXAMINATION
  BY MR. PEREYRA-SUAREZ.....................................96
  RECROSS-EXAMINATION
  BY MR. FLIER..............................................97

**GONZALO ZENDEJAS, SWORN**.................................99
  DIRECT EXAMINATION
  BY MS. YANG..............................................100
  CROSS-EXAMINATION
  BY MR. SEVERO............................................110
  CROSS-EXAMINATION
  BY MR. FLIER.............................................112
  REDIRECT EXAMINATION
  BY MS. YANG..............................................126
  RECROSS-EXAMINATION
  BY MR. SEVERO............................................126

**CHRISTOPHER KRIVAK, SWORN**..............................128
  DIRECT EXAMINATION
  BY MS. YANG..............................................128
  CROSS-EXAMINATION
  BY MR. FLIER.............................................135

**CHRIS SPENCER, SWORN**...................................148
  DIRECT EXAMINATION
  BY MS. YANG..............................................149

1                        **E X H I B I T S**

2                    GOVERNMENT'S EXHIBITS

3              JURY TRIAL – DAY 10, VOLUME I OF II

4                                                    <u>**Page**</u>

5

    Exhibit No. 242 received............................ 108

6

7

8

9                        <u>**PROCEEDINGS**</u>

10

11   Defendant Parsadanyan's motion to strike.............. 85

12   Ruling by the Court.................................. 85

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 8, 2014

 2                          A.M. SESSION

 3                            --oOo--

 4                           8:30 a.m.

 5

 6               (Jury enters courtroom.)

 7          THE CLERK:  All rise.  This United States District

 8     Court is now in session, the Honorable R. Gary Klausner,

 9     United States District Judge presiding.

10               (Judge enters courtroom.)

11          THE CLERK:  You may be seated.

12          THE COURT:  Okay.  The record may reflect all the

13     members of the jury are in their respective seats in the

14     jury box.  Again, my appreciation for how good the jurors

15     are as far as being here on time.  You've been golden on

16     that.  I really appreciate it.

17          I hope you all had a good weekend.  If you're a

18     Florida, Wisconsin, or Kentucky fan, my condolences.  If

19     you're a UConn fan, my congratulations to you.  And if you

20     don't care about basketball, I hope you enjoyed Dancing

21     With the Stars last night.  And if you don't watch TV, more

22     power to you.

23          Okay.  Everybody ready?  Okay.  We're at

24     cross-examination.

25          Counsel, you may continue.
```

```
 1              THE CLERK:  Real quickly, I'll just remind you,
 2     you're still under oath.
 3                      JEREMY STEBBINS,
 4      GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, TESTIFIED FURTHER:
 5              THE WITNESS:  Yes, ma'am.
 6              THE COURT:  Okay.
 7                  CROSS-EXAMINATION (Continued)
 8     BY MR. FLIER:
 9     Q.     I'm going to try not to repeat anything because I
10     questioned you for around an hour on Friday.  So I think I
11     left off with Exhibit No. 138.
12              And with respect to Exhibit 138, sir, that was on
13     July 13th of '09; is that correct?
14     A.     Yes, sir.
15     Q.     And is that the last call on July 13th with respect
16     to any exhibits presented?
17     A.     Yes, sir.
18     Q.     Thank you.
19              Now, going into July 14th, did you do any
20     independent surveillance on that day that you recall?
21     A.     I don't recall, sir.
22     Q.     You did some independent surveillance the day before
23     on the 13th; is that correct?
24     A.     Yes, sir.
25     Q.     And we briefly spoke about that that's where you saw
```

1   my client at the medical marijuana dispensary; is that

2   correct?

3   A.    Yes, sir.

4   Q.    Now, with respect to July 14th, do you have any idea

5   where my client was?

6   A.    No, sir.

7   Q.    With respect to July 14th up to July 18th, we now

8   know around 7:00, thereafter, on the 18th, you conducted

9   the surveillance; is that correct?

10  A.    On the 18th, yes, sir.

11  Q.    So between the 13th, last call, and up to that point

12  where you conducted surveillance, did you know where my

13  client was?

14  A.    I don't know, sir.

15  Q.    Okay.  Thank you.

16        And then on the 18th, you're at the point where

17  you're on the roof making some observations; is that

18  correct?

19  A.    Yes, sir.

20  Q.    I don't know if I asked you this.  Did you ever see

21  Mr. Darbinyan arrive at the business of my client on the

22  18th?

23  A.    No, sir.

24  Q.    So when you were on the rooftop making your

25  observations, was he in the store or in the parking lot,

1      Mr. Darbinyan?

2      A.      He was in the store, sir.

3      Q.      Did you actually see Mr. Darbinyan leave that area?

4      A.      Yes, sir.

5      Q.      What time approximately did he leave?

6      A.      Approximately 8:00 o'clock.

7      Q.      And did Mr. Darbinyan leave before or after

8      Mr. Parsadanyan left?

9      A.      Before, sir.

10     Q.      Thank you.

11             When Mr. Darbinyan left, at any point in time during

12     your observations, do you ever see Mr. Darbinyan hand

13     anything to my client, Mr. Parsadanyan?

14     A.      No, sir.

15     Q.      At any point in time when you were making the

16     observations at the rooftop or from the rooftop, do you

17     ever see my client at any point in time enter his vehicle?

18     A.      Yes, sir.

19     Q.      Did you see him enter his vehicle on more than one

20     occasion?

21     A.      I don't recall, sir.

22     Q.      On the occasion that you did see Mr. Parsadanyan

23     enter his vehicle, was that right before he then left the

24     area?

25     A.      Yes, sir.

1    Q.    At no time did we hear any testimony on Friday that

2    you saw Mr. Parsadanyan when he entered his vehicle that he

3    was holding anything.  Am I correct on that?

4    A.    That's correct, sir.

5    Q.    Now, with respect to Exhibit No. 140 and 141, there

6    was some references to judo, a judo uniform, and some type

7    of competition collectively as to those exhibits; is that

8    correct?

9    A.    Yes, sir.

10   Q.    And it's your testimony that any language pertaining

11   to the martial arts or judo was code for some other type of

12   conduct; is that correct?

13   A.    In these calls, yes, sir.

14   Q.    But you're aware that Mr. Darbinyan and I think it's

15   Mr. Tarverdyan's brother were into martial arts; is that

16   correct?

17   A.    I'm aware Mr. Tarverdyan's brother had a gym.

18   Q.    Thank you.

19         And with respect to Mr. Tarverdyan, the first name

20   is Robert; is that correct?

21   A.    Raymond, sir.

22   Q.    Raymond.  I'm sorry.  Raymond; correct?

23   A.    Yes, sir.

24   Q.    Raymond Tarverdyan, he was indicted in this case; is

25   that correct?

1    A.    Yes, sir.

2    Q.    Was his brother?

3    A.    No, sir.

4    Q.    And with respect to Raymond Tarverdyan -- and

5    correct me if I'm wrong -- it's your understanding that he

6    lived somewhere in North Hills; is that correct?

7    A.    At that time, yes, sir.

8    Q.    And I know that we have already heard, I think it

9    might have been in December and it might be December 23rd,

10   2009, you did a surveillance of his property; is that

11   correct?

12   A.    No, sir.

13   Q.    At some point in time, did you ever do a

14   surveillance of Mr. Tarverdyan's residence?

15   A.    Yes, on July 20th, 2009, sir.

16   Q.    Thank you.

17         When you did that surveillance on July 20th, did you

18   ever see my client at the residence?

19   A.    No, sir.

20   Q.    Have you ever seen my client at Mr. Tarverdyan's

21   residence?

22   A.    No, sir.

23   Q.    Did you ever acquire any wiretap -- did you ever do

24   any wiretaps on Mr. Tarverdyan's phone numbers?

25   A.    No, sir.

1    Q.    So during this entire investigation, that was never

2    done?

3    A.    No, sir.

4    Q.    But on July 18th, 2009, it's your belief that my

5    client turned over money to Mr. Tarverdyan; is that

6    correct?

7    A.    Yes, sir.

8    Q.    Now, with respect to the stop, I think we garnished

9    information that you were not present during the Glendale

10   Police Department stop of my client; is that correct?

11   A.    That's correct, sir.

12   Q.    Do you know how long, approximately, that stop was?

13   A.    It was quite lengthy, sir, but I don't know how

14   long.

15   Q.    So the stop of Mr. Parsadanyan on July 18th was a

16   lengthy stop, it's your understanding?

17   A.    Yes, sir.

18   Q.    With respect to after the stop -- and I don't want

19   to go into it again -- there was no other surveillance, and

20   we talked about there was some resource issue or whatever;

21   is that correct?

22   A.    Yes.

23   Q.    Now, from the location, based on your understanding

24   where my client's vehicle was stopped, how much time does

25   it take, approximately, to get to Mr. Tarverdyan's Mission

1    Hills -- or wherever he is located -- residence from there?

2    Approximately.

3    A.    It would have taken a while, sir.  It's about

4    30 miles.

5    Q.    And with respect to that type of drive, have you

6    ever done it, approximately, before?

7    A.    Yes, sir.

8    Q.    So it's around 30 minutes.  Does that make sense?

9    A.    30 to 40 minutes, yes, sir.

10   Q.    And when we see the exhibit that has the language

11   about a touchdown -- and we'll get to that.

12         Do you recall what exhibit number that is, sir, by

13   any chance?

14   A.    Not off the top of my head, sir.

15   Q.    Do you recall -- and we'll find it.  Do you recall

16   what time that call was made?

17   A.    Not off the top of my head, sir.

18         MR. FLIER:  Here it is.  It's Exhibit 160,

19   Your Honor.

20         THE COURT:  Okay.

21   BY MR. FLIER:

22   Q.    Directing your attention to Exhibit 160, please.

23   What is the time of that call, please?

24   A.    Approximately 10:21 p.m.

25   Q.    So that's around two hours, approximately, after the

1    stop of my client's vehicle.  Does that make sense?

2    A.    Yes, sir, approximately.

3    Q.    So do you have any idea where my client went, based

4    on your investigation, for that two-hour period.?

5    A.    As I said, he was at the stop for a lengthy period

6    of time, and then he went to Tarverdyan's house.

7    Q.    Well, that's your belief that he went to

8    Mr. Tarverdyan's house; is that correct?

9    A.    You asked me if I had any idea, sir.

10   Q.    No, that's fine, but that's your belief; is that

11   correct?

12   A.    Yes, sir.

13   Q.    And that's your belief based on no specific

14   evidence, just the fact that around 10:00 o'clock or 10:20,

15   thereafter, there's some language about a touchdown; is

16   that correct?

17   A.    No, sir.  It's based on the previous calls.

18   Q.    What evidence do you have -- not based on other

19   officers.  What do you have specifically to tell this jury

20   where my client went after the Glendale Police Department

21   stop?

22   A.    The calls before and after, and then also the

23   admission of Raymond Tarverdyan of his involvement in the

24   scheme.

25

1    Q.    So when you say the admission of Mr. Tarverdyan's

2    involvement in this scheme, are you saying that

3    Mr. Tarverdyan was a cooperating defendant or witness at

4    some point in time?

5    A.    No, sir.

6    Q.    So when you made that last statement, is that

7    predicated upon some of the taped calls?

8          Why did you make the statement based on

9    Mr. Tarverdyan's statement?  What did he say?

10   A.    Because he pled guilty to the scheme, sir.

11   Q.    So Mr. Tarverdyan entered into a plea; correct?

12   A.    Yes, sir.

13   Q.    And are you trying to say that during his

14   sentencing, he gave a statement about his involvement?

15   A.    No, sir.  He hasn't been sentenced yet.

16   Q.    So are you trying to say that during the plea

17   agreement itself and some of the terms, that he made

18   references about his specific conduct?

19   A.    Yes, sir.

20   Q.    Mr. Tarverdyan never said anything negative about my

21   client, Mr. Parsadanyan.  Am I correct on that?

22   A.    No, sir, not specifically.

23   Q.    Mr. Tarverdyan never told you that Mr. Parsadanyan

24   did anything wrong in any conversation you had with him,

25   Mr. Tarverdyan.  Am I correct?

1    A.    No, sir.  I don't believe so.

2    Q.    "No sir.  I don't believe so."  I am not correct?

3    A.    Yes, sir, you're correct.  He did not specifically

4    mention --

5    Q.    Thank you.  I think maybe I'm asking a

6    double-negative.

7          THE COURT:  Yes.

8    BY MR. FLIER:

9    Q.    And thank you for clarifying that, sir.

10         So back to my question, then I'll move on.

11         After the stop of Mr. Parsadanyan on that evening --

12   forgetting any calls -- what information do you have, with

13   personal information, where Mr. Parsadanyan went?

14   A.    Other than the calls, sir, nothing.

15   Q.    So based, again, on those calls, it's your opinion

16   that Mr. Parsadanyan went to that location and dropped off

17   money; is that correct?

18   A.    Yes, sir.

19   Q.    You testified on Friday and you used the monetary

20   figure of 34,000.  Do you remember that?

21   A.    Yes, sir.

22   Q.    Was that a mistake when you used that figure?

23   A.    No, I believe that's what he told the officers was

24   in the car.

25   Q.    Now, you, I assume, have reviewed the Glendale

1    Police Department report on that stop.  Am I correct on

2    that?

3    A.     Yes, sir.

4    Q.     He doesn't say 34,000.

5    A.     No, but there's a belt recorder, sir.

6    Q.     In the police report, is there any indication about

7    34,000?

8           MR. ESTRADA:  Objection, Your Honor.  This is

9    calling for speculation and hearsay.

10          THE COURT:  Sustained.

11   BY MR. FLIER:

12   Q.     With respect to the conversations with respect to

13   July 18th of 2009 -- and that seems to be an important day

14   in your investigation; am I correct?

15   A.     Yes, sir, one of them.

16   Q.     And I was just going to say I'm not trying to

17   minimize any other days, but there seems to be some

18   activity, surveillance, maybe money changed hands on that

19   particular day.  Am I correct?

20   A.     Yes, sir.

21   Q.     Now, with respect to Exhibit No. 156, Exhibit

22   No. 156 is a phone call between Mr. Tarverdyan and

23   Mr. Darbinyan on July 18th at 7:38 p.m.; is that correct?

24   A.     Yes, sir.

25   Q.     Now, Mr. Darbinyan says on the third speaker down

1    from the bottom, Speaker 1 (as read:)

2              "Yeah, here I just need to stop by at Rafo's

3              place.  How should I do those?  I'll have

4              Rafo"... and then it's blank, little dots,

5              "so he drives, so I don't take it on me."

6         That statement or sentence alone signifies that

7    Mr. Darbinyan has not arrived at the store yet of my

8    client; is that correct?  Would you agree with that?

9    A.    No, I don't believe it says that.

10   Q.    Okay.  So it's your belief that in Exhibit 156,

11   Mr. Darbinyan potentially is at my client's workplace

12   already?

13   A.    Potentially.  It could be.  I'd have to listen to

14   the call.

15   Q.    Okay.  But listening to the call, we now know that's

16   in Armenian; correct?

17   A.    Right, but you'd be able to tell if he's in a car or

18   not.

19   Q.    Okay.  Thank you.

20        So with respect to some of these calls, you cannot

21   discern the location where the speakers are at times; is

22   that correct?

23   A.    Mr. Darbinyan -- we had GPS on his phone.

24   Q.    Okay.  So since you had GPS on his phone, on

25   July 18th, around 7:38, where was he?

1    A.    I don't recall, sir.

2    Q.    When Mr. Tarverdyan says, "We are doing a barbecue,"

3    on the line above what I read, do you think the word

4    "barbecue" has some coded language?

5    A.    No, sir.

6    Q.    So sometimes, as I asked before, the words mean

7    exactly what they mean; is that correct?

8    A.    Yes.  Sometimes words mean what they mean.

9    Q.    And then, when we go back to Speaker No. 3, on the

10   top where it says Speaker 1, but the third one down

11   (as read:)

12             "No, I didn't just give those.  They had

13             already done some and had about 30 left.  I

14             took and dropped those off just now."

15   My question:  The numeral term "30," do you believe

16   that connotates a monetary figure or an amount of debit

17   cards?

18   A.    Amount of debit cards, sir.

19   Q.    So the word or the number 30 has nothing to do with

20   $30,000, at least in Exhibit 156; am I correct?

21   A.    No, sir.  I mean -- yes, you're correct, sir.

22   Q.    Okay.  Thank you.  (as read:)

23             "They had already done some and had about 30

24             left.  I took and dropped those off just

25             now."

1          Do you think, when Mr. Darbinyan made that

2    statement, "and dropped those off just now," do you think

3    that's at Mr. Parsadanyan's residence or business?

4    A.     No, sir.

5    Q.     Thank you.

6          Then, when we go Exhibit 157, that's around at 8:14;

7    is that correct?

8    A.     Yes, sir.

9    Q.     Now, like the last exhibit and this exhibit, my

10   client is not part of this conversation; is that correct?

11   A.     That's correct, sir.

12   Q.     Nobody can control -- and when I say nobody --

13   anybody can't control what other people say during

14   conversations at times.  Does that make sense?

15   A.     Yes, I suppose that makes sense, sir.

16   Q.     Okay.  Sometimes people bring up other people and

17   subject matters, whether accurate or not.  Would you agree

18   with that?

19          MR. ESTRADA:  Objection, Your Honor.  Argumentative.

20          THE COURT:  Well, it is, yeah.

21          MR. FLIER:  Thank you.

22   BY MR. FLIER:

23   Q.     With respect to conversations that do not deal with

24   my client specifically, one can't control what other people

25   say.  Does that make sense?

1           MR. ESTRADA:  Objection, Your Honor.  Argumentative.

2           THE COURT:  Well, it is, but you can answer it also.

3    Go ahead and answer.

4           THE WITNESS:  Can you repeat the question?

5    BY MR. FLIER:

6    Q.     One cannot control what other people speak or say

7    about someone on a phone.  Is that correct sometimes?

8    A.     That's correct sometimes, sir.

9    Q.     Okay.  Thank you.

10          Now, with respect to Exhibit No. 157, please, the

11   second speaker, when it says "Speaker 1", excuse me, it

12   says (as read:)

13                "The thing, uh, my friend is coming now and

14                he's bringing those things."

15          My first question:  The original "the thing," what

16   do you believe that means?

17   A.     He's talking about the money, sir.

18   Q.     And then it says, "My friend is coming now and he's

19   bringing those things."

20          So you think "those things" means money?

21   A.     That statement means he's bringing the money, sir.

22   Q.     Okay.  And in the last statement when there was a

23   "30" mentioned, that has to do with debit cards; correct?

24   A.     Yes, sir.

25   Q.     But in this exhibit, it's your explanation that that

1    statement must mean money; correct?

2    A.    Yes, sir.

3    Q.    Even though there's no monetary figure and there's

4    no number that would correspond with a monetary figure; is

5    that correct?

6          MR. ESTRADA:  Objection, Your Honor.  Argumentative.

7          THE COURT:  Sustained.

8    BY MR. FLIER:

9    Q.    Do you see any monetary figure in exhibit 157?

10   A.    No, sir.

11   Q.    So this is an example.  157, in Exhibit 157 where

12   there is a reference to, let's say, a number or a thing,

13   and in your opinion one of them means credit cards or debit

14   cards, and the other one might mean money; is that correct?

15   A.    Yes, based on the context, sir.

16   Q.    So an example of how "things" can mean different

17   things based on the context of the conversation; is that

18   correct?

19   A.    The context of the conversation and the context of

20   what's going on, yes, sir.

21   Q.    Now, in 157, and finally about that exhibit, at no

22   time is there a reference to who the person is; is that

23   correct?

24   A.    A name, sir?

25   Q.    Yes

1    A.    There's no name in the call, sir.

2    Q.    And Ralph, or Rafo, or Mr. Parsadanyan is not

3    specifically mentioned; am I correct?

4    A.    Not by name, sir.

5    Q.    Thank you.

6          Now, if this call in 157 shows that the call was at

7    8:14, then based on your testimony, Mr. Parsadanyan is

8    either still at his store or just left; is that correct?

9    A.    Right around that time, sir, yes.

10   Q.    Because we do not have any specific logs to show and

11   demonstrate the exact time that Mr. Parsadanyan left his

12   lot; am I correct?

13   A.    No, you are not correct, sir.

14   Q.    What was the exact time, based on any specific log,

15   that Mr. Parsadanyan left his lot?

16   A.    Do you have the log, sir?  I can tell you exactly.

17   Q.    No, I don't have it.

18         Do you have an independent recollection of it?

19   A.    I believe it was approximately 8:15, but I don't

20   know the time in the log, sir.

21   Q.    Thank you.

22         So if the call is at 8:14 and 58 seconds and there's

23   a reference that the person is on his way or hasn't arrived

24   yet -- to be specific, "My friend is coming now" -- and

25   your independent recollection is Mr. Parsadanyan left

1   around 8:15, are you sure they're talking about

2   Mr. Parsadanyan?

3   A.    Yes, sir.  I'm absolutely positive.

4   Q.    Now, absolutely positive, but you could be mistaken,

5   though; correct?

6   A.    No, sir.

7         MR. ESTRADA:  Objection.  Argumentative at this

8   point.

9         THE COURT:  Sustained.

10  BY MR. FLIER:.

11  Q.    What role do you think Mr. Tarverdyan was playing in

12  this case?  Was he a runner?

13  A.    No, sir.

14  Q.    Was he a master planner, shot-caller?

15  A.    Would you like me to explain his role, sir?  It's

16  difficult to put it into the little categories you're

17  talking about.

18  Q.    Please.  Thank you.

19  A.    I believe he was going into the stores and swapping

20  out the machines, and then he was also the one making the

21  debit cards for runners to go out and take with them.

22  Q.    With respect to anyone, but specifically

23  Mr. Tarverdyan, making the debit cards, did you ever do a

24  search of his residence?

25  A.    Yes, sir.

1    Q.    Do you find manufacturing materials?

2    A.    I don't believe so, sir.

3    Q.    Okay.  Now, Exhibit 15 -- let me just see.

4    Exhibit 158 indicates a time of 8:45; is that accurate?

5    A.    Yes, sir.

6    Q.    And, again, with respect to this conversation,

7    Mr. Parsadanyan is not part of it; is that correct?

8    A.    That's correct, sir.

9    Q.    And then there's a reference (as read:)

10                "He said he would be here in 15 minutes.

11                Brother, half an hour passed and he is still

12                not here."

13          That's the second R.T.

14          Here's my question:  Do you have any evidence that

15    there was any phone communications between Mr. Parsadanyan

16    and Mr. Tarverdyan that relate to the time period in

17    Exhibit 158?

18    A.    Yes, sir.

19    Q.    What phone call do you have?

20    A.    We have toll records between Parsadanyan and

21    Tarverdyan.

22    Q.    You have what?

23    A.    Toll records.

24    Q.    What are toll records?

25    A.    That's the records of the calls made.

1    Q.    So are you saying that there are toll call records

2    that are not part of these exhibits?

3    A.    That's correct, sir.

4    Q.    So what phone calls do you have that were not

5    presented as these calls on July 18th after 8:00 o'clock

6    that are not part of these exhibits?

7    A.    There were several calls between Tarverdyan and

8    Parsadanyan, sir.

9    Q.    Now, when you say "several calls," we already know

10   that you did not acquire a wiretap application for any of

11   Mr. Parsadanyan's phones; correct?

12   A.    That's correct, sir.

13   Q.    Based on discussions today, we now know

14   Mr. Tarverdyan's phones did not have any wire tie --

15   wiretaps; is that correct?

16   A.    That's correct, sir.

17   Q.    So you utilized some other form through the phone

18   company; is that correct?

19   A.    Yes, sir.

20   Q.    And that's what you just indicated; correct?

21   A.    Yes, sir.

22   Q.    But those calls do not show, do not speak, do not

23   say what the language was; is that correct?

24   A.    The toll records do not say what the context was.

25          THE COURT:  Well, let me -- because it may be

1    confusing to the jury.

2          What is a toll record?

3          THE WITNESS:  A toll record is basically a record of

4    person one calling person two.  And we use a subpoena to

5    get the historical toll records after the fact.

6          THE COURT:  You don't hear the conversation; it's

7    just who calls who?

8          THE WITNESS:  Who calls who, duration, time that

9    they called.

10          THE COURT:  Okay.

11          THE WITNESS:  That's about it.

12          THE COURT:  Go ahead, Counsel.

13          MR. FLIER:  Thank you, Your Honor.

14    BY MR. FLIER:

15    Q.    So let's be more specific.  After 8:00 o'clock on

16    July 18th of '09, how many toll records do you have that

17    deal with Mr. Parsadanyan's phone?

18    A.    Well, we just call it all "toll records," sir.

19          You mean toll hits between Mr. Parsadanyan and

20    Mr. Tarverdyan?

21    Q.    Well, I just want to make sure, based on what the

22    Court asked you, the toll records or any hit on that, is

23    that specifically on Mr. Parsadanyan's cell phones?

24    A.    Yes, we would have subpoenaed his toll records for a

25    month or two time period.

1   Q.     And when did you acquire that information?  When did

2   you submit the application for that?

3   A.     It would have been a subpoena, sir, and probably in

4   2009.

5   Q.     So sometime in 2009, there's a subpoena request for

6   some toll records of some phones; is that correct?

7   A.     Yes, sir.

8   Q.     And now we're hearing it's Mr. Parsadanyan that you

9   have that information about, at least during this time

10  period; correct?

11  A.     As well as some of the other targets, yes, sir.

12  Q.     So on July 18th after 8:00 o'clock, what calls do

13  you have made by Mr. Parsadanyan -- not that he received,

14  that he made?

15  A.     I don't recall the direction of the call, sir,

16  incoming or outgoing.

17  Q.     You do not recall the direction in or out-coming,

18  that's fine.  It's been a long time; correct?

19  A.     It's been a long time, sir.

20  Q.     How many calls can you tell us that you have -- I

21  don't want to use the word "intercepted," but you have

22  during that time period?

23  A.     There were several contacts between Tarverdyan and

24  Parsadanyan.

25  Q.     Now, when we get to Exhibit 159, this was not played

1    to the jury during your examination by Mr. Estrada.  Am I

2    correct?

3    A.    I don't recall whether it was or wasn't, sir.

4    Q.    Assume that I am accurate in that and it was not.

5    So I would like to talk about Exhibit 159, please.

6         With respect to Exhibit 159, that indicates a call

7    around 9:28 p.m.; is that correct?

8    A.    That's correct, sir.

9    Q.    And what I really want to focus on, sir, is on

10   page 2 of 3, and it's almost in the middle, it says

11   (as read:)

12            "Yeah, but two...there are other people

13            besides Khecho... I sent them to San Diego,

14            and, I am waiting for them."

15            R.T. responds, "Yeah."

16            Speaker 1 says, "Khecho's person has gone and

17            picked it up...from Misak"

18            "R.T.:  Okay...?" with a question mark.

19            "Yeah."

20       Now the next sentence:

21            "Speaker 1:  They went, dear.  Rafo is not

22            aware."

23       What do you think that means, sir, in your

24   investigation?

25   A.    I believe they're saying that Rafo doesn't know

1    exactly how many people are involved.

2    Q.    So there is an example of where there is a

3    conversation that my client's not part of where he's

4    referenced, though; am I correct?

5    A.    Yes, sir.

6    Q.    And in this context, that was not played to the

7    jury, he's referenced in the capacity that he's unaware of

8    some activities or information or whatever in that context;

9    is that correct?

10   A.    Yes, sir.

11   Q.    So do you think that's code for something, in any

12   way?

13   A.    That sentence?

14   Q.    Yeah.

15   A.    No, sir.

16   Q.    Do you have any reason to disbelieve that sentence?

17   A.    No, sir.

18   Q.    So that sentence connotates that Mr. Parsadanyan is

19   unaware of some activities; is that correct?

20   A.    Of some activities, yes, sir.

21   Q.    So Mr. Parsadanyan could have his own business

22   relations with Mr. Darbinyan that have nothing to do with

23   fraud.  Would you agree with that?

24   A.    No, sir.

25   Q.    As the investigating officer in this case, it's your

1    opinion that Mr. Parsadanyan's involved; correct?

2    A.    Absolutely, sir.

3    Q.    Now, absolutely.  Does that make it stronger in your

4    opinion because you used the word "absolutely"?

5         MR. ESTRADA:  Objection, Your Honor.

6         THE COURT:  Sustained.

7         MR. FLIER:  Thank you.

8    BY MR. FLIER:

9    Q.    You think he's involved; is that correct?

10   A.    Yes, sir.

11   Q.    And you've made mistakes before in this

12   investigation; am I correct?

13   A.    Yes, sir.

14   Q.    And just like anyone in this courtroom, sometimes

15   we're prone to make mistakes; correct?

16   A.    Yes, sir.

17   Q.    So your interpretation of these tapes is based on

18   your investigation and what the translator has interpreted;

19   correct?

20   A.    Based on the entirety of the investigation, yes,

21   sir.

22   Q.    If the translator's wrong, that affects some of your

23   beliefs.  Am I correct in that?

24        MR. ESTRADA:  Objection, Your Honor.  Calls for

25   speculation, argumentative.

1          THE COURT:  Sustained.

2     BY MR. FLIER:

3     Q.    If it turns out that the translator has made some

4     mistakes, does that change the flavor and the subject

5     matters of the some of these tapes?

6          MR. ESTRADA:  Objection, Your Honor.  Calls for

7     speculation and argumentative.

8          THE COURT:  Sustained.  Well, no, it calls for

9     speculation.

10         MR. FLIER:  Thank you, Your Honor.

11    BY MR. FLIER:

12    Q.    Mr. Parsadanyan is not part of this particular

13    exhibit, 159, but he is referenced; am I correct?

14    A.    Yes.  They also talk about giving him stuff.

15    Q.    Well, let's talk about that.

16         The next sentence after "Rafo is not aware," it says

17    (as read:)

18              "Okay."

19              "Rafo... whoever, whatever I gave him... Rafo

20              only brought that, the rest three things...

21              there are still different things outside,

22              bro."

23         Do you have an opinion as to what that sentence

24    means?

25    A.    Yes.

1    Q.    Now, does that sentence mean to you, money?

2    A.    In parts of that sentence, yes, sir.  "Whatever I

3    gave him" is the money.

4    Q.    But what about the word "whoever, whatever"?  What

5    does the "whoever" mean, or is that a mistake?

6    A.    I believe that was a mistake, sir.

7    Q.    So there is a word "whoever" in that sentence, and

8    it's your opinion or testimony that that's just a mistake

9    in language or just any speaking; correct?

10   A.    Yes, sir.

11   Q.    "Whatever I gave him" -- you have no idea of any

12   information that Mike Darbinyan gave my client anything on

13   July 18th; am I correct?

14         MR. ESTRADA:  Objection, Your Honor.  Argumentative.

15         THE COURT:  Overruled.

16         THE WITNESS:  No, you're not correct, sir.

17   BY MR. FLIER:

18   Q.    Sir, what specific information do you have of your

19   own specific knowledge that my client received anything

20   from Mr. Darbinyan?

21   A.    The multiple references that Darbinyan gave it to

22   him, our observations that Darbinyan was at his store, and

23   then him being stopped with multiple thousands of dollars

24   in cash.

25   Q.    Okay.  Back to my question -- and if I ask a

1    question that calls for a "yes" or a "no," can you please

2    just answer "yes" or "no"?

3            MR. ESTRADA:  Objection, Your Honor.

4            MR. FLIER:  I'm just saying.

5            THE WITNESS:  That's not what you asked, sir.

6            MR. ESTRADA:  Ask the right questions.

7            THE COURT:  Sustained.

8    BY MR. FLIER:

9    Q.    My question is --

10           THE COURT:  It's sustained.  The Court will figure

11   out whether it should be yes or no.

12           Go ahead.

13           MR. FLIER:  Thank you, Your Honor.

14   BY MR. FLIER:

15   Q.    What specific information that you have -- and I've

16   got to be very clear.

17           Besides any phone call and besides you may be

18   talking to a Glendale police officer, what information do

19   you have, sir, that my client was handed anything that day?

20           MR. ESTRADA:  This is argumentative, Your Honor, and

21   we've gone over this.

22           THE COURT:  Overruled.

23           THE WITNESS:  You're saying if we take out the

24   calls, take out the surveillance, and take out the car

25   stop?

```
 1   BY MR. FLIER:

 2   Q.     Well, take out the surveillance?  I already asked

 3   you if you saw any exchange of anything between the two,

 4   and you said "no"; correct?

 5   A.     That's correct, sir.

 6   Q.     So let's take out the surveillance.  Let's take out

 7   any calls.  Yes, that's my question.

 8   A.     And you would take out the car stop, sir?

 9   Q.     Yes.  We'll take out the car stop, too.

10   A.     Then there's nothing else, sir.

11   Q.     Okay.  Now, let's talk about those three items.

12          The car stop -- that's the Glendale Police

13   Department stop of my client where you're not a witness to

14   that; correct?

15   A.     That's correct, sir.

16   Q.     The phone calls is what we're talking about now.

17   Would you agree with that?

18   A.     Yes, sir.

19   Q.     The surveillance I already asked you.  There was no

20   surveillance that showed criminal activity between

21   Mr. Darbinyan and my client on the 18th; correct?

22          MR. ESTRADA:  Objection, Your Honor.  Argumentative

23   and misstates the evidence.

24          THE COURT:  Overruled.

25
```

BY MR. FLIER:

Q.     Correct?

A.     The surveillance verified that they were together,
that he was going to meet with him, that he was going to
send something with him.  We did not see the exchange.

Q.     Okay.  And that doesn't mean if there's a
conversation about sending something that that actually
came to fruition.  Would you agree with that?

A.     If you take out the car stop, sir?

Q.     If you take out the car stop.

A.     Then yes, there's nothing else that verifies that it
was sent with him.

Q.     So (as read:) "Rafo only brought that, the rest
               Three things... there are still different
               things outside, bro."

       Is it your testimony "the rest three things" means
money, cards, or something else?

A.     Something else, sir.

Q.     What's the something else?

A.     He referencing the multiple runner crews that he
sent out to various different places.

Q.     It doesn't say that people -- or a sentence about
people going somewhere.  It's talking about things.

A.     Earlier in the call it does, sir.

Q.     But I'm talking about this sentence right now that

1    we were talking about.  I asked you what do you think the

2    "things" means in that sentence?

3    A.     And I told you, sir.

4    Q.     And what's your answer?

5    A.     It is the crews of people that are doing the debit

6    card fraud, sir.

7    Q.     So this is a third example where you have said the

8    word "things" means something different than money or

9    credit cards, and in this example it's runners; correct?

10   A.     It's the groups of runners, yes, sir.

11   Q.     It's an example of where you, in your opinion, have

12   analyzed what the word "things" means, and we now know it

13   to mean three different things based on the different

14   tapes; is that fair?

15   A.     Based on the context, yes, sir.

16   Q.     Is there a reason why you never applied for a

17   wiretap application for Mr. Tarverdyan's phone?

18   A.     Yes, sir.

19   Q.     How long -- strike that.

20          When was the first time you became aware of

21   Mr. Tarverdyan, what year?

22   A.     Most likely January 2009, sir.

23   Q.     So you're aware of Mr. Tarverdyan, and you already

24   explained to the jury what you thought his role was; is

25   that correct?

```
1    A.    Yes, sir.

2    Q.    So is there a reason why you never received or

3    applied for a wiretap application for his phones?

4    A.    Yes, sir.

5    Q.    And what is that reason?

6    A.    We were already intercepting criminal conversations

7    over Darbinyan's phone.

8    Q.    So it's your testimony with the federal resources --

9    because you had your main target and his phone, let's say,

10   wiretapped -- it was not important to do the other

11   individuals?

12         MR. ESTRADA:  Objection, Your Honor.  Argumentative.

13         THE COURT:  Sustained.

14   BY MR. FLIER:

15   Q.    Do you think it's important to get wiretap

16   information on all of the suspects to whom you're

17   investigating?

18         MR. ESTRADA:  Argumentative, Your Honor, and he's

19   gone over this before.

20         THE COURT:  Overruled.

21         THE WITNESS:  Do you think we should wiretap

22   everyone?

23   BY MR. FLIER:

24   Q.    The main people who you think are involved, sir.

25   A.    It depends on the circumstances, sir.
```

1    Q.    Okay.  Now, Exhibit No. 160, we briefly talked about

2    that.  That call is around 10:20; is that correct?

3    A.    Yes, sir.

4    Q.    And that's the touchdown call; is that correct?

5    A.    That's correct, sir.

6    Q.    And clearly, in your opinion and testimony, that is

7    not a word for a football score; is that correct?

8    A.    That's correct, sir.

9    Q.    Now, there has been different phrases used during

10   these tapes.  Would you agree with that?

11   A.    They have used different phrases, yes, sir.

12   Q.    And a good example is we hear "touchdown"; we hear

13   "horses"; we hear the letter "W"; we hear "seized."  These

14   are words that you think have relevance; correct?

15   A.    Yes, sir.

16   Q.    These are words that you think support your

17   investigation about fraud; correct?

18   A.    Yes, sir.

19   Q.    With respect to Exhibit 160, it never mentions in

20   the conversation as to anyone bringing anything over by a

21   specific name.  Am I correct on that?

22   A.    Not by a specific name, sir.

23   Q.    Then it says (as read:)

24              "They had stopped him, but it's all okay.

25              Here, there are two, one for you."

1           "They had stopped him," I can assume that you

2    believe that references the stop of my client by the

3    Glendale Police Department; am I correct?

4    A.    Yes, sir.

5    Q.    You're not certain about that, but that's your

6    belief based on the investigation.  Does that make sense?

7    A.    I am certain, sir.

8    Q.    Well, you're certain without any evidence of that;

9    is that correct?

10          MR. ESTRADA:  Objection, Your Honor.  Argumentative.

11          THE COURT:  Sustained.

12   BY MR. FLIER:

13   Q.    You're certain about that based on your

14   investigation; correct?

15   A.    Yes, sir.

16   Q.    When it says, "Here, there are two, one for you,"

17   what do you think that means?

18   A.    When I heard the call, it sounded like he was

19   talking to somebody in the background; so I couldn't tell.

20   Q.    All right.  Are you trying to say that that

21   sentence, you believe, has nothing to do with the specific

22   conversation between Mr. Darbinyan and Mr. Tarverdyan?

23   It's somebody else maybe who's part of a conversation?

24   A.    I'd have to listen to the call again, sir.

25   Q.    Now, when you say you'd have to listen to the call,

1    is this in Armenian or English?

2    A.    It's in Armenian, sir.

3    Q.    So when you say you have to listen to the call, are

4    you trying to say simply you want to hear if you can

5    discern a third voice?

6    A.    No, sir.

7    Q.    Okay.  So when we read that sentence again, are you

8    trying to say you're not certain of the meaning because he

9    might have been speaking to somebody else?

10    A.    In that case, like I said, I'd have to hear it again

11    in order to see if he was speaking to somebody in the

12    background.

13    Q.    Okay.  But when you look at the sentence or read

14    it -- excuse me -- it seems like there's some coded

15    language maybe going on with "There are two, one for you."

16    Would you agree with that?

17    A.    It depends on what they're doing on the other side

18    of the phone, sir.

19    Q.    So this is an example of you have no idea what that

20    sentence means; correct?

21    A.    In this case, no, I don't.

22    Q.    But sometimes -- when you were talking to the

23    interpreter, every single word has importance.  Would you

24    agree with that?

25    A.    No, sir, I wouldn't agree with that.

1    Q.     Would you agree that if words are missing or it

2    doesn't make sense to you, it can take the subject matter

3    of that conversation out of context?  Does that make sense?

4    A.     If words are missing, sir?

5    Q.     Yes.

6    A.     Yes, I suppose that would mean something.

7    Q.     And not just words are missing, sometimes the

8    meaning of words are unclear to you, or you just don't know

9    what it means; correct?

10         MR. ESTRADA:  Objection, Your Honor.  This is

11   speculation and argument.

12         THE COURT:  Sustained.

13   BY MR. FLIER:

14   Q.     Did you ever see on July 18th at any time my client

15   with any alleged runner?

16   A.     No, sir.

17   Q.     On July 19th, did you ever see, during any

18   investigation -- and this question will involve any

19   officer.

20         Do you have information that my client, on

21   July 19th, was in the company of any believed-to-be

22   runners?

23   A.     No, sir.

24   Q.     Do you think my client is a runner in this case?

25   A.     No, sir.

1    Q.    Do you think my client is the "thief-in-law"?

2    A.    No, sir.

3    Q.    What role do you think my client has, then?

4    A.    I believe he managed the money and people came to

5    him to pick up debit cards and drop off money.

6    Q.    Okay.  So my client's role is he might be a manager

7    or have something to do with currency; correct?

8    A.    That's correct, sir.

9    Q.    And then the other issue -- do you have any proof

10   that my client had a conversation with, let's say, a

11   known-to-be runner and directed him anywhere in July of

12   2009?

13   A.    Not in July, sir.

14   Q.    Do you have any phone call after the purported stop

15   by my client by the Glendale Police Department where my

16   client is on the phone talking to Mr. Darbinyan or anyone

17   saying, "Hey, you know what, I just got stopped by the

18   police"?  Do you have anything like that?

19   A.    I don't recall, sir.

20   Q.    If there was a tape that my client was stopped by

21   the police, do you think you would recall that, where he

22   specifically says, "Hey, I just got stopped by the Glendale

23   Police Department and they found $30,000 in my car"?

24         Do you think you would remember if there was a tape

25   about that conversation?

1          MR. ESTRADA:  Objection, Your Honor.  Asked and

2     answered.

3          THE COURT:  Overruled.

4          THE WITNESS:  If he said the 30,000, yes, sir.  But

5     if he just called and said, "I got stopped but I got

6     there," I don't know that I would recall it.

7     BY MR. FLIER:

8     Q.    All right.  In the first part, there's no

9     conversation where my client said he did anything wrong

10    with 30,000; am I correct?

11    A.    Not on that day, sir.

12    Q.    Now, that call, Exhibit 160, is the last call with

13    respect to exhibits presented in this trial on July 18th,

14    of 2009; am I correct?

15    A.    Yes, sir.

16    Q.    And then we go to Exhibit 161, the next one,

17    obviously, numerically speaking.  And that has an

18    indication that the call was made at 2:30 in the afternoon

19    on July 19th; am I correct?

20    A.    Yes, sir.

21    Q.    What activity are you aware of -- specifically with

22    personal knowledge, from July 18th after the 8:00 o'clock,

23    let's stay, stop by the G.P.D., Glendale Police Department,

24    up until 2:30 the following day, where was my client, if

25    you know?

1    A.    I don't know, sir.

2    Q.    You cannot even tell this jury that my client was

3    even in Mission Hills on July 18th in the evening.  Am I

4    correct?

5          MR. ESTRADA:  Objection, Your Honor.  Argumentative.

6          THE COURT:  That it is.

7    BY MR. FLIER:

8    Q.    Can you tell the jury whether or not my client, in

9    the evening of July 18th, was in the North Hills area?

10          MR. ESTRADA:  Objection, Your Honor.  Argumentative

11   and misstates the testimony.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes.

14   BY MR. FLIER:

15   Q.    And besides maybe the language "touchdown," do you

16   have other information?

17   A.    No.  The calls are enough, sir.

18   Q.    Okay.  "The calls are enough, sir"; correct?

19   A.    Yes, sir.

20   Q.    How many runners did you arrest in this case?

21   A.    On the 99 Cent Store scheme?

22   Q.    Yes.

23   A.    We arrested the people that were involved in

24   installing the devices, but the people who were actually

25   maxing out the debit cards, none.

1    Q.    Now, the people who were installing the machinery --

2    the skimmers; correct?

3    A.    Yes, sir.

4    Q.    That's some of the exhibits that we saw with respect

5    to the two gentlemen in the stores exchanging items.  Am I

6    right?

7    A.    Yes, sir.

8    Q.    Those are the exhibits in July of 2009?

9    A.    And August, sir.

10   Q.    So the evidence so far that's been presented that

11   encompasses both July and August of 2009; is that correct?

12   A.    That's correct, sir.

13   Q.    And in those exhibits, there seem to be two primary

14   suspects; is that correct?

15   A.    No, sir.

16   Q.    Well, it seems to be two Armenian gentlemen that can

17   be depicted in some of those videos; is that correct?

18   A.    I believe we arrested three Armenian gentlemen, one

19   Armenian female, two Hispanic -- one female, one male.

20   Maybe more.

21   Q.    Back to my question:  It appears in the video there

22   are two main Armenian men doing some bad things; correct?

23   A.    No.  It -- no, you're not correct, sir.

24   Q.    We know now, based on your testimony, there were

25   around five people, based on who was exchanging skimmers or

1    who could be seen in the video -- two Armenian gentlemen

2    and a female Armenian lady; is that correct?

3    A.    No, sir.

4    Q.    Maybe I'll just do it this way:  How many total

5    people were caught?

6    A.    There was approximately six -- six arrested.  There

7    were several others that were not.

8    Q.    And with respect to the six, half and half --

9    there's some Hispanic people involved; correct?

10   A.    One Hispanic female and one Hispanic male.

11   Q.    Now, together with those people in combination,

12   collectively, it's your opinion that they are labeled

13   "runners."  Is that how you would label them?

14   A.    Some of people that were sent in there would be

15   runners.

16   Q.    So runners, to you, means someone -- more than

17   someone who's just supposed to go to the bank or go to the

18   wall and remove money.  It could be someone who actually is

19   doing the machine and putting them in place; correct?

20   A.    It depends on the circumstances, sir.

21   Q.    So it's your testimony the word "runner" depends on

22   the circumstances, on how that runner is being utilized?

23   A.    Yes, sir.

24   Q.    The two Armenian gentlemen, the runners, what are

25   their names again, please?

1    A.    They're not runners, sir.

2    Q.    I thought we just had this conversation.

3    A.    No, sir.

4          MR. ESTRADA:  Objection, Your Honor.  I think

5    there's some vagueness.

6          MR. FLIER:  It must have been vague.  I'll move on,

7    Your Honor.

8    BY MR. FLIER:

9    Q.    The two gentlemen that are in the videos that show

10   Armenians, the males, what are their names again?

11   A.    The first two are Raymond Tarverdyan and Simon

12   Antonyan.

13   Q.    Have you ever seen Raymond Tarverdyan with my

14   client?

15   A.    Yes, sir.

16   Q.    When?

17   A.    Well, your client was at his house on the July 20th

18   date that we talked about, and I can't remember any

19   specific days other than that.

20   Q.    Okay.  Thank you.

21         But clearly not on July 18th; correct?

22   A.    No, sir.

23   Q.    Turning your attention, please, to Exhibit 162 in

24   the middle of this exhibit (as read:)

25              "Speaker 1:  Bro, I have tons of things to

1    do, dear.  I just want to put it in place so

2    tomorrow again... Do you get it, my brother?"

3    K.A. says:

4    "Yeah.  Um... Rafo...the guys were waiting

5    for you to let them know.  Okay bro.  Let's

6    do --"

7    When K.A. makes that comment "Rafo," do you think

8    that was a mistake that he used Rafo's name, sir, based on

9    your investigation?

10    A.    I think he was trying not to use it on the phone,

11    and then he changed his topic.

12    Q.    Well, it says, "Yeah.  Um... Rafo," but then the

13    next thing is "...the guys were waiting for you."

14    And K.A. is speaking to Mr. Darbinyan, would you

15    agree, on this call?

16    A.    Yes, K.A. is speaking to Mr. Darbinyan.

17    Q.    So when you just said maybe K.A. doesn't want to

18    mention Rafo's name, it says, "The guys were waiting for

19    you."  He's talking about Mr. Darbinyan obviously; correct?

20    A.    Yes, sir.

21    Q.    So back to my question, that appears to be a

22    mistake -- Rafo's name included there -- based on your

23    investigation; am I correct?

24    A.    No, you're not correct, sir.

25    Q.    Okay.  Again, this conversation, my client's not

1    part of it; correct?

2    A.    No, sir.

3    Q.    Now, that was the last call that was played to this

4    jury, on July 19th, because when we go to Exhibit 163, that

5    is the first call for July 20th; am I correct, sir?

6    A.    Yes, sir.

7    Q.    And then it says 9:53.  Is that a.m. or p.m.?

8    A.    It would have been a.m., sir.

9    Q.    Now, with respect to this exhibit, there seems to be

10   two words I'd like to talk to you about.

11         R.T. makes a comment (as read:)

12              "We...we need the Range," R-a-n-g-e.

13         Range.  That could be a cell phone term; correct?

14   A.    A what term, sir?

15   Q.    Cell phone terminology.

16   A.    No, sir.

17   Q.    So since you said "no, sir," do you believe "Range"

18   means a vehicle?

19   A.    Yes, sir.  A Range Rover.

20   Q.    Okay.  So is "Range" coded, or does it mean what it

21   means maybe?

22   A.    It means what it means, sir.

23   Q.    Now, two sentences down, R.T. says (as read:)

24              "Okay, come in an hour, an hour and a half so

25              I can tell Sim --"

1          S-i-m for the reporter.

2               "-- so we can go, bro."

3          Sim -- that's a cell phone term; am I correct?

4     A.    Not in this case, sir.  He's saying "Sim" or "Sim,"

5     as in Simon.

6     Q.    He doesn't say "Simon," does he?

7     A.    No, but he calls him "Sim" repeatedly in other

8     calls.

9     Q.    So in your testimony "Range" and "Sim" or "Sim" only

10    means what you said and cannot mean cell phone terminology;

11    is that correct?

12             MR. ESTRADA:  Objection, Your Honor.  Argumentative.

13             THE COURT:  Sustained.  Argumentative.

14    BY MR. FLIER:

15    Q.    You testified to what you believe that means; is

16    that correct?

17             MR. ESTRADA:  Objection, Your Honor.  Argumentative

18    and irrelevant at this point.

19             THE COURT:  Sustained.

20    BY MR. FLIER:

21    Q.    Okay.  Now, in Exhibit 164, this is the call that's

22    on July 20th around 1:52 in the afternoon, where maybe

23    somebody has been identified in the surveillance team.

24             I think that might be you; is that correct?

25    A.    That's correct, sir.

1   Q.    That's what this call was about; correct?

2   A.    Yes, sir.

3   Q.    Now, based on this call, do you think that

4   Mr. Darbinyan changed phone lines?

5   A.    Yes, sir.

6   Q.    So in your investigation, you have seen where

7   Mr. Darbinyan has utilized a lot of different phones.  Is

8   that fair?

9   A.    Yes, sir.

10  Q.    If i'm simply to ask you, from the first day that

11  you investigated Mr. Darbinyan until his arrest, how many

12  phones do you think he had?

13  A.    Anywhere between 10 and 12, sir.

14  Q.    And those are phones that you're aware of

15  potentially; correct?

16  A.    Right.  Those were the phones that we identified.  I

17  believe he had more than that.

18  Q.    Thank you.

19        And also, there could be phones that he has and gave

20  to other people -- correct? -- that you're not aware of?

21  A.    Could you restate that, sir.

22  Q.    Could it be possible that Mr. Darbinyan had other

23  phones that he gave to other people?

24        MR. ESTRADA:  Objection, Your Honor.  Calls for

25  speculation.

1          THE COURT:  Sustained.

2    BY MR. FLIER:

3    Q.     Do you have information in your investigation that

4    Darbinyan would provide other people -- no matter how you

5    want to classify them -- with phones?

6    A.     Not that I recall, sir.

7    Q.     But you do agree that, in a lot of the thousands of

8    and thousands of calls, there is communications between

9    Mr. Parsadanyan and Mr. Darbinyan about phones?

10   A.     Yes, sir.  There are calls.

11   Q.     Thank you.

12          Up to this point in time, without speculating, in

13   your own eyes, have you ever seen Mr. Darbinyan giving

14   anything to Mr. Parsadanyan?

15   A.     I don't recall, sir.

16   Q.     With respect to the person to whom we've heard in

17   this case -- and I might be saying his name wrong -- "Kako"

18   or "Chako,"  K-h-e-c-h-o?

19   A.     "Kaycho," sir.

20   Q.     "Kaycho."  Thank you.

21          You know who I'm referencing; correct?

22   A.     Yes, sir.

23   Q.     Isn't that a common name in the Armenian community?

24   A.     "Khachatur"?

25   Q.     The first one.  Khecho?

1    A.    Well, that's not a name, sir.  His name is

2    Khachatur.

3    Q.    I know, but the nickname, isn't that a common

4    nickname in the Armenian community based on your

5    investigation?

6    A.    I wouldn't say it's common, sir.

7    Q.    Have you heard other people with that same common

8    name, though?

9    A.    I've heard other people with that name, sir.

10    Q.    As A matter of fact, are you aware that

11    Mr. Darbinyan has a relative with that name?  That's not

12    the guy you think it is.  Are you aware of that?

13    A.    Can you repeat that question, sir?

14    Q.    Are you aware that there's a family relative of

15    Mr. Darbinyan with that same name that has nothing to do

16    with this indictment?

17    A.    No, sir, I'm not aware.

18    Q.    We heard testimony about some pole surveillance; is

19    that correct?

20    A.    Yes, sir.

21    Q.    And can you tell the jury what that is, please.

22    A.    We put a pole camera on the top of basically a light

23    pole, and it's disguised like an electrical box.  And it

24    focuses on an area, and you control it remotely.

25    Q.    How many of these pole surveillances did you have in

1   this investigation?

2   A.      Well, the one in Mr. Darbinyan's propane yard was

3   there for several months.  I believe we had two others at

4   various locations.

5   Q.      What are the two other locations?

6   A.      There's one at a body shop in Hollywood for months,

7   and I don't recall if there's another one.

8   Q.      The body shop, the rim shop that we heard about

9   earlier in this case?

10  A.      No, sir.

11  Q.      So with the pole surveillance, was there any issue

12  that had materiality that deals with my client,

13  Mr. Parsadanyan?

14  A.      I don't recall, sir.

15  Q.      Surveillance logs.  Obviously, the FBI, and I assume

16  you, maintain surveillance logs of date and times?

17  A.      Yes, sir.

18  Q.      And you did that in this case?

19  A.      Yes, sir.

20  Q.      That would be similar to any video logs, too?

21  A.      I don't know what a video log is, sir.

22  Q.      Any video tapes logged?

23  A.      We don't have a practice of video logging things,

24  sir.

25  Q.      Okay.  On July -- I think we started with July 4th.

1   So on July 4th, July 17th, July 18th, July 19th, and July

2   20th, do you ever have any information that my client even

3   entered a 99 Cent Store?

4   A.    No, sir.

5   Q.    Do you have any information that any runner handed

6   over to my client anything on those days?

7   A.    Those specific days, sir?

8   Q.    Correct.

9   A.    No runners, sir.

10  Q.    With respect to the PIN pads and any materials to

11  manufacture credit cards, debit cards, or manipulate any

12  type of machinery, do you ever find any of those items on

13  my client?

14  A.    No, sir.

15  Q.    You testified that with respect to at least one of

16  the calls, that you came to the conclusion that the

17  monetary figures or the numbers mentioned really, in

18  essence, came down to percentages of cuts that runners or

19  other people were making.  Do you remember that?

20  A.    Yes, sir.

21  Q.    That had to do with a 9500 figure.  Am I correct?

22  A.    I'd have to look at the call, sir.

23  Q.    Do you have any information that my client was given

24  money by Mr. Darbinyan or any higher-up, let's say, as a

25  commission fee for illegal activity?

1    A.    Not as a commission fee, sir.

2    Q.    There's been, I think, at least one informant used

3    in this trial; is that correct?

4    A.    That's correct, sir.

5    Q.    And I think that's Mr. Moreno?

6    A.    He's a cooperating defendant, sir.

7    Q.    I'm not going to get into Mr. Moreno except for the

8    one question -- did he ever mention my client's name?

9    A.    I don't believe so, sir.

10   Q.    Sometimes in these calls, it mentions the numbers

11   200, 500.  When you see numbers, can you discern the

12   meaning, or does it matter on the context of the phone

13   call?

14   A.    Matters on the context of the phone call, sir.

15   Q.    In Exhibit No. 179, that purports to be a phone call

16   September 4 of 2009.  Is that accurate, sir?

17   A.    Yes, sir.

18   Q.    On page 3 of 4 of that exhibit, almost midway down,

19   H.S. says (as read:)

20              "Nothing.  I'm supposed to go to court at

21              1:00 o'clock, and then I was going to go down

22              to Raffo's place or I may drop by at your

23              place."

24        Do you see that?

25   A.    Yes, sir.

1    Q.    Do you think that language has any connotations of

2    criminal activity?

3    A.    Yes, sir.

4    Q.    You do?

5    A.    Yes, sir.

6    Q.    Doesn't it just mean what it sounds like?  I might

7    go visit Rafo at his place, or do you think there's

8    something more to that?  And I'm not challenging you.

9          Do you think there's more to that?

10   A.    Yes, sir.

11   Q.    Okay.  When you read that sentence by itself, is

12   there something or the wording of that sentence that makes

13   you believe that, or is there some other information in

14   this tape that helps?

15   A.    In this call and the next call where he says Hakop

16   came by and dropped off money, sir.

17   Q.    Okay.  And we're going to get to that.

18         So when we get back to Exhibit 179 and you read that

19   sentence, by itself it seems pretty innocuous, pretty

20   innocent so far -- and I don't mean innocent in conduct,

21   but just I just might come down to a friend's house.

22         MR. ESTRADA:  Objection, Your Honor.  Argumentative.

23         THE COURT:  Overruled.

24         THE WITNESS:  I don't believe this call was

25   innocent, sir.

1    BY MR. FLIER:

2    Q.    Okay.  What about when Speaker 1, two down, says

3    (as read:)

4              "Bro, I have a wedding today and won't be

5               able to make it.  Can you drop by at Raffo's

6               place before you go to court?"

7         Did you have any information whether Mr. Darbinyan

8    was attending a wedding on September 4th?

9    A.    I don't recall.

10   Q.    But in this sentence, "wedding" might mean exactly

11   what it's supposed to mean.  Would you agree with that?

12   A.    Yes, it may.

13   Q.    Okay.  So we now have two different sentences where

14   somebody mentions my client's place of business; correct?

15   A.    Yes, sir.

16   Q.    Okay.  So on September 4th of 2009, did you do

17   surveillance of my client's business?

18   A.    I don't believe so, sir.

19   Q.    Okay.  Do you have any idea on September 4th, if

20   H.S., who purportedly is Mr. Hakop Simitian --

21        With an "S" for the reporter.

22        -- and Mr. Darbinyan ever went even to Glendale that

23   day?

24   A.    Yes, sir.

25   Q.    What information do you have?

1    A.      The calls where he says Hakop came over and dropped

2    off the money.

3    Q.      But that's the next call; correct?

4    A.      Yes, sir.  You asked if I had any information.

5    Q.      Okay.  I'm talking about on September 4th, sir.  Do

6    you have any information on that day?

7    A.      Yes, sir, the next call is September 4th.

8    Q.      And now we're going to get to the next call, which

9    is Exhibit 180; is that correct?

10   A.      Yes, sir.

11   Q.      And that call is at 13:22 hours, which, I believe,

12   is around 1:22 in the afternoon; is that correct?

13   A.      That's correct, sir.

14   Q.      And that's around two and a half hours later from

15   the exhibit we just were speaking about; is that correct?

16   A.      Yes, sir.

17   Q.      Now, this exhibit, 180, this purports to be a

18   conversation between my client and Mr. Darbinyan; correct?

19   A.      Yes, sir.

20   Q.      And if you look at Speaker No. 2 the second time, it

21   says (as read:)

22              "Yes, bro.  I had someone next to me so I

23              couldn't pick up [the phone.]"

24          In italics or parentheses.  Do you see that?

25   A.      Yes, sir.

1    Q.    That's a good example of when someone is having a

2    conversation and it's mentioning somebody else is with me

3    or I'm speaking to someone else.  Would you agree with

4    that?

5         MR. ESTRADA:  Objection, Your Honor.  Calls for

6    speculation.

7         THE COURT:  Overruled.

8         THE WITNESS:  Yes, sir.  He does say somebody is

9    next to me.

10   BY MR. FLIER:

11   Q.    We talked about that same type of language in

12   another call where you said you thought maybe he was

13   conversing or speaking or referencing someone else.  Do you

14   remember that?

15   A.    Yes, sir.

16   Q.    This is an example where, specifically, it shows

17   maybe the person speaking to someone other than the person

18   to whom called him.  Would you agree with that?

19   A.    Yes, sir.

20   Q.    (As read:) "Bro, did Raf, Hakopik come

21              Over?"

22        H-a-k-o-p-i-k for the reporter.

23        When Speaker 1 says "Bro, did Raf, Hakopik" Raf is a

24   mistake there by the speaker.  Would you agree with that?

25   A.    Yes, sir.

1    Q.    And that's an example where my client's name, Ralph

2    (phonetic) in any context is mentioned, and it might be a

3    mistake.  Would you agree?

4    A.    Yes, sir.  He's talking to Raf.

5    Q.    Correct.  And the next person to whom they mention,

6    Hakopik, do you know who that person is?

7    A.    Yes, sir.

8    Q.    And who is that person?

9    A.    Hakop Simitian.

10   Q.    Is he indicted?

11   A.    No, sir.

12   Q.    Why not?

13   A.    That's not my call, sir.

14   Q.    This is a person who is specifically referenced in

15   calls, more than one call; correct?

16   A.    Yes, sir.

17   Q.    And as a matter of fact, this is a person who is

18   supposed to have contact in some capacity with my client;

19   correct?

20   A.    Yes, sir.

21   Q.    Did you conduct any surveillance on September 4th of

22   2009 at the business location of Mr. Parsadanyan?

23   A.    I don't believe so, sir.

24   Q.    Do you have any information besides the tapes that

25   Hakopik ever even went over to my client's place of

1    business on the 4th of September?

2    A.    Other than the tapes, sir?

3    Q.    Other than the tapes.

4    A.    No, sir.

5    Q.    (As read:)  "Yes, bro.  I gave it to him.

6              It's all right.  He also gave me some."

7         Now, as the investigator, do you think that has some

8    significance, those two sentences?

9    A.    Yes, sir.

10   Q.    And can I assume you think that has some criminal

11   language involved?

12   A.    Yes, sir.

13   Q.    "Yes, bro.  I gave it to him."  Do you have any idea

14   what he gave him?

15   A.    Yes, sir.

16   Q.    Do you have any idea based on personal information

17   what he gave him?

18   A.    Other than the phone call, sir?

19   Q.    Other than the phone calls.

20   A.    No, sir.

21   Q.    "He also gave me some."

22        Other than the phone calls, do you have any personal

23   information of what that might be?

24   A.    No, sir.

25   Q.    Now, my client's in the phone business.  Would you

1    agree with that?

2    A.    Yes, sir.

3    Q.    Although you might testify that language might mean

4    something criminal, it could also mean phone conversations

5    and products.  Would you agree with that?

6    A.    No, sir.

7         MR. ESTRADA:  Your Honor, calls for speculation,

8    this whole thing.

9         THE COURT:  It does call for speculation.

10        MR. FLIER:  Can I move to strike the answer then?

11        THE COURT:  Yes, it will be stricken.

12        MR. FLIER:  Thank you.

13   BY MR. FLIER:

14   Q.    (As read:)  "Just a second.  Bro, open that

15             drawer.  There's a piece of paper there.

16             Give it to me."

17        Is that sentence an example of maybe where

18   Mr. Parsadanyan's speaking to someone other than

19   Mr. Darbinyan?

20   A.    Yes, sir.

21   Q.    So this is a good example at least twice where

22   Mr. Parsadanyan's having other conversations it appears;

23   right?

24   A.    Yes, sir.

25   Q.    Then it says (as read:)  "There's a piece of paper.

1          There...no -- no.

2          "Unidentified male:  This one?"

3     And then my client says: "In general and all

4          Together, all that was withdrawn was 1300."

5     Do you see that language?

6  A.    Yes, sir.

7  Q.    The word "withdrawn," did you ever hear that word in

8  English when you were listening to any of the tapes?

9  A.    I don't know if I heard it in English, sir.

10 Q.    The word "withdrawn," did you develop what that

11 means when you spoke with Mr. Derpetrossian, the

12 interpreter?  Did you develop that?

13 A.    I don't know the word in Armenian, if that's what

14 you're asking, sir.

15 Q.    You heard the interpreter say that sometimes he

16 could not understand certain words and did his best.  Do

17 you remember that?

18     MR. ESTRADA:  Objection, Your Honor.  He's asking

19 the comments of another witness.

20     THE COURT:  Sustained.  That's improper.  The jury

21 knows what they have heard.

22     MR. FLIER:  Thank you, Your Honor.

23 BY MR. FLIER:

24 Q.    The figures on page 4 of 4 (as read:)

25          "3.2. Oh, Yesterday it was 6.  And oh, just a

1                    minute, bro.  Yesterday it was 6.3 and today

2                    it's 3.2.  There was a total of 9.5.  He took

3                    out 1900, and I have 1300 with me, bro."

4          I think I asked you earlier about the 9500 and a cut

5     or commission.  Do you remember that question?

6     A.     Yes, sir.

7     Q.     Is this the tape that you were referencing?

8     A.     It's one of them yes, sir.

9     Q.     Now, when it's using the word "yesterday it was 6,"

10    verse when it says an actual 1900, do you think those six

11    mean a monetary, numerical figure?

12    A.     Yes, sir.

13    Q.     So what does six means to you?  $6?

14    A.     6,000, sir.

15    Q.     Then how come it wouldn't say 6,000 as it says 1900?

16           Is there a reason for that based on your

17    investigation?

18    A.     It's just the way they talk, sir.

19    Q.     So you would agree that sometimes people are saying

20    things because that's just the way they talk, would you

21    agree?  It's what you just said I thought.

22    A.     Yes, some people just talk a certain way, sir.

23    Q.     Okay.  So when you look at these numbers, although

24    there's a prime number, 6 -- I think that's a prime

25    number -- 1900 and 1300 are utilized.  So you're saying

1    that when a sole number is used, does that mean thousands?

2    A.    It depends on the context, sir.  If you read the

3    entire sentence together, it becomes very clear.

4    Q.    It becomes very clear?

5    A.    Yes, sir.

6    Q.    Okay.  (as read)  "It was 6, and just a minute,

7              Bro.  Yesterday it was 6.3."

8         So you're saying the 6 and the 6.3 really means 6000

9    and 6300?

10   A.    Yes, sir.  6300, sir.

11   Q.    Okay.  And today it's 3.2.  Do you they that means

12   3,200?

13   A.    Yes, sir.

14   Q.    So why would there be a .2?

15        MR. ESTRADA:  Objection, Your Honor.  Calls for

16   speculation.

17        THE COURT:  Sustained.

18   BY MR. FLIER:

19   Q.    Have you, based on your investigation, developed

20   what these numerical terms mean and what the decimal points

21   mean?

22   A.    I don't know what you mean by "developed," sir.

23   Q.    I'm just trying to figure out how you can come to

24   the conclusion that any number solely means a monetary

25   figure.  That's what I'm asking.

1          MR. ESTRADA:  Objection, Your Honor.  Argumentative.

2     He's answered this already.

3          THE COURT:  Sustained.

4     BY MR. FLIER:

5     Q.     Do you think that that means debit card, credit card

6     numbers, or does it just mean monetary figures?

7     A.     In this call, it means dollar amount, sir.

8     Q.     On September 4th of 2009, did you catch my client

9     with any dollar amounts on his person?

10    A.     No, sir.

11    Q.     In his property business?

12    A.     No, sir.

13    Q.     At his home?

14    A.     No, sir.

15    Q.     So when you testified those numbers mean also a

16    percentage or a cut, would you agree with that?

17    A.     The 1900 is a percentage, sir.

18    Q.     Percentage of what?

19    A.     9500.  It's 20 percent, sir.

20    Q.     So in your investigation, that's what those figures

21    must mean; is that correct?

22    A.     That's what those figures do mean, sir.

23    Q.     That's what, in your opinion, they mean; is that

24    correct?

25         MR. ESTRADA:  Objection, Your Honor.  Argumentative.

1           THE COURT:  Sustained.

2           MR. ESTRADA:  Asked and answered.

3           THE COURT:  Sustained on both grounds.

4    BY MR. FLIER:

5    Q.     The runners, based on your previous testimony, are

6    supposed to acquire I think it was 20 percent; is that

7    correct?

8    A.     The group gets 20 percent of their take; the head of

9    the group gets 20 percent.

10   Q.     The head of the group gets 20 percent; is that

11   correct?

12   A.     Yes, sir.

13   Q.     So in this context, do you think my client's the

14   head of the group of runners?

15   A.     No, sir.

16   Q.     Okay.  So what percentage cut would my client get

17   based on just this language of this exhibit?

18   A.     I don't know what agreement Darbinyan and

19   Parsadanyan worked out.

20   Q.     So I thought you testified -- and please correct me

21   if I'm wrong -- that once the 20 percent cut was

22   determined, that maybe that leader gets a percentage of

23   that; am I correct?

24   A.     Could you ask that again, sir?

25   Q.     What does the leader of the runners get?  He should

1    get more than the runners.  Does that make sense?

2    A.    He's paid the 20 percent, and then he pays them from

3    the 20 percent.

4    Q.    Do you have any evidence that my client,

5    Mr. Parsadanyan, gave money to anyone beyond July 18th?

6    A.    Yes, sir.  I believe these calls are talking about

7    the money.

8    Q.    Okay.  But do you have any proof that he

9    specifically handed over or received money, like with a

10   photograph, with an observation, anything like that?

11   A.    We don't have a photograph or a surveillance outside

12   of July 18th where he brought the money.

13   Q.    Okay.  "He took out 1900, and I have 1300 with me,

14   bro."  What is it 20 percent of 1900?

15   A.    Like $380.

16   Q.    That doesn't add up to that 1300 figure right after

17   that; am I correct?

18   A.    You're not doing the math right, sir.

19   Q.    I didn't do it right?

20   A.    No, sir.

21   Q.    Okay.  Well, based on your testimony, some of these

22   calls seem suspicious to you; is that correct?

23   A.    Yes, sir.

24   Q.    But the fact that it's suspicious does not always

25   connotate criminal conduct.  Would you agree with that?

1           MR. ESTRADA:  Argumentative, Your Honor.

2           THE COURT:  Sustained.

3     BY MR. FLIER:

4     Q.    Whose decision was it to play the exhibits to this

5     jury trial?  Was it Mr. Estrada or your decision?

6     A.    It would be the prosecution, sir.

7     Q.    Okay.  Well, did you ever have a conversation with

8     Mr. Estrada about playing the exhibit that I spoke about

9     when it says "Rafo was unaware"?  That would be

10    Exhibit 159.

11          Did you have any specific conversation about playing

12    that exhibit to the jury?

13    A.    No, sir.  I don't believe so.

14    Q.    Is there a reason why?

15    A.    I don't know, sir.

16    Q.    During your investigation, can I assume that you do

17    background checks on everybody to the best of your ability?

18    A.    Yes, sir.

19    Q.    Mr. Parsadanyan had no criminal history; correct?

20          MR. ESTRADA:  Objection, Your Honor.  Calls for

21    hearsay.

22          THE COURT:  Sustained.

23    BY MR. FLIER:

24    Q.    Well, in this investigation, based on your

25    testimony, some of the other participants seem to have

1    criminal records; is that correct?

2    A.    Yes, sir.

3    Q.    As a matter of fact, we heard you testify a couple

4    times in this trial where you have said, "He's on

5    probation" or "He's on parole"; is that correct?

6    A.    That's correct, sir.

7    Q.    Was my client on probation or parole?

8          MR. ESTRADA:  Objection, Your Honor.  Calls for

9    hearsay.

10          THE COURT:  Sustained.

11   BY MR. FLIER:

12   Q.    How many total photographs do you have that show any

13   one to whom you believe is a runner at an ATM machine that

14   deals with the 99 Cent alleged fraud?

15   A.    There were several.  I don't know the number, sir.

16   Q.    Around?  How many?

17   A.    I'd say between 20 and 30.

18   Q.    And the 20 to 30 photos, are those of the same group

19   of people, around six, that we already talked about?

20   A.    No, sir.  You're talking about something different

21   now, sir.

22   Q.    Well, I want to talk about any alleged withdrawal of

23   any victim of the 99 Cent Store.  Are you with me on that?

24   A.    Yes, sir.

25   Q.    What video or photo surveillance do you have

1   regarding that?

2   A.     There's 20 to 30 surveillance photographs from the

3   bank.

4   Q.     And how many different participants or suspects?

5   Around.

6   A.     I'd say there's between six and eight.

7   Q.     Of the six and eight, do you have any photos of them

8   in contact with my client?

9   A.     No, sir.

10  Q.     Thank you.

11         Does my client, based on your information, have any

12  gang tattoos?

13  A.     I don't believe so, sir.

14  Q.     We heard testimony that you wanted Mr. Parsadanyan's

15  vehicle to be stopped after your observation point on the

16  roof by the Glendale Police Department; is that correct?

17  A.     Yes, sir.

18  Q.     When you make that direction or order, is it an

19  order or a request?

20  A.     It's a request, sir.

21  Q.     When you make that request, what do you tell them?

22  What do you tell the officers to do?  Do you say just pull

23  them over for no reason?  Wait until they commit a traffic

24  violation?  What do you say on why to stop them?

25  A.     I didn't speak to the officers, sir.

1    Q.    Who do you speak to?

2    A.    I speak to my Glendale contact on the task force,

3    and then they contact a unit from the Glendale Police

4    Department.

5    Q.    Who is that person?  Your contact person?

6    A.    I don't know who it would have been on that

7    surveillance.  It may have been Mark Stohl.  I don't

8    recall.  He's actually with Burbank Police Department.

9    Q.    So the point of my question is do you tell them to

10   stop whether or not there's any violations?  You just want

11   the car searched; correct?

12   A.    No, sir.  That's not correct.

13   Q.    So are you trying so say -- strike that.

14         Are you testifying that the stop should only be

15   predicated upon probable cause?

16         MR. ESTRADA:  Objection, Your Honor.  Relevance and

17   argumentative.

18         THE COURT:  Sustained.

19   BY MR. FLIER:

20   Q.    My client, Mr. Parsadanyan, did not confess to

21   anything to you; is that correct?

22   A.    I don't believe so.

23   Q.    I don't know -- do you ever attempt to subpoena any

24   financial records or business records from my client?

25   A.    As of today, sir?

1    Q.    Let's say 2009.

2    A.    Not in 2009, sir.

3    Q.    Well, did you do it today?

4    A.    We have within the last few weeks, sir.

5    Q.    Is that based on the discovery I provided, the bank

6    records?

7    A.    I don't know what it was based on, sir.

8    Q.    Thank you.

9          Do you have any photograph of my client at any bank

10   ever?

11   A.    No, sir.

12         MR. ESTRADA:  Objection, Your Honor.  Relevance.

13         THE COURT:  Overruled.

14   BY MR. FLIER:.

15   Q.    Would you agree, that in the course of this trial,

16   we heard the name "Rafael."  That means at least three

17   different people potentially.  Would you agree with that?

18   A.    There are three people in this case named Rafael

19   yes, sir.

20   Q.    And two have Hispanic names; correct?

21   A.    Yes, sir.

22   Q.    Thank you.

23         Did you ever physically enter the business property

24   of Mr. Parsadanyan?

25   A.    No, sir.

1    Q.    Do you ever return any property to Mr. Parsadanyan?

2    A.    Yes, sir.

3    Q.    Where did that occur?

4    A.    I believe at Glendale P.D., sir.

5    Q.    Mr. Muradyan, the gentleman who was in the car on

6    July 18th with Mr. Parsadanyan, have you ever seen him

7    besides July 18th?

8    A.    Yes, sir.

9    Q.    Have you ever returned any property where

10   Mr. Muradyan was present, if you recall?

11   A.    I believe he was present the one time, sir.

12   Q.    I definitely do not want to develop the Chicken

13   House Restaurant or Chicken House issue, but my client

14   wasn't there, was he?

15   A.    No, sir.

16   Q.    In this investigation, at least as it relates to

17   these exhibits, would you agree that there is gaps with

18   respect to time periods sometimes?

19   A.    Yes, there are gaps with respect to time periods

20   sometimes.

21   Q.    And sometimes those gaps could develop or engulf at

22   least a 2- to 3-week period; is that correct?

23   A.    Yes.

24   Q.    Mr. Muradyan, the person who was with

25   Mr. Parsadanyan, it maybe his friend, he wasn't indicted,

1   was he?

2   A.     No, sir.

3          MR. FLIER:  Can I just have a brief moment,

4   Your Honor?

5          THE COURT:  Yes.

6          MR. FLIER:  Thank you.

7           (Pause while counsel reviews documents.)

8   BY MR. FLIER:

9   Q.     I don't remember if I asked you this, sir.  So I

10  apologize.

11         Detective Padin, P-a-d-i-n, he apparently wrote some

12  policy on surveillance and counter-surveillance, driving

13  techniques.  Did you read his policy?

14  A.     At some point probably, yes, sir.

15  Q.     And then -- because I specifically asked him, he had

16  a section in his policy, the "Do's."  Do you remember that?

17  A.     No, sir.

18  Q.     Okay.  There was a section in his three- or

19  four-page policy that said "Do's," and the do's were keep a

20  log and take --

21         MR. ESTRADA:  Objection, Your Honor.  This is

22  hearsay.

23         THE COURT:  Sustained.

24         MR. ESTRADA:  And he's commenting on another

25  witness's testimony.

```
 1              THE COURT:  Sustained

 2              MR. FLIER:  I don't want to comment on another

 3    witness.

 4    BY MR. FLIER:

 5    Q.      Did you ever keep a log and maintain those same

 6    photos whenever you did a surveillance?

 7    A.      Can you ask that a little bit clearer, sir.

 8    Q.      Whenever you conducted a surveillance, did you make

 9    a log and also have photographs relating to the log?

10    A.      Not for every surveillance, sir.

11    Q.      Turning your attention, please, to Exhibit 142.

12              And as you're looking, that exhibit purports to be

13    July 16th of 2009, around 10:44 p.m.  My first question,

14    sir, is that call -- my client's not part of that call;

15    correct?

16    A.      No, sir, he's not.

17    Q.      Now, in that call, there are different numbers

18    mentioned.  Would you agree with that?

19    A.      Yes, sir.

20    Q.      Now, when you go to page 4 of 4, Speaker 1 in the

21    middle says (as read:)

22                  "You make something.  There are 400 things."

23              Do you see that?

24    A.      Yes, sir.

25    Q.      Is that an example where the numerical term means
```

1    card numbers and not monetary figure?

2          MR. ESTRADA:  Your Honor, I think we've beaten this

3    dead horse.  This has been asked and answered.

4          MR. FLIER:  I don't know if that's an objection,

5    Your Honor, about a dead horse, but that's okay.

6          MR. ESTRADA:  It is an objection, Your Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  Yes, sir.  The 400 things are debit

9    cards.

10          MR. FLIER:  Thank you.

11           *(Pause while counsel reviews documents.)*

12          MR. FLIER:  Your Honor, I have no further questions.

13    Thank you.

14          THE COURT:  Okay.

15          Redirect.

16          MR. ESTRADA:  Thank you, Your Honor.

17                    **REDIRECT EXAMINATION**

18    BY MR. ESTRADA:

19    Q.    Good morning, Special Agent Stebbins.

20    A.    Good morning, sir.

21    Q.    Let me go over some of the questions that counsel

22    for Parsadanyan asked you.

23          With regard to "Rafael," he said there were three

24    Rafaels in the case?

25    A.    Yes, sir.

1    Q.    Is there a Rafael Zendejas?

2    A.    Yes, sir.

3    Q.    Is he the guy arrested in Glendale with Darbinyan's

4    check fraud scheme?

5    A.    Yes, sir.

6    Q.    Now, he mentioned another "Rafael."  Who's the other

7    Hispanic Rafael?

8    A.    Rafael Gonzalez-Munoz.

9    Q.    Was that a Mexican Mafia member?

10   A.    Yes, sir.

11   Q.    Also known as "Cisco"?

12   A.    Yes, sir.

13   Q.    These other two Rafaels, do you know them to speak

14   Armenian?

15   A.    No, sir.

16   Q.    Now, you were asked about victims in this 99 Cent

17   Only Store scheme?  Were there victims?

18   A.    Yes, sir.

19   Q.    Were there many?

20   A.    Thousands.

21         MR. FLIER:  I'm going to object, no foundation.

22         THE COURT:  Overruled.

23   BY MR. ESTRADA:

24   Q.    Now, you were asked about Exhibit 159, which was not

25   played.  And again, whose fault is it for not playing

1   exhibits?

2   A.      It would be the prosecutor, sir.

3   Q.      And that's me; right?

4   A.      Yes, sir.

5   Q.      Has there been an effort, based on my communication

6   with you, to narrow this case to make it efficient?

7   A.      Yes, sir.

8   Q.      And I haven't played every call?

9   A.      That's correct, sir.

10  Q.      Let's take a look at Exhibit 159.  Do you have that

11  in front of you?

12  A.      Yes, sir.

13  Q.      Now, looking at Exhibit 159, was there anything

14  in -- looking at page 2, was there anything about this call

15  that indicated to you Parsadanyan was not part of the

16  99 Cent Only Store scheme?

17  A.      No, sir.

18  Q.      And looking at the third -- excuse me -- the fourth

19  speaker from the bottom, Darbinyan states (as read:)

20              "Rafo... whoever, whatever I gave him... Rafo

21              only brought that, the rest three things...

22              there's still different things outside, bro."

23      What did you understand that phrase to mean?

24  A.      He's talking about the money that he gave to

25  Parsadanyan, and then he's saying that Parsadanyan only

1    brought that amount and there are other groups out there

2    conducting debit card fraud.

3            MR. FLIER:  Objection.  Calls for speculation.

4            THE COURT:  Sustained.

5    BY MR. ESTRADA:

6    Q.    When you say "groups," what are you referring to?

7    A.    The groups of runners.

8    Q.    Now, earlier there's a reference to Khecho.  Was he

9    an individual, based on your investigation, who organized a

10   group of runners?

11   A.    Yes.

12   Q.    There's a reference to Misak.  Who is Misak?

13   A.    Misak is another individual that organized runners.

14   Q.    Was that defendant Chouldjian?

15   A.    Yes.

16   Q.    And then, third speaker from the bottom, Tarverdyan

17   says (as read:)

18                "Okay, dear M.  Just take care of them, bro

19                so it doesn't get later then 12, please

20                friend.

21                "Darbinyan:  Huh?  No.

22                "Tarverdyan:  Because it will be too late,

23                and I need to be asleep by that hour.  Do you

24                get what I'm saying?"

25            With regard to "later than 12," did you understand

```
 1    what that meant?

 2    A.      Yes, sir.

 3    Q.      Based on your knowledge of the investigation?

 4    A.      Yes, sir.

 5    Q.      What was that?

 6    A.      They would try to get --

 7            MR. SEVERO:  Objection, calls for speculation.

 8            THE COURT:  Ladies and gentlemen, at this time,

 9    we're going to break.

10            When we come back, you can reask the question.

11            It's ten o'clock, and we're going to break at this

12    time and be back in 15 minutes.  Remember the admonishment

13    not to discuss the case among yourselves or with anybody

14    else.

15            The court will still be in session when you leave.

16            THE CLERK:  All rise.

17              (10:00 a.m., jurors exit courtroom.)

18            THE COURT:  You may have a seat.  The jury has left

19    the courtroom.

20            Counsel, again, I'll get into an observation.

21    Sometimes attorneys, when they're involved with the case

22    and it's a big case for them, get self-absorbed in

23    questioning, and I'm talking about both sides.  I'm not

24    just talking about one side.

25            Both of you get so self-absorbed in asking
```

1    questions, and you think you're going a great job.  And

2    you're sitting there with your chest out, and the jury is

3    completely lost.  And not only lost, they have been put

4    under torture, almost, going through things that were not

5    really that relevant.

6         When you talk about dead horses, there's dead horses

7    all over this place, and there has been for the last ten

8    days.  I'm surprised that you brought up how efficiently

9    the case is being tried.  This case could have been tried

10   in half the time it has been so far.

11        So keep that in mind.  Remember, your audience isn't

12   yourself.  Remember, your audience is the jury.  Look at

13   them.  I've had to excuse them because they've fallen

14   asleep during this case.  Look at the pain on their face

15   when we are going through some of this questioning.  Look

16   at how they don't -- you know, they close their books.

17   They lay back.  They're almost trying to fight sleep or

18   trying to fight going to sleep on this case.  Keep in mind

19   your audience on it.

20        Again, just an observation.  But as of now, as I

21   said, there's been too many dead horses.  I think it would

22   benefit both sides if you're focused in, and just for the

23   jury's sake, focus in on what has to be done for your side

24   to succeed in this case.

25        MR. ESTRADA:  Yes, Your Honor.  I won't be much

1    longer.

2           THE COURT:  Okay.  We'll be in recess.

3           MR. FLIER:  Your Honor, I was going to bring up --

4    the Court had said that I could bring up the motion to

5    entertain striking some information.

6           I would like to strike all the testimony regarding

7    the kidnapping tape as irrelevant to my client again, and

8    the Court has said you'd take it under submission.  I'm

9    bringing it up again, of course.

10          THE COURT:  Okay.  And counsel want to be heard on

11   that?

12          MR. ESTRADA:  Yes, Your Honor.

13          Defense counsel's made the point that Parsadanyan

14   was simply a friend of Darbinyan.  And in his opening,

15   actually made the argument that there was a wide net cast,

16   and Parsadanyan is simply caught up in that net and wasn't

17   really part of the criminal activity.

18          The fact that he was involved and heard Darbinyan

19   reference a kidnapping, the fact that he was in calls

20   discussing erasing a tape for Darbinyan shows his knowledge

21   of Darbinyan's criminal activity.  And, therefore, when

22   he's in these calls talking about withdrawals, talking

23   about monetary amounts, it shows his knowing participation

24   in the fraudulent scheme.

25          He will likely claim that these calls have some

1    innocent meaning, that there was some phone business going

2    on, and that they weren't talking about criminal activity.

3    The fact that he knew that Darbinyan was involved

4    extensively in criminal activity shows that that

5    interpretation of the calls is not correct and that he

6    knowingly participated in the scheme.

7         THE COURT:  Okay.  All testimony relating to

8    connecting your client with the extortion or embezzlement,

9    or whatever you call it, extortion, will be stricken.

10         The fact that he talked to and knew the defendants,

11    that can come in, but anything connecting your client with

12    the extortion will be stricken.

13         MR. FLIER:  Your Honor, and that also applies to any

14    erased tape and the Chicken House, which is after the fact.

15    It has nothing to do --

16         THE COURT:  Erased tape and the Chicken House?

17         MR. ESTRADA:  There were calls, Your Honor, in which

18    Darbinyan referenced shooting up a restaurant, and then

19    Parsadanyan agrees to go to the restaurant and erase the

20    tape for him, of that particular shooting.

21         THE COURT:  That will not be -- no.  That will not

22    be stricken.  Okay.

23         That will be the order of the Court.

24         THE CLERK:  All rise.  This court is in recess.

25         *(10:18 a.m. to 10:32 a.m., recess taken.)*

```
 1            THE CLERK:  All rise.

 2                  (Jurors enter courtroom.)

 3            THE CLERK:  You may be seated.

 4            All rise.  This United States District Court is in

 5     session.

 6                  (Judge enters courtroom.)

 7            THE CLERK:  You may be seated.

 8            THE COURT:  Okay.  The record may reflect all the

 9     jurors are in their seats in the jury box, including the

10     alternates.  And we're at redirect examination.

11            You may continue, Counsel.

12            MR. ESTRADA:  Yes, Your Honor.

13     BY MR. ESTRADA:

14     Q.    Special Agent Stebbins, last week you testified

15     about how the task force first got involved with the

16     99 Cent Only Store scheme?

17     A.    Yes, sir.

18     Q.    You mentioned the name Hermione Barseghian

19     (phonetic).

20     A.    Hermione Barseghian, yes, sir.

21     Q.    What was the connection of that person to this

22     particular scheme?

23     A.    The vehicle registered in her name was seen outside

24     the 99 Cents Only Store when Tarverdyan and another

25     individual were checking out one of the PIN pads, and that
```

1    car is registered to Hermione Barseghian and it's known to

2    be driven by Raymond Tarverdyan.

3    Q.    Was the paperwork for that car, in fact, found at

4    Tarverdyan's house?

5    A.    Yes, it was.

6    Q.    Is that one of the exhibits in this case?

7    A.    Yes, it is.

8    Q.    Along with that Ingenico paper?

9    A.    Yes, Ingenico 2100.

10   Q.    What's the Ingenico 2100?

11   A.    That is the exact make and model of the

12   point-of-sale terminals used in the 99 Cent Store at that

13   time.

14   Q.    Now, you were also asked on Friday about the first

15   wiretap application in this case.  Do you recall that?

16   A.    Yes, sir.

17   Q.    Now, that was back in January of 2009?

18   A.    Yes, sir.

19   Q.    Before you'd obtained all this evidence that we

20   played throughout this trial?

21        MR. FLIER:  Objection to "all this evidence,"

22   argumentative.

23        THE COURT:  That part will be stricken.

24   BY MR. ESTRADA:

25   Q.    All the information we've heard during this trial?

1    A.    Yes, sir.

2    Q.    Now, even in that initial wiretap application, did

3    you talk about Armenian Power?

4    A.    Yes, I did.

5    Q.    Did you talk about Darbinyan's connection to

6    Armenian Power?

7    A.    Yes, sir.

8          MR. SEVERO:  Objection, hearsay.

9          THE COURT:  Overruled.

10   BY MR. ESTRADA:

11   Q.    And, in fact, does the application state at

12   Paragraph 7 that Darbinyan is a leader of Armenian Power?

13   A.    Yes, it does.

14   Q.    Now, in addition, does the application at page 45,

15   talk about a May 20th, 2008, incident?

16   A.    Yes, it does.

17   Q.    Now, without getting into the details of this

18   incident, was it a violent crime that occurred?

19   A.    Yes, it was.

20   Q.    And during this crime, were there various

21   individuals connected to Armenian Power involved?

22   A.    Yes, sir.

23         MR. FLIER:  Objection, beyond of scope of any cross.

24         THE COURT:  Counsel, I think it is.  I don't know

25   what it goes towards as far as cross.

```
1          MR. ESTRADA:  There's a question about whether the

2    first wiretap dealt with Armenian Power or not, and that's

3    the issue, Your Honor.

4          THE COURT:  Well, I think you already covered that.

5          Sustained.

6    BY MR. ESTRADA:

7    Q.    In any case, did the initial wiretap talk about

8    other individuals connected to Darbinyan who were members

9    of Armenian Power?

10          MR. SEVERO:  Objection, Your Honor.  It's the same

11    thing.  It's a written document.

12          THE COURT:  Sustained.

13    BY MR. ESTRADA:

14    Q.    Do you recall the initial wiretap?

15    A.    Yes, sir.

16    Q.    Do you recall it talking about individuals connected

17    to Armenian Power?

18          MR. SEVERO:  Your Honor, it's the same.

19          THE COURT:  Sustained.

20          Did you fill out the affidavit for the wiretap?

21          THE WITNESS:  Yes, I did, sir.

22          THE COURT:  Okay.  Did you mention it, or say

23    anything about Armenian Power?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  That part can come in.
```

1   BY MR. ESTRADA:

2   Q.    Did you talk about Paramaz Bilezikchyan?

3   A.    Yes, I did, sir.

4   Q.    Did you talk about Karo Yerkanyan?

5   A.    Yes, sir.

6   Q.    Did you talk about Arman Tangabekyan?

7   A.    Yes, sir.

8   Q.    Did you talk about them connected and working with

9   Darbinyan?

10  A.    Yes, sir.

11        MR. ESTRADA:  No further questions, Your Honor.

12        THE COURT:  Okay.  Recross.

13        MR. SEVERO:  Thank you, Your Honor.

14                  **RECROSS-EXAMINATION**

15  BY MR. SEVERO:

16  Q.    Of the Ingenico 2100's, how many were seized?

17  A.    I believe there was a total of nine seized, sir.

18  Q.    And do you know who made the skimming devices for

19  those nine?

20  A.    No, sir.

21  Q.    Do you know who of the defendants that are part of

22  this indictment is responsible for creating the skimming

23  devices?

24  A.    No, sir.

25  Q.    Do you know who generated Exhibit 344, the -- the

1    printout?

2    A.    Yes, sir.

3    Q.    Who did?

4    A.    Dave Ogden from Secret Service.

5    Q.    And which of the machines did he use?

6    A.    I think there are several machines in there, sir.

7    Q.    That's not my question.  Which machines did he use?

8    A.    Without looking at the report, I couldn't tell you,

9    sir.

10   Q.    Which report?  His?

11   A.    His report, sir.

12   Q.    Do you know that he generated this from three

13   machines?

14   A.    Yes, sir.

15   Q.    And do you know that he generated these --

16         That the number of records includes duplicative

17   records?

18   A.    There are some duplicates, sir.

19   Q.    Have you seen this?

20   A.    Yes, sir.  I've seen it.

21         MR. SEVERO:  May I publish?

22         THE COURT:  Yes.

23   BY MR. SEVERO:

24   Q.    I'll just pick page 2 of 76.

25         Do you see the ones that are in yellow?  They have

1   the same numbers; correct?

2   A.      Yes, sir.

3   Q.      And I don't want to show you all 76 pages, but if

4   you -- have you reviewed this exhibit?

5   A.      At some point, yes, sir.

6   Q.      And you know that every page has duplicative

7   entries?

8   A.      Yes, sir.

9   Q.      Several, in fact.  Sometimes as many as three or

10  four; correct?

11  A.      I don't know about that, sir.

12  Q.      Your investigation started in two thousand and --

13  strike that.

14          Your investigation in this case started in 2006; is

15  that true?

16  A.      Yes, in the Armenian Power case, yes, sir.

17  Q.      That's right.  And the only person mentioned in the

18  investigation when you came in, back in 2006, was this

19  Paramaz Bilezikchyan; correct?

20  A.      I don't know about that, sir.

21  Q.      In fact, that's who you were investigating,

22  Mr. Bilezikchyan, when you came in?

23  A.      No, sir.

24  Q.      The fact is that what led you to write the first

25  wiretap in 2008 or early 2009, to say that there was a

1  Darbinyan organization, was because you couldn't link

2  Paramaz Bilezikchyan to Mr. Darbinyan?

3  A.    No, sir.  It's because of the criminal activity that

4  Darbinyan was involved in.

5  Q.    Did you, in connection with this Exhibit 70 -- I'm

6  sorry -- 344, the printout.  Did you review all records

7  from the 99 Cent Store in order to determine the accuracy

8  of Exhibit 344?

9         MR. ESTRADA:  Objection, Your Honor.  Beyond the

10  scope.

11         THE COURT:  Sustained.

12         MR. SEVERO:  Your Honor, I have some questions that

13  actually were generated out of Mr. Flier's redirect -- or

14  rather cross.  May I?

15         THE COURT:  Yes.  You can do that.

16         MR. SEVERO:  Thank you.

17  BY MR. SEVERO:

18  Q.    I'm a little unclear about some things, and I wonder

19  if you can help us.

20         It's your testimony that six runners were arrested

21  in this case?

22  A.    It's my testimony that six people were arrested

23  installing devices in the store.

24  Q.    And are they all defendants in this case?

25  A.    Yes, sir.

1   Q.      Now, you call those "runners"?

2   A.      No, sir.  Some of them are, yes, and some of them

3   are not.

4   Q.      Of the six people that are arrested installing

5   devices, how many were runners?

6   A.      One or two, sir.

7   Q.      How many other runners did you arrest in this case?

8   A.      As it relates to the 99 Cent sentence only or the

9   entire case?

10  Q.      As to the 99 Cent Store.

11  A.      We were not able to identify from the bank

12  surveillance photos; so none of those runners.

13  Q.      But the ATM machines all had cameras, surveillance

14  cameras; correct?

15  A.      I don't know about all of ATM machines, sir.

16  Q.      Well, how many people did you identify at different

17  ATM locations?

18  A.      Like I said, we only got 20 to 30 photographs.

19  There were thousands of victims.

20          MR. ESTRADA:  Well, I'm going to move to strike

21  "thousands of victims" because that's not related to the

22  question.

23          THE COURT:  Sustained.  It will be stricken.

24  BY MR. SEVERO:

25  Q.      20 or 30 people were actually surveilled at the ATM

1    machines conducting some sort of fraud with fraudulent

2    debit cards.  Is that what your testimony is?

3    A.    No, sir.  We received 20 to 30 surveillance

4    photographs or surveillance videos from the bank.  Of those

5    20 or 30 photographs, there were approximately 6 to 8

6    different people observed.

7    Q.    And this is every bank -- these are 6 or 8 people

8    that were identified from Bank of America, Wells Fargo,

9    Chase, and U.S. Bank?

10         THE COURT:  I'm sorry.  I thought this was about the

11   ATM?

12         MR. SEVERO:  Yes.  That's what I meant, at the ATM.

13   Let me rephrase the question.

14         THE COURT:  To the 99 Cent Stores.

15   BY MR. SEVERO:

16   Q.    Right.  The ATM machines that you are talking about

17   that led to the identification of 6 to 8 people are from

18   Bank of America, Chase -- strike that -- from Altura Credit

19   Union and some of the other credit unions as well; correct?

20   A.    It was Bank of America, U.S. Bank, Union Bank,

21   Altura Credit Union, Arrowhead Credit Union, Ventura County

22   Credit Union, and maybe a couple others.  But not Chase.

23   Q.    Okay.  Thank you.

24         All those ATM machines generated 6 to 8 people you

25   could identify; correct?

1   A.     We were not able to identified them, sir.

2   Q.     6 to 8 people you were able to determine had -- were

3   using debit cards associated with a 99 Cent Store scheme in

4   this case?

5   A.     There were 20 to 30 photographs.  There were 6 to 8

6   different people.  That's all we received from the bank.

7   Q.     From all these banks.

8   A.     That's correct, sir.

9          MR. SEVERO:  May I have a moment, Your Honor?

10         THE COURT:  Yes.

11         *(Pause while counsel reviews documents.)*

12         MR. SEVERO:  Your Honor, I have no other questions

13  on this recross.

14         I do want to keep the witness on call.

15         THE COURT:  Okay.  Counsel.

16                    **RECROSS-EXAMINATION**

17  BY MR. PEREYRA-SUAREZ:

18  Q.     Agent Stebbins, I believe you testified a few

19  minutes ago that the first application you prepared in this

20  case was in January of 2009; is that correct?

21  A.     That's correct, sir.

22  Q.     And you didn't reference in that application any

23  entity known as the "Sharopetrosian Organization," did you?

24  A.     No, sir.

25  Q.     You didn't reference in that application any tattoos

1    found on Mr. Sharopetrosian; is that correct?

2    A.    I don't believe so, sir.

3    Q.    Did you reference Mr. Sharopetrosian at all in that

4    application?

5    A.    I don't recall, sir.

6    Q.    Did you say anything in that application about

7    Mr. Sharopetrosian being part of Armenian Power?

8    A.    Not in the initial application, sir.

9    Q.    Did you ever find any tattoo of any kind on

10   Mr. Sharopetrosian?

11   A.    I don't know if he has tattoos, sir.

12   Q.    You have no photos of any tattoos; correct?

13   A.    No, sir.

14   Q.    You have no information of any kind that he has any

15   tattoo on his body; is that correct?

16   A.    No, sir.

17         MR. PEREYRA-SUAREZ:  I have nothing further,

18   Your Honor.

19         THE COURT:  Counsel.

20         MR. FLIER:  Very briefly, Your Honor.

21                    **RECROSS-EXAMINATION**

22   BY MR. FLIER:

23   Q.    Agent Stebbins, maybe I missed something.

24         Are you saying that there are no runners that you

25   can identify that deal with the 99 Cent issue in this case?

1    A.    No, sir.  There were two runners arrested that dealt

2    with putting in the skimming devices in the 99 Cent Only

3    Stores.  As far as the runners that withdrew the money from

4    the ATM's, none of them were identified.

5    Q.    And I asked about runners.  So the other people you

6    just mentioned, how would you classify them?  What is their

7    role?

8    A.    I'm sorry.  Can you repeat that, sir?

9    Q.    The two people that you mentioned that were doing

10    anything with the skimmers, what is their role?  How do you

11    classify it?  They're not runners.  What are they?

12    A.    I just said they were runners.  They were hired for

13    one day.  They're Hispanic gang members.  They were hired

14    to go into the store, to pull out the ATM machine.

15    Q.    So someone who is hired to go to a store and pull

16    out a machine, is that a runner or not a runner in your

17    classification?

18    A.    In the case of these two people, they were runners.

19    Q.    Do you have any Armenian alleged runners that you

20    have photographs with my client?

21    A.    No, sir.

22    MR. ESTRADA:  Objection, Your Honor.  Beyond the

23    scope.

24    THE COURT:  Overruled.  He answered no.

25    MR. FLIER:  I have no further questions, Your Honor.

**002096**

```
1         THE COURT:  You may step down.

2         MR. FLIER:  Your Honor, just one last thing about

3    the motion to strike.

4         THE COURT:  Yes.

5         MR. FLIER:  I'd ask you to tell the jury.

6         THE COURT:  I will at the break.

7         MR. FLIER:  Okay.  Thank you.

8         MS. YANG:  Your Honor, the government calls Gonzalo

9    Zendejas.

10         THE COURT:  Counsel, if I forget, when we break for

11   lunch, remind me, please.

12         THE CLERK:  Good morning.

13                    GONZALO ZENDEJAS,

14    GOVERNMENT'S WITNESS, WAS SWORN, TESTIFIED AS FOLLOWS:

15         THE CLERK:  Please raise your right hand to be

16   sworn.

17         Do you solemnly swear the testimony you shall give

18   in the cause now pending before this Court shall be the

19   truth, the whole truth, and nothing but the truth, so help

20   you God?

21         THE WITNESS:  I do.

22         THE CLERK:  Thank you.  You may be seated.  You can

23   adjust the microphone if you need to.

24         May I ask that you state your full name for record

25   and spell your last name, please.
```

1          THE WITNESS:  First name Gonzalo.  Last name

2     Zendejas, Z-e-n-d-e-j-a-s.

3          THE COURT:  Thank you.

4          You may inquire, Counsel.

5          MS. YANG:  Thank you, Your Honor.

6                    **DIRECT EXAMINATION**

7     BY MS. YANG:

8     Q.    Good morning, Officer.

9     A.    Good morning.

10    Q.    Where are you currently employed?

11    A.    The City of Glendale.

12    Q.    For the Glendale Police Department?

13    A.    Correct.

14    Q.    And for approximately how many years have you worked

15    for the Glendale Police Department?

16    A.    Eight years.

17    Q.    And what is your current position at the Glendale

18    Police Department?

19    A.    Patrol officer.

20    Q.    Now, back in 2009, what was your position with the

21    Glendale Police Department?

22    A.    Patrol officer.

23    Q.    As a patrol officer, what were your general duties?

24    A.    I investigate crimes, write police reports, make

25    traffic stops.

1   Q.    And when you are out performing your duties as a

2   patrol officer, do you wear any sort of recording device?

3   A.    I do.

4   Q.    What kind of device is that?

5   A.    It's an audio recorder that I keep on my utility

6   belt.

7   Q.    Is that manually operated; so you turn it on and you

8   can turn it off?

9   A.    Yes, it is.

10   Q.    I'd liked to direct your attention to July 18th of

11   2009.  Were you on patrol that evening?

12   A.    Yes, I was.

13   Q.    Now, do you recall what day of the week July 18th,

14   2009, was?

15   A.    It was a Saturday.

16   Q.    And were you in a black-and-white patrol vehicle or

17   an undercover, unmarked vehicle?

18   A.    It was a fully marked black-and-white patrol car.

19   Q.    And were you on patrol by yourself, or did you have

20   a partner?

21   A.    I had a partner with me that night.

22   Q.    And who was your partner?

23   A.    Officer Christopher Krivak.

24   Q.    Now, at some point on the evening of July 18th,

25   2009, did you receive a request to keep an eye out for a

1    particular vehicle?

2    A.    Yes.

3    Q.    Do you recall what type of vehicle you were advised

4    to keep on eye out for?

5    A.    Yes.

6    Q.    And what kind of vehicle was it?

7    A.    It was a black two-door BMW 650.

8    Q.    Now, were you also given the license plate

9    information for that vehicle?

10   A.    I don't recall if we were given the license plate

11   number.

12   Q.    And what, if anything, was your -- was the request?

13   A.    We were advised to look out for this vehicle and, if

14   possible, find a reason to stop it and identify the

15   occupants.

16   Q.    Now, you say if possible find a reason.  What do you

17   mean by that?

18   A.    We find our own reason to make the traffic stop.  If

19   we don't find the reason, then we don't have enough to make

20   that traffic stop.

21   Q.    Now, when you say "find the reason," do you mean you

22   have to develop your own information that the vehicle has

23   committed some sort of traffic violation, for example?

24   A.    That is correct.

25   Q.    So as a patrol officer, you can't just stop any

```
 1    vehicle for any reason; is that correct?

 2    A.      Correct.

 3    Q.      Now, did you, on the evening of July 18th, 2009, see

 4    this black BMW 6 series?

 5    A.      Yes.

 6    Q.      And approximately what time did you see this

 7    vehicle?

 8    A.      It was approximately 8:15 that night.

 9    Q.      And where did you see this vehicle?

10    A.      It was traveling northbound Glendale Avenue,

11    approaching the 134 Freeway.

12    Q.      Now, when you observed the black BMW at

13    approximately 1:15, going northbound on Glendale towards

14    the 134 Freeway, did you see if the vehicle committed any

15    traffic violations, or did you develop any information that

16    would allow you to legally stop that vehicle?

17    A.      Yes, ma'am.

18            It wasn't at 1:15.  It was about 8:15.

19    Q.      I apologize if I misspoke it.  8:15 in the evening.

20    A.      Yes, we did find a reason.

21    Q.      And what did you observe that allowed you to stop

22    the vehicle?

23    A.      We observed the vehicle's rear license plate frame

24    had one of the letters partially blocked.  Also, as the

25    vehicle drove north on Glendale approaching the 134, it
```

1    stopped in the intersection with the 134 eastbound offramp,

2    blocking that intersection.

3    Q.    Now, is a partially obstructed license plate a

4    Vehicle Code violation?

5    A.    Yes, it is.

6    Q.    And is stopping in the intersection on to a freeway

7    off ramp also a Vehicle Code violation?

8         THE COURT:  Counsel, I'm going to have you move on

9    because the stop of the vehicle is not relevant to this

10   crime.  That's -- he's not being charged with anything that

11   has to do with a parking or moving violation, and probable

12   cause is not an issue.

13        MS. YANG:  That's fine, Your Honor.  I was

14   responding to some defense cross, but that's fine.  I'll

15   move on.

16        THE COURT:  Never anticipate what questions they're

17   going to ask.

18        MS. YANG:  Okay.

19   BY MS. YANG:

20   Q.    Officer Zendejas, after observing this vehicle, did

21   you and your partner stop the vehicle?

22   A.    Yes, we did.

23   Q.    And where did you pull the car over?

24   A.    The vehicle was northbound.  We pulled him over, and

25   he made a left turn onto the next street, which is Monterey

1    Road, Monterey west of Glendale Avenue.

2    Q.    Now, when the vehicle stopped on Monterey, did you

3    and Officer Krivak approach the vehicle?

4    A.    Yes, we did.

5    Q.    And what side of the vehicle did you approach?

6    A.    I approached the driver's side of the vehicle.

7    Q.    Now, is that standard operating procedure?

8          Well, let me ask you this:  Who was driving the

9    patrol vehicle on July 18th?

10    A.    I was driving.

11    Q.    And is that standard procedure for you, as the

12    driver, to approach the diver's side of the stopped

13    vehicle?

14    A.    Yes, it is.

15    Q.    Now, as you approached the driver's side of the BMW,

16    did you turn your recording device on?

17    A.    I did.

18    Q.    And what did you do when you first approached the

19    vehicle and made contact with the diver?

20    A.    I asked the driver for his license, registration,

21    and insurance.

22    Q.    And did the driver provide that information to you?

23    A.    Yes.

24    Q.    Now, do you recall what the name of the driver of

25    the black BMW was?

**002103**

1          MR. FLIER:  I'll stipulate it's Mr. Parsadanyan.

2          THE COURT:  Thank you, Counsel.

3          MR. FLIER:  You're welcome.

4          THE COURT:  Go ahead, Counsel.

5    BY MS. YANG:

6    Q.    Now, after you obtained --

7          Now, after you obtained identification information

8    from Mr. Parsadanyan, did you ask him to exit the vehicle?

9    A.    Yes.

10   Q.    And did the -- was there a passenger in the black

11   BMW?

12   A.    Yes, there was.

13   Q.    Did the passenger also exit the vehicle?

14   A.    Yes.

15   Q.    And where did the driver and the passenger go?

16   A.    We walked them back to the rear of the BMW, and we

17   sat them down at the curb.

18   Q.    Did you stay with Mr. Parsadanyan and the passenger

19   of the vehicle?

20   A.    Yes.

21   Q.    At some point, did you ask for consent to search the

22   BMW?

23   A.    Yes.

24   Q.    And did defendant Parsadanyan give you that consent?

25   A.    Yes.

1    Q.    Now, who searched the vehicle?

2    A.    My partner, Officer Krivak, searched the vehicle.

3    Q.    And during the search of the vehicle, did you remain

4    with defendant Parsadanyan and the passenger?

5    A.    Yes.

6    Q.    Now, what was defendant Parsadanyan's demeanor

7    during this traffic stop?

8    A.    He was very talkative, very cooperative.  He

9    wasn't -- didn't appear to be nervous in any way.

10   Q.    Now, you testified that you turned your body

11   recorder on when you approached the vehicle; correct?

12   A.    Correct.

13   Q.    Did you keep your body recorder on for the duration

14   of the traffic stop?

15   A.    Yes.

16   Q.    And approximately how long did the traffic stop

17   last?

18   A.    Approximately, 40 to 45 minutes.

19   Q.    Now, prior to testifying here in court today, did

20   you listen to your body recording of the traffic stop?

21   A.    Yes.

22   Q.    And did you also listen to excerpts that were taken

23   from that recording?

24   A.    Yes.

25         MS. YANG:  Your Honor, at this time, if Exhibit 242

1    could be placed before the witness.  It's a physical

2    exhibit.

3          THE COURT:  Okay.

4    BY MS. YANG:

5    Q.    Officer Zendejas, do you recognize what is contained

6    in Exhibit 242?

7    A.    Yes, I do.

8    Q.    And what is it?

9    A.    It's a CD with excerpts of part of the audio

10   recording of that day.

11   Q.    And do you recognize that exhibit because your

12   initials are on it?

13   A.    Correct.

14   Q.    And did you listen to this prior to testifying

15   today?

16   A.    Yes.

17         MS. YANG:  Your Honor, at this time, the government

18   moves to admit Exhibit 242 and play the three brief

19   excerpts.

20         THE COURT:  It's received and may be published.

21         *(Exhibit 242 is admitted into evidence.)*

22   BY MS. YANG:

23   Q.    Officer Zendejas, you said that defendant

24   Parsadanyan identified himself; correct?

25   A.    Correct.

1          MS. YANG:  If you could play clip 1.

2                    (Exhibit 242 played.)

3     BY MS. YANG:

4     Q.    So in that clip, he identified himself as Rafael.

5     Was Franklin his residence address?

6     A.    Correct.

7                    (Exhibit 242 played.)

8     BY MS. YANG:

9     Q.    And during the course of this traffic stop, did the

10    defendant also provide you with his telephone number?

11    A.    Yes, he did.

12    Q.    Do you recall what that telephone number was?

13    A.    I don't recall the entire phone number, but I recall

14    that it had -- the last four were all zeros, and that was

15    very unique to me.  It stood out.

16         MS. YANG:  If you could play the third clip.

17                    (Exhibit 242 played.)

18    BY MS. YANG:

19    Q.    Now, Officer Zendejas, you testified that the

20    traffic stop lasted approximately 45 minutes; correct?

21    A.    Correct.

22    Q.    Did you or your partner ticket or cite defendant

23    Parsadanyan for the traffic violations?

24    A.    No, we didn't.

25    Q.    And why not?

1    A.    Both occupants were cooperative.  They -- we had to

2    search their vehicle for some amount of time during the

3    traffic stop.  We used our discretion and decided that we

4    weren't going to give them a citation for the violations.

5          MS. YANG:  Your Honor, one moment.

6          THE COURT:  Uh-huh.

7          *(Pause while counsel reviews documents.)*

8          MS. YANG:  Nothing further.

9          THE COURT:  Cross?

10                    **CROSS-EXAMINATION**

11   BY MR. SEVERO:

12   Q.    Good morning, sir.

13   A.    Good morning.

14   Q.    In 2009, was it customary for Glendale police

15   officers to have partners in their cars?

16   A.    No.

17   Q.    They ran single, didn't they?

18   A.    Correct.

19   Q.    Were you on a special mission that evening?

20   A.    No, sir.

21   Q.    Were you training Mr. Krivak?

22   A.    No, I was not.

23   Q.    Was Mr. Krivak training you?

24   A.    No, he was not.

25   Q.    Did you have a partner in your car because you were

1    directed to make a stop of this -- this BMW?

2    A.    No, sir.

3    Q.    How many pretext stops --

4          Do you know what I mean by a pretext stop?

5    A.    When --

6    Q.    Do you know what I mean when I say "pretext stop"?

7    A.    Yes.

8    Q.    What's a pretext stop?

9    A.    When we receive information from someone in the

10   department that there is a vehicle or a person to be

11   stopped for investigation purposes or to identify the

12   person or the drivers or occupants.

13   Q.    And to search the car?

14   A.    Yes, if possible.

15   Q.    How many pretext stops have you made -- let me start

16   with a different question.

17         How many times have you been asked to try to stop

18   the car, if possible, on a pretext?

19   A.    That was possibly the only time.

20   Q.    One time in your eight-year career?

21   A.    Yes.

22   Q.    Okay.  And you know the reason it's called "pretext"

23   is because you'll find anything to try to stop the car so

24   you can search it; correct?

25         MR. ESTRADA:  Objection.  Argumentative.

```
 1          THE COURT:  Sustained.

 2          I stopped you from going into it.  It's not an issue

 3     as to the fact that the car was stopped.  It is not a

 4     consideration for you.  The car was stopped.  The question

 5     is what happened when it was stopped.

 6          MR. SEVERO:  I don't have anything further.

 7          THE COURT:  Okay.

 8          Cross.

 9          MR. PEREYRA-SUAREZ:  I have no questions,

10     Your Honor.

11          THE COURT:  Cross.

12                        CROSS-EXAMINATION

13     BY MR. FLIER:

14     Q.    Good morning, sir.

15     A.    Good morning.

16     Q.    Without getting into the reason why you stopped the

17     car, you were told to stop the car at some point in time;

18     correct?

19     A.    Correct.

20     Q.    Okay.  We're going to move on from that.

21          Do you have an independent recollection as to the

22     time you first stopped the vehicle in question?

23     A.    I have an approximate time, yes.

24     Q.    Please, approximately.

25     A.    About 8:15 in the -- that night.
```

1   Q.    And when -- once you stopped the vehicle in

2   question, you made contact with the occupants; correct?

3   A.    Correct.

4   Q.    With respect to the driver, that's Mr. Parsadanyan

5   over there; is that correct?

6   A.    I don't recall his -- how he looked at the time.

7   Q.    Well, did you have a conversation with

8   Mr. Parsadanyan that you knew of him because you responded

9   to a burglary report at his cell phone business?  Do you

10  remember that?

11  A.    I didn't respond to a burglary report.

12  Q.    Not that day.  I was very unclear with that

13  question.

14        Previous to the stop, did you recognize

15  Mr. Parsadanyan from another incident?

16  A.    No, sir.

17  Q.    You do not have an independent recollection of

18  meeting Mr. Parsadanyan regarding a burglary at his place

19  of business?

20  A.    No, sir.

21  Q.    Okay.  Thank you.

22        So with respect to the stop itself now, did you

23  prepare a police report regarding the incident that you're

24  now addressing?

25  A.    I did not, sir.

1   Q.     Do you normally do police reports once you conduct a

2   traffic stop and you speak to occupants?

3   A.     My partner is the one who prepared the police

4   report, Officer Krivak.  And depending on what happens on

5   any particular stop, if there's suspicious activity or a

6   crime occurring, we would write a police report.

7   Q.     I'm just asking:  Do you normally write a police

8   report when you stop someone and you speak to the

9   occupants?

10  A.     No.

11  Q.     In this case, have you reviewed the incident report

12  From the Glendale Police Department?

13  A.     Yes.

14  Q.     Just like you reviewed any audio CD; correct?

15  A.     Correct.

16  Q.     On every single stop that you make, do you turn on

17  that recorder?

18  A.     I can't say for certain on every single stop.

19  Q.     Now, in 2009, how long were you with Glendale Police

20  Department?

21  A.     About two and a half years.

22  Q.     And with respect to an officer named Bouzikian --

23         B-o-u-z-i-k-i-a-n for the reporter.

24         -- do you know who that gentleman is?

25  A.     Bouzikian, yes.  Yes, sir.

1   Q.    Was he your fellow officer when you first made the

2   stop?

3   A.    I don't -- can you rephrase the question?

4   Q.    Was he in the patrol vehicle with you when you

5   conducted the stop?

6   A.    No, sir.

7   Q.    We heard there was another individual, and I think

8   it was Krivak, with a "K"; is that correct?

9   A.    Correct.

10  Q.    Was he in the vehicle with you?

11  A.    Yes.

12  Q.    Did Officer -- if that's his right title -- Krivak

13  prepare a report in this case that you're aware of?

14  A.    He did.

15  Q.    You did not; correct?

16  A.    Correct.

17  Q.    Now, I mentioned an Officer Bouzikian.  Did he

18  prepare a report?

19        THE COURT:  If you know.

20        THE WITNESS:  I don't -- I don't know, sir.

21  BY MR. FLIER:

22  Q.    What report have you reviewed to refresh your

23  recollection about this event in 2009?

24  A.    Officer Krivak's report.

25  Q.    Now, with respect to the stop itself, not why,

1    there's no mention in any report that my client was driving

2    in a counter-surveillance method.  Am I correct?

3    A.    I can speak for the report that my partner wrote,

4    and that is correct.

5    Q.    Right.  And you're the driver of the police vehicle;

6    correct?

7    A.    Correct.

8    Q.    You are observing how the vehicle drives; correct?

9    A.    Correct.

10   Q.    If the vehicle was driving in a way that attracted

11   your attention, you would have made some type of

12   indication, told another officer, and that might be in a

13   report.  Does that make sense?

14   A.    It does.

15   Q.    Okay.  Thank you.

16         And you, at the academy, are trained on the

17   importance of note-taking and doing police reports to the

18   best of your ability; correct?

19   A.    Correct.

20   Q.    So when you initiated the traffic stop, it appears

21   that the vehicle pulled over and complied with your

22   demands; correct?

23   A.    Correct.

24   Q.    We also heard that the driver, Mr. Parsadanyan, I

25   think you said he did not appear nervous and he was

1    cooperating; correct?

2    A.    Correct.

3    Q.    As a matter of fact, I then heard that he gave you

4    consent to search; is that correct?

5    A.    Correct.

6    Q.    Would it be a fair statement that in a normal --

7    forget the word "normal."  In any traffic stop, do you

8    always have the people exit the vehicle?  The driver?

9    A.    Not always.

10   Q.    But in this case, you did; correct?

11   A.    Yes.

12   Q.    The whole purpose was for you to search that

13   vehicle.  That was your demand; is that correct?

14         MS. YANG:  Objection, argumentative.  "Demand."

15         THE COURT:  As to the word "demand."

16         MR. FLIER:  I'm sorry.

17         THE COURT:  He said if he wanted to search it, he

18   could.

19         MR. FLIER:  Yes.

20         THE WITNESS:  If I could search the vehicle -- I

21   wanted to, yes.

22   BY MR. FLIER:

23   Q.    But were you told information that's why that

24   vehicle was supposed to be stopped, to see what's inside

25   the vehicle; is that correct?

1    A.    I recall being told to see if we can stop the

2    vehicle and identify the occupants.

3    Q.    So nothing to do with the contents, if there are

4    supposed to be, inside the vehicle; just who's in the car?

5    A.    From what I recall, yes.

6    Q.    Okay.  Now, with respect to -- with respect to the

7    car itself, we now know that the occupants were placed at

8    the curb by the rear of that vehicle; is that correct?

9    A.    Correct.

10   Q.    You were by them, I assume, for officer safety,

11   too -- purposes?

12   A.    That is correct.

13   Q.    Another officer was doing whatever they were doing;

14   is that correct?

15   A.    Correct.

16   Q.    Were you watching any search of the vehicle?

17   A.    I was not.

18   Q.    With respect to any item, if there were items within

19   the vehicle, do you know where they were recovered, based

20   on you personally watching?

21   A.    No, sir.

22   Q.    Okay.  Thank you.

23        At any point in time, did you ever see anything

24   removed from the vehicle?  Forget where and by who.  Did

25   you ever see any contents ever when you were making any

1    observations?

2    A.    No, sir.

3    Q.    At no time did you see any item ever placed on the

4    rear of the trunk; am I correct?

5    A.    I don't recall, sir.

6    Q.    But we know that you're by the rear of the vehicle

7    in question.  Am I correct?

8    A.    Correct.

9    Q.    I'm just showing you -- I don't know how to turn

10   that on.

11        Does this appear to be a Glendale -- thank you -- a

12   Glendale Police Department Incident Report?

13   A.    Yes.

14   Q.    And you recognize how those reports look; is that

15   correct?

16   A.    Correct.

17   Q.    And was there an incident report done in this case?

18   A.    Yes, sir.

19   Q.    And you have reviewed it?

20   A.    Yes.

21        MS. YANG:  Objection.  Asked and answered, Your

22   Honor.

23        THE COURT:  Sustained.  He said he reviewed it.

24        MR. FLIER:  Your Honor, can I publish just the face

25   sheet of a report to show that it looks like a report, not

1    asking any of the contents?

2            MS. YANG:  Objection, Your Honor.  Relevance.

3            THE COURT:  Sustained.

4            I'm not sure you can show it without showing

5    content.

6            MR. FLIER:  Well, I didn't want to talk about the

7    content, Your Honor.  Thank you.

8    BY MR. FLIER:

9    Q.    Now, it says -- is there a topic or a section in the

10   police report about administrative information?

11           MS. YANG:  Objection, Your Honor.  This is hearsay.

12   He's reading from the report.

13           THE COURT:  Sustained.  I'm not too sure it's

14   relevant.

15           You didn't prepare the report in this matter;

16   correct?

17           THE WITNESS:  Correct.

18   BY MR. FLIER:

19   Q.    What I'm getting at, please, is was there a nature

20   of the call --

21           What was the nature of the call that you responded

22   to is my question, please.

23           THE COURT:  Okay.

24           THE WITNESS:  We responded -- can you rephrase the

25   question?

1   BY MR. FLIER:

2   Q.    If you recall, was there a nature of this particular

3   call that you were responding to?

4   A.    Yes.

5   Q.    And what was that, please?

6   A.    Obtain information, that there was this vehicle

7   traveling on the roadway, and if we can find a reason to

8   stop it and identify the occupants.

9   Q.    The nature of the call section says suspicious --

10        MS. YANG:  Objection, Your Honor.  This is hearsay.

11        THE COURT:  Sustained.

12  BY MR. FLIER:

13  Q.    Were you given any information before you made the

14  stop that the occupants were doing something suspicious?

15        THE WITNESS:  If I may explain, Your Honor.

16        THE COURT:  Yes.

17        THE WITNESS:  We knew they were being investigated.

18  We didn't have further details other than that.

19  BY MR. FLIER:

20  Q.    Well, do you recall the word "suspicious activity"

21  or anything of that nature with respect to -- forget a

22  police report -- that you were told why to stop the

23  vehicle?

24        MS. YANG:  Objection, asked and answered.

25        THE COURT:  Overruled.

**002119**

1    Do you understand the question?

2    THE WITNESS:  No, Your Honor.

3    THE COURT:  You indicated that you stopped the

4  vehicle because you were told to stop the vehicle, if you

5  could, and find out who is driving the vehicle.  Were you

6  told anything else other than that, if you remember?

7    THE WITNESS:  Not that I recall, sir.

8    THE COURT:  Okay.

9    MR. FLIER:  Thank you, Your Honor.

10  BY MR. FLIER:

11  Q.    And with respect to some of the excerpts that were

12  played with respect to the CD, that was played today in

13  front of you; is that correct?

14  A.    Yes.

15  Q.    And in those excerpts, there's some questions about,

16  like, a phone number and that information.  Do you believe

17  any of the information told you was false?

18  A.    No.

19  Q.    And, then, with respect to the stop itself, we heard

20  that the motorist, my client, he had a proper valid

21  driver's license; correct?

22  A.    That's correct.

23  Q.    The car was lawfully registered; correct?

24  A.    Yes.

25  Q.    And finally, it was properly insured, financial

1    responsibility; correct?

2    A.    Yes.

3    Q.    Then, with respect to exiting the car and any

4    communications, we already know he was cooperating with

5    you; correct?

6    A.    Correct.

7    Q.    Now, with respect to the time of the stop, can you

8    really tell us, based on an independent recollection, that

9    you believe it was around 40 to 45 minutes?  Did it seem

10   fast?  Short?  How would you really describe it?

11   A.    That it was about 40, 45 minutes, close to one hour.

12   Q.    Okay.  How long -- we heard you approach the

13   driver's side of the vehicle.  You get information.  They

14   exit the vehicle; correct?

15   A.    Correct.

16   Q.    They move to the area within the curb that you

17   described.  They sit down; correct?

18   A.    Yes.

19   Q.    What is this, around two minutes so far?

20   A.    Possibly.

21   Q.    What happened with the other 45 minutes?  Were they

22   just sitting outside doing nothing?

23   A.    I was speaking with the driver, yes.

24   Q.    So it's your testimony that you had a 45 -- around a

25   40-minute conversation by the rear of the vehicle?

1    A.    I wouldn't say continuous 40-minute conversation,

2    but yes, for the majority of those minutes, I was speaking

3    with the driver.

4    Q.    The driver never said he did anything wrong during

5    all of your conversation; am I correct?

6    A.    Correct.

7    Q.    With respect to documenting when you stopped the car

8    and when the car left, is there any paperwork that

9    documents that, the time issue?

10          THE COURT:  Other than the report that you already

11    mentioned.

12          MR. FLIER:  Correct, Your Honor.

13          THE WITNESS:  The call log from dispatch would have

14    time stamps, yes.

15    BY MR. FLIER:

16    Q.    And that would be the call for you to go and make

17    the stop eventually thereafter; correct?

18    A.    The incident log that dispatch enters into the

19    computer system.  When we make the traffic stop, dispatch

20    enters this information into the system.  It then states

21    the time that we pulled it over and the time that we

22    cleared the call.

23    Q.    Do you have any recollection based on those calls,

24    as you've just indicated, about the time that the motorists

25    were allowed to leave?

1    A.    No, sir.

2    Q.    So you have no idea?

3    A.    It was soon after we -- I ended my conversation with

4    the driver that the driver was allowed to leave.

5    Q.    And also, I assume, his passenger?

6    A.    Correct.

7    Q.    Did you issue any type of warning document to the

8    driver?

9    A.    No, sir.

10    Q.    Are you sure about that?

11    A.    Yes.

12    Q.    And would you agree that due to passage of time and

13    possibly other patrols that you have done continuously

14    since this stop, it's hard to recall the specifics?  Does

15    that make sense?

16    A.    Which specifics, sir?

17    Q.    And in no way did I mean that you cannot recall the

18    event at all.  I'm just saying that certain incidences and

19    issues within that incident are hard to recall based on

20    five years; correct?  Maybe not.  I don't know.

21    A.    If it's specific details, it may be, yes.

22    Q.    Okay.  And that's what's -- a reason why reports are

23    taken; correct?

24    A.    Correct.

25    Q.    And a good example -- you have it tape-recorded,

1    potentially; correct?

2    A.    Correct.

3         MR. FLIER:  No further questions.  Subject to

4    recall, Your Honor, potentially.

5         THE COURT:  Any redirect?

6                    **REDIRECT EXAMINATION**

7    BY MS. YANG:

8    Q.    Officer Zendejas, you listened to the entire body

9    recording of this traffic stop; is that correct?

10   A.    Yes.

11   Q.    And that contained from the moment you approached

12   the driver's side to the moment you allowed the car to

13   leave; correct?

14   A.    Correct.

15   Q.    Approximately, 45 minutes to an hour?

16   A.    Correct.

17        MS. YANG:  Nothing further.

18        THE COURT:  Counsel, anything on that?

19        MR. SEVERO:  On his cross, if I may.

20        THE COURT:  Whatever.  I'm not too sure what the

21   relevancy of any of this is, but go ahead.

22        MR. SEVERO:  I get that.

23                   **RECROSS-EXAMINATION**

24   BY MR. SEVERO:

25   Q.    Officer Zendejas, you, yourself, searched the car;

1    correct?

2           THE COURT:  He said he didn't.  He said somebody

3    else searched the car.

4    BY MR. SEVERO:

5    Q.    You did or did not?

6    A.    I did not.

7           MR. SEVERO:  Thanks.  Nothing further.

8           THE COURT:  Okay.

9           Counsel?

10          MR. PEREYRA-SUAREZ:  No, Your Honor.

11          MR. FLIER:  No, Your Honor.

12          THE COURT:  Okay.  You may step down.

13          THE WITNESS:  Thank you, Your Honor.

14          MS. YANG:  Your Honor, just for the record purposes,

15   the relevancy was voice identification has been contested.

16          THE COURT:  Counsel, I'm not -- it's not to be

17   argued in front of the jury.  I just said that -- I sense

18   overkill through this entire trial, and I think the jury

19   does, too.

20          Next witness, Counsel.

21          MS. YANG:  Your Honor, the government calls

22   Christopher Krivak.

23          THE CLERK:  Good morning.  Right here to be sworn,

24   please.

25   ///

1                    **CHRISTOPHER KRIVAK,**

2     GOVERNMENT'S WITNESS, WAS SWORN, TESTIFIED AS FOLLOWS:

3             THE CLERK:  Do you solemnly swear the testimony you

4     shall give in the cause now pending before this Court shall

5     be the truth, the whole truth, and nothing but the truth,

6     so help you God?

7             THE WITNESS:  I do.

8             THE CLERK:  Thank you.  You may be seated.

9             May I please ask that you state your full name and

10    spell your last name for the record.

11            THE WITNESS:  Christopher Krivak, K-r-i-v-a-k.

12            THE CLERK:  Thank you.

13            MS. YANG:  Your Honor, may I proceed?

14            THE COURT:  Yes.

15                    **DIRECT EXAMINATION**

16    BY MS. YANG:

17    Q.    Good morning, sir.

18    A.    Good morning.

19    Q.    Where are you currently employed?

20    A.    Glendale Police Department.

21    Q.    And for approximately how many years have you been

22    with the Glendale Police Department?

23    A.    Approximately eight years now.

24    Q.    What is your current position?

25    A.    I'm a detective in the violent crimes unit of the

1   police department.

2   Q.    Now, back in 2009, what was your position with the

3   Glendale Police Department?

4   A.    I was assigned to the patrol division.

5   Q.    Now, I'd like to direct your attention to July 18th

6   of 2009.  Were you on duty that evening?

7   A.    I was.

8   Q.    And were you in a black-and-white patrol vehicle?

9   A.    I was.

10  Q.    Now, were you alone, or were you with a partner?

11  A.    I was with a partner.

12  Q.    And who was your partner?

13  A.    Officer Gonzalo Zendejas.

14  Q.    Now, at some point in the evening of July 18, 2009,

15  did you and Officer Zendejas receive a request to stop a

16  black BMW 6 series?

17  A.    We did.

18  Q.    And were you asked to potentially identify the

19  occupants if you could?

20  A.    That's correct.

21  Q.    Did you see that vehicle on July 18th, 2009?

22  A.    We did.  The vehicle was driving northbound on

23  Glendale.

24  Q.    And was that at approximately 8:15 p.m.?

25  A.    Yes.

1   Q.    And did you and Officer Zendejas effect a traffic

2   stop on that vehicle?

3   A.    Yes, we did.

4   Q.    Now, did you pull the car over on Monterey Street?

5   A.    Yes, it was on Monterey just west of Glendale.

6   Q.    And was it near the 134 Freeway?

7   A.    Yes.

8   Q.    Now, we've heard testimony about what happened as

9   you and Officer Zendejas approached the vehicle.  At some

10  point, did you search the black BMW?

11  A.    I did.

12  Q.    And could you please explain to the jury what, if

13  anything, you found in the vehicle?

14  A.    In the back seat of the vehicle, I located a white

15  Ikea bag.  The bag was opened at the time, and I did notice

16  four large stacks of money.  The denominations were 20s,

17  50s, and hundreds, and that was in the back portion of the

18  vehicle.

19  Q.    Now, you described a white Ikea bag.  Was that like

20  a shopping bag?

21  A.    It looked to be a shopping bag, yes.

22  Q.    Now, aside from the four wrapped stacks of money

23  that you saw in the Ikea shopping bag, did you see any

24  banking documents, such as a deposit slip?

25  A.    No.

1    Q.    Now, did you find anything else in the vehicle that

2    was of interest to you?

3    A.    There were some other pieces of paper, you know,

4    that had some, like, certain numbers that were written on

5    it.  At the time, I really didn't know what any of that

6    stuff was, but I did notice that in the vehicle as well.

7    Q.    Now, after discovering the Ikea bag full of cash in

8    the back of the BMW, did you approach the driver or

9    passenger of the vehicle and ask any questions?

10    A.    I did.

11    Q.    And who did you speak with?

12    A.    I spoke to Mr. Parsadanyan and just asked him about

13    the money, due to the fact that it was a large amount of

14    cash.

15    Q.    You mentioned Mr. Parsadanyan.  Was Rafael

16    Parsadanyan the driver of the BMW that evening?

17    A.    Yes, he was the driver.

18    Q.    And when you asked him why he had so much cash in

19    his vehicle, what, if anything, did defendant Parsadanyan

20    say to you?

21    A.    He said he was the owner of an AT&T store in the

22    city of Glendale and that the customers predominantly pay

23    by cash or by credit.  He said that he takes all of the

24    money that was made through transactions through that week,

25    and makes a deposit at the end of the week, and that was

1    what the cash was for.

2    Q.    Now, the traffic stop on July 18th, 2009, what day

3    of the week was that?  Do you recall?

4    A.    It was a Saturday night.

5    Q.    And so, according to Mr. Parsadanyan, he took the

6    proceeds from his cell phone store out of his store at the

7    end of the week; correct?

8    A.    Correct.

9    Q.    And he stated he deposited it in the bank the

10   following week?

11   A.    I don't remember exactly when he said he deposits

12   it.  He says he takes it out at the end of the week and

13   makes a deposit.

14   Q.    Now, did he say anything about approximately how

15   much money was contained in that Ikea shopping bag?

16   A.    He said approximately $30,000.

17   Q.    Now, did you, at the traffic stop, count the money?

18   A.    I did not.

19   Q.    And why not?

20   A.    It was a large sum of money.  At the time, I mean,

21   it was suspicious to have that large amount of money, but

22   it wasn't necessarily illegal.  So I didn't see the need to

23   count it there.  Also, you know, we're on the side of the

24   road.  There's cars going by.  I didn't feel that it was

25   safe or warranted to be counting the money right there on

1  the side of the road.

2  Q.    Now, after you discussed this approximately $30,000

3  in the back of the BMW and spoke to defendant Parsadanyan

4  about it, did you request that a supervisor respond to the

5  scene?

6  A.    Yes.

7  Q.    And who did you -- who arrived at the scene in

8  response to your request?

9  A.    Sergeant Chris Spencer.

10  Q.    Now, why did you call a supervisor to the scene at

11  that time?

12       MR. FLIER:  Objection, irrelevant.

13       THE COURT:  Sustained.

14  BY MS. YANG:

15  Q.    Did Sergeant Spencer arrive at the scene?

16  A.    He did.

17  Q.    And did you advise him of the discovery of the money

18  and what defendant Parsadanyan had told you?

19       MR. FLIER:  Same objection.

20       THE COURT:  Overruled.

21       THE WITNESS:  Yes, I did.

22  BY MS. YANG:

23  Q.    Now, not revealing what Sergeant Spencer said, but

24  do you know if he conducted his own investigation of what

25  was in the back of that vehicle?

1    A.    Yeah, I mean, that he looked inside the vehicle to

2    verify what I was telling him --

3          MR. SEVERO:  Move to strike "to verify what I was

4    telling him" as speculation of the witness.

5          THE COURT:  It will be stricken.

6    BY MS. YANG:

7    Q.    Officer Krivak, did you ultimately seize the money

8    from the black of the BMW?

9    A.    No.

10   Q.    And why not?

11         MR. FLIER:  Objection.  Asked and answered.

12         THE COURT:  Well, I don't --

13         You may answer it.

14         THE WITNESS:  Okay.  Again, like I was saying,

15   although it is --

16         THE COURT:  The same reason you gave before?

17         THE WITNESS:  Correct.

18         THE COURT:  Sustained.

19         MS. YANG:  Your Honor, perhaps I missed it.

20   BY MS. YANG:

21   Q.    It was because it was suspicious, but you didn't

22   think -- had no information it was illegal; is that

23   correct?

24   A.    Correct.

25   Q.    Now, approximately, how long did the entire traffic

1     stop last?

2     A.      Approximately 45 minutes.

3     Q.      And following the discovery of the money, the

4     decision not to seize it, were Mr. Parsadanyan and the

5     passenger of the vehicle allowed to leave?

6     A.      Yes, they were.

7     Q.      And did you issue a ticket or a citation to either

8     defendant Parsadanyan or the passenger in the vehicle?

9     A.      No, we did not.

10          MS. YANG:  Your Honor, one moment.

11          THE COURT:  Uh-huh.

12          *(Pause while counsel reviews documents.)*

13          MS. YANG:  Nothing further at this time.

14          THE COURT:  Cross.

15          MR. SEVERO:  Your Honor, may I defer to --

16          MR. PEREYRA-SUAREZ:  No questions, Your Honor.

17          THE COURT:  Okay.

18          Counsel.

19          MR. FLIER:  Thank you, Your Honor.

20                      **CROSS-EXAMINATION**

21    BY MR. FLIER:

22    Q.      Good morning, sir.

23    A.      Good morning.

24    Q.      So you were the passenger officer in the patrol

25    vehicle?

1    A.    Yes, sir.

2    Q.    And with respect to why you were supposed to follow

3    and/or stop that vehicle, did you have some type of

4    direction about that?

5    A.    We were told to look for this particular vehicle, to

6    find a reason to stop the vehicle, and possibly identify

7    the people inside the vehicle.

8    Q.    So part of that request -- forget the word

9    "demand" -- had nothing to do with searching the vehicle?

10   A.    I believe they did ask us if we could get inside the

11   vehicle, if we could ask for consent or whatnot, then to

12   get inside the vehicle and search the vehicle.

13   Q.    Normally, when you pull over someone for a traffic

14   alleged violation, do you have them exit the vehicle

15   usually?

16   A.    If I'm going to be searching the vehicle, yes.

17   Q.    And in this case that was your intent, to identify

18   the occupants and search; is that correct?

19   A.    That's correct.

20   Q.    Now, with respect to the identification, one of them

21   was my client, the driver -- correct? -- over there?

22   A.    Correct.

23   Q.    Have you ever seen him before?

24   A.    No.

25   Q.    With respect to the passenger, did you ever see that

1    gentleman before?

2    A.    No.

3    Q.    Do you have an independent recollection of that

4    person's name, the passenger?

5    A.    Arman Muradyan.

6    Q.    And clearly, you remember that based on refreshing

7    with a report or some documentation?

8    A.    That is correct.

9    Q.    Is it a fair statement that since this stop, being

10   on patrol, and now a detective on violent crimes, you have

11   had contact with a lot of people thereafter?

12   A.    Yes.

13   Q.    Did you prepare a report yourself on this case?

14   A.    I did.

15   Q.    What about your fellow officer to whom was the

16   patrol officer with you that day?

17   A.    I do not believe he wrote the report.

18   Q.    With respect to the stop and your report, it

19   indicates a time approximately of the stop; is that

20   correct?

21   A.    Yes.

22   Q.    Is that 8:17 or 8:15?

23   A.    I believe it was 8:17 is what I put in the report.

24   Q.    What is a cad, c-a-d, call number?

25   A.    It's -- I don't know the exact terminology for cad,

1    but it's basically the printout, if you will.  It kind of

2    gives documentation of what took place during that call

3    with times and anything we relay to dispatch.

4    Q.    Do you have that information, that cad call

5    information with you today?

6    A.    I do not.

7    Q.    With respect to the nature of the call that you

8    received, did you receive any notification from law

9    enforcement personnel from Glendale?

10   A.    I believe so.

11   Q.    And then the report indicates suspicious

12   circumstances.

13          MS. YANG:  Objection, Your Honor.  Hearsay.

14          THE COURT:  Sustained.

15   BY MR. FLIER:

16   Q.    Do you recall whether or not you were told the

17   reason why you were to identify the occupants was under

18   suspicious circumstances?

19          MS. YANG:  Objection.  Asked and answered.

20          THE COURT:  Overruled.

21          Other than what you said, is there any other reason?

22          THE WITNESS:  No.

23   BY MR. FLIER:

24   Q.    Thank you.

25          Now, the stop itself around 40, 45 minutes.

1   A.      Approximately.

2   Q.      How much time elapsed from first making contact with

3   the driver, whether you did it or not, and having anyone

4   exit that vehicle?  That was probably in the beginning and

5   quick.  Is that a fair statement?

6   A.      Yeah, that would be fair.

7   Q.      So for the rest -- let's say 35, 40 minutes, the

8   occupants were placed by the curbside; is that accurate?

9   A.      Yes.  They sat to the rear of their vehicle, between

10  their vehicle and the patrol vehicle.

11  Q.      So they're closest to the rear of the BMW; correct?

12  A.      I believe so.  I mean, between their vehicle and the

13  a patrol vehicle is all I can really say.

14  Q.      Not everybody who is stopped by the police has to

15  cooperate and give consent; am I correct?

16  A.      Correct.

17  Q.      But in this case, Mr. Parsadanyan allowed you guys

18  to speak with him and search and whatever else you were

19  doing.  Is that a fair statement?

20  A.      That is a fair statement.

21  Q.      So he was cooperating with you?

22  A.      He was cooperative.

23  Q.      If I was simply to ask you how would you describe

24  his demeanor on the day and time you stopped him, what

25  would your answer be?

1    A.    Friendly.

2    Q.    Did he appear nervous?

3    A.    He did not appear nervous.

4    Q.    Okay.  He didn't appear under the influence, did he?

5    A.    No.

6    Q.    So after the stop, for whatsoever reason the stop

7    was made, there was no arrest effectuated; correct?

8    A.    Correct.

9    Q.    Do you have an independent recollection about

10   issuing a warning versus a citation?  Did you do that?

11   A.    I know we did not issue a citation.  I'm assuming we

12   would have given him a warning, but I do not have an

13   independent recollection of that.

14   Q.    And, lastly about the warning issue, would that be

15   verbal or written?

16   A.    A verbal warning.

17   Q.    Okay.  Now, with respect to the vehicle itself, you

18   just looked in the vehicle; correct?

19   A.    Yes.

20   Q.    You had all the opportunity to check, no time

21   restraints; correct?

22   A.    Correct.

23   Q.    And then we heard testimony that you saw in an Ikea,

24   white in color, bag some currency; correct?

25   A.    Correct.

1    Q.    Are you sure about the bag?

2    A.    What do you mean am I sure about the bag?

3    Q.    Are you sure it's a white bag, and if it's white, it

4    came from the company Ikea?

5    A.    I remember seeing an Ikea logo on it; so I'm

6    assuming it was an Ikea bag.

7    Q.    Do you shop at Ikea?

8    A.    I have shopped at Ikea.

9    Q.    They don't give white bags.

10         MS. YANG:  Objection, Your Honor.  Relevance.  It

11   assumes facts not in evidence.

12         THE COURT:  It's irrelevant and it's speculation.

13   BY MR. FLIER:

14   Q.    Did you take photographs of the bag?

15   A.    I did not.

16   Q.    Did you document how you described the bag in any of

17   your reports?

18   A.    I put that it was a white Ikea bag in my police

19   report.

20   Q.    One of -- I heard that the fellow officer, he had an

21   audio recorder on his belt, I think.  Is that accurate?

22   A.    I would say so, yes.

23   Q.    Do you have that same device on your belt?

24   A.    I do.

25   Q.    If you know, did your patrol car, yourself, or your

1   fellow partner on the day and time in question -- did you

2   have any camera with you?

3   A.    If we had a camera, we did not use it on this

4   particular stop.

5   Q.    So on this particular case, whether you had a camera

6   or not, it was not utilized; correct?

7   A.    Correct.

8   Q.    Is there a reason why you did not count the currency

9   on your own volition since you had a lot of time to do it?

10  A.    I explained earlier that I didn't feel the need to

11  count the money there at the traffic stop.  The last thing

12  I would want to do is a passing motorist or wind or

13  something blow the money away, and then I'm held liable for

14  that.

15       The other reason is, like I said, although it was

16  suspicious, it wasn't necessarily illegal to have the

17  money.  So I didn't feel the need to count every bill that

18  was inside the bag.

19  Q.    Well, did you have a demand or request, based on

20  your earlier call, the call to stop the car, to remove any

21  item of contraband?

22  A.    You mean to take something that was illegal?

23  Q.    Or document money.

24  A.    I put -- the documentation was in the police report.

25  I put that there was money inside the vehicle in the bag.

1   Q.    Did the call give you notice that there might be

2   money in the car and you should verify that?

3   A.    I don't believe that they specifically told me

4   anything about money.

5   Q.    Did you remove the item from the car, the Ikea white

6   bag, as you describe it?

7   A.    No.

8   Q.    So your observations -- and I'm not in any way

9   demeaning them -- was limited to just viewing it in the

10  back seat or whatever area it was in the vehicle?

11  A.    Yes.

12  Q.    And when you say you saw -- I think you kept on

13  using large amounts of money or currency -- what are you

14  saying, that there's four stacks of money that appeared

15  large, or it just looked like a group of money large --

16        What do you really mean by that?

17  A.    When I see -- to me it looked like a large stack of

18  cash, and there was four of them.  To me, that's a large

19  sum of money.

20  Q.    Okay.  But until you counted it and until you're

21  told, you have no idea what the denominations were;

22  correct?

23  A.    I was looking through it, and I noticed there was

24  20s, 50s, and hundreds.

25  Q.    Yeah, that would be the top of the separate four, I

**002141**

```
 1    assume, rubber band or however it's placed --

 2            Was it a rubber band?

 3    A.    I don't specifically remember that.

 4    Q.    So did you develop how much money was inside after

 5    the top, like did you actually flip and see?

 6    A.    I did not.

 7    Q.    I'm sorry?

 8    A.    I did not.

 9    Q.    So then you had a conversation with Mr. Parsadanyan

10    about the currency, and he told you approximately 30,000?

11    A.    Correct.

12    Q.    Did he tell you that's exactly how much it was, or

13    did he say the word "approximately"?

14    A.    I believe he said "approximately."

15    Q.    Okay.  And up to this point in time, this is the

16    same person to whom is cooperating with you; correct?

17    A.    Correct.

18    Q.    The same person, although you've found currency, you

19    didn't think it was enough to confiscate that?

20            THE COURT:  It's been asked and answered, Counsel.

21            MR. FLIER:  I'm sorry, Your Honor.  Thank you.

22    BY MR. FLIER:

23    Q.    Did you testify that the denominations were not just

24    20s, but other currency denominations?

25            MS. YANG:  Objection, asked and answered.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  20s, 50s, and hundreds.

3    BY MR. FLIER:

4    Q.     If you know, when you use your ATM machine, does it

5    throw out 50s and hundreds, or just 20s?

6          MS. YANG:  Objection, calls for speculation.

7          THE COURT:  Sustained.

8          MS. YANG:  Irrelevant.

9          THE COURT:  Sustained.

10   BY MR. FLIER:

11   Q.     I don't know if I've asked you this.  Did you ever

12   see, before this stop, my client, Mr. Parsadanyan, before?

13   A.     He does not look familiar; so I don't believe I ever

14   have.

15   Q.     With respect to any other information or

16   documentation that you saw or are aware of, did you

17   document that in any type of police report that you

18   prepared?

19   A.     No, no.

20   Q.     Now, what about other items in the vehicle, like

21   car -- like cell phones?  Did you ever see cell phones?

22   A.     I don't specifically remember.  I remember seeing

23   the money, and that was put in my police report.  But I'm

24   sure there was a number of other items inside the vehicle

25   that I don't specifically have a recollection of.

002143

1    Q.    My last question about documents:  Do you recall

2    ever seeing rebate type of documents that would go with

3    rebates to phones, if you recall?

4    A.    I don't specifically remember that, no.

5    Q.    Did you ever search the trunk?  Did you open the

6    trunk?

7    A.    I believe we would have gone into the trunk, but

8    again, I don't have a specific recollection of that.

9    That's part of the vehicle; so we would have gone through

10   the trunk, I'm assuming.

11   Q.    Before you made the stop, your observations as a

12   passenger -- you didn't see any counter-surveillance

13   driving techniques, did you?

14   A.    No.

15   Q.    And then with respect to Mr. Parsadanyan and his

16   passenger, did you think they were A.P. gang members?

17         MS. YANG:  Objection, Your Honor.

18         THE COURT:  Sustained.

19         MS. YANG:  Calls for speculation.

20         THE COURT:  Sustained.

21   BY MR. FLIER:

22   Q.    At some point in time, your involvement in the stop

23   and looking at any property or whatever, it ends around 45

24   minutes later; is that correct?

25   A.    Correct.

1   Q.    After your part of this was done, did you get back

2   in your police vehicle with your fellow partner and drive

3   off?

4   A.    At the conclusion of the stop, yes, we would have

5   left the scene.

6   Q.    Now, did you follow that vehicle?

7   A.    I mean, we were limited to where we could go

8   immediately after.  So we would have gone in the same

9   direction.  But did we follow them specifically to follow

10  them?  No.

11  Q.    Did the vehicle leave and then you left?  Is that

12  how it occurred?

13  A.    Correct.

14        MR. FLIER:  I have no further questions.  Thank you,

15  Your Honor.

16        THE COURT:  Any -- no, no, Counsel.  You deferred.

17        MR. SEVERO:  I had passed to him.

18        THE COURT:  No, no.  We don't go back and forth, but

19  I thought you passed to him.

20        MR. SEVERO:  I did pass to him.

21        THE COURT:  So then you --

22        So any redirect?

23        MS. YANG:  No, Your Honor.

24        THE COURT:  That's it.  Thank you, sir.

25        Next witness.

```
 1              You can always recall, Counsel, if you want to for

 2    your case but --

 3              MR. SEVERO:  No, that's fine.

 4              THE COURT:  Okay.  By passing, I thought you meant

 5    you're passing to him.

 6              MR. SEVERO:  And it's my fault.  I thought I made

 7    that clear.

 8              MS. YANG:  Your Honor, the government calls

 9    Christopher Spencer.

10              THE CLERK:  Good morning.  Right here to be sworn,

11    please.

12                         CHRIS SPENCER,

13      GOVERNMENT'S WITNESS, WAS SWORN, TESTIFIED AS FOLLOWS:

14              THE CLERK:  Do you solemnly swear the testimony you

15    shall give in the cause now pending before this Court shall

16    be the truth, the whole truth, and nothing but the truth,

17    so help you God?

18              THE WITNESS:  I do.

19              THE CLERK:  Thank you.  You may be seated.

20              May I please ask that you state your full name for

21    record and spell your last name.

22              THE WITNESS:  My first name is Chris; last name is

23    Spencer, S-p-e-n-c-e-r.

24              THE CLERK:  Thank you.

25              THE COURT:  Okay.  You may inquire.
```

1          MS. YANG:   Thank you, Your Honor.

2                   **DIRECT EXAMINATION**

3    BY MS. YANG:

4    Q.     Good morning, sir.

5    A.     Good morning.

6    Q.     Where are you currently employed?

7    A.     I'm employed as a supervisor with the Glendale

8    Police Department.

9    Q.     And for approximately how many years have you been

10   with the Glendale Police Department?

11   A.     About 12 years.  I've been there since 2002.

12   Q.     Now you just testified that you're a supervisor.

13   Are you in any particular division?

14   A.     Yeah, I currently supervise a crime suppression

15   unit.  We call it the Special Enforcement Detail.

16   Q.     Now, in 2009, what was your position with the

17   Glendale Police Department?

18   A.     I was supervisor in our patrol section.

19   Q.     Now, prior to joining the Glendale Police

20   Department, I guess approximately 12 years ago, where were

21   you employed?

22   A.     Between '99 and 2002, I was employed with the

23   sheriff's department, Los Angeles County Sheriff's

24   Department.  Before that, I worked about two and a half

25   years in retail banking with Great Western Bank, and then

1  it ultimate ly became Washington Mutual, and also with an

2  insurance company.

3  Q.    Now, when you say "retail banking," what were your

4  positions in that industry?

5  A.    I worked as a teller in a standard bank branch and

6  as a new accounts rep.

7  Q.    And during your years in retail banking, did you

8  become familiar with the banking practice for business

9  customers?

10 A.    Yes.

11 Q.    And in particular for businesses that operate a

12 large cash volume business?

13 A.    Yes.

14 Q.    Now, when you worked as a teller and as a new

15 accounts representative, in dealing with business

16 customers, was there a procedure that was generally

17 followed to allow for the efficient depositing of large

18 cash deposits?

19         MR. FLIER:  Your Honor, I would object.  Irrelevant

20 and -- irrelevant.

21         THE COURT:  Counsel.

22         MR. SEVERO:  I'm sorry.  Okay.  I wanted to deal

23 with that objection first.

24         THE COURT:  Okay.  I don't know what the relevancy

25 is.  Is there an offer of proof?  Where are you going with

1    this?

2           MS. YANG:  Your Honor, it's going to the questioning

3    about the large sum of cash that was found in the car,

4    whether in his experience it is reflective of a cell phone

5    store business, as a cash business.

6           THE COURT:  Overruled.

7           MR. SEVERO:  I think this is opinion testimony that

8    we have not been advised as would be forthcoming.  There

9    was no designation of this gentleman as an expert in this

10   case.

11          MS. YANG:  Your Honor, it is based on his prior

12   experience, but I'll move on at this point.

13          THE COURT:  Okay.

14   BY MS. YANG:

15   Q.     Sergeant Spencer, I think I skipped over this, but

16   while you've been employed with the Glendale Police

17   Department, in addition to your roles in the patrol section

18   as well as the Special Enforcement Detail, were you also

19   assigned to a different division within Glendale Police

20   Department?

21   A.     Yes.  I worked as a patrol officer.  I've worked as

22   a fraud detective.  That was for a period of four years,

23   approximately.

24          THE COURT:  Okay.

25          We can get into this area after the lunch break.

1          We're going to break at this time as it's 11:30.

2          Remember the admonishment not to discuss the case

3     among yourselves or with anybody else or form or express

4     any opinions about the matter until it's submitted to you

5     and you retire to the jury room.

6          Before you leave, there's a motion to strike some

7     testimony.

8          There's testimony concerning any knowledge

9     Mr. Parsadanyan had with the extortion, of what was going

10    on through the wiretap.

11         And I'm instructing you at this time anything to do

12    with Mr. Parsadanyan's knowledge of or participation in the

13    extortion will be stricken, and it is limited, and it's not

14    to be considered by you.

15         He's not charged with extortion.

16         And anything that deals with his knowledge or

17    participation in the extortion is not admitted into this

18    case.

19         MR. ESTRADA:  And your Honor, just to be clear, just

20    limited to the two defendants charged with extortion,

21    Darbinyan and Sharopetrosian.

22         THE COURT:  That's correct.

23         It's limited to just those two defendants.  Are you

24    with me on that?  Okay.

25         Now you're excused, and we'll see you back in at

1   1:00 o'clock.

2        THE CLERK:  All rise.

3              *(Jurors exit courtroom.)*

4        THE CLERK:  Court is in recess.

5              --oOo--

6    *(Whereupon the lunch recess taken until 1:00 p.m.)*

7   *(Afternoon Session Transcript filed under separate cover.)*

8              --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I hereby certify that, pursuant to Title 28,

4    Section 753, United States Code, the foregoing is a true

5    and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United

9    States.

10          Certified on March 23, 2015.

11

12                              /s/ Katherine M. Stride
                                KATHERINE M. STRIDE, CSR RPR
13                              Official Court Reporter
                                License No. 11773
14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3            HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                            - - - -

5

6
    UNITED STATES OF AMERICA,        )
7                                    )
                   PLAINTIFF,        )
8                                    )
             vs.                     )     No. CR 11-00072(A)-RGK
9                                    )
    (1)  MHER DARBINYAN,             )
10   (4)  ARMAN SHAROPETROSIAN,       )
    (35) RAFAEL PARSADANYAN,         )
11                                    )
                   DEFENDANTS.       )
12   _____)

13

14              REPORTER'S TRANSCRIPT OF JURY TRIAL

15                   DAY 10, VOLUME II of II

16                      PAGES 1 - 151

17                 TUESDAY, APRIL 8, 2014

18                       1:00 P.M.

19                 LOS ANGELES, CALIFORNIA

20

21

22       _____

23            *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
             *Official Reporter, U.S. District Court*
24                   *255 East Temple Street*
                 *Los Angeles, CA  90012*
25                      *213.894.5949*


        UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477

 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579

 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    I N D E X

 2   GOVERNMENT'S WITNESSES:                        PAGE
```

```
 3   CHRISTOPHER SPENCER
        DIRECT EXAMINATION (Continued) BY MS. YANG    4
 4      CROSS-EXAMINATION BY MR. FLIER               16
        REDIRECT EXAMINATION BY MS. YANG             24
 5      RECROSS-EXAMINATION BY MR. SEVERO            25

 6   CHRISTOPHER NESMITH
        DIRECT EXAMINATION BY ESTRADA                27
 7      CROSS-EXAMINATION BY MR. SEVERO              45

 8   LAWRENCE PITCHER
        DIRECT EXAMINATION BY MR. ESTRADA            51
 9      CROSS-EXAMINATION BY MR. SEVERO              56

10   DAVID McCAIN
        DIRECT EXAMINATION BY MR. ESTRADA            59
11      CROSS-EXAMINATION BY MR. SEVERO              69
        CROSS-EXAMINATION BY MR. FLIER               76
12
     GUSTAVO ORTEGA
13      DIRECT EXAMINATION BY MS. YANG               78
        CROSS-EXAMINATION BY MR. SEVERO             126
```

```
14

15

16                    E X H I B I T S

17                      GOVERNMENT'S
                  NUMBER        ADMITTED
18
                    340            44
19                  361            54
                    362            54
20                  363            39
                    364            41
21                  365            66

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 8, 2014

 2                             1:00 P.M.

 3                             - - - -

 4        (In the presence of the jury:)

 5              THE COURT:  Okay.  The record will reflect that all

 6     the members of the jury are in their respective seats in the

 7     jury box, including the alternates, and we were at direct

 8     examination.

 9          Counsel, you may continue.

10              MS. YANG:  Thank you, your Honor.

11      CHRISTOPHER SPENCER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

12                    DIRECT EXAMINATION (CONTINUED)

13     BY MS. YANG:

14     Q.   Good afternoon, Sergeant Spencer.

15     A.   Good afternoon.

16     Q.   Before we broke from lunch, you were explaining your prior

17     experience with the Glendale Police Department.  I believe we

18     had stopped at your time in the financial crimes unit.  Do you

19     recall that?

20     A.   Yes.

21     Q.   From approximately what year to what year were you in the

22     financial crimes unit?

23     A.   I was -- 2004 through 2007.

24     Q.   And were you also sergeant in that unit, or did you have a

25     different position?
```

1   A.   No, I was assigned as an investigator.

2   Q.   And what types of crimes did you investigate during that

3   time period?

4   A.    Investigated bank fraud, access card fraud, check forgery,

5   counterfeiting, anything that related to theft from financial

6   institutions.

7   Q.    And during the course of your investigations -- you just

8   mentioned financial institutions -- did you have frequent

9   contact with financial institutions?

10   A.   Yes, I did.

11   Q.   Now, I'd like to direct your attention to the evening of

12   July 18th, 2009.  Were you called out to a location on

13   Monterey Street in Glendale in response to a request from some

14   patrol officers?

15   A.   Yes, I was.

16   Q.   And did you go to that location?

17   A.   Yes.

18   Q.   And what patrol officers were at that location when you

19   arrived?

20   A.   Patrol officers Krivak and Zendejas were at the scene.

21   Q.   And was the driver and the passenger of the vehicle

22   removed from the vehicle at the time you arrived?

23   A.   Yes, they were outside of their vehicle.

24   Q.   Now, when you arrived on Monterey Street, what was the

25   first thing that you did?

1    A.    I immediately walked up and was greeted by Officer Krivak.

2    We had a brief conversation, and then I went over to the

3    vehicle that was there at the scene of the traffic stop in

4    addition to the patrol vehicle.

5    Q.    So based on your conversation with Officer Krivak, you

6    went to investigate the stopped vehicle; is that correct?

7    A.    I went to investigate the stopped vehicle, correct.

8    Q.    And was that vehicle a black BMW?

9    A.    Yes, it was a black 6 series BMW.

10   Q.    Now, when you went to the BMW, did you find anything?

11   A.    Inside the vehicle I found a quantity of currency, I found

12   some documents which I reviewed, and I also found a piece of

13   paper that had a handwritten number on it.

14   Q.    Now, when you talk about a quantity of currency, was

15   this -- were these bills?

16   A.    Yes.  It was all U.S. currency.  They were bills in

17   various denominations, and they were all contained within a

18   plastic shopping bag.

19   Q.    Now, do you recall how these bills or the currency was

20   wrapped?

21   A.    I don't recall specifically what they used to close in on

22   themselves.  None of it was loose.  Some of it, I believe, was

23   held in a circle.  Some of it was held in a fold.  I didn't see

24   any currency straps, so it could have been rubber bands,

25   something to that effect.

```
1   Q.   Now, you referenced a currency strap.  What is a currency
2   strap?
3   A.   Currency straps are used to separate denominations and to
4   indicate how much money is inside each strap.  So essentially a
5   hundred bills would be strapped together with a paper or
6   wrapper which tells whoever's looking at it how much that is in
7   total currency.  So a hundred hundreds would be $10,000.
8   Q.   And are these currency straps provided by financial
9   institutions?
10  A.   Yes, they can be --
11       MR. SEVERO:  Objection, no foundation, and this is
12  expert testimony that's not within the witness' --
13       THE COURT:  Sustained.
14  BY MS. YANG:
15  Q.   Based on your experience investigating financial crimes,
16  your contacts with financial institutions, is it your
17  understanding that these currency straps can be provided by
18  financial institutions?
19       MR. SEVERO:  Leading and expert testimony not
20  previously disclosed.
21       THE COURT:  Sustained.
22  BY MS. YANG:
23  Q.   So these -- the currency you found in the back of the BMW
24  were not wrapped with currency straps; is that correct?
25  A.   Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Do you recall if the currency was accompanied by a bank

2    deposit slip or similar bank documentation?

3    A.    There was no bank documentation in the bag.  It was just

4    currency.

5    Q.    Now, you mentioned that you had also seen some pieces of

6    paper and a piece of paper with some numbers written on it; is

7    that correct?

8    A.    Correct.

9    Q.    Did you also -- among the pieces of paper you saw, did you

10   see any MoneyGram receipts?

11   A.    I did.

12   Q.    And do you recall to whom the MoneyGram receipts were made

13   out to?

14            MR. FLIER:  Objection.

15            MR. SEVERO:  Not the best evidence.

16            MR. FLIER:  That's hearsay.

17            THE COURT:  Sustained.

18   BY MS. YANG:

19   Q.    Now, on the piece of paper you found with the -- with

20   numbers, based on your experience investigating financial

21   crimes as well as your retail banking experience, could you

22   determine what those numbers were?

23            MR. SEVERO:  Objection.

24            MR. FLIER:  Objection.

25            MR. SEVERO:  Calls for speculation, improper opinion

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   testimony.

2           MR. FLIER:  And hearsay again.

3           THE COURT:  Overruled on hearsay.  On the first

4   motion, it's premature.

5       So you can answer that question yes or no.

6           THE WITNESS:  Could you restate the question for me,

7   ma'am?

8   BY MS. YANG:

9   Q.   I hope so.

10      Based on your experience investigating financial crimes as

11  well as your experience in the retail banking industry, did

12  you -- were you able to determine what those numbers written on

13  that piece of paper were?

14          THE COURT:  Yes or no.

15          THE WITNESS:  Yes.

16  BY MS. YANG:

17  Q.   And what were you able to determine?

18          MR. FLIER:  Same objection.

19          MR. SEVERO:  Objection.

20          THE COURT:  Sustained.

21  BY MS. YANG:

22  Q.   Now, were you wearing a body recorder when you arrived on

23  July 18th, 2009, on Monterey Street?

24  A.   Yes.

25  Q.   And did you turn that body recorder on?

1    A.    Yes.

2    Q.    Now, did you read any of the information you were finding

3    in the car, such as the numbers on the piece of paper, the

4    contents of the MoneyGram receipt, anything like that?  Did you

5    read that into your body recorder?

6            MR. FLIER:  Objection, irrelevant.

7            THE COURT:  Overruled.

8            THE WITNESS:  Yes.  As I reviewed the document, I read

9    it to myself and captured it with a digital audio recorder.

10   BY MS. YANG:

11   Q.    And did you later upload that recording into the

12   Glendale Police Department database?

13   A.    Yes.

14   Q.    Now, having discovered -- well, let me ask you this.  Did

15   you learn approximately how much money was contained in that

16   plastic shopping bag?

17           MR. SEVERO:  Hearsay.

18           THE COURT:  Overruled.

19       Were you able to determine one way or the other how much

20   there was, yourself?  Not what someone told you.

21           THE WITNESS:  No independent determination, no.  I

22   didn't count it or anything.

23   BY MS. YANG:

24   Q.    Well, at the scene, did you speak with the defendant,

25   Parsadanyan?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, I did.

2   Q.   And did he, during that conversation, relay to you

3   approximately how much money was in that bag?

4   A.   He didn't relate to me individually.  I was there present

5   for a conversation between he and others.  But we did discuss

6   the quantity of currency.

7   Q.   And approximately how much money did he claim was in that

8   bag?

9   A.   He didn't tell me during our conversation how much money

10  was in the bag.

11  Q.   Did you overhear him tell other officers, since you were

12  in the vicinity, approximately how much money was in the bag?

13  A.   Yes, I did.

14  Q.   And what was that amount?

15  A.   $34,000.

16  Q.   Now, based on your experience investigating criminal

17  crime -- financial crimes, excuse me, and your prior retail

18  banking experience, did it seem unusual to you that there would

19  be that quantity of cash in the vehicle?

20          MR. FLIER:  Objection, argumentative.

21          MR. SEVERO:  Improper opinion testimony.

22          THE COURT:  Overruled.

23          THE WITNESS:  Yes.  I had handled thousands of

24  merchant transactions, and that seemed inconsistent with what

25  I'd seen in merchant banking.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. FLIER:  Going to move to strike, no foundation,
 2    your Honor.
 3              MR. SEVERO:  Yes.  Join.
 4              THE COURT:  Denied.
 5    BY MS. YANG:
 6    Q.   Now, Sergeant Spencer, at some point did you speak to the
 7    defendant, Parsadanyan?
 8    A.   I did.
 9    Q.   And did he tell you where the money came from or where he
10    claimed the money came from?
11    A.   Yes, he did.
12    Q.   And what did he tell you?
13    A.   He told me they were proceeds from his business selling
14    cell phones.
15    Q.   And did he tell you what he did with that money?
16    A.   He told me he collected it throughout the week and that he
17    planned to make a deposit with it.
18    Q.   And again, this stop was on a Saturday night; is that
19    correct?
20    A.   Correct.
21    Q.   Now, based on your prior experience investigating
22    financial crime as well as in the retail banking industry, was
23    it your understanding that cash businesses do bulk deposits
24    once a week?
25              MR. FLIER:  Objection.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3   BY MS. YANG:

 4   Q.   Why did it seem unusual to you that there would be this

 5   quantity of cash from a cell phone store business in the

 6   vehicle, based on your experience?

 7              MR. SEVERO:  Objection.

 8              MR. FLIER:  Objection, irrelevant.

 9              THE COURT:  Sustained.

10   BY MS. YANG:

11   Q.   Now, based on your experience investigating financial

12   crimes as well as in the retail banking industry, do cash

13   businesses deposit regularly during the week?

14              MR. SEVERO:  Objection.  Calls for speculation, and

15   it's improper opinion testimony.

16              THE COURT:  Sustained.

17       I'm assuming he was not designated as an expert.

18              MS. YANG:  No, your Honor, but this is --

19              THE COURT:  Sustained.

20              MS. YANG:  -- based on his on-the-job experience.

21              THE COURT:  You can't give an opinion unless you're an

22   expert on it.  Sustained.

23   BY MS. YANG:

24   Q.   Now, Sergeant Spencer, at some point did you make a

25   determination whether to seize that money or not?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes, I did.

2   Q.   And what did you decide?

3   A.   I decided not to seize it.

4   Q.   And why not?

5   A.   Well, even though I thought it was suspicious, I didn't

6   think that, based on what I had seen at the traffic stop, we

7   had enough information to justify seizing it.

8   Q.   Now, prior to responding to the scene, had you had a

9   conversation with a member of a task force about an

10  investigation?

11  A.   Yes.

12  Q.   And was that investigation related to this traffic stop of

13  the black BMW?

14  A.   I presumed it was.  They didn't give me any details about

15  the investigation.  He just informed me that the traffic stop

16  was being conducted at their request.

17         MS. YANG:  Your Honor, one moment.

18         THE COURT:  Yes.

19  BY MS. YANG:

20  Q.   Now, Sergeant Spencer, you've worked for the

21  Glendale Police Department, I believe you testified,

22  approximately 12 years; is that correct?

23  A.   Correct.

24  Q.   Have you personally conducted traffic stops or consent

25  searches of vehicles or residences during that time?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    And based on your experience as a officer, is it unusual

 3    for individuals engaged in criminal activity to consent to

 4    searches?

 5            MR. FLIER:  I'm going to object.

 6            MR. SEVERO:  Objection, your Honor.

 7            THE COURT:  Sustained.

 8    BY MS. YANG:

 9    Q.    Now, during your discussions with defendant Parsadanyan,

10    what was his demeanor?

11    A.    He seemed relaxed.

12            MR. SEVERO:  Cumulative.

13            THE WITNESS:  He was --

14            THE COURT:  Overruled.

15            THE WITNESS:  He seemed relaxed.  We had a casual

16    conversation.  I remember him sitting there smiling, and seemed

17    to be talking casually with us.

18    BY MS. YANG:

19    Q.    And was it your understanding that he had consented to the

20    search of his vehicle?

21    A.    Yes, it was.

22    Q.    And did that surprise you?

23    A.    Not at all.

24            MR. SEVERO:  Objection.  Irrelevant whether he was

25    surprised or not.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Overruled.

 2         You've answered no, it didn't surprise you?

 3              THE WITNESS:  It did not surprise me at all, no.

 4              MR. SEVERO:  Thanks.

 5              MS. YANG:  Thank you.  Nothing further.

 6              THE COURT:  Cross.

 7              MR. SEVERO:  Don't have any questions of this witness.

 8              MR. PEREYRA-SUAREZ:  And I have no questions,

 9    your Honor.

10                        CROSS-EXAMINATION

11    BY MR. FLIER:

12    Q.   Good afternoon, Officer.

13    A.   Good afternoon.

14    Q.   You did not arrive at the scene of the stop until after

15    the vehicle was stopped, correct?

16    A.   Correct.

17    Q.   How much time elapsed, approximately, based on your

18    information, between when the car actually was stopped until

19    you arrived?

20    A.   I would guess maybe 20, 25 minutes.

21    Q.   And were you by yourself when you arrived?

22    A.   Yes.

23    Q.   Were you wearing a police uniform?

24    A.   Yes.

25    Q.   And for you to be there, were you like a supervisor?
```

```
1    A.    I was, in fact, a supervisor.

2    Q.    Thank you.

3          Now, with respect to the officers who conducted the stop,

4    without getting into any conversations with them, did you speak

5    with them, though?

6    A.    I did.

7    Q.    And with respect to any device, you had some type of

8    tape-recording device, sir?

9    A.    Yes.

10   Q.    With respect to one of the other officers, were you aware

11   that they also had one, at least one of the officers?

12   A.    Yes.

13   Q.    Now, with respect to -- were you a training patrol

14   sergeant, ever?

15   A.    I'm sorry, I don't understand your question.

16   Q.    Were you ever a sergeant in the training patrol division?

17   A.    We don't have such a division.  I -- I don't understand

18   your question.

19   Q.    Did you ever supervise any patrolmen?

20   A.    Yes.

21   Q.    With respect to the money issue, is it your testimony that

22   you had a conversation with Mr. Parsadanyan and he told you

23   that the money, the aggregate total, was around 34,000?

24   A.    He did not tell me that.  I was there as he had a

25   conversation with somebody else.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Thank you, 'cause -- so your testimony was,

2    Mr. Parsadanyan did not specifically speak to you about any

3    monetary figure, but at some point in time you overheard a

4    conversation on that same subject matter; am I correct?

5    A.   Correct.

6    Q.   Now, who was Mr. Parsadanyan speaking to for you to

7    overhear the conversation, if you can recall that?

8    A.   I believe he was speaking with Officer Krivak.

9    Q.   And where was Officer Zendejas, if you have an independent

10    recollection?

11    A.   I was seated inside the vehicle, and the two officers were

12    outside, near the rear quarter panel, off to my right.

13    Q.   Maybe I misheard you.  When you say -- you were seated in

14    your own vehicle or the BMW vehicle?

15    A.   I was seated in the BMW.

16    Q.   So you entered the vehicle and sat down in either the

17    driver or passenger seat?

18    A.   Yes.

19    Q.   Okay.  And then we heard that you did a little search.

20    Strike the word "little."

21        Did you conduct a search in any capacity?

22    A.   I did.

23    Q.   Did you remove the money from whatever bag it was enclosed

24    in?

25    A.   No.  The money always stayed within the bag.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Did you physically touch the bag, ever?

2   A.   I may have moved it incidentally.  I don't even recall

3   moving it from the position that the bag was seated in.  I may

4   have opened it further.

5   Q.   Did you, yourself, or direct any law enforcement to take

6   photographs of the bag and the location where it was observed?

7   A.   I do recall taking photographs myself.  I didn't direct

8   anybody to take photographs.

9   Q.   So you did take photographs; is that correct?

10  A.   Correct.

11  Q.   Now, with respect to the currency, and my last question,

12  did you count it?

13  A.   No.

14  Q.   Is there a reason why you just would not do an inventory

15  and count the money?

16  A.   As a safeguard for us, if we're not going to be seizing

17  money, I wouldn't go about counting it.  It wasn't a need for

18  me to handle it at that point.

19  Q.   So is it your testimony that as soon as you became aware

20  of any money in the car, you had no intentions of confiscating

21  it?

22        MS. YANG:  Objection.  It calls for speculation,

23  misstates the testimony.

24        THE COURT:  Sustained.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. FLIER:
 2   Q.   Did you have any intention of confiscating any money
 3   allegedly found in the vehicle?
 4           MS. YANG:  Objection, vague.
 5           THE COURT:  Overruled.
 6           MS. YANG:  Intention as to when?
 7           THE COURT:  Overruled.
 8           THE WITNESS:  My intentions were to go there and
 9   evaluate what the patrol officers had.  They wanted me to take
10   a second look, basically.
11   BY MR. FLIER:
12   Q.   Were you ever spoken to before you arrived, in the very
13   first situation when you arrived, from any FBI agent?  Did you
14   speak with any agent before that?
15   A.   No, I never spoke with anybody from the FBI.
16   Q.   Did you ever speak with an FBI agent or personnel after
17   the stop and the parties were allowed to leave?
18   A.   I never spoke with anybody from the FBI.
19   Q.   Thank you.
20        The numerical figure 34,000, it's your testimony you
21   overheard that figure; is that correct?
22   A.   Correct.
23   Q.   And clearly, the person to whom made the reference of the
24   figure was Mr. Parsadanyan?
25   A.   That's who they were having the conversation with.  I
```

1   didn't see the words come out of his mouth per se, but that's

2   who they were talking to, so my presumption was that he was the

3   one that made that statement.

4   Q.   But you can't tell us that for certain; it could have been

5   an officer who made the numerical number?

6   A.   No, definitely wasn't one of the officers.

7   Q.   Now, why do you say that?  Because you recognize the

8   officer's voice?

9   A.   Yes.

10   Q.   Okay.  Have you ever seen Mr. Parsadanyan before this

11   stop?

12   A.   No.

13   Q.   With respect to -- and I'm almost done -- the conversation

14   that you had with him, he told you that he had a business; is

15   that correct?

16   A.   Correct.

17   Q.   That's -- did you check into whether that's a truthful

18   statement?

19   A.   Afterwards did I inquire?  No.

20   Q.   And he told you some other conversation; is that correct?

21   You spoke, correct?

22   A.   Correct.

23   Q.   And he seemed to be cooperating, correct?

24   A.   Correct.

25   Q.   He wasn't evasive; am I correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Correct.

2    Q.   Now, sometimes in your experience, people have currency on

3    them; is that correct?

4    A.   Correct.

5    Q.   Sometimes people might have -- whether you think it's a

6    large or small amount, some people carry a lot of cash on them,

7    correct?

8    A.   We'd have to discuss amounts.

9         THE COURT:   Court's going to sustain its own objection

10   as being irrelevant.

11   BY MR. FLIER:

12   Q.   Without getting into all of the conversations you've had

13   with motorists or people with cash, the fact that someone has

14   cash, by itself, is not criminal conduct; is that a fair

15   statement?

16   A.   Correct.

17   Q.   And I heard you testify that in your opinion you did not

18   confiscate, retain the money, because there was insufficient

19   evidence that it was part of any criminal activity; is that

20   correct?

21   A.   Yes.  I didn't have sufficient information to justify

22   seizing the currency.

23   Q.   But there's been other situations that you've been part of

24   patrol, searches where you did find currency and you did

25   confiscate it; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Correct.

 2    Q.    Did you ever see Mr. Parsadanyan's wallet inside the

 3    vehicle itself or near the bag of money?

 4    A.    It wasn't near the bag.  As to whether or not it was in

 5    the vehicle, I don't recall.

 6    Q.    With respect to the trunk, did you ever visually inspect

 7    the trunk?

 8    A.    I don't recall looking in the trunk.

 9    Q.    Do you have an independent recollection as to whether or

10    not you observed a lot of phone or merchandise related to

11    phones within the vehicle, including the trunk, if you recall?

12    A.    I don't recall seeing a large quantity of phones or -- or

13    phone-related merchandise.

14    Q.    Lastly, there was some testimony about your qualifications

15    before becoming law enforcement.  Do you remember that?

16    A.    Yes.

17    Q.    And you worked at a bank, correct?

18    A.    Correct.

19    Q.    If I was simply to remove money from an ATM card outside a

20    bank, do they give me denominations of 50s and 100s?

21              THE COURT:  Sustained.

22              MS. YANG:  Objection, your Honor.

23              THE COURT:  Sustained.  You're asking for expert

24    opinion again, Counsel.

25              MR. FLIER:  Okay.  Thank you.  I have no further
```

```
 1    questions.

 2              THE COURT:  Redirect.

 3              MS. YANG:  Very briefly, your Honor.

 4                    REDIRECT EXAMINATION

 5    BY MS. YANG:

 6    Q.   Sergeant Spencer, you testified that you took photos of

 7    the money in the BMW; is that correct?

 8    A.   Yes.

 9    Q.   Prior to testifying today, did you search for those

10    photos?

11    A.   Yes.

12    Q.   And were you able to locate them?

13    A.   No, I was not.

14    Q.   And prior to arriving at the traffic stop on July 18th,

15    were you advised by any member of the task force of any wiretap

16    calls involving defendant Parsadanyan?

17              MR. FLIER:  Objection, beyond the scope and

18    irrelevant.

19              THE COURT:  And hearsay.  Sustained.

20    BY MS. YANG:

21    Q.   Based on the information you were able to gather at that

22    traffic stop on July 18th, 2009, is that what you based your

23    determination on that you could not seize the money?

24    A.   Yes.  It was only based on what I saw at the traffic stop.

25              MS. YANG:  Nothing further.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Counsel.

 2                     RECROSS-EXAMINATION

 3  BY MR. SEVERO:

 4  Q.    Afternoon, sir.

 5  A.    Good afternoon.

 6  Q.    These photos that you took, do you remember what you did

 7  with them?

 8  A.    I think I e-mailed them.  I searched my e-mail, and

 9  there's no record of me e-mailing them.

10  Q.    Who would you have e-mailed them to?

11  A.    A task force officer who's employed by the City of

12  Glendale named Derrel McEntarffer.

13  Q.    But did you speak with Officer McEntarffer to see if he

14  had them?

15  A.    No, I haven't.

16  Q.    You did this right after the -- or reasonably soon after

17  the stop?

18  A.    Yes.

19  Q.    Within a day?

20  A.    Yes.

21  Q.    And when was it that you first went back to look for them?

22  A.    Maybe six weeks ago.

23  Q.    Did you speak to any task force officers about having

24  those pictures before six weeks ago?

25  A.    No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    You never told anyone about this other than McEntarffer?

2    A.    Yeah, my recollection is that I took photographs with a

3    phone that had e-mail capability and that that night I e-mailed

4    them.  The stop didn't result in any enforcement action, so up

5    until the time that I was interviewed by task force members, we

6    didn't talk about it further.

7    Q.    Which was when?

8    A.    About six weeks ago.

9              MR. SEVERO:  I have nothing further.  Thank you.

10             MR. PEREYRA-SUAREZ:  I have no questions, your Honor.

11             MR. FLIER:  I have no additional questions,

12   your Honor.

13             THE COURT:  You may step down.

14        Next witness.

15             MR. ESTRADA:  Your Honor, the government calls

16   Sergeant Chris Nesmith.

17             THE CLERK:  Good afternoon.  Right here to be sworn,

18   please.

19        (Witness sworn.)

20             THE CLERK:  Thank you.  You may be seated.

21        May I please ask that you state your full name for the

22   record and spell your last name.

23             THE WITNESS:  Christopher Patrick Nesmith,

24   N-e-s-m-i-t-h.

25             THE CLERK:  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  You may inquire, Counsel.

 2              MR. ESTRADA:  Thank you, your Honor.

 3          CHRISTOPHER NESMITH, GOVERNMENT'S WITNESS,

 4                     DIRECT EXAMINATION

 5  BY MR. ESTRADA:

 6  Q.   Sir, where do you work?

 7  A.   For the City of Huntington Beach Police Department.

 8  Q.   How long have you worked for the Huntington Beach Police

 9  Department?

10  A.   15 years.

11  Q.   What's your current position with the Huntington Beach

12  Police Department?

13  A.   Currently, I'm the supervisor of the air support unit.

14  Q.   Is that the helicopter unit?

15  A.   Yes, sir.

16  Q.   I'd like to turn your attention to 2009.  In 2009, where

17  were you working in the Huntington Beach Police Department?

18  A.   I was assigned to the bunco forgery fraud unit of the

19  detective division.

20  Q.   When you say "bunco forgery," what is that?

21  A.   That is crimes involving fraud, anything dealing with

22  money schemes.

23  Q.   Now, at this point in 2009, as a member of the

24  Huntington Beach Police Department, had you had experience

25  arresting individuals?
```

```
 1   A.   Yes, I had.

 2   Q.   About how many arrests would you say you'd been involved

 3   in?

 4   A.   Over a thousand.

 5   Q.   I'd like to turn your attention to the time frame of

 6   August 2009.  Do you have that time frame in mind?

 7   A.   Yes, sir.

 8   Q.   Back in August of 2009, did you have some information

 9   regarding a fraud occurring against customers of 99 Cent Only

10   Stores?

11   A.   Yes.

12   Q.   What did you learn?

13        MR. FLIER:  Objection, hearsay.

14        THE COURT:  Overruled.

15        THE WITNESS:  That the point-of-sale machine, the

16   devices, were -- customers would swipe their credit cards or

17   ATM cards, were compromised.

18   BY MR. ESTRADA:

19   Q.   Now, did the Huntington Beach Police Department get

20   contacted by financial institutions?

21   A.   Yes.

22   Q.   And were they alerted to this fraud going on?

23   A.   Yes.

24        MR. SEVERO:  Objection, hearsay.

25        THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. ESTRADA:

2   Q.   Did --

3   A.   Yes.

4   Q.   And did you learn that stores in the Huntington Beach area

5   were being affected?

6   A.   Yes.

7        MR. FLIER:  Object, your Honor, assumes facts not in

8   evidence, and he's -- submit.

9        THE COURT:  Overruled.

10       THE WITNESS:  Yes.

11  BY MR. ESTRADA:

12  Q.   Which stores in the Huntington Beach area were being

13  affected?

14  A.   The 99 Cents Only Store on Beach Boulevard and the

15  99 Cents Only Store located on Brookhurst in Huntington Beach.

16  Q.   Okay.  Now I want to turn your attention to a specific day

17  in August of 2009.  That's August 24th, 2009.  Do you have that

18  day in mind?

19  A.   Yes.

20  Q.   On that date, did you respond or go to a particular

21  99 Cent Only Store?

22  A.   Yes, I did.

23  Q.   What store was that?

24  A.   The one on Beach Boulevard, at 16672 Beach Boulevard in

25  Huntington Beach.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Why did you go there?

2    A.   I had learned that there was a tampered point-of-sale

3    machine at that location.

4    Q.   Now, when you arrived at that location, were there other

5    individuals there already?

6    A.   Yes.

7    Q.   Other investigators?

8    A.   Yes.

9    Q.   Were there employees with the 99 Cent Only Stores'

10   investigative team already there?

11   A.   Yes.

12   Q.   Did you meet with them?

13   A.   Yes, I did.

14   Q.   Now, you mentioned that you learned that a tampered

15   terminal had been found at that store?

16   A.   Yes.

17   Q.   Did you see that terminal?

18   A.   Yes, I did.

19   Q.   Now, before I show you the terminal, at this point, having

20   been in the bunco forgery unit of the Huntington Beach Police

21   Department, were you familiar with skimmers?

22   A.   Yes.

23   Q.   And skimming devices?

24   A.   Yes.

25              MR. ESTRADA:  Your Honor, with the Court's permission,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   I'd like to show the witness Exhibit 338, which is a physical

2   exhibit in one of the boxes.

3           THE COURT:  Okay.

4           MR. ESTRADA:  And your Honor, Exhibit 338 has

5   previously been admitted and published.

6       If I could ask the witness to just pull out Exhibit --

7   Exhibit 338.

8   Q.   Do you have Exhibit 338 in front of you?

9   A.   Yes, sir.

10  Q.   You recognize it?

11  A.   Yes, I do.

12  Q.   What is it?

13  A.   It is a point-of-sale machine that I was shown that day at

14  the 99 Cent Store.

15  Q.   Now, at this point you said you'd been familiar with

16  skimmers.  Did you look at the device and determine there was a

17  skimmer inside?

18  A.   Yes, I did.

19  Q.   Now, this skimmer, when you saw it at the 99 Cent Only

20  Store, Beach Boulevard, had it already been removed from the

21  cashier area?

22  A.   Yes.

23  Q.   Did you know whether it had been replaced?

24  A.   I'm sorry, I couldn't hear, sir.

25  Q.   Did you know whether it had been replaced?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes, it was replaced.

2    Q.    With what?

3    A.    An unmodified point-of-sale machine.

4    Q.    You mean without a skimmer?

5    A.    Correct.

6    Q.    Was that unmodified one marked in some way?

7    A.    Yes, it was.

8    Q.    How so?

9    A.    A scratch mark was put on the face of it.

10   Q.    Why was a scratch mark put on the face of it?

11         MR. SEVERO:  Objection, your Honor.  It's hearsay and

12   it's all cumulative.

13         THE COURT:  I don't know.

14      Did you put the scratch mark yourself on it?

15         THE WITNESS:  No, I did not.

16         THE COURT:  Sustained.

17   BY MR. ESTRADA:

18   Q.    When you looked at Exhibit 338, the tampered-with terminal

19   with the skimmer, did you notice there was a scratch mark on

20   it?

21   A.    Yes.

22   Q.    And did it appear that scratch mark was significant in

23   some way?

24   A.    Yes.

25   Q.    Why?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   The machines that were altered with the skimming devices

2   had scratch marks on them to identify them as being --

3         MR. SEVERO:  Move to strike as speculation, no

4   foundation.

5         THE COURT:  And cumulative.

6         MR. SEVERO:  And it's certainly cumulative.

7         THE COURT:  Sustained.

8         MR. ESTRADA:  And I'm just going to his knowledge,

9   your Honor.

10  Q.   Now, after you saw this terminal, this tampered-with

11  terminal with the skimmer in it, did you continue your

12  investigation at the store?

13  A.   Yes.

14  Q.   What did you do?

15  A.   I started watching video surveillance to determine when

16  the altered machine was installed at that particular store.

17  Q.   So historical surveillance video?

18  A.   Yes.

19  Q.   Did you see anything in that historical surveillance

20  video?

21  A.   Not at that time.

22  Q.   About how long were you looking at the video?

23  A.   I believe it was around 45 minutes or so.

24  Q.   At some point did you stop looking at the historical, the

25  past video, and start looking at the live camera feed?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes, I did.

 2   Q.   Why did you do that?

 3   A.   I was told that possible suspects were entering --

 4           MR. SEVERO:  Objection, hearsay.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  I was told that possible suspects were

 7   entering the store.

 8   BY MR. ESTRADA:

 9   Q.   Now, based on your knowledge of the investigation to this

10   point, were you looking for anything specific with regard to

11   the suspects in this case?

12   A.   Yes.

13   Q.   What?

14   A.   We were told that they were possibly driving a BMW and

15   that they would go through the store and select a large

16   aluminum foil-type turkey cooking pan and several rolls of

17   paper towels.

18           MR. FLIER:  Your Honor, I'm going to move to strike as

19   hearsay that they were told.

20           THE COURT:  Overruled.

21   BY MR. ESTRADA:

22   Q.   Now, as you looked at the live feed, did you see two

23   individuals get that big turkey pan and the paper towels and go

24   through the cashier area?

25   A.   Yes, I did.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    What did you do when you saw that?

2    A.    I walked to the front of the store.

3    Q.    Did you walk towards the suspects?

4    A.    Yes.

5    Q.    What did you do when you walked up to the suspects?

6          MR. SEVERO:  Cumulative.

7          THE COURT:  Overruled.

8          THE WITNESS:  I identified myself as a

9    Huntington Beach police officer and showed them the badge that

10   was on my belt.

11   BY MR. ESTRADA:

12   Q.    Now, these suspects, can you describe very generally what

13   they looked like.

14   A.    One was a short male, probably about five-foot-five

15   inches, dark complected.  The other was a female with

16   lighter-colored hair, and she was five-eight or five-nine.

17   Q.    Now, did you later identify these individuals?

18   A.    Yes, I did.

19   Q.    Who were these individuals?

20   A.    The male was Andranik Bakhchadjian, and the female was

21   Vartenie Ananian.

22         MR. ESTRADA:  Your Honor, these have been -- these

23   exhibits, 222 and 223, have been admitted.  I would like to

24   briefly publish for the witness.

25         THE COURT:  May be published.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

BY MR. ESTRADA:

Q.   Now, looking at 223 (sic), is that a photo of the male

suspect you saw, Andranik Bakhchadjian?

A.   Yes, it is.

Q.   Looking at 223, is that a photo of the female suspect,

Vartenie Ananian?

A.   Yes, it is.

Q.   Now, when you identified yourself to the suspects, what

did they do?

A.   They looked left and right, then they began walking

towards the back of the store, towards the east end of the

store.

Q.   Did they go away from you?

A.   Yes, they did.

Q.   When you approached them, had you identified yourself as a

police officer?

A.   Yes, I did.

Q.   How did you identify yourself?

A.   I said, "Huntington Beach Police, get on the ground."

Q.   Did they get on the ground?

A.   They did not.

Q.   Now, is this a particularly dangerous situation?

A.   Yes, it is.

Q.   Why is that?

A.   I don't know who they are, the extent of the crimes that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    they're committing, nor whether they're armed or not at that
 2    time.
 3    Q.   Did you draw your firearm?
 4    A.   Yes, I did.
 5    Q.   Now, we previously viewed in this trial a video of that.
 6    I'm not going to show it to you again.  But after you drew your
 7    firearm, eventually did the male suspect come forward again?
 8    A.   Yes, he did.
 9    Q.   What happened?
10    A.   I ordered him to get on the ground and to let me see his
11    hands, and he continually kept putting his hands towards his
12    waistband.  Eventually, he got down on his knees and then laid
13    on his stomach but continually kept reaching his hand towards
14    his waistband.
15    Q.   Did you tell him to stop that?
16    A.   Yes, I did.
17    Q.   Did you handcuff him?
18    A.   I did not handcuff him.
19    Q.   Did you see him being handcuffed?
20    A.   Yes.
21    Q.   So you said you didn't handcuff him.  Another police
22    officer did that?
23    A.   It was a security officer from the strip mall came in.
24    Q.   Now, was the other suspect, Ananian, was she eventually
25    apprehended, too?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes, she was.
 2   Q.   Now, when Bakhchadjian was apprehended and arrested, did
 3   you search his person?
 4   A.   Yes, I did.
 5   Q.   When you say you searched his person, what did you do?
 6   A.   I emptied out his pockets.
 7   Q.   What did you find in his pockets?
 8   A.   A key to a BMW and a wallet.
 9        MR. ESTRADA:  Your Honor, with the Court's permission,
10   I'd like to show the witness Exhibit 363, which is a physical
11   exhibit in one of the boxes.
12        THE CLERK:  363?
13        THE COURT:  Okay.
14        MR. ESTRADA:  363.
15        THE CLERK:  Thank you.
16   BY MR. ESTRADA:
17   Q.   Do you have 363 in front of you?
18   A.   Yes, I do.
19   Q.   What's Exhibit 363?
20   A.   It is the wallet that I took off of Mr. Bakhchadjian and
21   the -- some of the contents that were in it.
22   Q.   Does it appear to be fairly in the same condition as when
23   you found it when you arrested Andranik Bakhchadjian?
24   A.   Yes.
25        MR. ESTRADA:  Your Honor, the government moves to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   admit Exhibit 363 and requests permission to approach and
 2   publish.
 3           THE COURT:  Okay.
 4       (Received in evidence, Exhibit 363.)
 5   BY MR. ESTRADA:
 6   Q.   All right, Sergeant Nesmith.  I'm going to show you what's
 7   in Exhibit 363.  You mentioned there was a wallet?
 8   A.   Yes.
 9   Q.   And inside was a California driver's license?
10   A.   Yes.
11   Q.   Was that the suspect, Andranik Bakhchadjian?
12   A.   Yes.
13   Q.   Did you find anything else in the wallet?
14   A.   There was a traffic citation.
15   Q.   Is this the traffic citation you mentioned?
16   A.   Yes.
17   Q.   And that was inside Andranik Bakhchadjian's wallet?
18   A.   Yes, it was.
19   Q.   I'm going to zoom in here.  Did you look at that traffic
20   citation?
21   A.   Yes, I did.
22   Q.   Have an area where the traffic citation came from?
23   A.   It's the Glendale Police Department.
24   Q.   And the name there, was that the name of the suspect who
25   you'd arrested?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes, it was.

2    Q.    Did it have a list for the vehicle that Andranik

3    Bakhchadjian was stopped in?

4    A.    Yes, it did.

5    Q.    You see the license plate there?

6    A.    Yes.

7    Q.    Could you read that license plate?

8    A.    Looks like it's 6CAT524 -- or, I'm sorry, 6CAB124.

9    Q.    Obviously, it's a little hard.  It's handwritten.  But did

10   it have a make and model of the car?

11   A.    2008 Land Rover.

12   Q.    And below that, did it list the registered owner of that

13   car?

14   A.    Yes, it did.

15   Q.    You see that name there?

16   A.    Yes.

17   Q.    What's the name there?

18   A.    Mike Darbinyan.

19   Q.    Do you see an address for the registered owner?

20   A.    Yes.

21   Q.    What's the address?

22   A.    27033 Fairway Drive, Stevenson Ranch, California.

23   Q.    And now if you would please take a look at Exhibit 364,

24   and that's actually in one of the black binders behind you.

25   Exhibit 364.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        Your Honor, this is a certified public record of a vehicle

2   registration.  The government would ask to admit it and ask

3   permission to publish.

4            THE WITNESS:  I'm at 364.

5            THE COURT:  Okay.  It can be admitted and published.

6        (*Received in evidence, Exhibit 364.*)

7   BY MR. ESTRADA:

8   Q.   You mentioned the driver's license here at the top was

9   6CAB124?

10  A.   Yes, sir.

11  Q.   What is Exhibit 364?

12  A.   It is the official paperwork from the California DMV

13  stating the registered owner of that vehicle.

14           MR. ESTRADA:  Your Honor, with the Court's permission,

15  if I could publish.

16           THE COURT:  Yes.

17  BY MR. ESTRADA:

18  Q.   Now, looking at Exhibit 364, does it have that same

19  license number that we saw in the traffic ticket that was in

20  Bakhchadjian's wallet?

21  A.   Yes, it does.

22  Q.   And in terms of the registration information for that

23  particular license plate number, do you see that here at the

24  bottom?

25  A.   Yes, I do.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    What's the name?

2    A.    Mike Darbinyan.

3    Q.    And the address?

4    A.    27033 Fairway Lane, Stevenson Ranch.

5    Q.    So corresponding to what's on that ticket?

6    A.    Yes.

7    Q.    Now, after the suspects were arrested, Bakhchadjian and

8    Ananian, did you find another point-of-sale terminal hidden in

9    the aisle of the 99 Cents Only Store?

10   A.    Yes.

11   Q.    Did that one have a marking on it?

12   A.    That one did, yes.

13   Q.    Just to be clear, we're talking about one in the store

14   aisle?  If you could take a look at Exhibit 340.

15         And your Honor, with the Court's permission, maybe it'd be

16   easier if we took out 339 and 340 at this time, which are both

17   physical exhibits.

18             THE COURT:  Okay.

19             THE CLERK:  Do you want 340 first?

20             MR. ESTRADA:  Please, yes.

21             THE WITNESS:  Thank you.  I have 340.

22   BY MR. ESTRADA:

23   Q.    And looking at Exhibit 340, what's Exhibit 340?

24   A.    It is a point-of-sale machine.

25   Q.    Where was that one found in relation to the store?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   This was the one that was found in that aisle that you'd

2   mentioned.

3   Q.   Did that one have a marking on it?

4   A.   No, it did not.

5   Q.   Now, was that the one that was going to be switched out by

6   the suspects?

7          MR. SEVERO:  Objection.  That calls for speculation.

8          THE COURT:  Sustained.

9   BY MR. ESTRADA:

10  Q.   Was that one that had been left in the aisle by the

11  suspects?

12         MR. SEVERO:  Objection.  That calls for -- there's no

13  foundation.

14         THE COURT:  How do you recognize it?

15         THE WITNESS:  It was the one that was found in that

16  aisle, sir.

17         THE COURT:  How do you know that?

18         THE WITNESS:  Through the property tag, sir.

19         THE COURT:  Okay.  Overruled.

20         MR. ESTRADA:  And your Honor, this has been previously

21  admitted, Exhibit 340.

22  Q.   Now, in addition to that device that was found in the

23  aisle of the 99 Cent Only Store, was there another device that

24  was found at the cash register where the suspects had been?

25         MR. SEVERO:  Objection.  It's leading and no

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    foundation.

2            THE COURT:  Overruled.

3        Did you see another one at the location?

4            THE WITNESS:  Yes.

5            THE COURT:  Where did you see it?

6            THE WITNESS:  On the --

7            THE COURT:  Not what somebody told you.

8            THE WITNESS:  On the counter of the checkout stand.

9            THE COURT:  Okay.

10           MR. ESTRADA:  Before I get to that, I'm reminded,

11   actually, 340 hasn't been admitted.

12       Your Honor, the government would move to admit Exhibit

13   340.

14           THE COURT:  It will be received.

15       (Received in evidence, Exhibit 340.)

16   BY MR. ESTRADA:

17   Q.  Okay.  Now, back to the other point-of-sale terminal, did

18   you see one in the cash register area?

19   A.  Yes.

20   Q.  Was it attached to the area of the cash register?

21   A.  It was unattached.

22   Q.  Please take a look at Exhibit 339.

23   A.  Okay.

24   Q.  What's Exhibit 339?

25   A.  It is a point-of-sale machine.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   That one have a mark in the front?

2    A.   Yes, it does.

3    Q.   Is that the one that was replaced from the corrupted

4    terminal?

5    A.   Yes.

6    Q.   All these devices that you testified about today, 338,

7    339, 340, were those eventually released to the FBI?

8    A.   Yes.

9         MR. ESTRADA:  Just a moment, your Honor.

10        No further questions, your Honor.

11        THE COURT:  Cross?

12                    **CROSS-EXAMINATION**

13   BY MR. SEVERO:

14   Q.   Good afternoon, sir.

15   A.   Hello, sir.

16   Q.   Did you speak with Mr. Bakhchadjian at the -- after his

17   arrest?

18   A.   Yes, I did.

19   Q.   Did he talk to you?

20   A.   Briefly.

21   Q.   Did you ask him about this ticket?

22   A.   No, I did not.

23   Q.   Did you ask him how long he'd been driving this car?

24   A.   No.

25   Q.   Did you ask him how he knew Mike Darbinyan?

```
 1   A.   I didn't hear the question, sir.

 2   Q.   I'm sorry.  Did you ask him how he knew Mike Darbinyan?

 3   A.   I did not.

 4   Q.   You wrote -- you booked his wallet and contents into

 5   evidence; is that correct?

 6   A.   I did not book it, no.  It was booked, but not by me.

 7   Q.   So you searched the wallet, though?

 8   A.   Yes.

 9   Q.   You removed the contents?

10   A.   Yes.

11   Q.   You placed them in a bag, did you?

12   A.   I did not place it in a bag.

13   Q.   Do you know how it got to a bag?

14   A.   Yes.

15   Q.   Was it in your presence?

16   A.   Being put in a bag, no, it was not in my presence.

17        MR. SEVERO:  I am replacing all these items into

18   the -- call these buckets.

19        THE COURT:  You should return that to the clerk.

20        MR. ESTRADA:  May I approach, your Honor, to give it

21   to the clerk?

22        THE COURT:  Yes.

23   BY MR. SEVERO:

24   Q.   You recall that day at -- on August 24th, about what time?

25   A.   I believe it was around 4:00 in the afternoon, in that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   neighborhood.

 2   Q.   And you watched the video surveillance, the historical

 3   video I think it's been referred to, but didn't see anything

 4   that caught your attention?

 5   A.   Correct.

 6   Q.   And this -- I'm not clear on this.  The video surveillance

 7   that you watched was for what span of time?

 8   A.   It was in the -- I don't remember when we started.  We

 9   were going back and forth quite a bit.  I don't remember the

10   exact time frame that we were searching.

11   Q.   Was it more than a day?

12   A.   Yes.

13   Q.   More than two days?

14   A.   Yes.

15   Q.   More than a week?

16   A.   I don't know that.  I don't know that answer.

17   Q.   You were looking to see if you could find suspects coming

18   in and removing POS or replacing it with one?

19   A.   Yes.

20   Q.   And you found nothing?

21   A.   Correct.

22   Q.   While you're there, you -- then you're watching a live

23   feed?  Is that what it is?

24   A.   Yes.

25   Q.   So you happened to coincide with Mr. Bakhchadjian -- I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   hope I'm -- I'm probably butchering that, but -- coming into

 2   the store?

 3   A.   If I understand the correct -- your question, I was not

 4   watching live feed and the historical video at the same time.

 5   Q.   No.  I didn't mean to do that.

 6   A.   Okay.

 7   Q.   So let me -- just so that the record is clear, you stopped

 8   watching historical video and started watching live feed,

 9   correct?

10   A.   Yes.

11   Q.   How long were you at the store that day?

12   A.   Total, or up until that point?

13   Q.   Up to that point.  Sorry.

14   A.   45 minutes to an hour, probably, at that point.

15   Q.   You watched this lady and this gentleman come in, and they

16   appeared to you to be suspicious?

17   A.   Eventually, yes.

18   Q.   Eventually because they picked up the turkey roast pan and

19   so forth?

20   A.   Yes.

21   Q.   Did you -- when you seized these machines, did you

22   preserve them for fingerprint analysis?

23   A.   No, I don't believe I had them printed.

24   Q.   Were you by yourself that day when you were watching these

25   videos?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes, at that point, I was.

 2   Q.   At what point did you get backup?

 3   A.   At what point?

 4   Q.   Yes.

 5   A.   Probably a minute or two after I confronted the suspects.

 6   Q.   Using your own hand-held radio?

 7   A.   No.  It was my partner called them, who was -- I had

 8   called them and told them that the suspects were here, and he

 9   called uniform patrol to come respond.

10   Q.   This is while you're watching them pick up a roast pan and

11   so forth?

12   A.   During that time frame, yes.

13   Q.   Did you yourself run the DMV plates on this Land Rover?

14   A.   Are you referring to the vehicle from the ticket, sir?

15   Q.   Let me rephrase the question.

16        You have identified Exhibit 364 as a DMV printout.

17   A.   Yes.

18   Q.   Recall that?  Do you recall that?

19   A.   Yes, I do.

20   Q.   And did you run that yourself to get that printout?

21   A.   No, I did not.

22   Q.   You testified about it based on your familiarity with

23   these sorts of things?

24   A.   Yes.

25   Q.   You didn't ask -- strike that.
```

```
 1        On that date, when you spoke with Mr. Bakhchadjian, did
 2   you -- did you notice that he was driving someone else's car?
 3   A.   Yes, I did.
 4   Q.   Did you ask him about that?
 5   A.   He would not talk to me.
 6           MR. SEVERO:  That's all I have.  Thank you.
 7           MR. PEREYRA-SUAREZ:  I have no questions, your Honor.
 8           THE COURT:  Counsel.
 9           MR. FLIER:  I have no questions, your Honor.
10           THE COURT:  Okay.  You may step down.
11        Oh, I'm sorry.  Did you want redirect, Counsel?
12           MR. ESTRADA:  No, thank you.  No, thank you, your
13   Honor, but thanks for asking.
14           THE COURT:  Okay.
15           MR. ESTRADA:  Your Honor, the government would call
16   Larry Pitcher to the stand.
17           THE CLERK:  Good afternoon.  Right here to be sworn,
18   please.
19        (Witness sworn.)
20           THE CLERK:  Thank you.  You may be seated.
21        May I please ask that you state your full name for the
22   record and spell your last name.
23           THE WITNESS:  Lawrence Pitcher, P-i-t-c-h-e-r.
24           THE CLERK:  Thank you.
25           THE COURT:  Okay.  You may inquire.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Thank you, your Honor.
 2          LAWRENCE PITCHER, GOVERNMENT'S WITNESS,
 3                   DIRECT EXAMINATION
 4   BY MR. ESTRADA:
 5   Q.   Sir, where do you work?
 6   A.   For the Huntington Beach Police Department.
 7   Q.   How long have you worked for the Huntington Beach Police
 8   Department?
 9   A.   15 years.
10   Q.   Before that time, did you have other law enforcement
11   experience?
12   A.   Yes.
13   Q.   About how many years of law enforcement experience?
14   A.   Prior or total?
15   Q.   Say total.
16   A.   19.
17   Q.   19 years total?
18   A.   Yes.
19   Q.   Currently, what's your assignment with the Huntington
20   Beach Police Department?
21   A.   I'm assigned to the high-tech crimes lab.
22   Q.   Now, turning your attention to 2009, what area in the
23   Huntington Beach Police Department were you assigned to?
24   A.   To the bunco forgery unit.
25   Q.   Now, during your time as an officer, the 19 years total,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    had you conducted searches in the past?

 2    A.    Yes.

 3    Q.    Approximately how many searches would you say you've done

 4    in the past at that point in 2009?

 5    A.    Thousands.

 6    Q.    Now, I'd like to have you turn your attention to the time

 7    frame of August 2009.  Do you have that time frame in mind?

 8    A.    Yes.

 9    Q.    At some point did you learn about a fraud against

10    customers of 99 Cents Only Stores?

11    A.    Yes.

12    Q.    And involving two stores in Huntington Beach?

13    A.    Yes.

14    Q.    Did you learn at some point that two suspects were

15    arrested on August 24th, 2009?

16    A.    Yes.

17    Q.    Did you conduct a search related to those two suspects

18    being arrested?

19    A.    Yes.

20    Q.    What search was that?

21    A.    Search of a 2002 BMW X5.

22    Q.    Generally speaking, what kind of car was that?

23    A.    Like a SUV, a small SUV.

24    Q.    Did that search occur on August 24th, 2009?

25    A.    No.
```

```
1    Q.   When did it occur?

2    A.   The 25th, August 25th.

3    Q.   The next day?

4    A.   Yes, the next day.

5    Q.   Between the time when -- well, let me back up.  Was it

6    seized on August 24th?

7    A.   Yes.

8    Q.   Between the time when it was seized and to August 25th

9    when you did your search, was it preserved and kept in

10   Huntington Beach custody?

11   A.   Yes.  It was sealed with evidence tape across all the

12   doors and then towed to the back lot of Huntington Beach Police

13   Department.

14   Q.   Now, when you searched this BMW X5, did you find any items

15   of evidence inside?

16   A.   Yes.

17   Q.   What sorts of items of evidence did you find?

18   A.   Some cell phones, credit cards, a wallet, some clothing.

19   Q.   Did you find a Garmin device?

20   A.   Yes.

21   Q.   Please take a look at Exhibit 362.

22        And with the Court's permission, perhaps it would be

23   easier if I mentioned now, I'll be using 362 and 361, please,

24   which are both physical exhibits.

25             THE CLERK:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          I'll hand them to you.

2               THE WITNESS:  Okay.

3               THE CLERK:  362 first?

4               MR. ESTRADA:  Please.

5     Q.   Now, looking at 362, what is Exhibit 362?

6     A.   362 is a Garmin GPS unit.

7     Q.   Generally speaking, are you familiar with these types of

8     units?

9     A.   Yes.

10    Q.   Can they be used to find locations?

11    A.   Yes.

12    Q.   Now, please take a look at Exhibit 361.

13    A.   Any specific item or all of them?

14    Q.   If you could just generally say what's in Exhibit 361.

15    A.   There are five cell phones.

16    Q.   Were these five cell phones you found inside the BMW X5 on

17    August 25th, 2009?

18    A.   Yes.

19    Q.   Do they appear to be fairly in the same condition as when

20    you found them?

21    A.   Yes.

22               MR. ESTRADA:  Your Honor, the government moves to

23    admit Exhibit 361 and Exhibit 362 at this time.

24               THE COURT:  They'll be received.

25          (Received in evidence, Exhibits 361 and 362.)

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MR. ESTRADA:

2    Q.   Now, among those cell phones, is there an LG cell phone?

3    A.   Yes, there is.

4    Q.   Do you recall where you found that within the BMW X5?

5    A.   On the rear passenger floorboard behind the driver's seat.

6    Q.   Based on where it was found, did it appear accessible to

7    the driver?

8    A.   Yes.

9         MR. SEVERO:  Objection.  Objection, calls for

10   speculation.

11        THE COURT:  Overruled.  You can cross-examine on that.

12   Overruled.

13   BY MR. ESTRADA:

14   Q.   Were there other cell phones found as well?

15   A.   Yes.

16   Q.   Were there cell phones found in the passenger door area?

17   A.   Yes.

18   Q.   What cell phones were those?

19   A.   There was a Samsung cell phone and then a Blackberry cell

20   phone.

21   Q.   Now, with regard to the final two cell phones, where were

22   those found?

23   A.   On top of the center console.

24   Q.   What type were those?

25   A.   They were both Motorolas.  One was black.  One was silver.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   All these items you just testified about, Exhibit 361,

2   Exhibit 362, were those booked into evidence?

3   A.   Yes.

4   Q.   Did you participate any further in terms of the

5   investigation in this case?

6   A.   No.

7   Q.   Were the phones eventually turned over to the FBI?

8        MR. SEVERO:  Objection, calls for speculation,

9   hearsay.

10       THE COURT:  Unless you turned them over personally.

11  Do you know who turned them over?

12       THE WITNESS:  No, I do not, sir.

13       THE COURT:  Okay.  Sustained.

14       MR. ESTRADA:  Your Honor, no further questions.

15       THE COURT:  Okay.  Cross.

16       MR. SEVERO:  Thank you.

17                     **CROSS-EXAMINATION**

18  BY MR. SEVERO:

19  Q.   Afternoon, sir.

20  A.   Good afternoon, sir.

21  Q.   The Garmin unit that you found, where was it?

22  A.   It was in the glove compartment.

23  Q.   In a -- was the glove compartment unlocked?

24  A.   Yes.

25  Q.   Did you -- how did you get into the car?

```
1    A.   You know, I believe we used the keys to get into it.

2    Q.   You're not sure?

3    A.   Not sure.  I was with Detective Johnson, and he was -- he

4    may have opened it.  I don't remember opening it.

5    Q.   There were two of you doing the search?

6    A.   Correct.

7    Q.   Was it you, though, that found these -- these particular

8    items?

9    A.   Yes, sir.

10   Q.   The cell phones, if I get this correctly, one of them was

11   on a rear floorboard?

12   A.   Yes, sir.

13   Q.   Is that a rear floorboard that's directly behind the

14   driver?

15   A.   Yes, sir.

16   Q.   So that in order for a driver to reach that, he has to go

17   across and bend down --

18        I'm trying to imitate what might be happening.

19   A.   I -- yes, yes.

20   Q.   -- and try to -- try to reach that.

21   A.   Yes.

22   Q.   Is that correct?

23   A.   Yes, sir.

24   Q.   And this is an X5?

25   A.   The vehicle, sir?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    Yes.

2    A.    Yes.

3    Q.    I'm sorry, the vehicle.

4    A.    Yes.

5    Q.    It's not the smallest BMW, it's a -- sort of a midsize

6    SUV, right?

7    A.    I guess.  I'm not too familiar with all the different

8    types.

9    Q.    Okay.  You're a large man.  Are you able to fit into the

10   X5 comfortably?

11   A.    I didn't sit in it, and I don't own one, so I don't know.

12   Q.    Did you have to open the rear driver's door, driver's-side

13   door in order to get that phone?

14   A.    I -- yes.

15   Q.    And when you found it, was it in the middle of the

16   floorboard?  Middle of the floor?

17   A.    Yes, just sitting right -- right in the middle.  It wasn't

18   underneath anything.

19   Q.    Nor was it closer to the center, it was sort of in the

20   middle?

21   A.    Correct.

22   Q.    The other cell phones were on the console?

23   A.    Two of them were, yes.

24   Q.    Did you search the phones?

25   A.    No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. SEVERO:  That's all I have.  Thank you.

 2            THE WITNESS:  Thank you.

 3            MR. PEREYRA-SUAREZ:  I have nothing, your Honor.

 4            THE COURT:  Counsel.

 5            MR. FLIER:  I have no questions, your Honor.

 6            THE COURT:  Redirect?

 7            MR. ESTRADA:  No further questions, your Honor.

 8            THE COURT:  You may step down.  Thank you very much

 9    for coming in, sir.

10            THE WITNESS:  Thank you, sir.

11            THE COURT:  Next witness.

12            MR. ESTRADA:  Your Honor, the government calls

13    Dave McCain.

14        (Witness sworn.)

15            THE CLERK:  Thank you.  You may be seated.

16        May I please ask that you state your full name for the

17    record and spell your last name.

18            THE WITNESS:  David Lyle McCain, M-c-C-a-i-n.

19            THE CLERK:  Thank you.

20            THE COURT:  You may inquire.

21            MR. ESTRADA:  Thank you, your Honor.

22                DAVID MCCAIN, GOVERNMENT'S WITNESS,

23                        DIRECT EXAMINATION

24    BY MR. ESTRADA:

25    Q.   Sir, where do you work?
```

1   A.   Currently, I work for a private company in Orange County,

2   California.

3   Q.   What do you do for the private company?

4   A.   I'm the vice president for digital forensics.

5   Q.   Now, prior to this job with the private company, did you

6   work for the Huntington Beach Police Department?

7   A.   Yes.

8   Q.   About how long did you work for them?

9   A.   Just over 20 years.

10  Q.   Before that, did you have other law enforcement

11  experience?

12  A.   Yes.

13  Q.   What sort of law enforcement experience?

14  A.   I was a police officer for the City of Downey for three

15  years.

16  Q.   Now, during the time you were in the Huntington Beach

17  Police Department, were you in a particular crime unit?

18  A.   Yes.

19  Q.   Are you familiar with the high-tech crime unit?

20  A.   Yes.

21  Q.   Were you part of that?

22  A.   Yes.

23  Q.   What's the high-tech crime unit?

24  A.   We investigated high-tech crimes and performed forensics

25  on cell phones, computers, and other digital devices.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.    How long were you with the high-tech crime unit?

2   A.    Over 12 years.

3   Q.    Now, you mentioned that during your time in the high-tech

4   crime unit, you did forensic examinations of cell phones and

5   computers.

6   A.    Correct.

7   Q.    Did you receive training in doing those types of

8   examinations?

9   A.    Yes.

10  Q.    And did you actually have experience conducting forensic

11  examinations of, first, cell phones?

12  A.    Yes.

13  Q.    About how many cell phones would you say you'd examined

14  during your time at the Huntington Beach Police Department?

15  A.    Thousands.

16  Q.    Now, in searching a cell phone, doing a forensic

17  examination of a cell phone, is there a particular program

18  that's used?

19  A.    There's a variety of tools we use.  It depends on the

20  phone, and depending on the type of phone depends on which tool

21  we will use.

22  Q.    Are you familiar with a tool known as Cellebrite?

23  A.    Yes.

24  Q.    Had you used Cellebrite in the past?

25  A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Had you been trained in using Cellebrite?

2    A.    Yes.

3    Q.    Had you had experience using Cellebrite?

4    A.    Yes.

5    Q.    What is Cellebrite?

6    A.    Cellebrite is a tool.  It's an actual device and software

7    program that you can connect a phone to.  You might have seen

8    it like in a Verizon store when you take an old phone in and

9    they connect it to this little box that's got a screen and then

10   it transfers your old contacts to the new phone.

11        It's the same device, but they make one for law

12   enforcement, which is forensically sound, which prevents you

13   from changing any data on the original phone.  And we basically

14   collect the data from that phone, and it puts it into a report

15   format where you can review it and sort it and provide it to

16   investigators as a report.

17   Q.    You mentioned there is a law enforcement version of

18   Cellebrite and that ensures that you can't change data on the

19   phone.

20   A.    Correct.

21   Q.    What does that mean?

22   A.    In digital forensics, we never want to change the original

23   data, so we always used software or hardware that prevents our

24   computers or our systems from changing any data on the original

25   media, whether it's a computer hard drive or a cell phone.  We

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    always want to prevent our systems from changing any data, so

2    that way we preserve it in a state that we received it in.

3    Q.    Now, does Cellebrite extract data from a cell phone?

4    A.    Yes.

5    Q.    Are you familiar with the area in a cell phone known as

6    contacts or phone contacts?

7    A.    Yes.

8    Q.    Does Cellebrite extract the phone contact information from

9    a cell phone?

10   A.    Depending on the make and model of the phone, it will,

11   yes.

12   Q.    Can you explain that, what the cell phone contact

13   information would be.

14   A.    Again, depending on the manufacturer of the phone, the

15   model, the operating system on the phone, typically the

16   contacts will be in some form of a database on that phone.

17   And Cellebrite, depending on the make and model, will know

18   where that database is -- can be found, what its signature is,

19   and it knows how to read the database, and then it will read

20   it and present it to you as the examiner in a format that's

21   readable.

22   Q.    When you say a readable format, is that some sort of

23   report?

24   A.    Yes.

25   Q.    Now I want to turn your attention to an investigation in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   this case.  At some point did you learn about a fraud scheme

2   being perpetrated against customers of 99 Cent Only Stores?

3   A.   Yes.

4   Q.   Did you conduct searches of cell phones related to that

5   investigation?

6   A.   Yes.

7   Q.   And specifically on August 25th of 2009, did you analyze

8   cell phones connected to that investigation?

9   A.   Yes.

10  Q.   Were you aware of where those cell phones had come from?

11  A.   Generally, yes.

12  Q.   Where was that?

13       MR. SEVERO:  Objection, hearsay.

14       THE COURT:  Sustained.

15  BY MR. ESTRADA:

16  Q.   Were you aware that cell phones had been seized during the

17  investigation?

18  A.   Yes.

19  Q.   And you said you investigated many cell phones?

20  A.   Thousands, yes.

21  Q.   Well, with regard to this case.

22  A.   Oh, in this case?  There were several phones in this case.

23  Q.   Do you remember analyzing an LG cell phone?

24  A.   Yes.  I believe it was a LG VX10000.

25  Q.   Now, please take a look, if you would, at Exhibit 361, and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    that's one of the physical exhibits.

2        With the Court's permission.

3            THE CLERK:  Oh, it's physical?  Okay.

4            MR. ESTRADA:  And your Honor, 361 has been previously

5    admitted.

6            THE COURT:  Okay.

7    BY MR. ESTRADA:

8    Q.   Now, looking briefly at Exhibit 361, are those the cell

9    phones you analyzed on August 25th, 2009?

10   A.   Yes.

11           THE COURT:  For the record, you've removed five cell

12   phones; is that correct?

13           THE WITNESS:  Yes, your Honor.

14           THE COURT:  Okay.  Next question.

15   BY MR. ESTRADA:

16   Q.   Now, with regard to the LG phone in particular, did you

17   analyze that using Cellebrite?

18   A.   Yes.

19   Q.   Was a report prepared?

20   A.   Yes.

21   Q.   Okay.  Please take a look at Exhibit 365, and this one

22   should be in one of the black binders behind you or in front of

23   you.

24           THE CLERK:  I'm sorry.  Actually, I have it here.

25           THE WITNESS:  You said 365?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:

 2   Q.   365.

 3   A.   Okay.

 4   Q.   Have that in front of you?

 5   A.   Yes.

 6   Q.   What's 365?

 7   A.   365 is the report generated by Cellebrite on that

 8   particular make and model of phone.

 9   Q.   On the LG phone?

10   A.   Correct.

11   Q.   The one you analyzed on August 25th, 2009?

12   A.   Correct.

13        MR. ESTRADA:  Your Honor, the government moves to

14   admit Exhibit 365 and requests permission to publish.

15        MR. FLIER:  I object, your Honor, hearsay and no

16   foundation.

17        THE COURT:  Overruled.

18        MR. ESTRADA:  Permission to publish, your Honor?

19        THE COURT:  Yes.

20        (Received in evidence, Exhibit 365.)

21   BY MR. ESTRADA:

22   Q.   Now, looking just generally at the first page, see that

23   first page, "Examination Report Details"?

24   A.   Yes.

25   Q.   D. McCain, number 1121, is that you?
```

```
 1    A.    Correct.

 2    Q.    Then towards the bottom, that's selected model LG VX10000

 3    Voyager.  Is that the type of cell phone you analyzed?

 4    A.    Correct.

 5    Q.    Now, within the report, is there a section that is listed

 6    "Phone Contacts"?

 7    A.    Yes.

 8    Q.    What does that mean?

 9    A.    That Cellebrite, while analyzing the memory on the phone,

10    found a database containing contacts, and it read the data

11    within that database and presented it in the report.

12    Q.    Now, based on your knowledge of Cellebrite, looking at the

13    first entry there, when it says "Hovo sister," is that

14    something Cellebrite creates?

15    A.    No.

16    Q.    Where does that come from?

17    A.    That is user input data.

18    Q.    And by "user," do you mean the person who had the cell

19    phone?

20    A.    Correct.

21    Q.    And there's a mobile -- there's a bunch of numbers after

22    "mobile."  What does that correspond to?

23    A.    The number that's put into the contact for that name by

24    the same user -- or a user.

25    Q.    Is that something that Cellebrite does, or does it come
```

1    from the user?

2    A.   Comes from the user.

3    Q.   Now I'd like to show you entry No. 28.  You have that in

4    front of you?

5    A.   Yes, sir.

6    Q.   Where it says here, "Mher Hayko," do you have that in

7    front of you?

8    A.   Correct.

9    Q.   Is that something you created?

10   A.   No.

11   Q.   Is that something Cellebrite created?

12   A.   No.

13   Q.   Does that come from the user?

14   A.   Yes.

15   Q.   And this number here, 310-779-1177, is that something you

16   created?

17   A.   No.

18   Q.   Something Cellebrite created?

19   A.   No.

20   Q.   Where did that come from?

21   A.   The user.

22   Q.   Now, if I could just briefly show you an exhibit that's

23   already been admitted, Exhibit 161, which should be in the

24   binder in front of you.

25        And your Honor, if I could publish the first page of 161.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Yes.

 2              THE WITNESS:  161's not in this particular book.  Is

 3     it behind me?

 4              MR. ESTRADA:  It's Volume 3, but I'll -- it's been

 5     admitted, so I'm going to publish it.

 6              THE WITNESS:  Okay.

 7              MR. ESTRADA:  It'll be on the screen in front of you.

 8     Q.   You see that number, 310-779-1177, on the Cellebrite

 9     report?

10     A.   Yes.

11     Q.   Now, looking at the first page of 161, do you see that

12     same phone number depicted there?

13     A.   Yes.

14     Q.   And here under "Target Number"?

15     A.   Yes.

16              MR. ESTRADA:  No further questions, your Honor.

17              THE COURT:  Cross?

18              MR. SEVERO:  May I have a moment, your Honor?

19              THE COURT:  Certainly.

20                        CROSS-EXAMINATION

21     BY MR. SEVERO:

22     Q.   Afternoon, sir.

23     A.   Good afternoon.

24     Q.   Is this the entire report that was generated by

25     Cellebrite?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    For that phone?

2    Q.    Oh, yes.

3    A.    Yes.

4    Q.    Well, let me -- let me ask you differently.  Is this a

5    report for only the one phone, LG?

6    A.    Correct.

7    Q.    So did you generate reports for the other phones?

8    A.    Yes.

9    Q.    All five?

10   A.    If I was able to obtain the data from the phone, yes.

11   Q.    Okay.  Do you recall not obtaining data from some of these

12   phones?

13   A.    I don't remember.

14   Q.    When did you -- strike that.

15         At some point were you asked to turn this report, the

16   one -- 365 in evidence, to a member of the FBI?

17   A.    Not directly.

18   Q.    All right.  So at some point you turned the report over to

19   someone in your department?

20   A.    Yes.

21   Q.    And based on -- you turned that report over based on an

22   understanding that the FBI wanted it?

23   A.    I have no independent information of whether the FBI

24   wanted it or not.

25   Q.    Who did you turn it over to?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    I turned it in to my records bureau to be filed with the

2    department.

3    Q.    All right.  So you would have turned in all five reports?

4    A.    If I had all five, yes.

5    Q.    If you don't generate a report, does it generate a report

6    that says no report can be generated?

7    A.    No.  I mean, there will be something on the screen or

8    while we're preprocessing the phone to determine if Cellebrite

9    will process the phone.  We usually know ahead of time that it

10   can be covered or not.  So if we can't cover it, then we don't

11   connect it to Cellebrite and process it.

12   Q.    Does it tell you on this report who is the user of the

13   phone?

14   A.    No.

15   Q.    Does it tell you what calls went out on a particular day?

16   A.    I don't remember if this particular report had that

17   information or not.

18          MR. SEVERO:  May I publish page 9 of this report?

19          THE COURT:  Yes.

20   BY MR. SEVERO:

21   Q.    May I ask you to look at this.  There's something called

22   "Phone, Outgoing Calls List."  Do you see that?

23   A.    Yes, sir.

24   Q.    Is that the report that generates -- strike that.

25          Is that the report about outgoing calls?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.
 2   Q.   And does it show, in the outgoing calls, that -- the date
 3   of the calls?
 4   A.   No, it does not.
 5   Q.   Any of this -- I'm tempted to call it gibberish because
 6   that's what it is to me, but all the stuff here, does it tell
 7   you anything about the dates of the calls or --
 8   A.   No.  What that is, the hash value is a digital fingerprint
 9   of the data, so that when the data's collected, it gives it a
10   digital fingerprint.  And if somebody after the fact went in
11   and tried to change that data, that fingerprint would change,
12   and you would know somebody altered it.
13   Q.   I see.
14   A.   So that's just a preservation tool used by Cellebrite.
15   Q.   All right.  So the period of time -- and I'll represent to
16   you that page 10 contains additional number of outgoing calls.
17   In fact, I'll show it to you.
18        If I may, your Honor.
19            THE COURT:  Yes.
20   BY MR. SEVERO:
21   Q.   There are -- the page that follows page 9 is page 10,
22   surprisingly, and you see that there is a total of 44 outgoing
23   calls?  You see that?
24   A.   Yes.
25   Q.   Is that the number of calls for a particular span of time?
```

1   A.   Well, there's some reasons why there might only be 44, and

2   this particular reason, one, back --

3   Q.   Let me ask you first --

4   A.   Okay.  Sorry.

5   Q.   -- before you get there, because I -- generally, when you

6   download the data from the phone, does it give you all the

7   outgoing calls for a specific span of time?

8   A.   Usually it'll give you whatever is in the database, no

9   matter the span of time.

10  Q.   So if the phone is programmed to only keep the last 44

11  calls, that's all you're going to get?

12  A.   With this particular version of Cellebrite at that time,

13  yes.

14  Q.   If there had been a hundred calls, would it show here?

15  A.   If they were active and not deleted and the database

16  contained those calls, then yes.

17  Q.   It would have?

18  A.   Yes.

19  Q.   All right.  But we still don't know the time period for

20  these calls, do we?

21  A.   No.

22  Q.   It's just whatever is in the phone at that time?

23  A.   And what Cellebrite at that time was able to interpret --

24  Q.   Right.

25  A.   -- and produce.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   But it's fair to say that if the phones were seized, for

2   example, on August 24th, 2009, you conducted your search on --

3   or your --

4   A.   Analysis?

5   Q.   -- your anal- -- thank you -- your analysis on the 25th,

6   there would have been no calls from the time it was seized

7   until the time it was analyzed?

8   A.   As long as the phone was off, yes, that's correct.

9   Q.   All right.  So at the very least, on August 24th, 2009,

10  this -- these would have been the calls that were in the

11  database on the phone?

12  A.   Correct.

13  Q.   When the phone was seized and turned off, this is the --

14  it froze these calls into the database, correct?

15  A.   Correct.

16  Q.   That's also true for --

17       May I republish 10?

18           THE COURT:  Yes.

19           MR. SEVERO:  Page 10?

20  Q.   -- the missed calls, correct?

21  A.   Correct.

22  Q.   All of these reports are essentially -- is data that was

23  in the phone on August 24th, 2009, when it was seized?

24  A.   Correct.

25  Q.   You don't have this exhibit in front of you?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No, I do not.

 2              MR. SEVERO:  May I republish 9, page 9?

 3              THE COURT:  Yes.

 4    BY MR. SEVERO:

 5    Q.    Do you recall earlier you were directed to a phone number,

 6    310-779-1177?  Recall that?

 7    A.    Yes.

 8    Q.    Do you see it on page 9 of 15, the first page of the

 9    outgoing calls list?

10    A.    I do not.

11              MR. SEVERO:  And if I may show him page 10, your

12    Honor.

13              THE COURT:  Yes.

14              MR. SEVERO:  If I can find it.

15    Q.    The second page.  You see it there at all, sir?  Does it

16    need to be closer?

17    A.    Umm, I do not see it.

18              MR. SEVERO:  That's all I have.  Thank you.

19              THE COURT:  Counsel?

20              MR. PEREYRA-SUAREZ:  No questions, your Honor.

21              MR. FLIER:  Very briefly, your Honor.

22              THE COURT:  Yes.

23              MR. FLIER:  Thank you.

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**CROSS-EXAMINATION**

BY MR. FLIER:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   I'm terrible in electronics, so I just want to ask.
Cellebrite, is that the program or whatever you're using to
garnish the information from the item, the phone?

A.   Yes.

Q.   Do you work for Cellebrite?

A.   I work for a company that contracts with Cellebrite that
provides certification training for users of the tool.

Q.   But you're not gainfully employed by that company, are
you?

A.   I'm not.

Q.   Now, you conducted the examination, I think it was
August 25th of '09; is that correct?

A.   Sounds about right, yes.

Q.   And it was five phones, the five that were shown to you
today; is that correct?

A.   Correct.

Q.   During the course of this case, are those the only phones
you have ever been shown to try to do any type of analysis?

A.   To my knowledge, yes.

Q.   So you have no information that you were shown regarding
phone records for the month of July of '09; am I correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    That is correct.

 2    Q.    Were you told, after you used the program to acquire the

 3    data, the exhibit that was in front of you, to look for

 4    specific phone numbers?

 5    A.    No.

 6              MR. FLIER:  I have no further questions.  Thank you.

 7              THE COURT:  Redirect.

 8              MR. ESTRADA:  No questions, your Honor.

 9              THE COURT:  You may step down.  Thank you very much

10    for coming in.

11              THE WITNESS:  Thank you, your Honor.

12              THE COURT:  Next witness.

13              MS. YANG:  Yes, your Honor.

14         The government's next witness is an in-custody witness,

15    Gustavo Ortega.

16              MR. ESTRADA:  Your Honor, if I can be excused briefly

17    to check on a witness.

18              THE COURT:  Yes.

19              THE CLERK:  You can be seated.

20         (Witness sworn.)

21              THE CLERK:  Thank you.

22              THE COURT:  I don't know if you can or not, but get

23    the microphone closer to you so it can pick up your voice.

24    Thank you very much.

25         You may go ahead.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE CLERK:  I'm sorry.  May I ask that you please

 2    state your full name for the record and spell your last name.

 3              THE WITNESS:  Gustavo Ortega, O-r-t-e-g-a.

 4              THE CLERK:  Thank you.

 5              THE COURT:  Okay.  You may inquire.

 6              MS. YANG:  Thank you, your Honor.

 7              GUSTAVO ORTEGA, GOVERNMENT'S WITNESS,

 8                       DIRECT EXAMINATION

 9    BY MS. YANG:

10    Q.   Good afternoon, Mr. Ortega.

11    A.   Good afternoon.

12    Q.   In addition to the name you just gave, Gustavo Ortega, are

13    you also known by any other names?

14    A.   Yes, ma'am.

15    Q.   And what names would those be?

16    A.   It would be "Gus," "Bam Bam," or "Bams."

17    Q.   And by "Bams," you mean B-a-m-s?

18    A.   Yes, ma'am.

19    Q.   And, obviously, are you currently incarcerated?

20    A.   Yes, ma'am.

21    Q.   And are you incarcerated based on charges in this case?

22    A.   Yes, ma'am.

23    Q.   Now, have you pled guilty to those charges?

24    A.   Yes, ma'am.

25    Q.   And what charges have you pled guilty to?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   To wire fraud, bank fraud, the RICO, and there's one more,

 2   but I don't remember what it is.

 3   Q.   Did you plead guilty to aggravated identity theft?

 4   A.   Yes, ma'am.

 5   Q.   Now, is this the first time you've been in trouble with

 6   the law?

 7   A.   No, ma'am.

 8   Q.   Do you have prior convictions?

 9   A.   Yes, ma'am.

10   Q.   For what?

11   A.   For drug sales, guns, traffic tickets, other sorts --

12   other sorts of criminal activity.

13   Q.   Let's take those one by one.

14        You mentioned you have prior convictions for drug dealing;

15   is that correct?

16   A.   Yes, ma'am.

17   Q.   Approximately how many prior convictions do you have for

18   drug dealing?

19   A.   I believe approximately three or four.

20   Q.   Now, and you mentioned firearms --

21   A.   Yes, ma'am.

22   Q.   -- correct?

23        Do you have prior convictions for being a felon in

24   possession of firearms?

25   A.   Yes, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Approximately how many times have you been convicted of

2   that offense?

3   A.   Two or three.

4   Q.   And you mentioned traffic violations, correct?

5   A.   Yes, ma'am.

6   Q.   Do those include driving under the influence or DUI

7   convictions?

8   A.   I have one of those, ma'am.

9   Q.   Now, have you ever been convicted of any sort of theft

10  offenses, such as burglary or grand theft?

11  A.   Yes, ma'am.

12  Q.   Approximately how many times?

13  A.   Two.  Approximately two.

14          THE COURT:  Was that including the one that you've

15  presently pled guilty to?

16          MS. YANG:  Thank you, your Honor.  I will clarify.

17          THE COURT:  Okay.

18  BY MS. YANG:

19  Q.   Does that include the present conviction?

20  A.   Yes.

21  Q.   Now, do you have -- let me break that up.  Do you have

22  prior burglary convictions?

23  A.   Yes, ma'am.

24  Q.   Approximately how many?

25  A.   Two.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And do you have a prior grand theft conviction?

2    A.    Yes, ma'am.

3    Q.    And is that a state conviction?

4    A.    Yes, ma'am.

5    Q.    And did that involve access device cards?

6    A.    Yes, ma'am.

7    Q.    And that's separate and apart from your current

8    convictions here; is that correct?

9    A.    Yes, that's correct, ma'am.

10   Q.    Now, given your multiple prior convictions and the fact

11   you're incarcerated, have you ever been released on parole?

12   A.    Yes, ma'am.

13   Q.    And while you've been out on parole, have you violated

14   your parole?

15   A.    Yes, ma'am.

16   Q.    Approximately how many times?

17   A.    Three.

18   Q.    Now, separate and apart from the criminal conduct for

19   which you've been convicted, have you engaged in other criminal

20   activity for which you have not been arrested or convicted?

21   A.    Yes, ma'am.

22   Q.    And what generally -- what general types of criminal

23   activity would that be?

24   A.    More fraud, credit cards, drug sales.  Different --

25   different types of crime, ma'am.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Now, when you talk about other fraud crimes, are those

2   just -- apologize -- are those specific to credit cards or

3   debit cards?

4   A.   Yes, ma'am.

5   Q.   Have you engaged in any sort of fraud crimes involving

6   checks?

7   A.   Yes, ma'am.

8   Q.   Now, are you a member of a gang, Mr. Ortega?

9   A.   Not -- not now, but yes, I was a member of a gang, ma'am.

10  Q.   And what gang were you a member of?

11  A.   Little Hill gang.

12  Q.   For approximately how long were you a member of the

13  Little Hill gang?

14  A.   22 years.

15  Q.   And approximately how old are you now?

16  A.   I'm 44, ma'am.

17  Q.   So half your life?

18  A.   Yes, ma'am.

19  Q.   Now, the Little Hill gang, is that a Hispanic gang?

20  A.   Yes, ma'am.

21  Q.   And is the Little Hill gang affiliated with the

22  Mexican Mafia in any way?

23  A.   Yes, ma'am.

24  Q.   Could you please explain.

25  A.   Well, all southern gangs are related to the Mexican Mafia.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    They're under the Mexican Mafia control.
 2              MR. SEVERO:  Move to strike that.  No foundation of
 3    this witness.
 4              THE COURT:  Overruled.
 5    BY MS. YANG:
 6    Q.   Now, the Little Hill gang of which you are a member,
 7    Mr. Ortega, is that a southern gang?
 8    A.   Yes, ma'am.
 9    Q.   And based on your 22 years in the Little Hill gang, do you
10    know it to be affiliated or associated with the Mexican Mafia?
11    A.   Yes, ma'am.
12    Q.   Now, in fact, what was your position within the
13    Little Hill gang?
14    A.   I was one of the higher-rank members, ma'am.
15    Q.   And are you familiar with the term "shot-caller"?
16    A.   Yes, ma'am.
17    Q.   Were you considered a shot-caller of the Little Hill gang?
18    A.   You can consider that, yes, ma'am.
19    Q.   And what is a shot-caller?
20    A.   A shot-caller is a person that directs other gang members
21    and makes decisions amongst the gang.
22    Q.   Now, as a shot-caller of the Little Hill gang, did you
23    have direct contact with Mexican Mafia members?
24    A.   Not myself, but prior other shot-callers have.
25    Q.   And did the Little Hill gang have to pay taxes or rent to
```

1    the Mexican Mafia?

2    A.    Yes, ma'am.

3    Q.    Was there a particular member during the time you were a

4    member of Little Hill gang that the gang paid taxes to?

5    A.    Can you repeat that question to me once more?

6    Q.    I apologize, it was not clear.

7          During the time you were a shot-caller of the Little Hill

8    gang, was there a particular Mexican Mafia member to whom the

9    gang paid taxes or rent?

10   A.    Yes, ma'am.

11   Q.    And who was that?

12   A.    That was "Chuco" from VNE.

13   Q.    And "Chuco" is C-h-u-c-o; is that correct?

14   A.    Yes, ma'am.

15   Q.    And VNE, is that another Hispanic gang?

16   A.    Yes, another Hispanic gang, ma'am.

17   Q.    Now, how did the gang pay taxes or rent to the

18   Mexican Mafia?

19   A.    It all depend on what the gang had made prior on that

20   month, and then they would give approximately a third to the

21   Mexican Mafia member.

22   Q.    And when you say it depends on what the gang had made from

23   that month, is that from legal activity?

24   A.    No, that would be from criminal activities, ma'am.

25   Q.    And would the gang need to pay a percentage to the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Mexican Mafia regardless of the type of crime that was being

2   committed?

3   A.   Correct, ma'am.

4   Q.   Now, based on your time in the Little Hill gang and as a

5   shot-caller, did you know whether the Mexican Mafia was known

6   by a certain number?

7   A.   Yes, ma'am.  They were known by the 13.

8   Q.   And what, if anything, do you know about the Mexican Mafia

9   based on your experience as a shot-caller in the Little Hill

10  gang?

11  A.   Well, I know that the Mexican Mafia controls every

12  southern gang, and whether it's in the prison system or on the

13  streets, any gang that is a Sureño gang is -- carries the

14  number 13, which is the 13th letter of the Mexican Mafia -- of

15  the alphabet, which is M, that stands for the Mexican Mafia.

16  Q.   Now, are you familiar with Armenian Power?

17  A.   Yes, I am, ma'am.

18  Q.   And how are you familiar with Armenian Power?

19  A.   I know some of the associates -- some of the members, I'm

20  sorry.

21  Q.   So you know some of the members of Armenian Power?

22  A.   Yes, ma'am.

23  Q.   Based on your relationship with these members of

24  Armenian Power, do you know if Armenian Power is associated

25  with the Mexican Mafia?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Objection, calls for hearsay.

 2              THE WITNESS:  Yes, ma'am.

 3              MR. SEVERO:  No foundation, move to strike the answer.

 4              THE COURT:  Why don't you lay the foundation, Counsel.

 5         In fact, unfortunately, logistically, we still have to

 6    break, so let's break at this time, and we will come back in in

 7    15 minutes.

 8         Remember the admonishment not to discuss the case among

 9    yourselves.

10              THE CLERK:  All rise.

11         (Recess held from 2:32 p.m. to 2:47 p.m.)

12         (In the presence of the jury:)

13              THE COURT:  Okay.  The record will reflect that all

14    the jurors are in their respective seats in the jury box, the

15    witness is on the witness stand.

16         And Counsel, you may continue your direct examination.

17              MS. YANG:  Thank you, your Honor.

18    Q.   Mr. Ortega, before we took the afternoon break, you were

19    testifying about your familiarity with Armenian Power.  Do you

20    recall that?

21    A.   Yes, ma'am.

22    Q.   And I believe you testified that you knew members of

23    Armenian Power, correct?

24    A.   Correct, ma'am.

25    Q.   Who did you know who was a member of Armenian Power?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Mr. --
2              MR. SEVERO:  Objection.  That calls for hearsay.
3              THE COURT:  Overruled.
4              THE WITNESS:  Mr. Darbinyan.
5    BY MS. YANG:
6    Q.    Now, when you say "Mr. Darbinyan," what was this
7    individual's first name?
8    A.    Mike.
9    Q.    And did you know any other Armenian Power members other
10   than Mike Darbinyan?
11   A.    Yes, ma'am.
12   Q.    And who did you know?
13   A.    Another Mike, "V," Max.
14   Q.    Are these shorthand names that you knew these individuals
15   by?
16   A.    These are the names I knew the individuals by.
17   Q.    And we'll get to this later, but did you meet and get to
18   know these individuals during the course of engaging in certain
19   conduct with Mike Darbinyan?
20   A.    Correct, ma'am.
21   Q.    Now, based on your relationship with Mike Darbinyan and
22   your interactions with these other Armenian Power members, did
23   you know whether Armenian Power was associated with the
24   Mexican Mafia?
25   A.    Correct, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    And were they -- was Armenian Power associated with the

2    Mexican Mafia?

3              MR. SEVERO:  Hearsay.

4              THE WITNESS:  Yes, ma'am.

5              THE COURT:  Overruled.

6    BY MS. YANG:

7    Q.    Did you know Armenian Power by any other nicknames or

8    shorthand names?

9    A.    Just AP 13.

10   Q.    And based on your familiarity with Armenian Power, did

11   Armenian Power have a certain reputation?

12   A.    Yes, ma'am.

13   Q.    And what was that reputation?

14             MR. SEVERO:  Objection, hearsay.

15             THE WITNESS:  If --

16             THE COURT:  Overruled.

17             THE WITNESS:  They're, if not the most sophisticated

18   southern gang, or one of the most sophisticated southern gang

19   in making money.

20   BY MS. YANG:

21   Q.    So they're moneymakers, correct?

22   A.    Correct, ma'am.

23   Q.    Now, you testified that you know Mike Darbinyan.

24   A.    Correct, ma'am.

25   Q.    Approximately when did you meet him?  Was it several years
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    ago?  What year, generally, if you can recall?

 2    A.    Approximately '07, '08.

 3    Q.    Now, how did you know that Mike Darbinyan was

 4    Armenian Power?

 5    A.    I was in -- I was sent to him as someone to -- referred me

 6    to him to go and meet him, to go make money with him.

 7    Q.    And when you met --

 8          MR. SEVERO:  Move to strike the answer as

 9    nonresponsive.

10          THE COURT:  Overruled.

11    BY MS. YANG:

12    Q.    When you met Mike Darbinyan, did he introduce himself a

13    certain way?

14    A.    Yes, as "Capone" from AP.

15    Q.    Now, did you know Mike Darbinyan by any other names than

16    Mike or "Capone"?

17    A.    Mike.  Just Mike and "Capone."

18    Q.    Now, did you call Mike Darbinyan anything in particular?

19    A.    Yes, ma'am.

20    Q.    And what did you call him?

21    A.    "Papa."

22    Q.    And why did you call him "Papa"?

23    A.    That's a phrase for -- in -- in Spanish, for daddy in

24    English, and like the daddy of the bunch, you know, like.  That

25    was my -- my -- my little thing with him.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Was it a sign of respect?

2    A.   Very.  Yes, ma'am.

3    Q.   Now, having met Mike Darbinyan in approximately 2008, did

4    you spend time with him?

5    A.   Correct, ma'am.

6    Q.   And how frequently would you spend time with

7    Mike Darbinyan?

8    A.   Maybe three -- approximately three or four days out of the

9    week.

10   Q.   And when you spent time with Mike Darbinyan, was he

11   surrounded by other individuals?

12   A.   Yes, ma'am, at all time.

13   Q.   And based on your interactions with Mike Darbinyan, could

14   you observe how the other individuals acted around him?

15   A.   They were --

16           MR. SEVERO:  Calls for speculation.

17           THE WITNESS:  They were --

18           THE COURT:  Just a second.

19       It may be, depending on the answer.  I don't know what the

20   answer's going to be, so why don't you reask the question.

21           MS. YANG:  Yes, your Honor.

22   Q.   Mr. Ortega, did you observe how other individuals acted

23   around Mike Darbinyan?

24   A.   Umm, yes.  They were very --

25   Q.   Let me interrupt you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SEVERO:  Speculation.

 2              THE COURT:  Overruled.

 3  BY MS. YANG:

 4  Q.   So you actually personally observed this; is that correct?

 5  A.   Yes.

 6  Q.   What did you personally observe?

 7  A.   That they were waiting on him on any -- on anything he

 8  said, waiting to do what -- any -- anything he wanted to do.

 9  Q.   Now, based on your interactions with Mike Darbinyan and

10  personally observing how individuals around him acted, did you

11  have an understanding as to what Mike Darbinyan's position was

12  in Armenian Power?

13  A.   Yes.

14              MR. SEVERO:  Objection, hearsay.

15              THE COURT:  Overruled on hearsay.

16              THE WITNESS:  Yes, ma'am.

17              MR. SEVERO:  Calls for a conclusion, no foundation.

18              THE COURT:  Speculative, yes.  Sustained.

19  BY MS. YANG:

20  Q.   Based on your observations and your interactions with

21  Mike Darbinyan, what did you perceive his position to be?

22              MR. SEVERO:  Objection, irrelevant what his perception

23  is and --

24              THE COURT:  Sustained.  Sustained.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MS. YANG:

2    Q.   Mr. Ortega, you previously testified that you called

3    Mike Darbinyan "Papa" as a sign of respect; is that correct?

4    A.   Correct, ma'am.

5    Q.   Did you consider him a shot-caller?

6    A.   Yes, ma'am.

7          MR. SEVERO:  Objection.

8          THE COURT:  Overruled.

9    BY MS. YANG:

10   Q.   Now, based on your interactions with Mike Darbinyan, did

11   he ever tell you whether he paid taxes or rent to a

12   Mexican Mafia member?

13   A.   Yes, ma'am.

14   Q.   And what did he tell you?

15   A.   Umm, I don't know -- I -- I can't remember exactly the

16   conversation we had, but it had to do with paying rent, ma'am.

17          MR. SEVERO:  Move to strike the answer, speculation of

18   the witness after "but it had to do with paying" --

19          THE COURT:  Overruled.

20   BY MS. YANG:

21   Q.   So you had a conversation with Mike Darbinyan about him

22   paying rent or taxes to a Mexican Mafia member; is that

23   correct?

24          MR. SEVERO:  Objection, leading.

25          THE WITNESS:  Correct, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Sustained.  Sustained.

 2    BY MS. YANG:

 3    Q.    Mr. Ortega, did you ever have a conversation with

 4    Mike Darbinyan in which he told you which Mexican Mafia

 5    member --

 6            MR. SEVERO:  Objection.  She's leading him.

 7            THE COURT:  Overruled.

 8    BY MS. YANG:

 9    Q.    Did you have a conversation with Mr. Darbinyan in which he

10    told you which Mexican Mafia member he paid taxes to?  Do you

11    recall?

12    A.    Correct, ma'am.

13    Q.    Did you have that conversation?

14    A.    Yes, ma'am.

15    Q.    And who was that Mexican Mafia member?

16    A.    George Bustamante.

17    Q.    Now, in addition to spending time with Mr. Darbinyan in

18    person, did you also speak with him on the telephone

19    frequently?

20    A.    Yes, ma'am.

21    Q.    And did you always speak to Mr. Mike Darbinyan on the same

22    telephone, or did you have to call -- or did you receive calls

23    from a lot of different telephones?

24    A.    We'd speak on different telephones, ma'am.

25    Q.    During the time that you knew Mike Darbinyan, did you know
```

1    him to switch phones frequently?

2    A.   Every week or every two weeks, ma'am.

3    Q.   And did you ever have a conversation with Mike Darbinyan

4    about whether he believed he was being followed by law

5    enforcement?

6    A.   Yes, ma'am.

7    Q.   And what did he tell you?

8    A.   He would hang up on me and tell me not right now because

9    he was being followed.

10   Q.   Now, based on your in-person interactions with

11   Mike Darbinyan as well as your frequent phone contact, do you

12   recognize an individual sitting here in court as

13   Mike Darbinyan?

14   A.   Yes, ma'am.

15   Q.   If you could please point him out and describe an article

16   of clothing that he's wearing.

17   A.   He's the gentleman sitting in between the two counsels

18   with the black V-neck sweater.

19          THE COURT:  Indicating the defendant.

20   BY MS. YANG:

21   Q.   Now, during the time that you knew Mike Darbinyan, what

22   did you do with him?

23   A.   I did -- I committed crime.  I committed fraud, ma'am.

24   Q.   So you committed fraud.  What types of fraud crimes did

25   you commit with Mike Darbinyan?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Bank fraud, credit card fraud.

2    Q.    And when you say bank fraud, do you mean cashing

3    fraudulent checks or --

4    A.    Yes, ma'am.

5    Q.    Excuse me.

6          -- or going to ATM machines?

7    A.    Both, ma'am.

8    Q.    Can you specify?

9    A.    Both.

10   Q.    And when you talk about credit card fraud, could you

11   explain what you mean.

12   A.    Credit card fraud, we would make credit cards or we would

13   get other people's credit card numbers and we'd recode them and

14   use them to go and take money out of the ATM.

15   Q.    So in terms of the fraud crimes you committed with

16   Mike Darbinyan, you had the check cashings as well as the

17   credit card, debit card fraud, correct?

18   A.    Correct, ma'am.

19   Q.    Now, what would your role be in these fraud schemes?

20   A.    My role would be to get runners, ma'am.

21   Q.    And what are runners?

22   A.    Runners are people that -- excuse me.  Runners are other

23   people that we would use to either go and cash checks or open

24   up bank accounts or go and do the credit cards, ma'am.

25   Q.    So the runners would be the individuals that you and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Mike Darbinyan would send into banks; is that correct?

 2   A.    Correct, ma'am.

 3   Q.    And would runners also be the individuals that

 4   Mike Darbinyan sent into stores?

 5   A.    Correct, ma'am.

 6   Q.    Now, where would you find these runners?

 7   A.    I'd frequently find them on the streets, ma'am, in

 8   neighborhoods that I used to hang around in and do drugs with.

 9   Q.    Did you ever have trouble finding runners?

10   A.    No, not at all, ma'am.

11   Q.    And did your relationship with Mike Darbinyan continue

12   because you always had a steady supply of runners?

13   A.    Correct, ma'am.

14         MR. SEVERO:  Object, your Honor.  It's leading.

15         THE COURT:  Sustained.

16   BY MS. YANG:

17   Q.    During the time that you worked with Mike Darbinyan, did

18   you ever have trouble supplying him with runners?

19   A.    Not at all, ma'am.

20   Q.    I'd like to focus first on the check cashing fraud scheme,

21   okay?  Do you have that in mind?

22   A.    Okay, ma'am.

23   Q.    Could you please describe for the jury how Mike Darbinyan

24   operated that scheme in general.

25         MR. SEVERO:  Objection, calls for a narrative.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Overruled.

2              THE WITNESS:  The way we would do this, we would get

3    some runners to open up a small claims business account, and

4    Mr. Darbinyan would have someone that was working in another

5    bank and would get all the information to the person that we

6    were going to defraud, and we'd -- he would call the -- he

7    would call the bank as the owner of the -- of the business and

8    give all the correct answers, and then we would deposit the

9    checks into the banks, the small business claim banks that we

10   would open, then open.

11   BY MS. YANG:

12   Q.   Okay.  Let's break that down a little bit.  So

13   Mike Darbinyan would ask you to provide runners; is that

14   correct?

15   A.   Correct, ma'am.

16              MR. SEVERO:  This is all asked and answered now.  He's

17   already answered the whole thing.

18              THE COURT:  It is.  It is.  Sustained.

19   BY MS. YANG:

20   Q.   Now, when you were selecting runners for this check

21   cashing fraud scheme, did you look for anything in particular

22   that these runners had to have?

23   A.   Yes, ma'am.  They had to have two forms of ID or a bank --

24   excuse me, a bank card already.

25   Q.   Now, why would you look for runners who had two forms of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   ID?

2   A.   Because that's the only way that they would be able to

3   open up a small business claim, ma'am.  Then once we would open

4   up the small business, the bank would give them the small

5   business checks, the IDs, and the credit card or whatever it

6   was that they would give, and then I would get it and then

7   return it to Mr. Darbinyan.

8   Q.   So it sounds like there were two types of runners that you

9   recruited; is that correct?

10  A.   Correct, ma'am.

11  Q.   The runners that had two forms ID but no bank account; is

12  that correct?

13  A.   Yes, ma'am.

14  Q.   And then you would have runners who already had a bank

15  account?

16  A.   Correct, ma'am.

17  Q.   And for the runners who did not already have a bank

18  account, once they opened the account, you would collect all

19  that information and provide it to Mike Darbinyan, correct?

20  A.   Correct, ma'am.

21  Q.   Now, for the runners who already had an open bank account,

22  what would you do with them?

23  A.   Well, we would make checks for them, ma'am, and send them

24  to the -- send them to the bank to go and cash the check.

25  Because they would already have an account, so they would cash

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   it upon their account.
 2   Q.   So when you say "we would make checks for them," are you
 3   talking about fraudulent checks?
 4   A.   Correct, ma'am.
 5   Q.   Now, you also testified that Mike Darbinyan had someone
 6   inside a bank; is that correct?
 7   A.   Yes, ma'am.
 8   Q.   Do you know who this individual was?
 9   A.   No, I don't know who she was, ma'am.
10   Q.   But you said "she," so it was a female?
11   A.   Yes.  I know that there was a male, but I also know -- I
12   never met the female.
13   Q.   Now, you testified that this insider would provide
14   information to Mike Darbinyan; is that correct?
15   A.   Correct, ma'am.
16   Q.   Would this be profile information?
17   A.   Correct, ma'am.
18   Q.   And if you could briefly explain what a profile is.
19   A.   A profile is a person --
20        MR. SEVERO:  No foundation.
21        THE COURT:  Overruled.
22        THE WITNESS:  A profile is a person's whole identity,
23   from Social Security to bank numbers to all the secret
24   information that you give the bank, you know, to verify who you
25   are.  So that person in the bank would give it all to Mike so
```

```
1   he would be able to pertain -- pertain to be that person when

2   he called the bank.

3   BY MS. YANG:

4   Q.   So when you say "secret information," are you talking

5   about like the security questions you're asked by the bank and

6   the answers you -- the personal answers you --

7   A.   Correct, ma'am.

8   Q.   -- provide?

9   A.   Correct.

10  Q.   Do you know, to your knowledge, based on your interactions

11  with Mike Darbinyan, whether he also received checks for victim

12  accounts --

13  A.   Correct.

14  Q.   -- from the bank insider?

15  A.   Correct, ma'am.  He would receive the original checks from

16  the bank.

17  Q.   Now, once you had provided runners who could either open a

18  bank account or had an opened bank account and Mike Darbinyan

19  got profiles for victim account holders, was there a person who

20  actually forged signatures on checks?

21  A.   Correct, ma'am.

22  Q.   And what did you know the name of this --

23  A.   That's --

24  Q.   How did you know this -- I'm sorry, apologize.  How did

25  you know this person?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.    Through Mr. Darbinyan.

2   Q.    Did you meet him in person?

3   A.    Yes, ma'am.

4   Q.    And what name did you know him by?

5   A.    I knew him also as Mike.

6          MS. YANG:  Your Honor, at this time the government

7   would like to publish Exhibit 233, which is already in

8   evidence.

9          THE COURT:  Okay.

10  BY MS. YANG:

11  Q.    Mr. Ortega, looking at the screen in front of you, is this

12  individual the individual you knew as Mike who forged the

13  signatures on the checks?

14  A.    Correct, ma'am.

15         MS. YANG:  And for the record, Exhibit 233 is of

16  Hayko Mike Talasyan.

17  Q.    Now, was there also an individual in Mike Darbinyan's

18  organization who drove runners to the banks to cash these

19  fraudulent checks?

20  A.    Correct, ma'am.

21  Q.    What was this individual known to you by?

22  A.    I knew him as Max, ma'am.

23  Q.    Was there just one individual who drove runners to the

24  banks?

25  A.    No, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   I apologize, Mr. Ortega, you need to let me finish my

2   question first.

3   A.   Oh, I'm sorry.

4   Q.   It's okay.

5   A.   Sorry.

6   Q.   For the court reporter.

7        So was there another individual who also drove runners to

8   the banks?

9   A.   Correct, ma'am.

10  Q.   And how -- what name did you know this individual by?

11  A.   By "V".

12       MS. YANG:  Your Honor, I'd like to publish at this

13  time Exhibit 225, which has already been admitted into

14  evidence.

15       THE COURT:  Okay.

16  BY MS. YANG:

17  Q.   Mr. Ortega, looking at Exhibit 225, do you recognize this

18  individual?

19  A.   Yes, ma'am.

20  Q.   And who is this individual?

21  A.   I believe that's Max.

22       MS. YANG:  And for the record, your Honor, Exhibit 225

23  is Manuk Terzyan.

24       THE COURT:  Okay.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MS. YANG:  And government would also seek permission

 2   to publish at this time Exhibit 227.

 3          THE COURT:  Okay.

 4   BY MS. YANG:

 5   Q.   Mr. Ortega, looking at Exhibit 227, is this the individual

 6   known to you as "V"?

 7   A.   Correct, ma'am.

 8          MS. YANG:  And your Honor, Exhibit 227 is

 9   Vahe Mnatsakanyan, for the record.

10          THE COURT:  Okay.

11   BY MS. YANG:

12   Q.   Now, did you have frequent contacts with Mike -- not

13   Mike Darbinyan, but Mike, Max, and "V" as well?

14   A.   With -- yes.  Yes, ma'am.

15   Q.   And would you meet them when you were meeting with

16   Mike Darbinyan?

17   A.   Yes, ma'am.

18   Q.   Now, you testified that you provided Mike Darbinyan with

19   the runners who would go into the bank, correct?

20   A.   Correct, ma'am.

21          MS. YANG:  Your Honor, at this time the government

22   would like to play Exhibit 5A, which is already admitted into

23   evidence.

24          THE COURT:  Okay.

25          (Audio played.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MS. YANG:

 2   Q.   Mr. Ortega, do you recognize the voices on that phone call

 3   in Exhibit 5?

 4   A.   Yes, ma'am.

 5   Q.   And who are the speakers?

 6   A.   Me and Mr. Darbinyan.

 7   Q.   And by "Mr. Darbinyan," do you mean --

 8   A.   Mike.

 9   Q.   -- the individual known as Mike "Capone" Darbinyan?

10   A.   Yes, ma'am.

11   Q.   Now, in that call you mentioned four runners, correct?

12   A.   Correct, ma'am.

13   Q.   And those are the individuals you brought to

14   Mike Darbinyan to cash checks, correct?

15   A.   Correct, ma'am.

16   Q.   Now, later in that call, Defendant Darbinyan says, "Hey,

17   Bam, I don't want to talk on the phone about this stuff, you

18   know."

19        Do you recall hearing that?

20   A.   Yes, ma'am.

21   Q.   Did Defendant Darbinyan frequently tell you things like

22   that on the phone?

23   A.   Yes, ma'am.

24   Q.   Now, once you provided runners -- well, where did you

25   bring the runners for Mike Darbinyan?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I would take them either to North Hollywood or to a place

2   off Sunland.  I don't recall if that was Hollywood or -- it was

3   off -- off Sunland.

4   Q.   Was there a location in that area that Mike Darbinyan was

5   at?

6   A.   Yes, ma'am.  We called it the yard.

7   Q.   And had you ever been to the yard before?

8   A.   Correct, ma'am.  Yes.

9   Q.   Once or several times?

10  A.   Several times, ma'am.

11  Q.   And what was the yard?

12  A.   The yard was a place that -- that contained a bunch of

13  propane tanks.

14  Q.   Were the tanks full or empty?  Do you know?

15  A.   I never touched the tanks.  I wouldn't know, ma'am.

16  Q.   Now, this propane lot, do you recall where it was located?

17  A.   I just know it was off Sunland, by -- it was by a

18  Washington Mutual Bank.  I believe it was in Hollywood.

19  Q.   And was it an enclosed lot?

20  A.   Yes, ma'am.

21  Q.   And did defendant Darbinyan seem to use that lot as his

22  office?

23  A.   Yes, ma'am.

24  Q.   Now, once you were able to provide runners to

25  Mike Darbinyan, would fraudulent checks in large amounts

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   immediately be given to the runners to start cashing, or was

 2   there a progression of checks?

 3            MR. SEVERO:  Objection, your Honor.  This is leading.

 4            THE COURT:  Sustained.  Why don't -- sustained.

 5   BY MS. YANG:

 6   Q.   Mr. Ortega, what types of checks were the runners

 7   initially given to deposit?

 8   A.   Those were business checks, ma'am.

 9   Q.   And were they in large or small amounts?

10   A.   Some were in very large amounts, and some were in small

11   amounts.

12   Q.   Now, for -- to your knowledge, were the runners ever

13   provided with non-business checks?  For example, for

14   individuals?

15   A.   Not to my knowledge, ma'am.

16   Q.   Now, once the runners were provided with these checks, you

17   previously testified that there were individuals who would

18   drive them to the banks; is that correct?

19   A.   Correct, ma'am.

20   Q.   Where would you be when the runners were taken to the

21   banks to cash the checks?

22   A.   I would be with Mr. Darbinyan in the yard, ma'am.

23   Q.   Now, I believe you previously testified, and I just want

24   to clarify, that once Mike Darbinyan received this profile

25   information from the banks, did he or have -- did he or
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    have some -- did he have someone else call the banks to claim

2    to be the victim owner?

3    A.    Excuse me, ma'am.

4          Yes, Mr. Darbinyan would call the bank as the previous --

5    as the owner.

6    Q.    And during -- were you ever there when Mr. Darbinyan made

7    a call to a bank pretending to be an owner?

8    A.    Every time I -- I did fraudulent, umm, fraud with him,

9    yes.

10   Q.    And would Mr. -- would defendant Darbinyan tell the bank

11   anything?

12   A.    He would tell them that he was going on -- he would act

13   like he was the owner, would tell them that he was going on

14   vacation and would like to give them his new cell phone number

15   so if they had any questions or any answers that needed to be

16   asked, they can contact him on the new phone.

17   Q.    Now, while you stayed behind at the yard with

18   Mike Darbinyan and the runners went to go cash the checks, do

19   you know if Mike Darbinyan was in contact with the runners

20   and/or the drivers?

21   A.    At all time he'd be in contact with the driver.

22   Q.    And how?  By cell phone?  By radio?  Did you observe how

23   he kept in contact with them?

24   A.    It would be by cell phone, ma'am.

25   Q.    Now, did you ever drive the runners to cash checks at

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    banks?

2    A.   Not to cash checks, ma'am, no.

3    Q.   Did you ever drive runners to banks?

4    A.   Yes, ma'am.

5    Q.   And for what purpose?  Do you know?

6    A.   Just to -- just to deposit the checks, ma'am.

7    Q.   So you weren't responsible for driving runners to actually

8    cash checks and take funds out of the bank, correct?

9    A.   Correct, ma'am.

10   Q.   Would you sometimes drive or accompany the drivers of the

11   runners?

12   A.   Yes, ma'am.

13   Q.   Could you explain what you would do in that circumstance.

14   A.   Sometimes I would follow the -- the driver, to do

15   surveillance, because they were being followed.  So I would do

16   countersurveillance and let them know if they were -- if it was

17   okay for them to keep on going, or, if they were being

18   followed, to stop whatever was going on, from going to the

19   bank.

20   Q.   So were you driving in a separate vehicle?

21   A.   Correct, ma'am.

22   Q.   And by countersurveillance, do you mean you were just

23   looking out for police?

24   A.   For police, yes, ma'am.

25   Q.   And how would you communicate with the driver of the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    runners if, in fact, you spotted a police?

2    A.   Through cell phone, ma'am.

3    Q.   Now, when you did not accompany the drivers, you stayed at

4    the yard with Mr. Darbinyan, correct?

5    A.   Correct.

6    Q.   What would happen after the checks were cashed by the

7    runners?

8    A.   After the checks were cashed with the runners, I would get

9    a third of the -- of the taking of the checks or whatever we

10   cashed, and then I would pay the runners from my third, and

11   Mr. Darbinyan would keep the rest.

12   Q.   Now, would the runners be returned to the yard, or would

13   they be returned to the Auto Zone or that location on Sunland

14   that you previously testified about?

15   A.   No, ma'am, the runners would never go to the yard.  They

16   would either be returned to the Home Depot or the Auto Zone.

17   Q.   And would you then leave the yard to go meet with the

18   runners?

19   A.   Yes, ma'am.

20   Q.   And would that be after you received your one-third share

21   of the cashed checks?

22   A.   Correct, ma'am.

23   Q.   And approximately how much would you pay the runners out

24   of your one-third share?

25   A.   Basically about a one-third of what I got, ma'am.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Now, during the time that you knew Mike Darbinyan, did you

2   cash -- approximately how many fraudulent checks did you cash

3   with him?

4   A.   Ma'am, I wouldn't be able to give you an estimate as far

5   as how many, but I know it was a lot, a whole lot.

6   Q.   And during the course of your interactions with

7   Mike Darbinyan for this check cashing fraud scheme, you

8   provided him with multiple runners; is that correct?

9   A.   Correct, ma'am.

10        MS. YANG:  Your Honor, at this time the government

11  would like to publish Exhibit 218, which is already admitted

12  into evidence.

13        THE COURT:  Okay.

14  BY MS. YANG:

15  Q.   Mr. Ortega, is this individual, Rafael Zendejas, one of

16  the runners you provided to Mike Darbinyan?

17        MR. SEVERO:  Objection, your Honor.  It's leading.

18        THE WITNESS:  Yes, ma'am.

19        THE COURT:  Overruled.

20        MS. YANG:  Publishing Exhibit 219.

21  Q.   Mr. Ortega, do you recognize the individual in this

22  exhibit?

23  A.   Yes, ma'am.

24  Q.   And is he one of the runners you provided to Mike

25  Darbinyan?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Correct, ma'am.

2          MS. YANG:  For the record, 219 is Joseph Mares.

3    Q.    Did you also provide female runners to Mike Darbinyan?

4    A.    Yes, ma'am.

5    Q.    Now, was there a specific female runner that was referred

6    to as "La Tinta"?

7    A.    Yes, ma'am.

8    Q.    What does that mean?

9    A.    That means "the black lady."

10   Q.    Now, when you spoke with Mike Darbinyan both in person and

11   over the telephone, did he frequently use Hispanic terms?

12   A.    Yes, ma'am.

13   Q.    I'm showing you --

14         Your Honor, may I publish Exhibit 220, which is already

15   admitted into evidence?

16         THE COURT:  Yes.

17   BY MS. YANG:

18   Q.    Mr. Ortega, Debra Jane May-Lawson, is this the female that

19   you referred to as "La Tinta"?

20   A.    Correct, ma'am.

21   Q.    And is she one of the runners you provided to Mike

22   Darbinyan?

23   A.    Correct, ma'am.

24         MS. YANG:  And finally, your Honor, government

25   requests permission to publish Exhibit 226.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    THE COURT:  Okay.

 2   BY MS. YANG:

 3   Q.   Mr. Ortega, is Steven Wilson, who's in Exhibit 226, one of

 4   the runners you provided to Mike Darbinyan?

 5             MR. SEVERO:  Objection, your Honor, leading.

 6             THE WITNESS:  Correct, ma'am.

 7             THE COURT:  Sustained.

 8   BY MS. YANG:

 9   Q.   Mr. Ortega, do you recognize the individual in Exhibit

10   226?

11   A.   Yes, ma'am.

12   Q.   Who is he?

13   A.   I know him as Mike, Steve.  He's a runner that I used to

14   use frequently.

15   Q.   Now, when you say he's a runner you used to use

16   frequently, is he a runner you used to use frequently with

17   Mike Darbinyan?

18   A.   Yes, ma'am.

19   Q.   Now, you testified that you engaged also in credit card or

20   debit card fraud with Mike Darbinyan; is that correct?

21   A.   Correct, ma'am.

22   Q.   What kind of credit, debit card fraud did this operation

23   entail?

24             MR. SEVERO:  Calls for a narrative.

25             THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE WITNESS:  Can you repeat the last part, please,
 2   ma'am?
 3            THE COURT:  Why don't you repeat the whole question,
 4   Counsel.
 5            MS. YANG:  Yes, your Honor.
 6   Q.   Mr. Ortega, the credit, debit card fraud that you engaged
 7   in with Mike Darbinyan -- I can't remember my question now.
 8            THE COURT:  Why don't you come up with a new one,
 9   then.
10            MS. YANG:  Yes, your Honor.
11   Q.   Mr. Ortega, did you participate in a credit, debit card
12   fraud scheme with Mike Darbinyan involving the 99 Cents Only
13   Stores?
14   A.   Yes, ma'am.
15   Q.   Could you please describe generally how this scheme
16   worked.
17   A.   The way the scheme worked was, at the 99 Cent Store,
18   Mr. Darbinyan would have runners or somebody that he would --
19   he would get to go and put PINs and point, which is where you
20   run the credit card through, and set them into the 99 Cent
21   Store and leave them there for approximately, like, six months
22   or three months or -- depending on how long he leaves them
23   there.  So every person that goes to the store and uses their
24   credit card, not only are they recording their credit card
25   number but also their PIN number.  So once that is done, he
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    would -- he had -- he would call me, and I would get runners to

2    go there to take those things out.

3    Q.   And Mr. Ortega, you testified -- I think you called it a

4    PIN point; is that correct?

5    A.   Correct, ma'am.

6    Q.   So are these the devices in stores where you make your

7    payments with the credit or ATM card?

8    A.   Correct, ma'am.

9    Q.   Now, you also testified that Mike Darbinyan would keep

10   those devices in stores for three months or six months, those

11   time periods.  Do you recall that?

12   A.   I don't know the exact -- the exact approximate time, but

13   yes, ma'am.

14   Q.   So you don't know exactly how long these devices would be

15   left in the stores; is that correct?

16   A.   That -- that's correct, ma'am.

17   Q.   Is the three to six months a guess on your part?

18   A.   Yes, ma'am.

19         MR. FLIER:  I'm going to move to strike, your Honor, a

20   guess.

21         THE COURT:  Overruled.

22   BY MS. YANG:

23   Q.   Now --

24         THE COURT:  Well, I'll sustain it as to the six

25   months.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        But he left them in there for a period of time; is that

 2   correct?

 3            THE WITNESS:  That's correct, sir.

 4            THE COURT:  Okay.

 5   BY MS. YANG:

 6   Q.   But based on your personal knowledge, you don't know

 7   exactly how long or short that period of time was; is that

 8   correct?

 9   A.   That's correct, ma'am.

10   Q.   Now, you testified that Mike Darbinyan would have people

11   go in and out of the stores to switch out these devices; is

12   that correct?

13   A.   That's correct, ma'am.

14   Q.   And you would also provide individuals for that purpose,

15   correct?

16   A.   That's correct, ma'am.

17   Q.   Now, much like the check cashing fraud scheme, did you

18   have difficulty finding individuals to go into the stores to

19   swap out the devices?

20   A.   Not at all, ma'am.

21   Q.   Now, once -- well, do you know what happened once those

22   devices were retrieved from the stores with all of the credit

23   and debit card numbers?

24   A.   Yes, ma'am.

25   Q.   And what would happen?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    What would happen, that -- what would happen then was,

 2   Mr. Darbinyan would take them to wherever he would take them,

 3   and he would re-encode them and then use those to go and take

 4   out money out of the ATMs.

 5   Q.    Now, when you say re-encode them, do you mean take those

 6   credit or debit card numbers and put them on other cards?

 7   A.    Correct, ma'am.

 8   Q.    Do you know what kinds of cards were used for that

 9   purpose?

10   A.    Gift cards, Starbuck cards.  Any -- basically any -- any

11   type of card that had a magnetic strip in the back, ma'am.

12   Q.    Now, you testified that Mike Darbinyan would take these

13   devices somewhere.  Do you know where he would take these

14   devices?

15   A.    Not -- to which -- to the dispensary, as far as I know,

16   ma'am.

17   Q.    Now, when you --

18         MR. SEVERO:  Move to strike that as speculation of the

19   witness.

20         THE COURT:  Sustained.  It will be stricken.

21   BY MS. YANG:

22   Q.    Did you ever accompany Mike Darbinyan when he took one of

23   these devices to another location?

24   A.    No, ma'am.

25   Q.    But you understood that at some point these re-encoded
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   cards would be created; is that correct?

 2   A.   Correct, ma'am.

 3   Q.   And you testified that Mike Darbinyan would then have

 4   money withdrawn from ATM accounts, correct?

 5   A.   Correct, ma'am.

 6            MR. SEVERO:  It's hearsay.

 7            THE COURT:  Overruled.

 8            MR. SEVERO:  No foundation.

 9            THE COURT:  Overruled.

10   BY MS. YANG:

11   Q.   Would you provide individuals or runners to Mike Darbinyan

12   for this purpose as well?

13   A.   Yes, ma'am.

14   Q.   Now, in this scheme involving the 99 Cents Only Store

15   fraud, to your knowledge, was the defendant, Darbinyan,

16   interested in both debit card numbers and credit card numbers,

17   or just one type?

18   A.   Just one type, ma'am, and --

19   Q.   And which type of card numbers would defendant Darbinyan

20   be interested in?

21   A.   That would be the debit cards, ma'am.

22   Q.   And did he ever tell you why?

23   A.   Because those are the ones that give money.  The other

24   ones were trash.

25   Q.   So defendant Darbinyan told you the credit card numbers
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    were trash?

 2    A.   Yes, ma'am.

 3    Q.   Did you understand what he meant when he said they were

 4    trash?

 5    A.    In other words, it was too much of a hassle to just go to

 6    stores and use credit when you can just get money.

 7    Q.   Now, I'd like to direct your attention to August of 2009.

 8    Do you have that time frame in mind?

 9    A.   Yes, ma'am.

10    Q.   Did you go to San Diego in August of 2009?

11    A.   Yes, ma'am.

12    Q.   Why did you go to San Diego?

13    A.   I went to San Diego because Mr. Darbinyan gave me a call

14    and he was having troubles taking out some PIN -- the boxes out

15    of some of the 99 Cent Stores, and he called me down there to

16    go and pull them out.

17    Q.   Now, before you headed down to San Diego, did you -- were

18    you personally going to remove these boxes, or did you get

19    runners to go with you?

20    A.   No, I got runners, ma'am.

21    Q.   Approximately how many runners did you find to go with you

22    to San Diego?

23    A.    Three.

24    Q.   Now, did you know who these individuals were?

25    A.   Yes, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And did you have names for them?

 2   A.   Yes, ma'am.

 3   Q.   And what were their names?

 4   A.   One was Miguel, the other one was "Sparky," and the other

 5   one was "Baby Doll."

 6   Q.   So you only had, like, first names or nicknames, correct?

 7   A.   Correct, ma'am.

 8   Q.   And when you went down to San Diego, did you drive in the

 9   same vehicle with the other runners, or did you drive in

10   separate vehicles?

11   A.   We went in two vehicles, ma'am.

12   Q.   Now, did you know where to go in San Diego?

13   A.   No, ma'am.

14   Q.   So what happened?  You get a call from Mike Darbinyan and

15   you go find runners and then you just start driving to

16   San Diego?

17   A.   No, ma'am.  I get a call from Mr. Darbinyan, and he --

18            MR. SEVERO:  I don't think there's a question in that.

19            THE COURT:  Okay.  Why don't you ask the next

20   question, then, Counsel.

21   BY MS. YANG:

22   Q.   Your answer was "no"; is that correct?

23   A.   Correct, ma'am.

24   Q.   What, if anything, did Mr. Darbinyan tell you before you

25   drove to San Diego?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    He would call me and ask me if I can get some runners to

 2    come to San Diego to pull some boxes out of a store.

 3    Q.    Did he tell you where to go in San Diego?

 4    A.    No.  He just told me to come down to San Diego, and then

 5    when I get into San -- the county of San Diego, to call him.

 6    Q.    Did you in fact call defendant Darbinyan when you arrived

 7    in the county of San Diego?

 8    A.    Correct, ma'am.

 9    Q.    And did he tell you to meet him anyplace in particular?

10    A.    Yes, ma'am.

11    Q.    Where did he tell you to meet him?

12    A.    We met at a gas station.  I don't recall the exact

13    location, but he gave me directions to meet him at a gas

14    station.  I met him at a gas station in San Diego.

15    Q.    Now, when you met Mike Darbinyan at a gas station in

16    San Diego, was he alone, or was he somewhat -- was he with

17    someone else?

18    A.    No, he was with someone else, ma'am.

19    Q.    And when you met -- was it male or female?

20    A.    It was a male, ma'am.

21    Q.    And when you met with Mike Darbinyan, this male

22    individual, what, if anything, did Mike Darbinyan tell you?

23    A.    When I met him, he was explaining to me what needed to be

24    done and how to go about it.

25    Q.    And when you said he was explaining to you what needed to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   be done, was that the removing of devices from 99 Cent Only
 2   Stores?
 3   A.    Correct, ma'am.
 4   Q.    Did he tell you to look for anything in particular with
 5   regard to these devices?
 6   A.    Yes, ma'am.  The device would have two scratches on the
 7   side.
 8   Q.    And did he tell you what to do once you found the device
 9   with two scratches on the side?
10   A.    Yes, ma'am.  He would provide me with another PINs or
11   point box, and I would switch them.  He -- I would -- I was to
12   take the one it was on and then switch it with another one.
13   Q.    And were you to personally do that, or was -- were you
14   going to have one of the runners do that?
15   A.    No, the runners.  But I mean, Mr. Darbinyan, when he does
16   business with me, he does not talk to my runners.  He would
17   talk to me personally, and then I would relate to the runners
18   what he wanted done.
19   Q.    So you got instructions directly from Mike Darbinyan, and
20   then you told the runners what they needed to do; is that
21   correct?
22   A.    Correct, ma'am.
23   Q.    Now, when you were down in San Diego, approximately how
24   many 99 Cent Only Stores did you go into and/or have the
25   runners go into to switch out these boxes or devices?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Three or four, ma'am.

 2          MS. YANG:  Your Honor, at this time I'd like to play,

 3    briefly, Exhibit 351B.

 4          THE COURT:  Okay.

 5    BY MS. YANG:

 6    Q.    Mr. Ortega, if you could just look at this screen in front

 7    of you.

 8          (Video played.)

 9          MS. YANG:  You could pause.

10    Q.    Mr. Ortega, do you recognize the individual in the white

11    shirt and the white baseball cap in Exhibit 351B?

12    A.    Yes, I do.

13    Q.    And who is that?

14    A.    That would be me, ma'am.

15    Q.    Now, after you went into a 99 Cent Only Store in

16    San Diego, did you always go with a runner?

17    A.    Yes, ma'am.  Oh, did I always go in with the runners?

18    Q.    Yes.

19    A.    No.  Just on this one, ma'am.

20    Q.    Now, after you went into the store with the runners, did

21    the runners switch out the devices?

22    A.    Yes, ma'am.

23    Q.    And after you left the store, what did you do with the

24    switched-out device?

25    A.    After every device that was switched out, I would call
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Mr. Darbinyan, and he'd meet me in a different location, and

2   then I would hand him the box, and then he would tell me to --

3   to follow him, and then he would send me to a different

4   location to go and take out the next one.

5   Q.   So prior to leaving the gas station in San Diego,

6   defendant Darbinyan did not tell you every specific store you

7   were supposed to go to; is that correct?

8   A.   That's correct, ma'am.

9   Q.   And you would meet him after you removed a box from a

10  particular store; is that correct?

11  A.   Correct.

12  Q.   And then he would direct you to the next store, correct?

13  A.   To the next one.

14  Q.   And you would meet him after every store that you or your

15  runners had removed a box from?

16  A.   Correct, ma'am.

17  Q.   Now, after you and the runners had removed the device from

18  the last store in San Diego that you were going to do that day,

19  what happened?

20  A.   After we removed the last one, I gave it to Mr. Darbinyan,

21  and the -- the runners that came in one vehicle, they went

22  home, and I followed Mr. Darbinyan.

23  Q.   Now, where did you follow Mike Darbinyan?

24  A.   To Orange County.

25  Q.   And how did you know to follow Mike Darbinyan to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Orange County?

 2   A.   I followed him because he was going to give me some money,

 3   ma'am.

 4   Q.   So Mike Darbinyan told you to follow him to Orange County?

 5   A.   Yes, ma'am.

 6   Q.   Now, when you arrived in Orange County, where did you go?

 7   A.   I don't know the exact -- I didn't -- I wasn't familiar

 8   with the area, so I just know that when we were in

 9   Orange County, we got off on an off-ramp, and we stopped and he

10   gave me $800.

11   Q.   Now, did Mike Darbinyan at any point during this meeting

12   in Orange County tell you what he was going to give you for

13   your services in swapping out the devices in San Diego?

14   A.   Yes, ma'am.

15   Q.   And what, if anything, did he tell you?

16   A.   I was to receive 500 credit card numbers and $10,000 cash.

17   Q.   And again, the credit card numbers because Mike Darbinyan

18   considered those trash; is that correct?

19   A.   Correct, ma'am.

20   Q.   Now, had you previously been able to use credit card

21   numbers to commit fraud on your own?

22   A.   Yes, ma'am.

23   Q.   Now, following the swapping out of these devices in

24   San Diego in August of 2009, were you arrested in November of

25   2009 in Glendora?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   Yes, ma'am.

2   Q.   And were you arrested using fraudulent credit cards?

3   A.   I was arrested using those fraudulent credit cards, ma'am.

4   Q.   And what store was this at?

5   A.   I believe it was at a Wal-Mart.

6   Q.   Now, at the time you were arrested, did you have -- well,

7   let me back up a little bit.

8        Following the switching out of the devices in San Diego in

9   August of 2009, did you ever receive 500 -- approximately 500

10  credit card numbers from Mike Darbinyan or someone associated

11  with him?

12  A.   Yes, ma'am.

13  Q.   When did you, approximately, receive those 500 credit card

14  numbers?

15  A.   Approximately about two weeks after I pulled out the

16  box -- I had the boxes pulled out.

17  Q.   And in what form did you receive those approximately 500

18  credit card numbers?

19  A.   In a flash drive, ma'am.

20  Q.   And a flash drive, is that literally just a little device

21  you can insert in a computer?

22  A.   Yes, ma'am.

23  Q.   Now, when you were arrested in November of 2009 at the

24  Wal-Mart in Glendora, did you have a flash drive on you?

25  A.   Yes, ma'am.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And what did that flash drive contain?

2   A.   It contained the numbers that Mr. Darbinyan had given me.

3   Q.   And those approximately 500 credit card numbers, that was

4   your payment for your work in San Diego; is that correct?

5   A.   That, and the $10,000, ma'am.

6   Q.   $10,000.  Okay.

7        One moment, your Honor.

8        Your Honor, no further questions.

9             THE COURT:  Cross.

10            MR. SEVERO:  I need a moment, your Honor.

11                     **CROSS-EXAMINATION**

12   BY MR. SEVERO:

13   Q.   Didn't you in fact tell the agents that you had gotten

14   $800, not $10,000 and the credit cards?

15   A.   Can you repeat that question to me again?

16   Q.   Yes, sir.

17        You had spoken to a number of police officers in this case

18   in connection with telling them what your involvement was,

19   correct?

20   A.   Correct.

21   Q.   And you had -- you told them in December of '09 that you

22   had gotten $800 plus the credit cards.

23   A.   I believe that was just --

24   Q.   Just -- just answer me yes or no.

25            THE COURT:  He can explain it.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002278**

1      Did you tell them that?

2           THE WITNESS:  Your Honor, I believe that was a

3   misunderstanding with them, because I did get paid $800, but it

4   wasn't for the credit cards.

5           THE COURT:  Okay.

6   BY MR. SEVERO:

7   Q.   It was not their misunderstanding.  You said $800, didn't

8   you?

9           MS. YANG:  Objection, asked and answered.

10          THE COURT:  Overruled.  He said he got $800.

11  BY MR. SEVERO:

12  Q.   And now you changed your testimony later, on

13  February 20th --

14          MS. YANG:  Objection, argumentative.

15          THE COURT:  Well, it's not argumentative.  He

16  testified just a few minutes ago he got $800, also, on the

17  record.  He hasn't changed his testimony.  He testified just a

18  few minutes ago that when he came back from San Diego, I

19  think --

20      Is that correct?  When you came back from San Diego you

21  got $800?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  And that he was going to get 10,000 later.

24  So I don't want to confuse the jury on this.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1            MR. SEVERO:  Well -- okay.

2    Q.   On February 25th, 2014, did you have a conversation with

3    Special Agent Stebbins, seated over here, this --

4    A.   I -- I don't remember the date.

5    Q.   Okay.  Did you ever have a conversation with Mr. Stebbins

6    in 2014?

7    A.   I believe so, yes.

8    Q.   And during that conversation, you said that, in the

9    previous proffer, Darbinyan had not -- did not pay him $800 at

10   the gas station for his role in the 99 Cents Only scheme.

11   Didn't you say that?

12   A.   If that's what it says on your paper, I believe I did,

13   then.

14   Q.   So only if it says it on the paper?  If it doesn't say it,

15   then you don't know?

16   A.   Like I said, I do not remember.  It's been five years, six

17   years since this happened.

18   Q.   Actually, this statement was made on February 25th, 2014.

19   It's only a couple months ago.

20   A.   Can you repeat the question?

21   Q.   Yes.  On February 25th, twenty-thousand-four -- February

22   25th, 2014, you met with this gentleman seated over here?

23   A.   Correct.

24   Q.   The young guy, right?

25   A.   Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002280**

1  Q.   And you told him that you had not received $800 like you

2  had told them before.

3  A.   Correct.

4  Q.   And you changed your testimony then, or your proffer, to

5  say that you had gotten 10,000 instead of 800, right?

6         MS. YANG:  Objection, your Honor, argumentative --

7         THE COURT:  Overruled.

8         MS. YANG:  -- "changed your testimony."

9         THE WITNESS:  Can I explain that, your Honor?

10        THE COURT:  Well, I --

11  BY MR. SEVERO:

12  Q.   Why don't you answer my question first, and then we'll

13  talk about it.

14        THE COURT:  Why don't you state the question again.

15  There was an objection.  I lost it.

16  BY MR. SEVERO:

17  Q.   You told Agent Stebbins that you didn't receive $800 for

18  your role in the 99 Cent Store scheme; instead, you had

19  received 10,000.

20  A.   Correct.

21  Q.   You changed -- you first had said, earlier, months ago,

22  that it was 800, but then in February of this year you said

23  no, it was 10,000, correct?

24  A.   Well, I received 800 and 10,000.

25  Q.   Didn't you tell him that it was, instead of 800, you got

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    10,000?

2    A.   I don't believe so.

3    Q.   So if he wrote that it was instead, Mr. Stebbins is

4    incorrect?

5    A.   It could happen, I believe so, yes.

6    Q.   Where was this meeting with Mr. Stebbins?  Do you

7    remember?

8    A.   No.

9    Q.   Do you even remember meeting with him?

10   A.   Yes, I re- -- I recall meeting with him.

11   Q.   You don't remember where it was?

12   A.   I believe it was here, in -- in the building here

13   somewhere.

14   Q.   So you do remember?

15   A.   Yes.

16   Q.   The credit cards that you say you have received were

17   trash, right?

18   A.   Not to me.

19   Q.   Okay.  You were -- you were never a member of the

20   Mexican Mafia, were you?

21   A.   No.

22   Q.   In fact, you were a member of the Little Hill gang,

23   correct?

24   A.   Correct.

25   Q.   And the Little Hill gang had problems with the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Mexican Mafia, didn't it?

2  A.   Not to my knowledge.

3  Q.   Didn't you drop out of that gang in 1992?

4  A.   No.

5  Q.   '84?

6  A.   No.

7  Q.   When did you drop out of the gang?

8  A.   You have it right there, don't you?

9  Q.   How about you tell me.

10 A.   2001.

11 Q.   And you dropped out of the gang in 2001, long before you

12 met Mr. Darbinyan, correct?

13 A.   Correct.

14 Q.   Is that before or after you were stabbed 56 times?

15 A.   After.  After I was stabbed.

16 Q.   You were stabbed 56 times because you ran into one of the

17 Mexican Mafia members, correct?

18 A.   Correct.

19 Q.   "Cisco," right?

20 A.   Correct.

21 Q.   And this other fellow, "Chuco," he dropped out, let's see,

22 in '94, right?

23 A.   Correct.

24      MS. YANG:  Objection, assumes facts not in evidence.

25      THE COURT:  It's a question.  Overruled.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

BY MR. SEVERO:

Q.   So that when you were receiving money, presumably receiving money from this whole scheme, it had nothing to do with the Mexican Mafia, correct?

A.   My part didn't.

Q.   Did not.  Nor did it have anything to do with the Little Hill gang, did it?

A.   No.

Q.   You -- when was the last time you had a job?

A.   I haven't.

Q.   You haven't had a job ever?

A.   No.

Q.   You've lived off drug sales?

A.   Correct.

Q.   And you, I think, also had credit card fraud before 2007, correct?

A.   Correct.

Q.   So you knew how to use -- make fraudulent use of debit cards, correct, before 2007?

A.   No.

Q.   You knew how to make fraudulent use of credit cards before 2007?

A.   I knew how to use them, yes.

Q.   You knew how to print them?

A.   No.

```
 1   Q.   Didn't you have an embossing machine where you would

 2   emboss your own credit cards?

 3   A.   No.

 4   Q.   It's your testimony that you knew Armenian Power to be

 5   sophisticated in moneymaking?

 6   A.   Correct.

 7   Q.   That is the whole purpose of the gang, is it, to your

 8   knowledge?

 9   A.   No, that's not the whole purpose to the gang.

10   Q.   Did you -- how many times did you meet with Mr. Darbinyan?

11   A.   A lot.  I can't -- I couldn't -- I couldn't tell -- I

12   couldn't give you a number on it.

13   Q.   More than 50 times?

14   A.   Oh, yes.

15   Q.   How many times did you talk to him on the phone?

16   A.   Once again, I couldn't give you a number on it.

17   Q.   And you would always call him on the phone between 2008

18   and 2009?  You would call him on the phone?  Let me rephrase

19   the question.

20            THE COURT:  Yeah, Counsel.  You said "always."

21            MR. SEVERO:  Yes, I caught that.

22            THE COURT:  Might want to rephrase it.

23            MR. SEVERO:  Thank you, Judge.

24   Q.   You would call Mr. Darbinyan on the phone in 2009 many

25   times?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   Correct.

2   Q.   He would give you -- if he changed his number, he would

3   give you a new number to call?

4   A.   Correct.

5   Q.   You don't remember any of those numbers, do you?

6   A.   Nope.

7   Q.   You say he changed phones every week?

8   A.   Every week, every two weeks, every month.

9   Q.   Sure about that?

10  A.   No.

11  Q.   In fact, it could be every other day as far as you can

12  remember, right?

13  A.   It wasn't every oth- -- every day.

14  Q.   How many 99 Cent Stores did you go into in this caper?

15  A.   Approximately three or four.

16  Q.   And all of them were in San Diego?

17  A.   Correct.

18  Q.   You never went to the one -- to the store in Pasadena?

19  A.   No.

20  Q.   So you're only aware of the three or four stores that you

21  went into as far as what was being done with the 99 Cent

22  Stores, correct?

23  A.   I'm just aware of the ones that he had sent me to.

24  Q.   You remember the names of three of your runners, correct?

25  A.   Correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   How many runners did you deal with in the check fraud

 2    scheme?

 3    A.   Oh, many.

 4    Q.   Did you know their names?

 5    A.   Not all of them.

 6    Q.   All right.  Did you know -- how many names did you know?

 7    A.   I wouldn't be able to give you a number.

 8    Q.   How many runners did you meet?

 9    A.   Oh, plenty.

10    Q.   But you can't name them?

11    A.   Not all of them.

12    Q.   Can't name any of them, right?

13    A.   Oh, I can name them.

14    Q.   The money you'd been making since you've been a

15    criminal --

16         Which has been all your life, right?

17    A.   Pretty much.

18    Q.   -- was all for the use of drugs, correct?

19    A.   Yes.

20    Q.   What kind of drugs would you use?

21    A.   Cocaine and marijuana.

22    Q.   People that you met, "V," for example, you know who "V"

23    is?

24    A.   Yeah.

25    Q.   Did you see his tattoos?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Some of them.

2    Q.   Did you see any tattoos that said AP?

3    A.   No, but I seen two pendant stars on his knees.

4    Q.   That's nice.

5         How about Max?  Did he have AP tattoos on him?

6    A.   Never seen them.

7    Q.   You don't know, do you?

8    A.   Don't know.

9    Q.   This other fellow, Mike.  Is that what you called him,

10   Mike?  Not Mr. Darbinyan.  Somebody else called Mike.

11   A.   What about him?

12   Q.   What did he do?

13        THE COURT:  What did he do?

14   BY MR. SEVERO:

15   Q.   What did he do with you?

16   A.   What did he do with me?

17   Q.   Mm-hmm.  Yes.

18   A.   He would be the one that would sign the checks.

19   Q.   You're sure it's not -- can you describe this guy Mike?

20   A.   Can I describe him?

21   Q.   Yes.

22   A.   Yeah, I -- I described him when they showed me the

23   picture.

24   Q.   Well, how tall was he?

25   A.   Oh, about 5-11, 6 feet, approximately, 6-1.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Heavy?

2   A.   Medium.

3   Q.   You wouldn't call him a fat ass, would you?

4   A.   No, not at all.

5   Q.   So did you ever meet a guy by the name of Armen?

6   A.   That name, I -- I don't recall that name.

7   Q.   It's your testimony that Mr. Darbinyan would call the bank

8   to change a phone number so that the bank would call him; is

9   that correct?

10  A.   Correct.

11  Q.   He did that in your presence?

12  A.   All the time.

13  Q.   And did you ever hear the bank call him?

14  A.   Yes.

15  Q.   And he would say, "Sure, cash that check," correct?

16  A.   No.  They would ask him the check number, and he would

17  give them back the check number, and then they would go ahead

18  and, after they would confirm, they would cash the check.

19  Q.   When was the first time you heard a call like that?

20  A.   Approximately the first time I started doing business with

21  him.

22  Q.   When was the first time you heard him make a call like

23  that?

24  A.   I don't remember the dates.  It's been many years.

25  Q.   And during all this time you had been using drugs,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   correct?

 2   A.    All what time?

 3   Q.    During the time -- from the time you were -- you first met

 4   Mr. Darbinyan.

 5   A.    Frequently sometimes, yes.

 6   Q.    You were using all your money for drugs, weren't you?

 7   A.    No, not all of it.

 8   Q.    Just a little bit?

 9   A.    Yeah.

10   Q.    How much -- it's your testimony that you used to spend

11   three or four times -- strike that.

12        You used to see Mr. Darbinyan three or four times a week?

13   A.    Correct.

14   Q.    For how long a period of time?

15   A.    For all the time that I was doing fraud with him.

16   Q.    That would be a year?

17   A.    I wouldn't be able to give you the approximate time,

18   because I don't remember exactly what year I met him, and from

19   that, from the year that I met him to the time that I got

20   arrested.

21   Q.    Don't remember that?

22   A.    No.

23   Q.    You don't remember where you would meet three or four

24   times a week?

25   A.    Oh, I remember where we meet.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    Always at the yard?

2    A.    Always at the yard or right there in -- off on

3    North Hollywood.

4    Q.    And always you would make a phone call before you met,

5    right?

6    A.    Umm, yeah.

7    Q.    So there should be -- in all the recorded calls that we

8    have here, at least three or four times a week there should be

9    calls between you, correct?

10   A.    If --

11             MS. YANG:  Objection, calls for speculation.

12             THE COURT:  Sustained.

13             MS. YANG:  Lacks foundation.

14   BY MR. SEVERO:

15   Q.    So you would pick up a phone -- where did you live during

16   the time that you knew Mr. Darbinyan in '09?

17   A.    San Bernardino.

18   Q.    You would drive from San Bernardino here?

19   A.    Every day.

20   Q.    Oh, now it's every day?

21   A.    Every day I needed to drive.

22   Q.    These runners that you would find are all druggies, right?

23   A.    Not all.

24   Q.    Let me ask you this.  You've got at least nine felony

25   convictions, don't you?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   I believe so.

2   Q.   You lost count?

3          MS. YANG:  Objection, argumentative.

4          THE COURT:  Sustained.

5   BY MR. SEVERO:

6   Q.   You don't know?

7   A.   Don't know.

8   Q.   Don't remember?

9          THE COURT:  Well, approximately nine?

10         THE WITNESS:  Approximately nine, sir.

11         THE COURT:  Okay.

12  BY MR. SEVERO:

13  Q.   You remember nine because I told you nine; otherwise, you

14  wouldn't know?

15         MS. YANG:  Objection, argumentative.

16         THE COURT:  Sustained.

17         MS. YANG:  Asked and answered.

18         MR. SEVERO:  Just a moment, your Honor, please.

19         THE COURT:  Certainly.

20  BY MR. SEVERO:

21  Q.   Now, these -- it's your testimony that you think

22  Mr. Darbinyan had people inside the bank that would give him

23  information?

24  A.   Not that I think.  I knew that --

25  Q.   No, I didn't think so.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002292**

```
1    A.    -- he had some.

2    Q.    Did you know?

3    A.    Yes.

4         MS. YANG:  Objection, your Honor.  He's arguing with

5    the witness.

6         THE COURT:  Overruled.  He's indicated he knew that.

7    Okay.  Next question.

8    BY MR. SEVERO:

9    Q.    And which bank would that be?

10   A.    Bank of America.

11   Q.    Just at the Bank of America, correct?

12   A.    No.

13   Q.    Well, he -- you talked about one male and one female.

14   A.    Correct.

15   Q.    Both at Bank of America?

16   A.    No.

17   Q.    All right.  Where was the male from?

18   A.    Washington Mutual.

19   Q.    Washington Mutual.  That would have been in '09; is that

20   true?

21   A.    No, I don't believe it would be in '09.  'Cause

22   Washington Mutual turned into Chase Bank in '09, so I don't

23   believe it would be in '09.

24   Q.    So these checks that were being cashed fraudulently, when

25   were they being cashed?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Through the period of times that I was working with
2    Mr. Darbinyan.
3    Q.   Which was what?
4    A.   From approximately '07, '08 to the time I got arrested.
5    Q.   You sure that in '07 you were working with Mr. Darbinyan?
6    A.   Like I said, approximately.  I don't recall if it was '07
7    or '08.
8    Q.   So -- okay.  So you don't know if it's '07.  You don't
9    know if it's '08, either, do you?
10   A.   In between.  It could be '07 or '08.
11   Q.   Okay.  But not '09?
12   A.   And '09.  Like I said, from the time that I met him to the
13   time I got arrested.
14   Q.   And all that time you were doing -- you were cashing
15   fraudulent checks?
16   A.   Well, three or four times a week through all that time.
17   Q.   Really?
18   A.   Yes.
19   Q.   At Washington Mutual?
20   A.   No, I didn't say at Washington Mutual.
21   Q.   Okay.  Where?  Which banks?
22   A.   At all banks.
23   Q.   Every bank?
24   A.   Oh, not every bank.  The banks that we needed to cash them
25   at.  If it was Wells Fargo that day, it would be Wells Fargo.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   How many checks did you cash at Wells Fargo?
 2   A.   Oh, I -- I wouldn't be able to give you a number.  I don't
 3   know.
 4   Q.   What names of businesses did you use to cash checks at
 5   Wells Fargo?
 6   A.   I don't know.  I wasn't the one that was getting the check
 7   accounts to do them on.  I was just the one that was providing
 8   the runners.
 9   Q.   You would get the check and give it to the runners,
10   wouldn't you?
11   A.   No.  Mr. Darbinyan would get the checks and give it to
12   Max, and Max would take the runners.  I would sit down with
13   Mr. Darbinyan and wait until the checks were cashed.
14   Q.   You never went to the banks?
15   A.   Oh, I went to the banks a couple of times.
16   Q.   Which banks?
17   A.   Whatever bank I needed to go to.
18   Q.   Where was the female inside person, from which bank?
19   A.   From Bank of America.
20   Q.   Did you meet her?
21   A.   No.
22   Q.   Did you talk to her?
23   A.   No.
24   Q.   And the male was from Washington Mutual?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Did you meet him?

 2   A.   Yes.

 3   Q.   Where?

 4   A.   At the yard.

 5   Q.   Was he Armenian?

 6   A.   Yes, most definitely.

 7   Q.   What was his name?

 8   A.   Don't know his name.

 9   Q.   You're lying, aren't you?

10           MS. YANG:  Objection, argumentative.

11           THE COURT:  Sustained, Counsel.

12           MS. YANG:  Completely improper.

13           THE COURT:  It is improper.  Sustained.

14   BY MR. SEVERO:

15   Q.   Did you ever see a box of checks being received by

16   Mr. Darbinyan?

17   A.   Yes.

18   Q.   Where?

19   A.   The yard.

20   Q.   By mail?

21   A.   By male.

22   Q.   So the checks would be mailed to the yard, would it?

23   A.   Excuse me?

24   Q.   The checks, a box of checks would be mailed to the yard?

25   A.   Not mailed.  By a male.  By a male, not by mail.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  M-a-l-e rather than m-a-i-l?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  Okay.

 4   BY MR. SEVERO:

 5   Q.   It was being delivered by a male?

 6   A.   Yes.

 7              THE COURT:  M-a-l-e.

 8              MR. SEVERO:  Yes, m-a-l-e.

 9              THE COURT:  Just clarifying.  Long day.

10   BY MR. SEVERO:

11   Q.   And this male is -- was Armenian also?

12   A.   Correct.

13   Q.   Can you describe him?

14   A.   He was tall, about anywhere from to 5-10 to 6 feet tall.

15   Medium build.  Wavy hair.

16   Q.   How old?

17   A.   Approximately in his 30s.

18   Q.   You have a clear memory of that?

19   A.   Pretty much, yeah.

20   Q.   This is in '07, right?

21   A.   I don't recall when it -- what year it was.  Like I said,

22   I don't remember the year itself.  What are we in now?  2014?

23              THE COURT:  Yeah.

24              THE WITNESS:  It's quite a -- quite a long time.  I

25   don't remember what I ate three months ago.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Okay.  Next question, Counsel.
 2   BY MR. SEVERO:
 3   Q.   Your memory is not very good, is it?
 4   A.   Oh, it's pretty good.
 5   Q.   But it's not very good?
 6   A.   No, it's not very good, but it's pretty good.
 7   Q.   So you were cashing checks in '07, and you remember seeing
 8   a male deliver checks to the yard during that time?
 9            MS. YANG:  Objection, misstates the testimony.
10            THE COURT:  Sustained.  The testimony was it was
11   sometime in '07 or '08.
12   BY MR. SEVERO:
13   Q.   Okay.  '07 or '08, you remember that, being at the yard
14   when boxes of checks would be delivered?
15   A.   I don't remember the exact year, but yes.
16   Q.   When did you meet him?
17   A.   Excuse me?
18   Q.   When did you meet Mr. Darbinyan?
19   A.   '07, '08.
20   Q.   Where?
21   A.   At the yard.
22   Q.   You went there?
23   A.   Sure did.
24   Q.   The only thing you know about this male that you met at
25   the yard from the bank was that he delivered a box?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    No.

2    Q.    Did you -- you said you spoke to him?

3    A.    Never told you I spoke to him.  You -- the question that

4    you asked me was did I meet him.  Yes, I met him.

5    Q.    Did you speak to him?

6    A.    Well, I had to speak to him to meet him.

7    Q.    Other than saying hello, did you speak to him about

8    anything else?

9    A.    No.

10   Q.    So that's why you said yes when I said did you speak to

11   him?

12   A.    Correct.

13   Q.    That's what you meant?

14   A.    Yes.

15   Q.    You said that Max is the guy that you -- would drive the

16   runners back and forth?

17   A.    Correct.

18   Q.    From what place to what place?

19   A.    From the Auto Zone or from the Home Depot to the banks.

20   Q.    How would they get to Auto -- how would the runners get to

21   Auto Zone?

22   A.    I would take them to Auto Zone.

23   Q.    Deliver them to Max, who would then drive them to the

24   banks?

25   A.    I would pull up -- I would pull up in my truck.  I would
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   meet Max there.  They would go in Max's car, and I would go in

2   my truck to the -- to the yard.

3   Q.   What kind of car did Max drive?

4   A.   I believe it was a Maxima.

5   Q.   You sure?

6   A.   I believe.  I'm not -- I'm not too sure the make or model

7   of the car, but it was a white one.

8   Q.   Okay.  When you met with Mr. Stebbins -- strike that.

9        How many times did you meet with Agent Stebbins before

10  today?

11  A.   Oh, about approximately five or six times.

12  Q.   You sure about that?

13  A.   Approximately.

14  Q.   What does "approximately" mean?  Give or take one?

15  A.   Or give or take two.  I don't know.

16  Q.   And was he taking notes when he would meet with you?

17  A.   Sometimes.

18  Q.   Was he alone when he met with you?

19  A.   No.

20  Q.   Who else was there?

21  A.   I believe other agents, other law enforcements, the D.A.

22  Q.   The D.A. being this gentleman here to my left,

23  Mr. Estrada?

24  A.   Sometimes.

25  Q.   Ms. Yang?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Sometimes.

 2   Q.   Mr. Creighton?

 3   A.   Sometimes.

 4   Q.   When you met with Agent Stebbins, did you tell him

 5   everything that you knew about this -- your involvement in --

 6   in this supposed fraud?

 7   A.   Yeah.

 8   Q.   In Exhibit 5A when you're talking to Mr. Darbinyan on the

 9   phone, you called him "Mikey."  Remember that?

10   A.   Yeah, sure do.

11   Q.   You didn't call him "Papa," did you?

12   A.   No.

13   Q.   You didn't call him "Mr. Darbinyan," did you?

14   A.   No, I didn't.

15   Q.   Or "Capone"?

16   A.   No.

17        THE COURT:  Okay, ladies and gentlemen, it being

18   4:00 o'clock, we're going to break at this time.

19        Tomorrow -- I always like to keep you aware of what's

20   going on -- we may be breaking at quarter of 4:00 or ten of

21   4:00 rather than 4:00 o'clock.  I don't know how that affects

22   you, but I'd like to keep you informed as far as that goes.

23   But other than that, we should be right on schedule.  I'm

24   hopeful that maybe we can wrap up the government's case by

25   maybe tomorrow, maybe the next day at the latest.  Then we'll
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    get into defense.

 2         Remember the admonishment not to discuss the case among

 3    yourselves or with anybody else or form or express any opinions

 4    about the matter until it's submitted to you and you retire

 5    into the jury room.

 6         We'll see you back in here tomorrow morning at?

 7              JURORS:  8:15.

 8              THE COURT:  8:15.  Okay.  See you tomorrow at that

 9    time.

10              THE CLERK:  All rise.

11

12              (Proceedings adjourned at 4:02 p.m.)

13

14                          --oOo--

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                              *CERTIFICATE*

2

3       I hereby certify that pursuant to Section 753,

4    Title 28, United States Code, the foregoing is a true and

5    correct transcript of the stenographically reported proceedings

6    held in the above-entitled matter and that the transcript page

7    format is in conformance with the regulations of the

8    Judicial Conference of the United States.

9

10   Date:  MARCH 4, 2015

11

12

13

14              /S/ SANDRA MACNEIL

15           Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3         HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6  UNITED STATES OF AMERICA,      )
                                  )
7                   Plaintiff,    )
                                  )
8        vs.                      )   NO:  CR-11-0072(A)-RGK
                                  )
9  (1)  MHER DARBINYAN,           )
   (4)  ARMAN SHAROPETROSIAN,     )
10 (35) RAFAEL PARSADANYAN,       )
                                  )
11                  Defendants.   )
   _____)

12

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15      DAY 11; VOLUME I OF II; PAGES 1 THROUGH 144

16                   MORNING SESSION

17              Los Angeles, California

18            Wednesday, April 9, 2014

19

20

21

22

23                    KATHERINE M. STRIDE, RPR, CSR
                      1107 Fair Oaks Avenue, #68
24                    S. Pasadena, California  91030
                      www.stridecourtreporting.com
25                    (323)474-6420

**APPEARANCES:**

On behalf of the Government:

      UNITED STATES ATTORNEY'S OFFICE
      ANDRÉ BIROTTE, JR., UNITED STATES ATTORNEY
      BY:  E. MARTIN ESTRADA
          ELIZABETH R. YANG
      ASSISTANT UNITED STATES ATTORNEYS
      312 North Spring Street
      Los Angeles, California  90012
      (213)894-4477

      U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
      BY:  ANDREW CREIGHTON, TRIAL ATTORNEY
      312 North Spring Street
      Los Angeles, California  90012
      (213)894-2579

On behalf of Defendant Mher Darbinyan:

      THE SEVERO LAW FIRM
      BY:  MICHAEL SEVERO, ATTORNEY AT LAW
      70 South Lake Avenue, Suite 945
      Pasadena, California  91101
      (626)844-6400

On behalf of Defendant Arman Sharopetrosian:

      LAW OFFICES OF CHARLES PEREYRA-SUAREZ
      BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
      800 Wilshire Boulevard, 12th Floor
      Los Angeles, California  90012
      (213)623-5923

On behalf of Defendant Rafael Parsadanyan:

      FLIER AND FLIER, ALC
      BY: ANDREW REED FLIER, ATTORNEY AT LAW
      15250 Ventura Boulevard, Suite 600
      Sherman Oaks, California  91403
      (818)990-9500

Also Present:

      JEREMY STEBBINS, F.B.I. SPECIAL AGENT

      MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT

1                            **I N D E X**

2                      GOVERNMENT'S WITNESSES

3              JURY TRIAL – DAY 11, VOLUME I OF II

4                                                    Page

5    **GUSTAVO ORTEGA, PREVIOUSLY SWORN**...................... 6
        CROSS-EXAMINATION CONTINUED
6        BY MR. SEVERO........................................ 6
        CROSS-EXAMINATION
7        BY MR. PEREYRA-SUAREZ............................... 34
        CROSS-EXAMINATION
8        BY MR. FLIER....................................... 36
        REDIRECT EXAMINATION
9        BY MS. YANG........................................ 65
        RECROSS-EXAMINATION
10       BY MR. SEVERO...................................... 82
        RECROSS-EXAMINATION
11       BY MR. FLIER....................................... 89
        RECROSS-EXAMINATION REOPENED
12       BY MR. FLIER....................................... 90

13   **MARY JANE KING, SWORN**................................ 92
        DIRECT EXAMINATION
14       BY MR. ESTRADA..................................... 92
        CROSS-EXAMINATION
15       BY MR. SEVERO...................................... 98
        CROSS-EXAMINATION
16       BY MR. FLIER...................................... 100

17   **STEPHEN GONZALES, SWORN**............................ 104
        DIRECT EXAMINATION
18       BY MR. CREIGHTON.................................. 105
        CROSS-EXAMINATION
19       BY MR. SEVERO..................................... 109
        CROSS-EXAMINATION
20       BY MR. FLIER...................................... 111

21   **JANELL LYNN ARNOLD, SWORN**.......................... 113
        DIRECT EXAMINATION
22       BY MS. YANG....................................... 113
        CROSS-EXAMINATION
23       BY MR. SEVERO..................................... 120
        CROSS-EXAMINATION
24       BY MR. FLIER...................................... 121

25

1                        **I N D E X**

2

3              GOVERNMENT'S WITNESSES (CONTINUED)

4              JURY TRIAL – DAY 11, VOLUME I OF II

5                                               **Page**

6  **MURIEL L. JOHNSON, SWORN**............................ 122
      DIRECT EXAMINATION
7     BY MR. ESTRADA.................................... 122
      CROSS-EXAMINATION
8     BY MR. SEVERO.................................... 128

9  **MARIA LEMUS, SWORN**................................. 129
      DIRECT EXAMINATION
10    BY MR. CREIGHTON................................. 130
      CROSS-EXAMINATION
11    BY MR. SEVERO.................................... 133
      CROSS-EXAMINATION
12    BY MR. FLIER..................................... 134

13 **JUDITH DaVANZO, SWORN**.............................. 136
      DIRECT EXAMINATION
14    BY MS. YANG...................................... 137
      CROSS-EXAMINATION
15    BY MR. SEVERO.................................... 141

16

17

18

19

20

21

22

23

24

25

# E X H I B I T S

### GOVERNMENT'S EXHIBITS

### JURY TRIAL – DAY 11, VOLUME I OF II

**Page**

Exhibit No. 247 admitted into evidence................. 21

Exhibit No. 375 admitted into evidence............... 139

Exhibit No. 376 admitted into evidence............... 106

Exhibit No. 377 admitted into evidence............... 124

Exhibit No. 378 admitted into evidence............... 95

Exhibit No. 383 admitted into evidence............... 131

Exhibit No. 384 admitted into evidence............... 117

### PROCEEDINGS

Discussion with Juror No. 28.......................... 76

Juror No. 28, seat No. 11 excused..................... 80

Alternate Juror moved into Jury Panel................. 82

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 9, 2014

 2                         A.M. SESSION

 3                          --oOo--

 4                         8:35 A.M.

 5              (Jury enters courtroom.)

 6          THE CLERK:  All rise and face the flag.

 7              (Judge enters courtroom.)

 8          THE CLERK:  This United States District Court is now

 9      in session, the Honorable R. Gary Klausner, United States

10      District Judge presiding.

11          You may be seated.

12          THE COURT:  Okay.  The record will reflect that all

13      the members of the jury are in their respective seats in

14      the jury box, and the witness is on the witness stand.

15          And we're at cross-examination, Counsel.  You may

16      continue.

17          MR. SEVERO:  Thank you, Your Honor.

18          THE CLERK:  Excuse me.

19          Mr. Ortega, I remind you, you are still under oath.

20          Thank you.

21                       GUSTAVO ORTEGA,

22      GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, TESTIFIED FURTHER:

23                  CROSS-EXAMINATION (Continued)

24      BY MR. SEVERO:

25      Q.    You were arrested in Glendora; is that correct, sir?
```

1    A.    Yes, sir.

2    Q.    And you had another case pending in San Bernardino,

3    both of which were for -- both the San Bernardino and

4    Glendora case were for credit card fraud?

5    A.    Yes, sir.

6    Q.    And the credit card fraud that you perpetrated, you

7    thought you were going to get probation on, did you?

8    A.    Yes, sir.

9    Q.    So because you had these two cases, you have a long

10   criminal history, you thought you would want to cooperate

11   with the police at that point?

12   A.    Yes, sir.

13   Q.    So in December of '09, you sat with a couple of

14   officers and told them what you wanted to tell them about

15   how this credit card fraud was being done, did you?

16         MS. YANG:  Objection, argumentative.

17         THE COURT:  Sustained, the way it's phrased.

18   BY MR. SEVERO:

19   Q.    Okay.  Did you want to tell these officers what the

20   credit card fraud that you were engaged in was about?

21   A.    Yes, sir.

22   Q.    And do you remember telling them everything you

23   remember about that credit card fraud?

24   A.    Can you repeat the question, please?

25   Q.    Yes.  Did you tell them everything you remembered

1   about that credit card fraud scheme?

2   A.    Yes, sir.

3   Q.    As it turned out, you got seven years, didn't you?

4   A.    Yes, sir.

5   Q.    So you wanted to cooperate even more, didn't you?

6   A.    On what case, sir?

7   Q.    Well, at that time, the San Bernardino case.

8   A.    Well, I got seven years; so I couldn't cooperate.  I

9   mean, it was over with.

10  Q.    So you got indicted, then, in '11?

11  A.    Yes, sir.

12  Q.    In this case.

13  A.    Yes, sir.

14  Q.    And you do recall that in that first interview in

15  2009, you told the officers that your payment for the

16  participation in the credit card fraud scheme was credit

17  card numbers obtained from the PIN code?

18  A.    Yes, sir.

19  Q.    And that's all you told them -- correct? -- about

20  your compensation?

21  A.    I don't remember if that's all I told them, sir.

22  Q.    Well, would you have told them the truth then?

23  A.    Yes, I would have.

24  Q.    Well, would you have been complete in telling them

25  the truth then?

1    A.    Rephrase that for me, please.

2    Q.    Would you have told them everything you knew about

3    your participation and compensation in the scheme then?

4    A.    Yeah.

5    Q.    And you never mentioned any money being paid to you,

6    did you?

7    A.    I don't remember.

8    Q.    Your memory in 2009 about the credit card scheme was

9    better than your memory today?

10    A.    I'm pretty sure it was, yes.

11    Q.    And in fact, it was better than when you talked to

12    them again in September of 2010?

13          Let me rephrase that.

14          Your memory in 2009, when you first sat with the

15    officers, was better than in September of 2010 when you sat

16    with them again?

17    A.    I wouldn't say better.

18    Q.    No?

19    A.    No.

20    Q.    Do you think your memory was better in 2010 than in

21    '09?

22    A.    Well, sometimes you remember things after -- after

23    you have an interview.

24    Q.    Or after you get seven years.

25    A.    The seven years, I already had it.

1    Q.    Seven years you got in 2010, didn't you?

2    A.    I believe so.

3    Q.    In 2009, you said your payment for participation in

4    the scheme was getting the credit card numbers from the PIN

5    code.

6          MS. YANG:  Objection, asked and answered.

7          THE COURT:  Sustained.

8    BY MR. SEVERO:

9    Q.    In 2010, you told the officers that you got $800 for

10   your work and 500 credit card numbers.  Do you remember

11   that?

12   A.    Yes, sir.

13   Q.    So your compensation grew between 2009 and 2010;

14   correct?

15         MS. YANG:  Objection, argumentative.

16         THE COURT:  Sustained.

17   BY MR. SEVERO:

18   Q.    And then, in February of 2014, you told them that it

19   wasn't 800, that it was $10,000.  Do you recall that?

20   A.    Yes, sir.

21   Q.    Was your memory getting better as time went on?

22   A.    Well, the 800 and the 10,000 were two different

23   payments for two different things.

24   Q.    So you didn't say that, instead of 800, you got

25   10,000, to Mr. Stebbins in 2014?

1    A.    Yes, I did.

2    Q.    So was it instead of or in addition to?

3    A.    No.  What I was referring to was the $800 was for

4    another part of fraud.  The 10,000 was for the credit

5    cards.

6    Q.    You're sure about that?

7    A.    I'm positive.

8    Q.    You told the officers in 2010 that the people you

9    would find would be druggies; is that true?

10   A.    Some, yes.

11   Q.    Well, didn't you tell them that, because of your

12   previous drug history, you could find numerous people?

13   A.    Yes, I did.

14   Q.    Now, it's your testimony that Mr. Darbinyan told you

15   how the check scheme worked?

16   A.    Correct.

17   Q.    And he also introduced you to people that were

18   supposed to be insiders of the bank?

19   A.    Never introduced them to me.

20   Q.    Didn't he point it out -- point out to you who were

21   the insiders of the bank?

22   A.    No.

23   Q.    Somebody showed up at the yard, and Mr. Darbinyan

24   told you that that guy was a bank insider?

25   A.    Yes, I knew that.

1    Q.    So he revealed these things to you, did he?

2    A.    Yes.

3    Q.    He also entrusted you with the money from the check?

4    A.    No.

5    Q.    Isn't it a fact that you told the officers in 2010

6    that you knew little about the scheme because Mr. Darbinyan

7    was very secretive?

8    A.    In what part of the scheme are you referring to?

9    Q.    You shared little -- let me rephrase that.

10         "He told us very little about the -- how the scheme

11   worked because he was very secretive -- "

12   A.    I don't believe I told him that he told me very

13   little.  I just said that he was a very secretive person.

14   Q.    " -- and shared little of the operational

15   information with him."

16   A.    Yes, as far as the profiles.

17   Q.    All right.  But you didn't say that, did you?

18   A.    I don't remember if I said that at that interview.

19   Q.    You said he shared very little with you about the

20   operational information of the scheme, didn't you?

21         MS. YANG:  Objection, asked and answered.

22         THE COURT:  Sustained.

23   BY MR. SEVERO:

24   Q.    So what you learned was that these people you

25   brought to him would open business accounts?

1    A.    Some, yes.

2    Q.    And they would use these business accounts -- strike

3    that.

4          They would open these business accounts by

5    depositing cash?

6    A.    No.

7    Q.    Depositing checks?

8    A.    Correct.

9    Q.    Would they deposit large checks into these business

10   accounts?

11   A.    Some large, some small.

12   Q.    And they would cash them immediately?

13   A.    No, sir.

14   Q.    How long would it take to cash them?

15   A.    In -- as soon as they would be cleared.

16   Q.    So it wouldn't be a situation where a check would be

17   deposited and immediately the money would be out in

18   cashier's checks.

19   A.    I believe, no.

20   Q.    You believe?  You're not sure.

21   A.    I'm not sure.

22   Q.    You're not sure because you don't remember.

23   A.    No, I'm not sure because it all depends on when the

24   bank clears the check.

25   Q.    So this recently opened business account would get a

1   check, and the bank could just clear the check and issue

2   cashier's checks after that.  Is that what you're telling

3   us?

4   A.     As soon as the check was cleared, yes, correct.

5   Q.     Not the same day.

6   A.     As I said, as soon as the check is cleared.

7   Q.     Who taught you -- who told you how to unplug the

8   machines at the 99 Cents Stores?

9   A.     Mr. Darbinyan.

10  Q.     And did you have to use a screwdriver to do that?

11  A.     No.

12  Q.     What do you use to unplug the machines?

13  A.     I didn't unplug the machines.

14  Q.     So you didn't know how to do that, did you?

15         THE COURT:  He said he didn't unplug them.

16  BY MR. SEVERO:

17  Q.     Right.  You wouldn't know how to do that.

18  A.     Yes, I would know how to do that.

19  Q.     Have you seen any videos showing you unplugging

20  machines?

21  A.     No.

22  Q.     What is the most that you made from this whole

23  scheme in terms of money?

24  A.     The most in as far as a day?

25  Q.     Overall.

```
1    A.      I wouldn't be able to tell you a number.

2    Q.      The most in one day?

3    A.      Around 3,500.

4    Q.      And you get a third of that?

5    A.      No.  That would be after I paid everybody.  What

6    would be mine would be 3,500.

7    Q.      You're saying that the largest amount you received

8    was 3,500.

9    A.      I'm saying around.

10   Q.      So your testimony that Mr. Darbinyan, who was

11   secretive about how things worked, told you about his

12   Mexican Mafia connections?

13   A.      As far as what?

14   Q.      It's your testimony he told you about how he was

15   paying rent?

16   A.      We've talked about it.

17   Q.      And he was paying rent for what purpose?

18   A.      To be able to work, to continue to work with no one

19   getting involved in his work.

20   Q.      I'm sorry?  For -- for what?

21   A.      To continue the work he's doing so no other gang

22   member can get involved in his work.

23   Q.      You wouldn't be talking about territories given to

24   Mr. Darbinyan, are you?

25   A.      Somewhat.
```

1   Q.      Somewhat?  What territories would be controlled by

2   Mr. Darbinyan by paying rent?

3   A.      The way that works is, when you pay --

4   Q.      No, I don't want you to tell me the way it works.  I

5   want you to tell me what Mr. Darbinyan said he told you.

6           MS. YANG:  Objection, Your Honor.  The witness is

7   just trying to answer the question.

8           THE COURT:  Well, the question doesn't make a whole

9   lot of sense.

10          Why don't you restate the question again.

11  BY MR. SEVERO:

12  Q.      What did Mr. Darbinyan tell you about what he was

13  paying rent for?

14  A.      He was paying rent so he could operate his

15  operation.

16  Q.      Okay.  Did that include territory control?

17  A.      I believe so.

18  Q.      You believe so, but you don't know, or did he tell

19  you that?

20          THE COURT:  Did he ever tell you that --

21          MR. SEVERO:  I'm sorry, Your Honor.

22          THE COURT:  Did he ever tell you that he had a

23  certain territory that he controlled?

24          THE WITNESS:  No.

25          THE COURT:  Okay.

BY MR. SEVERO:

Q.    Did he tell you that he would pay rent so he could operate in different areas controlled by the Mexican Mafia?

A.    Correct.

Q.    And what areas would those be?

A.    North Hollywood, Hollywood.

Q.    Who was -- do you know who the Mexican Mafia member was that controlled those areas?

A.    Well, there was several.

Q.    Can you name them?

A.    A few.

Q.    Was Mr. Moreno one of them, Armando Moreno?

A.    I have never heard that name.

Q.    You were at the yard all the time?

A.    When I was to go visit him, yes.

Q.    Did you see any Mexican Mafia members there?

A.    Not when I was there, because I have a Mexican Mafia hit, so he would tell me not to come when they were there.

Q.    Did you ever see a Mexican Mafia member there?

A.    No.

Q.    Mr. Darbinyan, according to your statement, didn't trust you with money, did he?

A.    I believe he wouldn't trust me with the money when we were going to pick it up.

Q.    He didn't trust you with the money because you were

1   a drug user?

2   A.      Could be, yes.  That could be one of the reasons

3   why.

4   Q.      And he trusted you with all this information but not

5   with the money, is that what you're telling this jury?

6   A.      You would have to ask your client that.

7   Q.      I'm asking you.  You had all these conversations.

8           THE COURT:  That would be speculation, Counsel.

9   BY MR. SEVERO:

10  Q.      You don't know?

11  A.      I wouldn't know.

12  Q.      Sir, you were charged in this case with 83 counts of

13  fraud and other things?

14  A.      In which count?

15  Q.      In this case.

16  A.      I believe so.

17  Q.      And you're pleading to four counts; correct?

18  A.      Yes.

19  Q.      And the government has promised to dismiss the other

20  79 counts after you get sentenced?

21  A.      The government hasn't promised me anything.

22  Q.      They didn't say, "We're going to dismiss the other

23  79 counts"?

24  A.      If they did, they didn't tell me.  They probably

25  told my counsel.

1   Q.    Did your counsel tell you that they would dismiss

2   the 79 counts?

3   A.    No, he just let me know that there was four counts.

4   Q.    Did your counsel tell you that, by cooperating, you

5   could get your sentence reduced?

6   A.    No.

7   Q.    You're cooperating for free?

8   A.    No.

9   Q.    What are you cooperating for?

10  A.    I'm cooperating so that I can get lesser time, I

11  mean, but it's on the judge's behalf for him to decide what

12  my fate is on this case.

13  Q.    Did they tell you that the judge usually follows the

14  recommendation of the government?

15        MS. YANG:  Objection, argumentative.

16        THE COURT:  Sustained, and definitely assumes facts

17  not in evidence.

18        MR. SEVERO:  I'm -- I just want to know what he's

19  been told, Your Honor.

20        THE COURT:  Sure.

21  BY MR. SEVERO:

22  Q.    Your hope is that you'll get out in less time;

23  correct?

24  A.    I'm hoping that the judge will take in consideration

25  what I'm doing today so, when he sentences me, he would --

```
1    he would be more lenient on me.

2    Q.     Did you read your plea agreement?

3    A.     Yeah.

4    Q.     Did you understand it?

5    A.     Yeah.

6    Q.     You were promised by the government that they would

7    not offer as evidence crimes for which you are not

8    prosecuted -- let me restart that.

9         The government promised you in their plea

10   agreement -- in the plea agreement that you would not be

11   prosecuted for any crimes that you would tell them about in

12   your proffers; is that true?

13   A.     The prosecution did not promise me anything.

14   Q.     They didn't?

15   A.     No.

16        MR. SEVERO:  Your Honor, I have the witness's plea

17   agreement, which I believe has been marked, but I'm not

18   sure which -- which section.  If I may have a moment.

19        MS. YANG:  Your Honor, it's Government's

20   Exhibit 247.  And if Mr. Severo would like to, the

21   government does not object to having it admitted into

22   evidence.

23        MR. SEVERO:  So I would move to admit it into

24   evidence and ask permission to publish it.

25        THE COURT:  It will be received.
```

```
 1                    (Exhibit 247 is admitted into evidence.)

 2           MR. SEVERO:  Thank you.

 3    BY MR. SEVERO:

 4    Q.     Let me show you the last page -- or not the last

 5    page.  That is the last page.  Not the one I want.

 6           See this page here?

 7    A.     Yeah.

 8    Q.     Do you see it?

 9    A.     Yes, sir.

10    Q.     Is that your signature?

11    A.     Yes, sir.

12    Q.     It says you've read the agreement in its entirety.

13    Do you see that?

14    A.     Yes, sir.

15    Q.     And you have had time to review and consider it and

16    have discussed it with your lawyer?

17    A.     Correct.

18    Q.     And at page 4 of the agreement, the government

19    agrees to do certain things for you?

20    A.     Like I said, the government can't promise me

21    nothing.  They can agree to do something, but they can't

22    promise me nothing.

23    Q.     Well, they can promise you that they will abide by

24    all agreements regarding sentencing factors.  Do you see

25    that?
```

1    A.    Correct.

2    Q.    So they promised you that, didn't they?

3    A.    No.  There's no -- they never told me "promise."

4    Q.    The government's obligation under this plea

5    agreement, as you understand it, is that they would abide

6    by the terms of the agreement in terms of the sentencing

7    factors?

8    A.    Can you rephrase that to me, please?

9    Q.    Yes.  The government has agreed with you in this

10   plea agreement to follow the sentencing factors that are

11   included in this agreement; correct?

12   A.    Correct.

13         THE COURT:  I'm going to clarify for the jury's

14   sake.  The questions they're asking, what the government

15   promised they would do, he's not asking what the Court will

16   do or what will happen eventually, just what the government

17   would do.

18         THE WITNESS:  Okay.

19         THE COURT:  Okay.  Go ahead, Counsel.

20   BY MR. SEVERO:

21   Q.    Right.  The Court's not involved in any of this.

22   You do know that; right?

23   A.    Of course.

24   Q.    And they agreed further that they would not offer as

25   evidence in connection with any sentencing proceeding

1    anything you tell them about this case or any other case

2    you were involved in.

3    A.    Correct.

4    Q.    So they did promise you that.

5    A.    They agreed.

6    Q.    Okay.  They also told you they agreed, they promised

7    you, not to use the cooperation information for the purpose

8    of determining the sentencing guideline range.  Do you

9    remember that?

10   A.    Correct.

11   Q.    So that was important to you, wasn't it, that the

12   government would not use what you told them in order to

13   sentence you -- or rather to recommend a certain sentence?

14   A.    Correct.

15   Q.    They also agreed to recommend to the Court that

16   information not be used in determining the applicable

17   guideline range; correct?

18   A.    Correct.

19   Q.    You could tell them anything you wanted, and it

20   wouldn't be used against you; correct?

21        MS. YANG:  Objection, Your Honor, argumentative.

22        THE COURT:  Well, sustained.  And that's not exactly

23   what it says.  It says they wouldn't use it against him.

24        MR. SEVERO:  Right.

25        THE COURT:  Okay.

1    BY MR. SEVERO:

2    Q.    The government also promised you that if they

3    thought you were -- your cooperation was substantial, that

4    they would move the government -- the Court -- they would

5    make a motion to the Court to lower your sentence; correct?

6    A.    They said not to lower my sentence, but they would

7    give a letter of recommendation.

8    Q.    Saying what?

9    A.    That I participated in telling them what I knew.

10   Q.    Saying that -- is it your testimony that they would

11   not ask the Court to sentence you lower than whatever the

12   sentencing guidelines are?

13   A.    You're asking me if that would be my testimony?

14   Q.    No.  I'm asking if the agreement between you and the

15   government is that if they find that your cooperation was

16   substantial, that they would move the Court for a lowering

17   of your sentence below the guideline range in the

18   sentencing guidelines.

19   A.    No.  They said that they would send a letter of

20   recommendation to the courts to let them know my

21   participation.

22   Q.    So tell me what this means to you (as read:)

23              "To move the Court, pursuant to U.S.S.G.

24              Section 5K1.1, to fix an offense level and

25              corresponding guideline range below that

```
 1                     otherwise dictated by the sentencing

 2                     guidelines."

 3          What did that mean to you?

 4     A.    That means that they were going to send the letter

 5     to the courts, right, and let the judge know that I

 6     participated, and if it was possible, that I can get a

 7     lower sentence.

 8     Q.    They would recommend a lower sentence.

 9     A.    Correct.

10     Q.    Oh, finally.  Okay.

11          This also says to recommend the term of imprisonment

12     within this reduced range.

13          Do you see what the government agreed to do?

14     A.    Correct.

15     Q.    All right.  Do you recall in your sentencing --

16     rather, in your plea agreement, that a number of -- you

17     were asked to admit a number of facts.  Do you recall that?

18     A.    I don't remember.

19     Q.    Do you know what a factual basis in the agreement

20     is?

21     A.    No.  Please explain to me.

22     Q.    Well, didn't your lawyer explain it to you?

23     A.    I'm sure he did.

24     Q.    You didn't understand it?

25     A.    I don't remember what -- what he explained to me
```

1   back then.

2   Q.     Well, let's see.  At page 11 of the agreement, it

3   says (as read:)

4                "Defendant and the USAO, United States

5                Attorney's Office, agree to a statement of

6                facts provided below."

7   A.     Correct.

8   Q.     Do you remember that now?

9   A.     Now I do.

10  Q.     And it says here that, on a date unknown when it

11  started, but continuing to January of 2011, you did certain

12  things.

13         Now, was that true?

14  A.     I did certain things as far as what?

15         MS. YANG:  Your Honor, object.  This misstates the

16  document.

17         MR. SEVERO:  It does?

18         THE COURT:  And the document does speak for itself.

19  I want to give you some latitude, but we're getting very

20  close to a 403 in consumption of time, far outweighing the

21  relative --

22  BY MR. SEVERO:

23  Q.     You agreed in this agreement that you were an

24  associate of Armenian Power?

25  A.     That I was an associate?

1    Q.    Yes.

2    A.    Yes, I agree.

3    Q.    Did you ever go to Armenian Power meetings?

4    A.    No.

5    Q.    Do you ever participate in any gang stuff?

6    A.    Yes.

7    Q.    The only connection that you have with what you

8    believe is Armenian Power is that you knew Mr. Darbinyan;

9    correct?

10   A.    No.

11   Q.    In January of 2011, you were in jail, weren't you?

12   A.    Correct.

13   Q.    You were -- you'd been in jail since '09; correct?

14   A.    Correct.

15   Q.    So this thing that says continuing to January of '11

16   is not true, is it?

17         MS. YANG:  Objection, Your Honor.  Again, best

18   evidence is the document.

19         THE COURT:  Sustained.

20   BY MR. SEVERO:

21   Q.    It says that you conspired and agreed with a number

22   of people here.  Do you see that?

23   A.    Correct.

24   Q.    Who is Paramaz Bilezikchyan?

25   A.    Say that name again, one more time.

1    Q.    Paramaz Bilezikchyan.

2    A.    I knew him as "Sam."

3    Q.    Did you meet him?

4    A.    No.

5    Q.    Did you ever talk to him?

6    A.    No.

7    Q.    Did you ever agree to do anything with him?

8    A.    No.

9    Q.    Karo Yerkanyan, do you know who he is?

10   A.    No.

11   Q.    Did you ever agree to do anything with him?

12   A.    No.

13   Q.    How about Arman Sharopetrosian?

14   A.    No.

15   Q.    You never met Arman Sharopetrosian?

16   A.    If I have, I don't know him by that name.

17   Q.    If you have, would you recognize him?

18   A.    Yes.

19   Q.    Well, do you recognize anybody else in the courtroom

20   other than Mr. Darbinyan and the prosecution team?

21   A.    As far as --

22   Q.    Of anyone that you had agreements with during the

23   time you were committing all these crimes.

24   A.    No, just with Mr. Darbinyan.

25   Q.    So you don't -- you don't recognize

1    Mr. Sharopetrosian in this room, do you?

2    A.    No.

3    Q.    Arman Tangabekyan?

4    A.    No.

5    Q.    Hayk Karayan?

6    A.    No.

7    Q.    We can go on and on.  You don't know any of these

8    people, do you?

9    A.    Not by those names.

10   Q.    But you agreed to do certain things -- you agreed

11   that you had conspired with all these people.

12   A.    In the past, yes.

13   Q.    All of them?

14   A.    No, not all of them.

15   Q.    Well, there's a fellow down here called Armando

16   Moreno.  Do you know who he is?

17   A.    I know of him.

18   Q.    You told us a little while ago you never heard that

19   name.

20   A.    I never heard the name, but I know of him.

21   Q.    Okay.  Did you -- it says in this agreement,

22   page 14, line 19, that on this date, January 28th,

23   Darbinyan and somebody by the name of Terzyan discussed

24   committing bank fraud.

25         Were you there when that happened?

1    A.    I believe no.

2    Q.    There are lots of things in this agreement that you

3    don't know anything about but you agreed to admit to; true?

4    A.    As far as the fraud part, yes.

5    Q.    Do you know a Rafael Parsadanyan?

6    A.    I don't know none of these people as their real

7    names.

8    Q.    Well, let me ask you this:  At page 16 of this

9    agreement, you say that, on August 27th, Darbinyan told

10   Parsadanyan that he was on his way to San Diego.  Do you

11   see that right here (indicating)?

12   A.    Okay.  Correct.

13   Q.    Did you really know that that conversation took

14   place?

15   A.    If I knew that -- if I knew his moniker, who they

16   were referring him to, then I would be able to tell, yes.

17   Q.    How about Rafo?

18   A.    Rafo?

19   Q.    Rafa, Rafael, Rafi.  Ever heard that?

20   A.    Yeah.

21   Q.    Were you present on August 27, 2009, when Darbinyan

22   told Parsadanyan that he was on his way to San Diego?

23   A.    No.

24   Q.    So you say in this agreement you agree that this

25   happened, but you weren't there.

```
 1   A.     I was in San Diego.

 2          MS. YANG:  Objection.  The agreement doesn't specify

 3   if it was a phone call or a meeting.

 4          MR. SEVERO:  It doesn't matter.

 5          THE COURT:  Sustained.

 6          MR. SEVERO:  Thank you.

 7          THE COURT:  Because, if it helps, it's on the

 8   grounds of -- I didn't hear her, but I'm sure she meant

 9   argumentative.

10          MR. SEVERO:  May I have a moment, Your Honor?

11          THE COURT:  Sure.

12   BY MR. SEVERO:

13   Q.     Is it your testimony that these PIN pads would

14   remain at these locations for six months?

15   A.     Excuse me?

16          MS. YANG:  Objection.  Misstates the testimony from

17   yesterday.

18          THE COURT:  Overruled.

19          Would the PIN pads stay there, the altered PIN

20   pads --

21   BY MR. SEVERO:

22   Q.     For six months.

23   A.     I wouldn't know the exact date, how long they would

24   stay there.  I was just approximating.

25   Q.     When you said that they would stay there six months
```

1    or three months, you really didn't know that, did you?

2    A.    No, I didn't know how long they stayed there.

3    Q.    And you said six months or three months because you

4    decided to say whatever.

5          MS. YANG:  Objection, argumentative.

6          THE COURT:  Sustained.

7    BY MR. SEVERO:

8    Q.    Do you have a computer at your house?

9    A.    No.

10   Q.    The credit card numbers you say you received were in

11   a computer chip?

12   A.    Correct.

13   Q.    When you -- this time when you went to San Diego, is

14   it your testimony that Mr. Darbinyan was in San Diego as

15   well?

16   A.    Correct.

17   Q.    What kind of car was he driving?

18   A.    A Ford -- I mean a Toyota Tundra.

19   Q.    A truck?

20   A.    Correct.

21   Q.    Color?

22   A.    White.

23   Q.    And he was driving that car?

24   A.    Him and another occupant with him.

25   Q.    You never provided the officers with any dates as to

1    when things happened between you and Mr. Darbinyan, did

2    you?

3    A.    I don't recall on the dates.

4    Q.    You said in 2010 that bank account information was

5    coming from a Washington Mutual employee.  Do you remember

6    saying that?

7    A.    Correct.

8    Q.    And you're sure there was a Washington Mutual in

9    2010.

10   A.    Not in 2010.  As you recall, I told you they were --

11   they were turned into Chase Banks.

12   Q.    Yes.  Yes, you've told us.

13         MS. YANG:  Objection.  Commenting on the witness's

14   testimony.

15         THE COURT:  Overruled.

16   BY MR. SEVERO:

17   Q.    The fact is that you have very little memory of

18   many -- of anything really, because, in your own words, you

19   were often on drugs during this time?

20   A.    Sometimes.

21   Q.    Is the answer "yes"?

22         THE COURT:  Well, he answered "sometimes."

23         MR. SEVERO:  I have nothing further.

24         THE COURT:  Counsel.

25   ///

**CROSS-EXAMINATION**

BY MR. PEREYRA-SUAREZ:

Q.    Mr. Ortega, before coming to this courtroom on this case, you, in fact, have never met my client, Arman Sharopetrosian; is that correct?

A.    Correct.

Q.    You have never talked to him on the phone; is that correct?

A.    Correct.

Q.    You never got any money from Mr. Sharopetrosian; is that correct?

A.    Correct.

Q.    You never gave any money to Mr. Sharopetrosian; is that correct?

A.    Correct.

Q.    You never discussed runners with Mr. Sharopetrosian; is that correct?

A.    Correct.

Q.    You never discussed bank deposits with Mr. Sharopetrosian; correct?

A.    Correct.

Q.    You never discussed taking money out of bank accounts with Mr. Sharopetrosian; is that correct?

A.    Correct.

Q.    You never discussed anything relating to 99 Cents

1    Stores with Mr. Sharopetrosian; is that correct?

2    A.    Correct.

3    Q.    In fact, you had no interaction with

4    Mr. Sharopetrosian of any kind; is that correct?

5    A.    Correct.

6          MR. PEREYRA-SUAREZ:  Nothing further, Your Honor.

7          THE COURT:  Okay.  Counsel, for the record, I should

8    remind the jury again that, as to the 99 Cents Stores,

9    Mr. Sharopetrosian is not charged with anything relating to

10   those.

11         Counsel.

12         MS. YANG:  Your Honor, just for clarification, he's

13   not charged in the substantive bank fraud or aggravated

14   identity theft counts, but the 99 Cents Store fraud scheme

15   is charged as part of the RICO conspiracy.

16         THE COURT:  As part of the what?

17         MS. YANG:  The RICO conspiracy, the racketeering

18   conspiracy --

19         THE COURT:  Oh, okay.

20         MS. YANG:  -- in which Mr. Sharopetrosian is

21   charged.

22         THE COURT:  You're right.

23         MR. FLIER:  Your Honor, may I proceed?

24         THE COURT:  Yes, please.

25         MR. FLIER:  Thank you, sir.

### CROSS-EXAMINATION

BY MR. FLIER:

Q.     Mr. Ortega, how are you?

A.     Fine, sir.

Q.     If I was to ask you how many times do you think you spoke to the government prosecutors before you testified today, what's your answer?

A.     Approximately five or six.

Q.     And clearly, they told you always to tell the truth; is that correct?

A.     Correct.

Q.     And they, both of the prosecutors, would never tell you to mislead anybody when you're testifying; am I correct?

A.     Correct.

Q.     But did they ever speak to you about -- your testimony has to be truthful; am I correct?

A.     Correct.

Q.     And did you ever have a conversation with them, the government prosecutors and your lawyer, about who would tell you if it was truthful, in other words, who would determine that?  Did you ever have that conversation?

A.     No.

Q.     Thank you.

       Now, you testified yesterday and sometime briefly

1    today that you're very familiar with Mr. Darbinyan; is that

2    correct?

3    A.    Correct.

4    Q.    And I believe you said yesterday that you, during a

5    certain time period, were almost with him every day; is

6    that correct?

7    A.    Almost, correct.

8    Q.    Now, with respect to the time period that you were

9    with him almost every day, what year are we referencing, if

10   you have a recollection of that, sir?

11   A.    As far as when we were committing the fraud?

12   Q.    If that helps you remember the time period, yes,

13   sir.

14   A.    As far as time period, sir, it's been six years or

15   seven years, around that, I've been incarcerated.  I'm not

16   incarcerated since this was going on, so I wouldn't be able

17   to give you a time period.

18   Q.    Well, I think we heard today that you were arrested

19   on some other matter, maybe in a state proceeding, at the

20   end of 2010.

21   A.    Correct.

22   Q.    And with respect to -- was that a state proceeding

23   versus a federal issue, if you remember?

24   A.    It was state.

25   Q.    And that's where you received, I think you said, a

1    seven-year, or something to that effect, sentence?

2    A.    Correct, sir.

3    Q.    And then you were indicted on this case; correct?

4    A.    Correct, sir.

5    Q.    And I'm not going to go over what co-counsel went

6    through.  I'm going to ask you a couple questions on the

7    plea agreement.

8          But then you entered into a plea agreement on this

9    matter, as we heard; correct?

10   A.    Correct.

11   Q.    And clearly -- and I'll move on -- you think you're

12   going to hopefully get some benefit and leniency through

13   the judge based on your cooperation.  Does that make sense?

14   A.    Correct.

15   Q.    And you have been told, and even the Court said it

16   today, no one, no one can bind the judge.  Am I correct?

17   A.    Correct.

18   Q.    But you understand the importance of cooperating,

19   hopefully testifying truthfully, so then, when you are

20   before the sentencing judge, at least the government will

21   say you were cooperating.  Does that make sense?

22   A.    Correct.

23   Q.    Now, the gentleman that we spoke about, or

24   Mr. Moreno, first you said you had no idea who he was, and

25   then you said recently you have heard of him.  Am I

1    correct?

2    A.    Correct.

3    Q.    How have you heard of Mr. Moreno?

4    A.    He's a Mafia member.

5    Q.    And are you aware that Mr. Moreno testified in this

6    matter?

7    A.    No, I'm not aware.

8    Q.    Now, with respect to you, clearly there's

9    consequences for testifying; am I correct?

10   A.    Correct.

11   Q.    And are you being housed in some protective custody

12   right now?

13   A.    Correct.

14   Q.    Is that why you're wearing the color white, if you

15   know?

16   A.    No.  I wear green.

17   Q.    Okay.  With respect to the Mexican Mafia, there's

18   been testimony that you were a member or associating with

19   that gang; correct?

20   A.    With which gang?

21   Q.    Mexican Mafia.

22   A.    All southern gangs are associated with the Mexican

23   Mafia.

24   Q.    So therefore you are associating with them; correct?

25   A.    Correct.

1    Q.    And then, when you were younger, the first gang that

2    you were in was the Little -- Little-something gang, if I

3    heard correctly?

4    A.    Well, that's the gang that we associated with the

5    Mexican Mafia.  I'm not an associate of the Mexican Mafia,

6    but any southern gang is associated with the Mexican Mafia.

7    Q.    And what was your gang, again?

8    A.    Little Hill.

9    Q.    Hill.  Okay.

10          Now, clearly, anyone speaking against the Mexican

11   Mafia, it could be dangerous; correct?

12   A.    Correct.

13   Q.    But in your mind, it was important enough to at

14   least cooperate to see if you could get the benefit, and

15   that overtook any risk to you.  Does that make sense?

16   A.    Well, the risk has already been there due to the

17   fact that I've been stabbed 56 times.

18   Q.    I was going to get to that.

19   A.    Okay.

20   Q.    Since you just mentioned it, what year were you

21   stabbed 56 or 57 times?

22   A.    2001.

23   Q.    Okay.  2001.  But we now know that you were not

24   indicted on this case for many years thereafter; correct?

25   A.    Correct.

1    Q.    So in 2001, you were stabbed repeatedly; is that

2    correct?

3    A.    Correct.

4    Q.    Is that the same incident, where you were repeatedly

5    stabbed?

6          MS. YANG:  Objection, vague.

7          THE COURT:  Say that again.

8    BY MR. FLIER:

9    Q.    I'm sorry.  I'm just asking:  When you were stabbed

10   56 times, was that in the same act, all at one time?

11   A.    Correct.

12   Q.    And obviously, you survived.

13   A.    Correct.

14   Q.    But after that stabbing, you still kept on

15   committing crimes; is that correct?

16   A.    Correct.

17   Q.    So although you were stabbed all those times, it

18   didn't make you change the way you were acting on the

19   streets; am I correct?

20   A.    It did change the way I was acting on the streets.

21   Q.    Well, how did it change the way you were acting on

22   the street?

23   A.    I was cautious at that time.

24   Q.    My question is:  After you were stabbed and you were

25   on the street, you still kept on committing criminal acts;

1   correct?

2   A.      Correct.

3   Q.      So based on the stabbing, you didn't change your

4   ways.  Is that a fair statement?

5   A.      Of crime, no.

6   Q.      Of crime.  That is all I'm talking about, of course;

7   is that correct?

8   A.      Right.

9   Q.      Now, we heard that you have all these convictions

10  for drugs, theft; you've been indicted on this case; is

11  that correct?

12  A.      Correct.

13  Q.      You have testified that there was a certain

14  percentage that you would receive based on your fraud

15  activity; is that correct?

16  A.      Correct.

17  Q.      You testified yesterday that that was one-third; is

18  that correct?

19  A.      Correct.

20  Q.      And then you said that one-third of that one-third

21  would be disbursed to the runners; is that correct?

22  A.      Right.

23  Q.      I don't know if you're good at math, but that's

24  11 percent was going to the runners.

25          Let's say I am correct on the math.  Does that sound

1    accurate?

2    A.      It sounds pretty accurate.

3    Q.      So clearly the runners and yourself were never given

4    20 percent commission; am I correct?

5    A.      Like I said, we were getting 30 percent, and me and

6    the runners would split the money.

7    Q.      So back to my question, since you didn't answer it,

8    please.

9           At no time, based on your understanding of this

10   scheme and fraud with Mr. Darbinyan, did you ever get

11   20 percent; correct?

12   A.      I believe not.

13   Q.      Thank you.

14          Now, you also testified that, during the course of

15   your relationship with Mr. Darbinyan, he was on the phone a

16   lot; am I correct?

17   A.      Correct.

18   Q.      Matter of fact, you testified that he had a lot of

19   phones and would change the numbers a lot; is that correct?

20   A.      Right.

21   Q.      So here's my real question:  Do you know where he

22   got the phones?

23   A.      No.

24   Q.      Did he ever give you phones to use?

25   A.      No.

1   Q.      With respect to the runner issue -- and correct me

2   if I'm wrong -- you testified yesterday that, at least with

3   respect to your part of this alleged fraud, that you were

4   in charge in getting runners; is that correct?

5   A.      Correct.

6   Q.      And we heard yesterday that part of your running

7   team was composed of drug addicts; correct?

8   A.      Correct.

9   Q.      Then we saw some photographs of a male white

10  individual who you identified as someone to whom was

11  working with you; correct?

12  A.      Correct.

13  Q.      Then we saw a picture, maybe two, of Armenian

14  gentlemen; is that correct?

15  A.      No.

16  Q.      Okay.  Lastly, there was a female African-American

17  woman that you were shown.  Do you remember her?

18  A.      Correct.

19  Q.      Now, with respect to any runners, did you ever get,

20  on your own accord, any Armenian people that you got to be

21  as runners?

22  A.      Just one.  He was half Armenian and half Hispanic.

23  Q.      Okay.  And what was that person's name?

24  A.      I knew him also as "Mike."

25  Q.      Now, that is the same Mike to whom you referenced

1  yesterday.  That was not Mr. Darbinyan?

2  A.     No.

3  Q.     Okay.  So there's a third Mike, maybe; correct?

4  A.     Correct.

5  Q.     And now, just so the record is clear, the Mike that

6  I just referenced yesterday was someone whom you said

7  signed and did the fake checks; correct?

8  A.     Correct.

9  Q.     And then you were asked to describe him.  Remember

10 that?

11 A.     Correct.

12 Q.     And clearly, in your mind -- and excuse my

13 terminology here -- you didn't know that person as "Fat

14 Ass," did you?

15 A.     No.

16 Q.     Now, if someone says to you, "Hi, I'm Fat Ass," you

17 might remember that; correct?

18 A.     Correct.

19 Q.     With respect to my client, you don't know

20 Mr. Parsadanyan, this young man here, do you?

21 A.     No.

22 Q.     You've never dealt with Mr. Parsadanyan, have you?

23 A.     No.

24 Q.     So when you were -- and now I'm going to talk about

25 your plea agreement.  You were asked questions about the

1    factual basis of your plea, which starts on page 11, for

2    everyone's edification.

3         Do you remember those questions by cocounsel, this

4    nice man over here?

5    A.    Yes.

6    Q.    And he was asking you questions, to the best of his

7    ability, about the plea agreement.  Do you remember that?

8    A.    Correct.

9    Q.    Now, I'd like to talk about the factual basis.

10        It appears on page 11, and I want you to assume from

11   my questions that I'm reading it accurately.  It might

12   speed up everything, sir.

13        With regard to Count 1, it gives a time period of

14   January of 2011.  Does that time period make sense with

15   respect to Count 1 of this indictment?  Do you know what

16   Count 1 charges you?

17   A.    I believe RICO Act.

18   Q.    Correct.

19        So is it your testimony that sometime in January of

20   2011, that's when you were doing whatever you testified

21   with Mr. Darbinyan and, you believed, this Armenian Power?

22        MS. YANG:  Objection, Your Honor.  Misstates the

23   testimony, and this document speaks for itself.

24        THE COURT:  Why don't you publish it?

25        MR. FLIER:  Okay.

```
 1              THE COURT:  Okay.

 2              MR. FLIER:  Thank you, Your Honor.

 3     BY MR. FLIER:

 4     Q.    I'm just showing you now, on page 11, on the last

 5     photograph, do you see it's underlined, 2011, sir?

 6     A.    Yes, sir.

 7     Q.    Does that time period seem accurate to you?

 8     A.    Yes, sir.

 9     Q.    Even though we just heard you testify earlier that

10     the dates are very hard for you to recall time periods --

11     A.    Correct, sir.

12     Q.    -- would it be a fair statement -- and please

13     correct me if I'm wrong -- that anything referenced in this

14     factual basis you were going to agree to?

15              MS. YANG:  Objection, argumentative.

16              THE COURT:  Overruled.

17     BY MR. FLIER:

18     Q.    Is that correct?

19              THE COURT:  Would you have admitted to anything that

20     was said in there?

21              THE WITNESS:  Well, I admitted to what I did, yes.

22     BY MR. FLIER:

23     Q.    Okay.  But clearly, within this factual plea, and

24     based on your question and answer, you agreed to some of

25     the information in the plea agreement that you are unaware
```

1    of; is that correct?

2    A.    Correct.

3    Q.    Okay.  And a very good example is -- let's talk

4    about page 14 of the plea.  I'm getting better with this.

5         And that says -- and I apologize.  I was speaking

6    about page 16.  On page 16 right here, it says, on line 20,

7    (as read:)

8              "On or about August 27, 2009, Darbinyan told

9              Parsadanyan that he was on his way to

10             San Diego."

11        I want to talk about just that sentence by itself.

12   We just went over the fact that you did not know my client

13   in any capacity; am I correct?

14   A.    Correct.

15   Q.    We also went over the fact that you didn't even know

16   who my client was or his name; am I correct?

17   A.    Correct.

18   Q.    So when you look at this exhibit, Exhibit 247 on

19   page 16, you have no idea if that information is accurate

20   or not; am I correct?

21   A.    Correct.

22   Q.    So why would you agree to it?

23   A.    Because it's part of what I did.  I mean, we were --

24   I committed fraud, and that's why I agreed to it, as far as

25   what it said about me.

1    Q.    Well, when we read that sentence again, your name's

2    not even mentioned; is that correct?

3    A.    Correct.

4    Q.    So I'm just simply asking why you would agree to

5    something that's not factually correct, based on your

6    personal information, if there is a reason?

7    A.    I agreed because every fact that is in there that

8    states my name in there is true of what I've done.

9    Q.    I know, but I just went over the fact that your name

10   is not mentioned in that sentence.  So why would you agree

11   to that?

12         And then I'll move on.

13   A.    Because it's on the agreement.

14   Q.    Simply put, anything on the agreement you would have

15   agreed to in order to get your cooperation benefit,

16   potentially; does that make sense?

17         MS. YANG:  Objection, argumentative.

18         THE COURT:  Overruled.

19   BY MR. FLIER:

20   Q.    Does that make sense?

21   A.    Anything that had my name on it, that I did, I would

22   agree upon it if it was true.  And that was true of what

23   I've done.

24   Q.    What happens if your name is not mentioned in part

25   of the factual plea pursuant to a particular paragraph?  Is

1    it your testimony you would not have agreed to it, then?

2    A.    If it didn't have a name, no.

3    Q.    Okay.  So we just established that if it didn't have

4    your name, you would not agree to it; is that correct, sir?

5    A.    Correct.

6    Q.    So again, and definitely the last time, on or about

7    August 27th, Darbinyan told Parsadanyan that he was on his

8    way to San Diego.  You have no information about that; am I

9    correct?

10   A.    Right.

11   Q.    Okay.  Now, with respect to August 27th of 2009, do

12   you even know where you were on that date?

13   A.    As far as the date, no.

14   Q.    Without the aid of specific references like

15   San Diego, or specific time periods like August 27th, you

16   would be unable to tell this jury specific dates and

17   locations.  Does that make sense?

18   A.    Not locations, but dates, yes.

19   Q.    So with respect to your involvement with

20   Mr. Darbinyan -- correct me if I'm wrong -- it appears that

21   it dealt with different frauds; is that correct?

22   A.    Correct.

23   Q.    The beginning of your testimony yesterday dealt with

24   some type of check fraud scheme and banks; am I correct?

25   A.    Correct.

1    Q.    Then there was a transition to the 99 Cents Store

2    issue or scheme, believed to be; is that correct?

3    A.    Correct.

4    Q.    Now, when did you first have contact -- might be

5    hard, based on a date I'm going to ask you.

6         When did you first have contact with Mr. Darbinyan

7    about the 99 Cents fraud issue?

8    A.    Around in the summertime.

9    Q.    Summertime of what year?

10    A.    Well, if it says '09, then I believe it would be in

11    '09.

12    Q.    And that's fine, but you're not certain about that

13    it's even in '09; am I correct?

14    A.    Like I said, on dates I'm not sure because it's been

15    a long time.

16    Q.    And not only has the participation time lapse been

17    long, you were also a heavy drug user in the past; correct?

18    A.    I wouldn't say heavy.

19    Q.    And in no way am I trying to degrade you when I use

20    the word "heavy." You did testify that you did a lot of

21    drugs, I thought. Am I correct?

22    A.    Yes, I've done a lot of drugs in my time.

23    Q.    And the point of the question, at least for me, is:

24    It affects the way you think and your memory at times;

25    correct?

1    A.    If you let it, yes.

2    Q.    Okay.  Well, can I assume, when you were partying,

3    you would party a lot?

4         MS. YANG:  Objection, relevance.

5         THE COURT:  Overruled.

6         When you were taking drugs, were you taking a lot of

7    drugs?

8         THE WITNESS:  I was doing drugs, but what would you

9    consider a lot?

10         THE COURT:  Okay.  Fair question.

11         Counsel, go ahead.

12         MR. FLIER:  That is a fair question.  We won't get

13    into what's a lot.  Thank you.

14    BY MR. FLIER:

15    Q.    Now when we go back, sir, to the plea agreement, the

16    dates that are on the plea agreement on page 11, the first

17    one, we briefly discussed this, was for Count 1, the RICO,

18    January of 2011.

19         Do you remember that?

20    A.    Correct.

21    Q.    And now the next date is January 26th of 2009.  Do

22    you see that?

23    A.    Correct.

24    Q.    The day after that is right below it, January 28th

25    of 2009; is that correct?

1     A.     Correct.

2     Q.     Then we have a March 30th of 2009 and an April 15th

3     of 2009; is that correct?

4     A.     Right.

5     Q.     And then we jump from April to August 13th and

6     August 27th, the paragraph that I was focusing on with you

7     earlier; is that correct?

8     A.     Correct.

9     Q.     There is not one date in your plea agreement that

10    deals with June or July of 2009.  Am I correct on that,

11    sir?

12    A.     Correct.

13    Q.     So if you are not referenced in those two months of

14    2009, based on your previous testimony, you have no

15    information about that time period; correct?

16    A.     Correct.

17    Q.     Okay.  So you cannot tell us anything about June or

18    July of 2009 and any 99 Cents fraud; am I correct?

19    A.     Correct.

20    Q.     Thank you.

21           By any chance, because I don't know how it is

22    internally, have you seen Mr. Moreno ever in the last two

23    weeks?

24    A.     No.

25    Q.     Could it be possible that some of your testimony has

1   commingled, interjected the bank fraud checking issue with

2   some of the 99 Cents fraud issue?  Can you be mixing some

3   of these together?  Does that make sense?

4   A.     Not really.

5   Q.     So if it's not really, you clearly, then, can

6   separate those two conducts; is that correct?

7   A.     Right.

8   Q.     So now I'm going to ask you, and I'm not trying to

9   embarrass you:  Can you tell us the first day that you had

10  a conversation with Mr. Darbinyan, if that's to whom it was

11  with, about any 99 Cent fraud?

12         MS. YANG:  Objection.  Asked and answered.

13         THE COURT:  Overruled.

14         THE WITNESS:  Like I said, as far as on the dates, I

15  do not recall the dates.

16  BY MR. FLIER:

17  Q.     So you cannot even tell us 2008, 2009; am I correct?

18  A.     Correct.

19  Q.     We know, after 2010, where you were, though; is that

20  correct?

21  A.     Correct.

22  Q.     During your incarceration period -- and I assume up

23  until today, have you spoken to Mr. Darbinyan?

24  A.     No.

25  Q.     With respect to the 99 Cent fraud issue, were you

1    ever in San Diego?

2    A.    Yes.

3    Q.    All right.  Were you in other counties beyond L.A.

4    County, that you recall?

5         THE COURT:  As to relation to this --

6    BY MR. FLIER:

7    Q.    99 Cents.  That's all I'm talking about now, sir.

8         MR. FLIER:  Thank you, Your Honor.

9         THE WITNESS:  Just San Diego.

10   BY MR. FLIER:

11   Q.    So you were never in Ventura County; correct?

12   A.    Correct.

13   Q.    What about -- I think there's been testimony in this

14   case about two stores in Huntington Beach.  One references

15   "Beach," and other one is a second type of store.

16        Have you ever been to those stores?

17   A.    No.

18   Q.    Would it be a fair statement that sometimes, when

19   you were in the company of Mr. Darbinyan, he would be

20   speaking on the phone about different subject matters that

21   you could overhear.  Am I correct?

22   A.    Correct.

23   Q.    And sometimes those subject matters deal with why

24   you're testifying on potentially any fraud; am I correct?

25   A.    Correct.

1    Q.    But other times he's just talking regular casual

2    conversations sometimes; is that correct?

3    A.    To whom?

4    Q.    It doesn't matter to who.

5    A.    Well, I'm sure he did.  I mean, if he wasn't talking

6    fraud, I'm sure he was just holding conversation.

7    Q.    And that's what I just want to talk about.

8          At times -- and I'm not going to ask you dates and

9    specifics -- Mr. Darbinyan would be on the phone and

10   talking with people, like friends, that had nothing to do

11   with fraud; correct?

12         MS. YANG:  Objection, calls for speculation.

13         THE COURT:  Overruled.

14   BY MR. FLIER:

15   Q.    Is that correct?

16   A.    Correct.

17   Q.    We heard you talk about runners whom you acquired to

18   help on some of the fraud; is that correct?

19   A.    On all the fraud I've done.

20   Q.    On all the fraud.  Thank you.

21         So what about other runners?  During the time period

22   of 2008 and 2009, were you ever in the company of

23   Mr. Darbinyan where he was in the company of other alleged

24   runners that you did not obtain?  Did that ever happen?

25   A.    Not to my knowledge.

1    Q.    Thank you.

2          If I'm simply to ask you, as to the 99 Cent alleged

3    fraud, how the manufacturing of the items was produced, and

4    in other words, not just getting the machine but getting

5    the data from the machine, can you tell us anything about

6    the manufacturing process of this alleged fraud?

7    A.    Can you rephrase that?

8    Q.    Please, thank you.

9          I just want to know:  Were you present with anyone

10   who actually made the debit cards?

11   A.    Yes.

12   Q.    With respect to that person, what's that person's

13   name?

14   A.    "V."

15   Q.    And you mentioned V yesterday; is that correct?

16   A.    Correct.

17   Q.    And I think, without being disingenuous to V's last

18   name, he had a long last name; correct?

19   A.    Correct.

20   Q.    Is that why he was known as "V"?

21   A.    Those were the names that they gave me.  Those are

22   the names that I know about.

23   Q.    And you have testified that there are some names

24   that either were given to you or that you're aware of, and

25   sometimes those names were not full names but, let's say,

1   monikers or surnames; is that correct?

2   A.    Correct.

3   Q.    Did you testify yesterday that you've never had a

4   job?

5   A.    Correct.

6   Q.    Without getting too personal into your life, do you

7   have family, though?

8   A.    Correct.

9         MS. YANG:  Objection, relevance.

10        THE COURT:  Sustained.

11  BY MR. FLIER:

12  Q.    The reason why I'm asking about that, sir, is

13  because you are now a snitch; is that correct?

14        Is that the right terminology that you would use?

15  A.    Well, you could use "snitch," "rat," whatever.

16  Q.    And when I use the word "snitch," you're not mad at

17  me when I said that, are you?

18  A.    No, not at all.

19  Q.    So what I'm really getting at is:  You put your

20  family in jeopardy, too, by communicating with us about

21  this; correct?

22  A.    Correct.

23  Q.    Because what we've heard about this Mexican Mafia,

24  or any Southern California street gang, is that they

25  retaliate when someone does something against their

1    interest; is that correct?

2    A.      Correct.

3    Q.      We now know where you are; correct?

4    A.      Correct.

5    Q.      Let's hope your family is safe; am I correct on

6    that?

7    A.      Correct.

8            MS. YANG:  Objection, Your Honor, relevance.

9            THE COURT:  That part is overruled.

10           MR. FLIER:  And I'm going to move on now on that.

11   Thank you.

12   BY MR. FLIER:

13   Q.      You have mentioned, during the course your

14   testimony, two or three Mikes that you're aware of beyond

15   Mr. Darbinyan; is that correct?

16   A.      Correct.

17   Q.      So sometimes there might be phone calls that you

18   overheard were a Mike is referenced, but you are not

19   certain which specific Mike he's talking about; is that a

20   fair statement?

21   A.      As far as whose phone conversations?

22   Q.      Very good.  Thank you.

23           And I'm just talking about any phone information

24   that deals with the 99 Cent issue, okay?

25   A.      Well, there's only one Mike that dealt with the

1   99 Cent phone calls, and that was Mr. Darbinyan.

2   Q.    Okay.  So --

3         MR. SEVERO:  Move to strike, that no question is

4   pending.

5         THE COURT:  Overruled.

6   BY MR. FLIER:

7   Q.    So with respect to your last response as to the

8   99 Cents Store issue or alleged fraud, only one Mike's name

9   was ever utilized, and you believe that's Mr. Darbinyan?

10  A.    I know for a fact.

11  Q.    What are the drugs that you used to entertain with?

12  A.    Marijuana and cocaine.

13  Q.    Marijuana.  I think I heard you testify yesterday

14  that at least on one occasion did you go to a medical

15  marijuana clinic?

16  A.    Yes, sir.

17  Q.    Was it known to you as a medical marijuana clinic or

18  a weed store?

19  A.    A weed store, medical marijuana.  Both, whatever you

20  want to call it.

21  Q.    But you know what the subject matter of that store

22  is; correct?

23  A.    Of course.

24  Q.    Selling marijuana legally, hopefully; is that

25  correct?

1    A.    Well, that's what it's supposed to be doing.

2    Q.    Now, what about your cocaine usage?  And back to one

3    of my previous questions:  Are you the type of person, when

4    you would ingest cocaine, you'd only do one or two lines,

5    or would you do a lot more?

6    A.    I'd do about two sets.

7    Q.    What's that mean?

8    A.    .2, the 20, what they would call on the streets.

9    Q.    So you would just use some coded language about what

10   street terminology is about amounts; is that correct?

11   A.    Correct.

12   Q.    And what I gathered from that is you are saying 20

13   what?

14   A.    .2, which would be --

15   Q.    Grams?

16   A.    No, not grams.

17   Q.    Okay.

18   A.    .2.

19   Q.    Okay.

20   A.    A gram would be 2.0.

21   Q.    A gram would be 1.0; right?

22   A.    Well, yeah, if -- it was 2 grams you were talking

23   about.

24   Q.    Okay.  That's fair.

25         So you would ingest what you already described; is

1   that correct?  You would snort; is that correct?

2   A.    Okay.  But you need to rephrase this.  What -- I

3   mean, at what time or what are you talking about as far as

4   I would ingest?

5   Q.    That's fair.

6         My general question:  When you would party with

7   cocaine, my question was typically what amount you would

8   use.

9         Are you okay with that part?

10  A.    Yeah, that's fine.

11  Q.    And you already told us that; correct?

12  A.    Correct.

13  Q.    Now, what about smoking cocaine?  Did you ever do

14  that?

15  A.    I have when I was younger.

16  Q.    And there's a term for smoking cocaine; correct?

17  A.    Correct.

18  Q.    And what is that term?

19  A.    "Primos."

20  Q.    Do you speak Armenian?

21  A.    Not at all.

22        MR. FLIER:  May I just have a moment, Your Honor?  I

23  think I'm almost done.  Thank you.

24        *(Pause while counsel reviews documents.)*

25

BY MR. FLIER:

Q.    Did Mr. Darbinyan ever specifically speak with you

in any context exactly how the 99 Cent alleged fraud was

going to work, or did he just deal with you on your type of

job with him?

A.    He just explained to me what he wanted me to do,

and -- oh, actually, yes, he did.

Q.    I'm sorry -- never mind.

      So he did explain to you?

A.    As far as my part on what I'm going to get paid and

how I'm going to get paid, yes.

Q.    Did he ever explain to you other people's parts?

A.    No.

Q.    You testified, and lastly, that, at your greatest

height on one day with respect to compensation, monetary

compensation, it was around 3,500; is that correct?

A.    Correct.

Q.    How many times do you think you received a payment

regarding the 99 Cent issue, approximately?

A.    For the 99 Cents issue?

Q.    Because it seems like there's not many.  Am I

correct on that, first?

A.    Yeah, you're correct.

Q.    So we now know that.  We heard of $3,500.

      My next question:  Was the 3,500 windfall that you

1    received, profit, due to the check-cashing fraud that you

2    recalled or the 99 Cents store fraud?

3    A.    No.    That was check cashing.

4    Q.    So what about your best or greatest profit on any

5    alleged 99 Cent store issue?

6    A.    10,000.

7    Q.    How much?

8    A.    10,000.

9    Q.    That's the total?

10   A.    As far as in cash, yes.

11   Q.    So with respect to any involvement with you, and

12   based on your recollection, you made around $10,000;

13   correct?

14   A.    I made exactly 10,000.

15   Q.    You made exactly 10,000; correct?

16   A.    On the cash part, yes.

17   Q.    On the cash part; correct?

18   A.    Because there are two parts, now.

19   Q.    And the other part might be as a gift, getting

20   credit card numbers?

21   A.    Correct.

22   Q.    And the difference clearly is, when you go into a

23   store with a credit card, you're not going to get cash.

24   You have to buy merchandise.

25   A.    Correct.

1    Q.    Doesn't that heighten the risk of you being

2    detected?

3    A.    Yes.

4    Q.    But you didn't care, you still did it?

5    A.    I had other people do it.

6    Q.    So you were trying to shield yourself from

7    involvement by using other people.  Does that make sense?

8    A.    At times.

9          MR. FLIER:  I have no further questions, Your Honor.

10   Thank you.

11         THE COURT:  Thank you, Counsel.

12         Redirect?

13         MS. YANG:  Yes, Your Honor.

14                    **REDIRECT EXAMINATION**

15   BY MS. YANG:

16   Q.    Good morning, Mr. Ortega.

17   A.    Good morning.

18   Q.    I'd like to start with your plea agreement, given

19   that you were crossed about that pretty extensively.

20         I'm going to direct your attention to the factual

21   basis, which I'll put up on the screen.

22         Do you see this up on the screen in front of you,

23   Mr. Ortega?

24   A.    Yes, ma'am.

25   Q.    Now, before the factual statement starts, there is a

1    sentence -- correct? -- that says, "At trial, the

2    government would be prepared to prove the following facts."

3         Do you see that?

4    A.    Yes, ma'am.

5    Q.    Is it your understanding that the factual basis

6    contained in your plea agreement contains information that

7    the government would prove at trial had you not pled

8    guilty?

9    A.    Correct.

10   Q.    And some of the information contained in this

11   factual basis, in fact, involved telephone calls that you

12   were not a party to; correct?

13   A.    Correct, ma'am.

14   Q.    It involved events that you were not a party to;

15   correct?

16   A.    Correct, ma'am.

17   Q.    But because you pled to the racketeering conspiracy,

18   which had multiple members, the factual basis contained

19   facts that the government would have been prepared to prove

20   at trial; correct?

21        MR. SEVERO:  That's leading.

22        THE COURT:  Sustained.

23        MR. SEVERO:  I would request the answer come out.

24        THE COURT:  It will be stricken.

25   ///

1    BY MS. YANG:

2    Q.    Well, looking at page 12 of your plea agreement, it

3    lists a number of individuals, starting at lines 2 through

4    17.  Do you see that?

5    A.    Yes, ma'am.

6    Q.    And I believe you testified on cross-examination

7    that you don't know many of these individuals; correct?

8    A.    Correct, ma'am.

9    Q.    But you know Defendant Darbinyan; correct?

10   A.    Correct, ma'am.

11   Q.    And these other individuals that are listed in the

12   factual basis, to your knowledge, were they charged in the

13   racketeering conspiracy along with you?

14         MR. SEVERO:  Objection, that calls for hearsay.

15         THE WITNESS:  Correct, ma'am.

16         THE COURT:  I'm sorry, objection what?

17         MR. SEVERO:  Calls for hearsay.

18         THE COURT:  Overruled.

19         THE WITNESS:  Correct.

20   BY MS. YANG:

21   Q.    Now, you were also shown certain provisions of your

22   plea agreement, I believe first by Mr. Severo.  And I want

23   to go over a couple of those provisions with you.

24         First, what is your understanding of what you're

25   required to do under this plea agreement you signed with

1    the government?

2    A.    To be honest and truthfully.

3    Q.    Are you allowed to lie?

4    A.    No, ma'am.

5    Q.    Are you supposed to say things that will help the

6    government?

7    A.    No, ma'am.

8    Q.    And you were also asked about meetings that you had

9    with the government.  Do you recall that?

10   A.    Correct, ma'am.

11   Q.    In those meetings, were you told what to say, what

12   to tell the jury?

13   A.    No, ma'am, not at all.

14   Q.    What were you told to say?

15   A.    To be honest and truthfully.

16   Q.    Now, based on your understanding of this plea

17   agreement, what would happen to the agreement if you

18   testified untruthfully or if you lied?

19   A.    If I lied, it would be used against me, and there

20   wouldn't be no agreement.

21   Q.    So if you testified untruthfully or you lied, the

22   agreement would disappear; is that correct?

23   A.    Correct, ma'am.

24   Q.    And looking at page 3 of Exhibit 247, which is your

25   plea agreement, in fact, at line 18, does that provision

1    require you to be truthful at all times with the Court,

2    pretrial services, the probation office, everyone involved

3    in the case?

4    A.    Correct, ma'am.

5    Q.    And at page 4 of Exhibit 247 (as read:)

6              "This provision specifically states

7              This cooperation requires defendant -- "

8    Which is you; correct?

9    A.    Correct, ma'am.

10   Q.    What does it say here?

11   A.    (As read:)

12             " -- respond truthfully and completely to all

13             questions that may be put to defendant,

14             whether in interviews, before a grand jury,

15             or at any trial or other court proceedings."

16   Q.    Now, does the agreement also set out what happens to

17   you or what could happen to you if you lied?

18   A.    Yes, ma'am.

19   Q.    I direct your attention to page 6 of Exhibit 247.

20         Is that the provision here where it says that any

21   knowingly false or misleading statement by you will subject

22   you to prosecution for false statement, obstruction of

23   justice, and perjury?

24   A.    Correct, ma'am.

25   Q.    And it also states that that would also constitute a

1    breach of this plea agreement; is that correct?

2    A.    Correct, ma'am.

3    Q.    Now, with regard to breach, do you understand what

4    that means, if you breach your plea agreement?

5    A.    To break the agreement.

6    Q.    And under the breach provisions of your agreement,

7    starting at page 24 of Exhibit 247, in addition to

8    testifying falsely at trial, is it also your understanding

9    that if you falsely accuse someone of criminal conduct or

10   you falsely minimize your own role in criminal conduct or

11   the role of someone else in criminal conduct, that would be

12   considered a breach; is that correct?

13   A.    Correct, ma'am.

14   Q.    And you were also asked several questions about

15   promises the government has made regarding dismissing

16   counts or sentencing recommendations.  Do you recall that

17   testimony?

18   A.    Correct, ma'am.

19   Q.    Directing your attention to page 7 of Exhibit 247,

20   is the possibility that the government might recommend a

21   lower sentence to the Court dependent on whether the

22   government gets a conviction in this case or not?

23   A.    Can you repeat that question one more time, please?

24   Q.    Sure.

25         Looking at this Provision E on page 7 of

1    Exhibit 247, is it your understanding that the possibility

2    that the government will recommend a lower sentence for you

3    depends on whether the government gets a conviction in this

4    case or not?

5    A.      Yes.

6    Q.      So Provision E, which states (as read:)

7                "The government's determination whether the

8                defendant has provided substantial assistance

9                will not depend in any way on whether the

10               government prevails at any trial or court

11               hearing in which he testifies."

12           In which you testify.  Do you see that provision?

13   A.      Correct.

14   Q.      And that's a provision in your plea agreement;

15   correct?

16   A.      Correct, ma'am.

17   Q.      Now, I believe you also testified that even if the

18   government determined that it would make a recommendation

19   for a lower sentence, does the Court have to honor the

20   government's recommendation?

21   A.      No, ma'am.

22   Q.      And who makes the ultimate decision as to your

23   sentence?

24   A.      The honorable judge.

25   Q.      Now, you were also shown a provision in the plea

1    agreement by Mr. Severo where this page 5 of Exhibit 247,

2    he pointed out that the agreement says that the government

3    agrees not to offer or use the evidence, the information

4    you've provided, by cooperating in any other criminal

5    prosecution that may be brought against you.

6           Do you see that?

7    A.     Yes, ma'am.

8    Q.     Or in any sentencing proceeding.  Do you see that?

9    A.     Correct, ma'am.

10   Q.     If you look further down on this provision, however,

11   doesn't it also allow the government, though, to use the

12   information you've provided to obtain and pursue other

13   leads to other evidence?

14   A.     Yes, ma'am.

15   Q.     And if the government were able to do that, does

16   this agreement allow it to use that information including

17   in a criminal prosecution of you?

18   A.     Yes, ma'am.

19   Q.     Now, you were also asked on cross-examination about

20   the first time that you spoke with law enforcement.  Do you

21   recall that?

22   A.     Correct, ma'am.

23   Q.     And this was shortly after your arrest in Glendora

24   for use of fraudulent credit cards; is that correct?

25   A.     Correct, ma'am.

1    Q.    And you were asked a series of questions about your

2    drug use and its effect on your memory and whether you had

3    changed your testimony here today; is that correct?

4    A.    Correct, ma'am.

5    Q.    Now, back in 2009 when you first spoke with law

6    enforcement, did you tell them about Mike Darbinyan?

7    A.    Yes, ma'am.

8    Q.    And did you tell them -- tell law enforcement about

9    the boxes or pinpoint pad sale machines that were used at

10   99 Cents Only Stores?

11   A.    Yes, ma'am.

12   Q.    And did you tell them about Defendant Darbinyan's

13   scheme to swap out those devices and download the debit

14   cards?

15   A.    Yes, ma'am.

16   Q.    Now, in that first meeting with law enforcement, did

17   you also tell them that Defendant Darbinyan considered

18   credit cards to be trash?

19   A.    Yes, ma'am.

20   Q.    And that he and his crew were only interested in ATM

21   cards -- or ATM numbers; is that correct?

22   A.    Correct, ma'am.

23   Q.    Did you also tell them about how Defendant Darbinyan

24   and his crew would use the debit card numbers from those

25   point-of-sale terminals and re-encode them on gift cards?

1    A.    Correct, ma'am.

2    Q.    And during this first meeting with law enforcement

3    in 2009, right after your arrest in Glendora, did you also

4    tell them about Defendant Darbinyan's check fraud scheme?

5    A.    Correct, ma'am.

6    Q.    And did you tell them your role in that scheme was

7    to provided Defendant Darbinyan with runners?

8    A.    Yes, I did, ma'am.

9    Q.    And in that meeting with law enforcement, did you

10   tell them about Mike and his role as the person who forged

11   the checks?

12   A.    Yes, ma'am.

13   Q.    And back in 2009, did you also tell them about V and

14   his role in driving the runners?

15   A.    Yes, ma'am.

16   Q.    And back in 2009, did you also tell them that you

17   went down to San Diego to swap out point-of-sale terminals

18   at 99 Cents Only Stores for Defendant Darbinyan?

19   A.    Correct, ma'am.

20   Q.    And do you recall telling them that Defendant

21   Darbinyan was in a white truck at the time?

22   A.    Correct, ma'am.

23   Q.    And as part of your trip down to San Diego, did you

24   also tell law enforcement, in 2009, that Defendant

25   Darbinyan would meet you in a parking lot after you swapped

1     out a device?

2     A.     Correct, ma'am.

3     Q.     Now, you were asked also by Mr. Flier about the

4     percentage or the share that you would receive from

5     Defendant Darbinyan for your role in getting him runners

6     for his various fraud schemes.  Do you recall that?

7     A.     Yes, ma'am.

8     Q.     And your testimony is that you received a one-third

9     share; is that correct?

10    A.     Correct, ma'am.

11    Q.     Do you know what sort of agreements Defendant

12    Darbinyan had with others as to what percentage they would

13    receive?

14    A.     No, ma'am.

15    Q.     And based on your knowledge of Defendant Darbinyan,

16    the time you spent with him, the phone calls you had, was

17    it your understanding that he had many other people working

18    on various schemes with him?

19    A.     Correct, ma'am.

20    Q.     And you didn't know who all those people were, did

21    you?

22    A.     No, ma'am.

23    Q.     And with regard to the check-cashing fraud scheme

24    that you did with Defendant Darbinyan, there were different

25    variations of that scheme; correct?

```
1    A.      Correct, ma'am.

2    Q.      And I believe you testified on cross that sometimes

3    the checks would be deposited but not cashed; correct?

4    A.      Correct, ma'am.

5    Q.      And sometimes the checks would be deposited and

6    immediately cashed; correct?

7    A.      Correct, ma'am.

8            MS. YANG:  Your Honor, one moment.

9            Your Honor, no further questions.

10           THE COURT:  Okay.  Ladies and gentlemen, we're going

11   to break at this time.  We'll come back in 15 minutes.

12           Remember the admonishment not to discuss the case

13   among yourselves or with anybody else.

14           Okay.  We'll be in recess.

15           THE CLERK:  All rise.

16                (9:54 to 10:04 a.m. a recess is taken.)

17           THE CLERK:  All rise.

18                (Juror No. 28 enters courtroom.)

19           THE CLERK:  You may be seated.

20           All rise.  This United States District Court is now

21   in session.

22                (Judge enters courtroom.)

23           THE CLERK:  You may be seated.

24           THE COURT:  Let the record reflect that all the

25   jurors are out of the courtroom except for Juror No. 28.
```

```
 1            And Juror No. 28 has sent a note to the Court that
 2    says (reading:)
 3                    "I ask if I could be dismissed from jury duty
 4                    because I feel that I have become very ill.
 5                    I do not know what I have.  I do believe it
 6                    is the flu, and I do not want to contaminate
 7                    others."
 8            Is this a situation, sir, where you feel you
 9    can't -- you're going to get sick?
10            JUROR NO. 28:  Yeah.
11            THE COURT:  How long have you felt this way?
12            JUROR NO. 28:  Since Monday.
13            THE COURT:  Since Monday?
14            JUROR NO. 28:  Yeah.
15            THE COURT:  Is it getting worse?
16            JUROR NO. 28:  Yeah.
17            THE COURT:  Have you seen a doctor?
18            JUROR NO. 28:  No, I haven't.
19            THE COURT:  Okay.  What are your symptoms?
20            JUROR NO. 28:  Well, first it started out as I just
21    had a stomachache on Monday, and then yesterday I started
22    feeling very nauseous, and I feel very disoriented.
23            THE COURT:  I'm sorry, feeling what today?
24            JUROR NO. 28:  Disoriented.
25            THE COURT:  Disorientated?  Okay.  And do you feel
```

```
 1    it will be difficult for you to proceed any further?

 2              JUROR NO. 28:  Yeah.

 3              THE COURT:  Counsel, I'm going to ask you what you

 4    want to do on this.  The Court's not going to continue the

 5    case because we have no idea as to how long the condition

 6    will last or anything else.

 7              So the question is whether or not Juror No. 28

 8    should remain until he does get sick or if all sides will

 9    stipulate that he could be dismissed.

10              MR. ESTRADA:  I think we had three alternates for

11    the end of the case.  Given the fact that he is disoriented

12    and, what I gather from that, that he wouldn't be able to

13    deliberate, necessarily, I would have no issue with him

14    being dismissed.

15              THE COURT:  Mr. Severo?

16              MR. SEVERO:  I concur with Mr. Estrada in that

17    regard.  I don't want to get sick here.

18              MR. PEREYRA-SUAREZ:  I agree as well, Your Honor.

19              THE COURT:  Counsel?

20              MR. FLIER:  I think he's a good juror.  We'd like to

21    keep him.

22              THE COURT:  So it's your desire to keep him here,

23    even though he's sick?

24              Okay.  That's okay.

25              MR. FLIER:  Thank you.
```

```
 1        THE COURT:  Legally, we'll keep him here and --

 2        MR. FLIER:  I understand.  I wasn't feeling good

 3   yesterday; so I appreciate what he's saying, but maybe

 4   he'll get a second wind like I had.

 5        MR. ESTRADA:  I will ask, Your Honor, if the

 6   sickness gets to the point where he feels he can't

 7   deliberate --

 8        THE COURT:  Yes.  If you get to the point where you

 9   are so disoriented you can't pay attention or deliberate,

10   you let us know.

11        Yes.

12        MR. SEVERO:  I have noted, just for the record, that

13   this young man has -- slides down in his chair -- well,

14   since the last couple of days, and oftentimes has had

15   difficulty.

16        THE COURT:  Do you feel that you're able to pay

17   attention to what's going on?  Do you feel that your

18   disorientation has affected you?

19        JUROR NO. 28:  The past two days I have had a hard

20   time concentrating.

21        THE COURT:  So it's hard for you to hear what's

22   going on and concentrate on what's going on?

23        JUROR NO. 28:  Yeah.

24        THE COURT:  Okay.

25        MR. FLIER:  Your Honor, I'm sorry.  I spoke to my
```

 1    client.  I'm sorry to interrupt.

 2         THE COURT:  Sure.

 3         MR. FLIER:  No one wants him to feel terrible during

 4    all of this and have it affect -- so we do not object.

 5         THE COURT:  Okay.  And I'm assuming the jurors

 6    sitting on each side of him would not object either.

 7         Okay.  We're going to excuse you at this time, sir.

 8    You are not to discuss this case with anybody.

 9         JUROR NO. 28:  Okay.

10         THE COURT:  Because it may get back.  You can't talk

11    to your family or anyone else about what you have heard

12    about this case until this case has completely been

13    resolved and over.  You understand that?

14         And you are not to talk to any of the jurors when

15    you leave.

16         We'll bring the jury in and let them know that

17    somebody's taking your place, but the clerk will make sure

18    that you are able to exit without talking to any of the

19    other jurors.

20         JUROR NO. 28:  I won't.  Okay.

21         THE COURT:  Anything else, counsel?  If not, we'll

22    take a break.

23         MR. ESTRADA:  No, Your Honor.  And just for the

24    record, would that be Juror No. 11?

25         THE COURT:  No, it would be Juror No. 13.

1        MR. SEVERO:  Well, his seat -- he's No. 11.  No,

2   he's 11 now.

3        MR. ESTRADA:  Seat No. 11 within the jury box, just

4   for the record.

5        THE COURT:  The first alternate would go in to

6   Seat 11.

7        MR. ESTRADA:  Very good.

8        MR. SEVERO:  Thank you, Your Honor.

9        THE COURT:  I don't know what that alternate's

10  number is.

11       Counsel, were you going to say anything?

12       MR. FLIER:  No.  The Court's procedure is the next

13  juror up, not a raffle.

14       THE COURT:  Yeah, the next juror up.

15       THE CLERK:  All rise.

16       THE COURT:  Hopefully you're feeling better, sir.

17       JUROR NO. 28:  Thank you.

18            (Juror No. 28 dismissed, exits courtroom.)

19            (Short recess taken.)

20       THE CLERK:  All rise.

21            (10:16 a.m., jurors enter courtroom.)

22       THE CLERK:  You may be seated.

23       All rise.

24            (Judge enters courtroom.)

25       THE CLERK:  This United States District Court is now

1    in session.  You may be seated.

2          THE COURT:  Okay.  Ladies and gentlemen, one of your

3    fellow jurors has taken ill and is being dismissed from

4    this jury because of illness.

5          I see the jurors sitting next to him saying, oh, no.

6          But because of that, we will proceed with the trial,

7    and we'll take Juror No. 32.

8          You are going to move down two seats, into his seat.

9    You can do that at the next break, if you want.  And then

10   you'll become one of the 12.

11         And then we'll have two alternates there, and then

12   you can move into his seat, and you could actually get a

13   seat.

14         Okay.  And we'll do that during the lunch break

15   rather than doing it now.

16         Counsel, we're at recross.

17         MR. SEVERO:  Thank you.

18                   **RECROSS-EXAMINATION**

19   BY MR. SEVERO:

20   Q.    You were asked on redirect about the plea agreement

21   and the rules in the plea agreement; is that correct?

22   A.    Correct.

23   Q.    And you understand that your behavior as a witness

24   is to follow the rules in the plea agreement; correct?

25   A.    Correct.

1    Q.    And the rules in the plea agreement say that you

2    have to tell the truth; correct?

3    A.    Correct.

4    Q.    And the rules say that you have to be honest at all

5    times with the government, with pretrial services, and with

6    the Court; correct?

7    A.    Correct.

8    Q.    Those are the rules; true?

9    A.    Right.

10   Q.    Now, did you know that the rules, in 1992, were that

11   you could not carry a gun because you were already a felon?

12   Did you know that those were the rules?

13   A.    Correct.

14   Q.    Did you follow that rule?

15   A.    No.

16   Q.    Did you, in 2002, know that the rules were that you

17   couldn't manufacture methamphetamine?  Did you know those

18   were the rules?

19   A.    Correct.

20   Q.    Did you know that you couldn't possess

21   pseudoephedrine so -- in order to manufacture

22   methamphetamine?  Did you know those were the rules?

23   A.    Correct.

24   Q.    And you knew that those rules -- if you broke the

25   rules, you'd have consequences; right?

1    A.    Correct.

2    Q.    You didn't care about the consequences, did you?

3    A.    I wouldn't say I didn't care.

4    Q.    You didn't follow the rules, did you?

5    A.    That's more like it.  I didn't follow the rules.

6    Q.    And then, in 2004, you knew that the rules were,

7    again, that you couldn't manufacture drugs; correct?

8    A.    Correct.

9    Q.    You didn't learn anything from the consequences in

10   the previous two cases where you went to jail, did you?

11   A.    Correct.

12   Q.    You didn't follow the rules again in 2004, did you?

13   A.    Correct.

14   Q.    And then in 2010, you committed burglary, didn't

15   you?

16   A.    Correct.

17   Q.    You knew it was illegal to commit burglary; correct?

18   A.    Correct.

19   Q.    You didn't follow that rule, did you?

20   A.    Correct.

21   Q.    And you knew in -- let me see -- 2010 that it was

22   illegal to steal; correct?

23   A.    Correct.

24   Q.    In fact, you got charged with at least 10 or 12

25   counts in 2010 of not following the rules then; true?

1    A.    Correct.

2    Q.    And you have, all your life, made a living by

3    breaking the rules; correct?

4    A.    Somewhat.

5    Q.    A little bit?

6          THE COURT:  He said, "Somewhat."

7    BY MR. SEVERO:

8    Q.    "Somewhat" means a little or a lot?

9    A.    Whatsoever you want to make of it, little or not.

10   Q.    You never had a job; right?

11   A.    Correct.

12   Q.    So all your income has been from illegal activities;

13   correct?

14   A.    No.

15   Q.    How many -- well, let me ask you this:  Did you file

16   tax returns?

17   A.    No.

18   Q.    You knew that if you had income, you had to file tax

19   returns.  Those are the rules; true?

20   A.    True.

21   Q.    You didn't follow those rules, did you?

22   A.    No.

23   Q.    You, in 2009, when you were first interviewed, never

24   once mentioned anything about Mr. Darbinyan being -- paying

25   rent to the mafia -- correct? -- the Mexican Mafia, did

1    you?

2    A.      Rephrase that question one more time.

3    Q.      In 2009, when you first met with the deputies, you

4    never said anything about Mr. Darbinyan being involved with

5    the Mexican Mafia.

6    A.      I don't recall.

7    Q.      And the first time you ever said that was almost a

8    year later, in 2010; is that true?

9           THE COURT:  If you remember.

10          THE WITNESS:  I don't recall.

11   BY MR. SEVERO:

12   Q.      And in fact, in September of 2011, when you met with

13   Mr. Stebbins here, you never said, again, that

14   Mr. Darbinyan had any involvement with paying rent to the

15   Mafia, did you?

16   A.      I don't recall the dates.

17   Q.      The only time you said it was one time out of four

18   or five interviews.  You said it once, and you never

19   once -- and you never said it again, did you?

20   A.      I don't recall the dates.

21   Q.      Sir, your wife was involved in the scheme, wasn't

22   she?

23   A.      In what scheme?

24   Q.      The check scheme.

25   A.      No.

1    Q.    Well, didn't you tell Mr. Stebbins, in 2011, that

2    your wife would print 3- to $800 checks, and you would

3    supply the runners to cash the checks?

4    A.    Correct, but that wasn't in the scheme with

5    Mr. Darbinyan.

6    Q.    Oh, that's a different scheme.

7    A.    Correct.

8    Q.    Your own scheme.

9    A.    Correct.

10   Q.    The one that you really made up to -- that's the one

11   you're really talking about in this case, aren't you, your

12   own scheme?

13   A.    No.

14   Q.    Now, the government promised you not to prosecute

15   your wife?

16   A.    My wife does not have nothing to do with this case.

17   Q.    Did the government promise you not to prosecute your

18   wife for her criminal acts in your scheme?

19   A.    No, they did not.

20   Q.    Has she been charged?

21   A.    No.

22   Q.    The fact is that you thought Mr. Darbinyan had

23   connections to the Mexican Mafia.

24   A.    No, I didn't think, I knew.

25   Q.    You knew Mr. Darbinyan had connections with the

1    Mexican Mafia.

2    A.     Of course.

3    Q.     And you were stabbed by members of the Mexican Mafia

4    many times; correct?

5    A.     Correct.

6    Q.     And you would still -- your testimony is still that

7    you would still associate with one who you believed to be a

8    member of the Mexican Mafia.

9    A.     An associate, yes, correct.

10   Q.     That you would risk going into a yard where Mexican

11   Mafia members would gather in order to do this scheme you

12   think you were involved in.

13   A.     No, I wouldn't risk, because Mr. Darbinyan would

14   advise me not to come when they were there.

15   Q.     But he was himself, according to your testimony, a

16   member of that group.

17          MS. YANG:  Objection, misstates the testimony.  He

18   stated he associates.

19          THE COURT:  Sustained.

20   BY MR. SEVERO:

21   Q.     Why would you associate with someone who had

22   connections to the Mexican Mafia, the very people who tried

23   to kill you?

24   A.     All southern gang members are associates to the

25   Mexican Mafia.

```
 1            MR. SEVERO:  That's all I have.  Thanks.

 2            THE COURT:  Okay.

 3            Counsel?

 4            MR. PEREYRA-SUAREZ:  I have no questions.

 5            THE COURT:  Counsel?

 6            MR. FLIER:  Very briefly, Your Honor.

 7                    RECROSS-EXAMINATION

 8   BY MR. FLIER:

 9   Q.    The issue when you were stabbed 56 times, were you

10   in custody?

11   A.    Correct.

12   Q.    Thank you.

13            Just a couple questions, please.

14            You testified today that Mike Darbinyan, at times,

15   was very secretive about his other involvements or his

16   phone communications; am I correct?

17            MS. YANG:  Objection, beyond the scope.

18            THE COURT:  Sustained.

19            MR. FLIER:  Can I reopen on a couple questions, Your

20   Honor, or should I wait for my case?  It's going to be

21   brief.

22            THE COURT:  Counsel, do you care if he reopens?

23            MS. YANG:  No, Your Honor.

24            THE COURT:  Okay.  Go ahead.

25            MR. FLIER:  Thank you.
```

1          **RECROSS-EXAMINATION (Reopened)**

2     BY MR. FLIER:

3     Q.     Didn't you testify, either today or yesterday, that

4     Mike Darbinyan was very secretive and didn't really talk

5     about his businesses?

6     A.     To other people, yes.

7     Q.     Thank you.

8            So when you were asked the question on redirect

9     today about are you aware of whether or not Mr. Darbinyan

10    paid a different commission or percentage to other people

11    involved, you would have no idea on that answer; correct?

12    A.     Just of what he told me.

13    Q.     What he was telling you with respect to your

14    involvement and your commission; correct?

15    A.     Or what he has confided with me, at times.

16    Q.     Now, are you trying to say -- and I'm not

17    challenging you -- that you've had conversations with

18    Mr. Darbinyan about other people and their involvement?

19    A.     At times, yes.

20    Q.     Okay.  "At times, yes."  Let's get more specific.

21           Did you have conversations with Mr. Darbinyan about

22    the 99 Cent fraud issue and any other people involved?

23    A.     With the 99 Cents issue, no.

24    Q.     Thank you.

25           So with respect to anyone involved in the 99 Cent

1    issue, you could not tell this jury anything about

2    conversations Mr. Darbinyan had with other runners or other

3    managers; am I correct?

4    A.    If they weren't people that I brought, correct.

5    Q.    And we already discussed that; correct?

6    A.    Correct.

7    Q.    All right.  When you were first arrested in 2009, I

8    think it's around December, you never spoke to law

9    enforcement about the 99 Cent fraud initially; am I

10   correct?

11   A.    No, you're not correct.

12   Q.    Lastly, after you were arrested at the end of 2009,

13   what was the time period between the arrest and when you

14   first spoke to law enforcement in a cooperation capacity,

15   if you recall?

16   A.    I don't recall.

17   Q.    Was it the next day?

18   A.    No.

19         MR. FLIER:  I have no further questions.  Thank you.

20         THE COURT:  You may step down.

21         Counsel, next witness.

22         MR. ESTRADA:  Your Honor, the government calls Mary

23   Jane King to the stand.

24         THE CLERK:  Good morning.  Stand right here to be

25   sworn, please.

```
 1              Please raise your right hand.
 2                        MARY JANE KING,
 3     GOVERNMENT'S WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:
 4              THE CLERK:  Please wait right here and raise your
 5     right hand to be sworn.
 6              Do you solemnly swear the testimony that you are
 7     about to give in the matter now pending before this Court
 8     shall be the truth, the whole truth, and nothing but the
 9     truth, so help you God?
10              THE WITNESS:  Yes.
11              THE CLERK:  Thank you.  You may be seated.
12              And you can adjust the microphone if you need to.
13              May I please ask that you state your full name for
14     the record and spell your last name.
15              THE WITNESS:  Mary Jane King, K-i-n-g.
16              THE CLERK:  Thank you.
17              THE COURT:  You may inquire, Counsel.
18              MR. ESTRADA:  Thank you, Your Honor.
19                      DIRECT EXAMINATION
20     BY MR. ESTRADA:
21     Q.    Good morning, ma'am.
22     A.    Good morning.
23     Q.    What city do you live in?
24     A.    City of Whittier.
25     Q.    Now, do you have a particular bank that you use in
```

1    the city of Whittier?

2    A.     Yes.  I use U.S. Bank in the city of Whittier,

3    Santa Fe Springs, actually.

4    Q.     But your bank is U.S. Bank?

5    A.     Yes.

6    Q.     How long have you been with U.S. Bank?

7    A.     Over 30 years.

8    Q.     And certainly, in 2009, were you with U.S. Bank?

9    A.     Yes.

10   Q.     And focusing on 2009, were you also a customer of

11   99 Cents Only Stores?

12   A.     Yes.

13   Q.     Would you shop there on occasion?

14   A.     Yes.

15   Q.     And when you bought things at 99 Cents Only Stores,

16   generally speaking, how would you pay for those things?

17   A.     I usually paid cash.  And my children kept telling

18   me, "Mom, you're in the Dark Ages.  ATM is the way to go."

19   So I started using my ATM.

20   Q.     In 2009, do you recall starting to use your --

21   A.     Just starting, yeah.

22          MR. SEVERO:  I didn't hear the time, Your Honor.

23          MR. ESTRADA:  2009.

24          MR. SEVERO:  Thank you.

25

BY MR. ESTRADA:

Q.    Now, at some point in the summer of 2009, did you

learn that there was fraud occurring against your ATM

account?

A.    Yes.

Q.    How did you learn about that?

A.    I went to make a large purchase at a different

store -- it wasn't the 99 -- and they wouldn't -- my card

wouldn't go through.  And I asked them to do it again

because I knew I had money in the bank.  And they did it

again, and they did it again.  It was very embarrassing.  A

long line of people.

       But anyway, I couldn't pay for this purchase.  And

so I essentially went to my bank and found out that they

had canceled my card because of funds being taken out that

weren't me.

Q.    Did you end up getting a new card from the bank?

A.    Yes.

Q.    Did you learn that money had been stolen from your

account?

A.    Yes.

Q.    And how much money did you learn had been stolen

from your account?

A.    I believe it was $2,600.

       MR. ESTRADA:  Your Honor, the government requests

1    permission to admit and publish Exhibit 378.  This is a

2    certified business record.

3            THE COURT:  Okay.

4                (Exhibit 378 is admitted into evidence.)

5    BY MR. ESTRADA:

6    Q.    And, ma'am, I'm going to show you an exhibit there.

7    It's going to pop up on the screen there in front of you.

8            Do you see this exhibit?

9    A.    Yes.

10   Q.    And I'll zoom in a bit more.

11           But here in the middle, is that your name, Mary Jane

12   King?

13   A.    Yes.

14   Q.    And looking at the side here of this bank statement,

15   do you see this account number there?

16   A.    Yes.

17   Q.    Was that your account number back in 2009?

18   A.    Yes.

19   Q.    And this was your bank here, U.S. Bank?

20   A.    Yes.

21   Q.    Now, I'd like to show you a different page from that

22   statement, and specifically page 5 of 8.

23           Do you have that in front of you?

24   A.    Yes.

25   Q.    And you mentioned that, at times, you were a

1    customer of 99 Cents Only Stores.

2    A.    Yes.

3    Q.    Do you see this entry here, July 20th, 99 Cents Only

4    Store, Norwalk?

5    A.    Yes.

6    Q.    Was that one of the 99 Cents Only Stores you used?

7    A.    Yes.

8    Q.    Did you use other ones too?

9    A.    Yes.  When I was looking for a specific item, I

10   would sometimes have to go try a different store.  Someone

11   would give me the information, and so I would look for

12   something, and I would go from one store to the other to

13   find it.

14   Q.    Did you ever use the store in Whittier?

15   A.    Mostly.

16   Q.    Now, I'll zoom out a little bit.

17         There's a line here referring to an ATM withdrawal

18   July 23rd in Sylmar, California, for $203.

19         Do you see that?

20   A.    I do.

21   Q.    Did you make that ATM withdrawal?

22   A.    No.

23   Q.    Did you ever use an ATM in Sylmar?

24   A.    Never.

25   Q.    Looking at the next line, July 23rd, still an ATM

1    withdrawal for $503, do you see that?

2    A.    Yes.

3    Q.    Did you make that withdrawal?

4    A.    No.

5    Q.    Again, in Sylmar, California.  And did you ever use

6    an ATM in Sylmar, California?

7    A.    Never.

8    Q.    And the next day, July 24th, we've got two more.

9    July 24th, $203 in Sylmar, and again in Sylmar, $503.

10          Do you see that?

11   A.    Yes.

12   Q.    My marking is covering it up a little bit, but you

13   didn't make those withdrawals there?

14   A.    No.

15   Q.    Toward the bottom there, there's some more ATM

16   withdrawals entered on July 27th.

17          Do you see those?

18   A.    Yes.

19   Q.    For $203, another one for $203, another one for

20   $303, another one for $403.

21          Do you see that?

22   A.    Yes.

23   Q.    And it mentions ATMs in Northridge, California.

24          Do you ever use ATMs in Northridge, California?

25   A.    Never.

1    Q.    Now, with your ATM information, your PIN number and

2    your account number, do you keep those confidential?

3    A.    Yes.

4    Q.    You didn't share those with other people?

5    A.    No.

6    Q.    Do you know a person by the name of Mher Darbinyan?

7    A.    No.

8    Q.    Did you ever authorize Mher Darbinyan to have your

9    account number or your PIN?

10   A.    No.

11   Q.    Do you know a person by the name of Rafael

12   Parsadanyan?

13   A.    No.

14   Q.    Did you ever authorize that person to have your

15   account number or your PIN?

16   A.    No.

17         MR. ESTRADA:  No further questions, Your Honor.

18         THE COURT:  Okay.  Counsel.

19                     **CROSS-EXAMINATION**

20   BY MR. SEVERO:

21   Q.    Good morning, ma'am.

22   A.    Good morning.

23   Q.    Did you have a limit on how much you could withdraw

24   on your ATMs on a daily basis?

25   A.    I really don't know because I didn't withdraw a lot

1   of money at once, and I don't recall what it was when I

2   signed the agreement.

3   Q.    Did you ever, you personally, withdraw from an ATM

4   cash?

5   A.    At that point, no.

6   Q.    At any point.

7   A.    I think I have once.  Usually I use it just for

8   shopping.

9   Q.    Okay.  How did you get your -- you said you paid

10  cash for some things.  How did you get your cash?

11  A.    Well, my husband usually got it for me.

12  Q.    That's a good source, usually.

13        Do you remember what date it was that you tried to

14  make that large purchase but couldn't because there wasn't

15  enough money in the account?

16  A.    I do not remember.

17  Q.    Was it in 2009?

18  A.    Oh, yes.

19  Q.    It was in --

20  A.    It was in the summer of 2009.  I was getting ready

21  for a camping trip with a large amount of people, and I was

22  buying food for everyone.

23  Q.    Did you get it done?

24  A.    Eventually.

25  Q.    Eventually.  Good.

1          I have no other questions.

2          THE COURT:  Okay.

3          Counsel?

4          MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

5     of this witness.

6          THE COURT:  Mr. Flier.

7          MR. FLIER:  Very briefly.  Thank you, Your Honor.

8                         **CROSS-EXAMINATION**

9     BY MR. FLIER:

10    Q.     Based on your testimony, ma'am, you do not recall

11    the specific date, although it was in the summer of 2009,

12    where your card did not go through because of whatever the

13    reason is; is that correct?

14    A.     Correct.

15    Q.     Do you have an independent recollection when you

16    actually attended or did that camping trip, though, what

17    month?

18    A.     Yes.

19    Q.     What month?

20    A.     Labor Day weekend.

21    Q.     And what month is that?

22    A.     It's the first Monday in September 2009.

23    Q.     So it was around that time period, before a little?

24    A.     No, it was quite a bit before that time because --

25    weeks before that time, because I was buying non-perishable

1    items.

2    Q.    So maybe -- and we don't want you to guess -- maybe

3    in August?

4    A.    Most likely.

5    Q.    Okay.  Thank you.

6          Now, with respect to any transaction that was

7    removed from your account illegally, the prosecutor,

8    Mr. Estrada, showed you some of those withdrawals on the

9    exhibit; is that correct, ma'am?

10   A.    Yes.

11   Q.    Can you tell us who the person was, with personal

12   knowledge, who actually did those withdrawals, or you have

13   no idea?

14   A.    I have no idea.

15   Q.    Okay.  Thank you.

16         You were asked about the daily limits, and you

17   already answered you were uncertain about that because you

18   didn't utilize the card, nor did you remember what the

19   contract originally said about that; is that correct?

20   A.    Correct.

21   Q.    With respect to the total amount of loss, at least

22   that you were aware of, it appears to be around $2,000,

23   approximately?  And I'm not minimizing that, because you

24   said you were embarrassed, and this has been stressful, I

25   assume.

1    A.    Correct.

2    Q.    Of course.

3          But am I accurate, it's around $2,000.

4    A.    That was taken from my account without me?

5    Q.    Yes.

6    A.    More than that, but I don't recall exactly how much.

7          I've tried to let go of this because it's been very

8    painful.

9    Q.    Of course.

10         And obviously, the records speak for themselves

11   about that amount; correct, ma'am?

12   A.    Yes.

13   Q.    Okay.  Now, hopefully, did the bank compensate you,

14   pay you back?

15   A.    Eventually.

16   Q.    Now, with respect to what you were shown in my last

17   question, Exhibit 378 has to do with your U.S. Bank bank

18   statement; is that correct, ma'am?

19   A.    Yes.

20   Q.    And with respect to the page 5 of 8 of this

21   particular exhibit -- and I'm the one who did these

22   circles -- those markings by me, right here, right here,

23   right here (indicating), those correspond to the

24   withdrawals that you did not authorize; correct?

25   A.    Correct.

1  Q.    But what I didn't see, and maybe I missed it with

2  Mr. Estrada's questions, the very last one, July 27th,

3  mentions a Balboa area in Northridge.  Maybe I missed

4  whether or not he included that one, but is that included

5  in the unlawful transactions?

6  A.    Yes.

7  Q.    Okay.  Thank you.

8        So when we do the math, we have around $706 for the

9  23rd, we have the exact amount 706 for the 24th, and then

10 we have around 1100.

11       So you were correct, it's over $2,000.  It's around

12 2500.  Does that make sense?

13 A.    Yes.

14 Q.    When you went to the bank and told about what was

15 happening with your account, my next question is this:  Did

16 any banking representative ever show you any surveillance

17 photos of any ATM machine?

18 A.    No.

19 Q.    The dates -- these are the dates that you believed,

20 based on your banking records, there were unlawful

21 withdrawals -- on the 23rd, on the 24th, and on the 27th of

22 July; is that correct, ma'am?

23 A.    Correct.

24 Q.    It was your -- a family member's idea to use the ATM

25 card instead of cash; is that correct?

```
1    A.      Yes.

2    Q.      Are you going to listen to them again?

3    A.      Yes.

4            MR. ESTRADA:  Objection, relevance.

5            THE COURT:  Sustained.

6            MR. FLIER:  I had to say it.

7            No further questions.

8            THE COURT:  Any redirect?

9            MR. ESTRADA:  No, Your Honor.

10           THE COURT:  Okay.  You may step down.  Thank you

11   very much for coming in.

12           Next witness.

13           MR. CREIGHTON:  The United States calls Stephen

14   Gonzales.

15                       STEPHEN GONZALES,

16    GOVERNMENT'S WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

17           THE CLERK:  Please wait right here and raise your

18   right hand to be sworn.

19           Do you solemnly swear the testimony you shall give

20   in the cause now pending before this Court shall be the

21   truth, the whole truth, and nothing but the truth, so help

22   you God?

23           THE WITNESS:  Yes.

24           THE CLERK:  Thank you.  You may be seated.

25           May I please ask that you state your full name and
```

1    spell your last name for the record.

2           THE WITNESS:  Stephen Gonzales, S-t-e-p-h-e-n,

3    G-o-n-z-a-l-e-s.

4           THE COURT:  Thank you.

5           You may inquire, Counsel.

6           MR. CREIGHTON:  Thank you, Your Honor.

7                    **DIRECT EXAMINATION**

8    BY MR. CREIGHTON:

9    Q.    Good morning, Mr. Gonzales.

10   A.    Good morning.

11   Q.    Where do you live?

12   A.    Hooper Valley.

13   Q.    Is that in Riverside County?

14   A.    It is.

15   Q.    Where do you bank?

16   A.    Altura Credit Union.

17   Q.    How long have you banked with them?

18   A.    Approximately ten years.

19   Q.    Now, directing your attention to the -- to the year

20   2009, did you shop at 99 Cents Stores in that period?

21   A.    I did.

22   Q.    Do you recall learning of a fraud against your

23   account in 2009?

24   A.    I do.

25   Q.    How did you learn about it?

1   A.      I was sitting at my -- I have twins, and I was

2   sitting at their tennis lesson.  And I was enjoying the

3   boredom by going over and calling in my checking account

4   balance, and maybe take a small vacation with my wife and

5   kids.  And I didn't like what the balance said, and so I

6   called my wife, and I said, "I know we're poor, but I know

7   we're not this poor."

8           So she said, "Well, I'll check online."  She has

9   access to a computer.  And she called me back and said,

10  "There's some charges on here that aren't ours" and "Have

11  you ever been to these places?"

12          I said, "Not that I know of."

13          And so she called the bank, and they told us to come

14  in and pick up a fraud packet and go to the police station

15  and file a report.

16          THE COURT:  Next question.

17          MR. CREIGHTON:  Thank you, Your Honor.

18          Your Honor, the government, at this time, would like

19  to move Exhibit 376 into evidence.  It's a certified

20  business record.

21          THE COURT:  Yes.

22             (Exhibit 376 is admitted into evidence.)

23  BY MR. CREIGHTON:

24  Q.     Now, Mr. Gonzales, I'm showing you a document here.

25  Is this your name and your wife's name that I'm circling up

1    here?

2    A.    It is.

3    Q.    And then, looking over the right-hand side, do you

4    recall whether your account number ended in 7703 at that

5    point?

6    A.    It did.

7    Q.    And what are the dates listed on this bank

8    statement?

9    A.    July 1, 2009, through July 31, 2009.

10   Q.    Now, I'm going to direct your attention to page 2 of

11   9 of Exhibit 376.

12         And looking up here, do you see a transaction that

13   took place on 7-7?

14   A.    Yes.

15   Q.    And what transaction is that?

16   A.    99 Cents Store.

17   Q.    What is the location that's listed for it?

18   A.    8900 Limonite, Riverside, California.

19   Q.    And is that a 99 Cents Store where you and your wife

20   shop?

21   A.    Yes.

22   Q.    And what was the amount of the purchase?

23   A.    $6.97.

24   Q.    Directing your attention to page 4 of 9 of

25   Exhibit 376, do you see a transaction on 7-17?

1    A.    I do.

2    Q.    That is a withdrawal at Foothill and Rosemead in

3    Pasadena in the amount $303.  Did you make that withdrawal?

4    A.    No, I did not.

5    Q.    Did you go to that location to make withdrawals?

6    A.    No.

7    Q.    There's also a withdrawal on July 18th in Van Nuys,

8    California, in the amount of $200.

9          Did you make that withdrawal?

10   A.    No, I did not.

11   Q.    And then there's a withdrawal on July 20th in

12   Diamond Bar, California.

13         Did you make a withdrawal in Diamond Bar,

14   California?

15   A.    No, I did not.

16   Q.    And what is the amount of that withdrawal?

17   A.    $303.

18   Q.    Did you ever authorize anyone other than yourself or

19   your wife to have access to that account?

20   A.    No, I did not.

21   Q.    Did you ever authorize an individual named Mher

22   Darbinyan to make a withdrawal from your account?

23   A.    No, I did not.

24   Q.    Did you ever authorize an individual named Rafael

25   Parsadanyan to make a withdrawal?

```
1    A.      No, I did not.

2            MR. CREIGHTON:  No further questions.

3            THE COURT:  Cross.

4                        CROSS-EXAMINATION

5    BY MR. SEVERO:

6    Q.      Good morning, sir.

7    A.      Good morning.

8    Q.      Are you saying the twins' tennis lessons were

9    boring?

10           MR. CREIGHTON:  Relevance, Your Honor.

11           THE COURT:  Sustained.

12   BY MR. SEVERO:

13   Q.      Did you have a limit on ATM withdrawals?

14   A.      At that time, no.

15   Q.      So you could take out as much money as you wanted on

16   any given day?

17   A.      To the best of my knowledge, yes.

18   Q.      And to the -- of course, not exceeding your balance,

19   of course.

20   A.      Of course, yes.

21   Q.      Did you use the ATM with any degree of frequency to

22   take out cash?

23   A.      Probably not.  I don't like to go use the ATMs

24   because I'm cheap, and I don't like to pay 50 cents or 75

25   cents.
```

 1    Q.     Well, that makes sense.

 2           So let me direct your attention to Exhibit 376, 6 of

 3    9.  We've talked about the two $300 withdrawals not being

 4    yours; correct?

 5    A.     Correct.

 6    Q.     Is the $200 withdrawal something you did?

 7    A.     It's not something I would do, no.

 8    Q.     How about your wife?

 9    A.     No, not her.  She likes to go to the bank and make

10    withdrawals from Altura sites.

11    Q.     The ones that are yours are the ones that are like

12    $40 and stuff like that; right?

13    A.     Yes, the smaller ones.

14    Q.     Very good.

15           Did you get your money back from the bank?

16    A.     The bank granted me a provisional loan, and then

17    eventually, after the investigation, they did give it back.

18    Q.     So you didn't lose any money, did you?

19    A.     No.

20           MR. SEVERO:  Thank you.  Nothing further.

21           THE COURT:  Counsel?

22           MR. PEREYRA-SUAREZ:  Your Honor, I have no questions

23    of this witness.

24           THE COURT:  Mr. Flier.

25           MR. FLIER:  Very briefly, Your Honor.

1                        <u>CROSS-EXAMINATION</u>

2      BY MR. FLIER:

3      Q.      Good morning, sir.

4      A.      Good morning.

5      Q.      We're almost done.

6      A.      Okay.

7      Q.      The exhibit, page 2 of 9 of Exhibit 376, the

8      indication on July 7th of a transaction from 99 Cents

9      Stores, is it your testimony that you have an independent

10     recollection of being at that 99 Cents Store and doing a

11     transaction?

12     A.      Yes.

13     Q.      And then it says the store is Limon, L-i-m-o-n, in

14     Riverside; is that correct?

15     A.      "Limon" is an abbreviation for Limonite, which they

16     should have added the -i-t-e for the end of that.

17     Q.      I was just going to ask you about the end of that

18     word, and you just answered it.  Thank you.

19             And without minimizing any activity fraudulent on

20     your account, these exhibits, but in particular Exhibit

21     409, dictate or show the three transactions that you and

22     your wife and family did not authorize; is that correct?

23     A.      That is correct.

24     Q.      And with basic math skills, that appears to be $803

25     total loss, fraudulent activity; is that correct?

1          THE COURT:  806.

2          MR. FLIER:  I'm sorry.  Well, I did say I'm --  I

3     don't even know what I said, so let me do that one again,

4     please.

5          THE COURT:  Okay.

6          MR. FLIER:  It's 806, right?  Okay.

7     BY MR. FLIER:

8     Q.    $806; is that correct?

9     A.    That is correct.

10    Q.    All right.  And with respect to anyone who actually

11    did those three withdrawals fraudulently, you have no idea

12    who those people were; is that correct?

13    A.    No, I don't know who they are.

14    Q.    At any time, up to today's date, has anyone, banking

15    officials, the government over here, shown you any ATM

16    surveillance photos that correspond to these withdrawals?

17    A.    No, they have not.

18         MR. FLIER:  Thank you, sir.

19         I have no further questions, Your Honor.

20         THE COURT:  Thank you, Counsel.

21         Any further questions?

22         MR. CREIGHTON:  No, Your Honor.

23         THE COURT:  You may be excused.  Thank you very much

24    for coming in.

25         Next witness.

1          MS. YANG:  Your Honor, the government calls Janell

2    Arnold.

3                        **JANELL LYNN ARNOLD,**

4     GOVERNMENT'S WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

5          THE CLERK:  Please stop here and raise your right

6    hand to be sworn.

7          Do you solemnly swear the testimony you shall give

8    in the cause now pending before this Court shall be the

9    truth, the whole truth, and nothing but the truth, so help

10   you God?

11         THE WITNESS:  Yes.

12         THE CLERK:  Thank you.  You may be seated.

13         May I please ask that you state your full name for

14   the record and spell your last name.

15         THE WITNESS:  Janell Lynn Arnold.  J-a-n-e-l-l,

16   L-y-n-n, A-r-n-o-l-d.

17         MS. YANG:  Your Honor, may I proceed?

18         THE COURT:  Please.

19                     **DIRECT EXAMINATION**

20   BY MS. YANG:

21   Q.    Good morning, Ms. Arnold.

22   A.    Good morning.

23   Q.    What county do you live in?

24   A.    Riverside.

25   Q.    And what is your current occupation?

1   A.      I am a school secretary.

2   Q.      Now, what bank or credit union do you do your

3   banking with?

4   A.      Schools First Credit Union.

5   Q.      And how long have you been with Schools First Credit

6   Union?

7   A.      Since 2005.

8   Q.      Are you still with Schools First Credit Union?

9   A.      Yes.

10  Q.      Now, I'd like to direct your attention to 2009.

11          Were you also a customer of 99 Cents Only Stores?

12  A.      Yes, I was.

13  Q.      Was there a particular store that you regularly did

14  your shopping at?

15  A.      The one on Magnolia in Riverside.

16  Q.      And when you shopped at the Magnolia store in

17  Riverside, how did you usually pay for your purchases?

18  A.      Debit card.

19  Q.      And by "debit card," you mean your ATM card?

20  A.      Yes, my ATM card.

21  Q.      I'd like to direct your attention to July of 2009.

22          Did you learn at some point that a certain

23  fraudulent activity was being committed against your credit

24  union account?

25  A.      Yeah.  My husband and I were on our way out of a

1    wedding, and I had a voice-mail from Schools First Credit

2    Union saying -- or asking if we had withdrew $500 from a

3    North Hollywood ATM

4    Q.    Now, you testified that you were at a wedding with

5    your husband.  Was it in Los Angeles County?

6    A.    No, it was Orange County.

7    Q.    And the message from Schools First Credit Union was

8    there had been an ATM withdrawal in --

9    A.    North Hollywood.

10   Q.    -- North Hollywood.

11         What did you do when you received that voice-mail

12   message?

13   A.    I panicked.  Then I called them right back and said,

14   no, that we were at a wedding in Orange County.  And they

15   said well, shortly after, there was another attempt for a

16   $500 withdrawal from another ATM nearby and had tried that.

17   And then I said, no, that we hadn't been in the area at

18   all.

19   Q.    Now, when the credit union said there had been

20   another $500 ATM withdrawal attempt nearby, was the

21   "nearby" in North Hollywood or where you were in

22   Orange County?

23         MR. SEVERO:  Objection, hearsay, no foundation.

24         THE COURT:  Sustained.

25

1    BY MS. YANG:

2    Q.    But you received information from the credit union

3    that one withdrawal had been made on your account and one

4    attempt had been made on your account; correct?

5    A.    Yes, to the North Hollywood ATM.

6    Q.    Did you make the $500 withdrawal at the North

7    Hollywood ATM?

8    A.    No.

9    Q.    And did you attempt to make a second withdrawal of

10   $500 from the North Hollywood ATM?

11   A.    No.

12   Q.    Now, after you spoke to the credit union, what, if

13   anything, did they do with regard to your debit card?

14   A.    They canceled it.

15   Q.    And --

16   A.    They issued me another one.  I think it was three to

17   five days I received it.

18   Q.    So for approximately three to five days you were

19   without a debit card; is that correct?

20   A.    Correct.

21   Q.    Now, prior to receiving this notification from

22   Schools First Credit Union, had you shopped at a 99 Cents

23   Only Store in Riverside?

24   A.    Yes.

25         MS. YANG:  Your Honor, at this time the government

1    moves to admit Exhibit 384 as a certified business record.

2            THE COURT:  It's received, and it may be published.

3            MS. YANG:  Thank you.

4                (Exhibit 384 is admitted into evidence.)

5    BY MS. YANG:

6    Q.    Ms. Arnold, I'd like to direct your attention to the

7    screen in front of you.

8            Showing the first page of Exhibit 384, do you

9    recognize this document?

10   A.    Yes, I do.

11   Q.    And what is it?

12   A.    It's my Schools First statement.

13   Q.    Now, in the -- under your name, Janell Lynn Arnold,

14   there's a blacked-out portion.  Is that where your address

15   is?

16   A.    Yes.

17   Q.    And the time frame of this statement is July 4,

18   2009, to July 31, 2009; correct?

19   A.    Yes.

20   Q.    Now, you testified that prior to receiving the

21   notification from Schools First Credit Union about the

22   fraudulent activity, you had shopped at a 99 Cents Only

23   Store; correct?

24   A.    Yes.

25   Q.    Directing your attention to the bottom of page 1 --

1   A.      Uh-huh.

2   Q.      -- do you see the last entry on July 6, 2009, for

3   $11.70?

4   A.      Yes.

5   Q.      Is that the purchase that you made at the Magnolia

6   store in Riverside County?

7   A.      Yes, it was.

8   Q.      Now, with regard to the $500 ATM withdrawal that

9   Schools First notified you about, I'd like to direct your

10  attention to page 3 of Exhibit 384.

11          Do you see this entry dated July 18th for $503?

12  A.      Yes.

13  Q.      And was this at the ATM in North Hollywood?

14  A.      Yes.

15  Q.      And again, did you make this withdrawal?

16  A.      No.

17  Q.      Directly following this entry, there's -- on the

18  same date, there's a deposit/provisional credit of $500.

19  A.      Correct.

20  Q.      Do you understand what that was?

21  A.      Yes.  When I called back Schools First, they asked

22  me -- or told me that they would be sending me fraud papers

23  in the mail, that I was to fill them out and send them

24  back; but in the meantime, they would put the money back in

25  my account and investigate it.  And if they decided I had

1    nothing to do with it, I was allowed to keep it, but

2    otherwise, if I was involved, they would take it away

3    again.

4    Q.    Now, have you -- or do you share your debit card

5    number or your PIN number with anyone outside your family?

6    A.    No.

7    Q.    Do you generally keep your bank information

8    confidential?

9    A.    Yes.

10   Q.    Do you know an individual by the name of Mher or

11   Mike Darbinyan?

12   A.    No.

13   Q.    Do you know an individual by the name of Rafael

14   Parsadanyan?

15   A.    No.

16   Q.    Did you authorize either of those individuals to

17   have your debit card number and your PIN number?

18   A.    No.

19   Q.    And did you authorize either of those individuals to

20   make withdrawals from your Schools First Credit Union bank

21   account?

22   A.    No.

23         MS. YANG:  Nothing further, Your Honor.

24         THE COURT:  Cross-examination.

25         Could you bring the mic up a little closer to you?

```
1              THE WITNESS:  Yes.  I'm sorry.
2                        CROSS-EXAMINATION
3    BY MR. SEVERO:
4    Q.    Good morning.
5    A.    Good morning.
6    Q.    Did you have a daily limit on how much you could
7    withdraw from your ATM?
8    A.    $500.
9    Q.    That was your limit?
10   A.    Yes.
11   Q.    Okay.  But that didn't include, like, the $3 fee if
12   you were at some ATM outside of your credit union?
13   A.    I'm not sure, actually.  We've never taken out $500
14   from our ATM.
15   Q.    Okay.  That's good.
16         Your -- you were without a card for three days.
17   A.    At least.
18   Q.    Three to five?
19   A.    Uh-huh.
20   Q.    Yes?
21   A.    Yes.
22   Q.    Okay.  And did that cause you any financial loss?
23   A.    It was just difficult because I'm the primary
24   shopper in the family, groceries and everything else, and
25   bills, and so I didn't have that to use.
```

002423

1    Q.    Didn't send your husband out to shop?

2    A.    No.

3          MR. SEVERO:  That's all I have.  Thank you.

4          THE COURT:  Counsel?

5          MR. PEREYRA-SUAREZ:  I am not going to ask any

6    questions of this witness.

7          THE COURT:  Okay.

8          Counsel.

9          MR. FLIER:  Thank you, Your Honor.

10                    **CROSS-EXAMINATION**

11   BY MR. FLIER:

12   Q.    I will not ask you any math questions.

13   A.    Okay.

14   Q.    Had you used that ATM card before?

15   A.    Yes.

16   Q.    And when you do use your ATM card, does the

17   withdrawal come out in $20 increments?

18   A.    Yes.  Yes.

19         MR. FLIER:  I have no further questions.  Thank you.

20         THE COURT:  Anything further?

21         MS. YANG:  No, Your Honor.

22         THE COURT:  You may step down.  Thank you very much

23   for coming in.  I appreciate it.

24         Next.

25         MR. ESTRADA:  Your Honor, the government calls

1    Muriel Johnson to the stand.

2            THE CLERK:  I'm sorry.  Could I get the first name?

3            MR. ESTRADA:  Muriel Johnson.

4            THE CLERK:  Wait here to be sworn, please.

5                      **MURIEL L. JOHNSON,**

6      GOVERNMENT'S WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

7            THE CLERK:  Do you solemnly swear the testimony you

8    shall give in the cause now pending before this Court shall

9    be the truth, the whole truth, and nothing but the truth,

10   so help you God?

11           THE WITNESS:  I do.

12           THE CLERK:  Thank you.  You may be seated.

13           May I please ask that you state your full name for

14   record and spell your last name.

15           THE WITNESS:  It's Muriel L. Johnson, J-o-h-n-s-o-n.

16           THE COURT:  You may inquire, counsel.

17           MR. ESTRADA:  Thank you, Your Honor.

18                    **DIRECT EXAMINATION**

19   BY MR. ESTRADA:

20   Q.    Ms. Johnson, what city do you live in?

21   A.    Riverside, California.

22   Q.    Do you do banking at any particular institution?

23   A.    I bank at Compass Bank, but it was called previously

24   Guaranty Bank.

25   Q.    Now, I want to ask you about that previous time.

1    And I'm turning your attention to 2009.

2          In 2009, was your bank Guaranty Bank?

3    A.    Yes.

4    Q.    How long have you been a customer of Guaranty Bank

5    and now Compass Bank?

6    A.    At least 10 years.

7    Q.    Now, also, in the 2009 time frame, were you a

8    customer of 99 Cents Only Stores?

9    A.    Yes, I was.

10   Q.    Were there any particular 99 Cents Only Stores that

11   you would shop at?

12   A.    Well, the one I went to most was located on Magnolia

13   Avenue -- I think it's Avenue -- in Riverside.

14   Q.    When you would shop there, would you use your debit

15   card?

16   A.    Yes.  I used my Guaranty debit card.

17   Q.    Now, at some point in the summer of 2009, did you

18   learn about fraud on your debit card?

19   A.    I was contacted by -- I think it was the

20   investigating people as part of the bank.  I'm not sure,

21   but it was -- an investigator contacted me and asked me did

22   I make certain charges.

23         I was unaware until that time that my -- that

24   charges were being made on the card that I wasn't making.

25   Q.    And did you eventually have to repay your account in

1    some way?

2    A.    Well, I went immediately to my bank, I think the

3    next day, and reported that there was fraudulent use on my

4    card.  And they put a hold on the account, canceled the

5    debit card.  And I had to -- they had me sign various

6    documents after they went over the account and saw all the

7    charges.  They were coming from various areas in Southern

8    California where I never shopped.

9    Q.    Now, I'd like to turn your attention to an exhibit,

10   it's Exhibit 377.

11         MR. ESTRADA:  And, Your Honor, with the Court's

12   permission, the government would ask to admit 377 and ask

13   permission to publish.

14         THE COURT:  Yes.

15              (Exhibit 377 is admitted into evidence.)

16   BY MR. ESTRADA:

17   Q.    I'm going to place it on the screen there in front

18   of you.  Do you see Exhibit 377?

19   A.    Well, I don't see where it says "377," but I see it

20   says "Statement of Account."

21   Q.    Very observant of you.  So I'm going to zoom back.

22         You should have been a lawyer.

23         I'm going to zoom back here.  Do you see this, where

24   it says Exhibit 377?

25   A.    Yes, I do.

1   Q.    Okay.  Now I'm going to zoom in here at the top.

2         Okay.  Guaranty, was that your bank?

3   A.    Yes.

4   Q.    And Muriel L. Johnson, is that you?

5   A.    Muriel.  That's me.

6   Q.    I'm sorry.  Muriel -- Muriel.  I'll get it right

7   eventually.

8         And that account number, is that you?

9   A.    Yes.

10  Q.    I'd like to turn your attention to page 2 of that

11  exhibit, and I'm going to place that on the screen in front

12  of you.  And I'll just show you here page 2 of 377.

13        And looking at page 2 of the exhibit, do you see an

14  entry there for 99 Cents Only Stores?

15  A.    Yes, I do.

16  Q.    On Magnolia, Riverside, California?

17  A.    Right, I see it there.

18  Q.    And that's an entry for approximately $25?

19  A.    Yes, on June 29.

20  Q.    And now, did you shop at other 99 Cents Only Stores,

21  too?

22  A.    I shop at a couple.  The one in Rialto and another

23  one in Riverside.

24  Q.    That's what I was going to ask you about.

25        There's an entry here, 99 Cents Only Stores, Rialto,

1    California.  Do you see that?

2    A.    Yes, I see that.

3    Q.    And is that for about $41?

4    A.    Yes.

5    Q.    On July 13th.

6    A.    Correct.

7    Q.    Now, I want to turn your attention to some of the

8    entries at the bottom here of your statement.

9          Do you see an entry on July 17th for $502.50?

10   A.    Yes, I see it.

11   Q.    At an ATM in Studio City, California.

12         Did you make that withdrawal?

13   A.    I've never been in Studio City, and I did not make

14   that withdrawal.

15   Q.    And here, July 20th for $503; another July 20th,

16   $303, in Glendale, California.  Did you make either of

17   those withdrawals?

18   A.    No, I did not.

19   Q.    And you see various fees on your ATM card there.

20   Did you incur those fees?

21   A.    No, I did not incur those fees.

22   Q.    Now, generally speaking, would you make ATM

23   withdrawals?

24   A.    I usually didn't make withdrawals from the ATM.  I

25   used the debit card when I shopped for groceries or at the

1   99 Cents Store, and at the supermarket I would get cash

2   when I got my groceries.  I very seldom went to the ATM.

3   Q.    Now, finally, just showing you the next page, page 3

4   of Exhibit 377, $203, July 20th it posted, West Glendale,

5   California.

6         Did you ever make an ATM withdrawal at West

7   Glendale, California, in 2009?

8   A.    No, I did not.

9   Q.    Now, are you familiar with a person by the name of

10  Mher Darbinyan?

11  A.    Would you say that name again?

12  Q.    Yes.  A person by the name of Mher or Mike

13  Darbinyan.

14  A.    No.

15  Q.    Did you ever authorize that person to use your ATM

16  card --

17  A.    No.

18  Q.    -- or your PIN number?

19  A.    Never.

20  Q.    Ever hear of a person named Rafael Parsadanyan?

21  A.    No.

22  Q.    Ever authorize that person to have your ATM card or

23  your PIN number?

24  A.    No.

25  Q.    Did you tend to keep your ATM information

1    confidential?

2    A.    I did.  Even my husband didn't know my PIN number.

3          MR. ESTRADA:  No further questions, Your Honor.

4          THE COURT:  Counsel.

5                    **CROSS-EXAMINATION**

6    BY MR. SEVERO:

7    Q.    You say you didn't give your husband the PIN?

8    A.    No.

9    Q.    That's smart.

10   A.    Well, he never asked for it.

11   Q.    Okay.  Well, good morning to you, anyway.

12         Are you still using a debit card now?

13   A.    Occasionally I still do.

14   Q.    Like when you shop, you still use it then?

15   A.    I try to use it as a credit card now.

16   Q.    So you don't have to put in your PIN?

17   A.    Right.

18   Q.    Good.

19         Do you recall, back in 2009, whether you had a daily

20   limit with respect to ATM cash withdrawals?

21   A.    There was a limit.  As far as I knew, it was $300,

22   but I think charges were made in excess of that, and it's

23   possible the bank raised my limit and I wasn't aware of it.

24   Q.    You never used the card to withdraw that much money

25   from the ATM machine?

1    A.    No, I did not.

2    Q.    And you got your cash at the market, not at any ATM

3    machine.

4    A.    Right.

5          MR. SEVERO:  Good.  That's all I have.  Thank you.

6          THE COURT:  Counsel?

7          MR. PEREYRA-SUAREZ:  No questions, Your Honor.

8          THE COURT:  Mr. Flier.

9          MR. FLIER:  I have no questions, Your Honor.

10         THE COURT:  You may step down.  Thank you very much

11   for coming in.

12         MR. CREIGHTON:  The government calls Maria Lemus.

13         THE CLERK:  Good morning.  Stop right here to be

14   sworn, please.

15                      **MARIA LEMUS,**

16    GOVERNMENT'S WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

17         THE CLERK:  May I ask you to please raise your right

18   hand.

19         Do you solemnly swear the testimony you shall give

20   in the cause now pending before this Court shall be the

21   truth, the whole truth, and nothing but the truth, so help

22   you God?

23         THE WITNESS:  I swear.

24         THE CLERK:  Thank you.  You may be seated.

25         May I please ask that you state your full name for

1    record and spell your last name.

2            THE WITNESS:  L-e-m-u-s, Maria.

3            THE CLERK:  Thank you.

4            THE COURT:  Counsel.

5                    **DIRECT EXAMINATION**

6    BY MR. CREIGHTON:

7    Q.    Good morning, Ms. Lemus.

8    A.    Good morning.

9    Q.    Where do you live?

10   A.    I live in Riverside.

11   Q.    Where do you bank?

12   A.    Bank of America.

13   Q.    How long have you been with Bank of America?

14   A.    Twenty-some years.

15   Q.    Do you have a joint account there with your husband?

16   A.    Yes.

17   Q.    What is his name?

18   A.    Jesus.

19   Q.    Turning your attention to the year of 2009, did you

20   shop at 99 Cents Stores?

21   A.    Yes.

22   Q.    Do you recall learning of a fraud against your Bank

23   of America account in 2009?

24   A.    Yes.

25   Q.    How did you learn about it?

1    A.    Bank of America called me.  They contacted me.

2    Q.    What did they say?

3    A.    They said my -- they asked me if I had made some

4    withdrawals.  And right away they canceled my account,

5    because I didn't recognize the transactions.

6          MR. CREIGHTON:  Your Honor, the government, at this

7    time, would move into evidence Exhibit 383, which is

8    certified business records from Bank of America.

9          THE COURT:  It is received and can be published.

10         MR. CREIGHTON:  Thank you, Your Honor.

11              (Exhibit 383 is admitted into evidence.)

12   BY MR. CREIGHTON:

13   Q.    Now, turning your attention to the screen in front

14   of you, is this your name over here?

15   A.    Yes.

16   Q.    And your husband's?

17   A.    Yes.

18   Q.    Up on the top right, there's an account number.  Do

19   you recall if that was your account number in 2009?

20   A.    That's correct.

21   Q.    And is this the statement for the period June 13th

22   through July 15th?

23   A.    Yes.

24   Q.    I'm turning to the second page of Exhibit 383.

25         Do you see the transaction that I have marked

1    between these two dots?

2    A.     Yes.

3    Q.     What store is that at?

4    A.     99 Cents Store in Riverside.

5    Q.     And that's on July 7th; correct?

6    A.     Correct.

7    Q.     Turning to page 4 of Exhibit 383 --

8           MR. CREIGHTON:  I'm sorry, Your Honor.

9    BY MR. CREIGHTON:

10   Q.     Turning your attention to page 4 of Exhibit 383, is

11   this also a bank statement of yours for Bank of America?

12   A.     Yes.

13   Q.     And what time period is this for?

14   A.     July 16 through August 13, 2009.

15   Q.     Now, turning to page 5 of Exhibit 383, do you see

16   two cash withdrawals here on July 20th in the amounts of

17   $100 and $500?

18   A.     Yes.

19   Q.     Did you make those withdrawals?

20   A.     No.

21   Q.     Did you ever share your PIN and account number with

22   anyone outside the family?

23   A.     No.

24   Q.     Do you know the name Mher or Mike Darbinyan?

25   A.     No.

1  Q.    Did you ever authorize Mher or Mike Darbinyan to

2  have your account number or PIN number?

3  A.    No.

4  Q.    Do you know the name Rafael Parsadanyan?

5  A.    No.

6  Q.    Did you ever authorize Rafael Parsadanyan to have

7  your account number or PIN number?

8  A.    No.

9        MR. CREIGHTON:  No further questions.

10        THE COURT:  Cross.

11                    **CROSS-EXAMINATION**

12  BY MR. SEVERO:

13  Q.    Good morning, ma'am.

14  A.    Good morning.

15  Q.    Did you make use of your ATM to withdraw cash at

16  bank branches?

17  A.    I don't understand your question.

18  Q.    Let me rephrase that.

19        Back in 2009, were you -- did you use your ATM card

20  to go to bank branches and make cash withdrawals from ATM

21  machines?

22  A.    I don't remember.

23  Q.    Okay.  Do you know if you had a limit on how much

24  cash you could withdraw from your ATM machines -- from the

25  ATM machines?

1    A.      No, I don't know my limit.

2            MR. SEVERO:  I have nothing further.  Thank you.

3            THE COURT:  Counsel?

4            MR. PEREYRA-SUAREZ:  I don't have any questions,

5    Your Honor.

6            MR. FLIER:  Very briefly, Your Honor.

7            THE COURT:  Uh-huh.

8                          **CROSS-EXAMINATION**

9    BY MR. FLIER:

10   Q.      Good morning, ma'am.

11   A.      Good morning.

12   Q.      With respect to Exhibit 383, page 1 of 11, there

13   appears to be a box, right here, where it says number of

14   ATM withdrawals and transfers for the time period of

15   June 13th through July 15th of '09.

16           Do you see that, ma'am?

17           Right here (indicating).

18   A.      Yes.

19   Q.      And that shows that there were no ATM withdrawals on

20   that day in this time period; is that correct?

21   A.      Correct.

22   Q.      With respect to the withdrawal that you did not

23   authorize, did the bank compensate you, pay you back for

24   your loss?

25   A.      Yes, they did.

1    Q.    And with respect to what you can recall, how many

2    withdrawals do you believe were fraudulently done on your

3    account?  Was it just this -- I'm not minimizing it.  Was

4    it the one that we discussed today?

5    A.    The two withdrawals.

6    Q.    Okay.  So there's two; correct?

7    A.    Yes.

8    Q.    And with respect to those two withdrawals, obviously

9    the records speak for themselves about the amount; correct?

10   A.    Correct.

11   Q.    And then, with respect to page 4 of 11, in that same

12   box, it shows right here that there were three withdrawals

13   with respect to the time period of July 16th through

14   August 13th of '09; is that correct, ma'am?

15   A.    Yes.

16   Q.    So you know there was at least one withdrawal of the

17   three that was not fraudulent.  Is that a correct

18   statement, if you recall?

19   A.    I don't recall.

20   Q.    Okay.  Thank you.

21         Do you use the ATM sometimes in 2009?  Did you use

22   it?

23   A.    Yes, I did.

24   Q.    And when you go to the bank or whatever

25   establishment to use it, when you withdraw money, it's

```
1    always in $20 increments.  Am I correct on that?

2    A.     That's how the ATM gives me the money, yes.

3    Q.     Thank you, ma'am.

4           I have no further questions.

5           THE COURT:  Thank you.

6           Anything further?

7           MR. CREIGHTON:  No, Your Honor.

8           THE COURT:  You may step down.  Thank you very much

9    for coming in.

10          Next witness.

11          MS. YANG:  Your Honor, the government calls Judith

12   DaVanzo.

13          THE CLERK:  Good morning.  Please stop right here to

14   be sworn, please.  That's fine.

15          Can you please raise your right hand.

16                       JUDITH DaVANZO,

17    GOVERNMENT'S WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

18          THE CLERK:  Do you solemnly swear the testimony you

19   shall give in the cause now pending before this Court shall

20   be the truth, the whole truth, and nothing but the truth,

21   so help you God?

22          THE WITNESS:  Yes, I do.

23          THE CLERK:  Thank you.  You may be seated.

24          May I please ask you to state your full name and

25   spell your last name for the record.
```

**002439**

```
 1              THE WITNESS:  Judith DaVanzo.  The spelling of the
 2      last name is D-a, capital V-, a-n-z-o.
 3              THE CLERK:  Thank you.
 4              THE COURT:  You may inquire, Counsel.
 5              MS. YANG:  Thank you, Your Honor.
 6                        DIRECT EXAMINATION
 7      BY MS. YANG:
 8      Q.      Good morning, Ms. DaVanzo.
 9      A.      Good morning.
10      Q.      What county do you live in?
11      A.      Riverside.
12      Q.      And what banking institution do you -- financial
13      institution do you do your banking with?
14      A.      Altura Credit Union.
15      Q.      And how long have you been with Altura Credit Union?
16      A.      Probably 15 years.
17      Q.      And do you have a joint account with your husband at
18      Altura Credit Union?
19      A.      Yes, I do.
20      Q.      And what is your husband's first name?
21      A.      James.
22      Q.      Now, I'd liked to direct your attention to 2009.
23      Did you shop at 99 Cents Only Stores in 2009?
24      A.      Yes, I did.
25      Q.      Was there a particular store that you shopped at?
```

1    A.    Magnolia in Riverside.

2    Q.    And when you shopped at the Magnolia store in

3    Riverside, how did you generally pay for your purchases?

4    A.    Sometimes cash and other times ATM.

5    Q.    ATM, meaning your debit card?

6    A.    My debit card, uh-huh.

7    Q.    I'd like to direct your attention to July of 2009.

8          Did you receive notification that there was

9    fraudulent activity suspected on your Altura Credit Union

10   account?

11   A.    Actually, we notified the bank that there was

12   fraudulent activity.

13   Q.    So you discovered it yourself; is that correct?

14   A.    Yes.

15   Q.    And how did you discover it?

16   A.    My husband checks the checking account online, and

17   he noticed it right away.

18   Q.    And what was noticed -- what did your husband

19   notice, if you know?

20   A.    He noticed three different deposits -- or

21   withdrawals made within a short amount of time and kind of

22   raised his eyebrows.

23   Q.    And did you make those withdrawals?

24   A.    No, I did not.

25   Q.    And did he make those withdrawals?

1    A.    No, he did not.

2    Q.    Once you contacted the credit union, what happened?

3    A.    Their comment was that they would have to

4    investigate it and get back to us.

5    Q.    Did they cancel your card or suspend your account or

6    take any action?

7    A.    Not that I recall.

8    Q.    Now, prior to your husband discovering this strange

9    activity on your account, had you shopped at a 99 Cents

10   Only Store?

11   A.    Yes.

12         MS. YANG:  Your Honor, at this time the government

13   moves to admit Exhibit 375 as a certified business record.

14         THE COURT:  It may be received and published.

15         MS. YANG:  Thank you.

16             (Exhibit 375 is admitted into evidence.)

17   BY MS. YANG:

18   Q.    Ms. DaVanzo, if you could take a look at the screen

19   in front of you.  I'm putting up there page 1 of

20   Exhibit 375.  Do you see that?

21   A.    Yes.

22   Q.    I'm going to zoom in.

23         And does this -- is this your banking statement from

24   Altura Credit Union from July 1st to July 31st of 2009?

25   A.    Yes.

1    Q.    Now, I'd like to direct your attention to the third

2    entry, on July 11th, for $8.72.  Do you see that?

3    A.    Yes, I do.

4    Q.    And was this a purchase that you made at that

5    99 Cents Only Store on Magnolia in Riverside that you had

6    mentioned?

7    A.    I believe so, yes.

8    Q.    Now, you testified that your husband had noticed

9    three withdrawals from your account that neither of you had

10   made; correct?

11   A.    Right.

12   Q.    There's a withdrawal here on July 17th of $303 from

13   an ATM in Stanton, California.  Do you see that withdrawal?

14   A.    I see it.

15   Q.    There's a second withdrawal on July 18th of $300 at

16   an ATM in Westminster, California.

17   A.    Yes.

18   Q.    And then a July 19th withdrawal of another $300 in

19   Mission Hills, California.

20         Do you see those three withdrawals?

21   A.    Yes, I see them.

22   Q.    Did you make any of those withdrawals?

23   A.    No, I did not.

24   Q.    Did your husband?

25   A.    No, he did not.

1   Q.      Now, do you generally keep your bank account

2   information confidential?

3   A.      Yes.

4   Q.      Did you share your PIN number with anyone?

5   A.      No.

6   Q.      Do you know an individual by the name of Mher or

7   Mike Darbinyan?

8   A.      No.

9   Q.      Do you know an individual by the name of Rafael

10  Parsadanyan?

11  A.      No.

12  Q.      Did you authorize either of those individuals to

13  have your debit card number or your PIN number?

14  A.      No.

15  Q.      And did you authorize either of those individuals to

16  make withdrawals from your credit union account?

17  A.      No.

18          MS. YANG:  Nothing further, Your Honor.

19          THE COURT:  Cross?

20          MR. SEVERO:  Yes, briefly.

21                    **CROSS-EXAMINATION**

22  BY MR. SEVERO:

23  Q.      Good morning, ma'am.

24  A.      Good morning.

25  Q.      Did you use your ATM card to withdraw cash regularly

1   in 2009?

2   A.      Yes.

3   Q.      From the bank?

4   A.      Yes.

5   Q.      And did you use the card to get more than, say, $60?

6   A.      Yes.

7   Q.      And did you ever get any bills with larger

8   denominations than $20?

9   A.      No.

10  Q.      And did you have a daily limit on your ATM card

11  withdrawals?

12  A.      Yes.

13  Q.      How much?

14  A.      I thought it was $200.

15  Q.      You learned that it was three or more?

16  A.      Yes, I did.

17          MR. SEVERO:  Thank you.  Nothing further.

18          THE COURT:  Counsel.

19          MR. PEREYRA-SUAREZ:  No question.

20          MR. FLIER:  No questions.

21          THE COURT:  Anything further?

22          MS. YANG:  No, your Honor.

23          THE COURT:  You may step down.  Thank you very much

24  for coming in.  We appreciate it.

25          THE WITNESS:  Thank you.

1          THE COURT:  Ladies and gentlemen, it being noontime,

2     we're going to break at this time.  We'll see you back in

3     at one o'clock.

4          Remember the admonishment not to discuss the case

5     among yourselves or with anybody else or form or express

6     any opinions about the matter until submitted to you and

7     you have retired in the jury room.  See you back at 1:00.

8          THE CLERK:  All rise.

9               (Jurors exit courtroom.)

10          THE CLERK:  Court is in recess.

11                    --oOo--

12               *(Whereupon at 11:29 a.m., the*

13               *Lunch recess taken until 1:00 p.m.)*

14               *(Volume II of II transcript filed*

15               *Under separate cover.)*

16                    *--oOo--*

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I hereby certify that, pursuant to Title 28,

4    Section 753, United States Code, the foregoing is a true

5    and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United

9    States.

10          Certified on March 25, 2015.

11

12                              /s/ Katherine M. Stride
                                KATHERINE M. STRIDE, CSR RPR
13                              Official Court Reporter
                                License No. 11773

14

15

16

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                      - - - -

5

6
UNITED STATES OF AMERICA,        )
7                                 )
                   PLAINTIFF,     )
8                                 )
            vs.                   )    No. CR 11-00072(A)-RGK
9                                 )
(1)  MHER DARBINYAN,              )
10   (4)  ARMAN SHAROPETROSIAN,    )
     (35) RAFAEL PARSADANYAN,      )
11                                 )
                   DEFENDANTS.     )
12   _____)

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15             DAY 11, VOLUME II of II

16                 PAGES 1 - 129

17            WEDNESDAY, APRIL 9, 2014

18                  1:06 P.M.

19            LOS ANGELES, CALIFORNIA

20

21

22    _____

23         *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
           *Official Reporter, U.S. District Court*
24              *255 East Temple Street*
                *Los Angeles, CA  90012*
25                *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF UNITED STATES OF AMERICA:

 3         ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
           BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4              ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
           312 NORTH SPRING STREET
 5         LOS ANGELES, CALIFORNIA  90012
           213.894.4477
 6
           UNITED STATES DEPARTMENT OF JUSTICE
 7         BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
           312 NORTH SPRING STREET
 8         LOS ANGELES, CALIFORNIA  90012
           213.894.2579
 9

10    FOR DEFENDANT MHER DARBINYAN:

11         THE SEVERO LAW FIRM
           BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12         70 SOUTH LAKE AVENUE, SUITE 945
           PASADENA, CALIFORNIA  91101
13         626.844.6400

14    FOR DEFENDANT ARMAN SHAROPETROSIAN:

15         LAW OFFICES OF CHARLES PEREYRA-SUAREZ
           BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16         800 WILSHIRE BOULEVARD, 12TH FLOOR
           LOS ANGELES, CALIFORNIA  90017
17         213.623.5923

18    FOR DEFENDANT RAFAEL PARSADANYAN:

19         FLIER AND FLIER, ALC
           BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20         15250 VENTURA BOULEVARD, SUITE 600
           SHERMAN OAKS, CALIFORNIA  91403
21         818.990.9500

22

23    ALSO PRESENT:

24         SPECIAL AGENT JEREMY STEBBINS, FBI
           DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25         JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          I N D E X

 2    GOVERNMENT'S WITNESSES:                        PAGE

 3    DANIEL ORTEGA
         DIRECT EXAMINATION BY MR. CREIGHTON           4
 4       CROSS-EXAMINATION BY MR. SEVERO               10

 5    JOSEPH ABERCROMBY
         DIRECT EXAMINATION BY MR. CREIGHTON           12
 6       CROSS-EXAMINATION BY MR. SEVERO               20
         REDIRECT EXAMINATION BY MR. CREIGHTON         27
 7       RECROSS-EXAMINATION BY MR. SEVERO             28

 8    PAUL KASHANI
         DIRECT EXAMINATION BY MR. CREIGHTON           30
 9       CROSS-EXAMINATION BY MR. SEVERO               40

10

11    DEFENDANT DARBINYAN'S WITNESS:                 PAGE

12    MINAS MATOSYAN
         DIRECT EXAMINATION BY MR. SEVERO              46
13       CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ       77
         CROSS-EXAMINATION BY MR. ESTRADA              96
14       REDIRECT EXAMINATION BY MR. SEVERO            119

15

16

17                        E X H I B I T S

18                         GOVERNMENT'S

19               NUMBER              ADMITTED

20                 382                  6

21                 406                  36

22                 407                  17

23                 408                  34

24                 409                  39

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002450**

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 9, 2014

 2                            1:06 P.M.

 3                            - - - -

 4       (In the presence of the jury:)

 5            THE COURT:  Okay.  The record will reflect that all

 6    the jurors are in their new respective seats in the jury box.

 7         And Counsel, you'd like to call your next witness, please.

 8            MR. CREIGHTON:  Thank you, your Honor.

 9       Daniel Ortega, please.

10            THE CLERK:  Mr. Ortega, right here to be sworn,

11    please.

12            THE WITNESS:  Sure.

13       (Witness sworn.)

14            THE CLERK:  Thank you.  You may be seated.

15         May I please ask that you state your full name for the

16    record and spell your last name.

17            THE WITNESS:  Yes.  Daniel P. Ortega, D --

18    O-r-t-e-g-a.

19            THE COURT:  Okay.  Counsel, you may inquire.

20            MR. CREIGHTON:  Thank you, your Honor.

21            DANIEL ORTEGA, GOVERNMENT'S WITNESS,

22                       DIRECT EXAMINATION

23    BY MR. CREIGHTON:

24    Q.   Good afternoon, Mr. Ortega.

25    A.   Good afternoon.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Where do you live?

2    A.   In Whittier, California.

3    Q.   Where do you bank?

4    A.   At Bank of America.

5    Q.   And in 2009 were you banking with Bank of America?

6    A.   Yes, I was.

7    Q.   And also living in Whittier?

8    A.   Yes, that's correct.

9    Q.   Now, in 2009 was your name on the Bank of America account

10   that you use?

11   A.   No, it wasn't.  It was my -- my wife's account.

12   Q.   But you both shared and used the account together?

13   A.   That is correct.

14   Q.   And were you a customer of 99 Cent Stores in that time

15   period?

16   A.   We frequented a 99 Cent Store in Whittier.

17   Q.   Thank you.

18        Did you learn of a fraud against your account in the

19   summer of 2009?

20   A.   Yes, we did.

21   Q.   Would you please tell the jury how you learned.

22   A.   Umm, grocery shopping one evening, bought all the

23   groceries -- or went to the checkout stand and used the Bank of

24   America card, and it wasn't approved.  Ran it a couple times,

25   nothing approved.  And, you know, we had to leave all --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    everything there.  We went home.

 2         I had an online account at that -- we had an online

 3    account at that time, and I went right to my bank account that

 4    evening and just looked at it, and we were wiped out.

 5    Q.   Now, let me stop you there.

 6    A.   Sure.

 7    Q.   Did you then contact Bank of America?

 8    A.   Umm, I -- it was in the evening, so I can't remember if

 9    I -- I -- I think I did make a phone call that night, at least

10    to find out how do we -- how do we find out -- or how do we go

11    about getting this thing resolved, because I saw the bank

12    account and some withdrawals that weren't ours.

13              MR. CREIGHTON:  Your Honor, the government moves

14    Exhibit 382 into evidence, which is certified business records.

15              THE COURT:  Okay.  Will be received and can be

16    published.

17         (Received in evidence, Exhibit 382.)

18    BY MR. CREIGHTON:

19    Q.   Mr. Ortega, I'm showing you page 1 of Exhibit 382.  Do you

20    recognize this document?

21    A.   Yes, I do.

22    Q.   Is that your wife's name there?

23    A.   Yes, it is.

24    Q.   That's Alicia Soto-Ortega?

25    A.   That's correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   And these account numbers that I've circled, do you recall

 2   if those were your account numbers at that time?

 3   A.   Those --

 4         MR. SEVERO:  Object.  That misstates the evidence.

 5   It's not his account.

 6         THE COURT:  I'm sorry?

 7         MR. SEVERO:  It's not his account.  Calls for

 8   speculation.

 9         THE COURT:  Well, I don't know.

10      Is that your account?

11         THE WITNESS:  Yes, it is.  It's an account that I was

12   using with my wife at that time.

13         MR. SEVERO:  The testimony is that he was not on the

14   account, that it was his wife's account.  That's the reason I

15   placed the technical objection.

16         THE COURT:  Why don't you clear that up, Counsel.

17   BY MR. CREIGHTON:

18   Q.   You were using this account at this time, correct?

19   A.   That is correct.

20         THE COURT:  Was it a joint account or just your wife's

21   account?

22         THE WITNESS:  It was my wife's account that we both

23   used together.

24   BY MR. CREIGHTON:

25   Q.   Were you depositing your funds into this account?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    I was the sole provider for the house.  It was only my

2    income going into this bank account.

3    Q.    And were you able to take money out of the account?

4    A.    I was the only one that had the bank card.

5    Q.    And is that how you used the account, to get funds out of

6    it?

7    A.    Yes, with the bank card.

8    Q.    Turning to these account numbers here, do you recognize

9    these as the account numbers of the account that you were using

10   with your wife?

11          MR. SEVERO:  Same objection.

12          THE COURT:  It'll be noted.  Overruled.

13          THE WITNESS:  Yes.  Those -- those are -- were our

14   accounts at that time.

15   BY MR. CREIGHTON:

16   Q.    Thank you.

17         Now, turning to page 3 of Exhibit 382, do you see the

18   transaction that I have indicated on July 13th here?

19   A.    Yes, I do.

20   Q.    Where did that transaction take place?

21   A.    99 Cent Store in Whittier, California.

22   Q.    Turning to page 4 of Exhibit 382, do you see two

23   transactions that were posted on July 20th up at the top of the

24   document?

25   A.    I see those transactions.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Did you or your wife make those withdrawals?

2    A.    No, we did not.

3    Q.    And what are the amounts of those withdrawals?

4    A.    $500 each.

5    Q.    Now, I'm pointing down to two cash withdrawals on

6    July 23rd, towards the bottom, in the amounts of $202 and $302.

7    Did you make those withdrawals?

8    A.    No, we did not.

9    Q.    And finally, I'm pointing to the last withdrawal on that

10   page, posted on July 24th, in the amount of $300.  Did you make

11   that withdrawal?

12   A.    No, we did not.

13   Q.    Did you authorize an individual by the name of Mike or

14   Mher Darbinyan to possess your account number or PIN code?

15   A.    No, not at all.

16   Q.    Did you ever authorize him to make a withdrawal from your

17   account?

18   A.    No, I did not.

19   Q.    Did you ever authorize an individual named Rafael

20   Parsadanyan to possess your account number or PIN code?

21   A.    No, I never did.

22   Q.    Did you ever authorize that individual to make a

23   withdrawal from your account?

24   A.    No, I never did.

25          MR. CREIGHTON:  No further questions.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Cross.

 2            MR. SEVERO:  Thank you.

 3                      CROSS-EXAMINATION

 4   BY MR. SEVERO:

 5   Q.   Afternoon, sir.

 6   A.   Good afternoon.

 7   Q.   Is it my understanding --

 8        If I may publish, your Honor?

 9            THE COURT:  Yes.

10   BY MR. SEVERO:

11   Q.   -- that these two withdrawals were not done by you,

12   either?

13   A.   No, they were not.

14   Q.   How about the $2 down below?  Each one of those, the

15   balance inquiry, did you do those?

16   A.   No, I did not.

17   Q.   Do you remember the date, by chance, of -- that you went

18   grocery shopping and found out you didn't have enough balance?

19   A.   No.  I -- I -- I don't recall the date, the exact date at

20   all.

21   Q.   Would it have been in July or June?

22   A.   Yeah, the summertime, that's for sure.

23   Q.   Late July perhaps?

24   A.   I would gather so.

25   Q.   All right.  Did you use the ATM withdrawal yourself?
```

```
 1              THE COURT:  Did you ever withdraw from the ATM at that
 2    machine?
 3              MR. SEVERO:  Thanks, Judge.
 4              THE WITNESS:  Yeah, I -- I did have the bank card, but
 5    we rarely made any ATM withdrawals.
 6    BY MR. SEVERO:
 7    Q.   Right.  That's what I wanted to know.
 8    A.   Okay.
 9              MR. SEVERO:  That's all I have.  Thank you.
10              THE COURT:  Cross?
11              MR. PEREYRA-SUAREZ:  No questions, your Honor.
12              THE COURT:  Counsel?
13              MR. FLIER:  No questions, your Honor.
14              THE COURT:  You may step down.
15         May this witness be excused?
16              MR. SEVERO:  Yes, your Honor.
17              MR. CREIGHTON:  Yes, your Honor.
18              THE COURT:  Next witness, please.
19              MR. CREIGHTON:  The United States calls Detective
20    Joseph Abercromby.
21              THE CLERK:  Good afternoon.  Right here to be sworn,
22    please.
23         (Witness sworn.)
24              THE CLERK:  Thank you.  You may be seated.
25              THE WITNESS:  Good afternoon, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      THE CLERK:  May I please ask that you state your full

2  name for the record and spell your last name.

3      THE WITNESS:  Full name is Joseph David Abercromby.

4  The last name is spelled A-b-e-r-c-r-o-m, as in Mary, -b-y.

5      THE CLERK:  Thank you.

6      THE COURT:  Thank you.

7      You may inquire, Counsel.

8      MR. CREIGHTON:  Thank you, your Honor.

9              **JOSEPH ABERCROMBY, GOVERNMENT'S WITNESS,**

10                     **DIRECT EXAMINATION**

11  BY MR. CREIGHTON:

12  Q.   Where do you work?

13  A.   I currently work for Advanced Training Bureau, Los Angeles

14  County Sheriff's Department.

15  Q.   How long have you worked for the Los Angeles Sheriff's

16  Department?

17  A.   25 years.

18  Q.   What is your present rank?

19  A.   Senior deputy.

20  Q.   And what are your present duties?

21  A.   I'm a range instructor for the training bureau.

22  Q.   Now, casting your mind back to 2004, what was your

23  position at that time?

24  A.   I was a field training officer at the West Hollywood

25  Sheriff's Station.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And what were your duties at that point?

2    A.    I was responsible for training new deputies that were

3    newly assigned to patrol.

4    Q.    And at that point in 2004, approximately how many years

5    had you served on patrol?

6    A.    At that time on patrol, I would have served about

7    14 years.

8    Q.    And approximately how many vehicle stops did you

9    participate in?

10   A.    Thousands.

11   Q.    Directing your attention to October 21st, 2004 in the

12   early morning hours, do you have that in mind?

13   A.    Yes.

14   Q.    Where were you located at that point?

15   A.    I was on patrol somewhere in the city of West Hollywood

16   with my trainee.

17   Q.    At about 3:45 a.m., did you receive a call directing you

18   to a particular location?

19   A.    Yes, I did.

20   Q.    Where were you directed to go?

21   A.    The Bank of America which is located at Santa Monica

22   Boulevard and Crescent Heights Boulevard in the city of

23   West Hollywood.

24   Q.    Now, why were you directed to go there?

25   A.    The call initially stated that there was a burglary in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   progress, that there were two males extracting large amounts of
 2   cash and bending over the ATMs --
 3   Q.   Now, let me stop you there.  Did you get to the location
 4   of the ATM in question?
 5   A.   Yes, sir.
 6   Q.   When you got there, did you see anybody there?
 7   A.   No.
 8   Q.   Did you observe anything about the ATM in question?
 9   A.   Yes.  The ATMs did not appear to have been tampered with,
10   but there was a large amount of paper receipts on the ground in
11   front of it.
12   Q.   What did you do at this point?
13   A.   We had just gotten to that location when the call got
14   updated that one of the units had a suspect vehicle detained at
15   Santa Monica and La Brea.
16   Q.   Was that far from where you were located?
17   A.   It's about a mile.
18   Q.   Did you go to the location of the vehicle stop?
19   A.   Yes, sir.
20   Q.   What did you see when you got there?
21   A.   When my trainee and I arrived in the parking lot, we saw a
22   black Toyota Scion that had been stopped by two of our patrol
23   units, and the deputies assigned to those patrol units were in
24   the process of beginning a felony traffic stop.
25   Q.   Were you able to see how many people were in the car?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Initially when we got there, no.

2    Q.    Did you later learn how many people were in the car?

3    A.    Yes, sir.

4    Q.    And did you later learn the identities of these

5    individuals?

6    A.    Yes, sir.

7    Q.    Who were they?

8          MR. SEVERO:  Objection, hearsay.

9          THE COURT:  Overruled.

10         How did you learn it?  Somebody told you, or how did you

11   learn?

12         THE WITNESS:  We arrested both occupants after --

13         THE COURT:  You were there present for the arrest?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Okay.  Go ahead.

16         THE WITNESS:  Michael Darbinyan was in the passenger

17   seat and Haro or Hayo Talasyan was in the driver's seat.

18   BY MR. CREIGHTON:

19   Q.    Now, when you say Mike Darbinyan was in the passenger

20   seat, was that the front passenger seat?

21   A.    Yes, sir.  Both of them were in the front.

22   Q.    Do you see Mr. Darbinyan in the courtroom today?

23   A.    I don't recognize him.

24   Q.    Was Mr. Darbinyan removed from the car?

25   A.    Yes.  Both suspects were removed from the vehicle at

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   gunpoint, one at a time.

2   Q.   Where were you located when Mr. Darbinyan was removed from

3   the front passenger seat?

4   A.   I would have been on the far right radio car that were all

5   lined up behind -- side-by-side behind the suspect vehicle in

6   order to conduct felony traffic stop.  I was all the way over

7   on the right-hand side, on the driver's side of the vehicle, of

8   our patrol vehicle.

9   Q.   Were you able to observe him as he was being removed?

10  A.   Yes, sir.

11  Q.   Did you see him do anything as he was being removed?

12  A.   As he got out of the vehicle, we had -- as always, we

13  instruct the suspects to get out with their hands raised so we

14  can see that they are not armed.  He initially got out of the

15  vehicle with his hands down by his waist, and he appeared to be

16  manipulating something.

17  Q.   Could you see what he appeared to be manipulating?

18  A.   Not at that time, no.

19  Q.   Did you later go over and examine to see what he was

20  manipulating?

21  A.   Yes.  After he complied with orders and was eventually

22  handcuffed, myself and my trainee approached the car to clear

23  it after the other suspect had also been removed, and I noticed

24  a number of small plastic strips that appeared to have been cut

25  up with either a knife or scissors and had fallen on the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    ground.

2    Q.   Now, with the assistance of the court deputy and the

3    permission of the Court, I'd like to show you Exhibit 407, and

4    I believe there's an envelope you may open, and if you would

5    take out the comment -- the contents and examine them.

6    A.   All right.

7    Q.   Do you recognize the contents?

8    A.   Yes, sir.

9    Q.   What are they?

10   A.   They are white plastic card strips that have writing,

11   appears to be a grease marker or a marker of some sort, on one

12   side, and what appears to be a magnetic strip on the other.

13   Q.   Now, are they in substantially similar condition to when

14   you first found them?

15   A.   I believe so, yes.

16        MR. CREIGHTON:  Your Honor, permission to -- we move

17   to admit and permission to publish.

18        THE COURT:  Yes.

19        *(Received in evidence, Exhibit 407.)*

20        MR. CREIGHTON:  Now, with the assistance of the court

21   deputy, if I could take possession of those, that piece of

22   evidence.

23        THE WITNESS:  Put them all back together here.

24        THE CLERK:  Thank you.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. CREIGHTON:

2   Q.   Sir, are these the objects that were recovered next to the

3   location where Mr. Darbinyan was extracted?

4   A.   Yes, sir.

5   Q.   And this item that I'm putting up right here, is that the

6   black stripe that you were referring to?

7   A.   Yes, sir.

8   Q.   Some of these cards appear to have writing on them.  What

9   are the initials on these cards?

10  A.   The initials are "BA."

11  Q.   And there's also numbers that appear on some of these

12  pieces.  How many digits are in this number?

13  A.   Five digits, sir.

14  Q.   For the record, that's 47621.

15       And I'm showing you another card with some digits on it.

16  How many digits are on that card?

17  A.   Four.

18            MR. CREIGHTON:  If I may have a moment to clean up the

19  mess, your Honor.

20  Q.   Now, in addition to the plastic cards that were found in

21  the vicinity of where Mr. Darbinyan was extracted from the

22  vehicle, did you notice any other objects in that location?

23  A.   On the ground, no.  On the front passenger seat of the

24  vehicle, yes.

25  Q.   What did you see?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    There were additional cut-up cards, similar to what you

2    just showed me, and a pair of scissors.

3    Q.    Now, was the car subsequently searched?

4    A.    Yes, sir.

5    Q.    And I understand you did not search the car; is that

6    correct?

7    A.    That is correct, sir.

8    Q.    But did you observe the contents of the car at any point?

9    A.    Yes, sir, I did.  As -- when the vehicle was being

10   impounded for evidence, one of the other deputies had me come

11   over to see what they had found in the rear of the vehicle.

12   Q.    What else did you see in the rear of the vehicle?

13   A.    There were several bundles, large bundles of cash, what

14   appeared to be a laptop computer, what appeared to be some sort

15   of device like you would use at a store to swipe your credit

16   card or ATM card, and I believe a couple of memory cards as

17   well.

18   Q.    Were both suspects placed under arrest?

19   A.    Yes, sir.  There was one other item that was in the trunk

20   that I did not mention.

21   Q.    What's that?

22   A.    There were several bundles of the white cards, that were

23   complete, that had been rubber-banded together.

24   Q.    Can you say approximately how many of those cards there

25   were?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  A.   I believe there was over a hundred.

 2  Q.   And could you say approx- --

 3       MR. SEVERO:  Move to strike as speculation of the

 4  witness.

 5       THE COURT:  Sustained.

 6       MR. CREIGHTON:  No further questions.

 7       THE WITNESS:  Okay.

 8       THE COURT:  Cross.

 9       MR. SEVERO:  Wonder, is the exhibit -- thank you.

10                      CROSS-EXAMINATION

11  BY MR. SEVERO:

12  Q.   Good afternoon, sir.

13  A.   Good afternoon, sir.

14  Q.   You were on regular patrol on that day in 2004, I think

15  it's October 21st?

16  A.   That's correct.

17  Q.   And when you received the call, you went to the Bank of

18  America that was complained about and found paper on the floor

19  near the ATM, correct?

20  A.   That's correct.

21  Q.   But the ATM had not been tampered with, I think is your

22  testimony, true?

23  A.   That's correct.

24  Q.   At that point, what other information did you have other

25  than someone had been bending over at the ATM?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    The initial information that we had received was that

2    there were two individuals that appeared to be removing large

3    sums of cash and were -- one of them was bending over the ATM

4    with his jacket up.  That was it.

5    Q.    That was it?

6    A.    Yes, sir.

7    Q.    You didn't get a description of an automobile or anything

8    like that?

9    A.    When the -- as the call --

10   Q.    I'm saying on the initial call.

11   A.    On the initial call, no.

12   Q.    Right.  Then you arrived at the location, and the first

13   time you heard that a vehicle had been stopped was over the

14   radio while you were at the Bank of America?

15   A.    When we got to the Bank of America, if I remember

16   correctly, the call had been updated that the two possible

17   individuals had been last seen eastbound on Santa Monica

18   Boulevard in a black four-door sedan.

19   Q.    Okay.  What time of the night was it?

20   A.    It was about 3:45, 3:30 in the morning.

21   Q.    So the next call you get is that a unit had stopped a

22   black Scion?

23   A.    That's correct.  That was the next update.

24   Q.    And do you know, if you know, why it was stopped?

25   A.    If I remember correctly, it was stopped because it at

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   least matched somewhat the description of the initial vehicle.

2   Q.   There were two people in it, correct?

3   A.   Yes.

4   Q.   And it was black?

5   A.   Yes.

6   Q.   And it had four doors?

7   A.   Yes.

8   Q.   But it wasn't a sedan, was it?

9   A.   The -- the actual vehicle that was stopped was a Scion,

10   which is kind of a boxy car.

11   Q.   It's a boxy, small station-wagon-looking car, right?

12   A.   Sort of.

13   Q.   Yeah.  When you got there, was the car already stopped?

14   A.   What do you mean the car was already stopped?  The

15   Scion --

16   Q.   I seem to have -- the Scion -- let me rephrase the

17   question.

18       On direct examination, it sounded like when you arrived

19   the patrol unit was attempting to stop the Scion.  Is -- is

20   that correct?

21   A.   No, it is not.

22   Q.   All right.  Had it already stopped the Scion?

23   A.   Yes, it had.

24   Q.   All right.  The Scion was actually stopped on the street,

25   correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    Was it stopped on the sidewalk?

 3    A.    Nope.

 4    Q.    On a driveway?

 5    A.    Yes.

 6    Q.    All right.  Whose driveway?

 7    A.    The Carl's Jr. business that was located at the time at

 8    Santa Monica and La Brea.  It's no longer there.

 9    Q.    All right.  So it was in a parking lot?

10    A.    Yes.  It was in the exit driveway on the La Brea side.

11    Q.    All right.  Very well.

12          It was -- your car was parked directly next to the other

13    black-and-white unit; is that correct?

14    A.    That's correct.

15    Q.    And both cars, both occupants of the police cars exited

16    the vehicles with your guns drawn, true?

17    A.    Correct.

18    Q.    And all the information you had at that point was that it

19    was two people in a black vehicle at that moment.  That's all

20    the evidence you had?

21    A.    Yes.

22    Q.    You were investigating?

23    A.    Correct.

24    Q.    Now, let me direct your attention, if I may, to this

25    Exhibit 407.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        May I publish, your Honor?

 2             THE COURT:  Yes.

 3             MR. SEVERO:  Thank you.

 4   Q.   This is what fell out of the front passenger's side?

 5   A.   His hands.

 6   Q.   It was in his hands?

 7   A.   Correct.

 8   Q.   Was it in his hands when he exited the vehicle, or did

 9   they drop as he's still in the vehicle?

10   A.   He -- when he got out of the vehicle, he was not complying

11   with orders to put his hands up.

12   Q.   All right.  So you ordered -- again, one of you ordered

13   again to do it?

14   A.   Yes.

15   Q.   I assume that, from your testimony, that you don't know

16   what these numbers on these credit -- on these pieces of

17   plastic mean?

18   A.   No.

19   Q.   And to the best of your knowledge, is possession of any

20   one of these illegal?

21   A.   No.

22   Q.   You didn't discover the cash until the car was inventoried

23   at the station?

24   A.   No, the car was not inventoried at the station.

25   Q.   Oh, so it was searched at the scene?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Correct.

2   Q.   But it was searched after the arrest?

3   A.   Yes.

4   Q.   And the arrest came when you saw these pieces of credit

5   cards -- or these pieces of cards?

6   A.   Amongst other items.

7   Q.   You also saw a pair of scissors?

8   A.   Yes.

9   Q.   And -- let's see.  Let me ask you.  As I understand it,

10   the cash was in the trunk, correct?

11   A.   I believe so, yes.

12   Q.   So at the point of arrest, what you have is the cards, the

13   scissors.  What else?

14   A.   The cards being cut up and the scissors, that is the --

15   what we had at that point.

16   Q.   Well, you didn't see anyone cut anything up, did you?

17   A.   No, we did not.

18   Q.   You're putting two and two together.  You saw scissors,

19   you saw pieces of cards, and you assume that they had been cut

20   up at that time?

21   A.   Correct.

22        MR. SEVERO:  Just one moment, if I may, your Honor.

23        THE COURT:  Yes.

24   BY MR. SEVERO:

25   Q.   All the other items that -- strike that.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Before you came today, I assume you had opportunity to

2  review a police report that may have been written in connection

3  with this arrest.

4  A.   Correct.

5  Q.   Because it would be impossible for you to remember nearly

6  ten years later; is that true?

7  A.   Very true.

8  Q.   In fact, what you testified about today is not from your

9  independent recollection, but having reviewed the report?

10  A.   For the most part, yes.

11  Q.   Your review of the report shows that the -- all the other

12  stuff, other stuff that was collected was collected after the

13  search of the car in full?

14  A.   Correct.

15  Q.   And after the individuals had been arrested?

16  A.   Correct.

17  Q.   And when you said the individual's name was

18  Michael Darbinyan, is that in the report as Michael Darbinyan?

19  A.   It says "Mike," I believe.

20  Q.   Okay.  And you were able to identify the individual in

21  some -- by some official document?

22  A.   At that time, I --

23  Q.   If you remember.

24  A.   -- believe he had a -- either a driver's license or an ID

25  card on him.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   But you don't remember?

2    A.   I don't remember exactly, no, sir.

3    Q.   You assume that because there is a name, address, and so

4    forth here?

5    A.   Correct.

6         MR. SEVERO:  All right.  I have nothing further.

7    Thank you, sir.

8         THE WITNESS:  Thank you.

9         MR. PEREYRA-SUAREZ:  No questions, your Honor.

10        MR. FLIER:  I have no questions, your Honor.

11        THE COURT:  You may step down.

12        MR. CREIGHTON:  Redirect, your Honor?

13        THE COURT:  Oh, I'm sorry, Counsel.  Yes.

14                   REDIRECT EXAMINATION

15   BY MR. CREIGHTON:

16   Q.   When you saw Mr. Darbinyan being removed from the car, I

17   want to ask about his hands.  Was he just holding something, or

18   were there -- did you see his hands moving?

19   A.   If I remember correctly, one of the things that drew my

20   attention to him is he had his hands down in front of them --

21   in front of him, and appeared to be manipulating something.  My

22   worry at that point is that he was attempting to retrieve a

23   weapon.

24   Q.   Now, Counsel asked you if it was not illegal to possess

25   these cards.  But you arrested Mr. Darbinyan.  Why did you
```

```
1   arrest him?

2   A.   Based on the act- -- we also had a witness that gave us

3   further information as what he'd seen these two individuals

4   doing.  Based on that information, the cards, the fact that

5   there's a magnetic strip on the back of these cards, the fact

6   that he was cutting them up, we formed the opinion that the --

7   it had probably been used as fraudulent access cards in one

8   form or another.

9            MR. CREIGHTON:  No further questions.

10                    RECROSS-EXAMINATION

11  BY MR. SEVERO:

12  Q.   When I asked you on cross what information you had, you

13  didn't mention this witness.  So there is a witness that, at

14  the scene, identified the individuals as being the individuals

15  at the ATM machines?

16  A.   No, sir.  He identified them later.

17  Q.   After the arrest?

18  A.   Yes.

19  Q.   So when you testified on redirect that you had additional

20  information from a witness, just so that we don't misunderstand

21  that, that information didn't come until after you arrested

22  them?

23  A.   That's correct.

24  Q.   All right.  So, again, why did you arrest them?

25  A.   Because, looking at those cards, they appeared to be
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    fraudulent access cards.

2    Q.   Do you at that point -- without any indication that any

3    fraud had gone on at that point, you still arrested them for

4    that reason?

5    A.   Yep.

6            MR. SEVERO:  All right.  Thank you.

7            THE COURT:  Anything further?

8            MR. PEREYRA-SUAREZ:  No, your Honor.

9            MR. FLIER:  No, your Honor.

10            THE COURT:  Okay.  You may step down now.  Thank you

11   for coming in.

12            THE WITNESS:  Thanks.

13            MR. CREIGHTON:  The government calls Paul Kashani.

14            THE CLERK:  Counsel, are you done with 407?

15            MR. CREIGHTON:  I am.

16            THE CLERK:  Good afternoon.  Right here to be sworn,

17   please.

18        (Witness sworn.)

19            THE CLERK:  Thank you.  You may be seated.

20        May I please ask that you state your full name for the

21   record and spell your last name.

22            THE WITNESS:  My name's Paul Kashani.  Last name is

23   spelled K-a-s-h-a-n-i.

24            THE CLERK:  Thank you.

25            THE COURT:  Counsel.

```
 1              PAUL KASHANI, GOVERNMENT'S WITNESS,

 2                    DIRECT EXAMINATION

 3   BY MR. CREIGHTON:

 4   Q.    Good afternoon.

 5         Where do you work?

 6   A.    Hello, sir.

 7         I work at West Hollywood Station, L.A. County Sheriff's

 8   Department.

 9   Q.    How long have you worked for the Los Angeles Sheriff's

10   Department?

11   A.    Approximately 14 years now.

12   Q.    What's your present rank?

13   A.    I'm a deputy sheriff.

14   Q.    And what's your present assignment?

15   A.    I am the I.T. manager for the whole station.  That's --

16   that's my main duty, even though I wear a uniform.  For the

17   past five years, that's what I do.

18   Q.    Casting your mind back to October 2004, where were you

19   assigned at that point?

20   A.    At that point I was assigned to patrol on early mornings,

21   grave -- graveyard shift in West Hollywood.

22   Q.    Now, at approximately 3:45 a.m. on October 21st, 2004, did

23   you receive a radio call?

24   A.    I did.

25   Q.    Were you directed to do something?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I was directed to back up or assist the handling unit on a

2   possible burglary in progress.

3   Q.   Where did you go?

4   A.   I headed towards the location from our station, which

5   was -- from -- from our location, it was eastbound on Santa

6   Monica Boulevard, towards Crescent Heights, where the Bank of

7   America is.

8   Q.   Okay.  Did you arrive at the location of a vehicle stop?

9   A.   I -- I did.  Went inside the parking lot.  There was no

10  vehicles there.

11  Q.   I'm sorry.  I'm -- I'm confused.  Did you arrive at the

12  location where a vehicle was stopped by fellow officers?

13  A.   Oh.  Initially, I went to the Bank of America first, where

14  there was no vehicle stopped, and then we heard a second, a

15  follow-up call, where -- stated where the vehicle was stopped

16  on -- on La Brea.

17  Q.   I see.

18  A.   And I went to that location next.

19  Q.   Okay.  What did you see at the vehicle stop on or near

20  La Brea?

21  A.   When I got to La Brea, I saw a black Scion with two

22  occupants, with a couple of our patrol units who had initially

23  gotten there before, before me, who were conducting a felony

24  traffic stop with their guns drawn, pointed at the driver and

25  passenger.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Did you see at some point the contents of this vehicle?

2    A.   I did.

3    Q.   What did you see?

4    A.   What I observed was the -- the driver and passenger being

5    extracted from the vehicle one at a time.  When the passenger

6    got out, I saw a few white objects fall off his lap onto the

7    ground, and he -- he was instructed to walk backwards, put his

8    hands behind his back.  And the same thing happened to the

9    driver.  I wasn't able to see the --

10   Q.   Okay.  Let me -- let me stop you there.

11   A.   Okay.

12   Q.   At some point did you see the contents of the trunk of

13   this vehicle?

14   A.   Oh, yes, I did.  Well, while they were -- once

15   the occupants were transported to -- to the station, I -- I

16   observed the other deputies going through the -- opening up the

17   car and seeing the contents.

18   Q.   And did you see some of the contents inside the vehicle?

19   A.   I did.

20   Q.   What did you see?

21   A.   In the front passenger portion, I saw white plastic cards,

22   blank, that had been -- some were cut, some were still intact.

23   Looked like magnetic strip on one side, with some numbers and

24   stuff.  And in the back, in the trunk area -- you could see

25   through the glass.  It was a hatchback type.  And I was able to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    see a laptop and a credit card reader.

 2    Q.   Okay.  Now --

 3              MR. SEVERO:  Move to strike "credit card reader" as a

 4    conclusion of this witness without foundation.

 5              THE COURT:  Overruled.  I'll let you go into that on

 6    cross.

 7              MR. CREIGHTON:  With the Court's permission, I would

 8    like to show Exhibit 408 to the witness.  It's in a binder

 9    behind the witness.

10              THE COURT:  Okay.  408.

11              THE WITNESS:  Okay.  I'm there, sir.

12    BY MR. CREIGHTON:

13    Q.   Do you recognize this picture?

14    A.   I do.

15    Q.   What is it?

16              MR. SEVERO:  Objection, no foundation, no designated

17    expert.

18              THE COURT:  Well, do you recognize that as being

19    something you've seen in the past?

20              THE WITNESS:  I do, sir.

21              THE COURT:  Where did you see it?

22              THE WITNESS:  In the trunk of the -- of the vehicle.

23              THE COURT:  Overruled.

24    BY MR. CREIGHTON:

25    Q.   Does the picture fairly and accurately depict what you saw
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    in the trunk of the vehicle?

2    A.   Yes, it does.

3         MR. CREIGHTON:  Move to admit and permission to

4    publish Exhibit 408, your Honor.

5         THE COURT:  It will be received and may be published.

6         (*Received in evidence, Exhibit 408.*)

7    BY MR. CREIGHTON:

8    Q.   Do you see this picture, Deputy Kashani?

9    A.   Yes, sir, I do.

10   Q.   What is it?

11   A.   It's the credit card machine device that I -- that I

12   observed in the car, in the trunk, through the glass.

13   Q.   Now, it wasn't in this condition when you saw it through

14   the glass; is that correct?

15   A.   That's correct.

16   Q.   But is the front part or portion here with the numbers, is

17   that in the same condition as it was when you saw it in the

18   car?

19   A.   That -- yes.

20   Q.   Now, again, with regard to the contents of the car, you

21   said you saw cut-up plastic cards in the front of the vehicle.

22   A.   I did.

23   Q.   Did you see plastic cards elsewhere in the vehicle?

24   A.   And also in the trunk area.

25   Q.   Do you recall how many there were?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   A lot.  I -- I don't know exactly.  It was almost ten

2  years ago.

3  Q.   Do you recall how they were packaged?

4  A.   To the best of my recollection, I believe they were

5  rubber-banded together in stacks.

6  Q.   Now, did you see any cash in the vehicle?

7  A.   I did.

8  Q.   Was it a little or a lot?

9  A.   A lot.

10  Q.   Did you see a laptop computer?

11  A.   I did.

12        MR. SEVERO:  This is cumulative.  It's cumulative.

13        MR. CREIGHTON:  It's my last question on that,

14  your Honor.

15        THE COURT:  Overruled up to this point.

16  BY MR. CREIGHTON:

17  Q.   At this point were you directed to do something?

18  A.   Yes, sir.

19  Q.   What was that?

20  A.   The handling deputy instructed me to go back to the

21  Bank of America to see if I could find any ATM receipts.

22  Q.   Did you go back to the Bank of America?

23  A.   Yes, sir, I did.

24  Q.   Did you retrieve any ATM receipts?

25  A.   Yes, sir.  13 to be exact.

1        MR. CREIGHTON:  Your Honor, with the assistance of the

2   court deputy, I would like to show the witness Exhibit 406.

3        THE COURT:  Okay.

4        MR. CREIGHTON:  It's a physical exhibit.

5   Q.   If you would open that envelope and review the contents.

6   A.   Yes.

7   Q.   Do you recognize these items?

8   A.   Yes, sir, I do.

9   Q.   What are they?

10  A.   These are ATM receipts that I recovered from the ground in

11  front of the ATMs.

12  Q.   Are they in substantially similar condition to the way you

13  found them?

14  A.   Yes, sir.

15       MR. CREIGHTON:  Your Honor, move to admit and

16  permission to publish Exhibit 408.

17       THE COURT:  May be admitted and published.

18       (*Received in evidence, Exhibit 406.*)

19       MR. CREIGHTON:  I'm sorry, your Honor, Exhibit 406.

20  Thank you.  I need a new pair of glasses.

21       With the assistance of the deputy, if I could have the

22  exhibit.

23       THE COURT:  Okay.

24  BY MR. CREIGHTON:

25  Q.   Now, briefly, Deputy Kashani, is this one of the ATM

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   receipts that you found on that evening?

 2   A.   Yes, sir.

 3   Q.   Do you see a date and time circled over on the left?

 4   A.   Yes, sir, I do.

 5   Q.   And what is that date and time?

 6   A.   October 21st, 2004, approximately 3:40 a.m.

 7   Q.   Now, after -- after Defendant Darbinyan was arrested, was

 8   he transported to a sheriff's station?

 9   A.   Yes, sir, he was.

10   Q.   Where was he transported?

11   A.   To West Hollywood Sheriff's Station, which is

12   approximately a mile from the bank.

13   Q.   Were you at the station when he was processed following

14   the arrest?

15   A.   Yes, sir, I was.

16   Q.   Did you assist in searching him at that point?

17   A.   Yes, I did.

18   Q.   What, if anything, did you find?

19   A.   I searched the black -- a black leather jacket that the

20   defendant was wearing, and while I was searching it --

21        MR. SEVERO:  Move to strike "defendant."  He has not

22   been identified by this deputy as --

23        THE COURT:  Do you recognize the person that you saw

24   in court today, that you searched?

25        THE WITNESS:  Yes, sir, I do.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Can you describe him for us.

 2              THE WITNESS:  Gentleman in the black jacket with the

 3    goatee.

 4              THE COURT:  Indicating the defendant, Darbinyan.

 5              MR. SEVERO:  Thank you, your Honor.

 6              THE COURT:  Thank you.

 7              THE WITNESS:  Okay.

 8    BY MR. CREIGHTON:

 9    Q.   So the defendant had -- was wearing a black leather

10    jacket; is that correct?

11    A.   Yes, sir.  At the time of the arrest, yes, sir.

12    Q.   Okay.  Did you search that leather jacket at the station?

13    A.   I did, inside the jail area, yes, sir.

14    Q.   Yeah.  What, if anything, did you find?

15    A.   Inside the pockets, I found four stacks of cash, U.S.

16    currency, that were folded in half.  Three of them -- they were

17    all $20 bills.  The three stacks were $500 exactly.  The fourth

18    stack of cash was mostly 20s, a 50, and a couple of 1s, which

19    was a little over $690.

20    Q.   Do you recall the approximate total of all that cash?

21    A.   Approximately $2,192.

22              MR. CREIGHTON:  Your Honor, the government now moves

23    into evidence Exhibit 409, which is a certified public record

24    of judgment and conviction.

25              THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          (Received in evidence, Exhibit 409.)

 2              MR. CREIGHTON:  Permission to publish?

 3              THE COURT:  Yes.

 4   BY MR. CREIGHTON:

 5   Q.  Deputy Kashani, what are the two names that appear on this

 6   document?

 7              MR. SEVERO:  Objection, no foundation.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  The first one is Haykel Mike Talasyan,

10   and second one is Mike Darbinyan.

11   BY MR. CREIGHTON:

12   Q.  Were those the two individuals that were arrested on that

13   evening?

14   A.  Yes, sir, they were.

15              MR. CREIGHTON:  Very briefly, your Honor.

16   Q.  Turning to page 2 of Exhibit 409, we see a paragraph

17   labeled "Count 3" charging defendant Darbinyan and

18   Haykel Talasyan.  What offense are they charged with?

19   A.  California vehicle -- Penal Code Section 484G(a), grand

20   theft.

21              MR. CREIGHTON:  And very briefly, your Honor.

22   Q.  Turning to page 18 of the document, do you see a line

23   below Count 3, disposition, convicted?

24   A.  Yes, sir, I do.

25   Q.  What is the next sentence?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        MR. SEVERO:  Your Honor, document speaks for itself.

2        THE COURT:  Sustained.

3        MR. CREIGHTON:  Nothing further, your Honor.

4        THE COURT:  Cross.

5                    **CROSS-EXAMINATION**

6   BY MR. SEVERO:

7   Q.   Afternoon, sir.

8   A.   Hello, sir.

9   Q.   How long have you been in the I.T. department there?

10  A.   Approximately five to six years.

11  Q.   So you haven't been in patrol all that time?

12  A.   I still patrol once a week.  It's a -- it's a -- I have a

13  computer science background, so I do both.

14  Q.   Mixed assignment?

15  A.   Yes.

16  Q.   All right.

17  A.   Makes it interesting.

18  Q.   Yes.

19       Fair to say that this was a long time ago, what you've

20  been questioned about here today?  Correct?

21  A.   Yes, sir.

22  Q.   And you wouldn't have a independent recollection of what

23  happened, except that you read the police report in this case,

24  correct?

25  A.   I had some recollection with -- before I'd even spoken to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    anyone about it or -- or read the report.  I do have specific

2    things that I remember.

3    Q.   For example, you remember the blank credit cards?

4    A.   White.

5    Q.   Blank -- yes, but they were blank, correct?

6         THE COURT:  Blank, not black.

7         MR. SEVERO:  Not black, blank.

8         THE WITNESS:  Oh, I'm sorry.  My apologies.  Yes, I

9    do.  Yeah, I do recall that.  I remember --

10   BY MR. SEVERO:

11   Q.   That part you remember?

12   A.   Yes, sir.

13   Q.   But you don't remember there being $2,192, to use your

14   words, "approximately," except that you read the report?

15   A.   Correct, sir.

16   Q.   Yes.  And the denominations that you found them in is also

17   not your memory, it's something that came from this report?

18   A.   Correct.  The report I wrote.

19   Q.   And did anyone before court this afternoon point to you

20   who was Mr. Darbinyan?

21   A.   No, sir.

22   Q.   So do you remember both individuals that you arrested that

23   night, that early morning?

24   A.   Based on my recollection --

25   Q.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   -- I had a better recollection of defendant Darbinyan,

 2   'cause he -- I personally contacted him and searched him.  Not

 3   the -- not the driver.

 4   Q.   So you don't remember the driver at all?

 5   A.   Not the best of my recollection, no.

 6   Q.   Ten years later, be pretty difficult to remember unless

 7   you had something specific to juggle your memory.

 8   A.   True.

 9        MR. SEVERO:  The Exhibit 406, I wonder if that's

10   nearby here.  May I retrieve that, your Honor?

11        THE COURT:  Yes.

12        THE WITNESS:  It's in front of me.

13   BY MR. SEVERO:

14   Q.   406.  Thank you.  It's the -- what's been admitted into

15   evidence, and it's identified as ATM withdrawal slips.

16   A.   Yes, sir.

17   Q.   Now, these ATM withdrawal slips are not -- strike that.

18        You don't remember these independently, do you?

19   A.   No, sir.

20   Q.   So when you say they're in significantly or substantially

21   the same condition as when you first saw them, it's 'cause you

22   assume that, 'cause you can't remember that.

23   A.   That's correct.

24   Q.   Yes.

25        Did you add these up?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    No, sir.

2    Q.    So you don't know what they add up to?

3    A.    No, sir, I do not.

4    Q.    You don't know if they add up to $2,192, correct?

5    A.    Correct.

6    Q.    Or a thousand dollars, for that matter?

7    A.    That's correct.

8    Q.    You have no -- put it this way:  Because it's being shown

9    to you in court here, you assume that this is the stuff you

10    found that day?

11    A.    Correct.

12    Q.    Yeah.

13          And you didn't attend any court proceedings related to

14    this arrest, did you?

15    A.    Yes, sir, I did.  I testified in court.

16    Q.    Oh, you testified at, what, the preliminary hearing?

17    A.    Correct.  Beverly Hills court.

18    Q.    All right.  So after that, did you attend any other

19    proceedings?

20    A.    No, sir.  That was it.

21    Q.    And were you present when a -- any kind of a plea of guilt

22    was entered?

23    A.    No, sir, I was not present.

24    Q.    So these documents that were shown to you today, and I

25    believe that's 409 for identification and in evidence, it's the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   first time you've seen them?
 2   A.   That's correct.
 3           MR. SEVERO:  I have nothing further.  Thank you.
 4           MR. PEREYRA-SUAREZ:  No questions, your Honor.
 5           MR. FLIER:  I have no questions, your Honor.  Thank
 6   you.
 7           THE COURT:  Any redirect?
 8           MR. CREIGHTON:  Nothing from the government,
 9   your Honor.
10           THE COURT:  You may step down.
11           THE WITNESS:  Thanks.
12           MR. ESTRADA:  Have a moment, your Honor?
13           THE COURT:  I'm sorry?
14           MR. ESTRADA:  Can I just have a moment?
15           THE COURT:  Yes.
16           MR. ESTRADA:  Your Honor, the government rests at this
17   time.
18           THE COURT:  Okay.  Defense?
19           MR. SEVERO:  Your Honor, the defense has filed, I
20   believe, already --
21           THE COURT:  There is a motion made, and that will be
22   reserved, and I'll talk to you about that later.
23           MR. SEVERO:  What I'd like to do is be able --
24           THE COURT:  And if counsel for the other two
25   defendants want to reserve their motion to make a 28 --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. PEREYRA-SUAREZ:  Yes.  Your Honor, I'm going to

 2    join in that motion filed by Mr. Severo.

 3            THE COURT:  Okay.  Thank you.

 4        I don't know if you want to join in that or reserve the

 5    right to make one later.

 6            MR. FLIER:  Like to reserve.

 7            THE COURT:  You got it.

 8            MR. PEREYRA-SUAREZ:  And I'd also like to reserve to

 9    add something to his.

10            THE COURT:  Okay.

11            MR. PEREYRA-SUAREZ:  Thank you.

12            THE COURT:  And the only thing I request is that it be

13    in writing so we can have a chance to respond to it also.

14            MR. PEREYRA-SUAREZ:  Right.

15            THE COURT:  Very good.

16        Okay.  Counsel.

17            MR. SEVERO:  Yes, your Honor.

18        The defense -- defendant Darbinyan calls Minas Matosyan.

19            MR. ESTRADA:  Your Honor, the government will arrange

20    to have that witness brought up.

21            THE COURT:  I'm sorry?

22            MR. ESTRADA:  The government will arrange to have that

23    witness brought up.

24            THE COURT:  Okay.

25        (Brief pause.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE CLERK:  Good afternoon.  Right here to be sworn,
 2     please.
 3                THE WITNESS:  Here?
 4                THE CLERK:  Right here's fine.
 5        (Witness sworn.)
 6                THE CLERK:  Thank you.  You may be seated.
 7        May I please ask that you state and spell your full name
 8     for the record.
 9                THE WITNESS:  Minas Matosyan, M-i-n-a-s,
10     M-a-t-o-s-y-a-n.
11                THE COURT:  Okay.  Thank you.
12                MR. SEVERO:  For the record, your Honor, this witness
13     is being called as an adverse witness.
14                THE COURT:  Okay.
15        MINAS MATOSYAN, CALLED AS A WITNESS BY DEFENDANT DARBINYAN,
16                          DIRECT EXAMINATION
17     BY MR. SEVERO:
18     Q.   Good afternoon, sir.
19     A.   Good afternoon.
20     Q.   Do you know a -- I may butcher the name, but work with me
21     here -- Lusine Ogada- -- Ogadesian?
22     A.   Yes.
23     Q.   Why don't you say it so I -- so we all know how to say it.
24     A.   Lusine Ogandganyan.
25     Q.   Ogandganyan?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    I'm sorry, sir?

 3    A.    Ogandganyan.

 4    Q.    All right.  And how do you know Lusine Ogandganyan?

 5    A.    She's a family friend.

 6    Q.    A family friend?

 7    A.    Yes.

 8    Q.    A friend of your family?

 9    A.    Yes.

10    Q.    Or are you the godfather of one of the kids?

11    A.    Yes.

12    Q.    Whose kid?

13    A.    Lusine Ogandganyan's.

14    Q.    So you are --

15          THE COURT:  Before you go on, I'm going to ask you if

16    you can pull your chair a little bit closer so you don't have

17    to bend over all the time.

18       Okay.  Go ahead, Counsel.

19          MR. SEVERO:  Thank you.

20    Q.    How long have you known Lusine Ogandganyan?

21    A.    Ten years.

22    Q.    Before we go further, you have been convicted of several

23    felonies, have you not?

24    A.    Yes.

25    Q.    And in -- what was your first conviction?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I believe it was 2005.  It was for a check fraud.

2   Q.   Check fraud in 2005?

3   A.   Yeah.  Forged -- and forgery.

4   Q.   You had conviction for --

5   A.   I'm not exactly sure on the date, but for forgery.

6   Q.   Would you -- would it be in 2007?

7   A.   2007.

8   Q.   Is that correct?

9   A.   Yes.

10  Q.   And what happened?  You were falsifying somebody else's

11  checks?

12  A.   Excuse me?

13  Q.   You were forging somebody's signature on a check?

14  A.   Yes.

15  Q.   For how much?

16  A.   It was just different amounts.

17  Q.   Several checks?

18  A.   Yes.

19  Q.   What kind of amounts?

20  A.   9,000, 6,000.

21  Q.   You stole that money?

22  A.   That's what the Court concluded to, yes.

23  Q.   Not -- but you don't believe that was the case?

24  A.   No.

25  Q.   You decided to plead guilty to that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Is that -- did someone threaten you to do that?

 3    A.    No.

 4    Q.    You did that voluntarily, did you?

 5    A.    Yes.

 6    Q.    How much was the total amount you stole?

 7    A.    67,000.

 8    Q.    Did you go to jail?

 9    A.    Yes.

10    Q.    For how long?

11    A.    One month.

12    Q.    One month?

13    A.    It was a one-year sentence, but I served one month.  And

14    five years' probation.

15    Q.    Okay.  Now, sometime in 2009, you were arrested again?

16    A.    Yes.

17    Q.    This time for what?

18    A.    Traffic violation.

19    Q.    Okay.  But was your probation violated?

20    A.    No, I don't believe so.

21    Q.    All right.  In 2008, did you have another grand theft

22    conviction?

23    A.    That was the same case for 2007.

24    Q.    When was your next conviction?

25    A.    I don't recall a date.  There -- there -- the rest are
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    traffic violations.

 2    Q.   Didn't you have a 2010 arrest for grand theft?

 3    A.   Traffic violation.

 4    Q.   So is it your testimony that you --

 5         MR. ESTRADA:  Object, your Honor, improper impeachment

 6    of his own witness.

 7         THE COURT:  As to --

 8         MR. SEVERO:  It's an adverse witness.

 9         MR. ESTRADA:  As to arrests and not convictions.

10         THE COURT:  Overruled.

11    And again, it will be limited only as to convictions,

12    Counsel --

13         MR. SEVERO:  Yes.

14         THE COURT:  -- and felonies.

15         MR. SEVERO:  Sure.

16    Q.   Everything you have been convicted of, you've done one

17    month in jail, correct?

18    A.   Yes.

19    Q.   Now, in connection with this case, how many times did you

20    meet with law enforcement having to do with your allegations

21    that you were being extorted?

22    A.   Several times.

23    Q.   More than twice?

24    A.   Yes.

25    Q.   More than six times?
```

1    A.    Yes.

2    Q.    And you recognize Mr. Stebbins sitting here at the

3    prosecution table?

4    A.    Yes.

5    Q.    How many times did you meet with him?

6    A.    A lot of times.

7    Q.    And every time, you were interviewed, were you?

8    A.    Yes.

9    Q.    Now, let me direct your attention back to 2008 or

10   thereabouts.  Did you borrow some money from Lusine?

11   A.    Yes.

12   Q.    How much money did you borrow?

13   A.    95,000.

14   Q.    Is that money that had come from a wrongful death suit

15   that had paid her --

16   A.    Yes.

17   Q.    -- that money?

18         Sir?

19   A.    Yes.

20   Q.    You need to wait till I finish the question, and I will

21   wait until you finish the answer.  Let's try it that way,

22   'cause court reporter will start throwing things at us.

23   A.    Okay.

24   Q.    Okay.  Now, what did you do with that money?

25   A.    They were given in cashier's checks and cash, and I gave

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    it to a person to clean credit and get me a personal loan.

 2    Q.    So it was for your personal use?

 3    A.    Yes.

 4    Q.    Did you tell Lusine that?

 5    A.    Yes.

 6    Q.    Didn't you tell her that it was for a real estate

 7    investment?

 8    A.    No.

 9    Q.    Didn't you say, "I have an investment opportunity and we

10    can all make a lot of money"?

11    A.    No.

12    Q.    So when she loaned you this money, did she loan the money

13    with interest?

14    A.    No.

15    Q.    Interest-free?

16    A.    Yes.

17    Q.    And according to the terms of your agreement with her,

18    when were you supposed to pay that money back?

19    A.    After I had got the loan for myself.

20    Q.    So clean up your credit.  Your credit was not good?

21    A.    No.

22    Q.    So clean up your credit, then you get a personal loan and

23    give her the money back?

24    A.    Yes.

25    Q.    Did you not say that you knew a real estate professional
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   who had a lucrative business opportunity, to her?
 2   A.    Not in those words.
 3   Q.    Okay.  Why don't you tell me what words you used.
 4   A.    The person that was going to clean up the credit was in
 5   real estate.
 6   Q.    When you -- at some point you went to the FBI, did you
 7   not?
 8   A.    Yes.
 9   Q.    And you spoke to an Agent Hanks.  Do you remember him?
10   A.    Yes.
11   Q.    Didn't you tell him, in those words, that you had a real
12   estate professional who had a lucrative business opportunity?
13   A.    Ye- -- to get a loan for myself.
14   Q.    Did you tell Agent Hanks that you had gone to Lusine and
15   had told her that that real estate associate told you that the
16   deal had fallen through?
17   A.    Yes.
18   Q.    And the deal that had fallen through was this business
19   opportunity that you had earlier mentioned to him?
20   A.    To clean up a -- my credit and get -- help me get a
21   personal loan.
22   Q.    That was the business opportunity?
23   A.    Yes.  My further intention was to use the money to start
24   up a business afterwards.
25   Q.    But you never said that to anyone?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Lusine knew that.

 2    Q.    That's it?  That's the only person you told?

 3    A.    Umm, I'm sure at the time other people that knew me knew

 4    that's what I was using the money for.

 5    Q.    But you didn't tell Agent Hanks that, did you?

 6    A.    Well, I was under a lot of --

 7    Q.    Yes or no, sir.

 8          THE COURT:  If you remember.  If you remember.

 9          THE WITNESS:  I do not remember.

10    BY MR. SEVERO:

11    Q.    Did you start paying the money back?

12    A.    Yes.

13    Q.    How?

14    A.    By borrowing money.

15    Q.    You know you're under oath, right?

16    A.    Yeah.

17          There are other ways.  I did commit acts where I would

18    either borrow money or use the money that I borrowed to invest

19    in buying medications and selling them on the black market --

20    Q.    You're saying --

21    A.    -- for profit.

22    Q.    -- you were dealing drugs?

23    A.    They were prescription medications.

24    Q.    You were dealing prescription medications on the street?

25    A.    Yes.  For blood pressure and diabetes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   Okay.

 2    A.   And anxiety.

 3    Q.   Anything that you could buy in the black market that was

 4    not prescribed to you --

 5    A.   Yes.

 6    Q.   -- correct?

 7         And you knew that was illegal, correct?

 8    A.   Yes.

 9    Q.   And you knew you could be arrested for that, right?

10    A.   Yes.

11    Q.   So you used that money to pay back this debt?

12    A.   Yes.

13    Q.   How much of the debt did you pay before June of 2009?

14    A.   The date, I don't understand, but I personally, before I

15    was approached by other people than Lusine, I paid back 65,000,

16    I believe.

17    Q.   Okay.  You paid $65,000 by what point?  I didn't get -- I

18    didn't --

19    A.   Before I was approached by anybody other than Lusine.

20    Q.   Okay.

21    A.   That could have been in 2009.

22    Q.   Okay.  So to the best of your recollection, sometime in

23    2009 someone approached you about payment, repayment of this

24    debt?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   And you knew that this debt was a legitimate debt you owed

2   Lusine --

3   A.   Yes.

4   Q.   -- correct?

5        Yes?

6   A.   Yes.

7   Q.   Wait until I finish, please.

8        Who approached you in 2009 other than Lusine?

9   A.   I got a phone call from a person named Arman, and I -- I

10  was approached by a person named Mher.

11  Q.   When you were first approached by this person named Arman,

12  was it on the phone?

13  A.   Yes.

14  Q.   Was it on the phone by yourself, just -- I'm sorry, strike

15  that.

16       Was it on the phone, just you and Arman?

17  A.   Yes.

18  Q.   And did you know Arman --

19  A.   Yes.

20  Q.   -- from before that time?

21  A.   I knew of him.

22  Q.   Okay.  And you know of him that he was in jail?

23  A.   I knew of who he was.

24  Q.   Okay.  You mean as how he was related to the family?

25  A.   No.  Just in the community.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Well, you knew he was related to your -- to Lusine, right?

2    A.    I didn't know the specifics of how he was related to

3    Lusine.

4    Q.    When he first approached you, you're saying?

5    A.    Yes.

6    Q.    And when you were first approached, did -- what -- what

7    happened?  You're on the phone.  He said to you you gotta pay

8    back this debt, right?

9    A.    Yes.  And he told me to meet a friend of his.

10   Q.    So you could give him the payments?

11   A.    Yes.

12   Q.    For Lusine, right?

13   A.    Yes.

14   Q.    For the -- at least -- at least the additional 31,000 that

15   was owed, or 30,000?

16   A.    The amount that they told me was different.

17   Q.    When you say "they," you're -- you're really saying that

18   Arman would give you an amount that he said you wanted to pay?

19   A.    He gave me different amounts every single time.

20   Q.    How many times did you speak with Arman before you spoke

21   to this Mher?

22   A.    I do not recall, but many.

23   Q.    More than five times?

24   A.    Yes.  Probably.

25   Q.    And from the time you first spoke to him until you were

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   introduced to Mher, did you pay any money?

 2   A.    No.

 3   Q.    Were you told to make these payments to -- whatever

 4   payments you were going to make, to Mher?

 5   A.    I was told to make the payments to wherever I was told.

 6   It would be different every single time.

 7   Q.    How many times did you meet Mher?

 8   A.    Maybe five.

 9   Q.    Did you ever tell the FBI before February or April of this

10   year that you had met with Mher?

11   A.    I believe so.

12   Q.    You do?

13   A.    Yes.

14   Q.    All right.  Did you tell them on -- strike that.

15         When was the first time you met with the FBI?

16   A.    I'm not sure of the date.  Probably in 2009.

17   Q.    Sure, but what month?

18   A.    I'm not sure of the month.  Probably December.  I'm --

19   Q.    Was it, like, four months after you last met with Mher?

20   A.    Umm, I don't believe it was that long.  I'm -- I'm not

21   sure.

22   Q.    If I said to you that it was on October 26, does that

23   refresh your recollection at all?

24   A.    I'm not sure of the dates.

25   Q.    The last time you spoke to anyone called Mher was in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    two -- in early July of 2009; isn't that true?
 2           MR. ESTRADA:  Objection, your Honor, misstates the
 3    evidence.
 4           MR. SEVERO:  No.  What evidence?
 5           MR. ESTRADA:  Well, there's been calls played,
 6    your Honor.
 7           MR. SEVERO:  Well, calls played say early July of
 8    2009.
 9           THE COURT:  Why don't you re-ask the question again.
10    If it doesn't misstate the evidence, it's assuming facts not in
11    evidence, so why don't you restate the question.
12           MR. SEVERO:  Sure.
13    Q.  The last time you spoke to anyone called Mher was in or
14    about July 4th of 2009?
15           THE COURT:  If you remember, is that correct?
16           THE WITNESS:  I do not remember the date.
17    BY MR. SEVERO:
18    Q.  It was several months from the last time you spoke to Mher
19    before you went to the FBI; is that true?
20    A.  I'm not sure the dates that you are telling me.
21    Q.  I'm actually trying to see if I can get you to remember.
22    The last time --
23    A.  It wasn't months, if that is the question.
24    Q.  It was not what?
25    A.  It was not many months.  Probably -- I'm trying to go over
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    the time line in my head.  Maybe a month or less.
2    Q.   And would you have told the agents about when you last met
3    with Mher and when you last spoke to him?
4    A.   I was approached by many people, so I must have given them
5    multiple names.  And most of the people, I didn't know who they
6    were.
7    Q.   So it's possible you're confusing the last time you saw
8    Mher with the last time you saw Emil?
9         MR. ESTRADA:  Objection, your Honor, calls for
10   speculation and argumentative.
11        THE COURT:  Sustained.
12   BY MR. SEVERO:
13   Q.   Did you meet another person named Emil?
14   A.   Yes, I did.
15   Q.   And that is the person that you met later than Mher,
16   correct?
17   A.   Yes, but also I did meet Mher while I knew -- met Emil
18   also.
19   Q.   And did you tell the FBI that?
20   A.   Yes.
21   Q.   When did you tell them that?
22   A.   When I went into the Federal Building.
23   Q.   That first day?
24   A.   Yes.
25   Q.   The first day you -- when you went into the Federal
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Building, you spoke to Agent Hanks, correct?

2   A.   Correct.

3   Q.   And at that time you already knew Mher's name, did you

4   not?

5   A.   Yes.

6   Q.   Did you know his last name?

7   A.   No.

8   Q.   So you only knew him by Mher, correct?

9   A.   Also Mike.

10  Q.   Right.  So you knew those names, correct?

11  A.   Yes.

12  Q.   And you remember specifically, as you sit here today under

13  oath, that you told the agent the name of this individual?

14          MR. ESTRADA:  Object, your Honor, argumentative.  He

15  doesn't need to remind him he's under oath every time he asks

16  the question.

17          THE COURT:  Sustained.

18  BY MR. SEVERO:

19  Q.   All right.  Forget about the part about under oath.

20          On the first occasion when you went to see Mr. --

21  Agent Hanks at the Federal Building, did you specifically tell

22  him that Mher had met with you?

23  A.   Yes.

24  Q.   Did you give him the names of all the people you had met

25  related to repayment of this debt?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    To the best of my recollection.  There was a lot of

2    people, and I was under a lot of duress and stress.

3    Q.    So it's possible you made mistakes by not -- by omitting

4    someone?

5    A.    No.

6    Q.    You remember telling them everything?

7    A.    The people that I did tell were people that were -- I

8    remembered.  I didn't tell them any other names that I didn't

9    know.  I didn't assume anything.

10   Q.    What deal do you have with the government in this case?

11   A.    None.

12   Q.    Nothing at all?

13   A.    No.

14   Q.    Are you sure?

15   A.    Yes.

16   Q.    You have received no benefits from any deal that you've

17   made with the government?

18   A.    Can you -- no benefits?  I have been given -- I was

19   relocated.

20          THE COURT:  Are you talking about you got protection

21   but no benefits?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.

24          THE WITNESS:  I have received protection.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SEVERO:

 2   Q.   You were moved?

 3   A.   Yes.  When arrests were being dealt out, I was moved.

 4   Q.   When you were moved, were you given cash to move?

 5   A.   It was made into money order to pay for a house that I was

 6   moving into.

 7   Q.   So you were given money, and you took that money and

 8   did -- and relocated?

 9   A.   Yes.

10   Q.   How much?

11   A.   I think it was $15,050.  That was the amount of the rent

12   for the months that I was there, the first -- I don't remember

13   how many months, but I believe it was eight months that I was

14   going to be living there.  And then I had to --

15         THE COURT:  Why don't you wait till the next question.

16   We'll do this question and answer.

17         MR. SEVERO:  Thank you.

18         THE COURT:  You don't need to volunteer.  Just answer

19   the question.  Okay?

20      Go ahead, Counsel.

21   BY MR. SEVERO:

22   Q.   So you were paying rent in advance?

23   A.   Yes.

24   Q.   All of your rent in advance?

25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   Well, the $15,000 all went to rent?

2    A.   Yes.

3    Q.   For eight months?

4    A.   I'm not sure how many months, but I have a copy of the

5    lease.

6    Q.   And wherever you moved, did you remain there after the

7    eight months?

8    A.   Yes.

9    Q.   So you're still there?

10   A.   No.

11   Q.   Oh.  Well, what I mean to say is, you -- you paid rent on

12   your own?

13   A.   Yes.

14   Q.   All right.  Working -- where are you working?  Not where.

15   I don't want to know where.  I just want to know what you do.

16          MR. ESTRADA:  Your Honor --

17          THE COURT:  Sustained.

18          MR. ESTRADA:  -- based on security reasons --

19          THE COURT:  Sustained.

20          MR. ESTRADA:  -- if we can avoid specific locations --

21          THE COURT:  Excuse me, Counsel.  I sustained the

22   objection.  We don't have to argue in front of the jury.

23          MR. SEVERO:  I'm not asking for --

24          THE COURT:  It's not relevant, Counsel.  Sustained.

25          MR. SEVERO:  I understand, your Honor.  I'm just
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   trying to find out my boundaries here.  I'm not asking for
 2   location, I'm just --
 3            THE COURT:  I know you're not.
 4            MR. SEVERO:  I just want to know how he's getting the
 5   money to pay for rent.
 6            THE COURT:  Sustained.
 7   BY MR. SEVERO:
 8   Q.   Okay.  How are you getting the money to pay for rent?
 9   A.   The last two years I was --
10            THE COURT:  Sustained.
11   BY MR. SEVERO:
12   Q.   Are you stealing to pay for rent?
13   A.   No.
14   Q.   Are you defrauding other people to pay for rent?
15   A.   No.
16   Q.   Okay.  After you went to the Federal Building the first
17   time, did you have an interview with Agent Stebbins the next
18   day?
19   A.   I believe so.
20   Q.   You're not sure?
21   A.   I don't know if it was the next day or the day after,
22   because they took me -- I was arrested there, because I had a
23   traffic violation, so probably either the next day or the day
24   after.
25            THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MR. SEVERO:

2    Q.   You actually had two outstanding warrants, correct?

3    A.   Correct.

4    Q.   So you were -- you -- you met with Mr. Stebbins shortly

5    after being arrested at the Federal Building?

6    A.   Correct.

7    Q.   And you told Mr. Stebbins on that second interview that

8    Mher was also one that had contacted you, did you?

9    A.   Yes.

10   Q.   You're sure now?  I don't want -- you're sure about that?

11   A.   Yes.

12   Q.   Other than Mr. Stebbins on that second date, was there any

13   other officer there?

14   A.   I believe his name was Scott.

15   Q.   Padin?

16   A.   Yes.

17   Q.   Anybody else?

18   A.   There were -- the first date was very hectic, because

19   there was multiple police officers, sheriffs.  They had taken

20   my wife, who had just gotten out of the hospital, to a secure

21   location.

22           THE COURT:  The question was only -- listen to the

23   question.  The question was only was there anybody else there.

24           THE WITNESS:  Well, there were multiple police

25   officers.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Okay.

 2   BY MR. SEVERO:

 3   Q.   So you were interviewed multiple times by different

 4   officers?

 5   A.   No.  You said that were there --

 6   Q.   Right.

 7   A.   -- officers.

 8        There were.

 9   Q.   Okay.  But you were just interviewed by Mr. Stebbins,

10   correct?

11   A.   And I believe Scott --

12   Q.   Right.  The two of them -- Scott Padin.  The two of them

13   together, correct?

14   A.   Yes.

15   Q.   And you told them that day that you had met with Mher,

16   correct?

17   A.   That I had met Mher?

18   Q.   Yes.

19   A.   Yes.

20   Q.   And that Mher had demanded that you pay money?

21   A.   Yes.

22   Q.   And that you paid money to Mher?

23   A.   Umm, that I paid him?  No.

24   Q.   Yes.  Did you ever pay Mher any money?

25   A.   Umm, no, not directly to him, I don't believe.
```

```
1    Q.    In fact, during the time that you met with Mher, you never

2    made any payments regarding this debt; is that true?

3    A.    Yes.

4    Q.    That is true?

5    A.    Yes.

6    Q.    All right.

7    A.    Well, umm, just to be clear, making -- making a payment,

8    or taking a chain off my neck?

9    Q.    Well, that's not what I'm asking.

10   A.    Does that count as a payment?

11   Q.    We'll get to -- we'll get to the chain.

12         When was the first time you told anybody about this chain

13   business?

14   A.    I don't remember the first time, but I told them that I

15   was in a room with multiple people.

16   Q.    Right.

17   A.    And he was sitting at the -- the head of the table.

18   Q.    All right.  So did you tell that to Mr. Stebbins on the

19   day after you went to the Federal Building?

20   A.    I don't recollect if I told him that day or not.

21   Q.    Is it something that was important to you to tell?

22   A.    Yes.

23   Q.    So is it fair to say that this is something important that

24   you would have told?

25   A.    I said a lot of different things --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Sure.

 2   A.   -- that --

 3   Q.   Your next time that you met with Agent Stebbins was the

 4   day after that?

 5   A.   Yes.

 6   Q.   And on that date, did you tell Mr. Stebbins that you had

 7   paid money to Mher -- that you had met with Mher and given him

 8   your chain?

 9   A.   I told them that I had met with him.  I don't remember if

10   I told him about the chain incident.

11   Q.   So let -- just so that I understand, did you tell

12   Agent Hanks about the chain incident?

13   A.   No.

14   Q.   Did you tell Mr. Stebbins the first day that you met him

15   about the chain incident?

16   A.   No.

17   Q.   Did you tell him the second day about the chain incident?

18   A.   Possibly.  I'm not -- I'm not 100 percent.

19   Q.   All right.  So you met again with them about three or four

20   days later, with Mr. Stebbins, correct?

21   A.   Yes.

22   Q.   And again, did you tell him on that date about the chain

23   incident?

24   A.   Possibly.

25   Q.   You're not sure?
```

```
 1   A.   I'm not sure.

 2   Q.   You met again with Mr. Stebbins two days after this last

 3   meeting, and this is now, including the Federal Building

 4   meeting, the fifth time you met with federal agents.

 5   A.   Yes.

 6   Q.   Did you say anything about the chain incident on that

 7   date?

 8   A.   Possibly before that, also.  The time line is -- there was

 9   a lot of things that were happening, and every time, they asked

10   me specific questions.

11   Q.   When was the first time, if you can remember, that you

12   talked about this chain incident?

13        THE COURT:  Okay, ladies and gentlemen.  We're going

14   to break a little bit early.  I tell you, we may have to end a

15   little early today.  We're going to break at this time, and I'm

16   going to ask you again not to discuss the case among yourselves

17   or with anybody else or form or express any opinions about the

18   matter until it's submitted to you and you retire to the jury

19   room.  And I'm going to ask you to go ahead and leave quietly,

20   because we'll still be in session.

21        THE CLERK:  All rise.

22        THE COURT:  I'm going to ask the witness to also be

23   taken out of the courtroom.

24        (Outside the presence of the jury and the witness:)

25        THE COURT:  Okay.  The Court will note that the jury
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    has left the courtroom, the witness has left the courtroom, and
 2    we're going to be on a break now.
 3         You can have a seat.
 4         I've given you an awful lot of latitude.  A witness cannot
 5    be called for the mere purpose of impeaching a witness, and
 6    that's all that I've been hearing so far.  Let's get to the
 7    case itself.  I've given you a lot of latitude.  I haven't
 8    stopped you at all.  But if you're going to be asking questions
 9    just to impeach the witness, you're going to be stuck with
10    those answers.  You're not going to be able to impeach a
11    witness that you called just to impeach.
12         This testimony is not going towards whether there's
13    extortion or not.  It's all going towards, you know, did he
14    tell this officer that, did he tell that officer that.  And
15    under 403 also, I'm just getting close, so what's why I'm
16    telling you, so be careful in the future, because --
17         MR. SEVERO:  I made specific reference to the fact
18    that this is an adverse witness.
19         THE COURT:  I don't care if it's an adverse witness or
20    not.  You cannot call a witness for the simple purpose of
21    soliciting testimony to get impeachment testimony in that you
22    could not get in without calling that witness.  You just can't
23    do it.  And I sense that we're going to be right -- you can
24    impeach a witness if they testify, but you can't call a witness
25    for the sole purpose of calling another witness that you could
```

```
 1   not call to impeach that witness.

 2          MR. SEVERO:  I understand that, and I intend to call

 3   all the other witnesses to impeach this witness.  But the point

 4   is, that he blurted out, and I -- without being asked,

 5   something about a chain incident, and that's why I went off --

 6          THE COURT:  I understand that, Counsel, and you can

 7   get into that, and I've given you some leeway.  I'm just saying

 8   that we're getting close to the point where the Court is going

 9   to say under 403 we're not going to go any further.

10          MR. SEVERO:  Okay.  Fair enough.  Thank you.

11          THE COURT:  Counsel.

12          MR. ESTRADA:  Your Honor, I'll just note, we did file

13   a motion in regard to the --

14          THE COURT:  I know you did.

15          MR. ESTRADA:  -- impeachment, the extrinsic evidence

16   issue.

17          THE COURT:  I know you did.

18          MR. ESTRADA:  And then secondly, with regard to

19   attacking this witness based on his criminal history, the

20   government would also feel it's irrelevant to the charges at

21   issue.

22          THE COURT:  And Counsel, I've allowed that in up to

23   this time, and I'm not taking your argument from you, but I've

24   allowed it up to this time because it shows whether or not --

25   his motive for telling the truth or not.  It doesn't go towards
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    impeaching; it goes toward his motive for whether he's telling

 2    the truth or not, if he got paid for it or whatever.

 3         And I'm assuming that's why you put it in.  Is that

 4    correct, Counsel?

 5              MR. SEVERO:  Yes, your Honor, that's correct.

 6              THE COURT:  Okay.  We'll be in recess.

 7              MR. SEVERO:  Thank you, your Honor.

 8              THE CLERK:  All rise.

 9         (Recess held from 2:30 p.m. to 2:46 p.m.)

10         (In the presence of the jury:)

11              THE COURT:  Okay.  The record will reflect that all

12    the members of the jury are in their respective seats in the

13    jury box.

14         Ladies and gentlemen, I apologize.  I was told by the

15    clerk that maybe some of you, when I said we were going to

16    break early tonight, thought we were breaking 15 minutes ago.

17    You know, we're breaking at quarter of 4:00, okay?  So we got

18    one more hour left.

19         Counsel.

20              MR. SEVERO:  Thank you.

21    BY MR. SEVERO:

22    Q.   Did you -- other than talking to your attorney who's in

23    court here, did you talk to anybody about your testimony today?

24    A.   No.

25    Q.   Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        You -- your testimony -- your -- let me ask you this.

 2   Your -- you met with Mher at some point, correct?

 3   A.   Yes.

 4   Q.   And when you met with Mher, it was because you owed this

 5   debt and Arman was after you to pay it, correct?

 6   A.   Yes.

 7   Q.   Since you got into the silver chain incident, at some

 8   point, is it your testimony, that you had to give up your

 9   silver chain?

10   A.   Yes.

11   Q.   And what was that worth?

12   A.   Umm, I don't know what it was worth.  It wasn't the value,

13   it was the -- the duress I was in when they took the chain.

14   Q.   All right.  And at some point in time this gentleman

15   seated to my -- seated over here to my right -- you recognize

16   him?

17   A.   Yes.

18   Q.   Is that Mher?

19   A.   Yes.

20   Q.   Did Mher loan you a thousand dollars?

21   A.   Yes.

22   Q.   He loaned you a thousand dollars so you could make the

23   payment to Sharopetrosian, correct?

24   A.   Yes.

25   Q.   Actually, to Lusine, correct?
```

1   A.   Yes.

2   Q.   Do you remember when that loan was made?

3   A.   No.

4   Q.   Was that the day of the chain?

5   A.   No.

6   Q.   After the day of the chain?

7   A.   I believe so.

8   Q.   And that's -- that's -- you got your chain back?

9   A.   No.

10  Q.   Did you ever pay back the thousand dollars to Mher?

11  A.   From the money that they -- I gave them, I -- yes, he took

12  it, I believe.

13       MR. SEVERO:  Move to strike that as speculation of the

14  witness, "I believe."

15       THE COURT:  Yeah, "I believe" will be --

16       MR. ESTRADA:  He's simply answering the question.

17       THE COURT:  I'm sorry?

18       MR. ESTRADA:  Simply answering the question to his

19  best recollection.

20       THE COURT:  "I believe" will go out.  First part of

21  the sentence, "from the money I paid them," will stand.

22  BY MR. SEVERO:

23  Q.   Do you actually know that from that money he was paid

24  back?  Let me -- let me rephrase the question.

25       Did you pay any money directly to Mher to reimburse him

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    for the thousand dollars he had paid -- he had loaned you?

2    A.    No.

3    Q.    He had loaned you the thousand dollars to help you out,

4    correct?

5    A.    Yes.

6    Q.    So you didn't go to him and say, "Here's a thousand

7    dollars, thank you very much," did you?

8    A.    No.  I was directed to take the money somewhere else.

9    Q.    Did Mher tell you to take the money elsewhere?

10   A.    Yes.

11   Q.    You're sure about that?

12   A.    On an -- on occasion where I remember, yes.  Not that

13   money, but money that I did bring over.

14   Q.    But we're talking about the thousand dollars that he

15   loaned you.  The money that he loaned you, did you pay it back?

16   A.    He never called me to ask for that money.

17   Q.    All right.  Did he -- after he loaned you the money, you

18   then met with other people that said that they were associated

19   with Arman, correct?

20   A.    Yes.

21   Q.    Okay.  And you didn't talk to Mher again, correct?

22   A.    Umm, no, I -- I did.

23   Q.    And is that because he wanted his thousand dollars?

24   A.    No.  Just all -- just the money in general that would --

25   that's in question.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   When was the last time you did that?

 2   A.   I don't remember.  It was maybe two blocks away from my

 3   house on La Brea and Franklin.

 4   Q.   And it is something you told the agents, correct?

 5   A.   I believe so.

 6   Q.   You're not sure?

 7   A.   I did.

 8         MR. SEVERO:  Okay.  I have nothing further of this

 9   witness.

10         THE COURT:  Counsel, do you want to cross-examine

11   before you get to the government?

12         MR. PEREYRA-SUAREZ:  Yes.

13                        CROSS-EXAMINATION

14   BY MR. PEREYRA-SUAREZ:

15   Q.   Good afternoon, Mr. Matosyan.  I represent Arman

16   Sharopetrosian.

17         Let's go back to the time that you and Lusine talked about

18   Lusine giving you a loan of $95,000.  Wasn't that, in fact,

19   sometime in 2007?

20   A.   Umm, 2007, '8.

21   Q.   How did that happen?  Did you know at that point when you

22   approached -- did you approach Lusine, or was it the other way

23   around?

24   A.   It was the other way around.

25   Q.   So she offered to loan you some money?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    She knew I was looking for money.

2    Q.    And before you and Lusine had that conversation, you knew

3    that Lusine had obtained a wrongful death settlement; is that

4    correct?

5    A.    No.

6    Q.    She told you that?

7    A.    I -- I did not know that she had received any settlement

8    when I was looking for the money or she -- she told me that

9    this was money that she had.

10   Q.    Did she tell you that she was getting interest on that

11   money?

12   A.    No.

13   Q.    Did you tell her that you would pay her interest exceeding

14   the interest she was getting on that money?

15   A.    No.

16   Q.    So do you recall the circumstances how this came about?

17   Were you gathered at a family meeting, or how did this happen?

18   A.    She called me over to her house, and my aunt was there,

19   too, and they were friends, and she said, "I hear you're

20   looking -- you need money."

21         And I said, "Yes.  I'm looking for $95,000."

22   Q.    Did she tell you she would loan you exactly $95,000?

23   A.    Yes.

24   Q.    Who else was present during that conversation besides you

25   and Lusine?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    My aunt.

 2    Q.    How about Lusine's mother?

 3    A.    No.

 4    Q.    Did you in fact get four cashier's checks totaling

 5    $95,000?

 6    A.    I believe so.

 7    Q.    And that came from Lusine's mother; is that correct?

 8    A.    I don't -- she told me it was her money.

 9    Q.    Did she tell you that that money came from some illegal

10    activity?

11    A.    No.

12    Q.    Did you tell Lusine that you were going to use the loan

13    proceeds for some kind of illegal activity?

14    A.    No.

15    Q.    You just needed to borrow some money, correct?

16    A.    Yes.

17    Q.    And you needed that money urgently, correct?

18    A.    Not urgently.

19    Q.    And Lusine basically said "I'll help you out" --

20    A.    Yes.

21    Q.    -- "in this," correct?

22    A.    Yes.

23    Q.    Because she was a family friend of yours, correct?

24    A.    Yes.

25          MR. ESTRADA:  Objection, your Honor, relevance.
```

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  She had borrowed money from me before

 3    that.

 4    BY MR. PEREYRA-SUAREZ:

 5    Q.   And that's because you knew each other well, correct?

 6    A.   Yes.

 7    Q.   So however this got started, you eventually got four

 8    cashier's checks totaling $95,000?

 9    A.   Yes.

10    Q.   Did you tell Lusine who should be receiving those four

11    cashier's checks?

12    A.   Can you repeat the question?

13    Q.   Let me go back.  Those cashier's checks were not made out

14    to you personally; is that --

15    A.   No.

16    Q.   -- true?

17         They were made out to others, correct?

18    A.   Yes.

19    Q.   Was there one cashier's check dated August 7, 2007, made

20    out to Commercial Investment, Inc., in the amount of $25,000?

21    A.   Yes.

22    Q.   Was there another cashier's check dated August 7, 2007,

23    made out to Francisquito Car Wash --

24    A.   Yes.

25    Q.   -- in the amount of $25,000?
```

1   A.   Yes.

2   Q.   Was there a third cashier's check made out to Gayk,

3   G-a-y-k, Matosyan, M-a-t-o-s-y-a-n, dated August 8, 2007 --

4   A.   Yes.

5   Q.   -- in the amount of $25,000?

6   A.   Yes.

7   Q.   And Gayk Matosyan is your brother; is that correct?

8   A.   Yes.

9   Q.   Was there a fourth cashier's check made out to

10  Gayk Matosyan, same date of August 8, 2007, in the amount of

11  $20,000?

12  A.   Yes.

13  Q.   Did you tell Lusine that you wanted one of these checks

14  made out to Commercial Investment, Inc.?

15  A.   Yes.

16  Q.   That's one for $25,000, correct?

17  A.   Yes.

18  Q.   Did you tell Lusine why you wanted that cashier's check

19  made out to Commercial Investment, Inc.?

20  A.   Yes.

21  Q.   What did you tell her?

22  A.   I told them that the person that was helping me with the

23  loan needed it to be in that account and to -- and into that

24  name.  And that's what I was told, and that's what I told her.

25  Q.   All right.  So you basically told Lusine, "I have a person

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    who's helping me" --
 2    A.    She knew the person.
 3    Q.    All right.  Somebody that both of you knew, correct?
 4    A.    Yes.  She knew them better than I did, for longer.
 5    Q.    All right.  But it was -- whose idea was it to have a
 6    cashier's check in the amount of $25,000 made out to
 7    Commercial Investment, Inc.?
 8    A.    His name is Shahik (phonetic).  He was the person that was
 9    doing the loan -- helping me with the credit and the loan
10    applications.
11    Q.    So Shahik told you he needed a check payable to Commercial
12    Investment, Inc. in the amount of $25,000?
13    A.    Yes.
14    Q.    And you said that to Lusine, correct?
15    A.    Yes.
16    Q.    And so either Lusine or her mother or somebody in the
17    family got that cashier's check for you, correct?
18    A.    Yes.
19    Q.    Was her mother, Lusine's mother, involved in getting you
20    those cashier's checks?
21    A.    I don't know.  Not to me personally.
22    Q.    Well, you knew that the -- did you ever learn that
23    there's -- there had been a wrongful death settlement involving
24    a member of the family?
25    A.    Yes, I did learn.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Did you ever learn that the money you were getting from

2   Lusine or the family came from the proceeds of that wrongful

3   death settlement?

4   A.   Yes.

5   Q.   Did you ever tell Lusine or anybody else in the family

6   that you would pay more interest for that money than they were

7   getting from a bank?

8   A.   Umm, can you rephrase that question?  Because, umm, they

9   told me I had to pay more.  I never personally said I would pay

10  more.

11  Q.   Well, did you want the loan to be without any interest

12  whatsoever?

13  A.   Yes.

14  Q.   Did you know that they -- the family was getting interest

15  on that money from a bank?

16  A.   No.

17  Q.   And so your testimony is there was no discussion about any

18  interest being paid on the $95,000 loan, correct?

19  A.   Correct.

20  Q.   You expected it to be interest-free as a favor to you,

21  correct?

22  A.   Yes.

23  Q.   Because you were old friends, correct?

24  A.   Yes.  I had granted her similar favors.

25  Q.   And there was no written document setting forth the terms

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    of the loan; is that correct?

 2    A.    Correct.

 3    Q.    All on a handshake, correct?

 4    A.    Yes.

 5    Q.    So let's go back to this cashier's check in the amount of

 6    $25,000 to Commercial Investment, Inc.  The person who was

 7    going to help you get a personal loan told you, "I need a

 8    $25,000 cashier's check made out to Commercial Investment,

 9    Inc."  Did he explain why?

10    A.    No.

11    Q.    You had no understanding as to why that check had to be

12    made out that way?

13    A.    No.

14    Q.    How about the cashier's check in the amount of $25,000 to

15    Francisquito Car Wash?

16             MR. ESTRADA:  Objection, your Honor, relevance.

17             THE COURT:  Overruled.

18    BY MR. PEREYRA-SUAREZ:

19    Q.    Why was that check made out to Francisquito Car Wash, if

20    you know?

21    A.    I don't know.

22    Q.    And Frank was the person who told you he needed it that

23    way?

24    A.    Yes.

25    Q.    How about the two checks made out to your brother, one in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   the amount of $25,000, the other in the amount of $20,000?

2   A.   I was --

3   Q.   Whose idea was it to make those checks out that way?

4   A.   Shahik's.  He told me that I need to cash -- bring him

5   cash to clean the credit.

6   Q.   What was the role of your brother in that process?

7   A.   Nothing.  We just needed somebody to cash a check, and I

8   think Lusine said I can -- "It's better if I give it under your

9   brother's name than under your name or my name or to bring that

10  much cash."

11  Q.   So is there a reason that you didn't want any of these

12  cashier's checks --

13  A.   No.

14  Q.   -- made out to you personally?

15  A.   No.

16  Q.   It wouldn't have mattered to you one way or the other; is

17  that correct?

18  A.   No.

19  Q.   And so these checks were cut the way they were simply

20  because the person who was helping you told you it had to be

21  this way?

22  A.   Yes.

23  Q.   Did you tell Lusine at any point in time that you would

24  pay back this money within a certain time period?

25  A.   I told her I would pay it back as soon as I could.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Well, did you discuss any specific timetable?

2   A.   Not specific, but I would told her -- I told her that I

3   would bring it as soon as I could.

4   Q.   Basically, you just wanted to get a personal loan, and as

5   soon as you got that personal loan, you would repay Lusine,

6   correct?

7   A.   Correct.

8   Q.   That could be done within a few weeks?

9   A.   No.

10  Q.   You thought it was going to take longer than that?

11  A.   Yes.

12  Q.   How long did you think it was going to take?

13  A.   I believe the time that they told me would be in the

14  months.

15  Q.   So you thought it would take several months?

16  A.   Yes.

17  Q.   Did you think it would --

18  A.   Six months to a year, I believe I told her it might take.

19  Q.   Okay.  Did you ever tell her it would be 18 months or

20  longer?

21  A.   No.

22  Q.   So these four cashier's checks that we were just talking

23  about, totaling $95,000, once you got those four checks, what

24  did you do with them?

25  A.   I gave the two checks that were made out to the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Francisquito Car Wash, another one to the real estate company,

 2   to Shahik -- actually, I gave them to the person that was his

 3   friend and my friend at the time, and he gave it to Shahik in

 4   front of me, and the rest I gave as cash.

 5            THE COURT:  To whom?

 6            THE WITNESS:  To Shahik.

 7            THE COURT:  Okay.

 8   BY MR. PEREYRA-SUAREZ:

 9   Q.   Okay.  So your brother didn't actually get that cash; is

10   that correct?

11   A.   No.  He cashed the check, gave me the money, and I took it

12   and gave it to somebody named Greisha, and he gave it to

13   Shahik.

14   Q.   Who is Greisha?

15   A.   He's the person that introduced me to Shahik.

16   Q.   Did you know either Greisha or Shahik before?

17   A.   Yes.

18   Q.   How did you know Greisha?

19   A.   He was a friend of mine and Lusine's.

20   Q.   Okay.  So these are all people who knew each other?

21   A.   Yes.

22   Q.   Did you ever get a personal loan?

23   A.   No.

24   Q.   Never?

25   A.   Never.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Did you lose the money, the total of $95,000 that you got
 2   from Lusine?
 3   A.   Yes.
 4   Q.   How did you lose that money?
 5   A.   Shahik, I went to him months afterwards and asked him what
 6   the status of my loan was, and his wife came outside and said
 7   he was lying to all of us, he's gambled the money away.
 8   Q.   All right.  Did you tell Lusine, "Sorry, I've lost the
 9   money"?
10   A.   Yes.
11   Q.   When did you tell her that?
12   A.   After I found -- found out.
13   Q.   When was that?
14   A.   Several -- several months after I had taken the money to
15   Shahik.
16   Q.   Did you tell Lusine, "I'm going to try to repay you
17   anyway"?
18   A.   Yes.
19   Q.   Did you give her a timetable as to when you would repay
20   her?
21   A.   No.
22   Q.   In your mind, you weren't using that money for any
23   organized crime purpose, were you?
24   A.   No.
25   Q.   It was all a personal loan, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes.
2    Q.    At some point you decided to go to the FBI building in
3    Westwood, California; is that correct?
4    A.    Yes.
5    Q.    And why did you go?
6          I'm sorry.  First of all, when was that?  Was that in late
7    2009?
8    A.    Yes.
9    Q.    October or November?
10   A.    Yes.
11   Q.    Why did you go to the FBI?
12   A.    I felt fear for my life.
13   Q.    Because you were afraid somebody was trying to collect
14   this money that had been --
15   A.    Not only collect.  Physically harm me.  I was kidnapped.
16   Q.    That's what you thought; is that correct?
17   A.    Not what I thought, that's what happened.
18   Q.    All right.  So you met several times with federal law
19   enforcement about these issues, correct?
20   A.    Yes.
21   Q.    And at some point you agreed to work undercover for the
22   federal government; is that correct?
23   A.    Yes.
24   Q.    To initiate phone calls, correct?
25   A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   To make payments to certain people, correct?

 2   A.   Yes.

 3   Q.   And that money came from the federal agents; is that

 4   right?

 5   A.   Yes.

 6   Q.   At some point after October or November of 2009, did you

 7   have a dispute with Agent Stebbins about $4,000 that he

 8   provided to you for your work?

 9   A.   Dispute?

10   Q.   Well, was there an --

11   A.   We had --

12   Q.   -- issue as to what you did with $4,000 of the money that

13   you got from Agent Stebbins?

14   A.   No, not a dispute.  He'd given me 4,000 to give to them.

15   Q.   Give to whom?

16   A.   To Lusine's parents, I believe that 4,000 went to.  Or to

17   Lusine.

18   Q.   And did Agent Stebbins ask you what you'd done with that

19   money?

20   A.   No.  He knew.  Everything was monitored, where the money

21   went.

22   Q.   There was never an issue as to whether or not you gave the

23   money to the people who were supposed to get it?

24   A.   No.

25   Q.   Now, with respect to the approximate amount of $15,000
```

```
 1    that you received for relocation, when did you receive it?

 2    A.    I believe right after arrests started happening.

 3    Q.    Was it approximately June 14 of 2011?

 4    A.    Probably.

 5    Q.    So you didn't relocate until approximately that date; is

 6    that correct?

 7    A.    Yes.

 8    Q.    Did you ask for that money?

 9    A.    It came up in a conversation, whether I wanted to go into

10    witness relocation or -- just many different things, and I

11    didn't feel safe in L.A.

12    Q.    So you wanted to leave the area?

13    A.    I didn't -- I didn't want to leave.  I just didn't feel

14    safe in L.A.  I didn't want to leave at all, but it just --

15    there was no way, being able to -- the -- drive even on the

16    streets in L.A.

17    Q.    All right.  Now, at some point when you were working with

18    Agent Stebbins, from October 28, 2009 through November 21,

19    2009, you got different sums of money from the federal

20    government to pay to certain people; is that correct?

21    A.    Yes.

22    Q.    And was that supposed to be partial repayment of the loan

23    to Lusine?

24    A.    Yes.

25    Q.    Did you ever pay back the entire loan that you got from
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Lusine?

2    A.    I believe so.    Maybe -- the numbers were so diluted at the

3    end, I couldn't even remember.

4    Q.    Well, you know that you borrowed $95,000 --

5    A.    Yes.

6    Q.    -- in total, correct?

7    A.    Yes.

8    Q.    Nothing diluted about that.    You know that for sure --

9    A.    Yes.

10   Q.    -- right?

11         So what was it that was unclear?    That maybe the $12,000

12   was the entire amount still owing?

13   A.    No.    The number that I owed kept changing, from 106,000 to

14   127,000, 123,000, 110,000.    Every time, the number was

15   different.

16   Q.    Well, let's just use the number $95,000, because that's

17   the number you agree you owed to Lusine, correct?

18   A.    Yes.

19   Q.    Did that entire amount ever get paid back?

20   A.    Umm, I'm not sure.    I gave the $65,000, and then after

21   that, whatever the FBI gave was the total on top of it.

22   Q.    Now, you say you gave back $65,000.    When did that occur?

23   A.    Before I went to the FBI, maybe -- before 2009, like early

24   2009.

25   Q.    Did you pay that money directly to Lusine?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Yes.

2    Q.   Did you do it in cash or cashier's checks or --

3    A.   Cash.

4    Q.   -- some other way?

5    A.   Cash.

6    Q.   So you just went with large bills?

7    A.   Yes.

8    Q.   All at the same time?

9    A.   No.

10   Q.   Different times?

11   A.   Different times.

12   Q.   Did you keep a record of the amounts that you gave to

13   Lusine for --

14   A.   At the time, yes, I did.

15   Q.   You have a copy of that record?

16   A.   No.

17   Q.   Did you ever give a copy of that record to the government?

18   A.   I told them exactly when I had given, how much I had

19   given, in the beginning when we first met.

20   Q.   Did you ever get a receipt from Lusine for money that you

21   gave to her?

22   A.   No.

23   Q.   So, again, it was all just a matter of trust, correct?

24   A.   Yes.

25   Q.   By the end of 2009, was Lusine upset with you about the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    loan not being repaid?

2    A.    Yes.

3    Q.    And she told you she was upset, correct?

4    A.    Yes.

5    Q.    Did you talk to Lusine's mother about that money that had

6    not been repaid?

7    A.    Only once.

8    Q.    How did that come about?

9    A.    Myself, my father and mother went to their house, and the

10   father and mother were there, and the dad had no idea what was

11   going on.  He couldn't believe that the situation had

12   escalated.  He didn't even know that his daughter was, I

13   believe, either married or engaged to Arman.  He didn't even

14   know who he was.  And the mother was the one upset about it.

15   Q.    Whose mother?

16   A.    Lusine's.

17   Q.    Did you ever attempt to engage in some kind of mediation

18   process to resolve this dispute?

19   A.    Just personal conversations to Lusine.  I told her that I

20   wanted to pay the money to her directly and only her.

21   Q.    And to this day, you don't know for sure whether it's all

22   been repaid or not?

23   A.    She could not or would not speak to me about the debt

24   later on.

25            THE COURT:  That's not the question.  The question

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    was, to this day, you still don't know if you paid all 95 back

 2    or not?

 3              THE WITNESS:  Correct.

 4              THE COURT:  Okay.  Next question.

 5              MR. PEREYRA-SUAREZ:  I have nothing further,

 6    your Honor.

 7              THE COURT:  Okay.  All this has been limited to --

 8    well, Mr. Parsadanyan is not charged with any of this, and so

 9    the Court's limiting all the testimony that's come in up to

10    this time, as far as this witness goes, just to the two

11    defendants here.

12              MR. PEREYRA-SUAREZ:  I'm sorry, may I have a moment,

13    your Honor, with my client?

14              THE COURT:  Sure.  Sure.

15         But you do understand that, ladies and gentlemen?

16         Okay.

17    BY MR. PEREYRA-SUAREZ:

18    Q.   Sir, do you have a brother whose name is Phil?

19    A.   Phil?

20    Q.   Phil.

21    A.   No.

22    Q.   Do you know somebody whose name is Phillip?

23    A.   I know many people with that name, Phillip.

24    Q.   Did you ever engage in a phone call with a person named

25    Phillip and tell that person that you were working for the FBI
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   now?

 2   A.   No.

 3   Q.   Did you ever tell a person named Phillip on the phone that

 4   you'd been on the run for six or seven months?

 5   A.   No.

 6        MR. PEREYRA-SUAREZ:  I have nothing further,

 7   your Honor.

 8        THE COURT:  Counsel?

 9        MR. FLIER:  I have no questions.  Thank you,

10   your Honor.

11        THE COURT:  Counsel?

12        MR. ESTRADA:  Yes, your Honor.

13                    CROSS-EXAMINATION

14   BY MR. ESTRADA:

15   Q.   Good afternoon, sir.

16   A.   Good afternoon.

17   Q.   Now, you were asked about Lusine Ogandganyan.

18   A.   Yes.

19   Q.   I want to ask you about the defendants in this case.

20        Do you know a person named Arman Sharopetrosian?

21   A.   Yes.

22   Q.   Did he threaten you?

23   A.   Yes.

24   Q.   Did he -- were you in fear of Arman Sharopetrosian?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   I want to ask you about Mher Darbinyan.

 2        Do you know a person named Mher Darbinyan?

 3   A.   Yes.

 4   Q.   Did he threaten you?

 5   A.   Yes.

 6   Q.   Were you in fear of Mher Darbinyan?

 7   A.   Yes.

 8   Q.   Based on those threats and fear, did you pay money to

 9   Arman Sharopetrosian?

10   A.   Yes.

11   Q.   And people he wanted you to pay money to?

12   A.   Yes.

13   Q.   And based on those threats from Mher Darbinyan, did you

14   pay money to people directed by Sharopetrosian and Darbinyan?

15   A.   Yes.

16   Q.   Now, please take a look at -- hopefully you have a binder

17   behind you called Volume 2.  It's a black binder.

18   A.   Okay.

19            THE CLERK:  Do you have it?

20            THE WITNESS:  No.

21   BY MR. ESTRADA:

22   Q.   You have that binder in front of you?

23   A.   Yes.

24   Q.   Please take a look at Exhibit 71 in that binder.  You have

25   that in front of you?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Now, you say you were threatened by Arman Sharopetrosian?

 3    Sir?

 4    A.    Excuse me?

 5    Q.    You say you were threatened by Arman Sharopetrosian?

 6    A.    Yes.

 7    Q.    Look at page 3 of that transcript.

 8          I'll ask that the jurors please turn to page 3 of the

 9    transcript.

10          Last speaker at the bottom.  When Sharopetrosian told you,

11    "Neither thieves nor whores will be able to save you, my dear,

12    mine will come back and reach to me back 100 percent," did you

13    understand that to be a threat?

14    A.    Yes.

15    Q.    Take a look at Exhibit 75 in that same binder.  Take a

16    look at page 3 of 75.  Do you have that in front of you?

17    A.    Okay.

18    Q.    You have that in front of you?

19    A.    Yes.

20    Q.    Looking at page 3 of 8 on Exhibit 75A, four -- excuse me,

21    six speakers from the bottom, when Sharopetrosian told you:

22          "Whore, what should I do?  Hey, whore, should I hold you

23    and not let you go home for a couple of months so that you

24    understand?"

25          You said, "Bro."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Sharopetrosian, "So that your family members realize that
 2   I'm not -- that I'm not kidding.  Hey you idiot."
 3        Did you understand that to be a threat?
 4   A.   Yes.
 5   Q.   Take a look at Exhibit 87.  Looking at page 2 of 2 of
 6   Exhibit 87A, do you have that in front of you?
 7   A.   Yes.
 8   Q.   And four speakers from the bottom, when Sharopetrosian
 9   told you, "Hey, I will skin you if it does not happen," did you
10   understand that to be a threat?
11   A.   Yes.
12   Q.   You mentioned you knew Sharopetrosian.  Had you ever met
13   him?
14   A.   No.
15   Q.   Did you know of him?
16   A.   Yes.
17   Q.   What did you know of him?
18   A.   I knew his reputation of being a gangster in the
19   community.
20            MR. PEREYRA-SUAREZ:  Objection, move to strike.
21            THE COURT:  Sustained.
22            MR. PEREYRA-SUAREZ:  Lacks foundation.
23            THE COURT:  Sustained.
24   BY MR. ESTRADA:
25   Q.   Did he in fact tell you that he's a criminal?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.  He told me that he is a life-long criminal and he

 2    doesn't care about anything.

 3    Q.    Please take a look at Exhibit 90A in your binder, page 5

 4    of 6.  Do you have that in front of you?

 5    A.    Yes.

 6    Q.    90A, page 5 of 6, three speakers from the top,

 7    Sharopetrosian tells you, "I am a criminal, friend.  Today I am

 8    here, and tomorrow, in a couple of years you will see that I'm

 9    no longer here."

10          Based on your understanding of Sharopetrosian, were you in

11    fear of him?

12    A.    Yes.

13    Q.    Is he known to be a dangerous individual?

14    A.    Yes.

15    Q.    Did you know that Sharopetrosian, although he was in

16    prison, had people outside of prison who were helping him and

17    working for him?

18              MR. SEVERO:  Objection.

19              MR. PEREYRA-SUAREZ:  Objection.

20              THE COURT:  Sustained.

21    BY MR. ESTRADA:

22    Q.    Well, did you in fact deal with people who told you they

23    were acting on behalf of Sharopetrosian?

24              MR. SEVERO:  Objection, hearsay.

25              THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Co-conspirators, your Honor.

 2              THE COURT:  Sustained.

 3   BY MR. ESTRADA:

 4   Q.   Did you in fact deal with individuals who accosted you on

 5   behalf of Sharopetrosian?

 6              MR. SEVERO:  Your Honor, there is no --

 7              MR. PEREYRA-SUAREZ:  Lack of foundation.

 8              THE COURT:  Sustained.  Sustained.

 9   BY MR. ESTRADA:

10   Q.   Did you deal with other people with regard to this

11   extortion event?

12              MR. SEVERO:  Objection.

13              THE COURT:  Overruled.

14              THE WITNESS:  Yes.

15   BY MR. ESTRADA:

16   Q.   Is that a "yes"?

17   A.   Yes.

18   Q.   Did you deal with an individual named Emil Airapetian?

19   A.   Yes.

20   Q.   And did that Emil Airapetian, did he threaten you with

21   violence?

22   A.   Yes.

23   Q.   Did he in fact tell you he was doing this on behalf of

24   Sharopetrosian?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.    You mentioned that you had been kidnapped.  Can you

2   explain how this kidnapping took place.

3   A.    I was in a shopping center in Hollywood.  I turned

4   around -- somebody asked me for a cigarette.  I turned around,

5   and Emil was standing there.  He had a gun in his waistband.

6   There was a car parked right in front of me with two other

7   individuals in it.  Opened his jacket, showed me the weapon,

8   told me to get in the car.  I got in --

9   Q.    Before you go on, how did you get to that shopping center

10  in the first place?

11  A.    I was there to begin with.  He called me and said where I

12  was.

13  Q.    Who's "he"?

14  A.    Emil.

15        And Arman called me that same day, too, and asked me where

16  I was, and I told him where I was, and he came there.  He said

17  he had to talk to me about something.

18  Q.    When you say "Arman," are you referring to Arman

19  Sharopetrosian?

20  A.    Yes.

21  Q.    Okay.  So you said you were in the shopping center,

22  someone showed you a gun.

23  A.    Yes.

24  Q.    Did they force you into a car?

25  A.    Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   What kind of car?

2    A.   A Porsche SUV.

3    Q.   Once you were in that car, what did -- was it with Emil?

4    A.   Yes.

5    Q.   Was Emil near you?

6    A.   Emil was in the back seat, and there were two other

7    individuals sitting in the front seat, with the doors locked.

8    Q.   Did Emil talk to you?

9    A.   Yes.

10   Q.   What did he say?

11   A.   He told me that I couldn't leave until I brought him the

12   money right then and there.

13   Q.   On this same occasion as you're in the back of this

14   Porsche SUV, did you talk to Sharopetrosian?

15   A.   Yes.

16   Q.   How did this happen?

17   A.   Emil called him, spoke to him, gave the phone to me, and

18   he said that I had no choice, I had to either call somebody to

19   bring the money, anything to have the money right then and

20   there, or I couldn't leave.

21   Q.   Were you threatened?

22   A.   Yes.

23   Q.   Was anyone else threatened besides you?

24   A.   Yes.

25   Q.   Who else?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   My whole family.

 2    Q.   Did they threaten your family?

 3    A.   Yes.

 4         MR. PEREYRA-SUAREZ:  Objection, lack of foundation,

 5    hearsay.

 6         THE COURT:  Sustained.

 7    BY MR. ESTRADA:

 8    Q.   Did Sharopetrosian threaten your family?

 9    A.   Yes.

10    Q.   Anyone specifically in your family?

11    A.   My father, to begin with.

12         MR. PEREYRA-SUAREZ:  Objection, lack of foundation,

13    your Honor.

14         THE COURT:  Sustained.

15         Did he make those threats to you, or did --

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.  Overruled.

18    BY MR. ESTRADA:

19    Q.   So just to be clear, you're in the back of the Porsche?

20    A.   Yes.

21    Q.   There's a phone on, and Sharopetrosian's on the other end?

22    A.   Yes.

23    Q.   And in that phone conversation, Sharopetrosian threatened

24    you?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.    Your family?

 2    A.    Yes.

 3    Q.    You said your father?

 4    A.    Yes.

 5    Q.    Anyone else?

 6    A.    My whole family.  Wife, child.

 7    Q.    You had a child at the time?

 8    A.    Yes.

 9    Q.    Based on this kidnapping and these threats, did you take

10    any action?

11    A.    Yes.  I went to the -- to the government, to the FBI.

12    Q.    I want to ask you more about that.  Before I do, you

13    mentioned Darbinyan threatened you as well; is that right?

14    A.    Yes.

15    Q.    Take a look at Exhibit 71, if you would.  Do you have

16    Exhibit 71A in front of you?

17    A.    Yes.

18    Q.    And that's a call from June 29th, 2009.  Do you have that?

19    A.    Yes.

20    Q.    I'm looking at page 5 of 8.  Do you have that in front of

21    you?

22    A.    Yes.

23    Q.    Looking at page 5 of 8, six speakers from the bottom, when

24    Darbinyan told you, "Listen, listen, my friend, leave the

25    police thing out, do you hear me, brother," what did you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    understand that to mean?

2    A.   That it didn't matter if I was going to the police.

3    Q.   And what didn't matter about going to the police?

4    A.   What's that?  I'm sorry.

5    Q.   What didn't matter about going to the police?

6    A.   It didn't matter if I complained to the police or whatever

7    about my duress, I still had to be responsible to doing what

8    they said.

9    Q.   Now, turning to page 73.  Do you have that in front of

10   you?

11             MR. SEVERO:  Mean Exhibit --

12             THE COURT:  Exhibit 73, you mean?

13             MR. ESTRADA:  Exhibit 73, yes.

14             THE WITNESS:  I have it in front of me.

15   BY MR. ESTRADA:

16   Q.   And turning to page 73, page -- excuse me, Exhibit 73,

17   page 5 of 8.  Do you have that in front of you?

18   A.   Yes.

19   Q.   Two speakers from the bottom, Darbinyan states, "I

20   told" --

21             MR. SEVERO:  Your Honor, I'm going to object to this.

22   He's not a participant in this call, so it would be speculation

23   on his part to testify on anything.

24             THE COURT:  Were you on this call at all?

25             THE WITNESS:  Umm --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ESTRADA:  He's not, your Honor, but --

 2            THE COURT:  Okay.

 3            MR. ESTRADA:  -- Darbinyan's stating what he told him.

 4            MR. SEVERO:  So --

 5            THE COURT:  No.  Sustained.

 6   BY MR. ESTRADA:

 7   Q.   Now, please take a look at Exhibit 78.  Do you have

 8   Exhibit 78A in front of you?

 9   A.   Yes.

10   Q.   And looking at page 2 of that, do you see that?

11   A.   Yes.

12   Q.   Five speakers -- excuse me, four speakers from the bottom,

13   Darbinyan tells you, "I'm waiting for you in North Hollywood,

14   then.  Look, don't fuck around with me.  Hey, if you fuck

15   around with me, I will hurt you."

16        Did you understand that to be a threat?

17   A.   Yes.

18   Q.   And did you understand that to be a threat based on the

19   extortion demand Sharopetrosian and Darbinyan were making?

20   A.   Yes.

21   Q.   Please take a look at Exhibit 79.  Page 3 of 4 in

22   Exhibit 79, do you have that in front of you?

23   A.   Yes.

24   Q.   Six speakers from the top, do you see Darbinyan telling

25   you, "You are lying, I'll jerk off on the liar's mother's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    head"?

2        Did you understand that to be a threat?

3    A.   Yes.

4    Q.   Now, you mentioned Sharopetrosian was actually in jail at

5    this time.  Darbinyan wasn't, right?

6    A.   Yes.

7    Q.   Did you meet with him a few times?

8    A.   Yes.

9            THE COURT:  Meet with who?

10   BY MR. ESTRADA:

11   Q.   Did you meet with Darbinyan a few times?

12   A.   Yes.

13   Q.   And before meeting with Darbinyan, did you know who he

14   was?

15   A.   Yes.

16   Q.   When you met with him the first time, did he tell you who

17   he was?

18   A.   Yes.

19   Q.   What did he tell you?

20   A.   He told me that he's -- he's Mike from the neighborhood,

21   or Mher from the neighborhood.  He told me that everybody knows

22   him.

23   Q.   And did you understand his reputation?

24   A.   Yes.

25   Q.   What was that reputation?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Of being --

 2            MR. SEVERO:  Objection, your Honor.  That calls for --

 3            THE COURT:  Sustained.

 4            MR. SEVERO:  -- speculation.

 5   BY MR. ESTRADA:

 6   Q.   Did you have fear of Darbinyan?

 7   A.   Yes.

 8            MR. SEVERO:  Objection, no foundation.

 9            THE COURT:  Overruled.

10   BY MR. ESTRADA:

11   Q.   Excuse me?

12   A.   Yes.

13   Q.   Now, on these meetings you had had with Darbinyan, would

14   he call you to meet with him in certain places?

15   A.   Yes.

16   Q.   Did you feel free to leave from those meetings?

17   A.   No.

18   Q.   Why not?

19   A.   He -- he told me if I could leave or couldn't leave, and

20   if he said he -- I couldn't leave, I knew I couldn't or else

21   harm would come to me.

22   Q.   You recall on one occasion meeting with Darbinyan in the

23   lot of a Marquis location?

24   A.   Yes.

25   Q.   And on that occasion, did you bring him a clinic check?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    On that occasion when you met with Darbinyan at the

 3    Marquis lot, did you feel free to leave?

 4    A.    No.

 5    Q.    Why not?

 6    A.    Because he wanted cash, and I brought a check, and he was

 7    upset, and -- and if he said you can't leave, you can't leave.

 8    Q.    Now, was there an occasion where you met with Darbinyan at

 9    a cell phone store?

10    A.    Yes.

11    Q.    Did he ask you to go to that cell phone store?

12    A.    Yes.

13    Q.    Where was the cell phone store?

14    A.    On Colorado Boulevard in Glendale.

15    Q.    Did you know the owner of the cell phone store?

16    A.    Yes.

17    Q.    Who was that person?

18    A.    I believe his name's Rafo.

19          MR. FLIER:  I'm going to object, your Honor.

20          THE COURT:  Sustained.

21          MR. FLIER:  Move to strike all of that.

22          THE COURT:  Sustained.  All of that will be stricken,

23    Counsel.

24          MR. FLIER:  Thank you.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MR. ESTRADA:

2   Q.   You went to a cell phone store in Glendale?

3           MR. FLIER:  Same objection.  I will object to him

4   mentioning it --

5           THE COURT:  Sustained.

6   BY MR. ESTRADA

7   Q.   Did you go to a cell phone store?

8           THE COURT:  Sustained, Counsel.  I can't say it any

9   clearer than that.  Sustained.

10          MR. ESTRADA:  I won't go into the owner of the cell

11  phone store, your Honor.

12          THE COURT:  I don't care what you go to.  The question

13  is sustained.  The objection to the question is sustained.

14  BY MR. ESTRADA:

15  Q.   On an occasion did you meet with Darbinyan at a particular

16  business location?

17  A.   Yes.

18  Q.   And on that occasion, were you called into the back room

19  of the location?

20  A.   Yes.

21  Q.   Can you explain what happened.

22  A.   There were multiple individuals in the back.  He was

23  sitting at the head of the table.  They closed the door.  And

24  he called me to go stand next to him.  Took a -- told me to

25  take off the chain, give it to him, and he told me he couldn't
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   leave until matters were resolved.

 2   Q.   Was the door locked?

 3   A.   Yes.

 4   Q.   Were matters resolved?

 5   A.   No.

 6   Q.   What happened?

 7   A.   I had to beg for more time so he could let me go.

 8   Q.   Did you believe you were in danger when the door was

 9   locked and the chain was taken off you?

10   A.   Yes.

11   Q.   Why's that?

12   A.   I thought I was never going to leave there alive.

13   Q.   Eventually were you released?

14   A.   Yes.

15   Q.   What did you have to do to get released?

16   A.   I had to beg that I could come up with the money.

17   Q.   Now, you were asked about an occasion where Darbinyan gave

18   you a thousand dollars.  Do you recall that?

19   A.   Yes.

20   Q.   Was this a gift?

21   A.   No.

22   Q.   What did you understand the money was for?

23   A.   To buy more time so I wouldn't be punished right then and

24   there.

25   Q.   Did you know you'd have to eventually pay this money back?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    To who?

 3    A.    To -- to Mher and Arman.

 4    Q.    Did you feel that when Darbinyan gave you this money that

 5    you were no longer under threat from Darbinyan?

 6    A.    No.

 7              MR. PEREYRA-SUAREZ:  Objection, leading.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  No.

10    BY MR. ESTRADA:

11    Q.    Why not?

12    A.    I just saw it as the debt getting larger.

13    Q.    Did you feel, when Darbinyan gave you this thousand

14    dollars, that he was no longer extorting you?

15    A.    No.

16    Q.    Now, you were asked a few questions about

17    Lusine Ogandganyan.  Do you recall that?

18    A.    Yes.

19    Q.    When Sharopetrosian told you to pay the money, were you

20    paying the money directly to Lusine Ogandganyan?

21    A.    No.

22    Q.    Who were you paying the money to?

23    A.    To multiple places.  Arman was asking for it, and he was

24    telling me to give it to either her sister or send it via -- I

25    think it was like a Western Union or -- there are places where
```

```
 1  you send MoneyGrams, I think.

 2  Q.   Had Sharopetrosian ever lent you any money?

 3  A.   No.

 4  Q.   Now, in your conversation with Sharopetrosian, would the

 5  amounts that he demanded change?

 6  A.   Yes.

 7  Q.   Could you explain that.

 8  A.   I -- I -- one time it was 107,000.  One time it was

 9  123,000.  Just, the numbers kept on changing.  I didn't know

10  what I was paying.

11  Q.   Would he demand interest as well?

12  A.   Yes.

13  Q.   Had you ever agreed to pay any interest?

14  A.   No.

15  Q.   Now, please take a look at Exhibit 85, which should be in

16  that same binder in front of you.

17  A.   I have it.

18  Q.   Looking at page 5 of that, do you see that?

19  A.   Yes.

20  Q.   Do you have page 5 of 8 in front of you, of Exhibit 85A?

21  A.   Yes.

22  Q.   Looking at the first speaker at the top, Sharopetrosian

23  tells you, "You after what amount.  Listen, listen.  She gave

24  you that money with interest.  With interest it is for that

25  amount.  With interest calculated that will be $160,000."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        Was this an example of the money increasing?
 2   A.   Yes.
 3   Q.   Third speaker from the top, Sharopetrosian tells you, "And
 4   the $50 would be interest.  That is what I have been wanting
 5   from you, my friend, and whatever you have given before."
 6        And then you say, "Now, how much are we supposed to pay
 7   Luso back?"
 8        Sharopetrosian, "However much you have paid her or you
 9   have not paid her, it does not concern me.  That was before,
10   and it is over.  Do you understand?  Between us, your debt to
11   me has been 120 dollars since September 1st."
12        Do you remember that?
13   A.   Yes.
14   Q.   Did you understand Sharopetrosian to be collecting his own
15   debt or something for Lusine?
16            MR. SEVERO:  Leading.
17            THE COURT:  Overruled.
18            THE WITNESS:  His own.
19   BY MR. ESTRADA:
20   Q.   Now, when these threats started initially, from
21   Sharopetrosian and Darbinyan, did you go straight to the
22   police?
23   A.   No.
24   Q.   Why not?
25   A.   Going to the police in the Armenian community is frowned
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   upon, and it's just not accepted.

2   Q.   And before you went -- excuse me.  Before you were

3   threatened by these two individuals, Sharopetrosian, Darbinyan,

4   were you living in the Armenian community?

5   A.   Yes.

6   Q.   Were you part of the Armenian community?

7   A.   Yes.

8   Q.   And in what way is going to the police frowned upon?

9   A.   You're just considered a bad person and disgrace to

10  yourself and your family.

11  Q.   So if you didn't go to the police, how did you try to

12  resolve these threats and the extortion?

13  A.   I -- I tried to go to a meeting with different people in

14  the community that could help the matter out.  There is people

15  that were known in the community to even have ties with them,

16  to try to resolve it, where I could, you know, resolve the

17  matter as fast and without any problems.

18  Q.   In calls with Sharopetrosian and Darbinyan, you make

19  excuses for not having the money.

20  A.   Yes.

21  Q.   Did you tell them things to sort of buy time?

22  A.   Yes.

23  Q.   Now, you mentioned this kidnapping incident in the Porsche

24  SUV.  At some point you went to the police in October 2009.  Do

25  you recall that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Why did you go to the police?

 3    A.    I just thought my life was too much in danger to take

 4    another chance.

 5    Q.    You were concerned about your own life?

 6    A.    Yes.  My own, my family's.

 7    Q.    Did you believe that any amount you'd pay to

 8    Sharopetrosian would satisfy him?

 9    A.    Yes, I do.  I went to an individual in the Armenian

10    community to try to help resolve the matter, and his name is

11    Polik, and he told me to go to the FBI.  He told me there is no

12    reason for me to pay another dollar, because it just -- it

13    wouldn't help, how much I paid.

14    Q.    Eventually you went to the FBI?

15    A.    Yes.

16    Q.    Now, you were asked about benefits you received while

17    working with the FBI.

18    A.    Yes.

19    Q.    The amount of money that was given to you to pay the

20    extortion demands, did you ever keep any of that money?

21    A.    No.

22    Q.    Did you ever save any of that money?

23    A.    No.

24    Q.    The amount of money that was given to you to relocate, did

25    you ever keep any of that cash?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    No.

 2    Q.    Ever save any of that cash?

 3    A.    No.

 4    Q.    Now, you mentioned that, earlier when you were questioned,

 5    that you didn't want to leave Los Angeles.  Why not?

 6    A.    My family is here, my father and my mother and my brother,

 7    grandparents, and I -- I don't want to leave them.

 8    Q.    Now, did you feel safe at the time that you were

 9    relocated?

10    A.    No.

11    Q.    And to this day, do you feel safe?

12    A.    No.

13    Q.    Why not?

14    A.    I'm constant fear.

15    Q.    Of what?

16    A.    That because I did -- I did go to the police, that I will

17    be killed eventually.

18    Q.    You take any precautions because of that fear?

19    A.    Yeah.

20    Q.    What do you do?

21    A.    Just very, very careful.  Even when I'm at a red light, I

22    always keep, you know, two cars' distance, just so I have an

23    escape route.

24    Q.    You keep your location secret?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Has this event caused you any stress?

2   A.   Yes.

3   Q.   What sort of stress?

4   A.   I had multiple heart attacks two years ago.  I had bypass

5   surgery.

6   Q.   When you say you had multiple heart attacks --

7   A.   Yeah.  I had one, and then they put a stent in there, and

8   then --

9        THE COURT:  Counsel, the Court on its own is going to

10  find that this is not really relevant to the charge.  Whether

11  or not he had stress or not isn't relevant, or what medical

12  attention he's had is not relevant to the charges.

13       MR. ESTRADA:  Very good, your Honor.

14     No further questions.

15       THE COURT:  Okay.  Redirect.

16                   **REDIRECT EXAMINATION**

17  BY MR. SEVERO:

18  Q.   When you received the money from Lusine, you cashed two of

19  the checks?

20  A.   Yes.

21  Q.   You got $50,000 in cash?

22  A.   Yes.

23  Q.   Did you use that to buy more illegal prescription drugs so

24  you could sell them?

25  A.   No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   You gave the cash to -- is it Greisha?  Geisha?

2   A.   Yeah, Greisha.

3   Q.   Greisha?

4   A.   Yes.

5   Q.   You knew Greisha from before?

6   A.   Yes.

7        MR. ESTRADA:  Objection, beyond the scope and

8   relevance.

9        MR. SEVERO:  It's actually questioning that was done

10  by Mr. Pereyra-Suarez.  You want me to stay away from that?

11       THE COURT:  Yeah.  Yeah.

12       MR. SEVERO:  All right.  Sure.

13  Q.   When -- you say you were kidnapped in this Porsche SUV.

14  When was that?

15  A.   I don't remember the exact dates.  It was right before I

16  went to the FBI.

17  Q.   So it was late in -- in 2009?

18  A.   Yes.

19  Q.   And you were actually grabbed and taken to the SUV?

20  A.   The gun was pointed at me.

21  Q.   Okay.  Somebody pointed a gun at you?

22  A.   Yeah.  From his holster, his belt.

23  Q.   And this was in -- in a -- you were at a shopping center?

24  A.   Yes.

25  Q.   I think Mr. Estrada asked you how'd you get there, to the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   shopping center.  I don't think we got that answer.
 2   A.   I was already there.
 3   Q.   I know you were already there, but you weren't born there.
 4   How did you get there?
 5   A.   I drove there.  I --
 6   Q.   I'm sorry?
 7   A.   Possibly either drove there or walked there.
 8   Q.   You drove or walked there, and you were conducting some
 9   business?
10   A.   No.  There is a shopping center.  There was a Starbucks
11   there.  I like to do the crossword and --
12   Q.   Okay.  You were just sitting around?
13   A.   Yes.
14   Q.   And they showed up, Emil -- this guy Emil showed up?
15   A.   Yes.
16   Q.   And he pointed a gun at you?
17   A.   Yes.
18   Q.   He actually took it out of his holster and --
19   A.   No.  He had his hand on it.  Because we were in a shopping
20   center.  He had his hand on it, and it was tucked into his
21   belt, but I could see the gun.
22   Q.   So it wasn't pointed at you?
23   A.   No.
24   Q.   He just had his hand on it?
25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Ah.  And then you went into the SUV, right?

2  A.   Yes.

3  Q.   And where were you taken?

4  A.   We were parked there for several hours.

5  Q.   What's several?  One?  Two?  Three?

6  A.   Three, four hours.

7  Q.   Three or four hours you were sitting in an SUV at a

8  shopping center in Hollywood?

9  A.   Yes.

10  Q.   And what did you talk about?

11  A.   I was told that I need to come up with the money right

12  then and there.

13  Q.   Okay.  So you're sitting in the car.  Did you tell him you

14  didn't have the money --

15  A.   Yes.

16  Q.   -- then?

17       If you had to come up with the money right then and

18  there --

19  A.   I had to leave --

20  Q.   -- how would you -- hold on -- how would you do that if

21  you were still in the car about three or four hours later?

22  A.   Exactly.  They wouldn't let me leave.

23  Q.   Did they hurt you?

24  A.   Not physically.  He didn't touch me.

25  Q.   He didn't touch you, right?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Right.

2    Q.   But you felt threatened, of course?

3    A.   Yes.

4    Q.   And you left the SUV, and the next day you went to the

5    FBI?

6    A.   Yes, probably.  I don't know the next day, but I went

7    right afterwards.

8    Q.   Was that the last episode --

9    A.   That --

10   Q.   -- before -- hold on -- before you went to the FBI?

11   A.   Umm, I don't understand the question.  The last episode --

12   Q.   Was that the last time that you had contact with Mr. --

13   with Mr. Emil before you went to the FBI?

14   A.    I don't remember exact time lines.  I remember specific

15   actions and incidents and events, but --

16   Q.   Between the time you had paid $64,000 and the time the FBI

17   gave you money, which is in November of 2009, did you pay any

18   money as a result of Arman Sharopetrosian's --

19   A.   No.

20   Q.   -- demands?

21   A.   Oh, yes.

22   Q.   To whom?

23   A.   I was told to send money to different places.

24   Q.   But that's -- that's with the FBI money?

25   A.   I -- I believe before that, too.  I'm not -- I'm not
```

```
 1    100 percent sure, but I think I paid money before that, too.

 2    I'm not --

 3    Q.    You're --

 4            THE COURT:  We'll get into that tomorrow.

 5        Ladies and gentlemen, we're going to have to break, I told

 6    you, at 3:45.

 7        Remember the admonishment not to discuss the case among

 8    yourselves or with anybody else or form or express any opinions

 9    about the matter until it's submitted to you and you retire to

10    the jury room.

11        We'll see you back in tomorrow at?

12            JURORS:  8:15.

13            THE COURT:  8:15.  Okay.  See you at that time and

14    we'll get started.

15            THE CLERK:  All rise.

16            MR. FLIER:  Your Honor, after the jury leaves, I'd

17    like to --

18            THE COURT:  Okay.  Shortly, yes.

19        (Outside the presence of the jury:)

20            THE COURT:  Go ahead.

21        And we're going to excuse the witness at this time, also.

22            MR. SEVERO:  Your Honor, may the jury be allowed to

23    clear the hallway before the witness goes out in this parade

24    out there with all these --

25            THE COURT:  Will they be allowed to play in the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   hallway?

 2              MR. SEVERO:  No, no, no.

 3              THE COURT:  I didn't hear what you said.

 4              MR. SEVERO:  May the jury be allowed to clear the

 5   hallway before this witness is paraded out by all these agents?

 6              THE COURT:  Sure.

 7              MR. ESTRADA:  Your Honor --

 8              MR. SEVERO:  Because I don't want to --

 9              MR. ESTRADA:  -- it's not a parade.

10              MR. SEVERO:  May I finish?

11              MR. ESTRADA:  It's not a parade; it's a

12   security issue.

13              THE COURT:  No, I'm not listening to either one of

14   you.

15         The answer is, yes, before he leaves the courtroom,

16   hopefully the jury will be gone, and if the clerk could take

17   care of that, okay.

18              MR. SEVERO:  Thank you.

19         (Outside the presence of the jury and the witness:)

20              THE COURT:  Okay.  You can have seats.

21         I can appreciate the reporter's dilemma when people are

22   talking at the same time.

23         Okay, Counsel.

24              MR. FLIER:  Thank you, your Honor.

25         Briefly, two things.  I'll make a motion for a mistrial
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    based on Mr. Estrada bringing up a subject that -- I don't know

2    how many times the Court can tell the government not to bring

3    it up.

4              THE COURT:  Okay.

5              MR. FLIER:  And I think it was very prejudicial.  Then

6    he still didn't stop, asked two more questions.  The Court got

7    a little upset, and then he still didn't stop, and he did it in

8    an indirect way.

9              THE COURT:  Okay.  Next thing.

10             MR. FLIER:  And I just -- I feel that it's very

11   prejudicial.

12             THE COURT:  Okay.

13             MR. FLIER:  So there's that issue.

14        And then the second issue, again, troubling me, is, I try

15   to do everything correctly, and with respect to the very first

16   witness who was called in this case, the interpreter, I gave

17   notice he's going to be called as a witness for the defense.

18   The Court said 24-hour notice.  I remember.  I came up to the

19   people today, and I said --

20             THE COURT:  Get to the question, because I do have to

21   leave.

22             MR. FLIER:  Oh, I'm just saying, I gave notice to the

23   government that I need that witness, and I was told he's out of

24   the country and he's not coming back.

25             MR. ESTRADA:  Let me just be clear.  He gave us notice
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    right before the break.
 2              MR. FLIER:  Correct.
 3              MR. ESTRADA:  We didn't know that that witness was
 4    going to be called, and that witness needs to go on travel.  I
 5    understand he's leaving sometime tomorrow.
 6              THE COURT:  No, he's not, Counsel.  Counsel, he was
 7    never excused from this trial.  That witness was not excused
 8    from this trial, so he has to be available.
 9         As to your motion to dismiss, that will be denied.
10              MR. FLIER:  Thank you, your Honor.
11              THE COURT:  We'll see you in the morning at -- why
12    don't you come on in at 8:15 in case anybody has any other
13    issues.
14              MR. ESTRADA:  Your Honor, can I request that that
15    witness --
16              THE COURT:  Be called out of order?
17              MR. ESTRADA:  Yes.
18              THE COURT:  I have no problem with that.
19         Anybody have any problem with that?
20              MR. SEVERO:  I have no problems.
21              MR. PEREYRA-SUAREZ:  Neither do I.
22              THE COURT:  Okay.  You can call him first thing in the
23    morning, then.
24              MR. ESTRADA:  Very good.
25              THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE CLERK:  All rise.

 2

 3              (Proceedings adjourned at 3:49 p.m.)

 4

 5                        --oOo--

 6

 7

 8

 9                       CERTIFICATE

10

11      I hereby certify that pursuant to Section 753,

12  Title 28, United States Code, the foregoing is a true and

13  correct transcript of the stenographically reported proceedings

14  held in the above-entitled matter and that the transcript page

15  format is in conformance with the regulations of the

16  Judicial Conference of the United States.

17

18  Date:  MARCH 5, 2015

19

20

21

22          /S/ SANDRA MACNEIL

23          Sandra MacNeil, CSR No. 9013

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3         HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6   UNITED STATES OF AMERICA,      )
                                   )
7                   Plaintiff,     )
                                   )
8        vs.                       )   NO:  CR-11-0072(A)-RGK
                                   )
9   (1)  MHER DARBINYAN,           )
    (4)  ARMAN SHAROPETROSIAN,     )
10  (35) RAFAEL PARSADANYAN,       )
                                   )
11                  Defendants.    )
    _____)
12

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15      DAY 12; VOLUME I OF II; PAGES 1 THROUGH 147

16                  MORNING SESSION

17               Los Angeles, California

18              Thursday, April 10, 2014

19

20

21

22

23                  KATHERINE M. STRIDE, RPR, CSR
                    1107 Fair Oaks Avenue, #68
24                  S. Pasadena, California  91030
                    www.stridecourtreporting.com
25                  (323)474-6420

1    **APPEARANCES:**

2    On behalf of the Government:

3           UNITED STATES ATTORNEY'S OFFICE
            ANDRÉ BIROTTE, JR., UNITED STATES ATTORNEY
4           BY:  E. MARTIN ESTRADA
                 ELIZABETH R. YANG
5           ASSISTANT UNITED STATES ATTORNEYS
            312 North Spring Street
6           Los Angeles, California  90012
            (213)894-4477
7
            U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
8           BY:  ANDREW CREIGHTON, TRIAL ATTORNEY
            312 North Spring Street
9           Los Angeles, California  90012
            (213)894-2579
10
     On behalf of Defendant Mher Darbinyan:
11
            THE SEVERO LAW FIRM
12          BY:  MICHAEL SEVERO, ATTORNEY AT LAW
            70 South Lake Avenue, Suite 945
13          Pasadena, California  91101
            (626)844-6400
14
     On behalf of Defendant Arman Sharopetrosian:
15
            LAW OFFICES OF CHARLES PEREYRA-SUAREZ
16          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
            800 Wilshire Boulevard, 12th Floor
17          Los Angeles, California  90012
            (213)623-5923
18
     On behalf of Defendant Rafael Parsadanyan:
19
            FLIER AND FLIER, ALC
20          BY: ANDREW REED FLIER, ATTORNEY AT LAW
            15250 Ventura Boulevard, Suite 600
21          Sherman Oaks, California  91403
            (818)990-9500
22
     Also Present:
23
            JEREMY STEBBINS, F.B.I. SPECIAL AGENT
24
            MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25

1                           **I N D E X**

2                    DEFENSE WITNESSES

3          JURY TRIAL DAY 12; VOLUME I OF II

                                                    **Page**
4

5    **MINAS MATOSYAN, PREVIOUSLY SWORN**..................... 10
         REDIRECT EXAMINATION CONTINUED
6        BY MR. SEVERO...................................... 10
         REDIRECT EXAMINATION
7        BY MR. PEREYRA-SUAREZ ............................ 21
         RECROSS-EXAMINATION
8        BY MR. ESTRADA.................................... 25

9    **SAMUEL REED HANKS, SWORN**............................ 32
         DIRECT EXAMINATION
10       BY MR. SEVERO..................................... 32
         DIRECT EXAMINATION
11       BY MR. PEREYRA-SUAREZ............................. 40
         CROSS-EXAMINATION
12       BY MR. ESTRADA................................... 43

13   **SETH TUNSTALL, SWORN**................................ 46
         DIRECT EXAMINATION
14       BY MR. SEVERO.................................... 46
         CROSS-EXAMINATION
15       BY MR. ESTRADA................................... 56
         REDIRECT EXAMINATION
16       BY MR. SEVERO.................................... 57

17   **RAFAEL QUINTERO, SWORN**............................. 58
         DIRECT EXAMINATION
18       BY MR. SEVERO.................................... 59
         DIRECT EXAMINATION
19       BY MR. FLIER.................................... 67
         CROSS-EXAMINATION
20       BY MR. ESTRADA.................................. 68
         REDIRECT EXAMINATION
21       BY MR. SEVERO.................................... 72

22

23

24

25

# I N D E X

DEFENSE WITNESSES (CONTINUED)

JURY TRIAL DAY 12; VOLUME I OF II

                                                              **Page**

**JEREMY M. STEBBINS, SWORN**........................... 74
    DIRECT EXAMINATION
    BY MR. SEVERO...................................... 74
    DIRECT EXAMINATION
    BY MR. PEREYRA-SUAREZ............................. 107
    DIRECT EXAMINATION
    BY MR. FLIER...................................... 116
    CROSS-EXAMINATION
    BY MR. ESTRADA.................................... 119
    REDIRECT EXAMINATION
    BY MR. SEVERO..................................... 127
    REDIRECT EXAMINATION
    BY MR. PEREYRA-SUAREZ............................. 133
    REDIRECT EXAMINATION
    BY MR. FLIER...................................... 134
    RECROSS-EXAMINATION
    BY MR. ESTRADA.................................... 136


**HOVSEP ZADOURIAN, SWORN**............................ 137
    DIRECT EXAMINATION
    BY MR. SEVERO..................................... 138

## PROCEEDINGS

Rulings on motions in limine........................   5

Defendant Parsadanyan's Rule 29 motion,
taken under submission..............................   6

## EXHIBITS

Exhibit 500 marked for identification................ 62

```
 1          LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 10, 2014

 2                         A.M. SESSION

 3                          --oOo--

 4                        8:35 a.m.

 5          (Following held outside jury's presence:)

 6          THE CLERK:  All rise.  This District Court is now in

 7     session, the Honorable R. Gary Klausner, judge presiding.

 8                  (Judge enters courtroom.)

 9          THE CLERK:  You may be seated.

10          THE COURT:  The jury's going to be coming in, in

11     just a few minutes.  They're not here presently, but I am

12     going to give you rulings on this so you'll know.

13          These are motions that were made by the government,

14     motions in limine.  I have no opposition to them, but the

15     Court's ruling is as follows:

16          One of the motions was to exclude specific instances

17     of character evidence and evidence related to non-pertinent

18     character traits.  I don't quite understand the motion.

19     All it's asking me to do is follow the Rules of Evidence,

20     and the Court is going to follow the Rules of Evidence

21     which is in 404, 405; that is, that you prove character

22     evidence by either -- well, you can read it yourself, 405,

23     proving character evidence by opinion or by reputation

24     only.

25          As to No. 2, the government has asked to preclude
```

1    the introduction of hearsay evidence.  The situation has

2    changed.  I think this motion was made thinking that he may

3    or may not testify, but he has.  And, again, it's only

4    asking the Court to follow the Rules of Evidence, and the

5    Court's going to follow the Rules of Evidence.

6            The last two I can talk about, and one is asking

7    that the defendant be precluded from arguing that the gun

8    has to be operable, and obviously, I don't think the

9    government -- I don't think the defense can argue that.

10           MR. SEVERO:  I wasn't going to argue that.

11           THE COURT:  Yeah, so yes, you cannot argue the gun

12   has to be operable.

13           And No. 4 is pertaining to our character evidence as

14   far as certificates go.  Certificates would not be

15   appropriate.  That's for at time of sentencing, but not for

16   the case-in-chief.  The Exhibit 8 probably would not be

17   admitted.  I'm just giving you heads-up on that.  We're

18   talking about certificates of achievement.

19           There's two more things I wanted to talk about.

20           I did get the 29 motion from defendant Parsadanyan,

21   and I'm going to take that under submission like the other

22   Rule 29.

23           And also I understand that the government's witness

24   will not be in until 1:00 o'clock today.

25           MR. ESTRADA:  Yes.  The one, the translator is not

```
 1   available until 1:00 o'clock because he works for Superior

 2   Court.  The other witness, who was on yesterday afternoon,

 3   will be available in the morning, and he'll be up there,

 4   M.M. (indicating).

 5         THE COURT:  Yeah, okay.

 6         MR. ESTRADA:  And, Your Honor, just --

 7         THE COURT:  We'll go back to direct -- redirecting

 8   M.M.

 9         MR. ESTRADA:  Just one thing on the motion regarding

10   hearsay, it was also regarding extrinsic evidence, and it

11   pertained to Deputy Tunstall, who the defense has

12   subpoenaed.  That will be with regard to, I understand,

13   impeachment of witness Moreno.

14         THE COURT:  Okay.

15         MR. ESTRADA:  However, as pointed out in the motion,

16   there was never any inconsistent statement presented to

17   Moreno; he was never confronted with an inconsistent

18   statement.

19         THE COURT:  And the evidence code controls that.

20   I'll be making those rules -- I don't know what the

21   question's going to be, but I'll be applying the Rules of

22   Evidence to those.

23         MR. ESTRADA:  Very good, Your Honor.

24         THE COURT:  And you're correct.  And I'm telling you

25   what you all already know.  The witness has to have an
```

1    opportunity to address it before you can impeach him on it,

2    obviously.

3          MR. PEREYRA-SUAREZ:  Your Honor, I just wanted to

4    note for the record my office will be filing a written

5    joinder.

6          THE COURT:  Well, you already have joined

7    Mr. Darbinyan's 29 motion, and you will be filing a written

8    joinder of that also?

9          MR. PEREYRA-SUAREZ:  That will be filed this

10   morning.

11         THE COURT:  No problem.

12         MR. FLIER:  Your Honor, thank you.

13         Yesterday, I know it was getting late.  I made the

14   motion for the mistrial.  The Court denied that, but there

15   was still some testimony about an office, my client's name

16   "Rafo" was mentioned, and then there was evidence about

17   what happened in the office.  Unless the jury was

18   completely sleeping during that, which they might have

19   been, but I'm going to assume they were not, then what I

20   would ask -- obviously, the motion for mistrial was not

21   granted.  I would ask that the Court strike all of that

22   testimony, either in its entirety after that subject

23   matter, or again give the jury the limiting instruction

24   that it did not apply to my client.

25         THE COURT:  And, Counsel, I understand where you're

1    coming on that, and I'll be giving that limiting

2    instruction again.  It was inappropriate.

3           MR. ESTRADA:  Can I address that, Your Honor?

4           THE COURT:  No.  It was inappropriate.  The Court

5    ruled on it, and you kept pushing on it knowing it was

6    inappropriate.  And the Court was not happy about what

7    happened.

8           MR. ESTRADA:  Can I address that, Your Honor?

9           THE COURT:  No.

10          In this particular matter, we'll bring the jury in

11   at this time, and I'll give that instruction to the jury.

12          MR. ESTRADA:  Your Honor, I certainly didn't intend

13   to violate the Court's order.  My understanding was with

14   regard to the calls discussing kidnapping.

15          THE COURT:  Counsel, I just said "No."  I don't know

16   why counsel doesn't listen.  I said "No."  We're bringing

17   the jury in at this time.

18          MR. ESTRADA:  I wanted to give -- provide an

19   explanation on the record.

20          THE CLERK:  All rise.

21          THE COURT:  At the end of the trial, when the jury

22   goes back for deliberations, you can put it on the record

23   at that time.

24          THE CLERK:  All rise.

25                 (Brief recess taken.)

1          THE CLERK:  All rise.  You may be seated.

2               (Jurors enter courtroom.)

3          THE CLERK:  All rise.

4               (Judge enters courtroom.)

5          THE CLERK:  You may be seated.

6          THE COURT:  Let the record reflect all the members

7   of the jury are in their respective seats in the jury box.

8   Are you ready for a full day?  Okay.

9          Counsel, you may continue your redirect examination.

10         MR. SEVERO:  Thank you, Your Honor.

11                    **MINAS MATOSYAN,**

12    DEFENSE WITNESS, PREVIOUSLY SWORN, TESTIFIED FURTHER:

13               **REDIRECT EXAMINATION (Continued)**

14  BY MR. SEVERO:

15  Q.    Did you have any contact with Mher after you went to

16  the FBI?

17  A.    I don't believe so.

18  Q.    And if I understand it correctly, there were no

19  payments made before you went to the FBI, other than the

20  $64,000 you said were paid; is that correct?

21  A.    Yes.

22  Q.    Did you -- I may have asked you this, but do you

23  know how much that silver chain you say you had was worth?

24  A.    I don't know.

25  Q.    Was it just a chain?

**002585**

1    A.      Chain and a cross.

2    Q.      And it was after this presumable chain incident that

3    you got a loan from Mr. Darbinyan for 10,000 -- I'm

4    sorry -- a thousand dollars?

5    A.      Yes.

6    Q.      Is that the same day?

7    A.      I don't believe the same day, no.

8    Q.      The thousand dollars he gave you was so you could

9    buy time; correct?

10   A.      Yes.

11   Q.      To keep you from being hurt?

12   A.      Yes.

13   Q.      Now, you testified on direct, or rather

14   Mr. Estrada's cross, that you were worried about that other

15   debt to Mr. Darbinyan.

16   A.      Yes.

17   Q.      You sure?

18   A.      But what's -- excuse me.

19           I didn't understand the question.

20           THE COURT:  Why don't you restate the question.

21           THE WITNESS:  The other debt, what does that mean?

22           THE COURT:  Restate the question.  Go ahead.

23   BY MR. SEVERO:

24   Q.      When Mr. Darbinyan gave you the thousand dollars,

25   you said you were worried that now you owed him a thousand

1    dollars?

2    A.    Yes.

3    Q.    Why did you take the thousand dollars?

4    A.    I had to.

5    Q.    You had to so you could buy time?

6    A.    I had to because I had time.  I had to because he

7    offered it to me.

8    Q.    He offered -- he offered it?  You didn't ask him for

9    the thousand?

10   A.    No.

11   Q.    He said, "I'll give you a thousand dollars so you

12   could buy time"; correct?

13   A.    Yes.

14   Q.    So you don't -- so nobody hurts you; correct?

15   A.    Right.

16   Q.    And you said, "Okay.  I'll do that."

17   A.    Yes.

18   Q.    Did you not find that a friendly gesture?

19   A.    No.

20   Q.    This meeting that you had at a location where

21   Mr. Darbinyan, according to your testimony, asked for your

22   silver chain -- by the way, did you unhook the silver chain

23   yourself?

24   A.    I slipped it off.

25   Q.    You took it off?  He said, "Give me your silver

1    chain," and you took it off?

2    A.    Yes.

3    Q.    Do you recall the date of that meeting?

4    A.    No, I don't recall the date.

5    Q.    Was it in the summer?

6    A.    Possibly.

7    Q.    Did you know you were being -- you were under

8    surveillance during that time?

9    A.    No.

10   Q.    If I told you the surveillance never saw you going

11   anywhere with Mr. Darbinyan, would that change your

12   testimony?

13   A.    No.

14        MR. ESTRADA:  Your Honor, that assumes facts not in

15   evidence.

16        THE COURT:  Sustained.  It does.

17        THE WITNESS:  Absolutely not.

18        THE COURT:  No, no, no.  When I sustain an

19   objection, don't answer it.  If I overrule the objection,

20   then you can answer it.  Okay.

21   BY MR. SEVERO:

22   Q.    Who was it who lived at 7230 Franklin Street in

23   Los Angeles?

24   A.    I'm not sure.

25   Q.    Why did you go there?

1    A.    I'm -- I'm not sure.  72- -- oh, Franklin.  I'm not

2    sure exactly the building number for Franklin and La Brea.

3    Is that -- I lived there.

4    Q.    At 7230 Franklin?

5    A.    I'm not exact sure of the address, where that is.  I

6    lived on Franklin before.

7    Q.    At some point, you -- after you went to the FBI on

8    October 26th, you were wired for sound; is that correct?

9    A.    Yes.

10    Q.    Did you have any conversations with Mr. Darbinyan

11    after October 26th?

12    A.    No.

13    Q.    Did you ever even call him on the phone?

14    A.    No.

15    Q.    Did he call you?

16    A.    No.

17    Q.    The only incident where you -- that you have told us

18    about where you were kidnapped was the one time in the

19    Porsche; correct?

20    A.    Kidnapped or held against my will.

21    Q.    When you were taken from a particular location to

22    another location, the only instance of that is the Porsche;

23    correct?

24    A.    Yes.

25          MR. SEVERO:  Just one moment, Your Honor.

1          THE COURT:  Yes.

2          MR. SEVERO:  Thank you.

3              *(Pause while counsel reviews documents.)*

4     BY MR. SEVERO:

5     Q.    On this $4,000 check that you brought, in the summer

6     of 2009, was it ever cashed?

7     A.    No.

8     Q.    Did you keep the check?

9     A.    I believe so.

10    Q.    It was a check from you?

11    A.    From my business.

12    Q.    And what business was that?

13    A.    It was a medical office.

14    Q.    Are you a doctor?

15    A.    No, I managed the office at the time.

16    Q.    You managed the office and you took a check to pay

17    your personal debt?

18    A.    It was my business check from my office.  I owned

19    the management company.

20    Q.    This is at the same time that you were trying to get

21    a personal loan?

22    A.    Right after.

23         MR. SEVERO:  Just one moment, Your Honor, please.

24         THE COURT:  Yes.

25              *(Pause while counsel reviews documents.)*

1    BY MR. SEVERO:

2    Q.     Didn't you live at 1622 Harvard Street in Hollywood?

3    A.     No.

4    Q.     The meeting with Mr. Darbinyan that you say happened

5    at a particular location having to do with the silver

6    chain, was that something that was prearranged?

7    A.     I was told to come there.

8    Q.     And this was before you went to the FBI; correct?

9    A.     Yes.

10   Q.     And you testified yesterday that Mr. Darbinyan never

11   touched you?

12   A.     Yes.

13   Q.     And a phone call was played yesterday where the only

14   reference was to "I will hurt you," I think were the words;

15   is that correct?

16          Do you remember that?

17   A.     From yesterday?

18   Q.     Yes.

19   A.     Yes, I believe so.

20   Q.     But it was after that, that you got the

21   thousand-dollar loan from him?

22   A.     I'm not sure of the exact time line.  I remember the

23   events.

24   Q.     Every time you met with Mr. Stebbins, you told him

25   everything you knew about your involvement in this caper;

1    correct?

2    A.      Yes.

3    Q.      And it's your testimony that in every instance you

4    told him that Mr. Darbinyan was one of the ones that had

5    threatened you; true?

6    A.      I don't understand.

7    Q.      Every time you met with Mr. Stebbins, you mentioned

8    to him that Mr. Darbinyan, by name, Mher, had threatened

9    you.

10          MR. ESTRADA:  Objection, Your Honor.  Assumes facts

11   not in evidence.

12          THE COURT:  Here's the question -- I don't know.

13          Did you mention it to him every time you saw him or

14   do you remember?

15          THE WITNESS:  Every single time that I met him?

16          THE COURT:  Yes.

17          THE WITNESS:  Every single time there was a

18   different incident, and I told him the incidents that were

19   happening.

20          THE COURT:  Let me back up.

21          The question was:  If you remember, every single

22   time you met, did you tell him every single time that

23   Darbinyan had threatened you?

24          THE WITNESS:  Not every single time.

25          THE COURT:  Thank you.

```
1              MR. SEVERO:  Thank you, Your Honor.

2    BY MR. SEVERO:

3    Q.     Did you ever mention Mr. Darbinyan by name to

4    Mr. Stebbins?

5    A.     Yes.

6    Q.     More than once?

7    A.     Yes.

8    Q.     More than twice?

9    A.     Yes.

10   Q.     More than five times?

11   A.     I don't think so.  I don't recall.

12   Q.     So if there was an instance where Mr. Darbinyan had

13   threatened you, you would tell Mr. Stebbins?

14   A.     I always told the truth.

15   Q.     That's not my question, but I'm glad to hear that.

16            MR. ESTRADA:  Objection, Your Honor.  Argumentative

17   and improper impeachment.

18            THE COURT:  Overruled.  Overruled.

19   BY MR. SEVERO:

20   Q.     Every time -- when Mr. Darbinyan would call you and

21   you felt threatened, you would tell Mr. Stebbins?

22   A.     Yes.

23   Q.     So you started talking to Mr. Stebbins after

24   October 26th; correct?

25   A.     I believe so.
```

1    Q.    You just told us a little while ago that you never

2    spoke to Mr. Darbinyan after October 26th.

3    A.    Yes.

4    Q.    So when did you mention Mr. Darbinyan's name to

5    Mr. Stebbins?

6    A.    When he asked me what the events were happening

7    before.

8    Q.    Okay.  So you didn't -- did you tell that to the

9    first agent that you spoke to?

10   A.    Yes.

11   Q.    And you told them Mr. Darbinyan's name, by name?

12   A.    Yes.

13   Q.    Do you remember that agent's name?

14   A.    Hanks?  I'm not sure.  I remember what he looked

15   like exactly.

16   Q.    "Hanks" would be a good guess?

17   A.    Something to that -- I'm not exactly sure of his

18   name.

19   Q.    Okay.  This incident with the Porsche happened

20   before you went to the FBI?

21   A.    Yes.

22         MR. SEVERO:  If I could just have one moment.  I'm

23   almost done.

24   BY MR. SEVERO:

25   Q.    It's your testimony that at some point you went to

1    someone in the community to try to mediate this dispute?

2    A.    Yes.

3    Q.    You felt that someone in the community had enough

4    influence to try to mediate the dispute?

5    A.    I knew he was friends with them.

6    Q.    And that would be Polik?

7    A.    Yes.

8    Q.    Do you know his name?

9    A.    I just know him as Polik.

10   Q.    An older man?

11   A.    Yes.

12   Q.    Paramaz?

13   A.    Excuse me?

14   Q.    Paramaz was his name?

15   A.    I'm not sure of the exact name.  I know him as

16   "Polik."

17   Q.    He's Armenian?

18   A.    Yes.

19   Q.    Your testimony yesterday was you didn't call the

20   police because, in the Armenian community, that is not a

21   good thing?

22   A.    Yes.

23   Q.    You mean all Armenians abide by that rule?

24   A.    Yes, pretty much all the Armenians that I know.

25   Q.    Do you know any Armenian police officers?

1   A.     No, none personally.

2   Q.     But you've seen some in Glendale, haven't you?

3          THE COURT:  I'm not sure of the relevancy, Counsel.

4   BY MR. SEVERO:

5   Q.     This person in the community told you -- Polik told

6   you just go to the police; is that correct?

7   A.     Yes.  He told me to go to the FBI specifically.

8   Q.     And he's Armenian?

9   A.     Yes.

10  Q.     Do you remember the name of the individual who took

11  you to -- in the Porsche?

12  A.     Yes.

13  Q.     What's his name?

14  A.     Emil.

15  Q.     And you provided Emil's name to Mr. Stebbins by

16  name.

17  A.     Yes.

18  Q.     One last thing --

19         MR. SEVERO:  That's all I have.  Thank you.

20         THE COURT:  Thank you.

21         Counsel.

22                  **REDIRECT EXAMINATION**

23  BY MR. PEREYRA-SUAREZ:

24  Q.     Mr. Matosyan, you testified this morning and

25  possibly yesterday that you were worried about debts

1    claimed by Mr. Darbinyan and by Mr. Sharopetrosian;

2    correct?

3    A.    Correct.

4    Q.    And that made you stressed; correct?

5    A.    Yes.

6    Q.    In fact, you had debts to a lot of other people

7    during the same time; is that correct?

8    A.    Yes.

9    Q.    And you were dealing with other families beyond --

10   besides the Sharopetrosian family, regarding those debts;

11   correct?

12   A.    I borrowed the money from them to pay back Lusine.

13   Q.    All right.  So you owed a number of people some

14   money in 2009; correct?

15   A.    Yes.

16   Q.    And you were worried about all of those debts;

17   correct?

18   A.    Not all of them, because they were family friends,

19   and they gave it to me and said take care of the problem.

20   Q.    But at any rate, you owed a lot of money to people

21   other than Mr. Darbinyan and Mr. Sharopetrosian; correct?

22   A.    Yes.

23   Q.    Now, you testified this morning and also yesterday

24   about this silver chain incident.  Do you recall that

25   testimony?

1     A.     Yes.

2     Q.     Mr. Sharopetrosian was not physically present when

3     that occurred; is that correct?

4     A.     No.

5     Q.     And you testified about Emil yesterday and today.

6     Do you recall that testimony?

7     A.     Yes.

8     Q.     Did you, in fact, provide $1,900 to Emil in October

9     or November of 2009?

10    A.     Yes.

11    Q.     In fact, you and Emil were involved in drug

12    transactions together; is that correct?

13    A.     The way you're phrasing the question -- I wasn't

14    involved in drug transactions.  He told me to give him the

15    money so he could go pick up drugs.  And if I didn't give

16    it, that would be a problem.

17    Q.     Well, did you --

18    A.     I never asked him to buy drugs or bring them to me.

19    He told me that he knew that I had a source and I had to

20    take it.

21    Q.     All right.  And was it your understanding that the

22    $1,900 you were going to be providing to Emil was for --

23    used by him to purchase drugs?

24    A.     I didn't know if he would or wouldn't.  He told me

25    he needed it, and I gave it to him.

1   Q.     You don't know whether that $1,900 was to go to

2   Mr. Sharopetrosian or anybody in his family; is that

3   correct?

4   A.     Correct.

5   Q.     It was for Emil's purposes; is that correct?

6   A.     From what I knew, they were -- they were together.

7   I didn't separate the two.

8   Q.     Now, these other people that you were approaching to

9   get funds to pay a personal loan to Lusine --

10  A.     Uh-huh.

11  Q.     -- how much money did you ask those other people

12  for?

13  A.     I asked a personal friend of mine for 9,000 at a

14  time.  He took it out of his credit card and gave it to me,

15  just different amounts from -- from my friends.

16  Q.     And the reason you were asking your friends for

17  different amounts is you knew you owed some money to

18  Lusine; is that correct?

19  A.     Correct.

20  Q.     You knew you had to pay it back; correct?

21  A.     Correct.

22         MR. PEREYRA-SUAREZ:  Nothing further, Your Honor.

23         THE COURT:  And before we go further, there was

24  mention yesterday of going to a phone store in Glendale.

25         I struck that testimony.  And remember, any

```
 1   testimony on this extortion is limited only to these two

 2   defendants and that it would be improper for you to impugn

 3   that to the defendant Parsadanyan at all.  And it would

 4   even be incorrect and improper for you to assume it was his

 5   place that they went to.  Okay.

 6            Counsel, any questions?

 7            MR. FLIER:  Thank you, Your Honor, and no questions.

 8            THE COURT:  Okay.

 9            Counsel, recross-examination.  I'm sorry.

10                    RECROSS-EXAMINATION

11   BY MR. ESTRADA:

12   Q.    Sir, you were asked about other debts that you had

13   in 2009.  Do you recall that?

14   A.    Yes.

15   Q.    You had other debts in 2009?

16   A.    Yes.

17   Q.    Did those other people threaten you to get their

18   money back?

19   A.    No.

20   Q.    Did they put you in fear to get their money back?

21   A.    No.

22   Q.    Did they call you and threaten your child or your

23   family to get the money back?

24   A.    No.

25   Q.    You mentioned the incident with a Porsche, where a
```

1    gun was shown to you and you were put in the back of a

2    Porsche?

3    A.    Yes.

4    Q.    That was a kidnapping in your view?

5    A.    Yes.

6    Q.    You mentioned being taken against your will.  Were

7    there other times you were taken against your will?

8    A.    Yes.

9    Q.    What were the other times you were taken against

10   your will?

11   A.    When I was in the back room of --

12         THE COURT:  Let me just interrupt.

13         He didn't mention being taken.  He said that -- he

14   asked whether or not kidnapping included being held against

15   his will, not being taken against his will.  Taken implies

16   moving.

17         MR. ESTRADA:  Yes, Your Honor.  So I'll correct it.

18         THE COURT:  Okay.

19   BY MR. ESTRADA:

20   Q.    Held against your will.  Were there other times you

21   were held against your will?

22         And please don't mention the precise location of the

23   business, but generally speaking.

24   A.    I was held in a back room against my will.

25   Q.    And was Darbinyan present for that?

1    A.    Yes.

2    Q.    Where was he in that back room?

3    A.    He was sitting at the -- at the office desk.

4    Q.    Were there other people inside that room?

5    A.    Yes.

6    Q.    About how many people, generally?

7    A.    Multiple.  If I had to guess, over five.

8    Q.    And who appeared to be in charge in that back room?

9    A.    Mr. Darbinyan.

10          MR. SEVERO:  I move to strike that as speculation of

11   the witness.

12          THE COURT:  Overruled.

13   BY MR. ESTRADA:

14   Q.    Now, you were asked about the thousand dollars that

15   Darbinyan gave you.  Do you remember that?

16   A.    Yes.

17   Q.    Did you believe, because that thousand dollars was

18   given to you, that Darbinyan was no longer a threat to you?

19   A.    No.

20   Q.    Why not?

21   A.    I believed that the debt was just getting larger.

22   Q.    You mentioned you had to take it because he offered

23   it.  What did you mean by that?

24   A.    If I didn't take it, then physical harm would either

25   come to me that day or soon to come.

```
1    Q.     And did you understand that you would now have to

2    pay the money back to Darbinyan and Sharopetrosian?

3    A.     Yes.

4    Q.     You were also asked about payments that were made to

5    Sharopetrosian and Darbinyan before you went to the FBI.

6    If you could take a look at Exhibit 281 --

7           Which has been admitted, Your Honor, I'd ask

8    permission to publish.

9           THE COURT:  281, yes.

10   BY MR. ESTRADA:

11   Q.     I'll put it on the screen in front of you.

12   A.     281?

13   Q.     281.  It's on the computer screen in front of you.

14   Do you see that?

15   A.     Yeah.

16   Q.     Do you see a MoneyGram $1,000 receipt for Tony

17   Franco?

18   A.     Yes.

19   Q.     Who sent that?

20   A.     I did.

21   Q.     Why did you send it?

22   A.     Arman told me to.

23   Q.     And was that -- do you see the date, October 16th,

24   2009?  Was that before you went to the FBI?

25   A.     Yes.
```

1    Q.    Was that a payment you made before going to the FBI?

2    A.    Yes.

3    Q.    And there's more payments here.

4          It's a $440 payment, $600 payment also under Tony

5    Franco.  Did you send those?

6    A.    Yes.

7    Q.    Why did you do it under "Tony Franco"?

8    A.    I was instructed to.

9    Q.    And the names that are on these various receipts --

10   Esperanza Melgoza (phonetic), Rafael Armendariz, Porfirio

11   Guerrero -- where do those names come from?

12   A.    Arman told me to send them to those names.

13   Q.    You were also asked about Darbinyan's involvement in

14   this extortion plot.

15         Can you take a look at Exhibit 67, which should be

16   in Volume 1 of these binders behind you.

17         Your Honor, I believe we took this back from the

18   jury; so if I could publish 67 on the Elmo.

19         THE COURT:  Okay.

20         MR. ESTRADA:  I have it.

21   BY MR. ESTRADA:

22   Q.    Now, if you could turn to page 5 of 6 of

23   Exhibit 67A.

24   A.    I have it.

25   Q.    67A?

```
 1    A.      Yes.

 2            MR. ESTRADA:  Your Honor, with the Court's

 3    permission, I'll publish 5 of 6.

 4            THE COURT:  Yes.

 5    BY MR. ESTRADA:

 6    Q.      Looking at page 5 of 6, seven speakers from the

 7    bottom, A.S., Sharopetrosian -- I'll tell you this call is

 8    from August 20th, 2009.  (as read:)

 9                    "Sharopetrosian:  Dear, now about that son of

10                    a bitch... that Sisak or Minas, whatever the

11                    fuck his name was...

12                    "Darbinyan:  Yes...

13                    "You know, if you does not do it until the

14                    31st we'll have to see him on the 1st because

15                    that hundred and twenty dollars is still --

16                    "Darbinyan:  I know, brother.  His -- his

17                    father had come to see me.  I forgot to tell

18                    you about it.  He came and said, 'I will

19                    bring it in the next few days, please blah,

20                    blah, blah.'  So I said, 'Brother, I have

21                    nothing to talk about this.  You come when

22                    you have it available.'  He goes 'Perhaps

23                    Luso should be present there when we hand it

24                    over?'  I said, 'I don't care about Luso or

25                    else.  It must be done whatever way Arman
```

```
 1              says.'"

 2         Minas, was that your name?

 3   A.    Yes.

 4   Q.    Do you remember your father attempting to get

 5   involved and setting the dispute?

 6         MR. SEVERO:  Objection, beyond the scope.

 7         THE COURT:  Sustained.

 8   BY MR. ESTRADA:

 9   Q.    Do you remember other times dealing with Darbinyan

10   about the dispute close in time to when you went to the

11   FBI?

12   A.    Well, I believe about --

13         MR. SEVERO:  That calls for a "yes" or "no" answer.

14         THE COURT:  Do you remember talking with -- or any

15   other meeting close to that time?

16         THE WITNESS:  What's close?  A week?  A month?

17         THE COURT:  Within a week.

18         THE WITNESS:  No.

19   BY MR. ESTRADA:

20   Q.    Within weeks of when you went to the FBI?

21   A.    Weeks.

22         MR. ESTRADA:  No further questions, Your Honor.

23         THE COURT:  Okay.  You may step down.

24         Our next witness.

25         MR. ESTRADA:  Your Honor, if I could just check on
```

```
1    one of the defense witnesses.

2            THE COURT:  Okay.

3                  (Pause in the proceedings.)

4            MR. SEVERO:  Defense calls Agent Samuel Hanks.

5            THE CLERK:  Right here to be sworn.  Please raise

6    your right hand.

7                      SAMUEL REED HANKS,

8        DEFENSE WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

9            THE CLERK:  Do you solemnly swear the testimony you

10   shall give in the cause now pending before this Court shall

11   be the truth, the whole truth, and nothing but the truth,

12   so help you God?

13           THE WITNESS:  Yes.

14           THE CLERK:  Thank you.  You may be seated.

15           May I please ask you to state your full name for the

16   record and spell your last name.

17           THE WITNESS:  Samuel Reed Hanks, H-a-n-k-s.

18           THE COURT:  Okay.  You may inquire, Counsel.

19                   DIRECT EXAMINATION

20   BY MR. SEVERO:

21   Q.    Good morning, Mr. Hanks.

22   A.    Good morning.

23   Q.    What is your occupation and assignment?

24   A.    Special Agent with the Los Angeles office of the

25   FBI.
```

1   Q.    And were you so employed in 2009?

2   A.    I was.

3   Q.    Directing your attention to October 26th, 2009, what

4   was your assignment then with the FBI?

5   A.    I was on complaint duty.

6   Q.    What is complaint duty?

7   A.    In the Los Angeles office, special agents rotate

8   answering phones and addressing concerns from complainants

9   who come into the office.  It can be any type of complaint.

10  It was my rotation.  It was my day that day.

11  Q.    Very well.  Do you recall what was your shift that

12  day?

13  A.    What was my shift?

14  Q.    Yes, or is there only 8:00 to 5:00?

15  A.    Just regular business hours.

16  Q.    All right.  Do you have -- do you recognize the name

17  Minas Matosyan?

18  A.    I do.

19  Q.    Do you have any independent recollection of

20  Mr. Matosyan coming into the FBI to file a complaint?

21  A.    I do.

22  Q.    Do you recall the date that he came in?

23  A.    October 26th, I believe.  I would have to refer back

24  to my report.

25  Q.    Do you have your report with you?

1   A.    Not -- on my person?

2   Q.    Yes.

3   A.    No, I do not have my report on my person.

4   Q.    If you were to look at the report, would it help

5   refresh your recollection?

6   A.    It would.

7         MR. SEVERO:  Your Honor, may I hand the clerk --

8         THE WITNESS:  Yes.

9         MR. SEVERO:  -- the report.

10        And for the record, it's a three-page document

11   entitled "Complaint Form."

12        THE COURT:  Okay.  Just look at that document and

13   see if it refreshes your memory, and put it aside.  And

14   then testify from your memory and not from the document.

15        THE WITNESS:  Yes, sir.

16        THE COURT:  If it refreshes your memory.

17   BY MR. SEVERO:

18   Q.    Have you had an opportunity to look at it?

19   A.    October 26th is the correct date, sir.

20   Q.    All right.  What was the -- if you remember, did he

21   tell you that he was being threatened by certain people?

22   A.    Yes, sir.

23   Q.    Did he tell you that he was being threatened in

24   order to pay a debt?

25   A.    Yes, sir.

1    Q.    Did he tell you whether it was a personal debt that

2    he had?

3    A.    Yes.

4    Q.    And did he tell you that the debt was approximately

5    $95,000?

6    A.    Yes.

7    Q.    Did he tell you that he thought he had paid the debt

8    off?

9    A.    He did.

10   Q.    All right.  Did he make mention of certain names as

11   to who was threatening him?

12   A.    He mentioned names and groups of people, yes, sir.

13   Q.    And do you remember the name of the individual that

14   he said had threatened him?

15   A.    I remember the name that he referred to as the

16   leader, which was "Arman."  He didn't provide a last name.

17   Q.    He did not give you a last name?

18   A.    No.

19   Q.    And did he tell you at any time -- strike that.

20         How long was this interview?

21   A.    I don't remember.

22   Q.    Would the report help you refresh your recollection

23   in that regard?

24   A.    The report wouldn't contain the duration of the

25   interview.

1    Q.     All right.  Did he tell you at any time the name

2    "Mher"?

3    A.     I don't remember.

4    Q.     Would reviewing your report help refresh your

5    recollection?

6    A.     It may.  The report may not contain every detail --

7    Q.     I understand that.

8    A.     -- of the interview, but I'll look over it.

9           THE COURT:  Again, it's not whether or not it's in

10   the report; it's after reading the report, does it refresh

11   your memory.

12          So we're not interested in what's in the report;

13   we're interested in your memory.

14          THE WITNESS:  I don't remember that name, sir.

15          THE COURT:  If you looked at your report, might you

16   remember that name?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  I want to make sure we're clear on

19   refreshing memory.

20          If it refreshes your memory, that's fine.  But what

21   we don't want is for you to say the report says some name

22   unless it actually refreshes your memory.

23          So go ahead and look and see if it does.

24          THE WITNESS:  I understand, Your Honor.

25                  (Pause while witness reviews document.)

1          THE WITNESS:  After reviewing the report, it does

2    not refresh my memory about that name.

3    BY MR. SEVERO:

4    Q.    How about the name Emil?  Did he mention Emil?

5    A.    He did, sir.

6    Q.    And that you answered right away, without having to

7    review your report.

8    A.    I just reviewed the report.  That was one of the

9    names I remember.

10   Q.    So the two names he mentioned were Arman and Emil;

11   correct?

12   A.    That is correct.

13   Q.    And then he said "other people"; correct?

14   A.    He said, "Arman and Emil."

15         To be clear, I'm not a perfect report writer, and he

16   might have said other names.  Those are the two names that

17   I can remember.

18         THE COURT:  Okay.

19   BY MR. SEVERO:

20   Q.    Okay.  How much time did you spend at Quantico?

21   A.    Five months, sir.

22   Q.    And during that time, isn't one of the specific

23   classes that you take in report writing?

24   A.    We were trained on report writing.

25   Q.    And you are required to tell all the important --

1        THE COURT:  Counsel, I'm sorry.  This is trying to

2    impeach an impeaching witness, and it's not proper.

3        MR. SEVERO:  No, it's not -- well, I wasn't trying

4    to impeach him.

5        THE COURT:  Well, I don't know why it's otherwise

6    relevant.  He said he did what he did.  And some things he

7    can remember and some things he didn't.

8        MR. SEVERO:  I was going to the imperfect report

9    writing.

10       THE COURT:  No, he's already said he's an imperfect

11   report writer.

12   BY MR. SEVERO:

13   Q.    Well, if he mentioned people by name, that's

14   something you would include; correct?

15   A.    I would make every attempt to put as many names and

16   numbers as I can remember.

17   Q.    All right.  Fair enough.

18         The two names you remember, Arman and Emil; correct?

19   A.    Correct.

20   Q.    And it was short --

21         How did you -- what did you do with the report?

22   A.    The way complaint duty works, if it's a viable

23   complaint, we produce this type of report and enter it into

24   the system.  And we usually run a few basic searches on

25   names, on locations, on individuals therein to find out if

1    there's any FBI connection, any case information that we

2    have.

3            So with this particular report, I entered it into

4    the system, and I contacted Special Agent Jeremy Stebbins

5    because -- I'm not sure which names, but names came up that

6    overlapped some investigation that he had ongoing.

7    Q.    All right.

8    A.    So I apprised him of it, and it was taken from

9    there.

10   Q.    All right.  Just to be clear on this, you had no

11   last names for either Arman or Emil; is that true?

12   A.    Correct.

13   Q.    And do you remember whether this Mr. Matosyan

14   told -- whether he told you that he had names of

15   individuals, phone numbers, and all the contact

16   information -- account numbers and so forth -- with all the

17   people associated with these payments?

18   A.    He did.  When taking this report, it lays the

19   groundwork for further investigation.

20   Q.    Right.

21   A.    So it was definitely just to refer him and follow

22   on.

23   Q.    I understand.

24          Your Honor, I have no other questions of this

25   witness.

1          THE COURT:  Counsel.

2                    **DIRECT EXAMINATION**

3     BY MR. PEREYRA-SUAREZ:

4     Q.    Good morning, Agent Hanks.

5     A.    Good morning, sir.

6     Q.    Was it about 1:15 in the afternoon on October 26th,

7     2009, that Mr. Matosyan came to the FBI office?

8     A.    I can check my report and see if it matches the

9     time.

10    Q.    Go ahead and refresh your recollection.

11    A.    Okay.

12    Q.    If that helps you.

13    A.    I don't remember the time of day it was, sir.

14    Q.    Was Mr. Matosyan's father with him when he came to

15    the --

16    A.    Yes, sir.

17    Q.    Did you talk to the father as well?

18    A.    I did.

19    Q.    Did Mr. Matosyan tell you that he had paid back

20    approximately $64,000 to a woman named Lusine?

21    A.    He did.  A portion to her, and then continued to

22    pay, as I understand it.

23    Q.    And did he also mention an amount of $40,000?

24    A.    He did.

25    Q.    What did he say about the $40,000?

1    A.     I remember the $40,000 was collected by -- through

2    Arman and his men.  I guess Arman remotely, from the

3    understanding I had, was incarcerated, and he had a team of

4    collectors.

5    Q.     And did he tell you that Arman was trying to collect

6    money on behalf of Lusine?

7    A.     Correct.

8    Q.     Did he also mention an amount of $140,000?

9           MR. ESTRADA:  Objection, Your Honor.  Hearsay,

10   improper impeachment.

11          THE COURT:  Overruled.

12          Do you remember him saying anything about 140,000?

13          THE WITNESS:  No, sir.

14          THE COURT:  Okay.

15   BY MR. PEREYRA-SUAREZ:

16   Q.     With respect to the amounts of money that

17   Mr. Matosyan said he had paid to Lusine or to Arman, did

18   you or anybody else at the FBI, to your knowledge,

19   investigate whether or not that had actually happened?

20   A.     Sir, I took the report and passed it forward.  I

21   can't speak to the investigation thereafter.

22   Q.     You, yourself, did not investigate whether or not

23   that actually happened?

24   A.     I did not.

25   Q.     To your knowledge, did anybody else at the FBI, on

1    or about October 26th, 2009?

2    A.    Not to my knowledge.

3    Q.    So you simply took the report and put it in a file;

4    correct?

5    A.    I took the report, and I contacted the associated

6    agent and referred it to his investigation.  I also

7    contacted the Los Angeles Police Department to report

8    potential -- people in potential harm's way, and then

9    contacted L.A. County Sheriff's Office regarding some

10   outstanding warrants.  It was a series of follow-on steps

11   that I took.

12   Q.    All right.  Did you make reports of those contacts

13   to the sheriff's office or to the Los Angeles Police

14   Department?

15   A.    They're all contained in the same report, sir.

16   Q.    To your knowledge, did Mr. Matosyan provide you with

17   any receipts for monies paid?

18   A.    He did not.  At the complaint desk, we do not take

19   potential evidentiary items.  We take the report and

20   forward it on to the appropriate specialized investigator

21   for that particular category of crime.

22   Q.    And I think you mentioned an associated agent.  Who

23   was that?

24   A.    Jeremy Stebbins.

25   Q.    So whatever you learned from Mr. Matosyan, you

1    relate to Agent Stebbins; correct?

2    A.    I referred Special Agent Stebbins to my report.

3    Q.    And did you have follow-up conversations with

4    Agent Stebbins regarding your report?

5    A.    I can't remember, sir.

6    Q.    Did Agent Stebbins ever report to you what, if any,

7    investigation he conducted after getting your report

8    regarding the amounts of monies that Mr. Matosyan claimed

9    to have paid?

10   A.    Not to my recollection.

11         MR. PEREYRA-SUAREZ:  I have nothing further,

12   Your Honor.

13         MR. FLIER:  No, sir, thank you.

14         THE COURT:  Okay.  Cross.

15                    **CROSS-EXAMINATION**

16   BY MR. ESTRADA:

17   Q.    Good morning, sir.

18   A.    Good morning.

19   Q.    You mentioned when you're on complaint duty, you do

20   a report because -- if there's a viable complaint.

21         What do you mean by that?

22   A.    All sorts of people call into the FBI, and all sorts

23   of people walk into the FBI from various circumstances with

24   various stories or complaints to file.

25         And those who are on complaint duty and staffing the

1    phones and addressing those complaints have to sift through

2    the various complaints and either refer them to other

3    agencies or address whether or not they meet the threshold

4    of warranting FBI investigation involvement, and then also

5    to address those that may be those who would come in and

6    file repeat false complaints or things like that.  So we

7    have to make a determination if it warrants further

8    involvement.

9        More often than not, the complaint duty of the day

10   is not a specialist in all the complaints that come in, and

11   so we file reports.  When in doubt, you file a report and

12   you refer it to a squad or the supervisor of the squad, who

13   investigates that type of crime.

14   Q.    Did you believe this complaint to be a viable

15   complaint?

16   A.    I did.

17   Q.    Now, you were asked about names that were given.

18   Did the person who came in, Minas, M.M., did he mention a

19   bunch of names?

20   A.    He -- he mentioned very few names.  I recorded what

21   I could remember.

22   Q.    When you do your report, is it a verbatim report?

23   A.    No, sir.

24   Q.    What is it?

25   A.    The purpose of the complaint report is to put down

1    as much information as you can for the use of basically a

2    starting point for an investigator down the road.

3    Q.    And you recall this, the person complaining, M.M.,

4    mentioned the ringleader?

5    A.    He referred to "Arman."

6    Q.    Did he refer to people working for Arman as

7    "intimidators"?

8    A.    He did.

9         MR. ESTRADA:  No further questions, Your Honor.

10        THE COURT:  Redirect?

11        MR. SEVERO:  None.

12        THE COURT:  Counsel?

13        MR. PEREYRA-SUAREZ:  Nothing further, Your Honor.

14        MR. FLIER:  No, Your Honor.

15        THE COURT:  You may step down.  Thank you for coming

16   in.

17        Next witness.

18        MR. SEVERO:  Defense calls Deputy Tunstall.  May I

19   get him?

20        THE COURT:  Yes, please.

21        THE WITNESS:  Should I leave these here?

22        THE COURT:  Why don't you give them to the clerk,

23   please.

24        MR. ESTRADA:  Your Honor, just one matter before the

25   witness is called, is victim M.M. excused?

1          THE COURT:  I'm assuming.  Nobody's asked for him to

2   be held.

3          MR. ESTRADA:  Very good.  Thank you, Your Honor.

4          MR. SEVERO:  And to make a complete record, the

5   defense calls Deputy Tunstall.

6          THE COURT:  Yes, good morning.

7          THE CLERK:  Right here, please.

8                       **SETH TUNSTALL,**

9      DEFENSE WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

10         THE CLERK:  Do you solemnly swear the testimony you

11  shall give in the cause now pending before this Court shall

12  be the truth, the whole truth, and nothing but the truth,

13  so help you God?

14         THE WITNESS:  Yes.

15         THE CLERK:  Thank you.  You may be seated.

16         May I please ask you to state your full name and

17  spell your last name for the record.

18         THE WITNESS:  Deputy Seth Tunstall, T-u-n-s-t-a-l-l.

19         MR. SEVERO:  May I inquire?

20         THE COURT:  Yes, please.  Your Honor.

21                   **DIRECT EXAMINATION**

22  BY MR. SEVERO:

23  Q.    Good morning, Deputy Tunstall.

24  A.    Good morning.

25  Q.    What is your occupation and current assignment,

1    please?

2    A.    Currently assigned as a deputy sheriff to the

3    federal Santa Ana gang task force in Orange County.

4    Q.    How long have you been so assigned?

5    A.    Just under five years.

6    Q.    As a part of the federal Santa Ana gang task force,

7    do you investigate the Mexican Mafia?

8    A.    Yes.  That's our primary focus.

9    Q.    Do you investigate all gangs operating in

10   Orange County?

11   A.    Yes, underneath the Mexican Mafia.

12   Q.    No gangs outside the Mexican Mafia?

13   A.    I also have a focus on the Aryan Brotherhood, but my

14   main focus over there is the Mexican Mafia.

15   Q.    Very good.  So items that concern gang activity that

16   include Mexican Mafia fall under your umbrella?

17   A.    That's correct.

18   Q.    And are you acquainted with Agent Jeremy Stebbins?

19   A.    I have heard the name.  I haven't personally met

20   him.

21   Q.    Met him?

22   A.    Met him.

23   Q.    Any activities that are -- deal with Orange County

24   gangs are referred to your office?

25   A.    Yes, primarily.  Sometimes they get referred

1  outside, but they normally funnel back to us.

2  Q.    All right.  When did you -- do you know a person by

3  the name of Armando Moreno?

4  A.    Yes, I do.

5  Q.    When did you first meet Mr. Moreno?

6  A.    I believe I first personally spoke to him -- would

7  have been around the beginning of April 2009.

8  Q.    When you first spoke to him?

9  A.    Yes.

10  Q.    And after you first met him in 2009, did you meet

11  him thereafter soon?  I'm sorry.  Did you meet him soon

12  after April of 2009?

13  A.    To explain, he was in custody in the Orange County

14  jail, and I was involved in overseeing all of his

15  activities, any mail that he was sending out, any phone

16  calls that he was involved in.  That was about

17  approximately a four-month period before he was transferred

18  to state prison.

19  Q.    Okay.  Just so we understand what's going on here --

20  A.    Yes.

21  Q.    -- in April of 2009, he was held at the Santa Ana

22  jail?

23  A.    Actually, Theo Lacy Facility in the city of Orange.

24  Q.    Okay.  So that is a county jail for Orange County;

25  is that correct?

1   A.     Yes, it's a max-security jail.

2   Q.     Right.  And he was being held there on new charges

3   or a parole violation?

4   A.     On a miscellaneous state charge.

5   Q.     Miscellaneous state charge.

6          Did you actually interview him in April of 2009?

7   A.     Yes, briefly.  I also took pictures of his tattoos.

8   Q.     All right.  Did you, by any chance, turn those over

9   to the FBI?

10  A.     They were included in our case file for Operation

11  Black Flag, which went down in July 2011.

12  Q.     All right.  When was the first time -- let me ask

13  you this:  At some point, did you learn that Mr. Moreno had

14  been charged in a federal case in Los Angeles?

15  A.     Yes.  I had heard that.  I believe it would have

16  been around -- it would have been around the time when the

17  Armenian case went down, which was, I believe, a year prior

18  to our case going down.

19  Q.     Well, there were a number of Armenian cases, weren't

20  there?

21  A.     Yes.  I believe the one that he was indicted on was

22  around February of 2010, if I'm correct.

23  Q.     2011?

24  A.     My fault.  2011, yes.

25  Q.     So when you next interviewed Mr. Moreno, was it

1    after the takedown on the Armenian case in 2011?

2    A.    I did not speak again to Armando Moreno until, I

3    believe, the first time we did a proffer with him, which

4    would have been around November 2011.

5    Q.    Right.  Well, before you came to court today, did

6    you have an opportunity to review your case file?

7    A.    Yes, I did.

8    Q.    And did you review the different dates upon which

9    you interviewed Mr. Moreno?

10   A.    Yes.  There were several.

11   Q.    Did Mr. Moreno agree to cooperate in your case?  And

12   I'm talking about the case that you took down, I think you

13   said, in the summer of 2011?

14   A.    Yes, July 13th, 2011.

15   Q.    Was he indicted in that case?

16   A.    He was, yes, under the RICO conspiracy.

17   Q.    All right.  And the lead defendant in that case

18   was -- would be Ojeda?

19   A.    Yes.  It was Peter Ojeda, Armando Moreno, and Albert

20   Vargas.

21   Q.    And a number of others?

22   A.    Yes.  They were the three main Mexican Mafia

23   members.

24   Q.    So at what point did Mr. Moreno agree to cooperate

25   with you in connection with his activities?

1    A.    When we first spoke to him.  I believe it would have

2    been November of 2011.

3    Q.    All right.  So in November of 2011, were you aware

4    of whether he was cooperating anywhere else in any other

5    case?

6    A.    Yes.  I had heard that he had done an interview with

7    reference to an Armenian case, but I didn't know the

8    details about that.

9    Q.    And did you interview him with respect to his

10   activities in the Mexican Mafia?

11   A.    Yes, I did.

12   Q.    You didn't restrict your interview to anything that

13   happened just in Orange County, did you?

14   A.    I primarily focused on the activities in

15   Orange County.

16   Q.    But did you restrict your interview to

17   Orange County?

18   A.    No.  I believe there might have been a few topics

19   outside the county, but Orange County was the main focus.

20   Q.    Were you not concerned about gang activities of the

21   Mexican Mafia that he was involved in anywhere else?

22   A.    No, I wouldn't say I wasn't concerned.  I am

23   obviously concerned about the activities, but my main focus

24   is the expertise reference, what's going on in

25   Orange County.

1    Q.      Are you the lead investigator in the Orange County

2    case?  And I'm referring to the Ojeda case.

3    A.      Yes.  I'm one of the three case agents.

4    Q.      At some point, were you aware that Mr. Moreno had

5    entered into a plea agreement with the federal government?

6    A.      Reference -- which case?

7    Q.      The Ojeda case.

8    A.      Yes, I was aware.

9    Q.      Do you know when that happened?

10   A.      I don't have that date in front of me, no, I don't.

11   Q.      Now, you prepared a number of reports in connection

12   with his activities; is that correct?

13   A.      Yes, sir.

14   Q.      In connection with his interviews?

15   A.      Correct.

16   Q.      And every report that is prepared is prepared

17   shortly after the interview?

18   A.      Yes.  We try to get it done as soon as possible,

19   depending on workload.

20   Q.      Of course.  And would you be using your notes, or

21   would you record the interviews?

22   A.      Mainly my notes, and then after the notes are put

23   into the report, I would shred the notes because I put all

24   my details into the report.

25   Q.      Did you record any of the interviews with

1    Mr. Moreno?

2    A.    No, we did not.

3    Q.    All right.  In the proffers that -- what I mean by

4    "proffers," is the interviews.

5    A.    Yes, sir.

6    Q.    In the interviews that you had with Mr. Moreno, did

7    you ask an open question -- open-ended question like,

8    "Anything else you want to let us know?"

9            MR. ESTRADA:  Objection, Your Honor.  Relevance.

10           THE COURT:  Overruled.

11           THE WITNESS:  I believe we did, and I believe the

12    context of any information he gave is in those reports.

13    BY MR. SEVERO:

14    Q.    At any point on -- I mean, I'll direct your

15    attention to the interview of November of 2011.  Did

16    Mr. Moreno tell you what his activities were concerning any

17    Armenian gangs?

18           MR. ESTRADA:  Objection, Your Honor.  Improper

19    impeachment.

20           THE COURT:  Is this being offered for impeachment?

21           MR. SEVERO:  For impeachment of Mr. Moreno.  He was

22    asked about this.

23           MR. ESTRADA:  There's no inconsistent statement,

24    Your Honor.

25           THE COURT:  I don't remember any inconsistent

1   statement on this, Counsel.  Did he say -- did he not talk

2   to him?  I don't recall that.

3           So it will be sustained.

4           MR. SEVERO:  All right.

5   BY MR. SEVERO:

6   Q.     Did he tell you in his interview in March of 2012

7   about his involvement with --

8           Well, let me put it this way:  Did he tell you in

9   March of 2012 about his assignment in the Mexican Mafia to

10  kill Ralph Perico Rocha?

11          MR. ESTRADA:  Objection, Your Honor.  Inconsistent

12  statement.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes.  He stated that, I believe,

15  Ralph Rocha was to be killed.

16  BY MR. SEVERO:

17  Q.     And did he tell you that he had an order from the

18  Mexican Mafia membership at Pelican Bay?

19          THE COURT:  Counsel, he is -- again, it will be

20  sustained.  It's not impeachment.  He's saying the same

21  thing that Mr. Moreno said here.

22          MR. SEVERO:  Well, it's just foundational to the

23  next question.

24          THE COURT:  Why don't we go to the next question,

25  then.

```
 1            MR. SEVERO:  All right.

 2   BY MR. SEVERO:

 3   Q.     Did he tell you that he used a member of the -- of

 4   an Armenian gang to lure Mr. Rocha in order to kill him?

 5            MR. ESTRADA:  Again, Your Honor.  There's no

 6   inconsistent immaterial statement.

 7            MR. SEVERO:  That was directly asked of Mr. Moreno.

 8            THE COURT:  It's got to be impeachment, not just

 9   whether it was asked or not.

10            MR. SEVERO:  Well, I asked --

11            THE COURT:  Mr. Moreno never denied that he said

12   that he did that.

13            MR. SEVERO:  Right, but that's the whole point is

14   that he never told this --

15            THE COURT:  Let me try to ask it for you.

16            Did he ever deny that he was asked by somebody in

17   the Armenian gang to -- or to work with someone in the

18   Armenian gang to set up Mr. Rocha?

19            Did he ever deny that to you?

20            THE WITNESS:  I don't believe we spoke about the

21   Armenians.

22            THE COURT:  Okay.  Okay.

23   BY MR. SEVERO:

24   Q.     You never spoke about the Armenian -- any Armenian

25   luring Mr. Rocha to be killed?
```

1    A.    I don't recall that topic, no.

2    Q.    Would looking at your report help refresh your

3    recollection on that topic?

4    A.    I could, but I'm pretty sure there wasn't a mention

5    of Armenians in our discussions.

6    Q.    Mr. Moreno never told you that he had conducted gang

7    activities with the Armenians?

8          MR. ESTRADA:  Again, Your Honor, improper

9    impeachment.

10         THE COURT:  Sustained.

11         MR. SEVERO:  That's all I have.  Thank you.

12         THE COURT:  Counsel?

13         MR. PEREYRA-SUAREZ:  No question, Your Honor.

14         THE COURT:  Counsel?

15         MR. FLIER:  No questions, Your Honor.

16         THE COURT:  How about you, Counsel?

17         MR. ESTRADA:  Your Honor, just one question.

18                    **CROSS-EXAMINATION**

19   BY MR. ESTRADA:

20   Q.    Just to be clear, you never asked Moreno anything

21   about Armenian Power?

22   A.    No, we did not.  And the reason for that is we knew

23   that the FBI and investigators referenced in the Armenian

24   case were covering that topic, and they were the experts in

25   that field and we were not.

1      MR. ESTRADA:  No further questions, Your Honor.

2      THE COURT:  Redirect in that area?

3      MR. SEVERO:  In view of that excerpt --

4      THE COURT:  Sure.

5                    **REDIRECT EXAMINATION**

6  BY MR. SEVERO:

7  Q.     The overlap regarding killing Perico Rocha would be

8  something of your concern, wouldn't it?

9  A.     Yes, it would.

10  Q.     And any person that was used in order to accomplish

11  killing Mr. Rocha would be something you'd be interested

12  in, wouldn't it?

13  A.     Yes, it could be.

14  Q.     And the fact is that there was never any mention of

15  any Armenian conspiring with Mr. Moreno to kill -- to lure

16  Mr. Rocha to be killed.

17      MR. ESTRADA:  Your Honor, there's no inconsistent

18  statement.

19      THE COURT:  No inconsistent statement and it would

20  be hearsay.

21      MR. SEVERO:  Is that sustained?

22      THE COURT:  It would be hearsay.  And if it's not

23  offered for impeachment and there's no inconsistent

24  statement -- so it wouldn't be offered for impeachment.

25  Therefore, it's hearsay.  Therefore, it's sustained.

```
 1          MR. SEVERO:  May I respectfully disagree?

 2          THE COURT:  Counsel, I'm assuming that almost any

 3    ruling I make, one side or the other is going to disagree

 4    with it.

 5          MR. SEVERO:  That's true.

 6          That's all I have.  Thank you.

 7          THE COURT:  Okay.

 8          MR. ESTRADA:  No questions, Your Honor.

 9          THE COURT:  You may step down.

10          All right.  Next witness.

11          MR. SEVERO:  Defense calls Sergeant Rafael Quintero.

12          THE CLERK:  Good morning.  I'll need to place you

13    under oath again, please.

14                        RAFAEL QUINTERO,

15        DEFENSE WITNESS, IS SWORN, TESTIFIED FURTHER:

16          THE CLERK:  Do you solemnly swear the testimony you

17    shall give in the cause now pending before this Court shall

18    be the truth, the whole truth, and nothing but the truth,

19    so help you God?

20          THE WITNESS:  I do.

21          THE CLERK:  Thank you.  You may be seated.

22          May I please ask you to restate your name for the

23    record and spell your last name.

24          THE WITNESS:  Rafael Quintero, last is

25    Q-u-i-n-t-e-r-o.
```

1          THE COURT:  Okay.  You may inquire.

2          MR. SEVERO:  Thank you.

3                    **DIRECT EXAMINATION**

4    BY MR. SEVERO:

5    Q.    Good morning.

6    A.    Good morning.

7    Q.    What is your occupation and assignment?

8    A.    Police sergeant with the Glendale Police Department.

9    Q.    And how are you assigned now?

10   A.    Police sergeant, to patrol.

11   Q.    Directing your attention to 2009, were you a patrol

12   sergeant?

13   A.    No.

14   Q.    Were you a patrol officer?

15   A.    I was a gang detective.

16   Q.    And as a gang detective, did you have occasion to

17   conduct parole searches?

18   A.    Yes.

19   Q.    Did you conduct a parole search of Mher Darbinyan in

20   March of 2010?

21   A.    I conducted a parole search.  I don't recall the

22   exact date.

23   Q.    Do you recall the approximate date?

24   A.    No.

25   Q.    What year?

```
 1   A.     No.

 2   Q.     Did you write a report on this?

 3   A.     Not that I recall.

 4          MR. SEVERO:  May I have a moment, Your Honor?

 5          THE COURT:  Certainly.

 6              (Pause while counsel reviews documents.)

 7          MR. SEVERO:  I'm going to attempt this.

 8          Your Honor, I have a photograph that was produced in

 9   discovery that I would ask to publish.

10          THE COURT:  Okay.

11          MR. ESTRADA:  Your Honor, I'd like to take a look at

12   it, first.  None of this has been entered into evidence.

13          THE COURT:  Sure.

14              (Pause while counsel confer.)

15          MR. ESTRADA:  Your Honor, foundation hasn't been

16   laid yet, but I have no issue with him showing it to the

17   witness to see if it refreshes his recollection.

18          THE COURT:  Okay.

19          MR. SEVERO:  May I publish it?

20          THE COURT:  Yes, please.

21          Do you object to it being published at this time

22   until the foundation is laid?

23          MR. ESTRADA:  Yes.

24          THE COURT:  He said -- did you want to refresh his

25   memory with it first, to lay the foundation, you can.
```

1     MR. SEVERO:  Well, I would have to approach with the

2  computer.

3     THE COURT:  Well, I thought you asked could you

4  publish it.  You can approach the clerk and show him the

5  exhibit.

6     MR. SEVERO:  I understand.  I need to get rid of all

7  of this stuff.

8     THE COURT:  Okay.  No problem.

9     THE CLERK:  He only has it on his computer.

10         *(Pause while counsel reviews documents.)*

11     THE COURT:  I understand the problem now, Counsel.

12  The photo is only on the computer.  Is that the problem?

13     MR. SEVERO:  That is it, sir.  And I mean, I can --

14     THE COURT:  Counsel, why don't we publish subject to

15  a motion to strike or subject to --

16     MR. ESTRADA:  It's a laptop.  It's portable, but

17  that's fine, Your Honor.

18     THE COURT:  Why don't you go ahead and publish it.

19  We can save some time this way.

20         Counsel, are we marking these, or are they

21  previously marked?

22     MR. SEVERO:  They have not been previously marked,

23  and I would ask that it be marked as Exhibit 500.

24     THE COURT:  At this time, they'll be so marked.

25         *(Exhibit 500 marked for identification.)*

```
 1          MR. SEVERO:  Anyway, I'm having a little issue here.

 2          All right.  Let's try --

 3          THE COURT:  Sure.

 4          MR. SEVERO:  Hey, it worked.

 5   BY MR. SEVERO:

 6   Q.    Is that you in that picture?  It's kind of blurred.

 7   A.    It looks like me, sir.

 8   Q.    Do you recognize the premises, where you are?

 9   A.    Yes.

10   Q.    Is that Mr. Darbinyan's house?

11   A.    Yes.

12   Q.    At the time that you -- when did you become a gang

13   investigator?

14          MR. ESTRADA:  Objection, Your Honor.  It's been

15   shown to him to refresh his recollection.  It has no

16   relevance beyond that.

17          THE COURT:  Well, I don't know.  Why don't we take

18   it off until we get back to the picture.

19          Leave it on just for a second.  Let me see

20   something.

21          MR. SEVERO:  I've offered it in evidence,

22   Your Honor.

23          THE COURT:  No, it's marked.

24          MR. SEVERO:  It's marked.  May I offer it in

25   evidence?
```

1        THE COURT:  Just a minute.

2              (*Pause while the Court reviews exhibit.*)

3        THE COURT:  Seems to me there is something I can --

4    okay.  That way you can show it to the witness without the

5    jury seeing it.

6        MR. SEVERO:  Sure.

7        THE COURT:  It's been marked at this time.  The

8    relevance?

9        MR. SEVERO:  No, I don't need to -- except to

10   refresh his recollection regarding Darbinyan.

11       THE COURT:  Okay.

12   BY MR. SEVERO:

13   Q.    Does that refresh your recollection of being at

14   Mr. Darbinyan's house?

15   A.    Yes.

16   Q.    When did you become a gang detective?

17   A.    November 2004.

18   Q.    And when did you end that assignment?

19   A.    January 2012.

20   Q.    You testified in this case earlier for the

21   prosecution, did you not?

22   A.    Yes.

23   Q.    And you had some involvement with the investigation

24   of Armenian Power?

25   A.    Correct.

1  Q.    And this parole search was conducted in --

2  consistent with that assignment?

3  A.    Yes.

4  Q.    At the time that you appeared at Mr. Darbinyan's

5  house, was he there?

6  A.    Yes.

7  Q.    Was his wife there?

8  A.    Yes.

9  Q.    Were their children there, if you remember?

10  A.    I don't remember, but looking at the picture, I

11  would say yes.

12  Q.    Okay.  Did you -- at the time that you searched

13  Mr. Darbinyan's home, did you find any weapons?

14  A.    Not that I recall.

15  Q.    Did you find any stolen credit cards?

16  A.    Not that I recall.

17  Q.    Did you find any stolen debit cards?

18  A.    Not that I recall.

19  Q.    Did you find any ammunition?

20  A.    Not that I recall.

21  Q.    Did you find any documents that would -- strike

22  that.

23        Did you find any point of service or PIN pad

24  machines for credit cards?

25  A.    Not that I recall.

1   Q.    Did you find any bank account information?

2   A.    I think there were bank account information.

3   Q.    All right.  Did you seize that bank account

4   information?

5   A.    That I do not recall.

6   Q.    Did you find any account information or credit card

7   information that did not belong to Mr. Darbinyan or his

8   wife?

9   A.    I don't recall.

10        MR. SEVERO:  Just a moment, Your Honor.

11             (Pause while counsel reviews documents.)

12  BY MR. SEVERO:

13  Q.    Who was with you on this search that day?

14  A.    Normally, when we do a search, it's the whole -- the

15  entire gang unit.  I'm not sure who was there that day.

16  From looking at the picture, I know one of the persons was

17  Sergeant Bickel (phonetic).  I want to say Detective Riley

18  and Detective Meyer were also present.

19  Q.    Very well.  Was Sergeant Stohl there with you?

20  A.    I'll say he was.

21  Q.    You'll say he was?

22  A.    If I remember correctly.

23  Q.    All right.

24  A.    I don't know if it was that one or a different time

25  we were at the residence.

```
1    Q.    If I show you some documents, would that refresh

2    your recollection as to whether you seized these documents

3    on that day?

4    A.    Yes.

5          MR. SEVERO:  May I, Your Honor?

6          THE COURT:  Yes.

7          MR. SEVERO:  I'll hand these to the clerk.  They are

8    four pages.

9          MR. ESTRADA:  If I could just take a look, please.

10         THE COURT:  Sure.

11             (Pause while counsel reviews documents.)

12         MR. ESTRADA:  Thank you.

13         THE COURT:  Okay.  And, again, I have to admonish

14   every witness -- when something is being shown to you to

15   refresh your memory, you can look at it, then put it aside,

16   and then just testify from what your memory is.

17         It may or may not refresh your memory.  You're not

18   to testify as to what's in the report.  You're to testify

19   to what you remember after seeing the report.  Okay?

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  Go ahead, Counsel.

22         MR. SEVERO:  Thank you.

23   BY MR. SEVERO:

24   Q.    Does that refresh your recollection at all as to

25   whether you seized bank account documents?
```

```
 1   A.    No.

 2   Q.    You participated in the -- sorry.  Just a moment.

 3              (Pause while counsel reviews documents.)

 4         MR. SEVERO:  That's all I have.

 5         THE COURT:  Okay.

 6         Counsel, do you have any questions?

 7         MR. PEREYRA-SUAREZ:  No questions, Your Honor.

 8         MR. FLIER:  Very briefly, Your Honor.

 9         THE COURT:  Sure.

10                     DIRECT EXAMINATION

11   BY MR. FLIER:

12   Q.    Good morning, again.

13   A.    Good morning, sir.

14   Q.    I believe I heard that with -- any gang involvement

15   that you have at the Glendale Police Department started in

16   2004?

17   A.    As far as participating and being a part of the gang

18   unit, yes.

19   Q.    And then that ended in 2012?

20   A.    January, yes.

21   Q.    In 2009, were there any gang files relating to my

22   client, Mr. Parsadanyan?

23   A.    Who is your --

24         MR. FLIER:  Can you please stand up.

25              (Defendant Parsadanyan briefly stands.)
```

```
 1              THE WITNESS:  I'm not aware of him.

 2    BY MR. FLIER:

 3    Q.     Okay.  And with respect to the questions by my

 4    co-counsel about the search of Mr. Darbinyan's residence,

 5    my only question is:  Did you find any documentation,

 6    paperwork, or anything that mentions Mr. Parsadanyan's name

 7    at Mr. Darbinyan's residence, if you recall?

 8    A.     I don't recall.

 9              MR. FLIER:  Thank you.  I have no further questions.

10              THE COURT:  Cross?

11              MR. ESTRADA:  Yes, Your Honor.

12                    CROSS-EXAMINATION

13    BY MR. ESTRADA:

14    Q.     Good morning, Sergeant Quintero.

15    A.     Good morning.

16    Q.     Now, you were asked about items found at Darbinyan's

17    location?

18    A.     Yes.

19    Q.     You were asked if any credit cards were found?

20    A.     Yes.

21    Q.     Point-of-sale terminals?

22    A.     Yes, sir.

23    Q.     Firearms?

24    A.     Yes.

25    Q.     Ammunition?
```

1   A.      Yes.

2   Q.      None of that was found?

3   A.      Not that I recall.

4   Q.      Now, based on your time as an officer --

5           How long have you been a gang investigator?

6           THE COURT:  I'm sorry, Counsel.

7           Why don't you take down whatever is on the screen at

8   this time.

9           MR. SEVERO:  I'm sorry.  I wasn't aware that it was

10  showing anymore.

11          THE COURT:  It's not for the jury, but it is for me.

12          MR. SEVERO:  Oh, sorry.

13          MR. ESTRADA:  It's down, Your Honor.

14          MR. SEVERO:  Thank you.

15  BY MR. ESTRADA:

16  Q.      How long have you been a gang investigator?

17  A.      It was -- almost eight years.

18  Q.      How long have you been an officer?

19  A.      This year will be 15 years.

20  Q.      Are you familiar with dealing with people who are on

21  parole or probation?

22  A.      Yes.

23  Q.      Based on your training and experience dealing with

24  people on parole or probation, do they tend to keep illegal

25  items in their houses?

1   A.      No.

2   Q.      Can you explain that?

3   A.      Normally, when people are on probation or parole,

4   they give a listed address to their probation or parole

5   officer.   It's common for them not to give the place of

6   residence, their true place of residence.

7          The reason being is obviously they don't want to get

8   caught with items or be involved in any type of criminal

9   activity, which could violate their probation or parole.

10         So normally they have what you call a "safe house,"

11  whether it's a girlfriend or family somewhere else that's

12  not their listed location.

13  Q.      Are you familiar with people on parole keeping

14  illegal items with other associates?

15  A.      Yes.

16  Q.      Other people?

17  A.      Yes.

18  Q.      And people on parole keeping criminal items with

19  other individuals who they control?

20  A.      Yes.

21  Q.      Also as a gang detective, are you familiar with

22  shot-callers?

23  A.      Yes.

24  Q.      What's a shot-caller?

25  A.      A person of status, someone that's respected, a

1    leader, informal.

2    Q.    Generally speaking, do shot-callers direct others in

3    their groups?

4          MR. SEVERO:  Objection, "generally speaking" is

5    irrelevant.

6          THE COURT:  Sustained.

7    BY MR. ESTRADA:

8    Q.    With regard to a shot-caller, are you familiar with

9    the practice of shot-callers having others carry items for

10   them?

11         MR. SEVERO:  It's the same thing as "generally

12   speaking."  It's irrelevant as far as that goes.  We're

13   talking about Mr. Darbinyan.

14         THE COURT:  Well, sustained.  And I'm not too sure

15   it's within the scope.

16         MR. ESTRADA:  I can make it very specific.

17         THE COURT:  Okay.

18   BY MR. ESTRADA:

19   Q.    Did you understand Darbinyan to be a shot-caller?

20         MR. SEVERO:  Objection, hearsay, no foundation.

21         THE COURT:  Overruled.

22         THE WITNESS:  Yes.

23   BY MR. ESTRADA:

24   Q.    Now, you were asked about items that weren't found

25   at his residence.  Are you familiar with shot-callers

1    having others in their group carry criminal items for them?

2           MR. SEVERO:  Objection, irrelevant.

3           THE COURT:  Overruled.

4           THE WITNESS:  Yes.

5           MR. ESTRADA:  No further questions, Your Honor.

6           THE COURT:  Redirect?

7           MR. SEVERO:  Yes.

8                    **REDIRECT EXAMINATION**

9    BY MR. SEVERO:

10   Q.    How many parole searches have you conducted?

11   A.    Hundreds.

12   Q.    And is it your testimony that in every instance you

13   wouldn't find any contraband?

14   A.    We'd find contraband, yes.

15   Q.    Sure.  And is it your testimony that in every

16   instance parole -- parolees do not keep items that they're

17   not supposed to have, like guns, in their homes?

18   A.    A majority of the times, yes.

19   Q.    A majority of the times you find them; correct?

20   A.    No.  The majority of the times you would not find

21   them.

22   Q.    Are you saying that Mr. Darbinyan was -- had given

23   his parole officer an address for his residence that was

24   untrue?

25   A.    No, he gave a true residence.

1    Q.    So when you got there, it was early in the morning,

2    wasn't it?

3    A.    If I remember correctly, yes.

4    Q.    And he was asleep; correct?

5    A.    That I do not recall.

6    Q.    In fact, you photographed his tattoos that day,

7    didn't you?

8    A.    Don't recall.

9    Q.    Is that the only search you conducted, or part of,

10    involving Mr. Darbinyan?

11    A.    I thought there was one additional time.

12    Q.    When was that?

13    A.    I don't recall.

14    Q.    Was it at his home?

15    A.    Yes.

16    Q.    Did you find anything?

17    A.    Not that I recall.

18    Q.    Thank you.

19          MR. SEVERO:  I have nothing further.

20          MR. PEREYRA-SUAREZ:  Nothing further, Your Honor.

21          MR. FLIER:  I have no questions, Your Honor.

22          MR. ESTRADA:  No questions, Your Honor.

23          THE COURT:  You may step down.

24          THE WITNESS:  Thank you, Your Honor.

25          MR. SEVERO:  Defense calls --

1          Just a moment, Your Honor.

2          THE COURT:  Sure.

3              (Pause while counsel reviews documents.)

4          MR. SEVERO:  The defense calls Jeremy Stebbins.

5          THE COURT:  Okay.  Go ahead and place him under oath

6     again.

7                    **JEREMY M. STEBBINS,**

8        DEFENSE WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

9          THE CLERK:  Do you solemnly swear the testimony you

10    shall give in the cause now pending before this Court shall

11    be the truth, the whole truth, and nothing but the truth,

12    so help you God?

13         THE WITNESS:  I do.

14         THE CLERK:  Thank you.  You may be seated.

15         For the record, may I please ask that you state your

16    full name and spell your last name.

17         THE WITNESS:  Jeremy M. Stebbins.  Last name is

18    S-t-e-b-b-i-n-s.

19         THE COURT:  Okay.  You may inquire, Counsel.

20                    **DIRECT EXAMINATION**

21    BY MR. SEVERO:

22    Q.    Good morning.

23    A.    Good morning, sir.

24    Q.    I don't think we have to go over what you do.  We've

25    seen you enough.

```
 1            For the record, you are the lead investigator
 2   concerning this indictment; correct?
 3   A.     Yes, sir.
 4   Q.     And directing your attention specifically to what we
 5   have termed the "M.M. affair," if you will, do you
 6   understand what I'm talking about?
 7   A.     The extortion of victim M.M., yes, sir.
 8   Q.     Did you participate in the investigation of
 9   Mr. Matosyan's complaint?
10   A.     Yes, sir.
11   Q.     How did you become aware that he had complained to
12   the FBI?
13   A.     I was contacted by Special Agent Hanks, who said he
14   had come into the FBI to file a complaint related to being
15   kidnapped and extorted and then subsequently arrested.
16   Q.     Before you were contacted by Agent Hanks concerning
17   the complaint, had you been investigating the alleged
18   extortion of M.M.?
19   A.     Yes, sir.
20   Q.     And you had been investigating it back to June of
21   2009; is that true?
22   A.     Yes, sir.
23   Q.     And is that because it came in through some phone
24   calls you had intercepted pursuant to wiretap orders?
25   A.     Yes, sir.
```

1    Q.    Is it -- did you conduct surveillance of

2    Minas Matosyan?

3    A.    Yes, sir.

4    Q.    Did you conduct that surveillance before

5    October 26th, 2010?

6    A.    2009?

7    Q.    Excuse me.  2009.

8    A.    Yes, sir.

9    Q.    How many times did you conduct surveillance?

10   A.    I couldn't give you a number, sir.  There were

11   several.

12   Q.    More than three?

13   A.    Personally or throughout the investigation?

14   Q.    How about personally.

15   A.    Personally, I believe I was only there for one or

16   two.

17   Q.    All right.  In your -- in the times that you were in

18   surveillance, did you see Mr. Matosyan meet with

19   Mr. Darbinyan?

20   A.    The one time that comes to mind, I did not

21   personally see anything, sir.

22   Q.    My question is:  The one -- the times you did

23   participate, did you see him meet with Mr. Darbinyan?

24   A.    Not personally, sir.

25   Q.    Do you recall what time, when it was that you were

1    involved in that surveillance?

2    A.      June 29th, 2009.

3    Q.      So other times, based on your knowledge of this

4    investigation, was Detective Mark Stohl part of the

5    surveillance of M.M., or Minas Matosyan, at other points?

6    A.      I don't know, sir.

7    Q.      Did you ever observe Mr. Matosyan, if you know

8    personally, go to any businesses in the Glendale area?

9    A.      Prior to October 26th, sir?

10   Q.      Prior to October 26th, yes.

11   A.      I did not personally observe that, sir.

12   Q.      Based on your knowledge of this investigation, other

13   than speaking with Mr. Matosyan, do you have any

14   understanding that he went to any location in Glendale to

15   meet Mr. Darbinyan?

16   A.      Yes, sir.

17   Q.      Other than the -- his own testimony?

18   A.      Yes, sir.

19   Q.      All right.  And when was that?

20   A.      That was in July, perhaps july -- I'd be guessing.

21   Early July 2009.

22   Q.      Based on your knowledge of this investigation, the

23   only phone calls that were -- that were intercepted between

24   Mr. Darbinyan and Mr. Matosyan were between June 29th and

25   July 4th -- is that correct? -- of 2009?

1    MR. ESTRADA:  Objection, misstates the evidence.

2    THE COURT:  Overruled.

3    THE WITNESS:  No.  I don't believe that's true, sir.

4    I believe it was later in July than the 4th.

5    BY MR. SEVERO:

6    Q.    How much later in July?

7    A.    I don't recall, sir.

8    Q.    Was there an August call?

9    A.    Not that I remember, sir.

10   Q.    But certainly nothing later than late in July, based

11   on your best memory; is that true?

12   A.    Between -- directly between Darbinyan and Matosyan?

13   Q.    Yes.

14   A.    Not that I remember, sir.

15   Q.    In fact at some point, Mr. Matosyan, after he went

16   to the FBI, agreed to cooperate and wear a wire; is that

17   correct?

18   A.    That's correct, sir.

19   Q.    And he also agreed to have his own phone calls

20   monitored; correct?

21   A.    Correct, sir.

22   Q.    And during that time when he was cooperating, did

23   you intercept any calls between Mr. Matosyan and

24   Mr. Darbinyan?

25   A.    No, sir.

1    Q.    Did Mr. Matosyan tell you that he had paid 64,000

2    then another $40,000 to Mr. Sharopetrosian?

3    A.    I don't recall the numbers, sir.

4    Q.    Well, did he tell you he paid 64,000?

5    A.    Yes, he paid somewhere in that dollar amount.

6    Q.    Did he say he had paid any more money by the time

7    you interviewed him?

8    A.    Yes, sir.

9          MR. ESTRADA:  Objection, Your Honor.  Improper

10   impeachment.

11         THE COURT:  Overruled.

12         THE WITNESS:  Yes, sir.

13   BY MR. SEVERO:

14   Q.    Okay.  How much money did he say he had paid?

15   A.    I don't remember the number, sir.

16   Q.    You met with Mr. Matosyan on the same date as the

17   time of the complaint?

18   A.    Yes, sir.

19   Q.    Have you had an opportunity to review any of the

20   reports associated with your interviews of Mr. Matosyan?

21   A.    Yes, sir.

22   Q.    When did you last review those reports?

23   A.    Yesterday, sir.

24   Q.    Did you review them all?

25   A.    I don't think I reviewed all of them, sir.

1    Q.    In your first interview with him, was -- I'm sorry.

2          Was it the same day as the complaint?

3    A.    Yes, sir.

4    Q.    And did he mention to you any names associated with

5    people he had dealt with, with respect to this alleged

6    extortion?

7    A.    I don't believe the first day we really got into the

8    details, sir.

9    Q.    Okay.  That was just a brief interview, that first

10   day?

11   A.    It was just to make sure that he was going to be

12   willing to take this all the way to testifying against the

13   defendants.

14   Q.    Right.  Did he testify against the defendant?

15   A.    Yes, he did.

16   Q.    Actually, did you see him being called by the

17   prosecution in this case?

18         MR. ESTRADA:  Objection, irrelevant.

19         MR. SEVERO:  Well, you just said that.

20         THE COURT:  Sustained.  We all know he testified.

21         Next question.

22   BY MR. SEVERO:

23   Q.    All right.  You then met with him on the next day;

24   correct?

25   A.    Yes, sir.

1    Q.    And during that, that was a more comprehensive

2    interview, was it?

3    A.    Yes, sir.

4    Q.    And he gave you the entire story as he best

5    remembered; correct?

6    A.    I believe so, sir.

7    Q.    All right.  Did he mention the name of Arman

8    Sharopetrosian?

9    A.    I don't believe he ever really knew last names, sir,

10   but he said "Arman."

11   Q.    So if he said "Arman" and your report says "Arman

12   Sharopetrosian," how would Sharopetrosian get into that

13   report?

14   A.    Well, if we knew who they were, we would write the

15   names, sir.

16   Q.    All right.  So when he said "Arman," based on your

17   interception of phone calls, you felt you could put into

18   your report "Sharopetrosian" in there; correct?

19   A.    Yeah, I would say so, sir.

20   Q.    Okay.  So, for example, he also told you that he had

21   borrowed money from Lusine Ogandganyan; is that correct?

22   A.    Yes, sir.

23   Q.    And did he say "Lusine Ogandganyan," or did he say

24   "Lusine"?

25   A.    I think he knows Lusine's last name, sir.

1    Q.      So he doesn't know the last name of some of those

2    other people.  Is that what you're --

3    A.      Yes, sir.  That's correct.

4    Q.      All right.

5           THE COURT:  Let me break at this time.  It's

6    10:00 o'clock.  So we're going to break for our morning.

7           Remember the admonishment not to discuss the case

8    among yourselves or with anybody else or form or express

9    any opinions about the matter until it's submitted to you

10   and you retire to the jury room.

11           With that in mind, we'll see you back in 15

12     minutes.

13           THE CLERK:  All rise.

14                   (10:00 a.m., jurors exit courtroom.)

15                   (Recess taken.)

16                   (Jurors enter courtroom.)

17           THE CLERK:  All rise.  This United States District

18   Court is now in session.

19                   (Judge enters courtroom.)

20           THE CLERK:  You may be seated.

21           THE COURT:  Okay.  The record shall reflect that the

22   jurors are all in their respective seats in the jury box,

23   the witness is on the stand, and we're on direct

24   examination.

25           You may continue.

```
 1              MR. SEVERO:  Thank you, Your Honor.

 2              MR. ESTRADA:  Your Honor, I'll just note that

 3     defendant Parsadanyan's counsel is coming.

 4              MR. FLIER:  Sorry, Your Honor.

 5              THE COURT:  Okay.  Counsel, you may continue.

 6              MR. SEVERO:  Thank you.

 7     BY MR. SEVERO:

 8     Q.     In your meeting with Mr. Matosyan on October 27th,

 9     2009, did he mention to you the name "Mher"?

10     A.     I don't believe so.

11     Q.     You don't believe so, or have you reviewed that

12     report?

13     A.     I have reviewed it.  I don't believe it says "Mher."

14     Q.     Can you make certain of that -- or are you certain

15     that it doesn't say "Mher"?

16     A.     I'm not certain.

17     Q.     All right.  Would reviewing it help you determine

18     whether it's certain that it's not there?

19              THE COURT:  Well, you didn't ask him if it was in

20     the report.  You asked him whether or not he mentioned the

21     name.

22              MR. SEVERO:  Right.  He says I don't believe it's

23     there, and he can't tell me with certainly.  So I'd like

24     some certainty.

25              THE COURT:  Well, you asked whether or not the name
```

1    is mentioned, and he said, "I don't believe so."  And now

2    you're asking is it in the report.  I don't know what

3    you're asking -- whether he mentioned it or whether it's in

4    the report.

5    BY MR. SEVERO:

6    Q.    Okay.  You're not sure that it's not in the report?

7    A.    No, I'm not sure that it's not in the report, sir.

8    Q.    But reviewing the report would aid you in

9    determining whether it's actually there or not, wouldn't

10   it?

11        MR. ESTRADA:  Your Honor, objection.  The report's

12   hearsay.

13        MR. SEVERO:  I'm not asking him to tell me what's in

14   the report specifically.

15        THE COURT:  Sure you are.

16        MR. SEVERO:  All right.  I tried.

17   BY MR. SEVERO:

18   Q.    Did you -- if he had mentioned the name "Mher," it

19   would be in the report, would it?

20   A.    Yes, most likely.

21   Q.    And in the --

22        THE COURT:  Did you put it in the report, if you

23   know?

24        THE WITNESS:  I don't recall, sir.

25        THE COURT:  If you reviewed the report, could you

1    tell whether or not you put it in the report?

2         THE WITNESS:  If I reviewed the report, I could tell

3    whether or not "Mher" is in the report.

4         THE COURT:  Well, you could -- on your recollection,

5    after reviewing the report, you could tell us whether it's

6    in there or not?

7         THE WITNESS:  Yes, sir.

8         THE COURT:  Okay.  I don't want to take over, but do

9    you want --

10        MR. SEVERO:  No, I can see that, but I would like

11   him to review the report.

12        THE COURT:  Okay.

13        MR. SEVERO:  And for the record, it's four pages.

14        THE WITNESS:  Thank you.

15        THE COURT:  Okay.  Again, take a look at this, and

16   see if that refreshes your memory and see if you put that

17   in the report.

18        THE WITNESS:  Yes, sir.

19        THE COURT:  Okay.

20             *(Pause while witness reviews document.)*

21        THE WITNESS:  No, sir.  It just says,

22   "Sharopetrosian's associates."

23   BY MR. SEVERO:

24   Q.   So the name Mher Darbinyan doesn't appear -- strike

25   that.

```
 1              If he had said "Mher," you would have put in there
 2      "Mher Darbinyan," wouldn't you?
 3      A.     Yes, sir.
 4      Q.     Now, did he mention the name Emil to you?
 5      A.     Yes, he did, sir.
 6      Q.     And Emil's last name is Airapetian?
 7      A.     That's correct, sir.
 8      Q.     Did you include that in your report?
 9      A.     Yes, sir.
10      Q.     So you included Emil Airapetian, and you included
11      Arman Sharopetrosian, but you didn't include
12      Mher Darbinyan; correct?
13      A.     That's correct, sir.
14      Q.     Now, you next met him the next day, on October 28th.
15      That seems to be -- that was a brief meeting, was it?
16      A.     I don't recall, sir.
17      Q.     Did he mention the name Mher Darbinyan to you?
18      A.     I don't recall, sir.
19      Q.     I want to do this again.
20              Would reviewing the report help refresh your
21      recollection?
22      A.     I suppose, sir.
23              MR. SEVERO:  Let me see if I could save a little
24      time.
25              THE COURT:  Okay.
```

1    BY MR. SEVERO:

2    Q.    On October 29th, you met with him again.  Did he

3    mention the name Emil to you?

4    A.    Did he mention the name Emil?

5    Q.    Yes.

6    A.    I don't recall, sir.

7    Q.    All right.  Did he mention the name Mher?

8    A.    I don't recall, sir.

9    Q.    I have two reports, one dated 10/28 and one 10/29

10   and I'll ask if you could refresh your recollection.

11          MR. ESTRADA:  If I could look at them briefly,

12   Your Honor.

13          THE COURT:  Sure.

14              *(Pause while witness reviews documents.)*

15          THE WITNESS:  Yes, sir.  On the 28th, we just made a

16   payment or made several payments to Sharopetrosian.

17   BY MR. SEVERO:

18   Q.    So the report for October 28th refreshes your

19   recollection as to whether the name "Mher" or the witness

20   Matosyan had mentioned the name "Mher Darbinyan" to you?

21   A.    That's correct, sir.

22   Q.    It doesn't?

23   A.    No, it does not.

24   Q.    It doesn't name it?

25   A.    No, sir.

1    Q.    And on the 29th, have you read that report?

2    A.    Yes, sir.

3    Q.    Does it refresh your recollection as to whether the

4    name Mher Darbinyan came up?

5    A.    Yes, sir.

6    Q.    Does it?

7    A.    No, it does not.

8    Q.    All right.  Now you next met with him on

9    November 2nd -- oh, strike that.

10        On October 29th, does the name Sharopetrosian --

11   strike that.

12        Did he mention the name "Sharopetrosian" on the

13   29th?

14   A.    He mentioned the person we know as Sharopetrosian,

15   yes, sir.

16   Q.    You mentioned Arman; correct?

17   A.    Yes, sir.

18   Q.    And you put "Sharopetrosian" in the report, didn't

19   you?

20   A.    Based on the information that he gave us that he's

21   married to Christine Ogandganyan, that he was in prison.

22   Q.    Right.

23   A.    That's Arman.

24   Q.    Now, did he also mention Emil?

25   A.    Yes, sir.

1   Q.    And you placed that in your report, did you not?

2   A.    Yes, sir.  It's in the report.

3   Q.    The October 29th report?

4   A.    Yes, sir.

5   Q.    Now, directing your attention to November 2nd, you

6   met with him again; correct?

7   A.    Yes, sir.

8   Q.    And on November 2nd, did he mention to you the name

9   Mher Darbinyan or Mher?

10  A.    I don't believe so, sir.

11  Q.    And on November 4th -- let me see.

12        On November 2nd, he mentioned a number of names;

13  correct?

14  A.    I'd have to look at the report, sir.

15  Q.    All right.  You don't remember?

16  A.    I don't remember which names he mentioned, sir.

17  Q.    Do you remember -- did he mention Arman?

18  A.    I don't recall, sir.

19  Q.    On November 4th, did he mention the name Arman?

20  A.    Yes, sir.

21  Q.    Did he mention the name Mascorro?

22  A.    No, he was --

23        MR. SEVERO:  M-a-s-c-o-r-r-o for the reporter.

24        THE WITNESS:  No.  He was supposed to meet a gang

25  member.  He didn't know his name.

1          MR. SEVERO:  Could I get the ones he has back.

2          THE CLERK:  Sure.

3          MR. SEVERO:  Thank you.

4   BY MR. SEVERO:

5   Q.     And I don't know if I asked you -- on November 4th,

6   did he mention Mher?

7   A.     I don't believe so, sir.

8   Q.     On November 21st of 2009, did he mention the name

9   Mher to you?

10  A.     No, sir.

11  Q.     On November 30th, did he mention the Mher to

12  you?

13  A.     That I don't know, sir.

14  Q.     On November 12th, did he mention the name Mher to

15  you?

16  A.     I don't believe so, sir.

17  Q.     He -- essentially, none of the times you met with

18  him he ever mentioned the name Mher; correct?

19  A.     Back then, sir?

20  Q.     In November 2009 when you met with him.

21  A.     I don't believe so.

22  Q.     At some point, he paid a thousand dollars to Lusine.

23  Do you remember that?

24  A.     He paid several thousand dollars.  I don't know

25  which thousand dollars you're talking about, sir.

1    Q.    Now, let me ask you this:  On October 26th, a report

2    that you had already refreshed your recollection with,

3    Mr. Matosyan told you that he had paid over $16,000 because

4    he had feared for his life.  Do you remember that?

5    A.    I believe it was October 27th, sir.

6    Q.    The October 27th report; is that correct?

7    A.    Yes.

8    Q.    Yes.  But you knew, from your knowledge of the

9    investigation, that he had told Hanks, Agent Hanks, that he

10   had paid $40,000; is that correct?

11   A.    If that's what it said in his report, sir.  I don't

12   have any independent recollection of that.

13   Q.    Well, you heard him testify today --

14        MR. ESTRADA:  Objection, Your Honor.  Commenting on

15   another witness's testimony, and it's hearsay.

16        THE COURT:  Sustained.

17        Next question.

18   BY MR. SEVERO:

19   Q.    Okay.  So you conducted surveillance of Mr. Matosyan

20   on November 4th, 2009?

21   A.    Yes, sir.

22   Q.    And at that time, Mr. Matosyan was cooperating with

23   you?

24   A.    That's correct, sir.

25   Q.    And there were maybe 15, 18 officers assigned to

1    this surveillance?

2    A.    I believe there was 13, sir.

3    Q.    And did you see him meet with Mr. Darbinyan --

4    A.    No, sir.

5    Q.    -- on that day?

6    A.    Not that day, sir.

7    Q.    And, then, you also conducted surveillance on

8    November 21st, 2009, about 17 days after the first

9    surveillance.  Do you remember that?

10   A.    I don't believe that was the first surveillance,

11   sir, but 17 days after November 4th, yes, sir.

12   Q.    Right.  You conducted that.  That you were involved

13   in that surveillance; correct?

14   A.    Yes, sir.

15   Q.    Did you see him meet with Mr. Darbinyan on that day?

16   A.    No, sir.

17   Q.    And you had assigned others to conduct surveillance

18   of Mr. Matosyan after he cooperated with you?

19   A.    Can you rephrase that, sir?

20   Q.    You had assigned other officers to engage in

21   surveillance of Mr. Matosyan, other than yourself, while he

22   was cooperating with you; correct?

23   A.    I believe so, sir.

24   Q.    Surveillance activity that did not include you?

25   A.    That's correct, sir.

1    Q.    Okay.  And it was you who directed or gave the money

2    to Mr. Matosyan to pay on this alleged extortion?

3    A.    Yes, sir, after October 26th.

4    Q.    Right.  And you gave -- on October 28th, you gave

5    him $1,900; is that correct?

6    A.    I don't know if it was October 28th, but I did give

7    him $1,900 to pay Emil Airapetian, sir.

8    Q.    And on October 30th --

9          So on October 28th, did you see him actually pay

10   Emil Airapetian?

11   A.    We had him recorded.  I didn't personally see it.

12   Q.    All right.  But you know he paid Emil?

13   A.    Yes, sir.

14   Q.    And then on October 30th, you -- I mean the FBI --

15   provided $3,177 for payments?

16   A.    Yes, sir.

17   Q.    And those were all the wire transfers we've seen

18   here; correct?

19   A.    Yes, sir.

20   Q.    All right.  And did you accompany him to the Western

21   Union?

22   A.    Yes, I did, sir.

23   Q.    On November 2nd, you gave him $500 and that went to

24   Christine Ogandganyan?

25   A.    Yes, sir.

1    Q.    And on November 4th, you gave him $2,000 that went

2    to Luis Mascorro; correct?

3    A.    Ultimately, it went to the Mexican Mafia, but

4    initially paid to the Mascorros.

5          MR. SEVERO:  I'm going to move to strike that.

6          THE COURT:  It will be stricken.

7    BY MR. SEVERO:

8    Q.    I only asked you if the payment was to

9    Luis Mascorro.

10   A.    You said if it went to Luis Mascorro.  We paid him

11   initially, yes, sir.

12   Q.    On November 21st of 2009 -- strike that.

13         Who -- was it at the direction of Arman that the

14   payment went to Luis Mascorro?

15   A.    Yes, sir.

16   Q.    On November 21st, 2009, you gave -- again, you,

17   meaning the FBI -- gave Mr. Matosyan $3,844.  It's for an

18   extortion payment to Lusine Ogandganyan; is that correct?

19   A.    Yes, sir.

20   Q.    So you did not believe that Lusine Ogandganyan was

21   owed this money legitimately?

22   A.    I never said that, sir.

23   Q.    Was she owed this money?

24   A.    I didn't know whether she was or she wasn't.

25   Q.    Well, didn't he tell you that -- strike that.

1      Didn't Matosyan tell you that he still owed the

2  money to Lusine?

3  A.     I don't remember if he still owed any money, sir.

4  Q.     So five occasions you gave Mr. Matosyan money to

5  make these payments; correct?

6  A.     Approximately five, yes, sir.

7  Q.     Yes.  And in none of them did any of that money go

8  to Darbinyan; correct?

9  A.     Not to my knowledge, sir.

10  Q.     And then in June of '11, two years later, you paid

11  him $15,050 to relocate Mr. Matosyan; correct?

12  A.     Yes, sir.

13  Q.     And did you pay that in cash?  I mean, did you write

14  him a check?

15  A.     I don't believe -- I don't recall how it worked, but

16  I remember speaking to the rental agency and making sure

17  that the money was used for rent.

18  Q.     Right.  So did you pay the rental agency?

19  A.     Yes, sir.

20  Q.     You didn't pay it to Mr. Matosyan, did you?

21  A.     No, sir.

22  Q.     Because you didn't trust him to pay it -- to use the

23  money to do what he wanted to do?

24      MR. ESTRADA:  Objection, improper.

25      THE COURT:  Sustained.

1    BY MR. SEVERO:

2    Q.    Why did you need to make sure that the money went to

3    the rental agency?

4    A.    Because that's what the policy on the paperwork

5    said.

6    Q.    What paperwork?

7    A.    The paperwork with the FBI.

8    Q.    His paperwork with you?

9    A.    We had an agreement, sir, that the money would be

10   used for rental.  And in order for me to do this, I had to

11   pay it to the rental agency with receipts.

12   Q.    Okay.  Do you have an understanding as to what the

13   $15,050 was for?

14   A.    I believe it was either six -- maybe, maybe

15   longer -- six months rent.

16   Q.    And was there a security deposit included in there?

17   A.    I don't recall, sir.

18   Q.    After that date of June 14th, 2011, are you aware of

19   whether he moved from the premises that the FBI had paid

20   for?

21   A.    Yes, he did, sir.

22   Q.    And did you pay for the next move?

23   A.    No, sir.

24   Q.    So the total you provided to him was $26,471; is

25   that correct?

```
 1          MR. ESTRADA:  Objection, Your Honor.  Misstates the
 2   testimony.
 3          THE COURT:  What was the total amount you provided
 4   him?
 5          THE WITNESS:  Related to this case, sir?
 6          THE COURT:  Yes.
 7          THE WITNESS:  Sounds in the right ballpark.
 8   BY MR. SEVERO:
 9   Q.    About 26,000?
10   A.    Twenty-six, twenty-seven, yes, sir.
11   Q.    Okay.  All right.  Let me change subjects.
12          Are you aware of whether several trash searches were
13   made of Mr. Darbinyan?
14   A.    Yes, sir.  There were.
15   Q.    Are you aware of whether any of those searches
16   produced any documentation pertaining to fraudulent credit
17   cards?
18   A.    I don't know, sir.  I wasn't there.
19   Q.    Have you reviewed the information that was retrieved
20   from the trash searches?
21   A.    At some point I may have, but I don't have any
22   independent recollection now.
23   Q.    Is there anything about the investigation in this
24   case that you have not reviewed that you can recall?
25   A.    There are some things, sir.
```

1    Q.    Like trash searches?  That's something you might not

2    be interested in?

3          MR. ESTRADA:  Objection, Your Honor.  Relevance.

4          THE COURT:  Sustained.

5    BY MR. SEVERO:

6    Q.    If something of significance to you in your

7    investigation regarding Mr. Darbinyan had been turned up in

8    the trash search, it would have been called to your

9    attention?

10          MR. ESTRADA:  Objection, relevance.

11          THE COURT:  Overruled.

12          THE WITNESS:  Yes, sir.

13    BY MR. SEVERO:

14    Q.    And when I'm talking about trash searches, it's

15    essentially that.  You go out to the -- to his home and

16    wait for him to put out the trash, or someone to put out

17    the trash, and then you go through the trash; correct?

18    A.    Yes, sir.

19    Q.    Have you done those yourself?

20    A.    Yes, sir.

21    Q.    To the best of your knowledge, is there any PIN pad

22    machines that have ever been in his possession?

23          MR. ESTRADA:  Objection, Your Honor.  Speculation.

24          MR. SEVERO:  Let me rephrase the question.

25          THE COURT:  Okay.

```
1    BY MR. SEVERO:

2    Q.    To the best of your knowledge, based on your

3    investigation, has any searches of his home turned up PIN

4    pad machines?

5            MR. ESTRADA:  Objection, Your Honor.  Calls for

6    hearsay.

7            THE COURT:  Overruled.

8            If you know.

9            THE WITNESS:  Not to my knowledge, sir.

10   BY MR. SEVERO:

11   Q.    You investigated -- or rather, you conducted

12   surveillance of the yard, did you not?

13   A.    Yes, sir.

14   Q.    And the yard is the one on Ratner in -- I think it's

15   North Hollywood?

16   A.    That's correct, sir.

17   Q.    And it's the one with the propane tanks; correct?

18   A.    There are some propane tanks, yes, sir.

19   Q.    How often would you see Mr. Darbinyan there, to the

20   best of your knowledge?

21   A.    Very frequently for several months.

22   Q.    And did you ever see Mr. Moreno at the yard?

23   A.    Yes, sir.

24   Q.    How many times?

25   A.    I think we only saw him once, sir.
```

1    Q.    Now, during this time, you also had the pole

2    camera --

3    A.    Yes.

4    Q.    -- trained on the yard; correct?

5    A.    Yes, sir, that's correct.

6    Q.    And if I remember your testimony correctly, that

7    camera was trained on the yard for about 5,000 hours.

8    A.    I believe it was trained on the yard for a lot

9    longer than that, but we actually have recorded

10   approximately 5,000 hours.

11   Q.    And did you actually -- are you aware of the

12   evidence in this case of any of that 5,000 hours being

13   played?

14   A.    No, sir.  It was not played in this case.

15   Q.    Other than Mr. Moreno at the yard, did you see any

16   other members that you believed to be Mexican Mafia at the

17   yard?

18   A.    I don't recall, sir.

19   Q.    If that were on the 5,000-hour recording, you'd have

20   brought that up, wouldn't you?

21        MR. ESTRADA:  Objection, Your Honor.  Calls for

22   speculation.

23        THE COURT:  Sustained.

24   BY MR. SEVERO:

25   Q.    Would having Mexican Mafia at the yard be of

1    significance to you in your investigation?

2    A.    Yes, sir.

3    Q.    And if it was significant to you, is it something

4    you'd turn over to the U.S. Attorney's Office?

5    A.    Yes, sir.

6    Q.    Now, on August 27th, you intercepted a call that you

7    believe was between Mr. Parsadanyan and Mr. Darbinyan

8    talking about going to San Diego?

9    A.    August 27th, sir?

10   Q.    Yes.

11   A.    I don't know.  I'd have to look at the transcript,

12   sir.

13   Q.    All right.  But do you remember such a call?

14   A.    Yes, sir.

15   Q.    All right.  Now, did you engage in surveillance at

16   that time to follow Mr. Darbinyan?

17   A.    Not that I recall, sir.

18   Q.    No surveillance of Mr. Darbinyan was ever conducted

19   in San Diego?

20   A.    No, sir.

21   Q.    Did you intercept any phone calls between

22   Mr. Darbinyan and Mr. Ortega stating that -- let me

23   rephrase.

24         Just to be clear, is it your testimony that in

25   August of 2009, you did not conduct surveillance in

1    San Diego?  Is that your testimony?

2    A.    We never conducted surveillance of Darbinyan in

3    San Diego, sir.

4    Q.    You never saw him in San Diego, did you?

5    A.    No, sir.  We never conducted surveillance of

6    Mr. Darbinyan in San Diego.

7    Q.    And after August 27th --

8          May I have a moment, Your Honor?

9          THE COURT:  Yes.

10               *(Pause while counsel reviews documents.)*

11   BY MR. FLIER:

12   Q.    What phone calls have been played in that case

13   between Mr. Moreno -- I'm sorry -- Mr. Ortega and

14   Mr. Darbinyan while Mr. Ortega was in San Diego?

15   A.    We didn't have GPS on Mr. Ortega's phone, sir.  So I

16   don't know where he was when he was speaking on the phone.

17   Q.    Did you have the GPS on Mr. Darbinyan's phone?

18   A.    Yes, sir.

19   Q.    What evidence of the GPS has been introduced in this

20   trial that Mr. Darbinyan was detected in San Diego?

21   A.    We didn't introduce it in this trial, sir.

22   Q.    The information regarding the -- let me go back to

23   the yard for a moment, Mr. Moreno at the yard.

24         What evidence of -- what photographic evidence did

25   you introduce at this trial that shows Mr. Moreno at the

1    yard?

2          MR. ESTRADA:  Objection, Your Honor.  Relevance.

3          THE COURT:  Sustained.  The jury knows what's been

4    introduced at this trial.

5    BY MR. SEVERO:

6    Q.    Was Mr. Moreno at the yard while the pole camera was

7    going, if you know?

8          MR. ESTRADA:  Objection, Your Honor.  I don't know

9    if this is impeachment or --

10          THE COURT:  Overruled.

11          THE WITNESS:  Yes, I believe the pole camera was

12    going.

13    BY MR. SEVERO:

14    Q.    But, again, we didn't play any of that here;

15    correct?

16          MR. ESTRADA:  Objection, relevance.

17          THE COURT:  Sustained.

18          MR. SEVERO:  I just need one moment, Your Honor.

19          THE COURT:  Sure.

20              *(Pause while counsel reviews documents.)*

21    BY MR. SEVERO:

22    Q.    Let me direct your attention to August 10 of 2010.

23    Do you recall that Mr. Darbinyan was stopped by

24    Deputy Hickey?

25    A.    Yes, sir.

1    Q.     Were you -- did you direct that stop?

2    A.     Yes, sir.

3    Q.     Were you present when Detective -- or rather,

4    Deputy Hickey removed Mr. Darbinyan from the car?

5    A.     I don't believe I was that close to it, sir.

6    Q.     And do you recall Deputy Hickey testifying --

7           MR. ESTRADA:  Objection, Your Honor.  Improper

8    comment on another witness's testimony.

9           THE COURT:  Sustained.

10   BY MR. SEVERO:

11   Q.     Well, directing your attention to --

12          Just a moment, please.  I just need to find it, if I

13   may, for a moment.

14          THE COURT:  Uh-huh.

15              *(Pause while counsel reviews documents.)*

16          MR. SEVERO:  Your Honor, I wish to publish an

17   item -- items that were photographs that were taken on

18   August 10th and were shown to the jury earlier.

19          THE COURT:  Have they been marked?

20          MR. SEVERO:  Don't remember.

21          May I have a moment with counsel?

22          THE COURT:  Sure.

23              *(Counsel confer off the record.)*

24          MR. SEVERO:  It's Exhibit 298.

25          THE COURT:  Yes.

1          MR. SEVERO:  May I publish that, if I can?

2          THE COURT:  Yes.

3   BY MR. SEVERO:

4   Q.     Do you remember having seen these items when they

5   were collected -- after they were collected?

6   A.     No, sir.  I don't believe any of this was seized

7   from Darbinyan.

8   Q.     Who was it seized from?

9   A.     I believe the photographs were taken in the field,

10  sir.  They were not seized.

11  Q.     All right.  Do you remember seeing these photographs

12  in your investigation of this case?

13  A.     Yes, sir.

14  Q.     Do you see this phone number, 818-809-9322?

15  A.     Yes, sir.

16  Q.     Did you ever attempt to find out whose phone number

17  that was?

18  A.     I don't recall, sir.

19  Q.     Did you ever call that number?

20  A.     No, sir.

21  Q.     Did you ever remember seeing a photograph of the BMW

22  key?

23  A.     Yes, I've seen the photographs, sir.

24  Q.     Did you speak to Detective Hickey -- I'm sorry --

25  Deputy Hickey?

```
 1   A.      At what point, sir?

 2

 3   Q.      After this -- after this stop.

 4   A.      Yes, sir.

 5   Q.      And did he tell you that --

 6           MR. ESTRADA:  Objection, Your Honor.  Calls for

 7   hearsay.

 8           THE COURT:  Sustained.

 9           Next question.

10   BY MR. SEVERO:

11   Q.      Well, after speaking with him, was it your

12   understanding that Mr. Darbinyan was alone in the car?

13           MR. ESTRADA:  Objection, Your Honor.  Calls for

14   speculation.  He wasn't present.

15           THE COURT:  Sustained.

16           MR. SEVERO:  I don't have anything further of this

17   witness.

18           THE COURT:  Counsel, I think for purposes of

19   efficiency, both defense can take this witness as your own

20   witness.

21           Okay?

22           MR. PEREYRA-SUAREZ:  That's fine.  Thank you,

23   Your Honor.

24   ///

25   ///
```

1                        **DIRECT EXAMINATION**

2     BY MR. PEREYRA-SUAREZ:

3     Q.     Agent Stebbins, you met with Mr. Matosyan or talked

4     to him on the phone many times after October 26th, 2009; is

5     that correct?

6     A.     That's correct, sir.

7     Q.     Sometimes on a daily basis?

8     A.     Yes, sir.

9     Q.     Sometime in November of 2009, did you tell

10    Mr. Matosyan, "You know, we don't have a case against Arman

11    yet"?  Did you say those words?

12    A.     I don't believe I said, "We don't have a case."

13    Q.     What did you say in that regard?

14    A.     I don't recall my exact words, sir.

15    Q.     Did you say something to the effect that you still

16    weren't comfortable you had a case against Arman?

17    A.     I don't believe I said that, sir.

18    Q.     Did you tell Mr. Matosyan that you need to get Arman

19    upset about something?  Did you tell him that or words to

20    that effect?

21    A.     I told him that we couldn't just keep paying and he

22    would stay happy.  He couldn't be happy.  He needed to be

23    upset about not getting paid.

24    Q.     So did you strategize with Mr. Matosyan about how he

25    could get Mr. Sharopetrosian upset?

1    A.    Yes.  We talked about not paying the entire amount

2    as it wouldn't stop at that point.

3    Q.    Did you develop some kind of game plan to that

4    effect with Mr. Matosyan?

5    A.    Nothing formalized, but yes, sir.

6    Q.    But you talked several times to Mr. Matosyan about

7    how he could get Mr. Sharopetrosian upset; is that correct?

8    A.    No, not about how he could upset him.

9    Q.    Well, did you want Mr. Sharopetrosian to get upset?

10        MR. ESTRADA:  Objection, Your Honor.  Relevance.

11        THE COURT:  Overruled.

12        THE WITNESS:  We didn't want him to be happy about

13   the money being paid in full.

14   BY MR. PEREYRA-SUAREZ:

15   Q.    Well, when you said you didn't want him to be happy,

16   what do you mean by that?

17   A.    We believed that if he kept on just getting paid and

18   paid and paid, it would never stop and -- until the

19   government ran out of money.  And, basically, that wouldn't

20   constitute any kind of evidence on our part.  We'd just be

21   paying him.

22   Q.    So you just didn't want to just keep paying money to

23   Mr. Matosyan; is that correct?

24   A.    Mr. Sharopetrosian.

25   Q.    Well, you didn't want to keep coming up with federal

**002683**

```
 1   monies in connection with Mr. Matosyan's contacts with
 2   Mr. Sharopetrosian or his family; is that correct?
 3   A.    We did not want to keep paying Mr. Sharopetrosian.
 4   Q.    Now, you had Mr. Matosyan under surveillance at
 5   least several times after October 26th of 2009; correct?
 6   A.    Yes, sir.
 7   Q.    Why did you think it was important to have him under
 8   surveillance?
 9   A.    Most of the time it's when he was paying different
10   people because it was a dangerous situation.
11   Q.    Were there times when you thought you had
12   Mr. Matosyan under surveillance, but in fact, you did not?
13   A.    I don't know what you mean, sir.
14   Q.    Could Mr. Matosyan decide whether to turn on or turn
15   off a phone, for example?
16   A.    I'm sure he could decide whether to turn on or turn
17   off his phone, sir.
18   Q.    And you were okay with him deciding that; is that
19   correct?
20   A.    No, sir.  He was instructed to keep his phone on.
21   Q.    So he was supposed to have his phone on at all
22   times; is that correct?
23   A.    I would say generally.
24   Q.    Were you aware of some kind of meeting in November
25   of 2009 that Mr. Matosyan had with members of the
```

1    Sharopetrosian family?

2    A.    Members of the Ogandganyan family, yes, sir.

3    Q.    And that -- that family were in-laws to

4    Mr. Sharopetrosian; is that correct?

5    A.    I believe they would be -- they consider themselves

6    in-laws, yes, sir.

7    Q.    So Lusine was an in-law; correct?

8    A.    Yes, sir, sister-in-law.

9    Q.    All right.  Was there some significance during the

10   course of your investigation to the date November 20, 2009?

11   A.    Yes, sir.

12   Q.    What was that significance?

13   A.    That was the drop-dead date that Sharopetrosian had

14   given Matosyan to pay all the money.

15   Q.    To your knowledge, was the family going to be buying

16   a new headstone for a deceased family member on that date?

17   A.    I don't believe so, sir.

18   Q.    You didn't know why that was important to the

19   family; is that correct?

20   A.    No, sir.

21   Q.    Mr. Matosyan didn't tell you why that was important

22   to the family; is that correct?

23   A.    No, sir.

24   Q.    He just told you, "We need to do something on or

25   before November 20th"; correct?

1    A.    Actually, Sharopetrosian told him on recorded phone

2    calls.

3    Q.    And you were listening to those phone calls;

4    correct?

5    A.    Afterwards, yes, sir.

6    Q.    Sometime after October 26 of 2009, did Mr. Matosyan

7    tell you that he had been working for an organization known

8    as "Budget Blinds"?

9    A.    I don't recall that, sir.

10   Q.    Did he tell you that he had earned between 400,000

11   and $500,000 in a six- to seven-month period?

12   A.    I don't recall that either, sir.

13   Q.    He never bragged to you about how much money he was

14   making ever?

15   A.    I don't recall that, sir.

16   Q.    And you're sure you never mentioned "Budget Blinds";

17   is that correct?

18   A.    Not to my knowledge.

19   Q.    Now, with respect to the $1,900 amount you mentioned

20   earlier, that was to go to Emil; correct?

21   A.    Yes, sir.

22   Q.    And you did, in fact, provide from federal funds

23   $1,900 that was supposed to go to Emil; correct?

24   A.    That's correct, sir.

25   Q.    Did Mr. Matosyan tell you that that money had

1   something to do with a drug transaction that Mr. Matosyan

2   and Emil had engaged in?

3   A.    I don't recall the circumstances of it, sir.

4   Q.    Did he tell you that that money was supposed to go

5   to Mr. Sharopetrosian or his in-laws?

6   A.    I don't know if I knew where the money was supposed

7   to go after it went to Emil, sir.

8   Q.    Well, you didn't determine where that money would

9   go?

10  A.    Emil just said, "Pay me the money or I'll cut your

11  face off."

12  Q.    Did you surveil that delivery of money to Emil?

13  A.    Yes, sir.

14  Q.    When did you surveil that transfer?

15  A.    I'm sorry, sir?

16  Q.    When did you surveil that transfer?

17  A.    I believe that was October 30th, 2009.

18  Q.    Did you ever try to confirm the amounts of money

19  that Mr. Matosyan had told the government that he had paid

20  to Lusine?

21  A.    Yes, sir.

22  Q.    What did you do to confirm what Mr. Matosyan told

23  you?

24        MR. ESTRADA:  Objection, Your Honor.  Relevance.

25        THE COURT:  Overruled.

```
 1          THE WITNESS:  We directed Mr. Matosyan to talk to

 2    defendant Sharopetrosian on the phone about how much was

 3    owed to demonstrate how much had already been paid.

 4    BY MR. PEREYRA-SUAREZ:

 5    Q.     Did Mr. Matosyan ever tell you that he had already

 6    paid $40,000 to Lusine or to somebody else in the family?

 7    A.     I believe he said that he paid 64,000 to Lusine, and

 8    then it was -- after that, I don't recall the number.

 9    Q.     Well, with respect to the $64,000, did you do

10    anything to corroborate that that money had been paid by

11    Mr. Matosyan to Lusine or any member of the family?

12    A.     Other than the phone calls with Sharopetrosian?

13    Q.     Well, did you ask Mr. Matosyan if he'd ever obtained

14    any receipts for those payments?

15    A.     I don't recall, sir.

16    Q.     You just took his word that it was $64,000?

17    A.     I don't recall, sir.

18    Q.     Did it matter to you whether or not Mr. Matosyan had

19    actually paid $64,000 to Lusine?

20          MR. ESTRADA:  Objection, Your Honor.  Relevance.

21          THE COURT:  Sustained.

22    BY MR. PEREYRA-SUAREZ:

23    Q.     Were you concerned that Mr. Matosyan might be making

24    things up?

25          MR. ESTRADA:  Objection, Your Honor.  Relevance.
```

```
 1            THE COURT:  Sustained.
 2    BY MR. PEREYRA-SUAREZ:
 3    Q.     In fact, you wanted Mr. Matosyan to keep working
 4    with the government until, in your opinion, you had made a
 5    case against Mr. Sharopetrosian; is that correct?
 6            MR. ESTRADA:  Objection, Your Honor.  Relevance.
 7            THE COURT:  Overruled.
 8            THE WITNESS:  We wanted to keep working until we
 9    could make a case as well as relieve the pressure that he
10    was under.
11    BY MR. PEREYRA-SUAREZ:
12    Q.     Did Mr. Matosyan tell you that he owed money to
13    people other than the Sharopetrosian family or the in-laws?
14    A.     He said that he had borrowed from many different
15    people in order to pay Sharopetrosian's extortion.
16    Q.     Did he ever tell you how much money he owed in all
17    to -- all together to various people?
18    A.     I don't recall, sir.
19    Q.     Did he ever say to you, "I'm just really drowning in
20    debt," or words to that effect?
21    A.     I don't remember those words, sir.
22    Q.     Did he ever tell you that he was worried about all
23    the money he owed?
24    A.     Yes, sir.
25    Q.     How many times did he tell you that?
```

1    A.    Several.

2    Q.    Did you ever make any suggestions to Mr. Matosyan

3    about how he could be relieved of all these debts?

4         MR. ESTRADA:  Objection, Your Honor.  Relevance.

5         THE COURT:  Are you talking about all debts,

6    including the 9,500?

7         MR. PEREYRA-SUAREZ:  It's 95,000 Your Honor.

8         THE COURT:  95,000.  Overruled.

9         THE WITNESS:  Will you repeat that question, sir?

10   BY MR. PEREYRA-SUAREZ:

11   Q.    Yes.  Did you ever tell Mr. Matosyan how he might be

12   relieved of all of these debts?

13   A.    I don't know, sir.

14   Q.    Whose idea was it to come up with payments that

15   would go to various people in connection with this case?

16   A.    Arman Sharopetrosian's.

17   Q.    Well, did you ever come up with some kind of game

18   plan to pay certain amounts of money, not as much as you

19   understood were demanded, but certain amounts of money?

20        MR. ESTRADA:  Objection, Your Honor.  Asked and

21   answered.

22        THE COURT:  I'm going to allow this one question,

23   but we've gone over this before.

24        THE WITNESS:  Yes, sir.

25   ///

1    BY MR. PEREYRA-SUAREZ:

2    Q.    So that was your idea; correct?

3    A.    Yes, sir.

4    Q.    And, of course, you were monitoring how all of that

5    money that came from federal funds were being used;

6    correct?

7    A.    Yes, sir.

8          MR. PEREYRA-SUAREZ:  I have nothing further,

9    Your Honor.

10         THE COURT:  Counsel.

11         MR. FLIER:  Thank you, Your Honor.

12                    **DIRECT EXAMINATION**

13   BY MR. FLIER:

14   Q.    Good morning, again, sir.

15   A.    Good morning, sir.

16   Q.    In the summer of 2009, there's some references in

17   some of the exhibits to a "Hayk."  Do you know who I'm

18   referencing?

19   A.    Depends on the exhibit, sir.

20   Q.    I don't know the exact exhibit, but maybe this will

21   help you.

22         There was some evidence presented about

23   Mr. Darbinyan being arrested after like 3:00 in the

24   morning.  Do you remember that?

25   A.    Yes, sir.

1    Q.    There was some officers who testified about that

2    event; is that correct?

3    A.    Yes, sir.

4    Q.    There was a complaint, the filing complaint that was

5    shown to the jury on that; is that correct?

6    A.    Yes, sir.

7    Q.    That's who I'm talking about.  There was a

8    co-defendant, and I think his first name -- or there's a

9    reference to a "Mike" or "Michael"; is that correct?

10          MR. ESTRADA:  It's Exhibit 409 if you want to look

11   at the exhibit.

12          THE COURT:  Okay.

13   BY MR. FLIER:

14   Q.    I don't really want you to look at the exhibit.

15          But thank you.

16          Do you know who I'm referencing now?

17   A.    Yes, sir.

18   Q.    He is believed to be, based on your investigation, a

19   runner; is that correct?

20   A.    No, sir.

21   Q.    What is his role in your investigation?

22   A.    He was one of the individuals that we believed was

23   forging checks.

24   Q.    And was he arrested and is part of this indictment?

25   A.    Not part of this indictment, sir, different

1    indictment.

2    Q.    But you thought he was involved in some illegal

3    activity as it relates to your investigation on this

4    matter; is that correct?

5    A.    Yes, sir.

6    Q.    And you know exactly who that person is by full

7    name; is that correct?

8    A.    Yes, sir.

9    Q.    So there might be an issue with him on another case,

10   but why wasn't he arrested on this case?

11   A.    That's not my call, sir.

12         MR. ESTRADA:  Objection, Your Honor.  No foundation.

13         THE COURT:  Sustained.  That's the prosecutor's

14   call.

15   BY MR. FLIER:

16   Q.    Okay.  So can we assume, as an investigator, that

17   you tell the prosecution of people to whom you believe are

18   involved in criminal activity.  You mentioned as many

19   people as you believe is relevant; correct?

20   A.    Yes, sir.

21   Q.    And you're not holding back on names in any way, are

22   you?

23   A.    No, sir.

24   Q.    And when you give information about someone to whom

25   you believe is involved in criminal activity, do you also

1    tell the government, the prosecutors, of what evidence you

2    have to connect him, videos, calls -- you develop that

3    issue; correct?

4    A.    Yes, sir.

5    Q.    And you make recommendations; am I correct?

6    A.    Yes, sir.

7    Q.    And although the government, the prosecutors, they

8    decide how to present their case and whom to file against,

9    clearly you have input on that, based on all the work

10   you've done on the case; am I correct?

11   A.    Yes, sir.

12        MR. FLIER:  I have no further questions.

13        THE COURT:  Re- -- excuse me.  Cross-examination.

14        MR. ESTRADA:  Cross?

15                    **CROSS-EXAMINATION**

16   BY MR. ESTRADA:

17   Q.    Good morning, Special Agent Stebbins.

18   A.    Good morning.

19   Q.    Do you know if a headstone costs $120,000?

20   A.    Not to my knowledge, sir.

21   Q.    You mentioned Emil Airapetian, and he said he was

22   going to cut the victim's face off.  Who is Emil Airapetian

23   in your investigation?

24   A.    He's a very violent Armenian Power gang member and

25   associate of Darbinyan and Sharopetrosian.

1    Q.    Does he have a nickname?

2    A.    "Clever" from A.P.

3    Q.    Now, you were asked about a bunch of meetings you

4    had with victim M.M. starting in October, late October,

5    through November 2009.  Do you recall that?

6    A.    Yes, sir.

7    Q.    And you were asked if the name of "Darbinyan" came

8    up?

9    A.    Yes, sir.

10    Q.    If the name "Mher" came up?

11    A.    Yes, sir.

12    Q.    During the time you were involved and supervising

13    victim M.M., did the name Mher Darbinyan ever come up?

14    A.    No, sir.

15    Q.    Why not?

16    A.    At that time, it was more about triaging the

17    situation.  On a daily basis, he was getting threats from

18    Emil, Lusine, Arman, and we were just making payments and

19    dealing with those threats as quickly as we could.

20    Q.    So in these various meetings you had in late October

21    through November, generally speaking, what was covered in

22    those meetings?

23    A.    The latest phone call with Arman or Emil and how we

24    could relieve the pressure, how we could get out of the

25    situation.

1    Q.    At this time, were there actual meetings that you

2    surveilled with Emil Airapetian?

3    A.    Yes, sir.

4    Q.    You talked about money -- or you were asked about

5    money that was paid for the extortion demands.  Did you

6    take measures to ensure and follow where the money went?

7    A.    Yes, sir.

8    Q.    What did you do?

9    A.    Generally, we'd follow whoever the money was given

10   to if it was outside of a house.  We always followed any

11   payment.  He was always surveilled for safety reasons and

12   for intelligence-gathering reasons.

13   Q.    And also you were asked about this money provided to

14   M.M., the money for the extortion payment, the money for

15   the relocation.

16         To your knowledge, was money ever put in a bank

17   account for M.M.?

18   A.    No, sir.

19   Q.    Did you ever give him money so he could keep it for

20   himself?

21   A.    No, sir.

22   Q.    Did you take measures to ensure the money went to

23   where you wanted it to go to?

24   A.    Yes, sir.

25   Q.    Or who it was supposed to go to?

1    A.    Yes, sir.

2    Q.    What type of measures?

3    A.    As I said before, we always surveilled the money to

4    its drop-off person.  And then additionally, as I was

5    talking about earlier with the rental, we made sure that it

6    went to the rental company immediately.

7    Q.    You were also asked about surveillance of M.M.

8    before he came to the FBI.  Do you recall that?

9    A.    Yes, sir.

10   Q.    Before M.M. came to the FBI, was he being watched

11   24/7?

12   A.    No, sir.

13   Q.    How often was he watched?

14   A.    I think we did a couple surveillances of him, maybe

15   anywhere from 4 to 8 hours at a time.

16   Q.    Why didn't you watch him 24 hours, seven days a

17   week?

18   A.    He wasn't a target of our investigation.

19   Q.    Were there other issues going on in the

20   investigation at this time?

21   A.    Yes, sir.

22   Q.    You don't know exactly where he was during the

23   entire time before he came to you in October of 2009?

24   A.    No, sir, I don't.

25   Q.    Okay.  You were also asked about defendant Ortega

1   and his presence in San Diego.  Did you confirm Ortega's

2   presence in San Diego?

3   A.     Yes, I did.

4   Q.     Did you also obtain evidence that Darbinyan was

5   going to San Diego that same day, on August 27, 2009?

6   A.     Yes, sir.

7          MR. SEVERO:  Objection, calls for hearsay.  Move to

8   strike.

9          THE COURT:  Sustained.  It will be stricken.

10  BY MR. ESTRADA:

11  Q.     Well, without saying what the substance of the

12  evidence was, did you obtain some sort of evidence?

13  A.     Yes, sir.

14         MR. SEVERO:  I'll move to strike that answer,

15  response to "some sort of evidence."

16         THE COURT:  Sustained.  It will be stricken.

17  BY MR. ESTRADA:

18  Q.     Now, you were asked about calls, that there were

19  calls between Ortega and Darbinyan that you intercepted on

20  August 27th, 2009?

21  A.     Yes, sir.

22  Q.     Were there any that you intercepted?

23  A.     No, sir.

24  Q.     Did you understand that you, meaning the FBI as a

25  whole, had wiretapped every single phone Darbinyan was

**002698**

```
 1    using?

 2              MR. SEVERO:  Leading.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  Definitely not, sir.

 5    BY MR. ESTRADA:

 6    Q.    And why do you say "definitely not"?

 7    A.    When he was arrested in December of 2009, he had

 8    either three or four phones in his possession, and we were

 9    tapping only one of those phones.

10    Q.    You understood him to have more than just the phones

11    that you intercepted?

12    A.    Yes.

13    Q.    Based on your training and experience, is it common

14    for people involved in criminal activity to have multiple

15    phones?

16    A.    Yes, sir.

17    Q.    Now, you were asked about the yard, the yard area.

18    We haven't talked too much about the yard.  But generally

19    speaking, what is this yard?

20    A.    It's basically the parking lot where there's a

21    couple of large cargo containers.  And it's where all of

22    Darbinyan, his associates would gather, and send out people

23    with the check fraud scheme or do whatever criminal

24    activity they were up to for the day.

25    Q.    Did you and other officers ever surveil or watch the
```

```
 1   yard?

 2   A.      Yes, sir.

 3   Q.      Did you ever see any legitimate business going on

 4   there?

 5   A.      No, sir.

 6          MR. SEVERO:  Move to strike, no foundation.

 7          THE COURT:  Strike which answer?

 8          MR. SEVERO:  Well, the answer to the question about

 9   legitimate business.  There is no foundation for that.

10          THE COURT:  Sustained.

11   BY MR. ESTRADA:

12   Q.      Did you ever see big propane trucks coming in and

13   out of that area?

14   A.      No, sir.

15   Q.      What did you see coming in and out?

16   A.      Known targets of our investigation.

17   Q.      Now, you were asked about a pole camera.  And you

18   explained before what a pole camera was, and it was fixed

19   on that yard.

20          There was a pole camera that was fixed on the yard?

21   A.      Yes, sir.

22   Q.      Is there a reason why that video footage wasn't very

23   useful?

24          MR. SEVERO:  Objection.  Irrelevant.

25          THE COURT:  Overruled.
```

```
 1          THE WITNESS:  Yes.  The pole camera was there to
 2   assist us in surveillance.  It got to a point where
 3   Darbinyan and his associates would patrol all the parking
 4   lots around the yard to look for law enforcement cars.  So
 5   we put the camera up on poles so that we could sit a couple
 6   blocks away and be able to watch the yard.
 7          MR. SEVERO:  Move to strike the "to look for cars."
 8          THE COURT:  That part will be stricken as to what
 9   Darbinyan was doing.
10   BY MR. ESTRADA:
11   Q.     Now, you understood from calls that Darbinyan was
12   cognizant or aware of law enforcement?
13   A.     Yes.
14   Q.     Keeping track of law enforcement?
15   A.     Yes.
16   Q.     Now, in terms of this yard when you did surveillance
17   there, was there anything about the yard that made it
18   difficult to see what was going on inside?
19   A.     Yes.  There were often vehicles.  And at one time,
20   they had a boat parked perpendicular across the yard, and
21   then they sat underneath a tent behind the boat.
22   Q.     Did you know Darbinyan to be a boatman?
23   A.     Never saw him on a boat, sir.
24          MR. SEVERO:  Objection.  Calls for speculation.
25          THE COURT:  Sustained.
```

 1          MR. ESTRADA:  No further questions, Your Honor.

 2          THE COURT:  Redirect?

 3          MR. SEVERO:  Yes.

 4               *(Pause while counsel reviews documents.)*

 5                    **REDIRECT EXAMINATION**

 6   BY MR. SEVERO:

 7   Q.     Do you know Vartan Avedissian?

 8   A.     Yes, sir.

 9   Q.     Did he used to be a defendant in this case?

10   A.     Yes, sir.

11   Q.     He was dismissed; correct?

12   A.     That's correct, sir.

13   Q.     And he had a propane yard about a block and a half

14   away from his -- correct? -- from Mr. Darbinyan's?

15   A.     I don't know where it was, but I was aware that he

16   was in the propane business.

17   Q.     Isn't it a fact that Mr. Darbinyan and

18   Mr. Avedissian had an agreement where Mr. Darbinyan would

19   supply the propane to Mr. Avedissian?

20          MR. ESTRADA:  Calls for speculation, Your Honor.

21          THE COURT:  Sustained.

22   BY MR. SEVERO:

23   Q.     You testified that --

24          Just a moment, Judge.

25               *(Pause while counsel reviews documents.)*

1    BY MR. SEVERO:

2    Q.    How many calls have you played in this case between

3    Mr. Emil Airapetian and Mr. Darbinyan?

4    A.    None that we've played, sir.

5    Q.    Mr. Estrada asked you on cross, I guess, that --

6    whether you watched Mr. Matosyan 24/7.  Do you remember

7    that?

8    A.    Yes, sir.

9    Q.    Did you watch anybody in this case 24/7?

10   A.    No, sir.

11   Q.    Do you ever watch anybody 24/7?

12   A.    No, sir.

13   Q.    You don't have the resources for that; correct?

14   A.    That's correct, sir.

15   Q.    Not only that, it's just a whole waste of time --

16   correct? -- most of the time if it's 24/7?

17   A.    There would be some wasted time, yes, sir.

18   Q.    Now, when you were surveilling Mr. Matosyan, you

19   knew that he was a potential victim of a violent act;

20   correct?

21   A.    Which time, sir?

22   Q.    When you were -- well, let me go back.

23         After June 29th, it was your belief and you directed

24   or created an investigation regarding the extortion of

25   Mr. Matosyan, didn't you?

 1          MR. ESTRADA:  Objection as "to created an

 2     investigation."

 3          THE COURT:  Did you start an investigation

 4     concerning that?

 5          MR. SEVERO:  There's a difference

 6          THE WITNESS:  I directed an investigation, yes, sir.

 7     BY MR. SEVERO:

 8     Q.     You thought Mr. Matosyan was a victim of a crime?

 9     A.     Yes, sir.

10     Q.     And he was a victim of a violent crime; correct?

11     A.     Yes, he was being extorted, sir.

12     Q.     Right.  And when you say that you only had a couple

13     of surveillances of Mr. Matosyan because he wasn't a

14     target, didn't it concern you that he was a victim?

15     A.     Yes, that's why we were following Darbinyan, sir.

16     Q.     And the fact is that, by your own testimony,

17     Mr. Darbinyan was never seen with Mr. Matosyan.

18     A.     That is not my testimony, sir.

19     Q.     You never saw Mr. Darbinyan --

20     A.     I did not personally see him.

21     Q.     That's correct.

22          MR. ESTRADA:  Objection, Your Honor.  I would ask

23     that he not be argumentative with the witness, his own

24     witness.

25          THE COURT:  Sustained.  Sustained.

002704

```
1    BY MR. SEVERO:

2    Q.    I wasn't trying to be argumentative.  I was trying

3    to get you to tell me why an individual --

4         MR. ESTRADA:  Objection, Your Honor.

5         THE COURT:  Well, just let him ask the question.

6    BY MR. SEVERO:

7    Q.    I'm only trying to find out whether you were

8    concerned about the safety of Mr. Matosyan between

9    June 29th and July 4th.

10   A.    Yes, sir.

11   Q.    And between June 29th and August 20th of 2009, were

12   you concerned about his safety?

13   A.    Yes, sir.

14   Q.    And during that time, you only had a couple of

15   surveillances of Mr. Matosyan?

16         Is that "yes" or "no"?

17   A.    A couple surveillances of Mr. Matosyan?

18   Q.    Yes.

19   A.    Yes, sir.

20   Q.    Because he was not a target; correct?

21   A.    That's correct, sir.

22   Q.    Your only concern was trying to catch somebody, not

23   protect somebody; is that true?

24         MR. ESTRADA:  Objection, Your Honor.  Argumentative.

25         THE COURT:  Sustained.
```

BY MR. SEVERO:

Q.    When you arrested Mr. Darbinyan, he had how many

phones?

A.    Three or four, I believe.

Q.    And only one of them you had intercepted; is that

correct?

A.    Only one we had a wiretap on, yes, sir.

Q.    Were the other phones, to the best of your

knowledge, operational?

A.    I don't know, sir.

Q.    Well, you have seized phones in this case, where you

have gone and downloaded the information to see who he was

calling, what missed calls he may have had.

      Wouldn't the search of the phones that you were not

intercepting have been valuable information to you?

      MR. ESTRADA:  Objection, Your Honor.  Misstates the

evidence as to what phones were seized and searched.

      MR. SEVERO:  And that's misstating the evidence.

      THE COURT:  Overruled.  I think he can answer.

      THE WITNESS:  Yes, I believe they were searched.

BY MR. SEVERO:

Q.    So the phones that you obtained from Mr. Darbinyan,

other than the one you intercepted, were searched?

A.    I believe so, sir.

Q.    Were they downloaded?

1    A.    I believe so.

2    Q.    How much of that evidence have we seen in this

3    trial?

4         THE COURT:  Again, the jury has seen the evidence in

5    this trial.  They know what's come in and what hasn't.

6         MR. SEVERO:  All right.  Just a moment, Judge,

7    please.

8         THE COURT:  Uh-huh.

9              *(Pause while counsel reviews documents.)*

10   BY MR. SEVERO:

11   Q.    The payments that were made by the FBI, none of

12   those payments -- let me rephrase that because I changed

13   something.

14         The payments, or the money that the FBI gave to

15   Mr. Matosyan for payments, all went to people other than

16   Mr. Darbinyan; correct?

17   A.    Directly, yes, sir.

18   Q.    And, in fact, you have no evidence that after

19   October 26th, Mr. Darbinyan ever even talked to

20   Mr. Matosya; is that correct?

21         MR. ESTRADA:  Objection, Your Honor.  Beyond the

22   scope and asked and answered.

23         THE COURT:  Well, it may be beyond the scope, but

24   I'll let you answer this one question.

25         THE WITNESS:  Can you repeat the question, sir?

1    BY MR. SEVERO:

2    Q.    After April 26th, 2009, Mr. Matosyan never spoke to

3    Mr. Darbinyan; correct?

4    A.    Not to my knowledge, sir.

5          MR. ESTRADA:  That's all I have.

6          THE COURT:  Okay.

7    Counsel.

8                    **REDIRECT EXAMINATION**

9    BY MR. PEREYRA-SUAREZ:

10   Q.    Agent Stebbins, a few minutes ago, Mr. Estrada asked

11   you about a $120,000 amount.  Do you recall that?

12   A.    Yes, sir.

13   Q.    You never ever provided to Mr. Matosyan any amount

14   even approaching $120,000; correct?

15   A.    That's correct, sir.

16   Q.    In fact, on November 21 of 2009, you provided an

17   amount of $3,844; is that correct?

18   A.    That's correct, sir.

19   Q.    And, in fact, that money was supposed to go to

20   Lusine; correct?

21   A.    Yes, sir.

22         MR. PEREYRA-SUAREZ:  Nothing further, Your Honor.

23         THE COURT:  Counsel.

24         MR. FLIER:  Very briefly.

25         THE COURT:  Sure.

<b><u>REDIRECT EXAMINATION</u></b>

BY MR. FLIER:

Q.    Two topics only, please.  The first one is we now

heard -- strike that.

      There's been testimony about some time in December

of '09, Mr. Darbinyan was stopped, arrested, whatever, he

had multiple phones; is that correct?

A.    Yes, sir.

Q.    We then heard about only one of those phones had a

wiretap; is that correct?

A.    That's correct, sir.

Q.    With respect to all of the phones that were found on

Mr. Darbinyan, do you know where he received them from?

A.    No, I don't, sir.

Q.    And in this case, we heard a lot of testimony about

a lot of usage of phones; is that correct?

A.    That's correct, sir.

Q.    Do you know where anyone received their phones in

this case?

A.    No, sir.

Q.    But you are aware that my client owns a cellular

phone business; is that correct?

A.    That's correct, sir.

Q.    Now, with respect to stops, we heard testimony that

on maybe at least two or three occasions, based on your

1    request, either Glendale Police Department or some other

2    law enforcement department would make a stop of some of

3    these alleged suspects; is that correct?

4    A.    That's correct, sir.

5    Q.    A good example is July 18th of 2009, when you made

6    the request for the Glendale Police Department to stop my

7    client; is that correct?

8    A.    That's correct, sir.

9    Q.    Now, you cannot tell this jury whether or not any of

10   these suspects were stopped on any particular day that was

11   not based on your order or direction; am I correct?

12        MR. ESTRADA:  Objection, Your Honor.  This is beyond

13   the scope.

14        THE COURT:  It is, but I'll allow this one question.

15   BY MR. FLIER:

16   Q.    Am I correct?

17   A.    Can you rephrase that, sir?

18   Q.    You cannot tell the jury whether or not other

19   suspects were stopped on particular days that were not part

20   of your order; am I correct?

21   A.    Yes, you're correct, sir.

22   Q.    So sometimes people get stopped for whatever reason,

23   and they're let go; correct?

24   A.    Yes, sir.

25   Q.    And in this case, you have no idea if that happened

1   on particular dates besides what you ordered; is that

2   correct?

3   A.      Yes, sir.

4           MR. FLIER:  No further questions.  Thank you.

5           THE COURT:  Recross.

6                      **RECROSS-EXAMINATION**

7   BY MR. ESTRADA:

8   Q.      Special Agent Stebbins, did you understand the

9   amount that was being demanded by Sharopetrosian?

10  A.      Yes, sir.

11  Q.      What was that?

12  A.      Anywhere from a hundred thousand to 160,000.

13  Q.      Why didn't you pay the hundred thousand to 160,000?

14  A.      There's no way I'd be authorized to pay that kind of

15  money.

16  Q.      Is there a reason, based on your investigation, you

17  wouldn't want to give the whole amount of money to the

18  person demanding extortion?

19  A.      Yes.

20  Q.      Why is that?

21  A.      Even if we paid him 140,000, he would say you owe me

22  200,000 for interest for the last three months.

23          MR. PEREYRA-SUAREZ:  Objection, move to strike,

24  calls for speculation.

25          THE COURT:  Sustained.  It does.

1   BY MR. ESTRADA:

2   Q.    Based on your training and experience, as a general

3   matter, do you try to pay the entire amount to the person

4   demanding extortion?

5   A.    No, sir.

6         MR. PEREYRA-SUAREZ:  Objection.

7         MR. SEVERO:  Asked and answered.

8         THE COURT:  It's been asked and answered.

9         MR. ESTRADA:  No further questions, Your Honor.

10        THE COURT:  Okay.  You may step down.

11        Next witness.

12        MR. SEVERO:  Yes, Your Honor.  We will call Hovsep

13   Zadourian.

14        THE COURT:  Okay.

15        MR. SEVERO:  A very brief witness.

16        THE COURT:  Sure.

17              *(Pause while counsel reviews documents.)*

18        THE CLERK:  Good morning.  Right here to be sworn,

19   please, and please raise your right hand.

20                    **HOVSEP ZADOURIAN,**

21     DEFENSE WITNESS, IS SWORN, TESTIFIED AS FOLLOWS:

22        THE CLERK:  Do you solemnly swear the testimony you

23   shall give in the cause now pending before this Court shall

24   be the truth, the whole truth, and nothing but the truth,

25   so help you God?

```
 1              THE WITNESS:  Yes.

 2              THE CLERK:  Thank you.  You may be seated.

 3         May I please ask you to state your full name for the

 4    record and spell your last name.

 5              THE WITNESS:  Sure.  Hovsep Zadourian.  H-o-v-s-e-p,

 6    last name is Z-a-d-o-u-r-i-a-n.

 7              THE COURT:  Thank you.

 8              Counsel, you may inquire.

 9                        DIRECT EXAMINATION

10    BY MR. SEVERO:

11    Q.   Good morning, Mr. Zadourian.

12    A.   Good morning.

13    Q.   Do you know Mher Darbinyan?

14    A.   Yes.

15    Q.   How do you know him?

16    A.   Family friend.

17    Q.   How long have you known Mr. Darbinyan?

18    A.   Around seven, eight years.

19    Q.   And are you of Armenian extraction?

20    A.   Yes.

21    Q.   Would you hesitate calling the police if you needed

22    them?

23    A.   No.  I call them.

24    Q.   Would you hesitate calling the police if you thought

25    you were in danger?
```

002713

```
 1    A.    No.

 2    Q.    All right.  Now, I'm going to direct your attention

 3    to August 10th of 2010.  Do you recall what happened on

 4    that date?

 5    A.    Yes.  Me --

 6    Q.    Let me ask the question.

 7          THE COURT:  Let it go question and then answer.

 8    BY MR. SEVERO:

 9    Q.    On that date, were you with Mr. Darbinyan?

10    A.    Yes.

11    Q.    At what time of day?

12    A.    It was evening, around 6:00, 6:30.

13    Q.    How did you and Mr. Darbinyan come together?

14    A.    I just met him in Hollywood.

15    Q.    You met him in Hollywood?

16    A.    Yes.

17    Q.    And at the time -- were you in a car with

18    Mr. Darbinyan at any point?

19    A.    Yes.

20    Q.    Whose car?

21    A.    That was my car.

22    Q.    Was it registered to you?

23    A.    No.

24    Q.    Who was it registered to?

25    A.    My sister.
```

1    Q.    What's her name?

2    A.    Arlena Zadourian.

3    Q.    Same last name as yours?

4    A.    Yes.

5    Q.    Now, what kind of car was it, sir?

6    A.    It was 2006, BMW 750.

7    Q.    And at that time, at some time while you were in the

8    car with Mr. Darbinyan, did something happen?

9    A.    Yes.

10   Q.    What happened?

11   A.    They pull us over.

12   Q.    When you say "they," who?

13   A.    Two sheriff officers.

14   Q.    At the time that you were pulled over, were you in

15   the car with Mr. Darbinyan?

16   A.    Yes.

17   Q.    Were you -- who was driving?

18   A.    I was the driver.

19   Q.    Was there any other person in the car?

20   A.    Yes.

21   Q.    Who?

22   A.    His kid (indicating).

23   Q.    His kid?

24         When you say "his kid," may the record show he

25   pointed toward to the direction of --

```
 1   A.     Mike.

 2   Q.     -- the defense table.

 3          Is it Mher's kid?

 4   A.     Yes.

 5   Q.     What's his name?  Do you know?

 6          MR. ESTRADA:  Objection, irrelevant.

 7          THE COURT:  Objection sustained.  The name would be

 8   irrelevant.

 9          THE WITNESS:  I forgot.

10   BY MR. SEVERO:

11   Q.     No, no.  If he says "sustained," you don't answer.

12   A.     Okay.

13   Q.     How old was he at the time?

14          MR. ESTRADA:  Objection, relevance.

15          THE COURT:  How old was who?

16          MR. SEVERO:  I'm sorry?

17          THE COURT:  How old was who?

18   BY MR. SEVERO:

19   Q.     How old was the child?

20          MR. ESTRADA:  Objection.  Relevance, your Honor.

21          THE COURT:  Sustained.  You don't have to answer it.

22   BY MR. SEVERO:

23   Q.     When the car was stopped --

24   A.     Uh-huh.

25   Q.     -- did the officer approach your side of the car?
```

1    A.    One of those sheriffs approaches my side, and the

2    other one, the passenger side.

3    Q.    All right.  Were you asked to exit the car?

4    A.    Yes.

5    Q.    Did you have keys to the car?

6    A.    Yes.

7          MR. SEVERO:  May I publish 298?

8          THE COURT:  Yes.

9    BY MR. SEVERO:

10   Q.    Let me have you look at --

11         I lost it again.  Sorry, Judge.  There it is.

12         Let me direct your attention to Exhibit 298.  Do you

13   recognize what's depicted on 298?

14   A.    Yes.

15   Q.    What is it?

16   A.    It's my keys.

17   Q.    How do you know they're your keys?

18   A.    First of all, the --

19   Q.    And you can point on the screen like that --

20   A.    Uh-huh.

21   Q.    -- and it will make a line.

22   A.    I see.

23         This was a gift from my friend that went to Hawaii.

24   They brought me a gift.  And then this one also was a gift.

25   When you turn the bottom on, it shows your picture.  This

1    right here (indicating); so I recognize it's my keys.

2    Q.    All right.  Were you searched?

3    A.    Yes.

4    Q.    Did you have any money on you?

5    A.    Yes.

6    Q.    How much money.

7    A.    Around 6-, $700.

8    Q.    Let me direct your -- sorry.  Is it all showing up

9    there?  I lost my place.

10                  *(Pause while counsel reviews documents.)*

11   BY MR. SEVERO:

12   Q.    What denominations were you carrying?

13   A.    It was 20's.  I think I had 100.

14   Q.    All right.  Now, when you were -- were you told to

15   exit the car?

16   A.    I'm sorry.  What?

17   Q.    Were you instructed to exit the car?

18   A.    Yes.

19   Q.    And where did you go when you were told to exit the

20   car?

21   A.    Out.  They just told me to exit the car.  They

22   searched me.  It was next to my car, at that point, when

23   they searched me.

24   Q.    And after they searched you, did they place you

25   anywhere else?

```
 1    A.    Yes.

 2    Q.    Where?

 3    A.    The back the cruiser, sheriff's cruiser.

 4    Q.    The police cars?

 5    A.    Yes.

 6    Q.    Who else was sitting there with you?

 7    A.    Mike.

 8    Q.    Okay.  When you say "Mike," are you referring to

 9    Mher Darbinyan?

10    A.    Yes.

11    Q.    And where was the child?

12    A.    In the car.

13    Q.    In the car?

14    A.    Yes.

15    Q.    He remained in the car?

16    A.    No.  They told him to exit the car also.  He was on

17    the sidewalk.

18    Q.    Sitting on the sidewalk?

19    A.    Yes.

20    Q.    How old was this child?

21          MR. ESTRADA:  Objection, Your Honor.  Relevance.

22          THE COURT:  Sustained.

23          MR. ESTRADA:  He tried asking it before.

24          THE COURT:  Sustained.

25          MR. SEVERO:  Not any more relevant now.  All right.
```

1    That's all I have.

2            Thank you.

3            THE COURT:  Counsel.

4            MR. PEREYRA-SUAREZ:  No questions, Your Honor.

5            THE COURT:  Counsel.

6            MR. FLIER:  I have no questions, Your Honor.  Thank

7    you.

8            THE COURT:  Any cross?

9            MR. ESTRADA:  May I just have a moment, Your Honor?

10               *(Pause while counsel reviews documents.)*

11           MR. ESTRADA:  No questions, Your Honor.

12           THE COURT:  You may step down.  Thank you for coming

13   in.

14           THE WITNESS:  Thank you.

15           THE COURT:  Next witness.

16           Do you have any other witnesses?

17           MR. SEVERO:  I do.  I don't think it will be long.

18   I didn't know if you wanted to break.

19           THE COURT:  Well, we still have a couple minutes.

20           MR. SEVERO:  Okay.  Defense calls Mark Stohl.

21   Actually, may I change that to Scott Padin?  I think he's

22   out here.

23               (Mr. Severo exits courtroom.)

24           THE COURT:  Well, let's break at this time.

25           Ladies and gentlemen, we'll see you back here at

1    1:00 p.m.

2         Remember the admonishment not to discuss the case

3    amongst yourselves or with anybody else or form or

4    express any opinions about the matter until it's

5    submitted to you and you retire to the jury room.

6         THE CLERK:  All rise.

7              (*Whereupon the lunch recess*

8              *Was taken until 1:00 p.m.)*

9              (*Volume II of II transcript*

10             *Filed under separate cover.)*

11                  *--oOo--*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I hereby certify that, pursuant to Title 28,

4   Section 753, United States Code, the foregoing is a true

5   and correct transcript of the stenographically reported

6   proceedings held in the above-entitled matter and that the

7   transcript page format is in conformance with the

8   regulations of the Judicial Conference of the United

9   States.

10          Certified on March 25, 2015.

11

12                            /s/ Katherine M. Stride
                              KATHERINE M. STRIDE, CSR RPR
13                            Official Court Reporter
                              License No. 11773

14

15

16

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    – – – –

5


6
UNITED STATES OF AMERICA,        )
7                                 )
                    PLAINTIFF,    )
8                                 )
              vs.                 )   No. CR 11-00072(A)-RGK
9                                 )
(1)  MHER DARBINYAN,              )
10   (4)  ARMAN SHAROPETROSIAN,   )
     (35) RAFAEL PARSADANYAN,     )
11                                )
                    DEFENDANTS.   )
12   _____)

13


14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15             DAY 12, VOLUME II of II

16                PAGES 1 – 139

17           THURSDAY, APRIL 10, 2014

18                 1:03 P.M.

19           LOS ANGELES, CALIFORNIA

20


21


22     _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24              *255 East Temple Street*
                *Los Angeles, CA  90012*
25                 *213.894.5949*


        UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477
 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579
 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                        I N D E X

 2   DEFENDANT DARBINYAN'S WITNESS:              PAGE
     MARK STOHL
 3     DIRECT EXAMINATION BY MR. SEVERO            5
       CROSS-EXAMINATION BY MR. ESTRADA           16
 4     REDIRECT EXAMINATION BY MR. SEVERO         18

 5   DEFENDANT PARSADANYAN'S WITNESSES:          PAGE
     ARMAN MURADYAN
 6     DIRECT EXAMINATION BY MR. FLIER            22
       CROSS-EXAMINATION BY MR. ESTRADA           32
 7     REDIRECT EXAMINATION BY MR. FLIER          45
       RECROSS-EXAMINATION BY MR. ESTRADA         47
 8
     KAREN MANTASHYAN
 9     DIRECT EXAMINATION BY FLIER                48
       CROSS-EXAMINATION BY MR. CREIGHTON         50
10
     VAHAGN ZAKHARYAN
11     DIRECT EXAMINATION BY MR. FLIER            52
       CROSS-EXAMINATION BY MR. CREIGHTON         56
12
     LILIT PARSADANYAN
13     DIRECT EXAMINATION BY MR. FLIER            59
       CROSS-EXAMINATION BY MR. CREIGHTON         63
14
     ARMEN SIMONIAN
15     DIRECT EXAMINATION BY FLIER                66
       CROSS-EXAMINATION BY MR. CREIGHTON         67
16
     ALEN DERPETROSSIAN
17     DIRECT EXAMINATION BY MR. FLIER            69
       CROSS-EXAMINATION BY MR. SEVERO            96
18     CROSS-EXAMINATION BY MR. PEREYRA-SUAREZ   101
       CROSS-EXAMINATION BY MR. ESTRADA          106
19     REDIRECT EXAMINATION BY MR. FLIER         107

20

21   GOVERNMENT'S REBUTTAL WITNESSES:            PAGE
     JUDITH ARAGNO
22     DIRECT EXAMINATION BY MR. CREIGHTON       111
       CROSS-EXAMINATION BY MR. FLIER            117
23
     JEREMY STEBBINS
24     DIRECT EXAMINATION BY MR. ESTRADA         121
       CROSS-EXAMINATION BY MR. SEVERO           126
25     CROSS-EXAMINATION BY MR. FLIER            128
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

GOVERNMENT'S

| NUMBER | ADMITTED |
|--------|----------|
| 416 | 111 |
| 416A | 111 |
| 417 | 111 |
| 417A | 111 |

*FURTHER PROCEEDINGS:*                                    *PAGE*

Discussion re jury instructions                          131

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 10, 2014

 2                             1:03 P.M.

 3                              - - - -

 4        (In the presence of the jury:)

 5              THE COURT:  The record will reflect that all the

 6     members of the jury are in their respective seats in the jury

 7     box.

 8          And your next witness, Counsel.

 9              MR. SEVERO:  Yes, your Honor.

10          Mr. Darbinyan calls Mark Stohl.

11              THE COURT:  Okay.

12        (Witness sworn.)

13              THE CLERK:  Thank you.  You may be seated.

14          May I please ask that you state your name for the record

15     and spell your last name.

16              THE WITNESS:  Mark Stohl, S-t-o-h-l.

17              THE COURT:  Okay.  You may inquire, Counsel.

18              MR. SEVERO:  Thank you, your Honor.

19        MARK STOHL, CALLED AS A WITNESS BY DEFENDANT DARBINYAN,

20                         DIRECT EXAMINATION

21     BY MR. SEVERO:

22     Q.   Good afternoon, Detective Stohl.

23     A.   Good afternoon.

24     Q.   You are a sergeant in the Burbank Police Department; is

25     that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Correct.

2    Q.    And are you current -- how are you currently assigned?

3    A.    I'm assigned to the patrol division.

4    Q.    And before the patrol division, where were you assigned?

5    A.    I was assigned as a detective to the Eurasian Organized

6    Crime Task Force.

7    Q.    You testified in this case before, correct?

8    A.    Yes.

9    Q.    And you testified as an expert in this case, correct?

10   A.    Yes.

11   Q.    Let me ask you about some surveillance.  You, as part of

12   the -- I'll just shorthand the term, "task force."  Will you

13   understand what I mean by that?

14   A.    Yes.

15   Q.    As part of your duties in the task force, did you

16   undertake surveillance at different times?

17   A.    Yes, many times.

18   Q.    Many times.  Do you recall any of the surveillance

19   involving an individual by the name of Minas Matosyan?

20   A.    Some of them.

21   Q.    Yeah, but --

22   A.    Yes.

23   Q.    -- do you recognize the name?

24   A.    Yes.

25   Q.    Do you recognize the name as someone who was thought to be
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   a victim of a crime?

 2   A.   Yes.

 3   Q.   And did you surveil or engage in surveillance of

 4   Mr. Matosyan to ascertain various meetings that it was thought

 5   he'd be having?

 6   A.   Yes.

 7   Q.   Do you -- did you undertake surveillance in November of

 8   2009, if you remember?

 9   A.   We did surveillance for 14 to 18 months on this case.

10   Q.   I understand.

11   A.   So --

12   Q.   With respect to this Minas Matosyan individual, do you

13   have any recollection as to when you started surveillance with

14   respect to Mr. Matosyan?

15   A.   I don't know the exact dates.

16   Q.   Do you have any recollection as to how many times you

17   engaged in surveillance that pertained to Mr. Matosyan?

18   A.   No, I don't.

19   Q.   All right.  How many times did you -- you remember

20   Mr. Matosyan at all?

21   A.   Yes.

22   Q.   How many times did you see Mr. Matosyan meet with

23   Mr. Darbinyan?

24   A.   I don't recall.

25   Q.   Well, do you recall any?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Off the top of my head, without looking at notes, no, I
 2   don't.
 3   Q.   You were not the primary investigator with respect to
 4   Mr. Matosyan's problems; is that correct?
 5   A.   No, I was not.
 6   Q.   All right.  Now, you have previously testified that you're
 7   an expert in identity theft; is that correct?
 8   A.   Yes.
 9   Q.   And you're an expert in the manner in which PIN pad
10   machines at various stores are used to perpetrate identity
11   theft?
12   A.   Yes.
13   Q.   Are you aware of what information is generated by the PIN
14   pad machines that can be downloaded into a printout?
15   A.   By who?  By the store or by the people that alter the PIN
16   pads or --
17   Q.   By anyone.
18   A.   Yes.
19   Q.   Now, what the download -- let's start with the store.  The
20   store can download information from the PIN pad?
21   A.   I don't know that it can.  I don't believe the device has
22   a memory in it.
23   Q.   Do you know the skimming device --
24        THE COURT:  Counsel -- you asked the question I was
25   going to ask, Counsel.  Go ahead.  I want to make sure there's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    a distinction between a PIN pad and a PIN pad with a skimming

 2    device.

 3           MR. SEVERO:  Right.  That's where I was going next,

 4    your Honor.

 5           THE COURT:  Yeah.

 6    BY MR. SEVERO:

 7    Q.   A PIN pad with a skimming device, are you acquainted with

 8    the skimming devices?

 9    A.   Yes.

10    Q.   Now, do you know the skimming devices retain memory?

11    A.   Yes.

12    Q.   They do, don't they?

13    A.   Yes.

14    Q.   And the memory that it retains is the number of times that

15    a particular card is swiped; is that correct?

16    A.   It does retain the track data of swiped cards.

17    Q.   Right.  And that actually -- that question needs a little

18    more detail.

19         The information that is obtained by this skimming device

20    is the information that is contained on the magnetic strip of

21    the credit card or the debit card; is that true?

22    A.   It will retain the account number, and it also has some

23    data, I'm not really sure what it is, and then it usually will

24    have a date and time stamp.

25    Q.   Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    And then if the machine prompts for a PIN code or a ZIP

2    code, it will retain that, also.

3    Q.    Does the PIN pad machine have a time and date stamp, the

4    PIN pad machine without the skimming device?

5    A.    That, I don't know.

6    Q.    The PIN pad machine with a skimming device, actually, the

7    skimming device may capture the -- every time that the -- a

8    card is swiped, it captures the account information, the

9    account number, and the time that it was swiped, correct?

10   A.    If it's working properly, it should.

11   Q.    Right.  And have you seen a print -- have you seen any

12   printouts in this case concerning any of the skimming devices'

13   downloads?

14   A.    I haven't seen the actual -- from the 99 Cent Store

15   skimmers, I haven't seen the downloads.  I've just read the

16   reports from the Secret Service agent detailing how many

17   account numbers were present on each device.

18   Q.    All right.  So -- and let me direct your attention --

19         Your Honor, 344 has been admitted into evidence before.

20            THE COURT:  Yes.

21            MR. SEVERO:  I'll just -- may I publish page 2 of 344?

22            THE COURT:  Yes.

23            MR. SEVERO:  Thank you.

24   Q.    Let me just direct your attention to this page.  Every

25   time the card is swiped, it, the skimming device, picks up
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1    information about the account number and time stamp, correct?

 2    A.   It should, yes.

 3    Q.   Right.  Now, look at the first line, if you would, up

 4    here.  Is that one swipe?

 5    A.   I don't know, sir.  I wasn't there to see it get swiped.

 6    Q.   Oh, I realize that, but the information that you see on

 7    there says -- it has a number, some numbers here.  Can't seem

 8    to make this work.  Okay.  You see those?

 9    A.   Yes.

10    Q.   And then it has what appears to be a date -- whoops.

11    Well, may be easier this way.  A date and a time stamp.  Do you

12    see that?

13    A.   Yes.

14    Q.   And if you look at the numbers on the left, these numbers,

15    they appear to be the same, correct?

16    A.   Yes.

17    Q.   Now, you've seen these printouts before, have you not, in

18    other cases?

19    A.   Yes.

20    Q.   Now, is that the -- lines one and two, is that one swipe

21    or two swipes?

22    A.   I don't know, sir.  Sometimes it captures data in funny

23    ways.  I don't know if they swiped it one time.  Sometimes if

24    you're -- if you're at a store and you swipe it and you do it

25    too soon, they ask you to reswipe it.  I don't know.  I wasn't

```
 1   there.

 2   Q.   Well, look on the right side of this, and it gives you two

 3   different times.  You see that?

 4   A.   Yes.

 5   Q.   And one time is 3:20:37 a.m., and the next time is

 6   3:20:56 a.m.  Does that give you a clue as to whether it was

 7   swiped once or twice?

 8           MR. ESTRADA:  Objection, your Honor, calls for

 9   speculation.

10           MR. SEVERO:  No.

11           MR. ESTRADA:  There's been testimony on this.

12           THE COURT:  If you know.

13           THE WITNESS:  I don't know.  It -- it could be a point

14   where they swiped it too soon and the clerk asked them to swipe

15   it again.

16           MR. SEVERO:  Right.

17           THE WITNESS:  I don't know.  I wasn't there.

18   BY MR. SEVERO:

19   Q.   Well, I know you weren't there, but you're an expert on

20   these things and you know how these skimming devices capture

21   data, don't you?

22   A.   I've seen a lot of printouts from skimmers before.

23   Sometimes it'll have two, sometimes it has one.  I don't know

24   why.  You have to be there to watch the actual swiping to know

25   what actually happened.
```

1   Q.   So, actually, you could not tell from Exhibit 344 how many

2   times -- how many records it, the actual skimming device,

3   captured; is that correct?

4   A.   Well, you could count each one.

5   Q.   Right.  If you -- do you count line by line?  If I told

6   you that there were 1500 records on here --

7   A.   Mm-hmm.

8   Q.    -- would you start with one, two, three, just down the

9   line?

10   A.   Well, if you told me there was 1500 records, there would

11   be 1500 records.  If you said there's 1500 unique records, that

12   would be different.

13   Q.   So 1500 records means however many records show up here,

14   but unique records indicates to you that a credit card may

15   appear more than two or three times, and that's one unique

16   record, true?

17   A.   Yes, each -- each card number that's unique to itself is

18   one unique --

19   Q.   One record.  All right.  Now, do you know how quickly --

20   let me formulate this question right.

21        This information on the, I'd say, what, quarter of the

22   way, maybe an eighth of the way down, I'm pointing to those.

23   You see that?

24   A.   Ones highlighted in red?

25   Q.   The ones that I highlighted, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes.

2   Q.   Now, these appear to have the same name, Carmen Lemos,

3   L-e-m-o-s.  You see that?

4   A.   Yes.

5   Q.   Does that appear to you to be the same, the same card

6   swiped three times?

7   A.   It appears to be three records for the same card.

8   Q.   And there would be one at 11:53:03 p.m., one at 11:53 and

9   34 seconds, and one at 11:54 and 10 seconds, right?

10          MR. ESTRADA:  Your Honor, he's testifying as the

11   record.  There's been testimony about the times and the stamps.

12          MR. SEVERO:  Well --

13          THE COURT:  Okay.  Overruled.

14      Is that correct?

15          THE WITNESS:  What he's stated appears to be correct,

16   yes.

17          THE COURT:  Yes.

18   BY MR. SEVERO:

19   Q.   When I go from -- when we go -- actually, there are four

20   to Carmen Lemos, but when we go -- sorry.  Strike that.

21      When you go from one record to the next swipe -- strike

22   that.

23      Once it changes account numbers, it's fair to assume or to

24   conclude that a different card is being swiped; is that

25   correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Calls for speculation, your Honor.

 2              THE COURT:  If you know as an expert.

 3              THE WITNESS:  If it's a different tracker, it would

 4   indicate it's a different number.

 5   BY MR. SEVERO:

 6   Q.   All right.  So if we look again at Ms. Lemos here, the

 7   track numbering starts with B540.  You see that?

 8   A.   Yes.

 9   Q.   And then it goes to the next swipe, it has like a "P" and

10   then a 120.  Is that a different card?

11   A.   No.  You would look to the record below that, B486.

12   Q.   Okay.  All right.  So the P120 and so forth is part of the

13   B540 record there, right above it, correct?

14   A.   Yes.  You can see towards the middle of that highlighted

15   portion where it has the account number.

16   Q.   Again, right?

17   A.   Yes.

18   Q.   Right there.  All right.

19        So each record is two lines, more or less, in this

20   particular instance?

21   A.   It would appear if there's a name associated with the

22   track read that it's two lines.

23   Q.   Right.  When it changes names from Carmen Lemos to Claudia

24   Jimenez, then we get -- we get the next swipe approximately

25   seven minutes later; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. ESTRADA:  Object, your Honor, calls for
 2   speculation.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  That would appear correct.
 5   BY MR. SEVERO:
 6   Q.   Okay.  You don't know how many -- you never examined this
 7   exhibit before?
 8   A.   No.  It's the first time I've seen it.
 9   Q.   Never seen it.
10        I need just a moment, if I may, your Honor.
11              THE COURT:  Mm-hmm.
12              MR. SEVERO:  That is actually all I have of this
13   witness.
14              THE COURT:  Thank you.
15        Counsel.
16              PEREYRA-SUAREZ:  I have no questions, your Honor.
17              MR. SEVERO:  Thank you, Mr. Stohl.
18              MR. FLIER:  No questions, your Honor.
19              THE COURT:  Any direct -- redirect?
20              MR. ESTRADA:  Just a moment, your Honor.  Just
21   briefly.
22                       CROSS-EXAMINATION
23   BY MR. ESTRADA:
24   Q.   Sergeant Stohl, that record you were just shown, did you
25   examine the point-of-sale terminals?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, I did look at them.

 2    Q.    Are you an analyst of the point-of-sale terminals?

 3    A.    No, I'm not.

 4    Q.    Is that a different level of expertise?

 5    A.    Yes.

 6    Q.    Is there a different individual in this case who analyzed

 7    in a technical manner the point of sale terminals?

 8    A.    Yes.

 9    Q.    Are you that person?

10    A.    No.

11    Q.    Who is that person?

12          MR. SEVERO:  I'm sorry, your Honor, I think it calls

13    for -- it lacks foundation.

14          THE COURT:  Yeah, I don't know if you know, so --

15    BY MR. ESTRADA:

16    Q.    Well, do you know?

17    A.    I do know him.

18          THE COURT:  And do you know -- other than he told you

19    he examined them, do you know that he did examine them?  Were

20    you there when he examined or anything.?

21          THE WITNESS:  I know that he does many of the exams in

22    the Los Angeles area for other cases other than this one.

23          THE COURT:  But you don't know if he did this one or

24    not?

25          THE WITNESS:  I know he did this one.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  And is that only from what he told you

 2     or --

 3              THE WITNESS:  From what he told me and reading the

 4     reports.

 5              THE COURT:  Sustained.

 6     BY MR. ESTRADA:

 7     Q.   Are you familiar with a person by the name of David Ogden?

 8     A.   Yes.

 9     Q.   And has he worked with the task force in terms of skimmers

10     in the past?

11              MR. SEVERO:  Objection, no foundation.

12              THE COURT:  Overruled.

13              THE WITNESS:  Yes.

14              MR. ESTRADA:  No further questions, your Honor.

15                        REDIRECT EXAMINATION

16     BY MR. SEVERO:

17     Q.   You're not -- you testified on direct examination earlier

18     in this case that you were an expert on skimming devices; is

19     that correct?

20     A.   On skimming, the modes and methods.

21     Q.   And the information that it stores?

22     A.   Yes, but I'm not trained to forensically download the

23     devices.

24     Q.   That's fair enough.  But you know what information it

25     stores and how it stores it, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Yes.

 2   Q.    And you know that a particular skimming device, or any

 3   skimming device, will have track 1 records, right?  Track 2

 4   records, correct?

 5   A.    I know they'll -- they'll contain records unless they're

 6   deleted via remote download.

 7   Q.    Right.  And a time and date stamp?

 8   A.    Typically those are the records that are stored on the

 9   device.

10   Q.    Because you've seen those before?

11   A.    Yes.

12         MR. SEVERO:  All right.  That's all I have.

13         THE COURT:  Counsel?

14         PEREYRA-SUAREZ:  Nothing further, your Honor.

15         THE COURT:  Counsel?

16         MR. FLIER:  No, your Honor.

17         THE COURT:  Counsel?

18         MR. ESTRADA:  No, your Honor.

19         THE COURT:  You may step down.

20         THE WITNESS:  Thank you, sir.

21         THE COURT:  Counsel, next witness.

22         MR. SEVERO:  I'm sorry, your Honor.  Mr. Darbinyan has

23   no other witnesses.

24         THE COURT:  Okay.

25      Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1            PEREYRA-SUAREZ:  Your Honor, I have no witnesses.

2            THE COURT:  Okay.

3       Counsel.

4            MR. FLIER:  I have some witnesses.

5            THE COURT:  Okay.  How about calling the first.

6            MR. FLIER:  Okay.

7            MR. ESTRADA:  Your Honor, there had been a request for

8    an officer to be here, by Darbinyan, and I would ask that

9    officer be excused, Scott Padin.

10           MR. SEVERO:  Yes, your Honor, he may be excused.  I'm

11   sorry.

12           THE COURT:  Okay.  Thank you, Counsel.

13           MR. ESTRADA:  Thank you, your Honor.

14           MR. FLIER:  I'd like to call Mr. Muradyan.  May I get

15   him, your Honor?

16           THE COURT:  Sure.

17           MR. FLIER:  This witness is going to utilize the

18   interpreter, your Honor.  Thank you.

19           THE CLERK:  First I'll swear the interpreter in.

20      Do you solemnly swear that you will well and truly

21   interpret the questioning or the information from Armenian to

22   English and English to Armenian to the best of your knowledge

23   and ability, so help you God?

24           THE INTERPRETER:  I do.

25           THE CLERK:  And may I please have you state your name
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    for the record.

 2              THE INTERPRETER:  Yes.  Zarreh, Z-a-r-r-e-h, Martin,

 3    M-a-r-t-i-n.

 4              THE CLERK:  Thank you.

 5         And now for the witness.

 6         (Witness sworn.)

 7              THE CLERK:  Okay.  You may be seated.  Thank you.

 8              THE COURT:  When the witness is seated, I want to make

 9    sure that the mic is in front of the interpreter, not the

10    witness.

11         Before we go any further, let me instruct the jury.  I

12    think I've told you before, but let me explain to you.  Anytime

13    there's an interpretation of a different language, the

14    testimony that you are to consider is what comes from the

15    interpreter.  Even if you speak the language, you can't listen

16    to the language; you have to listen to the interpreter, so

17    everybody is using the same evidence.  So don't pay attention

18    to what the witness may be saying.  I think you've all told me

19    that nobody speaks Armenian anyway, but don't pay attention to

20    what the witness is saying.  Pay attention to what the

21    interpreter is saying the witness is saying, okay?

22              THE CLERK:  And may I please ask that the witness

23    state his full name for the record and spell your name.

24              THE WITNESS:  Arman Muradyan, M-u-r-a-d-y-a-n.

25              THE COURT:  Okay.  Counsel, you may inquire.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              MR. FLIER:  Thank you, your Honor.

2          ARMAN MURADYAN, CALLED AS A WITNESS

3              BY DEFENDANT PARSADANYAN,

4                  DIRECT EXAMINATION

5    BY MR. FLIER:

6    Q.   Good afternoon, Mr. Muradyan.

7    A.   Good afternoon.

8    Q.   You know who I am?

9    A.   Yes.

10   Q.   And I'm the lawyer for Mr. Parsadanyan; is that correct?

11   A.   Yes.

12   Q.   Have you ever testified before?

13   A.   No.

14   Q.   Directing your attention to my client, Rafael Parsadanyan,

15   do you know that young man?

16   A.   Yes.

17   Q.   And how do you know him?

18   A.   As a friend and also as a work friend.

19   Q.   How long have you known him for, approximately?

20   A.   Ten years.

21   Q.   With respect to any business relationship that you have

22   with Mr. Parsadanyan, have you had one with him?

23   A.   We work together.

24   Q.   What type of business?

25   A.   Wholesale coffee.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   How long have you been in the wholesale coffee business
 2    with Mr. Parsadanyan, approximately?
 3    A.   Five years.
 4    Q.   Thank you.
 5         Now, with respect to any other type of business that
 6    you're aware of that Mr. Parsadanyan's involved with, are you
 7    aware of other businesses?
 8    A.   No.
 9    Q.   Are you aware of any cellular phone business?
10    A.   No.
11    Q.   Okay.  With respect to specifically the year of 2009, in
12    July, were you still friendly and had some type of business
13    relationship with Mr. Parsadanyan?
14    A.   Yes.
15    Q.   I want to direct your attention specifically now to a
16    business in Glendale.  At some point in time in July, July 18th
17    specifically, were you with Mr. Parsadanyan?
18    A.   Yes.
19    Q.   Where were you with Mr. Parsadanyan, if you can recall?
20    A.   We were in his store, and then in the evening we went to a
21    birthday.
22    Q.   Okay.  Well, I'd like to break that down.  With respect to
23    when you said "we were in his store," what store are you
24    referencing?
25    A.   AT&T store.
```

1   Q.   Okay.  And with respect to that store, whose store is it?

2   A.   Rafael's.

3   Q.   So I asked earlier are you aware of any other business

4   that Mr. Parsadanyan's involved.  Is he involved in some type

5   of cell phone business?

6   A.   He has a business, but I'm not in that business.

7   Q.   Okay.  But you're aware that he has that business?

8   A.   Yes.

9   Q.   Okay.  Now, do you remember an event on July 18th,

10  sometime in the evening hours, maybe around 8:00 o'clock, that

11  you were stopped in a vehicle that Mr. Parsadanyan was driving,

12  by the Glendale Police Department?  Do you recall that?

13  A.   Yes.

14  Q.   Before you were in the car with Mr. Parsadanyan and it was

15  stopped, you came from the store that you just mentioned; am I

16  correct?

17  A.   Yes.

18  Q.   How long were you at the store, approximately, before you

19  left and before you got pulled over by the Glendale Police

20  Department, if you can recall, sir?

21        MR. ESTRADA:  Objection, your Honor, leading.

22        THE COURT:  Overruled.

23        THE WITNESS:  About 15, 20 minutes.

24  BY MR. FLIER:

25  Q.   And how did you arrive at the store?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I was at home with my relative's son.  My friend and his

2   son dropped me, dropped me off at the store.

3   Q.   And were you going to go somewhere with Mr. Parsadanyan

4   after you were dropped off at the store?

5   A.   We were going to go to his mom's home and then his home,

6   and then from there to a birthday.

7   Q.   Okay.  Now, I want to direct your attention specifically

8   to when the vehicle was pulled over and stopped by the Glendale

9   Police Department.  Do you remember that event?

10  A.   Yes.

11  Q.   Do you recall being stopped, even though you weren't the

12  driver, being pulled over in that vehicle?

13  A.   Yes.

14  Q.   If you recall, what type of vehicle was Mr. Parsadanyan

15  driving?

16  A.   A black BMW.

17  Q.   Now, once the car was stopped by the Glendale Police

18  Department, at some point in time were you ever asked to exit

19  that vehicle?

20  A.   Yes.

21  Q.   Did you exit the vehicle?

22  A.   Yes.

23  Q.   At any point in time did you see Mr. Parsadanyan exit the

24  vehicle?

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   After you exited the vehicle, where did you go?

2    A.   They made us sit on the ground.

3    Q.   When you say "they," are you referencing the policemen

4    that pulled the car over?

5    A.   Yes.

6    Q.   With respect to the policemen that pulled over the car,

7    were they wearing a police uniform, or were they in, let's say,

8    plain clothes, if you recall?

9    A.   No, they were in uniform.

10   Q.   If I was to ask you approximately how long this event took

11   place from when you were first stopped until you were allowed

12   to leave, approximately what was that time frame, sir?

13   A.   Probably about 20 minutes.

14   Q.   Now, at any point in time when you were making the

15   observation -- well, strike that.

16        Were you watching any observations while you were seated

17   wherever you were located?

18   A.   Yes.

19   Q.   Were you closest to the police vehicle or a particular

20   area in Mr. Parsadanyan's vehicle while you were outside

21   waiting?

22   A.   Close to his car.

23   Q.   At any point in time did you ever see any of the police

24   officers with a bag of money or currency that you can recall?

25   A.   No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Was Mr. Parsadanyan arrested that evening by the police?

2   A.   No.

3   Q.   After whatever happened that you witnessed by any of the

4   cars, including the police vehicle, at some point in time did

5   you leave the area with Mr. Parsadanyan?

6   A.   You mean when they released us?

7   Q.   Yes.

8   A.   Yeah.

9   Q.   Okay.  And now I want to talk about where you went after,

10  as you say, the police released you.  Do you recall where you

11  went, sir?

12  A.   We went to Hollywood.

13  Q.   And was there a particular --

14  A.   To Rafael's home.

15  Q.   Okay.  That kind of answered my question, but let me ask,

16  please.  Where did you go once you were released from the

17  police?

18  A.   Hollywood.

19  Q.   Who lives in Hollywood?

20  A.   Rafael, Rafael's mom.

21  Q.   Now, how long of a time, approximately, did it take once

22  you were released from the point of where the vehicle was

23  stopped until you arrived at Mr. Parsadanyan's, I think it's an

24  apartment?

25  A.   About 40 minutes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   So it takes around 40 minutes to get from the place of the

2   stop to Mr. Parsadanyan's apartment, approximately?

3   A.   No.   Counting the stop.

4   Q.   So, specifically, after the stop and you were allowed to

5   leave, are you simply saying it takes around 20 minutes to get

6   to his apartment?

7   A.   About 20 minutes, yeah.   15, 20 minutes.

8   Q.   Now, did you go directly, after the stop, to

9   Mr. Parsadanyan's apartment?

10  A.   Yes.

11  Q.   Once you arrived at the location around or by

12  Mr. Parsadanyan's apartment, did you exit the vehicle and go

13  into the apartment?

14  A.   No.

15  Q.   Where were you located?

16  A.   I stayed in the car.

17  Q.   Did Mr. Parsadanyan exit the vehicle?

18  A.   Yes.

19  Q.   Once Mr. Parsadanyan exited the vehicle, did you see if he

20  had anything in his hands?

21  A.   Yeah.

22  Q.   What, if anything, did you observe in either hand or both

23  hands of Mr. Parsadanyan, sir?

24  A.   There was a bag.

25  Q.   By any chance do you know what was inside the bag?

```
 1   A.   No.

 2   Q.   Okay.  But you saw a bag?

 3   A.   Yes.

 4   Q.   If I was to ask you do you have an independent

 5   recollection about a description or color of the bag, could you

 6   answer that question?

 7   A.   In my opinion, it was an AT&T bag.

 8   Q.   Do you recall the color, by any chance?

 9   A.   Bluish.

10   Q.   Now, after Mr. Parsadanyan exited his vehicle, he has the

11   item that you just described in his hand, did you see where he

12   went?

13   A.   He went inside the home.

14   Q.   From the location where you were located within the

15   vehicle, can you see the area that Mr. Parsadanyan went to?

16   A.   Yes.

17   Q.   And he went to his apartment?

18   A.   Yes.

19   Q.   How long, if you can recall, did you have to wait inside

20   the vehicle for Mr. Parsadanyan to return?

21   A.   10, 15 minutes.

22   Q.   So it was not an extensive, long period of time?

23   A.   No.

24   Q.   Now, once Mr. Parsadanyan came back, can we assume he

25   drove you somewhere else?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   A.   You mean he took me someplace else afterwards?

2   Q.   Yes, sir.

3   A.   Yes.

4   Q.   Do you recall where you guys went?

5   A.   Yes.

6   Q.   Where did you go?

7   A.   To a restaurant.

8   Q.   Do you recall the name of the restaurant?

9   A.   Yes.

10  Q.   What is the name?

11  A.   Cravings.

12  Q.   Okay.  And by any chance do you know how to spell that?

13  A.   I don't remember.

14  Q.   Now, do you recall what city or area the Cravings

15  restaurant is located?

16  A.   West Hollywood.

17  Q.   Did you drive directly from Mr. Parsadanyan's residence to

18  the restaurant?

19  A.   Yes.

20  Q.   How long, approximately, did it take you to get from the

21  apartment of Mr. Parsadanyan, approximately, to the restaurant

22  that you have briefly described?

23  A.   20 minutes.

24  Q.   And you went there directly?

25  A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   Do you remember the reason why you went to that particular

2   restaurant?  Was it a special occasion?  Was it for dinner?

3   Was it for some other reason?

4   A.   Yes, there was an occasion.

5   Q.   And what was the occasion?

6   A.   We were invited to a birthday.

7   Q.   How long, if you have an independent recollection, did you

8   stay at this particular restaurant for?

9   A.   Until about 12:00 o'clock.

10  Q.   And around midnight time did you leave the restaurant?

11  A.   Yes.

12  Q.   Did you leave with Mr. Parsadanyan?

13  A.   Yes.

14  Q.   And where did you guys go?

15  A.   He dropped me off at home.

16  Q.   And what city or area do you reside at, sir?

17  A.   In Glendale.

18  Q.   And after you were dropped off at Glendale, did

19  Mr. Parsadanyan leave your company?  He took off?

20  A.   Yeah.  He said, "I'm going home."

21  Q.   So from the time that you entered Mr. Parsadanyan's

22  vehicle at his store until the time that you were dropped off

23  at your home in Glendale after midnight, were you in the

24  company of Mr. Parsadanyan?

25  A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   Now, with respect to you, sir, and I'm almost done, what

 2    language are you most comfortable speaking in?

 3    A.   Eastern Armenian.

 4    Q.   Do you speak Russian?

 5    A.   Yes.

 6    Q.   Is Russian the exact same language as the Eastern Armenian

 7    dialect?

 8    A.   No.

 9    Q.   When you speak with Mr. Parsadanyan and you're speaking

10    non-English, what language are you speaking with him in?

11    A.   Armenian and Russian.

12         MR. FLIER:  I have no further questions.  Thank you.

13         THE COURT:  Counsel?  Counsel?

14         MR. SEVERO:  I'm sorry, your Honor.  No questions.

15         THE COURT:  Any questions?

16         PEREYRA-SUAREZ:  I have no questions, your Honor.

17         THE COURT:  Cross?

18         MR. ESTRADA:  Yes, your Honor.  Thank you.

19                        **CROSS-EXAMINATION**

20    BY MR. ESTRADA:

21    Q.   Good afternoon, sir.

22    A.   Good afternoon.

23    Q.   You know Mr. Parsadanyan?

24    A.   Yes.

25    Q.   You said you're a friend of his?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    In fact, haven't you said before that he's your cousin?

3    A.    No.

4    Q.    Do you recall going to the Glendale Police Department on

5    April 23rd, 2012?

6             THE INTERPRETER:  I'm sorry, may the interpreter have

7    the date again?

8             MR. ESTRADA:  Yes.  April 23rd, 2012.

9             THE INTERPRETER:  Thank you.

10            THE WITNESS:  Yes.

11   BY MR. ESTRADA:

12   Q.    And do you recall going there with Mr. Parsadanyan?

13   A.    Yes.

14   Q.    And you went there that day to file a report with the

15   Glendale Police Department, correct?

16   A.    Yes.

17   Q.    And on that date, you had Parsadanyan translate for you,

18   didn't you?

19   A.    Yes.

20   Q.    And you said you had him translate because he was your

21   cousin.  Didn't you say that?

22   A.    No.  I said he's my relative.

23   Q.    He's your relative now?

24            MR. FLIER:  I'm going to object to the "now" part.

25            THE COURT:  "Now" will be stricken.

```
 1            THE INTERPRETER:  May interpreter clarify the term?
 2    The term is interchangeable with relative and friend.
 3    BY MR. ESTRADA:
 4    Q.   So he is a relative?
 5    A.   He's not a relative.  He's a friend.
 6            THE INTERPRETER:  "Not friend," corrected by the
 7    witness.
 8            THE WITNESS:  The word "barekam" in Armenian,
 9    b-a-r-e-k-a-m, means one who wishes well to another.
10    BY MR. ESTRADA:
11    Q.   Are you his relative, sir?
12    A.   Relative, no.
13    Q.   Now, you've been sitting outside the courtroom the entire
14    time during this trial, correct?
15    A.   Yes.
16    Q.   And you're there because you're here to help your friend,
17    your relative, Parsadanyan?
18    A.   Yeah.
19    Q.   You don't want to see him get in trouble; is that right?
20    A.   Yes.
21    Q.   Now, let me ask you about this date in July 2009 when you
22    were with Mr. Parsadanyan.  Do you have that date in mind that
23    you just testified about?
24    A.   May 9th?
25    Q.   July 2009.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes.

 2    Q.   Now, you said you were at his store for 15 to 20 minutes;

 3    is that right?

 4    A.   Yes.

 5    Q.   And during that time, did you see a person named Mher

 6    Darbinyan?

 7    A.   No.

 8    Q.   Do you see this man seated here with the pink shirt and

 9    the purple sweater?

10    A.   Yes.

11    Q.   Did you see that person at the store?

12    A.   That day, I did not see him.

13    Q.   Have you seen him on previous days?

14    A.   Yes.

15    Q.   But that day, you say you didn't see him?

16    A.   Yes.

17    Q.   Did you see a Charger parked outside the store?

18         MR. SEVERO:  Object to that.  Charger like a phone

19    charger or --

20         THE COURT:  Car.

21         MR. ESTRADA:  I'll be more clear.

22         THE COURT:  That's okay.

23    BY MR. ESTRADA:

24    Q.   Did you see a Dodge --

25         THE COURT:  I think he understands the question.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          Did you see a car, Charger, parked outside?

 2              THE WITNESS:  I didn't notice it.

 3              THE COURT:  Okay.

 4  BY MR. ESTRADA:

 5  Q.   Are you familiar with what a Dodge Charger is?

 6  A.   Yes.

 7  Q.   And you didn't see that parked outside the store?

 8  A.   There were a lot of cars parked.  I didn't notice.

 9  Q.   But your testimony here is that you did not see

10  Mr. Darbinyan, the man seated right here, that day?

11              MR. SEVERO:  Asked and answered.

12              THE COURT:  Overruled.

13              THE WITNESS:  Yes.

14  BY MR. ESTRADA:

15  Q.   Now, after you left the store, you got into a black BMW,

16  you said?

17  A.   Yes.

18  Q.   What direction did you drive in?

19  A.   Towards Glendale Avenue.

20  Q.   Did you drive towards the 134 freeway?

21  A.   Yes.

22  Q.   Now, that's north from the store, correct?

23  A.   Yeah.

24  Q.   It was around the 134 freeway where you and Parsadanyan

25  got pulled over, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Now, you mentioned that you knew where Parsadanyan lived

 3    at this time, correct?

 4    A.    Yes.

 5    Q.    And he lived on Franklin Avenue in Hollywood, correct?

 6    A.    Yes.

 7    Q.    Is that 5356 Franklin Avenue?

 8    A.    I don't know.  I don't remember the block number.

 9    Q.    Does that sound right?

10    A.    I've never paid attention.

11    Q.    But you know it's Franklin Avenue?

12          THE COURT:  Asked and answered.  He's already

13    testified to that.  Next question.

14    BY MR. ESTRADA:

15    Q.    Now, you know that Franklin Avenue is actually south of

16    the store.  Do you know that?

17    A.    Well, you know, I'm not good with directions, north,

18    south.

19    Q.    Okay.  Now, you mentioned that you went to Franklin Avenue

20    and you were there for about 15 minutes.

21    A.    I was there?

22    Q.    I'll be clear.  You drove with Parsadanyan after the

23    traffic stop, correct?

24    A.    Yes.

25    Q.    You went to his house on Franklin Avenue in Hollywood,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   correct?

2   A.   Yes.

3   Q.   And you stayed parked outside while he went inside to his

4   house; is that right?

5   A.   Yes.

6   Q.   And you recall him taking some sort of bluish AT&T bag; is

7   that right?

8   A.   Yes.

9   Q.   Now, after that 15 to 20 minutes at the home of

10  Parsadanyan, you then drove to a restaurant?

11  A.   Yes.

12  Q.   And you said that was Cravings restaurant in West

13  Hollywood, right?

14  A.   Yes.

15  Q.   And then you stated that at that restaurant you then left

16  at about midnight; is that right?

17  A.   Yes.

18  Q.   Now, is it your testimony that you were with Parsadanyan

19  the entire time at this restaurant?

20  A.   Yes.

21  Q.   This was a party?

22  A.   Yes.

23  Q.   And you were next to Parsadanyan the whole time?

24  A.   Yes.

25  Q.   Sitting right next to you?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Now, sir, isn't it true that you haven't always been

 3    truthful with the police?

 4             MR. FLIER:  Objection.

 5             MR. SEVERO:  It's improper impeachment.

 6             THE COURT:  Overruled.

 7             THE WITNESS:  I've always spoken the truth.

 8    BY MR. ESTRADA:

 9    Q.    Do you recall speaking with Glendale police officers on

10    August 26, 2010?

11    A.    Yes.

12    Q.    And this was at your home on Chevy Chase?  531 East Chevy

13    Chase in Glendale?

14    A.    Yes.

15    Q.    And the officers had gone to speak to you because your

16    wife reported a threat.  Do you remember that?

17             MR. FLIER:  Objection, your Honor.

18             THE COURT:  As to what the report was, that's

19    sustained.

20    BY MR. ESTRADA:

21    Q.    Do you recall that the officers went to speak to you at

22    your house?

23    A.    Yes.

24    Q.    And at that time do you recall denying ever making a

25    threat?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. FLIER:  Same objection and irrelevant.

 2            MR. ESTRADA:  It's 608(b), your Honor.

 3            THE COURT:  Overruled.  It goes to credibility.

 4  Overruled.

 5            THE INTERPRETER:  Your Honor, may the interpreter have

 6  the question again?

 7            THE COURT:  Yes.

 8        Question again.

 9  BY MR. ESTRADA:

10  Q.   On that date, August 26, 2010, do you recall denying

11  making a threat to your wife?

12  A.   Yes.

13  Q.   And do you recall denying saying that she would not live

14  without you?

15  A.   I don't remember that.

16  Q.   Do you recall denying that you and your wife were

17  separated and seeking a divorce?

18            MR. FLIER:  I'm going to object, relevance, your

19  Honor.

20            THE COURT:  Overruled.  Goes to credibility.

21  Foundation's not laid, it'll all be stricken.

22            MR. SEVERO:  Sorry, your Honor, I didn't hear the

23  Court's last comment.

24            THE COURT:  This comes in for credibility as long as

25  he can show there's some impeachment on it.  We only have heard
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   one side so far.

 2          THE WITNESS:  No, I don't remember such a thing.

 3   BY MR. ESTRADA:

 4   Q.   But you remember the police going to speak to you?

 5   A.   The police came, and much later an interpreter came, and

 6   we only spoke for a couple minutes, and then he left.

 7   Q.   When you spoke to the interpreter to the police, do you

 8   recall at the time you not living with your wife, you guys were

 9   separated?

10          THE COURT:  I'm sorry, is the question did he say

11   that?

12          MR. ESTRADA:  Yes.

13          THE COURT:  Okay.

14      Did you say that you were not living with your wife and

15   that you were separated at that time?

16          THE WITNESS:  Yes.

17   BY MR. ESTRADA:

18   Q.   And do you recall saying the reason you and your wife were

19   living apart is because the apartment was too small and too

20   hot?

21   A.   No, I don't remember.

22   Q.   Now, when you denied the threat, that's not what your wife

23   said, right?

24          MR. FLIER:  Objection as to --

25          THE COURT:  Sustained.  It would be immaterial what
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    his wife said.  Do you have some evidence that he said

 2    something else?

 3              MR. ESTRADA:  Yes, your Honor.

 4              THE COURT:  Well, then let's get to that.  Very

 5    limited in impeachment.

 6    BY MR. ESTRADA:

 7    Q.   Now, do you recall that officers found on this occasion a

 8    loaded handgun on top of a black folding chair in your house?

 9              MR. FLIER:  Objection, your Honor.

10              THE COURT:  Sustained.

11    BY MR. ESTRADA:

12    Q.   Now, you were arrested on this date, correct?

13              THE COURT:  Sustained.

14              MR. FLIER:  Thank you.

15              THE COURT:  Counsel, you can go to only impeachment.

16    Trying to get in things that are not admissible to the jury is

17    improper.  You can go to impeachment.  If you have a saying

18    that he said and then impeach that he said something else,

19    that's fine, but not all this other stuff.

20              MR. ESTRADA:  Very good, your Honor.

21    Q.   Is it true that your wife had said --

22              MR. FLIER:  Objection already.

23              THE COURT:  Yeah, that's hearsay, what his wife might

24    have said.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. ESTRADA:

 2    Q.   Now, isn't it true that an emergency protective order was

 3    issued on this date?

 4         MR. FLIER:  Objection, irrelevant.

 5         THE COURT:  Sustained.

 6    BY MR. ESTRADA:

 7    Q.   Now, you denied on this occasion making any sort of threat

 8    towards your wife; is that right?

 9         MR. SEVERO:  Asked and answered.

10         THE COURT:  Sustained.  It has been asked and

11    answered.

12    BY MR. ESTRADA:

13    Q.   Now, you weren't with Mr. Parsadanyan all of July --

14         THE COURT:  I'm sorry, Counsel.  What's been going on

15    here is bothering the Court.

16       Did you ever threaten your wife on that day?

17         THE WITNESS:  No.

18         THE COURT:  And were you living with your wife on that

19    day or were you separated?

20         THE WITNESS:  Then, we lived together.

21         THE COURT:  On the date that you said you were not

22    living together, you did live together; is that correct?

23         THE WITNESS:  That day, we were living separately, and

24    later we lived together.

25         THE COURT:  Okay.  Go ahead.  I see no impeachment at
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    this time.

2        Ladies and gentlemen, I'm going to strike all that

3    testimony concerning that he was not telling the truth.  That

4    will be stricken from the record.  It should not be considered

5    by you.  It's not proper to throw up that.  It has nothing to

6    do with the case to try to get the jury to think that this

7    person is bad or whatever it is.  All that is excluded.

8        Next question.

9    BY MR. ESTRADA:

10   Q.   Now, you weren't with Parsadanyan all of July 2009; is

11   that right?

12        THE INTERPRETER:  I'm sorry, interpreter did not hear

13   you.  Were with him or were not?

14   BY MR. ESTRADA:

15   Q.   You were not with Parsadanyan all of July 2009?

16   A.   For the whole month, I can't remember, but we saw each

17   other every day.

18   Q.   Every day in July 2009?

19   A.   I can't remember.

20   Q.   And you weren't on phone calls of his when he would speak

21   to Darbinyan, were you?

22        THE INTERPRETER:  I'm sorry, your Honor.  For

23   clarification, when counsel's saying on phone calls --

24        MR. ESTRADA:  Yes, let me maybe move the microphone

25   up.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   You weren't on phone calls with him when he spoke to

2   Darbinyan, correct?

3          THE INTERPRETER:  Again, does counsel mean speaking on

4   the phone directly to him?

5          MR. ESTRADA:  Yes.

6          THE INTERPRETER:  Thank you.

7          THE WITNESS:  When?

8   BY MR. ESTRADA:

9   Q.   Were you ever on a phone call between Parsadanyan and

10  Darbinyan?

11  A.   I don't understand the question.

12  Q.   I'll repeat it.

13  A.   You mean three-way?

14  Q.   Sure, a three-way call.

15  A.   No.

16  Q.   You were never on a three-way phone call between Darbinyan

17  and Parsadanyan yourself?

18  A.   I don't know how to make a three-way call.

19         MR. ESTRADA:  No further questions, your Honor.

20         THE COURT:  Redirect?

21         MR. FLIER:  Very briefly, your Honor, and just one

22  topic.

23                    **REDIRECT EXAMINATION**

24  BY MR. FLIER:

25  Q.   There was a question by Mr. Estrada about you going to a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    police station with Mr. Parsadanyan where he helped interpret.

2    Do you remember that?

3    A.    Yes.

4    Q.    Directing your attention to Special Agent Stebbins, do you

5    recognize the man with the blue tie between the nice lady

6    prosecutor and the nice man prosecutor?

7    A.    I've seen him on another day, yes.

8    Q.    Yes, that's what I'd like to ask.  How many different

9    times have you seen Mr. Stebbins, this gentleman here?

10    A.    Two.

11    Q.    And is one of those occasions at the Glendale Police

12    Department?

13    A.    Yes.

14    Q.    Where was the other occasion?

15    A.    At Rafael's telephone store.

16    Q.    So it's your testimony that you specifically saw

17    Mr. Stebbins at Mr. Parsadanyan's store on at least one

18    occasion?

19    A.    I saw him one time in the store.

20    Q.    And if you know -- did Agent Stebbins, the man to whom

21    we're addressing, identify himself by a particular name?

22    A.    Yeah.

23    Q.    Do you recall the name?

24    A.    I don't know.  Something Smith.

25    Q.    He didn't say he was FBI Special Agent Stebbins?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    He presented himself, but -- but he gave another name, not
 2   Stebbins.
 3   Q.    Okay.  And do you recall what capacity, if anything --
 4              THE COURT:  Counsel, I'm not too sure this is --
 5              MR. FLIER:  I'm sorry, your Honor.
 6              THE COURT:  That's okay.  I'm not too sure this is
 7   within the redirect of the cross-examination.  I don't think
 8   they've gone into that.
 9              MR. FLIER:  That's fine.  I have no further questions.
10   Thank you.
11              THE COURT:  Any recross?
12              MR. ESTRADA:  Yes, your Honor.
13                       RECROSS-EXAMINATION
14   BY MR. ESTRADA:
15   Q.    Sir, you're certain you saw Special Agent Stebbins inside
16   that store?
17   A.    Yes.
18   Q.    And you're certain you didn't see Mher Darbinyan on July
19   18th, 2009, before you went to the Cravings party with
20   Parsadanyan?
21   A.    Yes.
22              MR. ESTRADA:  No further questions, your Honor.
23              THE COURT:  You may step down.
24              MR. FLIER:  Your Honor, I narrowed down some of my
25   character witnesses.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2              MR. FLIER:  I'm going to start with them, and that

 3   should be brief.

 4        Your Honor, the defense calls Karen Mantashyan.

 5              THE COURT:  Okay.

 6              MR. FLIER:  Your Honor, could I go outside just to see

 7   if any of the other witnesses need an interpreter?

 8        (Brief pause.)

 9        (Witness sworn.)

10              THE CLERK:  Thank you.  You may be seated.

11        May I please ask that you state your full name for the

12   record and spell your name, please.

13              THE WITNESS:  It's Karen Mantashyan, K-a-r-e-n, last

14   name M-a-n-t-a-s-h-y-a-n.

15              THE COURT:  Okay.  You may inquire.

16              KAREN MANTASHYAN, CALLED AS A WITNESS

17                 BY DEFENDANT PARSADANYAN,

18                     DIRECT EXAMINATION

19   BY MR. FLIER:

20   Q.   Sir, what do you do for work?

21   A.   I do TV commercials.

22   Q.   And with respect to my client, Mr. Rafael Parsadanyan, do

23   you know that young man?

24   A.   Yes.

25   Q.   How do you know him, please?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    I did TV commercials for them.  He's running coffee
 2   business.
 3   Q.    So you have some type -- are you friendly with him?
 4   A.    Yes, I am.
 5   Q.    Besides any friendship relationship, you also had some
 6   business with him?
 7   A.    Right.
 8   Q.    And he utilized your production crew or company for some
 9   business of his?
10   A.    Yes.
11   Q.    And what was that business of Mr. Parsadanyan?
12   A.    He run coffee business.
13   Q.    Okay.  Now, how long have you known Mr. Parsadanyan for,
14   approximately?
15   A.    From 2008, '9.  '8, I think.
16   Q.    And with respect to a different type of business, are you
17   aware that he had another business or businesses besides just
18   the coffee issue?
19   A.    Yes.  He had a AT&T store.
20   Q.    And you're familiar with that store?
21   A.    Yes.
22   Q.    By any chance do you know what city it's located in?
23   A.    It's Glendale.
24   Q.    And now with respect to Mr. Parsadanyan and your awareness
25   of him, is he an honest person?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Yes, he's very honest person.  He is.

 2   Q.    Is he a truthful person?

 3   A.    Right, he's truthful person, and he's very family guy.

 4   Q.    Is he the type of person that's going to steal?

 5   A.    No.

 6         MR. FLIER:  I have no further questions.

 7         THE COURT:  Cross.

 8     I'm sorry, Counsel.  Is there any question by defense

 9   counsel?

10         MR. SEVERO:  Falling asleep on that.  No.

11         PEREYRA-SUAREZ:  No, your Honor.

12         THE COURT:  Okay.  Counsel.

13                      CROSS-EXAMINATION

14   BY MR. CREIGHTON:

15   Q.    Good afternoon, sir.

16     So defendant Parsadanyan is a customer of yours?

17   A.    Yes.

18   Q.    Would you also call him a friend?

19   A.    Right.

20   Q.    You like him?

21   A.    Very much.

22   Q.    You want to help him?

23   A.    Right.

24   Q.    You don't want to see him go to prison, do you?

25   A.    Sure not.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   The reason you're here today is to help him; isn't that

2  right?

3  A.   The reason is I'm here to tell you truth about him.

4  Q.   You've testified that he's a law-abiding person?

5  A.   I didn't under- -- understand.

6  Q.   You testified he's the kind of person that obeys the laws?

7  A.   Obey the law?

8  Q.   Yes.

9       THE COURT:  I think he only said that he -- I don't

10 think he said obeys the laws.  I think he just referred to

11 theft.  I don't think he said obeys the law.

12      MR. CREIGHTON:  Okay.  I'm sorry, your Honor.

13      THE COURT:  I don't know if I would have permitted

14 that.

15   On the area of theft, you don't know him to be -- have

16 theft or be a thief or anything, do you?

17      THE WITNESS:  No.

18      THE COURT:  Okay.  That part can come in.

19 BY MR. CREIGHTON:

20 Q.   Do you know who Mher Darbinyan is?

21 A.   No.

22 Q.   Would it change your opinion of the defendant Parsadanyan

23 if he had been found with $30,000 in cash in a bag in his car?

24 A.   I don't understand that question.  Say it again, please.

25 Q.   If you knew that defendant Parsadanyan had been found with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   $30,000, approximately, in cash, in a shopping bag in the back

 2   of his car, that wouldn't affect your opinion?

 3   A.   No.

 4        MR. CREIGHTON:  No further questions.

 5        THE COURT:  Okay.  Any redirect?

 6        MR. FLIER:  No, your Honor.

 7        THE COURT:  You may step down.

 8      Next witness.

 9        THE WITNESS:  Thank you.

10        MR. FLIER:  Thank you.

11      Vahagn Zakharyan, your Honor.

12        THE CLERK:  Right here to be sworn, please.

13      (Witness sworn.)

14        THE CLERK:  Thank you.  You may be seated.

15      May I please ask that you state and spell your full name

16   for the record.

17        THE WITNESS:  Vahagn Zakharyan, V-a-h-a-g-n,

18   Z-a-k-h-a-r-y-a-n.

19        THE COURT:  Okay.  You may inquire.

20        MR. FLIER:  Thank you, your Honor.

21              VAHAGN ZAKHARYAN, CALLED AS A WITNESS

22                   BY DEFENDANT PARSADANYAN,

23                      DIRECT EXAMINATION

24   BY MR. FLIER:

25   Q.   Sir, what do you do for work?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    I'm an operations manager for an EMS company.

 2   Q.    And is that a uniform typical with your work?

 3   A.    Yes.

 4   Q.    With respect to Mr. Parsadanyan, do you know him?

 5   A.    Yes, sir.

 6   Q.    How long have you known Mr. Parsadanyan for?

 7   A.    16 years.

 8   Q.    And did you grow up in an area with Mr. Parsadanyan?

 9   A.    Yes, sir.

10   Q.    And have you ever testified before?

11   A.    Yes, sir.

12   Q.    With respect to knowledge of Mr. Parsadanyan, are you

13   aware of his family life?

14   A.    Yes, sir.

15   Q.    Does he have a mom?

16         MR. CREIGHTON:  Objection, relevance, your Honor.

17         THE COURT:  I don't know what the next question is.

18   Next question's what?

19         MR. FLIER:  Does he have a mother.

20         THE WITNESS:  Yes.

21         THE COURT:  Sustained.  Most of us have.  Sustained.

22         MR. FLIER:  At one point in time, we all have.  Okay,

23   I'm going to move on from the mother line.

24         THE COURT:  Thank you.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. FLIER:  Thank you.

 2   Q.   With respect to Mr. Parsadanyan, are you aware that he

 3   takes care of his mother?

 4   A.   Yes, sir.

 5   Q.   Now, with -- and I'll move on -- with respect to

 6   Mr. Parsadanyan, were you aware that he had some medical

 7   issues?

 8   A.   Yes, sir.

 9              MR. CREIGHTON:  Objection, relevance.

10              THE COURT:  Sustained.

11   BY MR. FLIER:

12   Q.   Now, with respect to Mr. Parsadanyan, when you speak with

13   Mr. Parsadanyan, growing up or whatever, for 16 years, is it

14   always in English?

15   A.   Not always.

16   Q.   You speak another language with him?

17   A.   Yes, sir.

18   Q.   What's the language?

19   A.   Armenian.

20   Q.   Now, when you speak with Mr. Parsadanyan, do you speak

21   with him in Russian?

22   A.   Yes, sir.

23   Q.   If I was simply to ask you, do you know that in the

24   Armenian language there appears to be two dialects, eastern and

25   western, does that make sense?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes, sir.

2         MR. CREIGHTON:   Relevance, sir.

3         THE COURT:   Overruled.

4    BY MR. FLIER:

5    Q.   Does that make sense?

6    A.   Yes, sir.

7    Q.   So when I'm asking the question, when you speak with

8    Mr. Parsadanyan, let's say outside a court of law or wherever,

9    what language are you speaking with him?

10   A.   Russian.

11   Q.   Thank you.

12        Now, with respect to Mr. Parsadanyan, you've known him for

13   at least 16 years.  Is he an honest person?

14   A.   Yes, sir.

15   Q.   Is he a truthful person?

16   A.   Yes, sir.

17   Q.   Is he the type of person that is going to lie and cheat

18   and steal?

19   A.   No, sir.

20   Q.   With respect to the business in 2009, were you aware of

21   what type of businesses Mr. Parsadanyan was involved in?

22   A.   Yes, sir.

23   Q.   Are you aware that he had an AT&T store in Glendale?

24   A.   Yes, sir.

25   Q.   Have you ever been to that store?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes, sir.

 2    Q.    Does he work hard?

 3    A.    Of course.

 4          MR. FLIER:  I have no further questions.

 5          THE COURT:  Cross.

 6          MR. SEVERO:  No questions.

 7          PEREYRA-SUAREZ:  None from me, your Honor.

 8          MR. SEVERO:  This time I --

 9          THE COURT:  Okay.  Cross.

10       Thank you, Counsel.

11          MR. CREIGHTON:  I apologize to counsel and the Court.

12                        CROSS-EXAMINATION

13    BY MR. CREIGHTON:

14    Q.    You've testified that defendant Parsadanyan is not the

15    kind of person that would lie, cheat or steal; is that correct?

16    A.    Correct, sir.

17    Q.    Do you know who Mher Darbinyan is?

18    A.    No, sir.

19    Q.    Would it change your opinion of defendant Parsadanyan if

20    you knew that he was recorded on a call discussing withdrawals

21    from ATMs with another individual --

22          MR. FLIER:  Object.  It's improper.

23          THE COURT:  Sustained.

24    BY MR. CREIGHTON:

25    Q.    Would it change your opinion of whether or not defendant
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Parsadanyan is the kind of person who lies, cheats and steals

 2    if you knew that he was stopped with a bag of cash containing

 3    approximately $30,000 in the back of his car?

 4    A.    No, sir.

 5    Q.    Would it change your opinion of defendant Parsadanyan if

 6    he was heard on a telephone conversation --

 7              MR. FLIER:  Same objection.

 8    BY MR. CREIGHTON:

 9    Q.    -- discussing the "day and night"?

10              MR. FLIER:  Same objection.

11              THE COURT:  I'm sorry.  Finish the question, first.

12              MR. FLIER:  Sorry, your Honor.

13              THE COURT:  Wait to answer until he finishes.

14         Can you state the question again.

15    BY MR. CREIGHTON:

16    Q.    Would it change your opinion of defendant Parsadanyan if

17    you knew that he was heard in a telephone conversation

18    discussing the "day and night"?

19              THE COURT:  Counsel?

20              MR. FLIER:  Same objection, your Honor.

21              THE COURT:  Sustained.

22    BY MR. CREIGHTON:

23    Q.    Were you with defendant Parsadanyan on July 18th, 2009?

24    A.    I cannot recall.

25    Q.    Were you with him in a BMW 6 series car in the summer of
```

```
 1    2009?

 2    A.   Not that I can recall, the date.

 3    Q.   You're a friend of the wit- -- of defendant Parsadanyan?

 4    A.   Yes.

 5    Q.   You like him?

 6    A.   He's my friend.  Of course.

 7    Q.   Do you want to help him?

 8    A.   Every chance I get.

 9    Q.   You don't want to see him get into trouble?

10    A.   Never.

11    Q.   You don't want him to go to prison?

12    A.   No.

13    Q.   And you're testifying here today because you want to help

14    the defendant?

15    A.   I'm testifying here today because I know that he is not

16    guilty.

17              MR. CREIGHTON:  No further questions.

18              THE COURT:  Anything further, Counsel?

19              MR. FLIER:  No, your Honor.

20              THE COURT:  You may step down.  Thank you very much

21    for coming in.

22              THE WITNESS:  Thank you, your Honor.

23              THE COURT:  Thank you very much for coming in.

24         Next witness.

25              MR. FLIER:  Thank you very much, your Honor.  I only
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    have two witnesses left regarding this issue.

 2        Miss Lilit Parsadanyan, please.

 3            THE CLERK:  Good afternoon.  Right here to be sworn,

 4    please.

 5        (Witness sworn.)

 6            THE CLERK:  Thank you.  You may be seated.

 7        May I please ask that you state your full name for the

 8    record and spell your last name.

 9            THE WITNESS:  Lilit Parsadanyan,

10    P-a-r-s-a-d-a-n-y-a-n.

11            THE COURT:  Okay.  I'm going to have you move up

12    closer to the microphone there so we can hear you when you

13    speak.

14            THE WITNESS:  Sure.

15            THE COURT:  Thank you very much.

16        You may inquire.

17            MR. FLIER:  Thank you, your Honor.

18              LILIT PARSADANYAN, CALLED AS A WITNESS

19                    BY DEFENDANT PARSADANYAN,

20                        DIRECT EXAMINATION

21    BY MR. FLIER:

22    Q.    What is your last name again?

23    A.    Parsadanyan.

24    Q.    Do you know my client who shares that same last name?

25    A.    I do.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002781**

```
 1   Q.   And how do you know Rafael?

 2   A.   He's my cousin.

 3   Q.   And he's a younger cousin?

 4   A.   Yes, he is.

 5   Q.   With respect to growing up with Mr. Parsadanyan, did you

 6   do that?

 7   A.   Yes, we grow up together.

 8   Q.   Okay.  And did you always grow up together with

 9   Mr. Parsadanyan in the United States?

10   A.   Yes.

11   Q.   Did you ever live with Mr. Parsadanyan outside the United

12   States?

13   A.   Yes.

14   Q.   Where did you live with Mr. Parsadanyan outside the

15   United States?

16   A.   Armenia.

17   Q.   In what time period did you live or were around

18   Mr. Parsadanyan outside the United States in Armenia?  When?

19   A.   Since his birth.

20        THE COURT:  You have a very soft voice.

21        THE WITNESS:  I apologize.

22        THE COURT:  That's okay, don't apologize, just get

23   closer to the mic.

24        THE WITNESS:  I apologize.

25        THE COURT:  Okay.  Speak right into it, and we can
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    hear you.

2        Go ahead.

3    BY MR. FLIER:

4    Q.    Have you ever testified before?

5    A.    No.

6    Q.    Now, were you living with Rafael Parsadanyan in Yerevan?

7    A.    Yes, I was.

8    Q.    In the same household?

9    A.    Correct.

10   Q.    When did you separate, if you did, and come to the United

11   States?

12   A.    19 -- 1996, for about a year.

13   Q.    If you know, did Mr. Rafael Parsadanyan come to the United

14   States in that same time period?

15   A.    Yes.

16   Q.    Okay.  Now, with respect to when Mr. Parsadanyan was in

17   the United States, did you live with him?

18   A.    Yes.

19   Q.    Do you live with him currently?

20   A.    No.

21   Q.    With respect to the family life of Mr. Parsadanyan, are

22   you aware of it?

23   A.    Yes.

24   Q.    Without getting into his mother or anything else, I want

25   to ask a different subject.  When you were back, I'd say, in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    your home country of Yerevan, what was the language that you

 2    spoke with, let's say, at the dinner table?

 3    A.   Mainly Russian.

 4    Q.   Now, are you aware that there's a difference between

 5    Armenian western and eastern dialect?

 6    A.   I am, yes.

 7              MR. CREIGHTON:  Objection, relevance.

 8              THE COURT:  Sustained.

 9    BY MR. FLIER:

10    Q.   When you would have general conversations in Yerevan, it

11    was in Russian?

12    A.   Yes.

13    Q.   And with respect to that same topic, when you're in the

14    United States, thereafter, what language did you speak?

15    A.   Mainly Russian.

16    Q.   Now, with respect to giving money or helping

17    Mr. Parsadanyan with his cell phone business, did you do that?

18    A.   Yes, I did.

19    Q.   Did you give him money?

20    A.   I did.

21    Q.   In what capacity would you give him money?

22    A.   I don't understand.

23    Q.   When did you give him money?

24              MR. CREIGHTON:  Objection, relevance, your Honor.

25              THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. FLIER:

 2   Q.   Would you help out his business?

 3            MR. CREIGHTON:  Objection, relevance.

 4            THE COURT:  Sustained.

 5   BY MR. FLIER:

 6   Q.   Now let's get to a different topic.  With respect to your

 7   awareness and familiarity with Mr. Parsadanyan, would you

 8   classify him as a honest person?

 9   A.   Yes.

10   Q.   A truthful person?

11   A.   Yes.

12   Q.   Is Mr. Parsadanyan, your cousin, the type of person that's

13   going to steal, cheat?

14   A.   No.

15            MR. FLIER:  All right.  I have no further questions.

16            THE COURT:  Cross?

17            MR. SEVERO:  No questions.

18            PEREYRA-SUAREZ:  No questions, your Honor.

19            THE COURT:  We're not keeping you awake, are we,

20   Counsel?

21                        CROSS-EXAMINATION

22   BY MR. CREIGHTON:

23   Q.   So is it fair to say you grew up with defendant

24   Parsadanyan?

25   A.   Correct, yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   And how do you pronounce the name?

 2    A.   Rafael.

 3    Q.   The last name.

 4    A.   Parsadanyan.

 5    Q.   Parsadanyan?

 6         It's fair to say that you like him?

 7    A.   Yes.

 8    Q.   You think he's an honest person?

 9    A.   I do.

10    Q.   Were you -- you don't want to see him get into trouble, do

11    you?

12    A.   No, I don't.

13    Q.   You don't want him to go to prison, do you?

14    A.   No, I don't.

15    Q.   And you're testifying here because you want to help him;

16    is that right?

17    A.   Yes.

18    Q.   Were you with him on July 18th, 2009?

19    A.   I don't recall, but --

20    Q.   Were you in a BMW 6 series car with him at some point that

21    summer?

22    A.   I don't recall.

23    Q.   Do you know who Mher Darbinyan is?

24    A.   No.

25    Q.   Would it change your opinion of defendant Parsadanyan's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   honesty if you knew that he was found in his car with a

 2   shopping bag full of $30,000 in cash?

 3   A.   No.

 4          MR. CREIGHTON:  No further questions.

 5          THE COURT:  Counsel?

 6          MR. FLIER:  I have no questions.  Thank you, your

 7   Honor.

 8          THE COURT:  You may step down.

 9          MR. FLIER:  And my last witness on the subject is

10   Armen Simonian, your Honor.

11          MR. CREIGHTON:  Objection as to cumulative, your

12   Honor.

13          MR. FLIER:  This'll be around five minutes at the

14   most, your Honor.

15          THE COURT:  If you limit it only to the opinion --

16          MR. FLIER:  Okay.

17          THE COURT:  -- I'm going to allow you to call him.

18          MR. FLIER:  Thank you, and I will do that.

19          THE CLERK:  Good afternoon.  Right here to be sworn,

20   please.

21       (Witness sworn.)

22          THE CLERK:  Thank you.  You may be seated.  Careful

23   going down.

24       May I please ask that you state your full name for the

25   record and spell your last name.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE WITNESS:  Simonian, Armen.  A-r-m-e-n,

2    S-i-m-o-n-i-a-n.

3          THE CLERK:  Thank you.

4          THE COURT:  Okay.  Thank you.

5      You may inquire, Counsel.

6          MR. FLIER:  Thank you, and briefly, your Honor.

7              **ARMEN SIMONIAN, CALLED AS A WITNESS**

8                  **BY DEFENDANT PARSADANYAN,**

9                     **DIRECT EXAMINATION**

10   BY MR. FLIER:

11   Q.   Directing your attention to Mr. Rafael Parsadanyan, do you

12   know him?

13   A.   Yes.

14   Q.   How do you know him?

15   A.   He's my nephew.

16   Q.   And so you know about Mr. Parsadanyan?

17   A.   Yes.

18   Q.   Okay.  I'm going to get right to it now.  Is Mr. Rafael

19   Parsadanyan an honest person in your eyes?

20   A.   Yes.

21   Q.   Is he a truthful person in your eyes?

22   A.   Yes.

23   Q.   Is Mr. Parsadanyan the type of person that's going to lie,

24   steal and cheat from people?

25   A.   No.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. FLIER:  I have no further questions.

 2            THE COURT:  Cross?  Counsel?

 3            MR. SEVERO:  No.  No questions.

 4            PEREYRA-SUAREZ:  I'm awake and I have no questions.

 5            MR. SEVERO:  He's awake.

 6                       CROSS-EXAMINATION

 7   BY MR. CREIGHTON:

 8   Q.   Good afternoon.

 9   A.   Hi.

10   Q.   Defendant Parsadanyan you said's your nephew?

11   A.   Yes.

12   Q.   Did you watch him grow up?

13   A.   Yes.

14   Q.   Did you help take care of him?

15   A.   Yes.

16   Q.   Do you like him?

17   A.   Of course.

18   Q.   As an adult, do you consider him a friend as well as a

19   relative?

20   A.   Yes.

21   Q.   You don't want to see him get into trouble?

22   A.   No.

23   Q.   Would you like to help him avoid going to prison?

24   A.   Yes.

25   Q.   And the reason you're testifying today is because you want
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    to help the defendant; is that right?

2    A.    I am here to tell the truth about him.

3    Q.    Do you know who Mher Darbinyan is?

4    A.    No.

5    Q.    Would it change your opinion of defendant Parsadanyan's

6    honesty if you knew that he was stopped in a car with a

7    shopping bag in the back with approximately $30,000 in cash?

8    A.    No.

9            MR. CREIGHTON:  No further questions.

10           MR. FLIER:  I have no questions, your Honor.

11           THE COURT:  You may step down.  Thank you very much

12   for coming in, sir.

13           MR. FLIER:  Your Honor, my next witness, I'm not sure

14   he's here.  He was the interpreter.

15           MR. ESTRADA:  Interpreter is here, your Honor.

16           THE COURT:  I'm sorry?

17           MR. ESTRADA:  The interpreter is here.

18           THE COURT:  Okay.

19           MR. FLIER:  I'm going to call Mr. Derpetrossian again,

20   please.

21           THE CLERK:  Good afternoon.  I'll put you under oath

22   again, please.

23       (Witness sworn.)

24           THE CLERK:  Thank you.  You may be seated.

25       May I please ask that you state your full name for the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    record and spell your last name.

 2            THE WITNESS:  My name is Alen Derpetrossian.

 3    D-e-r-p-e-t-r-o-s-s-i-a-n.

 4            THE COURT:  Okay.  Thanks.

 5        Counsel.

 6            MR. FLIER:  Thank you, your Honor.

 7        If I may have just a brief moment.

 8        Okay.

 9            ALEN DERPETROSSIAN, CALLED AS A WITNESS

10                    BY DEFENDANT PARSADANYAN,

11                      DIRECT EXAMINATION

12    BY MR. FLIER:

13    Q.   How are you again, sir?  I think we heard you're going out

14    of the country soon.

15    A.   Yes.

16    Q.   But that's not today?

17    A.   No.  It's tomorrow.

18    Q.   Okay.  You'll be done today, I believe.  Thank you.  Thank

19    you for coming back.

20    A.   Thank you.

21    Q.   Now, since you last testified, have you listened to any of

22    the tapes that you spoke about when you first testified in this

23    trial?

24    A.   No.

25    Q.   Have you spoken to any of the -- this side of the table,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002791**

```
 1   the government side of the table, since you testified?

 2   A.   Have I spoken?  Yeah.  Briefly say hi or -- I don't know

 3   what you mean by "spoken."

 4          THE COURT:  I'm going to ask you to bring that

 5   microphone up --

 6          THE WITNESS:  Yes.

 7          THE COURT:  -- a little closer to you.

 8   BY MR. FLIER:

 9   Q.   And when I utilize the word "spoken," I'm talking about

10   your testimony, of course, not just "Hello, how are you?"

11   A.   They just said it went well.

12   Q.   Okay.  So they gave you a compliment, correct?

13          MR. ESTRADA:  Object, your Honor.  Relevance.

14          THE COURT:  Sustained.

15   BY MR. FLIER:

16   Q.   Sir, have you had the opportunity to review any of the

17   tapes since you last spoke in this courtroom?

18   A.   No.

19   Q.   Your role in this case was, to the best of your ability,

20   to translate certain language into English; is that correct?

21   A.   Yes.

22   Q.   I don't want to get into all about the history of Armenia

23   again, but in your mind is there a difference between Eastern

24   Armenian dialect and Russian?

25   A.   The Russian language, you mean, or the Russian Armenian?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Russian language.

2    A.    Yes.   They are two distinct languages.

3    Q.    Is there similarity in any of the language between the

4    Russian language and Eastern Armenian dialect?

5    A.    Well, Eastern Armenian is Armenian.   That's spoken mainly

6    in Armenia, as I said.   Russian is a distinct language,

7    separate language of its own, but Eastern Armenian speakers who

8    are from Armenia use some -- some more, some less -- Russian

9    words in their daily conversation.

10   Q.    And when you testified last time, you do -- do you agree

11   that sometimes in the Eastern Armenian dialect, words could

12   have different subject meanings?   Does that make sense?

13   A.    I don't understand what you mean by "subject meanings."

14   Q.    Well, one word could have different meanings.   Does that

15   make sense?

16   A.    One word usually has a meaning, and I think that's true

17   with most languages, but some people use some words with

18   different interpretation of their own, what they have in their

19   own mind.   Some people use big words but they have small

20   meanings.   Some people use exaggerated words that, for an

21   American English speaker, may sound like a threat or -- or like

22   a big word, but, in actuality, in their daily vernacular, they

23   use it so often that it's not really a threat.   So there's all

24   kinds of variations.

25   Q.    Okay.   And thank you.   I want to show you --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1         And I believe it has been introduced and published, your
2    Honor.
3         -- Exhibit 159A, page 2 of 3.
4         Do you see that in front of you, sir?
5    A.   Yes.
6    Q.   I want to direct your attention to where it says Speaker 1
7    right here.
8    A.   Yes.
9    Q.   It says "Rafo," and then there's three little dots.  Do
10   you see that?
11   A.   Yes.
12   Q.   What does the three little dots indicate to you, based on
13   your memory of listening to the tape in your language?
14   A.   Dots usually -- we put dots, either dots or the two
15   separate dashes.  It means like a brief pause in conversation,
16   or when people say "umm" or "uh" or like a little pause, so
17   there's a break in the sentence.
18   Q.   Are you saying -- and I'm specifically referencing this
19   indication right here.  I'm not going to circle it.  Right
20   after "Rafo" the first time, are you saying that there was no
21   specific words that you heard?
22   A.   Best of my recollection, there was no words.
23   Q.   Now --
24   A.   I think what this indicates to me, that there was a brief
25   pause.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  We're going to break at this time, ladies

 2    and gentlemen.  We'll be back in 15 minutes.  Remember the

 3    admonishment not to discuss the case among yourselves or with

 4    anybody else.

 5              THE CLERK:  All rise.

 6         (Recess held from 2:32 p.m. to 2:46 p.m.)

 7         (In the presence of the jury:)

 8              THE COURT:  Okay.  The record will reflect that the

 9    witness -- excuse me, the jurors are all in their respective

10    seats in the jury box.

11         Counsel, you were at direct examination.  You may

12    continue.

13              MR. FLIER:  Thank you, your Honor.

14    Q.   Sir, I think we left off with the three dots, and you

15    already explained that; is that correct?

16    A.   Yes.

17    Q.   And you briefly explained that sometimes in the Armenian

18    language, and probably other languages, words could have

19    different meanings; is that correct?

20    A.   Umm --

21    Q.   They could have -- the expression could have different

22    meanings.  Is that better?

23    A.   Well, it's hard to describe it.  The word has one meaning

24    based on a dictionary or based on the common linguistic

25    concepts, but people, different people use it in different
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   contexts, in different variations, and what -- have different

2   meanings in their mind.  That's the best I can answer.

3   Q.   Thank you.

4        And when you were interpreting, to the best of your

5   ability, these transcripts, that was at the FBI office, as we

6   already heard, correct?

7   A.   Yes.

8   Q.   And at least one FBI agent was always present within that

9   room, also; is that correct?

10  A.   Do you mean -- do you mean during the live wire or

11  afterwards?

12  Q.   First the live wire.

13  A.   Live wire, most of the time, yes, there was somebody

14  present.

15  Q.   And then, as you say, what about the second part?

16  A.   Second part, usually no.

17  Q.   Because that's just you doing the translation to the best

18  of your ability, correct?

19  A.   Me and other translators working in a room or in different

20  cubicles.

21  Q.   And in this case, you are aware that other Armenian

22  translators were utilized besides yourself; is that correct?

23  A.   By the FBI, you mean?

24  Q.   Yes.

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Now, back to Exhibit 159A.  It then says, "whoever,"

2    comma, "whatever I gave him."

3        First, and I'm not trying to take you by surprise, but do

4    you actually recall the "whoever," comma, "whatever" language

5    being utilized?

6    A.   At this moment, I don't recall.  It's many year -- months

7    ago.

8    Q.   Do you think, when you see it says "Rafo" dot, dot, dot,

9    "whoever," comma, "whatever," could the "whoever" be a mistake

10   in that sentence?

11            MR. ESTRADA:  Calls for speculation, your Honor.

12            THE COURT:  Overruled.

13            THE WITNESS:  I don't recall the context now.

14            THE COURT:  I'm sorry, Counsel.  I'm not too sure what

15   you mean.  A mistake by the interpreter, or a mistake being

16   said and then -- I don't know what you mean.

17            MR. FLIER:  In the interpretation, your Honor.

18            THE COURT:  Okay.

19        Is there any reason for you to think that there is a

20   mistake in the interpretation there?

21            THE WITNESS:  I don't think so, but, as I said --

22            THE COURT:  Okay.

23            MR. FLIER:  That's fair.  Thank you.

24   Q.   Then it says "whatever I gave him" dot, dot, dot.

25        Are you again saying the dot, dot, dot references like

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    "uh-huh" and no specific words being utilized?

 2    A.    Yes, mostly, most of time it means a pause or a brief

 3    break.  If it's an "uh-huh," we actually put "uh-huh."

 4    Q.    Would you agree there's sometimes some wording that you

 5    heard in these tapes that you could not discern, so you put a

 6    dot, dot, dot?  Does that happen?

 7    A.    No.  When we could not understand a word, which happens

 8    often, because people talk over each other, or the audio

 9    quality's poor, we put usually "UI."  And there is an

10    expression in Armenian, the word "thing" used, is used a lot,

11    that in English it doesn't make sense.  Sometimes for the word

12    "thing" we put dot, dot, but for unintelligible, that we just

13    couldn't make out, we put "UI."

14    Q.    You brought up an interesting point about, in your

15    language, the word "thing" can have different meanings; is that

16    correct?

17    A.    No.  "Thing" means "thing."

18    Q.    Okay.  But in these tapes, do you recall seeing or

19    listening to the word "thing" in Armenian?

20    A.    Yes, it came up.

21    Q.    And in the context of when it comes up, it could have

22    different meanings; is that correct?

23          MR. ESTRADA:  Objection, your Honor.  Calls for

24    speculation and beyond his expertise.

25          THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE WITNESS:  Well, if they're -- if they are talking
 2    about a subject before, beforehand, in the beginning of the
 3    sentence, and then afterwards they say the word "thing,"
 4    usually that's what it refers to, but I don't want to guarantee
 5    that or speculate on that.
 6    BY MR. FLIER:
 7    Q.   Okay.  Thank you.
 8         Now, the next sentence, and I'm almost done with this
 9    particular exhibit, says "Rafo only brought" --
10    b-r-o-u-g-h-t -- "that," comma.  Do you see that?
11    A.   Yes.
12    Q.   Please bear with me.  I'm not Armenian, but do you recall
13    the word "vertsnel," and is that close in any way?
14    A.   Yes.
15    Q.   What does that mean?
16    A.   That means -- vertsnel.  It makes "take," usually.
17    Q.   Okay.  Again, I don't want to take you by surprise.  Do
18    you actually have an independent recollection about the word
19    "brought that" being utilized in this particular exhibit?
20    A.   At this time, I don't recall.
21    Q.   But with respect to the word "vertsnel," you just told us
22    what you believe that meaning has, correct?
23    A.   Usually that's what it means, yes.
24    Q.   And "vertsnel" means what again?
25    A.   Usually it means "take."
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   So do you think that "Rafo only took" or "take that" could
 2   have been the right language or word there?
 3   A.   At this time, I can't say.  At that -- that's what I
 4   wrote, so --
 5   Q.   Okay.  That's fair.
 6        Now, with respect to before, it says, again, "whoever,"
 7   comma, "whatever I gave him."  Do you know what the word --
 8   again I apologize if I say it incorrectly -- "mutsel,"
 9   m-u-t-s-e-l, approximately, do you know what that means?
10   A.   You mean "mutsel?"
11   Q.   I'm sure you say it better than me.  Yes.
12   A.   "Mutsel" means "pay" usually.
13   Q.   "Pay."
14        Now, when we see the word, or the words "whoever,
15   whatever, I gave him," let's assume for my question that how
16   you correctly said it, "mutsel," is the word in that sentence.
17        You just explained to the best of your ability what that
18   word means, correct?
19   A.   Yes.
20   Q.   And that word is not on this exhibit in that sentence,
21   correct?
22   A.   Yes.
23   Q.   Thank you.
24        Could there be, and is this an example, where a word could
25   have different meanings, and possibly your interpretation of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002800**

```
 1    the meaning is incorrect?

 2            MR. ESTRADA:  Object, your Honor.  Calls for

 3    speculation.

 4            THE COURT:  Sustained.

 5            MR. FLIER:  Directing everyone's attention now,

 6    please, to Exhibit 149A.

 7        Again, this has been published, so may I publish it also,

 8    your Honor?

 9            THE COURT:  Yes.

10            MR. FLIER:  Thank you, sir.

11    Q.   Now, with respect to this exhibit, 149A, for the record,

12    there purports to be, and at least I recall -- this is the one

13    that has the word "greet," I believe.

14        Yes, I see it right here.

15        Speaker 1, the word "to greet."  Do you see that, sir?

16    A.   Yes.

17    Q.   Then if you go down to Speaker 2, "It has been greeted

18    already."  You see the word "greeted," correct?

19    A.   Yes.

20    Q.   So with respect to Exhibit 149A, on page 2 of 3, in two

21    different areas, purportedly the word "greet" has been

22    utilized, correct?

23    A.   Yes.

24    Q.   Now, with respect to the word "greet," isn't it true that

25    in the Armenian language and culture, that word "greet" has
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    different meanings?  It could mean different things based on

2    the context of the sentence, let's say.  Does that make sense?

3    A.    It could mean say hi, welcome somebody, for example, from

4    the airport, picking up somebody, or just saying hi, hello.

5    Q.    Okay.  Thank you.

6          Now, with respect to -- and again please help me.  Have

7    you ever heard of the word "dimavorel"?

8    A.    Yes.

9    Q.    Did I say it right?

10   A.    Yes.

11   Q.    That's not bad.  Thank you.

12         With respect to that word, what does that mean?

13   A.    That means "greet."

14   Q.    Okay.  Now, "greet," does that word mean greet as in a

15   sociable event?  Hello, I'm going to say hi to someone,

16   "greet," correct?

17   A.    Usually, yes.

18   Q.    Okay.  Now --

19   A.    It happens a lot of -- some of the context I'm familiar

20   with is picking up somebody from the airport, or when somebody

21   comes, you take him or accept them.

22   Q.    So when we see Exhibit 149A, and in the two parts where it

23   mentions the same word that we're now addressing, when you are

24   speaking with me right now, that's a hello greeting type of

25   word, correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    I don't understand your question.

 2    Q.    The word "greet," do you have an independent recollection

 3    as to the specific word being utilized when you listened to

 4    this particular tape?

 5    A.    At this moment, I don't remember, but if you say

 6    "dimavorel," that sounds pretty close.  Greet.

 7    Q.    Okay.  Thank you.

 8          Now, with respect to, down at the bottom, last Speaker

 9    No. 2, it says "OV."  What does "OV" mean again, sir?

10    A.    I'm sorry, where are you?

11    Q.    Oh, I'm sorry.  Right there.

12          Wait, why isn't -- oh, that's why it's not --

13    A.    No.  It means overlapping voices.  That means people talk

14    over each other.

15    Q.    Just like I almost did just now, and I apologize.

16          Here's my question.  This is an example, the "OV,"

17    whereupon, sometimes you could hear different voices

18    overlapping; is that correct?

19    A.    Correct.

20    Q.    Can you tell us how long the overlapping occurred for?

21    Because it's just a little box here that says "OV."

22    A.    Yeah.  At -- with this particular one, I don't recall

23    specifically, but it usually, somebody uses a -- starts a

24    sentence, and the other guy interrupts him, like we do, of

25    course, every day in normal conversation.  So to indicate that,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   we usually put an "OV."  And usually it's just one word, you
 2   know, that goes over each other, maybe one or two words.  We
 3   just put it there to indicate that there was overlapping.
 4   Q.   As you just testified, sometimes, based on your
 5   experience, it could be one or two words overlapping, correct?
 6   A.   Yes.
 7   Q.   But one or two overlapping words could have significance
 8   as to the start of a sentence.  Would you agree with that?
 9        MR. ESTRADA:  Object, your Honor.  Calls for
10   speculation.
11        THE COURT:  Sustained.
12   BY MR. FLIER:
13   Q.   Can you tell us right now what any of the overlapping
14   language was as to this exact language that I'm talking about?
15   A.   When I look at this, it indicates to me that we heard
16   every word, because the sentence, the prior sentence, is
17   complete, and the sentence after that is also complete.  So if
18   there was a word that was overlapping that we didn't hear,
19   after the "OV" we usually put "UI."  But when I look at this,
20   it tells me that we heard everything.
21   Q.   But --
22   A.   Sometimes there is overlapping and there's loud voices,
23   you know, included with background noise and all that, so then
24   we can't hear it.  In that case, we put "unintelligible," but
25   in this, I don't see it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Now, you just mentioned that what assists you maybe in

2   interpretation is the sentence previous, correct?

3   A.   Yes.

4   Q.   If the sentence previous has dot, dot, dot a couple times,

5   that particular sentence was broken up a little, correct?

6   A.   Yeah, pauses.

7   Q.   Okay.  Now, when it -- back to Speaker 2 right here.

8   "No.  It's the 'day and night,' brother."

9        The "day and night," they're italics, correct?  You see

10  that?

11  A.   You mean quotation marks?

12  Q.   I don't -- whatever we want to call them.

13           THE COURT:  Yes, quotation marks.

14           MR. FLIER:  Thank you.  It's like my math.  I'm not

15  good in English, either, now.

16  Q.   So what I want to ask is, why -- was that "day and night"

17  in English that you heard, or translated from Armenian?

18  A.   I believe it was translate from Armenian.

19  Q.   And why is it in the quotes?

20  A.   I don't remember now.

21  Q.   Well, clearly there's significance for you putting quotes.

22  Would that be a fair statement?

23  A.   Usually when there is a particular name that's like a name

24  of an -- a place or a name of an institution that's in

25  Armenian, but we have to translate it, sometimes we put it in

1    quotation marks to indicate that it's the name.  I think that's

2    something like that, but I don't have independent recollection

3    right now.

4    Q.    Now, the phrase "day and night" could have different

5    expressions in interpretation, correct?

6    A.    Yes.

7    Q.    A good example would be, "Hey, you know, I've been trying

8    to call this guy all day, day and night.  I can't get in touch

9    with him."

10           MR. ESTRADA:  Objection, your Honor.  Calls for

11    speculation.

12           THE COURT:  Sustained.

13    BY MR. FLIER:

14    Q.    Isn't it true that whatever you recall hearing as to this

15    exhibit and that phrase, "day and night," can you tell us

16    specifically what context it meant?

17    A.    I don't recall.

18           MR. ESTRADA:  Object, your Honor.  Beyond the scope of

19    his testimony.

20           THE COURT:  He's already said he doesn't recall.

21           MR. FLIER:  Thank you.

22    Q.    Now, again, I might be butchering this.  Do you know the

23    word "orhugisher"?

24    A.    "Orhugisher," yes.

25    Q.    Okay.  What does that mean?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    That means day and night.

2    Q.    Okay.  Now, when you hear that word, forget this case,

3    would that have any specific meaning to you, or does it matter

4    in what context the whole phrase is being utilized?

5    A.    That phrase by itself means day and night.

6    Q.    So it could mean -- what does that mean to you, day and

7    night?

8           MR. ESTRADA:  Object, your Honor.  Calls for

9    speculation.

10          THE COURT:  Sustained.

11          MR. FLIER:  I would now like to direct everyone's

12   attention, please, to Exhibit 166A.

13   Q.    Do you recall -- when you see Speaker 2 right here where

14   I'm pointing at, it says "yeah, bro."  Period.  "I saw Hayko

15   yesterday and took care of everything."

16          You see that sentence?

17   A.    I see that.

18   Q.    Hayko.  Is that an Armenian name, or is that a word you

19   heard in Armenian?

20   A.    That's -- that's an Armenian name.  It's pronounced

21   "high-co."

22   Q.    Thank you.  "High-co."

23          With respect to "and took care of everything," what is

24   your independent recollection about what words you heard in

25   Armenian that say that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    I don't recall now.

2    Q.    With respect to the word "large" right here -- Speaker 2.

3    "Large."  Do you see that?

4    A.    Yes.

5    Q.    Is there a difference in your language between the words

6    "mets" with an M, and the word "nets" with an N?

7    A.    The word "mets" means large or big.

8    Q.    Now, the word "nets," n-e-t-s, is that a word that you're

9    familiar with in the Armenian language?

10   A.    With an N?

11   Q.    Yes.

12   A.    No.

13   Q.    Okay.  Are you familiar with the phone business operation?

14   Are you familiar with phones?

15   A.    Yes.

16   Q.    "Nets" could mean prepaid minutes.  Are you familiar with

17   that?

18          MR. ESTRADA:  Objection, your Honor.  Calls for

19   speculation.

20          THE COURT:  Sustained.

21   BY MR. FLIER:

22   Q.    What I'm asking is, when you -- if you recall, when you

23   heard the word "large" or "big," as you described, are you

24   certain that you heard the word "mets," with the M, and not the

25   N word that now we're discussing, or you're not sure?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  He's already testified he doesn't recall.

 2              MR. FLIER:  Oh, okay.

 3   Q.   Is that true?

 4              THE COURT:  I don't know if it's true or not.  He's

 5   testified to it, Counsel.

 6              THE WITNESS:  I don't recall the -- I don't recall the

 7   audio right now.

 8              MR. FLIER:  Thank you.

 9              THE COURT:  Next question.

10              MR. FLIER:  I'm not going to go over all these

11   exhibits, of course, your Honor.

12              THE COURT:  Okay.

13   BY MR. FLIER:

14   Q.   Directing your attention -- and I think I only have two

15   more.  Exhibit 167, please.

16        I'm sorry, your Honor.  Whenever I show these exhibits, I

17   forgot to ask, may I publish it?

18              THE COURT:  Sure.

19              MR. FLIER:  Thank you.

20   Q.   Referencing Exhibit 167, what I would like to know,

21   please, when we look at Speaker 1 here and it says "Man, where

22   is that tractor," comma, "man, that big bike," what did that

23   sentence mean to you when you were listening?

24              MR. ESTRADA:  Object, your Honor.  Calls for

25   speculation.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.

 2    BY MR. FLIER:

 3    Q.   Well, my real question about it, do you believe, when you

 4    were interpreting what that meant, that was referencing a

 5    product, like a motorcycle, or a human being?

 6              MR. ESTRADA:  Objection, your Honor.  Calls for

 7    speculation.

 8              THE COURT:  Overruled.

 9         If you could tell.

10              THE WITNESS:  At this time I don't recall the word

11    "tractor," but --

12              THE COURT:  Okay.

13              MR. FLIER:  Okay.

14              THE WITNESS:  -- I reviewed it, so it is what it is.

15    BY MR. FLIER:

16    Q.   With respect to -- showing you page 3 of 3 of Exhibit 167,

17    and specifically, please, Speaker 1 says, "When will it arrive?

18    He didn't tell you that."

19         The word "arrive" in your language is what, please?

20    A.   There are different words for it.  There is "hasnel"

21    (phonetic) or "gol" (phonetic).

22    Q.   What about the words "dimavorel"?

23    A.   "Dimavorel."

24    Q.   Now --

25    A.   That's -- that's more like greeting, but that's usually in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    the context of somebody arriving and greeting.

2    Q.   That word "dimavorel," you were already asked questions by

3    me a little earlier, and we talked about, in one of the other

4    exhibits, the word "greet"; is that correct?

5    A.   Yes.

6    Q.   And now with that same word in this exhibit --

7         THE COURT:  Counsel, we don't know if it's the same

8    word or not.

9         MR. FLIER:  Oh, I'm sorry.

10        THE COURT:  But you can ask him if that word could

11   mean something else.

12   BY MR. FLIER:

13   Q.   First question is, do you specifically have an independent

14   recollection about this exhibit?

15   A.   I don't have independent recollection.

16   Q.   And what the Court just asked, does that word have

17   different meanings based on the content?

18   A.   Usually means greet, greeting, or saying hi to someone,

19   but usually it's in context -- some, most of the time it's

20   context of somebody arriving, somebody coming.  So I -- I don't

21   know what to tell you.

22   Q.   Okay.  Thank you.

23        So the bottom line as to that word, that you recall, it

24   could mean "greet," "arrive," as you already described,

25   correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    Okay.  And that's another example of where a word in

3    Armenian could have different interpretations in English; is

4    that fair?

5    A.    Some --

6              MR. ESTRADA:  Objection.  Calls for speculation.

7              THE COURT:  Overruled.

8              THE WITNESS:  In somebody's mind, the speaker's mind,

9    yes.

10   BY MR. FLIER:

11   Q.    And clearly it's the speaker's mind that's controlling the

12   content and the expressions; is that correct?  The people are

13   having the conversation, obviously, correct?

14   A.    Yes, they are the ones who say something and what they

15   mean by it.

16   Q.    Lastly as to this exhibit, when you see Speaker 2 here,

17   and it says, "It should be already ready, bother."  Period.

18   "We are waiting for it to arrive."

19        The word "bother," do you think that should have been

20   "brother"?

21   A.    Very, very likely that's a typo.  Brother.

22   Q.    And during the course of listening to these tapes, at

23   least I recall reading the word "brother," "dear," those type

24   of phrases.  Do you recall that?

25   A.    Yes, many times.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Now, in your culture, do people use words interchangeably
 2   when describing a relationship with someone?  Like "He's my
 3   brother," "He's my good friend"?
 4   A.   Yes, they do.
 5   Q.   "Dear," correct?
 6   A.   Yes.
 7   Q.   Now, the fact that someone says, "You know what, he's my
 8   cousin," that doesn't necessarily equate to lineage, blood
 9   lineage; am I correct?
10        MR. ESTRADA:  Objection, your Honor.  Calls for
11   speculation.
12        THE COURT:  Sustained.
13   BY MR. FLIER:
14   Q.   "It should be already ready."  With respect to the word
15   "mut sats," does that make sense?  M-u-t, pause, s-a-t-s, that
16   type of word?  And I apologize.
17   A.   One more time?
18   Q.   "Mut sats."
19   A.   Spell it one more time.
20   Q.   M-u-t, s-a-t-s.
21   A.   "Mutsel."
22   Q.   There you go.
23   A.   I think that's what you're referring to.
24   Q.   I probably am.  Thank you.
25   A.   Mut- --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   What does that mean?

 2   A.   I'm not sure you're talking about "mutsel" or "matat"

 3   (phonetic).

 4   Q.   Let's do your first one.

 5   A.   "Mutsel" usually -- the verb "mutsel" means "pay."

 6   Q.   That's the word I'm looking for.  Thank you.

 7        Now, do you recall remembering or hearing that particular

 8   word in any tape, we'll say?

 9   A.   Yes.

10   Q.   All right.  Now, with respect to, clearly, this case, you

11   don't have any bias towards anyone in this case, do you?

12   A.   I do not.

13   Q.   You were just hired by whomever, in this case the FBI, to

14   interpret certain tapes, correct?

15   A.   Yes.

16   Q.   And you did your best in doing that, correct?

17   A.   Yes.

18   Q.   So when we use the word "blew it up" in Armenian, that can

19   mean different things, correct?

20        MR. ESTRADA:  Objection, your Honor.  Calls for

21   speculation.

22        THE COURT:  Sustained.

23   BY MR. FLIER:

24   Q.   What in Armenian --

25        THE COURT:  Let me ask a question, because I think
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002814**

```
 1    we're drifting away from where we should be.

 2        If I use the expression, "The eagle has landed," that

 3    could mean somebody's delivering something, it can mean all

 4    kinds of things, but you're just interpreting the words, and

 5    you would just put down "The eagle landed"; is that correct?

 6            THE WITNESS:  Yes.

 7            THE COURT:  You're not saying what it means or where

 8    they're going or what they mean by it, other than just saying

 9    that's what the words mean.

10            THE WITNESS:  Well, yes, but there are some

11    expressions in our language, and in any language, that, if you

12    translate word-for-word, it would sound ridiculous and amusing.

13    For example, one example that usually we give is, "The judge

14    threw the book at me."

15            THE COURT:  Okay.

16            THE WITNESS:  If I were to translate that in my

17    language, that would sound completely ridiculous.  So you have

18    to translate the meaning as much as possible.

19            MR. FLIER:  I know what that meaning --

20            THE COURT:  Excuse me, Counsel.

21        Now, when you're talking about interpreting phrases,

22    et cetera, I understand that.  But are you telling us what this

23    person is saying, or are you just telling us what the words are

24    that the person is saying?

25            THE WITNESS:  What the words are saying.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  Unless it's an outrageous expression,

 3   such as the one I mentioned --

 4              THE COURT:  Okay.

 5              THE WITNESS:  -- which will not translate into

 6   English.

 7              THE COURT:  You are not qualified to tell us what

 8   somebody means by those words as far as what they're trying to

 9   convey to somebody else?

10              THE WITNESS:  No.

11              THE COURT:  I just want to make sure, because there

12   have been some questions asked as to what somebody means as far

13   as what they're trying to convey to somebody else.  You're just

14   telling us what the expressions are.

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Okay.

17   BY MR. FLIER:

18   Q.   My last topic, and very similar to those questions, is,

19   when you, in any capacity, were doing your translation, did you

20   ever have any of the FBI agents with you during that process?

21   A.   As I stated, during the live wire there was an agent,

22   because it's a live event.  We need to tell them any new

23   developments.  But when -- after the wire was down and we were

24   just transcribing, usually there was no agent.

25   Q.   So then let's focus on the live wires.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        At any time when you heard a live wire that, let's say,

2   you documented and thought had relevance, did you ever ask any

3   of the agents near you, you know, "Hey, what's that subject

4   matter, because this word doesn't make sense to me?"  Anything

5   like that?

6   A.   Not exactly like that, but our obligation was to notify

7   the agents or supervisors, whoever is there, of any relevant or

8   pertinent matters.  And we were told and trained to what to

9   look for in this particular case.  I would tell them, and

10  there -- sometimes there were occasions where we heard

11  something, and at that time to the translator, it didn't make a

12  lot of sense, and we would tell the agent, this is what's being

13  said, and -- because the agents don't always tell everything to

14  the translators.  They know more about the case.  So we will

15  tell the agent, and the agent would make whatever inference he

16  wanted to make.

17  Q.   So there are occasions in this case when you informed any

18  agent, doesn't matter to whom it is, about a word or a

19  sentence, and they aided you with some interpretation or the

20  subject matter?

21        MR. ESTRADA:  Objection, your Honor.  Actually

22  misstates the testimony.

23        MR. FLIER:  I don't --

24        THE COURT:  It's a question.

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. FLIER:

 2    Q.   Am I correct?

 3    A.   "Aid" is not the word.  We would tell -- we would tell

 4    them what it says, and since they know, knew and know, more

 5    about the case, they would make their proper inference.

 6    Q.   Okay.  And that proper inference is to try to show

 7    criminal conduct, correct?

 8    A.   Well, the agents are looking for incriminating statements.

 9    There's no -- I mean, we know that.

10         MR. FLIER:  No further questions.  Thank you.

11         MR. SEVERO:  This time I'm awake.

12         THE COURT:  Yes.

13         MR. SEVERO:  Thank you.

14                       CROSS-EXAMINATION

15    BY MR. SEVERO:

16    Q.   Good afternoon again.

17    A.   Good afternoon, sir.

18    Q.   I think to follow up on what his Honor asked you, there

19    are times when what you wrote in your transcription was not a

20    literal translation of the words that were spoken; is that

21    correct?

22    A.   As I stated, in case of proverbs, expressions, the unique

23    expressions that are unique to this language, and it's true in

24    other languages --

25         THE COURT:  Okay.  So the answer would be "yes"?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE WITNESS:  Well, there are some expressions that
 2      are not translated --
 3              THE COURT:  He's not asking you to explain it.
 4              THE WITNESS:  Yes.  Yes.
 5              THE COURT:  We're really dragging this out.  So let's
 6      get down to where we're going on it.
 7              MR. SEVERO:  Ask one question.
 8              THE COURT:  No, no, sure you can.  I'm just saying
 9      that we don't have to go through the explanations.
10          One of the things I've already instructed the jury is that
11      the interpretation is to be considered by you as the evidence.
12      That's it.
13          Counsel, go ahead.
14      BY MR. SEVERO:
15      Q.   Okay.  So this issue of the literal translation came up a
16      few times, where you thought it didn't -- the proverb or the
17      words being spoken wouldn't make sense, and you interpreted
18      that in a meaning that you thought would make sense in the
19      context of the conversations?
20      A.   Only in term -- only in case of proverbs, not the regular
21      conversation.
22      Q.   All right.  Well, let me ask you this.  All the
23      transcripts here are replete with the word "dear."
24      A.   Yes.
25      Q.   That's the English word "dear"?
```

```
1    A.    Yes.

2    Q.    D-e-a-r.  Is that the word "kyank," k-y-a-n-k?  Is that

3    correct?

4    A.    Yes, sir.

5    Q.    Okay.  The word "kyank," is it translated literally as

6    "dear"?

7    A.    The word "kyank" means "life."

8    Q.    That's correct.  So when you say "dear," you are taking

9    the word "life" and changing it, because it doesn't make sense

10   to say "life," correct?

11   A.    The meaning is "dear," so we put "dear."

12   Q.    The word is "life," but the meaning is "dear," is that

13   what you're saying?

14   A.    Yes.

15   Q.    The meaning in whose mind?

16   A.    The speakers and the way it's spoken in the community.

17   Q.    All right.  Now, Armenian is a rough language.  Would you

18   agree with that?

19   A.    In what way?

20   Q.    I mean, it's spoken like Russian.  It's not mellifluous.

21   Like French or Spanish or --

22            MR. ESTRADA:  Objection.  Vague and --

23            THE COURT:  I'm trying to figure out what

24   "mellifluous" means.

25            MR. SEVERO:  Sorry.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Why don't you restate the question,
 2    Counsel.
 3    BY MR. SEVERO:
 4    Q.   It's not a -- Russian and, in this case, Eastern Armenian,
 5    is a word -- is a language that requires an inflection in the
 6    voice that's, by itself, rough, correct?
 7    A.   I don't know.  I'm a native speaker.  To me it sounds
 8    normal.
 9    Q.   Now, you heard Mr. Darbinyan speak many times on the
10    phone.  At least you thought it was Darbinyan.  Correct?
11    A.   Yes.  Yes.
12    Q.   And would you consider that he was an excited type of
13    speaker?
14              MR. ESTRADA:  Objection, your Honor.  Calls for
15    speculation.
16              THE COURT:  Overruled.
17              THE WITNESS:  What do you mean by "excited"?
18    BY MR. SEVERO:
19    Q.   I mean when he spoke, he spoke energetically and loud.
20    A.   Oftentimes he was animated, yes.
21    Q.   Oftentimes or most the time?
22    A.   A lot of times, I would say.
23    Q.   Yes.  And as you yourself said, people who speak Eastern
24    Armenian may say words, not intend them -- intending them to be
25    interpreted literally.  Is that still your testimony?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   I don't -- I don't understand what you mean.

 2   Q.   Okay.  You said people in Armenian sometimes will say

 3   something like a threat, sound like a threat to an American

 4   speaker, but it's not really a threat?

 5   A.   Yes, I agree with that.

 6   Q.   Right.  So it's not a literal meaning that's being given

 7   to the word, correct?

 8          MR. ESTRADA:  Objection, your Honor.  Calls for

 9   speculation.

10          THE COURT:  Overruled.

11   BY MR. SEVERO:

12   Q.   You understand "literal meaning"?

13   A.   What I'm saying is that people use a lot of raunchy and

14   juicy, cuss words and bad words that, to a native American

15   speaker, may sound very, very bad, really terrible, but --

16   though some of those words are used so often in the daily,

17   day-to-day conversation, that most of the time they don't

18   mean -- they're not as bad as --

19   Q.   As it sounds?

20   A.   -- as an American will hear it.

21   Q.   Right.  So when you made the translation of words, you're

22   not -- you didn't specify "this may not mean what it says, but

23   it's being translated literally"?

24   A.   I translated what they said.

25   Q.   Right.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   And the reader can make any inferences.

 2   Q.   Right.  So if someone says "I'm gonna hurt you," it

 3   doesn't really mean that that person intended to say "I'm gonna

 4   hurt you," it sounds like that, correct?

 5   A.   Well, that particular one, I don't know.  I can't read the

 6   person's mind.  I'm talking about the raunchy cuss words or

 7   juicy words that sometimes are used.  "Hurt" may mean "hurt."

 8   I don't -- I can't read people's mind.

 9   Q.   Okay.  Would you say that Mr. Darbinyan was generally

10   respectful when he spoke on the phone?

11   A.   I would say yes.

12           MR. SEVERO:  I have nothing further.  Thank you.

13           THE COURT:  And again, to cut through this, I'm going

14   to tell you one more time.  This witness has testified to the

15   interpretation that is being giving to you.  What was meant by

16   that is up to you to decide after you see the interpretation.

17   He is not qualified to say what anybody meant in these

18   conversations.  That's not what he's qualified for.  He's

19   qualified to interpret it into English for you.

20        Go ahead, Counsel.

21                       CROSS-EXAMINATION

22   BY PEREYRA-SUAREZ:

23   Q.   In fact, sir, it's difficult to determine what the speaker

24   actually meant, because in the Eastern Armenian dialect, some

25   words that sound like threats are not really threats; is that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   correct?

 2           MR. ESTRADA:  Objection, your Honor.  Calls for

 3   speculation.

 4           THE COURT:  Overruled.

 5           THE WITNESS:  Well, what I said is that there are a

 6   lot of bad language being used.  Some of them mean what they

 7   mean.  Some of them are used so often by some speakers, some

 8   people in the community, that -- that their degree diminishes.

 9   So there are some words that are -- sound really bad, but

10   they're not as bad, but there are some words that are bad, that

11   the speaker meant what he said.  So there is all kinds of

12   variations, and I can't speculate right now.

13           THE COURT:  Nor would you be allowed to.  You're not

14   here to tell us what people meant by what they said.  You're

15   just here to give the interpretation.

16       Go ahead, Counsel.

17   BY PEREYRA-SUAREZ:

18   Q.   So when bad words, raunchy words are used in the Eastern

19   Armenian dialect, it's a matter of interpretation by the

20   listener as to what is meant; is that correct?

21   A.   No.  The word, what it says, we put the words that -- that

22   are --

23           THE COURT:  We're going -- I tell 'ya.  Let me tell

24   you one more time.  He's not here to testify what somebody may

25   or may not mean or whether or not what they're saying means
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   what it's saying.  He's here to tell you what the words are

 2   when interpreted in English, and he is not qualified to tell

 3   you what somebody means by those words.  He's just here to

 4   translate.

 5   BY PEREYRA-SUAREZ:

 6   Q.   Let me ask you, sir.  In your work translating all of

 7   these recorded conversations, did you find a lot of bad words?

 8   A.   Yes.

 9   Q.   A lot of raunchy words?

10   A.   Yes.

11   Q.   Cuss words?

12   A.   Yes.

13   Q.   Sarcasm?

14   A.   Yes.

15   Q.   And that's consistent with your knowledge of the Armenian

16   language and culture; is that correct?

17   A.   Some people use more, some people don't use at all, so

18   it's not -- it's not a -- it's not universal.

19   Q.   Now, in your work on this case, did you find that a lot of

20   slang was used?  You know what I mean by "slang"?

21   A.   It's -- slang is hard to define.  There's a lot of

22   expressions, proverbs.  Is that what you mean?

23   Q.   In other words, a proverb might be a figure of speech; is

24   that correct?

25   A.   Sometimes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   That couldn't be translated directly, correct?

A.   Well, as I gave an example of the word, the expression in

English, sometimes some expressions cannot be translated

word-for-word.  They sound ridiculous.

Q.   And in fact, the slang expressions might be different in

different dialects of the Armenian language; is that correct?

         MR. ESTRADA:  Objection, your Honor.  Calls for

speculation.

         THE COURT:  Overruled.

         THE WITNESS:  I don't understand what you mean.

BY PEREYRA-SUAREZ:

Q.   Well, for example, the slang used by somebody speaking the

Western Armenian dialect might be different from the slang used

by a person who's speaking the Eastern Armenian --

A.   Yes.

Q.   -- dialect.

A.   I agree with that.

Q.   Just like the slang in this country might be different in

New York compared to Mississippi, correct?

A.   I agree.

Q.   Okay.  And you know, from your work as an interpreter and

as a translator, that sometimes you would lose the entire

meaning of the message if you were to translate directly

word-for-word, correct?

A.   In case of expressions and proverbs, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   So you need to figure out what the proverb or figure of

2    speech really means when you translate it to the other

3    language, correct?

4    A.   As I said, in very few cases.  Only in those cases, yes.

5    Q.   So, for example, if somebody is speaking in English, and

6    says, "He threw the book at me," when you're translating that

7    into Armenian, you don't translate that directly, correct?

8    A.   I would not put the word book -- "threw the book at me" in

9    Armenian, no.

10   Q.   And try to capture -- I'm sorry.

11   A.   The reader won't understand.

12   Q.   Yeah.  You try to capture the essence of the expression,

13   correct?

14   A.   In that case, yes.

15   Q.   I believe you said earlier, and correct me if I'm wrong,

16   that when you see bad language in Armenian, that may or may not

17   be serious; is that correct?

18          MR. ESTRADA:  Object, your Honor.  Calls for

19   speculation.

20          THE COURT:  May or may not be what?

21          PEREYRA-SUAREZ:  Serious.

22          THE COURT:  Vague.  I don't know what that means, what

23   you mean by "serious."

24   BY PEREYRA-SUAREZ:

25   Q.   Well, let me ask you another way.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Does bad language in Armenian always mean exactly what the

2   expression says?

3          MR. ESTRADA:  It calls for speculation, your Honor.

4          THE COURT:  Overruled.

5          THE WITNESS:  Well, it's an insulting word, it's a

6   disrespectful word, but the degree -- it depends on the

7   speaker.  It depends on the community.  The degree of

8   seriousness can increase or diminish by how often you use it.

9   If you use that word every other word in your sentence, then

10  the degree diminishes.

11  BY PEREYRA-SUAREZ:

12  Q.   So, for example, some people customarily use cuss words in

13  their language all the time; is that correct?

14  A.   There are some, yes.

15  Q.   Because that's just their personality, correct?

16  A.   Yes.

17          PEREYRA-SUAREZ:  I have nothing further, your Honor.

18          THE COURT:  Cross?

19                     **CROSS-EXAMINATION**

20  BY MR. ESTRADA:

21  Q.   Good afternoon, sir.

22  A.   Hello.

23  Q.   When you translated these transcripts which you've already

24  testified to, did you translate them accurately?

25  A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Are you confident in your translations?

2    A.   Yes.

3    Q.   Are you confident that you translated the words correctly

4    from Eastern Armenian into English?

5    A.   Yes.

6    Q.   You testified earlier about one of the calls, Exhibit

7    149A, in which there was a reference to "day and night."  Did

8    you translate that accurately?

9    A.   Yes.

10   Q.   Now, you were asked about all these words and what they

11   might mean.  You're not qualified to talk about the meaning of

12   words, correct?

13   A.   No.  I'm just a translator.

14   Q.   You translated from Eastern Armenian into English,

15   correct?

16   A.   Yes.

17   Q.   And "hurt," does that mean the same thing in English and

18   Eastern Armenian?

19   A.   Yes.

20           MR. ESTRADA:  No further questions, your Honor.

21           THE COURT:  Redirect?

22           MR. FLIER:  Very briefly.

23                      **REDIRECT EXAMINATION**

24   BY MR. FLIER:

25   Q.   Sir, with respect to all of the tapes that you heard,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   isn't it true that in a lot of the tapes, you heard

2   conversations about phones?

3          MR. ESTRADA:  Objection, your Honor.  Beyond the

4   scope.

5          THE COURT:  Overruled.

6          THE WITNESS:  Phones?

7          MR. FLIER:  Yes.

8          THE WITNESS:  There were conversation, but I wouldn't

9   say a lot.

10  BY MR. FLIER:

11  Q.   Okay.  Irrespective of how many there were, that subject

12  matter you did hear in some of the calls, correct?

13  A.   Phones, yes.

14  Q.   And isn't it also true, and lastly, that you heard, in

15  some of these tapes, conversations about the selling of phones,

16  correct?

17         MR. ESTRADA:  Objection, your Honor.  Calls for

18  speculation.

19         THE COURT:  Yeah.  The jury -- the transcripts speak

20  for themselves.

21  BY MR. FLIER:

22  Q.   Do you have -- my question is predicated upon the

23  transcripts that were not presented.  With respect to all of

24  the calls you heard, so it encompasses both of those, isn't it

25  true you heard conversation about selling phones?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1            MR. ESTRADA:  Object, your Honor.

2            THE COURT:  Sustained.

3            MR. ESTRADA:  Calls for hearsay.

4            MR. FLIER:  I have no further questions.

5            THE COURT:  Counsel?

6            MR. SEVERO:  Nothing further.

7            THE COURT:  Counsel?

8            PEREYRA-SUAREZ:  Nothing further.

9            THE COURT:  Counsel?

10           MR. ESTRADA:  No questions, your Honor.

11           THE COURT:  You may step down.

12           MR. FLIER:  Your Honor, the defense rests.  Thank you.

13           THE COURT:  Okay.  Any rebuttal witnesses?

14           MR. CREIGHTON:  Yes.  The government calls Judith

15    Aragno.  To save -- well, I'll stop there.

16           THE CLERK:  Good afternoon.  Right here to be sworn,

17    please.

18       (Witness sworn.)

19           THE CLERK:  Thank you.  You may be seated.

20       May I please ask that you state your full name for the

21    record and spell your last name.

22           THE WITNESS:  Judith Aragno, A-r-a-g-n-o.

23           THE CLERK:  Thank you.

24           MR. CREIGHTON:  And your Honor, the government at this

25    time would like to move into evidence Exhibits 416 and 417 as
```

```
 1   well as 416A and 417A.

 2            MR. SEVERO:  Your Honor, before that happens, may we

 3   have an opportunity --

 4            THE COURT:  Yes.

 5            MR. SEVERO:  -- to examine these?

 6            THE COURT:  Yes.

 7            MR. SEVERO:  Because this is a rebuttal case.

 8            THE COURT:  Yes.

 9            MS. YANG:  Your Honor, may I approach counsel to --

10            THE COURT:  Sure.

11            MS. YANG:  -- provide the exhibits?

12            MR. SEVERO:  These are not exhibits that are in the

13   book?

14            MR. CREIGHTON:  And your Honor, if I may, 416 and 417

15   are bank statements for The Wireless Exchange, Incorporated,

16   which has been provided to the government by defendant

17   Parsadanyan.

18            THE COURT:  Okay.

19            MR. CREIGHTON:  And Exhibits 416A and 417A are deposit

20   receipts to accompany those bank statements that are -- and

21   those documents are accompanied by a -- they are certified

22   documents that have been certified, in fact, by this witness.

23            THE COURT:  Okay.

24            MR. CREIGHTON:  The government would like to move

25   these exhibits into evidence at this time and publish.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Let me take a look at them first.

 2         They may be received and published.

 3              MR. CREIGHTON:  Thank you, your Honor.

 4         (Received in evidence, Exhibits 416, 416A, 417, 417A.)

 5              MR. FLIER:  Your Honor?

 6              THE COURT:  Yes.

 7              MR. FLIER:  I don't think this is rebuttal.

 8              THE COURT:  Well, I don't know if it is or not.  I'm

 9    just --

10              MR. FLIER:  Well --

11              THE COURT:  They're authen- -- the documents are

12    authenticated.

13              MR. CREIGHTON:  Thank you, your Honor.

14              THE COURT:  And if it's not proper rebuttal, it'll be

15    stricken.

16              MR. FLIER:  Thank you.

17              JUDITH ARAGNO, GOVERNMENT'S REBUTTAL WITNESS,

18                        DIRECT EXAMINATION

19    BY MR. CREIGHTON:

20    Q.   Now, good afternoon.

21    A.   Good afternoon.

22    Q.   Where do you work?

23    A.   I work for Bank of America.

24    Q.   And what's your title?

25    A.   I'm a vice president and senior investigator.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   What are your duties?

2    A.   I investigate fraud against the bank.

3    Q.   How long have you been doing that?

4    A.   Since 1992.

5    Q.   And what kinds of fraud do you investigate?

6    A.   Retail fraud.

7             MR. CREIGHTON:  One moment, your Honor.

8             THE COURT:  Yeah.  And Counsel, there is an objection

9    that it's not proper rebuttal, so before you get into it, you

10   may want to give me an offer of proof as to what it's

11   rebutting.

12            MR. CREIGHTON:  Thank you, your Honor.

13        These documents concern the destination of the $30,000 in

14   cash that was located on -- in the car of defendant

15   Parsadanyan.

16            THE COURT:  Okay.  Go ahead.

17   BY MR. CREIGHTON:

18   Q.   Do your duties encompass reviewing, being knowledgeable

19   about the forms and procedures of Bank of America?

20   A.   Yes.

21   Q.   And does it include the review of bank statements?

22   A.   Yes.

23   Q.   Including business checking statements?

24   A.   Yes.

25   Q.   So you're familiar with these documents?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes, I am.

 2    Q.   Are you also knowledgeable about the ATMs that are used by

 3    the Bank of America?

 4    A.   Yes.

 5    Q.   Now, I'd like to begin by showing you this document here.

 6    Can you tell us -- which is Exhibit 416.  Would you tell us

 7    what this document is.

 8    A.   It is a monthly bank statement.

 9    Q.   And what is the listed name on the -- title on the account

10    here?

11    A.   The Wireless Exchange, Incorporated.

12    Q.   And what is the address for that account?

13    A.   619 East Colorado Street, Glendale, California,

14    91205-1709.

15    Q.   And what time period is this statement for?

16    A.   This is from July 1st through July 31st, 2009.

17              MR. FLIER:  Your Honor, I'm going to make that same

18    objection.  No defense witness was called regarding the subject

19    matter of the money.  So they're rebutting their own evidence?

20    I don't understand.

21              THE COURT:  Overruled.

22              MR. FLIER:  Okay.

23              THE COURT:  It's going to be very limited.

24              MR. CREIGHTON:  Thank you, your Honor.  I'll be brief.

25              THE COURT:  I'm assuming this goes to whether or not
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   there was a deposit of $30,000 --
 2           MR. CREIGHTON:  Exactly right, your Honor.
 3           THE COURT:  -- into this particular bank.
 4           MR. CREIGHTON:  Correct.
 5           THE COURT:  I don't know if you want to stipulate
 6   whether there was or wasn't during this period of time, but I
 7   think that's where they're going.
 8       Go ahead.  I'm going to limit you just to that, Counsel.
 9           MR. CREIGHTON:  Absolutely, your Honor.
10   Q.   Now, Ms. Judith Aragno, I've circled an area of the bank
11   statement here that is labeled "deposits."  Would you tell the
12   jury what this is.
13   A.   Those are tangible deposits.
14   Q.   You use the word "tangible" deposits.  What does that
15   mean?
16   A.   These are deposits that would have been accepted at a
17   teller at a banking center.
18   Q.   And what form might these deposits take?
19   A.   They could be cash or checks.
20   Q.   And now, in the instance of this bank statement, are
21   there any tangible deposits made to a teller after July 10th,
22   2009?
23   A.   No.
24   Q.   Directing you to the second page of the exhibit, there's
25   a large section here that I'm circling that is labeled
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   "other deposits and credits."  What goes into this section?

2   A.   These would be the electronic deposits, ATM deposits.

3   Q.   Now, ATM deposits, what forms can they take?

4   A.   Checks or cash.

5   Q.   Have you reviewed this record previously?

6   A.   Yes.

7   Q.   Are you aware of what form this $600 deposit on the upper

8   right is?

9   A.   Yes.

10  Q.   What form did that take?

11  A.   Cash.

12  Q.   Now, let's talk about these electronic deposits here.

13  What are they?

14  A.   Those would be the electronic deposits from either debit

15  cards or credit cards that were used to purchase whatever at

16  the -- at the -- at the store, and they would be electronically

17  credited to a customer's account.

18  Q.   Now, is there any cash involved in these deposits?

19  A.   No.

20  Q.   Based on your review of this bank statement, was a deposit

21  of $30,000 in cash made in the month of -- from July 1st to

22  July 31st, 2009?

23  A.   No.

24          MR. CREIGHTON:  Your Honor, may I have a moment?

25          THE COURT:  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CREIGHTON:  And one quick question, your Honor.
 2    Q.   Did you also review a bank statement for -- this is
 3    Exhibit 417 I'm showing you.  Did you review a bank statement
 4    for August of 2009?
 5    A.   Yes.
 6    Q.   Was there any $30,000 cash deposit or similarly large cash
 7    deposit in that month?
 8    A.   No.
 9    Q.   And finally, you said that you're familiar with ATMs?
10    A.   Yes.
11    Q.   Do ATMs dispense 100-dollar bills?
12              MR. SEVERO:  Objection, your Honor.  That's beyond the
13    scope of the -- that's not rebuttal.  I don't --
14              THE COURT:  No, that's rebuttal.  It was brought up
15    in --
16        Do they?
17              THE WITNESS:  Yes, they do.
18              MR. CREIGHTON:  No further questions.
19              THE COURT:  Okay.  Cross.
20              MR. SEVERO:  I have no questions.
21              THE COURT:  Cross.
22              PEREYRA-SUAREZ:  No questions for me, your Honor.
23              THE COURT:  Mr. Flier?
24              MR. FLIER:  Thank you, and briefly, your Honor.
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**CROSS-EXAMINATION**

1

2    BY MR. FLIER:

3    Q.    Good afternoon, ma'am.

4    A.    Good afternoon.

5    Q.    When were you first spoken to about your testimony today?

6    A.    Today.

7    Q.    Today?

8    A.    Yeah.

9    Q.    When were you first notified that you might be a witness

10   today?

11   A.    Today.

12   Q.    So that someone called you today from maybe a bank and

13   said we need someone who has experience with bank records to

14   come in today?

15   A.    Yes.

16   Q.    Pretty impressive.    Thank you.

17         Was that an FBI agent?

18   A.    No.

19   Q.    Who was it?

20   A.    It was Mr. Creighton.

21   Q.    It was the prosecutor?

22   A.    Yes.

23   Q.    Okay.  Now let's talk about Exhibit 416.  These appear to

24   be copies; is that correct?

25   A.    Yes, they're copies.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. FLIER:  And for the record, your Honor, I
 2   indicated at 416 --
 3            THE COURT:  Yes.
 4            MR. FLIER:  -- right there.
 5   Q.   Now, when we look at this account, this purports to be,
 6   and to move on, a business checking statement for a particular
 7   period of time, correct?
 8   A.   Correct.
 9   Q.   And we know the period of time, 'cause it speaks for
10   itself, the document, correct?
11   A.   Correct.
12   Q.   Do you know anything about my client's business?
13   A.   No.
14   Q.   Do you know anything about the cell phone business?
15   A.   No.
16   Q.   Is it a crime to not deposit cash in a bank?
17   A.   No.
18   Q.   Okay.
19            MR. CREIGHTON:  He's arguing with the witness, your
20   Honor.
21            MR. FLIER:  I didn't argue.
22            THE COURT:  Next question.
23            MR. FLIER:  I'm sorry.
24            THE COURT:  Next question.
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    BY MR. FLIER:

2    Q.   Okay.  It is not a crime to have cash, correct?

3    A.   No.

4         MR. CREIGHTON:  Your Honor, he's still arguing with

5    the witness.

6         THE COURT:  He's not arguing, but this witness is not

7    qualified to testify what's a crime, what's not.

8    BY MR. FLIER:

9    Q.   Well, my question as to 416 is, as you look at the total

10   deposits and other credits, it purports to show 25,000

11   deposits, correct?

12   A.   In total deposits, yes.

13   Q.   Okay.  And then it shows withdrawals or checks around

14   25,000 also, correct?

15   A.   Correct.

16   Q.   So when you look at this statement, based on your

17   experience and expertise, it appears that on this time period,

18   $25,000 came into this account and almost 25,000 was withdrawn;

19   is that correct?

20   A.   Correct.

21   Q.   Okay.  When you look at Exhibit 416, based on your work

22   today on the case, do you see anything suspicious with that

23   exhibit, the face sheet?

24        MR. CREIGHTON:  Objection.

25        THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. CREIGHTON:  Speculation.

 2              THE COURT:  Sustained.  She's not testifying anything

 3    being suspicious.

 4              MR. FLIER:  Thank you.

 5    Q.   With respect to the history of this particular document,

 6    there's other pages that show the transactions; is that

 7    correct?

 8    A.   Correct.

 9    Q.   Now, did you testify that you were a fraud investigator

10    for the Bank of America?

11    A.   Yes.

12    Q.   Did you investigate any fraud regarding this account?

13    A.   No.

14              MR. CREIGHTON:  Objection, your Honor.

15              THE COURT:  Overruled.

16    BY MR. FLIER:

17    Q.   What was your answer again, please?

18    A.   No.

19              MR. FLIER:  I have no further questions.  Thank you.

20              THE COURT:  Redirect?

21              MR. CREIGHTON:  No, your Honor.

22              THE COURT:  Okay.  You may step down.

23         May this witness be excused?

24              MR. SEVERO:  Yes.

25              THE COURT:  Thank you very much for coming in.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE WITNESS:  Thank you, sir.

 2              THE COURT:  Next witness.

 3              MR. ESTRADA:  Your Honor, the government calls Special

 4    Agent Stebbins to the stand.

 5              THE CLERK:  I'll just remind you you're still under

 6    oath.

 7              MR. STEBBINS:  Yes, ma'am.

 8              THE CLERK:  Thank you.

 9              MR. ESTRADA:  Permission to inquire, your Honor?

10              THE COURT:  Yes.

11              MR. ESTRADA:  And permission to publish 416?

12              THE COURT:  Okay.

13    JEREMY STEBBINS, GOVERNMENT REBUTTAL WITNESS, PREVIOUSLY SWORN,

14                         DIRECT EXAMINATION

15    BY MR. ESTRADA:

16    Q.   I'm showing you what's just been published for the jury

17    with the previous witness, Exhibit 416.

18         Up there in the corner, 619 East Colorado Street.

19    Familiar with that address?

20    A.   Yes, sir.

21    Q.   How are you familiar with it?

22    A.   That was the cell phone store owned by Rafael Parsadanyan.

23    Q.   You do surveillance there?

24    A.   Yes, sir.

25    Q.   In Glendale, California?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes, sir.

 2   Q.   Ever gone by the name Smith?

 3   A.   No, sir.

 4   Q.   Would Smith be a good undercover name for you?

 5   A.   I think that would be a pretty poor undercover name.

 6   Q.   Now, did you ever go into defendant Parsadanyan's cell

 7   phone store?

 8   A.   No, sir.

 9   Q.   Why didn't you go into the cell phone store?

10   A.   From what we gathered from our surveillances, it was

11   primarily Armenian patrons, and that would look pretty funny

12   for me to walk in there as Agent Smith or whoever I was

13   supposed to be.

14           MR. FLIER:  I'm going to object.

15           THE COURT:  Sustained.

16           MR. FLIER:  This is not rebuttal.

17           THE COURT:  Last question will be stricken.

18   BY MR. ESTRADA:

19   Q.  Was there a concern for you, as an agent investigating

20   Armenian Power, to go and do undercover activities on foot?

21           MR. SEVERO:  Objection, irrelevant.

22           THE COURT:  Sustained.

23   BY MR. ESTRADA:

24   Q.  Was there a concern with you about getting burned in this

25   investigation?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Yes, sir.

 2    Q.   Did you ever, during the investigation, go into any of the

 3    defendants' or targets' stores?

 4    A.   No, sir.

 5    Q.   Did you ever go into the yard?

 6    A.   No, sir.

 7    Q.   Now, if you would, please take a look at Exhibit 415.

 8         This is a rebuttal exhibit, your Honor, and I'll go ahead

 9    and pass it out to defense counsel and the Court.

10         I understand it's already been passed out to the Court.

11              THE CLERK:  415?

12              MR. SEVERO:  415?

13              MR. ESTRADA:  415.

14              MR. SEVERO:  416, we got.

15              MR. ESTRADA:  Ah.  Apparently not.

16              MR. FLIER:  Your Honor, I'm going to object.  I don't

17    think this is the proper procedure, but I'll just say that,

18    please.

19              THE COURT:  Okay.  Take your objection under

20    submission.

21              MR. FLIER:  Thank you.

22              THE COURT:  I don't know what it is.

23              MR. ESTRADA:  Looks like the witness has that.

24    Q.   Is that Exhibit 415 in front of you?

25    A.   Yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.   What's Exhibit 415?

2    A.   They are maps that I created.

3    Q.   You prepared these?

4    A.   Yes, sir.

5    Q.   How did you prepare them?

6    A.   By using a MapQuest program.

7    Q.   Similar to the program you use for other maps in this

8    case?

9    A.   Yes, sir.

10   Q.   Would these maps assist you in testifying before the jury

11   today?

12   A.   Yes, sir.

13        MR. ESTRADA:  Your Honor, the government moves to

14   admit 415, requests permission to publish.

15        MR. FLIER:  I object.

16        THE COURT:  Sustained under 403.  Sustained.

17     Let me ask you a question.  The 134 -- and I think this is

18   where counsel's going, and I think we can save time.  134 is

19   north of the cell phone store?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  And the defendant Parsadanyan lives south

22   of the cell phone store?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Okay.  Go ahead, Counsel.

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. ESTRADA:
 2   Q.   Is the 134 also a means of getting up to the North Hills,
 3   Granada Hills area?
 4   A.   Yes, it is.
 5   Q.   Was there a target in this investigation who lived in the
 6   North Hills, Granada Hills area?
 7            MR. FLIER:  Objection.
 8            THE COURT:  Sustained.
 9   BY MR. ESTRADA:
10   Q.   You know Rafael -- or Ray Tarverdyan?
11            MR. FLIER:  Same objection.
12            THE COURT:  Sustained.
13            MR. ESTRADA:  It goes for rebuttal, your Honor.
14            THE COURT:  Sustained.
15   BY MR. ESTRADA:
16   Q.   Now, are you familiar with 5356 Franklin Avenue?
17   A.   Yes, sir.
18   Q.   Is that in the opposite direction of the 134?
19   A.   Yes, it is.
20   Q.   In addition, we just saw some Bank of America records that
21   were introduced.
22        You worked in the Glendale area during your time on the
23   task force?
24   A.   Yes, I did.
25   Q.   How long did you work in the Glendale area?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Approximately five and a half years.

2    Q.    Did you become familiar with the Glendale area?

3    A.    Yes, sir.

4    Q.    Are you familiar with a Bank of America branch near the

5    location of 619 East Colorado in Glendale?

6    A.    Yes, sir.

7    Q.    And just to be clear, 619 East Colorado in Glendale, what

8    is that?

9    A.    That is the cell phone store owned by Parsadanyan.

10   Q.    Are you familiar with the Bank of America branch at 203

11   North Glendale Avenue?

12   A.    Yes, sir.

13   Q.    About how many blocks away was the Bank of America branch?

14            MR. FLIER:  Objection.

15            THE COURT:  Overruled.

16        About how far from the cell phone store?

17            THE WITNESS:  Maybe three, four blocks.

18            THE COURT:  Okay.

19            MR. ESTRADA:  No further questions, your Honor.

20            THE COURT:  Cross.

21                        CROSS-EXAMINATION

22   BY MR. SEVERO:

23   Q.    What freeway do you know goes to -- from Glendale to

24   Franklin Avenue?

25   A.    The 5, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    And to get to the 5, you can get to the 5 through the 134?

2    A.    That would be a pretty roundabout way, but you can get

3    there, yes, sir.

4    Q.    It's actually -- Colorado is only few blocks from the 134

5    freeway; isn't that true?

6    A.    Yes, sir, but there's a 5 entrance onto -- off of

7    Colorado.

8    Q.    Right, but the -- if you want to catch the freeway in

9    order to get to the 5, the only freeway that gets you there is

10   the 134; is that correct?

11          MR. ESTRADA:  Objection, misstates the testimony.

12          THE COURT:  Overruled.

13          THE WITNESS:  If you want to take a freeway to a

14   freeway and go out of your way, yes, sir, you can do that.

15   BY MR. SEVERO:

16   Q.    If you wanted to go faster, you can go to the 134 and go

17   to the 5, correct?

18          MR. ESTRADA:  Speculation, your Honor.

19          THE COURT:  Sustained.

20   BY MR. SEVERO:

21   Q.    What you're saying is that your preference would have been

22   to go down to Colorado to get the freeway, the 5 freeway,

23   right?

24   A.    You could take any number of different ways southbound.

25   Q.    But the 134 to the 5 is a perfectly permissible route,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    isn't it?

2    A.    Permissible in what way, sir?

3    Q.    Well, I mean, it's not a completely out-of-the-way route.

4    A.    It's not one of the top ways I would choose to go, sir.

5    Q.    That you would choose.

6    A.    That somebody wanting to go directly to a location would

7    choose.

8    Q.    That you would choose.

9            MR. ESTRADA:  Objection, your Honor.  That's

10   argumentative.

11           MR. SEVERO:  Yeah, that's true.  I'll quit.  Thanks.

12           PEREYRA-SUAREZ:  Your Honor, I'm very familiar with

13   this area, but I won't stoop to the temptation and ask more

14   questions.

15           THE COURT:  Okay.

16                        **CROSS-EXAMINATION**

17   BY MR. FLIER:

18   Q.    You have no idea what route my client will take on any

19   given day to go anywhere; am I correct?

20           MR. ESTRADA:  Objection, argumentative.

21           THE COURT:  Overruled.

22   BY MR. FLIER:

23   Q.    Am I correct?

24   A.    Could you restate that, sir?

25   Q.    I don't know.  I think I used a lot of words there.  Let

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   me try again.

2        You have no idea what route my client will take on any

3   given day to go to a different area; am I correct?

4   A.   No, sir, I don't know what route your client would go

5   to --

6   Q.   So you came in rebuttal, showed -- were shown a MapQuest

7   to try to imply my client went a longer route than what you

8   expect him to take; am I correct?

9             MR. ESTRADA:  Object, your Honor, argumentative.

10             THE COURT:  Sustained.

11             MR. ESTRADA:  I think he is angry and argumentative,

12   so I would ask --

13             THE COURT:  Sustained.

14             MR. FLIER:  I might be angry.

15        Thank you.

16             THE COURT:  It is argumentative.  Sustained.

17             MR. FLIER:  Thank you, your Honor.

18   Q.   Sir, with respect to traffic conditions and construction

19   obstacles, can you tell this jury -- the jury how, on July

20   18th, 2009, the areas in the MapQuest were affected by

21   congestion?

22   A.   No, sir.

23   Q.   With respect to any surveillance of Mr. Parsadanyan, since

24   we have not heard it in this trial, did you ever follow him

25   yourself, directly, from his store to his apartment?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002851**

```
 1            MR. ESTRADA:  Objection, your Honor, misstates the

 2    evidence as to not hearing it during this trial.

 3            THE COURT:  Sustained.

 4    BY MR. FLIER:

 5    Q.    Have you ever followed Mr. Parsadanyan from his cellular

 6    business in Glendale to his home on Franklin?

 7    A.    I don't believe so, sir.

 8    Q.    So you have no idea what route he would normally take in

 9    that capacity; am I correct?

10            MR. ESTRADA:  Asked and answered, your Honor.

11            THE COURT:  Overruled.

12            THE WITNESS:  That's true, sir.

13            MR. FLIER:  I have no further questions.

14            THE COURT:  Any further questions of this witness?

15            MR. ESTRADA:  No further questions, your Honor.

16            MR. SEVERO:  None, your Honor.

17            PEREYRA-SUAREZ:  No further questions.

18            THE COURT:  Okay.  You may step down.

19        Next witness.

20            MR. ESTRADA:  No further rebuttal witnesses, your

21    Honor.

22            THE COURT:  Any further rebuttal on the government --

23    or on the defense?

24            MR. SEVERO:  None from Mr. Darbinyan.

25            PEREYRA-SUAREZ:  None from me, your Honor.
```

          UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Okay.

2              MR. FLIER:  That's correct, none by Mr. Parsadanyan.

3    Thank you.

4              THE COURT:  Ladies and gentlemen, I think we've gotten

5    to the end of the testimony.  We're going to break at this

6    time.  We're going to break at this time.  We're going to send

7    you home.  Tomorrow we'll bring you back in here and we'll hear

8    argument of counsel, and instructions will be given to you, and

9    then we'll submit the case to you.

10        Very important now that you understand and you adhere to

11   the fact that you're not to discuss the case with anyone else,

12   form or express any opinions about the matter until you get

13   back to the jury room and decide it after you get the input of

14   all the other jurors.

15        Have a pleasant evening, and we'll see you back tomorrow

16   at 8:15.

17        And I'm going to ask counsel to remain for a few minutes.

18   I'm going to come out and talk to you a little bit about jury

19   instruction.

20              THE CLERK:  All rise.

21        (Recess held from 3:52 p.m. to 3:58 p.m.)

22        (Outside the presence of the jury:)

23              THE COURT:  Counsel, this will be very brief, but let

24   me just tell you about the jury instructions.  There's not a

25   lot of issues about it.  I have the joint jury instructions
```

```
 1   that have been requested and the amendments that have been

 2   submitted to the Court.  I've spent the last couple nights

 3   going over those, and there's very few issues.  I do want to

 4   talk to you a little bit about the joint.

 5        Page 26 of the joint instructions and page 27 of the joint

 6   instructions, I'm assuming that we would only give 27 and not

 7   26, because he did not testify.

 8             MR. ESTRADA:  Yes, your Honor.

 9             THE COURT:  On the impeachment of -- impeachment

10   evidence as to witnesses, on page 29, which witnesses are we

11   talking about?  We're talking about Moreno, the victim M.M.

12             MR. ESTRADA:  And Ortega, your Honor.

13             THE COURT:  And Ortega.  Anybody have any other -- I

14   don't think there were any other witnesses that were --

15             MR. SEVERO:  Well --

16             MR. ESTRADA:  I think that was it, your Honor.

17             MR. SEVERO:  No, actually, Mr. Matosyan was also a

18   witness.

19             THE COURT:  I referred to him as M.M., but yeah,

20   Mr. Matosyan.

21             MR. SEVERO:  Yes.

22             THE COURT:  Yeah, those three.

23             MR. SEVERO:  Okay.  I missed it.

24             THE COURT:  It's easier for me to pronounce.

25        Okay.  And I think that that's all I had on that.  We have
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    the -- other than that, the joint instructions are --

 2              MR. SEVERO:  Your Honor?

 3              THE COURT:  Yes.

 4              MR. SEVERO:  If I may, I brought this matter up with

 5    Mr. Estrada yesterday.  On page 64.

 6              THE COURT:  64?

 7              MR. SEVERO:  The instruction regarding distribution

 8    for controlled substances.

 9              THE COURT:  Page 64.  Yes.

10              MR. SEVERO:  I don't believe there was any evidence of

11    any conspiracy or any distribution of controlled substances.

12    There is some passing reference in one of the calls about there

13    being some black -- black -- which is -- which I think was --

14    translated as heroin, but I don't think there was enough to

15    provide an instruction on distribution that goes to -- I'm

16    not -- doesn't go to any count.  Doesn't go to RICO.

17              THE COURT:  Counsel want to be heard on that?

18              MR. ESTRADA:  Yes, your Honor.

19         It's actually one of the predicates for RICO conspiracy,

20    and there were two calls that addressed smuggling black and

21    glass in the prison between Sharopetrosian and Darbinyan, and

22    the smuggling of those drugs into prison would constitute the

23    predicate act of an agreement to distribute controlled

24    substances.

25              THE COURT:  You're going to have to fly by the seat of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    your pants on that.  I'm going to check that out or look at
 2    that tonight very carefully.
 3             MR. ESTRADA:  I can mention the exhibits if you want,
 4    your Honor.
 5             THE COURT:  Pardon me?
 6             MR. ESTRADA:  I can mention the exhibits if --
 7             THE COURT:  I don't want the exhibits.  I remember the
 8    exhibits.  I just want to think about whether or not there's
 9    enough to proceed with that instruction or not.  I'll think
10    about that tonight.  You might have to craft your arguments
11    tomorrow by the seat of your pants, either to delete it or not
12    delete it.
13        On the two amendments to the proposed jury instructions,
14    it appears to be -- we're talking about amendments to 44, which
15    is typographical errors.
16             MR. ESTRADA:  Correct, your Honor.
17             THE COURT:  And to 53, I believe.  And those appear to
18    be appropriate, so the Court would amend it that way.
19        There is a defense request to talk about the expert
20    witness and dual role.  I'm not going to give it the way that
21    counsel's asked, but I am going to mention, before I get to
22    page 31, which is the joint proposed jury instruction 28, I am
23    going to, either before or after that, give the instruction
24    that there's more than one witness who has testified both as an
25    expert and a percipient witness on this.  So I'm going to give
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    the instruction that any opinion testimony given by, and if you
2    want me to list the people, if you want to provide me with a
3    list, that's fine, or I'll say any opinion given by any expert
4    in his capacity as an expert will be judged by this
5    instruction.  This instruction only goes towards any opinion
6    that is given by the expert.  Other than that, his testimony is
7    to be judged like any other witness.  But I think you're
8    correct.  I've gotta make sure that they understand that any
9    testimony, expert testimony that this person gives an opinion
10   on, has to be judged by this standard.
11            MR. ESTRADA:  Your Honor, the government agrees with
12   that.
13            THE COURT:  Okay.
14            MR. SEVERO:  And your Honor, I think the ones that
15   come to mind are Mr. Stebbins, Mr. Stohl, Mr. Quintero.  Those
16   are the three witnesses that I --
17            THE COURT:  If you want to stipulate to that.  What
18   are they again?
19            MR. SEVERO:  Stebbins.
20            THE COURT:  Okay.
21            MR. SEVERO:  Stohl.  Agent Stebbins.
22            THE COURT:  Okay.
23            MR. SEVERO:  Sergeant Stohl and Sergeant Quintero.  I
24   don't --
25            MR. ESTRADA:  That sounds right, but if I could just
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    confirm by looking at the witness list, your Honor.

2           THE COURT:  Just tell me tomorrow morning if there's

3    somebody different, okay?

4           MR. SEVERO:  Sure.

5           THE COURT:  But we'll take those three at least.  And

6    that's the jury instructions.

7        As to the verdict forms, we have those.  That may or may

8    not be modified insofar as any mention of narcotics after I

9    look at what we're seeing tonight.

10       Tomorrow, as far as time limits on the argument goes, I

11   don't know how long people are going to need on it.  I don't

12   know why -- you know, my first reaction is hour 10, hour 15

13   minutes, and 30 minutes each side here.  If you want me to

14   expand that, let me know.

15          MR. SEVERO:  I was thinking 45, but if --

16          THE COURT:  Whatever you want.

17          MR. SEVERO:  No, I think 45 minutes would be --

18          THE COURT:  Give you a little leeway, 45.

19          MR. SEVERO:  Yeah.

20          PEREYRA-SUAREZ:  That would work.  And I think I can

21   try to be more efficient, but I don't want to commit to --

22          THE COURT:  That's fine.  We've never penalized

23   anybody for finishing early.  It would be 45 minutes, 45

24   minutes, and an hour and a half, then.

25          MR. ESTRADA:  An hour and a half for both?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Yeah.  Yeah, for opening and closing.  You

 2     may want to do an hour and a half for -- you know, hour in the

 3     opening and a half hour at closing, or any way you want to do

 4     it.

 5              MR. ESTRADA:  Very good, your Honor.

 6              MR. FLIER:  Your Honor, ruling on Rule 29 motion?

 7              THE COURT:  Not before we send the jury back.

 8              MR. FLIER:  Okay.  Thank you.

 9              THE COURT:  By the way, if any written opposition

10     wants to be made to those Rule 29 motions, I should have that

11     by tomorrow evening.

12              MR. ESTRADA:  Tomorrow evening?

13              THE COURT:  Yes.

14              MR. ESTRADA:  Yes, your Honor.

15         One other thing.  I checked on the witness list.  It

16     appears to be accurate, the three that were given to you.

17              THE COURT:  Okay.  We'll go with those unless somebody

18     modifies it.

19         Have an enjoyable evening.  I'm sure it won't be, because

20     everyone's going to be working hard, but you have to appreciate

21     the fact that at least you're not going to be reading jury

22     instructions for an hour and a half, so it could be worse than

23     arguing.

24              MS. YANG:  And your Honor, just to clarify, the Court

25     post-instructs, correct?  You don't pre-instruct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Post-instruct.

2          MR. SEVERO:  And argue first?

3          THE COURT:  You argue first, yeah.  That gives me a

4    chance to correct you if you do something wrong in the

5    argument.

6          MR. SEVERO:  Thank you.

7          THE COURT:  Thank you, Counsel.

8          THE CLERK:  All rise.

9

10              *(Proceedings adjourned at 4:06 p.m.)*

11

12                    *--oOo--*

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  MARCH 4, 2015

11

12

13

14              /S/ SANDRA MACNEIL

15           Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                  Plaintiff,        )
                                     )
8        vs.                         )   NO:  CR-11-0072(A)-RGK
                                     )
9   (1)  MHER DARBINYAN,             )
    (4)  ARMAN SHAROPETROSIAN,       )
10  (35) RAFAEL PARSADANYAN,         )
                                     )
11                 Defendants.       )
    _____)

12

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15     DAY 13; VOLUME I OF II; PAGES 1 THROUGH 100

16                 MORNING SESSION

17             Los Angeles, California

18             Friday, April 11, 2014

19

20

21

22

23                      KATHERINE M. STRIDE, RPR, CSR
                        1107 Fair Oaks Avenue, #68
24                      S. Pasadena, California  91030
                        www.stridecourtreporting.com
25                      (323)474-6420

**APPEARANCES:**

On behalf of the Government:

       UNITED STATES ATTORNEY'S OFFICE
       ANDRÉ BIROTTE, JR., UNITED STATES ATTORNEY
       BY:  E. MARTIN ESTRADA
           ELIZABETH R. YANG
       ASSISTANT UNITED STATES ATTORNEYS
       312 North Spring Street
       Los Angeles, California  90012
       (213)894-4477

       U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
       BY:  ANDREW CREIGHTON, TRIAL ATTORNEY
       312 North Spring Street
       Los Angeles, California  90012
       (213)894-2579


On behalf of Defendant Mher Darbinyan:

       THE SEVERO LAW FIRM
       BY:  MICHAEL SEVERO, ATTORNEY AT LAW
       70 South Lake Avenue, Suite 945
       Pasadena, California  91101
       (626)844-6400

On behalf of Defendant Arman Sharopetrosian:

       LAW OFFICES OF CHARLES PEREYRA-SUAREZ
       BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
       800 Wilshire Boulevard, 12th Floor
       Los Angeles, California  90012
       (213)623-5923

On behalf of Defendant Rafael Parsadanyan:

       FLIER AND FLIER, ALC
       BY: ANDREW REED FLIER, ATTORNEY AT LAW
       15250 Ventura Boulevard, Suite 600
       Sherman Oaks, California  91403
       (818)990-9500

Also Present:

       JEREMY STEBBINS, F.B.I. SPECIAL AGENT

1

**I N D E X**

2

JURY TRIAL – DAY 13, VOLUME I OF II

3

<u>Page</u>

4

**Closing argument**

5

   On behalf of the United States...................... 5

6

   On behalf Mr. Darbinyan........................... 39

7

   On behalf of Mr. Sharopetrosian.................... 59

8

   On behalf of Mr. Parsadanyan...................... 70

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1           LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 11, 2014

 2                          A.M. SESSION

 3                            --oOo--

 4                          8:35 a.m.

 5


 6           THE CLERK:  All rise and face the flag.

 7               (Judge enters courtroom.)

 8           THE CLERK:  This United States District Court is now

 9      in session, the Honorable R. Gary Klausner, United States

10      District Judge presiding.

11           You may be seated.

12           THE COURT:  Okay.  The record will reflect that all

13      the members of the jury are in their respective seats in

14      the jury box.

15           Ladies and gentlemen, I have some good news, and I

16      have some bad news.  The good news is we have reached the

17      end part of the trial as far as the evidence that's been

18      produced for you.  So now, today, we'll go into the closing

19      argument, I'll instruct you on the law, and then we'll be

20      giving the case to you.  That's the good news.

21           The bad news is because of that, the strict, as you

22      know, time frames that we have been on may be altered a

23      little because we have to craft it around the arguments and

24      instructions and all.  Although I've talked with the

25      attorneys and we're going to try to get this done very
```

1    efficiently and end today, we may have to roll over a

2    little past the 4:00 o'clock time if we don't have the

3    instructions finished yet because I do want to get this

4    case to you today.

5           So with that, Counsel, are we ready to proceed?

6           MS. YANG:  We are, Your Honor.

7           THE COURT:  Okay.

8           MS. YANG:  Thank you.

9                **CLOSING ARGUMENT BY THE UNITED STATES**

10          MS. YANG:  Good morning, ladies and gentlemen.

11          "I am the one who asks the questions in this town."

12   "No one may ask me questions in this town."  These are the

13   words of an Armenian Power gang member and leader, a

14   validated associate of the Mexican Mafia, and one of the

15   leaders of a criminal organization notable for its

16   sophisticated fraud schemes and exertion of power through

17   money, fear, and violence.  These are the words of

18   defendant Mher "Capone" Darbinyan.

19          And as the evidence presented in this courtroom over

20   the past few weeks has shown, these words accurately

21   describe the position of defendant Darbinyan in a

22   racketeering enterprise comprised of members and associates

23   of Armenian Power, including defendant Arman "Horse"

24   Sharopetrosian, an enterprise that committed a multitude of

25   crimes including:  Extortion, identity theft, and fraud on

 1    such a scale as to earn Armenian Power the reputation in

 2    the criminal world as being moneymakers; fraud that

 3    included a sophisticated scheme to defraud thousands of

 4    customers at the 99 Cent Only stores and that involved

 5    individuals who are not charged in the racketeering

 6    conspiracy, individuals such as defendant Rafael

 7    Parsadanyan.

 8          Now, at the beginning of this case, the Court

 9    instructed you that a separate crime is charged against one

10    or more of the defendants in each count and that you are to

11    decide the case of each defendant on each crime charged

12    against that defendant separately.  Because the government

13    bears the burden of proof on each count, a burden which we

14    have embraced for over 200 years, I'm going to go through

15    the individual charges with you, some of the aspects of the

16    law that applies, and some of the evidence in support of

17    those charges.  As I do, I'll identify which defendants are

18    charged in which counts, but generally, I'm going to be

19    speaking about six different types of crime.

20          First, racketeering conspiracy, which is the crime

21    of agreeing to commit, for example, bank fraud and

22    extortion while working through an organization.  Now, the

23    organization is referred to as an "enterprise," which

24    essentially is an association of people who are united for

25    a common purpose, essentially to commit crime;

1          Extortion conspiracy and extortion, which is the

2   crime of agreeing to obtain or obtaining money from a

3   person because of threats;

4          Bank fraud, which is a crime of stealing a person's

5   money from the bank;

6          Aggravated identity theft, which is a crime of

7   possessing a means of identification and using it to

8   commit, for example, bank fraud, knowing that that person

9   is real;

10          Access device fraud conspiracy, which is a crime of

11   agreeing to use or possess unauthorized access devices or

12   counterfeit device-making equipment;

13          And felon in possession, which is a crime of

14   possessing firearms or ammunition after having already been

15   convicted of a crime punishable for more than one year in

16   prison.

17          Now, the first count is Count 1, which is the

18   conspiracy to commit racketeering offenses, also known as

19   "RICO" or racketeering conspiracy, and only defendants

20   Darbinyan and Sharopetrosian are charged in that count.  At

21   the end of closing arguments, the Court will instruct you

22   on the elements of a crime of racketeering conspiracy and

23   the law that applies.  So I'm just going to highlight some

24   general concepts for you now.

25          Conspiracy is simply an agreement to do something

1   illegal. And for RICO, or racketeering conspiracy, the

2   agreement is to commit what are called "racketeering acts."

3   Now, racketeering acts are just a group of state and

4   federal crimes that Congress, concerned about organized

5   crime, designated as crimes that if committed through an

6   organization, would be subject to RICO prosecution. What

7   is important to remember for RICO conspiracy, though, is

8   that it is the agreement itself that is the crime.

9         So for you to find the defendants Darbinyan or

10  Sharopetrosian guilty of Count 1, the government must prove

11  beyond a reasonable doubt four elements:

12        First, that Armenian Power would exist; Second, that

13  Armenian Power would affect interstate commerce; Third,

14  that the defendant agreed that someone would associate with

15  Armenian Power; And fourth, that the defendant agreed that

16  someone would participate in the conduct of the affairs of

17  Armenian Power through what is known as a "pattern of

18  racketeering activity," and we'll talk about that a little

19  bit later.

20        For the first element, the law does not require the

21  government to prove that an enterprise actually existed or

22  that it even had a particular name. But in this case, I

23  respectfully submit that the evidence has proven beyond a

24  reasonable doubt that an enterprise did exist, that it

25  existed for an extended period of time, that it was a

1    sophisticated moneymaker, and that it was Armenian Power.

2             And how do we know this?  We know this because of

3       known A.P. gang members, like Karo "Guilty" Yerkanyan,

4       who is tattooed with the name of the enterprise, and

5       because of items like Government's No. 293, an Armenian

6       Power gang roster that includes A.P. members "Capone,"

7       defendant Darbinyan, and "Guilty," Yerkanyan.  You also

8       know this because members of the enterprise themselves

9       admitted the existence of the enterprise and that it

10      was Armenian Power.  Remember what co-conspirator

11      Paramaz Bilezikchyan said in Government's Exhibit 96

12      when he learned of what happened to defendant Darbinyan

13      at the Chicken House (as read:)

14               "Brother, they know that those two guys are

15               A.P. guys.  Right?  Mher and Karo.  They came

16               against A.P. with guns."

17          And in a call, Exhibit 107, defendant Darbinyan,

18      himself, acknowledged his membership in Armenian Power

19      (as read:)

20               "He gave you one point for A.P. because my

21               address is in your phone book.  Don't you

22               know that I'm a serious criminal, Brother.

23               I'm not just a random face."

24          You also know that the enterprise existed because of

25      its ties to other organizations such as the Mexican Mafia,

1    which, as you've heard during this trial, is a powerful

2    prison gang that controls all southsider gangs.

3         Remember Government's 293, the gang roster for

4    AP-13, the 13 designated, designating A.P.'s association

5    with the Mexican Mafia, and defendant Darbinyan's own

6    admission in Government Exhibit 104, that he's a validated

7    Mexican Mafia member and he ran the yard at Chino State

8    Prison for the Mexican Mafia.

9         And you'll hear from the Court that to prove the

10   enterprise existed, the government has to show that it had

11   some sort of common purpose.  And throughout the course of

12   this trial, you heard call after call, you saw exhibit

13   after exhibit, and you listened to a lot of witnesses all

14   talk about that common purpose, which is to make money, and

15   to make money through sophisticated fraud crimes.

16        Has the government proven beyond a reasonable doubt

17   that an enterprise existed?  Yes.  And that enterprise is

18   Armenian Power, and defendant Darbinyan was one of its

19   leaders.

20        The second element the government must prove in

21   Count 1 is probably the easiest element, and that is that

22   the enterprise affected interstate commerce.  To satisfy

23   this element, all the government has to prove is that the

24   enterprise had some probable or potential minimal effect on

25   interstate commerce.

1          And in this case, that element is easily satisfied

2     by either the extortion payments victim M.M. was forced to

3     make using wire transfer companies that operate both

4     nationally and internationally, including a payment to

5     Arizona; by the multiple firearms seized from Armenian

6     Power members and associates, all of which previously

7     traveled in interstate commerce before being found in

8     Los Angeles; and by the fraud and identity theft schemes

9     that are the hallmark of Armenian Power and whose victims

10    bank at financial institutions that are federally insured

11    and many of which are headquartered out of the state of

12    California.

13          Now, the third element for Count 3 is that the

14    defendant agreed that a conspirator who can be, but does

15    not have to be the defendant himself, would associate with

16    Armenian Power.  What this basically means is that the

17    defendant would agree that someone would help Armenian

18    Power or conduct business with or through Armenian Power.

19          And in this case, the evidence proves beyond a

20    reasonable doubt that both defendants Darbinyan and

21    Sharopetrosian worked with and through Armenian Power to,

22    among other things, extort victim M.M.  At Government's

23    Exhibit 70, a conversation between defendants

24    Sharopetrosian and Darbinyan (as read:)

25               "Right now I'm going to do a three-way call

1          with" victim M.M., "meet with him at 7:30 and

2          see what kind of douche bag he is;"

3     And engage in fraud and identity theft, among other

4     offenses.

5     Government's Exhibit 68, conversation between

6     defendant Sharopetrosian and co-conspirator Emil "Clever"

7     Airapetian, which, as Special Agent Jeremy Stebbins

8     testified, is a known A.P. gang member, quote (as read:)

9          "Tell --" a Citibank insider "-- to bring

10         something in the amount of 700 to 800.  It

11         should be a man and have one phone number.

12         He should have more than one account, about

13         two, and he should be very old.  His age

14         should be under the year 30 to 35."

15    The fourth and final element of RICO conspiracy is

16    that the defendant agreed that a conspirator, again, who

17    can be the defendant but does not necessarily have to be,

18    would participate -- in other words, do something to help

19    Armenian Power through this pattern of racketeering

20    activity.

21    Now, although the law does not require that the

22    government prove that either defendant personally committed

23    racketeering acts -- in fact, the law is that they only

24    have to agree that someone in the enterprise would commit

25    two racketeering acts, here the evidence is clear that they

1    did commit racketeering acts and a pattern of racketeering

2    activity.

3         We've heard about numerous racketeering acts that

4    members and associates of American Power are involved in

5    from extortion to bank fraud to identity theft to access

6    device fraud.  For purpose of this argument, however, I'm

7    just going to focus on three types of racketeering acts,

8    which are charged as separate counts against some of the

9    defendants.

10        The first type of racketeering act is extortion

11   conspiracy and extortion.  Now, these crimes are also

12   charged in Count 4 and 5 against defendants Darbinyan and

13   Sharopetrosian.  And to prove extortion, the government has

14   to satisfy three elements beyond a reasonable doubt.

15        The first is that the defendant induced or forced a

16   victim to part with property, such as money; second, the

17   defendant did so by wrongful use of actual or threatened

18   force, violence, or fear; and third, that interstate

19   commerce would possibly or potentially be affected in some

20   minimal way by this conduct.

21        Now, there's also a state law violation for

22   extortion that is charged as a racketeering act in Count 1.

23   The elements of the state law violation are essentially the

24   same except there is no interstate commerce requirement.

25        As for extortion conspiracy, just as we previously

1    discussed, it's simply the agreement to commit extortion.

2    And in wiretap call after wiretap call, you heard defendant

3    Sharopetrosian and Darbinyan agree to extort victim M.M.

4    On June 29th, 2009, in a conversation between defendant

5    Sharopetrosian and Darbinyan (as read:)

6                    "Sharopetrosian:  120-and-something thousand

7                    based on the accounting.

8                    "Darbinyan:  Either give him my phone number

9                    or give me his phone number.

10                   "Sharopetrosian:  His name is Minas."

11        The next day:

12                   "Sharopetrosian:  Let him initially bring at

13                   least four or five.

14                   "Darbinyan:  I will grab him by his neck now

15                   when he calls.

16                   "Sharopetrosian:  We have to slowly take it

17                   from him, bro.  There is no other option."

18        Sharopetrosian, in two conversations with victim

19    M.M. on June 30th and July 4th (as read:)

20                   "Don't think my hands are so short just

21                   because I'm in this cage over here.  God

22                   forbid if you come without any money.  Hey,

23                   whore, should I hold you and not let you go

24                   home for a couple of months so that you can

25                   understand, so that your family members

1          realize that I'm not kidding?"

2          And defendant Darbinyan, in conversations with

3    victim M.M. on July 6th (as read:)

4               "If you fuck around with me, I will hurt you.

5               I am sitting and waiting for you.  Don't let

6               that happen.  Don't disappear from the scene.

7               If you are lying, I'll jerk-off on the liar's

8               mother's head."

9          And because defendant Sharopetrosian was in prison,

10   he had to work with Armenian Power members including

11   Darbinyan and Emil Airapetian who were out of prison to

12   collect the money from victim M.M.

13         Remember victim M.M.'s testimony about being forced

14   at gunpoint to get into a car with Emil Airapetian and,

15   while in a car, being held against his will, receiving a

16   call from defendant Sharopetrosian demanding that he pay

17   him money.

18         And remember his testimony about being summonsed to

19   a meeting with defendant Darbinyan, being locked in an

20   office with defendant Darbinyan and several of his

21   associates, and not being allowed to leave until he begged

22   for more time to pay some money.

23         And the threats, intimidation and fear exerted by

24   defendants Darbinyan and Sharopetrosian had their desired

25   effect.  As Government's Exhibit 281, for example, shows,

1    victim M.M. made multiple wire transfer payments as

2    directed and ordered by defendant Sharopetrosian in calls

3    such at Government's Exhibit 81 (as read:)

4              "Jesus Murillo, $1,600; Rafael Armendariz,

5              you will send this person $510; Porfirio

6              Guerrero, you are sending this person two and

7              two; Mercedes Bukhari $1,000 to this person."

8         And the threats continued, even after victim M.M.

9    went to the FBI.  In two conversations in November,

10   defendant Sharopetrosian threatened (as read:)

11             "I will skin you.  If that deposit does not

12             happen by 6:00 o'clock, I will not give a

13             fuck.  Good luck to you.  I have been

14             successful in receiving everything that I've

15             been involved in, friend.  Even if there is a

16             corpse, I would pick it up, too.  I don't

17             give a fuck."

18        And the wire transfer payment that defendant

19   Sharopetrosian demanded that victim M.M. made also

20   continued as shown Government's Exhibit 282.

21        Did defendants Darbinyan and Sharopetrosian conspire

22   to extort and extort victim M.M.?  I respectfully submit

23   that the evidence proves beyond a reasonable doubt that

24   they did.

25        Now, the next type of racketeering act is bank

1    fraud, and bank fraud is charged in multiple counts.

2    Specifically, it's charged in Counts 6 through 19 against

3    defendant Darbinyan only, and those are the bank fraud

4    counts that relate to the check cashing fraud scheme.

5          Bank fraud is also charged in Counts 38 through 41,

6    44 through 45, 48, 50 to 51, 54, 57, 60, 63, and 66 against

7    defendants Darbinyan and Parsadanyan.  And those bank fraud

8    counts relate to the 99 Cent Only Store scheme, which we'll

9    talk about in a little bit.  But the elements to prove bank

10   fraud are the same for both schemes; so I'm going to go

11   over that with you very quickly.

12         The crime of bank fraud has four elements:  First,

13   the defendant knowingly devised or executed a scheme to

14   defraud a bank; second, the scheme was material.  In other

15   words, it could have influenced a bank to part with money;

16   third, the defendant acted with the intent to defraud; and

17   fourth, the bank was federally insured.

18         As to this last element for both schemes, it is

19   undisputed that all the financial institutions at which the

20   victims banked are federally insured.  All you need to do

21   is take a look at Government's Exhibit 396 to 405, and

22   you'll find that this element is satisfied.

23         As to the remaining elements, for both schemes, the

24   evidence proves beyond a reasonable doubt that the

25   defendants worked to steal money from banks either through

1    cashing fraudulent checks or using re-encoded debit cards

2    to withdraw money from ATM machines based on personal

3    information stolen from victimized bank customers.  And in

4    robbing the banks and the bank customers, the defendants

5    didn't have to go in wearing a mask or a gun.  They had a

6    far more sophisticated and effective means of getting that

7    money.

8         The first way defendant Darbinyan had to steal money

9    from banks was through a check cashing fraud scheme, and as

10   you saw and heard during this trial, defendant Darbinyan

11   devised quite a successful scheme.

12        Remember the testimony of Armando Moreno and Gustavo

13   Ortega, who both participated in Darbinyan's check fraud

14   cashing scheme but not together.  But they both told of

15   very similar operations with defendant Darbinyan as the

16   leader and mastermind over associates who forged checks,

17   who recruited runners, who drove the runners to the banks,

18   and the runners themselves who actually entered the banks

19   to cash and deposit the checks.

20        Wiretapped calls, surveillance photographs, and

21   physical evidence confirmed defendant Darbinyan's execution

22   of this particular scheme.

23        There are five specific victims that are charged in

24   the bank fraud counts related to this scheme, and I'll go

25   through each of them briefly.

1          First is Manuel Angulo, who is charged in Count 6

2    through 9.  Mr. Angulo testified about how his business

3    bank account information for his family-owned jewelry

4    business, Pompos Jewelry Corporation, also known as PJC,

5    had been stolen in January 2009, and how he learned about

6    attempts to cash unauthorized checks on that account.

7          You heard Government's Exhibit 6A -- excuse me -- 8,

8    in which defendant Darbinyan is being advised by an

9    associate that, quote, "The number is 3444, 5,900," to

10   which Darbinyan responds, "Okay.  Yeah, I know.  Don't talk

11   man."

12         Several minutes later, a runner by the name of

13   Rafael Zendejas, a runner who Ortega admitted to recruiting

14   and providing to defendant Darbinyan, attempts to cash

15   check No. 3444 on the Pompos Jewelry Company corporate

16   account in the amount of $5,900 at a Bank of America in

17   Glendale.

18         And when Zendejas is arrested attempting to cash

19   that check, defendant Darbinyan tells his associate, in

20   Government's Exhibit 10, "Oh, man, Glendale is not a good

21   place, man."  And as Government's Exhibit 252 shows, three

22   additional checks, also using the victim's name, account

23   number, and signature were fraudulently cashed.

24         Each of these checks is a separate bank fraud count

25   and all were part of defendant Darbinyan's check cashing

1    fraud scheme.

2         You also heard from Grace Ferguson, who is charged

3    in Counts 10 through 13, and she testified that, in

4    March 2009, she learned that her personal bank account

5    information had been stolen and two unauthorized checks had

6    been cashed, specifically check No. 1462 in the amount of

7    $26,400 to Karen Hesham, and check No. 1463 in the amount

8    of $38,000 to the same Karen Hesham.

9         You heard Armando Moreno testify who Karen Hesham

10   was, also known as "Karen Samawi." She was his girlfriend

11   at the time, and he recruited and provided her to Darbinyan

12   as a runner to cash checks.

13        And you heard wiretap calls about these checks,

14   including Government's Exhibit 16, in which Darbinyan tells

15   Moreno that the amount of the check is going to be 26,300.

16   He was off by about a hundred. In Government's Exhibit 31,

17   Darbinyan tells another associate, Arman Tangabekyan, that

18   the amount of this, the second check is 38,000. The check

19   number is 1463. Bank records confirm, at Government's

20   Exhibit 256, that these checks were deposited in Karen

21   Hesham Samawi's bank account.

22        And Government's Exhibit 251-1 shows that

23   Ms Ferguson also was victimized in another way. She had

24   two unauthorized wire transfers on her personal bank

25   account, one for 45,000 and one for 40,000. Each of these

1  transfers and both of those checks are separate fraud

2  counts, but they're also part of defendant Darbinyan's

3  overall cash checking fraud scheme.

4      The next victim, Yoones Gidanian, is the victim in

5  counts 14 through 16, and he also testified that, in March

6  2009, he had been the victim of unauthorized check

7  deposits.  Like Mr. Angulo, Mr. Gidanian's business account

8  information had been stolen and three unauthorized checks

9  had been cashed.

10     In calls played at Government's Exhibits 44 to 46,

11 defendant Darbinyan confirmed that one check was for

12 $4,500, and another check was for $5,000 and told Ortega

13 that three checks in total had been cashed on this account.

14     When a runner recruited by Ortega, Steven Wilson,

15 left the fourth check -- a fourth check behind at the bank,

16 defendant Darbinyan was captured on wiretap calls telling

17 one of his associates, Manuk Terzyan, to just bring the

18 runner back.

19     Again, each of these checks is a separate bank fraud

20 count and part of the defendant Darbinyan's overall bank

21 fraud scheme.

22     And you also heard from Marjorie Duncan.  She and

23 her husband are charged in Count 17 and 18, who testified

24 about two unauthorized checks that had been cashed on their

25 bank account, specifically, check No. 2386 in the amount of

1   $28,357 made out to RZ Diginet and check No. 2387 in the

2   amount of $74,350 made out to David Petrosov.

3        And in Government's Exhibit 59 and 60, Darbinyan

4   confirms that the amount of one check is 28 and

5   300-something for RZ Diginet.  His associate, Manuk

6   Terzyan, who was also captured on bank surveillance

7   photographs at Government Exhibit 297, depositing one of

8   checks.  These checks are also separate bank fraud counts

9   and part of the check cashing fraud scheme.

10        Finally, you had heard about victim Loren Rose and

11   the $135,200 unauthorized check that was cashed on his

12   account.  Although Mr. Rose did not testify at trial, you

13   heard from Special Agent Stebbins, who had spoken to

14   Mr. Rose.  And his bank account records at Government

15   Exhibit 255 confirmed that the check was cashed.  More

16   importantly, you heard Government's Exhibit 62 in which

17   defendant Darbinyan provides Mr. Rose's Citibank account

18   number to an associate.  This check is count number 19 and

19   part of the check cashing fraud scheme.

20        Based on this evidence, did defendant Darbinyan

21   devise and execute this bank fraud scheme?  Did his scheme

22   influence banks to part with money?  And did he act with

23   the intent to deceive the banks?  The evidence proves

24   beyond a reasonable doubt that he did.

25        But the check cashing fraud scheme wasn't defendant

1    Darbinyan's only way to steal money from the banks.  He

2    also had another equally sophisticated scheme, this one

3    involving debit cards and PIN numbers instead of checks,

4    debit cards and PIN numbers that he and his enterprise were

5    able to retrieve from point-of-sale terminals at 99 Cent

6    Only stores, point-of-sale terminals that he called in

7    Exhibit 170 "Boxes of gold."  And this scheme also involved

8    defendant Parsadanyan.

9         For this scheme, Darbinyan and his associates

10   targeted these 99 Cent store customers.  And like the check

11   cashing fraud scheme, Darbinyan ran a very successful

12   operation with multiple associates fulfilling various

13   roles:

14        He had the installers of the skimming devices into

15   the point-of-sale terminals; he had people who would go

16   into the stores to swap out the terminals; he had

17   individuals to download the debit cards and PIN numbers

18   from the skimming devices; he had people to re-encode gift

19   cards with those stolen debit card and PIN numbers; and of

20   course, he had people recruiting and organizing the

21   runners; and the runners themselves, who would go to the

22   ATM machines, you heard, and attempt to make two

23   withdrawals when -- as defendant Parsadanyan in

24   Government's Exhibit 149, referred to as "day and night,"

25   in order to avoid the daily limit so they could get twice

1    as much out of one card as opposed to one single visit to

2    the ATM.

3         And defendant Parsadanyan was heavily involved in

4    the scheme, collecting money, distributing cards, and

5    reporting the runners' progress; and how do you know this?

6         MR. SEVERO:  Objection, there's no evidence of that.

7         THE COURT:  Overruled.

8         MR. ESTRADA:  And how do you know this?

9         Well, the best play is July 18, 2009, and the

10   wiretap calls.  On this date, Darbinyan calls defendant

11   Parsadanyan to say he is coming to a store because, quote,

12   "There are things that I need to give you and stuff."

13        Darbinyan then speaks with Raymond Tarverdyan, who

14   you have seen and heard during this trial, was an active

15   participant in the 99 Cent fraud scheme, frequently going

16   into the stores to swap out the point-of-sale terminals.

17        And Darbinyan, when he spoke with Tarverdyan, tells

18   him that, quote, "I'll have Raffo.  So he drives.  So I

19   don't take it on me."

20        Shortly thereafter, law enforcement surveillance

21   sees defendant Darbinyan at Rafael Parsadanyan's cell phone

22   store.  After Darbinyan leaves, he again calls Tarverdyan

23   and says, quote, "My front is coming now and he is bringing

24   those things."

25        At approximately 8:15 p.m., as you heard from the

1    Glendale Police Department officers, defendant Parsadanyan

2    was stopped as he approached the 134 freeway, which is the

3    direction to Tarverdyan's residence in North Hills and

4    found the $34,000 cash in a white Ikea shopping bag.

5        Claiming that the money came from his cell phone

6    store, Parsadanyan told the officers that he takes that

7    money out of his store at the end of every week to deposit

8    it into the bank sometime the following at week.

9        At approximately 8:45 p.m., Tarverdyan speaks to

10   Darbinyan and states, "This guy is not here.  He said he

11   would be here in 15 minutes.  Half an hour passed."

12       And remember what FBI Special Agent Stebbins told

13   you, that toll records confirm there was contact between

14   Parsadanyan and Tarverdyan the night of July 18th, 2009.

15       And later that night, after defendant Parsadanyan is

16   released from the traffic stop, Tarverdyan calls Darbinyan

17   back and tells him, "That matter is a touchdown.  He came.

18   It's a touchdown.  They had stopped him, but it's all

19   okay."

20       That money, ladies and gentlemen, the $34,000 that

21   constituted the proceeds of the 99 Cent Store fraud scheme,

22   not the proceeds from defendant Parsadanyan's cell phone

23   store, which is why he did not deposit it the bank in July

24   or August of 2009, and which is evidence to prove that he

25   was part of the scheme.

1        Further evidence of his knowledge and participation

2    in the 99 Cents Only store scheme can be found in his other

3    conversations with Darbinyan and his dealings with other

4    members and associates of the enterprise as well as the

5    99 Cent Only Store scheme, including among others,

6    Khachatur Arakelyan, also known as "Khecho," and Hakop

7    Simitian, also known as "Hakopik."

8        At Government's Exhibit 149, Parsadanyan is

9    discussing with Darbinyan, the scheme. Darbinyan asks if

10   they went to greet, which as you heard in other calls and

11   testimony here in trial, was code for had the runners come

12   back essentially.

13       Parsadanyan says "Yes, Khecho," Arakelyan, "already

14   went." He also said, "It's not the second time" when

15   Darbinyan asked if it's just one time. Parsadanyan

16   confirms, "It's day and night, brother. It is from the two

17   times." The two visits to the ATM machines, once before

18   midnight and once after to max out the daily limit.

19       They talk about the number of cards in the call.

20   "That's from the 65, and not the 50" and "As far as the 35,

21   they didn't make it." The re-encoded debit cards, ladies

22   and gentlemen. And Parsadanyan says he will call and wake

23   them, the runners, to tell them to take those.

24       In Government's Exhibit 166 and 167, Darbinyan is

25   asking Parsadanyan if he's had any news from Arakelyan,

1    Khecho; Parsadanyan's response, "Yeah, the total about 30

2    large."  They're not talking about cell phones, ladies and

3    gentlemen.  They're talking about proceeds from the scheme.

4            Exhibit 167, Darbinyan asks about quote,

5    "yesterday's things."

6            Parsadanyan replies, "It should be already ready.

7    We're waiting for it arrive.  He said in two days."  The

8    re-encoded debit cards.  That's what they're talking about.

9            Parsadanyan's participation in the scheme is also

10   evidenced by his associations with Mr. Arakelyan, as I just

11   said.  Parsadanyan was seen at the Weed Shop on Sunset with

12   Darbinyan and Arakelyan on July 13th, 2009.  Parsadanyan

13   tells Darbinyan in a call, at Government's Exhibit 161,

14   that he'll call Khecho to come over to his store.  And

15   Arakelyan later tells Darbinyan that "Raffo and the guys

16   were waiting for you to let them know," waiting on further

17   direction On what to do in furtherance of the scheme.

18           And the call at Exhibit 173, Darbinyan asked about

19   Khecho bringing the money.  And Parsadanyan responds that

20   it was ten and nine, $10,900.  It was the second one.

21           And Darbinyan asks if he still has those things.

22   Parsadanyan responds "He has everything."  He has given

23   whatever Darbinyan wants to Khecho.

24           Hakop "Hakopik" Simitian.  Parsadanyan also had

25   dealings with him, and he was a member of the scheme to

1   defraud the 99 Cents Only Stores customers.

2          Government's Exhibit 180, Darbinyan asks if Hakopik

3   had come over.  Parsadanyan, "Yes, bro, I gave it to him.

4   He also gave me some."  Then all that was withdrawn was

5   1300.  And taking together yesterday's withdrawal and

6   today's, there was a total of 9.5 and Simitian took out

7   1900, which is 20 percent.

8          You heard testimony throughout this trial, ladies

9   and gentlemen, that that was the percentage that was

10  generally given to the runners for cashing either the

11  checks or the ATM withdrawals, except with Mr. Ortega, who

12  got the one-third cut.

13         Parsadanyan's involvement and participation in the

14  scheme is also evidenced by his discussion with Darbinyan

15  and Darbinyan's discussion with people who are -- were

16  deeply involved in the scheme.  And defendant Darbinyan, as

17  evidenced by these wiretap calls, oversaw the scheme and

18  was talking to his associates frequently about how many

19  runners would be needed, the numbers of times the runners

20  could do withdrawals, and how much to pay the runners.

21         In several conversations with Garen Chouldjian, he

22  talks about wanting four to five runners, doing it from the

23  outside, withdrawing money from the outside ATM machines,

24  the amount that came out, and how many pieces are left, how

25  many cards.

1          Again, defendant Darbinyan is having conversations

2     also with co-conspirator Arakelyan about four judo

3     fighters, which, as you heard during trial, was code for

4     runners.  There was talking about two rounds, two visits to

5     the ATM, the third one should work as well.  And his

6     conversation with Petros Babelyan at Exhibit 148, about

7     wanting runners for the wall thing, they will get

8     20 percent, and he then gives Petros Raffo's phone number.

9          Defendant Darbinyan also was in close contact with

10    Raymond Tarverdyan, who was very active in the scheme, and

11    was repeatedly seen going into stores.

12         There are multiple conversations -- I won't go

13    through all of them -- but there's references to "horses,"

14    which you heard was Wells Fargo Bank.  He was very closely

15    tied to Andranik Bakhchadjian, who you saw on the 99 Cent

16    Store surveillance videos, went into the stores with

17    another individual by the name of Vartenie Ananian to swap

18    out point-of-sale terminals.

19         And he, of course, was tied to Gustavo Ortega, who

20    testified to you about his involvement in both the check

21    cashing fraud scheme as well as this 99 Cent Only Store

22    scheme.  And you had, Government's Exhibit 351B, video

23    footage of Ortega in a 99 Cents in San Diego, the same

24    store that he said defendant Darbinyan had directed him to,

25    to swap out the point-of-sale terminals.  Ortega admitted

1    his involvement in the scheme, and there's a call at

2    Government's Exhibit 172, where Darbinyan says he's going

3    to go see Bam-Bam that day.

4         Later, when Ortega's arrested, he's found with a

5    thumb drive containing approximately 500 credit card

6    numbers, the approximate number of credit card numbers that

7    Darbinyan and Antonyan talked about, September 16th, 2009,

8    as payment for Ortega's role in the San Diego swapping of

9    point-of-sale terminals.

10         Did defendants Darbinyan and Parsadanyan devise or

11   execute the scheme to defraud banks?  Did their scheme

12   influence banks to part with money, and did they do so with

13   the intent to defraud or steal money from the banks?  The

14   evidence proves beyond a reasonable doubt that they did;

15   that the banks did, in fact, give money through the ATM's

16   as you heard from the multiple victims who came here to

17   testify; and that they intended to essentially steal from

18   the banks by using those bank customers' PIN numbers

19   without their authorization.

20         The next racketeering act is access device fraud

21   conspiracy, which is charged also as Count 69 against

22   defendants Darbinyan and Parsadanyan.  Now, this

23   racketeering act and crime ties with the 99 Cent scheme,

24   which we've just talked about; so I'm not going to go over

25   it all again.

1        But I just want to briefly let you know what the

2   elements are for you to find the Defendants guilty of this

3   crime.  Again, because it's a conspiracy, it's an

4   agreement.  And it's an agreement to knowingly and with

5   intent to defraud use or possess unauthorized access

6   devices or device-making equipment, and this conspiracy

7   would have affected interstate commerce.

8        Now, the Court will instruct you that access devices

9   are basically any card, code, account number, PIN number,

10  or any other means of account access that can be used to

11  obtain money, such as a debit card and PIN numbers for the

12  99 Cents Store victims, who testified including, Mary Jane

13  King, whose bank is federally insured and headquartered out

14  of state, and the approximate 2,600 additional credit card

15  and/or debit card numbers that Secret Service Special Agent

16  Dave Ogden found on skimming devices recovered from

17  point-of-sale terminals that were at 99 Cents Only stores

18  in Riverside and Huntington Beach.

19       The next crime, aggravated identity theft, is not a

20  racketeering act for count 1.  It is just a substantive

21  crime charged in multiple counts -- 23 through 34, 71 to

22  73, 77, 79 through 81, 84, 87, 91, and 93.

23       And some of these counts are charged only against

24  defendant Darbinyan as listed on slide; the other are

25  against both Darbinyan and Parsadanyan.  That's because you

1    had the check cashing fraud scheme and the 99 Cents Store

2    fraud scheme.

3         And to find the defendants guilty of aggravated

4    identity theft, there are three elements.  First, did the

5    defendant knowingly, transfer, or possess, or used without

6    legal authority, a means of identification of another

7    person.

8         And the Court, again, will instruct you on what a

9    means of identification is.  And that is a name or number

10   that can be used to identify an individual, such as the

11   name, signature, and account number that defendant

12   Darbinyan used of Grace Ferguson; and the debit card and

13   PIN number that defendant Darbinyan and Parsadanyan used of

14   the Janell -- or had of Janell Arnold.

15        And as each of the victims of the check cashing and

16   the 99 Cents Store fraud scheme told you, they didn't know

17   defendant Darbinyan or defendant Parsadanyan; and they

18   didn't authorize either of them to possess, use, or give to

19   another their means of identification.

20        The second element of aggravated identity theft is

21   if the defendants knew that the means of identification

22   belonged to a real person.  Of course, the defendants knew

23   that the debit card numbers or the check account

24   information belonged to real people.  That's the whole

25   point of this scheme.  Fake people don't have checks.  Fake

1    people don't use their debit cards to buy things at

2    99 Cents Stores, and fake people don't have money in bank

3    accounts.

4           And the third element is that defendant possessed or

5    used this means of identification during and in relation to

6    bank fraud for the check cashing scheme or the crimes of

7    bank fraud or access device fraud conspiracy with regard to

8    the 99 Cents Only Store scheme.

9           This basically means that when the defendant

10   possessed information or when they used it or when they had

11   someone else in the scheme use or possess it, it was part

12   of the bank fraud scheme or the access device fraud

13   conspiracy.

14          And every single one of these possessions, uses, or

15   transfers, or causing someone else to possess or uses the

16   victims' information that you heard in this case was part

17   of those overall schemes or conspiracies.

18          And, of course, much like they knew it was a real

19   person, defendant Darbinyan possessed information in

20   relation to the bank fraud, and defendants Darbinyan and

21   Parsadanyan possessed this information in relation to the

22   access device fraud conspiracy and bank fraud; otherwise

23   what would be the point.  Means of identification were

24   necessary to commit the bank fraud.

25          Again, though because some of these charges relate

1    to what we've already talked about, the check cashing fraud

2    scheme as well as the 99 Cents Only scheme, I'm just going

3    to go over for you very briefly which victims are charged

4    in what counts and what are the means of identification.

5        The check cashing bank fraud schemes victims are

6    charged only as against defendant Darbinyan in the

7    following counts:

8        Manuel Angulo in 23 to 26 and the means of

9    identification are his name, account number, and signature.

10       Grace Ferguson, 27 and 28.

11       And all of these victims actually, ladies and

12   gentlemen, it's the same means of identification that

13   defendant Darbinyan and his co-schemers used to commit the

14   bank fraud.

15       Yoones Gidanian is in Counts 29 to 31;

16       Frank and Marjorie Duncan, 32 to 33;

17       And Loren Rose is in Count 34.

18       In regard to the 99 Cents Only stores bank fraud

19   victims, these are charged against defendant Darbinyan and

20   Parsadanyan.  And, again, with these victims, the means of

21   identification used were the account number and their PIN

22   number, and up on the screen is the counts in which they

23   are charged.

24       The final crime that is charged in this case, which

25   is also not a racketeering act, but it's charged in Counts

1    128 and 129 only against defendant Darbinyan is felon in

2    possession, the firearms and ammunition.

3        And the elements of that crime are very

4    straightforward.  They are:  One, the defendant knowingly

5    possessed a firearm or ammunition; two, the firearm or

6    ammunition was transported in interstate or foreign

7    commerce; and three, at the time the defendant possessed

8    the firearm or ammunition, he had previously been convicted

9    of a felony, a crime punishable for more than one year.

10       In this case, the second and third elements are not

11   in dispute because, as you heard in trial, the defendants

12   have stipulated or agreed that all the firearms and

13   ammunition in this case had traveled in interstate

14   commerce.  So that element is satisfied.

15       The last element is also satisfied.  If you look at

16   Government's Exhibit 409, which is defendant Darbinyan's

17   2005 felony conviction for fraudulent use of access cards

18   and account information.

19       So the only issue that is in dispute is whether

20   defendant Darbinyan possessed the three firearms and

21   ammunition recovered from Seroun Serobyan on November 24th,

22   2009, and whether he possessed the Omega high-powered rifle

23   found in the trunk of his Mercedes in Beverly Hills on

24   December 1st, 2009.

25       Now with regard to possession, the Court will

1    instruct you that a person has possession of something if

2    he knows of its presence and has physical control of it or

3    has the power and intention to control.  And yes, ladies

4    and gentlemen, more than one person can possess something.

5         In regard to the November 24th, 2009, possession of

6    the three firearms and ammunition that's charged in

7    Count 128, you heard Government's Exhibit 113, the call

8    between defendant Darbinyan -- I'm sorry, 118 -- and Miguel

9    Ramirez.

10        I'm sorry.  Government Exhibit 113, a call between

11   Darbinyan and Ramirez on November 23rd, the day before the

12   guns were seized, in which Ramirez offers Darbinyan guns,

13   including, quote, "a snub nose with no hammer."  Darbinyan

14   and Ramirez arrange to meet at the Weed Shop on Sunset

15   Boulevard, and that meeting was later confirmed by law

16   enforcement surveillance.

17        The next day, November 24th, 2009, the owner of the

18   Weed Shop, in Government's Exhibit 116, calls defendant

19   Darbinyan and asks him to, quote, "send someone here to

20   pick that up," end quote and said he didn't want to, quote,

21   "Keep it inside because there are a lot of big things and I

22   don't want them to come in and catch me."

23        Darbinyan agrees to have someone pick it up.  And he

24   then arranges for his guns to be picked up by "Suro,"

25   Souren Serobyan.  And that is reflected in Government's

1    Exhibit 118, when Darbinyan asks Mr. Serobyan can meet with

2    Kaj, and Serobyan says, "No, my brother -- "  He asks

3    (as read:)

4                    "Will you take it very far."

5                    And he says, "I will take it to our yard.  I

6                    have a car parked over there, my friend.

7                    I'll put it in that car's trunk and it will

8                    stay there."

9        And later that day, in the trunk of a car parked at

10   Serobyan's residence, law enforcement recovered defendant

11   Darbinyan's guns, including the snub nose with no hammer.

12       And as you heard from L.A.P.D. Detective Anna

13   Carlisle, defendant Darbinyan went to see what had happened

14   to his guns.  And she saw him drive down Harvard Avenue

15   looking very intently at the law enforcement action at

16   Serobyan's residence.

17       The evidence proves beyond a reasonable doubt that

18   defendant Darbinyan possessed the three guns and the

19   ammunition on November 24th, 2009.

20       And with regard to the possession on December 1st,

21   2009, I don't think there's a question the high-powered

22   rifle was found in the trunk of defendant Darbinyan's car,

23   and there had been a call that day, at Exhibit 125, and it

24   says (as read:)

25                    "I spoke to Gago yesterday.  I'm going to

```
 1                    gift him with a gun today.  One of my guns.

 2                    You know I had an Omega."

 3            And on December 1st, 2009, this Omega rifle was

 4      exactly what was found in defendant Darbinyan's car in

 5      Beverly Hills.

 6            Based on all of the evidence you've heard at trial,

 7      the United States respectfully submits that defendants

 8      Mher Darbinyan and Arman Sharopetrosian are guilty of

 9      racketeering conspiracy, extortion conspiracy, and

10      conspiracy; that defendants Darbinyan and Rafael

11      Parsadanyan are guilty of bank fraud, aggravated identity

12      theft, and access device fraud conspiracy; And defendant

13      Darbinyan is guilty of bank fraud and aggravated identity

14      theft and felon in possession of firearms and ammunition.

15            At the conclusion of this case, we will therefore

16      ask you to return the only verdicts that are consistent

17      with all the evidence in this case; and that is a verdict

18      of guilty on all counts as charged against each individual

19      defendant.

20            Thank you.

21            THE COURT:  Thank you very much, Counsel.

22            Counsel.

23            MR. SEVERO:  Your Honor, I need to -- there's only

24      one.

25            THE COURT:  Sure.  In fact, if you want to take a
```

1    moment to stretch, you may because we've got another 45

2    minutes before our break; and if you don't want to stand

3    up, that's fine, too.

4         Do you want help with the machine?

5         MR. SEVERO:  Thank you.

6             (Pause while counsel adjusts monitor.)

7    **CLOSING ARGUMENT ON BEHALF OF DEFENDANT DARBINYAN**

8         MR. SEVERO:  Good morning everyone.

9         No money trail, no fingerprints on anything, no

10   surveillance photos in most in instances, no loaded guns in

11   his possession, no credible evidence of how Mike Darbinyan

12   obtained any bank information, no evidence of ordering

13   checks or receiving checks, and no gift cards in his

14   possession, no credit cards in his possession, no PIN pads

15   in his possession, no text messages.

16        Every morning for the last three weeks when we come

17   in for the session, we're asked to face the flag and we're

18   actually reminded that it is the emblem of our Constitution

19   and also reminded of the principles for which it stands.

20        This is a case, I told you in the opening statement,

21   about guilt by innuendo, supposition, and guesswork.  The

22   principles for which it stands -- the presumption of

23   innocence.  It is the hallmark of our liberty.  It is what

24   puts a defendant or puts the government in a position of

25   having to prove beyond a reasonable doubt the guilt of the

```
1    defendant.  Each defendant is presumed innocent until the
2    government proves the defendant guilty beyond a reasonable
3    doubt.
4         Beyond a reasonable doubt -- that is the central
5    question in this case.  And what you will be told, "It is
6    proof beyond a reasonable doubt.  It's proof that leaves
7    you firmly convinced."  Let's see if I can do that.  No,
8    firmly convinced that the defendant is guilty.  Firmly
9    convinced.  It's the kind of stuff, the kind of state of
10   mind that we use almost daily to make major, major
11   decisions.  I want to buy this house.  That kind -- of it's
12   not certainty, but it's that kind of firm conviction that
13   you have when you go buy a car.
14        I'm trying to get away from these fancy terms that
15   we don't use in our daily life, but that's how we make
16   decisions.  We make decisions based on information that we
17   believe and that convinces us.
18        What is the evidence in this case.  You got the
19   overwhelming majority of the evidence is the transcripts of
20   calls.  And of course, in that regard, you have to remember
21   that the warning, if you will, by Mr. Derpetrossian, the
22   interpreter.  Most of these calls are all in Armenian, and
23   they get translated.  They're supposed to be sealed and put
24   away; so we don't tamper with them.  But the actual
25   transcripts are prepared from stuff that wasn't sealed.
```

1   But Mr. Derpetrossian said that people who speak eastern

2   Armenian may say words without intending them to be taken

3   literally.  That testimony came yesterday.

4        Once it gets interpreted into English, then it gets

5   interpreted again by Mr. Stebbins.  The information on the

6   phone calls means what Agent Stebbins wants them to mean.

7   If it's a thing, it's a gun.  If it's a toy, it's a gun.

8   If it's a thing, it's a PIN pad.  If it's a thing, it's a

9   credit card -- it could be anything.  As you go through

10  these calls, and as we listen to the opening argument by

11  Ms. Yang, you could see the specter -- and I don't mean

12  that disrespectfully -- the specter of Mr. Stebbins all

13  over that, telling us what do the calls mean.  And without

14  that testimony, you have nothing.

15       So what about his testimony.  He's a very well

16  mannered, very well trained witness.  He's been an agent

17  for nine years, but only five, six years on this case.  And

18  this is his major case, this is his baby.  So he takes the

19  stand and, without being asked a particular question, he'll

20  tell you what he's thinking.

21       For example, we would say something like who's so

22  and so?  Oh, he's an associate of Mr. Darbinyan, and he is

23  of Armenian Power.  An associate?  How about a friend?  He

24  testified not only as to his knowledge of the

25  investigation, but his opinions from who is a gang member

1    to how to get from Glendale to Hollywood.

2         And it's those opinions that this government is

3    relying on to get you to convict.  But without that

4    interpretation -- you have a two-step process, remember.

5    You have the Armenian to English, and words don't always

6    mean what they are intended to mean.  And then you have

7    Mr. Stebbins reinterpretation of English.

8         Proof beyond a reasonable doubt requires that you

9    are given or feel -- you're in a state of mind that leaves

10   you the next morning, the morning after, you don't have

11   buyer's remorse.  That's the kind of state of mind you've

12   got to have.  And you don't get that when somebody tells

13   you what you're supposed to understand the call to mean.

14   There are -- I will acknowledge there are some calls that

15   are specific.

16        For example, at one point -- I don't recall who said

17   it, but the word "runners" was used outright.  So why is it

18   that when they talk about those things, he thinks, Mr.

19   Stebbins thinks, it's runners but, sometimes they tell you

20   that it's runners.

21        If they wanted to say "runners," wouldn't they just

22   say that in the tape?  Yes.  So please understand that, as

23   you go through these calls, as you interpret these calls

24   again, you have to give up the meaning that it has.

25   There's no vagueness to -- he brought that stuff over

1    unless you listened to Mr. Stebbins's belief, his opinion,

2    that "stuff" means PIN pads or money or credit cards.

3          The government expects you to take his word as

4    gospel. Judo -- he had never heard the word "judo" used

5    before in any context. All of a sudden, "judo" means

6    something criminal to him. Why? Because it's convenient.

7    He's got to make it fit. If he doesn't make it fit, he

8    can't get you to convict. Despite the amount of personnel

9    and the gigantic resources of the federal government, they

10    still couldn't find a bank insider. They had to rely on

11    Mr. Ortega for that.

12          And for all the phone calls that were intercepted,

13    where were the phone calls between Mr. Darbinyan and

14    anybody within a bank to say hey get me some checks or even

15    if you want to re-interpret that -- anything. No, there

16    are no such calls.

17          How did they get there? Well, they get there -- or

18    they try to get there by the use of some informants. Let

19    talk about the informants. The testimony of informants --

20    and I'm going to direct you actually mostly to the last

21    sentence in the instruction.

22          The informant, or what I think was more

23    appropriately referred to as "a cooperating witness" is

24    someone who has pled guilty in a case and is trying to buy

25    or curry favor with the government to get a recommendation

1    for a judge to lower his sentence.

2         That's why, in our instructions, it says "You should

3    examine the testimony of a cooperating witness with greater

4    caution than that of other witnesses."  Why?  Well, you see

5    it here.  If there's any demonstration of why we have that

6    instruction, it came from both those gentlemen.

7         Mr. Moreno, this guy is a thug.  He is an

8    unrepentant criminal with no redeeming qualities.  He has

9    been in prison longer than outside.  He has never followed

10   the rule of law in his life.  But he'll come in here and

11   tell you very well mannered -- you think you want to invite

12   him over for dinner -- that I have taken the first step

13   towards reformation.  And now the plea agreement that I

14   entered into with the government that says I must tell the

15   truth, a rule that I have to follow, I will follow that

16   rule.  Trust me.  It is Mr. Moreno's testimony that you are

17   asked to rely on for the proposition that he received money

18   from Mr. Darbinyan, from the scheme, and that he gave two

19   thirds to Mr. Darbinyan.

20        And by the way, contrary to the argument earlier

21   today, the 20 percent didn't just apply -- the exception of

22   the 20 percent didn't just apply to Mr. Ortega.

23   Apparently, the informant -- the cooperating witness has

24   got more money than anybody else in the scheme.

25        But where do you find Mr. Moreno's other failings in

1    his credibility?  Well, you heard him testify out of the

2    blue that, as a Mexican Mafia member, he was instructed to

3    kill Perico, Mr. Rocha, and that he enlisted the help of

4    Mr. Darbinyan to lure Perico so he could kill him.

5         The problem with that is that, at the time that he

6    was saying that here, he had already told Deputy Tunstall

7    in Orange County, who was investigating the Mexican mafia,

8    who interviewed him about the Perico affair, and he never

9    once mentioned it.  He never once mentioned that he was --

10   to Mr. Stebbins in his testimony, about the businesses that

11   were being taxed.  Where did that come from?  All of a

12   sudden from the stand he starts telling you these stories.

13        Well, in the final analysis, he wants to get out

14   early.  We wants to put this guy back on the street early,

15   and he enlisted the help of the United States Government to

16   help him do that.  That's how we're going to get

17   Mr. Darbinyan; we're going to let Moreno out earlier if we

18   can.

19        If Mr. Moreno had actually seen something that is

20   corroborated elsewhere, you could say it doesn't matter

21   what he says.  But the problem is that Mr. Moreno testified

22   to information that only he would possess like the division

23   of the money.  No money trail is one of things that we have

24   a problem with in this case.  But he is asked.  He's asking

25   you to believe him when he says that he gave money to

1    Darbinyan.

2           As a matter of fact, look at Exhibit 18 and 18A, and

3    it's unquestioned -- he's a threat to Mr. Darbinyan.

4           I don't know how I'm doing this.  I think I go this

5    way.  Oh, boy.  All right.

6           I'll read it to you.  Six speakers from the bottom.

7           This is Speaker 1, which is supposed to be

8    Mr. Darbinyan

9                "Promise me when you come, you're not gonna

10                traumatize, man.

11               "I'm not gonna traumatize you?

12               "You're not gonna come down like one of

13               them -- you know, Samurais man.

14               "Was I mean to you?

15               "I wasn't mean to you my friend," he says.

16               "Imagine if you weren't my friend."

17          And he left and listen to voice.  If you hear this

18   recording, listen to Mr. Darbinyan's voice and how

19   incredibly -- I don't know what I did there.  All right.

20   How incredibly subdued that voice is.  Mr. Darbinyan is

21   being extorted by this guy.  He's the person who is -- whom

22   they're asking you to believe, cooperated with

23   Mr. Darbinyan and did all these other things.

24          You are asked also to believe Mr. Ortega.  This

25   fellow has never held a job in his life.  He has always

1    relied on criminal activities to make a living.  But of

2    course, the government will also help him be amongst us

3    earlier than he should be.

4         This is testimony that is crucial to the bank fraud

5    scheme -- check fraud scheme.  Why?  Because he is the

6    only -- he is the only item of evidence that they have been

7    able to put on that says oh, he had an insider at the bank,

8    and I met him.  He met him.  He met him at the yard.  A

9    yard that he would go through three to four times a week

10   sometimes.  Yet, 5,000 hours of pole camera trained on the

11   yard, none of that has been put before you.  Why?  Because

12   it showed no Ortega.  5,000 hours.  Months, no Ortega.

13   Ortega's lying to you.  He doesn't care.  They can't prove

14   it.  The government can't prove that he lied; therefore,

15   he's going to get his break.  He has never followed

16   anything just like Mr. Moreno.  He's never followed the

17   rule of law at all.  So but now he's intending to.  Trust

18   me.  Trust my word on this.  I will do this.

19        At the same time that he's telling you that

20   Mr. Darbinyan is giving him all this information about how

21   the operation works, he tells you that Darbinyan was

22   secretive and wouldn't disclose much about his operation.

23   Which is it?

24        The fact is that Mr. Ortega was doing nothing but

25   lying to you throughout the entire testimony.  There are

 1    items in his testimony that may coincide with some of the
 2    other evidence in this case, but the problem here is that
 3    there are elements that the government was unable to prove
 4    that you have to believe Ortega on.  And of course, that's
 5    what we just went over, the idea of a bank insider, and all
 6    this other stuff.  You have no evidence of that.

 7         Now, let's talk about the racketeering conspiracy.
 8    Why is it that the aggravated theft and those counts are
 9    not part of the racketeering conspiracy?  Because none of
10    it is.  Racketeering requires, the conspiracy here, the
11    RICO, requires that there be an enterprise or one that
12    would be formed.  They played to you the call from someone
13    called Paramaz Bilezikchyan, but who he is?  Did he testify
14    here?

15         This Bilezikchyan says, you know, Mher is A.P. Did
16    we have a chance to talk to Mr. Paramaz here in court to
17    determine how he knew that?  No.  So they're using a call
18    without allowing us to cross-examine that person
19    interpreted by Mr. Stebbins, and that's how they get to you
20    say "Okay.  There was this enterprise called Armenian Power
21    and Mike Darbinyan was part of that."

22         Beyond that, though, assuming that you can show an
23    enterprise somewhere, where do you get the activity for the
24    benefit of that enterprise?  All these things that they are
25    claiming happened -- the bank fraud, check fraud, the

1    extortion -- how did those get to benefit Armenian Power?

2    What you have is the testimony of Mr. Stebbins that, when

3    he first wrote his first wiretap motion in this case, he

4    said there was a Darbinyan Organization; so that had some

5    ties to Armenian Power.

6         Well, what changed his mind?  Actually, there's

7    nothing that happened along the way that changed his mind,

8    but they realized that they can't get this RICO unless they

9    talked about Armenian Power, a more -- an easier proof

10    because there are members of something called Armenian

11    Power out there, like the one with the A.P. tattoos and, by

12    the way, Mr. Darbinyan has none of those.

13         What I need you to focus on is what is the benefit

14    of these schemes, assuming they happened.  Gets go to the

15    check fraud or the credit card fraud.  If this money came

16    in was it for the use of Armenian Power?  Do you have that

17    evidence?  No.  That is reasonable doubt.  How did this

18    benefit Armenian Power?  It may have benefited some

19    members, some people who may have ties to Armenian Power,

20    but did it benefit Armenian Power?  It did not.

21         There is no RICO here.  What there is, if at all, is

22    independent individuals acting for their own good.  Moreno

23    says he got the money and he paid it -- he used it for

24    himself.  He didn't give it to the Mexican Mafia.

25         So all these ties with the Mexican Mafia stuff, that

```
1    was useless, a consumption of time that has nothing to do

2    with this case because the Mexican Mafia's got nothing

3    here.  It was only done to scare you.  It's got nothing.

4         So if, in fact, Mr. Stebbins testimony's to be

5    believed, in some respect, that Mr. Darbinyan used all this

6    money to buy luxury cars and condominiums, let's assume

7    that's the case, where is Armenian Power in all of this?

8    How many come that money didn't go to benefit Armenian

9    Power?

10        You heard testimony in this case that in the Mexican

11   Mafia, the money is used to benefit the members in prison.

12   Did you hear that about Armenian Power?  No.  None of that

13   money that may have been distributed was shown to go to any

14   organization called Armenian Power.  There is no RICO here.

15        The organization has to -- they have -- strike that.

16        They had to prove that this organization had a

17   common purpose, in other words, if Mr. Darbinyan did

18   anything, if Mr. Sharopetrosian did anything, it had to be

19   for a common purpose to benefit the gang.  That is not what

20   the evidence is.  No RICO.

21        In order to show you how this racketeering worked --

22        And it works better than my thing here.  I shouldn't

23   have done this.  I just need one moment, please.

24        THE COURT:  Uh-huh.

25             (Display on courtroom screen.)
```

1          MR. SEVERO:  There the Chicken House.  Now, what was

2     this evidence all about?  What was the evidence of the

3     Chicken House all about?  It was about showing you how this

4     gang is running around doing gang things.

5          But exhibit 92A is the call that is supposed to be

6     telling you that Mr. Darbinyan was heading to the Chicken

7     House to have some sort of shootout.

8          The problem with that is -- I'm not going to do

9     that -- exhibit 92A, says from the bottom up (as read:)

10               "Bro...'I am coming to see you' and went to

11               their bakery and there was some 20 people

12               there."

13          He goes to a particular location where there are 20

14     people there, which apparently are having some sort of

15     conversation (as read:)

16               "And I told them whatever was needed to say

17               and I said, 'Brother, it's not that way.'

18               'If that's not how it is, then come over to

19               this other place and I'll tell you how it

20               is.'  So now they're driving behind me in

21               five cars."

22          So they're going to have a shootout right in the

23     bakery or somewhere along the way?  Why did they go to the

24     Chicken House?  And this call is intercepted.

25          So Agent Stebbins tells you that he put out a call

1   to the L.A.P.D. because there was a fear of gang violence,

2   a fear of gang violence.

3       What did officer Giberson tell you?  He said that

4   they got the call to go to the Chicken House because there

5   was -- there was excessive congregation there.  And I asked

6   him, "Well, if it had been a situation where they feared

7   there was going to be gun violence, would you -- would they

8   have told you that?"  Remember his answer?  "I hope so."

9       He's the first responder to the scene, and he

10  doesn't know that there's going to be gun violence.  Why

11  doesn't he know?  Because Mr. Stebbins didn't know because

12  the call didn't tell him that.  What ended up happening was

13  that Mr. Darbinyan happened to be at the Chicken House,

14  three people were arrested for gun possession, none of them

15  was Mr. Darbinyan.  He was listed, if you may recall

16  Officer Giberson's testimony.  He was listed as a witness.

17      No fingerprints on anything.  They took six guns.

18  They paraded the guns here in this courtroom, none of them

19  can be tied to Mr. Darbinyan.  He was present, but presence

20  alone doesn't make you a criminal if you happen to be at

21  some spot and something's happening.  That doesn't make you

22  a criminal.  He is not a criminal in that -- at that

23  location.  They would have arrested him.  Where is the gun

24  possession?  No cars were found tied to Mr. Darbinyan with

25  any guns in them.

1      What's the Chicken House about?  It's to poison the

2  well.  If Darbinyan was there, there were guns there, he

3  must have had something to do with it.  That is the kind of

4  evidence, by the way, that you've gotten throughout this

5  case.  That's the kind of connections that they're asking

6  you to make because not long after that, we had the Hazatun

7  Restaurant.  What was that about?  Why did they bring that

8  evidence in?

9      There is a call that said I blew it up, Exhibit 131.

10  "It blew it up inside there," but does it say "I blew it

11  up" or "I blew up inside there"?  Either way Mr. Stebbins

12  will tell you that "I blew up" means I shot up the place.

13  Here's a good example of Mr. Stebbins telling you or

14  interpreting the call to mean what he wants it to mean.  "I

15  blew it up" means he shot it up.  Really?  Well, did you

16  send the police over there?  Yeah, we sent the police over

17  there, but it was dark inside and they couldn't see

18  anything.

19      We took care of those places is one of the other

20  calls that were intercepted, and that's what it means?

21  There's gunfire in a -- in a location and nobody heard it?

22  No evidence of anyone coming in to say "We heard some

23  shooting," and why is it being brought in here?

24      They are trying desperately, the government's trying

25  desperately to tie him up into this RICO conspiracy by all

1   these other acts of violence, and yet they don't bring you

2   the evidence to show that Mr. Darbinyan was acting for

3   Armenian Power when he gets drunk and shoots up a place,

4   assuming that were true?

5        So it's a two-prong problem. First, did he even

6   shoot up the place? And even if it he did, what does that

7   have to do with Armenian Power? No. It means nothing.

8   Hazatun Restaurant is inexplicable just like -- but it's an

9   example of how they have presented this case by innuendo,

10  supposition, and guesswork.

11       The other thing we have is the gambling house. What

12  is the gambling house about?

13       We know that there is Exhibit 293, this so-called

14  "Role Call." Look at the role call. We asked the

15  individuals how many -- I think it was Sergeant Stohl, how

16  many of the names that are on this list do you recognize as

17  being Armenian Power? He said "Half."

18       Well, what about the other half? What is role call,

19  a role call for what? This is nothing. This is a nothing

20  piece of paper. It's obviously a place where they gamble,

21  and it is written -- take a look at it closely. It's

22  written in different handwriting with different colored

23  inks. What's the role call? I mean, everybody came in and

24  signed in? When? When the date of this. No evidence.

25       THE COURT: About ten minutes left, Counsel.

1          MR. SEVERO:  Really?  Time flies, Judge.

2          The extortion elements.

3          Listen, Matosyan -- Minas Matosyan, very difficult

4    witness in this case.  Why?  Because he should have been

5    the prosecution's witness.  Why wasn't he?  Do you know

6    why?  Because he is not telling you the truth.  He had

7    never said, in any of the interviews he ever had, that he

8    had a silver chain pulled from him or given -- that he had

9    to give his silver chain to Mr. Darbinyan.  Never once

10   until he -- the government knew that we were going to call

11   him as a witness.

12         And then he was reinterviewed April 5th, this year,

13   three or four days ago.  And then he says, "Oh, yeah, yeah.

14   I had to give him my chain.  But then he gave me $1,000, a

15   loan so I could buy more time," from these other supposed

16   threats that he was getting.

17         Please, don't insult our intelligence.  This is

18   ridiculous.  There is no extortion, and the extortion --

19   demands for money, was it for Armenian Power or was it to

20   pay back the loan of $95,000 that he took?

21         Listen, he took the government.  He took $95,000

22   from Lusine Ogandganyan, and he took this government for

23   26 grand.  That's what Mr. Matosyan is.  If you talk about

24   racket, that's Mr. Matosyan, the guy who says Armenians

25   don't call the police because it's not good for the

1    community.

2         There is not one shred of credibility in that man,

3    not one.

4         The gun possession count of 11-24 is -- by the way,

5    Mr. Matosyan's testimony says that the loan -- that the

6    money that was being taken from him was to repay a personal

7    loan.  And you have a serious issue as to whether this --

8    one of the elements of extortion here in the federal courts

9    is that it must have some effect on commerce.

10        This is not a business.  This is an individual with

11   a personal loan.  So the element of commerce is not met by

12   this evidence.

13        Let's look at 11/24.  This is an inexplicable type

14   of charge.  Mr. Darbinyan was convicted in 2004; so he is

15   an ex-felon.  He can't have guns.  But where is the

16   possession element in this November 24 car stop of

17   Mr. Serobyan?  The key to this is possession.  Was he ever

18   in possession of those guns?

19        Where -- the one thing that I wanted you to see is

20   the key.  The key to the car that had the guns was with

21   Mr. Serobyan.  The key was not found with Mr. Darbinyan.

22   So he had no possession of the car that had the guns in it.

23        What's the deal with the guns?  Where are the

24   fingerprints?

25        By the way, there is no button to open the door on

 1    this key.

 2          Where's the money trail, ladies and gentlemen?

 3    Where is it?  You know, proof beyond a reasonable doubt is

 4    not about suspicion.  And you may have -- and candidly, you

 5    would have -- you should have suspicions.  But that's not

 6    reasonable doubt or proof beyond a reasonable doubt.  That

 7    is not.  We cannot convict people on supposition,

 8    guesswork, and speculation.

 9          By the way, the Parsadanyan stop on July 18th, look

10    at Exhibit 160.  Contrary to what the government said in

11    its opening statement, the call to Mr. Tarverdyan was

12    not -- started out with, "That matter is a touchdown."

13          Mr. Darbinyan says, "What?"

14          This is Tarverdyan speaking, "My matter is a

15    touchdown."

16          Mr. Darbinyan:  "Your matter?"

17          Well, the call means what Mr. Stebbins wants it to

18    mean.  There is no link between the $30,000 in

19    Mr. Parsadanyan's car and having it then delivered to

20    Mr. Tarverdyan.  They should have had the calls.  They

21    should have followed him.  They didn't find $30,000

22    anywhere.  By the way, no money anywhere ever exchanged

23    hands.

24          The conviction of Mr. Darbinyan may only be -- may

25    be used to determine the felon in possession count, but it

1   may not be used by you as evidence that because he had a

2   credit card fraud conviction in '04, he must have done this

3   one.  That's not permissible.  And you'll be instructed in

4   that regard.

5        Ladies and gentlemen, when it comes down to it, a --

6   the hallmark of our liberty sits right with you.  You are

7   the buffer between the government and the rest of us.  And

8   it is necessary for you to examine this case closely and to

9   remember that proof beyond a reasonable doubt must leave

10  you firmly convinced.  And that has not happened here.  It

11  is not guilty only because the evidence just doesn't rise

12  to that level.

13       I thank you for your attention.

14       THE COURT:  Thank you very much, Counselor.

15       Ladies and gentlemen, we're going to take a break at

16  this time, have you come back in 15 minutes.  I'm going to

17  ask you to see if you can come back in maybe 12 minutes, or

18  so, so we don't lose time.  Many times we lose time trying

19  to sit you in the jury box.  So let's make it a little bit

20  shorter, but we'll start right at 15 minutes.

21       THE CLERK:  All rise.

22            *(At 9:57 a.m., a recess is taken.)*

23       THE CLERK:  All rise.

24            *(At 10:09 a.m., jurors enter courtroom.)*

25       THE CLERK:  You may be seated.

```
 1          All rise.  This United States District Court is now
 2     in session.
 3               (Judge enters courtroom.)
 4          THE CLERK:  You may be seated.
 5          THE COURT:  Okay.  Let the record reflect that all
 6     the members of the jury are in their respective seats in
 7     the jury box.
 8          And we will proceed with the closing argument.
 9          Counsel, Mr. Suarez.
10     CLOSING ARGUMENT ON BEHALF OF MR. SHAROPETROSIAN
11          MR. PEREYRA-SUAREZ:  Good morning, ladies and
12     gentlemen.  Good morning, again.
13          On behalf of my client, Mr. Sharopetrosian, and
14     myself, I want to thank you for your service and for the
15     thoroughness and care you're going to take when you
16     deliberate after these closing arguments.  We know you have
17     taken your jobs seriously and that you will continue to do
18     that.
19          I have no fancy charts.  I'm not even going to try
20     to play with this equipment.  Hopefully, we can just talk.
21     Hopefully, we can just talk about common sense and manners.
22          You've heard a lot already about the reasonable
23     doubt standard.  You've heard about the government's
24     obligation under our federal criminal justice system to
25     prove its case beyond a reasonable doubt.
```

1          And another way of explaining that concept, given

2    some of the witnesses we've heard at this trial, is:  Would

3    you by a used car from some of these witnesses?  Would you

4    believe them enough or trust them enough to buy a used car?

5    Would you believe them enough or trust them enough to buy

6    some kind of bridge in Brooklyn from these people?

7          I'm going to talk about that, and I'm going to talk

8    specifically about alleged victim Minas Matosyan because

9    you heard him testify over at least a span of two days.

10         But before we get to him, I want to focus us on

11   three charges against Mr. Sharopetrosian.

12         You know that he is charged with an alleged

13   racketeering conspiracy, an organized crime conspiracy, if

14   you will.  And you know that he's charged with two

15   extortion-related matters.  So Count 1 being the RICO

16   conspiracy, Counts 4 and 5 being the extortion counts.

17         Now, I want to talk about this whole notion that

18   Mr. Sharopetrosian was involved somehow in an organized

19   crime conspiracy, in activities of some entity known as

20   Armenian Power.  I want you to ask yourselves whether the

21   government has established, in your mind, beyond a

22   reasonable doubt that my client, Mr. Sharopetrosian, was

23   involved in that kind of organized crime organization.

24         I suggest to you that there's no credible evidence

25   that Mr. Sharopetrosian was a member of some organization

```
 1    called Armenian Power.  There is no evidence in this case

 2    of any gang tattoos of any kind on Mr. Sharopetrosian, let

 3    alone any evidence of his membership in any organization

 4    known as Armenian Power.  No tattoos, no other insignia or

 5    demonstration of Mr. Sheropetrosian's connection to an

 6    organized crime entity by the name of Armenian Power.  No

 7    credible evidence that he was involved in any gang activity

 8    of any kind.

 9        You recall that the prosecutor, Ms. Yang, talked

10    about Exhibit 293.  Mr. Severo talked about Exhibit 293.

11    That's a piece of paper that was found by Officer Stohl at

12    what was described as "the gambling house."

13        Well, Mr. Sharopetrosian's name doesn't appear

14    there.  He wasn't at the gambling house.  We know he wasn't

15    at the chicken house.  We know he wasn't involved

16    physically at any 99 Cents Store.  He wasn't involved, and

17    there's no credible evidence that he was involved in any

18    check fraud, any bank fraud, identity theft, access devise

19    fraud, the 99 Cents Store fraud, drug trafficking.  There

20    is just nothing credible, nothing that the government has

21    been able to establish beyond a reasonable doubt to show

22    that Mr. Sharopetrosian was part of Armenian Power, the

23    Mexican Mafia, a gang.  Nothing like that in this case.

24        And so I suggest, ladies and gentlemen, that you can

25    righteously ask the question of yourselves:  Where is the
```

1    evidence?  Where's is the evidence that the government has

2    presented beyond a reasonable doubt that would establish

3    that Mr. Sharopetrosian was involved in organized crime

4    activity in this case?

5         You know that he was locked up during this entire

6    time at the Avenal State Prison.  That's why he wasn't at

7    the chicken house, that's why he wasn't at the gambling

8    house, that's why he wasn't at any 99 Cents Store.  He just

9    wasn't involved.  And that's why there were a lot of

10   witnesses in this case that I didn't even bother to

11   cross-examine because those witnesses had nothing to do

12   with Mr. Sharopetrosian.

13        And I want to suggest to you, again, that the

14   government's evidence falls short.  When you analyze

15   Mr. Sharopetrosian's role, it falls short as to the alleged

16   racketeering conspiracy involving Mr. Sharopetrosian.

17        Now, let's talk about the government's allegations

18   that Mr. Sharopetrosian was involved in some kind of

19   extortion scheme because he's charged twice with some form

20   of extortion.

21        You'll recall, because there was a lot of evidence

22   or testimony about it, that Mr. Sharopetrosian's

23   sister-in-law, Lusine, loaned some money to Mr. Matosyan,

24   an alleged victim in this case, who you were able to

25   evaluate from his personal appearance in this courtroom,

1    his testimony in this courtroom.

2         He was questioned by lawyers for all sides.  And of

3    course, it's part of your job to analyze the demeanor of

4    witnesses, the credibility of witnesses, how truthful are

5    they, how believable are they, and does the government

6    establish it's case beyond a reasonable doubt through

7    witnesses like Mr. Matosyan.

8         Interestingly enough, Mr. Matosyan was not called by

9    the government.  It was the defense that called

10   Mr. Matosyan.  The government was simply content to have

11   you listen to tape recordings and look at transcripts

12   involving Mr. Matosyan.  It was the defense who brought him

13   here in flesh and blood so you could physically see him, so

14   that you could actually analyze a real, live person and

15   determine his credibility.

16        We know now that Mr. Matosyan is a convicted felon,

17   a person who has defrauded people in the past, who's

18   actually served time, very little time, for his fraud.

19        We know something about the kind of person he is.

20   We know that somehow or another he got a total of $95,000

21   from Mr. Sharopetrosian's relative, Lusine.  We know that

22   that money went to him over two days' time on August 7 and

23   August 8 of 2007, roughly a year and a half before the

24   first recorded telephone conversation where Mr. Matosyan is

25   talking and Mr. Sharopetrosian is talking.

1          The government's testimony was somewhat

2     contradictory about what that money involved.  First,

3     Agent Stebbins said he thought this was some kind of

4     investment.  Mr. Matosyan himself said it was a personal

5     loan.  Nobody said that this was money to be used for

6     organized crime purposes.

7          What you do know from the evidence in this case is

8     that that money came from the proceeds of a wrongful death

9     settlement involving a member of the extended

10    Sharopetrosian family.

11         Now, if you believe Mr. Matosyan -- and again, would

12    you buy I used car from that man?  Would you buy a bridge

13    in Brooklyn from that man?  But if you believe him, you

14    will see he volunteered to withdraw $95,000 from an

15    interest-bearing account in order to help him out.  No loan

16    document, no understanding about the interest, no repayment

17    time.  It could be six months, it could be seven months.

18    As it turned out, it wasn't paid back in 18 months.  And

19    Special Agent Stebbins, when he testified, didn't seem to

20    recall the amount of money involved or what the purpose

21    was.

22         Mr. Matosyan confirmed that there were four checks,

23    one $25,000 check to Commercial Investment, Inc., dated

24    August 7, 2007; another $25,000 check to Francisquito

25    Carwash, also August 7, 2007; and two checks totaling

1    $45,000 on August 8, 2007, made out to Mr. Matosyan's

2    brother, Gayk Matosyan.

3         And what is he asked about those checks?

4    Mr. Matosyan told us, "Well, you know, this is all some

5    kind of plan I had.  It was my way of applying for a

6    personal loan.  That's why I needed these checks."  And no

7    explanation as to why $25,000 went to Commercial

8    Investments, Inc., no explanation as to why $25,000 went to

9    Francisquito Carwash, no explanation as to why $45,000

10   should go to Mr. Matosyan's brother, all in order to

11   arrange for a personal loan.

12        There was no corroboration by the government in this

13   case as to the actual amount loaned.  We had to get that

14   information from Mr. Matosyan.

15        No explanation from the government as to any

16   corroboration by the government as to any repayment made by

17   Mr. Matosyan on the original $95,000 loan.  The government

18   simply took him at his word.  The government simply took at

19   his word a convicted felon who had defrauded people.

20        You heard testimony that he was borrowing money, not

21   only from Lusine, but from other people he knew, people who

22   were friends or family.  He had no compunctions about

23   borrowing money.  He had no compunctions about making

24   excuses why it wasn't being repaid.  And the government

25   simply embraced him.  Let's not be concerned about when he

1    paid back certain money.  Let's not brother to corroborate.

2    We'll just trust you.  And we're going to trust you because

3    you can help us get at Mr. Sharopetrosian.

4         Whatever that money was for, there's no evidence

5    whatsoever in this case that that money was used for

6    organized crime purposes.  There is no evidence whatsoever

7    in this case that there was anything other than a personal

8    loan, a loan that Mr. Sharopetrosian was angry about

9    because it hadn't been repaid.  He was trying to get that

10   money back to his family.

11        And you heard some taped conversations about

12   communications that Mr. Sharopetrosian had with Minas

13   Matosyan.  I suggest to you, ladies and gentlemen, that

14   whatever you heard from Mr. Matosyan about these details or

15   lack of details are just not credible.  They don't pass the

16   smell test.  This is a convicted felon trying to sell you

17   on a theory.  And you know from the testimony of

18   Mr. Stebbins, Agent Stebbins himself, that he was trying to

19   coach Mr. Matosyan about how he could get Arman

20   Sharopetrosian angry.

21        Well, he was already angry because the money hadn't

22   been paid, but Agent Stebbins was telling Mr. Matosyan, you

23   know, we've got to be able to prove a case here.  We don't

24   have enough.  This conversation occurred in November of

25   2007.  So you know what you have to do, Mr. Matosyan.

 1    You've got to get him angry.  Let's figure out a way to

 2    upset him so badly that we can get some tape-recorded

 3    conversations that we can use to prosecute

 4    Mr. Sharopetrosian.

 5         There wasn't enough already.  So the government used

 6    a convicted felon who hadn't paid back money to the

 7    Sharopetrosians or to other people, and they wanted to see

 8    what they could get Mr. Matosyan to do to incriminate

 9    Mr. Sharopetrosian.

10         Now, you heard one of the most credible witnesses in

11    this case, I'm going to suggest to you, and that was the

12    translator, Mr. Derpetrossian, the translator who worked on

13    a lot of these recordings for the FBI, who was involved

14    both in live conversations and conversations that already

15    had occurred, a professional whose job was simply to try to

16    translate, a professional who knows the differences between

17    Armenian dialects, who was, I suggest to you, very honest

18    every time he got on the witness stand.

19         He did the best job he could to do what the FBI

20    hired him to do.  And he was questioned by the defense

21    yesterday, and he basically said:  You know, sometimes when

22    somebody's talking in the Armenian -- the eastern Armenian

23    dialect, what may seem like a threat may not really be a

24    threat.  Sometimes words that sound like threats are not

25    really threats.

1        He talked about people speaking in the eastern

2   Armenian dialects who talked tough, who used cuss words,

3   trash talk, if you will.

4        Now, I suggest to you, ladies and gentlemen, if

5   trash talk were a crime, maybe we'd shut down professional

6   basketball in this country because it's not just in the

7   Armenian culture but in many cultures where people talk

8   sarcastically, they talk in exaggerated terms, they talk in

9   an animated way, they raise their voices, they use bad

10  words perhaps because that's their personality.

11       And we know that Mr. Sharopetrosian uses bad words,

12  that he's loud, that he engages in trash talk.  And I

13  suggest to you, ladies and gentlemen, that that kind of

14  talk, in and of itself, is not a crime, that coming up with

15  that kind of conversation from Mr. Sharopetrosian toward a

16  person who has taken money from his family and not repaid

17  it, I suggest to you it's a stretch to say that that kind

18  of talk is necessarily extortion.

19       You have to decide that.  You have to weigh all of

20  the evidence in this case.  You have to consider the

21  context, and you have to decide:  Was that extortion or was

22  that just bad talk, trash talk, agitated talk?  Was that

23  talk part of the government's plan to get

24  Mr. Sharopetrosian angry and upset?  Did the government

25  create this trash talk, this agitated conversation?  Was

1    Mr. Matosyan actually instructed to get Mr. Sharopetrosian

2    angry?

3          Well, that plan was successful, but was it

4    extortion?  Only you can decide that.  You are the triers

5    of fact.  You are the people who weigh all of the evidence.

6    You are the people who have to decide whether the

7    government has been able to prove beyond a reasonable doubt

8    that extortion occurred involving Mr. Sharopetrosian.

9          Let me get back to this reasonable doubt standard.

10   That's what makes our system great.  You cannot convict

11   somebody in this country based upon guilt by association,

12   based upon innuendo, supposition, guesswork, an attempt by

13   a witness who has no credibility to set up

14   Mr. Sharopetrosian.  You have to decide whether the

15   government has carried the burden that it's required to

16   carry in our federal criminal justice system to convict a

17   person of a crime.

18         I suggest to you, ladies and gentlemen, that this

19   whole case is replete with reasonable doubt.  You have

20   witnesses like Armando Moreno, Gustavo Ortega, Minas

21   Matosyan.  I suggest to you that, in many respects, perhaps

22   most respects, they're not credible.  They have an

23   incentive to exaggerate, an incentive to help the

24   government.

25         And that's not your concern.  Your concern is to

1    determine whether they're telling truth, the whole truth,

2    and nothing but the truth, whether they're credible,

3    whether, through their testimony, the government has proved

4    a criminal case.

5         So I want to you ask you, on behalf of

6    Mr. Sharopetrosian, when you retire to deliberate in this

7    case, when you consider Counts 1, 4, and 5 as to

8    Mr. Sharopetrosian for RICO conspiracy, for extortion, and

9    conspiracy to engage in extortion, to weigh all of the

10   evidence and to come to the conclusion that the government

11   has not proved its case beyond a reasonable doubt.

12        We ask you to return verdicts of not guilty as to

13   Mr. Matosyan.

14        Thank you.

15        THE COURT:  Thank you very much, Counsel.

16        Counsel?

17        MR. FLIER:  Thank you.

18        **CLOSING ARGUMENT ON BEHALF OF MR. PARSADANYAN**

19        MR. FLIER:  Good morning, everybody.

20        One thing I know that has been proven beyond a

21   reasonable doubt is how exhausted I am.  I'm going to sit

22   down now.

23        Ladies and gentlemen, for the first two weeks of

24   this trial, my client shouldn't even been part of it.  You

25   heard twenty admonitions that you have to judge everyone

1    differently, separately.  My client is innocent.  He has

2    been thrown in with other individuals based on the

3    government's theory.  And as I said earlier, it's like the

4    dolphin in the tuna net.  Sometimes the dolphin gets caught

5    in the tuna net, and the only relationship that the dolphin

6    had with the tune was he's in the ocean swimming around the

7    tuna.

8        So why do I say that?  With respect to this case, we

9    have a couple topics, and these topics collectively show

10   that my client is innocent.  With respect to the topics we

11   have to judge everyone separately, don't lump everything

12   together.  There is no corroborating evidence.  The tapes

13   have two interpretations.  The investigation as to

14   Mr. Parsadanyan was extremely weak.  Expressions and each

15   word as to any tape is critical, and when you put that

16   together with the law, it's not here, period.

17       And how do we get to that conclusion?  It's not me

18   yelling, screaming, begging.  It's the evidence.

19       I've been doing this a long time on both sides of

20   the table, and one thing never changes:  The burden of

21   proof, presumption of innocence, and what that means.

22       But we know, for the first week, there was no

23   evidence against Mr. Parsadanyan.  But we know that the

24   government picks and chooses what tapes they wanted to be

25   played.  And I ask the question, as I asked a couple times,

1    and so did some of the other attorneys:  Where are all

2    those thousands of wiretap calls?

3          But we know there were calls about phones and

4    business with Mr. Parsadanyan.  We know that a lot of these

5    calls Mr. Parsadanyan was working.  And if you notice one

6    pattern in this case, there's only one person who had a

7    steady job, was hard-working, and had no record.  That's my

8    client, Mr. Parsadanyan.

9          So now suddenly he's guilty of bank fraud,

10   white-collar, aggravated identify fraud, and a conspiracy.

11         There's no wiretap of any of Mr. Parsadanyan's

12   phones.  If you can explain that, find him guilty.  There

13   is no reasonable explanation why that has not been

14   produced.  This government has more resources, and I

15   remember there was no objection when I said, "You killed

16   the national forests."

17         But they can't come in here after my

18   cross-examination and bring you one phone call toll record

19   on July 18th, after 8:00 o'clock, which Ms. Yang had the

20   courage to bring up to you today and say that was evidence?

21   That shows not guilty.  There's no excuse for that.

22         How good these lawyers are, how -- how hard

23   Mr. Stebbins worked on this case, years of preparation,

24   another trial, two indictments, and they can't bring any

25   evidence to connect my client except for mixing and

1    choosing tapes which is completely out of context.

2         There's no search of Mr. Parsadanyan's workplace.

3    They think this office had materiality, but they don't do

4    anything about it.

5         There's no video surveillance of Mr. Parsadanyan

6    doing anything wrong.  All we hear is how he is the group

7    leader, somehow is making runners do this and that, and not

8    one piece of evidence to support it.

9         You should be upset, and you should demand more.

10   This is a criminal case.  Liberty is at stake.

11        No money seized from Mr. Parsadanyan, not at his

12   work, his apartment, his vehicle.  And then, when we look

13   at the bank records, which was their only rebuttal, except

14   for, of course, Mr. Stebbins's trying to tell you my client

15   took the long way home, unbelievable reach.

16        Just like the July 18th issue with the 30,000, the

17   34,000, my client said, "These are currency proceeds from

18   work."

19        Glendale Police Department did not do anything with

20   respect to him, his friend Mr. Muradyan, or the money.

21        Not guilty.  But they want you to have this

22   suspicion, this black, nebulous cloud saying:  He must have

23   went to Raymond Tarverdyan's house because we have no

24   evidence that two hours later we hear something about a

25   touchdown and potentially somebody was stopped.

1          Well, I would submit to you that, in this case, a

2    lot of people are probably stopped.  But they need to

3    connect the case.  They can't just stand here and say

4    beyond a reasonable doubt is proved because we want you to

5    believe the interpretations of Detective Special Agent

6    Stebbins.

7          Well, he's biased.  He's biased.  And I think,

8    respectfully submitted, I think he was disingenuous during

9    this trial.  All he did was throw in little jabs, little

10   blurbs.  There were a lot of objections sustained, and why?

11   Because he wanted to prejudice, not only everyone, but I'm

12   going to focus on my client.

13         Couldn't get him to answer a straight question.  But

14   this is the same person who looked you in the eye and could

15   tell you an address and a phone number from years ago, but

16   I heard a lot, when I'm questioning him, "I don't remember.

17   I don't recall.  Maybe."

18         He couldn't even tell you, which is so disingenuous,

19   that he even knew how Mr. Darbinyan's interior of his

20   residence looked.  If you really believe he doesn't know

21   that, then the defense had no chance.

22         Where is my client's extravagant lifestyle?  He has

23   a BMW which is two years old.  He lives off an apartment in

24   Franklin.  You heard he has a mom.  That's all you heard

25   about my client.

1          The bank records that were produced by the defense

2     but played in rebuttal by the People, that was interesting.

3     There are no deposits showing, after July 18th, 30,000

4     influx or a deposit.  What does that mean?  This is a

5     currency business, and he takes the money and he buys

6     phones, buys products.  That's what he does.

7          But if you look at those bank records for July of

8     '09 and August of '09, what do you see?  You see that he

9     has an influx of 25,000, around, going in and out.  It's

10     completely consistent with a businessman.

11          And the bank lady who came in here.  I love that.

12     This government, with all of their federal resources, calls

13     the Bank of America representative in one day, yesterday,

14     to come to court, verify records, say that she knows

15     something about the records.

16          Well, I asked her.  I said, "Is it a crime?"

17          "No."

18          "Is it a crime to have money?

19          "No."

20          There's nothing wrong with any records or issue with

21     my client.  He denied going to Mr. Parsadanyan's apartment

22     or work.  Why would Mr. Muradyan make that up and say that

23     he has a different name?  Is it because he's disingenuous

24     or committing perjury or is it because it's true?

25          I submit it's true.  The same guy, Detective

1    Stebbins, who's telling you we're doing all of these

2    undercovers, we're having people followed, we don't want

3    anyone to defect us, we don't want to be burned," well,

4    maybe he is not telling you the truth, and maybe he didn't

5    want to be detected.  So he's using a different name.  I'm

6    not saying that has the most relevance in guilt or

7    innocence.  It just goes to his testimony being

8    disingenuous.

9         But then we heard him throw out the extreme

10   prejudice of saying, "My client is a gang member, an

11   associate gang member."

12        Can you look at him?  I think his moniker must be

13   "Hercules."  No offense, sir.

14        First, it started by the Darbinyan organization.  My

15   client's not charged with any of that.  It's not evidence.

16   The Court has painstakingly told you that.  Guilt by

17   association, and you must judge everyone separately.

18   That's this case.

19        I submit to you, if I had this case, just

20   Mr. Parsadanyan, it would have been three days, and on the

21   fourth day "not guilty" because all you would have heard

22   was convoluted tapes and not one piece of corroborative

23   evidence.

24        He's not in any gang files.  There's no field

25   identification cards, no gang arrests, no tattoos.  And

1    what he knows about Mr. Darbinyan, as you saw, was he has a

2    nice car or two, he's a family man, and he has some

3    children.

4         What evidence is there to show that my client did

5    not know anything different than that?

6         And then we heard Glendale Police Department Officer

7    Mr. Quintero, who said, "I've been in the gang unit in

8    Glendale for ten years.  I don't know that man."

9         Why would they bring it up, then?  I'm sure it's not

10   to prejudice Mr. Parsadanyan, exactly like, three

11   occasions, testimony was stricken by this Court, and all

12   three occasions dealt with the government asking improper

13   questions about my client.

14        Why?  Why are they so desperate to get my client and

15   overreaching with non-provable evidence and improper

16   questions?

17        Because they know the evidence simply isn't there

18   beyond a reasonable doubt.

19        The interpreter.  He's from Austria.  He talked

20   about the different dialects.  There are some differences.

21   Certain areas on the tapes are unintelligible, and there

22   are unknown speakers.

23        Every word counts, every tape with my client is in

24   Armenian.  There were no voice comparisons, and in some of

25   the tapes, listen, you don't have to know the language.

1    The voice and tone of the person whom they say is my client

2    seems to be quite different.

3        There's different subject matters in these

4    conversations.  As we heard from co-counsel, slang words

5    were commonly used.  And even the Court asked a question:

6    Sometimes it may or may not make sense?  And his answer was

7    yes.

8        But it made sense when you talk to Detective

9    Stebbins and he fills in the gaps.  And what are those

10   gaps?  Those gaps are to show that Mr. Parsadanyan was

11   guilty of something.

12       So now what happens next, without any evidence,

13   again?

14       Expressions and content of any sentence is

15   important.  I don't care if it's in English or whatever

16   language.  And if any word is off and a meaning is not

17   accurately portrayed, it changes the significance and

18   content.

19       And remember, the interpreter is in an FBI office,

20   and he knows the subject matter and that there's an

21   investigation.  So he is -- not that he's -- he's a nice

22   man.  First question I asked, "Don't you know who I am?"

23       "Yes, Mr. Flier."

24       I know who he is.  I'm not here to challenge him as

25   a human being like I would do if it was relevant to

```
 1    Mr. Moreno, Mr. Ortega, and M.M.

 2         I'm going to only say this about those three people:

 3    This case is so overkill that the government thought it was

 4    important enough to call in a killer, a thug, and a real --

 5    an indirect extortionist himself to prove the case with

 6    material witnesses.  And not one of them said one thing bad

 7    about my client.

 8         You're going to go to bed with a murderer for a

 9    fraud case?  It's a little scary.

10         What happens if some of the tapes are wrong?  Well,

11    then everything is wrong.

12         I contacted the court reporter, the one in the

13    afternoon.

14         THE COURT:  I'm going to interrupt just for a second

15    because one of rules of law is that the transcripts from

16    the tape are evidence.  How you interpret it is up to you

17    as jurors, but the content of the tapes is evidence and is

18    to be accepted by you as evidence.

19         Go ahead, Counsel.

20         MR. FLIER:  And I was just getting to that point

21    because yesterday after --

22         THE COURT:  Not the contents of the --

23         MR. FLIER:  The transcript is the evidence.

24         THE COURT:  Thank you, Counselor.

25         MR. FLIER:  Thank you, Your Honor.
```

1    And there's a jury instruction that says that, and

2  the reason is obvious -- because the tapes are in a

3  different language.  So you have to rely on the

4  transcripts.

5    So yesterday I was able to work out an arrangement

6  with the court reporter about the testimony of the

7  interpreter.

8    Well, one word could have different meanings.  Does

9  that make sense?  One word usually has a meaning, and I

10  think that's true with most languages.  But some people use

11  some words with different interpretation of their own, what

12  they have in their own mind.  Some people use big words,

13  but they have small meanings.  Some people use exaggerated

14  words that, for an American English speaker may sound like

15  a threat or like a big word, but in actuality, in their

16  daily vernacular, they use it so often that it's not really

17  a threat.

18    So there's all kinds of variations.  That's the

19  argument, in essence, that I just heard from

20  Mr. Sharopetrosian's attorney.  He hit it right on the

21  nail.  And just to show you, this is -- this is the

22  transcript I'm reading from (as read:)

23    "Next, they could have -- the expression could

24    have different" --

25    MR. ESTRADA:  Your Honor, the transcript is not

```
 1    evidence, it is the --
 2            THE COURT:  Overruled, overruled.
 3            Go ahead, Counsel.
 4            MR. FLIER:  Thank you, Your Honor (as read:)
 5                 "They could have -- the expression could have
 6                 different meanings.  Is that better?
 7                 "ANSWER:  Well, it's hard to describe it.
 8                 The word has one meaning based on a
 9                 dictionary or based on the common linguistic
10                 content, but people -- different people use
11                 it in different contexts, in different
12                 variations and what has different meanings in
13                 their minds.  That's the best I can answer."
14            And lastly, which I thought very powerful and was
15    one of the last questions in the whole trial:
16                 "Okay.  And the proper inference is to try to
17                 show criminal conduct, correct?
18            Now, watch this answer:
19                 "Well, the agents are looking for
20                 incriminating statements.  There's no -- I
21                 mean, we know that.
22                 "MR. FLIER:  No further questions."
23            That's exactly what we've been saying.  Any type of
24    ambiguity has been filled in improperly by the government.
25    And that's not sufficient evidence beyond a reasonable
```

1    doubt.

2          Now we get to what I consider the key to the case.

3    It's called evidence.  It's called, in this case, lack of

4    evidence.

5          We have insufficient corroboration evidence,

6    overkill.  They're going to bring in five witnesses to talk

7    about a gun but can't bring you any evidence about

8    Mr. Parsadanyan.  They're going to bring in a 2004

9    conviction about Mr. Darbinyan, but they can't bring in one

10   phone call record that has the materiality that you must be

11   asking for and request.

12         We have no skimmers near or around my client, but

13   I'm going to hear, I have a feeling, from Mr. Estrada, who

14   I have a gut feeling will be doing the rebuttal.  And you

15   know what?  He's going to say why don't you pay attention

16   to the August 8, 2009, phone call?

17         Well, pay attention to it?  It has nothing to do

18   with my client and skimmers.  And that was the only piece

19   of evidence presented about that topic.

20         Not guilty about the skimming charges already now,

21   unless you're going to prejudice my client by guilt by

22   association, which we know you cannot do.

23         Not one account information of a victim found on my

24   client.  Not one bad check, even though he's not charged

25   with the check fraud issue.  Not one 99 Cents account

1   information in this case.  There's no corroborating

2   evidence properly documented.

3        Detective Padin, in his own surveillance policy, The

4   Do's, assigned someone ahead of time to keep logs and take

5   photos.  Well, maybe Detective Stebbins failed that course.

6   Oh, wait a second.  This is the federal government.  Why

7   would Mr. Flier -- is he mean?  Is he being disingenuous?

8        No, what I'm saying is you need proof beyond a

9   reasonable doubt, and I sat there for three weeks and had

10  to listen to 95 percent of a case that had nothing to do

11  with my client.  So I give you all a compliment because I

12  was paying attention, and you were doing the best you can

13  to be attentive.

14       The Court is as punctual as I've ever seen in 25

15  years.  This is how the way the system works.  But you know

16  when it fails?  It fails at this point, when the government

17  lacks evidence but will be powerful enough, with their

18  beautiful exhibits, to try to imply and infer "What are you

19  talking about?  This case was overwhelming against

20  Mr. Parsadanyan."  If you hear that argument, you should

21  take note of it.  And remember, we don't get to respond

22  anymore, and I probably only have around 20 minutes left.

23       This is scary.  Do you know how scary it is to

24  defend an innocent person?  It's not fun, and maybe that's

25  another reason why I don't feel good and I'm tired.  But

1    I'm also angry now, and this is called "Argument."  I can

2    get angry.  I can't be disrespectful, and I've been doing

3    this a long time, and I will not be.  But I'm upset at this

4    evidence, and so should you.

5         If this case was tried separately, think about it.

6    You would be saying, "I don't understand some of this."

7    There would be none of this prejudice overflow.  Not one

8    illegal credit card, not one photo.  Three, four years of

9    an investigation of my client with any alleged runner,

10   which is exactly what Detective Stebbins says his main role

11   is.

12        We have a couple dates in this case.  I remember

13   them:  July 4th, July 17th, July 18th, July 19th.

14   August 8th, October 14th.  Those are the relevant dates of

15   the tapes that the government wants you to rely on.

16        There is so many gaps and time periods that are

17   mixed up in this case that you cannot even say the river

18   was flowing smoothly.  There's too many impediments.

19        Mr. Parsadanyan's business.  This is what he does.

20   And you heard him say, "I have a business, and I have

21   proceeds from a business, and I'm allowed to be a

22   hard-working young man, and if I have clients that are all

23   Armenian -- remember that testimony?  Most people are

24   Armenian in the store.  This is capitalism, but they want

25   to try to say and mix any credit card numbers and

1    information with my client's alleged activity.  You cannot

2    do that.  He's not charged with anything else except the

3    99 Cents issue.

4         I already mentioned there was no wiretaps on

5    Mr. Parsadanyan's phone, who they think is the main player,

6    obviously because only main players carry money.  No

7    evidence.  No idea of how many phones during this time

8    period have been purchased from Mr. Parsadanyan, not only

9    from anyone you heard in this case, from the community.

10        The federal government.  And I remember in one of

11   the tapes it says something about "I'm going to take you

12   out of your skin."  When I heard that testimony from

13   Detective Stebbins as to why they didn't follow my client

14   after the stop, I didn't know what to say.  If we weren't

15   in a court of law, I think I know what I would be saying.

16   That was outrageous and disingenuous.

17        Three to four agents.  The main guy is supposed to

18   be getting money, $30,000, but they fail to investigate

19   when it counts most.  And they want you to assume, by a

20   MapQuest, he took the wrong route.  That is unbelievable.

21        When I asked him, "Do you have any idea how my

22   client drives home on any given day for three years," he

23   said, "I never followed him one time."  But now suddenly

24   there's this sinister connotation that he took the long way

25   home, like the Supertramp song.

1           Well, I'm going to submit to you this:  It doesn't

2     take from 8:45, when the stop has ended, to 10:20, when the

3     touchdown line allegedly is stated, it doesn't take two

4     hours almost to go from that area to the North Hills in the

5     Valley.

6           And by the way, maybe I missed the testimony, but I

7     didn't hear one witness to say the exact area in

8     relationship to my client's business and how long it would

9     take to get there.  But they want you to guess.  And

10    remember, the officer said, "There's nothing wrong with

11    that money.  It might be suspicion, but we let him go."

12          Suspicion has no room in a court of law.  It might

13    have room on an arrest.  "Well, I thought he was doing

14    something suspicious."  But now you're here with a judge

15    with a black robe on, and guess what?  You've got to follow

16    the law.  They didn't prove this case.

17          I'm going to be quick with this because it's just

18    offensive.  The Hazatun Restaurant, some implication that

19    my client erased a tape or took the equipment.

20          And remember, in that taped conversation, it says,

21    "And can you fix it?"  If you're going to get rid of the

22    tape, why do you have to fix it?  Another textbook example

23    of how subject matters have been convoluted and mixed into

24    place to fit a theory.

25          Remember my question to Detective Stebbins again --

```
 1    excuse me, Special Agent Stebbins.  What was it:  Sir, why

 2    didn't you go?  Do you remember?

 3           It was too dark.  It was too dark.

 4           And then there five objections sustained when he

 5    tried to blurt out stuff.  But most importantly --

 6           MR. ESTRADA:  Objection, Your Honor, improper

 7    argument.

 8           THE COURT:  Overruled.

 9           MR. FLIER:  That's exactly what he did.

10           And with respect to the case, I then even, kind of

11    in a condescending tone, said, "Hey, don't you have a

12    flashlight?  Can't Glendale Police Department go the next

13    day?"

14           But they want to prejudice everyone with some "blew

15    up someplace" when in another tape Mr. Darbinyan says, "I

16    blew it up last night," and three sentences down it says,

17    "I was so drunk."  You'll do what you think is appropriate

18    as to that.  Another great example of not proving even an

19    incident beyond a reasonable doubt.

20           No wire taps are believed to be key phone numbers

21    and suspects.  A lot of time gaps between the phone calls.

22    And the agent had a lot of "I don't recalls.  I don't

23    recall certain searches.  I don't remember how stuff

24    looks."  And as I already told you, he could dictate

25    probably even Social Security numbers in this case.  But
```

 1    this is really -- I'm not a juror, though.

 2        Where are the phone toll records after 8:00?  If you

 3    can answer this question, that's negative to my client,

 4    find him guilty.  But if you can't, that is extreme doubt

 5    as to that issue.  And how do we know that?  Because we

 6    heard the detective say four days ago, by my questioning,

 7    "I have those records."  Four days they never produced one

 8    record to corroborate.  But again, Ms. Yang has the courage

 9    to look you in the eyes and say, "We have phone toll

10    records for Mr. Raymond Tarverdyan and Mr. Parsadanyan

11    going both ways."

12        That is the key to this case.  If they had those

13    records, it would have been the biggest chart around

14    because that shows a direct connection.

15        They don't have one piece of evidence that Raymond

16    Tarverdyan even knows my client, has been with him.

17    Nothing.  But when you're desperate to get a conviction and

18    you don't have any corroborating evidence, what do you say?

19    The money had to go to a certain location, and that's the

20    proceeds.

21        And what I really get upset about is this:  Maybe I

22    missed the case.  We're only dealing with the 99 Cents

23    fraud with Mr. Flier right now.  Forget Mr. Parsadanyan.  I

24    saw those nice people come to the stand.  There were like

25    six of them.  They're true victims, 100 percent.  I'm sure

1    we've all had people who have been victims of identity

2    fraud, and it's a nightmare.

3         But what did they tell you?  They told you nothing

4    about my client, number one, but most importantly -- this

5    was like the funny part of the trial, my math skills --

6    less than $7,000 total of any witness presented in this

7    case about the 99 Cents fraud.

8         You can do your own math.  So if someone is believed

9    to have 30 or 34,000 of illegal proceeds, how can that make

10   sense when the proceeds from the crime shown to you is

11   $7,000 only?  Where is this extra money coming from?  Are

12   they mixing the credit card fraud?  I don't know.  Because

13   it doesn't make sense.

14        And then we get to the next point, about the

15   20 percent by, again, Agent Stebbins because there's one

16   line in a tape of billion hours of tapes about what?

17   20 percent.

18        When their own main witness, lovely Mr. Ortega,

19   takes the stand and on cross-examination -- and that's why

20   there's two sides in this courtroom.  The system would fail

21   unless there was our side.  What happens?  What does

22   Mr. Ortega say?  "I get 33 percent and I give a third of

23   that to the runners."  My poor math skills, I was correct.

24   It's 11 percent.  So right there is a textbook example

25   when, if there is a numerical term and the government wants

1    it to fit their theory, they'll say what they think is

2    appropriate when their own witness completely refutes it.

3    Not Mr. Flier, not any of these lawyers.  Their own

4    witness.

5        Where are the photos of Mr. P., Parsadanyan, of

6    course, with any runners?  Where are the A.T.M. photographs

7    of these runners?  Nothing.

8        Remember my theory:  Evaluate Mr. Parsadanyan

9    separately and act like, when you're in the jury room,

10   there's nothing else you should consider, just him.  Not

11   guilty.

12       Where is the evidence I already mentioned about the

13   restaurant?  The time periods, based on the calls, have

14   huge gaps.  Look at the dates.  There's no evidence that

15   Mr. Parsadanyan received any illegal proceeds.

16       Now, Mr. Muradyan.  He's over there.  You can't see

17   him.  It's his friend.  He's come to court every day and

18   waited.  Could you imagine waiting outside every day?  It

19   was boring enough inside every day, but he still was here.

20       And when I say, "boring," I'm not being

21   disrespectful to the government.  These are very fine

22   lawyers, and they have the resources.  I commend them, but

23   that doesn't mean they're right.

24       You must come to this conclusion:  Mr. Muradyan, who

25   you heard anything negative -- oh, right, we did.  Oh, I

1    forget, it was stricken again, this domestic violence call.

2    Wow, look at the stretch to try to impugn the character of

3    a nice man by bringing up a domestic violence call that

4    happened a year or months after.

5         So I say this -- you must come to this conclusion:

6    Mr. Muradyan committed perjury.  If you cannot come to that

7    conclusion and there's no evidence to base it on, then it's

8    not guilty because Mr. Muradyan completely destroys their

9    theory on the North Hills dropoff of the touchdown money.

10   Destroys them.  He cannot be at two places at once.  They

11   went from the stop to Franklin, from Franklin to West

12   Hollywood, the Craven's restaurant.  "It's over around

13   12 o'clock.  We go home."

14        Where is the evidence to say that was untruthful?

15   Where is the corroborating rebuttal evidence to say it was

16   untruthful?  I forgot, again:  Who's going to come to the

17   rescue of the government?  Detective Stebbins is going to

18   come to the rescue and fill in the blanks.

19        Did he really fill it in?  I submit no.  Where are

20   the witnesses, including suspects, indicted people,

21   snitches, to say that Mr. Parsadanyan did one thing wrong?

22   Didn't we have three of them in this trial?  None of them

23   applied to my client?  Where is the evidence, folks?

24        This is scary.

25        The numbers just do not add up.  I already spoke

1    about that.  I suppose about the presentation of the true

2    victims as to this fraud and the value of the loss.

3         Look at Mr. P.'s -- Mr. P., I like that -- Mr.

4    Parsadanyan's bank statement.  And I have already talked

5    about that, and it shows the consistency, period.

6         I'm almost done.

7         They do not add up per the exhibits and the

8    testimony.

9         Then we had the defense.  I already said you must

10   call Mr. Muradyan a perjurer, a liar.  No evidence to do

11   that, but it might not fit the government's case.

12        The character witnesses, collectively, his friends,

13   relatives, all they said was Mr. Parsadanyan is a

14   hard-working young man, and he's a truthful person.

15        Where's the evidence to rebut that?  None.  Because

16   that's exactly his character, and that's why it's called

17   character evidence.

18        THE COURT:  About ten minutes left.

19        MR. FLIER:  Thank you, Your Honor.

20        Mr. Derpetrossian, the words have different

21   meanings.

22        And then the $30,000 was the best they could show

23   you with a MapQuest to try to rebut the defense tapes.

24        The tapes mix the check cashing scheme with the

25   99 Cents Store.  Obviously, it does, because the numbers

1    just don't match up.  The calls and the numbers, as I said,

2    do not add up to any specific loss that can be pointed to a

3    victim.  And the language is clearly very general compared

4    to some of the language in the first two weeks of the trial

5    that have specific statements, totally different than any

6    tape allegedly to either be Mr. Parsadanyan or involve him.

7         The Court is going to read to you about evidence

8    stricken, the indictment is not evidence, and the

9    presumption of innocence.  And the government has the

10   burden regarding every element beyond a reasonable doubt.

11        You have to be firmly convinced.  How can you be

12   firmly convinced, especially if you compare the evidence

13   against Mr. Parsadanyan and others?

14        Activities not charged, you cannot consider it.  And

15   separate considerations if there's multiple defendants and

16   counts.  That's this case and that is how it started today.

17        With respect to the actual charges, Ms. Yang covered

18   that as to what the charges are, but more importantly,

19   you -- they have to prove Mr. Parsadanyan executed a scheme

20   to defraud a bank with that same intention without any

21   evidence of a conspiracy, an overt agreement between two or

22   more people to commit an unlawful act.

23        Where is that evidence?  Did someone call him on the

24   phone?  There's no agreement, there's no conspiracy.  And

25   then, with the aggravated identity theft, "knowingly

```
 1    transferred or possessed."  What?  Where is any evidence

 2    that my client knowingly possessed, had the intent to do

 3    anything?

 4          He has been mixed up in this case, and that's not

 5    right.

 6          And then, as to the device fraud conspiracy, you

 7    have to knowingly and with the intent.  There has not been

 8    one piece of evidence about any of these skimmers and this

 9    issue as it relates to my client.

10          With respect to the actual law, I'm not going to do

11    it.  I know the Court is going to do that probably at

12    1 o'clock, but there are some instructions that I just

13    mentioned with respect to that last chart.  There are like

14    five of them.  I'm not going to go over them.

15          I heard both defense lawyers, and it was a pleasure

16    to meet them.  I didn't know them before.  They're

17    hard-working gentlemen.  They both tried to explain, to the

18    best of their ability, what the law means about beyond a

19    reasonable doubt.  You have to wake up, not tomorrow, in

20    six months, and say, "I still feel I did the right thing

21    because I'm firmly convinced."

22          How can you be firmly convinced when my client's

23    been improperly grouped?

24          Lastly, the tapes.  Here are some examples.

25          We have July 18th appears to be the big date for the
```

1    government against Mr. Parsadanyan, but when you break down

2    these tapes, like I do here, you can see that they're

3    definitely susceptible to two different interpretations.

4    And in our law, if there are two reasonable

5    interpretations, like in the baseball game, tie goes to the

6    runner, but in this example, a defendant.

7         This burden of proof has not been met in this case.

8    And when you look at these tapes, they have different

9    subject matters intertwined in each call.  Read it.  It's

10   amazing.  It's very confusing.  But more importantly, what

11   the government wants you to do is take any sentence, any

12   word.  Remember, the word "greet."  Didn't we have that

13   conversation yesterday that "greet" means arrive?  So we

14   have, in exhibit 149, the word "greet," and then if you

15   look at 167, the word "arrive," and they mean the same

16   thing.  But what the government wants you to believe is

17   that "greet" means what?  We greeted the machine or we

18   greeted the runners?  I don't know.  But it's not what it

19   means when you listen to the tapes.

20        And there are all these examples here where each

21   tape -- and by the way, in all of the negative tapes that

22   the government wants you to believe against

23   Mr. Parsadanyan, he's on three of them.  The other ones are

24   other people speaking and might reference his name.  You

25   can't control that.  But the fact that they mention Raffo

1    in any capacity does not mean he's complicit, that he did

2    this with the knowledge, the awareness to commit 99 Cents

3    fraud.

4         "I will do the thing."  If I ask Detective Stebbins

5    in six months, he'll give me 17 different answers for what

6    "things" meant.  In one example, 300 does not mean $300 or

7    3,000 or 30,000, it means 300 cars.

8         In another example, it means a monetary figure.  It

9    only means what fits the government as to Mr. Parsadanyan,

10   and it's scary again.

11        So collectively, when you go over the tapes -- and

12   you can see the time frame doesn't make sense.  The time

13   frame after 8:45, remember, Mr. Muradyan has told you where

14   my client is.  But isn't it strange, ladies and gentlemen,

15   that at no time do you have a tape from my client calling

16   Mr. Darbinyan or anyone saying, "Hey, this is July 19th.

17   Did you know I got stopped last night, but I turned over

18   the money?"

19        Why is that missing?  Because it never happened.

20   That tape would be there.  There would be a conversation

21   about, "Hey, I'm glad you brought the money.  Mike got the

22   money.  Whoever got the money."  But we don't have it in

23   this case.  And the reason why we don't have it in this

24   case is because you cannot pick and choose, another theme I

25   had when I started.  You cannot do that in a criminal case.

1          Lastly, if we were not in this courtroom -- which is

2     a magnificent-looking courtroom, by the way.  I do a lot of

3     state court, too.  They don't look like this.

4          The bottom line is:  If we were not in this

5     courtroom and this evidence about my client was presented

6     to you, you'd say, "It's not enough."

7          So nothing should change because you walk into this

8     palace of judicial power.  No.  You should expect and

9     demand more.  This is how the system works.  He's presumed

10    innocent.  This young man (indicating) has been grouped

11    with everyone else, and he didn't do anything.  But they

12    want you to believe, because he's here and they have some

13    tapes -- because they have nothing else -- that he must be

14    guilty beyond a reasonable doubt, and the evidence just

15    isn't there.

16         It's not showmanship by Mr. Flier.  It's called the

17    lack of evidence and the prejudice of picking and choosing.

18    But most importantly, they have a duty to present

19    everything to you, and they didn't present anything to you.

20         So on behalf of Mr. Parsadanyan, we respectfully

21    request that you come to the only true decision as to him

22    as to all counts.

23         This isn't pick and choose the counts either.  He is

24    not guilty, and if you break it down and give the

25    conscientious time that I know you will, you will come to

```
 1    that same conclusion, no matter what Mr. Estrada says

 2    shortly.

 3         And again, that's not being disrespectful to the

 4    prosecutors, but they know how to present a case.  They've

 5    done this case and they have failed to present material

 6    evidence that they say is out there somewhere.  And all

 7    they had to do was call Detective Stebbins and get all of

 8    that foundation in, and they failed miserably.  Why?

 9    Because they just don't have the case.

10         So again, on behalf of Mr. Parsadanyan, we would

11    respectfully request all not guiltys.

12         And now I'm definitely done.  I wanted to give a

13    compliment to the staff, the marshals.  I don't think I've

14    ever seen a staff work so hard in a case.

15         And to the Court, whether good or not, I thought he

16    was awesome.  Thank you.

17         THE COURT:  Thank you, Counsel.

18         Ladies and gentlemen, at this time we're going to

19    break for lunch.  We're going to come back in at 1 o'clock.

20         At 1 o'clock, the government has an opportunity to

21    respond.  Since the government has the burden of proof,

22    they always have the last argument on this.  So they'll

23    have an opportunity to respond.  And after they're through,

24    then I'll instruct you on the law that applies, and we'll

25    send you back to deliberate.
```

1          Remember the admonishment not to discuss the case

2    among yourselves or with anybody else or form or express

3    any opinions about this matter until it is presented to you

4    and you retire to the jury room.

5          See you back in at 1 o'clock.

6          THE CLERK:  All rise.

7           (At 11:19 a.m., jurors exit courtroom.)

8          THE CLERK:  Court is in recess.

9                (Whereupon the lunch

10                recess Taken until 1:00 p.m.)

11                (Volume II of II transcript

12                filed under separate cover.)

13                      --oOo--

1                    **C E R T I F I C A T E**

2

3          I hereby certify that, pursuant to Title 28,

4    Section 753, United States Code, the foregoing is a true

5    and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United

9    States.

10         Certified on March 27th, 2015.

11

12                          /s/ Katherine M. Stride
                            KATHERINE M. STRIDE, CSR RPR
13                          Official Court Reporter
                            License No. 11773

14

15

16

17

18

19

20

21

22

23

24

25

1        UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                      - - - -

5

6

    UNITED STATES OF AMERICA,        )
7                                     )
                     PLAINTIFF,       )
8                                     )
        vs.                          )    No. CR 11-00072(A)-RGK
9                                     )
    (1)  MHER DARBINYAN,              )
10   (4)  ARMAN SHAROPETROSIAN,       )
    (35) RAFAEL PARSADANYAN,          )
11                                    )
                     DEFENDANTS.      )
12   _____)

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15              DAY 13; VOLUME II of II

16                  PAGES 1 - 72

17            FRIDAY, APRIL 11, 2014

18            LOS ANGELES, CALIFORNIA

19                  1:07 P.M.

20

21

22        _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24            *255 East Temple Street*
          *Los Angeles, CA  90012*
25            *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477

 6
          UNITED STATES DEPARTMENT OF JUSTICE
 7        BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
          312 NORTH SPRING STREET
 8        LOS ANGELES, CALIFORNIA  90012
          213.894.2579

 9

10   FOR DEFENDANT MHER DARBINYAN:

11        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
13        626.844.6400

14   FOR DEFENDANT ARMAN SHAROPETROSIAN:

15        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
17        213.623.5923

18   FOR DEFENDANT RAFAEL PARSADANYAN:

19        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
21        818.990.9500

22

23   ALSO PRESENT:

24        SPECIAL AGENT JEREMY STEBBINS, FBI
          DETECTIVE MICHELLE GONZALEZ, GLENDALE POLICE DEPARTMENT
25        JERRY GETTLESON, LAW CLERK TO MR. FLIER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                           I N D E X

2    PROCEEDINGS:                                    PAGE

3      GOVERNMENT'S REBUTTAL ARGUMENT BY MR. ESTRADA      4

4      JURY INSTRUCTIONS                               25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

GOVERNMENT'S REBUTTAL ARGUMENT BY MR. ESTRADA     4

JURY INSTRUCTIONS     25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002964**

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 11, 2014

 2                            1:07 P.M.

 3                            -  -  -  -

 4        (In the presence of the jury:)

 5            THE COURT:  Okay.  The record will reflect that all

 6    the members of the jury are in their respective seats in the

 7    jury box.

 8        We're going into the closing argument of the government

 9    now, and then I'll instruct you.

10        Counsel, you may proceed.

11            MR. ESTRADA:  Thank you, your Honor.

12        Good afternoon, ladies and gentlemen.

13        Ladies and gentlemen, I want you to ask yourselves

14    something.  What else would you expect from these defendants?

15    What else would you expect when these three defendants

16    committed crime after crime after crime, when you had

17    defendants who were out there stealing money from other

18    people's bank accounts, stealing people's identifications,

19    committing firearms offenses, extorting other people?

20        What you would expect from defendants who did all this and

21    were caught on wiretaps when they didn't know that they were

22    being intercepted, when they didn't know they'd be charged,

23    when they didn't know they'd one day up at trial before you is

24    what you just got, these closing arguments.

25        Defendants will do anything to avoid responsibility.
```

1    Defendants will make any excuse for their conduct.  Defendants

2    will attempt to confuse the issues.  They present you with

3    conspiracy theories.  They give you bluster.  They give you

4    anger.  But ladies and gentlemen, here, in this courtroom, what

5    matters is the facts and the law.

6         There is a lot of reference to the flag here and to the

7    Constitution during these closing arguments.  That's all very

8    important.  But one of the most important parts of our criminal

9    justice system is you all.  It's the jury.  Because the jury

10   are the people who decide the facts in this case and apply the

11   law to the facts.  The reason we inconvenience you all and have

12   you here for three weeks during a sometimes painful trial is

13   because we need that common sense, that life experience that

14   you bring to the table to decide a case like this.  We don't

15   want a bunch of specialists.  We don't want a bunch of lawyers.

16   We don't want a bunch of people who can't agree on the

17   definition of "is."  We want people such as yourself who can

18   look at the facts, look at the law, and apply it and come to a

19   conclusion.

20        And ladies and gentlemen, I submit to you, based on the

21   facts you heard during this trial, there's only one conclusion:

22   That's all three defendants before you here are guilty of each

23   and every crime charged against them.

24        Now, I don't have a lot of time, and you sat here for a

25   long time with these closing arguments, so I'm not going to go

1    through every single argument that was raised during the

2    closing arguments.  I'm only going to go over some of those.

3    I'm also going to go over the charges as they come up, starting

4    with the RICO charge.  But before I get there, I want to just

5    talk about the transcripts very briefly.

6        You again heard argument about the transcripts, and during

7    the trial you heard this argument about Speaker 1, Speaker 2,

8    who's the person on the lines.  Ladies and gentlemen, you've

9    heard overwhelming evidence that the people speaking in those

10   wire calls are defendant Darbinyan, defendant Sharopetrosian,

11   and defendant Parsadanyan.  They challenge the transcripts, but

12   the transcripts have come in through a translator, who

13   testified before you about bias and testified to their

14   accuracy.  And you'll actually be instructed, the Court will

15   instruct you, that you're to accept those translations from the

16   translator as being accurate.  But the fact the defendants

17   challenge this is very telling, because it gives you an idea of

18   how far they'll go and how desperate they are to avoid the

19   truth in this case and to avoid the facts in this case, how far

20   they'll go to make excuses and convince you to avoid the facts.

21       Now, let's go to the RICO charge.  Defendant Darbinyan has

22   argued that he doesn't have any Armenian Power tattoos.  Well,

23   that doesn't matter.  You heard from a expert, a gang expert,

24   talking about Armenian Power.  You even heard from people

25   involved in gangs saying that Armenian Power was one of the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    more sophisticated gangs out there.  They're a white-collar

2    gang, low key, commit a lot of fraud offenses.  They don't all

3    have tattoos.  But in this case, defendant Darbinyan's actions

4    speak much louder than his tattoos.

5        And counsel asked, why the Chicken House?  Why did we talk

6    about the Chicken House in this case?  We talked about the

7    Chicken House because that's where Darbinyan is in a car with

8    Karo Yerkanyan, another Armenian Power leader, gets on the

9    phone, and just by getting on the phone fills up a restaurant

10   with gang members.  And his original argument, the same thing

11   he raised here, was that he just happened to be at the

12   restaurant.

13       He didn't just happen to be at the restaurant.  You heard

14   the calls.  He told people to meet him at the restaurant, and

15   he told gang members to go to that restaurant, and he talked

16   about guns being at the restaurant before and after.  And when

17   that happens, that Chicken House incident, one of his friends,

18   according to testimony, one of the other Armenian Power

19   leaders, says -- Paramaz Bilezikchyan -- that by going against

20   Mher and Karo, they went against AP.

21       And you saw also the AP roster sheet, which mentions the

22   name "Capone" on it.  Also mentions the name "Clever,"

23   Emil Airapetian.  And we'll talk about that individual as well.

24   Armenian Power members.  You saw that, in his pocket when he

25   was stopped, he had a card with the name Armen Hovanissian,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    "Sniper," another gang member for Armenian Power.  And you saw

 2    calls where he talks about White Fence.  White Fence came and

 3    erased everything, instructing the youngsters to pick it up,

 4    paint it over.

 5         Well, you heard during this trial from an expert in gangs

 6    that the rival of Armenian Power was White Fence.  So why would

 7    Darbinyan be talking about White Fence if he didn't care about

 8    Armenian Power, if he wasn't a member of Armenian Power, if he

 9    wasn't a leader of Armenian Power?

10         And he talks about working with a Mexican Mafia member,

11    Armando Moreno.  He commits fraud with Armando Moreno.

12         And defendant in his closing argument attacked the

13    cooperators, said you shouldn't trust them, you shouldn't

14    believe them.

15         As I said at the very beginning of this case, cooperators

16    are looking for a benefit.  You have to look for corroboration

17    in their testimony.  And in this case, you heard corroboration,

18    the wire calls where Moreno is talking about committing fraud

19    and talking directly to Darbinyan.  But another important point

20    about these cooperators is why they testified in the first

21    place.  We didn't put on Armando Moreno so you'd think he's a

22    good guy, so you'd want to have dinner with him, you'd want to

23    take him out.  We put him up there so you could see the person

24    that Darbinyan chose to spend his time with, that Darbinyan

25    chose to commit crimes with.  The same with Ortega, another
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    gang member that Darbinyan chose to work with and commit crimes

 2    with.  That's the importance of these cooperators, and that's

 3    the importance of the testimony they told you.

 4         And as you heard from Moreno, Darbinyan was a shot-caller.

 5    He was a person who ran a yard in prison, and you heard

 6    testimony about that.  You heard Darbinyan himself admit to

 7    running a yard in prison and saying he's validated.  He

 8    couldn't have worked with the Mexican Mafia, he couldn't have

 9    run a yard, he couldn't have been validated unless he was an

10    Armenian Power member, and not just a member but a leader.

11         Now, in the RICO charge, with regard to the RICO charge,

12    defendant Sharopetrosian has argued to you that he shouldn't be

13    found guilty because he's not a gang member.

14         Ladies and gentlemen, you're going to be instructed on

15    RICO.  You're going to be instructed on the elements of RICO,

16    and there's nothing in there about being a gang member.

17    There's nothing in there about having to be a gang member or a

18    member of Armenian Power to be guilty.  What it actually says

19    is you can be guilty for being an associate of Armenian Power.

20    And you heard about that through the testimony of the

21    cooperators.  Moreno and Ortega both pled guilty to RICO

22    conspiracy as associates.  They didn't need to be members of

23    Armenian Power.

24         And the instructions will actually talk to you about this.

25    It defines for you what an associate is.  Says, "A person is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    associated with an enterprise," in this case, Armenian Power,

2    "if he conducts business with or through the enterprise."

3        And what business are we talking about?  We're talking

4    about what Armenian Power does: fraud, extortion, identity

5    theft.

6        And that brings up another point that was made by both

7    Darbinyan and Sharopetrosian.  They both argued to you that

8    they weren't trying to further Armenian Power, there was no

9    evidence the money went to other Armenian Power members.

10       That's not in the jury instructions, either.  The jury

11   instructions simply say you conduct business through

12   Armenian Power.  We're not talking about a charitable

13   organization.  We're not talking about the Marine Corps.  We're

14   not even talking about General Electric.  We're talking about

15   Armenian Power, an organization that was out making money,

16   making money and making money, getting power and getting guns

17   to make money.

18       And that's what these defendants did.  Darbinyan was all

19   about making money, conducting fraud, doing identity theft, to

20   further the business of Armenian Power, of which he was a

21   member.  And Sharopetrosian did the same thing.  He worked with

22   Armenian Power to conduct fraud.  You heard calls from

23   August 20th, 2009 with Darbinyan, also a call from September of

24   2009 with Emil Airapetian, "Clever," where he's talking about

25   wanting bank accounts, large bank accounts, and wanting

```
 1    individuals whose dates of birth are under 1935 and under 1930

 2    so he can victimize them.  That's the business of

 3    Armenian Power.  He was conducting that business of

 4    Armenian Power.

 5         And of course, together they committed extortion, another

 6    part of the business of Armenian Power.  And now I want to turn

 7    to that extortion.

 8         You heard a bunch of calls in this case about this

 9    extortion of victim M.M., and you heard the words that were

10    used by these defendants.  This was not trash talk.  This was

11    just not passing language or rude language.  These were

12    threats, direct threats.

13         You look at some of the language that was used here by

14    Sharopetrosian.  He talks about "Neither thieves nor whores

15    will be able to save you.  God forbid if you come without my

16    money, should I hold you and not let you go home."

17         This is not trash talk.  If any of you ever were on a

18    basketball court and you heard that kind of language, you would

19    not think it was playful.  You would not think it was a joke.

20    You would not consider it trash talk, especially when you're

21    being forced to pay money, when you're being kidnapped by

22    others, when someone's showing you a gun and sticking you in a

23    Porsche Cayenne and threatening you to pay money.

24         Darbinyan also makes these threats.  He talks about

25    telling Minas that "we'll see each other," and tells others not
```

1    to give them advice, tell them to give money.  He says he's

2    waiting for him.  He says to Sharopetrosian he'll grab him by

3    his neck.  He tells Sharopetrosian he told him, "You make our

4    dick stand up on you, we're going to chase after you, and it

5    won't be good for you."  He says to Minas, "I will hurt you."

6         This is not trash talk.  These are threats.  And you heard

7    from M.M., and he testified here, and he told you how he was

8    forced to meet with Darbinyan, wasn't free to leave, and on one

9    occasion was sent into an office where the door was locked.

10   This was not anything playful.  It was not a joke.  It was a

11   very serious matter.

12        And with regard to M.M., it was brought up that he came up

13   when the defense called him.  And that's true.  But you heard

14   the threats and you heard the evidence.  How many times does

15   victim M.M. have to be victimized and forced to run the

16   gauntlet and testify here in fear of these individuals?  You

17   heard from him how he's still in fear.  He had to be relocated.

18   He's had two heart attacks over the stress.  The threats are

19   clear, and the threats are enough.

20        There was a lot of information in the case about this debt

21   issue, this issue with Lusine Ogandganyan, the relative of

22   Sharopetrosian.

23        Ladies and gentlemen, this was not about any sort of debt,

24   and it was made clear by defendant's own words.

25        Darbinyan, in Exhibit 67, August 20th, talking about

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    forcing Minas to pay money, said, "I don't care about Luso or

2    else, it must be done whatever way Arman says."

3        Sharopetrosian says, "However much money you have paid

4    her," Lusine Ogandganyan, "it does not concern me.  Between us,

5    your debt has been $120," $120,000, "since September 1st."

6        And there was argument about this interstate commerce

7    issue, whether it really was just a personal debt, whether it

8    affected interstate commerce.  They talk about wanting to get

9    involved in loan fraud.  They talk about wanting prescriptions,

10   Medicare fraud.  They have money sent through Arizona, through

11   wires.  Of course it touched on interstate commerce.

12       And another important point about this debt issue.  This

13   has really been a smoke screen throughout this trial with

14   regard to the charges, because you will see in the elements,

15   the legal instructions which the Court is going to give you,

16   "It is not a defense that a person claims that property

17   obtained rightfully belongs to that person."  Doesn't matter if

18   you claim a debt.

19       And with regard to state extortion, which is part of the

20   RICO and doesn't involve any interstate commerce, "A debt

21   cannot be collected by extortion."  And that makes perfect

22   sense.  You can't threaten someone just 'cause you believe they

23   owe you money.

24       You were talked about the language that was used, colorful

25   language.  Extortion applies under the laws of the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   United States.  We're not here under the laws of

 2   Armenian Power.  Armenian Power may think it's okay to threaten

 3   people over debt, to threaten people, kidnap them to force them

 4   to pay money, but under the laws of the United States, that's

 5   not allowed, and it's clear under the jury instructions.

 6        And on top of that, going back to the slide, you see in

 7   the calls that the defendants knew what they were doing was

 8   wrong, because they talk about the police getting involved.

 9   Darbinyan tells M.M., "Leave the police thing out."

10        And Sharopetrosian, in Exhibit 72, "Let's say if he calls

11   the police, mother fucker, I will die."

12        Darbinyan, "No, he would not call the police."

13        Why would they care about the police if they thought they

14   were doing something that was okay?  They knew what they were

15   doing was wrong.  They knew it was extortion, and they knew

16   what they were doing was illegal.

17        Now with regard to the bank fraud charges.  I'm not going

18   to spend a lot of time on the check fraud, because you've heard

19   a lot of evidence.  And by the way, a lot of that evidence is

20   actually in English.  A lot of the transcripts are in English.

21   They talk about check numbers, amounts, numbers of checks.  But

22   an important point I want to make, because it was addressed by

23   Darbinyan's counsel, he talked about the fact that there was no

24   insider and no money trail.  Look at the instructions.  Look at

25   the instructions on bank fraud.  You'll see nothing in there
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

about an insider or a money trail.  What you'll see is law on a
scheme to defraud, executing a scheme to cheat people.  And the
calls made clear this was about a scheme to cheat people.  And
you even heard calls where Darbinyan talks about dividing up
the money.  The fact that he was very good at hiding his money,
hiding his proceeds and hiding his criminal devices doesn't
mean he gets a pass.

The evidence is clear that this was a scheme to defraud.
They were stealing people's checks, cashing them, and stealing
the money.

And now we come to the 99 Cent Only Store fraud scheme
that you heard about during this case.  Darbinyan talked about
that, mentioned how there weren't any point-of-sale terminals
found in his house.  Of course there weren't.  This scheme
involved installing point-of-sale terminals, skimming devices
at 99 Cent Only Stores, and using those devices to create
counterfeit debit cards.

Does it sound familiar?  There was evidence you heard from
2004 in West Hollywood where Darbinyan is caught doing the same
thing with debit cards.  Cashing them out, stealing money from
an ATM.  He went to jail for that.  And when he got out, he got
smarter.  He got more sophisticated.  And now he wasn't going
to be the guy out there putting in the counterfeit debit cards
to get money.  He had runners to do that.  And he not even had
the runners, he had people who organized the runners.  He

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   wasn't going to touch the runners.  He had a buffer between him

2   and the runners.

3        You heard about this "Khecho," Arakelyan.  You heard about

4   Chouldjian, "Misak."  You heard about Simitian, another

5   individual who organized runners.  And he talks in the calls

6   with these individuals about exactly what he's doing, talking

7   about runners.  And on the same day he's talking about runners

8   with Chouldjian, he talks about judo fighters, needing four

9   judo fighters with Arakelyan.  And you heard -- while they

10  fought this judo fighter issue, you heard Arakelyan himself

11  admitted that that was runners.

12       Now, with regard to the way the scheme would work, he

13  mentioned runners in a call with Petros, Exhibit 148, for "that

14  wall thing," for the ATMs.  And he says expressly, 20 percent.

15  That's how, in this scheme, they would pay the runners.

16       He's connected to the people doing the fraud.  He has

17  calls with Raymond Tarverdyan.  You saw videos of Raymond

18  Tarverdyan, the bald guy in the 99 Cent Only Stores who's in

19  there replacing these point-of-sale terminals.  And he talks to

20  him about second rounds, about competitions, about doing the

21  fraud.

22       He's also connected to this other guy who's arrested in

23  Huntington Beach, Andranik Bakhchadjian, "Ando."  When that

24  guy's arrested red-handed trying to replace a point-of-sale

25  terminal, what he has in his wallet is a ticket, a citation

1   from the day before when he was driving defendant Darbinyan's

2   car.  He's also got a phone in his car which has Darbinyan's

3   telephone number, that same telephone number you heard calls on

4   where they talk about the scheme, that same telephone number he

5   dropped on July 21st.

6        You heard a call from July 20th between Darbinyan and

7   Tarverdyan.  Tarverdyan had gone into a 99 Cent Only Store at

8   Limonite in Riverside.  They had replaced the terminal, so he

9   inspects it.  He doesn't take it because it doesn't have the

10  marking, and then he calls Darbinyan and he tells him someone

11  has discovered our moves, our movements, and this isn't good.

12  And Darbinyan shortly discards that telephone.  But that same

13  telephone number is in Ando's possession.

14       And he's connected to Ortega, "Bam Bam," who's caught on

15  video going into the 99 Cent Only Stores to replace them,

16  committing the fraud, and you heard calls where he works with

17  "Bam Bam," Ortega.

18       And then we come to Parsadanyan.  Now, Parsadanyan,

19  through his counsel, told you that the only way he can be

20  convicted is if there's a stretch of the evidence.  He got very

21  upset.  He felt it was very upsetting that the evidence was

22  presented against him, and that there would have to be some

23  stretch in order for him to be convicted.

24       It's actually the opposite, because in order for him to

25  get away with what he did, in order for him to walk away from

```
 1    the charges against him, in order for him to get away with
 2    defrauding customers of the discount store 99 Cent Only Stores,
 3    he has to get you to believe that the officers in this case,
 4    including Agent Stebbins, lied to you on the stand.  He also
 5    has to get you to believe that the calls, which he didn't
 6    really talk about, all those calls he's on, are not true,
 7    they're a bunch of make-believe.  When they're talking about
 8    "day and night," talking about withdrawals, it's all a
 9    make-believe story.
10        But as I told you at the beginning of this case, those
11    wire calls are very important.  These calls are when the
12    defendants don't think anyone is listening.  These calls are
13    when they didn't know they'd be in trial here.  These calls
14    show them planning to commit criminal activity.  And the calls
15    were not make-believe, because you heard the calls with
16    Tarverdyan, "I'm on my way to the location," July 6, 2009, and
17    there's video of him at the location, 99 Cent Only Stores.
18    There's calls about, "I'm on my way to Rafo's place," July
19    18th, 2009.  Darbinyan goes to Rafo's place.  There's calls
20    about meeting "Bam Bam" in San Diego on August 27, 2009.  He
21    meets with "Bam Bam," and Ortega's there on August 27, 2009.
22        Now, much of the argument of Parsadanyan focuses on this
23    $34,000 in the back of his car.  There's far more than that.
24    There's the wire calls.  But I want to address that $34,000 in
25    the back of the car.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          Think about this.  There's $34,000 in an IKEA bag in the
 2     back of his BMW 6 series.  He tells officers it's the week's
 3     money and he's going to deposit it.  The problem is, he never
 4     deposits it.  Because you saw the bank records.  There's no
 5     $30,000 deposit.  And you'll have those bank records,
 6     Exhibits 416 to 417.  There's nothing even close to $30,000.
 7     And all the deposits after that time are all debit/credit
 8     transactions, not cash.  And the other problem is, $34,000 in a
 9     week.  Think about that.  His business would be making over
10     $1.7 million in cash alone a year if that was a week's intake.
11     And you heard from the testimony that he lived at Franklin, in
12     an apartment, with his mother.  If he had that sophisticated a
13     business, was making that kind of money, surely he would have
14     deposited the money in a bank three blocks away.  Surely he
15     wouldn't stick all that cash in some IKEA bag.
16               THE COURT:  You have about 10 minutes left.
17               MR. ESTRADA:  Thank you, your Honor.
18          And then there is the testimony of his friend, Muradyan.
19     Now, it may surprise you, it may shock you, but it actually
20     sometimes happens that a person will come into federal court,
21     take the stand, and not tell the truth.  It surprised me when I
22     first started doing this job.  But it happens.  And I submit to
23     you the story he told you was not accurate, because there were
24     important inconsistencies.  He told you that the traffic stop
25     lasted 20 minutes.  He was certain about that.  But you heard
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   from the officers it was 45 minutes to an hour.  And they knew

2   that because they have a little belt recorder on that lasted

3   for 45 minutes.  It couldn't have been 20 minutes.

4           MR. FLIER:  Object.  There's no evidence of that.

5           THE COURT:  Sustained as to the recorder saying it's

6   45 minutes.

7           MR. FLIER:  Thank you.

8           MR. ESTRADA:  In addition, he's going north to the 134

9   when you heard from the evidence that in fact the Franklin

10  apartment is to the south.

11      And his story can't be true based on the other evidence.

12  He says when he was at the cell phone store he didn't see

13  Darbinyan.  But you heard about surveillance where Darbinyan

14  was actually seen there in a Dodge Charger.  And Darbinyan is

15  on the phone saying he's going to Rafo's store.

16      Muradyan also tells you that Agent Stebbins, he saw him

17  before; he came in and identified himself as Smith.  Well,

18  Agent Stebbins said that wasn't true.  And that makes perfect

19  sense that he wouldn't go into the store of a target,

20  potentially burn himself and the investigation under the

21  cockamamie name of Smith.  You heard about that Hazatun

22  incident where there's a shooting.  They shoot up the place,

23  and Parsadanyan assists Darbinyan in erasing a tape.  Agent

24  Stebbins told you he didn't himself go to that restaurant to

25  investigate because that could compromise the investigation.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**002981**

 1   He had other Glendale police officers go there.  It's fully

 2   consistent with protecting the investigation.  And it's

 3   inconsistent that he would ever go to some cell phone store as

 4   an Agent Smith.

 5       Also in the Muradyan story, the money somehow disappears.

 6   You heard about the white IKEA bag.  He told you about some

 7   blue AT&T bag that was dropped off.  What happened to the white

 8   IKEA bag?  What happened to all the cash which he claims he

 9   never saw?  They went and partied in West Hollywood, and they

10   just left the cash in the back of the BMW?  $34,000 in cash?

11   For a businessman?

12       What actually happened, ladies and gentlemen, is what you

13   heard in the calls.  You heard in the calls about Darbinyan

14   saying he was going to go to Parsadanyan's store.  "There are

15   things I need to give you."  Then he tells Tarverdyan, "I'll

16   have Rafo so he drives, so I don't take it on me."  He tells

17   Tarverdyan, Exhibit 157, "My friend is coming now.  He's

18   bringing those things."

19       Then the stop happens.  And then about 30 minutes later,

20   when the stop is still going on, according to testimony, "This

21   guy is not here.  He said it would probably be in 15 minutes."

22   Half an hour has passed.  Darbinyan, "He was at the store.

23   Probably somebody came to the store, that is why."

24       Where was Darbinyan right before this?  At Parsadanyan's

25   store.  "That matter's a touchdown.  They had stopped him."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    The person they stopped was Parsadanyan.

2         But as I mentioned, in addition to this $34,000, there's

3    the calls.  And he forgets about all these calls.  The one from

4    July 18th, Exhibit 149, where Darbinyan asks if they went "to

5    greet."  "Greet" is the same word used in Exhibit 44 when they

6    defraud Yoones Gidanian in the Diamond House to say runners are

7    coming back.

8         He talks about Khecho.  Khecho's the judo fighter guy, the

9    runner guy.  He's talking about another guy involved in the

10   scheme.

11        Darbinyan asks if it was just a one time.  Parsadanyan,

12   "It's the day and night, brother, from the two times."

13        August 8th, he talks about Khecho again, the judo fighter

14   guy.  "Did they finish?"  He says, "There were 30 large."

15        What's 30 large?  What's day and night have to do with a

16   cell phone store?  What's it have to do with a coffee business?

17   Nothing.

18        He talks about "yesterday's things," Darbinyan.

19   Parsadanyan, "It's already ready."

20        He talks about Khecho and his dealings with Khecho, judo

21   fighter guy, August 28th.  He talks about Khecho bringing

22   money, "Ten and nine," 10,900.  Asks if he still has "those

23   things."  "He has everything."

24        This has nothing to do with the cell phone store, has

25   nothing to do with the coffee business, has everything to do

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   with fraud.

2        And that call with Simitian, I misspelled it here, but

3   it's Simitian, he talks about "yesterday's withdrawal."  Talks

4   about 9,500 and taking out 1,900.  That's exactly the 20

5   percent that was talked about by Darbinyan in previous calls.

6   Has nothing to do with cell phone store, has nothing to do with

7   the coffee business, everything to do with fraud.

8        Now, what Parsadanyan wants to argue to you is that he's

9   simply a friend of Darbinyan and he got caught in this wide

10  net.  He calls himself a dolphin who was caught in this wide

11  net.

12       He's not a dolphin, ladies and gentlemen.  I actually

13  spend a lot of time in the ocean.  See dolphins and porpoises

14  out there.  He's no dolphin.  There's actually a better example

15  for him.  There's a fish that follows around the shark, and

16  when the shark eats, it eats, and it helps the shark.  It's

17  called a pilot fish.  That's Parsadanyan.  He's the person who

18  spent time with Darbinyan in order to make money.  He's the

19  person who spent time with Darbinyan when he knew what

20  Darbinyan was all about, as you heard in those calls about the

21  Hazatun restaurant incident, erasing a tape.  He knew Darbinyan

22  was a guy who committed crime after crime after crime, and he

23  spent time with him and he worked with him for one reason, and

24  that was to make money, not legitimately, but through fraud.

25       Now, the last thing I want to bring up with you, because

1  it's come up, is this standard which you must follow, which the

2  Court will instruct you on, about reasonable doubt.  The Court

3  will instruct you on what reasonable doubt is, and it's

4  evidence that leaves you firmly convinced of defendant's guilt.

5  But I want to make clear to you that this standard is not some

6  mythical standard.  It's not some abstract standard.  It's the

7  same standard used in every criminal case throughout this

8  courthouse, throughout this county, throughout this state,

9  throughout this country.  Every single defendant sitting in

10  prison today was convicted beyond a reasonable doubt.

11        MR. FLIER:  Objection.

12        THE COURT:  Excuse me.  You have about two minutes

13  left on it, Counsel.

14        MR. ESTRADA:  Ladies and gentlemen, we don't need to

15  play for you 1,000 calls, 2,000 calls.  We don't need to do

16  overkill, as has been suggested, for you to see what the

17  evidence shows.

18      Now, what the evidence shows in this case, ladies and

19  gentlemen, beyond any reasonable doubt, is that all three of

20  these defendants are guilty, guilty of each and every count

21  charged against them.

22      Thank you very much.

23        THE COURT:  Thank you, Counsel.

24      Okay.  Ladies and gentlemen, since we have a long reading

25  of instructions, I think what I'm going to do is, I'm going to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    read the introductory instructions to you first, then we'll
 2    take a break.  It will probably be in about a half hour.  And
 3    then we'll come back and we'll do the instructions that pertain
 4    to the individual elements.
 5         Now that you've heard all the evidence, it is my duty to
 6    instruct you on the law that applies to this case.  A copy of
 7    these instructions will be available for you in the jury room
 8    for you to consult.
 9         It is your duty to weigh and evaluate all the evidence
10    received in this case and in that process to decide the facts.
11    It is also your duty to apply the law as I give it to you to
12    those facts as you find them, whether you agree with the law or
13    not.  You must decide this case solely on the evidence and the
14    law and must not be influenced by any personal likes or
15    dislikes, opinions, prejudice, or sympathy.  You recall that
16    you took an oath promising to do so at the beginning of this
17    case.
18         You must follow all the instructions and not single out
19    some or ignore others.  They are all equally important.  Please
20    do not read into these instructions or to anything that I may
21    have said or done any suggestion as to what your verdict should
22    be or what verdict you should return.  That is a matter that is
23    entirely up to you.
24         The indictment charges that the defendants alleged --
25    excuse me.  The indictment charges that the offenses alleged
```

1    were committed on or about or in or around a certain date.

2    Although it is necessary for the government to prove beyond a

3    reasonable doubt that an offense was committed on a date

4    reasonably near the date alleged in the indictment, it is not

5    necessary for the government to prove that the offense was

6    committed precisely on that set date.

7         The indictment is not evidence.  Each defendant has pled

8    not guilty to the charges.  Each defendant is presumed to be

9    innocent unless and until the government proves the defendant

10   guilty beyond a reasonable doubt.  In addition, the defendant

11   does not have to testify or present any evidence to prove

12   innocence.  The government has the burden of proving every

13   element of the charges beyond a reasonable doubt.

14        A defendant in a criminal action has a constitutional

15   right not to testify.  You are not to draw any inference of any

16   kind from the fact that the defendant did not testify.

17        Proof beyond a reasonable doubt, the definition.  Proof

18   beyond a reasonable doubt is proof that leaves you firmly

19   convinced that the defendant is guilty.  It is not required

20   that the government prove guilt beyond all possible doubt.

21        A reasonable doubt is a doubt based on reason and common

22   sense and is not based purely on speculation.  It may arise

23   from a careful and impartial consideration of all the evidence

24   or from the lack of evidence.

25        If, after a careful and impartial consideration of all the

1    evidence, you are not convinced beyond a reasonable doubt that

2    the defendant is guilty, it is your duty to find the defendant

3    not guilty.

4         On the other hand, if, after a careful and impartial

5    consideration of all the evidence, you are convinced beyond a

6    reasonable doubt that the defendant is guilty, it is your duty

7    to find the defendant guilty.

8         As we talked about before, evidence you are to consider in

9    deciding the facts of this case consist of three things:  The

10   sworn testimony of witnesses, the exhibits received into

11   evidence, and any facts to which the parties have stipulated

12   to.

13        In reaching your verdict, you may consider only the

14   testimony and exhibits received into evidence.  The following

15   things are not evidence, and you may not consider them in

16   deciding what the facts are:  Questions, statements,

17   objections, or argument by the lawyers are not evidence.  The

18   lawyers are not witnesses.  Although you must consider a

19   lawyer's question in understanding the answer of a witness, the

20   lawyer's questions are not evidence.  Similarly, what the

21   lawyer has said in their opening statements or closing

22   arguments or at other times is intended to help you interpret

23   the evidence, but it is not evidence.  If the facts as you

24   remember them differ from the way the attorneys have stated

25   them, your memory of them controls.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          Any testimony that I have excluded, stricken, or

2     instructed you to disregard is not evidence.  In addition, if

3     any evidence was received only for a limited purpose, when I

4     have instructed you to consider certain evidence for a

5     limited -- in a limited way, you must do so.

6          Anything you may have seen or heard when court is not in

7     session is not evidence.  You are to decide this case solely on

8     the evidence received in this trial.

9          Evidence may be either direct or circumstantial.  Direct

10     evidence is direct proof of a fact, such as the testimony by a

11     witness about what that witness personally saw or heard or did.

12     Circumstantial evidence is indirect evidence; that is, it is

13     proof of one or more facts from which you can find another

14     fact.

15          You are to consider both direct and circumstantial

16     evidence.  Neither can be used -- excuse me.  Either can be

17     used to prove any fact.  The law makes no distinction between

18     the weight to be given to either direct or circumstantial

19     evidence.  It is for you to decide how much weight is to be

20     given to any evidence.

21          In deciding the facts of this case, you may have to decide

22     which testimony to believe and which testimony not to believe.

23     You may believe everything the witness says, or part of it, or

24     none of it.

25          In considering the testimony of a witness, you may take

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   into account the witness's opportunity and ability to see or

2   hear or know the things testified to; the witness's memory; the

3   witness's manner while testifying; the witness's interest in

4   the outcome of the case, if any; the witness's bias or

5   prejudice, if any; whether other evidence contradicts a

6   witness's testimony; the reasonableness of a witness's

7   testimony in light of all the other evidence; or any other fact

8   that bears on believability.

9       The weight of the evidence as to any fact does not

10  necessarily depend on the number of witnesses who have

11  testified.  What is important is how believable the witnesses

12  are and how much weight you think their testimony deserves.

13      You are the -- excuse me.  You are here only to determine

14  whether the defendants are guilty or not guilty of the charges

15  in this indictment.  The defendants are not on trial for any

16  conduct or offense not charged in this indictment.

17      Separate crimes.  A separate crime is charged against one

18  or more of the defendants in each count.  The charges have been

19  joined for trial.  You must decide this case for each defendant

20  on each crime charged against the defendants separately.  Your

21  verdict on any count as to any defendant should be

22  controlled -- or should control your verdict -- let me try that

23  again.  Your verdict on any count as to any defendant should

24  not control your verdict on any other count or as to any other

25  defendant.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Now, you have heard testimony that the defendants have

2  made statements.  It is for you to decide whether the defendant

3  has made statements, and if so, how much weight to give to

4  those statements.  In making those decisions, you should

5  consider all the evidence about the statement, including the

6  circumstances under which the defendants may have made those

7  statements.

8    You have heard evidence that the defendant has previously

9  been convicted of a -- defendant Darbinyan has previously been

10  convicted of a crime.  You may consider that evidence only as

11  it relates to whether the defendant was prohibited from

12  possessing a firearm or ammunition as charged in the

13  indictment, and, two, for its bearing, if any, on the question

14  of the defendant's intent, plan, knowledge, identity, or

15  absence of a mistake.  You may not consider that prior

16  conviction for any other purpose.

17    You have heard testimony from some witnesses during this

18  trial that have previously been convicted of a felony offense.

19  You may consider this evidence in deciding whether or not to

20  believe that witness or how much weight to give the testimony

21  of that witness.

22    You have heard testimony from witnesses who may have

23  received benefits from the government in connection with this

24  case and who pled guilty to crimes arising out of the same

25  events from which the defendants are here on trial.  The guilty

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

plea is not evidence against the defendant, and you may not

consider it -- or you may consider it only in determining the

witness's believability.

For these reasons, in evaluating the testimony of a

witness, you should consider the extent to which or whether the

witness's testimony may have been influenced by any of those

factors.  In addition, you should examine the testimony of a

witness with greater caution than other witnesses.

In this case, we've had what we call expert witnesses

testify.  Now I'm talking about Agent Stebbins, I believe it

was Detective or Sergeant Stohl, and Officer Quintero.  So any

testimony concerning any opinion offered by those experts in

their capacity as an expert are governed by the following

instruction:

You have heard testimony from persons who, because of

education or experience, are permitted to state an opinion and

the reasons for that opinion.  Such opinion testimony should be

judged like any other testimony.  You may accept it or reject

it and give it as much weight as you think it deserves,

considering the witness's education and experience, the reason

given for the opinion, and all the other evidence in the case.

Certain charts and summaries have been admitted into

evidence.  Charts and summaries are only as good as the

underlying supporting material.  You should therefore give them

only such weight as you think the underlying material deserves.

1      You have heard English language recordings that have been

2   received into evidence.  Transcripts of those recordings have

3   been provided to help you identify speakers and to help you

4   decide what the speaker is saying.  Remember that the

5   recordings are the evidence, not the transcripts.  If you hear

6   it -- something different from what appears in the transcripts,

7   what you hear is controlling.  The transcripts will not be

8   available during your deliberations.  That's on English.

9      On the other hand, you have also heard recordings in the

10  Eastern Armenian language.  That's treated differently.

11  Transcripts of these recordings have been admitted into

12  evidence and will be available for you during your

13  deliberations.  These transcripts are official English language

14  translations of the recording.  Although some of you may know

15  Eastern Armenian, it is important that all jurors consider the

16  same evidence.  Therefore, you must accept the English

17  translation contained in the transcripts even if you would

18  translate it differently.

19      For reasons that do not concern you, the cases against

20  co-defendants named in the indictment are not before you.  Do

21  not speculate as to why.  These facts should not influence your

22  verdicts with reference to the remaining defendants, and you

23  must base your verdict solely on the evidence against these

24  remaining defendants.

25      The parties have agreed or stipulated to certain facts

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    that have been stated to you.  Anytime parties have stipulated

2    or agreed to a fact, you will therefore treat those facts as

3    having been conclusively proved.

4        Now, we have quite a few other instructions to read to

5    you.  I think it's best if we take a break now and come back,

6    and we'll go right into what the elements are in the offenses

7    that were charged, but I think because of the length of time

8    it's best to give you a break now.  We'll come back in 15

9    minutes.

10        We'll be in recess.

11            THE CLERK:  All rise.

12        *(Recess held from 1:54 p.m. to 2:09 p.m.)*

13        *(In the presence of the jury:)*

14            THE COURT:  Okay.  The record will reflect that all

15    the members of the jury are in their respective seats in the

16    jury box.

17        Ladies and gentlemen, we're now going to go into the jury

18    instructions that pertain to the individual counts.  Some of

19    these may be a little confusing.  Remember what I told you

20    before, that you will get a copy of these instructions when you

21    go back to the jury room, and you can peruse over them at that

22    time.  And I'll try to identify the -- excuse me.  I'll try to

23    identify the allegations as we go through.

24        The first two instructions I'm going to give you deal with

25    conspiracy.  Or excuse me.  Let me get to that after the first

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    instruction here.

2        The indictment accuses the defendants of various crimes.

3    These crimes are set forth in different counts of the

4    indictment, and I'll give you a general overview of that

5    indictment.

6        Count 1 charges the defendant Darbinyan and Sharopetrosian

7    with racketeering conspiracy.

8        Charge 4 charges the defendants Darbinyan and

9    Sharopetrosian with extortion conspiracy.

10        Count 5 charges defendant Darbinyan and Sharopetrosian

11    with extortion.

12        Counts 6 through 19 charge defendant Darbinyan with bank

13    fraud.

14        Counts 23 through 34 charge defendant Darbinyan with

15    aggravated identity theft.

16        Count 38 through 41, 44 through 45, 48, 50 to 51, 54, 57,

17    60 and 63 and 66 charge defendant Darbinyan and Rafael

18    Parsadanyan with bank fraud.

19        Count 69 charges defendant Darbinyan and Parsadanyan with

20    access device fraud conspiracy.

21        Counts 71 through 73, 77, 79 through 81, 84, 85, 91 and 93

22    charge defendant Darbinyan and Parsadanyan with aggravated

23    identity theft.

24        Counts 128 and 129 charge defendant Darbinyan with felon

25    in possession of a firearm or ammunition.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Now, before explaining each of the elements of

2    racketeering conspiracy in detail, I will provide some general

3    instructions on conspiracy.

4    Conspiracy is a kind of criminal partnership, an agreement

5    of two or more persons to commit one or more crimes.  The crime

6    of conspiracy is the agreement to do something unlawful.  It

7    does not matter whether or not the crime agreed upon was

8    committed.

9    For conspiracy to have existed, it is not necessary that

10   the conspirators make a formal agreement or that they agree on

11   every detail in the conspiracy.  It is not enough, however, for

12   the conspirators simply to meet, discuss the matters of common

13   interest, act in a similar way or perhaps help one another.

14   You must find that there is a plan to commit at least one of

15   the crimes alleged in the indictment as an object or a purpose

16   of the conspiracy, with all of you agreeing as to the

17   particular crime which the conspirators agreed to commit.

18   One becomes a member of a conspiracy by willfully

19   participating in an unlawful plan with the intent to advance or

20   further some object or purpose of the conspiracy, even though

21   the person does not have full knowledge of all the details of

22   the conspiracy.  Further, one who willfully joins an existing

23   conspiracy is as responsible as its originators.  On the other

24   hand, one who has no knowledge of the conspiracy but happens to

25   act in a way which furthers some object or purpose of the

```
 1    conspiracy does not therefore become a conspirator.  Simply --
 2    or similarly, a person who does not become a conspirator --
 3    excuse me.  Similarly, a person does not become a conspirator
 4    merely by association with one or more persons who are the
 5    conspirators, nor merely by knowing that the conspiracy exists.
 6         A conspiracy may continue for a long period of time and
 7    may include the performance of many transactions.  It is not
 8    necessary that all the members of the conspiracy join in at all
 9    times, and one may become a member of a conspiracy without full
10    knowledge of all the other details of the unlawful scheme or
11    the names, identities, or locations of all the other members.
12         It is no defense that the person participating in the
13    conspiracy was a minor -- was minor or for a short period of
14    time.
15         Now, racketeering conspiracy charged in Count 1 and
16    extortion conspiracy charged in Count 4 do not require proof
17    that a member of a conspiracy committed an overt act in
18    furtherance of the conspiracy.  On the other hand, access fraud
19    or access device fraud conspiracy charged in Count 69 does
20    require proof that a member of the conspiracy committed an
21    overt act in furtherance of the conspiracy.
22         Conspiracy may be proved by circumstantial evidence and
23    may exist without a formal agreement.  The elements may
24    therefore be established by evidence of coordinated activities
25    between the defendants.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    The government is not required to prove that the parties

2  to or members of an alleged agreement or conspiracy were

3  successful in achieving all the objects of the agreement or the

4  conspiracy.

5    Now, as to racketeering conspiracy as alleged in

6  Count 1 -- and probably the next 12 or 14 instructions are

7  going to be related to Count 1, so...

8    Count 1 of the indictment charges defendant Darbinyan and

9  Sharopetrosian and others with racketeering conspiracy; that

10  is, conspiracy to commit a racketeering offense, in violation

11  of Section 1962(d) of Title 18 of the United States Code.  In

12  order for the defendant to be found guilty of the charge, the

13  government must prove each of the following elements beyond a

14  reasonable doubt:

15    First, the charged enterprise, which is Armenian Power,

16  was or would be established;

17    Second, the enterprise or the activities would affect

18  enterprise -- excuse me.  The enterprise or its activities

19  would affect interstate or foreign commerce;

20    Third, that the defendant knowingly agreed that either the

21  defendant or another person would be associated with the

22  enterprise;

23    And fourth, that the defendant knowingly agreed that

24  either he or another person would conduct or participate

25  directly or indirectly in the conduct of the affairs of the

1   enterprise through a pattern of racketeering activities.

2         And in a few minutes, I'll explain those four elements to

3   you.

4         An enterprise is a group of people who have associated

5   together for a common purpose of engaging in a course of

6   conduct over a period of time.  This group of people, in

7   addition to having a common purpose, must have some sort of

8   framework, formal or informal, for carrying out its objectives.

9         The government is not required to prove that the

10  enterprise actually existed, the defendant was actually

11  associated with the enterprise, or that the enterprise or its

12  activities actually affected the interstate commerce.  There is

13  no requirement of some overt act or specific act.  The

14  existence of a racketeering conspiracy is an agreement to

15  commit a racketeering offense.

16        Racketeering activity refers to certain crimes that

17  include, for example, any crimes which may involve the act or

18  threat of extortion, extortion conspiracy, bank fraud,

19  attempted bank fraud, access device fraud, or access device

20  fraud conspiracy, or that are felonies under the state or

21  federal law.

22        In order for you to convict the defendant of racketeering

23  conspiracy, the government must prove beyond a reasonable doubt

24  that the defendant agreed to participate in the enterprise with

25  the knowledge and the intent that at least one of its members

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   of the racketeering conspiracy would intentionally commit or
 2   cause or aid or abet in the commission of two or more of the
 3   type or types of racketeering activities listed in the
 4   indictment.  That one member could be -- that one member could
 5   be the defendant himself or it could be another person.  The
 6   government is not required to prove that the defendant
 7   personally participated or agreed personally -- to personally
 8   commit two or more racketeering acts.
 9        Now, I talked to you about the four elements that the
10   government needed to prove to establish Count -- that first
11   count or that first charge.  Let me explain those four elements
12   to you.
13        First of all, the first element the government must prove
14   as to Count 1 is that the charged enterprise, which is the
15   Armenian Power, was or would be established.
16        An enterprise is a group of people who have associated
17   together for a common purpose of engaging in a course of
18   conduct over a period of time.  This group of people, in
19   addition to having a common purpose, may have some sort -- must
20   have some sort of framework, either formal or informal, for
21   carrying out its objectives.  The personnel of the enterprise,
22   however, may change.  It need not be associated with the
23   enterprise for the entire period alleged in the indictment.
24   This group of people does not have to be a legally recognized
25   entity, such as a partnership or a corporation.  This group may
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   be organized for a legitimate or lawful purpose, or it may be

2   organized for an unlawful purpose.  The name of the

3   organization itself is not an element of the offense and does

4   not have to be proved.

5       The government therefore must prove beyond a reasonable

6   doubt that the enterprise had or would have had at least the

7   three following structural features:

8       Number 1, a purpose;

9       Number 2, relationship among the associates with the

10  enterprise;

11      And number 3, a longevity sufficient to point -- to permit

12  these associates to pursue the enterprise's purpose.

13      It is not necessary for the enterprise to have a

14  particular or formal structure, but it must have a sufficient

15  organization that its members did or would function to operate

16  in a coordinated manner in order to carry out the alleged

17  common purpose or purposes of the enterprise.  Such a group

18  need not have a hierarchal structure or a chain of command.

19  Decisions may be made on an ad hoc basis and by a number of

20  methods.  Members of this group need not have fixed roles.

21  Different members may perform different roles at different

22  times.  The group need not have a name, regular meetings, dues,

23  established rules or regulations, disciplinary procedures, or

24  inductions or initiation ceremonies.  While the group must or

25  would function as a continuing unit and remain in existence
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    long enough to pursue a common course of conduct, you may

2    nevertheless find that the enterprise elements are satisfied by

3    finding a group whose associates engaged in spurts of

4    activities punctuated by a period of inactivity.

5         The second element to prove that count, to prove as to

6    Count 1, is that the enterprise did or would engage, or that

7    the enterprise activities did or would affect, interstate or

8    foreign commerce.

9         Interstate commerce means commerce between one state and

10   that of another.  Foreign commerce means commerce between the

11   United States and a foreign country.  Interstate commerce

12   includes the movements of goods, services, money, and

13   individuals between states.  These goods could be either legal

14   or illegal.  This effect on interstate commerce could be --

15   could have occurred in any way, and it need not -- or excuse

16   me, and it need only be minimal.

17        It is not necessary for you to find the defendant himself

18   engaged in interstate or foreign commerce or that he knew the

19   enterprise was engaged in interstate or foreign commerce.  Only

20   a minimal effect on commerce is required, and the effect need

21   only be probable or potential, not actual.  It is not necessary

22   to prove that the defendant's own acts affected interstate

23   commerce as long as the enterprise's acts had or would have had

24   such an effect.  Nor is it necessary that the effect on

25   interstate commerce have been adverse to commerce.  All that is

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    necessary is the enterprise would have -- would engage in or

2    its activities would affect interstate commerce in some minimal

3    way.

4         The third element the government must prove as to

5    Count 1 is that the defendant agreed that a conspirator, who

6    might be the defendant himself, would be employed by or

7    associated with the enterprise.  The government need not prove

8    both.  Providing that a conspirator either was employed by or

9    was associated with the enterprise is sufficient to establish

10   the elements.

11        The term "employed by" should be given its common, plain

12   meaning.  "Associated with" should also be given its plain

13   meaning.  A person is associated with an enterprise when, for

14   example, he joins with other members of the enterprise and

15   knowingly aids or furthers the activities of the enterprise, or

16   he conducts business with or through the enterprise.

17        It is not required that the defendant agree that any

18   particular conspirator would be employed by or associated with

19   the enterprise for the entire time of the enterprise -- that

20   the enterprise existed.  The government also need not prove

21   that the defendant agreed that any particular conspirator had a

22   formal position in the enterprise or participated in all the

23   activities of the enterprise or had full knowledge of all the

24   activities of the enterprise, or knew about the participation

25   of all the other members of the enterprise.  Rather, it is

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    sufficient that the government prove beyond a reasonable doubt

2    that at some point during the existence of the enterprise as

3    alleged in the indictment, defendant agreed with the

4    conspire -- with the conspirator who would be either employed

5    by or associated with the enterprise within the meaning of

6    those terms that I have just explained to you, and that

7    would -- and that he would know of the general nature of the

8    enterprise and would know that the enterprise extended beyond

9    his or her own role in the enterprise.

10        The fourth element that the government must prove as to

11   Count 1 is the defendant agreed that the conspirator, who might

12   be the defendant himself, would knowingly conduct or

13   participate in the conduct or the affairs of the enterprise

14   through a pattern of racketeering activity.  A pattern of

15   racketeering activity requires at least two acts of

16   racketeering, the last of which occurred within ten years after

17   the commission of a prior act of racketeering.

18        A defendant may be convicted of racketeering conspiracy

19   even if he did not personally participate in the operation or

20   management of the enterprise, so long as the evidence

21   establishes that the defendant knowingly agreed that at least

22   one conspirator would participate in the operations or

23   management of the enterprise.

24        Proof of operation or management may be -- may include

25   evidence that the defendant agreed that a conspirator would

1    intentionally perform acts, functions, or duties which are

2    necessary to or helpful in the operation of the enterprise or

3    that a conspirator would have some part in directing the

4    enterprise's affairs.

5        The government need not prove, however, that the

6    conspirator would exercise significant control over or within

7    the enterprise, or that he had a formal position in the

8    enterprise, or that he had primary responsibility for the

9    enterprise's affairs.  Rather, an enterprise is operated not

10   just by the upper management but also by lower-rung

11   participants in the enterprise who are under the direction of

12   upper management or carry out upper management's orders.  The

13   enterprise also might be operated -- might be operated or

14   managed by one who exercises control over the enterprise.

15       To establish a pattern of racketeering activity as alleged

16   in Count 1 of the indictment, the government must prove the

17   following beyond a reasonable doubt:

18       Number 1, that the defendant agreed that a conspirator,

19   who could be the defendant himself, would intentionally commit

20   or cause or aid or abet in the commission of any two or more

21   racketeering acts of the type of racketeering activities

22   alleged in the indictment; that is, extortion, extortion

23   conspiracy, bank fraud, attempted bank fraud, access device

24   fraud, access device fraud conspiracy, or any combination

25   thereof.  The racketeering acts need not be of the same type,

1    but you must all agree upon, beyond a reasonable doubt, as to

2    which type or types of racketeering activities you find the

3    defendant agreed would be committed, caused or aided or

4    abetted.  At the end of these instructions, I will instruct you

5    on the elements charged in the racketeering activity.

6         Second element of racketeering activity, the racketeering

7    activity would be related.  To be related, the racketeering

8    activity might have the same or similar purposes, results,

9    participants, victims, or methods of commission, or be

10   otherwise interrelated by distinguishing characteristics and

11   not merely by isolated events.  Racketeering acts might also be

12   related if they are dissimilar, provided that the racketeering

13   acts have a meaningful connection to the enterprise.  For

14   example, a meaningful connection could be shown by evidence

15   that the defendant's position in the enterprise would

16   facilitate his commission of the racketeering acts, or that the

17   racketeering acts would benefit the enterprise, or that the

18   racketeering acts would be authorized by the enterprise, or

19   that the racketeering acts would promote the furtherance of the

20   purpose of the enterprise.

21        Third element, the racketeering activities must have

22   extended over a substantial period of time or posed a threat of

23   continual -- or continued criminal activity.  The government

24   need not prove a threat of continuity by the -- by mathematical

25   formula or by any particular method of proof, but rather may

1    prove it in a variety of ways.  For example, the threat of

2    continuing unlawful activity could be established when the

3    evidence shows that the racketeering activity is part of a

4    long-term association that existed for criminal purposes, and

5    when the racketeering activity would be shown to be the regular

6    way of conducting the affairs of the enterprise.  Sporadic,

7    widely separated, or isolated criminal acts do not form a

8    pattern of racketeering activity.

9         In determining whether or not the government has proved

10   the threat of continued unlawful activity, you are not limited

11   to consideration of any specific type or types of racketeering

12   activities charged against the defendant; rather, you may also

13   consider the nature of the enterprise and other unlawful

14   activities of the enterprise and its members viewed in their

15   entirety, including both charged and uncharged unlawful

16   activities.

17        In order to convict the defendant of racketeering

18   conspiracy offense, the jury must be unanimous that the

19   defendant agreed on two or more racketeering acts would be

20   committed, and be unanimous as to the types or -- type or types

21   of predicated racketeering activity, as alleged in the

22   indictment, that the defendant agreed would be committed, such

23   as extortion, bank fraud, access device fraud, or any

24   combination thereof.

25        In conclusion, it is important to note that the government

```
 1    is not required to prove that the alleged enterprise was
 2    actually established, that the enterprise was actually engaged
 3    in or its activities actually affected interstate or foreign
 4    commerce, that the defendants were actually employed by or
 5    associated with the enterprise, or that the acts of
 6    racketeering were actually committed.  Because it is the
 7    agreement to commit at least two racketeering offenses that is
 8    the essence of racketeering conspiracy offense, the government
 9    need only prove the elements as I've described them to you in
10    these instructions.
11        Now, the next five or six are going to describe
12    racketeering activities and define what they are.  I said I'd
13    go over that later in these instructions, and we're going to do
14    that now.
15        I will now instruct you on the law regarding the various
16    types of predicated racketeering activities alleged in the
17    indictment.
18        I'll first instruct you that the law regarding extortion
19    by force, in violation of Title 18 of the United States Code,
20    Section 1951, as alleged in Count 1, that extortion is a type
21    of racketeering activity that the defendant agreed would be
22    committed as part of the racketeering conspiracy.
23        In order for the individual to be found guilty of
24    extortion by force, in violation of Title 18 of the
25    United States Code, Section 1951, the government must prove
```

```
1   each of the following elements beyond a reasonable doubt:

2       First, that the individual induced a victim to part with

3   property by wrongful use of actual or threatened force,

4   violence, or fear;

5       Second, the individual acted with the intent to obtain

6   property;

7       And third, commerce from one state to another was affected

8   in some way.  The statute is not limited to conduct that

9   directly or immediately obstructs the movement of goods, but it

10  is necessary that commerce actually be affected by a

11  conspirator's conduct -- excuse me, nor is it necessary that

12  commerce actually be affected by the conspirator's conduct.  It

13  is sufficient if the extortion possibly or potentially affected

14  interstate or foreign commerce.  The individual's action only

15  need to have minimal or slight effect on interstate commerce.

16      I'll now instruct you on the law of extortion in violation

17  of the California Penal Code Statute 518 to 520.

18          MR. ESTRADA:  Your Honor, I apologize for

19  interrupting.  There's one line at the bottom that was skipped

20  over, extortion by force.

21          THE COURT:  I'm sorry?

22          MR. ESTRADA:  There's one line at the very bottom.

23          THE COURT:  Did I miss it?

24          MR. ESTRADA:  Yes, I think so.

25          THE COURT:  Oh, I'm sorry.  You're correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    It is not a defense that a person's claim to the property

2  obtained rightfully belongs to that person.

3    I'll now instruct you on the law that applies to

4  extortion, in violation of California Penal Code Section 15 --

5  518 to 520.  It is alleged in Count 1 that extortion is a type

6  of racketeering activity that the defendant agreed would be

7  committed as part of the racketeering conspiracy.

8    In order for an individual to be found guilty of

9  extortion, in violation of California Penal Code Section 518 to

10  520, the government must prove each of the following elements

11  beyond a reasonable doubt:

12    First, that the individual threatened to unlawfully injure

13  or use force against another person or the property of another

14  person;

15    Second, when making the threat or using force, the

16  individual intended to use fear or force to obtain the other

17  person's consent to give defendant money or property;

18    And third, as a result of the threat or use of force, the

19  other person consented to give the individual money or

20  property;

21    And fourth, as a result of the intended -- excuse me, of

22  the threat or use of force, the other person then gave the

23  individual money or property.

24    The threat may involve harm to be inflicted by an

25  individual other -- or by somebody else.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A good faith belief in the right to the property does not

2  negate the specific intent required for extortion.  A debt

3  cannot be collected by extortion.

4    I'll now instruct you on the law regarding bank fraud, in

5  violation of Title 18 of the United States Code, Section 1344.

6  It is alleged in Count 1 that bank fraud is a type of

7  racketeering activity that the defendant agreed would be

8  committed as part of the racketeering conspiracy.

9    In order for the individual to be found guilty of bank

10  fraud, in violation of Title 18 of the United States Code,

11  Section 1344, the government must prove each of the following

12  elements beyond a reasonable doubt:

13    First, that the individual knowingly executed a scheme to

14  defraud a financial institution;

15    Second, the fraudulent scheme was material; that is, it

16  had a natural tendency to influence, or was capable of

17  influencing, a financial institution to part with money or

18  property;

19    And third, the individual did so with the intent to

20  defraud;

21    And fourth, that the financial institution was federally

22  insured.

23    An intent to defraud is an intent to deceive or cheat.

24  Intent to defraud may be established by circumstantial

25  evidence.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        I'll now instruct you on the law that regards access

 2   device fraud, in violation of Title 18 of the United States

 3   Code, Section 1029(a)(1).  It is alleged in Count 1 that access

 4   device fraud is a type of racketeering activity that the

 5   defendant agreed would be committed as part of the racketeering

 6   conspiracy.

 7        In order for an individual to be found guilty of access

 8   fraud, the government must prove each of the following elements

 9   beyond a reasonable doubt:

10        First, that the individual knowingly used a counterfeit

11   access device;

12        Second, that the individual acted with the intent to

13   defraud;

14        And third, that the individual conducted -- conduct in

15   some way affected commerce between one state and that of

16   another or between states of the United States and foreign

17   country.

18        An access device means any card, plate, code, account

19   number, electronic serial number, mobile identification number,

20   personal identification number, or any other telecommun -- or

21   other telecommunications services, equipment, or instrument

22   identifiers or other means of account access that can be used

23   alone or in conjunction with other access devices to obtain

24   money, goods, services, or any other thing of value, or that

25   can be used to initiate a transfer of funds other than a
```

1     transfer originated solely by a paper instrument.

2         A counterfeit -- just a second.  A counterfeit access

3     device is any access device that is counterfeited, fictitious,

4     altered, or forged, or an identifiable component of an access

5     device or a counterfeited access device.

6         I'll now instruct you on the law require -- or regarding

7     unlawful possession of 15 or more access devices, in violation

8     of Title 18 of the United States Code, Section 1029(a)(3).  It

9     is alleged in Count 1 that access device fraud is a type of

10    racketeering activity that the defendant agreed would be

11    committed as part of the racketeering conspiracy.

12        In order for the individual to be found guilty of that

13    charge, the government must prove each of the following

14    elements beyond a reasonable doubt:

15        First, that the individual knowingly possessed at least 15

16    counterfeit or unauthorized access devices at the same time;

17        Second, the individual knew the devices were counterfeit

18    or unauthorized;

19        Third, the individual acted with the intent to defraud;

20        And fourth, the individual conduct in some way affected

21    commerce between one state and another state or between a state

22    of the United States and a foreign country.

23        An unauthorized access device is any access device that is

24    lost, stolen, expired, revoked, canceled, or obtained with the

25    intent to defraud.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      I'll now instruct you on the law regarding identity theft,

2   in violation of Title 18 of the United States Code, Section

3   1028(a)(7).  It is alleged in Count 1 of the -- that identity

4   theft is a type of racketeering activity that the defendant

5   agreed would be committed as part of the racketeering

6   conspiracy.

7      In order for an individual to be found guilty of that

8   charge, the government must prove each of the following

9   elements beyond a reasonable doubt:

10      First, that the individual knowingly transferred,

11   possessed, or used a means of identification of another person;

12      And second, that the individual did so without lawful

13   authority;

14      And third, the individual transferred, possessed, or used

15   as a means of identification in connection with bank fraud or

16   access device fraud;

17      And fourth, that the transfer, possession, or use of the

18   means of identification or another -- of another person was in

19   or affected commerce between states, one state and another, or

20   between the states of the United States and a foreign country.

21      Those are all the instructions that pertain to the

22   racketeering activities that were alleged.

23      Now I'm going to talk to you about the individual counts

24   that were alleged.

25      Defendant Darbinyan and Sharopetrosian are charged in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  Count 4 with extortion conspiracy, in violation of Title 18 of
 2  the United States Code, Section 1951(a).  In order for the
 3  defendant to be found guilty of extortion conspiracy, the
 4  government must prove each of the following elements beyond a
 5  reasonable doubt:
 6      First -- excuse me -- beginning on or about an unknown
 7  date, but no later than on or about June 27, 2009, a
 8  continuing -- and continuing through and around about the date
 9  of December 2009, there was an agreement between two or more
10  persons to interfere with interstate commerce by extortion;
11      And second, that the defendant became a member of that
12  conspiracy knowing at least one of its objects and intending to
13  help accomplish that object.
14      The government need not prove the conspiracy actually
15  affected interstate commerce, but need only prove that the
16  conspiracy scheme, if successful, would have affected commerce.
17      Defendant Darbinyan and Sharopetrosian are charged in
18  Count 5 with extortion by force.  The last one was extortion
19  conspiracy.  This is extortion by force, in violation of
20  Title 18 of the United States Code, Section 1951.  In order for
21  the defendant to be found guilty of this charge, the government
22  must prove each of the following elements beyond a reasonable
23  doubt:
24      That the defendant induced a victim to part with property
25  by the wrongful use of actual or threatened force, violence, or
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   fear;

 2        Second, the defendant acted with the intent to obtain

 3   money;

 4        And third, commerce from one state to another was affected

 5   in some way.  The statute is not limited to conduct that

 6   directly or immediately obstructs the movement of goods, nor is

 7   it necessary that commerce actually be affected by a

 8   conspirator's conduct.  It is sufficient that the extortion

 9   possibility or potentially affected interstate or foreign

10   commerce.  The defendant's actions only need to have a minimal

11   or slight effect on interstate commerce.

12        It is not a defense that the person claims that the

13   property obtained rightfully belongs to that person.

14        Defendant Darbinyan is charged with bank fraud, in

15   violation of Title 18 of the United States Code, Section 1344,

16   in the following counts:

17        In Count 6, against a victim, P.J.C., on January 26, 2009;

18   in Count 7, against the same victim, P.J.C., January 26, 2009;

19   Count 8, the same victim, P.J.C., on January 28th, 2009;

20   Count 9 -- Count 9, against the same victim, P.J.C., on

21   January 29th, 2009; Count 10, victim -- against victim G.F., on

22   March 9th, 2009; Count 11, against the same victim, G.F., on

23   March 17th, 2009; Count 12, against the same victim, G.F., on

24   March 18th, 2009; Count 13, against the same victim, G.F., on

25   March 19th, 2009; Count 14, against victim Y.G., on March 30th,
```

1    2009; Count 15, against the same victim, Y.G., on March 30th,

2    2009; and Count 16, against the same victim, Y.G., on March

3    30th, 2009; on Count 17, against victim F.D. and M.D., on April

4    14th, 2009; Count 18, against victim F.D. and M.D., on April

5    14th, 2009; and Count 19, against victim L.R., October 16th,

6    2009.

7        Those counts are all alleged against defendant Darbinyan.

8        Defendant Darbinyan and Parsadanyan are charged with the

9    same offense on the following counts:

10       Count 38, they're both charged with -- against -- with the

11   same charge against victim J.D., on July 17th, 2009; Count 39,

12   against victim S.G., July 17, 2009; Count 40, against

13   victim M.L., on July 17th, 2009; 41 -- Count 41, against

14   victim M.J., July 17, 2009; Count 44, against victim J.D., on

15   July 18th, 2009; Count 45, against victim S.G., July 18th,

16   2009; Count 48, against M.L., victim M.L., on July 18, 2009;

17   Count 50, against victim M.L., on July 18, 2009; Count 51,

18   against victim M.L., on July 18th, 2009; Count 54, against

19   victim J.A., on July 18th, 2009; Count 57, against victim J.D.,

20   on July 19th, 2009; Count 60, against victim M.J., on July

21   19th, 2009; Count 63, against victim S.G., July 20th, 2009; and

22   Count 66, against victim M.J.K., on July 23rd, 2009.

23       In order for the defendants to be found guilty of bank

24   fraud, in violation of Title 18 of the United States Code,

25   Section 1344, the government must prove each of the following

1    elements beyond a reasonable doubt:

2        That the defendant knowingly executed a scheme to defraud

3    a financial institution;

4        Second, the defendant's scheme was material; that is, it

5    had a natural tendency to influence, or was capable of

6    influencing, a financial institution to part with money or

7    property;

8        Third, the defendant did so with the intent to defraud;

9        And fourth, that the financial institution was federally

10   insured.

11       An intent to defraud is an intent to deceive or cheat.

12   Intent to defraud may be established by circumstantial

13   evidence.

14       The next charge -- I'm sorry, before I get to that...

15       Defendant or co-schemer's actions can constitute a scheme

16   to defraud even if there was no specific false statement

17   involved.

18       A scheme to defraud can also consist of false statements,

19   false representations, or omissions, as well as half-truths and

20   the knowing concealment of facts.  In determining whether or

21   not a scheme to defraud exists, you're entitled to consider not

22   only the defendant and co-schemer's words or statements, but

23   also the circumstances in which they were used as a whole.

24   Even if statements made as part of the scheme are not literally

25   false, you may consider whether or not the statement taken as a

1    whole is misleading or deceptive.  You may find a scheme to

2    defraud if you find beyond a reasonable doubt that the scheme

3    was reasonably calculated to deceive.

4        It is not necessary for the government to prove that the

5    bank fraud scheme succeeded, that money or property was

6    obtained from the bank, or that there was an actual loss.

7        The next instruction, defendant Darbinyan is charged with

8    aggravated identity theft, in violation of Title 18 of the

9    United States Code, Section 1028A.  The counts in which he is

10   charged with the offense involve a specific victim or victims,

11   are as follows, and this is just as to defendant Darbinyan:

12       Count 23, against a victim, M.A., on January 26, 2009;

13   Count 24, against victim M.A., on January 26, 2009; and Count

14   25, against victim M.A., on January 28th, 2009; Count 26,

15   against victim M.A., on January 28th, 2009; on Count 27,

16   against victim G.F., March 17th, 2009; Count 28, against victim

17   G.F., on March 18th, 2009; Count 29, against victim Y.G., March

18   30th, 2009; Count 30, against same victim, Y.G., on March 30,

19   2009; Count 31, against the same victim, Y.G., on March 30,

20   2009; Count 32, against victim -- victims F.D. and M.D., on

21   April 14th, 2009; Count 33, against victims F.D. and M.D., on

22   April 14th, 2009; and Count 34, against victim L.R., on

23   April 16th, 2009.

24       Now, as to -- the following counts are as to defendant

25   Darbinyan and Parsadanyan, are charged with the same offense as

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    pertains to the following specified victims:

2         In Count 71, they're both charged with the offense against

3    victim J.D., July 17, 2009; 72, against victim S.G., July 17th,

4    2009; Count 73, against victim M.J., July 17th, 2009; Count 77,

5    against victim J.D., July 18th, 2009; Count 79, against

6    victim S.J. -- or S.G., July 18th, 2009; Count 80, against

7    victim M.J., July 18, 2009; Count 81, against victim M.L., July

8    18th, 2009; Count 84, against victim J.A., July 18th, 2009; and

9    Count 87, against victim M.J., July 19th, 2009; Count 91,

10   against victim S.G., July 18 -- or July 20th, 2009; Count 93,

11   against M.J.K., July 23rd, 2009.

12        In order for the defendants to be found guilty of

13   aggravated identity theft, the government must prove each of

14   the following elements beyond a reasonable doubt:

15        First, that the defendant knowingly transferred,

16   possessed, or used without legal authority a means of

17   identification of another person;

18        Second, that the person knew that the means of

19   identification belonged to a real person;

20        And third, that the defendant did so during or in relation

21   to a bank fraud which regard -- with regards to Count 23

22   through 34, or bank fraud or access device fraud conspiracy

23   with regards to Count 71, 73, 77, 79 to 81, 84, 87, 81 -- or 91

24   and 93.

25        A means of identification is any name or number that may
```

1   be used, alone or in conjunction with any other information, to

2   identify a specific individual, including any name,

3   Social Security number, date of birth, official state or

4   government-issued driver's license, identification number,

5   unique electronic identification number, address, routing

6   number, or signature.

7       Oops.

8       The government -- excuse me.

9       The defendants, Darbinyan and Parsadanyan, are charged in

10  Count 69 with access device fraud conspiracy, in violation of

11  Title 18 of the United States Code, Section 1029(b)(2).  In

12  order for a person to be found guilty of access device fraud

13  conspiracy, the government must prove each of the following

14  elements beyond a reasonable doubt:

15      For at least in or around July of 2009, and continuing to

16  or in and around August, there was an agreement between two or

17  more persons to knowingly and with the intent to defraud,

18  produce, use, or traffic in one or more counterfeit access

19  device, or, knowingly and with the intent to defraud, possess

20  15 or more access devices which are counterfeit or unauthorized

21  device -- access devices, or, knowingly and with the intent to

22  defraud, produce, traffic in, or have control or custody of or

23  possess access-making equipment.

24      Second, the individual becomes a member of the conspiracy

25  knowing of at least one of its objects and intending to help

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  accomplish that object.

2     The government need not prove that the conspiracy actually

3  affected interstate commerce, but need only prove that the

4  conspiracy scheme, if successful, would have affected commerce.

5     Oops.

6     Now, in Count 128 and -29, that's the weapons charge.

7     Defendant Darbinyan is charged in Count 128 and 129 with

8  possession of a firearm and ammunition by a convicted felon, in

9  violation of Title 18 of the United States Code, Section

10  992(g)(1).

11     More specifically, in Count 128, defendant Darbinyan is

12  charged with knowingly possessing, on or about November 24th,

13  2009, a Smith & Wesson model 638-2 .38 caliber revolver, serial

14  number CCH2705, a Star model 30 millimeters -- 30 millimeter 9

15  millimeter caliber semi-automatic pistol bearing serial number

16  188 -- I'm sorry, let me read that again.  A Star model 30M

17  9 millimeter caliber semi-automatic pistol, bearing serial

18  number 1885728, and an Intratec model Tec-22 -- Tec-22, a .22

19  caliber semi-automatic pistol, bearing serial number 36039, and

20  11 rounds of Federal .22 caliber ammunition.

21     In Count 129, the defendant, Darbinyan, is charged with

22  knowingly possessing an Omega Arms model Omega III 30-aught-6

23  caliber bolt action rifle, bearing serial number 549.

24     In order for the defendant to be found guilty of

25  possession of a firearm by a convicted felon, the government

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    must prove each of the following elements beyond a reasonable

2    doubt:

3         First, that the defendant knowingly possessed a firearm or

4    ammunition;

5         Second, that the firearm or ammunition had been shipped or

6    transported from one state to another or between a foreign

7    nation and the United States;

8         And third, at the time of the defendant's possession of a

9    firearm or ammunition, the defendant had been convicted of a

10   crime punishable by imprisonment for a term exceeding one year.

11        Now, a defendant may be found guilty of extortion, bank

12   fraud, or aggravated identity theft even if the defendant

13   personally did not commit the act or acts constituting the

14   crime but aided or abetted -- aided or abetted in the

15   commission.  To prove defendant's guilty of aiding and

16   abetting, the government must prove beyond a reasonable doubt

17   the following:

18        First, extortion, bank fraud, or aggravated identify theft

19   was committed by someone;

20        Second, that the person -- or that the defendant knowingly

21   and intentionally aided, counseled, commanded, induced, or

22   procured that person to commit each element of the extortion or

23   bank fraud or aggravated identity theft;

24        And third, that the defendant acted before the crime was

25   committed.

1        It is not enough that the defendant merely associated with

2   a person committing the crime, or unknowingly or

3   unintentionally did things that were helpful to that person, or

4   was present at the scene of the crime.  The evidence must show

5   beyond a reasonable doubt that the defendant acted with the

6   knowledge and intention of helping that person commit extortion

7   and bank fraud, aggravated identity theft, or attempted

8   possession of a firearm.

9        An act is done knowingly if the defendant is aware of the

10  act and does not act through ignorance, mistake, or accident.

11  The government is not required to prove that the defendant knew

12  that the act or omission were unlawful.  You may consider

13  evidence of the defendant's words, acts, or omissions, along

14  with all other evidence, in determining whether or not the

15  defendant acted knowingly.

16       The knowledge that a person possesses at any time may not

17  ordinarily be proved by -- directly, because there is no way of

18  directly scrutinizing the working of a human mind.  In

19  determining the issue of what the defendant knew at a

20  particular time, you may consider any statement made or any

21  acts done by the defendant and all other factors and

22  circumstances received into evidence which may aid in your

23  determination of the defendant's knowledge.  It is entirely up

24  to you to decide what facts to find from the evidence received

25  during this trial.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          Circumstantial evidence may be used to prove the

2    defendant's knowledge.

3          A person has possession of something even if that person

4    know -- a person has possession of something if that person

5    knows of its presence and has physical control of it, or knows

6    of its presence and has the power or intention to control it.

7    More than one person can be in possession of something if each

8    knows of its presence and each has the power or intention to

9    control it.

10         Okay.

11         When you begin your deliberations -- excuse me -- you

12   should elect one of your mem- -- one of the members of the jury

13   to be your foreperson.  That person will preside over your

14   deliberations and speak for you here in court.

15         You will then decide this case with your fellow jurors to

16   reach an agreement if you can do so.  Your verdict, whether

17   guilty or not guilty, must be unanimous.

18         Each of you must decide this case for yourselves, but you

19   should do so only after you have considered all the evidence,

20   discussed it fully with all the other jurors, and listened to

21   the views of the fellow jurors.

22         Do not be afraid to change an opinion if the discussion

23   persuades you that you should, but do not come to a decision

24   simply because the other jurors think it's right.

25         It is important that you attempt to reach a unanimous

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  verdict, but, of course, only if each of you can do so after

2  having made up your own conscientious decision.  Do not change

3  an honest belief about the weight or the effect of the evidence

4  simply to reach a verdict.

5      Because you must base your verdict only on the evidence

6  received in this case and in these instructions, I remind you

7  that you must not be exposed to any other information about the

8  case or the issues it involves.  Except for discussing the case

9  with your fellow jurors during your deliberations, do not

10  communicate with anyone in any way and do not let anyone

11  communicate with you in any way about the matters -- or excuse

12  me, the merits of this case or anything to do with it.  This

13  includes discussing the case in person or in writing, by phone

14  or electronic means or via e-mail, text messaging, or any

15  Internet chat room, blog, website, or other features.  I don't

16  know, nowadays I probably should say Facetime and -- I can't

17  keep up with that.  It applies to communicating with your

18  family members or your employer, the media or press, and people

19  involved or anybody involved in this trial.  If you are asked

20  to or approached in any way about your jury service or anything

21  about this case, you must respond that you have been ordered

22  not to discuss this matter, and must report that conduct to the

23  Court immediately.

24      Do not read, watch, listen to any news or media

25  accounts -- I don't think there are any out there -- or

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    commentary about the case or anything to do with it.  Do not do

2    any research, such as consulting dictionaries, searching the

3    Internet, or using other reference materials, and do not make

4    any investigation in or any other way try to learn anything

5    about the case.

6        It's important that you realize you're jurors.  You're to

7    determine what the facts are that have been presented to you.

8    It's not your job to go out and investigate or do anything

9    else.  That's why you can't go out and look at dictionaries or

10   anything like that.  You have to base it on what you heard here

11   in court.

12       The law requires these restrictions to ensure that the

13   parties have a fair trial based on the same evidence that each

14   party has had an opportunity to address.  The jurors who

15   violate these restrictions jeopardize the fairness of the

16   proceedings.  If any juror is exposed to any outside

17   information, please notify the Court immediately.

18       Some of you, I hope most of you, have taken notes during

19   the trial.  Whether or not you took notes, you should rely on

20   your own memory of what was said.  Notes are only to assist

21   your memory.  You should not be overly influenced by notes.

22       We've had problems sometimes with this, where jurors will

23   go back and say, "I think it's A," and some other juror will

24   say, "It's gotta be B, because it's in my notes."  Notes, as I

25   said earlier in the trial, is only a way to help you remember

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    what's going on, and it's your memory that controls, not the

2    notes.

3        The punishment provided by the law in this case is for the

4    Court to decide.  You may not consider punishment in deciding

5    whether or not the government has proved its case against the

6    defendant beyond a reasonable doubt.

7        Separate verdict forms for each defendant have been

8    prepared for you.  After you have reached a unanimous verdict,

9    agreement on a verdict, your foreperson should complete that

10   verdict form according to your deliberations, sign it and date

11   it and advise the bailiff that you are ready to return to this

12   courtroom.

13       If it becomes necessary during deliberations for you to

14   communicate with me, you may send a note out through the

15   bailiff, signed by one or more of the jurors.  No member of the

16   jury should ever attempt to communicate with me except in a

17   signed writing or -- and I will respond to the jury concerning

18   this case only in writing or here in open court.  If you send

19   out a question, I will consult with the jurors (sic) before

20   answering it, which may take some time.

21       Let me talk to you about that, because starting Monday

22   I've got all kinds of other cases.  Sometimes -- and the

23   reporter, we have to find the reporter, et cetera.  Sometimes

24   when you send out a question, it may take a couple of hours

25   before we get back to you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    So, keeping that in mind, you may continue your

2  deliberations while waiting for the answer to any question.

3  Remember that you are not to tell anyone, including me, how the

4  jury stands numerically or otherwise in any question submitted

5  to you, including the question of the guilt of the defendant,

6  until after you have reached a unanimous verdict or after I

7  have discharged you from this case.

8    Any questions before I send you back to deliberate?

9    I did tell the clerk earlier that whenever you're through

10  this afternoon, you let the bailiff know, and the bailiff will

11  excuse you.  You know, if you want to go past 4:00 o'clock,

12  that's okay, but if you don't, that's fine.

13    We'll have you come back in Monday.  I've given -- told

14  the clerk to give you your choice, and you don't have to make

15  up your mind now.  You can make it up when you get back to the

16  jury room.  You can either come back in at 8:30 or 10:00

17  o'clock, but whatever you choose, tell the bailiff, so if you

18  come back in at 10:00, they're not waiting here from 8:00

19  o'clock, you know, until you get here.  And then you come

20  straight back in.  You go back and deliberate at that time.

21    Any questions anybody has?

22    If not, why don't you just go ahead and swear in the

23  bailiff.

24        THE CLERK:  Okay.  Would you please state your full

25  name for the record.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE BAILIFF:  Kurt Hams, K-u-r-t, H-a-m-s.

 2              THE CLERK:  Thank you.

 3          (Bailiff sworn.)

 4              THE CLERK:  Thank you.

 5          All rise.

 6          (The jury was escorted to the jury room at 3:04 p.m.)

 7          (Outside the presence of the jury:)

 8              THE COURT:  Okay.  The record will reflect that the

 9      jurors have left the courtroom, and the two alternates are now

10      gone.

11          You may have a seat.

12          Just a couple logistical issues that I want to bring up.

13      One is that today I'd appreciate if you could stay here till

14      4:00 o'clock, in the courthouse here, so we could get you if we

15      need you.  Tomorrow, as long as you can be in court between,

16      you know, 10 to 15 minutes.

17              MR. SEVERO:  Tomorrow's Saturday, but if you want us

18      here, we'll come.

19              THE COURT:  I want you to be ready to come in 10 to

20      15 -- no.  Monday, 10 to 15 minutes, as long as you can be

21      here.  But if I say that, I really mean 10 to 15 minutes,

22      because we don't want to hold up the jury while you're out

23      finishing your Starbucks coffee.  So make sure that you can be

24      here within 10 or 15 minutes.

25              MR. PEREYRA-SUAREZ:  Your Honor, I'm sorry.  I was
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    confused by Mr. Severo.

 2              THE COURT:  We all are.

 3              MR. SEVERO:  That's not unusual.

 4              MR. PEREYRA-SUAREZ:  That was a -- I didn't get when

 5    you want us here Monday.

 6              THE COURT:  Well, you probably should report -- I've

 7    got a feeling, just knowing juries and my time with juries,

 8    that I'll almost guarantee that they won't come in till 10:00

 9    o'clock on Monday.  After that, they're going to have to be in

10    at 8:15.  But we won't need you at 10:00 o'clock as long as,

11    from 8:00 o'clock -- 8:30 on, you're at a phone number that the

12    clerk can get ahold of you and you can be in within 10 to 15

13    minutes from when she calls.

14              MR. PEREYRA-SUAREZ:  That's fine.  Thank you.

15              THE COURT:  So, you know, there's no need -- I'd love

16    to see your faces, but I don't have to on Monday until we have

17    to.

18         Second thing is, that I'd like you to consider for Monday

19    whether or not you will stipulate to, and it's up to you, the

20    alternate jurors having lunch with the jurors.  We instructed

21    them they can't talk about the case.  But it gets lonely being

22    an alternate juror, so sometimes they enjoy at least being able

23    to talk to the other jurors during lunch.  The other jurors

24    cannot deliberate about the case during lunch anyway.

25         So think about that, and Monday if you all agree on that,
```

1    that's fine.  Otherwise, we'll keep them separate.

2        Okay.  Yes?

3            MR. FLIER:  What about a Rule 29 ruling?

4            THE COURT:  You've got till tonight to respond on

5    that, and I'll take that under submission.

6            MR. FLIER:  Thank you.

7            THE CLERK:  All rise.

8

9                    *(Off record at 3:07 p.m.)*

10

11                        *--oOo--*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

CERTIFICATE

    I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported proceedings

held in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the

Judicial Conference of the United States.


Date:  MARCH 5, 2015




                    /S/ SANDRA MACNEIL

                Sandra MacNeil, CSR No. 9013

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                   – – – –

5

6

UNITED STATES OF AMERICA,        )
7                                )
                PLAINTIFF,       )
8                                )
       vs.                       )   No. CR 11-00072(A)-RGK
9                                )
(1)  MHER DARBINYAN,             )
10 (4)  ARMAN SHAROPETROSIAN,    )
(35) RAFAEL PARSADANYAN,         )
11                               )
                DEFENDANTS.      )
12 _____)

13

14        REPORTER'S TRANSCRIPT OF JURY TRIAL

15                   DAY 14

16                 PAGES 1 – 20

17            MONDAY, APRIL 14, 2014

18            LOS ANGELES, CALIFORNIA

19                 2:47 P.M.

20

21

22    _____

23      *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
        *Official Reporter, U.S. District Court*
24            *255 East Temple Street*
            *Los Angeles, CA  90012*
25               *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF UNITED STATES OF AMERICA:

 3         ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
           BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4              ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
           312 NORTH SPRING STREET
 5         LOS ANGELES, CALIFORNIA  90012
           213.894.4477

 6
           UNITED STATES DEPARTMENT OF JUSTICE
 7         BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
           312 NORTH SPRING STREET
 8         LOS ANGELES, CALIFORNIA  90012
           213.894.2579

 9

10    FOR DEFENDANT MHER DARBINYAN:

11         THE SEVERO LAW FIRM
           BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
12         70 SOUTH LAKE AVENUE, SUITE 945
           PASADENA, CALIFORNIA  91101
13         626.844.6400

14    FOR DEFENDANT ARMAN SHAROPETROSIAN:

15         LAW OFFICES OF CHARLES PEREYRA-SUAREZ
           BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
16         800 WILSHIRE BOULEVARD, 12TH FLOOR
           LOS ANGELES, CALIFORNIA  90017
17         213.623.5923

18    FOR DEFENDANT RAFAEL PARSADANYAN:

19         FLIER AND FLIER, ALC
           BY:  ANDREW REED FLIER, ATTORNEY AT LAW
20         15250 VENTURA BOULEVARD, SUITE 600
           SHERMAN OAKS, CALIFORNIA  91403
21         818.990.9500

22

23    ALSO PRESENT:

24         SPECIAL AGENT JEREMY STEBBINS, FBI

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                          I N D E X

2       *PROCEEDINGS:*                                    *PAGE*

3          JUROR NOTE                                     4

4          JURY QUESTION 1                                6

5          JURY QUESTION 2                                7

6          JURY QUESTION 3                                8

7          DISCUSSION WITH JUROR NO. 8                    10

8          JUROR NO. 8 EXCUSED                            14

9          DISCUSSION RE DELIBERATIONS,
           JURY QUESTIONS                                 17

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              LOS ANGELES, CALIFORNIA; MONDAY, APRIL 14, 2014

2                            2:47 P.M.

3                            - - - -

4        (Outside the presence of the jury:)

5              THE COURT:  Okay.  The record will reflect that none

6    of the jurors are present.

7        There are three -- four communications I've had from the

8    jury.  Let me read them all to you, then we'll talk a little

9    bit, then we'll bring the jury in.

10       First one says -- a note from one of the jurors saying:

11            "Judge Klausner, I am having difficult time

12            coping with the stress of the deliberation

13            process.  I am ten weeks pregnant, and along with

14            my hormones, I feel I am stressed beyond the level

15            I can handle.  I do not feel I can contribute

16            reasonably to this process, and I am fearful this

17            situation will create health issues for my

18            pregnancy.  For these reasons, I'm requesting to

19            be excused from this trial at this moment.  Thank

20            you."

21       And it's Juror No. 8.

22       So that's the first one we have to talk about.  I don't

23   know if you want me to question her any further, or where you

24   do you stand on it?

25            MR. ESTRADA:  Your Honor, from the government's
```

```
1   perspective, if it's a issue regarding pregnancy and not being

2   able to deliberate, we would have no objection to dismissing

3   that juror.

4           MR. SEVERO:  And I would join on behalf of

5   Mr. Darbinyan.

6           THE COURT:  No question.

7           MR. PEREYRA-SUAREZ:  I join in that, your Honor.

8           THE COURT:  Counsel?

9           MR. FLIER:  We'd like to keep her, thank you.

10          THE COURT:  Okay.  We'll explain to her.

11      Counsel, let me just ask you a question, because you did

12  this last time, too.  Do you really want to keep someone who is

13  having health problems?  I mean, is that really -- and says

14  they cannot deliberate?  I just want to have an honesty with

15  the Court.

16          MR. FLIER:  Well, I --

17          THE COURT:  Or do you just want -- and it's okay.  If

18  you want to create an appellate issue, that's fine.  Because

19  you've made your objection, you can create it.  I just want to

20  find out if there's something you know that I don't know.

21          MR. FLIER:  No, I definitely don't know something the

22  Court does not know.  I just feel that it's in my client's best

23  interest that --

24          THE COURT:  Not to stipulate to anybody being excused?

25          MR. FLIER:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Then let me ask you one other
 2    question.  And I appreciate that, and it's on the record.  But
 3    the next question is, does anybody care for me to examine that
 4    witness -- or that juror any further?
 5              MR. ESTRADA:  I think, regardless of whether one
 6    attorney won't stipulate, I think if we can inquire about the
 7    deliberation aspect.  If she's truly not able to deliberate
 8    with her fellow jurors --
 9              THE COURT:  I think that's appropriate.
10              MR. ESTRADA:  -- then it would be beyond one
11    objection, and she can be dismissed regardless.
12              THE COURT:  Counsel?
13              MR. FLIER:  Yes, your Honor.
14              MR. PEREYRA-SUAREZ:  Frankly, we're willing to take it
15    at face value.
16              THE COURT:  Okay.  I appreciate that, Counsel.
17         We'll bring her in first, but after that, we get to the
18    more interesting questions.
19         First is:
20              "I'd like to hear the police body recording
21              taken from the stop of defendant Parsadanyan, only
22              the clip previously heard."
23         What clip was played?  I don't recall any clip being
24    played.  Was there a clip that was played?
25              MR. FLIER:  Very briefly.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. YANG:  Your Honor, there was three clips that were
 2   played for voice identification purposes.  One was
 3   identification of the name.
 4        A second clip --
 5              THE COURT:  Oh, that's right.
 6              MS. YANG:  -- my recollection is he gave a phone
 7   number as well as confirmed that he lived on Franklin, and
 8   third clip was, there was a brief explanation of that he had a
 9   cell phone store and where they were coming from.
10              THE COURT:  Those are very brief clips.
11              MS. YANG:  They're very brief, your Honor.  They're on
12   one CD.
13              THE COURT:  Okay.  Well, they're entitled to hear
14   that, so we'll let them hear that.
15        Then we have:
16             "Court instruction No. 22 makes a distinction
17              between helping and supporting the object or
18              purpose of a conspiracy.  If the benefit of the
19              act is solely for the purpose of the individual --
20              of an individual, and a different individual
21              participates but receives no benefit, can that
22              support be considered a conspiracy?"
23        I loved everybody's expression when I read that.  Anybody
24   want to be heard on that?
25        Okay.  I can tell you where the Court seems to be going on
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    it, unless everybody agrees on something else, and that is,

 2    you've been given the instructions, you have to read the

 3    instructions, you have to follow the instructions, and that's

 4    all we can do for you.

 5            MR. SEVERO:  I concur.

 6            MR. PEREYRA-SUAREZ:  So do I, your Honor.

 7            MR. FLIER:  So do I, your Honor.

 8            MR. ESTRADA:  We agree with that, your Honor.

 9            THE COURT:  Okay.  Last one may be the same, but it

10    goes towards one of the motions that was made on the 29, but

11    let me talk about it.  It says:

12               "Court instruction No. 47" -- quotation marks,

13               dot, dot, dot -- '...or knows if its presence, has

14               a power to and intention to control it."

15        Obviously, they're talking about the weapon.

16               "Does power and intention to control it mean

17               control relative to discharging the weapon, or can

18               it be control relative to the distribution without

19               any relationship to the usage?"

20            MR. SEVERO:  Distribution without -- I'm sorry,

21    distribution without --

22            THE COURT:  Without relation to the usage.

23        I think what they're saying is, control, does it have to

24    be controlling the operation of it or controlling the weapon

25    itself?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. SEVERO:  I think it's possession.  And I think the

2     only instruction they got is on possession.

3          THE COURT:  Yeah.  I think it's --

4          MR. SEVERO:  They got -- it's the same issue as

5     before.  I think you just gotta go to the instruction.

6          THE COURT:  That's what I intend to do, unless

7     somebody has --

8          MR. ESTRADA:  Yeah, and I'm not sure if they're asking

9     about operability, if it goes to that.

10         THE COURT:  No, no, no.

11         MR. SEVERO:  It never came up.

12         THE COURT:  I don't think they are, Counsel.  I think

13    they're saying, when you say control and intention to -- excuse

14    me.  When you say power and intention to control, does that

15    mean power and intention to operate it, or does it mean power

16    and intention to control the physical object?  We all know it

17    means controlling the physical object, but I'm not going to get

18    into an explanation of that.  I'm going to just say the

19    instructions speak for itself, you gotta read the instructions

20    carefully and go by the instructions.

21         MR. ESTRADA:  Very good, your Honor.

22         MR. SEVERO:  I agree.

23         THE COURT:  Anything else?  Okay.

24         MR. SEVERO:  Obviously, the only other thing is, if

25    the first -- if the juror is excused, then they start all over

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   again.

 2          THE COURT:  That's correct.  And I'll tell them that.

 3          MR. ESTRADA:  Two quick things, your Honor.

 4      One is, the agent went to go get the computer so he can

 5   play that clip again.  He'll come back shortly with that.

 6          THE COURT:  Okay.

 7          MR. ESTRADA:  And then the second issue is with regard

 8   to the -- potentially one of our team members has a family

 9   issue.  If he could be excused from further appearances, we'd

10   appreciate it, your Honor.

11          THE COURT:  That's fine.  As long as somebody's here

12   representing your office, I don't care.

13          MR. ESTRADA:  Very good.  Thank you, your Honor.

14          THE COURT:  Okay.  Let's bring in -- have them bring

15   in just Juror No. 8.

16          MR. SEVERO:  Your Honor, if I may, I'm wondering if

17   it's appropriate to re-read the reasonable doubt instruction.

18          THE COURT:  Not unless they ask for it.

19      Is he bringing her in?

20          THE CLERK:  Yes, he is.

21          THE COURT:  Okay.

22          THE CLERK:  All rise.

23      (Juror No. 8 enters the courtroom.)

24          THE CLERK:  Please be seated.

25          THE COURT:  Okay.  We have a note here from you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    indicating -- and I don't have to read it again, because you

2    wrote it -- indicating your problems as far as health reasons

3    and why this may affect your deliberation.  So I have to talk

4    to you on that, because if you're excused -- you're in

5    deliberation now, which really throws a monkey wrench into

6    everything, and so I'm going to have to ask you some questions.

7        I understand that you're in your tenth week of your

8    pregnancy.  I understand that you have worries about your

9    health.  You mentioned deliberations are affecting that?

10           JUROR NO. 8:  It's the stress of the -- the -- I view

11   it as arguing the, "Well, let me try to convince you," and "Let

12   me try to convince you," and it's just really stressful, and

13   I'm feeling like -- like my heart pound, like maybe my blood

14   pressure is going to go up, and I'm -- I'm just -- my emotions,

15   I'm feeling like this is too -- like, I normally am -- I

16   consider myself a rational person.  I don't know that I can

17   hang in there for this.

18           THE COURT:  Well, let me ask you, and let me ask you

19   that last question, about whether you can hang in there,

20   because the proper procedure is to let the juror hang in until

21   they can't do it anymore because of the dire consequences of

22   excusing somebody and bringing somebody in and starting

23   everything all over again.  So I'd really have to be

24   convinced -- or not convinced.  I really have to understand how

25   it's going to affect your deliberations.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Is it -- are you having a hard time paying attention in

2    there?  Are you having -- what -- how does it affect your --

3    because you have indicated here -- let me just see if I have

4    this correctly.

5    It says, "I do not feel I can contribute reasonably to

6    this process, and I am fearful that the situation will create

7    health issues."

8    It's the being able to contribute reasonably to the

9    process.  How would that affect that?

10    JUROR NO. 8:  I feel like I'm not going to say

11    anything, like I'm just going to shut down, I'm not going to

12    contribute, I'm not going to give my opinion, and I'm going to

13    ignore the arguing, the -- the going back and forth.  And I

14    don't know that that's --

15    THE COURT:  Well, that's not what we want, obviously.

16    JUROR NO. 8:  Right, and that's -- and I feel I need

17    to do that just to calm down, just to, you know, like,

18    boundaries for myself, and I'm afraid that I'm gonna just not

19    be present --

20    THE COURT:  Okay.

21    JUROR NO. 8:  -- mentally.

22    THE COURT:  And therefore, you feel you may not be

23    able to participate meaningfully in the deliberations or listen

24    to other people's views?

25    JUROR NO. 8:  Right.  Because it's upsetting me and --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  Okay.  Is it the first time this
 2    happened, after you got back there for deliberation?
 3              JUROR NO. 8:  No.
 4              THE COURT:  You didn't have those problems before?
 5              JUROR NO. 8:  I was there Friday, and I could sense
 6    them Friday, but we only had a short amount of time.
 7              THE COURT:  Well, I know.  That was during
 8    deliberation.  You didn't have these feelings until you saw
 9    the --
10              JUROR NO. 8:  Right.
11              THE COURT:  -- confrontation?
12              JUROR NO. 8:  Right.  Because, here, it's fine.  I
13    could listen, I could take it in, but it's the confrontations
14    that are upsetting to me.
15              THE COURT:  Okay.
16         Anybody have any questions?
17              MR. ESTRADA:  Not from the government, your Honor.
18              MR. SEVERO:  Not from Mr. Darbinyan.
19              MR. PEREYRA-SUAREZ:  I have no questions, your Honor.
20              MR. FLIER:  I just got a brief question.
21         I know it's difficult, ma'am.  Do you think you can at
22    least last one more day potentially?
23              JUROR NO. 8:  Yes, I do, if -- but I think it may come
24    to at some point I'm just going to check out.  So -- so by
25    hanging in there, yeah, I can show up, but I can't -- I don't
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    know that I can --
2            THE COURT:  Well, and I just want --
3            MR. FLIER:  Thank you.
4            THE COURT:  I want to make sure his question's clear.
5    It's not whether you can hang in there physically.  It's can
6    you still meaningful participate and give your opinion and
7    listen to other opinions for the next day?
8            JUROR NO. 8:  No, I don't think so.  I'm ready to --
9    I'm -- I feel like I'm done, like I don't want -- I can't
10   handle this anymore.
11           THE COURT:  So you don't even think for another day
12   you can hold out?
13           JUROR NO. 8:  No.
14           THE COURT:  Anything else?
15           MR. SEVERO:  No.
16           MR. ESTRADA:  No, your Honor.
17           MR. FLIER:  No, your Honor.
18           THE COURT:  Okay.  I'm go to have the other jurors
19   come in.
20       In fact, at this time the Court's going to make a finding
21   that this juror has given sufficient reasons why she cannot
22   meaningfully deliberate, and therefore, I'm going to excuse
23   this juror from jury service and we're going to appoint the
24   next juror, who is Juror No. 13, to come into her position.
25   I'm sorry, sitting in seat No 13.  That would be Juror No. 33.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1         So why don't you -- at this time you're excused.

 2         And if you could bring the jury in, and we'll reseat them.

 3              THE BAILIFF:  Yes.

 4              THE COURT:  You still can't talk about the case until

 5    after there's a verdict, so don't --

 6              JUROR NO. 8:  Okay.

 7              THE COURT:  -- talk to anybody about anything you

 8    remember about the case.

 9              JUROR NO. 8:  Okay.

10         (Juror No 8. was excused and exited the courtroom.)

11         (Outside the presence of the jury:)

12              THE COURT:  While he's bringing in the jury, I must

13    instruct the jury that they have to start all their

14    deliberations all over again.

15              MS. YANG:  Your Honor, in that case, should we still

16    set up the computer for the body recording playing?

17              THE COURT:  I'm going to ask --

18              MR. SEVERO:  I'm wondering if --

19              MS. YANG:  Since they have to start anew, that means

20    not playing the body --

21              THE COURT:  Oh, we shouldn't be playing it right now.

22    But you may find out very shortly after they get in there, they

23    want it.  You're absolutely correct, Counsel, but make sure you

24    have it available so we can pull it up right away.

25              MS. YANG:  Yes, your Honor.  We'll have the computer
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   here.

 2              THE COURT:  Do we have Juror No. 33?

 3              MR. FLIER:  There were two outside.

 4              MR. SEVERO:  He was sitting outside.

 5              THE COURT:  Not you guys.  Let's have one of the

 6   clerks go get Juror No. 33.

 7         *(In the presence of the jury and alternate juror No. 33:)*

 8              THE COURT:  We have somebody out of order.

 9         I believe you're down here.

10         Okay.  Juror No. 33, I'm going to put you back in seat 8

11   back there.  All the way, the empty seat in back.

12         Thank you, sir.

13         Okay.  You may have a seat.

14         The record will reflect that all the jurors are present.

15         We've had to replace Juror No. 8 with Juror No. 33.  So

16   you are now part of this jury, whether you want to be or not.

17         And I must instruct you, ladies and gentlemen, if you've

18   never been through this process before, if a juror's excused

19   during deliberation, which we have just done, you have to go

20   and start the deliberation all over again, because all 12 of

21   the jurors have to be there for the total deliberation.  So I

22   want to make sure everybody understands that, that you have to

23   start the deliberation over again, bring in Juror No. 33, and

24   so the decision you make is a decision of the 12 of you.

25              Now, with that in mind, you've sent out a couple of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    questions, and one of the them is you wanted readback?

2        Our foreperson is?

3        Yes.  Juror No. 4?

4            JURY FOREPERSON:  Yes.

5            THE COURT:  Okay.  You sent out three questions.  One

6    is you wanted the replay of testimony.  That will have to wait

7    until all of you have started to deliberate again, because we

8    don't know if it's going to be needed or not.

9        You also had two instructions that you wanted given

10   explanations of.  And again, I don't know if you still would

11   need that or not after you have a new juror, but you have to

12   start the deliberation again.

13       I can tell you this, that we instruct you in all the law

14   that is applicable to the case, and everything that you need to

15   decide that case is within those jury instructions.  So there's

16   not a lot of -- I don't want to make you hesitant to ever ask

17   questions, but normally the response is going to be, it's in

18   the jury instructions; you gotta figure it out from the jury

19   instruction.

20       Anyway, with that admonishment, sorry, but you're going to

21   have to go back in and start the deliberations again.  And if

22   you have any of these questions, even if they're the same

23   questions, just ask them again and I'll be happy to address

24   them.

25       Okay, take the jury back.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE CLERK:  All rise.

 2         (Outside the presence of the jury:)

 3              THE COURT:  Okay.  Record will reflect that all the

 4    jurors have left the courtroom.

 5         Counsel, you wanted to ask a question?

 6              MR. SEVERO:  Your Honor, I have a brief matter in

 7    state court at 9:00 o'clock tomorrow.  It's going to take 15

 8    minutes.

 9              THE COURT:  Okay.

10              MR. SEVERO:  Judge Perry said that, who knows you very

11    well, if you need to call him, please do.  But I told him

12    that -- I'm still in the Criminal Courts Building, so I

13    wouldn't be too far.

14              THE COURT:  We told you 10 to 15 minutes.  You're

15    telling me you may be 15 minutes late.  That's fine.

16              MR. SEVERO:  So my hearing is at 9:00 o'clock.

17              THE COURT:  Yeah, if you can't get here by 9:15 or so,

18    let me know and I'll be happy to call that judge for you.

19              MR. SEVERO:  Wonderful.

20              MR. PEREYRA-SUAREZ:  Your Honor, if I may follow up.

21    My office is quite close, at Wilshire and Figueroa.  Today I

22    was delayed because of security downstairs, who thought I

23    looked very suspicious.  Do you want us in the courthouse, or

24    how --

25              THE COURT:  No.  No.  As long as you can be here
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   within 10 to 15 minutes.  Today, although you were a little

2   late, you weren't the latest.  So as long as you get here

3   within 10 to 15 minutes.  I don't want to have to wait 20

4   minutes or a half hour or anything, because when they have a

5   question, they have a question on it.

6          MR. PEREYRA-SUAREZ:  That's fine.

7          THE COURT:  Well, enjoyable seeing you again, and

8   we'll see you back in on the next question.

9          MR. SEVERO:  Thank you, your Honor.

10          MR. FLIER:  Thank you, your Honor.

11          THE CLERK:  All rise.

12

13                    *(Off record at 3:06 p.m.)*

14

15                      *--oOo--*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                          <u>CERTIFICATE</u>

2

3       *I hereby certify that pursuant to Section 753,*

4    *Title 28, United States Code, the foregoing is a true and*

5    *correct transcript of the stenographically reported proceedings*

6    *held in the above-entitled matter and that the transcript page*

7    *format is in conformance with the regulations of the*

8    *Judicial Conference of the United States.*

9

10   *Date:  MARCH 5, 2015*

11

12

13

14              <u>/S/ SANDRA MACNEIL</u>

15            *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3     HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4               - - - -

5

6

UNITED STATES OF AMERICA,        )
7                                )
              PLAINTIFF,         )
8                                )
      vs.                        )   No. CR 11-00072(A)-RGK
9                                )
(1)  MHER DARBINYAN,             )
10   (4)  ARMAN SHAROPETROSIAN,  )
     (35) RAFAEL PARSADANYAN,    )
11                               )
              DEFENDANTS.        )
12   _____)

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15                    DAY 15

16                 PAGES 1 - 7

17            TUESDAY, APRIL 15, 2014

18            LOS ANGELES, CALIFORNIA

19                  3:51 P.M.

20

21

22        _____

23        *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
          *Official Reporter, U.S. District Court*
24            *255 East Temple Street*
              *Los Angeles, CA  90012*
25               *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF UNITED STATES OF AMERICA:

 3          ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
            BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4               ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
            312 NORTH SPRING STREET
 5          LOS ANGELES, CALIFORNIA  90012
            213.894.4477

 6

 7

      FOR DEFENDANT MHER DARBINYAN:
 8
            THE SEVERO LAW FIRM
 9          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
            70 SOUTH LAKE AVENUE, SUITE 945
10          PASADENA, CALIFORNIA  91101
            626.844.6400
11

12    FOR DEFENDANT ARMAN SHAROPETROSIAN:

13          LAW OFFICES OF CHARLES PEREYRA-SUAREZ
            BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
14          800 WILSHIRE BOULEVARD, 12TH FLOOR
            LOS ANGELES, CALIFORNIA  90017
15          213.623.5923

16    FOR DEFENDANT RAFAEL PARSADANYAN:

17          FLIER AND FLIER, ALC
            BY:  ANDREW REED FLIER, ATTORNEY AT LAW
18          15250 VENTURA BOULEVARD, SUITE 600
            SHERMAN OAKS, CALIFORNIA  91403
19          818.990.9500

20

21    ALSO PRESENT:

22          SPECIAL AGENT JEREMY STEBBINS, FBI

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

I N D E X

*PROCEEDINGS:*                                          *PAGE*

  JURY QUESTION                                          4

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

003056

1              LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 15, 2014

2                              3:51 P.M.

3                              – – – –

4        *(Outside the presence of the jury:)*

5            THE CLERK:  Calling item No. 1, criminal

6   11-00072(A)-RGK, United States of America versus Mher

7   Darbinyan, Arman Sharopetrosian and Rafael Parsadanyan.

8        Counsel, please state your appearances.

9            MR. ESTRADA:  Good afternoon, your Honor.  Martin

10  Estrada on behalf of United States.  With me at counsel table

11  are Elizabeth Yang, also of the United States, and Jeremy

12  Stebbins of the FBI.

13           MR. SEVERO:  Good afternoon, your Honor.  Michael

14  Severo appearing on behalf of Mr. Darbinyan, who's present, in

15  custody.

16           MR. PEREYRA-SUAREZ:  And good afternoon.  Charles

17  Pereyra-Suarez with Mr. Sharopetrosian.  He's present, in

18  custody.

19           MR. FLIER:  Andrew Flier behalf of Mr. Parsadanyan,

20  who is out of custody before the Court.

21           THE COURT:  Counsel, we have a note from the jury.  It

22  doesn't mean much other than it's at the end of the day so I

23  thought I'd call you in.  It says:

24           "If the jury is not unanimous on certain

25           counts, how do we fill out the verdict form?"

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003057**

1        I'm just going to tell them that they keep deliberating

2   until they can reach a verdict or until they find that they're

3   at an impasse and they can't reach a verdict.

4        The other thing I could ask, if counsel all agree, is, if

5   they've reached a verdict on one and not others, we could take

6   that verdict.

7            MR. PEREYRA-SUAREZ:  May we confer for a moment?

8            THE COURT:  Sure.

9        *(Defense counsel confer privately.)*

10           MR. PEREYRA-SUAREZ:  Your Honor, defense would request

11  that the jury continue to deliberate until they have a full

12  verdict.

13           THE COURT:  Okay.

14           MR. SEVERO:  Or hopelessly deadlocked.

15           MR. PEREYRA-SUAREZ:  Either way.

16           THE COURT:  Okay.

17           MR. ESTRADA:  The government agrees in terms of the

18  additional counts.  I don't understand from the question

19  whether they've reached a verdict as to some defendants and not

20  other defendants?  I think it's to certain counts --

21           THE COURT:  I don't know.

22           MR. ESTRADA:  -- and that situation, the government

23  would agree that they should continue to deliberate on those

24  additional counts.

25           THE COURT:  Okay.  Let's bring them in.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (In the presence of the jury:)

 2            THE COURT:  The record will reflect that all the

 3    jurors are present.

 4        And we have a note from the jury that says basically if

 5    the jury is not unanimous on certain counts, how do we fill out

 6    the verdict form?

 7        Is that your question?

 8            JURY FOREPERSON:  Yes, it is.

 9            THE COURT:  Okay.  The answer is, is that you are

10    asked to see if you can come to a unanimous verdict on the

11    entire verdict.  So until and unless you get to the point where

12    you are no longer able to come to a verdict on a form, we're

13    going to ask you to continue to deliberate, obviously.  And if

14    and when we get to that point, then we'll address the question

15    that you had now, but everything should be taken as one verdict

16    form per defendant on it.  Okay?

17        Called you out a little bit early, so if you don't want to

18    deliberate anymore tonight, you're free to go home, or if you

19    want to go back and deliberate a little bit more, that's up to

20    you.  Otherwise, we'll see you at 8:30 in the morning, okay?

21            THE CLERK:  All rise.

22

23            (Off record at 3:56 p.m.)

24                    --oOo--

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                          <u>CERTIFICATE</u>

2

3       *I hereby certify that pursuant to Section 753,*

4   *Title 28, United States Code, the foregoing is a true and*

5   *correct transcript of the stenographically reported proceedings*

6   *held in the above-entitled matter and that the transcript page*

7   *format is in conformance with the regulations of the*

8   *Judicial Conference of the United States.*

9

10  *Date:  MARCH 5, 2015*

11

12

13

14              <u>/S/ SANDRA MACNEIL</u>

15          *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

 4                        - - - -

 5



 6
    UNITED STATES OF AMERICA,        )
 7                                   )
                    PLAINTIFF,       )
 8                                   )
          vs.                        )    No. CR 11-00072(A)-RGK
 9                                   )
    (1)  MHER DARBINYAN,             )
10  (4)  ARMAN SHAROPETROSIAN,       )
    (35) RAFAEL PARSADANYAN,         )
11                                   )
                    DEFENDANTS.      )
12  _____)

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL

15                      DAY 16

16                   PAGES 1 - 22

17             WEDNESDAY, APRIL 16, 2014

18              LOS ANGELES, CALIFORNIA

19                    9:53 A.M.

20

21

22    _____

23        SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
          Official Reporter, U.S. District Court
24               255 East Temple Street
                 Los Angeles, CA  90012
25                    213.894.5949
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:

 3        ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 5        LOS ANGELES, CALIFORNIA  90012
          213.894.4477

 6

 7   FOR DEFENDANT MHER DARBINYAN:

 8        THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
 9        70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
10        626.844.6400

11   FOR DEFENDANT ARMAN SHAROPETROSIAN:

12        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
13        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
14        213.623.5923

15   FOR DEFENDANT RAFAEL PARSADANYAN:

16        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
17        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
18        818.990.9500

19

20   ALSO PRESENT:

21        SPECIAL AGENT JEREMY STEBBINS, FBI

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                          I N D E X

2      PROCEEDINGS:                                    PAGE

3      JURY QUESTION                                    4

4      JUROR NOTE                                       8

5      JURY QUESTIONS                                  13

6      EXHIBIT 242 AUDIO CLIPS PLAYED                  16

7      READBACK OF GONZALO ZENDEJAS'S TESTIMONY        17

8      READBACK OF CHRISTOPHER KRIVAK'S TESTIMONY      17

9      READBACK OF CHRISTOPHER SPENCER'S TESTIMONY     18

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 16, 2014

 2                          9:53 A.M.

 3                          - - - -

 4       (Outside the presence of the jury:)

 5          THE COURT:  Okay.  In this matter the jury has come

 6   back with basically the same question they had last night, and

 7   so I'm going to have to talk to them a little bit more about

 8   it, and that is:

 9              "How do we, the jury, complete the verdict form

10           if we fail to reach a unanimous verdict?"

11       And I'll talk to them about that when we bring them out.

12       Let's go ahead and bring them out.

13          MR. SEVERO:  Is the Court intending to instruct on --

14   give them instruction or --

15          THE COURT:  I'm going to talk to them about where they

16   are, what their problem is, and -- I don't know yet.

17          MR. SEVERO:  Well, I just didn't know if you were --

18          THE COURT:  Oh, the Allen instruction, you mean?

19          MR. SEVERO:  Yeah.

20          THE COURT:  Not at this point, yeah.  That may come

21   later today or tomorrow, but not at this point.

22       (In the presence of the jury:)

23          THE COURT:  You may have a seat.

24       The record will reflect that the jury is now present.

25       I have a note, basically the same one that was sent to us
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    yesterday, saying, "How do we, the jury, complete the verdict

2    form if we fail to reach a unanimous verdict?"

3        In the instructions, we told you that each defendant, each

4    count has to be separately considered, and there's verdicts on

5    each form -- or excuse me, on each count as to each defendant.

6    Now, we have a form that contains many counts, but there has to

7    be a separate verdict rendered on each count as to each

8    defendant, and I'm sure you understand that and you've read the

9    instructions on that.

10       I don't know where you stand right now, but what we do is,

11   we continue to go until we reach a verdict on as many counts as

12   we can, and we just have to go through each verdict, and until

13   we can reach a verdict, a unanimous verdict, on each count as

14   to each defendant, if you can do so.

15       I don't know if that helps you a lot, but they are

16   separate, but they are part of the same verdict.  So I guess

17   what I'm telling you is, is those that you have verdicts on,

18   fine.  Concentrate on those that you don't have verdicts on and

19   see if you can resolve those also, because those are separate

20   counts.

21       It sounds like you're a little worried about being able to

22   reach a verdict.  I don't know if you are or not, but let me

23   just ask you this.  You have indicated -- and be very careful,

24   because you can't talk to me about which way it's going, you

25   know, one way or the other, but have you reached a verdict on

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    some counts?

2            JURY FOREPERSON:  Yes.

3            THE COURT:  Okay.  As to -- and let me just talk to

4    the foreperson on this, because I want to make sure we don't

5    mess this up.

6        As to the verdicts that you've reached, I don't want a

7    number count, I don't want to know anything about them, which

8    side one way or the other, but percentage wise, are you talking

9    about that you have a lot of counts that you have not reached

10   verdicts on, or a small number, or what?

11           JURY FOREPERSON:  A small number.

12           THE COURT:  Okay.  And the last thing I want to know

13   is, have you reached verdicts -- each defendant has many

14   counts.  Are there any of the defendants that you've reached

15   verdicts on all counts as to that defendant?

16           JURY FOREPERSON:  Yes.

17           THE COURT:  Okay.  I'm going to have you go back in.

18   It's a three-week trial, as you know, and we've only been

19   deliberating for two, three days.  I'm going to have you go

20   back in and continue to work on counts that you have not

21   reached verdicts on.  We'll see if you can reach a verdict on

22   those counts.  If you can't, you can't; if you can, you can,

23   but we're going to have to give it more time on it.  And then

24   when we get to that point where you're ready to come back to

25   the court, we'll talk to you on that, okay?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Yes, sir?

2      By the way, is there anything I can do to help you?

3           JURY FOREPERSON:  No.  You said if you can, go ahead

4   and continue, and if you can't, then I end it, and that's --

5           THE COURT:  Yeah.  And I think I know where you're

6   going.  You tell me if I'm wrong, but that is, well, right now

7   we're deadlocked on it.

8           JURY FOREPERSON:  Yeah.

9           THE COURT:  At this point, you haven't been

10  deliberating long enough for the Court to be satisfied that

11  deliberation no longer is useful.  We'll get back to you later,

12  either today or tomorrow, to find out whether or not you still

13  are in the same position, whether or not your votes have

14  changed on that or not.  If -- we may go through each one of

15  you and ask if there's anything we can do to help you

16  deliberate, do you see any chance if we deliberate further,

17  anything we can give you, you can reach a verdict on those

18  counts, but we'll probably be doing that either later today or

19  tomorrow on that.  Okay?  But we have to give it a shot.  We

20  can't, in a three-day like -- or three-week trial like this, we

21  gotta keep giving it a shot if we can.  If you can't, that's

22  fine, you know, but go back, deliberate again and see if

23  anything breaks.  If it doesn't, that's fine.  If it does,

24  that's good, too.

25      I don't know if that helps you or not.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            JURY FOREPERSON:  No, that does.

 2            THE COURT:  Okay.  Okay.  Well, we'll go back, and

 3     we'll be talking later, okay?

 4         And if there's anything we can do for you that way -- you

 5     had a couple of questions to begin with that I have put aside

 6     because a new juror came in.

 7            JURY FOREPERSON:  Well, no, those questions have been

 8     resolved.

 9            THE COURT:  Oh, okay.

10         Okay.  Thank you very much.  Sorry we have to put you back

11     in there again, and see what you can come up with, and we'll

12     talk to you later.

13            THE CLERK:  All rise.

14         Court's in recess.

15         (Off record at 9:59 a.m.)

16         (Outside the presence of the jury at 10:25 a.m.:)

17            THE COURT:  First thing I want to do is thank all of

18     you for convincing Judge Pregerson to send this case to me.

19         We have another note.  And I cannot read the juror's name,

20     but I don't think it's the foreperson, and maybe that's good

21     that I can't read the name.  It says the following:

22              "Can I be excused, because all the deliberation

23              has occurred, and we cannot come up with a

24              unanimous verdict.  I cannot change my decision,

25              and all the jurors cannot change theirs.  At this
```

```
 1              point, I need to be excused at this time, and

 2              maybe the other jurors will agree with the rest of

 3              the jurors."

 4         Simple answer is no.

 5              MR. SEVERO:  No.

 6              THE COURT:  But I think I am going to bring them out

 7    and one more time read the jury instruction on their duty to

 8    deliberate, to listen to all the other jurors, and if it

 9    convinces you you're wrong, change your mind, and if it doesn't

10    convince you you're wrong, stay with your opinion.

11              MR. SEVERO:  I will object to an *Allen* charge at this

12    point.

13              THE COURT:  It's not an *Allen* charge.

14              MR. SEVERO:  Oh, I thought you were doing that now.

15              THE COURT:  No, no.  All I'm going to do is read that

16    one instruction to them again that they've already had, the one

17    on duty to deliberate.  I'm not going to give them the *Allen*

18    instruction yet.  In fact, I'm not too sure I'm going to give

19    them an *Allen* instruction on this case.

20              MR. ESTRADA:  I was just going to inquire, your Honor,

21    if the Court is inclined to take a partial verdict in this

22    case.

23              THE COURT:  When the time is right, sure.

24              MR. ESTRADA:  Okay.

25              THE COURT:  But as I explained to them, there's a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    separate verdict on every count as to every defendant.

2              MR. ESTRADA:  Okay.

3              THE COURT:  But I don't want to do that yet.

4              MR. ESTRADA:  Very good.

5              THE COURT:  Okay.  Let's bring them out.

6          (In the presence of the jury:)

7              THE COURT:  Okay.  The record will reflect that all

8    the jurors are present.

9        I have another note that indicates that a juror wants to

10   be excused because the jurors cannot come to a decision, a

11   unanimous decision, on some verdicts, and everyone has already

12   considered and had their positions.  And I guess it's really

13   saying, why deliberate any further?  We all have our positions,

14   we're not supposed to change our positions unless we're

15   convinced we're wrong.

16       The jury instructions I gave you at the end of the trial

17   on your duty to deliberate, I'm going to read to you one more

18   time.

19       In answer to that last question, why do we continue to

20   deliberate if we haven't reached a decision, well, the first

21   time you take a vote, you may not reach a decision and

22   everybody feels they got the right answer on it, but what the

23   law says is you continue to deliberate, listen to the other

24   side openly, both sides listen to the other side openly, and

25   second time, third time, fourth time, they may or may not
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    convince you that you should move or they should move, and if

2    they do, that's fine; if they don't, you stay with your verdict

3    if you're not convinced on it.  But that doesn't mean that you

4    don't continue to listen openly to both sides as you further

5    through your deliberation.  Even though you don't think you're

6    going to change one way or the other or that they're going to

7    change one way or the other, you have to listen openly and see

8    if it does or doesn't affect your decision.

9        So let me read it to you one more time so you understand.

10       Each of you must decide this case for yourselves, but you

11   should do so only after you have considered all the evidence,

12   discussed it fully with all the other jurors and listened to

13   the views of all the other jurors.  Do not be afraid to change

14   your opinion if the decision (sic) persuades you that you

15   should, but do not come to a decision simply because the other

16   jurors think it's right.  It is important that you attempt to

17   reach a unanimous verdict, but of course only if each of you

18   can do so after having made your own conscientious decision.

19   Do not change an honest belief about the weight or the effect

20   of the evidence simply to reach a verdict.

21       And I think you all understand that, and I understand your

22   question:  Well, first time we didn't agree, why go any

23   further?  Again, as part of the deliberation process, you

24   listen to everybody.  You may listen two or three times.  It

25   may never convince you to change your mind.  It may convince

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    you to change your mind.  It may not convince the other side to

2    change their mind.  It may.  But you give it a shot.

3        So the easy answer is, no, you can't get excused.  The

4    jury is the jury, and we can't excuse one of the jurors.  You

5    have to come to a decision as the 12 of you, unanimously if you

6    can, and if you can't, that's fine, too.

7        Okay.  With that, I'm going to send you on back.

8            THE CLERK:  All rise.

9            THE COURT:  If -- before you go back, if there is any

10   way the Court can help you, as far as, if it would help you as

11   far as, you know, having something read back to you or having

12   the Court read instructions, something like that, let me know.

13   If it doesn't, that's fine, too.  Okay?

14            JURY FOREPERSON:  Do we --

15            THE COURT:  Go ahead.

16       (Outside the presence of the jury:)

17            THE COURT:  Counsel -- record will reflect the jurors

18   have left the courtroom.

19       I don't -- you can have seats.

20       I don't imagine -- I don't think that I'm going to give a

21   Allen instruction.  You can ask for it if you want, but I don't

22   think I'll be giving it.  I think we pretty much know what's

23   happening, and if the jurors are convinced they cannot reach a

24   decision, then we'll take whatever verdicts they have and go

25   on, but I'm going to give this a little bit more time, because

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   we've only had two days on a three-week trial.  Okay?

 2            MR. ESTRADA:  Very good, your Honor.

 3            MR. SEVERO:  Thank you, your Honor.

 4            THE COURT:  I'm sorry to keep bringing you back.  Some

 5   of you hadn't left the courtroom, I don't think, before they

 6   came back on the next question.  I don't know when the next

 7   one's coming back, but...

 8            THE CLERK:  All rise.

 9      Court's in recess.

10      (Off record at 10:35 a.m.)

11      (Outside the presence of the jury at 11:30 a.m.:)

12            THE COURT:  Okay.  You may have a seat.

13      The foreperson has a question.  I'm going to bring them

14   out and address those questions as to what they would like.

15      I think they're coming out.

16      (In the presence of the jury:)

17            THE COURT:  You can have a seat.

18      Juror No. 8, the foreperson, in this matter you mentioned

19   that you're requesting for the jury five different items, and

20   I'll go through those first.

21      Exhibit 242, audio clip of the car stop of

22   Mr. Parsadanyan.  And we can get that for you.

23      Testimony of the three officers:  Zendejas, Krivak, is it,

24   and Spencer, of the Glendale Police Department?

25            JURY FOREPERSON:  Yes.
```

1          THE COURT:  And we can get those for you.  We'll do

2    those two this afternoon.

3          Third thing, we cannot produce; that is transcripts of

4    closing arguments.  There is no transcripts of closing

5    arguments and -- that can be presented to the jury.

6          And fourth one is prosecution's Power Point slides from

7    their closing argument.  Again, that can't be -- that's why you

8    take notes.  That will not be sent back to you.

9          The last one is, and I'll talk to you tomorrow if you

10   still need it, is the testimony of Agent Stebbins on April 4th

11   and April 8th.  And if you still need that, we can probably get

12   that for you, but that's two days of testimony that will have

13   to be re-read, and I'm going to have to get reporters and all.

14   So we'll see if you need that tomorrow morning.  If you still

15   need that, we'll work on that.  But we will do the first two

16   this afternoon.

17         I'm going to send you out for lunch now, because it's

18   11:30.  When you come back in, we'll have those first two

19   exhibits for you.  The testimony -- or excuse me, the audio

20   clip will have to be played for you here in court, and the

21   testimony will be re-read by the reporter.  Hopefully we can

22   get it in time.

23         Okay?  Have a pleasant lunch.  We'll see you back in right

24   after lunch.

25               THE CLERK:  All rise.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (Recess held from 11:35 a.m. to 1:00 p.m.)

 2        (Outside the presence of the jury at 1:13 p.m.:)

 3           THE COURT:  Okay.  Counsel, we're going to bring them

 4    back in, as I promised them before lunch.

 5        Does the AUSA have the facilities of playing that clip?

 6           MS. YANG:  Yes, your Honor.  Exhibit 242 is actually

 7    three clips, and they are queued up and ready to go.

 8           THE COURT:  Three clips.  Okay.  And I'm going to have

 9    you play those clips, and then we're going to do the testimony

10    of the three officers that they asked for, and then that's all

11    we're going to be able to do today.  I'll have to figure out

12    what we can do as far as the rest of the testimony, but we'll

13    put it over till tomorrow.

14        Can you all stay awake?

15        Okay.  Let's --

16           MR SEVERO:  Plenty of coffee.

17           THE COURT:  Okay.  Let's bring the jury out.

18        (In the presence of the jury:)

19           THE COURT:  You may have a seat.

20        The record will reflect all the members of the jury are in

21    their respective seats in the jury box.

22        And at this time we're going to play Exhibit 242, which is

23    the audio clip from the car stop of defendant Parsadanyan.

24        You want to go ahead and play it.

25           MS. YANG:  Yes, your Honor.
```

1        *(Audio played.)*

2        *(Audio played.)*

3            MS. YANG:  Your Honor, that was the second clip, and

4    this is now the third clip from Exhibit 242.

5            THE COURT:  Okay.

6        *(Audio played.)*

7            THE COURT:  Okay.  Those are the three clips.  Anybody

8    want to replay it again, or is that sufficient?

9            JURY FOREPERSON:  We're okay.

10           THE COURT:  Okay?  I'm sorry?

11           JURY FOREPERSON:  No, we're fine.

12           THE COURT:  Now we're going to have the testimony.  We

13   have three Glendale police officers.  We had different

14   reporters during this, so let me read --

15       You've got one; is that correct?

16           THE REPORTER:  Yes, your Honor.

17           THE COURT:  Why don't you go ahead and read that one

18   at this time, then we'll have another reporter come in and read

19   the two that she took.

20       *(Discussion between the reporter and the Court.)*

21           THE COURT:  So let me put you back in the jury room at

22   this time.  I'm assuming she'll be up pretty soon.  We thought

23   that we'd have one testimony read, and by that time she'd be

24   here.  So she should be coming up pretty soon.  We'll be in

25   recess.  As soon as she gets up, we'll call you back.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    *(Off record at 1:20 p.m.)*

2    *(In the presence of the jury at 2:05 p.m.:)*

3    THE COURT:  All the jurors are present in their

4    respective seats.

5    We are re-reading the testimony of the three Glendale

6    police officers, and why don't you go forward and let us know

7    which one you're reading first.

8    COURT REPORTER STRIDE:  Officer Zendejas.

9    THE COURT:  Okay.

10   *(Whereupon, the testimony of Gonzalo Zendejas, as*

11   *reported by Official Reporter Katherine Stride, was*

12   *read back to the jury in open court by Official*

13   *Reporter Katherine Stride.)*

14   COURT REPORTER STRIDE:  That's the end of the

15   testimony from Officer Zendejas.

16   The next testimony is from Officer Krivak.

17   *(Whereupon, the testimony of Christopher Krivak, as*

18   *reported by Official Reporter Katherine Stride, was*

19   *read back to the jury in open court by Official*

20   *Reporter Katherine Stride.)*

21   COURT REPORTER STRIDE:  That's the end of the

22   testimony of Officer Krivak.

23   Testimony of --

24   THE COURT:  You're going to read the first part of the

25   next witness; is that correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          COURT REPORTER STRIDE:  Yes.  It's only two pages

 2   long.

 3          THE COURT:  When you're finished, then we'll change

 4   reporters.

 5          COURT REPORTER STRIDE:  Yes.

 6       Okay.  This is the testimony of Officer Spencer.

 7        (Whereupon, the testimony of Christopher Spencer, as

 8        reported by Official Reporter Katherine Stride, was

 9        read back to the jury in open court by Official

10        Reporter Katherine Stride.)

11        (Whereupon, the remaining testimony of Christopher

12        Spencer, as reported by Official Reporter Sandra

13        MacNeil, was read back to the jury in open court

14        by Official Reporter Sandra MacNeil.)

15          THE COURT:  Okay.  Ladies and gentlemen, we have read

16   back to you the -- make sure I've got it covered here.  We have

17   played for you the clips that you asked for from the audio, and

18   we've read to you the three testimonies of the three Glendale

19   police officers.

20       I've told you that you can't get argument.  You can't get

21   things that were presented in argument.  That wouldn't be

22   proper to put in front of you.

23       As to the testimony of Agent Stebbins on April 4th and

24   April 8th, we're going to have to do some work to see if we can

25   get that and when we can get it by.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        I'm going to have you go back and deliberate now.

 2   Tomorrow morning if you still need that testimony, let me know,

 3   and we'll see if we can get it.  We probably, although we'll

 4   try to get it tomorrow, probably would not be able to get it

 5   until Friday morning.  So let me talk to you a little bit about

 6   that, because we talk about you planning your schedule and all.

 7        Friday you're going to be cut loose at 11:30, or whenever

 8   you go for your lunch, you're going to be cut loose for rest of

 9   the day.  There's not going to be an afternoon session on

10   Friday.  The testimony I believe that you're looking at, if you

11   still need it tomorrow morning, it's going to be long enough

12   that we probably wouldn't be able to finish it Friday.  When we

13   come back Monday, we got problems on Monday.  We probably can

14   give you an hour or so in the morning, and maybe an hour in the

15   afternoon, and Tuesday I think we can give you more time.  But

16   I just wanted you to be familiar with what your schedule would

17   be.

18        So at this time we're going to have you go on back.

19        Is there anything else I can do for you at this time?  If

20   not, I'm going to have you go back and deliberate some more,

21   and then tomorrow morning when you come in, if you still wish

22   that testimony, let me know.

23        Okay?  Anything else you need?

24        JURY FOREPERSON:  No.  Cool.  We're good.

25        THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1            THE CLERK:  All rise.

2            THE COURT:  I'm going to stay here.

3        (Outside the presence of the jury:)

4            THE COURT:  Okay.  Counsel, let me tell you something

5    that disturbs the Court quite a bit.

6        I have been contacted over the last three days by three

7    separate people that are in security and -- for the courts, to

8    tell me the jury is very uncomfortable with what's been

9    happening.  When they go to lunch, friends, relatives or people

10   involved in this case move into tables right next to them.

11   They feel like they've been followed coming in and out of the

12   courthouse.  They feel like people are looking at them, getting

13   too close to them.

14       One thing I will not permit -- and I told you this before.

15   We get to the jury, jury intimidation, this Court really gets

16   serious on it.  I will not put up with anything that puts in

17   the minds of the jury that they're being intimidated, which

18   they've indicated that they feel they have been, intimidated or

19   scared at all.

20       I'm ordering right now, ordering all the attorneys and

21   anybody associated with the attorneys and any friends of

22   anybody in this courtroom to stay at least away 50 feet from

23   any juror until this case is over with.  Do not want any issues

24   of intimidation.  That's a court order.  So you could tell

25   people if they come around or if they do break that court
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003080**

1   order, they're looking at not only a contempt hearing, but

2   they're looking at remand, also.  I will not put up with an

3   intimidation the jury.

4        So I'm not saying who did it or what did it, I'm just

5   saying from here on in there's going to be a 50-foot security

6   zone around those jurors, that I don't want anybody breaking

7   that, and that's the order of the Court.

8        Okay.  With that in mind, I don't think anybody's going to

9   come back -- oh, better keep you here tonight.  With this jury,

10  I better keep you here tonight, until 4:00 o'clock.  We'll

11  excuse you at 4:00 o'clock, but don't be surprised if I call

12  you four, five minutes with another question.

13       We'll be in recess.

14           THE CLERK:  All rise.

15

16                     *(Off record at 3:17 p.m.)*

17

18                        *--oOo--*

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                          CERTIFICATE

2

3        I hereby certify that pursuant to Section 753,

4   Title 28, United States Code, the foregoing is a true and

5   correct transcript of the stenographically reported proceedings

6   held in the above-entitled matter and that the transcript page

7   format is in conformance with the regulations of the

8   Judicial Conference of the United States.

9

10  Date:  MARCH 6, 2015

11

12

13

14                  /S/ SANDRA MACNEIL

15              Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3    HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4    – – – –

5

6

UNITED STATES OF AMERICA,          )
7                                   )
                   PLAINTIFF,       )
8                                   )
        vs.                         )    No. CR 11-00072(A)-RGK
9                                   )
(1)  MHER DARBINYAN,                )
10   (4)  ARMAN SHAROPETROSIAN,     )
     (35) RAFAEL PARSADANYAN,       )
11                                  )
                   DEFENDANTS.      )
12   _____)

13

14    REPORTER'S TRANSCRIPT OF JURY TRIAL

15    DAY 17

16    PAGES 1 – 45

17    THURSDAY, APRIL 17, 2014

18    LOS ANGELES, CALIFORNIA

19    9:35 A.M.

20

21

22    _____

23    *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
      *Official Reporter, U.S. District Court*
24    *255 East Temple Street*
      *Los Angeles, CA  90012*
25    *213.894.5949*

```
1   APPEARANCES OF COUNSEL:

2   FOR PLAINTIFF UNITED STATES OF AMERICA:

3         ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
4             ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
5         LOS ANGELES, CALIFORNIA  90012
          213.894.4477

6

7   FOR DEFENDANT MHER DARBINYAN:

8         THE SEVERO LAW FIRM
          BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
9         70 SOUTH LAKE AVENUE, SUITE 945
          PASADENA, CALIFORNIA  91101
10        626.844.6400

11  FOR DEFENDANT ARMAN SHAROPETROSIAN:

12        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
13        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
14        213.623.5923

15  FOR DEFENDANT RAFAEL PARSADANYAN:

16        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
17        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
18        818.990.9500

19

20  ALSO PRESENT:

21        SPECIAL AGENT JEREMY STEBBINS, FBI

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1                          I N D E X

2       PROCEEDINGS:                                    PAGE

3          JURY NOTES                                     4

4          VERDICT AS TO DEFENDANT MHER DARBINYAN         5

5          VERDICT AS TO ARMAN SHAROPETROSIAN            25

6          VERDICT AS TO RAFAEL PARSADANYAN              28

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS: ... PAGE
JURY NOTES 4
VERDICT AS TO DEFENDANT MHER DARBINYAN 5
VERDICT AS TO ARMAN SHAROPETROSIAN 25
VERDICT AS TO RAFAEL PARSADANYAN 28

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 17, 2014

 2                            9:35 A.M.

 3                             - - - -

 4       (Outside the presence of the jury:)

 5           THE COURT:  Counsel, we have two notes from the jury.

 6       The first one was in the morning, where they said:

 7           "Please cancel our prior request for the

 8            testimony of Agent Stebbins."

 9       And then about a half hour later, they said:

10           "We have reached a verdict."

11       So I'm going to bring them in at this time.

12       (In the presence of the jury:)

13           THE COURT:  Okay.  The record will reflect that all of

14       the jurors are present.

15           I've had two notes from you this morning.  One is, is that

16       you said that, "Please cancel our prior request for

17       Agent Stebbins' testimony."

18           Did you get to the point where you don't need that

19       testimony anymore?  Is that correct?

20           JURY FOREPERSON:  Yes, that's correct.

21           THE COURT:  Okay.  And then the second one is that you

22       said -- about a half hour later, you sent out one that says you

23       have reached a unanimous verdict.

24           Juror No. 4, have you reached a unanimous verdict?

25           JURY FOREPERSON:  Yes, we have.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  And is that to all counts?

 2            JURY FOREPERSON:  Yes, it is.

 3            THE COURT:  And do you have that with you?

 4            JURY FOREPERSON:  Yes.

 5            THE COURT:  Have you signed it and dated it?

 6            JURY FOREPERSON:  Yes, I have.

 7            THE COURT:  Okay.  Why don't you pass that up to the

 8     bailiff, please.

 9        And if you'd pass it to her.

10        Let me take a look at it before you read it.

11            THE COURT:  Okay.

12        Okay.  Will you read the verdict, please.

13            THE CLERK:  (Reading:)

14               "The United States District Court for the

15            Central District of California, Western Division.

16            The United States of America, plaintiff, versus

17            Mher Darbinyan, et al.  Verdict form for Mher

18            Darbinyan, case No. CR-11-72(A)-RGK.

19               "Count 1.  Racketeering conspiracy, 18 United

20            States Code, Section 1962(d).  Count No. 1.  We,

21            the jury in the above-captioned cause, unanimously

22            find beyond a reasonable doubt defendant Mher

23            Darbinyan guilty of racketeering conspiracy, in

24            violation of Title 18 United States Code, Section

25            1962(d), as charged in the indictment.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1           "Count 4.  Extortion conspiracy, 18 United
2        States Code, Section 1952(a) [sic].  Two -- we,
3        the jury in the above-captioned cause, unanimously
4        find beyond a reasonable doubt defendant Mher
5        Darbinyan guilty of extortion conspiracy, in
6        violation of Title 18 United States Code, Section
7        1951(a), as charged in the indictment.
8           "Count 5.  Extortion, 18 United States Code,
9        Section 1951(a).  We, the jury in the
10       above-captioned cause, unanimously find beyond a
11       reasonable doubt defendant Mher Darbinyan guilty
12       of extortion, in violation of Title 18 United
13       States Code, Section 1951(a), as charged in the
14       indictment.
15          "Count 6.  Bank fraud, 18 United States Code,
16       Section 1344.  We, the jury in the above-captioned
17       cause, unanimously find beyond a reasonable doubt
18       defendant Mher Darbinyan guilty of bank fraud as
19       to check No. 349, in the amount of $10, in the
20       name of victim P.J.C., or -- on or about January
21       26th, 2009, in violation of Title 18 United States
22       Code, Section 1344, as charged in the indictment.
23          "Count 7.  Bank fraud, 18 United States Code,
24       Section 1344.  We, the jury in the above-captioned
25       cause, unanimously find beyond a reasonable doubt

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    defendant Mher Darbinyan guilty of bank fraud as

2    to check No. 3442, in the amount of $15, in the

3    name of victim P.J.C., on or about January 26th,

4    2009, in violation of Title 18 United States Code,

5    Section 1344, as charged in the indictment.

6        "Count 8.  Bank fraud, 18 United States Code,

7    Section 1344.  We, the jury in the above-captioned

8    cause, unanimously find beyond a reasonable doubt

9    defendant Mher Darbinyan guilty of bank fraud as

10   to check No. 3438, in the amount of $5,600, in the

11   name of victim P.J.C., on or about January 28th,

12   2009, in violation of Title 18 United States Code,

13   Section 1344, as charged in the indictment.

14       "Count 9.  Bank fraud, 18 United States Code,

15   Section 1344.  We, the jury in the above-captioned

16   cause, unanimously find beyond a reasonable doubt

17   defendant Mher Darbinyan guilty of bank fraud as

18   to check No. 3444, in the amount of $5,900, in the

19   name of victim P.J.C., on or about January 28th,

20   2009, in violation of Title 18 United States Code,

21   Section 1344, as charged in the indictment.

22       "Count 10.  Bank fraud, 18 United States Code,

23   Section 1344.  We, the jury in the above-captioned

24   cause, unanimously find beyond a reasonable doubt

25   defendant Mher Darbinyan guilty of bank fraud as

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          to transfer of $45,000 from an account in the name
2          of victim G.F. on or about March 9th, 2009, in
3          violation of Title 18 United States Code, Section
4          1344, as charged in the indictment.
5          "Count 11.  Bank fraud, 18 United States Code,
6          Section 1344.  We, the jury in the above-captioned
7          cause, unanimously find beyond a reasonable doubt
8          defendant Mher Darbinyan guilty of bank fraud as
9          to check No. 1462, in the amount of $26,400, in
10         the name of victim G.F., on or about March 17th,
11         2009, in violation of Title 18 United States Code,
12         1344, as charged in the indictment.
13         "Count 12.  Bank fraud, 18 United States Code,
14         Section 1344.  We, the jury in the above-captioned
15         cause, unanimously find beyond a reasonable doubt
16         defendant Mher Darbinyan guilty of bank fraud as
17         to check No. 1463, in the amount of $38,000, in
18         the name of victim G.F., on or about March 18th,
19         2009, in violation of Title 18 United States Code,
20         Section 1344, as charged in the indictment.
21         "Count 13.  Bank fraud, 18 United States Code,
22         Section 1344.  We, the jury in the above-captioned
23         cause, unanimously find beyond a reasonable doubt
24         defendant Mher Darbinyan guilty of bank fraud as
25         to the transfer of $40,000 from an account in the
```

1        name of victim G.F. on or about March 19th, 2009,

2        in violation of Title 18 United States Code,

3        Section 1344, as charged in the indictment.

4           "Count 14.  Bank fraud, 18 United States Code,

5        Section 1344.  We, the jury in the above-captioned

6        cause, unanimously find beyond a reasonable doubt

7        defendant Mher Darbinyan guilty of bank fraud as

8        to check No. 304, in the amount of $4,500, in the

9        name of victim Y.G., on or about March 30th, 2009,

10       in violation of Title 18 United States Code,

11       Section 1344, as charged in the indictment.

12          "Count 15.  Bank fraud, 18 United States Code,

13       Section 1344.  We, the jury in the above-captioned

14       cause, unanimously find beyond a reasonable doubt

15       defendant Mher Darbinyan guilty of bank fraud as

16       to check No. 305, in the amount of $5,300, in the

17       name of victim Y.G., on or about March 30th, 2009,

18       in violation of Title 18 United States Code,

19       Section 1344, as charged in the indictment.

20          "Count 16.  Bank fraud, 18 United States Code,

21       Section 1344.  We, the jury in the above-captioned

22       cause, unanimously find beyond a reasonable doubt

23       defendant Mher Darbinyan guilty of bank fraud as

24       to check No. 306, in the amount of $5,000, in the

25       name of victim Y.G., on or about March 30, 2009,

1          in violation of Title 18 United States Code,

2          Section 1344, as charged in the indictment.

3              "Count 17.  Bank fraud, 18 United States Code,

4          Section 1344.  We, the jury in the above-captioned

5          cause, unanimously find beyond a reasonable doubt

6          defendant Mher Darbinyan guilty of bank fraud as

7          to check No. 2386, in the amount of $28,357, in

8          the names of victims F.D. and M.D., on or about

9          April 14th, 2009, in violation of Title 18 United

10         States Code, Section 1344, as charged in the

11         indictment.

12             "Count 18.  Bank fraud, 18 United States Code,

13         Section 1344.  We, the jury in the above-captioned

14         cause, unanimously find beyond a reasonable doubt

15         defendant Mher Darbinyan guilty of bank fraud as

16         to check No. 2387, in the amount of $74,350.09, in

17         the names of victims F.D. and M.D., on or about

18         April 14th, 2009, in violation of Title 18 United

19         States Code, Section 1344, as charged in the

20         indictment.

21             "Count 19.  Bank fraud, 18 United States Code,

22         Section 1344.  We, the jury in the above-captioned

23         cause, unanimously find beyond a reasonable doubt

24         defendant Mher Darbinyan guilty of bank fraud as

25         to check No. 1459, in the amount of $135,200, in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              the name of victim L.R., on or about April 16th,

2         2009, in violation of Title 18 United States Code,

3         Section 1344, as charged in the indictment.

4              "Count 23.  Aggravated identity theft, 18

5         United States Code, Section 1028A.  We, the jury

6         in the above-captioned cause, unanimously find

7         beyond a reasonable doubt defendant Mher Darbinyan

8         guilty of aggravated identity theft as to victim

9         M.A., check No. 3439, on or about January 26th,

10        2009, in violation of Title 18 United States Code,

11        Section 1028A, as charged in the indictment.

12             "Count 24.  Aggravated identity theft, 18

13        United States Code, Section 1028A.  We, the jury

14        in the above-captioned cause, unanimously find

15        beyond a reasonable doubt defendant Mher Darbinyan

16        guilty of aggravated identity theft as to victim

17        M.A., check No. 3442, on or about January 26th,

18        2009, in violation of Title 18 United States Code,

19        Section 1028A, as charged in the indictment.

20             "Count 25.  Aggravated identity theft, 18

21        United States Code, Section 1028A.  We, the jury

22        in the above-captioned cause, unanimously find

23        beyond a reasonable doubt defendant Mher Darbinyan

24        guilty of aggravated identity theft as to victim

25        M.A., check No. 3438, on or about January 28th, in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1           violation of Title 18 United States Code, Section

2           1028A, as charged in the indictment.

3               "Count 26.  Aggravated identity theft, 18

4           United States Code, Section 1028A.  We, the jury

5           in the above-captioned cause, unanimously find

6           beyond a reasonable doubt defendant Mher Darbinyan

7           guilty of aggravated identity theft as to victim

8           M.A., check No. 3444, on or about January 28th,

9           2009, in violation of Title 18 United States Code,

10          Section 1028A, as charged in the indictment.

11              "Count 27.  Aggravated identity theft, 18

12          United States Code, Section 1028A.  We, the jury

13          in the above-captioned cause, unanimously find

14          beyond a reasonable doubt defendant Mher Darbinyan

15          guilty of aggravated identity theft as to victim

16          G.F., check No. 1462, on or about March 17th,

17          2009, in violation of Title 18 United States Code,

18          Section 1028A, as charged in the indictment.

19              "Count 28.  Aggravated identity theft, 18

20          United States Code, Section 1028A.  We, the jury

21          in the above-captioned cause, unanimously find

22          beyond a reasonable doubt defendant Mher Darbinyan

23          guilty of aggravated identity theft as to victim

24          G.F., check No. 1463, on or about March 18th,

25          2009, in violation of Title 18 United States Code,

1        Section 1028A, as charged in the indictment.

2            "Count 29.  Aggravated identity theft, 18

3        United States Code, Section 1028A.  We, the jury

4        in the above-captioned cause, unanimously find

5        beyond a reasonable doubt defendant Mher Darbinyan

6        guilty of aggravated identity theft as to victim

7        Y.G., check No. 304, on or about March 30th, 2009,

8        in violation of Title 18 United States Code,

9        Section 1028A, as charged in the indictment.

10           "Count 30.  Aggravated identity theft, 18

11       United States Code, Section 1028A.  We, the jury

12       in the above-captioned case -- cause, excuse me,

13       unanimously find beyond a reasonable doubt

14       defendant Mher Darbinyan guilty of aggravated

15       identity theft as to victim Y.G., check No. 305,

16       on or about March 30th, 2009, in violation of

17       Title 18 United States Code, Section 1028A, as

18       charged in the indictment.

19           "Count 31.  Aggravated identity theft, 18

20       United States Code, Section 1028A.  We, the jury

21       in the above-captioned cause, unanimously find

22       beyond a reasonable doubt defendant Mher Darbinyan

23       guilty of aggravated identity theft as to victim

24       Y.G., check No. 306, on or about March 30th, 2009,

25       in violation of Title 18 United States Code,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            Section 1028A, as charged in the indictment.

 2                 "Count 32.  Aggravated identity theft, 18

 3            United States Code, Section 1028A.  We, the jury

 4            in the above-captioned cause, unanimously find

 5            beyond a reasonable doubt defendant Mher Darbinyan

 6            guilty of aggravated identity theft as to victims

 7            F.D. and M.D., check No. 2386, on or about April

 8            14th, 2009, in violation of Title 18 United States

 9            Code, Section 1028A, as charged in the indictment.

10                 "Count 33.  Aggravated identity theft, 18

11            United States Code, Section 1028A.  We, the jury

12            in the above-captioned cause, unanimously find

13            beyond a reasonable doubt defendant Mher Darbinyan

14            guilty of aggravated identity theft as to victims

15            F.D. and M.D., check No. 2387, on or about April

16            14th, 2009, in violation of Title 18 United States

17            Code, Section 1028A, as charged in the indictment.

18                 "Count 34.  Aggravated identity theft, 18

19            United States Code, Section 1028A.  We, the jury

20            in the above-captioned cause, unanimously find

21            beyond a reasonable doubt defendant Mher Darbinyan

22            guilty of aggravated identity theft as to victim

23            L.R., check No. 1459, on or about April 16th,

24            2009, in violation of Title 18 United States Code,

25            Section 1028A, as charged in the indictment.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              "Count 38.  Bank fraud, 18 United States Code,
 2         Section 1344.  We, the jury in the above-captioned
 3         cause, unanimously find beyond a reasonable doubt
 4         defendant Mher Darbinyan guilty of bank fraud as
 5         to a $300 withdrawal from victim J.D.'s account on
 6         or about July 17th, 2009, in violation of Title 18
 7         United States Code, Section 1344, as charged in
 8         the indictment.
 9              "Count 39.  Bank fraud, 18 United States Code,
10         Section 1344.  We, the jury in the above-captioned
11         cause, unanimously find beyond a reasonable doubt
12         defendant Mher Darbinyan guilty of bank fraud as
13         to a $300 withdrawal from victim S.G.'s account on
14         or about July 17th, 2009, in violation of Title 18
15         United States Code, Section 1344, as charged in
16         the indictment.
17              "Count 40.  Bank fraud, 18 United States Code,
18         Section 1344.  We, the jury in the above-captioned
19         cause, unanimously find beyond a reasonable doubt
20         defendant Mher Darbinyan guilty of bank fraud as
21         to a $100 withdrawal from victim M.L.'s account on
22         or about July 17th, 2009, in violation of Title 18
23         United States Code, Section 1344, as charged in
24         the indictment.
25              "Count 41.  Bank fraud, 18 United States Code,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              Section 1344.  We, the jury in the above-captioned
 2              cause, unanimously find beyond a reasonable doubt
 3              defendant Mher Darbinyan guilty of bank fraud as
 4              to a $500 withdrawal from victim M.J.'s account on
 5              or about July 17th, 2009, in violation of Title 18
 6              United States Code, Section 1344, as charged in
 7              the indictment.
 8                  "Count 44.  Bank fraud, 18 United States Code,
 9              Section 1344.  We, the jury in the above-captioned
10              cause, unanimously find beyond a reasonable doubt
11              defendant Mher Darbinyan guilty of bank fraud as
12              to a $300 withdrawal from victim J.D.'s account on
13              or about July 18th, 2009, in violation of Title 18
14              United States Code, Section 1344, as charged in
15              the indictment.
16                  "Count 45.  Bank fraud, 18 United States Code,
17              Section 1344.  We, the jury in the above-captioned
18              cause, unanimously find beyond a reasonable doubt
19              defendant Mher Darbinyan guilty of bank fraud as
20              to a $200 withdrawal from victim S.G.'s account on
21              or about July 18th, 2009, in violation of Title 18
22              United States Code, Section 1344, as charged in
23              the indictment.
24                  "Count 48.  Bank fraud, 18 United States Code,
25              Section 1344.  We, the jury in the above-captioned
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  cause, unanimously find beyond a reasonable doubt

2  defendant Mher Darbinyan guilty of bank fraud as

3  to a $500 withdrawal from victim M.L.'s account on

4  or about July 18th, 2009, in violation of Title 18

5  United States Code, Section 1344, as charged in

6  the indictment.

7   "Count 50.  Bank fraud, 18 United States Code,

8  Section 1344.  We, the jury in the above-captioned

9  cause, unanimously find beyond a reasonable doubt

10  defendant Mher Darbinyan guilty of bank fraud as

11  to a $300 withdrawal from victim M.J.'s account on

12  or about July 18th, 2009, in violation of Title 18

13  United States Code, Section 1344, as charged in

14  the indictment.

15   "Count 51.  Bank fraud, 18 United States Code,

16  Section 1344.  We, the jury in the above-captioned

17  cause, unanimously find beyond a reasonable doubt

18  defendant Mher Darbinyan guilty of bank fraud as

19  to a $200 withdrawal from victim M.J.'s account on

20  or about July 18th, 2009, in violation of Title 18

21  United States Code, Section 1344, as charged in

22  the indictment.

23   "Count 54.  Bank fraud, United States Code --

24  18 United States Code, Section 1344.  We, the jury

25  in the above-captioned cause, unanimously find

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          beyond a reasonable doubt defendant Mher Darbinyan

2          guilty of bank fraud as to a $500 withdrawal from

3          victim J.A.'s account on or about July 18th, 2009,

4          in violation of Title 18 United States Code,

5          Section 1344, as charged in the indictment.

6              "Count 57.  Bank fraud, 18 United States Code,

7          Section 1344.  We, the jury in the above-captioned

8          cause, unanimously find beyond a reasonable doubt

9          defendant Mher Darbinyan guilty of bank fraud as

10         to a $300 withdrawal from victim J.D.'s account on

11         or about July 19th, 2009, in violation of Title 18

12         United States Code, Section 1344, as charged in

13         the indictment.

14             "Count 60.  Bank fraud, 18 United States Code,

15         Section 1344.  We, the jury in the above-captioned

16         cause, unanimously find beyond a reasonable doubt

17         defendant Mher Darbinyan guilty of bank fraud as

18         to a $500 withdrawal from victim M.J.'s account on

19         or about July 19th, 2009, in violation of Title 18

20         United States Code, Section 1344, as charged in

21         the indictment.

22             "Count 63.  Bank fraud, 18 United States Code,

23         Section 1344.  We, the jury in the above-captioned

24         cause, unanimously find beyond a reasonable doubt

25         defendant Mher Darbinyan guilty of bank fraud as

1          to a $300 withdrawal from victim S.G.'s account on

2          or about July 20th, 2009, in violation of Title 18

3          United States Code, Section 1344, as charged in

4          the indictment.

5              "Count 66.  Bank fraud, 18 United States Code,

6          Section 1344.  We, the jury in the above-captioned

7          cause, unanimously find beyond a reasonable doubt

8          defendant Mher Darbinyan guilty of bank fraud as

9          to a $500 withdrawal from victim M.J.K.'s account

10         on or about July 23rd, 2009, in violation of

11         Title 18 United States Code, Section 1344, as

12         charged in the indictment.

13             "Count 69.  Access device fraud conspiracy, 18

14         United States Code, Section 1029(b)(2).  We, the

15         jury in the above-captioned cause, unanimously

16         find beyond a reasonable doubt defendant Mher

17         Darbinyan guilty of access device fraud

18         conspiracy, in violation of Title 18 United States

19         Code, Section 1029(b)(2), as charged in the

20         indictment.

21             "Count 71.  Aggravated identity theft, 18

22         United States Code, Section 1028A.  We, the jury

23         in the above-captioned cause, unanimously find

24         beyond a reasonable doubt defendant Mher Darbinyan

25         guilty of aggravated identity theft as to victim

1    J.D. on or about July 17th, 2009, in violation of

2    Title 18 United States Code, Section 1028A, as

3    charged in the indictment.

4        "Count 72.  Aggravated identity theft, 18

5    United States Code, Section 1028A.  We, the jury

6    in the above-captioned cause, unanimously find

7    beyond a reasonable doubt defendant Mher Darbinyan

8    guilty of aggravated identity theft as to victim

9    S.G. on or about July 17th, 2009, in violation of

10   Title 18 United States Code, Section 1028A, as

11   charged in the indictment.

12       "Count 73.  Aggravated identity theft, 18

13   United States Code, Section 1028A.  We, the jury

14   in the above-captioned cause, unanimously find

15   beyond a reasonable doubt defendant Mher Darbinyan

16   guilty of aggravated identity theft as to victim

17   M.J. on or about July 17th, 2009, in violation of

18   Title 18 United States Code, Section 1028A, as

19   charged in the indictment.

20       "Count 77.  Aggravated identity theft, 18

21   United States Code, Section 1028A.  We, the jury

22   in the above-captioned cause, unanimously find

23   beyond a reasonable doubt defendant Mher Darbinyan

24   guilty of aggravated identity theft as to victim

25   J.D. on or about July 18th, 2009, in violation of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          Title 18 United States Code, Section 1028A, as
 2          charged in the indictment.
 3            "Count 79.  Aggravated identity theft, 18
 4          United States Code, Section 1028A.  We, the jury
 5          in the above-captioned cause, unanimously find
 6          beyond a reasonable doubt defendant Mher Darbinyan
 7          guilty of aggravated identity theft as to victim
 8          S.G. on or about July 18th, 2009, in violation of
 9          Title 18 United States Code, Section 1028A, as
10          charged in the indictment.
11            "Count 80.  Aggravated identity theft, 18
12          United States Code, Section 1028A.  We, the jury
13          in the above-captioned cause, unanimously find
14          beyond a reasonable doubt defendant Mher Darbinyan
15          guilty of aggravated identity theft as to victim
16          M.J. on or about July 18th, 2009, in violation of
17          Title 18 United States Code, Section 1028A, as
18          charged in the indictment.
19            "Count 81.  Aggravated identity theft, 18
20          United States Code, Section 1028A.  We, the jury
21          in the above-captioned cause, unanimously find
22          beyond a reasonable doubt defendant Mher Darbinyan
23          guilty of aggravated identity theft as to victim
24          M.L. on or about July 18th, 2009, in violation of
25          Title 18 United States Code, Section 1028A, as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  charged in the indictment.

2  "Count 84.  Aggravated identity theft, 18

3  United States Code, Section 1028A.  We, the jury

4  in the above-captioned cause, unanimously find

5  beyond a reasonable doubt defendant Mher Darbinyan

6  guilty of aggravated identity theft as to victim

7  J.A. on or about July 18th, 2009, in violation of

8  Title 18 United States Code, Section 1028A, as

9  charged in the indictment.

10  "Count 87.  Aggravated identity theft, 18

11  United States Code, Section 1028A.  We, the jury

12  in the above-captioned cause, unanimously find

13  beyond a reasonable doubt defendant Mher Darbinyan

14  guilty of aggravated identity theft as to victim

15  M.J. on or about July 19th, 2009, in violation of

16  Title 18 United States Code, Section 1028A, as

17  charged in the indictment.

18  "Count 91.  Aggravated identity theft, 18

19  United States Code, Section 1028A.  We, the jury

20  in the above-captioned cause, unanimously find

21  beyond a reasonable doubt defendant Mher Darbinyan

22  guilty of aggravated identity theft as to victim

23  S.G. on or about July 20th, 2009, in violation of

24  Title 18 United States Code, Section 1028A, as

25  charged in the indictment.

1      "Count 93.  Aggravated identity theft, 18

2   United States Code, Section 1028A.  We, the jury

3   in the above-captioned cause, unanimously find

4   beyond a reasonable doubt defendant Mher Darbinyan

5   guilty of aggravated identity theft as to victim

6   M.J.K. on or about July 23rd, 2009, in violation

7   of Title 18 United States Code, Section 1028A, as

8   charged in the indictment.

9      "Count 128.  Felon in possession of firearms,

10   ammunition, 18 United States Code, Section

11   922(g)(1).  We, the jury in the above-captioned

12   cause, unanimously find beyond a reasonable doubt

13   defendant Mher Darbinyan guilty of possession of

14   firearms and ammunition by a convicted felon on or

15   about November 24th, 2009, in violation of

16   Title 18 United States Code, Section 922(g)(1), as

17   charged in the indictment.

18      "Count 129.  Felon in possession of a firearm,

19   18 United States Code, Section 922(g)(1).  We, the

20   jury in the above-captioned cause, unanimously

21   find beyond a reasonable doubt defendant Mher

22   Darbinyan guilty of possession of a firearm by a

23   convicted felon on or about December 1st, 2009, in

24   violation of Title 18 United States Code, Section

25   922(g)(1), as charged in the indictment."

```
 1        This verdict is signed and dated by the jury foreperson on

 2   April 17th, 2009, at Los Angeles, California.

 3           THE COURT:  That's Juror No. 4.

 4        Is that correct, sir?

 5           JURY FOREPERSON:  Yes.

 6           THE COURT:  Okay.  Ladies and gentlemen, as to

 7   Mr. Darbinyan, the verdict that has just been read, is that

 8   your verdict, say you one, say you all?

 9           THE JURY:  Yes.

10           THE COURT:  Anytime we take a verdict, I have to go

11   through and poll each juror.  So I'm going to be asking each

12   juror if the verdict, as read, reflects your own individual

13   verdict also.  So let me just go through each one.

14        Juror No. 13?

15           JUROR:  Yes.

16           THE COURT:  Juror No. 15?

17           JUROR:  Yes.

18           THE COURT:  Juror No. 3?

19           JUROR:  Yes.

20           THE COURT:  Juror No. 4?

21           JUROR:  Yes.

22           THE COURT:  Juror No. 5?

23           JUROR:  Yes.

24           THE COURT:  Juror No. 30?

25           JUROR:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          THE COURT:  Juror No. 24?

2          JUROR:  Yes.

3          THE COURT:  Juror No. 33?

4          JUROR:  Yes.

5          THE COURT:  Juror No. 27?

6          JUROR:  Yes.

7          THE COURT:  Juror No. 21?

8          JUROR:  Yes.

9          THE COURT:  Juror No. 32?

10         JUROR:  Yes.

11         THE COURT:  And Juror No. 14?

12         JUROR:  Yes.

13         THE COURT:  The Court, then, would order that the

14   verdict forms as to -- or that the verdict as to Mr. Darbinyan

15   be recorded at this time.

16      And at this time, do you want to read the next verdict

17   form as to Mr. Sharopetrosian.

18         THE CLERK:  (Reading:)

19            "United States District Court for the Central

20         District of California, Western Division.  United

21         States of America, plaintiff, versus Mher

22         Darbinyan, et al., defendant, Case No. CR

23         11-72(A)-RGK.  Verdict form for defendant Arman

24         Sharopetrosian.

25            "Count 1.  Racketeering conspiracy, 18 United
```

1          States Code, Section 1962(d).  We, the jury in the

2          above-captioned cause, unanimously find beyond a

3          reasonable doubt defendant Arman Sharopetrosian

4          guilty of racketeering conspiracy, in violation of

5          Title 18 United States Code, Section 1962(d), as

6          charged in the indictment.

7              "Count 4.  Extortion conspiracy, 18 United

8          States Code, Section 1951(a).  We, the jury in the

9          above-captioned cause, unanimously find beyond a

10          reasonable doubt defendant Arman Sharopetrosian

11          guilty of extortion conspiracy, in violation of

12          Title 18 United States Code, Section 1951(a), as

13          charged in the indictment.

14              "Count 5.  Extortion, 18 United States Code,

15          Section 1951(a).  We, the jury in the

16          above-captioned cause, unanimously find beyond a

17          reasonable doubt defendant Arman Sharopetrosian

18          guilty of extortion, in violation of 18 --

19          Title 18 United States Code, Section 1951(a), as

20          charged in the indictment."

21      This verdict is signed and dated by the jury foreperson,

22  dated April 17th, 2014, at Los Angeles, California.

23          THE COURT:  Again, Juror No. 4, you are the

24  foreperson; is that correct?

25          JURY FOREPERSON:  Yes.

```
1          THE COURT:  And this is your verdict form?

2          JURY FOREPERSON:  Yes.  Yes.

3          THE COURT:  Okay.  And let me go through again.  Is

4   that your verdict, say you one, say you all?

5          THE JURY:  Yes.

6          THE COURT:  And polling the jury again, does it

7   reflect, as read by the clerk, your own individual verdict?

8       Juror No. 13?

9          JUROR:  Yes.

10         THE COURT:  15?

11         JUROR:  Yes.

12         THE COURT:  3?

13         JUROR:  Yes.

14         THE COURT:  4?

15         JUROR:  Yes.

16         THE COURT:  5?

17         JUROR:  Yes.

18         THE COURT:  30?

19         JUROR:  Yes.

20         THE COURT:  Juror 30 -- or 24?

21         JUROR:  Yes.

22         THE COURT:  33?

23         JUROR:  Yes.

24         THE COURT:  Juror No. 27?

25         JUROR:  Yes.
```

```
 1            THE COURT:  21?

 2            JUROR:  Yes.

 3            THE COURT:  32?

 4            JUROR:  Yes.

 5            THE COURT:  14?

 6            JUROR:  Yes.

 7            THE COURT:  Okay.  The Court, then, will order that

 8    the verdict as to Mr. Sharopetrosian be recorded at this time,

 9    also.

10        And do you want to read the next verdict, please.

11            THE CLERK:  (Reading:)

12                "United States District Court for the Central

13                District of California, Western Division.  United

14                States of America, plaintiff, versus Mher

15                Darbinyan, et al., defendants, Case No. Criminal

16                11-72(A)-RGK.  Verdict form for defendant Rafael

17                Parsadanyan.

18                "Count 38.  Bank fraud, 18 United States Code,

19                Section 1344.  We, the jury in the above-captioned

20                cause, unanimously find beyond a reasonable doubt

21                defendant Rafael Parsadanyan guilty of bank fraud

22                as to a $300 withdrawal from victim J.D.'s account

23                on or about July 17th, 2009, in violation of

24                Title 18 United States Code, Section 1344, as

25                charged in the indictment.
```

```
 1              "Count 39.  Bank fraud, 18 United States Code,
 2         Section 1344.  We, the jury in the above-captioned
 3         cause, unanimously find beyond a reasonable doubt
 4         defendant Rafael Parsadanyan guilty of bank fraud
 5         as to a $300 withdrawal from victim S.G.'s account
 6         on or about July 17th, 2009, in violation of
 7         Title 18 United States Code, Section 1344, as
 8         charged in the indictment.
 9              "Count 40.  Bank fraud, 18 United States Code,
10         Section 1344.  We, the jury in the above-captioned
11         cause, unanimously find beyond a reasonable doubt
12         defendant Rafael Parsadanyan guilty of bank fraud
13         as to a $100 withdrawal from victim M.L.'s account
14         on or about July 17th, 2009, in violation of
15         Title 18 United States Code, Section 1344, as
16         charged in the indictment.
17              "Count 41.  Bank fraud, 18 United States Code,
18         Section 1344.  We, the jury in the above-captioned
19         cause, unanimously find beyond a reasonable doubt
20         defendant Rafael Parsadanyan guilty of bank fraud
21         as to a $500 withdrawal from victim M.J.'s account
22         on or about July 17th, 2009, in violation of
23         Title 18 United States Code, Section 1344, as
24         charged in the indictment.
25              "Count 44.  Bank fraud, 18 United States Code,
```

```
1        Section 1344.  We, the jury in the above-captioned
2        cause, unanimously find beyond a reasonable doubt
3        defendant Rafael Parsadanyan guilty of bank fraud
4        as to a $300 withdrawal from victim J.D.'s account
5        on or about July 18th, 2009, in violation of
6        Title 18 United States Code, Section 1344, as
7        charged in the indictment.
8            "Count 45.  Bank fraud, 18 United States Code,
9        Section 1344.  We, the jury in the above-captioned
10       cause, unanimously find beyond a reasonable doubt
11       defendant Rafael Parsadanyan guilty of bank fraud
12       as to a $200 withdrawal from victim S.G.'s account
13       on or about July 18th, 2009, in violation of
14       Title 18 United States Code, Section 1344, as
15       charged in the indictment.
16           "Count 48.  Bank fraud, 18 United States Code,
17       Section 1344.  We, the jury in the above-captioned
18       cause, unanimously find beyond a reasonable doubt
19       defendant Rafael Parsadanyan guilty of bank fraud
20       as to a $500 withdrawal from victim M.L.'s account
21       on or about July 18th, 2009, in violation of
22       Title 18 United States Code, Section 1344, as
23       charged in the indictment.
24           "Count 50.  Bank fraud, 18 United States Code,
25       Section 1344.  We, the jury in the above-captioned
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          cause, unanimously find beyond a reasonable doubt

2          defendant Rafael Parsadanyan guilty of bank fraud

3          as to a $300 withdrawal from victim M.J.'s account

4          on or about July 18th, 2009, in violation of

5          Title 18 United States Code, Section 1344, as

6          charged in the indictment.

7             "Count 51.  Bank fraud, 18 United States Code,

8          Section 1344.  We, the jury in the above-captioned

9          cause, unanimously find beyond a reasonable doubt

10          defendant Rafael Parsadanyan guilty of bank fraud

11          as to a $200 withdrawal from victim M.J.'s account

12          on or about July 18th, 2009, in violation of

13          Title 18 United States Code, Section 1344, as

14          charged in the indictment.

15             "Count 54.  We, the jury -- bank fraud, 18

16          United States Code, Section 1344.  We, the jury in

17          the above-captioned cause, unanimously find beyond

18          a reasonable doubt defendant Rafael Parsadanyan

19          guilty of bank fraud as to a $500 withdrawal from

20          victim J.A.'s account on or about July 18th, 2009,

21          in violation of Title 18 United States Code,

22          Section 1344, as charged in the indictment.

23             "Count 57.  Bank fraud, 18 United States Code,

24          Section 1344.  We, the jury in the above-captioned

25          cause, unanimously find beyond a reasonable doubt

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          defendant Rafael Parsadanyan guilty of bank fraud

2          as to a $300 withdrawal from victim J.D.'s account

3          on or about July 19th, 2009, in violation of

4          Title 18 United States Code, Section 1344, as

5          charged in the indictment.

6              "Count 60.  Bank fraud, 18 United States Code,

7          Section 1344.  We, the jury in the above-captioned

8          cause, unanimously find beyond a reasonable doubt

9          defendant Rafael Parsadanyan guilty of bank fraud

10         as to a $500 withdrawal from victim M.J.'s account

11         on or about July 19th, 2009, in violation of

12         Title 18 United States Code, Section 1344, as

13         charged in the indictment.

14             "Count 63.  Bank fraud, 18 United States Code,

15         Section 1344.  We, the jury in the above-captioned

16         cause, unanimously find beyond a reasonable doubt

17         defendant Rafael Parsadanyan guilty of bank fraud

18         as to a $300 withdrawal from victim S.G.'s account

19         on or about July 20th, 2009, in violation of

20         Title 18 United States Code, Section 1344, as

21         charged in the indictment.

22             "Count 66.  Bank fraud, 18 United States Code,

23         Section 1344.  We, the jury in the above-captioned

24         cause, unanimously find beyond a reasonable doubt

25         defendant Rafael Parsadanyan guilty of bank fraud

```
1              as to a $500 withdrawal from victim M.J.K.'s

2              account on or about July 23rd, 2009, in violation

3              of Title 18 United States Code, Section 1344, as

4              charged in the indictment.

5                 "Count 69.  Access device fraud conspiracy, 18

6              United States Code, Section 1029(b)(2).  We, the

7              jury in the above-captioned cause, unanimously

8              find beyond a reasonable doubt defendant Rafael

9              Parsadanyan not guilty of access device fraud

10             conspiracy in violation of Title 18 United States

11             Code, Section 1029(b)(2), as charged in the

12             indictment.

13                "Count 71.  Aggravated identity theft, 18

14             United States Code, Section 1028A.  We, the jury

15             in the above-captioned cause, unanimously find

16             beyond a reasonable doubt defendant Rafael

17             Parsadanyan not guilty of aggravated identity

18             theft as to victim J.D. on or about July 17th,

19             2009, in violation of Title 18 United States Code,

20             Section 1028A, as charged in the indictment.

21                "Count 72.  Aggravated identity theft, 18

22             United States Code, Section 1028A.  We, the jury

23             in the above-captioned cause, unanimously find

24             beyond a reasonable doubt defendant Rafael

25             Parsadanyan not guilty of aggravated identity
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            theft as to victim S.G. on or about July 17th,

 2            2009, in violation of Title 18 United States Code,

 3            Section 1028A, as charged in the indictment.

 4               "Count 73.  Aggravated identity theft, 18

 5            United States Code, Section 1028A.  We, the jury

 6            in the above-captioned cause, unanimously find

 7            beyond a reasonable doubt defendant Rafael

 8            Parsadanyan not guilty of aggravated identity

 9            theft as to victim M.J. on or about July 17th,

10            2009, in violation of Title 18 United States Code,

11            Section 1028A, as charged in the indictment.

12               "Count 77.  Aggravated identity theft, 18

13            United States Code, Section 1028A.  We, the jury

14            in the above-captioned cause, unanimously find

15            beyond a reasonable doubt defendant Rafael

16            Parsadanyan not guilty of aggravated identity

17            theft as to victim J.D. on or about July 18th,

18            2009, in violation of Title 18 United States Code,

19            Section 1028A, as charged in the indictment.

20               "Count 79.  Aggravated identity theft, 18

21            United States Code, Section 1028A.  We, the jury

22            in the above-captioned cause, unanimously find

23            beyond a reasonable doubt defendant Rafael

24            Parsadanyan not guilty of aggravated identity

25            theft as to victim S.G. on or about July 18th,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          2009, in violation of Title 18 United States Code,

2          Section 1028A, as charged in the indictment.

3              "Count 80.  Aggravated identity theft, 18

4          United States Code, Section 1028A.  We, the jury

5          in the above-captioned cause, unanimously find

6          beyond a reasonable doubt defendant Rafael

7          Parsadanyan not guilty of aggravated identity

8          theft as to victim M.J. on or about July 18th,

9          2009, in violation of Title 18 United States Code,

10         Section 1028A, as charged in the indictment.

11             "Count 81.  Aggravated identity theft, 18

12         United States Code, Section 1028A.  We, the jury

13         in the above-captioned cause, unanimously find

14         beyond a reasonable doubt defendant Rafael

15         Parsadanyan not guilty of aggravated identity

16         theft as to victim M.L. on or about July 18th,

17         2009, in violation of Title 18 United States Code,

18         Section 1028A, as charged in the indictment.

19             "Count 84.  Aggravated identity theft, 18

20         United States Code, Section 1028A.  We, the jury

21         in the above-captioned cause, unanimously find

22         beyond a reasonable doubt defendant Rafael

23         Parsadanyan not guilty of aggravated identity

24         theft as to victim J.A. on or about July 18th,

25         2009, in violation of Title 18 United States Code,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1       Section 1028A, as charged in the indictment.

2          "Count 87.  Aggravated identity theft, 18

3       United States Code, Section 1028A.  We, the jury

4       in the above-captioned cause, unanimously find

5       beyond a reasonable doubt defendant Rafael

6       Parsadanyan not guilty of aggravated identity

7       theft as to victim M.J. on or about July 19th,

8       2009, in violation of Title 18 United States Code,

9       Section 1028A, as charged in the indictment.

10         "Count 91.  Aggravated identity theft, 18

11      United States Code, Section 1028A.  We, the jury

12      in the above-captioned cause, unanimously find

13      beyond a reasonable doubt defendant Rafael

14      Parsadanyan not guilty of aggravated identity

15      theft as to victim S.G. on or about July 20th,

16      2009, in violation of Title 18 United States Code,

17      Section 1028A, as charged in the indictment.

18         "Count 93.  Aggravated identity theft, 18

19      United States Code, Section 1028A.  We, the jury

20      in the above-captioned cause, unanimously find

21      beyond a reasonable doubt defendant Rafael

22      Parsadanyan not guilty of aggravated identity

23      theft as to victim M.J.K. on or about July 23rd,

24      2009, in violation of Title 18 United States Code,

25      Section 1028A, as charged in the indictment."

1          This verdict is signed and dated by the jury foreperson,

2     dated April 17th, 2014, at Los Angeles, California.

3              THE COURT:  Okay.  For the record, again, and Juror

4     No. 4, you are the foreperson, and that was your verdict form

5     that you signed; is that correct?

6              JURY FOREPERSON:  Yes, it was.

7              THE COURT:  Okay.  And ladies and gentlemen, is the

8     verdict as to Mr. Parsadanyan, does that reflect your verdict,

9     say you one, say you all?

10             THE JURY:  Yes.

11             THE COURT:  And going through each one of you

12    individually, the verdict as read by the clerk here in open

13    court, does that reflect your individual verdict?

14        Juror No. 13?

15             JUROR:  Yes.

16        THE COURT:  Juror No. 15?

17             JUROR:  Yes.

18        THE COURT:  Juror No. 3?

19             JUROR:  Yes.

20        THE COURT:  Juror No. 4?

21             JUROR:  Yes.

22        THE COURT:  Juror No. 5?

23             JUROR:  Yes.

24        THE COURT:  Juror No. 30?

25             JUROR:  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Juror No. 24?

2              JUROR:  Yes.

3              THE COURT:  Juror No. 33?

4              JUROR:  Yes.

5              THE COURT:  Juror No. 27?

6              JUROR:  Yes.

7              THE COURT:  Juror No. 21?

8              JUROR:  Yes.

9              THE COURT:  Juror No. 32?

10             JUROR:  Yes.

11             THE COURT:  And Juror No. 14?

12             JUROR:  Yes.

13             THE COURT:  Okay.  The Court, then, will order that

14   that verdict also be recorded at this time.

15        Ladies and gentlemen, it's been a long time, four weeks I

16   guess it is, and I appreciate you've put in a lot of work, a

17   lot of effort, and I think you've been very diligent in

18   listening to the evidence and carrying out your duty as far as

19   deliberating and resolving the case, and I want to thank you

20   very much.  It's been long, been hard.  Hopefully, it's been an

21   experience for you.  Hopefully, it's something that you will

22   remember and see how the justice system works.

23        At this time I'm going to relieve you from your duty that

24   you can't talk about the case with anybody else.  From here on

25   in, you can.  Keep in mind a few restrictions, though.
```

```
 1        First of all, you know, if the attorneys or anybody want
 2   to talk to you out in the hallway, that's fine.  Most of the
 3   jurors like to be taken out separately and don't like to
 4   particularly go out there, and if you don't want to, that's
 5   fine.  The bailiff will find a way to escort you out of the
 6   building without having you talk with anybody.
 7        If you do choose to talk to anybody about this case,
 8   remember, what goes on in the jury room is sacred.  You can't
 9   talk about what other jurors thought or what other jurors
10   communicated with you.  That's between you, the jurors.  If you
11   want to talk about what you thought of the case or what you
12   thought was weak or you thought was strong, that's okay, but
13   you can't talk about what other jurors did or what other jurors
14   voted on or whatever went on in the jury room, because that is
15   protected by the sanctity of the jury deliberation.
16        With that, if you have any questions; if not, I'm going to
17   excuse you at this time and thank you very much for your
18   participation.  Okay.
19             THE CLERK:  All rise.
20        (Outside the presence of the jury:)
21             THE COURT:  You may have a seat.
22        In this particular matter, we should put this over for
23   sentencing.
24        Date?
25             MR. SEVERO:  Your Honor, there is a second portion of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   the case that involves Mr. Darbinyan that is set for trial on
 2   July 15th.
 3            THE COURT:  Okay.
 4            MR. SEVERO:  So I believe that perhaps whatever date
 5   we pick should certainly -- probably would be beyond that date
 6   anyway.
 7            THE COURT:  Whatever date, it would be, yes.
 8            MR. ESTRADA:  I think based on --
 9            THE COURT:  Do you want me to tell you what the normal
10   date would be?
11            MR. ESTRADA:  Yes, your Honor.
12            THE COURT:  Do you have it?
13            THE CLERK:  Twelve weeks is July 14th.
14            THE COURT:  July 14.  Do you want to put it over past
15   that?
16            MR. ESTRADA:  I think, your Honor, it's safe to put it
17   a little past that.  I'm not sure if Mr. Darbinyan will be part
18   of the mortgage fraud case at this point.
19            THE COURT:  I don't know if he will or not, and I
20   don't know what the status is.  The defendants are in custody,
21   and all the defendants will be remanded after we leave the
22   bench today.  So I want to make sure that it's comfortable with
23   you and your clients as to what date.
24            MR. SEVERO:  Why don't we go -- sorry.
25            THE COURT:  Why don't you -- if you want to talk with
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    each other, that's fine.  If you don't --

2              MR. SEVERO:  Two weeks beyond the 14th date?

3              THE COURT:  28th.

4              THE CLERK:  28th?

5              THE COURT:  28th, is that date agreeable, Counsel?

6              MR. SEVERO:  28th of -- is agreeable with me.

7              THE COURT:  Okay with you, sir?

8              MR. ESTRADA:  Mr. Severo?

9              MR. SEVERO:  Yes.

10        (Mr. Severo and Mr. Estrada conferred privately.)

11             MR. ESTRADA:  It would be agreeable to do it one week

12   past the date given.

13             THE CLERK:  August 4th?

14             MR. ESTRADA:  July 21st.

15             THE COURT:  July 31st?

16             MR. ESTRADA:  21st.

17             THE COURT:  21st?

18             MR. ESTRADA:  21st.

19             MR. SEVERO:  Yes.

20             THE COURT:  Is July 21st okay with the government?

21             MR. ESTRADA:  Yes, your Honor.

22             THE COURT:  Mr. Severo, with you?

23             MR. SEVERO:  Yes, your Honor.

24             THE COURT:  Counsel?

25             MR. PEREYRA-SUAREZ:  Your Honor, as to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Mr. Sharopetrosian, he has another pending case before

 2   Judge Carter --

 3             THE COURT:  Okay.

 4             MR. PEREYRA-SUAREZ:  -- in Santa Ana.

 5        That case is up on appeal, and there are some sentencing

 6   issues that are part of that appeal.  He would prefer to put

 7   over his sentencing in this case until September, because,

 8   hopefully, the Ninth Circuit will shed some light --

 9             THE COURT:  They don't have to be sentenced at the

10   same time.  Everybody can have a different sentencing date.

11             MR. ESTRADA:  I should just clarify.  He's been

12   sentenced in the Santa Ana case.

13             MR. PEREYRA-SUAREZ:  That's correct.

14             MR. ESTRADA:  That sentence is now on appeal.  I doubt

15   very strongly whether the Ninth Circuit will even hear the

16   case.

17             THE COURT:  I don't know if they will or not.

18             MR. ESTRADA:  We haven't even filed an opposition at

19   this point.

20             THE COURT:  So you'll have some date the first part of

21   September?

22             MR. PEREYRA-SUAREZ:  You like to do it on Mondays,

23   your Honor?

24             THE COURT:  Yes.

25             MR. PEREYRA-SUAREZ:  How about September 15th?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  September 15th for your client.

2        Is that agreeable with the government?

3              MR. ESTRADA:  That's fine, your Honor.

4              THE COURT:  Okay.

5              MR. PEREYRA-SUAREZ:  Thank you, your Honor.

6              THE COURT:  And we've got the 21st of July with

7   Mr. Darbinyan.

8        And Counsel, how about you?

9              MR. FLIER:  We would like the first available date,

10  and of course it's going to be dependent also on whether or not

11  my client's remanded.

12             THE COURT:  Your defendant will be remanded, Counsel.

13             MR. ESTRADA:  That's why it matters.

14             THE COURT:  So that's why I told you.  So you'd like

15  to get the earliest possible date?

16             MR. FLIER:  Yes, sir.

17             THE COURT:  Okay.  July 14th, is that agreeable with

18  your calendar?

19             MR. FLIER:  It is, yes, sir.

20             THE COURT:  We'll see you back July 14th.  Everybody

21  will be sentenced separately on it, on different dates.

22             MR. ESTRADA:  Your Honor, just to clarify, the times

23  of the various sentencings?

24             THE COURT:  Well, let me ask each person.  1:30 or

25  10:00?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. ESTRADA:  The government's fine with either time.

2          THE COURT:  1:30 or 10:00?

3          MR. SEVERO:  Either.  Either.

4          MR. PEREYRA-SUAREZ:  Either is fine with me, your

5    Honor.

6          MR. FLIER:  Either.

7          THE COURT:  Okay.  Let's do it at 10:00 o'clock.

8     Okay.  That'll be the order of the Court.

9          THE CLERK:  All rise.

10

11              *(Proceedings concluded at 10:32 a.m.)*

12

13                        *--oOo--*

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  MARCH 6, 2015

11

12

13

14                  /S/ SANDRA MACNEIL

15              Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                  - - - -

5

6                           CERTIFIED COPY

UNITED STATES OF AMERICA,        )
7                                )
                PLAINTIFF,       )
8                                )
        vs.                      )   No. CR 11-00072(A)-RGK-35
9                                )
RAFAEL PARSADANYAN,              )
10                               )
                DEFENDANT.       )
11  _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           MONDAY, SEPTEMBER 15, 2014

16                  1:31 P.M.

17           LOS ANGELES, CALIFORNIA

18

19

20

21

22      _____

23       *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
         *Official Reporter, U.S. District Court*
24             *255 East Temple Street*
            *Los Angeles, CA  90012*
25               *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

003128

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF UNITED STATES OF AMERICA:

 4        OFFICE OF THE UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 5            ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 6        LOS ANGELES, CALIFORNIA  90012
          213.894.4477

 7

 8   FOR DEFENDANT RAFAEL PARSADANYAN:

 9        FLIER AND FLIER, ALC
          BY:  ANDREW REED FLIER, ATTORNEY AT LAW
10        15250 VENTURA BOULEVARD, SUITE 600
          SHERMAN OAKS, CALIFORNIA  91403
11        818.990.9500

12

13   ALSO PRESENT:

14         CARL R. KNUDSON, FORENSIC ACCOUNTANT

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 15, 2014

 2                              1:31 P.M.

 3                              - - - -

 4          THE CLERK:  Calling calendar item No. 10, Case

 5  No. Criminal 11-72(A)-RGK, United States of America versus

 6  Rafael Parsadanyan.

 7      Counsel, please state your appearances.

 8          MR. ESTRADA:  Good afternoon, your Honor.  Martin

 9  Estrada and Elizabeth Yang on behalf of the United States.

10          THE COURT:  Counsel.

11          MS. YANG:  Good afternoon.

12          MR. FLIER:  Good afternoon, your Honor.  Andrew Flier,

13  F-l-i-e-r, on behalf of Mr. Parsadanyan, who is in custody

14  before the Court.  Good afternoon, sir.

15          THE COURT:  Good afternoon.

16      Counsel, if you and your client could approach the

17  lectern, please.

18      Okay.  In this particular matter, this is the time set for

19  sentencing.  The Court has read and considered numerous

20  documents that have been presented to the Court, including the

21  presentence report, the defendant's position paper, the

22  government's position paper, the responses by the government

23  and the defense, the objections to the presentence report, all

24  the exhibits that have also been introduced to the Court.

25      Are there any other documents that you'd like me to look
```

1    at before --

2         And we got one document this morning, Counsel, which I

3    believe was your reply to the -- to the government's position.

4         Is there any other documents you'd like me to read before

5    sentencing?

6              MR. ESTRADA:  Not on behalf of the government, your

7    Honor.

8              THE COURT:  Okay.  Counsel?

9              MR. FLIER:  Not on behalf of the defense, but I do

10   have Mr. Knudson here if the Court has any questions about that

11   issue.  Thank you.

12             THE COURT:  Okay.  Counsel, then, do you wish to -- do

13   you wish to be heard as far as sentence is concerned?

14             MR. FLIER:  Yes, very briefly.  Thank you, your Honor.

15        Your Honor -- and just procedurally, we're not going to

16   discuss anything about the motion for new trial.  We'll move on

17   from that, of course.

18             THE COURT:  Counsel, let me -- before you get to

19   sentencing, I think this is appropriate.

20        I understand the government is going to be making a

21   motion.

22             MR. ESTRADA:  Yes, your Honor.

23        Given that the charge, the fraud scheme, and defendant was

24   convicted of other counts with regard to the fraud scheme, the

25   government would move, in the interest of justice, to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    dismissing without prejudice Counts 63 and 66 at this time.

2            THE COURT:  63 and 66?

3            MR. ESTRADA:  Correct, your Honor.

4            THE COURT:  Any objection to those being dismissed?

5            MR. FLIER:  No, your Honor.

6            THE COURT:  Okay.  Okay.  Thank you, Counsel.

7        Now we can go ahead with sentencing.

8            MR. FLIER:  Procedurally, I wanted to start with that.

9    Thank you, your Honor.

10       Your Honor, I've been doing this a long time on both sides

11   of the table, and I'm really troubled about this case, and I'm

12   not going to be too long, and that's why we filed a very

13   lengthy sentencing brief of our position, probably the longest

14   one my law firm's ever prepared and been part of.  And the

15   reason why is -- and without getting into the facts of the

16   case, the Court heard the trial.  So that's going to save at

17   least 15 minutes of my argument already.  Unless the Court has

18   any specific questions about any specific fact that was alluded

19   to or stricken or any issue during the trial, of course I am

20   prepared to answer that and respond.

21       So let's get right to it.

22            THE COURT:  Okay.

23            MR. FLIER:  The main issue that the defense is having

24   a big problem with is twofold.

25       Number one is the amount of loss.  Clearly, in this case,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   I think the government can only proceed on the intended loss,

 2   because that figure, I would even argue, is greater than any

 3   actual loss.  But that's not what really troubles me here, and

 4   that's why we retained the expert, Mr. Knudson, who I think is

 5   fantastic, and he really developed those issues, too.  But he

 6   prepared a report, so I'll move on from him as to his findings,

 7   and that's why I said he's here and available to speak.

 8       During the trial, I said to my client and Mr. Gettleson,

 9   the law clerk, I said, I am going to focus, when any victim

10   testifies about the 99 Cent Store incident, about the loss.

11   And when I was done, and I know the Court was here with respect

12   to those specific issues, the loss was between seven and eight

13   thousand dollars.  In addition, we did find out, your Honor,

14   that although those were their losses and they're true victims,

15   the bank compensated all of them.  So that's why I started

16   again with my intended loss issue.

17       Your Honor, this loss of 16 levels or the 18 levels that

18   the people want, or the government, is wrong.  We have always

19   asked for a specific accounting, a specific fact, not just

20   records that are believed to be certain indications, because we

21   are truly troubled by this loss.

22       Next, the amount of victims issue.  If the Court looks at

23   the PSI report, we have an additional 16 levels for the loss,

24   which we are completely refuting, and then we have another six

25   levels for the 250-plus victims under the other code.  Right
```

1  there, those two combined, add 22 levels on a case that the

2  Court heard, and none of that evidence was presented.

3      Now, I understand that a defendant takes a big risk when

4  they go to trial, and that's the only reason why I mention --

5  not to tie the government's hands and definitely not the

6  Court -- that at one time before trial, not right before trial,

7  there was a two-year offer.  He didn't take it.  That's his

8  problem now.  But to go from a two-year offer, whether it goes

9  up a little by the people, to a recommendation by the

10  government of almost 14 years, I'm very troubled, and I don't

11  like it.  But whether I don't like something's a different

12  issue.  I just wanted to explain that to the Court, who I know

13  has experience both in state and federal.  So we're quarreling

14  with the loss issue.

15      My next argument comes to 3553 factors, your Honor, and

16  what I have articulated in my moving papers about minor role,

17  aberrant behavior, and other factors that would allow the Court

18  in its judicial discretion for a downward departure.  Those

19  issues are completely laid out in my moving papers, so unless

20  there's a specific issue -- and they also correlate with the

21  moving exhibits that we also filed with the Court.

22      Lastly, there is no doubt in my mind -- and I'm not here

23  to blame other co-defendants.  It's not my style.  But I will

24  say simply, as the Court knows, throughout this trial when the

25  Court admonished the jury repeatedly this only goes to

1   Mr. Parsadanyan, or Mr. Darbinyan, or Mr. Sharopetrosian, for

2   the first three weeks of this trial, 98 percent of the evidence

3   was limited to the two co-defendants that were also before the

4   Court, Sharopetrosian and Mr. Darbinyan.

5       So I know, just by objective factors, clearly

6   Mr. Parsadanyan is in a complete different situation than the

7   others.  And when I say the others, now I'm going to expand it,

8   your Honor, to not only the two co-defendants who went to

9   trial, but all the other defendants.  And I could be here for

10  another hour talking about the disparity issue that I laid out

11  in my 3553 part, your Honor, that if you really break down all

12  these defendants, I think only three or four at the most are

13  going to get a lengthy sentence.

14      That doesn't mean that he can't get a lengthy sentence,

15  but when we break it down, Mr. Parsadanyan has strong family

16  support.  He's a united -- strong family support.  He has a

17  business.  He's always had his businesses.  He works hard.  He

18  has no criminal prior history.  That's why I keep on saying I

19  don't want to get into the facts of the case, 'cause I

20  actually -- I believe the tapes show some conduct, but I don't

21  believe those tapes show the conduct that the people are trying

22  to articulate within their moving papers, your Honor.  My

23  client answers a phone, he's talking about some money, period.

24  His conduct is so different than all of the other main players,

25  I don't even think it's reasonable to argue against that.

```
 1          So now maybe we get to one of my main arguments.  And I'm
 2    almost done.  When is the starting point of this conspiracy?  I
 3    don't know.  I still don't know, and I tried the case.  I don't
 4    know if they want to say it's the beginning of February of
 5    2009.  Is it July of 2009, your Honor?  Does it end in August
 6    or September?  I don't know, but that becomes a critical issue
 7    for the Court in its analysis about the loss.
 8          It's our position, and finally, that Mr. Parsadanyan
 9    should be found responsible and accountable for the July 17th,
10    18th, and 19th dates.  Nothing else.  That doesn't mean he's
11    not in serious trouble, but that's what this conduct is
12    bestowed with respect to the evidence, your Honor.
13          And then, with all of the other factors, there should be a
14    significant downward departure.  And I don't say that lightly.
15    I've been doing this so long now, especially lately this year
16    with federal sentencing, and it's one of the few things I like.
17    I like federal sentencing because I know everything is going to
18    be analyzed and really looked into.
19          Everything bows in the favor of this young man, your
20    Honor, except the conviction, which of course is bad, and
21    that's bad, and that's why you remanded him.  He's been in
22    custody for four or five months now.  He has learned his
23    lesson, I promise you.  Plus, he's a sick man.  His whole
24    diet/health issue has changed.  But I already mentioned that.
25          So in the totality, if the Court would like me to address
```

1    any specific issues, or Mr. Knudson or anything, we are ready

2    to respond, but at this point what we would ask for is how I

3    articulate it in my moving papers, and I thought I was a little

4    creative -- I don't know if anyone else does -- with respect to

5    different sentencing options.

6         Thank you, your Honor.

7             THE COURT:  Thank you.

8         Counsel?

9             MR. ESTRADA:  Thank you, your Honor.

10        I don't think it will come as any surprise, but during the

11   course of this trial, there's very little that I've agreed with

12   Mr. Flier with, but I do agree with him on a point that he just

13   raised, which is that there's a lot of troubling facts in this

14   case.  But the troubling aspects of this case all point to his

15   defendant, because, while he claims that his defendant had a

16   minimal role in the case and a minor role in the case, the

17   Court knows this case very well, sat through the trial,

18   listened to calls.  This defendant had as many calls with

19   Darbinyan as any other defendant whose calls were played during

20   the course of this trial.  He had calls spanning the time from

21   July 2009 all the way to September of 2009, and for him to say

22   now that he wasn't aware of the scheme or the extent of the

23   scheme is belied by the calls themselves.

24        The Court will remember that he's in calls where he's

25   talking about delivering $34,000 to another co-schemer in the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    case.  The Court will recall calls, and I'm pointing

2    specifically to Exhibit 149 where he's talking about doing the

3    "day and night," meaning taking out the money before midnight

4    and after midnight, and talking about different amounts of

5    debit cards, a stack of 65, a stack of 50, a stack of 35.  For

6    him to claim now that he wasn't aware of the number of victims

7    in this case, which, by his calls alone, are at least over 50,

8    which is a plus-four enhancement, is belied by the facts.

9         In addition, as the Court knows, those amounts, those

10   debit card numbers are then to be multiplied by at least 500.

11   But as the government has argued, it should be a thousand,

12   given the "day and night" calls.  And totaling all that

13   together, just his calls alone, get him to a loss of well over

14   $110,000, just on what his calls were alone.

15        The Court will remember in Exhibit 166 he talks about

16   "thirty large," $30,000.  And the Court will recall how, in

17   other calls, regarding the recruiters of runners, he talked

18   about $10,900, $9,500.  He talked about very large amounts.

19   And that goes to the government's argument that the loss here,

20   as set forth by the guidelines, is to be determined by what is

21   reasonably foreseeable to this defendant.

22        This defendant essentially operated a trading house for

23   Darbinyan in which he'd receive the debit card numbers, the

24   fraudulent cards, and pass them on to the recruiters of

25   runners, who would then go out and have their runners get the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   money and bring it back.  Then he'd get the proceeds and give
 2   it back to Darbinyan.  He occupied a very important role in the
 3   scheme as having that one location, that brick-and-mortar
 4   location, his own business at AT&T, where all this illegal
 5   activity could take place.  In the government's view, that
 6   role, that very integral role, shows that the loss requested
 7   here is indeed reasonable, reasonably foreseeable to this
 8   defendant, and the losses are reasonably foreseeable to this
 9   defendant.
10       The government's already addressed the sophisticated
11   means.  All other courts to have addressed the scheme found
12   sophisticated means.  The Court has already addressed the
13   unauthorized access device enhancement of plus two.  All other
14   courts to have addressed defendants in this case have found the
15   plus two.  So I won't go into that again.
16       With regard to the 3553(a) factors, again, I'll share
17   Mr. Flier's view:  I'm very troubled by this case.  But what
18   I'm troubled by is a defendant who now claims to have all this
19   familial support, all these good deeds that he's done in his
20   past, these educational opportunities in the past, yet, despite
21   all that, despite having a seemingly legitimate business in the
22   AT&T store, he chose to work with Darbinyan, a validated Eme
23   associate, to be involved, and not just involved but greatly
24   involved, in this scheme.  He chose to be at his store and
25   allow Darbinyan to bring in proceeds.  He chose to be at his
```

```
1    store and allow other co-schemers to bring him money.  He chose

2    to be at his store and allow himself to hold on to these

3    counterfeit debit cards, which were then passed out to

4    victimize the hundreds of individuals who suffered through this

5    scheme.

6        So while I understand the argument of 3553(a), for me

7    personally, it doesn't fly in this case, because other

8    defendants who come before the Court, they don't have

9    opportunities, they don't have chances, they don't have

10   options.  This defendant had every opportunity, every option to

11   avoid this criminal conduct, yet he chose to be involved with

12   it, and that's why the government requests the sentence that it

13   does request.

14       Unless the Court has any further questions...

15       THE COURT:  Counsel, did your client -- why don't you

16   take the stand, or take the lectern again, you and your client.

17       Did your client wish to be heard on this?

18       MR. FLIER:  No, your Honor.

19       THE COURT:  Okay.  And do you wish to be heard any

20   further?

21       MR. FLIER:  Very briefly.

22       Your Honor, how is a defense supposed to respond to a

23   sentencing issue where the government attacks the best point

24   for the defense, which is his criminal background, since there

25   is none?  So, in other words, I just heard Mr. Estrada say he's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  troubled that he had all these opportunities and was good and

2  then fell into bad company and did this.

3      Well, I don't know when the argument for the defense would

4  ever work.  So if he has a record, he argues he has a terrible

5  record.  If there is no record, he argues he should have known

6  better.

7      The first, how he started, your Honor, respectfully, was,

8  we never said that Mr. Parsadanyan was not aware of the scheme.

9  We are saying that the government has miserably failed to prove

10  the loss figures on the specific time period of his involvement

11  in the scheme.

12      Number two, I don't remember one piece of evidence in this

13  case where it shows that the office and his store was a brewery

14  for all these people.  One incident, your Honor, on July 18th,

15  and that's the -- plus money that was found when he was stopped

16  with his friend in the car.  So that has now been turned around

17  to say their whole money pit and operation is coming out of

18  that business.  There's no evidence of that.

19      The 3553 factors, of course they become relevant.  That's

20  why they're in the guidelines, and they fall for his benefit,

21  not the government's.

22      So there's one last exhibit I want to talk about, and I

23  don't remember the number, your Honor, but there was an exhibit

24  during the trial that said, when Mr. Darbinyan was talking to a

25  co-conspirator, "Hey, let's not tell Rafi.  He doesn't know."

1    And I blasted that in final argument.  The point being, they

2    can talk about exhibits and calls.  There were some calls that

3    were beneficial to Mr. Parsadanyan.  But of course that's why

4    he was convicted, I think.  But the point is, he was not part

5    of the conspiracy the way the others were.  He was a little

6    player, and now he's turned out to be a big mole.

7        On behalf of Mr. Parsadanyan, we would respectfully

8    request what we asked for in our moving papers.

9        Thank you, your Honor.

10           THE COURT:  Thank you, Counsel.

11           MR. FLIER:  Thank you.

12           THE COURT:  Any legal cause why sentence should not --

13           MR. FLIER:  Mr. Parsadanyan -- thank you.

14           THE COURT:  Any legal cause why sentence should not

15    now be imposed?

16           MR. ESTRADA:  No, your Honor.

17           MR. FLIER:  No, your Honor.

18           THE COURT:  In this particular matter, the Court's

19    going to be making a few findings for the record.

20        First of all, as to the objections that were made by the

21    government and the defense to the presentence report, the

22    Court's going to overrule the objections.  I think that the

23    response of the probation department is appropriate as far as

24    those objections are concerned, and the Court would adopt

25    those.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1       I think that the probation department -- I know both sides

2  have an interest in the outcome of this.  The probation

3  department in the presentence report I think did an outstanding

4  job as far as being objective and really viewing this case as

5  it should be viewed and all the evidence that is before the

6  Court, and that is, that I don't think that we could stretch

7  this to over two million dollars, and I don't think you can

8  stretch it to under a million dollars.  I think they're

9  appropriate in their evaluation on it.  So the Court's going to

10 adopt -- and the number of victims.  The Court's going to adopt

11 the presentence report's recommendation on that, and that is,

12 that it's a level 33 guideline range, which is 133 months to

13 168 months, at a category 1, and that would be on all counts

14 other than 63 and 66.

15      I will also say at this time, though, once we get to those

16 guideline levels, under 3553, the Court must apply what it

17 thinks is appropriate and is sufficient to, but not more than

18 is necessary, to address the situation.

19      There's no question this is a very serious enterprise that

20 was entered into here, with very serious and sophisticated

21 actions on the part of the defendant: multiple bank fraud

22 involving skimming devices, et cetera.  Extremely serious.  At

23 the same time, there's mitigating factors, such as the -- there

24 is evidence, or maybe a lack of evidence, that he really

25 profited as much as the other people that were involved in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    this, didn't have as much at stake as maybe the others did,

2    although he was very integral and sophisticated in his entry

3    into this enterprise, but there's also no evidence that he is

4    part of this Armenian Power that the others were part of.

5        The outside activity, other than his activity in this, he

6    seems to have had no problems at all in his life.  He seems to

7    be a law-abiding citizen with the exception of this

8    involvement, which, again, I'm not minimizing.  It's a very

9    serious involvement.  But there is no criminal history, and he

10   has been isolated, at least as far as the evidence goes, from

11   some of the activities of the others involved in this case.

12   But he is also responsible for any foreseeable acts of himself

13   and others in furtherance of this enterprise that he was

14   involved with.  And therefore, the Court, under 3553, finds

15   that there is a variance that is appropriate in this, taking it

16   from the level 33, and the Court feels, under all the factors

17   of 3553, including the seriousness of the crime, the nature and

18   circumstances of the offense, the history and characteristics

19   of the defendant, the need to reflect the seriousness of the

20   offense, all the factors of 3553, and I could go through them

21   all here, but I'm not going to, even including such things as

22   disparate sentences and all, the Court feels comfortable, even

23   considering the guideline level, the appropriate sentence on

24   this would be a six-year sentence on it.

25        Therefore, it is ordered the defendant will pay to the

1   United States a special assessment of $1,200, which is due

2   immediately.  Any unpaid balance shall be due during the period

3   of imprisonment at a rate of no less than $25 per quarter and

4   pursuant to the Bureau of Prisons' Financial Responsibility

5   Program.

6       Pursuant to Title 18 of the United States Code, Section

7   3664(d)(5), a deferred restitution hearing shall be calendared

8   for no more than 90 days from this date.  An amended judgment

9   will be entered after such determination.  If the amended

10  judgment is not entered within 90 days, the ability to order

11  such restitution will terminate.

12      All fines are waived, as it is found the defendant does

13  not have the ability to pay a fine in addition to the

14  restitution.

15      Pursuant to the Sentencing Reform Act of 1984, it's the

16  judgment of the Court that the defendant is hereby committed on

17  Counts 38 to 41, 44, 45, 48, 50, 51, 54, 57, and 60 of the

18  first superseding indictment to the custody of the Bureau of

19  Prisons, to be imprisoned for a term of 72 months.

20      This term is to consist of 72 months on each of Counts 38

21  through 41, 44, 45, 48, 50, 51, 54, 57, and 60 of the first

22  superseding indictment, to be served concurrently.

23      Upon release from imprisonment, defendant shall be placed

24  on supervised release for a term of five years under the

25  following terms and conditions.  This term is to consist of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    five years on each of Counts 38 to 41, 44, 45, 48, 50, 51, 54,

2    57 to 60, 63, and sixty- -- excuse me -- 57 and 60, not 63 and

3    66, of the first superseding indictment, all such terms to run

4    concurrently under the following terms and conditions:

5        The defendant shall comply with the rules and regulations

6    of the United States Probation Department and General Order

7    5-02;

8        The defendant shall not commit any violations of local,

9    state, or federal law or ordinances.

10       The recommended -- and I think both sides have had

11   recommended tentative supervised release conditions.  Number 3

12   was a drug condition.  I don't see any need for that at this

13   time.

14           MR. FLIER:  That was the only one I was going to bring

15   up.  Submitted, your Honor.

16           THE COURT:  Okay.  So I'm not going to impose number

17   3, the drug condition.

18       Number 4, during the period of community supervision, the

19   defendant shall pay a special assessment in accordance with the

20   judgment's order pertaining to such payment;

21       Also, defendant shall comply with any immigration rules

22   and regulations of the United States, and if deported from this

23   country either voluntarily or involuntarily, not re-enter the

24   United States illegally;

25       The defendant is not required to report to the probation

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   officer while residing outside the United States; however,

 2   within 72 hours of release from any custody or any re-entry

 3   into the United States during the period of court-ordered

 4   supervision, the defendant shall report for instructions to the

 5   United States Probation Office located at the United States

 6   Courthouse, 312 North Spring Street, Room 600, Los Angeles,

 7   California, 90012;

 8        The defendant shall cooperate in the collection of DNA

 9   sample from the defendant;

10        The defendant shall not associate with anyone known by him

11   to be an Armenian Power gang member or others known to him to

12   be participants in the Armenian Power gang criminal activities,

13   with the exception of any family members.  He may not wear,

14   display, use, or possess any gang insignias, emblems, badges,

15   buttons, caps, hats, jackets, shoes, or any other clothing that

16   the defendant knows evidences affiliation with the Armenian

17   Power gang, and may not display any signs or gestures that the

18   defendant knows evidences affiliation with the Armenian Power

19   gang;

20        As directed by the probation officer, defendant shall not

21   be present at any area known by him to be a location where the

22   members of the Armenian gang members meet or assemble.

23        One more time, under 3553, I think this variance is

24   appropriate.  It's about half of what it would be without the

25   variance, a little bit more than half, about half, but I think
```

1    it is appropriate under all the conditions, which I'm saying

2    basically is that you've got everything going for you when you

3    get out, and you're not going to be that old when you get out.

4    There is no reason for you to get back into this again.  You've

5    got everything going for you.  You've got family behind you.  I

6    would assume that, when you get out, you'll have no

7    affiliations, hopefully, with the Armenian gang or any other

8    gangs.  You can really make yourself a productive person in

9    society, someone that people can be proud of.  So good luck on

10   that, sir.

11          MR. FLIER:  Your Honor, I would just ask for a local

12   jurisdiction, and we would ask for Terminal Island, your Honor,

13   please.

14          THE COURT:  Okay.

15          MR. FLIER:  Thank you.

16          THE COURT:  In this particular matter, first of all,

17   the restitution hearing is going to be on December 1st, 2014,

18   at 1:30 p.m.

19      The Court also is advising the defendant, if you wish to

20   appeal this sentence, it has to be done within 14 days of

21   today.

22      The Court is going to recommend that you be housed in the

23   Southern California area.

24      The Court doesn't make specific recommendations to a

25   particular location, but I will go on the record as saying I

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    have no objection to him being housed in Terminal Island.

2              MR. FLIER:  Thank you, your Honor.

3              MR. ESTRADA:  Your Honor?

4              THE COURT:  Yes, Counsel.

5              MR. ESTRADA:  Two things.  One is, I may have

6    misheard, but I thought I heard the Court say the sentencing

7    guidelines range of imprisonment, based on the Court's

8    findings, were 133 to 168.

9              THE COURT:  135 to 168.

10             MR. ESTRADA:  The second thing, your Honor, is with

11   regard to restitution, the government did brief that in its

12   position paper and stated the number and also provided the

13   exhibit supporting that restitution amount.  If the Court wants

14   to avoid having a restitution hearing, I think that can be

15   resolved now.

16             THE COURT:  I don't know if counsel wants to submit

17   it, or if not, we have the restitution hearing on -- we should

18   give both sides a chance to respond to it on February 1st.

19             MR. FLIER:  I thought it was December 1st.

20             THE COURT:  Excuse me.  December 1st.

21             MR. FLIER:  We would like to have the hearing, your

22   Honor.

23             THE COURT:  We'll set it for December 1st, then.

24             MR. FLIER:  Thank you.

25             THE COURT:  And you've already been -- I'm assuming
```

1    you've already gotten his position papers on restitution?

2            MR. FLIER:  Yes.

3            MR. ESTRADA:  And that was filed, your Honor, on July

4    22nd, 2014.

5            THE COURT:  Okay.

6            MR. ESTRADA:  Docket No. 3399.

7        And finally, your Honor, in the interest of justice, the

8    government would move to dismiss the counts in the underlying

9    indictment as to this defendant.

10           THE COURT:  That'll be granted.

11           MR. ESTRADA:  Thank you, your Honor.

12           THE COURT:  Thank you, Counsel.

13

14                *(Proceedings adjourned at 1:59 p.m.)*

15

16                        *--oOo--*

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003150**

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  MARCH 3, 2015

11

12

13

14               /S/ SANDRA MACNEIL

15            Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                        - - - -

5

6                                    CERTIFIED COPY

   UNITED STATES OF AMERICA,        )
7                                    )
                     PLAINTIFF,      )
8                                    )
        vs.                          )    No. CR 11-00072(A)-RGK-4
9                                    )
   ARMAN SHAROPETROSIAN,            )
10                                   )
                     DEFENDANT.      )
11   _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            MONDAY, SEPTEMBER 22, 2014

16                   10:20 A.M.

17            LOS ANGELES, CALIFORNIA

18

19

20

21

22     _____

23        SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
           Official Reporter, U.S. District Court
24                255 East Temple Street
                  Los Angeles, CA  90012
25                   213.894.5949

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF UNITED STATES OF AMERICA:

 4        OFFICE OF THE UNITED STATES ATTORNEY
          BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
 5            ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 6        LOS ANGELES, CALIFORNIA  90012
          213.894.4477

 7

 8   FOR DEFENDANT ARMAN SHAROPETROSIAN:

 9        LAW OFFICES OF CHARLES PEREYRA-SUAREZ
          BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
10        800 WILSHIRE BOULEVARD, 12TH FLOOR
          LOS ANGELES, CALIFORNIA  90017
11        213.623.5923

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 22, 2014

 2                        10:20 A.M.

 3                        - - - -

 4          THE CLERK:  Calling calendar item No. 11, case

 5  No. Criminal 11-72(A)-RGK, United States of America versus

 6  Arman Sharopetrosian.

 7       Counsel, please state your appearances.

 8          MR. ESTRADA:  Good morning, your Honor.  Martin

 9  Estrada and Elizabeth Yang on behalf of the United States.

10          THE COURT:  Okay.

11          MS. YANG:  Good morning.

12          MR. PEREYRA-SUAREZ:  Good morning, your Honor.

13  Charles Pereyra-Suarez with Mr. Sharopetrosian.  He is present,

14  in custody.

15          THE COURT:  Okay.  And Counsel, why don't you approach

16  the lectern.  And would your client like to be with you up

17  there?

18       There you go.

19       Okay.  In this particular matter, this is the time set for

20  sentencing.  The Court has read and considered multiple

21  documents that have been submitted to the Court, including the

22  presentence report, the position papers by the defendant and

23  the government, the response papers by the government and the

24  defendant, and the objections that have been filed, and the

25  probation department's response to those objections.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          Are there any other documents you want me to take a look
 2     at?
 3              MR. ESTRADA:  I don't believe so, your Honor.  I think
 4     you covered it.
 5              THE COURT:  Okay.  Counsel, then, do you wish to be
 6     heard?
 7              MR. PEREYRA-SUAREZ:  Yes.  Thank you, your Honor.
 8          You're correct, your Honor, that there have been quite a
 9     few sentencing position papers filed in this case, including a
10     PSR, a recommendation letter, an addendum to the PSR, the
11     government's two sentencing position papers, its original
12     sentencing position and then a supplemental response --
13              THE COURT:  To your --
14              MR. PEREYRA-SUAREZ:  -- to the government's papers,
15     and then reply papers from the defense to that response.
16              THE COURT:  Correct.
17              MR. PEREYRA-SUAREZ:  Obviously, the Court is aware of
18     the circumstances of this case because a trial occurred in your
19     courtroom.
20              THE COURT:  Sure.
21              MR. PEREYRA-SUAREZ:  And the Court heard quite a bit
22     of testimony from government witnesses, defense witnesses.
23     More to the point, the testimony of alleged victim M.M.  We've
24     addressed in our sentencing position memoranda how we think the
25     Court ought to treat that testimony in terms of a potential
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    downward departure for Mr. Sharopetrosian.

2         What is somewhat unique about this case is that there have

3    been two prosecutions, one in the Santa Ana Federal Court,

4    another one here.  There were two indictments.  This -- the

5    indictment in this case was filed in July of 2011.  The

6    indictment -- I'm sorry.

7              THE DEFENDANT:  January.

8              MR. PEREYRA-SUAREZ:  My client says it was in January,

9    but in any event --

10             THE COURT:  Of 2011.

11             MR. PEREYRA-SUAREZ:  2011.

12        The other one filed subsequently in 2011, and that became

13   the case assigned to Judge Carter in Santa Ana.

14        The government and the U.S. Probation Office are both

15   recommending a concurrent 210-month sentence.

16             THE COURT:  Consecutive.

17             MR. PEREYRA-SUAREZ:  I'm sorry, a consecutive sentence

18   of 210 months in this case.  That would be on top of a sentence

19   of 300 months in the case before Judge Carter.  If my math is

20   correct, that's 510 months total, or 42 and a half years.

21        There is a lot of discussion in the sentencing position

22   papers about sentencing guidelines calculations, groupings,

23   policy positions of the U.S. Sentencing Commission.  There's a

24   lot of case law regarding the issues of concurrent versus

25   consecutive sentencing.  And I won't belabor all of the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   material that's already been briefed, but it's

2   Mr. Sharopetrosian's position that what would be appropriate

3   here is a sentence sufficient to punish him, to act as a

4   deterrent, and nothing more than what is sufficient.

5        The government, for its own reasons, chose to prosecute

6   this case against Mr. Sharopetrosian in two separate

7   indictments.  That already has occurred.  That was an exercise

8   in prosecutorial discretion, but now we come to an issue that's

9   within the Court's discretion.  And the issue posed by

10  Mr. Sharopetrosian is whether it would be appropriate at this

11  juncture essentially to pile it on, to add another 210 months,

12  or another 17 and a half years, to the sentence imposed by

13  Judge Carter in Santa Ana of 25 years.

14       Mr. Sharopetrosian is now approximately 36 years old.  A

15  sentence of 25 years is already a lengthy sentence for a person

16  his age.  Our position is that, certainly under the analysis

17  presented in the sentencing position papers, the analysis

18  presented by the defense, a sentence of 30 months concurrent to

19  the 25-year sentence imposed by Judge Carter would be a

20  sufficient sentence to accomplish all of the punishment and

21  deterrence purposes of sentencing in this case.

22       Thank you.

23            THE COURT:  Counsel?

24            MR. ESTRADA:  Yes, your Honor.

25       Your Honor, like counsel, I'm not going to go over the

```
1   guidelines again.  I think there have been sufficient
2   submissions with regard to the guideline analysis.  We
3   obviously agree with the probation department, the probation
4   department's calculation of the total offense level of 31 in
5   this case.  And that's not based on just facts that were
6   presented during sentencing, they are based on facts that this
7   Court saw firsthand during the presentation of evidence in this
8   case.  And related to that guideline analysis, what the Court
9   saw firsthand in this case was remarkably reprehensible conduct
10  by this defendant, a very serious extortion plot that involved
11  others on the outside, outside prison, intimidating, holding,
12  threatening a victim, and not just a victim, but his family and
13  his children and his father as well.  So it's incredibly
14  reprehensible conduct, which goes to the government's
15  recommendation in this case.
16      As the Court is aware, all this occurred, which, for me is
17  an aggravating factor, while this defendant was already in
18  state prison, and he's in state prison getting smuggled cell
19  phones to commit further criminal activity, including this
20  extortion plot.
21      Now, I want to address this issue of the two indictments.
22  The reason there were two indictments is because there were two
23  completely separate sorts of criminal conduct.  In this case,
24  the entirety of the evidence presented before this Court had
25  nothing to do with the Orange County case.  This defendant, if
```

1    anything, showed that he was a very intense criminal in the

2    sense that he had varied activities.  He didn't limit himself

3    to extortions.  He also engaged in fraud and identity theft.

4    And what was in the Orange County case was him working with

5    African-American inmates and people on the outside to engage in

6    a bank fraud scheme that had already been going on by the time

7    that he joined in and began using his people on the outside,

8    who, again, were completely separate from the Los Angeles

9    indictment except for one person, to get them to assist and

10   engage in massive check fraud and identity theft.  And for

11   that, he was punished, and for that, Judge Carter, finding that

12   it was one of the more sophisticated schemes he'd ever seen,

13   gave him a 25-year sentence.

14        But this case was completely separate.  This case involved

15   his conduct with Mher Darbinyan.  And his conduct with Mher

16   Darbinyan was him using Darbinyan as, in his own words, his

17   arms and hands on the outside to help intimidate the victim and

18   to threaten the victim.  And that was completely separate.

19   That had nothing to do with the African-American inmate.

20        In the government's view, for him to now try to shield

21   himself from criminal liability for his extortion plot, using

22   the fact that he was a very varied criminal in the sense that

23   he did many different activities, goes against the purposes of

24   the sentencing guidelines, goes against the purpose of

25   appropriate sentencing.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      Now, I think, as the Court saw from the papers, and there

2  was a very voluminous filing, sentencing position, by the

3  defendant, the sentence in the Orange County case is being

4  hotly contested, is on appeal, and certainly the defendant is

5  attempting to limit his exposure in that case.  And there are

6  various issues with regard to that appeal.  That, in the

7  government's view, only enhances the fact that, for this Court,

8  they should be treated separately.  They are separate conduct,

9  they occurred at separate times, and they are different issues

10 that are going to be addressed on appeal in that case and that

11 are going to be addressed in this case.  For that reason, the

12 government believes that the recommended sentence of 210 months

13 in this case is appropriate, given the varied criminal activity

14 that this defendant was involved with.

15      THE COURT:  Okay.  Thank you, Counsel.

16 You may respond.

17      MR. PEREYRA-SUAREZ:  Yes.  Briefly, your Honor.

18      I've cited in my reply papers at page 2, the very top of

19 the page, as one example of the similarities between the Santa

20 Ana case and this case.  Pages 67 through 72 and pages 76

21 through 78 of the first superseding indictment in this case

22 allege the very same conduct underlying the Santa Ana federal

23 indictment.

24      Certainly this Court is aware of massive, massive

25 indictments in RICO cases that the U.S. Attorney's Office has

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   been filing for many years.  They certainly could have filed

2   this case as one indictment.  There was a lot of overlap.

3        But more importantly, whatever happens on the Ninth

4   Circuit appeal of the Santa Ana case, whether the ultimate

5   sentence, after the Ninth Circuit reviews all of those issues,

6   whether that ultimate sentence is going to be 25 years or some

7   other number, we still, as a criminal justice system, do not

8   need to pile it on.  And whatever sentence this Court imposes

9   could be made concurrent to the sentence in the Santa Ana case,

10  so that whatever happens on the Santa Ana appeal, we're not

11  talking about a total sentence of 42 and a half years, but only

12  a sentence that is sufficient to punish Mr. Sharopetrosian for

13  his criminal conduct.  So, therefore -- for example, if the

14  Court decided to impose a sentence greater than 30 months,

15  whatever that sentence is, it could be made to run concurrent

16  to the Santa Ana federal sentence so that we don't have an

17  unnecessary piling on of time for a 36-year-old defendant.

18            THE COURT:  Thank you.

19            MR. ESTRADA:  Can I just -- the charges -- very

20  briefly, your Honor.  I think talking about the indictment and

21  the charges misses the point.  There were charges in the

22  indictment that showed this defendant's connection to another

23  person, Markosian, who was also in both cases, but that was the

24  extent of it.  But when that case was tried in Santa Ana, and

25  we were having, years later, a separate trial here, they were

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    completely separate.  They were distinct conspiracies, separate

2    conspiracies, and of course, this defendant would be

3    complaining legally if we had presented the same conduct in the

4    Orange County case in this case.  The bottom line is, what

5    mattered is what was presented in court.  What was presented in

6    court was completely separate criminal activity.

7         In the government's view, this defendant shouldn't get a

8    free pass simply because he was a very aggressive and varied

9    criminal.

10             THE COURT:  Okay.  Mr. Sharopetrosian, would you care

11    to address the Court?

12             THE DEFENDANT:  No.  No, your Honor.

13             THE COURT:  Okay.  In this particular matter, the

14    Court's got to make a couple of findings.

15         First of all, on the objections to the presentence report,

16    the first objection being that the indictment should have been

17    tried at the same time, the Court's going to overrule that

18    objection based on the fact that these are two different,

19    separate conduct, separate victims, separate incidences, and

20    the Court is going to find that charging him separately is

21    appropriate.

22         As to the second one, the five-level enhancement and

23    two-level enhancement for the physical restraints and the

24    brandishing of firearm, the Court's going to find that those

25    are appropriate.  There's an argument as to whether or not it

1    should be proof by clear and convincing or if it should be by

2    preponderance of evidence.  I think it's preponderance of

3    evidence.  But one way or the other, even if it were not -- if

4    it's clear and convincing, the Court, having heard all the

5    testimony in this case and reviewing all the reports, would

6    even be convinced by clear and convincing evidence.

7        The double counting -- excuse me.  I'm sorry.

8        The two-level enhancement for the aggravating role, again

9    I think is appropriate.  And the defense objection to the

10   criminal history 5, also the Court feels criminal history 5 is

11   appropriate, and that the guideline range as established in the

12   presentence report is the appropriate guideline range.  That is

13   168 to 210 months, level 31, category 5.

14       The government and the PS -- and the probation department

15   are asking for the high end of that range, which is 210 months.

16       Based on the aggravation, the type of offense it was, and

17   based on the fact that it was done, second time done from in

18   custody, no mitigating factors -- the Court finds there are

19   some mitigating factors as far as his involvement in this

20   crime, but at the same time, the aggravating factors probably

21   outweigh those.  So then I've gotta go to 3552 -- or 3553,

22   because that's really what I sentence under.  I do take into

23   consideration the guideline levels, which I have in this case,

24   but then I have to look at what is the appropriate sentence

25   under 3553.  And under all the circumstances, taking all those

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    factors into consideration, such as the nature and

2    circumstances of the offense and the history and

3    characteristics of the defendant, the need for the

4    sentencing -- the sentence that's imposed to reflect the

5    seriousness of the offense, to promote respect for the law and

6    provide just punishment for the offense, to afford adequate

7    deterrence to criminal conduct, to protect the public from

8    further crimes, all these areas, to avoid unwarranted

9    disparities, all these factors of 3553, what is the appropriate

10   sentence that is sufficient enough but not more than is

11   required in this case, and I think it's a little less than the

12   210.  I think that the appropriate range, if I was filing -- or

13   sentencing just under 3553, would be a 16-year sentence, and so

14   the Court's going to impose that, or 192 months.

15        Therefore, it is ordered the defendant shall pay the

16   United States a special assessment of $300, which is due

17   immediately.  Any unpaid balance shall be due during the period

18   of imprisonment at a rate of no less than $25 per quarter and

19   pursuant to the Bureau of Prisons' Financial Responsibility

20   Program.

21        Pursuant to Title 18 of the United States Code, Section

22   3664(d)(5), a deferred restitution hearing shall be calendared

23   for 90 days from the date of this offense.

24        Do we have a date on that?

25             THE CLERK:  I'll look it up.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Okay.

 2      An amended judgment will be entered after that

 3  determination.  If the amended judgment is not entered within

 4  90 days, the ability to order such restitution will terminate.

 5          MR. ESTRADA:  Your Honor, the government has consulted

 6  with the victim and will not be seeking restitution.

 7          THE COURT:  Then, in that case, the restitution

 8  condition will be stricken.

 9          MR. PEREYRA-SUAREZ:  In that case, we don't need to

10  schedule another hearing?

11          THE COURT:  No.

12      All fines are waived, as it is found the defendant does

13  not have the ability to pay any fine in addition to the

14  restitution in -- or excuse me -- does not have the ability to

15  pay such fine.

16      Pursuant to the Sentencing Reform Act of 1984, it's the

17  judgment of the Court that the defendant is hereby committed on

18  Count 1, 4, and 5 of the first superseding indictment to the

19  custody of Bureau of Prisons for a term of 192 months.

20      This term is to consist of 192 months on each of Count 1,

21  4, and 5 of the first superseding indictment, to be served

22  consecutively with the undischarged term imposed under docket

23  No. 8:09-CR-00248(B)-DOC, which is the Orange County case that

24  we were talking about earlier.

25      The Bureau of Prisons shall determine the defendant's
```

```
1    eligibility to participate in the 500-hour drug treatment

2    program.

3         Upon release from imprisonment, the defendant shall be

4    placed on supervised release for a term of three years.  The

5    term consists of three years on each of 1, 4, and 5 of the

6    first superseding indictment.  All such terms shall run

7    concurrently to each other and concurrently to the supervised

8    release terms imposed under docket No. CR-248(B), which is the

9    Santa Ana case that we've been talking about, and shall be

10   under the following terms and conditions:

11        The defendant shall comply with the rules and regulations

12   of the United States Probation Office and General Order 5-02;

13        The defendant shall not commit any violations of local,

14   state, or federal law;

15        The defendant shall refrain from any unlawful use of a

16   controlled substance.  The defendant shall submit to one drug

17   test within 15 days of imprisonment -- excuse me -- of release

18   from imprisonment and at least two periodic drug tests

19   thereafter, not to exceed eight drug tests per month as

20   directed by the probation officer;

21        The defendant shall participate in an outpatient substance

22   abuse treatment and counseling program that includes

23   urinalysis, breath and/or sweat patch testing as directed by

24   the probation office.  The defendant shall obtain -- shall

25   abstain from using any illicit drugs or alcohol or from abusing
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    prescription medication;

2    During the course of supervision, the probation officer,

3    with the agreement of the defendant and defense counsel, may

4    place the defendant in a residential drug treatment program

5    approved by the United States Probation Office for treatment of

6    narcotic addiction or drug dependency, which may include

7    counseling or testing to determine if the defendant has

8    reverted to the use of drugs, and the defendant shall reside in

9    the drug treatment program until discharged by the program

10   director and probation officer;

11   As directed by the probation officer, the defendant shall

12   pay all or part of the cost of treating the defendant's drug

13   dependency to the aftercare contractor during the period of

14   community supervision pursuant to Title 18 of the United States

15   Code, Section 3672, and the defendant shall provide payment or

16   proof of payment as directed by the probation officer;

17   During the period of community supervision, the defendant

18   shall pay the special assessments in accordance with this

19   judgment's order pertaining to such payment;

20   The defendant shall comply with the immigration rules and

21   regulations of the United States, and if deported from this

22   country either voluntarily or involuntarily, not re-enter the

23   United States illegally.  The defendant is not required to

24   report to the probation officer while residing outside of the

25   United States; however, within 72 hours of release from any

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003167**

```
1   custody or any re-entry into the United States during the

2   period of court-ordered supervision, the defendant shall report

3   for instructions to the United States Probation Office located

4   at the United States Courthouse, 312 North Spring Street, Room

5   600, Los Angeles, California, 90012;

6        I don't quite understand the tax -- I'm not going to

7   impose paragraph 9.

8        The defendant shall not obtain or possess any driver's

9   license, Social Security number, birth certificate, passport,

10  or any other form of identification in any name other than the

11  defendant's true legal name, nor shall the defendant use for

12  any purpose or in any manner any name other than his true legal

13  name or names without the prior written approval of the

14  probation officer;

15       Defendant shall cooperate in a collection of DNA sample

16  from the defendant;

17       And -- just a second.

18       The defendant shall apply monies received from any income

19  tax refund, lottery winnings, inheritances, judgments, or any

20  unanticipated or anticipated financial gain, to the outstanding

21  court-ordered financial obligations;

22       The defendant shall not associate with anyone known to him

23  to be Armenian Power gang members or others known by him to

24  participate in the Armenian Power gang criminal activity, with

25  the exception of his own family members.  He may not wear,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    display, use, or possess any gang insignias, emblems, badges,

2    buttons, caps, hats, jackets, shoes, or any other form of

3    clothing that the defendant knows evidences affiliation with

4    the Armenian Power gang, and may not display any signs or

5    gestures that defendant knows evidences affiliation with the

6    Armenian Power gang;

7         As directed by the probation officer, the defendant shall

8    not be present at any areas known by him to be locations where

9    members of the Armenian Power gang meet or assemble;

10        The Court authorizes the probation office to disclose the

11   presentence report to the substance abuse treatment provider to

12   facilitate the defendant's treatment of narcotic addiction or

13   drug dependency.  Further redisclosure of the presentence

14   report by the treatment provider is prohibited without the

15   consent of the sentencing judge.

16        I did recommend the 500-hour narcotic program, I believe.

17             MR. PEREYRA-SUAREZ:  Yes, you did, your Honor.

18             THE COURT:  That's assuming that the defendant wants

19   to be considered for that program.

20             MR. PEREYRA-SUAREZ:  May I have a moment, your Honor?

21             THE COURT:  Yeah.

22        (Mr. Pereyra-Suarez and the defendant confer privately.)

23             THE COURT:  Counsel, the reality is, is that he

24   doesn't have to take it if he doesn't want to.  That's just a

25   recommendation if he wants it.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. PEREYRA-SUAREZ:  That's fine, your Honor.  I

 2    understand from Mr. Sharopetrosian that Judge Carter also

 3    recommended it.

 4              THE COURT:  Yeah.  And some -- he can take it if he

 5    wants.

 6         You don't have to take it if you don't want it.  It's just

 7    a recommendation that, if you do want it, then you should be

 8    evaluated for it.

 9         Counsel, anything else?

10              MR. ESTRADA:  Just a couple matters, your Honor.

11         First, with regard to the condition No. 9 about the filing

12    and paying of taxes, I believe that's related to paragraph 50

13    of the PSR where the defendant has a conviction for failure to

14    file tax return.

15              THE COURT:  Yeah, but not in this case.

16              MR. ESTRADA:  Yes.

17              THE COURT:  Okay.

18              MR. ESTRADA:  The second thing is, in the interest of

19    justice, the government would move to dismiss the underlying

20    indictment in this case.

21              THE COURT:  Dismissed.

22              MR. ESTRADA:  As well as any remaining counts in the

23    first superseding indictment for which this defendant was not

24    convicted.  I don't believe there are any, but in the abundance

25    of caution, I'll --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003170**

```
 1            THE COURT:  If there are, they will be dismissed.

 2            MR. ESTRADA:  Thank you, your Honor.

 3            THE COURT:  Are you asking for local -- Southern

 4     California housing?

 5            MR. PEREYRA-SUAREZ:  No.  I thought I would be asking

 6     for that, but my client just told me he doesn't need that

 7     recommendation.

 8            THE COURT:  That's fine.  That's fine.

 9            MR. PEREYRA-SUAREZ:  Thank you, your Honor.

10            THE COURT:  That'll be the order of the Court.

11            MR. ESTRADA:  Thank you, your Honor.

12            THE COURT:  If you wish to appeal this sentence, it

13     has to be done within 14 days of today.

14            THE CLERK:  All rise.

15

16            (Proceedings adjourned at 10:45 a.m.)

17

18                        --oOo--

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

<u>CERTIFICATE</u>

   *I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported proceedings
held in the above-entitled matter and that the transcript page
format is in conformance with the regulations of the
Judicial Conference of the United States.*

*Date:  MARCH 3, 2015*

                    */S/ SANDRA MACNEIL*
                    _____

             *Sandra MacNeil, CSR No. 9013*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1           UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                     - - - -

5

6                                    CERTIFIED COPY

   UNITED STATES OF AMERICA,        )
7                                    )
                   PLAINTIFF,        )
8                                    )
        vs.                          )   No. CR 11-00072(A)-RGK-1
9                                    )
   MHER DARBINYAN,                   )
10                                   )
                   DEFENDANT.        )
11   _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             MONDAY, NOVEMBER 10, 2014

16                   2:01 P.M.

17             LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23        SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
          Official Reporter, U.S. District Court
24               255 East Temple Street
              Los Angeles, CA  90012
25                 213.894.5949


       UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   APPEARANCES OF COUNSEL:

2

3   FOR PLAINTIFF UNITED STATES OF AMERICA:

4         OFFICE OF THE UNITED STATES ATTORNEY
          BY:  ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
5         312 NORTH SPRING STREET
          LOS ANGELES, CALIFORNIA  90012
6         213.894.4477

7         UNITED STATES DEPARTMENT OF JUSTICE
          BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
8         312 NORTH SPRING STREET
          LOS ANGELES, CALIFORNIA  90012
9         213.894.2579

10
    FOR DEFENDANT MHER DARBINYAN:
11
          THE SEVERO LAW FIRM
12        BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
          70 SOUTH LAKE AVENUE, SUITE 945
13        PASADENA, CALIFORNIA  91101
          626.844.6400
14

15  ALSO PRESENT:

16        SPECIAL AGENT JEREMY STEBBINS, FBI

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, NOVEMBER 10, 2014

 2                             2:01 P.M.

 3                             -  -  -  -

 4         THE CLERK:  Calling calendar item No. 13, case

 5  No. Criminal 11-72(A)-RGK, United States of America versus

 6  Mher Darbinyan.

 7       Counsel, please state your appearances.

 8         MS. YANG:  Good afternoon, your Honor.  Elizabeth Yang

 9  and Andrew Creighton on behalf of the United States.  Joining

10  us at counsel table is Agent Jeremy Stebbins from the FBI.

11         THE COURT:  Okay.  Thank you, Counsel.

12         MR. SEVERO:  Good afternoon, your Honor.  Michael

13  Severo appearing on behalf of Mr. Darbinyan.  He's present, in

14  custody.

15         THE COURT:  Thank you, Counsel.  If you and your

16  client could approach the lectern, please.

17         MR. SEVERO:  Yes, your Honor.

18         THE COURT:  Okay.  In this particular matter, the

19  Court, first of all, heard the jury trial in this matter.  Also

20  I've read numerous documents from the defendants, from the

21  government, as far as positions go and oppositions and replies

22  and positions, presentence report, numerous exhibits,

23  government's exhibits, Government's Exhibits A through G, the

24  Defense Exhibits A through D.

25       Are there any other documents that I've not been presented
```

1    with yet?

2            MR. SEVERO:  I think you have it all from the defense

3    now.

4            THE COURT:  Okay.

5            MS. YANG:  Not on behalf of the government, your

6    Honor.

7            THE COURT:  I'm not too sure I don't have every

8    document here.

9        Okay.  In this matter, this is the time set for

10   sentencing.

11       Counsel, do you wish to be heard?

12           MR. SEVERO:  Yes, your Honor.  Thank you very much.

13           MS. YANG:  Your Honor, I apologize for interrupting.

14       I think, as a procedural matter, the Court needs to rule

15   on the defendant's second motion for new trial that he had

16   filed just last Thursday prior to proceeding to the sentencing.

17           THE COURT:  Why?  Why, Counsel?

18           MS. YANG:  If there is a pending motion for new trial,

19   your Honor, my understanding is that the sentencing needs to be

20   held in abeyance until the Court rules as to whether the newly

21   discovered -- or, as it's phrased, the newly discovered

22   evidence warrants a new trial.

23           THE COURT:  Well, he's made his motion.  You made your

24   opposition to the motion.  I've got both of those in front of

25   me.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003176**

1          MS. YANG:  Yes, your Honor.

2          THE COURT:  Okay.  Anything else?  Because I have had

3    a chance to read it all.

4       In that matter, I would be denying the motion without

5    prejudice to be made later if new facts come up, but at this

6    time, I'm denying the motion.

7          MS. YANG:  Thank you, your Honor.

8          THE COURT:  Counsel wish to be heard as far as

9    sentence?

10          MR. SEVERO:  Yes, your Honor.  Thank you so much.

11          THE COURT:  Mm-hmm.

12          MR. SEVERO:  As you can glean from all the documents

13   you've received, we have an ongoing dispute over particularly

14   the calculations in the guidelines ranges, those made by the

15   PSR, those advanced by the government, and of course, what we

16   as the -- on the defense side believe the appropriate

17   calculation should be.

18       The government, not unlike at trial, is trying to fill the

19   gap on some of this evidence with using motions, speculation,

20   and so forth.  And what the defendant simply asks is that the

21   Court impose a reasonable sentence based on a fair and accurate

22   calculation made in accordance with reliable facts.  That's

23   where we have the dispute, because we believe that the

24   government's -- the PSR, which relied practically exclusively

25   on the government's submissions, not only unfairly

1    characterized some of the evidence, but it also provided some

2    unreliable data that caused some of the calculations to skew

3    higher, as we've noted in our papers.

4        As the Court is aware, in this case the defendant,

5    Mr. Darbinyan, was charged with crimes that the probation

6    department ultimately grouped into three separate categories of

7    crimes that group together.  We have already provided a great

8    deal of our arguments to you, and I'm hoping I won't repeat a

9    lot of that, although sometimes it's inevitable to do, since

10   the government, in its response to our position, sort of redid

11   some of its own position that it had earlier advanced.

12       The extortion counts are of some concern because of what

13   we have already shown and was shown at trial to have been a

14   very limited involvement by Mr. Darbinyan in what was

15   Mr. Sharopetrosian's brainchild that he created for his own

16   benefit.  And I think the most compelling fact is that no

17   serious bodily injury was threatened by my client to be

18   inflicted upon Minas Matosyan, that he never, in all the time

19   that -- the four or five, six days of phone calls that he was

20   involved, there was some bluster going on on the phone, but

21   there was never a threat of serious bodily injury.

22       The government can only point to one call where he'll say

23   "If you mess around with me, I will hurt you."  The fact that

24   days passed and nothing happened is kind of telling, because "I

25   will hurt" you doesn't say "I'm going to hurt you seriously,

1  I'm going to break your leg, I'm going to break your knees, I'm

2  going to knock your teeth out."  It was more of what has become

3  a familiar cry in this case, and that is, Mr. Darbinyan

4  exaggerates a great deal and yells a lot.  But there was no

5  serious bodily injury threat.

6      And in fact, as I've shown you with additional evidence in

7  our papers and we showed at trial, even by Mr. Matosyan's own

8  admission, Mr. Darbinyan was trying to help him out by loaning

9  him money and by, as he said in one of his phone calls that was

10  not played at trial, saving his skin -- didn't say "skin," but

11  I'm not going to use that word.  Saving his life, so to speak,

12  from further harm from Mr. Sharopetrosian.

13      So I think the involvement of Mr. Darbinyan was very

14  limited.  I say that because the guideline calculation adds

15  substantial levels for physical restraint and use of a firearm,

16  and those -- to be exact, I think there are about like nine

17  levels, if my memory serves, that makes the difference there.

18      What we're saying is that physical restraint and the use

19  of the firearm came about two months, possibly three months

20  later, when an associate of Mr. Sharopetrosian, a fellow by the

21  name of Emil Airapetian, shoved Mr. Matosyan into a van and

22  showed him a firearm.

23      Now, there are no calls -- and you heard the evidence.

24  You heard the trial in this case.  Hundreds and hundreds of

25  calls were intercepted.  It wasn't like Mr. Darbinyan's life

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003179**

1   was a secret during that period of time.  Everything was

2   recorded.  Not one phone call between him and this Airapetian

3   fellow, not one phone call between him and this Sharopetrosian

4   fellow where they would talk about how Airapetian was going to

5   shove this guy into a van and tie him up and show him a

6   firearm.

7        So when we talk about reasonable -- reasonably foreseeable

8   events that Mr. Darbinyan would justly be accountable for, in

9   July, when he stopped conversations with Matosyan, when he

10  stopped conversing with Sharopetrosian, he could not foresee

11  that two, three months later, somebody was going to use a

12  firearm to point it at this guy to make him pay.

13       So I don't think in the guidelines calculation it is fair

14  to -- it's not proper to add levels for physical restraint and

15  for possession of a firearm.  That added seven levels to this

16  PSR calculation.  Two of those were, additional, were for

17  threat of death or serious bodily injury, which I've already

18  commented were not part of what Mr. Darbinyan did in this very

19  limited involvement here.  So we felt that nine levels -- the

20  calculation in the PSR is nine levels too high.

21            THE COURT:  Okay.

22            MR. SEVERO:  Then we switch over to what is probably

23  the most contentious of the groups, and that is this whole

24  business of actual or intended loss in the fraud group, group

25  two.  I don't think there has ever been a demarcation, a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    separation, between actual loss and intended loss, and I --
 2    it's pretty clear that the application note, and that would be,
 3    I think, 3(A) of 2B1.1, clearly says that you either apply
 4    actual or you apply intended, whichever is greater and
 5    whichever you can more reliably find from the facts presented.
 6         The check fraud in this case, the actual loss amount was
 7    $278,000.  A little over that, $278,432.  Even the PSR, at
 8    paragraph 35, disagrees with the government that the $600,000
 9    figure should be used.  So, and that's because there's just
10    simply a -- what's become typical in this case is, you throw
11    something in there, since Mr. Darbinyan was involved in so many
12    different activities, throw something in there and you hope the
13    judge will believe it.  The idea that he intended to ransack
14    those accounts could not find support even in the submission to
15    the probation office.  So the loss figure for fraud is the
16    $278,000 figure, which was the amount of the checks actually
17    cashed or attempted to be cashed.
18         Even more problematic is the 99 Cents Only Store.  The
19    loss chart that we attached as our Exhibit B, I think -- yes,
20    our Exhibit B, and it's part of the government's submission as
21    well, pretty much shows -- not pretty much, it specifically
22    shows that some of these adjustments that were made were
23    because the banks, a couple of the banks could not tie certain
24    transactions to what they call "the crew."  And what everybody
25    in this case, including the government, acknowledges, is that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   they were referring to defendant and the people that were

2   thought to be associated with him.  I say this because this is

3   of particular significance.  There are two significant facts

4   here that show that the loss in the 99 Cents Only Store scheme

5   was not due entirely to Mr. Darbinyan's activities, as set

6   forth by the government.

7        First, the one I pointed out already, that the loss chart

8   has some adjustments because they couldn't attach those losses

9   to Mr. Darbinyan, signifying that there's somebody else out

10  there that was doing stuff that they couldn't tie to

11  Mr. Darbinyan, that this 99 Cent Store scheme was not exclusive

12  to Mr. Darbinyan or anyone associated with him.

13       The second part I gave to you in Exhibit C, and I know the

14  government -- and you've denied the motion for new trial just

15  now.  The government thinks that this is just a co-conspirator

16  trying to kiss up to his boss and that kind of stuff, but it is

17  an uncontradicted statement that says that what he did, he did

18  for himself.

19       Now, if that was just all you had, you could say, okay,

20  well, there are some facts that corroborate -- are there facts

21  that corroborate this?  Yes, there are.  There is not, in this

22  entire universe of phone calls, thousands of them, at least

23  hundreds, certainly, not one call between Andranik Bakhcha- --

24  sorry -- Bakhchadjian and my client.  Not one.  They want to

25  tie approximately a million dollars, almost a million dollars'

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003182**

1   worth of losses, and there isn't one communication between

2   these two fellows?  When, in fact, the government played and

3   played and played and interpreted every call between

4   Mr. Darbinyan and every other person that he ever talked to?

5   But not once did they bring in Mr. Bakhchadjian's words to say,

6   "Hey, I am doing this, and we're going to conspire to do this

7   stuff so we can make all this money."  Not one.

8        The other factor is, there wasn't one iota of evidence

9   that you could point to that showed any money from this

10  Andranik Bakhchadjian back to Mr. Darbinyan or Mr. Parsadanyan,

11  who is believed to be one of his confederates, or even

12  Mr. Tarverdyan, who is also believed to be one of his

13  confederates.  Not one cent went from Bakhchadjian to

14  Mr. Darbinyan.  What they're relying on is a traffic ticket the

15  day after he was seen at the 99 Cent -- the day after

16  Bakhchadjian was seen at the 99 Cent Store, where he's believed

17  to be driving Mr. Darbinyan's car.  That's it.  And

18  Mr. Bakhchadjian explained the circumstances of that in his

19  affidavit.  Uncontradicted.

20       So when you look at the loss for the 99 Cent Store, they

21  cannot, the government cannot tie the entirety of the actual

22  loss, the 167,000 -- because that's all they got.  They proved

23  4,800 at trial.  They're claiming 167,000 in related -- in

24  relevant conduct, but not one cent of that from

25  Mr. Bakhchadjian is tied to Mr. Darbinyan.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    The second aspect of this thing is the question of

2    intended loss, and they rely on that lengthy Exhibit A that I

3    attached to my submission.  And what is most striking is that

4    the response by the government is a declaration by Ms. Yang

5    telling us that the expiration dates are found, according to

6    David Ogden, who is their expert who testified at trial,

7    Secret Service man, the expiration date is found after the name

8    and a -- I think the correct use of that symbol is "caret" or

9    "caret," c-a-r-e-t.  The caret is the little pointing arrow up.

10   And the four numbers that follow it, when you -- let me take

11   that back.  You take the name, look for the little caret, and

12   the four numbers that follow is the expiration date, or you

13   look at the account number, and there's an equal sign, and the

14   four numbers that follow are the expiration dates.

15       Just this morning, I just happened to flip open to any

16   page, and I happened to have found on page 2 a little caret

17   after the name and the numbers 1201, which, according to the

18   declaration, would mean that the expiration date on that

19   particular card would have been December of '01.  Remembering

20   that this event happened in July, August of '09 --

21       MS. YANG:  Actually, your Honor, that misstates the

22   declaration.  The 1201 would read January 2012.

23       THE COURT:  You can, again --

24   Go ahead, Counsel.

25       MR. SEVERO:  Thank you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        Why that wasn't -- well, I suppose that if we then flip

2   over to page 37 and we look at another one that has an account

3   number, the equal sign, and the four numbers 4912, does that

4   mean that it expired in December of '49?

5            THE COURT:  I'm sorry, 37?

6            MR. SEVERO:  Yes, page 37.  I am about -- about 12 or

7   13 numbers up.  The name is Priscilla Ramirez.

8            THE COURT:  Okay.

9            MR. SEVERO:  If you look at Priscilla Ramirez, there

10  is the caret that follows it and 4912.

11           THE COURT:  Again, Counsel, rather than object at this

12  time, I'll hear you on --

13           MR. SEVERO:  Right, but --

14           MS. YANG:  Yes, your Honor.

15           THE COURT:  Okay.  Go ahead.

16           MR. SEVERO:  Whichever formula you wish to follow,

17  that would mean either December, if you want to read backwards,

18  '94, or December of '49.  So that entire frame of -- that

19  entire idea that you have the expiration numbers on here is not

20  supported even by the latest evidence they've put forth.

21       What does that tell you?  That tells you that under -- I

22  wish I could pronounce that one -- *Onyesoh,* and I think it's

23  O-y-e-n-o-h, a Ninth Circuit case, they cannot -- the

24  government's burden to produce the evidence to show that these

25  accounts are usable numbers has not been met.  How difficult

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003185**

1    would it have been to do what we attempted to do and never got

2    to do it, which was to get 99 Cent Stores to give them a list

3    of the people who used debit cards or credit cards on the date

4    that they believed, the government believed, it happened, and

5    match it to this?  Even if they had matched one name, just one,

6    to validate this exhibit.  They have not been able to show you

7    that.  With the latest evidence they've come forth, they can't

8    even show that these expiration dates are legitimate.

9         There are two parts to this, your Honor.  First is, are

10   these people -- are these numbers, numbers taken by the machine

11   from the 99 Cent Stores?  And yet they can't tell you yes,

12   because what they -- they downloaded these numbers from the

13   skimmer, not from any piece of equipment owned by 99 Cent

14   Stores.  So we don't know where the skimmer got those numbers

15   or whose numbers they are.

16        Secondly is this notion of this latest idea that the

17   expiration numbers are on here, and they -- you can't reliably

18   say that what was said by Mr. Ogden would have been correct.

19   Of course, we have already in our papers told you that it is --

20   the whole exhibit is suspect, because you've got the same names

21   being run within seconds of each other, three times.  How did

22   the machine do that?  How did the skimmer do that?  And why

23   wasn't there an explanation as to what that was?  This is

24   unreliable evidence.  1,983 numbers, they say.  We think it's

25   different.  We think it's 1,420.  But whatever the count is, it

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    is certainly not anything that this Court could reliably accept

2    as evidence of an intended loss and comply with motions and due

3    process in sentencing the defendant based on that, on that

4    supposed intended loss.

5        Most significantly is the whole question of 250 or more

6    victims.  We have lots of numbers, but it is clear from the

7    application notes in the guidelines that a victim -- and from,

8    I might add, *United States vs. Pham,* P-h-a-m, that a victim is

9    only someone who suffers -- I'm going to put this in bold

10   letters -- pecuniary harm.  Not that they went through some

11   stress or inconvenience or other elements.  They have to suffer

12   pecuniary harm.

13       We asked on cross-examination of each one of those folks

14   whether they had been fully reimbursed, and they said yes.  The

15   government did not bring to you, not even in the loose

16   framework of sentencing, where stuff comes in by declarations

17   and pointing to different documents and so forth, not once have

18   they shown you a pecuniary loss to an individual.  Not once.

19   What you have is nine banks.  We think it's seven.  But we have

20   nine banks, at best, who had to fork over money because of some

21   of these transactions.  Nine victims.  Not one -- not 250.  Not

22   one over 250.  Not 246.  Not 1,983.  Certainly not that,

23   because they have to be pecuniary harm.  There has to be an

24   actual loss for there to be a victim, and there wasn't here.

25   So the six levels -- that's critical in this calculation,

1    Judge.  The six levels that they added for 250 victims or more

2    has not been properly applied.

3         I will remind the Court also that the government -- I

4    provided the Court, in one of my several requests to continue

5    because of the 99 Cent Store subpoena, the motion to compel the

6    production of the documents the government should have

7    requested, that the government never asked 99 Cent Store for

8    any of this information.  So that's the reason we never got it,

9    is because they never received it themselves, never asked for

10   it.  That information is critical to the calculation the way

11   the PSR has made it.

12        Under Ninth Circuit precedent, just to go back to this

13   point for a moment, the Ninth Circuit precedent under *Armstead*

14   and *Pham,* there is no victim unless there's pecuniary harm, and

15   they have not shown you pecuniary harm to an individual.

16        Finally, this notion that the firearms -- the obliteration

17   of a serial number.  The government pointed you to a case, I

18   think it's *United States vs. Carter*, that required microscopy

19   in order to see what the individual had done to the gun.  What

20   you had here was apparently some paint over the serial number.

21   When removed, the serial number was there.  It's concealed, but

22   it's neither obliterated nor altered.  So I believe that

23   particular enhancement for group three is also improper.

24        Based on a proper calculation, it is our position that the

25   base offense level, the highest, highest base offense level is,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   depending upon which factors you use, is between 29 and 31.

2   And we agree, and I don't think there's a dispute, that

3   Mr. Darbinyan has a criminal history 4, and that the proper

4   calculation of the guidelines yields a range of between 121

5   months and 188 months.  We naturally believe that you should

6   come in at the low end of that.  I don't think that, for all

7   the brouhaha that was part of this trial and that was part of

8   even the submissions in the sentencing -- Mr. Darbinyan is a

9   family man.  He is not a monster.  Or he has -- he has never

10  been shown to harm anyone physically.  I believe that the

11  3553(a) factors and that maintaining parity in this case

12  require a sentence around the 120-month level.

13       Now, I don't want to lose -- we, in this job, all of us,

14  sometimes become a little callous as to what ten years means,

15  but I wish I had ten years less.  Ten years is a long time.

16  It's a long time for anyone.  In fact, a ten-year sentence to

17  this defendant means that his son will be of driving age,

18  almost of driving age, by the time he gets out, and he's only

19  about nine now, ten.  That's a long time.  And I don't believe

20  that it is improper to say that ten years is not enough

21  retribution, because that's what this is about.  I know there

22  are four objectives of sentencing, but retribution,

23  incapacitation, those two are -- deal with imprisonment.  Ten

24  years is a long, long time.

25       Sufficient but not greater than necessary to attain all of

1    the sentencing objectives.  Given the advisory guideline range

2    of 121 to 188, in our view, we believe that our requested

3    ten-year sentence is sufficient but not greater than necessary.

4        Thank you.

5        THE COURT:  Thank you very much, Counsel.

6    Counsel.

7        MR. SEVERO:  Do you want us back?

8        THE COURT:  Do you need the podium?

9        MS. YANG:  Nah, I can talk right here.

10        THE COURT:  Okay.

11        MS. YANG:  Defense counsel goes on a great deal about

12   how the probation office's guideline calculations and the

13   government's guideline calculations and sentencing

14   recommendation are based on emotion and speculation.  The only

15   emotion that is coming into this courtroom, your Honor, is from

16   defense counsel.

17        The government and the probation office has based its

18   sentencing guideline calculations and its recommendations

19   solely on the evidence that was presented in this court, the

20   evidence that this Court heard, the evidence that this Court

21   saw, and the evidence that this Court considered in determining

22   not one but two new trial motions and finding that the jury's

23   verdict was sustained by the evidence.

24        With regard to defense counsel's argument about

25   reliability of the evidence, other than his speculation and his

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   characterization that the evidence is not reliable, there is no

2   indication of that as the case.  Again, the evidence and the

3   facts that the government has presented are reliable, can be

4   relied upon by this Court, and should be relied upon by this

5   Court.  As the government noted in its sentencing response,

6   even though the Federal Rules of Evidence do not apply in

7   sentencing proceedings, virtually all of the evidence the

8   government has presented to the Court was admitted or testified

9   to at trial.

10      Now, to address counsel's specific objections to the

11   groups, I'll start with the extortion group.

12      He continues to maintain that there must be evidence that

13   Mr. Darbinyan threatened serious bodily injury to victim M.M.

14   The guideline, the plain language of the guideline is clear.

15   There is no threat of serious bodily injury; it is simply

16   bodily injury.  And in the one phone call that the government

17   highlighted -- which is not the only phone call.  This Court

18   heard many phone calls.  In one phone call, Darbinyan did,

19   himself, threaten victim M.M. with bodily injury.

20      There are also phone calls, as the Court is well aware and

21   heard, between defendant Darbinyan and Sharopetrosian in which

22   they talk in extensive detail about the money that needed to be

23   demanded and collected from victim M.M., victim M.M.'s refusal

24   or reluctance to provide the money, very angry, strident

25   conversations about what they would do to collect that money,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   and what Sharopetrosian wanted Darbinyan to do to collect that
 2   money.
 3        With regard to physical restraint, again, your Honor, the
 4   defendant himself admitted that he physically restrained victim
 5   M.M., the call the government has noted in its response.  In
 6   addition, there was testimony at trial about a meeting held at
 7   co-defendant Parsadanyan's cell phone store where victim M.M.
 8   was summoned to a back office, the door was closed, and he was
 9   surrounded by Darbinyan's associates, with Darbinyan in the
10   room.
11        The defense counsel makes a great deal about the fact that
12   there was not one single phone call played in court between
13   defendant Darbinyan and Emil Airapetian, but the government
14   wishes to remind the Court, as the case agent testified to,
15   defendant Darbinyan had multiple telephones during the course
16   of this investigation.  Law enforcement was not able to tap,
17   or, frankly, even identify all of those telephones.  And a
18   specific telephone that defendant Darbinyan was communicating
19   with co-defendant Sharopetrosian on regarding the extortion of
20   victim M.M., as the Court will recall, that telephone
21   defendant Darbinyan dropped in July of 2009 when his
22   co-defendant Raymond Tarverdyan notified him that he believed
23   that they had been detected or were being followed by law
24   enforcement.  The fact that no calls between the defendant and
25   Emil Airapetian were played in court doesn't mean that any --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    they do not exist.

2        More to the point, however, as the government pointed out

3    in its sentencing response, the defendant is liable for acts

4    that are reasonably foreseeable by his co-conspirators, and it

5    was surely reasonably foreseeable to defendant Darbinyan, a

6    leader of Armenian Power, an individual who himself is no

7    stranger to the use of guns or violence -- in fact, the Court

8    heard testimony about an incident at the Chicken House in which

9    defendant Darbinyan summoned multiple Armenian Power members

10   and associates, some armed with guns, to a potential

11   confrontation with rivals at that Chicken House.  It was surely

12   reasonably foreseeable to defendant Darbinyan that, during the

13   course of this extortion of victim M.M., when he wasn't going

14   to pay the money that co-defendant Sharopetrosian believed he

15   was owed, that a firearm at some point would be used to

16   threaten victim M.M.

17       Now, with regard to the felon in possession count, I'll

18   jump to that one real quick.  In terms of the obliterated

19   serial number, the Ninth Circuit case the government cited is

20   clear.  The serial number does not have to be completely

21   obliterated.  It has to make access to accurate information

22   more difficult.  And in that case, that is exactly what

23   happened.  The serial number was painted over.  Law enforcement

24   could not identify the serial number until they took steps to

25   remove the paint and the substance that covered that serial

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003193**

1    number.

2        Now, with regard to the fraud count, it is not an

3    either/or proposition that the Court can only take into account

4    actual loss or intended loss.  The case law, the guidelines are

5    clear.  When you have actual loss and intended loss, the Court

6    is to take both into consideration.  And that is actually set

7    forth in the PSR by the probation office as well.

8        With regard to the check fraud count -- and just as a

9    preliminary matter, the government has noted this in its

10   initial sentencing paper and in its response.  The loss amount

11   that actually the probation office calculated, set forth in the

12   PSR to support a 16-level enhancement, that is, in the

13   government's belief, an incredibly conservative amount.  That

14   is an amount that does not take into account the multiple

15   point-of-sale terminals that the defendant and his co-schemers

16   were able to successfully retrieve from 99 Cents Only Stores.

17   Those swaps of the terminals were captured on video.  The loss

18   amount does not account for the multiple point-of-sale

19   terminals that defendant and his co-schemers also swapped out

20   at 99 Cent Stores that we were unable to get surveillance

21   footage for.  It also does not account for the "day and night,"

22   or the two rounds of withdrawals that defendant and his

23   co-schemers discussed to maximize the amount of money that

24   could be taken out of a victim's account: not just $500, but a

25   thousand dollars.  And it does not include the total amount

1    that was present in all five victims' of the check fraud

2    schemes bank accounts.

3         Now, the defendant makes an argument that it's unlike the

4    Ninth Circuit case the government cited because the defendant

5    wasn't arrested, so there's no evidence that he intended to

6    deplete all of those accounts.  But two points about that, your

7    Honor.  One, there was testimony at trial that when the fraud

8    was detected on these check fraud accounts, law enforcement

9    reached out to the banks, and the banks would put a freeze on

10   those accounts.  So it was the action of law enforcement, the

11   intervening action of law enforcement that prohibited the

12   defendant from fully depleting those accounts.  Second point

13   is, based solely on the counts of conviction for the check

14   fraud scheme, the total amount the defendant and his

15   co-schemers either cashed, deposited, or attempted to cash or

16   deposit comes to $413,632.09.  So if the Court is going to

17   limit the loss calculation for the check fraud scheme, the

18   government submits that is the appropriate figure.  The

19   government of course, though, argues that the full amount in

20   all five counts, which is the $640,616.09, should be included

21   in the loss calculation.

22        For the 99 Cent Only Store scheme, defense counsel points

23   to the actual loss chart that he submitted, as well as the

24   government.  As the government noted in its response, the

25   adjustments that were made because there was insufficient

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   information to tie certain losses to defendants and his
 2   co-schemers is already accounted for in the column that says
 3   "adjustments."  The column that says "total loss" has already
 4   taken into account those adjustments.  So the $167,169.57
 5   figure is accurate.
 6        Now, as the government has done throughout the course of
 7   this case in terms of estimating loss, in terms of estimating
 8   number of victims, the government has taken a very cautious and
 9   conservative approach, and it did the same thing with this
10   actual loss chart.  To the extent either the banks or law
11   enforcement did not feel there's sufficient information to tie
12   a particular loss to the defendant and his co-schemers, it
13   didn't.  That doesn't mean there wasn't information that could
14   tie them to the loss.  It's just that, taking a very
15   conservative approach, the government left those amounts out.
16        Now, the intended loss, as the Court is well aware, is
17   based on the four point-of-sale terminals that law enforcement
18   was able to recover before defendant and his co-schemers could
19   remove them, harvest the victims' account numbers, and then use
20   them to steal money from the victims' accounts.  Those four
21   terminals were from the Limonite, Beach, Brookhurst, and
22   Arlington stores, and as set forth in both the PSR and the
23   government's sentencing papers, there were a total of 1,983
24   unique account numbers that the case agent counted, line by
25   line, from all four of those devices.  And using what the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   guidelines and the case law call a minimum value -- it is the

2   bear minimum the Court should assess -- of $500, that intended

3   loss amount comes to $991,500.  That, plus the actual loss

4   amount, comes to the over a million dollars that the probation

5   office has assessed the 16-level enhancement to.  But again,

6   your Honor, as I previously stated, it doesn't take into

7   account the point-of-sale terminals that defendant and his

8   co-schemers were seen swapping out at the Magnolia, Camarillo,

9   Ventura, Whittier, University, and Clairemont Mesa stores, and

10  it does not account for the point-of-sale terminals they

11  successfully retrieved from the Venice, Woodman, Reseda, North

12  Hollywood, and Northridge terminals.

13       Now, with regard to -- I'm sorry, your Honor, I apologize.

14       The argument that the numbers that are located on

15  Government Exhibits A through D, that the government hasn't

16  provided sufficient proof that they were actual or usable, I

17  have two points with regard to that.  First, the entire modus

18  operandi of defendant and his co-schemers was well established,

19  as this Court saw at trial.  Defendant and his co-schemers

20  would obtain a point-of-sale terminal, the same brand that 99

21  Cent Store used.  They would install a skimming device.  They

22  would then take, for lack of a better word, that corrupted

23  point-of-sale terminal, go into a 99 Cent Store, swap out that

24  corrupted terminal with one of the 99 Cent Store's original

25  terminals, leave their corrupted terminal in the 99 Cents Only

1    Stores for anywhere from one to three weeks.  I'm not exactly

2    sure in terms of the date time frame, but video surveillance

3    show anywhere from one to three weeks.  They would then come

4    back after that time period to retrieve their corrupted

5    point-of-sale terminal and replace it with the uncorrupted 99

6    Cent Only store terminal.

7        That entire modus operandi during that one- to three-week

8    period demonstrates that the credit cards that were swiped in

9    that point-of-sale terminal, that those numbers that were then

10   registered onto the skimming devices, which were attached to

11   the point-of-sale terminals by wires, as Special Agent Ogden

12   testified and showed during the course of the trial, those

13   were -- common sense tells you that those were actual usable

14   credit cards, that individuals coming into the 99 Cent Store to

15   purchase something wouldn't be swiping an expired credit card;

16   they would be swiping a credit card or debit card that was

17   usable so they could actually pay for their purchases.  And

18   that is reflected in Government's Exhibit A through D, which

19   shows expiration dates of, as Mr. Severo pointed out, that one

20   entry of January 2012.

21       Now, there are entries that show a 4912 number.  And when

22   I was in the process of responding to Mr. Severo's papers, that

23   number puzzled me, because I recalled Special Agent Ogden

24   testifying about track 1, track 2 data, how that data contained

25   expiration date information.  So when I spoke with him and he

1    gave me clarification on where the expiration dates exactly

2    could be found, I saw the 4912 number, and I asked him about

3    that.  Now, I did not put his response in my declaration,

4    because we didn't -- me, meaning myself, and Special Agent

5    Ogden -- didn't have sufficient time to track that information

6    down, and I did not feel comfortable putting it in a

7    declaration before this Court until I was able to do so.  But

8    given the timing of defendant's filing and the government's

9    need to respond quickly, I presented as much as I could.  But

10   what my understanding is --

11        MR. SEVERO:  Objection.  I think that's well outside

12   any reliable evidence that you could come up with here.  I

13   don't think it's proper for sentencing for --

14        THE COURT:  Overruled.  This is argument as far as

15   sentence is concerned.

16        MS. YANG:  Thank you, your Honor.

17   4912, that is an identification for what is known as a

18   benefits card.  So when -- for example, if someone gets Aid to

19   Families and Dependent Children, their benefits will be

20   provided on what appears to be like a debit card, but in fact

21   it is a benefits card.

22   So that was my understanding of what the 4912 meant, which

23   is why it would not be -- it doesn't read properly as an

24   expiration date.  Mr. Severo's correct, otherwise it would be

25   December of 1949, and that makes absolutely no sense.  It also

1    makes no sense based on the pattern and the dates and times

2    that are shown for the -- when all of these access devices were

3    swapped.

4         As this Court will remember, Special Agent Ogden testified

5    that the dates and times of the swiping, which, for the most

6    part, they were started in January of 2004, which seemed odd,

7    given the fact that that scheme took place in 2009.  If your

8    Honor recalls, the testimony was that that date and time is

9    manually set.  So whoever takes the skimming device and inserts

10   it into another device, they need to manually set that date and

11   time, and if they don't, it's the date and time of when they

12   either obtained the device or they last set the date and time

13   of the device.  But if the Court looks at Exhibits A through D,

14   all of the swipes are chronologically consistent, and it's

15   consistent with the testimony and evidence presented at trial

16   that the defendant and his co-schemers would leave those

17   point-of-sale terminals, corrupted terminals, in 99 Cent Stores

18   anywhere from one to three weeks before retrieving them.

19        Now, with regard to the number of victims, the question of

20   the number of victims who suffered actual pecuniary loss, the

21   government has submitted, in both its original sentencing

22   position and its response, information about the actual number

23   of victims.

24        As the Court can see from Exhibit 1 to the government's

25   sentencing position -- or actually, I'm sorry, Exhibit E to the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    government's sentencing response, based on bank records which

2    the government has provided to the defense in discovery, the

3    total number of victims who suffered actual loss that the banks

4    reimbursed them for comes out to more than 250.  It is, if I

5    did my math correctly, approximately 305.  This figure takes

6    into account the losses that the government did not feel

7    comfortable attributing to defendant and his co-schemers, not

8    because there wasn't evidence of it, but the government felt it

9    wasn't sufficient at that time.

10       Now, a representative sampling of these victims testified

11   at trial, as this Court remembers.  And while defense counsel's

12   correct that on cross-examination they each testified to being

13   reimbursed by the banks, what defense counsel fails to mention,

14   they also testify, some of them, to the fact that they weren't

15   reimbursed immediately.  I believe one victim testified they

16   were at a grocery store when they attempted to use their debit

17   card.  They were unable to.  They contacted the bank.  The bank

18   said that there was a fraud alert on it.  They did not have

19   access to their money or the ability to use their card for

20   several days.  Another victim testified similarly that she was

21   out at a family event when she received the alert from the

22   bank, and she was unable to access her money for several days.

23   There was another victim who testified, I believe, that she

24   lived paycheck-to-paycheck.  So not being able to access that

25   money, not getting the immediate reimbursement, was devastating

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    to her even though it was just over a matter of a few days.

2        The government presented that testimony at trial.  The

3    Court is well aware of it.  These victims did suffer actual

4    loss.  The government has more than satisfied its burden of

5    demonstrating that more -- at least 250 victims suffered actual

6    loss and this adjustment properly applies.

7        With regard to the declaration of Andranik Bakhchadjian,

8    the government would not like to belabor the point.  It's

9    already set forth its arguments in its papers.  Government

10   simply notes -- again, there's been an argument that there were

11   no calls between the defendant and Bakhchadjian, and that, for

12   some reason, has some import.  Again, as the Court is aware

13   based on the witness testimony, Darbinyan had multiple

14   telephones, and he dropped the one telephone that law

15   enforcement was actively wiretapping in July of 2009.

16       One other thing about, your Honor, Government's Exhibits

17   A through D.  Mr. Severo mentions that there would be entries

18   of the same victim, the same name, and there would be like

19   three swipes in a row, and, you know, there's a mystery to

20   that, and that somehow leads to the argument that these were

21   not numbers that were swiped by 99 Cent Only customers.

22       Again, Agent Ogden testified at trial to explain why there

23   are those multiple swipes.  And he testified, based on

24   counsel's recollection, your Honor, that some customers would

25   swipe and it wouldn't register in the point-of-sale because the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    skimming device was interrupting or interfering with the

2    operation of the point-of-sale terminal, so it appeared that it

3    hadn't registered.  So they'd have to swipe their cards a few

4    times to see that it would actually go through to what they

5    believe showed payment for the purchase that they had just

6    made.

7         And unless your Honor has any further questions with

8    regard to any of the other sentencing enhancements that

9    defendant has objected to, the government would submit with

10   regard to those arguments on its papers.

11        THE COURT:  Okay.  Both sides have extensively briefed

12   this and argued it.  I don't need to hear any further

13   information on it.

14        I will say, for counsel's worry about this, your

15   interpretation of where that 4912, whatever it is, came in, the

16   Court's not taking that as evidence that that's where it came

17   in from, Counsel.  You're familiar with what I'm talking about?

18        MR. SEVERO:  That what?  I'm sorry.  That it came in

19   from?

20        THE COURT:  Counsel mentioned what she thought the

21   49- --

22        MR. SEVERO:  Yes, -12 was a benefit card.

23        THE COURT:  Yeah, yeah.  And I'm not taking that as

24   evidence before the Court as to where it came from.  I don't

25   know where it came from.

```
 1              MR. SEVERO:  Okay.

 2              THE COURT:  Okay.

 3         Mr. Darbinyan, do you wish to address the Court?

 4              MR. SEVERO:  Your Honor, at this time Mr. Darbinyan

 5    would like to reserve that.  He's not -- he doesn't wish to

 6    address the Court.

 7              THE COURT:  That's fine.  That's fine.

 8         Any legal cause at this time?

 9              MR. SEVERO:  None other than the motion that you've

10    already denied.

11              THE COURT:  Okay.

12              MR. SEVERO:  I did have a couple comments on that, but

13    I didn't know -- on what Ms. Yang talked about, but I didn't

14    know if you wanted to hear any more.

15              THE COURT:  Comments on what she talked about?

16              MR. SEVERO:  Yes.

17              THE COURT:  If you feel there's something that's

18    really necessary that you haven't briefed.  Because I've gotta

19    tell you, and I'm sure you appreciate this, knowing the volumes

20    of paperwork, we've spent hours and hours and hours on what has

21    already been produced paperwork wise and argument today, but if

22    there's something that was left out that you feel is important,

23    go ahead.

24              MR. SEVERO:  One item.

25              THE COURT:  Sure.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. SEVERO:  If you believe that people were standing
 2   back-to-back at those 99 Cent Stores for hours at a time and
 3   swiping the card three or four times, every one of them, within
 4   10 seconds and sometimes 15 seconds of each other, frankly,
 5   99 Cent Stores' stock should be higher than it is, because the
 6   amount of volume that appears from this exhibit is outrageous.
 7          Yes, the date, we never challenged the date because we
 8   heard the testimony that it was manually set.  But the time was
 9   also -- you can't change that.  And the sequence, when you go
10   from one second, your Honor, to within 10 seconds of each
11   other, one client standing behind -- in one register, because
12   there's only one skimmer at a time here, that's just not
13   believable.  So I think that's one item.
14          And the other is that you can't tie -- the problem with
15   the government's case is, they cannot tie these numbers to
16   99 Cent Store customers.  They can't do it.  They didn't.
17          That's it.
18          THE COURT:  Counsel, do you wish to respond to either
19   of those two?  Only if you want to.
20          MS. YANG:  Your Honor, I think common sense would
21   dictate that the access device numbers that were captured on
22   the skimming devices installed by defendant and his
23   co-schemers in the point-of-sale terminals that were then
24   placed in 99 Cents Only Stores came from 99 Cent Only Store
25   customers.  And the information that defense counsel asked
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    99 Cent Store for, one, as the government's previously advised
 2    the Court in its filings, there's no evidence it even exists.
 3         So the government submits.
 4              THE COURT:  Okay.  In this particular matter, then,
 5    the Court's going to go ahead with sentencing, and I'm going to
 6    start, first of all, by again stating for the record that this
 7    was a jury trial.  Many of these arguments were made during the
 8    jury trial.  It did go before the jury.  The jury made its
 9    findings.  The Court found that the evidence supported those
10    findings, which would also support much of what we're doing
11    here today.
12         As to the guideline level, the Court will establish the
13    guideline levels at this time.  Breaking it down into the three
14    groups we talked about -- and let me make sure I do this
15    correctly for you.
16         Group one, which is the extortion, the Court finds that
17    the base level is a base level 18.  The Court finds that the
18    evidence did support the threat of bodily injury, which is a
19    two-level increase.  The Court finds the level -- excuse me,
20    that the evidence also supported an amount over $50,000, that
21    it supported possession of firearm and physical restraints,
22    keeping in mind that this case was based on not what just one
23    person did, but a conspiracy of people, where each one is
24    responsible for each other.  Therefore, the Court finds that
25    the guideline level, appropriate guideline level on extortion
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   is a 29.

 2        On group two, the fraud, the Court finds the base level is

 3   a seven.  The biggest disagreement I see here as far as the

 4   arguments I've heard is the difference between the 14 and the

 5   16 as far as the amount of intended loss.  The Court finds that

 6   the intended loss -- excuse me, the intended loss plus the

 7   actual loss, any way you figure it, it well exceeds a million

 8   dollars, and finds a 16 level appropriate.  Finds that the

 9   allegation of sophisticated means is appropriate, the

10   allegation of involving device-making equipment is supported by

11   the evidence.  More than 500 victims is supported by the

12   evidence.

13        And by the way, although the government didn't recommend

14   it, the fact that you lose something and somebody, for whatever

15   reason, feels sorry and wants to reimburse you, if somebody

16   steals your car and somebody turns around and says, "Gee, I'm

17   sorry you lost your car.  I'm going to give you another one,"

18   doesn't mean that you haven't had pecuniary loss.  The fact

19   that somebody else steps in, particularly if they had no

20   obligation -- I mean, you've lost it, and if somebody wants to

21   come in and pay you back, that's fine, but you still lost it.

22        So the Court finds more than 250 victims.  Also finds that

23   the defendant did fill a role of leadership or organizer, and

24   feels that the appropriate guideline level for that fraud

25   section is a 37.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1        As to the last one, which is the possession of the

2   firearm, the Court finds 22 is the base level, that there are

3   three or more guns, so that would be 25 -- 24, that the serial

4   numbers were obliterated and the evidence supports that, and

5   the defendant, again, was a leader/organizer, which comes out

6   to a level 30.

7        So the guideline levels as established by the P & S report

8   also seem to be appropriate, and when you factor in with that

9   the multiple count adjustments, and I'm not going to go through

10  the calculations, but they're in the P & S report, is

11  appropriate.  And therefore, this would be a combined adjusted

12  offense level of a level 39.

13       Level 39 carries with it, at a category 4 criminal

14  history, 360 months to life imprisonment.  The Court will

15  consider that along with all the factors of 3553, the guideline

16  level just being one of those factors.  The need to consider

17  the nature and circumstances of the offense and the history and

18  characteristics of the defendant, I think are obvious in this

19  case.  This was a heinous -- it's a large organization and a

20  large amount of criminal activity on it and a significant

21  history.  The need for the sentence imposed to reflect the

22  seriousness of the offense, to promote respect for the law, to

23  provide just punishment for the offense, calls for a serious

24  sentence on this matter.  To afford adequate deterrence, to

25  protect the public from crimes.  All the factors of 3553, and
```

1   I'm not going to go through them now, but they all have been

2   met by a sentence at the low end of the guideline range.

3       The Court has to -- the Court has to give reasons why, if

4   it's the low end of the guideline range and there is a large

5   discrepancy between the high end and the low end, as to why I'm

6   picking the low end, and that is because all the situations in

7   this case, the factors that were mentioned during the trial as

8   far as mitigation and as far as maybe not understanding some of

9   the things that were going on, some of the weaknesses or

10  strengths of the case, feels that the low end is appropriate.

11      Therefore, it is ordered that the defendant shall pay to

12  the United States a special assessment of $5,600, which is due

13  immediately.  Any unpaid balance shall be due during the period

14  of imprisonment at a rate of no less than $25 per quarter and

15  pursuant to the Bureau of Prisons' Inmate Financial

16  Responsibility Program.

17      Counsel, you have been provided before this hearing with

18  the tentative supervised release conditions, I believe.

19          MR. SEVERO:  I have.

20          THE COURT:  Counsel, you have, too?

21          MS. YANG:  Yes, your Honor.

22      One matter for the special assessment.  The defendant was

23  convicted of 57 counts, so I believe it should be $5,700.

24          THE COURT:  Counsel?

25          MR. SEVERO:  I thought it was 56, but...

```
 1              THE COURT:  I thought it was 56, also.  I'm going to

 2     set it at 56.  If I made a mistake, you know, file something in

 3     writing.

 4              MS. YANG:  Yes, your Honor.

 5              THE COURT:  Make sure defense counsel has an

 6     opportunity to see it.  If he was convicted of 57 -- I've gotta

 7     tell you, when you get up that high, it's hard to keep track.

 8              MS. YANG:  I understand, your Honor.

 9              THE COURT:  But I can adjust that.

10         The probation -- excuse me.  It is ordered the

11     defendant -- I don't know if I finished that or not.

12         Any unpaid balance shall be due during the period of

13     imprisonment at a rate of no less than $25 per quarter and

14     pursuant to the Bureau of Prisons' Financial Responsibility

15     Program.

16         Pursuant to Title 18 of the United States Code, Section

17     3664(d)(5), a deferred restitution hearing shall be calendared

18     for no later than 90 days after the date of sentencing.

19         That date, we'll give you at this time, will be

20     February --

21         What?

22              THE CLERK:  February 2nd at 1:30 p.m.

23              MS. YANG:  Your Honor, may I have one moment with

24     counsel?

25              THE COURT:  Sure.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (Counsel confer privately.)

 2            MS. YANG:  Your Honor, I was only conferring with

 3   Mr. Severo because the government had submitted papers

 4   supporting restitution, and Mr. Severo had not objected in his

 5   papers.  He would like a later hearing, though, so we can

 6   further discuss that.

 7            THE COURT:  Let's leave it at that date, and if

 8   counsel needs more time on the restitution hearing, the Court

 9   will accommodate you.

10            MS. YANG:  Yes, your Honor.

11            MR. SEVERO:  Thank you, your Honor.

12            THE COURT:  An amended judgment will be entered after

13   such determination.  If the amount or the amended judgment --

14   excuse me.  We've already set it within the 90 days, so that's

15   not a problem.  If it is not heard within 90 days, the order

16   for restitution would be terminated.

17        All fines are waived, as it is found the defendant does

18   not have the ability to pay fines in addition to the

19   restitution.

20        Pursuant to the -- and you may want to count here,

21   Counsel.

22        Pursuant to the Sentencing Reform Act of 1984, it's the

23   judgment of the Court that defendant is hereby committed on

24   Count 1, 4, 5, 6, 19 through 23 -- excuse me.  Let me rephrase

25   that.  On Count 1, 4, 5, 6 through 19, 23 through 34, 38
```

1    through 41, 44, 45, 48, 50, 54, 57, 60, 63, 66, 69, 71 through

2    73, 77, 79 through 81, 84, 87, 91, 93, 128 through 129 of the

3    first superseding indictment to the custody of Bureau of

4    Prisons for a term of 384 months.

5        This term consists of 360 months on each of the Count 6

6    through 19, 38 through 41, 44, 45, 48, 50, 54, 57, 60, 63 and

7    66, and 240 months on Counts 1, 4, 5, and 120 months on Count

8    69 of the first superseding indictment, all of them to be

9    served concurrently, and 24 months on Count 23 to be served

10   consecutively with the foregoing counts, and 24 months on Count

11   24 through 34, 71 through 73, 77, 79 through 81, 84, 87, 91 and

12   93 to be served concurrently in each other -- excuse me, to

13   each other and to Count 23.

14       Corrections?

15       MS. YANG:  Your Honor, I do believe, unless I missed

16   it, also it would be 120 months on Counts 128 and 129, the

17   felon in possession counts, to run concurrently.

18       THE COURT:  I'm sorry?

19       MS. YANG:  The 120 months stat max applies to Counts

20   69 --

21       THE COURT:  Yes.

22       MS. YANG:  -- 128 and 129.

23       THE COURT:  We hadn't included those in there?

24       MS. YANG:  I do not believe so, unless I missed it,

25   your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  And on Count 128 and 129.

 2              MR. SEVERO:  Your Honor, I -- when you're done.

 3              THE COURT:  Yeah, okay.  But if you want me to correct

 4    anything as we go through it, let me know.

 5              MR. SEVERO:  Okay.

 6              THE COURT:  Upon release from imprisonment, defendant

 7    shall be placed on supervised release for a term of five years.

 8    This term consists of five years on each of Count 6 through 19,

 9    38 through 41, 44, 45, 48, 50, 54, 57, 60, 63 and 66, and two

10    years on each of Count 1, 4, 5 and 69 of the first superseding

11    indictment, and one year on each of Count 23 through 34, 71,

12    73, 77, 79 through 81, 84, 87, 81 -- or 91, and 93, all such

13    terms to run concurrently under the following terms and

14    conditions.

15         And I believe you want 120 in there, also?

16              MS. YANG:  Yes, your Honor.  For the three-year term

17    of supervised release, it would be for 128 and 129.

18              THE CLERK:  Judge, I'm sorry, did you say Counts 23

19    through 34?

20              THE COURT:  Yes.

21              THE CLERK:  Okay.

22              THE COURT:  Count 23 through 34.

23         The defendant shall comply with the rules and -- under the

24    following conditions, which are as follows, the defendant will

25    be on supervised release:
```

1    The defendant shall comply with the rules and regulations

2    of the United States Probation Office and General Order 5-02;

3    The defendant shall not commit any violation of local,

4    state, or federal laws or ordinances;

5    The defendant shall refrain from any unlawful use of a

6    controlled substance.  The defendant shall submit to one drug

7    test within 15 days of release from imprisonment and at least

8    two periodic drug tests thereafter, not to exceed eight drug

9    tests per month, as directed by the probation officer;

10    During the period of community supervision, the defendant

11    shall pay the special assessments in accordance with the

12    judgment's order pertaining to such payments;

13    The defendant shall comply with the immigration rules and

14    regulations of the United States, and if deported from this

15    country either voluntarily or involuntarily, not re-enter the

16    United States illegally.  The defendant is not required to

17    report to the probation office while residing outside the

18    United States.  However, within 72 hours of release from any

19    custody or any re-entry into the United States during the

20    period of court-ordered supervision, the defendant shall report

21    for instructions to the United States Probation Office located

22    at the United States Courthouse, 312 North Spring Street, Room

23    600, Los Angeles, California, 90012;

24    The defendant shall not obtain or possess any driver's

25    license, Social Security number, birth certificate, passport,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    or any other form of identification in any name other than
2    his -- defendant's true legal name, nor shall the defendant use
3    for any purpose or in any manner any name other than his true
4    legal name or names without the permission of the probation
5    office;
6          The defendant shall cooperate in the collection of DNA
7    sample from the defendant;
8          The defendant shall not associate with anyone known to him
9    to be Armenian Power gang members or others known to him to
10   participate in the Armenian Power gang criminal activities,
11   with the exception of his family members.  He is not to wear,
12   display, use, or possess any gang insignias, emblems, badges,
13   buttons, caps, hats, jackets, shoes, or any other clothing that
14   the defendant knows evidences affiliation with the Armenian
15   Power gang, and may not display any signs or gestures that
16   defendant knows evidences affiliation with the Armenian Power
17   gang;
18         As directed by the probation officer, defendant shall not
19   be present in any area known to him to be a location where
20   members of the Armenian Power gang meet or assemble.
21         And Counsel, you had a question?
22         MR. SEVERO:  Yes, your Honor.  I heard you say that
23   the sentence was 384 plus 24, but I --
24         THE COURT:  No, no, no.
25         MR. SEVERO:  360 plus?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  360 plus 24.

2              MR. SEVERO:  That's what I -- I wasn't sure that -- I

3    thought you had said 384 plus 24, but you may have said 384

4    consisting of --

5              THE COURT:  The total sentence is 384, and it consists

6    of, on those counts I mentioned, 360 months, and 24 months

7    consecutive to.  There are a lot of other counts there that

8    were run concurrent.

9              MR. SEVERO:  Thank you.

10             THE COURT:  I apologize.  There are a lot of counts

11   here.

12             MR. SEVERO:  I understand.

13             THE COURT:  I think we have it.

14       In this particular matter, if you wish to appeal the

15   sentence, it has to be done within 14 days of today.

16       Are you asking for any Southern California designation or

17   anything along those lines?

18             MR. SEVERO:  I am, your Honor.

19             THE COURT:  Okay.  Any objection?

20             MS. YANG:  No, your Honor.

21             THE COURT:  Okay.  The Court will recommend to the

22   Bureau of Prisons that you be housed locally in a Southern

23   California area.

24             MR. SEVERO:  Thank you very much.

25             THE COURT:  Thank you, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MS. YANG:  Your Honor, two final matters.

2          THE COURT:  Yes.

3          MS. YANG:  One, at this time, in the interest of

4    justice, the government would move to dismiss the underlying

5    count and any remaining counts in the first superseding

6    indictment as against this defendant only without prejudice.

7          THE COURT:  Granted.

8          MS. YANG:  Secondly, given the fact that the Court has

9    now sentenced defendant, the government would ask the Court to

10   strike or deny his refiled motion to compel compliance with

11   that subpoena to 99 Cent Only Stores as moot.  It is still

12   pending, and the Court did not rule on the government's

13   request.

14         THE COURT:  Counsel, my understanding, if counsel

15   wishes to subpoena records in, there can be a motion to quash

16   that subpoena, but that has to be made by the person that was

17   subpoenaed in.  That would be made by the 99 Cent Store.

18         MS. YANG:  Very well, your Honor.  I'll inform them.

19         MR. SEVERO:  We did -- what I think Ms. Yang is

20   referring to is that we set a motion to compel for November

21   24th, but before that, there will be -- a notice of appeal

22   filed in this case will deprive the Court of jurisdiction

23   anyways.

24         THE COURT:  Okay.

25         MR. SEVERO:  So I don't -- that motion I think will

1    just go off calendar.

2             THE COURT:  Okay.  Thank you, Counsel.

3             MR. SEVERO:  Thank you.

4             THE COURT:  We'll be in recess.

5             THE CLERK:  All rise.

6

7                 *(Proceedings adjourned at 3:10 p.m.)*

8

9                          *--oOo--*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4    Title 28, United States Code, the foregoing is a true and

 5    correct transcript of the stenographically reported proceedings

 6    held in the above-entitled matter and that the transcript page

 7    format is in conformance with the regulations of the

 8    Judicial Conference of the United States.

 9

10    Date:  MARCH 3, 2015

11

12

13

14                    /S/ SANDRA MACNEIL

15                 Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiffs,               )
                                    )
                                    )
     vs.                            ) No. CR 11-00072-RGK
                                    )
                                    )
                                    )
MHER DARBINYAN, MIGUEL              )
RAMIREZ, et al.,                    )
                                    )
          Defendants.               )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*JOINDER IN MOTION TO SEVER DEFENDANT AND*
*JOINDER IN MOTION TO DISMISS CASE OR CONTINUE*
*TRIAL DATE*

LOS ANGELES, CALIFORNIA

MONDAY, MARCH 5, 2012

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
ROOM 404
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

**ON BEHALF OF THE PLAINTIFFS,**
**UNITED STATES OF AMERICA:**        OFFICE OF THE UNITED STATES
                                     ATTORNEY
                                     BY:  STEPHEN G. WOLFE, ESQ.
                                     312 NORTH SPRING STREET
                                     15TH FLOOR
                                     LOS ANGELES, CALIFORNIA 90012
                                     (213) 894-7408


                                     OFFICE OF THE UNITED STATES
                                     ATTORNEY
                                     BY:  SARAH C. LEVITT
                                     312 NORTH SPRING STREET
                                     12TH FLOOR
                                     LOS ANGELES, CALIFORNIA 900012
                                     (213) 894-2579


**ON BEHALF OF THE DEFENDANTS,**
**MHER DARBINYAN, MIGUEL**            LAW OFFICES OF ANTHONY E.
**RAMIREZ, et al.:**                  COLOMBO, JR.
                                     BY:  ANTHONY E. COLOMBO,
                                     ESQ.
                                     1800 CENTURY PARK EAST
                                     SUITE 600
                                     LOS ANGELES, CALIFORNIA 90067
                                     (310)229-5770


                                     CHERNIS LAW GROUP
                                     BY:  MICHAEL S. CHERNIS,
                                     ESQ.
                                     (NOT PRESENT)
                                     3110 MAIN STREET
                                     SUITE 205
                                     SANTA MONICA, CALIFORNIA 90401
                                     (310)566-4388

3

1          **I N D E X**

2

3                                                                PAGE

4     JOINDER IN MOTION TO SEVER DEFENDANT AND

5  JOINDER IN MOTION TO DISMISS CASE OR CONTINUE

6  TRIAL DATE:                                                   4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                LOS ANGELES, CALIFORNIA; MONDAY, MARCH 5, 2012

 2                               -o0o-

 3                    (COURT IN SESSION AT 2:44 P.M.)

 4              THE CLERK:  Calling item 23 and 24,

 5     CR 11-00072-DDP:  United States v. Darbinyan, et al.

 6              Before the Court today is defendant number one and

 7     the joinder was filed by defendant number 50.  That counsel

 8     is not here but being represented by counsel for

 9     Mr. Darbinyan.

10              MR. WOLFE:  Good afternoon, Your Honor.

11     Stephen Wolfe and Sarah Levitt for the Government.

12              THE COURT:  Good afternoon.

13              MR. COLOMBO:  Good afternoon, Your Honor.

14              Anthony Colombo on behalf of Mr. Darbinyan, who is

15     present in custody.  And I'd be specially appearing on behalf

16     of Michael Chernis' client, Miguel Ramirez, who is on bond

17     and not present.  It is my understanding that they filed a

18     joinder.  And I would specially appear for them as they're

19     not here, if that's acceptable to the Court?

20              THE COURT:  Sure.  Very well.

21              You know, having read everything, it seems to me

22     that what I would be inclined to do would be to deny

23     everything without prejudice.  The matter is being continued

24     for a year.  I think your points are good points though in

25     terms of trial management issues; and there may be due
```

```
 1    process issues with a trial that if it were to remain in the
 2    same configuration and size.  You know, it creates all sort
 3    of case management issues for me if it really stays that
 4    size.  Maybe the trial would have to run four hours a day,
 5    and I'd be able to do my other work in the afternoon.  I
 6    don't know; but I'm about to start -- well, I'm in a
 7    two-month trial that involves just four defendants.  So, you
 8    know, it creates a lot of real issues for all of the parties
 9    in this case.  So I'm aware of that.  And we're going to have
10    to, I think, deal with those issues at some point down the
11    road.  So I guess the message to you is, I hear what you're
12    saying.  And there are -- you know, you make some good
13    points; but I think we should perhaps wait a little bit and
14    see how things work out in terms of the number of defendants,
15    possible amendments, or additional indictments.  And, you
16    know, advise the Government that structurally right now, I
17    don't know how this case could be tried; but we'll see how
18    we -- how we -- how things move in the future.  So that's
19    really all I have to say.  That's the tentative at this
20    point.
21                Did you want to say anything?
22                MR. COLOMBO:  I do, Your Honor.  If Your Honor
23    could indulge me...
24                THE COURT:  Go ahead.
25                MR. COLOMBO:  The motion was filed -- the motion to
```

1     dismiss, in the alternative continue as well as the motion to

2     sever was filed prior to the parties agreeing to a

3     stipulation to continue the trial for a year as Your Honor is

4     aware.  I filed the motion because we were coming onto the

5     trial date, and there had been nothing that had been done by

6     the Government in regards to any trial management.  So I

7     started to get concerned, and I thought Your Honor should be

8     alerted to the potential issues that could be raised by a

9     case of this magnitude.

10          Now, having that said and having that the parties

11    have agreed to continue the case for another year which I

12    felt I was compelled to do, because there were -- it would be

13    completely ineffective for me to go to trial in May.  I think

14    that these issues are not moot as the Government has said.

15    And I think they should be dealt with, the parties and the

16    Court sooner rather than later, so we don't have the same

17    issue that we previously ran into.

18          And what -- what -- short of a dismissal,

19    Your Honor -- and I understand that the Government -- as the

20    Government said that *Baker* and *Fernandez* and the precedent

21    that I cited were all in the context of a due process

22    violation and a severance, but I think that we do have some

23    serious due process concerns here because we he have

24    Mr. Darbinyan who has been in pretrial confinement for over a

25    year now.  He is in administrative segregation.  So he is

```
1    suffering from his pretrial confinement in a much more severe
2    way than other individuals, because he's locked down 23 hours
3    out of a 24 hour a day.  When I go visit him, he's in
4    handcuffs.  He has limited phone access; limited visits, et
5    cetera.  It's much more of a -- a burden upon him and his
6    counsel to adequately prepare.  So although I agreed to the
7    stipulation, I feel that I was forced to because nothing had
8    been done in the way of any decisions by the Government.  And
9    I think at the time that the Government indicted the case
10   back in January of 2011, they -- they should have been in a
11   position as to what they said in their motion as to where
12   they're going to go with this case, because the Speedy Trial
13   clock would require them to try the case within 70 days.  And
14   indicting 70 defendants together, they know that that's not
15   going to happen.  And they put counsel -- defense counsel in
16   a position where they have to agree to continue the case,
17   but they should have been, I believe, more judicious in their
18   decision to indict 70 people.  And they could have broken the
19   indictments down in a much more, I think, judicious way than
20   indict 70 people together.  And here we are over a year
21   later -- and the Government is advising the Court that, Hey,
22   look, they don't know what witnesses they're going to call.
23   They don't know what counts they're going to go forward with.
24   They don't know what overt acts they're going to prove.
25   They're not sure exactly what draft transcripts they're going
```

```
 1   to use, because they haven't finalized any of those.  They

 2   narrowed it down to 2,000 phone calls.  So, I think, Your

 3   Honor, that there is significant concern here.  And I'd

 4   rather be in a position today where we know that we have a

 5   trial date a year from now, not wanting to continue it any

 6   further than that, that the Government should really make

 7   some decisions as to what witnesses they're going to call;

 8   what phone calls they're going to use; what -- rather than

 9   draft transcripts, I should be given final transcripts a year

10   after the case is indicted; and what exhibits, if any, they

11   intend to use.

12            Now, I understand that over the course of the next

13   year, there is going to be a significant number of cases that

14   resolve, including possibly Mr. Darbinyan's.  I don't know.

15            But I think, Your Honor, that, as I said, the

16   Government should do that.  And what I'm asking Your Honor is

17   short of a dismissal which I believe is an extraordinary

18   remedy.  And I recognize that, but it would send a message to

19   the Government that they should be more judicious in their

20   decisions and not just dump this case on the Court and on

21   defense counsel to defend; but short of that, I would like

22   the Court's intervention, consistent with the proposed order

23   that I submitted with some type of dates to where the

24   Government has to make these decisions, so that defense

25   counsel can adequately prepare and has a sufficient amount of
```

```
 1    time to prepare --
 2              THE COURT:  Well, I'll order you to meet and confer
 3    with the Government and review the dates and the proposed
 4    order and come up with something that makes sense.
 5              MR. COLOMBO:  That's fine, Your Honor.  And I'm
 6    more than willing to do that, and hopefully we can come to
 7    some agreement and then supply a stipulation to the Court.
 8              THE COURT:  Okay.  And I'll order you to meet and
 9    confer in person to do that within the next 30 days.
10              MR. COLOMBO:  That's fine, Your Honor.
11              In addition, I think -- and this is more of a
12    concern that came up recently.  And I think it would also --
13    it goes to the underlying concerns and the due process
14    violation that I've stated in my papers, is that all of the
15    discovery that has been provided to defense counsel,
16    approximately now 175,000 pages of discovery, 50,000 phone
17    calls, none of the information that was provided is -- is any
18    of the evidence that is addressed in the initial wiretap
19    application that was submitted in January of 2009 which all
20    of the evidence that I have is subsequent to that -- or
21    almost 90 percent, I would say is subsequent to that.  I
22    submitted a request to initially Ms. Levitt and then to
23    Mr. Wolfe.  And the response I received is I think somewhat
24    concerning to counsel, because the Government doesn't believe
25    that any of that information is material; but here I am now
```

```
 1    over a year later after the case has been indicted -- and I
 2    don't have any of the information or documents or reports or
 3    phone calls or consensual recordings that are addressed in
 4    the application for the wiretap.
 5            Now, without any of that information, I would never
 6    be able to review it and be able to say whether there were
 7    any material misstatements or omissions on the part of the
 8    Government.  And I would never be able to surmount a
 9    challenge, pursuant to Title 3 to the wiretap, and the
10    Government doesn't believe that any f that information is
11    material.
12            And in addition, some of the four out of the ten
13    requests that I made informally to the Government, they're
14    not aware of whether they have it or whether it's even been
15    disclosed to me in discovery.  And I can tell the Court that
16    I don't -- it wasn't disclosed in discovery.  So these are
17    the issues that I think I'm having with the case --
18            THE COURT:  I don't want to have to intervene in
19    any of these issues.  And I know the parties understand that.
20    So why don't you just add that to the meet-and-confer list
21    and you can submit a formal request or a joint statement in
22    writing after you've met and conferred.  And if you're unable
23    to resolve any of those issues, then you should bring the
24    appropriate motion.
25            MR. COLOMBO:  Very well, Your Honor.
```

```
 1              I appreciate Your Honor's comments in the
 2      beginning.  And I appreciate --
 3              THE COURT:  Well -- and it's a case management
 4      issue for me and for the Government and for you.
 5              And, you know, I don't want to get into a situation
 6      where I can't plan for a -- where I've got to start telling
 7      all of the 375 civil people that I'm dealing with on civil
 8      cases that I'm not going to have any trials available for the
 9      next year or two.  I mean, it presents serious case
10      management issues for my staff and me.  So I'm hoping that
11      with a little time, things will shake out; but they may not.
12              So, Mr. Wolfe, what do you suggest we do?
13              MR. WOLFE:  Your Honor, I believe the Court's
14      suggestion about meeting and conferring is a valuable one.
15      The point Your Honor makes about case management are
16      concerning to the Government as well.  48 defendants is an
17      awful lot to try at once, and I can't imagine how we would go
18      about t.  The Government to some extent is --
19              THE COURT:  We'd have to rent an auditorium
20      somewhere -- I mean, literally.
21              MR. WOLFE:  Yes.  Yes, Your Honor.
22              To some extent, the Government is hostage to the
23      speed with which defense counsel prepare and by which -- by
24      that, I mean the resolution of the pending wiretap motion
25      stands in the way of some of the likely resolutions in the
```

```
1    case; that is, defendants will not plead guilty who believe
2    they have a chance of having the wiretap suppressed.  So they
3    don't -- when I asked five months ago, whether the Karayan
4    defendants wanted to discuss disposition, I was told that
5    they didn't want to do so until after the wiretap motion was
6    decided.  I can't say that I blame them; but it does mean
7    that the Government to some extent cannot move the case
8    faster than defendants, who promised me in September that the
9    wiretap motion would be filed in October.  And, in fact, it
10   wasn't filed for four months thereafter.
11             THE COURT:  Well, do they have all the material
12   that they need to prepare the wiretap motion?
13             MR. WOLFE:  Well, I gather they do.  They filed the
14   motions.
15             THE COURT:  That's not what I'm hearing though.  I
16   mean, I don't know.  Do they have everything?
17             MR. COLOMBO:  No, Your Honor.  And I could tell you
18   that the -- what Mr. Wolfe is talking about is -- is Karayan,
19   who is only part of the -- the last wiretap application -- my
20   understanding application number 16.  And they specifically
21   are only addressing telephone -- target telephone number 25.
22   There were 24 target telephones that proceeded that and 15
23   applications that proceeded that.  Mr. Darbinyan was the
24   original target of the wiretap applications which the
25   original was in January of 2009.  And Mr. Darbinyan had seven
```

1   subsequent telephones tapped.  And he was part of those 15
2   applications that proceeded that.  Now, in reviewing all of
3   the discovery that I have, that the Government has provided,
4   I think I was very specific in my request to Mr. Wolfe that I
5   sent over on February 17th, after reviewing all of that and
6   beginning to at this stage, attempt to mount a challenge to
7   the wiretap application, because I believe the majority of
8   discovery is based upon that initial wiretap.  I don't have
9   any of the discovery that the -- the affiant purports to rely
10  upon in his application.
11        So I don't have, for example, there was a CI
12  number -- No. 2 which my understanding is an individual with
13  the first name of Sarkis, who wore a consensual wire on
14  Mr. Darbinyan, and they -- the affiant used that as probable
15  cause, as well as -- you know, toward necessity to obtain the
16  wiretap application.  I don't have those conversations
17  with -- which are summarized in the wiretap.
18        Now, in order for me to determine whether there
19  have been any material misstatements, whether that
20  information was correct, I would need a copy of those
21  recordings, which I don't have at this point.  So I'm not in
22  a position for Mr. Darbinyan to mount a challenge to the
23  wiretap because I don't have any of the information that was
24  relied upon by the affiant in that initial wiretap
25  application.

| | |
|---|---|
| 1 | Now, other individuals who came much later in the |
| 2 | case, because the application number 25 wasn't submitted |
| 3 | until January of 2010, a year later, have the benefit of |
| 4 | having all the discovery after the wiretap application -- the |
| 5 | initial one, was granted.  So that application number 25 was |
| 6 | based upon all the information that was acquired by the |
| 7 | Government after they received the initial wiretap |
| 8 | application.  So they may have had that information. |
| 9 | For Mr. Darbinyan, I can represent to the Court I |
| 10 | don't have that information.  So I'm in a completely |
| 11 | different -- |
| 12 | THE COURT:  Okay.  So -- |
| 13 | MR. COLOMBO:  -- position than my co-counsel. |
| 14 | MR. WOLFE:  Your Honor, defense counsel relied upon |
| 15 | Rule 16, saying that the material was covered by |
| 16 | Rule 16.  And I read the cite to the section cite, and no, I |
| 17 | don't believe that it is. |
| 18 | I'm not persuaded by anything that defense counsel |
| 19 | cited in his letter to me that there is an independent |
| 20 | discovery right for probable cause that does not ripen into |
| 21 | admissible evidence.  And defense counsel did not -- |
| 22 | THE COURT:  Rule 16 says material -- material to |
| 23 | the Defense.  It doesn't have to do with probable cause. |
| 24 | It's just, period -- material to the Defense. |
| 25 | MR. WOLFE:  Your Honor, I read *Franks v. Delaware*, |

```
 1    that seem to me to say that if the defendant doesn't -- is
 2    not able to make a serious and specific --
 3              THE COURT:  Sure.  But that is different than
 4    Rule 16; that's all I'm saying.  In terms of Rule 16, you
 5    know, it broadly requires the discovery of matters that are
 6    material to the defense.  So that is completely independent
 7    of the Franks issue.
 8              MR. WOLFE:  Your Honor, I might add that defense
 9    counsel says now that he needs to know what the conversations
10    were between his client and CI No. 2.
11              THE COURT:  I mean --
12              MR. WOLFE:  I hope that it is not out of line for
13    the Government to say that he might ask his client.  I do not
14    believe it is fair to tax the Government with an
15    unwillingness to provide information that sits beside defense
16    counsel at table.  The conversations that were the basis for
17    the wiretap were between defendant Darbinyan and an
18    informant.  It seems to me that defendant Darbinyan has equal
19    access --
20              THE COURT:  Well, but on the Franks' issue, the
21    defendant does have to make a prima facie showing of an
22    entitlement to a Franks' hearing, meaning the defendant has
23    to show that there may be some evidence of bad faith or some
24    other issue that would be pertinent to the validity of the
25    warrant; correct?
```

```
 1              MR. WOLFE:  Yes, Your Honor.

 2              THE COURT:  Okay.  So to do, he would need to be --

 3    and would be entitled to whatever information is normally

 4    discoverable, pursuant to Rule 16; right?

 5              MR. WOLFE:  Your Honor, I've not ever seen a case

 6    that makes that point.  And I don't find it in

 7    Franks v. Delaware, the opinions --

 8              THE COURT:  No, it isn't in Franks.  I'm saying

 9    that they're completely independent.  Whatever may be

10    discoverable or may be required under Brady or Giglio or

11    Rule 16, those materials, the first step would be all of that

12    be turned over.  Has that been done?

13              MR. WOLFE:  Oh, I believe so, Your Honor.

14    Defendant -- what I understand defendant Darbinyan to be

15    saying is that there are matters that were used in the

16    investigation, only to establish probable cause for the

17    wiretap.  None of them ripened into charges in the

18    indictment.  Notwithstanding that and not withstanding that I

19    took part in the conversations, I believe the Government's

20    obliged to give me discovery about them so that I can

21    consider whether I want to file a motion.  And I have never

22    seen the case that stands for --

23              THE COURT:  Okay.  Well, I mean, Franks sort of --

24    Franks sets forth the showing that you have to make in order

25    to be entitled to a hearing.
```

```
 1          MR. COLOMBO:  That's correct, Your Honor.

 2          THE COURT:  Okay.  So the Government isn't required

 3   to turn over everything that it would be required to turn

 4   over at a Franks' hearing preliminarily.

 5          MR. COLOMBO:  I would agree.  What I'm saying --

 6   and just let me be clear, because I agree with Your Honor.

 7   Rule 16 what it specifically states is that -- is that any --

 8   anything that is relevant and material to the preparation of

 9   defense, is discoverable.

10          Now, it's relevant and material to the preparation

11   of the defense to challenge the legality of a wiretap

12   application.  Now, in order to get a hearing, I would have --

13   in order to get a Franks' hearing -- an actual evidentiary

14   hearing, I would have to demonstrate that there was a

15   material omission or misstatement, et cetera or some

16   deliberate falsehood that was made in the application; but

17   what I'm telling the Court is I can't determine whether there

18   is a material misstatement, falsehood, or et cetera, without

19   having the information that the Government agent relied upon

20   to make the determination that there was probable cause and

21   then submit that to the Court.

22          THE COURT:  I don't think you're necessarily

23   entitled to that.  There has to be some independent showing

24   of bad faith.  I mean, you're entitled -- I would have you

25   take a look at the case that I wrote maybe 10, 12 years ago,
```

```
1    called Sudikoff vs. United States.  It talks about Rule 16.
2    It's a published opinion.  You know, it's an opinion that I'm
3    comfortable with.  And I think that it -- it broadly requires
4    discovery by the Government.  And then I think if you feel
5    that you need to file a motion concerning discovery, then you
6    should just do so; but I think it's too difficult to discuss
7    it in a vacuum.
8              MR. WOLFE:  Your Honor, if I may, I'd add one more
9    thing...
10             The rule that defendant Darbinyan contends for is
11   more expansive than any other discovery rule, because he
12   essentially says, I get to see what the affiant got to see.
13   He --
14             THE COURT:  No --
15             MR. WOLFE:  He reads the Government's
16   responsibilities out of the rule.  The Government would -- if
17   I were aware of a material misstatement, I would be obliged
18   to produce the material.  Defendant doesn't say he wants the
19   material misstatements that I find.  He wants to see
20   everything, so that I don't have to look at it.  And I do not
21   believe that's the rule.
22             MR. COLOMBO:  Well, Your Honor, what we're left at
23   if that's the case, then we're left upon the Government to
24   review the information and then determine on their own,
25   whether there's any -- any -- any challenges that
```

1    Mr. Darbinyan could or should make to the wiretap.  What I'm

2    saying is that I -- I cannot determine whether the

3    information in the affidavit is reliable, is credible, is

4    accurate, without reviewing the reports or any of the

5    conversations that were recorded.

6         Now, I understand that the Government is saying

7    that these -- all the informants that were used to -- to

8    demonstrate probable cause for the affidavit aren't going to

9    be witnesses at trial.  I understand that; but I think under

10   Rule 16 in order for me to establish any type of -- of review

11   to determine whether the wiretap is -- meets the requirements

12   of Title -- Title 3, I have to see what the affiant is

13   relying upon.  If I don't get to see that, then I'm just

14   relying upon the face of the -- the affidavit.  And it would

15   be impossible to make any material showing that there were

16   misstatements made.

17        MR. WOLFE:  Your Honor, defense counsel just said

18   these conversations were between two parties, CI 2 and this

19   defendant.  If this defendant is not capable of making a

20   showing of a material misstatement, then I submit, it's

21   because there were none, because the defendant knows as well

22   as anyone on the planet, whether any material misstatements

23   in the affidavit -- all he has to do is say, I didn't see

24   that.  I didn't say that.  No one told that to me.  And under

25   *Simmons*, it's not admissible against him.  I believe that's

```
 1   the avenue, and that's why there is no independent right of
 2   discovery with respect to probable cause.
 3            MR. COLOMBO:  And if that's sufficient to the
 4   Court --
 5            THE COURT:  I think that's correct as a --
 6   generally as a matter of law.  So we've been talking about
 7   two different things.  One is Rule 16 and just the general
 8   criminal discovery and the breadth of it, and the other one
 9   is probable cause material.  And I don't think the Government
10   is obligated to turn over everything that led to a probable
11   cause determination without some preliminary showing and the
12   way that you make that preliminary showing perhaps is through
13   independent evidence; through declarations of your client.
14   If I'm incorrect and I've stated the law incorrectly on that,
15   then you should do some research; file the appropriate motion
16   and I'll take it up when I'm fully prepared to deal with it.
17            MR. COLOMBO:  That's fine, Your Honor.
18            THE COURT:  Okay.  But I would read Sudikoff.  I
19   believe it is S-u-d-i-k-o-f-f.
20            MR. WOLFE:  It is, Your Honor.
21            THE COURT:  Okay.  And in terms of trial management
22   issues, Mr. Wolfe, maybe it is a good time to talk to you
23   about preparing a trial management plan where we can have
24   motion filing cutoff dates for various types of motions;
25   discovery motions, so that this matter gets managed, so we
```

21

```
 1    don't have defense lawyers doing as you are concerned they
 2    may be doing, which is simply waiting and not filing things.
 3    And that may be holding up your disposition process as well.
 4              MR. WOLFE:  Your Honor, Ms. Levitt included a
 5    number of motions' cutoffs in the stipulation that was
 6    submitted to Your Honor.  And I believe Your Honor issued
 7    that order.
 8              THE COURT:  Okay.  I don't recall that it had
 9    stipulations for those kinds of motions.  Did it?
10              MR. WOLFE:  There's a date for all motions, except
11    motion in limine with opposition and reply dates and a
12    hearing date.  And there is a separate schedule for motions
13    in limine.
14              THE COURT:  Okay.  And does it deal with -- is it
15    too soon -- too close to trial for Franks'-type motions, et
16    cetera?  I don't think that was addressed separately.  That
17    seemed to be your concern.
18              MR. WOLFE:  It began -- I don't remember the
19    precise date; but the first motions date is in October with
20    oppositions and replies in November to a hearing in December.
21    Then in January, motions in limine, leading to a hearing at
22    the end of February --
23              THE COURT:  Well, does it address the Government's
24    concerns about having motions heard that might result in
25    dispositions?
```

```
1           MR. WOLFE:  Your Honor, I believe that it does,
2     because I believe that the -- the pending wiretap motion and
3     the trial in Orange County are very likely to have a salutary
4     effect on the willingness of defendants to enter a discussion
5     about the trial.
6           THE COURT:  Okay.  Mr. Colombo, can I just change
7     topics for a moment with you?
8           MR. COLOMBO:  Sure.
9           THE COURT:  You know, I received a letter about a
10    month ago through the clerk -- just a copy of a letter,
11    addressed to the clerk about request for production of
12    records under Jury Selection Service Act.  I didn't do
13    anything, because my clerk was instructed to communicate to
14    you that you should file a formal motion.
15          MR. COLOMBO:  Yes.  In -- I sent a letter to the
16    clerk's office in anticipation of receiving certain
17    documentation to possibly mount a challenge to the jury
18    wheel.  And I received a response from the clerk's office if
19    there are any issues, that I have to address in a formal
20    motion to Your Honor.  So in the event that I do decide to go
21    forward with that motion, I will --
22          THE COURT:  Okay.  Well, I just wanted to make sure
23    that you weren't expecting me to do anything at this point.
24          MR. COLOMBO:  No, I was not.  And I understood
25    exactly what Your Honor just conveyed.
```

```
 1              THE COURT:  Okay.

 2              MR. COLOMBO:  Yes.

 3              THE COURT:  Okay.  Then in terms of case management

 4     issues, Mr. Wolfe, Ms. Levitt, is there anything else that

 5     would make sense in terms of dealing with --

 6              MR. WOLFE:  Your Honor, I can't visualize any as I

 7     stand here now.  I believe that the motion schedule which

 8     would require severance to be taken up starting in October of

 9     this year, ought to provide enough time.  I'm hopeful, as I

10     said a moment ago, that the wiretap hearing that is to be

11     held April 2nd and the outcome of the Orange County trial is

12     liable to have a real effect on how many defendants --

13              THE COURT:  Tell me about that.  Tell me about that

14     and what the status is.

15              MR. WOLFE:  Well, the -- the Orange County trial

16     started two weeks ago.  They were in trial for a week, and

17     then Judge Carter was away for a week.  They're in trial this

18     week and next week.  I believe it's expected to end near the

19     end of March.

20              THE COURT:  How is that trial related to what may

21     happen here?

22              MR. WOLFE:  Well, two of the defendants are common

23     to this case.  And I believe that it's likely to take care of

24     those two defendants, at least.  And those two defendants --

25     one is Haro Petrosian, who is defendant number 6 or 8, a very
```

| 1 | significant figure in this case.  The resolution of his |

1    significant figure in this case.  The resolution of his

2    case -- the resolution of both of his cases was discussed

3    prior to trial but could not be agreed.  I believe that it's

4    likely to be agreed after the outcome of that case.  I

5    believe that there are defendants who specifically told us

6    that they would not resolve their own cases until defendant

7    Charo Petrosian's case was resolved.  So that I believe his

8    plea is liable to lead to negotiations that will lead to a

9    number of others.  Markosian is also -- he is a common

10   defendant in the two cases; is equally likely to dispose of

11   his case once he -- if he's acquitted, I imagine he'll tell

12   us he wants a trial, and if he's convicted, I imagine he's

13   liable to want to dispose of this case.

14              THE COURT:  Okay.  And there's a *Franks'* hearing in

15   that case as well?

16              MR. WOLFE:  Your Honor, the only wiretap challenge

17   that was made in that case was decided months ago, adversely

18   to the defendants who made it.

19              THE COURT:  But there are no pending wiretap

20   motions anywhere?

21              MR. WOLFE:  In this case, Your Honor, the one that

22   defense counsel adverted to, made by -- the Karayan,

23   Hayk Karayan, Zhirayr Karayan, Jack Gambaryan and a couple

24   others, joined in a wiretap motion that's -- the Government's

25   response is due Tuesday of next week.

```
 1                THE COURT:  Okay.  Okay.  Well that's good.

 2                MR. WOLFE:  Give me one second.

 3                THE COURT:  Okay.  Well, I was just -- I just

 4     wasn't sure what the timing of that one was.  Okay.  All

 5     right.  Is there anything else I can help you with,

 6     Mr. Colombo?

 7                MR. COLOMBO:  No, Your Honor.

 8                Thank you.

 9                THE COURT:  Thank you.

10                     (Whereupon proceeding adjourned.)

11                          - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    C E R T I F I C A T E

2

3

4

5      UNITED STATES OF AMERICA          :

6                 vs.                     :   No. CR 11-00072-RGK

7      MHER DARBINYAN, MIGUEL RAMIREZ,    :

8      et al.

9

10

11     I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

12     UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

13     CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

14     TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

15     CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

16     PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

17     TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

18     OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

19     FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

20     REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

21     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

22

23     /S/_____          11/12/2014

24     MARIA R. BUSTILLOS                   DATE
       OFFICIAL REPORTER
25
```



```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4                       - - -

 5    HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

 6

 7    UNITED STATES OF AMERICA,       )
                                      )
 8            Plaintiffs,             )
                                      )
 9                                    )
                                      )
10         vs.                        ) No. CR 11-00072-DDP
                                      )
11                                    )
                                      )
12    MHER DARBINYAN, ET AL.,         )
                                      )
13            Defendants.             )
      _____)

14

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              WIRETAP SUPPRESSION HEARING

18               LOS ANGELES, CALIFORNIA

19                FRIDAY, JUNE 1, 2012

20    _____

21                 MARIA R. BUSTILLOS
                 OFFICIAL COURT REPORTER
22                   C.S.R. 12254
                UNITED STATES COURTHOUSE
23              312 NORTH SPRING STREET
                       ROOM 404
24           LOS ANGELES, CALIFORNIA 90012
                   (213) 894-2739
25
```

```
1                    A P P E A R A N C E S

2

3

4       ON BEHALF OF THE PLAINTIFFS,
        UNITED STATES OF AMERICA:        OFFICE OF THE UNITED STATES
5                                        ATTORNEY
                                         BY:  STEPHEN G. WOLFE, ESQ.
6                                        312 NORTH SPRING STREET
                                         15TH FLOOR
7                                        LOS ANGELES, CALIFORNIA 90012
                                         (213) 894-7408
8

9                                        OFFICE OF THE UNITED STATES
                                         ATTORNEY
10                                       BY:  E. MARTIN ESTRADA, ESQ.
                                         312 NORTH SPRING STREET
11                                       12TH FLOOR
                                         LOS ANGELES, CALIFORNIA 90012
12                                       (213) 894-4477

13

14                                       OFFICE OF THE UNITED STATES
                                         ATTORNEY
15                                       BY:  SARAH C. LEVITT
                                         312 NORTH SPRING STREET
16                                       15TH FLOOR
                                         LOS ANGELES, CALIFORNIA 90012
17                                       (213) 894-2579

18

19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S  (CONT'D)

 2

 3    ON BEHALF OF THE DEFENDANTS,
      ET AL.,                          MARKS & BROOKLIER
 4    MHER DARBINYAN:                  BY:  ANTHONY BROOKLIER, ESQ.
                                       10100 SANTA MONICA BOULEVARD
 5                                     SUITE 300
                                       LOS ANGELES, CA 90067
 6                                     (310) 772-2287

 7

 8                                     LAW OFFICES OF FRED McCURRY
                                       BY:  FREDRICO McCURRY, ESQ.
                                       PO BOX 3695
 9                                     VAN NUYS, CALIFORNIA 91407
                                       (818) 901-8418

10

11

12

13    ON BEHALF OF THE DEFENDANTS,
      MHER DARBINYAN, ET AL.:          MARKS & BROOKLIER
14                                     BY:  DONALD B. MARKS, ESQ.
                                       10100 SANTA MONICA BOULEVARD
15                                     SUITE 300
                                       LOS ANGELES, CA 90067
16                                     (310) 772-2287

17

18                                     LAW OFFICES OF ANTHONY E.
                                       COLOMBO, JR.
                                       BY:  ANTHONY E. COLOMBO, JR.
19                                     ESQ.
                                       1800 CENTURY PARK EAST
20                                     SUITE 600
                                       LOS ANGELES, CA 90067
21                                     (310) 229-5770

22

23

24

25
```

```
 1              A P P E A R A N C E S  (CONT'D)

 2

 3      ON BEHALF OF THE DEFENDANTS,
        MHER DARBINYAN, ET AL.:        LAW OFFICES OF PAUL W. BLAKE
 4                                     BY:  PAUL W. BLAKE, ESQ.
                                       355 SOUTH GRAND BOULEVARD
                                       SUITE 2450
 5                                     LOS ANGELES, CA 90071
                                       (213) 215-1920
 6

 7                                     LAW OFFICES OF JAY L.
                                       LICHTMAN
 8                                     BY:  JAY L. LICHTMAN, ESQ.
                                       3550 WILSHIRE BOULEVARD
 9                                     SUITE 2000
                                       LOS ANGELES, CA 90010
10                                     (213) 386-3878

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S

 2

 3

 4       ON BEHALF OF THE DEFENDANTS,
         MHER DARBINYAN, ET AL.:        LAW OFFICES OF GEORGE STEELE
 5                                      BY:  GEORGE L. STEELE, ESQ.
                                        127 NORTH MADISON AVENUE
 6                                      SUITE 24
                                        PASADENA, CALIFORNIA 91101
 7                                      (626) 405-4860

 8
                                        LAW OFFICES WILLIAM HARRIS
 9                                      BY:  WILLIAM S. HARRIS, ESQ.
                                        1499 HUNTINGTON DRIVE
10                                      SUITE 403
                                        SOUTH PASADENA, CA 91030
11                                      (951) 441-9300

12

13

14       ON BEHALF OF THE DEFENDANTS,
         MHER DARBINYAN, ET AL.:        BUEHLER & KASSABIAN, LLP
15                                      BY:  GEORGE W. BUEHLER, ESQ.
                                        350 WEST COLORADO BOULEVARD
16                                      SUITE 200
                                        PASADENA, CALIFORNIA 91105
17                                      (626) 792-0500

18                                      LAW OFFICES OF JOSEPH WALSH
                                        BY:  JOSEPH F. WALSH  ESQ.
19                                      205 SOUTH BROADWAY
                                        LOS ANGELES, CA 90012
20                                      (213) 627-1793

21

22

23

24

25
```

1               **I N D E X**

2

3                                                                    PAGE

4     WIRETAP SUPPRESSION HEARING:                                     7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, JUNE 1, 2012

 2                            -o0o-

 3              (COURT IN SESSION AT 10:30 A.M.)

 4         THE CLERK:  Calling Items 1through 17,

 5    CR 11-00072-DDP:  United States vs. Darbinyan, et al.

 6         Before the Court today are Defendants 1, 5, 55, 22,

 7    23, 45, 28, 44, 20, 11, 4, 46.  And the following defendants

 8    did file motions or joinders, who are not present, 35, 27,

 9    38, 30, 22.

10         Counsel, may we have appearances, please.

11         MR. ESTRADA:  Good morning, Your Honor.

12         Martin Estrada on behalf of the United States.

13    With me at counsel table is Assistant United States Attorney

14    Stephen Wolfe, Sarah Levitt and also trial attorney Andrew

15    Creighton.

16         THE COURT:  Good morning.

17         MR. MARKS:  Good morning, Your Honor.

18         Donald Marks for Number 4, Mr. Sharopetrosian.  I

19    would mention to the Court that Mr. Brooklier will be making

20    the appearance for me this morning.

21         THE COURT:  Yes.  Thank you.

22         Okay.

23         MR. BROOKLIER:  Yes, Your Honor.  Good morning.

24         Anthony Brooklier for Hayk Karayan.  He's defendant

25    Number 5.  I'm also standing in for Defendant Number 11,
```

 1    Garik Galastyan for his attorney who is not -- neither his

 2    attorney or he are present, and his attorney is

 3    Gevork Chilingaryan.

 4              MR. WALSH:  Good morning, Your Honor.

 5              I'm Joseph Walsh appearing for Defendant Number 55,

 6    Zhirayr Karayan, who is present in Court, on bond.  And I'm

 7    making a special appearance for Attorney David Reed who is

 8    the attorney for Jack Gambaryan, Defendant Number 23, and

 9    I'll be appearing for Mr. Gambaryan for these proceedings

10    only.  And Mr. Gambaryan is present in Court, on bond.

11              THE COURT:  Thank you.

12              MR. MCCURRY:  Your Honor, good morning.

13              Fred McCurry representing Number 21, Arman Karayan.

14    He is present on bond.  I'm also specially appearing for

15    Attorney William Domnarski on behalf of Mr. Arsen Ayranjian.

16    I'm sorry.  I don't know his number on the indictment, but he

17    is present.

18              THE COURT:  Thank you.

19              MR. COLOMBO:  Good morning, Your Honor.

20              Anthony Colombo on behalf on Mr. Darbinyan, who is

21    present, in custody.  He is Defendant Number 1.

22              MR. BLAKE:  Good morning, Your Honor.

23              Paul Blake on behalf of Lusine Ogandganyan,

24    Defendant Number 28, who is present, on bond.

25              MR. LICHTMAN:  Good morning, Your Honor.

```
1              Jay Lichtman for Mr. Karamusyan, Number 44, who's
2    present, on bond.
3              THE COURT:  Good morning.
4              MR. STEELE:  Good morning, Your Honor.
5              George Steele on behalf of Grigor Garibyan.
6              THE COURT:  Good morning.
7              MR. HARRIS:  Good morning, Your Honor.
8              William Harris on behalf of Number 45,
9    Mr. Melkonian.  He is present, on bond.
10             THE COURT:  Good morning.
11             MR. BUEHLER:  Good morning, Your Honor.
12             George Buehler on behalf of Number 35,
13   Rafael Parsadanyan, who is not present.
14             THE COURT:  Okay.  Let's take up the suppression
15   motion.
16             Mr. Brooklier, you're going to be arguing the
17   motion?
18             MR. BROOKLIER:  Mr. Walsh initially, Your Honor.
19             MR. WALSH:  I will be, Your Honor.
20             THE COURT:  Okay.  And --
21             MR. BROOKLIER:  One other thing, Your Honor.
22             THE COURT:  Yes?
23             MR. BROOKLIER:  Mr. Petrosian who I believe --
24   Aram Petrosian, who I believe is Defendant Number 20, as the
25   Court probably knows, his attorney, Philip DeMassa, passed
```

```
 1    away last weekend.
 2              Anthony Brooklier.  With regard to Defendant Number
 3    20, Aram Petrosian, Mr. DeMassa, his attorney of record,
 4    passed away last week.  And then Roger Rosen is going to
 5    stand in, but he's in another court.
 6              May I make this appearance for him at this point
 7    until Mr. Rosen gets here?
 8              THE COURT:  Yes.
 9              MR. BROOKLIER:  Thank you, Your Honor.
10              THE COURT:  Okay.  Mr. Walsh, in terms of
11    organizing your presentation, I -- I found it was helpful to
12    look at the -- the affidavit as a table of contents, if you
13    will, or a guideline or outline to -- since that's the
14    primary source material that is at issue here, to look at
15    that and make references to particular paragraphs when you're
16    dealing with -- with a particular argument.  I don't know if
17    you have structured your argument that way, but because
18    that's the most important document we're dealing with, I
19    think it's important that we be referring to that document so
20    that I can follow along and see what the -- what the
21    affidavit says.
22              MR. WALSH:  Yes, Your Honor.
23              I --
24              THE COURT:  You know -- and the reason for that is
25    you both -- both sides have given me, I don't know, 150 pages
```

```
 1   of documents and exhibits, and just trying to organize and
 2   understand the arguments and refer back to primary sources
 3   where you disagree, and you disagree about almost everything,
 4   is very difficult to pull that all together unless there is
 5   some anchor and I use the affidavit as that -- that anchor.
 6            MR. WALSH:  Your Honor, the one thing we did in
 7   preparation for the hearing is -- although we weren't sure we
 8   would get an evidentiary hearing, is that we pulled some of
 9   the documents and put them in an evidentiary book that we
10   could -- perhaps, could provide to the Court that references
11   pages from the affidavit.
12            THE COURT:  Sure.
13            MR. WALSH:  And I --
14            THE COURT:  We can try that if you've done that
15   already.
16            MR. WALSH:  And that -- and I might indicate that
17   we -- we had assumed that the affiant, Mr. Stebbons would be
18   here at the hearing and then I talked to Mr. Wolfe, and he
19   indicated that Mr. Stebbons wasn't here.  So that may not
20   become an issue until the Court makes a final determination
21   as to whether to grant the Franks hearing, but I wanted to
22   raise that.  I had assumed that he would be here.  I think
23   it's a mistakes on both of our parts.  I thought the
24   Government should have brought him here since that was the
25   main focus of the hearing, but I should have, perhaps, sent
```

(3257 of 3613)

Case 2:15-cv-05173-RGK 06/27/2016 ID of 0003431-0 DktEntry: 22-1 Page 3857 of 3613
Case 2:11-cr-00072-RGR Document 1934 Filed 09/19/12 Page 12 of 93 Page ID #:8512

12

| | |
|---|---|
| 1 | him a letter in advance of the hearing.  But be that as it |
| 2 | may, he is presently not here and that may be an -- |
| 3 | THE COURT:  Is he here where he can e made -- can |
| 4 | he come, Mr. Wolfe? |
| 5 | MR. WOLFE:  No, Your Honor.  He's on leave, |
| 6 | actually, in Florida, I believe. |
| 7 | THE COURT:  Okay.  Okay.  I assumed he was going to |
| 8 | be here because typically he would want to be here, but he's |
| 9 | apparently not here.  So let's proceed. |
| 10 | MR. WALSH:  All right, then. |
| 11 | THE COURT:  Okay.  Now, in terms of ordering your |
| 12 | argument, do you intend to discuss probable cause, or is that |
| 13 | something that you wish to submit? |
| 14 | MR. WALSH:  Your Honor, Mr. Frederico McCurry was |
| 15 | going to argue probable cause and he was going to do that |
| 16 | after I had focused the argument on necessity.  It's -- we -- |
| 17 | we made a decision in preparing that we felt that the |
| 18 | necessity issue was the strongest and wanted to make that |
| 19 | argument first and then -- but we don't want to waive the |
| 20 | probable cause -- |
| 21 | THE COURT:  The focus is clearly on necessity, I |
| 22 | agree. |
| 23 | MR. WALSH:  Thank you. |
| 24 | THE COURT:  Okay. |
| 25 | MR. WALSH:  Your Honor, I have this book if I can |

1    approach your --

2              THE CLERK:  Do you have a second copy, by any

3    chance?

4              THE COURT:  Okay.  Mr. Walsh.

5              MR. WALSH:  All right.  So maybe I'll begin the

6    argument and then when it -- when I'm referring to the search

7    warrant affidavit, then I'll try and find it in the exhibit

8    book.  But our argument begins with the fact that this is the

9    last wiretap application in a series of many wiretap

10   applications, and it's the last target telephone listed in

11   the case.  It's target telephone number 25.  That means that

12   they've had wiretap investigations on 1 through 24 before

13   turning to target telephone number 25.  And the important

14   point about the wiretap law is that when the Government

15   proceeds on the last wiretap application for a different

16   phone and a different suspect, they're still required to make

17   a showing of necessity.  And the purpose of necessity

18   requirement is to ensure that wiretapping is not resorted to

19   in situations where traditional techniques would suffice to

20   expose the crime.  And in making -- in meeting that

21   requirement, they have to not only set forth necessity in

22   their application, but the magistrate also has to find it

23   before granting the wiretap application upon reading the --

24   the affidavit.  And the statement and necessity requires a

25   complete and -- a full and complete statement as to whether

```
1    or not other investigative procedures have been tried and
2    failed or why they reasonably appear to be unlikely to
3    succeed if tried, or to be too dangerous, and it requires --
4           THE COURT:  Go ahead.
5           MR. WALSH:  And it requires that -- obviously from
6    all of the cases, the -- starting with Franks, there is this
7    fundamental requirement that the affidavit has to make
8    truthful statements and the -- the additional requirement of
9    the full and complete statement requires that the affidavit
10   cannot contain material omissions, and we believe that this
11   affidavit has both misstatements and omissions.  And the
12   first major misstatement -- I think if you turn to Exhibit 1
13   in the exhibit book where we have excerpted two pages from
14   the wiretap application for target telephone number 25 and
15   I -- and we have highlighted where we're going on this.
16          Does Your Honor's book have a highlighted area?
17          THE COURT:  Yes, it does.
18          MR. WALSH:  Okay.  On Paragraph E, Page 104, the
19   highlighted area -- the affiant represents that Karayan also
20   serves as the primary contact with Goggle; however, at this
21   time, Goggle, last name unknown's number is unknown.  And
22   then turning to Page 151, it again repeats at Paragraph 64:
23   "Moreover, interception of target telephone 25 is
24   particular" -- "in particular, is necessary because target
25   subject Karayan, the primary user of target telephone 25, is
```

```
 1    the primary contact of Goggle, last name unknown."  And then
 2    down below at the end of the paragraph:  "Indeed, at this
 3    time, Goggle's, last name unknown's full identity and
 4    telephone number are unknown."
 5              And so that's the first -- we have a series of
 6    false statements, but that's the first and the most glaring
 7    false statement that's in the -- in the wiretap application.
 8    And we have several exhibits that we -- we intended to offer
 9    at the hearing on cross-examination of the affiant in this
10    case.  And if you turn to Exhibit 2, the first exhibit that
11    we were going to show to Agent Stebbons and -- and the Court
12    will recall that the wiretap -- the dates are important.
13    This is a -- a line sheet from a telephone call from November
14    25, 2009, which predates the application for the wiretap.
15    The application was November 13, 2010.  And if you look up at
16    the right-hand corner of Exhibit 2 it says this -- these line
17    sheets were prepared under the direction and for Jeremy
18    Stebbons, which is the affiant on the search warrant -- the
19    wiretap application.  And this references a call between
20    Paramaz Bilezikchyan and Aram Petrosian at which
21    Mr. Bilezikchyan is asking for the telephone number of
22    Goggle.  And then on page -- the succeeding page -- the
23    telephone number is provided to Mr. Bilezikchyan and the
24    number appears in the line sheets reporting what was
25    overheard during the course of earlier wiretaps that were
```

```
 1    reported to --
 2              THE COURT:  And your point about the timing is that
 3    this was all known prior to the application?
 4              MR. WALSH:  Prior to the application.
 5              THE COURT:  Okay.
 6              MR. WALSH:  And then it's significant because if
 7    you look at that telephone number, it's (213) 377-6539, and
 8    then you go to Exhibit 3, and you'll see that that's the same
 9    telephone number that on January 5th, 2010, which is still
10    prior to the application for the wiretap, there is an
11    emergency request of -- for telephone records -- call records
12    from that number (213) 377-6539, and the request is based on
13    an ongoing kidnapping investigation.  So -- so it's clear
14    that they -- the representation that they didn't have
15    Goggle's telephone number in the wiretap on January 13, was
16    false because they had -- they had picked it up.
17              THE COURT:  It says -- so they were asking for
18    subscriber information; they got subscriber information and
19    the name was Mike Tyson, which everybody acknowledge is -- is
20    unlikely.  So...
21              MR. WALSH:  Yes.  But I think that's a different
22    issue.  The issue that we're focusing on is were they falsely
23    representing that they didn't have Goggle's telephone number,
24    and they did have his telephone number.  It's just that the
25    number was registered under a different person's name.  So as
```

```
 1   to that part of the wiretap application where they say we

 2   didn't have his number, that was -- that was incorrect.

 3            THE COURT:  Okay.  Well -- and just sort of

 4   reserved the right to play devil's advocate as we go along.

 5   So knowing a number may be different than believing that you

 6   have likely the correct number.  So there is certainty and

 7   there is likelihood.

 8            Do you understand that distinction in terms of this

 9   issue?

10            MR. WALSH:  Yes.

11            THE COURT:  So if you're dealing with a criminal

12   investigation, you want to be precise; right?

13            MR. WALSH:  Yes.

14            THE COURT:  Okay.  So the Government may say, well,

15   we had all this information; it certainly was pointing in

16   that direction; it seemed likely, but we didn't know

17   precisely if that number was the correct number.

18            MR. WALSH:  Yes.

19            But under the -- under Title 3, the requirement of

20   a full and complete statement would require that that

21   information be set forth in the wiretap application.  And if

22   we turn back to look and see what exactly they did state in

23   the wiretap application, it said, "At this time, Goggle's

24   phone number is unknown."

25            THE COURT:  Okay.  And it would have been better,
```

```
 1   obviously, and maybe from your perspective it was, you know,
 2   a material omission, but it certainly would have been better
 3   to say exactly what they had.  We had information from an
 4   intercepted phone call that said it was Goggle's phone number
 5   and we did a -- a subpoena of phone records for that number,
 6   and we came back with what was obviously a fictitious number.
 7   So we knew that there was something pointing in that
 8   direction that seemed fishy about this phone number.  That
 9   would have been a better disclosure; right?
10            MR. WALSH:  Yes.  And it wasn't a fictitious
11   number.  It was a legitimate number.
12            THE COURT:  Well, I meant fictitious --
13            MR. WALSH:  Fictitious name.
14            THE COURT:  -- name associated with the number,
15   yes.
16            MR. WALSH:  Yes.
17            THE COURT:  Okay.
18            MR. WALSH:  Okay.  So -- but our argument is the
19   statement that they didn't know Goggle's number is false and
20   that's just as to one number.  There is an additional exhibit
21   where prior to the application for the wiretap -- if you turn
22   to Exhibit 4, there's another line sheet and this is the one
23   at the bottom of the page, and the date of this line sheet is
24   December 21, 2009.  And if you turn to the -- and it's a
25   conversation between Paramaz Bilezikchyan and Mher, the
```

```
1   jeweler, and during this conversation, they're discussing
2   Goggle, any news from Goggle.  And Mher says, "No.  He called
3   Friday and asked me how is everything."  And then
4   Mr. Bilezikchyan says, "Give me his number, please."  And
5   then I think there's a failure to ascribe the next phrase to
6   Mher, the jeweler, where it says, "Let me find out and I'll
7   call you back."  And that was on December 21.
8           And then if you turn to Exhibit 5, there's a line
9   sheet for the same date just a few minutes later.  That's a
10  line sheet dated December 21, 2009 between Paramaz
11  Bilezikchyan and Mher, the jeweler, in which Mher, the
12  jeweler, calls back and gives another number, (818) 844-7895.
13          So this is December 21, which is almost a month
14  before the April -- excuse me -- the January 13 wiretap
15  application that now they have a second telephone number for
16  Goggle.
17          So now we believe we have proven that the -- the
18  Government's statement that they had no telephone number --
19  or Goggle's telephone number is unknown is now disproven
20  [sic] by two entries in the wiretap preceding the wiretap
21  application of target telephone number 25, and we state
22  that --
23          THE COURT:  Okay.  Well, certainly from what you've
24  said it could be characterized that they had information
25  pointing to two telephone numbers from two independent phone
```

```
 1    interceptions involving different providers of the phone
 2    number.  And, again, that information was not included and it
 3    should have been to provide a complete information --
 4    complete information to the judge.
 5              MR. WALSH:  Not only that it wasn't included, there
 6    was an affirmative false statement and misrepresentation, we
 7    believe, in the -- so it was an intentional false -- false
 8    statement made in the affidavit when they said that Goggle's
 9    telephone number is unknown when, in fact, they had two
10    telephone numbers for Goggle.  And then --
11              THE COURT:  Well, we should take up the phone issue
12    as sort of discreetly, and I can hear from the Government if
13    you're done with the phone issue, or is there more on the --
14              MR. WALSH:  Well, there --
15              THE COURT:  -- from the Goggle --
16              MR. WALSH:  There is -- there is more -- well,
17    the -- the next issue is concerning whether Goggle's identity
18    was really unknown.  So I'll be -- it's a -- they made a
19    representation in the -- so I'll be -- I'll be doing another
20    factual change, if the Court wishes to hear from the
21    Government on the telephone one.  If the Court will recall,
22    back on Exhibit 1, they made the representation that Goggle's
23    full identity is -- is unknown, and so I'm going to be -- the
24    next succeeding exhibits go to the question of whether that
25    statement that they didn't know his identity was a false
```

```
 1    representation.  So I --
 2              THE COURT:  And tell me again where the -- let's
 3    see.  The reference -- full identity, that's on Page 151.  I
 4    see that.
 5              So we're dealing with the -- the guideline.  I
 6    think we can continue on your -- your side with the Goggle
 7    issue on identity and phone, and then I'll go to the
 8    Government on that --
 9              MR. WALSH:  All right.
10              THE COURT:  -- those issues.
11              MR. WALSH:  Okay.  So now I'm turning on whether
12    that representation that they didn't know his identity was
13    false... and that takes us to Exhibit 6, which is a line
14    sheet of an earlier -- of an earlier wiretap of a call
15    occurring on November 26, 2009 between Paramaz Bilezikchyan
16    and a person named Gocor (phonetic).  And during the
17    conversation that occurred in November 26, Mr. Bilezikchyan
18    says that he met with Goggle yesterday and then Mr. Gocor,
19    the other person on the line, states that -- asked if -- if
20    Bilezikchyan was talking about the old guy, and
21    Mr. Bilezikchyan says, "yes."  And then on the next -- on the
22    next page, the continuation of the conversation between Gocor
23    and Mr. Bilezikchyan where they're referencing the events
24    surrounding the alleged kidnapping where Mr. Bilezikchyan
25    states that "I gave him something to drink, fed him, hit him,
```

```
 1    and then sent him off on his way," which indicates that --
 2              THE COURT:  Is that on seven -- Exhibit 7 in the
 3    book that you've given --
 4              MR. WALSH:  Exhibit 6.
 5              THE COURT:  Yeah.
 6              My Exhibit 6 just has one page.
 7              MR. WALSH:  I'm sorry.
 8              THE COURT:  Is they're supposed to --
 9              MR. WALSH:  There's supposed to be two.
10              Does yours have only one?
11              I'm sorry.  I -- I made duplicates of Page 2 and
12    forgot to put them in the books.
13              THE COURT:  Okay.
14              MR. WALSH:  Okay.
15              THE COURT:  Okay.
16              MR. WALSH:  And I --
17              THE COURT:  So now I -- so let's start over with
18    that.
19              MR. WALSH:  Okay.  On -- so on -- on the second
20    page of Exhibit 6, on the third line, Mr. Bilezikchyan is
21    stating:  "I gave him something to drink, fed him, hit him,
22    and then sent him off on his way."  So this appears to be a
23    conversation on November 26, 2009, in which Mr. Bilezikchyan
24    is talking about the alleged kidnapping of Goggle, which is
25    alleged to have occurred the day before.  And he is speaking
```

```
 1     to this individual, Gocor, and we have later identified him
 2     as Gocor Opian, and we believe that this -- this particular
 3     individual is -- is Confidential Informant Number 5, who was
 4     someone that was available to Agent Stebbons, providing
 5     information during the time of the application for the
 6     wiretap.  And it -- it seems to indicate that Gocor Opian who
 7     we believe is CE 5 -- CI 5, knew exactly who the kidnapped
 8     victim was, Goggle, because he states:  "Are you talking
 9     about the old guy?"  And so there's some indication here
10     that, in fact, through an ordinary traditional investigation,
11     that is, using an informant, that they could have learned the
12     identity of Goggle, the kidnapped victim, and that's
13     completely missing from the necessity portion of the wiretap
14     application.  So this would be an omission of the fact that
15     they had an informant that could provide them with the
16     identity of the kidnapped victim through a traditional
17     investigation.
18             And then turning to Exhibit 7 is another line sheet
19     summary for the date of December 28, 2009, which is also a
20     date prior to the application for the wiretap in this case,
21     in which there is a conversation involving Paramaz
22     Bilezikchyan in which Mr. Bilezikchyan says that he is -- he
23     is with Goggle now and he is headed to Pizo's (phonetic) home
24     to talk and we believe that Agent Stebbons is knowledgeable
25     about who Pizo is and about where Pizo lives and our offer of
```

```
 1    proof is that Mr. Bilezikchyan lives in an apartment building
 2    which is the same apartment building as Pizo and the agents
 3    knew, at least, where Mr. Bilezikchyan lived, and if they had
 4    overheard this conversation over an earlier wiretap that
 5    Mr. Bilezikchyan was taking Goggle, the alleged kidnapped
 6    victim, to the home of Pizo or the apartment of
 7    Mr. Bilezikchyan, that they could have conducted
 8    surveillance, or, in fact, I believe they did conduct
 9    surveillance, and that Goggle's identity could have been
10    obtained through ordinary and traditional investigations
11    making it unnecessary for a wiretap.
12              THE COURT:  So they -- they -- your point is they
13    could have conducted surveillance at Bilezikchyan's and/or
14    Pizo --
15              MR. WALSH:  Yes.
16              THE COURT:  -- at his house, is that what you said?
17              MR. WALSH:  Yes.
18              And -- and, actually, to be more precise, now that
19    I'm looking at it, if you turn to Exhibit 8, there is a
20    reference in the -- the wiretap application.  Now, this is
21    a -- the wiretap application in this case that is referencing
22    the surveillance that was conducted on December 28 and it
23    says, "While Kazaryan (phonetic) may have attempted to act as
24    an advocate on Goggle's behalf, Goggle ultimately adhered to
25    Bilezikchyan's extortion request at this meeting" --
```

```
 1                    THE COURT:  I'm sorry.  I'm -- I'm not finding
 2       that.  You're under which book?
 3                    MR. WALSH:  Exhibit 8.
 4                    THE COURT:  Okay.  And just -- I know the court
 5       reporter would appreciate it if you would slow down when you
 6       read.
 7                    MR. WALSH:  Sure.
 8                    THE COURT:  Okay.  So I'm looking at eight, which
 9       is Page 62 of the affidavit.
10                    MR. WALSH:  Yes.
11                    And is your book highlighted, Your Honor?
12                    THE COURT:  Yes, but it -- I don't recall it being
13       highlighted with what you just read.  But let's start over.
14                    MR. WALSH:  So the four lines from the --
15                    THE COURT:  From the --
16                    MR. WALSH:  From the top, "While Kazaryan may have
17       attempted to act as an advocate on Goggle's behalf, Goggle
18       ultimately adhered to Bilezikchyan's extortion request at
19       this meeting.  EOCTF surveillance confirmed that Yerkanyan,
20       Opian, Karayan and two unknown individuals, one of which was
21       believed to be Goggle, were observed leaving the premises."
22                    So it appears as though a month prior to applying
23       for the wiretap on December 28, 2009, the agents had Goggle
24       under surveillance at a meeting and I believe it to be at the
25       apartment building of Bilezikchyan.  Also present at the
```

```
 1    locations was Mr. Opian, who we believed was Confidential
 2    Informant Number 5.  And they -- and so they -- they had an
 3    ability through a traditional investigation to determine the
 4    identity of Goggle at that point in time and there further --
 5    there's further reports concerning this particular
 6    surveillance and that's Defendant's Exhibit No. 9 --
 7              THE COURT:  Do they reference whether photographs
 8    were taken?
 9              MR. WALSH:  There is no reference of any
10    photographs, Your Honor.
11              THE COURT:  Okay.
12              MR. WALSH:  But -- but if you turn to Exhibit 9, we
13    see it's the same date, November 28, 2009, where its
14    surveillance was conducted at 343 Pioneer Drive in Glendale,
15    which we believe the evidence would be that that's
16    Mr. Bilezikchyan's apartment building.  And Agent Jeremy
17    Stebbons, who is the affiant, is listed as one of three
18    persons conducting the surveillance.  And the people that
19    they're surveilling is listed down below at 2330 hours.  They
20    observed Bilezikchyan; they observed Mr. Yerkanyan; they
21    observed Hayk Karayan, and Gregor Opian (phonetic) and two
22    unknown males.  And the males get into two different vehicles
23    and one -- one vehicle, a black Mercedes, has one of the
24    unknown vehicles -- one of the unknown males going in one
25    direction and they determined to follow the silver Lexus,
```

 1   which has the other unknown male and the -- it states -- and

 2   then if you turn to the next page, it states:  "The driver,

 3   who is one of the two unknown males, and Opian were observed

 4   talking inside the vehicle for several minutes before parting

 5   ways.  And Opian was observed walking into the apartment

 6   complex area and entering an open attached garage belonging

 7   to a number at Via Serento, and then the surveillance was

 8   terminated."

 9            So what -- what this appears to be is that

10   approximately one month before the wiretap application on

11   December 28th, the affiant, Agent Stebbons, had Goggle under

12   surveillance and it appears as though Goggle was in the

13   presence of Mr. Opian, who we believed to be Confidential

14   Informant Number 5, and that through their traditional

15   investigation they had already had access or availability

16   to -- to determine the identity of Goggle, the alleged

17   kidnapped victim.  And so this is a complete omission within

18   the wiretap application.

19            And then if you continue to the third page of

20   Exhibit No. 9, there's another line sheet.

21            MR. WOLFE:  We don't have a third page, John.

22            MR. WALSH:  Does Your Honor have third page?

23            THE COURT:  No.  I have three pages, but one of

24   them is the -- the -- just the cover exhibit page and then I

25   have two -- two pages of --

```
 1                THE CLERK:  I can make some copies.

 2                MR. WALSH:  All right.  I can go on to the next

 3     exhibit and then -- and then backtrack if you want --

 4                THE COURT:  Sure.

 5                MR. WALSH:  -- when he comes out.

 6                Okay.  This -- this next exhibit is the sole

 7     exhibit that is referring to another -- a third false

 8     statement concerning Goggle in Exhibit 1.

 9                And if you go back to Exhibit 1 on Page 2, which is

10     actually Page 151, at Paragraph 64 it says, "Moreover,

11     interception of target telephone 25, in particular, is

12     necessary because target subject Karayan, the primary user of

13     target telephone 25, is the primary contact with Goggle."

14                And then if you turn to Exhibit No. 10 and

15     reference the -- the call on January 12, 2010, at the bottom

16     of that first page is the call involving Paramaz -- Paramaz

17     Bilezikchyan.  And then turning to the next page, there's an

18     incoming call from Goggle at the 818 telephone number, and

19     this appears to be a conversation one day before the

20     application for the wiretap.  So the wiretap was applied for

21     on January 13, 2010, and the affiant represented that Hayk

22     Karayan was the primary contact for Goggle.  And, yet, the

23     date before on January 12, there's a conversation between

24     Goggle, the alleged kidnapped victim, and Mr. Bilezikchyan in

25     which Goggle states:  "I talked to Hyco (phonetic).  I have
```

```
 1    some problems in these days.  I will solve it anyhow."  And
 2    then Bilezikchyan says, "No problem.  No problem.  No
 3    problem, Bro.  Keep contact with me; call me."  And we
 4    believe this -- this line sheet was available to Jeremy
 5    Stebbons, as indicated at the top right-hand corner of the
 6    page, and it contradicts the statement in the wiretap
 7    application that Hayk Karayan was the primary contact with
 8    Goggle because the call indicates that Mr. Bilezikchyan told
 9    Goggle specifically to call Bilezikchyan and not Hayk Karayan
10    in the future concerning the discussions over the money.
11             THE COURT:  Well, to call Mr. Bilezikchyan
12     directly, is that what you're saying, and not use --
13             MR. WALSH:  And not use Hayk as the primary
14    contact.
15             THE COURT:  Right.
16             But just commenting on that, I -- I recall that
17    there were 185 telephone calls recorded between
18    Mr. Bilezikchyan and Mr. Karayan during about a 20-day period
19    right around this time.  So what that leads me to believe is
20    that Mr. Bilezikchyan and Mr. Karayan were in contact
21    multiple times a day.
22             So, I guess, what I'm getting at is this issue of
23    sort of primary contact.  It seems like they were sort of
24    both working together, at least given the volume of the
25    communications between them.  So I'm suggesting that that
```

```
 1    argument that you've just made doesn't necessarily just speak
 2    of something particularly nefarious.
 3            MR. WALSH:  Well, I think that what -- the showing
 4    we're trying to make is that the statement in the affidavit
 5    is -- is false and requesting a hearing on it so that the
 6    Court can make a determination.
 7            THE COURT:  I understand that, but -- okay.  Go
 8    ahead.
 9            MR. WALSH:  All right.  And then going back to
10    Exhibit 9 where the -- the missing page has now been
11    provided.
12            THE COURT:  Let me just put that in my book, if you
13    give me one second, please.
14            So we were dealing with the stakeout in the
15    following of the Lexus; right?
16            MR. WALSH:  Yes, Your Honor.
17            THE COURT:  Okay.  So --
18            MR. WALSH:  And that was on December 28.  And I
19    believe the -- the last page, which is now inserted, is -- is
20    that December 29?  Mine is hard to -- it's a copy; it's hard
21    to read.
22            And I believe this is a telephone call between
23    Mr. Bilezikchyan and Gocor, which we believe is Confidential
24    Informant Number 5, and there is a reference during the call,
25    and the reference is in a bracketed area when Gocor is
```

```
 1    talking and stating:  "I told him are you dumb?  He is like
 2    brother to you.  I was trying to talk to him mildly, talking
 3    about him there."  And I believe that they were talking about
 4    Gocor talking with the alleged kidnapped victim.  And then in
 5    the brackets it appears as though the listening agent makes a
 6    comment that as far as -- the listening agent remembers from
 7    another conversation that Gocor is the guy who accompanied
 8    Goggle to get the money, and then there was a dispute about
 9    how much money was being paid over -- whether it was 15,000
10    or 20,000.
11            So it appears as though as of December 29, the
12    agents had information, possibly from gold core, Opian, that
13    he was in personal contact with Goggle, assisting Goggle in
14    collecting money and paying it over to Bilezikchyan, which --
15    which indicates that through a confidential informant the
16    agents did have access to the identity of Goggle and -- or
17    could have had access through this particular confidential
18    informant and so --
19            THE COURT:  That all presumes that Gocor was CI 05?
20            MR. WALSH:  Right.  Which may necessitate an
21    evidentiary hearing on that point, although when we raised
22    it, I believe, in our moving papers, the Government didn't --
23    didn't dispute it.  They didn't confirm it.  They didn't deny
24    it.  They didn't dispute it.
25            THE COURT:  I see.
```

```
 1              MR. WALSH:  So -- so, with that, I would be -- I
 2    would be moving into -- with the next succeeding exhibits, a
 3    different direction beyond those particular representations.
 4              THE COURT:  Why don't we --
 5              MR. WALSH:  Did the Court want to hear from the
 6    Government?
 7              THE COURT:  Let's do that then.
 8              MR. WOLFE:  Your Honor, this is terrifically
 9    useful, I think, because it serves to focus on what the
10    Government thinks is the essential failing of the Franks
11    analysis, which Your Honor, I believe, is on top of.
12              Defendant has gone through a number of instances
13    here and they say they're false statements, but that's
14    really -- I suppose that's a necessary cause, but it's not a
15    sufficient one.  The Franks standard is that a state -- a
16    statement or an omission has to be intentional or reckless,
17    and defendants aren't addressing that question.
18              As Your Honor made the point about Exhibit 10,
19    where Bilezikchyan says once, "Call me," and then four lines
20    later, or five, he says, "Yes, call us."
21              And Your Honor makes the point that because
22    Bilezikchyan and Hayk Karayan have been in touch 185 times in
23    a 20-day period, so they're calling one another eight or nine
24    times a day, that the argument just made is not necessarily
25    nefarious.  That's the point that defendants miss again and
```

```
 1    again.  It's not enough to show that agents didn't do as well

 2    as they should have.  The showing has to be they knew and

 3    they intentionally concealed, and defendant's aren't making

 4    that showing.

 5              THE COURT:  Well -- but what they're saying is on

 6    the necessity side you have to reasonably, you know, utilize

 7    traditional investigative tools.  And if one of the

 8    justifications for the wiretap is the identity of Goggle and

 9    confirming these phone numbers, that traditional

10    investigative tools may have utilized -- may have been

11    effective, and I understand that argument.  I think the

12    question is whether that is, you know, material and what it

13    really means in the overall context of all of the other

14    statements that were made about necessity.

15              So maybe the question is:  Do you -- do you dispute

16    Mr. Walsh's essential point that, for lack of a better

17    phrasing, the -- the agent could have been a lot more precise

18    and could have put this additional information in there, and,

19    you know, that -- and then we can deal with whether that

20    is -- the omission was in bad faith or not?

21              MR. WOLFE:  No.  Your Honor, I -- I agree with the

22    way Your Honor formulates it.  The agent ought to have

23    said -- I'll accept this -- rather than say Goggle's identity

24    is unknown and the phone number is unknown, I prefer Your

25    Honor's formulation.  We had numbers and when we followed
```

 1    them up, and I submit that when they follow them up through

 2    traditional means on January 5th, eight days before the

 3    affidavit is submitted, what they get is a dead end.  They

 4    get Mike Tyson's phone number that has been expired for six

 5    days.  And if the agent had said we followed up on this phone

 6    number and it came back to a false subscriber, we followed up

 7    on the other phone number, it came back to a false

 8    subscriber, it's a Hispanic name, Gonzalez, I think, who

 9    certainly can't be the Armenian crime victim, and -- and he

10    might also have said and we were loathed to ask detailed

11    questions of informants because we would have had to say we

12    have a wiretap up and we know that you were with the victim

13    on day one.  Who was he?

14              THE COURT:  You're talking about CI 5?

15              MR. WOLFE:  Yes, Your Honor.

16              Your Honor also made the point by asking were

17    photos taken at the surveillance of December 28th.  Well, no,

18    they weren't.  And because the exhibit -- whichever one it

19    was, nine, I think, makes the point that the surveillance

20    begins at 11:30 at night, photos are not going to answer the

21    need.

22              And the description of Opian going in to the

23    apartment complex, I believe, is that the agents believed

24    that it was the victim; but when they followed him in they

25    discovered it wasn't the victim.  It was CI 5.  And they

1    could say, we know from wiretap and surveillance evidence

2    that you were with the victim on such and such a day, but if

3    they're not entirely positive that the informant's --

4              THE COURT:  Trustworthy.

5              MR. WOLFE:  Yes.

6              And, of course, they're not, because it is

7    undisputed, I believe, and defendants always -- when I say

8    something is undisputed they begin disputing it, but the

9    assertion is that all the informants said, "We're afraid of

10   these defendants."  And that means that if an informant won't

11   testify, there is some anxiety about saying we have a wire

12   up, because if that word alone leaks to Bilezikchyan or any

13   of the other -- Hayk Karayan, any of the other defendants,

14   the investigation is in tatters from that moment.

15             And I believe the evidence, which I recited, I

16   think, in the Government's opposition, is when they ask CI 5

17   who's Goggle, he says, as defendants say in their papers,

18   "there a lot of Goggles."

19             What's his last name?

20             Well, they want to know his last name.

21             Have you got a picture of him?

22             No, we don't.

23             So that the defendants have shown that after the

24   fact with dozens or hundreds of hours of investigation, they

25   can show that the agents could have been more precise.  But

```
 1   it's not what they're obliged to show.  They're obliged to
 2   show that as of January 13th the agents knew and
 3   intentionally are reckless and disregarded.  Defense counsel
 4   blithely says about the call --
 5            THE COURT:  Well, let's just agree that it was not
 6   a complete statement.  And then the question is:  What does
 7   that mean and is it material?  And does it -- does it show
 8   bad faith?  Because I -- I think the record is pretty clear
 9   that there was additional information that would have
10   informed on the issue of the phone numbers and the
11   identities.  But I also -- you know, certainly I understand
12   your arguments about some of the pitfalls of -- of pursuing
13   those leads traditionally and the need to be precise as well.
14   So I think the question is, you know, was there bad faith in
15   the context of what was presented to Judge Wilson.  And this
16   is just one piece of that argument.  There are other issues
17   that we'll probably have to go through --
18            MR. WOLFE:  Uh-huh.
19            THE COURT:  -- but I'm just simply trying to frame
20   the issue and describe its significance as we go.
21            MR. WOLFE:  Very well, Your Honor.
22            THE COURT:  Okay.
23            MR. WOLFE:  Unless Your Honor has a separate
24   question, we'll submit as it stands.
25            THE COURT:  Okay.
```

```
1              Mr. Walsh...

2              MR. WALSH:  And just in brief rebuttal, I think our

3      initial burden is to show that the affidavit has a false

4      statement and then in addition to that, it has to be either

5      intentionally false or reckless disregard for the truth

6      and -- and it's rarely that you can prove intentional

7      false -- falsity.  Most of the cases where suppression

8      motions are granted are cases in which the Court found it was

9      reckless disregard for the truth and that's -- that's all we

10     have to -- to establish and I think --

11             THE COURT:  Sure.

12             And that -- that relates, though, to materiality,

13     not just in the context of what may have been omitted, but in

14     the overall application?

15             MR. WALSH:  Yes.  But I -- but I think this was a

16     key point.  They were basically saying the only way we can

17     get this information is through a wiretap and -- and I think

18     that that -- or they were saying that we need the wiretap in

19     order to get Goggle's telephone number and learn his identity

20     and I think that that's --

21             THE COURT:  Yes, they did say that, and we talked

22     about that issue.  But they're also seeking the wiretap in

23     connection with how much -- a much broader investigation

24     where they set forth the various crimes that they're

25     investigating and the nature of the enterprise and what else
```

```
 1    they hoped to gain other than just the identity of Goggle and
 2    his -- his phone numbers; right?
 3              MR. WALSH:  That's correct, Your Honor.
 4              THE COURT:  Okay.
 5              MR. WALSH:  But -- but that's on the --
 6              THE COURT:  Because, remember, we talked
 7    about the -- the law also says, look, the -- the scope of a
 8    wiretap is not simply limited to the narrow issue of
 9    determining, for example, in this case, identity and
10    confirmation of phone numbers.  It can be used to also prove
11    broadly or gather evidence -- it can be used to prove broadly
12    and prove beyond a reasonable doubt lots of other important
13    things related to the investigation; right?
14              MR. WALSH:  Yes.
15              THE COURT:  Okay.
16              MR. WALSH:  Which is -- which really goes to the
17    probable cause issue.  And then if we focus on the necessity
18    issue, that's an issue of has there been full disclosure by
19    the Government in the affidavit that other traditional
20    investigations have been tried and failed are unlikely to
21    succeed or too dangerous.  And so the focus, then, switches.
22    Even though the Government wants a broad investigation, they
23    want to find all the information and all the -- and all the
24    evidence in order to prosecute a large conspiracy, that is no
25    justification for a failure to engage in a traditional
```

```
 1    investigation prior to seeking the wiretap.
 2           THE COURT:  There is tension between manufacturing
 3    necessity and -- and, you know, being sufficiently precise
 4    about what exactly you need the information for, because if
 5    you cast your net very broadly, you can always argue
 6    necessity; and so there is that tension.
 7           MR. WALSH:  And so now I'm going to focus on what
 8    other investigative techniques are indicated in the -- in the
 9    wiretap, and on page -- or Exhibit 11, these are the
10    statements that we believe are not correct and are false in
11    the wiretap application --
12           THE COURT:  Okay.
13           MR. WALSH:  -- concerning the use of surveillance
14    and before -- before going through them in detail, maybe it
15    would be easier if I kind of summarized what our position is.
16    And, ultimately, we believe that the Government's
17    representation that they use surveillance or considered it as
18    an investigative technique in this case was false and falsely
19    stated that that technique was exhausted, because we have
20    other exhibits following this showing that there was only one
21    day of surveillance of Hayk Karayan.
22           THE COURT:  Let's assume that's true.  Okay?  So
23    you have one day of actual surveillance of Mr. Karayan, you
24    have him being picked up on surveillance on four or five
25    other occasions when they're doing surveillance of other
```

```
 1    locations or people; right?
 2               MR. WALSH:  Yes.  Where he was not the target of
 3    the investigation.
 4               THE COURT:  Correct.  Let's accept that as true.
 5    Then it seems to me the question that has to be asked is,
 6    sure, they only did one directed surveillance, but in the
 7    context of the information that they were seeking to -- to
 8    bolster their -- their burden of proof in this case, would it
 9    have been productive to do physical surveillance?  What would
10    they learn by doing that?
11               They already knew a fair amount of information
12    about Mr. Karayan.  They knew he had lots of contacts with
13    Mr. Bilezikchyan.  They knew that he was -- had
14    communications and had some involvement, it appears, with the
15    Goggle situation and possibly also with skimming -- devices
16    that can be used for skimming.  So just putting it in to
17    context, I agree there was only one surveillance, it appears
18    to be true.  But the question, then, is so what?  And what
19    would they have learned that they needed to learn by doing
20    additional surveillance?
21               MR. WALSH:  Well, I think the real issue is can the
22    Government completely jump over the step of using any
23    traditional investigation when they're seeking this very last
24    wiretap.  In other words, they've done a lot of work for
25    wiretaps, 1 through 24, but then when it came to the wiretap
```

```
 1    on target telephone number 25, they still have the obligation
 2    to conduct a traditional ordinary criminal investigation
 3    prior to seeking the wiretap on target telephone number 25.
 4              THE COURT:  They don't have the obligation to do
 5    something that would be useless.
 6              MR. WALSH:  But they -- but they -- the cases
 7    that -- the case that we relied on is United States vs.
 8    Gonzalez.
 9              THE COURT:  Gonzalez Inc., is that --
10              MR. WALSH:  Gonzalez Inc., yes.
11              THE COURT:  Okay.
12              MR. WALSH:  And in there they focused just on the
13    face of the search warrant affidavit and they said that five
14    days worth of pen register analysis and equally short use of
15    trap and trace and a limited surveillance of the -- the
16    Los Angeles office after there was an investigation in
17    another state, they held that that was insufficient as a
18    matter of law to meet the necessity requirement.
19              THE COURT:  Sure.
20              But in the context of that case, they were dealing
21    with an aliens smuggling ring and they were going to
22    apparently were focusing on an interception involving
23    Francisco -- maybe the son, as I recall, of -- of the
24    proprietor of that -- they didn't have a lot of other
25    information about the son.  And the question was in the
```

```
 1   context of that case, which did not involve an enterprise
 2   that I think could be fairly characterized as similar to the
 3   ones that are alleged -- or the one that is alleged to have
 4   existed here, whether -- you know, whether we're really
 5   dealing with a sort of a like kind situation.  Here, they
 6   already knew a lot about Mr. Karayan.  They didn't know a lot
 7   about -- about the son in the Gonzalez, Inc. case, as I
 8   recall.
 9             MR. WALSH:  Well, I think it was in Gonzalez, Inc.
10   they were -- they were focusing on the quantity of the other
11   traditional investigation.  And they're saying that five days
12   was -- was too little.  And limited surveillance -- so here
13   we have -- when they're trying to say -- I mean, the -- if
14   we -- if we look at Exhibit 11 --
15             THE COURT:  But, sure, the five days it always has
16   to be in the context of what they're investigating and who
17   they're investigating and what use it would be.
18             MR. WALSH:  And -- well, on -- on Exhibit 11 at
19   page -- third page in, it's --
20             THE COURT:  Okay.
21             MR. WALSH:  -- 117.  It says, "Repeated attempts to
22   surveil the target subjects, including Bilezikchyan,
23   Yerkanyan and Karayan has failed to reveal the full scope of
24   their criminal activity.  So that --
25             THE COURT:  I'm sorry.  What page are you on just
```

```
 1    so I'm --
 2              MR. WALSH:  I'm sorry.  It's -- it's Exhibit 11.
 3              THE COURT:  Yes.
 4              MR. WALSH:  And at the bottom it's Page 117.  It's
 5    the 3rd one in.
 6              THE COURT:  Oh, okay.
 7              MR. WALSH:  Correction, the fourth if you include
 8    the --
 9              THE COURT:  Yes.  I -- I think that you made the
10    point in your brief that that statement could be arguably
11    misleading because Mr. Karayan was not the subject personally
12    of repeated attempts to surveil; right?
13              MR. WALSH:  Because -- because all of those earlier
14    surveillance --
15              THE COURT:  Right?  Am I right on that?  That's
16    what -- that's what you're saying, basically?  That
17    statement, they lump everybody together and really
18    Mr. Karayan was the subject of one surveillance?
19              MR. WALSH:  Correct.
20              THE COURT:  Therefore, the statement and the -- the
21    way that the sentence reads is misleading?
22              MR. WALSH:  Correct.
23              THE COURT:  Okay.
24              MR. WALSH:  And -- and that statement --
25              THE COURT:  I get that argument.
```

```
1              MR. WALSH:  And that statement is critical for them
2    meeting their requirement of making a full statement
3    concerning what traditional investigations they have tried in
4    the past that have failed or unlikely to succeed.  They --
5    they, essentially, have not tried with Karayan and so that's
6    what makes this statement false because those earlier
7    surveillances were not at Mr. Karayan's home.  He was not the
8    person they were following.  They were following other people
9    and he happened to cross paths and see those people and then
10   he went away and the agents never followed him.  They were
11   always following someone else.
12             THE COURT:  I agree that this statement does not
13   accurately characterize the record concerning surveilling
14   Mr. Karayan himself, but then we're back to the bad faith
15   issue and materiality.  So I -- I agree with your point on
16   that, Mr. Walsh.
17             MR. WALSH:  All right.  And -- and on the issue of
18   whether or not other investigative techniques like
19   surveillance have been tried and failed, that turns us to
20   Exhibit 12, which is the actual surveillance report on
21   Mr. Karayan, which is dated December 28th.  That's the one
22   day of surveillance where he was the target of the
23   surveillance.  And I believe the 3450 Cahuenga in Los Angeles
24   is Mr. Karayan's residence.
25             No.  I'm sorry.  I misspoke.  It was at another
```

```
1    location where surveillance was set up and it goes on in to a
2    lengthy dissertation of the surveillance that was conducted
3    that day, but on -- on the issue of whether or not
4    surveillance is productive or successful, I'd ask the Court
5    to turn to Page 4 of the surveillance report where I've
6    highlighted the fact that during the course --
7              THE COURT:  I'm sorry.  Let me just get there,
8    please.
9              MR. WALSH:  All right.  At the bottom it's 23283
10   and the top on the right it says Page 4.
11             THE COURT:  Okay.
12             MR. WALSH:  And this is surveillance on the same
13   day, and during the course of that surveillance they're
14   reporting that the entry at 18:32 hours, that the
15   surveillance led to the observation of two other subjects of
16   this investigation involved in a hand-to-hand exchange with a
17   Mr. Vasquez and that local law enforcement, upon seeing that,
18   then placed them all under arrest.  And the fact of the
19   arrest of all three is reported on the very last page.
20             THE COURT:  Okay.
21             MR. WALSH:  Which is Page 7.
22             So -- so, here, we have in December 228, 2009,
23   almost a month before the application for the wiretap where
24   the full and complete statement does not reference the fact
25   that on the one day of surveillance that they conducted of
```

```
 1    Hayk Karayan, who is the person using target telephone 25,
 2    the surveillance did not fail to the extent that it led to
 3    the arrest of three people, the seizure of drugs, and --
 4             THE COURT:  Why was that important in the context
 5    of this overall investigation, though?
 6             MR. WALSH:  It's -- it's one aspect of their
 7    attempt to establish necessity.  That their application
 8    falsely represents that repeated attempts at surveillance
 9    have been unproductive.  There's two -- two misstatements
10    concerning that.  Number one, there were no repeated targeted
11    surveillances of Mr. Hayk Karayan.  There was only one.  And,
12    number two, on that particular day, the surveillance was
13    productive and successful and led to the arrest of three
14    people and I think two of the three people are -- are
15    connected with the -- the Armenian Power investigation.  So
16    it was -- it was success directly related to what they were
17    investigating, and that makes this particular aspect of the
18    necessity showing a false statement, which is -- which is
19    critical because if -- if the Court is retesting where we've
20    proven a false statement, then the standard under *Epilito* is,
21    once you correct it, then the Court has to review it whether
22    it's reasonably possible that the -- the wiretap would be
23    denied by the issuing magistrate on the basis of a lack of
24    showing of necessity.
25             THE COURT:  Sure.
```

```
 1              So, in this case, if Judge Wilson could have been
 2     told -- perhaps, should have been told, we did one
 3     surveillance; we didn't see Mr. Karayan there; I don't know
 4     if it's referenced -- no, I guess -- I guess it is -- he is
 5     referenced to have been there, and we observed a transaction
 6     and we arrested some individuals involving -- that were
 7     involved in a hand-to-hand exchange and then the -- right?
 8              MR. WALSH:  Yes, and two of them appeared to have
 9     been -- Armenian last names that appeared to have been the
10     targets of this particular investigation of Armenian Power --
11              THE COURT:  Okay.  So how -- how am I to judge the
12     materiality of this information in light of the scope of the
13     Government's investigation and its -- its need to be able to
14     gather evidence about, you know, the enterprise and all these
15     various crimes charged?  So let's concede your point that it
16     could have been written more expansively with additional
17     information.
18              MR. WALSH:  Well, the --
19              THE COURT:  The implication seems to be that
20     necessity was manufactured and that if they would have used
21     traditional means, you know, they, perhaps, wouldn't have
22     needed the more drastic disfavored step of getting a wiretap;
23     right?
24              MR. WALSH:  Yes, Your Honor.
25              And -- and the -- the point is that if you look at
```

```
 1    what traditional investigation was actually done directed

 2    towards Hayk Karayan before they got the wiretap on target

 3    telephone 25, it consisted, we believe, of just two things:

 4    And one was the one day of surveillance on December 28, which

 5    was not a repeated surveillance like they said, and it was

 6    not an unsuccessful surveillance, which is required in order

 7    for them to establish necessity.  And then -- and then the

 8    other thing that they did is referenced in the next exhibit,

 9    Exhibit No. 13, and I think these two exhibits have to be

10    looked at together because on Exhibit 13 it shows that on

11    December 29, they are requesting the telephone records of

12    target telephone number 25, in other words, Hayk Karayan's

13    telephone records.  So when you took -- when you look at what

14    traditional investigation --

15              THE COURT:  I'm sorry.  What page are you on now?

16              MR. WALSH:  It's on Exhibit 13.

17              THE COURT:  Okay.

18              MR. WALSH:  And it's an FBI report.

19              THE COURT:  Oh, this is 25 again, okay.

20              MR. WALSH:  And the telephone number there is the

21    target telephone number 25.  And so they're -- they're

22    attempting to conduct their necessity investigation -- their

23    traditional investigation and the only thing now they have

24    done in addition to one day of surveillance is on December 29

25    they request the telephone records to review those records.
```

```
1    And, of course, those records are then reviewed to see who he

2    has called to see if he has called other people --

3              THE COURT:  Okay.  So that's --

4              MR. WALSH:  -- in the investigation, which is a

5    proper necessity investigation --

6              THE COURT:  Sure.

7              MR. WALSH:  -- but totally lacking in sufficiency

8    based upon what we see from the case Gonzalez, Inc., and the

9    other case was United States v. Carnero and

10   United States v. Blackman.  There has to be a good faith

11   attempt by law enforcement to conduct an ordinary traditional

12   investigation before going to the wiretap.

13             Now, they don't have to necessarily succeed in that

14   traditional investigation because that would be illogical to

15   say that we're expecting you to succeed before you can get

16   the wiretap.

17             THE COURT:  They don't have to do anything that

18   would be pointless either?

19             MR. WALSH:  Yes.  That they --

20             THE COURT:  They don't have to go dig through trash

21   when they -- they know this person -- what they're looking at

22   him for is unlikely to have disposed of anything that would

23   be in the trash can?

24             MR. WALSH:  Yeah.

25             But -- but -- but two things that they're not
```

```
 1    allowed to do and one is they can't sit and do nothing or do
 2    minimal efforts, and that's what we're saying has happened
 3    here, is they've done minimal efforts; one day of
 4    surveillance and getting the telephone records -- you know,
 5    one request for telephone records for -- for -- for December.
 6    The other thing they can't do is to cut and paste the
 7    necessity requirement from earlier wiretap applications and
 8    paste them into the wiretap application necessity section for
 9    the last wiretap, and that's what they did in the *Blackman*
10    case and the Court clearly held that the cut and paste
11    approach is manufacturing necessity.  And, as a matter of
12    law, the -- the Government cannot use necessity that they've
13    developed on target telephone number 24 in order to go show
14    necessity on target telephone number 25 if 25 is a different
15    phone and a different person.
16               THE COURT:  Sure.
17               And -- and --
18               MR. WALSH:  And --
19               THE COURT:  I think everybody agrees with that
20    statement of the law, you can't bootstrap necessity but you
21    can be informed by what has happened previously and what you
22    have learned previously.
23               MR. WALSH:  And it appears as though -- and I --
24    and I agree those two principles seems to be in conflict and
25    it's hard to try and figure out where -- how you can -- you
```

```
 1    can do both.  How you can look at what's happened in the
 2    past, but on the other hand you can't use it for necessity.
 3    I -- so it's a very -- it's a very delicate balance, but I
 4    think that -- the thing that we can anchor the decision on,
 5    is what actual investigation they did and if -- if -- if we
 6    basically have them one day of surveillance and then
 7    requesting telephone records and that's it, and then the rest
 8    of the necessity is incorporated by reference in a cut and
 9    paste approach which -- which appears as though they have
10    done when we turn to Exhibit 14.  That appears to be a
11    paragraph that was cut and paste from a prior affidavit and
12    they did a poor job of it.
13            It was a wiretap application -- this is the wiretap
14    application for target telephone number 25 and it appears
15    from the language of the -- of the application -- I think if
16    you look at the bottom is the -- is the particular
17    language -- the bottom on page -- where it has 107.
18            THE COURT:  Yes.
19            MR. WALSH:  And here is where they -- the word --
20    the name "Darbinyan" this appears to be a wiretap directed
21    toward Mr. Darbinyan, Bilezikchyan and Yerkanyan, and it was
22    cut and paste.  And the name on 107, Darbinyan, wasn't
23    removed, but it was removed on Page 108.  And, in reading it,
24    it doesn't make a lot of sense.  If -- if I start at 107,
25    I'll read it, it says, "Yet despite CI 2's interactions with
```

1    Bilezikchyan, Yerkanyan and Darbinyan, CI 2 continues to only

2    be able to provide limited information regarding the criminal

3    activities of Bilezikchyan, Yerkanyan and Karayan."  So

4    there they removed Darbinyan and put in Karayan and then --

5    but then they leave him in in the next sentence.  It says --

6    follows up with, "Because CI 2 does not engage in criminal

7    conduct with Bilezikchyan, Yerkanyan and Darbinyan and

8    receives only information that Bilezikchyan, Yerkanyan and

9    Karayan choose to share with CI 2, CI 2 is unable to gather

10   information regarding the full scope of the criminal

11   activities of Bilezikchyan, Yerkanyan and Darbinyan."

12          So it appears through some sort of word processing,

13   that they've lifted out the paragraphs from a prior wiretap

14   application and then failed to properly remove all of the

15   Darbinyan references and include Karayan in that paragraph

16   leading to almost a statement that doesn't logically

17   follow -- the conclusions don't follow from the premise.

18          THE COURT:  Let me just see if I follow this also.

19          That phrase -- sentence that starts "because" on

20   the top of Page 108 -- "Because CI 2 does not engage in

21   criminal conduct with Bilezikchyan, Yerkanyan and Darbinyan,

22   and receives only information that Bilezikchyan, Yerkanyan

23   and Karayan choose to share with CI 2, CI 2 is unable," et

24   cetera," so that state -- that sentence in and of itself

25   is -- is okay.  I mean, the way I read it is the CI 2

```
 1    didn't -- didn't actually personally witness or get involved

 2    with actual conduct and he only receives information from --

 3    from the individuals that they choose to share with him.

 4               MR. WALSH:  Except that in -- in our moving papers

 5    we file a declaration of Hayk Karayan stating that he doesn't

 6    know CI 2 and he has never spoken to him, and in the

 7    opposition they have never -- never challenged that.  And --

 8    and so I think that this -- this line is technically

 9    incorrect where it says that CI 2 only receives information

10    from Bilezikchyan, Yerkanyan and Karayan -- choose to share

11    with CI 2.  That --

12               THE COURT:  Oh, I see.

13               MR. WALSH:  That's --

14               THE COURT:  So the reference -- the declaration

15    that Mr. Karayan filed just simply says I don't know CI 2 and

16    therefore the statement that he only receives information

17    that they choose to share is -- is not really true because he

18    doesn't know them and there's -- there is no refusal to

19    share.  There's an inability to share because he doesn't know

20    them.

21               MR. WALSH:  But I guess the point is that it

22    appears to be a cut and paste --

23               THE COURT:  Yeah, no I get that.

24               MR. WALSH:  -- from the prior, and -- and the point

25    of -- I think the case law says that when there is a cut and
```

1    paste like that, it means that the affiant is not actually

2    considering this other traditional investigation and

3    whether -- as to the defendant in the -- Karayan.  He's not

4    really considering it because he's got his facts completely

5    wrong and he's cutting and pasting and using his necessity

6    showing from a prior one -- and -- and that's the -- one of

7    the primary reasons that -- that the cut and paste approach

8    is improper.  Number one is that you're -- you're trying to

9    transport necessity from a prior wiretap to a later one; and,

10   number two, when you do that, it's not a good faith analysis

11   by the agent as to whether or not other traditional

12   investigations have been tried and failed with respect to

13   Mr. Karayan because he's just using his statements from a

14   prior application and applying it to Karayan.  So -- so

15   there's no real analysis by the affiant at that point in time

16   when he's cutting and pasting, and his analysis is really an

17   analysis for the earlier wiretap and not for the wiretap of

18   Mr. Karayan.

19          THE COURT:  Okay.  And let me just comment on that.

20   Inaccurate cutting and pasting is certainly bad and sloppy

21   cutting and pasting is certainly bad.  But accurate cutting

22   and pasting, if it is independently correct, is not bad.  The

23   fact that you cut and paste is not by in and of itself bad as

24   long as you're not being sloppy and including information

25   that really isn't material.  That's the way I would view it.

```
 1              MR. WALSH:  And the other -- the other holding of
 2    the Court is if you're cutting and pasting necessity for an
 3    earlier wiretap into a later one, then you're -- that's not
 4    allowed either.
 5              THE COURT:  Right.
 6              You can't just -- because of the fact that there
 7    was necessity once, you can't say we got necessity
 8    previously; we want to borrow some of that necessity and
 9    incorporate it into this case just because we simply got it
10    as opposed to, you know, what facts might be at issue.  So I
11    agree with that if that's your characterization of what the
12    law is.
13              MR. WALSH:  Yes, Your Honor.
14              THE COURT:  Okay.
15              MR. WALSH:  And then I'm going to be turning to the
16    representations concerning financial investigation.  So I'm
17    moving to a different subject.
18              Did the Court want to hear from the Government --
19              THE COURT:  Sure.
20              MR. WALSH:  -- on -- on the two issues of
21    surveillance and whether -- one day of surveillance and just
22    gathering one month's telephone records are sufficient
23    showing of necessity?
24              THE COURT:  Sure.
25              MR. WOLFE:  Your Honor, I don't disagree with much
```

```
 1    of what Your Honor has induced defendant's to say they
 2    understand the law to be.  Inaccurate sloppy cut and pasting
 3    is bad.  But it's their insistence that there is only one day
 4    of surveillance and one request for phone records is just
 5    contrary to the law of the circuit.  Because, as Your Honor
 6    said is, it's not that you can borrow necessity; that's
 7    improper, but it is true that you can use the facts from
 8    prior observations to address where relevant -- whether prior
 9    traditional methods have worked.  Defendants are in love with
10    Gonzalez, Incorporated and so is the Government, because in
11    the ways that are important to the Government's argument
12    Gonzalez is good for us.  And the ways that Gonzalez is
13    important to the defense, it's bad for them.  Your Honor made
14    the point that Gonzalez involved investigation of the father
15    in Phoenix and the Court made the point that the
16    investigation of the father in -- there had been -- excuse
17    me, Your Honor, I'm looking at the wrong case.
18            THE COURT:  Well, there was an investigation of the
19    father in that case.  He was sort of the kingpin and there
20    was an issue concerning his son, as I recall.
21            MR. WOLFE:  Yes, Your Honor, and -- and
22    importantly, there was a physical gulf between where they
23    operated.  The investigation in Phoenix went on for months
24    and months.  It involved drivers who went undercover.  It
25    involved drivers who became ticket agents -- agents who
```

1   became drivers -- agents who became baggage handlers and

2   ticket agents.

3           THE COURT:  Right.  There were three locations

4   involved in that case, as I recall.

5           MR. WOLFE:  And -- and the one that the Court said

6   was improperly approved was in Los Angeles where after months

7   of investigation, which was found proper and as to which

8   necessity was found proper, the agents jumped to Los Angeles,

9   a completely different location with completely different

10  targets and that's where, as defendants say, the Court said

11  you can't just jump to a new location with new targets and do

12  five days of work; but that's not this case.  It's not all

13  this work that was done in the past is no longer relevant

14  because Hayk Karayan operates in Minnesota and he has nothing

15  to do with these defendants.  The law in the circuit is --

16  I'm referring to *United States v. Garcia V. Alba*, which is

17  585 F.3d, 1223 at 1232 -- this is a 2009 case.

18          Although the Government may not rely on the

19  conclusion that a previous wiretap was necessary to justify

20  the current application, that's the defendant's point about

21  which there can be no dispute.  The Government may not rely

22  on the conclusion to justify the current application.

23          Historical facts from previous applications,

24  particularly those within the same investigation, will almost

25  always be relevant.  So will previous investigatory tactics

```
 1   so long as they bear on whether the Government has adequately
 2   shown necessity within the current application.  If these
 3   facts are incorporated into the latest affidavit, the issuing
 4   judge may examine them.  For instance or for example, the
 5   Government may rely on past failed attempts to infiltrate an
 6   organization, detailed and past affidavits as evidenced that
 7   future attempts would be fruitless, and the Government
 8   submits that's this case.  It's not jumping from one state to
 9   another and from old targets to new targets.  This was the
10   Government saw observations and intercepted calls that made
11   them think Hayk Karayan is a major player.  And when they did
12   that, they looked back and they discovered that he had been
13   found to be a target subject in months passed twice by Judge
14   Wilson.  They found that he was a member of Armenian Power.
15   They found, as Your Honor pointed out, that he was talking to
16   Paramaz Bilezikchyan and Karo Yerkanyan again and again and
17   again.  Your Honor made the point, 185 times in 20 days.
18          They also went back and looked at surveillance.
19   They picked him up with other defendants who were certainly
20   on the facts engaged in the criminal enterprise of Armenian
21   Power and they looked back and say we followed him on five or
22   six days, did we find anything that met the means of the
23   investigation, and they found they didn't.  And the -- I love
24   the -- the example of following Karayan and finding this
25   hand-to-hand... that's like finding a quarter on the
```

```
1    sidewalk.  Of course they would pick it up.  But it's not a
2    suggestion that following him again and again and again and
3    again will be productive because the prior investigation had
4    involved surveillance almost everyday of almost all the
5    target subjects, as the affidavit said, and it was not
6    successful in relation to the goals of the investigation.
7              Defendants are enamored to the point that they made
8    an arrest one day.  Well, so they did, but it was an arrest
9    about which they had no idea going in and it didn't lead to
10   anything going out.  The surveillance was not productive and
11   the historical facts from the prior investigation are
12   incorporated properly.  If these facts are incorporated into
13   the latest affidavit, the issuing judge may examine them.
14   The law is the failure of other means to be fully -- to fully
15   achieve the goals of the investigation means that necessity
16   is shown.  It's not the conclusion that's borrowed that would
17   be improper.  It's the facts.
18             THE COURT:  No, I understand that, Mr. Wolfe.
19             MR. WOLFE:  Okay.
20             THE COURT:  I understand that.
21             And I think the other useful point that is made in
22   the -- the Villa Alba case is that, you know, the Court is
23   instructed to look at the big picture; apply common sense
24   approach.  And, you know, my initial reaction when I read
25   everything that was submitted in this case and I thought, you
```

```
 1    know, there are some things that I would characterize as
 2    omissions; there are things that I would characterize as
 3    sloppy; there are things that I would characterize as things
 4    that should have been in this application to be thorough.
 5    But when you -- when you step back, big picture-wise, and
 6    apply a common sense approach, you say, well, this is the
 7    25th wiretap application.  There have been 21 before -- 24
 8    before.  You don't use that fact to bolster why 25 should be
 9    issued, but it does tell you that this has been a large and
10    wide reaching investigation when you look at the necessity
11    portion of the application just referring to page -- of
12    the -- of the affidavit 104, you know, it goes through the --
13    you know, the reasons that the wiretap is important and when
14    you then go back and think about, you know, what they've
15    already learned through all of these other wiretaps and what
16    they might learn in addition from Mr. Karayan, at least, to
17    me, I thought well, they know a lot; they want to tie up, it
18    seems like, some lose ends and really nail things down as,
19    perhaps, a little more thoroughly.
20          It's not going to be helpful to do physical
21    surveillance necessarily to learn that.  They already know
22    that Mr. Karayan is closely associated with one of the more
23    senior people involved in this.  They know a lot.  And
24    they're trying to learn additional information about sort of
25    broadly the scope and other things and it's unlikely that
```

```
 1    traditional means, in addition to what was already done, are

 2    going to yield much fruit in that regard.

 3            That was my sort of overview common sense approach.

 4    I certainly kept in mind the whole time that I thought there

 5    were things that were sloppy and I thought there were things

 6    that -- particularly with Goggle -- other things that could

 7    have been far more complete and could arguably be misleading.

 8    But when I looked at it all I didn't think that -- that I was

 9    seeing something that was done in bad faith or something that

10    was done recklessly.  Certainly not ideally done.  And,

11    anyway, that's the overview, and I'm -- again, I'm trying to

12    apply a common sense approach and look at where the

13    investigation was at this time; what the objectives were

14    of -- of the Government in terms of this broad alleged

15    conspiracy, and, you know, what additional information they

16    felt they could derive, essentially from wiretaps, when, you

17    know, they had already done a lot of other investigation

18    using lots and lots of other techniques.

19            So it isn't a case where the Government sort of

20    jumped in with a wiretap and said we're putting all of this

21    stuff aside and we want to really use wiretaps and forget

22    about all of the other things that are available; all those

23    other tools.  So that's my sort of big picture overview.

24            But I don't know if you're ready to continue with

25    your -- your arguments on what we've discussed so far.  We're
```

```
1    not done, I know.

2              MR. WOLFE:  Your Honor, I don't disagree with

3    anything that Your Honor has said about the big picture

4    summation.  I don't have anything else.  Unless Your Honor

5    has a question, I have nothing else to reply about the

6    assertions defense counsel has made about cutting and pasting

7    and the minimal efforts.  I've explained the reasons why I

8    don't think that adequately characterizes what's happened.

9    So unless Your Honor has questions, I'll wait for the next

10   assertion.

11             THE COURT:  Okay.  Thank you.

12             Mr. Walsh...

13             Would it be -- maybe we should take about a

14   15-minute break.  Do you want to do that?

15             MR. BROOKLIER:  Whatever -- whatever the

16   Court wants.

17             THE COURT:  How much longer do you believe you

18   have?

19             MR. BROOKLIER:  I think maybe a half hour.

20             THE COURT:  Let's take a brief recess.

21             (Recess.)

22             THE COURT:  Go ahead, Mr. Walsh.

23             MR. WALSH:  Yes, Your Honor.

24             In looking over the records, I think that the

25   Government may have misspoke about the number of prior calls
```

```
 1   between Mr. Hayk Karayan and Mr. Bilezikchyan, and they

 2   reference to a number of 181 calls.  And in looking at the

 3   wiretap, that 185 calls was actually calls between Hayk

 4   Karayan and another defendant in the case, Yerkanyan.  And --

 5   and that's referenced -- I don't mean for the Court to read

 6   it right now, but on Page 91 and Page 95 of the wiretap

 7   application, 185 calls is actually between Hayk Karayan and

 8   Mr. Yerkanyan and not -- not Bilezikchyan.  So I just want to

 9   correct that because I think the Government made that

10   argument in respect to several different points they were

11   making and -- and I just wanted to correct that.

12             THE COURT:  Okay.

13             MR. WALSH:  And then if -- before going back to the

14   exhibits, I just wanted to make a brief response.

15             THE COURT:  Then I misspoke also, because I

16   understood, from my recollection, was that they were between

17   Mr. Karayan and Mr. Bilezikchyan.

18             MR. WALSH:  Well, I -- I've just looked at them

19   and --

20             THE COURT:  I thought that that was --

21             MR. WALSH:  Maybe the Court might want to take a --

22             THE COURT:  -- what I had read, but --

23             MR. WALSH:  -- as to the pages.

24             THE COURT:  Where are you again?

25             MR. WALSH:  On Page 91 it references target
```

```
1   telephone 24 as Yerkanyan, and then if -- that's on Page 91,
2   and then if you go to Page 95 --
3            THE COURT:  Yeah, I'm looking at 95 now.
4            MR. WALSH:  And that's -- they reference the 185
5   calls and that's between 24, which is Yerkanyan's telephone
6   and Karayan's, which is 25.
7            THE COURT:  Okay.  I -- maybe I had thought that
8   Mr. Bilezikchyan's phone was 24, but...
9            But 24 was -- was who?
10           MR. WALSH:  Yerkanyan.
11           I think it's on Page 91.  It does the total
12   analysis of target telephone 24.
13           THE COURT:  Oh, I see.  Okay.
14           MR. WALSH:  And --
15           THE COURT:  And --
16           MR. WALSH:  And that telephone references the
17   person s that Yerkanyan is in contact regarding criminal
18   activities.
19           THE COURT:  Okay.  And what was -- what was said
20   about Mr. Yerkanyan's -- what information was in the
21   affidavit about Mr. Yerkanyan's involvement, alleged
22   involvement in the scheme because the point that I was making
23   was that there appeared to be, you know, lots of contacts
24   with Mr. Karayan and Mr. Bilezikchyan, indicating to me that,
25   you know, there was a lot of information already that there
```

```
 1    was contact with some senior person in the alleged
 2    organization.
 3             Does that premise still apply to Mr. Yerkanyan?
 4    And that's a question for you, Mr. Wolfe.
 5             MR. WOLFE:  Oh.  Your Honor, I believe that it
 6    does.  The prior affidavits -- the filing 13-N that was made
 7    in November showed that there had been 50 calls between Karo
 8    Yerkanyan and Hayk Karayan between September and October of
 9    2010; 50 calls between Paramaz Bilezikchyan and Hayk Karayan
10    between a date in October and November 1st of 2010 --
11             THE COURT:  This is all -- we're talking all about
12    the target telephone 25 application?
13             MR. WOLFE:  No, Your Honor.
14             THE COURT:  Because that's all I'm focusing on.
15             MR. WOLFE:  It's -- those calls are in the prior
16    application.
17             THE COURT:  Okay.  Well, what I'm focusing on is
18    there is this application for interception of target
19    telephone 25.  So the necessity of that, in part, I thought,
20    derived from the number of telephone calls that were between
21    Mr. Karayan and that telephone number 25 and others that were
22    believed to be important within the organization.
23             MR. WOLFE:  Yes, Your Honor.  Exactly.
24             THE COURT:  So the question is:  Are those types of
25    references in the -- the affidavit?
```

```
1              MR. WOLFE:  Yes, Your Honor, I believe they are.

2    In the same way that defense counsel is pointing to -- I

3    believe he says Page 91, phone analysis for target telephone

4    24, I believe there's a separate one for target telephone 25.

5    And, in any event, there are the prior ones that are

6    incorporated by reference that Judge Wilson was aware of.

7              THE COURT:  Okay.  Well, it says on Page 95 of the

8    affidavit, target telephone 24 was in contact with target

9    subject Karayan, target telephone 25, 185 times.

10             So what does the declaration or affidavit tell us

11   about target -- telephone 24 and its user's importance or

12   role in the alleged scheme?

13             MR. WOLFE:  Your Honor, target telephone 24 is used

14   by Karo Yerkanyan, who is described at the beginning of each

15   of the applications as a member and senior member of Armenian

16   Power, and they describe his role in the enterprise, and

17   moreover, they're the calls --

18             THE COURT:  Well, tell -- tell -- reference me to

19   that specifically, if you could...

20             MR. WOLFE:  Well, Your Honor, I'm ashamed to say

21   that I brought all the exhibits with me except the one of the

22   actual affidavit --

23             THE COURT:  Okay.

24             MR. WOLFE:  -- because that's the only one

25   important because I took it out and left it on my desk.
```

```
 1              THE COURT:  Okay.

 2              MR. MCCURRY:  Page 4.

 3              THE COURT:  Page 4.

 4              MR. MCCURRY:  Bottom paragraph.

 5              THE COURT:  I see.

 6              Page 4, Paragraph 5(B), target subject, Yerkanyan

 7    AKA guilty, AKA Cane, a high-ranking Armenian organized crime

 8    figure and high-ranking Armenian Power member with close ties

 9    to Bilezikchyan and the user of target telephone 23 and

10    target telephone 24.

11              Okay.  Are there any other references to target

12    subject Yerkanyan?

13              MR. WOLFE:  Your Honor, there's a call about fraud

14    between Karayan and Yerkanyan.

15              THE COURT:  Okay.  Well, there's -- on Page 14,

16    Subparagraph H says, "Yerkanyan is a member of the Darbinyan

17    organization and Armenian Power and a close associate of

18    Bilezikchyan.  Yerkanyan often works as an enforcer in

19    connection with Darbinyan's and Bilezikchyan's criminal

20    activity and is believed to act as a liaison between Armenian

21    Power and the Mexican Mafia."

22              So the -- the affiant is swearing that

23    Mr. Yerkanyan is close to Mr. Bilezikchyan.  And if made in

24    good faith would likewise indicate that the 185 telephone

25    calls was to Mr. Bilezikchyan or somebody that he works
```

```
 1   closely with.  So unless my logic is incorrect, the same
 2   logic I applied earlier to the 185 telephone calls would, I
 3   think, still apply.
 4            MR. WALSH:  Right.  I was just trying to correct
 5   the miss -- mislabeling.
 6            THE COURT:  I just wanted to make sure that my
 7   assumptions were still valid or not.
 8            Go ahead, Mr. Walsh.
 9            MR. WALSH:  Okay.  And then before going to the
10   exhibits, I just wanted to make a brief response to the
11   citation to Garcia V. Alba case, which was relied upon by the
12   Government, and there is aspects of the Garcia V. Alba case
13   that are favorable to the defendants in this case,
14   specifically on the Gonzalez, Inc. issue of whether a short
15   duration of -- of surveillance and -- and pen register
16   analysis and trace analysis constitutes sufficient of
17   necessity investigation.  And, in Garcia Alba, the defendant
18   cited Gonzalez, Inc. and said there isn't a sufficient
19   necessity investigation or a traditional investigation and
20   that was rejected in Garcia V. Alba.  And the Court states
21   that here by contrast in Garcia V. Alba, the Government used
22   pen registers and trap and trace data for months, not days.
23   In addition, the Government conducted significantly more
24   extensive physical surveillance.
25            So -- so I think Garcia V. Alba is distinguishable
```

```
 1   where the wiretap motion was denied when it was challenged
 2   for a lack of traditional investigation prior to applying for
 3   the wire trap because there were months of trap and trace and
 4   extensive physical surveillance in contrast to the Gonzalez,
 5   Inc. case where there was only five days of pen register and
 6   limited surveillance, and in contrast to this case where
 7   there's only one day of targeted surveillance on Hayk Karayan
 8   and one -- one request for telephone records for -- for a
 9   period of one month prior to the wiretap for target telephone
10   25, Hayk Karayan.
11            THE COURT:  Sure.  Sure.
12            But the way that I'm -- and I -- I think the record
13   should be clear.  The way that I'm thinking about those cases
14   and that argument is that you still -- the Government is
15   still entitled to provide information about all of the other
16   traditional investigative techniques that were used in the
17   past in connection with the investigation as a whole and in
18   connection with other wiretap applications.  You can't
19   bootstrap necessity.  You don't get -- just because you have
20   necessity, you don't get to bring it over and add it to the
21   next application, but the fact that lots and lots of non --
22   of lots and lots of conventional techniques were used in the
23   past, dealing with the same investigation in this case, is
24   relevant to whether traditional investigative means were used
25   in connection with the reason that telephone 25 was sought to
```

```
 1    be intercepted.

 2              So I want to make it clear that that's the

 3    assumption that I'm going on when I'm stating the law as I

 4    believe it exists.  We don't look at it in a vacuum.

 5              MR. WALSH:  Yes, Your Honor.  But I think that

 6    although you can look at it and you can consider it, you

 7    can't use it to establish that the necessity requirement has

 8    been -- has been proven on Hayk Karayan's target telephone

 9    number 25 based upon my reading of the Blackman, the Carnero

10    and the Gonzalez cases and in -- in Blackman, there was one

11    investigation of one drug trafficker and they got a wiretap

12    and then they learned of Blackman and then they wanted to

13    wiretap Blackman's home, but they didn't conduct any further

14    ordinary investigation.  And the Court held that -- that when

15    the application used all of the necessity showings for the

16    first wiretap investigation and cut and paste them in the

17    wiretap application for Blackman, that that was improper.  So

18    that you can consider what has gone in the past, but you

19    can't take those justifications and those necessities

20    showings from the first wiretap and then just use them

21    wholesale in the second and state that you have complied with

22    the necessity requirement.  There has to be something in

23    addition.  And that was the same problem with Carnero, the --

24    the -- the Government said that the second spinoff wiretap

25    that was obtained in Carnero, they didn't do any further
```

1    investigation or attempt any further investigation.  They

2    just incorporated by reference the -- the necessity

3    investigation that was conducted on the prior wiretap and

4    incorporated it into the second one, and that was

5    insufficient.

6            And the same thing with -- with Gonzalez.  They --

7    and the holding in those cases is that -- that a necessity

8    showing has to be made independently of each succeeding

9    telephone number, and if it's not, then suppression is

10   required under *Gonzalez* and *Carnero* and *Blackman*.  And --

11           THE COURT:  Sure.

12           I -- I understand that, but I think what I'm saying

13   is part of that analysis is you have to look at who the

14   target is, and if the target is somebody who is heavily

15   involved or integrated into a large organization, you have

16   done a lot of traditional investigative means over the course

17   of -- perhaps years with many, many people involved with that

18   specific organization that that all becomes relevant to

19   determining whether there is necessity for, in this case,

20   a -- the last or, you know, almost the last interception.

21           The Government could have used, for example,

22   exhausted every possible investigative technique on the

23   investigation all the way through target telephone 24.  When

24   they get to target telephone 25, the Government says, look,

25   you know, we're not going to learn anything more through pen

```
 1   registers or search warrants or pole cameras or any of the

 2   other means.  You know, to -- to complete our investigation

 3   and -- and have the tools to prove guilt beyond a reasonable

 4   doubt, you know, we need this final wiretap of this person,

 5   who is not an outsider.  He's not somebody that -- you know,

 6   that we're not really sure about.  He's a person that we

 7   think is -- is very -- very involved at upper levels in this

 8   organization.

 9            And I think under those circumstances, when you've

10   done all of the background, traditional means, I don't think

11   you're required to start anew and ignore all of that and make

12   the Government go through the, essentially, pointless

13   exercise of using traditional investigative techniques

14   that -- that they've used in the past on associates of that

15   person.

16            So, you know, if I'm wrong on the law, I'm wrong on

17   the law, but I wanted to state it clearly on the record so

18   that, you know, you understood what I was -- the way I was

19   thinking about it, Mr. Walsh.

20            MR. WALSH:  Yes, Your Honor.

21            And I respectfully submit I think the Court is

22   wrong on the law, and in reading from *United States vs.*

23   *Gonzalez, Inc.*, it says what the Government is not allowed to

24   do is to transfer a statutory showing of necessity from one

25   application to another even in the same investigation.
```

```
 1              THE COURT:  I agree with that.  And -- but -- but
 2    the Government is permitted to incorporate the knowledge, the
 3    usefulness of the techniques that were used to acquire that
 4    knowledge into the subsequent investigation as part of making
 5    a showing that the -- that the wiretap is necessary.  That's
 6    what I believe to be true.  And, again, I want to make the
 7    record clear so that if this issue comes up on appeal there's
 8    a clear statement for you and the Court of Appeals to -- to
 9    tell me I'm wrong.
10              MR. WALSH:  Yes.
11              And -- and the reason I think the Court is wrong
12    is, for example, if -- if wiretap A is being conducted, after
13    a traditional investigation of Mr. A, and then during the
14    course of wiretapping A's phone they learn about Mr. B, and
15    the fact that there was an extensive -- an exhaustive other
16    investigation of Mr. A cannot establish that necessity is
17    shown as to Mr. B even if -- even if the investigators had
18    the same framework or types of investigations available that
19    failed as to -- as to Mr. A, they still have to make the
20    effort as to Mr. B.  There has to be some -- some --
21              THE COURT:  I don't necessarily disagree with that,
22    but I think the example here would be they're investigating A
23    and in the course of that investigation, they learn a lot
24    about B as well.  And they -- they -- they learn a lot of
25    information from lots of different sources about B.  They see
```

```
 1    B as being very involved.  They see how he is involved.  They
 2    have a lot of knowledge about that.  So I don't -- I -- I
 3    understand your argument dealing with sort of more discreet
 4    proof issues.  I see this case as involving lots and lots of
 5    overlapping proof issues.  So I don't necessarily disagree
 6    with your -- your narrow characterization, but I just don't
 7    think that's this case.
 8              MR. WALSH:  But -- but my last statement is --
 9              THE COURT:  Okay.
10              MR. WALSH:  -- the -- the fact that they learn a
11    lot about Hayk Karayan through the earlier wiretaps and they
12    learned that he may or may not be involved in Armenian Power
13    and crimes being committed with Mr. Bilezikchyan, the step
14    thereafter to seek a wiretap on Mr. Karayan's phone has to
15    comply with the statutory directive that some additional
16    investigation be targeted as to Mr. Karayan.  And I don't
17    think that the -- the fact that they followed
18    Mr. Bilezikchyan around and it did not result in -- and they
19    exhausted that traditional investigation and it wasn't
20    successful necessarily means that because Hayk Karayan was
21    seen during the course of those surveillances, that now they
22    can completely dispense with the traditional technique of
23    surveillance of Mr. Karayan in targeting his house because
24    they never really surveilled Mr. Karayan's house until --
25    until the period of time when they were trying to get a
```

```
 1    wiretap during the December -- before the January

 2    application.

 3            And -- and it goes -- and the same is with respect

 4    to all of the other types of investigations and the point is

 5    that throughout here there is certain types of traditional

 6    investigations that were available to the -- to the

 7    Government, and the cases say that if these investigations

 8    are available the Government has to make a good faith effort

 9    in trying to succeed even if --

10            THE COURT:  Or explaining why they wouldn't be

11    useful; right?

12            MR. WALSH:  Yeah, that's correct.

13            But -- but in this particular case, the fact that

14    they're not -- they may not have been useful in following

15    Mr. Bilezikchyan around doesn't necessarily mean that they

16    wouldn't be useful in the investigation of Mr. Karayan and --

17    and maybe that takes us to the next exhibit, which is one of

18    the points in establishing necessity is they made the

19    representation that they -- that Mr. Bilezikchyan, although

20    he was an informant in the past, was not available and

21    wouldn't -- wouldn't assist law enforcement in the future.

22    And that representation is Exhibit 18.

23            THE COURT:  Right.

24            And, in summary, the offer of proof in that, is

25    that Mr. Bilezikchyan had been in contact with the case agent
```

```
 1    or one of the investigators many, many times, maybe 15 or
 2    something like that.  And the Government said, well, we
 3    didn't think he was reliable; we thought he was sort of
 4    playing a double game.  We didn't really want to characterize
 5    him as a confidential informant and -- but, on the other
 6    hand, your argument is, well, you talked to him an awful lot,
 7    and you haven't really demonstrated that you couldn't have
 8    used him to develop whatever information you needed to
 9    develop without going to a wiretap.
10             MR. WALSH:  Exactly.  And -- and the -- the
11    application it says -- itself says that Bilezikchyan refused
12    to provide information about his own criminal activities and
13    those of close associates such as Bistrimate, and -- and
14    therefore, an interview of Bilezikchyan would not be useful,
15    and that's Exhibit 18.  And then just for contrast we showed
16    that in the original first wiretap, which is Exhibit 19, they
17    set out that in the past from 2004 to 2005 and 2007 and 2008,
18    Bilezikchyan was acting as a confidential informant for the
19    FBI.  And during those periods, Bilezikchyan provided on
20    numerous occasions to the FBI and other members of the EOCTF
21    reliable and accurate information that was independently
22    corroborated and verified regarding the criminal activities
23    of members and associates of various Armenian organized crime
24    groups.
25             So, here, we have the first wiretap application
```

```
1    appearing to be directly in contradiction of what was in the
2    affidavit in support of the wiretap for Mr. Karayan's
3    telephone --
4             THE COURT:  Right.
5             But we're dealing with different time periods;
6    right?
7             MR. WALSH:  That's correct.
8             But -- but then there was an omission -- there was
9    a critical omission which is not in the book, and the reason
10   why we didn't put it in the book is because this was a
11   lengthy document that was filed under seal.  It was
12   attached -- it's Exhibit P to the original moving papers and
13   it was filed under seal.  And these were debriefings of -- of
14   Mr. Bilezikchyan, and we felt that it referred to so many
15   things -- so many far-reaching investigations; it was
16   appropriate to file it under seal with the Court.  But it's
17   under seal as Defendant's Exhibit P in support of the motion
18   to suppress the wiretap.  And I didn't make copies of it, but
19   essentially, I can -- there's only like one paragraph that
20   kind of summarizes what Agent -- what Agent Jeremy Stebbons
21   wrote in his report concerning his interview of -- of
22   Mr. Bilezikchyan on July 30, 2009, which is about six months
23   before he applied for the wiretap on Mr. Hayk Karayan's
24   telephone.
25            And Agent Stebbons, in his report, states that --
```

```
 1    essentially that Bilezikchyan was reporting that he had
 2    spoken to a Vahan (phonetic), which was another suspect who
 3    turns out to be one of the defendant's ultimately indicted in
 4    this case and Vahan had kidnapped a person named
 5    Sando (phonetic) in North Hollywood.  And -- and it states in
 6    here that Vahan had told Bilezikchyan in person on the
 7    morning of July 29, 2009, that he had kidnapped Sandro.  And
 8    so the -- the very next day that Bilezikchyan gets this
 9    information from Vahan about this kidnapping, Bilezikchyan
10    reports to the FBI and speaks to the affiant in this case and
11    provides this information, and it's -- it's an exhibit under
12    seal in support of the -- of the motion -- and as a result of
13    this information, this kidnapped victim is rescued and that
14    appears --
15              THE COURT:  I remember that reference.
16              MR. WALSH:  Yeah.
17              And the reference is on Defendant's Exhibit 24 in
18    the exhibit book.
19              THE COURT:  No.  I -- I remember that reference.
20              MR. WALSH:  And the reference was:  Using
21    surveillance pen register information and confidential
22    sources, LAPD officers were able to determine that
23    Vahan Adzemian (phonetic) was involved in a kidnapping.  And
24    then on the next page of the affidavit it says,
25    "On August 3, 2009, shortly after the arrest of Gambaryan and
```

```
1    Adzemian, LAPD SWAT officers entered the Delaware residence
2    wherein they discovered the victim lying on his back on an
3    air mattress on the floor on the ground" -- "on a ground
4    floor bedroom.  The victim was blindfolded and was suffering
5    from an untreated gunshot wound to the abdomen.  The victim
6    was in medical distress and in need of immediate intention.
7    The victim also had burn marks on his sternum and ligature
8    marks and abrasions above the ankles."  And I believe we
9    could show on cross-examination of Officer Stebbons that this
10   is the same kidnapped victim that was rescued on August 3,
11   2009, that had been reported to him on August 30, 2009, just
12   a few days earlier by Paramaz Bilezikchyan.
13           So the reason why this is important is it shows
14   that the representation in the search warrant or the wiretap
15   application that Bilezikchyan would not provide any useful
16   information -- I'm sorry?
17           It -- it -- I thought Counsel was making an
18   objection.  So it directly refutes the representations made
19   January 13, 2010, that Bilezikchyan is not providing
20   information to law enforcement that leads to successful
21   investigations.  And so I think that -- that that is an -- an
22   important factual misrepresentation or omission concerning
23   the availability of informants.  That's one of the ways that
24   the Government establishes necessity.  That the use of
25   informants would not result in further successful
```

```
 1    investigations leading to furthering of the investigation in
 2    this case, and -- and I think that is refuted by the
 3    Defendant's Exhibit P that's filed under seal.
 4            THE COURT:  And -- and the Government, as I recall,
 5    says in their brief -- and Mr. Wolfe can speak to that --
 6    that -- you know, that it was a mixed bag in terms of
 7    reliability.  When it was convenient for Mr. Bilezikchyan to
 8    do it, he would provide information if he thought it could
 9    help him.  And they didn't trust his -- his honesty and
10    veracity beyond that -- at least that's what I recall from --
11    from reading the brief.  But do you want to -- I don't want
12    to stop you if you're continuing with this issue because I --
13            MR. WALSH:  Yes.  There was -- there was -- there
14    were two other points and one -- one is, I think, a
15    misattribution or omission of -- of where the information
16    about the kidnapping was provided to by law enforcement and
17    that is Exhibit 21 in the search warrant affidavit or the
18    wiretap application at Paragraph H, it says, "As discussed in
19    prior affidavits, CI 5 has recently been able to provide
20    EOCTF with useful information regarding a kidnapping."  And
21    from -- from Exhibit P we see that Mr. Bilezikchyan was
22    instrumental in providing that information.
23            So this is like incomplete because it was not only
24    CI 5, but it was also Mr. Bilezikchyan and that is seen by
25    the line sheets that are in the next exhibit, Exhibit 22.
```

```
 1   And this is a line sheet from August 3, 2009, where there's a
 2   conversation between Mr. Bilezikchyan and Gocor, which we
 3   believe is Confidential Informant Number 5, and in there
 4   there's a reference --
 5           THE COURT:  So -- but doesn't that all just mean
 6   that the Government has used Mr. Bilezikchyan in some
 7   capacity as an informant?  That -- that doesn't mean that
 8   they have to exhaust his use prior to --
 9           MR. WALSH:  Well, they --
10           THE COURT:  -- being able to establish necessity.
11   They don't -- they don't have to continue if they feel in
12   good faith that there isn't going to be anything more useful
13   in terms of the other information they're interested in
14   gathering to prove their -- their case.
15           MR. WALSH:  Well, it -- it does -- the Government
16   is required to give a full and complete statement why this
17   confidential informant, Mr. Bilezikchyan, is expected to be
18   not useful.  And they made that representation that he wasn't
19   useful in January; and yet, earlier in July he had given them
20   valid truthful information that solved a kidnapping, resulted
21   in the rescue of a kidnapped victim, and the arrest and
22   conviction of the kidnappers.  And that was completely
23   omitted.  And it's a material omission because it goes to the
24   issue of whether or not their representations are true that
25   Mr. Bilezikchyan is not available to assist law enforcement
```

```
 1    in ordinary traditional investigations.
 2            Now, if they didn't want to use him for other
 3    reasons, that should have been in their application for the
 4    wiretap, which it wasn't there.  And it may be once this
 5    information is -- is inserted into the wiretap application,
 6    then the test becomes under the --
 7            THE COURT:  Right.
 8            MR. WALSH:  -- under the Carnero case --
 9            THE COURT:  Wouldn't Judge Wilson have --
10            MR. WALSH:  Well, the standard is if the facts
11    alleged in the affidavit could mislead the issuing judge, and
12    I think it is misleading to say this person will not give us
13    information -- will not help us.
14            THE COURT:  Such that he may not have issued the
15    warrant.
16            MR. WALSH:  It said if these omissions and
17    misstatements had been revealed, a reasonable judge could
18    have denied the wiretap.  If that's shown, if the Court makes
19    that finding --
20            THE COURT:  Right.
21            MR. WALSH:  -- then the wiretap must be suppressed.
22            THE COURT:  Right.
23            MR. WALSH:  And I think that these are critical
24    miss -- misrepresentations that goes right to the heart of
25    whether or not Bilezikchyan, who is identified as an
```

1    informant, was available to assist law enforcement; provide

2    them true information, and become proactive.  And those --

3    those representations that were -- were made were not true,

4    were not complete, had a -- had glaring omission about his

5    usefulness just six months prior to the application.  And the

6    fact that they have been kept out, I think, brings this case

7    within United -- the holding of *United States vs. Epilito*

8    where there was a misrepresentation in the wiretap

9    application and the application said we have a confidential

10   informant, but the informant refused to provide information

11   and be proactive.  And then at the hearing on the motion to

12   suppress the wiretap, it turned out that the informant didn't

13   say that; that he was available to continue to help and would

14   have been proactive if had asked, but was specifically told

15   that they didn't want him during the course of the

16   investigation.  And the holding in *Epilito* was that was a

17   material misrepresentation on the necessity issue.  And that

18   prong of the necessity issue had to do -- had to do with the

19   availability of informants to be proactive and to be -- to

20   give information and to insist in what?  A traditional

21   investigation before the wiretap was resorted to.

22          And that's the -- the main complaint here over and

23   over, is that where there are traditional investigations that

24   in good faith are still available -- because we're dealing

25   with another person in the investigation and just because

```
1    they have thousands of hours of investigation in telephone 1

2    through telephone number 24 and all of those other suspects

3    related to those other phones doesn't mean that they can

4    automatically go and use what they've learned before and get

5    a telephone tap on -- on target telephone 25 without first

6    conducting a traditional investigation.

7              In other words, what the agents did in this case,

8    was to resort to a wiretap as the first type of investigation

9    for target telephone 25, and that's what violates Title 3;

10   they have to -- they have to utilize the resources that are

11   available and -- and make an effort to do a traditional

12   investigation first, and then once they have exhausted that

13   and they haven't reached fruition in terms of locating all

14   the sources and all the information that they want to get

15   with the wiretap, then they reveal that necessity

16   investigation in the wiretap application.  And if it's

17   sufficient, if they've done enough work, then the wiretap

18   will be granted.

19             However, in the Gonzalez, Inc. case where they

20   didn't do enough, was only a few days of pen register

21   examinations and a -- and a couple of days of surveillance,

22   the Court said as a matter of law you haven't done enough and

23   there were other good faith investigations that you could

24   have done.  And, granted, those other investigations many

25   Gonzalez, Inc. probably wouldn't have obtained all the
```

1    information that a wiretap would have obtained, but that's

2    not the test.  The test is they can't resort to a wiretap as

3    the first decision in their -- in their investigation.

4           And, I think in this case, we've established not

5    only false statements and omissions, but false statements and

6    omissions that go directly to the heart of -- of the

7    necessity issue, whether or not the Government met their

8    requirement of conducting a traditional investigation and

9    what it comes down to is they did not reveal that

10   Mr. Bilezikchyan was being cooperative in July when they

11   applied for the wiretap in April.  Their surveillance, in

12   reality, targeted against Mr. Hayk Karayan was only one day,

13   and then they got his telephone records and they examined his

14   telephone records for a month, during the month of December

15   of 2009, one month prior to the wiretap, and -- and -- and

16   then all of the other necessity showings were basically

17   incorporated by reference from the prior wiretap application.

18   And so -- and we submit that that's an insufficient showing

19   in this case.

20           THE COURT:  Thank you.  Thank you, Mr. Walsh.

21           MR. WOLFE:  Your Honor, I like to think of myself

22   as a patient guy, but defense counsel is obliged, it seems to

23   me, to get on top of the facts of this case.

24           Defendants say that P.B. provided information in

25   July that -- about a defendant in this case.  That's not so.

```
1    In fact, what defendants just argued is a perfect -- letter
2    perfect illustration of what the Government has asserted from
3    the beginning is the case with respect to Bilezikchyan.  He
4    was an informant.
5              As Your Honor pointed out, when he was working as
6    an informant, he provided reliable information; and he was
7    terminated for misconduct.  And after that, when it suited
8    him, according to the affidavit, he provided information
9    about other defendants when he was eliminating rivals.  And
10   that's what happened in July of 2009.  When Vahan Adzemian
11   was dimed out by Bilezikchyan, it's a different defendant; a
12   different kidnapping; a different organized crime group, and
13   Bilezikchyan provided a great deal of information about a
14   rival.
15             If defense counsel says Bilezikchyan could have --
16   these are Mr. Walsh's words, "become proactive," if there is
17   the slightest sign of that anywhere in this record, and they
18   write it out on a sheet of paper, I'll eat it.  That is the
19   difference between Epilito.  That has nothing to do with this
20   case on the facts.
21             In Epilito, Epilito says at 774 F.2d at 1484,
22   quote, "The testimony at the suppression hearing also
23   established that Hanafee was willing and probably able to
24   infiltrate the entire California conspiracy."
25             Defendants have not pointed to a single thing
```

```
 1    suggesting that Defendant Bilezikchyan, prior to the wiretap

 2    application, ever gave information about himself or his

 3    crimes or his close associates.  He dimed out Adzemian

 4    because he's a rival.  And this is perfectly illustrated by

 5    the fact that the record makes plain as day that the FBI knew

 6    that Bilezikchyan in July of 2009 dimed out Adzemian.

 7              So if the Defendant Bilezikchyan is willing to dime

 8    out himself, and his crimes, and his close associates, then

 9    where is the information that he gave about the Goggle

10    kidnapping?

11              He turned in rival kidnappers; he never turned in

12    himself or his associates.  It is no informant who can become

13    proactive who does not provide information about the crimes

14    that he personally seized.

15              The Government said to Judge Wilson, Bilezikchyan

16    is unreliable because you never know when he's telling the

17    truth.  He turns people in when it's convenient for him,

18    meaning his rivals, and he doesn't provide information about

19    himself.  And that's what the defendants have shown.  And

20    that's no showing of misstatement.  It's exactly what the

21    Government said was the case.  And it's got nothing to do

22    with Epilito where the testimony was that the leader of the

23    organization asked Epilito, again at Page 1484, Epilito had

24    asked Hanafee if he, Hanafee, would run his operation while

25    Epilito served an upcoming prison term.  That is not this
```

```
1   case.
2           Defendant's argument about this and often other
3   instances is rhetoric from prior cases that doesn't match the
4   other facts.
5           Unless Your Honor has a question, I have nothing
6   more to say about the argument that's come so far.
7           THE COURT:  No.  That's fine.  Thank you.
8           Let me just say one other thing that I -- I sort of
9   grasped onto that I thought was important in the law.
10  There's U.S. vs. Gilberto Baez Rivera.  That's a published
11  opinion.  It's a Ninth Circuit opinion.  I don't have the
12  cite for it, but it's a 2008 opinion by Judge Fletcher.  And
13  she notes in Footnote Number 2:  "Because the purpose of the
14  wiretap was to obtain evidence against the entire Rivera
15  organization, we consider in our necessity analysis all the
16  DEA's pre wiretap investigative efforts directed at the
17  Rivera organization, not only those efforts directed at the
18  users of the two telephones for which the wiretap was sought.
19  By contrast in Gonzalez, Inc., we considered in our necessity
20  analysis only the Government's investigative efforts directed
21  at the bus company's main office and not its earlier efforts
22  directed at the alien smuggling activities because the
23  purpose of the wiretap was to obtain evidence specifically
24  against the employees who worked in that office."  And then
25  she cites Gonzalez.  So that's been the guidepost for my
```

```
1    analysis in trying to consider how to think about this case.
2         And, you know, I'm ready to conclude this portion
3    of it, but I want to make sure that you've -- you've got the
4    last word, Mr. Walsh.
5         MR. WALSH:  Thank you, Your Honor.
6         I recognize I forgot to mention one exhibit,
7    Exhibit 23, which was a page from a wiretap application
8    around August of 2009, which was in this case that referenced
9    Vagan Adazemian (phonetic), who was the kidnapper, as being
10   one of the targets of -- of the Armenian investigation.  The
11   fact that he may have been a rival gang within the overall
12   umbrella of the investigation, I think, doesn't really
13   distinguish it.  I mean, if -- if he's part of the targeted
14   individuals as indicated by that particular wiretap
15   application.
16        And then, finally, just in response to the Court's
17   comment, I think it's a gray area as to which of those two
18   would apply in this case, which of the two scenarios that the
19   Court mentioned in the footnote from Gilbert Baez Rivera.  In
20   other words, is this a wiretap for an -- a -- for a very
21   extremely large organization on the one hand, or is this a
22   wiretap for the individual telephone of one person, Hayk
23   Karayan, who came upon the scene at the very end of the
24   investigation and they wanted to tap this one additional
25   phone after they had completed 24 wiretaps and completed an
```

```
 1    exhaustive investigation of the entire organization and were
 2    ready to stop?  And they decided, well, we'll do one more
 3    wiretap and we'll tap Mr. Hayk Karayan's telephone, and I
 4    think under those circumstances we come closer to the
 5    Gonzalez, Inc. situation than we do to the other situation of
 6    seeking a wiretap for an overall investigation.  And I think
 7    that the first paragraph in Footnote 2, may have
 8    applicability to the application for the first wiretap at the
 9    start of the investigation.  But I think the second paragraph
10    in Footnote 2 of the Rivera case would apply to the last
11    wiretap in this -- in this case --
12             THE COURT:  The -- the -- the prosecution here
13    already knew that Mr. Karayan was deeply involved, at least
14    appeared to be deeply involved in this organization.  They
15    weren't -- they weren't seeking this wiretap for the purpose
16    of incriminate -- getting incriminating evidence specifically
17    as to him.  They had all of that.  You know, there's a --
18    they've intercepted him saying various things.  They know who
19    he associates with; they know he's involved.  So I just --
20    I'm disagreeing with your characterization on that issue,
21    Mr. Walsh.
22             MR. WALSH:  Just in response, though, as soon as
23    the wiretap on Mr. Karayan's phone ended, the wiretap
24    investigation ended.  So it was -- it was the very tail
25    end...
```

```
 1              THE COURT:  I understand that.

 2              And, again, I look to Page 104 of the affidavit and

 3     it -- it discusses the need for the interception and it goes

 4     through the scope and method of operations of the

 5     organization.  And -- okay.

 6              Anything further from either party on this -- this

 7     issue?

 8              MR. WOLFE:  Nothing more from the Government.

 9              MR. WALSH:  Nothing more on necessity.  We still

10     have --

11              THE COURT:  Probable cause.

12              MR. WALSH:  -- probable cause argument and -- and I

13     think also an argument on the motion for discovery for the

14     wiretap -- or for the grand jury transcripts.

15              THE COURT:  Okay.  Let me just say this on the

16     probable cause analysis:  The tentative is to deny the motion

17     as to probable cause.  If you read the affidavit, there are

18     incriminating statements, any single one of which I believe

19     would constitute probable cause.

20              So, Mr. McCurry, I certainly don't want to deprive

21     you of the opportunity to be heard, but I want to let you

22     know preliminarily what my view is.

23              MR. MCCURRY:  Just a moment, Your Honor.

24              THE COURT:  Sure.

25              MR. ESTRADA:  Your Honor.  I'm sorry.  Before we
```

```
 1    begin, I have a 1:20 commitment.  If I can be excused?

 2              THE COURT:  Yes.

 3              MR. ESTRADA:  Thank you, Your Honor.

 4              MR. MCCURRY:  Your Honor, I'm going to submit on

 5    the issue of probable cause.

 6              THE COURT:  Okay.  I'm going to deny the probable

 7    cause motion.  I'm also going to deny the necessity motion.

 8              As I indicated earlier, I think that one can fairly

 9    point to some significant flaws in the affidavit and some

10    significant omissions, and I think that -- that those are

11    troubling.  But they don't rise to the level of bad faith or

12    recklessness, in my opinion, because there is also an

13    abundance of other information that is provided that -- that

14    I think independently support necessity.  I am guided, in

15    large part, on how to focus my analysis by that footnote that

16    I referenced.  So I'm just putting that as a guidepost for

17    counsel on appeal and to the Court.

18              So I -- I am finding that I do not believe that the

19    issuing judge would have not issued the application had he

20    been provided with information more consistent with what the

21    defense has urged he should have been provided with or with

22    the inclusion of omissions that the defense argues that

23    should have been included.  So that's my ruling on the

24    necessity issue.

25              The tentative on the grand jury transcript
```

```
 1    information request is to deny as well, but I will certainly
 2    hear argument on that, if Counsel wishes to make argument.
 3              MR. BROOKLIER:  Your Honor, Anthony Brooklier.
 4              As a practical matter, I think at some point we're
 5    going to get the -- my speculation is, and I think it's
 6    probably true... is that it was an agent who had testified at
 7    the -- at the grand jury.  And I expect that that agent will
 8    probably testify at trial.  So, as a practical matter, I
 9    think at some point we get the grand jury under -- under
10    Jencks.
11              All we're asking for now is some mechanism whereby
12    we can take a look and see if the grand jury was A, either
13    not told about this -- what we consider to be exculpatory
14    statement, the April 2011 statement from the alleged
15    kidnapping victim wherein we think he's basically saying -- I
16    think a fair reading of it is he's basically saying I
17    wasn't -- I wasn't kidnapped.  So if that's not exculpating,
18    I don't -- I don't know -- I don't know what is.
19              We would even offer, if the Court thought it was
20    appropriate, to have the Court look at the grand jury
21    portions and we would trust the prosecutor to give to Your
22    Honor or the portions that would be relevant to our grand --
23    we don't need all of it -- to the issue that we bring up
24    about the kidnapping and exculpating.
25              THE COURT:  But doesn't he in the same statement
```

```
 1    talk about being in fear as well and --
 2              MR. BROOKLIER:  Well --
 3              THE COURT:  But put it in the big picture.  You
 4    have somebody that's associated with this alleged
 5    organization and supposedly he's been kidnapped or
 6    threatened.  He's associated with these people in some way as
 7    well.  There is some question about where he got his money;
 8    there is some question about whether he is -- has -- you
 9    know, some possible criminal involvement, perhaps, in the
10    past as well.  So he may make some statements, perhaps he
11    did, I wasn't kidnapped.
12              I -- you know, I can understand that as being very
13    good fodder on cross-examination, but in terms of the kind of
14    information and the overall picture, that would be misleading
15    to the grand jury given the sort of more nuanced view that
16    I -- I sort of am inclined to think occurred here.  I'm just
17    not seeing that, Mr. Brooklier.
18              MR. MARKS:  Well, Your Honor, you can --
19              THE COURT:  What -- what do you think the
20    transcript is going to say?
21              MR. BROOKLIER:  I think -- well, I think the
22    transcript is going to indicate that this -- A, this
23    information wasn't given to the grand jury; and quite
24    possibly that the Government was not in possession of any
25    exculpating evidence.
```

1          Now, I understand the -- the argument or the

2     comments that the Court has made, but still, it would be up

3     to the grand jury to determine whether or not that was an

4     important statement -- the circumstances under which it was

5     made -- and how it would affect the probable cause

6     determination.

7          I don't -- I don't see why the Government would

8     even resist this invitation to see -- to see what happened

9     here.  It -- we -- it could be given -- it could be given to

10    us with an order that only Counsel and their clients would --

11    would have access to it and no further use would be -- would

12    be made of it.

13         THE COURT:  Should I hear from the Government,

14    then, on that issue?

15         MR. WOLFE:  Your Honor, I'm willing to answer the

16    question if Your Honor dispenses -- gives us an order

17    dispensing with grand jury secrecy.  I know the answer and

18    I'd be happy to answer if Your Honor -- the questions are --

19    was exculpatory information given to the grand jury?  That's

20    one.  The second I understand to be:  Was the grand jury told

21    there is no exculpatory information?

22         I know the answer to both of those questions, I

23    believe, and I'd be happy to state them if Your Honor

24    relieves us of the burden of the grand jury secrecy rule of

25    Rule 16.

```
1            THE COURT:  Relating to those two issues?

2            MR. WOLFE:  Yes, Your Honor.

3            THE COURT:  Go ahead.

4            MR. WOLFE:  No exculpatory information about the

5     kidnapping was given and there was no representation that

6     there was no exculpatory information.

7            MR. BROOKLIER:  Okay.  I'm okay on number two, but

8     why wasn't the grand jury told of this April 2011 report?

9            This -- they had this in their possession -- the

10    Government had it -- this report in their possession prior to

11    the time of the First Superseding Indictment.

12           MR. WOLFE:  Your Honor, the defendant has no right

13    to ask the question and the Government will not answer it for

14    that reason.  There is no right to have exculpatory

15    information presented to the grand jury.  We cited the cases

16    in our papers.

17           MR. BROOKLIER:  I'll buy that.  I understand.  We

18    all understand the law on that.  But I think -- I think we're

19    in a different area now.  I think when you have that, and you

20    tell the grand jury, and obviously somebody testified before

21    the grand jury that there was a kidnapping, and you have in

22    your possession exculpating evidence, you are misleading the

23    grand jury if you don't present that evidence.  That's --

24    that's our argument.

25           Now, you know, there's -- it's a difficult
```

```
 1    proposition to explain when you -- when you buy -- when you
 2    buy the proposition that you don't have to give exculpating
 3    evidence, and that seems to be the law, and on the other hand
 4    you can't mislead the grand jury, you're in a difficult and
 5    difficult -- admittedly a difficult area.
 6              I think the Court could exercise its discretion and
 7    fashion a -- a disclosure that protects grand jury secrecy.
 8    Just give it to Counsel.  Let us look at it.  Let us make an
 9    appropriate motion.  If we don't think there's an appropriate
10    motion, we won't file anything.
11              MR. WOLFE:  Your Honor, I'm not sure I understand
12    Counsel's assertion.
13              What does defense counsel want to see?
14              There was no exculpatory information given and they
15    were never told that there was exculpatory information.
16              Is defense counsel saying they want to read the
17    entire transcript to find out whether I'm lying to the Court?
18              MR. BROOKLIER:  Well, I guess Counsel has answered
19    our question.  He didn't -- this is the way I've interpreted
20    it, and I'm sure he'll correct me if I'm wrong:  They saw fit
21    not to tell the grand jury about the April 2011 report that
22    they had in their possession prior to the First Superseding
23    Indictment.
24              MR. WOLFE:  Your Honor, I'm willing to answer that
25    question.
```

```
 1          The Government does not believe that the April 2010
 2    interview, which took place after the first presentation to
 3    the grand jury, but before the second, we don't believe it is
 4    exculpatory.  We believe that the victim was in fear; no
 5    matter how sweetly Bilezikchyan talked to him.  And when he
 6    says, we had lunch and I went with him because I was afraid
 7    of what might happen, that's kidnapping.  And it wouldn't
 8    cross my mind then to tell the grand jury about the fact that
 9    they ate lunch and drank vodka, or whatever it was; ate
10    Menudo.
11          THE COURT:  I understand.
12          Well, the tentative is to deny the motion,
13    Mr. Brooklier, but I will take it under submission.
14          MR. BROOKLIER:  Thank you very much, Your Honor.
15          THE COURT:  Okay.  Thank you.
16          Anything further?
17          MR. WOLFE:  No, Your Honor.
18          THE COURT:  Thank you.
19               (Whereupon proceeding adjourned.)
20                    - - -
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5      UNITED STATES OF AMERICA          :

 6               vs.                       :   No. CR 11-00072-DDP

 7      MHER DARBINYAN, ET AL.             :

 8

 9

10    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22    /S/_____        09/19/2012

23    MARIA R. BUSTILLOS                      DATE
      OFFICIAL REPORTER
24

25
```



1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   WESTERN DIVISION

4   - - -

5   HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

6

7   UNITED STATES OF AMERICA,          )
                                       )
8        Plaintiffs,                   )
                                       )
9                                      )
                                       )
10       vs.                           ) No. CR 11-00072-RGK-50
                                       )
11                                     )
                                       )
12   MIGUEL AGUSTIN RAMIREZ, et        )
     al.,                              )
13                                     )
         Defendants.                   )
14   _____

15

16   REPORTER'S TRANSCRIPT OF PROCEEDINGS, VOLUME I

17   *MOTION HEARING*

18   LOS ANGELES, CALIFORNIA

19   FRIDAY, MARCH 8, 2013

20   _____

21

22   MARIA R. BUSTILLOS
     OFFICIAL COURT REPORTER
23   C.S.R. 12254
     UNITED STATES COURTHOUSE
24   312 NORTH SPRING STREET
     ROOM 404
25   LOS ANGELES, CALIFORNIA 90012
     (213) 894-2739

(3346 of 3613)

Case 2:15-2-50172-06/27/2016, ID:159034310, DktEntry: 22-1, Page 3346 of 3613
Case 2:11-cr-00072-RGK Document 3652 Filed 11/17/14 Page 2 of 61 Page ID #:23539

2

```
 1                  A P P E A R A N C E S

 2

 3

 4        ON BEHALF OF THE PLAINTIFFS,
          UNITED STATES OF AMERICA:      OFFICE OF THE UNITED STATES
 5                                       ATTORNEY
                                         BY:  MARTIN ESTRADA, ESQ.
 6                                           ANDREW CREIGHTON, ESQ.
                                         312 NORTH SPRING STREET
 7                                       12TH FLOOR
                                         LOS ANGELES, CALIFORNIA 90012
 8                                       (213)894-4477

 9
                                         OFFICE OF THE UNITED STATES
10                                       ATTORNEY
                                         BY:  STEPHEN WOLFE, ESQ.
11                                       312 NORTH SPRING STREET
                                         12TH FLOOR
12                                       LOS ANGELES, CALIFORNIA 90012
                                         213)894-0044
13

14

15        ON BEHALF OF THE DEFENDANTS,
          MIGUEL AGUSTIN RAMIREZ, et     LAW OFFICES OF MARK WINDSOR
          al.:                           BY:  MARK WINDSOR, ESQ.
16                                       1 SOUTH FAIR OAKS AVENUE
                                         SUITE 401
17                                       PASADENA, CALIFORNIA 91105
                                         (626) 792-6700
18

19                                       (ALL COUNSEL PRESENT
                                         REFLECTED IN MINUTE ORDER)
20

21    NOT APPEARING:  DOMINIC CANTALUPO

22

23

24

25
```

```
1                          I N D E X

2

3                                                          PAGE

4       MOTION HEARING:                                      4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1              LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 8, 2013

2                            -o0o-

3              (COURT IN SESSION AT 10:14 A.M.)

4         THE CLERK:  Calling items 1 through 15.

5         CR 11-00072(JA)-DDP:  United States of America v.

6    Mher Darbinyan, et al.

7              Before the Court today are defendants 1, 56, 34,

8    40, 35, 6, 20, 3, 4, 50, 57, 26, 25, 47 and 43.

9              Counsel, may we have appearances, please.

10   BY MR. ESTRADA:

11   Q    Good morning, Your Honor.

12             Martin Estrada on behalf of the United States with

13   me at counsel table for the United States.  Also for the

14   United States are Stephen Wolfe and Andrew Creighton?

15             THE COURT:  Good morning.

16             MR. COLOMBO:  Good morning, Your Honor.

17             Anthony Colombo on behalf of Mr. Darbinyan.  I'm

18   especially appearing for Curt Leftwich on behalf of his

19   client who's present on bond, Vahav Matasakian.  He is number

20   25, Your Honor.

21             THE COURT:  Good morning.

22             MR. NASATIR:  Michael D. Nasatir and Juan Acevedo

23   on behalf of Sarkis Avedisian, number 56.

24             THE COURT:  Good morning.

25             MR. KESSEL:  Good morning, Your Honor.
```

5

```
 1              Attorney Alex Kessel for defendant
 2    Karine Mkrtchyan.  She's present.  She's defendant number 34.
 3              THE COURT:  Good morning.
 4              MR. KESSEL:  Good morning, Your Honor.
 5              MR. SUAREZ:  Good morning, Your Honor.
 6              Charles Pereyra-Suarez.  I'm representing
 7    Arman Sharopetrosian, number four.  He is present, in
 8    custody.
 9              THE COURT:  Good morning.
10              MR. MGDESYAN:  Good morning, Your Honor.
11              George Mgdesyan, here for defendant number 3,
12    Karo Yerkanyan, who's present in custody.
13              THE COURT:  Good morning.
14              MR. WINDSOR:  Good morning, Your Honor.
15              Mark Windsor, specially appearing for
16    Dominic Cantalupo for number ten on calendar, appearing for
17    Miguel Augustin Ramirez, who is present on bond.
18              And I'm also appearing for my client,
19    Vartan Avedissian, number 11 on calendar.  He is not present;
20    he has a waiver on file.
21              THE COURT:  Thank you.
22              Good morning, Your Honor.
23    George Buehler.  George Buehler on behalf of Rafael
24    Parsadanyan, number 35.  He is on bond and present.
25              Thank you, Your Honor.
```

**003349**

```
 1                THE COURT:  Good morning.

 2                MR. CARLTON:  Good morning, Your Honor.

 3      John Carlton on behalf of Aram Petrosian number 20, who is

 4      present, in custody.

 5                THE COURT:  Good morning.

 6                MR. HORGAN:  Good morning, Your Honor.

 7      Paul Horgan on behalf of Andranik Bakhchadjian before the

 8      Court, in custody, number 40.

 9                THE COURT:  Good morning.

10                Ms. Brewer?

11                MS. BREWER:  Good morning, Your Honor.

12      Marsha Brewer, appearing on behalf Mr. Arman Tangabekyan, who

13      is present before the Court.  He is out of custody.

14                THE COURT:  Good morning.

15                MR. SHANNON:  Good morning, Your Honor.

16      Michael Shannon, appearing on behalf of Khachatur Arakelyan,

17      who is present, number 43.

18                THE COURT:  Good morning.

19                MR. LANNEN:  Good morning, Your Honor.

20      Tim Lannen, appearing for Mr. Adam Davoodian, number 47, who

21      is present before the Court.

22                THE COURT:  Good morning.

23                MR. MEZA:  Good morning.  Mike Meza on behalf of

24      Mr. Moreno, who is present in custody, number 26.

25                THE COURT:  Good morning.
```

7

```
1          Going once...

2          Okay.  Mr. Colombo, why don't we start with you and

3     your suppression motion.  Many have joined in, but you've

4     taken the lead position in that motion and some of the other

5     motions as well.  So let's start with the suppression

6     motion...

7          MR. COLOMBO:  Your Honor, I believe in the initial

8     application that was filed in January of 2009, as well as the

9     subsequent applications that were filed, there are first,

10    material misstatements and omissions that were discussed in

11    the motion in support of probable cause and necessity that

12    would necessitate first suppression or in the alternative, at

13    the very least, a Franks hearing.

14          And I believe that there are at least ten of these

15    material misstatements or omissions.  And I would put them

16    in, I guess three different types of categories in regards to

17    where they would fit under the material misstatements or

18    omissions.  The first is, I believe, materially false or

19    affirmatively false information in the -- in the application

20    and I believe that there are three clearly false statements

21    in -- in the application.

22          The first, discussing the existence of a Darbinyan

23    Organization; the second concerning a statement in regards to

24    the car tracking devices; and the third, concerning CI-2's

25    inability to access target subject, Tangabekyan.  The second
```

 1  category I think would fall under what would be considered

 2  incomplete or material omissions, and I think there are

 3  several of those.  One is -- the first one in that category

 4  would be the failure of the application to discuss what

 5  evidence derived from Paramaz Bilezikchyan, who as Your Honor

 6  is aware from the pleadings, was a Government informant; what

 7  information in the application was relied upon from -- from

 8  him.

 9        The second would be CI-2's relationship with

10  Mr. Darbinyan and the nature of the alleged false debt.

11        The third would be CI-2's access to Mr. Darbinyan.

12        The fourth would be a recording made by CI-2

13  concerning the North Hollywood shooting, wherein a recording

14  was made of an eyewitness by CI-2 concerning who he saw pull

15  the trigger in that particular case.

16        The last in that particular category is the failure

17  to completely disclose or intentionally omit the close

18  relationship between CI-2 and Paramaz Bilezikchyan.

19        The third category, Your Honor, I would submit

20  or -- is, the application was artfully drafted in a way to

21  intentionally mislead the reviewing judge.  And there are

22  two -- two particular items that I would put in that

23  category:  The first is the contradictions concerning

24  Paramaz Bilezikchyan when discussing the probable cause and

25  when discussing necessity.

```
 1            And then the second is the same thing, the
 2     contradictions when discussing CI-2's ability to infiltrate
 3     the alleged Darbinyan Organization and the contradictions
 4     that are in the probable cause statement as opposed to the
 5     necessity statement in support of the wiretap application.
 6            So first, Your Honor, in looking at the -- what I
 7     believe is a material false statement, the
 8     Agent Stebbins' use of the moniker, the Darbinyan
 9     Organization, I believe in the Government's response to my
10     motion, they concede that, in fact, it is a -- a moniker that
11     was fabricated by the agent to -- for this particular case.
12     It's not something that was based upon investigation.
13            THE COURT:  Right.  The organization if it exists,
14     doesn't call itself that.  And the Government's argument
15     perhaps is that it would have been better, had a sentence
16     been added that said, you know, for purposes of this motion
17     and for purposes of not having to repeat what we believe the
18     organization consists of, we're just going to simply call it
19     by that name, and we want to make it clear to the Court that
20     again, this isn't a name that is used by the purported
21     organization.  It's just simply used for purposes of
22     shorthand as lawyers sometimes do, in this application;
23     right?
24            MR. COLOMBO:  That's it.  The Government basically
25     says that the -- my argument is quibbling over the language;
```

 1    but I do believe that there is a distinction with a

 2    difference here.  And I think the -- the point is that first,

 3    you have to look at what Agent Stebbins wrote in the ap- --

 4          THE COURT:  Yeah.  Okay.  That's what I was going

 5    to say.  If you look at page two -- well, bottom third, "The

 6    EOCTF is responsible for conducting investigations of

 7    violations of criminal laws by members and associates of

 8    Eurasian organized crime groups, operating in the Los Angeles

 9    area and elsewhere, including an Armenian organized crime

10    group controlled by Darbinyan, that is closely associated

11    with Armenian Power, herein referred to as the Darbinyan

12    Organization; right?

13          MR. COLOMBO:  Yes.

14          THE COURT:  That's the part that you object to.

15          MR. COLOMBO:  Well, in addition, Your Honor, I

16    think the specific language used -- and what I referred to in

17    my brief and I'll recite it here, it's in Exhibit A, page 28

18    and 29.  And the particular -- what I believe is clearly

19    false, is Agent Stebbins' representation -- and I'm quoting,

20    "During the course of the investigation, it has been

21    determined that Darbinyan is the leader of the Darbinyan

22    Organization, as well as a leader of Armenian Power."  And I

23    think the problem here, Your Honor, is misleading the Court

24    into believing that investigation revealed the existence of a

25    Darbinyan Organization.  And the reason why I -- I have made

1     a point of this as being false, the problem here is that the

2     analogy or using a false moniker and the analogy that it

3     brings, it lends to the reviewing judge's mind that the

4     Darbinyan Organization is the equivalent of "La Costa Nostra"

5     or Eme --

6                THE COURT:  No, I understand that --

7                MR. COLOMBO:  -- or something of that nature.

8                THE COURT:  -- the implication is this things

9     exists.  This things exists.  Now, let's talk about what it

10    consists of.  That's the implication you're concerned about.

11    By calling it that, there's an alleged inference that it

12    indeed exists -- self-identifies as that.  And, you know,

13    we're dealing with a known quantity at that point as opposed

14    to simply a lawyer's way of identifying shorthand; right?

15               MR. COLOMBO:  Yes --

16               THE COURT:  I get that.  I get that.

17               MR. COLOMBO:  And I don't think that that would be

18    a problem if in the application Agent Stebbins had identified

19    through a footnote or some other means in the application

20    that this is a moniker that has been applied for shorthand

21    purposes.  But that was not done in the application, but we

22    do know in further applications that were submitted, that

23    there is that distinction drawn on -- to the Court; that the

24    Court is alerted to the fact that this organization is --

25    isn't such.  So --

```
 1            THE COURT:  Sure.  So then when you read the whole
 2    thing -- the whole application though, and you look at the
 3    whole context with a lot of the -- the leadership allegations
 4    pointing back to Mr. Darbinyan, doesn't the context of all of
 5    that, in effect, cure the imprecise language -- or at least
 6    mitigate the concerns that you've raised because when you go
 7    through it, you can say to yourself, Well, defendant
 8    Darbinyan's name is highlighted prominently and he does
 9    appear to be allegedly connected with lots of different types
10    of activities.  So, therefore, even if you eliminate the --
11    and you concede your point, there is still a -- information
12    there that is independent of the -- you know, the poor choice
13    of language that you are objecting to.
14            MR. COLOMBO:  Well, I would disagree with
15    Your Honor because I think --
16            THE COURT:  I'm not making a statement about a
17    ruling.  I'm simply saying that that appears to be the
18    argument.
19            MR. COLOMBO:  Well, Your Honor, what I would
20    respond to that then, is that I believe there is a difference
21    because of -- of the inference.  And why it's important in
22    regards to the case law and what the case law bears out in
23    the Ninth Circuit has determined, is that the more difficult
24    an organization seems to be to penetrate, the more reason for
25    necessity -- the wiretap becomes more necessary.  And in this
```

 1   particular case, you -- using that language, I believe leads

 2   to the inference that this is a well-organized organization,

 3   analogous to the Eme, et cetera, other established

 4   organizations, and therefore, is more difficult to

 5   infiltrate, to penetrate, and investigate.  And, therefore,

 6   that would necessitate a wiretap.

 7        So I think that's -- that's the import of -- of the

 8   argument, Your Honor.

 9        THE COURT:  No, I understand that argument; but the

10   Government then says, and it's obvious from the context, that

11   essentially, the organization is comprised of individuals who

12   share common ethnic background, common cultural issues and in

13   some ways common language or languages as well.  So the fact

14   that it may be difficult to penetrate, seems to be there,

15   independent of your -- your fear and concern that referring

16   to it as the Darbinyan Organization, sort of bootstraps it

17   improperly into an insular category.

18        MR. COLOMBO:  I would agree that the majority of

19   individuals involved in this investigation are from the same

20   ethnic background, Your Honor.  So --

21        THE COURT:  I guess I was inclined to understand

22   your argument but not think that it was dispositive for the

23   reasons that I've stated; but why don't you continue then.

24        MR. COLOMBO:  Well, I think, Your Honor, when

25   you're thinking about the -- the wiretap application and

14

```
1    whether suppression is warranted, I think you have to look at
2    the application in the totality.  And that's just one of the
3    problematic statements with -- with the application in
4    addition to the other ones.
5           The second one, Your Honor -- and I know that the
6    Government --
7           THE COURT:  And I agree with you.  Certainly I have
8    to look at it in its totality.
9           MR. COLOMBO:  The second statement I think is one
10   that was really dismissed by the Government, but I feel that
11   again, it's -- it is a complete misstatement with no facts --
12   and that's concerning the car tracking devices.  And
13   Agent Stebbins' statement that the target subjects utilized
14   sophisticated internal computers in their vehicles.  I think
15   that's completely false.  There's no technology that I'm
16   aware of that has been used, and the problem with this,
17   again, is -- in looking at the totality of the application,
18   is it exaggerates the difficulty of traditional means of
19   investigation.  And of course, exaggerating the difficulty of
20   the traditional means of investigation is the reason for
21   suppression of the wiretap.
22          Your Honor, the third -- what I believe is --
23          THE COURT:  Do you want to comment on that or do
24   you want to just -- I mean, my reaction to it was, you know,
25   they don't really explain this idea that certain -- maybe
```

```
 1    more modern cars with the way their electronics work may
 2    somehow sense or have interference caused by some tracking
 3    device.  That is the way I understood it.  It wasn't
 4    articulated very well.  It didn't seem to me a very plausible
 5    reason that the Government presented because it wasn't
 6    explained very well; but on the other hand, the Government
 7    makes a general argument that seemed plausible and credible
 8    for why tracking devices were going to be of limited use and
 9    difficult to install.  And you'll recall those arguments are
10    essentially the hanging around the body shops, the sort of
11    custom nature of the cars, the fact that multiple cars were
12    used, that the business of the alleged organization took
13    place -- not between people stepping out of cars but behind
14    closed doors traditionally.  So -- and then they talked about
15    the risk of trying to place those devices in areas where at
16    least some of the -- some of the places where individuals
17    lived -- other individuals allegedly in the organization,
18    lived there as well.  There is allegation about security --
19    people there that may have alerted individuals in the alleged
20    organization to suspicious activities.  So they go through a
21    whole list of reasons that seem to independently, at least
22    indicate that GPS tracking wasn't likely to be very useful.
23          I'm not trying to make the Government's arguments.
24    I think I'm just trying to let you know that I thought about
25    your arguments, and I wanted to put them in context.
```

```
 1           MR. COLOMBO:  Understood, Your Honor.  The third,
 2   what I believe is a clear and material false statement in the
 3   application, is the Agent Stebbins' averment concerning
 4   CI-2's inability or access to target subject
 5   Arman Tangabekyan -- and specifically, what I would refer to,
 6   Your Honor, is the language in the -- in the application and
 7   in the necessity section which states --
 8           THE COURT:  Just -- let's just find it then.  Where
 9   are we?
10           MR. COLOMBO:  It's -- I'm referring to the -- it's
11   Exhibit A, and it's page 100 of Exhibit A.
12           THE COURT:  Just one second, please.
13           Okay.
14           MR. COLOMBO:  What Agent Stebbins asserted in the
15   application was that currently none of the CI's, including
16   CI-2, have been able to interact with target subjects,
17   Bustamante, Talasyan, Ambarsumyan, Tangabekyan,
18   Oganes Tangabekyan, and Mkrtchyan.  And it does not appear as
19   if they will gain access to these target subjects.  I believe
20   this is clearly false as borne out by the FBI 302's that I
21   submitted as Exhibit J which shows prior to -- and also, in
22   the averments in a later wiretap,
23   Exhibit E, which clearly shows that CI-2 not only had access
24   to target subject Tangabekyan, but did, in fact, interact
25   with him and interacted with him not just on a social level
```

```
 1    but discussed potential medical fraud and other criminal
 2    activity in regards to, I believe, distributing ecstasy or
 3    CI-2's knowledge that that was going on.  So there is
 4    clearly, interaction between CI-2 and target subject
 5    Tangabekyan.  That was not disclosed to the Court.  And it's
 6    a clear statement.  There is no confusion here in regards to
 7    the statements by Agent Stebbins in support of this.  He
 8    clearly states currently none of the CI's, including --
 9    specifically including CI-2 have been able to interact with
10    the target subjects, including Tangabekyan.  And I think,
11    Your Honor, that that is a clear false statement that we know
12    from the -- that's borne out from the FBI 302's.
13         THE COURT:  Okay.  And isn't the argument though,
14    again, the organization was involved with its -- with its
15    hands allegedly in lots of different types of illegal
16    activities that the individuals that were controlling it were
17    unlikely to share all the details with all of the various
18    enterprises with this individual to even ask about it; may
19    raise suspicions that he had access that's quite different
20    than being, you know, in the type of relationship where one
21    would volunteer or share information widely about a variety
22    of criminal activities?
23         MR. COLOMBO:  Well, Your Honor, that may explain
24    why the -- using CI-2 or the other CI's may not be fruitful.
25    However, that's not what the -- what the statement says.  It
```

1    says that there has been no interaction.  It's a clear

2    statement.  So it's -- even going further saying, they're --

3            THE COURT:  I'm having trouble finding the

4    statement.  You said page 100 -- and that's at Exhibit A --

5    and I would just like to take a look at it; but I don't see

6    it.  Are you sure that's the right page?

7            MR. COLOMBO:  I believe so, Your Honor.

8            THE COURT:  Okay.  Is it Bates stamp 100 or page

9    100 of the exhibit?

10           MR. ESTRADA:  I believe it's Bates 100.  So it's

11   the number on the bottom right corner.

12           THE COURT:  I gotcha.

13           MR. COLOMBO:  And my response to -- to the -- I

14   guess the counter-argument that Your Honor addressed, is that

15   it -- although, no single CI would be able to achieve all of

16   the goals in the investigation, we recognize that.  However,

17   affirmatively stating that there's been zero interaction, is

18   completely different to saying that there's been interaction

19   but it hasn't been fruitful.  That's not what -- what was --

20   was stated here.

21           THE COURT:  And it's primarily paragraph D there

22   that says currently none of the CI's, including CI-2 have

23   been able to interact with -- and it lists the various

24   individuals?

25           MR. COLOMBO:  Yes.

```
 1            THE COURT:  Okay.  Why don't I hear from
 2    Mr. Estrada on that issue.
 3            MR. ESTRADA:  Yes, Your Honor.
 4            With regard to that issue, there's no question that
 5    what was written there was inartful, in the sense that there
 6    was no direct access.  What's clear from the affidavit and
 7    clear from the evidence is there was no access in terms of
 8    criminal activity.  And even the exhibits that are put forth
 9    by the defendant, Exhibit J, if the Court looks at that,
10    Exhibit J, which I have here, it's essentially an FBI 302,
11    and it talks about purely hearsay information that the
12    informant knows about Tangabekyan.  It talks about the fact
13    that Tangabekyan was recently beat up by -- that he stated
14    that Tangabekyan was arrested approximately one year ago with
15    a large quantity of ecstasy, and that CI's perception of
16    Tangabekyan was that he may be working with law enforcement.
17    So not only was it hearsay, but it was incorrect hearsay,
18    because we have no information that in fact Tangabekyan was
19    working with law enforcement.  So, of course, the point of
20    that is that it's completely immaterial to the wiretap
21    because it is true that the CI had no direct criminal
22    dealings with -- with Tangabekyan.
23            Second of all, even if he had had direct criminal
24    dealings with Tangabekyan, that's just one additional target
25    subject.  And of course, the purpose of the wiretap was to
```

 1   uncover the scope of the organization, and there were

 2   numerous other individuals that were target subjects in the

 3   organization.  There is also a reference in Exhibit E

 4   attached to the motion about Tangabekyan wanting the

 5   informant to help a kidnapping victim of Tangabekyan's,

 6   Edward Galstyan helped him get involved in the medicare fraud

 7   business, but there's no indication from the evidence, that

 8   Tangabekyan himself would be involved in that business as

 9   opposed to just making the introduction.  So there's no

10   information or facts showing, A, that the informant would

11   have direct criminal dealings with Tangabekyan, and then

12   secondly, even if he did have direct dealings, whether that

13   could ever be material toward the entire wiretap affidavit.

14           THE COURT:  Sure.  But the sentence saying,

15   "currently none, including CI-2 have been able to interact"

16   is not strictly true; is it?

17           MR. ESTRADA:  Correct.  It's not strictly true

18   because of that one attempt by Tangabekyan to have the

19   informant set up Edward Galstyan in a medicare fraud

20   business.  So that was not strictly true.  The -- the point I

21   think was that the informant had had direct criminal dealings

22   with Tangabekyan as opposed to some sort of other social

23   dealings; but it is correct that that was not artfully

24   written.  But the Government's position is regardless of

25   that, there's no materiality shown for purposes of Frank's,

```
 1    that this would have changed in any way the necessity for the
 2    wiretap application.
 3              THE COURT:  Okay.  Thank you.
 4              MR. COLOMBO:  Your Honor, I do believe it -- it
 5    changes the -- the analysis for necessity because here, you
 6    have Tangabekyan requesting CI-2 as it's borne out in a later
 7    wiretap application from June which is Exhibit E attached to
 8    my motion, requesting another individual to engage in
 9    healthcare fraud.  So I believe that, obviously, there's some
10    conspiracy there.  I'm not sure how the Government would say
11    that an individual has to directly be involved in the actual
12    fraud if they're the individuals who are requesting and
13    putting the parties together.  I think that would be enough;
14    but having that said, Your Honor, I think that the failure to
15    disclose this interaction and that CI-2 did, in fact, have
16    access to Tangabekyan and that Tangabekyan trusted CI-2
17    enough to go to him and say, I have an individual who I
18    believe would like to engage in healthcare fraud, I want to
19    set you two together.  So I think that when you're looking at
20    it in terms of necessity, that means that CI-2 does has
21    access to Tangabekyan.  CI-2 is somebody who is trusted by
22    Tangabekyan to engage in this type of activity.  So,
23    Your Honor, I think that -- that it takes on a whole
24    different light when you're talking about necessity because
25    they did have an avenue to pursue that might have been
```

1    fruitful.  And, therefore, the wiretap might not have been

2    necessary.

3         THE COURT:  It might have been fruitful as to one

4    issue, but the Government I think makes the credible argument

5    that we're dealing with, you know, identifying individuals

6    engaged in what may be a wide variety and combination of

7    different types of illegal activities.  So you have to look

8    at the -- you know, the overall scope and intent of the

9    wiretap and what it seeks to do and what its target is.  And

10   I understand that you can also abuse that scope by

11   characterizing the breadth of what you need so broadly

12   that -- that you can manufacture necessity, but on the other

13   hand, you know, I'm inclined to think that this particular

14   issue is not dispositive, but it's certainly a point that you

15   make.

16        MR. COLOMBO:  Well, Your Honor, in regards to the

17   issue of it being dispositive, again in looking at the

18   totality of the circumstances we have to look at -- and I'll

19   get to these points later on -- CI-2's access, to not only

20   Darbinyan, the alleged leader of the organization, but

21   Tangabekyan, high-ranking member of this alleged

22   organization, and then in addition, Ms.  Bleziktsian, who is

23   also an alleged high-ranking member of this organization --

24   so it's not just CI-2's access to Tangabekyan, he has access

25   to other individuals; but I'll get to the point with

```
1    Bleziktsian in a second.

2           The -- so that -- those are, I think the three

3    material -- materially clearly false statements that are in

4    the application.  The others -- the second category is the

5    incomplete or intentional omissions, Your Honor.  And the

6    first one I would refer to is the failure for the Government

7    to disclose in the application what particular evidence is

8    relied upon or derived from Paramaz Bilezikchyan.

9           Now, as we know he was an informant.  He was acting

10   as an informant for some time for several years prior to the

11   application in this -- in this particular case.  He proved to

12   be somebody who was unreliable and who was engaging in -- in

13   crimes while he was acting as a Government informant and as a

14   result, was removed from -- from the confidential informant

15   program.

16          The reason why I raise this point, Your Honor, is I

17   think the credibility of the informants that are relied upon

18   in this -- in the application is material to the -- the

19   reviewing judge's decision as to whether or not to rely upon

20   this information and if relying upon it, does that support

21   probable cause or necessity?  And in this particular case,

22   there's no explanation to the reviewing court in the

23   application what information is being relied upon from this

24   informant, who is clearly not trusted by the Government --

25   clearly somebody who is duplicitous and clearly somebody who
```

 1    can't be trusted.  So if he can't be trusted by the

 2    Government on one hand, then it should be disclosed in the

 3    application what information is coming from him, so that you

 4    can take that information with a grain of salt, so to

 5    speak -- or at least allow the reviewing judge to -- to -- to

 6    determine what, if any weight, that particular information

 7    is -- is to be given in the application; but this was I

 8    believe a deliberate omission that was made on the part of --

 9    of Agent Stebbins in submitting the application.

10              THE COURT:  Okay.

11              MR. COLOMBO:  The second point, Your Honor, is that

12    in regards to Confidential Informant 2's relationship with

13    Mr. Darbinyan and the -- the nature of -- of the alleged

14    false debt and extortion...

15              What -- what we know is that CI-2 and Mr. Darbinyan

16    had a close personal relationship for about 15 years.

17    They -- Mr. Darbinyan had loaned him money; had bought his

18    daughter furniture as a gift to furnish her apartment.  And I

19    think most importantly, CI-2 and Mr. Darbinyan's wife engaged

20    in an investment transaction into healthcare wherein

21    Ms. -- Mr. Darbinyan's wife provided as an investment to

22    CI-2, $325,000 to invest in -- in healthcare.  I submitted my

23    supplemental filing the other day, that attaches the exhibits

24    which are the initial contract to -- to purchase 49 percent

25    of -- of a healthcare business, the contract between

```
 1    Mr. Darbinyan's wife and CI-2, the promissory note explaining
 2    the amount that was to be invested and then the continued
 3    bounced checks after checks after check by CI-2 to
 4    Ms. -- Mr. Darbinyan's wife.  So there's clearly here not
 5    only a close relationship among Mr. Darbinyan and CI-2, but a
 6    relationship where they're -- they're engaging in business
 7    where there's a lot of money at stake.  And I -- and there
 8    was absolutely zero discussion at all concerning any of the
 9    prior relationship or history between CI-2 and Mr. Darbinyan
10    and Mr. Darbinyan's family and their relationship.
11             THE COURT:  Okay.  But hadn't that relationship
12    purportedly soured?
13             MR. COLOMBO:  Well, I -- I don't --
14             THE COURT:  Is this the -- this is the situation
15    involving the alleged display of the firearm with a silencer;
16    is that right?  Are we talking about the same individual?
17             MR. COLOMBO:  Yes, we're talking about the same
18    individual.
19             THE COURT:  And we're talking about multiple
20    instances of alleged threats to his life; is that right?
21             MR. COLOMBO:  That is the Government's allegation;
22    correct.
23             THE COURT:  I just want to make sure I'm --
24             MR. COLOMBO:  Yes.  CI-2 is the same individual
25    that we're discussing.
```

```
 1             I think, Your Honor, the reason why omitting the
 2   prior relationship and the history between the two -- in
 3   addition, where this -- this false debt may have come from --
 4   I think the first part in regards to not disclosing the
 5   relationship and the closeness of the relationship is an
 6   omission, because in the necessity section of the wiretap
 7   application, the Government goes -- or Agent Stebbins goes on
 8   at some length about how CI-2 does not have access to
 9   Mr. Darbinyan; that he's not trusted; that he's not somebody
10   who Mr. Darbinyan would disclose, other crimes, et cetera.
11   And I think it's clear that that's not -- not true.
12             And clearly, I think anyone who is a confidential
13   informant is -- is vetted by the Government thoroughly; that
14   they go through the history, especially they would go through
15   the history with the CI and the target subject when they're
16   interviewing them.  However, we --
17             THE COURT:  So let's assume that was an omission.
18   What does it say about necessity and access though if there
19   is credible evidence that these various death threats were
20   made?
21             MR. COLOMBO:  Well, I think, Your Honor --
22             THE COURT:  So would the reviewing judge have said
23   okay.  Gee, they had this history where they were doing
24   things and were confidants, but there's this other
25   information that a silenced weapon was displayed and, you
```

1    know -- and, you know, various statements were made about,

2    "Look at me" or "Look into my eyes.  Do you think I'm

3    kidding?" Or that sort of thing -- do you think that that

4    would have mattered to the reviewing judge, that the history

5    was there; that they used to have a cordial relationship in

6    terms of necessity?

7              MR. COLOMBO:  I think it would, because it provides

8    more context and background to analyze this, because when

9    you're looking at this situation, on the one hand, you have

10   this confidential informant who is saying he's continually

11   being extorted by Mr. Darbinyan and being threatened and that

12   a gun was displayed.  On the other hand, you have the

13   confidential informant saying that Mr. Darbinyan is seeking

14   to engage in other criminal conduct with him: credit card

15   fraud, et cetera.  And Mr. Darbinyan's willingness to meet

16   with a merchant that's introduced to him by the confidential

17   informant.  So there is this --

18             THE COURT:  I don't know that he says he's willing

19   to meet with him.  I think they talk about meeting with him,

20   but I don't recall that there was a meeting of the minds that

21   there would be a meeting.  Maybe I'm wrong on that.

22             MR. COLOMBO:  Well, I think my interpretation of

23   the conversation is -- is that -- is that Mr. Darbinyan

24   was -- was allegedly willing to be introduced to this

25   merchant and advised CI-2, "Before we meet, you should find

1  out how many cards the merchant wants.  I can send over 52"

2  and et cetera.  So I think there is this -- this --

3          THE COURT:  Well, this discussion by the informant

4  where he apparently wants to retain the trust of

5  Mr. Darbinyan and convey to Mr. Darbinyan that he's still

6  willing to do shady stuff.  That is the context that I took

7  it as -- in.  Whether that means Mr. Darbinyan believed him

8  in the context of displaying a weapon, also is an open

9  question.

10         MR. COLOMBO:  Well -- and I understand, Your Honor;

11  but I think to -- to have the background would -- would be

12  more appropriate, so that the reviewing judge could

13  understand that -- that this relationship and these -- these

14  alleged threats may not be exactly what they are, because I

15  think it's belied by CI-2 and Mr. Darbinyan discussing other

16  mutually beneficial criminal activity that's alleged in

17  the -- in the application.  But in addition, Your Honor, I

18  think the fact that -- that Mr. Darbinyan was not pulled

19  over -- he was surveilled at these meetings after the CI-2

20  discloses to the Government that he had been threatened with

21  a weapon; that there was a weapon with a silencer on the

22  seat, the Government does nothing about it.  They surveil

23  him.  They don't pull him over.  They don't do anything.

24  They let him go on his way even after the fact.  So...

25         THE COURT:  Okay.  So they didn't want to break

1    open the investigation at that point.

2            MR. COLOMBO:  Well, if that's the case, I don't

3    know; but my point is, is that, Your Honor, I think that the

4    reviewing court is entitled to have the complete context of

5    the relationship between CI-2 and Mr. Darbinyan to understand

6    what's going on.  And the failure to disclose that here, I

7    think was -- was a material omission.

8            The next material omission that I would refer to,

9    Your Honor, is -- is CI-2's recording that he made of an

10   eyewitness to the -- what's referred to in the application as

11   the Hollywood shooting.  And I think, Your Honor, with this

12   particular -- with the Government's excuse is, is that this

13   wasn't disclosed to the reviewing court in the application is

14   because we didn't get to actually interpreting this call

15   until a year after -- after the fact in April of -- of

16   2009 -- a significant amount of time after -- or sometime

17   after the initial application was submitted.  And -- and I

18   find this -- this excuse to -- to really not be credible,

19   because all of the conversations between CI-2 and Mr. --

20   Mr. Darbinyan were in Armenian.  And the Government is saying

21   that they didn't -- none of the agents spoke Armenian;

22   therefore, there was a delay in translating this call and

23   listening to this call.  So therefore, they didn't know -- or

24   this recording, they didn't know it at the time.  So the

25   excuse to me doesn't seem credible, because they didn't have

```
 1    a problem translating and transcribing any of the other
 2    recordings that CI-2 made between himself and Mr. Darbinyan.
 3    They -- and apparently, had a problem with --
 4              THE COURT:  Was this recording made before or after
 5    the alleged threats and display of the silenced weapon?
 6              MR. COLOMBO:  My understanding is this -- well, I
 7    don't know, Your Honor.  This recording was apparently made
 8    prior to the -- to the January 2009 wiretap application and
 9    it was a recording made by the Confidential Informant, No. 2,
10    who was speaking with a witness to the Hollywood shooting.
11    And apparently, CI-2 recorded that the witness told him that
12    an individual, other than Mr. Darbinyan, was the individual
13    who -- who pulled the trigger during that particular
14    shooting.  So the events are not related in regards to the
15    threatened display of -- of the weapon.
16              THE COURT:  Right, but we're talking about the
17    usefulness of CI-2; right?
18              MR. COLOMBO:  Yes.
19              THE COURT:  Okay.  So who was the other party to
20    the recorded conversation?  Do we -- do you know?
21              MR. COLOMBO:  Yes.  I -- I -- I can't pronounce his
22    name, but it's Kerboyan (phonetic).  It's in my -- or in my
23    wiretap motion, Your Honor.
24              THE COURT:  Is he a defendant?
25              MR. COLOMBO:  No, he is not a defendant in this
```

```
 1    particular case.
 2              THE COURT:  Okay.  So how does it bear on CI-2's
 3    usefulness?
 4              MR. COLOMBO:  Well, the point is, is that in the
 5    application, Your Honor, it was represented that the
 6    wiretap -- in addition to the probable cause, the wiretap was
 7    necessary to determine who was responsible for this
 8    particular North Hollywood shooting.  And Mr. Darbinyan was
 9    alleged in the application to believe -- to be one of the --
10    the individuals who pulled the trigger.
11              Now, CI-2 has a recording by an eyewitness,
12    inconsistent with the information that's put in -- in the
13    application.  So I believe it speaks to one, probable cause;
14    but two, it also speaks to the necessity that there was
15    eyewitness -- a recorded eyewitness statement that was made
16    by a CI-2 concerning this particular shooting that was not
17    disclosed in the application.  Obviously, if they have
18    eyewitness recorded statements, the Government could follow
19    up on it, and they don't need a wiretap.  And that's --
20    that's the import of the failure to disclose this particular
21    information, Your Honor.
22              THE COURT:  Mr. Estrada...
23              MR. ESTRADA:  Let me just clarify, Your Honor...
24              This is a recording on a consensual wire between
25    the informant and a person by the name of
```

1  Hovak Kerboyan (phonetic). Kerboyan was allegedly at the

2  scene of this double homicide in May of 2008. The recording

3  specifically says that according to Kerboyan, that -- let me

4  just make sure I have it right -- that Tangabekyan was one of

5  the shooters at the double homicide. There are two things

6  there. First is, this recording on the consensual wire,

7  wasn't actually transcribed until April of 2009, after the

8  January 2009 wiretap was submitted. Agent Stebbins isn't

9  fluent in Armenian. He couldn't have known and known what

10  the recording contained. There's a difference between the

11  consensual wire that the informant had and all those

12  recordings which were many and numerous and the body wire

13  recordings that he had with Darbinyan. Those were getting

14  transcribed and listened to and recorded more quickly than

15  the others. So there's no material omission or deliberate --

16         THE COURT: Wouldn't CI-2 be expected to say, Hey,

17  this guy just talked to me about the homicide? Wouldn't -- I

18  mean, it's not like the Government, I think can credibly say,

19  We didn't know that the subject matter was about a murder.

20  So I --

21         MR. ESTRADA: Based on the information I have, that

22  information wasn't relayed in person. It was on the

23  consensual wire, but beyond that, this information on a

24  recorded call that Tangabekyan was one of the people involved

25  in the shooting. That information was already contained in

1   the wiretap. The wiretap already said that according to
2   various sources - not just this particular informant but CI-1
3   and other informants - Darbinyan, Tangabekyan, and
4   Paramaz Bilezikchyan, were all involved in that May 2008
5   double homicide and that they were all potentially
6   responsible.
7         The purpose of the wiretap wasn't to determine
8   specifically who was involved. There was already information
9   about who was involved. The purpose of the wiretap was to
10   gather admissible evidence to prove, if possible, that those
11   particular individuals were involved in the homicide. So
12   there --
13         THE COURT: No, I understand. Sure. I understand.
14   It certainly doesn't answer the question and doesn't say the
15   Government's not likely to say, Gee, we have enough. We
16   don't need a wiretap because we have a -- one person who says
17   that they saw something. We don't know what the credibility
18   of that person is. We don't know what they he really could
19   see. We don't know their bias, their interest. We may not
20   know all the details. And we might need corroborating
21   evidence anyway.
22         MR. ESTRADA: And that recording would be
23   admissible anyway, because that individual was one of the
24   victim 's of the shooting on the other side. So he wouldn't
25   be a coconspirator for a coconspirator statement. So it

```
 1   wouldn't come in, in any case.
 2            THE COURT:  Well, I don't know.  I'd have to think
 3   about that one, but I understand your point.
 4            Yes?
 5            MR. COLOMBO:  Your well, Your Honor, I think in
 6   response to both what you said and what the Government said,
 7   is the application didn't contain any of this.  It didn't
 8   state, We -- we have this particular recording; however, even
 9   with this particular recording, we still need a wiretap.
10   That's not what happened here.  What happened here is nowhere
11   in the application is there any mention that CI-2 is actually
12   wearing a wire on any other individuals, other than -- than
13   Mr. Darbinyan or that CI-2 is wearing a consensual recording
14   device on any other potential target subjects or any other --
15   other investigation that was going -- was ongoing in regards
16   to the -- the allegations or the --
17            THE COURT:  I thought the -- the application had
18   lots of examples of consensual recordings -- at least, more
19   than what you may have stated in your brief, if I'm correct?
20            MR. ESTRADA:  Yes.  There are numerous recordings
21   with different individuals.
22            THE COURT:  I think you mentioned three or
23   something.  And the Government stated there were ten or more;
24   but again, I --
25            MR. ESTRADA:  I don't know -- the distinction I was
```

1    making is that there -- the body wire recordings with

2    in-person meetings.  And as a practice and as a precaution,

3    the Government attempts with informants to have a consensual

4    wiretap; to have the telephone conversations that are being

5    made, all being recorded.  Of course, there can be hundreds

6    of those types of calls, and they aren't all transcribed

7    immediately.  And that's the point -- that's the information

8    I have that that particular recording wasn't transcribed

9    until April of 2009.

10           THE COURT:  Okay.  Go ahead.

11           MR. COLOMBO:  Your Honor, I understand the

12   distinction between a consensual recording device that an

13   individual is wearing and a consensual wiretap that they're

14   allowing on their phone.  And it appears that this particular

15   conversation was of the latter when recorded on the

16   consensual device, but there is, obviously, regular

17   debriefings done of the confidential informants during the

18   course of the investigation and whether -- whether or not,

19   CI-2 disclosed this and it wasn't put in the application or

20   whether or not CI-2 did not disclose this and it wasn't

21   revealed until April, I don't know; but it does appear that

22   it was from -- from the facts that we have here and an

23   omission that is material.  And that would go to the probable

24   cause as well as the necessity.

25           Finally, Your Honor, in regards to the -- to the

```
 1   incomplete and/or material omission section, I believe that
 2   the -- the -- the failure to disclose the close relationship
 3   between CI-2 and Paramaz Bilezikchyan is a material omission
 4   that would be necessary for the reviewing court to have known
 5   when determining whether or not necessity has been
 6   established because -- the close -- the close relationship
 7   between a confidential informant and its target subject is
 8   obviously material to the determination.  And nothing in the
 9   application discusses how close of relationship CI-2 had with
10   one of the named target subjects, Bilezikchyan.  There's no
11   discussion in that at all.  And what the evidence bears out,
12   that in fact CI-2 and Bilezikchyan not only had a close
13   relationship, but they had a -- had a relationship where they
14   both recognize each other standing within the Armenian
15   community and they're standing within the Armenian -- the
16   alleged Armenian criminal community.  And it -- it seems to
17   me that if CI-2 has a relationship that's close enough with
18   the target subject where the target subject is advising the
19   CI he wants to take him under his wing and has loaned him
20   hundreds of thousands of dollars, that that is something that
21   should be put in the application, so that the reviewing court
22   has access to it, because not disclosing it to the reviewing
23   court would lead the reviewing court to believe that CI-2 has
24   no access to any other individuals, other than Mr. Darbinyan
25   as the -- the application states.  And he doesn't have access
```

```
 1    to other target subjects.  And I think, Your Honor, that the

 2    reviewing court should have had this information, and it was

 3    not disclosed.

 4            MR. ESTRADA:  The reviewing court did have the

 5    information because if the Court looks at Bates number 100,

 6    the affidavit actually states that the CI has access to

 7    Bilezikchyan.  CI-2 has had access to the target subject,

 8    including Bilezikchyan.  It goes on to say that that

 9    interaction is primarily social in nature without much

10    discussion of criminal and or related activities.  So the

11    affidavit did disclose there was a relationship there, but

12    that there is limited discussion of any criminal activity.

13            THE COURT:  Okay.  I see that.

14            MR. COLOMBO:  And -- and -- but the problem is --

15    is, Your Honor, that's not exactly accurate from the evidence

16    that we have from the 302's because it's clear that CI-2 and

17    Bilezikchyan have an ongoing relationship wherein prior to

18    the application, CI-2 was lent a substantial amount of money

19    by Bilezikchyan.  So there's more than this social

20    interaction that is -- is addressed in the wiretap

21    application.  And, again, I think this is -- this is a

22    material omission on the part of Agent Stebbins to not give

23    the reviewing court the full context between the relationship

24    that CI-2 has with the target subject, Bilezikchyan, because

25    that goes to necessity.  Obviously, if CI-2 can be trusted by
```

1    Bilezikchyan to be loaned hundreds of thousands of dollars,

2    and to what we see later on, discussing details of --- of a

3    murder, they have a close relationship.  So CI-2 might have

4    been able to pursue or record conversations; might have been

5    able to pursue further criminal conduct; might have been able

6    to infiltrate this organization further, but just saying that

7    the interaction was social in nature --

8            THE COURT:  It doesn't say that.

9            MR. COLOMBO:  -- is not exactly accurate.

10           THE COURT:  It says the CI-2's interaction with

11   these other target subjects has been primarily social in

12   nature without much discussion of criminal and or related

13   activities.  So it's -- it's not expressly limited to social.

14           MR. COLOMBO:  Well, then I would say that the --

15   the artfully, drafting the application in such a way

16   that's -- intentionally misleads the -- the reviewing court

17   to believe that the interaction was primarily -- primarily

18   social in nature and that there would be -- there's no other

19   interaction that would allow the CI to gain further

20   information of Bilezikchyan and target subject, or other

21   target subject I think is --

22           THE COURT:  How does one gain further information?

23   You know, you'd have to know the context of their

24   relationship, how much they trusted each other.  You'd have

25   to know whether the CI was able to ask about other activity

```
 1    without jeopardizing his own safety.  You'd have to know what
 2    the boundaries of that reshape were.  You would have to know
 3    a lot of things that would be difficult to know and so --
 4    right?  I mean, it's not that simple.  You just don't walk
 5    into a -- walk up to somebody that you know that you may have
 6    some relationship with and start asking them about what else
 7    they're doing.
 8             MR. COLOMBO:  I would agree, Your Honor, that it is
 9    difficult to make that determination as to what are the
10    boundaries of the relationship; but here, the import of the
11    particular sentence is that the interactions are social in
12    nature.  I would agree that -- there's the modifier
13    primarily; but in order to give the Court the context to see
14    if the boundaries of this relationship might have been
15    stretched to be fruitful and pursue some other traditional
16    means of investigation, I think that that is something that
17    the reviewing court should have been provided.
18             THE COURT:  Okay.
19             MR. COLOMBO:  Now, the last section, Your Honor, in
20    regards to the -- to the probable -- the material
21    misstatements and omissions would be what I would
22    characterize as artfully drafting the application because of
23    the contradictions between what is stated in the probable
24    cause section and then the necessity section concerning
25    Paramaz Bilezikchyan and then in addition the contradictions
```

1    between CI-2's ability to infiltrate the -- the -- or

2    usefulness in the probable cause section and then in the

3    necessity section -- and I think what we have here, is on the

4    one hand, when the -- the application -- in the application

5    in support of probable cause, Bilezikchyan -- all the

6    information that Bilezikchyan has provided in the past is

7    reliable and trustworthy.  And then, of course, when we talk

8    about necessity, the -- the Government -- or Agent Stebbins

9    goes on to say, Well, look, this guy can't be trusted.

10   Interviewing him would be a complete waste of time.  We're

11   not going to pursue that with him.

12         So it's contradictory in the sense that it's either

13   one or the other.  It's either, he's -- he's not reliable for

14   probable cause.  And, therefore, you'd need a wiretap because

15   you can't interview him because he's not trustworthy, or it's

16   the other way around, Your Honor.  I think in the

17   application, it seems the Government -- it seems the

18   Government wanted to it both ways.  And I think that that's

19   the same argument that can be advanced in regards to CI-2 --

20   that on the one hand, when they're talking about the probable

21   cause, that CI-2 has provided a whole wealth of information

22   and has been able to continuously record on a consensual

23   recording device, Mr. Darbinyan and has been able to gather

24   all of this information concerning credit card fraud;

25   concerning extortion; concerning murder, et cetera, and then

```
 1    in the necessity section we can't use him.  He's -- he's not
 2    somebody that we can use that's reliable.  So I think that
 3    there are these -- these material contradictions.
 4            THE COURT:  Well, we can't use him for purposes of
 5    a witness.
 6            MR. COLOMBO:  Well --
 7            THE COURT:  I mean, we feel that given the beyond a
 8    reasonable doubt standard, that he's got problems; but
 9    probable cause is a lower standard.  He has provided
10    information, and that supports probable cause.
11            Where's the -- where's the problem with that?
12            MR. COLOMBO:  Well, Your Honor, I do agree that
13    there is a -- there is a distinction between evidence that's
14    obtained to -- for the wiretap -- the probable cause standard
15    and then what would be required to prove a case beyond a
16    reasonable doubt.  I don't -- I can't argue with that -- with
17    that reasoning.  That's clearly stated in the law.
18            But what I do think is that -- is that on the one
19    hand, when referring to probable cause, these individuals
20    just are -- are not trustworthy, not reliable.  And then on
21    the other hand, when referring to probable cause, they're
22    trustworthy and reliable.  And on the other hand, when
23    referring to necessity, they're completely unreliable and
24    can't be trusted.  I think that that is -- is a contradiction
25    that's artfully drafted in the application that it -- it
```

```
1    should not have not been written that way -- or at least, I
2    would think that the reviewing Court should have questioned
3    the -- the applicant further concerning why there is this
4    contradiction.
5              THE COURT:  Okay.
6              MR. COLOMBO:  So, Your Honor, that addresses, I
7    believe, all of the material misstatements or omissions that
8    would require, in my opinion, suppression under the current
9    state of the law -- or at very least would require a -- a
10   Franks' hearing.
11             In addition, though, Your Honor, I believe in just
12   looking at the application itself, there is a -- a lack of
13   necessity overall when examining -- when putting apart --
14   putting aside the material omissions or misstatements.  We
15   still have an issue with whether or not this wiretap was
16   necessary.  And my first argument as I -- I explained in my
17   motion, is that it appears that the -- the crimes that the
18   Government were investigating in this particular case which
19   are the alleged RICO murder, the alleged RICO extortion and
20   then access device fraud, it appears from the application
21   that they had achieved all of the goals of their
22   investigation.  I -- I painstakingly went through in my
23   motion all of the evidence that apparently the -- the
24   Government had marshalled up to that point.  And it would
25   appear that all of the evidence that was obtained would meet
```

1   a reasonable doubt standard.  So it didn't appear that the

2   traditional means of investigation up to this point weren't

3   successful.  If you read the application, it appears that

4   they were very, very successful.

5           THE COURT:  Okay.  All that says is, they did a

6   good job in exploiting traditional investigative methods and

7   now they wanted to build a better case for trial.

8           Is there anything wrong with that?

9           MR. COLOMBO:  Well, I think there is, Your Honor,

10  because the wiretap needs to be a last ditch effort where

11  traditional means of investigation have failed or likely to

12  fail or have been tried and failed, but in this particular

13  case, they didn't.  They had, what appeared to me, to not

14  just probable cause for the wiretap, but it would appear that

15  they had evidence beyond a reasonable doubt concerning the --

16  the crimes that they were investigating.

17          THE COURT:  Sure.  But the Government was

18  interested in seeing whether the lead defendants were

19  connected; whether -- whether the alleged organization was

20  involved in these varied crimes.  They were interested, they

21  say.  And it seems credible to me in identifying the scope of

22  the -- the involvement with other individuals.  They were

23  interested in sending a strong message to the particular

24  community that it was going to be a deep and broad

25  investigation.  So they had -- you know, they had goals that

1    were beyond the traditional 3, 4, 5-defendant case.

2           MR. COLOMBO:  And, Your Honor, I don't disagree

3    that the Government's goals were enormous, but I think in

4    this particular case, the -- the net can't be cast so far and

5    so wide to manufacture necessity.  And that's I believe what

6    is happening in this case.

7           THE COURT:  Sure.  You're saying, look, they had

8    enough information to prosecute everybody and make strong

9    cases.  They just didn't need this additional information.

10   And that's a credible argument, but it's a difficult one

11   to -- to -- to -- for me or for you or for anybody to put

12   yourselves in the shoes of the Government and say, We had

13   enough information to, you know, make a successful case,

14   without additional admissions from many, many other

15   individuals.

16          MR. COLOMBO:  And, I understand, Your Honor.  I

17   that I goes to the Government's point, that they're allowed

18   to be given more leeway where they're investigating a

19   conspiracy; but in this particular case, which I think is

20   distinguishable from all of those other conspiracy cases that

21   have been filed -- and I think that this particular case

22   would be an issue of first impression is where the Government

23   has access to the alleged boss prior to the application of --

24   of the wiretap.

25          Does it become necessary then to obtain the wiretap

```
 1    and go all the way down, because traditionally -- and in the
 2    cases that have upheld the wiretap in -- in the conspiracy
 3    context, was that the Government only had access to smaller
 4    individuals -- individuals who were on the outskirts or not
 5    individuals who were as trusted or high up in the alleged
 6    organizations.  And therefore, in order to -- to determine
 7    the scope of the conduct, they have to go up the chain; but
 8    in this particular case, in contrast to that, the Government
 9    was at the alleged pinnacle.  They were at the top.  They had
10    access to Mr. Darbinyan, the alleged boss of the Darbinyan
11    Organization and they had a confidential informant who was
12    willing to wear a consensual recording device to record
13    everything Mr. Darbinyan was saying.  So I think there's a
14    distinction here in that -- among the case law, where it
15    would demonstrate that in this particular case, they didn't
16    need to go further with a wiretap.  They could have continued
17    to pursue traditional means of investigation; one, because
18    they were very successful and that would lead me to my second
19    point, Your Honor, in regards to necessity that the
20    Government did not fail -- or failed to exhaust all of the
21    other traditional avenues of investigation that they could
22    have pursued.  And I think most importantly, in regards to
23    confidential informant 2 and the other confidential
24    informants, where the Government says none of these six
25    individuals, who they used in the application -- I think
```

```
 1    there were six --
 2            THE COURT:  Six or seven.
 3            MR. COLOMBO:  Yeah, were willing to testify.  They
 4    don't provide any case-specific details in regards to why
 5    these individuals were not willing to -- to testify and go
 6    further with their cooperation.  And I think, Your Honor,
 7    that this boilerplate language, is something that -- that all
 8    of the case law bears out, is -- is not appropriate and
 9    not -- would not support necessity; but I think more
10    importantly -- and I will give a specific example as to where
11    the Government failed to exhaust and could have pursued
12    traditional means of investigation further, is what we talked
13    about earlier -- and that is concerning introducing
14    Mr. Darbinyan to the merchant through CI-2, and the merchant
15    being the individual who said who owns the store, who
16    wants -- wants to engage in credit card -- credit card fraud.
17    The Government could have easily inserted an undercover agent
18    as the merchant.  They could have easily followed through
19    with that avenue of investigation, but they didn't do that.
20    They didn't do that because they thought it would be much
21    easier to get the wiretap --
22            THE COURT:  Well, they say they thought it would be
23    dangerous.  It would be hard to find somebody that would be
24    credible within the insular community.  And they had some
25    doubts about whether Mr. Darbinyan believed that the
```

1    informant was on the level with him.

2           MR. COLOMBO:  Well, I think, Your Honor, that

3    the -- what the Government explained is -- is the boilerplate

4    and what would -- what you could say of any type of similar

5    investigation in this case, because there is, obviously, an

6    inherent danger in this situation --

7           THE COURT:  So let's assume you're right then.

8    Then you only would have been dealing with one, among many

9    different schemes, within the overall activity.

10          MR. COLOMBO:  Well, that's true, Your Honor, but we

11   don't know what that might have led to, whether it might have

12   led to information on other schemes.  We just don't know.

13   And that's the point of investigation.  That's the point of

14   the following up.  The Government goes into a situation where

15   they may be investigating one crime.  And, obviously, that

16   leads them to -- to other -- other crimes in other

17   situations.  So I think, Your Honor, in this particular case,

18   the Government was in a perfect position to introduce an

19   undercover informant and didn't.  And as far as CI-2 not

20   being trusted by Mr. Darbinyan, I think if you are to believe

21   what the Government asserts in their application -- in the

22   application for the wiretap, Mr. Darbinyan did trust him or

23   else he wouldn't have engaged in any of these alleged

24   conversations concerning the credit card with CI-2.  And I

25   think again, leaving out the context of the relationship, is

1    also a problem, because it would further support that CI-2

2    would have been in a position to introduce this undercover

3    informant to Mr. Darbinyan in the context of this credit card

4    fraud, Your Honor.

5              THE COURT:  Thank you.

6              Mr. Estrada...

7              MR. ESTRADA:  Your Honor, I think this argument

8    about CI-2's access to Darbinyan is really the crux of the

9    problem with this motion.  It's the failure to acknowledge

10   that CI-2 was not some co-equal of Darbinyan's, but rather

11   his victim.  If you look at the recordings, over and over --

12   and they're listed in the motion, Darbinyan references

13   threats against CI-2.  At Bates 79, he says he wasn't joking

14   with CI-2 and says and would shoot CI-2.  At Bates 80, he

15   says, there's no more room for negotiation.  He says he would

16   shoot CI-2 right there.  At Bates 83, he threatens harm

17   against CI-2.  At Bates 84, he screams at and makes veil

18   threats against CI-2.  And then at Bates 84, we have an

19   incident in December of 2008 where Darbinyan brandishes a

20   semiautomatic firearm with a silencer on it and said that he

21   should kill CI-2.  So there's no co-equal status.  There

22   wasn't some ability for CI-2 to dictate any terms to

23   Darbinyan.  And that goes to why CI-2 couldn't be used to

24   complete the goals of the investigation.  Use of CI-2 was

25   incredibly risky, and the FBI recognized that.  And while the

1    defendant makes the point that CI-2 wasn't actually killed,

2    wasn't actually shot, that's beside the point.

3         The FBI was taking great measures to make sure that

4    Darbinyan didn't kill CI-2. Most importantly, of which they

5    were supplying the money to provide partial payments for this

6    false debt that Darbinyan was continuously requesting.

7         And even this argument that is now made about the

8    merchant, if the Court actually looks at the context of this

9    discussion -- and that comes up at Bates numbers 80 through

10   81, it's all about how CI-2 can get the money to pay back

11   Darbinyan for this false debt. So it's about how he can pay

12   the extortion of payment to Darbinyan, using whatever means

13   necessary -- and in this case, use of a merchant. And with

14   regard to that merchant, as is made clear in the affidavit,

15   Darbinyan is contemplating a merchant, who is simply going to

16   allow his business to slide the cards. He even asks at

17   Bates 80, whether -- Darbinyan asks whether the merchant

18   would be doing business or just sliding the cards. And CI-2

19   merchant would be a low level anyway. But the bigger point

20   is, in the overall context, this is just yet another means

21   for CI-2 to pay the extortion of money that Darbinyan is

22   requesting. There is no co-equal footing. There is no

23   demonstrated ability for CI-2 to infiltrate the organization,

24   much less have co-equal dealings with Darbinyan based on his

25   status of Darbinyan's extortion victim.

```
1              THE COURT:  Okay.  I understand that.

2              Do you want to just summarize your arguments

3    though?  I believe Mr. Colombo has done so.

4              MR. ESTRADA:  With regard to the entire motion?

5              THE COURT:  Yes.

6              MR. ESTRADA:  Yes, Your Honor.

7              Just briefly on the issue regarding Bilezikchyan...

8              There is no contradiction there.  What the

9    affidavit makes clear is that at one point -- two points:  In

10   the past, Bilezikchyan worked as an informant.  And he

11   provided information that was deemed to be reliable and

12   accurate.  The problem was that in 2008, the FBI learned that

13   Bilezikchyan was double-dealing.  He wasn't admitting the

14   fact that he was actively involved in criminal activity with

15   a Mexican mafia member named Bustamante, Jr., and he was

16   caught on a wiretap, discussing criminal activity with

17   Bustamante Jr.  So when confronted with that, he admitted

18   that he was a close associate of Bustamante Jr., but wouldn't

19   give any information about Bustamante, Jr., and of course,

20   wasn't giving information about his own criminal dealings.

21   So at that point, he was terminated.  So there is no

22   contradiction in the discussion of Bilezikchyan, because it's

23   true, he provided some accurate information that was used in

24   the wiretap affidavit for the background information, not

25   necessarily probable cause.  And then with regard to
```

```
 1    necessity, he was already terminated for double-dealing on
 2    the FBI.  The FBI shouldn't be expected to then use an
 3    informant who has been double-dealing them to sign them up
 4    for a third time and see if he's going to then prove to not
 5    double-deal.
 6              THE COURT:  And does that conclude your arguments?
 7              MR. ESTRADA:  That concludes the arguments, Your
 8    Honor.  I would submit on the papers, unless the Court has
 9    any questions.
10              THE COURT:  No.  I have no further questions.
11              You know, I read over the entire wiretap
12    submission.  I agree he that there are grounds for criticism,
13    but the request for a *Franks*' hearing and the motion to
14    suppress are denied.  I was troubled by the reference to the
15    Darbinyan Organization because I think that it does lend
16    itself to bootstrap the sense that there is a self-identified
17    organization called the "Darbinyan Organization," which adds
18    more gravitas to the situation than is appropriate and that
19    the affidavit should have indicated that it was shorthand.
20    And I could understand that a reviewing judge in reading
21    that, might understand things -- might understand that it did
22    refer to a particular organization, as you've said like the
23    mafia, for example; but when I read the overall declaration
24    and the probable cause section, the necessity section, I felt
25    that although there certainly could be criticisms, that there
```

```
 1    had been good faith effort to use traditional law enforcement

 2    means, including all of the various things that were

 3    discussed trash searches, pole camera, et cetera -- and

 4    again, there certainly can be criticisms, concerning the need

 5    to make more detailed disclosures, but I think overall, it

 6    was a -- it was a good application.

 7              I didn't feel that it in any way -- certainly not

 8    deliberately -- attempted to mislead Judge Wilson or present

 9    a false situation.  I felt that the context was the

10    investigation of a -- an extremely large, allegedly violent

11    organization that was difficult to penetrate.  So given all

12    of those considerations, I felt that the very well stated

13    flaws that Mr. Colombo has mentioned, do not rise to the

14    level where the motion should be granted.  So that is the

15    Court's ruling on that subject.

16              The next thing in order, would appear to be the

17    severance issues.

18              And let me just take a minute to get organized.

19              And maybe we can deal with some of the similar ones

20    first.

21              There is Edgar Yerkanyan's, defendant number 33's,

22    motion which has been withdrawn -- is that correct,

23    Mr. Chambers?

24              THE CLERK:  Yes, Your Honor.

25              THE COURT:  Okay.  And, Counsel?
```

```
 1              MR. ESTRADA:  That's correct, Your Honor.
 2              THE COURT:  Okay.
 3              Next, is, Karapet Karamusyan, that particular
 4    motion has been withdrawn, as well.  Mr. Litman -- he's not
 5    here.  And that's --
 6              -- MR. ESTRADA:  That was withdrawn, Your Honor.
 7              THE COURT:  Yes.  Okay.
 8              MR. WINDSOR:  Mark Windsor.  I join that motion and
 9    incorporate it into the RICO analysis and factual analysis
10    into my joinder -- Mark Windsor on behalf of Mr. Avedissian,
11    defendant number 57.  I have joined that motion and
12    incorporate it by reference, the legal analysis and the facts
13    into my motion for a severance for Mr. Avedissian.
14              THE COURT:  Yes.  And that stands.
15              MR. WINDSOR:  Thank you.
16              THE COURT:  Thank you.
17              Next is Aram Petrosian.  And the tentative is to
18    grant as to count 138.  The Government does not o[pose that;
19    correct, Mr. Estrada?
20              MR. ESTRADA:  Correct, Your Honor.
21              THE COURT:  And is counsel, Mr. Carlton here?
22              MR. CARLTON:  Yes, Your Honor.
23              THE COURT:  And you agree with that?
24              MR. CARLTON:  Yes, I do.
25              THE COURT:  Okay.  Okay.  Next is
```

54

1    Andranik Bakhchadjian.  That is as to count 136.  The motion

2    to sever is not opposed by the Government, right,

3    Mr. Estrada?

4              MR. ESTRADA:  Correct, Your Honor.

5              THE COURT:  And, Mr. Horgan, we're on the same

6    page; correct?

7              MR. HORGAN:  Yes, Your Honor.

8              THE COURT:  Okay.  Thank you.

9              Next, the one that I wanted to discuss is

10   Sarkis Avedissian's motion.  And I'd like to hear from

11   counsel.

12             MR. COLOMBO:  Good morning, Your Honor.

13             Juan Acevedo for the defendant Sarkis Avedissian,

14   who is present in Court.

15             THE COURT:  Good afternoon.

16             MR. COLOMBO:  Your Honor, I'm just going to make it

17   brief.  Looking at this entire indictment, out of the 446

18   overt acts, my client's named in just one of them.

19             Over four years of alleged criminal activity, the

20   only thing that ties him to this case is a one-minute and 47

21   telephone conversation where it is alleged that he agreed to

22   store some marijuana for a co-defendant and supposed friend.

23             Other than that, it's not alleged that he is a

24   member or even an associate of any criminal activity

25   organization.  He has no other ties to this case.  There's

```
 1    a -- you know, introduction of evidence, would be extremely

 2    prejudicial to him to be charged with all these other

 3    codefendants.

 4          I know that in its opposition, the Government

 5    stated that they did propose a severance of three groups.

 6    One of which has almost entirely disappeared but even with

 7    that being said, there is still 25 remaining defendants,

 8    eight of which are still in my client's group, and eight of

 9    which have far more serious involvement and are alleged with

10    and charged with more serious crimes than my client.

11          THE COURT:  I was inclined to agree with you as to

12    this one.  I want to hear from the Government, but your

13    client -- what you said was he was a successful business

14    person who had no prior criminal contact at all; that there

15    was a very short telephone conversation where perhaps he

16    agreed to do something stupid and that -- that the spillover

17    prejudice may be significant in terms of your client.  And my

18    notes indicate that to try this matter separately would not

19    be very time-consuming or difficult.  Maybe take a day.  And

20    I felt that to have your client sit through a multiple-month

21    long trial, in light of this particular incident -- was

22    perhaps unduly prejudicial to your client and certainly

23    unnecessary perhaps.

24          I'll hear from the Government from their

25    perspective.  So I was inclined to break this one out.
```

56

```
 1    Mr. Estrada...

 2              MR. ESTRADA:  Yes, Your Honor.

 3              I just want to clarify...

 4              We're not talking about a multiple month trial with

 5    regard to this particular individual.  The Government has

 6    proposed -- has proposed --

 7              THE COURT:  To this individual, we're talking

 8    about --- maybe I didn't understand what you proposed; but I

 9    thought that he was in which group?

10              MR. ESTRADA:  Group three, Your Honor.

11              THE COURT:  Group three.  And it would be tried

12    with group three, and that would be a multiple month trial

13    perhaps.

14              MR. ESTRADA:  I wouldn't anticipate that,

15    Your Honor.  That group largely consists of two incidents

16    which are a kidnapping incident and a marijuana theft

17    conspiracy incident.  This -- almost all of the defendants in

18    that group were involved in the marijuana theft conspiracy,

19    including Sarkis Avedissian.  And, of course, as the Court

20    knows the law is clear.  The mere fact that there are

21    differing levels of proof and different levels of culpability

22    in a conspiracy, isn't enough to warrant severance.  This

23    defendant is part of the marijuana conspiracy.  So in the

24    Government's view, he should be tried with the other

25    marijuana --
```

1      THE COURT:  Is he part of it in any in-depth sense?

2    You know, I've seen examples of other individuals in this

3    case who have been asked to do things that they felt some

4    pressure to do, that was out of character and didn't speak of

5    them being some part of a greater organization.  And it

6    struck me that this brief telephone call that was retracted

7    shortly thereafter in another telephone call didn't rise to

8    that level.  And it also struck me that the Government could

9    certainly put on all of the evidence that it needed on this

10   particular conspiracy in the case -- in the case in chief in

11   group number three, regardless of whether this individual was

12   severed out or not.  So I didn't see any prejudice to the

13   Government prejudice.  I didn't see any prejudice to the

14   Court because we were dealing with a day-long trial

15   perhaps -- or two-day trial.  And it seemed like the

16   individual was -- maybe in the category of doing something

17   stupid rather than being part of a bigger organization.

18        MR. ESTRADA:  I certainly agree he did something

19   stupid.  I don't know if he was -- necessarily that divorce

20   from the organization, mainly Bilezikchyan Paramaz, but I do

21   think --

22        THE COURT:  Well, you don't know, because my

23   impression was that -- at least from counsel's submission --

24   that he was -- had a legitimate business, unlike a lot of

25   other individuals -- that he had done positive things in the

```
 1    community that seemed to -- to not be of the same ilk as
 2    other defendants.  And I simply felt in balance that there
 3    was very little harm in severing him.
 4            MR. ESTRADA:  And I certainly think that's
 5    accurate.  He did have a legitimate business, and certainly
 6    for sentencing purposes I don't think he stands in the shoes
 7    of the other marijuana theft conspirators.  In terms of the
 8    Government's view, it is a -- potentially a waste of judicial
 9    resources, jury resources.  Given that to prove the marijuana
10    conspiracy and his membership in it, the Government is going
11    to have to prove the marijuana conspiracy anyway in two
12    separate trials.  So there are going to have to be wire calls
13    played and the evidence presented that a marijuana conspiracy
14    existed --
15            THE COURT:  Don't they have what this case -- isn't
16    there a recorded conversation where he says he'll agree to
17    store it.
18            MR. ESTRADA:  But store what?  And the Government
19    is going to have to show to the jury, that there was a
20    marijuana conspiracy; what the nature of the marijuana
21    conspiracy was; and that this particular defendant was a
22    member of that particular conspiracy.  So I don't --
23            THE COURT:  Well, the conspiracy was -- isn't
24    itself made when the -- they're two or more people, the
25    person on the other hand of the telephone call asks him to
```

1    store marijuana?

2           So...

3           MR. ESTRADA:  Well, potentially, it could be proved

4    by one call, but, of course, the Government will want to

5    present the best case possible, and have the jury find beyond

6    a reasonable doubt -- so it's going to want to present the

7    full proof of the conspiracy; how detailed it was -- the

8    actual evidence that was discovered of the marijuana

9    actually --

10          THE COURT:  And the other -- the other component of

11   group three is what charge?

12          MR. ESTRADA:  It's a kidnapping charge, Your Honor,

13   which many of the same defendants, essentially, extorted and

14   kidnapped --

15          THE COURT:  Right.  So we would be grouping this

16   individual who was involved in one or two telephone calls in

17   the course of an hour with the kidnapping charge, as well.

18          MR. ESTRADA:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MR. ESTRADA:  But I just want to be clear, there is

21   no violence in the kidnapping.  The --  they may sound very

22   distinct, but both of these incidents are somewhat similar.

23   The kidnapping incident involved essentially taking someone

24   to a location and forcing that person to pay money to

25   Bilezikchyan.  And the marijuana theft involved Bilezikchyan

1    duping someone AND then through the co-conspirators, forcing

2    that person to turn over the marijuana which they then used

3    and distributed.  So it's -- in name, it certainly sounds far

4    more different than I think it is in actuality; but in the

5    Government's view, it's the waste of judicial resources and

6    time for the jury that would counsel against severance for

7    this particular defendant.

8              THE COURT:  Okay.  And I'm sensitive to that issue,

9    as well; but I think that the weight of the arguments go

10   toward severance for this individual.  So I'm going to grant

11   the motion as to him.

12             MR. COLOMBO:  Thank you, Your Honor.

13             MR. ESTRADA:  Very well, Your Honor.

14             THE COURT:  Okay.

15             Let's take a five or ten-minute break.

16                            (Recess.)

17             (Volume II was reported by Leandra.)

18                             - - -

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5      UNITED STATES OF AMERICA          :

 6               vs.                       :   No. CR 11-0002-RGK-50

 7      MIGUEL AGUSTIN RAMIREZ, et al.     :

 8

 9

10    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22    /S/_____        11/15/2014

23    MARIA R. BUSTILLOS                   DATE
      OFFICIAL REPORTER
24

25
```

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3          HONORABLE DEAN D. PREGERSON, JUDGE PRESIDING

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                                    )
                                      )
 6                    Plaintiff,      )
                                      )
 7                                    )
                                      )
 8         Vs.                        )  No. CR 11-00072 DDP
                                      )
 9                                    )
                                      )
10   DARBINYAN, ET AL.,               )
                                      )
11                                    )
                                      )
12                    Defendants.     )
                                      )
13   _____)

14

15

16       REPORTER'S TRANSCRIPT OF HEARING ON MOTIONS

17             LOS ANGELES, CALIFORNIA

18       FRIDAY, MARCH 8, 2013; 12:25 P.M.

19

20

21          LEANDRA AMBER, CSR 12070, RPR
         OFFICIAL U.S. DISTRICT COURT REPORTER
22          312 NORTH SPRING STREET, # 408
            LOS ANGELES, CALIFORNIA 90012
23               www.leandraamber.com
                  (213) 894-6603
24

25
```

```
 1                        A P P E A R A N C E S

 2

 3        IN BEHALF OF THE PLAINTIFFS,
          UNITED STATES OF AMERICA:      U.S. DEPARTMENT OF JUSTICE
 4                                       U.S. ATTORNEY'S OFFICE
                                         BY:  E. MARTIN ESTRADA, AUSA
 5                                            STEPHEN G. WOLFE, AUSA
                                         312 NORTH SPRING STREET
 6                                       12TH FLOOR
                                         LOS ANGELES, CA 90012
 7                                       (213) 894-7408

 8

 9        IN BEHALF OF THE DEFENDANT,
          DARBINYAN, ET AL.:             LAW OFFICE OF MARCIA BREWER
10                                       BY:  MARCIA BREWER, ESQ.
                                         400 CORPORATE POINTE
11                                       SUITE 800
                                         CULVER CITY, CA 90230
12
                                         LAW OFFICE OF TIMOTHY LANNEN
13                                       BY:  TIMOTHY CREAN LANNEN, ESQ.
                                         880 WEST FIRST STREET
14                                       SUITE 304
                                         LOS ANGELES, CA 90012
15                                       (213) 680-3617

16                                       LAW OFFICE OF KATHERINE WINDSOR
                                         BY:  KATHERINE WINDSOR, ESQ.
17                                       1 SOUTH FAIR OAKS AVENUE
                                         SUITE 401
18                                       PASADENA, CA 91105

19                                       LAW OFFICES OF ALEX R. KESSEL
                                         BY:  ALEX R. KESSEL, ESQ.
20                                       16000 VENTURA BOULEVARD
                                         SUITE 1208
21                                       ENCINO, CALIFORNIA 91436
                                         (818) 995-1422
22                                       kessellaw@sbcglobal.net

23

24

25
```

**A P P E A R A N C E S**

1

2

3   **IN BEHALF OF THE DEFENDANT,**
  **DARBINYAN, ET AL.:**

4                           LAW OFFICES GEORGE G. MGDESYAN
                          BY:  GEORGE G. MGDESYAN, ESQ.

5                           15260 VENTURA BOULEVARD
                          PH 2200

6                           SHERMAN OAKS, CA 91403

7                           LAW OFFICES OF PAUL HORGAN
                          BY:  PAUL C. HORGAN, ESQ.

8                           800 WILSHIRE
                          SUITE 1510

9                           LOS ANGELES, CA 90017

10                           LAW OFFICES OF ANTHONY E. COLOMBO
                          BY:  ANTHONY E. COLOMBO, JR., ESQ.

11                           1800 CENTURY PARK EAST
                          SUITE 600

12                           LOS ANGELES, CA 90067

13

14   **ALSO APPEARING:**

15

16

17

18

19

20

21

22

23

24

25

4

**I N D E X**

**PAGE**

**HEARING:**   HEARING ON MOTIONS

UNITED STATES DISTRICT COURT

1    LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 8, 2013; 12:25 P.M.

2                              -o0o-

3

4         THE CLERK:  And for the record, the interpreters

00:00:01 5  who were being used today -- the defendants who had been

6    using the interpreters have asked the interpreters just to be

7    standby.  And just so the record's clear, no one's being

8    interpreted at this time due to the defendants' request.

9         Thank you.

00:00:11 10       THE COURT:  Okay.  Mr. Kessel?

11        MR. KESSEL:  Yes, your Honor.

12        THE COURT:  Why don't I hear from you if you don't

13   mind.

14        MR. KESSEL:  Thank you, your Honor.

00:00:31 15       Your Honor, I think it's clear that my client,

16   Ms. Mkrtchyan, who is in the Government's suggested Group 2

17   should be severed, your Honor.  Briefly, she's currently in a

18   group that I think the trial could take easily two months.

19        She's charged in a single false conspiracy to

00:00:52 20  commit loan fraud or mortgage fraud, if you will, by

21   submitting a loan with false information.  And the overt acts

22   as to her can even be interpreted as innocent conduct, one or

23   two phone calls with her husband, Mr. Darbinyan, and that's

24   part of the problem.

00:01:22 25       She would love to sit at the table with him, your

003410

1   Honor, but from a trial standpoint with the extortion, the

2   check fraud, the weapons charge, the credit card fraud that

3   obviously the Government would have a right to put on to

4   prove up the charges with a number of people in Group 2 has

00:01:42 5   absolutely no nexus, no bearing on the single substantive

6   account that my client's charged in, who has no record, who I

7   believe her trial would take a day or less, your Honor.

8        To sit there for months not so much for convenience

9   purposes, but for the prejudicial value that she would suffer

00:02:01 10   in what I believe is otherwise a weak case -- and I think

11   it's incumbent on the Court to grant a severance, your Honor.

12        THE COURT:  Okay.  Thank you.

13        Mr. Estrada?

14        MR. ESTRADA:  Your Honor, with regard to defendant

00:02:11 15   Mkrtchyan, the Government's proposal is that she be in

16   Group 2.  As the Government has set forth, Group 2's conduct

17   is led by Darbinyan.  It largely consists of fraudulent

18   activity.  The 99 Cent Only store scheme, which the Court is

19   all too familiar with, and the bank fraud check scheme, which

00:02:30 20   the Court is also very familiar with, in addition to

21   extortion conduct with Sheriff Petrosian, the Government's

22   position on Mkrtchyan is her conduct is similar in the sense

23   that it's the same sort of fraudulent conduct that Darbinyan

24   perpetrates throughout the entirety of his conspiracy.

00:03:02 25        It's conducted with two other individuals who are

1    part of the RICO conspiracy, Karo Yerkanyan and Darbinyan.

2    And for that reason the Government believes that severance is

3    inappropriate.

4            THE COURT:  Does the fact that it involves a

00:03:24 5    personal residence mean that it might differ in kind from the

6    other types of fraudulent activities?

7            MR. ESTRADA:  It certainly differs in kind.  It's a

8    different sort of scheme in the sense that --

9            THE COURT:  But is it a -- is it a separate

00:03:41 10    conspiracy?  Is it part of the same alleged conspiracy

11    that -- the reason I ask is I -- you know, my notes say what

12    is the logical relationship between the other incidences and

13    this one?  How is this transaction related?  Is the fraud

14    concerning the home, you know, more personal?  Is it in a

00:04:11 15    sense a sort of one-shot deal that really isn't related to

16    the purported gang's activity?

17            It's just an example of, you know, Mr. Darbinyan,

18    you know, acting and, you know, the violating the law

19    concerning his personal residence.  And one could argue, you

00:04:42 20    know, disregard for the laws, but is it really related to

21    the -- because group -- this -- this is a Group 2 conspiracy.

22    Is it really related to the other allegations?  There are

23    conspiracy allegations in Group 2 as well.

24            MR. ESTRADA:  Yes, your Honor.

00:05:02 25            THE COURT:  Okay.  So how do you argue that this is

UNITED STATES DISTRICT COURT

**003412**

1    part of or relevant to the conspiracy?

2            MR. ESTRADA:  Well, it -- specifically Mkrtchyan is

3    charged in Count 113, Count 114.  Count 113 is a conspiracy

4    to make a false statement on a residential loan application,

5    essentially the false statement to the bank.

6            THE COURT:  Sure.  Is that the conspiracy, this

7    particular discrete --

8            MR. ESTRADA:  This particular conspiracy with

9    Darbinyan, Karo Yerkanyan, Edgar Yerkanyan --

10           THE COURT:  This is not the Count 1 conspiracy?

11           MR. ESTRADA:  Correct, your Honor.

12           And the only reason the Government sought to group

13   this is because it's the same sort of fraudulent conduct with

14   Darbinyan at the head directing others to engage in

15   fraudulent conduct.

16           I certainly understand the Court's point that --

17   and the Government isn't alleging as part of the RICO

18   conspiracy, it's certainly another fraudulent scheme with

19   Darbinyan at the head conducting others in conducting fraud.

20           THE COURT:  What about the other participants in

21   the home fraud scheme?  Are they named in Count 1?  Two of

22   them are; right?

23           MS. BREWER:  Two of them are.

24           THE COURT:  And which two?

25           MR. ESTRADA:  That would be Darbinyan and Karl

9

1    Yerkanyan.

2        THE COURT:  Okay.  And what does this separate

3    conspiracy do to show some common plan, scheme, control as to

4    these two individuals related to Count 1?

00:06:38 5        MR. ESTRADA:  Related to Count 1 it certainly shows

6    their association, but the Government isn't alleging that

7    this is a predicate of Count 1.  Specifically it's not a

8    predicate of the RICO conspiracy.

9        THE COURT:  Sure.  Then why is it important that it

00:06:51 10    be tried in the context of -- are there -- are there other

11    separate conspiracy counts in Group 2 other than this one?

12        MR. ESTRADA:  There are, your Honor.

13        THE COURT:  Other than Count 1, I mean.

14        MR. ESTRADA:  Yes, your Honor.

00:07:11 15        THE COURT:  Okay.

16        MR. ESTRADA:  Because within Count 1, the

17    predicates involve bank fraud, identity theft, access fraud.

18    And there are within Count 1 the predicates, for instance,

19    the 99 Cent Only store conspiracy that involves individuals

00:07:32 20    who participate with Darbinyan in the fraud that was being

21    perpetrated against customers of 99 Cent Only store scheme.

22        That's the RICO conspiracy, and also within that

23    umbrella, there's the fraud conspiracy directed at 99 Cent

24    Only store.  Similarly there's a bank fraud scheme alleged in

00:07:52 25    which various individuals obtain checks, made fraudulent

```
         1    checks and they're all part of one scheme, but those
         2    individuals are also within the umbrella of the RICO
         3    conspiracy because those are predicate acts of the RICO
         4    conspiracy.
00:08:07 5         The Government doesn't allege that this particular
         6    loan fraud scheme is a predicate.  It couldn't be a predicate
         7    in a RICO conspiracy.  It simply sought to group it together
         8    because it's consistent with the fraud activity and for
         9    purposes of judicial efficiency.  It seemed convenient to
00:08:21 10   have it all within the same umbrella, but I understand the
        11    Court's point that it's not part of Count 1.
        12         THE COURT:  Well, I wasn't clear.  I asked you if
        13    there were other discrete conspiracies charged in Group 2,
        14    and you told me that there was one other discrete conspiracy.
00:08:41 15   Is there more than one other?
        16         MR. ESTRADA:  There's a -- you mean in terms of the
        17    charges?
        18         THE COURT:  Yes, in terms -- we have Count One.  I
        19    understand that, the sort of overarching conspiracy.  And
00:08:52 20   then we have the sub conspiracies, the satellite
        21    conspiracies.  This is one of them that you allege is a
        22    satellite conspiracy.
        23         MR. ESTRADA:  No, your Honor.
        24         THE COURT:  Yes.  Isn't it a separate conspiracy?
00:09:12 25   It's not part of Count 1, but it's a separate conspiracy
```

```
 1    showing, as you say, Mr. Darbinyan's alleged control.
 2              MR. ESTRADA:  Yes.  When you use the term
 3    "satellite," I thought you meant a predicate of the RICO
 4    conspiracy.
 5              THE COURT:  No.  No.
 6              MR. ESTRADA:  It's not alleged to be a predicate of
 7    the RICO conspiracy.  It's alleged as a separate conspiracy
 8    but involving similar members to being in the RICO
 9    conspiracy.
10              THE COURT:  Okay.  I understand that.  So how many
11    separate conspiracies are there other than this one?
12              MR. ESTRADA:  That are not predicates?
13              THE COURT:  Correct.
14              MR. ESTRADA:  None other than this one.
15              THE COURT:  Okay.  And were the ones that are
16    predicates charged as separate conspiracies?  No.
17              MR. ESTRADA:  Yes.
18              THE COURT:  Okay.  And how many of those are there?
19              MR. ESTRADA:  There's an extortion conspiracy,
20    which involved Darbinyan, Sharopetrosian, Lusine Ogandganyan,
21    and may be others there.  I can't think off the top of my
22    head.
23              There's also the 99 Cent Only store conspiracy
24    which involves numerous defendants who are in Group 2, the
25    proposed Group 2.
```

00:09:23
00:09:31
00:09:41
00:09:51
00:10:12

1          THE COURT:  Do any of them involve Yerkanyan?

2          MR. ESTRADA:  No.

3          THE COURT:  Okay.

4          MR. ESTRADA:  Then there's a bank fraud scheme

00:10:23  5   that's charged as a scheme to defraud, not as a conspiracy

6   per se, but they're similar, and that involves the obtaining

7   of victims' checks and the cashing and depositing of victims'

8   checks and that is also predicate within the RICO conspiracy.

9          THE COURT:  Okay.  So is that all of them?

00:10:41 10   MR. ESTRADA:  Yes, your Honor, within Group 2.

11          THE COURT:  Okay.  And the logical relationship

12   between the home loan conspiracy and Group 2 -- tell me again

13   what that is.

14          MR. ESTRADA:  It simply involves similar

00:11:01 15   participants Darbinyan, Karo, Yerkanyan and similar conduct

16   which is the fraudulent activity targeting a bank, which is

17   similar in terms of the bank fraud fraudulent statements.

18          THE COURT:  And what about Yerkanyan?  Is he

19   charged in other -- he's charged in Count 1.  Is he charged

00:11:20 20   in any of the other conspiracies or schemes?

21          MR. ESTRADA:  He is, your Honor, but for

22   convenience purposes, the Government's proposed that he be in

23   Group 3 because he's involved in the marijuana theft, the

24   kidnapping, and other bank fraud schemes with Bilezikchyan.

00:11:42 25   THE COURT:  So just in Group 2, other than Count 1,

```
 1    is he involved in any other scheme or conspiracy?
 2              MR. ESTRADA:  Within Group 2?  No.
 3              THE COURT:  Well, he's not being charged in
 4    group -- he's only -- is he being charged in other groups
 5    other than Group 2?
 6              MR. ESTRADA:  The proposal is to try him in
 7    Group 3, not in Group 2.
 8              THE COURT:  I see he's not being tried in Group 2.
 9    He's just --
10              MR. ESTRADA:  That's the proposal.
11              THE COURT:  I see.
12              MR. ESTRADA:  Because so many other activities
13    involve other individuals that aren't involved in the Group 2
14    activities.  In the Government's view, it makes sense to just
15    have him tried in Group 3.
16              THE COURT:  I see.
17              MR. KESSEL:  Your Honor, may I respond?
18              THE COURT:  Yes.
19              MR. KESSEL:  I think that dilutes even their
20    argument that two are in -- because Mr. Karo Yerkanyan is in
21    Group 3.  My client -- the only common defendant -- because I
22    might add, your Honor, the other defendant Edgar Yerkanyan,
23    who apparently is in the house loan conspiracy -- he pled
24    yesterday.
25              So my client's only common defendant in Group 2 now
```

1    is her husband.  And, your Honor, as the Government conceded,

2    the -- my client shouldn't sit there -- and I'm talking about

3    purposes for Rule 14 and the prejudice that would inure to

4    her detriment from sitting there with all these other counts

00:13:14 5   where the alleged crime she's involved with -- mind you, even

6    if they can prove it, involves a short sale of her house

7    where an application was submitted giving, I think, wrongful

8    employment information, wage information and checking the box

9    whether you're going to reside there or not.

00:13:31 10          I'm not undermining the crime, I'm just saying it's

11   totally isolated from anything that's going to be litigated

12   with respect to the bulk of Group 2's substantive charges.

13   And for her to sit there not for time purposes but for

14   prejudicial purposes of all this coming out -- and I think

00:13:51 15  there's an added element of the added prejudice of being at

16   trial with her husband that's going to come out, who is

17   charged with all this, that guilt by association, your Honor,

18   is there that the Ninth Circuit says is also a consideration

19   for the Court.

00:14:02 20          For all those reasons, your Honor, I think -- I'm

21   asking you to sever her.  Again, her -- her conduct can be

22   tried, I think, in one, maybe two days.

23          THE COURT:  Okay.  For Mr. Estrada, just because

24   I'm just -- I'm still just trying to understand the

00:14:22 25  interrelationship here.  You know, when I thought about it, I

```
 1    thought, well, you know, the -- this involved the home.
 2          It does not necessarily evidence any sort of
 3    typical related scheme conduct or conspiracy conduct.  And it
 4    may be convenient to try it with Group 2, but it does not
 5    necessarily seem that logically related as to Mr. Darbinyan's
 6    bad activities.  Am I right?
 7          MR. ESTRADA:  The only other thing I would say --
 8    you are correct, your Honor -- is that the only other logical
 9    relationship would be it's the same sort of activity.
10    Fraudulent activity, which is the gravamen of Group 2, in any
11    case.
12          THE COURT:  I know, but that's pretty broad.  I'm
13    going to grant the motion to sever as to this one.
14          MR. KESSEL:  Thank you, your Honor.
15          THE COURT:  Okay.
16          MR. KESSEL:  Thank you.
17          THE COURT:  Next we have Mr. Windsor.
18          MR. WINDSOR:  Thank you, your Honor.
19          I have received and read the Government's filed
20    opposition to my joinder and motion for severance as to
21    Mr. Vartan Avedissian in this case.  And while I did actually
22    read it this morning, I think in light of the content I can
23    probably address it now.
24          Essentially, my reading of their opposition is that
25    they do not dispute my characterization of the evidence.  But
```

1    they're essentially saying "So what?"

2         And it doesn't matter when we know it does, from

3    the legal analysis that's already been done.  And we also

4    know it does from the conversation that's already taken place

00:16:26  5    in the courtroom because Mr. Darbinyan is part of Group 2.

6         I would add to the papers that there are 17 people,

7    by my count, still left in Group 2 and I don't think there's

8    going to be a trial with 17 people.  I think that group in

9    and of itself is going to have to be split up.

00:16:41 10         And what I'm attempting to achieve, which I think

11   is consistent both with efficiency considerations and with

12   the more important prejudice considerations, is at the very

13   least to split off the scheme, which is now what it's called,

14   in which Mr. Avedissian is alleged to be connected in the

00:17:01 15   indictment from the panoply of horrors or that will be

16   paraded before the jury with regard to Count 1 and defendant

17   Darbinyan.  And we've seen the substance of much of what that

18   evidence is going to consist of here today and we also see it

19   in, of course, the wire tap applications.

00:17:22 20         While a lot of it is not alleged specifically in

21   the indictment, I know this Court has heard several RICO

22   cases, and I certainly have sat through them and litigated

23   them.

24         And I know the government will attempt to bring in

00:17:32 25   allegations of a double murder in Hollywood, for instance, of

1    Mr. Darbinyan allegedly connecting the Armenian Power with

2    the Mexican Mafia and other things of a similar nature, not

3    to mention the series of fraudulent activities concerning

4    skimming machines and other forms of bank fraud and identity

00:18:04 5    theft.

6          Now, Mr. Avedissian apparently is charged with

7    identity theft, but I haven't found any evidence that

8    connects him to such a conspiracy.  At least none that's been

9    provided to me so far.  And the Government in their

00:18:11 10   opposition has not identified any either.

11         Essentially what this state of the case is against

12   my client, Mr. Avedissian, at this point, to the best of my

13   analysis, is that he is caught in a phone conversation with

14   Mr. Darbinyan agreeing at Mr. Darbinyan's request to go down

00:18:33 15   to Orange County and pick up money from a person that

16   Mr. Darbinyan does business with.

17         He agrees to do that.  He is offered money to do

18   it, and he refuses the money.  He says, "I'm happy it do it

19   as a favor."  It's clear also from the context of those phone

00:18:52 20   calls that he's not aware of the quantity of the money that's

21   supposed to be picked up and that he has very little

22   knowledge of what's going on.

23         That's the only connection between Mr. Avedissian

24   and this alleged scheme.  I see no connection with identity

00:19:02 25   theft and no evidence to support the allegation that he is

UNITED STATES DISTRICT COURT

1    somehow connected to those charges.

2          So in light of that, I would ask at the very least

3    that he -- that the group of this -- whatever this bank

4    scheme is be severed out from the allegations against

00:19:23 5  Mr. Darbinyan concerning Armenian Power and that the violent

6    RICO.  And, really, I think what is required is that

7    Mr. Avedissian be severed out on his own.

8          But whether it's a severance of defendants or a

9    severance of the charges, I believe that some form of

00:19:41 10 severance that insulates Mr. Avedissian from the prejudicial

11   evidence that would come forth in Count 1 is absolutely

12   required in this case.

13         THE COURT:  Mr. Estrada?

14         MR. ESTRADA:  Your Honor, this is far different

00:20:01 15 from the situation with Mkrtchyan and even Sarkis Avedisian.

16         What we have here in Group 2 is -- the core parts

17   of the Group 2 conspiracy are the 99 Cent Only store scheme

18   and this check fraud.

19         This defendant is part of the check fraud.  He may

00:20:12 20 dispute the evidence.  That's not for the Court to decide at

21   this point with regard to the severance motion.  But he is in

22   a core category of the conduct in Group 2 that's a predicate

23   of the RICO conspiracy and it involves, by my count, at least

24   seven of the current members of Group 2 who are also part of

00:20:22 25 that check fraud.  So the Government believes it certainly

UNITED STATES DISTRICT COURT

**003423**

1    would be completely inefficient to cut this particular

2    defendant out of that Group 2.

3              THE COURT:  I agree with the Government.

4              Anything further?

00:20:37 5         MR. WINDSOR:  Yes, your Honor.  I think it is

6    clear, though, that -- I don't think 17 people are going to

7    be able to go to trial together at the same time.  So I could

8    question whether Group 2 is actually an entity that's going

9    to go forward in any event.  And I think a division is going

00:20:51 10   to have to take place and I would ask the Court to do that,

11   to establish that division now and reject the Government's

12   recommendation that all 17 of these people be tried at once.

13             And when the Court does make that division, I would

14   request that it consider my arguments here today.

00:21:01 15        THE COURT:  Fair enough.  If that happens, the

16   motion is denied.

17             Next is Ms. Brewer.

18             MS. BREWER:  My arguments follow previous counsel's

19   arguments with regard to Group 2 where my client has been

00:21:32 20   designated by the Government.

21             As I put forth in my papers, and I won't belabor

22   the points that I made there, my client has some minor

23   allegations in the RICO count that I have had some

24   explanation for in the moving papers.

00:21:52 25        The gravamen of the charges against my client are

| | |
|---|---|
| 1 | in the fraud section, the bank frank and the identity fraud. |
| 2 | And then putting him in with the RICO charges, which previous |
| 3 | counsel just pointed out to the Court that there are going to |
| 4 | be a lot of facts about things that happened that are violent |
| 00:22:13 5 | and these violent activities are taking place by other people |
| 6 | other than my client. |
| 7 | And then this -- the second set of counts, I think |
| 8 | it's four through five, has to do with an extortion of |
| 9 | somebody. And the Government's trying to play that counsel |
| 00:22:21 10 | saying it's not going to be violent. But I think when the |
| 11 | jurors hear things that somebody is being forced one place to |
| 12 | do something, et cetera and there may be guns pointed against |
| 13 | them or other forms of violence being used against them. |
| 14 | It's going to overlap on to my client. When some |
| 00:22:41 15 | of my client's focus is just on the bank fraud and then we |
| 16 | get into the gun charges at the very end of the list of -- of |
| 17 | the counts in the indictment here that will be brought out. |
| 18 | My client has nothing to do with those. |
| 19 | So that -- I had asked alternatively that the |
| 00:22:52 20 | people who are involved in the bank frauds be grouped |
| 21 | together in one group so that those charges can be tried |
| 22 | against them and that would make more clear for the jurors to |
| 23 | look at as far as the charges are concerned. |
| 24 | And the other thing, too, for me, I don't know how |
| 00:23:12 25 | many defendants are left but initially there were 17. And I |

1   don't -- if there's less, it's fine.  But with 17 defendants

2   it's going to be very difficult for the jurors to segment out

3   a particular defendant and say, Okay, what is the evidence

4   only against this person.

00:23:28 5      With a large amount of evidence that will come in

6   when we include Count 1 and we include the other counts that

7   have nothing to do with the bank fraud.

8       The jurors are going to have a hard time trying to

9   figure out who did what.  And try to parse out and say, Okay,

00:23:41 10  we're just going to use this evidence against this person to

11  determine the guilt.  And that was another issue I had raised

12  in here.

13      THE COURT:  Thank you.

14      MR. ESTRADA:  Your Honor, I think this is the one

00:23:51 15  defendant moving for severance who is also in the RICO

16  conspiracy.  So to complain about having RICO allegations

17  against this defendant doesn't make a lot of sense to me,

18  because he is charged in the RICO conspiracy and has

19  allegations of an extortion against him.

00:24:12 20     And he is deeply involved in the identity theft and

21  check fraud.  The indictment details numerous conversations

22  where he's discussing obtaining the bank information.  He's

23  even calling the banks himself and impersonating victims.  So

24  I think he certainly falls into the core of Group 2.

00:24:32 25     THE COURT:  Submitted, Ms. Brewer?

```
 1              MS. BREWER:  Yes, your Honor.
 2              THE COURT:  I'm going to deny the motion.  I agree
 3     with the Government's characterization.  I considered the
 4     number of counts as well as the involvement with Count 1.  So
 5     thank you for your argument.
 6              All right.  Next is Mr. Antonyan's case -- I'm
 7     sorry.  Yes, go ahead.
 8              MR. MGDESYAN:  I think that was vacated.
 9              THE COURT:  That was vacated?
10              MR. MGDESYAN:  Yes.
11              THE COURT:  Okay.  I think that I've covered all of
12     the severance except for the joinders.
13              MR. HORGAN:  Excuse me, your Honor.  On Antonyan
14     did I misunderstand the Court, or is that off calendar?
15              THE COURT:  Did you do what?
16              MR. HORGAN:  The motion to sever on behalf of
17     Defendant Antonyan.  This is Paul Horgan.
18              THE COURT:  Yes.  What was your question?
19              MR. HORGAN:  My question is, is the Court
20     entertaining that motion, or is it off calendar?
21              THE COURT:  I'll entertain it.
22              MR. HORGAN:  I joined in the motion, that's why.
23              THE COURT:  Did you want to say anything?
24              MR. HORGAN:  I'll submit on the papers.  The
25     argument's been stated -- excuse me -- I suppose relative to
```

```
 1    the previous two defendant, but I will submit to the Court

 2    based on the papers.

 3              THE COURT:  Okay.  Then I'm going to deny it for

 4    the reasons previously stated.

 5              MR. HORGAN:  Thank you.

 6              THE COURT:  Thank you.  I think that deals with the

 7    severance motions that I'm aware of.  Unless I've missed some

 8    joinders and people wish to be heard further, then the Court

 9    intends to agree to the three-part division as stated and

10    grants and denies the severance motions as previously stated.

11              Mr. Colombo, we had some other motions that you

12    filed?

13              MR. COLOMBO:  There were three remaining motions,

14    your Honor, a motion for discovery, a motion for discovery of

15    proffer evidence and then a motion for Henthorn material.

16              And I don't really believe 1, that there's anything

17    specific to discuss at this point and it doesn't appear to me

18    that the Government is entirely disagreeing with my

19    entitlement to some of the information I've -- I've

20    characterized as proffer evidence and then, of course, the

21    Henthorn I think that their position is that it's -- both of

22    those requests are premature.

23              THE COURT:  I think what they're saying on Henthorn

24    is the request that the material be simply turned over to the

25    Government without the Government's obligation and right to
```

1   review the material itself is incorrect.  That's what I

2   understand the Government's position.

3           MR. COLOMBO:  In regards to the *Henthorn*, their

4   position is -- I believe it's 1, it's premature because

00:27:55 5   they're not exactly sure what particular law enforcement

6   agents are going to testify at trial at this point.  And on

7   the other hand, they don't believe that they have an

8   obligation to disclose to the Court for an in-camera review

9   any material that might be questionable.  I think --

00:28:11 10          THE COURT:  I don't think that's true.  I think

11  what they're saying is they'll do the first cut.  If they

12  have questions they -- at least my experience has been, the

13  Government, if there's been an issue that they're feeling

14  uncomfortable, they'll submit it to the Court's review in

00:28:31 15  camera.

16          They're not required to do that, but they're

17  required to disclose re *Giglio* material.  They know that if

18  there's an area where they're unsure, typically they submit

19  it to me and that's been the normal procedure.

00:28:42 20          MR. WOLFE:  Your Honor, if I may, the Government's

21  position is precisely as your Honor articulated it just now.

22          THE COURT:  Okay.  So --

23          MR. COLOMBO:  Your Honor, in regards to the proffer

24  evidence as well as the *Henthorn* material, and in considering

00:29:02 25  a realistic trial date, because we're currently scheduled for

1    trial April 9th, and I've spoken with Mr. Estrada concerning

2    an alternate trial date and I believe we've agreed to

3    October 15th.

4            But in the context of the motions that was filed,

00:29:28 5   in addition to picking a new trial date, I think what would

6    be very helpful not only for the defense but also for the

7    Court would -- would be to set some type of scheduling in

8    advance of that.

9            Now, I know I've spoken with the Government in

00:29:41 10  regards to an in limine hearing and as well as expert and

11   404(b) disclosure, but I think that what I would like, your

12   Honor --

13           THE COURT:  Well, what I did in the last large

14   RICO, like our case, category, discovery of material posing

00:30:01 15  potential threat to witnesses -- the parties in that case

16   stipulated to an attorneys' eyes only protective order, and

17   I'm sure the Government has a copy of that, which was

18   executed and the material was turned over, according to my

19   notes, 60 days before trial pursuant to that eyes only

00:30:32 20  protective order.

21           On *Bruton* redactions, the Government turned over

22   the redacted statements 60 days before trial.  The witness

23   and exhibit lists, the standing order that I have, says the

24   day of trial but I have always cautioned the Government that

00:31:02 25  if a particular defendant was not prepared because of the

```
 1    timing of the disclosure that I would pause the trial and

 2    give the defendant the opportunity to catch up, which is

 3    something I would be loathe to do in a jury trial.

 4          So I invited discussion with the Government about

 5    how early before trial they would turn over witness and

 6    exhibit lists.  And perhaps two weeks before trial would make

 7    sense but we can discuss that.

 8          Motions in limine, the filing deadline 28 days

 9    before trial.  And Bradley, Giglio, Henthorn material 60 days

10    before trial.  And although if the Government was doing

11    additional Henthorn review after the 60-day deadline, they

12    would produce the material as soon thereafter as possible.

13          I ordered the Government to produce a list of law

14    enforcement officers who were, one, likely to testify and

15    two, separate category might testify, I believe, 60 days

16    before trial as well.

17          So that was the timing that I worked out on the

18    large multi-defendant RICO trial that I had last year.

19          MR. COLOMBO:  Your Honor, I don't have a problem

20    with that -- with that scheduling.  However, I would add one

21    additional character -- category to the 60-day deadline

22    before trial.  And that would be final transcripts of any

23    calls that the Government intends to play at trial.

24          In addition to that, any of the actual calls that

25    they intend to play, so that the Government sufficiently in
```

```
 1    advance of trial, I think 60 days would be appropriate, has

 2    selected what calls they intend to play and provided a final

 3    transcript or a transcript that they believe they'll seek to

 4    use.

 5         And the reason why I do that, your Honor, is

 6    because the universe of calls in this case is enormous.

 7    There's 50,000 recorded calls.

 8         Now, I can -- and I had parsed through many of

 9    these calls to isolate them to the particular events that the

10    Government intends to try in -- in group -- in Group 2 but

11    it's very difficult given that there's, I think, 486 overt

12    acts in regards to the RICO conspiracy.  So I think adding

13    that to the 60-day requirement would be the request.

14         And I think, your Honor, in addition to that -- and

15    thinking of Count 1 the RICO conspiracy, I think 60 days

16    prior to the trial I -- it would be the request of the

17    defense for the Government to disclose what -- what acts they

18    intend to prove concerning the conspiracy, aside from the --

19    the predicate crimes that are charged in the other

20    conspiracies and the other substantive counts.

21         But because there are some overt acts in Count 1

22    that don't relate to two of those particular charges and

23    Mr. Darbinyan hasn't specifically been charged with some of

24    the overt acts that are in Count 1.

25         So I think that would also be helpful, your Honor.
```

UNITED STATES DISTRICT COURT

```
 1              Finally I think in regards to if there's going to
 2    be the witness and exhibit list disclosure, I think we have
 3    to talk about Jencks and my preference, although I understand
 4    it's not a requirement of the Government to disclose prior to
 5    the completion of the witness's testimony on direct, I think
 6    that it would obviously be helpful for judicial economy if
 7    that information was disclosed sufficiently in advance of
 8    trial.
 9              The Government and I spoke about two weeks, I think
10    it might be appropriate for 60 days.
11              MR. WOLFE:  Your Honor, the only objection I would
12    make to what defendant counsel proposes is to know whether
13    what he has in mind is a schedule that is convenient and
14    helpful for the defense or that sandbags the Government.
15              And this is what I mean by that --
16              THE COURT:  Would you just pull that mic a little
17    closer.
18              MR. WOLFE:  Your Honor, the -- the vice of early
19    disclosure is not that it's helpful to the defense.  The
20    Government's not interested in trial by surprise.  Trial by
21    surprise is impossible, after all, on something that's a
22    hundred pages long by indictment and that was indicted two
23    years ago.
24              But what defense counsel doesn't say is whether he
25    wants things early to be helpful or whether he wants things
```

1    early to preclude the Government from doing any work after

2    the dates.

3                 THE COURT:  Well, I -- I always have a good faith

4    exception.  If the Government makes a disclosure, I know that

00:36:57  5    it's a moving -- the Government's trial strategy may evolve

6    as it prepares in the last intense burst before trial.

7                 So I -- I wouldn't have a rule of if you don't

8    disclose it it's not definitely going to be used as long as

9    I'm comfortable, you know, that the Government acted in good

00:37:21  10    faith when it made whatever decisions that it made and that

11    there isn't any undue surprise.

12                 So I understand that there's going to have to be

13    some, you know, and -- some imprecision, some play between

14    what may get disclosed early and the fact that there may be

00:37:51  15    additional materials that we weren't aware of or that we

16    didn't think about at the time, as long as, you know, it's

17    all in the spirit of good faith, I'm not going to have a

18    problem with it.  Is that what you were concerned about?

19                 MR. WOLFE:  Yes, your Honor.  That's the only

00:38:02  20    concern I have.  The other days or --

21                 THE COURT:  All I'm asking that the Government be

22    required to do is to make its best good faith efforts.  If

23    that's done and something wasn't disclosed, and it appears

24    that it was either inadvertent or information wasn't known or

00:38:22  25    there's another good reason, then I'm not going to hold that

1    against the Government.

2            If the defense feels that it somehow causes

3    prejudice and needs some additional time to deal with that

4    issue, then I would look at that argument and consider

00:38:41 5    whether that was appropriate as well.

6            MR. WOLFE:  And I don't believe the Government

7    objects to any of these dates, your Honor.

8            MR. ESTRADA:  Just one of the -- just related to

9    that, the final transcripts -- the Court should understand

00:38:51 10   and this -- you know, I've done three of these trials

11   involving the Armenian language.  There are limited resources

12   in terms of any final certified transcript.

13           The Government would have no problem providing --

14   and it's already provided draft transcripts -- providing a

00:39:11 15   listing of the calls it anticipates using.  But to actually

16   get the final transcript 60 days before time would be very

17   difficult given that there are currently about 17 or 16

18   defendants.  I don't anticipate there are going to be 17 or

19   16 by the time we get to trial on Group 2.

00:39:32 20           And we can have an idea of what the calls are going

21   to be but to get the final transcripts.

22           THE COURT:  Right.  But the rough transcripts

23   60 days and the final transcript within ten days of trial.

24           MR. ESTRADA:  Certainly with the exhibits, if the

00:39:42 25   exhibit books that are prepared two weeks before trial, they

UNITED STATES DISTRICT COURT

1   would contain the final transcripts in any case.

2           MR. COLOMBO:  That's fine, your Honor.  I don't

3   have a problem with that.

4           THE COURT:  Okay.

00:39:57 5           MR. COLOMBO:  I think what the important thing is

6   having the list of calls and then, of course, if there's a --

7   if there's a draft transcript that accompanies that, at least

8   I have something to review with Mr. Darbinyan, my client,

9   because if there are any glaring mistakes, at least I have

00:40:11 10   the opportunity to address it in the motion if limine.

11           THE COURT:  Sure, sure.  That seems fine.  Okay.

12           MR. ESTRADA:  So the only -- and that brings to the

13   Court's attention something that I just wanted to address.  I

14   spoke with Mr. Colombo about a October 15th, 2013, trial

00:40:33 15   date.  I also sent an e-mail to all remaining counsel

16   regarding that date and some other deadlines.

17           I haven't heard any opposition to a continuance.

18   There was one defense counsel who thought he may need a few

19   extra weeks.  I think we can work that out internally.  But I

00:40:42 20   do anticipate submitting a stipulation with all or at least

21   most of the defendants agreeing to a continuance of the trial

22   date.

23           But again at this point, there were three groups

24   proposed for trial by the Government.  The first group is

00:41:02 25   almost entirely disposed at this point.

1          My question is whether the Court is inclined to

2     have both groups tried back to back or have a different --

3     for Groups 2 or 3 or have a different trial date submitted,

4     different stipulations.

00:41:27  5          Or would the Court intend to have them tried

6     concurrently with another judge or just to get an idea of

7     what the Government should do in terms of the scheduling.

8          THE COURT:  I don't know of any judge that would be

9     available to try them concurrently.  My intention was to just

00:41:41  10    try them one after the other.

11         MR. ESTRADA:  Okay.  Very good.  So in terms of the

12    speedy trial waiver, it would be the same date with the

13    understanding that Group 3 would just commence at the

14    conclusion of Group 2's trial.

00:41:51  15         THE COURT:  I think that you could certainly put

16    that in your stipulation that it's essentially one continuous

17    trial.

18         MR. ESTRADA:  Very good.

19         THE COURT:  Which is what you're saying; correct?

00:42:02  20         MR. ESTRADA:  Yes.

21         THE COURT:  It's all the same indictment as well.

22    So it would continue.

23         MR. ESTRADA:  Yes, your Honor.

24         THE COURT:  Okay.  Does that take care of, in

00:42:12  25    general, your concerns?

```
 1            MR. COLOMBO:  Yes.  As long as the Government's
 2    agreeable to it and they'll write up a stipulation consistent
 3    with the dates that we've discussed today.  I think that
 4    addresses the concerns, your Honor.
00:42:28 5            THE COURT:  Okay.  In terms of the timing issues
 6    that I just went through, I think it would be useful for the
 7    Government to prepare a proposed order that sets forth the
 8    dates that we've just indicated.  Did you do that,
 9    Mr. Estrada?
00:42:41 10           MR. ESTRADA:  Yes, your Honor.  And I think the
11    other case that the Court referred to is the-- other RICO
12    case 18th Street case.
13            THE COURT:  Yes.
14            MR. ESTRADA:  If I could obtain those documents
00:42:51 15   from those prosecutors.
16            THE COURT:  That's fine.  And there are also jury
17    instructions from that case that might be useful for all
18    parties to look at and decide if they might be of and use.
19            MR. ESTRADA:  Very good.
00:43:02 20           THE COURT:  Okay.  Did you have any other motions
21    or issues that haven't been addressed?
22            MR. COLOMBO:  No, your Honor.
23            THE COURT:  Okay.  Does anyone else have any other
24    matters they wish to discuss?
00:43:22 25           MR. KESSEL:  No, your Honor.
```

```
 1              MR. LANNEN:  Just for clarity, if I may, your
 2   Honor.  Tim Lannen.
 3              Regarding the trial date, if I understood the Court
 4   correctly, I would assume that Group 3 would -- October --
 5   the October date would not be a hard date.  And I ask that
 6   because I have another trial a month before that may overlap.
 7              I'm assuming that the -- that the Government is
 8   going to proceed with Group 2 because I'm anticipating, I
 9   suppose, all the numbers could shrink by the time we get to
10   trial, but I want to just be sure so that I can make
11   Government and the Court aware of any conflict I have, that
12   Group 3 really won't start on October 15th.  Can I assume
13   that.
14              THE COURT:  It's not going to go first.
15              MR. LANNEN:  Right.
16              THE COURT:  So you can assume that it's not going
17   to start on the day that the -- that Number 2 or Number 1 go.
18   But you should assume that it would start at some point
19   thereafter depending on how long the previous group takes.
20   So I don't think we can be more precise than that.
21              MR. LANNEN:  Very well.  Thank you, your Honor.
22              MR. ESTRADA:  And I was just going to mention --
23   obviously it's the Court's preference, however the Court
24   wants to proceed with Group 3 is fine with the Government.
25              THE COURT:  You mean in terms of right afterwards?
```

```
    1              MR. ESTRADA:  Yes.

    2              THE COURT:  I think we should just finish it all

    3     up.

    4              MR. ESTRADA:  Very good.

00:44:36 5         THE COURT:  Okay.  All right.  Thank you.

    6              THE CLERK:  All rise.

    7              (Whereupon, at 1:10 p.m. , the proceeding

    8              concluded.)

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3   COUNTY OF LOS ANGELES )
                           ) ss.
 4   STATE OF CALIFORNIA   )

 5

 6   I, LEANDRA AMBER, OFFICIAL FEDERAL COURT REPORTER, REGISTERED

 7   PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

 8   COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

 9   CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES

10   CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

11   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

12   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS

13   IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

14   CONFERENCE OF THE UNITED STATES.

15

16

17   DATE: _____

18

19

20   _____/s/_____

21   LEANDRA AMBER, CSR 12070, RPR

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25
```

1               **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3                  **WESTERN DIVISION**

4                     **- - -**

5    **HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING**

6

7    **UNITED STATES OF AMERICA,**    )
                                 )

8          **Plaintiffs,**         )
                                 )

9                             )
                                 )

10        **vs.**                ) **No. CR 11-00072-DDP**
                                 ) **(PAGES 37-48 SEALED**

11                           ) **TRANSCRIPT FILED**
                                 ) **SEPARATELY)**

12    **DARBINYAN, et al., (DEFENDANTS** )
    **1, 4, 19, 35, 50, 57, 22, 27,**   )

13    **and 34)**                    )
                                 )

14

15          **Defendants.**
    _____

16

17       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

18         ***STATUS CONFERENCE RE: TRIAL DATE***

19           **LOS ANGELES, CALIFORNIA**

20       **THURSDAY, SEPTEMBER 5, 2013**

21

22            **MARIA R. BUSTILLOS**
          **OFFICIAL COURT REPORTER**

23            **C.S.R. 12254**
        **UNITED STATES COURTHOUSE**

24        **312 NORTH SPRING STREET**
              **ROOM 404**

25     **LOS ANGELES, CALIFORNIA 90012**
           **(213) 894-2739**

2

1                        **A P P E A R A N C E S**

2

3

4        **ON BEHALF OF THE PLAINTIFFS,**
         **UNITED STATES OF AMERICA:**        OFFICE OF THE UNITED STATES
5                                             ATTORNEY
                                              BY:  MARTIN ESTRADA, ESQ.
6                                             312 NORTH SPRING STREET
                                              12TH FLOOR
7                                             LOS ANGELES, CALIFORNIA 90012
                                              (213)894-4477
8

9                                             OFFICE OF THE UNITED STATES
                                              ATTORNEY
10                                            BY:  ANDREW CREIGHTON, ESQ.
                                              312 NORTH SPRING STREET
11                                            15TH FLOOR
                                              LOS ANGELES, CALIFORNIA 90012
12                                            (213)894-2579

13

14       **ON BEHALF OF THE DEFENDANTS,**
         **DARBINYAN, et al.**                **THE SEVERO LAW FIRM**
15       **(DEFENDANTS 1, 4, 19, 35,**        **BY:  MICHAEL V. SEVER, ESQ.**
         **50, 57, 22, 27, and 34):**         **70 LAKE AVENUE**
16                                            **SUITE 945**
                                              **PASADENA, CALIFORNIA 91101**
17                                            **(626)844-6400**

18
                                              **LAW OFFICES OF CHARLES**
19                                            **PEREYRA-SUAREZ**
                                              **BY:  CHARLES PEREYRA-SUAREZ,**
20                                            **ESQ.**
                                              **800 WILSHIRE BOULEVARD**
21                                            **12TH FLOOR**
                                              **LOS ANGELES, CALIFORNIA 90017**
22                                            **(213)623-5923**

23

24       **ALSO APPEARING:**

25

                        UNITED STATES DISTRICT COURT

```
 1              A P P E A R A N C E S  (CONT'D)

 2

 3

 4      ON BEHALF OF THE DEFENDANTS,
        DARBINYAN, ET AL.              LAW OFFICES OF DALE RUBIN
 5      (DEFENDANTS 1, 4, 19, 35,      BY:  DALE M. RUBIN, ESQ.
        50, 57, 22, 27, and 34):       2274 HUNTINGTON DRIVE
 6                                      SUITE 902
                                        SAN MARINO, CALIFORNIA 91108
 7                                      (800)695-3717

 8
                                        LAW OFFICES OF GEORGE
 9                                      BUEHLER
                                        BY:  GEORGE W. BUEHLER, ESQ.
10                                      350 WEST COLORADO BOULEVARD
                                        SUITE 200
11                                      PASADENA, CALIFORNIA 91105
                                        (626)792-0500
12

13

14      ON BEHALF OF THE DEFENDANTS,
        DARBINYAN, et al.              LAW OFFICES OF DOMINIC
15      (DEFENDANTS 1, 4, 19, 35,      CANTALUPO
        50, 57, 22, 27, and 34):       BY:  DOMINIC CANTALUPO, ESQ.
16                                      100 WILSHIRE BOULEVARD
                                        SUITE 940
17                                      SANTA MONICA, CALIFORNIA 90401
                                        (310)388-6016
18
                                        LAW OFFICES OF MARK WINDSOR
19                                      BY:  MARK WINDSOR, ESQ.
                                        1 FAIR OAKS AVENUE
20                                      SUITE 401
                                        PASADENA, CALIFORNIA 91105
21                                      (626)792-6700

22

23

24

25
```

1                    **A P P E A R A N C E S** (CONT'D)

2

3      ON BEHALF OF THE DEFENDANTS,
       DARBINYAN, ET AL.                GERAGOS & GERAGOS, APC
       (DEFENDANTS 1, 4, 19, 35,        BY:  ROBERT KALUNIAN, ESQ.
4      50, 57, 22, 27, and 34):         644 SOUTH FIGUEROA STREET
                                        LOS ANGELES, CALIFORNIA 90017
5                                       (213)625-1600

6
                                        GERAGOS & GERAGOS, APC
7                                       BY:  MARK JOHN GERAGOS, ESQ.
                                        644 SOUTH FIGUEROA STREET
8                                       LOS ANGELES, CALIFORNIA 90017
                                        (213)625-1600
9

10
       ON BEHALF OF THE DEFENDANTS,
11     DARBINYAN, et al.                LAW OFFICES OF ALEX KESSEL
       (DEFENDANTS 1, 4, 19, 35,        BY:  ALEX R. KESSEL, ESQ.
12     50, 57, 22, 27, and 34):         15910 VENTURA BOULEVARD
                                        SUITE SUITE 1030
13                                      ENCINO, CALIFORNIA 91436
                                        (818)995-1422
14

15                                                           PAGE
       STATUS CONFERENCE RE: TRIAL DATE:                      5
16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, SEPTEMBER 5, 2013

 2                                  -o0o-

 3                    (COURT IN SESSION AT 10:59 A.M.)

 4              THE CLERK:  Calling item one through nine,

 5     CR 11-00072(A)-DDP:  United States of America v. Mher

 6     Darbinyan, et al.

 7              Before the Court today are defendants 1, 4, 19, 35,

 8     50, 57, 22, 27, and 34.

 9              Counsel, may we have appearances for defendant

10     number one.

11              MR. WINDSOR:  Good morning, Your Honor.

12              Mark Windsor, specially appearing for

13     Anthony Colombo.

14              MR. SEVERO:  Good morning, Your Honor.

15              Michael Severo, seeking the Court's approval for

16     substitution of attorney in this case.

17              THE COURT:  I'm sorry?  What is your status,

18     Counsel?

19              MR. SEVERO:  I'm seeking approval of my request for

20     substitution of attorney, per Mr. Darbinyan's request.

21              THE COURT:  You want to substitute in?

22              MR. SEVERO:  Yes.  I filed my request last week.

23              THE COURT:  Sure.  And Mr. Colombo, who has been

24     representing this person for two years --

25              MR. SEVERO:  That's correct.
```

1        THE COURT:  -- is not going to be here today, and

2    didn't think it was important enough to be here today when we

3    are 40 days from trial?  I don't want to begrudge him

4    personally.  I know he's a fine lawyer, but I have difficulty

5    understanding how he would not be here today.

6        MR. SEVERO:  I think my client feels the same way.

7        THE COURT:  Well, that doesn't answer the question

8    for me, because those matters are typically handled in camera

9    or with a sealed courtroom.  And then I can make the type of

10   inquiry that I'm required to make to determine whether the

11   substitution is bona fide or there is some other tactical

12   reason for the substitution.  So I cannot do that now.

13       MR. WINDSOR:  To the extent it may be helpful to

14   the Court, I have spoken to Mr. Colombo by telephone in

15   preparation for this hearing.  And he indicated to me that he

16   received the request from his client; that he checked in with

17   his client about this, and he spoke to the client's wife, as

18   well; that he signed the substitution of counsel and that it

19   was his understanding that it was a foregone conclusion he

20   was going to be substituted out.  And he's appointed on this

21   case.  He certainly didn't want to cause any unnecessary

22   expenses to the CJA panel at this particular time to come up

23   here from San Diego and make the appearance when it appeared

24   to be a foregone conclusion.  So to the extent that that's

25   helpful to the Court, I believe that's the rationale.

```
1              THE COURT:  Well, okay.  I mean, why wasn't it made
2    earlier?
3              MR. SEVERO:  What wasn't --
4              THE COURT:  The request for substitution made
5    earlier?
6              And should I seal the courtroom to ask that
7    question?
8              MR. SEVERO:  It's simply that Mr. Darbinyan has
9    chosen to retain counsel at this time based on --
10             THE COURT:  And he also wants to delay the trial?
11             MR. SEVERO:  Well, it's the only time he's asked
12   for a delay of trial.
13             THE COURT:  Well, that may be.  And I'm not --
14   I apologize for my tone.  I'm not trying to be
15   confrontational with you.  I'm just trying to manage the
16   case.
17             MR. SEVERO:  I realize that.
18             The COURT:  And, you know, I -- we agreed on this
19   date.  It's not unusual for parties for various reasons, not
20   all of are legitimate reason to seek new counsel on the eve
21   of trial -- and 40 days before trial involving a case that
22   involves how many counts against Mr. Darbinyan?
23             MR. ESTRADA:  At least over 20, Your Honor.
24             THE COURT:  It is in my book on the eve of trial,
25   especially when we're dealing with a trial estimate of
```

```
1    several months; right?
2              MR. ESTRADA:  For Mr. Darbinyan, the estimate would
3    be four to six weeks, Your Honor.
4              MR. SEVERO:  I believe that there's an additional
5    reason.  And that is that within the last week or ten days,
6    over 5000 pages of new discovery have been provided that I
7    don't believe will allow trial to go forth in 40 days,
8    because too new to be processed and to be -- allow counsel --
9    and I don't want to speak for all other counsel -- but
10   certainly, for Mr. Colombo in my consultations with him, that
11   he would not be able to go to trial on October 15th as
12   scheduled.
13             MR. WINDSOR:  Your Honor, I can speak to this
14   issue, as well on behalf of Vartan Avedisian, who is
15   defendant number 57 whom I represent, as well...
16             We have received the same discovery on July 31st or
17   around there.  The pages that we received were somewhat
18   voluminous.  They appear to be -- to have been within the
19   possession of the Government for some time.
20             In addition, I am still waiting to receive pole
21   camera video and other discovery that apparently exceeds 1.5
22   terabytes of material that has been made available by the
23   Government.  I immediately produced to the Government a
24   hard drive to receive that material at the end of July, and I
25   am still waiting for that to be produced.  It is my
```

1  understanding that there is over 5000 hours of pole camera

2  video.  I don't intend to review it all, but some of that

3  pole camera video, involves a Ratner lot that my client is

4  associated with.  And that's a lot on Ratner that is, I

5  believe, going to be the subject of some critical testimony

6  at the trial in this matter.  So I really must review it, and

7  I haven't even received it let alone had time to review that

8  early it.  So on behalf of Mr. Avedisian -- and I did, in

9  fact, discuss this with Mr. Colombo, I planned on making a

10  request to continue the trial as well.

11          MR. ESTRADA:  And, Your Honor, if I can just

12  clarify that...

13          The Government in preparation for trial, produced

14  discovery.  The vast bulk of it is redundant with other

15  materials already produced.  As the Court is very familiar in

16  preparing for the trial, the Government must speak with the

17  witnesses local officers.  Many of the reports that were

18  produced, are simply redundant with other copies of FBI

19  reports that have already been produced.

20          With regard to pole camera footage, that is pole

21  camera footage from the time of the wiretaps, which of

22  course, was set forth within the wiretap applications and

23  affidavits.

24          The Government made clear in its letters to

25  counsel, it intends to use none of that material at trial.

```
 1    None of it will be used in the case in chief.  And the

 2    Government believes none of it is relevant; nonetheless, in

 3    an abundance of caution, it's stated that if counsel wished

 4    to view these thousands of hours of video, it can do so.  The

 5    only counsel who requested that was counsel for

 6    Mr. Avedisian.  The Government is downloading that.  It's

 7    taken two weeks to get that material onto hard drive.  And

 8    the Government is in the process of still doing that.

 9          So I understood that this discovery issue was going

10    to come up; but the vast bulk of this is material that

11    counsel already has.  And beyond that, it's materials that

12    are redundant with other reports already produced by the

13    Government.

14          THE COURT:  Have you requested the pole camera

15    videos?  Are they relevant to your defense -- I mean I

16    shouldn't ask you that question.  So I take it back.

17          Have you asked for the pole camera?

18          MR. SEVERO:  I have not.  I have -- because the

19    Court has not signed my request for approving substitution of

20    attorney...

21          THE COURT:  That's correct.

22          MR. SEVERO:  I have not.

23          THE COURT:  But has it been made on your client's

24    behalf?

25          MR. SEVERO:  I believe --
```

```
1              MR. ESTRADA:  It has not, Your Honor.
2              THE COURT:  All right.
3              MR. ESTRADA:  The only defendant who asked for it
4    was Avedisian, which is Mr. Windsor's client.
5              MR. SEVERO:  But the concern I have -- the concern
6    I have is -- and I appreciate Mr. Estrada's characterization
7    of the discovery; but I think it behooves every defense
8    lawyer to review the information and determine whether, in
9    fact, it is redundant or whether in fact, there is some Brady
10   material there that might be helpful to the Defense.  I don't
11   think that we should be allowed -- should be required --
12             THE COURT:  You're talking about the 5,000 pages of
13   material?
14             MR. SEVERO:  Whatever is new that he believes is
15   redundant.  I'm not talking about whatever has been produced
16   earlier, because obviously that's not --
17             THE COURT:  Right.  I was just talking about the
18   pole camera.
19             MR. SEVERO:  Yes --
20             THE COURT:  Are you talking about both things?
21             MR. SEVERO:  I don't know what's there.
22             THE COURT:  Okay.
23             MR. SEVERO:  I don't know what's there, but I think
24   it's important for defense counsel -- at least in my humble
25   opinion, to review if -- even if --
```

```
 1              THE COURT:  Let me just ask you sort of a practical
 2     question:  So this trial is scheduled to go October 15th; is
 3     that right?
 4              MR. SEVERO:  That's correct.
 5              THE COURT:  Okay.  And then we have trailing the
 6     groups three and the single defendant?
 7              MR. SEVERO:  Correct.
 8              THE COURT:  So that was the plan.  The problem is
 9     if I don't go forward on October 15th -- and I maybe take the
10     single defendant case, Mr. Kessel, will probably object to
11     that.  There's Mr. Kessel col.
12              MR. KESSEL:  I am here, Your Honor.  And I would
13     like to address it in terms of an objection.
14              THE COURT:  No, I understand that.  Then we get
15     into Thanksgiving and Christmas.  And I tell jurors, Gee,
16     you're going to be in a two-month trial perhaps, starting
17     sometime mid-November.  And then every one of them says,
18     Well, I have plans over Christmas.  I'm going to be gone for
19     two weeks.  And then we end up with asking our jury
20     department to bring down, you know, twice as many jurors.
21     And we end up having a difficult case management problem.
22              THE DEFENDANT:  I understand, but from my part,
23     just knowing what there is by way of discovery and my
24     conversations with Mr. Colombo, it was my request -- and I
25     think Mr. Estrada and I have spoken about a -- a more time of
```

```
1    a couple of months.  We have actually selected the date of
2    March 11th potentially to ask the Court to approve that.
3    That I think in view of the volume of this case with new
4    counsel coming in -- counsel of Mr. Darbinyan's, choice.  I
5    think a six-month continuance is not unreasonable and I,
6    again, reiterate that the Court -- that Mr. Darbinyan -- any
7    delays in this trial -- this case started in February of '11.
8    Any delays in this trial have not been because he's gone back
9    and forth.  He -- I'm speaking about Mr. Darbinyan -- gone
10   back and forth changing lawyers.  He hasn't done that.  It
11   just has come to a point where he hasn't even seen the new
12   discovery.  There's been a -- a falling out --
13            THE COURT:  Okay.  Well, let's -- we'll sort of
14   argue the merits in a moment.
15            Let me just talk to the Government about when you
16   think this matter should go to trial.  And I'm talking about
17   group two.
18            MR. ESTRADA:  Your Honor, the Government has always
19   been prepared to take this case to trial anytime the Court
20   wishes.
21            THE COURT:  Sure.  What is your current position on
22   the request for a continuance?
23            MR. ESTRADA:  We would not -- well, first a
24   substitution, we wouldn't oppose a substitution request.  I
25   think under the law counsel is entitled to it, so long as he
```

1    can show that his continuance isn't through some sort of

2    purposeful delay or something of that sort.  And that's why

3    the Government provided the case law and inquiries to the

4    Court that it did.

5             With regard to a continuance, if Mr. Severo is

6    allowed into the case, the Government wouldn't oppose a

7    continuance.  I think a little context is in order.

8             Mr. Darbinyan has asked for continuances in the

9    past.  And I think looking at the case as a whole, it was

10   charged in February of 2011.  There was a wiretap suppression

11   motion in mid 2012.  Mr. Darbinyan filed his own wiretap

12   motions, as well as other various motions which were heard by

13   this Court in March of this year.

14            At that time, this Court made very clear that the

15   Court -- that the case had been pending for a very long time

16   and that this next continuance would be the last continuance.

17            THE COURT:  Sure.  Then what do I do with the

18   5,000 hours of pole camera -- or not 5,000 hours -- whatever

19   it was -- the 5,000 pages of documents and then the two years

20   of streaming video?  I don't know if that's the right number,

21   but it seemed like a lot.

22            MR. ESTRADA:  Always in preparation for a case, the

23   Government is going to uncover information that local law

24   enforcement may have --

25            THE COURT:  How many hours are in that pole camera

1   video?

2           MR. ESTRADA:  Can I have a moment, Your Honor?

3           THE COURT:  Yes.

4           MR. ESTRADA:  I'm told it's approximately hundreds

5   of hours.  He's not sure exactly of number of hours, but it

6   is numerous hours; but just to be clear, the Government

7   doesn't intend to use any of the --

8           THE COURT:  I understand that, but the Defense is

9   going to say, So what?  We might think that there is

10  something in there that's important.

11          MR. ESTRADA:  And of course, it doesn't go to

12  the -- it goes to the period of time where a wiretap

13  interception is being sought.  And the existence of the pole

14  camera is set forth in the affidavits.  And of course,

15  the mere --

16          THE COURT:  How is that relevant?

17          MR. ESTRADA:  Well, the mere fact that the pole

18  cameras were available didn't defeat any sort of necessity.

19  So just by viewing the videos, there is going to be nothing

20  in there that's going to show that the wiretap issue needs to

21  be revisited.  The Government is not going to use it in its

22  case in chief.

23          THE COURT:  I don't they're arguing that.  I think

24  they're just saying there may be some absence of someone on a

25  pole camera that may be important or there may be something

1    in there that is inconsistent with some witness may say.

2             MR. ESTRADA:  But that's all it could show,

3    absence.  But the Government --

4             THE COURT:  Well, it's not a little thing.

5             MR. ESTRADA:  It is a little thing when the

6    Government isn't alleging that the person was there at all

7    during that period of time, because in the case in chief

8    we're not going to allege during the entire time the pole

9    camera was up, that any of those people were there.  So the

10   absence --

11            THE COURT:  What was pole camera looking at?

12            MR. ESTRADA:  Just a moment, Your Honor.

13            Just because there were -- I want to clarify which

14   pole camera this was.  It was in a lot in north Los Angeles

15   county where the defendants would routinely meet.  However,

16   there is a gate on that lot that prevented any visual from

17   the outside, and the pole camera I understand was also

18   blocked by that same gate.  So essentially, the video is a

19   view of this gate or wall where the defendants would be

20   meeting inside.

21            THE COURT:  So you can't see any person at any time

22   on the pole camera?

23            MR. ESTRADA:  I think you can see people going in

24   and out, but the Government isn't using that in any way in

25   its case in chief.

```
 1              THE COURT:  I understand.  Mr. Chambers, why don't
 2    we continue with appearances in some since you kindly
 3    reminded me that I didn't let you do that.
 4              THE CLERK:  Continuing with appearances, may I have
 5    appearance for defendant number four.
 6              MR. PEREYRA-SUAREZ:  Yes, Your Honor.
 7              Charles Pereyra-Suarez.  Good morning.  For
 8    Mr. Sharopetrosian; he's present, in custody.
 9              THE COURT:  Good morning.
10              THE CLERK:  For defendant 19.
11              MR. RUBIN:  Yes.  Good morning, Your Honor.
12              Dale Rubin on behalf of Mr. Pembejian.  He is
13    present in the audience; he's on bond.
14              THE CLERK:  For defendant 35.
15              MR. BUEHLER:  Good morning, Your Honor.
16              George Buehler for Mr. Parsadanyan, who is present.
17              MR. FLIER:  Andrew Flier, I'm also here.  I'm going
18    to be requesting to substitute in also, Your Honor.
19              Thank you.
20              THE CLERK:  For defendant 50.
21              MR. CANTALUPO:  Dominic Cantalupo, Your Honor.
22    Good morning.  For my client, Miguel Ramirez, who's present;
23    he's on bond.
24              THE COURT:  Good morning.
25              THE CLERK:  Could I have appearance for defendant
```

```
 1    number 57.

 2              MR. WINDSOR:  Mark Windsor, Your Honor, on behalf

 3    of Vartan Avedissian who has a waiver on file.

 4              THE CLERK:  For that of defendant 22?

 5              MR. GERAGOS:  Good morning, Your Honor.

 6              Mark Geragos, G-e-r-a-g-o-s for my client who is

 7    present.

 8              THE CLERK:  And also defendant 27?

 9              MR. GERAGOS:  Also appearing for Pat Harris for

10    Mr. Teroganesyan who is also present in the back.

11              MR. KALUNIAN:  And Robert Kalunian, requesting to

12    sub in on behalf of Mr. Teroganesyan.

13              THE CLERK:  And Mr. Geragos is for defendant number

14    27, and Mr. Harris is for defendant number 22.

15              And for defendant 34.

16              MR. KESSEL:  Good morning, Your Honor.

17              Alex Kessel for Karine Mkrtchyan.  She is present;

18    out on bond.

19              THE CLERK:  And with that, that of the Government.

20              MR. ESTRADA:  Good morning, Your Honor.

21              Martin Estrada on behalf the United States.  With

22    me at counsel table is Andrew Creighton, Department of

23    Justice, trial attorney.

24              Also with me at counsel table is FBI Special Agent

25    Joseph Rock.
```

```
1              THE COURT:  Good morning.
2              Just, Mr. Estrada, and Mr. Geragos, just remind me
3   at some point...
4              There's a substitution request.  Your firm
5   represents two defendants, Mr. Geragos?
6              MR. GERAGOS:  Yes, Your Honor.  The -- I
7   represent -- or Mr. Harris, who was with me who was my
8   partner for 17 years, was representing Mr. Teroganesyan, he
9   left the firm about a month and a half ago.  Mr. Kalunian has
10  now joined the firm.  He's met with Mr. Teroganesyan and is
11  requesting to sub in.
12             THE COURT:  Okay.  And one of the questions that
13  always pops up when you have counsel from the same firm
14  representing codefendants, is the issue of conflict.  So at
15  some point we probably need to talk about that issue.
16  And so --
17             MR. GERAGOS:  We have -- I've executed conflict
18  waivers between the two of them, and we can do -- handle it
19  in whatever fashion the Court wants.
20             THE COURT:  Okay.  Thank you.
21             All right.  Mr. Estrada, just sort of cutting
22  through this a little bit.  My sense is that this trial
23  probably needs to get continued because of the new discovery.
24  We could argue about the merits of what may be in that
25  discovery, but it seems to me that I probably would allow a
```

```
 1   brief continuance, at least for purposes of this current

 2   discussion group two.

 3            So did you talk about dates?

 4            MR. ESTRADA:  We -- Mr. Severo and I had spoken.

 5   The earlier that Mr. Severo believes he could do the trial is

 6   March 11th.  That would be fine with the Government.  Of

 7   course, if we set March 11th, there would need to be some

 8   additional dates -- motion cutoff dates and a motion in

 9   limine hearing date would need to be set as well.

10            THE COURT:  Okay.  And do any counsel in group two

11   object to a continuance to March 11th?

12            THE CLERK:  Counsel, for the record, please answer.

13            MR. PEREYRA-SUAREZ:  Your Honor,

14   Charles Pereyra-Suarez again.  I have no objection on behalf

15   of Mr. Arman Sharopetrosian.

16            MR. RUBIN:  Dale Rubin on behalf of Mr. Pembejian.

17   We have no objection.

18            MR. CANTALUPO:  Dominic Cantalupo on behalf of

19   Miguel Ramirez; no objection.

20            MR. WINDSOR:  Mark Windsor on behalf of

21   Vartan Avedissian; no objection, Your Honor.

22            MR. FLIER:  On behalf of number 35; if I'm allowed

23   in no objection, of course, Your Honor.  And that date is

24   fine.

25            THE COURT:  Okay.  In terms of moving the dates,
```

```
 1    have you worked out a schedule that would keep the same gaps
 2    essentially?
 3            MR. ESTRADA:  Yes, Your Honor.  The -- we had
 4    already started down the path with disclosures.  That's
 5    already been done.  The next date that was pending was the
 6    motion in limine filing date.  I've discussed this with
 7    Mr. Severo.  We talked about a date of February 10th, 2014,
 8    as the deadline for filing motions in limine; with the
 9    oppositions due a week later and the hearing being
10    February 24th, 2014, if that works for the Court?
11            THE COURT:  Okay.  And what other dates?
12            MR. ESTRADA:  There was also a *Jencks* disclosure
13    date with regard to information regarding testifying
14    witnesses.  And that would be February 25th, 2014, the day
15    after the motion in limine hearing and two weeks before the
16    trial date.
17            THE COURT:  All right.  Any other dates?
18            MR. ESTRADA:  That's all, Your Honor.
19            THE COURT:  Okay.  Any counsel object to those
20    dates?
21            MR. SEVERO:  I certainly don't object, because --
22            THE CLERK:  State your name for the record.
23            MR. SEVERO:  Michael Severo for Mr. Darbinyan.
24            My only concern is that I may want to move the
25    Court for an earlier disclosure date, but I -- and I don't
```

```
1    want to prejudice that by simply stipulating; but I would not
2    disagree with these dates otherwise.
3              THE COURT:  Okay.  Let's just do this then:  It
4    seems to me that there is good cause to continue the trial.
5    Have -- how are we in Speedy Trial Act issues?
6              MR. ESTRADA:  The current waiver goes through
7    January 2014.  So I would request that defendants who are
8    present here, also make waivers on the record.
9              THE COURT:  Okay.  And let me just address all of
10   the defendants in group two...
11             If you could just state their names for me, please.
12             MR. ESTRADA:  Yes.  First, would be defendant
13   number one, Mher Darbinyan.
14             THE COURT:  State them all.
15             MR. ESTRADA:  Mher Darbinyan -- let me take my --
16   let's see here...
17             Second, would be defendant Sharopetrosian --
18   Arman Sharopetrosian.
19             Third defendant, people Artur Pembejian.
20             Fourth, Vardan Amirkhanyan.
21             Fifth defendant, Rafael Parsadanyan.
22             And finally, defendant Miguel Ramirez which is I
23   think all remaining six.
24             THE COURT:  Okay.  So to those defendants, do you
25   understand your rights under the Speedy Trial Act?  And if
```

1    so, please state yes and state your name.

2           DEFENDANT DARBINYAN:  Yes.  Mher Darbinyan...

3           DEFENDANT PETROSIAN:  Yes, Your Honor.  Arman

4    Sharopetrosian...

5           DEFENDANT PARSADANYAN:  Raphael Parsadanyan...

6           Yes.

7           DEFENDANT RAMIREZ:  Miguel Ramirez...

8           Yes.

9           Artur Pembejian...

10          Yes.

11          MR. WINDSOR:  Mr. Avedissian is not present in

12   court today.  How would you like me to proceed as far as he's

13   concerned?

14          THE COURT:  You'll -- as with everyone else, there

15   will also be a written waiver of the Speedy Trial Act issues.

16   If there is any issue with your client, you'll advise

17   Mr. Estrada forthwith.

18          MR. WINDSOR:  I have spoken with him on the

19   subject, and I don't anticipate any issues.

20          THE COURT:  Okay.  Okay.

21          Let me just indicate to the defendants that under

22   the Speedy Trial Act you have a right to have your case go to

23   trial within 70 days of the latter of the date of the

24   indictment or information or your first appearance before a

25   judicial officer.  If you do not waive your rights under the

```
 1    Speedy Trial Act, then you must end -- the law provides that
 2    you are entitled to go to trial within that 70-day period.
 3            Again, to each defendant, do you understand your
 4    rights under the Speedy Trial Act?
 5            And again, I'll have you -- why don't you just
 6    state your defendant number at this point.  We'll make it
 7    simple.
 8            DEFENDANT DARBINYAN:  Number one, Mher Darbinyan...
 9            Yes.
10            DEFENDANT SHAROPETROSIAN:  Number four,
11    Arman Sharopetrosian...
12            Yes.
13            DEFENDANT PEMBEJIAN:  19, yes.
14            DEFENDANT PARSADANYAN:  Number 35, yes.
15            DEFENDANT RAMIREZ:  50, yes.
16            THE COURT:  And again to all defendants --
17            THE CLERK:  Your Honor, I apologize --
18            THE COURT:  To all defendants, have you had a
19    chance to discuss with your attorney your rights under the
20    Speedy Trial Act?  Same drill, please.
21            DEFENDANT DARBINYAN:  Mher Darbinyan...
22            Yes.
23            DEFENDANT SHAROPETROSIAN:  Yes.
24            DEFENDANT RAMIREZ:  Yes.
25            DEFENDANT PEMBEJIAN:  Artur Pembejian...
```

```
 1              Yes.
 2              THE COURT:  And do you have any questions at all
 3    concerning your rights under the Speedy Trial Act,
 4    Mr. Darbinyan?
 5              DEFENDANT DARBINYAN:  Mher Darbinyan...
 6              No.
 7              DEFENDANT SHAROPETROSIAN:  Arman Sharopetrosian...
 8              No.
 9              DEFENDANT PARSADANYAN:  Raphael Parsadanyan...
10              No.
11              DEFENDANT RAMIREZ:  Miguel Ramirez...
12              No.
13              DEFENDANT PEMBEJIAN:  Artur Pembejian...
14              No.
15              THE COURT:  And to counsel, in the same order...
16              Have you discussed with your client their rights
17    under the Speedy Trial Act?
18              MR. SEVERO:  Michael Severo for Mr. Darbinyan, yes.
19              MR. PEREYRA-SUAREZ:  Charles Pereyra-Suarez for
20    Mr. Sharopetrosian, yes, I have.
21              MR. RUBIN:  Dale Rubin on behalf of Mr. Pembejian,
22    yes.
23              MR. FLIER:  Andrew Flier on behalf of number 35,
24    yes, Your Honor.
25              MR. WINDSOR:  Mark Windsor on behalf of number 57,
```

26

```
 1     yes, Your Honor.
 2              MR. CANTALUPO:  Dominic Cantalupo on behalf of
 3     Miguel Ramirez, number 50, yes.
 4              THE COURT:  Okay.  Very well.  Then the Court finds
 5     that the clients -- the defendants understand their rights
 6     under the Speedy Trial Act.  The Court continues the trial
 7     date until March 11th; is that the date?
 8              MR. ESTRADA:  Yes, Your Honor.
 9              THE COURT:  Okay.  And the other dates that
10     Mr. Estrada stated will become the new cutoff dates for the
11     various matters that he mentioned.  It's without prejudice by
12     counsel to file a motion to seek relief from those dates, if
13     appropriate.  In terms of the substitution of counsel...
14              I will grant the substitution of counsel motion on
15     behalf of Mr. Colombo and Mr. Darbinyan.  And Mr. Severo is
16     now counsel of record.
17              MR. SEVERO:  Thank you, Your Honor.
18              THE COURT:  There is another request for
19     substitution of counsel as well.
20              MR. BUEHLER:  Number 35, Your Honor --
21     Mr. Parsadanyan.  Mr. Flier is seeking to substitute in.
22              THE COURT:  Okay.  And you're -- is there any
23     objection to that request by the Government?
24              MR. ESTRADA:  No, Your Honor.
25              THE COURT:  Okay.  And, sir, you want to substitute
```

```
 1     Mr. Flier in for present counsel; is that correct?
 2              DEFENDANT PARSADANYAN:  Yes, Your Honor.
 3              THE COURT:  Okay.  The Court grants that motion as
 4     well.
 5              Are there any other substitution of counsel issues?
 6              MR. GERAGOS:  I believe it's number 22.
 7              THE COURT:  Yes, sir.
 8              MR. GERAGOS:  It's a different group.
 9              THE COURT:  Okay.  I will grant that motion just
10     subject to a discussion that I think we need to have about
11     possible conflict issues.
12              MR. Geragos:  Correct.
13              THE COURT:  Okay.  In terms of the next group of
14     defendants, I anticipate they're probably going to raise the
15     same discovery issues, at least as to group three.
16              Have you discussed trial dates with group three and
17     with the single defendant?
18              MR. ESTRADA:  We have, Your Honor; but just to be
19     clear:  This discovery issue pertains to group two, because
20     the additional reports that were produced with regard to the
21     99 Cents Only Stores scheme.  And the only new material -- I
22     just want to be clear about this, was a BNA examination -- or
23     a skimming device that connected to a different defendant,
24     Khachatur Arakelyan who's now filed a plea agreement and
25     additionally, a letter written by Mr. Darbinyan in which he
```

```
 1    is threatening one of the witnesses in this case.

 2           MR. SEVERO:  I'm going to object to that as a

 3    conclusion of Mr. Estrada without any foundation --

 4           MR. ESTRADA:  Well, that's the only new material

 5    that was produced.  So it doesn't impact at all the

 6    severed defendant or the group three defendants.

 7           THE COURT:  The seven -- you said the seven

 8    defendants?

 9           MR. ESTRADA:  The severed defendant.

10           THE COURT:  Oh, "the severed"?

11           MR. ESTRADA:  Yes.

12           THE COURT:  Oh, okay.  The severed defendants are

13    just the two defendants that --

14           MR. ESTRADA:  Just one that's --

15           THE COURT:  Or the severed defendant -- yes, yes.

16    Yes, I understand that.  So that just leaves the three

17    defendants.

18           MR. ESTRADA:  Correct, Your Honor.

19           One severed defendant, Karine Mkrtchyan and two

20    defendants who would have been in group three which are

21    Oganes Teroganesyan and Andrew Nigoloyan (phonetic).

22           THE COURT:  Okay.  And is there any reason that we

23    can't go forward with those trials on the currently scheduled

24    trial date which --

25           THE CLERK:  To October --
```

```
 1              THE COURT:  -- which is October 15th?
 2              MR. GERAGOS:  I talked to the Government before
 3    this morning about potentially moving the date from October
 4    to December.  If Mr. Aloyan is tried alone, I don't
 5    anticipate that the case would take longer than two or
 6    three days to try.  So not running into the case management
 7    issue that you'd brought up for a six or eight-week trial
 8    over the holidays.  I think if we try Aloyan alone -- and I
 9    say that, because there is some discussion about
10    Mr. Teroganesyan's pleading.  Aloyan I can fit in virtually
11    anytime in December if the Court is available.  October 15th,
12    my only worry is I've got three or four other cases that
13    could potentially go, in effect, that date.  December I don't
14    have the same problem.
15              THE COURT:  I see.  Okay.  And if there isn't a
16    resolution though, I would not want to continue those dates.
17    They would just have to be that date.  It would have to be a
18    firm date either way.
19              MR. GERAGOS:  Correct.
20              THE COURT:  Okay.
21              MR. GERAGOS:  Correct.  I mean, and December
22    usually opens up.  For whatever reason, most people are not
23    trying cases in December.
24              THE COURT:  Okay.  All right.
25              Is there any objection to say the first week in
```

```
 1    December for group number three?
 2              MR. ESTRADA:  No objection, Your Honor.
 3              Just to be clear, I agree with Mr. Geragos, that if
 4    Andrew Nigoloyan (phonetic) is tried separately, it would
 5    take no more than a week or three days.  If
 6    Oganes Teroganesyan remains in the case, I think a real more
 7    realistic estimate would be approximately two weeks.
 8              THE COURT:  Okay.  Well, then let's make it the
 9    first week in December.
10              THE CLERK:  And that date is December 3rd, 2013.
11              THE COURT:  And is that date still within your
12    current Speedy Trial Act waiver?
13              MR. GERAGOS:  I believe that it is, yes.
14              THE COURT:  Okay.  So that is your new trial date
15    as well.
16              MR. GERAGOS:  Thank you, Your Honor.
17              THE COURT:  And in terms of Mr. Kessel.
18              MR. ESTRADA:  Oh, one thing, Your Honor, before we
19    move on to Mr. Kessel...
20              I believe counsel had requested new motion dates.
21              MR. GERAGOS:  Correct.  I forgot.
22              THE COURT:  Sure.  And what do you have there,
23    Mr. Estrada?
24              MR. ESTRADA:  It would seem the manageable -- from
25    our schedule -- but it obviously depends on what's convenient
```

```
 1    to the Court -- it would be a hearing date -- let me pull up
 2    my calendar here.
 3                    (Pause in the proceedings.)
 4              MR. ESTRADA:  If convenient to the Court,
 5    November 18th which is a Monday for the hearing date --
 6              THE COURT:  That's fine.
 7              MR. ESTRADA:  -- with motions to be filed
 8    October 28th and any oppositions to be due November 11th.
 9              THE CLERK:  That's a week before the hearing date.
10              THE COURT:  That's fine.
11              Okay all right.  Those are the new dates.  And
12    we'll table the conflict issue just for a moment.  And we'll
13    go to Mr. Kessel.
14              MR. KESSEL:  Thank you, Your Honor.
15              Having been at the last appearance where my client
16    was severed and she was going to be the last person tried, I
17    just have some other commitments, Your Honor, definitely in
18    October and November through the end of the year.  I also
19    think practically, Your Honor, my client is the wife of
20    Mr. Darbinyan, and she's charged in a very small section
21    provision of the -- of the indictment regarding a loan fraud.
22              I think, Your Honor -- and I would hope the
23    Government would concur that the resolution of
24    Mr. Darbinyan's case may very well help settle my client's
25    case.  And I think there is some practicality in that.  For
```

1   those two reasons, Your Honor, it's my request that

2   Ms. Mkrtchyan trail or have a date set after the March date,

3   Your Honor.

4              THE COURT:  Any objection?

5              MR. ESTRADA:  The Government has no objection to

6   that, Your Honor.

7              THE COURT:  That's fine, Mr. Kessel.

8              MR. KESSEL:  Thank you, Your Honor.

9              THE COURT:  Okay.  So we'll set it the same date as

10  the -- as the trial, March 11th.

11             MR. KESSEL:  11th, Your Honor.

12             THE COURT:  And it will simply trail, and you will

13  have your client execute a Speedy Trial Act stipulation if

14  that's an issue.

15             MR. KESSEL:  Yes.

16             MR. ESTRADA:  Perhaps if it's easier for the Court,

17  the Government can prepare a stipulation circulated to all

18  the parties; have them -- the counsel sign.  We already have

19  the defendants' waivers and then also prepare a proposed

20  order which would encompass the group two defendants and the

21  severed defendant, Karine Mkrtchyan.

22             THE COURT:  That will be helpful.

23             Thank you.

24             MR. ESTRADA:  And the only thing we need on the

25  record is Ms. Mkrtchyan make her waiver.

```
1              THE COURT:  Yes, ma'am.  And you heard me go
2    through the speedy Trial act.
3              MR. KESSEL:  She's on crutches, Your Honor.
4              THE COURT:  You don't need to stand up.
5              But you heard me, ma'am, go through the discussion
6    I had with the other defendants in the case?
7              THE DEFENDANT:  Yes.
8              THE COURT:  Did you understand that discussion?
9              THE DEFENDANT:  Yes.
10             THE COURT:  Did you discuss your Speedy Trial Act
11   rights with Mr. Kessel.
12             THE DEFENDANT:  Yes.
13             THE COURT:  And do you waive your rights under the
14   Speedy Trial Act and agree to the new trial date of
15   March 11th, knowing that that date may actually trail into
16   the future possibly for several months?
17             DEFENDANT MKRTCHYAN:  Yes.
18             THE COURT:  Very well.
19             MR. KESSEL:  And as her counsel, join in that
20   request, Your Honor, and concur.
21             THE CLERK:  Procedurally with trailing a criminal
22   trial, what we've done in the past is have excludable time
23   set up after trial, so that the other trial could commence.
24   So excludable time of May 7th, that should be enough time to
25   complete group three and impanel a jury for the severed
```

34

1    defendant.

2            THE COURT:  Just add 90 days or whatever you think

3    is appropriate to that.

4            MR. ESTRADA:  Very good, Your Honor.

5            MR. KESSEL:  Just to correct the clerk, it was

6    group two, Your Honor, I think.  He had indicated group

7    three.

8            THE CLERK:  Yes, sorry.  Thank you.

9            THE COURT:  That's fine.  So let me talk to

10   Mr. MR. GERAGOS then.  And we'll clear the courtroom.  Let me

11   just say one other thing.  In terms of this trial date, I am

12   not going to continue that trial date, unless this building

13   falls down, okay.  So anything further from the Government

14   on -- on any of the common issues?

15           MR. ESTRADA:  I just want to reiterate that

16   request, Your Honor, that if Mr. Darbinyan tends to change

17   counsel at any other time, that he make that decision on a

18   timely basis with the trial being continued past March 11th.

19           THE COURT:  We've already discussed that issue.

20           MR. ESTRADA:  Thank you, Your Honor.

21           MR. KESSEL:  Other counsel excused, Your Honor?

22           THE COURT:  Yes, you are.

23           Thank you.

24               (Pause in the proceedings.)

25           THE COURT:  Courtroom is clearing...

UNITED STATES DISTRICT COURT

```
 1              I think what we're going to do is just have your
 2    client present first with you.  And I will excuse the
 3    Government as well.
 4              MR. ESTRADA:  Yes, Your Honor.
 5              THE COURT:  I'm going to excuse him during this
 6    discussion with just -- with Mr. Geragos' client.
 7              THE CLERK:  Mr. Geragos' client is in custody.
 8              THE COURT:  Oh, I see.  I understand, yes.
 9              THE CLERK:  So, marshals, if possible, take all
10    three down -- or just take --
11              THE COURT:  The only thing I need is defendant
12    number 22 to just remain in the hallway for about five
13    minutes.
14              THE CLERK:  27, Your Honor.
15              THE COURT:  22.
16              MR. GERAGOS:  22 I believe is Teroganesyan.  Do you
17    want him in the hall -- he's out of custody.
18              THE COURT:  Yes.  That is the defendant with whom
19    your partner was just to substitute in on; correct?
20              MR. GERAGOS:  Right.
21              THE COURT:  So that's all I need.
22              THE CLERK:  And you don't need Mr. Geragos' client?
23              THE COURT:  I do need his client.  He's going to go
24    first.  And he'll stay here.  Does that -- I guess we have
25    the other defendants in the courtroom as well.  So that
```

1   creates a logistical problem.  I'm just trying to have a way

2   that Mr. Aloyan can stay in the courtroom for five minutes

3   alone with his --

4        (Whereupon sealed transcript is filed separately.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21                          - - -

22

23

24

25

```
 1                     C E R T I F I C A T E

 2

 3

 4

 5     UNITED STATES OF AMERICA           :

 6                 vs.                     :   No. CR 11-00072-DDP

 7     DARBINYAN, et al. (DEFENDANTS       :

 8     1, 4, 19, 35, 50, 57, 22, 27,

 9     and 34)

10

11

12     I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

13     UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

14     CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

15     TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

16     CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

17     PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

18     TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

19     OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

20     FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

21     REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

22     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

23

24     /S/_____        01/09/2015

25     MARIA R. BUSTILLOS                       DATE
       OFFICIAL REPORTER
```

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      WESTERN DIVISION

4      - - -

5      HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

6

7   UNITED STATES OF AMERICA,        )
                                     )
8           Plaintiffs,              )
                                     )
9                                    )
                                     )
10          vs.                      ) No. CR 11-00072-DDP
                                     )
11                                   )
                                     )
12   DARBINYAN, et al (DEFENDANTS    )
     1, 4, 27, and 34)               )
13                                   )
            Defendants.              )
14   _____

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17          *MOTION TO SUPPRESS EVIDENCE*

18          LOS ANGELES, CALIFORNIA

19          MONDAY, NOVEMBER 18, 2013

20   _____

21

22          MARIA R. BUSTILLOS
            OFFICIAL COURT REPORTER
            C.S.R. 12254
23          UNITED STATES COURTHOUSE
            312 NORTH SPRING STREET
24          ROOM 404
            LOS ANGELES, CALIFORNIA 90012
25          (213) 894-2739

2

1                        **A P P E A R A N C E S**

2

3

4       **ON BEHALF OF THE PLAINTIFFS,**
        **UNITED STATES OF AMERICA:**        OFFICE OF THE UNITED STATES
5                                            ATTORNEY
                                             BY:  MARTIN ESTRADA, ESQ.
6                                            312 NORTH SPRING STREET
                                             12TH FLOOR
7                                            LOS ANGELES, CALIFORNIA 90012
                                             (213)894-4477
8

9                                            DEPARTMENT OF JUSTICE
                                             BY:  ANDREW CREIGHTON, ESQ.
10                                           312 NORTH SPRING STREET
                                             15TH FLOOR
11                                           LOS ANGELES, CALIFORNIA 90012
                                             (213)894-2579
12

13

14      **ON BEHALF OF THE DEFENDANTS,**
        **DARBINYAN, ET AL.**                GERAGOS & GERAGOS, PC
        **(DEFENDANTS 1, 4, 27, and**        BY:  MARK J. GERAGOS, ESQ.
15      **34):**                             644 SOUTH FIGUEROA STREET
                                             LOS ANGELES, CALIFORNIA 90017
16                                           (213)625-9300

17
                                             SEVERO LAW FIRM
18                                           BY:  MICHAEL V. SEVERO, ESQ.
                                             70 SOUTH LAKE AVENUE
19                                           SUITE 945
                                             PASADENA, CALIFORNIA 91101
20                                           (626)844-6400

21

22

23

24

25

003480

1                    **A P P E A R A N C E S** *(CONT'D)*

2

3

4       *ON BEHALF OF THE DEFENDANTS,*
        *DARBINYAN, ET AL.*              *LAW OFFICES OF CHARLES*
5       *(DEFENDANTS 1, 4, 27, and*      *PEREYRA-SUAREZ*
        *34):*                           *BY:  CHARLES PEREYRA-SUAREZ,*
6                                        *ESQ.*
                                         *800 WILSHIRE BOULEVARD*
7                                        *12TH FLOOR*
                                         *LOS ANGELES, CALIFORNIA 90017*
8                                        *(213)623-1890*

9

10      *ON BEHALF OF THE DEFENDANTS,*
        *DARBINYAN, ET AL.*              *GERAGOS & GERAGOS, PC*
11      *(DEFENDANTS 1, 4, 27, and*      *BY:  MARK J. GERAGOS, ESQ.*
        *34):*                           *644 SOUTH FIGUEROA STREET*
12                                       *LOS ANGELES, CALIFORNIA 90017*
                                         *(213)625-9300*

13

14                                       *SEVERO LAW FIRM*
                                         *BY:  MICHAEL V. SEVERO, ESQ.*
15                                       *70 SOUTH LAKE AVENUE*
                                         *SUITE 945*
16                                       *PASADENA, CALIFORNIA 91101*
                                         *(626)844-6400*

17

18

19

20

21

22

23

24

25

4

1    _**I N D E X**_

2

3                                                                    _PAGE_

4    *MOTION TO SUPPRESS EVIDENCE:*

5      ^

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

# *I N D E X*

2

3
*PAGE*

4    *MOTION TO SUPPRESS EVIDENCE:*                            7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, NOVEMBER 18, 2013

 2                            -o0o-

 3                    (COURT IN SESSION AT 3:16 P.M.)

 4              THE CLERK:  Calling items 6, 7, 8, and 9,

 5    CR 11-00072-DDP:  United States v. Darbinyan, et al.

 6              Before the Court today are defendants one, four,

 7    27, and 34.

 8              Counsel, may we have appearances, please.

 9              MR. ESTRADA:  Good afternoon, Your Honor.

10    Martin Estrada on behalf of the United States.  With me at

11    counsel table are Andrew Creighton, also for the United

12    States and FBI Special Agent Jeremy Stebbins.

13              THE COURT:  Good afternoon.

14              MR. SEVERO:  Good afternoon, Your Honor.

15              Michael Severo, appearing on behalf of

16    Mr. Darbinyan.  Mr. Darbinyan is present and in custody.

17              THE COURT:  Good afternoon.

18              MR. GERAGOS:  Good afternoon, Your Honor.

19              Mark Geragos, G-e-r-a-g-o-s for

20    Mr. Andranik Aloyan, who is present in custody.

21              THE COURT:  Good afternoon.

22              MR. PEREYRA-SUAREZ:  And good afternoon,

23    Your Honor.  Charles Pereyra-Suarez, representing

24    Arman Sharopetrosian.  He also is present, in custody.

25              THE COURT:  Good afternoon.
```

```
1            THE CLERK:  And for the record, Your Honor,
2   Mr. Severo is representing Michael -- I'm sorry -- Alex
3   Kessel and Mr. Kessel's client is present.
4            MR. SEVERO:  Yes, Your Honor.  I'm sorry.  I forgot
5   to inform the Court.
6            THE COURT:  Yes.  Thank you.
7            Okay.  Why don't I start with Mr. Estrada.
8            I received your -- thank you for the status report,
9   Mr. Estrada.  I appreciate that.  And I think we can deal
10  with that perhaps toward the end; but in term of where we are
11  right now, there's a suppression motion.  Where are we with
12  the suppression motion?
13           MR. ESTRADA:  Correct, Your Honor.  There's a
14  suppression motion filed by Aloyan as to Aloyan only.  And
15  then there's also a motion regarding sentencing entrapment
16  filed by Aloyan as to Aloyan only.  And, of course, that's
17  the trial set for December 3rd.
18           THE COURT:  Okay.
19           MR. ESTRADA:  And then there are the other motions
20  filed by Darbinyan.  Does the Court want to address the
21  motion to suppress first?
22           THE COURT:  The motion to suppress first, sure.
23           MR. ESTRADA:  Or the Darbinyan motions, either
24  one --
25           THE COURT:  Well, the suppression involves
```

```
 1    potential witnesses?

 2              MR. ESTRADA:  Correct.  The Government submitted

 3    two declarations and would submit on those declarations with

 4    minor modification.  The other motions do not involve any

 5    declarations.

 6              THE COURT:  I understand that.  And none were

 7    filed.  And you objected to that.  And -- so thank you.

 8              Why don't I hear from counsel on that issue.

 9              MR. GERAGOS:  Whatever the Court's preference is.

10    My understanding was, is that -- if I understood correctly,

11    that you weren't expecting witnesses today this afternoon.

12    I'm okay with doing it this afternoon; I'm okay with doing it

13    at some other time; whenever the Court is available.

14              THE COURT:  I mean, the Government's objection

15    essentially is you haven't put the matter at issue.  The

16    Local Rules require that your client be willing to attest to

17    some statement of what occurred different from what the

18    police say occurred.  The Court has discretion whether to

19    consider that failure to be conclusive or to allow you to

20    proceed.  I'm inclined to allow you to proceed.  We have

21    witnesses here, I presume.

22              Who do we have, Mr. Estrada?

23              MR. ESTRADA:  We have the two declarants, Your

24    Honor.  Sergeant Rafael Quintero and

25    Officer Guillermo Jimenez.
```

1          THE COURT:  And I understand the issue revolves, at

2     least, initially on consent?

3          MR. GERAGOS:  Correct.  Consent and whether --

4     whether he was living there and the definition or the -- we

5     went into the Ninth Circuit law on that.

6          THE COURT:  Well, it would consent obviate living

7     there though?

8          MR. GERAGOS:  Yes.

9          THE COURT:  Okay.  Is there any objection just to

10    proceeding on the consent issue, Mr. Estrada?

11         MR. ESTRADA:  No objection, Your Honor.

12         THE COURT:  Well, let's just do that then.

13         MR. GERAGOS:  That's fine.

14         THE COURT:  So who would you like to hear from?

15         MR. GERAGOS:  I think first what I was going to do

16    was put my client on to attest -- and I apologize that we

17    didn't do it according to the Local Rules.  Both times I've

18    been down there -- the last two times I haven't been able to

19    get in to see him.

20         THE COURT:  I did not realize you intended to do

21    that.  That's fine.

22         You may proceed.

23         MR. GERAGOS:  Thank you.  I call Andranik Aloyan.

24    **DEFENSE'S WITNESS, ANDRANIK ALOYAN, SWORN.**

25         THE CLERK:  State and spell your last name for the

```
1    record.
2              THE DEFENDANT:  My name is Andranik,
3    A-n-d-r-a-n-i-k Aloyan, A-l-o-y-a-n.
4              THE CLERK:  Thank you.
5              THE COURT:  Go ahead, Mr. Geragos.
6              MR. GERAGOS:  Thank you.
7                        DIRECT EXAMINATION
8    BY MR. GERAGOS:
9    Q    Mr. Aloyan, you're the defendant in this matter;
10   correct?
11   A    Yes, that's correct.
12   Q    Okay.  Directing your attention to the day that the
13   search was executed, do you have that date in mind?
14   A    Yes.
15   Q    Okay.  And where were you when the officers first came
16   to the location?
17   A    I was in the living room.
18   Q    Where was that location.
19   A    The location was on the inside.
20   Q    If I can just interrupt for a minute, Your Honor...
21             Does the Court want witnesses excluded?
22             MR. GERAGOS:  I'd move for that.
23             THE COURT:  Very well.
24             MR. ESTRADA:  Sorry.  I didn't catch that earlier,
25   Your Honor.
```

```
 1    BY MR. GERAGOS:

 2    Q    Mr. Aloyan, on that day why were you there?

 3    A    I had surgery the day before.  And it was in

 4    Olympia Hospital, which was like three minutes away from the

 5    location, and because my house is -- where I live it's in

 6    Hollywood.  I wasn't able to drive well.  So the person who

 7    lives in the place -- the place, she was helping me with my

 8    situation to giving me rides and watching after me basically.

 9    Q    Okay.  And when that day -- when you say the person who

10    was helping you with this situation, was that her place?

11    A    Yeah, that was her place?

12    Q    What's her name?

13    A    Anca, A-n-c-a Stefeanenasu, S-t-e-f-e-a-n-e-n-a-s-u.

14    Q    Okay.  Now, what time was it when the police first came?

15    A    It was close to 9 o'clock in the morning.

16    Q    In the morning?

17    A    Yes.

18    Q    Okay.  Were you awake at the time when they came?

19    A    No.

20    Q    Did the -- how did you become awake?  How did you first

21    notice they were there?

22    A    By the knock and the -- the doorbell.

23    Q    Okay.  And when the doorbell rang, what happened next?

24    A    Next, the uncle went to open the door.  Then they -- I

25    heard the sounds that it's Glendale PD; open the door.  And
```

```
 1    like -- because I wasn't mobile at the time.  So uncle came
 2    from her bedroom to open the door, and they're, like, "Open
 3    the door.  You have enough time to flush the drugs."
 4    Q    Then what happened after that?
 5    A    Then uncle opened the door; she went outside.  And when
 6    she opened the door, I saw the door, like, when she was
 7    outside, I saw the door opened.  And I saw the people behind
 8    her already.  So --
 9    Q    What do you mean?
10    A    Officers -- officers coming in.  And the first thing,
11    they're, like, "Where you've been, man?  We were looking for
12    you."
13    Q    They were saying that to you?
14    A    Yeah.  And I said, like, you know, "Why?  What
15    happened?"
16    Q    Okay.  Did they -- did you hear them ask her to enter --
17    to let them in?
18    A    No.
19    Q    Did they ever ask her to let them in?
20    A    I don't think so.
21    Q    Did they ever ask her, Do we have permission to search?
22    A    What I remember is no.  And she said that, "I don't want
23    you guys here."  That's what I heard almost the time.
24    Q    How long were they there inside of the house itself
25    before they went to go get a search warrant; do you know?
```

1    A    Whole thing took -- we got out of the house close to

2    5:00 afternoon.

3    Q    Okay.  Were they -- and where were they during that

4    period of time from 9 o'clock to 5 o'clock?

5    A    Just going through the rooms -- just again, going and

6    getting the food for themselves; eating in the house,

7    watching TV, and like, you know, going to bedroom -- getting

8    into her purse; getting her wallet.

9    Q    Okay.  Did you -- did the officers also ask you about

10   where you lived -- where you resided?

11   A    Yes.  I told them my address where I live.

12   Q    Did you tell them that you did not reside at that

13   location?

14   A    Yeah, I told them that I reside at 6072 Franklin Avenue

15   Number 202, Los Angeles, California.  90028.

16   Q    Is that also where you reported for probation?

17   A    Yes, always.

18   Q    And is that where your license was, the address?

19   A    Yes.

20        MR. GERAGOS:  Okay.  Thank you.  I have no further

21   questions.

22                    **CROSS-EXAMINATION**

23   BY MR. ESTRADA:

24   Q    Good afternoon, Mr. Aloyan.

25        Mr. Aloyan, you're a defendant in this case;

```
1    correct?

2    A    That's correct.

3    Q    And the date we're talking about here when the search

4    took place, that was in September of 2010; is that correct?

5    A    September 3rd, 2010.

6    Q    September 3rd, 2010; correct?

7    A    Correct.

8    Q    And you said you were staying at the residence of your

9    girlfriend, Stefeanenasu; correct?

10   A    Yes.

11   Q    You'd been staying there for quite some time; correct?

12   A    Not staying there -- on and off.

13   Q    You had a medical injury; correct?

14   A    Yes.

15   Q    And you'd been staying there with her based on that

16   medical injury; correct.

17   A    Yes.

18   Q    And, in fact, you had stayed there previously in

19   March of 2010; correct?

20   A    It happened.

21   Q    In March 10th of 2010, officers actually followed you

22   from a location in Murrieta, California to that same

23   location -- that house where you were found on

24   September 2010; correct?

25   A    Well, she was with me.  I gave her a ride.
```

1    Q    And you actually went into that location; correct?

2    A    Yes.

3    Q    Now, let's get to the search that occurred on

4    September 3rd of 2010.

5         You stated you were immobile at the time; correct?

6    A    Yes.

7    Q    And you said when officers arrived, you were asleep;

8    correct?

9    A    Yes.

10   Q    Now, when officers spoke to Stefeanenasu, you didn't

11   hear exactly what was going on, did you?

12   A    I didn't hear like what was going on meaning?

13   Q    Correct.

14   A    Meaning?  I didn't hear what's going on?

15   Q    You didn't hear the exact words that officers used when

16   they approached the door, did you?

17   A    Yes, I heard.  They said -- they were saying, "Open the

18   door.  You had enough time to flush the drugs in the toilet."

19   Q    So you're saying you heard exactly the words they used;

20   is that your testimony?

21   A    I'm saying that's what I heard.

22   Q    Listen to my question.  Did you hear exactly the

23   questions the officers asked when they went to the door?

24   A    To whom?

25   Q    Can you answer the question.

```
 1   A     To whom?  To ask the questions to whom?

 2   Q     Let me ask it again.  And if you don't understand, let

 3   me know, okay.

 4   A     Yes.

 5   Q     When officers approached the door, they asked questions.

 6   Is it your testimony that you heard exactly the words that

 7   officers used?

 8   A     I didn't hear exact words, but I heard what Stefeanenasu

 9   told them.

10   Q     But, of course, you couldn't have heard the exact words

11   because you were asleep; correct?

12   A     No.  I was awake at the time because when I heard them

13   knocking the door and the doorbell, I woke up and basically

14   that's what happened.

15   Q     But you weren't at the door; correct?

16   A     I was close by the door.

17   Q     You said you were immobile.

18   A     Because the place where I sleep is like five -- five

19   steps from the door.  I was sleeping in the living room.

20   Q     So your testimony is you were sleeping in the living

21   room?

22   A     Yes.

23   Q     You were asleep when officers arrived, and your

24   testimony is you heard exactly the words that officers used?

25   A     Yes.
```

```
1   Q    You heard exactly the words that Stefeanenasu used?

2   A    I heard the words when the officers came in already and

3   the words were that --

4   Q    And you heard when officers arrived, them announce

5   themselves as Glendale police officers?

6   A    Yes.

7   Q    And you heard when they arrived, them announce and say

8   they wanted to come inside?

9   A    I didn't hear that.

10  Q    And you heard when officers arrived, Stefeanenasu admit

11  them into the apartment; correct?

12  A    No.

13  Q    Your testimony is that Stefeanenasu never admitted them

14  into the apartment?

15  A    Yes.

16  Q    And that's your testimony based on you being asleep when

17  they arrived; right?

18  A    I was awake when they arrived.

19  Q    You were asleep when they arrived; correct?

20  A    I was awake when they knocked the door and the doorbell;

21  I woke up.

22            MR. GERAGOS:  Objection, Your Honor.  Asked and

23  answered.

24            THE COURT:  Cross-examination.  Overruled.

25            THE WITNESS:  I got awake when I heard the knock
```

```
 1    and the doorbell.
 2            MR. ESTRADA:  Your Honor, move to strike as
 3    non-responsive.
 4            THE COURT:  Overruled.
 5    BY MR. ESTRADA:
 6    Q    When they arrived at the house, you were asleep;
 7    correct?
 8    A    Inside the house meaning?
 9    Q    Do you want me to repeat the question for you?
10    A    Yes.
11    Q    When they arrived at the house, officers -- you were
12    asleep; right?  That was your testimony?
13    A    I was awake.  When they -- when they -- when I was
14    asleep when they arrived by the door, and they start knocking
15    the door, which woke me up.
16    Q    Okay.  So just to be clear, when officers arrived at the
17    apartment, you were asleep; correct?
18    A    Yes.
19    Q    And you were immobile; correct?
20    A    Immobile meaning, I couldn't drive the car.  I can't
21    drive the car because I had colonitis cyst surgery on my bone
22    tail.
23    Q    Okay.  That was your testimony.  You said you were
24    immobile; correct?
25    A    Immobile, meaning that, you know, not fully function.
```

UNITED STATES DISTRICT COURT

```
 1    Q    Okay.  You weren't fully functional?

 2    A    Not fully functioning.

 3    Q    And you had just had medical surgery; correct?

 4    A    Yes, that's correct.

 5    Q    You were lying on the sofa; correct?

 6    A    Yes.

 7    Q    Yet your testimony is you heard exactly the words

 8    exchanged between the officers and Stefeanenasu;

 9    correct?

10    A    Yes.

11    Q    Okay.  Let me show you something.

12              MR. ESTRADA:  Your Honor, these are exhibits

13    attached to the Government's opposition.

14              If I could approach the Court to hand them to the

15    witness and to the Court?

16              THE COURT:  Very well.

17              MR. ESTRADA:  Now, I just handed you a set of

18    exhibits.  Do you have that in front of you?

19              THE WITNESS:  Yes.

20    BY MR. ESTRADA:

21    Q    And would you please take a look at Exhibit 2.

22              MR. ESTRADA:  And, Your Honor, with the Court's

23    permission, I'll publish Exhibit 2.

24              THE COURT:  Any objection to the admission of

25    Exhibit 2?
```

20

```
 1              MR. GERAGOS:  No.

 2              THE COURT:  Very well.

 3      (Whereupon Government's Exhibit 2 is admitted hereto.)

 4              MR. ESTRADA:  Okay.  I've placed on the Elmo there

 5   Exhibit 2; do you see that?

 6              THE WITNESS:  Say it again.

 7              MR. ESTRADA:  Do you see Exhibit 2?

 8              THE WITNESS:  Yes.

 9              MR. ESTRADA:  And --

10              THE COURT:  It's on the screen there right there

11   too.

12   BY MR. ESTRADA:

13   Q    And Exhibit 2 that shows the layout of the apartment

14   where you were staying with Stefeanenasu; correct?

15   A    This is not the same apartment.

16   Q    Your testimony is this is not the same apartment?

17   A    This is not the same apartment.

18   Q    Now -- and you're sure that's not the same apartment?

19   A    Yes, I'm positive.  It's not the same -- I mean, it's

20   the same layout, but it's not the apartment which, like she

21   was living in.

22   Q    So you're convinced this is not the same apartment?

23   A    Yes, I'm convinced.

24   Q    Okay.  Now, let's take a look at the layout of this

25   apartment.  Bear with me for a second.  And this apartment
```

```
1   certainly you see there's no couch or anything near the door;
2   correct?
3   A    This is -- this is the -- it's the photo taken from the
4   couch side.
5   Q    Okay.  From the couch side?
6   A    Yes.
7   Q    So that's where the couch would be?
8   A    Yes.
9   Q    And that's a distance away from the door; correct?
10  A    Yes.
11  Q    Now, when officers went to the location, they found your
12  personal items; correct?
13  A    Some of my stuff, like clothes maybe.
14  Q    They found your driver's license; correct?
15  A    Yes.
16  Q    They found your watch; correct?
17  A    Yes.
18  Q    And those items were on a nightstand in the master
19  bedroom; correct?
20  A    Yes.
21  Q    Let me show you Exhibit 1.
22            MR. ESTRADA:  Your Honor Court's permission, I
23  would publish Exhibit 1.
24            MR. GERAGOS:  No objection.
25            THE COURT:  Very well.  Exhibit 1 is admitted as
```

22

```
 1   well.
 2        (Whereupon Government's Exhibit 1 is admitted hereto.)
 3   BY MR. ESTRADA:
 4   Q    And now, looking at Exhibit 1, that shows the layout of
 5   the apartment; correct?
 6   A    Yes.
 7   Q    And you'll see the door area is here where I've circled;
 8   correct.
 9   A    Yes.
10   Q    And the master bedroom area is here where I circled;
11   correct?
12   A    Yes.
13   Q    That's not next to the door, right, where the master
14   bedroom is?
15   A    Yes.
16   Q    So where your items were located your driver's license,
17   your watch, that was not near the door; correct?
18   A    No.
19   Q    Now, Ms. Stefeanenasu is not here to testify;
20   right?
21   A    No.
22              MR. ESTRADA:  May I just have a moment, Your Honor?
23                   (Pause in the proceedings.)
24              MR. ESTRADA:  No further questions, Your Honor.
25              THE COURT:  Thank you.
```

```
1              MR. GERAGOS:  No further questions, Your Honor.

2              THE COURT:  Thank you.  You may step down.

3              MR. GERAGOS:  I think before I inquired one of the

4     officers I wanted to hear from, I believe -- just if they

5     have Quintero, which I think they said they did, he would be

6     the one I would want to hear from.

7              THE COURT:  Fine.

8              MR. ESTRADA:  The Government would call

9     Sergeant Quintero, Your Honor.

10             THE COURT:  You're going to admit the declaration

11    as the Government's prima facie case?

12             MR. ESTRADA:  Yes, Your Honor.  There's just one

13    minor correction in the back section.

14             And then I would just admit the remainder of the

15    exhibits.

16    DEFENSE's WITNESS, RAFAEL QUINTERO, SWORN.

17             MR. ESTRADA:  With the Court's permission, I'd

18    like --

19             THE CLERK:  Sir, please state your full name and

20    spell your first name and spell your last name for the

21    record.

22             THE WITNESS:  Rafael Quintero, R-a-f-a-e-l; last

23    name Q-u-i-n-t-e-r-o.

24             THE CLERK:  Thank you.

25             MR. ESTRADA:  Now, with the Court's permission, if
```

```
 1    I can hand a copy of the declaration to the witness?
 2              THE COURT:  Very well.
 3                        DIRECT EXAMINATION
 4    BY MR. ESTRADA:
 5    Q    Good afternoon, sir.
 6    A    Good afternoon, sir.
 7    Q    I just handed you a declaration of Rafael Quintero and
 8    I'll represent that is attached to the Government's
 9    opposition, to defendant Aloyan's motion to suppress the
10    evidence.
11              Do you have that in front of you?
12    A    Yes, sir.
13    Q    And that declaration, have you reviewed it?
14    A    Yes.
15    Q    Are there any changes that need to be made to that
16    declaration?
17    A    The only change would be the title at the top,
18    "Declaration of Detective."
19    Q    And that should be changed to sergeant?
20    A    Correct.
21    Q    Now, have you also reviewed exhibits that were attached
22    both to your declaration and the Government's opposition?
23    A    Yes.
24    Q    And you'll see there is a copy of those exhibits before
25    you on the witness stand.
```

```
 1    A    Yes.

 2    Q    Having reviewed those, do those exhibits, based on the

 3    statements you stated in the declaration, fairly and

 4    accurately depict the items noted in the declaration?

 5    A    Yes, they do.

 6         MR. ESTRADA:  Your Honor, the Government would move

 7    to admit the remaining exhibits which are 1 through 7,

 8    attached to the Government's opposition.

 9         MR. GERAGOS:  No objection.

10         THE COURT:  Very well.

11   (Whereupon Government's Exhibits 1 - 7 are admitted hereto.)

12         MR. ESTRADA:  No further questions, Your Honor.

13         THE COURT:  Thank you.

14                    CROSS-EXAMINATION

15         MR. GERAGOS:  Officer -- it's Sergeant?

16         THE DEFENDANT:  Yes, sir.

17   BY MR. ESTRADA:

18   Q    The -- how many times had you been made aware prior to

19   going to this location on September 3rd that my client had

20   stayed at this place?

21   A    One time.

22   Q    And was that a March date?

23   A    No.  That was actually on that day.

24   Q    September 3rd?

25   A    Correct.
```

1    Q    So the only -- and where did you get that information
2    that he was there on September 3rd?
3    A    We didn't know if he was going to be there on
4    September 3rd.
5    Q    And so you just went to see if he would be there on
6    September 3rd; is that correct?
7    A    Correct.
8    Q    Okay.  You had an address that he listed with probation;
9    correct?
10   A    Correct.
11   Q    Did you go by that address?
12   A    Not that I recall.
13   Q    That morning at any time, did you go to any other
14   location looking for him, other than this particular address?
15   A    I did not, no.
16   Q    When you arrived there, how many officers were with you?
17   A    Approximately seven.
18   Q    Okay.  And when you knocked --  did you knock on the
19   door first?
20   A    Yes.
21   Q    Who knocked on the door first; was it you?
22   A    I did.
23   Q    When you knocked on it, did you then ring the doorbell
24   as well?
25   A    Yes, I did.

1  Q   And isn't it true that she -- she said she had to get

2  dressed?

3  A   Correct.

4  Q   And at that point, did she open the door or did you

5  knock again before she opened the door?

6  A   I knocked again before she opened the door.

7  Q   And then when she opened the door again, isn't it true

8  that you pushed the door open?

9  A   No.

10  Q   Isn't it true that you asked to come inside or told her

11  you were coming inside?

12  A   I asked to come inside.  I didn't tell her I was coming

13  inside.

14  Q   Didn't you tell her that specifically you were there to

15  do a probation compliance check on Mr. Aloyan and you were

16  going to come inside to see if he was present; isn't that

17  what you told her?

18  A   No.

19  Q   What did you tell her?

20  A   I told her that I was looking for Aloyan.

21  Q   And did she say he's in here?

22  A   Yes.

23  Q   Okay.  Didn't you also ask her if you had -- if she

24  would consent to search the location?

25  A   Correct.

1    Q    She said she would not; correct?

2    A    Correct.

3    Q    She told that to you -- how quickly did you ask her to

4    consent to search.

5    A    I don't recall how quickly.

6    Q    Okay.  We had seven officers, I assume.  Were you

7    wearing uniforms?

8    A    Yes.

9    Q    And seven officers had guns?

10   A    Yes.

11   Q    Were the guns out?

12   A    No.

13   Q    So you were approaching a location where you didn't know

14   if he would be in there.  You considered him to be a felon on

15   probation; correct?

16   A    Correct.

17   Q    And this compliance check was instituted by whom?

18   A    By me.

19   Q    By you.

20        And based on information that you list in your

21   report; is that right?

22   A    Correct.

23   Q    And at no time did Ms. -- I call her Anca -- did she

24   ever give you permission to search, isn't that correct?

25   A    She did not give us permission.

1    Q    Specifically told you that you did not have or she would

2    not consent to a search; correct?

3    A    Correct.

4    Q    Specifically, told you that he does not stay there,

5    meaning Aloyan, except he just had had surgery to remove a

6    cyst on his lower back; correct?

7    A    I don't remember her saying he does not stay there.  I

8    remember her mentioning the medical issue.

9    Q    Did he tell you that he was staying because he'd just

10   had surgery and she was taking care of him?

11   A    Yes.

12   Q    Did she say she would not consent to a search?

13   A    Correct.

14   Q    Okay.  And then you said you were going to freeze the

15   location while a search warrant was being written; correct?

16   A    Correct.

17   Q    And how long -- and that would have been 9:30 roughly

18   that this happened?

19   A    9:30 when we arrived at the location.

20   Q    Correct.  And what time was the search warrant signed?

21   A    I don't recall what time the actual search warrant was

22   signed.

23   Q    Do you have an exhibit in front of you that includes the

24   face sheet of the search warrant?

25        MR. ESTRADA:  It's Exhibit 7, Your Honor.

```
1              THE WITNESS:  Here it is, yes.
2              MR. GERAGOS:  Okay.  What time?
3              THE WITNESS:  2:07 p.m.
4    BY MR. ESTRADA:
5    Q    2:07 p.m.?
6    A    Correct.
7    Q    Okay.  So you froze the residence from 9:30 to roughly
8    2:07.  Was that a telephonic order, by the way?
9              MR. ESTRADA:  Objection, Your Honor.  Relevance.
10             THE COURT:  Overruled.
11   BY MR. GERAGOS:
12   Q    How many officers remained at the location for that
13   roughly three, four, five hours roughly -- four and a half to
14   five hours?
15   A    I believe it was approximately five.
16   Q    And stayed inside of the location?
17   A    I don't know.
18   Q    Did you leave?
19   A    I left.
20   Q    Did you go to Judge Green to get the warrant?
21   A    Eventually, yes.
22   Q    Okay.  Was the -- was the first warrant that you
23   attempted to get, was that rejected?
24   A    No.
25   Q    Okay.  But you wrote it.  And then what time did you
```

```
1    come back to execute the search?

2    A    After the judge authorized the warrant; went back to the

3    station and left within 30 minutes.

4    Q    So would it be safe to say you didn't get back to the

5    location until 3:30 or 4:00?

6    A    Not sure.  I mean, West L.A. at that time has a lot of

7    traffic.  I remember being stuck in traffic.  So...

8    Q    Could it have been as late as 5 o'clock?

9    A    No, I don't think it was that late.

10             MR. GERAGOS:  Thank you.

11             I have no further questions -- oh wait.  I'm sorry.

12   May I inquire just a couple more?

13   BY MR. GERAGOS:

14   Q    Officer, did you find a key to the residence in the

15   possession of my client?

16   A    No.

17   Q    Did you find anything besides a watch or a driver's

18   license and clothes that belonged to my client?

19   A    On his person?

20   Q    On his person.

21   A    I didn't search him.

22   Q    Okay.  And as far as you know, there -- there was no

23   utility bills or any other indicia that he was living at that

24   location that you found; correct?

25   A    I didn't search for any of the documents.  So I'm
```

32

```
 1    unaware.
 2    Q    Okay.  Thank you.
 3          MR. ESTRADA:  Your Honor, just briefly.  Just one
 4    point...
 5                    REDIRECT EXAMINATION
 6    BY MR. ESTRADA:
 7    Q    You went to search the location in
 8    September 3rd, 2010; correct?
 9    A    Correct.
10    Q    And it was on September 3rd, 2010, you were informed
11    that the defendant had previously been seen going into that
12    residence?
13    A    Correct.
14    Q    Late in the evening?
15    A    Correct.
16    Q    And you'd been informed that on that prior occasion was
17    March of 2010; correct?
18    A    Correct.
19          MR. ESTRADA:  No further questions, Your Honor.
20                    RECROSS EXAMINATION
21    BY MR. GERAGOS:
22    Q    Did anybody say that the one time roughly six months
23    prior, that they had seen him at this location -- that they
24    had seen him bring in laundry; take out trash, anything of
25    that nature?
```

```
1   A     No, sir.

2   Q     Do you have any other information besides somebody

3   telling you -- do you remember who it was who told you this,

4   by the way?

5   A     Detective Mark Stull (phonetic).

6   Q     And he was from what agency?

7   A     Burbank PD.

8   Q     And that's not where are; is that correct?

9   A     It is, because he was assigned at the Eurasian organized

10  task force out of Glendale PD.

11  Q     Okay.  So you had no information other than what he told

12  you that they spotted him six months prior at his

13  girlfriend's house; is that right?

14  A     Correct.

15  Q     That was the sole sum and the total of your information

16  before you went there at 9:30 that morning?

17  A     Correct.

18         MR. GERAGOS:  Thank you.

19         THE COURT:  What caused you to go inside?  It says

20  you were given permission, in your declaration.  I'm just a

21  little unclear.  Can you sort of --

22         THE WITNESS:  Well, we were doing various probation

23  searches that day.  Aloyan was one of the people that we were

24  going to -- or attempt to conduct a probation search on.

25  When we went to the residence, Sergeant Scott Pickle at that
```

```
 1    time, specifically, we had discussed prior to knocking on the
 2    door, that we did not know if he resided there.  So at that
 3    time, our intention was just to knock, verify that he was
 4    there or not there.  And then we made sure to obtain
 5    consent -- not sure exactly how that consent was voiced as
 6    far as being, yes, go ahead.  No verbalized.  And once we got
 7    consent, that he was there --
 8                THE COURT:  When you say "we," were you the lead
 9    person?
10                THE WITNESS:  I was the lead person, yes.
11                THE COURT:  What leads you to believe that she gave
12    you consent?
13                The witness:  She told me.  I don't -- like I said,
14    Your Honor, I don't remember exactly how she told me, whether
15    it was yes, you know, go ahead.  Come in.  That, I do not
16    recall.
17                THE COURT:  And what was the -- what did you ask
18    her when you said that you were interested in coming in?
19                THE WITNESS:  We were asking specifically for
20    Aloyan.  Once she said that he was there, and I said, May we
21    come in and talk to him?  He's on probation.
22                THE COURT:  So you had not seen him before you
23    asked permission to come inside?
24                THE WITNESS:  Once she allowed us in, he kind of
25    right around the same time, came out of the north bedroom.
```

```
 1              THE COURT:  So are you saying you didn't see him
 2    before you were permitted to go inside?
 3              THE DEFENDANT:  Correct.
 4              THE COURT:  Any further questions?
 5              MR. GERAGOS:  No.
 6              MR. ESTRADA:  I just have very briefly, Your Honor,
 7    based on the Court's questions.
 8                   REDIRECT EXAMINATION (FURTHER)
 9    BY MR. ESTRADA:
10    Q    And just to clarify.
11              You were called, asking for permission to go in the
12    apartment; correct?
13    A    Yes.
14    Q    You don't remember exactly what she said in response,
15    but you remember it was some verbal response?
16    A    Yes.
17    Q    And that verbal response, you don't remember the exact
18    words; but it was something that you recall being permission
19    to enter?
20    A    Yes.
21    Q    In addition to her verbalizing permission to enter, did
22    she also take any movements that led you to believe she was
23    allowing you to enter?
24    A    She opened the door and stepped to the side.
25    Q    And when she stepped to the side, was she stepping --
```

```
 1    opening the door and stepping aside, so the officers could

 2    pass in front of her?

 3    A    Correct.  So the door opened inward, and she moved away

 4    allowing us free passage.

 5    Q    Later you asked for consent, and she -- to search the

 6    apartment, and she twice said no; correct?

 7    A    Correct.

 8    Q    But at that point when you asked for consent to enter,

 9    she admitted you?

10    A    Yes.

11              MR. ESTRADA:  I have nothing further, Your Honor.

12                   RECROSS EXAMINATION (FURTHER)

13    BY MR. GERAGOS:

14    Q    Seven officers at the door when she opened the door, and

15    you said she stepped aside.  Is that your testimony?

16    A    Correct.

17    Q    Okay.  When you open a door, you have to step aside,

18    don't you?  I mean, you can't just open the door in your

19    face?

20    A    No, you can open the door.  I mean, there's various

21    doors to open a door.  You can open it and then you can still

22    stand in the middle.

23    Q    Okay.  Well -- and she is approximately how big, 5'2;

24    maybe a hundred pounds, dripping wet?

25    A    I don't remember exactly how tall or how much she
```

1    weighed.

2    Q    Okay.  She certainly was not big in stature, was she?

3    A    Not that I recall.

4    Q    Right.  She's slightly built; correct?

5    A    From my recollection, yes.

6    Q    And there's seven officers standing at the door with

7    uniforms on and equipment and weapons and everything else

8    saying, We're here to check on Andrew Nikolayan (phonetic);

9    correct?

10   A    I wasn't the only one that was discussing or having a

11   conversation with -- all seven officers weren't congregating

12   at that door.

13   Q    You never asked her the specific question, Can I have

14   consent to come in, did you?

15   A    It was wasn't expressed.  I asked her, May we come in?

16   I don't know exactly how it was verbalized, but it was

17   consent.

18   Q    Right.  You don't remember.  But you do remember

19   verbalizing, Can I have consent to search.  And when you

20   asked her that specific question, she declined not once but

21   twice?

22   A    She declined twice.  Correct.

23   Q    And that's when you used the term, "Do I have your

24   consent to search"?

25   A    Correct.

```
1    Q    But you don't remember asking, Do I have consent to come
2    in?
3    A    Correct.
4              MR. GERAGOS:  Nothing further.
5              THE COURT:  Thank you, sir.
6              You may step down.
7              THE DEFENDANT:  Sure.
8              THE COURT:  Next witness.
9              MR. GERAGOS:  I don't need anybody else.  I can
10   submit based on this.
11             MR. ESTRADA:  We would submit based on the
12   declarations of Guillermo Jimenez.
13             The Government would call FBI Special Agent
14   Jeremy Stebbins to the stand briefly.
15             THE COURT:  Is there another declaration that --
16   that Jimenez declaration, has that been admitted?
17             MR. ESTRADA:  The Jimenez declaration was attached
18   to the Government's opposition.
19             THE COURT:  Jimenez.
20             MR. ESTRADA:  The Government would move to admit it
21   at this time.
22             MR. GERAGOS:  I'm sorry.  I didn't hear.
23             THE COURT:  I was just trying to understand whether
24   the Jimenez declaration was part of this case or not.  It was
25   part of your motion.
```

```
1              MR. ESTRADA:  Yes, part of the opposition.
2              THE COURT:  Yes.  Part of the opposition.  And you
3    have submitted it to the Court as part of your opposition.
4    Is there any objection to the declaration?
5              MR. GERAGOS:  What I -- I apologize.  What I didn't
6    hear was, were they saying they now wanted to call him?
7              MR. ESTRADA:  Since it appears that that portion of
8    the opposition is not at issue.  The Government wouldn't need
9    to call him.  We would just submit the declaration.  That was
10   my understanding based on counsel's submission.
11             THE COURT:  Is the detective here?
12             MR. ESTRADA:  He is here.
13             THE COURT:  I would like to hear from him.
14             MR. ESTRADA:  Okay.  Your Honor, I'm going to hand
15   him the declaration when he comes in.  Is it easier if I do
16   that now?
17             THE COURT:  That's fine.
```

**GOVERNMENT'S WITNESS, GUILLERMO JIMENEZ, SWORN.**

```
19             THE CLERK:  Sir, please state your full name and
20   spell your first name and spell your last name for the
21   record.
22             THE WITNESS:  Guillermo Jimenez.  First name,
23   G-u-i-l-l-e-r-m-o; last name, J-i-m-e-n-e-z.
24             THE CLERK:  Thank you.
25                      DIRECT EXAMINATION
```

40

```
1    BY MR. ESTRADA:

2    Q    Good afternoon, Officer Jimenez.

3    A    Good afternoon.

4    Q    You have in front of you what I'll submit is a

5    declaration of yours attached to the Government's opposition

6    to defendant Aloyan's motion to suppress.  Do you see that in

7    front of you?

8    A    Yes.

9    Q    Have you previously reviewed that declaration?

10   A    I have.

11   Q    Is it true and accurate based on your knowledge of the

12   case?

13   A    Yes, it is.

14            MR. ESTRADA:  Your Honor, the Government would move

15   to admit the declaration into evidence?

16            THE COURT:  Very well.  Any objection?

17            MR. GERAGOS:  Could we reserve that until I

18   cross-examine?

19            THE COURT:  Yes.

20            I think the Government is entitled to submit it as

21   evidence.

22            MR. ESTRADA:  The declaration would be the

23   Government's direct.  If counsel prefers that I --

24            MR. GERAGOS:  If that's what they want to do,

25   that's fine.
```

```
 1                THE COURT:  It's admitted.

 2                MR. ESTRADA:  Thank you, Your Honor.

 3        (Whereupon Government's Exhibit is admitted hereto.)

 4                        CROSS-EXAMINATION

 5                MR. GERAGOS:

 6   BY MR. ESTRADA:

 7   Q    Officer Jimenez did you talk -- how many officers were

 8   with you that morning?

 9   A    Maybe five or six; maybe more.  I don't recall exactly.

10   Q    And did you talk to the manager of the building prior to

11   knocking on the door?

12   A    I did not.

13   Q    Did somebody -- who in your group talked to the manager

14   of the building?

15   A    I believe they did.

16   Q    Right.  And they found out from the manager of the

17   building that my client did not live there; correct?

18   A    I don't know what the manager had told that officer.

19   Q    You reviewed the discovery in this case?

20   A    Not entirely, no.

21   Q    How about the police reports?

22   A    Yes.

23   Q    Okay.  Do you remember who it was that talked to the

24   manager?

25   A    I think it might have been Detective at the time
```

```
 1    Quintero.

 2    Q    Detective Quintero?

 3    A    Yes.

 4    Q    Okay.  Were you with Detective Quintero when you sought

 5    out the search warrant in this case?

 6    A    No.

 7    Q    Okay.  Do you know if they put in the affidavit any

 8    information about the manager of the building saying that

 9    they did not -- that my client did not live there?

10    A    I don't -- I don't recall reviewing the search warrant

11    or affidavit.

12    Q    Okay.  When you approached the door itself, who was the

13    person who was actually knocking on the door?

14    A    Detective Quintero.

15    Q    And did detective Quintero -- was the door open

16    immediately or did he have to wait after knocking?

17    A    He had to wait a little bit.

18    Q    Okay.  And what was said behind the door that caused him

19    to wait?

20    A    He -- I was standing maybe a few feet away.  So I

21    believe he knocked and identified himself and some words were

22    exchanged with a female on the other side.  I did remember

23    hearing a female's voice on the other side of the door.

24    Q    Right.  But you were far enough away that you couldn't

25    hear what she was saying; correct?
```

```
1    A    Not exactly.  I heard her say, "Who is it," and then
2    they were exchanging some words.  I could hear some words
3    being said by the female but not the whole entire
4    conversation.  Correct.
5    Q    After a little bit after she opened the door, you never
6    heard Detective Quintero say, Do we have permission or
7    consent to come in?  He never said that; right?
8              MR. ESTRADA:  Objection, Your Honor.
9              THE COURT:  Overruled.
10             MR. ESTRADA:  Compound.
11             THE COURT:  Overruled.
12             THE WITNESS:  He did ask for consent.
13   BY MR. GERAGOS:
14   Q    He asked for consent?  He said, "I want consent to come
15   inside and search the house"?
16   A    Not in that -- not in those words, but he asked if we
17   may -- if we can -- if she allowed us to come in because we
18   were looking for Mr. Andranik Aloyan.
19   Q    Did he ask her at any point the word, "Could I have
20   consent," did he use that term?
21             MR. ESTRADA:  Objection, Your Honor.  Calls for
22   speculation.
23             THE COURT:  Overruled.
24             THE DEFENDANT:  I don't recall him -- I don't
25   recall if I heard him say that.
```

UNITED STATES DISTRICT COURT

BY MR. GERAGOS:

Q   Okay.  And out of the -- when the door was open, did you -- all of you end up pushing your way in?

A   No.

Q   Did everybody go in?

A   Yeah -- yes, we did all enter the residence.

Q   Five, six or seven officers?

A   Yeah.  I don't exactly remember the exact total, but we all ultimately ended up inside the apartment or the residence.

Q   Were you standing there when she specifically said she would not consent to a search when she told that to keen Quintero?

A   No, I wasn't there.

Q   Okay.

A   I was in there, but I wasn't next to them when the exchange -- whatever words they exchanged.

Q   Did you gather at some point -- did it occur to you that she did not consent to search the when you froze the residence and sent somebody to go get a search warrant?

        MR. ESTRADA:  Objection, Your Honor.  Calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

BY MR. GERAGOS:

```
1    Q    Okay.  At that point, did you freeze the location?

2    A    Yes.

3    Q    And you froze it for approximately how many hours?

4    A    Maybe three or more.  It was quite a bit.

5    Q    Quite a long time; correct?

6    A    Yes.

7              MR. GERAGOS:  May I have just one moment,

8    Your Honor?

9              THE COURT:  Yes.

10             MR. GERAGOS:  Did you see the search warrant is

11   Exhibit 7?

12             MR. ESTRADA:  Exhibit 7, yes.

13   BY MR. GERAGOS:

14   Q    Can you tell me anywhere in the search warrant

15   affidavit -- have you ever looked at the search warrant

16   affidavit?

17   A    Say again.

18   Q    Have you ever looked at the search warrant affidavit?

19   A    No.

20             MR. GERAGOS:  Thank you.  No further questions of

21   this witness.

22             MR. ESTRADA:  No questions, but I understand the

23   Court has questions.

24             THE COURT:  I'm just trying to focus on the reason

25   that you entered the apartment.
```

46

```
1              What caused you to enter?

2              THE WITNESS:  Detective Quintero said that she had

3    given us consent to go inside.  She opened -- I seen the door

4    slide open, and I followed my --  my partner Detective

5    Quintero inside.

6              THE COURT:  Okay.  So you never personally heard

7    anything that indicated to you that it was okay to come in?

8              THE WITNESS:  I did hear her say -- I did hear her

9    say -- like I said, I wasn't -- I was far enough where I

10   could hear some words being exchanged.  And at some point, I

11   did hear her say like, something to the effect like, Yeah,

12   sure.  And then she kind of like, opened the door -- like the

13   door slid open on her own; but Detective Quintero is still

14   standing at the doorway, and then that's when we walked in.

15             THE COURT:  You think she said, "oh, sure"?

16             I just want to understand exactly what you're

17   saying.

18             THE WITNESS:  Yeah, she -- I was under the

19   impression that she allowed us to come in, because I heard --

20   they were exchanging some words -- they said -- he was

21   identifying himself, explaining that we were there to look

22   for a Mr. Aloyan.  And I recall saying, like, sure.  Come on

23   in or something to that effect.  I'm not saying -- I'm not

24   saying exactly those words; but she allowed us to come in.

25   So and then that's what the door opened.  And I seen -- when
```

47

1     I walked in, she was standing on the -- by the side holding

2     the door open for us.

3                THE COURT:  Okay.

4     BY MR. GERAGOS:

5     Q    I think in response to the Court's questions, I heard

6     you say two different things.  Did you first testify that

7     Quintero turned around and said, Okay.  She gave us consent

8     to come in.  Was that a mistaken statement by you?

9     A    Yeah, she never said -- he never turned around it and

10    said, Okay.  We can go in; Gave us consent.  He didn't say

11    that.  It was a mistake if I said that.

12    Q    Okay.  So if you said that or if it's not -- or if it's

13    in the record, it's not accurate?

14    A    It's not accurate.

15    Q    Okay.  If you said that or testified to that, we should

16    whatever way, ignore that because that didn't happen?

17    A    Yeah.  I don't recall saying that, no.

18    Q    Okay.  Then did you also say you were several feet back

19    that you heard something and it was -- did I understand

20    correctly -- it was your impression that she was allowing

21    the -- you guys to come in?

22    A    I said we were -- I heard a conversation.  She said -- I

23    heard her say something to the effect like, Yeah, go ahead.

24    Sure.  Come on in, and then it's when the door slid in.  So I

25    saw my partner enter.  So then again, like I said, I was

```
 1   thinking to myself, Okay.  Well, you know, we got -- we were
 2   allowed in.  So I followed my partner inside, because like I
 3   said, I wasn't going to let him go inside by himself.
 4   Q    Okay.  You didn't hear the exact words.  And as you sit
 5   here today, you can't remember what her exact words were;
 6   correct?
 7   A    Exact words, no.
 8   Q    Okay.  And you absolutely know that he never stated --
 9   Quintero never stated she gave me consent to come in.  That
10   just did not happen?
11   A    She didn't -- he didn't tell me specifically, no.
12   Q    And you didn't hear him say that to anybody else on
13   those steps out on the porch?
14          There was a porch area -- or kind of a landing
15   area, if you will?
16   A    I believe it was a hallway.
17   Q    Hallway.
18          MR. GERAGOS:  Okay.  Thank you.
19          No further questions.
20                  REDIRECT EXAMINATION
21   BY MR. ESTRADA:
22   Q    I just want to clarify, Your Honor...
23          This was back in September 2010; correct?
24   A    Yes.
25   Q    You're not saying you remember the exact words that
```

```
1    Stefeanenasu said to Quintero; correct?

2    A    Correct.

3    Q    You remember some words used, what you understood to be

4    permission to enter; correct?

5    A    Correct.

6    Q    But you don't remember the exact words?

7    A    I do not recall the exact words, no.

8    Q    And, of course, this happening over three years ago, you

9    wouldn't remember the exact --

10              MR. GERAGOS:  Objection.  Leading.

11              THE COURT:  Sustained.

12   BY MR. ESTRADA:

13   Q    This happened three years ago; correct?

14   A    Yes.

15   Q    Now, in the interim, have there been many searches that

16   you conducted?

17   A    Yes, several.

18   Q    This wasn't the only search you've ever been involved

19   in?

20   A    Correct.  It has not.

21   Q    There were many others?

22   A    Yes.

23   Q    But you do recall --

24              MR. GERAGOS:  Objection.  Leading.

25              THE COURT:  You already asked that question.  "You
```

```
1   do recall?"
2           Didn't you already ask that question?
3           MR. ESTRADA:  It depends on what I was going to
4   ask --
5           THE COURT:  Well, I can't think of a different
6   question, but go ahead and try.
7                       (Laughter.)
8   BY MR. ESTRADA:
9   Q    You remember a conversation that occurred between
10  Quintero and the woman at the door; correct?
11  A    Yes.
12  Q    And in that communication, you remember Stefeanenasu
13  admitting officers with permission?
14  A    Yes.
15          MR. ESTRADA:  No further questions, Your Honor.
16          THE COURT:  Okay.  Thank you.
17          You may step down.
18          THE WITNESS:  Thank you.
19          THE COURT:  Any further witnesses?
20          MR. ESTRADA:  Very briefly, Your Honor.
21  FBI Special Agent Jeremy Stebbins...
22  GOVERNMENT'S WITNESS JEREMY STEBBINS SWORN.
23          THE CLERK:  Sir, please state your full name and
24  spell your last name for the record.
25  A    Jeremy M. Stebbins, J-e-r-e-m-y M. S-t-e-b-b-i-n-s.
```

```
 1              THE CLERK:  Thank you.

 2                    DIRECT EXAMINATION

 3   BY MR. ESTRADA:

 4   Q    Agent Stebbins, you work for the FBI?

 5   A    Correct.

 6   Q    You're the case agent on this case?

 7   A    Yes, sir.

 8   Q    In connection with the motion to suppress that was filed

 9   by defendant Aloyan, did you go to the location at

10   Burnside -- 215 Burnside to obtain photographs?

11   A    Yes.

12   Q    And specifically, did you go to the exact location that

13   was searched on September 3rd, 2010?

14   A    Yes.

15   Q    Please take a look at Exhibit 2 which is one of the

16   exhibits that should be before you.

17          Do you have that in front you?

18   A    I do.

19   Q    That Exhibit 2, where is that photograph taken?

20   A    It is from the living room, looking towards the front

21   door of the residence.

22   Q    Of what apartment?

23   A    Apartment 215 at 740 Burnside.

24   Q    And that was the apartment that was searched; correct?

25   A    That's correct.
```

```
 1    Q    Now, were you told whether there were any minor
 2    alterations to the apartment?
 3    A    They did say that there were some cosmetic changes.
 4    Though the manager couldn't tell me whether it was paint or
 5    cabinets or what.
 6    Q    But that is the apartment --
 7              MR. GERAGOS:  Objection; leading.
 8              THE COURT:  Sustained.
 9    BY MR. ESTRADA:
10    Q    The apartment that you took photographs of, the inside
11    which we see in Exhibit 2, what's that apartment?
12    A    Apartment 215.
13              MR. ESTRADA:  No further questions.
14              THE COURT:  Just -- what was the date of the
15    photograph compared to when this entry took place?
16              THE WITNESS:  I believe it was mid-October 2013.
17              THE COURT:  I see.  Okay.
18              Okay.  So -- thank you.
19                      CROSS-EXAMINATION
20    BY MR. GERAGOS:
21    Q    Yeah.  You have the exhibits in front you; is that
22    right?
23    A    Yes, sir.
24    Q    Do you see the exhibit that has a floor plan that says
25    Plan D, two-bedroom, two-bath?
```

1    A    Yes, sir.

2    Q    Okay.  When you went back, that was about three years

3    and a month later -- 37 months later?

4    A    It was October 2013, yes.

5    Q    Okay.  And did Ms. Stefeanenasu, did she still live

6    there?

7    A    No.

8    Q    So it was somebody completely different that was in that

9    unit.

10   A    That's correct.

11   Q    Okay.  Did you -- were you aware -- you're the case

12   agent; correct?

13   A    That's correct.

14   Q    Okay.  So you're the guy most familiar with what is

15   going on in this case?

16   A    In certain instances, yes.

17   Q    Okay.  Did anybody ever check with the manager prior to

18   September 3rd of 2010 and find out whether or not Mr. Aloyan

19   lived there?

20        MR. ESTRADA:  Objection, Your Honor.  Calls for

21   speculation and hearsay.

22        THE COURT:  Overruled.

23        THE WITNESS:  I don't recall.

24   BY MR. GERAGOS:

25   Q    But you went there 37 months later and took pictures of

1    an apartment that was -- while it was the same unit, somebody

2    different was living there; is that right?

3    A    Correct.

4    Q    And the manager told you at that point that there had

5    been changes to the interior of the apartment but couldn't

6    remember what it was?

7    A    Cosmetic changes yes.

8    Q    Okay.  Cosmetic changes?  So they'd made changes.  It's

9    1100 square feet and something was different then, than it

10   was three years before; is that right?

11   A    Correct.

12   Q    Are you familiar with the search warrant affidavit in

13   this case?

14   A    Somewhat familiar, yes.

15   Q    Okay.  Was there anything apprising if the manager had

16   said that the -- Mr. Aloyan didn't live there, wouldn't that

17   be something you would put into a search warrant affidavit?

18           MR. ESTRADA:  Objection, Your Honor.  Calls for

19   speculation; relevance.

20           THE COURT:  Sustained.

21           MR. GERAGOS:  Thank you.  I have no further

22   questions.

23           MR. ESTRADA:  Nothing further, Your Honor.

24           THE COURT:  Thank you.

25           You may step down.

1          Argument...

2          Are we done with all our witnesses, Mr. Geragos?

3          MR. GERAGOS:  Yes, Your Honor.

4          THE COURT:  Argument.

5          MR. GERAGOS:  May I go first?

6          I harken back to what the Court said initially

7     about consent...

8          They have very clear memories that when asked, she

9     gave no consent to the search.  That was memorialized both in

10    the declaration police reports and in the testimony.  There

11    is nobody who has testified out of the three as to anything

12    that would lead this Court to say, Okay.  I'm convinced that

13    she let them come in, and they had seven officers who were

14    out in the hallway.  She opens the door after she says, Let

15    me get dressed or something to that effect.  It does not

16    appear that there was any permission.  It's frankly the --

17    the second officer who just testified was starting to make

18    something up on the fly about, Okay.  He turned around -- I

19    believe what I had asked him that he testified to -- and I

20    thought I took good notes on it, was that he -- Quintero

21    turned around and said, Okay.  I have consent to -- to enter

22    the premises which when confronted on cross-examination he

23    backed off immediately.  Besides the consent, as well under

24    the Ninth Circuit standards -- and we put that into the law

25    in the case -- clearly, there was no key.  There was no

1    issue -- ripe information.  It was six months prior in March

2    that they'd seen somebody at a girlfriend's house.  That was

3    it.  There was nothing I think that would lend credence to

4    anything that was testified to, other than what really went

5    on here, is they had a task force.  They wanted to make

6    themselves useful.  They went out looking for probationers

7    and they forced their way into the location, and then they

8    froze it for five hours while they got a search warrant.  And

9    everything else I think is -- to be kind or gentle -- is

10   after the fact, they're ad hoc manufacturing of cause for

11   letting them in.

12             THE COURT:  Okay.  Thank you.

13             Mr. Estrada...

14             MR. ESTRADA:  And I want to be clear about how the

15   Government is justifying the entry.  The Government isn't in

16   any way attempting to say that based on the law of the

17   Circuit, that there is some sort of probation search or

18   parole search.

19             THE COURT:  I agree with that.  I don't think that

20   there's a basis for finding that it was a valid probation

21   search because I don't think there's evidence that he resided

22   there.  And it's a slippery slope if every time you spend the

23   night in some place you reside there.  So I agree that that's

24   not what it's about.  It's about consent.

25             MR. ESTRADA:  Correct, Your Honor.  And the

1    Government isn't attempting to justify it on that basis.

2           In fact, what you have here is a situation where

3    the officers really did exactly what is called for by

4    Ninth Circuit law.  They didn't have probable cause to

5    believe Aloyan lived there.  So they went there to inquire if

6    he lived there.  When they knocked on the door and the person

7    there, in fact, stated that Aloyan was staying at the

8    location, they asked consent to enter.  And if the Court

9    looks at the facts in what the officers stated, their version

10   of events is consistent with commonsense.  They're saying

11   that they recall consent being given.  They don't remember

12   the exact words, because who would remember the exact words

13   three years later; but they remember a conversation.  They

14   remember Stefeanenasu, the then-girlfriend, verbalizing some

15   sort of consent, permission come in.  Please enter; whatever

16   it was, but they remember that.  They don't remember any

17   pushing on the door.  They don't remember any forcing entry.

18   What they recall and what the facts bear out, is that she

19   verbalized something that allowed them to enter.  She stepped

20   back, demonstrating that they could enter.  And in the case

21   law in the *Povo* case which the Government cited, even without

22   verbalized consent, the actions of the occupant are enough to

23   demonstrate consent.  It's all consistent with a voluntary

24   and valid consent.

25           The defendant's version of events do not comport

1   with commonsense.  He's trying to say he remembers the exact

2   words that were used.  He's trying to say that even though he

3   was asleep and immobile feet away, he remembers exactly the

4   conversation that took place, even though he --

5              THE COURT:  I actually don't think he said that.  I

6   think that Mr. Aloyan was uncertain whether he heard or could

7   recall all of the words.

8              MR. ESTRADA:  My recollection was that he

9   remembered the exact words when I pressed him on that point.

10  And also I remember asking him very clearly if he --

11  Exhibit 2, whether he was sure that that was not the same

12  apartment.  And he expressed certainty on that point.

13             THE COURT:  But I can't fault him for that.  If a

14  painting is -- the paint color has been changed, the

15  accouterments are different...

16             So I don't think that's important one way or the

17  other.

18             MR. ESTRADA:  I don't fault him for the paint being

19  different or lining of the apartment being different or

20  cosmetic changes.  What I do fault him for is having such

21  certainty about events that happened three years ago when we

22  know from commonsense that he wouldn't have that sort of

23  certainty.  He has a motive here.  He has an interest.  He

24  has bias --

25             THE COURT:  You know, the way these cases get

```
 1   analyzed, you look at the totality of the circumstances to
 2   determine whether consent was voluntarily given.  The
 3   Government has the burden.  It's a burden b the
 4   preponderance.  So then you look at the objective factors,
 5   and you go, Okay.  Well, there were seven officers.  Well,
 6   it's more than one or two; but, you know, then you look at,
 7   Well, they were armed.  Sure.  They were in uniform, sure.
 8   Were guns drawn?  No.  Were they in tactical gear?  No.  Was
 9   there something else that lended some oppressive error to
10   whether there might have been consent, other than the fact
11   that there were a fair number of officers there?  No.  There
12   was nothing else about what happened that would indicate --
13   there weren't flashing lights going on outside.  There wasn't
14   a helicopter thundering overhead; not that all of those were
15   required; but you look at the totality.  So I didn't find
16   anything about the number or the fact that they were in
17   uniform to be, you know, particularly coercive.  I don't
18   know, for example, whether she was even able to see all seven
19   of the officers.  I don't know what the railing was like,
20   what the door was like, just -- so I don't have any sense of
21   whether that was important to her or not.  So that's sort of
22   the stage, the way I set it.
23          And then it comes down to, has the Government met
24   its burden in terms of showing consent?
25          So you may continue.
```

```
1              MR. ESTRADA:  Certainly, Your Honor.

2              And in the Government's view, we have met that

3    burden.  And the Court referred to the Jones factors.  If the

4    Court looks at those Jones factors as the Court stated, there

5    were no guns drawn.  The defendant wasn't in custody; no

6    Miranda warnings were given because they were unnecessary

7    since the -- neither Stefeanenasu nor Aloyan were in custody.

8    Whether the defendant was notified of a right not to consent,

9    that was not given.  And the Government concedes that; but

10   it's unnecessary first to check off all the factors; but

11   secondly, as the testimony demonstrated and as the facts

12   demonstrated, we had an individual, Stefeanenasu, who was

13   well aware of her rights because she twice denied the

14   officers in their desire to search the location when they

15   asked for consent.

16             And in my view, that cuts in favor of showing that

17   the consent that she gave was not --

18             THE COURT:  It cuts neutrally.  I mean, both sides

19   can make credible arguments.  It's neutral.

20             MR. ESTRADA:  Certainly, Your Honor; but in the

21   Government's view, it does show a lack of corrosiveness.  And

22   then in -- with regard to whether there was any threatening

23   demonstration of force, there certainly wasn't in this case.

24   What we have was officers going to a location, asking for

25   consent to search.  The occupant, Stefeanenasu, permitting
```

```
1    officers entry to the location and nothing to demonstrate in
2    any way that there was any sort of coercive aspect to that.
3              THE COURT:  Okay.  Thank you.
4              Just going through it, I thought Mr. Aloyan's
5    testimony was somewhat of a mixed bag.  He seemed like
6    perhaps he was just waking up, and I tended to discount some
7    of his recollection of the events.  He also indicated, I
8    believe, that he had surgery the day before and perhaps he
9    was taking some sort of medication.  I don't know; but it
10   wouldn't be unusual for someone to feel a little sleepy the
11   day after having a cyst removed from their back.  My
12   recollection is that Mr. Aloyan at one point, I believe said
13   he didn't -- or there was no consent given.  Another point I
14   believe I recollect, he said words to the effect that he
15   wasn't sure that he heard all of the words or the exact
16   words.
17             Certainly there's no evidence of any dramatic
18   pushing their way in or anything like that.  No one seems to
19   indicate that.  I thought the officers' testimony was
20   generally credible on the issue.  And again, I didn't see
21   anything coercive about the number of officers.  And I
22   thought that what the officers did in terms of going to get a
23   warrant is consistent with what the law requires as well.
24   And they're allowed to freeze a residence for a reasonable
25   period of time.  It's going to vary under the circumstances.
```

```
 1    It doesn't strike me that the amount of time here, you know,

 2    was unreasonable.  I mean, there are certainly cases that

 3    deal with individuals who are frozen out of their residence

 4    for a period of time.  They can't get medicine.  They don't

 5    have access.  And those -- those cases are not that case

 6    here.

 7            So for those reason the motion to suppress is

 8    denied.  What's the next order of business then, Mr. Estrada?

 9            MR. ESTRADA:  Your Honor, the next motion that was

10    filed by defendant Aloyan was a motion for sentencing

11    entrapment.

12            THE COURT:  Okay.  The tentative is to deny.  I

13    didn't feel that the defendant's statement under the law was

14    persuasive on this issue.  I'll certainly hear argument.

15            MR. GERAGOS:  I was going to suggest even before

16    you gave the tentative was to deny, that we reserve that

17    because on the desk there, they handed over some items today

18    which I have not had a chance to --

19            THE COURT:  I'm sorry.  Did you say that you

20    wanted -- I didn't hear what you said initially.

21            MR. GERAGOS:  That I wanted to reserve that motion.

22            THE COURT:  You want to reserve it for some later

23    date?

24            MR. GERAGOS:  For a later date.  Correct.

25            THE COURT:  That's fine.  You can reserve it.
```

1    MR. GERAGOS:  Because I thought it was more of a

2    trial issue in any event.  I just filed it to make sure that

3    we had it out there, so there wasn't going to be any

4    surprises; but the turning over the information regarding

5    informants was just given to me today.  I want to review that

6    and then maybe revisit the issue at trial.

7         THE COURT:  That's fine.  Then what I will do is,

8    it is simply going to be vacated without prejudice to renew

9    it in the future.

10        MR. GERAGOS:  That's fine.

11        THE COURT:  Okay.  Thank you.

12        MR. ESTRADA:  And just to be clear, Your Honor,

13   what the Government provided Defense counsel, Mr. Geragos

14   today was, under the Court's protective order of March 20th

15   of this year, cooperator information for witnesses

16   anticipated to testify at trial.

17        THE COURT:  Sure.  Let's get to that in a minute.

18   Let me just clean up all of the other issues or at least make

19   sure we've dealt with all of the other issues.  Have we dealt

20   with all of your motions?

21        MR. GERAGOS:  Yes, we have, Your Honor.

22        THE COURT:  Okay.  And is there anything else with

23   Mr. Geragos then?

24        MR. ESTRADA:  That would be both his motions, Your

25   Honor.

```
 1              THE COURT:  Okay.  We've taken care of that then.
 2              MR. ESTRADA:  There are certain pretrial matters
 3    that I wanted to bring up, if the Court wants to address
 4    those now or later.
 5              THE COURT:  We can do that.  Are there any other
 6    pending substantive motions?  There was an interstate
 7    commerce.
 8              MR. ESTRADA:  That was defendant Darbinyan's
 9    motion, Your Honor.
10              THE COURT:  Mr. Darbinyan's motion.  Why don't we
11    take that up next then.
12              Yes?
13              MR. SEVERO:  Thank you, Your Honor.  Our motion
14    addresses the lack of any indication that any of the overt
15    acts or any of the facts alleged in the indictment point to
16    any effect on interstate commerce in Counts 4 and 5.
17    Recognizing that no great evidentiary detail is necessary in
18    an indictment, particularly one under the Hobbs Act.
19              The Government's assertion that no facts at all are
20    needed is just simply wrong.  In looking at, for example, the
21    case that they cite in *Woodruff*, the -- that court did
22    indicate that that great detail is not necessary, but they
23    were faced with allegations that the defendant had robbed
24    three jewelry stores; was attempting to rob a fourth and
25    identified the locations and so forth of the activities.
```

```
 1    That, the Court said would be sufficient; but what we have
 2    here, is an allegation that an individual --
 3              THE COURT:  Does that mean they were just focusing
 4    on the monetary impact?
 5              MR. SEVERO:  They were focusing on the fact that in
 6    order for a Hobbs Act allegation to pass muster, it -- it
 7    must point to some, even de minimis effect on interstate
 8    commerce.  And no case anywhere in the country has ever ruled
 9    that an individual being extorted on a personal loan is that
10    impact on interstate commerce.  And as I -- as you peruse
11    the --
12              THE COURT:  Well, isn't the amount something like
13    $80,000.
14              MR. SEVERO:  That alone --
15              THE COURT:  Sorry to interrupt you.  Isn't that
16    less than the -- does that seem like a de minimis amount in
17    terms of jewelry robberies?  Is that what you're saying?
18              I'm not --
19              MR. SEVERO:  No.  The amount itself is not the
20    significant aspect of it.  The amount it's because the -- the
21    exceptions or the de minimis impact, for example, that an
22    individual has to be, whether it depletes the assets of the
23    individual to such an extent that it would have, that impact
24    on interstate commerce.  What I'm saying to the Court is that
25    in the cases cited by the Government, there were
```

1    allegations -- bare as they were -- but there were

2    allegations that some business was involved in the extortion.

3    And I am -- the problem with the Counts 4 and 5, despite the

4    large number of overt acts and despite the large number of

5    allegations, is that not once, does it point to any impact on

6    any business, which would be interstate commerce.  Just the

7    fact that the individual owes a personal debt -- a personal

8    debt to another is not any kind of an impact on interstate

9    commerce; at least, not one that's been recognized by any of

10   the cases that have visited this issue.  So I -- I was

11   struck, particularly, by -- by the complete dearth of any

12   allusion to anything that had to do with commerce.  It had to

13   do with an individual who was being, according to the

14   Government, extorted on a personal loan that was made; but

15   none had to do with interstate commerce at all, contrary to

16   the cases that are cited in the Government's opposition.  So

17   for those -- for those reasons, we believe that a Hobbs Act

18   violation has not been stated --

19          THE COURT:  So just to be precise:  You're saying,

20   Okay.  The jewelry store robberies involved things, jewelry.

21   The jewelry perhaps itself came from some other place; may

22   have come from some other place.  I'm not really clear what

23   the distinction is between an individual that gets extorted

24   theoretically for a million dollars or a large sum and a

25   jewelry store that is extorted for some items of jewelry,

```
1    just --
2             MR. SEVERO:  Jewelry stores and the merchandise
3    that they sell may travel on interstate commerce.  And a
4    jeweler deals in interstate commerce, no matter how small a
5    jewelry store is, because it necessarily must buy and sell
6    goods.  So in that sense as in Woodruff, there was enough of
7    a de minimis allegation of impact on the -- on interstate
8    commerce where there is a business involved that trades in
9    goods that come from places outside the -- the state, but
10   it's not the case here and it's not the allegation -- those
11   are not the allegations here.  The allegations here are
12   completely devoid of any indication that what was being --
13   the individual being extorted was engaged in any kind of
14   commerce at all.  This is strictly a local matter.  And
15   exhibits -- or rather Counts 4 and 5 as you scanned this
16   rather gargantuan indictment, you still can't find any
17   indication that MM, who is the individual being extorted
18   according to the indictment, was involved in any commerce at
19   all.
20            So contrary to the Government's cases, there is
21   nothing at all here.  And the Government's assertion that no
22   facts at all need to be alleged, is just not correct.  You
23   have to have some facts under Rule 7 -- to not a great detail
24   but some facts that would at least point to an impact on
25   interstate commerce.
```

```
1            THE COURT:  I mean, the -- the page that I printed

2   from Woodruff says, "Although, the indictment contained no

3   facts" -- to me, "no facts" means none -- "alleging how

4   interstate commerce was interfered with and did not state any

5   theory of interstate impact.  Prior decisions of our court

6   compel the conclusion that the indictment was sufficient as

7   written."

8            And then the Court goes on to say, the Government

9   still has to prove this nexus in trial.  You're saying, Well,

10  go behind that case and look at the facts that they were

11  dealing with.

12           Am I following you?

13           MR. SEVERO:  Absolutely.  I think that the

14  generalized statement that included no facts that it impacted

15  interstate commerce is generally correct.  And that in

16  Woodruff there are no -- no allegations that the jewelry

17  store was engaged in interstate commerce.  And I think that's

18  where the Court was alluding to when it said you don't have

19  any facts in this indictment that show an impact on

20  interstate commerce, but we do have -- and I'm quoting from

21  the case:  "Obstructing commerce by robbing three jewelry

22  stores and attempting to rob a fourth."  It identified the

23  location and the date of each of the charged activities.  It

24  does serve its intended functions.

25           So technically you look at that and you say, Well,
```

1   from that, the Court can fairly assume or deduct that there

2   is a -- an impact on interstate commerce.  It's not the case

3   here.  We don't even have that here.  We don't have anything

4   at all here that would point to commerce in any respect, and

5   I think to allow these cases to -- these two counts to go

6   forward --

7           THE COURT:  You mean in light of the broad language

8   in *Woodruff*, are you aware of any case that is directly on

9   point or closer on point to your position?

10          MR. SEVERO:  Other than very generally, also saying

11  that it is necessary to plead some facts, I have no other

12  case that comes close to that.  The *Woodruff* language is

13  broad, but it must be interpreted in terms of the facts that

14  it had before it.  So to the extent that it is breadth was

15  caused by the factual underpinnings that it decided the case

16  on.  I believe that that not -- that's not -- that must be

17  construed in that sense; but where -- the whole idea of

18  Rule 7 -- and -- and allegations in a complaint require that

19  necessary requirements of the crime be alleged, even if

20  minimally.  And we're saying -- and I think that's

21  essentially what's lacking here, is that even that minimal

22  involvement.  I am -- I do remember citing to the case -- to

23  the Court, a -- the lynch cases and -- and *U.S. v. Collins*, a

24  Fifth Circuit case, that talk about robbing an individual as

25  opposed to robbing a business.  It's at pages eight and nine

1    of my motion.  And it essentially -- and it essentially goes

2    to the heart of the -- the problem with the *Woodruff* case is

3    that it did state in overly broad terms, a -- a manner of

4    pleading that is not consistent with what is required under

5    Rule 7.

6            THE COURT:  Sure.  That was a case -- was decided

7    at trial though; right?  I mean, that was an interstate nexus

8    at trial?  So the Court just said, the evidence was

9    insufficient and the Government would concede here that it

10   still has to prove that nexus in trial.

11           MR. SEVERO:  And I agree the Government has so

12   conceded; but this particular case is so bare in any

13   indications that I think the Court need not allow the matter

14   to go forward to trial.

15           THE COURT:  Okay.  Thank you.

16           MR. SEVERO:  Thank you.

17           CREIGHTON:  Your Honor, the *Woodruff* case does

18   control under the circumstances.  The reason perhaps for

19   including the additional facts in the *Woodruff* case may have

20   been the Circuit demonstrating the difficulty of the district

21   court's position below in that case where in *Woodruff* you did

22   have a robbery of three commercial establishments.  And it is

23   the law everywhere in this country, that those qualify as

24   Hobbs Acts' robberies.  That, in fact, is not close in any

25   sense.  Robberies of five and dime stores, dollar stores,

```
 1    7-Eleven's, all qualify as Hobbs Act robberies.  So just
 2    looking at the facts of Woodruff, the judge below may indeed
 3    just have been mistaken; but that doesn't take away from the
 4    strength of the rule that was not announced but reaffirmed in
 5    Woodruff, having originally been announced in Carvo back in
 6    1963, I believe it was.  And it's a commonsense rule.  The
 7    Hobbs Acts statute says that anyone who in any way or degree
 8    affects interstate commerce is liable.  It is a de minimis
 9    standard it requires --
10         THE COURT:  I think what Mr. Severo is saying,
11    Well, then everything impacts interstate commerce.  There
12    just isn't a situation where it wouldn't.
13         CREIGHTON:  No.  The -- the Government would --
14    there are plenty of situations where it doesn't affect
15    interstate commerce.  There are plenty of low-level crimes
16    that do not rise to an interference in interstate commerce --
17         THE COURT:  Sure.  But are you saying that
18    Hobbs Act per se crimes do -- that Hobbs Act crimes per se
19    affect interstate commerce?
20         CREIGHTON:  I think that's definitional,
21    Your Honor.  I think we may be confused there.
22         THE COURT:  Extortion per se affects interstate
23    commerce?
24         CREIGHTON:  Extortion per se does not affect
25    interstate commerce, but there are extortions that do affect
```

1    interstate commerce, and we have alleged in this case a

2    number of overt acts that point in the direction of where

3    interstate commerce may have been interfered with.  However,

4    under -- and those facts would include the wiring of funds in

5    the course of this extortion, the use of telephones, the use

6    of the victim repeatedly to provide funds to a number of

7    individuals; not just the defendant and the sum of the

8    cumulative sum of money that was involved.

9          The Government is -- believes that is sufficient

10   under this pleading standard that was stated in -- as set out

11   in *Carvo* and *Woodruff*.

12         The Defense mentioned the *Lynch* case and the *Lynch*

13   case is highly relevant here in the following sense:  -- Your

14   Honor is absolutely correct that -- that *Lynch* and the

15   Collins case are cases that involve the burden of proof at

16   trial.  And as Your Honor pointed out, the Government, you

17   know, concedes that we're going to have to prove an

18   interstate nexus here at trial; but what the *Lynch* case does

19   interestingly, in the case of robberies or extortions of

20   individuals is point out that the effect on interstate

21   commerce can come not only in a variety of indirect forms but

22   also in terms of a direct effect on interstate commerce, in

23   short, again, there are a lot of ways that the Government can

24   prove this.  And the Government has alleged in the indictment

25   in listing out all these overt acts, many occasions on which

1    the -- in which the victim was being threatened to engage in

2    a number of financial transactions in a number of forms,

3    whether by depositing funds, using telephones, or by wiring

4    funds.

5            Now, again, nothing absolves the Government of

6    proof here; but the standard articulated in *Carvo* and

7    *Woodruff* is clear.  The indictment in *Woodruff* contained no

8    facts, alleging how interstate commerce was interfered with.

9    And it did not state the theory of interstate impact.  And

10   the Court has now held in *Carvo* and in *Woodruff* that that's

11   appropriate.  And the Ninth Circuit has taken that same

12   standard and taken it out of the Hobbs Act context, and in, I

13   believe it's the *Fernandez* case, applied that same standard

14   to the RICO statute.  We believe the rule here is definitive

15   and controlling.  The pleading is adequate.

16           THE COURT:  Anything further, Mr. Severo?

17           MR. SEVERO:  Just very briefly, if I might...

18           The use of interstate facilities, such as wires and

19   felons is not the test for whether the act of extortion

20   impacts interstate commerce.  So I vehemently disagree that

21   there is a need that -- that any use of wires and phones

22   meets that -- that definition of impact on interstate

23   commerce.  I think in that respect, the courts are focused

24   only on whether the individual is -- and there -- there's

25   actually three aspects to it.

1           THE COURT:  Right.  But those were all the

2      questions at trial; right?

3           MR. SEVERO:  I would -- I would agree with you.

4           THE COURT:  I mean, there's that three-part test in

5      *Lynch*; right?

6           MR. SEVERO:  I normally would agree with that.  And

7      this is a rare instance where this is -- where I would have

8      taken an objection to this indictment; but it's just that

9      this indictment has nothing concerning -- not just minimal --

10     but nothing concerning a linkage to a business.  And I

11     understand that they have to prove that at trial.  That's not

12     the -- there -- I think -- that is one thing we agree on, but

13     we are -- as you look back at this indictment, there's just

14     nothing there that says that this is anything more than a

15     California state case, other than not a federal case.

16          THE COURT:  Thank you.

17          Okay I think that the *Woodruff* case does control.

18     And I think the Government's burden is at trial to prove

19     beyond a reasonable doubt that there is an interstate nexus,

20     and the language of *Woodruff* is extremely broad.  I'm not

21     going to recite it here, but I think it is controlling.  So

22     the motion is denied.

23          Are there any other substantive motions?

24          MR. ESTRADA:  No, Your Honor.

25          MR. SEVERO:  No -- well, we don't have agreement on

1    the informant disclosure issue and the *Giglio* statement.

2          MR. ESTRADA:  There is a motion pertaining to

3    deadlines and discovery issues.

4          THE COURT:  Sure.  I issued an order last week.

5    Thank you for meeting and conferring.  It was very helpful,

6    what you submitted.  Are we going ready to take that up now

7    or is there something else?

8          MR. SEVERO:  Well, there is -- perhaps I

9    misunderstand what you mean by "substantive," but the motion

10   to compel disclosure of informant identity, I believe, fell

11   into that category.  It goes hand in hand with the --

12         THE COURT:  We can call it "substantive" if you

13   want.

14                    (Laughter.)

15         MR. SEVERO:  So yes, we have that left.

16         THE COURT:  Okay.  Fine.  Well, where are we with

17   that, Mr. Estrada?

18         MR. ESTRADA:  Your Honor, the Government filed a

19   status report yesterday as the Court can see, the parties are

20   largely in agreement as to the various categories of material

21   that defendant Darbinyan identified.  The one point of

22   disagreement -- and let me -- before I get to that, I should

23   just say with regard to numbers four, five and six, there is

24   an issue about grand jury transcripts.  The Government is

25   producing grand jury transcripts to defendant Aloyan today --

```
1    well, subject to the Court's issuance of a Rule 6(e) order
2    which I have provided to the Court -- but the Government
3    would be fine with producing that material to the remaining
4    defendants as well, subject to the Court's granting of the
5    Rule 6(e) motion.
6              MR. SEVERO:  That's acceptable.
7              THE COURT:  Okay.  Thank you.
8              MR. ESTRADA:  The point of disagreement is as to
9    cooperator information -- cooperating witnesses at trial.
10             THE COURT:  And we're talking about the -- which
11   trial?
12             MR. ESTRADA:  We're talking about the
13   March 11th, 2014 trial.  With regard to the
14   December 3rd, 2013 trial as to Aloyan only, that material is
15   being produced -- has been produced to Defense counsel
16   today --
17             THE COURT:  Right.
18             MR. ESTRADA:  -- two weeks before trial.  Two weeks
19   and a day before trial.
20             THE COURT:  So the March 11th trial, the date that
21   you want to disclose identities is what?
22             MR. ESTRADA:  The date we had proposed was
23   February 25th, 2014 which is two weeks before the trial.  And
24   the reason for that as stated in the Government's opposition,
25   is concerned for the safety of the cooperating witnesses
```

1  based on the materials being submitted to the Court. And, of

2  course, as the Court is well aware, our office's general

3  practice is to produce this material a week ahead of trial.

4  Here we're producing it two weeks ahead of trial, given the

5  security issues which the defendant has already demonstrated

6  exist in this case; based on his attempts to uncover

7  cooperators and disseminate to other gang members cooperator

8  information. The Government very weary of having to produce

9  that material to cooperating witnesses --

10       THE COURT: How voluminous is the material -- the

11  defendants -- or defendants argue that they will be

12  compromised in their ability to prepare.

13       So how voluminous is it?

14       MR. ESTRADA: We're talking about plea

15  agreements -- cooperation plea agreements, rap sheets for

16  those cooperators and proffer statements that those

17  cooperators have made to the Government. That core material

18  is not voluminous, because of the limited number of meetings

19  that typically occur between the Government and cooperating

20  witnesses. I can't give you a page number right now, but

21  we're talking generally about plea agreements, rap sheets,

22  and the proffer statements.

23       THE COURT: And are we dealing with a large number

24  of individuals?

25       MR. ESTRADA: I anticipate that the Government will

```
 1    produce approximately three to five individuals.

 2              THE COURT:  Okay.

 3              MR. GERAGOS:  Could I address the Court as to

 4    Mr. Aloyan because, obviously, I have not had a chance to

 5    take a look at how voluminous the material is, but,

 6    obviously, we have two weeks till trial.  It is being

 7    produced today.  I have no idea what the breadth or the scope

 8    of that material is.  I don't want to be in a position where

 9    I'm running back here saying, Judge, I need more time.  I'd

10    like to try to front-load this issue, if we could.

11              THE COURT:  What does that mean exactly?

12              MR. GERAGOS:  Well, the -- maybe -- I don't know if

13    the 3 two five applies in our case with Aloyan -- I suspect

14    it does not.

15              MR. ESTRADA:  It does not, Your Honor.  There are

16    only two with regard to defendant Aloyan, and those have been

17    provided pursuant to the protective order to counsel.  And

18    again, the material comes down to reports.  In one case, plea

19    agreement, listing of benefits and rap sheets they said

20    exist.

21              With regard to one of the cooperating witnesses,

22    there is a large number of reports based on the history of

23    that particular cooperating defendant, but in terms of

24    reports pertaining to this case, there are approximately --

25    let me just verify if I can have a minute, Your Honor...
```

```
 1                    (Pause in the proceedings.)
 2              MR. ESTRADA:  Approximately five to seven reports,
 3      Your Honor.
 4              MR. GERAGOS:  Could I -- I know the Court does not
 5      like cross-talking or --
 6              THE COURT:  Go ahead --
 7              MR. GERAGOS:  But my question is --
 8              THE COURT:  -- you can cross-talk.
 9                         (Laughter.)
10              MR. GERAGOS:  Can I have one moment on this?
11              THE COURT:  Yes.
12                         (Counsel confer.)
13              MR. ESTRADA:  There is five to seven, approximately
14      reports that pertain to this case where the FBI interviewed
15      that particular witness with regard to the events in this
16      case.  There are also I'm told several hundred pages
17      historically for that witness, but those pages are largely
18      redacted.  They include, for instance, a cooperator talking
19      about that witness.  And there will be one paragraph where it
20      pertains to that witness and where that cooperator talks
21      about others that aren't testifying that aren't connected to
22      the case.  That material is redacted.
23              THE COURT:  Okay.
24              MR. GERAGOS:  Okay.  Your Honor, obviously, I
25      haven't seen it.  I wanted to front-load it.  If I look at it
```

1    and it turns out I need more time to investigate it, I'll

2    bring it to the Court's attention.

3              THE COURT:  That's fine.  Thank you.

4              Go ahead.

5              MR. SEVERO:  I think that what's not being said, is

6    that once that material is made available, it opens something

7    of a flood gate to what intercepted calls there may have been

8    concerning these individuals before they became cooperators

9    and how voluminous that information might be.  It also

10   doesn't allow for when you're talking about five to -- I

11   don't know three to five or six individuals that are going to

12   be cooperators with two weeks left to go to trial -- the

13   focus on investigation has to be just on that.  It may not --

14   we just simply won't have time to cover it all without

15   risking a -- as one judge put it a cascade of mid-trial

16   continuances because the information that comes in will be

17   new to us as it comes off the witness stand.  So there is, I

18   believe, a substantial risk that unless earlier disclosed,

19   that we're going to end up having to move this case around in

20   the middle of it.  I -- I don't see --

21             THE COURT:  Is there an issue concerning

22   transcripts on other intercepted conversations?

23             MR. ESTRADA:  No, Your Honor.  And just to clarify,

24   what we're talking about here is not witnesses who will

25   augment the charges in this case.  The charges are what they

1   are in the indictment and what's in the evidence that has

2   been provided to these defendants for quite some time now.

3   We're talking about cooperating witnesses who will simply add

4   context to some of the calls in evidence that's already been

5   produced to defendants.

6           THE COURT:  They're not going to be on any of the

7   interceptions?

8           MR. ESTRADA:  Some of them may be on the

9   interceptions, but those interceptions have already been

10  produced to counsel.

11          MR. SEVERO:  But I don't know whose they are.  So

12  to put them in context --

13          THE COURT:  Are they searchable and findable?

14          MR. SEVERO:  Well, yes.

15          THE COURT:  I just -- I mean, I don't have any

16  sense of scope.

17          MR. SEVERO:  Searchable would mean every one of

18  them, yes.  I suspect that the -- I'm not sure how you

19  answer -- one would answer yes to that question.  It depends

20  on what we're looking for.  I don't know that until we

21  actually get it.  Now, we might be able to get a name and

22  search under that particular name, but I'm not sure --

23          THE COURT:  Well, I assume you're going to get a

24  name.  That's what we're talking about.

25          MR. SEVERO:  Well, exactly; but if -- if it's going

82

```
 1    to be disclosed two weeks early, is there any prejudice to
 2    the Government in disclosing it four weeks early as opposed
 3    to two and allowing more time for the Defense to -- to
 4    investigate and prepare for these very, very crucial
 5    witnesses?
 6            This is -- this case may also hinge on the fact
 7    that some of these witnesses may have, in our view, some
 8    Brady material that perhaps --
 9            THE COURT:  Well, that has to be independently
10    produced.
11            MR. SEVERO:  Right.  Exactly.
12            THE COURT:  And that's been done.
13            MR. SEVERO:  Well, there is -- I don't doubt that
14    it is honestly, earnestly being given; but shouldn't that be
15    our decision to look at the stuff and decide whether, in
16    fact, this is something we may want to use and shouldn't we
17    be allowed to look at that beforehand?  These witnesses may
18    hold a significant amount of information that may exonerate
19    my client.
20            THE COURT:  What's the trial estimate?
21            MR. ESTRADA:  The trial estimate, Your Honor, is
22    approximately four to six weeks.
23            THE COURT:  Okay.
24            MR. SEVERO:  Well, yeah.
25            THE COURT:  I'm going to order the production
```

```
1    30 days beforehand.  The Government can take care of these

2    witnesses for two more weeks.  So right now the date of trial

3    is March 11th.  So we'll make it 30 days prior to that date.

4             THE CLERK:  That will be -- so, Your Honor, the

5    12th -- February 12th.

6             MR. SEVERO:  That's -- okay.  Do we have a Leap

7    Year --

8             THE COURT:  We're in Leap Year.  What day of the

9    week is the 12th?

10             THE CLERK:  Wednesday.

11             THE COURT:  Okay.  The 11th.

12             MR. SEVERO:  All right.  Fair enough.

13             THE COURT:  I don't want you to make the Leap Year

14    argument.  So that's fine.

15             Okay.  Anything further?

16             MR. ESTRADA:  No, Your Honor.

17             MR. SEVERO:  That's all, Your Honor.

18                  (Whereupon proceeding adjourned.)

19                          - - -

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5     UNITED STATES OF AMERICA          :

 6               vs.                     :  No. CR 11-00072-DDP

 7     DARBINYAN, ET AL.  (DEFENDANTS    :

 8     1, 4, 27, and 34)

 9

10

11

12     I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

13     UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

14     CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

15     TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

16     CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

17     PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

18     TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

19     OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

20     FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

21     REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

22     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

23

24     /S/_____        01/06/2014

25     MARIA R. BUSTILLOS                    DATE
       OFFICIAL REPORTER
```

1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5

6                              CERTIFIED COPY

UNITED STATES OF AMERICA,        )

7                                )

                 PLAINTIFF,      )

8                                )

     vs.                         )    No. CR 11-00072(A)-RGK

9                                )

MHER DARBINYAN, ET AL.,          )

10                               )

                 DEFENDANTS.     )

11   _____)

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15        TUESDAY, FEBRUARY 11, 2014

16              2:04 P.M.

17       LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23       *SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
         *Official Reporter, U.S. District Court*
24              *255 East Temple Street*
              *Los Angeles, CA  90012*
25                *213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:
             ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
 3           BY:  ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
             312 NORTH SPRING STREET
 4           LOS ANGELES, CALIFORNIA  90012
             213.894.1785
 5

 6   FOR DEFENDANT MHER DARBINYAN:
             THE SEVERO LAW FIRM
 7           BY:  MICHAEL V. SEVERO, ATTORNEY AT LAW
             70 SOUTH LAKE AVENUE, SUITE 945
 8           PASADENA, CALIFORNIA  91101
             626.844.6400
 9

10   FOR DEFENDANT ARMAN SHAROPETROSIAN:
             LAW OFFICES OF CHARLES PEREYRA-SUAREZ
11           BY:  CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
             800 WILSHIRE BOULEVARD, 12TH FLOOR
12           LOS ANGELES, CALIFORNIA  90017
             213.623.5923
13

14   FOR DEFENDANT RAFAEL PARSADANYAN:
             FLIER AND FLIER, ALC
15           BY:  ANDREW REED FLIER, ATTORNEY AT LAW
             15250 VENTURA BOULEVARD, SUITE 600
16           SHERMAN OAKS, CALIFORNIA  91403
             818.990.9500
17

18   FOR DEFENDANT MIGUEL AGUSTIN RAMIREZ:
             DOMINIC CANTALUPO LAW OFFICES
19           BY:  DOMINIC CANTALUPO, ATTORNEY AT LAW
             100 WILSHIRE BOULEVARD, SUITE 940
20           SANTA MONICA, CALIFORNIA  91401-1113
             310.397.2637
21

22   FOR DEFENDANT VARTAN AVEDISSIAN:
             MARK WINDSOR LAW OFFICES
23           BY:  MARK WINDSOR, ATTORNEY AT LAW
             1 SOUTH FAIR OAKS AVENUE, SUITE 401
24           PASADENA, CALIFORNIA  91105
             626.792.6700
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, FEBRUARY 11, 2014

 2                              2:04 P.M.

 3                              - - - -

 4         THE CLERK:  Calling calendar item No. 2, case No.

 5    Criminal 11-72(A)-RGK, United States of America versus Mher

 6    Darbinyan, Arman Sharopetrosian, Rafael Parsadanyan, Miguel

 7    Agustin Ramirez and Vartan Avedissian.

 8        Counsel, please state your appearances.

 9         MS. YANG:  Good afternoon, your Honor.  Elizabeth Yang

10    on behalf of the United States.

11         THE COURT:  Counsel.

12         MR. SEVERO:  Good afternoon, your Honor.  Michael

13    Severo appearing on behalf of Mr. Darbinyan.  He's present, in

14    custody.

15         THE COURT:  Thank you.

16         MR. PEREYRA-SUAREZ:  And good afternoon, your Honor.

17    Charles Pereyra-Suarez representing Mr. Sharopetrosian.  He is

18    present, in custody.

19         THE COURT:  Okay.

20         MR. FLIER:  Good afternoon, your Honor.  Andrew Flier,

21    F-l-i-e-r, on behalf of Mr. Parsadanyan, who's not in custody

22    but before the Court.  Thank you.

23         THE COURT:  Okay.

24         MR. WINDSOR:  Good afternoon, your Honor.  Mark

25    Windsor on behalf of Vardan Avedissian, who is not present.  He
```

1    has a waiver on file, and he's on bond.

2            MR. CANTALUPO:  And good afternoon, your Honor.

3    Dominic Cantalupo appearing with Miguel Ramirez.  He's present,

4    on bond.

5            THE COURT:  Counsel, we called you in for a couple of

6    reasons.  One is to get a status.  The other is to rule on this

7    motion.  There's a motion to continue the case.

8        The Court has read and considered the moving papers, which

9    is the motion itself, the opposition to the motion, the reply

10   to the opposition of the motion, the joinder.

11       I think I've read all the documents on that, have I not?

12           MR. SEVERO:  I believe you have all the documents we

13   submitted, yes.

14           THE COURT:  Okay.

15           MS. YANG:  Yes, on behalf of the government as well,

16   your Honor.

17           THE COURT:  Okay.  The motion to continue is going to

18   be denied, and let me talk to you a little bit about it, just

19   to state the reasons so as not to seem -- so it doesn't seem

20   arbitrary.  And you all know the history, but I'll go through

21   it anyway.

22       The arraignment was back on March 30th of 2011.  The first

23   trial was set in February -- or excuse me, on May 3rd of 2011.

24   Then there was a year-long continuance until May 1st of 2012.

25   Then there was an 11-month-long continuance, so the third trial

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    was set on April 9th.  Then there was another six-month
 2    continuance, and it was set on April 15th of 2013.  And then
 3    there's another six-month continuance, which is the fifth
 4    setting of this trial.  And so it's got a long history to it.
 5         The last couple of continuances, everyone agreed to no
 6    further continuance.  I know one of the attorneys came in in
 7    September of last year, but at that time -- before we ever
 8    substitute attorneys in, we always ask to make sure that, as an
 9    officer of the court, they represent to the Court that they can
10    be ready to go on this trial, which was done in this particular
11    case, and they were allowed to substitute in.  It was almost a
12    six-month -- five to six months, and everybody agreed at that
13    time no further continuances, that they would be ready,
14    everyone would be ready for trial.  In fact, the words "final
15    request" for trial were used by the attorneys at that time.  In
16    the interim, I know the government's said two cases have been
17    tried.  That's not accurate.  One has been tried, and one's
18    still in trial, I believe next door, and that won't be up until
19    probably tonight or tomorrow.
20         MS. YANG:  Yes, your Honor.  We apologize for the
21    inadvertent statement.
22         THE COURT:  Anyway, all the reasons given for the
23    continuances are reasons that can be given six months from now,
24    a year, two years from now.
25         Going through the four factors.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    One, is it dilatory?  I gotta tell you, after three and a

2    half years, it's more consistent with dilatory than it is with

3    needed preparation, so I don't think that speaks in favor of a

4    continuance.

5    Is the request for continuance, does it serve the stated

6    purpose?  Well, sure it does, but anytime you request, unless

7    you're disingenuous, will always serve the stated purpose of

8    the continuance.

9    Number three, the extent to which it inconveniences the

10   Court and the opposing party, with all due respect to the AUSA,

11   I'm more concerned with how it deals with the Court and the

12   inconvenience to the Court.  Five trials over -- five trial

13   dates over three years is inconvenience as far as the Court is

14   concerned, and scheduling.  We've taken this case, as you know,

15   from another judge who no longer can handle it.  He represented

16   this is ready for trial, would like you to try it.  I'm ready.

17   I've had to sandwich in, move cases around and done quite a bit

18   of logistical work so we can get this case in.

19   The fourth factor is prejudice to the defendant.  I don't

20   know if there's any more prejudice in denying the continuance

21   now than there would be six months from now, a year from now.

22   The bottom line is, there's been no exceptional or

23   unforeseen events since the last time that we said no

24   continuances, other than just getting ready for trial, which is

25   something that would come up every single time, could be raised

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    before a trial date, that we need more time.  One way or the

2    other -- and I'm not throwing this out for argument or anything

3    else, I'm just throwing it out to give you a basis for the

4    Court's ruling on it.  But the ruling, after reading

5    everything, would be denied.

6         I do want to talk to everybody a little bit about the

7    pretrial in this case, and I don't know how many of you have

8    been in this -- oh, before we get to that, there were dates

9    that were set for a hearing on motions in limine.  All those

10   dates will remain except for the day of the hearing.  I don't

11   do motions in limine that way.  I'll come in on the day of

12   trial and I'll give you the rulings on the motions in limine.

13   If you want it a week beforehand, let me know, and I'll

14   probably try to give you those rulings a week beforehand.

15        As far as trial goes, so that you can be prepared, if you

16   haven't -- if you have been fortunate enough not to have a case

17   in this court and you're new here, I can give you a little bit

18   of insight into it.

19        First of all, on the voir dire, Court does all its own

20   voir dire with the jury.

21        Oh, before I get to that, I've gotta go back on the motion

22   for a continuance, because counsel for -- I'm sorry, you're

23   going to have to tell me.

24             MR. WINDSOR:  Vartan Avedissian, your Honor.

25             THE COURT:  Yes.

```
 1        May have medical reasons, may not.  At this time the
 2   medical reasons that were given to the Court were not
 3   sufficient.  It just said he shouldn't stress out.  You know,
 4   I've had that same advice from doctors.  But I'm not
 5   foreclosing you.  That's without prejudice on your case,
 6   because if you bring in documentation in the next week or two,
 7   I'm very likely to sever out that defendant and try that
 8   defendant separately.
 9        MR. WINDSOR:  Thank you, your Honor.
10        THE COURT:  The voir dire in the case, I'm going to
11   have to talk to you when you come in on the trial date as to
12   how many peremptories you'll have, because we'll have -- it
13   depends on the number of defendants that are being tried.  We
14   will probably take at least two alternate jurors, so there will
15   be more than the ten and six or whatever it is, but I'll have
16   to tell you what it is.
17        I'm going to ask defense counsel to think about this,
18   because let's assume I give you -- I'm just picking a number.
19   Let's assume I give you 12, and let's assume there's three
20   defendants.  You're going to have to figure out and you're
21   going to have to let the Court know, do you want those 12 to be
22   in unison with each other, or do you want three, three and
23   three?  And that's up to the attorneys.  You figure that out,
24   whatever you think is best on it, if you want to have three
25   separate ones or if you want to have the challenges together.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    The voir dire of the jury is done in such a way -- again,

2    this is just to kind of give you a feeling for how the Court

3    conducts its business.  When I finish voir dire of the jury --

4    I'm going to ask if you want any questions asked in voir dire,

5    submit them to me by the 28th of February, and I will

6    incorporate them to the extent that I think it's appropriate to

7    incorporate it into my voir dire.  When I get finished, I'll go

8    over to the side bench here, we'll talk about it, we'll ask

9    about challenges for cause and peremptory challenges, and when

10   we get through so we only have 11 jurors left out here, then

11   we'll stop, I'll come back, excuse all those other jurors and

12   bring in other jurors.  We'll probably start with 18, and so

13   when we go through seven of those jurors, we'll come back in,

14   excuse those seven and bring seven new ones on and continue.

15   You've all done this before.

16       Couple of things to remember.  One is that they will never

17   know who excused them.  They're not going to know what

18   attorney, what side, anything, whether it's for cause, whether

19   it's not for cause.  I'm just going to give the number of seven

20   jurors and excuse them en banc.  So there's not going to be any

21   designation as to who or why I excused them.  When I get to

22   peremptory challenges, I think it's universal now, but it's

23   always been my policy that if you pass on a peremptory

24   challenge, you don't lose it.  So if you pass and if the other

25   side doesn't pass, then you get to store it up and use it

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    later.

2         As far as time -- and I know I'm going quick here, and if

3    you want me to repeat anything, that's fine.  As far as time

4    goes, I've gotta tell you, I'm very, very sensitive towards

5    jurors and the inconvenience we put them through.  We bring

6    them in against their will, involuntary servitude, if you

7    would, and require them to be here when they really don't want

8    to be here.  The least we can do is have efficiency and they

9    can depend on the times that I'm giving them.  And I guess what

10   I'm saying is this:  When we get into trial on this case, after

11   the voir dire, after the first day, from then on in, we will

12   start every morning at 8:30.  Not 8:31, not 8:32.  If the

13   jurors are late, they're going to be embarrassed, because

14   everybody's going to be sitting out here waiting for them to

15   walk in, including the other jurors.  They'll understand the

16   importance of we start every day at 8:30 and go till 11:30.

17   That's a three-hour block.  I'll give you a 15-minute break in

18   there to do what you have to do personally.  From 11:30 until

19   1:00 o'clock, we'll have the lunch break.  From 1:00 o'clock

20   until 4:00 o'clock, we're going to be in trial, again with that

21   15-minute break.

22        That means you're going to get three hours in the morning,

23   three hours in the afternoon, and it's your time, devoted just

24   to you.  I'm not going to have other cases.  I'm not going to

25   be bringing in other cases.  This is going to be your time.  So

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    you're going to get -- I mentioned six hours, but you're going
2    to get two breaks there, so you're going to get at least five
3    hours, probably closer to five and a half hours with those
4    breaks.  We will live and die by that.  If you're in the middle
5    of a question and it strikes 4:00 o'clock, I'm going to tell
6    you, remember that question.  You're going to say, well, can I
7    finish?  Remember the question, you can ask it the next day.
8    The jurors will be guaranteed at 4:00 o'clock they can leave
9    and get their buses or pick up their kids or whatever they have
10   to do.  So you can almost set your watch by that.
11         The time that you're going to have on the case, I don't
12   know -- I know what you've estimated at.  It seems to me that
13   this is a case -- and I've tried several of these before.  You
14   probably should be able to be done, if I give you that time
15   that I've told you, in ten days.  I don't know why it can't be.
16   In fact, it should be done before that.
17         Just to give you kind of a insight into that, I'm old
18   enough to remember when PBS did the entire Civil War in a
19   16-hour mini-series, the entire Civil War.  I'm not too sure
20   this is more complicated than the entire Civil War, and you're
21   going to get up to 50 hours, not just 16 hours.
22         Let me see.  Oh, if it comes to be 3:30 or quarter of 4:00
23   and you say my next witness isn't here yet, can we put it over
24   till tomorrow, the answer is no.  You know, if you don't have
25   another witness, you rest.  So make sure you have witnesses
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    available.  Make sure you have backup witnesses available,

2    otherwise you're going to be in a very uncomfortable position.

3        Okay.  What else do we talk about as far as -- oh, one of

4    the things I wanted to tell you about.  Every court's

5    different.  We will not have any sidebar conferences during

6    this trial.  I don't do sidebar conferences.  I've been in this

7    game for, I don't even want to think about it, since 1974.  You

8    do the mathematics on it.  I feel confident enough that I can

9    rule on motions -- or excuse me, on objections on evidentiary

10   problems.  If you don't like the objection, I don't want to

11   foreclose you from putting it on the record, but we'll put it

12   on the record the next time we break so the jury, they're gone,

13   we're not entreating their time.  We'll put it all on the

14   record to preserve your record on it, but we will not have

15   bench conferences here on the side.

16       Now, I very much encourage, and the only thing that can

17   really get me going is the area of civility.  In front of this

18   jury, the attorneys, I expect them to be -- you're officers of

19   the court.  And I know I probably don't have any problems with

20   the ones I'm talking to now, but you're officers of the court.

21   I expect you to conduct yourself that way.  I don't want any

22   juror leaving here that doesn't think that you have the utmost

23   respect for each other as we go through this process.  I don't

24   care what you do in the alley afterwards, as long as the jury's

25   not around, but in front of the jury, we want to keep that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   civility going through the case.

 2        Let me see if there's anything else that I've missed on

 3   this.  Oh, I also encourage the attorneys to, as officers of

 4   the court, to cooperate as much as you can with each other.

 5   I've gotta tell you, as long as you run everything efficiently

 6   and we're not really, you know, browbeating the jury by going

 7   into repetitive questions and redundancy and inefficiency, I

 8   really don't care what happens in the trial.  I want you to try

 9   the case.  You are the experts in trying the case.  You know

10   the case much better than I do, and I want you to be able to do

11   it.  Which means, in most cases, if you say something that

12   really is not admissible or I have some problem with and the

13   other side doesn't object, go ahead.  Unless it's in a

14   situation where I think we're denying defendant some

15   constitutional right, go ahead.  If you want to call witnesses

16   out of order, go ahead.  Whatever the attorneys agree on, I

17   pretty much will go along with anything that you people agree

18   on, and I really like to take a back seat and let you try the

19   case.  To me, the perfect situation is for the judge to become

20   invisible during the trial.  Be nice if I could be invisible,

21   but that's not going to happen.  I think I'll have to be here.

22        I think I've covered most of the areas as far as pretrial

23   and trial goes and how we conduct things here.  And again, it's

24   just to give you a sense, because I know that most of you have

25   not been here before.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        So do you have any questions that you might have?

2    Counsel?

3        MR. SEVERO:  Michael Severo for Mr. Darbinyan.

4        Ms. Wang and I arrived at a bit of an agreement with

5    respect to the filing of in limine motions.  Do you care about

6    that, or you just want to hear them on the date of trial?

7        THE COURT:  Good question.  Good question.  I would

8    like to have -- well, what did you agree on as far as time is

9    concerned?

10        MR. SEVERO:  In limine motions were to be filed

11    yesterday.

12        THE COURT:  Oh, okay.

13        MR. SEVERO:  The government was kind enough to allow

14    me till Friday to --

15        THE COURT:  I have no problem with that at all.  I'll

16    be ruling on them later.  But I thought the other way around.

17    If you agree that you can file the motion in limine the day

18    before trial, no, I won't go with that.  I need some time to

19    review it.  So you're going to have to get it in by the 28th of

20    this month for me to be able to review it, but other than that,

21    anything you want.

22        MR. SEVERO:  So the February 24th hearing is vacated?

23        THE COURT:  Yes.

24        MR. SEVERO:  And the hearing on the in limine motions

25    now will be March 11?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Will be what?

 2              MR. SEVERO:  March 11?

 3              THE COURT:  Yes.  Yes.  And I gotta tell you, most

 4    times, unless I need further information, I go off the papers,

 5    and I'll come in and I'll say motion in limine No. 1 will be

 6    granted or denied, No. 2 will be granted or denied.  So there's

 7    not going to be a long -- that won't take long to go through

 8    those.

 9              MS. YANG:  Your Honor, you had offered to rule on the

10    motions in limine potentially earlier than the first day of

11    trial, and the government would just request that.  Given the

12    Court's admonition that you expect this case to be tried in ten

13    court days, we will desperately of course try and tighten and

14    narrow the case, but the sooner we can get in limine rulings,

15    the sooner we'll know how we can present our case the most

16    efficient way possible.

17              THE COURT:  I understand that.  How about -- and I

18    don't know what everyone's calendar is like, but how would you

19    like to come in on --

20         How we looking on the 3rd?

21              THE CLERK:  Let me see.

22              THE COURT:  The 4th or 3rd, if you can do that.  I'm

23    thinking a week before.

24              MS. YANG:  Yes, your Honor.

25              THE COURT:  If you want any motions in limine ruled
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    on, I can -- why don't you come in by then.  I'll be happy to

 2    share that with you at that time.

 3              THE CLERK:  We can do it on the 3rd at 1:30.

 4              THE COURT:  3rd at 1:30.  How does that work out for

 5    counsel's calendar?

 6              MR. SEVERO:  It works for me.

 7              MS. YANG:  Works for the government.

 8              THE COURT:  That's one.

 9              MR. WINDSOR:  That's fine, your Honor.

10              THE COURT:  Two.

11              MR. WINDSOR:  I would like to address the --

12              THE COURT:  Okay, we'll give you time.

13              MR. FLIER:  That's fine, your Honor.

14              MR. CANTALUPO:  Fine.

15              THE COURT:  Three, four.

16              MR. PEREYRA-SUAREZ:  Fine.

17              THE COURT:  Five.  Okay.  Then we'll meet back here on

18    the 3rd, and any other issues that you want to bring up at that

19    time, we can bring up at that time.

20              MR. SEVERO:  We said 1:30, correct?

21              THE COURT:  1:30, yes.

22              MS. YANG:  And your Honor, I do understand the Court's

23    admonition that you would like the trial conducted within ten

24    court days.  The government's original estimate was four to six

25    weeks.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  I know.

 2              MS. YANG:  Obviously, it would depend on the number of

 3   defendants who go to trial, and the government will, as I said,

 4   endeavor to narrow and to tighten its case to try to reach that

 5   goal.

 6              THE COURT:  I know you're good.  You'll be able to do

 7   it.

 8              MR. SEVERO:  We received a witness list of 97

 9   witnesses yesterday.

10              THE COURT:  And if they call 97 witnesses, they better

11   talk fast.

12         Anything else?

13              MR. WINDSOR:  Yes, your Honor.

14              THE COURT:  Oh, that's one of the things --

15         Counsel, I'm sorry to cut you off.

16         That's one of things I wanted to mention.  On the

17   witnesses, every day in the evening just before you leave, I'd

18   like to have a list of the witnesses you intend to call the

19   next day, so the Court knows which witnesses are going to be

20   called the next day.

21              MS. YANG:  Yes, your Honor.

22              THE COURT:  Any problem with that?

23              MR. SEVERO:  No, not at all.  So far, all we have are

24   a lot of witnesses with initials only, so we're not sure who's

25   who.  I assume we'll get those names today.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MS. YANG:  The initialed witnesses on the witness list

2    we provided to counsel a month in advance of trial are bank

3    fraud victims, of which they have most of the discovery.  There

4    are a couple of witnesses who are cooperating witnesses.  We

5    did not want their full names in any document that would be

6    circulated a month before trial.  We will provide that

7    information to counsel tomorrow.

8          THE COURT:  See if you can get together.  See if you

9    can work it out.  If not, bring motions.  I'm happy to rule on

10   them.

11         MS. YANG:  Yes, your Honor.

12         MR. SEVERO:  I believe the disclosure date was today.

13         MS. YANG:  Not for cooperators.  It is tomorrow.

14         MR. SEVERO:  Okay, we have a discrepancy there.

15         THE COURT:  We already do.  And if you can't work that

16   out, as I say, make your motion.  But you know what, by the

17   time we hear the motion, tomorrow it's going to come anyway.

18      Counsel?

19         MR. CANTALUPO:  Yes, your Honor.  Dominic Cantalupo

20   for Miguel Ramirez.  I filed a motion to sever that I noticed

21   for March 10, and I don't know the government's position on

22   this, but would it be possible to shorten the time to March

23   3rd?

24         THE COURT:  Was the motion filed today?  Because I

25   haven't seen it yet.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1           MR. CANTALUPO:  Yesterday.  I dropped a copy off
 2    earlier today.
 3           THE COURT:  Well, let me ask, is the motion to
 4    sever -- well, two questions.  One is, rather than setting it
 5    for the 10th, are you going to be responding to it?
 6           MS. YANG:  Yes, your Honor.  The government will be
 7    opposing it.  We would not object to advancing that hearing to
 8    the 3rd.
 9           THE COURT:  Can it be done on the papers?  I mean, is
10    there something that's going to have to be said other than
11    what's in the moving papers and the objections and the reply?
12           MS. YANG:  I don't believe so, your Honor.  I believe
13    it can be ruled on off the papers.
14           THE COURT:  Then I can rule on it even faster for you.
15           MR. CANTALUPO:  Very well.
16           MS. YANG:  We'll file our opposition by next Monday.
17           THE COURT:  Okay.  That'll bring it in before the 3rd,
18    then.
19           MR. CANTALUPO:  And my reply few days after that?
20           THE COURT:  Your opposition is going to be when?
21    Thursday?
22           MS. YANG:  Your Honor, the government could file its
23    opposition by Monday.
24           THE COURT:  By Monday.
25           MS. YANG:  Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  And then you can have your reply in by
 2    what, Wednesday or Thursday of that week?
 3              MR. CANTALUPO:  Thursday be perfect.
 4              THE COURT:  Thursday that week.  Got it.  Got it.
 5              MR. CANTALUPO:  Thank you.
 6              THE COURT:  Anything else we can -- you guys are too
 7    cooperative.  Anything else we can do today?
 8              MR. WINDSOR:  Your Honor, I'm going to be requesting
 9    of the government some additional time to be filing in limines.
10    Given the Court's new date for having the hearing on the 3rd, I
11    believe, what is the amount of time the Court would need as far
12    as when I could file my motions, when they'd be replied to?
13    The date's now the 3rd.  I wonder if I could have until the
14    21st to file motions.
15              THE COURT:  Yes.
16         Counsel?
17         MS. YANG:  Your Honor, the government would object.
18    The motion in limine deadline had been set long ago.  We need
19    to sort of resolve these motions prior to trial.
20              THE COURT:  Counsel, one of the things that is kind of
21    a blessing but also an annoyance is, in this court, rather than
22    do things just summarily without really knowing it, if you
23    agree on it, that's fine; if you don't agree on it, file your
24    motion ex parte.  You don't have to set it down for a hearing
25    date.  Ex parte, chance to respond within 24 hours, and I'll
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003582**

1   rule on it.  So if there's a problem -- you know, I don't know

2   why you'd be objecting to it, but if you are objecting, just

3   let me know and I'll rule on it.

4           MR. WINDSOR:  Thank you, your Honor.

5           THE COURT:  Anything else I can do for everybody?  If

6   not, thank you very much for being here.  We'll see you back

7   here on the 3rd, and any motions you want to file, you can do

8   it ex parte rather than set it for a motion date.  Okay?

9           THE CLERK:  All rise.

10

11          *(Proceedings concluded at 2:25 p.m.)*

12

13                      --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                                    *CERTIFICATE*

2

3        I hereby certify that pursuant to Section 753,

4    Title 28, United States Code, the foregoing is a true and

5    correct transcript of the stenographically reported proceedings

6    held in the above-entitled matter and that the transcript page

7    format is in conformance with the regulations of the

8    Judicial Conference of the United States.

9

10   Date:  NOVEMBER 15, 2014

11

12

13

14              /S/ SANDRA MACNEIL

15          Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    - - - -

5

6                               CERTIFIED COPY

UNITED STATES OF AMERICA,        )
7                                )
                PLAINTIFF,       )
8                                )
      vs.                        )    No. CR 11-00072(A)-RGK
9                                )
MHER DARBINYAN, ET AL.,          )
10                               )
                DEFENDANTS.      )
11   _____)

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           MONDAY, MARCH 3, 2014

16               2:14 P.M.

17         LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23        SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
          Official Reporter, U.S. District Court
24              255 East Temple Street
             Los Angeles, CA  90012
25               213.894.5949


     UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF UNITED STATES OF AMERICA:
             ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
 3           BY:  E. MARTIN ESTRADA, ASSISTANT UNITED STATES ATTORNEY
                  ELIZABETH R. YANG, ASSISTANT UNITED STATES ATTORNEY
 4           312 NORTH SPRING STREET
             LOS ANGELES, CALIFORNIA  90012
 5           213.894.1785

 6           UNITED STATES DEPARTMENT OF JUSTICE
             BY:  ANDREW CREIGHTON, TRIAL ATTORNEY, CRIMINAL DIVISION
 7           312 NORTH SPRING STREET
             LOS ANGELES, CALIFORNIA  90012
 8           213.894.2579

 9   FOR DEFENDANT MHER DARBINYAN:
             MICHAEL V. SEVERO, ATTORNEY AT LAW
10           70 SOUTH LAKE AVENUE, SUITE 945
             PASADENA, CALIFORNIA  91101
11           626.844.6400

12   FOR DEFENDANT ARMAN SHAROPETROSIAN:
             CHARLES PEREYRA-SUAREZ, ATTORNEY AT LAW
13           800 WILSHIRE BOULEVARD, 12TH FLOOR
             LOS ANGELES, CALIFORNIA  90017
14           213.623.5923

15   FOR DEFENDANT RAFAEL PARSADANYAN:
             FLIER AND FLIER, ALC
16           BY:  ANDREW REED FLIER, ATTORNEY AT LAW
             15250 VENTURA BOULEVARD, SUITE 600
17           SHERMAN OAKS, CALIFORNIA  91403.
             818.990.9500
18
     FOR DEFENDANT MIGUEL AGUSTIN RAMIREZ:
19           DOMINIC CANTALUPO, ATTORNEY AT LAW
             100 WILSHIRE BOULEVARD, SUITE 940
20           SANTA MONICA, CALIFORNIA  91401-1113
             310.397.2637
21
     FOR DEFENDANT VARTAN AVEDISSIAN:
22           MARK WINDSOR, ATTORNEY AT LAW
             1 SOUTH FAIR OAKS AVENUE, SUITE 401
23           PASADENA, CALIFORNIA  91105
             626.792.6700
24

25   ALSO PRESENT:  SPECIAL AGENT JEREMY STEBBINS, F.B.I.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, MARCH 3, 2014

 2                            2:14 P.M.

 3                            - - - -

 4         THE CLERK:  Calling calendar item No. 6, case No.

 5    Criminal 11-72(A)-RGK, United States of America versus Mher

 6    Darbinyan, Arman Sharopetrosian, Rafael Parsadanyan, Miguel

 7    Ramirez and Vartan Avedissian.

 8       Counsel, please state your appearances.

 9         MR. ESTRADA:  Good afternoon, your Honor.  Martin

10    Estrada on behalf of the United States.  With me at counsel

11    table are Elizabeth Yang, Andrew Creighton, also of the United

12    States, and Special Agent Jeremy Stebbins with the FBI.

13         MR. SEVERO:  Good afternoon, your Honor.  Michael

14    Severo appearing on behalf of Mr. Darbinyan.  Mr. Darbinyan is

15    present, in custody.

16         THE COURT:  Okay.

17         MR. PEREYRA-SUAREZ:  And good afternoon, your Honor.

18    Charles Pereyra-Suarez representing Mr. Sharopetrosian, present

19    in custody.

20         THE COURT:  Thank you, Counsel.

21       Who wants to go first?

22         MR. FLIER:  Andrew Flier on behalf of Mr. Parsadanyan,

23    number 35.  He's out of custody, your Honor.

24         THE COURT:  Okay.

25         MR. CANTALUPO:  Good afternoon, your Honor.  Dominic
```

1    Cantalupo appearing with Miguel Ramirez.  He's on bond.

2             MR. WINDSOR:  Mark Windsor, your Honor, on behalf of

3    Vartan Avedissian, who is present.

4             THE COURT:  Thank you, Counsel.

5        We've put this over today as kind of a status conference

6    because everybody said that they would like to get some

7    motions, rulings on the motions in limine, and we can do that

8    now.  And there's also two motions set for today, to sever.

9    There's another motion to sever that the Court's still looking

10   at that just came in last week, and responses just came in.  So

11   let me give you some of the rulings so that we can go from

12   there, and then I'll talk to you a little about the pretrial

13   process and what we're going to do as far as the trial is

14   concerned, as far as logistics go.

15       In this matter, on the motions to sever, first of all, the

16   Court has read and considered the moving papers on both sides.

17       The motion to sever Mr. Ramirez -- and my understanding is

18   that there's only one charge in the superseding indictment that

19   alleges Mr. Ramirez's involvement.  Is that correct?

20             MR. WINDSOR:  That's correct, your Honor.

21             THE COURT:  And that is -- Counsel, is that --

22             MR. CANTALUPO:  Yes, your Honor, that's correct.

23             THE COURT:  And that's the ex con with the gun?

24             MR. CANTALUPO:  That's correct, your Honor.

25             THE COURT:  The motion to sever Mr. Ramirez is going

1   to be granted.  We are going to put this over to a date

2   sometime in the, oh, I don't know, middle, late part of April,

3   if that's okay, Counsel, to see where this other -- where the

4   first case goes.

5       Is there any problem with the time waiver as far as your

6   client is concerned?

7           MR. CANTALUPO:  No, your Honor.

8           THE COURT:  Okay.  Do you want me to handle that now,

9   or do you want to proceed with everything else?

10          MR. CANTALUPO:  Well, your Honor, there's an limine

11  motion that I suppose --

12          THE COURT:  There is.

13          MR. CANTALUPO:  -- we can put over to the time of

14  Mr. Ramirez's trial.

15          THE COURT:  Yeah, that's what I was thinking of.

16  Getting closer.

17      Mr. Ramirez?

18          DEFENDANT RAMIREZ:  Yes.

19          THE COURT:  Where are you?

20      Is that agreeable with you, that we put your case over?

21  We're severing your case off at your attorney's request, and

22  we're going to put it over until the middle of April.  I'm

23  going to get a date from my clerk here.

24          THE CLERK:  April 22nd.

25          THE COURT:  April 22nd.  It may or may not go on that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   date, because we may have to put it over further depending on

 2   this trial and what's going on, but let's put it over for April

 3   22nd at this time.

 4        And is that agreeable with you, and do you understand that

 5   you have a right to be tried before then, but we're going to

 6   put it over to April 22nd with the understanding that you get

 7   tried on that day or shortly thereafter, within 15 days

 8   thereafter?

 9            DEFENDANT RAMIREZ:  Yes, your Honor.

10            THE COURT:  Okay.

11        Counsel joins?

12            MR. CANTALUPO:  Yes, your Honor.

13            THE COURT:  Okay.

14            MR. CANTALUPO:  May I be excused?

15            THE COURT:  You may be excused.  You don't want to sit

16   and watch the fun?  Come on, Counsel.

17            MR. CANTALUPO:  I might sit back there.

18            THE COURT:  Okay.

19        Okay.  Let me talk to you about the other matters.

20   There's another motion to sever.  Excuse me just a second.

21        Okay.  There is a second motion to sever, and that is by

22   the defendant Parsadanyan; is that correct?

23            MR. FLIER:  Parsadanyan.  And that's correct, your

24   Honor.

25            THE COURT:  Parsadanyan.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        And I'm going to apologize to everybody.  We're going to

2   be mispronouncing names all the time, but we'll get as close as

3   we can.

4        That motion, the Court has read and considered the moving

5   papers on both sides.  That motion is going to be denied.  That

6   matter will not be severed.

7        So with that in mind, the third motion to sever, I'm going

8   to be able -- I'll rule on the papers, but I don't have that in

9   front of me now, and I'm still considering that.  That motion

10  to sever is as to Mr. Darbinyan, but it's only as to the gun

11  charges, I believe.

12          MR. SEVERO:  That's correct, your Honor.

13          THE COURT:  Okay.  So let's go ahead with the motions

14  in limine.  I'm going to give you the rulings on them.  The

15  Court has, again, read and considered all the moving papers on

16  these matters, and I'm going to give you these rulings.

17       Keep in mind, on motions in limine, they really are -- I

18  like to explain it as tentative rulings, because I may rule one

19  way or other, exclude it or not exclude it, but at the time of

20  trial when the evidence comes in, it may become relevant or it

21  may not.  So any motions in limine governs up until the time I

22  say, well, you know, we're going to go the other way.  So they

23  are tentative, and if the evidence shows that they have to be

24  revisited, let the Court know at that time.

25       So the rulings are going to be as follows:

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        First of all, let me go to the government's motion in

2   limine No. 1, which talks about impeachment testimony and using

3   priors for impeachment.  And I'm just going to go through this

4   pretty quickly, so you can just jot it down as I tell you.  The

5   rulings at this time -- and again, remember they're tentative,

6   but the rulings at this time on the motions in limine:  As to

7   Mr. Darbinyan's 1998 conviction for 211, that's not going to be

8   admitted for purposes of impeachment.  All these are for

9   purposes of impeachment.  The second prior that was alleged,

10  for 2005, that would be admissible.  That's the one for access

11  code cards.

12       As to Mr. -- let me see which one we have here.  We have

13  Mr. Sharopetrosian's convictions.  As to the conviction in 2002

14  for 487 or grand theft, that will be excluded.  All the rest of

15  the allegations here -- or excuse me, all the rest of the

16  alleged convictions would be able to come in for impeachment

17  purposes only.

18       As to Mr. Ramirez, I'm not going to rule on that, because

19  he's not here in front of us today.  So if you want me to go

20  through those rulings that would be admissible at this time,

21  that would be the three convictions in 2004, in July, the three

22  convictions in October 2004, or four convictions, and the three

23  convictions in 2012, of March 2012.

24       As to the government's second motion to exclude, as to

25  Mr. Darbinyan's 2005 conviction, these motions to exclude

```
 1    are -- excuse me, these motions to admit are not for

 2    impeachment, they're for the case in chief, is my

 3    understanding.

 4         Is that correct, Counsel?

 5         MS. YANG:  That is correct, your Honor.

 6         THE COURT:  Okay.  As to the first issue, and that is

 7    the 2005 conviction for fraudulent use of access cards, that's

 8    going to be granted.  As to facts underlying that conviction,

 9    will also be granted, that being part of and are relevant to

10    this case.

11         As to the letter that was sent in 2013, I haven't seen a

12    copy of that letter, but I know what it's alleging, and at this

13    time -- it's a 2013 letter.  The Court's going to not admit

14    that at this time.  I don't think that that is relevant to the

15    facts that are being alleged at this time.  The only thing you

16    could get in it, that I could see, would be an admission of

17    guilt or something like that line, would be maybe for

18    impeachment or something, but that would not be granted at this

19    time.

20         And Mr. Ramirez's prior conviction, he's not in front of

21    us anymore.  I don't know if you still want a ruling on that or

22    not.  I don't know if the other attorneys want a ruling on it.

23         MR. SEVERO:  We're not interested in that one.

24         THE COURT:  I didn't think so.  So I'll put that one

25    over.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          As to the defendants' motions in limine -- and as I say,

2    as I go through this, if you miss something I said, I will

3    repeat it for you.

4          As to the defendants' motions in limine, as to motion

5    No. 1 that deals with the testimony concerning the coding on

6    the calls, that's going to be denied.

7          On No. 2 that deals with the expertise of the witness

8    testifying into that area, that's going to be denied.

9          As to No. 3, to exclude evidence of prior bad acts,

10   granted and denied.  It's going to be denied as to any acts

11   that fall within this conspiracy or are directly relevant to

12   the acts in this conspiracy.  As to anything other than that,

13   it will be granted, it will be excluded.

14         As to the fourth request, which is a motion to exclude

15   evidence not disclosed in discovery, I don't have anything

16   specific in front of me.  All I can tell you is the Court

17   intends to follow the law, and if it's not -- you know, if it's

18   not properly before the Court because it hasn't been disclosed,

19   then, you know, I'll exclude it, but I just don't have the

20   specific details on that, but I intend to follow the law in

21   that area.  I know that surprises a lot of people, but...

22         On No. 5 -- and that one really is Mr. Parsadanyan's.

23              MR. SEVERO:  Number 5 is Mr. Darbinyan's, to sever the

24   counts.

25              THE COURT:  Oh, that one, I'm holding, because that's

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003594**

1    the motion to sever that I've talked about.  You're correct.

2            MR. SEVERO:  Yes.

3            THE COURT:  I've got it numbered No. 5 here, but it's

4    really No. 1 and No. 2 of Mr. Parsadanyan.

5        Mr. Parsadanyan's No. 1, which is asking to exclude the

6    audio recordings of the transcripts, it really is I think

7    twofold.  Let me talk about that.  As to excluding the

8    recording and transcripts, that's going to be denied.  But the

9    second part is, as excluding from the transcript or redacting

10   from the transcript the name of the person that's talking, that

11   should be granted.  You can say Speaker 1 is talking or

12   Speaker 2 is talking, but somebody's going to have to identify

13   who that speaker is.  That should not be in the transcript.

14       Any questions in that area?

15           MR. ESTRADA:  There are, your Honor.

16       In terms of the transcripts, what the government intends

17   to do is introduce evidence that the government -- evidence

18   regarding the identity of the speaker.  That'll be through

19   voice exemplars, things of that sort.

20           THE COURT:  That's okay.  That's not what I'm ruling

21   on.  I'm saying on the transcript it has the name put in there.

22           MR. ESTRADA:  The transcript will say who the speaker

23   is at a particular time.  Otherwise it's difficult to follow

24   the transcript.

25           THE COURT:  Let me try it again.  It may be difficult,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   but that's the cost of doing business.  Let me just take it
 2   again.
 3        If you have a transcript, you can have Speaker 1 says,
 4   Number 2 says, Number 1, 2, 1, 2, et cetera.  Their names
 5   should not specified in that transcript, because that's
 6   something that someone's going to have to testify to: Speaker 1
 7   is Mr. -- whoever it is, Mr. Smith.  And that goes to the
 8   credibility of the witness who is testifying.  The jury's going
 9   to have to determine whether Speaker 1 is really Mr. Smith or
10   not.  But on the transcript itself, the name should be redacted
11   and it should just be identified generically as Speaker 1,
12   Speaker 2, and then you can have testimony as to who that is.
13             MR. ESTRADA:  Perhaps I should clarify, your Honor.
14        In terms of introducing transcripts, there will be
15   testimony prior to its introduction -- and remember, these will
16   be Armenian-language transcripts, where the transcript will be
17   the evidence.  There will be testimony prior to introduction
18   that those speakers are who the testimony says they are.  It
19   goes to the weight of the evidence --
20             THE COURT:  Maybe you didn't listen to what I was just
21   saying.  I'll say it one more time.
22        There may be testimony as to Speaker 1 being Mr. Smith.
23   And what you're saying is, from then on I'd like to refer to
24   Mr. Smith.  I'm saying that's something the jury has to
25   determine.  They may believe that witness has said Speaker 1 is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Mr. Smith.  They may not believe the speaker is -- and you're

2   really taking it away from the jury when we say, whether you

3   believe it or not, you have to assume it's Mr. Smith.

4        So what I'm saying, on the transcript, identify them as

5   Speaker 1 or Speaker 2, but do not identify them by name on the

6   transcript, but you can have testimony as to who Speaker 1 is,

7   Speaker 2 is.  That's all I'm saying.  Okay?  It may be a

8   little bit difficult for you, but that's --

9        MR. ESTRADA:  It will be unconventional, your Honor,

10  but we'll fix the transcripts and --

11       THE COURT:  It should be easy enough to redact, yeah.

12     Any other questions in that area?

13       MR. SEVERO:  That's as to all the transcripts in the

14  case, correct?

15       THE COURT:  That is to any one where there was an

16  objection made.

17       MR. SEVERO:  Yeah.

18       THE COURT:  If there was an objection made to it,

19  that's correct.

20       MR. ESTRADA:  Then I should clarify that point, your

21  Honor.

22       THE COURT:  Yeah, I thought you would, because I'm not

23  too sure I have Mr. Parsadanyan's -- I'd have to look at the

24  motion again as to whether or not it's as to all transcripts or

25  not.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        MR. ESTRADA:  There were originally 350 calls.  The

2   government's culled that down at the Court's directive.  It's

3   now about 180 calls.  There are many speakers apart from the

4   defendants in this case.  There will be testimony, prior to the

5   introduction of the transcripts, of the fact that those

6   speakers are who the government says they are, based on

7   personal interaction with those speakers.

8        THE COURT:  That's fine.

9        MR. ESTRADA:  The government would like to have those

10  names in the transcript for ease of following the transcript

11  for the jury.

12       THE COURT:  If you get an agreement on it, that's

13  fine.  If you do not, and there's an issue as to who that

14  speaker is, that's gotta come through live testimony, and we're

15  not going to have a transcript foreclose the jury from making

16  those determinations.

17       MR. ESTRADA:  There will be live testimony, your

18  Honor, without question, on all the identities of the speakers.

19       THE COURT:  I don't know, maybe I'm speaking some

20  other language.  Let me try it one more time.

21      If somebody is speaking, and you have a transcript of it,

22  you can identify them by Speaker 1 or Speaker 2 or Speaker 3 or

23  Speaker 30 or whatever it is, you'll have live testimony as to

24  who Speaker 1 is, 2, 3, but I'm not going to allow the

25  transcript to dictate to the jury that they have to believe

1   Speaker 2 is Mr. Jones, so I'm not going to have that name in

2   there.  That's all I'm saying.

3           MR. ESTRADA:  Does that include defendants who aren't

4   present at trial, other people in the calls that aren't the

5   defendants at trial?

6           THE COURT:  Well, I'm going to leave that to counsel.

7   You know, if something is not an issue -- I'm assuming we're

8   going to get some cooperation between the attorneys in this

9   case.  If something's not an issue, you can agree on it, and

10  that's fine with me.  If it's agreed on both sides, you can put

11  the person's name in there.  If it's easier that way, you can

12  put the -- I'll leave that to you.  But if there's an objection

13  to it, it's going to have to be redacted.  That's all I'm

14  saying.

15          MR. SEVERO:  I'm not sure the record is clear on this.

16  I thought we had joined in this motion, but if we haven't,

17  we're joining in it.

18          THE COURT:  Okay.  And I'm going to say one more --

19          MR. SEVERO:  The same objection.  It would be the same

20  objection.

21          THE COURT:  Okay.  I think I really have covered it

22  enough.  I would again encourage the attorneys on both sides --

23  both sides want the jury to focus in on the issues involved in

24  this case.  If it's not an issue, if both sides agree, and it's

25  not an issue, just stipulate to it, and we could save a lot of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    time and a lot of effort on it.  And I'm assuming that you'll

2    do this as professionals and as officers of the court.  But if

3    there's a legitimate issue on it, then I'm not going to let the

4    transcripts dictate what the jurors' decision has to be as to

5    who was speaking, who is not.  That's all I'm saying.  Okay?

6    Okay.

7        As to -- I know I never should have asked for

8    clarification on that.

9        Okay.  As to the second motion by Mr. Parsadanyan, there

10   are really five different issues here.  One is to exclude

11   reference to the Armenian Power gang.  That's going to be

12   denied.

13       Number 2 is to limit evidence to the individual defendants

14   in reference.  That's going to be denied, too, particularly in

15   the area of conspiracy.  When we're talking about conspiracy,

16   it may not be limited just to the one defendant.

17       For instructions as to associations to co-defendants is

18   not criminal, it may or may not be criminal.  Conspiracy

19   certainly is, and that's an association.  If we need any type

20   of clarifying instructions at the end of the case, we'll give

21   it at that time.

22       Number 4 is to exclude references to aliases.  I don't

23   know -- I normally would overrule that, but I don't know if

24   you're going to be using aliases or not.  You probably don't

25   know, either.

```
 1          MR. ESTRADA:  Some of the monikers will be important,

 2   your Honor.

 3          THE COURT:  Well, okay, I'm going to deny that.

 4      And the last one is to disclose all deals given to

 5   informants or cooperating defendants.  That's going to be

 6   granted.

 7      Okay.  Those are the rulings on the motions in limine.

 8   And as I said, again, they are motions in limine.  They may or

 9   may not change when evidence comes in and some things become

10   relevant or some things may not become relevant.

11      Let me talk to you about the trial.  We talked about time

12   qualifying, and everybody has agreed to do that, and we can do

13   that by the 25th, and so that's when we're going to be starting

14   the trial.  I'm assuming, from everything I've heard from all

15   sides, that that's everybody's understanding.

16      Is that correct?

17          MR. ESTRADA:  No objection, your Honor.

18          THE COURT:  Any objection, Counsel?

19          MR. SEVERO:  No, your Honor.

20          MR. PEREYRA-SUAREZ:  No, your Honor.

21          MR. SEVERO:  As the Court is aware, I had wanted July,

22   but we have no objection to March 25th, but we would like more.

23          THE COURT:  Well, no, I can't go more, but I thought

24   you were worried about the trial taking into July, and I was

25   going to say, I don't think you have to worry about this trial
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   going into July.
 2              MR. SEVERO:  No, I wasn't.  As the Court may recall,
 3   Mr. Darbinyan's motion --
 4              THE COURT:  I remember it now.  It's denied.  I
 5   remember that.  But as far as putting over for the 25th, you
 6   don't --
 7              MR. SEVERO:  There's no objection to that.
 8              THE COURT:  You and your clients are going to give up
 9   their right to be tried before the 25th; is that correct?
10              MR. SEVERO:  That's correct.
11              THE COURT:  Counsel, you agree?
12              MR. PEREYRA-SUAREZ:  Yes, I do, your Honor.
13              MR. FLIER:  Your Honor, on behalf of Mr. Parsadanyan,
14   we're okay with the 25th and that new date.  My only issue,
15   because I thought if we were going to start on the 11th, I have
16   a murder evidentiary hearing ordered by the state appellate
17   court, and it is the second day of that hearing.  We had it two
18   Fridays ago.  Now, obviously, if I'm ordered here, we're going
19   to have to make arrangements, but I just want -- is there any
20   way we could have that day off?
21              THE COURT:  I don't know.
22              MR. FLIER:  Okay.
23              THE COURT:  I appreciate the notification of this.  I
24   just can't tell you at this time.
25              MR. FLIER:  I understand, and that's why I just wanted
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    to give notice, and we'll figure it out --

2              THE COURT:  I appreciate that.

3              MR. FLIER:  Thank you.

4              THE COURT:   Thank you.

5         Counsel, that's agreeable with you?

6              MR. WINDSOR:  That is agreeable, your Honor, on behalf

7    of Vartan Avedissian.

8              THE COURT:  Okay.

9         Okay.  Let's talk to you a little bit about the 25th.

10   When you come in on that day, hopefully we'll have enough

11   jurors to be time-qualified.  The Court will pick 12 jurors,

12   but we're going to pick three alternates.

13        As far as voir dire goes, as far as peremptory challenges

14   goes, the defendant -- and this, I may revisit the day of

15   trial, the day before trial, but at this time the defendants

16   will have 12 jointly, and each defendant will have one

17   separately.  So that's 12 -- 16 for the defense.  The

18   government will have six and three, which would be nine.  And

19   then we'll have one each for the alternate jurors, so we'll

20   have another three, which is -- 16, 20, 26 -- 29, about 29

21   peremptory challenges.  So we'll probably have to have a jury

22   panel of around 50 to 60 come on down on that date.

23        Let me talk to you about voir dire.  The Court conducts

24   all the voir dire itself.  If you have any voir dire questions

25   you want the Court to consider, if you have not already
```

```
 1    submitted them, submit them to the Court.  I will incorporate
 2    them to the extent that I feel it's appropriate during my voir
 3    dire of the jury.
 4         When we voir dire the jury, I will go through and ask them
 5    questions.  When I get through asking them questions, we will
 6    put -- what do we put in there, 18?  Eighteen jurors.  When I
 7    get through asking the first 18 questions, we will take a side
 8    bench conference over at the side, and I'll go through with you
 9    any peremptories you have, any challenges for cause you might
10    have.
11         Interesting thing, because each court is different.  Once
12    we get through voir dire of the jury, we will not have bench
13    conferences.  You will never see us go over to the side bench.
14    If you have an objection, you make them in court.  I'll rule on
15    them.  I'm not bragging about this, but unfortunately maybe,
16    I've been in this business for over 30 years.  I feel
17    comfortable making evidentiary rulings on it.  If you disagree
18    with me, that's fine.  The next time we take a break in the
19    jury trial, you put anything you want on the record.  We'll
20    make sure you're protected that way.  But we won't have bench
21    conferences.  We'll do it right here in court.  If you have
22    objections, you don't argue them in court.  You just make the
23    objection, and the Court will rule on it.
24         Getting back to the voir dire.  We'll go over here, we'll
25    go through challenges for cause, we'll go through peremptory
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003604**

1   challenges.  When we get through seven peremptory challenges, I

2   will come back on the bench, I'll excuse those seven.  They're

3   not going to know who excused them or why they're excused.

4   We'll just excuse them en masse, bring in another seven in.

5   We'll voir dire those, and we'll go through the same process

6   until we get our jury.

7        As you know, my policy's always been, but I understand

8   that now it's probably Ninth Circuit law, that anytime you pass

9   on a peremptory challenge, you don't lose it.  But if the other

10  sides pass and you pass, then you lose it.  But if you don't,

11  you don't lose it; you can keep that peremptory challenge.

12       Anything else about peremptory or challenges for cause?

13       Any questions in the area of voir dire?

14       If not --

15          MR. ESTRADA:  No, your Honor.

16          MR. SEVERO:  No, your Honor.

17          MR. FLIER:  No, your Honor.

18          THE COURT:  If not, let's go to logistics of the case.

19       We'll start the jury on Tuesday.  I would anticipate -- I

20  would be very surprised if we don't have the jury picked

21  Tuesday.

22       If you wish, because you're worried about opening

23  statement, if we get the jury picked early, I will give the

24  introductory instructions, but we won't make you give opening

25  statement -- if you'd like that assurance now, so you don't

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    have to worry about it, we won't get into opening statement

2    that first day.

3         Okay.  Next day and until the end of trial, we will start

4    session every day at 8:30 in the morning.  Not at 9:00.  At

5    8:30.  And we will go from 8:30 until 11:30 with a 15-minute

6    break.  We'll go to lunch from 11:30 until 1:00.  We will come

7    back at 1:00 and go from 1:00 until 4:00 with a 15-minute

8    break.  Which means that you'll get five and a half hours a day

9    of trial in.  You can set your watch by that.  And by that I

10   mean, at 8:30 we'll start.  If the jurors are here and one

11   juror is late, those jurors are going to be sitting in the jury

12   box, you're going to be sitting in your seats, and when that

13   juror walks in five minutes late, they're going to be terribly

14   embarrassed, but that's too bad.  They will know that they have

15   to be here at 8:30.  Same is true for the attorneys and the

16   clients:  They have to be here right at 8:30.  At 11:00 o'clock

17   and 4:00 o'clock, we'll stop.  If you're midway through a

18   question at 4:00 o'clock, don't be surprised if the Court tells

19   you, remember what your question is, you can ask it again

20   tomorrow morning, it's 4:00 o'clock, and I know you want to get

21   it in now, but it's 4:00 o'clock, we're breaking at 4:00.  And

22   we do this for a reason.  As you know, jurors really are

23   serving in involuntary servitude.  None of them want to be

24   here.  They all have jobs.  They have families they want to get

25   to.  The one thing I can guarantee them is, we're going to run

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    this case so they can guarantee themselves that they will

2    have -- they can pick up their child at 4:20 or whatever it is.

3    They'll know exactly what they can do, what they can't do.  As

4    I said before, they can set their watch by what we're doing as

5    far as how this trial's going to be run.

6         Five and a half hours, that's going to be a full day.  So

7    let me talk to you a little bit about that.  If you have

8    witnesses -- and as I said before, I really expect officers of

9    the court to cooperate with each other.  Get as much done as

10   you can get done that is not essential and is not an issue

11   between yourselves and work things out in stipulations.  Almost

12   anything you work out, as long as it doesn't affect that timing

13   and the jury, I'll agree to.  Almost anything.  Want to call a

14   witness out of order, I will almost always say yeah, I don't

15   care.  Now, problem:  What happens if you get to quarter of

16   4:00 and run out of witnesses?  Interesting question.  You

17   rest.  So if you get to quarter of 4:00 and you run out of

18   witnesses, that's it.  So you better have witnesses available.

19   If you're going to be able to put on six witnesses, have eight

20   available.  Have witnesses available all the time so you don't

21   run into that situation.

22        Anything else?

23        Well, let me throw it out to you.  I've been talking a

24   long time here.  You might have questions.

25        Counsel?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

| 1 | MR. WINDSOR:  Your Honor, I don't remember whether the |
|---|---|

1    MR. WINDSOR:  Your Honor, I don't remember whether the

2    court has trial on Monday or just Tuesday --

3    THE COURT:  Okay.  Good question.  Normally, Monday,

4    at least Monday morning, you won't have to worry about.

5    Sometimes you'll have Monday morning on Monday.  You're

6    correct.  The schedule I gave you is for Tuesday through

7    Friday.  And I would not mind, and I might, if I can move my

8    calendar around, have sessions on Monday.  So I'm not going to

9    tell the jury they're off Mondays, because they may not be, but

10   that's only if I can move my other criminal and sentencings and

11   everything around.  But for your sake, I'll work with you on

12   that, and, you know, I'll check with you beforehand to see if

13   you're available on Monday, what we can do.

14   Other questions, anything else you might have?

15   MR. ESTRADA:  Your Honor, you mentioned taking

16   witnesses out of order.  There will be a lot of victims in this

17   case.  We will try to do that as -- be as convenient to them as

18   possible.

19   Another thing.  With regard to jury instructions, we plan

20   on filing that one week before trial, if that's agreeable to

21   the Court.

22   THE COURT:  Fine.

23   MR. ESTRADA:  Trial memo.  Does the Court want a trial

24   memo in this particular case?  And if so, we'd file it the week

25   before trial.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  You know, I would like to have a trial

 2   memo on it, and I'd also like to have from both sides a joint

 3   statement of the case, so we can read to the jury what both

 4   sides agree as far as the statement of the case is concerned.

 5        Witness list, obviously, you know what the rules on that

 6   are.  Every day, at the close of every day, I would like to

 7   have what witnesses you're going to be calling the next day, so

 8   I know what's going on.  So give me a list of the witnesses

 9   you'll be calling the next day.

10              MR. ESTRADA:  Yes, your Honor.

11        With regard to witnesses -- because as far as a wiretap

12   call, we plan on having one particular agent, in fact, Agent

13   Stebbins there, come on and off the stand, at this point

14   approximately five times.  And I leave it to how the Court and

15   counsel want to do in terms of cross-examining him five times

16   or waiting till the end, but that's how we --

17              THE COURT:  Work it any way you want it.  Counsel, if

18   they want to do it at one time or they want to do it later,

19   that's fine.

20              MR. PEREYRA-SUAREZ:  Your Honor, with respect to that

21   point -- Charles Pereyra-Suarez, representing

22   Mr. Sharopetrosian.  I just learned today, when I received the

23   letter dated February 28th from government counsel, that

24   government counsel intend for the jury to listen to testimony

25   from certain witnesses who they will not make available at
```

```
1   trial, who therefore cannot be cross-examined at trial.  I will

2   try to work out that issue with government counsel, but if it

3   cannot be worked out, I would like to raise it again with the

4   Court.

5          THE COURT:  Oh, sure.  If it can't be worked out,

6   there's rules that control that.  You make your motion, and

7   I'll be happy to rule on it.  As much as you can work out on

8   your own, better.

9          MR. ESTRADA:  Certainly, your Honor.  We'll respond to

10  the motion.

11         THE COURT:  Sure.

12         MR. ESTRADA:  If it pertains to a victim in the case

13  which the government doesn't intend to call as a witness at

14  trial, just so the Court's aware, but we'll file our opposition

15  when it --

16         THE COURT:  Okay.  And the other thing along the lines

17  you were talking about, sometimes you may call a witness and

18  the other side may want to go outside the area of direct as

19  their own witness, and I don't care if they want to take that

20  witness on direct.

21         MR. ESTRADA:  We won't object to that, your Honor.

22         THE COURT:  Whatever you work out.  Whatever the

23  attorneys work out to make the trial more efficient, more

24  focused, so that both sides have going to the jury those things

25  that really the jurors should be considering and not confused
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    by other matters.

 2             MR. ESTRADA:  Just so the Court's aware, there are

 3    several counts in the case dealing with fraud, bank fraud,

 4    which the government will not be proceeding on.  To make it

 5    easier, what I would propose is, we would draft up verdict

 6    forms which will list out the counts for each defendant.  We'll

 7    submit those to the Court, and they'll list out every count the

 8    government intends to proceed on.

 9             THE COURT:  Okay.  And you're going to share that,

10    obviously, with counsel.

11             MR. ESTRADA:  Of course.  Of course.

12             THE COURT:  That would help quite a bit before trial

13    if I knew exactly what we're pursuing, what we're not.

14             MR. ESTRADA:  Just because some witnesses are no

15    longer available.  That's simply the reason.

16             THE COURT:  Okay.

17         Anything else?  Anybody have any other ideas or questions

18    or anything?

19         Okay.  We'll see you back in, then, on the 25th.  Any

20    motions that you wish the Court to rule on before that date,

21    feel free to make the motions, and the Court will consider

22    them.

23             MR. ESTRADA:  Thank you, your Honor.

24             MR. FLIER:  Thank you, your Honor.

25             MR. SEVERO:  Thank you, your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  We'll be in recess.

2

3          *(Proceedings concluded at 2:43 p.m.)*

4

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                          <u>CERTIFICATE</u>

2

3        *I hereby certify that pursuant to Section 753,*

4    *Title 28, United States Code, the foregoing is a true and*

5    *correct transcript of the stenographically reported proceedings*

6    *held in the above-entitled matter and that the transcript page*

7    *format is in conformance with the regulations of the*

8    *Judicial Conference of the United States.*

9

10   *Date:  NOVEMBER 16, 2014*

11

12

13

14              <u>/S/ SANDRA MACNEIL</u>

15            *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**003613**