Nos. 14-50516, 15-50173,
14-50434, 14-50423, 15-50004

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

MHER DARBINYAN,
ARMAN SHAROPETROSIAN,
RAFAEL PARSADANYAN,
*Defendants-Appellants.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 11-72-RGK*

## GOVERNMENT'S EXCERPTS OF RECORD
## VOLUME II OF V

SANDRA R. BROWN
Acting United States Attorney

PATRICK FITZGERALD
Assistant United States Attorney
Chief, National Security Division

ELIZABETH R. YANG
Assistant United States Attorney

1500 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-1785
Email: elizabeth.yang@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                           **PAGE**

## VOLUME I

1. Defendant Darbinyan's Motion to Suppress Wiretap and Derivative Evidence; Request for a *Franks* Hearing [without exhibits] (CR 2002)...........................1

2. Government's Opposition to Defendant Darbinyan's Motion to Suppress Wiretap Evidence (CR 2081).....................74

3. Defendant Darbinyan's Reply to Government's Opposition to Suppress Wiretap Evidence and Derivative Evidence (CR 2112)................................129

4. Defendant Darbinyan's Supplemental Brief in Support of His Motion to Suppress Wiretap Evidence [without exhibits] (CR 2277)................................156

5. Defendant Parsadanyan's Motion for Severance from Co-Defendants (CR 2967)................................160

6. Government's Opposition to Defendants' Motions for Severance (CR 2992).......................................169

7. Joint Proposed Jury Instructions (CR 3095)..........................181

8. Defendant Darbinyan's Motion for Judgment of Acquittal Pursuant to Federal Rules of Criminal Procedure, Rule 29 (CR 3139)................................282

## VOLUME II

9. Government's Omnibus Opposition to Defendants Darbinyan's and Parsadanyan's Motions for Judgment of Acquittal (CR 3155).......................................294

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

10. Order denying Defendant Darbinyan's Motion for
    Judgment of Acquittal (CR 3164)……………………………………..309

11. Defendant Sharopetrosian's Motion to Vacate
    Judgment and for New Trial Pursuant to Rule 33
    of the Federal Rules of Criminal Procedure (CR 3282)…..……..311

12. Defendant Parsadanyan's Motion for New Trial (CR 3283)…….314

13. Government's Opposition to Defendant Darbinyan's
    Motion for New Trial (CR 3327)…………………………………329

14. Government's Opposition to Defendant Sharopetrosian's
    Motion to Vacate Judgment and for New Trial (CR 3328)………351

15. Government's Opposition to Defendant Parsadanyan's
    Motion for New Trial (CR 3329)…….………………………………360

16. Government's Position re: Presentence Report and
    Sentencing of Defendant Parsadanyan (CR 3399)………………372

17. Government's Position re: Presentence Report and
    Sentencing of Defendant Sharopetrosian (CR 3413)……………423

18. Defendant Parsadanyan's Response to the Probation
    Officer's Presentence Report (CR 3451)……………………………441

19. Defendant Sharopetrosian's Sentencing Position
    Memorandum [without exhibits] (CR 3466)…………………..........511

20. Government's Response to Sentencing Position
    of Defendant Parsadanyan (CR 3475)…..………………………518

21. Defendant Parsadanyan's Sentencing Reply to the
    Sentencing Response of the Government (CR 3484)……………536

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                               **PAGE**

22. Government's Response to Sentencing Position Memorandum of Defendant Sharopetrosian (CR 3491)............539

23. Defendant Sharopetrosian's Reply to Government's Responsive Sentencing Position Memorandum (CR 3502).........551

24. Amended Judgment and Commitment Order for Defendant Parsadanyan (CR 3709)..................556

## **VOLUME III**

25. List of Exhibits and Witnesses (CR 3189)............................562

26. GEX 245: Chart of speakers...................................................623

27. GEX 5A: Transcript of intercepted telephone call on 01/26/2009, at 9:58 am PST, between Mher Darbinyan and Gustavo Ortega (English)............................625

28. GEX 6A: Transcript of intercepted telephone call on 01/26/2009, at 12:07 pm PST, between Mher Darbinyan and Gustavo Ortega (English)............................628

29. GEX 7A: Transcript of intercepted telephone call on 01/27/2009, at 6:07 pm PST, between Mher Darbinyan, Gustavo Ortega, and Unknown Male (English)................................................................631

30. GEX 8A: Transcript of intercepted telephone call on 01/28/2009, at 11:43 am PST, between Mher Darbinyan and Julio Rivas (English)..................................634

31. GEX 9A: Transcript of intercepted telephone call on 01/28/2009, at 12:14 pm PST, between Mher Darbinyan and Unknown Male (English)..............................636

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                      **PAGE**

32.    GEX 10A: Transcript of intercepted telephone call on 01/28/2009, at 12:33 pm PST, between Mher Darbinyan and Julio Rivas (English)...................638

33.    GEX 11A: Transcript of intercepted telephone call on 01/28/2009, at 1:09 PM PST, between Mher Darbinyan and Unknown Male (English)..............641

34.    GEX 13A: Transcript of intercepted telephone call on 03/16/2009, at 12:47 PM PST, between Mher Darbinyan and Armando Moreno (English)...........643

35.    GEX 14A: Transcript of intercepted telephone call on 03/16/2009, at 2:04 pm PST, between Mher Darbinyan and Arman Tangabekyan (Armenian)...................646

36.    GEX 15A: Transcript of intercepted telephone call on 03/16/2009, at 2:27 pm PST, between Mher Darbinyan and Arman Tangabekyan (Armenian)...................649

37.    GEX 16A: Transcript of intercepted telephone call on 03/16/2009, at 3:36 pm PST, between Mher Darbinyan, Armando Moreno, and Karen Samawi (English)...................651

38.    GEX 17A: Transcript of intercepted telephone call on 03/16/2009, at 3:44 pm PST, between Mher Darbinyan, Armando Moreno, and Unknown Male (English)...................654

39.    GEX 18A: Transcript of intercepted telephone call on 03/17/2009, at 9:45 am PST, between Mher Darbinyan, Armando Moreno, and Unknown Male (English)...................659

iv

# TABLE OF CONTENTS (continued)

**DESCRIPTION**          **PAGE**

40.    GEX 19A: Transcript of intercepted telephone call on 03/17/2009, at 12:58 pm PST, between Mher Darbinyan and Arman Tangabekyan (Armenian)...................665

41.    GEX 20A: Transcript of intercepted telephone call on 03/17/2009, at 4:46 pm PST, between Mher Darbinyan and Manuk Terzyan (Armenian)..........................667

42.    GEX 21A: Transcript of intercepted telephone call on 03/17/2009, at 4:56 pm PST, between Mher Darbinyan and Manuk Terzyan (Armenian)..........................669

43.    GEX 22A: Transcript of intercepted telephone call on 03/18/2009, at 9:16 am PST, between Mher Darbinyan and Armando Moreno (English)............................671

44.    GEX 23A: Transcript of intercepted telephone call on 03/18/2009, at 10:35 am PST, between Mher Darbinyan, Armando Moreno, and Karen Samawi (English)..................................................................676

45.    GEX 24A: Transcript of intercepted telephone call on 03/18/2009, at 12:17 pm PST, between Mher Darbinyan, Armando Moreno, and Karen Samawi (English)..................................................................683

46.    GEX 25A: Transcript of intercepted telephone call on 03/18/2009, at 2:51 pm PST, between Mher Darbinyan, Armando Moreno, and Karen Samawi (English)..................................................................686

47.    GEX 27A: Transcript of intercepted telephone call on 03/18/2009, at 4:59 pm PST, between Mher Darbinyan and Arman Tangabekyan (Armenian)...................689

v

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                      **PAGE**

48.   GEX 28A: Transcript of intercepted telephone call
      on 03/18/2009, at 5:07 pm PST, between Mher
      Darbinyan, Armando Moreno, and Karen Samawi
      (English)…………………………………………………………..692

49.   GEX 30A: Transcript of intercepted telephone call
      on 03/19/2009, at 11:16 am PST, between Mher
      Darbinyan and Armando Moreno (English)………………………695

50.   GEX 31A: Transcript of intercepted telephone call
      on 03/19/2009, at 12:01 pm PST, between Mher
      Darbinyan and Arman Tangabekyan (Armenian)……………….699

51.   GEX 32A: Transcript of intercepted telephone call
      on 03/19/2009, at 4:31 pm PST, between Mher
      Darbinyan and Arman Tangabekyan (Armenian)……………..…701

52.   GEX 36A: Transcript of intercepted telephone call
      on 03/20/2009, at 1:54 pm PST, between Mher
      Darbinyan and Armando Moreno (English)………………………704

53.   GEX 37A: Transcript of intercepted telephone call
      on 03/20/2009, at 3:23 pm PST, between Mher
      Darbinyan and Karen Samawi (English)…………………………707

54.   GEX 38A: Transcript of intercepted telephone call
      on 03/20/2009, at 3:37 pm PST, between Mher
      Darbinyan and Karen Samawi (English)…………………………711

55.   GEX 39A: Transcript of intercepted telephone call
      on 03/20/2009, at 4:51 pm PST, between Mher
      Darbinyan and Arman Tangabekyan (Armenian)….…………….714

vi

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                           **PAGE**

56.   GEX 40A: Transcript of intercepted telephone call
      on 03/30/2009, at 2:47 pm PST, between Mher
      Darbinyan, Gustavo Ortega, Unknown Male, and
      Manuk Terzyan (Armenian)................................................716

57.   GEX 41A: Transcript of intercepted telephone call
      on 03/30/2009, at 2:52 pm PST, between Mher
      Darbinyan and Manuk Terzyan (Armenian)...........................719

58.   GEX 42A: Transcript of intercepted telephone call
      on 03/30/2009, at 3:01 pm PST, between Mher
      Darbinyan and Manuk Terzyan (Armenian)..........................721

59.   GEX 43A: Transcript of intercepted telephone call
      on 03/30/2009, at 3:06 pm PST, between Mher
      Darbinyan and Manuk Terzyan (Armenian)..........................723

60.   GEX 44A: Transcript of intercepted telephone call
      on 03/30/2009, at 3:14 pm PST, between Mher
      Darbinyan and Manuk Terzyan (Armenian)..........................725

61.   GEX 45A: Transcript of intercepted telephone call
      on 03/30/2009, at 3:14 pm PST, between Mher
      Darbinyan and Manuk Terzyan (Armenian).........................727

62.   GEX 46A: Transcript of intercepted telephone call
      on 03/30/2009, at 3:45 pm PST, between Mher
      Darbinyan and Manuk Terzyan (Armenian)..........................729

63.   GEX 47A: Transcript of intercepted telephone call
      on 03/30/2009, at 4:44 pm PST, between Mher
      Darbinyan and Gustavo Ortega (English).............................731

vii

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

64.  GEX 48A: Transcript of intercepted telephone call
     on 03/30/2009, at 5:00 pm PST, between Mher
     Darbinyan and Manuk Terzyan (Armenian)………………………..734

65.  GEX 49A: Transcript of intercepted telephone call
     on 03/30/2009, at 5:09 pm PST, between Mher
     Darbinyan and Manuk Terzyan (Armenian)………………...……736

66.  GEX 50A: Transcript of intercepted telephone call
     on 03/30/2009, at 5:09 pm PST, between Mher
     Darbinyan and Manuk Terzyan (Armenian)…..………………….738

67.  GEX 51A: Transcript of intercepted telephone call
     on 04/14/2009, at 1:52 pm PST, between Mher
     Darbinyan and Arman Tangabekyan (Armenian)…….………….742

68.  GEX 52A: Transcript of intercepted telephone call
     on 04/14/2009, at 2:08 pm PST, between Mher
     Darbinyan and Hagop Yamalyan (Armenian)………….………….745

69.  GEX 53A: Transcript of intercepted telephone call
     on 04/14/2009, at 2:12 pm PST, between Mher
     Darbinyan and Manuk Terzyan (Armenian)……...…………….748

70.  GEX 54A: Transcript of intercepted telephone call
     on 04/14/2009, at 3:24 pm PST, between Mher
     Darbinyan, Arman Tangabekyan, and Manuk Terzyan
     (Armenian)………………………………………………………..750

71.  GEX 55A: Transcript of intercepted telephone call
     on 04/14/2009, at 4:33 pm PST, between Mher
     Darbinyan and Hagop Yamalyan (Armenian)…….……………….753

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

72.  GEX 56A: Transcript of intercepted telephone call
     on 04/14/2009, at 4:39 pm PST, between Mher
     Darbinyan and Manuk Terzyan (Armenian)………...……………755

73.  GEX 57A: Transcript of intercepted telephone call
     on 04/14/2009, at 4:41 pm PST, between Mher
     Darbinyan and Arman Tangabekyan (Armenian)………………..757

74.  GEX 58A: Transcript of intercepted telephone call
     on 04/14/2009, at 4:55 pm PST, between Mher
     Darbinyan and Manuk Terzyan (Armenian)………...……………760

75.  GEX 59A: Transcript of intercepted telephone call
     on 04/14/2009, at 5:38 pm PST, between Mher
     Darbinyan and Musho LNU (Armenian)………...………………762

76.  GEX 60A: Transcript of intercepted telephone call
     on 04/15/2009, at 2:53 pm PST, between Mher
     Darbinyan and Musho LNU (Armenian)…………………………765

77.  GEX 61A: Transcript of intercepted telephone call
     on 04/16/2009, at 4:01 pm PST, between Mher
     Darbinyan and Karen Markosian (Armenian)……………………768

78.  GEX 62A: Transcript of intercepted telephone call
     on 04/17/2009, at 3:22 pm PST, between Mher
     Darbinyan and Lusine Ogandganyan (Armenian)………………770

79.  GEX 63A: Transcript of intercepted telephone call
     on 04/21/2009, at 1:51 pm PST, between Mher
     Darbinyan and Lusine Ogandganyan (Armenian)……………….774

80.  GEX 64A: Transcript of intercepted telephone call
     on 06/23/20089, at 12:58 PM PST, between Arman
     Tangabekyan and Bank Service Representative (English)….…..777

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                              **PAGE**

81. GEX 65A: Transcript of intercepted telephone call on 08/05/2009, at 12:17 am PST, between Mher Darbinyan and Arman Tangabekyan (Armenian)...................784

82. GEX 66A: Transcript of intercepted telephone call on 08/20/2009, at 10:46 am PST, between Mher Darbinyan and Arman Sharopetrosian (Armenian)................787

83. GEX 67A: Transcript of intercepted telephone call on 08/20/2009, at 4:19 pm PST, between Mher Darbinyan and Arman Sharopetrosian (Armenian)................794

84. GEX 68A: Transcript of intercepted telephone call on 09/01/2009, at 6:31 pm PST, between Arman Sharopetrosian and Emil Airapetian (Armenian)..................800

85. GEX 69A: Transcript of intercepted telephone call on 06/29/2009, at 3:01 pm PST, between Mher Darbinyan and Arman Sharopetrosian (Armenian)................804

86. GEX 70A: Transcript of intercepted telephone call on 6/29/2009, at 3:07 pm PST, between Mher Darbinyan and Arman Sharopetrosian (Armenian)................809

87. GEX 71A: Transcript of intercepted telephone call on 06/29/2009, at 3:14 pm PST, between Mher Darbinyan, Arman Sharopetrosian, and M.M. (Armenian).......813

88. GEX 72A: Transcript of intercepted telephone call on 06/29/2009, at 6:07 pm PST, between Mher Darbinyan and Arman Sharopetrosian (Armenian)................821

89. GEX 73A: Transcript of intercepted telephone call on 06/30/2009, at 1:58 pm PST, between Mher Darbinyan and Arman Sharopetrosian (Armenian)................827

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

90.   GEX 74A: Transcript of intercepted telephone call
      on 07/03/2009, at 10:45 pm PST, between Mher
      Darbinyan, Arman Sharopetrosian, and M.M. (Armenian).......835

91.   GEX 75A: Transcript of intercepted telephone call
      on 07/04/2009, at 1:10 pm PST, between Mher
      Darbinyan, Arman Sharopetrosian, and M.M. (Armenian).......843

92.   GEX 76A: Transcript of intercepted telephone call
      on 07/04/2009, at 4:22 pm PST, between Mher
      Darbinyan and Rafael Parsadanyan (Armenian)....................851

93.   GEX 77A: Transcript of intercepted telephone call
      on 07/05/2009, at 8:16 pm PST, between Mher
      Darbinyan and Arman Sharopetrosian (Armenian)...........…...854

## **VOLUME IV**

94.   GEX 78A: Transcript of intercepted telephone call
      on 07/06/2009, at 4:21 pm PST, between Mher
      Darbinyan, M.M., and Unknown Male (Armenian)..........…...861

95.   GEX 79A: Transcript of intercepted telephone call
      on 07/06/2009, at 4:58 pm PST, between Mher
      Darbinyan and M.M. (Armenian)……………....................864

96.   GEX 80A: Transcript of intercepted telephone call
      on 09/03/2009, at 11:40 pm PST, between Arman
      Sharopetrosian and M.M. (Armenian)…………….............868

97.   GEX 81A: Transcript of intercepted telephone call
      on 10/28/2009, at 11:50 am PST, between Arman
      Sharopetrosian and M.M. (Armenian)…………….............873

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                             **PAGE**

98. GEX 82A: Transcript of intercepted telephone call on 10/30/2009, at 12:14 am PST, between Arman Sharopetrosian, M.M., and Unidentified Male (Armenian)...........................................................................881

99. GEX 83A: Transcript of intercepted telephone call on 10/30/2009, at 1:13 am PST, between Arman Sharopetrosian and M.M. (Armenian)..................................891

100. GEX 84A: Transcript of intercepted telephone call on 10/30/2009, at 6:47 pm PST, between Arman Sharopetrosian and M.M. (Armenian)..................................901

101. GEX 85A: Transcript of intercepted telephone call on 11/02/2009, at 10:57 am PST, between Arman Sharopetrosian and M.M. (Armenian)..................................905

102. GEX 86A: Transcript of intercepted telephone call on 11/02/2009, at 4:11 pm PST, between Arman Sharopetrosian and M.M. (Armenian)..................................913

103. GEX 87A: Transcript of intercepted telephone call on 11/02/2009, at 4:27 pm PST, between Arman Sharopetrosian and M.M. (Armenian)..................................915

104. GEX 88A: Transcript of intercepted telephone call on 11/03/2009, at 8:01 PM PST, between Arman Sharopetrosian and M.M. (Armenian)..................................917

105. GEX 89A: Transcript of intercepted telephone call on 11/04/2009, at 6:05 PM PST, between Arman Sharopetrosian and M.M. (Armenian)..................................923

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

106. GEX 90A: Transcript of intercepted telephone call
     on 11/21/2009, at 7:06 pm PST, between Arman
     Sharopetrosian and M.M. (Armenian)………………....………925

107. GEX 91A: Transcript of intercepted telephone call
     on 08/20/2009, at 8:20 pm PST, between Mher
     Darbinyan and Karen LNU (Armenian)…………….…………931

108. GEX 92A: Transcript of intercepted telephone call
     on 08/20/2009, at 8:30 pm PST, between Mher
     Darbinyan and Arthur Pembejian (Armenian)…….………..935

109. GEX 93A: Transcript of intercepted telephone call
     on 08/20/2009, at 8:32 pm PST, between Mher
     Darbinyan, Paramaz Bilezikchyan, and Karapet
     Kalantaryan (Armenian)……………………………...………938

110. GEX 94A: Transcript of intercepted telephone call
     on 08/20/2009, at 8:33 pm PST, between Mher
     Darbinyan and Paramaz Bilezikchyan (Armenian)……………..940

111. GEX 95A: Transcript of intercepted telephone call
     on 08/20/2009, at 8:34 pm PST, between Mher
     Darbinyan, Arthur Pembejian, and Karo Yerkanyan
     (Armenian)………………………………………………...………942

112. GEX 96A: Transcript of intercepted telephone call
     on 08/20/2009, at 11:25 pm PST, between Paramaz
     Bilezikchyan and Jack Gambaryan (Armenian)…….....…..…..945

113. GEX 97A: Transcript of intercepted telephone call
     on 08/21/2009, at 2:19 am PST, between Mher
     Darbinyan, Arthur Pembejian, and Unknown Male
     (Armenian)………………………………….……...…………….950

xiii

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                           **PAGE**

114. GEX 98A: Transcript of intercepted telephone call on 08/21/2009, at 12:31 PM PST, between Mher Darbinyan, Alen Petrosian, Unknown Male, and Souren Serobyan (Armenian)…………………….……………….956

115. GEX 99A: Transcript of intercepted telephone call on 10/12/2009, at 1:18 PM PST, between Mher Darbinyan and Karo Yerkanyan (Armenian)……..……………….972

116. GEX 100A: Transcript of intercepted telephone call on 08/04/2009, at 1:15 pm PST, between Mher Darbinyan and Alen Petrosian (Armenian)…………..……..…….976

117. GEX 101A: Transcript of intercepted telephone call on 08/19/2009, at 9:03 pm PST, between Mher Darbinyan and Unidentified Male (Armenian)……..…………….980

118. GEX 102A: Transcript of intercepted telephone call on 08/19/2009, at 9:49 pm PST, between Mher Darbinyan and Armen Kirakosyan (Armenian)……..……..…….989

119. GEX 103A: Transcript of intercepted telephone call on 08/19/2009, at 11:00 pm PST, between Mher Darbinyan and Vahan LNU (Armenian)………………………..1005

120. GEX 104A: Transcript of intercepted telephone call on 08/28/2009, at 11:01 am PST, between Mher Darbinyan and Unknown Male (Armenian)……..……………..1011

121. GEX 105A: Transcript of intercepted telephone call on 11/13/2009, at 7:34 pm PST, between Mher Darbinyan and Karen Markosian (Armenian)……..…………..1026

xiv

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                  **PAGE**

122. GEX 106A: Transcript of intercepted telephone call on 04/24/2009, at 3:31 pm PST, between Mher Darbinyan and Aram Petrosian (Armenian).........................1030

123. GEX 107A: Transcript of intercepted telephone call on 07/08/2009, at 12:41 pm PST, between Mher Darbinyan, Armen Mkrtchyan, and Aram Petrosian (Armenian)..............................................................1034

124. GEX 108A: Transcript of intercepted telephone call on 07/12/2009, at 10:39 pm PST, between Mher Darbinyan, Arman Sharopetrosian, and Zero LNU (Armenian)..........................................................1044

125. GEX 109A: Transcript of intercepted telephone call on 07/13/2009, at 3:54 pm PST, between Mher Darbinyan and Arman Sharopetrosian (Armenian)...............1051

126. GEX 110A: Transcript of intercepted telephone call on 08/19/2009, at 1:22 pm PST, between Mher Darbinyan and Aram Petrosian (Armenian).........................1056

127. GEX 111A: Transcript of intercepted telephone call on 10/19/2009, at 12:22 pm PST, between Mher Darbinyan and Miguel Ramirez (English)...........................1059

128. GEX 112A: Transcript of intercepted telephone call on 10/19/2009, at 12:26 pm PST, between Mher Darbinyan and Miguel Ramirez (English)...........................1064

129. GEX 113A: Transcript of intercepted telephone call on 11/23/2009, at 11:27 am PST, between Mher Darbinyan and Miguel Ramirez (English)...........................1068

# TABLE OF CONTENTS (continued)

**DESCRIPTION**  **PAGE**

130. GEX 114A: Transcript of intercepted telephone call on 11/23/2009, at 11:40 am PST, between Mher Darbinyan and Arthur Pembejian (Armenian)......................1070

131. GEX 115A: Transcript of intercepted telephone call on 11/23/2009, at 3:35 pm PST, between Mher Darbinyan and Miguel Ramirez (English)............................1073

132. GEX 116A: Transcript of intercepted telephone call on 11/24/2009, at 10:43 am PST, between Mher Darbinyan and Gevork Kasabyan (Armenian)......................1075

133. GEX 117A: Transcript of intercepted telephone call on 11/24/2009, at 10:45 am PST, between Mher Darbinyan and Gevork Kasabyan (Armenian)......................1077

134. GEX 118A: Transcript of intercepted telephone call on 11/24/2009, at 12:05 pm PST, between Mher Darbinyan and Souren Serobyan (Armenian).........................1081

135. GEX 119A: Transcript of intercepted telephone call on 11/24/2009, at 1:06 pm PST, between Mher Darbinyan and Gevork Kasabyan (Armenian)......................1085

136. GEX 120A: Transcript of intercepted telephone call on 11/24/2009, at 1:27 pm PST, between Mher Darbinyan, Gevork Kasabyan, and Unknown Male (Armenian).................................................................1089

137. GEX 121A: Transcript of intercepted telephone call on 11/24/2009, at 1:34 pm PST, between Mher Darbinyan and Gevork Kasabyan (Armenian)......................1093

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

138. GEX 122A: Transcript of intercepted telephone call
     on 11/24/2009, at 2:50 pm PST, between Mher
     Darbinyan and Miguel Ramirez (English)............................1098

139. GEX 123A: Transcript of intercepted telephone call
     on 11/24/2009, at 3:57 pm PST, between Unknown
     Male and Alen Petrosian (Armenian).................................1101

140. GEX 124A: Transcript of intercepted telephone call
     on 11/25/2009, at 2:27 pm PST, between Mher
     Darbinyan and Miguel Ramirez (English)............................1106

141. GEX 125A: Transcript of intercepted telephone call
     on 11/30/2009, at 7:25 pm PST, between Mher
     Darbinyan and Hakob Makseredzhyan (Armenian)...............1110

142. GEX 126A: Transcript of intercepted telephone call
     on 11/30/2009, at 7:32 pm PST, between Mher
     Darbinyan and Armen Sarkissian (Armenian)....................1115

143. GEX 127A: Transcript of intercepted telephone call
     on 12/01/2009, at 9:28 pm PST, between Mher
     Darbinyan and Arthur Pembejian (Armenian)....................1121

144. GEX 128A: Transcript of intercepted telephone call
     on 12/01/2009, at 9:34 pm PST, between Mher
     Darbinyan and Arthur Pembejian (Armenian)....................1123

145. GEX 129A: Transcript of intercepted telephone call
     on 12/01/2009, at 9:44 pm PST, between Mher
     Darbinyan and Arthur Pembejian (Armenian)....................1126

146. GEX 130A: Transcript of intercepted telephone call
     on 10/13/2009, at 10:38 pm PST, between Mher
     Darbinyan and Paramaz Bilezikchyan (Armenian)...............1128

xvii

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                                                 **PAGE**

147.  GEX 131A: Transcript of intercepted telephone call
      on 10/14/2009, at 11:31 am PST, between Mher
      Darbinyan and Rafael Parsadanyan (Armenian)..................1141

148.  GEX 132A: Transcript of intercepted telephone call
      on 10/14/2009, at 11:55 am PST, between Mher
      Darbinyan and Paramaz Bilezikchyan (Armenian)...............1144

149.  GEX 133A: Transcript of intercepted telephone call
      on 10/14/2009, at 3:18 pm PST, between Mher
      Darbinyan and Harut Khachaturyan (Armenian).....….......1148

150.  GEX 134A: Transcript of intercepted telephone call
      on 10/14/2009, at 4:54 pm PST, between Mher
      Darbinyan and Rafael Parsadanyan (Armenian)..................1152

151.  GEX 135A: Transcript of intercepted telephone call
      on 07/06/2009, at 11:05 am PST, between Mher
      Darbinyan and Raymond Tarverdyan (Armenian)...............1155

## **VOLUME V**

152.  GEX 136A: Transcript of intercepted telephone call
      on 07/11/2009, at 2:05 pm PST, between Mher
      Darbinyan and Arman Sharopetrosian (Armenian)..............1159

153.  GEX 137A: Transcript of intercepted telephone call
      on 07/13/2009, at 5:25 pm PST, between Mher
      Darbinyan and Khachatur Arakelyan (Armenian)..............1166

154.  GEX 138A: Transcript of intercepted telephone call
      on 07/13/2009, at 7:09 pm PST, between Mher
      Darbinyan, Aram Petrosian, and Garen Chouldjian
      (Armenian)...............................................................1168

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                          **PAGE**

155. GEX 139A: Transcript of intercepted telephone call
     on 07/16/2009, at 10:20 pm PST, between Mher
     Darbinyan, Khachatur Arakelyan, and Automated
     Recording (Armenian).......................................................1171

156. GEX 140A: Transcript of intercepted telephone call
     on 07/16/2009, at 10:27 pm PST, between Mher
     Darbinyan and Khachatur Arakelyan (Armenian)................1174

157. GEX 141A: Transcript of intercepted telephone call
     on 07/16/2009, at 10:39 pm PST, between Mher
     Darbinyan and Raymond Tarverdyan (Armenian).................1177

158. GEX 142A: Transcript of intercepted telephone call
     on 07/16/2009, at 10:44 pm PST, between Mher
     Darbinyan and Garen Chouldjian (Armenian)......................1179

159. GEX 143A: Transcript of intercepted telephone call
     on 07/17/2009, at 1:44 pm PST, between Mher
     Darbinyan and Raymond Tarverdyan (Armenian).................1183

160. GEX 144A: Transcript of intercepted telephone call
     on 07/17/2009, at 2:19 pm PT, between Mher
     Darbinyan and Raymond Tarverdyan (Armenian).................1185

161. GEX 145A: Transcript of intercepted telephone call
     on 07/17/2009, at 5:34 pm PST, between Mher
     Darbinyan and Raymond Tarverdyan (Armenian).................1187

162. GEX 146A: Transcript of intercepted telephone call
     on 07/17/2009, at 11:32 pm PST, between Mher
     Darbinyan and Raymond Tarverdyan (Armenian).................1189

xix

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                             **PAGE**

163. GEX 147A: Transcript of intercepted telephone call on 07/17/2009, at 11:44 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)...............1192

164. GEX 148A: Transcript of intercepted telephone call on 07/18/2009, at 2:51 pm PST, between Mher Darbinyan and Petros Babelyan (Armenian).......................1195

165. GEX 149A: Transcript of intercepted telephone call on 07/18/2009, at 2:51 pm PST, between Mher Darbinyan and Petros Babelyan (Armenian).......................1202

166. GEX 150A: Transcript of intercepted telephone call on 07/18/2009, at 2:15 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)...............1205

167. GEX 151A: Transcript of intercepted telephone call on 07/18/2009, at 2:15 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)...............1207

168. GEX 152A: Transcript of intercepted telephone call on 07/18/2009, at 4:49 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)...............1210

169. GEX 153A: Transcript of intercepted telephone call on 07/18/2009, at 5:20 pm PST, between Mher Darbinyan and Khachatur Arakelyan (Armenian)...............1214

170. GEX 154A: Transcript of intercepted telephone call on 07/18/2009, at 5:22 pm PST, between Mher Darbinyan, Garen Chouldjian, and Unknown Male (Armenian)........................................................1218

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                             **PAGE**

171. GEX 155A: Transcript of intercepted telephone call on 07/18/2009, at 5:25 pm PST, between Mher Darbinyan and Rafael Parsadanyan (Armenian)..................1222

172. GEX 156A: Transcript of intercepted telephone call on 07/18/2009, at 7:38 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)..................1226

173. GEX 157A: Transcript of intercepted telephone call on 07/18/2009, at 8:14 PM PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)..................1228

174. GEX 158A: Transcript of intercepted telephone call on 07/18/2009, at 8:45 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)..................1231

175. GEX 159A: Transcript of intercepted telephone call on 07/18/2009, at 9:28 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)..................1235

176. GEX 160A: Transcript of intercepted telephone call on 07/18/2009, at 10:20 pm PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)..................1238

177. GEX 161A: Transcript of intercepted telephone call on 07/19/2009, at 2:20 pm PST, between Mher Darbinyan and Rafael Parsadanyan (Armenian)..................1240

178. GEX 162A: Transcript of intercepted telephone call on 07/19/2009, at 8:49 pm PST, between Mher Darbinyan and Khachatur Arakelyan (Armenian)..................1243

179. GEX 163A: Transcript of intercepted telephone call on 07/20/2009, at 9:53 am PST, between Mher Darbinyan and Raymond Tarverdyan (Armenian)..................1246

xxi

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                        **PAGE**

180.  GEX 164A: Transcript of intercepted telephone call
      on 07/20/2009, at 1:52 pm PST, between Mher
      Darbinyan and Raymond Tarverdyan (Armenian)…..………1248

181.  GEX 165A: Transcript of intercepted telephone call
      on 07/21/2009, at 3:41 pm PST, involving Raymond
      Tarverdyan (Armenian)……………….....................................1250

182.  GEX 166A: Transcript of intercepted telephone call
      on 08/08/2009, at 3:00 pm PST, between Mher
      Darbinyan and Rafael Parsadanyan (Armenian)……….………1253

183.  GEX 167A: Transcript of intercepted telephone call
      on 08/09/209, at 3:49 PM PST, between Mher
      Darbinyan and Rafael Parsadanyan (Armenian)…….…………1257

184.  GEX 168A: Transcript of intercepted telephone call
      on 08/14/2009, at 6:28 pm PST, between Mher
      Darbinyan and Simon Antonyan (Armenian)…….……………1260

185.  GEX 169A: Transcript of intercepted telephone call
      on 08/19/2009, at 1:07 pm PST, between Mher
      Darbinyan and Simon Antonyan (Armenian)…….……………1264

186.  GEX 170A: Transcript of intercepted telephone call
      on 08/24/2009, at 2:55 pm PST, between Mher
      Darbinyan and Simon Antonyan (Armenian)…….……………1268

187.  GEX 171A: Transcript of intercepted telephone call
      on 08/24/2009, at 10:41 pm PST, between Mher
      Darbinyan and Artur Margaryan (Armenian)…….…..…………1272

188.  GEX 172A: Transcript of intercepted telephone call
      on 08/27/2009, at 10:46 am PST, between Mher
      Darbinyan and Artur Margaryan (Armenian)…….…..…………1280

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

189.  GEX 173A: Transcript of intercepted telephone call
      on 08/28/2009, at 10:59 am PST, between Mher
      Darbinyan and Rafael Parsadanyan (Armenian)..................1284

190.  GEX 174A: Transcript of intercepted telephone call
      on 08/29/2009, at 10:45 pm PST, between Mher
      Darbinyan and Khachatur Arakelyan (Armenian)…….....……1287

191.  GEX 175A: Transcript of intercepted telephone call
      on 08/30/2009, at 10:29 am PST, between Mher
      Darbinyan and Hakop Simitian (Armenian)…….....…...…….1291

192.  GEX 176A: Transcript of intercepted telephone call
      on 08/30/2009, at 10:29 am PST, between Mher
      Darbinyan and Hakop Simitian (Armenian)……...…...….……1295

193.  GEX 177A: Transcript of intercepted telephone call
      on 08/30/2009, at 12:29 pm PST, between Mher
      Darbinyan and Khachatur Arakelyan (Armenian)…….....……1298

194.  GEX 178A: Transcript of intercepted telephone call
      on 09/03/2009, at 6:32 pm PST, between Mher
      Darbinyan and Garen Chouldjian (Armenian)…….....……….1301

195.  GEX 179A: Transcript of intercepted telephone call
      on 09/04/2009, at 10:59 am PST, between Mher
      Darbinyan and Hakop Simitian (Armenian)……...…...….……1304

196.  GEX 180A: Transcript of intercepted telephone call
      on 09/04/2009, at 1:22 pm PST, between Mher
      Darbinyan and Rafael Parsadanyan (Armenian)..................1308

197.  GEX 181A: Transcript of intercepted telephone call
      on 09/16/2009, at 11:42 am PST, between Mher
      Darbinyan and Simon Antonyan (Armenian)…….....…..……1312

xxiii

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                    **PAGE**

198. GEX 282: Western Union receipts from M.M.
     sent after 10/26/2009…………………………..……………………1317

199. GEX 283: Certified Moneygram records for
     10/16/2009-10/21/2009 money transfers to
     various individuals in the name of Tony Franco……..…………1329

200. GEX 284: Certified Western Union records for
     transactions on 10/30/2009 for money transfers
     to various individuals from M.M……………………………….…1338

201. GEX 293:  Armenian Power roll call/gang roster………..………1347

1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   E. MARTIN ESTRADA (Cal. SBN: 223802)
4  ELIZABETH R. YANG (Cal. SBN: 196461)
   Assistant United States Attorneys
5  ANDREW CREIGHTON (Maryland State Bar Member)
   Trial Attorney, U.S. Department of Justice
6       1500 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone: (213) 894-3358
8       Facsimile: (213) 894-3713
        Email:   Martin.Estrada@usdoj.gov
9                Elizabeth.Yang@usdoj.gov
                 Andrew.Creighton@usdoj.gov
10
   Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

12              UNITED STATES DISTRICT COURT

13        FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                   WESTERN DIVISION

15 UNITED STATES OF AMERICA,       No. CR 11-72(A)-RGK

16         Plaintiff,              GOVERNMENT'S OMNIBUS OPPOSITION TO
                                   DEFENDANT MHER DARBINYAN'S AND
17         v.                      DEFENDANT RAFAEL PARSADANYAN'S
                                   MOTIONS FOR JUDGMENT OF ACQUITTAL
18 MHER DARBINYAN, et al.,

19         Defendant.              TRIAL DATE: March 25, 2014

20

21

22

23        Plaintiff, United States of America, by and through its counsel

24 of record, the United States Attorney's Office for the Central

25 District of California, hereby files this omnibus opposition to

26 defendant MHER DARBINYAN's and defendant RAFAEL PARSADANYAN's Motions

27 for Judgment of Acquittal Pursuant to Federal Rules of Criminal

28 Procedure.  (CR 3139 (DARBINYAN); CR 3141 (PARSADANYAN).)  Defendant

1

GER000294

Defendant SHAROPETROSIAN moved seeking joinder in DARBINYAN's motion. (CR 3143.)  This motion is based upon the attached memorandum of points and authorities, the complete files and records of this case, any further argument or evidence the Court wishes to consider.


Dated: April 11, 2014          Respectfully submitted,

                               ANDRÉ BIROTTE JR.
                               United States Attorney

                               ROBERT E. DUGDALE
                               Assistant United States Attorney
                               Chief, Criminal Division


                                    /s/
                               _____
                               E. MARTIN ESTRADA
                               ELIZABETH R. YANG
                               Assistant United States Attorney
                               ANDREW CREIGHTON
                               Trial Attorney, Department of Justice

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

GER000295

1        <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3        Defendants MHER DARBINYAN ("DARBINYAN"), ARMAN SHAROPETROSIAN

4    ("SHAROPETROSIAN"), and RAFAEL PARSADANYAN ("PARSADANYAN") are

5    charged in the First Superseding Indictment ("Indictment") with

6    multiple offenses related to the activities of Armenian Power.  In

7    Counts 4 and 5, DARBINYAN and SHAROPETROSIAN are charged with

8    Extortion Conspiracy and Extortion, in violation of 18 U.S.C. §

9    1951(a).  DARBINYAN is charged in Count 128[1] with possessing three

10   firearms in violation of 18 U.S.C. § 922(g).  PARSADANYAN is charged

11   with Access Device Fraud Conspiracy as well as multiple counts of

12   Bank Fraud and Aggravated Identity Theft.

13       DARBINYAN moves for a judgment of acquittal on Counts 4, 5, and

14   128, claiming that no rational juror could find the evidence

15   sufficient for conviction on these counts.  (CR 3139.)  Defendant

16   SHAROPETROSIAN subsequently requested joinder.  (CR 3143.)  Defendant

17   PARSADANYAN moves for a judgment of acquittal on all counts against

18   him.  (CR 3141.)  Despite acknowledging that all the evidence must be

19   viewed in the light most favorable to the government, defendant

20   DARBINYAN contends that there is insufficient evidence of an effect

21   on interstate commerce for extortion and extortion conspiracy, and

22   insufficient evidence of possession for the felon-in-possession

23   count.

---

24       [1] DARBINYAN's motion states that he seeks judgment of acquittal

25   on <u>Count 129</u>. (DARBINYAN Mot. for Judgment of Acquittal at 10
     ("Defendant here only challenges the sufficiency of the evidence on

26   Count 129.").)  Defendant DARBINYAN, however, contests only the
     possession of the firearms that are charged in <u>Count 128</u>.  (<u>Id.</u> at

27   10-12.)  The government therefore assumes that there is a consistent
     error in defendant's motion, and responds assuming that defendant

28   meant to move for a judgment of acquittal on Count 128.

1

GER000296

1    The jury, however, heard evidence that the extortion victim made

2    wire transfers in response to the demands of defendants, including an

3    interstate wire transfer, and also paid associated money transfer

4    fees.  The jury also heard that the victim's businesses, both legal

5    and illegal, could have been and were affected by the extortionate

6    acts of DARBINYAN and SHAROPETROSIAN.  This is sufficient to show the

7    required *de minimis* effect on interstate commerce.  With regard to

8    the firearms, the jury heard that DARBINYAN agreed to come and pick

9    up the firearms.  This is sufficient to show the intent and knowledge

10   necessary for constructive possession.  The jury also heard detailed

11   evidence that defendant PARSADANYAN participated in an Access Device

12   Fraud Conspiracy and joined in acts of Bank Fraud and Aggravated

13   Identity Theft.

14   Upon reviewing the evidence from the government's case-in-chief

15   in the light most favorable to the prosecution, a rational trier of

16   fact therefore had sufficient evidence to find the essential elements

17   of extortion and felon-in-possession beyond a reasonable doubt.

18   Defendant's motion should be denied in its entirety.

19   **II.   APPLICABLE LAW**

20       **A.   THE RULE 29 STANDARD**

21   Rule 29(a) of the Federal Rules of Criminal Procedure states

22   that "[a]fter the government closes its evidence . . . , the court on

23   defendant's motion must enter a judgment of acquittal of any offense

24   for which the evidence is insufficient to sustain a conviction."

25   Fed. R. Crim. P. 29(a).  The rule also states that "[t]he court may

26   reserve decision on the motion, proceed with the trial (where the

27   motion is made before the close of all evidence), submit the case to

28   the jury, and decide the motion either before the jury returns a

2

GER000297

1  verdict or after it returns a verdict of guilty . . . ."  Fed. R.

2  Crim. P. 29(b).

3       In ruling on a Rule 29 motion, the question is "whether 'after

4  viewing the evidence in the light most favorable to the prosecution,

5  *any* rational trier of fact could have found the essential elements of

6  the crime beyond a reasonable doubt.'"  <u>United States v. Nevils</u>, 598

7  F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (quoting <u>Jackson v.</u>

8  <u>Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original)).  The

9  court must also bear in mind that "it is the exclusive function of

10  the jury to determine the credibility of witnesses, resolve

11  evidentiary conflicts, and draw reasonable inferences from facts."

12  <u>United States v. Rojas</u>, 554 F.2d 938, 943 (9th Cir. 1977).

13       **B.   THE HOBBS ACT INTERSTATE COMMERCE REQUIREMENT**

14       The Hobbs Act makes it a crime to commit an extortion that "in

15  any way or degree obstructs, delays, or affects commerce or the

16  movement of any article or commodity in commerce."  18 U.S.C. §

17  1951(a) (emphasis added).  The Hobbs Act therefore extends to the

18  full limits of the Commerce Clause.  <u>Stirone v. United States</u>, 361

19  U.S. 212, 215 (1960).  "To establish the interstate commerce element

20  of a Hobbs Act charge, the government need only establish that a

21  defendant's acts had a *de minimis* effect on interstate commerce."

22  <u>United States v. Lynch</u>, 437 F.3d 902, 908 (9th Cir. 2006).  The

23  effect may be established "by showing either that the crime had a

24  direct effect or an indirect effect on interstate commerce."  <u>Lynch</u>

25  437 F.3d at 916.  Indirect effects on interstate commerce include

26  "depletion of assets," in which the "depletion of the resources of

27  the business . . . permits the reasonable inference that its

28  operations are obstructed or delayed."  <u>Lynch</u>, 437 F.3d at 910.  For

3

GER000298

direct effects, "there is no intervening step nor intermediate effect." United States v. Mattson, 671 F.2d 1020, 1028 (7th Cir. Cir. 1982).  The effect on interstate commerce need not necessarily be negative.  United States v. Ambrose, 740 F.2d 505, 512 (7th Cir. 1984).

The Ninth Circuit has observed that "[t]his court has consistently upheld convictions under the Hobbs Act even where the connection to interstate commerce was slight." United States v. Atcheson, 94 F.3d 1237, 1243 (9th Cir. 1996) (quotation marks and citation omitted).

## C.   CONSTRUCTIVE POSSESSION

Constructive possession consists of "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the firearms." United States v. Vasquez, 654 F.3d 880, 885 (9th Cir. 2011). Possession does not require "proof of exclusive actual possession." United States v. Soto, 779 F.2d 558, 560 (9th Cir. 1986).  Instead, constructive possession requires only proof of "knowing dominion and control." United States v. Valentin, 569 F.2d 1069, 1071 (9th Cir. 1978) (affirming a defendant's constructive possession of cocaine once an associate consigned the contraband to the defendant at an air freight terminal).  The government may demonstrate the required knowledge and intent through circumstantial evidence. Vasquez, 654 F.3d at 885.

## III.  ARGUMENT

### A.   THE EVIDENCE IS SUFFICIENT TO ESTABLISH A DE MINIMIS EFFECT ON INTERSTATE COMMERCE

Count 4 charges defendants DARBINYAN and SHAROPETROSIAN with

4

GER000299

Hobbs Act Extortion Conspiracy; Count 5 charges DARBINYAN AND
SHAROPETROSIAN with substantive Hobbs Act Extortion.  While defendant
complains that the evidence is insufficient to show a *de minimis*
effect on interstate commerce, there is, to the contrary, sufficient
evidence to establish such an effect.  The jury received evidence
that:

- The victim sent money at the direction of SHAROPETROSIAN
  using the money transfer companies MoneyGram and Western
  Union.  SHAROPETROSIAN stated: "You will send it to BUKAR
  [PH]. 125 dollars over there.  Do these with Money Gram."
  (Ex. 88A at 6);

- Both MoneyGram and Western Union engage in business both
  nationally and internationally.  (Testimony of witnesses
  Lozano and Carter);

- The victim paid fees in order to transfer money to
  individuals at the direction of SHAROPETROSIAN.  (Exs. 281-
  284);

- Receipts showed that funds transferred in the MoneyGram
  transfers amounted to $3,374, and the fees paid for making
  those transfers amounted to $244.  (Exs. 281, 283);

- One of the MoneyGram transfers was a $499 transfer, with a
  transaction fee of $37, from a location in North Hollywood,
  California, across state lines, to a MoneyGram agent in
  Bullhead City, Arizona.  (Id.);

- Receipts showed that funds transferred in the Western Union
  transfers amounted to $2,860, and the fees paid for making
  those transfers amounted to $270. (Exhibits 282, 284); and

- SHAROPETROSIAN was aware of the fees charged: "You will

5

1    probably need a few hundred dollars to deliver everything."

2         (Ex. 83A).

3         The jury also received evidence from which it could infer that

4    the extortion of the victim was a business shakedown, whether of a

5    legal or an illegal business.  See United States v. Ostrander, 411

6    F.3d 684, 692 (6th Cir. 2005) (de minimis effects on interstate

7    commerce can arise from both legal and illegal businesses).  The jury

8    heard that:

9    • Defendants SHAROPETROSIAN and DARBINYAN were aware that the

10        victim was involved in a medical clinic business (Ex. 70A at

11        4);

12   • Defendants SHAROPETROSIAN and DARBINYAN extorted the victim

13        knowing of and relying on his business endeavors to pay the

14        extortion.  DARBINYAN said "He [M.M.] said he has two other

15        opportunities he is working on and he will take me with him

16        and have it signed and you will see.  I said okay bro . . .

17        He said, 'I have a clinic.'  I told him 'That's even better

18        bro.'" (Ex. 73A at 5);

19   • Defendants SHAROPETROSIAN and DARBINYAN planned to interfere

20        directly with the victim's business.  SHAROPETROSIAN stated:

21        "Looks like we need to take the clinic and other things away

22        from him." (Ex. 73A at 5);

23   • The extortion victim was attempting to pay or was paying

24        funds using proceeds from an illegal prescription business;

25   • The victim was using clinic resources in an attempt to pay

26        the extortion.  DARBINYAN stated: "He brought his clinic

27        check.  He says there is 4,200 in there . . . ." (Ex. 75A at

28        2);

6

GER000301

1   • The victim was directed to get the funds to pay the extortion

2       from his partner, including from a loan.  SHAROPETROSIAN

3       stated: "Call your partner and tell him to get it from his

4       home, to get it from his wife's credit card . . . To get it

5       from his kid's loan . . . Business or student loan . . . I

6       don't give a fuck! Don't come without money, friend." (Ex.

7       74A at 6);

8       The wire transfers and the evidence regarding the sources of the

9   funds used to pay the extortion, as well as the impact that the

10  threats themselves had in altering the victim's business affairs, are

11  sufficient evidence from which a jury could infer that there was a *de*

12  *minimis* effect, whether direct or indirect, on interstate commerce,

13  thereby satisfying that element of Extortion and Extortion

14  Conspiracy.[2]   Defendant DARBINYAN's motion on Counts 4 and 5 should

15  therefore be denied.

16      **B.   THE EVIDENCE IS SUFFICIENT TO ESTABLISH DARBINYAN'S
            CONSTRUCTIVE POSSESSION OF THE COUNT 128 FIREARMS**

17

18      Count 128 charges that defendant DARBINYAN unlawfully possessed

19  three firearms: a 9mm semiautomatic handgun, an IntraTec .22 caliber

20  semiautomatic firearm, a .38 caliber Smith & Wesson hammer-less

21  revolver, and 11 rounds of .22 caliber ammunition.  The jury heard

22  evidence that is sufficient for a rational trier of fact to conclude

23  that DARBINYAN had the necessary knowledge and intent to exercise

24  dominion and control over these firearms:

25      • In a call recorded on November 23, 2009, at 11:27 a.m.,

26      [2] Moreover, with regard to the extortion conspiracy charged in
    Count 4, no actual effect on interstate commerce is required.  United
27  States v. Bagnariol, 665 F.2d 877, 895-96 (9th Cir. 1981)(holding
    that where objective acts corroborate the necessary criminal intent,
28  impossibility is no defense to a Hobbs Act charge).

7

GER000302

1      Miguel Ramirez tells DARBINYAN that he had "got you more of

2      those things bro" and DARBINYAN asks "Okay, can we see it?"

3      (Ex. 113A.)  The two agree to meet.  (<u>Id.</u>)

4    • In a call recorded at 11:40 a.m. the same day, DARBINYAN

5      tells Arthur Pembejian that one of the firearms is "a

6      handheld thing, that's missing the thing on the back." (Ex.

7      114A.)  DARBINYAN then says that "We'll just go over there

8      and take a look." (<u>Id.</u>)  DARBINYAN is seen entering a

9      marijuana dispensary at the corner of Sunset Boulevard and

10     Hobart Boulevard at approximately 12:30 p.m.  Miguel Ramirez

11     is also observed leaving the location at approximately the

12     same time. (Testimony of law enforcement officers.)

13    • On November 24, 2009 at 10:43 a.m., DARBINYAN is asked by

14     Gevork Kasabyan, the owner of the marijuana dispensary, if

15     DARBINYAN "could . . . send someone here to pick that up?"

16     (Ex. 116A.)  DARBINYAN responds: "Yeah, of course bro.  I'll

17     come and pick it up, bro." (<u>Id.</u>)

18    • And on November 24, 2009 at 12:05 p.m., DARBINYAN speaks by

19     phone with Souren Serobyan.  DARBINYAN asks Serobyan: "When

20     you meet with Kaj, are you going to take it very far?"

21     Serobyan replies: "No my brother, I will take it to our yard.

22     I have a car parked over there, my friend.  I will put it in

23     that car's trunk and it will stay there." (Ex. 118A.)

24    • Serobyan was subsequently arrested and taken to the location

25     of the Mercedes Benz containing the three firearms.

26     DARBINYAN is observed driving by the location during the

27     arrest and search. (Testimony of law enforcement officers.)

28  This is evidence from which a rational juror could conclude that

GER000303

1   DARBINYAN, who had said "I'll come and pick it up," and who had

2   discussed with his associate Serobyan where the firearms would be

3   taken, had the knowledge and intent to control these firearms and the

4   associated ammunition, thereby satisfying the possession element of

5   the charged offense.  Defendant DARBINYAN's motion on Count 128

6   should therefore be denied.

7       **C.   THE EVIDENCE IS SUFFICIENT TO ESTABLISH PARSADANYAN'S
             CULPABILITY FOR ACCESS DEVICE FRAUD CONSPIRACY, BANK FRAUD,
8            AND AGGRAVATED IDENTITY THEFT**

9       Defendant PARSADANYAN is charged as follow:

10      Counts 38-41, 44-45, 48, 50-51, 54, 57, 60, 63, and 66 charge

11  PARSADANYAN with Bank Fraud, in violation of Title 18, United States

12  Code, Section 1344.

13      Count 69 charges PARSADANYAN with Access Device Fraud

14  Conspiracy, in violation of Title 18, United States Code, Section

15  1029.

16      Counts 71-73, 77, 79-81, 84, 87, 91, and 93 charge PARSADANYAN

17  with Aggravated Identity Theft, in violation of Title 18, United

18  States Code, Section 1028A.

19      The elements of Bank Fraud are:

20      First, the individual knowingly executed a scheme to defraud a

21  financial institution;

22      Second, the fraudulent scheme was material; that is, it had a

23  natural tendency to influence, or was capable of influencing, a

24  financial institution to part with money or property;

25      Third, the individual did so with the intent to defraud; and

26      Fourth, the financial institution was federally insured.

27  See 18 U.S.C. § 1344(1); United States v. Rizk, 660 F.3d 1125, 1135

28  (9th Cir. 2011).

GER000304

1     The elements of Access Device Fraud Conspiracy are:

2     First, from at least in or around July 2009, and continuing to

3 in or around August, there was an agreement between two or more

4 persons to:

5     - knowingly and with intent to defraud produce, use, or traffic

6         in one or more counterfeit access devices; or

7     - knowingly and with intent to defraud possess fifteen or more

8         devices which are counterfeit or unauthorized access devices;

9         or

10    - knowingly, and with intent to defraud, produce, traffic in,

11        have control or custody of, or possess device-making

12        equipment;

13    Second, the individual became a member of the conspiracy knowing

14 of at least one of its objects and intending to help accomplish that

15 object.

16 See 18 U.S.C. § 1029(b)(2); 18 U.S.C. § 1029(a)(1,3-4); Ninth Circuit

17 Model Criminal Jury Instructions, No. 8.20 (2014 ed.).

18    The elements of Aggravated Identity Theft are:

19    First, the defendant knowingly transferred, possessed, or used

20 without legal authority a means of identification of another person;

21    Second, the defendant knew that the means of identification

22 belonged to a real person; and

23    Third, the defendant did so during and in relation to Bank Fraud

24 or Access Device Fraud Conspiracy.

25 See Ninth Circuit Model Criminal Jury Instructions, No. 8.83 (2014

26 ed.).

27    The evidence at trial satisfied all of the above-listed

28 elements.  At trial, the government proved that PARSADANYAN was part

10

GER000305

of a fraud scheme and access-device conspiracy targeting customers of the 99 Cents Only Stores.  In short, the evidence showed that the scheme and conspiracy involved stealing customers' debit/credit card numbers (access devices) using skimming devices inside tampered point-of-sale terminals, creating counterfeit and unauthorized access devices using the skimmers, and then using the counterfeit and unauthorized access devices to steal the victims' money at ATMs throughout Southern California.

Defendant PARSADANYAN actively participated in the scheme.  In wiretap calls, PARSADANYAN discussed the scheme with co-defendant MHER DARBINYAN, who was deeply involved in the scheme.  Among other things, on July 18, 2009, PARSADANYAN told DARBINYAN that organizers of runners, including co-defendant Khachatur Arakelyan, had gone to "greet" (meaning come back with money), and that they had retrieved criminal proceeds from "the day and night," referring the practice of fraudsters of taking a customer's daily maximum withdrawal before midnight and after midnight, in order to steal as much money as possible. (Ex. 149.)  On August 8, 2009, PARSADANYAN told DARBINYAN that co-defendant Arakelyan had brought "30 . . . large" in criminal proceeds. (Ex. 166.)  On August 28, 2009, PARSADANYAN told DARBINYAN that co-defendant Arakelyan had brought "10 and nine" ($10,900) in criminal proceeds, and that Arakelyan still had fraudulent access devices in his possession. (Ex. 173.)  And, on September 4, 2009, PARSADANYAN told DARBINYAN that co-schemer Hagop Simitian had brought a total of $9,500 in criminal proceeds, and had "took out 1900," which was precisely the 20% commission fee that DARBINYAN stated in other calls was the portion of criminal proceeds for the organizers of runners. (Ex. 180.)

11

1    Further, on July 18, 2009, PARSADANYAN, after having met with

2    DARBINYAN at his store in Glendale, California, was stopped by

3    officers and found in possession of a white IKEA bag containing

4    $34,000 in cash.  There was a call before the seizure in which

5    DARBINYAN told PARSADANYAN "There are things that I need to give

6    you and stuff."  (Ex. 155.)  DARBINYAN also told co-defendant

7    Raymond Tarverdyan (one of the individuals responsible for installing

8    skimming devices at 99 Cents Only Stores, "How should I do those? . .

9    . I'll have Rafo . . . so he drives, so I don't take it on me."

10   (Ex. 156.)  During the time of the traffic stop, Tarverdyan

11   complained to DARBINYAN, "This guy is not here . . . he said he would

12   be here in 15 minutes . . . half an hour passed," and DARBINYAN

13   assured him, "He was at the store.  Probably somebody . . . came to

14   the store, that is why."  (Ex. 157.)  By 10:20 p.m., after

15   PARSADANYAN was released by officers, Tarverdyan called DARBINYAN to

16   say the money had arrived:  "That matter is a touch down . . . he

17   came, it's a touchdown . . . They had stopped him, but it's all ok."

18   (Ex. 160.)

19   With regard to the Bank Fraud elements, the scheme was designed

20   to defraud financial institutions (Element 1), the scheme was

21   material, in that it, in fact, caused banks and credit unions to part

22   with money (Element 2), the defendants acted with the intent to

23   defraud (Element 3), and the banks and credit unions were financially

24   insured (Element 4).

25   With regard to the Access Device Fraud Conspiracy elements,

26   there was an agreement to commit various types of access device fraud

27   with regard to the customers of 99 Cents Only Stores (Element 1), and

28   PARSADANYAN, through his conduct, became a member of the agreement

GER000307

1   (Element 2).

2        With regard to the Aggravated Identity Theft elements,

3   PARDADANYAN himself transferred or possessed a means of

4   identification of another person, or aided and abetted that

5   transfer or possession (Element 1), PARSADANYAN knew the account

6   numbers and PINs that were being transferred or possessed belonged

7   to real people, since only real people possess money in their bank

8   accounts (Element 2), and the transfer or possession of those means

9   of identification was during and in relation to Bank Fraud or Access

10   Device Fraud Conspiracy (Element 3).

11        As such, PARSADANYAN's motions should be denied.

12   **IV.**   **CONCLUSION**

13        For foregoing reasons, the government respectfully requests that

14   the Court deny defendants' motions for judgment of acquittal in their

15   entirety.

GER000308

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| Case No. | CR 11-00072-RGK | | Date | April 14, 2014 |
|---|---|---|---|---|

| Present: The Honorable | R. Gary Klausner |
|---|---|
| Interpreter | N/A |

| Not present | Not present | E. Martin Estrada |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 1) Mher Darbinyan | | x | | 1) Michael V. Severo | | | x |

**Proceedings:** Minute Order re: Defendant's Motion for Judgment of Acquittal (DE 3139)

On January 26, 2011, defendant Mher Darbinyan ("Darbinyan") and 67 other defendants were charged in a 140-count indictment. In the First Superseding Indictment, Darbinyan is joined in 63 of the 140 counts. Following the government's presentation of its case in chief, Darbinyan filed a Motion for Judgment of Acquittal on counts 4, 5, and 129 on April 7, 2014. Defendant Arman Sharopetrosian joined the Motion on April 10, 2014.

Rule 29 of the Federal Rules of Criminal Procedure provides that

(a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

In Counts 4 and 5, the government alleges that Darbinyan and Sharopetrosian conspired to delay, affect, and obstruct commerce, and threatened to harm victim M.M., in violation of the Hobbs Act, 18 U.S.C. § 1951. Defendants contend that the government has not introduced any evidence showing an effect on commerce. The Court disagrees.

"To establish the interstate commerce element of a Hobbs Act charge, the government need only establish that a defendant's acts had a de minimis effect on interstate commerce." *United States v. Lynch*, 437 F.3d 902, 908 (9th Cir. 2006). The effect may be established "by showing either that the crime had a direct effect or an indirect effect on interstate commerce." *Id*. at 916.

The government presented evidence that victim M.M. sent money across state lines at the direction of Sharopetrosian, after receiving what M.M. perceived to be threats from both Darbinyan and Sharopetrosian. This and other evidence was sufficient to support a finding that the conduct alleged affected interstate

GER000309

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

commerce.

Count 129 charges Darbinyan with violation of 18 U.S.C. § 922(g), which provides in pertinent part that "It shall be unlawful for any person–
(1) who has been convicted in any court of, [sic] a crime punishable by imprisonment for a term exceeding one year ... to ... possess in or affecting commerce, any firearm or ammunition ... "

Darbinyan challenges the sufficiency of the evidence as to the element of possession in Count 129. The Court finds that there was sufficient evidence to support a finding that Darbinyan possessed a firearm.

Constructive possession requires "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the firearms." *United States v. Vasquez*, 654 F.3d 880, 885 (9th Cir. 2011). There was sufficient evidence at trial for a jury to conclude that Darbinyan exercised dominion and control over three firearms in November of 2009. There was evidence that the firearms were procured at the direction of Darbinyan. There was evidence that the firearms were placed in the trunk of a car at the direction of Darbinyan, and that Darbinyan knew the location of this car. The Court finds that this and other evidence is sufficient to support a finding that Darbinyan possessed a firearm.
For the above reasons, the Court **DENIES** Defendants' Motion.

### <u>IT IS SO ORDERED.</u>

_____     :  _____

Initials of Deputy
Clerk   mku

1 | CHARLES PEREYRA-SUAREZ
State Bar No. 67106
2 | LAW OFFICES OF CHARLES PEREYRA-SUAREZ
UNION BANK PLAZA
3 | 800 WILSHIRE BLVD., 12TH FLOOR
LOS ANGELES, CALIFORNIA 90017
4 | Tel. (213) 623-5923
cpereyra@cpslawfirm.com
5
Attorneys for Defendant
6 | ARMAN SHAROPETROSIAN

7 | UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
8

9 | UNITED STATES OF AMERICA,        ) CASE NO. CR 11-72-RGK-4
                                    )
10 |              Plaintiff,         ) DEFENDANT ARMAN
                                    ) SHAROPETROSIAN'S MOTION TO
11 |     v.                          ) VACATE JUDGMENT AND FOR NEW
                                    ) TRIAL PURSUANT TO RULE 33 OF THE
12 | ARMAN SHAROPETROSIAN,          ) FEDERAL RULES OF CRIMINAL
                                    ) PROCEDURE
13 |              Defendant.        )
                                    ) Hearing Date: July 28, 2014
14 |                                ) Hearing Time: 10:00 a.m.
    _____) U.S. District Judge R. Gary Klausner
15

16

17 |        Defendant Arman Sharopetrosian, by and through his counsel of record, Charles Pereyra-

18 | Suarez, hereby moves the Court to vacate judgment and for a new trial pursuant to Rule 33 of the

19 | Federal Rules of Criminal Procedure.[1]

20 |        This motion is made on the ground (among other potential grounds to be addressed by all

21 | counsel at the July 28, 2014 motions hearing) that the interests of justice require the requested relief

22 | //

23

24 |        [1]Rule 33 provides as follows: (a) Defendant's Motion. Upon the defendant's motion, the court may vacate
any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court
25 | may take additional testimony and enter a new judgment. (b) Time to File. (1) Newly Discovered Evidence. Any
motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or
26 | finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court
remands the case. (2) Other Grounds. Any motion for a new trial grounded on any reason other than newly
27 | discovered evidence must be filed within 14 days after the verdict or finding of guilty.

28 |        By Stipulation and Order (Document 323), the deadline for submission of Rule 33 motions in this case been
extended to June 2, 2014.

**DEFENDANT ARMAN SHAROPETROSIAN'S MOTION TO VACATE JUDGMENT AND FOR NEW
TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**
1

GER000311

because the Government's evidence presented at trial was insufficient to sustain the April 17, 2014 guilty verdicts returned by the jury against Mr. Sharopetrosian on Counts 1, 4 and 5.[2]

As argued by Mr. Sharopetrosian's counsel to the jury in closing argument on April 11, 2014, the Government did not establish beyond a reasonable doubt that Mr. Sharopetrosian was a member of any racketeering conspiracy alleged in Count One. For example, no credible evidence was presented that Mr. Sharopetrosian was a member of any Armenian Power organization or even a related gang. There was no evidence that Mr. Sharopetrosian had any gang tattoos or any Armenian Power leadership role; his name was not found on any gang roster or Armenian Power organizational chart that was presented to the jury. There was no credible evidence that Mr. Sharopetrosian personally engaged in bank fraud, identity theft, access device fraud or drug trafficking activities. Similarly, there was no credible evidence that Mr. Sharopetrosian personally had anything to do with 99 Cent Store activities, or with the Chicken House or Gambling House events, or that any of his personal conduct benefitted any organized crime organization. In fact, Mr. Sharopetrosian was locked up in the Avenal State Prison for the entire time that these alleged organized crime activities took place.

With respect to the extortion-related allegations in Counts Four and Five, as argued to the jury by counsel for Messrs. Sharopetrosian and Darbinyan on April 11, 2014, there was no credible evidence that the $95,000 loan made by Mr. Sharopetrosian's sister-in-law to alleged victim MM was anything other than a personal loan transaction. In short, this loan did not pertain to any Armenian Power, criminal enterprise or gang business of any kind. Moreover, the alleged "interstate commerce" connection relating to this loan was tenuous at best.[3]

//

//

//

---

[2] Mr. Sharopetrosian also joins in the Rule 33 motion papers to be filed by counsel for co-defendant Mher Darbinyan insofar as those motion papers address the jury verdicts relating to Counts 1, 4 and 5.

[3] Mr. Sharopetrosian previously joined in the Rule 29 motion papers filed by counsel for co-defendant Darbinyan, arguing (among other things) that the Government had not established the required interstate commerce connections as to Counts 4 and 5. Mr. Sharopetrosian again joins in those arguments for purposes of the Rule 33 motions to be heard on July 28, 2014.

**DEFENDANT ARMAN SHAROPETROSIAN'S MOTION TO VACATE JUDGMENT AND FOR NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

2

GER000312

1       Accordingly, the Court should grant Mr. Sharopetrosian's Rule 33 motion as to Counts 1,

2  4 and 5 -- the only counts involving Mr. Sharopetrosian.

3                        Respectfully submitted,

4  DATE: May 30, 2014            LAW   OFFICES OF CHARLES PEREYRA-

5                           SUAREZ

6

7                 By     /S/ Charles Pereyra-Suarez
                       Charles Pereyra-Suarez

8                       Attorneys for Defendant
                       ARMAN SHAROPETROSIAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT ARMAN SHAROPETROSIAN'S MOTION TO VACATE JUDGMENT AND FOR NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

GER000313

Andrew Reed Flier, Esq.
California State Bar No. 137372
Theodore S. Flier, Esq.
California State Bar No. 23734
FLIER AND FLIER
16133Ventura Boulevard, Suite 1160
Encino, California 91436
Tel: (818) 990-9500
Fax: (818) 990-1303
Attorneys for Defendant
RAFAEL PARSADANYAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 11CR00072-RGK-35 |
| Plaintiff, | DEFENDANT RAFAEL PARSADANYAN'S MOTION FOR **NEW TRIAL** (RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| v. | |
| RAFAEL PARSADANYAN, | |
| Defendant. | |
| | DATE: July 28, 2014 |
| | TIME: 10:00 A.M. |
| | PLACE: Courtroom 850 |

The Honorable R. Gary Klausner

**TO: ANDRE BIROTTE JR., UNITED STATES ATTORNEY; AND TO MARTIN ESTRADA, ELIZABETH YANG AND ANDREW CREIGHTON, ASSISTANT UNITED STATES ATTORNEYS:**

**TO: THE CLERK OF THE COURT**

Defendant Rafael Parsadanyan, by and through his counsel of record, moves the Court to vacate judgment and for a **New Trial** pursuant to **Rule 33(a)** of the **Federal Rules of Criminal Procedure**. This motion is made on the grounds that the interests of justice require a **New Trial** in this matter because the inclusion of Mr. Parsadanyan in this trial with the co-defendants, and the introduction of certain prejudicial evidence, deprived Mr. Parsadanyan of his constitutional right to a fair trial.

MOTION FOR NEW TRIAL

GER000314

1    This motion is based on the Memorandum in Support of the Motion for New Trial, on the

2    records and files in this case, and on such further matters as may be presented at the hearing on

3    this motion.

4    DATED: May 21, 2014                                FLIER AND FLIER
                                                        A Law Corporation
5

6                                                       By: /s/ Andrew Reed Flier
                                                           ANDREW REED FLIER
7                                                          Attorney for Defendant
                                                           RAFAEL PARSADANYAN
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GER000315

1

<div align="center">**TABLE OF CONTENTS**</div>

2  **I.      INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3  **II.     STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4  **III.    RELEVANT PROCEDURAL HISTORY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5  **IV.     LEGAL STANDARD**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6  **V.      ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7       **A.     Mr. Parsadanyan Was Denied His Due Process Rights under the Sixth and**

8              **Fourteenth Amendments of the U.S. Constitution When His Motion to Sever**

9              **Was Denied**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10      **B.     There Was Insufficient Evidence Presented at Mr. Parsadanyan's Trial to Be**

11             **"Firmly Convinced" to Convict Mr. Parsadanyan of the Bank Fraud**

12             **Charges "Beyond a Reasonable Doubt**. . . . . . . . . . . . . . . . . . . . . . . . . . 11

13      **C.     Federal Rules of Evidence § 403 Mandates the Exclusion of Evidence If its**

14             **Probative Value Is Substantially Outweighed by the Danger of Unfair**

15             **Prejudice**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16      **D.     The Court Should Not Have Allowed the Taped Statements to Be Introduced**

17             **into Mr. Parsadanyan's Trial**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18  **VI.     CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19

20

21

22

23

24

25

26

27

28

GER000316

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Your Honor should grant a **New Trial** for Defendant Rafael Parsadanyan because several errors occurred during Mr. Parsadanyan's jury trial. These errors include lack of proof, errors in certain evidentiary rulings, repeated prejudicial questions by the Government, after rulings were sustained, and guilt by association which in total denied Mr. Parsadanyan of a fair trial. However, and most importantly, the case against Mr. Parsadanyan should have been **severed** from the beginning. Clearly, guilty by association and weeks of irrelevant and prejudicial trial evidence **severely impacted** Mr. Parsadanyan from receiving a fair trial.

In addition, the Court's admission of prejudicial and inadmissible evidence over defense objection also warrants a **New Trial**. As an example, untrustworthy audio recordings were played before the jury. These tapes unfairly implicated Mr. Parsadanyan and, if Mr. Parsadanyan was tried alone, were taken completely out of context. Further, certain questions and subject matters were objected to and granted, but the evidence was still improperly introduced to the jury by the repetitive and improper questioning by the Government. This even after being directed to proceed by Your Honor on more than one occasion.

The **totality of these errors** undoubtedly prejudiced Mr. Parsadanyan's right to a fair trial. As will be explained in more detail below, this motion should be granted and a **New Trial ordered**.

### II

### STATEMENT OF THE CASE

The Indictment, and the First Superseding Indictment in this case, charged defendants MHER DARBINYAN ("DARBINYAN"), ARMAN SHAROPETROSIAN ("SHAROPETROSIAN"), and MR. PARSADANYAN with certain violations of Federal Law.

The Indictment charged defendants DARBINYAN AND SHAROPETROSIAN with one count of illegally agreeing to conduct and participate in the illegal activities of a criminal enterprise through a pattern of racketeering activity. In addition, DARBINYAN AND

GER000317

1   SHAROPETROSIAN were also charged with two counts of being members of a conspiracy to

2   extort, and in fact extorting money from victim "M.M." by threatening physical violence to

3   victim "M.M." and victim "M.M.'s" family.

4       The Indictment also charged defendant DARBINYAN with several counts involving the

5   creation and execution of a bank fraud scheme between July 2008 and December 2010, and

6   January 2009, through April 2009.  Further, DARBINYAN was charged with two counts of

7   being a felon in possession of firearms.

8       Finally, the Indictment charged defendants DARBINYAN and <u>PARSADANYAN</u> with

9   several counts of executing a bank fraud scheme between July 2009 and August 2009.  In

10  addition, several counts of aggravated identity theft were charged and there was one count of

11  access device fraud conspiracy charged.  Your Honor heard the trial and ruled upon the

12  evidentiary rulings.  Therefore, a complete recitation of the facts is not necessary unless Your

13  Honor directs counsel to do so.

14                          **III.**

15              **RELEVANT PROCEDURAL HISTORY**

16      The Indictment (hereafter "Indictment") in this case was filed on January 26, 2011, and

17  charged Mr. Parsadanyan with 25 counts collectively of bank fraud, and aggravated identity theft,

18  and one count of possessing access devices.  In the First Superseding Indictment ("FSI"), Mr.

19  Parsadanyan was charged in counts 38-68, 69 and 71-95.

20      Mr. Parsadanyan's trial in this case commenced on March 25, 2014.  Prior to trial, the

21  Government and the defense filed various motions *in limine*.  Specifically, the defense on behalf

22  of Mr. Parsadanyan filed a motion *in limine* to **sever** Mr. Parsadanyan's case from that of the co-

23  defendants.  In addition, Mr. Parsadanyan filed a motion to exclude the tape recordings and their

24  associated transcripts from certain wiretap intercepted calls.

25      The recordings were problematic and untrustworthy for many reasons.  The

26  Government's transcripts of the recordings are taken out of context, inaudible in certain areas and

27  are vague.  Further, some of these same taped calls improperly identified Mr. Parsadanyan as

28  making incriminating ("coded") statements even though the audio recordings are unclear in

1    certain areas and, as stated, seem to be taken out of context.  Notwithstanding the inherent

2    unreliability of the recordings, the defense motion was denied.

3         The trial witnesses for the Government in this case included the investigating FBI agent,

4    Informants, Federal Agents, various "GPD" police officers, Bank Representatives and various

5    Banking Victims.  The victims testified that the fraud presented as to the **99 Cent Store** matter

6    alone had a **total loss of approximately of $7,000 - 8,000 dollars**.

7         Three of the four weeks of this trial had **<u>nothing</u>** to do with Mr. Parsadanyan.  However,

8    there was a tremendous amount of voluminous and repetitive information pertaining to the

9    nefarious conduct of both DARBINYAN and SHARPETIYAN.

10        On April 17, 2014, after almost four days of deliberations and certain questions, the jury

11   found Mr. Parsadanyan guilty on the bank fraud counts alone.  Mr. Parsadanyan was found **<u>not</u>**

12   guilty of the remaining counts which related to both the aggravated identity fraud contentions and

13   the access device fraud conspiracy charge.

14   **IV.**

15   **LEGAL STANDARD**

16        Under <u>Federal Rule of Criminal Procedure 33</u>, a "court may vacate any judgment and

17   grant a new trial if the interest of justice so requires." [<u>Fed. R. Crim. P. 33(a)</u>.] "A district court's

18   power to grant a motion for new trial is much broader than its power to grant a motion for

19   judgment of acquittal. . ." [<u>United States v. Inzunza</u>, 638 F.3d 1006, 1026 (9th Cir. 2009) (internal

20   citations and quotations omitted).] In a motion for new trial setting, a district court "need not

21   view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so

22   doing evaluate for itself the credibility of the witnesses." [<u>United States v. Kellington</u>, 217 F.3d

23   1084, 1095 (9th Cir. 2000) (internal citations and quotations omitted).]

24   ///

25   ///

26   ///

27   ///

28   ///

MOTION FOR NEW TRIAL
- 6 -

<center>V.</center>

<center>ARGUMENT</center>

**A.**   **MR. PARSADANYAN WAS DENIED HIS DUE PROCESS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN HIS MOTION TO "SEVER" WAS DENIED**

At first, it was Mher Darbinyan whom was the target of this 140 count Indictment.  Mr. Darbinyan was believed to be one of the prime leaders of the dangerous "Armenian Power" ("AP") Gang.  And, in addition to being heavily involved in white collar offenses, it was believed, and a known fact, that the "AP" Gang possessed firearms, committed kidnappings and dealt in extortion threats.  Finally, that the "AP" Gang was affiliated with and loyal to the extremely dangerous prison gang the "Mexican Mafia".

This case was investigated primarily by the "FBI" and the Eurasion Organized Task Force ("EOCTF").  The investigation as to Mr. Darbinyan commenced in 2006 and originally was predicated upon interviews with informants.  In 2009, the Government applied for and obtained wiretap orders to record the conversations of twenty-five (25) "Target Telephones".  There were sixteen (16) different wiretap applications.

Mr. Parsadanyan was <u>not</u> charged in either Indictment with the racketeering offenses, nor any conspiracy acts related to those serious offenses.  However, Mr. Parsadanyan was charged in counts 38-68, 69 and 71-95.  These counts encompassed alleged bank fraud, aggravated identity theft and access device fraud.

Mr. Parsadanyan filed a motion for severance [cr 2967].  This critical motion was denied.  However, now it has become even more crystal clear that Mr. Parsadanyan did <u>not</u> receive a fair trial by being joined in with the other two co-defendants in this matter.

**1.**   **LAW**

Federal Rule of Criminal Procedure 8 ("Rule 8") governs the joinder of defendants and counts in multi-defendant cases.  Rule 8 provides that an indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." [Fed. R. Crim. P. 8(b)].  Rule 8

<center>MOTION FOR NEW TRIAL</center>

GER000320

1   further provides that "defendants may be charged in one or more counts together or separately,"

2   and that "[a]ll defendants need not be charged in each count." [Id.]

3         The determination of whether counts are properly joined in the same indictment should be

4   based only on the allegations of the indictment, and not extrinsic evidence. [See United States v.

5   VonWillie, 59 F.3d 922, 929 (9th Cir. 1995.  In determining whether the offenses are based on

6   the same transaction, " 'transaction' is to be interpreted flexibly and may comprehend a series of

7   related occurrences." [United States v. Terry, 911 F.2d 272, 276 (9th Cir. 1990) (internal

8   quotation marks omitted).  The phrase "common scheme or plan" requires only that the counts "

9   'grow out of related transactions,'" [United States v. Jawara, 474 F.3d 565, 574 (9th Cir. 2007)

10  (quoting United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996)], or that " 'proof of the one

11  act either constituted or depended upon proof of the other.'" [Id.] and severance is disfavored.

12  The Supreme Court has explained: "There is a preference in the federal system for joint trials of

13  defendants who are indicted together." [Zafiro v. United States, 506 U.S. 534, 537 (1993).] Joint

14  trials promote efficiency and "serve the interests of justice by avoiding the scandal and inequity

15  of inconsistent verdicts." [Id.] [internal citation omitted].  Therefore, "Rule 8(b) is construed

16  liberally in favor of joinder." [United States v. Sarkisian, 197 F.3d 966, 975 (9th Cir. 1999); see

17  also United States v. Jenkins, 633 F.3d 788, 807 (9th Cir. 2011) (a joint trial is "particularly

18  appropriate" where defendants are charged with conspiracy).

19        Severance of defendants is governed by Federal Rule of Criminal Procedure 14 ("Rule

20  14").  Rule 14 provides: "If the joinder of offenses or defendants in an indictment . . . appears to

21  prejudice a defendant . . . the court may . . . sever the defendant's trials, or provide any other

22  relief that justice requires." [Fed. R. Crim. P. 14(a)].  Prejudice is a main consideration in

23  deciding severance.  Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district

24  court's sound discretion." [Zafiro, 506 U.S. at 538-39].  Severance is the proper remedy "only if

25  there is a serious risk that a joint trial would compromise a specific trial right of one of the

26  defendants, or prevent the jury from making a reliable judgment about guilt or innocence." [Id. at

27  539].

28        The Ninth Circuit has stated that the "primary consideration" in evaluating the risk of

MOTION FOR NEW TRIAL

- 8 -

1   prejudice is "whether the jury can reasonably be expected to compartmentalize the evidence as it

2   relates to separate defendants, in view of its volume and the limited admissibility of some of the

3   evidence." [United States v. Lazarenko, 564 F.3d 1026, 1043 (9th Cir. 2009) (quotations and

4   citations omitted).  The jury's ability to compartmentalize the evidence is a function of the nature

5   of the evidence.  [See Schaffer v. United States, 362 U.S. 511, 515 (1960)].

6        The Ninth Circuit has also stated that in considering a request for severance under Rule

7   14, consideration must be given to judicial economy.  [United States v. Polizzi, 801 F.2d 1543,

8   1553 (9th Cir. 1986).  Courts should balance whether the claimed prejudice is "sufficiently severe

9   to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."

10  [United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984).]

11       **Finally, severance is appropriate "if the spillover prejudice is 'manifestly**

12  **prejudicial.'" [United States v. Hanley, 190 F.3d 1017, 1028 (9th Cir. 1999)**.

13       Mr. Parsadanyan, through counsel, originally objected to being tried together with the co-

14  defendants.  In addition, at least **3x**, the defense renewed the severance request during the trial

15  proceedings themselves.  The extreme and substantial prejudice existed in this case from the

16  beginning.  And, it clearly carried on throughout Mr. Parsadanyan's jury trial.

17  **2.        EXAMPLES OF THE EXTREME PREJUDICE:**

18       a)   Having Mr. Parsadanyan tried with the co-defendants whom had extensive

19            criminal records, were ex-cons, possessed weapons, involved in gangs and whom

20            committed acts of violence.

21       b)   By having Mr. Parsadanyan linked, in any capacity, with **any** gang association.

22            Mr. Parsadanyan was charged with theft crimes only.  However, instead the jury

23            heard for the first three (3) weeks of the trial about gangs, extortion, shootings and

24            other non-related white collar crimes; until and finally the charged crimes against

25            Mr. Parsadanyan were presented.  Extreme guilt by association was present and

26            crystal clear in this case.  And, no admonition could or did cure this extremely

27            prejudicial affect.

28       c)   By allowing evidence of the July 4th, 2009 alleged kidnapping of "MM" to any

GER000322

relationship with Mr. Parsadanyan. Mr. Parsadanyan had <u>nothing</u> to do with any threats; nor, did he assist anyone in any kidnapping. And, that "MM" knew Mr. Parsadanyan.

d) By allowing evidence relating to "MM" being <u>kidnapped and brought to an office in Glendale</u> after an "AP" Gang member displayed a gun, forced "MM" into a car and then took "MM" to this unknown office.

e) By allowing "MM" to testify and reference a first name "<u>Rafo</u>" during his testimony. And. that "MM" knew Mr. Parsadanyan.

f) By allowing any reference to a <u>money gram</u> being seen/observed in the possession of Mr. Parsadanyan when his vehicle was stopped on July 18, 2009. This money gram was never produced, proved up at trial, nor properly documented. However, there was plenty of testimony about money grams concerning Mr. Darbinyan relating to counts which had <u>nothing</u> to do with Mr. Parsadanyan.

g) <u>By not granting Mr. Parsadanyan's request for a **Mistrial** on the **3** occasions</u> in which improper testimony was elicited and then stricken. However, the prejudicial affect could never have been cured.

h) By allowing the evidence about the "Hazatun" Restaurant shootings in October, 2009. Mr. Parsadanyan had nothing to do with that incident; nor, did Mr. Parsadanyan assist anyone, including Mr. Darbinyan, in getting rid of any tape or associated machinery. This evidence was introduced <u>after</u> the jury heard testimony about the "Chicken" Restaurant incident.

i) By allowing the evidence about the "Chicken" Restaurant incident. This incident was in reality a meeting to show force, intimidate, and to have extreme firing power present. **(Firearms)**.

3. It is critical to also reference that in this case, the jury's verdict was very **<u>inconsistent</u>**. Mr. Parsadanyan was charged with bank fraud, but was <u>acquitted</u> of the associated aggravated identity theft charges. Further, Mr. Parsadanyan was found <u>not</u> guilty of the access device conspiracy charge. <u>Therefore, with three major category of charges facing Mr. Parsadanyan, he</u>

MOTION FOR NEW TRIAL

GER000323

1   was **acquitted** on two of them.  And, two of the major category of charges are directly related to

2   each.

3        As to the bank fraud charges themselves, Mr. Parsadanyan was **seriously prejudiced** by

4   being tried with the co-defendants.  It is clear that the jury could **not de-compartmentalize** the

5   separate counts.  Instead, for the first three weeks of trial, the jury heard testimony about Mr.

6   Darbinyan's bank fraud in another alleged scheme.  The taped wiretap calls in that matter were

7   played first to the jury.  Then, the jury heard believed to be similar type of language (calls) in Mr.

8   Parsadanyan's part of the trial.  However, those calls were not as specific as to Mr. Parsadanyan.

9   **Coincidently**, it was those counts in which Mr. Parsadanyan was solely convicted on.  That is a

10   text book example of the **extreme prejudice** that occurred in this trial.  That is why the

11   **severance** motion should have been granted, even after the jury trial had commenced.

12   **B.**    **THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT MR.**

13       **PARSADANYAN'S TRIAL TO BE "FIRMLY CONVINCED" TO CONVICT MR.**

14       **PARSADANYAN OF THE BANK FRAUD CHARGES "BEYOND A**

15       **REASONABLE DOUBT"**

16        In the case at bar, the evidence fell way short of the legal principles to convict Mr.

17   Parsadanyan of the bank fraud charges "beyond a reasonable doubt."  The **many examples** which

18   demonstrate the complete lack of sufficient evidence to support the verdicts are:

19   1.    No wiretap applications for Mr. Parsadanyan's work, home and/or cell phone records.

20   2.    No search warrant for Mr. Parsadanyan's vehicle, nor place of work at "Cellular

21       Exchange, Inc."

22   3.    No video surveillance of Mr. Parsadanyan doing anything illegal.

23   4.    No money was seized on July 18th in Mr. Parsadanyan's vehicle, nor at his apartment.

24       Further, there was no accounting of the amount of money that was inside Mr.

25       Parsadanyan's vehicle.

26   5.    Mr. Parsadanyan did not live in any fashion an "extravagant" lifestyle.

27   6.    Mr. Parsadanyan is not a gang member, nor an associate gang member.  Mr. Parsadanyan

28       is not in the gang files, and there are no field identification cards documenting Mr.

GER000324

1    Parsadanyan as a gang member or an associate gang member. GPD Detective Quintero,

2    whom was in the Glendale Gang Unit for almost 10 years, testified that he had <u>no</u> idea

3    whom Mr. Parsadanyan was and has never seen Mr. Parsadanyan before.

7.   With all of the Federal and State Government's <u>financial resources</u> utilized in the

5    investigation of this case, there was:

6       a)   <u>No skimmers</u> found near/at Mr. Parsadanyan.

7       b)   <u>No illegal banking/checking accounts or related documentation</u> found near/at Mr.

8            Parsadanyan.

9       c)   <u>Not one bad check</u> was found in the possession of Mr. Parsadanyan.

10      d)   Mr. Parsadanyan did <u>not have one illegal credit card</u> on himself, at work, nor

11           within his vehicle.

12      e)   There was <u>not one photograph of Mr. Parsadanyan with any alleged "runner"</u>.

13      f)   There was <u>not one video clip of Mr. Parsadanyan at any bank or 99 Cent Store</u>.

14      g)   There was <u>no evidence that Mr. Parsadanyan was with Mr. Tarverdyan in the San</u>

15           <u>Fernando Valley in July of 2009</u>; and especially on July 18.

16      h)   As stated, there was <u>not one wiretap call from any of Mr. Parsadanyan's phones</u>

17           produced in this trial. And, the Government was well aware of Mr. Parsadanyan's

18           phone number. [Government Exhibit presented during trial reflecting Mr.

19           Parsadanyan's residence and phone numbers.]

20      I)   There was <u>no</u> evidence presented during the trial pertaining to <u>any shooting at the</u>

21           <u>"Hazatun" Restaurant</u>. The explanation was that it was "too dark."

22      j)   There was a lot of "<u>time gaps</u>" between certain intercepted phone calls.

23      k)   There were <u>no phone "toll" records</u> presented. Most importantly, none on July 18,

24           2009 <u>after</u> 8:00 p.m. Especially, between Mr. Parsadanyan and Raymond

25           Tarverdyan.

26      l)   The percentage numbers relating to the alleged profit in the 99¢ Store fraud just

27           did <u>not</u> match up. Was it 20% or 1/3 of 33%? If you believe the Agent's

28           testimony it was 20%. However, if you believe the informant, it was 11%. That

1   is a big difference.  Further, there was no specific evidence presented that Mr.

2   Parsadanyan received one cent in this matter.

3   m)   There was no evidence presented of any surveillance of Mr. Parsadanyan after the

4   "GPD" stop on July 18, 2009.

5   n)   There was no evidence presented that Mr. Parsadanyan assisted, or even went to

6   the "Hazatun" restaurant to aid Mr. Darbinyan.

7   **C.   FEDERAL RULE OF EVIDENCE § 403 MANDATES THE EXCLUSION OF**

8   **EVIDENCE IF ITS PROBATIVE VALUE IS SUBSTANTIALLY OUTWEIGHED**

9   **BY THE DANGER OF UNFAIR PREJUDICE**

10   Federal Rule of Evidence § 403 states:

11   "Although relevant, evidence may be excluded if its probative value is

12   substantially outweighed by the danger of unfair prejudice, confusion of the

13   issues, or misleading the jury, or by considerations of undue delay, waste of time,

14   or needless presentation of cumulative evidence."

15   In this matter, the Court should have never allowed any evidence of the "Armenian

16   Power" Street Gang to be introduced into Mr. Parsadanyan's trial.  Further, any inflammatory

17   testimony from any "Mexican Mafia" gang members or informants.  The Government wanted to

18   demonstrate and influence the jury with the horrible subject matter of gangs in this case.  It was

19   Mr. Darbinyan whom was associating with "AP" gang members, Russian Gangsters and the

20   "Mexican Mafia" gang.  The extreme "spillover" and its corresponding prejudicial effect about

21   these type of issues was huge in this case.  Anyone associating with Mr. Darbinyan had to be

22   classified as bad and involved in violent and/or and criminal activity with him.

23   In addition, the Court should have never allowed the testimony of any kidnapping of

24   "MM" or any believed to be shooting at the "Hazatun" Restaurant to be introduced during Mr.

25   Parsadanyan's trial.  These subject matters speak for themselves.  Mr. Parsadanyan was clearly

26   denied his right to a fair trial.

27   ///

28   ///

MOTION FOR NEW TRIAL
- 13 -

GER000326

**D.**     **THE COURT SHOULD NOT HAVE ALLOWED THE TAPED STATEMENTS
TO BE INTRODUCED INTO MR. PARSANDYAN'S TRIAL**

Pursuant to a motion in limine, the defense on behalf of Mr. Parsandyan, moved to exclude the taped recorded statements under a number of legal and factual grounds.  The law states that a recording will be excluded if ". . .the unintelligible portions are so substantial that the recording as a whole is untrustworthy." [United States v. Lepez, 976 F.2d 738 (9th Cir. 1992); United States v. Lawe, 514 F.2d 22, 27 (9th Cir. 1975).]

In this case, the translator, Mr. Derpetrossian, was not from Russia; nor raised to speak Eastern Russian dialect.  In addition, Mr. Derpetrossian testified that there are some significant differences between the certain languages involved in this case.  [Russian (v) Eastern Armenian (v) Western Armenian].

Further, that at times there are phrases and words that could not be deciphered as to the taped intercepted calls.  And, that there are slang words that have different meanings.  Even Your Honor asked Mr. Derpetrossian, "sometimes it may or may not make sense," and Mr. Derpetrossian's answer was "yes".

But, and equally as important, is the fact that the subject matters on the tapes are being prodded and told to Mr. Derpetrossian by the Investigating Agents.  Also, whom these same speakers are supposed to be.  Finally, there are unintelligible portions of the recordings as a whole, and their associated transcripts are therefore also untrustworthy.

At trial Mr. Derpetrossian testified:

**Q: "Okay.  And that proper inference is to try to show criminal conduct,
correct?"**

**A: "Well, the agents are looking for incriminating statements.  There's no - -
I mean, we know that." [P. 31, Reporter Transcript].**

Also, there was testimony which demonstrated how the words and contexts could be misinterpreted.

**Q: "And when you testified last time, you do - - do you agree that sometimes
in the Eastern Armenian dialect, words could have different subject**

1    meanings? Does that make sense?

2    A: I don't understand what you mean by "subject meanings."

3    Q: Well, one word could have different meanings.  Does that make sense?

4    A: One word usually has a meaning, and I think that's true with most

5    languages, but some people use some words with different interpretation of

6    their own, what they have in their own mind.  Some people use big words but

7    they have small meanings.  Some people use exaggerated words that, for an

8    American English speaker, may sound like a threat or - - or like a big word,

9    but, in actuality, in there daily vernacular, they use it so often that it's not

10    really a threat.  So there's all kinds of variations." [P. 7, Reporter

11    Transcript].

12

**IV**

13

**<u>CONCLUSION</u>**

14    Accordingly, Your Honor should grant Mr. Parsadanyan's <u>Rule 33</u> motion as to the guilty

15 verdict counts.  The <u>re-trial</u> on this case if Mr. Parsadanyan is tried alone will be less than one

16 week.  The evidence is known and the trial will proceed smoothly.  Counsel urges Your Honor to

17 allow the opportunity to demonstrate that there <u>will be</u> a different result when this New Trial

18 motion is granted.

19 DATED: May 21, 2014           FLIER AND FLIER
                                  A Law Corporation

20

21                                  By: /s/ Andrew Reed Flier
                                    ANDREW REED FLIER

22                                    Attorney for Defendant
                                    RAFAEL PARSADANYAN

23

24

25

26

27

28

GER000328

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
E. MARTIN ESTRADA (Cal. SBN: 223802)
ELIZABETH R. YANG (Cal. SBN: 196461)
Assistant United States Attorneys
ANDREW CREIGHTON (Maryland State Bar Member)
Trial Attorney, U.S. Department of Justice
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3358
     Facsimile: (213) 894-3713
     Email:   Martin.Estrada@usdoj.gov
             Elizabeth.Yang@usdoj.gov
             Andrew.Creighton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | No. CR 11-72(A)-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT MHER DARBINYAN'S MOTION FOR NEW TRIAL |
| v. | |
| MHER DARBINYAN, et al., | |
| Defendant. | |

    Plaintiff, United States of America, by and through its counsel
of record, the United States Attorney's Office for the Central
District of California, hereby files this opposition to defendant
MHER DARBINYAN's Motion for New Trial.  (CR 3298.)

1

GER000329

This motion is based upon the attached memorandum of points and authorities, the complete files and records of this case, any further argument or evidence the Court wishes to consider.

Dated: June 23, 2014                    Respectfully submitted,

                                        ANDRÉ BIROTTE JR.
                                        United States Attorney

                                        ROBERT E. DUGDALE
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                              /s/
                                        _____
                                        E. MARTIN ESTRADA
                                        ELIZABETH R. YANG
                                        Assistant United States Attorney
                                        ANDREW CREIGHTON
                                        Trial Attorney, Department of Justice

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                      PAGE

TABLE OF AUTHORITIES..........................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.   INTRODUCTION.................................................1

II.  ARGUMENT....................................................2

     A.   Legal Standards Under Rule 33.........................2

     B.   The Court Properly Admitted Expert And Lay Opinion
          Testimony Regarding Vague And Coded Language In
          Recorded Telephone Calls..............................3

          1.   The Testimony Was Proper Lay And Expert Opinion......3

          2.   The Court Properly Instructed The Jury On The
               Testimony........................................5

          3.   The Court Exercised Proper Gatekeeping And Was
               Not Required Under Rules 104 And 702 To Conduct A
               Separate Hearing.................................6

          4.   The Law Enforcement Testimony Was Properly
               Disclosed........................................7

     C.   THERE WAS NO ERROR IN THE COURT'S ADMISSION OF CO-
          CONSPIRATOR STATEMENTS................................8

          1.   No Hearing Is Required For The Admission Of Co-
               Conspirator Statements...........................8

          2.   There Was Substantial Evidence Of The Declarants'
               Participation In The Conspiracy . . . . . . . . 8

          3.   The Declarant Was A Target Of The Investigation......9

     D.   The Evidence Was Sufficient On The Extortion Charges9

          1.   There Was Substantial Evidence Of A De Minimis
               Effect On Interstate Commerce.......................10

          2.   There Was Substantial Evidence Of Defendant's
               Participation In The Extortion.......................10

          3.   Victim M.M. Was Credible And Corroborated..........11

          4.   The Jury Was Properly Instructed On California
               Extortion Law, Which Requires No Interstate Nexus...12

i

GER000331

        E.    The Evidence Of Felon-In-Possession Was Sufficient . 13

III. CONCLUSION..................................................... 15

GER000332

1

<h2 style="text-align:center">TABLE OF AUTHORITIES</h2>

2

DESCRIPTION                                                    PAGE

3

Bourjaily v. United States,
      483 U.S. 171 (1987).......................................8, 9

4

5

Crawford v. Washington,
      541 U.S. 36 (2004).........................................9

6

United States v. Alatorre,
7
      222 F.3d 1098 (9th Cir. 2000)..............................7

8

United States v. Alston,
9
      974 F.2d 1206 (9th Cir. 1992)..............................2

10

United States v. Bagnariol,
      665 F.2d 877 (9th Cir. 1981)..............................10

11

12

United States v. Del Toro-Barboza,
      673 F.3d 1136 (9th Cir. 2012)..............................2

13

14

United States v. Freeman,
      498 F.3d 893 (9th Cir. 2007)........................4, 5, 6

15

United States v. Hankey,
16
      203 F.3d 1160 (9th Cir. 2000)..............................7

17

United States v. Jawara,
      474 F.3d 565 (9th Cir. 2007)...............................7

18

United States v. Kellington,
19
      217 F.3d 1084 (9th Cir. 2000)..............................2

20

United States v. Lincoln,
      630 F.3d 1313 (8th Cir. 1980)...........................2, 3

21

22

United States v. Lopez-Martinez,
      543 F.3d 509 (9th Cir. 2008)...............................7

23

United States v. Martinez,
24
      657 F.3d 811 (9th Cir. 2011)............................4, 5

25

United States v. Medrano,
      5 F.3d 1214 (9th Cir. 1993)...............................13

26

27

United States v. Morrison,
28
      529 U.S. 598 (2000)......................................12

<p style="text-align:center">iii</p>

GER000333

United States v. Nungaray,
        697 F.3d 1114 (9th Cir. 2012)................................15

United States v. Pimentel,
        654 F.2d 538 (9th Cir. 1981)............................ 2, 12

United States v. Reed,
        575 F.3d 900 (9th Cir. 2009)................................ 4

United States v. Sanchez,
        969 F.2d 1409 (2d Cir. 1992)................................ 3

United States v. Sherpa,
        97 F.3d 1239 (9th Cir. 1996)................................ 3

United States v. Shirley,
        884 F.2d 1130 (9th Cir. 1989)...............................13

United States v. Shryock,
        342 F.3d 948 (9th Cir. 2004)................................10

United States v. Silverman,
        861 F.2d 571 (9th Cir. 1988)................................ 9

United States v. Simas,
        937 F.2d 459 (9th Cir. 1991)................................ 4

United States v. Steel,
        759 F.2d 706 (9th Cir. 1985)................................ 2

United States v. Valencia Amezcua,
        278 F.3d 901 (9th Cir. 2002)................................ 4

United States v. Vasquez,
        654 F.3d 880 (9th Cir. 2011)...............................14

United States v. Watkins,
        600 F.2d 201 (9th Cir. 1979)................................ 8

United States v. Zemek,
        634 F.2d 1159 (9th Cir. 1980)............................... 8

**FEDERAL STATUTES**

18 U.S.C. § 1962(c)...........................................12

iv

**FEDERAL RULES**

Fed. R. Crim. P. 33(a).......................................... 2

Fed. R. Evid. 104(b)........................................... 8

Fed. R. Evid. 701.............................................. 5

Fed. R. Evid. Rule 104(a)...................................... 8

GER000335

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

On April 17, 2014, a jury convicted defendant MHER DARBINYAN ("defendant") of 57 criminal counts: RICO Conspiracy, in violation of Title 18, United States Code Section 1962(d) (Count 1); Extortion Conspiracy and Extortion, in violation of Title 18, United States Code, Section 1951(a) (Count 4 and Count 5); Bank Fraud, in violation of Title 18, United States Code, Section 1344 (Counts 6-19; 38-41, 44-45, 48, 50-51, 54, 57, 60, 63, 66); Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A (Counts 23-34; 71-73, 77, 79-81, 84, 87, 91, 93); Access Device Fraud Conspiracy, in violation of Title 18, United States Code, Section 1029(b)(2) (Count 69); and Felon-in-Possession of Firearms or Ammunition, in violation of Title 18, United States Code, Section 922(g)(1) (Counts 128-129). These charges arose from defendant's association and work with the Armenian Power criminal enterprise.

On April 9, 2014, defendant DARBINYAN moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on Counts 4, 5, and 129. (See CR 3139.) This Court denied the motion in all respects on April 14, 2014. (See Minute Order Re: Def. Mot. for J. of Acquittal (CR 3164).)

Defendant now moves under Federal Rule of Criminal Procedure 33 for a new trial. In so doing, defendant relies largely upon arguments and objections previously made *in limine*, during trial, and in his motion for a judgment of acquittal. This Court has already considered these claims and has properly denied them. Defendant's new contentions are similarly without merit. Defendant thus fails to show that this is the sort of "exceptional" case in which the

1

GER000336

 1 | "interests of justice" require a new trial, as is required under
 2 | Federal Rule of Criminal Procedure 33.  Accordingly, and because the
 3 | evidence fully supported the jury's verdict, defendant's motion for a
 4 | new trial should be denied.

 5 | **II.  ARGUMENT**

 6 |     **A.  Legal Standards Under Rule 33**

 7 |       Rule 33 provides that "[u]pon the defendant's motion, the court
 8 | may vacate any judgment and grant a new trial if the interest of
 9 | justice so requires."  Fed. R. Crim. P. 33(a).  "[A] decision to
10 | grant or deny a new trial is within the sound discretion of the
11 | district court."  United States v. Steel, 759 F.2d 706, 713 (9th Cir.
12 | 1985).  Because a verdict is presumptively valid, the Ninth Circuit
13 | has stated that a new trial motion under Rule 33 "should be granted
14 | only in exceptional cases in which the evidence preponderates highly
15 | against the verdict."  United States v. Pimentel, 654 F.2d 538, 545
16 | (9th Cir. 1981) (internal quotation marks omitted); accord United
17 | States v. Del Toro-Barboza, 673 F.3d 1136, 1153 (9th Cir. 2012); see
18 | also United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000)
19 | (a new trial motion should only be granted where "the evidence
20 | preponderates sufficiently heavily against the verdict" that "a
21 | serious miscarriage of justice may have occurred") (citation
22 | omitted).  While defendant relies upon United States v. Alston, 974
23 | F.2d 1206 (9th Cir. 1992), that case holds no differently:  A court
24 | may grant a new trial "'[i]f the court concludes that . . . the
25 | evidence *preponderates sufficiently heavily against the verdict that*
26 | *a serious miscarriage of justice may have occurred*.'"  Alston, 974 at
27 | 1211 (quoting United States v. Lincoln, 630 F.3d 1313, 1319 (8th Cir.
28 | 1980) (emphasis added).

<center>2</center>

1    In ruling upon a Rule 33 motion, a court's "authority should be

2  exercised sparingly and with caution."  <u>Lincoln</u>, 630 F.3d at 1319;

3  <u>cf.</u> <u>United States v. Sherpa</u>, 97 F.3d 1239, 1244 (9th Cir. 1996) (a

4  court "cannot simply set aside a verdict just because he or she

5  personally disagrees with a jury's finding").  A defendant must

6  establish a genuine concern that he was wrongly convicted to overturn

7  a presumptively valid guilty verdict:  "There must be a real concern

8  that an innocent person may have been convicted.  It is only when it

9  appears that an injustice has been done that there is a need for a

10 new trial 'in the interest of justice.'"  <u>United States v. Sanchez</u>,

11 969 F.2d 1409, 1414 (2d Cir. 1992).

12    **B.**    **<u>The Court Properly Admitted Expert And Lay Opinion</u>**

13        **<u>Testimony Regarding Vague And Coded Language In</u>**

14        **<u>Recorded Telephone Calls</u>**

15    Defendant's principle complaint is that the Court erred in

16 admitting agent and officer testimony regarding recorded telephone

17 conversations played at trial, (Def. Mot. at 2-3), claiming that the

18 testimony was improper expert and lay opinion, that the Court did not

19 exercise its gatekeeping function, that the Court did not instruct

20 the jury on expert and lay opinion testimony, and that the expert

21 testimony was improperly disclosed.  None of these contentions

22 withstands scrutiny.

23    1.    <u>The Testimony Was Proper Lay And Expert Opinion</u>

24    The admission of testimony by the law enforcement witnesses was

25 fully consistent with principles well-established in the Ninth

26 Circuit.  Testimony regarding the meaning of vague or coded language

27 has been repeatedly recognized by the Circuit as a valid area for law

28 enforcement expert and lay-opinion testimony, which has held that

3

GER000338

1    such testimony may be "both expert and lay testimony, depending on

2    the circumstances." United States v. Reed, 575 F.3d 900, 922 (9th

3    Cir. 2009). "Coded terms are the subject of expert testimony, when

4    based on the witness's experience in investigating narcotics

5    offenses." Id. On the other hand, "[t]he meaning of other,

6    ambiguous terms is the proper subject of lay testimony, when based on

7    the witness's knowledge of the particular case and the defendants."

8    Id.

9        It is also well-established that, pursuant to Federal Rule of

10   Evidence 702, law enforcement experts may "'testify as to the general

11   practices of criminals to establish the defendants' modus operandi,'

12   which 'helps the jury to understand complex criminal activities, and

13   alerts it to the possibility that combinations of seemingly innocuous

14   events may indicate criminal behavior.'" United States v. Freeman,

15   498 F.3d 893, 906 (9th Cir. 2007) (quoting United States v. Valencia

16   Amezcua, 278 F.3d 901, 908-09 (9th Cir. 2002)). The Ninth Circuit

17   has repeatedly recognized that law enforcement expert testimony is

18   permitted as to the interpretation of coded language. See, e.g.,

19   United States v. Martinez, 657 F.3d 811, 817 (9th Cir. 2011)

20   (permitting expert testimony regarding "the Mexican Mafia's coded

21   communications.").

22       Moreover, an officer's testimony about the meaning of ambiguous

23   terms or phrases is admissible under Federal Rule of Evidence 701 as

24   lay-opinion testimony if it is based on the witness's knowledge of

25   the particular case and defendants. Reed, 575 F.3d at 922; Freeman,

26   498 F.3d at 902, 904 ("A lay witness may provide opinion testimony

27   regarding the meaning of vague or ambiguous statements."); United

28   States v. Simas, 937 F.2d 459, 465 (9th Cir. 1991) ("[Appellant's]

4

GER000339

1   statements to the FBI agents were vague and, at times, seemingly

2   incomprehensible.  The listener's understanding of the words and

3   innuendo was helpful to the jury in determining what [appellant]

4   meant to convey.").  Such lay opinion must be "rationally based on

5   the witness's perception" and be helpful to the jury in acquiring a

6   "clear understanding of the witness's testimony or to determining a

7   fact in issue."  Fed. R. Evid. 701.

8       The testimony fully satisfied these standards, and defendant has

9   entirely failed to satisfy his burden.

10          2.   The Court Properly Instructed The Jury On The

11               Testimony

12      Defendant further objects to the absence of a final charge to

13  the jury regarding the expert and lay opinion testimony by law

14  enforcement witnesses.  (Def. Mot. at 6-7.)  No such instruction is

15  required, however, and the Court's instruction to the jury during the

16  government's case satisfied Ninth Circuit requirements regarding dual

17  role testimony.

18      The Ninth Circuit has held that an officer can testify both "as

19  a percipient witness of some events" and "as an expert" on other

20  topics, so long as the testimony is "properly identified as

21  percipient or as expert."  Martinez, 657 F.3d at 817.  Testimony by

22  an officer in both an expert and lay-opinion role "may save time and

23  expense, and will not necessarily result in juror confusion, provided

24  that the district court engages in vigilant gatekeeping" by making

25  the jury "aware of the witness's dual roles."  Freeman, 498 F.3d at

26  904.

27      The Court instructed the jury during the government's case

28  regarding the two forms of testimony and the dual character of

                                    5

GER000340

1    testimony by law enforcement witnesses, and the Court observed this

2    distinction throughout trial.  Moreover, the jury was further

3    apprised of this distinction by the manner of direct examination of

4    law enforcement witnesses.  As the defendant concedes, (Def. Mot. at

5    3), the government clarified the nature of testimony by prefacing

6    questions which elicited opinion testimony with either, "Based on

7    your training and experience," for questions seeking expert opinion,

8    or with, "Based on your role in the investigation," for questions

9    seeking percipient testimony.  As the Ninth Circuit noted in <u>Freeman</u>:

10   "[T]he opportunity does not lie solely with the district court to

11   clarify in the eyes of the jury the demarcation between lay and

12   expert testimony offered by the same witness. That distinction can

13   also be revealed through direct or cross examination." <u>Id.</u>  Because

14   the jury was consistently made aware of the dual role of these

15   witnesses, there was no danger that the jury would become confused

16        No final charge was therefore required.  This Court's

17   instructions during the government's case "[made] clear to the jury

18   what the attendant circumstances are in allowing a government case

19   agent to testify as an expert. . . ." <u>Freeman</u>, at 904.  Defendant in

20   any event failed to object during the final conference on the jury

21   instructions to the absence of such an instruction.  Defendant has

22   failed to show that the absence of a written jury instruction created

23   an injustice requiring a new trial.

24        3.   <u>The Court Exercised Proper Gatekeeping And Was Not</u>

25             <u>Required Under Rules 104 And 702 To Conduct A Separate</u>

26             <u>Hearing</u>

27        Defendant claims that in admitting expert opinion testimony by

28   the law enforcement witnesses the Court failed to exercise its

6

1    gatekeeping function under Federal Rule of Evidence 702.  Trial

2    courts are, however, "afforded wide latitude both in deciding whether

3    to admit expert testimony and in deciding how to test reliability."

4    United States v. Alatorre, 222 F.3d 1098, 1102 (9th Cir. 2000).

5    Furthermore, "in considering the admissibility of testimony based on

6    some 'other specialized knowledge,' Rule 702 generally is construed

7    liberally."  United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir.

8    2000) (admitting agent testimony regarding drug trade).

9         Defendant points to this Court's refusal to conduct a hearing on

10   the opinion testimony, (Def. Mot. at 4), but Ninth Circuit law

11   expressly holds that this is not error.  "[T]rial courts are not

12   compelled to conduct pretrial hearings in order to discharge the

13   gatekeeping function."  Alatorre, 222 F.3d at 1100; see also United

14   States v. Lopez-Martinez, 543 F.3d 509, 514 (9th Cir. 2008) ("[T]hese

15   procedures are not required under Supreme Court precedent or our own

16   case law."); United States v. Jawara, 474 F.3d 565, 582-83 (9th Cir.

17   2007) ("This obligation does not, however, require the court to hold

18   a separate Daubert hearing.").  This Court therefore properly

19   fulfilled its function in the admission of expert opinion testimony.

20            4.   The Law Enforcement Testimony Was Properly Disclosed

21        Defendant also renews his protest regarding the disclosure of

22   expert testimony by law enforcement regarding the meaning of vague or

23   coded language.  (Def. Mot. at 5.)  Defendant had previously objected

24   to this testimony in a motion, (CR 2993), which was subsequently

25   denied by this Court.  (CR 3049.)  Defendant here advances no

26   additional argument or evidence.  The claim should thus be denied.

27

28

GER000342

**C.** **THERE WAS NO ERROR IN THE COURT'S ADMISSION OF CO-CONSPIRATOR STATEMENTS**

Defendant next objects on several grounds to the admission of out-of-court co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).

    1.   No Hearing Is Required For The Admission Of Co-Conspirator Statements

Defendant first claims, without authority, that the Court was required to conduct a hearing on the admissibility of the statements pursuant to Fed. R. Evid. Rule 104(a). Neither Rule 801(d)(2)(E) nor Bourjaily v. United States, 483 U.S. 171 (1987) require such a hearing. Nor would such a requirement be consistent with Rule 104, which permits evidence to be admitted "on the condition that the proof be introduced later." Fed. R. Evid. 104(b); see United States v. Watkins, 600 F.2d 201, 204 (9th Cir. 1979)("the trial judge may admit the challenged statements conditionally, subject to a later motion to strike if the prosecution fails to establish the required foundation."). As the Ninth Circuit has stated, "This court has held repeatedly that the order of proof is within the sound discretion of the trial court. The procedure of conditionally admitting [a] co-conspirator's statements subject to later motions to strike is well within the court's discretion." United States v. Zemek, 634 F.2d 1159, 1169 (9th Cir. 1980) (citation omitted).

    2.   There Was Substantial Evidence Of The Declarants' Participation In The Conspiracy

Moreover, the evidence heard at trial fully supports admission of the co-conspirator statements to which the defendant objects. The Court heard the hearsay statements themselves, which may be

8

1    considered in establishing the declarant's participation in a

2    conspiracy with the defendant.  <u>Bourjaily</u>, 483 U.S. at 175; <u>United</u>

3    <u>States v. Silverman</u>, 861 F.2d 571, 577 (9th Cir. 1988).  The Court

4    also heard independent evidence of the existence of the conspiracy

5    and the defendant's and declarant's participation in that conspiracy.

6    This was more than sufficient to establish that the requirements of

7    the hearsay exception were satisfied by a preponderance of the

8    evidence.

9                    3.    <u>The Declarant Was A Target Of The Investigation</u>

10         Defendant further objects to the admission of certain co-

11   conspirator statements on the grounds that one of the declarants was

12   a government informant.  (Def. Mot. at 9.)  That declarant, however,

13   was not an informant at the time those statements were made: he was

14   instead a target of the Armenian Power investigation and an indicted

15   co-defendant in this case whose recorded statements were made in

16   furtherance of the conspiracy.  Because the Sixth Amendment bars only

17   the use of "testimonial" hearsay, <u>Crawford v. Washington</u>, 541 U.S. 36

18   (2004), and because <u>Crawford</u> expressly notes that statements in

19   furtherance of a conspiracy are "by their nature . . . not

20   testimonial[,]" the statements were properly admitted.  <u>Id.</u> at 56.

21        **D.    <u>The Evidence Was Sufficient On The Extortion Charges</u>**

22         Defendant again contends that the evidence was insufficient on

23   the Extortion charges in Counts 4 and 5, repeating his previously-

24   denied argument concerning the interstate nexus element.  (<u>See</u> Minute

25   Order Re: Def. Mot. for J. of Acquittal (CR 3164).)  Defendant now

26   raises two additional arguments, attacking the credibility of the

27   victim-witness and the connection between defendant's threats and the

28   victim's payments.  None of these complaints have merit.

GER000344

1            1.   There Was Substantial Evidence Of A De Minimis

2                 Effect On Interstate Commerce

3        The jury heard substantial evidence from which it could conclude

4   beyond a reasonable doubt that the extortion had a *de minimis* effect

5   on interstate commerce.  See United States v. Shryock, 342 F.3d 948,

6   984 (9th Cir. 2004) ("The district court, therefore, correctly

7   instructed the jury that a de minimis [e]ffect on interstate commerce

8   was sufficient to establish jurisdiction under RICO.").  As noted in

9   the Court's order denying defendant's Rule 29 motion, the jury heard

10  evidence that "victim M.M. sent money across state lines at the

11  direction of Sharopetrosian, after receiving what M.M. perceived to

12  be threats from both Darbinyan and Sharopetrosian." (See Minute

13  Order Re: Def. Mot. for J. of Acquittal (CR 3164), at 2.)  The jury

14  also heard that wire transfer fees were paid.  Finally, the jury

15  heard evidence, such as defendant's statement to DARBINYAN, referring

16  to the victim's business, that, "we need to take the clinic and other

17  things away from him," from which it could infer that the victim's

18  business dealings were affected. (Ex. 73A.)  The interstate commerce

19  element was therefore satisfied.

20       Additionally, while defendant does not distinguish the two

21  extortion counts, it is worth noting that the extortion conspiracy

22  charge, Count 4, did not require an actual effect on interstate

23  commerce.  United States v. Bagnariol, 665 F.2d 877, 895-96 (9th Cir.

24  1981) (holding even impossibility is no bar to a Hobbs Act conspiracy

25  charge.)

26            2.   There Was Substantial Evidence Of Defendant's

27                 Participation In The Extortion

28       The jury also heard evidence regarding defendant's actions

10

1 during the extortion, including that defendant threatened victim

2 M.M., that defendant ordered M.M. not to call the police, that

3 defendant told M.M. that if M.M. made SHAROPETROSIAN upset then

4 defendant would chase after M.M.  The jury also heard that defendant

5 detained M.M. in a car against M.M.'s will and that M.M. was

6 threatened by SHAROPETROSIAN via phone while defendant and M.M. were

7 in the car.  The jury also heard that M.M. subsequently paid monies

8 to accomplices identified by SHAROPETROSIAN.  The jury could conclude

9 from this evidence that defendant's role in the extortion was to

10 terrorize victim M.M., that defendant discouraged M.M. from

11 contacting law enforcement prior to making the wire payments, and

12 that this led to M.M.'s fear and later payments.[1]  This is

13 substantial evidence of defendant's culpability in the extortion.

14                   3.   <u>Victim M.M. Was Credible And Corroborated</u>

15       Defendant also challenges the credibility of victim M.M., who

16 testified in the defense case.  Contrary to defendant's claim, victim

17 M.M. testified credibly regarding the events surrounding his

18 extortion, including by recounting his experiences being detained by

19 defendant and by other co-conspirators and his continuing fears for

20 his personal safety after having provided information against

21 defendant.  Victim M.M.'s testimony was also corroborated by the

22 documentary evidence of the wire transfers introduced by the

23 government.  Most fundamentally, victim M.M.'s testimony was also

24 supported by the recordings, introduced by the government in its

25 case-in-chief, of SHAROPETROSIAN and the defendant threatening victim

26

27       [1] Defendant claims that the "entirety of the evidence in this
regard" was a single statement by defendant on July 6, 2009.  (Def.

28 Mot. at 11.)  This is incorrect.

GER000346

1    M.M. by telephone.  Nothing about victim M.M.'s testimony

2    preponderates heavily against the verdict.

3         Defendant therefore entirely fails to establish that this is the

4    "exceptional case[] in which the evidence preponderates highly

5    against the verdict." Pimentel, 654 F.2d at 545 (internal quotation

6    marks omitted).

7              4.   The Jury Was Properly Instructed On California

8                   Extortion Law, Which Requires No Interstate Nexus

9         Defendant also attacks his RICO Conspiracy conviction with

10   regard to his extortion activities.  In this regard, defendant claims

11   that Court's Instruction No. 30, (CR 3190 at 37), explaining the

12   elements of the RICO predicate of extortion in violation of

13   California law, "was confusing and erroneous because it does not

14   include an interstate commerce nexus requirement."  This claim, which

15   is not further explained, is baseless.  California extortion law is

16   within a state's general police power and requires no connection with

17   interstate commerce. United States v. Morrison, 529 U.S. 598, 617

18   (2000) ("[W]e can think of no better example of the police power,

19   which . . . reposed in the States, than the suppression of violent

20   crime and vindication of its victims.").

21        By contrast, federal jurisdiction for RICO Conspiracy is based

22   upon the activities of the enterprise. See 18 U.S.C. § 1962(c)

23   ("[A]ny enterprise engaged in, or the activities of which affect,

24   interstate or foreign commerce.").  There is no requirement that a

25   state law predicate for a federal racketeering prosecution itself

26   have an interstate commerce nexus.  The jury was therefore properly

27   instructed regarding the state law predicate.

28

                                    12

                                                            **GER000347**

**E.  The Evidence Of Felon-In-Possession Was Sufficient**

Finally, defendant again challenges the sufficiency of the evidence on Count 129.  Defendant again also mixes up his counts, moving for a new trial on Count 129 (felon-in-possession of an Omega Arms bolt action rifle), but discussing only facts relevant to the possession element of Count 128 (felon-in-possession of three firearms, a .38 caliber revolver, a 9mm semi-automatic pistol, and a .22 caliber semi-automatic pistol).  (See Def. Mot. for J. of Acquittal (CR 3139), at 10-12; Gov. Omnibus Opp. to Def. Mot. for J. of Acquittal (CR 3155), at 1 n.1, 7-9.)  Because Count 129 charges possession of the Omega Arms rifle, and defendant was stopped in a vehicle with the Omega Arms rifle, and defendant contests no facts concerning that possession, defendant's claim with regard to Count 129 is utterly devoid of merit.

Even if the Court were to construe defendant's motion as a request for a new trial on Count 128, defendant fails to satisfy his burden.  Defendant claims that United States v. Shirley, 884 F.2d 1130, 1134 (9th Cir. 1989), requires a new trial because the defendant there directed an accomplice to leave firearms in a car, which the accomplice did, leaving as well the car keys.  (See Def. Mot. at 16.)  By contrast, defendant notes, DARBINYAN's accomplice SEROBYAN retained the keys.  Lack of possession of the car keys, however, does not negate possession.  See United States v. Medrano, 5 F.3d 1214, 1218 (9th Cir. 1993) ("Nevertheless, the defendant's confederate had the keys, this provided access to the contraband, and there was sufficient evidence of dominion and control to support the conviction.") (citing United States v. Martorano, 709 F.2d 863, 69 (3d Cir. 1983).)  There is ample evidence supporting the jury's

13

GER000348

1  finding of constructive possession, which requires "a sufficient

2  connection between the defendant and the contraband to support the

3  inference that the defendant exercised dominion and control over the

4  firearms." <u>United States v. Vasquez</u>, 654 F.3d 880, 885 (9th Cir.

5  2011) (internal quotation marks omitted).  Here the jury heard that:

6  - In a call recorded on November 23, 2009, at 11:27 a.m., Miguel

7    Ramirez tells DARBINYAN that he had "got you more of those

8    things bro" and DARBINYAN asks "Okay, can we see it?"  (Ex.

9    113A.)  The two agree to meet.  (<u>Id.</u>)

10 - In a call recorded at 11:40 a.m. the same day, DARBINYAN tells

11   Arthur Pembejian that one of the firearms is "a handheld thing,

12   that's missing the thing on the back."  (Ex. 114A.)  DARBINYAN

13   then says that "We'll just go over there and take a look."

14   (<u>Id.</u>)  DARBINYAN is seen entering a marijuana dispensary at the

15   corner of Sunset Boulevard and Hobart Boulevard at approximately

16   12:30 p.m.  Miguel Ramirez is also observed leaving the location

17   at approximately the same time.  (Testimony of law enforcement

18   officers.)

19 - On November 24, 2009 at 10:43 a.m., DARBINYAN is asked by Gevork

20   Kasabyan, the owner of the marijuana dispensary, if DARBINYAN

21   "could . . . send someone here to pick that up?"  (Ex. 116A.)

22   DARBINYAN responds: "Yeah, of course bro.  I'll come and pick it

23   up, bro."  (<u>Id.</u>)

24 - And on November 24, 2009 at 12:05 p.m., DARBINYAN speaks by pone

25   with Souren Serobyan.  DARBINYAN asks Serobyan: "When you meet

26   with Kaj, are you going to take it very far?"  Serobyan replies:

27   "no my brother, I will take it to our yard.  I have a car parked

28

14

**GER000349**

1    over there, my friend.  I will put it in that car's trunk and it

2    will stay there."  (Ex. 118A.)

3  • Serobyan was subsequently arrested and taken to the location of

4    the Mercedes-Benz containing the three firearms.  DARBINYAN is

5    observed driving by the location during the arrest of Serobyan

6    and search of the car.  (Testimony of law enforcement officers.)

7  "In a real and pragmatic sense," this was substantial evidence of

8  DARBINYAN's knowledge of and intent to control the firearms and

9  associated ammunition.  United States v. Nungaray, 697 F.3d 1114,

10 1117 (9th Cir. 2012).  Defendant's motion for a new trial on the

11 felon-in-possession count should be denied.

12 **III.  CONCLUSION**

13     For foregoing reasons, the government respectfully requests that

14 the Court deny defendant's motions for new trial.

15 Dated: June 23, 2014            Respectfully submitted,

16                                 ANDRÉ BIROTTE JR.
                                   United States Attorney

17
                                   ROBERT E. DUGDALE
18                                 Assistant United States Attorney
                                   Chief, Criminal Division

19

20                                 _____/s/_____
                                   E. MARTIN ESTRADA
21                                 ELIZABETH R. YANG
                                   Assistant United States Attorney
22                                 ANDREW CREIGHTON
                                   Trial Attorney, Department of Justice

23
                                   Attorneys for Plaintiff
24                                 UNITED STATES OF AMERICA

25

26

27

28

15

GER000350

1 ANDRÉ BIROTTE JR.
 United States Attorney
2 ROBERT E. DUGDALE
 Assistant United States Attorney
3 Chief, Criminal Division
 E. MARTIN ESTRADA (Cal. SBN: 223802)
4 ELIZABETH R. YANG (Cal. SBN: 196461)
 Assistant United States Attorneys
5 ANDREW CREIGHTON (Maryland State Bar Member)
 Trial Attorney, U.S. Department of Justice
6   1500 United States Courthouse
    312 North Spring Street
7   Los Angeles, California 90012
    Telephone: (213) 894-3358
8   Facsimile: (213) 894-3713
    Email: Martin.Estrada@usdoj.gov
9       Elizabeth.Yang@usdoj.gov
       Andrew.Creighton@usdoj.gov
10
 Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

12     UNITED STATES DISTRICT COURT

13    FOR THE CENTRAL DISTRICT OF CALIFORNIA

14      WESTERN DIVISION

15 UNITED STATES OF AMERICA,  No. CR 11-72(A)-RGK

16    Plaintiff,  GOVERNMENT'S OPPOSITION TO
         DEFENDANT ARMAN SHAROPETROSIAN'S
17    v.   MOTION TO VACATE JUDGMENT AND FOR
         NEW TRIAL
18 MHER DARBINYAN, et al.,

19    Defendant.

20

21

22

23   Plaintiff, United States of America, by and through its counsel

24 of record, the United States Attorney's Office for the Central

25 District of California, hereby files this opposition to defendant

26 ARMAN SHAROPETROSIAN'S Motion to Vacate Judgment and for New Trial

27 Pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  (CR

28 3282.)

          1

This motion is based upon the attached memorandum of points and authorities, the complete files and records of this case, any further argument or evidence the Court wishes to consider.

Dated: June 23, 2014    Respectfully submitted,

          ANDRÉ BIROTTE JR.
          United States Attorney

          ROBERT E. DUGDALE
          Assistant United States Attorney
          Chief, Criminal Division


             /s/
          E. MARTIN ESTRADA
          ELIZABETH R. YANG
          Assistant United States Attorney
          ANDREW CREIGHTON
          Trial Attorney, Department of Justice

          Attorneys for Plaintiff
          UNITED STATES OF AMERICA

GER000352

1    <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2    **I.    INTRODUCTION**

3         On April 17, 2014, a jury convicted defendant ARMAN

4    SHAROPETROSIAN ("defendant") of RICO Conspiracy, in violation of

5    Title 18, United States Code Section 1962(d) (Count 1); Extortion

6    Conspiracy, in violation of Title 18, United States Code, Section

7    1951(a) (Count 4); and Extortion, in violation of Title 18, United

8    States Code, Section 1951(a) (Count 5).  These charges arose from

9    defendant's association and commission of crimes with the Armenian

10   Power criminal enterprise.

11        On April 10, 2014, defendant moved to join co-defendant MHER

12   DARBINYAN's motion for a judgment of acquittal under Federal Rule of

13   Criminal Procedure 29 on Counts 4 and 5.  (<u>See</u> CR 3143.)  This Court

14   denied the motion for a judgment of acquittal in all respects on

15   April 14, 2014.  (<u>See</u> Minute Order Re: Def. Mot. for J. of Acquittal

16   (CR 3164).)

17        Defendant now moves under Federal Rule of Criminal Procedure 33

18   for a new trial.  (Def. Mot. for New Trial Pursuant to Rule 33, CR

19   3282 ("Def. Mot.")).  Defendant contends that the evidence is

20   insufficient on the racketeering conspiracy charge and on the two

21   extortion charges.  The jury, however, heard overwhelming evidence of

22   defendant's guilt, and defendant's motion fails to show that this is

23   an "exceptional" case in which the "interests of justice" require a

24   new trial, as is required under Federal Rule of Criminal Procedure

25   33.  Accordingly, defendant's motion for a new trial should be

26   denied.

27   ///

28   ///

<div align="center">1</div>

GER000353

II. **ARGUMENT**

  A.  **Legal Standards Under Rule 33**

      Rule 33 provides that "[u]pon the defendant's motion, the court
may vacate any judgment and grant a new trial if the interest of
justice so requires." Fed. R. Crim. P. 33(a). "[A] decision to
grant or deny a new trial is within the sound discretion of the
district court." United States v. Steel, 759 F.2d 706, 713 (9th Cir.
1985). Because a verdict is presumptively valid, the Ninth Circuit
has stated that a new trial motion under Rule 33 "should be granted
only in exceptional cases in which the evidence preponderates highly
against the verdict." United States v. Pimentel, 654 F.2d 538, 545
(9th Cir. 1981) (internal quotation marks omitted); accord United
States v. Del Toro-Barboza, 673 F.3d 1136, 1153 (9th Cir. 2012); see
also United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000)
(a new trial motion should only be granted where "the evidence
preponderates sufficiently heavily against the verdict" that "a
serious miscarriage of justice may have occurred") (citation
omitted).

      In ruling upon a Rule 33 motion, a court's "authority should be
exercised sparingly and with caution." Lincoln, 630 F.3d at 1319;
cf. United States v. Sherpa, 97 F.3d 1239, 1244 (9th Cir. 1996) (a
court "cannot simply set aside a verdict just because he or she
personally disagrees with a jury's finding"). A defendant must
establish a genuine concern that he was wrongly convicted to overturn
a presumptively valid guilty verdict: "There must be a real concern
that an innocent person may have been convicted. It is only when it
appears that an injustice has been done that there is a need for a
new trial 'in the interest of justice.'" United States v. Sanchez,

GER000354

1  969 F.2d 1409, 1414 (2d Cir. 1992).

2        **B.**    **The Evidence Established Defendant's Agreement**

3              **To Join The Racketeering Conspiracy**

4        Defendant first challenges the sufficiency of evidence

5  establishing his membership in the racketeering conspiracy charged in

6  Count One.  Significantly, defendant does not challenge the

7  sufficiency of the evidence showing that the racketeering conspiracy

8  existed.  Hence, there need only be "slight" evidence that defendant

9  was a member or associate of the enterprise.  See <u>United States v.</u>

10  <u>Friedman</u>, 593 F.2d 109, 115 (9th Cir. 1979) ("Once a conspiracy is

11  shown, there need be only slight evidence to link the defendant with

12  it.").  In proving membership in a racketeering conspiracy, the

13  government's burden is "only to show his assent to the conspiracy and

14  the acts furthering its end." <u>United States v. Martinez</u>, 657 F.3d

15  811, 816 (9th Cir. 2011); <u>see also</u> <u>Salinas v. United States</u>, 522 U.S.

16  52, 63 (1997) (holding racketeering conspiracy does not require proof

17  of an overt act).

18        The evidence presented at trial amply established defendant's

19  assent to the racketeering conspiracy and acts in furtherance.  For

20  example, defendant engaged, while incarcerated, in the extortion of

21  victim M.M. with the aid of co-defendant and racketeering conspiracy

22  member DARBINYAN and others.  Among other things, the jury heard the

23  following:

24  • In a call on June 29, 2009, defendant, speaking about Russians

25     whom defendant believed were involved with extortion victim

26     M.M., told DARBINYAN: "We have to take it little by little, but

27     during that time, *we should get all those people who are doing*

28     *this business under us*."  (Ex. 70A (emphasis added).)

<center>3</center>

**GER000355**

- In a call with victim M.M. that same day, defendant told the victim that his DARBINYAN was coming to see him. Defendant then threatened M.M., saying, "Neither the thieves nor whores will be able to save you . . . ." (Ex. 71A.)

- In a call with DARBINYAN on June 30, 2009, defendant heard DARBINYAN say, "I will grab him by his neck now when he calls." (Ex. 73.) Later in the same call, defendant told DARBINYAN, "Looks like we need to take the clinic and other things away from him." (Id.)

- In a call with victim M.M. on July 3, 2009, defendant, who was incarcerated, threatened victim M.M., saying: "Don't think my hands are so short just because I am in this cage over here . . . ." (Ex. 74A.)

The jury further heard from victim M.M., who testified to the participation of defendant, DARBINYAN, and others in the extortion.

The jury also heard that defendant was involved in other illegal acts with DARBINYAN, including bank fraud. For example, the jury heard that:

- In a call on August 20, 2009, defendant asked DARBINYAN, in coded language, for a bank profile of a customer with four or five hundred thousand dollars, saying "please obtain one from someone." (Ex. 66A at 2.)

- In a call later that same day, defendant discussed with DARBINYAN the availability of bank customer profiles for customers at CitiBank, Wells Fargo, and other banks. (Ex. 67A.)

- And in a call recorded on September 1, 2009, defendant directed a different co-conspirator to supply the identity of a fraud

4

1    victim who "should be a man . . . and have more than one

2    account, about two and he should be very old." (Ex. 68A.)

3        Finally, the jury also heard testimony from an officer with the

4    California Department of Corrections, who testified that defendant

5    was designated as a "Southerner" while he was incarcerated at Avenal

6    State Prison, a designation that is only given to inmates who are

7    members or associates of a Southern California gang, such as the

8    Armenian Power criminal enterprise.

9        Thus, there was substantial evidence from which the jury could

10    infer defendant's assent to participation in the racketeering

11    conspiracy.  Against this, defendant points to a variety of acts in

12    which he was not involved and to his lack of gang tattoos. (<u>See</u> Def.

13    Mot. at 2.)  The absence of such evidence, however, does not weaken

14    the evidence that the jury did hear that established beyond a

15    reasonable doubt defendant's membership in the racketeering

16    conspiracy charged in Count One.  Defendant has failed in his burden

17    to show that the interests of justice require a new trial on Count

18    One.[1]

19    **C.**    <u>**The Extortion Of Victim M.M. Affected Interstate Commerce**</u>

20        Defendant also contends that the evidence in support of his

21    conviction for extortion and extortion conspiracy was insufficient

22    because, in his view, the government did not meet its burden to show

23    the scheme's effect on interstate or foreign commerce.  The jury,

24

25       [1] Defendant also continues to characterize the extortion of
victim M.M. as involving repayment of a personal loan, (Def. Mot. at

26    2), but this claim is both legally irrelevant and rebutted by
defendant's own words.  On November 2, 2009, defendant told the

27    victim: "How much you have paid her or you have not paid, it does not
concern me . . . *Between us, your debt has been 120* [thousand]

28    dollars since September 1."  (Ex. 85A (emphasis added).)

<div align="center">5</div>

GER000357

1    however, heard substantial evidence from which it could conclude

2    beyond a reasonable doubt that the extortion of victim M.M., as

3    required, had a *de minimis* effect on interstate commerce.  See United

4    States v. Shryock, 342 F.3d 948, 984 (9th Cir. 2004) ("The district

5    court, therefore, correctly instructed the jury that a de minimis

6    [e]ffect on interstate commerce was sufficient to establish

7    jurisdiction under RICO.").  As noted in the Court's order denying

8    defendant's Rule 29 motion, the jury heard evidence that "victim M.M.

9    sent money across state lines at the direction of Sharopetrosian,

10   after receiving what M.M. perceived to be threats from both Darbinyan

11   and Sharopetrosian."  (See Minute Order Re: Def. Mot. for J. of

12   Acquittal (CR 3164), at 2.)  The jury also heard that wire transfer

13   fees were paid, and heard evidence from which it could infer that the

14   victim's business dealings were affected, such as defendant's

15   statement to Darbinyan, referring to the victim's business, that, "we

16   need to take the clinic and other things away from him."  (Ex. 73A.)

17   The interstate commerce element was therefore satisfied.

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

GER000358

## III. **CONCLUSION**

For foregoing reasons, the government respectfully requests that the Court deny defendant's motion for new trial.

Dated: June 23, 2014

Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
E. MARTIN ESTRADA
ELIZABETH R. YANG
Assistant United States Attorney
ANDREW CREIGHTON
Trial Attorney, Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

7

GER000359

1    ANDRÉ BIROTTE JR.
     United States Attorney
2    ROBERT E. DUGDALE
     Assistant United States Attorney
3    Chief, Criminal Division
     E. MARTIN ESTRADA (Cal. SBN: 223802)
4    ELIZABETH R. YANG (Cal. SBN: 196461)
     Assistant United States Attorneys
5    ANDREW CREIGHTON (Maryland State Bar Member)
     Trial Attorney, U.S. Department of Justice
6         1500 United States Courthouse
          312 North Spring Street
7         Los Angeles, California 90012
          Telephone: (213) 894-3358
8         Facsimile: (213) 894-3713
          Email:   Martin.Estrada@usdoj.gov
9                  Elizabeth.Yang@usdoj.gov
                   Andrew.Creighton@usdoj.gov
10
     Attorneys for Plaintiff
11   UNITED STATES OF AMERICA

12                    UNITED STATES DISTRICT COURT

13              FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                        WESTERN DIVISION

15   UNITED STATES OF AMERICA,        No. CR 11-72(A)-RGK

16            Plaintiff,              GOVERNMENT'S OPPOSITION TO
                                     DEFENDANT RAFAEL PARSADANYAN'S
17            v.                     MOTION FOR NEW TRIAL

18   MHER DARBINYAN, et al.,

19            Defendant.

20

21

22

23        Plaintiff, United States of America, by and through its counsel

24   of record, the United States Attorney's Office for the Central

25   District of California, hereby files this opposition to defendant

26   RAFAEL PARSADANYAN's Motion for New Trial.  (CR 3283.)

27

28

                                     1

GER000360

This motion is based upon the attached memorandum of points and authorities, the complete files and records of this case, any further argument or evidence the Court wishes to consider.

Dated: June 23, 2014                    Respectfully submitted,

                                        ANDRÉ BIROTTE JR.
                                        United States Attorney

                                        ROBERT E. DUGDALE
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                             /s/
                                        _____
                                        E. MARTIN ESTRADA
                                        ELIZABETH R. YANG
                                        Assistant United States Attorney
                                        ANDREW CREIGHTON
                                        Trial Attorney, Department of Justice

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

GER000361

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3         On April 17, 2014, a jury convicted defendant RAFAEL PARSADANYAN

4    ("defendant") of thirteen counts of Bank Fraud, in violation of Title

5    18, United States Code Section 1344 (Counts 38, 39, 40, 41, 44, 45,

6    48, 50, 51, 54, 57, 63, and 66).

7         Defendant now moves under Federal Rule of Criminal Procedure 33

8    for a new trial, (CR 3283), claiming that the Court erred in denying

9    his motion for severance and in admitting audio recordings.  In so

10   doing, defendant repeats objections and arguments made *in limine* and

11   at trial that the Court correctly denied.  Defendant also contests

12   the sufficiency of the evidence, repeating a claim made earlier in

13   his motion for a judgment of acquittal, which the Court also

14   correctly denied.  Defendant, therefore, fails to show that this is

15   the sort of "exceptional" case in which the "interests of justice"

16   require a new trial, as is required under Rule 33 of the Federal

17   Rules of Criminal Procedure.  Accordingly, defendant's motion should

18   be denied.

19   **II.   ARGUMENT**

20        **A.    <u>Legal Standards Under Rule 33</u>**

21        Rule 33 provides that "[u]pon the defendant's motion, the court

22   may vacate any judgment and grant a new trial if the interest of

23   justice so requires."  Fed. R. Crim. P. 33(a).  "[A] decision to

24   grant or deny a new trial is within the sound discretion of the

25   district court."  <u>United States v. Steel</u>, 759 F.2d 706, 713 (9th Cir.

26   1985).  Because a verdict is presumptively valid, the Ninth Circuit

27   has stated that a new trial motion under Rule 33 "should be granted

28   only in exceptional cases in which the evidence preponderates highly

1

GER000362

1  against the verdict." <u>United States v. Pimentel</u>, 654 F.2d 538, 545

2  (9th Cir. 1981) (internal quotation marks omitted); <u>accord</u> <u>United</u>

3  <u>States v. Del Toro-Barboza</u>, 673 F.3d 1136, 1153 (9th Cir. 2012); <u>see</u>

4  <u>also</u> <u>United States v. Kellington</u>, 217 F.3d 1084, 1097 (9th Cir. 2000)

5  (a new trial motion should only be granted where "the evidence

6  preponderates sufficiently heavily against the verdict" that "a

7  serious miscarriage of justice may have occurred") (citation

8  omitted).

9      In ruling upon a Rule 33 motion, a court's "authority should be

10  exercised sparingly and with caution." <u>Lincoln</u>, 630 F.3d at 1319;

11  <u>cf.</u> <u>United States v. Sherpa</u>, 97 F.3d 1239, 1244 (9th Cir. 1996) (a

12  court "cannot simply set aside a verdict just because he or she

13  personally disagrees with a jury's finding"). A defendant must

14  establish a genuine concern that he was wrongly convicted to overturn

15  a presumptively valid guilty verdict: "There must be a real concern

16  that an innocent person may have been convicted. It is only when it

17  appears that an injustice has been done that there is a need for a

18  new trial 'in the interest of justice.'" <u>United States v. Sanchez</u>,

19  969 F.2d 1409, 1414 (2d Cir. 1992).

20      **B. <u>The Court Did Not Err In Refusing To Sever Defendant</u>**

21      Defendant contends that the Court erred in refusing to grant his

22  motion to sever, which was based on a claim of risk of undue

23  spillover prejudice. On March 3, 2014, the Court denied that motion,

24  (<u>See</u> CR 3049), and defendant has failed to advance any new contention

25  or argument warranting a different result.

26      Federal Rule of Criminal Procedure 14 provides for severance of

27  defendants where "the joinder of offenses or defendants in an

28  indictment . . . appears to prejudice a defendant." <u>See</u> Fed. R.

GER000363

1    Crim. P. 14(a).  Rule 14 does not require severance.  <u>Zafiro v.</u>
2    <u>United States</u>, 506 U.S. 534, 538-39 (1992).  Severance is the proper
3    remedy "only if there is a serious risk that a joint trial would
4    compromise a specific trial right of one of the defendants, or
5    prevent the jury from making a reliable judgment about guilt or
6    innocence."  <u>Id.</u> at 539.  The "primary consideration" in evaluating
7    the risk of prejudice is "whether the jury can reasonably be expected
8    to compartmentalize the evidence as it relates to separate
9    defendants, in view of its volume and the limited admissibility of
10   some of the evidence."  <u>United States v. Lazarenko</u>, 564 F.3d 1026,
11   1043 (9th Cir. 2009) (quotations and citations omitted).  A disparity
12   in evidence against the defendant, which is "inherent in any joinder
13   of defendants," <u>United States v. Smith</u>, 893 F.2d 1573, 1581 (9th Cir.
14   1990), requires severance only if the spillover prejudice is
15   "manifestly prejudicial," <u>United States v. Mayfield</u>, 189 F.3d 895,
16   899 (9th Cir. 1999) (citation omitted), and only if defendant
17   "demonstrate[s] the insufficiency of limiting instructions given by
18   the judge."  <u>United States v. Nelson</u>, 137 F.3d 1094, 1109 (9th Cir.
19   1998).

20        This the defendant could not do.  During the trial, the Court
21   carefully and consistently assisted the jury in compartmentalizing
22   the evidence.  The Court directed the government to provide, prior to
23   the testimony of each government witness, an introductory statement
24   clarifying the defendant and the charges for which that witness's
25   testimony would be relevant.  This procedure, to which defendant did
26   not object, readily permitted the jury to compartmentalize the case
27   against defendant.  Furthermore, the jury also was instructed that
28   they were to consider the case against each defendant separately.

GER000364

1  (See Court's Instruction No. 11 (CR 3190).)   There is also no

2  indication of any manifestly prejudicial spillover of evidence

3  against the defendant, who was acquitted on charges of Access Device

4  Fraud Conspiracy (Count 69), and 11 counts of Aggravated Identity

5  Theft (Counts 71, 72, 73, 77, 79, 80, 81, 84, 87, 91, and 93).

6  Because a jury is presumed to have followed its instructions, Weeks

7  v. Angelone, 528 U.S. 225, 234 (2000), severance was therefore not

8  required.

9       In claiming prejudice, defendant protests that evidence of

10  violent crimes and gang activities were introduced at trial but were

11  not relevant to his charges.   Yet, the jury heard substantial

12  evidence that defendant's bank fraud activities were closely tied to

13  the activities of the Armenian Power criminal enterprise, such that

14  one criminal activity "naturally flowed" from the separate

15  racketeering conduct.   See United States v. Golb, 69 F.3d 1417, 1426

16  (9th Cir. 1995).   This evidence also established a "logical

17  relationship [as] shown by the existence of a common plan, scheme, or

18  conspiracy," which was, in this case, the racketeering conspiracy.

19  United States v. Ford, 632 F.2d 1354, 1372 (9th Cir. 1980) (overruled

20  on other grounds by Huddleston v. United States, 485 U.S. 681

21  (1988)).

22       Defendant also claims that the Court erred in denying

23  defendant's Federal Rule of Evidence 403 objections to testimony

24  regarding gang activity during trial.   The Court here, however,

25  weighed the probative and prejudicial effects of the testimony and

26  ruled correctly.   See United States v. Wahchumwah, 710 F.3d 862, 870-

27  71 (9th Cir. 2012) ("The decision to admit potentially prejudicial

28  evidence under Rule 403 is committed to the sound discretion of the

GER000365

1    trial court." (internal quotation marks and citations omitted)).

2        For these reasons, the Court did not err in denying severance

3    and defendant's Rule 403 objections.  Defendant has failed to

4    demonstrate that a new trial is required for reasons of unfair

5    prejudice.

6        **C.    The Court Did Not Err In Admitting Audio Recordings**

7        Defendant also contends that the Court erred in admitting audio

8    recordings, claiming that the recordings had unintelligible portions

9    and that English language transcripts were untrustworthy.  In so

10   doing, defendant repeats contentions from his motion *in limine* to

11   exclude the audio recordings, (See CR 2963), which the Court

12   correctly denied on March 3, 2014.  (See CR 3049.)  In the instant

13   motion, defendant fails to show that any issue he claims to have

14   identified goes to admissibility rather than to weight.

15       Recordings are "generally admissible unless the unintelligible

16   portions are so substantial that the recording as a whole is

17   untrustworthy."  United States v. Lane, 514 F.2d 22, 27 (9th Cir.

18   1975).  Further, "[t]he inaudibility of a portion of a tape, which is

19   generally audible, is relevant only to its weight, a jury question,

20   not to its admissibility."  United States v. Robinson, 956 F.2d 1388,

21   1395 (7th Cir. 1992).  The recorded conversations played at trial

22   contained brief unintelligible portions, as in any normal

23   conversation, but defendant fails to show that such lapses, which

24   were noted in the jury transcripts, render untrustworthy the

25   recordings as a whole.  Because the audio recordings played at trial

26   were clear and complete, the Court did not err in admitting them.

27       Defendant also attacks the accuracy of the translations of the

28   calls from the Eastern Armenian language to English.  Significantly,

GER000366

however, defendant did not present his own alternative interpretation
of the recordings and offer alternative transcripts, as he was free
to do.  Because defendant presented no alternative translations, and
because defendant was able to cross-examine the interpreter and argue
the weight of the evidence to the jury, the Court did not err in
admitting the transcriptions.  See United States v. Armijo, 5 F.3d
1229, 1234-35 (9th Cir. 1993) (holding no error where the district
court admitted a written Spanish-to-English translation of a
recording, where there was testimony regarding the accuracy of that
transcript, and where defendant was able to argue an alternative
translation).

Defendant, therefore, fails to show that admission of either the
recorded conversations or the English-language transcripts of those
calls was error that requires, in the interests of justice, a new
trial.

### D. **The Evidence Was Sufficient**

Finally, defendant claims that the evidence was insufficient to
support the verdicts, pointing to investigative techniques not used.
and to the absence of evidence of his gang association.  Arrayed
against the defendant, however, was the evidence of recorded calls,
the surveillance of defendant's movements, defendant's statements to
Glendale Police officers during a traffic stop, the cash observed by
those officers in the back of defendant's car, and the bank records
for his business showing no large cash deposit.

The evidence showed that defendant actively participated in the
scheme.  In wiretap calls, defendant discussed aspects of the scheme
with co-defendant MHER DARBINYAN, the scheme's leader.  Among other
things, on July 18, 2009, defendant told DARBINYAN that organizers of

6

GER000367

runners, including co-defendant Khachatur Arakelyan, had gone to "greet" (meaning come back with money), and that they had retrieved criminal proceeds from "the day and night," referring the practice of fraudsters of taking a customer's daily maximum withdrawal before midnight and after midnight, in order to steal as much money as possible. (Ex. 149.) On August 8, 2009, defendant told DARBINYAN that co-defendant Arakelyan had brought "30 . . . large" in criminal proceeds. (Ex. 166.) On August 28, 2009, defendant told DARBINYAN that co-defendant Arakelyan had brought "10 and nine" ($10,900) in criminal proceeds, and that Arakelyan still had fraudulent access devices in his possession. (Ex. 173.) And, on September 4, 2009, defendant told DARBINYAN that co-schemer Hagop Simitian had brought a total of $9,500 in criminal proceeds, and had "took out 1900," which was precisely the 20% commission fee that DARBINYAN stated in other calls was the portion of criminal proceeds for the organizers of runners. (Ex. 180.)

Further, there was substantial evidence that defendant transported scheme proceeds for DARBINYAN on July 18, 2009. This evidence included the following:

- A call between defendant and co-defendant DARBINYAN in the early afternoon of July 18, 2009, in which defendant informed DARBINYAN in vague and coded language about the status of runners and in which defendant told DARBINYAN that the runners had been "two times" using the "day and night" method. (Ex. 149A.)

- A second call on the same day between defendant and DARBINYAN, at 5:25 p.m., in which DARBINYAN says that he will come by

GER000368

1    defendant's store and says, "There are things that I need to
2    give you and stuff." (Ex. 155A.)
3    • A call on the same day at 7:38 p.m., in which co-defendant
4      DARBINYAN tells co-defendant RAYMOND TARVERDYAN that, "They had
5      already done some and had about 30 left[,]" and then says that
6      he "need[s] to stop by . . . Rafo's place. . . . I'll have Rafo
7      . . . so he drives, so I don't take it on me." (Ex. 156A.)
8    The jury heard testimony from an FBI special agent that
9    DARBINYAN was seen arriving that evening at the cell phone store
10   operated by the defendant. The jury also heard:
11   • A call on the same day at 8:14 p.m., in which DARBINYAN tells
12     TARVERDYAN that "My friend is coming now and he is bringing
13     those things." (Ex. 157A.)
14   The jury heard testimony from the FBI special agent that
15   defendant drove away from his cell phone store after DARBINYAN had
16   arrived. The jury heard that a few minutes after the defendant left
17   the cell phone store, defendant was stopped by Glendale Police
18   officers, who conducted a consent search of defendant's BMW. During
19   the search the officers located a shopping bag in the rear seat,
20   containing approximately $34,000 in cash. When asked about the cash,
21   the defendant stated to the officers that the cash was proceeds of
22   his business that he was intending to deposit in his business
23   account. The defendant was then permitted to drive away with the
24   cash. The calls continued:
25   • A call on July 18, 2009 at 8:45 p.m. between TARVERDYAN and
26     DARBINYAN, in which TARVERDYAN says: "Brother, this guy is not
27     here . . . He said he would be here in 15 minutes. Brother,
28     half an hour passed and he is still not here." (Ex. 158A.)

8

GER000369

- A call the same day at 10:20 p.m. between TARVERDYAN and DARBINYAN, in which TARVERDYAN says: "That matter is a 'touch-down,' friend . . . My matter is a 'touch-down' . . . That he came, bro, he came, he came, it's a 'touch-down. . . . They had stopped him, but it's all okay."

The jury also heard testimony from a Bank of America representative that PARSADANYAN did not deposit any large amount of cash to his business account during the following month.

This was sufficient evidence for the jury, which had been instructed on aiding and abetting, (Court's Instruction No. 44, Doc. 3190), to conclude beyond a reasonable doubt that the defendant had committed bank fraud.  Defendant has therefore failed to meet his burden of showing that this is an "exceptional case[] in which the evidence preponderates highly against the verdict."  Pimentel, 654 at 545 (9th Cir. 1981).  Defendant's request for a new trial on the grounds of sufficiency should therefore be denied.

Finally, defendant claims the verdicts are inconsistent, but fails to recognize that even if this were the case, which it is not, "[i]nconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict."  United States v. Suarez, 682 F.3d 1214, 1218 (9th Cir. 2012) (citation omitted). Thus, there is no reason for a new trial.

///

///

///

9

GER000370

III. **CONCLUSION**

    For foregoing reasons, the government respectfully requests that the Court deny defendant's motion for new trial.

Dated: June 23, 2014            Respectfully submitted,

                            ANDRÉ BIROTTE JR.
                            United States Attorney

                            ROBERT E. DUGDALE
                            Assistant United States Attorney
                            Chief, Criminal Division

                                    /s/

                            E. MARTIN ESTRADA
                            ELIZABETH R. YANG
                            Assistant United States Attorney
                            ANDREW CREIGHTON
                            Trial Attorney, Department of Justice

                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA

GER000371

1   ANDRÉ BIROTTE JR.
    United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    E. MARTIN ESTRADA (Cal. SBN: 223802)
4   ELIZABETH R. YANG (Cal. SBN: 196461)
    Assistant United States Attorneys
5   ANDREW CREIGHTON (Maryland State Bar Member)
    Trial Attorney, U.S. Department of Justice
6       1500 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone: (213) 894-3358/1785/7408
8       Facsimile: (213) 894-3713
        Email:   Martin.Estrada@usdoj.gov
9                Elizabeth.Yang@usdoj.gov
                 Andrew.Creighton@usdoj.gov
10
    Attorneys for Plaintiff
11  UNITED STATES OF AMERICA

12              UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                    WESTERN DIVISION

15  UNITED STATES OF AMERICA,          No. CR 11-72(A)-DDP

16          Plaintiff,                 GOVERNMENT'S POSITION RE: PRE-
                                        SENTENCE REPORT AND SENTENCING OF
17          v.                          DEFENDANT RAFAEL PARSADANYAN (#35)

18  MHER DARBINYAN, et al.,

19          Defendants.

20

21      Plaintiff United States of America, by and through its attorney

22  of record, the United States Attorney for the Central District of

23  California, hereby files its position regarding the Presentence

24  Report ("PSR") submitted by the United States Probation Office for

25  defendant RAFAEL PARSADANYAN ("defendant").

26  ///

27  ///

28

                            1

The government's sentencing position is based on the attached memorandum of points and authorities, the PSR, the attached exhibit, the records and files of this case, and any argument that the Court may request at the sentencing hearing.  The government respectfully requests the opportunity to supplement its position as may become necessary.

Dated: July 22, 2014                    Respectfully submitted,

                                        ANDRÉ BIROTTE JR.
                                        United States Attorney

                                        ROBERT E. DUGDALE
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                        _____/s/_____
                                        E. MARTIN ESTRADA
                                        ELIZABETH R. YANG
                                        Assistant United States Attorneys
                                        ANDREW CREIGHTON
                                        Trial Attorney, DOJ

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

GER000373

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ............................... 1

I.    INTRODUCTION ................................................. 1

II.   BACKGROUND ................................................... 2

III.  ARGUMENT ..................................................... 6

      A.    The Sentencing Guidelines ............................. 6

            1.    The Standard of Proof Applicable at Sentencing ..... 6

            2.    Defendant's Guidelines Calculations ............... 7

                  a.    Loss Amount ................................. 8

                  b.    Victim Adjustment ........................... 12

                  c.    Sophisticated Means ......................... 12

                  d.    Device-Making Equipment ..................... 13

      B.    Section 3553(A) Factors ............................... 15

IV.   THE GOVERNMENT'S RESTITUTION RECOMMENDATION ................. 16

V.    CONCLUSION ................................................... 17

i

GER000374

<div align="center">**TABLE OF AUTHORITIES**</div>

DESCRIPTION                                                        PAGE

**CASES:**

Nichols v. United States,
    511 U.S. 738 (1994) .........................................7

United States v. Armstead,
    552 F.3d 769 (9th Cir. 2008) ...............................6

United States v. Booker,
    543 U.S. 220 (2005) .......................................15

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000) .................................9

United States v. Carty,
    520 F.3d 984 (9th Cir. 2008) ..............................15

United States v. Christensen,
    732 F.3d 1094 (9th Cir. 2013) ..............................7

United States v. Cruz,
    713 F.3d 600 (11th Cir. 2013) .............................14

United States v. Egu,
    379 F. Appx. 605 (9th Cir. 2010).......................12, 13

United States v. Gutierrez,
    453 F. Appx. 705 (9th Cir. 2011).........................15

United States v.  Johnson,
    540 F. Appx. 573 (9th Cir. 2013).......................6, 7

United States v. Lambert,
    498 F.3d 963 (9th Cir. 2007) ..............................14

United States v. Ortiz,
    362 F.3d 1274 (9th Cir. 2004) ...........................9, 12

United States v. Riley,
    335 F.3d 919 (9th Cir. 2003) ...............................6

United States v. Robinson,
    538 F.3d 605 (7th Cir. 2008) ..............................12

United States v. Treadwell,
    593 F.3d 990 (9th Cir. 2010) ...............................8

GER000375

Case 2:11-cr-00072-RGK Document 399 Filed 07/22/14 Page 5 of 23 Page ID #:20897

**TABLE OF AUTHORITIES (Continued)**

United States v. W. Coast Aluminum Heat Treating Co.,
    265 F.3d 986 (9th Cir. 2001) ..................................8

United States v. Wayland,
    549 F.3d 526 (7th Cir. 2008) ...............................12

**FEDERAL STATUTES**

18 U.S.C. § 1029(e)(6)..........................................14

18 U.S.C. § 3553(a).............................................15

18 U.S.C. § 3661..............................................7, 8

**FEDERAL RULES**

Fed. R. App. P. 32.1(a).........................................7

Fed. R. Evid. 1101(d)(3)........................................7

iii

GER000376

1             <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2 **I.**    **INTRODUCTION**

3      On April 17, 2014, a jury convicted defendant RAFAEL

4 PARSADANYAN ("defendant" or "PARSADANYAN") of 14 counts of Bank

5 Fraud, in violation of Title 18, United States Code, Section 1344

6 (Counts 38-41, 44-45, 48, 50-51, 54, 57, 60, 63, 66). The criminal

7 conduct underlying defendant's convictions arose out of his

8 participation in a wide-ranging scheme to steal money from the bank

9 accounts of hundreds of customers of the discount store 99 Cents

10 Only Stores.

11      On June 11, 2014, the United States Probation Office ("USPO")

12 disclosed to the parties its Presentence Report ("PSR") in this

13 matter. The USPO determined that defendant's Sentencing Guidelines

14 total offense level for all counts of conviction is 33. The USPO

15 arrived at this figure by determining that defendant was subject to

16 a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), a 16-level

17 upward adjustment for a loss of more than one million dollars under

18 U.S.S.G. § 2B1.1(b)(1)(I), a 6-level upward adjustment for 250 or

19 more victims under U.S.S.G. § 2B1.1(b)(2)(C), a 2-level upward

20 adjustment for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C),

21 and a 2-level upward adjustment for device-making equipment under

22 U.S.S.G. § 2B1.1(b)(11)(A). <u>See</u> PSR ¶¶ 14-26. Coupled with

23 defendant's criminal history category of Category I, <u>see</u> PSR ¶¶ 31-

24 32, these calculations result in a Sentencing Guidelines range of

25 imprisonment of 135 to 168 months incarceration. <u>See</u> PSR ¶ 60.

26      The government agrees with all of the USPO's calculations,

27 except that the government believes that defendant's intended loss

28 amount as to his Bank Fraud convictions is greater than 2.5 million

GER000377

1 dollars, such that an 18-level enhancement pursuant to U.S.S.G.

2 § 2B1.1(b)(1)(J) is applicable. With an 18-level enhancement for

3 loss, defendant's total offense level is 35, and his Sentencing

4 Guidelines range of imprisonment of 168 to 210 months incarceration.

5 Based on the Sentencing Guidelines range and the factors set forth

6 in Title 18, United States Code, Section 3553(a), the government

7 believes that defendant should be sentenced to 168 months'

8 incarceration, to be followed by five years' supervised release, and

9 a special assessment of $1,400. Defendant should also be ordered to

10 pay restitution in the amount of $167,169.57.

11 **II. BACKGROUND**

12     The evidence at trial showed, among other things, that

13 beginning in or around July 2009, and continuing

14 through September 2009, defendant, co-defendant MHER DARBINYAN

15 ("DARBINYAN"), and others executed a scheme to defraud Bank of

16 America, Guaranty Bank, Altura Credit Union, Ventura County Credit

17 Union, Schools First Credit Union, U.S. Bank, and other financial

18 institutions as to material matters and to obtain money and property

19 from Bank of America, Guaranty Bank, Altura Credit Union, Ventura

20 County Credit Union, Schools First Credit Union, U.S. Bank, and

21 other financial institutions by means of material false and

22 fraudulent pretenses, representations, and promises, and the

23 concealment of material facts.

24     This large-scale bank fraud and access device fraud scheme

25 targeted customers of 99 Cents Only Stores and generally operated as

26 follows:  Defendant and his co-schemers would purchase point-of-sale

27 ("POS") terminals (credit card/debit card key pads), the same type

28 used by 99 Cents Only Stores, and would insert skimming devices in

<center>2</center>

GER000378

1  the POS terminals.  Co-schemers would then go to 99 Cents Only

2  Stores - in Riverside, Whittier, Huntington Beach, Ventura, San

3  Diego, and elsewhere - to switch out the original terminals for

4  their altered terminals equipped with skimmers.  Days later, the

5  schemers would go back and retrieve their skimmer-equipped

6  terminals, replacing them with the original POS terminals.  Once

7  they retrieved the skimming devices, defendant, DARBINYAN, and their

8  co-schemers would round up teams of runners, provide them with debit

9  cards re-encoded with the debit card numbers captured from the 99

10 Cents Only Store customers, direct the runners to use the cards at

11 ATMs to withdraw money from the victims' bank accounts, and then

12 distribute the proceeds.  The scheme targeted thousands of victims,

13 many of whom testified at trial.

14      Defendant helped coordinate the scheme from his cellular

15 telephone business in Glendale, where he would distribute packets of

16 re-encoded cards to co-defendants responsible for recruiting and

17 organizing runners, and receive and distribute criminal proceeds.

18 Officers repeatedly recorded defendant and his co-defendants

19 discussing and carrying out the scheme in telephone calls.

20      Testimony at trial showed that in these conversations the term,

21 "greeted," was used to refer to successful ATM withdrawals using re-

22 encoded cards, and that the phrase, "day and night," was used to

23 refer to the withdrawal of funds both shortly before and shortly

24 after midnight, in order to evade ATM maximum daily withdrawal

25 limits.  For example, on July 18, 2009, defendant and DARBINYAN had

26 the following exchange:

27      DARBINYAN: "Bro, they went to the thing . . . right?  To

28      greet . . . already."

GER000379

1    PARSADANYAN: "Yeah, yeah, yeah."

2    DARBINYAN: "Khecho and others already went, right?"

3    PARSADANYAN: Everything is already ready, bro."

4    DARBINYAN: "How is it ready?"

5    PARSADANYAN: "It has been **greeted** already." . . .

6    DARBINYAN: "Is that from that one time?"

7    PARSADANYAN: "Yeah. . . . It's the '**Day and Night**,'

8    brother . . . It's from the **two times**."

9    (Gov't Ex. 149, July 18, 2009 (emphasis added).)

10   Evidence at trial also showed that defendant transported cash

11   in furtherance of the scheme. On the evening of July 18, 2009,

12   Glendale police officers conducted a traffic stop on defendant.

13   Prior to the traffic stop, law enforcement intercepted telephone

14   calls between co-defendants DARBINYAN and RAYMOND TARVERDYAN

15   ("TARVERDYAN") in which DARBINYAN told TARVERDYAN that defendant

16   would be transporting fraud proceeds to TARVERDYAN for DARBINYAN.

17   (E.g., Gov't Ex. 156, July 18, 2009.) That same evening, law

18   enforcement surveilled DARBINYAN meeting with defendant at

19   defendant's cell phone store. During a search of defendant's

20   vehicle, officers discovered approximately $34,000 in cash in a

21   shopping bag. Shortly after officers let defendant continue on his

22   way,[1] the following conversation took place between co-defendants

23   DARBINYAN and TARVERDYAN:

24   TARVERDYAN: "That matter is a 'touch-down,' friend."

25   DARBINYAN: "What?"

26   TARVERDYAN: "My matter is a touchdown."

27   _____

28   [1] The officers did not seize the money because doing so could
     have exposed the wiretap investigation.

4

GER000380

1    DARBINYAN: "Your matter?"

2    TARVERDYAN: "That he came, bro, he came, he came, it's a

3        'touchdown.'"

4    DARBINYAN: "Oh, did he just come, bro?"

5    TARVERDYAN: "Yeah, yeah. . . . **They had stopped him, but it's**

6        **all okay.**"

7    (Gov't Ex. 160, July 18, 2009 (emphasis added).)

8        Throughout the time of the scheme, defendant repeatedly

9    discussed with DARBINYAN coordinating the retrieval and use of

10   victims' re-encoded debit cards, and obtaining fraud proceeds from

11   other co-schemers.  For instance, on August 8, 2009, defendant and

12   DARBINYAN were recorded discussing the scheme in the following

13   conversation:

14   DARBINYAN: "Did they finish?"

15   PARSADANYAN: "Yeah, bro.  I saw Hayko yesterday and took care

16       of everything."

17   DARBINYAN: "Yeah? Okay."

18   PARSADANYAN: "Yeah, bro. Yeah."

19   DARBINYAN: "What happened?"

20   PARSADANYAN: "Uh . . . the total about 30."

21   DARBINYAN: "30 . . . Uh . . ."

22   PARSADANYAN: "Large."

23   (Gov't Ex. 166, August 8, 2009.)

24       Later, on August 9, 2009, DARBINYAN asked defendant about

25   "yesterday's things," and defendant responded, "It should be

26   already ready . . . We are waiting for it to arrive . . . He said

27   in two days."  (Gov't Ex. 167, August 9, 2009.)

28

5

GER000381

1    Defendant also repeatedly received money from other co-schemers

2    who were responsible for recruiting runners.  On August 28, 2009,

3    defendant discussed with DARBINYAN receiving fraud proceeds from co-

4    defendant KHACHATUR ARAKELYAN, aka "Khecho" ("ARAKELYAN"):

5    DARBINYAN asked about "Khecho" bringing "the money," and defendant

6    responded, "It was ten and nine ($10,900) . . . It was the second

7    one."  DARBINYAN asked if ARAKELYAN still had re-encoded cards to

8    use, and defendant said, "He has everything."  (Gov't Ex. 173,

9    August 28, 2009.)

10    Also, on August 30, 2009, DARBINYAN discussed getting "greens"

11    from a recruiter, and on September 4, 2009, defendant confirmed that

12    the recruiter, "Hakopik" had come to defendant's business and

13    dropped off a "total of 9.5" and taken out his "1900" (20% of the

14    proceeds, which was the agreed upon rate for the recruiters).

15    (Gov't Ex. 179, September 4, 2009.)

16    Defendant's involvement in the scheme covered its full time

17    frame, from July to September 2009.

18  **III.  ARGUMENT**

19      **A.    The Sentencing Guidelines**

20          1.    The Standard of Proof Applicable at Sentencing

21    The Ninth Circuit has been clear that when a Sentencing

22    Guidelines enhancement is based on the scope of "criminal activity

23    for which the defendant has already been convicted," a preponderance

24    standard applies.  United States v. Armstead, 552 F.3d 769, 777 (9th

25    Cir. 2008).  Indeed, the Ninth Circuit has repeatedly applied a

26    preponderance standard in determining sentencing enhancements under

27    U.S.S.G. § 2B1.1, even when those enhancements are substantial.  See

28    id. (applying preponderance standard to loss and victim enhancements

6

GER000382

1    under U.S.S.G. § 2B1.1); <u>United States v. Riley</u>, 335 F.3d 919, 926-

2    27 (9th Cir. 2003) (applying preponderance standard to loss

3    enhancement under U.S.S.G. § 2B1.1); <u>see also</u> <u>United States v.</u>

4    <u>Johnson</u>, 540 Fed. Appx. 573, 576-77 (9th Cir. 2013)[2] (applying

5    preponderance standard to 16-level loss enhancement and 2-level

6    victim enhancements under U.S.S.G. § 2B1.1).

7         Further, with regard to determinations of facts for purposes of

8    sentencing, the Ninth Circuit has explained, "The Federal Rules of

9    Evidence do not apply at a sentencing hearing." <u>United States v.</u>

10   <u>Christensen</u>, 732 F.3d 1094, 1102 (9th Cir. 2013) (citing Fed. R.

11   Evid. 1101(d)(3)); <u>see also</u> U.S.S.G. § 6A1.3 ("In resolving any

12   dispute concerning a factor important to the sentencing

13   determination, the court may consider relevant information without

14   regard to its admissibility under the rules of evidence applicable

15   at trial, provided that the information has sufficient indicia of

16   reliability to support its probable accuracy."). "Indeed, 'a

17   sentencing judge may appropriately conduct an inquiry broad in

18   scope, largely unlimited either as to the kind of information he may

19   consider, or the source from which it may come.'" <u>Id.</u> (quoting

20   <u>Nichols v. United States</u>, 511 U.S. 738, 747 (1994)). Federal law

21   expressly provides that "[n]o limitation shall be placed on the

22   information concerning the background, character, and conduct of a

23   person convicted of an offense which a court of the United States

24

25        [2] Pursuant to Federal Rule of Appellate Procedure 32.1, "a
26   court may not prohibit or restrict the citation of federal judicial
     opinions" that have been designated unpublished but "issued on or
27   after January 1, 2007." Fed. R. App. P. 32.1(a). Under Ninth
     Circuit Rule 36-3, unpublished dispositions "issued on or after
28   January 1, 2007 may be cited to the courts of this circuit in
     accordance with FRAP 32.1."

GER000383

may receive and consider for the purpose of imposing an appropriate sentence." See 18 U.S.C. § 3661.

### 2. Defendant's Guidelines Calculations

The record shows that defendant's total offense level is 35. The USPO found that defendant was subject to a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), a 16-level upward adjustment for a loss of more than $1 million under U.S.S.G. § 2B1.1(b)(1)(I), a 6-level upward adjustment for 250 or more victims under U.S.S.G. § 2B1.1(b)(2)(C), a 2-level upward adjustment for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C), and a 2-level upward adjustment for device-making equipment under U.S.S.G. § 2B1.1(b)(11)(A). See PSR ¶¶ 14-26. The government agrees with all the USPO's calculations, except that the government believes that defendant's intended loss amount is more than $2.5 million, such that an 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) is applicable. These calculations result in a Sentencing Guidelines range of 168 to 210 months incarceration.

### a. Loss Amount

Under the Sentencing Guidelines, "loss" is defined as "the greater of actual loss or intended loss." See U.S.S.G. § 2B1.1, cmt. n.3(A). "Intended loss" is defined as "the pecuniary harm that was intended to result from the offense," and "includes intended pecuniary harm that would have been impossible or unlikely to occur." Id. § 2B1.1 cmt. n.3(A)(ii). In determining loss, the district court "need only make a reasonable estimate of the loss." Id. § 2B1.1 cmt. n.3(C); United States v. W. Coast Aluminum Heat Treating Co., 265 F.3d 986, 991 (9th Cir. 2001) ("[T]he district court's obligation is to adopt a reasonable 'realistic, economic'

8

1  projection of loss based on the evidence presented."). "[A]

2  district court is not required to proceed item-by-item through a

3  complete list of all losses attributed to a criminal conspiracy."

4  United States v. Treadwell, 593 F.3d 990, 1003 (9th Cir. 2010).

5  Where some victims experienced actual loss and others faced only an

6  intended loss, the actual loss should be included within the

7  intended loss. See United States v. Carboni, 204 F.3d 39, 47 (2d

8  Cir. 2000) ("Logically, intended loss must include both the amount

9  the victim actually lost and any additional amount that the

10 perpetrator intended the victim to lose.").

11     A defendant is responsible not just for losses that he intended

12 or caused but also for losses that he could reasonably foresee his

13 co-conspirators intended or caused. The Guidelines state that loss

14 amount is determined on the basis of "(1)(A) all acts and omissions

15 committed, aided, abetted . . . or willfully caused by the

16 defendant" and also:

17        (B) in the case of a jointly undertaken criminal

18        activity . . . whether or not charged as a

19        conspiracy[], all reasonably foreseeable acts and

20        omissions of others in furtherance of the jointly

21        undertaken criminal activity.

22 U.S.S.G. § 1B1.3(a)(1); see United States v. Ortiz, 362 F.3d 1274,

23 1277 (9th Cir. 2004) (the conduct of others must be jointly

24 undertaken and reasonably foreseeable).

25     The 99 Cents Only Stores scheme involved significant intended

26 losses. This is based on POS terminals that were recovered, as well

27 as others known to have been used that were not recovered.

28 Defendants were observed on surveillance camera footage installing

GER000385

and retrieving POS terminals containing skimming devices at ten 99 Cents Only Stores, including stores at Limonite (Store 285), Arlington (Store 104), Magnolia (Store 134), Beach (Store 75), Brookhurst (Store 97), Camarillo (Store 113), Ventura (Store 213), Whittier (Store 76), University (Store 144), and Claremont-Mesa (Store 142).  In addition, there were other 99 Cent Only Stores where POS terminals were swapped, but for which no video footage was obtained, including stores in Venice (Store 92), Woodman (Store 42), Reseda (Store 47), North Hollywood (Store 61), and Northridge (Store 106).

Officers were able to seize four POS terminals before defendants could remove them, and those POS terminals were found to contain a total of 1,983 unique account numbers.  These four include terminals at Limonite (1,058 account numbers), Beach (330), and Brookhurst (553).  The fourth terminal, from the Arlington store, was recovered before it could skim substantial amounts of access devices, and therefore contained only 42 account numbers.

Based on the POS terminals seized by law enforcement, the Court should also estimate the number of access devices (unique account numbers) obtained by defendants from the POS terminals at the 99 Cents Only Stores where the defendants planted and then successfully retrieved skimming devices.  See U.S.S.G. § 2B1.1 cmt. n.3(C) (requiring only that a district court "make a reasonable estimate of the loss").  On the three POS terminals seized that actually remained in place for a period of time – the Limonite store (1,058), the Brookhurst store (553), and the Beach store (330) – there was an average of 647 unique credit/debit card numbers captured per POS terminal.  Thus, for the 6 stores where there is video footage of

10

GER000386

1  defendants successfully retrieving POS terminals, there are an

2  additional 3,882 access devices (6 devices x 647 average).

3       Under Application Note 3(F)(i) of U.S.S.G. § 2B1.1, a minimum

4  of $500 applies to each access device. That would result in an

5  intended loss of $2,932,500 (3,882 (estimated) + 1,983 (seized) x

6  $500).

7       But even a $2,932,500 loss amount does not accurately account

8  for defendant's conduct. Defendant and his co-defendants repeatedly

9  discussed maximizing the amount of money they could obtain using the

10 counterfeit debit cards by using the cards two and three times each.

11 The evidence showed that defendants used the cards both before and

12 after midnight in order to circumvent the $500 daily ATM withdrawal

13 limit, and take out $1000 or more. (See Gov't Ex. 147, Call # 3529

14 (MD (defendant) to RT: "They will bring it all . . . You will see

15 what it is and how it is. You will separate it. Then, they will

16 come and take theirs until they start the next round."); Gov't Ex.

17 149, Call # 3562 (RP: "Everything is already ready, bro . . . It has

18 been greeted already."; MD: "Did he not go the second time?"; RP:

19 "Oh, no, brother. Not the second time. Here, I'll call Khecho and

20 tell him to come then"; MD: "Is that from that one time?"; RP: "No.

21 It's the 'day and night' brother . . . It's from the two times");

22 Gov't Ex. 176, Call # 4087 (MD: "These judokas that got into it, did

23 they get into two rounds?"; KA: "Yeah-yeah"; MD: "Okay"; KA: "The

24 ones that have been completed so far are two rounds . . . but bro,

25 one of them is not tired at all. The third one should work as

26 well.").)

27      Therefore, a $1000 figure per access device more accurately

28 reflects defendant and his co-defendants' conduct. This results in

GER000387

1  an intended loss of $5,865,000 (3,882 (estimated) + 1,983 (seized) x

2  $1,000).

3      Accordingly, the government believes that the Court should

4  impose an 18-level upward adjustment for loss of more than 2.5

5  million dollars, but not more than 7 million dollars, under U.S.S.G.

6  § 2B1.1(b)(1)(J).

7                    **b.    Victim Adjustment**

8      A 6-level adjustment for 250 or more victims also applies.

9  Information provided by the banks and credit unions shows that, from

10  July to August 2009, at least 305 victim accounts were used in the

11  scheme.  Furthermore, intercepted wiretap calls show that co-

12  defendants discussed using the debit cards of well over 250 victims.

13  (See Gov't Ex. 142, Call # 3399 (conversation between DARBINYAN and

14  co-defendant GAREN CHOULDJIAN discussing 400 fraudulently obtained

15  account numbers to be used by "runners").)  Hence, a 6-level

16  enhancement for 250 or more victims under U.S.S.G. § 2B1.1(b)(2)(C)

17  applies.

18                    **c.    Sophisticated Means**

19      An enhancement under Section 2B1.1(b)(10)(C) for "sophisticated

20  means" applies to "especially complex or especially intricate

21  offense conduct pertaining to the execution or concealment of an

22  offense."  See U.S.S.G. § 2B1.1, cmt. 8(B).  As an example of

23  sophistication, the Sentencing Guidelines state that "in a

24  telemarketing scheme, locating the main office of the scheme in one

25  jurisdiction but locating soliciting operations in another

26  jurisdiction ordinarily indicates sophisticated means."  Id.  Courts

27  have held that "[o]ffense conduct is sophisticated if it displays 'a

28  greater level of planning or concealment'" than a typical fraud

12

GER000388

1  scheme.  <u>See</u> <u>United States v. Wayland</u>, 549 F.3d 526, 528 (7th Cir.

2  2008) (quoting <u>United States v. Robinson</u>, 538 F.3d 605, 607 (7th

3  Cir. 2008)).  For instance, the Ninth Circuit applied the

4  "sophisticated means" enhancement in <u>United States v. Egu</u>, 379 Fed.

5  Appx. 605 (9th Cir. 2010), when it held that a "sophisticated means"

6  enhancement was properly included where the defendant "fraudulently

7  opened new credit accounts using the victims' personal identifiers

8  . . . had fraudulently-purchased goods delivered to upscale, vacant

9  homes in order to avoid detection; and made bursts of purchases on

10  new credit accounts before creditors shut the accounts down."  <u>Id.</u>

11  at 607.  Further, the court held that "the district court properly

12  considered the number of victims" in applying the "sophisticated

13  means" enhancement, "because the use of multiple victims to obtain

14  multiple cards was a sign of sophistication."  <u>Id.</u>

15      The evidence shows that the 99 Cents Only Stores scheme

16  employed especially complex conduct with regard to both its

17  execution and concealment.  Among other things, defendant's and his

18  codefendants' roles were specialized to ensure the success of the

19  scheme and avoid detection.  Some defendants were tasked with going

20  to 99 Cents Only Stores and swiftly removing the legitimate POS

21  terminals and installing the corrupted POS terminals.  Other

22  defendants were skilled at removing the skimming devices from the

23  POS terminals, downloading the stolen debit-card information, and

24  creating fraudulent/counterfeit access devices.  Still other

25  defendants recruited runners – individuals willing to go to bank

26  ATMs (notwithstanding bank surveillance video) and use the

27  fraudulent/counterfeit access devices to steal money – and then

28  collected and distributed the money to other defendants.  The 2-

GER000389

1  level enhancement for sophisticated means under U.S.S.G. §

2  2B1.1(b)(10)(C) clearly applies to defendant.

### d. Device-Making Equipment

4      Section 2B1.1(b)(11)(A) imposes a 2-level upward adjustment for

5  an offense involving device-making equipment. "Device-making

6  equipment" is defined according to Title 18, United States Code,

7  Section 1029, see U.S.S.G. § 2B1.1, cmt. 9(A), which, in turn,

8  defines the term as "any equipment, mechanism, or impression

9  designed or primarily used for making an access device or a

10 counterfeit access device." See 18 U.S.C. § 1029(e)(6).

11     Here, the 99 Cents Only Stores fraud scheme involved the

12 harvesting of customer debit-card information in order to create

13 counterfeit debit cards, which were then used in order to withdraw

14 money from the victim-account owners' bank accounts without the

15 victim-account owners' consent, knowledge, or authorization. Hence,

16 by its very nature, the scheme required the use of device-making

17 equipment in order to manufacture the fraudulent debit cards that

18 would then be used by runners at ATMs. See United States v. Cruz,

19 713 F.3d 600, 607-08 (11th Cir. 2013) (affirming application of the

20 enhancement where possession of a re-encoded card rendered

21 reasonably foreseeable the use of device-making equipment).[3]

22

_____

23     [3] Although potentially applicable, the government does not seek
here a 2-level upward adjustment for use of a means of
24 identification to obtain another means of identification under
U.S.S.G. § 2B1.1(b)(11)(C)(i). The Ninth Circuit has instructed
25 that "[t]he Guidelines, including enhancements, are ordinarily
applied in light of available commentary, including application
26 notes." United States v. Lambert, 498 F.3d 963, 966 (9th Cir.
2007). The application notes for Section 2B1.1(b)(11)(C)(i) state
27 that the enhancement applies "in a case in which a means of
identification other than the defendant . . . is used without that
28 individual's authorization unlawfully to produce or obtain another

14

**B.** **Section 3553(A) Factors**

A sentencing court must start with the sentence advised by the Sentencing Guidelines. United States v. Booker, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). The Ninth Circuit has held that the Sentencing Guidelines sentence is a "starting point" to determine a reasonable sentence and that a sentence under the Sentencing Guidelines will usually be reasonable. See United States v. Carty, 520 F.3d 984, 994 (9th Cir. 2008) (en banc).

The government believes that the recommended sentence is reasonable in light of the factors the Court must consider under 18 U.S.C. § 3553(a). Specifically, such a sentence justly reflects the seriousness of defendant's crime of participating in an expansive and complex bank fraud scheme that targeted thousands of customers of the discount store, 99 Cents Only Stores. The recommended

---

means of identification." See U.S.S.G. § 2B1.1, n.9(C). As examples, the application notes state that the enhancement applies where a "defendant obtains an individual's name and social security number from a source . . . and obtains a bank loan in that individual's name," and where a "defendant obtains an individual's name and address from a source . . . and applies for, obtains, and subsequently uses a credit card in that individual's name." Id.; see United States v. Gutierrez, 453 Fed. Appx. 705, 706 (9th Cir. 2011) (applying 2-level enhancement for use of a means of identification to obtain another means of identification where defendant used "a customer's signature to obtain a loan for his own benefit"). Here, defendant, in his check fraud scheme, unlawfully obtained victims' means of identification, including names, account numbers, social security numbers, and dates of birth, and used them to obtain another means of identification, namely, bank checks in those victims' names. This conduct falls squarely within the examples set forth in Section 2B1.1(b)(11)(C)(i)'s application notes. Accordingly, the 2-level enhancement under Section 2B1.1(b)(11)(C)(i) applies. Nonetheless, because the government is pursuing imposition of a 2-year mandatory, consecutive sentence under Section 1028A, it does not seek this enhancement here.

15

GER000391

1   sentence takes into account the nature of all the offense conduct

2   charged and defendant's criminal history.  Thus, the recommended

3   sentence would serve to promote respect for the criminal laws, work

4   to deter defendant and others from further criminal activity, and

5   serve to protect the public from future crimes by this defendant.

6        Furthermore, defendant's history and characteristics support

7   the sentence.  Defendant did not accept responsibility for his

8   misconduct, and even put forth a witness who told a story that

9   cannot be reconciled with the facts.  Moreover, he appears to have

10  had every opportunity to avoid the criminal activity he chose to

11  engage in – he had a cellular telephone business in operation, as

12  well as other employment opportunities, and numerous supportive

13  family members.  See PSR ¶¶ 41, 51-54.  Yet despite these

14  opportunities to avoid criminal conduct, defendant elected to

15  coordinate a scheme that involved stealing money from thousands of

16  customers of a discount store, without regard to the impact that

17  this reprehensible conduct would have on the many victims.

18       Additionally, the deterrence factor under Section 3553(a)

19  is important in this case.  Defendant worked with a leader of a

20  powerful organized crime group to perpetrate crimes.  He

21  associated with DARBINYAN in numerous criminal aspects, even

22  apart from the 99 Cents Only Store Scheme.  It is important

23  that a message be sent to the community that this sort of

24  massive fraud and identity theft is impermissible, and that

25  association with organized crime figures will result in

26  undesirable consequences

27       Hence, the factors set forth in Section 3553(a) support

28  the recommended sentence.

<center>16</center>

GER000392

1   **IV.   THE GOVERNMENT'S RESTITUTION RECOMMENDATION**

2       Defendant participated in a wide-spread conspiracy involving

3   the theft of money from bank accounts belonging to 99 Cents Only

4   Stores customers. Based on the supporting materials, the amount of

5   restitution (actual loss) applicable to defendant is approximately

6   $167,169.57. This is based on the following losses (with

7   adjustments) sustained by the banks and credit unions whose

8   customers' debit card numbers were stolen by defendant and his co-

9   defendant.

10       •   Altura Credit Union = $17,424.45

11       •   Arrowhead Credit Union = $8,199.00

12       •   Bank of America = $51,102.66

13       •   Bank of the West = $8,710.00

14       •   Schools First Credit Union = $6,355.00

15       •   Guaranty Bank = $6,347.50

16       •   Union Bank = $46,297.96

17       •   U.S. Bank = $4,433.00

18       •   Ventura County Credit Union = $18,300.00

19   TOTAL = $167,169.57

20       These calculations are based on spreadsheets provided by the

21   banks and credit unions, all of which are attached hereto as Exhibit

22   1.[4] See Exhibit 1. Accordingly, the government recommends that the

23   Court impose restitution as to defendant in the amount of

24   $167,169.57.

25

26       [4] Although the full amount of loss and full number of customers

27   victimized by the scheme may never be known, at the very least, agents and officers have been able to obtain information from the banks and credit unions demonstrating the minimum losses incurred by

28   customers who shopped at the affected 99 Cents Only Stores.

GER000393

## V.  CONCLUSION

    Based on the foregoing, the government respectfully submits that defendant should be sentenced to 168 months' incarceration, to be followed by five years' supervised release, and a special assessment of $1,400.  Defendant should also be ordered to pay restitution in the amount of $167,169.57.

GER000394

**Exhibit 1**

GER000395

# 99 CENT STORE ACTUAL LOSSES
## AS OF 11-21-2013

| BANKING INSTITUTION | TOTAL FROM BANK | ADJUSTMENT | TOTAL LOSS | REASON FOR ADJUSTMENT | RELEVANT BATES |
|---|---|---|---|---|---|
| Altura Credit Union | $17,424.45 | $0.00 | $17,424.45 | N/A | 025771-772 |
| Arrowhead Credit Union | $9,708.00 | ($1,509.00) | $8,199.00 | APPLE VALLEY SKIM COULDN'T BE CONNECTED TO CREW | 25773 |
| BANK OF AMERICA | | | $51,102.66 | ADJUSTMENT DUE TO DUPLICATE ENTRIES - INITIAL SPREADSHEETS HAD NO "DUPLICATE" NOTATIONS | |
| - Limonite | $22,342.42 | ($8,796.21) | | | 25785 |
| - Magnolia | $17,619.45 | $0.00 | | | 25786-787 |
| - Whittier | $13,937.00 | $0.00 | | | 25789 |
| - Montebello | $6,000.00 | $0.00 | | | 25788 |
| Bank of the West | $8,710.00 | $0.00 | $8,710.00 | N/A | 25790 |
| Schools First CU | $11,610.85 | ($5,255.85) | $6,355.00 | MULTIPLE SKIM LOCATIONS COULDN'T BE POSITIVELY CONNECTED TO CREW | 25803-804 |
| Guaranty Bank | $6,347.50 | $0.00 | $6,347.50 | N/A | 25798 |
| Union Bank | $50,715.45 | ($4,417.49) | $46,297.96 | AMOUNT ADJUSTED DUE TO CLARIFICATION FROM BANK THAT ONLY "APPROVED WITH BALANCE" MEANS A LOSS TO THE BANK | 147351-362 |
| US Bank | $4,433.00 | $0.00 | $4,433.00 | N/A | 25859 |
| Ventura County CU | $18,300.00 | $0.00 | $18,300.00 | LOSS GIVEN BY BANK INVESTIGATOR VERBALLY TO HBPD | 146337 |

TOTAL LOSS $167,169.57

GER000396

Abra

| First Name | Last Name | Card Number | Date of Fraud | Fraud Amount | Attempted | Ind. Tran. Amt | Fraud Location | Location Name | Address | City | Zip Code | Date | Time | Terminal ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AHERNS | AHERNS | 3851 | 07/18/09 | $568.00 | $ 1,360.00 | 300.00 | WELLS FARGO | GLENDORA-602 | | GLENDORA | | 7/18/09 | 4:29 PM | ICAN9006 |
| RENEA | PEREDA | 3851 | 07/22/09 | $ - | $ - | 300.00 | BANK OF AMERICA | FOOTHILL & ROSEMEAD | | PASADENA | | 7/22/09 | 10:19 PM | M92BEEC7 |
| DONNA | BAKER | 3548 | 07/18/09 | $303.00 | $ - | 300.00 | WELLS FARGO | | | TUJUNGA | | 7/18/09 | 1:37 AM | 06650270 |
| | BYLAND | 2862 | 07/18/09 | $555.00 | $ 500.00 | 202.50 | UNION BANK | ENCINITAS WMJ | | ENCINITAS | | 7/18/09 | 1:39 AM | 08191E |
| BYLAND | BYLAND | 2862 | 07/22/09 | $ - | $ - | 202.50 | UNION BANK | ENCINITAS WMJ | | ENCINITAS | | 7/22/09 | 3:47 PM | ICAD0191 |
| BARRETTE | BARRETTE | 1498 | 07/17/09 | $300.00 | $ 2,300.00 | 300.00 | CALS CRANE | | | ENCINO | | 7/17/09 | 6:57 PM | ICAD0191 |
| BARRETTE | BARRETTE | 1769 | 07/17/09 | $300.00 | $ - | 300.00 | US BANK | ENCINITAS WMJ | | ENCINO | | 7/17/09 | 3:46 PM | ICAD4355 |
| MERELDA | CASTILLO | 0173 | 07/17/09 | $300.00 | $ - | 300.00 | WELLS FARGO | SANTA MONICA | | SANTA MONICA | | 7/17/09 | 4:47PM | M82XEVNC1 |
| | CASTILLO | 0173 | 07/18/09 | $303.00 | $300.00 | 203.00 | BANK OF AMERICA | BARRANCA ST | | WEST COVINA | | 7/18/09 | 17:34AM | 9815C |
| ELLEN | CHHOLA | 6083 | 07/18/09 | $303.00 | $600.00 | 303.00 | BANK OF AMERICA | TOPANGA CNYN/VENTURA | | WOODLAND HILLS | | 7/18/09 | 9:25 PM | 0934C |
| SAVANNE | CORTEZ | 4193 | 07/18/09 | $909.00 | $ 2,500.00 | 303.00 | BANK OF AMERICA | | | STANTON | | 7/18/09 | 9:27 AM | ICAD7211 |
| | CORTEZ | 4193 | 07/18/09 | $ - | $ - | 300.00 | BANK OF THE WEST | | 11051 BEACH BLVD | STANTON | 90272 | 7/18/09 | 1:39 PM | ICAD7211 |
| NORTH | DAVANZO | 4193 | 07/18/09 | $303.00 | $800.00 | 303.00 | BANK OF AMERICA | WESTMINSTER | | WESTMINSTER | | 7/18/09 | 1:37 AM | ICAD0191 |
| | DAVANZO | 8423 | 07/18/09 | $203.00 | $ 1,100.00 | 203.00 | BANK OF AMERICA | SEPULVEDA-DEVONSHIRE | | MISSION HILLS | | 7/18/09 | 6:59 PM | ICAD0191 |
| DOUTH | DAVANZO | 3259 | 07/17/09 | $250.00 | $760.00 | 202.50 | BANK OF AMERICA | LAVERNE | | LAVERNE | | 7/17/09 | 6:28 PM | S27K |
| DENISE | DEANO | 3259 | 07/17/09 | $503.00 | $ 1,100.00 | 203.00 | BANK OF AMERICA | WEST ARCADIA | | ARCADIA | | 7/17/09 | 4:32 PM | ICAK5206 |
| | DENO | 3259 | 07/17/09 | $300.00 | $ - | 300.00 | BANK OF AMERICA | 11002 VENTURA BLVD | | STUDIO CITY | | 7/17/09 | 3:56 PM | ICAN2849 |
| CRISTILITA | DUNCAN | 6771 | 07/18/09 | $506.00 | $ - | 300.00 | BANK OF AMERICA | SUNLAND | | SUNLAND | | 7/18/09 | 4:43 AM | ICAH5066 |
| CRISTILITA | DUNCAN | 4353 | 07/18/09 | $ - | $ - | 300.00 | BANK OF AMERICA | DUARTE | | DUARTE | | 7/18/09 | 5:10 PM | LX373423 |
| CRISTINITA | DUNCAN | 4353 | 07/18/09 | $996.00 | $ 1,600.00 | 300.00 | BANK OF AMERICA | PASADENA | | PASADENA | | 7/18/09 | 6:11 PM | LX373423 |
| | DUNCAN | 4353 | 07/18/09 | $ - | $ - | 100.00 | 7-11 | FOOTHILL & ROSEMEAD | | VAN NUYS | | 7/18/09 | | |
| SALLY | GARCIA | 4353 | 07/18/09 | $ - | $ - | 300.00 | BANK OF AMERICA | | | VAN NUYS | | 7/18/09 | | |
| SALLY | GARCIA | 4448 | 07/20/09 | $906.00 | $ - | 303.00 | WELLS FARGO | EASTLAND | | WESTMINSTER | 91325 | 7/20/09 | | |
| STEPHEN | GONZALEZ | 4448 | 07/18/09 | $605.00 | $ - | 303.00 | BANK OF AMERICA | | | WESTMINSTER | | 7/18/09 | | |
| STEPHEN | GONZALEZ | 8483 | 07/17/09 | $202.00 | $ - | 202.50 | BANK OF AMERICA | CITRUS & ALOSTA | | AZUSA | | 7/17/09 | | |
| STEPHEN | GONZALEZ | 4251 | 07/18/09 | $202.50 | $ - | 202.50 | TORREY PINES BANK | | 550 W C ST | SAN DIEGO | | 7/18/09 | | |
| STEPHEN | GONZALEZ | 6117 | 07/18/09 | $806.00 | $ - | 303.00 | WELLS FARGO | | | SAN DIEGO | | 7/18/09 | | |
| STEPHEN | GUIDRY | 0117 | 07/18/09 | $ - | $ - | 300.00 | BANK OF AMERICA | SEAL BEACH | | SEAL BEACH | | 7/18/09 | | |
| MARION | GUIDRY | 3508 | 07/18/09 | $300.00 | $ 1,200.00 | 300.00 | WELLS FARGO | | | SEAL BEACH | | 7/18/09 | | |
| RICHELLE | HARTJE | 7141 | 07/18/09 | $300.00 | $ 1,800.00 | 300.00 | BANK OF AMERICA | 11323 RIVERSIDE DR | | DUARTE | | 7/18/09 | | |
| GISELA | LIZARRAGA | 3421 | 07/17/09 | $123.00 | $ 1,400.00 | 123.00 | US BANK | | | NORTH HOLLYWOOD | | 7/17/09 | | |
| LYSA | LOZA | 4953 | 07/22/09 | $200.00 | $ 1,660.00 | 203.00 | CITIBANK | 7-11 PLAZA | | PACIFIC PAL | | 7/22/09 | | |
| JOSEPH | MAROE | 5184 | 07/22/09 | $ 1,209.00 | $ 1,500.00 | 303.00 | WELLS FARGO | GRAND & DIAMOND BAR | | NORTH HOLLYWOOD | | 7/22/09 | | |
| RUTH | MARTINEZ | 5184 | 07/23/09 | $ - | $ - | 202.00 | BANK OF AMERICA | WESTMINSTER | | NORTH HOLLYWOOD | | 7/23/09 | | |
| KITCHEN | MCCROSKEY | 5184 | 07/23/09 | $ - | $ - | 503.00 | BANK OF AMERICA | WESTMINSTER | 755 BROADWAY CIR | SAN DIEGO | 91335 | 7/23/09 | | |
| | MENDEZ | 5265 | 07/18/09 | $ - | $ - | 303.00 | BANK OF AMERICA | BALBOA-DEVON | | NORTHRIDGE | | 7/18/09 | | |
| RENEA | NORRIS | 5265 | 07/18/09 | $606.00 | $ 1,880.00 | 303.00 | BANK OF AMERICA | BALBOA-PARTHENIA | | NORTHRIDGE | | 7/18/09 | | |
| RENEA | NORRIS | 5265 | 07/18/09 | $ - | $ - | 300.00 | BANK OF AMERICA | BALBOA-PARTHENIA | | NORTHRIDGE | 91711 | 7/18/09 | | |
| RENEA | NORRIS | 6646 | 07/18/09 | $203.00 | $200.00 | 203.00 | US BANK | 147 WILSHIRE | | NORTHRIDGE | | 7/18/09 | | |
| ANGELA | PADILLA | 5265 | 07/21/09 | $ - | $ - | 300.00 | WELLS FARGO | MANHATTAN BEACH | | MANHATTAN BEACH | 90463 | 7/21/09 | | |
| GISELA | PADILLA | 6646 | 07/21/09 | $203.00 | $ - | 203.00 | WELLS FARGO | MONTEREY PARK | | MONTEREY PARK | 90266 | 7/21/09 | 12:34AM | 909C |
| | RAMIREZ | 2597 | 07/21/09 | $ - | $ - | 303.00 | BAL NU ONLY | AZUSA | | AZUSA | 91754 | 7/21/09 | 12:34AM | 0614C |
| REYNOLDS | REYNOLDS | 9652 | 07/18/09 | $303.00 | $800.00 | 303.00 | WOODMAN SHERMAN WAY | | | TUJUNGA | | 7/18/09 | | |
| ELIZABETH | RODRIGUEZ | 0408 | 07/18/09 | $183.00 | $960.00 | 183.00 | WELLS FARGO | | | TUJUNGA | 91042 | 7/18/09 | | |
| ROMAN | ROMAN | 0408 | 07/18/09 | $385.00 | $ 1,180.00 | 283.00 | WELLS FARGO | | | VAN NUYS | | 7/18/09 | | |
| JOSEPH | SCANDURA | 3848 | 07/22/09 | $ - | $ - | 103.00 | BANK OF AMERICA | BOUQUET CANYON | | SAUGUS | | 7/22/09 | | |
| JOSEPH | SCANDURA | 7228 | 07/17/09 | $240.00 | $ - | 40.00 | WELLS FARGO | BOUQUET CANYON | | SAUGUS | | 7/22/09 | | |
| CORMAY | STEPFAST | 6919 | 07/22/09 | $183.00 | $680.00 | 103.00 | BANK OF AMERICA | CLAREMONT | | CLAREMONT | | 7/22/09 | | |
| CORMAY | STEPFAST | 9159 | 07/17/09 | $183.00 | $680.00 | 183.00 | BANK OF AMERICA | NORTH HOLLYWOOD | | NORTH HOLLYWOOD | | 7/17/09 | | |
| TERRY | TERRY | 3705 | 07/18/09 | $603.00 | $ 1,720.00 | 103.00 | BANK OF AMERICA | | | MONROVIA | | 7/18/09 | | |
| KEITH | HANSON | 3705 | 07/18/09 | $ - | $ - | 303.00 | BANK OF AMERICA | | | VAN NUYS | | 7/18/09 | | |
| CORMAY | TINSLEY | 3705 | 07/18/09 | $ - | $ - | 303.00 | BANK OF AMERICA | DUARTE | | DUARTE | | 7/18/09 | | |
| MANITA | TINSLEY | 3705 | | $507.50 | $ 2,000.00 | 102.25 | RAPID 64 VAN NUYS | | 7204 VAN NUYS BLVD | VAN NUYS | 91405 | 7/18/09 | | |
| MARTIN | TOCHTROP | 9456 | | $ - | $ - | 102.25 | RAPID 64 VAN NUYS | | 7204 VAN NUYS BLVD | VAN NUYS | | 7/18/09 | | |

025771

GER000397

Azusa

| Last Name | First Name | No. | Date | Amount | Amount | Bank | Branch | City | Address | City | Zip | Date | Time | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MARTIN | RODRIGO | 9458 | 02/18/09 | $ - | $ 300.00 | WELLS FARGO | GLENDORA-602 | -- | | GLENDORA | 91740 | 7/16/09 | 3:39 PM | 071064 |
| TOOLTHOP | TORRES | 9872 | 07/17/09 | $ 103.00 | $ 660.00 | CITIBANK | -- | ARCADIA | | ARCADIA | -- | 7/17/09 | 8:31 PM | 0014927I |
| JEANETTE | TROIANO | 1888 | 07/16/09 | $ 709.00 | $ 2,200.00 | BANK OF AMERICA | CHINO HILLS | CHINO HILLS | | CHINO HILLS | 7/25/09 | 7:15 PM | ICAD2789 |
| JEANETTE | TROIANO | 1888 | 07/16/09 | $ - | $ 200.00 | WASHINGTON MUTUAL | -- | AZUSA | 1185 E ALOSTA AVE | AZUSA | -- | 7/16/09 | 7:05 PM | CA6602 |
| JEANETTE | TROIANO | 1888 | 07/16/09 | $ - | $ 300.00 | BANK OF AMERICA | NORTH HOLLYWOOD | NORTH HOLLYWOOD | | NORTH HOLLYWOOD | -- | 7/16/09 | 5:01 PM | ICAN2643 |
| TIFFANY | VALLE | 8189 | 07/17/09 | $ 500.00 | $ 1,000.00 | WACHOVIA (?) | BALDWIN & DUARTE | ARCADIA | 1200 S BALDWIN AVE | ARCADIA | -- | 7/17/09 | 8:18 PM | FCIL4941 |
| TIFFANY | VALLE | 8189 | 07/17/09 | $ - | $ 200.00 | 7-11 | -- | NORTH HOLLYWOOD | 11401 VENTURA BLVD | NORTH HOLLYWOOD | -- | 7/16/09 | 3:39 PM | ICAN2643 |
| WEISS | LELA | 3990 | 07/17/09 | $ 406.00 | $ 1,600.00 | BANK OF AMERICA | -- | NORTH HOLLYWOOD | | NORTH HOLLYWOOD | -- | 7/16/09 | 2:29 AM | ICAN2649 |
| WEISS | LELA | 7990 | 07/17/09 | $ - | $ 200.00 | BANK OF AMERICA | CANYON PLAZA | SUN VALLEY | | SUN VALLEY | -- | 7/17/09 | 11:02 PM | ICAD3303 |
| WEISS | | 7560 | 07/17/09 | $ 900.00 | $ 1,880.00 | WELLS FARGO | CARLSBAD-OCEAN | OCEANSIDE | | OCEANSIDE | -- | 7/15/09 | 11:24 PM | 0950A |
| WHITE-PIPER | CYNTHIA | 7560 | 07/17/09 | $ - | $ 300.00 | US BANK | MANHATTAN BEACH | MANHATTAN BEACH | | MANHATTAN BEACH | 90266 | 7/14/09 | 12:30 AM | M329TC16 |
| WHITE-PIPER | CYNTHIA | 7559 | 07/17/09 | $ - | $ 300.00 | US BANK | PACIFIC PAL | PACIFIC PALISADES | | PACIFIC PALISADES | 90272 | 7/14/09 | 10:35 PM | M06EXC7 |
| WHITE-PIPER | CYNTHIA | 1599 | 07/17/09 | $ - | $ 500.00 | BANK OF AMERICA | SUN VALLEY | SUN VALLEY | | SUN VALLEY | -- | 7/17/09 | 10:17 PM | ICAN3643 |
| WILSON | DAVID | 3621 | 07/20/09 | $ 123.00 | $ 629.00 | WELLS FARGO | -- | NORTHRIDGE | | NORTHRIDGE | 91324 | 7/23/09 | 8:45 PM | 074AC |
| NGUYEN | FRANCO | 3368 | 07/20/09 | $ 78.45 | $ 78.45 | EXXONMOBIL | -- | NORTHRIDGE | | NORTHRIDGE | 91401 | 7/20/09 | 8:10 PM | 074AC |
| ANITA | ALCARA | 1428 | 07/22/09 | $ 303.00 | $ 1,200.00 | | VAN NUYS | VAN NUYS | | VAN NUYS | 91401 | 7/20/09 | 11:11 PM | 0011692 |
| ASSENDO / BERTHA | LOPEZ | 5161 | 07/22/09 | $ 655.00 | $ 1,500.00 | CITIBANK | -- | TUJUNGA | 10460 MT GLEASON | TUJUNGA | -- | 7/20/09 | 11:15 PM | 0011692 |
| | Total | | | $ 17,424.45 | $ 38,480.00 | | | | | | | | | |

025772

GER000398

11/17/2010 15:35 FAX 9093837303 ☑0002/0002
025773

| Acct # | Card # | Name | POS Term # - 99 Cent Store | Date - 99 Cent Store Trans | Time - 99 Cent Store Trans | Amt. - 99 Cent Store Trans | Subsequent Unauthorized Transactions | Date - Subsequent Unauth Transactions | Merchant or Bank - Unauth Transaction(s) | City Where Fraud Occurred | ATM # | 99 cent store location |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2921 | 41137 0 | MacDonald Greg | 00134001 | 7/8/09 | 13:12:11 | $39.15 | $503.00 | 7/18/09 | Bank of America | North Hollywood | ICAN2849 | Magnolia |
| 3137 | 84409 2 | Powell Amanda | 00134001 | 7/1/09 | 17:59:39 | $22.03 | $503.00 | 7/17/09 | ATM ? | Arcadia | | Magnolia |
| 27/86 | 03544 2 | Adams Naomi | 00134001 | 7/8/09 | 13:45:59 | $19.95 | $503.00 | 7/18/09 | Bank of America | Sunland | ICAN7213 | Magnolia |
| 27/86 | 03544 2 | Adams Naomi | 00134001 | 7/8/09 | 10:43:50 | $24.52 | $483.00 | 7/19/09 | Bank of America | Duarte | ICAD1471 | Magnolia |
| 5256 | 29797 9 | Hernandez Gail | 00134001 | 7/4/09 | | | $503.00 | 7/18/09 | WFB | Westminster | | Magnolia |
| 5256 | 29797 9 | Hernandez Gail | 00134001 | 7/4/09 | 14:45:58 | $13.79 | $503.00 | 7/18/09 | WFB | Garden Grove | | Magnolia |
| 3367 | 47893 2 | Caro Jorge | 00134001 | 7/4/09 | 14:12:05 | $20.57 | $503.00 | 7/18/09 | WFB | Garden Grove | | Magnolia |
| 3546 | 41356 6 | Reshaw Cynthia | 00134001 | 7/10/09 | | | $503.00 | 7/17/09 | US Bank | North Hollywood | ICAN2849 | Magnolia |
| 9249 | 22133 5 | McMoran Ralph | 00134001 | 7/10/09 | 13:58:04 | $12.84 | $343.00 | 7/18/09 | Bank of America | Santa Monica | | Magnolia |
| 0922 | 10254 1 | Baker Genevieve | 00134001 | 7/1/09 | 9:35:46 | $8.70 | $203.00 | 7/18/09 | Bank of America | North Hollywood | ICAN2849 | Magnolia |
| 4900 | 33229 5 | Newman Darryl | 00134001 | 7/1/09 | 18:51:53 | $4.77 | $303.00 | 7/17/09 | Bank of America | San Diego | ICAD5441 | Magnolia |
| | | | | | | Total | $4,653.00 | | ATM ? | Arcadia | | Magnolia |
| 8108 | 59826 1 | Shawn Gilliam | 00285001 | 7/10/09 | 12:32:48 | $39.53 | $503.00 | 7/23/09 | Bank of America | Northridge | ICAD4955 | Limonite |
| 8064 | 70293 9 | Conejo Elena | 00134001 | 7/11/09 | 16:37:10 | $42.18 | $203.00 | 7/17/09 | Bank of America | Sherman Oaks | | Magnolia |
| 8064 | 70293 9 | Conejo Elena | 00134001 | 7/11/09 | | | $503.00 | 7/17/09 | USB | Sherman Oaks | | Magnolia |
| 2123 | 84721 3 | Latimer Jeremy | 00285001 | 7/7/09 | 14:53:18 | $15.59 | $443.00 | 7/22/09 | Bank of America | Winnetka | | Magnolia |
| 2654 | 98536 6 | Ben Lievanos | 285001 | 7/11/09 | 14:05:21 | $7.54 | $503.00 | 7/22/09 | Bank of America | Clarita CA | | Limonite |
| 2654 | 98536 6 | Ben Lievanos | | | | | $402.00 | 7/23/09 | Bank of America | Palmdale Ca | | Limonite |
| 2654 | 98536 6 | Ben Lievanos | | | | | $503.00 | 7/24/09 | Bank of America | Valencia Ca | | Limonite |
| | | | | | | Total | $3,060.00 | | | | | |
| 6360 | 56173 7 | Uliona Esters | UKN | 6/29/09 | 16:10:00 | $24.66 | $83.00 | 7/17/09 | Bank of America | North Hollywood | ICAN2849 | Limonite |
| 9819 | 84233 6 | Justine Conriquez | 76001 | 7/24/09 | 15:13:40 | $8.59 | $203.00 | 7/23/09 | Bank of America | Van Nuys | ICAD7391 | Whittier |
| 1970 | 10497 9 | Russ Heller | 49237554 | 7/6/09 | 16:15:00 | $22.47 | $503.00 | 7/25/09 | ATM? | Pasadena | | Apple Valley |
| 1970 | 10497 9 | Russ Heller | | 7/6/09 | | | $503.00 | 7/24/09 | ATM? | Pasadena | | Apple Valley |
| 1970 | 10497 9 | Russ Heller | | | | | $403.00 | 7/24/09 | ATM? | Reseda | | Apple Valley |
| 1970 | 10497 9 | Russ Heller | 134001 | 7/5/09 | 20:36:00 | $35.00 | $300.00 | 7/17/09 | ATM? | Van Nuys | | Magnolia |
| 9894 | 67074 4 | Yolanda Rios | | | | Total | $1,995.00 | | | | | Magnolia |
| | | | | | | Grand Total | $9,708.00 | | | | | |

025785

Bank of America
Inv. Barbara Ridlet
(626) 599-8476

99 Cent Store
8900 Limonite
Riverside, CA 92509

| Account Number | Customer Name | Fraud $ | Tran Date | Tran Time | Address | City | State | Zip | Phone | Fraud Date & Tr | Terminal | Amount | Location |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17016 | VICKY J HALL | 500 | 7/6/2009 | 1:09:37 PM | | | | | | 7/19/09 16:32 | ICA033340 | 200.00 | BofA - Foothill/Rosemead, Pasadena, CA |
| 78197 | STEPHEN A MALDONADO | 200 | 7/6/2009 | 5:25:54 PM | | | | | | 7/19/09 16:32 | ICA033340 | 200.00 | BofA - Foothill/Rosemead, Pasadena, CA |
| 9152 | RENE MENDEZ | 500 | 7/6/2009 | 11:07:16 AM | | | | | | 7/18/09 12:08 | ICAN5046 | 500.00 | BofA - Riverside/Woodman, Sherman Oaks, CA |
| 75172 | BEATRICE MONTOYA | 200 | 7/6/2009 | 3:41:13 PM | | | | | | 7/19/09 16:34 | ICA033346 | 200.00 | BofA - Foothill/Rosemead, Pasadena, CA |
| 2365 | CRYSTAL S MADRIGAL | 200 | 7/6/2009 | 8:34:44 PM | | | | | | 7/20/09 | ICA03167 | 160.00 | BofA - Foothill/Rosemead, Pasadena, CA |
| 0781 | MAYRA ROSALES | 500 | 7/7/2009 | 10:43:52 AM | | | | | | 7/17/09 16:30 | ICA03346 | 170.00 | BofA - Foothill/Rosemead, Pasadena, CA |
| 13419 | TOM J OLIVERAS | 1000 | 7/2/2009 | 12:06:37 PM | | | | | | 7/17/09 19:51 | ICA03340 | 500.00 | BofA - No. Long Beach, Long Beach, CA |
| 59129 | CASTANEDA GARDENING | 503 | 6/27/2009 | 2:34:54 PM | | | | | | 7/17/09 13:35 | ICAN6885 | 202.00 | #CO3913 California, 3330 Cahuenga Blv, Los Angeles, CA |
| 59129 | BENABE R CRUZ | 63 | 7/10/2009 | 9:50:16 AM | | | | | | 7/18/09 16:23 | Non BofA | 503.00 | #CA7414 Washington, 3501 Atlantic Ave, Long Beach, CA |
| 9329 | MAYNULO PENA | 303 | 7/20/2009 | 10:46:33 AM | | | | | | 7/17/09 17:14 | Non BofA | 80.00 | #A826NCI US Bank, 125 Arnaz Blvd, Santa Monica |
| 9002 | LETICIA ESQUIVEL | 143 | 7/8/2009 | 12:41:14 PM | | | | | | 7/19/09 21:45 | Non BofA | 303.00 | #9800A WF B. Barranca Sta, West Covina, CA |
| 17087 | CYNTHIA L CHRISMAN | 480 | 7/16/2009 | 9:47:39 AM | | | | | | 7/19/09 16:28 | ICA03346 | 500.00 | BofA - FoothilRosemead, Pasadena, CA |
| 07291 | TANYA DUARTE-MACIAS | 500 | 7/2/2009 | 3:07:01 PM | | | | | | 7/20/09 17:27 | ICA06778 | 500.00 | BofA - North Upland, Upland, CA |
| 02291 | CYNTHIA L DRAKE | 1280 | 7/4/2009 | 2:19:05 PM | | | | | | 7/18/09 16:50 | ICA11916 | 500.00 | Woodward Sherman, Van Nuys, CA |
| 16760 | RONITA C PIQUING | 500 | 7/11/2009 | 7:24:18 AM | | | | | | 7/20/09 16:42 | ICA07391 | 143.00 | #CA8048 Washington, 4th & Indian Hill, Claremont, CA |
| 14314 | SARA S PINZON | 500 | 7/11/2009 | 8:50:42 AM | | | | | | 7/20/09 16:47 | ICA06776 | 500.00 | BofA - Claremont, Claremont, CA |
| 25510 | DANNY YARBROUGH | 460 | 7/10/2009 | 8:03:30 PM | | | | | | 7/20/09 16:10 | ICA06445 | 700.00 | BofA - Claremont, Claremont, CA |
| 15179 | SARA O ESCOBEDO | 200 | 7/13/2009 | 7:58:38 PM | | | | | | 7/22/09 18:10 | ICA03229 | 360.00 | BofA - Sierra Madre, Sierra Madre, CA |
| 19152 | MARIA G OROZCO | 500 | 7/11/2009 | 2:02:42 PM | | | | | | 7/22/09 18:54 | ICA04307 | 300.00 | BofA - Newhall, Newhall, CA |
| 17025 | MARGARITA RAMIREZ | 1000 | 7/13/2009 | 6:51:37 PM | | | | | | 7/23/09 6:19 | ICA04655 | 480.00 | BofA - Balboa-Partnina Harimidge, CA |
| 17022 | DANEL ROSE | 220 | 7/13/2009 | 9:04:01 PM | | | | | | 7/23/09 19:20 | ICA42964 | 500.00 | BofA - Balboa-Partnina Harimidge, CA |
| 84589 | BRAULIO R CAMACHO | 500 | 7/2/2009 | 9:37:48 AM | | | | | | 7/23/09 6:20 | ICA04955 | 200.00 | BofA - Balboa-Partnina Harimidge, CA |
| 13683 | JAMES E WRAY | 302 | 5/29/2009 | 8:12:15 PM | | | | | | 7/2/09 0:00 | Non BofA | 98.70 | Cardenas Market E Riverside CA |
| 2441 | MARIA L LEWIS | 600 | 5/21/2009 | 8:41:57 AM | | | | | | 7/23/09 0:00 | Non BofA | 53.51 | Wal-Mart #3028 Riverside(s) CA |
| 59129 | CASTANEDA GARDENING | 503 | 6/26/2009 | 7:21:17 PM | | | | | | 7/22/09 18:12 | ICA07910 | 500.00 | BofA - Newhall, Newhall, CA |
| 20191 | TONI J OLIVERAS | 500 | 6/26/2009 | 11:58:37 AM | | | | | | 7/23/09 0:00 | ICA07910 | 100.00 | BofA - Valencia, Valencia, CA |
| 2281 | CYNTHIA L DRAKE | 1280 | 7/4/2009 | 2:19:05 PM | | | | | | 7/26/09 15:11 | Non BofA | 100.00 | #LKI16 954 Alpine Vill, 833 W Torrance Bl, Torrance, CA |
| 9502 | LETICIA ESQUIVEL | 143 | 7/4/2009 | 11:42:45 AM | | | | | | 7/22/09 19:00 | ICA06791 | 102.00 | #CA00250 Ct 711, 6947 Hunter Ave, Corona, CA |
| 72606 | SUSAN J VAN BEEBE | 500 | 6/28/2009 | 9:59:51 PM | | | | | | 7/22/09 16:55 | ICA06791 | 460.00 | BofA - Bouquet Canyon Garigus |
| 51181 | MELISSA VALENZUELA | 530.21 | 6/25/2009 | 5:41:19 PM | | | | | | 7/12/09 19:50 | ICA06463 | 200.00 | BofA - Bouquet Canyon Garigus |
| 2510 | DANNY YARBROUGH | 460 | 7/13/2009 | 8:03:30 PM | | | | | | 7/22/09 18:28 | ICA07909 | 500.00 | BofA - Valencia, Valencia, CA |
| 11179 | SARA O ESCOBEDO | 200 | 7/13/2009 | 7:58:38 PM | | | | | | 7/22/09 18:33 | ICA06731 | 500.00 | BofA - Valencia, Valencia, CA |
| 27918 | ARLENE SMITH | 960 | 7/7/2009 | 4:12:50 PM | | | | | | 7/23/09 18:53 | ICA05331 | 500.00 | BofA - Palmdale Palmdale, CA |
| 19152 | MARIA G OROZCO | 500 | 7/11/2009 | 2:02:42 PM | | | | | | 7/23/09 16:02 | ICA03239 | 120.00 | BofA - Newhall, Newhall, CA |
| 17525 | MARGARITA RAMIREZ | 1000 | 7/13/2009 | 6:51:57 PM | | | | | | 7/11/09 0:00 | Non BofA | 322.00 | #CA00250 Ct 711, 6947 Hunter Ave, Corona, CA |
| 7072 | DANE L ROSE | 220 | 7/13/2009 | 9:04:01 PM | | | | | | 7/19/09 20:52 | ICAN5451 | 500.00 | BofA - Gateway, Glendale, CA |

Fraud Loss  22342.4

Bank of America
Inv. Barbara Riblet
(626) 599-8476

99 Cent Store
9915 Magnolia Ave.
Riverside, CA 92503

| Account Number | Customer Name | Fraud $ | Tran Date | Tran Time | Date & Time of Fraud Terminal | Location | Amount |
|---|---|---|---|---|---|---|---|
| 31293 | DANIEL V GOYTIA | 562 | 7/12/2009 | 3:20:27 PM | 7/18/09 1:03 AM ICAD3244 | Bank of America, San Diego, CA | 280 |
| 10116 | MARIA IRIZARRY | 20 | 7/7/2009 | 1:49:50 PM | 7/18/09 8:59 PM Non BoA | #CA05274 Ct 7-11, 1118 S El Camino, San | 302 |
| 42925 | MYRRINA A DELEON | 20 | 6/5/2009 | 2:00:01 PM | 7/18/09 11:10 PM ICAD6322 | Bank Of America, Westminster, CA | 300 |
| 99802 | ARTEMISA VARGAS | 500 | 6/29/2009 | 9:12:18 AM | 7/9/09 12:00 AM Non BoA | Circle K 05705 Corona CA | 20 |
| 65776 | GLORIA M ROGERS | 500 | 6/29/2009 | 12:04:23 PM | 7/17/09 6:48 PM ICAD4071 | Bank Of America, Tarzana, CA | 500 |
| 02567 | OFELIA HARTHCOCK | 260 | 7/4/2009 | 4:11:05 PM | 7/17/09 8:46 PM ICAD0008 | Bank Of America, West Covina, CA | 500 |
| 04118 | HANNELORE E BETHKE | 1000 | 6/5/2009 | 9:53:15 AM | 7/18/09 8:05 PM ICAN3643 | Bank Of America, Los Angeles, CA | 260 |
| 218657 | JOYCE S MAYO | 20 | 6/27/2009 | 6:56:16 PM | 7/18/09 8:06 PM ICAN3643 | BofA - Sun Valley, Sun Valley, CA | 300 |
| 160 | MIRIAM CANALES | 160 | 7/4/2009 | 3:43 PM | 7/18/09 8:04 PM ICAN3643 | BofA - Sun Valley, Sun Valley, CA | 500 |
| 87207 | CINDY MEJIA | 500 | 7/4/2009 | 1:21:36 PM | 7/18/09 3:43 PM ICAD3000 | BofA - Sun Valley, Sun Valley, CA | 160 |
| 82641 | MARIA L LEMUS | 600 | 7/7/2009 | 2:20:56 PM | 7/18/09 6:59 PM ICAD4507 | BofA - Monrovia, Monrovia, CA | 500 |
| 03946 | CARLOS ORDONEZ | 303 | 7/11/2009 | 11:52:27 AM | 7/18/09 4:22 PM ICAN2723 | BofA - Balboa/Parthenia, Northridge, CA | 100 |
| 83755 | SHIRLEY DE SANTIAGO | 300 | 6/5/2009 | 4:12:18 PM | 7/18/09 8:52 PM ICAN5451 | BofA - Gateway, Glendale, CA | 600 |
| 99309 | MAXIMA BARDALES | 1000 | 7/11/2009 | 12:47:12 PM | 7/18/09 4:56 PM Non BoA | BofA - Van Nuys Main, Van Nuys, CA | 303 |
| 91107 | ALICE T LEON | 540 | 6/5/2009 | 11:18:43 AM | 7/18/09 2:38 PM ICAD7695 | W.F.B. Gardn-Grv-Fron, Garden Grove | 300 |
| 95234 | ALFREDO F MENDOZA | 83 | 6/5/2009 | 6:17:12 PM | 7/18/09 7:45 AM ICAD7211 | Bank Of America, Northridge, CA | 200 |
| 64724 | CUIYING ZHANG | 707 | 6/29/2009 | 11:08:06 AM | 7/18/09 7:45 AM ICAD7211 | BofA - Azusa, Azusa, CA | 200 |
| 34952 | RENALDO BELLO | 500 | 7/4/2009 | 12:30:47 PM | 7/18/09 7:44 AM ICAD7211 | BofA - Azusa, Azusa, CA | 500 |
| 01713 | ROSENDA H RUIZ | 180 | 7/7/2009 | 11:14:45 AM | 7/20/09 9:45 AM ICAN2895 | BofA - Monrovia, Monrovia, CA | 500 |
| 13567 | DELMY ALVARADO | 500 | 7/7/2009 | 7:32:18 PM | 7/18/09 4:25 PM ICAN3396 | BofA - Glendale, Glendale, CA | 40 |
| 84903 | J P LEWIS TRUCKING | 500 | 7/11/2009 | 4:18:57 PM | 7/18/09 4:25 PM ICAN3396 | #9919E W.F.B. Covina-Main, Covina, CA | 83 |
| 99308 | CRAIG A BASSHAM | 161.95 | 7/11/2009 | 1:00:42 PM | 7/18/09 10:59 PM ICVcom, 8724 Foothil Blv, Santa | #2548401V Ct Vcom, 8724 Foothil Blv, Santa | 102 |
| 02819 | ADRIANA DELGADO | 480 | 7/13/2009 | 22:13:32 PM | 7/18/09 10:57 PM Non BoA | #2548401V Ct Vcom, 8724 Foothil Blv, Santa | 303 |
| 00680 | PEDRO A ZAPATA | 103 | 7/13/2009 | 9:02:45 PM | 7/18/09 3:33 PM Non BoA | #8770 W.F.B. Topanga-Canyn, Canoga Par | 303 |
| 97614 | DESIREE T WALKER | 500 | 7/13/2009 | 5:04:20 PM | 7/18/09 2:19 PM ICAD4100 | BofA - Los Angeles, Los Angeles, CA | 500 |
| 05902 | MARIA SANCHEZ | 200 | 7/3/2009 | 8:03:51 PM | 7/18/09 2:17 PM ICAN5977 | Bank Of America, Northridge, CA | 180 |
| 84045 | SUSAN M SHEPPARD | 500 | 7/3/2009 | 12:07:54 PM | 7/17/09 7:38 PM ICAN4583 | Bank Of America, San Clemente, San Clemente | 500 |
| 54901 | MARTHA MARAVILLA | 500 | 7/3/2009 | 6:33:13 PM | 7/18/09 11:05 PM ICAD5953 | #0821D W.F.B. San Clemente, San Clemente | 303 |
| 88951 | THOMAS J REYES | 383 | 7/3/2009 | 8:34:13 PM | 7/18/09 11:05 PM ICAD5953 | Bank of America, Sherman Oaks, CA | 161.95 |
| 20400 | ROSA K MILLAN | 500 | 7/2/2009 | 7:07:38 PM | 7/9/09 1:18 PM ICAD1930 | #A70731 Glendale 76, 1501 West Glendale, | 480 |
| 63217 | MARIBEL HERNANDEZ | 500 | 7/2/2009 | 8:31:00 PM | 7/9/09 3:16 AM ICAD7695 | Bank Of America, Carlsbad, CA | 103 |
| 15040 | TAMSAK PRASANCHUM | 543 | 7/2/2009 | 10:38:29 AM | 7/18/09 11:12 PM ICAD5953 | BofA - Westminster, Westminster, CA | 5920 |
| 46711 | LINDA BROWN | 303 | 7/2/2009 | 5:43:19 PM | 7/18/09 3:45 PM ICAD3200 | BofA - Westminster, Westminster, CA | 383 |
| 17741 | JESSICA L RINEHART | 460 | 7/22/2009 | 11:15:43 AM | 7/18/09 7:57 PM ICAN4615 | BofA - Arcadia, CA | 500 |
| 54709 | GENIECE L CLAYTON | 63 | 7/10/2009 | 1:59:22 PM | 7/18/09 6:02 PM Non BoA | #CA8310 Washington, 13949 Ventura Blv, Sh | 43 |
| 44573 | DENISE W CURRY | 500 | 7/10/2009 | 10:26:11 AM | 7/18/09 9:39 PM Non BoA | #0820K W.F.B, Edinger-Beach, Huntington B | 303 |
| 83758 | LUCINDA E MURILLO | 600 | 7/10/2009 | 8:47:35 AM | 7/18/09 9:44 PM ICAD4994 | Bank Of America, Woodland Hill, CA | 160 |
| 77249 | ADELINA CARIOLA | 400 | 7/3/2009 | 2:54:07 PM | 7/18/09 1:42 AM ICAN6005 | Calsando0567 Sn Diego CA | 63 |
| 05637 | PIERRE C RIVIGERA | 200 | 7/10/2009 | 2:55:14 PM | 7/18/09 12:08 PM ICAD3218 | Bank Of America, N. Hollywood, CA | 500 |
| 15642 | SELENE BAILON | 202 | 7/10/2009 | 12:27:24 PM | 7/18/09 2:10 PM ICAD5956 | Bank Of America, Glendale, CA | 300 |

GER000401

025787

Bank of America
Inv. Barbara Riblet
(626) 599-0476

**99 Cent Store**
**9915 Magnolia Ave.**
**Riverside, CA 92503**

| | | | | | | |
|---|---|---|---|---|---|---|
| 71109 | LUIS J CARDOZA | 500 | 7/22/2009 | 3:21:02 PM | 7/18/09 3:52 PM ICAD8300 Bank Of America, Canoga Park, CA | 500 |
| 09209 | MERENA CASTILLO | 260 | 7/22/2009 | 8:38:58 PM | 7/17/09 9:01 PM ICAD0008 Bank Of America, Canoga Park, CA | 260 |
| 41584 | KATHLEEN A THOMSEN | 1425 | 7/10/2009 | 1:23:14 PM | 7/19/09 2:19 PM Nkn BoA #NK01 Union Bank, Encinitas WU, Encinitas, | 1425 |
| 34604 | ROMAN MONTES-MELLI | 500 | 7/22/2009 | 7:24:45 PM | 7/2/09 6:12 PM ICAD3774 BofA - La Sierra, Riverside, CA | 7601 |
| 24952 | MARIA E GUSTAVE | 500 | 7/22/2009 | 10:53:53 AM | 7/18/09 8:25 PM ICAN3735 BofA - E. Glendora/Lone Hill, Glendora, CA | 4202 |
| Fraud Loss | | 17619 | | | | 4202 |

GER000402

025789

Bank of America
Inv. Barbara Riblet
(626) 599-8476

**99 Cent Store**
**Whittier, CA**

| Account Number | Customer Name | Fraud $ | Tran Date | Tran Time | Address | City | State | Zip | Phone | Tran Date & Time | Terminal ID | Amount, Location of Fraud |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 929018 | DENNIS R AZEVEDO | | 7/6/2009 | 5:33:27 PM | | | | | | | | |
| 929503 | CARADJ P MARTINEZ | 1300 | 7/6/2009 | 5:53:27 PM | | | | | | 7/2409 5:09 PM | ICA07910 | 500 BoA - Valencia, Valencia, CA |
| | | | | | | | | | | 7/2409 5:09 PM | ICA07910 | 200 BoA - Valencia, Valencia, CA |
| | | | | | | | | | | 7/2409 5:24 PM | ICA01053 | 400 Unable to locate |
| | | | | | | | | | | 7/2409 5:25 PM | ICA01053 | 200 Unable to locate |
| | MARTHA CARDENAS | 650 | 7/6/2009 | 4:28:29 PM | | | | | | 7/23/09 1:21 PM | ICA05760 | 80 BoA - Sylmar, Sylmar, CA |
| | | | | | | | | | | 7/23/09 1:22 PM | ICA05760 | 200 BoA - Sylmar, Sylmar, CA |
| | MARY V FOSTER | 500 | 7/9/2009 | 8:10:09 PM | | | | | | 7/23/09 1:45 PM | ICA02390 | 500 BoA - Bouquet Canyon, Saugus, CA |
| 30141 | | | 7/9/2009 | | | | | | | 7/23/09 3:37 PM | Non BoA | 202 #CA03737 C7-11; 7040 Sunset, Los Angeles, CA |
| 95784 | MARION A LUKENS | 404 | 7/10/2009 | 12:06:41 PM | | | | | | 7/23/09 3:37 PM | Non BoA | 202 #CA03737 C7-11; 7040 Sunset, Los Angeles, CA |
| | | | | | | | | | | 7/23/09 3:32 PM | ICA03043 | 340 BoA - Newhall, Newhall, CA |
| 99993 | LAWRENCE J JOHANSEN | 340 | 7/12/2009 | 8:51:56 AM | | | | | | 7/23/09 3:32 PM | ICA03043 | 340 BoA - Newhall, Newhall, CA |
| 95261 | M SYLVIA AGUIRRE | 600 | 7/12/2009 | 12:51:41 PM | | | | | | 7/23/09 2:30 PM | ICA03043 | 200 BoA - Newhall, Newhall, CA |
| | | | | | | | | | | 7/23/09 2:30 PM | ICA03043 | 400 BoA - Newhall, Newhall, CA |
| 76937 | MONTSERRATH CALDERON | 902 | 7/17/2009 | 9:11:42 PM | | | | | | 7/24/09 4:43 PM | ICA01424 | 300 BoA - Horn Arcadia, Arcadia, CA |
| | | | | | | | | | | 7/24/09 4:43 PM | ICA01424 | 400 BoA - Horn Arcadia, Arcadia, CA |
| 33423 | DAMIEN DAVID GONZALES | 263 | 7/15/2009 | 12:22:40 PM | | | | | | 7/23/09 5:18 PM | Non BoA | 263 #D102077 Colson0016, 13003 Vasy Bv, N Hwood, CA |
| 77774 | MANUEL D RIVAS | 500 | 7/16/2009 | 10:36:13 AM | | | | | | 7/23/09 5:16 PM | Non BoA | 500 BoA - Sylmar, Sylmar, CA |
| 66019 | JOANNE L MARGUSON | 760 | 7/16/2009 | 1:22:51 PM | | | | | | 7/23/09 3:11 PM | ICA07226 | 250 BoA - Glencoe Hubbard, Sylmar, CA |
| | | | | | | | | | | 7/23/09 3:49 PM | ICA03065 | 500 BoA - Sylmar, Sylmar, CA |
| 76593 | KATHERINE J GILL | 700 | 7/16/2009 | 3:46:21 PM | | | | | | 7/23/09 1:18 PM | ICA02483 | 200 BoA - Sylmar, Sylmar, CA |
| | | | | | | | | | | 7/23/09 1:18 PM | ICA02483 | 500 BoA - Roscoe-Winnetca, Winnetca, CA |
| 39424 | YAJAIRA PEREZ | 300 | 7/17/2009 | 9:09:00 AM | | | | | | 7/23/09 3:56 PM | ICA06079 | 300 BoA - El Camino Cener, Woodland Hills, CA |
| 205702 | MARSHALL M MARION | 380 | 6/17/2009 | 7:26:17 PM | | | | | | 7/23/09 3:52 PM | Non BoA | 302 #CA03737 C7-11; 145 S La Cienega, Los Angeles, CA |
| 90963 | ALICIA SOTO-ORTEGA | 504 | 7/17/2009 | 11:18:44 AM | | | | | | 7/25/09 5:28 PM | Non BoA | 202 #CA03737 C7-11; 145 S La Cienega, Los Angeles, CA |
| 14597 | RUBEN GARCIA, JR | 900 | 7/17/2009 | 6:18:33 PM | | | | | | 7/24/09 4:53 PM | ICA03043 | 200 BoA - Newhall, Newhall, CA |
| | | | | | | | | | | 7/25/09 12:00 AM | ICA01053 | 300 Unable to locate |
| 31009 | SHARON K COLE | 1004 | 7/8/2009 | 11:28:32 AM | | | | | | 7/25/09 12:00 AM | ICA01053 | 400 Unable to locate |
| | | | | | | | | | | 7/23/09 4:27 PM | Non BoA | 302 #CA037308 C7-11; 7990 Santa Monica, W Hollywood, CA |
| | | | | | | | | | | 7/23/09 4:27 PM | Non BoA | 202 #CA037308 C7-11; 7950 Santa Monica, W Hollywood, CA |
| 01302 | ALEJANDRO RAYA | 400 | 7/7/2009 | 1:12:13 PM | | | | | | 7/24/09 5:02 PM | ICA04245 | 500 #CA42445 Bank Of America, Arcadia, CA |
| | | | | | | | | | | 7/23/09 3:54 PM | ICA06365 | 200 BoA - Canyon Country, Santa Clara, CA |
| 63981 | KIMBERLY ANN BURGESS | 700 | 7/7/2009 | 10:21:57 AM | | | | | | 7/23/09 3:38 PM | ICA01555 | 200 BoA - Newhall, Newhall, CA |
| 78955 | CHARLES LARKIN SCHWIND | 163 | 6/15/2009 | 3:44:30 PM | | | | | | 7/23/09 3:20 PM | ICA03785 | 500 Bank Of America, Woodland Hill, CA |
| 57595 | ERIN CAMPBELL | 200 | 7/6/2009 | 8:39:56 AM | | | | | | 7/24/09 3:32 PM | Non BoA | 163 Bk Of The W, 16027 Ventura Blv, Encino, CA |
| 66026 | MARCUS BLACKSHER | 200 | 6/14/2009 | 8:24:35 AM | | | | | | 7/24/09 3:18 PM | ICA05079 | 200 Bank Of America, La Canada, CA |
| 60519 | LILLIAN D ARGIONE | 163 | 6/15/2009 | 9:37:25 AM | | | | | | 7/24/09 1:02 PM | ICA10897 | 200 Bank Of America, Montrose, CA |
| 57632 | CORA SALIDVAR | 440 | 6/14/2009 | 8:24:55 AM | | | | | | 7/25/11 5:59 PM | Non BoA | 163 Bk Of The W, 15165 Ventura Blv, Sherman Oaks, CA |
| | | | | | | | | | | 7/24/09 4:45 PM | ICA03208 | 240 Bank Of America, Newhall, CA |
| 71861 | LEONOR GONZALEZ | 600 | 7/16/2009 | 9:17:01 PM | | | | | | 7/24/09 1:47 PM | ICA02390 | 300 Bank Of America, Saugus, CA |
| | | | | | | | | | | 7/25/09 5:59 PM | ICA07386 | 300 Bank Of America, Listerock, CA |
| | | | | | | | | | | 7/24/09 5:07 PM | ICA07910 | 300 Bank Of America, Valencia, CA |

| | Fraud Loss | 13937 | | | | | | | | | | |

025788

**99 Cent Store Montebello**

| Account Number | Customer Name | Fraud $ | Tran Date | Tran Time | Address | City | State | Zip | Phone | Fraud Date & Time | Location | Terminal | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01422 | SERENA DONG | 500 | 7/1/2009 | 4:03:44 PM | | | | | | 8/5/09 8:32 PM | BoA - Valley/Almansor, Alhambra, CA | ICAN5873 | 300 |
| 1440 | DIANA D ROBINSON | 500 | 7/1/2009 | 4:46:38 PM | | | | | | 8/4/09 7:36 PM | BoA - Reseda, Reseda, CA | ICAD6772 | 500 |
| 70854 | LESLIE D SINAY | 500 | 7/15/2009 | 3:47:26 PM | | | | | | 8/4/09 8:23 PM | BoA - Monrovia, Monrovia, CA | ICAN3187 | 200 |
| 88524 | RUDY CEBALLOS | 300 | 6/1/2009 | 9:29:59 AM | | | | | | 8/4/09 6:50 PM | BoA - Monrovia, Monrovia, CA | ICAN3187 | 300 |
| 90845 | ANSELMO CARRILLO | 300 | 7/20/2009 | 7:07:45 PM | | | | | | 8/4/09 6:22 PM | BoA - Duarte Sxx on Center, Duarte, CA | ICAD6025 | 300 |
| 77966 | ELBA E PASILLAS | 500 | 7/11/2009 | 104:32 AM | | | | | | 8/6/09 7:18 PM | BoA - San Gabriel, San Gabriel, CA | ICAD1819 | 300 |
| 96542 | GLORIA D RUBALCABA | 500 | 7/11/2009 | 9:58:59 AM | | | | | | 8/4/09 5:02 AM | BoA - La Crescenta, La Crescenta, CA | ICAN0961 | 500 |
| 41341 | PABLO R VALDEZ | 500 | 7/14/2009 | 11:14:57 AM | | | | | | 8/4/09 11:01 AM | BoA - La Crescenta, La Crescenta, CA | ICAN0961 | 500 |
| 00811 | MICHELLE LIBARRA | 500 | 6/1/2009 | 7:12:58 PM | | | | | | 8/6/09 6:53 PM | BoA - Valley/Almansor, Alhambra, CA | ICAN5873 | 500 |
| 91908 | LUIS PAYES | 200 | 7/16/2009 | 5:19:02 PM | | | | | | 8/5/09 4:32 AM | BoA - Gateway, Glendale, CA | ICAN2388 | 200 |
| 69276 | EVELYN TORO | 300 | 7/2/2009 | 6:27:41 PM | | | | | | 8/4/09 5:09 AM | BoA - La Crescenta, La Crescenta, CA | ICAN0961 | 300 |
| 07438 | KAM F LIN | 1000 | 7/2/2009 | 4:50:57 PM | | | | | | 8/5/09 7:42 AM | BoA - RoscoeWinnetka, Winnetka, CA | ICAN2463 | 500 |
| 09447 | JEFFREY R JIMENEZ | 300 | 7/20/2009 | 9:13:35 PM | | | | | | 8/6/09 8:18 PM | BoA - RoscoeWinnetka, Winnetka, CA | ICAN2463 | 500 |
| 32023 | MARITZA BALDERAS | 300 | 7/2/2009 | 1:51:04 PM | | | | | | 8/4/09 5:15 AM | BoA - La Crescenta, La Crescenta, CA | ICAN0961 | 300 |
| | Fraud Loss | 6000 | | | | | | | | | | | |

GER000404

025790

rOryCardListClaimsExcel

| CardNum | ClaimID | ClaimDateRecieved | ClosedDate | ClaimAmt | LossAmt | CloseReason | City | State | PostalCode | ClaimType | checking acct | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 81879 | 0709-015955 | 7/24/2009 | 7/28/2009 | 204 | $204.00 | Counterfeit | WHITTIER | CA | 90605-2357 | PIN Based | 0710 | AMANDA | YEPIZ |
| 20384 | 0709-016352 | 7/24/2009 | 7/28/2009 | 503 | $503.00 | Counterfeit | DUARTE | CA | 91010-4000 | PIN Based | 8376 | JERRIE | RICHARDS |
| 62867 | 0709-015999 | 7/24/2009 | 7/31/2009 | 528 | $528.00 | Counterfeit | WHITTIER | CA | 90606 2330 | PIN Based | 3770 | RICKY | MIDDLETON |
| 83408 | 0709-016931 | 7/26/2009 | 8/5/2009 | 827 | $827.00 | Counterfeit | LOS ANGELES | CA | 90039 2109 | PIN Based | 7034 | JOSE | REYNA |
| 35138 | 0709-017726 | 7/27/2009 | 7/29/2009 | 2515 | $2,515.00 | Counterfeit - ATM | CORONA | CA | 92880-3078 | PIN Based | 1214 | ARLINE | SILVEIRA |
| 73694 | 0709-017457 | 7/27/2009 | 8/7/2009 | 907 | $907.00 | Counterfeit | WHITTIER | CA | 90604-1561 | PIN Based | 2552 | ANNE | TOY |
| 10500 | 0709-017472 | 7/27/2009 | 7/30/2009 | 1013 | $1,013.00 | Counterfeit | WHITTIER | CA | 90606 | PIN Based | 4432 | DORIS | MORA |
| 69047 | 0809-001628 | 8/4/2009 | 8/14/2009 | 503 | $503.00 | Counterfeit - ATM | LOS ANGELES | CA | 90022-2508 | PIN Based | 1557 | ALONDRA | AMADOR |
| 18283 | 0809-003171 | 8/6/2009 | 8/17/2009 | 303 | $303.00 | Counterfeit | S EL MONTE | CA | 91733 3125 | PIN Based | 9515 | MICHELLE | TIGER |
| 27069 | 0809-004397 | 8/7/2009 | | 503 | $503.00 | | MONTEBELLO | CA | 90640 | PIN Based | 9901 | ALEX | ACEVEDO |
| 67358 | 0809-005082 | 8/8/2009 | 8/12/2009 | 906 | $906.00 | Counterfeit | DINUBA | CA | 93618-1735 | PIN Based | 2559 | PATRICIA | CABALLERO |

$8,710.00

Page 1

GER000405

Schools First Credit Union

| Name | claim # | card # | loss | date | merchant | Phone Number |
|------|---------|--------|------|------|----------|--------------|
| VAUGHN,BETTIE | JUL09-043 | 8730 | $303.00 | 7/18 | 99 CENT STORE RIVERSIDE | |
| MADRIGAL,XOCHITL | JUL09-041 | 6042 | $286.00 | 7/17 | 99 CENT STORE RIVERSIDE | |
| HARRIS,PAUL | JUL09-061 | 2707 | $503.00 | 7/18 | 99 CENT STORE RIVERSIDE | |
| SALAZAR,YESENIA | JUL09-048 | 4028 | $504.00 | 7/17 | 99 CENT STORE RIVERSIDE /WESTMINSTER WFB FRAUD | |
| JUAN,MARIA | JUL09-045 | 6766 | $1,432.00 | 7/21 | 99 CENT STORE RIVERSIDE FRAUD/BOFA ARCADIA | |
| CORBETT,HEATHER | JUL09-054 | 6603 | $504.00 | 7/17 | 99 CENT STORE RIVERSIDE/ BOFA LONG BEACH | |
| MAESTAS,YVONNE | JUL09-062 | 2663 | $203.00 | 7/17 | 99 CENT STORE SANTA ANA/WAMU WEST COVINA | |
| CONTRERAS,CARLOS | JUL09-038 | 6418 | $343.00 | 7/17 | 99 CENT STORE SANTA ANA /BOFA WEST COVINA FRAUD | |
| RODRIGUEZ,STACIE | JUL09-039 | 3614 | $203.00 | 7/18 | 99 CENT STORE SANTA ANA /WFB Ontario FRAUD | |
| SOTO,EDUARDO | JUL09-050 | 4326 | $503.00 | 7/18 | 99 CENT STORE SANTA ANA / WFB WEST COVINA FRAUD | |
| SOWA,MARIA | JUL09-051 | 2626 | $503.00 | 7/18 | 99 CENT STORE SANTA ANA/ BOFA SAN DIMAS FRAUD | |
| STIGALL,KEVIN | JUL09-049 | 1842 | $503.00 | 7/17 | 99 CENT STORE SANTA ANA/ WFB WEST COVINA FRAUD | |
| ANDERSON,MILDRED | JUL09-052 | 6689 | $64.00 | 7/18 | 99 CENT STORE SANTA ANA/WFB COVINA | |
| GOMES,AIDA | JUL09-053 | 8318 | $163.00 | 7/18 | 99 CENT STORE SANTA ANA/ BOFA WOODLAND HILLS | |
| MEZA,MICHELLE | AUG09-001 | 6330 | $1,011.00 | 7/26 | 99 CENT STORE NORWALK/ BOFA NORTHRIDGE | |
| FLORES,GABRIEL | AUG09-004 | 4162 | $468.00 | 7/17 | 99 CENT STORE RIVERSIDE/US BANK PACIFIC PALASAIDES | |
| ORNELAS,RAQUEL | AUG09-005 | 2628 | $608.00 | 7/18 | 99 CENT STORE RIVERSIDE/ WFB Manhattan Beach | |

025803

GER000406

Schools First Credit Union

| Name | Code | Acct | Amount | Date | Description |
|---|---|---|---|---|---|
| MAGANA,MARTHA | AUG09-010 | 8140 | $438.00 | 7/23 | 99 CENT STORE WHITTER/ bank of the west encino |
| GODINEZ-RUIZ,IMELDA | AUG09-021 | 4464 | $808.40 | 8/12 | POSSIBLE 99CENT STORE IN ANAHEIM/ sherman oaks atm |
| MARTINEZ,ARMANDO | SEP09-049 | 2688 | $263.00 | 9/4 | 99 CENT STORE WEST COVINA/ BOFA ARCADIA |
| SCUDELLARI,JULIE | SEP09-093 | 4165 | $223.00 | 9/24 | POSSIBLE 99CENT STORE IN Placentia/ EAGLE ROCK CITIBANK ATM |
| ROBBINS,EDIE | AUG09-038 | 0488 | 503.00 | 8/22 | POSSIBLE 99 CENT STORE VENTURA/ WFB PASADENA |
| FLORES, AMELIA-ELAINE | JUN09-160 | 5211 | 465.45 | 6/19 | POSSIBLE 99 CENT LA MIRADA |
| HERNANDEZ,CHANEL | JUL09-064 | 0716 | 203.00 | 7/19 | 99 CENT STORE RIVERSIDE/ BOFA VAN NUYS |
| ARNOLD,JANELL | JUL09-065 | 6700 | 503.00 | 7/18 | 99 CENT STORE RIVERSIDE/ BOFA NORTH HOLLYWOOD |
| STEVENS,CARROL | JUL09-066 | 9355 | 100.00 | 7/17 | 99 CENT STORE RIVERSIDE/ 7-11 SHERMAN OAKS ATM |

TOTAL LOSS    11,610.85

GER000407

GUARANTY BANK 99Cent Store  Card Compromise     Effective 23July09

| Card # | | Acct # | $ Amt | Date | Time | Desc | Address | Terminal ID ID 2 | Notes |
|---|---|---|---|---|---|---|---|---|---|
| 1148 | Cline, Ryan | *****4363 | $103.00 $103.00 | 7/18/09 | 15:38:21 | Bank of America | North Hollywood, N. Hollywood, CA | | Provisional Credit |
| 0995 | Thomas, Brian | *****7309 | $503.00 $503.00 $1,006.00 | 7/17/09 7/18/09 | 20:10:29 7:16:23 | Wells Fargo Bank Wells Fargo Bank | 7902 Edinger, Huntington Bch, CA Gardn-Grv-Pro, Garden Grove, CA | 0820K 9955T | Provisional Credit Provisional Credit |
| 9892 | Townsend, Rudy | *****3666 | $503.00 $503.00 | 7/17/09 | 13:15:03 | Washington Mutual | 13949 Ventura Blvd,Sherman Oaks, CA | CA8311 | Provisional Credit |
| 4493 | Ortiz, Yahiliz | *****6213 | $403.00 $503.00 $503.00 $1,409.00 | 7/18/09 7/19/09 7/20/09 | 18:05:49 16:56:00 0:26:50 | Wells Fargo Bank Bank of America Bank of America | San Fernan-WF, San Fernando, CA West Glendale, Glendale, CA West Glendale, Glendale, CA | 9956U ICAD5956 ICAD5956 | Provisional Credit Provisional Credit Provisional Credit |
| 9252 | Hampton, Thomas | *****1283 | $503.00 $503.00 | 7/17/09 | 12:35:44 | Citibank | 12191 Ventura, Studio City, CA | 649071 | Provisional Credit |
| 2125 | Ross, Richard | *****9996 | $503.00 $203.00 $303.00 $303.00 $1,312.00 | 7/17/09 7/18/09 7/18/09 7/19/09 | 19:55:39 18:07:13 20:52:37 7:17:16 | Bank of America Washington Mutual Wells Fargo Bank Bank of America | West Arcadia, Arcadia, CA 13949 Ventura Blvd, Sherman Oaks, CA Gardn-Grv-Pro, Garden Grove, CA Duarte, Duarte, CA | ICAN4615 CA8311 9955T ICAD1471 | Provisional Credit Provisional Credit Provisional Credit Provisional Credit |
| 3243 | Johnson, Munial | *****8903 | $502.50 $303.00 $203.00 $503.00 $1,511.50 | 7/17/09 7/18/09 7/18/09 7/19/09 | 12:53:13 15:31:55 15:32:29 12:08:14 | Comerica Bank Bank of America Bank of America Bank of America | Studio City Office, Studio City, CA West Glendale, Glendale, CA West Glendale, Glendale, CA West Glendale, Glendale, CA | Y6848441 ICAD5956 ICAD5956 ICAD5956 | Provisional Credit Provisional Credit Provisional Credit Provisional Credit |

TOTAL LOSS  $6,347.50

025798

02/04/2011 FRI 13:17  FAX 951 687 5546 BBVA Compass  ☑001/001

147351

GER000409

147352

GER000410

147353

GER000411

GER000412

147355

GER000413

147356

147357

GER000416

GER000417

| Card Number | Tran Date | Tran Amount | Merchant Name | Merchant Street Address | Merchant City | Merchant State | Merchant ZIP | Response Code |
|---|---|---|---|---|---|---|---|---|
| [illegible] | 09/16/2009 21:50 | $303.00 | CITIBANK007971 | 2621 FTHL BV | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 09/16/2009 21:50 | $303.00 | CITIBANK007971 | 2621 FTHL BV | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 09/16/2009 08:20 | $503.00 | BANK OF AMERICA | *LA CRESCENTA | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 09/16/2009 08:19 | $503.00 | BANK OF AMERICA | *LA CRESCENTA | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 08/29/2009 22:09 | $303.00 | BANK OF AMERICA | *BALBOA-PARTHENIA | NORTHRIDGE | CA | | Approved - With Balances |
| [illegible] | 08/29/2009 22:09 | $203.00 | BANK OF AMERICA | *BALBOA-PARTHENIA | NORTHRIDGE | CA | | Approved - With Balances |
| [illegible] | 08/29/2009 22:07 | $503.00 | BANK OF AMERICA | *BALBOA-PARTHENIA | NORTHRIDGE | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 22:11 | $0.00 | CITIBANK003371 | 5670 W 158 BVDS [illegible] | LA | CA | | Approved - With Balances |
| [illegible] | 09/30/2009 22:11 | $503.00 | CITIBANK003371 | 5670 W 158 BVDS [illegible] | LA | CA | | Approved - With Balances |
| [illegible] | 09/30/2009 22:12 | $0.00 | CITIBANK003371 | 5670 W 158 BVDS [illegible] | LA | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:45 | $0.00 | UNION BANK | STUDIO CITY W/U | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:44 | $203.00 | UNION BANK | STUDIO CITY W/U | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:44 | $303.00 | UNION BANK | STUDIO CITY W/U | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:47 | $0.00 | UNION BANK | STUDIO CITY W/U | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:48 | $0.00 | CITIBANK006471 | 12191 VENTURA | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:49 | $0.00 | CITIBANK006471 | 12191 VENTURA | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 02:02 | $3.00 | W F B | STUDIO-CITY | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 02:03 | $3.00 | W F B | STUDIO-CITY | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/06/2009 11:25 | $119.50 | OC TOLL ROADS | | IRVINE | CA | 92618 | Approved - With Balances |
| [illegible] | 08/07/2009 20:25 | $119.50 | OC TOLL ROADS | 125 PACIFICA STE 100 | OC TOLL ROADS | CA | 92618 | Approved - With Balances |
| [illegible] | 08/07/2009 11:51 | $7.65 | [illegible] | MAIN STREET | [illegible] | KY | [illegible] | Approved - With Balances |
| [illegible] | 08/01/2009 04:11 | $197.00 | [illegible] | MAIN STREET | [illegible] | KY | [illegible] | Approved - With Balances |
| [illegible] | 08/30/2009 20:53 | $3.00 | BANK OF AMERICA | *LARCHMONT VILLAGE | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 20:54 | $353.00 | BANK OF AMERICA | *LARCHMONT VILLAGE | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 20:56 | $303.00 | BANK OF AMERICA | *LARCHMONT VILLAGE | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 02:16 | $403.00 | BANK OF AMERICA | *SHERMAN OAKS | SHERMAN OAKS | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 06:13 | $303.00 | BANK OF AMERICA | *LA CRESCENTA | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 06:11 | $503.00 | BANK OF AMERICA | *LA CRESCENTA | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 08/29/2009 21:15 | $303.00 | BANK OF AMERICA | *LA CRESCENTA | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 08/29/2009 21:14 | $203.00 | BANK OF AMERICA | *LA CRESCENTA | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 08/29/2009 21:13 | $503.00 | BANK OF AMERICA | *LA CRESCENTA | LA CRESCENTA | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:42 | $303.00 | CITIBANK006471 | 12191 VENTURA | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:42 | $403.00 | CITIBANK006471 | 12191 VENTURA | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:41 | $403.00 | CITIBANK006471 | 12191 VENTURA | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:41 | $0.00 | CITIBANK006471 | 12191 VENTURA | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/31/2009 01:40 | $303.00 | CITIBANK006471 | 12191 VENTURA | STUDIO CITY | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 21:53 | $463.00 | BANK OF AMERICA | *WILSHIRE LA BREA | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 21:53 | $363.00 | BANK OF AMERICA | *WILSHIRE LA BREA | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 21:52 | $463.00 | BANK OF AMERICA | *WILSHIRE LA BREA | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 08/30/2009 21:51 | $0.00 | BANK OF AMERICA | *WILSHIRE LA BREA | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 07/29/2009 17:36 | $503.00 | CITIBANK014170 | 8750 VAN NUYS BL | VAN NUYS | CA | | Approved - With Balances |
| [illegible] | 07/27/2009 19:21 | $203.00 | BANK OF AMERICA | *CANYON COUNTRY | SANTA CLARA | CA | | Approved - With Balances |
| [illegible] | 07/27/2009 19:22 | $0.00 | BANK OF AMERICA | *CANYON COUNTRY | SANTA CLARA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 17:36 | $303.00 | BANK OF AMERICA | *SEPULVEDA-SHERMAN WAY | VAN NUYS | CA | | Approved - With Balances |
| [illegible] | 07/29/2009 19:07 | $303.00 | BANK OF AMERICA | *CHINO HILLS | CHINO HILLS | CA | | Approved - With Balances |
| [illegible] | 07/29/2009 19:06 | $0.00 | BANK OF AMERICA | *CHINO HILLS | CHINO HILLS | CA | | Approved - With Balances |
| [illegible] | 07/29/2009 19:06 | $403.00 | BANK OF AMERICA | *CHINO HILLS | CHINO HILLS | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 18:16 | $203.00 | CITIBANK007871 | 4464 VAN NUYS BV | SHERMAN OAKS | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 17:54 | $303.00 | BANK OF AMERICA | *NORTH LONG BEACH | LONG BEACH | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 17:53 | $503.00 | BANK OF AMERICA | *NORTH LONG BEACH | LONG BEACH | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 17:53 | $0.00 | BANK OF AMERICA | *NORTH LONG BEACH | LONG BEACH | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 17:52 | $503.00 | BANK OF AMERICA | *NORTH LONG BEACH | LONG BEACH | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 07:07 | $503.00 | BANK OF AMERICA | *MONROVIA | MONROVIA | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 21:45 | $3.00 | W F B | SEAL BEACH | SEAL BEACH | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 21:46 | $203.00 | W F B | SEAL BEACH | SEAL BEACH | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 19:21 | $303.00 | BANK OF AMERICA | *EDGEWOOD CENTER | AZUSA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 19:20 | $0.00 | BANK OF AMERICA | *EDGEWOOD CENTER | AZUSA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 16:41 | $303.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | NORTH HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 21:27 | $0.00 | W F B | EDINGER BEACH | HUNTINGTON BC | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 21:26 | $203.00 | W F B | EDINGER BEACH | HUNTINGTON BC | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 11:08 | $0.00 | CT 2-11 | 201 OAK AVENUE | CARLSBAD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 11:09 | $203.00 | CT 2-11 | 201 OAK AVENUE | CARLSBAD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 11:10 | $202.00 | CT 2-11 | 201 OAK AVENUE | CARLSBAD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:26 | $503.00 | BANK OF AMERICA | *FOOTHILL & ROSEMEAD | PASADENA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:29 | $0.00 | BANK OF AMERICA | *DUARTE WAY CH CENTER | DUARTE | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:28 | $503.00 | BANK OF AMERICA | *DUARTE WAY CH CENTER | DUARTE | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 01:36 | $0.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | N HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 01:33 | $503.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | N HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 17:39 | $203.00 | W F B | GLENDORA 602 | GLENDORA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 17:38 | $0.00 | W F B | GLENDORA 602 | GLENDORA | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 17:57 | $203.00 | BANK OF AMERICA | *VAN NUYS MAIN | VAN NUYS | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 17:56 | $203.00 | BANK OF AMERICA | *VAN NUYS MAIN | VAN NUYS | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 16:53 | $0.00 | BANK OF AMERICA | *GLENDORA | GLENDORA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 16:53 | $0.00 | BANK OF AMERICA | *GLENDORA | GLENDORA | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 17:22 | $203.00 | BANK OF AMERICA | *RIVERSIDE-WOODMAN | SHERMAN OAKS | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 17:22 | $203.00 | BANK OF AMERICA | *RIVERSIDE-WOODMAN | SHERMAN OAKS | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 17:42 | $0.00 | BANK OF AMERICA | *WEST GLENDALE | GLENDALE | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:38 | $302.00 | BANK OF AMERICA | *CITRUS & ALOSTA | AZUSA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:35 | $0.00 | BANK OF AMERICA | *CITRUS & ALOSTA | AZUSA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 08:29 | $93.00 | BANK OF AMERICA | *FOOTHILL & ROSEMEAD | PASADENA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 08:28 | $0.00 | BANK OF AMERICA | *FOOTHILL & ROSEMEAD | PASADENA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 08:27 | $503.00 | BANK OF AMERICA | *FOOTHILL & ROSEMEAD | PASADENA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 08:27 | $0.00 | BANK OF AMERICA | *FOOTHILL & ROSEMEAD | PASADENA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:49 | $302.00 | BANK OF AMERICA | *LA VERNE | LA VERNE | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:48 | $0.00 | BANK OF AMERICA | *LA VERNE | LA VERNE | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 11:54 | $503.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | NORTH HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 16:03 | $503.00 | BANK OF AMERICA | *WOODMAN-SHERMAN WAY | VAN NUYS | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 07:33 | $303.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | N HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 20:08 | $203.00 | WASHINGTON MUTUAL | 1075 VINCENT AVENUE | WEST COVINA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 20:09 | $0.00 | WASHINGTON MUTUAL | 1075 VINCENT AVENUE | WEST COVINA | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 17:31 | $43.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | NORTH HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 18:17 | $0.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | NORTH HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 19:53 | $0.00 | BANK OF AMERICA | *WEST COVINA | WEST COVINA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 16:51 | $303.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | NORTH HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 21:57 | $183.00 | BANK OF AMERICA | *SAN DIEGO MAIN | SAN DIEGO | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 21:56 | $0.00 | BANK OF AMERICA | *SAN DIEGO MAIN | SAN DIEGO | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 19:20 | $302.50 | ARCO - AMPM | 11705 VAN BUREN BL | RIVERSIDE | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 22:27 | $302.00 | I T W 0141 | 12461 Victory Blvd US | North Hollywood | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:01 | $403.00 | W F B | VICTORIA-CARD | RANCHO CUCAMONGA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 09:01 | $0.00 | W F B | VICTORIA-CARD | RANCHO CUCAMONGA | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 19:53 | $3.00 | U S BANK | US BANK CATALINA AVE NU | REDONDO BEACH | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 22:29 | $403.00 | U S BANK | US BANK PACIFIC PAL | PACIFIC PLSDS | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 22:29 | $0.00 | U S BANK | US BANK PACIFIC PAL | PACIFIC PLSDS | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 22:21 | $32.50 | ONTARIO AMES 75376 | [illegible] | Ontario | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 20:56 | $47.95 | Continent CCSB | 1 MILLS CIRCLE 2 | ONTARIO | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 07:44 | $303.00 | BANK OF AMERICA | *AZUSA | AZUSA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 07:44 | $0.00 | BANK OF AMERICA | *AZUSA | AZUSA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 07:43 | $0.00 | BANK OF AMERICA | *AZUSA | AZUSA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 17:41 | $283.00 | BANK OF AMERICA | *DUARTE | DUARTE | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 17:42 | $0.00 | BANK OF AMERICA | *DUARTE | DUARTE | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 14:39 | $503.00 | BANK OF AMERICA | *SUNLAND | SUNLAND | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 14:39 | $0.00 | BANK OF AMERICA | *SUNLAND | SUNLAND | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 14:39 | $0.00 | BANK OF AMERICA | *SUNLAND | SUNLAND | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 14:38 | $503.00 | BANK OF AMERICA | *SUNLAND | SUNLAND | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 01:35 | $303.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | NORTH HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 01:34 | $0.00 | BANK OF AMERICA | *NORTH HOLLYWOOD | NORTH HOLLYWOOD | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 18:34 | $503.00 | WASHINGTON MUTUAL | APL LAUREL CANYON BLVD | SUN VALLEY | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 15:39 | $503.00 | WASHINGTON MUTUAL | 334 E DIAMOND BAR BLVD | DIAMOND BAR | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 15:36 | $0.00 | WASHINGTON MUTUAL | 334 E DIAMOND BAR BLVD | DIAMOND BAR | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 20:49 | $483.00 | U S BANK | US BANK 14TH/WILSHIRE | SANTA MONICA | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 20:48 | $0.00 | U S BANK | US BANK 14TH/WILSHIRE | SANTA MONICA | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 17:17 | $503.00 | BANK OF AMERICA | *BIXBY-ATLANTIC | LONG BEACH | CA | | Approved - With Balances |
| [illegible] | 07/17/2009 17:17 | $203.00 | BANK OF AMERICA | *BIXBY-ATLANTIC | LONG BEACH | CA | | Approved - With Balances |
| [illegible] | 07/18/2009 16:31 | $203.00 | CALIFORNIA CU | 1800 ARLINGTON BLVD W | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 14:51 | $203.00 | W F B | TUJUNGA VDWS | TUJUNGA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 14:49 | $203.00 | W F B | TUJUNGA VDWS | TUJUNGA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 14:49 | $303.00 | W F B | TUJUNGA VDWS | TUJUNGA | CA | | Approved - With Balances |
| [illegible] | 07/19/2009 14:50 | $503.00 | W F B | TUJUNGA VDWS | TUJUNGA | CA | | Approved - With Balances |
| [illegible] | 09/15/2009 14:37 | $303.00 | WASHINGTON MUTUAL | 10701 W PICO BLVD | LOS ANGELES | CA | | Approved - With Balances |
| [illegible] | 09/15/2009 19:05 | $303.00 | CITIBANK001671 | 422 TELEGRAPH RD | VENTURA | CA | | Approved - With Balances |
| [illegible] | 09/14/2009 19:57 | $29.00 | CHEVRON 0771718 | 17201 DEVONSHIRE BLVD | NORTHRIDGE | CA | 91325 | Approved - With Balances |
| [illegible] | 09/14/2009 19:39 | $15.95 | CVS/PHARMACY #9643 OTB | 8530 RESEDA BLVD | NORTHRIDGE | CA | 91324 | Approved - With Balances |
| [illegible] | 09/16/2009 14:44 | $0.00 | CITIBANK007971 | 16401 VENTURA BV | ENCINO | CA | | Approved - With Balances |
| [illegible] | 09/16/2009 14:41 | $303.00 | CITIBANK007971 | 16401 VENTURA BV | ENCINO | CA | | Approved - With Balances |

147360

147361

GER000419

147362

GER000420

US BANK

| Owner | Location | Account # | Card # | Date | Time | Amt | Description | POC | Address | Date | Time |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gini N. Attticaps | Riverside CA | 0991 | 1488 | 7/18/2009 | 1:06:58 | $500.00 | 0718/09PLUSTERM*NORTH HOLLYWOODN- HOLLYWOODCAUS2 | | | | |
| | | | | 7/18/2009 | 15:20:01 | $500.00 | 0718/09 CAUS2 | | | | |
| Jane King | Whittier CA | 9336 | 1481 | 7/23/2009 | 15:20:39 | $503.00 | 072309PLUSTERM*SYLMAR | SYLMAR | Norwalk | 14029 Pioneer Blvd. | Norwalk CA 90650 |
| | | | | 7/24/2009 | 20:27:43 | $503.00 | 072409PLUSTERM*SYLMAR CAUS2 | SYLMAR | Whittier - Scott | 15345 Whittier Blvd. | Whittier CA 90603 |
| | | | | 7/24/2009 | 20:38:47 | $503.00 | 072409PLUSTERM*SYLMAR CAUS2 | SYLMAR | La Mirada | 14540 Leffingwell Rd. | La Mirada CA 90638 |
| | | | | 7/26/2009 | 17:57:23 | $203.00 | 072609PLUSTERM*DEVONSHIRE- CAUS2 | Norwalk | 14029 Pioneer Blvd. | Norwalk CA 90650 | |
| | | | | 7/26/2009 | 17:56:16 | $203.00 | 072609PLUSTERM*DEVONSHIRE- CAUS2 | La Mirada | 14540 Leffingwell Rd. | La Mirada CA 90638 | |
| | | | | 7/26/2009 | 17:55:52 | $203.00 | 072609PLUSTERM*DEVONSHIRE- CAUS2 | La Mirada | 14540 Leffingwell Rd. | La Mirada CA 90638 | |
| | | | | 7/25/2009 | 18:59:25 | $403.00 | 072509PLUSTERM*HALIDA- PARTHENNORTHRIDGE CAUS2 | | | | |
| Schwartz | Riverside CA | 6935 | 7266 | 7/17/2009 | 21:26:31 | $503.00 | 0717/09VISATERM660 W DUARTE RD ARCADIA | Riverside - Magnolia | 9915 Magnolia Ave. | Riverside CA 92503 | |
| Napoli | Riverside CA | 0713 | 7284 | 7/18/2009 | 0:26:10 | $500.00 | 071809A9926TCI60USBANK MANHATTAMANHATTAN BCCAUS2 | Riverside- Magnolia | 9915 Magnolia Ave. | Riverside CA 92503 | |
| Sima J. Guerrero Whittier | Riverside CA | 3298 | 6938 | 7/24/2009 | 18:10:33 | $403.00 | 072409PLUSTERM*SIERRA MADRE SIERRA | Pico Rivera | 9535 Whittier Blvd. | Pico Rivera CA 90660 | |

$4,433.00

025859

GER000421

## HUNTINGTON BEACH POLICE DEPARTMENT
### Supplementary & Follow-Up Report

Copies To:                                                        DR:  09-14481

Classification: Follow Up Report                                  Date: 8/25/2009

---

### SUPPLEMENTAL

On 8/24/09, I met with ESPINOSA in the parking lot of the 99 Cent Store at 16672 Beach Blvd soon after I arrived at the location to assist in the arrest of BAKHCHADJIAN and ANANIAN.

ESPINOSA told me he works loss prevention for the 99 Cent Stores. He was surveilling the front of the business at about 1630 hours when he observed a black BMW vehicle enter the lot and park near the front of the business. The vehicle was occupied by **BAKHCHADJIAN** and **ANANIAN. BAKHCHADJIAN** exited the driver door of the vehicle and **ANANIAN** the right front passenger door. Both walked towards the front entrance of the business and entered the store. This vehicle had a temporary 'paper plate' attached at the rear license plate area.

At that point, ESPINOSA said he telephoned a fellow loss prevention person inside the store (DAVIS) who subsequently alerted Detective Nesmith who was also inside the store viewing digital evidence.

### LOSSES

On 8/25/09 I spoke with MITCHELL. She told me their office has approximately 20 victim cardholders who fell victim to identity theft and misuse of their account information. MITCHELL discovered through a brief analysis that the common point of compromise was various 99 Cent Stores in the Riverside, Ventura and Whittier stores. The estimated loss to School's First cardholders and the credit union is approximately $11,300.00.

STEVENS reported that Altura Credit Union has discovered approximately 40 cardholder victims that fell victim to identity theft. The current loss is estimated at $16,500.00. However, STEVENS said there were attempts in the amount of $38,500.00 with their cardholders.

I spoke with HOLMES who said Ventura County Credit Union had approximately 26 account holders fall victim to identity theft. Their access card information was compromised at a common point determined to be the 99 Cent Store on Victoria in Ventura, CA. The estimated loss at this point is $18,300.00.

- 3 -

Detective Humphreys, #111
Bunco-Forgery Unit                                       Signature of Supervisor

**146337**

GER000422

1   ANDRÉ BIROTTE JR.
    United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    E. MARTIN ESTRADA (Cal. SBN: 223802)
4   ELIZABETH R. YANG (Cal. SBN: 196461)
    Assistant United States Attorneys
5   ANDREW CREIGHTON (Maryland State Bar Member)
    Trial Attorney, U.S. Department of Justice
6        1500 United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012
         Telephone: (213) 894-3358/1785/7408
8        Facsimile: (213) 894-3713
         Email:    Martin.Estrada@usdoj.gov
9                  Elizabeth.Yang@usdoj.gov
                   Andrew.Creighton@usdoj.gov
10
    Attorneys for Plaintiff
11  UNITED STATES OF AMERICA

12              UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                    WESTERN DIVISION

15  UNITED STATES OF AMERICA,        No. CR 11-72(A)-RGK

16            Plaintiff,             GOVERNMENT'S POSITION RE: PRE-
                                     SENTENCE REPORT AND SENTENCING OF
17            v.                     DEFENDANT ARMAN SHAROPETROSIAN
                                     (#4)
18  MHER DARBINYAN, et al.,

19            Defendants.

20

21       Plaintiff United States of America, by and through its attorney

22  of record, the United States Attorney for the Central District of

23  California, hereby files its position regarding the Presentence

24  Report ("PSR") submitted by the United States Probation Office for

25  defendant ARMAN SHAROPETROSIAN ("defendant").

26  ///

27  ///

28

                            1

GER000423

The government's sentencing position is based on the attached memorandum of points and authorities, the PSR, the records and files of this case, and any argument that the Court may request at the sentencing hearing.  The government respectfully requests the opportunity to supplement its position as may become necessary.

Dated: August 1, 2014          Respectfully submitted,

                               ANDRÉ BIROTTE JR.
                               United States Attorney

                               ROBERT E. DUGDALE
                               Assistant United States Attorney
                               Chief, Criminal Division


                               _____/s/_____
                               E. MARTIN ESTRADA
                               ELIZABETH R. YANG
                               Assistant United States Attorneys
                               ANDREW CREIGHTON
                               Trial Attorney, DOJ

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

GER000424

## **TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES..................................................**ii**

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND..........................................2

III.    ARGUMENT .................................................5

        A.    The Sentencing Guidelines.............................5

              1.    The Standard of Proof Applicable at Sentencing.....5

              2.    Defendant's Sentencing Guidelines Calculation......7

        B.    Section 3553(A) Factors...............................14

IV.   CONCLUSION..................................................14

GER000425

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                                    PAGE

**CASES:**

Nichols v. United States,
        511 U.S. 738 (1994)........................................6

United States v. Armstead,
        552 F.3d 769 (9th Cir. 2008)..............................5

United States v. Booker,
        543 U.S. 220 (2005).......................................10

United States v. Carty,
        520 F.3d 984 (9th Cir. 2008)..............................10

United States v. Christensen,
        732 F.3d 1094 (9th Cir. 2013)..............................6

United States v. Ingham,
        486 F.3d 1068 (9th Cir. 2007)..............................8

United States v. Johnson,
        540 F. Appx. 573 (9th Cir. 2013)...........................6

United States v. Maldonado,
        215 F.3d 1046 (9th Cir. 2000)..............................9

United States v. Pena,
        380 F. Appx. 623 (9th Cir. 2010)...........................8

United States v. Riley,
        335 F.3d 919 (9th Cir. 2003)...............................6

**FEDERAL STATUTES**

18 U.S.C. § 3584(a)...............................................12

18 U.S.C. § 3584(b)...............................................12

18 U.S.C. § 3661...................................................7

**FEDERAL RULES**

Fed. R. App. P. 32.1(a)............................................6

Fed. R. Evid. 1101(d)(3)...........................................6

GER000426

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   <u>INTRODUCTION</u>

On April 17, 2014, a jury convicted defendant ARMAN SHAROPETROSIAN ("defendant" or "SHAROPETROSIAN") of three criminal counts: RICO Conspiracy, in violation of Title 18, United States Code, Section 1962(d) (Count 1); and Extortion Conspiracy and Extortion, in violation of Title 18, United States Code, Section 1951(a) (Counts 4 and 5).

The criminal conduct underlying defendant's convictions arose out of his association with the Armenian Power criminal enterprise ("Armenian Power"), a Eurasian organized crime group involved in a wide array of criminal acts, including violent crimes, fraud, and identity theft.  The evidence at trial showed that defendant, while incarcerated at Avenal State Prison, used smuggled cellular telephones to work with an Armenian Power leader, MHER DARBINYAN ("DARBINYAN"), and others to engage in fraud and an extortion scheme that involved death threats and actual displays of force.

On July 29, 2014, the United States Probation Office ("USPO") disclosed to the parties its Presentence Report ("PSR") in this matter.  The USPO found a total offense level of 31, calculating the following: a base offense level of 18 under U.S.S.G. §§ 2E1.1(a)(2), 2B3.2(a), a 2-level upward adjustment for threat of death/bodily injury/kidnapping under U.S.S.G. § 2B3.2(b)(1), a 2-level upward adjustment for demand of more than $50,000 under U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(C), a 5-level upward adjustment for firearm possessed under U.S.S.G. § 2B3.2(b)(3)(A)(iii), a 2-level upward adjustment for person physically restrained under U.S.S.G. § 2B3.2(b)(5), and a 2-level upward adjustment for aggravating role

1

under U.S.S.G. § 3B1.1(c).  See PSR ¶¶ 27-39.  Combined with defendant's criminal history category of V, see PSR ¶¶ 44-54, these calculations result in a Sentencing Guidelines range of imprisonment of 168 to 210 months incarceration.  See PSR ¶ 91.

     The government agrees with all of the USPO's calculations. Especially because defendant's racketeering activity and extortion involved organized crime activity and threats to the victim's family, a sentence at the high end of the applicable sentencing range, 210 months, is appropriate here.  See U.S.S.G. § 2B3.2, cmt. n.8 ("If the offense involved organized criminal activity, or a threat to a family member of the victim, an upward departure may be warranted.").  Accordingly, based on the Sentencing Guidelines range and the factors set forth in Title 18, United States Code, Section 3553(a), the government believes that defendant should be sentenced to 210 months' incarceration, to be followed by three years' supervised release, and a special assessment of $300.

## II.  **FACTUAL BACKGROUND**

     The evidence at trial showed the following:

     Beginning on an unknown date, defendant and others were members of or associated with the criminal racketeering conspiracy known as Armenian Power, and agreed that a conspirator would knowingly participate in the conduct of the affairs of Armenian Power through a pattern of racketeering activity.  Armenian Power is a criminal organization that has operated in the Los Angeles area and elsewhere, beginning in the 1980s.  Members and associates of the organization have engaged in acts including murder, attempted murder, kidnapping, robbery, extortion, bank fraud, access device fraud, and identity theft.  Defendant was an Armenian Power

2

GER000428

associate.  Among other things, the types of racketeering activity
that defendant agreed would be committed were acts of bank fraud,
identity theft, and extortion.

With regard to the bank fraud and identity theft components of
the RICO Conspiracy (Count 1), defendant discussed on wiretap calls
obtaining victim bank accounts that would contain $700,000 to
$800,000 ("something in the amount of 700-800 dollars") so that
defendant could steal the money from the bank accounts.  (See Gov't
Ex. 68.)  Further, defendant targeted vulnerable victims, older
account holders who he believed would not catch onto his fraud,
specifying that he wanted victims who were born in the years 1930 to
1935:  "He should have more than one account, about two and he
should be very old.  His age should be under the year 30-35." (See
Gov't Ex. 68.)

With regard to the extortion conduct, which is part of the RICO
Conspiracy (Count 1) and the Extortion Conspiracy and Extortion
(Counts 4 and 5), the evidence showed that beginning no later than
June 27, 2009, and continuing to in or around December 2009,
defendant and DARBINYAN, as well as co-defendants who did not go to
trial, Emil Airapetian ("Airapetian") and Lusine Ogandganyan
("Ogandganyan"), and others conspired to extort and extorted victim
M.M. for money under threat of violence or death.  In multiple
recorded telephone calls, defendant and DARBINYAN were captured
threatening victim M.M. and victim M.M.'s family with kidnapping,
physical violence, and/or death if victim M.M. did not pay the
demanded money.  As a result of defendant's threats, victim M.M.
paid defendant and/or DARBINYAN thousands of dollars, both in cash

GER000429

1  and, via Moneygram or Western Union, in money orders sent to

2  individuals designated by defendants to collect the money.

3       Among other threats, defendant made the following threats to

4  victim M.M.:

5       • "Neither **thieves nor whores** will be able to save you."

6         (Gov't Ex. 71, 6/29/09 (emphasis added).)

7       • "Don't think my hands are so short just because I am in this

8         cage over here . . . **God forbid** if you come without any

9         money." (Gov't Ex. 74, 6/30/09 (emphasis added).)

10      • "If you plan on coming without money it would be better not

11        to come . . . The longer it goes the more problems it will

12        cause you." (Gov't Ex. 74, 6/30/09.)

13      • "Hey, whore.  Should I hold you and **not let you go home** for

14        couple of months so that you can understand? . . . So that

15        your family members realize that I am not kidding?" (Gov't

16        Ex. 75, 7/4/09 (emphasis added).

17      • "I have been down those roads 12 years ago.  I have done

18        this to other people." (Gov't Ex. 75, 7/4/09.)

19      • "I will put you in a very terrible situation." (Gov't Ex.

20        80, 9/3/09.)

21      • "I will **skin** you . . . If that deposit does not happen by 6

22        o'clock.  I will not give a fuck.  Good luck to you."

23        (Gov't Ex. 87, 11/2/09 (emphasis added).)

24      • "Guys like me come once in a century . . . I am a **criminal**."

25        (Gov't Ex. 90, 11/21/09 (emphasis added).)

26      • "I have been successful in receiving everything I have been

27        involved in friend.  Even if there was a **corpse**, I would

28

4

GER000430

1          pick it up too.  I don't give a fuck."  (Gov't Ex. 90,

2          11/21/09 (emphasis added).)

3       Further, defendant discussed large amounts of money that he

4  wanted from victim M.M.  On June 29, 2009, defendant stated that

5  victim M.M. would have to pay him "120 and something thousand based

6  on the accounting."  (Gov't Ex. 69.)  Later, on November 2, 2009,

7  defendant told victim M.M., "Between us, your debt has been 120

8  dollars [$120,000] since September 1."  (Gov't Ex. 85.)

9       In addition, victim M.M. testified at trial that at one point,

10  shortly before October 26, 2009 when victim M.M. went to the FBI to

11  report the extortion, victim M.M. was confronted at a location by an

12  defendant's associate, Airapetian.  At the location, Airapetian

13  showed victim M.M. a firearm and forced victim M.M. into a Porsche

14  Cayenne.  Inside the vehicle, Airapetian put defendant (who was in

15  prison) on the telephone to speak with victim M.M.  Consistent with

16  the wiretap calls, victim M.M. testified that defendant repeatedly

17  threatened victim M.M. and victim M.M.'s father and child, demanding

18  that money be paid.  It was at this point, fearing for the life of

19  victim M.M.'s loved ones, that victim M.M. went to the FBI for help.

20  **III. <u>ARGUMENT</u>**

21       **A.   <u>The Sentencing Guidelines</u>**

22            1.   <u>The Standard of Proof Applicable at Sentencing</u>

23       The Ninth Circuit has been clear that when a Sentencing

24  Guidelines enhancement is based on the scope of "criminal activity

25  for which the defendant has already been convicted," a preponderance

26  standard applies.  <u>United States v. Armstead</u>, 552 F.3d 769, 777 (9th

27  Cir. 2008).  Indeed, the Ninth Circuit has repeatedly applied a

28  preponderance standard in determining sentencing enhancements under

<div align="center">5</div>

GER000431

U.S.S.G. § 2B1.1, even when those enhancements are substantial.  See id. (applying preponderance standard to loss and victim enhancements under U.S.S.G. § 2B1.1); United States v. Riley, 335 F.3d 919, 926–27 (9th Cir. 2003) (applying preponderance standard to loss enhancement under U.S.S.G. § 2B1.1); see also United States v. Johnson, 540 Fed. Appx. 573, 576–77 (9th Cir. 2013)[1] (applying preponderance standard to 16-level loss enhancement and 2-level victim enhancements under U.S.S.G. § 2B1.1).

Further, with regard to determinations of facts for purposes of sentencing, the Ninth Circuit has explained, "The Federal Rules of Evidence do not apply at a sentencing hearing." United States v. Christensen, 732 F.3d 1094, 1102 (9th Cir. 2013) (citing Fed. R. Evid. 1101(d)(3)); see also U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). "Indeed, 'a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" Id. (quoting Nichols v. United States, 511 U.S. 738, 747 (1994)).  Federal law expressly provides that "[n]o limitation shall be placed on the

---

[1] Pursuant to Federal Rule of Appellate Procedure 32.1, "a court may not prohibit or restrict the citation of federal judicial opinions" that have been designated unpublished but "issued on or after January 1, 2007." Fed. R. App. P. 32.1(a). Under Ninth Circuit Rule 36-3, unpublished dispositions "issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."

GER000432

1    information concerning the background, character, and conduct of a

2    person convicted of an offense which a court of the United States

3    may receive and consider for the purpose of imposing an appropriate

4    sentence." See 18 U.S.C. § 3661.

5                2.    Defendant's Sentencing Guidelines Calculation

6          As found by the USPO, defendant's total offense level under the

7    Sentencing Guidelines is 31.  The Sentencing Guidelines calculations

8    fully support the government's 210-month sentencing recommendation.

9          A base offense level of 18 is applicable under U.S.S.G. §§

10   2E1.1(a)(2), 2B3.2(a).

11         Based on the nature of the threat, a 2-level upward adjustment

12   for threat of death/bodily injury/kidnapping applies under U.S.S.G.

13   § 2B3.2(b)(1).  As summarized in the factual background above, the

14   evidence showed that defendant repeatedly made threats of death,

15   assault, and kidnapping against victim M.M.  Among other things,

16   defendant warned victim M.M. that others would not be able to "save"

17   victim M.M., threatened victim M.M. to "not let you go home for

18   couple of months," told victim M.M. that defendant would "put you in

19   a very terrible situation," and said he would "skin" victim M.M.

20   (See Gov't Exs. 71, 75, 80, 87.)  Defendant's coconspirators also

21   threatened victim M.M., with DARBINYAN stating that he would "chase

22   after" victim M.M., "hurt" victim M.M., and "jerk off" on victim

23   M.M.'s mother's head.  (See Gov't Exs. 73, 78, 79.)  Indeed, because

24   the jury instructions required that the jury find that defendant

25   used "actual or threatened force, violence, or fear" to induce

26   victim M.M. to part with money or property, the jury necessarily

27   found evidence establishing this enhancement.

28

GER000433

1    A 2-level upward adjustment for demand of more than $50,000

2    also applies under U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(C).

3    Defendant and DARBINYAN discussed large amounts of money they wanted

4    from victim M.M.  On June 29, 2009, defendant told DARBINYAN that

5    victim M.M. would have to pay him "120 and something thousand based

6    on the accounting."  (Gov't Ex. 69.)  Later, on November 2, 2009,

7    defendant told victim M.M., "Between us, your debt has been 120

8    dollars [$120,000] since September 1."  (Gov't Ex. 85.)

9    Additionally, defendant is subject to a 5-level upward

10   adjustment under U.S.S.G. § 2B3.2(b)(3)(A)(iii) for firearm

11   possessed, and a 2-level upward adjustment for person physically

12   restrained under U.S.S.G. § 2B3.2(b)(5).  Shortly before victim M.M.

13   went to the FBI to report the extortion, victim M.M. was confronted

14   at a location by Airapetian, who brandished a firearm and forced

15   victim M.M. into a Porsche Cayenne.  Inside the vehicle, Airapetian

16   put defendant on the telephone and, for hours, defendant repeatedly

17   threatened victim M.M. and victim M.M.'s father and child, demanding

18   that the money be paid.

19   A 2-level upward adjustment for aggravating role also applies

20   to defendant under U.S.S.G. § 3B1.1(c) because defendant was "an

21   organizer or leader" of the extortion conduct.  A court may impose

22   this enhancement if there is "evidence that the defendant exercised

23   some control over others involved in the commission of the offense

24   or was responsible for organizing others for the purpose of carrying

25   out the crime."  United States v. Ingham, 486 F.3d 1068, 1074 (9th

26   Cir. 2007); see also United States v. Pena, 380 Fed. Appx. 623, 626

27   (9th Cir. 2010) (holding that "organizer-leader" enhancement applied

28   to a mail fraud defendant who enlisted and supervised four other

GER000434

1 individuals in a scheme).  "A single incident of persons acting

2 under a defendant's direction is sufficient evidence to support" a

3 role enhancement.  United States v. Maldonado, 215 F.3d 1046, 1050

4 (9th Cir. 2000).

5     Here, the evidence showed that defendant initiated, planned,

6 and directed the extortion conspiracy.  Indeed, because defendant

7 was incarcerated, yet was taking the lead in threatening and

8 instructing victim M.M. on how to make payments, he necessarily had

9 to direct his coconspirators, including DARBINYAN and Airapetian, in

10 the execution of the extortion conspiracy.  In fact, defendant used

11 his non-incarcerated coconspirators as his agents and directed them

12 in extorting victim M.M. and causing victim M.M. to fear for his and

13 his family's life.  As defendant told victim M.M., "Don't think my

14 hands are so short just because I am in this cage over here . . .

15 God forbid if you come without any money."  (Gov't Ex. 74.)

16     Other wiretap calls showed defendant instructing DARBINYAN as

17 to what defendant wanted DARBINYAN to do to victim M.M. and how they

18 would get money from victim M.M.  On June 29, 2009, defendant told

19 DARBINYAN that victim M.M. had business dealings with "some

20 Russians" and that defendant wanted to take those business dealings,

21 along with money, from victim M.M.:  "We have to take it little by

22 little, but during that time, we should get all those people who are

23 doing this business under us."  (Gov't Ex. 70.)  On July 4, 2009,

24 DARBINYAN reported to defendant that victim M.M. brought a "clinic

25 check," and defendant then got on the telephone with victim M.M.,

26 threatened to kidnap victim M.M., and told victim M.M. to wire

27 $4,000 to addresses that defendant was going to provide to

28 DARBINYAN.  (Gov't Ex. 75.)  On July 5, 2009, defendant told

9

GER000435

1  DARBINYAN how they would divide the money ("So 63,000 are mine and
2  yours, dear.  Are you listening?"), and to hold on to a check that
3  victim M.M. had brought to DARBINYAN.  (Gov't Ex. 77.)

4      Finally, the government's 210-month recommendation is also
5  supported by virtue of the nature of the conspiracy and the threats.
6  The Sentencing Guidelines state that "[i]f the offense involved
7  organized criminal activity, or a threat to a family member of the
8  victim, an upward departure may be warranted."  See U.S.S.G. §
9  2B3.2, cmt. n.8.  The government is not seeking an upward departure
10  here, but at a minimum, defendant's egregious conduct warrants a
11  sentence at the high-end of the sentencing range.

12  **B.    Section 3553(A) Factors**

13      A sentencing court must start with the sentence advised by the
14  Sentencing Guidelines.  United States v. Booker, 543 U.S. 220, 264
15  (2005) ("The district courts, while not bound to apply the
16  Guidelines, must consult those Guidelines and take them into account
17  when sentencing.").  The Ninth Circuit has held that the Sentencing
18  Guidelines sentence is a "starting point" to determine a reasonable
19  sentence and that a sentence under the Sentencing Guidelines will
20  usually be reasonable.  See United States v. Carty, 520 F.3d 984,
21  994 (9th Cir. 2008) (en banc).

22      The Section 3553(a) factors favor the recommended sentence.
23  Section 3553(a)(1) requires the Court to consider the nature and
24  circumstances of the offense, and the history and characteristics of
25  the defendant.  Defendant's offense conduct was particularly
26  egregious.  In his fraudulent conduct, defendant discussed stealing
27  the identities and account information of victims, and specifically
28  sought to target vulnerable victims – elderly individuals who would

GER000436

1  be less likely to quickly become aware of the theft.  In his

2  extortion conduct, defendant, over the course of many months,

3  threatened victim M.M. and victim M.M.'s family with violence in

4  order to force victim M.M. to make repeated extortion payments.

5  Defendant made clear that he would not be deterred and no one would

6  be able to save victim M.M. from him:  "Neither thieves [other

7  criminals] nor whores [law enforcement] will be able to save you."

8  (Gov't Ex. 71.)

9      Moreover, defendant's history and characteristics favor the

10 recommended sentence.  Defendant has a disturbing criminal history,

11 involving numerous offenses involving theft, assault, firearms, and

12 bank fraud.  See PSR ¶¶ 46-51.  Defendant's convictions only tell

13 part of the story.  They stem from his association with Armenian

14 Power.  For instance, defendant's 2003 convictions for shooting at

15 an occupied vehicle, carrying a concealed firearm, and assault with

16 firearms, were from consolidated cases that occurred in 2001 and

17 2002.  Further, they were pled down from attempted murder with a

18 gang enhancement, in which he his co-defendant, Armenian Power

19 member Airapetian, were involved in drive-by shootings.  See PSR ¶

20 49.

21     It was while serving his 10n-year sentence for the drive-by

22 shootings that defendant engaged in the RICO conspiracy and

23 extortion conduct at issue here.  What is more, defendant himself

24 admitted that the convictions he had sustained and his criminal

25 conduct captured during the brief period of the wiretaps were only

26 the tip of the iceberg:  Defendant went so far as to brag about his

27 success as a crook, saying, "I have been successful in receiving

28 everything I have been involved in friend.  Even if there was a

11

GER000437

corpse, I would pick it up too.  I don't give a fuck."  (Gov't Ex. 90.)

Section 3553(a)(2), which requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, also favors the recommended sentence.  As can be seen from defendant's criminal history, numerous arrests, convictions, and periods of incarceration have failed to deter him from continued criminal activity.  In fact, the instant offenses were committed while defendant was incarcerated in a state prison facility while serving a 10-year sentence.  Defendant has shown himself to be unrepentant in his criminal conduct:  "Guys like me come once in a century . . . I am a *criminal*."  (Gov't Ex. 90 (emphasis added).)  A substantial sentence, therefore, is necessary.

Furthermore, defendant's sentence in this case should be consecutive to his current undischarged term of imprisonment.  Under 18 U.S.C. § 3584, where a sentence is imposed on a defendant who is already subject to an undischarged term of imprisonment, the district court is to consider the factors set forth in Section 3553(a) in determining whether the sentence shall run consecutively or concurrently to the undischarged term.  See 18 U.S.C. § 3584(b).  "Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."  See 18 U.S.C. § 3584(a).

Defendant was paroled from his 10-year sentence for his drive-by shootings, see PSR ¶ 49, but is currently serving a 300-month

12

GER000438

1  sentence imposed in Case Number CR SA 09-248(B)-DOC ("the Orange
2  County case"). See PSR ¶ 51. The offense conduct in the Orange
3  County case was entirely distinct from the offense conduct in this
4  case, and defendant's sentence here should run consecutively to the
5  sentence in the Orange County case. Defendant was prosecuted in the
6  Orange County case for organizing and leading a massive and
7  sophisticated bank fraud scheme in which he partnered with another
8  jail inmate, co-defendant Angus Brown, to steal victims' bank
9  account information and then use that information to create
10 fraudulent checks for the victims' accounts that were used by co-
11 schemers to steal the victims' money. None of the acts and calls
12 presented at trial in the instant case, including defendant's
13 association with DARBINYAN and Armenian Power, were part of the
14 Orange County case.

15     Moreover, as reflected in the Sentencing Guidelines
16 calculation, defendant's sentence here is based on his extortion
17 conduct. This was extremely serious misconduct that involved a
18 long-term campaign of threats of violence in order to extract money
19 from victim M.M. Defendant's extortion conduct was not an anomaly –
20 he stated to victim M.M., "I have been down those roads 12 years
21 ago. I have done this to other people." (Gov't Ex. 75.) This
22 conduct represents an entirely different harm than the conduct at
23 issue in the Orange County case. As such, his sentence here should
24 therefore run consecutively to his bank fraud sentence in the Orange
25 County case.

26     For all these reasons the Section 3553(a) factors weigh in
27 favor of the recommended sentence.
28 ///

13

GER000439

**IV.   <u>CONCLUSION</u>**

Based on the foregoing, the government respectfully submits that defendant should be sentenced to 210 months' incarceration, to be followed by three years' supervised release, and a special assessment of $300.

14

GER000440

1     Andrew Reed Flier, Esq.
     California State Bar No. 137372
2     FLIER AND FLIER
     16133Ventura Boulevard, Suite 1160
3     Encino, California 91436
     Tel: (818) 990-9500
4     Fax: (818) 990-1303
     Email: andrew@flierandflier.com
5

6     Attorney for Defendant
     RAFAEL PARSADANYAN

7

8              IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
9

10

11     UNITED STATES OF AMERICA,     )     CRIMINAL ACTION
                                       )     CASE NO. CR 11CR00072(A)-RGK-35
12                   Plaintiff,     )
                                       )     **DEFENDANT RAFAEL PARSADANYAN'S**
13     vs.                               )     **RESPONSE TO THE PROBATION**
                                       )     **OFFICER'S PRESENTENCE REPORT**
14     RAFAEL PARSADANYAN,     )
                                       )     DATE: September 15, 2014
15                   Defendant     )     TIME: 1:30 P.M.
    _____ )
16                                           The Honorable R. Gary Klausner
                                          United States District Judge
17

18         Defendant, RAFAEL PARSADANYAN, by and through his attorney of record, Andrew

19 Reed Flier, hereby submits herewith his Response to the Probation Officer's Presentence Report

20 ("PSI"). In addition, the defendant, Mr. Parsadanyan, respectfully requests that Your Honor

21 **significantly depart downward** the sentence of Mr. Parsadanyan for a **plethora of reasons**. In

22 addition, that the sentence of Mr. Parsadanyan be **departed downward** due to **mitigating**

23 **considerations** enunciated under **18 U.S.C. §§ 3553, 5K2.20, and case law**. Finally, that Mr.

24 Parsadanyan be sentenced to a **Probationary Term; or, to the Low End of any Sentencing**

25 **Guideline Range in which the Court imposes**.

    ///

26     ///

27     ///

28     ///

1   Dated: August 25, 2014

2                                     Respectfully submitted,
                                       FLIER AND FLIER

3                                       A Law Corporation

4

5                                     By: /s/ Andrew Reed Flier
                                          Andrew Reed Flier, Esq.,

6                                          Attorney for Defendant
                                        RAFAEL PARSADANYAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 2 –

<div align="center">

INDEX

</div>

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     THE DEFENDANT

        A.      Rafael Parsadanyan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                1.      Social History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                2.      Schooling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                3.      Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                4.      Relationships. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                5.      Physical Condition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                6.      Alcohol/Drug History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                7.      Mental/Emotional Health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III     THE OFFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     OBJECTIONS TO THE PRESENTENCE REPORT

        A.      Factual Objections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Loss Computation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.      A 16 or 18 Level Enhancement For "Loss" is Not Supported By the Evidence; Therefore, Section 2B1.1(I) or (J) Are Not Applicable. . . . . . . . . . . . . . . . . . . . . . 12

                1.      The Intended and Actual Loss Calculations Have Been Improperly Added Together to Inflate the "Loss" Amount. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                2.      The Loss Calculation Is Unsupported by the Facts and Evidence. . . . . . . 13

V.      SENTENCING PRINCIPLES

        A.      Case Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        B.      18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        C.      18 U.S.C. § 5K2.20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        D.      §3B1.2- Mitigating Role. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        E.      § 5H1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

///

///

///

GER000443

VI. CONSIDERATION OF THE STATUTORY FACTORS AND THE DEFENDANT'S SENTENCING RECOMMENDATION

1. The Nature and Circumstances of the Offense and the History and Characteristics of the Offender. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   a. The Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . . . 32

   b. The Offense Conduct Includes Mitigating Circumstances Such as Not Involving Violence and No Weapons Usage. . . . . . . . . . . . . . . . . . . . . . . 32

   c. The History and Characteristics of the Offender. . . . . . . . . . . . . . . . . . . 32

      Mr. Parsadanyan has no prior contacts with law enforcement. . . . . . . . . 31

2. The Need for the Sentence Imposed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3. The Possible Sentences Available. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

4. The Guidelines Sentencing Range. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

5. The Policy Statements of the Sentencing Commission. . . . . . . . . . . . . . . . . . . . 36

6. Avoiding Unwarranted Sentencing Disparities Among Similarly Situated Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

7. The Need to Provide Restitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VII. DEFENSE RECOMMENDATION AND COMPUTATION

   A. LOSS COMPUTATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

   B. DEFENDANT'S CRIMINAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

VIII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

GER000444

**I.**

**INTRODUCTION**

1  
2  
3     Before the court is the defendant, Rafael Parsadanyan, whom is a 30 year old young man.

4 On April 17, 2014, Mr. Parsadanyan was found guilty by a jury trial of 14 Counts of a 140-count

5 First Superseding Indictment in which Mr. Parsadanyan and 69 other defendants were named.  The

6 counts relating to the guilty verdicts against Mr. Parsadanyan were 38-41, 44, 45, 48, 50, 51, 54, 57,

7 60, 63, and 66, which charged Bank Fraud, in violation of 18 U.S.C. § 1344.  Mr. Parsadanyan was

8 found **not** guilty on Count 69, which charged 18 U.S.C. § 1029(b)(2) - Access Device Fraud, and

9 **not** guilty on Counts 71 through 73, 77, 79, 81, 84, 87, 91 and 93 which charged 18 U.S.C. §

10 1028(a)(1), 2 - Aggravated Identity Theft.

11     On June 2, 2014, Mr. Parsadanyan filed a Motion for a New Trial.  The Court **ruled** that a

12 **New Trial is warranted as to Counts 63 and 66**.  Sentencing in this matter is set for September

13 15, 2014.

14     The United States Probation Office ("USPO") calculates Mr. Parsadanyan's **total offense**

15 **level** to be at a **33** with a **criminal history category** of **I**.  Therefore, Mr. Parsadanyan's Advisory

16 Range under the Federal Sentencing Guidelines is between **135 to 168 months**.

17     The Government, however, is requesting that Mr. Parsadanyan be sentenced to a term of **168**

18 months. **[That is quite shocking and interesting since the Government's offer before trial was**

19 **2 years.]** The Government submits that Mr. Parsadanyan's total offense level is at a 35. [168-210

20 months; See Gov't Brief, P. 8, L. 4-17, P. 18, L. 1-5].

21     As set forth below, and pursuant to **objectionable issues**, the **guidelines of 18 U.S.C. § §**

22 **3553 and 5K2.20, and case law**, Mr. Parsadanyan respectfully requests that **Your Honor** allow Mr.

23 Parsadanyan to be sentenced to a **Probationary Sentence**; or, in the alternative to the **Low End of**

24 **any sentencing guideline range** in which Your Honor imposes.

25 ///

26 ///

27 ///

28

GER000445

# II.

## THE DEFENDANT

**A.      RAFAEL PARSADANYAN**

Mr. Parsadanyan agrees with the representations enunciated within the "PSI" Report on pages 4 through 18; **except for specifically referenced objections**.

1)      **SOCIAL HISTORY**

Mr. Parsadanyan was born in Armenia, to the marital union of Sergei Parsadanyan and Hasmik P. Simonyan. Mr. Parsadanyan's father died when Mr. Parsadanyan was 12 years old. Mr. Parsadanyan's father was **murdered** during a home invasion robbery. Mr. Parsadanyan's mother is 57 years old and resides in Hollywood. **She is disabled following a diagnosis of a major depressive disorder**, and Mr. Parsadanyan's mother does not work. [See **Exhibit # A**, Medical history and diagnosis of Mr. Parsadanyan's mother and the medication she takes.] Prior to her failing health, Mr. Parsadanyan's mother worked as a caretaker at a board and care facility.

Mr. Parsadanyan has no siblings. Mr. Parsadanyan and his mother came to the United States following his father's murder. Mr. Parsadanyan's maternal uncle had come to the United States previously. The family first lived in Los Angeles and then moved to Fresno, California, for about one year. Then, the family returned to Los Angeles.

Mr. Parsadanyan is very close with his mother and on his free time continuously looked after her. She is still unaware of his conviction in this case; or that Mr. Parsadanyan is in custody. Mr. Parsadanyan fears that mentally and emotionally, his mother will not be able to handle the news well. [See paragraphs 37-41 of "PSI" Report]. Mr. Parsadanyan's mother already is sick and has attempted suicide in the past.

2)      **Schooling:**

Mr. Parsadanyan graduated from Bravo Medical Magnet High School in Los Angeles in 2003. During his time in high school, Mr. Parsadanyan's studies concentrated on acquiring dentistry skills. Mr. Parsadanyan still hopes to become a dentist one day.

While in middle school, Mr. Parsadanyan played basketball, received an award for excellence in science (1999); an award for imagination, sensitivity and clarity in communicating with

GER000446

others (1999); and Honor Roll distinction award (1999); and a Certificate of Achievement award from the Emergency Immigrant Education Program (1998).

Following high school, Mr. Parsadanyan attended dental assistant school and was trained as a dental assistant and x-ray technician. From 2003 to 2005, Mr. Parsadanyan attended Los Angeles Community College and earned an Associate of Arts degree. At that time, Mr. Parsadanyan's plan was to transfer to the University of Southern California. Mr. Parsadanyan had applied, but his mother's diagnosis of severe depression and her physical ailments stalled his college plans. To help his family, Mr. Parsadanyan began to work full time. Mr. Parsadanyan has skills as a dental assistant and x-ray technician. [See "PSI" Report, paragraphs 46-50]; [See **Exhibit # B**, Diplomas, Educational Achievements, Dental School Certificates, Volunteer Work letters from St. Vincent Medical Center, and other documentation to demonstrate Mr. Parsadanyan's past achievements.]

3)      **Employment:**

From 2013 until he was remanded following his conviction, Mr. Parsadanyan ran an import/export business called "Merit International Inc." Mr. Parsadanyan would import goods from Singapore, such as coffee.

From 2006 to 2012, Mr. Parsadanyan was an authorized retailer for AT&T and operated "Wireless Exchange" in Glendale, California.

From 2003 to 2005, while also attending school, Mr. Parsadanyan worked for St. Vincent Hospital in the billing and human resources departments. Mr. Parsadanyan also volunteered at St. Vincent Medical Center during the summer of 2002, and was considered an "excellent addition" to the human resources team. [See **Exhibit # B**].

In 2003, Mr. Parsadanyan worked for a valet service in the Koreatown area of Los Angeles. From 2003 to 2006, Mr. Parsadanyan also volunteered and worked for Karapetyan Dental Corp. in Hollywood. [See "PSI" Report, paragraphs 51-55].

4)      **Relationships:**

Mr. Parsadanyan has never been married and has no children. [See "PSI" Report, paragraph

GER000447

40].  However, Mr. Parsadanyan is in a serious dating relationship with his girlfriend Nano.

5)      **Physical Condition:**

Approximately six years ago, Mr. Parsadanyan had a **cancerous cyst** removed from his **liver** and **lost about 35% of his liver**.  Around the same time, Mr. Parsadanyan suffered from kidney stones and has had kidney infections.  Mr. Parsadanyan had surgery to remove a portion of one of the kidney stones that did not respond to the less invasive measures. [See "PSI" Report, paragraph 42]; [See **Exhibit # C**, Medical records and charts pertaining to Mr. Parsadanyan's health.]

6)      **Alcohol/Drug History:**

Mr. Parsadanyan has **no** history of substance abuse. [See "PSI" Report, paragraph 45].

7)      **Mental/Emotional Health:**

Mr. Parsadanyan has **no** history of mental or emotional health problems. [See "PSI" Report, paragraph 44].

### III

### THE OFFENSE

Beginning in or around July 2009, and continuing through in or around August of 2009, Mr. Darbinyan, Mr. Parsadanyan and others executed a scheme to defraud 99¢ Only Stores.  This scheme targeted 99¢ Only Stores by placing fraudulent point of sale terminals inside some of their stores instead of the store's terminals.  Later, these fraudulent devices would be retrieved and the customer's credit card information obtained.  Then, "runners" would be utilized to withdraw money from the victim's bank accounts.

### IV.

### OBJECTIONS TO THE PRESENTENCE REPORT

**A.      Factual Objections**

The sentencing guideline summary on Page 4, dated May 12, 2014, prepared by the U.S. Probation Department, provides a base offense level to the offense in which Mr. Parsadanyan was found guilty  to at a level "**7**".  And, based upon other factors and conduct characteristics, that base offense level was then adjusted upward to a level "**33**".  The basis for this increase of **26 levels needs to be critically assessed and re-evaluated because the factors being relied upon for that**

GER000448

increased level are either **inaccurate, not sufficiently proved up, unfairly applied to Mr. Parsadanyan, or simply do not apply at all to the specific conduct of Mr. Parsadanyan**.

Mr. Parsadanyan does have some **specific, factual objections** to the "PSI" report. Mr. Parsadanyan respectfully **objects to**:

[**Paragraph(s) 9, 15, 16, 17, 18, 19, 70, 71**]

> **Further, Mr. Parsadanyan contends that: 1- He is only responsible for the very limited period of time when Mr. Parsadanyan first entered into the conspiracy; 2- Mr. Parsadanyan was found <u>not</u> guilty of access device fraud and aggravated identity theft. Therefore, that initial conduct attributed to Mr. Parsadanyan cannot be used against Mr. Parsadanyan for sentencing considerations; 3- The "loss" figures cannot be properly calculated as to Mr. Parsadanyan in this case. Your Honor heard this trial and presided over the evidence/witnesses. The "loss" figures were very limited between $7,000 and $8,000; 4- Mr. Parsadanyan never had any of the access information/data; therefore, he cannot be held accountable for those losses; and 5- The dates pertaining to the removal of the "POS" terminals do not correspond to the time period in which Mr. Parsadanyan was involved in this conspiracy.**

**B.    Loss Computation**

At <u>no</u> time does Mr. Parsadanyan, nor counsel, mean to diminish the fact that certainly there were some minor losses, both actual and intended, in this case. However, the loss calculations and how they relate to each specific defendant is being highly contested. The defense is objecting to the "PSI" Reports calculations and is urging the Court to base its decision on a **<u>loss hearing or a reasonable estimate of those alleged losses</u>**. And, not hold Mr. Parsadanyan liable for unsubstantiated losses.

– 9 –

Therefore, the fact that the direct losses attributable to Mr. Parsadanyan are <u>not</u> all specifically known, the defense respectfully asks that the Court use its discretion and <u>not</u> impose those speculative and unsupported loss figures. The defense requests that Your Honor not automatically fix the amount recommended by Probation within the "PSI" Report. Even the "PSI" Report appears vague as to the specific amounts of loss/restitution in this matter. As the "PSI" Report indicates, the **"information regarding compensable losses and identified victims was not received"**. [See Paragraph 70 of "PSI" Report].

Additionally, it must be recognized that Mr. Parsadanyan, any co-defendant, and/or any known suspect(s) are **not** all similarly situated. In addition, Mr. Parsadanyan would point out that the restitution orders and loss figures are of less and different calculations between the defendants. <u>Therefore, Mr. Parsadanyan's request is not unreasonable as to an accurate accounting which directly relates to Mr. Parsadanyan's specific conduct as to when he first joined in on the conspiracy</u>.

As an analogy, in essence, by applying the victim enhancement, the "PSI" reports an enhancement increase despite the fact that the referenced victims may have suffered no provable and/or actual loss. However, defendant has now been convicted of <u>12</u> counts of Bank Fraud. It is assured that Mr. Parsadanyan will be sentenced under <u>Title 18, U.S.C. § 1344</u>. In such a case, the Guidelines decree - -

> "If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the <u>transfer, possession or use of a means of identification</u> when determining the sentence for the underlying offense. A sentence under this guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct) . . . "[Emphasis added] <u>[U.S.S.G. §2B1.6, Applic.Note, 2]</u>.

Pursuant to the Commentary Notes in Section (D) of **<u>USSG 2B1.1( c)</u>**:

- 10 -

"**Estimation of Loss** - The Court need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon the evidence.  For this reason, the court's loss determination is entitled to appropriate deference. [See <u>18 U.S.C. § 3742(e) and (f).</u>]

The estimate of loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

(i)     The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

(ii)    In the case of proprietary information (e.g., trade secrets) the cost of developing that information or the reduction in the value of that information that resulted from the offense.

(iii)   The cost of repairs to damaged property.

(iv)    The approximate number of victims multiplied by the average loss to each victim.

(v)     The reduction that resulted from the offense in the value of equity securities or other corporate assets.

(vi)    More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

(D)     <u>Exclusions from Loss</u> - Loss shall not include the following:

(i)     Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return of rate, or other similar costs.

(ii)    Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an

GER000451

offense."

**[In this case, Mr. Parsadanyan's money situation has never changed. Mr. Parsadanyan has limited money and just a parcel of money amount in the bank. Mr. Parsadanyan has <u>never</u> lived a lavish lifestyle.]**

**C.    A <u>16 or 18</u> level enhancement for "loss" is not supported by the evidence; therefore, Section 2B1.1(I) or (J) are not applicable**

U.S.S.G. Section 2(B)(1) is the guideline used by the courts in determining the "loss" value for fraud cases. The guideline enhances a defendant's sentence to correlate to the amount of loss caused by the defendant's fraud. [See <u>U.S.S.G. § 2B1.1(b)(1)</u>]. **Therefore, loss calculation is a highly individualized and fact specific inquiry; and, the same method is not necessarily appropriate in all cases**. [<u>United States v. Jenkins</u>, 633 F.3d 788, 808 (9th Cir. 2011); see also <u>United States v. Zolp</u>, 479 F.3d 715, 718-719 (9th Cir. 2007).]. The loss is usually the greater between the actual loss and the intended loss. [<u>U.S.S.G. § 2B1.1</u>, App. Note 3(A)]. Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." [<u>Id</u>. App. Note 3(A)(i).] Intended loss is defined as the "pecuniary harm that was intended to result from the offense [including] intended pecuniary harm that would have been impossible or unlikely to occur." [<u>Id</u>. App. Note 3(A)(ii).]

Loss calculation should be realistic, economic, and take into account the true losses that the defendant caused or intended to cause. [<u>United States v. Harper</u>, 32 F.3d 1387, 1392 (9th Cir. 1994).] In <u>Harper</u>, the Ninth Circuit concluded that in most instances with a loss based on a fraud crime for purposes of applying the <u>U.S.S.G.</u>, the loss to the victims is based on actual loss and not intended loss. [See <u>id</u>. at 1391]. Similarly, the <u>Allison</u> Court concluded that the defendant was only liable for the actual loss. [See <u>Allison, supra</u>, 86 F.3d at 944]. The Ninth Circuit concluded that this was the "economic reality approach" that most accurately reflected the victim's loss. [See <u>id</u>.]

Here, Mr. Parsadanyan was never caught receiving any illegal funds which could be connected to a specific victim or crime; nor, were any illegal funds found in any bank account

- 12 -

GER000452

belonging to Mr. Parsadanyan. Although the economic impact of Mr. Parsadanyan's actions are minimal, and the Government cannot trace any significant claimed loss directly back to Mr. Parsadanyan, the "PSI" Report still relied upon the information provided by the Government to ascertain the "loss" calculations in their report. Therefore, the "PSI" Report indicates that Mr. Parsadanyan should be liable for up to 2.5 million in losses under the guidelines range. [$167,169.57 of an actual loss and a $991,500 additional loss for the 1,983 credit/debit card numbers]. This results in a 16-level loss enhancement. [See "PSI" Report, Paragraph 15].

**This figure is patently unrealistic and grossly overstates the losses caused by or which can be traced directly back to the conduct of Mr. Parsadanyan**. [See United States v. Allison, 86 F.3d 940, 943 (9th Cir. 1996) (". . .in calculating loss in fraud cases, the sentencing court should take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.").

**1.    The Intended and Actual Loss Calculations Have Been Improperly Added Together to Inflate the "Loss" Amount.**

An error in the "PSI" Reports loss calculation is the addition of the actual and intended loss calculations to formulate a loss figure of up to $1,115,669.50; or, as the Government submits should be set at $5,865,000. [See Gov't Sentencing Brief, Pgs. 8-12]. This approach is applied instead of taking the greater of either the actual or intended loss figures. The relevant Guidelines commentary and this Circuit's case law provides that the "amount of loss" in a fraud case is the actual loss to the victim **or** the intended loss, whichever is greater. [U.S.S.G. § 2B1.1, App. Note 3(A); United States v. Willis, 881 F.2d 823, 827 (9th Cir. 1989). Here, that "loss" calculation then would be less than $1,000,000, and under § 2B1.1(b)(1)(H), would increase the sentence 14 levels.

**2.    The Loss Calculation Is Unsupported by the Facts and Evidence.**

The critical factor in the application of an enhancement is the culpability of an individual defendant. [United States v. Kohli, 110 F.3d 1475, 1477 (9th Cir. 1997) (applying U.S.S.G. §

- 13 -

2F1.1, the predecessor to <u>U.S.S. G. § 2B1.1</u>)].  The fact that multiple defendants are convicted of a conspiracy "...does not impose joint liability on them for purposes of the financial institutions of enhancement." [<u>Id</u>.] As such, a sentencing court must determine the amount derived from the offense by each defendant individually. [<u>Id</u>]  "It follows that in making that determination, no part of the amount found to have been derived by one defendant can be counted as having been derived by another defendant." [<u>Id</u>]  In <u>Kohli</u>, the Ninth Circuit vacated a defendant's sentence because the sentencing court made no finding with respect to the amount derived by that defendant in the conspiracy offenses. [See <u>id</u>. at 1478].  The loss calculation should be based on a figure that can be properly calculated and supported. [See <u>Allison, supra</u>, 86 F.3d at 944; <u>United States v. Bussell</u>, 504 F.3d 956, 960 (9th Cir. 2007); see also <u>United States v. Schild</u>, 269 F.3d 1198, 1200 (10th Cir. 2001).

Further, <u>Section 2B1.1</u> should not be mechanically applied when calculating loss in fraud cases. [<u>United States v. Stoddard</u>, 150 F.3d 1140, 1146 (9th Cir. 1998).] Rather, when calculating loss, courts are instructed to take the economic reality approach, and in doing so, the Ninth Circuit has cautioned that district courts "should not ascribe a larger loss to the defendants than they intended to or actually did inflict." [<u>United States v. Blitz</u>, 151 F.3d 1002, 1010 (9th Cir. 1998).]

In <u>United States v. Allison, supra</u>, 86 F.3d at 941, the defendant pled guilty to conspiracy to defraud or use one or more unauthorized access devices to obtain goods and services having a value of more than $1,000.00.  The defendant was a loan processor at a bank. [<u>Id</u>.] The defendant created credit card accounts that were not supported by any applications, and caused credit cards to be issued to her and a co-defendant. [<u>Id</u>.] The defendants made a total of $40,208.35 in charges on the cards, incurred interest and fees in the amount of $1,609.69.

The District Court in <u>Allison</u> adopted the "PSR's" calculation of the amount of loss to be $40,208.35, the total amount charged on the credit cards, and sentenced the defendant based on this amount.  [<u>Id</u>.] On appeal, the defendant argued that the amount of loss should have been the outstanding credit card balance prior to discovery of the offense, not the total amount charged on

- 14 -

the cards. [Id.] Applying <u>Harper's</u> economic reality approach, the Ninth Circuit agreed that the District Court miscalculated the defendant's offense level and vacated the sentence. [Id. at 944].

Similarly, in <u>United States v. Barnes</u>, 125 F.3d 1287, 1290-91 (9th Cir. 1997), the Ninth Circuit found that the Circuit court's application of a loss calculation in excess of $4,000,000.00 was not supported by the facts or the evidence. The <u>Barnes</u> Court concluded that the District Court merely accepted the Government's loss calculation and in doing so ran counter to established precedent. [Id.] In <u>Barnes</u>, the defendant was impersonating a physician and practiced medicine for years by using falsified documents that suggested he was legitimately licensed. [Id. at 1289]. The defendant worked for a company for three years and received $181,989.00 in total wages for his work. [Id. at 1290]. The Government claimed that the loss amount should be $4,2214,655.00 because this was the company's gross revenues during the defendant's tenure. [Id.] The Ninth Circuit remanded the case for a recalculation of whether the defendant's fraud itself caused any losses to the victims. [Id. at 1291]. The district court's calculation was rejected because the losses could not be connected to the defendant's conduct. [See id.] On remand, the district court recalculated the monetary loss to $181,898.00 in <u>United States v. Barnes</u>, 185 F.3d 869, *1-2 (9th Cir. 1999).

In this matter, the over 1 million figure range ("PSI" Report); or, the over $5 million figure range (Gov't Position) attributed to Mr. Parsadanyan consists of calculations which do not take into account the conduct of all of the co-defendants **before** Mr. Parsadanyan's involvement. Nor, was there any concrete evidence that Mr. Parsadanyan actually caused the loss himself or that he, directly or indirectly, received any fraudulently obtained funds**. Further, Mr. Parsadanyan never had any of the key component in this fraud - the data itself**. Applying such a high loss figure with no support flies directly against the Ninth Circuit's economic reality approach. [See <u>Barnes, supra</u>, 125 F.3d at 1290-91].

While the Government has produced evidence regarding the general, overall scheme in this case, the Government has not provided specific and reliable evidence about the "loss" calculations as they relate directly to Mr. Parsadanyan. Further, it is impossible to determine

GER000455

whether Mr. Parsadanyan actually was involved in defrauding all of these accounts pertaining to the 99¢ Only Stores, or only those accounts directly affected when Mr. Parsadanyan **first joined** into this conspiracy. Absent that information, the increased level pursuant to the loss enhancement <u>cannot</u> be applied. The evidence produced to the Court in Mr. Parsadanyan's jury trial should dictate this analysis.

In Mr. Parsadanyan's case, the Government submits that there were 1,983 credit/debit card numbers captured in the "POS" terminals. The Government also contends that of the three "POS" terminals seized, there was an average of 647 numbers captured per "POS" terminal. And, for the 6 stores where there is video footage of defendants retrieving "POS" terminals, there is an additional loss of $2,932,500 (3,882 estimated and 1,983 seized) (x) $500. [Gov't Brief, P. 9, L. 25-28 to P. 12, L. 1-6]. This analysis by the Government is completely unsupported by expert forensic accountant Carl Knudson. Mr. Knudson's report disputing the Government's findings is attached as **Exhibit # D**. **Mr. Knudson's interpretation of the data is quite different than that of the Government. However, Mr. Knudson has broken down the documentation and exhibits. Mr. Knudson's monetary figures and the number of victims are contained within his report. Mr. Knudson's conclusions were the product of his analysis of the evidence which he was provided to counsel which were the Government's exhibits**.

Mr. Parsadanyan **objects** to **paragraph # 17** when referencing a violation of <u>**USSG 2B1.1(b)(10)( C)**</u> [**Criminal Sophistication**]:

Pursuant to <u>**USSG 2B1.1(b)(10)**</u>:

"If (A) the defendant relocated, or participated in relocated, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or **( C)** the offense otherwise involved sophisticated means, increase by **2** levels. If the resulting offense level is less than level **12**, increase to level **12**."

///

GER000456

Also, pursuant to **USSG 2B1.1(b)(10)( C)**:

**Sophisticated Means Enhancement under Subsection (b)(10)**

(A)    Definition of United States - For purposes of subsection (b)(10)(B),

"United States" means each of the 50 states, the District of Columbia, the

commonwealth of Puerto Rico, the United States Virgin Islands, Guam,

the Northern Mariana Islands, and American Samoa.

**Sophisticated Means Enhancement** - For purposes of subsection (b)(9)

( C), the Application Notes explains that the term "sophistication means" means

especially complex or especially intricate offense conduct pertaining to the

execution or concealment of an offense.  For example, in a telemarking scheme,

locating the main office of the scheme in one jurisdiction but locating soliciting

operations in another jurisdiction ordinarily indicates sophisticated means.

Conduct such as hiding assets or transactions, or both, through the use of fictitious

entities, corporate shells, or offshore financial accounts also ordinarily indicates

sophisticated means.

There is absolutely nothing sophisticated attributable to the conduct of Mr. Parsadanyan.

Mr. Parsadanyan is a simple man and, in essence, was a "pawn" in this case. **[Note: That is why

there was no illegal money traced specifically back to Mr. Parsadanyan; as well as, why

there is no money in any bank accounts associated to Mr. Parsadanyan.  Mr. Parsadanyan

did not conceal anything in this matter.]**

Therefore, the additional 2 level increase documented within the "PSI" Report under this

theory should **not** be included within Mr. Parsadanyan's offense levels.  In addition, that the

Government has not sustained its burden of showing the applicability of a two-level increase for

sophisticated means.

The Government bears the burden of proving the applicability of the enhancement. [See,

United States v. Waldner, 564 F. Supp. 2d 911, 934 (N.D. Iowa 2008), aff'd, 580 F.3d 699 (8th

Cir. 2009) (where the prosecution sought an "increase, pursuant to USSG § 2B1.1(b) . . . ,

- 17 -

GER000457

because [the defendant] used "sophisticated means'", "[t]he government bore the burden to prove this enhancement applied."). [See also <u>Showalter</u>, 569 F.3d at 1159.] (the prosecution bears the burden to prove the applicability of all sentencing enhancements) (citing <u>Burnett</u>, 16 F.3d at 361).

**The "PSI" Report does not provide any meaningful discussion of the applicability of this enhancement besides just one brief paragraph**. [See "PSI" Report, Paragraph 17]. Most importantly, the "PSI" Report does not produce any evidence in support of the enhancement. As mentioned above, on disputed issues in sentencing, "[t]he court may not simply rely on the factual statements in the "PSI" Report." [<u>Showalter</u>, 569 F.3d at 1160 (citations omitted).] The Government cannot carry its burden if it does not produce "at least some evidence". [<u>Showalter</u>, 569 F.3d at 1160] (emphasis in original) (citation omitted).

Although further discussion is unnecessary, nonetheless (for the sake of thoroughness), it is also noted that the "PSI" Report fails to provide any true rationale for applying the enhancement. The sophisticated means adjustment is set forth and discussed in <u>USSG § 2B1.1(b)(10)( C)</u> and Application Note 9(B).

Application Note 9(B) sets forth examples of the types of facts that warrant the adjustment - including "locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction" or "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." [<u>USSG § 2B1.1</u>, Application Note 9(B)]. None of these circumstances are present in this case - as there was no use of multiple jurisdictions, fictitious entities, corporate shells, or offshore financial accounts.

In this case, Mr. Parsadanyan had nothing to do with any skimmers; nor any "POS". Further, there is nothing intricate; nor, especially complex about this scheme. Placing skimmers and removing illegally obtained credit information and numbers is <u>not</u> sophisticated. The fact that Mr. Parsadanyan is on a phone does not automatically equate to "sophistication."

Further, this enhancement is not warranted merely because there were alleged attempts to

- 18 -

evade detection. [See United States v. Executive Recycling, Inc., 953 F.Supp.2d 1138, 1167] (D.Colo. 2013) (sophisticated means enhancement was inapplicable, notwithstanding "evidence of emails exchanged between Defendants and the overseas brokers about how to hide computer monitors so they would not be detected by foreign customs officials.").

Sophisticated means is defined as "...especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." [U.S.S.G. § 2T1.1(b)(2) n.4].

In Mr. Parsadanyan's case, the conduct does not reach the level of especially complex or intricate offenses to warrant a sophisticated means enhancement. In United States v. Egu, 379 Fed.Appx. 605, 607 (9th Cir. 2010), the enhancement was applied because the defendant had fraudulently opened new credit accounts using the victims' personal identifiers, got the identifiers through his wife's business, had fraudulently purchased goods delivered to vacate and upscale homes to avoid detection, and made bursts of purchases on new credit accounts before creditors shut the accounts down. Similarly, in United States v. Johnson, 529 Fed.Appx. 846, 848 (9th Cir. 2013), the Ninth Circuit found sophisticated means where the defendant concealed her offenses by manipulating computer software to create fraudulent receipts, by running fraudulent cashier's audit reports, and using special security codes to "doctor" member records. The Ninth Circuit applied the enhancement in United States v. Olumuyiwa, 406 Fe.Appx. 243, 244 (9th Cir. 2010) because the defendant was involved in a fraudulent telemarketing scheme operating overseas.

The conduct here was far less sophisticated than the cases in which the sophisticated means enhancement has been applied. [See Egu, supra, 379 Fed.Appx. at 244]. This case is more like United States v. Soni, 231 Fed.Appx. 612, 613 (9th Cir. 2007), where the Ninth Circuit found the court erred in applying the sophisticated means enhancement because there was insufficient evidence to find the offense involved the use of sophisticated means more complex than the ordinary credit card fraud case. [Id]. Accordingly, the 2-level enhancement for sophisticated

- 19 -

GER000459

means should not be applied.

Mr. Parsadanyan objects to **paragraph # 18** when referencing a violation of **USSG 2B1.1(b)(11)( c)(i)**.

Pursuant to **USSG 2B1.1(b)(11)**: " if the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or ( C)(i) the unauthorized transfer or use of any means of identification unlawfully to product or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by **2** levels.  If the resulting offense level is less than level **12**, increase to level **12**."

Pursuant to **18 U.S.C. § 1028(d)(7)**: "the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any - (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number; (B) unique biometric data, such a fingerprint, voice print, retina or iris image, or other unique physical representation; ( C) unique electronic identification number, address, or routing code; or (D) telecommunication identifying information or access device (as defined in section 1029(e))."

Mr. Parsadanyan objects to the two-level enhancement for possession or use of device

- 20 -

GER000460

making equipment.  There is insufficient evidence to conclude that Mr. Parsadanyan possessed or used such equipment.  [See Soni, supra, 231 Fe.Appx. At 613].  Merely having re-coded debit and credit cards is not enough to show that Mr. Parsadanyan used or possessed the device making equipment himself.  As such, this enhancement should not be applied.  **Most importantly, Mr. Parsadanyan was found not guilty of the access device fraud charge**.  **[Count 69].**

Mr. Parsadanyan objects to **paragraph # 19** when referencing a violation of **USSG 2B1.1(b)(2)( c)**.

Pursuant to **USSG 2B1.1(b)(2)( c)**: "(Apply the greatest) If the offense -

(A)  (i) involved 10 or more victims; or (ii) was committed through mass-marketing, increase by 2 levels;

(B)  involved 50 or more victims, increase by 4 levels; or

( C)  involved 250 or more victims, increase by 6 levels."

In this case, the Government submits that there should be a 6-level adjustment for 250 or more victims.  This assertion is based upon "information provided by the banks and credit unions show that, from July to August 2009, at least 305 victim accounts were used in the scheme." [Gov't Brief, P. 12, L. 8-17].  Again, this evidence is seriously lacking proof.  Mr. Parsadanyan's involvement is related to a specific time period in July of 2009 based upon the verdicts.  Further, forensic expert Knudson rebuts the Government's "loss" calculations. [See **Exhibit # D**].  Finally, Mr. Parsadanyan was acquitted of all of the aggravated identify theft counts.

## V.

## SENTENCING PRINCIPLES

**A.**  **Case Law**

The Supreme Court held in United States v. Booker that the mandatory nature of the sentencing guidelines system violated the Sixth Amendment of the United States Constitution.

- 21 -

GER000461

[543 U.S. 220, 226-227 (2005).]  To remedy this, the Supreme Court modified the federal sentencing statute to make the sentencing guidelines advisory. [Id. at 245.]

The advisory guidelines are "the starting point and the initial benchmark" in determining a sentence. [Gall v. United States (2007) 128 S.Ct. 586].  "A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range".  "[T]he Guidelines are not the only consideration, [and] the district judge should consider all of the § 3553(a) factors" to fashion the appropriate sentence. [Gall, at 596].

**B.**     **18 U.S.C. 3553**

As required by the Sentencing Reform Act, the "overarching provision instruct[s] [the] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" [Kimbrough v. United States, (2007) 128 S.Ct. 558, 570]. [Quoting 18 U.S. C. § 3553(a)].

In determining the sentence that is "sufficient, but not greater than necessary," the statute further directs the sentencing court to consider:

(1)     The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     The need for the sentence imposed;

(3)     The kinds of sentences available;

(4)     The kinds of sentence and the sentencing range established by the guidelines;

(5)     Any pertinent policy statement issued by the Sentencing Commission;

(6)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     The need to provide restitution to any victims of the offense.

**C.**     **18 U.S.C. § 5K2.20**

Section 5K2.20 of the United States Sentencing Guidelines provides that the Court may

– 22 –

GER000462

depart downward in certain exceptional cases for aberrant behavior if the defendant committed a single criminal transaction or occurrence without significant planning, of a limited duration, and if such conduct represents a marked deviation from an otherwise law-abiding life. [See U.S.S.G. §§ 5K2.20(a), (b)]. The offenses here are not prohibited under subsection ( c) of Section 5K2.20, as they do not involve serious bodily injury or death, the use or discharge of a firearm or other dangerous weapons, or a serious drug trafficking offense. [See 5K2.20( c)].

Here, the offense committed by Mr. Parsadanyan meets the definition and spirit of aberrant behavior under Section 5K2.20. The period in question was relatively brief, and did not require any significant planning by Ms. Hong. [See United States v. Takai, 941 F.2d 738, 743 (9th Cir. 1991) (departing downward based on aberrant behavior in sentencing defendants for convictions of conspiring to bribe, and bribing an INS official, even though each defendant "performed a whole series of actions leading up to the commission of the crime").

Section 5K2.20 of the United States Sentencing Guidelines provides that the Court may depart downward in certain exceptional cases for aberrant behavior if the defendant committed a single criminal transaction or occurrence without significant planning, of a limited duration, and if such conduct represents a marked deviation from an otherwise law-abiding life. [See U.S.S.G. §§ 5K2.20(a), (b).] The offenses here are not prohibited under subsection ( c) of Section 5K2.20, as they do not involve serious bodily injury or death, th use or discharge of a firearm or other dangerous weapon, or a serious drug trafficking offense. [See id. § 5K2.20( c)].

Here, the offense committed by Mr. Parsadanyan did not take place over a substantial period of time, which meets the definition and spirit of aberrant behavior under Section 5K2.20. The period in question was relatively brief, lasted only a few months, and did not require significant planning by Mr. Parsadanyan. [See, e.g., United States v. Takai, 941 F.2d 738, 743 (9th Cir. 1991) (departing downward based on aberrant behavior in sentencing defendants for convictions of conspiring to bribe, and bribing an INS official, even though each defendant "performed a whole series of actions leading up to the commission of the crime").

Clearly, Mr. Parsadanyan's conduct was a serious departure from his law-abiding life, as

- 23 -

GER000463

evidenced by this being his only criminal conviction.  Prior to this conduct, Mr. Parsadanyan held

several jobs and was singularly focused on providing for his family.  Mr. Parsadanyan worked

hard to overcome the obstacles of a less than modest life.  Further, the **length** of the involvement

by Mr. Parsadanyan in this case was **minimal**.

Because Mr. Parsadanyan's conduct constitutes "aberrant behavior," Your Honor should

depart downward under Section 5K2.20. [See, e.g., United States v. Vieke, 348 F.3d 811 (9th

Cir. 2003) (defendant convicted of identity theft sentenced to 5 years probation based on 4-level

downward departure for aberrant behavior).

**Mr. Parsadanyan's conduct in this case is a serious departure from his law-abiding**
**life.  Prior to this conduct, Mr. Parsadanyan has always worked hard and has lived  a**
**crime free life**.  (See **Exhibit # E**, Character letters on behalf of Mr. Parsadanyan).

Mr. Parsadanyan's family is extremely supportive of him and his rehabilitation process.

Mr. Parsadanyan is very close with his mother and immediate family. [See "PSI" Report,

Paragraphs 37-41].  Further, Mr. Parsadanyan has the support of not only his friends and family;

but also from members of the community. [See **Exhibit # E**].

The support of close family members is commonly cited as a factor favoring a lesser

sentence. [See United States v. Autery, 555 F.3d 864, 868 (9th Cir. 2009) (affirming probationary

sentence, where the Guidelines recommended sentence range of 41-51 months in prison, bases

upon mitigating factors including the defendant's having "the support of his . . . children");

United States v. Ruff, 535 F.3d 999, 1001-1002 (9th Cir. 2008) (affirming sentence of "one day

of imprisonment . . . with the condition that he serve 12 months and one day of [the defendant's]

supervised release at Geiger [Corrections Center]," nothwithstanding, "guideline range as 30-37

months", where the mitigating factors included the defendant's "support from his siblings"). [See

also United States v. Valdavinos-Torres, 704 F.3d 679, 684-685 (9th Cir. 2012) (affirming,

where the "PSI" Report recommended a downward variance "in light of Valdavinos' supportive

family" and other factors, and - citing the supportive family - the district court granted a

downward variance to the defendant, who was convicted of illegal reentry and had prior narcotics

GER000464

offenses); <u>United States v. Jones</u>, 460 F.3d 191, 194, 196 (2d Cir. 2006) (affirming below-Guidelines sentence for defendant, based upon various factors, including the defendant's "assistance and support for other members of his family"; the defendant had been convicted of being a felon in possession of firearms); <u>United States v. Beiermann</u>, 599 F.Supp.2d 1087, 1110 (N.D.Iowa 2009) (support of family members "suggests that this defendant is redeemable and will have significantly greater support than usual in his efforts at rehabilitation.").

Because Mr. Parsadanyan's conduct constitutes **aberrant behavior**, Your Honor should significantly depart downward the sentence of Mr. Parsadanyan under <u>Section 5K2.20</u>. [See <u>United States v. Vieke</u>, 348 F.3d 811 (9th Cir. 2003) (defendant convicted of identity theft sentenced to 5 years probation based on 4-level downward departure for aberrant behavior).

**D.      §3B1.2 - <u>Mitigating Role</u>**

"Based on the defendant's role in the offense, decrease the offense level as follows:

(a)      If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

(b)      If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

In the Application Notes, under Section 3, "**<u>Applicability of Adjustment</u>**", reads:

"(A)      <u>Substantially Less Culpable than Average Participant</u> - This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant. A defendant who is accountable under <u>§1B1.3</u> (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal

- 25 -

GER000465

activity is not precluded from consideration for an
adjustment under this guideline.  For example, a
defendant who is convicted of a drug trafficking
offense, whose role in that offense was limited to
transporting or storing drugs and who is accountable
under §1B1.3 only for the quantity of drugs the
defendant personally transported or stored is not
precluded from consideration for an adjustment
under this guideline.

Likewise, a defendant who is accountable under
§1B1.3 for a loss amount under §2B1.1 (Theft,
Property Destruction, and Fraud) that greatly
exceeds the defendant's personal gain from a fraud
offense and who had limited knowledge of the
scope of the scheme is not precluded from
consideration for an adjustment under this
guideline.  For example, a defendant in a health care
fraud scheme, whose role in the scheme was limited
to serving as a nominee owner and who received
little personal gain relative to the loss amount, is not
precluded from consideration for an adjustment
under this guideline.

(B)     Conviction of Significantly Less Serious Offense -
If a defendant has received a lower offense level by
virtue of being convicted of an offense significantly
less serious than warranted by his actual criminal
conduct, a reduction for a mitigating role under this

- 26 -

GER000466

section ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense.  For example, if a defendant whose actual conduct involved a minimal role in the distribution of 25 grams of cocaine (an offense having a Chapter Two offense level of level 14 under §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy)) is convicted of simple possession of cocaine (an offense having a Chapter Two offense level of level 6 under §2D2.1 (Unlawful Possession; Attempt or Conspiracy)), no reduction for a mitigating role is warranted because the defendant is not substantially less culpable than a defendant whose only conduct involved the simple possession of cocaine.

( C )    Fact-Based Determination - The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case.

Section 4 of the Application Notes defines:

**Minimal Participant** - Subsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal role in concerted activity.  It is intended to cover defendants who are

- 27 -

plainly among the least culpable of those involved in the conduct

of a group.  Under this provision, the defendant's lack of

knowledge or understanding of the scope and structure of the

enterprise and of the activities of others is indicative of a role as

minimal participant.

Section 5 of the Application Notes defines:

> **Minor Participant** - Subsection (b) applies to a defendant described in
>
> Application 3(A) who is less culpable than most other participants, but
>
> whose role could not be described as minimal."

**In this case, Mr. Parsadanyan's conduct was quite different than that of the co-defendants.**  In Mr. Parsadanyan's trial, the evidence presented, or the lack of evidence, demonstrated that:

1.    There were no wiretap applications for Mr. Parsadanyan's work, home and/or cell phone records.

2.    There were no search warrants prepared, nor executed for Mr. Parsadanyan's vehicle and place of work at "Cellular Exchange, Inc."

3.    There was no video surveillance of Mr. Parsadanyan doing anything illegal.

4.    There was no money seized on July 18th in Mr. Parsadanyan's vehicle; nor, at his apartment.  Further, there was no specific accounting of the amount of money that was observed inside Mr. Parsadanyan's vehicle.  Although suspicious, this money was from legitimate sources.

5.    Mr. Parsadanyan did not live in any fashion an "extravagant" lifestyle.

6.    Mr. Parsadanyan is not a gang member, nor an associate gang member.  Mr. Parsadanyan is not in the gang files, and there are no field identification cards documenting Mr. Parsadanyan as a gang member or an associate gang member.  GPD Detective Quintero, whom was in the Glendale Gang Unit for almost 10 years, testified that he had no idea whom Mr. Parsadanyan was and has never seen Mr. Parsadanyan before.

- 28 -

GER000468

7. With all of the Federal and State Government's <u>financial resources</u> utilized in the investigation of this case, there were:

    a)     <u>No skimmers</u> found near/on Mr. Parsadanyan.

    b)     <u>No illegal banking/checking accounts or related fraudulent documentation</u> found near/on Mr. Parsadanyan.

    c)     <u>Not one bad check</u> was found in the possession of Mr. Parsadanyan.

    d)     Mr. Parsadanyan did <u>not have one illegal credit card</u> on himself, at work, nor within his vehicle.

    e)     There was <u>not one photograph of Mr. Parsadanyan with any alleged "runner"</u>. Nor, was there any evidence of Mr. Parsadanyan specifically directing anyone, especially an alleged "runner", to do anything illegal.

    f)     There was <u>not one video clip of Mr. Parsadanyan at any bank or any 99 Cent Only Store(s)</u>.

    g)     There was <u>no evidence that Mr. Parsadanyan was with Mr. Tarverdyan in the San Fernando Valley in July of 2009</u>; and <u>especially on July 18</u>. [Day Mr. Parsadanyan's vehicle was stopped].

    h)     There was <u>not one wiretap call intercepted from any of Mr. Parsadanyan's phones</u> produced in this trial. And, the Government was well aware of Mr. Parsadanyan's phone number(s). [Government Exhibit presented during trial reflecting Mr. Parsadanyan's residence and phone numbers.]

    I)     There was <u>no</u> evidence presented during the trial pertaining to <u>any shooting at the "Hazatun" Restaurant</u>. The explanation was that it was "too dark."

    j)     There were a lot of "<u>time gaps</u>" between certain intercepted phone calls.

    k)     There were <u>no phone "toll" records</u> presented in this case. Most importantly, none were presented on July 18, 2009 <u>after</u> 8:00 p.m. Especially, between Mr. Parsadanyan and Raymond Tarverdyan.

    l)     The percentage numbers relating to the alleged profit in the 99 Cent Only Store

GER000469

fraud just did <u>not</u> match up. Was it 20% or 1/3 of 33%? If you believe the Agent's testimony it was 20%. However, if you believe the informant, it was 11%. That is a big difference. <u>Further, there was no specific evidence presented that Mr. Parsadanyan received one cent in this matter.</u>

m) There was <u>no</u> evidence presented of any surveillance of Mr. Parsadanyan **after** the "Glendale Police Department" stop on July 18, 2009.

n) There was <u>no</u> evidence presented that Mr. Parsadanyan assisted, or even went to the "Hazatun" restaurant to aid Mr. Darbinyan in any context.

o) <u>Not one thumb drive was found on or believed to be in the possession of Mr. Parsadanyan which would allow him access to not only to skimmers, but the data contained within. Therefore, Mr. Parsadanyan could not have acted upon the utilization of any of the datas' information.</u>

**[A 4-Level Decrease Is Warranted for Mr. Parsadanyan's Mitigating Role in the Offense Pursuant to <u>Section 3B1.2(a)</u>]**

<u>Section 3B1.2(a)</u> of the United States Sentencing Guidelines provides for a <u>4-point reduction</u> if the defendant was a **minimal participant** in any criminal activity. [<u>U.S.S.G. § 3B1.2(a)</u>]. <u>Section 3B1.2(b)</u> provides for a 2-level reduction if the defendant was a minor participant in any criminal activity. [<u>Id. § 3B1.2(b)</u>]. In cases falling between subsections (a) and (b), the defendant should receive a 3-level reduction. [<u>Id. § 3B1.2</u>].

When determining whether a downward adjustment for minimal role in the offense is warranted, the Court considers whether the defendant's role was minimal as compared to other participants in the same offense or relevant conduct. [<u>United States v. Kipp</u>, 10 F.3d 1463, 1468 (9th Cir. 1993). For example, in <u>United States v. Petti</u>, 973 F.2d 1441, 1447 (9th Cir. 1992), the defendant qualified for a 4-level reduction for minimal participation in money laundering scheme, even though he performed critical functions as a member of a conspiracy, where he was not involved in the actual "smurfing" of money into banks, or privy to all the mechanics of the money laundering operation and his role was subordinate to that of co-participants.

GER000470

Here, like the defendant in <u>Petti</u>, and as compared to the co-defendants, **Mr. Parsadanyan's participation in the enterprise was limited in duration and passive**. While others, including Mher Darbinyan, were facilitators and architects of the scheme, Mr. Parsadanyan was a dispensable and insignificant participant. Outside of some phone conversations, there is <u>no evidence</u> that Mr. Parsadanyan actively participating in this scheme. Not only was Mr. Parsadanyan a dispensable participant, but he also did not gain any lucrative monetary benefits through his participation in this scheme.

Because Mr. Parsadanyan's participation in the offense was **<u>minimal</u>** and quite different than that of his co-defendants, Mr. Parsadanyan respectfully requests a **4-level reduction** in his offense level pursuant to <u>U.S.S.G. Section 3B1.2(a)</u>.

**E.**     **<u>Pursuant to § 5H1.4:</u>**

> "Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; <u>e.g.,</u> in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

**VI.**

**<u>CONSIDERATION OF THE STATUTORY FACTORS AND</u>**
**<u>THE DEFENDANT'S SENTENCING RECOMMENDATION</u>**

Analyzing the seven statutory factors referenced and applying them to the present case, Mr. Parsadanyan, respectfully submits that the Court should impose the lower levels as to the sentencing guidelines and the law of <u>Booker</u> as they relate to the guilty verdicts.

**1.**     **<u>The Nature and Circumstances of the Offense and the History and Characteristics</u>**
       **<u>of the Offender</u>**

///

GER000471

### a. The Nature and Circumstances of the Offense

See Sections II and III regarding the nature and circumstances of the offense. Further, Your Honor presided over Mr. Parsadanyan's jury trial. Counsel knows that Your Honor is fully aware of the facts and circumstances of all of these matters.

### b. The Offense Conduct of Mr. Parsadanyan Himself Includes Mitigating Circumstances Such as Not Involving Violence and No Weapons Usage

The nonviolence of the offense conduct is also a strong mitigating factor. Mr. Parsadanyan's offense was **nonviolent** and **did not involve possession of any weapons** which provides established grounds for mitigation. For example, in United States v. Whitehead, 532 F.3d 991 (9th Cir. 2008) (*per curiam*), the Guidelines range was 41 to 51 months, but a sentence of probation was instead imposed (along with community service and restitution). [Id at 993.] The probationary sentence was imposed based in part upon the district court's "finding that Whitehead's crime '[di]d not pose the same danger to the community as many other crimes.' " Id. The Ninth Circuit explained that this consideration was "properly take[n] into account" by the district court. Id. (affirming the sentence). United States v. Feemster, 572 F.3d 455, 463 (8th Cir. 2009) (affirming sentence which was 240 months below Guideline range, based in part upon the fact that "apparently no weapon was present at the time Feemster committed the instant offense"); United States v. Stagni, CR. 06-10(2)ADMJJG, 2007 WL 1175839, *2 (D. Minn. Apr. 20, 2007) (the seriousness of the offense was diminished by the fact that "Stagni's tax crimes did not involve any physical harm to others.").

### c. The History and Characteristics of the Offender

**Mr. Parsadanyan has no prior contacts with law enforcement**. [See "PSI" Report, Part B, paragraphs 28-35]. While compliance is expected, it is also a well-recognized mitigating factor.[1]

---

[1] See United States v. Baird, 580 F.Supp.2d 889, 894 (D.Neb. 2008) (imposing below-Guidelines sentence based in part upon the fact that the defendant "has complied with stringent conditions of pretrial release"). See also United States v. Edwards, 595 F.3d 1004, 1017 (9th Cir. 2010) (affirming probationary sentence on remand, where at the time of resentencing the district court considered the fact that the defendant had "completed without incident three and one half years of probation").

GER000472

Moreover, when taken together with the defendant's strong employment record (as set forth directly below), the absence of any criminal history becomes an even more powerful indication that the present offense was an anomalous occurrence in an otherwise law-abiding and productive life. [See United States v. Pena, 930 F.2d 1486, 1495 (10th Cir. 1991) ("Implicit in the district judge's findings is the conclusion that Pena's behavior here was aberration from her usual conduct, which reflected long-term employment, economic support for her family, no abuse of controlled substances, and no prior involvement in the distribution of such substances. The aberrational character of her conduct, combined with her responsibility to support two infants, justified a departure.") (citations omitted) (affirming departure under USSG § 5H1.6).]

**Mr. Parsadanyan Had A Strong Employment History, Before and After Release**

Since Mr. Parsadanyan's arrest, his conduct, like always, was exemplary. In addition, Mr. Parsadanyan has always been previously gainfully employed. Likewise, Mr. Parsadanyan had a long-standing, positive employment record prior to the present offense. Mr. Parsadanyan's work history is well documented within the "PSI" Report. Mr. Parsadanyan has always worked and has always worked hard. [See "PSI" Report Paragraphs 51-55]; [See also **Exhibit # B**]

**A strong employment history constitutes a significant mitigating factor**. [See United States v. Denton, 611 F.3d 646, 650, 650 n.8 (9th Cir. 2010) ("the [district] court departed downward and sentenced Denton to nine months' imprisonment", notwithstanding Guidelines range of "24-30 months' imprisonment", based upon the defendant's mitigating circumstances which included "his prior employment") (reversing and remanding on other grounds to consider a *lesser* sentence, based upon the defendant's appeal).[2]

Mr. Parsadanyan's strong employment record is even more impressive because he

---

[2] See also Kimbrough v. United States, 552 U.S. 85, 110, 128 S.Ct. 558, 575 (2007) (approving of reasoning by which the district court imposed substantially below-Guidelines sentence, based upon various factors, including "that [the defendant] had a steady history of employment"); United States v. Munoz-Nava, 524 F.3d 1137, 1142 (10th Cir. 2008) (affirming below-Guidelines sentence that was imposed based upon various factors, including the defendant's "long and consistent work history"); United States v. Caruso, 814 F.Supp. 382, 383, 384 (S.D.N.Y. 1993) (citing the defendant's "employment record" as one of the mitigating factors justifying a downward departure, where the defendant "ha[d] been employed as a parking lot attendant and bus driver, receiving commendation from his employer for faithful service").

GER000473

moved to theUnited States less than 18 years ago.  Mr. Parsadanyan nonetheless persevered in

work and later even trained to become a dental assistant and x-ray technician.  Mr. Parsadanyan's

advancement shows resilience, which provides further grounds for mitigation under *Booker*.[3]

Taken together, Mr. Parsadanyan's activities before and after his present offense - i.e.,

extended gainful employment, with the absence of any criminal history - helps demonstrate that

this offense as to Mr. Parsadanyan was an "**aberration**."

## 2.    The Need for the Sentence Imposed

Mr. Parsadanyan should be given an opportunity to be sentenced to either **Probation** or

the **Low End of his sentencing guideline range**.  Mr. Parsadanyan's life has completely

changed before, during and after this offense.

The need for the sentence imposed encompasses both "specific deterrence" of the

particular defendant as well as "general deterrence" of other offenders who might pay attention to

the sentence imposed for this offense.  As for specific deterrence, Mr. Parsadanyan's lack of

serious criminal history coupled wit the proposed term of imprisonment will deter him from

future misconduct.  Indeed, Mr. Parsadanyan has already been incarcerated at a federal detention

center for four months.  A **Probationary Sentence**, or a **Low Term Federal Sentence** is more

than sufficient to deter Mr. Parsadanyan from committing similar crimes, or any other crimes for

that matter, in the future.  This type of sentence is not only sufficient to deter Mr. Parsadanyan

from future misconduct, but it would also be consistent with other District Courts' treatment of

similar crimes post-Booker.

As for general deterrence, the proposed sentence is sufficient to deter similar offenders,

since comparable conduct under federal law often yields sentences well below 36 months.  For

---

[3] Additionally, resilience provides grounds for a downward departure, under USSG § 5K2.0. [See United States v. Decora, 177 F.3d 676, 677-678 (8th Cir. 1999) (affirming sentence with downward departure, under USSG § 5K2.0, where district court had "found that there were unusual mitigating circumstances in the case, namely, the adversity defendant Decora had faced on the reservation and the 'remarkable resilience' he had nonetheless shown in his determination to succeed.") (defendant was convicted of assault with a deadly weapon and had a guidelines range of 37-46 months, but a downward departure was granted for a sentence of three years' probation); [United States v. Big Crow, 898 F.2d 1326, 1331 (8th Cir. 1990) (affirming sentence with downward departure, which was granted based in part upon the defendant's "consistent efforts to overcome the adverse environment" surrounding him).

–  34  –

instance, in <u>United States v. Ruff</u>, 535 F.3d 999 (9th Cir. 2008), over the course of three years, the defendant whom worked as a Materials Supervisor at a medical center took advantage of his authority to steal $644,866 worth of inventory and sell it over eBay. [<u>Id</u>. at 1001].  The defendant pled guilty to numerous counts including health care fraud, 4 counts of theft, an embezzlement count, a count for the conversion of property and assets defrauding the health care benefit program, and four counts of money laundering. [<u>Id</u>.].  However, the defendant was sentenced to 1 day of imprisonment and years of supervised release at a corrections centers, and the government appealed. [<u>Id</u>.]

In affirming the reasonableness of the sentence on appeal, the Court disagreed with the Government's categorization of the sentence as "a mere slap on the wrist." [<u>Id</u>. at 1003].  The Court stated that even probationary sentences "are quite oppressive given that probationers are 'subject to several standard conditions that substantially restrict their liberty.'" [<u>Id</u>.] (quoting <u>Gall, supra</u>, 552 U.S. at 48).  The Ninth Circuit also explained that it had recently affirmed a sentence of probation, community service and restitution, where the guidelines range recommended 41 to 51 months. [<u>Id</u>.] (citing <u>United States v. Whitehead</u>, 532 F.3d 991 (9th Cir. 2008)). [See also generally <u>Ruff, supra</u>, 535 F.3d at1006-1007 (discussing how frequently lax or non-custodial sentences are imposed by district courts for white-collar or economic crimes) (Gould, J., dissenting).

Indeed, having been arrested, tried, and convicted of 12 Felony Counts, then immediately remanded is quite a "waker-upper".  Further, serving 4 months in Federal Custody, and away from his family, is sufficient punishment in this case to deter Mr. Parsadanyan from committing any crimes in the future.

**3.**     **The Possible Sentences Available**

As noted in the "PSI" report, <u>the sentencing options for Mr. Parsadanyan are **not limited**</u>. Mr. Parsadanyan could receive 1- Straight **Probation** if "extenuating circumstances" exist; 2- Straight Federal Imprisonment; 3- a Probationary sentence that includes community confinement or home detention as a condition; or 4- a Sentence of Imprisonment up to 5 years followed by a

- 35 -

GER000475

term of supervised release that includes community confinement or home detention as a condition.

Counsel respectfully requests that Your Honor sentence Mr. Parsadanyan to a **Probationary sentence**. Mr. Parsadanyan will comply with any and all terms and conditions in which Your Honor imposes.

**4.    The Guidelines Sentencing Range**

The "PSI" report has concluded that the Guideline range Mr. Parsadanyan is facing is a total offense level at a <u>33</u>. [See "PSR.", Pg. 3]. The Government has filed a response to the "PSI" Report, and has acknowledgment that the Government agrees with the contents within the "PSI" report, except for the loss amount calculations which should be even higher. Therefore, this would put Mr. Parsadanyan at a sentencing range between <u>135 to 168 months</u> ("PSI" Rpt) or <u>168 to 210 months</u> (Gov't position). In addition, Mr. Parsadanyan's criminal history was calculated to be at a level **I**.

**5.    The Policy Statements of the Sentencing Commission**

This factor appears not to be truly applicable in this case. Punishment is, and will be, made. Rehabilitation is, and will be, demonstrated.

**6.    Avoiding Unwarranted Sentencing Disparities Among Similarly Situated**
       **Defendants (Related Cases):**

Pursuant to the statutory sentencing factors, Courts need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Sentencing Mr. Parsadanyan to a term within the "PSI" Report and the Government's proposed range would result in <u>grave sentencing disparities</u> with those defendants whom have been convicted of comparable crimes in this case; as well, as defendants whom are convicted of comparable crimes in general.

In the instant case, the majority of Mr. Parsadanyan's co-defendants have been sentenced to far less than the guidelines range suggested by their own "PSI" Reports. **(See "PSI" Report, P. 4-8 as to the other defendants sentences and/or case status in this investigation)**. Indeed,

GER000476

most of Mr. Parsadanyan's co-defendants have been sentenced to terms far less than what was requested in their own "PSI" Reports and by the Government. There have been departures from the Advisory Guidelines. Further, only the true "Heavy Hitters" in this investigation have, or will, receive lengthy sentences. And, there are very few of them. (2 or 3).

Co-defendant Mher Darbinyan (Listed in the Indictment as No. 1), whom was recognized as the leader of the enterprise and an individual whom, as a gang member, was engaged in multiple acts of fraud and violence, has a requested sentence of 360 months by the Government. It would be a highly unwarranted sentencing disparity if Mr. Parsadanyan received a sentence anywhere near that of Mr. Darbinyan.

Co-defendant Arman Sharopetrosian (Listed in the Indictment as No. 4), whom was found guilty of "RICO" Conspiracy, Extortion Conspiracy and Extortion, is a gang member with a serious criminal history. The Government is requesting that Mr. Sharopetrosian receive a sentence of 210 months.

The Court should reject a sentence within the Sentencing Guidelines range as calculated by the Probation Officer because it would result in a significant and unjustified sentencing disparity with the sentences imposed on as to the majority of the co-defendants. Rather, a sentence of Probation or a low end Federal Sentence will satisfy the sentencing goal of avoiding unwarranted sentencing disparities with the sentences imposed by this Court on Mr. Parsadanyan's co-defendant's as well as sentences imposed by different Federal Courts for similar criminal conduct. [See Rita, supra, 551 U.S. at 349].

Further, a probationary sentence would fulfill "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." [18 U.S.C. § 3553(a)(6).]

The inquiry into sentence disparities concerns comparisons between the defendants in different cases nationwide. The Ninth Circuit has stated: "[o]ur sister circuits generally agree that 'Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case.'" [United States v.

– 37 –

1  Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007) (quoting United States v. Parker, 462 F.3d 273,

2  277 (3d Cir. 2006)). '[T]he kind of 'disparity' with which § 3553(a)(6) is concerned is an

3  unjustified difference across judges (or districts) rather than among defendants to a single case."

4  [Id. ] (quoting United States v. Boscario, 437 F.3d 634, 638 (7th Cir. 2006)).

5      In other cases, probationary sentences have been granted, under the circumstances which

6  are similar - or which warrant more severe sentences than that which is appropriate for Mr.

7  Parsadanyan.

8      In determining whether a sentencing disparity is warranted, mitigating factors must be

9  examined - as they can provide a basis for distinguishing cases.[4]

10     For example, in Lehmann, the conviction was for a dangerous offense, involving the

11  possession of weapons and a departure was still warranted. [Lehmann, 513 F.3d at 806] (the

12  defendant was convicted of "unlawful possession of a firearm as a previously convicted felon, in

13  violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).").

14     In the above-cited Whitehead case, the probationary sentence was also based (in part)

15  upon the nonviolent nature of the crime.

16      •    Whitehead, 532 F.3d at 993 ("Whitehead's crime '[di]d not pose the same danger

17           to the community as many other crimes.'").

18     Likewise, in this matter, Mr. Parsadanyan's offense did not involve any act of violence or

19  the use of any weapons.

20     Moreover, defendants whom - unlike Mr. Parsadanyan - have *histories of serious prior*

21  *criminal convictions* have nonetheless been granted *probationary* sentences.  For example:

22      •    In United States v. Edwards, 595 F.3d 1004 (9th Cir. 2010), the Ninth Circuit

23           affirmed a probationary sentence (with "102,696.07 in restitution, id. at 1011) for

24           a defendant who was "no stranger to the criminal justice system" - as the

25

26

27     _____

       [4] For example, United States v. Edwards, 595 F.3d 1004 (9th Cir. 2010), the Ninth Circuit ruled that there was
28  no unwarranted sentence disparity (under 18 U.S.C. § 3553(a)(6)), because "[t]he district court considered and explained
    why he felt a disparity was warranted and distinguished Edward's case from other federal fraud cases." [Id. at 1017-18].

                                  –  38  –

GER000478

defendant had a lengthy criminal history of similar crimes. Id. at 1008. The

defendant had previously been convicted of numerous criminal frauds, in which

he had harmed innocent parties by an amount in excess of $ 3 million. [Id. at

1008-09].

- See also Waldena, 470 F.3d at 736 (the defendant "had a prior conviction for

misapplication of tribal funds and money laundering").

This is significant because the Edwards and Wadena defendants had not learned from their

previous troubles with the law, despite having prior convictions.[5]

In addition, a defendant's support from family members has been cited as a factor

supporting a substantial departure to probationary sentences. *See, e.g.,*

- United States v. Autery, 555 F.3d 864, 868 (9th Cir. 2009) (affirming

probationary sentence (with no restitution), where the Guidelines recommended

sentence range of 41-51 months in prison, based upon mitigating factors including

the defendant's having "the support of his . . . children");

- United States v. Ruff, 535 F.3d 999, 1001-1002 (9th Cir. 2008) (affirming sentence

of "one day of imprisonment . . . with the condition that he serve 12 months and

one day of [the defendant's] supervised release at Geiger [Corrections Center]"

(with restitution of an unspecified amount), nothwithstanding "guideline range as

30-37 months", where mitigating factors included the defendant's "support from

his siblings").

**Mr. Parsadanyan has very strong support from his family members. [See Section II**

**and V above]**.

Furthermore, sentences are typically reduced substantially in fraud cases, presumably

---

[5] See United States v. Davis, No. 12-11598, 491 Fed.Appx. 143, 146, 2012 WL 4711594, *2 (11th Cir. Oct. 4, 2012) ("The district court observed that Davis had already been to jail, paroled multiple times, has his parole revoked, went on probation, and then had probation violation warrants issued. The district court stated that Davis's criminal history and current conduct indicated that Davis had not learned from his experience and that Davis's prior imprisonments and probation 'had no effect on Mr. Davis whatever'.") (affirming sentence) (unpublished, but citable under Fed.R.App.P. 32.1(a) & U.S. Ct. of App. 9th Cir. Rule 36-3(b)).

GER000479

based largely on the nonviolent nature of the offense.  The most recent available date (for the year 2013) shows that (1) for downward departures in fraud cases, the median percent decrease from the guideline minimum is 66.7%, and (2) the below Guidelines range sentences under Booker/18 U.S.C. § 3553 in fraud cases, the median percent decrease from the guideline minimum is 52.9%.  For the reasons set forth above, this case warrants a much larger reduction than the typical case - namely, a reduction to a probationary sentence.

**7.**      **The Need to Provide Restitution**

Restitution is an issue in this case. [See "PSI" Report, Paragraph 70].  Mr. Parsadanyan understands his restitution obligations; but, as stated is simply requesting a true accounting of the specific amount of restitution specifically attributed to Mr. Parsadanyan's involvement and role in this case.  In this case, the proposed sentence - of restitution and probation - would accomplish the societal and punitive purposes of 18 U.S.C. § 3553(a)(2), subdivision (A) and (B).

**Restitution constitutes a form of punishment**. [See United States v. Edwards, 595 F.3d 1004, 1013-14 (9th Cir. 2010) (describing "Supreme Court precedent holding that 'criminal restitution is not ordered because victims have an independent legal entitlement to it but, rather, as a means of achieving penal objectives such a deterrence, rehabilitation, or retribution[.]' ") (emphasis added) (quoting United States v. Cloud, 872 F.2d 846, 854 (9th Cir. 1989), itself discussing Kelly v. Robinson, 479 U.S. 36, 52, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)); United States v. Dubose, 146 F.3d 1141, 1148 (9th Cir. 1998) ("Restitution undoubtedly serves traditional purposes of punishment.") (quoting United States v. Brown, 744 F.2d 905, 909 (2d Cir. 1984)); United States v. Sharp, 442 F.3d 946, 952 (6th Cir. 2006) ("restitution constitutes punishment") (quoting United States v. Sosebee, 419 F.3d 451, 461 (6th Cir. 2005)).

Because restitution constitutes punishment, a large amount of restitution constitutes *severe* punishment - which helps provide justification for a probationary sentence.  For example, in United States v. Whitehead, 532 F.3d 991 (9th Cir. 2008) (*per curiam*), the prosecution appealed the district court's imposition of a probationary sentence, arguing that it was unreasonable.  Id. at 992.  In affirming the probationary sentence, the Ninth circuit explained:

- 40 -

"We find no abuse of discretion in the district court's conclusion that a substantial amount of community service (1000 hours), **a hefty restitution order ($50,000)** and five years of supervised release were more appropriate than prison." Id. at 993 (emphasis added). Considering that $50,000 constitutes a "hefty restitution order" that helps to justify a probationary sentence, the restitution order in the present case - which is of an entirely different magnitude ( $2,257,866.00) - provides a much stronger justification for a probationary sentence. Indeed, the contemplated restitution amount here ($2,257.866.00) exceeds the result when the Whitehead "hefty restitution" ($50,000) is multiplied by 182.

In addition to the punishment and deterrence provided by a vast restitution amount, it must also be considered that a probationary sentence would best allow Mr. Parsadanyan to make restitution payments. In United States v. Edwards, 595 F.3d 1004 (9th Cir. 2010), the prosecution appealed (based on alleged unreasonableness) the imposition of a probationary sentence with the defendant ordered "to pay $102,696.07 in restitution". Id. at 1011. In affirming the sentence, the Ninth Circuit explained, with approval, that "the district court reasoned that its order of restitution would satisfy the requirement that Edwards's sentence have general deterrent value, and a probationary sentence would best accomplish the goals of the restitution order because it would enable Edwards to earn the money he is required to pay." Id. at 1016.

The Ninth Circuit's reasoning (in Edwards) is even more applicable in the present case. The general deterrent value in the present case is similar to Edwards. [Edwards $102,699.07; here, the Government's request is $167,169.57]. Similarly, although Mr. Parsadanyan will struggle to be able to pay off the entire amount of restitution, a probationary sentence would allow him to continue to have positive monthly cash flow. Some of which would be devoted to paying restitution. If Mr. Parsadanyan continues to work steadily, then - over an extended period of time - he may be able to make considerable restitution payments. By contrast, incarceration would cut off his income both in the short-term and in the long-term, thereby greatly impeding his ability to provide restitution. Once Mr. Parsadanyan returns home, he will need to find a job

- 41 -

to support himself and his family.  This may prove a difficult task given his conviction and [custodial] sentence in this case.

Furthermore, the Ninth Circuit has acknowledged that "probation constitutes punishment", including various restrictions on liberty. [Kennick v. Superior Court of Cal., Los Angeles Cnty., 736 F.2d 1277, 1282 (9th Cir. 1984).  Accordingly, it is appropriate to consider the reasoning and conclusion set forth in United States v. Pena, 930 F.2d 1486 (10th Cir. 1991):

> Defendant has no prior record of drug abuse, nor other felony criminal convictions and has held long-term employment.  She poses no threat to the public and *would be justly punished, sufficiently deterred* and adequately rehabilitated *by a sentence of probation* with community confinement as a special condition.  Accordingly, a downward departure to a term of probation is appropriate as the Defendant does not now need to be incarcerated to protect the public from other crimes.

Id. at 1494 (emphasis added) (quoting the district court's ruling).  Based on this reasoning, a probationary sentence was affirmed in Pena - without any restitution obligation.  Id.  The Pena Court's reasoning and conclusion are *far more* applicable here, in light of the vast restitution burden that Mr. Parsadanyan will face for the rest of her life.

Finally, empirical data shows that "[i]t appears to be primarily in the certainty of punishment, *not its severity*, that deterrent power lies." [United States v. Bannister,786.F.Supp.2d 617, 660 (E.D.N.Y. 2001) (emphasis added).[6]  As explained above, the restitution amount gives this punishment value; additional severity - in the form of prolonged incarceration - is not necessary to accomplish deterrence.  The restitution figures regarding the compensable losses of the victims was not received by the probation department. [See "PSI" Report, Paragraph 70].

## VII.

## DEFENSE RECOMMENDATION AND COMPUTATION

**The defense agrees with the base offense level as indicated on Page 3 and Page 10 of the "PSI" Report: 7.**

---

[6] Citing Steven N. Durlauf & Daniel S. Negin, Imprisonment and Crime: Can Both be Reduced?, 10 Criminology & Pub. Pol'y 13, 37 (2011); Valerie Wright, Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment 8 (2010), available at http://www.sentencing project.org/doc/Deterrence$20Briefing%20.pdf., at 1-2, 4-5).

GER000482

1

## A.   LOSS COMPUTATION

The defense is respectfully requesting a true accounting pertaining to both the purported and intended loss calculations referenced within the "PSI" report and within the Government's Sentencing Position.  The loss computation, pursuant to the "PSI" report between $1,000,000, but not less than $ 2.5 million, increases Mr. Parsasdanyan's sentence an additional <u>16</u> levels.  Shockingly, the Government is requesting an even higher "loss" figure, which would elevate Mr. Parsadanyan's sentence an additional <u>18</u> levels.

At <u>no</u> time does Mr. Parsadanyan, nor counsel, mean to diminish the fact that certainly there were losses in this case.  The defense merely asks the Court to base its decision on a <u>loss hearing or a reasonable estimate of those losses and not hold Mr. Parsadanyan liable for unsubstantiated losses</u>.

Therefore, the fact that the direct losses attributable to Mr. Parsadanyan are not specifically known, the defense respectfully asks that the Court use its discretion to determine, through a hearing, the reasonable amount of loss.  Further, that Your Honor not automatically fix the amount recommended within the "PSI" report; nor, the Government's recommended figures.  Your Honor heard this trial.  **The Government called only 5 or 6 victims as to the 99 Cents Only Store frauds.  And, these victims suffered a total loss of less than $7,000- $8,000 pursuant to their own testimony.  Further, all of them were reimbursed by the banks**.

## B.   DEFENDANT'S CRIMINAL HISTORY

Mr. Parsadanyan's criminal history is referenced in <u>paragraphs # 28-35</u> of the "PSI" Report.  The United States Probation Department has determined that Mr. Parsadanyan has a <u>criminal history score of **I**</u>.  [See "PSI" Report, page 3 and paragraph # 60].  Mr. Parsadanyan agrees with this assessment.  **Mr. Parsadanyan had <u>no</u> prior contacts with law enforcement**.

///

///

///

- 43 -

GER000483

## VIII.

## CONCLUSION

Few legal principles are as deeply etched in our present jurisprudence as the concept of individualized sentencing.  As the United States Supreme Court has observed:

> [P]unishment should fit the offender and not merely every offense in a like legal
> category calls for an identical punishment without regard to the past life and
> habits of a particular offender. [Williams v. New York, 337 U.S. 241, 247 (1949);
> United States v. Barker, 771 F.2d 1362 (9th Cir., 1985).]

Thus, in each case, a sentence should reflect an individualized assessment of a particular offender's culpability and potential success on probation, rather than a mechanistic application of a given sentence to a particular category of crime.  The Ninth Circuit has also observed:

> "The exercise of sound discretion requires consideration of all the circumstances
> of the crime ... The sentencing Judge is required to consider all mitigating and
> aggravating circumstances involved.  There is a strong public interest in the
> imposition of a sentence based upon an accurate evaluation of the particular
> offender and designed to aid in his personal rehabilitation.  Thus, appellate Courts
> have vacated sentences reflecting a preconceived policy always to impose the
> maximum penalty for certain crimes." [United States v. Barker, Supra, at 1365].

In Koon v. United States, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Supreme Court wrote: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  More recently, the Supreme Court stated that the district court's "reasoned sentencing judgement rest[s] upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors . . . ." [Rita v. United States, 551 U.S. 338, 127 S.Ct. 2456, 2469, 168 L.Ed.2d 203 (2007).

"The district court may not presume that the Guidelines range is reasonable." [United

– 44 –

GER000484

States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*)]  In Carty, the Ninth Circuit Court of Appeals held:

"The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment."

After calculating the Guidelines range, the court must consider arguments that a Guidelines sentence is not appropriate 'perhaps because ... the case at hand falls outside the 'heartland' to which the [Sentencing] Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." [ Rita v. United States, 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) (citation omitted).]  If a court decides to impose a sentence outside the Guidelines range, it must ensure that the justification for the variance is sufficiently compelling to support the degree of the variance. [Gall, 552 U.S. at 50, 128 S.Ct. 586].

Therefore, it is respectfully submitted that Your Honor give Mr. Parsadanyan the opportunity to be sentenced to a **Probationary Sentence**.

The defense, on behalf of Mr. Parsadanyan, respectfully suggests **alternative sentencing options**:

A)   **First Sentencing Option:**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Probation**

B)   **Second Sentencing Option:**

     A.   Base Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B.   Loss Level [Computed at a loss of more than $ 5,000 and not more than

        $ 10,000 pursuant to [§2B1.1(b)(1)(B)]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     C.   No 2 level increase due to "Sophisticated Means" [§2B1.1(b)(10)( C)]. . . . . . . . 0

///

GER000485

D.    No $\underline{2}$ level increase due to "Unauthorized Device-Making Equipment"

    [§ 2B1.1(b)(11)(A)]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

E.    No $\underline{6}$ level increase due to "250 or more victims" [§ 2B1.1(b)(2)( c)]. . . . . . . . . 0

F.    Adjusted Offense Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

G.    Downward Departure Due to §§§ 3553, 5K2.20 and Other Considerations. . . . (?)

H.    New Adjusted Offense Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (?)

I.    Criminal History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Category **I**

J.    Total Offense Level If No Departures. . . . . . . . . . . . . . . . . . . . . . . 9 (4-10 months)

C)    **Third Sentencing Option:**

A.    Base Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B.    Loss Level [Computed at a loss of more than $ 70,000 and not more than

    $120,000  pursuant to [§2B1.1(b)(1)(E)] [This figure is consistent with Mr.

    Knudson's conclusions]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C.    $\underline{2}$ level increase due to "Sophisticated Means"  [§2B1.1(b)(10)( C)]. . . . . . . . . . 2

D.    No $\underline{2}$ level increase due to "Unauthorized Device-Making Equipment"

    [§ 2B1.1(b)(11)(A)]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

E.    An increase due to "10, but less than 50 victims" [§ 2B1.1(b)(2)(A)]. . . . . . . . . 2

F.    New Adjusted Offense Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

G.    Criminal History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Category **I**

H.    Downward Departure Due to §§§ 3553, 5K2.20 and Other Considerations. . . . (?)

I.    New Adjusted Offense Level:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (?)

J.    Total Offense Level If No Departures. . . . . . . . . . . . . . . . . . . . . 19(30-37 months)

D)    **Fourth Sentencing Option:**

A.    Base Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B.    Loss Level [Computed at the loss indicated within the "PSI" Report]. . . . . . . . 16

C.    $\underline{2}$ level increase due to "Sophisticated Means"  [§2B1.1(b)(9)( C)]. . . . . . . . . . . 2

D.    No $\underline{2}$ level increase due to "Unauthorized Transfer of Identification". . . . . . . . . 0

E.    An Increase due to "10, but less than 50 victims" [§ 2B1.1(b)(2)(A)]. . . . . . . . . 2

F.    New Adjusted Offense Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

G.    Departure Due to "Minimal Participation" [§ 3B1.2(a)]. . . . . . . . . . . . . . . . . . (-4)

H.    Criminal History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Category **I**

I.    Total Offense Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 (46-57 months)

J.    **This sentencing option does not include any other downward departure due to the mitigating factors referenced within this sentencing brief.  The defense urges Your Honor to consider significant downward departures.**

Dated: August 25, 2014

Respectfully submitted,
FLIER AND FLIER
A Law Corporation


By: /s/ Andrew Reed Flier
      Andrew Reed Flier, Esq.,
      Attorney for Defendant,
      RAFAEL PARSADANYAN

GER000487

# EXHIBIT D

GER000488

August 18, 2014

Andrew Reed Flier
Flier and Flier ALC
15250 Ventura Blvd., Suite 600
Sherman Oaks, CA 91403

In re:  US v. Rafael Parsadanyan, et al

## REPORT OF FINDINGS

Dear Mr. Flier:

I am pleased to provide a report of my findings in the above titled matter.

This report is being submitted in rebuttal of the government's sentencing position of Rafael
Parsadanyan and specifically addresses the loss calculations asserted. Unless otherwise stated,
the information in this declaration is based upon information and belief, this declaration is based
upon my personal knowledge and if called upon to testify, I could and would competently testify
thereto.

## QUALIFICATIONS AND BACKGROUND

Exhibit "A" attached hereto is a true and correct copy of my Curriculum Vitae and accurately
sets forth my qualifications and background.

1.      I am the owner of Knudson and Associates and have been since November 2000.
I am a consultant with in the area of forensic accounting and fraud investigations.   My clients
include, among others, non-profit organizations, insurance companies, retail stores, electronic
manufacturers, real estate companies, golf courses, construction companies, banks, corporations,
and the Federal Public Defenders' Office in Los Angeles. I consult, and sometimes conduct
investigations for my clients on issues regarding the alleged laundering of monies, and purported
embezzlement and laundering of the proceeds by corporate officers and employees.  I have
consulted for the Federal Public Defenders Office in Los Angeles, California in tax fraud cases

US v. Rafael Parsadanyan
August 18, 2014

## REPORT OF FINDINGS
## CARL R. KNUDSON
## FORENSIC ACCOUNTANT

and Ponzi-embezzlement schemes. I have also consulted with CJA Panel attorneys, in their

defense of clients accused of complex financial crimes such as tax fraud, Ponzi schemes, mail

fraud, money laundering, identity theft and wire fraud and have testified in Federal and State

court proceedings regarding my findings and opinions.

2.      Since I began Knudson and Associates in November 2000, I have also been

engaged as an expert witness in connection with federal and state court proceedings in

approximately 100 cases. I have testified as an expert witness at trial in ten cases. My expert

witness engagements have been in the following areas: tax fraud, federal and state money

laundering schemes, federal money structuring schemes, wire fraud schemes, mail fraud

schemes, bankruptcy fraud schemes, SEC violations, bank fraud schemes, loan fraud schemes,

mortgage banking fraud, narcotics trafficking, Ponzi schemes, Pyramid schemes, Telemarketing

schemes, Identity Theft Schemes, Political Corruption schemes, and embezzlement schemes.

3.      Prior to becoming a consultant, from June 1997 to October 2000, I was employed

as a director in the Financial Advisory Service practices at the Big 5 accounting firms of Price

WaterhouseCoopers and KPMG. As a director, I managed and conducted engagements into

internal embezzlement schemes by corporate officers employed at high tech companies,

construction companies, insurance companies, hotel management companies, hospitals, HMO's,

not-for-profit organizations, city government and casinos. I coordinated investigative and

forensic accounting efforts with external counsel, general counsel, human resources and the

internal accounting staff. Traced flow of embezzled funds through corporate books and records,

bank accounts and internal backup documents. As a director, I also consulted with national

banking institutions regarding purported money laundering schemes that had occurred at their

bank(s) and suspected malfeasance by a bank officer.

4.      From May 1973 to June 1997, I was employed as a special agent with the IRS,

Criminal Investigation Division ("CID"). As a special agent, I conducted numerous

2

GER000490

US v. Rafael Parsadanyan
August 18, 2014

### REPORT OF FINDINGS
### CARL R. KNUDSON
### FORENSIC ACCOUNTANT

investigations into money structuring and money laundering cases relative to narcotic traffickers
and organized crime subjects. I worked with banking institution and local regulators in
providing guidance into the implementation of money structuring (USC, Title 31) and money
laundering laws (USC, Title 18, section 1956) and related banking regulations. I also worked
closely with local banking institutions while conducting joint investigations with the Federal
Bureau of Investigations (FBI) during the Savings and Loan crisis in the 1980's.
In connection with my employment with the organizations described in the preceding two
paragraphs, I received extensive training on auditing, accounting and financial investigative
techniques. In those positions, I participated in, and conducted, hundreds of investigations of
alleged criminal offenses, including tax crimes, money laundering, structuring, wire fraud, mail
fraud, health care fraud, bankruptcy fraud, Ponzi schemes, pyramid schemes, bank fraud,
embezzlement and other fraud related offenses.

     5.     As a result of my experience and training as shown above in paragraphs 2 through
4, I have become familiar with identify theft schemes and related bank fraud schemes. As a
result of my employment, I have reviewed hundreds of thousands of banking documents that
document every possible transaction that occurs at a banking institution. I have also interviewed
suspects who have been accused of identity theft, bank fraud and telemarketing fraud in order to
gain further education into the inner workings of identity theft/bank fraud rings.

     I have also become aware through my 40-years of experience that violent criminal
organizations often recruit and coerce ethnic members of Armenian groups to become involved
in potentially illegal activities based on threats to their person or to threats against their families
who live outside the United States.

     6.     I have a Bachelor of Science degree in business administration. I am a licensed
private investigator in the State of California and a Certified Fraud Examiner (CFE).

3

GER000491

US v. Rafael Parsadanyan
August 18, 2014

### REPORT OF FINDINGS
### CARL R. KNUDSON
### FORENSIC ACCOUNTANT

#### DOCUMENTS REVIEWED

7.    I have reviewed the following documents and government exhibits:

a. The PSR dated June 11, 2014 re Rafael Parsadanyan

b. The Government's sentencing position paper dated July 22, 2014 with attached exhibits which include summaries of the actual loss calculation by the government.

c. The indictment of Rafael Parsadanyan dated 1/26/2011 including summary of counts related to Mr. Parsadanyan.

d. Government's list of exhibits 328 to 345 which includes detail related to POS terminals.

e. Government's exhibit 344 which is a printout of purported credit card data recovered from POS terminals related to the 99 Cent Stores in the government's case in chief.

#### ANALYSIS

8.    The grand jury indictment charged Parsadanyan with 26 counts of "Identify Theft" and 31 counts of "Bank Fraud." According to the PSR, Mr. Parsadanyan was acquitted of the "Identity Theft" charges and found guilty on 14 of the 31 counts related to "Bank Fraud." The government in its sentencing paper contends that Mr. Parsadanyan should be charged with an actual loss of $167,169.57 and an intended and actual loss of $1,115,669.50 (PSR, page 10).

9.    I have constructed a summary of the counts related to the guilty verdicts handed down by the jury (Exhibit B, attached hereto). Exhibit B shows that there were a total of 14 transactions/counts, involving 5 banking institutions for a total actual loss of $4,800.

10.    In the alternative method of determining an "intended loss," the government asserts that the 1,983 unique credit/debit card numbers, allegedly identified in this scheme, is an access device and pursuant to Application Note 3(F)(i) of USSG 2B1.1, each is valued at $500 each for a total of $991,500. The government then includes the purported actual loss of $167,169.57 with the intended loss for a grand total of $1,158,669.50. It appears that the government is double counting by combing the "actual loss" and "Intended Loss" amounts.

#### ACTUAL LOSS

11.    The government's **"Actual loss"** analysis of $167,169.57 is summarized in government's summary Exhibit 1, titled "99 Cent Store Actual Losses (as of 11-21-2013)," which identifies nine (9) victim bank/lending institutions, with further references to "relevant

4

**US v. Rafael Parsadanyan**
**August 18, 2014**

## REPORT OF FINDINGS
## CARL R. KNUDSON
## FORENSIC ACCOUNTANT

bates" numbers. The "relevant bates" numbers are identified as schedules of purported fraudulent activity as determined by each of the bank/lending institutions. I noted that the spreadsheets attached as Exhibit 1 to the government's sentencing position paper appeared to be a work in progress, a rough draft at best. The spreadsheet analysis in a PDF format for Union Bank (bates 147351-362) was so degraded that it was virtually impossible to read any of the data. If these same spreadsheets for Union Bank were provided to the Probation Department or the court, it would be almost impossible to verify the government's analysis related to Union Bank.

Further, there is no summary contained in the government's "Exhibit 1" that identifies how many debit/credit cards were actually verified as having been used in the scheme related to Mr. Parsadanyan. It is clear that the jury only found Mr. Parsadanyan guilty on 14 of the 31 bank fraud counts and not guilty on all of the identity theft counts. Moreover, there were no charges in the government's indictment that included any transactions on 4 of the 9 "victim" banks.

12. My analysis (summarized in my Exhibit C) of the government's evidence as summarized in their Exhibit 1. "Actual Loss" calculation is as follows:

a. Altura Credit Union (bates 025771-772) is the first institution where a loss number of $17,424.50 was alleged.. I have reviewed the two-page schedule which shows that there were **46** total cards identified, but there were *only two victims*: JD (Judith Davanzo, counts 38, 44 and 57) and SG (Stephen Gonzalez, counts 39, 45 and 63) were the jury found Parsadayan guilty according to the PSR at page 10, para 13. The date range on the two-page schedule was 7/17/2009 to 7/23/2009. This date-range is consistent with the government's indictment at pages 131 through 133. The "actual loss" for JD and SG proved during the trial was $1,700.

b. Arrowhead Credit Union (bates 25773) ("Arrowhead") is the second institution where a loss number of $8,199 was alleged. I have reviewed the one-page schedule which shows that there were **eighteen (18)** credit cards used during the period July 17, 2009 to July 23, 2009 for a total loss amount $8,299. The government's calculation was in error since the total "Apple Valley" loss was $1,409 ($503, $503, and $403) not $1,509 as shown on the government schedule. It does not appear that Parsadanyan was found guilty on any of the Arrowhead transactions, nor does it appear that the government charged the Arrowhead in counts 38 through 68.

c. Bank of America ("BOA") (bates 25785, 25786-787, 25789, 25788) is the third institution where a total loss number of $51,102.66 was alleged. The government analysis was divided into four separate spreadsheet analysis; **Limonite**, **Magnolia**, **Whittier** and **Montebello**.

5

GER000493

US v. Rafael Parsadanyan
August 18, 2014

### REPORT OF FINDINGS
### CARL R. KNUDSON
### FORENSIC ACCOUNTANT

   i.  I reviewed the <u>Limonite</u> spreadsheet (bates 25785) where the government alleged that $13,546.21 resulted in a fraud loss from **28** credit cards during the period July 11, 2009 to July 23, 2009. The July 11, 2009 loss of $302 associated with James E.Wray seems to be an outlier and prior to the July 17, 2009 date established as the start of the fraud by the government's schedules. The fraud loss alleged in counts 40 ($100) and 44 ($500) for Maria L. Lemus seems to have been combined ($600) per the government's spreadsheet (last line on spreadsheet).

   ii.  I reviewed the Magnolia spreadsheet (bates 25786-787) where the government alleged that $17,619.45 resulted in a fraud loss from **45** credit cards. I noticed that the entry on this spreadsheet for Maria L. Lemus was the same found on the "Limonite" spreadsheet and the only difference in the data was that the time of the fraud was expressed in military time versus conventional time. I noticed that there were two outliers (outside of the date range) on July 3, 2009 and July 9, 2009 and prior to the July 17, 2009 date as referenced above. There were no bank fraud losses charged on the indictment related to this Magnolia spreadsheet.

   iii.  I reviewed the Whittier spreadsheet (bates 025789) where the government alleged that $13,937 resulted in a fraud loss from **26** credit cards. I noticed that there were two outliers on July 24, 2009 and after the July 23, 2009 as referenced above. There was no bank fraud losses charged on the indictment related to this spreadsheet.

   iv.  I reviewed the Montebello spreadsheet (bates 025788) where the government alleged that $6,000 resulted in a fraud loss from **14** credit cards. I noticed that the date of the first fraud started on August 4, 2009 and was well beyond the July 23, 2009 as referenced above.

   d.  Bank of the West (bates 025790) is a one page spreadsheet analysis of purported fraudulent credit card activity involving eleven **(11)** credit cards during the period 7/26/2009 to 8/17/2009. There were no bank fraud losses charged on the indictment related to Bank of the West. Further, the date range of the alleged transactions is well beyond the date range as referenced above.

   e.  The Schools First Credit Union (bates 0257803-804 is a two-page spreadsheet analysis of purported fraudulent credit card activity involving **20** credit cards totaling $11,610.85 related to transactions during the period 6/19/2009 to 9/24/2009. The government's summary spreadsheet (no bates #) indicates that the adjusted loss was $6,355 *due to "multiple skim locations couldn't be positively connected to crew."* The government's statement suggests that there were possibly other "crews" working in the same area. There were six outliers that included; June 19, 2009, which was well before the 7/17/2009 date established by the

<div align="center">6</div>

US v. Rafael Parsadanyan
August 18, 2014

### REPORT OF FINDINGS
### CARL R. KNUDSON
### FORENSIC ACCOUNTANT

government's indictment, and there were transactions dated in August and September of 2009, which was also well after the date of 7/23/2009. The total value of the 6 outliers was $3,273.85. ***Parsadanyan was found guilty on count 54*** a transaction dated "7/18" for $500 (government schedule indicates a $503 transaction). The government has provided no evidence of how they arrived at their adjusted number of $6,355 which is over 54% of the $11,610.85 in the government's gross loss amount.

      f.      Guaranty Bank (bates 025798) is a one page spreadsheet analysis of the credit card transactions for the period 7/17/2009 to 7/20/2009 which alleges a loss of $6,347.50 from seven **(7)** credit cards. Parsadanyan was found guilty on counts 41, 50, 51 and 60 which were all related to ***one victim, Murial Johnson ("MJ") for a total of $1,511.50***.

      g.      Union Bank (bates 147351-362) is a twelve-page spreadsheet analysis, which was virtually impossible to read with the human eye. ***There were no transactions that were included in the government's indictment.*** The analysis is confusing since it lists what appears to be normal activity on the credit card and then a section that lists "fraudulent" activity on the credit card account. Sixty-two percent (62%) of the activity was for the period well after the 7/23/2009 cutoff date and does not appear to be related to Parsadanyan.

      I constructed a spreadsheet Exhibit C-1 (attached hereto) of the Union Bank activity by enhancing the PDF data by 200%, but even then it was hard to read the data contained on certain pages. I included account numbers (last four digits), date of transaction and the amount of the transaction for all of the events during the relevant period of time starting on 7/17/2009 to 7/23/2009. I also included a column where I totaled the number of transactions per day, which gave me a grand total of 102 transactions during the relevant period of time for a total value of $32,943.95.

      h.      US Bank (bates 025859) is a one page spreadsheet analysis of the credit card transactions for the period 7/17/2009 to 7/26/2009 which alleges a loss of $4,433 from five **(5)** credit cards. ***Parsadanyan was found guilty on count 66 which was related to one transaction related to Mary Jane King ("MJK") for $500***. Of the 12 total transactions, there were 6 outliers or 50% that were dated after July 23, 2009.

      i.      Ventura County CU (bates 146337) was a one page supplemental report from Huntington Beach Police Department interview of "Holmes" who indicated that there were 26 account holders whose information was compromised with an estimated loss of $18,300. There was no spreadsheet analysis to show when the alleged activity occurred, and we therefore have no way of knowing whether the activity was within the time parameters of July 17, 2009 to July 23, 2009. There is no information indicating what the "actual loss" was or if the "compromised"

GER000495

US v. Rafael Parsadanyan
August 18, 2014

### REPORT OF FINDINGS
### CARL R. KNUDSON
### FORENSIC ACCOUNTANT

accounts were used by the "crew." The indictment on counts 67 and 68 showed a date of 8/19/2009 and 8/20/2009 which is well beyond the time frame where Parsadayan was involved. Further, *the jury did not find Parsadanyan guilty of counts 67 or 68.*

### INTENDED LOSS

13.     In the government's **"Intended Loss"** calculation of $991,500, they contend that there were "1,983 unique credit/debit cards captured in the POS terminals" (PSR, page 10, para 15) and the assumption is that the 1,983 credit/debit cards information was in the possession or control of Mr. Parsadanyan. I am informed and believe that Mr. Parsadanyan did not possess or control the POS devices at any time, nor was there any evidence that the POS data was stored on any other devices that Mr. Parsadanyan had access to. Therefore, in simple terms, Mr. Parsadanyan could not have intended to use the data for further fraudulent activity when he did not have access to the POS data. In fact, the evidence shows that Mr. Parsadanyan was not a "thief in law" or a high-ranking member of the AP organization.

14.     I have reviewed government's exhibit 344 which purports to be "Data recovered from analysis of POS terminals" which appears to be 76 pages of data recovered from POS terminals listed in government's exhibits 336 to 341. In general, I reviewed all of the data contained on pages 3 through 76 and found that the dates on all of the transactions were in January of 2004. I next conducted a "name" search for all of the victims listed on government's exhibit 1, and found that none of the names appeared on the 76 pages of data.

15.     In particular, I reviewed the recovered transaction data that appears to be related to government's exhibit 336, POS data for "Limonite" 99 Cents Only Store." I analyzed the pages beginning at page 5 of 76 to page 59 of 76 and found that all dates referenced the period January 2004, and there were no names associated with government's Exhibit 1, list of credit/debit card holders.

### CONCLUSIONS

16.     As summarized in my Exhibit B (attached hereto) and after reviewing the government's Exhibit 1 (a summary of the "actual loss" calculation), I have determined that there was an **"actual loss"** of $4,800. This loss is based upon the 14 counts where Mr. Parsadanyan was actually convicted, and supported by the fact that Mr. Parsadanyan was acquitted on all of the other related counts on the government's indictment.

17.     In the alternative, if the court adopts government's Exhibit 1 Actual Loss Calculation (attached to their sentencing paper), I calculated an **alternative "actual loss"** calculation of $112,151.71. As I explained in my "comments" section in my Exhibit C, the reductions in the government's actual loss calculation was attributed to transactions that were not within the date range ("Outliers") where Mr. Parsadanyan was a potential participant (July 17,

8

GER000496

US v. Rafael Parsadanyan
August 18, 2014

### REPORT OF FINDINGS
### CARL R. KNUDSON
### FORENSIC ACCOUNTANT

2009 to July 23, 2009). The "outliers" were determined by examining each of the dates listed on the government's schedules related to the nine victim banks.

18.     As stated above at paragraphs 13 to 15, based upon the evidence that I have reviewed, the **"intended loss"** cannot be calculated since the government's evidence supporting the 1,983 credit/debit cards on the recovered POS skimming devices was "stale," without substance and there was no proof that Mr. Parsadanyan controlled or possessed the POS devices or the purported 1,983 credit/card data stored on the devices. Given the fact that the POS data was all dated in January 2004 it is highly likely that the credit cards were "stale," "compromised" and unusable. Further, the government provides no summary or accounting of the purported 1,983 credit cards and expects the court to examine government's exhibit 344 in order to verify that the 1,983 number is in fact accurate.

19.     However, if the court adopts government's Exhibit 1, I have determined that an alternative **"intended loss"** was at most $148,000. This amount is based upon my analysis of the government's Exhibit 1 (and related evidence), and summarized on my Exhibit C, which showed that there were a total of 296 debit/credit card transactions documented by the 9 victim banks, and pursuant to the sentencing guidelines adopted by the government, the loss amount would be; $500 X 296 = $148,000.

20.     In my experience, "runners" are not in the upper echelon of criminal organizations and would therefore have little knowledge of the complexity or the breadth of the criminal enterprise. I have not seen any evidence that Mr. Parsadanyan was involved in the placement of the "skimming" devices at the 99 Cent Stores or was part of a "skimming" crew. Moreover, based upon the PSR, which summarizes the criminal conduct of Mr. Parsadanyan, it is apparent that Mr. Parsadanyan was employed and his participation in the bank fraud scheme was essentially limited to one week, July 17, to July 23, 2009.

Respectfully submitted,

*Carl R. Knudson*

Carl R. Knudson
Forensic Accountant
Certified Fraud Examiner

Attachments; as stated

9

## Carl R. Knudson – Forensic Accountant and Certified Fraud Examiner

### Professional Experience

Consulting and expert testifying services related to government law enforcement and white-collar investigations, both criminal and civil matters. Former IRS special agent experienced in the investigation and prosecution of complex white-collar crime violations. Served as summary fact witness and as expert witness in federal and state court proceedings regarding criminal and civil matters. Areas of expertise include: tax fraud, federal and state money laundering schemes, federal money structuring schemes, wire fraud schemes, mail fraud schemes, bankruptcy fraud schemes, SEC violations, bank fraud schemes, loan fraud schemes, mortgage banking fraud, narcotics trafficking, Ponzi schemes, Pyramid schemes, Telemarketing schemes, Political Corruption schemes, and embezzlement schemes.

### As a Consultant:

- Managed and conducted engagements into internal embezzlement schemes by corporate officers employed at high tech companies, construction companies, insurance companies, hotel management companies, hospitals, HMO's, not-for-profit organizations, city government and casinos. Coordinated investigative and forensic accounting efforts with external counsel, general counsel, human resources and the internal accounting staff. Traced flow of embezzled funds through corporate books and records, bank accounts and internal backup documents. Reviewed audit work papers to assess whether SAB 99 (fraud audit considerations) were considered. Assembled evidence and provided written and oral reports to board of directors and other corporate officers. When appropriate obtained technical expertise to preserve evidence on accused's computer hard drive. Testified in civil and criminal proceedings regarding my findings.

- Conducted international warranty fraud investigation for prominent computer manufacturer that had purportedly been overcharged $100 million by its service providers. Participated in the design and implementation of analytical approaches to mining a large data field that culminated in attaining bottom-line warranty loss figures for client. Coordinated field investigations of alleged fraudsters and provided report of findings to client. Worked with client in designing reports to SEC regarding "materiality" issues on fraud loss.

- Conducted investigation for California city government regarding allegations of corruption in the award of a $65 million construction project and subsequent "evaporation" of the funds from the project. The engagement team analyzed the government contracting process utilized in the construction and operation of the project, reconciled all bank accounts and traced funds to their origin. The team performed testing of account receivable and accounts payable to determine whether all income was reported and/or all expenses accounted for. Issued report to City Manager of our findings.

- Consulted on Bank of New York case as money laundering expert re alleged Russian Mafia laundering of billions of dollars through client wire room.

GER000498

Carl R Knudson
Resume June 2014

- Consulted for National Insurance Carrier in $74 million fraud-loss claim related to CEO fraudulent conversion of corporate monies.

- Consulted for International Insurance Broker, Fortune 50 Company re embezzlement scheme by vice president of accounting department. Conducted analysis of client accounting records and bank documents showing how the fraud was perpetrated against the client. Prepared report of findings for client, which was used to prosecute the fraudster.

- Consulted for national grocery chain regarding over-billing assertions by local government entities. Conducted statewide secret sampling of grocery chain stores, which rebutted assertions of local government allegations.

- Consulted for International Religious organization regarding embezzlement of church funds by Chief Financial Officer. Analyzed accounting records for five-year period of time and provided report to document findings of embezzlement.

- Consulted for Los Angeles Public Golf Course operator accused of arson to prevent government audit of books and records of golf course. Recovered relevant records needed for audit request from burned out storage area where accounting records were stored.

- Engaged by the defense in US v. _Weider_ (May 2005) to provide analysis of government's allegations of narcotics money-laundering. Analyzed the government's evidence and provided report to rebut government's assertions. Assisted counsel in trial during cross-examination of government's money laundering experts.

- Engaged by defense counsel in US v. _Ealy_ (March 2008) to provide analysis of government's allegations of narcotics money laundering against client. Analyzed government's purported evidence of the crime and also assisted counsel in developing the strategy that rebutted the government's assertions.

- Engaged by an international construction company to investigate embezzlement from Political Action Committee (PAC) bank accounts. Documented internal embezzlement scheme and reconciled accounting records to restated FEC reports.

- Engaged by counsel to assist in defending client in divorce proceedings. Created database and analyzed 15 years of bank transactions involving over 25 bank accounts. Reconciled all accounts and traced personal and community property transactions. Prepared several reports related to Marital Standard of Living analysis to be used in settlement proceedings.

- Engaged by Arizona hospital that suspected the CEO and CFO had embezzled millions from company bank accounts. Reconciled company bank accounts and analyzed accounts receivable and accounts payables for anomalies. Analyzed the health provider contract

2

GER000499

Carl R Knudson
Resume June 2014

---

(capitation rates, industry standards, and reasonableness tests) in politically charged situation. Presented findings and conclusions to Board of Directors and hostile physicians.

- Engaged by counsel in civil fraud case to assist multi national client in recovering millions of dollars in fraudulently obtained funds. Constructed several large databases used to trace flow of funds in and out of "fraudsters" bank accounts. Provided reports of findings to Bankruptcy Court and to counsel.

- Engaged by counsel to provide cash flow analysis of funds between numerous related entities being investigated by the FTC. Analyzed internal documents, bank statements and prepared report of findings.

- Engaged by State Department to provide expert analysis of billion-dollar embezzlement, money laundering and bankruptcy scheme by high-ranking official in foreign country. Also provided training to foreign government officials relative to conducting complex financial investigations.

- Engaged as expert in US v. Anthony Pendleton (August 2009) to provide analysis of IRS charges regarding multiple-filer scheme.

- Engaged as expert in USA v. Annya Nguyen to provide analysis of IRS charges regarding failure to file quarterly corporate tax returns (August 2009). Prepared IRS quarterly tax returns for client's corporations for a four-year period.

- Engaged by client to reconstruct six years of business and banking records for several limited partnerships and personal returns.

- Engaged as expert by counsel in US v. Samual and Zipoora Klein to provide tax loss calculation using the "Bank Deposit" method of proving income.

- Engaged as expert by counsel in US v. Gilbert Camero to provide analysis of identity theft and bank fraud charges against client. Reviewed discovery and provided report to counsel (2012).

- Engaged as expert by counsel in US v. Johnny Stewart to provide analysis of identity theft and bank fraud charges against client. Reviewed discovery and provided report to counsel (2012).

- Engaged by general counsel to perform a nationwide investigation of a major electronics vender. Investigative team visited over 100 stores and conducted assessment of how vendor's product was being promoted. Prepared reports of findings to general counsel (2013).

GER000500

Carl R Knudson
Resume June 2014

---

### *As an Expert Testifier:*

- Testified as expert in Santa Ana Federal Court re US v. Charles M. Davis, Pro per (June 2014) regarding allegations of Mail Fraud, Wire Fraud and Money Laundering. Analyzed discovery related to the charges and designed templates and exhibits for my direct examination, which rebutted government's analysis of the expenditure of investor funds. Also provided templates for cross examination of government's summary witness.

- Testified as expert in Los Angeles Federal Court re US v. Bart *Slanaker*, et al (April 2012) regarding allegations of Telemarketing Fraud, mail fraud and wire fraud. Analyzed discovery related to the charges and designed templates for my direct examination. Assisted defense counsel in constructing cross-examination of government expert.

- Testified as expert in Los Angeles Federal Court re US v. *Vandevort* (July 2010) regarding allegations of bankruptcy fraud and money laundering. Analyzed discovery related to the charges and designed template for my direct examination. Assisted defense counsel in constructing cross-examination template of government expert.

- Testified as expert at Pomona Superior Court Mao v. *Hsieh* (June 2010) re civil fraud allegations. Analyzed bank account documents, loan documents, real estate documents and accounting records. Designed spreadsheet analysis to support assertions of fraudulent activity by other investors. Designed template for my direct examination by counsel.

- Testified as expert in Los Angeles Federal Court, US v. *Ronald Rakow and Denise Del Bianco* (July 2006) on criminal tax charges. Provided alternate tax loss calculations, which contradicted the government's allegations of tax evasion.

- Testified as expert in Los Angeles Superior Court, People v. *Maritza Martinez* (January 2002) re drug money laundering charges. Analyzed government's evidence and provided rebuttal report to counsel. Government subsequently dropped charges and case was dismissed with prejudice.

- Testified as expert in US v. *Anne Masters Sholtz* (April 2008) to provide loss analysis of client's alleged multi-million dollar fraud-Ponzi scheme. Provided in depth analysis of energy trading credits that showed victim's fraud-loss was zero. Sentencing judge agreed with my loss calculation of no loss.

- Testified as expert in the defense of CEO accused of evading over $2 million in federal taxes. Reviewed government's evidence of alleged scheme and provided report of findings to counsel showing government's assertions to be substantially overstated. In civil IRS case that followed, prepared further analysis of IRS civil findings that rebutted alleged tax loss reasserted.

GER000501

Carl R Knudson
Resume June 2014

- Engaged by counsel to assist in the defense US v. *Lynn Meredith*, et al. Client accused of
  Failure to File, IRS Klein Conspiracy and Mail Fraud. Provided analysis of government's
  evidence and attended 12-week trial. Also prepared ten years of delinquent federal and state
  tax returns for other defendant in same case.

- Testified as expert in US v. *Osaki* re $350 million "Ponzi" scheme. Provided analysis of
  government's assertions and issued report that showed the government's expert had used a
  "plug" figure in their analysis of the defendant's bank accounts, which caused an
  overstatement of the alleged fraud loss.

- Testified as expert in civil fraud proceedings in re: DAS Corporation v. *Christopher and
  Erica Kim,* Optional Capital v. Christopher and Erica Kim and US v. 475 Martin Lane,
  Beverly Hills, CA. All three proceedings related to an alleged $24 million embezzlement and
  money laundering scheme. Plaintiffs including the US Attorneys Office (USAO) in Los
  Angeles. Testified in several depositions and prepared declaration of findings to rebut
  plaintiff's expert testimony.

- Testified as expert in Los Angeles Federal Court in re US v. *Stephen Sayre*. "Pro Se" client
  re financial analysis of stock trading trends and profits in alleged SEC 10b5 violations.
  Analyzed data provided by FINRA re trading of various stocks which rebutted government's
  assertions of stock manipulation.

- Testified as expert in Los Angeles Federal Court in re US v. *Gerald and Patricia Green*
  (September 2009), re Foreign Corrupt Practices Act (FCPA), False Corporate Tax Returns,
  Money Laundering and obstruction case. Provided analysis of client's accounting records,
  bank accounts, and work papers of tax preparer. Prepared summary chart of my findings that
  rebutted government's allegations. Assisted counsel during cross-examination of government
  witnesses during four-week trial.

- Testified as expert in Santa Ana Federal Court in re CFTC (Commodities Future Trade
  Commission) v. *Forex Liquidities, LLC* (July 2009) order to show cause action against client.
  Reviewed client general ledger, trustee's report of findings, and related bank documents.
  Provided report that rebutted assertions of appointed trustee.

- Testified as expert in Los Angeles Federal Court in re, US v. *Steve Austin* (August 2009)
  conducted extensive analysis of client investment records, which rebutted the alleged
  government loss calculation.

- Testified as expert in Los Angeles Superior Court in re People v. J*ustice Edem* (July 2008)
  conducted analysis of government discovery, which rebutted the government's assertions of
  tax fraud.

5

GER000502

Carl R Knudson
Resume June 2014

---

- Testified as expert in Los Angeles Federal Court in re US v. *Khaled Amed,* conducted analysis of extensive government accounting database related to payments to client business entities. Analyzed business billing records related to medical fraud charges.

- Testified as expert in Los Angeles Federal Court in re US v. *Rafael Yepez,* conducted analysis of government discovery and provided report to counsel, which rebutted the allegation of money laundering.

### *As a Special Agent*

- Developed the investigation of the largest known narcotics money laundering organization in U.S. history. Coordinated the nationwide investigative efforts of the IRS, DEA, FBI and U.S. Customs Service personnel with the Los Angeles United States Attorney's Office ("USAO"). The investigation, known as "Polar Cap," revealed that over $1 billion in U.S. currency had been laundered by a Los Angeles-based organization for the infamous "Medellin" Columbia Cartel. Supervised the collection and analysis of all financial data, which documented the flow of currency from "Cartel" collection points, through the Los Angeles based money launderers and subsequently wire-transferred to a South American money exchange account. Received "The Distinguished Agent of the Year" award from the Los Angeles County Bar Association in May of 1990 for this investigation. Exploits of this investigation were detailed in the book "Washed in Gold," (1994) *Simon & Schuster.*

- Conducted investigation of an international entrepreneur that was accused of operating a "Pyramid" scheme in the U.S. Uncovered several sophisticated paper-schemes devised by he and his advisors in order to siphon-off tens of millions of dollars from the corporate entity. Traced the flow of the ill-gotten funds through a complex international money-laundering scheme, which attempted to secrete the ill-gotten gains into offshore bank accounts and into the control of the entrepreneur. Authored and co-authored numerous requests for assistance from government and bank officials from The Netherlands, Canada, Hong Kong, Switzerland and The British West Indies.

- Conducted investigation with the Federal Bureau of Investigation ("FBI") and Los Angeles, United States Attorneys Office ("USAO") of a California politician who was receiving bribes from a local real estate developer. Provided the financial analysis of the politician's bank records that uncovered the fraudulent scheme and led to his conviction on tax and bribery charges.

- Conducted investigation with the FBI and Los Angeles USAO of political corruption in a local city's government. Provided financial analyses of bank records that resulted in convictions of City Councilperson and Congressman on tax and bribery charges.

GER000503

Carl R Knudson
Resume June 2014

___

- Assisted in the international investigation of a well-known arms dealer who brokered the purchase of U.S. aircraft between U.S. based aircraft producers with Mid-east Countries. Investigations involved IRC, section 162c violations regarding "bribes" paid by aircraft manufacturers.

- Led a team of IRS and Customs agents including local police officers that successfully arrested and prosecuted numerous Los Angeles-based narcotics traffickers. Authored numerous affidavits for search and arrest warrants obtained from federal and state judges. Seized over $2 million in currency and assets. Testified in California State Court as an expert in narcotics organizations. Exploits of several of these investigations were detailed in the book, "Dark Alliance," 1997.

- Conducted investigations of several prominent "sports" agents who embezzled monies from their unsuspecting clients. Reconstructed three years of corporate bank records in order to document the embezzlement scheme and trace the stolen funds to the agent's bank accounts.

- Coordinated a multi-agency investigation of alleged fraud in the mortgage banking industry. Worked closely with the FBI and the Los Angeles USAO in the investigation of large-scale mortgage bankers who were defrauding the Veterans Administration ("VA") and the Department of Housing and Urban Development ("HUD"). Provided the financial analysis that tracked the proceeds from the illegal schemes to the fraudsters.

- Conducted several investigations into the Savings and Loan scandal that swept the country in the 1980's. Coordinated investigative efforts with the FBI and the USAO that focused on Savings and Loan officials using "straw buyers" to purchase over-priced commercial real estate that was then sold to tax-motivated property syndicates. Designed the financial investigation that documented the flow of funds from the illegal schemes to the perpetrators of the crime.

- Conducted investigations of several organized crime figures that had acquired substantial real estate holdings by defrauding financial institutions and tax shelter investors. Subjects acquired commercial real estate by using a maze of corporate and partnership alter egos and straw buyers. Reconstructed three years of partnership and corporate records in order to trace gains on illegal activity to the perpetrator.

### *Education:*

Bachelor of Science, Business Administration, Weber State University, Ogden, UT, 1973
United States Navy, Office of Naval Intelligence Training School (1963)
Central Intelligence Agency technical school, 1967
United States Treasury Department academy, 1973-74
Continuing Professional Education to present

7

GER000504

Carl R Knudson
Resume June 2014

---

### *Professional Affiliations:*

Private investigators license #19339, California
Association of Certified Fraud Examiners (1995-current)

### *Employment History:*

United States Navy – 1962 to 1966
Central Intelligence Agency – 1967 to 1970
Internal Revenue Service, Ogden Service Center – August 1970 to March 1973
Internal Revenue Service, Criminal Investigation Division – May 1973 to June 1997
- Position: Special Agent
- Duties: Investigate alleged criminal violations of the Internal Revenue Code, Currency Transaction Laws, and Money Laundering Laws.

Price Waterhouse & PricewaterhouseCoopers – June 1997 to June 1999
- Position: Director in the Financial Advisory Services practice.
- Duties: Manage engagements regarding internal/external fraud investigations for Fortune 500 companies; Design marketing materials; Organize symposium's for presentation of marketing materials to various groups and organizations; Prepare proposals; and Mentor new-hires and junior consultants.
- Attended seminars and training sessions regarding accounting and auditing standards relative to the reporting requirements of publicly traded companies to the SEC.

KPMG – July 1999 to June 2000
- Position: Director in the Forensic and Litigation Services practice.
- Duties: Manage engagements regarding internal/external fraud investigations for Fortune 500 companies; Design marketing materials; Assist in the organization of symposium's for presentation of marketing materials to various groups and organizations; Prepare proposals; and Mentor new-hires and junior consultants.
- Attended seminars and training sessions regarding accounting and auditing standards relative to the reporting requirements of publicly traded companies to the SEC.

Stonefield Josephson, Inc. - July 2000 to October 2000
- Position: Co-Director of Financial Recovery Services practice.
- Duties: Develop marketing materials to promote new Financial Recovery Services practice, Prepare proposals, and prepared articles for presentation to market target-groups. Developed new work and managed projects.

November 2000 to the present, Owner-Operator of Knudson & Associates
- Provide consulting services to corporate, government and individual clients regarding civil and criminal allegations.

8

GER000505

Carl R Knudson
Resume June 2014

---

- o  Testified as expert in Federal and State court proceedings.
- o  Conducted internal and external investigations and fraud examinations for corporate clients
- o  Provided expert consulting services to Federal Public Defenders office in Los Angeles regarding; bank fraud, wire fraud, tax fraud, identity theft, telemarketing fraud and Ponzi schemes.
- o  Provided expert consulting services to Criminal Justice Act (CJA) attorneys for indigent clients regarding; bank fraud, wire fraud, tax fraud, identity theft, telemarketing fraud and Ponzi schemes.

### *Publications:*

Co-authored a professional training manual for the IRS on conducting international investigations   The extensive training manual details the means, methods and requirements of obtaining evidence from abroad through international tax treaties and legal assistance treaties.

Authored article on "Conducting International Investigation" and presented at Price Waterhouse Symposium, September 1997.

Originated the Los Angeles White Collar Crime Symposium. The Symposium included panelists from the leading Los Angeles law firms and experts from the private and government sectors, which addressed issues regarding Financial Statement Fraud, 10b5 Violations and International Investigations of White Collar Fraud, 1998 and 1999.

Co-authored article and presentation on financial reporting fraud (10b5 Violations), which was presented to a CFO conference in November 1998, and The Los Angeles White Collar Symposium in May 1999.

Authored article on "State Money Laundering Trends" for participation on panel of "Money Laundering" experts to the American Bar and American Bankers Association Conference in October of 1999.

Authored book on "State Money Laundering" statutes (February 2000).

Co-authored article on "Earnings Management," which was published on KPMG's Website. Certain portions of presentation regarding 10b5 violations were used in the May 2000 KPMG Audit Roundtable symposia.

Co-authored article on "Earnings Management" which was presented at Business Valuation Services forum in May of 2001.

Lectured at California State University, Los Angeles on Economic Crime topics to group of Chinese law enforcement group in February 2003.

9

GER000506

Carl R Knudson
Resume June 2014

---

Lectured at Weber State University, Ogden, Utah on Financial Reporting Fraud, September 2003.

Lectured at Utah Bankers Association, May 2004 conference regarding Earnings Management Fraud and provided full-day seminar on white-collar crime subjects such as; Money Laundering, Tax Fraud, Identity Theft and Financial Statement Fraud.

Lectured at annual meeting of the Federal Judicial Center Seminar for Federal Public Defender Investigators and Paralegal Specialists, April 2006 regarding Financial Fraud Investigations. Lectured at 22nd Annual Association of Certified Fraud (ACFE) Fraud Conference and Exhibition (June 2011) on the Fraud Expert in Litigation and Trial.

Co-Authored Book on Bribery and Corruption Case Book with Joseph T. Wells, President and Founder of the Certified Fraud Examiners Association (April 2012).

Authored White Paper on Combating Government Vendor Fraud (Thomson Reuters) (April 2012).

Co-Authored Book on Insurance Fraud Casebook with Joseph T. Wells, President and Founder of the Certified Fraud Examiners Association (April 2013).

### *Awards and Recognition:*

Key to City of Hawthorne, California for investigation into Political Corruption in the South Bay, 1977.

Key to City of Redondo Beach, California for investigation of Political Corruption of councilman, 1978.

Key to City of Bell, California for investigation of drug traffickers and seizure of assets, 1986.

Special award from United States Customs Service for investigation of narcotics traffickers.

Distinguished Agent of the Year Award, Los Angeles County Bar Association, 1990, for "Polar Cap" investigation.

Albert Gallatin Award for distinguished services to US Treasury during career, 1997

Special Proclamation from City of Los Angeles upon retirement, 1997

Special Proclamation from Los Angeles County Board of Supervisors upon retirement, 1997

GER000507

Carl R Knudson
Resume June 2014

Special award from Federal Bureau of Investigation for investigation of Political Corruption, 1997

Letter of Recognition, President Bill Clinton, 1997
For further detail of specific cases, please go to my website at: www.knudsonandassociates.com

References will be provided upon request.

GER000508

US v. Parsadanyan                                   EXHIBIT B

| ANALYSIS OF ACTUAL LOSS -GUILTY VERDICT | | | | | | | |
|---|---|---|---|---|---|---|---|
| Item # | Count | Banking Institution | Amount | | Date | Name on Card | Card No. |
| 1 | 38 | Altura Credit Union | $ | 300.00 | 7/17/2009 | Judith Davanzo | 4193 |
| 2 | 39 | Altura Credit Union | $ | 300.00 | 7/17/2009 | Stephen Gonzalez | 4353 |
| 3 | 40 | Bank of America Limonite | $ | 100.00 | 7/17/2009 | Maria L. Lemus | 2441 |
| 4 | 41 | Guaranty Bank | $ | 500.00 | 7/17/2009 | Murial Johnson | 8903 |
| 5 | 44 | Altura Credit Union | $ | 300.00 | 7/18/2009 | Judith Davanzo | 4193 |
| 6 | 45 | Altura Credit Union | $ | 200.00 | 7/18/2009 | Stephen Gonzalez | 4353 |
| 7 | 48 | Bank of America - Limonite | $ | 500.00 | 7/18/2009 | Maria L. Lemus | 2441 |
| 8 | 50 | Guaranty Bank | $ | 300.00 | 7/18/2009 | Murial Johnson | 8903 |
| 9 | 51 | Guaranty Bank | $ | 200.00 | 7/18/2009 | Murial Johnson | 8903 |
| 10 | 54 | Schools First Credit Union | $ | 500.00 | 7/18/2009 | Janell Arnold | 6700 |
| 11 | 57 | Altura Credit Union | $ | 300.00 | 7/19/2009 | Judith Davanzo | 4193 |
| 12 | 60 | Guaranty Bank | $ | 500.00 | 7/19/2009 | Murial Johnson | 8903 |
| 13 | 63 | Altura Credit Union | $ | 300.00 | 7/20/2009 | Stephen Gonzalez | 4353 |
| 14 | 66 | U.S. Bank | $ | 500.00 | 7/23/2009 | Mary Jane King | 9326 |
| Summary | | 5 Banks | $ | 4,800.00 | | | 5 Cards |

Prepared by:

Carl R. Knudson

Forensic Accountant                            1                            8/19/2014

GER000509

US v. Rafael Parsadanyan

EXHIBIT C

| DEFENDANTS ANALYSIS OF CREDIT CARD LOSS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Banking Institution per Government | | Total Loss per Government Exhibit 1 | | Loss per Analysis | | Number of Cards | Comments | Bates Refence |
| Altura Credit Union | | $ | 17,424.45 | $ | 17,424.45 | 46 | No change | 025771-772 |
| Arrowhead Credit Union | | $ | 8,199.00 | $ | 8,299.00 | 18 | Math error | 25773 |
| Bank of America (BOA): | | | | | | | | |
| | Limonite | $ | 13,546.21 | $ | 13,546.21 | 28 | No change | 25785 |
| | Magnolia | $ | 17,619.45 | $ | 17,099.45 | 43 | Two Outliers | 25786-787 |
| | Whittier | $ | 13,937.00 | $ | 10,795.00 | 26 | Five Outliers | 25789 |
| | Montebello | $ | 6,000.00 | $ | - | 0 | All 14 are Outliers | 25788 |
| | Total BOA | $ | 51,102.66 | | | | | |
| Bank of The West | | $ | 8,710.00 | $ | - | 0 | All 11 are Outliers | 25790 |
| Schools First CU | | $ | 6,355.00 | $ | 3,081.15 | 20 | 6 Outliers | 25803-804 |
| Guaranty Bank | | $ | 6,347.50 | $ | 6,347.50 | 7 | No change | 25798 |
| Union Bank | | $ | 50,724.45 | $ | 32,943.95 | 102 | Exhibit C-1, 169 Outliiers | |
| US Bank | | $ | 4,433.00 | $ | 2,615.00 | 6 | 6 Outliers | 25859 |
| Ventura County CU | | $ | 18,300.00 | $ | - | 0 | No detailed analysis | 146337 |
| Totals | | $ | 167,169.57 | $ | 112,151.71 | 296 | Actual loss comparison | |
| Per 3(F)(i) of USG 2B1.1 | | 296 cards X $500 | | $ | 148,000.00 | | Alternative "intended loss" calculation | |

Prepared by:
Carl R. Knudson
Forensic Accountant

1

GER000510

1  CHARLES PEREYRA-SUAREZ
   State Bar No. 67106
2  LAW OFFICES OF CHARLES PEREYRA-SUAREZ
   UNION BANK PLAZA
3  800 WILSHIRE BLVD., 12TH FLOOR
   LOS ANGELES, CALIFORNIA 90017
4  Tel. (213) 623-5923
   cpereyra@cpslawfirm.com
5
   Attorneys for Defendant
6  ARMAN SHAROPETROSIAN

7              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
8

9  UNITED STATES OF AMERICA,          )  CASE NO. CR 11-72-RGK-4
                                      )
10              Plaintiff,            )  DEFENDANT ARMAN SHAROPETROSIAN'S
                                      )  SENTENCING POSITION MEMORANDUM;
11         v.                         )  ATTACHED EXHIBITS A, B AND C
                                      )
12  ARMAN SHAROPETROSIAN,             )
                                      )
13              Defendant.            )  Hearing Date: September 22, 2014
                                      )  Hearing Time: 10:00 a.m.
14                                    )  U.S. District Judge R. Gary Klausner
   _____)
15

16      Defendant Arman Sharopetrosian, by and through his counsel of record, Charles Pereyra-

17  Suarez, hereby submits his Sentencing Position Memorandum and attached Exhibits A, B and C - -

18  to be supplemented by whatever evidence and/or oral argument may be presented at the hearing.

19                                    I.

20                    BACKGROUND CIRCUMSTANCES

21      On April 17, 2014, a jury convicted Mr. Sharopetrosian of three criminal counts: RICO

22  conspiracy (in violation of 18 USC §1962(d) (Count One); and Extortion Conspiracy and

23  Extortion (in violation of 18 USC §1951(a) (Counts 4 and 5).  Also convicted at the same jury

24  trial of various offenses were co-defendants Mher Darbinyan and Rafael Parsadanyan.

25      On July 29, 2014, the U.S. Probation Office ("USPO") disclosed its Presentence Report

26  ("PSR") and recommendation letter.  In the PSR, the USPO found a total offense level of 31,

27  calculating the following: a base level of 18 under U.S.S.G. §§2E1.1(a)(2), 2B3.2(a), a 2-level

28  upward adjustment for threat of death/bodily injury/kidnapping under U.S.S.G § 2B3.2(b)(1), a

2-level upward adjustment for demand of more that $50,000 under U.S.S.G §§2B3.2(b)(2), 2B3.1(b)(7)(c), a 5-level upward adjustment for firearm possessed under U.S.S.G §2B3.2(b)(3)(A)(iii), a 2-level upward adjustment for person physically restrained under U.S.S.G § 2B3.2(b)(5), and a 2-level upward adjustment for aggravating role under U.S.S.G §3B1.1(c). See PSR ¶¶ 27-39. Combined with an assigned criminal history of V, see PSR ¶¶ 44-54, these calculations result in a purported Sentencing Guidelines range of 168-210 months' incarceration. See PSR ¶ 9. The USPO recommended a 210-month sentence.

The Government in its sentencing position papers agreed with the USPO's calculations and recommendation letter, arguing for a sentence of 210 months' incarceration to be followed by three years' supervised release as well as a special assessment of $300.00.

For the reasons discussed below, Mr. Sharopetrosian disagrees with both the USPO and the Government. Mr. Sharopetrosian contends that, at most, the Court should impose a sentence of 30 months consecutive to the 300-month sentence already imposed by U.S. District Court Judge David Carter in the related Santa Ana, California federal case of United States v. Sharopetrosian, et al., Case No. CR-09-248-DOC. That sentence was imposed on November 28, 2012, after a court trial that ran from February 22, 2012 to March 16, 2012.[1]

## II.

## THE COURT SHOULD NOT ALLOW THE GOVERNMENT
## TO MANIPULATE THE GUIDELINES AND THE CONCURRENT/
## CONSECUTIVE SENTENCING ANALYSIS BY ITS
## UNUSUAL CHARGING DECISION.

### A. At Most, A 30-Month Consecutive Sentence Is Appropriate

The sentencing proceedings in this case arrive to this Court in an unusual posture. The Government clearly could have, and should have, charged Mr. Sharopetrosian in one indictment. Indeed, it charged co-defendants with the same offense conduct in a single indictment. The Government, however, elected to charge Mr. Sharopetrosian in two separate indictments, the

[1] A copy of the Second Superseding Indictment in the Santa Ana, California federal case is attached hereto at Tab A. A copy of the November 28, 2012 Judgment & Commitment Order in that case is attached at Tab B. A copy of Mr. Sharopetrosian's February 5, 2014 Ninth Circuit Court of Appeals Opening Brief in that case is attached hereto at Tab C.

instant indictment and an indictment in the Santa Ana division before Judge Carter, and now it seeks to inflate his sentence based on its inefficient and arbitrary charging decision. Consistent with the spirit of the Sentencing Guidelines, basic fairness, and the directive of 18 U.S.C. § 3553(a) that courts should impose a sentence that is "sufficient, but not greater than necessary," the *maximum* consecutive sentence that this Court should impose is 30 months.

In the Santa Ana case, Judge Carter calculated an offense level of 37 and a Criminal History Category of IV. These calculations produced a Guidelines range of 292-365 months, and Judge Carter imposed a sentence of 300 months. Although Mr. Sharopetrosian believes that Judge Carter's offense level calculation was flawed in several respects, he will assume for the moment that it is accurate. Furthermore, he will assume, for the moment, that the PSR's calculation of an offense level of 31 for the instant indictment is correct. Thus, under these calculations, if the indictments had been consolidated, Mr. Sharopetrosian's total offense level under "grouping" principles would have been increased by one level to level 38, thereby producing a Guidelines range of 324-405 months. *See* U.S.S.G. § 3D1.4. Thus, his Guidelines range would have been increased by approximately 30 months. Accordingly, at most, Mr. Sharopetrosian should be facing a consecutive sentence of approximately 30 months.

The commentary to the Guidelines explains that this Court should consider the Government's unusual charging decision when determining whether to impose concurrent or consecutive sentences. For example, application note 3 to U.S.S.G. § 5G1.3 states that, "[i]n order to achieve a reasonable incremental punishment for the instant offense and avoid sentencing disparity," a court should consider whether "the prior undischarged sentence may have been imposed . . . at a different time before the same or different federal court" in determining whether to impose concurrent or consecutive sentences. U.S.S.G. § 5G1.3 comment. (n.3). Likewise, the commentary also states that a downward departure "may be warranted to ensure that the combined punishment is not increased unduly by the fortuity and timing of separate prosecutions and sentencings." *Id.* In other words, the Guidelines calculations should not be manipulated due to the fortuity of an unconsolidated indictment and separate sentencing hearings, as is the case here. *See, e.g.*, *United States v. Greer*, 91 F.3d 996, 1000 (7th Cir. 1996) ("The general purpose of § 5G1.3 is to 'mitigate the possibility that the

1    fortuity of two separate prosecutions will grossly increase a defendant's sentence.'") (citation

2    omitted).

3         In sum, even if this Court follows the Guidelines calculations suggested in the PSR,

4    which recommends a Guidelines range of 168-210 months, it should only impose, at most, 30

5    months consecutive to the sentence imposed by Judge Carter.  Indeed, this Court has the

6    authority to impose a sentence that runs "partially concurrently" in order "to achieve a

7    reasonable punishment for the instant offense."  U.S.S.G. § 5G1.3(c).  Accordingly, even if this

8    Court were to impose a sentence in the 168-210 month range, it should impose no more than 30

9    months of that sentence to run consecutively.

10       **B.  No Consecutive Sentence Is Appropriate**

11         While the *maximum* portion of the instant sentence that should run consecutively is 30

12    months, Mr. Sharopetrosian submits that none of the instant sentence should run consecutively.

13    If this Court follows Mr. Sharopetrosian's Guidelines calculations for the instant indictment, as

14    set forth below, there would have been no increase in the Guidelines under "grouping" principles

15    if the two indictments had been consolidated, because the offense level for this indictment is 9 or

16    more levels less than the offense level calculated by Judge Carter for the Santa Ana indictment.

17    *See* U.S.S.G. § 3D1.4.

18         Furthermore, as set forth in the attached copy of the opening brief submitted before the

19    Ninth Circuit, Mr. Sharopetrosian contends that his sentence for the Santa Ana indictment was

20    based on numerous incorrect guidelines calculations.  Rather than an offense level of 37, his

21    Ninth Circuit opening brief demonstrates that his offense level should have been as low as level

22    20, which in Criminal History Category IV produces a Guidelines range of 51-63 months.  Thus,

23    Mr. Sharopetrosian submits that his 25-year sentence for the Santa Ana indictment was

24    improperly excessive, perhaps by as much as 20 years.  There is no reason why this Court needs

25    to add any additional time to a 25-year sentence to arrive at a total sentence that is "sufficient,

26    but not greater than necessary."  18 U.S.C. § 3553(a).

27

28

**III.**

**THE PSR INCORRECTLY CALCULATED THE GUIDELINES
AND FAILED TO CONSIDER A DOWNWARD DEPARTURE
UNDER U.S.S.G. § 5K2.10.**

**A.  Objection To Increases Under U.S.S.G. §§ 2B3.2(b)(3) And (b)(5)**

Mr. Sharopetrosian objects to the PSR's assessment of a 5-level increase for brandishing a firearm and the similar 2-level increase for physical restraint due to the alleged use of the firearm.  Because of the significant combined 7-level increase, the Government must prove the facts supporting these enhancements by clear and convincing evidence.  *See United States v. Pineda-Doval*, 614 F.3d 1019, 1040-41 (9th Cir. 2010); *United States v. Staten*, 450 F.3d 384, 392-94 (9th Cir. 2006).  The only evidence cited in the PSR to support these increases is M.M.'s testimony that he was told to enter a car at gunpoint.  M.M.'s testimony on many topics, including this one, was not credible for numerous reasons set forth in Mr. Sharopetrosian's pre-trial, trial and post-trial motion filings.  Accordingly, his testimony does not constitute clear and convincing evidence to support the enhancements.

Furthermore, even if M.M.'s testimony did constitute clear and convincing evidence, the 2-level increase for physical restraint under section 2B3.2(b)(5) should still not apply.  The Guidelines define "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up."  U.S.S.G. § 1B1.1 comment. (n.1(K)).  M.M. was not tied, bound, or locked up, and the physical restraint increase alleged is essentially a double-counting of the firearm increase.  Accordingly, the physical restraint increase should not apply.  *See United States v. Parker*, 241 F.3d 1114, 1118 (9th Cir. 2001) (overruling physical restraint increase where "robbers pointed a gun at a bank teller and yelled at her to get down on the floor").

**B.  Objection To Aggravating Role**

Mr. Sharopetrosian objects to the PSR's assessment of a 2-level increase for aggravating role under U.S.S.G. § 3B1.1.  The Ninth Circuit has interpreted section 3B1.1 and its commentary to require a defendant to have control and authority over another participant in the offense in order to receive an aggravating role adjustment.  *See United States v. Woods*, 335 F.3d 993, 1001-02 (9th Cir. 2003); *United States v. Luca*, 183 F.3d 1018, 1024 (9th Cir. 1999); *United*

1   *States v. Avila*, 95 F.3d 887, 890-92 (9th Cir. 1996). The PSR does not assert that Mr.

2   Sharopetrosian had control and authority over another participant in the extortion offense.

3       The seminal case is *Avila*, a drug conspiracy case where the defendant was the sole

4   negotiator with the undercover operatives for the price and quantity of the drugs, obtained and

5   mailed samples of cocaine, negotiated the fee for each kilogram of cocaine, was the only

6   member of the conspiracy who met face to face with the undercover operatives, organized the

7   delivery of the cocaine by his co-conspirators, and was assisted by armed co-conspirators serving

8   as lookouts. *Id.* at 890. Despite this extensive involvement and organizational role, the Ninth

9   Circuit found that the district court clearly erred in applying an aggravating role adjustment. The

10  Ninth Circuit explained that mere organization was not enough; instead, the defendant must have

11  "exercised some degree of *control* or organizational *authority* over others." *Id.* at 890 (emphases

12  added).

13      The Ninth Circuit made it clear that an organizational role, without authority or control

14  over co-conspirators, is not enough to apply the adjustment. *Id.* at 891-92 ("Avila may have,

15  acting on behalf of the seller, arranged the transaction, which may make him more culpable than

16  some of the other defendants, but that alone is not enough to justify an upward adjustment; he

17  must have exercised organizational authority or control over others.") (citation omitted).

18  Similarly, in *United States v. Lopez-Sandoval*, 146 F.3d 712, 716-18 (9th Cir. 1998), the Ninth

19  Circuit extended the rationale in *Avila* and held that, without authority or control over others, not

20  even a two-level upward adjustment for aggravating role under section 3B1.1(c) is appropriate.

21  Here, Mr. Sharopetrosian did not maintain authority over another participant in the extortion

22  offense. Thus, he should not receive a 2-level increase under section 3B1.1.

23      **C. Objection To Criminal History Category**

24      In the Santa Ana case before Judge Carter, Mr. Sharopetrosian was placed in Criminal

25  History Category IV. The PSR now scores him Category V because it has added points for the

26  Judge Carter case. For the reasons explained earlier in this memorandum, Mr. Sharopetrosian's

27  criminal history score should not be manipulated into a higher category based on the

28  Government's charging decision. *See, e.g.*, *Greer*, 91 F.3d at 1000-01 (reversing sentence where

---

DEFENDANT ARMAN SHAROPETROSIAN'S SENTENCING POSITION MEMORANDUM; EXHIBITS A, B & C

GER000516

1   manipulation of defendant's criminal history category under similar circumstances).  He should

2   be placed in Category IV.

3   **D.  Downward Departure Under U.S.S.G. § 5K2.10**

4   Section 5K2.10 states:  "If the victim's wrongful conduct contributed significantly to

5   provoking the offense behavior, the court may reduce the sentence below the guideline range to

6   reflect the nature and circumstances of the offense."  U.S.S.G. § 5K2.10.  Here, M.M. stole

7   almost $100,000.00 from Mr. Sharopetrosian's sister-in-law, which provoked his efforts to

8   collect the money as borne out by the trial record.

9                                           **IV.**

10                                     **CONCLUSION**

11

12  For the reasons explained above, the Court should not allow the Government to

13  manipulate the Guidelines and a concurrent/consecutive sentencing analysis to impose a severe

14  210-month consecutive sentence on top of an already hefty 300-month sentence imposed by

15  Judge Carter -- a total of more than 42 years.  Such a sentence would be far "greater than

16  necessary" to accomplish any fair sentencing objective in this case.

17  Instead, the Court should impose a sentence no more than 30 months consecutive to the

18  sentence imposed by Judge David Carter in the related Santa Ana federal case of United States v.

19  Sharopetrosian, et al., Case No.  CR-09-248-DOC.

20  DATED: September 5, 2014                    Respectfully submitted,
                                                Law Offices of Charles Pereyra-Suarez

21

22                                                  /S/ Charles Pereyra-Suarez
                                                Charles Pereyra-Suarez
23                                              Attorneys for Defendant Arman Sharopetrosian

24

25

26

27

28

DEFENDANT ARMAN SHAROPETROSIAN'S SENTENCING POSITION MEMORANDUM; EXHIBITS A, B & C

7

GER000517

STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
E. MARTIN ESTRADA (Cal. SBN: 223802)
ELIZABETH R. YANG (Cal. SBN: 196461)
Assistant United States Attorneys
ANDREW CREIGHTON (Maryland State Bar Member)
Trial Attorney, U.S. Department of Justice
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3358/1785/7408
    Facsimile: (213) 894-3713
    Email:   Martin.Estrada@usdoj.gov
             Elizabeth.Yang@usdoj.gov
             Andrew.Creighton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | No. CR 11-72(A)-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO SENTENCING POSITION OF DEFENDANT RAFAEL PARSADANYAN (#35 |
| v. | |
| MHER DARBINYAN, et al., | |
| Defendant. | |

    Plaintiff, by and through its attorney of record, the Acting United States Attorney for the Central District of California, hereby files its Response to the Sentencing Position of defendant RAFAEL PARSADANYAN.

///

///

///

The government's response is based on the attached memorandum of points and authorities, the government's previously filed Sentencing Position (CR 3399), the PSR, the records and files of this case, and any argument that the Court may request at the sentencing hearing. The government respectfully requests the opportunity to supplement its position as may become necessary.


Dated: September 9, 2014      Respectfully submitted,

                              STEPHANIE YONEKURA
                              Acting United States Attorney

                              ROBERT E. DUGDALE
                              Assistant United States Attorney
                              Chief, Criminal Division


                                       /s/
                              _____
                              E. MARTIN ESTRADA
                              ELIZABETH R. YANG
                              Assistant United States Attorneys
                              ANDREW CREIGHTON
                              Trial Attorney

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

GER000519

# TABLE OF CONTENTS

DESCRIPTION                                                                                                          PAGE

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.    INTRODUCTION....................................................1

II.   DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE REPORT ARE
      MERITLESS.......................................................2

      A.    The Loss Amount Was Correctly Calculated..................2

            1.    Loss Amount Includes Both Actual And Intended
                  Loss..............................................2

            2.    Intended Loss Estimates Reasonably Include Actual
                  Losses............................................5

            3.    Defendant Is Accountable For The Actions Of His
                  Co-Schemers.......................................6

      B.    The Other Enhancements Properly Apply.....................8

      C.    Defendant Was Not A Minimal Participant..................10

      D.    No Downward Departure Is Warranted Under U.S.S.G.
            § 5K2.20.................................................11

III.  DEFENDANT'S PLEA FOR LENIENCY SHOULD BE REJECTED..............12

IV.   CONCLUSION....................................................14

i

GER000520

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**FEDERAL CASES**

United States v. Allison,
    86 F.3d 940 (9th Cir. 1996)..............................3, 7

United States v. Barnes,
    125 F.3d 1287 (9th Cir. 1997)..............................7

United States v. Blitz,
    151 F.3d 1002 (9th Cir. 1998)..............................7

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000).................................5

United States v. Harper,
    32 F.3d 1387 (9th Cir. 1994)...............................3

United States v. Jennings,
    711 F.3d 1144 (9th Cir. 2013)..............................9

United States v. Kohli,
    110 F.3d 1475 (9th Cir. 1997)..............................7

United States v. McCormac,
    309 F.3d 623 (9th Cir. 2002)...............................3

United States v. Riley,
    143 F.3d 1289 (9th Cir. 1998)........................3, 4, 5

United States v. Santos,
    527 F.3d 1003 (9th Cir. 2008)..............................3

United States v. Tanke,
    743 F.3d 1296 (9th Cir. 2014)..............................9

United States v. Tulaner,
    512 F.3d 576 (9th Cir. 2008).............................4, 6

United States v. Watson,
    118 F.3d 1315 (9th Cir. 1997)..............................5

United States v. Watts,
    519 U.S. 148 (1997).......................................8

GER000521

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

In his "Response to the United States Probation Office's Presentence Report," defendant RAFAEL PARSADANYAN ("defendant" or "PARSADANYAN") disputes the application of several specific offense characteristics in the PSR, objects to the Probation Office's failure to recommend a downward departure, and seeks additional downward departures "due to mitigating considerations" for a far-below Guidelines sentence.[1]   Defendant's objections and arguments are without support in the law or facts and should therefore be rejected.

In seeking to minimize the charges of which he was convicted, defendant ignores the fact that he was convicted at trial of multiple counts of bank fraud stemming from his participation in an extensive and sophisticated fraud *scheme*, which involved numerous other co-schemers working to target hundreds of customers of 99 Cents Only Stores throughout Southern California.  Operating under the guise of being a legitimate cellular telephone business owner, defendant actively worked with co-defendant MHER DARBINYAN ("DARBINYAN") to carry out the scheme, coordinating the retrieval and use of victims' re-encoded debit cards, the withdrawal of money from victim ATM accounts, and the obtaining of fraud proceeds from other co-schemers. At one point, defendant personally transported more than $30,000 in fraudulent proceeds derived from the scheme.

Based on the substantial evidence of defendant's involvement in the scheme, the government respectfully submits that the facts and calculations set forth in the PSR are amply supported by the evidence

---

[1] Defendant also, confusingly, contests Paragraph 70 of the PSR, which does not make a restitution determination.

in this case, but believes that an 18-level upward adjustment for loss amount, rather than the 16-level adjustment recommended in the PSR, more properly applies.  With this adjustment, defendant's total offense level is 35, resulting in a range of imprisonment of 168 to 210 months' incarceration.

Based on the facts set forth in Title 18, United States Code, Section 3553(a), including the extensive and sophisticated nature of the scheme, the government continues to recommend that defendant be sentenced to a term of 168 months' incarceration, to be followed by five years' supervised release, as well as a $1,200 special assessment[2] and restitution in the amount of $167,169.57.

## II.  DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE REPORT ARE MERITLESS

### A.  The Loss Amount Was Correctly Calculated

Defendant objects to the loss amount calculation on three grounds.  Defendant claims, contrary to case law, that where loss results from a fraud, loss should be based on actual, not intended loss.  Defendant also argues that actual loss and intended loss were improperly summed, without acknowledging that actual loss is a common sense indicator of intended loss.  Finally, ignoring abundant evidence of his involvement in and knowledge of the scheme, defendant claims no culpability for losses intended or inflicted by his co-schemers.  All three objections are meritless.

#### 1.  Loss Amount Includes Both Actual And Intended Loss

The Sentencing Guidelines unequivocally state that loss amount is "the **greater** of actual loss or intended loss."  See U.S.S.G.

---

[2] Although defendant was convicted by jury of 14 counts of Bank Fraud, this Court subsequently granted defendant a new trial on 2 counts.  Compare CR 3204 with CR 3421.

2

GER000523

§ 2B1.1, cmt. n.3(A) (emphasis added).  Indeed, "intended loss . . .

includes intended pecuniary harm that would have been **impossible or**

**unlikely** to occur."  Id. § 2B1.1 cmt. n.3(A)(ii) (emphasis added);

United States v. Santos, 527 F.3d 1003, 1006 (9th Cir. 2008).  This

is a "broad definition."  United States v. McCormac, 309 F.3d 623,

628 (9th Cir. 2002) ("[T]he 2001 amendments adopt a broad definition

of 'intended loss.'"); Santos, 527 at 1008 (court may reasonably

infer that counterfeiters "intend to take as much as they know they

can").

Citing United States v. Harper, 32 F.3d 1387 (9th Cir. 1994),

and United States v. Allison, 86 F.3d 940, 944 (9th Cir. 1996),

defendant claims that "in most instances with a loss based on a fraud

crime for purposes of applying the [Sentencing Guidelines], the loss

to the victim is based on actual loss and not intended loss." (Def.

Pos. at 12).  Defendant's claim is incorrect.  The Ninth Circuit has

made clear that Harper and Allison stand only for the modest

proposition that in some fraud cases "the intended loss calculation

requires a more sophisticated examination of other factors, including

the amount of actual loss."[3]  United States v. Riley, 143 F.3d 1289,

1291 (9th Cir. 1998).  The case against defendant is not one of these

cases "in which the value of the property obtained, or sought to be

obtained . . . bears little or no relation to the amount of loss the

defendant actually inflicted or intended to inflict."  Id. at 1291-

---

[3]   Harper, for example, involved skimming rent from homeowners
with little equity; the Ninth Circuit held that the fair market value
of the homes subsequently lost to foreclosure was not the measure of
either the actual or intended loss.  Harper, 32 F.3d at 1392-93.
Allison involved calculating losses on fraudulently obtained credit
cards where the defendant actually made payments on a portion of the
credit card debt.  Allison, 86 F.3d at 944.

3

GER000524

92.  Rather the actual losses incurred and the number of access device numbers possessed by defendant and his co-schemers is an accurate and realistic indicator of the intentions of defendant and his co-schemers.

Defendant's reliance on the "economic reality" approach of Harper and Allison also fails to consider that the Guidelines have since been amended.  See U.S.S.G. Appendix C, Vol. II, 177 ("Accordingly, concepts such as 'economic reality' or 'amounts put at risk' will no longer be considerations in the determination of intended loss.").  Hence, the Ninth Circuit has subsequently explained that: "[p]ursuant to the Sentencing Guideline's commentary, as explicated by our circuit's case law, the value of the intended loss does not have to be 'realistic,' nor must the 'defendant be capable of inflicting the loss he intends.'  Rather the full scope of the defendant's fraudulent conduct is taken into account when calculating the intended loss." United States v. Tulaner, 512 F.3d 576, 578 (9th Cir. 2008).

Here, the scheme's intended loss was clearly more than 2.5 million dollars and results in an 18-level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(J).  This amount is based squarely on evidence admitted and presented at trial.  As discussed in the government's Sentencing Position (CR 3399 at 9-11), officers seized four terminals used in this scheme, which contained a total of 1,983 unique access device numbers.  In addition, there were at least 6 additional stores (based on video footage presented at trial) that defendant and his co-schemers targeted and successfully retrieved the POS terminals. With an average of 647 unique credit/debit card numbers captured per POS terminal, the 6 stores account for an additional 3,882 access

4

devices (6 devices x 647 average).  Pursuant to Application Note

3(F)(i) of U.S.S.G. § 2B1.1, and applying a minimum of $500 to each

access device as required by the Sentencing Guidelines, this results

in an intended loss of $2,932,500 (3,882 (estimated) + 1,983 (seized)

x $500).[4]

    The 18-level enhancement, based on undisputed evidence,

therefore clearly constitutes "a reasonable estimate of the loss,"

and should be used by the Court here.  See U.S.S.G. § 2B1.1 cmt.

n.3(C).

            2.    Intended Loss Estimates Reasonably Include Actual
                  Losses

    Loss calculations may incorporate actual loss in arriving at a

figure for intended loss.  See Riley, 143 F.3d at 1291-92; see also

United States v. Watson, 118 F.3d 1315, 1319 (9th Cir. 1997)

(affirming a loss calculation based on multiplying the average of

known actual losses by the total number of units); United States v.

Carboni, 204 F.3d 39, 47 (2d Cir. 2000) ("Logically, intended loss

must include both the amount the victim actually lost and any

additional amount that the perpetrator intended the victim to

lose.").  Indeed, actual loss is a necessary component of the "full

scope" of the intended total loss.  See Tulaner, 512 F.3d at 578

(arriving at an actual loss of $0 prior to calculating total intended

loss).  The Probation Officer therefore appropriately considered both

---

    [4] Furthermore, as set forth in its Sentencing Position (CR 3399
at 11-12), the government believes that a $1000 figure per access
device more accurately reflects defendant and his co-schemers'
conduct in light of evidence that defendants sought to maximize the
amount of money they could obtain using the counterfeit debit cards
by using the cards two and three times each, including before and
after midnight in order to circumvent the $500 daily ATM withdrawal
limit.  Using a $1000 figure results in an intended loss of
$5,865,000 (3,882 (estimated) + 1,983 (seized) x $1,000).

GER000526

known actual losses and an estimate of intended losses for the possessed access device numbers in arriving at a total figure for loss.

### 3. Defendant Is Accountable For The Actions Of His Co-Schemers

Defendant's final argument against the loss calculation is that he was not individually culpable, claiming that he is responsible only for the amount that he derived from the offense. (Def. Pos. at 14.) This misstates the law.

Defendant's relevant conduct in determining the loss amount is determined:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly taken criminal activity, that occurred during the commission of the offense of conviction [and] in preparation for that offense.

U.S.S.G. § 1B1.3(a)(1)(B). Defendant is thus accountable not only for his own conduct, but for "the conduct of others that was both: (i) 'in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity.'" United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998).

Defendant relies on United States v. Kohli, 110 F.3d 1475 (9th Cir. 1997), to support his claim that the Court must determine how much he derived from the offense. Kohli, however, is limited to the

6

GER000527

1    application of the former Sentencing Guidelines Section

2    2F1.1(b)(6)(b), which applied where a defendant "*derived* more than

3    $1,000,000 in gross receipts from the offense." <u>Kohli</u>, 110 F.3d at

4    1477 (emphasis added).  Defendant's other cases are similarly inapt.

5    In <u>Allison</u>, the Court dealt with the issue of whether, "in a credit

6    card fraud case, the amount paid by the defendant to the victim

7    before indictment should be deducted from the amount of 'loss' in

8    calculating the sentence." 86 F.3d at 942.  There is no such pay-

9    back issue here – neither defendant nor any of his co-schemers have

10   paid back one cent of the money they stole from the 99 Cents Only

11   Stores customers.  Likewise, in <u>United States v. Barnes</u>, 125 F.3d

12   1287 (9th Cir. 1997), the Court considered the conduct of a defendant

13   who impersonated a physician and worked for a fixed salary, whose

14   "fraudulent actions resulted in no harm to either patients or plasma

15   customers [and] absent his total salary . . . imposed no monetary

16   loss upon the clinic, donors, or customers." <u>Id.</u> at 1290.  In

17   contrast, defendant's conduct here as well as the reasonably

18   foreseeable conduct of his co-schemers resulted in demonstrable

19   actual and intended losses.

20        Here, the evidence showed that defendant was deeply involved in

21   the scheme.  He was caught in numerous calls with DARBINYAN, from

22   July 2009 to September 2009, discussing the successful operation of

23   the scheme, including distributing re-encoded cards, having others

24   conduct ATM withdrawals with those cards, reporting on the amounts of

25   money received from other co-schemers, and relaying information

26   between DARBINYAN and other co-schemers.  That defendant intended

27   fraud on the 99 Cents Only Stores victims and that he could

28   reasonably foresee that his co-schemers also intended those losses is

7

GER000528

clear.  Equally clear is that defendant and his co-schemers intended to **maximize** the losses of the victims, employing the "night and day" scheme to withdraw funds both shortly before and shortly after midnight, in order to evade ATM maximum daily withdrawal limits. Defendant was also stopped in his car during the pendency of the scheme with more than $30,000 in cash.  It was therefore reasonably foreseeable to defendant, convicted at trial of multiple counts of bank fraud,[5] that his co-schemers in this extensive scheme would cause intended losses of at least $1,115,669.50.[6]

### B. The Other Enhancements Properly Apply

As more fully discussed in the government's Sentencing Position, the enhancements for sophisticated means, device-making equipment, and number of victims were properly applied.  (CR 3399 at 12-14). None of defendant's objections are meritorious.

Defendant claims that this fraud does not warrant a sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C), relying on the examples found in U.S.S.G. § 2B1.1(b), cmt. n.9(B). But the Ninth Circuit has recently rejected a similar claim: "We agree with other circuits that the enhancement properly applies to

---

[5] Defendant's acquittal on the access device fraud conspiracy and aggravated identity theft counts does not avail him as acquitted conduct may be considered as relevant conduct for sentencing. United States v. Watts, 519 U.S. 148, 149 (1997) (per curiam).  Because defendant's expert recognizes neither defendant's liability for acquitted conduct nor for the conduct of his co-schemers despite well-settled case law, and because defendant's expert assumed that defendant participated in the scheme only between July 17 to July 23, 2009, contrary to what the intercepted telephone calls demonstrated, the expert's "conclusions" are flawed and the report should be disregarded by the Court.

[6] See also supra note 4 (reasonably foreseeable that the intended loss was $5,865,000 based on $1000 figure per access device).

8

GER000529

1   conduct less sophisticated than the list articulated in the

2   application note." United States v. Jennings, 711 F.3d 1144, 1147

3   (9th Cir. 2013) ("Conduct need not involve highly complex schemes or

4   exhibit exceptional brilliance to justify a sophisticated means

5   enhancement."). In United States v. Tanke, 743 F.3d 1296, 1307 (9th

6   Cir. 2014), for example, the Ninth Circuit affirmed the application

7   of the sophisticated means enhancement where the appellant, who was

8   diverting business checks, "created at least six false invoices and

9   falsified carbon copies of checks in [the company's] check register

10  on at least 10 occasions to conceal the payments." And in United

11  States v. Egu, 379 Fed. Appx. 605 (9th Cir. 2010), the Ninth Circuit

12  affirmed the application of a sophisticated means enhancement where

13  the defendant "fraudulently opened new credit accounts using the

14  victims' personal identifiers . . . had fraudulently-purchased goods

15  delivered to upscale, vacant homes in order to avoid detection; and

16  made bursts of purchases on new credit accounts before creditors

17  shut the accounts down." Id. at 607.

18      The conduct here exceeded that in both Tanke and Egu in terms of

19  sophistication. Defendant and his co-schemers relied on a system of

20  substituting POS terminals with terminals that had been equipped with

21  skimmers at various 99 Cents Only Stores locations throughout

22  Southern California. Testimony at trial established that the

23  skimmers were capable of obtaining both the account numbers and PIN

24  codes from the debit/credit cards used by store customers. Testimony

25  also established that some of the skimmer-installed terminals were

26  equipped with Bluetooth transmitters, enabling the co-schemers to

27  download the stolen data without re-entering a store to retrieve the

28  skimmer-installed POS terminals, thereby lessening their risk of

9

GER000530

1   detection and apprehension.  This clearly constitutes use of

2   sophisticated means.

3       Furthermore, defendant's objection to application of the device-

4   making equipment enhancement is groundless, because the scheme

5   required the use of cards re-encoded with access device numbers

6   stolen from the customers of the stores.  Similarly, defendant could

7   reasonably foresee that a scheme which resulted in the collection of

8   1,983 credit/debit account numbers had more than 250 victims.  For

9   all these reasons, as well as the reasons set forth in the

10   government's Sentencing Position, defendant's objections to the PSR

11   are meritless.

12      **C.**   **Defendant Was Not A Minimal Participant**

13       Defendant claims, not just that he had a minor role in the

14   fraudulent scheme, but that he had a *minimal* role.  The Sentencing

15   Guidelines state that a minor or minimal participant is one who

16   "plays a part in committing the offense that makes him *substantially*

17   less culpable than the average participant." <u>See</u> U.S.S.G. § 3B1.2

18   cmt. n.3(A) (emphasis added).  The minimal role adjustment "is

19   intended to cover defendants who are plainly among the least culpable

20   of those involved in the conduct of a group." <u>See</u> U.S.S.G. § 3B1.2

21   cmt. n.4.  The Ninth Circuit "has emphasized that any downward role

22   adjustment should be restricted to those cases presenting

23   "exceptional circumstances." <u>United States v. Davis</u>, 36 F.3d 1424,

24   1436 (9th Cir. 1994).  "Whether the defendant qualifies for either a

25   minimal or minor role adjustment depends on the facts of the

26   particular case." <u>United States v. Awad</u>, 371 F.3d 583, 591 (9th Cir.

27   2004).

28

GER000531

1    Defendant in no way satisfies the sort of "exceptional

2 circumstances" warranting a minor or minimal role adjustment.

3 Indeed, defendant's argument is difficult to maintain in the face of

4 the evidence that defendant was intercepted in numerous calls with

5 DARBINYAN discussing and coordinating the successful operation of the

6 scheme, and personally transported criminal proceeds of the scheme.

7 Defendant merits no adjustment under U.S.S.G. § 3B1.2.

8    **D.  No Downward Departure Is Warranted Under U.S.S.G. § 5K2.20**

9    Defendant claims that his conduct in this case, which he has not

10 admitted, warrants a downward departure under U.S.S.G. § 5K2.20.

11 However, the evidence adduced at trial makes plain that the conduct

12 for which defendant was found guilty was normal, and not aberrant,

13 behavior.  As the calls demonstrated, defendant was deeply entrenched

14 in criminal activity with DARBINYAN and very involved in the fraud

15 scheme.

16    In the alternative, the instant offenses of conviction serve to

17 bar defendant from eligibility under U.S.S.G. § 5K2.20, which states

18 that "[t]he court may depart downward under this policy statement

19 only if the defendant committed a single criminal occurrence or

20 single criminal transaction that (1) was committed without

21 significant planning; (2) was of limited duration; and

22 (3) represents a marked deviation by the defendant from an otherwise

23 law-abiding life."  U.S.S.G. § 5K2.20(b).  The instant offenses were

24 in fact marked by substantial planning, involved conduct over at

25 least a two-month period, and were in no way a "marked deviation."

26 Indeed, defendant in effect used his cellular telephone business as a

27 front for his criminal activity, meeting with DARBINYAN and his other

28 co-schemers at the location and claiming on one occasion that the

11

GER000532

1    more than $30,000 in cash found in his car constituted the proceeds

2    of his cellular telephone business -- the same $30,000 that co-

3    defendant Raymond Tarverdyan later reported to DARBINYAN as having

4    been successfully delivered although "[the police] had stopped him,

5    but it's all okay." (Gov't Ex. 160, July 18, 2009). No downward

6    departure is therefore warranted.

7    **III.  DEFENDANT'S PLEA FOR LENIENCY SHOULD BE REJECTED**

8         Finally, defendant seeks the Court's leniency and asks for a

9    probationary sentence, or alternatively, a sentence far below the

10   advisory Guidelines range.  Defendant essentially argues that he

11   should receive such a lenient sentence because he is an otherwise

12   law-abiding citizen who maintained legitimate employment and familial

13   support, while engaged in criminal activity with Armenian Power

14   leader DARBINYAN.  Defendant's argument should be rejected.  Because

15   his requested sentence falls far short of adequately taking into

16   account the factors delineated in Section 3553(a), the Court should

17   decline to grant such a drastic and unjustified deviation.

18        Although defendant relies extensively on letters from family and

19   friends, it is the rare defendant who does not present to the Court

20   letters from friends and family attesting to the love and support the

21   defendant enjoys.  For defendant, however, this same love and support

22   existed when he worked with DARBINYAN on the 99 Cents Only Stores

23   fraud scheme, distributing packets of re-encoded cards, coordinating

24   the "day and night" withdrawals from victim ATM accounts, collecting

25   criminal proceeds from other co-schemers, and personally transporting

26   criminal proceeds of the scheme.  This same love and support also

27   existed when he used his cellular telephone business to meet with

28   DARBINYAN and other co-schemers to further their criminal

                                     12

GER000533

1    activities,[7] and allowed DARBINYAN to use the store to extort victim

2    M.M.[8]  And this same love and support existed when defendant went to

3    the Hatsatoun Restaurant for DARBINYAN after DARBINYAN had shot up

4    the restaurant in order to pick up the video of the incident and

5    confirm that the owner was placated.  (See Gov't Ex. 133, October 9,

6    2009 (DARBINYAN telling a co-defendant that he was sending "Rafo" to

7    the restaurant "so he can come and erase [the video]"); Gov't Ex.

8    134, October 9, 2009 (defendant confirming with DARBINYAN that he

9    "picked up this thing [video]" and asked the owner if "there was

10   anything" he needed)).  Thus, despite having the unwavering love and

11   support of his family and every opportunity to lead an honest and

12   productive life, defendant instead chose to work with the leader of a

13   power organized crime group, steal money from thousands of hard-

14   working victims, and assist DARBINYAN in furthering his other

15   criminal activities.

16       Defendant's misconduct should not be minimized.  He held an

17   important role in a wide-ranging and sophisticated scheme aimed at

18   stealing money from hundreds of victims throughout Southern

19   California.  The wiretap calls between defendant and DARBINYAN

20   discussing the continued operation of the scheme from June through

21

22       [7]  See, e.g., Gov't Ex. 137, July 13, 2009 (DARBINYAN telling
23   co-schemer to meet at "Rafo's store"); Gov't Ex. 155, July 18, 2009
     (DARBINYAN telling defendant that he will go to defendant's store
24   because "[t]here are things that I need to give you"); Gov't Ex. 161,
     July 19, 2009 (defendant telling DARBINYAN that he will call a co-
25   schemer to come over to his store); Gov't Ex. 179, September 4, 2009
     (co-schemer telling DARBINYAN that he will "drop by Rafo's place").

26       [8]  This aspect of victim M.M.'s testimony was limited by the
27   Court at trial such that victim M.M. was not allowed to identify the
     location of the meeting in which he was threatened by DARBINYAN and
28   surrounded by associates of DARBINYAN.

GER000534

1  September demonstrate that during that time, defendant helped

2  coordinate the distribution of stacks of fraudulent debit cards and

3  the receipt of large sums in criminal proceeds.  Defendant should not

4  be allowed to evade substantial criminal liability for his criminal

5  actions.

6       Thus, rather than meriting this Court's leniency, defendant is

7  deserving a significant sentence to send a strong message of

8  deterrence to both defendant and the community and to reflect the

9  seriousness of defendant's crimes, to protect the public from future

10  crimes by this defendant, and to promote respect for the criminal

11  laws which defendant and his co-schemers appear to have little of.

12  **IV.**  **CONCLUSION**

13       Based on the foregoing, as well as the reasons set forth in the

14  government's Sentencing Position, the government respectfully submits

15  that defendant should be sentenced to 168 months' incarceration, to

16  be followed by five years' supervised release, and a special

17  assessment of $1,400.  Defendant should also be ordered to pay

18  restitution in the amount of $167,169.57.

14

GER000535

Andrew Reed Flier, Esq.
California State Bar No. 137372
FLIER AND FLIER
16133 Ventura Boulevard, Suite 1160
Encino, California 91436
Tel: (818) 990-9500
Fax: (818) 990-1303

Attorney for Defendant
RAFAEL PARSADANYAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.  CR 11CR00072-RGK-35 |
| | ) | |
| Plaintiff, | ) | RAFAEL PARSADANYAN'S REPLY |
| | ) | TO THE SENTENCING RESPONSE OF |
| v. | ) | THE GOVERNMENT |
| | ) | |
| RAFAEL PARSADANYAN, | ) | Hearing Date:  September 15, 2014 |
| | ) | Time:            1:30 P.M. |
| Defendant. | ) | |
| | ) | The Honorable R. Gary Klausner |

Mr. Parsadanyan, by and through his attorney of record, Andrew Reed Flier, hereby files his reply to the Sentencing Response of the Government.

Mr. Parsadandanyan's reply is based on the attached memorandum of points and authorities, Mr. Parsadanyan's previously filed Sentencing Position, the "PSR", the records and files of this case, and any argument the Court may request at the sentencing hearing.

DATED: February 11, 2014

FLIER AND FLIER
A Law Corporation

By: /s/ Andrew Reed Flier
ANDREW REED FLIER
Attorney for Defendant
RAFAEL PARSADANYAN

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.** The Government, in its response to the Sentencing Position of Mr. Parsadanyan, again fails to properly prove-up the "actual and intended loss" calculations as they apply specifically to Mr. Parsadanyan. Nothing has changed in the Government's response to support their "loss" figures. The Government simply claiming those "losses" and the "number of victims" is not supported by the evidence.

**2.** The 1,983 unique account numbers derived by the Government is wrong. These unique numbers are credit and debit card numbers in combination. The evidence in Mr. Parsadanyan's trial demonstrated, through the informant(s), only the debit card numbers were useful. Therefore, the debit card numbers must dictate this analysis. A credit card does not have a pin number and cannot be used like a debit card to withdraw money from ATM machines. Again, this completely changes the "loss" calculations.

**3.** The dates that the "POS" terminals were removed by law enforcement were not during the time period of Mr. Parsadanyan's involvement in this case.

**4.** Mr. Parsadanyan never had any thumb-drives; nor, any victims' credit information.

**5.** The "PSI" Report, which relied upon the information provided by the Government, does not agree with the Government's "loss" calculations. (See Addendum to the Presentence Report filed by Probation Department).

**6.** Mr. Parsadanyan is not responsible for any loss **before** he entered into this criminal scheme. Mr. Parsadanyan's responsibility lies only in that brief time period of July 17 - 19. After July 20th, those counts (63 and 66) were overturned by the Court. (Count 63 dealt with July 20; while Count 66 dealt with July 23).

**7.** Clearly, Mr. Parsadanyan is substantially less culpable than the co-schemers and the average participant. Mr. Parsadanyan properly falls under the classification of "minor" role.

**8.** Mr. Parsadanyan is also deserving of a departure under the guidelines of §5K2.20.

- 2 -

1    Mr. Parsadanyan's conduct was "aberrant." Mr. Parsadanyan did not plan any

2    criminal acts; his conduct was limited in duration; and clearly marked a deviation

3    by Mr. Parsadanyan from an otherwise law-abiding life.

4    **9.**    Mr. Parsadanyan did not allow anyone to utilize his store for nefarious purposes.

5    Mr. Parsadanyan adamantly denies that victim "M.M." was ever at his store.

6    **10.**    The Government offered Mr. Parsadanyan a 2 year sentence before trial. For the

7    Government to ask for almost 14 years is wrong.

8    DATED: September 12, 2014                    FLIER AND FLIER
                                                    A Law Corporation
9

10                                                 By: /s/ Andrew Reed Flier
11                                                 ANDREW REED FLIER
                                                    Attorney for Defendant
12                                                 RAFAEL PARSADANYAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GER000538

1   STEPHANIE YONEKURA
    Acting United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    E. MARTIN ESTRADA (Cal. SBN: 223802)
4   ELIZABETH R. YANG (Cal. SBN: 196461)
    Assistant United States Attorneys
5   ANDREW CREIGHTON (Maryland State Bar Member)
    Trial Attorney, U.S. Department of Justice
6        1500 United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012
         Telephone: (213) 894-3358/1785/7408
8        Facsimile: (213) 894-3713
         Email:   Martin.Estrada@usdoj.gov
9                 Elizabeth.Yang@usdoj.gov
                  Andrew.Creighton@usdoj.gov
10
    Attorneys for Plaintiff
11  UNITED STATES OF AMERICA

12              UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                  WESTERN DIVISION

15  UNITED STATES OF AMERICA,        No. CR 11-72(A)-RGK

16          Plaintiff,               GOVERNMENT'S RESPONSE TO
                                     SENTENCING POSITION MEMORANDUM
17          v.                       OF DEFENDANT ARMAN SHAROPETROSIAN
                                     (#4)
18  MHER DARBINYAN, et al.,

19          Defendants.

20

21

22       Plaintiff, by and through its attorney of record, the Acting

23  United States Attorney for the Central District of California,

24  hereby files its Response to the Sentencing Position Memorandum of

25  defendant ARMAN SHAROPETROSIAN.  (CR 3466).

26  ///

27  ///

28  ///

                              1

GER000539

1   The government's response is based on the attached memorandum

2   of points and authorities, the government's previously filed

3   Sentencing Position (CR 3413), the Pre-Sentence Report ("PSR"), the

4   records and files of this case, and any argument that the Court may

5   request at the sentencing hearing.  The government respectfully

6   requests the opportunity to supplement its position as may become

7   necessary.

8

9   DATED: September 15, 2014       Respectfully submitted,

10                                  STEPHANIE YONEKURA
                                    Acting United States Attorney
11

12                                  ROBERT E. DUGDALE
                                    Assistant United States Attorney
13                                  Chief, Criminal Division

14

15                                       _____/s/_____
                                    E. MARTIN ESTRADA
16                                  ELIZABETH R. YANG
                                    Assistant United States Attorneys
17                                  ANDREW CREIGHTON
                                    Trial Attorney
18

19                                  Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

20

21

22

23

24

25

26

27

28

2

GER000540

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In his "Sentencing Position Memorandum," defendant ARMAN SHAROPETROSIAN ("defendant" or "SHAROPETROSIAN") argues for the imposition of an overwhelmingly concurrent sentence, objects to the imposition of the firearm, physical restraint, and aggravating role enhancements, and objects to his criminal history category and to the Probation Office's failure to recommend a downward departure. These objections and arguments are meritless and should be rejected.

In arguing for the imposition of a maximum 30-month, consecutive sentence, defendant accuses the government of manipulating the present Guidelines calculation by charging defendant in separate indictments.  Defendant completely ignores the fact that the trials and sentencing in this case and the previous case ("the Orange County case") involved **completely different conduct**.  In the Orange County case, defendant was convicted of joining and helping to lead a conspiracy in which, while incarcerated, he partnered with another inmate and his associates, who were members of Black gangs, to steal bank victims' identities and plunder their bank accounts.  The overall conspiracy stretched over a six-year period from 2005 through 2011, caused over 13 million dollars in losses, and did not involve co-defendant MHER DARBINYAN ("DARBINYAN").  By contrast, in the present case, defendant was convicted of his criminal activities with DARBINYAN, mainly his organization of an extortion plot against victim M.M. and M.M.'s family.  Indeed, defendant's Sentencing Guidelines calculation is entirely based on the extortion plot.  See PSR ¶¶ 27-39.

1

GER000541

1    Defendant should not be able to evade punishment for his
2  egregious extortion plot by pointing to another sentence he earned
3  by participating in a completely separate fraud conspiracy.  A
4  consecutive sentence is the truly just punishment for defendant's
5  crimes.  The government therefore continues to agree with all of the
6  USPO's calculations and recommendations, including that defendant's
7  recommended sentence of 210 months' incarceration be served entirely
8  consecutively.  (USPO Recommendation Letter at 2, CR 3409.)

9  **II.   DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE REPORT ARE MERITLESS**

10       **A.   A Consecutive Sentence Is Just**

11    Where a defendant is serving "an undischarged term of
12  imprisonment, the sentence for the instant offense may be imposed to
13  run concurrently, partially concurrently, or consecutively . . . to
14  achieve a reasonable punishment for the instant offense."  U.S.S.G.
15  § 5G1.3(c).  When imposed at different times, however, multiple
16  sentences are presumptively consecutive.  See United States v.
17  Fitfield, 432 F.3d 1056, 1065 (9th Cir. 2005).

18    In exercising its discretion to impose a consecutive or
19  concurrent sentence, the court "shall consider . . . the factors set
20  forth in [18 U.S.C. §] 3553(a)."  18 U.S.C. § 3584(b).  The court
21  should also consider the additional factors described in Comment 3
22  to Section 5G1.3(c):

23    • the type and length of the prior undischarged sentence,
24    • "the time served on the undischarged sentence and the time
25       likely to be served before release,"
26    • "the fact that the prior undischarged sentence may have been
27       imposed . . . at a different time before the same or
28       different federal court[,]" and

2

GER000542

1          • "any other circumstance relevant to the determination of an

2            appropriate sentence . . . ."

3    U.S.S.G. § 5G1.3 cmt. 3(A); see also United States v. Kim, 196 F.3d

4    1079, 1084 (9th Cir. 1999) (affirming the imposition of consecutive

5    sentences where the offenses were "totally discreet" and both

6    "serious").

7          These factors weigh heavily in favor of the imposition of a

8    wholly consecutive sentence in this case.  First, as discussed at

9    length in the government's Sentencing Position (CR 3413),

10   defendant's offense conduct, criminal history, and characteristics

11   fully support a sentence at the high end of the resulting Guidelines

12   range, namely, 210 months' imprisonment.  Defendant is a recidivist

13   with a disturbing criminal history, including theft, assault,

14   firearms violations, and bank fraud, stemming in part from his long-

15   term association with Armenian Power.  Over the course of a six-

16   month period, he relentlessly threatened victim M.M. and M.M.'s

17   family with violence in order to force victim M.M. to make repeated

18   extortion payments.  He did so – and engaged in the additional

19   racketeering conduct for which he was convicted here – while

20   incarcerated at Avenal State Prison, serving a 10-year prison

21   sentence for Armenian Power-related drive-by shootings.

22         Second, in the Orange County case, defendant was sentenced two

23   years ago by a different federal judge for *entirely separate conduct*

24   to that presented at trial in this case.  In the Orange County case,

25   defendant, while incarcerated on state charges, joined and helped

26   lead a massive and sophisticated bank fraud scheme in which he

27   partnered with another inmate, Angus Brown, and his associates to

28   steal victims' bank account information and then use that

GER000543

1    information to create fraudulent checks that were used by co-

2    schemers to steal the victims' money.  The overall conspiracy in

3    that case spanned from 2005 through 2011 and caused over 13 million

4    dollars in losses.  The Orange County case did not charge or involve

5    DARBINYAN at all, and, apart from defendant's cohort, Karen

6    Markosian, none of the defendants charged in the instant 70-

7    defendant indictment were charged in the Orange County case.

8    Defendant has served approximately 22 months of his 300-month

9    sentence,[1] which he has appealed, contesting the loss amount, number

10   of victims, and the vulnerability of the victims, and is seeking to

11   lower his sentence considerably.

12        In contrast, defendant's trial in this case concerned only his

13   dealings with DARBINYAN in committing additional fraud, unrelated to

14   the Orange County case, and, principally, organizing a violent

15   extortion plot against victim M.M.  Thus, at trial, none of the

16   acts, none of the recorded calls, and none of the victims from the

17   Orange County case were presented or referenced.  And, because of

18   this, defendant's instant Sentencing Guidelines calculation is based

19   entirely on his extortion of victim M.M., and has nothing to do with

20   the Orange County case.

21        Against these facts, defendant argues for imposition of a

22   concurrent sentence, because of what he baldly characterizes as the

23   "unusual posture" of the case and the "inefficient and arbitrary"

24   charging decision of the government.  To the contrary, it was

---

[1]    Subsection (c) "does not authorize an adjustment of the sentence for the instant offense for a period of imprisonment already served on the undischarged term of imprisonment."  U.S.S.G. § 5G1.3 cmt. 3(e).

4

defendant's prolific and varied criminal conduct, together with the need to promote judicial efficiency, that led to his indictment in two separate cases.  Defendant kept himself criminally busy while in state prison.  At the same time as he was working with Black gang members to carry out massive fraud targeting hundreds of elderly victims, as charged in the Orange County case, defendant also enlisted DARBINYAN and other Armenian Power members and associates to pursue extremely serious acts of extortion against victim M.M., as charged in the instant case.  The conspiracies were distinct and were necessarily charged separately.  Defendant cannot now shield himself from criminal liability for his reprehensible acts of extortion based on the fact that he also chose to lead a wide-spread fraud and identity theft conspiracy.

Defendant's reliance on United States v. Greer, 91 F.3d 996 (7th Circuit), is inapt.  In Greer, the defendant, a felon, was indicted for drug conspiracy in the Northern District of Illinois, and, after he was found three years later in possession of a firearm in Indiana, was indicted for felon-in-possession in the Northern District of Indiana.  A judge in the Northern District of Indiana was assigned both cases by special designation and sentenced both cases sequentially on the same day, applying U.S.S.G. § 5G1.3 (Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment).  The Seventh Circuit held only that where sentencing was imposed on the same day, U.S.S.G. § 5G1.2 (Sentencing on Multiple Counts of Conviction) should have been applied, drawing a sharp contrast between sentencings occurring on the same day and those separated by greater intervals.  Where, as here, the defendant is being sentenced two years after he was sentenced in the Orange

GER000545

1 | County case, an interval far beyond sequential sentencings minutes

2 | apart, <u>Greer</u> has no application.

3 |     Because defendant should not be given a "free ride" on this

4 | case where the crimes of conviction are "totally discreet" from the

5 | Orange County case and both cases involved "serious offenses," a

6 | consecutive sentence in the instant case is both just and not

7 | greater than necessary. <u>See</u> <u>United States v. Kim</u>, 196 F.3d 1079,

8 | 1084 (9th Cir. 1999).

9 |     **B.**   **The Firearm And Physical Restraint Enhancements Are**

10 |       **Properly Applied**

11 |     Defendant next objects to the 5-level enhancement for

12 | brandishing a firearm and the 2-level enhancement for physical

13 | restraint. Defendant's objections are without merit.

14 |     Defendant first claims that where a combined 7-level

15 | enhancement is applied, the standard must be clear and convincing

16 | evidence. Defendant is wrong. The Ninth Circuit has clearly stated

17 | that when a Sentencing Guidelines enhancement is based on the scope

18 | of "criminal activity for which the defendant has already been

19 | convicted," a preponderance standard applies. <u>United States v.</u>

20 | <u>Armstead</u>, 552 F.3d 769, 777 (9th Cir. 2008). Moreover, with regard

21 | to other enhancements, only where a fact triggers an enhancement

22 | that has an "extremely disproportionate" effect on a sentence does

23 | the Ninth Circuit require proof by clear and convincing evidence.

24 | <u>United States v. Pineda-Doval</u>, 614 F.3d 1019, 1041 (9th Cir. 2010).

25 | Here, defendant has identified only the increase in offense levels

26 | to support application of a clear and convincing standard, yet the

27 | associated increase in offense level, from 92-115 months to 168-210

28 | months, does not double the length of defendant's sentencing range.

GER000546

1   See id.  The increase is also far less than that which has been
2   approved under a preponderance standard.  See United States v.
3   Johnson, 540 Fed. Appx. 573, 576-77 (9th Cir. 2013) (affirming
4   application of a preponderance standard to a combined 18-level
5   enhancement).

6       Regardless, whether under a preponderance standard or a clear
7   and convincing standard, the evidence fully supports application of
8   both enhancements to defendant.  At trial, victim M.M. testified
9   credibly regarding the events surrounding his extortion, including
10  by recounting how one of defendant's co-conspirators brandished a
11  firearm to force M.M. to get into a car where M.M. was detained for
12  an extended period of time during which he spoke with defendant on
13  the telephone.  Victim M.M.'s testimony was corroborated by
14  documentary evidence of wire transfers and by recordings, introduced
15  by the government in its case-in-chief, of defendant and DARBINYAN
16  making threats.

17      Defendant further objects that application of the physical
18  restraint enhancement is unwarranted, citing United States v.
19  Parker, 241 F.3d 1114, 1118 (9th Cir. 2001).  The Court in Parker,
20  however, held only that a physical restraint enhancement did not
21  apply to a bank robber who yelled at a teller to lie down on the
22  floor.  In so holding, the Court stated that a "'sustained focus' on
23  the restrained person that lasts long enough for the robber to
24  direct the victim into a room or order the victim to walk somewhere"
25  is sufficient for application of the physical restraint enhancement.
26  Id. at 1118.  Given that victim M.M. was ordered into a car by a co-
27  conspirator brandishing a pistol and held there for an extended

28

7

1    period of time, there was clearly a "sustained focus" on M.M. and

2    the physical restraint enhancement therefore properly applies.

3        Finally, defendant also claims that application of the

4    brandishing and physical restraint enhancements is double-counting.

5    Such an "argument that the two-point enhancement constitutes double-

6    counting has been foreclosed by United States v. Nelson, 137 F.3d

7    1094, 1112 (9th Cir. 1998))." United States v. Lindsey, 634 F.3d

8    541, 556 (9th Cir. 2011).

9        **C.    The Aggravating Role Enhancement Is Properly Applied**

10       Although defendant claims that the aggravating role enhancement

11   is unwarranted, the court should apply the enhancement under

12   U.S.S.G. § 3B1.1.

13       "A court may impose this enhancement if there is evidence that

14   the defendant exercised some control over others involved in the

15   commission of the offense or was responsible for organizing others

16   for the purpose of carrying out the crime." United States v.

17   Whitney, 673 F.3d 965, 975 (9th Cir. 2012) (quotation marks and

18   citation omitted).

19       As referenced at paragraph 34 in the PSR, the evidence fully

20   supports application of the two-level enhancement.  For example, in

21   recorded conversations with DARBINYAN, defendant directed the

22   approach that DARBINYAN would take in extorting victim M.M., saying:

23   "We have to take it little by little, but during that time, we

24   should get all those people who are doing this business under us."

25   (Trial Exhibit 70.)  In a later call, when DARBINYAN stated, "I will

26   grab him by his neck now when he calls," defendant responded, "We

27   have to slowly take it from him, bro, there is no other option."

28   (Trial Exhibit 73.)  And again in the same call, defendant stated,

8

GER000548

1  "Looks like we need to take the clinic and other things away from

2  him," to which DARBINYAN responded, "That's it.  I told him."

3  (Trial Exhibit 73.)  Later defendant provided evidence from which

4  his authority could further be inferred when he told victim M.M.,

5  "Don't think my hands are so short just because I am in this cage

6  over here . . . God forbid if you come without any money."  (Trial

7  Exhibit 74.)  Coupled with the facts of victim M.M.'s abduction

8  during the course of the extortion, there is more than enough

9  evidence to support application of the aggravating role enhancement

10  to defendant.

11      **D.   Defendant's Criminal History Is Correctly Calculated**

12      Defendant also claims manipulation of the Sentencing Guidelines

13  when it comes to his criminal history category, citing Greer v.

14  United States, 91 F.3d 996 (7th Cir. 1996).  The Guidelines make

15  plain, however, that "prior sentences are counted separately unless

16  (A) the sentences resulted from offenses contained in the same

17  charging instrument; or (B) the sentences were **imposed on the same**

18  **day**."  U.S.S.G. § 4A1.2 (emphasis added).  Defendant's criminal

19  history is therefore properly increased because of his conviction

20  for the five-year course of bank fraud conduct for which he was

21  convicted in the Orange County case.  Because in the instant case

22  there is a two-year separation between sentencings, resulting from

23  the distinctiveness of the cases against defendant, Greer is inapt.

24      **E.   No Downward Departure Is Warranted**

25      Finally, defendant claims once again to have been justified or

26  excused in his conduct because he claims that victim M.M. stole

27  money from his sister-in-law.  Much as this claim is no defense to

28

9

GER000549

1  the crime charged,[2] it does not justify a downward departure in his

2  sentence.  More significantly, defendant's own recorded statements

3  demonstrate the falsity of that claim: "How much you have paid her

4  [his sister-in-law] or you have not paid, it does not concern me

5  . . . Between us, your debt has been 120 dollars since September 1."

6  (Trial Exhibit 85.)  Defendant, who showed no leniency to victim

7  M.M., is not entitled to this Court's leniency.

8  **III. CONCLUSION**

9       Based on the foregoing, as well as the reasons set forth in the

10  government's Sentencing Position, the government respectfully

11  submits that defendant should be sentenced to 210 months'

12  incarceration to be served consecutively to the sentence imposed in

13  the Orange County case, to be followed by three years of supervised

14  release, and a special assessment of $300.

15

16

17

18

19

20

21

22

23

24

25

26

---

27       [2] See, e.g., United States v. Lynch, 437 F.3d 902, 908-09 (9th

28  Cir. 2006); United States v. Daane, 475 F.3d 1114, 1120 (9th Cir. 2007).

10

GER000550

1   CHARLES PEREYRA-SUAREZ
    State Bar No. 67106
2   LAW OFFICES OF CHARLES PEREYRA-SUAREZ
    UNION BANK PLAZA
3   800 WILSHIRE BLVD., 12TH FLOOR
    LOS ANGELES, CALIFORNIA 90017
4   Tel. (213) 623-5923
    cpereyra@cpslawfirm.com
5
    Attorneys for Defendant
6   ARMAN SHAROPETROSIAN

7                      UNITED STATES DISTRICT COURT
                       CENTRAL DISTRICT OF CALIFORNIA
8

9   UNITED STATES OF AMERICA,          ) CASE NO. CR 11-72-RGK-4
                                        )
10             Plaintiff,               ) REPLY TO GOVERNMENT'S RESPONSIVE
                                        ) SENTENCING POSITION MEMORANDUM
11        v.                            )
                                        )
12  ARMAN SHAROPETROSIAN,              )
                                        ) Hearing Date: September 22, 2014
13             Defendant.               ) Hearing Time: 10:00 a.m.
                                        ) U.S. District Judge R. Gary Klausner
14  _____ )
                                        )
15

16        Defendant Arman Sharopetrosian, by and through his counsel of record, Charles Pereyra-

17  Suarez, hereby submits his Reply to the Government's responsive sentencing position memorandum

18  (Document 3491) filed on September 15, 2014.  That sentencing position memorandum was

19  supported by the PSR Addendum (Document 3494) submitted by the U.S. Probation Office on

20  September 16, 2014.

21                                      I.

22  **THE COURT SHOULD NOT ALLOW THE GOVERNMENT TO MANIPULATE THE**

23  **GUIDELINES AND THE CONCURRENT/CONSECUTIVE SENTENCING ANALYSIS**

24             **BY ITS UNUSUAL CHARGING DECISION.**

25        With respect to the issue of consecutive sentencing, the Government in its responsive papers

26  contends that the instant First Superseding Indictment involved "completely different conduct" and

27  "entirely separate conduct" than the Santa Ana federal court Indictment before Judge David Carter.

28  The Government's argument is not compelling and, in any event, misses the point.

GER000551

1    As an example, pages 67-72 and 76-78 of the First Superseding Indictment in this case allege

2    the very same conduct underlying the Santa Ana federal Indictment.  While the Government

3    contends that the Santa Ana federal Indictment alleged a conspiracy from 2005 to 2011, it neglects

4    to mention that Mr. Sharopetrosian's involvement in the conspiracy was limited to a few-month

5    period in 2009.  The Government also neglects to mention that its very own cooperating witness

6    (Kelly Benson) testified at trial in that case that there were really three different conspiracies, and

7    that the involvement of Mr. Sharopetrosian and his Armenian co-defendants was only for a few

8    months in 2009.

9    Accordingly, the Government's argument that the extortion conduct at issue here is somehow

10   vastly different from the bank fraud conduct at issue in the Santa Ana federal case is not supportable.

11   Indictments, particularly RICO Indictments, often charge defendants with varied and different

12   criminal conduct.  This RICO Indictment is no exception, including charges of kidnapping,

13   extortion, bank fraud, identity theft, access device fraud, false statements, drug trafficking, illegal

14   gambling, and firearms offenses.  Because Indictments often include multiple and different acts of

15   criminal conduct, the "grouping" provisions of the Sentencing Guidelines set forth a mechanism for

16   courts to utilize in determining the appropriate "total" punishment for all of the different conduct.

17   *See* U.S.S.G. § 3D1.1 et seq.  The Government does not (indeed, it cannot) dispute that it could have

18   charged Mr. Sharopetrosian in one Indictment, rather than two, and the Guidelines make it quite

19   clear that a defendant's sentence should not be manipulated due to the Government's decision to

20   elect multiple Indictments rather than a single Indictment.

21   The Government also apparently concedes that, assuming Judge Carter's Guidelines

22   calculations and the calculations in the PSR are correct, there would have been an adjustment of one

23   offense level had there been one Indictment instead of two.  That one-level adjustment results in an

24   increase of approximately 30 months in the Guidelines range.  At most, therefore, the Court should

25   impose a consecutive sentence of 30 months.  Despite the Government's protestations, a 30-month

26   increase certainly seems more than sufficient when considering that Mr. Sharopetrosian already

27   received a severe 25-year sentence from Judge Carter, and that the offense here involves the

28   //

//

REPLY TO GOVERNMENT'S RESPONSIVE SENTENCING POSITION MEMORANDUM

2

GER000552

extortion of a man who stole almost $100,000 from Mr. Sharopetrosian's sister-in-law. Indeed, as set forth below, Mr. Sharopetrosian contends that under his Guidelines calculations, there would not have been any increase in the offense level and, therefore, no consecutive time is appropriate.

## II.

### THE PSR INCORRECTLY CALCULATED THE GUIDELINES AND FAILED TO CONSIDER A DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K2.10.

#### A. Objection To Increases Under U.S.S.G. §§ 2B3.2(b)(3) And (b)(5)

The Government contends that the clear and convincing evidence standard should not apply because the enhancements at issue were based on conduct for which Mr. Sharopetrosian was convicted. However, Mr. Sharopetrosian was not convicted of using a firearm or physically restraining MM. The First Superseding Indictment did not allege such conduct, and the jury was not instructed that it had to find use of a firearm or physical restraint in connection with the extortion.

The Government also argues that the combined 7-level increase based on use of the firearm is not sufficient to trigger the clear and convincing standard. But the seminal post-*Booker* case, *see United States v. Staten*, 450 F.3d 384, 392 (9th Cir. 2006), suggests that the clear and convincing standard applies when the increase is more than four levels. Thus, even the 5-level increase for brandishing a firearm alone would satisfy the *Staten* standard. The unpublished opinion cited by the Government is not on point because the defendant in that case was convicted of the conduct that supported the sentencing enhancement.

The Government contends that MM's testimony satisfies even a clear and convincing standard because it was credible and corroborated. There was *no* corroboration of MM's claim regarding the use of a gun, and the Government does not point to any such corroboration in its responsive sentencing brief. If MM was credible, why didn't the Government call him as a witness at trial? It certainly appears unusual for the Government to decline to call the victim of an extortion when prosecuting an extortion charge. MM's prior record and his inconsistent statements throughout this prosecution demonstrate his lack of credibility. Indeed, by failing to argue otherwise, the Government apparently concedes that MM may have committed perjury at trial when,

GER000553

1  in an effort to cover up his fraud, he changed his initial story to the federal agents that the money

2  was given to him as part of a real estate investment to his far-fetched trial story about a personal loan

3  provided to him on very vague and extraordinarily favorable terms by a good friend.

4  **B. Objection To Aggravating Role**

5  The Government's argument in support of aggravating role only mentions conversations

6  between Mr. Sharopetrosian and co-defendant Mher Darbinyan. Mr. Sharopetrosian, however, had

7  no control or authority over Mr. Darbinyan. The one case cited by the Government, *United States

8  v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012), actually supports Mr. Sharopetrosian's argument

9  because it reversed an aggravating role increase where the defendant was actively involved in the

10  offense but did not have control over another participant. In short, aggravating role does not apply

11  under longstanding Ninth Circuit precedent.

12  **C. Downward Departure Under U.S.S.G. § 5K2.10**

13  The Government does not dispute that M.M. stole almost $100,000.00 from Mr.

14  Sharopetrosian's sister-in-law, thereby provoking Mr. Sharopetrosian's efforts to collect the money.

15  Furthermore, MM apparently committed perjury at the trial regarding the true circumstances of his

16  obtaining these funds in an effort to cover up his theft. In *United States v. Dailey*, 24 F.3d 1323,

17  1327-28 (11th Cir. 1994), the Eleventh Circuit held that it was permissible to grant a downward

18  departure under U.S.S.G. § 5K2.10 in an extortion case where the "victim had defrauded [the

19  defendant] out of tens of thousands of dollars." This Court should follow the Eleventh Circuit's lead

20  in the *Dailey* case.

21  **D. Proposed Guidelines Calculations**

22  Under U.S.S.G. § 2B3.2, the base offense level is 18. There is a 2-level increase under

23  section 2B3.2(b)(1) and a 2-level increase under section 2B3.2(b)(2), resulting in an offense level

24  of 22. Mr. Sharopetrosian maintains that the Court should place him in Criminal History Category

25  IV, and that it should depart downward 7 levels under section 5K2.10. At an offense level of 15 and

26  Category IV, the Guidelines range is 30-37 months.

27  //

28  //

GER000554

1      ## III.

2      ### CONCLUSION

3           Mr. Sharopetrosian therefore recommends a sentence of 30 months, to run concurrently to

4      his sentence in the Santa Ana federal case.

5                                 Respectfully submitted,

6      DATE: September 18, 2014          LAW OFFICES OF CHARLES PEREYRA-SUAREZ

7

8                                 By_____/S/ Charles Pereyra-Suarez_____
                                   Charles Pereyra-Suarez
                                   Attorneys for Defendant

9                                         ARMAN SHAROPETROSIAN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED                                                                                    JS-3

# United States District Court
# Central District of California

**UNITED STATES OF AMERICA vs.**                **Docket No.**    CR 11-00072(A)-RGK-35

**Defendant**   RAFAEL PARSADANYAN              **Social Security No.**  2  4  2  6

akas:                                           (Last 4 digits)

## JUDGMENT AND PROBATION/COMMITMENT ORDER

|  | MONTH | DAY | YEAR |
|---|---|---|---|
| In the presence of the attorney for the government, the defendant appeared in person on this date. | **SEPT** | **15** | **2014** |

| **COUNSEL** | **ANDREW REED FLIER, RETAINED** |
|---|---|
| | (Name of Counsel) |

| **PLEA** | ☐ **GUILTY,** and the court being satisfied that there is a factual basis for the plea. | ☐ **NOLO CONTENDERE** | ☐ **NOT GUILTY** |
|---|---|---|---|

| **FINDING** | There being a finding/verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of: Bank Fraud, in violation of 18 USC 1344, as charged in Counts 38-41, 44, 45, 48, 50, 51, 54, 57 and 60 of the First Superseding Indictment |
|---|---|

| **JUDGMENT AND PROB/ COMM ORDER** | The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: |
|---|---|

It is ordered that the defendant shall pay to the United States a special assessment of $1,200, which is due immediately. Any unpaid balance shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

Defendant shall pay restitution in the total amount of $167,169.57 to victims set forth in a separate victim list prepared by the probation office which this Court adopts and which reflects the Court's determination of the amount of restitution due to each victim. The victim list, which shall be forwarded to the fiscal section of the clerk's office, shall remain confidential to protect the privacy interests of the victims. The defendant shall be held jointly and severally liable with co-participants (Docket No. CR-11-00072-DDP and Docket No. CR-11-00072-RGK) who have already been ordered to pay restitution or who may in the future be ordered to pay restitution to the named victims for the amount of restitution ordered in this judgment. The victims' recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victims receive full restitution.

All fines are waived as it is found that the defendant does not have the ability to pay a fine in addition to restitution.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Rafael Parsadanyan, is hereby committed on Counts 38-41, 44, 45, 48, 50, 51, 54, 57 and 60 of the First Superseding Indictment to the custody of the Bureau of Prisons for a term of SEVENTY-TWO (72) MONTHS. This term consists of 72 months on each of Counts 38-41, 44, 45, 48, 50, 51, 54, 57 and 60 of the First Superseding Indictment, to be served concurrently.

GER000556

| USA vs. | RAFAEL PARSADANYAN | Docket No.: | CR 11-00072(A)-RGK-35 |
|---|---|---|---|

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of FIVE (5) YEARS. This term consists of 5 years on each of Counts 38-41, 44, 45, 48, 50, 51, 54, 57 and 60 of the First Superseding Indictment, all such terms to run concurrently under the following terms and conditions:

1.  The defendant shall comply with the rules and regulations of the United States Probation Office and General Order 05-02.

2.  The defendant shall not commit any violation of local, state, or federal law or ordinance.

3.  During the period of community supervision, the defendant shall pay the special assessment in accordance with this judgment's orders pertaining to such payment.

4.  The defendant shall comply with the immigration rules and regulations of the United States, and if deported from this country, either voluntarily or involuntarily, not reenter the United States illegally. The defendant is not required to report to the Probation Office while residing outside of the United States; however, within 72 hours of release from any custody or any reentry to the United States during the period of Court-ordered supervision, the defendant shall report for instructions to the United States Probation Office located at United States Court House, 312 North Spring Street, Room 600, Los Angeles, California 90012.

5.  The defendant shall cooperate in the collection of a DNA sample from the defendant.

6.  The defendant shall not associate with anyone known to him to be a Armenian Power gang member and others known to him to be participants in the Armenian Power gang's criminal activities, with the exception of his family members. He may not wear, display, use or possess any gang insignias, emblems, badges, buttons, caps, hats, jackets, shoes, or any other clothing that defendant knows evidence affiliation with the Armenian Power gang, and may not display any signs or gestures that defendant knows evidence affiliation with the Armenian Power gang.

7.  As directed by the Probation Officer, the defendant shall not be present in any area known to him to be a location where members of the Armenian Power gang meet and/or assemble.

Counsel for the government motions the Court to dismiss the underlying indictment. Motion granted.

GER000557

USA vs. RAFAEL PARSADANYAN      Docket No.: CR 11-00072(A)-RGK-35

The Court recommends that the defendant be designated to a Bureau of Prisons facility in Southern California, and has no objection to Terminal Island.

Defendant is advised of his right to appeal.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

| January 5, 2015 | R. Gary Klausner, U. S. District Judge |
| --- | --- |
| Date | |

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

| January 5, 2015 | By | S. Williams |
| --- | --- | --- |
| Filed Date | | Deputy Clerk |

USA vs. __RAFAEL PARSADANYAN__      Docket No.: __CR 11-00072(A)-RGK-35__

---

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

GER000559

USA vs.   RAFAEL PARSADANYAN           Docket No.:    CR 11-00072(A)-RGK-35

☐    The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

      1. Special assessments pursuant to 18 U.S.C. §3013;
      2. Restitution, in this sequence:
           Private victims (individual and corporate),
           Providers of compensation to private victims,
           The United States as victim;
      3. Fine;
      4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
      5. Other penalties and costs.

## SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure; and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

GER000560

USA vs.  RAFAEL PARSADANYAN                    Docket No.:  CR 11-00072(A)-RGK-35

---

**RETURN**

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal
determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

_____              _____
        Date                              Deputy Marshal

---

**CERTIFICATE**

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By _____

_____              _____
      Filed Date                          Deputy Clerk

---

**FOR U.S. PROBATION OFFICE USE ONLY**

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed)_____          _____
              Defendant                                          Date

_____          _____
U. S. Probation Officer/Designated Witness            Date

| 9th Circuit Case Number(s) | 14-50516, 15-50173, 14-50434, 14-50423, 15-50004 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) April 28, 2017 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Elizabeth R. Yang

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)